# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket No. 1454** |

## DEBTORS' MEMORANDUM OF LAW (I) IN SUPPORT OF AN ORDER (A) CONFIRMING THE NINTH AMENDED JOINT CHAPTER 11 PLAN OF FRANCHISE GROUP, INC. AND ITS DEBTOR AFFILIATES AND (B) APPROVING THE GLOBAL SETTLEMENT AND RELEASE OF CLAIMS AND CAUSES OF ACTION BY AND AMONG THE GLOBAL SETTLEMENT PARTIES, AND (II) OMNIBUS REPLY TO OBJECTIONS THERETO

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

## TABLE OF CONTENTS

**Page(s)**

RELIEF REQUESTED ..................................................................................................1

PRELIMINARY STATEMENT ....................................................................................2

PROCEDURAL BACKGROUND AND VOTING RESULTS ......................................4

I.      Procedural History. ...........................................................................................4

II.     The Plan Equitization Transaction. ...................................................................6

III.    The Global Settlement. .....................................................................................7

IV.     The Solicitation Process and Voting Results. .................................................11

ARGUMENT .............................................................................................................17

I.      The Global Settlement Should Be Approved ..................................................17

A.      Entry into the Global Settlement Was an Appropriate Exercise of Business
        Judgment, and the Global Settlement Is Fair and Reasonable. .......................17

        1.      Legal Standard:  Bankruptcy Rule 9019. ..............................................17

        2.      The Global Settlement Is Reasonable and in the Best Interests of the
                Debtors' Estates. ...................................................................................18

                a.      The Global Settlement Is the Result of Good-Faith, Arm's-Length
                        Negotiations. ...........................................................................20

                b.      The Complex Factual and Legal Issues Make the Probability of
                        Success Highly Uncertain. ........................................................20

                c.      Collecting from Other Debtors in Their Own Bankruptcy
                        Proceeding Would Be Costly and Complicated. ........................21

                d.      The Complexity, Expense, and Delay of the Litigation Involved
                        Support the Global Settlement. .................................................21

                e.      The Global Settlement Is in the Paramount Interest of All of the
                        Debtors' Creditors. ...................................................................22

B.      Overview of the Global Settlement ..................................................................23

II.     Response to Outstanding Objections to Confirmation of the Plan. .................30

**Page(s)**

A.     The Kahn Objection Should Be Overruled. ........................................................30

B.     The Objection from Buddy Mac Holdings, LLC and Affiliates Should Be Overruled. ..............................................................................................................35

C.     The Resolution of Cure Objections after the Effective Date Is Proper............................37

III.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed. ......................................................................................38

A.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)). ..................................................................................................38

     1.     The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ..........................................................................39

         a.     The Classification of Claims and Equity Interests Under the Plan Is Not Designed to Gerrymander Votes..........................................................42

     2.     The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code....................................................................43

         a.     Designation of Classes of Claims and Equity Interests and Specification of Unimpaired Classes (§ 1123(a)(1)–(2))..........................43

         b.     Treatment of Impaired Classes (§ 1123(a)(3))............................................43

         c.     Equal Treatment Within Classes (§ 1123(a)(4)). .......................................44

         d.     Means for Implementation (§ 1123(a)(5)). ................................................44

         e.     Issuance of Non-Voting Securities (§ 1123(a)(6))....................................45

         f.     Directors and Officers (§ 1123(a)(7)). ......................................................46

B.     The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. ..................................................................................47

     1.     Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code. ..........................................................................47

     2.     The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code....................................................48

         a.     The Debtor Release Is Appropriate............................................................49

         b.     The Third-Party Release Is Consensual and Appropriate and Complies with the Bankruptcy Code. ......................................................55

      3.      The Plan Complies with Section 1123(d) of the Bankruptcy Code.......................62

C.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2))...................................................................................................................63

      1.      The Debtors Complied with Section 1125 of the Bankruptcy Code. ....................63

      2.      The Debtors Complied with Section 1126 of the Bankruptcy Code. ....................66

D.      The Plan Is Proposed in Good Faith (§ 1129(a)(3)). ...........................................68

E.      The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Is Subject to Court Approval (§ 1129(a)(4)).........................................................70

F.      The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ................................................................................71

G.      The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).............73

H.      The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).................73

I.      The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ......................................................................................75

J.      The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).....................................................................................................76

K.      At Least One Impaired Class of Non-Insider Claims Accepted the Plan (§ 1129(a)(10))...................................................................................................77

L.      The Plan Is Feasible (§ 1129(a)(11)). ................................................................78

M.      All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ........................80

N.      Sections 1129(a)(13) Through 1129(a)(16) Do Not Apply to the Plan. ...........................81

O.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code. ............................................................................................82

      1.      The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1))........................83

      2.      The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii))..............................................84

P.      The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)). ..........................................................................85

Q.      Modifications to the Plan Do Not Require Resolicitation. ................................86

**Page(s)**

R.       Good Cause Exists to Waive the Stay of the Confirmation Order. ...................................87

CONCLUSION ....................................................................................................................89

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship*,
190 B.R. 567 (Bankr. N.D. Ill. 1995) .................................................................70

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ................................48

*In re Abbotts Dairies of Pa., Inc.*,
788 F.2d 143 (3d Cir. 1986)...............................................................................55

*In re Accuride Corp.*,
No. 24-12289 (JKS) ........................................................................................72, 87

*Ad Hoc Grp. of Second Lien Creditors v. LNV Corp.*,
609 B.R. 80 (D. Del. 2019)..................................................................25, 39, 64, 67

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ..................................................................61

*In re Aegerion Pharms., Inc.*,
605 B.R. 22 (Bankr. S.D.N.Y. 2019) ...................................................................23

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)........................22, 66

*In re Am. Cap. Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)...............................................................................66

*In re Am. Fam. Enters.*,
256 B.R. 377 (D.N.J. 2000) ...............................................................................56

*In re Apex Oil Co.*,
118 B.R. 683 (Bankr. E.D. Mo. 1990) ..................................................................59

*In re Arden*,
176 F.3d 1226 (9th Cir. 1999) ............................................................................46

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (Bankr. D. Del. 2006) ....................................................................21, 69

*In re Armstrong World Indus., Inc.*,
348 B.R. 136 (D. Del. 2006) ..............................................................................22, 60

**Page(s)**

*In re Armstrong World Indus., Inc.*,
432 F.3d 507 (3d Cir. 2005).................................................................71

*In re At Home Corp.*,
392 F.3d 1064 (9th Cir. 2004) ...........................................................82

*Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs Strauss, Inc.)*,
473 B.R. 525 (Bankr. D. Del. 2012) ...................................................57

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) .............................................70

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999).............................................................61, 71, 72

*Begier v. IRS*,
496 U.S. 53 (1990)...............................................................................28

*Berkeley Fed. Bank & Tr. v. Sea Garden Motel & Apartments*,
195 B.R. 294 (D.N.J. 1996) ................................................................65

*In re Beyond.com Corp.*,
289 B.R. 138 (Bankr. N.D. Cal. 2003) ...............................................59

*Bos. Post Rd. Ltd. P'ship v. Fed. Deposit Ins. Corp.*,
21 F.3d 477 (2d Cir. 1994)..................................................................26

*Boy Scouts of Am. & Del. BSA, LLC*,
No. 20-10343 (Bankr. D. Del. Feb. 22, 2022) ....................................52

*Brady v. Andrew (In re Com. W. Fin. Corp.)*,
761 F.2d 1329 (9th Cir. 1985) ............................................................23

*Brinkley v. Chase Manhattan Mortg. & Realty Tr.*,
622 F.2d 872 (5th Cir. 1980) ..............................................................23

*Brite v. Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985) ..............................................................56

*In re Burns & Roe Enters., Inc.*,
No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ...........74

*Mabey ex rel. Cajun Elc. Power Co-op., Inc. v. Southwestern Elec. Power Co.*,
150 F.3d 503 (5th Cir. 1998) ..............................................................57

*In re Capmark Fin. Grp. Inc.*,
438 B.R. 471 (Bankr. D. Del. 2010) ...................................................36

Page(s)

*In re Capmark Fin. Grp. Inc.*,
    No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Aug. 24, 2011) ...........................49

*Carnero G&P, LLC v. SN EF Maverick LLC*,
    657 B.R. 202 (S.D. Tex. 2024) .......................................................................................85

*In re CCI Wireless, LLC*,
    297 B.R. 133 (D. Colo. 2003) ........................................................................................82

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
    860 F.2d 94 (3d Cir. 1988) ...........................................................................38, 50, 66

*In re Clamp-All Corp.*,
    233 B.R. 198 (Bankr. D. Mass. 1999) ...........................................................................50

*CMB Exp., LLC v. Tonopah Solar Energy, LLC*,
    657 B.R. 393 (D. Del. 2022) .........................................................................................42

*In re Coho Energy, Inc.*,
    309 B.R. 217 (Bankr. N.D. Tex. 2004) ........................................................................85

*In re Coram Healthcare Corp.*,
    271 B.R. 228 (Bankr. D. Del. 2001) ......................................................................55, 56

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ......................................................................33, 43

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
    699 F.2d 599 (2d Cir. 1983) ..........................................................................................36

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) .........................................................................61

*Donaldson v. Bernstein*,
    104 F.3d 547 (3d Cir. 1997) ..........................................................................................85

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..........................................................................59

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) ....................................................................................47, 48

*In re Encompass Servs. Corp.*,
    337 B.R. 864 (Bankr. S.D. Tex. 2006) .........................................................................85

*Cohen ex rel. Est. of Ampace Corp. v. TIC Fin. Sys.*,
    279 B.R. 145 (Bankr. D. Del. 2002) .............................................................................50

*In re Exaeris, Inc.*,
   380 B.R. 741 (Bankr. D. Del. 2008) ...................................................36

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ...............................................37, 70

*In re Flintkote Co.*,
   486 B.R. 99 (Bankr. D. Del. 2012) ...................................................65

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996) .............................................70

*In re G-I Holdings Inc.*,
   420 B.R. 216 (D.N.J. 2009) ...........................................................66

*In re Glob. Safety Textiles Holdings LLC*,
   No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) .............74

*In re Greene*,
   No. 09-33312, 2012 WL 279434 (Bankr. E.D. Tenn. Jan. 31, 2012) ...................75

*Hargreaves v. Nuverra Env't Sols., Inc.*,
   590 B.R. 75 (D. Del. 2018), *aff'd*, 834 Fed.Appx. 729 (3d Cir. 2021) ............69, 70

*Harrington v. Purdue Pharma L. P.*,
   603 U.S. 204 (2024) ......................................................................42

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II*,
   994 F.2d 1160 (5th Cir. 1993) ...........................................................65

*In re Hercules Offshore, Inc.*,
   565 B.R. 732 (Bankr. D. Del. 2016) ...................................................39

*In re Idearc, Inc.*,
   423 B.R. 138 (Bankr. N.D. Tex. 2009) ...............................................22

*In re Indianapolis Downs, LLC.*,
   486 B.R. 286 (Bankr. D. Del. 2013) ...........................................*passim*

*In re Insilco Techs., Inc.*,
   480 F.3d 212 (3d Cir. 2007) ............................................................79

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd.*,
   419 B.R. 585 (Bankr. S.D.N.Y. 2009) ...............................................72

*In re Ionosphere Clubs, Inc.*,
   98 B.R. 174 (Bankr. S.D.N.Y. 1989) ...............................................23

**Page(s)**

*In re Jamesway Corp.*,
    179 B.R. 33 (S.D.N.Y. 1995) ............................................................82

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987) ......................................................22, 23

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993) ..............................................22, 27, 69

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ............................................70

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ..........................................................65

*King v. Burwell*,
    576 U.S. 473 (2015) .......................................................................54

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003) ...........................................................50

*Lamie v. U.S. Tr.*,
    540 U.S. 526 (2004) .......................................................................78

*In re Landmark at Plaza Park, Ltd.*,
    7 B.R. 653 (Bankr. D.N.J. 1980) ....................................................66

*In re Lason, Inc.*,
    300 B.R. 227 (Bankr. D. Del. 2003) ..........................................61, 62

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003) ..............................................70

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship*,
    115 F.3d 650 (9th Cir. 1997) .........................................................69

*In re Lightsquared Inc.*,
    513 B.R. 56 (Bankr. S.D.N.Y. 2014) ............................................22

*In re Maremont Corp.*,
    601 B.R. 1 (Bankr. D. Del. 2019) ..........................................22, 49, 59

*In re Martin*,
    91 F.3d 389 (3d Cir. 1996) ............................................................33

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ..........................................36

*In re Midway Gold US, Inc.*,
   575 B.R. 475 (Bankr. D. Colo. 2017) ...................................................................38

*In re Millennium Lab Holdings II, LLC*,
   575 B.R. 252 (Bankr. D. Del. 2017) ....................................................................37

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
   587 U.S. 370 (2019).............................................................................................83

*Monarch Life Ins. Co. v. Ropes & Gray*,
   65 F.3d 973 (1st Cir. 1995)..................................................................................48

*In re MVK FarmCo LLC*,
   No. 23-11721 (LSS)...................................................................................72, 75, 88

*N.L.R.B. v. Bildisco & Bildisco*,
   465 U.S. 513 (1984).............................................................................................55

*Nantucket Invs. II v. Cal. Fed. Bank*,
   61 F.3d 197 (3d Cir. 1995)...................................................................................26

*Nat'l Union Fire Ins., Co. of Pittsburgh, Pa. v. Boy Scouts of Am. & Del. BSA,
   LLC*,
   650 B.R. 87 (D. Del. 2023) .............................................................................21, 51

*In re Neff*,
   60 B.R. 448 (Bankr. N.D. Tex. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986) .........................62

*In re Neshaminy Office Bldg. Assocs.*,
   62 B.R. 798 (E.D. Pa. 1986) ................................................................................33

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) ....................................................................21

*In re O'Neil Theatres, Inc.*,
   257 B.R. 806 (Bankr. E.D. La. 2000) ..................................................................82

*In re Ocean View Motel, LLC*,
   No. 20-21165 (ABA), 2022 WL 243213 (Bankr. D.N.J. Jan. 25, 2022)................................70

*Pettibone Corp. v. Hawxhurst*,
   163 B.R. 989 (N.D. Ill. 1994) ..............................................................................48

*In re Pisces Energy, LLC*,
   No. 09-36591-H5-11, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) .........................22

*In re PolarityTE, Inc.*,
   No. 23-22358 (KRA), 2025 WL 310866 (Bankr. D. Utah Jan. 27, 2025)..................54, 79, 80

*In re PPI Enters. (U.S.), Inc.*,
    228 B.R. 339 (Bankr. D. Del. 1998) ...................................................................55

*In re Premier Int'l Holdings, Inc.*,
    No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) .................38, 39, 45

*Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v.
    Anderson*,
    390 U.S. 414 (1968) ..................................................................................33

*In re Prussia Assocs.*,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ...............................................................65

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)............................................................44, 45, 47, 49, 55

*In re Resorts Int'l, Inc.*,
    372 F.3d 154 (3d Cir. 2004)............................................................................85

*In re Richard Buick, Inc.*,
    126 B.R. 840 (Bankr. E.D. Pa. 1991) ...............................................................23

*In re Rubicon U.S. REIT, Inc.*,
    434 B.R. 168 (Bankr. D. Del. 2010) .................................................................57

*In re rue21, inc. v. Off. Comm. of Unsecured Creditors*,
    575 B.R. 90 (Bankr. W.D. Pa. 2017) ............................................................68, 69

*In re Rusty Jones, Inc.*,
    110 B.R. 362 (Bankr. N.D. Ill. 1990) ...............................................................59

*In re S&W Enters.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) .................................................................21

*In re Sentinel Mgmt. Grp., Inc.*,
    398 B.R. 281 (Bankr. N.D. Ill. 2008) ...............................................................51

*In re Sentry Operating Co. of Tex., Inc.*,
    264 B.R. 850 (Bankr. S.D. Tex. 2001) ..............................................................23

*In re Smallhold, Inc.*,
    665 B.R. 704 (Bankr. D. Del. 2024) .............................................................42, 43

*In re Smith*,
    388 B.R. 603 (Bankr. E.D. Pa. 2008) ...............................................................23

*In re Spansion, Inc.*,
    No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. Apr. 16, 2010) ..............................45

*In re Specialty Equip. Cos., Inc.*,
   3 F.3d 1043 (7th Cir. 1993) ............................................................42

*In re Stratford Assocs. Ltd. P'ship*,
   145 B.R. 689 (Bankr. D. Kan. 1992) ..............................................59

*Su v. Offshore Inv. Ltd.*,
   603 B.R. 538 (D. Del. 2019) ...........................................................37

*In re SunPower Corp.*,
   No. 24-11649 (CTG) ..................................................................75, 87

*In re Toy & Sports Warehouse, Inc.*,
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) .........................................55, 59

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011) ..........................................38, 65

*In re Trump Ent. Resorts, Inc.*,
   519 B.R. 76 (Bankr. D. Del. 2014) ..................................................55

*U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ......................................36, 37, 42

*In re U.S. Truck Co., Inc.*,
   47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ................65, 66

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*,
   326 B.R. 497 (S.D.N.Y. 2005)..........................................................47

*Peltz ex rel. USN Commc'ns Liquidating Tr. v. Worldnet Corp.*,
   280 B.R. 573 (Bankr. D. Del. 2002) ................................................74

*In re Verso Corp.*,
   No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) .........................47

*In re Vyaire Med., Inc.*,
   No. 24-11217 (BLS) ........................................................................75

*In re W. Coast Video Enters., Inc.*,
   174 B.R. 906 (Bankr. E.D. Pa. 1994) ..............................................43

*W. Real Est. Equities, L.L.C. v. Village at Cam Bowie I, L.P.*,
   710 F.3d 239 (5th Cir. 2013) ..........................................................27

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ................................................. *passim*

Page(s)

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ................................................................ *passim*

*In re Woodbridge Grp. of Cos., LLC*,
    592 B.R. 761 (Bankr. D. Del. 2018) ....................................................................36

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) ....................................................................36

*In re Worldcom, Inc.*,
    No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .........49

*In re WR Grace & Co.*,
    729 F.3d 332 (3d Cir. 2013)..................................................................55, 65, 66

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ....................................................36, 37, 38, 39

**Statutes**

11 U.S.C. § 101 ..............................................................................54, 73, 79

11 U.S.C. § 365 ..................................................................................82, 83

11 U.S.C. § 503(b)(9) ................................................................................6

11 U.S.C. § 507 ..................................................................................25, 67

11 U.S.C. § 510 ..................................................................................25, 54

11 U.S.C. § 1123 ....................................................................................*passim*

11 U.S.C. § 1125 ......................................................................................50

11 U.S.C. § 1126 ..................................................................................52, 53

11 U.S.C. § 1127(a) ..............................................................................51, 74

11 U.S.C. § 1129 ....................................................................................*passim*

11 U.S.C. § 1107(a) ....................................................................................6

11 U.S.C. § 1108 ........................................................................................6

11 U.S.C. § 1122 ..............................................................22, 23, 26, 48, 74

11 U.S.C. § 1123 ..............................................................33, 34, 36, 41, 46

11 U.S.C. § 1125 ..............................................................49, 50, 51, 52

**Page(s)**

11 U.S.C. § 1129 ................................................................................ *passim*

**Rules**

Bankruptcy Rule 1015-1 ....................................................................... 6

Bankruptcy Rule 1015(b) ...................................................................... 6

Bankruptcy Rule 3019 ..................................................................... 51, 74

Bankruptcy Rule 3020 ....................................................................... 75

Bankruptcy Rule 6004 ....................................................................... 75

Bankrtupcy Rule 6006 ....................................................................... 75

Bankruptcy Rule 9019 ................................................................ 33, 34, 36

**Other Authorities**

Publication Notice ............................................................................ 16

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 ................................ 21, 49

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C.C.A.N. 5787 ................................... 21, 49

*Disclosure Statement for the Joint Chapter 11 Plan* ...................................... 7, 62

*Disclosure Statement for the Sixth Amended Joint Chapter 11 Plan* ........................... 87

*Disclosure Statement Supplement for the Eighth Amended Joint Chapter 11 Plan* ............... 16

**RELIEF REQUESTED**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully submit this memorandum of law (this "Memorandum") in support of confirmation of the *Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates*, filed contemporaneously herewith (as modified, amended, or supplemented from time to time, the "Plan"), and the approval of the Global Settlement (the "Global Settlement") contemplated thereunder, pursuant to sections 1125, 1126, 1129, and 9019, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and in response to the objections thereto (the "Objections").[2]   The Debtors believe that they have resolved all Objections to Confirmation except the *Objection and Reservation of Rights of Brian Kahn and Lauren Kahn JT TEN to Confirmation of Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1430] (the "Kahn Objection") and the *Objection of Buddy Mac Holdings, LLC and Affiliates to (I) Confirmation of Chapter 11 Plan, (II) Adequate Assurance of Future Performance, (III) Proposed Rejection of Contracts and Leases, and (IV) Reservation of Rights* [Docket No. 1435] (the "BMH Objection").[3]

In support of confirmation of the Plan and approval of the Global Settlement, the Debtors have also filed (a) the *Declaration of David Orlofsky in Support of Confirmation of the Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* (the "Orlofsky Declaration"); (b) the *Declaration of Jeffrey Kopa in Support of Confirmation of the Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates*

---

[2]   A summary chart of the filed Objections and the status of each is attached hereto as **Exhibit A** (the "Objection Summary Chart").  The Debtors have also received a number of informal objections and other comments from various parties in interest.

[3]   The Debtors are also actively working with varies parties that filed cure Objections to address their Objections, and all parties' respective rights are reserved to address any unresolved matters at a future hearing, if necessary.

(the "Kopa Declaration"); (c) the *Declaration of Christopher Grubb in Support of Confirmation of the Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* (the "Grubb Declaration"); (d) the *Declaration of Michael J. Wartell in Support of Confirmation of the Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* (the "Wartell Declaration"); (e) the *Declaration of Christopher P. Meyer in Support of Confirmation of the Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* (the "Meyer Declaration"); and (f) the *Declaration of Craig Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* (the "Voting and Opt-In Report," and together with the Orlofsky, Kopa, Grubb, Wartell, and Meyer Declarations, collectively, the "Declarations").  In further support of confirmation of the Plan, the Debtors respectfully state as follows:[4]

## PRELIMINARY STATEMENT

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") should confirm the Plan and approve the Global Settlement.  The Plan and the Global Settlement constitute a value-maximizing and balanced compromise of a range of complex and hotly contested issues presented in these Chapter 11 Cases.

2.      The Plan and the Global Settlement significantly deleverage the Debtors' balance sheet by $1.55 billion; settle all Intercompany Claims among TopCo, the Freedom HoldCo Debtors, and the OpCo Debtors; establish a single, consolidated Litigation Trust to preserve and pursue claims and causes of action against non-Debtors; otherwise provide releases to parties that

---

[4]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Disclosure Statement.

are integral to the go-forward operations of the Debtors; and maximize the recoveries available for prepetition creditors.

3.      As the Court is well aware, this negotiated, consensual outcome[5] was not arrived at easily.  It is the result of months of diligence, analysis, market checks, and significant litigation on a range of issues.  In the beginning of these cases, the parties had widely divergent views on a range of issues, which were complicated by intercompany conflicts between the Debtors and stakeholders that held claims across the Debtors' corporate structure.  The Debtors established a robust governance structure, which was further enhanced during these Chapter 11 Cases, to be able to appropriately discharge their fiduciary duties with respect to these intercompany issues and all other issues.

4.      Thanks to these efforts, these cases now conclude with broad consensus on a carefully calibrated and negotiated resolution of the many issues that plagued these Debtors.  This is how chapter 11 is supposed to work.  It is now critical that the Plan be confirmed, the Global Settlement be approved, and the Debtors emerge from chapter 11 so that they can continue operating and creating value for their many stakeholders for years to come.

5.      Two Objections to confirmation of the Plan remain unresolved—the Kahn Objection and the BMH Objection.  Both Objections lack merit and should be overruled.  The Kahn Objection is filed by Brian Kahn and Lauren Kahn as joint tenants by the entirety.  Brian Kahn is an unindicted co-conspirator of an alleged fraud that resulted in criminal prosecution, who is seeking to recover on account of his equity interests in TopCo.  For reasons explained in greater detail herein, the Kahn Objection lacks merit.  The Kahns' equity interests sit behind DIP Claims

---

[5]     The Plan is supported by each of the Debtors' key constituents, including the Ad Hoc Group, the Freedom Lender Group, and the Creditors' Committee.  The Plan is also supported by Holders of Claims in Classes 3, 4, 5, 6 (at certain Debtors), 7, 8-A, and 8-B.

and Administrative Expense Claims, and the liquidation analysis readily shows that their equity interests would not be better off under a chapter 7 liquidation. In addition, as the Kahns readily concede, there are no impaired Claims at TopCo, and because section 1129(a)(10) of the Bankruptcy Code is applicable only to the extent that there is an Impaired Class of Claims, the TopCo Plan is confirmable.

6.      The BMH Objection also lacks merit, as the Debtors' assumptions of executory contracts and releases are fully consistent with the Bankruptcy Code and applicable case law. Further the Debtors' disclosure was appropriate under the circumstances, as approved by the Court. The Disclosure Statement Supplement provided adequate information of the incremental changes to the Plan as a result of the Global Settlement and gave voting creditors fourteen additional days to consider whether to vote in favor of the Plan.

7.      For these and other reasons set forth more fully in this Memorandum, the Debtors respectfully request that the Court confirm the Plan and approve the Global Settlement.

## PROCEDURAL BACKGROUND AND VOTING RESULTS

### I.      Procedural History.

8.      The Debtors are privately held operators of franchised businesses with a diverse collection of retail brands in their portfolio. Across all brands, the Debtors have approximately 1,700 total retail store locations (including both corporate-owned and franchised locations) and approximately 9,000 total employees. Despite their ownership of highly recognized, market-leading, and emerging brands, the Debtors—who had approximately $1.985 billion in total funded debt obligations as of the Petition Date—faced several challenges in recent years, including macroeconomic headwinds in the retail industry, rising interest expenses, and the impending maturities of the Debtors' revolving credit facility and term loans in 2026. These factors, along with the alleged misconduct of the Debtors' former Chief Executive Officer, Brian Kahn, stressed

the Debtors' capital structure and liquidity profile and ultimately guided them toward in-court restructuring measures.

9.      After evaluating strategic alternatives, the Debtors commenced these Chapter 11 Cases to effectuate a comprehensive balance sheet restructuring that would "right-size" their capital structure and position them for long-term success.  On November 1, 2024, the Debtors and certain consenting First Lien Lenders holding approximately 80% of the principal amount outstanding under the First Lien Term Loan Facility entered into a Restructuring Support Agreement (the "Restructuring Support Agreement").  Two days after the Petition Date, on November 5, 2024, the Court entered an order authorizing the procedural consolidation and joint administration of these Chapter 11 Cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.[6]  To fund the Debtors' operations and pave a path to confirming the agreed-upon Restructuring Transactions, the DIP Lenders committed to providing postpetition DIP financing to the Debtors.[7]

10.      On November 19, 2024, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Creditors' Committee.[8]  On December 6, 2024, the Court entered an order[9] establishing January 23, 2025, as the General Claims Bar Date and May 2, 2025,

---

[6]   *Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases* [Docket No. 88].

[7]   *See Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 414].

[8]   *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 188].

[9]   *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and (B) Approving the Form and Manner of Notice Thereof* [Docket No. 354].

as the Governmental Bar Date (each as defined therein) and provided that any claimant that failed to timely submit a Proof of Claim by the applicable bar date may not be treated as a creditor with respect to such claim for the purposes of voting or distribution.[10]  On January 15, 2025, the Debtors appointed a fee examiner.[11]  To date, the Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.    The Debtors originally proposed Willkie Farr and Gallagher, LLP ("Willkie") to serve as counsel to the Debtors in these Chapter 11 Cases.  However, on January 3, 2025, January 13, 2025, and February 1, 2025, the U.S. Trustee, the Settlement-related Liquidating Trust 2022-23, and the Freedom Lender Group, respectively, objected to the Debtors' application to retain Willkie, arguing, among other things, that Willkie's prepetition representations of Brian Kahn and other entities associated with the Take-Private Transaction resulted in a conflict of interest in these Chapter 11 Cases.  On February 6, 2025, the Court held a hearing on Willkie's retention and on February 13, 2025, the Court entered an order denying the Debtors' application to retain Willkie.[12]  One day later, on February 14, 2025, the Debtors engaged Kirkland & Ellis LLP ("Kirkland") as proposed co-counsel in these Chapter 11 Cases.

**II.    The Plan Equitization Transaction.**

12.    After filing the *Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* [Docket No. 150] and the *Disclosure Statement for the Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* [Docket No. 151] (the "Original Disclosure Statement") on

---

[10]   *Id.* ¶ 21.

[11]   *Order Appointing Fee Examiner and Establishing Procedures for Consideration of Requested Fee Compensation and Reimbursement of Expenses* [Docket No. 747].

[12]   *Order* [Docket No. 976].

November 11, 2024, the Debtors filed several amended plans of reorganization [Docket Nos. 654, 894, 925, 957, 996, 1015, 1233, and 1312]. On May 14, 2025, the Debtors filed the Plan. The Plan will substantially deleverage the Debtors' balance sheet, allow the Debtors to implement their go-forward business strategy, and maintain key relationships with the Debtors' creditors and vendors. Importantly, the Plan is in the best interests of the Debtors' Estates and will provide the Debtors with a definite, viable path to exit chapter 11.

13.     On March 27, 2025, the Debtors filed the Plan Supplement.[13] On March 27, 2025, the Debtors caused the Plan Supplement to be transmitted to all parties listed on the Debtors' master service list.[14]

14.     On April 30, 2025, the Debtors filed an amended Plan Supplement [Docket No. 1371] (the "First Amended Plan Supplement") and caused a notice of the First Amended Plan Supplement to be transmitted to all parties listed on the Debtors' master service list.[15]

## III.    The Global Settlement.

15.     The early days of these Chapter 11 Cases were extremely contentious, particularly because the Freedom Lender Group opposed numerous forms of relief sought by the Debtors and indicated they would not vote in favor of the chapter 11 plan. Following the denial of the Debtors' application to retain Willkie and the Debtors' retention of Kirkland, the Debtors made certain enhancements to their governance structure and began renewed efforts to reach resolution, including resolution of intercompany issues among the Debtors.

---

[13]  *Notice of Filing of Plan Supplement* [Docket No. 1182].

[14]  *See Affidavit of Service* [Docket No. 1311].

[15]  *See Affidavit of Service* [Docket No. 1444].

16.     In March 2025, the Debtors presented a potential framework for an intercompany settlement of claims between the OpCo Debtors and the HoldCo Debtors.  In the days that followed, the Special Committee of Franchise Group, Inc. and Freedom VCM Holdings, LLC (the "Special Committee") and the Conflicts Committee of the Boards of Directors of Freedom VCM Interco, Inc. and Freedom VCM, Inc. (the "Conflicts Committee") engaged in around-the-clock arm's-length, good-faith negotiations to address and settle claims they could assert in exchange for mutually beneficial and valuable consideration.

17.     In parallel with these settlement efforts, Michael J. Wartell, in his capacity as the Freedom HoldCo Independent Director (the "Freedom HoldCo Independent Director") and the sole member of the Conflicts Committee, investigated, prepared, and issued a report on the proposed Freedom HoldCo Debtor Released Claims (the "Freedom HoldCo Independent Director Report").  The Freedom HoldCo Independent Director concluded that certain Claims and Causes of Action belonging to the Freedom HoldCo Debtors should not be released as of the date thereof given, among other things, the lack of consideration to the Freedom HoldCo Debtors provided under the *Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates* (the "Sixth Amended Plan") [Docket No. 1015].

18.     In November 2023, the Debtors engaged Petrillo Klein + Boxer LLP ("Petrillo") to investigate Franchise Group, Inc.'s involvement in the alleged investment fraud of Brian Kahn related to Prophecy Asset Management ("Prophecy").[16]  At the conclusion of its investigation, Petrillo found, among other things, that there was no evidence that Franchise Group, Inc. was complicit in the alleged Prophecy conduct.[17]  In October 2024, in anticipation of the

---

[16]   *See* Meyer Decl. ¶ 6.

[17]   *See id.* ¶ 8.

commencement of these Chapter 11 Cases, the Debtors engaged Petrillo as special counsel to the Debtors and directed Petrillo to conduct a second independent investigation (the "OpCo Independent Investigation") related to the appropriateness of the potential releases of the directors and officers of Franchise Group, Inc. in connection with a chapter 11 plan.[18]   The OpCo Independent Investigation was tasked with reviewing, among other things, the acquisition of Franchise Group Inc., various transactions between the Debtors and B. Riley Financial, Inc., the sale of Badcock, certain SEC and Department of Justice materials, and certain dividend payments and share repurchases.[19]   Petrillo also evaluated the Debtors' financial circumstances for certain periods, Brian Kahn's alleged pledge of equity interests, and potential fiduciary duty breach claims related to the foregoing.[20]

19.     On March 26, 2025, after fourteen interviews and review of countless documents, Petrillo released its report.  Petrillo concluded that there was no evidence of misconduct by Andrew Laurence, Andrew Kaminsky, Tiffany McMillan-McWaters, or Eric Seeton related to any of the foregoing and recommended that the proposed releases of such directors and officers were appropriate under the circumstances.[21]

20.     Following the release of the Freedom HoldCo Independent Director Report and the Petrillo report, the Special Committee, and the Freedom HoldCo Independent Director, as the sole member of the Conflicts Committee of the Boards of Directors of Freedom VCM Interco, Inc. and Freedom VCM, Inc, engaged in arm's-length negotiations that ultimately resulted in an agreement

---

[18]   *See id.* ¶¶ 9, 11.

[19]   *See id.* ¶¶ 10, 14.

[20]   *See id.* ¶ 14.

[21]   *See* Meyer Decl. ¶¶ 18, 25–28.

on the terms of a settlement by and among the OpCo Debtors, the Freedom HoldCo Debtors, and TopCo (the "Intercompany Settlement").

21.     Pursuant to the Intercompany Settlement, each of the Debtors agreed to, among other things, resolve any and all disputes by and among the OpCo Debtors, the Freedom HoldCo Debtors, and TopCo in exchange for, among other things:  (a) additional consideration for the members of the Freedom Lender Group; (b) mutual releases as provided in (and subject to the limitations set forth in) the Plan; (c) the transfer of certain Claims and Causes of Action that are not released under the Plan to a combined Litigation Trust; (d) the settlement of all Intercompany Claims by and between the OpCo Debtors, the Freedom HoldCo Debtors, and TopCo; (e) the settlement of the professional fee allocations among the OpCo Debtors, the Freedom HoldCo Debtors, and TopCo; and (f) the allocation of approximately $13.25 million in Cash from TopCo to fund the Litigation Trust.

22.     However, this Intercompany Settlement was not yet supported by certain of the Debtors' creditor constituencies, including the Freedom Lender Group and the Ad Hoc Group. Therefore, in the days that followed, the Debtors worked with the Ad Hoc Group and the Freedom Lender Group to build on the Intercompany Settlement to settle various additional Claims and Causes of Action between the Debtors, the Ad Hoc Group, the Freedom Lender Group, and the Creditors' Committee (collectively, the "Global Settlement Parties") and achieve global support for the Plan.  On April 17, 2025, following extensive arm's-length negotiations, the Global Settlement Parties agreed to the terms of the Global Settlement as set forth in the *Notice of Global Settlement* [Docket No. 1290] (the "Settlement Notice").  The Global Settlement resolves multiple complex issues presented throughout these Chapter 11 Cases, as highlighted below.

23.     The Plan incorporates and seeks approval of the terms of the value-maximizing Global Settlement, which incorporates the Intercompany Settlement and the resolution of various other claims and issues between the parties, pursuant to Bankruptcy Rule 9019.[22]  In connection with the Global Settlement, the Debtors prepared a supplemental disclosure that summarizes, among other things, the key terms of the Global Settlement, the related modifications to the Plan, and the resulting impact on the treatment and projected recoveries of certain Classes set forth therein.[23]  Article XV of the Plan states: "The Plan, taken together with the Disclosure Statement and Disclosure Statement Supplement, shall serve as a motion to approve the Global Settlement, including, for the avoidance of doubt, approval of the releases provided by the Freedom HoldCo Debtors with respect to any Claims or Causes of Action previously identified or preserved by the Freedom Holdco Independent Director, pursuant to Bankruptcy Rule 9019."

## IV.     The Solicitation Process and Voting Results.

24.     On February 21, 2025, the Court entered the Disclosure Statement Order[24] that, in relevant part, (a) approved the Disclosure Statement; (b) approved the solicitation procedures set forth in the Disclosure Statement; and (c) approved certain deadlines related to solicitation.

25.   On   February 25,   2025,   the   Debtors   caused   Kroll   to   serve   the   notice   of   the Confirmation Hearing and published the notice of the Confirmation Hearing in *The Wall Street*

---

[22]   *See generally* Settlement Notice (outlining terms of the Global Settlement); Plan at 1 ("This Plan serves as a motion to approve the Global Settlement pursuant to Bankruptcy Rule 9019.").

[23]   *Disclosure Statement Supplement for the Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1314-1] (the "Disclosure Statement Supplement").

[24]   *See Order (I) Approving the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures, Including (A) Fixing the Voting Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballots and Solicitation Materials and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation, (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures, and (IV) Granting Related Relief* [Docket No. 1019] (the "Disclosure Statement Order").

*Journal* (the "<u>Publication Notice</u>").  Concurrently with the filing of this Memorandum, the Debtors

submitted a proposed version of the order confirming the Plan (the "<u>Confirmation Order</u>").

26.    On February 28, 2025, the Debtors caused their solicitation agent, Kroll

Restructuring Administration LLC ("<u>Kroll</u>"), to distribute Solicitation Packages[25] containing,

among other items, the Disclosure Statement, the Plan, and Ballots[26] to all known Holders of

Claims and Equity Interests in Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, and 11, the Classes entitled to

vote to accept or reject the Sixth Amended Plan, as of January 31, 2025 (the "<u>Voting Record

Date</u>"), in accordance with sections 1125 and 1126 of the Bankruptcy Code.[27]  Kroll transmitted

the Solicitation Packages to Holders in the Voting Classes by first class mail, express mail, and

electronic mail (as applicable), and such Holders were directed in the Disclosure Statement and

Ballots to follow the instructions contained in the Ballots (and described in the Disclosure

Statement) to complete and submit their respective Ballots to cast a vote to accept or reject the

Plan.  Simultaneously, Kroll also caused to be distributed the notice of non-voting status and Opt-

In Forms to Holders of Claims and Equity Interests in Classes 1, 2, 9, 10, and 12.  A detailed

description of Kroll's distribution of Solicitation Packages is set forth in Kroll's *Affidavit of

Service of Solicitation Materials*, which was filed with this Court on May 2, 2025 [Docket

No. 1383].

---

[25]    The following materials constituted the solicitation package (the "<u>Solicitation Package</u>"):  (a) The Disclosure
Statement with all annexes and exhibits, including the Plan; (b) the Disclosure Statement Order (excluding
exhibits); (c) the Creditors' Committee letter; (d) the Ballots for respective Classes and voting instructions; (e) a
pre-addressed, pre-paid return envelope; and (f) the Publication Notice.

[26]    The forms of ballot used in solicitation were included as <u>Exhibits</u> <u>3-A</u>, <u>3-B</u>, <u>3-C</u>, <u>3-D</u>, <u>3-E</u>, <u>3-F</u>, <u>3-G</u>, <u>3-H</u>, and <u>3-I</u>
attached to the Disclosure Statement Order (the "<u>Ballots</u>").

[27]    *See Affidavit of Service of Solicitation Materials* [Docket No. 1383], ¶¶ 1–2.

27.     On April 25, 2025, the Debtors filed the Disclosure Statement Supplement to provide additional disclosures with respect to the Global Settlement.  On April 26, 2025, the Court entered the *Order (I) Approving the Form, Content, and Manner of Notice of the Disclosure Statement Supplement, (II) Approving Certain Deadlines and Procedures in Connection with Confirmation, and (III) Granting Related Relief* [Docket No. 1322] (the "Disclosure Statement Supplement Order") (a) authorizing distribution of the Disclosure Statement Supplement; (b) establishing May 7, 2025, at 5:00 p.m. (prevailing Eastern Time), as the objection deadline for the Disclosure Statement and the Plan (the "Objection Deadline"); and (c) setting May 20, 2025, at 10:00 a.m. (prevailing Eastern Time), as the date of the Confirmation Hearing, among other things.

28.     On April 29, 2025, the Debtors caused the Disclosure Statement Supplement and the Disclosure Statement Supplement Order to be transmitted to all known Holders of Claims in Classes 3, 4, 5, 6, 7, 8-A, and 8-B (collectively, the "Voting Classes"), as well as known Holders of Claims and Equity Interests in Class 11, and purported Holders of Class 8-C Claims, as of the Voting Record Date and the parties listed on the Debtors' master service list.[28]

29.     Each Holder was explicitly informed in the Disclosure Statement Supplement to submit its Ballot so that it was actually received by Kroll by 5:00 p.m. (prevailing Eastern Time) on May 7, 2025 (the "Voting Deadline"), to be counted.[29]  Holders of Claims and/or Interests were not provided a Solicitation Package if such Holders were either (a) Unimpaired under and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code or (b) Impaired, entitled to receive no distribution on account of such Claims or Interests under the

---

[28]     *See Affidavit of Service of Supplemental Solicitation Materials*, [Docket No. 1448].

[29]     *See Disclosure Statement Supplement Order*.

Plan and, therefore, deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

30.    The Debtors completed their final tabulation of the Ballots after the Voting Deadline, following a complete review and audit of all Ballots received.[30] 51 Ballots were excluded from tabulation by Kroll.[31] As set forth below and in the Voting and Opt-In Report:[32]

| TOTAL BALLOTS COUNTED | | | | |
|---|---|---|---|---|
| **VOTING CLASS**[33] | **ACCEPT** | | **REJECT** | |
| | **Amount** | **Number** | **Amount** | **Number** |
| **Class 3** Prepetition ABL Loan Claims | $261,264,526.98 | 3 | $0 | 0 |
| | 100% | 100% | 0% | N/A |
| **Class 4** Prepetition First Lien Loan Claims | $471,605,091.67 | 230 | $0 | 0 |
| | 100% | 100% | 0% | N/A |
| **Class 5** Prepetition Second Lien Loan Claims | $115,625,000.00 | 10 | $0 | 0 |
| | 100% | 100% | 0% | N/A |
| **Class 6**[34] OpCo General Unsecured Claims | $11,442,857,574.45 | 258 | $48,709,272.13 | 76 |
| | 99.57% | 77.25% | 0.43% | 22.75% |
| **Class 7** Prepetition HoldCo Loan Claims | $457,609,220.60 | 10 | $0 | 0 |
| | 100% | 100% | 0% | N/A |
| **Class 8-A** Freedom HoldCo General Unsecured Claims | $4.00 | 4 | $0 | 0 |
| | 100% | 100% | 0% | N/A |
| | $900,000,000.00 | 3 | $0 | 0 |

---

[30]    For additional discussion about, and certification of, the solicitation and vote tabulation processes, *see* Voting and Opt-In Report.

[31]    *See* Voting and Opt-In Report ¶ 12.

[32]    Voting and Opt-In Report, Ex. A.

[33]    Although the Debtors do not believe that there are any claims at Class 8-C, the Debtors received one vote in favor of the Plan from a purported claimant with a Class 8-C claim. This was the only vote received from Class 8-C.

[34]    This is an aggregate summary of Class 6 OpCo General Unsecured Claims, for a full summary of Class 6 at all Debtors, *see* Voting and Opt-In Report, Ex. A.

| TOTAL BALLOTS COUNTED | | | | |
|---|---|---|---|---|
| **VOTING CLASS**[33] | **ACCEPT** | | **REJECT** | |
| | **Amount** | **Number** | **Amount** | **Number** |
| **Class 8-B**<br>HoldCo Receivables General Unsecured Claims | 100% | 100% | 0% | N/A |

31.    All Holders of Claims and Equity Interests had notice and opportunity to "opt in" to the Third-Party Release.  Specifically, all Holders of Claims in the Voting Classes had the opportunity to "opt in" to the Third-Party Release through their Ballots.  Holders of Claims and Equity Interests in the non-Voting Classes were given the opportunity to "opt in" to the Third-Party Release via the opt-in forms (the "Opt-In Forms").  The deadline to opt in to the Third-Party Release was May 7, 2025 at 5:00 p.m. (prevailing Eastern Time).  Ultimately, 517 parties elected to opt in to the Third-Party Release prior to the Opt-In Deadline, which was extended to May 7, 2025.  The affirmative opt-ins received by the Debtors are summarized as follows:

| Plan Class | Class Description | Total Opt-Ins Received |
|---|---|---|
| N/A | Non-Voting Classes | 19 |
| 3 | Prepetition ABL Loan Claims | 3 |
| 4 | Prepetition First Lien Loan Claims | 330 |
| 5 | Prepetition Second Lien Loan Claims | 10 |
| 6 | OpCo Debtors General Unsecured Claims | 139 |
| 7 | Prepetition Holdco Loan Claims | 14 |
| 8-A | Freedom HoldCo General Unsecured Claims | 0 |
| 8-B | HoldCo Receivables General Unsecured Claims | 0 |
| 8-C | TopCo General Unsecured Claims | 0 |
| 11 | Existing TopCo Equity Interests | 2 |

## **ARGUMENT**

32.     This Memorandum is organized into three sections.  The first section of this Memorandum explains why the Global Settlement should be approved.  The second section requests that the Bankruptcy Court overrule various objections to the Plan.  The third section explains how the Plan satisfies section 1129 of the Bankruptcy Code.  For the reasons stated herein, and in light of the evidentiary support to be offered at the Confirmation Hearing, the Debtors request that the Bankruptcy Court approve the Global Settlement and confirm the Plan.

## I.    **The Global Settlement Should Be Approved.**

### A.    **Entry into the Global Settlement Was an Appropriate Exercise of Business Judgment, and the Global Settlement Is Fair and Reasonable.**

#### 1.    **Legal Standard:  Bankruptcy Rule 9019.**

33.     Bankruptcy Rule 9019 provides that the Court may approve a compromise or settlement by the Debtors after notice and a hearing.[35]

34.     "To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"[36]  A court need not hold a full evidentiary hearing or even a "mini-trial" before a compromise can be approved.[37]  Nor must a court determine that the

---

[35]    Fed. R. Bankr. P. 9019(a).

[36]    *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); *see also Protective Comm. for Indep. S'holders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Compromises are 'a normal part of the process of reorganization.'" (citation omitted)).

[37]    10A Collier on Bankruptcy ¶ 9019.02; *In re Decade, S.A.C., LLC*, C.A. No. 18-1880-MN, 2020 WL 564903, at *5 (D. Del. Feb. 5, 2020) ("Although the Goodwins may have meritorious arguments to the contrary, the Bankruptcy Court was not required to hold a mini-trial on each aspect of the parties' disputed claims against one another.").

settlement is the "best possible compromise";[38] rather, a court must simply be convinced that the settlement "falls above the lowest point in the range of reasonableness."[39]

35.     The Third Circuit considers four criteria to determine whether a settlement should be approved:  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of creditors.[40]  In addition to the above factors, the Court must determine whether the proposed settlement is fair and equitable and in the best interests of the estate.[41]  When determining the best interests of the estate, the Court must balance the value to the estate of accepting the settlement against the claims that are being compromised.[42]

### 2.     The Global Settlement Is Reasonable and in the Best Interests of the Debtors' Estates.

36.     The Global Settlement is an integrated resolution of a host of complex issues between the Debtors and their various creditor constituencies, as well as intercompany issues among different Debtor entities, for which no other party has proposed any viable solution.  By agreeing to the Global Settlement, the Global Settlement Parties resolve complex and uncertain claims and rights involving highly contested facts and legal principles, often based on projected, unknown outcomes—any of which could generate extensive litigation at an extraordinary cost to

---

[38]  *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (citations omitted).

[39]  *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010) ("The court need not decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." (citations omitted)).

[40]  *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) (quoting *In re Martin*, 91 F.3d at 393).

[41]  *See Anderson*, 390 U.S. at 424 ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle.").

[42]  *Martin*, 91 F.3d at 393.

the Estates.  The Global Settlement has many benefits, including providing a negotiated recovery for holders of Prepetition Second Lien Loan Claims, the settlement of all Intercompany Claims, the funding of a consolidated Litigation Trust to pursue Permitted Litigation Claims, and releases for the benefit of the Global Settlement Parties and their related Parties (including current management).[43]  The Global Settlement struck a delicate balance between the competing interests of the many stakeholders involved—the Debtors, the Committee, the Ad Hoc Group, and the Freedom Lender Group— and paves the way for the Debtors' Estates to confirm the Plan and emerge from chapter 11 without the time, expense, and risk of value-destructive litigation.

37.    With respect to TopCo specifically, the Global Settlement is justified.  Without the Global Settlement TopCo would be saddled with substantial obligations under the DIP Facility, in addition to its allocable share of professional fee expenses, that it would not have sufficient cash to pay.  It also faced substantial litigation risk associated with the Take-Private Transaction, prepetition dividends, prepetition and postpetition intercompany transactions and other issues. Further, TopCo will require a resolution of its Chapter 11 Case.  The Global Settlement and the Plan address and resolve all of these issues in a manner that is fair and in the best interests of TopCo and its stakeholders.  It provides for full releases for TopCo, resolves all intercompany issues, and provides for a resolution of TopCo's Chapter 11 Case.  While not all stakeholders at TopCo are receiving a recovery under the Plan, that was inevitable given the overlay of the DIP Facility, Administrative Claims, and Intercompany Claims.  On balance, TopCo is significantly better off under the Global Settlement and Plan than it would be otherwise.

---

[43]    *See generally* Settlement Term Sheet [Docket No. 1290-1].

a. **The Global Settlement Is the Result of Good-Faith, Arm's-Length Negotiations.**

38.     As discussed in greater detail below,[44] the Global Settlement is supported by months of analysis, diligence, investigation, and negotiations by the Freedom HoldCo Independent Director and the Special Committee, each of which was disinterested and independently advised and represented at all relevant times, as well as extensive negotiations between the Debtors, the Ad Hoc Group, the Freedom Lender Group, and the Creditors' Committee.

b. **The Complex Factual and Legal Issues Make the Probability of Success Highly Uncertain.**

39.     The Debtors have reached a compromise of the complex and unique issues presented in these Chapter 11 Cases.  The Freedom HoldCo Independent Director and the Special Committee concluded that the Global Settlement was reasonable in light of their assessment of the individual claims being released and the significant benefits of stopping the cost, expense, and disruption of litigation.[45]  The various claims, objections, and appeals that were in the process of being litigated prior to the Global Settlement were complicated and fact-intensive, requiring extensive discovery and expert analysis.  The resolution of these issues provides for a greater recovery to creditors overall and eliminates inherent risk of litigation.  The complexity and

---

[44]   *See also supra*, Background § III.

[45]   *See, e.g.*, *In re Tribune Co.*, 464 B.R. 125, 173–74 (Bankr. D. Del. 2011) (concluding that outcome of claims was uncertain but determining that settlement fell above lowest point in the range of reasonableness); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 747 (Bankr. S.D.N.Y. 1992) (approving settlement that was "not derived from a precise mathematical formula" but "represent[ed] the product of the agreed resolution of a large number of uncertain claims in the context of a comprehensive settlement of issues regarding the treatment of all Claims against the Debtors"); *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995) ("[T]he settlement may be approved even if the court finds it likely that the [settling party] would ultimately succeed in the litigation.").

uncertainty associated with the many competing claims and objections resolved by the Global Settlement make this "the precise type of multi-faceted litigation that cries out for settlement."[46]

> **c.    *Collecting from Other Debtors in Their Own Bankruptcy Proceeding Would Be Costly and Complicated.***

40.    As courts have recognized in assessing Bankruptcy Rule 9019 settlements, a litigation claim is only valuable insofar as it is collectible.[47] Here, many claims would be difficult to collect.  If any one of the Debtors were to obtain a large net judgment (accounting for setoff) on any of the Intercompany Claims against another Debtor, that Debtor likely would face considerable difficulty in collecting on that judgment because the judgment would likely be characterized as a general unsecured claim.  Net judgments on account of the Intercompany Claims would also significantly increase the claims pool with limited assets to recover against, reducing the recovery to third-party creditors.  The cost of litigating the Intercompany Claims would further deplete the value available to the Debtors to satisfy any judgment and could be prohibitive to successfully pursuing any of this litigation.

> **d.    *The Complexity, Expense, and Delay of the Litigation Involved Support the Global Settlement.***

41.    Litigation of the claims, objections, and appeals that were resolved by the Global Settlement would have an uncertain, likely lengthy duration and could cost the Estates tens of millions of dollars in attorneys' and other professional fees.  These relate to a variety of prepetition and postpetition transactions and issues including (i) the potential avoidability of certain dividend

---

[46]    *In re Wash. Mut., Inc.*, 442 B.R. at 345.

[47]    *Id.* at 327 (Bankr. D. Del. 2011) (discussing complexity and difficulties of collecting large judgments, even against parties with substantial liquid assets—e.g., a massive judgment against a bank could result in bank collapse); *In re Coram Healthcare*, 315 B.R. 321, 331 (Bankr. D. Del. 2004) (concluding that settlement was reasonable because of, among other factors, "enormous difficulty in collecting" against a party in its own bankruptcy proceeding).

payments made to TopCo, (ii) allocation of administrative expenses (including estate professional fees) between the Debtors, (iii) allocation of obligations under the DIP Facility between the Debtors, (iv) various Intercompany Claims and (v) potential Claims and Causes of Action that certain Debtors may have against other Debtors related to the Take-Private Transaction and other prepetition transactions.  The claims present fact-intensive questions for judicial resolution related to various intercompany transactions and other challenges.  Complicated factual and legal questions concerning the timeliness of many of these claims would be litigated on motions to dismiss and summary judgment, adding significant expense and uncertainty before even getting to trial.  And even after months of trial, there is the strong possibility that losing parties would appeal the judgment—as has already occurred in these cases—and cause even further delay and expense to these Chapter 11 Cases.  Extensive expert work, including sophisticated financial modeling, would be required for many claims, ensuring that discovery would be protracted, complex, and costly.

42.     In addition to these direct litigation costs, the Debtors would incur substantial indirect costs from litigation.  Litigation would materially harm the Debtors' business, creating operational risk and delaying the Debtors' emergence from bankruptcy.  Extended litigation would distract the Debtors' employees and key management from their primary responsibility—running the Debtors' businesses and implementing the business plan—as they would be forced to respond to the many demands for their time and attention that results from litigation.

e.     *The Global Settlement Is in the Paramount Interest of All of the Debtors' Creditors.*

43.     The Global Settlement is in the best interests of the creditors.  The Global Settlement avoids draining estate resources to the detriment of the Debtors' Estates, as protracted

litigation would likely deplete millions more dollars from the Debtors' Estates that could otherwise be used for distributions to creditors (as provided under the Global Settlement).[48]

44.    Resolution of the Intercompany Claims provides certainty and allows the Debtors to promptly emerge from bankruptcy.  The Global Settlement maximizes recoveries to all the Debtors' stakeholders, including through the creation of the Litigation Trust, which creates the prospect for greater recoveries for creditors from the pursuit of litigation post-emergence.

**B.    Overview of the Global Settlement.**

45.    After many months of hard-fought arm's-length negotiations, the Debtors and the Global Settlement Parties reached a resolution on numerous complex Claims, issues, and Causes of Action that have been litigated throughout these Chapter 11 Cases—and that would continue to be litigated to the detriment of the Debtors' Estates and their businesses absent approval of the Global Settlement.

46.    Viewed within the applicable legal framework, the Global Settlement far exceeds the lowest point in the range of reasonableness that the Court must look to when evaluating settlements. The Global Settlement is a carefully balanced and integrated settlement of various issues in these cases, which accomplishes the following:

- settles all pending litigation and potential litigation between the Global Settlement Parties, including (a) appeals of various first and second day orders, (b) alleged fraudulent transfer Claims against the Freedom HoldCo Debtors, (c) alleged fraudulent transfer Claims against

---

[48]    *See, e.g., Order (I) Authorizing and Approving the HBC Settlement Agreement by and Among the Debtors and the HBC Secured Parties to the HBC Settlement and (II) Granting Related Relief, In re Le Tote, Inc.,* No. 20-33332 (KLP) (Bankr. E.D. Va. Feb. 5, 2021) [Docket No. 900] at ¶ B (finding that settlement "avoid[s] protracted, value-destructive litigation . . . that would adversely affect the Debtors' restructuring to the detriment of all stakeholders"); *Order Granting the Motion of Energy Future Holdings Corp., et al., to Approve a Settlement of Litigation Claims and Authorize the Debtors to Enter into and Perform Under the Settlement Agreement, In re Energy Future Holdings Corp.,* No. 14-10979 (CSS) (Bankr. D. Del. Aug. 10, 2015) [Docket No. 7243] at ¶ 149 (finding that settlement conferred "substantial benefits" on the Debtors' estates due to, among other things, "the elimination of the substantial expense, delay, and risk of loss associated with litigation of the foregoing matters").

TopCo, (d) the allocation professional fees between the Freedom HoldCo Debtors and the OpCo Debtors, and (e) an objection to Confirmation of the Plan;

- establishes and provides funding for a consolidated Litigation Trust;

- provides increased recovery to the Freedom Lender Group;

- resolves issues related to the funding of the Litigation Trust, issues related to the prosecution of overlapping claims among multiple trusts, and allocation of recoveries among trust beneficiaries; and

- provides for the release of actionable claims of the individuals identified by the Freedom HoldCo Independent Director Report.

47.     The Global Settlement is a tremendous achievement because it allows the Debtors to avoid litigating this multitude of issues at great expense, delay, and risk to the Debtors' Estates. A piecemeal resolution would be impracticable and could jeopardize the Debtors' ability to emerge from these Chapter 11 Cases as a going concern.  As with all reasonable compromises, no one party will realize its "best-of-all-worlds" outcome under the Global Settlement, but the Global Settlement is clearly reasonable.

48.     The Global Settlement not only is fair and equitable, but it maximizes the value of the Debtors' Estates and therefore should be approved.

## C.    Overview of the Global Settlement Process.

49.     In the initial weeks and months after the commencement of these Chapter 11 Cases, each of the Global Settlement Parties was engaged in value-destructive litigation over the issues resolved in the Global Settlement.  Among other things, the Debtors and their stakeholders filed, objected to, supported, sought to pursue, and/or appealed various pleadings, including:

- *Motion of the Ad Hoc Group of Freedom Lenders for Entry of an Order (I) Terminating Exclusivity in the HoldCo Debtors' Cases, (II) Lifting the Automatic Stay in the HoldCo Debtors' Cases, or (III) Appointing a Chapter 11 Trustee for the HoldCo Debtors* [Docket No. 192];

- *The Ad Hoc Group of Freedom Lender's Emergency Motion for Entry of an Order (I) Adjourning the Second Day Hearing Set Forth on December 10, 2024, (II) Extending*

*the Objection Deadlines in Connection with the Second Day Hearing and (III) Granting Related Relief* [Docket No. 194];

- *Objection of the Ad Hoc Group of Freedom Lenders to Final Approval of the Debtors' DIP Motion* [Docket No. 274];

- *Objection of the Ad Hoc Group of Freedom Lenders to Debtors' Bidding Procedures Motion* [Docket No. 275];

- *Objection of the Ad Hoc Group of Freedom Lenders to Final Approval of The Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing The Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors, Foreign Vendors, Shippers & Logistics Providers and 503(b)(9) Claimants; and (II) Granting Related Relief* [Docket No. 277];

- the appeal of the Final DIP Order in *Freedom Lender Group v. Franchise Group, Inc., et al*, Case No. 24-1404 (D. Del. 2024);

- the appeal of the Critical Vendors Order in *Freedom Lender Group v. Franchise Group, Inc., et al.*, Case No. 24-1403 (D. Del. 2024);

- the appeal of the Bidding Procedures Order in *Freedom Lender Group v. Franchise Group, Inc., et al.*, Case No. 24-1405 (D. Del. 2024);

- the appeal of the Order Denying Exclusivity Termination in *Freedom Lender Group v. Franchise Group, Inc., et al.*, Case No. 24-1394 (D. Del. 2024);

- *Objection of the Ad Hoc Group of Freedom Lenders to the Debtors' Motion to Extend the Deadline to File SOFAS and Schedules* [Docket No. 296];

- *Supplemental Objection of the Ad Hoc Group of Freedom Lenders to Final Approval of the Debtors' DIP Motion* [Docket No. 308];

- *Objection of the Ad Hoc Group of Freedom Lenders to the Debtors' Disclosure Statement Motion* [Docket No. 686];

- *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [Docket No. 855];

- *Objection of the Ad Hoc Group of Freedom Lenders to Debtors' Application for Order Authorizing the Retention and Employment of Willkie Farr & Gallagher LLP as Co-Counsel for the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 885];

- *The Ad Hoc Group of Freedom Lenders' (I) Motion to Adjourn Disclosure Statement Hearing and (II) Supplemental Objection of the Ad Hoc Group of Freedom Lenders to Debtors' Disclosure Statement Motion* [Docket No. 922];

25

- *Motion of OpCo 2L Agent and Ad Hoc Group of Second Lien Lenders for Allowance of a Superpriority Administrative Expense Claim* [Docket No. 978];

- *Objection of the Ad Hoc Group of Freedom Lenders to the Debtors' Exclusivity Extension Motion* [Docket No. 1099];

- *Adversary Complaint by Wilmington Trust, National Association Against Alter Domus (US) LLC, in its Capacity as Administrative Agent and Collateral Agent for the Lenders Under the Second Lien Credit Agreement* [Docket No. 1157]; and

- *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting the Committee, Leave, Standing, and Authority to Commence, Prosecute and Settle Certain Claims on Behalf of the OpCo Debtors' Estates* [Docket No. 1200].

50.    On February 14, 2025, the Debtors engaged Kirkland as co-counsel in these Chapter 11 Cases.   Immediately after Kirkland's engagement, Kirkland held numerous conversations with the Debtors and their stakeholders, including counsel to the Creditors' Committee, counsel to the Freedom Lender Group, counsel to the Ad Hoc Group, and counsel to the ABL Lenders.  These conversations were productive and laid the groundwork for the Global Settlement but did not immediately lead to resolution.

51.    On February 19, 2025, the Court held a hearing to consider approval of the Disclosure Statement, and on February 21, 2025, the Bankruptcy Court entered the Disclosure Statement Order approving the Disclosure Statement and authorizing the Debtors to commence solicitation of the Sixth Amended Plan.  The Freedom Lender Group indicated that it would not vote in favor of the Plan as to the Freedom HoldCo Debtors or the OpCo Debtors on account of their Prepetition HoldCo Loan Claims and Prepetition Second Lien Loan Claims, as applicable. Nonetheless, the Debtors continued to engage with all the Global Settlement Parties in good faith to reach a global resolution, including on the Freedom Lender Group's anticipated objections to Confirmation of the Plan.  The Debtors, as fiduciaries for these Estates, understood that the only responsible path forward (and the only path forward to preserve the Debtors' retail businesses and

approximately 9,000 jobs) was to end the litigation war and confirm a Plan that maximizes value for all stakeholders, including unsecured creditors.

52.     On March 17, 2025, the Debtors held a status conference and announced that the Conflicts Committee and Special Committee were working towards a comprehensive settlement of certain Intercompany Claims, which would result in additional value being allocated to Holders of Claims against the HoldCo Debtors and significant cost savings for all of the Debtors through the resolution of several inter-Debtor disputes, including:  (a) alleged fraudulent transfer claims against the Freedom HoldCo Debtors of approximately $56.6 million; (b) alleged fraudulent transfer claims against TopCo of approximately $54 million; (c) the allocation professional fees between TopCo, Freedom HoldCo Debtors, and the OpCo Debtors; and (d) funding of a Litigation Trust to pursue Claims and Causes of Action for the benefit of creditors.  Over the course of the next several weeks, the Special Committee and the Conflicts Committee met regularly with their advisors, engaged in hard-fought, good-faith negotiations at arm's length, exchanged multiple draft term sheets, held multiple board meetings to discuss and evaluate the terms of a settlement, and met together via video conference.[49]

53.     On March 26, 2025, Mr. Wartell, in his capacity as Freedom HoldCo Independent Director and sole member of the Conflicts Committee issued the Freedom HoldCo Independent Director Report.[50]  Mr. Wartell concluded that the certain Claims and Causes of Action belonging to the Freedom HoldCo Debtors should not be released as of the date thereof, given, among other things, the lack of consideration provided to the Freedom HoldCo Debtors under the Sixth

---

[49]  *See* Meyer Decl. ¶ 31; Wartell Decl. ¶ 25.

[50]  Per the Disclosure Statement, the scope of this investigation includes "Claims or Causes of Action against the Independent Directors, the Consenting First Lien Lenders, Andrew M. Laurence, Andrew F. Kaminsky, Eric Seeton, and Tiffany McMillan-McWaters."  Disclosure Statement § IV.A.vii.

Amended Plan.[51]  Following the release of the Freedom HoldCo Independent Director Report, the Special Committee and Mr. Wartell continued to engage in arm's-length, good-faith negotiations to resolve the open issues between the parties.[52]

54.    After weeks of hard-fought arm's-length negotiations, the Debtors (including the Conflicts Committee and the Special Committee) and the other Global Settlement Parties agreed to a global resolution of certain issues, Claims, and Causes of Action by and between the Global Settlement Parties.  The Global Settlement incorporates the Intercompany Settlement, provides meaningful recoveries to Holders of Prepetition HoldCo Loan Claims and Holders of Prepetition Second Lien Loan Claims, releases Claims and Causes of Action identified as actionable by Mr. Wartell in his report, and resolves the above-mentioned motions, adversary proceedings, and appeals between the Global Settlement Parties.

55.    The Global Settlement should be approved for the reasons described above.  No party objects to approval of the Global Settlement—not even Brian Kahn.  Moreover, all parties in interest received notice of the Global Settlement,[53] going back to the Settlement Notice[54] filed on April 17, the Disclosure Statement Supplement filed on April 25[55] and approved by the Court

---

[51]  *See* Plan Supplement, Ex. J.

[52]  *See* Wartell Decl. ¶ 25.

[53]  *Settlement Notice* AOS-1404; *Eighth Amended Plan* AOS-1451; *Disclosure Statement Supplement* AOS-1451; *Disclosure Statement Supplement Order* AOS-1422.

[54]  *See* Settlement Notice at 1.

[55]  *See* Disclosure Statement Supplement, Ex. 1 at 6 (describing the Global Settlement).

on April 26,[56] and the *Eighth Amended Plan Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates* [Docket No. 1312] (the "Eighth Amended Plan"), filed on April 25.[57]

56.     For the reasons described herein, the Kahn Objection is wrong, and the Plan is confirmable at TopCo because there is no Impaired Class of Claims, and thus section 1129(a)(10) of the Bankruptcy Code is satisfied or inapplicable.[58]  However, to the extent the Court disagrees, the Court should still approve the Global Settlement for all Debtors, including TopCo, as a sound exercise of the Debtors' business judgment (including TopCo's) and should confirm the Plan at the remaining Debtor entities.   Indeed, in *Tribune*, another court in this jurisdiction opined that such a result was permissible.  *See In re Tribune Co.*, 464 B.R. 126, 184 (Bankr. D. Del. 2011). As the *Tribune* court said:  "[A] plan proponent could . . . drop from a proposed joint plan those debtors that do not or cannot meet the § 1129(a)(10) requirement."[59]  In conclusion, even if the Court were to find the Plan is not confirmable at TopCo, the Debtors respectfully request that the Court (i) approve the Global Settlement as a sound exercise of the Debtors' business judgment under the circumstances and (ii) Confirm the Plan at all Debtors other than TopCo.

---

56    *See* Disclosure Statement Supplement Order.

57    *See* Eighth Amended Plan, Art. XV ("The Global Settlement is integral to the development and implementation of this Plan. The Plan, taken together with the Disclosure Statement and Disclosure Statement Supplement, shall serve as a motion to approve the Global Settlement, including, for the avoidance of doubt, approval of the releases provided by the Freedom HoldCo Debtors with respect to any Claims or Causes of Action previously identified or preserved by the Freedom HoldCo Independent Director, pursuant to Bankruptcy Rule 9019.").

58    *See infra* Argument § II.A.

59    *Id.*

## II.        Response to Outstanding Objections to Confirmation of the Plan.

57.        Certain parties in interest objected to Confirmation of the Plan.[60]  These Objections are without merit and should be overruled.

### A.        The Kahn Objection Should Be Overruled.

58.        Brian Kahn and Lauren Kahn as joint tenants by the entirety (collectively, and in their capacities as such, the "Kahns") filed the Kahn Objection.  The Kahn Objection provides that (a) the Plan fails to satisfy the best interests test of section 1129(a)(7) of the Bankruptcy Code at TopCo, and (b) the Plan fails to satisfy section 1129(a)(10) of the Bankruptcy Code at TopCo.[61] The Kahn Objection is without merit and should be overruled.

59.        The best interests test requires that holders of impaired claims receive the same or more than they would under a hypothetical chapter 7 liquidation.[62]  The Plan satisfies the best interests test and, thus, section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis demonstrates that Holders of Claims in Class 8-C (if any) would receive the same recovery— nothing—under a hypothetical chapter 7 liquidation.[63]  Assertions to the contrary are wrong, and the Kahn Objection should be overruled.

60.        The Kahn Objection provides that the Final DIP Order (a) caps the liability of TopCo to the new money portion of the DIP and (b) provides that the assets of TopCo are third in

---

[60]  A chart overviewing the informal objections and their resolutions is attached hereto as **Exhibit A**.

[61]  *See* Kahn Obj. ¶¶ 7–8.

[62]  *See* 11 U.S.C. § 1129(a)(7).

[63]  *See* Kopa Decl. ¶ 24 ("Recoveries under the Liquidation Analysis were compared to recoveries under the Plan to demonstrate that each holder of a claim or interest in an impaired class will receive at least as much, if not more, under the Plan as such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.").

line to satisfy DIP Claims.[64]  This is correct,[65] but that fact does not support a recovery to equity. Under the Final DIP Order, DIP Claims take priority over equity interests.[66]  The Liquidation Analysis provides that in a hypothetical chapter 7 liquidation, Holders of DIP Claims would be impaired and would only recover approximately 4.3–4.4% on account of their DIP Claims from TopCo.[67]  Put differently, ***even after the DIP Lenders received all the proceeds*** they were entitled to ***from all other entities***, they would ***still be impaired***.[68]  Therefore, with respect to TopCo, Holders of DIP Claims are still entitled to be paid ahead of Holders of Claims in Class 8-C (if any), and further ahead of holders of Existing TopCo Equity Interests, because of their priority status.[69] All of the assets of TopCo would have to be used to satisfy the DIP Claims in a hypothetical chapter 7.

61.    Even if the Kahns were correct that the DIP Claims could not recover against TopCo (the DIP Claims would) in a hypothetical chapter 7, they seem to disregard the other claims standing in their way to an equity recovery.  One of the many benefits of the Global Settlement is that it resolves professional fee allocation issues and intercompany litigation claims among the Debtors.  Absent the Global Settlement and in a chapter 7 liquidation, the OpCo and HoldCo

---

[64]  *See* Kahn Obj. ¶¶ 39–40.

[65]  *See* Final DIP Order ¶¶ (a), 33.  Note, the Kahn Objection provides that TopCo is liable only for $250 million in New Money DIP Loans.  *See* Kahn Objection at ¶ 39.  That is incorrect.  Pursuant to the DIP Order, TopCo guaranteed the full amount of New Money DIP Loans, including any associated "interest, fees, reimbursement, indemnity and other amounts owed in respect thereof."  Final DIP Order ¶¶ 2(b).  Thus, TopCo is obligated with respect to the New Money DIP Loans for approximately $283 million in DIP Obligations.

[66]  *See id.*, Ex. 2.

[67]  *See* Kopa Decl. ¶ 27.

[68]  *See id.*

[69]  *See* Final DIP Order, Ex. 2.

Debtors would have asserted—and did assert in the intercompany settlement negotiations—Claims against TopCo.  In particular, TopCo would face Claims for its share of the professional fees, estimated to be approximately $12.1 million, of the cases and fraudulent transfer claims related to the Cash at TopCo that the Kahns now seek to recover on account of their prepetition equity.

62.    The Kahns are mistaken that the Plan does not satisfy section 1129(a)(7) of the Bankruptcy Code, because Holders of Existing TopCo Equity Interests are no worse off than they would be under a hypothetical chapter 7 liquidation.

63.    The Kahn Objection also asserts that the Plan fails to satisfy section 1129(a)(10) of the Bankruptcy Code with respect to TopCo by arguing that there is no impaired accepting class of claims.[70]  The Kahns are wrong again.  The starting point of any statutory analysis is the text of the statute.[71]  "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'"[72]  The text of section 1129(a)(10) reads, in relevant part, "*[i]f a class of claims is impaired under the plan*, at least one class of claims that is impaired under the plan has accepted the plan . . . ."[73]  The plain meaning of the text is clear that an impaired class of claims under the plan must accept, *if a class of claims is impaired under the plan*.  To the extent that no "class of claims" is impaired, then section 1129(a)(10) is satisfied or inapplicable.[74]

---

[70]    *See* Kahn Obj. ¶ 44.

[71]    *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text . . . ." (citations omitted)).

[72]    *Id.* (citations omitted).

[73]    11 U.S.C. § 1129(a)(10) (emphasis added).

[74]    *See In re PolarityTE, Inc.*, No. 23-22358 (KRA), 2025 WL 310866, at *5 (Bankr. D. Utah Jan. 27, 2025).

64.     Section 1129(a)(10) specifically references a "class of claims."[75]   "[C]laim" is defined under section 101 of the Bankruptcy Code as either a "right to payment" or a "right to an equitable remedy."[76]   Importantly, under the Bankruptcy Code, "claims" are a distinct concept from "interests."[77]   Under this distinction an "equity security" is not a "right to payment" or a "claim," but rather an "interest."[78]   Thus, taken together, section 1129(a)(10) **only applies** if a "class of claims," as opposed to a "class of interests," including a class of "equity securities," is impaired.

65.     Therefore, section 1129(a)(10) is satisfied if a plan only has classes of claims that are "deemed to accept," even if there is a class of interests that is "deemed to reject."   Indeed, the court in *In re PolarityTE, Inc.* held exactly this.[79]   In *Polarity.*, all classes of claims were deemed to accept the plan.[80]   The only class that was impaired was a class of equity interests that was deemed to reject.[81]   When discussing section 1129(a)(10) the *Polarity* court said:  "The Debtors' Plan has no impaired Classes of Claims besides the Class 4 Equity Interests.   The accepting-

---

[75]  11 U.S.C. § 1129(a)(10).

[76]  11 U.S.C. § 101(5).

[77]  *See In re Insilco Techs., Inc.*, 480 F.3d 212, 217 (3d Cir. 2007) ("In the Bankruptcy Code, the distinction between creditors (who hold 'claims' against the estate) and equity investors (who hold 'interests' in the estate) is important, for holders of claims receive much more favorable treatment than holders of interests.").

[78]  *See id.* at 218 ("Equity investment brings not a right to payment, but a share of ownership in the debtor's assets— a share that is subject to all of the debtor's payment obligations.").

[79]  *See In re PolarityTE, Inc.*, 2025 WL 310866, at *5 ("[T]he Debtors' Plan has no impaired Classes of Claims besides the Class 4 Equity Interests.  The accepting-impaired class requirement does not apply to classes of equity. Therefore, [section 1129(a)(10)] is met or inapplicable.").

[80]  *See id.* at *2.

[81]  *See id.*

33

impaired class requirement does not apply to classes of equity.  Therefore, this requirement is met or inapplicable."[82]  The *Polarity* court subsequently confirmed the debtors' plan.[83]

66.    Applying the text of the Bankruptcy Code and *Polarity* to our facts yields the same result.  At TopCo, there are a limited number of classes of Claims or Interests.  Classes 1 and 2 are deemed to accept the Plan, like in *Polarity*.  Class 11, a class of **interests** as opposed to a class of **claims**, is deemed to reject, which per *Polarity* does not affect the analysis under 1129(a)(10).[84] This leaves only Class 8-C, where there are no Claims.[85]  Even the Kahns admit this: "[T]here were no anticipated prepetition claims against TopCo."[86]  The Kahns admit that the Debtors were consistent on this fact in all prior filings:  "Consistent with the TopCo Schedules, all versions of the Debtors' disclosure statement that accompanied the prior iterations of their proposed plan that classified TopCo General Unsecured Claims projected there being $0 of such claims."[87]  In fact, this conclusion is necessary to their strained effort to recover on their equity interests, while multiple classes of senior creditors ahead of them are impaired.  Thus, Class 8-C is irrelevant for purposes of section 1129(a)(10) of the Bankruptcy Code at TopCo.[88]  Therefore, under the

---

[82]    *Id.* at *5.

[83]    *See id.*

[84]    *See id.* ("The accepting-impaired class requirement does not apply to classes of equity.").

[85]    Orlofsky Decl. ¶ 54.

[86]    Kahn Obj. ¶ 16, n.6.

[87]    *Id.* ¶ 18 (citations omitted).

[88]    Pursuant to Article 6.5 of the Plan, inasmuch as Class 8-C is not occupied as of the commencement of the Confirmation Hearing by any Claims or Equity Interests that are eligible to vote, the Class shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan or for purposes of determining acceptance or rejection of the Plan.  *See* Plan Art. 6.5.

Bankruptcy Code and *Polarity*, section 1129(a)(10) of the Bankruptcy Code is satisfied or inapplicable with respect to TopCo.

67.    Accordingly, the Kahns are incorrect that the Plan cannot be confirmed at TopCo because it does not satisfy section 1129(a)(10) of the Bankruptcy Code. Therefore, neither of the two bases of the Kahn Objection has any merit, and it should be overruled.

68.    In any event, the Plan constitutes a separate request for approval of the Global Settlement under Bankruptcy Rule 9019. For the reasons stated above, the Global Settlement should be approved independent of any confirmation issues with respect to the Plan. Therefore, even if the Court were to find that the Plan is not confirmable as to TopCo—though the Debtors submit that it is confirmable, as described herein—the Court should still approve the Global Settlement as to TopCo for the reasons described above.

### B.    The Objection from Buddy Mac Holdings, LLC and Affiliates Should Be Overruled.

69.    Buddy Mac Holdings, LLC and its subsidiaries (collectively, "BMH") filed the BMH Objection, which should be overruled in its entirety.[89] Among other things, BMH argues: (a) the Plan's impermissibly provides for the cure of all defaults, even those defaults that are incurable;[90] (b) the Plan was not properly solicited;[91] and (c) a litany of cure and adequate assurance arguments that will be resolved post-emergence and are not relevant for Confirmation.

70.    Among other things, BMH argues that the Plan was not properly solicited because the Disclosure Statement estimated a recovery to Holders of Class 6 OpCo General Unsecured

---

[89]  *Objection of Buddy Mac Holdings, LLC and Affiliates to (I) Confirmation of Chapter 11 Plan, (II) Adequate Assurance of Future Performance, (III) Proposed Rejection of Contracts and Leases, and (IV) Reservation of Rights* [Docket No. 1435].

[90]  *See id.* ¶ 78.

[91]  *See id.* ¶ 85.

Claims of approximately 1.0% and the Disclosure Statement Supplement estimated a recovery to Holders of Class 6 General Unsecured Claims of approximately 0.75%. As provided in both the Disclosure Statement and the Disclosure Statement Supplement, estimated recoveries did not include any recoveries on account of pursuit of Permitted Litigation Claims, and the decrease in estimated recoveries was a result of additional accrued fees from the Creditors' Committee due to the passage of time. Even if BMH were correct the change from 1% to a number that rounds to 1% is not material.[92]

71.     Specifically, and contrary to the BMH Objection, any risk of a decrease tied to the General Unsecured Creditors Litigation Trust Allocation was clearly disclosed in the Disclosure Statement Supplement, which states that "holders of Litigation Trust Units may not receive any recoveries from the Litigation Trust on account of the Permitted Litigation Claims. ***Beneficiaries of the Litigation Trust should read § II. Risk Factor Relating to the Litigation Trust and Potential Recoveries of this Disclosure Statement Supplement for additional information***."[93] The Disclosure Statement Supplement further warns, under the section "Risk Factor Relating to the Litigation Trust and Potential Recoveries," of the risk that Holders of Allowed General Unsecured Claims "would not receive any proceeds on account of such Permitted Litigation Claims, and, as a result, may not receive any distribution under the Plan if, among other things, the Litigation Trust Funding is exhausted and/or if the Permitted Litigation Claims are not successfully pursued," and advises that "*[f]or purposes of voting on the Plan*, Holders of Claims entitled to receive Litigation Trust Units should assume they will not receive any distributions

---

[92]   *See* Disclosure Statement Supplement at 14.

[93]   Disclosure Statement Supplement at 9.

from the Litigation Trust on account of their Litigation Trust Units."[94]  Similarly, the Disclosure Statement advised of the risk that Holders of General Unsecured Claims may not receive any distributions from the trusts therein described.[95]

### C.    The Resolution of Cure Objections after the Effective Date Is Proper.

72.    The Debtors received several formal and informal objections[96] relating to the Debtors' proposed cure amounts with respect to Executory Contracts and Unexpired Leases to be assumed as identified in the First Amended Plan Supplement.[97]  Certain objecting parties believe that the proposed cure amount is incorrect and must be corrected before such contract or lease may be assumed.  Certain franchisees also assert that their franchise agreements are unassumable as a result of an alleged incurable default.  The Debtors intend to work with the various parties on their cure disputes in an effort to reach a consensual resolution.  To the extent the Debtors and the contract counterparties are unable to reach a consensually resolution on these cure-related matters, the Debtors may seek relief from the Court and all parties rights are reserved with respect thereto. To the extent that the Debtors are unable to consensually resolve the proposed cure amount, the Debtors will schedule a hearing to have the matter heard before the Court.[98]

---

[94]    *Id.* at 16–17 (emphasis added).

[95]    *Disclosure Statement for the Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1014], Articles XI, XIV(M)(i).  The Debtors will continue to work with BMH post-confirmation to address their assumption and cure related issues and all parties' rights are reserved with respect thereto.  However, such issues should not be an obstacle to Confirmation of the Plan for the reasons provided herein.

[96]    A detailed description of all objections to the Plan can be found on **Exhibit A**, attached hereto.

[97]    First Amended Plan Supplement, Ex. F.

[98]    Pursuant to Article 10.2 of the Plan, "In the event that a non-Debtor contract counterparty Files a timely Cure Dispute and the Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard on at least seven (7) days' notice to the applicable non-Debtor contract counterparty, or such date as the parties agree, subject to the Bankruptcy Court's calendar."

73.     Courts in this district and others often resolve cure objections post-confirmation.[99] Accordingly, the Debtors submit that these objections are properly post-confirmation matters and should not delay confirmation of the Plan.

## III.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed.

74.     To confirm the Plan, the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[100] As described herein, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law.  The Plan far exceeds the preponderance of evidence standard set forth in the Bankruptcy Code and will be further supported by evidence that will be submitted at the Confirmation Hearing.  The Debtors thus respectfully request that the Bankruptcy Court confirm the Plan.

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

75.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[101]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the

---

[99]  *See, e.g.*, *In re Accuride Corp.*, No. 24-12289 (JKS), ¶58 (Bankr. D. Del. Feb. 12, 2025), ECF No. 704 ("[I]f a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved."); *In re SunPower Corp.*, No. 24-11649 (CTG), ¶43 (Bankr. D. Del. Oct. 18, 2024), ECF No. 872 (allowing for payment of cure costs "as soon as reasonably practicable" after the effective date); *In re MVK FarmCo LLC*, No. 23-11721 (LSS), ¶41 (Bankr. D. Del. Mar. 29, 2024), ECF No. 858 (same).

[100]  *See Nat'l Union Fire Ins., Co. of Pittsburgh, Pa. v. Boy Scouts of Am. & Del. BSA, LLC (In re Boy Scouts of Am. & Del. BSA, LLC)*, 650 B.R. 87, 157 (D. Del. 2023); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119–20 (Bankr. D. Del. 2006).

[101]  11 U.S.C. § 1129(a)(1).

content of a plan of reorganization, respectively.[102]  As explained below, the Plan complies with

the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other

applicable provisions.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

76.    The classification requirement of section 1122(a) of the Bankruptcy Code provides,

in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a
> claim or an interest in a particular class only if such claim or interest is
> substantially similar to the other claims or interests of such class.[103]

77.    Consistent with the text of this provision, claims or interests in a particular class

must be "substantially similar" to the other claims or interests in such class.[104]  Section 1122(a),

however, does not require all substantially similar claims or interests to be grouped together in the

same class.[105]  In fact, courts have long held that plan proponents have significant discretion to

place substantially similar claims in separate classes so long as the plan proponent identifies a

"rational" or "reasonable" basis for such separate classification.[106]  Multiple grounds can justify

---

[102] S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (quoting *In re S&W Enters.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.")).

[103] 11 U.S.C. § 1122(a).

[104] *See, e.g.*, *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060 (3d Cir. 1987) ("The express language of [section 1122] explicitly forbids a plan from placing dissimilar claims in the same class . . ."); *In re Maremont Corp.*, 601 B.R. 1, 15 (Bankr. D. Del. 2019) ("As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within such Class.").

[105] *See Jersey City Med. Ctr.*, 817 F.2d at 1061 ("[W]e agree with the general view which permits the grouping of similar claims in different classes.").

[106] *See, e.g.*, *In re Armstrong*, 348 B.R. at 159 (holding that separate classification is appropriate where a reasonable basis exists for the structure and the claims or interests within each particular class are substantially similar); *Jersey City Med. Ctr.*, 817 F.2d at 1061 (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *John Hancock Mut. Life Ins. Co. v.*

separate classification, including where the Debtors have valid business reasons for classification[107] and where members of a class possess different legal rights from similar claimants, such as creditors with claims against different property[108] or with different priority liens against the same property.[109]

78.    The Plan's classification of Claims and Equity Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity Interests into separate Classes, with Claims and Equity Interests in each class differing from the Claims and Equity Interests in each other class in a legal or factual way or based on other relevant criteria.[110]

79.    In general, the Plan's classification scheme follows the Debtors' capital and corporate structure.  For example, debt and equity are classified separately, and secured and

---

*Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (holding that a classification scheme is proper as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *13 (Bankr. D. Del. May 13, 2010) (holding that separate classification is proper when "reasonable and necessary for administrative convenience"); *In re Lightsquared Inc.*, 513 B.R. 56, 82–83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit . . . have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Idearc, Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009) ("Decisions interpreting section 1122(a) generally uphold separate classification of different groups of unsecured claims when a reasonable basis exists for the classification." (citations omitted)); *In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("[A] plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar.").

[107]    *See In re Aegerion Pharms., Inc.*, 605 B.R. 22, 35 (Bankr. S.D.N.Y. 2019) (approving a chapter 11 plan where similar claims were classified differently for a legitimate business reason).

[108]    *See In re Smith*, 388 B.R. 603, 609 (Bankr. E.D. Pa. 2008) (citing *Brady v. Andrew* (*In re Com. W. Fin. Corp.*), 761 F.2d 1329, 1338 (9th Cir. 1985) ("[C]reditors with claims against different properties generally are entitled to separate classification." (citations omitted))).

[109]    *See In re Richard Buick, Inc.*, 126 B.R. 840, 853 (Bankr. E.D. Pa. 1991) ("[M]any courts have concluded that secured creditors may not be classified together when they have liens in different property, or possess liens of different priority in the same property, since their respective legal rights are not substantially similar." (citing *In re Jersey City Med. Ctr.*, 817 F.2d at 1060)).

[110]    *See* Plan, Art. IV.

unsecured Claims are classified separately.  Class 1 Priority Non-Tax Claims and Class 2 Other Secured Claims are classified separately due to their required treatment under the Bankruptcy Code.[111]  Class 3 Prepetition ABL Loan Claims, Class 4 Prepetition First Lien Loan Claims, Class 5 Prepetition Second Lien Loan Claims, and Class 7 Prepetition HoldCo Loan Claims are classified in their own Classes to account for certain legal rights such Holders of those Claims have under their prepetition credit agreements, including their secured status, and, in some cases, different collateral, as well as existing intercreditor agreements, including the Existing ABL Intercreditor Agreement and the Existing First Lien/Second Lien Intercreditor Agreement, in accordance with section 510 of the Bankruptcy Code.[112]  Class 6 OpCo General Unsecured Claims, Class 8-A Freedom HoldCo General Unsecured Claims, Class 8-B HoldCo Receivables General Unsecured Claims, and Class 8-C TopCo General Unsecured Claims are classified separately because of the Debtors' corporate structure and the corresponding nature of such Claims. In addition, Interests are classified separately between Class 11 and Class 12 because Existing TopCo Equity Interests and Existing Intercompany Equity Interests have different legal rights and Existing TopCo Equity Interests are held by certain Debtor entities instead of third parties.

80.    The Plan separately classifies the Claims and Equity Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.  For example, the classification scheme

---

[111]  *See* 11 U.S.C. § 507; 4 Collier on Bankruptcy ¶ 507.02[1] ("The structure of the Bankruptcy Code reflects a decision by Congress to prefer certain categories of claims over other categories of claims.").

[112]  *See* 11 U.S.C. § 510(a); *Ad Hoc Grp. of Second Lien Creditors v. LNV Corp. (In re La Paloma Generating Co. LLC)*, 609 B.R. 80, 95 n.30 (D. Del. 2019) (holding that plan providing for enforcement of intercreditor agreement is consistent with the Bankruptcy Code); 4 Collier on Bankruptcy ¶ 510.03[1] ("Bankruptcy courts have jurisdiction to enforce . . . inter-creditor agreements . . . .").

distinguishes Holders of Prepetition First Lien Loan Claims (Class 4) from Holders of Prepetition Second Lien Loan Claims (Class 5) because of the different circumstances of each Class and the relative priority of their Claims against the Debtors.

81.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal reasons.  The Plan fully complies with and satisfies section 1122(a) of the Bankruptcy Code.

### a.     *The Classification of Claims and Equity Interests Under the Plan Is Not Designed to Gerrymander Votes.*

82.     Section 1129(a)(10) of the Bankruptcy Code requires that, if any class of claims is impaired under a chapter 11 plan, at least one such impaired class must vote to accept the plan for it to be confirmed.[113]   The primary concern with a debtor's classification scheme is whether the debtor's classes were designed solely to gerrymander votes to guarantee an impaired accepting class to satisfy section 1129(a)(10) of the Bankruptcy Code.[114]

83.     Here, no party challenges whether the Claims or Interests in Classes 3, 4, 5, 6, 7, 8-A, 8-B, or 8-C are appropriately classified, and the Debtors' classification scheme is appropriate because it is not designed to gerrymander an Impaired accepting vote on the Plan.

---

[113]  *See* 11 U.S.C. § 1129(a)(10); *Nantucket Invs. II v. Cal. Fed. Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 209 n.18 (3d Cir. 1995) ("Where the debtor cannot secure the acceptance of all classes of impaired claims, the Bankruptcy Code permits the confirmation of a plan over the objections of impaired classes under certain conditions through a procedure known as a cram down." (citations omitted)).

[114]  *See John Hancock*, 987 F.2d at 159 ("[W]here . . . the sole purpose and effect of creating multiple classes is to mold the outcome of the voting, it follows that the classification scheme must provide a reasonable method for counting votes.  In a 'cram down' case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed.  Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10)."); *W. Real Est. Equities, L.L.C. v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 247 (5th Cir. 2013) ("[I]n [*Greystone*] we held that a plan proponent cannot gerrymander creditor classes *solely* for purposes of obtaining the impaired accepting class necessary to satisfy § 1129(a)(10). . . . *Greystone* does not stand for the proposition that a court can ride roughshod

### 2. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

84.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.[115]  The Plan satisfies each of these requirements.

### a. *Designation of Classes of Claims and Equity Interests and Specification of Unimpaired Classes (§ 1123(a)(1)–(2)).*

85.     Section 1123(a)(1) requires that the Plan designate "classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interest."[116]  Section 1123(a)(2) requires that the Plan "specify any class of claims or interests that is not impaired under the plan."[117]  For the reasons set forth above, Article IV of the Plan properly designates Classes of Claims and Equity Interests and identifies each Class of Claims or Interests that is not Impaired under the Plan.[118]

### b. *Treatment of Impaired Classes (§ 1123(a)(3)).*

86.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."[119]  The Plan satisfies this requirement by setting forth the treatment of each Class that is Impaired in Article V.[120]

---

over affirmative language in the Bankruptcy Code to enforce some Platonic ideal of a fair voting process." (emphasis added)).

[115]   *See* 11 U.S.C. § 1123(a).  Section 1123(a)(8) is applicable only to individual debtors.

[116]   11 U.S.C. § 1123(a)(1).

[117]   11 U.S.C. § 1123(a)(2).

[118]   *See* Plan, Art. IV.

[119]   11 U.S.C. § 1123(a)(3).

[120]   *See* Plan, Art. V.

### c.    *Equal Treatment Within Classes (§ 1123(a)(4)).*

87.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[121]  "Equality of distribution among creditors is a central policy of the Bankruptcy Code."[122]  A plan provides equal treatment if:  (a) all class members are subject to the same process for claim satisfaction; (b) all class members' claims are of "equal value" through the application of the pro rata distribution or payment percentage procedures to all claims; and (c) all class members give up the same degree of consideration for their distribution under the plan.[123]  The Bankruptcy Code does not require perfect or precise equality, only approximate equality.[124]

88.    The Plan satisfies this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.

### d.    *Means for Implementation (§ 1123(a)(5)).*

89.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[125]  The Plan satisfies this requirement because Article VII of the Plan, as well as other provisions thereof, provides for the means by which the

---

[121]  11 U.S.C. § 1123(a)(4).

[122]  *Begier v. IRS*, 496 U.S. 53, 58 (1990).

[123]  *In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2025), *aff'd*, 729 F.3d 311 (3d Cir. 2013) (citations omitted).

[124]  *Id.*

[125]  11 U.S.C. § 1123(a)(5).

Plan will be implemented,[126] including, among other things, the Plan Equitization Transaction,[127] the Partial Sale Transaction,[128] the sources for cash distributions under the Plan,[129] the Take-Back Debt Facility,[130] the Reorganized Debtors' ownership,[131] the Litigation Trust,[132] the cancellation of existing securities and agreements,[133] and the Global Settlement.[134]

90.    The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplements. The Debtors submit that the Plan sets forth adequate means for its implementation and satisfies section 1123(a)(5) of the Bankruptcy Code.

**e.    *Issuance of Non-Voting Securities (§ 1123(a)(6)).***

91.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[135] The Corporate Governance Term Sheet, filed with the First Amended Plan Supplement, provides only for the issuance of voting equity securities.[136] Further, the Plan provides that the New Organizational

---

[126] *See generally* Plan, Art VII (listing 22 separate means for implementation of the Plan).

[127] *See id.*, Art. 7.2.

[128] *See id.*, Art. 7.3.

[129] *See id.*, Art. 7.6.

[130] *See id.*, Art. 7.7.

[131] *See id.*, Art. 7.9.

[132] *See id.*, Art. 7.10.

[133] *See id.*, Art. 7.15.

[134] *See id.*, Art. 7.20.

[135] 11 U.S.C. § 1123(a)(6).

[136] First Amended Plan Supplement, Ex. A(i), New Common Units.

Documents will be deemed to be modified to prohibit (and will include a provision prohibiting) the issuance of non-voting equity securities, pursuant to and solely to the extent required under section 1123(a)(6) of the Bankruptcy Code.[137]   Thus, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.  No party has asserted otherwise.

### f.    *Directors and Officers (§ 1123(a)(7)).*

92.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto be "consistent with the interests of creditors and equity security holders and with public policy."[138] Pursuant to Article 7.16 of the Plan, as of the Effective Date, "the members of each of the Boards shall be deemed to have resigned from such Board."[139]   The Debtors will disclose the identities and affiliations of the members of the New Board, as applicable, the officers of the Reorganized Debtors, if any, and other information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code prior to the Effective Date of the Plan.  From and after the Effective Date, each member of the New Board and each officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

93.    The selection of the members of the New Board is consistent with the interests of all Holders of Claims and Equity Interests and public policy.  Accordingly, the Plan satisfies the requirements of 1123(a)(7) of the Bankruptcy Code.

---

[137]  Plan, Art. 7.12.

[138]  11 U.S.C. § 1123(a)(7).

[139]  Plan, Art. 7.16.

B.      **The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

1.      **Overview of the Plan's Compliance with Section 1123(b) of the Bankruptcy Code.**

94.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the Estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.[140]

95.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article IV of the Plan, Classes 1, 2,  and, potentially, 9 and 12, are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims and Equity Interests within such Classes.[141]  On the other hand, Classes 3, 4, 5, 6, 7, 8-A, 8-B, 10, and 11 and, potentially, 9 and 12 are Impaired since the Plan modifies the rights of the Holders of Claims and Equity Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[142]

---

[140]   *See* 11 U.S.C. § 1123(b)(1)–(3), (6).

[141]   *See* Plan, Art. IV.

[142]   *See id.*

96.     In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article X of the Plan provides for the assumption of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code, except to the extent set forth in the Plan.[143]

97.     The Plan provides for a general settlement of all Claims and Equity Interests pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, as described in greater detail herein.[144]   Accordingly, the Plan's discretionary general settlement provisions satisfy the requirements of section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

**2.     The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

98.     As is customary in large, complex chapter 11 cases, the Plan contains release, exculpation, and injunction provisions.[145]   These provisions comply with the Bankruptcy Code, because, among other things, they are the product of extensive good-faith, arm's-length negotiations between the Debtors, the Releasing Parties, and the Released Parties and were material inducements for the parties to enter the Global Settlement.[146]   Moreover, the overwhelming approval of the Plan by the Debtors' stakeholders and the election to opt in to the Third-Party Release strongly support the conclusion that the release and exculpation provisions are appropriate.[147]   Additionally, these provisions are fair, reasonable, and in the best interests of the Debtors and their Estates, and are consistent with the Bankruptcy Code and applicable

---

[143]  *See id.*, Art. X.

[144]  *See supra* Argument § I.

[145]  *See generally* Plan, Art. 12.2–12.4, 12.6 (containing the various release, exculpation, and injunction provisions).

[146]  *See* Wartell Decl. ¶ 18-27; Meyer Decl. ¶ 30-37.

[147]  *See* Voting and Opt-In Report ¶ 14.

precedent.  Accordingly, and as set forth more fully below, the Debtors respectfully request that the Bankruptcy Court approve the Plan's release, exculpation, and injunction provisions.

99.    Furthermore, these provisions were conspicuously disclosed to all parties in interest through the Ballots,[148] the Plan,[149] the Disclosure Statement,[150] the Disclosure Statement Supplement,[151] and the Publication Notice,[152] which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.  In addition, the Ballots include in bolded frame an explanation in plain English that (a) Holders of Claims would be deemed to have released whatever claims they may have against various parties if the Holder checks the box to opt in and (b) that a Holder's decision to opt in will not affect its distribution under the Plan.

### a. *The Debtor Release Is Appropriate.*

100.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[153]    Further, a debtor may release claims under section 1123(b)(3)(A) of the

---

[148]  *See* Disclosure Statement Order Exs. 3-A, 3-B, 3-C, 3-D, 3-E, 3-F, 3-G, 3-H, and 3-I.

[149]  *See* Plan Art. XII.

[150]  *See* Disclosure Statement § III.K.

[151]  *See* Disclosure Statement Supplement at 10–11.

[152]  *See Affidavit* [Docket No. 1030].

[153]  11 U.S.C. § 1123(b)(3)(A); *see also In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 772 (Bankr. D. Del. 2018) ("The standards for approving settlements under Rule 9019 or as part of a plan are the same."). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "falls below the lowest point in the range of reasonableness." *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. at 78 (internal quotation marks and citations omitted); *In re Capmark Fin. Grp. Inc.*, 438 B.R. at 515 (same); *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (same); *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (same); *In re World Health*, 344 B.R. at 296 (stating that settlement must be within reasonable range of litigation possibilities).

Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[154]

101.    In determining whether a debtor release is proper, courts in this jurisdiction and elsewhere generally analyze the following five factors, commonly known as the *Zenith* or *Master Mortgage* factors:[155]

      a.    whether the non-debtor has made a substantial contribution to the debtor's reorganization;

      b.    whether the release is essential to the debtor's reorganization;

      c.    agreement by a substantial majority of creditors to support the release;

      d.    identity of interest between the debtor and the third party; and

      e.    whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[156]

These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining the fairness of a debtor's releases.[157]

---

[154] *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate." (internal citations omitted)).

[155] *See In re Indianapolis Downs, LLC.*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 936–37 (Bankr. W.D. Mo. 1994).

[156] *See, e.g.*, *In re Spansion*, 426 B.R. at 143 n.47; *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017); *In re Indianapolis Downs*, 486 B.R. at 303; *Su v. Offshore Inv. Ltd. (In re Vantage Drilling Int'l)*, 603 B.R. 538, 539 n.5 (D. Del. 2019) ("[A] release requires consideration of, *inter alia*, whether the released party has made a 'substantial contribution' of assets to the reorganization, and whether the release is essential to the success of the reorganization" (citing *id.*)).

[157] *See, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. at 365; *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (same).

102.     Article 12.2 of the Plan provides for releases by the Debtors, as of the Effective Date, of, among other things, certain claims, rights, and causes of action that the Debtors and the Reorganized Debtors may have against the Released Parties (the "Debtor Release").[158] The Debtors filed, concurrently with this Memorandum, the Meyer Declaration and Wartell Declaration, both of which support the need for the Debtor Release.[159]  The Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release satisfies the applicable standard because it is fair, reasonable, and the product of arm's-length negotiations, was critical to obtaining support for the Plan and the Global Settlement from various

---

[158] Article 1.191 of the Plan defines "Released Parties" as, collectively, and each solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Ad Hoc Group; (d) the DIP Agent and each DIP Lender; (e) the First Lien Credit Agreement Agent; (f) the Second Lien Credit Agreement Agent and the HoldCo Credit Agreement Agent; (g) Consenting First Lien Lenders; (h) the Creditors' Committee and each of its members solely in their capacities as members of the Creditors' Committee; (i) the members of the Freedom Lender Group; (j) the officers (including, without limitation, the CRO), directors (including, without limitation the Independent Directors), management, employees, and advisors of the Debtors who are retained by the Debtors as of the Confirmation Date (including Andrew M. Laurence, Andrew F. Kaminsky, Eric Seeton, and Tiffany McMillan-McWaters); (k) the former employees and directors of the Debtors that were terminated without cause between February 3, 2025 and the Effective Date of the Plan; (l) all Estate Professionals retained as of the Confirmation Date; (m) all Holders of Claims that elect to opt in to the Third-Party Release contained in the Plan; (n) all Holders of Equity Interests that elect to opt in to the Third-Party Release contained in the Plan; and (o) each Related Party of each Entity in clause (a) through clause (n); provided that, notwithstanding the foregoing, Released Parties shall not include:  (i) former directors of the Debtors, other than those terminated without cause between February 3, 2025 and the Effective Date; (ii) former employees, including officers of the Debtors other than those terminated without cause between February 3, 2025 and the Effective Date; (iii) Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, and each of their respective Affiliates and Related Parties (other than any of the officers, directors, or employees of the Debtors that are retained or employed by the Debtors as of the Confirmation Date) (provided that none of Bryant Riley, B. Riley Financial, Inc., and B. Riley Receivables II, LLC, shall be deemed Affiliates or Related Parties of the Debtors for purposes of this proviso); (iv) Brian Kahn, Lauren Kahn, Vintage Capital Management LLC, Prophecy Asset Management LP, and each of their respective Affiliates and Related Parties (other than any of the officers, directors, or employees of the Debtors that are retained or employed by the Debtors as of the Confirmation Date) (provided that none of Brian Kahn, Lauren Kahn, Vintage Capital Management LLC, and Prophecy Asset Management LP, shall be deemed Affiliates or Related Parties of the Debtors for purposes of this proviso); and (v) any advisors previously retained by the Debtors that are not retained as of the Confirmation Date (including, without limitation, (A) WFG, (B) Troutman Pepper Locke LLP, (C) Wachtell, Lipton, Rosen & Katz, and (D) Jefferies, LLC, and each of their respective members, partners, employees, consultants, contractors, financial or other advisors, Affiliates, or Related Parties (provided that none of WFG, Troutman Pepper Locke LLP, Wachtell, Lipton, Rosen & Katz, and Jefferies, LLC shall be deemed Affiliates or Related Parties of the Debtors for purposes of this proviso)) (the parties listed in (i) through (v) of this proviso, collectively, the "Excluded Parties").

[159] See Meyer Decl. ¶¶ 29-37; Wartell Decl. ¶¶ 18-28.

constituencies and is in the best interests of the Debtors' Estates.  Indeed, the Debtor Release was negotiated in connection with the other terms of the Plan and the Global Settlement and is an indispensable component to achieving final resolution of potential disputes that would otherwise negatively affect these Chapter 11 Cases, all stakeholders, and the available recoveries under the Plan.

103.    **First**, each Released Party has contributed to the reorganization of the Debtors' Estates.  As Delaware bankruptcy courts have recognized, a wide variety of acts may illustrate a material contribution to a debtor's reorganization.[160]  The Released Parties played an integral role in the formulation of the Plan and contributed to the Plan not only by expending significant time and resources analyzing the issues facing the Debtors and negotiating the terms of a comprehensive restructuring, but also in giving up material economic interests to ensure the success of the Plan.  For instance, the Debtor Release was a material inducement for the Ad Hoc Group and Freedom Lenders to support the Plan.[161]  Furthermore, the Debtors' directors, officers, and other agents, as well as the creditors' professionals and other agents, have been instrumental in

---

[160]  *See, e.g.*, *In re Indianapolis Downs*, 486 B.R. at 303–04 (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *Wash. Mut.*, 442 B.R. at 347 (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [chapter 11 plan] or to creditors nor provided an extraordinary service"); *In re Tribune Co.*, 464 B.R. at 189 (finding non-debtor party had substantially contributed where non-debtor parties entered into a settlement where non-debtor parties agreed to reduce their claim); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding non-debtor parties had substantially contributed where (a) officers and directors made substantial contributions by designing and implementing the operational restructuring and negotiating the financial restructuring; (b) plan sponsor funded the plan and agreed to compromise its claim; and (c) a committee negotiated the plan and assisted in the solicitation of its constituents).

[161]  *See In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) ("[T]he releases are an integral part of the agreement with the [non-debtor parties] to finance the chapter 11 cases and to fund the [p]lan."); *In re Midway Gold US, Inc.*, 575 B.R. 475, 510 (Bankr. D. Colo. 2017) (finding that without the contributions of the third parties being granted releases by the debtors, which included the provision of financing for the chapter 11 cases and consent to the use of their cash collateral by the debtors, the chapter 11 cases would not likely have reached confirmation).

negotiating, formulating, and implementing the Restructuring Transactions contemplated under the Global Settlement and the Plan.[162]

104.    **Second**, the Plan, including the Debtor Release, was vigorously negotiated by sophisticated entities that were represented by able counsel and financial advisors.  The release provisions were a necessary element of consideration that the Releasing Parties required before entering in the Global Settlement or supporting Confirmation of the Plan, as applicable.  Indeed, absent the Debtor Release, it is highly unlikely the Debtors would have been able to build the extraordinary level of consensus with respect to the Plan and the settlements and transactions contemplated thereby.  As described above, each Released Party contributed substantial value to these Chapter 11 Cases and did so with the understanding that they would receive releases from the Debtors.  Importantly, the Debtor Release is the product of good faith, arm's-length negotiations between the Debtors and their key stakeholders.  In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties in addition to the significant benefits provided to the Debtors through this prearranged chapter 11 process.  If certain of the Released Parties do not receive the benefit of the Plan's proposed release provisions, an extensively negotiated and integral component of the Global Settlement, which in turn provides support for Confirmation of the Plan, the Global Settlement itself fails and the likelihood of Confirmation of the Plan is

---

[162] *See In re Zenith Elecs. Corp.*, 241 B.R. at 111 (holding that directors, officers, bondholders' committee, and others made a substantial contribution to the case by designing, negotiating, and implementing the financial restructuring); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 757–58 (Bankr. D. Del. 2016) (holding that a release of the debtors' officers, directors, and professionals was appropriate where the record reflected an "intensive and thoughtful effort by management and the special committee," with the advice and assistance of its hired professionals, "to respond to the market challenges" and who "chose the option that they believed would conserve the value of the [e]states and maximize recovery for all stakeholders, including equity holders"); *In re Premier Int'l Holdings*, 2010 WL 2745964, at *10 (holding that release of directors and officers was proper under *Zenith* to ensure the "continued success of the [r]eorganized [d]ebtors").

threatened.  Moreover, the Debtor Release provides finality, underpins the Global Settlement and compromise of issues achieved by the Plan, and avoids significant delay in consummating the Plan.  There is no question that directors, managers, officers, and employees of the Debtors provided (and continue to provide) valuable consideration to the Debtors, as they commit substantial time and effort (in addition to their daily responsibilities) to the Debtors' Estates and restructuring efforts throughout this chapter 11 process.  Finally, the scope of the Debtor Releases is narrowly tailored to the facts and circumstances of these Chapter 11 Cases.  The Plan does not provide a blanket release for all current and former directors and officers, and certain current and former directors and officers are explicitly carved out of the releases, for the benefit of the Litigation Trust.  Therefore, the Debtor Release is a critical component of the Plan that inures to the benefit of all the Debtors' stakeholders and should be approved.

105.    **Third**, the vast majority of the Voting Classes have overwhelmingly voted in favor of the Plan, including the Debtor Release.  Pursuant to the Global Settlement, Holders of Class 5 Prepetition Second Lien Loan Claims, Holders of Class 6 OpCo General Unsecured Claims, and Holders of Class 7 Prepetition HoldCo Loan Claims are set to receive meaningful recoveries under the Plan and therefore support the Debtor Release.

106.    **Fourth**, an identity of interest exists between the Debtors and the parties to be released.  Each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed.  Like the Debtors, these parties seek to confirm the Plan and implement the Restructuring Transactions contemplated thereunder.  Moreover, with respect to certain of the releases—e.g., those releasing the Debtors' current and former directors, officers, and principals—there is a clear identity of interest supporting the release because the Debtors will assume certain indemnification obligations under the Plan that will be

honored by the Reorganized Debtors.[163]   Thus, a lawsuit commenced by the Debtors (or derivatively on behalf of the Debtors) against certain individuals would effectively be a lawsuit against the Reorganized Debtors' own interests.

107.    *Fifth*, the Plan provides for meaningful recoveries for creditors in exchange for, among other things, the Debtors' Release of potential claims, and the Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances in the context of the Global Settlement.

108.    Accordingly, the Plan fairly provides the various Released Parties the global closure for which they negotiated in exchange for, among other things, the various concessions and benefits provided to the Debtors' Estates under the Plan, and the Debtors submit that the Debtor Release is consistent with applicable law, represents a valid settlement and release of claims the Debtors may have against the Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, is a valid exercise of the Debtors' business judgment, and is in the best interests of their Estates.

### b.    *The Third-Party Release Is Consensual and Appropriate and Complies with the Bankruptcy Code.*

109.    Article 12.3 of the Plan contains a third-party release (the "Third-Party Release"). It provides that each Releasing Party who elects to opt in releases any and all Causes of Action (including a list of specifically enumerated claims) that such Releasing Party could assert against the Debtors, the Reorganized Debtors, and the Released Parties.[164]   Courts in this jurisdiction

---

[163]  Plan, Art. 7.5.  *See In re Indianapolis Downs*, 486 B.R. at 303 (Bankr. D. Del. 2013) ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

[164]  *See* Plan, Art. 12.3.

routinely approve such release provisions if, as here, they are consensual.[165]  Ultimately, the value-maximizing restructuring contemplated by the Plan would not be possible absent the support of the Released Parties.  Thus, the Third-Party Release operates to maximize the Debtors' fresh start by minimizing the possibility of distracting post-emergence litigation or other disputes.  The Third-Party Release is consensual, consistent with established Third Circuit law, and integral to the Plan, and therefore should be approved.

110.    Numerous courts have recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.[166]  Consensual releases are permissible on the basis of general principles of contract law.[167]  Courts have also held than an affirmative agreement from an affected creditor will render a release consensual.[168]

111.    Approval of the Third-Party Release under the circumstances of these Chapter 11 Cases is appropriate because they are not binding on any non-consenting parties.  The Third-Party

---

[165]  *See, e.g.*, *In re Smallhold, Inc.*, 665 B.R. 704, 708 (Bankr. D. Del. 2024) (post-*Purdue* observing that "*Consensual* releases, on the other hand, are commonplace" (emphasis in original)); *In re Indianapolis Downs*, 486 B.R. at 304–06 (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *In re Spansion*, 426 B.R. at 144 ("Courts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan." (citing *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993))); *In re Wash. Mut., Inc.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *cf. CMB Exp., LLC v. Tonopah Solar Energy, LLC (In re Tonopah Solar Energy, LLC)*, 657 B.R. 393, 407 (D. Del. 2022) (holding that creditors were not impaired by plan's consensual third-party release that they did not opt in to).

[166]  *See, e.g.*, *In re Indianapolis Downs*, 486 B.R. at 305 (collecting cases); *In re Spansion*, 426 B.R. at 144 (stating that "a Third-Party Release may be included in a plan if the release is consensual"); *see also Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 206 (2024) ("Today's decision is a narrow one.  Nothing in the opinion should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan.").

[167]  *See In re Smallhold, Inc.*, 665 B.R. at 722–23 (following the "contract model" of evaluating third-party releases); *In re Coram Healthcare Corp.*, 315 B.R. at 336 ("[A] [p]lan is a contract that may bind those who vote in favor of it.").

[168]  *See id.* ("[T]o the extent creditors or shareholders voted in favor of [a plan providing for the release of their claims] they are bound by that [plan]."); *In re W. Coast Video Enters., Inc.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("[E]ach creditor bound by the terms of the [non-debtor] release must individually affirm same, either with a vote in favor of a plan including such a provision, or otherwise.").

Release is generally provided by the parties participating in the formulation and negotiation of the Plan or to the extent a party affirmatively opts in to the release.  Thus, the only parties providing the Third-Party Release are creditors that have affirmatively acted, or otherwise agreed, to such releases.  All parties had ample opportunity to evaluate and opt in to the Third-Party Release.  All non-Debtor Releasing Parties had additional time to consider their decision to participate in the Third-Party Releases, in light of the Disclosure Statement Supplement and Disclosure Statement Supplement Order.  The deadline for parties to opt in, or change their election, was extended to May 7, 2025.[169]

112.    The Third-Party Release is warranted under the circumstances of these Chapter 11 Cases because it is critical to the success of the Plan, and it is fair and appropriate.  Without the efforts of the Released Parties, both in negotiating and navigating the Global Settlement and Plan negotiations, the Debtors would not be poised to confirm a plan that reorganizes their business and operations and paves the way for future success.  In addition, many of the Released Parties have been instrumental in supporting these Chapter 11 Cases and facilitating a smooth and expeditious administration thereof.  Finally, throughout these Chapter 11 Cases and the related negotiations, the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders, investing countless hours.[170]

113.    The Debtors submit that the Third-Party Releases are consensual and are an integral and necessary part of the Plan.  Accordingly, the Third-Party Releases should be approved.

---

[169]    *See* Disclosure Statement Supplement § III.

[170]    *See* Meyer Decl. ¶¶ 31-37.

### (i)    The Exculpation Provision Is Appropriate.

114.    Article 12.4 of the Plan provides that the Exculpated Parties shall be released and exculpated from any claims or Causes of Action taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with these Chapter 11 Cases and certain related transactions except for any Causes of Action rising from willful misconduct, actual fraud, or gross negligence (the "Exculpation Provision").[171]    The Exculpation Provision is intended to prevent collateral attacks against the estate fiduciaries that have acted in good faith to help facilitate the Debtors' restructuring.  The Exculpation Provision is an integral part of the Plan and otherwise satisfies the governing standards in the Third Circuit.  The Exculpation Provision provides necessary and customary protections to estate fiduciaries whose efforts were and continue to be vital to implementing the Plan.

115.    Exculpation provisions that apply only to estate fiduciaries, and are limited to claims not involving a criminal act, actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[172]    Unlike third-party releases, exculpation provisions do not affect the liability of third parties per se, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[173]

---

[171] The Exculpations do not exculpate Brian Kahn, Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, WFG, or any of their Affiliates or Related Parties (other than any officers, directors, or employees of the Debtors that acted as an Estate fiduciary after the Petition Date).

[172] *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that committee members as fiduciaries in the case are entitled to immunity); *In re Wash. Mut., Inc.*, 442 B.R. at 350–51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[173] *See In re PWS Holding Corp.*, 228 F.3d at 245 (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *In re Premier Int'l Holdings*, 2010 WL 2745964, at *10 (approving a

116.    Here, the Plan's definition of Exculpated Parties includes the following estate fiduciaries (in each case, solely in their respective capacities as such):

> (a) the Debtors, (b) the Debtors' directors and officers who served at any time between the Petition Date and the Effective Date, (c) the Creditors' Committee, (d) the members of the Creditors' Committee and the individuals who served on the Creditors' Committee on behalf of each member in their capacities as such, (e) the Professional Persons, (f) as to all Debtors who are limited liability companies, their members, and (g) with respect to each of the foregoing in clauses (a) and (c), solely to the extent they are Estate fiduciaries, and without duplication of parties otherwise set forth above, each such Entity's current and former Affiliates, and each such Entity's and its current and former Affiliates' current and former subsidiaries, officers, directors (including any sub-committee of directors), managers, principals, members (including ex officio members and managing members), employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such on or before the Petition Date and prior to or on the Effective Date; provided that, for purposes of the foregoing clause (g), any "former" party shall only be treated as an "Exculpated Party" to the extent they acted as an Estate fiduciary after the Petition Date . . . .[174]

117.    The Exculpated Parties have participated in good faith in formulating and negotiating the Restructuring Support Agreement, the Plan, the sale of the Vitamin Shoppe business, and the Global Settlement as it relates to the Debtors, and they should be entitled to

---

similar exculpation provision as that provided for under the Plan); *In re Spansion, Inc.*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. Apr. 16, 2010) (same).

[174] Plan, Art. 1.84. For purposes of clause (g) of the definition of Exculpated Parties, any "former" party shall only be treated as an "Exculpated Party" to the extent they acted as an Estate fiduciary after the Petition Date; provided that, notwithstanding the foregoing, Brian Kahn and Prophecy Asset Management LP, Bryant Riley, B. Riley Financial, Inc., B. Riley Receivables II, LLC, WFG and each of their respective Related Parties and Affiliates (other than any officers, directors, or employees of the Debtors that acted as an Estate fiduciary after the Petition Date), shall not be included in the definition of Exculpated Parties and, for the avoidance of doubt, none of such parties shall be considered Affiliates of the Debtors for purposes of this proviso.

protection from exposure to any lawsuits related to this chapter 11 process filed by unsatisfied parties.[175]

118.    Moreover, the Exculpation Provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's length and in good faith.  Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack.

119.    Here, the Debtors and their officers, directors, managers, and professionals actively negotiated with Holders of Claims and Equity Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive, and the resulting agreements were implemented in good faith with a high degree of transparency.  As a result, the Plan enjoys strong support from Holders of Claims entitled to vote.[176]  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Global Settlement, the Disclosure Statement, the Plan, and related documents in furtherance of the

---

[175] *In re Arden*, 176 F.3d 1226, 1228 (9th Cir. 1999) ("Under 11 U.S.C. § 1123(b)(3)(A), a bankruptcy court may approve a claim compromise as part of a plan of reorganization.").

[176] *See, e.g.*, Voting and Opt-In Report, Ex. A.

Restructuring Transactions.[177]    Accordingly, the Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.

120.    Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.  All the Exculpated Parties played a key role in developing the Plan that paved the way for a successful reorganization and likely would not have been so inclined to participate in the plan process without the promise of exculpation.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[178]  In short, the Exculpation Provision represents an integral piece of the Global Settlement and is the product of good-faith, arm's-length negotiations and significant sacrifice by the Exculpated Parties.

121.    Accordingly, under the circumstances, it is appropriate for the Court to approve the Exculpation Provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[179]

### (ii)    The Injunction Provision Is Appropriate.

122.    The injunction provision set forth in Article 12.6 of the Plan implements the Plan's release, discharge, and exculpation provisions by, in part, permanently enjoining all persons and entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect

---

[177] *See* Hr'g Tr. 58:18–19; *In re Verso Corp.*, No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ("[T]he debtors did not do this alone; they did it with the help of many others.").

[178] *See Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992).

[179] *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision with willful misconduct and gross negligence exceptions); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

to any such Claims, Equity Interests, or Causes of Action released, discharged, settled, or subject to exculpation pursuant to Article 12.4 of the Plan.  Thus, the injunction provision is a key provision of the Plan because it enforces the release, discharge, and exculpation provisions that are centrally important to the Plan.[180]  Further, the injunction provided for in the Plan is narrowly tailored to achieve its purpose.

123.    Accordingly, the Debtors submit that the discretionary provisions of the Plan are consistent with and are permissible under section 1123(b) of the Bankruptcy Code.

**3.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

124.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[181]

125.    The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the default amount, if any, on the Effective Date or in the ordinary course of business, subject to the limitations described in Article 10.2 of the Plan or the proposed Confirmation Order.[182]  In accordance with Article 10.2 of the Plan and section 365 of the Bankruptcy Code, the Debtors will satisfy any monetary defaults

---

[180] *See In re Drexel Burnham*, 960 F.2d at 293 (holding that a court may approve an injunction provision where such provision "plays an important part in the debtor's reorganization plan"); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *12 (Bankr. D.N.J. Mar. 5, 2014) (same); *Pettibone Corp. v. Hawxhurst*, 163 B.R. 989, 995 (N.D. Ill. 1994) (same); *see also Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 985 (1st Cir. 1995) ("Where an injunction allows a settlement that forms the basis of a chapter 11 plan to take effect, where the entire settlement and hence the plan hinges on the parties being free from the very claims that the injunction would prohibit, courts will order the injunctive relief." (citations omitted)).

[181] 11 U.S.C. § 1123(d).

[182] *See* Plan, Art. 10.2.

under each Executory Contract and Unexpired Lease to be assumed under the Plan on the Effective Date or in the ordinary course of business.  In light of the foregoing, because the Plan fully complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

     **C.**     **The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

126.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.[183]  The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[184]  As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

     **1.**     **The Debtors Complied with Section 1125 of the Bankruptcy Code.**

127.    As discussed in this Background Section IV of this Memorandum, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.[185]

---

[183]  *See* 11 U.S.C. § 1129(a)(2).

[184]  *See, e.g.*, *In re Maremont Corp.*, 601 B.R. at 20 (listing compliance with sections 1125 and 1126 as requirements of section 1129(a)(2)); *In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *28 (Bankr. D. Del. Aug. 24, 2011) ("The legislative history to section 1129(a)(2) explains that this provision is intended to incorporate the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code." (citing H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978))); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (same); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (holding that plan proponent must comply with sections 1125 and 1126 to comply with section 1129(a)(2)); *cf. In re PWS Holding Corp.*, 228 F.3d at 248 n.23 (holding that section 1129(a)(2) requires compliance with section 1125 and remarking that other courts hold that section 1125 is *one of* the applicable provisions of section 1129).

[185]  *See generally* Background § IV (describing the Debtors' solicitation process).

Section 1125 prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[186] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that such parties may make an informed decision whether to approve or reject the plan.[187]

128.    The Debtors have satisfied section 1125 here.  Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement as containing adequate information.  The Debtors provided additional disclosure via the Disclosure Statement Supplement, to add further context to changes in the Plan subsequent to the filing of the Disclosure Statement.  These additional disclosures included the terms of the Global Settlement, a statement that holders could change their vote, certain changes to risk factors, certain modifications to treatment of Claims and Equity Interests, and updated estimated recoveries.[188] Following the filing of the Plan, the Court, with the agreement of the Debtors and other parties, extended the Voting Deadline and Objection Deadline to May 7, 2025.

---

[186]  11 U.S.C. § 1125(b).

[187]  *In re Indianapolis Downs*, 486 B.R. at 295–96 ("The Code's robust disclosure requirements were designed to end the 'undesirable practice' . . . of soliciting acceptance or rejection at a time when creditors and stockholders were too ill-informed to act capably in their own interests.") (citing *In re Clamp-All Corp.*, 233 B.R. 198, 208 (Bankr. D. Mass. 1999)) (internal quotation marks omitted); *Cohen ex rel. Est. of Ampace Corp. v. TIC Fin. Sys. (In re Ampace Corp.)*, 279 B.R. 145, 161 (Bankr. D. Del. 2002) ("[Information provided] is sufficient to 'enable a hypothetical reasonable investor . . . to make an informed judgment about the plan,' thereby satisfying the disclosure requirements of § 1125." (quoting 11 U.S.C. § 1125(a)(1))); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing 'adequate information' to 'enable a creditor to make 'an informed judgment' about the Plan.") (citing 11 U.S.C. § 1125(a)(1)); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) (section 1125 "seeks to guarantee a minimum amount of information to the creditor asked for its vote" (citations omitted)).

[188]  *See generally* Disclosure Statement Supplement.

129.    Because the Debtors provided the Disclosure Statement Supplement to update creditors and interest holders of the changes incorporated in the Plan, and extended the Voting Deadline by 14 days, there is no solicitation issue.   Under the Plan, Classes 8-C (which, as described above, has no claims), 10, and 11 will receive no recovery.[189]  As noted in the Original Disclosure Statement, recoveries to these classes were contingent on the consummation of a sale transaction for substantially all the assets of the Debtors.[190]  Because the Debtors were unable to find a buyer to execute such a transaction, the recoveries to these Classes never changed.  Thus, despite any changes to these Classes' recovery status, no re-solicitation is required because the Plan does not materially and adversely affect any voting class.[191]  The plan modifications in this consensual, zero-recovery scenario are immaterial.  They will not "'so affect a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.'"[192]

130.    Relatedly, only minimal additional disclosure is necessary to inform constituents of changes to treatment under the Plan.[193]  The only material changes to the Plan were to increase

---

[189]  *See* Plan, Art. 5.10, 5.12, 5.13.

[190]  *See* Original Disclosure Statement § IV.A.

[191]  *See In re Boy Scouts of Am.*, 650 B.R. at 167–68 ("The Bankruptcy Code permits modifications of a plan 'at any time' prior to confirmation.  11 U.S.C. § 1127(a).  The Bankruptcy Code further provides that all voting creditors who previously accepted a plan will be deemed to have accepted the modified plan.  *Id.*  Bankruptcy Rule 3019(a) specifies that post-solicitation plan modifications do not require re-solicitation if the modifications do not adversely change the treatment of parties who previously voted for the plan.  As such, courts have found that only 'material' and 'adverse' modifications require re-solicitation." (citations omitted)).

[192]  *Id.* at 168; *see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("If modifications made to a plan prior to confirmation (but after the ballots have been counted) are minor, impact only a creditor who has been fully involved, and do not adversely impact any other creditor, then it is not necessary to solicit new acceptances.").

[193]  *See Sentinel Mgmt. Grp.*, 398 B.R. at 301 ("[A] new disclosure statement is not required in every instance where a modification is made; if the modification is minor, the existing disclosure statement will suffice.").

the recoveries of Class 5 Prepetition Second Lien Loan Claims and Class 7 Prepetition HoldCo Loan Claims, who both overwhelming supported the Plan. Furthermore, the Disclosure Statement only provided potential projected cash figures for Classes 8-C, 10, and 11, subject to other claims with higher priority.[194] Much like in *Boy Scouts*, where the court remarked that case law "recognizes that when parties have been involved . . . extensively . . . the relevant disclosure needed for those parties to make an informed decision is minimal," and the same parties could "fashion any supplemental objections that they want to file, with respect to the plan," the parties here have been significantly involved in the post-petition process, making further extensive disclosure unnecessary.[195]

131. Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125, the Disclosure Statement Order, and the Disclosure Statement Supplement Order.

## 2. The Debtors Complied with Section 1126 of the Bankruptcy Code.

132. Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.[196] Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.[197] Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

---

[194] *See* Disclosure Statement § III.D.

[195] Hr'g Tr. 77:10–17, *Boy Scouts of Am. & Del. BSA, LLC*, No. 20-10343 (LSS) (Bankr. D. Del. Feb. 22, 2022) [Docket No. 8927].

[196] *See* 11 U.S.C. § 1126.

[197] *See id.*

> (a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .
>
> (f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.[198]

133.    As set forth above, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Allowed Claims and Equity Interests in Classes 3, 4, 5, 6, 7, 8-A, and 8-B.  The Debtors did not solicit votes from Holders of Claims in Class 1 or 2 because Holders of Claims in these classes are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.  Depending on their ultimate treatment by the Debtors, Holders of Claims in Class 9 (Intercompany Claims) and Equity Interests in Class 12 (Existing Intercompany Equity Interests) will be either conclusively deemed to accept or conclusively deemed to reject the Plan, and in either scenario are not entitled to vote on the Plan.  Similarly, the Debtors did not solicit votes from Class 10 (Subordinated Claims) and Class 11 (Existing TopCo Equity Interests), because such Holders are deemed to reject the Plan.  While the Debtors originally solicited Holders of Class 8-C (TopCo General Unsecured Claims), pursuant to the Disclosure Statement Order, the Debtors have now determined that there are no Claims at Class 8-C.[199]  Thus, pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims in Classes 3, 4, 5, 6, 7, 8-A, and 8-B were entitled to vote to accept or reject the Plan.

---

[198]  11 U.S.C. § 1126(a), (f).

[199]  Orlofsky Decl. ¶ 54.

134.    With respect to the Voting Classes, (a) section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-thirds in amount and more than one-half in number of allowed claims in such class vote to accept such plan and (b) section 1126(d) of the Bankruptcy Code provides that a class accepts a plan where holders of at least two-thirds in amount of allowed interests vote to accept such plan.[200]  As explained further below, the Plan has been accepted by each of the voting classes in accordance with section 1126. Based upon the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

### D.    The Plan Is Proposed in Good Faith (§ 1129(a)(3)).

135.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[201]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good-faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[202]  The fundamental purpose of chapter 11 is to enable a debtor to reorganize its affairs to prevent job losses and the adverse

---

[200]  11 U.S.C. § 1126(c)–(d).

[201]  11 U.S.C. § 1129(a)(3); *In re PWS Holding Corp.*, 228 F.3d at 242 ("Section 1129(a)(3) provides that the court shall confirm a plan only if '[t]he plan has been proposed in good faith and not by any means forbidden by law.'" (quoting 11 U.S.C. § 1129(a)(3))); *In re W.R. Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013) ("Under § 1129(a)(3), courts may only confirm reorganization plans proposed in good faith.").

[202]  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) ("Although the term 'good faith' is not further defined in the Code, in the context of a Chapter 11 plan, courts have held a plan is to be considered in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" (quoting *In re Toys & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)); *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." (internal quotation marks and citations omitted)).

economic effects associated with disposing of assets at liquidation value.[203]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[204]

136.    The Debtors negotiated, developed, and proposed the Plan in good faith, and the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  The Plan was negotiated with, and is supported by, the Ad Hoc Group, the Freedom Lender Group, the Creditors' Committee, and other key stakeholders.  These parties only came to consensus after months of restructuring efforts, which involved significant arm's-length negotiations.  As provided in the Declarations, the value-maximizing Plan delivers value to creditors and preserves the Reorganized Debtors as a going concern.  The Plan was proposed in good faith and not by any means forbidden by law, has a high likelihood of success, and will achieve a result consistent with the objectives of the Bankruptcy Code.

137.    The Plan satisfies section 1129(a)(3).  Here, the Plan will enable the Debtors to emerge with a substantially deleveraged capital structure and sufficient liquidity that puts the Debtors in a strong position to execute their go-forward business plan.  Moreover, the Plan is the product of extensive good-faith, arm's-length negotiations.  The strong support of the Plan by the voting creditors is strong evidence that the Plan has a proper purpose.  Accordingly, the Plan and

---

[203]  *In re Trump Ent. Resorts, Inc.*, 519 B.R. 76, 87 (Bankr. D. Del. 2014) ("The fundamental purpose of [chapter 11] reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." (quoting *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984))).

[204]  *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. at 87 ("[I]t has been established that a determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal." (citing *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985))); *In re Coram Healthcare Corp.*, 271 B.R. at 234 (evaluating the totality of the circumstances to determine good faith (citing *In re Am. Fam. Enters.*, 256 B.R. 377, 401 (D.N.J. 2000) (same))).

the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.  No party has asserted otherwise.

### E. The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Is Subject to Court Approval (§ 1129(a)(4)).

138.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses payable by the debtor, the plan proponent, or a person issuing securities or acquiring property under the plan be approved or subject to approval by the bankruptcy court as reasonable.[205]  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the court as to their reasonableness.[206]

139.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  Payment of professional claims is the only category of payments that falls within the ambit of section 1129(a)(4) of the Bankruptcy Code in these Chapter 11 Cases, and the Debtors may not pay their professional claims absent Court approval.[207]  Further, all such professional claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and/or 330 of the Bankruptcy Code.[208]  Article 3.3 of the Plan, moreover, provides that the Debtors' professionals shall file all final requests for payment of the professional claims no later than 45 days after the Effective Date, thereby providing adequate time for interested

---

[205]  11 U.S.C. § 1129(a)(4).

[206]  *See Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 584–85 (Bankr. D. Del. 2012) (holding that section 1129(a)(4) is satisfied when payments made or to be made to a debtor's professionals are approved or subject to approval by the bankruptcy court as reasonable); *In re Rubicon U.S. REIT, Inc.*, 434 B.R. 168, 177 (Bankr. D. Del. 2010) (same); *Mabey ex rel. Cajun Elec. Power Co-op., Inc. v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.)*, 150 F.3d 503, 513–18 (5th Cir. 1998) (same); *see also In re Wash. Mut., Inc.*, 442 B.R. at 365 (sustaining objection to plan under section 1129(a)(4) when fees of indenture trustees, settlement noteholders, and liquidating trustee will be paid without notice or approval by the bankruptcy court as to their reasonableness).

[207]  *See* Plan, Art. 3.3.

[208]  11 U.S.C. §§ 328(a), 330(a)(1)(A).

parties to review such professional claims.[209]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4).

### F. The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).

140.    Section 1129(a)(5)(A) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.[210]  Additionally, it further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[211]  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[212]  Section 1129(a)(5)(A)(ii) directs the Court to ensure that the post-confirmation governance of the Reorganized Debtors is in "good hands."[213]  Little case law exists on this subsection,[214] but courts have interpreted it to mean that (a) the proposed individuals have experience in the reorganized debtors' business and industry;[215] (b) the proposed individuals have

---

[209]  Plan, Art. 3.3.

[210]  11 U.S.C. § 1129(a)(5)(A)(i).

[211]  11 U.S.C. § 1129(a)(5)(A)(ii).

[212]  11 U.S.C. § 1129(a)(5)(B).

[213]  *See* 7 Collier on Bankruptcy ¶ 1129.02[5][b] ("[The public policy requirement] may be easy enough to [interpret] if members of the proposed management are known criminals who are incarcerated at the time of confirmation. It is more difficult if management for the reorganized debtor is the same as management for the prepetition debtor, and significant questions exist as to their competency.").

[214]  *Id.* ("Little case law exists . . . but it would seem that if the bankruptcy court is to have a role beyond the ministerial one of counting ballots, then the public policy requirement would enable it to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management." (citations omitted)).

[215]  *See In re Rusty Jones, Inc.*, 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*,

experience in financial and management matters;[216] (c) the debtors and creditors believe control of the entity by the proposed individuals will be beneficial;[217] and (d) the proposed individuals do not "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[218]  The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[219]

141.    The Plan satisfies section 1129(a)(5) of the Bankruptcy Code.  On the Effective Date, the officers of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.[220]  The Debtors will make all known disclosures in advance of the Effective Date regarding the identity and affiliations of any members of the New Board in the Plan Supplements.[221]  The Debtors and their creditors believe control of the Reorganized Debtors by the proposed individuals or individuals to be appointed in accordance with the Plan and New Organizational Documents will

---

37 B.R. 141, 149–50 (Bankr. S.D.N.Y. 1984) (holding that continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied section 1129(a)(5)).

[216]  *In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992).

[217]  *See In re Maremont Corp.*, 601 B.R. at 21 (holding that plan satisfied 1129(a)(5) where debtors, asbestos claimants committee, and future claimants' representatives approved director and officer); *In re Apex Oil Co.*, 118 B.R. 683, 704–05 (Bankr. E.D. Mo. 1990) (holding that plan satisfied 1129(a)(5) where debtors and creditor's committee agreed on directors and officers); *In re Drexel Burnham*, 138 B.R. at 760 (same) (citing *id.*).

[218]  *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003); *cf. In re Maremont*, 601 B.R. at 21 ("The continuation in office of the proposed sole director and officer of each of the Reorganized Debtors will allow the Reorganized Debtors to benefit from the director's familiarity with the Debtors' reorganization and business going forward, which is consistent with the interests of Holders of Claims and Interests and with public policy.").

[219]  7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2018).

[220]  *See* Plan, Art. 7.16.

[221]  *See In re Armstrong*, 348 B.R. at 165 (finding disclosure of identities and nature of compensation of persons to serve as directors and officers on the effective date sufficient for section 1129(a)(5) of the Bankruptcy Code).

be beneficial, and no party in interest has objected to the Plan on these grounds.  Therefore, the requirements under section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.

142.    Finally, the Plan satisfies section 1129(a)(5)(B) of the Bankruptcy Code because, to the extent known, the Debtors have or will publicly disclose the identity of all insiders that the Reorganized Debtors will employ or retain in compliance with the Bankruptcy Code in the Plan Supplements.

### G.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).

143.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.[222]  No such rate changes are provided for in the Plan.  Thus, section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

### H.    The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).

144.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)    each holder of a claim or interest of such class—
>
>    (i)    has accepted the plan; or
>
>    (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[223]

---

[222]  11 U.S.C. § 1129(a)(6).

[223]  11 U.S.C. § 1129(a)(7).

145.    The best interests test applies to individual dissenting holders of impaired claims and interests—rather than classes—and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[224] As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of impaired claims or interests that do not accept a chapter 11 plan.[225]  Classes 3, 4, 5, 6, 7, 8-A and 8-B voted in favor of Confirmation of the Plan, and Holders of Claims and Equity Interests in all Impaired Classes will recover at least as much as a result of the confirmation of the Plan as they would in a hypothetical chapter 7 liquidation, satisfying section 1129(a)(7).[226]

146.    Additionally, the Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates recoveries for members of each Class under the Plan.[227]  This analysis "included a review of the Debtors' books and records and discussions with the Debtors'

---

[224] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("Section 1129(a)(7) provides that if the holder of a claim impaired under a plan of reorganization has not accepted the plan, then such holder must 'receive . . . on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive . . . if the debtor were liquidated under chapter 7 . . . on such date.' The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("To measure value [for the purposes of the best interests of creditors], the Court must contrive a hypothetical chapter 7 liquidation conducted on the effective date of the plan."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation"); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

[225] *In re 203 N. LaSalle*, 526 U.S. at 442 n.13 ("The 'best interests' test applies to *individual creditors* holding impaired claims, even if the class as a whole votes to accept the plan." (emphasis added)).

[226] *See Lason*, 300 B.R. at 232 ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'" (internal citations omitted)); *In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan").

[227] *See* Kopa Decl., Ex. C.

management" and is "based on the estimated value of the Debtors' assets and liabilities as of the Conversion Date" (as defined in the Kopa Declaration).[228]  The projected recoveries under the Plan for each Class are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.[229]  Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and provides the best possible outcome for TopCo, which would receive the same recovery in a chapter 7 liquidation as compared to the current Plan.

I.      **The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

147.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[230]  If not, the plan must satisfy the "cram down" requirements of section 1129(b) with respect to the claims or interests in that class.[231]

148.    Classes 3, 4, 5, 6, 7, 8-A, and 8-B were each impaired and each voted to accept the Plan.  As such, there is an Impaired consenting Class that affirmatively voted to accept the Plan, at each Debtor, where applicable.  Holders of Class 9 Claims and Class 12 Equity Interests are presumed to accept or deemed to reject the Plan, as applicable.  Holders of Class 10 Claims and Class 11 Equity Interests are deemed to reject the Plan and thus were not entitled to vote; Class 8-C is vacant,[232] and according to the Plan, vacant classes "shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or

---

[228]  Kopa Decl. ¶ 9.

[229]  *See id.* ¶ 24.

[230]  11 U.S.C. § 1129(a)(8).

[231]  11 U.S.C. § 1129(b).

[232]  *See* Orlofsky Decl. ¶ 54.

rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code."[233] Notwithstanding such rejections, the Plan is confirmable because it satisfies section 1129(b), as discussed herein.[234]

**J.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

149.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[235]   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[236] Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[237]   Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy

---

[233]  Plan, Art. 6.5.

[234]  *See infra* § II.P.

[235]  *See* 11 U.S.C. § 1129(a)(9).

[236]  *Id.* § 1129(a)(9)(A).

[237]  *Id.* § 1129(a)(9)(B).

Code—i.e., priority tax claims—must receive cash payments over a period not to exceed five years from the Petition Date, the present value of which equals the allowed amount of the claim.[238]

150.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. *First*, Article 3.2 of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive cash equal to the amount of such Allowed Administrative Claim.[239]   *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of claims specified by 1129(a)(9)(B) are Impaired under the Plan, and such Claims have been paid in the ordinary course. *Third*, Article 3.4 of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms of section 1129(a)(9)(C) of the Bankruptcy Code.[240]   The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.  No party has asserted otherwise.

## K.    At Least One Impaired Class of Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).

151.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[241]

---

[238] *Id.* § 1129(a)(9)(C).

[239] *See* Plan, Art. 3.2.

[240] *See id.*, Art. 3.4.

[241] 11 U.S.C. § 1129(a)(10).

152.    As set forth in the Orlofsky Declaration, "all Voting Classes are Impaired, and the requisite number and amount of Claims specified under the Bankruptcy Code voted to accept the Plan, determined without including any acceptance of the Plan by any insider."[242]  Here, Classes 3, 4, 5, 6, 7, 8-A, and 8-B, which are Impaired, voted to accept the Plan independent of any insiders' votes with respect to every Debtor entity.[243]  Thus, the Plan has been accepted by 6 Voting Classes holding impaired, non-insider claims with respect to each Debtor.

153.    Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**L.    The Plan Is Feasible (§ 1129(a)(11)).**

154.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation.[244]  Specifically, the Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[245]  The debtor bears the burden of demonstrating the feasibility of the plan by a preponderance of the evidence.[246]  The threshold to satisfy the feasibility requirement is relatively low.[247]  To demonstrate that a plan is feasible, it is

---

[242]  Orlofsky Decl. ¶ 54.

[243]  No claimant entitled to vote as of the Voting Record Date in Class 8-A submitted a ballot to accept or reject the Plan.

[244]  *See* 11 U.S.C. § 1129(a)(11).

[245]  *Id.*

[246]  *In re W.R. Grace & Co.*, 475 B.R. at 114.

[247]  *See, e.g.*, *In re Tribune Co.*, 464 B.R. at 185 ("[I]t is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement." (quoting *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1166 (5th Cir. 1993))); *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports

not necessary for a debtor to guarantee success.[248]  Rather, a debtor must provide only a reasonable

assurance of success.[249]   As demonstrated below, the Plan is feasible within the meaning of

section 1129(a)(11) of the Bankruptcy Code.

155.    In determining standards of feasibility, courts have identified the following

probative factors:

    a.    the adequacy of the capital structure;

    b.    the earning power of the business;

    c.    the economic conditions;

    d.    the ability of management;

    e.    the probability of the continuation of the same management; and

    f.    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[250]

---

a finding of feasibility" (citing 7 Collier on Bankruptcy ¶ 1129.03[11] (Matthew Bender 15th ed., rev.))); *Berkeley Fed. Bank & Tr. v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 305 (D.N.J. 1996) (same).

[248] *See In re W.R. Grace & Co.*, 729 F.3d at 348 ("Success need not be guaranteed, but must be reasonably likely." (citing *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (same))); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012) (same); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

[249] *See In re W.R. Grace & Co.*, 729 F.3d at 348 ("Success need not be guaranteed, but must be reasonably likely." (citing *In re Am. Cap. Equip., LLC*, 688 F.3d at 156 (same))); *In re G-I Holdings Inc.*, 420 B.R. 216, 267 (D.N.J. 2009) ("[T]he key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed." (citing *U.S. Truck*, 47 B.R. at 944)).

[250] *See, e.g.*, *In re Aleris*, 2010 WL 3492664, at *28; *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J. 1980) (same); *In re W.R. Grace & Co.*, 475 B.R. at 115 (listing factors a–d above and noting that "[t]he bankruptcy court can consider a wide array of factors . . . *including* [listing factors]" (emphasis added) (citing *id.*)).

156.    ***First***, as set forth in the Grubb Declaration, the Debtors thoroughly analyzed their ability post-confirmation to meet their obligations under the Plan and continue as a going concern without the need for further financial restructuring.[251]  The Debtors have concluded based on their analysis that they will be able to make all payments required under the Plan while conducting ongoing business operations.  This is not surprising and is indisputable given that the Debtors' Restructuring Transactions contemplated by the Plan will eliminate approximately $1.55 billion in funded debt from the Debtors' capital structure and the Exit ABL Facility will provide approximately $80 million of liquidity upon emergence from chapter 11.  The Debtors also stand to emerge from chapter 11 with approximately $35 million of Cash.

157.    ***Second***, the Debtors prepared Financial Projections of the Debtors' financial performance through fiscal year 2029, which Financial Projections were part of the Disclosure Statement Exhibits.[252]  These Financial Projections demonstrate the Debtors' ability to meet their obligations under the Plan and to have a viable business going forward.[253]  Thus, the Debtors respectfully submit that the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**M.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

158.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[254]  Section 507(a)(2) of the Bankruptcy Code provides

---

[251]  *See* Grubb Decl. ¶¶ 9-17.

[252]  *See* Disclosure Statement Exhibits, Ex. 2.

[253]  *See* Grubb Decl. ¶¶ 9-18.

[254]  11 U.S.C. § 1129(a)(12).

that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[255]

159.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article 3.5 of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid in full in Cash on the Effective Date, and the Reorganized Debtors will remain obligated to pay any applicable U.S. Trustee Fees in full in Cash when due and payable.[256]

### N.    Sections 1129(a)(13) Through 1129(a)(16) Do Not Apply to the Plan.

160.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[257]  The Debtors do not have any retiree benefits that fall within the scope of section 1129(a)(13) of the Bankruptcy Code, and thus its requirements do not apply.

161.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.[258]  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.

162.    Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.[259]  Because none of the

---

[255]  *Id.* § 507(a)(2).

[256]  Plan, Art. 3.5.

[257]  11 U.S.C. § 1129(a)(13).

[258]  *Id.* § 1129(a)(14).

[259]  *Id.* § 1129(a)(15).

Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.[260]

163.    Finally, each of the Debtors is a moneyed, business, or commercial corporation, and therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation that is not a moneyed, business, or commercial corporation or trust must be made in accordance with any applicable provisions of nonbankruptcy law,[261] is not applicable in these Chapter 11 Cases.[262]

## O.    The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.

164.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[263]  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[264]

---

[260]  *See rue21, inc. v. Off. Comm. of Unsecured Creditors (In re rue21, inc.)*, 575 B.R. 90, 103 (Bankr. W.D. Pa. 2017).

[261]  11 U.S.C. § 1129(a)(16).

[262]  *See In re rue21*, 575 B.R. at 103.

[263]  11 U.S.C. § 1129(b)(1).

[264]  *See id.*; *see also John Hancock*, 987 F.2d at 157 n.5 (holding that a plan "must not 'discriminate unfairly' against and must be 'fair and equitable' with respect to all impaired classes that do not approve the plan"); *In re Armstrong*, 348 B.R. at 120 ("Section 1129(b) allows the confirmation of a plan over the objection of an impaired class if the 'plan does not discriminate unfairly, and is fair and equitable . . . .'"); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa L.P.)*, 115 F.3d 650, 653 (9th Cir. 1997) ("[T]he [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not

### 1. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)).

165. The concept of "unfair discrimination" is not defined in the Bankruptcy Code, and the legislative history provides little guidance.[265] The "hallmarks of the various tests [for unfair discrimination] have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."[266] The pertinent inquiry *is not* whether the plan discriminates, but whether any discrimination is *unfair*.[267] Courts typically examine the facts and circumstances of the particular case to determine if unfair discrimination exists.[268] In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) *only if* it provides materially different treatment for creditors and interest holders with similar legal rights *without compelling justifications for doing so*.[269]

---

discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[265] *See Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra Env't Sols., Inc.)*, 590 B.R. 75, 89 (D. Del. 2018), *aff'd*, 834 Fed. Appx. 729 (3d Cir. 2021) (citing *In re Armstrong*, 348 B.R. at 121).

[266] *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd sub nom. Stonington Partners, Inc. v. Off. Comm. of Unsecured Creditors (In re Lernout & Hauspie Speech Prods. N.V.)*, 308 B.R. 672 (D. Del. 2004); *In re Exide Techs.*, 303 B.R. at 78 ("Therefore, in order to confirm the [p]lan, the [d]ebtor must show that (i) there is a reasonable basis for the [d]ebtor's separate classification of the general unsecured creditors, the 10 percent Senior Noteholders, and the 2.9 percent Convertible Note Claims; and (ii) that the Debtor cannot confirm a plan absent the separate classification of unsecured claims.").

[267] *In re Nuverra*, 590 B.R. at 89 (citations omitted); *see also* 7 Collier on Bankruptcy ¶ 1129.03[3] ("By including the 'unfair discrimination' test, Congress made it clear that such a reorganization surplus did not have to be allocated to creditors on the basis of liquidation preferences. There can be 'discrimination,' so long as it is not 'unfair.'").

[268] *In re Nuverra*, 590 B.R. at 89; *see also In re 203 N. LaSalle*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[269] *See In re Nuverra*, 590 B.R. at 93 (holding that a plan's unequal treatment of substantially similar claims did not constitute unfair discrimination where such unequal treatment was justified); *In re Lernout*, 301 B.R. at 660–61

166.    Here, the Plan's treatment of the non-accepting Impaired Classes is proper because generally all similarly situated Holders of Claims and Equity Interests will receive substantially similar treatment, and the Plan's classification scheme rests on a legally acceptable rationale. Intercompany Claims in Class 9 and Existing Intercompany Equity Interests in Class 12 are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Equity Interests, and may be Unimpaired.  These Intercompany Claims and Existing Intercompany Equity Interests, which exist to support the Debtors' corporate structure, may be Reinstated because Reinstatement of Intercompany Claims and Existing Intercompany Equity Interests advances an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the Reorganized Debtors.  This Reinstatement does not affect the economic substance of the Plan for the Debtors' stakeholders.

167.    Thus, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code, and the Plan may be confirmed notwithstanding the deemed rejection by Classes 10 and 11.

### 2.    The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).

168.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[270]  The

---

(permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *see also In re Ocean View Motel, LLC*, No. 20-21165 (ABA), 2022 WL 243213, at *1 (Bankr. D.N.J. Jan. 25, 2022) (stating that "[u]nder 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment" (citation omitted)); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[270]    *See In re 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority

absolute priority rule requires either that an impaired rejecting class of claims or interests be paid in full or that any class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[271]

169.    Although Intercompany Claims and Existing Intercompany Equity Interests may be reinstated under the Plan and, therefore, would be Unimpaired, such treatment is for the purposes of preserving the Debtors' corporate structure and will have no economic substance.[272] As such the plan does not violate the absolute priority rule.[273]

170.    Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims and Equity Interests and satisfies section 1129(b) of the Bankruptcy Code.

## P.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).

171.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c), which prohibits the confirmation of multiple plans,[274] is not implicated because there is only one proposed plan of reorganization.

---

rule.'"); *cf. In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) ("The absolute priority rule was later codified as part of the 'fair and equitable' requirement of 11 U.S.C. § 1129(b).").

[271] *See 203 N. LaSalle*, 526 U.S. at 441–42.

[272] *See Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re ION Media Networks, Inc.)*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan. The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure."); *In re Accuride Corp.*, No. 24-12289 (JKS), ¶ 30 (Bankr. D. Del. Feb. 12, 2025) [Docket No. 704] (confirming plan that preserved certain intercompany interests); *cf. In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Mar. 29, 2024) [Docket No. 858] ¶ 51, Ex. A, Art. III.J (confirming plan that preserves certain intercompany interests for administrative convenience of making distributions).

[273] *See ION Media Networks*, 419 B.R. at 601.

[274] *See* 11 U.S.C. § 1129(c).

172.    Section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[275]  The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[276]  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.[277]  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

173.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases is a "small business case."[278]  Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

## Q.    Modifications to the Plan Do Not Require Resolicitation.

174.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code.[279]  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.[280]  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be

---

[275]  *See id.* § 1129(d).

[276]  *See* Orlofsky Decl. ¶ 71.

[277]  *See id.*

[278]  *See* 11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $3,424,000[] (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101(51D)(B).

[279]  *Id.* § 1127(a); *see also Peltz ex rel. USN Commc'ns Liquidating Tr. v. Worldnet Corp. (In re USN Commc'ns, Inc.)*, 280 B.R. 573, 596 (Bankr. D. Del. 2002) ("[Section 1127(a)] provides that a plan proponent may modify the plan at any time prior to confirmation.  The only conditions placed on such a modification is that is [sic] must meet the requirements of §§ 1122 and 1123.").

[280]  *Id.*

deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder. Interpreting Bankruptcy Rule 3019, courts have consistently held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[281]

175.    Contemporaneously with the filing of this Memorandum, the Debtors filed an amended version of the Plan, which makes technical clarifications and resolves certain formal and informal comments to the Plan by parties in interest.    The modifications incorporate nonsubstantive comments from various stakeholders and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.    The Global Settlement Parties support these modifications.    Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

**R.    Good Cause Exists to Waive the Stay of the Confirmation Order.**

176.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[282] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory

---

[281]    *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[282]    Fed. R. Bankr. P. 3020(e).

contract or unexpired lease under section 365(f) of the Bankruptcy Code.[283]  Each rule also permits modification of the imposed stay upon court order.[284]

177.    The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.[285]  As noted above, these Chapter 11 Cases and the related Plan transactions have been negotiated and implemented in good faith and with a high degree of transparency.  Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs, which will be significantly reduced if the Debtors emerge expeditiously.

178.    For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into, and consummation of the documents and transactions related to the Restructuring Transactions so that the Effective Date of the Plan may occur as soon as possible after the Confirmation Date.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

---

[283]  *See* Fed R. Bankr. P. 6004(h), 6006(d); *see also In re Greene*, No. 09-33312, 2012 WL 279434, at *4 n.4 (Bankr. E.D. Tenn. Jan. 31, 2012) ("Rules [3020(e), 4001(a)(3), 6004(h), and 6006(d)], utilizing the identical language, provide[] that the underlying order is 'stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise.'").

[284]  *See* Fed R. Bankr. P. 3020(e), 6004(h), 6006(d).

[285]  *See, e.g.*, *In re Vyaire Med., Inc.*, No. 24-11217 (BLS), ¶ 129 (Bankr. D. Del. Nov. 14, 2024) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re SunPower Corp.*, No. 24-11649 (CTG), ¶ 131 (Bankr. D. Del. Oct. 18, 2024) [Docket No. 872] (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS), ¶ 154 (Bankr. D. Del. Mar. 29, 2024) [Docket No. 858] (same).

## **CONCLUSION**

179.    The Plan and the Global Settlement before the Court—which enjoys the overwhelming support of the Debtors' capital structure—is the product of a hard-fought, good-faith process which included massive amounts of diligence, analysis, and fierce negotiation.  The Plan and the Global Settlement resolve incredibly complex issues presented in these Chapter 11 Cases, and position the Debtors to emerge and return to business as usual.  The Plan and the Global Settlement constitute a value-maximizing and carefully balanced compromise between the various constituents, where the only alternative is lengthy, uncertain, and value-destructive litigation.  The lone objectors to the Plan—(a) the former Chief Executive Officer and unindicted co-conspirator in a securities fraud indictment pertaining to a multiyear fraud that concealed losses of hundreds of millions of dollars, and (b) a disgruntled franchisee—should be overruled.  No party objects to the Global Settlement.[286]

180.    The Plan reflects the only path to emergence.  It will allow the Debtors to successfully meet their long-term strategic goals and continue to focus on generating long-term value for the benefit of their stakeholders, including vendors, franchisees, and approximately 9,000 employees.  For the reasons set forth herein and in the Declarations, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court confirm the Plan and approve the Global Settlement.

*[Remainder of Page Intentionally Left Blank.]*

---

[286]  Even if the Court were to find that the Plan is not confirmable as to TopCo—though the Debtors submit that it is confirmable, as described herein—the Court should still approve the Global Settlement as to TopCo for the reasons described above.

Dated:  May 14, 2025
Wilmington, Delaware

/s/ Allison S. Mielke

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:           emorton@ycst.com
                 mlunn@ycst.com
                 amielke@ycst.com
                 sborovinskaya@ycst.com

*Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)

601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                 nicole.greenblatt@kirkland.com
                 derek.hunter@kirkland.com

- and -

Mark McKane, P.C. (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:      (415) 439-1500
Email:           mark.mckane@kirkland.com

*Co-Counsel to the Debtors
and Debtors in Possession*