## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRANCHISE GROUP, INC., *et al.,*[1] | ) | Case No. 24-12480 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## DECLARATION OF DAVID ORLOFSKY
## IN SUPPORT OF AN ORDER (I) CONFIRMING THE NINTH
## AMENDED JOINT CHAPTER 11 PLAN OF FRANCHISE GROUP, INC.
## AND ITS DEBTOR AFFILIATES AND (II) GRANTING RELATED RELIEF

I, David Orlofsky, Chief Restructuring Officer ("CRO") of Freedom VCM Holdings, LLC

and Franchise Group, Inc., hereby declare under penalty of perjury:

### Background and Qualifications

1.      I am a Partner and Managing Director of AlixPartners, LLP, an affiliate of

AP Services LLC ("APS") and an internationally recognized restructuring and turnaround firm.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

By order, dated December 16, 2024, the Bankruptcy Court approved (a) APS's employment and retention by the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") and (b) my designation as CRO.  I have served as the CRO since October 11, 2024.  I have over 25 years of experience in financial restructuring, interim management, turnaround, and management consulting across a wide variety of industries, including, but not limited to, the retail and real-estate industries.  I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      I submit this declaration (the "Declaration") in support of Confirmation of the *Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates*, [Docket No. 1454] (as modified, amended, or supplemented from time to time in accordance with its terms, the "Plan").[2]  All facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and financing, information learned from my review of relevant documents, information supplied to me from members of the Debtors' management or advisors, or my opinion based on my knowledge, experience, and information concerning the Debtors' operations and financial condition.  If called to testify, I could and would testify competently to the matters set forth in this Declaration.

3.      On November 3, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On the Petition Date, I submitted the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "First Day Declaration") to

---

2    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Debtors' Memorandum of Law (I) in Support of an Order (A) Confirming the Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates and (B) Approving the Global Settlement and Release of Claims and Causes of Action By and Among the Global Settlement Parties, and (II) Omnibus Reply to Objections Thereto*, filed contemporaneously herewith, or the Plan, as applicable.

provide the Bankruptcy Court and other parties in interest with an overview of the Debtors' businesses and to describe the circumstances compelling the commencement of these chapter 11 cases.

### The Proposed Restructuring

4.      The Plan and the Global Settlement are the culmination of months of effort by the Debtors and their key stakeholders to right size the Debtors' capital structure and position the Debtors for long-term success.  Specifically, after extensive good-faith, arm's-length negotiations with their various stakeholders, the Debtors reached an agreement with the Freedom Lender Group, the Ad Hoc Group consisting of Required Consenting First Lien Lenders, and the Creditors' Committee on the terms of a Global Settlement as embodied in the Plan.  This considerable achievement came together despite a myriad of challenges facing the Debtors and resulted in a Plan that is (a) supported across the Debtors' entire capital structure and (b) in the best interest of the Debtors, their Estates, and other parties in interest.

5.      On November 11, 2024, the Debtors filed the *Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* [Docket No. 150] and the *Disclosure Statement for the Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* [Docket No. 151].  On February 21, 2025, the Bankruptcy Court entered an order [Docket No. 1019] (the "Disclosure Statement Order") granting the relief requested in the Disclosure Statement Motion, including, among other things, approval of the Disclosure Statement and the solicitation and voting procedures in connection with the Plan.

6.      On April 17, 2025, the Debtors (including the Special Committee of the Board of Directors of Freedom VCM Holdings, LLC and Franchise Group, Inc. and the Conflicts Committee of the Board of Directors of Freedom VCM Interco, Inc. and Freedom VCM, Inc.), the

Freedom Lender Group, the Ad Hoc Group consisting of Required First Lien Lenders, and the Creditors' Committee (collectively, the "Supporting Stakeholders") agreed to a global resolution of, among other things, certain Claims and Causes of Action by and between the Supporting Stakeholders.

7.     In connection with the Global Settlement, on April 25, 2025, the Debtors filed the *Disclosure Statement Supplement for the Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Affiliated Debtors* [Docket No. 1314] (as may be amended, modified, or supplemented from time to time, the "Disclosure Statement Supplement"), which summarized, among other things, the key terms of the Global Settlement, the related modifications to the Plan, and the resulting impact on the treatment and projected recoveries of certain Classes set forth therein.    On April 26, 2025, the Bankruptcy Court entered an order [Docket No. 1322] (the "Disclosure Statement Supplement Order") authorizing distribution of the Disclosure Statement Supplement and modification of certain deadlines and procedures in connection with Confirmation.    The Debtors, through their Claims Agent, caused the Disclosure Statement Supplement to be transmitted to all known Holders of Claims in Classes 3, 4, 5, 6, 7, 8-A, and 8-B (collectively, the "Voting Classes"), as well as known Holders of Claims and Equity Interests in Class 11, and purported Holders of Class 8-C Claims as of the Voting Record Date and the parties listed on the Debtors' master service list.[3]    The Disclosure Statement Supplement provided such Holders with additional disclosures to the Plan in connection with the Global Settlement, informing such Holders of the extended Voting Deadline to May 7, 2025, and setting May 20, 2025, at 10:00 a.m. (prevailing Eastern Time) as the date of the Confirmation Hearing.

---

[3]    *See Affidavit of Service* [Docket No. 1383].

8.      In addition to the Disclosure Statement Supplement, on April 25, 2025, the Debtors filed the Plan, incorporating the terms of the Global Settlement.  Importantly, the Plan and the Global Settlement significantly deleverage the Debtors' balance sheet by $1.55 billion, settle all Intercompany Claims between and among TopCo, the Freedom Holdco Debtors, and the OpCo Debtors, establish a single, consolidated Litigation Trust to preserve and pursue Claims and Causes of Action against non-Debtors, and otherwise provide releases to parties that are integral to the go-forward operations of the Debtors, and maximize the recoveries available for prepetition creditors.  Under the Plan:

- each Holder of an Allowed Priority Non-Tax Claim shall receive (at the election of the Debtors in consultation with the Required Consenting First Lien Lenders):  (a) Cash in an amount equal to such Allowed Claim or in the ordinary course of business as and when due; or (b) such other treatment that will render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code;

- each Holder of an Allowed Other Secured Claim shall receive:  (a) Cash in an amount equal to such Allowed Claim; or (b) such other treatment that will render such Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that, to the extent consistent with the DIP Budget, Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, without further notice to or order of the Bankruptcy Court; provided, further, that in the event of a Partial Sale Transaction, any Other Secured Claim that has been expressly assumed by the Buyer under the applicable Sale Documents shall not be an obligation of the Debtors;

- each Holder of an Allowed Prepetition ABL Loan Claim shall receive its *pro rata* share of (a) the American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any ABL Priority Collateral, including as a result of any Partial Sale Transactions, if applicable, and (b) (i) proceeds of the Exit ABL Facility or (ii) loans under the Take-Back ABL Term Loan Facility, in each case, in an amount equal to the amount of the Prepetition ABL Loan Claims minus any amounts to be distributed under clause (a) hereunder;

- each Holder of an Allowed Prepetition First Lien Loan Claim shall receive, subject to the terms of the Plan, payment of all outstanding unreimbursed fees and expenses, if any, and its *pro rata* share of (a) American Freight Liquidation Proceeds and Cash Sale Proceeds, as applicable, resulting from the sale of any Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), including as a result of any Partial Sale Transaction, if applicable, (b) 100% of the Reorganized Common Equity

(subject to dilution by (i) the Management Incentive Plan, (ii) the DIP Premium Conversion, (iii) the DIP Equitization, and (iv) the Prepetition Second Lien Loan Equity Allocation), and (c) the Prepetition First Lien Loan Claims Litigation Trust Allocation;

- each Holder of an Allowed Prepetition Second Lien Loan Claim shall receive its *pro rata* share of (a) the Prepetition OpCo 2L/HoldCo Loan Claims Litigation Trust Allocation, (b) the Prepetition Second Lien Loan Cash Consideration (subject to the Prepetition Second Lien Loan Cash Consideration Waiver), and (c) Reorganized Common Equity in an amount equal to the Prepetition Second Lien Loan Equity Allocation;

- each Holder of an Allowed General Unsecured Claim at any OpCo Debtor, an Allowed Prepetition HoldCo Loan Claim, or an Allowed Freedom HoldCo General Unsecured Claim shall receive its *pro rata* share of the applicable allocation of the Litigation Trust Units, pursuant to the Global Settlement;

- each Holder of an Allowed HoldCo Receivables General Unsecured Claim shall receive its *pro rata* share of Cash, if any, held by the HoldCo Receivables Debtors;

- all Intercompany Claims, between and among the Freedom HoldCo Debtors on the one hand and the other Debtors on the other, shall be settled pursuant to the Global Settlement, discharged, canceled, and released without any distribution on account of such Intercompany Claims;

- each Holder of a Subordinated Claim shall receive no distribution or recovery on account of its Subordinated Claim;

- each Holder of an Allowed Existing TopCo Equity Interest shall not receive or retain any property or distributions under the Plan on account of such Allowed Existing TopCo Equity Interests;

- each Allowed Existing Intercompany Equity Interest shall be, at the option of the applicable Debtor or Reorganized Debtor, either (a) Reinstated or (b) set off, settled, distributed, contributed, canceled, and released without any distribution on account of such Existing Intercompany Equity Interests, or otherwise addressed at the option of the Reorganized Debtors and the Required Consenting First Lien Lenders.

9.    This negotiated, consensual outcome[4] was not arrived at easily.  It is the result of

months of diligence, analysis, market checks, and significant litigation on a range of issues.  In the

---

[4]    The Plan is supported by each of the Debtors' key constituents, including the Ad Hoc Group, the Freedom Lender Group, and the Creditors' Committee.  The Plan is also supported by Classes 3, 4, 5, 6, (at certain Debtors) 7, 8-A, and 8-B.

beginning of these cases, the parties had widely divergent views on a range of issues, which were complicated by intercompany conflicts between the Debtors and stakeholders that held claims across the Debtors' corporate structure.  I understand that the Debtors established a robust governance structure, which was further enhanced during the chapter 11 cases, to be able to appropriate discharge their fiduciary duties with respect to these intercompany issues.  Thanks to these efforts, these cases now conclude with broad consensus on a carefully calibrated and negotiated resolution of the many issues that plagued these Debtors.

10.      I believe that the terms of the Plan and the Global Settlement constitute a value-maximizing and balanced compromise of a range of complex and hotly-contested issues presented in these cases.  I further believe that the Plan and the Global Settlement are in the best interests of the Debtors and all of their stakeholders and that, accordingly, the Bankruptcy Court should confirm the Plan, approve the Global Settlement, and allow the Debtors to emerge from chapter 11 so they can continue operating and creating value for their many stakeholders for years to come.

**Entry Into The Global Settlement Is a Sound Exercise of the Debtors' Business Judgment**

11.      I believe that entering into the Global Settlement is a sound exercise of the Debtors' business judgment and that the Global Settlement serves the best interests of the Debtors and their Estates.  Critically, the Global Settlement provides a sound alternative to protracted litigation, represents a more efficient use of the Debtors' already limited assets, and inures to the benefit of all stakeholders.

12.      The Global Settlement is broadly supported various stakeholders of the Debtors. The Supporting Stakeholders engaged in multiple rounds of negotiations and shared various drafts of the key documents related to the Global Settlement, including but not limited to the Plan, over the last few months to resolve multi-layered and complex disputes that began in the spring of 2024

and accelerated with the filing of these Chapter 11 Cases.  Additionally, the Special Committee of Franchise Group, Inc. and Freedom VCM Holdings, LLC (together, the "Special Committee") and the Conflicts Committee of the Boards of Directors of Freedom VCM Interco, Inc. and Freedom VCM, Inc. (together, the "Conflicts Committee") engaged in around the-clock, arm's length, good faith negotiations to address and settle Claims they could assert in exchange for mutually beneficial and valuable consideration.  The Global Settlement is supported by months of analysis, diligence, investigation, and negotiations by the Conflicts Committee and the Special Committee, each of which was disinterested and independently advised and represented at all relevant times, as well extensive negotiations between the Supporting Stakeholders.  The Conflicts Committee and the Special Committee concluded that the Global Settlement was reasonable in light of their assessment of each of the individual Claims being released, and, moreover, the significant benefits from a global resolution of all intercompany litigation.

13.     I understand that the Third Circuit specifically sets forth four factors (collectively, the "*Martin* Factors") to be considered by the court in determining the fairness, reasonableness, and adequacy of a settlement, as follows:

- the probability of success in litigation;

- the likely difficulties in collection;

- the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

- the paramount interest of creditors.

14.     I believe the *Martin* Factors weigh in favor of approval of the Global Settlement. First, the Debtors are not certain to succeed in litigating the underlying claims.  Absent the Global Settlement, the issues at hand could result in extensive, protracted litigation, the outcome of which is uncertain, and the cost to litigate would be exorbitant.  Specifically, the Debtors would be subject

to continued value-destructive litigation to the detriment of all of their stakeholders, including the stakeholders of the TopCo Debtors.  The Debtors were faced with complex issues regarding valuation and adequate protection Claims, Intercompany Claims, as well as various appeals, which my team estimated could cost the Debtors up to an additional approximately $56-$83 million in incremental professional fees, including the resolution of an estimate of approximately $12 million in professional fee obligations that may be allocable to TopCo.  It is my understanding that the potential litigation costs could exceed the consideration provided in the Global Settlement.  If the Global Settlement is not approved, the Debtors will likely face additional litigation concerning the valuation of the Debtors' assets and the Supporting Stakeholders' Claims.  Litigation between the Supporting Stakeholders would reopen resolved issues and require substantial focus from the Debtors' management team, distracting from the Debtors' day-to-day operations and from progressing these cases toward a successful reorganization.  Conversely, the Global Settlement spares the Debtors' Estates the multimillion-dollar costs of litigating numerous matters related to these various complex and costly disputes.

15.    Second, there are likely to be difficulties in collecting any judgment that might result (if any) from the protracted litigation the Global Settlement avoids.  The depletion of the Debtors' Estate from extended litigation, along with further business degradation may render any judgment uncollectable.    The Global Settlement avoids approximately $56-$83 million in additional professional fees, at least, and maximizes recovery for Holders of Claims and Equity Interests, pursuant to the Plan.

16.    Third, the avoided litigation would be complex, expensive, inconvenient, and delayed in providing any recovery to the Debtors, their stakeholders, and creditors.  I believe the efficient resolution of the underlying disputes through the Global Settlement will reduce expenses

and inconvenience at this critical juncture in these Chapter 11 Cases and that the advantages of the Global Settlement will inure to the benefit of all stakeholders.  The Debtors have agreed to provide Cash and Reorganized Common Equity to the Freedom Lender Group and to establish a Litigation Trust to pursue third-party Claims and Causes of Action.  The proceeds of the Litigation Trust shall benefit all of the Supporting Stakeholders, as detailed in the *Notice of Global Settlement* [Docket No. 1290] and the Disclosure Statement Supplement.  Under the terms of the Global Settlement, all Supporting Stakeholders agreed to settle, waive, and/or release all Claims, including Intercompany Claims.  The Debtors, in turn, have agreed to release the Supporting Stakeholders from all Claims and Causes of Action arising prior to the Effective Date.  Moreover, the Global Settlement settles, among other things, (a) alleged fraudulent transfer Claims against TopCo of at least $54 million and (b) the allocation of Professional Fee Claims among theOpCo Debtors, the Freedom HoldCo Debtors, TopCo, and all other Debtors.  Therefore, the Global Settlement eliminates the effort and expense otherwise required to adjudicate the underlying disputes and any claims for rejection damages, while also providing the Debtors with a clear path to emergence that will benefit the Debtors' Estates and their stakeholders.

17.    Finally, with respect to the interest of creditors, I believe that the terms and conditions of the Global Settlement are in the best interests of creditors because they (a) resolve any Claims that the Freedom Lenders may have against the Debtors in connection with the Intercompany Claims and (b) limit the significant costs the Debtors would incur in defending such Claims absent the Global Settlement.  The compromises reflected in the Global Settlement set forth a consensual framework for the Litigation Trust to pursue third-party Claims and Causes of Action which will, importantly, allow the Debtors to pursue Claims and potentially return funds rightfully owed to the Debtors' Estate during a critical juncture in their chapter 11 cases.

18.     Further, the Global Settlement allows the Debtors to swiftly emerge from bankruptcy and preserve their business relationship with vendors, customers, and employees, which benefits all stakeholders by preserving the value of the business and preventing further degradation.  Not only does the Global Settlement allow the Debtors to realize the immediate value of reduced professional fees and litigation expense, but it also creates opportunity for the Debtors to emerge from bankruptcy with a strengthened balance sheet and capture new business in the future.  As a result, I believe the Global Settlement is fair and reasonable and is a sound exercise of the Debtors' business judgment.

19.     I believe that entering into the Global Settlement is in the best interest of the Debtors and their Estates by avoiding value-destructive and time-consuming litigation that could impede the Debtors' attempts to reorganize their business upon emergence from chapter 11.

## The Plan Satisfies the Requirements of Confirmation

20.     I have been advised of the applicable standards under which a chapter 11 plan may be confirmed.  For the reasons detailed below, and with the assistance of the Debtors' advisors, I believe, to the best of my knowledge, that the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a plan of reorganization pursuant to section 1129 of the Bankruptcy Code.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents or where it will be the subject of other evidence introduced at the Confirmation Hearing.

I.     **The Plan Complies with the Applicable Provisions of the Bankruptcy Code — Section 1129(a)(1).**

21.     I understand that section 1129(a)(1) of the Bankruptcy Code requires that a chapter 11 plan comply with all applicable provisions of the Bankruptcy Code.  As set forth below, I believe that the Plan satisfies section 1129(a)(1) of the Bankruptcy Code.

**A.      Proper Classification of Claims and Equity Interests — Section 1122.**

22.      It is my understanding that section 1122 of the Bankruptcy Code requires that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class.

23.      I believe that the Plan satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity Interests into 14 separate Classes, with Claims and Equity Interests in each Class differing from the Claims and Equity Interests in each other Class on a legal or factual basis or based on other relevant criteria.

24.      Article III of the Plan provides for the following classification scheme for Claims and Equity Interests:

> Class 1:  Priority Non-Tax Claims
> Class 2:  Other Secured Claims
> Class 3:  Prepetition ABL Loan Claims
> Class 4:  Prepetition First Lien Loan Claims
> Class 5:  Prepetition Second Lien Loan Claims
> Class 6:  OpCo General Unsecured Claims
> Class 7:  Prepetition HoldCo Loan Claims
> Class 8-A:  Freedom HoldCo General Unsecured Claims
> Class 8-B:  HoldCo Receivables General Unsecured Claims
> Class 8-C:  TopCo General Unsecured Claims
> Class 9:  Intercompany Claims
> Class 10:  Subordinated Claims
> Class 11:  Existing TopCo Equity Interests
> Class 12:  Existing Intercompany Equity Interests

25.      I believe that the Claims or Equity Interests in each particular Class described above are substantially similar to the other Claims or Equity Interests in each such Class.  The distinctions among Classes are based on valid business, factual, and legal reasons warranting separate classification of the particular Claims or Equity Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Equity Interests.  In general, the Plan's classification scheme follows the Debtors' capital structure, taking into account

the relative priority among Claims and Equity Interests. For example, debt and equity are separately classified and secured debt is separately classified from unsecured debt. Additionally, General Unsecured Claims are classified separately based on which Debtors such Claims are asserted against. It is my understanding that other aspects of the classification scheme reasonably recognize the different legal or factual nature of the Claims or Equity Interests.

26.    Further, each Claim or Equity Interest in each particular Class is substantially similar to every other Claim or Equity Interest in that Class. Accordingly, I believe the Plan complies with and satisfies section 1122 of the Bankruptcy Code.

**B.    Specification of Classes, Impairment, and Treatment — Section 1123(a)(1)-(3).**

27.    I understand that sections 1123(a)(1), (2), and (3) of the Bankruptcy Code require that a chapter 11 plan specify in detail the classification of claims or equity interests, whether such claims or equity interests are unimpaired by the plan, and the treatment of each impaired class of claims or equity interests. Article IV of the Plan specifies in detail the classification of Claims and Equity Interests, and whether such Claims and Equity Interests are Impaired or Unimpaired. Further, Article IV of the Plan also specifies the treatment of each Impaired Class under the Plan, which are Classes 3, 4, 5, 6, 7, 8-A, 8-B, 8-C, 10, and 11. It is my understanding that Class 8-C (TopCo General Unsecured Claims) is vacant and there are no valid General Unsecured Claims at TopCo. Holders of Claims and Equity Interests in Classes 10, and 11 are Impaired under the Plan and are conclusively deemed to have rejected the Plan. Further, Holders of Claims and Equity Interests in Classes 9 and 12 are deemed to have accepted or deemed to have rejected the Plan depending on whether such Claims and Equity Interests are reinstated or canceled and released

without any distribution an account of such Claims or Equity Interests. Accordingly, I believe that the Plan complies with and satisfies sections 1123(a)(1)-(3) of the Bankruptcy Code.

      **C.**      **No Discrimination — Section 1123(a)(4).**

28.      I understand that section 1123(a)(4) of the Bankruptcy Code requires that a chapter 11 plan provide the same treatment to each claim or equity interest of a particular class. Article IV of the Plan provides that Holders of Allowed Claims or Equity Interests within a given Class receive the same rights and treatment, unless the Holder of such Claim or Equity Interest has agreed to less favorable treatment. Therefore, I believe that the Plan provides for equal treatment of similarly situated Claims and Equity Interests and complies with and satisfies section 1123(a)(4) of the Bankruptcy Code.

      **D.**      **Implementation of the Plan — Section 1123(a)(5).**

29.      I understand that section 1123(a)(5) of the Bankruptcy Code requires that a chapter 11 plan provide adequate means for a plan's implementation. I believe that the Plan satisfies this requirement. Article VII of the Plan sets forth the means for implementation of the Plan, including, among other things:

      (a)      the good faith compromise and settlement of Claims and Equity Interests;

      (b)      the authorization for the Debtors, the Reorganized Debtors, or New TopCo, as applicable, to take all actions necessary to effectuate the Plan and the Restructuring Transactions, including, without limitation, the Plan Equitization Transaction and the Partial Sale Transaction;

      (c)      the funding and sources for the Plan distributions, including the Cash distributions under the Plan;

      (d)      the consummation of the New ABL Facility;

      (e)      the consummation of the Take-Back Debt Facility;

      (f)      the issuance and distribution of Reorganized Common Equity;

      (g)      the adoption of the New Organizational Documents;

(h)     the consummation of various corporate or other similar transaction steps necessary to implement the new corporate and organizational structure upon emergence;

(i)     the formation of the Litigation Trust, the execution of the Litigation Trust Agreement, the appointment of the Litigation Trustee and the Litigation Trust Advisory Board, and the transfer of the Litigation Trust Assets, including the Litigation Trust Assets and the Litigation Trust Escrow Amount, to the Litigation Trust;

(j)     the authorization, approval, and entry into corporate actions under the Plan;

(k)     the creation of the Professional Fee Escrow Account;

(l)     the appointment of the New Boards;

(m)    the adoption and implementation of the Management Incentive Plan;

(n)     the preservation and vesting of certain Causes of Action in the Reorganized Debtors;

(o)     the preservation of the D&O Liability Insurance Policies in accordance with the terms set forth in the Plan;

(p)     except as otherwise set forth in the Plan, the continued corporate existence of the Debtors;

(q)     the cancellation of existing agreements and Equity Interests;

(r)     the assumption of certain employment obligations; and

(s)     the effectuation and implementation of further transactions contemplated by the Plan, including as may be necessary or appropriate to Reinstate Claims or Equity Interests or render Claims or Equity Interests Unimpaired, as provided for under the Plan.

30.     In addition to these core elements, the Plan sets forth various other key components of the Debtors' restructuring and emergence from chapter 11, including the treatment of Executory Contracts and Unexpired Leases and the mechanics for Plan distributions.

31.     The precise terms governing the execution of these transactions are set forth in the applicable Definitive Documents or forms of agreements, including in the Plan Supplement.  As a

result, I believe that the Plan complies with and satisfies section 1123(a)(5) of the Bankruptcy Code.

**E.    Non-Voting Equity Securities— Section 1123(a)(6).**

32.    I am advised that section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities. The Corporate Governance Term Sheet, filed with the First Amended Plan Supplement, provides only for the issuance of voting equity securities. Further, Section 7.12 of the Plan provides that the New Organizational Documents will be deemed to be modified to prohibit (and will include a provision prohibiting) the issuance of non-voting equity securities, pursuant to and solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. Accordingly, I believe that the Plan complies with and satisfies section 1123(a)(6) of the Bankruptcy Code.

**F.    Designation of Officers and Directors — Section 1123(a)(7).**

33.    I understand that section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto be "consistent with the interests of creditors and equity security holders and with public policy." Pursuant to Section 7.16 of the Plan, as of the Effective Date, "the members of each of the Boards shall be deemed to have resigned from such Board." I understand that the Debtors will disclose the identities and affiliations of the members of the New Board, as applicable, the officers of the Reorganized Debtors, if any, and other information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code prior to the Effective Date of the Plan. From and after the Effective Date, each member of the New Board and each officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

34.     I believe that the selection of the members of the New Board is consistent with the interests of all Holders of Claims and Interests and public policy.  Thus, I believe that the Plan complies with and satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

G.    **Cure of Defaults — Section 1123(d).**

35.     I believe that the Plan satisfies section 1123(d) of the Bankruptcy Code.  I understand that Article X of the Plan provides for the satisfaction of Cure Costs associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.  It is my understanding that any Cure Disputes will be determined in accordance with the procedures set forth in Article X of the Plan and applicable bankruptcy and non-bankruptcy Law.  As such, the Plan provides that the Debtors will cure defaults with respect to assumed Executory Contracts and Unexpired Leases in accordance with section 365(b)(1) of the Bankruptcy Code.  Thus, I believe the Plan complies with section 1123(d) of the Bankruptcy Code.

H.    **The Debtors Solicited the Plan in Compliance with the Bankruptcy Code — Section 1129(a)(2).**

36.     Based on consultation and guidance from legal counsel, I believe that the Plan satisfies section 1129(a)(2) of the Bankruptcy Code, which I understand requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.  I have been advised that section 1129(a)(2) encompasses both the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code, as well as the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.

37.     It is my understanding that the Debtors solicited and tabulated votes on the Plan fairly, in good faith, and in accordance with the customary solicitation procedures for chapter 11 plans of reorganization established in this district.  The Debtors, through their Claims Agent,

complied with the content and delivery requirements of sections 1125(a) and (g) of the Bankruptcy Code, mailing copies of the Disclosure Statement and the Plan to all voting creditors and posting the Disclosure Statement and the Plan on the Debtors' public restructuring case website.[5]  Prior to the solicitation, on February 21, 2025, the Bankruptcy Court entered the Disclosure Statement Order, approving the Disclosure Statement as having "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorizing the Debtors' procedures for soliciting and tabulating votes to accept or reject the Plan.

38.     Once the Global Settlement was reached, the Debtors filed the Disclosure Statement Supplement to provide additional disclosures related to the Plan and to ensure that Holders of Impaired Claims who were entitled to vote on the Sixth Amended Plan understood the resulting impact of the Global Settlement on the treatment and projected recoveries applicable under the Plan.  On April 26, 2025, the Bankruptcy Court entered the Disclosure Statement Supplement Order, approving, among other things, the form, content, and manner of notice of the Disclosure Statement Supplement and certain modifications to deadlines and procedures in connection with Confirmation.

39.     On April 28, 2025, the Debtors caused, through their Claims Agent, the Disclosure Statement Supplement to be transmitted to all Holders of Impaired Claims in the Voting Classes, as well as all parties listed on the Debtors' master service list.[6]  To the best of my knowledge, no economic stakeholder has asked for additional information or disputed that the Disclosure Statement contained information sufficient for Holders of Impaired Claims in the Voting Classes

---

[5]     For additional details regarding the Debtors' solicitation process and voting results, see the *Declaration of Craig Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Sixth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates*, filed contemporaneously herewith (the "Voting Report").

[6]     *See Affidavit of Service* [Docket No. 1383].

to be able to cast an informed vote on the Plan.  Each Holder was also given sufficient information through the Disclosure Statement Supplement to consider how the Global Settlement affects their Claim and allowed additional time to submit their Ballot prior to the Extended Voting Deadline.

40.    The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.  Based on the foregoing, I believe that the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code by complying with sections 1125 and 1126 of the Bankruptcy Code.

## I.    Plan Proposed in Good Faith — Section 1129(a)(3).

41.    I believe that the Plan was proposed in good faith, with the legitimate purpose of allowing the Debtors to maximize the value of the Debtors' Estates and to effectuate a successful chapter 11 proceeding for the Debtors.  The Debtors have proposed the Plan and the Restructuring Transactions (and all documents necessary to effectuate the Plan (including the Plan Supplement)) in good faith and not by any means forbidden by Law.

42.    The Plan, including the Global Settlement incorporated therein, is a result of extensive collaborative efforts between the Debtors and multiple groups of stakeholders.  I believe that the Plan and the Global Settlement will enable the Debtors to emerge with a deleveraged capital structure and sufficient liquidity that puts the Reorganized Debtors in a strong position to execute their business plan.  Moreover, the Plan was the product of extensive negotiations conducted at arm's length among the Debtors and certain of their key stakeholders and parties in interest in these Chapter 11 Cases including, but not limited to the Supporting Stakeholders.  As such, I believe that the Plan has been proposed in good faith and that the Plan and the Global Settlement will achieve a result consistent with the objectives and purposes of section 1129(a)(3) of the Bankruptcy Code.

**J.      Payment of Professional Fees and Expenses Are Subject to Court Approval —
Section 1129(a)(4).**

43.      It is my understanding that section 1129(a)(4) of the Bankruptcy Code requires that

certain fees and expenses paid by the plan proponent, by a debtor, or by a person receiving

distributions of property under the plan be approved by the Bankruptcy Court as reasonable.  The

Plan provides that Professional Fee Claims and corresponding payments are subject to prior

Bankruptcy Court approval and the reasonableness requirements under sections 328 and 330 of

the Bankruptcy Code.  Section 3.3(a) of the Plan, moreover, provides that Professional Persons

shall file all final requests for payment of Professional Fee Claims no later than 45 days after the

Effective Date, thereby providing an adequate period of time for parties in interest to review such

Professional Fee Claims.  Accordingly, I believe that the Plan complies with and satisfies the

requirements of section 1129(a)(4) of the Bankruptcy Code.

**K.      Directors, Officers, and Insiders — Section 1129(a)(5).**

44.      The Plan sets forth the process for appointment of the members of the New Boards,

and the identities of the members the New Boards were disclosed (to the extent known) in the Plan

Supplement.  The appointment to, or continuance in, office of the applicable persons is consistent

with public policy.  Accordingly, I believe that the Debtors have satisfied the requirements of

section 1129(a)(5) of the Bankruptcy Code.

**L.      No Rate Changes — Section 1129(a)(6).**

45.      It is my understanding that section 1129(a)(6) of the Bankruptcy Code permits

confirmation only if any regulatory commission that has or will have jurisdiction over a debtor

after confirmation has approved any rate change provided for in the plan.  The Plan does not

contain any rate changes subject to the jurisdiction of any governmental regulatory commission

and will not require governmental regulatory approval.  Thus, I believe that section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

**M.    Best Interests of Creditors — Section 1129(a)(7).**

46.    I understand that section 1129(a)(7) of the Bankruptcy Code generally requires that with respect to each class of claims or interests that is impaired under a chapter 11 plan, each holder of a claim or interest in such class either (a) accepts the plan or (b) receives or retains under the plan property of a value that is not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is commonly known as the "best interests" test.  The best interests test applies to each non-consenting member of an impaired class and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.

47.    As set forth in further detail in the Kopa Declaration, filed contemporaneously herewith, the Debtors, with the assistance of APS, prepared a liquidation analysis that estimates recoveries for members of each Class of Claims and Equity Interests based on the Debtors' assets and liabilities and assumes an orderly liquidation of inventory and certain other assets and subsequent wind-down, amongst other assumptions.  The projected recoveries for these Claims under the Plan are equal to or in excess of recoveries estimated in a hypothetical chapter 7 liquidation, and no Holders of Claims or Equity Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan.  I believe that the Liquidation Analysis represents a good-faith and reasonable estimate of what creditors would recover in a hypothetical chapter 7 liquidation scenario.

48.     Further, the Kahn Objection argues that the Plan fails to satisfy the best interests test of section 1129(a)(7) of the Bankruptcy Code with respect to TopCo.  I believe that the Kahn Objection is without merit and should be overruled.  The liquidation analysis as described further in the Kopa Declaration demonstrates that Holders of Existing TopCo Equity Interests in Class 11 would receive the same recovery—nothing—under a hypothetical chapter 7 liquidation. Moreover, the Liquidation Analysis demonstrates that, with respect to TopCo, Holders of Existing TopCo Equity Interests in Class 11 would receive no recovery in a hypothetical chapter 7 liquidation because DIP Claims have priority under the Final DIP Order and must be paid in full before any distribution can be made to Class 11.

49.     Accordingly, I believe the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**N.      Classes Unimpaired Under or Accepting the Plan — Section 1129(a)(8).**

50.     I understand that the Bankruptcy Code generally requires that each class of claims or equity interests must either accept the plan or be unimpaired under the plan.  Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired Classes of Claims, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.  As evidenced by the Voting Report, each of the Voting Classes have voted to accept the Plan, with the exception of the Deemed Rejecting Classes.  Additionally, subclasses of Class 6 (OpCo General Unsecured Claims) at Debtor entities American Freight FFO, LLC, American Freight Franchising, LLC, American Freight Group, LLC, American Freight Management Company, LLC, American Freight Outlet Stores, LLC, Buddy's Franchising and Licensing LLC, Buddy's Newco, LLC, American Freight Franchisor, LLC, American Freight Holdings, LLC, Franchise Group Intermediate B, LLC, and Franchise Group Intermediate Holdco,

LLC also voted to reject the Plan. Class 9 (Intercompany Claims) and Class 12 (Intercompany Interests) are either Unimpaired by the Plan and conclusively presumed to have accepted the Plan, or Impaired and deemed to have rejected the Plan, depending on whether Claims and Equity Interests in Class 9 and Class 12 are reinstated or canceled and released without any distribution an account of such Claims or Equity Interests. Class 10 (Subordinated Claims) and Class 11 (Existing TopCo Equity Interests) are Impaired Classes that will not receive or retain any property under the Plan on account of the Claim or Interest in each such Class, are not entitled to vote on the Plan, and are deemed to have rejected the Plan (collectively, together with Class 9 and Class 12 as applicable, the "Deemed Rejecting Classes").

51.    Nevertheless, because the Plan has not been accepted by the Deemed Rejecting Classes, as well as Class 6, with respect to certain Debtor entities,[7] the Debtors seek Confirmation under section 1129(b), solely with respect to the Deemed Rejecting Classes, and Class 6, with respect to certain Debtor entities, rather than section 1129(a)(8), of the Bankruptcy Code, as applicable.[8]  Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Deemed Rejecting Classes, I believe that the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below and, thus, is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes.

---

[7]    Class 6 voted to reject the Plan with respect to Debtor entities American Freight FFO, LLC, American Freight Franchising, LLC, American Freight Group, LLC, American Freight Management Company, LLC, American Freight Outlet Stores, LLC, Buddy's Franchising and Licensing LLC, Buddy's Newco, LLC, American Freight Franchisor, LLC, American Freight Holdings, LLC, Franchise Group Intermediate B, LLC, and Franchise Group Intermediate Holdco, LLC; *see also* the Voting Report, filed contemporaneously herewith.

[8]    It is my understanding that Class 8-C (TopCo General Unsecured Claims) is vacant and does not satisfy section 1129(a)(8) of the Bankruptcy Code.

**O.    Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code— Section 1129(a)(9).**

52.    The treatment of DIP Claims, Administrative Expense Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Tax Claims under Article III of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code. Thus, I believe the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

**P.    Acceptance by at Least One Impaired Class of Claims — Section 1129(a)(10).**

53.    It is my understanding that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As set forth in the Voting Report, all Voting Classes are Impaired, and the requisite number and amount of Claims specified under the Bankruptcy Code voted to accept the Plan, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code). Further, as set forth in the Voting Report, the Classes that are not entitled to receive or retain any property under the Plan are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

54.    The Kahn Objection asserts that the Plan fails to satisfy section 1129(a)(10) of the Bankruptcy Code with respect to TopCo because there is no Impaired accepting Class of Claims.[9] As described in greater detail in my declaration in support of the *Debtors' First Omnibus (Nonsubstantive) Objection to Proofs of Claim*, filed contemporaneously herewith, upon review of the Debtors' books and records and as reflected in the *Schedules of Assets and Liabilities for Freedom VCM Holdings, LLC* [Docket No. 536], Class 8-C (TopCo General Unsecured Claims) is vacant and that there are no valid General Unsecured Claims at TopCo. I further understand that, upon discussion with counsel, section 1129(a)(10) of the Bankruptcy Code is only applicable

---

[9]    *See* Kahn Objection ¶ 44.

where a chapter 11 plan impairs a class of claims.  It is my understanding that the text of section 1129(a)(10) of the Bankruptcy Code applies to classes of claims, and not classes of equity interests, and that an impaired class of claims under the plan must accept the plan, *if a class of claims is impaired under the plan*.  Accordingly, to the extent that no "class of claims" at TopCo is impaired, then I understand that section 1129(a)(10) of the Bankruptcy Code is satisfied as it relates to TopCo.

55.    Further, I understand that any Class of Claims or Equity Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  Moreover, any Class of Claims that is occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, but as to which no vote is cast, shall be presumed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

56.    Accordingly, I believe that the Plan complies with and satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**Q.    The Plan is Feasible — Section 1129(a)(11).**

57.    It is my understanding that section 1129(a)(11) of the Bankruptcy Code provides that a plan may only be confirmed if confirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.  This is commonly referred to as the requirement that the plan be "feasible."

25

58.     In connection with filing the Disclosure Statement, the Debtors and their advisors prepared Financial Projections for the Reorganized Debtors, which are set forth in Exhibit C to the Disclosure Statement [Docket No. 592].

59.     I have reviewed the material assumptions included in the Financial Projections, and I believe that the assumptions embodied therein were prepared in good faith and are reasonable and appropriate to provide the foundation for the Financial Projections and the Plan.  I believe that the process for developing and preparing the Financial Projections was robust and that the Financial Projections are reasonable.

60.     The Debtors and their advisors thoroughly analyzed the Reorganized Debtors' ability to meet their respective post-Confirmation Date obligations under the Plan and to continue as a going-concern without the need for further financial restructuring.  The Debtors, together with their advisors, have closely evaluated their cash flows to ensure that the Plan provides the Debtors with a reasonable assurance of commercial viability upon emergence and will not be followed by a liquidation or the need for a further financial reorganization of the Debtors or any successors to the Debtors.  The Plan will entirely deleverage the Debtors' balance sheet, which will position the Reorganized Debtors for post-emergence success.  Moreover, the Plan provides an infusion of additional liquidity, with the New ABL Facility to be funded upon the Effective Date.  I believe that the Financial Projections included in the Disclosure Statement demonstrate that the Debtors will be well-positioned when they emerge from bankruptcy to execute their business plan and to meet their obligations as they come due in the ordinary course of business.  Based on the foregoing, I believe that the Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code

**R.      The Plan Provides for Payment of All Statutory Fees — Section 1129(a)(12).**

61.      Article III of the Plan provides for the payment of all fees due and payable by the Debtors pursuant to section 1930(a) of title 28 of the United States Code on the Effective Date, and after the Effective Date, each of the Reorganized Debtors (or the Disbursing Agent acting on behalf of each of the Reorganized Debtors) shall pay any and all applicable U.S. Trustee Fees in full in Cash when due and payable.  The Debtors and the Reorganized Debtors shall remain obligated to pay any applicable U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a case under chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the Debtors or the Reorganized Debtors, as applicable, is responsible.  Thus, I believe that the Plan complies with and satisfies section 1129(a)(12) of the Bankruptcy Code.

**S.      Sections 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

62.      It is my understanding that the Debtors do not owe retiree benefit obligations or any domestic support obligations, are not individuals, and are not nonprofit corporations. Therefore, sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.

**II.      "Cram Down" Requirements — Section 1129(b) of the Bankruptcy Code.**

63.      It is my understanding that section 1129(a)(8) of the Bankruptcy Code generally requires that each class of claims or equity interests must either accept a plan or be unimpaired under a plan.  I also understand that section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met, other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  Further, I understand that to confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section

27

1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.

64.     I believe that the Plan satisfies section 1129(b) of the Bankruptcy Code.  As noted above, the Holders of Claims in Class 3 (Prepetition ABL Loan Claims), Class 4 (Prepetition First Lien Loan Claims), Class 5 (Prepetition Second Lien Loan Claims), Class 6 (OpCo General Unsecured Claims), Class 7 (Prepetition HoldCo Loan Claims), Class 8-A (Freedom HoldCo General Unsecured Claims), and Class 8-B (HoldCo Receivables General Unsecured Claims), the seven Voting Classes holding Impaired, non-insider Claims, unanimously voted to accept the Plan. The Classes that are deemed to reject or may be deemed to reject the Plan consist of:  Class 9 (Intercompany Claims), Class 10 (Subordinated Claims), Class 11 (Existing TopCo Equity Interests), and Class 12 (Existing Intercompany Equity Interests).  Further, there are no Holders of Claims in Class 8-C (TopCo General Unsecured Claims); therefore, it is my understanding that section 1129(b) of the Bankruptcy Code is satisfied.  Notwithstanding the fact that such Impaired Classes are deemed to have or may be deemed to reject the Plan, I believe that the Plan satisfies section 1129(b) of the Bankruptcy Code and is confirmable because, as demonstrated below, the Plan does not discriminate unfairly and is fair and equitable with respect to the non-accepting Impaired Classes.

### A.    The Plan Does Not Unfairly Discriminate — Section 1129(b)(1).

65.     The Plan's treatment of the non-accepting Impaired Classes is proper because all similarly situated Holders of Claims and Equity Interests at each applicable Debtor will receive substantially similar treatment.   More specifically, Claims in the non-accepting Impaired Classes—*i.e.*, Class 9 (Intercompany Claims), Class 10 (Subordinated Claims), Class 11 (Existing

TopCo Equity Interests), and Class 12 (Existing Intercompany Equity Interests—are not similarly situated to any other Classes, given they are distinctly different legally and factually from all other Claims and Equity Interests.  Accordingly, I believe that the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

       **B.**       **The Plan is Fair and Equitable — Section 1129(b)(2)(B)(ii).**

66.      I understand that a plan is "fair and equitable" with respect to an impaired class of claims or equity interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.  The absolute priority rule provides that a junior stakeholder may not receive or retain property under a plan of reorganization "on account of" its junior claims or interests unless all senior classes either (a) are paid in full or (b) vote in favor of the plan.

67.      Under the Plan, no Holder of a Claim or Equity Interest junior to a non-accepting Impaired Class of Claims or Equity Interests will receive any recovery under the Plan on account of such Claim or Equity Interest.  It is my understanding that, with respect to Class 8-C TopCo General Unsecured Claims, the Plan is fair and equitable because it satisfies the absolute priority rule.  Specifically, I understand that, as to Class 8-C TopCo General Unsecured Claims, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Class that will receive or retain any property on account of the Claims or Equity Interests in such Class, at the applicable Debtor entities.  As such, the Plan does not violate the absolute priority rule.

68.      With respect to Class 9 (Intercompany Claims) and Class 12 (Intercompany Equity Interests), the relevant Claims and Equity Interests may be Unimpaired.  These Intercompany Claims and Intercompany Equity Interests, which exist to support the Debtors' corporate structure, may be Reinstated because Reinstatement of Intercompany Claims and Equity Interests advances

an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the Reorganized Debtors.  Such treatment is for the purposes of preserving the Debtors' corporate structure and will have no economic substance.  I understand that this Reinstatement does not affect the economic substance of the Plan for the Debtors' stakeholders.

69.    Thus, the Plan satisfies the absolute priority rule (and is fair and equitable) as to these Classes, because, as to such Classes, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Classes will receive or retain any property on account of the Claims or Equity Interests in such Class.  Accordingly, I believe that the Plan satisfies the "fair and equitable" requirement of the Bankruptcy Code and that the Plan may be confirmed notwithstanding the deemed rejecting Classes.

### III.    Only One Plan is Eligible to be Confirmed — Section 1129(c).

70.    I understand that section 1129(c) of the Bankruptcy Code prohibits the confirmation of multiple plans.  Other than the Plan (including previous versions thereof), no other plan has been filed for the Debtors in these Chapter 11 Cases.  The Plan, therefore, satisfies the requirements of section 1129(c) of the Bankruptcy Code.

### IV.    Principal Purpose of the Plan — Section 1129(d).

71.    I understand that section 1129(d) of the Bankruptcy Code prohibits confirmation of a chapter 11 plan if it was designed and proposed to evade taxes or the requirements of section 5 of the Securities Act.  I do not believe that the Plan was proposed for either proscribed purpose; rather, I believe that the Plan was proposed with the sincere intention to provide a framework for the Debtors' restructuring.  The Debtors filed the Plan to accomplish their objective of reorganizing their capital structure and maximizing value for all stakeholders.  The Restructuring Transactions contemplated by the Plan, including the Plan Equitization Transaction, the Partial Sale Transaction, and the terms of the Global Settlement, are the result of good-faith, arm's-length

negotiations with various stakeholders.  The Plan's comprehensive deleveraging will strengthen the Debtors' balance sheet and set the Debtors on the path for long-term success.  Moreover, no party that is a Governmental Unit, or any other Entity, has requested that the Bankruptcy Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  Accordingly, I believe that the Debtors have satisfied the requirements of section 1129(d) of the Bankruptcy Code.

## V.      Modifications to the Plan do not Require Resolicitation.

72.      I understand that section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, I understand that when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  I understand that Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equityholders who have previously accepted the plan if the court finds that the proposed modifications do not materially and adversely change the treatment of the claim of any creditor or the equity interest of any equityholder.

73.      Here, the Debtors extended the Solicitation Period from April 23, 2025, to May 7, 2025 and provided the Disclosure Statement Supplement to ensure that creditors understood certain modifications to the Plan.[10]  Each Holder was informed how the Global Settlement would impact their treatment under the Plan and had adequate time to make an informed decision on whether to vote to accept or reject the Plan before the Extended Voting Deadline.

---

[10]    *See Disclosure Statement Supplement Order* [Docket No. 1322], extending the Voting Deadline to May 7, 2025.

74.     Here, the Debtors made certain modifications to the Plan after the Solicitation Period ended.   Contemporaneously with the filing of this Declaration, the Debtors filed an amended version of the Plan, which makes technical clarifications and resolves certain formal and informal comments to the Plan by parties in interest.   The modifications incorporate nonsubstantive comments from various stakeholders and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.   I understand that the Global Settlement Parties support these modifications.   Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

**The Consensual Third Party Release and Exculpation Provisions Are Appropriate**

75.     Article XII of the Plan contains the Third-Party Release.  Based on my discussion with the Debtors' advisors, I understand that the Third-Party Release is a consensual opt-in release.

76.     Ultimately, the value-maximizing transaction contemplated by the Plan would not be possible without the support of the Released Parties.  Thus, the Third-Party Release operates to maximize the Reorganized Debtors' fresh start by minimizing the possibility of distracting post-emergence litigation or other disputes.

77.     I believe that the Third-Party Release is an integral and essential provision of the Plan and provides finality for the Released Parties regarding the Released Parties' respective obligations under the Plan, is in exchange for good and valuable consideration provided by the Released Parties, is in the best interests of the Debtors, the Estates, and all creditors, is fair, equitable, and reasonable, and is given and made after due notice and opportunity to be heard.

78.     The Third-Party Release is generally provided by the parties participating in the formulation and negotiation of the Plan or to the extent a party affirmatively opts in to the Release. Moreover, the Third-Party Release is critical to the success of the Plan.  Without the efforts of the

Released Parties, both in negotiating and navigating the Global Settlement and Plan negotiations, the Debtors would not have been poised to confirm a plan that reorganizes their business and operations and paves the way for future success.  In addition, many of the Released Parties have been instrumental in supporting these Chapter 11 Cases and facilitating their smooth and expeditious administration.  Finally, throughout these Chapter 11 Cases and the related negotiation, the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders and invested countless hours in their efforts to do so.

79.    Article XII contains the exculpation provision.  Like the Released Parties, the Exculpated Parties played key roles in formulating and negotiating the Restructuring Support Agreement, the Plan, the sale of the Vitamin Shoppe business, and the Global Settlement as it relates to the Debtors.  Moreover, the Exculpated Parties took these actions in good faith and with a high degree of transparency.  Finally, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful reorganization, and likely would not have participated in the Plan process without the promise of exculpation.

## VI.    Good Cause Exists to Waive the Stay of the Confirmation Order.

80.    I understand that Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  I also understand that Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the

Bankruptcy Code.  It is my understanding that each rule also permits modification of the imposed stay upon court order.

81.     Good cause exists for waiving and eliminating any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order will be effective immediately upon its entry.  The Debtors are seeking to confirm the Plan after extensive negotiations with their key stakeholders.  These negotiations culminated in the Global Settlement and resolves various litigation and other matters that were rapidly depleting the Debtors' Estates.  Preserving value for the benefit of the Debtors' Estates depends, in large part, on Confirmation of the Plan, approval of the Global Settlement contained therein, and quickly emerging from chapter 11.

82.     Emerging swiftly from chapter 11 will enable the Debtors to minimize uncertainty for employees, customers, and vendors, will mitigate potential disruptions to the Debtors' businesses, and will reduce incremental professional fees and other administrative costs that would reduce the Reorganized Debtors' available Cash at emergence.  Further, these Chapter 11 Cases have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information, both pre- and postpetition.  Given that the Plan, incorporating the Global Settlement, has been accepted by seven Voting Classes holding Impaired Claims, the expeditious Confirmation of the Plan, including approval of the Global Settlement contained therein, and swift emergence from chapter 11 are in the best interests of the Debtors, their Estates, and all interested parties.

83.     For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into, and Consummation of, the documents and transactions related to the Restructuring Transactions so that the Effective Date of the Plan may occur as soon

as possible after the Confirmation Date.  Accordingly, I believe that good cause exists to waive the stay of the Confirmation Order.

### **Conclusion**

84.    In conclusion, it is my opinion that the Plan satisfies the requirements of Confirmation and should be approved.


*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  May 14, 2025

*/s/ David Orlofsky*
David Orlofsky
Chief Restructuring Officer