**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | ) ) | Case No. 24-12480 (LSS) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF JEFFREY W. KOPA
IN SUPPORT OF AN ORDER (I) CONFIRMING THE NINTH
AMENDED JOINT CHAPTER 11 PLAN OF FRANCHISE GROUP, INC.
AND ITS DEBTOR AFFILIATES AND (II) GRANTING RELATED RELIEF**

I, Jeffrey W. Kopa, hereby declare under penalty of perjury:

**Background and Qualifications**

1.  I am a Partner and Managing Director in the Investigations, Disputes & Advisory Services practice at AlixPartners, LLP ("AlixPartners"), which has a principal place of business at

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260); Franchise Group Newco BHF, LLC (4123); Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 109 Innovation Court, Suite J, Delaware, Ohio 43015.

909 Third Avenue, Floor 30, New York, New York 10022. I joined AlixPartners in 2006 and have held the position of Partner and Managing Director since January 2024.

2. I have 20 years of professional experience in valuation and financial analysis, much of which has involved troubled or bankrupt companies, and have analyzed companies in a diverse range of industries. I have a Bachelor of Business Administration (with high distinction) from the University of Michigan and a Master of Business Administration and Master of Science in Finance from the Indiana University Kelley School of Business. I am a CFA Charterholder and a member of the CFA Institute and the Turnaround Management Association. My *curriculum vitae* ("CV") with additional detail on my background and qualifications is attached hereto as **Exhibit A**.

3. As an advisor, I have conducted numerous financial, valuation, and liquidation analyses for various companies, including Ebix, Inc., Ditech Holding Corporation, Lonestar Resources US Inc., Sheridan Holding Company II, LLC, Paragon Offshore plc, General Motors, Tidewater, Linn Energy, Berry Petroleum, C&J Energy Services, Basic Energy Services, SH130, CGG Holdings, Gymboree, Dura Automotive, Motorcar Parts of America, Velocity Holding Company, Inc., Fisker Automotive, and Cano Health, Inc. Additionally, I have previously been qualified as an expert in U.S. bankruptcy courts and in U.S. district courts.

4. AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing financial advisory services and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these Chapter 11 Cases.[2] Since its inception in

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Memorandum of Law (I) in Support of an Order (A) Confirming the Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates and (B) Approving the Global Settlement and Release of Claims and Causes of Action By and Among the Global Settlement Parties, and (II) Omnibus Reply to Objections Thereto*, [Docket No. 1457], or the Plan (as defined herein), as applicable.

2

1981, AlixPartners has provided restructuring or crisis management services in numerous large cases. AlixPartners has extensive experience in providing financial and restructuring advisory services to debtors and financially distressed companies.

5. I submit this declaration (the "Declaration") in support of Confirmation of the *Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates* [Docket No. 1454] (as may be modified, amended, or supplemented from time to time, the "Plan").

6. AlixPartners has been engaged as a financial advisor to the Debtors since July 2024. In that time, AlixPartners' personnel providing services to the Debtors, including myself, worked closely with the Debtors and other professionals in assisting with the Debtors' restructuring efforts and the various requirements of these Chapter 11 Cases. As a result of that work, I am familiar with the Debtors' financial affairs, capital structure, business operations, books and records, liquidity position and needs.

7. The statements in this Declaration are based on my personal knowledge, my discussions with the Debtors' employees or advisors, my review of relevant documents (listed in **Exhibit B** attached hereto), and my opinion based upon my experience, knowledge, and information concerning the Debtors' financial affairs. If called upon to testify, I would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

### The Plan Satisfies the Best Interests Test

8. I understand that section 1129(a)(7) of the Bankruptcy Code generally requires that with respect to each class of claims or interests that is impaired under a chapter 11 plan, each holder of a claim or interest in such class either (a) accepts the plan or (b) receives or retains under the plan property of a value that is not less than the value such holder would receive if the debtor

were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly known as the "best interests" test. The best interests test applies to each non-consenting member of an impaired class and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.

9.  To determine whether the Plan satisfies the best interests test, I, with the assistance of my team and the Debtors, prepared a liquidation analysis, which is attached as **Exhibit C** to my Declaration (the "Liquidation Analysis"). The Liquidation Analysis estimates (a) the projected cash proceeds that a chapter 7 trustee would generate if the chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code on or about May 16, 2025 (the "Conversion Date") and (b) the distribution that each Class of Allowed Claims or Equity Interests would receive from the liquidation proceeds under the priority scheme dictated by the Bankruptcy Code. Such recoveries are then compared with the estimated recoveries to Holders of Allowed Claims and Equity Interests under the Plan.

10. I oversaw the preparation of the Liquidation Analysis and worked closely with a team of AlixPartners professionals in its development. The Liquidation Analysis was completed following due diligence by the Debtors, the AlixPartners team, and Ducera, the Debtors' investment banker, which included a review of the Debtors' books and records and discussions with the Debtors' management. The Liquidation Analysis is based on the estimated value of the Debtors' assets and liabilities as of the Conversion Date. In addition, the Liquidation Analysis incorporates various estimates and assumptions, including those detailed in **Exhibit D**, which I believe are reasonable under the circumstances and are customarily used in chapter 11 cases similar to this one. These estimates and assumptions include the projected costs associated with the

administration of the Estate and the support required to wind down the Debtors' operations in a hypothetical conversion to a chapter 7 liquidation.

**I.     Documents Relied Upon**

11.     In preparing the Liquidation Analysis and applying the best interests test, I relied upon numerous documents, including the following (as listed in **Exhibit B**): (a) the Debtors' 2025 budget; (b) the valuation and inventory reports of Pet Supplies Plus, LLC ("PSP") and The Vitamin Shoppe, Inc. ("TVS") prepared by Gordon Brothers Asset Advisors, LLC; (c) the final reconciliation of the liquidation of the American Freight Debtors; (d) numerous Debtor trial balances; (e) publicly available documents from these Chapter 11 Cases and a March 2025 claims calculation; and (f) other publicly available information related to historical trademark sales.

**II.    Recovery Methodologies**

12.     Certain of the assumptions and recoveries I used to complete the Liquidation Analysis are detailed in **Exhibit D** and include three classes of assets: (a) accounts receivable, (b) inventory, and (c) trademarks included within other intangible assets. My methodologies for the expected recovery of each class of assets detailed in **Exhibit D** are explained below:

   **a. Accounts Receivable**

13.     To estimate the recovery of accounts receivable, I considered brand-specific accounts made at the sub-classification level. The recoveries I estimated were based on several factors, such as counterparty, aging, concentration, and potential offsets. The recovery estimates provide a range of low, mid, and high recovery percentages. The balances for all the above accounts are sourced from the trial balances I reviewed as listed in **Exhibit B**.

b. **Inventory**

14. To estimate inventory recoveries for PSP, WNW Stores, and TVS, I began by estimating the midpoint recovery according to the most recent (December 2024) net orderly liquidation value ("NOLV") contained within each respective inventory appraisal. The NOLV was adjusted for potential upside and downside. The low and high recovery estimates were calculated by applying a 5% plus or minus recovery range.

15. To estimate the inventory recovery for the Buddy's Debtors, I used precedent liquidation data related to the recent liquidation of the American Freight Debtors' inventory. The American Freight Debtors liquidated from late 2024 into early 2025 and operated a similar business to the Buddy's Debtors. The American Freight Debtors' liquidation recovery of 45% is a reasonable indication of liquidation proceeds that could be recovered for the Buddy's Debtors. As the data was not identical to the Buddy's Debtors' inventory, I applied a plus or minus 15% recovery range (30% low to 60% high).

c. **Trademark Value**

16. To estimate trademark recovery value, I gathered publicly available tradename sales of 14 liquidating businesses and calculated the ratio of the tradename sale price to each business's corresponding revenue. I then calculated the median ratio of these 14 businesses as 0.44%. Using this ratio as the midpoint recovery estimate ratio, I calculated the mid-recovery value of each of Debtors' trademarks based on the latest LTM revenue of each store brand. I calculated plus or minus 50% as the low and high recovery estimates.

III. **Calculation of Total Liquidation Proceeds**

17. I calculated liquidation proceeds by totaling the following assets of the Debtors: (a) cash & cash equivalents, (b) current receivables, (c) inventory, (d) prepaid expenses and other

current assets, (e) property, plant, and equipment, (f) notes and other receivables, (g) goodwill, (h) other intangible assets, (i) right-of-use assets, and (j) other assets. Using the low and high recovery estimates, I calculated the range of liquidation assets to be $13.2 million for Freedom VCM Holdings, LLC ("TopCo"), $0.0-$9.9 million for Freedom VCM Interco Holdings, Inc., Freedom Receivables II, LLC, and Freedom VCM Receivables, Inc ("HoldCo Receivables"), $0.0 million for Freedom VCM Interco, Inc. and Freedom VCM, Inc. ("HoldCo," and together with TopCo and the HoldCo Receivables, the "HoldCo Debtors"), $501.8-$584.8 million for Debtor Franchise Group, Inc. and its direct and indirect subsidiaries ("OpCo"), $0.2-$0.3 million for WNW Franchising, LLC, and $0.6-$0.9 million for WNW Stores, LLC.

### IV.     Deduction of Liquidation Costs

18.     I then estimated the liquidation costs as the total wind-down costs, professional fees, and Chapter 7 trustee fees. I estimated trustee fees to be 3% of gross distributable proceeds. Assuming an expeditious six-month liquidation process, I estimated the range of liquidation costs to be $1.0-$1.1 million for TopCo, $0.9-$1.0 million for HoldCo Receivables, $0.0 million for HoldCo, $64.2-$74.3 million for OpCo, $0.2-$0.3 million for WNW Franchising LLC, and $0.6 million for WNW Stores, LLC. Deducting liquidation costs from assets gives the following ranges of net proceeds available for distribution to creditors: $12.1-$12.3 million for TopCo, $0.0-$8.9 million for HoldCo Receivables, $0.0 for HoldCo, $427.5-$520.7 million for Opco, $0.0 for WNW Franchising, LLC, and $0.0-$0.3 million for WNW Stores, LLC.

### V.     Calculation of Recoveries for Each Class of Creditor

19.     The $12.1-$12.3 million net proceeds from TopCo will only cover 4.3%-4.4% of the new money DIP Claims, which total $280.2 million, leaving nothing for each remaining Impaired Class.

7

20. The $0.0-$8.9 million net proceeds from HoldCo Receivables will only cover 0.0%-3.2% of the new money DIP Claims, leaving nothing for the remaining Impaired Classes. There are no net proceeds from HoldCo to cover the DIP Claims.

21. Of the $427.5-$520.7 million range of net proceeds from OpCo, the total net proceeds from ABL Collateral are $383.3-$450.2 million, enough to recover 100% of the $262.9 million of Prepetition ABL Loan Claims. Deducting the Prepetition Loan Claims from total net proceeds from ABL Collateral leaves a $120.4-$187.3 million surplus range. Adding back the non-ABL Priority Collateral proceeds results in total net proceeds available for distribution to other creditors in a range of $164.6-$257.8 million. The remaining net liquidation proceeds will cover only a fraction (21.0%–32.8%) of the $784.9 million in DIP Claims for OpCo, leaving nothing for the remaining Impaired Classes.

22. While the sale of the Vitamin Shoppe business has not yet closed, assuming that sale closes and as depicted in the scenario at **Exhibit E**, the midpoint of DIP Claims recovery in a liquidation scenario is $270.0 million. Therefore, even accounting for the proceeds from a sale of the Vitamin Shoppe business in a hypothetical liquidation, there would still be insufficient assets to cover all the new money DIP Claims and provide a recovery to TopCo stakeholders.

23. There are no net proceeds from WNW Franchising, LLC to cover the DIP Claims, and the $0.0-$0.3 million in net proceeds from WNW Stores, LLC will also not cover the DIP Claims.

### VI. Comparison of Plan Recovery and Liquidation Recovery

24. The projected recoveries under the Plan[3] and the results of the Liquidation Analysis for all Holders of Claims and Equity Interests are as follows:

| Class | Claims and Equity Interests | Estimated Plan Recovery | Estimated Liquidation Recovery |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | 100% | 100% |
| Class 2 | Other Secured Claims | 100% | 100% |
| Class 3 | Prepetition ABL Loan Claims | 100% | 100% |
| Class 4 | Prepetition First Lien Loan Claims | 4.3%-6.1% | 0% |
| Class 5 | Prepetition Second Lien Loan Claims | 24.1%-30.9% | 0% |
| Class 6[4] | OpCo General Unsecured Claims | .75% | 0% |
| Class 7 | Prepetition HoldCo Loan Claims | 1.5% | 0% |
| Class 8-A | Freedom HoldCo General Unsecured Claims | N/A | 0% |
| Class 8-B | HoldCo Receivables General Unsecured Claims | N/A | 0% |
| Class 8-C[5] | TopCo General Unsecured Claims | N/A | 0% |
| Class 9 | Intercompany Claims | N/A | 0% |

---

[3] The source of Plan recoveries is the *Disclosure Statement Supplement for the Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates* [Docket No. 1314-1] filed on April 25, 2025.

[4] As described more fully in the Disclosure Statement Supplement, the projected recoveries to Holders of Allowed OpCo General Unsecured Claims assume that such Holders will receive its *pro rata* share of estimated Litigation Trust Funding of approximately $19 million on account of their *pro rata* share of the Litigation Trust Units in accordance with the Litigation Trust Units Allocation. However, pursuant to the Plan, the Litigation Trust Funding shall be primarily reserved for the costs and expenses (including advisor fees and expenses) of the Litigation Trust and Holders of Allowed OpCo General Unsecured Claims may not receive any recovery on account of the Litigation Trust Units. Further, the actual amount of Litigation Trust Funding may be higher or lower than the amount used herein, depending on the total amount of fees and expenses of Professional Persons retained by the Creditors' Committee.

[5] As described more fully in the *Declaration of David Orlofsky in Support of the Debtors' First Omnibus (Nonsubstantive) Objection to Proofs of Claim*, filed contemporaneously herewith, upon review of the Debtors' books and records and as reflected in the Schedules of Assets and Liabilities for TopCo [Docket No. 536], I understand that Class 8-C TopCo General Unsecured Claims is vacant, and there are no valid General Unsecured Claims at TopCo.

| Class | Claims and Equity Interests | Estimated Plan Recovery | Estimated Liquidation Recovery |
|---|---|---|---|
| Class 10 | Subordinated Claims | 0% | 0% |
| Class 11 | Existing TopCo Equity Interests | 0% | 0% |
| Class 12 | Existing Intercompany Equity Interests | 0% | 0% |

25. Recoveries under the Liquidation Analysis were compared to recoveries under the Plan to demonstrate that each Holder of a Claim or Equity Interest in an Impaired Class will receive at least as much, if not more, under the Plan as such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Moreover, four impaired classes (Classes 4, 5, 6, and 7) will receive more under the Plan than under a hypothetical liquidation. Based on the Liquidation Analysis, a liquidation of the Debtors' assets would produce less value for distribution to creditors and equity interest holders than recoverable under the Plan.

### Response to Brian and Lauren Kahn's Plan Objection

26. I have reviewed the *Objection and Reservation of Rights of Brian Kahn and Lauren Kahn JT Ten to Confirmation of Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates* [Docket No. 1430] ("Kahn Objection") filed on May 7, 2025. In their objection, the Kahns assert that they are equity holders in TopCo, which they contend has considerable assets and minimal liabilities and "presents the exceedingly rare situation in bankruptcy where equity holders are entitled to receive distributions." The Kahns argue that the Plan fails the best interests test because the TopCo distributions would be paid out in a hypothetical liquidation, while the Plan provides no recovery for their Class of Impaired Equity Interests (Existing TopCo Equity Interests – Class 11).

10

27. The Kahn Objection is incorrect in its assertion that Class 11 would receive a greater recovery in a hypothetical liquidation than under the Plan. To the contrary, the Existing TopCo Equity Interests would not be entitled to any recovery or distribution in a hypothetical liquidation. Instead, in a hypothetical liquidation, TopCo's $12.1 to $12.3 million in net proceeds would first need to be used to satisfy other obligations of that entity.

28. *First*, TopCo would be responsible for its share of the $280.2 million in new money DIP Claims, resulting in approximately 4.3% to 4.4% of recovery to the $280.2 million in new money DIP Claims. The payment of those claims would leave TopCo with $0.0. Based on the scenario depicted in **Exhibit E**, this remains true even assuming the Debtors close the sale of the Vitamin Shoppe business.

29. *Second*, even if the new money DIP Claims could be paid in full (they cannot), TopCo would still be responsible for its share of administrative costs, including professional fees. I have assumed that TopCo would be allocated approximately $12.1 million in total estimated professional fees. Accordingly, even in a hypothetical scenario where new money DIP Claims were paid in full, TopCo stakeholders would still never receive any liquidation recoveries.

30. *Finally*, it is also unlikely that TopCo would have any assets available for distribution given that TopCo's $12.1 to $12.3 million of net proceeds is subject to litigation risk. Specifically, it is my understanding that the HoldCo entities would be able to assert a fraudulent transfer claim in connection with the transfer of the $13.2 million to TopCo (which fraudulent transfer claim the Plan resolves pursuant to the Global Settlement). Without the Global Settlement, TopCo would need to expend substantial resources defending against this fraudulent transfer claim. And if this claim were successful, TopCo would not have any assets to distribute to the Equity Interests (Class 11) claimed by the Kahns. Consequently, none of TopCo's assets would

be available in a hypothetical liquidation to provide a recovery to the Equity Interests (Class 11) claimed by the Kahns.

## **Conclusion**

31.    Accordingly, it is my conclusion that the Plan is in the best interests of creditors and interest holders and satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  May 14, 2025               /s/ *Jeffrey W. Kopa*
                                   Jeffrey W. Kopa
                                   Partner and Managing Director
                                   AlixPartners, LLP