**<u>Exhibit A</u>**

***Gale v. Vintage Cap. Mgmt., LLC*, Case No. 2024-0726-LWW, Complaint ¶¶ 178–201**[1]

---

\*    The redactions included in this **<u>Exhibit A</u>** are as originally filed.   The Debtors have not applied any redactions to this **<u>Exhibit A</u>** and are not seeking admission of any information that is redacted herein.  The Debtors therefore have not, and do not intend to, file a motion to seal any redacted information.

**EFiled: Jul 12 2024 03:58PM EDT**
**Transaction ID 73648030**
**Case No. 2024-0726-LWW**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BRIAN GALE, MARK NOBLE, TERRY PHILIPPAS, and LAWRENCE BASS, | ) ) ) |
| Plaintiffs, | ) ) C.A. No. 2024-0726-LWW |
| v. | ) ) ) |
| VINTAGE CAPITAL MANAGEMENT, LLC, BRIAN KAHN, ANDREW LAURENCE, MATTHEW AVRIL, and B. RILEY FINANCIAL, INC. | ) **PUBLIC [REDACTED]** ) **VERSION AS FILED** ) **ON JULY 12, 2024** ) ) ) |
| Defendants. | ) ) |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiffs Brian Gale, Mark Noble, Terry Philippas, and Lawrence Bass (collectively, "Plaintiffs"), on behalf of themselves and similarly situated former stockholders of Franchise Group, Inc. ("Franchise Group" or the "Company"), bring this Verified Class Action Complaint (the "Complaint") asserting breaches of fiduciary duty and related claims stemming from the August 21, 2023 management-led take-private of the Company (the "Merger"), in financial partnership with B. Riley Financial, Inc. ("B. Riley") and Irradiant Partners ("Irradiant").

The allegations herein are based on Plaintiffs' knowledge as to themselves and, as to all other matters, on information and belief, including counsel's investigation, review of publicly available information, and the review of certain

books and records produced by Franchise Group in response to Plaintiffs' demands made under 8 *Del. C.* § 220 (collectively, the "Demands").[1]

## **INTRODUCTION**

1.      On August 21, 2023, Franchise Group's Chief Executive Officer, Brian Kahn ("Kahn"), along with his investment vehicle Vintage Capital Management, LLC ("Vintage") and other Company insiders, took Franchise Group private for the unfair price of $30.00 per share (the "Merger").  Kahn, Vintage, and Andrew Laurence ("Laurence") (the Company's Executive Vice President and also a Vintage partner) controlled approximately 43.5% of the Company's voting power and were all members of the buyout consortium.

2.      While the Company's Definitive Proxy Statement (the "Proxy") and other public filings stated that the sale process leading to the Merger began in mid-March of 2023 with an unsolicited offer to acquire the Company for $30 per share by Kahn's long-time investing partner B. Riley, that was not true.  Kahn had begun exploring a take-private transaction at least as early as January 2023.  Then Kahn, through the Company, approached Jefferies LLC ("Jefferies") about providing potential debt financing for a take-private transaction and personally engaged in

_____

[1] On June 17, 2024, the Company certified completeness of its productions in response to the Demands.

discussions with Jefferies for the next two months.  During this time, in late February/early March 2023, Jefferies prepared an analysis of theoretical take-private prices between *$30 and $38* per share, which assumed that Kahn would roll over his equity and that B. Riley would roll over its existing preferred equity and make an additional equity investment.  *None of this information is disclosed in the Proxy.*

3.     Approximately three weeks later, on March 19, 2023, following discussions with Kahn, B. Riley submitted its offer to acquire the Company for $30 per share, conditioned on Kahn rolling over his equity in the Company.  In response, the Company's board of directors (the "Board") formed a special committee (the "Special Committee") comprised of Matthew Avril ("Avril"), Cynthia Dubin ("Dubin"), and Thomas Herskovits ("Herskovits") to evaluate the proposal.  But Avril, who was also the Chairman of the Special Committee, was a long-time Kahn associate who was invested in and had served as an advisor to Vintage.  Avril immediately took control of the Special Committee and worked with Kahn to engage Jefferies as the Special Committee's financial advisor, despite Jefferies' recent work for Kahn on a potential take-private.

4.     Avril not only excluded the other members of the Special Committee from discussions with the Special Committee's advisors and Kahn, but he also effectively delegated all Merger negotiations *to Kahn*, who ultimately abandoned

the charade of B. Riley being the acquirer of the Company and stepped in as the head of the buying consortium in the Merger.  During the entirety of the six-week Merger process, the Special Committee made one counteroffer of $33 per share and, when it was immediately rejected, simply approved the $30 original offer and recommended it to the Board.

5.    Moreover, during the Special Committee process, Kahn and Laurence drastically slashed the Company's EBITDA projections used by Jefferies in its fairness opinion by approximately 50% across the entire projection period as compared to the projections that Kahn had provided Jefferies for analyzing financing for his potential take-private transaction.  This reduction had the effect of lowering Jefferies' valuation of Franchise Group significantly, rendering the takeout price unfair.  Indeed, B. Riley appeared to acknowledge that the Merger was a steal, publicly touting that the value of just two of Franchise Group's individual business segments were worth well in excess of the $2.8 billion Merger value.

6.    After the Merger closed in August 2023, Kahn was implicated in a multi-hundred million dollar fraud scheme, which appears to have ties to both Franchise Group-related businesses and B. Riley.  The fraud, which pre-dated the Merger, uncovered numerous additional investment ties between Kahn, Vintage, and B. Riley that were never disclosed to Franchise Group stockholders in the Proxy.

7.    For all the foregoing reasons, the Merger's "facial" compliance with the precepts of *Kahn v. M&F Worldwide Corp.* fails.  *See Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 645 (Del. 2014).  Plaintiffs bring this entire fairness Action to recover the damages to Franchise Group's minority public stockholders flowing from Defendants' actions.

## PARTIES AND RELEVANT NON-PARTIES

### I.    PLAINTIFFS

8.    **Plaintiffs** each owned shares of common stock of Franchise Group at all relevant times and each received $30 per share in cash for those shares when the Merger closed.

### II.    DEFENDANTS

9.    **Defendant Vintage Capital Management, LLC** (as defined above, "Vintage") is a value-oriented, operations-focused, private and public equity investor specializing in the consumer, aerospace and defense, and manufacturing sectors.

10.    **Defendant Brian Kahn** (as defined above, "Kahn") served as a director of the Company from September 2018 until the closing of the Merger, and as the Company's President and Chief Executive Officer ("CEO") from October 2019 until the closing of the Merger.  Kahn founded and has served as the investment

5

manager of Vintage and its predecessor, Kahn Capital Management, LLC, since 1998.

11.     Kahn, individually and beneficially through a family trust, and through Vintage, owned 41.9% of Franchise Group's common stock before the Merger. Pursuant to amended rollover agreements executed by Kahn and other members of management disclosed on August 8, 2023,[2] Kahn and his affiliates rolled over approximately 11.9 million shares of Company common stock, contributing approximately $357 million to the post-Merger Company.

12.     Upon information and belief, Kahn sold approximately $64.6 million of his rolled-over Franchise Group shares to B. Riley within days after the August 21, 2023 close of the Merger.[3]  On January 22, 2024, in the midst of heavy scrutiny of his involvement with an imploded investment fund accused of defrauding investors out of nearly $300 million, Kahn resigned as the post-Merger Company's CEO.

---

[2] On August 8, 2023, the Company filed several amendments (the "Supplemental Disclosures") to the Franchise Group, Inc. Definitive Proxy Statement (Schedule 14A) (July 14, 2023) (previously defined as the "Proxy").

[3] Jonathan Weil, *Unraveling the Money Trail at B. Riley Financial*, WALL ST. J. (Feb. 12, 2024),         https://www.wsj.com/livecoverage/stock-market-today-dow-jones-02-12-2024/card/unraveling-the-money-trail-at-b-riley-financial-ghNNvsaYRCafETT6ye9z (hereinafter "*Unraveling the Money Trail*").

13.   **Defendant Andrew Laurence** (as defined above, "Laurence") served as the Company's Executive Vice President from October 2019 until the closing of the Merger, and previously served as a Company director from September 2018 until May 2021.  Laurence is a longtime partner at Vintage, where since 2010 he has been "responsible for all aspects of its transaction sourcing, due diligence and execution."[4] Laurence replaced Kahn as the post-Merger Company's CEO.

14.   Laurence owned 573,482 shares of Company common stock, approximately 1.6% of the common stock outstanding.[5]  Pursuant to amended rollover agreements executed by Laurence and other members of management disclosed on August 8, 2023, he rolled over 573,482 shares of Company common stock, contributing approximately $17 million to the post-Merger Company.  In addition to equity interests in the post-Merger Company, Laurence received over $2 million in cash in connection with the acceleration of his Company restricted stock.

15.   **Defendant Matthew Avril** (as defined above, "Avril") served as a director of the Company from September 2018 until the closing of the Merger, and he served as Chairman of the Board at the time of the Merger.  Avril also served as Chairman of the Special Committee.  Additionally, Avril served on Vintage's

---

[4] Proxy at 107.

[5] Proxy at 109.

strategic advisory board until at least 2022 (and possibly as late as February 2023),[6] personally invested in certain Vintage-affiliated investments, and owned a limited partnership interest in Vintage.

16.    In connection with his service on Vintage's strategic advisory board, Avril was appointed to the boards of Vintage's portfolio companies, including Aaron's Inc. ("Aaron's"), AP Technologies Corp. ("API"), and Babcock & Wilcox Enterprises, Inc. ("B&W").

17.    With respect to Aaron's, Kahn was appointed to Aaron's board of directors pursuant to a settlement agreement to resolve a proxy contest between Vintage and Aaron's board of directors.  Kahn personally designated Avril to serve alongside him on the Aaron's board as Vintage's second board designee.  In 2016, while Avril was on the board of directors, Aaron's sold its HomeSmart stores to a

---

[6] It remains unclear if, and when, Avril stepped down from his position on Vintage's strategic advisory board.  While the Company's Supplemental Disclosures state Avril served on Vintage's strategic advisory board until 2019, Avril remained listed as a member of the strategic advisory board on Vintage's website until February 2022, and the Company's 2022 proxy statement filed in April 2022 states Avril was *currently* serving on Vintage's strategic advisory board at the time of the filing.  *See* Franchise Group, Inc., Definitive Proxy Statement (Schedule 14A) (April 22, 2022), at 6.  Additionally, on February 16, 2023, in his 2023 Director & Officer Questionnaire, Avril confirmed the information listed in his Proxy Statement Background was "correct and complete," which included the following line: "He is *currently* a member of the strategic advisory board of Vintage Capital Management, LLC[.]"  *See* FG_00001781, -1819 (emphasis added).  Meanwhile, the 2023 Proxy—filed less than two months later in the midst of the Merger process—entirely removed the sentence referencing Avril's service on Vintage's strategic advisory board.

subsidiary of Buddy's Home Furnishing ("Buddy's"), a portfolio company of Vintage. Due to Avril's ties to Vintage, Avril *abstained from the board's vote* on the HomeSmart transaction.

18.    With respect to API, Kahn became the chairman and CEO of API in connection with a merger whereby Vintage became API's majority stockholder. Following that merger, Avril joined Kahn on API's board of directors, and Defendant Laurence joined API's management.

19.    And finally, with respect to B&W, Kahn and Avril each joined its board of directors in connection with a voting agreement with Vintage. Avril also served as a director of B&W alongside Bryant Riley ("Riley"). Moreover, prior litigation in this Court involving Avril, Kahn, and B. Riley confirmed that Avril "had social ties with Brian Kahn," had previously "noted his lengthy relationship with Kahn in an email[,]" and sent a text message to a potential director at B&W "highlighting the benefits of working with Vintage and Kahn."[7]

20.    **Defendant B. Riley Financial, Inc.** (as defined above, "B. Riley") is a diversified financial services platform that provides investment banking, brokerage, wealth management, asset management, direct lending, business advisory, valuation, and asset disposition services to a broad client base spanning public and private

---

[7] *Parker v. Avril*, C.A. No. 2020-0280-PAF (Del. Ch.) (Dkt. 124).

companies, financial sponsors, investors, financial institutions, legal and professional services firms, and individuals.  B. Riley also opportunistically invests in and acquires companies or assets, owning and operating several uncorrelated consumer businesses and investing in brands on a principal basis.  Riley is the founder, director, and co-CEO of B. Riley.

21.    Defendants Vintage, Kahn, and Laurence are referred to herein collectively as the "Controller Defendants."

22.    Defendants Kahn and Avril are referred to herein together as the "Director Defendants."

23.    Defendants Kahn and Laurence are referred to herein together as the "Officer Defendants."

24.    The Controller Defendants, the Director Defendants, the Officer Defendants, and B. Riley are referred to herein collectively as the "Defendants."

## III.    RELEVANT NON-PARTIES

25.    **Franchise Group, Inc.** (as defined above, "Franchise Group" or the "Company") was a Delaware corporation that owned and operated franchised and "franchiseable" businesses, with business lines including Pet Supplies Plus, Wag N' Wash, American Freight, The Vitamin Shoppe, Badcock Home Furniture & more ("Badcock"), Buddy's, and Sylvan Learning.  On a combined basis, the Company

operated over 3,000 locations predominantly located in the U.S. that are either Company-run or operated pursuant to franchising and dealer agreements. Before the Merger, the Company's stock traded on the Nasdaq under the ticker "FRG."

26.    **Bryant Riley** (as defined above, "Riley") is B. Riley's founder, co-CEO, and Chairman of its board of directors. Riley owned 1,804 shares of Company common stock. Pursuant to Riley's Schedule 13D/A filed on August 9, 2023, Riley rolled over all of his Company common stock into the post-Merger Company and agreed to vote his shares in favor of the Merger.

27.    **Cynthia S. Dubin** (as defined above, "Dubin") served as a director of the Company from May 2021 until the closing of the Merger. Dubin also served as a member of the Special Committee.

28.    **Thomas Herskovits** (as defined above, "Herskovits") served as a director of the Company from October 2015 until November 2017, and then from March 2018 until the closing of the Merger. Herskovits also served as a member of the Special Committee.

29.    **Irradiant Partners** (as defined above, "Irradiant") is an alternative investment manager, with total assets under management in excess of $9.1 billion, that focuses on credit and private equity opportunities. Irradiant was an existing Company lender prior to the Merger and led debt financing for the Merger.

## SUBSTANTIVE ALLEGATIONS

## I.    VINTAGE AND B. RILEY FORM THE COMPANY

30.    In July 2018, Vintage and B. Riley invested in Franchise Group's predecessor, Liberty Tax, Inc. ("Liberty Tax").  Vintage acquired the equity interests in Liberty Tax held by the company's founder and former CEO, as well as a former director, for $8.54 per share (the "2018 Transactions").  Thereafter, Vintage retained approximately 1.5 million shares of Liberty Tax common stock and assigned to B. Riley and another investor the right to purchase approximately 3.5 million shares.

31.    As a result of the 2018 Transactions, Vintage and B. Riley obtained 14.8% and 22.1% of Liberty Tax's voting power, respectively, and both also received board representation.  In 2019, Vintage appointed Kahn, Laurence, and Avril to Liberty Tax's nine-member board of directors, and B. Riley appointed Riley and Kenneth Young ("Young"), B. Riley's President.

32.    In July 2019, Vintage and Liberty Tax entered a series of strategic transactions, including a tender offer of Liberty Tax's outstanding common stock for $12 per share and the acquisition of Buddy's (the "2019 Transactions").  As a result of the 2019 Transactions, Vintage's stake in Liberty Tax grew from 14.8% (as of October 29, 2018) to 37.0% (as of July 26, 2019).  Liberty Tax also changed its name to "Franchise Group, Inc."

12

33.    On March 31, 2020, Riley and Young "voluntarily resigned from the Board" of Franchise Group, "effective immediately."  None of the Company, B. Riley, Riley, or Young provided explanations for these resignations.[8]  Thereafter, Avril, Vintage's designee, assumed the role of Chairman of the Board.

## II.    VINTAGE AND B. RILEY'S TIES EXTEND BEYOND FRANCHISE GROUP

34.    Kahn and Riley, through their investment firms Vintage and B. Riley, are repeat co-investors and financing partners.  Their relationship spans decades.

### A.    Rent-A-Center

35.    On June 18, 2018—prior to B. Riley's and Vintage's investment in Liberty Tax—Vintage announced that it acquired Rent-A-Center, Inc. ("Rent-A-Center") for $15 per share in cash, representing total consideration of approximately $1.365 billion (including net debt).  B. Riley served as an equity and debt participant in the transaction.

36.    In a corresponding press release, Riley said: "*We have worked with the Vintage Capital team for over two decades* and have seen firsthand their experience

---

[8] March 31, 2020 is the same day that Deloitte & Touche resigned as an auditor for a fund affiliated with Kahn.  As described at ¶¶ 129–138, this fund appears to have been a vehicle used by Kahn and his co-conspirators to defraud investors out of nearly $300 million. Deloitte & Touche reportedly resigned after uncovering the fraud.  Jonathan Weil, *How an Unremarkable Deal Became a Big Threat to a Small Investment Bank*, WALL ST. J. (Feb. 12, 2024), https://www.wsj.com/finance/how-an-unremarkable-deal-became-a-big-threat-to-a-small-investment-bank-f819a169 (hereinafter "*An Unremarkable Deal*").

in the space.  We are excited to work with them and leverage the resources across the B. Riley Financial platform."[9]  Kahn added: "*Having worked with the B. Riley team on multiple deals*, I have a great deal of respect for their willingness to think differently to get deals done."[10]

37.    The Rent-A-Center transaction never closed, resulting in Kahn—with B. Riley serving as a guarantor—being on the hook for a significantly above-market termination fee.

38.    On December 18, 2018, Rent-A-Center terminated its merger agreement prior to closing because "Rent-A-Center did not receive an extension notice from Vintage Capital at or prior to 11:59 p.m., Eastern Time, on December 17, 2018, which was the deadline set forth in the Merger Agreement."[11]

39.    On March 14, 2019, this Court affirmed the validity of Rent-A-Center's termination of the merger agreement with Vintage.[12]  According to *Reuters*, "Rent-

---

[9] Press Release, Franchise Group, Inc., *B. Riley Financial Assists Vintage Capital in Announced Acquisition of Rent-A-Center* (Jun. 18, 2018), https://markets.businessinsider.com/news/stocks/b-riley-financial-assists-vintage-capital-in-announced-acquisition-of-rent-a-center-1027176494. (emphasis added).

[10] *Id.* (emphasis added).

[11] Press Release, Rent-A-Center, Inc., *Rent-A-Center Terminates Merger Agreement with Vintage Capital* (Dec. 18, 2018), https://investor.rentacenter.com/news-releases/news-release-details/rent-center-terminates-merger-agreement-vintage-capital.

[12] *Vintage Rodeo Parent, LLC v. Rent-a-Center, Inc.*, 2019 WL 1223026 (Del. Ch. Mar. 14, 2019).

A-Center also maintains that Vintage owes it a $126.5 million termination fee, *which was guaranteed by Vintage Capital's banker, B. Riley Financial Inc.*"[13]

40.    On April 22, 2019, Rent-A-Center announced that it had agreed to settle all litigation with Vintage and B. Riley and that it would receive a payment of $92.5 million.    As described below at Paragraphs 129–138, Kahn may have misappropriated investor funds from one of his affiliated investment vehicles to cover the termination fee that Vintage owed to Rent-A-Center.

### B.    B&W

41.    B. Riley and Vintage also provided capital to B&W, a publicly traded thermal energy company.   On August 9, 2018, B&W "amended its first-lien revolving credit facility and received a commitment for a Last Out Loan that will provide net proceeds of $30 million from Vintage Capital and backstopped by B. Riley."[14]

42.    Approximately one year later, on July 29, 2019, B. Riley entered into an amendment and restatement of certain loan obligations with Vintage.  As part of the loan, Vintage agreed to pledge as collateral 5,000,000 shares of B&W.

---

[13] Brendan Pierson, *Rent-A-Center not bound by merger deal with Vintage Capital -judge*, REUTERS (Mar. 14, 2019), https://www.reuters.com/article/idUSL1N21122N/ (emphasis added).

[14] Press Release, Babcock & Wilcox Enterprises, Inc., *Babcock & Wilcox Announces Second Quarter 2018 Results* (Aug. 9, 2018)

43.     Then, on February 9, 2021, B. Riley and Vintage entered into an agreement pursuant to which B. Riley would purchase approximately 10.7 million shares of B&W common stock from Vintage.

44.     As with the Rent-A-Center deal, B. Riley's and Vintage's investment in B&W culminated in litigation before this Court.[15]  Plaintiffs in that action alleged that B. Riley and Vintage sought to lower the cost of acquiring a majority stake in B&W by driving it to the brink of bankruptcy.[16]  On February 17, 2023, *Bloomberg* reported that B. Riley and Vintage agreed to resolve the B&W litigation for $4.75 million.[17]

### C.    American Freight

45.     In February 2020, B. Riley served as an advisor and provided financing support—by arranging and placing a $675 million credit facility—to Franchise Group in its acquisition of American Freight.  Riley emphasized his connection to Kahn when he stated that he was "pleased to work with Brian Kahn and his team on

---

https://www.babcock.com/home/about/corporate/news/babcock-wilcox-announces-second-quarter-2018-results.

[15] *Parker v. Avril*, C.A. No. 2020-0280-PAF (Del. Ch.).

[16] Mike Leonard, *B. Riley, Vintage Capital Pay $4.75 Million to End Babcock Case*, Bloomberg (Feb. 17, 2023), https://news.bloomberglaw.com/securities-law/b-riley-vintage-capital-pay-4-75-million-to-end-babcock-case.

[17] *Id.*

this transaction and look[ed] forward to continuing to serve as a strategic partner to Franchise Group."[18]

### D.    Other Financings

46.    On January 5, 2023, *The Friendly Bear* reported that Kahn had pledged various stockholdings to B. Riley, according to Uniform Commercial Code ("UCC") filings.  B. Riley made at least ten different loans to Kahn and entities he controlled from 2018 through 2023, according to financing statements filed with state agencies in Nevada, Delaware, and Florida.[19]

47.    The total dollar amount of all loans that B. Riley made to Kahn is currently unknown.  However, a July 2023 slide presentation by the investment bank Nomura, which provided financing to B. Riley as part of the Merger, included information about B. Riley's loans over the years to Kahn.  The earliest one it listed was a $37 million loan in July 2019, and by mid-2023 the principal balance on Kahn's loans was $154 million.[20]

---

[18] Press Release, B. Riley Financial, Inc., *B. Riley Financial Affiliates Serve as Advisor and Provide Financing to Support Franchise Group's Acquisition of American Freight* (Feb. 24, 2020), https://ir.brileyfin.com/2020-02-24-B-Riley-Financial-Affiliates-Serve-as-Advisor-and-Provide-Financing-to-Support-Franchise-Groups-Acquisition-of-American-Freight.

[19] *An Unremarkable Deal*.

[20] *Id*.

17

III.     **B. RILEY FINANCES VARIOUS COMPANY-RELATED TRANSACTIONS, AND FRANCHISE GROUP SEEKS TO RAPIDLY DE-LEVER**

48.     On November 11, 2020, B. Riley provided funding to Bebe Stores, Inc. so it could acquire 47 Buddy's rent-to-own franchises from Franchise Group.

49.     A year later, in November 2021, Franchise Group acquired Badcock for $580 million in cash (the "Badcock Acquisition"). To finance the Badcock Acquisition, the Company entered into first and second lien credit agreements that provided $575 million in term loans.[21] The Company also maintained a revolving loan facility with certain lenders, and, in August 2022, Franchise Group entered into the Third Amendment to the Company's Third Amended and Restated Loan and Security Agreement, which increased the Company's senior secured revolving loan facility thereunder (the "ABL Revolver") to $400 million.[22]

50.     Following the Badcock Acquisition, Franchise Group disclosed that its "acquisition strategy and capital allocation plan" going forward contemplated "evaluat[ing] alternatives for certain non-core assets to rapidly de-lever the Company back to its target net leverage ratio" and "explor[ing] partnerships with

---

[21] Proxy at 19.

[22] *Id.* at 20.

third-party consumer finance vendors in order to facilitate Badcock's transition out of underwriting, holding and servicing consumer credit accounts."[23]

51.     To achieve the latter goal, Franchise Group unsurprisingly turned to B. Riley.

52.     In December 2021, B. Riley and Badcock entered into a Master Receivables Purchase Agreement (the "Receivables Agreement"), pursuant to which B. Riley paid $400 million to acquire Badcock's existing portfolio of consumer credit receivables.[24]  B. Riley would, per the Receivables Agreement, continue to purchase additional Badcock consumer credit receivables from December 20, 2021 through an undefined future date that Badcock and B. Riley would "specify in writing in their sole discretion."[25]  In connection with entry into the Receivables Agreement, Riley stated: "[t]his transaction is also a continuation of our commitment to enable Franchise Group's success as a leading operator in the franchising sector."[26]

---

[23] *Id*. at 19.

[24] *Id*.

[25] Franchise Group, Inc., Current Report (Form 8-K) (Dec. 21, 2021) at Ex. 2.1.

[26] Press Release, B. Riley Financial, Inc., *B. Riley Financial Purchases Receivables Portfolio in Connection with Franchise Group's Recent Acquisition of W.S. Badcock Corporation* (Dec. 20, 2021) https://m.insidertracking.com/b-riley-financial-purchases-receivables-portfolio-in-connection-with-franchise-group-s-recent-acquisition-of-w-s-badcock-corporation.

53.     Following the Badcock Acquisition, beginning in late 2021 and continuing throughout 2022, Franchise Group purportedly solicited proposals from other third-party consumer finance vendors to facilitate Badcock's complete exit from its consumer credit business.[27]  Yet, by the time of the Merger, Franchise Group and Badcock supposedly had not been able to "find a satisfactory solution" with third-party consumer finance vendors.[28]

54.     Thus, beginning in November 2022, the Company "initiated discussions with certain of its lenders to consider modifications to the Company's financing arrangements that would permit Badcock to finance its accounts receivables outside the scope of the covenants under the Company's financing facilities."[29]    The undisclosed lenders communicated that "the necessary amendments to [Franchise Group's] financing facilities to accommodate the necessary working capital financing would likely come at a significant cost to the Company and ultimately may not be approved by the lenders."[30]

55.     Getting the message, in mid-January 2023, the Company pursued an upsizing of its credit facility to "provide additional capacity to finance working

---

[27] Proxy at 20.

[28] *Id.*

[29] *Id.*

[30] *Id.*

capital, including, if necessary, Badcock accounts receivables."[31]   To do so, the

Company turned to its FRG First Lien Credit Agreement—one of the two loans used

to finance the Badcock Acquisition—and determined to pursue an amendment of its

terms for a third time to upsize its credit facility.[32]  Franchise Group also disclosed

that it intended to finalize the transition from in-house financing by the end of June

2023.[33]

56.    The January 18, 2023 Board minutes indicate that the Company initially

considered ███████████████████████████████████████████████████████

███████████████[34]  Franchise Group intended to ███████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████  The Board resolutions to

the January 18 meeting indicate that the ███████████████████████████████████

███████████████████████[35]

---

57.    On February 2, 2023, Franchise Group completed the upsizing of the FRG First Lien Credit Agreement and obtained an incremental term loan facility in the principal amount of $300 million.[36]

## IV.    KAHN AND LAURENCE SET THE STAGE FOR A TRANSACTION BY CAUSING FRANCHISE GROUP TO REPURCHASE MILLIONS OF OUTSTANDING SHARES IN LATE 2022

58.    On May 18, 2022, as the Company purportedly solicited potential buyers and financing for the Badcock receivables, the Board approved a stock repurchase plan whereby the Company, at the discretion of management (*i.e.*, Kahn and Laurence), could repurchase up to *$500 million* of its outstanding shares of common stock over the next three years.[37]  The stock repurchase plan superseded a previous repurchase plan that was in place since June 2016, which authorized up to *only $10 million* in share repurchases.[38]  Under the previous plan, the Company did not make any repurchases of its common stock in fiscal years 2018 through 2021,

---

[36] Proxy at 20.

[37] Franchise Group, Inc., Current Report (Form 8-K) (May 19, 2022) (stating "[t]he actual timing, number and value of shares, if any, repurchased under the program will be determined by management in its discretion[.]").

[38] Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (June 29, 2016) at 31.

and only repurchased a total of approximately 115,000 shares in fiscal years 2016 and 2017.[39]

59.    Yet beginning in late July 2022, at the direction of Kahn and Laurence, the Company began to rapidly repurchase shares.  From July 24, 2022 to September 24, 2022, the Company repurchased approximately 2.23 million shares, purchasing nearly 1.4 million shares alone between August 21, 2022 and September 24, 2022.[40] From July 24, 2022 to September 20, 2022, the Company's stock price traded above $30 per share, suggesting that the Board and Company management valued Franchise Group on a per share basis in excess of the Merger price during this time. On the August 4, 2022 earning call, in response to a question concerning the

---

[39] Franchise Group, Inc., Annual Report (Form 10-K) (Feb. 23, 2022), at 28 ("During the year ended December 25, 2021, we did not repurchase any shares of our common stock"); Franchise Group, Inc., Annual Report (Form 10-K) (Mar. 10, 2021), at 30 ("During the year ended December 26, 2020, we did not repurchase any shares of our common stock"); Franchise Group, Inc., Annual Report (Form 10-KT) (Apr. 24, 2024), at 38 ("During the Transition Period [May 1, 2019 – December 28, 2019], we did not repurchase any shares of our common stock"); Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (June 27, 2019), at 32 ("During fiscal 2019, we did not repurchase any shares of our common stock."); Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (Oct. 5, 2018), at 32 ("During fiscal 2018, we did not repurchase any shares of our Class A common stock"); Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (July 7, 2017), at 30 (repurchasing 33,153 shares of common stock in FY 2017); Franchise Group, Inc. (f/k/a Liberty Tax, Inc.), Annual Report (Form 10-K) (June 29, 2016), at 31 (repurchasing 82,355 shares of common stock in FY 2016).

[40] Franchise Group, Inc., Quarterly Report (Form 10-Q) (Nov. 3, 2022), at 37.

Company's $500 million stock buyback plan, Kahn noted the Company would be "opportunistic" with respect to buying back shares.[41]

60.    Indeed, beginning in late October 2022, the Company repurchased approximately 3.7 million additional shares, purchasing nearly 3 million shares alone between November 20, 2022 and December 31, 2022.[42]  In total, by the end of 2022, the Company repurchased more than 5.9 million shares for a total of $172.5 million.[43]

61.    As a result, in the span of just five months, the Company reduced the number of shares outstanding by approximately 15% compared to the start of 2022, setting the stage to initiate the management-led take-private.[44]

## V.    KAHN KICKS OFF THE SALE PROCESS (CONTRARY TO THE PROXY'S DISCLOSURES)

62.    On January 10, 2023, the *Wall Street Journal* reported that Franchise Group was considering a management-led buyout *spearheaded by Kahn* (the "*WSJ Article*").[45]  According to the *WSJ* Article, Kahn would take Franchise Group private

---

[41] Franchise Group, Inc. Q2 2022 Earnings Call (Aug. 4, 2022).

[42] Franchise Group, Inc., Annual Report (Form 10-K) (Feb. 28, 2023), at 29.

[43] *Id.*

[44] Franchise Group, Inc., Current Report (Form 8-K) (Feb. 28, 2023), at Ex. 99.1.

[45] Lauren Thomas, *Vitamin Shoppe Owner Franchise Group Considers Going Private*, WALL ST. J. (Jan. 10, 2023), https://www.wsj.com/articles/vitamin-shoppe-owner-franchise-group-considers-going-private-11673383894.

for somewhere between $30 to $35 per share.  The Proxy is silent about the *WSJ* Article and the initial reports that Kahn was planning a take-private.

63.    The next day, on January 11, 2023, a private equity firm and an investment bank each separately reached out to Kahn to express their respective interest in the management-led take-private reported by the *WSJ* Article.[46]  Kahn agreed to speak with each entity the same day, lending credence to the report that Kahn was in fact planning a take-private at this time.

64.    Moreover, according to Jefferies' April 6, 2023 disclosure letter to the Special Committee concerning Jefferies' relationships with B. Riley (the "Disclosure Letter"), sometime between January 1 and January 15, 2023, Kahn contacted Jefferies "regarding Jefferies possibly participating in a Company debt financing in connection with a potential recapitalization transaction involving the Company."[47]  Jefferies then entered into a confidentiality agreement with Franchise Group on January 16, 2023.[48]  The Disclosure Letter states that "[d]iscussions [concerning the potential recapitalization transaction] took place from time to time through early March 2023 and Jefferies was provided with a Company financial

---

[46] FG_00004162, FG_00004164.

[47] FG_00004115.

[48] *Id.*

model and *Jefferies provided a theoretical analysis* showing sources and uses in connection with such potential transaction under various scenarios (both documents accompany this disclosure)."[49]

65.     Jefferies' banal characterization of its work for Franchise Group management (*i.e.*, Kahn) is belied by the attachment to the Disclosure Letter, *which is an analysis of a take-private transaction of Franchise Group* at prices between $30 per share (*i.e.*, B. Riley's opening offer as well as the Merger price) and $38 per share, *with Kahn rolling over his stakes* and B. Riley rolling over its preferred shares and investing $400 million of new equity (the "Take-Private Analysis").[50]  The Franchise Group share price used by Jefferies to calculate premiums (and other information) for the Take-Private Analysis was from February 24, 2023, and the file name of the document is "AVP Analysis (3.1.2023) 2050.pdf," suggesting that this analysis was done somewhere between February 24 and March 1, 2023, just weeks in advance of B. Riley's March 19, 2023 opening offer discussed below.[51]  Indeed, Jefferies' Disclosure Letter indicates that it "did not have any discussions with [B. Riley] regarding [a potential recapitalization transaction involving the Company]."

---

[49] *Id*. (emphasis added).

[50] FG_00005798.

[51] *Id.*

But Jefferies certainly had discussions with Kahn concerning a take-private where Kahn would rollover his stake in Franchise Group.

66.    As discussed in greater detail below, none of this information concerning Jefferies' work for Kahn on a take-private transaction was disclosed to Franchise Group stockholders in the Proxy, and it is unclear when, or if, it was fully disclosed to the Special Committee.[52]

## VI.    B. RILEY CUTS OFF BADCOCK RECEIVABLES FINANCING TO FACILITATE KAHN'S TAKE-PRIVATE OF THE COMPANY

67.    In late February 2023, only weeks after the Company undertook an additional $300 million credit facility, B. Riley advised the Company that it "had determined not to continue to purchase any further Badcock accounts receivable."[53] Franchise Group then determined "that a failure to continue to sell Badcock Receivables and reduce the outstanding balance of the ABL Revolver[] may result

---

[52] While Jefferies' Disclosure Letter was purportedly reviewed by the Special Committee on March 30, 2023, the projections and the Take-Private Analysis that "accompan[ied]" the Disclosure Letter could not be found by Company counsel in connection with the production of 220 materials responsive to the Demands (but rather only the Disclosure Letter itself).  The projections and Take-Private Analysis were only located within Avril's custodial files and there are no books and records indicating that he provided those documents to the other members of the Special Committee.

[53] Proxy at 20.

in, among other things, . . . a potential default under the FRG First Lien Credit Agreement."[54]

68.    As a purported result of B. Riley's position on the Badcock accounts receivables, Kahn engaged in a series of communications with Riley and certain other representatives of B. Riley throughout late February and early March 2023 concerning the Badcock accounts receivables.[55] ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

69.    Following Kahn's and Riley's communications, B. Riley requested "additional information" on "Badcock and the Company and its other businesses," prompting B. Riley and Franchise Group to enter into a confidentiality agreement on March 7, 2023.[57]  The next day, Kahn sent B. Riley four sets of presentation materials, one of which included projections made by the Company's management as of January 2023 (the "January Projections").[58] ███████████████████

---

[54] *Id*. at 20–21.

[55] *Id*.; *see also* FR_00004170, -4174, -4204, -4212, -4214, -4226, -4626.

[56] FG_00004170.

[57] Proxy at 21.

[58] *Id*.; FG_00004243.

██████████████████████████████████████████

███████  ███████████████████████████████████ ██

██████████████████████████████████████████

███████  ███████████████████████████████████

████████████████████████  B. Riley reviewed these materials and concluded that instead of continuing to purchase Badcock accounts receivables pursuant to the Receivables Agreement, B. Riley "would prefer to explore the acquisition of all of the outstanding equity of [Franchise Group], rather than expose itself to continued balance sheet risk of the Company without any equity or similar upside."[63]

70.    In expressing this sentiment, B. Riley declared that it was "willing to fund Badcock accounts receivables one final time for the first quarter of 2023, but that it was unwilling to do so for the second quarter of 2023 and beyond."[64]  Thus, B. Riley informed the Company it was cutting off funding critical to the Company contemporaneously to initiating a sale process with the Company.

---

[59] FG_00004244.

[60] FG_00004286.

[61] FG_00004294.

[62] FG_00004317; FG_00004330.

[63] Proxy at 21.

[64] *Id.*

71.     Soon thereafter, on March 16 and 17, 2023, Kahn and Riley met in person to discuss B. Riley's interest in an acquisition of Franchise Group, and Riley indicated that "B. Riley intended to submit a non-binding offer to acquire the Company."[65]

72.     Two days later, on March 19, 2023, B. Riley submitted a written proposal to acquire all of Franchise Group's common stock for $30 per share (the "Original Proposal").[66]    The Original Proposal contemplated "Company management rolling over their equity stake in [Franchise Group] and agreeing to continue to manage the Company on an ongoing basis[.]"[67]  In addition to "approval and recommendation" of the proposed transaction by a special committee of the Company's Board, the Original Proposal also referenced approval of the proposed transaction "by holders of a majority of the outstanding shares of [Franchise Group] Common Stock other than participants in any potential transaction."[68]  The Original Proposal was signed by Riley as Chairman and co-CEO of B. Riley.

---

[65] *Id.*

[66] *Id.*; FG_00002886.

[67] *Id.*; FG_00002270.

[68] *Id.*

73. ████████████████████████████████████████

███████████████████████████[69]    The same day, Kahn forwarded the

Original Proposal to the remainder of the Board,[70] which Avril then forwarded to

Wachtell, Lipton, Rosen & Katz ("Wachtell")—the eventual legal advisor to the yet-

to-be-formed Special Committee.[71]

74. ████████████████████████████████████████

████████████████████████████████████████

## VII.    THE COMPANY COMMENCES A FLAWED SALE PROCESS

75. The next day, on March 20, 2023, the Board met to discuss the Original

Proposal and issued a press release,[73] disclosing only that the Company:

> [R]eceived an unsolicited non-binding proposal, which is
> subject to certain conditions, to acquire all of the
> outstanding shares of the common stock of the Company
> for a price of $30.00 per share in cash.  The [Board] will
> carefully evaluate the proposal to determine the course of
> action that it believes is in the best interests of the
> Company and all [Company] stockholders.[74]

---

[69] FG_00004635.

[70] *Id.*

[71] FG_00004644.

[72] *Id.*

[73] FG_00002272.

[74] Press Release, Franchise Group, Inc., *Franchise Group, Inc. Announces Receipt of Unsolicited Proposal* (Mar. 20, 2023), https://www.globenewswire.com/en/news-

31

76.    The March 20, 2023 press release made no mention of the January 2023 proposal of a Kahn-led management buyout of the Company, as reported in the *WSJ* Article published two months prior.

### A.    The Board Forms a Conflicted Special Committee Spearheaded by Long-time Kahn Associate Avril

77.    On March 22, 2023, the Company's counsel, Troutman Pepper Hamilton Sanders LLP ("Troutman"), emailed Avril a draft of the Board resolutions that would form the Special Committee two days later.[75]  The other members of the soon-to-be formed Special Committee (*i.e.*, Herskovits and Dubin) were not copied on this email.

78.    On March 24, 2023, the Board met with Troutman and Wachtell to discuss the formation of the Special Committee and to consider and recommend to the full Board any sale of the Company.

79.    Avril and Kahn personally invited Wachtell to attend the March 24 Board meeting after Avril forwarded Wachtell the Original Proposal.[76]  On March 23, 2023, the day before the Board meeting, Avril emailed Wachtell instructing

---

release/2023/03/20/2630276/0/en/Franchise-Group-Inc-Announces-Receipt-of-Unsolicited-Proposal.html.

[75] FG_00004800.

[76] Proxy at 21; FG_00004644.

Wachtell to attend the meeting and stated that further "info will come from [Kahn]."[77]

80.    At the March 24, 2023 Board meeting, the Board recognized that "certain directors and officers of the Company may be deemed to have an interest in the Original Proposal that is different from, or in addition to, the interests of the Company's Unaffiliated Stockholders."[78]

81.    Indeed, Kahn was directly interested in the Merger, and Avril had long-standing ties to Kahn, Laurence, and Vintage (*i.e.*, the Controller Defendants), as well as Riley.  Specifically, Avril served on the strategic advisory board of Vintage until at least 2022 (and possibly as late as February 2023), joined the Liberty Tax board as a Vintage appointee in connection with the 2018 Transactions (serving alongside Kahn, Laurence, and Riley), and was appointed to the boards of three of Vintage's portfolio companies (*i.e.*, Aaron's, API, and B&W).  Additionally, Avril personally invested in certain investments affiliated with Vintage and owned a limited partnership interest in Vintage.  Considering B. Riley's Original Proposal contemplated Kahn's rollover and continued management of the post-transaction Company, Avril's long-standing and close relationship with Kahn called into

---

[77] FG_00004803.

[78] Proxy at 21.

question his independence and even interestedness considering his investments in Vintage.

82.    Nevertheless, at the March 24, 2023 meeting, the Board formed a special committee comprised of Dubin, Herskovits, and *Avril* (as defined above, the "Special Committee").[79]  The Board, with Kahn in attendance, went out of its way to resolve that Avril, despite his long-standing relationship with Kahn and Laurence, was "independent of the Corporation's management" based on an inquiry directed to Avril "as to any information relevant to determination of [his] eligibility to serve on the Special Committee."[80]  The Board itself, with Kahn in attendance, then appointed Avril as Chairman of the Special Committee, rather than letting the Special Committee select its own chairman.  The newly formed Special Committee immediately determined to engage Wachtell as its legal advisor.[81]  Thereafter, Avril drove the Special Committee process.

83.    Avril's forwarding of the Original Proposal to Wachtell on March 19, 2023, his receipt of the draft Board resolutions to establish the Special Committee prior to the March 24, 2023 Board meeting, and his and Kahn's invitation to

---

[79] FG_00002263.

[80] FG_00002265.

[81] Proxy at 22.

Wachtell to join the March 24, 2023 Board meeting that established the Special Committee indicates that Avril: (i) knew that he would be appointed to the Special Committee (and likely would be appointed its Chairman) and (ii) pre-selected Wachtell as the Special Committee's legal advisor while coordinating with *Kahn* but not with the members of the Special Committee.

84.    Over the following days, Avril, Kahn, and Wachtell coordinated and conducted interviews with potential financial advisors without Herskovits or Dubin.[82]

85.    For example, on March 26, 2023, Kahn personally reached out to potential advisors to schedule interviews with them for the position of the Special Committee's financial advisor.[83]  Kahn scheduled interviews with a total of four potential financial advisors to take place on March 27, 2023.[84]  But Herskovits and Dubin were not copied on any emails that scheduled any of the March 27, 2023 interviews.[85]

86.    Jefferies was purportedly selected by the Special Committee as its advisor.  However, Jefferies' interview was conducted via Zoom on March 27, 2023,

---

[82] FG_00004811.

[83] FG_00004821; FG_00004824.

[84] FG_00004821.

[85] FG_00004811; FG_00004817; FG_00004821; FG_00004828.

and Herskovits and Dubin were not copied on the Zoom invitation sent to Avril and Wachtell.[86]  By contrast, Kahn continued to be copied on email communications between Avril, Wachtell, and Jefferies regarding Jefferies' interview.[87]

87.    Also on March 27, 2023, Jefferies sent Avril and Wachtell (but not the other members of the Special Committee) a 46-page presentation to be reviewed during Jefferies' interview, which included valuable sell-side information, such as

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

88.    The following day, on March 28, 2023, Avril forwarded these materials *to Kahn*.[89]  A day after that, and two days after Jefferies' interview, on March 29, 2023, Avril forwarded the same materials to Herskovits and Dubin telling them to "please find[] attached the proposal from Jeffries [*sic*] to the SC."[90]  From the documentary record, it appears clear that  Herskovits and Dubin were receiving these

---

[86] FG_00004817.

[87] FG_00004819.

[88] FG_00004826 (email); FG_00004830 (attached materials).

[89] FG_00004876.

[90] FG_00004934.

materials for the first time, indicating that they were not present for Jefferies' interview on March 27, 2023.

89.    Two days later, on March 31, 2023, Avril informed the other potential financial advisors that the Special Committee was engaging Jefferies and thus ending its advisor search.[91]  The Special Committee formally engaged Jefferies on April 6, 2023.[92]

90.    The selection of Jefferies, effectively by Avril and Kahn, is particularly problematic because Jefferies had been working with Kahn for the prior three months on a potential take-private where Kahn would rollover his Company shares. According to the Disclosure Letter, as discussed above, Kahn contacted Jefferies in January 2023 "regarding Jefferies possibly participating in a Company debt financing in connection with a potential recapitalization transaction involving the Company."[93]  Jefferies signed a confidentiality agreement with the Company on January 16, 2023 and "[d]iscussions took place from time to time through early March 2023 and Jefferies was provided with a Company financial model and

---

[91] FG_00005660.

[92] Proxy at 23.

[93] FG_00004115.

Jefferies provided a theoretical analysis showing sources and uses in connection with such a potential transaction under various scenarios . . . ."[94]

91.    The Proxy fails to disclose that: (i) Kahn solicited Jefferies' services with respect to potentially financing debt for a take-private transaction; (ii) Jefferies signed a confidentiality agreement in January 2023 and received various sets of Company projections (notably different than what Jefferies used for purposes of its fairness opinion for the Merger); and (iii) Jefferies and Company management engaged in continued discussions through March 2023, each of which occurred just prior to the Special Committee retaining Jefferies as its "independent" financial advisor.

92.    In light of his recent interaction with Jefferies concerning debt financing for a take-private where Kahn would roll over his shares, Kahn's involvement in the scheduling and interviewing of Jefferies as the Special Committee's potential financial advisor undermines the independence of the Special Committee process.  In fact, Kahn should not have been involved in the Special Committee's advisor selection process at all.

93.    Instead, between March 26 and March 31, 2023, Kahn: (i) reached out directly to potential financial advisors to schedule interviews exclusively with Avril

---

[94] *Id.*

and Wachtell,[95] (ii) provided the Special Committee (through Avril) with his own "fee run" analysis concerning the cost of engaging each potential advisor,[96] and (iii) received a 46-page Jefferies presentation from Avril that included sell-side analyses of the Company.[97]  Despite these conflicts, Jefferies was engaged as the Special Committee's financial advisor, and based on the 220 record, Kahn never disclosed Jefferies' work on a take-private transaction for him to the Special Committee members.

94.    On April 3, 2023, Avril (but not the other members of the Special Committee), Jefferies, and Wachtell met to discuss Jefferies' preliminary financial analysis.[98]  Avril instructed Jefferies to "identify, and conduct outreach to, potential third-party bidders," as well as to "reach out to B. Riley for additional information regarding its proposal."[99]

95.    In connection with Jefferies' preliminary financial analyses, on April 4, 2023, Company management sent Jefferies new management projections for FY2023 through FY2026 (the "Preliminary Management Projections") to be shared

---

[95] FG_00004821; FG_00004824.

[96] FG_00004987.

[97] FG_00004826 (email); FG_00004830 (attached materials).

[98] Proxy at 23; FG_00002579.

[99] Proxy at 23.

with potential bidders.[100]    Company management "updated" the Preliminary Management Projections periodically over the next several weeks with certain cash flow and debt adjustments.  These financial projections differed significantly from what Jefferies had used to create its Take-Private Analysis for Kahn just a month earlier, which incorporated a "theoretical purchase price[]" range of $30 to $38 per share and showed this purchase price range as a multiple to Franchise Group's projected 2023 EBITDA ranging from 9.0x to 9.9x.[101]

96.    Indeed, the Preliminary Management Projections slashed projections for Total Revenue and EBITDA across the projection period from 2023 to 2026, as shown below:

| (Numbers in millions) | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|
| Jefferies Projections | Revenue- $4,468 EBITDA- $370 | Revenue- $4,693 EBITDA- $444 | Revenue- $5,087 EBITDA- $527 | Revenue- $5,540 EBITDA- $613 |
| Preliminary Management Projections | Revenue- $4,227 EBITDA- $244 | Revenue- $4,428 EBITDA- $281 | Revenue- $4,876 EBITDA- $366 | Revenue- $5,334 EBITDA- $440 |

97.    Notably, the reductions made to the EBITDA projections were far more substantial than the modest reductions made to Revenue in the Preliminary Management Projections, which would have an outsized negative impact on the

---

[100] Proxy at 23.

[101] FG_00005798.

Company's free cash flows and would, in turn, have an outsized negative impact on the Company's valuation.

98.    When the Special Committee met to review the Preliminary Management Projections on April 12, 2023, attendees at the meeting included Company management, Troutman, and Wachtell, but not Jefferies, the Special Committee's financial advisor.[102]   There is no record of Jefferies raising any concerns with the significant reductions in the Company's financial projections for purposes of their Special Committee engagement, despite knowing that management had provided Jefferies with far higher projections during Jefferies' discussions with Kahn.  Indeed, at the Special Committee's next meeting on April 14, 2023, Jefferies proceeded with an update on its third-party outreach and presented its preliminary financial analysis based on the Preliminary Management Projections.[103]  The Special Committee instructed Jefferies to continue its outreach "to identify any viable alternative buyers for the Company or certain of its businesses" and to continue "diligence and negotiations" with B. Riley.[104]

---

[102] *Id*.; FG_00002578.

[103] Proxy at 24; FG_00002600-01.

[104] Proxy at 24; FG_00002601.

### B.    Kahn "Joins" the Sale Process and Leads Price Negotiations

99.    Also on April 14, 2023, Kahn's legal advisor Willkie Farr & Gallagher LLP ("Willkie") met with Wachtell and Avril (but not with the other members of the Special Committee).[105]   According to the Proxy, the group discussed B. Riley's Original Proposal.[106]   Avril then communicated "the Special Committee's view on Brian Kahn speaking directly with B. Riley regarding the potential transaction proposed by B. Riley or potential alternative acquisition transactions."[107]   Between April 14 and April 16, 2023, Avril (but not the other members of the Special Committee) and Wachtell discussed "these and related matters," and Wachtell and Willkie "had several telephone calls."[108]

100.   On April 16, 2023, Avril (but not the other members of the Special Committee), Kahn, Wachtell, and Willkie met.  That day, "the Special Committee granted Brian Kahn permission to pursue discussions, negotiations and actions in connection with any potential acquisition transaction (with B. Riley or other potential bidders) so long as Brian Kahn kept the Special Committee and its counsel

---

[105] Proxy at 24.

[106] *Id.*

[107] *Id.*

[108] *Id.*

reasonably informed on a current basis regarding any such discussions, negotiations, or actions."[109]

101.   In other words, Avril unilaterally shirked the full scope of the Special Committee's negotiation responsibilities, which specifically included "all power and authority of the Board, to the fullest extent permitted by law, to take actions with respect to any Potential Transaction and any review, discussion, consideration, deliberation, examination, investigation, analysis, assessment, evaluation, exploration, response, negotiation, termination, rejection, approval and/or authorization on behalf of the Corporation of the terms and conditions of any Potential Transaction, or any other strategic alternatives available to the Corporation"[110]—so long as Kahn kept the Special Committee and its counsel reasonably informed.  In an internal email from the same day, Wachtell confirmed that the Special Committee was providing Kahn "broad latitude" with respect to his involvement in the Transaction.[111]

---

[109] Proxy at 24.

[110] FG_00002266.  Indeed, the Special Committee was specifically provided "the power and authority on behalf of the Corporation to formulate, structure, negotiate and document any Potential Transaction, including, without limitation, proposals, agreements or transaction in connection with any Potential Transaction with any of the corporation, *any of the Corporation's officers, directors or employees, and/or any of their affiliates or associates, and any third parties*."  *Id.* at 2266–2267 (emphasis added).

[111] FG_00005695.

102.    In response, Kahn informed Avril that he "would consider engaging in discussions with any bidder that makes [a potential acquisition transaction proposal], *if there would be a role for [Kahn] in connection with any such alternative acquisition transaction*."[112]    In other words, Kahn wanted to remain CEO of the Company and roll over his equity stake, consistent with the modeling that Jefferies had performed for Kahn in late February/early March 2023.    Of course, as the Company's controlling stockholder, Kahn had the power to make that happen, especially in light of Avril allowing him to shepherd the sale process.

103.    The next day, on April 17, 2023, Kahn and Vintage filed an amended Schedule 13D.[113]    Referencing a purportedly unsolicited proposal to acquire the Company for $30 per share, the Schedule 13D disclosed that Kahn and Vintage "determined that they wish to discuss the Proposed Transaction with the Bidder and may negotiate with the Bidder (and other interested parties, including the Issuer) with respect to their participation in, and take other actions in furtherance of, that or any other acquisition transaction."[114]    However, like the March Press Release, the Schedule 13D failed to disclose the identity of the "Bidder" (*i.e.*, B. Riley—Kahn's

---

[112] Proxy at 24 (emphasis added).

[113] Franchise Group, Inc., Schedule 13D/A (No. 21) (Apr. 17, 2023) (Vintage Capital Management, LLC).

[114] *Id.*

and Vintage's long-time business partner).  Later that day, Avril forwarded the Schedule 13D to the Board and noted that it was filed "in connection with conversations [B]rian [Kahn] is having with the *bidder* to better understand how they envision Brian's role should the transaction occur and he 'rolls' his equity as required under the bid."[115]

104.   On April 18, 2023, Kahn and Willkie met with B. Riley and its legal advisor, Sullivan & Cromwell LLP ("S&C"), to "discuss certain terms relating to a potential transaction."[116]  The next day, on April 19, 2023, the Special Committee met to receive an update on the Original Proposal and instructed Jefferies "to continue to engage with B. Riley and Brian Kahn with respect to the proposal initiated by B. Riley."[117]

105.   At an April 26, 2023 meeting, the Special Committee again abdicated its responsibilities and deferred its authority to Avril, requesting that Avril "speak with Brian Kahn to discuss his willingness to enter into a proposed transaction with

---

[115] FG_00005721 (emphasis added).

[116] Proxy at 24.

[117] *Id*. at 24–25; FG_00002580.

B. Riley on the terms of the Original Proposal."[118]  Avril did so, and Kahn "indicated his willingness to proceed with negotiations with B. Riley."[119]

106.   Two days later, on April 28, 2023, the Special Committee convened and, according to the minutes for the meeting, Avril "confirmed that Brian Kahn indicated his willingness to proceed with negotiations with B. Riley and was supportive of the [Special] Committee making a counteroffer to B. Riley with an increased price per share over $30.00."[120]  Accordingly, the Special Committee instructed Jefferies to communicate the Special Committee's *first and only* counteroffer of $33 per share.[121]  B. Riley shot down the counteroffer the same day and reiterated its original offer of $30 per share.[122]  Additionally, B. Riley insisted on expediting the Merger negotiations "to facilitate a deal announcement prior to, or contemporaneous with, the Company's planned earnings announcement on May 10, 2023."[123]

---

[118] Proxy at 25; FG_00002590–91.

[119] Proxy at 25.

[120] FG_00002585.

[121] *Id.*

[122] Proxy at 25; FG_00002596.

[123] Proxy at 25.

107.   On April 29, 2023, the Special Committee met to discuss B. Riley's response to their counteroffer and directed Jefferies to ask B. Riley if it "would be willing to pay more than $30.00 per share in cash under any other circumstances."[124] Neither the Proxy nor the Board meeting minutes disclose any further price negotiations.

108.   On May 2, 2023, the Board met to discuss the Merger.  According to the Proxy, at this meeting, "Kahn provided an update to the Board on the Company's operations and performance and departed such meeting after providing such update."[125]  But the minutes for this meeting make clear that Kahn did not leave after providing the operations and performance update.  Instead, Kahn "reported on the potential transaction with B. Riley Financial, Inc." and "indicated that he was prepared to move forward with the proposal from B. Riley."[126]  The minutes then record a discussion of the Merger with Kahn present and participating, only after which Kahn departed.[127]  The Proxy does not disclose this discussion or Kahn's unilateral statement that *he* (not the Special Committee) was prepared to move forward.

---

[124] *Id.*; FG_00002597.

[125] Proxy at 26.

[126] FG_00002545.

[127] *Id.*

109.   On May 4, 2023, Company management sent Jefferies' final updated projections from the series of preliminary management projections provided throughout April (the "Management Projections").[128]   In a March 31, 2023 email, Jefferies had informed Avril (who in turn informed Kahn) that it "will need [to] ultimately [] work with *approved* projections" to generate its analysis of the Company in connection with a potential transaction.[129]   Unsurprisingly then, the Proxy disclosed that the Management Projections "were reviewed and approved by the Special Committee for purposes of Jefferies' financial analysis," but the Proxy does not disclose when that review and approval occurred.[130]

110.   The Special Committee minutes similarly fail to shed light on this purported approval, as Company management first sent the Preliminary Management Projections to the Special Committee on April 4, but the Committee did not formally approve those projections during any of the seven meetings it held between April 4 and May 4, 2023.[131]   In fact, the April 12, 2023 Special Committee minutes are the only one of those seven minutes that reference the Preliminary

---

[128] Proxy at 23.

[129] FG_00005603 (emphasis added).

[130] Proxy at 23.

[131] The Special Committee convened on April 12 (FG_00002579), April 14 (FG_00002600), April 19 (FG_00002580), April 26 (FG_00002590), April 28 (FG_00002584), April 29 (FG_00002596), and May 2 (FG_00002545).

Management Projections, and those minutes merely indicate that the Special Committee "reviewed and discussed" the Preliminary Management Projections but do not state that the Preliminary Management Projections were *approved*.[132]  Thus, it is reasonably conceivable that Company management sent the Management Projections to Jefferies on May 4, 2023 without the Special Committee's approval.

111.    Moreover, while the Management Projections left revenue projections virtually untouched from the Preliminary Management Projections, they made non-corresponding drastic downward revisions to the EBITDA projections (down from the already outsized downward revisions to EBITDA in the Preliminary Management Projections from the Jefferies Projections):

| (Numbers in millions) | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|
| Preliminary Management Projections | Revenue- $4,227 EBITDA- $244 | Revenue- $4,428 EBITDA- $281 | Revenue- $4,876 EBITDA- $366 | Revenue- $5,334 EBITDA- $440 |
| Management Projections | Revenue- $4,223 EBITDA- $162 | Revenue- $4,428 EBITDA- $199 | Revenue-$4,876 EBITDA - $288 | Revenue- $5,334 EBITDA- $363 |

112.    Once again, Jefferies failed to raise any concerns with the revised projections despite their significant departure from the projections Jefferies received from Kahn for purposes of the Take-Private Analysis.

---

[132] FG_00002578.

### C.    Kahn Replaces B. Riley as the Company's Acquirer at the Eleventh Hour

113.   Between April 30 and May 9, 2023, the Proxy indicates that B. Riley held discussions with Kahn regarding the potential transaction and the relationship among the parties with respect thereto.[133]

114.



115.   At the May 5, 2023 Board meeting, according to the minutes, Kahn informed the Board that "B. Riley determined that, while it remained interested in providing financing to facilitate a transaction, it would be necessary to do so in a manner that would not result in it controlling or having to consolidate the Company

---

[133] Proxy at 26.

[134] FG_00004675 (emphasis added).

[135] FG_00004684.

into its financial statements."[136]   No explanation was provided why this would purportedly be "necessary."

116.   It is incredibly odd that a sophisticated financier like B. Riley suddenly discovered, after making an offer to acquire the Company, that it no longer could participate in an acquisition that would result in B. Riley having a controlling interest in the Company.   Rather, it is reasonably conceivable that this was a charade orchestrated by Kahn and B. Riley to make it appear that B. Riley was the initiator of the sale process rather than Kahn himself.

117.   In response to B. Riley's statement, Kahn came to the rescue, announcing that he and B. Riley determined that if a transaction were to proceed, "*Kahn would control the surviving company from a governance perspective and may own, directly or indirectly, a majority of the outstanding equity of the surviving company.*"[137]

118.   Thus, Kahn precipitously informed the Board that following further discussions with B. Riley, the parties now contemplated that "Kahn and his affiliates

---

[136] Proxy at 26.

[137] *Id.*

will have control of the surviving company, with B. Riley participating in the transaction as a financing source, including from an equity perspective."[138]

119.    Aside from the Special Committee's meeting later on May 5, 2023 to "discuss the status of the proposed transaction and next steps related thereto,"[139] the Proxy's disclosures do not include any subsequent action taken by the Special Committee to discuss or address the change to the Merger structure, seek additional Merger consideration, or engage in substantive negotiation with Kahn and B. Riley. According to the May 5, 2023 Special Committee meeting minutes, the Special Committee determined that the "proposed change in structure ha[d] not impacted the material terms of the Proposed Transaction."[140]  However, neither the May 5 Board minutes nor the May 5 Special Committee minutes indicate that Kahn disclosed specific terms for his proposal as the Company's "new" acquirer.[141]

120.    Nevertheless, according to the May 5 minutes, the Special Committee concluded it would "discuss final transaction terms with Wachtell" concerning the proposed transaction over the following week.[142]

---

[138] *Id.*

[139] *Id*.

[140] FG_00002595

[141] *See* Proxy at 26; FG_00002508 (Board minutes); FG_00002594 (Special Committee minutes).

[142] FG_00002595.

121.   Also on May 5, 2023, Irradiant, the lead source of debt financing for the Merger, sent an "initial draft of the Irradiant Fee Letter" to Kahn's counsel, Willkie,[143] which contemplated a fee to be received by Irradiant in consideration of debt financing arrangements in connection with the Merger.[144]   The draft Irradiant fee letter also bound Kahn personally to work exclusively with Irradiant on any debt financing connected with the Merger.[145]   The existence of the draft Irradiant fee letter dated May 5, 2023, *i.e.*, the same day Kahn informed the Board that he would control the post-Merger Company, combined with the fact that a managing director of Irradiant forwarded the *WSJ Article* to Kahn on January 10, 2023, implies coordination between Irradiant, Kahn, and B. Riley in the days or weeks leading to Kahn supplanting B. Riley as the Company's eventual acquiror.[146]

122.   On May 8, 2023, the Special Committee convened again.   The Proxy indicates that the Special Committee and Jefferies discussed "the status of representatives of Jefferies' outreach to potential bidders[,]"[147] yet the meeting minutes indicate only that "Jefferies confirmed to the [Special] Committee that . . .

---

[143] FG_00004706; FG_00004707.

[144] FG_00004707.

[145] FG_00004709.

[146] FG_00004126.   An April 2023 presentation prepared by Jefferies also references ongoing discussions between Jefferies and Irradiant concerning the Merger.   FG00002371.

[147] Proxy at 27.

there had still been no *inbound* interest from any third-party with respect to a full or partial acquisition of the Company."[148]  The minutes, however, discuss no *outreach* by Jefferies, Kahn, or the Special Committee members since Kahn's proposal to acquire Franchise Group three days earlier.

123.   In fact, of the eight Board and Special Committee meetings held between Kahn's May 5, 2023 proposal and the Special Committee's resolution to recommend the Board approve the Merger Agreement, *none* of the meeting minutes there from describe any outreach to third-party potential transaction partners by Jefferies, Kahn, or the Special Committee.[149]  The Proxy likewise makes no other mention of any outreach over this period.

124.   The Special Committee met three times on May 9, 2023.  At the first two meetings, the Special Committee discussed and reviewed "transaction documents" and Jefferies' "update to its preliminary financial analysis."[150]  At the third meeting that evening, the Special Committee reviewed the Merger Agreement, a voting agreement dated May 10, 2023 (the "Voting Agreement"), and Kahn and

---

[148] FG_00002576 (emphasis added).

[149] The Board convened on May 7 and May 9 (twice), and the Special Committee convened on May 8 (twice) and May 9 (thrice).  *See* Proxy at 27–28.

[150] Proxy at 27; FG_00002574; FG_00002598.

Laurence's rollover agreements.[151]  The Special Committee also reviewed an equity commitment letter entered into between the Company and B. Riley pursuant to which B. Riley would contribute $560 million in equity financing.[152]  Jefferies then rendered its opinion that the Merger's $30 per share price – that was never negotiated since B. Riley's opening offer and was at the very bottom of Jefferies' "theoretical purchase price[]" range of $30 to $38 in their Take-Private Analysis for Kahn – was financially fair to the Company's unaffiliated stockholders.  The Special Committee then approved the Merger Agreement.[153]

125.    Later, on May 9, 2023, the Board, excluding Kahn, approved the Merger Agreement.[154]  The Merger Agreement was executed the next day, on May 10, 2023, and prior to the market's open, Franchise Group issued a press release announcing the Merger.[155]

126.    On July 14, 2023, the Company issued the Proxy.

127.    On August 17, 2023, Company stockholders approved the Merger.

---

[151] Proxy at 27–28; FG_00002602–03.

[152] *Id.*

[153] Proxy at 27; FG_00002603.

[154] Proxy at 28; FG_00002515–16.

[155] Proxy at 28.

128.   Sometime between the issuance of the Proxy on July 14, 2023 and August 25, 2023, B. Riley purchased $64.6 million of Kahn's rollover shares.[156]

## VIII.    THE MERGER'S AFTERMATH

129.   The Merger's aftermath has been riddled with controversy, including revelations that Kahn was involved with a fraudulent $300 million investment fund and Kahn's subsequent resignation as the post-Merger Company's CEO.

### A.    Kahn is Implicated in a Criminal Conspiracy

130.   On November 2, 2023, the U.S. Attorney's Office for the District of New Jersey announced that John Hughes ("Hughes"), the former co-founder and executive of the investment fund Prophecy Asset Management LP ("Prophecy"), pleaded guilty to conspiring to defraud dozens of victim investors out of $294 million in funds.  Hughes admitted that he worked with two co-conspirators—a co-founder of Prophecy and the CEO of a multibillion-dollar retail franchise company. *Bloomberg reported that the latter was Kahn*.[157]

131.   Hughes admitted he helped raise hundreds of millions of dollars by falsely marketing Prophecy as following a low-risk and transparent investment

---

[156] *Unraveling the Money Trail.*

[157] David Voreacos, *Prophecy Fund Co-Founder Pleads Guilty to $294 Million Fraud*, BLOOMBERG (Nov. 2, 2023), https://www.bloomberg.com/news/articles/2023-11-02/prophecy-fund-co-founder-pleads-guilty-to-294-million-fraud?embedded-checkout=true.

strategy in which investors money were spread among many so-called sub-advisers with successful track records.  These sub-advisers were also supposed to provide cash collateral equivalent to 10% of the Prophecy funds they were accessing.

132.   As part of the fraud, in December 2019—shortly before the fund's collapse—Prophecy showed an astonishing 99 consecutive months of positive returns:

**PROPHECY** Asset Management, LP.

**THE FLAGSHIP FIRST-LOSS STRATEGY**

Prophecy Trading Advisors, L.P.

December 2019

**INVESTMENT OBJECTIVE**

Generate absolute returns in all market conditions by providing notional allocations to sub-advisors who invest in equities and other asset classes. Preserve capital and achieve risk-adjusted returns by utilizing a contractual structure that requires each sub-advisor to participate in profits and losses within their allocation. Develop a diversified portfolio of sub-advisors that generate consistent returns, while achieving a favorable risk/reward dynamic for fund investors.

**FUND STRATEGY**

The fund seeks to generate returns by making notional allocations to a diverse group of sub-advisors running a variety of discretionary

**MONTHLY FUND RETURNS (IN %)**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 0.54 | 0.56 | 0.52 | 0.57 | 0.68 | 0.69 | 0.57 | 0.55 | 0.51 | 0.55 | 0.53 | 0.55 | 7.04 |
| 2018 | 0.62 | 0.56 | 0.57 | 0.70 | 0.81 | 0.79 | 0.75 | 0.64 | 0.54 | 0.53 | 0.55 | 0.60 | 7.94 |
| 2017 | 0.67 | 0.54 | 0.62 | 0.67 | 0.67 | 0.65 | 0.52 | 0.61 | 0.55 | 0.59 | 0.60 | 0.67 | 7.61 |
| 2016 | 0.42 | 0.33 | 0.53 | 0.49 | 0.42 | 0.43 | 0.42 | 0.43 | 0.57 | 0.63 | 0.92 | 0.67 | 6.44 |
| 2015 | 0.66 | 0.80 | 0.94 | 0.69 | 0.84 | 0.68 | 0.79 | 1.52 | 0.76 | 0.89 | 0.83 | 0.68 | 10.56 |
| 2014 | 0.82 | 0.72 | 0.70 | 1.01 | 0.82 | 0.52 | 0.70 | 0.59 | 0.49 | 0.56 | 0.62 | 0.40 | 8.24 |
| 2013 | 0.78 | 0.69 | 0.54 | 0.32 | 0.45 | 0.47 | 0.60 | 0.43 | 0.74 | 1.00 | 0.94 | 0.76 | 8.00 |
| 2012 | 1.29 | 0.93 | 0.71 | 0.55 | 0.47 | 0.96 | 0.98 | 0.86 | 1.06 | 0.43 | 0.79 | 0.48 | 9.93 |
| 2011 | | | | | | | | | | 0.65 | 0.30 | 0.91 | 1.86 |

133.   In reality, 86% of Prophecy's funds were allocated to just six trading entities controlled by Kahn, who was largely exempted from the collateral requirements.  Those entities lost $294 million by March 2020, but Hughes, Kahn, and another co-conspirator concealed the losses from investors and their auditor through bogus transactions and forged documents.[158]

---

[158] *Id.*  Market participants have speculated that some of these losses are attributable to Vintage's $92.5 million termination fee owed to Rent-A-Center in April or May 2019.  *See*

134.   Kahn agreed to pay more than $200 million to compensate Prophecy's investors, including cash and Franchise Group stock.   According to a trustee overseeing the settlement, however, Kahn failed to pay $1.5 million in cash or turn over $5 million in Franchise Group shares by the January 31, 2024 deadline.[159]

## B.   Additional B. Riley Entanglements with Kahn are Revealed

135.   On December 13, 2023, B. Riley hosted an investor day and published an investor presentation that showed a $201 million loan maturing in 2027 from B. Riley to Kahn's Vintage.[160]  Vintage secured this loan with Franchise Group shares, though it appears that Kahn pledged those *same* shares to compensate Prophecy victims.[161]

136.   On December 21, 2023, Vintage deleted its website.[162]

---

¶40; *see also* Matt Levine, *Don't Forget to Do Your Merger*, BLOOMBERG (Mar. 15, 2019), https://www.bloomberg.com/opinion/articles/2019-03-15/don-t-forget-to-do-your-merger.  From March 2019 to May 2019, Kahn's trading losses for Prophecy increased by about $105 million, from $164.9 million to $270.4 million.  Edwin Dorsey, *Problems at a Billion Dollar Mess*, BEAR CAVE (Feb. 1, 2024), https://thebearcave.substack.com/p/problems-at-a-billion-dollar-mess (hereinafter "*Billion Dollar Mess*").  *See An Unremarkable Deal.*

[159] Donal Griffin & David Voreacos, *B. Riley Client Misses Date to Repay Investors in Collapsed Fund*, BLOOMBERG (Feb. 26, 2024), https://www.bloomberg.com/news/articles/2024-02-26/b-riley-client-misses-date-to-repay-investors-in-collapsed-fund.

[160] *Billion Dollar Mess.*

[161] *An Unremarkable Deal.*

[162] *Billion Dollar Mess.*

137.   On January 21, 2024, *Bloomberg* reported that the "Securities & Exchange Commission carried out interviews in recent months about B. Riley and its relationship with Brian Kahn," and that "the probe is in its early stages."[163]

138.   On January 22, 2024, Kahn resigned as CEO of Franchise Group.[164] Laurence replaced Kahn as CEO.

## IX.   THE MERGER WAS A CONFLICTED CONTROLLER TRANSACTION UNFAIR TO THE COMPANY'S MINORITY STOCKHOLDERS

### A.   Kahn Controlled Franchise Group and Received Non-Ratable Benefits Through the Merger

139.   Kahn was the *de facto* controller of the Company.

140.   Kahn was the Company's largest stockholder.  As of July 13, 2023, Kahn wielded 41.9% of the Company's voting power.

141.   Kahn's control over Franchise Group was not limited to mere voting power.  Kahn exerted actual control over the Company's operations as a Company officer, serving as Franchise Group's President and CEO since October 2019. Additionally, Laurence, the Company's Executive Vice President, is also a partner

---

[163] Donal Griffin & David Voreacos, *SEC Probes B. Riley Deals With Client Tied to Failed Fund*, BLOOMBERG (Jan. 22, 2024), https://www.bloomberg.com/news/articles/2024-01-22/sec-probes-b-riley-deals-with-client-tied-to-failed-hedge-fund.

[164] *Franchise Group CEO steps down amid SEC probe*, InvestmentNews (Jan. 24, 2024), https://www.investmentnews.com/regulation-and-legislation/news/franchise-group-ceo-steps-down-amid-sec-probe-248315.

at Kahn's Vintage.  Not only is Laurence beholden to Kahn for the reasons described above, but Laurence also owned 1.6% of the Company's voting power.  Together, the Controller Defendants wielded 43.5% of the Company's voting power.  Indeed, the Company acknowledged the Controller Defendants' significant control in its public filings:

> As a result of substantial ownership of our stock, and Mr. Kahn's participation on the Board, Vintage currently has the ability to influence certain actions requiring stockholder approval, including increasing or decreasing the authorized share capital, the election of directors, declaration of dividends, the appointment of management, and other policy decisions. The interests of Mr. Kahn and Vintage may be different from the interests of our other stockholders. While any future transaction with Mr. Kahn and Vintage or other significant stockholders could benefit us, the interests of Mr. Kahn and Vintage could at times conflict with the interests of other stockholders. Conflicts of interest may also arise between us and Mr. Kahn and Vintage, which may result in the conclusion of transactions on terms not determined by market forces. Any such conflicts of interest could adversely affect our business, financial condition and results of operations, and the trading price of our common stock. Moreover, the concentration of ownership may delay, deter or prevent acts that would be favored by other stockholders or deprive our stockholders of an opportunity to receive a premium for their shares of our common stock as part of a sale of us.[165]

142.  Moreover, as discussed above, Kahn exerted situational control over the sale process and the Special Committee.  For example, Kahn initiated the sale process and put the Company in play.  Additionally, Kahn has deep ties to Avril, the

---

[165] Franchise Group, Inc., Annual Report (Form 10-K), at 16 (Feb. 28, 2023).

Chairman of the Special Committee, who on multiple occasions unilaterally made decisions and conducted negotiations on behalf of the Special Committee without the participation of Dubin and Herskovits (the other members of the Special Committee), but with Kahn in attendance. As such, the Special Committee failed to act independently from Kahn given Kahn's interference and Avril's deep ties to Kahn.

143.    Kahn plainly received non-ratable benefits through the Merger that were not shared with the Company's minority stockholders, including:

- Kahn was able to rollover his equity stake into the post-Merger Company, instead of being cashed out at the unfair Merger price.

- Not only was Kahn able to roll over his equity stake, but the Merger also allowed him to turn his *de facto* control over Franchise Group into mathematical control of the post-Merger Company (with *zero* cost to him).

- Kahn remained the CEO of the post-Merger Company.

- Certain affiliates of Kahn received payments upon closing of the Merger because, pursuant to the terms of a tax receivables agreement entered into with the Company in July 2019 in connection with the Company's acquisition of Buddy's (which will terminate upon the closing of the Merger in accordance with its terms), the former equity holders of Buddy's were to receive payments upon such termination.[166]

---

[166] Franchise Group, Inc., Amendment to Definitive Proxy Statement (Schedule 14A) (July 6, 2023) ("Proxy").

61

## B.    The Merger Consideration is Unfair

144.    A review of the Company's historical trading prices suggests that the acquisition of the Company for $30 per share does not represent the fair value of Franchise Group's common stock.  The Company touted the $30 per share Merger price as a 31.9% premium to the Company's $22.75 trading price on March 17, 2023,[167] but only two weeks before, on March 1, 2023, Franchise Group's common stock maintained intraday values up to $30.44 per share.  Indeed, $22.75 was the lowest price at which the Company's stock had traded in well over a year, indicating that B. Riley's Original Proposal was opportunistically timed.

145.    Moreover, as discussed, the Management Projections disclosed in the Proxy were manipulated with downward revisions to validate the only price proposal submitted by B. Riley and Kahn and do not appear to be management's best estimate of Franchise Group's future performance.[168]  Comparing the Jefferies Projections to the Management Projections illuminates that in the two months of Merger negotiations with B. Riley and Kahn, Company management significantly reduced their projections.[169]  Compared against the EBITDA values in the Jefferies

---

[167] Proxy at 29.

[168] Proxy at 55–57.

[169] *Id.*

Projections, *the EBITDA values used in connection with the Merger in the Management Projections reflect reductions of 56.2% in FY2023, 55.2% in FY2024, 45.4% in FY2025, and 41% in FY2026.*

146.   Setting aside Jefferies' "theoretical purchase price[]" range of $30 to $38 per share set forth in the Take-Private Analysis that Jefferies presented to Kahn, which were premised on the Jefferies Projections, several of Jefferies' analyses presented to the Special Committee and disclosed in Franchise Group's Schedule 13E-3 filed on June 8, 2023 suggest that the $30 per share Merger price is not fair.

147.   For example, Jefferies' April 14, 2023 presentation listed Franchise Group price targets from five analysts.  The median price target was $39 per share, well above the Merger price.[170]  Even applying a range of discount rates to determine the present value of the median $39 per share price target still reflected a value range of $31.25–$33.50 per share in Jefferies' presentation.[171]  Similarly, Jefferies' final presentation to the Special Committee on May 9, 2023 uses the same price targets of the same five analysts; however, this time, Jefferies uses the lower mean price target of $36.80 per share, rather than the higher median price target of $39 per share

---

[170] Franchise Group, Inc., Transaction Statement (Schedule 13E-3) (June 8, 2023), Ex 99.(C)(1) ("Jefferies April 14 Presentation") at 10.

[171] *Id.*

that was used in the April 14, 2023 materials.[172]  Nevertheless, the mean and median price targets are well in excess of the $30 per share Merger price.

148.   As another example, the sum of the parts analysis Jefferies presented to the Special Committee on April 14, 2023 generates a per share price range of $31–$39.25 per share.[173]  This range, completely above the $30 per share offered in B. Riley's Original Proposal received in March and prior to the Special Committee's only counteroffer, suggests that the Special Committee recognized that $30 per share did not represent fair value for a sale of the Company.

149.   Finally, on a December 13, 2023 B. Riley analyst/investor day call, Kahn conceded that the Merger was an opportunistic acquisition at a bargain-basement price, stating: "as we saw 2 of their businesses . . . what we think were great businesses, suffer because of the pull-up of COVID and the stock go from 50 down to 21, we thought there was an opportunity for B. Riley to buy the company.  So we bid for the company, and we bid $30 a share based on the thought that a $2.8 billion enterprise value was cheap and really based on the fact that there's

---

[172] Franchise Group, Inc., Amended Schedule 13E-3 (July 6, 2023), Ex. 99.(c)(6) ("Jefferies May 9 Presentation") at 11.

[173] Jefferies April 14 Presentation at 29.

2 assets in that $2.8 billion enterprise value that are worth combined significantly

more, in our opinion, than that valuation."[174]

### C.    The Merger Process Was Unfair

150.    The Merger negotiation process contains numerous indicia of

unfairness, including:

- The Special Committee's financial advisor, Jefferies, had already been engaged in discussions for months with Kahn concerning financing a potential take-private *prior* to being retained by the Special Committee with Kahn's involvement.

- Avril, the Chairman of the Special Committee, was conflicted due to his significant ties to Vintage, Kahn, and Laurence, *and* due to his investments in Vintage.  As described above, Avril previously served on Vintage's strategic advisory board, co-invested with Vintage, and received over $4.2 million in Merger consideration from his Company stock ownership that he only held as a result of his relationship with Kahn and Vintage.

- Furthermore, Avril often acted *unilaterally* on behalf of the Special Committee, without the participation of the other Special Committee members, including by: (i) pre-selecting Wachtell as the Special Committee's advisor; (ii) meeting with potential financial advisors; (iii) discussing Jefferies's financial analyses; (iv) meeting with Kahn's legal counsel; and (v) delegating the Special Committee's powers to negotiate with third parties, including B. Riley, to Kahn.  Indeed, Avril's unilateral negotiations resulted in him having to "convene[] a number of information sessions with the independent directors of the Company (*including the members of the Special Committee*), to provide

---

[174] B. Riley Financial, Inc. - Analyst/Investor Day Transcript (Dec. 12, 2023), BamSEC, https://www.bamsec.com/transcripts/1bb434f0-b7d5-41b9-b41b-419fc3c72a2d.

periodic updates regarding a potential transaction and alternatives to a potential transaction."[175]

- Avril's utter failure to utilize negotiating leverage demonstrates his controlled mindset, *i.e.*, his actions demonstrate his predisposition to pleasing Kahn.  For instance, Avril allowed Kahn to conduct negotiations in connection with the sale process on behalf of the Company even *after* Kahn informed Avril that he would *only* consider engaging with bidders that contemplated a role for Kahn in a post-transaction entity.  As another example, after Kahn precipitously told the Board that B. Riley wanted to change the transactional structure so that Kahn would control the post-Merger Company, the Special Committee, spearheaded by Avril, entirely failed to discuss or address the change to the merger structure, seek additional merger consideration, or engage in substantive negotiations with Kahn and B. Riley.

- Additionally, in contravention of the Special Committee's conditional authorization that allowed Kahn to conduct negotiations with potential bidders, including B. Riley, on the Company's behalf, Kahn failed to keep the Special Committee reasonably informed regarding those negotiations.  Instead, Kahn had near free rein to negotiate the sale process with B. Riley, his long-time business partner, without meaningful assessment, feedback, and/or direction from the Special Committee.

- After Kahn changed the Merger structure, proposing to acquire the Company himself, at the May 5, 2023 Board meeting, the Special Committee, spearheaded by Avril, agreed to maintain the unnecessarily expedited May 10, 2023 deadline to reach an agreement purportedly *set by B. Riley*.  Had Avril and the Special Committee taken time to consider Kahn's proposal, the Special Committee may have been able to obtain a more favorable per share Merger price after the May 10, 2023 earnings call.

---

[175] Proxy at 26.

### D. The Proxy and Supplemental Disclosures Were Materially Misleading and Incomplete

151. The Proxy and related Supplemental Disclosures are materially false and misleading.

### i. The Proxy Misled Public Stockholders as to Key Events Related to the Merger Negotiations

152. Despite the awareness of the *WSJ* Article by at least Kahn and Laurence,[176] the Proxy does not even disclose the *WSJ* Article, let alone discuss how the Board responded to its publication, or that Kahn expressed an interest in taking the Company private in January 2023. The Proxy also fails to disclose that Kahn reached out to Jefferies, around the time of the *WSJ* Article and worked with them through early March 2023 regarding debt financing in connection with a potential recapitalization transaction involving the Company (*i.e.*, a take-private). During this time, Jefferies entered into a confidentiality agreement, dated January 16, 2023, and was provided with a Company financial model (materially different from the Management Projections) and provided the Take-Private Analysis.[177] None of this information was ever disclosed to stockholders in the Proxy. Jefferies' extensive dealings with Kahn and Company management related to debt financing for a

---

[176] *See* supra ¶¶ 63, 121; *see also* FG_00004168 (Kahn forwarding an email referencing the WSJ Article to Laurence).

[177] FG_00004115.

potential take-private transaction that contemplated Kahn's rollover in the three months leading up to B. Riley's Original Proposal, and right before the Special Committee retained Jefferies, is material information that Franchise Group stockholders would want to know to evaluate Jefferies' and the Special Committee's independence, as well as the reliability of Jefferies' fairness opinion, which was at the very bottom of the "theoretical purchase price[]" range of $30 to $38 in its Take-Private Analysis.

153.    The Proxy does not disclose that Kahn led a discussion of the Merger during a May 2, 2023 Board meeting or that he told the Board "he was prepared to move forward with the proposal from B. Riley."[178]  The Proxy instead misleadingly states that Kahn discussed only Company operations and performance before leaving the meeting.[179]  Kahn's participation in this discussion and unilateral statement that he was prepared to move forward with a transaction would be material information that Franchise Group stockholders would want to know to evaluate Kahn's interest in the Merger.

154.    Finally, the Proxy does not disclose how Laurence entered the sale process to become a member of the buyer consortium (although it is reasonably

---

[178] FG_00002545.

[179] Proxy at 26.

conceivable that he interacted with Jefferies in connection with their Take-Private Analysis and related discussions with Kahn). Likewise, the Supplemental Disclosures do not disclose how Eric Seeton (Franchise Group's Chief Financing Officer), Andrew Kaminsky (Franchise Group's Executive Vice President and Chief Administrative Officer), and Todd Evans (Franchise Group's Chief Franchising Officer) entered the sale process to become members of the buyer consortium.[180]

### ii. The Proxy Failed to Include Information About Kahn and B. Riley's Long-Standing Business Relationship

155. Glaringly, the Proxy fails to document the close, long-standing, and legally problematic ties between Kahn and B. Riley. The substance and breadth of this relationship provide evidence that Franchise Group and Kahn's ability to negotiate a Merger with B. Riley that was fair to minority stockholders was compromised.

156. In particular, the Proxy does not disclose the close business relationship between Kahn's Vintage and Riley's B. Riley. As described above, in 2018, B. Riley served as an equity and debt participant in Vintage's purchase of Rent-A-Center. When the Rent-A-Center transaction failed to close, B. Riley was the guarantor of

---

[180] Franchise Group, Inc., Amendment to Definitive Proxy Statement (Schedule 14A) (July 6, 2023).

Vintage's termination fee.  Rent-A-Center sued Vintage and B. Riley to recover this fee.

157.    Starting in 2018, Vintage and B. Riley served as co-investors in B&W. Similar to the Rent-A-Center debacle, B&W sued Vintage and B. Riley for allegedly trying to drive B&W to the brink of bankruptcy so that they could acquire a majority stake in B&W at a bargain price.

158.    And in 2020, B. Riley provided financing support to Franchise Group in its acquisition of American Freight.

159.    None of the Rent-A-Center, B&W, or American Freight transactions were mentioned in the Proxy.  Franchise Group also failed to disclose that two of these deals ended with Vintage and B. Riley serving as co-defendants in civil litigation.

160.    And sometime between July 14, 2023 and August 25, 2023, B. Riley purchased $64.6 million worth of the Franchise Group shares that Kahn rolled over into the post-Merger Franchise Group.  The Proxy did not inform minority stockholders of any agreement for B. Riley to purchase Kahn's rollover shares.

161.    Without information about any of these transactions, the Proxy lacked material facts that show the significant and long-standing ties between Franchise Group, Kahn, and B. Riley.

### iii.    Franchise Group Did Not Acknowledge the Criminal Legal Issues Facing Kahn and B. Riley

162.    Worse still, Franchise Group did not disclose—and is likely trying to conceal—the fact that B. Riley has aided and abetted Kahn in defrauding investors in the Prophecy fund.

163.    Kahn managed 86% of the Prophecy investments.  He illegally covered up $294 million in lost Prophecy funds.

164.    In fact, Kahn's impetus for Franchise Group's take-private Merger may have been to avoid public company scrutiny of his fraudulent transactions.  The Proxy does not provide information regarding this key issue.

165.    Also, new details of loans by B. Riley to Kahn show a longer and closer relationship than previously known.  They also raise questions about whether Franchise Group should have disclosed more details about some of the loans years ago, when the Company's board included two B. Riley executives as directors.

166.    B. Riley's loans to Kahn also date back longer than previously known. B. Riley made at least 10 different loans to Kahn and entities he controlled from 2018 through 2023, according to UCC financing statements filed with state agencies in Nevada, Delaware and Florida.  The UCC filings do not show the amounts borrowed, but a presentation generated by an investment bank that provided financing to B. Riley as part of the Merger indicated that the principal balance on

71

Kahn's loans was $154 million by mid-2023.  The Proxy does not disclose the existence of these loans.

167.   Kahn has agreed to pay more than $200 million, including cash and Franchise Group stock, to compensate Prophecy's investors.  At the same time, Kahn has pledged Franchise Group stock as collateral for a $200 million loan from B. Riley to Vintage.  Unsurprisingly, Kahn's double-pledging of Franchise Group stock also was not disclosed in the Proxy.

168.   Minority stockholders were not informed of either B. Riley's longtime financing of various Kahn-controlled operations or B. Riley and Kahn's connections to the Prophecy fraud, even though Kahn obviously had knowledge of their relationship and their shared involvement in the fraud.  Thus, the Proxy did not adequately show the close ties and sway that B. Riley had with respect to Kahn and Franchise Group.

## CLASS ALLEGATIONS

169.   Plaintiffs bring this action individually and as a class action pursuant to Rule 23 on behalf of themselves and all other stockholders whose shares of the Company's common stock were exchanged for $30 per share in cash in the Merger (the "Class").  The Class excludes the Defendants and any persons or entities affiliated with or controlled by Defendants as of the closing of the Merger.

170.    This action is properly maintainable as a class action.

171.    A class action is superior to other available methods for fair and efficient adjudication of this controversy.

172.    The Class is so numerous that joinder of all members is impracticable. The number of Class members is believed to be in the thousands and Class members are likely scattered across the United States.

173.    There are questions of law and fact which are common to all Class members and which predominate over any questions affecting only individuals, including, without limitation:

a.  Whether the Merger is entirely fair;

b.  Whether Defendants breached their fiduciary duties or aided and abetted in the breach of fiduciary duties to Plaintiffs and the Class;

c.  The existence and extent of any injury to Plaintiffs and the Class caused by any breach;

d.  The proper measure of the Class's damages; and

e.  The appropriateness of any other relief, including any equitable remedies.

174.    Plaintiffs' claims and defenses are typical of the claims and defenses of other Class members, and Plaintiffs have no interests antagonistic or adverse to the interests of other Class members.  Plaintiffs will fairly and adequately protect the interest of the Class.

175.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

176.    Defendants have acted in a manner that affects Plaintiffs and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

177.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other Class members or substantially impair or impede their ability to protect their interests.

## COUNT I

### (Claim for Breach of Fiduciary Duty Against the Controller Defendants)

178.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

179.    The Controller Defendants were the controlling stockholders of the Company.   As such, the Controller Defendants owed Plaintiffs and the Class the utmost fiduciary duties of care, loyalty, good faith, and candor.

74

180.   At all relevant times, the Controller Defendants had the power to control, influence, and cause—and actually did control, influence, and cause—the Company to enter into the Merger Agreement.  The Merger consideration was inadequate and unfair, reflecting an unfair price and unfair process, and the Proxy and related filings were materially misleading and contained material omissions.

181.   Plaintiffs and the Class suffered damages in an amount to be determined at trial.

182.   Plaintiffs and the Class do not have an adequate remedy at law.

## COUNT II

**(Claim for Breach of Fiduciary Duty Against the Director Defendants)**

183.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

184.   As directors of the Company, the Director Defendants owed Plaintiffs and the Class the utmost fiduciary duties of care, loyalty, good faith, and candor in their capacity as Company directors.

185.   These duties required them to place the interests of Company stockholders above their personal interests and the interests of any controller, third party, and/or themselves.

186. Through the events and actions described herein, the Director Defendants breached their fiduciary duties by approving the Merger without maximizing the Merger consideration and ensuring that the Merger was entirely fair to Plaintiffs and other public stockholders.

187. Plaintiffs and the Class suffered damages in an amount to be determined at trial.

188. Plaintiffs and the Class do not have an adequate remedy at law.

## COUNT III

**(Claim for Breach of Fiduciary Duty Against the Officer Defendants)**

189. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

190. As the senior officers of the Company, the Officer Defendants owed Plaintiffs and the Class the utmost fiduciary duties of care, loyalty, good faith, and candor.

191. These duties required the Officer Defendants to place the interests of Company stockholders above their personal interests and the interest of any controller, third party, and/or themselves.

192. Through the events and actions described herein, the Officer Defendants breached their fiduciary duties by orchestrating the Merger without

maximizing the Merger consideration and ensuring that the Merger was entirely fair to Plaintiffs and other public stockholders.

193.   Upon information and belief, by virtue of their roles at the Company, the Officer Defendants would have been involved in drafting and disseminating a Proxy that they knew or should have known to be misleading and materially incomplete.

194.   These breaches of duty in their capacity as Franchise Group officers are not exculpable, as the Company did not amend its certificate of incorporation to provide exculpation for its officers pursuant to 8 *Del. C.* § 102(b)(7).

195.   Plaintiffs and the Class suffered damages in an amount to be determined at trial.

196.   Plaintiffs and the Class do not have an adequate remedy at law.

## COUNT IV

### (Claim for Aiding and Abetting Against B. Riley)

197.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

198.   As alleged above, the Controller Defendants, the Director Defendants, and the Officer Defendants breached fiduciary duties of loyalty and care.

77

199.   B. Riley aided and abetted the foregoing breaches of fiduciary duties by knowingly participating in and facilitating the Controller Defendants', Director Defendants', and Officer Defendants' implementation and oversight of the sale process leading to the Merger. ██████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

200.   Plaintiffs and the Class suffered damages in an amount to be determined at trial.

201.   Plaintiffs and the Class do not have an adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in favor of themselves and the Class and against each Defendant as follows:

78

A.      Declaring that this action is properly maintainable as a class action, and certifying Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

B.      Declaring that the Controller Defendants were the Company's controlling stockholders;

C.      Declaring that the Controller Defendants, Director Defendants, and Officer Defendants breached their fiduciary duties to Plaintiffs and the Class;

D.      Declaring that B. Riley aided and abetted the Controller Defendants', Director Defendants', and Officer Defendants' breaches of fiduciary duty;

E.      Awarding damages, including rescissory damages and/or quasi-appraisal damages, to Plaintiffs and the Class;

F.      Ordering disgorgement of the Controller Defendants' and B. Riley's profits (plus pre-judgment and post-judgment interest) resulting from the Controller Defendants' breaches of fiduciary duty and B. Riley's aiding and abetting thereof as alleged herein;

G.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and expert witnesses' fees and other costs;

H.      Awarding pre- and post-judgment interest from the effective time of the Merger to and including the date of payment; and

I.      Granting Plaintiffs and the Class such further relief as the Court deems just and equitable.

Dated:  July 9, 2024

OF COUNSEL:

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
Jeroen van Kwawegen
Ed Timlin
Christopher J. Orrico
Shiva Mohan
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

**KESSLER TOPAZ MELTZER
& CHECK, LLP**
J. Daniel Albert
Michael McCutcheon
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**BLOCK & LEVITON LLP**
Jason Leviton
Joseph Kiefer
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**

*/s/ Daniel E. Meyer*
Daniel E. Meyer (Bar No. 6876)
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
(302) 364-3600
daniel.meyer@blbglaw.com

*Counsel for Plaintiffs Brian Gale, Mark
Noble, and Terry Philippas*

**BLOCK & LEVITON LLP**

*/s/ Kimberly A. Evans*
Kimberly A. Evans (Bar No. 5888)
Irene R. Lax (Bar No. 6361)
Robert Erikson (Bar No. 7099)
3801 Kennett Pike, Suite C-305
Wilmington, DE 19807
(302) 499-3600
kim@blockleviton.com
irene@blockleviton.com
robby@blockleviton.com

*Counsel for Plaintiff Lawrence Bass*

80

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr.
7817 Ivanhoe Ave., Suite 102
La Jolla, CA 92037
(858) 914-2001

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel E. Meyer, hereby certify that, on July 12, 2024, the foregoing *Public*

*[Redacted] Version of the Verified Class Action Complaint* was filed and served via

File & Serve*Xpress* upon the following counsel of record:

Kimberly A. Evans, Esq.
Irene R. Lax, Esq.
Robert Erikson, Esq.
BLOCK & LEVITON LLP
3801 Kennett Pike, Suite C-305
Wilmington, DE 19807

*/s/ Daniel E. Meyer*
Daniel E. Meyer (Bar No. 6876)

**<u>Exhibit B</u>**

**Third Amended and Restated Certificate of Incorporation of Franchise Group, Inc.**

Exhibit 3.1

**THIRD AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**FRANCHISE GROUP, INC.**

\* \* \* \* \* \* \* \*

It is hereby certified that:

1. The name of the corporation (hereinafter called the "Corporation") is Franchise Group, Inc.

2. The Certificate of Incorporation of the Corporation was originally filed with the Secretary of State of the State of Delaware on September 23, 2010, under the name of JTH Holdings, Inc. The Amended and Restated Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on July 14, 2011. The Second Amended and Restated Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on December 18, 2018 (the "Second Amended and Restated Certificate"), under the name of Liberty Tax, Inc. The Certificate of Amendment to the Second Amended and Restated Certificate was filed with the Secretary of State of the State of Delaware on September 19, 2019.

3. This Third Amended and Restated Certificate of Incorporation of the Corporation (this "Third Amended and Restated Certificate"), which both restates and amends the provisions of the Second Amended and Restated Certificate, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware, as amended from time to time (the "DGCL"), and by the written consent of its stockholders in accordance with Section 228 of the DGCL.

4. This Third Amended and Restated Certificate restates, integrates, and amends the provisions of the Second Amended and Restated Certificate. Certain capitalized terms used in this Third Amended and Restated Certificate are defined where appropriate herein.

5. This Third Amended and Restated Certificate shall become effective on the date of filing with the Secretary of State of the State of Delaware.

6. The text of the Second Amended and Restated Certificate is hereby restated and amended in its entirety to read as follows:

ARTICLE I

The name of the corporation (the "Corporation") is: Franchise Group, Inc.

ARTICLE II

The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, Wilmington, County of New Castle, Delaware, 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

ARTICLE III

The nature of the business or purposes to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

ARTICLE IV

The total number of shares of stock which the Corporation shall have authority to issue is 100 shares of common stock, each of which shall have a par value of $0.0001 per share (the "Common Stock").

ARTICLE V

In furtherance and not in limitation of the powers conferred by statute, the by-laws of the Corporation may be made, altered, amended or repealed by the stockholders or by a majority of the entire board of directors of the Corporation (the "<u>Board</u>").

ARTICLE VI

Elections of directors need not be by written ballot.

ARTICLE VII

1. <u>Right of Indemnification</u>. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "<u>Covered Person</u>") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "<u>Proceeding</u>"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, manager, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person. Notwithstanding the preceding sentence or Section 2 of this Article VII, except as otherwise provided in Section 3 of this Article VII, the Corporation shall be required to indemnify, or advance expenses to, a Covered Person in connection with a Proceeding (or part thereof) commenced by such Covered Person only if the commencement of such Proceeding (or part thereof) by the Covered Person was authorized by the Board of Directors.

2. <u>Prepayment of Expenses</u>. The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any Proceeding in advance of its final disposition, provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this Article VII or otherwise.

3. <u>Claims</u>. If a claim for indemnification (following the final disposition of the Proceeding with respect to which indemnification is sought, including any settlement of such Proceeding) or advancement of expenses under this Article VII is not paid in full within thirty days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by applicable law. In any such action the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under this Article VII and applicable law.

4. <u>Non-Exclusivity of Rights</u>. The rights conferred on any Covered Person by this Article <u>VII</u> shall not be exclusive of any other rights which such Covered Person may have or hereafter acquire under any statute, any other provision of this Third Amended and Restated Certificate of Incorporation, the Bylaws of the Corporation, or any agreement, vote of stockholders or disinterested directors or otherwise.

5. <u>Amendment or Repeal</u>. Any right to indemnification or to advancement of expenses of any Covered Person arising hereunder shall not be eliminated or impaired by an amendment to or repeal of this Article VII after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought.

6. <u>Other Indemnification and Advancement of Expenses</u>. This Article VII shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

ARTICLE VIII

the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim for breach of a fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, the Certificate of Incorporation or the by-laws of the Corporation or (iv) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.

IN WITNESS WHEREOF, Franchise Group, Inc. has caused this Third Amended and Restated Certificate of Incorporation to be duly executed and acknowledged in its name and on its behalf by an authorized officer as of the date first set forth above.

**FRANCHISE GROUP, INC.**

By:    /s/ Brian R. Kahn
Name: Brian R. Kahn
Title: Authorized Person

**<u>Exhibit C</u>**

**Third Amended and Restated By-Laws of Franchise Group, Inc.**

**THIRD AMENDED AND RESTATED BYLAWS**

**OF FRANCHISE GROUP, INC.**

_____

**AS OF FEBRUARY 24, 2023**

_____

## ARTICLE I
## OFFICES

**Section 1.1.    Offices**. In addition to the registered office of Franchise Group, Inc. (the "Corporation") in the State of Delaware, as provided for in the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the Corporation may also have and maintain an office or principal place of business at such place as may be fixed by the Board of Directors, and may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine or the business of the Corporation may require.

**Section 1.2.    Books and Records.** The books and records of the Corporation may be kept at the Corporation's headquarters in Delaware, Ohio, or such other location or locations inside or outside the State of Delaware as may from time to time be designated by the Board of Directors.

## ARTICLE II
## CORPORATE SEAL

**Section 2.1.    Corporate Seal.** The corporate seal shall consist of a die bearing the name of the Corporation and the inscription, "Corporate Seal - Delaware." The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

## ARTICLE III
## STOCKHOLDERS' MEETINGS

**Section 3.1.    Place of Meetings.** Meetings of the stockholders of the Corporation shall be held at such place, either within or without the State of Delaware, as may be designated from time to time by the Board of Directors. The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but instead shall be held solely by means of remote communication as provided under the General Corporation Law of the State of Delaware, as amended (the "DGCL").

**Section 3.2.    Annual Meeting.** To the extent required by applicable law, an annual meeting of stockholders of the Corporation shall be held each year at such date and time designated by the Board of Directors. At each annual meeting of stockholders, directors shall be elected and any other proper business may be transacted.

**Section 3.3.    Special Meetings.** Except as may be provided in a resolution or resolutions providing for any series of Preferred Stock of the Corporation, special meetings of stockholders of the Corporation may be called, for any purpose or purposes, only by the Chairman of the Board or by the Secretary upon direction of the Board of Directors pursuant to a resolution adopted by a majority of the entire Board of Directors, or by the holders of not less than twenty percent (20%) of all of the outstanding shares entitled to vote on the matter for which the meeting is called. At any special meeting, the business transacted shall be limited to the purpose or purposes of such meeting specified in the notice of the meeting.

**Section 3.4.    Notice of Meetings.**

(a)    Notice. Except as otherwise required by law, the Certificate of Incorporation or these Bylaws, written, printed or electronic notice stating the place, if any, date and hour of the meeting, the record date for determining the stockholders entitled to vote at the meeting (if such date is different from the record date for stockholders entitled to notice of the meeting) and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be prepared and delivered by the Corporation not less than ten nor more than sixty days before the date of the meeting, either personally, by mail, or in the case of stockholders who have consented to such delivery, by electronic transmission (as such term is defined in the DGCL), to each stockholder of record entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting, such notice to specify the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at any such meeting.

(b)    Notice Deemed Received. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the stockholder at such address as it appears on the records of the Corporation. Notice given by electronic transmission shall be effective (1) if by facsimile, when faxed to a number where the stockholder has consented to receive notice; (2) if by electronic mail, when mailed electronically to an electronic mail address at which the stockholder has consented to receive such notice; (3) if by posting on an electronic network together with a separate notice of such posting, upon the later to occur of (i) the posting or (ii) the giving of separate notice of the posting; or (4) if by other form of electronic transmission, when directed to the stockholder in the manner consented to by the stockholder.

(c)    Waiver of Notice. Notice of the date, hour and place, if any, and, if applicable, the purpose of any meeting of stockholders may be waived in writing, signed by the person entitled to notice thereof, or by electronic transmission by such person, either before or after such meeting, and will be waived by any such stockholder's attendance at the meeting in person, by remote communication, if applicable, or by proxy, except if the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so

waiving notice of such meeting shall be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.

(d)        Postponement-Cancellation. Any previously scheduled meeting of stockholders may be postponed, and, unless otherwise prohibited by applicable law or the Certificate of Incorporation, may be cancelled by resolution duly adopted by a majority of the entire Board of Directors, upon public notice given prior to the date previously scheduled for such meeting of stockholders.

**Section 3.5.    Quorum and Adjournment.** Unless otherwise provided in the Certificate of Incorporation or these Bylaws or required by applicable law, holders of a majority of the voting power of the issued and outstanding shares of capital stock of the Corporation entitled to vote at the meeting, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of stockholders. If such quorum is not so present or represented at any meeting of stockholders, then the chairman of the meeting or the holders of a majority in voting power of the shares present in person or represented by proxy at the meeting shall have power to adjourn the meeting from time to time until a quorum is so present or represented. When a meeting is adjourned to another time or place, if any, notice need not be given of the adjourned meeting if the time and place, if any, of such adjourned meeting, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At such adjourned meeting at which a quorum is so present or represented, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall also fix a new record date for determining the stockholders entitled to notice of such adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date for notice of such adjourned meeting.

**Section 3.6.    Voting.** Each stockholder shall be entitled to that number of votes for each share of capital stock held by such stockholder as set forth in the Certificate of Incorporation. In all matters, other than the election of directors and except as otherwise required by law, the Certificate of Incorporation, these Bylaws or the rules and regulations of any stock exchange applicable to the Corporation, the affirmative vote of a majority of the voting power of the shares present or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders. Subject to the rights of the holders of any series of Preferred Stock to elect directors, a plurality of the voting power of the shares present in person or represented by proxy at the meeting and entitled to vote with respect to the election of directors shall elect directors.

**Section 3.7.    Voting Rights; Proxies.** For the purpose of determining those stockholders entitled to vote at any meeting of the stockholders, except as otherwise provided by law, only persons in whose names shares stand on the stock records of the Corporation on the record date for such purpose shall be entitled to vote at any meeting of stockholders. Every stockholder entitled to vote at a meeting may authorize another person or persons to act for such

3

stockholder by proxy. No proxy shall be voted or acted upon after three years from its date unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date.

**Section 3.8.    Administration of the Meetings.**

(a)    <u>Annual Meetings of Stockholders</u>.

(1)    Nominations of persons for election to the Board of Directors and the proposal of other business to be considered by stockholders may be made at an annual meeting of stockholders only (i) pursuant to the Corporation's notice of meeting (or any supplement thereto), (ii) by or at the direction of the Board of Directors or any duly authorized committee thereof, or (iii) by any stockholder of the Corporation who (A) was a stockholder of record of the Corporation (and, with respect to any beneficial owner, if different, on whose behalf the nomination or proposal is made, only if such beneficial owner was the beneficial owner of shares of the Corporation) at the time the notice provided for in this Section 3.8 is delivered to the Secretary of the Corporation and at the time of the meeting, (B) is entitled to vote at the meeting, (C) complies with the procedures set forth in this Section 3.8 and (D) complies with the requirements of Regulation 14A under the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), including, without limitation, the requirements of Rule 14a-19 (as such rule and regulations may be amended from time to time by the Securities and Exchange Commission including any SEC Staff interpretations relating thereto).

(2)    For any nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of the immediately preceding paragraph, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation and provide any updates or supplements to such notice required under paragraph (4) of this Section 3.8(a), and any proposed business must constitute a proper matter for stockholder action under the DGCL. To be timely, a stockholder's notice shall be delivered to the Secretary of the Corporation at the principal executive offices of the Corporation not later than the close of business on the ninetieth day, nor earlier than the close of business on the one hundred twentieth day, prior to the first anniversary of the preceding year's annual meeting (provided, however, that in the event that the date of the annual meeting is more than thirty days before or more than seventy days after such anniversary date, notice by the stockholder must be so delivered not earlier than the close of business on the one hundred twentieth day prior to such annual meeting and not later than the close of business on the later of the ninetieth day prior to such annual meeting and the tenth day following the day on which public announcement of the date of such meeting is first made by the Corporation). In no event shall the public announcement of an adjournment or postponement of an annual meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above. Such stockholder's notice shall set forth as to each person whom the stockholder proposes to nominate for election as a director: (i) all information relating to such person that is required to be disclosed in connection with solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to and in accordance with Section 14(a)

of Exchange Act and the rules and regulations promulgated thereunder, (ii) all information relating to such person that would be required to be set forth in the notice provided for in this Section 3.8 if such person were the stockholder giving the notice, (iii) all information that would be required to be disclosed pursuant to Item 404 under Regulation S-K if the stockholder giving the notice were the "registrant" for purposes of such rule and such person were a director or executive officer of such registrant and (iv) such person's written consent to being named in the proxy statement as a nominee, such person's agreement to serve as a director if elected and, if applicable, to file an application for licensing or finding of suitability if required by any gaming or other regulatory authority having jurisdiction over the Corporation or otherwise deemed necessary or advisable by the Board of Directors, and such person's acknowledgement that, to the extent required by applicable law, such person's eligibility to serve on the Board of Directors shall be contingent upon receipt of any such licensing or finding of suitability. In addition to the requirements set forth in this Section 3.8, unless otherwise required by law, (i) no stockholder shall solicit proxies in support of director nominees other than the Corporation's nominees unless such stockholder has complied with Rule 14a-19 promulgated under the Exchange Act, in connection with the solicitation of such proxies in all respects, including but not limited to the minimum solicitation and notice requirements. If any stockholder (1) provides notice pursuant to Rule 14a-19(b) promulgated under the Exchange Act and (2) subsequently fails to comply with the requirements of Rules 14a-19(a)(2) and Rule 14a-19(a)(3) promulgated under the Exchange Act, then the Corporation shall disregard any proxies or votes solicited for the stockholder's candidates. Upon request by the Corporation, if any stockholder provides notice pursuant to Rule 14a-19(b) promulgated under the Exchange Act, such stockholder shall deliver to the Corporation, no later than five (5) business days prior to the applicable meeting, reasonable evidence that it has met the requirements of Rule 14a-19(a)(3) and 14a-19(b). As to any other business that the stockholder proposes to bring before the meeting, a stockholder's notice given pursuant to this paragraph (4) of Section 3.8(a) shall set forth a brief description of the business desired to be brought before the meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend these Bylaws, the language of the proposed amendment), the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made; and (z) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made: (i) the name and address of such stockholder, as they appear on the Corporation's books, and of any such beneficial owner, (ii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially and of record by such stockholder and any such beneficial owner, (iii) a description of any agreement, arrangement or understanding with respect to the nomination or proposal between or among such stockholder and/or any such beneficial owner, any of their respective affiliates or associates, and any others acting in concert with any of the foregoing, including, in the case of any nomination, the nominee, (iv) a description of any agreement, arrangement or understanding (including any derivative or short positions, profit interests, options, warrants, convertible securities, stock appreciation or similar rights, hedging transactions, and borrowed or loaned shares) that has been entered into as of the date of the stockholder's notice by, or on behalf of, such stockholder and any such beneficial owner, whether or not such instrument or right shall be subject to settlement in underlying shares of capital stock of the Corporation, the effect or intent of which is to mitigate loss to, manage risk or benefit of share price changes for, or increase or decrease the

voting power of, such stockholder or any such beneficial owner, with respect to shares of stock of the Corporation, (v) a representation that the stockholder is a holder of record of stock of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to propose such business or nomination, (vi) a representation as to whether the stockholder or the beneficial owner, if any, intends or is part of a group that intends to deliver a proxy statement and/or form of proxy to holders of the higher of (A) at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal or elect the nominee and/or otherwise to solicit proxies or votes from stockholders in support of such proposal or nomination and (B) the percentage of stockholders meeting the minimum solicitation requirements set forth in Rule 14a-19 of the Exchange Act and (ix) any other notice requirements in Rule 14a-19, and (vii) any other information relating to such stockholder and beneficial owner, if any, required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for, as applicable, the proposal and/or the election of directors in an election contest pursuant to and in accordance with Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder. The foregoing notice requirements of this Section 3.8 shall be deemed satisfied by a stockholder with respect to business other than a nomination if the stockholder has notified the Corporation of his, her or its intention to present a proposal at an annual meeting in compliance with applicable rules and regulations promulgated under the Exchange Act and such stockholder's proposal has been included in a proxy statement that has been prepared by the Corporation to solicit proxies for such annual meeting. The Corporation may require any proposed nominee to furnish such other information as it may reasonably require to determine the eligibility of such proposed nominee to serve as an independent director of the Corporation or that could be material to a reasonable stockholder's understanding of the independence of such proposed nominee.

(3)     Notwithstanding anything in the second sentence of the immediately preceding paragraph to the contrary, in the event that the number of directors to be elected to the Board of Directors is increased effective at the annual meeting and there is no public announcement by the Corporation naming the nominees for the additional directorships at least one hundred days prior to the first anniversary of the preceding year's annual meeting, a stockholder's notice required by this Section 3.8 shall also be considered timely, but only with respect to nominees for the additional directorships, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the tenth day following the day on which such public announcement is first made by the Corporation.

(4)     A stockholder providing notice of any nominations or other business to be brought before an annual meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice under this Section 3.8 shall be true and correct as of the record date for determining the stockholders entitled to notice of the meeting and as of the date that is ten business days prior to the date of the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to the Secretary of the Corporation at the principal executive offices of the Corporation not later than five business days after the record date of determining the stockholders entitled to notice of the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed)

(in the case of the update and supplement required to be made as of ten business days prior to the date of the meeting or any adjournment or postponement thereof).

(b)      Special Meetings of Stockholders. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting (i) by or at the direction of the Board of Directors or any duly authorized committee thereof or (ii) provided that the Board of Directors has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who (x) is a stockholder of record (and, with respect to any beneficial owner, if different, on whose behalf the nomination is made, only if such beneficial owner was the beneficial owner of shares of the Corporation) at the time the notice provided for in this Section 3.8 is delivered to the Secretary of the Corporation and at the time of the meeting, (y) is entitled to vote at the meeting and upon such election and (z) who complies with the notice procedures set forth in this Section 3.8. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board of Directors, for any stockholder entitled to vote in such election of directors to nominate a person or persons (as the case may be) for election to such position(s) as specified in the Corporation's notice of meeting, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation, which notice shall set forth the information otherwise required to be included in a notice of a nomination to be made at an annual meeting in accordance with paragraph (a)(2) of this Section 3.8, and provide any updates or supplements to such notice required by this paragraph (b). To be timely, a stockholder's notice shall be delivered to the Secretary of the Corporation at the principal executive offices of the Corporation not earlier than the close of business on the one hundred twentieth day prior to such special meeting and not later than the close of business on the later of the ninetieth day prior to such special meeting and the tenth day following the day on which public announcement is first made of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting. In no event shall the public announcement of an adjournment or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

A stockholder providing notice of nominations of persons for election to the Board of Directors at a special meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice under this Section 3.8 shall be true and correct as of the record date for determining the stockholders entitled to notice of the meeting and as of the date that is ten business days prior to the date of the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to the Secretary of the Corporation at the principal executive offices of the Corporation not later than five business days after the record date for determining the stockholders entitled to notice of the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight business days prior to the date of the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten business days prior to the date of the meeting or any adjournment or postponement thereof).

(c)    General.

(1)    Only such persons who are nominated in accordance with the procedures set forth in this Section 3.8 shall be eligible to be elected at an annual or special meeting of stockholders of the Corporation to serve as directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 3.8. Except as otherwise provided by law, the chairman of the meeting shall have the power and duty (i) to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in this Section 3.8 (including whether the stockholder or beneficial owner, if any, on whose behalf the nomination or proposal is made solicited (or is part of a group that solicited) or did not so solicit, as the case may be, proxies or votes in support of such stockholder's nominee or proposal in compliance with such stockholder's representation as required by clauses (a)(2)(z)(v) and (a)(2)(z)(vi) of this Section 3.8) and (ii) if any proposed nomination or business was not made or proposed in compliance with this Section 3.8, to declare that such nomination shall be disregarded or that such proposed business shall not be transacted. Notwithstanding the foregoing provisions of this Section 3.8, unless otherwise required by applicable law, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual or special meeting of stockholders of the Corporation to present a nomination or proposed business, such nomination shall be disregarded and such proposed business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation. For purposes of this Section 3.8, to be considered a qualified representative of the stockholder, a person must be a duly authorized officer, manager or partner of such stockholder or must be authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such persons must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of stockholders.

(2)    For purposes of this Section 3.8, "public announcement" shall include disclosure in a press release reported by the Dow Jones News Service, Associated Press or other national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act and the rules and regulations promulgated thereunder.

(3)    Notwithstanding the foregoing provisions of this Section 3.8, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations promulgated thereunder with respect to the matters set forth in this Section 3.8; provided, however, that any references in these Bylaws to the Exchange Act or the rules and regulations promulgated thereunder are not intended to and shall not limit any requirements applicable to nominations or proposals as to any other business to be considered pursuant to this Section 3.8, and compliance with this Section 3.8 shall be the exclusive means for a stockholder to make nominations or submit other business. Nothing in this Section 3.8 shall be deemed to affect any rights (i) of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to applicable rules and regulations promulgated under the Exchange Act or (ii) of the holders of any class of Common Stock or series of Preferred Stock to elect directors pursuant to any applicable provisions of the Certificate of Incorporation.

**Section 3.9.    List of Stockholders.** The officer of the Corporation who has charge of the stock ledger shall prepare and make available, at least ten days before every meeting of stockholders a complete list of the stockholders entitled to vote at said meeting (provided, however, if the record date for determining the stockholders entitled to vote is less than ten days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting at least ten days prior to the meeting (a) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (b) during ordinary business hours at the principal place of business of the Corporation. Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this Section 3.9 or to vote in person or by proxy at any meeting of stockholders.

**Section 3.10.    Organization.**

(a)    At every meeting of stockholders, the Chairman of the Board, or, if a Chairman of the Board has not been appointed or is absent, the Chief Executive Officer, or, if the Chief Executive Officer is absent, a chairman of the meeting chosen by a majority in voting power of the stockholders entitled to vote, present in person or by proxy, shall act as chairman of the meeting. The Secretary of the Corporation, or, in his or her absence, an Assistant Secretary or other person directed to do so by the chairman of the meeting, shall act as secretary of the meeting.

(b)    The Board of Directors shall be entitled, to the extent not prohibited by law, to make such rules or regulations for the conduct of meetings of stockholders as it shall deem necessary, appropriate or convenient. Subject to such rules and regulations, if any, the chairman of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are necessary, appropriate or convenient for the proper conduct of the meeting, including, without limitation, convening and (for any or no reason) adjourning the meeting, establishing an agenda or order of business for the meeting, rules and procedures for maintaining order at the meeting and the safety of those present, limitations on attendance at or participation in such meeting to stockholders of record of the Corporation entitled to vote at the meeting and their duly authorized and constituted proxies and such other persons as the chairman shall permit, restrictions on entry to the meeting after the time fixed for the commencement thereof, limitations on the time allotted to questions or comments by participants and regulation of the opening and closing of the polls for balloting on matters which are to be voted on by ballot. Unless and to the extent determined by the Board of Directors or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with rules of parliamentary procedure.

**Section 3.11.    Inspection of Elections.** If required by applicable law, the Board of Directors by resolution shall appoint one or more inspectors, which inspector or inspectors may include individuals who serve the Corporation in other capacities, including, without limitation, as officers, employees, agents or representatives of the Corporation, to act at the meeting and

make a written report thereof. One or more persons may be designated as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate has been appointed to act, or if all inspectors or alternates who have been appointed are unable to act, at a meeting of stockholders, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall have the duties prescribed by the DGCL.

**Section 3.12.   Action by Stockholders without a Meeting.** Any action required to be taken at an annual or special meeting of stockholders of the Corporation, or any action which may be taken at an annual or special meeting of stockholders, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holder or holders of shares having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all shares entitled to vote thereon were present and voted. Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent received in accordance with applicable law, a written consent or consents signed by a sufficient number of holders to take such action are delivered to the Corporation as required by law. Prompt written notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who did not consent in writing and who would be entitled to vote thereon at a meeting. The consent may be in more than one counterpart so long as each stockholder signs one of the counterparts. Delivery of the consent may be by hand, mail or electronic or facsimile transmission. Electronic or facsimile transmission by a stockholder consenting to an action to be taken is considered to be written, signed and dated for the purposes of this Section if the transmission sets forth or is delivered with information from which the Corporation can determine that the transmission was transmitted by the stockholder and the date on which the stockholder transmitted the transmission. The date of transmission is the date on which the consent was signed. Consent given by electronic or facsimile transmission may be delivered to the principal place of business of the Corporation or to an officer or agent of the Corporation having custody of the book in which proceedings of stockholder meetings are recorded to the extent and in the manner provided by resolution of the Board of Directors.

## ARTICLE IV
## DIRECTORS

**Section 4.1.   Powers.** Subject to the provisions of the DGCL and any limitations in the Certificate of Incorporation, the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised by or under the control of the Board of Directors.

**Section 4.2.   Meetings.**

(a)   Regular Meetings. The Board of Directors may, by resolution, provide for the time and place for the holding of regular meetings of the Board of Directors. No further notice shall be required for regular meetings of the Board of Directors.

(b)     <u>Special Meetings</u>. Special meetings of the Board of Directors may be held at any time and place within or without the State of Delaware, whenever called by the Chairman of the Board, the Chief Executive Officer or any two of the directors.

(c)     <u>Meetings by Electronic Communications Equipment</u>. Any member of the Board of Directors, or of any committee thereof, may participate in a meeting by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)     <u>Notice of Special Meetings</u>. Notice of the time and place of all special meetings of the Board of Directors shall be given to each director at his business or residence in writing, or by facsimile transmission, telephone communication or electronic transmission. If mailed, such notice shall be deemed adequately delivered when deposited in the United States mail so addressed, with postage thereon prepaid, at least five days before such meeting. If by facsimile transmission or other electronic transmission, such notice shall be transmitted at least twenty-four hours before such meeting. If by telephone, the notice shall be given at least twelve hours prior to the time set for the meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Directors need be specified in the notice of such meeting.

(e)     <u>Waiver of Notice</u>. Notice of any meeting may be waived in writing, or by electronic transmission, at any time before or after the meeting and will be deemed waived by any director by attendance at the meeting, except when the director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting was not lawfully called or convened. All waivers shall be filed with the corporate records or made a part of the minutes of the meeting.

**Section 4.3.    Quorum and Voting.**

(a)     Unless the Certificate of Incorporation requires a greater number, a quorum of the Board of Directors shall consist of a majority of the total number of directors constituting the entire Board of Directors, as such total number is fixed from time to time by the Board of Directors in accordance with the Certificate of Incorporation; <u>provided</u>, <u>however</u>, at any meeting, whether a quorum be present or otherwise, a majority of the directors present may adjourn the meeting from time to time until the time fixed for the next regular meeting of the Board of Directors, without notice other than by announcement at the meeting.

(b)     At each meeting of the Board of Directors at which a quorum is present, all questions and business shall be determined by the affirmative vote of a majority of the directors present, unless a different vote is required by the DGCL, the Certificate of Incorporation or these Bylaws.

**Section 4.4.    Action Without a Meeting.** Unless otherwise prohibited by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or the committee, as the case may be, consent thereto in

11

writing or by electronic transmission, and such writing or writings or transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or the committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 4.5.    **Fees and Compensation.** Directors shall be entitled to such compensation for their services as may be approved by the Board of Directors, including, if so approved, a fixed sum and expenses of attendance, if any, for attendance at each regular or special meeting of the Board of Directors and at any meeting of a committee of the Board of Directors. Nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity as an officer, agent, employee, or otherwise and receiving compensation therefor.

Section 4.6.    **Committees.**

(a)    Establishment of Committees. The Board of Directors may, by resolution of a majority of the entire Board of Directors, designate one or more committees, each such committee to consist of one or more of the directors of the Corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the DGCL and to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following matters: (i) approving or adopting, or recommending to the stockholders any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval; or (ii) adopting, amending or repealing any By-Law.

(b)    Term. Except as provided by applicable law, the Board of Directors may at any time increase or decrease the number of members of a committee or terminate the existence of a committee. The Board of Directors may at any time for any reason remove any individual committee member and the Board of Directors may fill any committee vacancy created by death, resignation, removal or increase in the number of members of the committee.

(c)    Meetings. Unless the Board of Directors shall otherwise provide, regular meetings of any committee appointed pursuant to this Section 4 shall be held at such times and places, if any, as are determined by the Board of Directors, the Chairman of the Board, or by any such committee, and when notice thereof has been given to each member of such committee, no further notice of such regular meetings need be given thereafter. Special meetings of any such committee may be held at any place which has been determined from time to time by such committee, and may be called by any director who is a member of such committee, upon notice to the members of such committee of the time and place of such special meeting given in the matter provided for the giving of notice to members of the Board of Directors of the time and

place of special meetings of the Board of Directors. Notice of any special meeting of any committee may be waived in writing at any time before or after the meeting and will be deemed waived by any director by attendance at the meeting, except when the director attends such special meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Unless otherwise provided by the Board of Directors in the resolutions authorizing the creation of the committee, a majority of the authorized number of members of any such committee shall constitute a quorum for the transaction of business, and the act of a majority of those present at any meeting at which a quorum is present shall be the act of such committee.

**Section 4.7.    Organization.** At every meeting of the Board of Directors, the Chairman of the Board, or, if a Chairman of the Board has not been appointed or is absent, the Chief Executive Officer (if a director), or if the Chief Executive Officer is absent, a chairman of the meeting chosen by a majority of the directors present, shall preside over the meeting. The Secretary, or in his or her absence, an Assistant Secretary or other person directed to do so by the chairman of the meeting, shall act as a secretary of the meeting.

**Section 4.8.    Audit Committee.** The Board of Directors shall have an Audit Committee composed of three or more Directors, each of whom shall satisfy any securities exchange independence requirements then in effect and applicable to the Corporation. The responsibilities of the Audit Committee shall be stated in the committee's charter, as approved by the Board of Directors.

**Section 4.9.    Compensation Committee.** The Board of Directors shall have a Compensation Committee composed of three or more directors, each of whom shall satisfy any securities exchange independence requirements then in effect and applicable to the Corporation. The responsibilities of the Compensation Committee shall be stated in the committee's charter, as approved by the Board of Directors.

**Section 4.10.   Nominating and Corporate Governance Committee.** The Board of Directors shall have a Nominating and Corporate Governance Committee composed of three or more directors, each of whom shall satisfy any securities exchange independence requirements then in effect and applicable to the Corporation. The responsibilities of the Nominating and Corporate Governance Committee shall be stated in the committee's charter, as approved by the Board of Directors.

## ARTICLE V
## OFFICERS

**Section 5.1.    Officers Designated.** The officers of the Corporation shall include, if and when designated, a Chairman of the Board, a Chief Executive Officer, a Chief Financial Officer, one or more Vice Presidents, a Secretary, and a Treasurer and such other officers and agents as the Board of Directors from time to time may designate. The Board of Directors may give any officer such further designations or alternative titles as it deems appropriate. The Chairman of the Board shall be chosen from the directors. All officers chosen by the Board of Directors shall each have such powers and duties as generally pertain to their respective offices, subject to the specific provisions of this Article V. Such officers shall also have such powers and duties as

13

from time to time may be conferred by the Board of Directors or by any committee thereof. Any one person may hold any number of offices of the Corporation at any one time unless specifically prohibited therefrom by the DGCL. The salaries and other compensation of the officers of the Corporation shall be fixed by or in the manner designated by the Board of Directors.

**Section 5.2.    Term of Office.** Each officer of the Corporation shall hold office at the pleasure of the Board of Directors and shall hold office until his or her successor shall have been duly elected and qualified, or until his or her death or until he or she shall resign or be removed.

**Section 5.3.    Duties of Officers.**

(a)    <u>Chairman of the Board</u>. The Chairman of the Board, when present, shall preside at all meetings of the stockholders and at all meetings of the Board of Directors. The Chairman of the Board shall have general supervision, direction and control of the business and affairs of the Corporation, subject only to the power and authority of the Board of Directors. The Chairman of the Board shall perform other duties commonly incident to his or her office and shall also perform such other duties and have such other powers, as the Board of Directors shall designate from time to time.

(b)    <u>Chief Executive Officer</u>. The Chief Executive Officer shall preside at all meetings of the stockholders and (if a director) at all meetings of the Board of Directors, unless a Chairman of the Board has been appointed and is present. The Chief Executive Officer shall have general supervision, direction and control of the business and affairs of the Corporation, subject only to the power and authority of the Board of Directors. The Chief Executive Officer shall perform other duties commonly incident to his or her office, and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time.

(c)    <u>Chief Financial Officer</u>. The Chief Financial Officer shall keep or cause to be kept the books of account of the Corporation in a thorough and proper manner and shall render statements of the financial affairs of the Corporation in such form and as often as required by the Board of Directors or the Chief Executive Officer. The Chief Financial Officer, subject to the order of the Board of Directors, shall have custody of all funds and securities of the Corporation. The Chief Financial Officer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Board of Directors, at its regular meetings or when the Board of Directors so requires, an account of the financial condition of the Corporation. The Chief Financial Officer shall perform other duties commonly incident to his or her office, and shall also perform such other duties and have such other powers *as* the Board of Directors or the Chief Executive Officer shall designate from time to time.

(d)    <u>Vice Presidents</u>. The Vice Presidents shall perform other duties commonly incident to their office and shall also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer shall designate from time to time.

(e)      Secretary. The Secretary shall attend all meetings of the stockholders and the Board of Directors and shall record all acts and proceedings thereof in the minute book of the Corporation. The Secretary shall give notice in conformity with these Bylaws of all meetings of the stockholders and of all meetings of the Board of Directors and any committee thereof requiring notice. The Secretary shall perform all other duties given to the Secretary in these Bylaws and other duties commonly incident to his or her office and shall also perform such other duties and have such other powers as the Board of Directors shall designate from time to time. Any Assistant Secretary may assume and perform the duties of the Secretary in the absence or disability of the Secretary, and each Assistant Secretary shall perform other duties commonly incident to his or her office and shall also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer shall designate from time to time. The Secretary shall have custody of the seal of the Corporation and shall affix the same to all instruments requiring it, when authorized by the Board of Directors or the Chairman of the Board, and attest to the same.

(f)      Treasurer. The Treasurer may assume and perform the duties of the Chief Financial Officer in the absence or disability of the Chief Financial Officer or whenever the office of Chief Financial Officer is vacant. The Treasurer shall perform other duties commonly incident to his or her office and shall also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer shall designate from time to time. Any Assistant Treasurer may assume and perform the duties of the Treasurer in the absence or disability of the Treasurer, and each Assistant Treasurer shall perform other duties commonly incident to his or her office and shall also perform such other duties and have such other powers as the Board of Directors or the Chief Executive Officer shall designate from time to time.

**Section 5.4.    Delegation of Authority.** The Board of Directors may from time to time delegate the powers or duties of any officer to any other officer or agent, notwithstanding any provision hereof.

**Section 5.5.    Resignations.** Any officer may resign at any time by giving notice in writing or by electronic transmission to the Board of Directors, the Chairman of the Board, the Chief Executive Officer or the Secretary. Any such resignation shall be effective when received by the person or persons to whom such notice is given, unless a later time is specified therein in which event the resignation shall become effective at such later time. Unless otherwise specified in such notice, the acceptance of any such resignation by the Corporation shall not be necessary to make it effective. Any resignation shall be without prejudice to the rights, if any, of the Corporation under applicable law, the Certificate of Incorporation, these Bylaws or any contract with the resigning officer.

**Section 5.6.    Removal.** Any officer may be removed from office at any time, either with or without cause, by the affirmative vote of a majority of the entire Board of Directors, or by the unanimous written consent of the directors in office at the time, or by any committee or superior officers upon whom such power of removal may have been conferred by the Board of Directors.

## ARTICLE VI
## EXECUTION OF CORPORATE INSTRUMENTS AND VOTING OF SECURITIES OWNED BY THE CORPORATION

**Section 6.1.    Execution of Corporate Instruments.** The Board of Directors may, in its discretion, determine the method and designate the signatory officer or officers, or other person or persons, to execute on behalf of the Corporation any corporate instrument or document, or to sign on behalf of the Corporation the corporate name, or to enter into contracts on behalf of the Corporation, except where otherwise provided by applicable law or these Bylaws, and such execution or signature shall be binding upon the Corporation.

In the absence of any determination by the Board of Directors, all instruments and documents requiring the corporate signature, unless otherwise required by applicable law, may be executed, signed or endorsed by the Chairman of the Board, the Chief Executive Officer or Treasurer or in such other manner as may be directed by the Board of Directors.

All checks and drafts drawn on banks or other depositaries on funds to the credit of the Corporation or in special accounts of the Corporation shall be signed by such person or persons as the Board of Directors shall authorize so to do.

Unless authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

**Section 6.2.    Voting of Securities Owned by the Corporation.** All stock and other securities of other corporations owned or held by the Corporation for itself, or for other parties in any capacity, shall be voted, and all proxies with respect thereto shall be executed, by the person authorized so to do by resolution of the Board of Directors, or, in the absence of such authorization, by the Chairman of the Board, the Chief Executive Officer or any Vice President.

## ARTICLE VII
## SHARES OF STOCK

**Section 7.1.    Form and Execution of Certificates.** The Corporation may issue shares of any class or series of stock in certificated or uncertificated form, as determined by the Board of Directors. Certificates for the shares of stock of the Corporation shall be in such form as is consistent with the Certificate of Incorporation and applicable law. Every holder of stock in the Corporation represented by certificate shall be entitled to have a certificate signed by or in the name of the Corporation by the Chairman of the Board, or the Chief Executive Officer or any Vice President and by the Treasurer or Assistant Treasurer or the Secretary or Assistant Secretary, certifying the number of shares owned by such stockholder in the Corporation. Any or all of the signatures on the certificate may be facsimiles. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued with the same effect as if he or she were such officer, transfer agent, or registrar at the date of issue. Each certificate shall state upon the face or back thereof, in full or in summary, all

16

of the powers, designations, preferences, and the relative, participating, optional or other special rights, and the qualifications, limitations or restrictions of the shares authorized to be issued or shall, except as otherwise required by applicable law, set forth on the face or back a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences, and the relative, participating, optional or other special rights, and the qualifications, limitations or restrictions, of a class or any series of stock. Upon request and within a reasonable time after the issuance or transfer or uncertificated stock, the Corporation shall send to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to this Section 7.1 or otherwise required by applicable law, or with respect to this Section 7.1 a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences, and the relative, participating, optional or other special rights, and the qualifications, limitations or restrictions, of a class or any series of stock. Except as otherwise expressly provided by law, the rights and obligations of the holders of certificates representing stock of the same class or series shall be identical.

Section 7.2.    **Lost Certificates.** A new certificate or certificates or uncertificated shares shall be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed. The Corporation may require, as a condition precedent to the issuance of a new certificate or certificates or uncertificated shares, the owner of such lost, stolen, or destroyed certificate or certificates, or such owner's legal representative, to give the Corporation a surety bond in such form and amount as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

Section 7.3.    **Fixing Record Dates.**

(a)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, subject to applicable law, not be more than sixty nor less than ten days before the date of such meeting. If the Board of Directors so fixes a record date, such record date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days prior to such action. If no such record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 7.4.    **Registered Stockholders.** The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by applicable law.

## ARTICLE VIII
## OTHER SECURITIES OF THE CORPORATION

Section 8.1.    **Execution of Other Securities.** All bonds, debentures and other corporate securities of the Corporation, other than stock certificates (covered in Section 7.1), may be signed by the Chairman of the Board, the Chief Executive Officer or any Vice President, or such other person as may be authorized by the Board of Directors, and the corporate seal may be impressed thereon or a facsimile of such seal imprinted thereon and attested by the signature of the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer; provided, however, that where any such bond, debenture or other corporate security shall be authenticated by the manual signature, or where permissible facsimile signature, of a trustee under an indenture pursuant to which such bond, debenture or other corporate security shall be issued, the signatures of the persons signing and attesting the corporate seal on such bond, debenture or other corporate security may be the imprinted facsimile of the signatures of such persons. Interest coupons appertaining to any such bond, debenture or other corporate security, authenticated by a trustee as aforesaid, shall be signed by the Treasurer or an Assistant Treasurer of the Corporation or such other person as may be authorized by the Board of Directors, or bear imprinted thereon the facsimile signature of such person. In case any officer who shall have signed or attested any bond, debenture or other corporate security, or whose facsimile signature shall appear thereon or on any such interest coupon, shall have ceased to be such officer before the bond, debenture or other corporate security so signed or attested shall have been delivered such bond, debenture or other corporate security nevertheless may be adopted by the Corporation and issued and delivered as though the person who signed the same or whose facsimile signature shall have been used thereon had not ceased to be such officer of the Corporation.

## ARTICLE IX
## DIVIDENDS

Section 9.1.    **Declaration of Dividends.** Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation and applicable law, if any, may be declared by the Board of Directors pursuant to law at any regular or special meeting.

18

Dividends may be paid in cash, in property, or in shares of capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation and applicable law.

**Section 9.2.    Dividend Reserve.** The Board of Directors may set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

## ARTICLE X
## FISCAL YEAR

**Section 10.1.    Fiscal Year.** The fiscal year of the Corporation shall end on the Saturday closest to December 31 (whether such Saturday occurs in the month of December or January) or such other date as shall be fixed from time to time by resolution of the Board of Directors.

## ARTICLE XI
## INDEMNIFICATION

**Section 11.1.    Right of Indemnification.** The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, manager, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person. Notwithstanding the preceding sentence, except as otherwise provided in Section 11.3, the Corporation shall be required to indemnify, or advance expenses to, a Covered Person in connection with a Proceeding (or part thereof) commenced by such Covered Person only if the commencement of such Proceeding (or part thereof) by the Covered Person was authorized by the Board of Directors.

**Section 11.2.    Prepayment of Expenses.** The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any Proceeding in advance of its final disposition, provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this Article XI or otherwise.

**Section 11.3.    Claims.** If a claim for indemnification (following the final disposition of the Proceeding with respect to which indemnification is sought, including any settlement of such Proceeding) or advancement of expenses under this Article XI is not paid in full within thirty days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in

19

whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by applicable law. In any such action the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under this Article XI and applicable law.

**Section 11.4.  Non-Exclusivity of Rights.** The rights conferred on any Covered Person by this Article XI shall not be exclusive of any other rights which such Covered Person may have or hereafter acquire under any statute, any other provision of the Certificate of Incorporation, these Bylaws, or any agreement, vote of stockholders or disinterested directors or otherwise.

**Section 11.5.  Amendment or Repeal.** Any right to indemnification or to advancement of expenses of any Covered Person arising hereunder shall not be eliminated or impaired by an amendment to or repeal of this Article XI after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought.

**Section 11.6.  Other Indemnification and Advancement of Expenses.** This Article XI shall not limit the right of the Corporation, to the extent and in the matter permitted by law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

**ARTICLE XII**
**NOTICES**

**Section 12.1.  Notice to Stockholders.** Notice to stockholders of stockholder meetings shall be given as provided in Section 3.4 herein. Without limiting the manner by which notice may otherwise be given effectively to stockholders under any agreement or contract with such stockholder, and except as otherwise required by law, notice to stockholders for purposes other than stockholder meetings may be sent by U.S. mail or nationally recognized overnight courier, or by facsimile, or by electronic mail or other applicable electronic means consented to by such stockholder in accordance with Section 232 of the DGCL.

**Section 12.2.  Notice to Directors.** Any notice required to be given to any director may be given by the method stated in Section 12.1, as otherwise provided in these Bylaws, or by U.S. mail or nationally recognized overnight courier, or by facsimile, or by electronic mail, except that such notice other than one which is delivered personally shall be sent to such address as such director shall have filed in writing with the Secretary, or, in the absence of such filing, to the last known post office address of such director.

**Section 12.3.  Affidavit of Notice.** An affidavit of notice, executed by a duly authorized and competent employee of the Corporation or its transfer agent appointed with respect to the class of stock affected, specifying the name and address or the names and addresses of the stockholder or stockholders, or director or directors, to whom any such notice or notices was or were given, and the time and method of giving the same, shall, in the absence of fraud, be prima facie evidence of the facts therein contained.

20

**Section 12.4.  Time Notices Deemed Given.** All notices given by mail, as above provided, shall be deemed to have been given as of the time of mailing, and all notices given by facsimile or electronic mail shall be deemed to have been given as of the sending time recorded at time of transmission.

**Section 12.5.  Methods of Notice.** It shall not be necessary that the same method of giving notice be employed in respect of all directors or stockholders, but one permissible method may be employed in respect of any one or more, and any other permissible method or methods may be employed in respect of any other or others.

**Section 12.6.  Failure to Receive Notice.** The period or limitation of time within which any stockholder may exercise any option or right, or enjoy any privilege or benefit, or be required to act, or within which any director may exercise any power or right, or enjoy any privilege, pursuant to any notice sent to such stockholder in the manner above provided, shall not be affected or extended in any manner by the failure of such stockholder or such director to receive such notice.

**Section 12.7.  Notice to Person with Whom Communication is Unlawful.** Whenever notice is required to be given, under any provision of law or of the Certificate of Incorporation or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the Corporation is such as to require the filing of a certificate under any provision of the DGCL, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

**Section 12.8.  Notice to Person with Undeliverable Address.** Whenever notice is required to be given, under any provision of law or the Certificate of Incorporation or Bylaws, to any stockholder to whom (a) notice of two consecutive annual meetings, and all notices of meetings to such person during the period between such two consecutive annual meetings, or (b) all, and at least two, payments (if sent by first-class mail) of dividends or interest on securities during a twelve-month period, have been mailed addressed to such person at his or her address as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such person shall not be required. Any meeting which shall be taken or held without notice to such person shall have the same force and effect as if such notice had been duly given. If any such person shall deliver to the Corporation a written notice setting forth his or her then current address, the requirement that notice be given to such person shall be reinstated. In the event that the action taken by the Corporation is such as to require the filing of a certificate under any provision of the DGCL, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to this paragraph. Notwithstanding the foregoing, this Section 12.8 shall not apply to notice given by means of electronic transmission.

21

**Section 12.9.   Notice to Stockholders Sharing an Address.** Except as otherwise prohibited under the DGCL, any notice given under the provisions of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. Such consent shall have been deemed to have been given if such stockholder fails to object in writing to the Corporation within sixty days of having been given notice by the Corporation of its intention to send the single notice. Any consent shall be revocable by the stockholder by written notice to the Corporation.

**ARTICLE XIII**
**AMENDMENTS**

**Section 13.1.   Amendments.** These Bylaws may be altered or amended or new Bylaws adopted as provided in the Certificate of Incorporation.

## Exhibit D

**Consulting Agreement**

Execution Version

# FRANCHISE GROUP, INC.

January 19, 2024

BRIAN KAHN
BY ELECTRONIC DELIVERY

Re:    Consulting Agreement

Dear Brian,

This letter agreement (this "***Agreement***") is intended to confirm our mutual understanding with respect to your resignation from the board of directors (the "***Board***") of Freedom VCM Holdings, LLC ("***Franchise Group Parent***") and as an employee of Franchise Group, Inc. (the "***Company***"), as well as your engagement by the Company as a strategic consultant to the Board of the Franchise Group Parent and your prior consent to the consummation of the contribution of the Company's former Badcock subsidiary to Conn's Inc. and related amendments to certain credit facilities of the Company Group (as defined below) (collectively, the "***Conns Transaction***"), all as further described herein.  By signing below, you represent and warrant that you are under no obligation to any third-party that would interfere with your rendering to the Company the professional services described and covered by this Agreement.

## Consulting Period and Duties

Your engagement as a consultant hereunder shall commence on January 19, 2024, the effective date of your resignation as an employee of the Company and as a director of Franchise Group Parent and each of its direct and indirect subsidiaries, and continue until terminated by you or the Board (the "***Consulting Period***"); *provided*, *however*, that you or the Board may terminate your engagement at any time upon ten (10) days' notice; *provided, further, that,* if you engage in conduct that constitutes Cause (as defined below), the Board may terminate your engagement immediately.  Upon any termination of the Consulting Period by you or by the Board for any reason, except as otherwise provided below under the heading "Termination Fee" with respect to a termination of your engagement by the Board without Cause prior to the twenty-four month anniversary of the commencement of the Consulting Period, you will be entitled only to any Consulting Bonus earned in respect of any Qualifying Transaction (each, as defined below) consummated prior to such termination, and the Company shall have no further obligations to you under this Agreement thereafter.

During the Consulting Period, you agree to render your assistance and participation, giving at all times the full benefit of your knowledge, expertise, technical skill and ingenuity, in acting as a strategic consultant to the Board, focusing on helping the Company and its direct or indirect subsidiaries or affiliates (collectively, the "***Company Group***") pursue and execute on strategic alternatives, including the sale or other disposition of one or more of the Business Lines (as defined below) and the pursuit of other monetization transactions, including the PSP Whole Business Securitization (as defined below), of one or more of such Business Lines and such other consulting services in relation to the strategy, business or operations of the Company Group as the Board may request from time to time (collectively, "***Consulting Services***").

You agree that you will perform the Consulting Services as an independent contractor, and not as an employee, agent or representative of the Company or any member of the Company Group, and you will not have the power or authority to act on behalf of, or bind in any way, any member of the Company Group. Further, you agree that you will not have oversight or authority over any employees of the Company Group.

70678719.2

You will report to the Board and render the Consulting Services from location(s) of your choosing and you will furnish any equipment, supplies and other materials used to perform the Consulting Services.

## Consulting Fees

In consideration for the Consulting Services, the Company will pay you the following one-time payments upon the consummation of each of the following transactions that are consummated during the Consulting Period (each, a "**Consulting Bonus**"): (i) an amount equal to 0.15% of the Gross Proceeds (as defined below) received by the Company Group upon the sale of at least a majority of the outstanding equity interests in, or all or substantially all of the assets of, any subsidiary thereof that owns and operates any of the business lines of the Company Group (each that are listed on Exhibit A hereto (each, aa "**Business Line**") , and (ii) an amount equal to 0.075% of the Gross Proceeds received by the Company Group from any issuance of notes or similar financial instruments that is secured by the income generating assets that constitute substantially all of the revenues of the Business Line of the Company Group commonly referred to as "Pet Supplies Plus" (the "**PSP Whole Business Securitization**")(each such sale of a Business Line or PSP Whole Business Securitization transaction, a "**Qualifying Transaction**"), in each case, as soon as practicable following the consummation of the Qualifying Transaction and in all events no later than ten (10) business days following the day on which such Qualifying Transaction occurs.

For purposes of determining the Consulting Bonus, if any portion of the applicable proceeds is escrowed or otherwise set aside, or is subject to an "earn-out" or similar form of delayed payment that is payable after the applicable Qualifying Transaction (an "**Earn-Out Amount**"), then such portion of such aggregate proceeds shall not be included in determining the Gross Proceeds at the consummation of such Qualifying Transaction, and solely to the extent either (A) you remain engaged as a consultant through such date, (B) payment of such amount will not cause the Consulting Bonus to cease being exempt from Section 409A of the Code, or (C) payment of such amount may be made in compliance with the requirements of Treas. Reg. § 1.409A-3(i)(5)(iv)(A), each such Earn-Out Amount shall be included in determining the Gross Proceeds at such time that the same is actually received by the Company or the direct or indirect equityholders of the Company, with your applicable portion of any such Earn-Out Amounts to be paid to you by the Company immediately following such receipt by the Company or the direct or indirect equityholders of the Company.

If all or a portion of the consideration payable in connection with a Qualifying Transaction shall be non-cash consideration, the Board shall determine in good faith the value thereof, which determination shall be final, binding and conclusive. The Company will pay each Consulting Bonus in the form of cash, or in the event the Company or its direct or indirect equity holders receive any consideration other than cash in connection with the Qualifying Transaction, the Consulting Bonus may be (i) in the form of cash, or (ii) such other consideration or any combination thereof in the same proportions as is payable to the Company or its direct or indirect equity holders, as applicable. The Board will make all determinations necessary or appropriate to determine in good faith the amount of Gross Proceeds in connection with each Qualifying Transaction and its determinations will be final, binding and conclusive upon all parties.

For purposes of this Agreement, "**Gross Proceeds**" shall mean the gross proceeds received by the Company Group, as determined by the Board in good faith, upon the consummation of a sale of the applicable Business Line or the PSP Whole Business Securitization, as applicable, including any such proceeds that are used by (or on behalf of) the Company Group to repay outstanding indebtedness for borrowed money thereof upon the consummation of any such transaction, and excluding any contingent or deferred consideration (which shall only be deemed and become part of Gross Proceeds to the extent actually received by the Company Group as provided in the second paragraph under the heading "Consulting Fees" above). Computation of Gross Proceeds will be determined before giving effect to any income taxes

70678719.2

payable by the Company Group as a result of the consummation of the sale of any Business Line or PSP Whole Business Securitization.

In addition to each Consulting Bonus that may be earned during the Consulting Period, to the extent permitted by applicable law without any penalty to you or any member of the Company Group and subject to your timely election of COBRA continuation coverage, during the Consulting Period, you and your eligible dependents shall be entitled to continuation of your and your eligible dependent's enrollment under the Company's group health insurance plan as of immediately prior to your last date of employment, and the Company will pay directly to you or on your behalf an amount equal to the monthly COBRA premium cost (the "***COBRA Continuation Coverage and Reimbursement***").

During the Consulting Period, the Company shall pay (or promptly reimburse you) for documented, out-of-pocket expenses reasonably incurred by you in accordance with the Company's expense reimbursement policy in the course of performing the services hereunder, which, for the avoidance of doubt, requires pre-approval of all expenses incurred by consultants. Any expenses that are to be reimbursed to you pursuant to the terms of this Agreement will be subject to the Company's policies in effect from time to time with respect to business expenses.

As an independent contractor, you will be solely responsible for payment of all applicable taxes payable in respect of amounts payable to you under this Agreement, and the Company will not withhold for taxes from any such amounts. In addition, without limitation of the terms of the second immediately preceding paragraph, you understand and agree that you are not eligible by virtue of your engagement as a consultant to participate in any of the employee benefit plans or programs of the Company or any other member of the Company Group. In the event that this consulting arrangement is reclassified as employment by any governmental agency or court, you further agree that you will not seek to participate in or benefit from any of the employee benefit plans or programs of the Company Group as a result of such reclassification.

Notwithstanding anything herein to the contrary, no amounts shall be payable pursuant to this Agreement in respect of any Consulting Bonus, the COBRA Continuation Coverage and Reimbursement or the Termination Fee following any time that you are (x) convicted of, or plea nolo contendere to, a crime constituting (x) a felony under the laws of the United States or any state thereof or (y) a misdemeanor under the laws of the United States or any state thereof (not including any traffic offense) involving moral turpitude, deceit, dishonesty or fraud (other than, for purposes of clause (y), any misdemeanor related to any action or inaction by you in connection with, or relating to, the "Prophecy", matters known to the Company as of the date hereof as determined in good faith by the Board).

## Resignation

Effective as of commencement of the Consulting Period, you hereby confirm your resignations from all offices, directorships, trusteeships, committee memberships and fiduciary and other capacities held with, or on behalf of, the Company Group effective as of January 19, 2024 and your execution of this Agreement will be deemed the grant by you to the officers of the Company of a limited power of attorney to sign in your name and on your behalf any such documentation as may be required to be executed solely for the limited purposes of effectuating such resignations. In addition, you hereby acknowledge and agree in connection with your resignation, you are not entitled to any severance payments pursuant to that certain Employment Agreement by and between you and the Company, dated October 2, 2019 (the "***Employment Agreement***") or any other alleged written or oral employment agreement, policy, plan or procedure of the Company.

70678719.2

In connection with such resignation, the Company will concurrently return to you all of your personal property, if any, in its possession. For the avoidance of doubt, such personal property does not include any documents on the Company Group's servers.

**Termination Fee**

Although the Company expressly reserves the right to terminate this Agreement and your engagement at any time upon ten (10) days' notice and for any reason, should your engagement with the Company be terminated by the Company other than for Cause prior to the twenty-four (24) month anniversary of the commencement of the Consulting Period, the Company will pay you (i) the Termination Fee (as hereinafter defined) in substantially equal installments over the Termination Fee Period (as hereinafter defined), and (ii) if such termination occurs prior to the eighteen (18) month anniversary of the commencement of the Consulting Period, to the extent permitted by applicable law without any penalty to you or any member of the Company Group and subject to your timely election of COBRA continuation coverage, the monthly COBRA premium cost for your and your eligible dependent's enrollment under the Company's group health insurance plan until you are no longer eligible to receive COBRA continuation coverage. Notwithstanding any provision herein to the contrary, as an additional prerequisite for receipt of any Termination Fee, you must (i) execute, deliver to the Company, and not revoke a customary and reasonable separation agreement that provides for a release of claims in favor of the Company and its affiliates, which is substantially similar (subject to modifications to reflect the terms of this Agreement) to that used for departing executives of the Company who receive severance (the "*Separation Agreement*") within sixty (60) calendar days (or such longer period as is provided in the Separation Agreement) following your receipt of such Separation Agreement, which the Company must provide you within ten (10) days following the termination of your engagement with the Company, and (ii) comply with the Restrictive Covenants set forth in Schedule I. If your date of termination and the last day of the applicable revocation period could fall in two separate taxable years, regardless of when you actually execute the Separation Agreement, payments will not commence until the later taxable year. The Termination Fee will immediately cease should you fail to comply with the Restrictive Covenants set forth in Schedule I.

For purposes of this Agreement:

- "*Cause*" shall mean any of the following, as determined by the Board in its reasonable judgment, exercised in good faith: (i) your willful, intentional or grossly negligent failure to substantially perform your duties to the Company Group; if, within 30 days of receiving a written demand for substantial performance from the Board that specifically identifies the manner in which you have not substantially performed such duties, you shall have failed to cure the non-performance or to take measures to cure the non-performance; (ii) your willful, intentional or grossly negligent violation of the Company's Code of Conduct; (iii) your conviction of, or plea of nolo contendere to, a crime constituting (x) a felony under the laws of the United States or any state thereof or (y) a misdemeanor under the laws of the United States or any state thereof (not including any traffic offense) involving moral turpitude, deceit, dishonesty or fraud; or (iv) your willful, intentional or grossly negligent conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise. For purposes of this definition of Cause, no act, or failure to act, on your part shall be deemed willful, intentional or grossly negligent if you acted in good faith and in a manner that the you reasonably believed to be in, or not opposed to, the best interest of the Company. For the avoidance of doubt, for purposes of clause (ii), (iii)(y) and (iv), "Cause" shall not include any action or inaction by you in connection with, or relating to, the "Prophecy" matters known to the Company as of the date hereof as determined in good faith by the Board.

- "*Termination Fee*" shall mean: (i) one (1) times the sum (i) $900,000 plus (ii) the number determined by multiplying $900,000 times a fraction, the numerator of which is the number of days

70678719.2

that have elapsed from the commencement of the Consulting Period (which shall not be greater than 365) to (and including) the date of termination of your engagement with the Company and the denominator of which is 365; provided that if your termination date occurs on or prior to August 21, 2024, then the Termination Fee shall mean $3.6 million.

- ***Termination Fee Period***" shall mean the twelve (12)-month period following your termination date; provided that if the termination date occurs on or prior to August 21, 2024, then the Termination Fee Period shall mean the twenty-four (24)-month period following your termination of service with the Company.

## Retention of Company Email and Laptop; Return of other Company Property

You agree that you will retain a Company email address and that all email correspondence by you relating to the Consulting Services will be made solely through such Company email address.  Further, you agree that, other than with respect to your Company issued laptop, following the date hereof you will promptly either (i) return to the Company or (ii) with respect to confidential information and documents (including copies thereof) to the extent in electronic form and not unique, destroy, and, in each case, you will not retain any copies in any form (including electronic) of, any property belonging to the Company and/or any other member of the Company Group, including but not limited to any proprietary and/or confidential information and documents (including any copies thereof) in any form (including email) belonging to the Company, keys, credit card and access card.  Notwithstanding the forgoing, the requirement to return any confidential information or property to the Company shall not extend to (i) any confidential information and property which is subject to a "litigation hold" or similar obligation and (ii) proprietary and/or confidential information and documents retained on your Company issued laptop to which the Company shall have remote access to at all times, it being understood that such information and documents are being retained by you solely for purposes of use by you in connection your providing the Consulting Services contemplated by this Agreement.  You further acknowledge and agree that the Company will have a reasonable opportunity, subject to the reasonable supervision of your counsel, to inspect your personal computer and confirm that all Company systems and proprietary and/or confidential information and documents have been removed from such device.

## Other Terms

By signing below, you represent and warrant to the Company that your provision of the Consulting Services hereunder will not violate any applicable law and covenant and agree to comply with all applicable laws in providing the Consulting Services.  Further, you agree to maintain in good standing any permits and licenses as may be necessary or appropriate from time to time in providing the Consulting Services hereunder.

You hereby acknowledge and agree that effective as of your resignation as an employee of the Company Group and solely for the period following such resignation, in lieu of the confidentiality, non-compete, non-solicit, invention assignment, non-disparagement or similar restrictions set forth in Section 7 of the Employment Agreement (which covenants as they relate to any period following the date hereof are hereby terminated and deleted therefrom), you have agreed to be subject to and will comply with obligations set forth in Schedule I (the "***Restrictive Covenants***").  You further hereby acknowledge that your continued compliance with these obligations is a condition of your receiving each Consulting Bonus and the COBRA Continuation Coverage and Reimbursements described above.  The parties hereto acknowledge and agree that this Agreement and the Restrictive Covenants set forth in Schedule I will be considered separate contracts, and the Restrictive Covenants will survive any termination of your employment and/or of this Agreement for any reason.

70678719.2

To the extent permitted by law, the invalidity of any provision of this Agreement (including those set forth in Schedule I hereof) will not and shall not be deemed to affect the validity of any other provision. In the event that any provision of this Agreement (including any provision set forth in Schedule I hereof) is held to be invalid, it shall be, to the furthest extent permitted by law, modified to the extent necessary to be interpreted in a manner most consistent with the present terms of the provision, to give effect to the provision. Finally, in the event that any provision of this Agreement (including any provision set forth in Schedule I hereof) is held to be invalid and not capable of modification by a court, then it shall be considered expunged, and the parties agree that the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement of the invalid provision.

The termination or expiration of this Agreement will not affect the rights or obligations of the parties hereunder arising out of, or relating to, circumstances occurring prior to the termination or expiration of this Agreement, which rights and obligations will survive the termination or expiration of this Agreement. In addition, the following provisions shall survive the termination or expiration of this Agreement: the provisions under the headings "Termination Fee" (as necessary for the payments and benefits due thereunder to be paid or provided) and "Other Terms" and the provisions set forth on Schedule I.

You acknowledge and agree that any claim or cause of action by you against the Company or any member of the Company Group shall not constitute a defense to the enforcement of the restrictions and covenants set forth in this Agreement (including Schedule I hereof) and shall not be used to prohibit injunctive relief.

The parties acknowledge that, prior to the date hereof and in connection with obtaining your consent to the Conns Transaction and in recognition of your resignation as herein provided and your consent to the amendments to the limited liability company agreement of Franchise Group Parent being executed concurrently herewith and that were discussed in connection with the consummation of the Conns Transaction and pursuant to a separate letter agreement (the "***Prior Agreement***"), (a) Franchise Group Parent deposited $15 million with your counsel, which constituted a loan to you (the "***Loan***") by Franchise Group Parent and shall be delivered to you promptly following the date hereof for use as determined by you in your sole discretion (and, in furtherance of the foregoing, concurrently herewith, you and Franchise Group Parent are entering into the promissory note in respect of such loan, which shall govern the terms and conditions thereof, with no limitation on the use of proceeds of the loan contemplated thereby), and (b) Franchise Group Parent agreed to create a management equity incentive plan and to make an allocation thereunder to you (and, in furtherance of the foregoing, concurrently herewith, you have been granted a one-time grant of [35,161] Class A Units (the "***Units***") of Franchise Group Parent pursuant to Franchise Group Parent's 2024 Restricted Class A Unit Plan (the "***Plan***") in the form attached hereto as <u>Exhibit B</u> and the form of Restricted Class A Unit Grant Notice and Agreement attached hereto as <u>Exhibit C</u> (the "***Award Agreement***"), which Units will vest in connection with your service as a consultant hereunder in accordance with and otherwise be subject to the terms and conditions of the Plan and the Award Agreement). The parties further agree that upon the execution of this Agreement, the Prior Agreement shall be terminated and is of no further force or effect.

This Agreement will be administered by the Board, which shall have the sole authority, in its absolute discretion, to (i) construe, interpret, and implement the terms of this Agreement, and (ii) make all other determinations deemed necessary or advisable for the administration of the Agreement. All good faith determinations of the Board on all matters relating to the Agreement or any amounts payable hereunder shall be final, binding, and conclusive absent manifest error.

There can be no assurance that any Qualifying Transaction will be completed or that one will be completed in the required timeframe, and any sale process may be discontinued at any time for any reason (or no reason) by the Board in its sole discretion. This Agreement does not in any way create any fiduciary or similar duty to you on the part of the Company Group, the Board, or any of the officers of the Company

Group, and the Board shall be free to pursue (or not pursue) any sale transaction at such valuation and terms as it may determine to be appropriate.

Each Consulting Bonus is unfunded and unsecured and payable out of the general funds of the Company as and when amounts are payable hereunder. Each Consulting Bonus under this Agreement is intended to be a "short-term deferral" that does not constitute "deferred compensation" subject to Section 409A of the Internal Revenue Code of 1986, as amended (the "**Code**"), or to be compliant with the requirements of Treas. Reg. § 1.409A-3(i)(5)(iv)(A), if applicable, and, accordingly, this Agreement and the payment hereunder will be interpreted and administered in a manner consistent with such intent.  The payment of any contingent transaction-based compensation that is subject to holdback or escrow will be made in compliance with the requirements of Treas. Reg. § 1.409A-3(i)(5)(iv)(A), and any such payments will not be made unless they are made on the same schedule and under the same conditions applicable to other securityholders generally, and within five (5) years following the applicable transaction.  Each payment in a series of payments hereunder shall be deemed to be a separate payment for purposes of Section 409A of the Code.  It is intended that this Agreement will comply with Section 409A of the Code and any regulations and other published guidance of the IRS thereunder, to the extent the Agreement is subject thereto, and the Agreement shall be interpreted on a basis consistent with such intent. While the payments and benefits provided hereunder are intended to be structured in a manner to avoid the implication of any penalty taxes under Section 409A of the Code, in no event whatsoever shall Franchise Group Parent or any of its affiliates (including, without limitation, the Company) be liable for any additional tax, interest, or penalties that may be imposed on you as a result of Section 409A of the Code or any damages for failing to comply with Section 409A of the Code (other than for withholding obligations or other obligations applicable to employers, if any, under Section 409A of the Code).

With respect to any reimbursement or in-kind benefit arrangements of the Company that constitutes deferred compensation for purposes of Section 409A of the Code, the following conditions shall be applicable (except as otherwise permitted by Section 409A of the Code): (a) the amount eligible for reimbursement, or in-kind benefits provided, under any such arrangement in one calendar year may not affect the amount eligible for reimbursement, or in-kind benefits to be provided, under such arrangement in any other year (except that any health or dental plan may impose a limit on the amount that may be reimbursed or paid), (b) any reimbursement must be made on or before the last day of the calendar year following the calendar year in which the expense was incurred, and (c) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

The terms contained in this Agreement constitute and embody the full and complete understanding and agreement with respect to your engagement as a consultant for the Company and the other matters addressed herein, and supersede and replace any prior or contemporaneous agreements or understandings, written or oral, concerning such subject matter, including the Prior Agreement.  The terms of this Agreement may be modified only by a writing duly executed by you and the Company, and this Agreement, and your obligations hereunder, may not be assigned by you without the prior written consent of the Company.  The benefits and obligations contained in this Agreement will inure to the benefit of and be binding upon the Company and its respective successors and assigns.

This Agreement will be governed under the laws of the state of Delaware, without giving effect to the choice of law principles thereof.  By signing below, you agree that all disputes and claims of any nature that you may have against any member of the Company Group including, without limitation, all statutory, contractual, and common law claims and claims pursuant to this Agreement, will be submitted solely and exclusively first to mandatory mediation and, if mediation is unsuccessful, then to binding arbitration in accordance with the then-current arbitration rules and procedures of the Judicial Arbitration Mediation Services (JAMS) to be held in the closest JAMS office to Delaware.  All information regarding the dispute or claim and mediation and arbitration proceedings, including any settlement, shall not be disclosed by you

70678719.2

or any mediator or arbitrator to any third party without the written consent of the Company, except with respect to judicial enforcement of any arbitration award.  The cost of any mediation or arbitration will be borne equally between you and the Company, except where prohibited by applicable law.

\*       \*       \*

If you are in agreement with the terms of your consulting engagement described above, please execute this Agreement where indicated below and return to me.  The execution of this Agreement may be by actual signature or by signature delivered by facsimile or by email as a portable document format (.pdf) file or image file attachment.

Sincerely,

**FRANCHISE GROUP, INC.**

By: _Andrew Laurence_

Name: Andrew Laurence
Title: Executive Vice President

AGREED AND ACCEPTED as of this
19th day of  January, 2024 by:

_Brian Kahn_

**Brian Kahn**

[*Signature page to Consulting Agreement*]

70678719.1

**Schedule I**

**Restrictive Covenants**

(a) **Confidentiality**.  You acknowledge and agree that your work for the Company will bring you into close contact with many confidential affairs of the Company Group not readily available to the public, including plans for further developments or activities by the Company Group.  You agree that during the Consulting Period and at all times thereafter, you shall keep and retain in the strictest confidence all confidential matters ("*Confidential Information*") of the Company Group, including but not limited to, "know how," sales and marketing information or plans; business or strategic plans; salary, bonus, or other personnel information; information about or concerning existing, new, or potential customers, franchisees, clients, or shareholders; trade secrets; pricing policies; operational methods; technical processes; inventions and research projects; and other business affairs of the Company, in each case that you may have developed or learned in the course of your prior employment with the Company Group may develop or learn in the course of your engagement, and shall not remove such Confidential Information from the Company's premises (other than for the purpose of working from home), use such Confidential Information for personal gain or disclose such Confidential Information to anyone outside of the Company, either during or after the Consulting Period, except (i) in good faith, in the course of performing your duties under this Agreement; (ii) with the prior written consent of the Board; (iii) it being understood that Confidential Information shall not be deemed to include any information that is or becomes generally available to the public other than as a result of disclosure by you; or (iv) to the extent disclosure is compelled by a court of competent jurisdiction, arbitrator, agency, or other tribunal or investigative body in accordance with any applicable statute, rule, or regulation (but only to the extent any such disclosure is compelled, and no further).  Further, nothing herein shall prevent you from cooperating with any investigation or inquiry conducted by the Equal Employment Opportunity Commission regarding any employment practice or policy of the Employers.  In addition, pursuant to Section 7 of the Defend Trade Secrets Act of 2016 (which added 18 U.S.C. § 1833(b)), You acknowledge that you shall not have criminal or civil liability under any federal or state trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by such section.  Upon the termination of your engagement with the Company, or at any time the Company may so request, you shall return to the Company all tangible embodiments (in whatever medium) relating to Confidential Information and Work Product (as defined below) that you may then possess or have under your control.

(b) **Ownership of Property**.  You acknowledge that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, processes, programs, designs, analyses, reports, patent applications, copyrightable work, and mask work (whether or not including any Confidential Information), and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) that relate to the Company's actual or anticipated business, research and development, or existing or future products or services and that are conceived, developed, contributed to, made, or reduced to practice by you (either solely or jointly with others) while engaged or employed by the Company, including any of the foregoing that constitutes any proprietary information or records ("*Work Product*") belonging to the Company, and you hereby assign, and agree to assign, all of the above Work Product to the Company.  Any copyrightable work prepared in whole or in part by you in the course of your work for the Company shall be deemed a "work made for hire" under the copyright laws, and the Company shall own all rights therein.  To the extent that any such copyrightable work is not a "work made for hire," you hereby assign and agree to assign to the Company all right, title, and interest, including without limitation, copyright in and to such copyrightable work.  You shall perform all actions reasonably requested by the Board, at the Company's sole expense, to establish and confirm the Company's ownership (including, without limitation, assignments, consents,

70678719.1

powers of attorney, and other instruments) in Work Product and copyrightable work identified by the Board.

(c) **Third Party Information**.  You understand that the Company will receive from third parties confidential or proprietary information ("***Third Party Information***") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  During your engagement with the Company and thereafter, and without in any way limiting the provisions of Section (a) of this Schedule I, you shall hold Third Party Information in the strictest confidence and shall not disclose to anyone (other than personnel and consultants of the Company who need to know such information in connection with their work for the Company) or use, except in connection with your work for the Company, Third Party Information unless expressly authorized by the Board in writing.

(d) **Restrictive Covenants**.  You acknowledge that (i) in the course of your engagement by the Company, you have become familiar with the Company's trade secrets and with other Confidential Information concerning the Company; (ii) your services are of special, unique and extraordinary value to the Company; and (iii) the agreements and covenants contained in this Schedule I are essential to the business and goodwill of the Company.  Therefore, you agree that, without limiting any other obligation pursuant to this Schedule I or the Agreement:

    (i) **Non-Competition**.  Except with prior written permission of the Board, you shall not, during the Consulting Period and for a period of twelve (12) months thereafter, directly or indirectly (individually or on behalf of other persons) (i) enter (or prepare to enter) the employ of, or render services to, any person engaged in (a) the provision of franchising or tax preparation services or (b) any other line of business actively being conducted by the Company accounting for more than ten percent (10%) of the Company's gross revenues on the date of your termination (a "***Competitive Business***"); (ii) engage (or prepare to engage) in a Competitive Business on your own account; or (iii) become interested in any such Competitive Business, directly or indirectly, as an individual, partner, shareholder, director, officer, principal, agent, employee, trustee, consultant, or in any other relationship or capacity; provided, however, that nothing contained in this Schedule I Section (d)(i) shall be deemed to prohibit you from acquiring, solely as a passive investment, less than five percent (5%) of the total outstanding securities of any publicly-traded corporation.

    (ii) **Non-Solicitation**.  Except with prior written permission of the Board, you shall not, directly or indirectly (individually or on behalf of other persons), during the Consulting Period and for a period of twelve (12) months thereafter, for any reason hire, offer to hire, or entice away any officer, employee, franchisee, or agent of any member of the Company Group (or any former officer, employee, or agent of any member of the Company Group who was employed by any member of the Company Group at any time during the twelve (12) month period prior to your termination of service) or interfere with or attempt to interfere with business relationships between any member of the Company Group and any current or prospective franchisee, customer, client, or supplier of any member of the Company Group; provided that the foregoing shall not be violated by general advertisements not targeted at employees or consultants of the Company Group.

    (iii) **Non-Disparagement**.  At any time during or after the Consulting Period, you shall not make (whether directly or through any other person) any public or private statements (whether oral or in writing) which are derogatory or damaging to the Company or its direct or indirect parents or subsidiaries, together with each of its current and former principals, officers, directors, direct or indirect equity holders, general and limited partners, agents, representatives, and employees, or any of their businesses, activities, operations, affairs, reputations, or prospects, and the Company will not authorize any of their officers, directors, or employees to make disparaging or derogatory statements about you (and will use its reasonable best efforts to prevent such individuals from

70678719.1

making such statements) except, in each case, to the extent required by law, and only after consultation with the other party to the maximum extent possible to maintain the goodwill of such party.

(iv) **Injunctive Relief with Respect to Covenants**. You acknowledge and agree that in the event of any material breach by you of any of section of this Agreement that remedies at law may be inadequate to protect the Company, and, without prejudice to any other legal or equitable rights and remedies otherwise available to the Company, you agree to the granting of injunctive relief in the Company's favor in connection with any such breach or violation without proof of irreparable harm.

(v) **Enforcement**. If, at the time of enforcement of this Schedule I, a court or other body of legal authority holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration, scope, or geographical area reasonable under such circumstances shall be substituted for the stated period, scope, or area and that the court may revise such restrictions to cover the maximum duration, scope, and area permitted by law and reasonable under such circumstances. Because your services are unique and because you have access to Confidential Information, the parties hereto agree that the Company would be irreparably harmed by, and money damages would be an inadequate remedy for, any breach of this Agreement. Therefore, in the event of a breach or threatened breach of this Agreement, the Company and/or its respective successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security).

(e) **Reasonable Restrictions**. You agree that the terms and conditions in Sections (a) through (d) of Schedule I are reasonable and necessary for the protection of the Company's business and to prevent damage or loss to the Company as the result of action taken by you. You acknowledge that you could continue to actively pursue your career and earn sufficient compensation without breaching any of the restrictions contained in Sections (a) through (d) of Schedule I.

(f) **Trade Secrets**. Nothing in this Agreement diminishes or limits any protection granted by law to trade secrets or relieves you of any duty not to disclose, use, or misappropriate any information that is a trade secret, for as long as such information remains a trade secret.

(g) **Notice**. You agree that you will give notice of your obligations to comply with the terms of this Schedule I to any person or organization that you may become associated with during the first twelve (12) months after the termination of your engagement with the Company. You further agree that the Company may, if it desires, send a copy of, or otherwise make the provisions in Schedule I hereof known to any such person, firm or entity during that time.

(h) **Return of Company Property**. Upon termination of your service, you shall promptly return to the Company: (i) all documents, records, procedures, books, notebooks, and any other documentation in any form whatsoever, including but not limited to written, audio, video or electronic, containing any information pertaining to the Company which includes Confidential Information and Third Party Information, including any and all copies of such documentation then in your possession or control regardless of whether such documentation was prepared or compiled by you, Company, other employees of the Company, representatives, agents, or independent contractors, and (ii) all equipment or tangible personal property entrusted to you by the Company. You acknowledge that all such documentation, copies of such documentation, equipment, and tangible personal property are and shall at all times remain the sole and exclusive property of the Company.

70678719.1

(i) **No Conflicts**. You hereby represent and warrant that the performance of your obligations under this Schedule I will not breach or be in conflict with any other agreement to which you are a party or are bound to and that you are not now subject to any covenants against competition or similar covenants or any court order that could affect the performance of your obligations under the Agreement and this Schedule I. Further, you hereby represent and warrant that: (a) you will not bring any confidential information of any former employer, nor any proprietary work product created as part of your duties with your former employer; (b) you will not use or disclose any former employer's confidential information or proprietary work product in the performance of your duties with the Company; and (c) you are not currently, nor will you take or be in a position, that breaches the Company's ethics policies as in effect from time to time.

70678719.1

**Exhibit A**

- American Freight

- Sylvan Learning

- Buddy's

- Vitamin Shoppe

- Pet Supplies Plus

- Wag n Wash

- Equity interests in Conn's, Inc. (to the extent sold for cash and not distributed in kind)

70678719.1

**Exhibit B**

**2024 Restricted Class A Unit Plan**

**(see attached)**

**FREEDOM VCM HOLDINGS, LLC**
**2024 RESTRICTED CLASS A UNIT PLAN**

1.    **PURPOSE.**

The purpose of the Plan is to assist the Company in attracting, retaining, motivating, and rewarding certain key employees, officers, directors, and consultants of the Company Group and promoting the creation of long-term value for members of the Company by closely aligning the interests of such individuals with those of such members.  The Plan authorizes the award of Class A Units on the terms and conditions set forth in the Plan and the Operating Agreement to Eligible Persons to encourage such Eligible Persons to expend maximum effort in the creation of member value.  The terms of the Operating Agreement are hereby incorporated into the Plan as if set forth herein in their entirety.  In the event of a conflict between the Plan and the Operating Agreement, the provisions of the Operating Agreement shall control.

2.    **DEFINITIONS.**

For purposes of the Plan, the following terms shall be defined as set forth below:

(a)    "Award" means any Restricted Class A Units  granted under the Plan.  Class A Units retained upon vesting of any Award shall be considered an Award for all purposes of the Plan.

(b)    "Award Agreement" means a written agreement between the Company and a Participant evidencing the terms and conditions of an individual Award grant.

(c)    "Board" means the board of directors of the Company.

(d)    "BR Member" has the meaning set forth in the Operating Agreement.

(e)    "Cause" means, with respect to a Participant and in the absence of an Award Agreement or Participant Agreement otherwise defining Cause, (1) the Participant's plea of *nolo contendere* to, conviction of or indictment for, any crime (whether or not involving the Company Group) (A) constituting a felony or (B) that has, or could reasonably be expected to result in, an adverse impact on the performance of the Participant's duties to the Service Recipient, or otherwise has, or could reasonably be expected to result in, an adverse impact on the business or reputation of any member of the Company Group; (2) conduct of the Participant, in connection with his, her or their employment or service, that has resulted, or could reasonably be expected to result, in material injury to the business or reputation of any member of the Company Group; (3) any material violation of the policies of the Service Recipient, including, but not limited to, those relating to sexual harassment or the disclosure or misuse of confidential information, or those set forth in the manuals or statements of written policy of the Service Recipient; (4) the Participant's act(s) of negligence or willful misconduct in the course of his, her or their employment or service with the Service Recipient; (5) misappropriation by the Participant of any assets or business opportunities of any member of the Company Group; (6) embezzlement or fraud committed by the Participant, at the Participant's direction, or with the Participant's prior actual knowledge; or (7) willful neglect in the performance of the Participant's duties for the Service Recipient or willful or repeated failure or refusal to perform such duties following written notice by the Company.  If,

70678527.1

subsequent to the Termination of a Participant for any reason other than by the Service Recipient for Cause, it is discovered that the Participant's employment or service could have been terminated for Cause, such Participant's employment or service shall, at the discretion of the Committee, be deemed to have been terminated by the Service Recipient for Cause for all purposes under the Plan, and the Participant shall be required to repay or return to the Company all amounts and benefits received by him, her or them in respect of any Award following such Termination that would have been forfeited under the Plan had such Termination been by the Service Recipient for Cause. In the event that there is an Award Agreement or Participant Agreement otherwise defining Cause, "Cause" shall have the meaning provided in such agreement, and a Termination by the Service Recipient for Cause hereunder shall not be deemed to have occurred unless all applicable notice and cure periods in such Award Agreement or Participant Agreement are complied with.

(f)     "Change of Control" has the meaning set forth in the Operating Agreement.

(g)     "Class A Unit" has the meaning set forth in the Operating Agreement.

(h)     "Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time, including the rules and regulations thereunder and any successor provisions, rules and regulations thereto.

(i)     "Committee" means the Board or such committee thereof consisting of two or more individuals appointed by the Board to administer the Plan.

(j)     "Company" means Freedom VCM Holdings, LLC, a Delaware limited liability company.

(k)     "Company Group" means the Company, together with each direct or indirect subsidiary of the Company.

(l)     "Competitive Activity" means, with respect to any Participant and in the absence of an Award Agreement or Participant Agreement containing covenants relating to competition with the Service Recipient of the Participant, any activity reasonably determined by the Committee to be competitive with the business of any member of the Company Group. If a Participant's Award Agreement or effective Participant Agreement contains covenants relating to restrictions on competition, engaging in "Competitive Activity" with respect to such Participant shall mean the breach of such restrictive covenants.

(m)     "Corporate Event" has the meaning set forth in Section 9(b) hereof.

(n)     "Data" has the meaning set forth in Section 17(g) hereof.

(o)     "Disability" means, in the absence of an Award Agreement or Participant Agreement otherwise defining Disability, the permanent and total disability of such Participant within the meaning of Section 22(e)(3) of the Code. In the event that there is an Award Agreement or Participant Agreement defining Disability, "Disability" shall have the meaning provided in such agreement, and a Termination by reason of a Disability hereunder shall not be deemed to have occurred unless all applicable notice periods in such Award Agreement or Participant Agreement are complied with.

2

70678527.1

(p) "<u>Effective Date</u>" means January 19, 2024.

(q) "<u>Eligible Person</u>" means (1) each employee of any member of the Company Group, including each such person who may also be a director of any member of the Company Group, (2) each non-employee director of any member of the Company Group, (3) each other natural person who provides substantial services to any member of the Company Group, and (4) any natural person who has been offered employment by any member of the Company Group; *provided*, that such prospective employee may not receive any payment or exercise any right relating to an Award until such person has commenced employment with any member of the Company Group.  An employee on an approved leave of absence may be considered as still in the employ of a member of the Company Group for purposes of eligibility for participation in the Plan.

(r) "<u>Exchange Act</u>" means the U.S. Securities Exchange Act of 1934, as amended from time to time, including the rules and regulations thereunder and any successor provisions, rules and regulations thereto.

(s) "<u>Fair Market Value</u>" has the meaning set forth in the Operating Agreement; provided, that, so long as the BR Member remains a member of the Company, the Fair Market Value of a Class A Unit of the Company shall not be less than the value of the Class A Unit of the Company implied by the value of the Company reported in the most recent quarterly audited financial statements of B. Riley Financial, Inc. or its applicable affiliate.

(t) "<u>IPO</u>" has the meaning set forth in the Operating Agreement.

(u) "<u>Management Investor Member</u>" has the meaning set forth in the Operating Agreement.

(v) "<u>Operating Agreement</u>" means the Second Amended and Restated Limited Liability Company Operating Agreement of the Company, dated as of January 19, 2024, as may be amended and restated from time to time.

(w) "<u>Participant</u>" means an Eligible Person who has been granted an Award under the Plan or, if applicable, such other person or entity who holds an Award.

(x) "<u>Participant Agreement</u>" means an employment or other services agreement between a Participant and the Service Recipient that describes the terms and conditions of such Participant's employment or service with the Service Recipient and is effective on the applicable date of grant with respect to any Award.

(y) "<u>Plan</u>" means this Freedom VCM Holdings LLC 2024 Restricted Class A Unit Plan, as amended from time to time.

(z) "<u>Prime Rate</u>" means the rate from time to time published in the "Money Rates" section of *The Wall Street Journal* as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates).

(aa) <u>Repurchase Price</u>" means —

70678527.1

(1)     on or following the Termination of a Participant other than by the Service Recipient for Cause, an amount equal to the Fair Market Value of a Class A Unit on the date that the written notice of repurchase is delivered pursuant to Section 7(a) hereof;

(2)     on or following the Termination of a Participant by the Service Recipient for Cause, the lesser of (A) the original purchase price paid for such units (as adjusted for any subsequent changes in the outstanding Class A Units or in the capital structure of the Company) less any dividends or other distributions or bonus received (or to be received) by the Participant (or any transferee) in respect of the Class A Units prior to the date of repurchase and (B) the Fair Market Value of the Class A Units on the date that the written notice of repurchase is delivered pursuant to Section 7(a) hereof; or

(3)     notwithstanding anything contained within clause (1) or (2) above, if a Participant has violated any restrictive covenant to which he or she is subject to with any member of the Company Group, the Repurchase Price shall be the lesser of (A) the original purchase price paid for such Class A Units (as adjusted for any subsequent changes in the outstanding Class A Units or in the capital structure of the Company) *less* any dividends or other distributions or bonus received (or to be received) by the Participant (or any transferee) in respect of the Class A Units prior to the date of repurchase and (B) the Fair Market Value of the Class A Units on the date that the written notice of repurchase is delivered pursuant to Section 7(a) hereof.

(bb)     "Repurchase Right" has the meaning set forth in Section 7 hereof.

(cc)     "Repurchase Right Exercise Period" means the period commencing on the date of Termination of a Participant with the Service Recipient for any reason and ending on the earlier to occur of (1) an IPO and (2) the twenty-four (24) month anniversary of the commencement of the Repurchase Right Exercise Period; *provided*, that, in the event that a Participant has violated any restrictive covenant to which he or she is subject to with any member of the Company Group, the Repurchase Right Exercise Period shall commence (or restart if the Repurchase Right Exercise Period has already commenced) as of the date on which the Company first acquires actual knowledge of such violation and shall continue until the later of (x) the date on which the Repurchase Right Exercise Period would have otherwise expired as set forth herein, and (y) the twelve (12) month anniversary of the date on which the Company first acquires actual knowledge of such violation.

(dd)     "Repurchase Right Lapse Date" means the earlier to occur of (1) an IPO and (2) a Change of Control.

(ee)     "Restricted Class A Units" means an Award granted to a Participant under Section 5 hereof that is subject to certain restrictions and to a risk of forfeiture.

(ff)     "Securities Act" means the U.S. Securities Act of 1933, as amended from time to time, including the rules and regulations thereunder and any successor provisions, rules and regulations thereto.

(gg)     "Service Recipient" means, with respect to a Participant holding a given Award, the applicable member of the Company Group by which the Participant is, or following a

4

70678527.1

Termination was most recently, principally employed or to which the Participant provides, or following a Termination was most recently providing, services, as applicable.

(hh)    "<u>Termination</u>" means the termination of a Participant's employment or service, as applicable, with the Service Recipient; *provided*, *however*, that, (x) if so determined by the Committee at the time of any change in status in relation to the Service Recipient (*e.g.*, a Participant ceases to be an employee and begins providing services as a consultant, or vice versa), such change in status will not be deemed to be a Termination hereunder, and (y) if so determined by the Committee at the time of a furlough, temporary layoff or similar event with respect to a Participant, such furlough, temporary layoff or similar event will not be deemed to be a Termination hereunder until such time as the Committee determines that a Termination has occurred.  Notwithstanding anything herein to the contrary, a Participant's change in status in relation to the Service Recipient (for example, a change from employee to consultant) shall not be deemed a Termination hereunder with respect to any Awards constituting nonqualified deferred compensation subject to Section 409A of the Code that are payable upon a Termination unless such change in status constitutes a "separation from service" within the meaning of Section 409A of the Code.  Unless otherwise determined by the Committee, in the event that any Service Recipient ceases to be a member of the Company Group (by reason of sale, divestiture, spin-off, or other similar transaction), each Participant that is employed by or provides services to such Service Recipient shall be deemed to have suffered a Termination hereunder as of the date of the consummation of such transaction, unless the Participant's employment or service is transferred to another entity that would constitute a Service Recipient immediately following such transaction.  For the avoidance of doubt, in the event that a Participant provides notice of his, her or their intention to resign at a future date, the Service Recipient may, in its sole and absolute discretion, accelerate such date of Termination without changing the characterization of such Termination, and such Termination shall remain a resignation by the Participant.

3.    **ADMINISTRATION.**

(a)    <u>Authority of the Committee</u>.  Except as otherwise provided below, the Plan shall be administered by the Committee.  The Committee shall have full and final authority, in each case subject to and consistent with the provisions of the Plan, to (1) select Eligible Persons to become Participants, (2) grant Awards, (3) determine the type, number of Class A Units subject to, other terms and conditions of, and all other matters relating to, Awards, (4) prescribe Award Agreements (which need not be identical for each Participant) and rules and regulations for the administration of the Plan, (5) construe and interpret the Plan and Award Agreements and correct defects, supply omissions, and reconcile inconsistencies therein, and (6)  make all other decisions and determinations as the Committee may deem necessary or advisable for the administration of the Plan.  Any action of the Committee shall be final, conclusive, and binding on all persons, including, without limitation, each member of the Company Group, Eligible Persons, Participants, and beneficiaries of Participants.  For the avoidance of doubt, the Board shall have the authority to take all actions under the Plan that the Committee is permitted to take.

(b)    <u>Delegation</u>.  To the extent permitted by applicable law, the Committee may delegate to officers or employees of any member of the Company Group, or committees thereof, the authority, subject to such terms as the Committee shall determine, to perform such functions under the Plan, including, but not limited to, administrative functions, as the Committee may

70678527.1

determine appropriate.  The Committee may appoint agents to assist it in administering the Plan. Any actions taken by an officer or employee delegated authority pursuant to this Section 3(b) within the scope of such delegation shall, for all purposes under the Plan, be deemed to be an action taken by the Committee.  Notwithstanding the foregoing or any other provision of the Plan to the contrary:  (i) any Award granted under the Plan to any Eligible Person who is not an employee of any member of the Company Group (including any non-employee director of any member of the Company Group) must be expressly approved by the Committee; (ii) no officer or employee may grant an Award to himself or herself; and (iii) the Committee may not delegate authority to an officer or employee who is acting solely in the capacity of an officer or employee (and not also as a director of the Company) to determine the Fair Market Value pursuant to Section 2(s) hereof.

(c)    Sections 409A and 457A.  The Committee shall take into account compliance with Sections 409A and 457A of the Code in connection with any grant of an Award under the Plan, to the extent applicable.  Any payments in respect of an Award constituting nonqualified deferred compensation subject to Section 409A of the Code that are payable upon a Termination shall be delayed for such period as may be necessary to meet the requirements of Section 409A(a)(2)(B)(i) of the Code.  On the first business day following the expiration of such period, the Participant shall be paid, in a single lump sum without interest, an amount equal to the aggregate amount of all payments delayed pursuant to the preceding sentence, and any remaining payments not so delayed shall continue to be paid pursuant to the payment schedule applicable to such Award. While the Awards granted hereunder are intended to be structured in a manner to avoid the imposition of any penalty taxes under Sections 409A and 457A of the Code, in no event whatsoever shall the Company Group be liable for any additional tax, interest, or penalties that may be imposed on a Participant as a result of Section 409A or Section 457A of the Code or any damages for failing to comply with Section 409A or Section 457A of the Code or any similar state or local laws (other than for withholding obligations or other obligations applicable to employers, if any, under Section 409A or Section 457A of the Code).

4.    **CLASS A UNITS AVAILABLE UNDER THE PLAN.**

(a)    Number of Class A Units Available for Delivery.  Subject to adjustment as provided in Section 9 hereof, the total number of Class A Units reserved and available for delivery in connection with Awards under the Plan shall equal 100,460.  Class A Units delivered under the Plan shall consist of authorized and unissued units or previously issued Class A Units reacquired by the Company on the open market or by private purchase.  Notwithstanding anything herein to the contrary, amounts payable or otherwise distributable in respect of Class A Units issued under this Plan at any time following the Effective Date (whether in connection with any purchase, distribution, dividend or otherwise and whether in cash or in-kind) shall not exceed $90 million in the aggregate, and any amounts payable or distributable (whether in connection with any purchase, distribution, dividend or otherwise and whether in cash or in-kind) that exceeds $90 million shall not be payable to the Class A Units issued under this Plan and shall instead be available for distribution to the other members of the Company, in accordance with, and subject to, the terms of the Operating Agreement as though the Class A Units issued under this Plan were not outstanding.

70678527.1

(b)    <u>Class A Unit Counting Rules</u>.  The Committee may adopt reasonable counting procedures to ensure appropriate counting, avoid double-counting (as, for example, in the case of tandem awards or substitute awards) and make adjustments if the number of Class A Units actually delivered differs from the number of units previously counted in connection with an Award.  To the extent that an Award expires or is canceled, forfeited, settled in cash or otherwise terminated without delivery to the Participant of the full number of Class A Units to which the Award related, the undelivered Class A Units will again be available for delivery under the Plan.  Additionally, , any unvested Class A Units repurchased by the Company pursuant to Section 5(c) below following a Participant's Termination for any reason will again be available for delivery under the Plan.  Class A Units withheld in payment of the taxes relating to an Award and Class A Units equal to the number surrendered in payment of any taxes relating to an Award shall not be deemed to constitute Class A Units delivered to the Participant and shall be deemed to again be available for delivery under the Plan.

5.    **RESTRICTED CLASS A UNITS.**

(a)    <u>General</u>.  Restricted Class A Units may be granted to Eligible Persons in such form and having such terms and conditions as the Committee shall deem appropriate.  The provisions of separate Awards of Restricted Class A Units shall be set forth in separate Award Agreements, which agreements need not be identical.  Subject to the restrictions set forth in Section 5(b) hereof, and except as otherwise set forth in the applicable Award Agreement, upon the grant of Restricted Class A Units, the Participant shall generally have the rights and privileges of a member as to such Restricted Class A Units, including the right to vote such Restricted Class A Units.  Unless otherwise set forth in a Participant's Award Agreement, a Participant shall be entitled to cash dividends, unit dividends and distributions, if any, with respect to any Restricted Class A Units granted under the Plan.

(b)    <u>Vesting and Restrictions on Transfer</u>.  Restricted Class A Units shall vest in such manner, on such date or dates, or upon the achievement of performance or other conditions, in each case as may be determined by the Committee and set forth in an Award Agreement; *provided, however*, that notwithstanding any such vesting dates, the Committee may in its sole discretion accelerate the vesting of any Award at any time and for any reason.  Unless otherwise specifically determined by the Committee or in a Participant's Award Agreement, the vesting of a Restricted Class A Unit shall occur only while the Participant is actively employed by or actively rendering services to the Service Recipient, and all vesting (other than vesting as a result of the applicable Termination) shall cease upon the Termination of a Participant for any reason (or earlier on the date on which the Participant's active employment or active services rendering terminates).  For purposes of this Section 5(b) only, a Participant's active employment or other active service rendering relationship shall not include any notice period mandated under applicable law or pursuant to the terms of any contract and active employment shall not include any period of "garden leave" or similar period pursuant to applicable law or the terms of any contract.  To the extent permitted by applicable law and unless otherwise determined by the Committee, service based vesting shall be suspended during the period of any approved unpaid leave of absence by a Participant following which the Participant has a right to reinstatement and shall resume upon such Participant's return to active employment.  Further, unless otherwise determined by the Committee, in the event that the Committee determines that a furlough, temporary layoff or similar event with respect to a Participant does not constitute a Termination, vesting shall be suspended

during the period of any such furlough, temporary layoff or similar event and shall resume upon such Participant's return to active employment.  In addition to any other restrictions set forth in a Participant's Award Agreement, the Participant shall not be permitted to sell, transfer, pledge, assign, hypothecate or otherwise encumber or dispose of the Restricted Class A Units prior to the time the Restricted Class A Units have vested pursuant to the terms of the Award Agreement.

(c)     Termination of Employment or Service.  Except as provided by the Committee in an Award Agreement, Participant Agreement or otherwise, in the event of a Participant's Termination for any reason prior to the time that such Participant's Restricted Class A Units have vested, (i) all vesting with respect to such Participant's Restricted Class A Units shall cease, and (ii) as soon as practicable following such Termination, the Company shall repurchase from the Participant, and the Participant shall sell, all of such Participant's unvested Restricted Class A Units at a purchase price equal to the lesser of (A) the original purchase price paid for the Restricted Class A Units (as adjusted for any subsequent changes in the outstanding Class A Units or in the capital structure of the Company) *less* any dividends or other distributions or bonus received (or to be received) by the Participant (or any transferee) in respect of such Restricted Class A Units prior to the date of repurchase, (B) the Fair Market Value of a Class A Units on the date of such repurchase; provided that, if the original purchase price paid for the Restricted Class A Unit is equal to zero dollars ($0), such unvested Restricted Class A Units shall be forfeited to the Company by the Participant for no consideration as of the date of such Termination

6.     **OTHER RESTRICTIONS AND RIGHTS AND CONDITIONS APPLICABLE TO AWARDS.**

(a)     Prohibition on Transfers.  Except (1) as otherwise approved by the Committee, (2) pursuant to Section 7.3 of the Operating Agreement, or (3) pursuant to Section 7 hereof, Class A Units acquired by a Participant pursuant to the vesting of any Award granted hereunder may not be sold, transferred, pledged, assigned, hypothecated, or otherwise encumbered or disposed of, nor may a Participant (or any transferee) sell, transfer, pledge, assign, hypothecate or otherwise encumber or dispose of his, her or its right to receive all or any portion of the future proceeds to be received upon the sale, transfer or other disposition of such Class A Units in either case, prior to the one hundred eightieth (180th) day following an IPO (or such other period as may reasonably be requested by the Company or the underwriter(s) for the IPO to accommodate regulatory restrictions on (i) the publication or other distribution of research reports or (ii) analyst recommendations and opinions, including (without limitation) the restrictions set forth in Rule 2711(f)(4) of the National Association of Securities Dealers and Rule 472(f)(4) of the New York Stock Exchange, as amended, or any similar successor rules or amendments thereto) (the "Lock-Up Period").  If requested by the underwriters managing any public offering, each Participant shall execute a separate agreement to the foregoing effect.  The Company may impose stop-transfer instructions with respect to the units (or securities) subject to the foregoing restriction until the end of such Lock-Up Period.

(b)     Joinder to Operating Agreement.  Except as otherwise specifically provided in the Plan, no person shall be entitled to the rights and privileges of Class A Unit ownership in respect of Class A Units that are subject to Awards hereunder until such Class A Units have been issued to that person.  Upon accepting a Restricted Class A Unit, Participant shall become a party to the Operating Agreement by execution of a joinder agreement or such other document(s) provided by the Company for such purpose.  Without limiting the terms and conditions contained

70678527.1

in the Plan, all transfers of Class A Units acquired pursuant to Awards granted hereunder shall be subject to the terms of the Operating Agreement.

7.    **REPURCHASE RIGHTS UPON TERMINATION.**

(a)    <u>Company Repurchase Right</u>.  If, prior to the Repurchase Right Lapse Date, a Participant undergoes a Termination with the Service Recipient for any reason, then at any time during the Repurchase Right Exercise Period, in addition to any repurchase right or obligation of the Company with respect to unvested Restricted Class A Units as provided in Section 5 hereof, the Company shall have the right, but not the obligation, to repurchase all or any portion of the Class A Units  received by the Participant pursuant to Awards granted hereunder at a per-unit price equal to the Repurchase Price (the "<u>Repurchase Right</u>").   The Repurchase Right shall be exercisable upon written notice to the Participant indicating the number of Class A Units to be repurchased and the date on which the repurchase is to be effected, such date to be not more than thirty (30) days after the date of such notice; *provided*, *however*, that to the extent necessary or desirable to avoid triggering adverse accounting treatment, as determined by the Committee, the Company shall not exercise the Repurchase Right with respect to Class A Units acquired pursuant to an Award prior to the six (6) month anniversary of the date an Award vests.  To the extent not otherwise held in book entry form by the Company, the certificates representing the Class A Units to be repurchased shall be delivered to the Company (or its assignee, as applicable) prior to the close of business on the date specified for the repurchase.

(b)    <u>Payment of Repurchase Price</u>.

(1)    If the Company (or its assignee, as applicable) exercises the Repurchase Right following the Termination of a Participant other than (A) by the Service Recipient for Cause or (B) by such Participant's voluntary resignation, the aggregate Repurchase Price shall be paid in a lump sum at the time of repurchase.

(2)    If the Company (or its assignee, as applicable) exercises the Repurchase Right following the Termination of a Participant (A) by the Service Recipient for Cause or (B) by such Participant's voluntary resignation, the Company (or its assignee, as applicable) shall be permitted to issue a promissory note equal to the aggregate Repurchase Price in lieu of a cash payment; *provided*, *however*, that such promissory note shall have a maturity date that does not exceed three (3) years from the date of such repurchase, shall bear simple interest of not less than the Prime Rate in effect on the date of such repurchase, and shall be payable as to interest in equal monthly installments during the term of the note and as to principal on the maturity date; *provided*, *further*, that if the Company (or its assignee, as applicable) does not issue a promissory note to exercise such Repurchase Right, the aggregate Repurchase Price shall be paid in a lump sum at the time of repurchase.

(c)    <u>Delay of Repurchase</u>.  Notwithstanding anything contained in this Section 7 to the contrary, in the event that any repurchase described herein would result in a default under any applicable financing documents of any member of the Company Group, or would otherwise be prohibited by applicable law (as applicable, a "<u>Prohibition Event</u>"), commencement of the

70678527.1

applicable Repurchase Right Exercise Period shall be delayed until the Prohibition Event ceases to exist, but in no event shall such delay extend for more than eighteen (18) months.

(d)    Participant Representations; Repayment Obligation.   In connection with any repurchase of Class A Units pursuant to this Section 7, the Company (or its assignee, as applicable) will be entitled to receive customary representations, warranties and releases from the Participant regarding the repurchase of such Class A Units as may be reasonably requested by the Company (or its assignee, as applicable), including, but not limited to, the representation that the Participant has good and marketable title to such Class A Units to be transferred free and clear of all liens, claims, and other encumbrances.   If a Participant violates any restrictive covenant to which he or she is subject to with any member of the Company Group following the payment of the Repurchase Price, the Participant shall, promptly following demand from the Company (or its assignee, as applicable) and without prejudice to any other remedies available to the Company Group under applicable law in connection with such violation, repay to the Company (or its assignee, as applicable) an amount equal to the excess of (x) the Repurchase Price received by the Participant, and (y) the amount that would have been payable to the Participant had the Repurchase Right been exercised after such violation.

(e)    Failure to Deliver Certificates or Repurchase Agreement.   If a Participant (or any transferee) fails to deliver certificates representing the Class A Units to be repurchased or an agreement containing the representations, warranties and releases requested by the Company (or its assignee, as applicable) pursuant to Section 7(d) in a repurchase or similar agreement, in each case prior to the close of business on the date specified for the repurchase: (1) such Class A Units shall be deemed for all purposes (including the right to vote and receive payment for dividends) to have been transferred to the Company (or its assignee, as applicable); (2) to the extent such Class A Units are evidenced by certificates, such certificates shall be deemed cancelled; (3) the Company shall make an appropriate notation in its records to reflect the transfer of such Class A Units; and (4) the Participant (or any transferee) shall merely be an unsecured creditor of the Company (or its assignee, as applicable) with the right only to receive payment of the Repurchase Price, without interest.

8.    **COMPETITIVE ACTIVITIES.**

Notwithstanding anything contained in the Plan to the contrary and to the extent permitted by applicable law, except as otherwise provided by the Committee in an Award Agreement or otherwise, in the event that a Participant engages in any Competitive Activity during the term of such Participant's employment or service with the Service Recipient or during the six (6) month period following the Termination of such Participant for any reason, the Committee may determine, in its sole discretion, to (a) require all Awards held by such Participant to be immediately forfeited and returned to the Company without additional consideration, or (b) to the extent that such Participant received any profit from the Class A Units underlying an Award within the twelve (12) month period prior to the date of such Competitive Activity, require that such Participant promptly repay to the Company any profit received pursuant to such sale.

9.    **ADJUSTMENT FOR RECAPITALIZATION, MERGER, ETC.**

(a)    <u>Capitalization Adjustments</u>.  In the event of (1) changes in the outstanding Class A Units or in the capital structure of the Company by reason of unit dividends, unit splits, reverse unit splits, recapitalizations, reorganizations, mergers, amalgamations, consolidations, combinations, exchanges, or other relevant changes in capitalization occurring after the date of grant of any such Award (including any Corporate Event); (2) the declaration and payment of any extraordinary distribution in respect of Class A Units, whether payable in the form of cash, units, or any other form of consideration; or (3) any change in applicable laws or circumstances, in the case of clauses (1), (2) and (3) above, to the extent that the Committee in its sole discretion determines that such event results in or could reasonably be expected to result in any substantial dilution or enlargement of the rights intended to be granted to, or available for, Participants in the Plan, then the Committee shall: (A) equitably and proportionately adjust or substitute, as determined by the Committee in its sole discretion, (w) the aggregate number of Class A Units that may be delivered in connection with Awards (as set forth in Section 4 hereof), (x) the number of Class A Units covered by each outstanding Award, (y) the price per Class A Unit underlying each outstanding Award, and/or (z) the kind of unit or other consideration subject to each outstanding Award and available for future issuance pursuant to the Plan; (B) in respect of an outstanding Award, make one or more cash payments to the holder of an outstanding Award, which payment shall be subject to such terms and conditions (including timing of payment(s), vesting and forfeiture conditions) as the Committee may determine in its sole discretion, in an amount that the Committee determines in its sole discretion addresses the diminution in the value of such outstanding Award in connection with such event; or (C) any combination of clauses (A) and (B) above as determined appropriate by the Committee in its sole discretion.  The Committee will make such adjustments, substitutions or payment, and its determination will be final, binding and conclusive.  The Committee need not take the same action or actions with respect to all Awards or portions thereof or with respect to all Participants.  The Committee may take different actions with respect to the vested and unvested portions of an Award.

(b)    <u>Corporate Events</u>.  Notwithstanding the foregoing, except as provided by the Committee in an Award Agreement, Participant Agreement or otherwise, in connection with (1) a merger, amalgamation, or consolidation involving the Company in which the Company is not the surviving corporation, (2) a merger, amalgamation, or consolidation involving the Company in which the Company is the surviving corporation but the holders of Class A Units receive securities of another company or other property or cash, (3) a Change of Control, or (4) the reorganization, dissolution or liquidation of the Company (each, a "<u>Corporate Event</u>"), all Awards outstanding on the effective date of such Corporate Event shall be treated in the manner described in the definitive transaction agreement (or, in the event that the Corporate Event does not entail a definitive agreement to which the Company is party, in the manner determined by the Committee in its sole discretion), which agreement may provide, without limitation, for one or more of the following:

(1)    The assumption or substitution of any or all Awards in connection with such Corporate Event, in which case the Awards shall be subject to the adjustment set forth in subsection (a) above, and to the extent that such Awards vest subject to the achievement of performance objectives or criteria, such objectives or criteria shall be adjusted appropriately to reflect the Corporate Event;

(2)    The acceleration of vesting of any or all Awards, subject to the consummation of such Corporate Event;

(3)    The cancellation of any or all Awards (whether vested or unvested) as of the consummation of such Corporate Event, together with the payment to the Participants holding vested Awards (including any Awards that would vest upon the Corporate Event but for such cancellation) so canceled of an amount in respect of cancellation based upon the per-share consideration being paid for the Class A Units in connection with such Corporate Event; and/or

(4)    The replacement of any or all Awards with a cash incentive program that preserves the value of the Awards so replaced (determined as of the consummation of the Corporate Event), with subsequent payment of cash incentives subject to the same vesting conditions as applicable to the Awards so replaced and payment to be made within thirty (30) days of the applicable vesting date (or such later date on which the applicable consideration is payable for the Class A Units in connection with the Corporate Event, unless otherwise determined by the Committee).

Payments to holders pursuant to paragraph (3) above shall be made in cash or, in the sole discretion of the Committee, in the form of such other consideration necessary for a Participant to receive property, cash, or securities (or a combination thereof) as such Participant would have been entitled to receive upon the occurrence of the transaction if the Participant had been, immediately prior to such transaction, the holder of the number of Class A Units covered by the Award at such time. In addition, in connection with any Corporate Event, prior to any payment or adjustment contemplated under this subsection (b), the Committee may require a Participant to (A) represent and warrant as to the unencumbered title to his or her Awards, (B) bear such Participant's pro-rata share of any post-closing indemnity obligations and be subject to the same post-closing purchase price adjustments, escrow terms, offset rights, holdback terms, and similar conditions as the other holders of Class A Units, and (C) deliver customary transfer documentation as reasonably determined by the Committee.

The Committee need not take the same action or actions with respect to all Awards or portions thereof or with respect to all Participants.  The Committee may take different actions with respect to the vested and unvested portions of an Award.

(c)    <u>Fractional Class A Units</u>.  Any adjustment provided under this Section 9 may, in the Committee's discretion, provide for the elimination of any fractional units that might otherwise become subject to an Award.  No cash settlements shall be made with respect to fractional units so eliminated.

10.    **USE OF PROCEEDS.**

The proceeds received from the sale of Class A Units pursuant to the Plan shall be used for general corporate purposes.

70678527.1

11.    **EMPLOYMENT OR SERVICE RIGHTS.**

No individual shall have any claim or right to be granted an Award under the Plan or, having been selected for the grant of an Award, to be selected for the grant of any other Award. Neither the Plan nor any action taken hereunder shall be construed as giving any individual any right to be retained in the employ or service of any member of the Company Group.

12.    **COMPLIANCE WITH LAWS.**

(a)    Delivery of Class A Units.  The obligation of the Company to deliver Class A Units upon issuance or vesting of any Award shall be subject to all applicable laws, rules, and regulations, and to such approvals by governmental agencies as may be required.  Notwithstanding any terms or conditions of any Award to the contrary, the Company shall be under no obligation to offer to sell or to sell, and shall be prohibited from offering to sell or selling, any Class A Units pursuant to an Award unless such units have been properly registered for sale with the U.S. Securities and Exchange Commission pursuant to the Securities Act and any applicable state agency (or with a similar non–United States regulatory agency pursuant to a similar law or regulation) or unless the Company has received an opinion of counsel, satisfactory to the Company, that such units may be offered or sold without such registration pursuant to an available exemption therefrom and the terms and conditions of such exemption have been fully complied with.  The Company shall be under no obligation to register for sale or resale under the Securities Act or any applicable state laws any of the Class A Units to be offered or sold under the Plan.  If the Class A Units offered for sale or sold under the Plan are offered or sold pursuant to an exemption from registration under the Securities Act, the Company may restrict the transfer of such units and may legend the Class A Unit certificates representing such units in such manner as it deems advisable to ensure the availability of any such exemption.

(b)    Investment Assurances.  The Committee may require a Participant, as a condition of exercising or acquiring Class A Units, (1) to give written assurances satisfactory to the Committee as to the Participant's knowledge and experience in financial and business matters and/or to employ a purchaser representative reasonably satisfactory to the Committee who is knowledgeable and experienced in financial and business matters and that he or she is capable of evaluating, alone or together with the purchaser representative, the merits and risks of exercising the Award; and (2) to give written assurances satisfactory to the Committee stating that the Participant is acquiring Class A Units for the Participant's own account and not with any present intention of selling or otherwise distributing the Class A Units.  The foregoing requirements, and any assurances given pursuant to such requirements, will be inoperative if, as to any particular requirement, a determination is made by counsel for the Company that such requirement need not be met in the circumstances under the then applicable securities laws.

13.    **WITHHOLDING OBLIGATIONS.**

As a condition to the issuance or vesting of any Award (or upon the making of an election under Section 83(b) of the Code), the Committee may require that a Participant satisfy, through deduction or withholding from any payment of any kind otherwise due to the Participant, or through such other arrangements as are satisfactory to the Committee, the amount of all federal, state, and local income and other taxes of any kind required or permitted to be withheld in

70678527.1

connection with such issuance or vesting. The Committee, in its discretion, may permit Class A Units to be used to satisfy tax withholding requirements, and such shares shall be valued at their Fair Market Value as of the issuance or vesting date of the Award, as applicable.

14.    **AMENDMENT OF THE PLAN OR AWARDS.**

(a)    <u>Amendment of Plan</u>.  The Board may amend the Plan at any time and from time to time.

(b)    <u>Amendment of Awards</u>.  The Board or the Committee may amend the terms of any one or more Awards or any Award Agreement at any time and from time to time.

(c)    <u>Addenda</u>.  The Board may approve such addenda to the Plan as it may consider necessary or appropriate for the purpose of granting Awards to Eligible Persons, which Awards may contain such terms and conditions as the Board deems necessary or appropriate to accommodate differences in local law, tax policy or custom, which, if so required under applicable laws, may deviate from the terms and conditions set forth in the Plan.  The terms of any such addenda shall supersede the terms of the Plan to the extent necessary to accommodate such differences but shall not otherwise affect the terms of the Plan as in effect for any other purpose.

(d)    <u>Member Approval</u>. Notwithstanding anything herein to the contrary, no amendment to the Plan or any Award shall be effective without member approval to the extent that such approval is required pursuant to applicable law or the applicable rules of each national securities exchange on which the units may be listed.

(e)    <u>No Impairment</u>.  No amendment to the Plan or any Award shall adversely impair a Participant's rights under any Award unless the Participant consents in writing (it being understood that no action taken by the Board or the Committee that is expressly permitted under the Plan, including, without limitation, any actions described in Section 9 hereof, shall constitute an amendment to the Plan or an Award for such purpose).  Notwithstanding the foregoing, subject to the limitations of applicable law, if any, and without an affected Participant's consent, the Board or the Committee may amend the terms of the Plan or any one or more Awards from time to time as necessary to bring such Awards into compliance with applicable law.

15.    **TERMINATION OR SUSPENSION OF THE PLAN.**

The Board may suspend or terminate the Plan at any time.  Unless sooner terminated or otherwise provided by the Board at any time, the Plan shall terminate on the day before the tenth (10th) anniversary of the date the Plan is adopted by the Board.  No Awards may be granted under the Plan while the Plan is suspended or after it is terminated; *provided, however*, that following any suspension or termination of the Plan, the Plan shall remain in effect for the purpose of governing all Awards then outstanding hereunder until such time as all Awards under the Plan have been terminated, forfeited, or otherwise canceled, or earned or otherwise paid out in accordance with their terms.

16.    **EFFECTIVE DATE OF THE PLAN.**

The Plan is effective as of the Effective Date.

14

70678527.1

17.    **MISCELLANEOUS.**

(a)    Certificates.  Class A Units acquired pursuant to Awards granted under the Plan may be evidenced in such a manner as the Committee shall determine.  If certificates representing Class A Units are registered in the name of the Participant, the Committee may require that (1) such certificates bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Class A Units, (2) the Company retain physical possession of the certificates, and (3) the Participant deliver an instrument of transfer to the Company, endorsed in blank, relating to the Class A Units.  Notwithstanding the foregoing, unless otherwise determined by the Committee, in its sole discretion, the Class A Units shall be held in book-entry form rather than delivered to the Participant pending the release of any applicable restrictions.

(b)    Other Benefits.  No Award granted or paid out under the Plan shall be deemed compensation for purposes of computing benefits under any retirement plan of any member of the Company Group nor affect any benefits under any other benefit plan now or subsequently in effect under which the availability or amount of benefits is related to the level of compensation.

(c)    Corporate Action Constituting Grant of Awards.  Corporate action constituting a grant by the Company of an Award to any Participant will be deemed completed as of the date of such corporate action, unless otherwise determined by the Committee, regardless of when the instrument, certificate, or letter evidencing the Award is communicated to, or actually received or accepted by, the Participant.  In the event that the corporate records (*e.g.*, Committee consents, resolutions or minutes) documenting the corporate action constituting the grant contain terms (*e.g.*, vesting schedule or number of Class A Units) that are inconsistent with those in the Award Agreement as a result of a clerical error in connection with the preparation of the Award Agreement, the corporate records will control and the Participant will have no legally binding right to the incorrect term in the Award Agreement.  Unless otherwise determined by the Committee, all Award Agreements must be signed by the applicable Eligible Person and returned to the Company within sixty (60) days following the date the Award Agreement is delivered to the applicable Eligible Person, and failure of an applicable Eligible Person to timely execute and return an Award Agreement to the Company will result in an immediate forfeiture of such Award.

(d)    Clawback/Recoupment Policy.  Notwithstanding anything contained herein to the contrary, all Awards granted under the Plan shall be and remain subject to any incentive compensation clawback or recoupment policy currently in effect or as may be adopted by the Board (or a committee or subcommittee of the Board) and, in each case, as may be amended from time to time.  No such policy, adoption, or amendment shall in any event require the prior consent of any Participant.  No recovery of compensation under such a clawback policy will be an event giving rise to a right to resign for "good reason" or "constructive termination" (or similar term) under any agreement with any member of the Company Group.  In the event that an Award is subject to more than one such policy, the policy with the most restrictive clawback or recoupment provisions shall govern such Award, subject to applicable law.

(e)    Participants Outside of the United States.  The Committee may modify the terms of any Award under the Plan made to or held by a Participant who is then a resident, or is primarily employed or providing services, outside of the United States in any manner deemed by

70678527.1

the Committee to be necessary or appropriate in order that such Award shall conform to laws, regulations, and customs of the country in which the Participant is then a resident or primarily employed or providing services, or so that the value and other benefits of the Award to the Participant, as affected by non–United States tax laws and other restrictions applicable as a result of the Participant's residence, employment, or providing services abroad, shall be comparable to the value of such Award to a Participant who is a resident, or is primarily employed or providing services, in the United States.  An Award may be modified under this Section 17(e) in a manner that is inconsistent with the express terms of the Plan, so long as such modifications will not contravene any applicable law or regulation.  Additionally, the Committee may adopt such procedures and sub-plans as are necessary or appropriate to permit participation in the Plan by Eligible Persons who are non–United States nationals or are primarily employed or providing services outside the United States.

(f)    Electronic Delivery.  Any reference herein to a "written" agreement or document will include any agreement or document delivered electronically or posted on the Company's intranet (or other shared electronic medium controlled by the Company to which the Participant has access).

(g)    Data Privacy.  As a condition of receipt of any Award, each Participant explicitly and unambiguously consents to the collection, use, and transfer, in electronic or other form, of personal data as described in this subsection by and among, as applicable, the Company Group for the exclusive purpose of implementing, administering, and managing the Plan and Awards and the Participant's participation in the Plan.  In furtherance of such implementation, administration, and management, the Company Group may hold certain personal information about a Participant, including, but not limited to, the Participant's name, home address, telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, job title(s), information regarding any securities of any member of the Company Group held by such Participant, and details of all Awards (the "Data").  In addition to transferring the Data amongst themselves as necessary for the purpose of implementation, administration, and management of the Plan and Awards and the Participant's participation in the Plan, each member of the Company Group may transfer the Data to any third parties assisting the Company in the implementation, administration, and management of the Plan and Awards and the Participant's participation in the Plan.  Recipients of the Data may be located in the Participant's country or elsewhere, and the Participant's country and any given recipient's country may have different data privacy laws and protections.  By accepting an Award, each Participant authorizes such recipients to receive, possess, use, retain, and transfer the Data, in electronic or other form, for the purposes of assisting the Company in the implementation, administration, and management of the Plan and Awards and the Participant's participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Company or the Participant may elect to deposit any Class A Units.  The Data related to a Participant will be held only as long as is necessary to implement, administer, and manage the Plan and Awards and the Participant's participation in the Plan.  A Participant may, at any time, view the Data held by the Company with respect to such Participant, request additional information about the storage and processing of the Data with respect to such Participant, recommend any necessary corrections to the Data with respect to the Participant, or refuse or withdraw the consents herein in writing, in any case without cost, by contacting his or her local human resources representative.  The Company may cancel the Participant's eligibility to participate in the Plan, and, in the Committee's discretion, the

70678527.1

Participant may forfeit any outstanding Awards if the Participant refuses or withdraws the consents described herein.  For more information on the consequences of refusal to consent or withdrawal of consent, Participants may contact their local human resources representative.

(h)     No Liability of Committee Members.  No member of the Committee (nor any employee or director delegated authority pursuant to Section 3(b) hereof) shall be personally liable by reason of any contract or other instrument executed by such member or on his or her behalf in his or her capacity as a member of the Committee or for any mistake of judgment made in good faith, and the Company shall indemnify and hold harmless each member of the Committee and each other employee, officer, or director of the Company to whom any duty or power relating to the administration or interpretation of the Plan may be allocated or delegated, against all costs and expenses (including counsel fees) and liabilities (including sums paid in settlement of a claim) arising out of any act or omission to act in connection with the Plan, unless arising out of such person's own fraud or willful misconduct; *provided*, *however*, that approval of the Board shall be required for the payment of any amount in settlement of a claim against any such person.  The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled under the Company's certificate or articles of incorporation or bylaws, each as may be amended from time to time, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

(i)     Payments Following Accidents or Illness.  If the Committee shall find that any person to whom any amount is payable under the Plan is unable to care for his or her affairs because of illness or accident, or is a minor, or has died, then any payment due to such person or his or her estate (unless a prior claim therefor has been made by a duly appointed legal representative) may, if the Committee so directs the Company, be paid to his or her spouse, child, relative, an institution maintaining or having custody of such person, or any other person deemed by the Committee to be a proper recipient on behalf of such person otherwise entitled to payment.  Any such payment shall be a complete discharge of the liability of the Committee and the Company therefor.

(j)     Governing Law.  The Plan shall be governed by and construed in accordance with the internal laws of the State of Delaware without reference to the principles of conflicts of laws thereof.

(k)     Arbitration.  All disputes and claims of any nature that a Participant (or such Participant's transferee or estate) may have against the Company or any other member of the Company Group arising out of or in any way related to the Plan or any Award Agreement must be submitted solely and exclusively to binding arbitration in accordance with the then-current employment arbitration rules and procedures of the American Arbitration Association (AAA) to be held in Delaware.  All information regarding the dispute or claim and arbitration proceedings, including any settlement, shall not be disclosed by the Participant or any arbitrator to any third party without the written consent of the Company, except with respect to judicial enforcement of any arbitration award.  Any arbitration claim must be brought solely in the Participant's (or such Participant's transferee's or estate's) individual capacity and not as a claimant or class member (or similar capacity) in any purported multiple-claimant, class, collective, representative or similar proceeding, and the arbitrator may not permit joinder of any multiple claimants and their claims without the express written consent of the Company.  Any arbitrator selected to adjudicate the

70678527.1

claim must be knowledgeable in the industry standards and practices, and, by signing an Award Agreement, each Participant will be deemed to agree that any claims pursuant to the Plan or an Award Agreement is inherently a matter involving interstate commerce and thus, notwithstanding the choice of law provision included herein, the Federal Arbitration Act shall govern the interpretation and enforcement of this arbitration provision.  The arbitrator shall not be permitted to award any punitive or similar damages, but may award attorney's fees and expenses to the prevailing party in any arbitration.  Any decision by the arbitrator shall be binding on all parties to the arbitration.

(l)      <u>Statute of Limitations</u>.  A Participant or any other person filing a claim for benefits under the Plan must file the claim within one (1) year of the date the Participant or other person knew or should have known of the facts giving rise to the claim.  This one-year statute of limitations will apply in any forum where a Participant or any other person may file a claim and, unless the Company waives the time limits set forth above in its sole discretion, any claim not brought within the time periods specified shall be waived and forever barred.

(m)      <u>Funding</u>.  No provision of the Plan shall require any member of the Company Group, for the purpose of satisfying any obligations under the Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made or otherwise to segregate any assets, nor shall any member of the Company Group be required to maintain separate bank accounts, books, records, or other evidence of the existence of a segregated or separately maintained or administered fund for such purposes.  Participants shall have no rights under the Plan other than as unsecured general creditors of the Company, except that insofar as they may have become entitled to payment of additional compensation by performance of services, they shall have the same rights as other employees and service providers under general law.

(n)      <u>Reliance on Reports</u>.  Each member of the Committee and each member of the Board shall be fully justified in relying, acting, or failing to act, and shall not be liable for having so relied, acted, or failed to act, in good faith, upon any report made by any independent public accountant of any member of the Company Group and upon any other information furnished in connection with the Plan by any person or persons other than such member.

(o)      <u>Titles and Headings</u>.  The titles and headings of the sections in the Plan are for convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.

*      *      *

The Plan was approved by the Board on January 19, 2024.

70678527.1

# APPENDIX A

## TO

## FREEDOM VCM HOLDINGS, LLC 2024 Restricted CLASS A UNIT PLAN

### (for California residents only, to the extent required by
### California Corporations Code Section 25102(o))

This Appendix A to the Freedom VCM Holdings, LLC 2024 Restricted Class A Unit Plan (the "Plan") shall apply only to the Participants who are residents of the State of California and who are receiving an Award under the Plan in reliance on California Corporations Code Section 25102(o) only. Capitalized terms contained herein shall have the same meanings given to them in the Plan, unless otherwise provided by this Appendix A. Notwithstanding any provisions contained in the Plan to the contrary and to the extent required by applicable laws, the following terms shall apply to all Awards granted to residents of the State of California, until the earlier to occur of (i) such time as the Committee amends this Appendix A or (ii) at such time as the Committee otherwise provides.

(a)     Unless determined otherwise by the Committee, set forth in the Plan, an Award Agreement or in the Operating Agreement, Awards may not be sold, transferred, pledged, assigned, hypothecated, or otherwise encumbered or disposed of in any manner other than by will or by the laws of descent and distribution. If the Committee makes an Award transferable, such Award may only be transferred (i) by will, (ii) by the laws of descent and distribution, (iii) to a revocable trust, or (iv) as permitted by Rule 701 of the Securities Act.

(b)     No Award shall be granted, nor shall any Class A Units be issued upon the vesting of any Award, to a resident of California more than ten (10) years after the earlier of the date of adoption of the Plan or the date the Plan is approved by the Company's security holders.

(c)     The Plan must be approved by a majority of the outstanding securities of the Company entitled to vote by the later of (1) within twelve (12) months before or after the date the Plan is adopted or (2) prior to or within twelve (12) months of the issuance of any security under the Plan in California. Any issuance of securities purchased before security holder approval is obtained must be rescinded if security holder approval is not obtained in the manner described in the preceding sentence. Such securities shall not be counted in determining whether such approval is obtained.

(d)     In the event of a unit split, reverse unit split, unit distribution, recapitalization, combination, reclassification or other distribution of the Company's equity securities without the receipt of consideration by the Company, of or on the Company's class of securities subject to the purchase right or underlying an Award, the Committee will make such proportionate adjustments, if any, to an Award as required by Section 25102(o) of the California Corporations Code to the extent the Company is relying upon the exemption afforded thereby with respect to the Award.

(e)     This Appendix A shall be deemed to be part of the Plan and the Committee shall have the authority to amend this Appendix A in accordance with Section 14 of the Plan.

70678527.1

\*       \*       \*

70678719.1

**Exhibit C**

**Restricted Class A Unit Grant Notice and Agreement**

**(see attached)**

**Execution Version**

**RESTRICTED CLASS A UNIT GRANT NOTICE AND AGREEMENT**

Freedom VCM Holdings, LLC (the "Company"), pursuant to its 2024 Restricted Class A Unit Plan (as may be amended, restated or otherwise modified from time to time, the "Plan"), hereby grants to Holder the number of Class A Units (the "Restricted Class A Units") set forth below. The Restricted Class A Units are subject to all of the terms and conditions set forth in this Restricted Class A Unit Grant Notice and Agreement (this "Award Agreement"), as well as all of the terms and conditions of the Plan, all of which are incorporated herein in their entirety. To the extent that any provisions herein (or portion thereof) conflicts with any provision of the Plan, the Plan shall prevail and control. Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.

| | |
|---|---|
| **Holder**: | Brian Kahn |
| **Date of Grant**: | January 19, 2024 |
| **Number of Restricted Class A Units**: | 35,161 |
| **Vesting Schedule:** | One-hundred percent (100%) of the Restricted Class A Units granted hereunder shall vest if a Measurement Date occurs prior to the fifth (5th) anniversary of the Date of Grant. For the avoidance of doubt, in the event that a Measurement Date does not occur on or prior to the fifth (5th) anniversary of the Date of Grant, one-hundred percent (100%) of the Restricted Class A Units granted hereunder shall immediately be forfeited by Holder to the Company for no consideration. "Measurement Date" shall mean such date following the Date of Grant on which the Company ceases to have any active operating companies or revenue generating subsidiaries. |
| **Termination:** | Notwithstanding the provisions of Section 5(c) and Section 7 of the Plan to the contrary, in the event of Holder's Termination for any reason, all unvested Restricted Class A Units shall remain outstanding under the Plan and shall not be subject to repurchase, and shall remain eligible to vest pursuant to the terms of this Award Agreement until the fifth (5th) anniversary of the Date of Grant, at which time, if they are not vested, shall be automatically forfeited for no consideration. Further, and notwithstanding anything herein to the contrary, if (i) Holder's service with the Company Group is Terminated for "Cause" (as defined below), (ii) Holder's service with the Company Group is Terminated by Holder at a time when circumstances that constitute "Cause" exist or (iii) Holder is convicted of, or pleas nolo contendere to, a crime constituting (x) a felony under the laws of the United States or any state thereof or (y) a misdemeanor under the laws of the United States or any state thereof (not including any traffic offense) involving moral turpitude, deceit, dishonesty or fraud (other than, for purposes of clause (y), |

70678661.1

any misdemeanor related to any action or inaction by you in connection with, or relating to, the "Prophecy", matters known to the Company as of the date hereof as determined in good faith by the Board), Holder will automatically forfeit for no consideration the Applicable Percentage of the outstanding Restricted Class A Units for no consideration.

For purposes of this Award Agreement, "<u>Applicable Percentage</u>" shall mean (i) as of the Date of Grant, one-hundred percent (100%), (ii) between the Date of Grant and the first anniversary of the Date of Grant, one-hundred percent (100%) *less* 4.167% times the number of monthly anniversaries of the Date of Grant that have passed, (iii) as of the first anniversary of the Date of Grant, fifty percent (50%), (iv) between the first anniversary of the Date of Grant and the second anniversary of the Date of Grant, fifty percent (50%) *less* 2.083% times the number of monthly anniversaries of the first anniversary of the Date of Grant that have passed, (v) as of the second anniversary of the Date of Grant, twenty-five percent (25%), (vi) between the second anniversary of the Date of Grant and the third anniversary of the Date of Grant, twenty-five percent (25%) *less* 2.083% times the number of monthly anniversaries of the second anniversary of the Date of Grant that have passed, and (vii) as of and all times following the third anniversary of the Date of Grant, zero percent (0%).

For the avoidance of doubt, for purposes of this Award Agreement, "<u>Cause</u>" shall have the meaning ascribed to such term in that certain consulting agreement by and between the Holder and Franchise Group, Inc., dated January 19, 2024.

**Restrictions on Restricted Class A Units:** The transfer restrictions described in Section 7.1 of the Operating Agreement are incorporated herein by reference and made a part hereof.

**Restrictive Covenant Agreement:** As a condition of the grant of Restricted Class A Units hereunder, Holder acknowledges and reaffirms Holder's obligations and restrictions set forth in any Participant Agreement or other agreement with the Company Group containing non-competition, non-interference, non-solicitation, non-hire, confidentiality, invention or other intellectual property assignment or non-disparagement covenants. Holder acknowledges and agrees that this Award Agreement and any agreement containing such covenants to which Holder is subject, will be considered separate contracts, and any agreement containing such covenants will survive the termination of this Award Agreement for any reason. Further,

70678661.1

Holder acknowledges and agrees that each member of the Company Group shall be a third party beneficiary of the covenants set forth in any agreement containing such covenants, and each shall have the right to enforce such covenants for all purposes in the event of a breach of such covenants.

**Joinder to Operating Agreement:**

From and after the date hereof, Holder hereby agrees to be bound by the terms and provisions of the Operating Agreement as if Holder were an original signatory thereto. As a condition to the issuance of any Restricted Class A Units hereby, Holder shall execute such additional documents as the Company may reasonably request to effectuate Holder's Joinder to the Operating Agreement.

**Additional Terms:**

The Restricted Class A Units shall be subject to the following additional terms:

- The Restricted Class A Units granted hereunder shall be registered in Holder's name on the books of the Company during the Lock-Up Period and for such additional time as the Committee determines appropriate in its reasonable discretion. Any certificates representing the vested Restricted Class A Units delivered to Holder shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations, and other requirements of the Securities and Exchange Commission, any stock exchange upon which such units are listed, and any applicable federal or state laws, and the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions as the Committee deems appropriate.

- Holder shall be the record owner of the Restricted Class A Units until or unless such Restricted Class A Units are forfeited or repurchased, or otherwise sold or transferred, in accordance with the terms of the Plan, and as record owner shall generally be entitled to all rights of a member with respect to the Restricted Class A Units; *provided*, *however*, that notwithstanding anything to the contrary, Holder shall be entitled to any dividends and distributions made or declared on the Restricted Class A Units following the Date of Grant regardless of whether such Restricted Class A Units are otherwise subject to additional service-based or performance-based vesting conditions.

- Upon vesting of the Restricted Class A Units (or such other time that the Restricted Class A Units are taken into income),

70678661.1

Holder will be required to satisfy applicable withholding tax obligations, if any, as provided in the Plan.

- This Award Agreement does not confer upon Holder any right to continue as an employee or service provider of the Service Recipient or any other member of the Company Group.

- This Award Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of law thereof.

- Holder agrees that the Company may deliver by email all documents relating to the Plan or the Restricted Class A Units (including, without limitation, a copy of the Plan) and all other documents that the Company is required to deliver to its security holders (including, without limitation, disclosures that may be required by the Securities and Exchange Commission). Holder also agrees that the Company may deliver these documents by posting them on a website maintained by the Company or by a third party under contract with the Company. If the Company posts these documents on a website, it shall notify Holder by email or such other reasonable manner as then determined by the Company.

- This Award Agreement and the Plan constitute the entire understanding and agreement of the parties hereto and supersede all prior negotiations, discussions, correspondence, communications, understandings, and agreements (whether oral or written and whether express or implied) between the Company and Holder relating to the subject matter of this Award Agreement. Without limiting the foregoing, to the extent Holder has entered into an employment or similar agreement with the Company or any of its affiliates, and the terms noted in such employment or similar agreement are inconsistent with or conflict with this Award Agreement, then the terms of this Award Agreement will supersede and be deemed to amend and modify the inconsistent or conflicting terms set forth in such employment or similar agreement.

- If Holder is married on the Date of Grant, the grant of the Restricted Class A Units hereunder is conditional upon, and will be effective only after, Holder's spouse has duly executed the spousal consent on the signature page hereto or in a form acceptable to the Company, with an effective date

- 4 -

70678661.1

as of the Date of Grant.  If, at any time subsequent to the Date of Grant, Holder becomes legally married (whether in the first instance or to a different spouse), Holder shall cause Holder's spouse to execute and deliver to the Company a spousal consent in a form acceptable to the Company. Holder's failure to deliver the Company an executed spousal consent in a form acceptable to the Company at any time when Holder would otherwise be required to deliver such consent shall constitute Holder's continuing representation and warranty that Holder is not legally married as of such date (the breach of which would constitute a material breach of this Award Agreement and shall cause the Class A Units granted hereunder to be immediately null and void).

**Section 83(b) Election**    Under Section 83 of the Code, the difference between the purchase price paid for the Restricted Class A Units and their Fair Market Value on the date any forfeiture restrictions applicable to such units lapse will be reportable as ordinary income at that time.  For this purpose, "forfeiture restrictions" include the forfeiture as to unvested Restricted Class A Units described above.  Holder **may** elect to be taxed at the time the Restricted Class A Units are acquired, rather than when such units cease to be subject to such forfeiture restrictions, by filing an election under Section 83(b) of the Code with the Internal Revenue Service within thirty (30) days after the Date of Grant specified in this Award Agreement.  The form for making this election is attached as <u>Exhibit A</u> hereto.  Failure to make this filing within the thirty (30) day period will result in the recognition of ordinary income by Holder  as the forfeiture restrictions lapse.  Holder will promptly notify the Company if Holder timely elects to file an election with respect to the Restricted Class A Units under Section 83(b) of the Code.

**HOLDER ACKNOWLEDGES THAT IT IS HOLDER'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S, TO FILE A TIMELY ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF HOLDER REQUESTS THE COMPANY OR ITS REPRESENTATIVES TO MAKE THIS FILING ON HOLDER'S BEHALF.  HOLDER IS RELYING SOLELY ON HOLDER'S OWN ADVISORS WITH RESPECT TO THE DECISION AS TO WHETHER OR NOT TO FILE ANY ELECTION UNDER SECTION 83(B) OF THE CODE.**

**Representations and Warranties of Holder:**    Holder hereby represents and warrants to the Company that:

- Holder understands that the Class A Units have not been registered under the Securities Act, nor qualified under any state securities laws, and that they are being offered and sold

70678661.1

pursuant to an exemption from such registration and qualification based in part upon Holder's representations contained herein; the Class A Units are being issued to Holder hereunder in reliance upon the exemption from such registration provided by Section 4(a)(2) of the Securities Act for transactions by an issuer not involving any public offering;

- Holder is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act and has such knowledge and experience in financial and business matters that Holder is capable of evaluating the merits and risks of the investment contemplated by this Award Agreement; and Holder is able to bear the economic risk of this investment in the Company (including a complete loss of this investment);

- Except as specifically provided herein or in the Plan, Holder has no contract, undertaking, understanding, agreement or arrangement, formal or informal, with any person to sell, transfer or pledge all or any portion of his, her or its Class A Units, and has no current plans to enter into any such contract, undertaking, understanding, agreement or arrangement;

- Holder has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation as to the Company's sale to Holder of his, her or its Class A Units;

- Holder is familiar with the business and operations of the Company and has been afforded an opportunity to ask such questions of the Company's agents, accountants and other representatives concerning the Company's proposed business, operations, financial condition, assets, liabilities and other relevant matters as he, she or it has deemed necessary or desirable in order to evaluate the merits and risks of the investment contemplated herein;

- Holder has been informed that the Class A Units are restricted securities under the Securities Act and may not be resold or transferred unless the Class A Units are first registered under the federal securities laws or unless an exemption from such registration is available; and

- Holder is prepared to hold the Class A Units for an indefinite period and that Holder is aware that Rule 144 as promulgated

70678661.1

under the Securities Act, which exempts certain resales of restricted securities, is not presently available to exempt the resale of the Class A Units from the registration requirements of the Securities Act.

- Holder acknowledges and agrees that the Company has not provided any tax advice to Holder in connection with this Award Agreement and Holder has been advised by the Company to seek tax advice from Holder's own tax advisors regarding this Award Agreement and the payments that may be made to Holder pursuant to this Award Agreement, including advice as to whether Holder should make an election under Section 83(b) of the Code within thirty (30) days of the Date of Grant.

*   *   *

**THE UNDERSIGNED HOLDER ACKNOWLEDGES RECEIPT OF THIS AWARD AGREEMENT AND THE PLAN, AND, AS AN EXPRESS CONDITION TO THE GRANT OF RESTRICTED CLASS A UNITS UNDER THIS AWARD AGREEMENT, AGREES TO BE BOUND BY THE TERMS OF BOTH THIS AWARD AGREEMENT AND THE PLAN.**

**FREEDOM VCM HOLDINGS, LLC**  **HOLDER**

By:_____      _____
Signature                          Signature

Title:_____      Print Name: _____

Date:_____      Date:_____

### SPOUSAL CONSENT

To the extent that Holder's spouse and Holder are domiciled in Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington or Wisconsin, or are otherwise entitled to the benefits of the statutes of such states, Holder's spouse indicates by the execution of this Award Agreement his or her consent to be bound by the terms herein as to his or her interests, whether as community property or otherwise, if any, in the shares of Restricted Class A Units.

_____      _____
Name                              Signature              Date

*[Signature Page to Brian Kahn Restricted Class A Unit Grant Notice and Agreement]*

**EXHIBIT A**

**ELECTION TO INCLUDE VALUE OF RESTRICTED PROPERTY IN
GROSS INCOME IN YEAR OF TRANSFER UNDER CODE § 83(b)**

The undersigned taxpayer elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code"), to include in gross income in 2024 as compensation for services rendered, the fair market value of property received in connection with his services in excess of the amount paid for the property and supplies the following information in accordance with the regulations promulgated thereunder.

1. The name, address and taxpayer identification number of the undersigned are:

   Name: _____
   Address: _____
   Social Security #:_____

2. The property with respect to which the election is made consists of _____ Class A Units of Freedom VCM Holdings, LLC (the "Company") granted pursuant to that certain Restricted Class A Unit Grant Notice and Agreement between the Company and the taxpayer.

3. The date on which property was transferred is __, 2024.

4. The taxable year to which this election relates is calendar year 2024.

5. The aggregate fair market value at time of transfer (determined without regard to any restrictions other than restrictions which by their terms will never lapse) of the property with respect to which this election is being made is $_____.

6. The property is subject to transfer restrictions and is subject to forfeiture in the event certain employment or performance conditions are not satisfied.

7. The amount paid by taxpayer for the property is $0.00.

8. A copy of this statement has been furnished to the Company, in accordance with Treas. Reg. § 1-83-2(e)(7).

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property.

The undersigned understand(s) that the foregoing election may not be revoked except with the consent of the Commissioner.

_____          Dated: _____, 2024
Taxpayer's Signature

### Exhibit E

**Merger Agreement**

EX-2.1 2 tm2315302d1_ex2-1.htm EXHIBIT 2.1

Exhibit 2.1

AGREEMENT AND PLAN OF MERGER

entered into by and among

FRANCHISE GROUP, INC.,

FREEDOM VCM, INC.

and

FREEDOM VCM SUBCO, INC.

Dated as of May 10, 2023

TABLE OF CONTENTS

Page

ARTICLE I Definitions; Interpretation and Construction                                                                                    2

1.1.      Definitions                                                                                                                       2
1.2.      Other Terms                                                                                                                      20
1.3.      Interpretation and Construction                                                                                                 20

ARTICLE II Closing; Certificate of Merger and Effective Time; The Merger                                                                 22

2.1.      Closing                                                                                                                          22
2.2.      Certificate of Merger and Effective Time                                                                                        22
2.3.      The Merger                                                                                                                       23

ARTICLE III Certificate of Incorporation, Bylaws, Directors and Officers of the Surviving Corporation                                    23

3.1.      Certificate of Incorporation of the Surviving Corporation                                                                       23
3.2.      Bylaws of the Surviving Corporation                                                                                             23
3.3.      Directors of the Surviving Corporation                                                                                          23
3.4.      Officers of the Surviving Corporation                                                                                           23

ARTICLE IV Effect of the Merger on Capital Stock; Delivery of Merger Consideration                                                       24

4.1.      Effect of the Merger on Capital Stock                                                                                           24
4.2.      Delivery of Merger Consideration                                                                                                25
4.3.      Treatment of Equity Awards                                                                                                      29
4.4.      Adjustments to Prevent Dilution                                                                                                 31

ARTICLE V Representations and Warranties of the Company                                                                                  31

5.1.      Organization, Good Standing and Qualification                                                                                   32
5.2.      Capital Structure                                                                                                                32
5.3.      Corporate Authority; Approval and Fairness                                                                                      34
5.4.      Governmental Filings; No Violations.                                                                                            35
5.5.      Compliance with Laws; Licenses.                                                                                                 36
5.6.      Company Reports                                                                                                                  38
5.7.      Disclosure Controls and Procedures and Internal Control Over Financial Reporting                                                39
5.8.      Financial Statements; No Undisclosed Liabilities; Off-Balance Sheet Arrangements; Books and Records                             41
5.9.      Litigation                                                                                                                       42
5.10.     Absence of Certain Changes                                                                                                       42
5.11.     Material Contracts                                                                                                               42
5.12.     Customers and Suppliers                                                                                                          45
5.13.     Employee Benefits                                                                                                                46

-i-

5/9/25, 7:20 PM                   sec.gov/Archives/edgar/data/1528930/000110465923058675/tm2315302d1_ex2-1.htm#:~:text=This AGREEMENT AND PLAN OF,a…

Case 24-12480-LSS   Doc 1480-1   Filed 05/14/25   Page 161 of 380

| 5.14. | Labor Matters | 48 |
| 5.15. | Environmental Matters | 49 |
| 5.16. | Tax Matters | 50 |
| 5.17. | Real Property. | 51 |
| 5.18. | Tangible Property | 52 |
| 5.19. | Intellectual Property; IT Assets | 53 |
| 5.20. | Privacy | 55 |
| 5.21. | Insurance | 55 |
| 5.22. | Takeover Statutes | 55 |
| 5.23. | Brokers and Finders | 55 |
| 5.24. | Related Party Transactions | 55 |
| 5.25. | Inventory | 56 |
| 5.26. | Product Liability | 56 |
| 5.27. | No Other Representations or Warranties; Non-Reliance | 56 |

ARTICLE VI Representations and Warranties of Parent and Merger Sub        57

| 6.1. | Organization, Good Standing and Qualification | 57 |
| 6.2. | Capitalization and Business of Merger Sub | 57 |
| 6.3. | Corporate Authority | 57 |
| 6.4. | Governmental Filings; No Violations | 57 |
| 6.5. | Litigation | 58 |
| 6.6. | Financing | 59 |
| 6.7. | Brokers and Finders | 61 |
| 6.8. | Ownership of Shares or Preferred Shares | 61 |
| 6.9. | No On-Sale Agreements | 61 |
| 6.10. | Solvency | 61 |
| 6.11. | No Other Representations or Warranties; Non-Reliance | 62 |

Article VII Covenants        62

| 7.1. | Interim Operations | 62 |
| 7.2. | Acquisition Proposals; Change of Recommendation | 66 |
| 7.3. | Company Stockholders Meeting | 72 |
| 7.4. | Obligations of Parent and Merger Sub | 73 |
| 7.5. | Proxy Statement; Schedule 13E-3 and Other Regulatory Matters | 73 |
| 7.6. | Intentionally Omitted | 78 |
| 7.7. | Third-Party Consents | 78 |
| 7.8. | Information and Access | 78 |
| 7.9. | Publicity | 80 |
| 7.10. | Employee Benefits | 80 |
| 7.11. | Indemnification; Directors' and Officers' Insurance | 82 |
| 7.12. | Treatment of Certain Existing Indebtedness; Financing | 83 |
| 7.13. | Financing Cooperation | 86 |
| 7.14. | Takeover Statutes | 89 |
| 7.15. | Transaction Litigation | 89 |
| 7.16. | Section 16 Matters | 89 |

-ii-

| 7.17. | Delisting and Deregistration | 89 |
| 7.18. | Redemption of Series A Preferred Stock | 89 |

**ARTICLE VIII Conditions to Effect the Closing**   90

| 8.1. | Conditions to Each Party's Obligation to Effect the Closing | 90 |
| 8.2. | Conditions to Parent's and Merger Sub's Obligation to Effect the Closing | 90 |
| 8.3. | Conditions to the Company's Obligation to Effect the Closing | 91 |

**ARTICLE IX Termination**   92

| 9.1. | Termination by Mutual Written Consent | 92 |
| 9.2. | Termination by Either the Company or Parent | 92 |
| 9.3. | Termination by the Company | 93 |
| 9.4. | Termination by Parent | 93 |
| 9.5. | Notice of Termination; Effect of Termination and Abandonment | 94 |

**ARTICLE X Miscellaneous and General**   98

| 10.1. | Survival | 98 |
| 10.2. | Notices | 98 |
| 10.3. | Expenses | 99 |
| 10.4. | Transfer Taxes | 99 |
| 10.5. | Amendment or Other Modification; Waiver | 99 |
| 10.6. | Governing Law and Venue; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury | 100 |
| 10.7. | Specific Performance | 101 |
| 10.8. | Third-Party Beneficiaries | 102 |
| 10.9. | Fulfillment of Obligations | 102 |
| 10.10. | Successors and Assigns | 103 |
| 10.11. | Entire Agreement | 103 |
| 10.12. | Severability | 104 |
| 10.13. | Counterparts; Effectiveness | 104 |
| 10.14. | Non-recourse | 104 |
| 10.15. | Effect of Breach of Specified Persons | 105 |

-iii-

EXHIBITS AND SCHEDULES

<u>EXHIBITS</u>

Exhibit A Form of Certificate of Incorporation of the Surviving Corporation

<u>SCHEDULES</u>

Company Disclosure Schedule
Parent Disclosure Schedule

-iv-

# AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER (this "**Agreement**"), dated as of May 10, 2023, is entered into by and among Franchise Group, Inc., a Delaware corporation (the "**Company**"), Freedom VCM, Inc., a Delaware corporation ("**Parent**"), and Freedom VCM Subco, Inc., a Delaware corporation and an indirectly Wholly Owned Subsidiary of Parent ("**Merger Sub**" and, together with the Company and Parent, the "**Parties**").

## RECITALS

WHEREAS, the Parties intend that, subject to the terms and conditions of this Agreement and the applicable provisions of the DGCL, Merger Sub shall merge with and into the Company (the "**Merger**"), with the Company surviving the Merger;

WHEREAS, the special committee of the Company Board (the "**Special Committee**") has, at a duly convened and held meeting: unanimously (A) approved and declared advisable this Agreement, the Voting Agreement and the transactions contemplated by this Agreement, (B) determined that this Agreement, the Voting Agreement and the transactions contemplated by this Agreement are fair to, and in the best interests of, the Company and the holders of the Shares, other than Excluded Shares and Shares held by Rolling Stockholders (as defined herein), and (C) resolved to recommend to the Company Board that the holders of the Shares (other than the Rolling Stockholders) adopt this Agreement at any Company Stockholders Meeting (the "**Special Committee Recommendation**");

WHEREAS, the Company Board has, at a duly convened and held meeting, acting on the Special Committee Recommendation: (i) unanimously (A) approved and declared advisable this Agreement, the Voting Agreement and the transactions contemplated by this Agreement, (B) determined that this Agreement, the Voting Agreement and the transactions contemplated by this Agreement are fair to, and in the best interests of, the Company and the holders of the Shares, other than Excluded Shares, and (C) resolved to recommend that the holders of the Shares adopt this Agreement at any Company Stockholders Meeting (the "**Company Recommendation**"); and (ii) unanimously directed that this Agreement be submitted to the holders of the Shares for their adoption at the Company Stockholder Meeting;

WHEREAS, the board of directors of Parent has unanimously (a) approved and declared advisable this Agreement and the transactions contemplated by this Agreement and (b) determined that this Agreement and the transactions contemplated by this Agreement are fair to, and in the best interests of, Parent;

WHEREAS, the board of directors of Merger Sub has unanimously (a) approved and declared advisable this Agreement and the transactions contemplated by this Agreement, (b) determined that this Agreement and the transactions contemplated by this Agreement are fair to, and in the best interests of Merger Sub and its sole stockholder, (c) directed that this Agreement be submitted to its sole stockholder for its adoption and (d) resolved to recommend that its sole stockholder adopt this Agreement;

WHEREAS, as an inducement to the Company's willingness to enter into this Agreement, concurrently with the execution and delivery of this Agreement, Parent has delivered to the Company the Equity Commitment Letter (as defined below) pursuant to which B. Riley Financial, Inc. (the "**Guarantor**") has agreed to provide to Parent on the Closing Date the Equity Financing (as defined below);

WHEREAS, as an inducement to the Company's willingness to enter into this Agreement, concurrently with the execution and delivery of this Agreement, Parent has delivered to the Company a limited guarantee by the Guarantor in favor of the Company on the terms and conditions set forth therein (the "**Guarantee**" or "**Limited Guarantee**");

WHEREAS, concurrently with the execution and delivery of this Agreement, as a condition and material inducement to Parent's and Merger Sub's willingness to enter into this Agreement, Brian R. Kahn and certain affiliated Persons and Andrew Laurence, as beneficial owners of Shares representing, in the aggregate, 36.43% of the issued and outstanding Shares as of the execution and delivery of this Agreement, are entering into a voting agreement with Parent (the "**Voting Agreement**"), pursuant to which, among other things, such Persons have agreed to vote the Shares and any other equity interests of the Company beneficially owned by each of them in favor of the adoption of this Agreement as more particularly set forth therein;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a condition and material inducement to Parent's willingness to enter into this Agreement, Brian R. Kahn and certain affiliated Persons and Andrew Laurence (the "**Rolling Stockholders**") have entered into a rollover contribution agreement (the "**Rollover Agreement**"), whereby, subject to the provisions contained in the Rollover Agreement, (i) each Rolling Stockholder has agreed, among other things, to, immediately prior to the Effective Time, contribute, transfer and assign all of its right, title and interest in the number of Shares owned by the Rolling Stockholders identified on Schedule I and Schedule II of the Rollover Agreement (as may be adjusted in accordance with the terms thereof, the "**Rollover Shares**") to Freedom VCM Holdings, LLC ("**TopCo**") and (ii) TopCo has agreed, concurrently with such contribution, to accept such Rollover Shares in exchange for certain TopCo Common Units (as defined in the Rollover Agreement); and

WHEREAS, the Parties desire to make certain representations, warranties, covenants and agreements in connection with this Agreement and the transactions contemplated by this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements set forth in this Agreement, the Parties, intending to be legally bound, agree as follows:

ARTICLE I

Definitions; Interpretation and Construction

1.1.    Definitions. Unless otherwise specified in this Agreement and subject to Section 1.2 and Section 1.3, the following terms have the meanings set forth in this Section 1.1:

-2-

"**2L Credit Agreement Modification**" has the meaning set forth in Section 7.12(a).

"**ABL Credit Agreement**" has the meaning set forth in the definition of "Existing Indebtedness."

"**Acquisition Proposal**" means any proposal, offer, inquiry or indication of interest relating to (a) a merger, joint venture, partnership, exclusive license, consolidation, dissolution, liquidation, tender offer, share exchange, recapitalization, reorganization, spin-off, plan of arrangement, asset purchase, business combination, acquisition or any other similar transaction (or series of related transactions) involving the Company or any of its Subsidiaries by any Third Person or (b) a direct or indirect acquisition, exchange, transfer or other similar transaction (or series of related transactions) by any Third Person of assets or equity securities of the Company or any of its Subsidiaries, that in the case of clauses (a) or (b), if consummated would result in any Third Person, directly or indirectly, becoming the beneficial owner of twenty percent or more of the: (i) total voting power or any class of equity securities of the Company or any of its Subsidiaries; or (ii) consolidated net revenues, consolidated net income or consolidated total assets of the Company, in each case of the foregoing clauses (i) and (ii) of this definition, as of the date of such proposal, offer, inquiry or indication of interest, or acquisition.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (for purposes of this definition, the term "control" and the correlative meanings of the terms "controlled by" and "under common control with," as used with respect to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided, that the Rolling Stockholders shall not be deemed Affiliates of the Company or its Subsidiaries for the purposes of this Agreement.

"**Agreement**" has the meaning set forth in the Preamble.

"**Alternative Acquisition Agreement**" means, other than a Permitted Confidentiality Agreement, any agreement, letter of intent, term sheet memorandum of understanding, agreement in principle or any other similar agreement or document relating to any Acquisition Proposal.

"**Alternative Financing**" has the meaning set forth in Section 7.12(c).

"**Antitrust Law**" means all U.S. and non-U.S. antitrust, competition or other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, including the Sherman Antitrust Act of 1890, the Clayton Act of 1914 and the HSR Act.

"**Applicable Date**" means January 1, 2021.

"**Audit Committee**" means the audit committee of the Company Board.

-3-

"**Bankruptcy and Equity Exception**" means bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles.

"**BK Breach**" has the meaning set forth in Section 10.15.

"**Book-Entry Share**" means each book-entry account formerly representing any non-certificated Eligible Shares.

"**Business Day**" means any day ending at 11:59 p.m. (New York time) other than a Saturday or Sunday or a day on which (a) banks in New York, New York are required or authorized by Law to close or (b) solely for purposes of determining the Closing Date, the Department of State of the State of Delaware is required or authorized by Law to close.

"**Bylaws**" has the meaning set forth in Section 3.2.

"**Capitalization Time**" means 5:00 p.m. (New York time) on May 5, 2023.

"**Certificate**" means each certificate formerly representing any Eligible Shares.

"**Certificate of Designation**" has the meaning set forth in Section 4.1(b).

"**Certificate of Merger**" means a certificate of merger relating to the Merger.

"**Change of Recommendation**" means any of the actions set forth in clauses (A) through (F) of Section 7.2(d)(i).

"**Charter**" has the meaning set forth in Section 3.1.

"**Chosen Courts**" means the Court of Chancery of the State of Delaware, or if such court finds it lacks subject matter jurisdiction, the Superior Court of the State of Delaware (Complex Commercial Division); provided that if subject matter jurisdiction over the matter that is the subject of the applicable Proceeding is vested exclusively in the U.S. federal courts, such Proceeding shall be heard in the U.S. District Court for the District of Delaware.

"**Closing**" means the closing of the transactions contemplated by this Agreement.

"**Closing Date**" means the date on which the Closing actually occurs.

"**Code**" means the Internal Revenue Code of 1986.

"**Company**" has the meaning set forth in the Preamble.

"**Company 401(k) Plan**" means the Franchise Group, Inc. 401(k) Plan.

"**Company Approvals**" has the meaning set forth in Section 5.4(a).

-4-

"**Company Benefit Plan**" means any benefit or compensation plan, program, policy, practice, agreement, arrangement or other obligation, whether or not in writing and whether or not funded, in each case, which is sponsored or maintained by, or required to be contributed to, or with respect to which any potential obligation or liability is borne by, the Company or any of its Subsidiaries, including ERISA Plans, employment, consulting, retirement, severance, termination or "change of control" agreements, deferred compensation, equity-based, incentive, bonus, supplemental retirement, profit sharing, insurance, medical, welfare, fringe or other material benefits or material remuneration of any kind, but specifically excluding any Multiemployer Plan.

"**Company Board**" means the board of directors of the Company, and also includes any committee thereof (other than the Special Committee).

"**Company Compensation Committee**" means the compensation committee of the Company Board.

"**Company Disclosure Schedule**" has the meaning set forth in Article V.

"**Company Employee**" means any employee (whether full- or part-time and, including any officer) of the Company or any of its Subsidiaries.

"**Company Equity Awards**" means, collectively, the Company Options, Company RSUs, Company PRSUs, and Company MPRSUs.

"**Company Equity Payments**" has the meaning set forth in Section 4.3(e).

"**Company ERISA Affiliate**" means all employers (whether or not incorporated) that would be treated together with the Company or any of its Subsidiaries as a "single employer" within the meaning of Section 414 of the Code.

"**Company Government Contract**" means any Contract to which the Company or any of its Subsidiaries is a party, the ultimate contracting party of which is a Governmental Entity (including any subcontract with a prime contractor or other subcontractor who is a party to any such Contract).

"**Company Intellectual Property**" means all Intellectual Property owned by or purported to be owned by the Company or any of its Subsidiaries.

"**Company IT Assets**" means all IT Assets owned by or purported to be owned by the Company or any of its Subsidiaries.

"**Company MPRSU**" means any outstanding restricted stock unit granted under the Stock Plans that vests based on both the achievement of a specified total shareholder return relative to the Company's per share price in June 2021 and continued employment or service.

"**Company Option**" means any outstanding option to purchase Shares granted under the Stock Plans.

-5-

"**Company PRSU**" means any outstanding stock unit granted under the Stock Plans that vests based on both the achievement of performance goals (other than performance goals relating to the Company's share price) and continued employment or service.

"**Company Recommendation**" has the meaning set forth in the Recitals.

"**Company Recovery Costs**" has the meaning set forth in Section 9.5(d).

"**Company Registered IP**" has the meaning set forth in Section 5.19(a).

"**Company Related Parties**" means (a) the Company and its Affiliates; and (b) the former, current and future holders of any equity, Representatives, Affiliates, members, managers, general or limited partners, stockholders and assignees of each of the Company and its Affiliates.

"**Company Reports**" means the reports, forms, proxy statements, prospectuses, registration statements and other statements, certifications and documents required to be or are otherwise filed with or furnished to the SEC pursuant to the Exchange Act or the Securities Act by the Company, including notes, exhibits and schedules thereto and any amendments and supplements thereto.

"**Company RSU**" means any outstanding restricted stock unit granted under the Stock Plans that vests solely based on continued employment or service.

"**Company Stockholders Meeting**" means the meeting of stockholders of the Company to be held to consider the adoption of this Agreement.

"**Confidentiality Agreement**" means the confidentiality agreement, entered into between the Company and an Affiliate of Parent, dated March 7, 2023.

"**Consent**" has the meaning set forth in Section 5.4(a).

"**Continuing Employees**" means the Company Employees at the Effective Time who continue to remain employed with the Company or any of its Subsidiaries immediately after the Effective Time.

"**Contract**" means any legally binding contract, subcontract, agreement, lease, license, sublicense, note, bond, mortgage, loan, indenture; provided, however, that "Contracts" shall not include any Company Benefit Plan.

"**D&O Insurance**" has the meaning set forth in Section 7.11(b).

"**Debt Commitment Letter**" has the meaning set forth in Section 6.6(a).

"**Debt Financing**" has the meaning set forth in Section 6.6(a).

"**Debt Financing Source Parties**" means the Debt Financing Sources, together with their Affiliates, officers, directors, employees, agents and representatives involved in the Debt Financing and successors and assigns of each of the foregoing; provided that none of Parent, Merger Sub, or any Affiliate thereof shall be a Debt Financing Source Party.

-6-

"**Debt Financing Sources**" means the Persons (including the agents, arrangers and lenders) that have committed to provide, or have otherwise entered into agreements in connection with all or any portion of the Debt Financing or any Alternative Financing in connection with the transactions contemplated hereby pursuant to the Debt Commitment Letter, and any joinder agreements, indentures or credit agreements entered into pursuant thereto or relating thereto; provided that neither Parent nor Merger Sub shall be a Debt Financing Source.

"**Definitive Agreements**" has the meaning set forth in Section 7.12(b).

"**DGCL**" means the General Corporation Law of the State of Delaware.

"**Dissenting Shares**" has the meaning set forth in the definition of "Dissenting Stockholders."

"**Dissenting Stockholders**" means the holders of Shares who have duly demanded appraisal pursuant to Section 262 of the DGCL and have not effectively withdrawn or otherwise waived or lost such right to appraisal under Section 262 of the DGCL (such Shares for which appraisal has been so duly demanded and the right thereto under Section 262 of the DGCL not effectively withdrawn or otherwise waived or lost, the "**Dissenting Shares**").

"**DTC**" means The Depository Trust Company.

"**Effective Time**" has the meaning set forth in Section 2.2.

"**Eligible Shares**" means the Shares, the Preferred Shares and the Series A Preferred Shares issued and outstanding immediately prior to the Effective Time, other than, subject to the last sentence of Section 4.2(f), any Excluded Shares.

"**Encumbrance**" means any pledge, lien, charge, option, hypothecation, mortgage, deed of trust, security interest of any nature, right of first refusal, right of first offer, lease, sublease, preemptive right, license, sublicense, restriction, easement or any other encumbrance of any kind or nature whatsoever (including any restriction on the right to vote or transfer), whether contingent or absolute.

"**Environmental Law**" means any Law relating to: (a) the protection, investigation, remediation or restoration of the environment, health, safety or natural resources; (b) the handling, labeling, management, recycling, generation, use, storage, treatment, transportation, presence, disposal, release or threatened release of any Hazardous Substance; or (c) any noise, odor, indoor air, employee exposure, wetlands, pollution, contamination or any injury or threat of injury to Persons or property relating to any Hazardous Substance.

"**Equity Commitment Letter**" has the meaning set forth in Section 6.6(a).

"**Equity Financing**" means the equity financing to be provided pursuant to the Equity Commitment Letter.

-7-

"**Equity Financing Sources**" has the meaning set forth in Section 6.6(a).

"**Equity Financing Syndication**" means the sale, transfer or syndication by the Guarantor or any of its Affiliates to any Person (other than the Rolling Stockholders) of any equity interests of Parent or any of its Affiliates or any investment vehicles that are organized to invest in Parent or any of its Affiliates.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Plans**" means "employee benefit plans" within the meaning of Section 3(3) of ERISA.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Exchange Fund**" has the meaning set forth in Section 4.2(a).

"**Excluded Information**" means (a) consolidating financial statements, separate Subsidiary financial statements, related party disclosures, or any segment information, including any required by FASB Accounting Standards Codification Topic 280, (b) financial statements or other financial data (including selected financial data) for any period earlier than the year ended December 31, 2020, (c) financial information that the Company or its Affiliates does not maintain in the ordinary course of business, (d) information not reasonably available to the Company or its Affiliates under their respective current reporting systems, or (e) (x) pro forma financial information or pro forma financial statements or (y) projections.

"**Excluded Party**" means any Third Person (i) who submits a written bona fide Acquisition Proposal to the Company or any of its Representatives after the date of this Agreement and prior to the No-Shop Period Start Date and (ii) whose Acquisition Proposal is determined by the Company Board, in good faith, prior to the start of the No-Shop Period Start Date (acting on the recommendation of the Special Committee and after consultation with outside legal counsel and the Special Committee's independent financial advisor), to be, or would reasonably be expected to lead to, a Superior Proposal; provided, however, that a Third Person shall immediately cease to be an Excluded Party (and the provisions of this Agreement applicable to Excluded Parties shall cease to apply with respect to such Person) if (1) such Acquisition Proposal is withdrawn by such Third Person or (2) such Acquisition Proposal, in the good faith determination of the Company Board (acting on the recommendation of the Special Committee and after consultation with outside legal counsel and the Special Committee's independent financial advisor), no longer is or would no longer be reasonably expected to lead to a Superior Proposal, including as a result of any modification to the terms thereof.

"**Excluded Shares**" means the (a) Shares, Preferred Shares and the Series A Preferred Shares owned by Bryant Riley, the Guarantor or any other Wholly Owned Subsidiary of the Guarantor, Parent, Merger Sub or any other Wholly Owned Subsidiary of Parent, the Company or any Wholly Owned Subsidiary of the Company, and in each case not held on behalf of third parties, (b) Dissenting Shares and (c) Rollover Shares.

-8-

"**Existing Indebtedness**" means (i) the First Lien Credit Agreement, dated as of March 10, 2021, among the Company, Franchise Group Newco PSP, LLC, a Delaware limited liability company ("**FG Newco PSP**"), Valor Acquisition, LLC, a Delaware limited liability company ("**Valor**"), Franchise Group Newco Intermediate AF, LLC, a Delaware limited liability company ("**FG Newco Intermediate AF**"), certain other subsidiaries of the Company party thereto from time to time as guarantors, the lenders party thereto from time to time and JPMorgan Chase Bank, N.A. ("**JPM**"), in its capacities as administrative agent and collateral agent, (ii) that certain Second Lien Credit Agreement, dated as of March 10, 2021 (the "**FRG Second Lien Credit Agreement**"), among the Company, FG Newco PSP, Valor, FG Newco Intermediate AF, certain other subsidiaries of the Company party thereto from time to time as guarantors, the lenders party thereto from time to time and Alter Domus (US) LLC, in its capacities as administrative agent and as collateral agent, (iii) the Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among the Company, Valor, FG Newco Intermediate AF, FG Newco PSP, W.S. Badcock Corporation ("**WSB**"), certain other subsidiaries of the Company party thereto from time to time, as borrowers and guarantors, the lenders party thereto from time to time and JPM, in its capacities as administrative agent and collateral agent (the "**ABL Credit Agreement**"), (iv) the Master Receivables Purchase Agreement, dated as of December 21, 2021, between WSB and B. Riley Receivables, LLC ("**BRR**"), (v) the Servicing Agreement, dated as of December 21, 2021, between WSB and BRR, (vi) the Guaranty, dated as of September December 21, 2021, by the Company, as guarantor, in favor of BRR, as confirmed and ratified on December 13, 2022, (vii) the Master Receivables Purchase Agreement, dated as of September 23, 2022, between WSB and B. Riley Receivables II, LLC ("**BRR II**"), (viii) the Servicing Agreement, dated as of September 23, 2022, between WSB and BRR II, (ix) the Guaranty, dated as of September 23, 2022, by the Company, as guarantor, in favor of BRR II, as confirmed and ratified on January 12, 2023 and on March 31, 2023, in each case, as amended, amended and restated, refinanced, modified, supplemented or otherwise in effect from time to time and (x) such other Indebtedness as set forth on Section 5.11(a)(iv) of the Company Disclosure Schedule.

"**Export and Sanctions Regulations**" means all applicable sanctions and export control and similar Laws in jurisdictions in which the Company or any of its Subsidiaries do business, have done business or are otherwise subject to, including the U.S. International Traffic in Arms Regulations, the Export Administration Regulations, and U.S. sanctions Laws administered by the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**FCPA**" means the U.S. Foreign Corrupt Practices Act of 1977.

"**Fee Letter(s)**" has the meaning set forth in Section 6.6(a).

"**Financing**" has the meaning set forth in Section 6.6(a).

"**Financing Amounts**" has the meaning set forth in Section 6.6(c).

"**FRG Second Lien Credit Agreement**" has the meaning set forth in the definition of Existing Indebtedness.

"**GAAP**" means the generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board applicable as of the time of the relevant financial statements or accounting procedure or action referred to herein and consistently applied during the periods involved.

-9-

"**Governmental Entity**" means any U.S. or non-U.S. (including any supranational, federal, national, state or local) governmental, quasi-governmental, regulatory or self-regulatory authority, enforcement authority, agency, commission, licensing authority, body or other entity or any subdivision or instrumentality thereof, including any public international organization, stock exchange or other self-regulatory organization, court, tribunal or arbitrator or any subdivision or instrumentality thereof, in each case of competent jurisdiction.

"**Group**" has the meaning set forth in Rule 13d-5 under the Exchange Act.

"**Guarantor**" has the meaning set forth in the Recitals.

"**Guarantor Parties**" means the Guarantor and its Affiliates.

"**Hazardous Substance**" means any: (a) substance that is listed, designated, classified or regulated pursuant to any Environmental Law; (b) substance that is a petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing, polychlorinated biphenyls, mold, radioactive material or radon; and (c) other substance that poses a risk of harm or may be the subject of regulation, obligation or liability in connection with any Environmental Law.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976.

"**Indebtedness**" means, with respect to any Person, without duplication, all obligations or liabilities of such Person (a) for borrowed money (including deposits or advances of any kind to such Person), (b) evidenced by bonds, debentures, notes or similar instruments, (c) for finance leases (as determined in accordance with GAAP) or to pay the deferred and unpaid purchase price of property or equipment, (d) pursuant to securitization or factoring programs or arrangements, (e) for net cash payment obligations of such Person under swaps, options, forward sales contracts, derivatives and other hedging Contracts, financial instruments or arrangements that will be payable upon termination thereof (assuming termination on the date of determination), (f) for letters of credit, bank guarantees, and other similar Contracts entered into by or on behalf of such Person, in each case to the extent funds have been drawn and are payable thereunder, (g) pursuant to guarantees and arrangements having the economic effect of a guarantee of any obligation, liability or undertaking of any other Person contemplated by the foregoing clauses (a) through (f) of this definition, or (i) for the foregoing clauses (a) through (f) of this definition, all premiums, accrued interest and other payment obligations in respect thereto due or that would become due, in each case, solely as a result of the consummation of the transactions contemplated by this Agreement, including termination fees, prepayment penalties, "breakage costs" or similar payments associated with the repayment of such amounts, if any; provided that Indebtedness shall not include any intercompany indebtedness between or among a Person and/or its Subsidiaries.

"**Indemnified Parties**" means, collectively, each director or officer of the Company or any of its Subsidiaries, or, while a director or officer of the Company, is or was serving at the request of the Company as a director, officer, manager, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, in each case, when acting in such capacity.

-10-

"**Inquiry**" means an inquiry, request for discussions or negotiations or request to review non-public information of the Company and its Subsidiaries that would reasonably be expected to lead to an Acquisition Proposal or an Alternative Acquisition Agreement.

"**Insurance Policies**" means any fire and casualty, general liability, business interruption, product liability, sprinkler and water damage, workers' compensation and employer liability, directors, officers and fiduciaries policies and other liability insurance policies, including any reinsurance policies and self-insurance programs and arrangements maintained by the Company or any of its Subsidiaries.

"**Intellectual Property**" means all intellectual property, industrial or proprietary rights arising under the laws of the United States or any other jurisdiction in the world, including rights in or to: (a) trademarks, service marks, trade names, corporate names, service names, symbols, logos, trade dress, slogans, Internet domain names, social media accounts, uniform resource locators, and other identifiers of origin, in each case, whether or not registered, and any and all common law rights thereto, and registrations and applications for registration thereof and any goodwill associated therewith (collectively, "**Trademarks**"); (b) patents, patent applications, registrations and invention disclosures, divisionals, revisions, supplementary protection certificates, continuations, continuations-in-part, renewals, extensions, substitutes, re-issues and re-examinations; (c) trade secrets, know-how, inventions, discoveries, algorithms, data, designs and other confidential or proprietary information (collectively, "**Trade Secrets**"); (d) data and related rights, including database rights, and (e) published and unpublished works of authorship, whether copyrightable or not (including software, and website and mobile content), in each case, whether or not registered or sought to be registered, copyrights therein and thereto, together with all common law rights and moral rights therein, and any registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof.

"**Intervening Event**" means an event, change, development, circumstance, fact or effect with respect to the Company and its Subsidiaries occurring after the date of this Agreement that is material to the Company and its Subsidiaries, taken as a whole, that (a) was not reasonably foreseeable (with respect to substance or timing), by the Special Committee as of or prior to the execution and delivery of this Agreement, and (b) first becomes actually known to the Special Committee after the execution and delivery of this Agreement and any time prior to the time the Requisite Company Vote is obtained; provided that: (i) any change in GAAP or in any applicable Law; or (ii) any event, change, development, circumstance, fact or effect (A) that is the result of factors generally affecting the industries in which the Company and its Subsidiaries operate, in the geographic markets in which they operate or where their products or services are sold or sourced (as applicable), (B) that involves or relates to an Acquisition Proposal or a Superior Proposal, (C) related to the fact that the Company meets or exceeds any internal or analysts' expectations or projections or (D) resulting from any event, change, development, circumstance or fact after the execution and delivery of this Agreement in the market price or trading volume of the Shares, individually or in the aggregate, in each case, shall not be deemed to constitute an Intervening Event; provided further that any event, change, development, circumstance, fact or effect (not otherwise excluded under this definition) underlying, giving rise to or contributing to such facts, events, changes or developments in circumstances contemplated by the foregoing clauses (C) and (D) of this definition may be taken into account in determining whether an Intervening Event has occurred.

-11-

"**IRS**" means the U.S. Internal Revenue Service.

"**IT Assets**" means technology devices, computers, hardware, software, servers, networks, workstations, routers, hubs, circuits, switches, data communications lines, and all other information technology equipment, and all data stored therein or processed thereby, and all associated documentation, interfaces or related systems.

"**JPM**" has the meaning set forth in the definition of "Existing Indebtedness."

"**Knowledge**" or any similar phrase means (a) with respect to the Company, the actual knowledge of the individuals set forth in Section 1.1 of the Company Disclosure Schedule and any individuals that, following the date of this Agreement, replace or share the employment responsibilities of any such individuals, in each case after reasonable inquiry of those direct reports who would reasonably be expected to have actual knowledge of the matter in question, and (b) with respect to Parent and/or Merger Sub, the actual knowledge of the individuals set forth in Section 1.1 of the Parent Disclosure Schedule and any individuals that, following the date of this Agreement, replace or share the employment responsibilities of any such individuals, in each case after reasonable inquiry of those direct reports who would reasonably be expected to have actual knowledge of the matter in question.

"**Law**" means any U.S. or non-U.S. federal, state or local law, statute, constitution, treaty, principle of common law, ordinance, code, standard, rule, regulation, directive, interpretive guidance, ruling or requirement issued, enacted, adopted, promulgated or otherwise put into effect by or under the authority of any Governmental Entity.

"**Leased Real Property**" means all leasehold or subleasehold estates and other rights to use and occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by the Company or any of its Subsidiaries.

"**Leases**" means all leases, subleases, licenses, concessions and other agreements (written or oral) entered into by the Company or any of its Subsidiaries, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, pursuant to which the Company or any of its Subsidiaries holds any Leased Real Property.

"**Licenses**" means all licenses, permits, certifications, approvals, registrations, consents, authorizations, accreditations, qualifications, rights, privileges, franchises, variances and exemptions issued or granted by a Governmental Entity.

"**Limited Guarantee**" has the meaning set forth in the Recitals.

"**Material Adverse Effect**" means any event, change, development, circumstance, fact or effect ("**Effect**") that, individually or in the aggregate is, would or would reasonably be expected to have a materially adverse effect on the assets, liabilities, financial condition, business operations or results of operations of the Company and its Subsidiaries (taken as a whole); provided, however, that no event, change, development, circumstance, fact or effect arising out of or resulting from any of the following, either individually or in the aggregate, shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur:

-12-

(a)    events, changes, developments, circumstances, facts or effects that are the result of factors generally affecting the economy, credit, capital, securities or financial markets or political, geopolitical, regulatory or business conditions;

(b)    events, changes, developments, circumstances, facts or effects that are the result of factors generally affecting the industries in which the Company or any of its Subsidiaries operate;

(c)    changes in GAAP or other accounting standards or in any applicable Law (or the enforcement or interpretation of any of the foregoing);

(d)    any failure by the Company or any of its Subsidiaries to meet any internal or public projections or forecasts or estimates of revenues, earnings or other financial performance or results of operations for any period; provided that any event, change, development, circumstance, fact or effect underlying such failure may be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur;

(e)    any acts of war (whether or not declared), outbreak of hostilities, terrorism or military actions any weather event or natural disaster, earthquakes, volcanic activity, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural or man-made disasters and other force majeure event or any outbreak of a pandemic or disease outbreaks (including COVID-19), including any escalation or general worsening of any such events or occurrences or any action, Law, pronouncement or guideline taken or promulgated by any Governmental Entity in response to any of the foregoing);

(f)    (i) the taking of any action specifically required by, or the failure to take any action specifically prohibited by, this Agreement (excluding any such actions required to be taken or not taken pursuant to the first sentence of Sections 7.1(a)) or the other Transaction Documents or any actions taken or refrained from being taken by the Company or any of its Subsidiaries upon Parent's or the Guarantor's written approval or request;

(g)    the availability or cost of equity, debt or other financing to Parent or Merger Sub;

(h)    any Transaction Litigation;

(i)    any Effect resulting from the execution and delivery of this Agreement and the other Transaction Documents, the pendency or consummation of the Merger or the other transactions contemplated hereby or thereby or the public announcement of any of the foregoing, including the impact thereof on the relationships, contractual or otherwise, of the Company and its Subsidiaries with employees, suppliers, lessors, customers, partners, vendors, regulators, Governmental Entities, or any other third Person; provided, however, that this clause (i) shall not apply to any representation or warranty contained in this Agreement to the extent that such representation and warranty expressly relates to such Effect; or

-13-

(j)        a change in the market price or trading volume of the Shares on NASDAQ; <u>provided</u> that any event, change, development, circumstance, fact or effect underlying such change in the market price or trading volume may be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur; <u>provided further</u> that, with respect to clauses (a), (b), (c) and (e) of this definition, such events, changes, developments, circumstances, facts or effects (as the case may be) shall be taken into account in determining whether a "Material Adverse Effect" has occurred or would reasonably be expected to occur if they disproportionately affect the Company and its Subsidiaries (taken as a whole) relative to other companies of similar size operating in the industries in which the Company or any of its Subsidiaries operate, in which case, only such incremental disproportionate effect shall be taken into account.

"**Material Contract**" has the meaning set forth in Section 5.11(a)(xviii).

"**Merger**" has the meaning set forth in the Recitals.

"**Merger Sub**" has the meaning set forth in the Preamble.

"**Multiemployer Plans**" means "multiemployer plans" as defined by Section 3(37) of ERISA.

"**NASDAQ**" means the Nasdaq Global Select Market.

"**Non-Recourse Parties**" has the meaning set forth in Section 10.14(a).

"**Non-U.S. Company Benefit Plan**" means a Company Benefit Plan that is maintained primarily for the benefit of current or former Company Employees outside of the United States.

"**Non-Wholly Owned Subsidiary**" has the meaning set forth in Section 5.2(d).

"**Notice Period**" has the meaning set forth in Section 7.2(d)(iii).

"**Open Source Software**" means any software that is licensed or otherwise provided under any license identified as an open source license by the Open Source Initiative (www.opensource.org), including any software that is licensed or otherwise provided under any version of the following licenses: the GNU General Public License, GNU Lesser General Public License, GNU Affero General Public License, Apache License, Mozilla Public License, BSD License, MIT License, Common Public License, the Artistic License, the Eclipse Public License, the Netscape Public License, the Open Software License, the Sleepycat License, or the Common Development and Distribution License.

"**Order**" means any order, award, judgment, injunction, writ, decree (including any consent decree or similar agreed order or judgment), directive, settlement, stipulation, ruling, determination, charge, required undertaking, corrective action plan, decision or verdict, whether civil, criminal or administrative, in each case, that is imposed, entered, issued, made or rendered by any Governmental Entity.

-14-

"**<u>Ordinary Course of Business</u>**" means, with respect to any Person, the conduct that is consistent in nature, scope and magnitude with the past practices of such Person.

"**<u>Organizational Documents</u>**" means (a) with respect to any Person that is a corporation, its certificate of incorporation and bylaws, or comparable documents, (b) with respect to any Person that is a partnership, its certificate of partnership and partnership agreement, or comparable documents, (c) with respect to any Person that is a limited liability company, its certificate of formation and limited liability company agreement, or comparable documents, (d) with respect to any Person that is a trust, its declaration of trust, or comparable documents and (e) with respect to any other Person that is not an individual, its comparable organizational documents.

"**<u>Original Date</u>**" has the meaning set forth in Section 7.3(b).

"**<u>Other Anti-Bribery Laws</u>**" means, other than the FCPA, all applicable anti-bribery, anti-corruption, anti-money-laundering and similar Laws in jurisdictions in which the Company or any of its Subsidiaries do business, have done business, in which any Person associated with or acting on behalf of the Company or any of its Subsidiaries is conducting or has conducted business involving the Company or any of its Subsidiaries or the Company or any of its Subsidiaries are otherwise subject.

"**<u>Outside Date</u>**" has the meaning set forth in Section 9.2(a).

"**<u>Owned Real Property</u>**" means all land, together with all buildings, structures, improvements and fixtures located thereon, and all easements and other rights and interests appurtenant thereto, owned by the Company or any of its Subsidiaries.

"**<u>Parent</u>**" has the meaning set forth in the Preamble.

"**<u>Parent Approvals</u>**" has the meaning set forth in Section 6.4(a).

"**<u>Parent Benefit Plan</u>**" means any benefit or compensation plan, program, policy, practice, Contract or other obligation, whether or not in writing and whether or not funded, in each case, which is sponsored or maintained by, or required to be contributed to, or with respect to which any potential obligation or liability is borne by, Parent or any of its Subsidiaries, including ERISA Plans, employment, consulting, retirement, severance, termination or "change of control" agreements, deferred compensation, equity-based, incentive, bonus, supplemental retirement, profit sharing, insurance, medical, welfare, fringe or other material benefits or material remuneration of any kind.

"**<u>Parent Disclosure Schedule</u>**" has the meaning set forth in Article VI.

"**<u>Parent Recovery Costs</u>**" has the meaning set forth in Section 9.5(e).

-15-

"**Parties**" has the meaning set forth in the Preamble.

"**Paying Agent**" means the paying agent selected by Parent and approved in advance by the Company in writing prior to the Effective Time.

"**Paying Agent Agreement**" means the Contract pursuant to which Parent shall appoint the Paying Agent, which shall be in form and substance reasonably acceptable to the Company.

"**Per Share Merger Consideration**" means $30 per Share in cash, without interest.

"**Permitted Confidentiality Agreement**" has the meaning set forth in Section 7.2(b)(ii).

"**Permitted Encumbrances**" means: (a) Encumbrances for current Taxes or other governmental charges not yet due and payable or, if due and payable, that the Person subject to such Taxes or other governmental charges is contesting in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP; (b) mechanics', carriers', workmen's, repairmen's, landlords' or other like Encumbrances arising or incurred in the Ordinary Course of Business that relate to obligations (x) that are not yet due and payable or, if due, are not delinquent or (y) as to which the validity or amount of which is being contested in good faith by appropriate proceedings, for which adequate reserves have been established in accordance with, and to the extent required by, GAAP and which are not, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole; (c) other Encumbrances that would be shown by a current title report or other similar report, each to the extent such Encumbrance does not, individually or in the aggregate, materially impair the continued use, operation or value of the specific parcel of Real Property to which they relate or the conduct of the business of the Company and its Subsidiaries as currently conducted; (d) pledges or deposits in connection with workers' compensation, unemployment insurance, and other social security legislation, (e) Encumbrances relating to intercompany borrowings among a Person and its wholly owned subsidiaries, (f) Encumbrances securing the Existing Indebtedness, (g) "Permitted Encumbrances" as defined in the ABL Credit Agreement, (h) precautionary UCC financing statements (including any assignments), including any filed in respect of any Existing Indebtedness or any other obligation and similar filings made in respect of consignment arrangements or other similar agreements and (i) licenses or other rights granted to Company Intellectual Property in the Ordinary Course of Business.

"**Person**" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity or other entity of any kind or nature.

"**Personal Information**" means any information defined as "personal data", "personally identifiable information", "personal information" or other similar term under any Laws relating to privacy or data security or the Company's or its Subsidiaries' public policies or public statements relating to privacy or data security.

-16-

"**Preferred Shares**" means any shares of the Company's preferred stock, par value $0.01 per share.

"**Privacy Requirements**" means (a) any Laws relating to privacy or data security, (b) any Contracts or other written commitments of the Company and its Subsidiaries relating to privacy or data security, and (c) any public statements or policies adopted by the Company or its Subsidiaries relating to privacy or data security.

"**Proceeding**" means any action, cause of action, claim, demand, litigation, suit, investigation by a Governmental Entity, review, grievance, citation, summons, subpoena, inquiry, audit, hearing, originating application to a tribunal, arbitration or other similar proceeding of any nature, civil, criminal, regulatory, administrative or otherwise, whether in equity or at law, in contract, in tort or otherwise.

"**Prohibited Modifications**" has the meaning set forth in Section 7.12(d).

"**Proxy Statement**" has the meaning set forth in Section 7.5(a)(i).

"**Real Property**" means the Owned Real Property and Leased Real Property.

"**Registered**" means registered with, issued by, renewed by or the subject of a pending application before any Governmental Entity or Internet domain name registrar.

"**Representative**" means, with respect to any Person, any director, principal, partner, manager, member (if such Person is a member-managed limited liability company or similar entity), employee (including any officer), consultant, investment banker, financial advisor, legal counsel, attorney-in-fact, accountant or other advisor, agent or other representative of such Person, in each case acting in their capacity as such.

"**Requisite Company Vote**" means the approval and adoption of this Agreement by (a) the holders of a majority of the outstanding Shares entitled to vote on such matter and (b) the holders of a majority of the outstanding Shares (other than Shares held by the Rolling Stockholders and their respective Affiliates) entitled to vote on such matter, in each case, at a stockholders' meeting duly called and held for such purpose.

"**Reverse Termination Fee**" means an amount equal to $55,000,000.

"**Rolling Stockholders**" has the meaning set forth in the Recitals.

"**Rollover Agreement**" has the meaning set forth in the Recitals.

"**Rollover Shares**" has the meaning set forth in the Recitals.

"**Sarbanes-Oxley Act**" means the Sarbanes-Oxley Act of 2002.

"**Schedule 13E-3**" has the meaning set forth in Section 7.5(a)(i).

"**SEC**" means the U.S. Securities and Exchange Commission.

-17-

"**Securities Act**" means the Securities Act of 1933.

"**Series A Preferred Shares**" means shares of the Company's 7.50% Series A Cumulative Perpetual Preferred Stock, par value $0.01 per share.

"**Share**" means any share of the common stock of the Company, par value $0.01 per share.

"**Significant Subsidiaries**" means the "significant subsidiaries" (as defined in Rule 1-02(w) of Regulation S-X) of the Company.

"**Special Committee**" has the meaning set forth in the Recitals.

"**Special Committee Recommendation**" has the meaning set forth in the Recitals.

"**Specified Person**" means BK and Andrew Laurence.

"**Stock Plans**" means, collectively, the JTH Holding, Inc. 2011 Equity and Cash Incentive Plan and the Franchise Group, Inc. 2019 Omnibus Incentive Plan.

"**Subsidiary**" means, with respect to any Person, any other Person of which at least a majority of (a) the securities or ownership interests of such other Person having by their terms ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions or (b) the equity or ownership interests of such other Person, in each case is directly or indirectly owned or controlled by such first Person and/or by one or more of its Subsidiaries.

"**Substantial Detriment**" has the meaning set forth in Section 7.5(b)(ii)(E).

"**Superior Proposal**" means a *bona fide* written Acquisition Proposal made after the date of this Agreement made by a Third Person (with references to twenty percent being deemed to be replaced with references to fifty percent) that the Special Committee determines in good faith, after consultation with its outside legal counsel and independent financial advisor and after taking into account such legal, financial, regulatory, likelihood of consummation and other aspects of such proposal, as the Special Committee deems relevant, to be more favorable to the Company's stockholders (other than the Rolling Stockholders and their Affiliates) from a financial point of view than the Merger (after taking into account any revisions to the terms and conditions of this Agreement proposed by Parent pursuant to Section 7.2(d)(iii).

"**Surviving Corporation**" has the meaning set forth in Section 2.3.

"**Tail Period**" means the six years from and after the Effective Time.

"**Takeover Statute**" means any "fair price," "moratorium," "control share acquisition" or other similar anti-takeover statute or regulation or Law that limits or restricts business combinations or the ability to acquire or vote shares.

-18-

"**Tax Returns**" means all returns and reports (including elections, declarations, disclosures, schedules, estimates, information returns and other documents and attachments thereto) relating to Taxes or the administration of any Laws relating to Taxes, including, for the avoidance of doubt, any amendments or supplements thereof, filed or supplied or required to be filed or supplied to any Taxing Authority.

"**Taxes**" means all income, profits, franchise, transfer, net income, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, escheat and unclaimed property obligations, value added, *ad valorem,* occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions, in each case imposed by any Governmental Entity having competent jurisdiction over the assessment, determination, collection or imposition of any such taxes, duties and assessments (such a Governmental Entity, a "**Taxing Authority**").

"**Taxing Authority**" has the meaning set forth in the definition of "Taxes."

"**Termination Fee**" means an amount equal to $20,720,000; provided, that if the Acquisition Proposal that ultimately resulted in a termination by the Company pursuant to Section 9.3(b) or by Parent pursuant to Section 9.4(b) was first received by the Company from an Excluded Party following the date of this Agreement and prior to the No-Shop Period Start Date, the Termination Fee payable pursuant to Section 9.5(c)(iii) shall instead be $10,350,000.

"**Third-Party Consents**" has the meaning set forth in Section 7.7.

"**Third Person**" means any Person or Group, other than the Rolling Stockholders, Guarantor Parties, Parent, Merger Sub, or any their respective its Subsidiaries or any Group that includes Rolling Stockholders, Guarantor Parties, Parent, Merger Sub, or any their respective its Subsidiaries.

"**Top Customer**" has the meaning set forth in Section 5.12(a)(i).

"**Top Supplier**" has the meaning set forth in Section 5.12(b)(i).

"**TopCo**" has the meaning set forth in the Recitals.

"**Trade Secrets**" has the meaning set forth in the definition of "Intellectual Property."

"**Trademarks**" has the meaning set forth in the definition of "Intellectual Property."

"**Transaction Documents**" has the meaning set forth in Section 10.11(a).

"**Transaction Litigation**" has the meaning set forth in Section 7.15.

-19-

"**Transfer Taxes**" means all transfer, documentary, sales, use, stamp, recording, value added, registration and other similar Taxes and fees.

"**Voting Agreement**" has the meaning set forth in the Recitals.

"**Wholly Owned Subsidiary**" means, with respect to any Person, any Subsidiary of such Person of which all of the equity or ownership interests of such Subsidiary are directly or indirectly owned or controlled by such Person.

"**Willful and Material Breach**" means a material breach of any representation, warranty, covenant or agreement set forth in this Agreement that is a consequence of an act or failure to act by a Party with the actual knowledge that the taking of such act or failure to act would cause, or would reasonably be expected to result in, such material breach.

1.2.    <u>Other Terms</u>. Each of the capitalized terms used in this Agreement and not defined in Section 1.1 has the meaning set forth where such term is first used or, if no meaning is set forth, the meaning required by the context in which such term is used.

1.3.    <u>Interpretation and Construction</u>.

(a)    The table of contents and headings in this Agreement are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions of this Agreement.

(b)    Unless otherwise specified in this Agreement or the context otherwise requires:

(i)    all Preamble, Recital, Article, Section, clause, Exhibit and Schedule references used in this Agreement are to the preamble, recitals, articles, sections, clauses exhibits and schedules to this Agreement and references to Schedules include the Company Disclosure Schedule and the Parent Disclosure Schedule;

(ii)    if a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb);

(iii)    the terms defined in the singular shall have a comparable meaning when used in the plural and *vice versa*;

(iv)    words importing the masculine gender shall include the feminine and neutral genders and *vice versa*;

(v)    whenever the words "includes" or "including" are used, they shall be deemed to be followed by the words "without limitation";

(vi)    the words "hereto," "hereof," "hereby," "herein," "hereunder" and similar terms shall refer to this Agreement as a whole and not any particular provision of this Agreement;

-20-

(vii)     the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends and such phrase shall not mean simply "if";

(viii)     all accounting terms not expressly defined in this Agreement shall have the meanings given to them under GAAP;

(ix)     whenever the word "transfer" is used, it shall be deemed to be followed by the words "including, if applicable, pursuant to the division of a limited liability company, limited partnership or other entity";

(x)     references to the "United States" or abbreviations thereof mean the United States of America and its states, territories and possessions;

(xi)     the rule known as the *ejusdem generi*s rule shall not apply, and accordingly, general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things;

(xii)     the term "dollars" and the symbol "$" mean U.S. Dollars and all amounts in this Agreement shall be paid in U.S. Dollars, and if any amounts, costs, fees or expenses incurred by any Party pursuant to this Agreement are denominated in a currency other than U.S. Dollars, to the extent applicable, the U.S. Dollar equivalent for such costs, fees and expenses shall be determined by converting such other currency to U.S. Dollars at the foreign exchange rates published in the *Wall Street Journal* or, if not reported thereby, another authoritative source reasonably determined by Parent, in effect at the time such amount, cost, fee or expense is incurred, and if the resulting conversion yields a number that extends beyond two decimal points, rounded to the nearest penny;

(xiii)     references to information or documents having been "made available" (or words of similar import) by or on behalf of one or more Parties to another Party or Parties such obligation shall be deemed satisfied if (x) one or more Parties or Representatives thereof made such information or document available in any virtual data rooms established by or on behalf of (I) the Company and accessible by any Specified Persons, Parent or its Representatives or (II) Parent and accessible by the Company and its Representatives, as applicable, in each case in connection with the transactions contemplated by this Agreement prior to the date of this Agreement or (y) information or document is disclosed in the Company Reports filed or furnished on or after the Applicable Date and prior to the date of this Agreement;

(xiv)     when calculating the period of time within which, or following which, any action is to be taken pursuant to this Agreement, the date that is the reference day in calculating such period shall be excluded and if the last day of the period is a non-Business Day, the period in question shall end on the next Business Day or if any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day and references to a number of days shall refer to calendar days unless Business Days are specified;

-21-

(xv)    all references to any (A) statute include the rules and regulations promulgated thereunder and all applicable, guidance, guidelines, bulletins or policies issued or made in connection therewith by a Governmental Entity and (B) Law shall be a reference to such Law as amended, re-enacted, consolidated or replaced as of the applicable date or during the applicable period of time; and

(xvi)    all references to (A) any Contract, other agreement, document or instrument (excluding this Agreement) mean such Contract, other agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof and, unless otherwise specified therein, include all schedules, annexes, addendums, exhibits and any other documents attached thereto or incorporated therein by reference and (B) this Agreement mean this Agreement, as amended or otherwise modified from time to time in accordance with Section 10.5.

(c)    The Company Disclosure Schedule and the Parent Disclosure Schedule may include items and information the disclosure of which is not required either in response to an express disclosure requirement of this Agreement or as an exception to one or more provisions set forth in this Agreement. Inclusion of any such items or information in the Company Disclosure Schedule or the Parent Disclosure Schedule shall not be deemed to be an acknowledgement or agreement that any such item or information (or any non-disclosed item or information of comparable or greater significance) is "material" or that, individually or in the aggregate, it has had or would reasonably be expected to result in a Material Adverse Effect.

(d)    The Parties have jointly negotiated and drafted this Agreement and if an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

ARTICLE II

Closing; Certificate of Merger and Effective Time; The Merger

2.1.    Closing. The Closing shall take place at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, at 8:00 a.m. (New York time) or by electronic exchange of deliverables and release of signatures for the purpose of confirming the satisfaction or waiver, as the case may be, on the fifth Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of the conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted by applicable Law, waiver of those conditions) or at such other date, time and place (or by means of remote communication) as the Parties may agree in writing.

2.2.    Certificate of Merger and Effective Time. As promptly as practicable following the Closing, but on the Closing Date, the Parties shall (a) cause the Certificate of Merger to be duly executed and filed with the Secretary of State of the State of Delaware as provided in Section 251 of the DGCL and (b) deliver and tender, or cause to be delivered or tendered, as applicable, any Taxes and fees and make all other filings or recordings required under the DGCL in connection with such filing of the Certificate of Merger and the Merger, which shall become effective at the date and time when the Certificate of Merger has been executed and filed pursuant to clause (a) of this Section 2.2, or at such later date and time as may be agreed by the Parties in writing and specified in the Certificate of Merger so executed and filed (such date and time, as applicable, the "**Effective Time**").

-22-

2.3.    <u>The Merger</u>. Subject to the terms and conditions of this Agreement and pursuant to the applicable provisions of the DGCL, (a) at the Effective Time, Merger Sub shall be merged with and into the Company and the separate corporate existence of Merger Sub shall thereupon cease, (b) the Company shall be the surviving corporation in the Merger (sometimes referred to as the "**Surviving Corporation**") and, from and after the Effective Time, shall be a Wholly Owned Subsidiary of Parent and the separate corporate existence of the Company shall continue unaffected by the Merger, and (c) the Merger shall have such other applicable effects as set forth in this Agreement and in the applicable provisions of the DGCL.

ARTICLE III

<u>Certificate of Incorporation, Bylaws, Directors and Officers of the Surviving Corporation</u>

3.1.    <u>Certificate of Incorporation of the Surviving Corporation</u>. At the Effective Time, subject to Section 7.11, the certificate of incorporation of the Surviving Corporation (the "**Charter**") shall be amended and restated in its entirety to read substantially as set forth in Exhibit A, until thereafter duly amended, restated or amended and restated as provided therein and/or by applicable Law.

3.2.    <u>Bylaws of the Surviving Corporation</u>. Subject to Section 7.11, the bylaws of the Merger Sub in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation (the "**Bylaws**"), except that references to Merger Sub's name shall be replaced with references to the Surviving Corporation's name, until thereafter amended, restated or amended and restated as provided therein, the Charter and/or by applicable Law.

3.3.    <u>Directors of the Surviving Corporation</u>. The board of directors of Merger Sub immediately prior to the Effective Time shall, from and after the Effective Time, be the directors of the Surviving Corporation, each to hold office until his or her or their successor has been duly elected or appointed and qualified or until his or her or their earlier death, resignation or removal pursuant to the Charter, the Bylaws and/or applicable Law.

3.4.    <u>Officers of the Surviving Corporation</u>. The officers of the Company immediately prior to the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Corporation, each to hold office until his or her or their successor has been duly elected or appointed and qualified or until his or her or their earlier death, resignation or removal pursuant to the Charter, the Bylaws and/or applicable Law.

-23-

ARTICLE IV

Effect of the Merger on Capital Stock; Delivery of Merger Consideration

4.1.    Effect of the Merger on Capital Stock. By virtue of the Merger and without any action on the part of the holder of any capital stock of the Company or on the part of the sole stockholder of Merger Sub:

(a)    Merger Consideration. At the Effective Time, each Share (other than Excluded Shares) issued and outstanding immediately prior to the Effective Time shall be converted into the right to receive the Per Share Merger Consideration, and shall cease to be outstanding, shall be cancelled and shall cease to exist, and each Certificate representing one or more of such Share(s), and each Book-Entry Share representing one or more of such Share(s), shall thereafter only represent the right to receive the Per Share Merger Consideration, payable pursuant to Section 4.2.

(b)    Series A Preferred Shares. At the Effective Time, each Series A Preferred Share issued and outstanding immediately prior to the Effective Time shall remain outstanding, subject to the following sentence, Section 7.18 and the terms and conditions of that certain Certificate of Designation of 7.50% Series A Cumulative Perpetual Preferred Stock of the Company, dated as of September 18, 2020 (the "**Certificate of Designation**"). Each Series A Preferred Share issued and outstanding immediately prior to the Effective Time shall, at the election of the holder of such Series A Preferred Share in accordance with the Certificate of Designation, convert into the Alternative Conversion Consideration (as defined in the Certificate of Designation) on the Change of Control Conversion Date (as defined in the Certificate of Designation) unless, on or prior to the Change of Control Conversion Date, the Company, solely in accordance with Section 7.18, has provided or provides notice of its election to redeem such Series A Preferred Share pursuant to the terms and conditions of the Certificate of Designation. In the event that the Company provides a notice of election to redeem such Series A Preferred Shares in accordance with Section 7.18, then each holder of such Series A Preferred Shares shall (i) be entitled to receive the redemption value provided in the Certificate of Designation and (ii) forfeit such holder's Change of Control Conversion Right (as defined in the Certificate of Designation). Notwithstanding anything in this Agreement to the contrary, any (i) election by the holders of Series A Preferred Shares to convert into the Alternative Conversion Consideration pursuant to this Section 4.1(b) must be made in accordance with the terms of Section 8(c) of the Certificate of Designation and (ii) election by the Company to redeem the Series A Preferred Shares pursuant to this Section 4.1(b) must be made in accordance with the terms of Section 6(a) of the Certificate of Designation and shall only be made by the Company to the extent so directed by Parent pursuant to Section 7.18.

(c)    Treatment of Excluded Shares. At the Effective Time, each Excluded Share shall cease to be outstanding, shall be cancelled without payment of any consideration therefor and shall cease to exist, subject to any rights any Dissenting Stockholders may have pursuant to Section 4.2(f) with respect to any Excluded Shares that are Dissenting Shares, provided that any Excluded Shares that are Rollover Shares shall be treated in the manner specified in the Rollover Agreement and clause (d) immediately below.

-24-

(d) <u>Rollover Shares</u>. For the avoidance of doubt, the Rollover Shares shall not be entitled to receive the Per Share Merger Consideration and shall, immediately prior to the Effective Time, be contributed (or otherwise transferred), directly or indirectly, to TopCo (or an Issuing Entity) pursuant to the terms of the Rollover Agreement.

(e) <u>Merger Sub</u>. At the Effective Time, each share of common stock of Merger Sub, par value $0.0001 per share, issued and outstanding immediately prior to the Effective Time shall be converted into one share of common stock of the Surviving Corporation, par value $0.0001 per share, and shall, together with any outstanding Series A Preferred Shares that are not redeemed pursuant to Section 7.18 or converted into Alternative Conversion Consideration, constitute the only outstanding shares of capital stock of the Surviving Corporation as of immediately after the Effective Time.

4.2. <u>Delivery of Merger Consideration</u>.

(a) <u>Deposit of Merger Consideration and Paying Agent</u>. At or prior to the Closing, Parent shall deposit, or cause to be deposited, with the Paying Agent, an amount in cash in immediately available funds sufficient in the aggregate to provide all funds necessary for the Paying Agent to make payments in respect of the Shares pursuant to Section 4.1(a) (such cash, the "**Exchange Fund**"). Pursuant to the Paying Agent Agreement, the Paying Agent shall, among other things, (A) act as the paying agent for the payment and delivery of the Per Share Merger Consideration pursuant to the terms and conditions of this Agreement, and (B) invest the Exchange Fund, if and as directed by Parent; <u>provided</u>, <u>however</u>, that any investment shall be in obligations of or guaranteed as to principal and interest by the U.S. government or any agency or instrumentality thereof and backed by the full faith and credit of the U.S. government or such agency or instrumentality thereof in commercial paper obligations rated A-1 or P-1 or better by Moody's Investors Service, Inc. or Standard & Poor's Financial Services, LLC, respectively, in certificates of deposit, bank repurchase agreements or banker's acceptances of commercial banks with capital exceeding $10 billion (based on the most recent financial statements of such bank that are then publicly available), or in money market funds having a rating in the highest investment category granted by a nationally recognized credit rating agency at the time of acquisition or a combination of the foregoing and, in any such case, no such instrument shall have a maturity exceeding three months. To the extent that there are losses with respect to such investments, or the Exchange Fund diminishes for other reasons below the level sufficient to make prompt payment and delivery of the aggregate Per Share Merger Consideration as contemplated by Section 4.1(a), or to the extent the Exchange Fund is not sufficient to make prompt payment and delivery of the aggregate Per Share Merger Consideration in respect of any Dissenting Shares that become Shares entitled to receive the Per Share Merger Consideration pursuant to the last sentence of Section 4.2(f), Parent shall or shall cause the Surviving Corporation to promptly, but in any event within five Business Days, deposit or cause to be deposited such additional amounts in cash in immediately available funds with the Paying Agent for the Exchange Fund so as to ensure that the Exchange Fund is maintained at a level sufficient to make such cash payments. Any interest and other income resulting from such investment (if any) in excess of the amounts payable pursuant to Section 4.2(b) shall be promptly returned to Parent or the Surviving Corporation, as determined by Parent in accordance with the terms and conditions of the Paying Agent Agreement. The Exchange Fund shall not be used for any purposes other than the payment of holders of Shares as contemplated herein.

-25-

(b)     Procedures for Surrender.

(i)     As promptly as practicable after the Effective Time (but in any event within three Business Days thereafter), Parent shall cause the Paying Agent to mail or otherwise provide each holder of record of Shares entitled to receive the Per Share Merger Consideration that are (A) Certificates or (B) Book-Entry Shares not held, directly or indirectly, through DTC notice advising such holders of the effectiveness of the Merger, which notice shall include (1) appropriate transmittal materials (including a customary letter of transmittal) specifying that delivery shall be effected, and risk of loss and title to the Certificates or such Book-Entry Shares shall pass only upon delivery of the Certificates (or affidavits of loss in lieu of the Certificates, as provided in Section 4.2(e)) or the surrender of such Book-Entry Shares to the Paying Agent (which shall be deemed to have been effected upon the delivery of a customary "agent's message" with respect to such Book-Entry Shares or such other reasonable evidence, if any, of such surrender as the Paying Agent may reasonably request pursuant to the terms and conditions of the Paying Agent Agreement), as applicable, and (2) instructions for effecting the surrender of the Certificates (or affidavits of loss in lieu of the Certificates, as provided in Section 4.2(e)) or such Book-Entry Shares to the Paying Agent in exchange for the Per Share Merger Consideration that such holder is entitled to receive as a result of the Merger pursuant to this Article IV.

(ii)     With respect to Book-Entry Shares held, directly or indirectly, through DTC, Parent and the Company shall cooperate to establish procedures with the Paying Agent, DTC, DTC's nominees and such other necessary or desirable third-party intermediaries to ensure that the Paying Agent shall transmit to DTC or its nominees as promptly as practicable after the Effective Time, but in any event within two Business Days after the Closing Date, upon surrender of Shares held of record by DTC or its nominees in accordance with DTC's customary surrender procedures and such other procedures as agreed by Parent, the Company, the Paying Agent, DTC, DTC's nominees and such other necessary or desirable third-party intermediaries, an amount in cash, in immediately available funds, equal to the Per Share Merger Consideration to which the beneficial owners thereof are entitled to receive as a result of the Merger pursuant to this Article IV.

(iii)     Upon surrender to the Paying Agent of Shares that (A) are Certificates, by physical surrender of such Certificates (or affidavits of loss in lieu of the Certificates, as provided in Section 4.2(e)) together with the letter of transmittal, duly completed and executed, and such other documents as may be reasonably required by the Paying Agent, (B) are Book-Entry Shares not held through DTC, by book-receipt of an "agent's message" by the Paying Agent in connection with the surrender of Book-Entry Shares (or such other reasonable evidence, if any, of surrender with respect to such Book-Entry Shares, as the Paying Agent may reasonably request pursuant to the terms and conditions of the Paying Agent Agreement), in each case of the foregoing clauses (A) and (B) of this Section 4.2(b)(iii), pursuant to such materials and instructions contemplated by Section 4.2(b)(i), and (C) are Book-Entry Shares held, directly or indirectly, through DTC, in accordance with DTC's customary surrender procedures and such other procedures as agreed by the Company, Parent, the Paying Agent, DTC, DTC's nominees and such other necessary or desirable third-party intermediaries pursuant to Section 4.2(a), the holder of such Certificate or Book-Entry Share shall be entitled to receive in exchange therefor, and Parent shall cause the Paying Agent to pay and deliver, out of the Exchange Fund, as promptly as practicable to such holders, an amount in cash in immediately available funds (after giving effect to any required Tax withholdings as provided in Section 4.2(h)) equal to the product obtained by *multiplying* (1) the number of Shares represented by such Certificates (or affidavits of loss in lieu of the Certificates, as provided in Section 4.2(e)) or such Book-Entry Shares by (2) the Per Share Merger Consideration, and each Certificate so surrendered shall forthwith be cancelled.

-26-

(iv)     In the event of a transfer of ownership of any Certificate that is not registered in the stock transfer books or ledger of the Company or if the consideration payable is to be paid in a name other than that in which the Certificate or Certificates surrendered or transferred in exchange therefor are registered in the stock transfer books or ledger of the Company, a check for any cash to be exchanged upon due surrender of any such Certificate or Certificates may be issued by the Paying Agent to such a transferee if the Certificate or Certificates is or are (as applicable) properly endorsed and otherwise in proper form for surrender and presented to the Paying Agent, accompanied by all documents required to evidence and effect such transfer and the Person requesting such payment has paid any Transfer Taxes required by reason of the payment of the Per Share Merger Consideration to a Person other than the registered holder of such Certificate or Certificates, or established that any applicable Transfer Taxes have been paid or are not applicable, in each case, in form and substance, reasonably satisfactory to Parent and the Paying Agent. Payment of the Per Share Merger Consideration with respect to Book-Entry Shares shall only be made to the Person in whose name such Book-Entry Shares are registered in the stock transfer books or ledger of the Company. None of Parent, Merger Sub or the Surviving Corporation shall have any liability for any such Transfer Taxes in the circumstances described in this Section 4.2(b).

(v)     For the avoidance of doubt, no interest shall be paid or accrued for the benefit of any holder of Shares on any amount payable upon the surrender of any Shares.

(c)     <u>Transfers</u>. All Per Share Merger Consideration paid upon surrender of a Certificate or Book-Entry Share in accordance with the terms of this Article IV shall be deemed to have been paid in full satisfaction of all rights pertaining to such Shares formerly represented by such Certificates or Book-Entry Shares. From and after the Effective Time, there shall be no transfers on the stock transfer books or ledger of the Company of the Shares. If, after the Effective Time, any Certificate or acceptable evidence of a Book-Entry Share is presented to the Surviving Corporation, Parent or the Paying Agent for transfer, it shall be cancelled and exchanged for the cash amount in immediately available funds to which the holder thereof is entitled to receive as a result of the Merger pursuant to this Article IV.

(d)     <u>Termination of Exchange Fund</u>.

(i)     Any portion of the Exchange Fund (including any interest and other income resulting from any investments thereof (if any)) that remains unclaimed by the holders of Shares for twelve months from and after the Closing Date shall be delivered to Parent or the Surviving Corporation, as determined by Parent. Any holder of Shares who has not theretofore complied with the procedures, materials and instructions contemplated by this Section 4.2 shall thereafter look only to Parent or the Surviving Corporation as a general creditor thereof for such payments (after giving effect to any required Tax withholdings as provided in Section 4.2(h) and Sections 4.3(a) through 4.3(d), as applicable) in respect thereof.

-27-

      (ii)    Notwithstanding anything to the contrary set forth in this Article IV, none of the Surviving Corporation, Parent, the Paying Agent or any other Person shall be liable to any former holder of Shares or Company Equity Awards for any amount properly delivered to a public official pursuant to applicable abandoned property, escheat or similar Laws. If any Shares shall not have been surrendered prior to two years after the Effective Time (or immediately prior to such earlier date on which any Per Share Merger Consideration would otherwise escheat to or become the property of any Governmental Entity), any Per Share Merger Consideration payable in accordance with this Article IV shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

      (e)    <u>Lost, Stolen or Destroyed Certificates</u>. In the event any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit, in a form and substance reasonably acceptable to Parent, of such fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent and/or the Paying Agent pursuant to the Paying Agent Agreement or otherwise, the posting by such Person of a bond in customary amount and upon such terms as may be required by Parent and/or the Paying Agent pursuant to the Paying Agent Agreement or otherwise as indemnity against any claim that may be made against it or the Surviving Corporation with respect to such Certificate, the Paying Agent shall, in exchange for such Certificate, issue a check in the amount (after giving effect to any required Tax withholdings as provided in Section 4.2(h)) equal to the product obtained by *multiplying* (i) the number of Shares represented by such lost, stolen or destroyed Certificate by (ii) Per Share Merger Consideration.

      (f)    <u>Appraisal Rights</u>. Subject to the last sentence of this Section 4.2(f), no Dissenting Stockholder shall be entitled to receive the Per Share Merger Consideration with respect to the Dissenting Shares owned by such Dissenting Stockholder and each Dissenting Stockholder shall be entitled to receive only the payment provided by Section 262 of the DGCL with respect to the Dissenting Shares owned by such Dissenting Stockholder and, at the Effective Time, such Dissenting Stockholder shall cease to have any other rights with respect to such Dissenting Shares, except the rights provided in Section 262 of the DGCL. The Company shall give Parent (i) prompt written notice and copies of any written demands for appraisal, actual, attempted or purported withdrawals of such demands, and any other instruments served pursuant to (or purportedly pursuant to) applicable Law that are received by the Company, its Subsidiaries or their respective Representatives relating to the Company's stockholders' demands of appraisal or any alleged dissenters' rights and (ii) a reasonable opportunity to direct all negotiations and Proceedings with respect to any demand for appraisal under the DGCL, including any determination to make any payment or deposit with respect to any of the Dissenting Stockholders with respect to any of their Dissenting Shares under Section 262(h) of the DGCL prior to the entry of judgment in the Proceedings regarding appraisal or entering into any Contracts with any such Dissenting Stockholders relating thereto. The Company shall not, except with the prior written consent of Parent voluntarily make any payment or deposit with respect to any demands for appraisals, offer to settle or settle any such demands or approve any withdrawal of any such demands, or agree, authorize or commit to do any of the foregoing. If any Dissenting Stockholder shall have effectively withdrawn or otherwise waived or lost the right under Section 262 of the DGCL with respect to any Dissenting Shares, such Dissenting Shares shall become eligible to receive the transaction consideration pursuant to Section 4.1.

-28-

     (g)    <u>Payment in Respect of Series A Preferred Shares that are Converted</u>. Parent shall cause the Surviving Corporation to comply with the terms set forth in Section 8 of the Certificate of Designation in respect of the Series A Preferred Shares. If any Series A Preferred Shares are not redeemed pursuant to the Certificate of Designation and Section 7.18 and if any holder of Series A Preferred Shares elects to convert the same into Alternative Conversion Consideration, then Parent shall cause the Surviving Corporation to make the payments required by Section 8 of the Certificate of Designation in the amounts and at the times set forth therein.

     (h)    <u>Withholding Rights</u>. Each of Parent, the Surviving Corporation, the Company and the Paying Agent (and any of their respective Affiliates) shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Person such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any other applicable Tax Law. To the extent that amounts are so withheld, (i) such withheld amounts shall be remitted to the applicable Governmental Entity in accordance with applicable Law, and (ii) any such withheld amounts so remitted shall be treated for all purposes of this Agreement as having been paid to the Persons in respect of which such deduction and withholding was made. If Parent or the Surviving Corporation determines that it or any of its Affiliates, permitted successors or assigns is required to deduct or withhold any amount from any payment hereunder (other than any backup withholding under Section 3406 of the Code (or a similar provision of state, local or foreign Law) or any withholding in respect of Company equity awards covered by Section 4.3) or in connection with the transactions contemplated hereby, as applicable, it shall use commercially reasonable efforts to provide reasonable advance notice to the Company of the intent to deduct or withhold such amount and the basis for such deduction or withholding, and the Parties shall provide for a reasonable opportunity for forms or other documentation to be provided that would, and use commercially reasonable efforts to, mitigate, reduce or eliminate such deduction or withholding.

     4.3.    <u>Treatment of Equity Awards</u>.

     (a)    <u>Company Options</u>. At the Effective Time, (i) any vesting conditions applicable to any Company Option shall, automatically and without any required action on the part of the holder thereof, accelerate and be vested and exercisable in full, to the extent not vested previously, and (ii) each Company Option shall, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right by the holder of such Company Option to receive, without interest, as soon as reasonably practicable after the Effective Time (but in any event no later than five Business Days after the Effective Time) an amount in cash equal to the product obtained by *multiplying* (i) the number of Shares subject to such Company Option immediately prior to the Effective Time by (ii) the excess, if any, of (A) the Per Share Merger Consideration over (B) the exercise price per Share of such Company Option, *less* applicable Taxes required to be withheld with respect to such payment. For the avoidance of doubt, any Company Option which has an exercise price per Share that is greater than or equal to the Per Share Merger Consideration shall be cancelled at the Effective Time for no consideration, payment or right to consideration or payment.

-29-

(b)     <u>Company Restricted Stock Units</u>. Unless otherwise agreed between the holder of a Company RSU and the Company prior to the Effective Time, at the Effective Time, (i) any vesting conditions applicable to any Company RSU shall, automatically and without any required action on the part of the holder thereof, accelerate and be vested in full, to the extent not vested previously, and (ii) each Company RSU shall, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right by the holder of such Company RSU to receive, without interest, as soon as reasonably practicable after the Effective Time (but in any event no later than five Business Days after the Effective Time) an amount in cash equal to the product obtained by _multiplying_ (A) the number of Shares subject to such Company RSU immediately prior to the Effective Time by (B) Per Share Merger Consideration, _less_ applicable Taxes required to be withheld with respect to such payment; <u>provided</u> that with respect to any Company RSUs that constitute nonqualified deferred compensation subject to Section 409A of the Code and that are not permitted to be paid at the Effective Time without triggering a Tax or penalty under Section 409A of the Code, such payment shall be made at the earliest time permitted under the applicable Stock Plan and award agreement that will not trigger a Tax or penalty under Section 409A of the Code.

(c)     <u>Company Performance Stock Units</u>. Unless otherwise agreed between the holder of a Company PRSU and the Company prior to the Effective Time, at the Effective Time, (i) any service-based vesting conditions applicable to any Company PRSU shall, automatically and without any required action on the part of the holder thereof, accelerate and be vested in full, to the extent not vested previously, and any performance-based vesting conditions applicable to any Company PRSU shall, automatically and without any required action on the part of the holder thereof, accelerate and be vested at target performance, and (ii) each Company PRSU shall, automatically and without any action on the part of the holder thereof, be cancelled and converted into the right by the holder of such Company PRSU to receive, without interest, as soon as reasonably practicable (but in any event no later than five Business Days after the Effective Time) an amount in cash equal to the product obtained by _multiplying_ (A) the number of Shares subject to such vested Company PRSU immediately prior to the Effective Time by (B) the Per Share Merger Consideration, _less_ applicable Taxes required to be withheld with respect to such payment; <u>provided</u> that, with respect to any Company PRSUs that constitute nonqualified deferred compensation subject to Section 409A of the Code and that are not permitted to be paid at the Effective Time without triggering a Tax or penalty under Section 409A of the Code, such payment shall be made at the earliest time permitted under the applicable Stock Plan and award agreement that will not trigger a Tax or penalty under Section 409A of the Code.

(d)     <u>Company Market-Based Restricted Stock Units</u>. At the Effective Time, each Company MPRSU shall, automatically and without any action on the part of the holder thereof, be cancelled for no consideration, payment or right to consideration or payment.

(e)     <u>Company Equity Payments</u>. As soon as reasonably practicable after the Effective Time (but no later than five Business Days after the Effective Time), the Surviving Corporation shall, through the payroll system of the Surviving Corporation, pay or cause to be paid to the holders of the Company Equity Awards, the amounts contemplated by Section 4.3(a), Section 4.3(b) and Section 4.3(c) respectively (collectively, prior to withholding of any applicable Taxes required to be withheld therefrom, the "**Company Equity Payments**"); <u>provided</u>, <u>however</u>, that to the extent the holder of a Company Equity Award did not receive the Company Equity Award in connection with the holder's status as a Company Employee, such amounts shall not be paid through the payroll system, but shall be paid by the Paying Agent pursuant to Section 4.2.

-30-

(f)      Company Actions. At or prior to the Effective Time, the Company, the Company Board and the Company Compensation Committee, as applicable, shall adopt any resolutions and take any actions that are necessary to (i) effectuate the treatment of the Company Equity Awards consistent with their intended treatment under Sections 4.3(a) through Section 4.3(f) and (ii) cause the Stock Plans to terminate at or prior to the Effective Time, including to the extent necessary the consent and/or waiver of the holder of the respective Company Equity Award.

4.4.      Adjustments to Prevent Dilution. Notwithstanding anything to the contrary set forth in this Agreement, if, from the execution and delivery of this Agreement to the earlier of the Effective Time and the termination of this Agreement pursuant to Article IX, the issued and outstanding Shares or securities convertible or exchangeable into or exercisable for Shares shall have been changed into a different number of Shares or securities or a different class by reason of any reclassification, stock split, stock dividend or distribution, recapitalization, merger, issuer tender or exchange offer, or other similar transaction, or a stock dividend with a record date within such period shall have been declared, then the Per Share Merger Consideration and any other amounts payable pursuant to this Agreement shall be equitably adjusted to provide the holders of Shares the same economic effect as contemplated by this Agreement prior to such event; provided, however, that nothing in this Section 4.4 shall be construed to permit the Company or any other Person to take any action except to the extent consistent with, and not otherwise limited or prohibited by, the terms and conditions of this Agreement.

ARTICLE V

Representations and Warranties of the Company

Except (a) as disclosed in the Company Reports filed or furnished by the Company on or after the Applicable Date and prior to the date of this Agreement (other than any disclosures contained or referenced therein under the captions "Risk Factors," "Forward-Looking Statements," or "Quantitative and Qualitative Disclosures About Market Risk" to the extent that they are predictive, cautionary or forward-looking in nature); or (b) as set forth in the corresponding sections of the confidential disclosure schedule delivered to Parent by the Company prior to the execution and delivery of this Agreement (the "**Company Disclosure Schedule**") (it being agreed that for the purposes of the representations and warranties made by the Company in this Agreement, disclosure of any item in any section of the Company Disclosure Schedule shall be deemed disclosure with respect to any other section to the extent the relevance of such item is reasonably apparent on its face from the face of such disclosure), the Company hereby represents and warrants to Parent and Merger Sub that:

-31-

5.1.    <u>Organization, Good Standing and Qualification</u>.

(a)    The Company and each of its Subsidiaries is a legal entity duly organized, validly existing and to the extent such concept is applicable, in good standing under the Laws of its respective jurisdiction of organization, except in the case of the Company's Subsidiaries, as would not have a Material Adverse Effect, or would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the Merger or perform any of its obligations under this Agreement by the Outside Date. The Company and each of its Subsidiaries has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as currently conducted, except where the failure to have such power or authority would not have a Material Adverse Effect or would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the Merger or perform any of its obligations under this Agreement by the Outside Date. The Company and each of its Subsidiaries is qualified to do business and, to the extent such concept is applicable, is in good standing as a foreign corporation or other legal entity in each jurisdiction where the ownership, leasing or operation of its properties or assets or conduct of its business requires such qualification, in each case, except as would not have a Material Adverse Effect.

(b)    The Company has made available to Parent correct and complete copies of the Company's and the Company's Significant Subsidiaries' Organizational Documents that, in each case, are in full force and effect as of the date of this Agreement.

5.2.    <u>Capital Structure</u>.

(a)    The authorized capital stock of the Company consists of 180,000,000 Shares and 20,000,000 Preferred Shares. As of the Capitalization Time: (i) 35,172,623 Shares were issued and outstanding, (ii) 4,541,125 Series A Preferred Shares were issued and outstanding, (iii) 0 Shares were issued and held by the Company in its treasury, (iv) (A) Company Options covering 216,376 Shares (with a weighted exercise price equal to $9.28), (B) Company RSUs covering 506,189 Shares, (C) Company PRSUs covering 454,093 Shares, assuming target performance, and (D) Company MPRSUs covering 803,426 Shares, and (v) no Shares were reserved for issuance other than 1,968,430 Shares reserved for issuance pursuant to the Stock Plans and 8,904,238 Shares reserved for issuance upon conversion of the Series A Preferred Shares. Since the Capitalization Time and through the date of this Agreement, no Stock Plan has been amended or otherwise modified and no Shares, Preferred Shares, or other securities of the Company or any of its Subsidiaries or securities convertible into or exercisable for Shares, Preferred Shares or such securities (including for the avoidance of doubt Company Equity Awards) have been repurchased or redeemed or issued (other than with respect to the exercise, vesting or settlement of Company Equity Awards outstanding prior to the Capitalization Time and pursuant to the terms of the applicable Stock Plan in effect on the Capitalization Time), and no Shares, Preferred Shares or other securities of the Company or any of its Subsidiaries have been reserved for issuance and no Company Equity Awards have been granted.

-32-

(b)        Neither the Company nor any of its Subsidiaries have outstanding any bonds, debentures, notes or other obligations, the holders of which have the right to vote (or convert into or exercise for securities having the right to vote) with the stockholders of the Company on any matter or with the equity holders of any of the Company's Subsidiaries on any matter, respectively, except for the Series A Preferred Shares.

(c)        The Shares and Series A Preferred Shares constitute the only outstanding classes of securities of the Company or its Subsidiaries registered under the Securities Act and no shares of capital stock of the Company are held by any Subsidiary of the Company.

(d)        Each Company Option (i) was validly issued and granted in compliance with all the terms and conditions of the Stock Plans pursuant to which it was issued, (ii) has an exercise or reference price per Share equal to or greater than the fair market value of a Share on the date of such grant, (iii) has a grant date identical to the date on which the Company Board or Company Compensation Committee actually awarded such Company Option, and (iv) does not trigger any obligation or liability for the holder thereof under Section 409A of the Code.

(e)        Section 5.2(e) of the Company Disclosure Schedule sets forth: (i) each of the Company's Subsidiaries; (ii) whether or not each such Subsidiary is a Wholly Owned Subsidiary (any Subsidiary that is not a Wholly Owned Subsidiary, a "**Non-Wholly Owned Subsidiary**"); and (iii) for each Non-Wholly Owned Subsidiary, (A) the percentage of the Company's ownership interest in each such Subsidiary, and (B) the percentage of such other Person or Persons' ownership interest owned by such other Person or Persons in each such Subsidiary, and the name of such other Person or Persons.

(f)        Section 5.2(f) of the Company Disclosure Schedule sets forth the Company's or its Subsidiaries' capital stock or other direct or indirect equity interest in any Person that is not a Subsidiary of the Company, other than equity securities in a publicly traded company or other entity held for investment by the Company or any of its Subsidiaries and consisting of less than one percent of the outstanding capital stock or other equity interest of such company or other entity.

(g)        All of the outstanding shares of capital stock or other voting securities of the Company (including, for the avoidance of doubt, the Shares) and the Series A Preferred Shares have been duly authorized and are validly issued, fully paid and non-assessable and free and clear of any Encumbrance (other than any Permitted Encumbrance). Upon the issuance of any Shares in accordance with the terms of the Stock Plans, such Shares will be duly authorized, validly issued, fully paid and non-assessable and free and clear of any Encumbrance (other than any Permitted Encumbrance). Each of the outstanding shares of capital stock or other voting securities of each of the Company's Subsidiaries is duly authorized, validly issued, fully paid and non-assessable and, except for any shares of capital stock or other securities of any Non-Wholly Owned Subsidiaries, owned by the Company or by a Wholly Owned Subsidiary of the Company, free and clear of any Encumbrance (other than any Permitted Encumbrance).

(h)        Other than the Company Equity Awards and the Series A Preferred Shares, and except as set forth on Section 5.2(h) of the Company Disclosure Schedule, as of the execution of this Agreement, there are no preemptive, antidilutive or other outstanding rights, subscriptions, options, warrants, conversion rights, exchange rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights (whether or not currently exercisable) of any kind that obligate the Company or any of its Subsidiaries to issue, transfer, exchange, register, redeem, acquire or sell any shares of capital stock or other securities of the Company or any of its Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, valued by reference to, or giving any Person a right to subscribe for or acquire, any securities of the Company or any of its Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding.

-33-

(i)       Except as set forth on Section 5.2(i) of the Company Disclosure Schedule, there are no voting agreements, voting trusts, stockholders agreements, proxies or other agreements or understandings to which the Company or any of its Subsidiaries is a party with respect to the voting of the capital stock or other equity interest of, restricting the transfer of, providing for registration rights with respect to, the securities of the Company or any of its Subsidiaries.

5.3.      Corporate Authority; Approval and Fairness.

(a)       The Company has all requisite corporate power and authority and, other than obtaining the Requisite Company Vote, has taken all corporate action necessary in order to execute, deliver and perform under this Agreement and to consummate the transactions contemplated by this Agreement, subject only to obtaining the Requisite Company Vote. This Agreement has been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by Parent and Merger Sub, constitutes a valid and binding agreement of the Company enforceable against the Company in accordance with its terms, subject to the Bankruptcy and Equity Exception.

(b)       The Special Committee has, at a duly convened and held meeting: (i) unanimously (A) approved and declared advisable this Agreement, the Voting Agreement and the transactions contemplated by this Agreement, (B) determined that this Agreement, the Voting Agreement and the transactions contemplated by this Agreement are fair to, and in the best interests of, the Company and the holders of the Shares, other than Excluded Shares and Shares held by Rolling Stockholders, and (C) resolved to recommend the Special Committee Recommendation to the Company Board; and (ii) received the opinion of its financial advisor, Jefferies LLC, to the effect that, based upon and subject to the qualifications and assumptions set forth therein, the Per Share Merger Consideration is fair, from a financial point of view, as of the date of such opinion, to the holders of Shares, other than Excluded Shares and Shares held by the Rolling Stockholders. A copy of which opinion shall have been delivered to Parent promptly (but, in any event, within two Business Days) following the date of this Agreement solely for informational purposes (it being agreed that such opinion is for the benefit of the Company Board and may not be relied upon by Parent or Merger Sub).

(c)       The Company Board has, at a duly convened and held meeting, acting on the Special Committee Recommendation: (i) unanimously (A) approved and declared advisable this Agreement, the Voting Agreement and the transactions contemplated by this Agreement, (B) determined that this Agreement, the Voting Agreement and the transactions contemplated by this Agreement are fair to, and in the best interests of, the Company and the holders of the Shares, other than Excluded Shares and Shares held by Rolling Stockholders, and (C) resolved to recommend the Company Recommendation and (ii) unanimously directed that this Agreement be submitted to the holders of the Shares for their adoption at the Company Stockholder Meeting.

-34-

(d)     Other than obtaining the Requisite Company Vote, no further corporate action is required by the Company Board or the Special Committee in order for the Company to approve this Agreement, the Voting Agreement and the transactions contemplated by this Agreement. Subject to the accuracy of the representations and warranties of Parent and Merger Sub set forth in Section 6.9, the Requisite Company Vote is the only approval of the Shares, the Preferred Shares or any class or series of securities of the Company necessary to approve or adopt this Agreement and the transactions contemplated by this Agreement. Except for any Change of Recommendation made after the execution of this Agreement and in accordance with Section 7.2, the resolutions and determinations of the Special Committee and the Company Board referenced in this Section 5.3 have not been amended or withdrawn.

5.4.     Governmental Filings; No Violations.

(a)     No consent, approval, permits, declarations, order or authorization of, filing, licenses or registration with, or notification to (any of the foregoing, a "**Consent**") any Governmental Entity is required on the part of the Company or its Subsidiaries in connection with (A) the execution and delivery of this Agreement by the Company; (B) the performance by the Company of its covenants and obligations pursuant to this Agreement; or (C) the consummation of the transactions contemplated by this Agreement, except: (i) such Consents as may be required under the HSR Act or any Antitrust Laws in any case that are applicable to the transactions contemplated by this Agreement, (ii) as required by the DGCL, (iii) required to be made with or obtained from the SEC, (iv) as required to be made with or by the NASDAQ, (v) as required under the Takeover Statutes and state securities and "blue sky" Laws, (vi) other Consents of Governmental Entities set forth in Section 5.4(a) of the Company Disclosure Schedule, and (vii) such other Consents which if not obtained or made would not have a Material Adverse Effect or would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the transactions contemplated by this Agreement by the Outside Date (collectively, the "**Company Approvals**").

(b)     The execution and delivery of and performance under this Agreement by the Company do not, and the consummation of the transactions contemplated by this Agreement, will not: (i) assuming (solely with respect to the consummation of the transactions contemplated by this Agreement) the Requisite Company Vote is obtained, constitute or result in a breach or violation of or a contravention or conflict with or a default under the Organizational Documents of the Company or any of its Subsidiaries; (ii) assuming (solely with respect to the performance under this Agreement by the Company and the consummation of the transactions contemplated by this Agreement) the Requisite Company Vote and the Company Approvals are obtained, violate, conflict with, result in the breach of, constitute a default (or an event that, with or without notice or lapse of time or both, would become a default) pursuant to, result in the termination of, accelerate the performance required by, result in a right of termination or acceleration pursuant to, require any consent or the provision of notice pursuant to any Material Contract to which the Company or any of its Subsidiaries are party or by which any of their respective properties or assets are bound, or (iii) result in the creation of any Encumbrance (other than Permitted Encumbrances) upon any of the properties or assets of the Company or any of its Subsidiaries, except, in the case of clauses (ii), (iii) and (iv) of this Section 5.4(b), as would not have a Material Adverse Effect.

-35-

5.5.     Compliance with Laws; Licenses.

(a)     Compliance with Laws.

(i)     Since the Applicable Date, (A) the Company and its Subsidiaries have been in compliance with all Laws or Orders applicable to the Company or any of its Subsidiaries or the conduct of any of their business or operations and (B) none of the Company or its Subsidiaries have received any written or, to the Knowledge of the Company, oral notice or communication from a Governmental Entity asserting (i) any material noncompliance with any applicable Law or any Order, or any material failure to comply in any respect with any term or requirement of any Order, by the Company or its and (ii) any actual revocation, withdrawal, suspension cancellation, termination or modification of any Order, in each case, except as would not have a Material Adverse Effect or would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the transactions contemplated hereby or perform any of its obligations under this Agreement by the Outside Date.

(ii)     Except as permitted by the Exchange Act, including Sections 13(k)(2) and 13(k)(3) or rules of the SEC, since the enactment of the Sarbanes-Oxley Act, none of the, Company, any of its Affiliates or, to the Knowledge of the Company, the Rolling Stockholders has made, arranged or modified, in any material respect, any extensions of credit in the form of a personal loan to any executive officer or director of the Company.

(iii)     The Company is in compliance in all material respects with the applicable listing and corporate governance rules and regulations of the NASDAQ.

(b)     FCPA and Other Anti-Bribery Laws.

(i)     Except as would not be reasonably likely to be material to the Company and its Subsidiaries (taken as a whole), none of the Company, any of its Subsidiaries, or, to the Knowledge of the Company and when acting on behalf of the Company or its Subsidiaries, their respective owners, directors and employees (including officers) are in compliance with and have complied with, the FCPA and the Other Anti-Bribery Laws.

(ii)     None of the Company or any of its Subsidiaries have, and to the Knowledge of the Company, none of any of their respective owners, directors and employees (including officers) have paid, offered or promised to pay, or authorized or ratified the payment, directly or indirectly, of any monies or anything of value to any official or Representative (including anyone elected, nominated or appointed to be a Representative) of, or any Person acting in an official capacity for or on behalf of, any Governmental Entity (including any official or employee of any entity directly or indirectly owned or controlled by any Governmental Entity), any royal or ruling family member or any political party or candidate for public or political office for the purpose of influencing any act or decision of any such Governmental Entity or Person to obtain or retain business, or direct business to any Person or to secure any other improper benefit or advantage in each case in violation of the FCPA or any of the Other Anti-Bribery Laws.

-36-

(iii)      The Company and its Subsidiaries have instituted commercially reasonable policies and procedures designed to ensure compliance with the FCPA and the Other Anti-Bribery Laws and have maintained such policies and procedures in full force and effect.

(iv)      Since the Applicable Date there have been no Proceedings against the Company or any of its Subsidiaries or any Indemnified Party or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries or any Indemnified Party, and there are no Proceedings against the Company or any of its Subsidiaries or any Indemnified Party pending by or before any Governmental Entity or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries or any Indemnified Party by any Governmental Entity, in each case relating to a violation of the FCPA or the Other Anti-Bribery Laws.

(v)      Neither the Company nor any of its Subsidiaries have made a voluntary disclosure to a Governmental Entity related to the FCPA or any of the Other Anti-Bribery Laws.

(c)      Export and Sanctions Regulations.

(i)      Except as would not be reasonably likely to be material to the Company and its Subsidiaries (taken as a whole), the Company and each of its Subsidiaries are in compliance and have been in compliance with the Export and Sanctions Regulations.

(ii)      Section 5.5(c)(ii) of the Company Disclosure Schedule sets forth a correct and complete list, as of the date of this Agreement, of material Licenses held by the Company or any of its Subsidiaries under the Export and Sanctions Regulations, if any.

(iii)      The Company and its Subsidiaries have instituted commercially reasonable policies and procedures designed to ensure compliance with the Export and Sanctions Regulations and have maintained such policies and procedures in full force and effect in all material respects.

(iv)      Since the Applicable Date, there have been no Proceedings against the Company or any of its Subsidiaries or any Indemnified Party or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries or any Indemnified Party, and there are no Proceedings against the Company or any of its Subsidiaries or any Indemnified Party pending by or before any Governmental Entity or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries or any Indemnified Party by any Governmental Entity, in each case relating to a violation of any Export and Sanctions Regulation.

(v)      Neither the Company nor any of its Subsidiaries has engaged in, nor is now engaging in, any dealings or transactions with any Person that at the time of the dealing or transaction is or was the subject or target of sanctions administered by U.S. Department of the Treasury's Office of Foreign Assets Control or any Person in Cuba, Iran, Sudan, Syria, North Korea, the Crimea region of Ukraine, and the so-called Donetsk People's Republic and so-called Luhansk People's Republic regions of Ukraine.

-37-

(vi)     Neither the Company nor any of its Subsidiaries have made a voluntary disclosure to a Governmental Entity related to the Export and Sanctions Regulations

(d)     <u>Licenses</u>. Each of the Company and its Subsidiaries have, and, to the Knowledge of the Company, each Company Employees has obtained, holds and is in compliance with all Licenses necessary to conduct their respective businesses as currently conducted and none of the Company, its Subsidiaries or the Company Employees has received any written or, to the Knowledge of the Company, oral notice or other communication from a Governmental Entity asserting any non-compliance with any such Licenses by the Company or any of its Subsidiaries, in each case, except as would not have a Material Adverse Effect or would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the transactions contemplated hereby or perform any of its obligations under this Agreement by the Outside Date.

5.6.     <u>Company Reports</u>.

(a)     All Company Reports filed or furnished since the Applicable Date have been (and shall have been) filed or furnished on a timely basis and all fees related thereto have been timely paid. Correct and complete copies of each of the Company Reports filed or furnished since the Applicable Date and prior to the date of this Agreement have been made available to Parent (including via the EDGAR system).

(b)     Each of the Company Reports filed or furnished since the Applicable Date, at the time of its filing or being furnished (or, if amended or supplemented, as of the date of such amendment or supplement, or, in the case of a Company Report that is a registration statement filed pursuant to the Securities Act or a proxy statement filed pursuant to the Exchange Act, on the date of effectiveness of such Company Report or date of the applicable meeting, respectively), complied or will have complied (as applicable), in all material respects, with the applicable requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act, as applicable, in effect on the date that such Company Report was filed. The Company Reports filed or furnished since the Applicable Date have not and shall not have (as applicable), contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except that any such Company Report that is a registration statement filed pursuant to the Securities Act, did not and shall not have (as applicable), contain any untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. No executive officer of the Company has failed to make the certifications required of him or her under Section 302 or 906 of the Sarbanes Oxley Act.

(c)     To the Knowledge of the Company, none of the Company Reports filed or furnished since the Applicable Date is subject to any pending Proceeding by or before the SEC.

-38-

(d)    None of the Subsidiaries of the Company is subject to the reporting requirements of Section 13(a) or Section 15(d) of the Exchange Act or is subject to reporting requirements of any non-U.S. Governmental Entity that regulates securities or any applicable non-U.S. securities Law or any exchange or quotation service.

(e)    The Company has made available (including via the EDGAR system) to Parent all material correspondence between the SEC on the one hand, and the Company or any of its Subsidiaries, on the other hand, since the Applicable Date. There are no material outstanding or unresolved comments in comment letters from the SEC staff with respect to any of the Company Reports. To the Knowledge of the Company, none of the Company Reports is the subject of ongoing SEC review or outstanding SEC comment and neither the SEC nor any other Governmental Entity is conducting any investigation or review of any Company Report.

5.7.    Disclosure Controls and Procedures and Internal Control Over Financial Reporting.

(a)    Since the Applicable Date, the Company has been in compliance in all material respects with the applicable provisions of the Sarbanes-Oxley Act. The Company (with respect to itself and its Subsidiaries) maintains "disclosure controls and procedures" (as defined pursuant to Rule 13a-15 promulgated under the Exchange Act) that are reasonably designed to ensure that all material information required to be disclosed by the Company in the reports that it files or furnishes pursuant to the Exchange Act is recorded and reported within the periods specified in the rules and forms of the SEC to the individuals responsible for the preparation of the Company's filings with the SEC and other public disclosure documents.

(b)    The Company maintains "internal control over financial reporting" (as defined pursuant to Rule 15d-15 promulgated under the Exchange Act) that are designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management of the Company and the Company Board and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of the Company that would reasonably likely to have a material effect on its financial statements.

(c)    The Company's management has completed an assessment of the effectiveness of the Company's internal control over financial reporting in compliance with the requirements of Section 404 of the Sarbanes-Oxley Act for the fiscal year ended December 31, 2022, and such assessment concluded that such control was not effective. Since such date, except as disclosed in the Company's Reports, there have been no changes in the Company's internal control over financial reporting. The Company's independent registered public accountant has issued (and not subsequently withdrawn or qualified) an attestation report concluding that the Company did not maintain effective internal control over financial reporting as of December 31, 2022.

-39-

(d)     The Company has disclosed, based on the most recent evaluation of its chief executive officer and its chief financial officer prior to the date of this Agreement, to the Company's auditors and the Audit Committee, (i) any significant deficiencies in the design or operation of its internal controls over financial reporting that are reasonably expected to adversely affect the Company's ability to record, process, summarize and report financial information and has identified for the Company's auditors and Audit Committee any material weaknesses in internal control over financial reporting, and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

(e)     Since the Applicable Date, no material written or, to the Knowledge of the Company, oral complaints from any source regarding accounting, internal accounting controls or auditing matters, and no concerns from current or former Company Employees regarding questionable accounting or auditing matters, have been received by the Company. The Company has made available to Parent (i) a correct and complete summary of any disclosure made by management to the Company's auditors and Audit Committee contemplated by Section 5.7(d) since the Applicable Date, (ii) any material written or, to the Knowledge of the Company, oral communication since the Applicable Date made by management or the Company's auditors to the Audit Committee required or contemplated by listing standards of the NASDAQ, the Audit Committee's charter or professional standards of the Public Company Accounting Oversight Board and (iii) a correct and complete summary of all material complaints or concerns relating to other matters made since the Applicable Date through the Company's whistleblower hotline or equivalent system for receipt of employee concerns regarding possible violations of Law.

(f)     Since the Applicable Date, to the Knowledge of the Company, no attorney representing the Company or any of its Subsidiaries, whether or not employed by the Company or any of its Subsidiaries, has reported evidence of a violation of securities Laws, breach of fiduciary duty or similar violation by the Company or any of its Representatives to the Company's chief legal officer, Audit Committee (or other committee of the Company Board designated for the purpose) or the Company Board pursuant to the rules adopted pursuant to Section 307 of the Sarbanes-Oxley Act or any Company policy contemplating such reporting, including in instances not required by those rules.

(g)     To the Knowledge of the Company, there are no SEC inquiries or investigations, other governmental inquiries or investigations or internal investigations pending or threatened regarding any accounting practices of the Company or its Subsidiaries. Since the Applicable Date, there has not been any internal investigation of the Company or any of its Subsidiaries regarding revenue recognition or other material accounting or auditing issues discussed with, reviewed by or initiated at the direction of the chief executive officer, chief financial officer, general counsel or similar legal officer, the Company Board or any committee thereof. Since the Applicable Date, to the Knowledge of the Company, (i) no employee of the Company or any of its Subsidiaries has provided or is providing information to any law enforcement agency regarding the commission or possible commission of any crime or the violation or possible violation of any Laws of the type described in Section 806 of the Sarbanes- Oxley Act by the Company or any of its Subsidiaries and (ii) neither the Company nor any of its Subsidiaries has discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against an employee of the Company or any of its Subsidiaries in the terms and conditions of employment because of any lawful act of such employee described in Section 806 of the Sarbanes-Oxley Act.

-40-

5.8. <u>Financial Statements; No Undisclosed Liabilities; Off-Balance Sheet Arrangements; Books and Records</u>.

(a) <u>Financial Statements</u>. Each of the consolidated statements of operations, consolidated balance sheets, consolidated statements of comprehensive income (loss), consolidated statements of stockholders' equity and consolidated statements of cash flows included in or incorporated by reference into the Company Reports filed since the Applicable Date: (i) were or will be prepared(as applicable), in each case in accordance with applicable Law and GAAP; and (ii) did or will fairly present (as applicable), in all material respects, the consolidated financial position of the Company and its consolidated Subsidiaries as of its date and the consolidated results of operations, retained earnings (loss) and changes in financial position, as the case may be, of such companies for the periods set forth therein, as applicable (subject, in the case of any unaudited statements, to notes and normal and recurring year-end audit adjustments). There are no unconsolidated Subsidiaries of the Company.

(b) <u>No Undisclosed Liabilities</u>. Except for obligations or liabilities (i) reflected or otherwise reserved against in the Company's most recent consolidated balance sheet included in or incorporated by reference into the Company Reports filed prior to the date of this Agreement (including the notes thereto), (ii) arising pursuant to this Agreement or incurred in connection with the consummation of the transactions, (iii) incurred in the Ordinary Course of Business since the date of such consolidated balance sheet or (iv) that would not have a Material Adverse Effect, there are no obligations or liabilities of the Company or any of its Subsidiaries, known or unknown, whether or not accrued, contingent or otherwise and whether or not required to be disclosed.

(c) <u>Off-Balance Sheet Arrangements</u>. Neither the Company nor any of its Subsidiaries is a party to, or has any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar Contract or arrangement (including any Contract or arrangement relating to any transaction or relationship between or among the Company and/or one or more of its Subsidiaries, on the one hand, and any other Person, including any structured finance, special purpose or limited purpose entity or Person, on the other hand), or any "off-balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K of the Securities Act).

(d) <u>Books and Records</u>. The books of account of the Company and its Subsidiaries have been kept accurately in all material respects in the Ordinary Course of Business, the transactions entered therein represent *bona fide* transactions, and the revenues, expenses, assets, obligations and liabilities of the Company and its Subsidiaries have been properly recorded therein in all material respects. The corporate records and minute books of the Company and each of its Subsidiaries have been maintained in accordance with all applicable Laws in all material respects, and such corporate records and minute books are correct and complete in all material respects, including, the fact that the minute books contain the minutes of all meetings of the boards of directors, including the Company Board (or other collection of Persons performing similar functions), committees of the boards of directors, including committees of the Company Board (or other collection of Persons performing similar functions) and stockholders and all resolutions passed by the boards of directors, including the Company Board (or other collection of Persons performing similar functions), committees of the boards of directors, including committees of the Company Board (or other collection of Persons performing similar functions) and the stockholders, except that, in the Ordinary Course of Business, minutes of certain recent meetings of the boards of directors, including the Company Board (or other collection of Persons performing similar functions), or committees thereof have not been finalized as of the date of this Agreement. Correct and complete copies of all the minute books of the Company for calendar years 2021 and 2022 have been made available by the Company to Parent.

-41-

5.9.    Litigation.

(a)    Since the Applicable Date, there have been no Proceedings against the Company or any of its Subsidiaries or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries, except as would not have a Material Adverse Effect or would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the transactions contemplated by this Agreement by the Outside Date.

(b)    Neither the Company nor any of its Subsidiaries (nor any of their respective properties, assets or businesses) is a party to or subject to the provisions of any Order that restricts the manner in which the Company and its Subsidiaries conduct their businesses, except as would not have a Material Adverse Effect or would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the transactions contemplated by this Agreement by the Outside Date.

5.10.    Absence of Certain Changes.

(a)    Since December 31, 2022, (i) the Company and its Subsidiaries have conducted their respective businesses only in the Ordinary Course of Business and (ii) there has not been any material damage, destruction or other casualty loss with respect to any material property or asset owned, leased or otherwise used by the Company or any of its Subsidiaries (including any Real Property), whether or not covered by insurance.

(b)    Since December 31, 2022 through the date of this Agreement, there has not been any event, change, development, circumstance, fact or effect that, individually or in the aggregate with such other events, changes, developments, circumstances, facts or effects, has resulted in a Material Adverse Effect.

5.11.    Material Contracts.

(a)    Except as set forth in the respective subsection in Section 5.11 of the Company Disclosure Schedule, as of the date of this Agreement, neither the Company nor any of its Subsidiaries is a party to or bound by any of the following Contracts in effect as of the date of this Agreement:

-42-

(i)  any Contract requiring either (A) annual payments to or from the Company and its Subsidiaries of more than $5 million or (B) aggregate payments to or from the Company and its Subsidiaries of more than $20 million; other than, as applicable, the Existing Indebtedness or any Contract for the purchase of inventory or products by a Subsidiary in the Ordinary Course of Business;

(ii)  any Contract with a Top Customer or Top Supplier;

(iii)  any Company Government Contract;

(iv)  any Contracts relating to Indebtedness, in each case in excess of $5 million other than (A) accounts payables in the Ordinary Course of Business; (B) loans to Subsidiaries of the Company in the Ordinary Course of Business; and (C) extensions of credit to customers in the Ordinary Course of Business;

(v)  Excluding licenses contained in franchise agreements with franchisees entered into in the Ordinary Course of Business, (A) any material Company Intellectual Property is licensed or otherwise provided to any third party, (B) any material Intellectual Property is licensed or otherwise provided by any third party to the Company or any of its Subsidiaries, other than non-exclusive licenses from third parties for unmodified off-the-shelf software on commercially available terms and conditions or (C) the Company or any of its Subsidiaries is subject to any obligation with respect to the use, licensing, enforcement, prosecution or other exploitation of any material Company Intellectual Property rights, including stand-stills, settlements, and Trademark co-existence or consent Contracts;

(vi)  any Contract related to a collective bargaining arrangement or with a labor union, labor organization, works council or similar organization;

(vii)  any Contract related to any settlement of any Proceeding pursuant to which the Company is currently obligated to make payments in excess of $1 million as of the date of this Agreement;

(viii)  any partnership, limited liability company, joint venture or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any partnership, limited liability company or joint venture;

(ix)  any Contract relating to the direct or indirect acquisition or disposition of any capital stock or other securities, assets or business since the Applicable Date (whether by merger, sale of stock, sale of assets or otherwise) in each case with a fair market value or purchase price in excess of $5 million or pursuant to which the Company or any of its Subsidiaries reasonably expects to be required to pay or receive any earn-out, deferred or other contingent payments;

(x)  any Contract that (A) purports to restrict the ability of the Company or any of its Subsidiaries from (1) directly or indirectly, engaging in any material line of business or competing in any line of business that is material to the Company or its Subsidiaries (taken as a whole) with any Person, (2) operating its business in any manner or location or (3) enforcing any of its rights with respect to any of its material assets, (B) prohibiting the Company or any of its Subsidiaries from engaging in any business with any Person or levying a fine, charge or other payment for doing so, (C) grants "most favored nation" status to any other Person, (D) includes "take or pay" requirements or similar provisions obligating a Person to obtain a minimum quantity of goods or services from another Person or would constitute a "requirements" contract, or (E) otherwise includes a non-competition obligation, or any Contract that grants any right of first refusal or right of first offer or similar right that, in each case, materially limits the ability of the Company or any Subsidiary to own, operate, sell, transfer, pledge, or otherwise dispose of any material assets of the Company or any of its Subsidiaries, in each case other than any such Contracts that may be cancelled without material liability to the Company or its Subsidiaries upon notice of 120 days or less;

-43-

(xi) any Contract that prohibits the payment of dividends or distributions in respect of the capital stock or other equity interests of the Company or any of its Subsidiaries, the pledging of the capital stock or other equity interests of the Company or any of its Subsidiaries or the incurrence of Indebtedness by the Company or any of its Subsidiaries;

(xii) any Contract that was not negotiated and entered into on an arm's length basis, except for any such Contract solely between or among the Company and any of its Wholly Owned Subsidiaries;

(xiii) any Contract between the Company or any of its Subsidiaries, on the one hand, and any director or officer of the Company or any Person beneficially owning five percent or more of the outstanding Shares or shares of common stock of any of their respective Affiliates or the Rolling Stockholders, on the other hand;

(xiv) any Contract which involves commitments to make capital expenditures in respect of assets or properties or which provide for the purchase of goods or services by any member of the Company from any one Person under which the undelivered balance of such products or services has a purchase price in excess of $3 million which cannot be cancelled without penalty or without more than 90 days' notice, other than purchase orders with suppliers in the Ordinary Course of Business; and

(xv) any other Contract not otherwise described in the foregoing clauses (i) through (xiv) of this Section 5.11(a) that is material to the Company and its Subsidiaries and not entered into in the Ordinary Course of Business (together with each Contract constituting any of the foregoing types of Contracts described in clauses (i) through (xiv) of this Section 5.11(a) and together with any Contract that has been or would be required to be filed by the Company as a "material contract" pursuant to Item 601(b)(10) of Regulation S-K under the Securities Act or disclosed as a "material contract" on a Current Report on Form 8-K or has been or would be required to be disclosed pursuant to Item 404 of Regulation S-K under the U.S. Securities Act, a "**Material Contract**").

(b) A correct and complete copy of each Material Contract (including, for the avoidance of doubt, any amendments or supplements thereto) has been made available to Parent.

(c) Each Material Contract (other than any Material Contract that has expired in accordance with its terms) is in full force and effect, valid and binding on, and enforceable against the Company or each Subsidiary of the Company that is a party thereto, as the case may be, and, to the Knowledge of the Company, each other party thereto, except as would not have a Material Adverse Effect.

-44-

(d)       There is no breach or violation of, or default under, any Material Contract by the Company or any of its Subsidiaries or, to the Knowledge of the Company, any other party thereto, and no event has occurred that with or without notice, lapse of time or both, would constitute or result in a breach or violation of, or default under, any such Contract by the Company or any of its Subsidiaries or, to the Knowledge of the Company, any other party thereto or would permit or cause the termination, non-renewal or modification thereof or acceleration or creation of any right or obligation thereunder, in each case, except for such breaches and defaults that would not have a Material Adverse Effect.

5.12.       Customers and Suppliers.

(a)       Customers.

(i)       Section 5.12(a)(i) of the Company Disclosure Schedule sets forth a correct and complete list of the top four customers of the Company and its Subsidiaries determined on the basis of revenue received by the Company and its Subsidiaries, taken as a whole, during the twelve months ended December 31, 2022 (each, a "**Top Customer**").

(ii)       No single Top Customer accounted for more than ten percent of the revenue received by the Company and its Subsidiaries, taken as a whole, during the twelve months ended December 31, 2022.

(iii)       Since the Applicable Date: (A) there has been no (1) suspension or termination of or materially adverse change to the business relationship of the Company or its Subsidiaries with any Top Customer, (2) material reduction in purchase of products or services from the Company or its Subsidiaries or materially adverse changes to the terms and conditions on which any Top Customer purchases products or services from the Company or its Subsidiaries or (3) no written, or to the Knowledge of the Company, oral notice from any Top Customer received by the Company or its Subsidiaries to initiate or effect any of the foregoing; and (B) neither the Company nor any of its Subsidiaries have engaged or are currently engaging in a material dispute with any Top Customer.

(b)       Suppliers.

(i)       Section 5.12(b)(i) of the Company Disclosure Schedule sets forth a correct and complete list of the top ten suppliers of the Company and its Subsidiaries determined on the basis of the amounts paid for goods and services by the Company and its Subsidiaries, taken as a whole, during the twelve months ended December 31, 2022 (each, a "**Top Supplier**").

(ii)       No single Top Supplier accounted for more than ten percent of the amounts paid for goods and services by the Company and its Subsidiaries, taken as a whole, during the during the twelve months ended December 31, 2022.

-45-

(iii)    Since the Applicable Date: (A) there has been no (1) suspension or termination of or materially adverse change to the business relationship of the Company or its Subsidiaries with any Top Supplier, (2) material reduction in supply of products or services to the Company or its Subsidiaries or materially adverse changes to the terms and conditions on which any Top Suppliers supply products or services to the Company or its Subsidiaries or (3) no written, or to the Knowledge of the Company, notice from any Top Supplier received by the Company or its Subsidiaries to initiate or effect any of the foregoing; and (B) neither the Company nor any of its Subsidiaries have engaged or are currently engaging in a material dispute with any Top Customer.

5.13.    <u>Employee Benefits</u>.

(a)    Section 5.13(a) of the Company Disclosure Schedule sets forth a correct and complete list of each material Company Benefit Plan and separately identifies each (i) material Non-U.S. Company Benefit Plan or (ii) material Company Benefit Plan that provides retiree or post-employment medical, disability, life insurance or other welfare benefits to any Person, other than those benefits required to be provided by applicable Law.

(b)    With respect to each material Company Benefit Plan required to be listed on Schedule 5.13(a), the Company has made available to Parent, to the extent applicable, correct and complete copies of (i) the Company Benefit Plan document, including, for the avoidance of doubt, any amendments or supplements thereto, and all related trust documents, insurance Contracts or other funding vehicle documents (ii) the most recently prepared actuarial report and (iii) all material correspondence to or from any Governmental Entity received in the last three years with respect thereto.

(c)    Except as would not have a Material Adverse Effect, (i) each Company Benefit Plan (including any related trusts), excluding for avoidance of doubt any Multiemployer Plans and Non-U.S. Company Benefit Plans, has been established, operated and administered in compliance with its terms and applicable Laws, including ERISA and the Code; (ii) all contributions or other amounts payable by the Company or any of its Subsidiaries with respect thereto in respect of current or prior plan years have been paid or accrued in accordance with GAAP; and (iii) there are no Proceedings (other than routine claims for benefits) pending or, to the Knowledge of the Company, threatened by a Governmental Entity by, on behalf of or against any material Company Benefit Plan or any trust related thereto.

(d)    With respect to each ERISA Plan, the Company has made available to Parent, to the extent applicable, correct and complete copies of (i) the most recent summary plan description together with any summaries of all material modifications and supplements thereto, (ii) the most recent IRS determination or opinion letter and (iii) the two most recent annual reports (Form 5500 or 990 series and all schedules and financial statements attached thereto).

(e)    Each ERISA Plan that is intended to be qualified under Section 401(a) of the Code is the subject of an IRS determination letter or can rely upon an IRS opinion issued to the prototype plan sponsor that the ERISA Plan has been determined by the IRS to be so qualified and, to the Knowledge of the Company, nothing has occurred that would reasonably be expected to materially and adversely affect the qualification or Tax exemption of any such Company Benefit Plan. With respect to any such ERISA Plan, neither the Company nor any of its Subsidiaries has engaged in a transaction in connection with which the Company or any of its Subsidiaries would reasonably be expected to result in any material liability to the Company or any of its Subsidiaries from a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a Tax imposed pursuant to Section 4975 of the Code.

-46-

(f)        With respect to each ERISA Plan, the Company has prepared in good faith and timely filed all requisite governmental reports, which were accurate and complete in all material respects as of the date filed, and has properly and timely filed and distributed or posted all notices and reports to all participants in each such plan required to be filed, distributed or posted with respect to each such ERISA Plan. Neither the Company nor any of its Subsidiaries has incurred any material liability or penalty under Sections 4976 through 4980 of the Code or Title I of ERISA with respect to any ERISA Plan.

(g)        Neither the Company nor any Company ERISA Affiliate has in the last six years contributed (or has had any obligation to contribute) to a plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA.

(h)        Neither the Company nor any Company ERISA Affiliate has in the last six years contributed to, or had an obligation to contribute to, any Multiemployer Plan.

(i)        No Company Benefit Plan is a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

(j)        Except as required by applicable Law, no material Company Benefit Plan provides retiree or post-employment medical, disability, life insurance or other welfare benefits to any Person, and none of the Company or any of its Subsidiaries has incurred any material obligation to provide any such benefits.

(k)        Each Company Benefit Plan that is a "nonqualified deferred compensation plan" (within the meaning of Section 409A of the Code) and not otherwise exempt from Section 409A of the Code is in all material respects in documentary compliance with, and has been operated and administered in all material respects in compliance with, Section 409A of the Code and the guidance issued by the IRS provided thereunder.

(l)        Except as otherwise set forth in Section 5.13(l) of the Company Disclosure Schedule, none of the execution and delivery of or the performance under this Agreement, nor the consummation of the transactions contemplated by this Agreement is reasonably expected , either alone or in combination with another related event, to (i) entitle any current or former Company Employee, director or independent contractor of the Company to severance pay or any material increase in severance pay, (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation due to any such current or former Company Employee, director or independent contractor of the Company, (iii) cause the Company to transfer or set aside any material assets to fund any material benefits under any Company Benefit Plan, or (iv) limit or restrict the right to merge, terminate, materially amend or otherwise modify or transfer the assets of any Company Benefit Plan in accordance with applicable Law on or following the Effective Time.

-47-

(m)      Except as otherwise set forth in Section 5.13(m) of the Company Disclosure Schedule, none of the execution and delivery of or the performance under this Agreement, nor the consummation of the transactions contemplated by this Agreement is reasonably expected, either individually or in combination with another related event, to result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment" as defined in Section 280G(b)(1) of the Code. The Company has made available to Parent accurate and complete copies of any Section 280G calculations prepared (whether or not final) with respect to any disqualified individual in connection with the transactions contemplated by this Agreement.

(n)      Neither the Company nor any Subsidiary thereof has any obligation to provide, and no Company Benefit Plan or other agreement or arrangement provides any individual with the right to, a gross up, indemnification, reimbursement or other payment for any excise or additional Taxes incurred pursuant to Section 409A or Section 4999 of the Code or due to the failure of any payment to be deductible under Section 280G of the Code.

(o)      No Company Benefit Plan is maintained outside the jurisdiction of the United States (including Puerto Rico) or covers any current or former Company Employees, director or independent contractor of the Company who reside or work outside of the United States.

(p)      Section 5.13(p) of the Company Disclosure Schedule sets forth a correct and complete list of all outstanding Company Equity Awards as of the Capitalization Time, setting forth the number of Shares subject to each Company Equity Award and the holder, grant date and exercise or reference price per Share with respect to each Company Equity Award, as applicable.

5.14.    Labor Matters.

(a)      Except as set forth on Section 5.14(a) of the Company Disclosure Schedule, during the past three (3) years, neither the Company nor any of its Subsidiaries has been or is a party to any collective bargaining agreement or other agreement with a labor union, labor organization, works council or similar organization, and to the Knowledge of the Company, there are no pending labor organizing activities with respect to any employees of the Company or any of its Subsidiaries with regard to their employment with the Company or any of its Subsidiaries.

(b)      There is no material strike, lockout, slowdown, work stoppage, unfair labor practice or other material labor dispute, or arbitration or grievance pending or, to the Knowledge of the Company, threatened directly against the Company or any of its Subsidiaries that may interfere in any material respect with the respective business activities of the Company or any of its Subsidiaries or prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the transactions contemplated by this Agreement by the Outside Date, and none of the Company or any of the Company's Subsidiaries has experienced any strike, lockout, slowdown or work stoppages by or with respect to any current or former Company Employee in the past three (3) years. The Company and each of its Subsidiaries is and has been for the past three (3) years in compliance in all material respects with all applicable Laws regarding labor, employment and employment practices (including equal employment opportunity laws), terms and conditions of employment, wages and hours (including classification of employees, discrimination, harassment and equitable pay practices), and occupational safety and health. Neither the Company nor any of its Subsidiaries has incurred any obligation or liability under the Worker Adjustment and Retraining Notification Act or any similar state or local Law that remains unsatisfied as of the date of this Agreement.

-48-

(c)      There are no material proceedings pending or, to the Company's Knowledge, threatened against the Company or any of its Subsidiaries in any forum by or on behalf of any present or former employee of the Company or any of its Subsidiaries, any applicant for employment or classes of the foregoing alleging violation of any Law governing employment or the termination thereof, except as would not have a Material Adverse Effect or would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the transactions contemplated by this Agreement by the Outside Date.

(d)      Neither the Company nor any of its Subsidiaries has any material liability, with respect to any misclassification of any person as an independent contractor rather than as an employee, with respect to any misclassification of any current or former Company Employee as exempt versus non-exempt, or with respect to any employee leased from another employer, and neither the Company nor any its Subsidiaries has received any written notice of any pending or, to the Company's Knowledge, threatened claim by any Person who is performing or has performed services for the Company or any of its Subsidiaries that he/she is or was misclassified for any purpose.

(e)      Since the Applicable Date, (i) to the Company's Knowledge, no allegations of workplace sexual harassment or illegal retaliation or discrimination have been made known to the Company or any of the Company's Subsidiaries, initiated, filed or threatened against the Company or any of the Company's Subsidiaries or any current or former Company Employee at or above the level of Vice President and (ii) none of the Company or any of the Company's Subsidiaries has entered into any material settlement agreement related to allegations of sexual harassment or illegal retaliations or discrimination by any current or former Company Employee at or above the level of Vice President.

5.15.    <u>Environmental Matters</u>. Except as would not have a Material Adverse Effect: (i) the Company and its Subsidiaries have complied at all times with all applicable Environmental Laws; (ii) no property owned or operated by the Company or any of its Subsidiaries (including soils, groundwater, surface water, buildings and surface and subsurface structures) is contaminated with any Hazardous Substance; (iii) neither the Company nor any of its Subsidiaries is subject to obligation or liability for any Hazardous Substance disposal or contamination on any third-party property; (iv) neither the Company nor any of its Subsidiaries has received any written, or to the Knowledge of the Company, oral notice, demand, letter, claim or request for information alleging that the Company or any of its Subsidiaries may be in violation of or subject to any obligation or liability under any Environmental Law; (v) neither the Company nor any of its Subsidiaries is subject to any Order or other agreement with any Governmental Entity or any indemnity or other agreement with any third party relating to any obligations or liabilities under any Environmental Law; and (vi) the Company made available to Parent, correct and complete copies of all environmental reports, studies, assessments, sampling data and other environmental information accessible or controlled by the Company relating to the Company or its Subsidiaries or their respective properties or operations.

-49-

5/9/25, 7:20 PM    sec.gov/Archives/edgar/data/1528930/000110465923058675/tm2315302d1_ex2-1.htm#:~:text=This AGREEMENT AND PLAN OF,a…

Case 24-12480-LSS    Doc 1480-1    Filed 05/14/25    Page 213 of 380

5.16.  <u>Tax Matters</u>. Except as has not had a Material Adverse Effect:

(a)  The Company and each of its Subsidiaries (i) have prepared in good faith and duly and timely filed (taking into account any extension of time within which to file) all Tax Returns required to be filed by any of them with the appropriate Taxing Authority and all such filed Tax Returns are correct and complete, (ii) have timely paid all Taxes that are required to be paid (whether or not shown on any Tax Returns), except for Taxes being contested in good faith and for which adequate reserves have been established in accordance with GAAP, (iii) have withheld and paid all Taxes to the appropriate Taxing Authority required to have been withheld and paid in connection with amounts paid or owing to any employee, stockholder, supplier, creditor, independent contractor or third party (each as determined for Tax purposes), (iv) have complied in with all information reporting (and related withholding) and record retention requirements and (v) have not waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to any Tax assessment or deficiency (except for automatic extensions of time to file income Tax Returns obtained in the Ordinary Course of Business).

(b)  The relevant statute of limitations is closed with respect to all Tax Returns of the Company and each of its Subsidiaries for all years up to and including 2018.

(c)  No deficiency with respect to Taxes has been proposed, asserted or assessed against the Company or any of its Subsidiaries and there are no pending or, to the Knowledge of the Company, threatened audits, claims or proceedings regarding any Taxes of the Company and its Subsidiaries or the properties or assets of the Company and its Subsidiaries.

(d)  Neither the Company nor any of its Subsidiaries has been informed in writing by any Taxing Authority that such Taxing Authority believes that the Company or any of its Subsidiaries was required to file any Tax Return that was not filed, which claim has not been finally resolved.

(e)  The Company and each of its Subsidiaries have at all times complied in all respects with Section 482 of the Code and any similar provision of foreign Tax Law.

(f)  There are no Encumbrances for Taxes (other than any Permitted Encumbrance) on any of the properties or assets of the Company or any of its Subsidiaries.

(g)  Neither the Company nor any of its Subsidiaries will be required to include any item of income in, or to exclude any item of deduction from, taxable income in any taxable period (or portion thereof) ending after the Closing Date as a result of any closing agreement, installment sale or open transaction on or prior to the Closing Date, any accounting method change or agreement with any Tax authority on or prior to the Closing Date, any prepaid amount received on or prior to the Closing Date (other than prepaid amounts substantially consistent with those shown on the Company and its Subsidiaries' federal income Tax Returns for the tax year ended 2021), or any intercompany transaction or excess loss account described in Section 1502 of the Code (or any corresponding provision of Tax Law). Neither the Company nor any of its Subsidiaries will have any liability for Taxes under Section 965(h) of the Code after the Closing Date due to an election made prior to the Closing Date.

-50-

(h)    At no time since the date that precedes the date of this Agreement by five years has the Company or any of its Subsidiaries been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(i)    The Company has made available to Parent correct and complete copies of any private letter ruling requests, closing agreements or gain recognition agreements with respect to Taxes requested or executed since the date that precedes the date of this Agreement by six years.

(j)    Neither the Company nor any of its Subsidiaries is a party to or is bound by any Tax sharing, allocation, indemnification or similar agreement or arrangement (other than such an agreement or arrangement solely between or among the Company and any of its Wholly Owned Subsidiaries and the TRA, or any customary provisions of any commercial, leasing, financing or employment agreement entered into in the ordinary course of business no principal purpose of which relates to Taxes).

(k)    Neither the Company nor any of its Subsidiaries (i) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group the common parent of which was the Company) or (ii) has any obligation or liability for the Taxes of any person (other than the Company or any of its Subsidiaries) under Treasury Regulation Section 1.1502-6 (or any similar provision of Law), as a transferee or successor, by Contract or otherwise.

(l)    Since the date that precedes by two years the date of this Agreement, neither the Company nor any of its Subsidiaries has been a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Code) in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code.

(m)    Neither the Company nor any of its Subsidiaries has participated in a "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4(b) or any other transaction requiring disclosure under analogous provisions of Tax Law.

Notwithstanding any other provisions of this Agreement to the contrary, the provisions of Section 5.8(a), Section 5.13(k), Section 5.13(m) and Section 5.13(n) (to the extent relating to Taxes) and the above provisions of this <u>Section 5.16</u> constitute the sole and exclusive representations and warranties by the Company with respect to all matters relating to Taxes.

5.17.    <u>Real Property</u>.

(a)    Section 5.17(a) of the Company Disclosure Schedule sets forth a true, correct and complete list of all Owned Real Property and Leased Real Property.

(b)    With respect to the Owned Real Property, (i) the Company or one or more of its Subsidiaries, as applicable, has good and marketable title to such property, free and clear of any Encumbrance (other than Permitted Encumbrances), (ii) there are no outstanding options, rights of first offer or rights of first refusal or other similar rights to purchase such property, or any portion thereof or interest therein, (iii) there are no Persons other than the Company or its Subsidiaries in possession thereof, and (iv) the Company and its Subsidiaries are not party to any agreement or option to purchase any real property or interest therein relating to the business of the Company and its Subsidiaries. All buildings, structures, fixtures and building systems included in the Owned Real Property are in good operating condition in all material respects, subject to reasonable wear and tear, and are reasonably sufficient in all material respects to enable the Owned Real Property to continue to be used and operated in the manner currently being used and operated by the Company or its applicable Subsidiaries, and comply with all applicable Laws.

-51-

(c)     With respect to the Leased Real Property, except as would not have a Material Adverse Effect, (i) each Lease for such property is valid, legally binding, enforceable and in full force and effect in accordance with its terms, (ii) neither the Company nor any of its Subsidiaries is in breach or violation of, or default under, any such Leases by the Company or any of its Subsidiaries, and, no event has occurred that with or without notice, lapse of time or both would constitute or result in a breach or violation of, or default under, any such Leases by the Company or any of its Subsidiaries or, to the Knowledge of the Company, any other party thereto, and no event has occurred that with or without notice, lapse of time or both, require any consent of, the provision of notice to or other action by any person under, would constitute or result in a breach or violation of, or default under, any such Leases by the Company or any of its Subsidiaries or, to the Knowledge of the Company, any other party thereto or would permit or cause the termination, non-renewal or modification thereof or acceleration or creation of any right or obligation thereunder, and (iii) there are no written or oral subleases, concessions, licenses, occupancy arrangements or other Contracts or arrangements granting to any Person other than the Company or its Subsidiaries the right to use or occupy any such property.

(d)     The Real Property has been maintained in accordance with normal industry practice, is in good operating condition and repair and is suitable for the purposes for which it is currently used, in each case, except as would not result in a Material Adverse Effect.

(e)     Neither the Company nor any of its Subsidiaries has received any written, or to the Knowledge of the Company, oral notice of any pending or threatened condemnation or eminent domain of any Real Property by any Governmental Entity, nor, to the Knowledge of the Company, is there any condemnation or eminent domain proceeding threatened with respect to any Real Property.

5.18.    Tangible Property.

(a)     Except as would not have a Material Adverse Effect, each of the Company and its Subsidiaries has good and valid title to, or a valid leasehold interest in all the tangible properties and assets which it owns or leases or purports to own or lease, including all the tangible properties and assets reflected on consolidated balance sheets included in or incorporated by reference into the Company Reports filed since the Applicable Date and prior to the date of this Agreement and correct and complete copies of which have been made available to Parent, free and clear of all Encumbrances (other than Permitted Encumbrances).

-52-

(b)    The tangible properties and assets contemplated by Section 5.18(a) are, in the aggregate, reasonably sufficient to carry on the respective businesses of the Company and each of its Subsidiaries, in all material respects, as conducted as of the date of this Agreement.

5.19.    Intellectual Property; IT Assets.

(a)    Section 5.19(a) of the Company Disclosure Schedule sets forth a true, correct and complete list of (i) all Company Intellectual Property (other than domain names) that is Registered, and (ii) all domain names included within Company Intellectual Property that are material to the business of the Company or any of its Subsidiaries ((i) and (ii), collectively, the "**Company Registered IP**"), indicating for each item of Company Registered IP, as applicable, the owner (including the co-owner(s), if any), registration or application number, registration or application date and the applicable filing jurisdiction or in the case of an Internet domain name, the applicable domain name registrar.

(b)    All material Company Registered IP is subsisting, and to the Knowledge of the Company valid and enforceable. There is no outstanding Order or Proceeding challenging or adversely affecting the scope, validity or enforceability of any material Company Intellectual Property, or the Company's or its Subsidiaries' ownership or rights in any material Company Intellectual Property.

(c)    Except as would not result in a Material Adverse Effect, the Company or one of its Subsidiaries solely and exclusively owns all right, title and interest in and to all Company Intellectual Property, free and clear of all Encumbrances (except for Permitted Encumbrances). Except as would not result in a Material Adverse Effect, the Company Intellectual Property, together with any Intellectual Property licensed to the Company or its Subsidiaries from third parties, constitute all material Intellectual Property used or held for use in, or necessary to, conduct the business of the Company and its Subsidiaries as currently conducted and currently proposed to be conducted. Except as would not result in a Material Adverse Effect, all ownership, license and other rights of the Company and its Subsidiaries with respect to Intellectual Property shall survive unchanged the consummation of the transactions contemplated by this Agreement, without termination or impairment or the acceleration of any obligation with respect thereto, in each case, on terms and conditions that are the same as those in effect immediately prior to the Closing.

(d)    Except as would not result in a Material Adverse Effect, neither the Company nor any of its Subsidiaries, nor the conduct of the respective businesses of the Company and its Subsidiaries, has since January 1, 2020 infringed, misappropriated or otherwise violated the Intellectual Property of any third Person. Since January 1, 2020, to the Knowledge of the Company, no Person has infringed, misappropriated or otherwise violated the Company Intellectual Property in any material respect.

(e)    The Company and its Subsidiaries have taken all commercially reasonable measures to protect and maintain the confidentiality of the material Trade Secrets owned, held for use or otherwise used by the Company or any of its Subsidiaries, and to the Knowledge of the Company, no such Trade Secret has been disclosed to, or discovered by, any Person except pursuant to a written and valid non-disclosure agreement restricting the disclosure and use thereof, which agreement, to the Knowledge of the Company, has not been breached.

-53-

(f)       The Company and its Subsidiaries have used commercially reasonable efforts to police and enforce all material Trademarks included in Company Intellectual Property against unauthorized use by any Person, and have exercised quality control measures, adequate in accordance with applicable Laws, over all material uses of such Trademark by licensees

(g)       Each of the current and former employees and contractors of the Company or any of its Subsidiaries who have been involved in the development or creation of any material Company Intellectual Property has executed a valid written invention assignment agreement containing a present assignment of all such Intellectual Property to the Company or one of its Subsidiaries.

(h)       The Company and its Subsidiaries are in compliance in all material respects with all licenses for Open Source Software that are used by the Company or any of its Subsidiaries. The Company and its Subsidiaries have not embedded, linked to, or incorporated any Open Source Software into any product, service or software that is distributed or made available by the Company or any of its Subsidiaries to third parties that (i) requires making available source code for any proprietary software, (ii) prohibits or limits the ability to charge fees or other consideration for any proprietary software, (iii) grants any license or other right to any Person to decompile or otherwise reverse-engineer any proprietary software, or (iv) requires the licensing of any proprietary software for the purpose of making derivative works.

(i)       The Company or one of its Subsidiaries solely and exclusively owns all material Company IT Assets, free and clear of all Encumbrances (except for Permitted Encumbrances). The Company IT Assets, together with any IT Assets licensed or provided to the Company or any of its Subsidiaries from third parties, constitute all material IT Assets used in, held for use, or necessary to conduct the Company's and its Subsidiaries' respective businesses as currently conducted in all material respects. Except as would not result in a Material Adverse Effect, all ownership, license and other rights of the Company or any of its Subsidiaries with respect to IT Assets shall survive unchanged the consummation of the transactions contemplated by this Agreement, without termination or impairment or the acceleration of any obligation with respect thereto, in each case, on terms and conditions that are the same as those in effect immediately prior to the Closing.

(j)       The Company IT Assets and, to the Knowledge of the Company, all other IT Assets used by the Company and its Subsidiaries in their respective businesses, have not materially malfunctioned or failed since the Applicable Date. The Company IT Assets and, to the Knowledge of the Company, all other IT Assets used in the Company's and its Subsidiaries' respective businesses, do not contain any "Trojan horse," "virus," "worm," "spyware," "malware," "ransomware" (as such terms are commonly understood in the software industry) or any other code designed to disrupt, disable or harm the operation of, or providing unauthorized access to, any IT Asset or any data or information stored or otherwise processed thereby.

(k)       Since the Applicable Date, to the Knowledge of the Company, no Person has gained unauthorized access to or used without authorization the Company IT Assets or any other IT Assets used in the Company's or its Subsidiaries' respective businesses, or any data or information stored or otherwise processed by any of the foregoing, in each case, in any material respect.

-54-

5.20.   Privacy. Except as would not result in a Material Adverse Effect, since the Applicable Date, (i) the Company and its Subsidiaries have complied with all Privacy Requirements, (ii) neither of Company nor its Subsidiaries has received any notice, claim or other written communication from any Governmental Entity or any third Person regarding any unauthorized or unlawful use, collection, transfer or other processing of Personal Information or other violation of any Privacy Requirements, and (iii) to the Knowledge of the Company, there has been no unauthorized or unlawful use, collection, transfer or other processing of any Personal Information collected or otherwise processed by or on behalf of the Company or its Subsidiaries. To the Knowledge of the Company, the consummation of the transactions contemplated by this Agreement will not result in any breach or other violation of any Privacy Requirements in any material respect.

5.21.   Insurance. The Insurance Policies constitute all of the material policies of insurance that is customarily carried by Persons conducting business similar to that of the Company and its Subsidiaries. Each Insurance Policy is in full force and effect, and all premiums due with respect to all Insurance Policies have been paid, and neither the Company nor any of its Subsidiaries has taken any action or failed to take any action (including with respect to the transactions contemplated by this Agreement) that, with or without notice, lapse of time or both, would constitute or result in a breach or violation of, or default under, any of the Insurance Policies or would permit or cause the termination, non-renewal or modification thereof or acceleration or creation of any right or obligation thereunder, in each case, except as would not result in a Material Adverse Effect. Neither the Company nor any of its Subsidiaries has received any written notice or, to the Knowledge of the Company, oral notice, regarding any cancellation or invalidation, premium increase with respect to, or material alteration of coverage under, any Insurance Policy. The Company has made available to Parent true, correct and complete copies of the Insurance Policies.

5.22.   Takeover Statutes. Assuming that the representations of Parent and Merger Sub set forth in Section 6.8 are true and correct in all material respects, the Company Board has taken all appropriate and necessary actions to render inapplicable to this Agreement or the transactions contemplated by this Agreement, the provisions of any Takeover Statute. There is no stockholder rights plan, "poison pill," anti-takeover plan or other similar agreement or plan in effect to which the Company or any of its Subsidiaries is a party or is otherwise bound.

5.23.   Brokers and Finders. Neither the Company, nor any of its Subsidiaries, nor any of their respective directors or employees has employed or retained any broker, finder or investment bank or has incurred or will incur any obligation or liability for any brokerage fees, commissions or finders fees in connection with the transactions contemplated by this Agreement, except that the Special Committee has retained Jefferies LLC as its financial advisor, each of whose fees and expenses will be paid by the Company.

5.24.   Related Party Transactions. Except for compensation, benefit or other employment arrangements in the Ordinary Course of Business, since the Applicable Date, (a) there have been no Contracts, transactions, arrangements or understandings between the Company or its Subsidiaries, on the one hand, and any Affiliate (including any officer or director) or the Rolling Stockholders, on the other hand that would be required to be disclosed under Item 404 of Regulation S-K under the Securities Act, in each case, that have not been disclosed in the Company Reports.

-55-

5.25.    <u>Inventory</u>. Except as would not result in a Material Adverse Effect, (a) all inventory of the Company and its Subsidiaries was acquired and has been maintained in accordance with the regular business practices of the Company and its Subsidiaries, consists of new and unused items of a quality and quantity substantially all of which is usable or saleable in the ordinary course of business and is valued in accordance with GAAP, (b) such inventory has not been consigned to, or held on consignment from, any third Person and (c) the inventory of the Company and its Subsidiaries consists, and will as of the Closing consist of products of quality and quantity commercially usable and salable at not substantially less than cost in the ordinary course of business, the present quantities of all inventory are reasonable in the present circumstances of the Company and its Subsidiaries and consistent with the average level of inventory in the past 24 months.

5.26.    <u>Product Liability</u>. Except as would not result in a Material Adverse Effect, there have been no (a) product recalls relating to the Company or any of its Subsidiaries, (b) product liability or other claims or proceedings relating to Company or any of its Subsidiaries, (c) claims or proceedings based on breach of warranty, breach of contract or negligence in respect of any defect in any products or services provided by the Company or any of its Subsidiaries, and there are not any such recalls or claims or proceedings pending or, to the Knowledge of the Company, threatened, or (d) any customer complaints, incident reports, or other reports claiming any products of the Company or any of its Subsidiaries pose a product hazard.

5.27.    <u>No Other Representations or Warranties; Non-Reliance</u>. Except for the express written representations and warranties made by the Company in this Article V, neither the Company nor any other Person makes any express or implied representation or warranty regarding the Company or any of its Subsidiaries or any of its or their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects or its or their respective Representatives in connection with this Agreement or the transactions contemplated by this Agreement, and the Company expressly disclaims any other representations or warranties and none of Parent, Merger Sub or any of their respective Affiliates or its or their respective Representatives has relied on and none are relying on any representations or warranties regarding the Company or any of its Subsidiaries or any of its or their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects or its or their respective Representatives in connection with this Agreement or the transactions contemplated by this Agreement, other than the express written representations and warranties expressly set forth in this Article V.

-56-

ARTICLE VI

Representations and Warranties of Parent and Merger Sub

Except as set forth in the corresponding sections of the confidential disclosure schedule delivered to the Company by Parent prior to the execution and delivery of this Agreement (the "**Parent Disclosure Schedule**") (it being agreed that for the purposes of the representations and warranties made by Parent or Merger Sub in this Agreement, disclosure of any item in any section of the Parent Disclosure Schedule shall be deemed disclosure with respect to any other section to the extent the relevance of such item is reasonably apparent on its face from the face of such disclosure), Parent and Merger Sub each hereby represent and warrant to the Company that:

6.1.    Organization, Good Standing and Qualification. Parent and each of its Subsidiaries is a legal entity duly organized, validly existing and, to the extent such concept is applicable, in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as currently conducted and is qualified to do business and, to the extent such concept is applicable, is in good standing as a foreign corporation or other legal entity in each jurisdiction where the ownership, leasing or operation of its properties or assets or conduct of its business requires such qualification, except, solely with respect to Parent's Subsidiaries (other than Merger Sub), as would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of Parent or Merger Sub to consummate the transactions contemplated by this Agreement by the Outside Date.

6.2.    Capitalization and Business of Merger Sub. The authorized capital stock of Merger Sub consists of 100 shares of common stock of Merger Sub, par value $0.0001 per share. As of the date of this Agreement, all such shares were issued and outstanding. All of the outstanding shares of capital stock of Merger Sub have been duly authorized and are validly issued, fully paid and non-assessable and owned by Parent. Merger Sub has not conducted any business and has no properties, assets, obligations or liabilities of any nature, in each case other than those incident to its organization and pursuant to this Agreement and the transactions contemplated by this Agreement.

6.3.    Corporate Authority. Each of Parent and Merger Sub has all requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform under this Agreement and to consummate the transactions contemplated by this Agreement, subject only to adoption of this Agreement the sole stockholder of Merger Sub. This Agreement has been duly executed and delivered by each of Parent and Merger Sub and, assuming due execution and delivery by the Company, constitutes a valid and binding agreement of Parent and Merger Sub, enforceable against each of Parent and Merger Sub in accordance with its terms, subject to the Bankruptcy and Equity Exception.

6.4.    Governmental Filings; No Violations.

(a)    Other than the expirations of statutory waiting periods and the filings, notices, reports, consents, registrations, approvals, permits and authorizations (i) under the HSR Act, (ii) pursuant to the DGCL, (iii) required to be made with or obtained from the SEC, (iv) required to be made with or by the NASDAQ, (v) under the Takeover Statutes and state securities and "blue sky" Laws and (vi) other filings set forth in Section 6.4(a)(v) of the Company Disclosure Schedule (collectively, the "**Parent Approvals**"), and assuming the accuracy of the representations and warranties set forth in Section 5.4(a), no expirations of any statutory waiting periods under applicable Laws are required and no filings, notices, reports, consents, registrations, approvals, permits, orders, declarations, licenses or authorizations are required to be made by Parent or any of its Subsidiaries with, nor are any required to be made or obtained by Parent or any of its Subsidiaries from, any Governmental Entity, in connection with the execution and delivery of and performance under this Agreement by Parent and Merger Sub and the consummation of the transactions contemplated by this Agreement, except as would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of Parent or Merger Sub to consummate the transactions contemplated by this Agreement by the Outside Date.

-57-

(b)     The execution and delivery of and performance under this Agreement by Parent and Merger Sub do not, and the consummation of the transactions contemplated by this Agreement, will not: (i) assuming (solely with respect to the consummation of the transactions contemplated by this Agreement) the satisfaction of the obligations contemplated by Section 7.4, constitute or result in a breach or violation of or a contravention or conflict with or default under the Organizational Documents of Parent or any of its Subsidiaries; (ii) assuming (solely with respect to the performance under this Agreement by Parent and Merger Sub and the consummation of the transactions contemplated by this Agreement) the satisfaction of the obligations contemplated by Section 7.4 and the statutory waiting periods, filings, notices, reports, consents, registrations, approvals, permits and authorizations contemplated by Section 6.4(a) expire, are made and/or obtained, as applicable, with or without notice, lapse of time or both, constitute or result in a breach or violation of or a contravention or conflict with any Law to which Parent or any of its Subsidiaries is subject; or (iii) assuming (solely with respect to the performance under this Agreement by Parent and Merger Sub and the consummation of the transactions contemplated by this Agreement) the statutory waiting periods, filings, notices, reports, consents, registrations, approvals, permits and authorizations contemplated by Section 6.4(a) expire, are made and/or obtained, as applicable, with or without notice, lapse of time or both, constitute or result in a breach or violation of, or default under, or cause or permit a termination, non-renewal or modification of or acceleration or creation of any right or obligation under or the creation of an Encumbrance on any of the rights, properties or assets of Parent or any of its Subsidiaries pursuant to, any Contract or any License necessary to conduct of the business of Parent or any of its Subsidiaries as currently conducted, except, in the case of clauses (ii) and (iii) of this Section 6.4(b), as would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of Parent or Merger Sub to consummate the transactions contemplated by this Agreement by the Outside Date.

6.5.     Litigation.

(a)     There have been no Proceedings against Parent or any of its Subsidiaries, in each case when acting in such capacity, or, to the Knowledge of Parent, threatened against the Parent or any of its Subsidiaries, except as would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of Parent or Merger Sub to consummate the transactions contemplated by this Agreement by the Outside Date.

-58-

(b)      Neither Parent nor any of its Subsidiaries is a party to or subject to the provisions of any Order, except as would not or would not reasonably be expected to prevent, materially delay or materially impair the ability of the Parent or Merger Sub to consummate the transactions contemplated by this Agreement by the Outside Date.

6.6.      Financing.

(a)      As of the date of this Agreement, Parent has delivered to the Company true, correct and complete copies of (i) a fully executed equity commitment letter, dated as of the date hereof, from the committing party thereto (the "**Equity Financing Sources**") (together with all exhibits, schedules, or annexes attached thereto, and as the same may be amended, modified, supplemented, extended or replaced from time to time, in each case in accordance with the terms of this Agreement and without any Prohibited Modification, the "**Equity Commitment Letter**"), pursuant to which the Equity Financing Sources have agreed, subject to the terms and conditions thereof, to provide the equity investment in the amount set forth therein (the "**Equity Financing**"), (ii) a fully executed debt commitment letter, dated as of the date of this Agreement, by and among Parent and the Debt Financing Sources party thereto (together with all exhibits, schedules, or annexes attached thereto, and as the same may be amended, modified, supplemented, extended or replaced from time to time, in each case in accordance with the terms of this Agreement and without any Prohibited Modification, the "**Debt Commitment Letter**"), pursuant to which the Debt Financing Sources party thereto have agreed, subject to the terms and conditions thereof, to provide or cause to be provided debt financing in the amounts set forth therein (the "**Debt Financing**" and together with the Equity Financing, the "**Financing**") and (iii) fully executed fee letter(s) relating to the Debt Financing (together with all exhibits, schedules, or annexes attached thereto, and as the same may be amended, modified, supplemented, extended or replaced, in each case in accordance with the terms of this Agreement and without any Prohibited Modification, the "**Fee Letter(s)**") (subject to redaction of the fee amounts, pricing caps and other economic terms that are customarily redacted in connection with transactions of this type and that could not in any event affect the conditionality, enforceability, availability, termination or amount of the Financing). The Equity Commitment Letter provides that the Company is an express third-party beneficiary of, and entitled to enforce, the Equity Commitment Letter.

(b)      As of the date of this Agreement, neither the Debt Commitment Letter nor Equity Commitment Letter, nor the commitments thereunder, have been withdrawn, modified, amended, altered, terminated, repudiated or rescinded in any respect, and, to the Knowledge of Parent, the Debt Commitment Letter and Equity Commitment Letter and the commitments thereunder are not contemplated to be withdrawn, modified, amended, altered, terminated, repudiated or rescinded in any respect, except as permitted by Section 7.12 (with any such withdrawal, modification, amendment, alteration, termination, repudiation or rescission thereof promptly notified in writing to the Company). As of the date of this Agreement, there are no other agreements, side letters or arrangements to which Parent or any of its Subsidiaries is a party that would permit the Debt Financing Sources party to the Debt Commitment Letter or Equity Financing Sources party to the Equity Commitment Letter to reduce the amount of the Debt Financing or Equity Financing, respectively, provided therein, or that would reasonably be expected to affect the conditionality, availability or amount of the Debt Financing or Equity Financing, except as expressly set forth in the Debt Commitment Letter or Fee Letter or Equity Commitment Letter, as applicable, as delivered to the Company on the date of this Agreement, as applicable.

-59-

(c)       The Financing, when funded in accordance with the Equity Commitment Letter and Debt Commitment Letter, will provide Parent with cash proceeds on the Closing Date sufficient to (i) satisfy all payment obligations of Parent and Merger Sub contemplated by this Agreement in connection with the transactions contemplated hereby, including the Per Share Merger Consideration and (ii) pay all fees, costs and expenses required to be paid at the Closing by the Parent or Merger Sub in connection with the transactions contemplated hereby (such amounts, collectively, the "**Financing Amounts**").

(d)       Each of the Debt Commitment Letter and Equity Commitment Letter is in full force and effect and constitutes the legal, valid and binding obligations of Parent, Merger Sub and the other parties thereto, as applicable, enforceable against Parent, Merger Sub, and to the Knowledge of Parent, the other parties thereto, as applicable, in accordance with their terms, except, in each case, as enforcement may be limited by the Bankruptcy and Equity Exception. Other than as expressly set forth in the Debt Commitment Letter or the Equity Commitment Letter, as applicable, there are no conditions precedent related to the funding, investing or use of the full proceeds of the Debt Financing or the Equity Financing or any contingencies that would permit the Debt Financing Sources or Equity Financing Sources, as applicable, to reduce the aggregate principal amount of the Financing, including any condition or contingency relating to the amount or availability of the Financing pursuant to any "flex" provision. As of the date of this Agreement, none of Parent nor Merger Sub nor, to the Knowledge of Parent, any other party to the Debt Commitment Letter or Equity Commitment Letter has committed any breach of any of its covenants or other obligations set forth in, or is in default under, the Debt Commitment Letter or the Equity Commitment Letter. As of the date of this Agreement, no event has occurred which, with or without the notice, lapse of time or both, would, or would reasonably be expected to, (i) constitute or result in a breach or default on the part of Parent or Merger Sub (or, to the Knowledge of Parent or Merger Sub, any other party to the Debt Commitment Letter or Equity Commitment Letter) under the Debt Commitment Letter or Equity Commitment Letter; (ii) constitute or result in a failure by Parent or Merger Sub (or, to the Knowledge of Parent or Merger Sub, any other party to the Debt Commitment Letter or Equity Commitment Letter) to satisfy any of the conditions set forth in either the Debt Commitment Letter or the Equity Commitment Letter; or (iii) otherwise result in any portion of the Debt Financing or the Equity Financing not being available on the Closing Date. As of the date of this Agreement, assuming the satisfaction of the conditions set forth in Section 8.1 and 8.2, neither Parent nor Merger Sub has any reason to believe that it will be unable to satisfy on a timely basis all terms and conditions to be satisfied by it in the Debt Commitment Letter or the Equity Commitment Letter on or prior to the Closing Date, or that the Financing will not be available for funding on the Closing Date, nor do B. Parent or Merger Sub have Knowledge that any Debt Financing Source or Equity Financing Source will not perform its obligations thereunder.

-60-

(e)     As of the date of this Agreement, Parent has delivered to the Company a true, correct and complete copy of the Guarantee, pursuant to which, among other things, the Guarantor has guaranteed certain of the obligations of Parent set forth in this Agreement on the terms and subject to the conditions expressly set forth in (and subject to the limitations set forth in) the Guarantee. The Guarantee is in full force and effect and constitutes the valid and binding obligation of the Guarantor, subject to the Bankruptcy and Equity Exception, and has not been withdrawn, modified, amended, altered, terminated, repudiated or rescinded in any respect. As of the date of this Agreement, no event has occurred which, with or without the notice, lapse of time or both, would, or would reasonably be expected to, constitute a default or breach on the part of the Guarantor under the Guarantee. The Guarantee provides that the Company is an express third party beneficiary of, and entitled to enforce, the Guarantee.

(f)     In no event shall the receipt or availability of any funds or financing (including the Financing) by Parent, Merger Sub or any of their respective Affiliates or any other financing or other transactions be a condition to any of Parent or Merger Sub's obligations under this Agreement.

6.7.     <u>Brokers and Finders</u>. Neither Parent, nor any of its Subsidiaries, nor any of their respective directors or employees (including any officers) has employed or retained any broker, finder or investment bank or has incurred or will incur any obligation or liability for any brokerage fees, commissions or finders fees in connection with the transactions contemplated by this Agreement.

6.8.     <u>Ownership of Shares or Preferred Shares</u>. As of the date of this Agreement, other than the Rolling Stockholders, none of the Guarantor, Parent, Merger Sub or any of their respective Affiliates beneficially own (as defined in Rule 13d-3 of the Exchange Act) any capital stock of the Company.

6.9.     <u>No On-Sale Agreements</u>. As of the date of this Agreement, and during the three month period prior to the date of this Agreement, neither Parent nor its Affiliates have entered into any agreements or understandings (including agreements in principle, term sheets, memorandums of understanding or the like) with any Person (other than the Company or its Subsidiaries) with respect to a purchase and sale transaction, whether by merger, stock sale, asset sale or otherwise, involving any material assets or businesses of the Company or any of its Subsidiaries outside of the Ordinary Course of Business.

6.10.     <u>Solvency</u>. Immediately after giving effect to the consummation of the transactions contemplated by this Agreement (including any financings being entered into in connection therewith), assuming the satisfaction of the conditions set forth in Section 8.2, (i) the Fair Value of the assets of Parent and its Subsidiaries, taken as a whole, shall be greater than the total amount of Parent's and its Subsidiaries' liabilities (including all liabilities, whether or not reflected in a balance sheet prepared in accordance with GAAP, and whether direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed), taken as a whole; (ii) Parent and its Subsidiaries, taken as a whole, shall be able to pay their debts and obligations in the ordinary course of business as they become due; and (iii) Parent and its Subsidiaries, taken as a whole, shall have adequate capital to carry on their businesses and all businesses in which they are about to engage. No transfer of property is being made, and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Parent, Merger Sub, the Company or any of their respective Subsidiaries. For the purposes of this Section 6.10, "**Fair Value**" means the amount at which the assets (both tangible and intangible), in their entirety, of Parent and its Subsidiaries would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

-61-

6.11.    No Other Representations or Warranties; Non-Reliance. Except for the express written representations and warranties made by Parent and Merger Sub in this Article VI, none of Parent, Merger Sub or any other Person makes any express or implied representation or warranty regarding Parent, Merger Sub or any of their respective Affiliates or any of its or their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects or its or their respective Representatives in connection with this Agreement or the transactions contemplated by this Agreement, and each of Parent and Merger Sub expressly disclaims any other representations or warranties and none of the Company or its Affiliates or its or their respective Representatives has relied on and none are relying on any representations or warranties regarding Parent, Merger Sub or any of their respective Affiliates or any of its or their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects or its or their respective Representatives, other than the express written representations and warranties expressly set forth in this Article VI and in any instrument or other document delivered pursuant to this Agreement.

## ARTICLE VII

## Covenants

7.1.    Interim Operations.

(a)    The Company shall, and shall cause each of its Subsidiaries to, until the earlier of the Effective Time and the termination of this Agreement pursuant to Article IX (unless (I) Parent shall otherwise approve in writing, which approval shall not be unreasonably withheld, conditioned or delayed, (II) expressly contemplated or required by this Agreement, applicable Law, (III) as set forth in Section 7.1(a) of the Company Disclosure Schedule or (IV) with respect to actions taken or omitted by, or at the specific direction of, any Specified Person taken at the direction of BK or with BK's consent (the exceptions set forth in the foregoing clauses (I) – (IV), the "**Interim Covenant Exceptions**")), use commercially reasonable efforts to conduct its business in the Ordinary Course of Business and, to the extent consistent therewith, shall use and cause each of its Subsidiaries to use their respective commercially reasonable efforts to (x) maintain, in all material respects, its and its Subsidiaries' relations and goodwill with Governmental Entities, customers, suppliers, licensors, licensees, distributors, creditors, lessors, employees, consultants, agents and business associates and (y) keep available, in all material respects, the services of the employees and consultants of the Company and Subsidiaries. Without limiting the generality of and in furtherance of the foregoing sentence, at all times during the period commencing with the execution and delivery of this Agreement and continuing until the earlier of the Effective Time and the termination of this Agreement pursuant to Article IX, except pursuant to any Interim Covenant Exception, the Company shall not (and shall cause its Subsidiaries not to):

-62-

(i)      adopt any change in its Organizational Documents, other than immaterial amendments to applicable organizational documents of the Company's Wholly Owned Subsidiaries;

(ii)      merge or consolidate with any other Person, or restructure, reorganize or completely or partially liquidate, in each case except for any such transactions solely among Wholly Owned Subsidiaries of the Company;

(iii)      acquire, directly or indirectly by merger, consolidation, acquisition of stock or assets or otherwise, any business, Person, properties (including real properties) or assets from any other Person with a fair market value or purchase price in excess of $5 million in the aggregate, in each case, including any amounts or value reasonably expected to be paid in connection with a future earn-out, purchase price adjustment, release of "holdback" or similar contingent payment obligation, or that would reasonably be expected to prevent, materially delay or materially impair the ability of the Company or any of its Subsidiaries to consummate the transactions contemplated by this Agreement by the Outside Date, other than acquisitions of inventory or assets, goods or properties in the Ordinary Course of Business;

(iv)      transfer, sell, convey, lease, sublease, license, pledge, mortgage, assign, divest, grant any option in, cancel or otherwise abandon or dispose of, or incur, permit or suffer to exist the creation of any Encumbrance (other than Permitted Encumbrances) upon, any properties (including any Real Property) or assets (tangible or intangible, but other than Intellectual Property which is addressed in Section 7.1(a)(xx)), product lines or businesses of the Company or any of its Subsidiaries, including capital stock or other equity interests of any of its Subsidiaries, except in connection with (A) sales of obsolete assets in the Ordinary Course of Business, (B) sales or other dispositions of franchises or dealer locations in the Ordinary Course of Business, (C) sales, leases, or other dispositions of assets (not including services) with a fair market value not in excess of $5 million in the aggregate in the Ordinary Course of Business and (D) sales of receivables in securitization or factoring transactions;

(v)      issue, deliver, sell, pledge, dispose of, grant, transfer, lease, license, guarantee, Encumber, or otherwise enter into any Contract with respect to the voting of, any shares of capital stock of the Company (including, for the avoidance of doubt, Shares) or capital stock or other equity or equity-based interests of any of its Subsidiaries, securities convertible or exchangeable into or exercisable for any such shares of capital stock or other equity interests, or any options, warrants or other rights of any kind to acquire any such shares of capital stock, other equity interests or such convertible or exchangeable securities (other than (A) the Voting Agreement or (B) the issuance of shares of such capital stock, other equity securities or convertible or exchangeable securities in respect of Company Equity Awards outstanding as of the date of this Agreement in accordance with their terms and, as applicable, the Stock Plans in effect on the Capitalization Time;

(vi)      make any loans, advances, guarantees or capital contributions to or investments in any Person (other than to or from the Company and any of its Wholly Owned Subsidiaries) in excess of $2 million individually or $5 million in the aggregate, except for extensions of credit to customers in the Ordinary Course of Business;

-63-

(vii)      declare, set aside, establish a record date for, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock or other equity interests (including with respect to the Company, for the avoidance of doubt, Shares), except for dividends (A) paid by any Wholly Owned Subsidiary to the Company or to any other Wholly Owned Subsidiary of the Company and (B) dividends payable to the holders of Series A Preferred Shares, payable in cash in an amount not to exceed $1.875 per Series A Preferred Share annually, in accordance with the terms of the Certificate of Designation;

(viii)      reclassify, split, combine, subdivide or redeem, purchase or otherwise acquire or offer to do any of the foregoing, any of its capital stock, other equity interests or securities convertible or exchangeable into or exercisable for any shares of its capital stock or other equity interests (including with respect to the Company, for the avoidance of doubt, Shares);

(ix)      incur, assume, repurchase or prepay or guarantee or endorse or otherwise become responsible for any Indebtedness for borrowed money (including the issuance of any debt securities, warrants or other rights to acquire any debt security), except for (A) trade payables incurred in the Ordinary Course of Business, (B) pursuant to Existing Indebtedness (including borrowings under the ABL Credit Agreement), (C) any refinancing, extension, renewal or replacement of any outstanding Indebtedness of the Company, in the case of this clause (C), that does not increase the principal amount of Indebtedness outstanding, (D) the incurrence of Indebtedness for borrowed money in the Ordinary Course of Business not to exceed $5 million in the aggregate in the case of this subclause (D), or (E) the renewal and refinancing of any Insurance Policies;

(x)      make or authorize any payment of, or accrual or commitment for, capital expenditures, except to the extent set forth in the line items of the Company's capital budget set forth in Section 7.1(a)(x) of the Company Disclosure Schedule;

(xi)      enter into any Contract that would have been a Material Contract had it been entered into prior to this Agreement, other than any Material Contract permitted by Section 7.1(a)(ix)(C) and in the Ordinary Course of Business;

(xii)      terminate, fail to renew or amend or otherwise modify or waive or assign, convey, Encumber or otherwise transfer, in whole or in part, rights or interest pursuant to or in, any Material Contract, other than expirations or non-renewals of any such Contract in the Ordinary Course of Business and in accordance with the terms of such Contract with no further action by the Company, any of its Subsidiaries or other party to such Contract;

(xiii)      cancel, modify or waive any debts or claims held by or owed to the Company or any of its Subsidiaries except as canceled, modified, or waived in the Ordinary Course of Business not to exceed $1 million individually or $2 million in the aggregate;

(xiv)      amend any material License contemplated by Section 5.5(b)(i) in any material respect, or allow any such material License to lapse, expire or terminate (except where the lapse, expiration or termination of any such License is with respect to a License that has become obsolete, redundant or no longer required by applicable Law);

-64-

(xv)    amend, modify, terminate, cancel or let lapse any Insurance Policy or fail to file any claims thereunder in a timely manner as required under such Insurance Policies;

(xvi)    sell inventory outside of the Ordinary Course of Business or fail to order, maintain and manage levels of inventory consistent with the levels ordered, maintained and managed by the Company in the Ordinary Course of Business;

(xvii)    settle, pay, discharge or compromise any Proceeding for an amount in excess of $2 million individually or $4 million in the aggregate during any calendar year or on a basis that would result in the imposition of any Order that would restrict the future activity or conduct of the Company or any of its Subsidiaries or a finding or admission of a violation of Law or violation of the rights of any Person, or which would reasonably be expected to prevent, materially delay or materially impair the consummation of the transactions contemplated by this Agreement by the Outside Date;

(xviii)    make any material changes with respect to financial accounting policies or procedures, except as required by changes in GAAP (as confirmed in writing by the Company's independent registered public accounting advisor);

(xix)    other than in the Ordinary Course of Business, (A) make, change or revoke any material Tax election or change any material Tax accounting method, (B) file any material amended Tax Return, (C) enter into, cancel or modify any closing agreement with respect to a material amount of Taxes, (D) settle or otherwise compromise any Tax claim, audit, assessment or dispute with respect to a material amount of Taxes, in the case of clause (C), (D) or (E), for an amount materially in excess of the amount reserved for Taxes on the financial statements of the Company, (E) surrender any right to claim a refund with respect to a material amount of Taxes, (F) request any material ruling with respect to Taxes, (G) agree to an extension or waiver of the statute of limitations with respect to any material Taxes (in each case, other than in connection with extensions of time to file Tax Returns that are automatic or automatically granted or otherwise constitute ordinary course extensions), or (H) enter into any material Tax indemnification, sharing, allocation or similar agreement or arrangement (other than customary provisions under any commercial, leasing, financing, employment or other agreement entered into in the ordinary course of business no principal purpose of which relates to Taxes);

(xx)    transfer, sell, lease, license or otherwise dispose of, grant a covenant not to sue or other right under, abandon, cancel or allow to lapse or expire any Company Intellectual Property, other than (A) non-exclusive licenses granted in the Ordinary Course of Business, or (B) abandonments, cancellation, lapses or expiry of Company Intellectual Property that is not material to the Company's or its Subsidiaries' respective businesses.

-65-

(xxi)     except as required by applicable Law or pursuant to the terms of any Company Benefit Plan in effect as of the date of this Agreement, (A) materially increase in any manner the cash compensation or consulting fees, bonus opportunity, severance or termination pay of any current or former Company Employee, except for (1) in respect of those Company Employees who are not officers, increases in annual salary, wage rate or consulting fees in the Ordinary Course of Business that do not exceed four percent (4%) in the aggregate, and any consequent increases in severance or termination pay, and (2) in respect of all Company Employees, the payment of annual bonuses for completed periods based on actual performance, if applicable, in the Ordinary Course of Business, (B) become a party to, establish, adopt, amend, commence participation in or terminate any material Company Benefit Plan, except for renewals in the Ordinary Course of Business, (C) grant any new equity-based awards, or amend or modify the terms of any outstanding equity-based awards, under any Stock Plan, (D) take any action to accelerate the vesting or lapsing of restrictions or payment, or fund or in any other way secure the payment, of compensation or benefits under any Stock Plan, except as contemplated under the terms of this Agreement, (E) materially change any actuarial or other assumptions used to calculate funding obligations with respect to any Company Benefit Plan that is required by applicable Law to be funded or change the manner in which contributions to such plans are made or the basis on which such contributions are determined, except as may be required by GAAP, (F) forgive any loans or issue any loans to any current or former Company Employee (other than routine travel and other expense advances issued in the Ordinary Course of Business), (G) hire any Company Employee above the level of Vice President (as such term is used to reflect corporate Vice Presidents); or (H) terminate without cause the employment of any Company Employee above the level of Vice President (as such term is used to reflect corporate Vice Presidents);

(xxii)     become a party to, establish, adopt, amend, commence participation in or terminate any collective bargaining agreement or other similar agreement with a labor union, labor organization, works council or similar organization, except for renewals in the Ordinary Course of Business; or

(xxiii)     agree, authorize or commit to do any of the foregoing.

(b)     Nothing set forth in this Agreement shall give Parent, directly or indirectly, the right to control or direct the Company's or its Subsidiaries' operations prior to the Effective Time or give the Company, directly or indirectly, the right to control or direct the Parent's or its Subsidiaries' operations prior to the Effective Time.

7.2.     Acquisition Proposals; Change of Recommendation.

(a)     No Solicitation. At all times during the period commencing with the No-Shop Period Start Date and continuing until the earlier of the Effective Time and the termination of this Agreement pursuant to Article IX, except as expressly permitted by this Section 7.2 and for actions taken or omitted by, or at the specific direction of, any Specified Person taken at the direction of BK or with BK's consent, the Company shall not, and shall instruct its and its Subsidiaries' directors, employees (including any officers) and other Representatives not to, directly or indirectly:

(i)     initiate, solicit, propose an Acquisition Proposal or knowingly encourage, knowingly assist or otherwise knowingly facilitate any action that constitutes or would reasonably be expected to lead to or result in an Acquisition Proposal;

-66-

(ii)    engage in, continue, knowingly facilitate, respond to or otherwise participate in any discussions or negotiations relating to any Acquisition Proposal or any action that would reasonably be expected to lead to or result in an Acquisition Proposal;

(iii)    provide or make available any non-public information or data concerning the Company, its Subsidiaries or their respective Representatives or access to the Company or its Subsidiaries' properties, books and records to any Third Person (other than the Rolling Stockholders, Parent, Merger Sub or any of their respective Representatives or designees) in connection with any Acquisition Proposal or any action that would reasonably be expected to lead to or result in an Acquisition Proposal, or that, to the Knowledge of the Company, is considering making or effecting, an Acquisition Proposal;

(iv)    recommend, authorize, approve, adopt, endorse, declare advisable (or make any public statement recommending, authorizing, approving, adopting, endorsing, declaring advisable) or enter into any Alternative Acquisition Agreement;

(v)    take any action to exempt any third party (other than the Rolling Stockholders, Parent, Merger Sub or any of their respective Representatives or designees) from any applicable Takeover Statute or otherwise cause such restrictions not to apply;

(vi)    otherwise knowingly facilitate any effort or attempt to make or effect an Acquisition Proposal; or

(vii)    resolve, agree, authorize or commit to do any of the foregoing.

Notwithstanding the commencement of the No-Shop Period Start Date, the Company may continue to engage in the activities described in Section 7.2(a) with respect to any Excluded Party (but only for so long as such Person is and remains an Excluded Party), including with respect to any amended or modified Acquisition Proposal submitted by any Excluded Party following the No-Shop Period Start Date, and the restrictions in this Section 7.2(a) shall not apply with respect thereto.

(b)    Exceptions to No Solicitation. Notwithstanding anything to the contrary set forth in Section 7.2(a), but subject to the provisions of Section 7.2(c), prior to the time the Requisite Company Vote is obtained (whether during the Go-Shop Period or after the No-Shop Period Start Date), in response to an unsolicited, *bona fide* written Acquisition Proposal that is made after the date of this Agreement and did not arise from a breach of the obligations set forth in this Section 7.2, the Company may:

(i)    contact the third party making such Acquisition Proposal solely to clarify the terms and conditions thereof or inform such person of the existence of the provisions in this Section 7.2;

(ii)    provide information and data concerning the Company and its Subsidiaries and access to the Company and its Subsidiaries' properties, books and records in response to a request to the Third Person who made such an Acquisition Proposal; provided that correct and complete copies of such information or data or access has previously been made available to Parent, or is made available to Parent prior to or concurrently with the time such information and/or access is made available to such Third Person, and prior to providing any such information or data or access, the Company and the Third Person making such Acquisition Proposal shall have entered into a legally binding confidentiality agreement with terms not less restrictive to such Third Person than the terms in the Confidentiality Agreement are on Parent (it being understood that such agreement need not have comparable standstill provisions) (a "**Permitted Confidentiality Agreement**"); provided, however, that if the Third Person making such Acquisition Proposal is a competitor of the Company or Parent, the Company shall not provide any competitively sensitive information to such Person in connection with any actions permitted by this Section 7.2 (b) other than in accordance with customary "clean room" or other similar procedures designed to limit the disclosure of competitively sensitive information; and

-67-

(iii)     engage or otherwise participate in any discussions or negotiations with any such Third Person regarding such Acquisition Proposal, if prior to taking any action described in clause (ii) or this clause (iii) of this Section 7.2(b), the Company Board (acting on the recommendation of the Special Committee) determines in good faith, after consultation with outside legal counsel, that based on the information then available (A) and after consultation with the Special Committee's independent financial advisor, that such Acquisition Proposal constitutes or would reasonably be expected to lead to or result in a Superior Proposal and (B) the failure to take such action would reasonably be expected to be inconsistent with the directors' fiduciary duties under applicable Law.

(c)     <u>Notice of Acquisition Proposals.</u>

(i)     From the date of this Agreement until the first to occur of the No-Shop Period Start Date and the termination of this Agreement pursuant to Article IX, the Company shall as promptly as reasonably practicable (and, in any event, within twenty-four hours) notify Parent in writing if the Company, any of its Subsidiaries or any of their respective Representatives receives any bona fide written Acquisition Proposal (provided that, solely for this purpose, all references to "20%" in the definition of "Acquisition Proposal" will be deemed to be references to "50%"), including copies of any written materials relating thereto provided to the Company or its Representatives. Within two Business Days following the No-Shop Period Start Date, the Company shall deliver to Parent a written notice setting forth (A) the identity of each Excluded Party and (B) the material terms and conditions of the pending Acquisition Proposal made by such Excluded Party. The Company agrees that it shall not, and shall cause its Subsidiaries not to, enter into any confidentiality or other agreement subsequent to the date hereof which prohibits or otherwise interferes with the Company from complying with this Section 7.2(c).

(ii)     From the No-Shop Period Start Date and continuing until the earlier of the Effective Time and the termination of this Agreement pursuant to Article IX, the Company shall promptly (but, in any event, within twenty-four hours) give notice to Parent if an Acquisition Proposal or an Inquiry is received by the Company, its Subsidiaries or any of their respective Representatives, setting forth in such notice the name of the applicable Person or names of Persons that, to the Knowledge of the Company, comprise the applicable Group, the material terms and conditions of any such Acquisition Proposal or Inquiry (including, if applicable, correct and complete copies of any such written Acquisition Proposals or of any written materials relating thereto (or where no such copies are available, a reasonably detailed written description thereof), and thereafter shall keep Parent informed, on a reasonably current basis of the status and terms and conditions of any such Acquisition Proposals or Inquiries (including any amendments or supplements thereto) and the status of any such discussions or negotiations.

-68-

(d)     <u>No Change of Recommendation or Alternative Acquisition Agreement</u>.

(i)     Except as expressly permitted by Section 7.2(d)(iii) and subject to Section 7.2(e), the Company Board and the Special Committee, shall not:

(A)     fail to include the Company Recommendation or the Special Committee Recommendation in the Proxy Statement;

(B)     withhold, withdraw, change, qualify, amend or modify (or publicly propose or resolve to withhold, withdraw, change, qualify, amend or modify) the Company Recommendation or the Special Committee Recommendation in a manner adverse to Parent;

(C)     make any recommendation in support of, or, within ten (10) Business Days following its commencement, fail to recommend against, a tender or exchange offer structured as such pursuant to Rule 14d-2 of the Exchange Act that constitutes an Acquisition Proposal;

(D)     following the public disclosure of an Acquisition Proposal, fail to publicly reaffirm the Company Recommendation or the Special Committee Recommendation within ten Business Days after receipt of any written request to do so from Parent (provided, that the Company shall not be required to reaffirm more than once per Acquisition Proposal (unless the terms of such Acquisition Proposal change in any material respects and such change is publicly announced or disclosed));

(E)     approve, recommend, declare advisable or publicly propose to approve any Acquisition Proposal or approve, recommend, declare advisable or propose to enter into, any Alternative Acquisition Agreement; or

(F)     agree, authorize or commit to do any of the foregoing.

(ii)     Except as permitted by Section 7.2(d)(iii) and after compliance with Section 7.2(d)(iii) and Section 9.3(b), the Company Board and the Special Committee, shall not cause or permit the Company or any of its Subsidiaries to enter into an Alternative Acquisition Agreement or agree, authorize or commit to do so.

-69-

(iii)    Notwithstanding anything to the contrary set forth in this Section 7.2, prior to the time the Requisite Company Vote is obtained, if there has been no breach by the Company in any material respect of its obligations set forth in this Section 7.2, each of the Company Board and the Special Committee, may: (A) effect a Change of Recommendation (1) if an (x) unsolicited, *bona fide* written Acquisition Proposal is received by the Company after the date of this Agreement and has not been withdrawn or (y) Intervening Event has occurred, and (2) the Company Board (acting on the recommendation of the Special Committee) determines in good faith, after consultation with outside legal counsel and after consultation with the Special Committee's independent financial advisor, a failure to effect a Change of Recommendation would reasonably be expected to be inconsistent with the directors' fiduciary duties under applicable Law and, in the case of an Acquisition Proposal contemplated by clause (A)(1)(x) of this Section 7.2(d)(iii), that such Acquisition Proposal constitutes a Superior Proposal; and/or (B) cause or permit the Company to terminate this Agreement in accordance with Section 9.3(b) and cause or permit the Company or any of the Company's Subsidiaries to enter into an Alternative Acquisition Agreement with respect to such Superior Proposal (and the Company may enter into or cause a Subsidiary thereof to enter into such an Alternative Acquisition Agreement) or agree, authorize or commit to do so, in each case, so long as the Company complies with Section 9.5(c)(iii)); provided, however, that no Change of Recommendation, action to terminate the Agreement pursuant to Section 9.3(b) to enter into an Alternative Acquisition Agreement or such other actions may be taken unless and until: (I) the Company has given Parent written notice at least four Business Days in advance (the "**Notice Period**"), which notice shall set forth in writing that it intends to take such action and a reasonably detailed description of the basis therefor, and shall also include, (y) in the case of such an Acquisition Proposal, all information required by Section 7.2(c), *mutatis mutandis*, and (z) in the case of an Intervening Event, a reasonably detailed description of such Intervening Event; (II) during the Notice Period, the Company shall, and shall cause its Representatives to, negotiate in good faith with Parent, including providing Parent the opportunity to make a presentation to the Company Board and the Special Committee regarding this Agreement and, to the extent applicable, any proposed revisions thereto, to revise this Agreement so that conditions set forth in clauses (A)(2) of this Section 7.2(d)(iii) would not be satisfied or such Acquisition Proposal would no longer be with respect to a Superior Proposal, as applicable; and (III) at the end of the Notice Period, the Company Board and the Special Committee shall have taken into account any revisions to this Agreement proposed by Parent in writing prior to the end of the Notice Period, and shall have thereafter determined in good faith that, after consultation with outside legal counsel and after consultation with the Special Committee's independent financial advisor, (x) a failure to effect a Change of Recommendation or take such other action would continue to be reasonably be expected to be inconsistent with the directors' fiduciary duties under applicable Law, and/or (y) that such Acquisition Proposal continues to be a Superior Proposal, as the case may be (it being understood that (y) any revisions to the financial or other material terms of any Acquisition Proposal shall be deemed to be a new Acquisition Proposal for purposes of Section 7.2(c) and this Section 7.2(d)(iii), including for purposes of the Notice Period, except that subsequent to the initial Notice Period, the Notice Period shall be reduced to three Business Days) and (z) prior to the Company or any Subsidiary thereof entering into an Alternative Acquisition Agreement contemplated by clause (B) of this Section 7.2(d)(iii), the Company shall have terminated this Agreement pursuant to Section 9.3(b).

(e)    Certain Permitted Disclosure. Nothing set forth in this Agreement shall prohibit the Company from (i) disclosing a position contemplated by Rule 14d-9, Rule 14e-2(a) or Item 1012(a) of Regulation M-A under the Exchange Act, or (ii) making any "stop, look and listen" statement or similar communication of the type contemplated by Rule 14d-9(f) under the Exchange Act; provided, however, that nothing in this Section 7.2(e) will be deemed to permit the Company, the Company Board or the Special Committee to effect a Change of Recommendation other than in accordance with Section 7.2(d); provided, that it being understood that a disclosure that constitutes only a "stop, look and listen" statement or similar communication of the type contemplated by Rule 14d-9(f) under the Exchange Act shall not be deemed to be a Change of Recommendation if it reaffirms the Company Recommendation and a public statement that describes the Company's receipt of an Acquisition Proposal, that the Company Board and the Special Committee is considering the Acquisition Proposal, that no position has been taken by the Company Board and the Special Committee as to the advisability or desirability of such Acquisition Proposal and the operation of this Agreement with respect thereto will not be deemed a Change of Recommendation.

(f)      Existing Discussions. The Company (i) agrees, that from and after the No-Shop Period Start Date, it shall cease and cause to be terminated any activities, solicitations, discussions and negotiations with any Person conducted prior to the No-Shop Period Start Date with respect to an Acquisition Proposal or any inquiry, proposal or offer that would reasonably be likely to lead to an Acquisition Proposal and (ii) shall promptly (but in any event within three Business Days of the No-Shop Period Start Date): (A) deliver a written notice to each such Person providing only that the Company (1) is ending all activities, discussions and negotiations with such Person with respect to an Acquisition Proposal or any inquiry, proposal or offer that would reasonably be likely to lead to an Acquisition Proposal and (2) is requesting the prompt return or destruction of all confidential information concerning the Company and any of its Subsidiaries; and (B) if applicable, terminate any physical and electronic data or other diligence access previously granted to such Persons.

(g)      Standstill Provisions. From the No-Shop Period Start Date and continuing until the earlier of the Effective Time and the termination of this Agreement and abandonment of the transactions contemplated by this Agreement pursuant to Article IX, the Company shall not terminate, amend or otherwise modify or waive any provision of any confidentiality, "standstill" or similar agreement to which the Company or any of its Subsidiaries is a party and shall enforce, to the fullest extent permitted under applicable Law, the provisions of any such agreement; provided that the Company shall be permitted to terminate, amend or otherwise modify, waive or fail to enforce any provision of any such agreement if the Company Board (acting on the recommendation of the Special Committee) determines in good faith, after consultation with its outside legal counsel, that the failure to take such action would be reasonably be expected to be inconsistent with the directors' fiduciary duties under applicable Law.

(h)      Compliance by Affiliates and Representatives. The Company agrees that any violation of this Section 7.2 by any Affiliate of the Company or any of the Company's or its Affiliates' respective Representatives (acting in such person's capacity as such) shall be deemed a breach of this Section 7.2 by the Company.

-71-

(i)     <u>Go-Shop Period</u>. Notwithstanding anything to the contrary set forth in this Agreement, during the period (the "**<u>Go-Shop Period</u>**") beginning on the date hereof and continuing until 11:59 p.m., New York time on June 9, 2023 (the "**<u>No-Shop Period Start Date</u>**"), the Company and its Affiliates and their respective Representatives shall have the right to: (i) solicit, initiate, propose or induce the making, submission or announcement of, or knowingly encourage, facilitate or assist, any proposal or inquiry that constitutes, could constitute or is reasonably expected to lead to, an Acquisition Proposal; (ii) subject to the entry into, and solely in accordance with, a Permitted Confidentiality Agreement, furnish to any third party (and its Representatives, prospective debt and equity financing sources and/or their respective Representatives), any non-public information relating to the Company and its Subsidiaries or afford to any such third party (and its Representatives, prospective debt and equity financing sources and/or their respective Representatives) access to the business, properties, assets, books, records or other non-public information, or to any personnel, of the Company and its Subsidiaries, in any such case with the intent to induce the making, submission or announcement of an Acquisition Proposal (or any proposal or inquiry that could constitute or is reasonably expected to lead to an Acquisition Proposal); <u>provided</u>, <u>however</u>, that (A) the Company will promptly (and in any event within forty-eight (48) hours) provide to Parent, or provide Parent access to, any such non-public information concerning the Company and its Subsidiaries that is provided to any such Third Person or its Representatives that was not previously provided to Parent or its Representatives and (B) the Company and its Subsidiaries shall not provide (and shall not permit any of their respective Representatives to provide) any competitively sensitive non-public information to any Third Person who is or whose Affiliates are a competitor of the Company in connection with the actions permitted by this Section 7.2(i), except in accordance with customary "clean room" or other similar procedures; (iii) continue, enter into, maintain, participate or engage in discussions or negotiations with any Third Person (and its Representatives, prospective debt and equity financing sources and/or their respective Representatives) with respect to an Acquisition Proposal (or any proposal or inquiry that could constitute or is reasonably expected to lead to an Acquisition Proposal); and (iv) cooperate with or assist or participate in or facilitate any such proposals, inquiries, offers, discussions or negotiations or any effort or attempt to make any Acquisition Proposal, including that the Company may grant a limited waiver under any "standstill provision" or similar obligation of any Third Person with respect to any the Company to allow such Third Person to submit or amend an Acquisition Proposal on a confidential basis to the Company Board (or any committee thereof).

7.3.     <u>Company Stockholders Meeting</u>.

(a)     The Company shall take, in accordance with applicable Law and its Organizational Documents, all action necessary to (i) duly convene, give notice of, and hold the Company Stockholders Meeting as promptly as practicable after the preliminary Proxy Statement is filed (but in any event within forty-five days following the mailing of the definitive Proxy Statement and the Schedule 13E-3), (ii) cause a vote regarding the adoption of this Agreement to be taken thereat and (iii) solicit from its stockholders proxies and votes in favor of approval of this Agreement and secure the Requisite Company Vote.

(b)     The Company Stockholders Meeting shall not be postponed, recessed or adjourned by the Company without Parent's prior written consent; <u>provided</u>, that: (i) the Company may postpone, recess or adjourn the Company Stockholders Meeting, (A) as required by applicable Law, or (B) prior to the time and time for which the Company Stockholders Meeting is originally scheduled, as set forth in the definitive Proxy Statement (the "**<u>Original Date</u>**") or any time and date that the Company Stockholders Meeting is scheduled to be held thereafter in accordance with the terms of this Section 7.3, the Company or Parent, respectively reasonably believes there will be insufficient Shares represented (either in person or by proxy) to constitute a quorum necessary to conduct the business of the Company Stockholders Meeting or to obtain the Requisite Company Vote; <u>provided</u> that (i) in no event will the Company postpone or adjourn the Company Stockholders Meeting beyond the date that is three Business Days prior to the Outside Date without the prior written consent of Parent and (ii) the Company may not postpone or adjourn the Company Stockholders Meeting more than two times or for more than 45 calendar days in total without the prior written consent of Parent.

-72-

(c)      The Company shall, unless there has been a Change of Recommendation in accordance with Section 7.2(d), take all lawful action to obtain the Requisite Company Vote. The Company agrees that, unless this Agreement is terminated pursuant to Article IX, its obligations to hold the Company Stockholders Meeting pursuant to this Section 7.3 shall not be affected in any manner, including in connection with (i) the making of a Change of Recommendation or (ii) the commencement of or announcement or disclosure of or communication to the Company of any Acquisition Proposal.

(d)      Once the Company has established a record date for the Company Stockholders Meeting, the Company shall not change or establish a different record date for the Company Stockholders Meeting without the prior written consent of Parent (such consent not to be unreasonably withheld, delayed or conditioned).

(e)      The Company agrees to provide Parent reasonably detailed periodic updates concerning proxy solicitation results on a timely basis (including, if requested, promptly providing daily voting reports to the extent reasonably practicable).

(f)      Without the prior written consent of Parent, the adoption of this Agreement shall be the only matter (other than related procedural matters) that the Company may propose to be acted on by the Company's stockholders at the Company Stockholders Meeting.

7.4.      <u>Obligations of Parent and Merger Sub</u>. Following the execution and delivery of this Agreement, Parent shall cause the sole stockholder of Merger Sub to execute and deliver, in accordance with applicable Law and Merger Sub's Organizational Documents, a written consent adopting this Agreement.

7.5.      <u>Proxy Statement; Schedule 13E-3 and Other Regulatory Matters</u>.

(a)      <u>Proxy Statement; Schedule 13E-3</u>.

(i)      The Company shall prepare and file with the SEC, as promptly as practicable after the date of this Agreement, but in any event within twenty Business Days after the date of this Agreement, a proxy statement in preliminary form relating to the Company Stockholders Meeting (such proxy statement, including, for the avoidance of doubt, any amendments or supplements thereto, and the definitive proxy statement related thereto, the "**<u>Proxy Statement</u>**"). Except under the circumstances expressly permitted by Section 7.2, the Proxy Statement shall include the Company Recommendation and the Special Committee Recommendation. The Company and Parent shall cooperate to, concurrently with the preparation and filing of the Proxy Statement, jointly prepare and file with the SEC a Rule 13e-3 Transaction Statement on Schedule 13E-3 (such transaction statement, including any amendment or supplement thereto, the "**<u>Schedule 13E-3</u>**") relating to the transactions contemplated by this Agreement.

-73-

5/9/25, 7:20 PM    sec.gov/Archives/edgar/data/1528930/000110465923058675/tm2315302d1_ex2-1.htm#:~:text=This AGREEMENT AND PLAN OF,a…

Case 24-12480-LSS    Doc 1480-1    Filed 05/14/25    Page 237 of 380

(ii)    The Company shall ensure that the Proxy Statement complies as to form and substance with the provisions of the Exchange Act in all material respects. The Company and Parent shall ensure, as to themselves and their Affiliates, that the Schedule 13E-3 complies as to form and substance with the provisions of the Exchange Act in all material respects. The Company and Parent shall ensure that none of the information supplied by it or any of its Affiliates or their respective Representatives for inclusion or incorporation by reference in the Proxy Statement or the Schedule 13E-3 shall, at the date of mailing to stockholders of the Company, at the time of the Company Stockholders Meeting or of filing with the SEC (as applicable), contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(iii)    If at any time prior to the Company Stockholders Meeting, any information relating to the Company or Parent, or any of their respective Subsidiaries or its or their respective Representatives, should be discovered by a Party, which information should be set forth in an amendment or supplement to the Proxy Statement or the Schedule 13E-3, so that either the Proxy Statement or the Schedule 13E-3, as applicable, would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, the Party that discovers such information shall as promptly as practicable following such discovery notify the other Party or Parties (as the case may be) and after such notification (A) the Company shall, as and to the extent required by applicable Law, promptly prepare an amendment or supplement to the Proxy Statement, (B) the Company and Parent shall, as and to the extent required by applicable Law, promptly prepare an amendment or supplement to the Schedule 13E-3 and (C) the Company shall cause the Proxy Statement or Schedule 13E-3 as so amended or supplemented to be filed with the SEC and to be disseminated to its stockholders.

(iv)    The Company shall (A) provide Parent and its Representatives with a reasonable opportunity to review and comment on drafts of the Proxy Statement and other documents and communications related to the Company Stockholders Meeting prior to filing, furnishing or delivering such documents with or such communications to the applicable Governmental Entity and dissemination of such documents or communications to the Company's stockholders and (B) include in the Proxy Statement and such other documents and communications related to the Company Stockholders Meeting all comments reasonably proposed by Parent and its Representatives, and the Company agrees that all information relating to Parent, its Subsidiaries and its and their respective Representatives included in the Proxy Statement shall be in form and content satisfactory to Parent. The Company and Parent shall (1) provide each other with a reasonable opportunity to review and comment on drafts of the Schedule 13E-3 prior to filing it with the SEC and (2) include in the Schedule 13E-3 all comments reasonably proposed by the other Party and its Representatives, and each of the Company and Parent agrees that all information relating to the other Party, its Subsidiaries and its and their respective Representatives included in the Schedule 13E-3 shall be in form and content satisfactory to such other Party.

(v)    The Company shall promptly notify Parent, and Parent shall promptly notify the Company, as applicable, of the receipt of any comments from the SEC with respect to the Proxy Statement or the Schedule 13E-3 and of any request by the SEC for any amendment or supplement to the Proxy Statement or the Schedule 13E-3 or for additional information and shall as promptly as reasonably possible following receipt thereof provide the other Party with copies of all correspondence between itself and/or any of its Representatives and the SEC with respect to the Proxy Statement or the Schedule 13E-3 (or where no such copies are available, a reasonably detailed written description thereof) and provide the other Party and its Representatives a reasonable opportunity to participate in any discussions or meetings with the SEC (or portions of any such discussions or meetings that relate to the Proxy Statement or the Schedule 13E-3). Each of the Company and Parent (as the case may be) shall, subject to the requirements of Section 7.5(a)(iv), promptly provide responses to the SEC with respect to any comments received on the Proxy Statement or the Schedule 13E-3 by the SEC and any requests by the SEC for any amendment or supplement to the Proxy Statement or the Schedule 13E-3 or for additional information. The Company shall cause the definitive Proxy Statement and the Schedule 13E-3 to be mailed as promptly as reasonably possible after the date the SEC staff confirms that the SEC does not intend to review the preliminary Proxy Statement or advises that it has no further comments thereon or that the Company may commence mailing the Proxy Statement.

-74-

(vi)     At the Guarantor's reasonable request and its cost, the Company shall provide reasonable cooperation to the Guarantor in connection with the Guarantor's preparation of any SEC filings as a result of the execution of this Agreement and the consummation of the transactions contemplated hereby, including in connection with the preparation and filing of any pro forma financial statements with respect to the transactions contemplated hereby.

(b)     <u>Other Regulatory Matters</u>.

(i)     In addition to and without limiting the rights and obligations set forth in Section 7.1, Section 7.5(a) and Section 7.7 and subject to the other terms and conditions of this Section 7.5(b), the Company and Parent shall cooperate with each other and use (and shall cause their respective Subsidiaries to use) their respective reasonable best efforts to take or cause to be taken all actions necessary or advisable on its part under this Agreement and applicable Laws to consummate the transactions contemplated by this Agreement as promptly as practicable after the date of this Agreement, including preparing and delivering or submitting documentation to (A) effect the expirations of all statutory waiting periods under applicable Antitrust Law, including under the HSR Act, and, if applicable, any contractual waiting periods under any timing agreements with a Governmental Entity applicable to the consummation of the transactions contemplated by this Agreement, as promptly as practicable after the date of this Agreement or the entry into any such timing agreements, respectively, and (B) make with and obtain from, any Governmental Entity, as applicable, all filings, notices, reports, consents, registrations, approvals, permits and authorizations, in each case, necessary or advisable in order to consummate the transactions contemplated by this Agreement, including the other Company Approvals and the other Parent Approvals.

(ii)     Without limiting the generality of, and in furtherance of the provisions of Section 7.5(b)(i), each of the Company and Parent, as applicable, shall (and shall cause their respective Subsidiaries to):

-75-

(A)      prepare and file, with respect to the transactions contemplated by this Agreement an appropriate filing of a Notification and Report Form pursuant to the HSR Act as soon as reasonably practicable (and in no event later than ten Business Days after the date hereof with respect to any necessary filings under the HSR Act) and make, deliver or submit, as applicable, all other initial filings, notices, and reports under any applicable Antitrust Laws as soon as reasonably practicable after the date of this Agreement, and in connection therewith, request, to the extent possible, early termination of the statutory waiting period under the HSR Act, and to the extent applicable, under the applicable Antitrust Laws, and provide confirmation to each other of any such filings and requests;

(B)      not, without the prior written consent of the other Party or Parties, as the case may be (which consent shall not be unreasonably conditioned, withheld or delayed), (1) cause any filing, delivery or submission contemplated by Section 7.5(b)(i) or Section 7.5(b)(ii)(A) applicable to it to be withdrawn, refiled, or redelivered or resubmitted for any reason, including to provide the applicable Governmental Entities with additional time to review any or all of the transactions contemplated by this Agreement, or (2) consent to any voluntary extension of any statutory waiting period or, if applicable, any contractual waiting period under any timing agreement with a Governmental Entity applicable to the consummation of the transactions contemplated by this Agreement or to any voluntary delay of the consummation of the transactions contemplated by this Agreement at the behest of any Governmental Entity;

(C)      provide or cause to be provided to each Governmental Entity any non-privileged or protected information and documents requested by any Governmental Entity or that are necessary or advisable to permit consummation of the transactions contemplated by this Agreement as promptly as practicable following any such request;

(D)      use its reasonable best efforts to take necessary steps to (1) avoid the entry of, and (2) vacate, reverse or suspend any permanent, preliminary or temporary Order, in each case, that in the case of each of the foregoing clauses (1) and (2) of this 7.5(b)(ii)(D), would prevent, materially delay or materially impair the consummation of the transactions contemplated by this Agreement by the Outside Date, including the proffer and agreement by Parent of its willingness to (I) sell, lease, license, transfer, dispose of, divest or otherwise Encumber, or hold separate pending such disposition, and promptly to effect the sale, lease, license, transfer, disposal, divestiture or other Encumbrance, and holding separate of, assets, operations, rights, product lines, licenses, businesses or interests therein of the Company or its Subsidiaries and/or (II) limit or restrain the freedom of action with respect to the Company's or any of its Subsidiaries' ability to retain or make changes in any such assets, operations, rights, product lines, licenses, businesses or interests therein, and in each case, the entry into agreements with, and submission to Orders of, the relevant Governmental Entity giving effect thereto; and

-76-

(E)    notwithstanding anything to the contrary set forth in this Section 7.5(b), neither this Section 7.5(b) nor the "reasonable best efforts" nor any other provision set forth in this Agreement shall require, or be construed to require Parent or the Company or any of their respective Affiliates to (1) sell, lease, license, transfer, dispose of, divest or otherwise Encumber, or hold separate, or propose, negotiate or offer to effect, or consent or commit to, any such sale, leasing, licensing, transfer, disposal, divestiture or other Encumbrance or holding separate, before or after the Effective Time, of any assets, licenses, operations, rights, product lines, businesses or interest therein of Parent, the Company or the Surviving Corporation (or any of their respective Affiliates), or (2) take or agree to take any other action or agree or consent to any limitations or restrictions on freedom of actions with respect to, or its ability to retain, or make changes in, any such assets, licenses, operations, rights, product lines, businesses or interest therein of Parent, the Company or the Surviving Corporation (or any of their Affiliates) that in the case of all such requirements described in clauses (1) and (2) of this 7.5(b)(ii)(E), individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect without regard to the exceptions set forth therein (an action having the foregoing effects as described in this Section 7.5(b)(ii)(E), a "**Substantial Detriment**"); provided, however, that Parent can compel the Company to (and to cause the Company's Subsidiaries to) take any of the actions referred to in this Section 7.5(b)(ii)(E) (or agree to take such actions) with respect to the assets, operations, rights, product lines, licenses, businesses or interests therein of the Company and its Affiliates so long as the effectiveness of such action is contingent upon the consummation of the Merger and the transactions contemplated by this Agreement.

(iii)    Notwithstanding anything to the contrary set forth in this Agreement, in no event shall (1) any Party or any of its Affiliates be required to agree to any term, condition, obligation, liability, requirement, limitation, qualification, remedy, commitment, sanction or other action imposed, required or requested by a Governmental Entity in connection with effecting (x) the expiration of any statutory waiting period under applicable Antitrust Law, (y) the expiration period of any contractual waiting period under any timing agreements with a Governmental Entity applicable (to the consummation of the Company's Subsidiaries to) the consummation of the transactions contemplated by this Agreement or (z) a Governmental Entity's grant of any consent, registration, approval, permit or authorization, in each case necessary or advisable in order to consummate the transactions contemplated by this Agreement, including the other Company Approvals and the other Parent Approvals, that is not conditioned upon the consummation of the transactions contemplated by this Agreement or (2) the Company or any of its Affiliates agree to any actions contemplated by Section 7.5(b)(ii)(D) or any term, condition, obligation, liability, requirement, limitation, qualification, remedy, commitment, sanction or other action in connection with the expiration of any such waiting period or obtaining of any such consent, registration, approval, permit or authorization that is not conditioned upon the consummation of the transactions contemplated by this Agreement without the prior written consent of Parent.

-77-

5/9/25, 7:20 PM                    sec.gov/Archives/edgar/data/1528930/000110465923058675/tm2315302d1_ex2-1.htm#:~:text=This AGREEMENT AND PLAN OF,a…

Case 24-12480-LSS    Doc 1480-3    Filed 05/14/25    Page 241 of 380

(iv)    Cooperation. Separate and apart from and without limiting or expanding the rights and obligations set forth in Section 7.5(a), Parent shall have the right to direct all matters with any Governmental Entity consistent with its obligations hereunder; provided that Parent and the Company shall have the right to review in advance and, to the extent practicable, each shall consult with the other on and consider in good faith the views of the other in connection with, all the information relating to Parent or the Company, as the case may be, any of their respective Affiliates and any of its or their respective Representatives, that appears in any filing made with, or written materials delivered or submitted to any Governmental Entity in connection with the transactions contemplated by this Agreement. Neither the Company nor Parent shall permit any of its Affiliates or any of its or their respective Representatives to participate in any discussions or meetings with any Governmental Entity in respect of any documentation to effect the expiration of any statutory waiting periods under applicable Laws, including under the HSR Act, or any contractual waiting period under any timing agreements with a Governmental Entity applicable to the consummation of the transactions contemplated by this Agreement or make with or obtain from any Governmental Entity, as applicable, all filings, notices, reports, consents, registrations, approvals, permits and authorizations, in each case, necessary or advisable in order to consummate the transactions contemplated by this Agreement, including the other Company Approvals and the other Parent Approvals or any investigation or other inquiry by a Governmental Entity relating thereto unless it consults with the other in advance and, to the extent permitted by such Governmental Entity, gives the other the opportunity to attend and participate thereat.

(v)    Between the date of this Agreement and the earlier of the Effective Time and the termination of this Agreement in accordance with Article IX, Parent shall not, and shall ensure that none of its Subsidiaries shall, consummate, enter into any agreement providing for, or announce, any investment, acquisition, divestiture or other business combination that would reasonably be expected to materially delay, materially impair or prevent the consummation of the transactions contemplated by this Agreement.

7.6.    Intentionally Omitted.

7.7.    Third-Party Consents. Separate and apart from the obligations set forth in Section 7.5, at Parent's request, the Company shall use its, and shall cause its Subsidiaries to use their, commercially reasonable efforts to give, obtain and/or effect (as the case may be as promptly as reasonably practicable), following the date of this Agreement, all notices, acknowledgments, waivers, consents, amendments, supplements or other modifications required under any Contract to which Company or any of its Subsidiaries is a party to or bound (the "**Third-Party Consents**") and that are necessary to be given, obtained and/or effected from any counterparty to such Contract in order to consummate the transactions contemplated by this Agreement; provided, that in connection therewith, neither the Company nor any of its Subsidiaries shall (a) make any payment of a consent fee, "profit sharing" payment or other consideration (including increased or accelerated payments) or concede anything of value, (b) amend or otherwise modify any such Contract or (c) agree or commit to do any of the foregoing, in each case for the purposes of giving, obtaining and/or effecting any Third-Party Consents without the prior consent of Parent; provided, however, that Parent can compel the Company to (and to cause the Company's Subsidiaries to) take any such actions so long as the effectiveness of such action is contingent on and occurs solely at or following the Closing.

7.8.    Information and Access.

-78-

(a)      The Company shall (and shall cause its Subsidiaries to), upon reasonable prior written notice, during normal business hours, to afford Parent and its Representatives reasonable access from the date of this Agreement and continuing until the earlier of the Effective Time and the termination of this Agreement pursuant to Article IX, to its employees, Representatives, properties, offices and other facilities, Contracts, books and records, in each case, for purposes of consummating the Merger and the transactions contemplated hereby, and, during such period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to Parent all other information and documents concerning or regarding its businesses, properties and assets and personnel as may reasonably be requested by or on behalf of Parent for purposes of consummating the Merger and the transactions contemplated hereby; provided, however, that, subject to compliance with the obligations set forth in Section 7.8(b), neither the Company nor any of its Subsidiaries shall be required to provide such access or furnish such information or documents to the extent doing so would, in the reasonable opinion of the Company, reasonably be expected to result in (i) a violation of applicable Law, (ii) waive the protection of attorney-client privilege or other privilege or trade secret protection or the work product doctrine, (iii) such documents or information that are reasonably pertinent to any pending litigation, suit, action or proceeding between the Company and its Affiliates, on the one hand, and Parent and its Affiliates, on the other hand (but without limiting any rights to discovery in any legal proceeding according to the applicable rules of the forum), (iv) any information to the extent related to the negotiation and execution of this Agreement or to transactions potentially competing with or alternative to the transactions contemplated by this Agreement or proposals from other third parties relating to any competing or alternative transactions (including Acquisition Proposals) and the actions of the Special Committee, the Company Board (or any other committee thereof) with respect to any of the foregoing, whether prior to or after execution of this Agreement, or (v) subject to, and without limiting, the requirements of Section 7.2, any information related to a Change of Recommendation or the actions of the Special Committee, the Company Board (or any other committee thereof) with respect thereto; provided, further, any such access or investigation by Parent or its Representatives shall be conducted under reasonable supervision of appropriate personnel of the Company and in such a manner as not to unreasonably interfere with the normal business or operations of the Company or its Subsidiaries or otherwise result in any unreasonable burden with respect to the prompt and timely discharge by employees of the Company or its Subsidiaries of their normal duties and Parent shall use its commercially reasonable efforts to minimize to the extent reasonably practicable any disruption to the businesses of the Company that may result from any such requests for access and any access pursuant to this Section 7.8 will be subject to the Company's reasonable security measures, policies and insurance requirements and will not include the right to sample soil, sediment, groundwater, surface water, air or building materials or conduct any other environmental sampling or analysis.

(b)      In the event that the Company objects to any request submitted pursuant to Section 7.8(a) on the basis of the matters set forth in clauses (i) or (ii) of Section 7.8(a), it must do so by reasonably promptly providing Parent the reasons therefor, and prior to preventing such access or withholding such information or documents from Parent and its Representatives, the Company shall cooperate with Parent and use commercially reasonable efforts to make appropriate substitute arrangements to permit reasonable disclosure that does not suffer from any of the impediments expressly set forth in clauses (i) and (ii) of Section 7.8(a), including through taking such actions and implementing appropriate and mutually agreeable measures to as promptly as practicable permit such access and the furnishing of such information and documents in a manner to remove the basis for the objection, including by arrangement of appropriate "counsel-to-counsel" disclosure, clean room procedures, redaction and other customary procedures, entry into a customary joint defense agreement. For the avoidance of doubt, Parent hereby agrees that all information provided to it or its Representatives in connection with this Agreement and the consummation of the transactions contemplated hereby shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect in accordance with its terms and shall apply to Parent and Merger Sub as if they were parties thereto.

-79-

7.9.  _Publicity_. The initial press release with respect to the transactions contemplated by this Agreement shall be a joint press release by the Parties. Thereafter, the Company and Parent shall consult with each other, provide each other with a reasonable opportunity for review and give due consideration to reasonable comments by each other, prior to issuing any other press releases or otherwise making public statements, disclosures or communications with respect to the transactions contemplated by this Agreement and shall not issue any such press release or otherwise make such public statements, disclosures or communications prior to such consultation except (a) as may be required or rendered impractical by applicable Law or by obligations pursuant to any listing agreement with or rules of any national securities exchange, interdealer quotation service or NASDAQ, (b) with respect to any Change of Recommendation made in accordance with this Agreement or Parent's responses thereto, (c) with respect to any dispute between the parties relating to this Agreement or any Transaction Documents or (d) with respect to the Parties' disclosures or communications with any Governmental Entity regarding the Proxy Statement or any Company Approvals or Parent Approvals contemplated by Section 7.5 or with respect to the communications contemplated by Section 7.10(d), which shall be governed by the provisions of Section 7.5 and Section 7.10(d), respectively and in addition to the exceptions set forth in foregoing clauses (a) through (d) of this second sentence of this Section 7.9, each of the Company and Parent (and Representatives thereof) may make any public statements, disclosures or communications in response to inquiries from the press, analysts, investors, customers or suppliers or via industry conferences or analyst or investor conference calls, so long as such statements, disclosures or communications are not inconsistent in tone and substance with previous public statements, disclosures or communications jointly made by the Company and Parent or to the extent that they have been reviewed and previously approved by both the Company and Parent.

7.10.  _Employee Benefits_.

(a)    Parent shall provide, or shall cause to be provided, to the Continuing Employees, during the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time, annual base salary or base wages, and target annual cash bonus opportunities, employee benefits, including pension and welfare benefits (excluding equity awards and long-term incentive opportunities), and severance benefits that, in each case, are no less favorable than those provided to such Continuing Employee prior to the Effective Time; _provided_, _however_, that the requirements of this Section 7.10(a) shall not apply to Continuing Employees, if any, who are covered by a collective bargaining agreement. From and after the Effective Time, Parent shall, or shall cause one or more of its Subsidiaries to, assume and honor all Company Benefit Plans set forth on Section 5.13(a) of the Company Disclosure Schedule in accordance with their terms as in effect immediately before the Effective Time.

(b)    Parent shall use commercially reasonable efforts to (i) cause any pre-existing and actively at work conditions or limitations and eligibility and participation waiting periods under any group health plans or other welfare benefit plans, programs and arrangements maintained, sponsored or contributed to by Parent or any of its Subsidiaries in which Continuing Employee may participate after the Effective Time to be waived with respect to the Continuing Employees and their eligible spouse, dependents and beneficiaries, and to (ii) give each Continuing Employee and their eligible spouse, dependents and beneficiaries credit for the plan year in which they first participate in any group health plans or other welfare benefit plans, programs and arrangements maintained, sponsored or contributed to by Parent or any of its Subsidiaries towards applicable deductibles, co-payments, and annual out-of-pocket limits for medical expenses incurred prior to their participation for which payment has been made. Parent shall give, or shall cause to be given, each Continuing Employee service credit for such Continuing Employee's employment with the Company and its Subsidiaries that is no less than that to which such Continuing Employee was entitled before the Effective Time, for purposes of vesting, benefit accrual and eligibility to participate under each applicable Parent Benefit Plan (including without limitation for purposes of level of vacation, paid time-off and severance to which the Continuing Employee may be entitled), as if such service had been performed with Parent, except for benefit accrual under defined benefit pension plans, for purposes of qualifying for subsidized early retirement benefits or to the extent it would result in a duplication of benefits.

-80-

(c)    Prior to the Effective Time, if requested by Parent in writing no less than thirty days before the Effective Time, to the extent permitted by applicable Law and the terms of the applicable plan or arrangement, the Company shall (i) cause to be amended the employee benefit plans and arrangements of it and its Subsidiaries to the extent necessary to provide that no employees of Parent and its Subsidiaries (excluding the Surviving Corporation and its Subsidiaries) shall commence participation therein following the Effective Time unless the Surviving Corporation or such Subsidiary explicitly authorizes such participation and (ii) have its Board of Directors adopt resolutions to cause the Company's 401(k) Plan to be terminated effective immediately prior to the Effective Time. In the event that Parent requests that the Company 401(k) Plan be terminated, the Company shall provide Parent with evidence that the Board of Directors has adopted resolutions to terminate such plan (the form and substance of which shall be subject to review and approval by Parent, which approval may not be unreasonably withheld or delayed) not later than the day immediately preceding the Effective Time.

(d)    In the event that Parent requests that the Company 401(k) Plan be terminated pursuant to Section 7.10(c), the Company and Parent shall take all actions as may be reasonably required, including amendments to the Company 401(k) Plan and/or the tax-qualified defined contribution retirement plan designated by Parent (the "**Parent 401(k) Plan**") to permit each Continuing Employee to make rollover contributions of "eligible rollover distributions" (within the meaning of Section 401(a)(31) of the Code) in the form of cash, Parent Common Stock, the Continuing Employee's plan loan promissory note, or a combination thereof, in an amount equal to the full account balance distributed or distributable to such Continuing Employee from the Company 401(k) Plan to the Parent 401(k) Plan. In the event that Parent requests that the Company 401(k) Plan be terminated, each Continuing Employee shall become a participant in the Parent 401(k) Plan on the Closing Date (giving effect to the service crediting provisions of Section 7.10(b)). Prior to making any broad-based written or formal oral communications to the directors or employees (including any officers) of the Company or any of its Subsidiaries pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, the Company shall provide Parent with a copy of the intended communication, Parent shall have a reasonable period of time to review and comment on the communication, and the Company shall cooperate in providing any such mutually agreeable communication.

-81-

(e)     Nothing set forth in this Agreement is intended to (i) be treated as an amendment of any particular Company Benefit Plan, (ii) prevent Parent, the Surviving Corporation or any of their Affiliates from amending or terminating any of their benefit plans or, after the Effective Time, any Company Benefit Plan in accordance with their terms and applicable Law, (iii) prevent Parent, the Surviving Corporation or any of their Affiliates, after the Effective Time, from terminating the employment of any Continuing Employee, or (iv) without limiting the generality of Section 10.8, create any third-party beneficiary rights in any Continuing Employee, any spouse, beneficiary or dependent thereof, or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any Continuing Employee by Parent, the Surviving Corporation or any of their Affiliates or under any benefit plan which Parent, the Surviving Corporation or any of their Affiliates may maintain.

7.11.     Indemnification; Directors' and Officers' Insurance.

(a)     During the Tail Period, Parent shall, and to the fullest extent that the Company would have been permitted under the Company's Organizational Documents in effect as of the date of this Agreement, Parent shall cause the Surviving Corporation to, (i) indemnify, defend and hold harmless the Indemnified Parties (acting in their capacities as such) against any reasonable and documented costs or expenses (including reasonable and documented attorneys' fees), judgments, fines, losses, claims, damages, amounts paid in settlement or liabilities incurred in connection with, arising out of or otherwise related to any actual or threatened Proceeding arising out of, related to or in connection with matters existing or any action or omission occurring or alleged to have occurred at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, and (ii) advance reasonable, documented out-of-pocket expenses as incurred in connection therewith (upon receipt from such Indemnified Party of a request therefor, accompanied by invoices or other relevant documentation); provided that any Person to whom expenses are so advanced provides an undertaking to repay such advances if it is ultimately determined by final adjudication by the Chosen Courts that such Person is not entitled to such advanced expenses. During the Tail Period, Parent and the Surviving Corporation shall maintain in effect the exculpation, indemnification and advancement of expenses provisions of the Company's and any of its Subsidiary's Organizational Documents in effect as of the date hereof, and shall not amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any individuals who at the Effective Time were Indemnified Parties; provided, further, that all rights to indemnification in respect of any Proceeding pending or asserted or any claim made within such period shall continue until the disposition of such Proceeding or resolution of such claim.

-82-

(b)        Prior to the Effective Time, the Company shall use commercially reasonable efforts and, if the Company is unable to, Parent shall cause the Surviving Corporation as of the Effective Time to, obtain and fully pay the premium for "tail" insurance policies for the extension of the directors' and officers' liability and fiduciary coverage of the Company's existing directors' and officers' insurance policies ("**D&O Insurance**"), in each case for a claims reporting or discovery period of the Tail Period with respect to any claim related to matters existing or occurring at or prior to the Effective Time (including covering the Merger and the transactions contemplated hereby) from the Company's D&O Insurance carrier as of the date of this Agreement or one or more insurance carriers with the same or better credit rating as such carrier with terms, conditions, retentions and limits of liability that are at least as favorable to the insureds as the Company's existing policies; provided, however, that in no event shall the premium amount for such policies exceed 300 percent of the current aggregate annual premium paid by the Company in respect of such coverage; provided, further, that the Company shall give Parent a reasonable opportunity to participate in the selection of such "tail" insurance policy and the Company shall give reasonable and good faith consideration to any comments made by Parent with respect thereto. If the Company for any reason fails to obtain or Parent for any reason fails to cause to be obtained such "tail" insurance policies as of the Effective Time, the Surviving Corporation shall, and Parent shall cause the Surviving Corporation to, continue to maintain in effect for the Tail Period the D&O Insurance in place as of the date of this Agreement with the Company's D&O Insurance carrier as of the date of this Agreement or with or one or more insurance carriers with the same or better credit rating as such carrier with terms, conditions, retentions and limits of liability that are at least as favorable to the insureds as provided in the Company's existing policies as of the date of this Agreement, or the Surviving Corporation shall, and Parent shall cause the Surviving Corporation to, purchase comparable D&O Insurance for the Tail Period with terms, conditions, retentions and limits of liability that are at least as favorable as provided in the Company's existing policies as of the date of this Agreement and from an insurance carrier with the same or better credit rating as the Company's D&O Insurance carrier as of the date of this Agreement, in each case providing coverage with respect to any matters existing or occurring at or prior to the Effective Time (including covering the Merger and the transactions contemplated hereby); provided, however, that in no event shall the annual cost of such D&O Insurance exceed during the Tail Period 300 percent of the current aggregate annual premium paid by the Company for such purpose; and provided further, that if the cost of such insurance coverage exceeds such amount, the Surviving Corporation shall, and Parent shall cause the Surviving Corporation to, obtain a policy with the greatest coverage available for a cost not exceeding such amount.

(c)        If Parent or the Surviving Corporation or any of their respective legal successors or permitted assigns (i) shall consolidate with or merge into any other Person and shall not be the continuing or surviving Person of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the legal successors and permitted assigns of Parent or the Surviving Corporation shall assume all the obligations set forth in this Section 7.11.

(d)        The provisions of this Section 7.11 are intended to be for the benefit of, and from and after the Effective Time shall be enforceable by, each of the Indemnified Parties, who shall be third-party beneficiaries of this Section 7.11.

7.12.    <u>Treatment of Certain Existing Indebtedness; Financing</u>.

(a)        <u>2L Credit Agreement Modification</u>.

-83-

---

(i)    The Company shall, as soon as reasonably practicable after the receipt of a written request from Parent to do so, use reasonable best efforts to seek the consent of the requisite lenders under the FRG Second Lien Credit Agreement, on such terms and conditions as may be specified by Parent, to amend, waive, consent to or otherwise modify the FRG Second Lien Credit Agreement, in each case as contemplated by the Debt Commitment Letter and shall use reasonable best efforts to seek the consent of the requisite lenders under the FRG Second Lien Credit Agreement to obtain such other amendments, waivers, consents or modifications of the applicable provisions of such FRG Second Lien Credit Agreement as may be reasonably requested by Parent in connection with the transactions contemplated by this Agreement (collectively with all related documentation, marketing materials, amendments or supplements thereto, the "**2L Credit Agreement Modification**"). The Company will use reasonable best efforts to provide all necessary cooperation, including providing consent to or executing any documentation necessary to effect any assignment of indebtedness under the FRG Second Lien Credit Agreement contemplated by or sought in connection with, and subject to the terms of, the Debt Commitment Letter.

(ii)    The 2L Credit Agreement Modification shall be prepared by Parent and reviewed by the Company.

(iii)    The Company shall, and shall cause its Subsidiaries to, undertake reasonable best efforts to (a) assist Parent with the preparation of the 2L Credit Agreement Modification and (b) enter into the 2L Credit Agreement Modification, including to (1) execute an amendment to the FRG Second Lien Credit Agreement (that will become effective only upon the occurrence of the Closing), (2) deliver all documentation reasonably requested by Parent in connection with or that is necessary to consummate the 2L Credit Agreement Modification, including delivery of corporate resolutions of the Company and its Subsidiaries authorizing the 2L Credit Agreement Modification, customary officer's certificates of the Company and its Subsidiaries, notices, and any other customary documents that are required to be delivered in connection with the 2L Credit Agreement Modification under the terms thereof and/or the terms of the FRG Second Lien Credit Agreement, which will become effective only upon the occurrence of the Closing and (3) use reasonable best efforts to cause the agent and required lenders under the FRG Second Lien Credit Agreement to enter into such amendment prior to or substantially simultaneously with execution thereof by the Company. The effectiveness of the 2L Credit Agreement Modification will be expressly conditioned on the occurrence of the Closing. The Company and its Affiliates and representatives will not be required to cooperate with respect to any action contemplated in this Section 7.12 that would reasonably be expected to be in violation of the terms of the FRG Second Lien Credit Agreement or any other Existing Indebtedness or any applicable Law. In no event shall the consummation of the 2L Credit Agreement Modification be a condition to any of Parent or Merger Sub's obligations under this Agreement.

(iv)    Parent shall, promptly upon written request by the Company, reimburse the Company and its Subsidiaries for all reasonable and documented out-of-pocket costs and expenses (including professional fees and expenses of accountants, attorneys, and other advisors) to the extent such costs are incurred by the Company or any of its Subsidiaries in connection with activities of the Company, the Company's Subsidiaries and its and their respective Representatives (including counsel) in connection with this Section 7.12 and Section 7.13 (provided that such reimbursement shall not include general auditor and legal expenses of the Company or its Subsidiaries that would have been incurred regardless of whether cooperation was requested in connection with this Section 7.12 or Section 7.13), and Parent will indemnify and hold harmless the Company, the Company's Subsidiaries and its and their respective Representatives (collectively, the "**Financing Indemnitees**") from and against any and all losses, damages, claims, costs (including cost of investigation), settlement payments, injuries, liabilities, judgements, awards, penalties, Taxes, fines or expenses (including reasonable outside attorneys' fees and disbursements) suffered or incurred by any of them in connection with the arrangement or consummation of the Debt Financing, any action taken by them at the request of Parent or their representatives pursuant to this Section 7.12 or Section 7.13, and any information used in connection therewith. Each Financing Indemnitee is intended to be a third-party beneficiary of this Section 7.12(a)(iv) with full rights of enforcement as if a Party.

-84-

(b)        Each of Parent and Merger Sub shall use its reasonable best efforts to take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable to obtain the proceeds of the Financing on or prior to the Closing Date, to the extent required, when taken together with the other sources of funds available to Parent on the Closing Date, to pay the Financing Amounts on the Closing Date, including using its reasonable best efforts to (i) maintain in effect the Debt Commitment Letter and Equity Commitment Letter in accordance with their respective terms; (ii) negotiate, enter into, execute and deliver definitive agreements with respect to the Financing contemplated by the Equity Commitment Letter and Debt Commitment Letter (the "**Definitive Agreements**") and Fee Letter, in each case, consistent with the terms and conditions contained therein and without any Prohibited Modification; (iii) satisfy (or if determined advisable by Parent, obtain the waiver of) all conditions to funding contained in the Debt Commitment Letter and Equity Commitment Letter and such Definitive Agreements that are within Parent's control and comply with its obligations thereunder; (iv) enforce its rights pursuant to the Debt Commitment Letter and Equity Commitment Letter; and (v) in the event that all conditions to funding contained in the Debt Commitment Letter and Equity Commitment Letter have been satisfied or waived, as applicable, consummate the Financing on or prior to the Closing Date, including causing the Debt Financing Sources party to the Debt Commitment Letter to fund the Debt Financing and the Equity Financing Sources to fund the Equity Financing in an amount sufficient, when taken together with any other sources of funds available to Parent and Merger Sub on the Closing Date, to fund the Financing Amounts. To the extent requested in writing by the Company from time to time, Parent shall keep the Company reasonably informed about the status of its efforts to consummate the Financing, including any Alternative Financing.

(c)        In the event that any portion of the Financing contemplated by the Debt Commitment Letter or the Equity Financing becomes unavailable, Parent and Merger Sub will (i) promptly notify the Company in writing of such unavailability and the reason therefor and (ii) use reasonable best efforts to obtain alternative financing (in an amount sufficient to pay the Financing Amounts when taken together with (x) the available portion of the Financing and (y) if the Closing is reasonably anticipated to occur within the next thirty (30) days, any other sources of funds available provided that such other sources are actually available at Closing) (any such alternative financing, the "**Alternative Financing**") and, without limiting the foregoing, shall use reasonable best efforts to cause such Alternative Financing not to include any Prohibited Modifications (as defined below) or conditions to the consummation thereof that are more onerous in any material respect than those set forth in the Debt Commitment Letter as of the date hereof; provided that in no event shall such reasonable best efforts require Parent to pay any fees or any interest rate in respect of the Debt Financing, taken as a whole, that exceeds those contemplated by the Debt Commitment Letter or the Fee Letter in any material amount.

-85-

(d)       Neither Parent nor Merger Sub shall, without the prior written consent of the Company, (i) consent to any amendment, supplement or modification to, or any waiver of any provision under, the Equity Commitment Letter, the Debt Commitment Letter or any Definitive Agreement if such amendment, supplement, modification or waiver (1) adds new (or adversely modifies any existing) conditions to the consummation of all or any portion of the Financing , (2) reduces the amount of the Financing , (3) affects the ability of Parent or Merger Sub to enforce its rights against the other parties to the Equity Commitment Letter, the Debt Commitment Letter or the Definitive Agreements as so amended, replaced, supplemented, or otherwise modified or waived, relative to the ability of Parent or Merger Sub to enforce their rights against the other parties to the Equity Commitment Letter or the Debt Commitment Letter, as applicable, as in effect on the date hereof or (4) would otherwise reasonably be expected to prevent, impede or delay the consummation of the transactions contemplated by this Agreement (the effects described in clauses (1) through (4), collectively, the "**Prohibited Modifications**") or (ii) terminate or cause the termination of the Debt Commitment Letter, the Equity Commitment Letter or any Definitive Agreement; provided, however, that, for the avoidance of doubt, Parent or Merger Sub may amend and/or modify the Debt Commitment Letter to add lenders, lead arrangers, bookrunners, syndication agents or similar entities as parties thereto who had not executed the Debt Commitment Letter as of the date of this Agreement or to increase the amount of commitments under the Debt Commitment Letter or the Equity Commitment Letter. Parent and Merger Sub shall promptly deliver to the Company copies of any such amendment, supplement, termination modification or waiver to the Debt Commitment Letter, the Equity Commitment Letter or any Definitive Agreement (subject to redaction of the fee amounts, pricing caps and other economic terms that are customarily redacted in connection with transactions of this type and that would not in any event be reasonably expected to affect the conditionality, enforceability, availability, termination or amount of the Financing).

(e)       To the extent Parent or Merger Sub obtains Alternative Financing or amends, replaces, supplements, terminates, modifies or waives any of the Financing, in each case pursuant to this Section 7.12 and without any Prohibited Modification, references to the "Financing," "Debt Financing Sources Parties," "Debt Commitment Letter," and "Definitive Agreements" (and other like terms in this Agreement) shall be deemed to refer to such Alternative Financing, the commitments thereunder and the agreements with respect thereto, or the Financing as so amended, replaced, supplemented, terminated, modified or waived.

7.13.    <u>Financing Cooperation</u>.

(a)       From the date of this Agreement and continuing until the earlier of the Effective Time and the termination of this Agreement and abandonment of the transactions contemplated by this Agreement pursuant to Article IX, the Company shall use its reasonable best efforts to, and shall cause its Subsidiaries and its and their respective Representatives to use their respective reasonable best efforts to, provide such customary cooperation and information as may be reasonably requested by Parent or Merger Sub in writing, to assist Parent in connection with arranging, obtaining and consummating the Debt Financing and the Equity Financing Syndication (as applicable), including using reasonable best efforts to:

-86-

5/9/25, 7:20 PM                              sec.gov/Archives/edgar/data/1528930/000110465923058675/tm2315302d1_ex2-1.htm#:~:text=This AGREEMENT AND PLAN OF,a...

Case 24-12480-LSS   Doc 1480-1   Filed 05/14/25   Page 250 of 380

(i)        assist Parent and Merger Sub in its preparation and execution of any credit agreement, guarantees, security agreements, closing certificates (including solvency certificates) and other certificates, resolutions, letters and documents;

(ii)        to the extent required by the Debt Financing, facilitate the pledging of collateral, effective no earlier than the Closing, including using reasonable best efforts to facilitate the delivery to the Debt Financing Sources or any other lenders in connection with the Financing at the Closing all certificates representing outstanding equity interests of the Company and its Subsidiaries and taking all reasonable actions that are necessary and customary to facilitate the release of all material Encumbrances;

(iii)        reasonably cooperate with the external and internal counsel of the Parent and Merger Sub and any financing source or any other lenders or investors in connection with the Financing in connection with providing back-up certificates and factual information related to any legal opinion that such counsel may be required to deliver in connection with the Financing and using reasonable best efforts to cause the local and internal counsel of the Company and its Affiliates to provide assistance to Parent;

(iv)        furnish the Guarantor, Parent, Merger Sub and the Debt Financing Sources or any other lenders or investors in connection with the Financing or the Equity Financing Syndication with any other historical financial information or other pertinent and customary information regarding the Company and its Subsidiaries as may be reasonably requested by the Guarantor, Parent or Merger Sub in connection with the Financing or the Equity Financing Syndication, including as is required by Parent or Merger Sub to produce customary pro forma financial statements as required pursuant to the Debt Commitment Letter or as customary for the arrangement of loans contemplated by Debt Financing;

(v)        furnish to Parent, Merger Sub and the Debt Financing Sources or any other lenders in connection with the Financing, at least 4 Business Days prior to the Closing Date (to the extent requested at least 9 Business Days prior to the Closing Date), all documentation and other information about the Company and its Subsidiaries requested by Parent for purposes of satisfying requirements of bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations (including, without limitation, the PATRIOT Act and, if applicable, the Beneficial Ownership Regulation); and

(vi)        take all corporate actions, subject to the occurrence of the Closing, reasonably requested by Parent to permit the consummation of the Financing and the proceeds thereof to be made available on the Closing Date.

-87-

(b)       The foregoing notwithstanding, none of the Company nor any of its Affiliates shall be required to take or permit the taking of any action pursuant to Section 7.12 or this Section 7.13 that would reasonably be expected to: (i) require the Company or its Subsidiaries or any of their respective Affiliates or any persons who are officers or directors of such entities to pass resolutions or consents to approve or authorize the execution of the 2L Credit Agreement Modification, the Equity Financing Syndication or the Debt Financing or enter into, execute or deliver any certificate, document, instrument or agreement or agree to any change or modification of any existing certificate, document, instrument or agreement (provided that the Company will, to the extent otherwise required hereby, use commercially reasonable efforts to cause persons who will continue as officers or directors, as applicable, of the Company and its Subsidiaries after the occurrence of Closing, and who will not be removed or replaced in connection therewith, to pass resolutions and to execute documents, in each case which are subject to and conditioned upon, and do not become effective until, the occurrence of Closing), (ii) cause any representation or warranty in this Agreement to be breached by the Company or any of its Affiliates, (iii) require the Company or any of its Affiliates to pay any commitment or other similar fee or incur any other expense, liability or obligation in connection with the Debt Financing, the 2L Credit Agreement Modification or the Equity Financing Syndication prior to the Closing for which Parent is not obligated to provide reimbursement or indemnification or otherwise incur any obligation under any agreement, certificate, document or instrument (except to the extent Parent is obligated to provide reimbursement or indemnification for such obligation or the effectiveness of such obligation under such agreement, certificate, document or instrument is subject to and conditioned upon the occurrence of Closing), (iv) reasonably be expected to cause any director, officer, employee or stockholder of the Company or any of its Affiliates to incur any personal liability, (v) reasonably be expected to conflict with the Existing Indebtedness, the organizational documents of the Company or any of its Affiliates or any Laws, (vi) reasonably be expected to result in a material violation or breach of, or a default (with or without notice, lapse of time, or both) under, any Contract to which the Company or any of its Affiliates is a party, (vii) provide access to or disclose information that the Company or any of its Affiliates determines on advice of counsel would jeopardize any attorney-client privilege or other applicable privilege or protection of the Company or any of its Affiliates, (viii) require the delivery of any opinion of counsel, (ix) require the Company to prepare any financial statements or information that are not available to it and prepared in the ordinary course of its financial reporting practice or (x) require the Company to prepare or deliver any Excluded Information. Nothing contained in Section 7.12 or this Section 7.13 or otherwise in this Agreement shall require the Company or any of its Affiliates, prior to the Closing, to be an issuer or other obligor with respect to the Debt Financing.

(c)       All non-public or otherwise confidential information regarding the Company or any of its Affiliates obtained by Parent or their representatives pursuant to Section 7.12 or this Section 7.13 shall be kept confidential in accordance with the Confidentiality Agreement; provided that Parent and its representatives shall be permitted to disclose such information to (i) the Debt Financing Sources subject to their confidentiality obligations under the Debt Commitment Letter and the Definitive Agreements, (ii) otherwise to the extent necessary and consistent with customary practices in connection with the Debt Financing subject to customary confidentiality arrangements reasonably satisfactory to the Company and (iii) investors in the Equity Financing Syndication that have signed a joinder to the Confidentiality Agreement or otherwise signed a customary confidentiality agreements with the Company as party or a third party beneficiary, which in any case, must be reasonably satisfactory to the Company.

(d)       Notwithstanding anything contrary in this Agreement or any Transaction Documents, the Guarantor and its Affiliates shall not sell, transfer or syndicate to any Person (other than the Rolling Stockholders) if such sale, transfer or syndication (i) would reasonably be expected to result in any delay in satisfying, or increase the risk of not satisfying, the conditions to the Closing set forth in Article VIII or (ii) cause any statement made or information provided to a regulatory authority prior to such assignment to become materially untrue or misleading; provided, further, any sale, transfer or syndication to a competitor of the Company must be subject to the prior approval of the Company and Parent.

-88-

7.14.   <u>Takeover Statutes</u>. If any Takeover Statute is, becomes or is deemed applicable to the transactions contemplated by this Agreement the Company and the Company Board (acting on the recommendation of the Special Committee) shall grant such approvals and shall take such actions as are necessary and advisable so that such transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise act to eliminate or minimize the effects of any such Takeover Statutes.

7.15.   <u>Transaction Litigation</u>. In the event that any stockholder litigation related to this Agreement or the transactions contemplated by this Agreement is brought, or, to the Knowledge of the Company, threatened, against the Company or any Indemnified Party from and following the date of this Agreement and prior to the Effective Time (such litigation, other than any Proceeding in connection with, arising out of or otherwise related to a demand for appraisal under Section 262 of the DGCL, which shall be governed by Section 4.2(f), "**Transaction Litigation**"), the Company shall as promptly as practicable (a) notify Parent thereof and shall keep Parent reasonably informed with respect to the status thereof, (b) give Parent the opportunity to participate in the defense and/or settlement of any Transaction Litigation, (c) timely consult with Parent with respect to the defense and/or settlement of any Transaction Litigation and (d) shall consider in good faith Parent's advice and recommendations with respect to such Transaction Litigation; <u>provided</u> that the Company shall not settle or agree to settle any Transaction Litigation without prior written consent of Parent.

7.16.   <u>Section 16 Matters</u>. The Company shall, prior to the Effective Time, take all such actions as may be reasonably necessary to cause any dispositions of Shares (including derivative securities) in connection with the transactions contemplated by this Agreement by any individual who is subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to the Company, to be exempt under Rule 16b-3 under the Exchange Act, to the extent permitted by applicable Law.

7.17.   <u>Delisting and Deregistration</u>. Prior to the Closing Date, the Company shall cooperate with Parent and use reasonable best efforts to take, or cause to be taken, all actions, and do or cause to be done all things, necessary or advisable on its part under applicable Law, including, for the avoidance of doubt, the rules and policies of NASDAQ to enable the delisting by the Surviving Corporation of the Shares and the Series A Preferred Shares from NASDAQ and the deregistration of the Shares and the Series A Preferred Shares under the Exchange Act as promptly as practicable after the Effective Time.

7.18.   <u>Redemption of Series A Preferred Stock</u>. Notwithstanding anything to the contrary in this Agreement, if Parent shall request in writing that the Company effect the redemption of all or any portion of the Series A Preferred Shares, the Company shall promptly take, or cause to be taken, such actions as may be required (and that are approved by Parent) to effect the redemption of such Series A Preferred Shares in accordance with the terms set forth in the Certificate of Designation, <u>provided</u> that, for the avoidance of doubt, any redemption of such Series A Preferred Shares shall be subject to the occurrence of the Closing. If Parent shall request that the Company effect the redemption of any Series A Preferred Shares, Parent shall cause the Surviving Corporation to pay the redemption price payable in respect thereof as determined pursuant to the Certificate of Designation when such redemption price shall become due and payable in accordance with the terms set forth therein.

-89-

ARTICLE VIII

Conditions to Effect the Closing

8.1.     Conditions to Each Party's Obligation to Effect the Closing. The respective obligations of each Party to effect the Closing is subject to the satisfaction or, to the extent permitted by applicable Law, waiver at or prior to the Closing of each of the following conditions:

(a)     Company Stockholder Approval. The Requisite Company Vote shall have been obtained.

(b)     Regulatory Approvals. The statutory waiting period (and any extensions thereof) applicable to the consummation of the transactions contemplated by this Agreement under the HSR Act shall have expired or been earlier terminated.

(c)     No Legal Prohibition. No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that is in effect and makes unlawful or prevents the consummation of the transactions contemplated by this Agreement.

8.2.     Conditions to Parent's and Merger Sub's Obligation to Effect the Closing. The obligations of Parent and Merger Sub to effect the Closing are also subject to the satisfaction or, to the extent permitted by applicable Law, waiver by Parent at or prior to the Closing Date of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties set forth in: (i) Section 5.10(b) (*Absence of Certain Changes*) shall have been true and correct as of the date of this Agreement and shall be true and correct as of the Closing as though made as of the Closing (except to the extent that any such representation and warranty expressly speaks as of a particular date or period of time, in which case such representation and warranty shall be so true and correct as of such particular date or period of time); (ii) Section 5.2(a) (*Capital Structure*) shall have been true and correct as of the date of this Agreement and shall be true and correct as of the Closing, in each case, except for *de minimis* inaccuracies, as though made as of the Closing (except to the extent that any such representation and warranty expressly speaks as of a particular date or period of time, in which case such representation and warranty shall be so true and correct as of such particular date or period of time); (iii) Section 5.1(a) (*Organization, Good Standing and Qualification*), Sections 5.2(c), (g) and (h) (*Capital Structure*), Section 5.3 (*Corporate Authority; Approval and Fairness*), Section 5.22 (*Takeover Statute*) and Section 5.23 (*Brokers and Finders*), shall have been true and correct in all material respects as of the date of this Agreement and shall be true and correct in all material respects as of the Closing as though made as of the Closing (except to the extent that any such representation and warranty expressly speaks as of a particular date or period of time, in which case such representation and warranty shall be so true and correct in all material respects as of such particular date or period of time); and (iv) Article V (other than those set forth in the foregoing clauses (i), (ii) and (iii) of this Section 8.2(a)), without giving effect to any "materiality" or "Material Adverse Effect" qualifiers or qualifiers of similar import set forth therein, shall have been true and correct as of the date of this Agreement and shall be true and correct as of the Closing as though made as of the Closing (except to the extent that any such representation and warranty expressly speaks as of a particular date or period of time, in which case such representation and warranty shall be so true and correct as of such particular date or period of time), except, in the case of this clause (iv), for any failure of any such representation and warranty to be so true and correct that would not result in a Material Adverse Effect.

-90-

(b)    <u>Performance of Obligations of the Company</u>. The Company shall have performed in all material respects each of its obligations required to be performed by it under this Agreement at or prior to the Closing.

(c)    <u>No Material Adverse Effect</u>. Since the date of this Agreement, there shall not have occurred any Material Adverse Effect that is continuing.

(d)    <u>Company Closing Certificate</u>. Parent shall have received a certificate duly executed on behalf of the Company by an executive officer of the Company certifying that the conditions set forth in Section 8.2(a), Section 8.2(b) and Section 8.2(c) have been satisfied.

8.3.    <u>Conditions to the Company's Obligation to Effect the Closing</u>. The obligation of the Company to effect the Closing is also subject to the satisfaction or, to the extent permitted by applicable Law, waiver by the Company at or prior to the Closing of the following conditions:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties of Parent and Merger Sub set forth in this Agreement, without giving effect to any "materiality" qualifiers or qualifiers of similar import set forth therein, shall have been true and correct as of the date of this Agreement and shall be true and correct as of the Closing as though made as of the Closing (except to the extent that any such representation and warranty expressly speaks as of a particular date or period of time, in which case such representation and warranty shall be so true and correct as of such particular date or period of time), in each case, except for any failure of any such representations and warranties to be so true and correct that would not reasonably be expected to prevent, materially delay or materially impair the ability of Parent or Merger Sub to consummate the transactions contemplated by this Agreement by the Outside Date.

(b)    <u>Performance of Obligations of Parent and Merger Sub</u>. Each of Parent and Merger Sub shall have performed in all material respects each of its obligations required to be performed by it under this Agreement at or prior to the Closing.

-91-

(c)     _Parent and Merger Sub Closing Certificate_. The Company shall have received a certificate duly executed on behalf of Parent and Merger Sub by an executive officer of Parent and Merger Sub certifying that the conditions set forth in Section 8.3(a) and Section 8.3(b) have been satisfied.

ARTICLE IX

Termination

9.1.    _Termination by Mutual Written Consent_. Subject to the other provisions of this Article IX, this Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Effective Time, whether before or after the Requisite Company Vote has been obtained, by the mutual written consent of the Parties.

9.2.    _Termination by Either the Company or Parent_. Subject to the other provisions of this Article IX, this Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Effective Time by either the Company or Parent if:

(a)     the transactions contemplated by this Agreement shall not have been consummated by 5:00 p.m. (New York time) on November 10, 2023 (the "**Outside Date**"), whether before or after the Requisite Company Vote has been obtained; _provided, however_, that the right to terminate this Agreement and abandon the transactions contemplated by this Agreement or extend the Outside Date pursuant to this Section 9.2(a) shall not be available to either the Company or Parent if it has breached any representation, warranty, covenant or agreement set forth in this Agreement and such breach shall have proximately caused the occurrence of the failure of a condition to the Closing to occur on or prior to the Outside Date (_it being understood_ that for the purposes of this Section 9.2(a) any such breach by Merger Sub shall be deemed a such breach by Parent);

(b)     the Requisite Company Vote shall not have been obtained at the Company Stockholders Meeting or at any postponement, recess or adjournment thereof taken in accordance with this Agreement; or

(c)     if any Governmental Entity shall have enacted, issued, promulgated, enforced or entered any Law or Order that is in effect and makes unlawful, prevents or impairs the consummation of the transactions contemplated by this Agreement and such Law or Order shall have become final and non-appealable, whether before or after the Requisite Company Vote has been obtained; _provided_ that the right to terminate this Agreement and abandon the transactions contemplated by this Agreement pursuant to this Section 9.2(c) shall not be available to the Company or Parent if it has breached representation, warranty, covenant or agreement set forth in this Agreement and such breach shall have proximately caused the occurrence of such final and non-appealable Law or Order (_it being understood_ that for the purposes of this Section 9.2(c) any such breach by Merger Sub shall be deemed such a breach by Parent).

-92-

9.3.    Termination by the Company. Subject to the other provisions of this Article IX, this Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Effective Time by the Company:

(a)    if there has been a breach of any representation, warranty, covenant or agreement made by Parent or Merger Sub set forth in this Agreement, or if any representation or warranty of Parent or Merger Sub shall have become untrue or incorrect following the date of this Agreement, in either case such that the conditions in Section 8.3(a) or Section 8.3(b) would not be satisfied (and such breach or failure to be true and correct is not curable prior to the Outside Date, or if curable prior to the Outside Date, has not been cured within the earlier of (i) thirty days after the giving of written notice of such breach or failure by the Company to Parent and Merger Sub specifying this Section 9.3(a) and describing such breach or failure and (ii) three Business Days prior to the Outside Date), whether before or after the Requisite Company Vote has been obtained; provided that the right to terminate this Agreement and abandon the transactions contemplated by this Agreement pursuant to this Section 9.3(a) shall not be available to the Company if it has breached any representation, warranty, covenant or agreement set forth in this Agreement and such breach shall have proximately caused the occurrence of the failure of a condition to the Closing to occur or if Parent has the right to terminate this Agreement and abandon the transactions contemplated by this Agreement pursuant to Section 9.4(a);

(b)    in order for the Company Board and the Special Committee to cause or permit the Company or any of the Company's Subsidiaries to enter into an Alternative Acquisition Agreement with respect to a Superior Proposal, in each case, so long as the Company has complied with the obligations contemplated by Section 7.2(d)(iii) and the Company pays or causes to be paid to Parent the Termination Fee by wire transfer of immediately available funds in accordance with Section 9.5(c)(iii); or

(c)    if (i) all of the conditions set forth in Section 8.1 and Section 8.2 (except for those conditions that by their nature are to be satisfied at the Closing) have been and continue to be satisfied, (ii) the Company has notified Parent in writing that all of the conditions set forth in Section 8.1 and Section 8.2 have been satisfied or, with respect to the conditions set forth in Section 8.2, validly waived (or would be satisfied or validly waived if the Closing were to occur on the date of such notice) and it stands ready, willing and able to consummate the Merger at such time, (iii) the Company shall have given Parent written notice at least three Business Days prior to such termination stating that the Company's intention is to terminate this Agreement pursuant to this Section 9.3(c) and (iv) Parent fails to consummate the Closing at the end of such three Business Day period following the delivery of such notice specified in clause (iii) above.

9.4.    Termination by Parent. Subject to the other provisions of this Article IX, this Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Effective Time by Parent:

(a)    if there has been a breach of any representation, warranty, covenant or agreement made by the Company set forth in this Agreement, or if any representation or warranty of the Company shall have become untrue or incorrect following the date of this Agreement, in either case such that the conditions in Section 8.2(a) or Section 8.2(b) would not be satisfied (and such breach or failure to be true and correct is not curable prior to the Outside Date, or if curable prior to the Outside Date, has not been cured within the earlier of (i) thirty days after the giving of written notice of such breach or failure by Parent to the Company specifying this Section 9.4(a) and describing such breach or failure and (ii) three Business Days prior to the Outside Date), whether before or after the Requisite Company Vote has been obtained; provided that the right to terminate this Agreement and abandon the transactions contemplated by this Agreement pursuant to this Section 9.4(a) shall not be available to Parent if either Parent or Merger Sub has breached any representation, warranty, covenant or agreement set forth in this Agreement and such breach shall have proximately caused the occurrence of the failure of a condition to the Closing to occur or if the Company has the right to terminate this Agreement and abandon the transactions contemplated by this Agreement pursuant to Section 9.3(a); or

-93-

(b)     at any time prior to the time the Requisite Company Vote is obtained, if (i) the Company Board or the Special Committee shall have effected a Change of Recommendation and (ii) the Company shall have committed a Willful and Material Breach of the terms of Section 7.2.

9.5.     Notice of Termination; Effect of Termination and Abandonment.

(a)     In the event the Company or Parent intends to terminate this Agreement and abandon the transactions contemplated by this Agreement pursuant to Section 9.2 or Section 9.3, as applicable, the Company or Parent, as applicable, shall give written notice to the other Party or Parties (as the case may be) specifying the provision or provisions of this Agreement pursuant to which such termination and abandonment is intended to be effected.

(b)     In the event this Agreement is terminated pursuant to this Article IX, this Agreement shall become void and of no effect with no liability to any Person on the part of any Party (or any of its Affiliates or its or their respective Representatives); provided, however, that: (i) subject to the terms set forth in Section 9.5(e), no such termination shall relieve any Party of any liability or damages resulting from any actual fraud or Willful and Material Breach of such Party; (ii) the provisions set forth in this Section 9.5(b), Section 7.12(a)(iv), Section 7.13(d), Section 9.5(c), Section 9.5(d), Section 9.5(e) and Article X shall survive any termination of this Agreement and any abandonment of the transactions contemplated by this Agreement; and (iii) the Confidentiality Agreement and the Limited Guarantee shall survive any termination of this Agreement in accordance with their respective terms.

(c)     In the event this Agreement is terminated and the transactions contemplated by this Agreement abandoned pursuant to this Article IX:

-94-

(i)      by either the Company or Parent pursuant to Section 9.2(a) or Section 9.2(b) or by Parent pursuant to Section 9.4(a) and (A) an Acquisition Proposal shall have been made to the Company Board or the Special Committee, the Company or any Subsidiaries of the Company or to the stockholders of the Company or publicly disclosed or any Person shall have publicly announced an intention (whether or not conditional) to make an Acquisition Proposal prior to, and not publicly withdrawn at least two Business Days prior to (1) the date of termination and abandonment, with respect to any termination and abandonment pursuant to Section 9.2(a) or Section 9.4(a) or (2) the Company Stockholders Meeting (including any postponement, recess or adjournment thereof taken in accordance with this Agreement), with respect to termination and abandonment pursuant to Section 9.2(b) and (B) within twelve months after any such termination and abandonment, (1) the Company or any of Subsidiaries shall have entered into an Alternative Acquisition Agreement for any Acquisition Proposal that is subsequently consummated (which, for this purpose shall include an Alternative Acquisition Agreement with the Person submitting a Withdrawn Proposal or its Affiliates), or (2) any Acquisition Proposal (which, for this purpose shall include an Alternative Acquisition Agreement with the Person submitting a Withdrawn Proposal or its Affiliates) shall have been consummated (with "fifty percent" being substituted in lieu of "twenty percent" in each instance thereof in the definition of "Acquisition Proposal" referenced in the definition of "Alternative Acquisition Agreement" or otherwise for purposes of this Section 9.5(c)(i)(B)), then the Company shall pay or cause to be paid to Parent the Termination Fee by wire transfer of immediately available funds within five Business Days of the consummation of such Acquisition Proposal;

(ii)      by the Company pursuant to Section 9.3(a) or Section 9.3(c), then the Parent shall pay or cause to be paid to the Company the Reverse Termination Fee by wire transfer of immediately available funds within five Business Days following the date of such termination; or

(iii)      by the Company pursuant to 9.3(b) or by Parent pursuant to Section 9.4(b), then the Company shall pay or cause to be paid to Parent the Termination Fee by wire transfer of immediately available funds within (A) in the case of a termination and abandonment by the Company pursuant to Section 9.3(b), prior to or concurrently with such termination, and (B) in the case of a termination and abandonment by Parent pursuant to Section 9.4(b), within five Business Days following the date of such termination.

-95-

(d)        The Parties acknowledge and agree that (i) in no event shall Parent be required to pay the Reverse Termination Fee on more than one occasion and (ii) the agreements set forth in this Section 9.5 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the other Parties would not enter into this Agreement and accordingly, if Parent (or, if applicable, the Guarantor to the extent provided in and subject to the terms of the Guarantee) fails to promptly pay or cause to be paid the Reverse Termination Fee if and to the extent the same becomes due and payable by Parent pursuant to this Article IX, and, in order to obtain such amount, the Company commences a Proceeding that results in a judgment against Parent (or, if applicable, the Guarantor to the extent provided in and subject to the terms of the Guarantee) for the Reverse Termination Fee (or any portion thereof), Parent (or, if applicable, the Guarantor to the extent provided in and subject to the terms of the Guarantee) shall pay or cause to be paid to the Company its reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) in connection with such Proceeding, together with compounding interest on the Reverse Termination Fee (or any portion thereof), as the case may be, at the annual rate of two percent (2%) plus the prime lending rate as published in The Wall Street Journal in effect on the date such payment was required to be made through the date of payment (or such lesser rate as is the maximum permitted by applicable Law) (collectively, the "**Company Recovery Costs**"). Notwithstanding anything to the contrary in this Agreement, the Company's right to receive from Parent (or, if applicable, the Guarantor to the extent provided in and subject to the terms of the Guarantee) the Reverse Termination Fee (and, if applicable, the Company Recovery Costs) shall, to the extent the Reverse Termination Fee (and, if applicable, the Company Recovery Costs) is owed, constitute the sole and exclusive remedy of the Company against the Non-Recourse Parties (as defined herein) affiliated with the Guarantor Parties, Parent or Merger Sub for any breach, loss or damage suffered by the Company or any Subsidiary or Affiliate thereof or any other Person as a result of or relating to or arising out of this Agreement or any agreement executed in connection herewith or the transactions contemplated hereby or thereby, including for any matters forming the basis for the termination of this Agreement and abandonment of the transactions contemplated hereby or thereby, provided that, notwithstanding anything to the contrary in this Agreement or any Transaction Documents, (x) nothing shall relieve the parties thereto of their obligations under the Confidentiality Agreement or relieve the Guarantor (to the extent provided in and subject to the terms of the Guarantee), Parent or Merger Sub from any liability or damages to the Company resulting from any actual fraud or Willful and Material Breach of the Guarantor (to the extent provided in and subject to the terms of the Guarantee), Parent or Merger Sub, which, for the avoidance of doubt, shall not be limited by the amount of the Reverse Termination Fee and the Company Recovery Costs, in the aggregate. Without limiting the foregoing, in no event will the Company or any Subsidiary or Affiliate thereof seek or obtain, nor will they permit any of their Representatives or any other Person acting on their behalf to seek or obtain, nor will any Person be entitled to seek or obtain, any recovery or award (other than the payment by Parent (or the Guarantor to the extent provided in and subject to the terms of the Guarantee) of the Reverse Termination Fee, the Company Recovery Costs, payments required to be made pursuant to Section 7.12(a)(iv) or any damages in respect of any actual fraud or Willful and Material Breach of the Guarantor (to the extent provided in and subject to the terms of the Guarantee), Parent, or Merger Sub, against any Non-Recourse Parties affiliated with the Guarantor Parties, Parent or Merger Sub, and in no event will the Company or any Subsidiary or Affiliate thereof seek or obtain, nor will they permit any of their Representatives or any other Person acting on their behalf to seek or obtain any monetary damages of any kind, including consequential, special, indirect or punitive damages (other than the payment by Parent (or the Guarantor to the extent provided in and subject to the terms of the Guarantee) of the Reverse Termination Fee, the Company Recovery Costs or payments required to be made pursuant to Section 7.12(a)(iv) or any damages in respect of any actual fraud or Willful and Material Breach of the Guarantor (to the extent provided in and subject to the terms of the Guarantee), Parent, or Merger Sub, in each case to the extent payable pursuant to the express terms of this Agreement or the Guarantee) against the Non-Recourse Parties affiliated with Guarantor Parties, Parent or Merger Sub as a result of or relating to or arising out of this Agreement or any agreement executed in connection herewith or the transactions contemplated hereby or thereby, including for any matters forming the basis for the termination of this Agreement and abandonment of the transactions contemplated hereby or thereby, provided that (w) nothing shall relieve the parties thereto of their obligations under the Confidentiality Agreement, (x) nothing contained herein shall limit the rights and remedies of the Company in the event of, or relieve the Guarantor (to the extent provided in and subject to the terms of the Guarantee), Parent or Merger Sub from, any liability or damages to the Company resulting from any actual fraud or Willful and Material Breach of the Guarantor, Parent or Merger Sub, and (y) nothing contained herein shall limit the rights and remedies of Parent or Merger Sub under the Debt Commitment Letter, the Equity Commitment Letter or the definitive agreements relating to the Debt Financing or the Equity Financing, nor limit Parent or Merger Sub (or any other party thereto other than the Company or any of its Subsidiaries) from seeking to recover any such damages or obtain equitable relief from or with respect to any Debt Financing Source or other financing source pursuant to the Debt Commitment Letter, the Equity Commitment Letter or the definitive agreements relating to the Debt Financing or the Equity Financing. Nothing in this Section 9.5(d) shall limit or otherwise affect the Company's right to specific performance as provided in Section 10.7, except as provided in the following sentence. Notwithstanding anything in this Agreement or the Guarantee to the contrary, (A) while the Company may pursue both a grant of specific performance and payment of the Parent Termination Fee, under no circumstances shall the Company be entitled to receive both a grant of specific performance which results in the consummation of the Merger, on the one hand, and be awarded any monetary damages (including the Parent Termination Fee), on the other hand, and (B) in the event that the Company is entitled pursuant to this Agreement to both payment of any monetary damages (including monetary damages in respect of any actual fraud or Willful and Material Breach of the Guarantor, Parent, or Merger Sub)

and payment of the Parent Termination Fee, the Parent Termination Fee to the extent paid shall reduce the damages to which the Company is entitled (if any) on a dollar for dollar basis.

-96-

(e)     The Parties acknowledge and agree that (i) in no event shall the Company be required to pay the Termination Fee on more than one occasion and (ii) the agreements set forth in this Section 9.5 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the other Parties would not enter into this Agreement and accordingly, if the Company fails to promptly pay or cause to be paid the amount due pursuant to this Article IX, and, in order to obtain such amount, Parent commences a Proceeding that results in a judgment against the Company for the Termination Fee (or any portion thereof), the Company shall pay or cause to be paid to Parent its reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) in connection with such Proceeding, together with compounding interest on the Termination Fee (or any portion thereof), as the case may be, at the annual rate of two percent (2%) plus the prime lending rate as published in The Wall Street Journal in effect on the date such payment was required to be made through the date of payment (or such lesser rate as is the maximum permitted by applicable Law) (collectively, the "**Parent Recovery Costs**"). Notwithstanding anything to the contrary in this Agreement, Parent's right to receive from the Company the Termination Fee (and, if applicable, the Parent Recovery Costs) shall, to the extent the Termination Fee (and, if applicable, the Parent Recover Costs) is owed, constitute the sole and exclusive remedy of Parent or Merger Sub against the Non-Recourse Parties (as defined herein) affiliated with the Company for any breach, loss or damage suffered by Parent or any Subsidiary or Affiliate thereof or any other Person as a result of or relating to or arising out of this Agreement or any agreement executed in connection herewith or the transactions contemplated hereby or thereby, including for any matters forming the basis for the termination of this Agreement and abandonment of the transactions contemplated hereby or thereby, provided that, notwithstanding anything to the contrary in this Agreement or any Transaction Documents, (x) nothing shall relieve the parties thereto of their obligations under the Confidentiality Agreement or relieve the Company from any liability or damages to Parent or Merger Sub resulting from any actual fraud or Willful and Material Breach of the Company or any of its Subsidiaries and (y) the Company shall remain liable for any liability or damages to Parent or Merger Sub resulting from any actual fraud or Willful and Material Breach of the Company or any of its Subsidiaries (which, for the avoidance of doubt, shall not be limited by the amount of Termination Fee and the Parent Recovery Cost, in the aggregate).

## ARTICLE X

### Miscellaneous and General

10.1.    <u>Survival</u>. Those covenants and agreements set forth in this Agreement that by their terms apply, or that are to be performed in whole or in part, after the Effective Time, shall survive the Effective Time in accordance with their respective terms. All other representations, warranties, covenants and agreements in this Agreement or in any instrument or other document delivered pursuant to this Agreement, including rights in connection with, arising out of or otherwise related to any breach of such representations, warranties, covenants and agreements, shall not survive the Effective Time.

10.2.    <u>Notices</u>. All notices and other communications given or made hereunder by one or more Parties to one or more of the other Parties shall, unless otherwise specified herein, be in writing and shall be deemed to have been duly given or made on the date of receipt by the recipient thereof if received prior to 5:00 p.m. (New York time) (or otherwise on the next succeeding Business Day) if (a) served by personal delivery or by nationally recognized overnight courier service upon the Party or Parties for whom it is intended, (b) delivered by registered or certified mail, return receipt requested or (c) sent by email; <u>provided</u> that any email transmission is promptly confirmed by a responsive electronic communication by the recipient thereof or receipt is otherwise clearly evidenced (excluding out-of-office replies or other automatically generated responses) or is followed up within one Business Day after such email by dispatch pursuant to one of the methods described in the foregoing clauses (a) and (b) of this Section 10.2). Such communications must be sent to the respective Parties at the following street addresses or email addresses (as may be amended, supplemented or modified from time to time in writing); (<u>it being understood</u> that rejection or other refusal to accept or the inability to deliver because of changed street address or email address of which no notice was given in accordance with this Section 10.2 shall be deemed to be receipt of such communication as of the date of such rejection, refusal or inability to deliver);

if to the Company:

> Franchise Group, Inc.
> 109 Innovation Court, Suite J,
> Delaware, Ohio 43015
> Attention:    Tiffany McMillan-McWaters
> Email:        tmcwaters@franchisegrp.com

-98-

with a copy to (which shall not constitute notice):

> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, New York 10019
> Attention: David A. Katz
> Zachary S. Podolsky
> Email: DAKatz@wlrk.com
> ZSPodolsky@wlrk.com
>
> and
>
> Troutman Pepper Hamilton Sanders LLP
> 600 Peachtree Street, NE, Suite 3000
> Atlanta, Georgia 30308
> Attention:  David W. Ghegan
> Email:  david.ghegan@troutman.com

if to Parent or Merger Sub:

> c/o Vintage Capital Management, LLC
> 8529 Southpark Circle, Suite 150
> Orlando, Florida 32819
> Attention:   Brian Kahn
> Email:       bkahn@vintcap.com

with a copy to (which shall not constitute notice):

> Sullivan & Cromwell LLP
> 1888 Century Park East, Suite 2100
> Los Angeles, CA 90067
> Attention: Patrick S. Brown
> Email: brownp@sullcrom.com
>
> and
>
> Willkie Farr & Gallagher LLP
> 787 7th Avenue
> New York, NY 10019
> Attention: Russell L. Leaf; Jared N. Fertman
> Email: rleaf@willkie.com; jfertman@willkie.com

10.3.    Expenses. Except as otherwise expressly provided herein, whether or not the transactions contemplated by this Agreement are consummated, all costs, fees and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement including all costs, fees and expenses of its Representatives, shall be paid by the Party incurring such cost, fee or expense, except as otherwise expressly provided herein.

10.4.    Transfer Taxes. Except as otherwise provided in Section 4.2(b), all Transfer Taxes incurred in connection with the Merger shall be paid by Parent.

10.5.    Amendment or Other Modification; Waiver.

---

-99-

5/9/25, 7:20 PM                    sec.gov/Archives/edgar/data/1528930/000110465923058675/tm2315302d1_ex2-1.htm#:~:text=This AGREEMENT AND PLAN OF,a…

Case 24-12480-LSS   Doc 1480-3   Filed 05/14/25   Page 264 of 380

(a)  At any time prior to the Effective Time, this Agreement may be amended or otherwise modified only by a written instrument duly executed and delivered by the Parties (and in the case of the Company, by action taken or authorized by the Company Board (acting on the recommendation of the Special Committee)); provided, that after the receipt of the Requisite Company Vote, no amendment shall be made that by applicable Law requires further approval by the holders of Shares without obtaining such further approval.

(b)  The conditions to each of the respective Parties' obligations to consummate the transactions contemplated by this Agreement are for the sole benefit of such Party and may be waived by such Party. Any Party may, to the extent permitted by applicable Law and subject to the provisions of Section 7.11, waive any provision of this Agreement in whole or in part (including by extending the time for the performance of any of the obligations or other acts of the other Parties); provided, however, that any such waiver shall only be effective if made in a written instrument duly executed and delivered by the Party against whom the waiver is to be effective. No failure or delay by any Party in exercising any right, power or privilege hereunder or under applicable Law shall operate as a waiver of such rights, and, except as otherwise expressly provided herein, no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law except to the extent provided for otherwise in Section 9.5.

(c)  Notwithstanding anything in this agreement to the contrary, the provisions of this Section 10.5, along with the provisions of Sections 9.5(d), 10.6(d), 10.8, 10.10 and 10.14, in each case solely as it related to any Debt Financing Source or Debt Financing Source Party, as applicable, may not be amended in a manner adversely affecting any such Debt Financing Source or Debt Financing Source Party, as applicable, without the written consent of such adversely affected related Debt Financing Source.

10.6.  Governing Law and Venue; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury.

(a)  This Agreement and all Proceedings against any other Party in connection with, arising out of or otherwise relating to this Agreement, shall be interpreted, construed, governed by, and enforced in accordance with, the Laws of the state of Delaware, including, subject to Section 10.1, its statutes of limitations, without regard to the conflicts of laws provisions, rules or principles thereof (or any other jurisdiction) to the extent that such provisions, rules or principles would direct a matter to another jurisdiction.

(b)  Each of the Parties agrees that: (i) it shall bring any Proceeding against any other Party in connection with, arising out of or otherwise relating to this Agreement, any instrument or other document delivered pursuant to this Agreement or the transactions contemplated by this Agreement exclusively in the Chosen Courts; and (ii) solely in connection with such Proceedings, (A) irrevocably and unconditionally submits to the exclusive jurisdiction of the Chosen Courts, (B) irrevocably waives any objection to the laying of venue in any such Proceeding in the Chosen Courts, (C) irrevocably waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party, (D) agrees that mailing of process or other papers in connection with any such Proceeding in the manner provided in Section 10.2 or in such other manner as may be permitted by applicable Law shall be valid and sufficient service thereof and (E) it shall not assert as a defense any matter or claim waived by the foregoing clauses (A) through (D) of this Section 10.6(b) or that any Order issued by the Chosen Courts may not be enforced in or by the Chosen Courts.

-100-

(c)      Each Party acknowledges and agrees that any Proceeding against any other Party which may be connected with, arise out of or otherwise relate to this Agreement, any instrument or other document delivered pursuant to this Agreement or the transactions contemplated by this Agreement is expected to involve complicated and difficult issues, and therefore each Party irrevocably and unconditionally waives to the fullest extent permitted by applicable Law any right it may have to a trial by jury with respect to any such Proceeding. Each Party hereby acknowledges and certifies that (i) no Representative of the other Parties has represented, expressly or otherwise, that such other Parties would not, in the event of any Proceeding, seek to enforce the foregoing waiver, (ii) it understands and has considered the implications of this waiver, (iii) it makes this waiver voluntarily and (iv) it has been induced to enter into this Agreement, the instruments or other documents delivered pursuant to this Agreement and the transactions contemplated by this Agreement by, among other things, the mutual waivers, acknowledgments and certifications set forth in this Section 10.6(c).

(d)      Notwithstanding anything in this Agreement to the contrary, each of the Parties acknowledges and irrevocably agrees (i) that subject to Section 10.14, any Proceeding involving any Debt Financing Source Party arising out of, or relating to, the transactions contemplated hereby, the Debt Financing, the Debt Commitment Letter (or definitive agreements) related to the Debt Financing, or the performance of services thereunder, will be subject to the exclusive jurisdiction of any state or federal court sitting in the State of New York in the borough of Manhattan and any appellate court thereof, and each Party submits for itself and its property with respect to any such Proceeding to the exclusive jurisdiction of such court; (ii) subject to Section 10.14, not to bring or permit any of their Affiliates to bring or support anyone else in bringing any such Proceeding in any other court; (iii) that service of process, summons, notice or document by registered mail addressed to them at their respective addresses provided in the Debt Commitment Letter (or definitive agreements) related to the Debt Financing will be effective service of process against them for any such Proceeding brought in any such court; (iv) to waive and waives, to the fullest extent permitted by applicable Law, any objection that it may now or hereafter have to the laying of venue of, and the defense of an inconvenient forum to the maintenance of, any such Proceeding in any such court; and (v) any such Proceeding will be governed and construed and enforced in accordance with the Laws of the State of New York. Additionally, each of the Parties hereto knowingly, intentionally and voluntarily waives to the fullest extent permitted by applicable Law all rights of trial by jury in any Action brought against the Debt Financing Source Parties in any way arising out of or relating to, this Agreement, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder.

10.7.    Specific Performance.

(a)      Each of the Parties acknowledges and agrees that the rights of each Party to consummate the transactions contemplated by this Agreement are special, unique and of extraordinary character and that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to breach such provisions, immediate and irreparable harm or damage would be caused for which money damages would not be an adequate remedy. Accordingly, each Party agrees that in addition to any other available remedies a Party may have in equity or at law and subject to the terms set forth in Section 10.7(b), each Party shall be entitled to (x) enforce specifically the terms and provisions of this Agreement or (y) an injunction restraining any breach or violation or threatened breach or violation of the provisions of this Agreement, consistent with the provisions of Section 10.6(b), in the Chosen Courts, without proof of actual damages or the inadequacy of monetary relief and without posting a bond or other form of security. In the event that any Proceeding should be brought in equity to enforce the provisions of this Agreement, no Party shall allege, and each Party hereby waives the defense, that there is an adequate remedy at law or in equity.

-101-

(b)    Notwithstanding the foregoing, it is explicitly agreed that the right of the Company to an injunction, specific performance or other equitable remedies in connection with the Company's enforcing Parent's and Merger Sub's obligations to effect the Closing shall be subject to the following requirements, and notwithstanding anything to the contrary in Section 9.5(b), any failure of Parent or Merger Sub, or the Guarantor (or any of its Affiliates) to effect the Closing upon the closing conditions set forth in Section 8.1 and Section 8.2 having been satisfied or waived (except for those conditions that by their nature are to be satisfied at the Closing) shall not be deemed a Willful and Material Breach by Parent, Merger Sub, the Guarantor or their respective Affiliates unless: (i) all conditions in Section 8.1 and Section 8.2 have been satisfied or waived (except for those conditions that by their nature are to be satisfied at the Closing), (ii) the Debt Financing has been funded or will be funded at the Closing in accordance with the terms of the Debt Commitment Letter if the Equity Financing is funded, (iii) the Company has irrevocably confirmed in a written notice that (A) the Company is ready, willing and able to consummate the Closing and (B) if specific performance is granted and the Equity Financing and the Debt Financing are funded, then the Company would take such actions required of it by this Agreement to cause the Closing to occur, and (iv) Parent and Merger Sub have failed to consummate the Closing prior to the third Business Day following the delivery of such confirmation specified in clause (iii) above.

10.8.    Third-Party Beneficiaries. The Parties hereby agree that their respective representations, warranties, covenants and agreements set forth in this Agreement are solely for the benefit of the other, subject to the terms and conditions of this Agreement, and this Agreement is not intended to, and does not, confer upon any other Person any rights or remedies, express or implied, hereunder, except that (a) from and after the Effective Time, the Indemnified Parties pursuant to the provisions of Section 7.11, (b) the provisions of Sections 9.5(d), 10.5, 10.6(d), 10.10, 10.14 and this Section 10.8 shall inure to the benefit of the Debt Financing Source Parties, (c) the Guarantor pursuant to Sections 7.5(a)(vi) and 7.13 and (d) the Non-Recourse Parties pursuant to Sections 9.5 and 10.14.

10.9.    Fulfillment of Obligations. Whenever this Agreement requires a Subsidiary of Parent to take any action, such requirement shall be deemed to include an undertaking on the part of Parent to cause such Subsidiary to take such action. Whenever this Agreement requires a Subsidiary of the Company to take any action, such requirement shall be deemed to include an undertaking on the part of the Company to cause such Subsidiary to take such action and, after the Effective Time, on the part of the Surviving Corporation to cause such Subsidiary to take such action. Any obligation of one Party to any other Party under this Agreement, which obligation is performed, satisfied or properly fulfilled by a Subsidiary of such Party, shall be deemed to have been performed, satisfied or fulfilled by such Party.

-102-

10.10.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, legal representatives and permitted assigns. No Party may assign this Agreement, any right to damages for breach of this Agreement or any of its rights or interests or delegate any of its obligations under this Agreement, in whole or in part, by operation of Law, by transfer or otherwise, without the prior written consent of the other Parties not seeking to assign this Agreement, any right to damages for breach of this Agreement or any of its rights or interests or delegate any of its obligations, except as provided for in Section 10.9, and any attempted or purported assignment or delegation in violation of this Section 10.10 shall be null and void; provided, however, that (a) Parent may designate another Wholly Owned Subsidiary to be a constituent corporation in lieu of Merger Sub, in which event all references to Merger Sub in this Agreement shall be deemed references to such other Wholly Owned Subsidiary of Parent, except that all representations and warranties made in this Agreement with respect to Merger Sub as of the date of this Agreement shall be deemed representations and warranties made with respect to such other Wholly Owned Subsidiary as of the date of such designation; and (b) Parent and Merger Sub will have the right to assign all or any portion of their respective rights and obligations pursuant to this Agreement from and after the Effective Time to any Debt Financing Source or other lender pursuant to the terms of the Financing for purposes of creating a security interest herein or otherwise assigning as collateral in respect of the Financing. Notwithstanding anything in this Agreement to the contrary, Parent shall be responsible for, and shall indemnify and hold harmless the Company and its stockholders from and against, any and all incremental Taxes that result from an assignment by Parent (or any of its Affiliates) to a Person who is not a "United States person" (as defined in Section 7701(a)(30) of the Code), for the avoidance of doubt including any increase in the amount of Tax required to be deducted or withheld pursuant to Section 4.2(h).

10.11.    Entire Agreement.

(a)    This Agreement (including the Exhibits and Schedules), the Company Disclosure Schedule, the Parent Disclosure Schedule, the Rollover Agreement, the Voting Agreement, the Equity Commitment Letter, the Debt Commitment Letter, the Guarantee and the Confidentiality Agreement (collectively, the "**Transaction Documents**") constitute the entire agreement among the Parties with respect to the subject matter hereof and thereof and supersede all other prior and contemporaneous agreements, negotiations, understandings, representations and warranties, whether oral or written, with respect to such matters.

(b)    In the event of (a) any inconsistency between the statements in the body of this Agreement, on the one hand, and any of the Exhibits and Schedules, the Company Disclosure Schedule and the Parent Disclosure Schedule (other than an exception expressly set forth in the Company Disclosure Schedule or the Parent Disclosure Schedule (as the case may be)), on the other hand, the statements in the body of this Agreement shall control or (b) any inconsistency between the statements in this Agreement, on the one hand, and the Rollover Agreement, the Voting Agreement and the Confidentiality Agreement, on the other hand, the statements in this Agreement shall control.

-103-

10.12.  <u>Severability</u>. The provisions of this Agreement shall be deemed severable and the illegality, invalidity or unenforceability of any provision shall not affect the legality, validity or enforceability of the other provisions of this Agreement. If any provision of this Agreement, or the application of such provision to any Person or any circumstance, is illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such illegality, invalidity or unenforceability, nor shall such illegality, invalidity or unenforceability affect the legality, validity or enforceability of such provision, or the application of such provision, in any other jurisdiction.

10.13.  <u>Counterparts; Effectiveness</u>. This Agreement (a) may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement and (b) shall become effective when each Party shall have received one or more counterparts hereof signed by each of the other Parties. An executed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement.

10.14.  <u>Non-recourse</u>.

(a)  This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and none of the Company's, Parent's or Merger Sub's former, current and future Affiliates, assignees, stockholders, limited partners, controlling persons, directors, officers, employees, agents, attorneys or any other Representatives (including, in the case of Parent, any of the Guarantor Parties or any of their Representatives or any Debt Financing Source Party) (collectively, the "**<u>Non-Recourse Parties</u>**") (other than the Guarantor to the extent provided in and subject to the terms of the Guarantee or the Equity Commitment Letter) shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, the transactions contemplated hereby or in respect of any oral representations made or alleged to be made in connection herewith. Without limiting the rights of (x) the Company against Parent or Merger Sub or (y) Parent and Merger Sub against the Company, in no event shall any Party or any of its Affiliates, and each Party agrees not to and to cause its Affiliates not to, seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages from, any Non-Recourse Party affiliated with the other Party (other than, in the case of the Company, to the extent provided in and subject to the terms of the Guarantee or the Equity Commitment Letter).

-104-

(b)     The Company, on behalf of itself and its Subsidiaries and controlled Affiliates, (a) agrees that none of the Debt Financing Source Parties will have any liability to the Company or any Company Related Party, relating to or arising out of this Agreement, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise, and (b) (i) waives any and all rights or claims against any Debt Financing Source Party in connection with this Agreement, the Debt Financing or any of the agreements entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or equity, contract, tort or otherwise, and (ii) agrees not to commence (and if commenced agrees to dismiss or otherwise terminate) any proceeding or legal or equitable action against any Debt Financing Source Party in connection with this Agreement, the Debt Financing or any of the agreements entered into in connection with the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder Agreement (it being understood that nothing in this Section 10.14 shall limit the rights or obligations of Parent under this Agreement, or any of the parties to the Debt Commitment Letter, Fee Letter or any other definitive agreement entered into in connection with the Debt Financing).

10.15.     Effect of Breach of Specified Persons. Notwithstanding anything in this Agreement to the contrary, to the extent any actions or omissions of any Specified Person taken after the date of this Agreement and taken by or at the direction of BK or with BK's consent, or any actions or omissions of other persons taken at the direction or with the consent of any Specified Person, would constitute a breach by the Company of a covenant or agreement contained in this Agreement, the Voting Agreement, the Equity Commitment Letter, the Limited Guarantee or the Rollover Agreement, or would result in any of the representations or warranties of the Company contained in this Agreement, the Voting Agreement, the Equity Commitment Letter, the Limited Guarantee or the Rollover Agreement becoming inaccurate for which the Company otherwise would have been responsible (a "**BK Breach**"), such breach or inaccuracy shall be disregarded as a basis for providing Parent or Merger Sub with any rights or remedies, or relieving Parent or Merger Sub of any obligations, or otherwise providing a benefit to Parent or Merger Sub under this Agreement. Without limiting the foregoing, Parent or Sub shall not have any right to rely on any failure of the closing conditions set forth in Section 8.2(a) or Section 8.2(b) to be satisfied (or terminate this Agreement under Section 9.4(q) a result thereof) or claim any damage or seek any other remedy at law or in equity to the extent that such failure, damage or injury arises from any BK Breach.

[*Signature Page Follows*]

-105-

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by duly authorized officers of the Parties as of the date first written above.

FRANCHISE GROUP, INC.

By: /s/ Eric Seeton
    Name:  Eric Seeton
    Title:   Chief Financial Officer

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by duly authorized officers of the Parties as of the date first written above.

FREEDOM VCM, INC.

By: /s/ Brian R. Kahn
    Name:  Brian R. Kahn
    Title:   President

FREEDOM VCM SUBCO, INC.

By: /s/ Brian R. Kahn
    Name:  Brian R. Kahn
    Title:   President

## THIRD AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION

## OF

## FRANCHISE GROUP, INC.

**\* \* \* \* \* \* \* \***

It is hereby certified that:

1.     The name of the corporation (hereinafter called the "Corporation") is Franchise Group, Inc.

2.     The Certificate of Incorporation of the Corporation was originally filed with the Secretary of State of the State of Delaware on September 23, 2010, under the name of JTH Holdings, Inc. The Amended and Restated Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on July 14, 2011. The Second Amended and Restated Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on December 18, 2018 (the "Second Amended and Restated Certificate"), under the name of Liberty Tax, Inc. The Certificate of Amendment to the Second Amended and Restated Certificate was filed with the Secretary of State of the State of Delaware on September 19, 2019.

3.     This Third Amended and Restated Certificate of Incorporation of the Corporation (this "Third Amended and Restated Certificate"), which both restates and amends the provisions of the Second Amended and Restated Certificate, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware, as amended from time to time (the "DGCL"), and by the written consent of its stockholders in accordance with Section 228 of the DGCL.

4.     This Third Amended and Restated Certificate restates, integrates, and amends the provisions of the Second Amended and Restated Certificate. Certain capitalized terms used in this Third Amended and Restated Certificate are defined where appropriate herein.

5.     This Third Amended and Restated Certificate shall become effective on the date of filing with the Secretary of State of the State of Delaware.

6.     The text of the Second Amended and Restated Certificate is hereby restated and amended in its entirety to read as follows:

## ARTICLE I

The name of the corporation (the "Corporation") is: Franchise Group, Inc.

-1-

## ARTICLE II

The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, Wilmington, County of New Castle, Delaware, 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

## ARTICLE III

The nature of the business or purposes to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

## ARTICLE IV

The total number of shares of stock which the Corporation shall have authority to issue is 100 shares of common stock, each of which shall have a par value of $0.0001 per share (the "Common Stock").

## ARTICLE V

In furtherance and not in limitation of the powers conferred by statute, the by-laws of the Corporation may be made, altered, amended or repealed by the stockholders or by a majority of the entire board of directors of the Corporation (the "Board").

## ARTICLE VI

Elections of directors need not be by written ballot.

## ARTICLE VII

1.    Right of Indemnification. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, manager, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person. Notwithstanding the preceding sentence or Section 2 of this Article VII, except as otherwise provided in Section 3 of this Article VII, the Corporation shall be required to indemnify, or advance expenses to, a Covered Person in connection with a Proceeding (or part thereof) commenced by such Covered Person only if the commencement of such Proceeding (or part thereof) by the Covered Person was authorized by the Board of Directors.

-2-

5/9/25, 7:20 PM       sec.gov/Archives/edgar/data/1528930/000110465923058675/tm2315302d1_ex2-1.htm#:~:text=This AGREEMENT AND PLAN OF,a…

Case 24-12480-LSS   Doc 1480-3   Filed 05/14/25   Page 273 of 380

2.      <u>Prepayment of Expenses</u>. The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any Proceeding in advance of its final disposition, <u>provided</u>, <u>however</u>, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this Article VII or otherwise.

3.      <u>Claims</u>. If a claim for indemnification (following the final disposition of the Proceeding with respect to which indemnification is sought, including any settlement of such Proceeding) or advancement of expenses under this Article VII is not paid in full within thirty days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by applicable law. In any such action the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under this Article VII and applicable law.

4.      <u>Non-Exclusivity of Rights</u>. The rights conferred on any Covered Person by this Article <u>VII</u> shall not be exclusive of any other rights which such Covered Person may have or hereafter acquire under any statute, any other provision of this Third Amended and Restated Certificate of Incorporation, the Bylaws of the Corporation, or any agreement, vote of stockholders or disinterested directors or otherwise.

5.      <u>Amendment or Repeal</u>. Any right to indemnification or to advancement of expenses of any Covered Person arising hereunder shall not be eliminated or impaired by an amendment to or repeal of this Article VII after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought.

6.      <u>Other Indemnification and Advancement of Expenses</u>. This Article VII shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

-3-

ARTICLE VIII

the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim for breach of a fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, the Certificate of Incorporation or the by-laws of the Corporation or (iv) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.

-4-

IN WITNESS WHEREOF, Franchise Group, Inc. has caused this Third Amended and Restated Certificate of Incorporation to be duly executed and acknowledged in its name and on its behalf by an authorized officer as of the date first set forth above.

**FRANCHISE GROUP, INC.**

By: _____

    Name: [●]

    Title: [●]

-5-

**<u>Exhibit F</u>**

**Stock Grant Agreement**

**RESTRICTED CLASS A UNIT GRANT NOTICE AND AGREEMENT**

Freedom VCM Holdings, LLC (the "Company"), pursuant to its 2024 Restricted Class A Unit Plan (as may be amended, restated or otherwise modified from time to time, the "Plan"), hereby grants to Holder the number of Class A Units (the "Restricted Class A Units") set forth below. The Restricted Class A Units are subject to all of the terms and conditions set forth in this Restricted Class A Unit Grant Notice and Agreement (this "Award Agreement"), as well as all of the terms and conditions of the Plan, all of which are incorporated herein in their entirety. To the extent that any provisions herein (or portion thereof) conflicts with any provision of the Plan, the Plan shall prevail and control. Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.

| | |
|---|---|
| **Holder**: | Brian Kahn |
| **Date of Grant**: | January 19, 2024 |
| **Number of Restricted Class A Units**: | 35,161 |
| **Vesting Schedule:** | One-hundred percent (100%) of the Restricted Class A Units granted hereunder shall vest if a Measurement Date occurs prior to the fifth (5th) anniversary of the Date of Grant. For the avoidance of doubt, in the event that a Measurement Date does not occur on or prior to the fifth (5th) anniversary of the Date of Grant, one-hundred percent (100%) of the Restricted Class A Units granted hereunder shall immediately be forfeited by Holder to the Company for no consideration. "Measurement Date" shall mean such date following the Date of Grant on which the Company ceases to have any active operating companies or revenue generating subsidiaries. |
| **Termination:** | Notwithstanding the provisions of Section 5(c) and Section 7 of the Plan to the contrary, in the event of Holder's Termination for any reason, all unvested Restricted Class A Units shall remain outstanding under the Plan and shall not be subject to repurchase, and shall remain eligible to vest pursuant to the terms of this Award Agreement until the fifth (5th) anniversary of the Date of Grant, at which time, if they are not vested, shall be automatically forfeited for no consideration. Further, and notwithstanding anything herein to the contrary, if (i) Holder's service with the Company Group is Terminated for "Cause" (as defined below), (ii) Holder's service with the Company Group is Terminated by Holder at a time when circumstances that constitute "Cause" exist or (iii) Holder is convicted of, or pleas nolo contendere to, a crime constituting (x) a felony under the laws of the United States or any state thereof or (y) a misdemeanor under the laws of the United States or any state thereof (not including any traffic offense) involving moral turpitude, deceit, dishonesty or fraud (other than, for purposes of clause (y), |

70678661.1

any misdemeanor related to any action or inaction by you in connection with, or relating to, the "Prophecy", matters known to the Company as of the date hereof as determined in good faith by the Board), Holder will automatically forfeit for no consideration the Applicable Percentage of the outstanding Restricted Class A Units for no consideration.

For purposes of this Award Agreement, "Applicable Percentage" shall mean (i) as of the Date of Grant, one-hundred percent (100%), (ii) between the Date of Grant and the first anniversary of the Date of Grant, one-hundred percent (100%) *less* 4.167% times the number of monthly anniversaries of the Date of Grant that have passed, (iii) as of the first anniversary of the Date of Grant, fifty percent (50%), (iv) between the first anniversary of the Date of Grant and the second anniversary of the Date of Grant, fifty percent (50%) *less* 2.083% times the number of monthly anniversaries of the first anniversary of the Date of Grant that have passed, (v) as of the second anniversary of the Date of Grant, twenty-five percent (25%), (vi) between the second anniversary of the Date of Grant and the third anniversary of the Date of Grant, twenty-five percent (25%) *less* 2.083% times the number of monthly anniversaries of the second anniversary of the Date of Grant that have passed, and (vii) as of and all times following the third anniversary of the Date of Grant, zero percent (0%).

For the avoidance of doubt, for purposes of this Award Agreement, "Cause" shall have the meaning ascribed to such term in that certain consulting agreement by and between the Holder and Franchise Group, Inc., dated January 19, 2024.

**Restrictions on Restricted Class A Units:**    The transfer restrictions described in Section 7.1 of the Operating Agreement are incorporated herein by reference and made a part hereof.

**Restrictive Covenant Agreement:**    As a condition of the grant of Restricted Class A Units hereunder, Holder acknowledges and reaffirms Holder's obligations and restrictions set forth in any Participant Agreement or other agreement with the Company Group containing non-competition, non-interference, non-solicitation, non-hire, confidentiality, invention or other intellectual property assignment or non-disparagement covenants. Holder acknowledges and agrees that this Award Agreement and any agreement containing such covenants to which Holder is subject, will be considered separate contracts, and any agreement containing such covenants will survive the termination of this Award Agreement for any reason. Further,

70678661.1

Holder acknowledges and agrees that each member of the Company Group shall be a third party beneficiary of the covenants set forth in any agreement containing such covenants, and each shall have the right to enforce such covenants for all purposes in the event of a breach of such covenants.

**Joinder to Operating Agreement:**

From and after the date hereof, Holder hereby agrees to be bound by the terms and provisions of the Operating Agreement as if Holder were an original signatory thereto. As a condition to the issuance of any Restricted Class A Units hereby, Holder shall execute such additional documents as the Company may reasonably request to effectuate Holder's Joinder to the Operating Agreement.

**Additional Terms:**

The Restricted Class A Units shall be subject to the following additional terms:

- The Restricted Class A Units granted hereunder shall be registered in Holder's name on the books of the Company during the Lock-Up Period and for such additional time as the Committee determines appropriate in its reasonable discretion. Any certificates representing the vested Restricted Class A Units delivered to Holder shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations, and other requirements of the Securities and Exchange Commission, any stock exchange upon which such units are listed, and any applicable federal or state laws, and the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions as the Committee deems appropriate.

- Holder shall be the record owner of the Restricted Class A Units until or unless such Restricted Class A Units are forfeited or repurchased, or otherwise sold or transferred, in accordance with the terms of the Plan, and as record owner shall generally be entitled to all rights of a member with respect to the Restricted Class A Units; *provided*, *however*, that notwithstanding anything to the contrary, Holder shall be entitled to any dividends and distributions made or declared on the Restricted Class A Units following the Date of Grant regardless of whether such Restricted Class A Units are otherwise subject to additional service-based or performance-based vesting conditions.

- Upon vesting of the Restricted Class A Units (or such other time that the Restricted Class A Units are taken into income),

70678661.1

Holder will be required to satisfy applicable withholding tax obligations, if any, as provided in the Plan.

- This Award Agreement does not confer upon Holder any right to continue as an employee or service provider of the Service Recipient or any other member of the Company Group.

- This Award Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of law thereof.

- Holder agrees that the Company may deliver by email all documents relating to the Plan or the Restricted Class A Units (including, without limitation, a copy of the Plan) and all other documents that the Company is required to deliver to its security holders (including, without limitation, disclosures that may be required by the Securities and Exchange Commission). Holder also agrees that the Company may deliver these documents by posting them on a website maintained by the Company or by a third party under contract with the Company. If the Company posts these documents on a website, it shall notify Holder by email or such other reasonable manner as then determined by the Company.

- This Award Agreement and the Plan constitute the entire understanding and agreement of the parties hereto and supersede all prior negotiations, discussions, correspondence, communications, understandings, and agreements (whether oral or written and whether express or implied) between the Company and Holder relating to the subject matter of this Award Agreement. Without limiting the foregoing, to the extent Holder has entered into an employment or similar agreement with the Company or any of its affiliates, and the terms noted in such employment or similar agreement are inconsistent with or conflict with this Award Agreement, then the terms of this Award Agreement will supersede and be deemed to amend and modify the inconsistent or conflicting terms set forth in such employment or similar agreement.

- If Holder is married on the Date of Grant, the grant of the Restricted Class A Units hereunder is conditional upon, and will be effective only after, Holder's spouse has duly executed the spousal consent on the signature page hereto or in a form acceptable to the Company, with an effective date

as of the Date of Grant.  If, at any time subsequent to the Date of Grant, Holder becomes legally married (whether in the first instance or to a different spouse), Holder shall cause Holder's spouse to execute and deliver to the Company a spousal consent in a form acceptable to the Company. Holder's failure to deliver the Company an executed spousal consent in a form acceptable to the Company at any time when Holder would otherwise be required to deliver such consent shall constitute Holder's continuing representation and warranty that Holder is not legally married as of such date (the breach of which would constitute a material breach of this Award Agreement and shall cause the Class A Units granted hereunder to be immediately null and void).

**Section 83(b) Election**

Under Section 83 of the Code, the difference between the purchase price paid for the Restricted Class A Units and their Fair Market Value on the date any forfeiture restrictions applicable to such units lapse will be reportable as ordinary income at that time.  For this purpose, "forfeiture restrictions" include the forfeiture as to unvested Restricted Class A Units described above.  Holder **may** elect to be taxed at the time the Restricted Class A Units are acquired, rather than when such units cease to be subject to such forfeiture restrictions, by filing an election under Section 83(b) of the Code with the Internal Revenue Service within thirty (30) days after the Date of Grant specified in this Award Agreement.  The form for making this election is attached as <u>Exhibit A</u> hereto.  Failure to make this filing within the thirty (30) day period will result in the recognition of ordinary income by Holder  as the forfeiture restrictions lapse.  Holder will promptly notify the Company if Holder timely elects to file an election with respect to the Restricted Class A Units under Section 83(b) of the Code.

 **HOLDER ACKNOWLEDGES THAT IT IS HOLDER'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S, TO FILE A TIMELY ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF HOLDER REQUESTS THE COMPANY OR ITS REPRESENTATIVES TO MAKE THIS FILING ON HOLDER'S BEHALF.  HOLDER IS RELYING SOLELY ON HOLDER'S OWN ADVISORS WITH RESPECT TO THE DECISION AS TO WHETHER OR NOT TO FILE ANY ELECTION UNDER SECTION 83(B) OF THE CODE.**

**Representations and Warranties of Holder:**

Holder hereby represents and warrants to the Company that:

- Holder understands that the Class A Units have not been registered under the Securities Act, nor qualified under any state securities laws, and that they are being offered and sold

- 5 -

70678661.1

pursuant to an exemption from such registration and qualification based in part upon Holder's representations contained herein; the Class A Units are being issued to Holder hereunder in reliance upon the exemption from such registration provided by Section 4(a)(2) of the Securities Act for transactions by an issuer not involving any public offering;

- Holder is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act and has such knowledge and experience in financial and business matters that Holder is capable of evaluating the merits and risks of the investment contemplated by this Award Agreement; and Holder is able to bear the economic risk of this investment in the Company (including a complete loss of this investment);

- Except as specifically provided herein or in the Plan, Holder has no contract, undertaking, understanding, agreement or arrangement, formal or informal, with any person to sell, transfer or pledge all or any portion of his, her or its Class A Units, and has no current plans to enter into any such contract, undertaking, understanding, agreement or arrangement;

- Holder has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation as to the Company's sale to Holder of his, her or its Class A Units;

- Holder is familiar with the business and operations of the Company and has been afforded an opportunity to ask such questions of the Company's agents, accountants and other representatives concerning the Company's proposed business, operations, financial condition, assets, liabilities and other relevant matters as he, she or it has deemed necessary or desirable in order to evaluate the merits and risks of the investment contemplated herein;

- Holder has been informed that the Class A Units are restricted securities under the Securities Act and may not be resold or transferred unless the Class A Units are first registered under the federal securities laws or unless an exemption from such registration is available; and

- Holder is prepared to hold the Class A Units for an indefinite period and that Holder is aware that Rule 144 as promulgated

70678661.1

under the Securities Act, which exempts certain resales of restricted securities, is not presently available to exempt the resale of the Class A Units from the registration requirements of the Securities Act.

- Holder acknowledges and agrees that the Company has not provided any tax advice to Holder in connection with this Award Agreement and Holder has been advised by the Company to seek tax advice from Holder's own tax advisors regarding this Award Agreement and the payments that may be made to Holder pursuant to this Award Agreement, including advice as to whether Holder should make an election under Section 83(b) of the Code within thirty (30) days of the Date of Grant.

*     *     *

**THE UNDERSIGNED HOLDER ACKNOWLEDGES RECEIPT OF THIS AWARD AGREEMENT AND THE PLAN, AND, AS AN EXPRESS CONDITION TO THE GRANT OF RESTRICTED CLASS A UNITS UNDER THIS AWARD AGREEMENT, AGREES TO BE BOUND BY THE TERMS OF BOTH THIS AWARD AGREEMENT AND THE PLAN.**

**FREEDOM VCM HOLDINGS, LLC**

By: _Andrew Lawrence_

Signature

Title: Authorized Signatory

Date: January 19, 2024

**HOLDER**

_Brian Kahn_

Signature

Print Name: Brian Kahn

Date: January 19, 2024

### SPOUSAL CONSENT

To the extent that Holder's spouse and Holder are domiciled in Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington or Wisconsin, or are otherwise entitled to the benefits of the statutes of such states, Holder's spouse indicates by the execution of this Award Agreement his or her consent to be bound by the terms herein as to his or her interests, whether as community property or otherwise, if any, in the shares of Restricted Class A Units.

Lauren Kahn

Name

_Lauren Kahn_

Signature

January 19, 2024

Date

*[Signature Page to Brian Kahn Restricted Class A Unit Grant Notice and Agreement]*

**EXHIBIT A**

**ELECTION TO INCLUDE VALUE OF RESTRICTED PROPERTY IN GROSS INCOME IN YEAR OF TRANSFER UNDER CODE § 83(b)**

The undersigned taxpayer elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended (the "Code"), to include in gross income in 2024 as compensation for services rendered, the fair market value of property received in connection with his services in excess of the amount paid for the property and supplies the following information in accordance with the regulations promulgated thereunder.

1.    The name, address and taxpayer identification number of the undersigned are:

Name:            _____
Address:         _____
Social Security #:_____

2.    The property with respect to which the election is made consists of _____ Class A Units of Freedom VCM Holdings, LLC (the "Company") granted pursuant to that certain Restricted Class A Unit Grant Notice and Agreement between the Company and the taxpayer.

3.    The date on which property was transferred is __, 2024.

4.    The taxable year to which this election relates is calendar year 2024.

5.    The aggregate fair market value at time of transfer (determined without regard to any restrictions other than restrictions which by their terms will never lapse) of the property with respect to which this election is being made is $_____.

6.    The property  is subject to transfer restrictions and is subject to forfeiture in the event certain employment or performance conditions are not satisfied.

7.    The amount paid by taxpayer for the property is $0.00.

8.    A copy of this statement has been furnished to the Company, in accordance with Treas. Reg. § 1-83-2(e)(7).

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property.  The transferee of such property is the person performing the services in connection with the transfer of said property.

The undersigned understand(s) that the foregoing election may not be revoked except with the consent of the Commissioner.

_____          Dated: _____, 2024
Taxpayer's Signature

## Exhibit G

**Freedom VCM Holdings, LLC 2024 Restricted Class A Unit Plan**

# FREEDOM VCM HOLDINGS, LLC
# 2024 RESTRICTED CLASS A UNIT PLAN

1.    **PURPOSE.**

The purpose of the Plan is to assist the Company in attracting, retaining, motivating, and rewarding certain key employees, officers, directors, and consultants of the Company Group and promoting the creation of long-term value for members of the Company by closely aligning the interests of such individuals with those of such members.  The Plan authorizes the award of Class A Units on the terms and conditions set forth in the Plan and the Operating Agreement to Eligible Persons to encourage such Eligible Persons to expend maximum effort in the creation of member value.  The terms of the Operating Agreement are hereby incorporated into the Plan as if set forth herein in their entirety.  In the event of a conflict between the Plan and the Operating Agreement, the provisions of the Operating Agreement shall control.

2.    **DEFINITIONS.**

For purposes of the Plan, the following terms shall be defined as set forth below:

(a)    "Award" means any Restricted Class A Units  granted under the Plan.  Class A Units retained upon vesting of any Award shall be considered an Award for all purposes of the Plan.

(b)    "Award Agreement" means a written agreement between the Company and a Participant evidencing the terms and conditions of an individual Award grant.

(c)    "Board" means the board of directors of the Company.

(d)    "BR Member" has the meaning set forth in the Operating Agreement.

(e)    "Cause" means, with respect to a Participant and in the absence of an Award Agreement or Participant Agreement otherwise defining Cause, (1) the Participant's plea of *nolo contendere* to, conviction of or indictment for, any crime (whether or not involving the Company Group) (A) constituting a felony or (B) that has, or could reasonably be expected to result in, an adverse impact on the performance of the Participant's duties to the Service Recipient, or otherwise has, or could reasonably be expected to result in, an adverse impact on the business or reputation of any member of the Company Group; (2) conduct of the Participant, in connection with his, her or their employment or service, that has resulted, or could reasonably be expected to result, in material injury to the business or reputation of any member of the Company Group; (3) any material violation of the policies of the Service Recipient, including, but not limited to, those relating to sexual harassment or the disclosure or misuse of confidential information, or those set forth in the manuals or statements of written policy of the Service Recipient; (4) the Participant's act(s) of negligence or willful misconduct in the course of his, her or their employment or service with the Service Recipient; (5) misappropriation by the Participant of any assets or business opportunities of any member of the Company Group; (6) embezzlement or fraud committed by the Participant, at the Participant's direction, or with the Participant's prior actual knowledge; or (7) willful neglect in the performance of the Participant's duties for the Service Recipient or willful or repeated failure or refusal to perform such duties following written notice by the Company.  If,

70678527.1

subsequent to the Termination of a Participant for any reason other than by the Service Recipient for Cause, it is discovered that the Participant's employment or service could have been terminated for Cause, such Participant's employment or service shall, at the discretion of the Committee, be deemed to have been terminated by the Service Recipient for Cause for all purposes under the Plan, and the Participant shall be required to repay or return to the Company all amounts and benefits received by him, her or them in respect of any Award following such Termination that would have been forfeited under the Plan had such Termination been by the Service Recipient for Cause.  In the event that there is an Award Agreement or Participant Agreement otherwise defining Cause, "Cause" shall have the meaning provided in such agreement, and a Termination by the Service Recipient for Cause hereunder shall not be deemed to have occurred unless all applicable notice and cure periods in such Award Agreement or Participant Agreement are complied with.

(f)    "Change of Control" has the meaning set forth in the Operating Agreement.

(g)    "Class A Unit" has the meaning set forth in the Operating Agreement.

(h)    "Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time, including the rules and regulations thereunder and any successor provisions, rules and regulations thereto.

(i)    "Committee" means the Board or such committee thereof consisting of two or more individuals appointed by the Board to administer the Plan.

(j)    "Company" means Freedom VCM Holdings, LLC, a Delaware limited liability company.

(k)    "Company Group" means the Company, together with each direct or indirect subsidiary of the Company.

(l)    "Competitive Activity" means, with respect to any Participant and in the absence of an Award Agreement or Participant Agreement containing covenants relating to competition with the Service Recipient of the Participant, any activity reasonably determined by the Committee to be competitive with the business of any member of the Company Group.  If a Participant's Award Agreement or effective Participant Agreement contains covenants relating to restrictions on competition, engaging in "Competitive Activity" with respect to such Participant shall mean the breach of such restrictive covenants.

(m)    "Corporate Event" has the meaning set forth in Section 9(b) hereof.

(n)    "Data" has the meaning set forth in Section 17(g) hereof.

(o)    "Disability" means, in the absence of an Award Agreement or Participant Agreement otherwise defining Disability, the permanent and total disability of such Participant within the meaning of Section 22(e)(3) of the Code.  In the event that there is an Award Agreement or Participant Agreement defining Disability, "Disability" shall have the meaning provided in such agreement, and a Termination by reason of a Disability hereunder shall not be deemed to have occurred unless all applicable notice periods in such Award Agreement or Participant Agreement are complied with.

70678527.1

(p)     "Effective Date" means January 19, 2024.

(q)     "Eligible Person" means (1) each employee of any member of the Company Group, including each such person who may also be a director of any member of the Company Group, (2) each non-employee director of any member of the Company Group, (3) each other natural person who provides substantial services to any member of the Company Group, and (4) any natural person who has been offered employment by any member of the Company Group; *provided*, that such prospective employee may not receive any payment or exercise any right relating to an Award until such person has commenced employment with any member of the Company Group.  An employee on an approved leave of absence may be considered as still in the employ of a member of the Company Group for purposes of eligibility for participation in the Plan.

(r)     "Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended from time to time, including the rules and regulations thereunder and any successor provisions, rules and regulations thereto.

(s)     "Fair Market Value" has the meaning set forth in the Operating Agreement; provided, that, so long as the BR Member remains a member of the Company, the Fair Market Value of a Class A Unit of the Company shall not be less than the value of the Class A Unit of the Company implied by the value of the Company reported in the most recent quarterly audited financial statements of B. Riley Financial, Inc. or its applicable affiliate.

(t)     "IPO" has the meaning set forth in the Operating Agreement.

(u)     "Management Investor Member" has the meaning set forth in the Operating Agreement.

(v)     "Operating Agreement" means the Second Amended and Restated Limited Liability Company Operating Agreement of the Company, dated as of January 19, 2024, as may be amended and restated from time to time.

(w)     "Participant" means an Eligible Person who has been granted an Award under the Plan or, if applicable, such other person or entity who holds an Award.

(x)     "Participant Agreement" means an employment or other services agreement between a Participant and the Service Recipient that describes the terms and conditions of such Participant's employment or service with the Service Recipient and is effective on the applicable date of grant with respect to any Award.

(y)     "Plan" means this Freedom VCM Holdings LLC 2024 Restricted Class A Unit Plan, as amended from time to time.

(z)     "Prime Rate" means the rate from time to time published in the "Money Rates" section of *The Wall Street Journal* as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates).

(aa)     Repurchase Price" means —

70678527.1

(1)     on or following the Termination of a Participant other than by the Service Recipient for Cause, an amount equal to the Fair Market Value of a Class A Unit on the date that the written notice of repurchase is delivered pursuant to Section 7(a) hereof;

(2)     on or following the Termination of a Participant by the Service Recipient for Cause, the lesser of (A) the original purchase price paid for such units (as adjusted for any subsequent changes in the outstanding Class A Units or in the capital structure of the Company) less any dividends or other distributions or bonus received (or to be received) by the Participant (or any transferee) in respect of the Class A Units prior to the date of repurchase and (B) the Fair Market Value of the Class A Units on the date that the written notice of repurchase is delivered pursuant to Section 7(a) hereof; or

(3)     notwithstanding anything contained within clause (1) or (2) above, if a Participant has violated any restrictive covenant to which he or she is subject to with any member of the Company Group, the Repurchase Price shall be the lesser of (A) the original purchase price paid for such Class A Units (as adjusted for any subsequent changes in the outstanding Class A Units or in the capital structure of the Company) *less* any dividends or other distributions or bonus received (or to be received) by the Participant (or any transferee) in respect of the Class A Units prior to the date of repurchase and (B) the Fair Market Value of the Class A Units on the date that the written notice of repurchase is delivered pursuant to Section 7(a) hereof.

(bb)     "Repurchase Right" has the meaning set forth in Section 7 hereof.

(cc)     "Repurchase Right Exercise Period" means the period commencing on the date of Termination of a Participant with the Service Recipient for any reason and ending on the earlier to occur of (1) an IPO and (2) the twenty-four (24) month anniversary of the commencement of the Repurchase Right Exercise Period; *provided*, that, in the event that a Participant has violated any restrictive covenant to which he or she is subject to with any member of the Company Group, the Repurchase Right Exercise Period shall commence (or restart if the Repurchase Right Exercise Period has already commenced) as of the date on which the Company first acquires actual knowledge of such violation and shall continue until the later of (x) the date on which the Repurchase Right Exercise Period would have otherwise expired as set forth herein, and (y) the twelve (12) month anniversary of the date on which the Company first acquires actual knowledge of such violation.

(dd)     "Repurchase Right Lapse Date" means the earlier to occur of (1) an IPO and (2) a Change of Control.

(ee)     "Restricted Class A Units" means an Award granted to a Participant under Section 5 hereof that is subject to certain restrictions and to a risk of forfeiture.

(ff)     "Securities Act" means the U.S. Securities Act of 1933, as amended from time to time, including the rules and regulations thereunder and any successor provisions, rules and regulations thereto.

(gg)     "Service Recipient" means, with respect to a Participant holding a given Award, the applicable member of the Company Group by which the Participant is, or following a

4

70678527.1

Termination was most recently, principally employed or to which the Participant provides, or following a Termination was most recently providing, services, as applicable.

(hh)    "<u>Termination</u>" means the termination of a Participant's employment or service, as applicable, with the Service Recipient; *provided*, *however*, that, (x) if so determined by the Committee at the time of any change in status in relation to the Service Recipient (*e.g.*, a Participant ceases to be an employee and begins providing services as a consultant, or vice versa), such change in status will not be deemed to be a Termination hereunder, and (y) if so determined by the Committee at the time of a furlough, temporary layoff or similar event with respect to a Participant, such furlough, temporary layoff or similar event will not be deemed to be a Termination hereunder until such time as the Committee determines that a Termination has occurred. Notwithstanding anything herein to the contrary, a Participant's change in status in relation to the Service Recipient (for example, a change from employee to consultant) shall not be deemed a Termination hereunder with respect to any Awards constituting nonqualified deferred compensation subject to Section 409A of the Code that are payable upon a Termination unless such change in status constitutes a "separation from service" within the meaning of Section 409A of the Code. Unless otherwise determined by the Committee, in the event that any Service Recipient ceases to be a member of the Company Group (by reason of sale, divestiture, spin-off, or other similar transaction), each Participant that is employed by or provides services to such Service Recipient shall be deemed to have suffered a Termination hereunder as of the date of the consummation of such transaction, unless the Participant's employment or service is transferred to another entity that would constitute a Service Recipient immediately following such transaction. For the avoidance of doubt, in the event that a Participant provides notice of his, her or their intention to resign at a future date, the Service Recipient may, in its sole and absolute discretion, accelerate such date of Termination without changing the characterization of such Termination, and such Termination shall remain a resignation by the Participant.

3.    **ADMINISTRATION.**

(a)    <u>Authority of the Committee</u>. Except as otherwise provided below, the Plan shall be administered by the Committee. The Committee shall have full and final authority, in each case subject to and consistent with the provisions of the Plan, to (1) select Eligible Persons to become Participants, (2) grant Awards, (3) determine the type, number of Class A Units subject to, other terms and conditions of, and all other matters relating to, Awards, (4) prescribe Award Agreements (which need not be identical for each Participant) and rules and regulations for the administration of the Plan, (5) construe and interpret the Plan and Award Agreements and correct defects, supply omissions, and reconcile inconsistencies therein, and (6) make all other decisions and determinations as the Committee may deem necessary or advisable for the administration of the Plan. Any action of the Committee shall be final, conclusive, and binding on all persons, including, without limitation, each member of the Company Group, Eligible Persons, Participants, and beneficiaries of Participants. For the avoidance of doubt, the Board shall have the authority to take all actions under the Plan that the Committee is permitted to take.

(b)    <u>Delegation</u>. To the extent permitted by applicable law, the Committee may delegate to officers or employees of any member of the Company Group, or committees thereof, the authority, subject to such terms as the Committee shall determine, to perform such functions under the Plan, including, but not limited to, administrative functions, as the Committee may

70678527.1

determine appropriate. The Committee may appoint agents to assist it in administering the Plan. Any actions taken by an officer or employee delegated authority pursuant to this Section 3(b) within the scope of such delegation shall, for all purposes under the Plan, be deemed to be an action taken by the Committee. Notwithstanding the foregoing or any other provision of the Plan to the contrary: (i) any Award granted under the Plan to any Eligible Person who is not an employee of any member of the Company Group (including any non-employee director of any member of the Company Group) must be expressly approved by the Committee; (ii) no officer or employee may grant an Award to himself or herself; and (iii) the Committee may not delegate authority to an officer or employee who is acting solely in the capacity of an officer or employee (and not also as a director of the Company) to determine the Fair Market Value pursuant to Section 2(s) hereof.

(c)    Sections 409A and 457A.    The Committee shall take into account compliance with Sections 409A and 457A of the Code in connection with any grant of an Award under the Plan, to the extent applicable. Any payments in respect of an Award constituting nonqualified deferred compensation subject to Section 409A of the Code that are payable upon a Termination shall be delayed for such period as may be necessary to meet the requirements of Section 409A(a)(2)(B)(i) of the Code. On the first business day following the expiration of such period, the Participant shall be paid, in a single lump sum without interest, an amount equal to the aggregate amount of all payments delayed pursuant to the preceding sentence, and any remaining payments not so delayed shall continue to be paid pursuant to the payment schedule applicable to such Award. While the Awards granted hereunder are intended to be structured in a manner to avoid the imposition of any penalty taxes under Sections 409A and 457A of the Code, in no event whatsoever shall the Company Group be liable for any additional tax, interest, or penalties that may be imposed on a Participant as a result of Section 409A or Section 457A of the Code or any damages for failing to comply with Section 409A or Section 457A of the Code or any similar state or local laws (other than for withholding obligations or other obligations applicable to employers, if any, under Section 409A or Section 457A of the Code).

4.    **CLASS A UNITS AVAILABLE UNDER THE PLAN.**

(a)    Number of Class A Units Available for Delivery.    Subject to adjustment as provided in Section 9 hereof, the total number of Class A Units reserved and available for delivery in connection with Awards under the Plan shall equal 100,460. Class A Units delivered under the Plan shall consist of authorized and unissued units or previously issued Class A Units reacquired by the Company on the open market or by private purchase. Notwithstanding anything herein to the contrary, amounts payable or otherwise distributable in respect of Class A Units issued under this Plan at any time following the Effective Date (whether in connection with any purchase, distribution, dividend or otherwise and whether in cash or in-kind) shall not exceed $90 million in the aggregate, and any amounts payable or distributable (whether in connection with any purchase, distribution, dividend or otherwise and whether in cash or in-kind) that exceeds $90 million shall not be payable to the Class A Units issued under this Plan and shall instead be available for distribution to the other members of the Company, in accordance with, and subject to, the terms of the Operating Agreement as though the Class A Units issued under this Plan were not outstanding.

70678527.1

(b)    <u>Class A Unit Counting Rules</u>.   The Committee may adopt reasonable counting procedures to ensure appropriate counting, avoid double-counting (as, for example, in the case of tandem awards or substitute awards) and make adjustments if the number of Class A Units actually delivered differs from the number of units previously counted in connection with an Award.  To the extent that an Award expires or is canceled, forfeited, settled in cash or otherwise terminated without delivery to the Participant of the full number of Class A Units to which the Award related, the undelivered Class A Units will again be available for delivery under the Plan.  Additionally, , any unvested Class A Units repurchased by the Company pursuant to Section 5(c) below following a Participant's Termination for any reason will again be available for delivery under the Plan.  Class A Units withheld in payment of the taxes relating to an Award and Class A Units equal to the number surrendered in payment of any taxes relating to an Award shall not be deemed to constitute Class A Units delivered to the Participant and shall be deemed to again be available for delivery under the Plan.

5.    **RESTRICTED CLASS A UNITS.**

(a)    <u>General</u>.  Restricted Class A Units may be granted to Eligible Persons in such form and having such terms and conditions as the Committee shall deem appropriate.  The provisions of separate Awards of Restricted Class A Units shall be set forth in separate Award Agreements, which agreements need not be identical.  Subject to the restrictions set forth in Section 5(b) hereof, and except as otherwise set forth in the applicable Award Agreement, upon the grant of Restricted Class A Units, the Participant shall generally have the rights and privileges of a member as to such Restricted Class A Units, including the right to vote such Restricted Class A Units.  Unless otherwise set forth in a Participant's Award Agreement, a Participant shall be entitled to cash dividends, unit dividends and distributions, if any, with respect to any Restricted Class A Units granted under the Plan.

(b)    <u>Vesting and Restrictions on Transfer</u>.  Restricted Class A Units shall vest in such manner, on such date or dates, or upon the achievement of performance or other conditions, in each case as may be determined by the Committee and set forth in an Award Agreement; *provided, however*, that notwithstanding any such vesting dates, the Committee may in its sole discretion accelerate the vesting of any Award at any time and for any reason.  Unless otherwise specifically determined by the Committee or in a Participant's Award Agreement, the vesting of a Restricted Class A Unit shall occur only while the Participant is actively employed by or actively rendering services to the Service Recipient, and all vesting (other than vesting as a result of the applicable Termination) shall cease upon the Termination of a Participant for any reason (or earlier on the date on which the Participant's active employment or active services rendering terminates).  For purposes of this Section 5(b) only, a Participant's active employment or other active service rendering relationship shall not include any notice period mandated under applicable law or pursuant to the terms of any contract and active employment shall not include any period of "garden leave" or similar period pursuant to applicable law or the terms of any contract.  To the extent permitted by applicable law and unless otherwise determined by the Committee, service based vesting shall be suspended during the period of any approved unpaid leave of absence by a Participant following which the Participant has a right to reinstatement and shall resume upon such Participant's return to active employment.  Further, unless otherwise determined by the Committee, in the event that the Committee determines that a furlough, temporary layoff or similar event with respect to a Participant does not constitute a Termination, vesting shall be suspended

70678527.1

during the period of any such furlough, temporary layoff or similar event and shall resume upon such Participant's return to active employment.  In addition to any other restrictions set forth in a Participant's Award Agreement, the Participant shall not be permitted to sell, transfer, pledge, assign, hypothecate or otherwise encumber or dispose of the Restricted Class A Units prior to the time the Restricted Class A Units have vested pursuant to the terms of the Award Agreement.

(c)     Termination of Employment or Service.   Except as provided by the Committee in an Award Agreement, Participant Agreement or otherwise, in the event of a Participant's Termination for any reason prior to the time that such Participant's Restricted Class A Units have vested, (i) all vesting with respect to such Participant's Restricted Class A Units shall cease, and (ii) as soon as practicable following such Termination, the Company shall repurchase from the Participant, and the Participant shall sell, all of such Participant's unvested Restricted Class A Units at a purchase price equal to the lesser of (A) the original purchase price paid for the Restricted Class A Units (as adjusted for any subsequent changes in the outstanding Class A Units or in the capital structure of the Company) *less* any dividends or other distributions or bonus received (or to be received) by the Participant (or any transferee) in respect of such Restricted Class A Units prior to the date of repurchase, (B) the Fair Market Value of a Class A Units on the date of such repurchase; provided that, if the original purchase price paid for the Restricted Class A Unit is equal to zero dollars ($0), such unvested Restricted Class A Units shall be forfeited to the Company by the Participant for no consideration as of the date of such Termination

6.     **OTHER RESTRICTIONS AND RIGHTS AND CONDITIONS APPLICABLE TO AWARDS.**

(a)     Prohibition on Transfers.   Except (1) as otherwise approved by the Committee, (2) pursuant to Section 7.3 of the Operating Agreement, or (3) pursuant to Section 7 hereof, Class A Units acquired by a Participant pursuant to the vesting of any Award granted hereunder may not be sold, transferred, pledged, assigned, hypothecated, or otherwise encumbered or disposed of, nor may a Participant (or any transferee) sell, transfer, pledge, assign, hypothecate or otherwise encumber or dispose of his, her or its right to receive all or any portion of the future proceeds to be received upon the sale, transfer or other disposition of such Class A Units in either case, prior to the one hundred eightieth (180th) day following an IPO (or such other period as may reasonably be requested by the Company or the underwriter(s) for the IPO to accommodate regulatory restrictions on (i) the publication or other distribution of research reports or (ii) analyst recommendations and opinions, including (without limitation) the restrictions set forth in Rule 2711(f)(4) of the National Association of Securities Dealers and Rule 472(f)(4) of the New York Stock Exchange, as amended, or any similar successor rules or amendments thereto) (the "Lock-Up Period").  If requested by the underwriters managing any public offering, each Participant shall execute a separate agreement to the foregoing effect.  The Company may impose stop-transfer instructions with respect to the units (or securities) subject to the foregoing restriction until the end of such Lock-Up Period.

(b)     Joinder to Operating Agreement.  Except as otherwise specifically provided in the Plan, no person shall be entitled to the rights and privileges of Class A Unit ownership in respect of Class A Units that are subject to Awards hereunder until such Class A Units have been issued to that person.  Upon accepting a Restricted Class A Unit, Participant shall become a party to the Operating Agreement by execution of a joinder agreement or such other document(s) provided by the Company for such purpose.  Without limiting the terms and conditions contained

70678527.1

in the Plan, all transfers of Class A Units acquired pursuant to Awards granted hereunder shall be subject to the terms of the Operating Agreement.

7. **REPURCHASE RIGHTS UPON TERMINATION.**

(a)     <u>Company Repurchase Right</u>.  If, prior to the Repurchase Right Lapse Date, a Participant undergoes a Termination with the Service Recipient for any reason, then at any time during the Repurchase Right Exercise Period, in addition to any repurchase right or obligation of the Company with respect to unvested Restricted Class A Units as provided in Section 5 hereof, the Company shall have the right, but not the obligation, to repurchase all or any portion of the Class A Units  received by the Participant pursuant to Awards granted hereunder at a per-unit price equal to the Repurchase Price (the "<u>Repurchase Right</u>").   The Repurchase Right shall be exercisable upon written notice to the Participant indicating the number of Class A Units to be repurchased and the date on which the repurchase is to be effected, such date to be not more than thirty (30) days after the date of such notice; *provided*, *however*, that to the extent necessary or desirable to avoid triggering adverse accounting treatment, as determined by the Committee, the Company shall not exercise the Repurchase Right with respect to Class A Units acquired pursuant to an Award prior to the six (6) month anniversary of the date an Award vests.  To the extent not otherwise held in book entry form by the Company, the certificates representing the Class A Units to be repurchased shall be delivered to the Company (or its assignee, as applicable) prior to the close of business on the date specified for the repurchase.

(b)     <u>Payment of Repurchase Price</u>.

(1)     If the Company (or its assignee, as applicable) exercises the Repurchase Right following the Termination of a Participant other than (A) by the Service Recipient for Cause or (B) by such Participant's voluntary resignation, the aggregate Repurchase Price shall be paid in a lump sum at the time of repurchase.

(2)     If the Company (or its assignee, as applicable) exercises the Repurchase Right following the Termination of a Participant (A) by the Service Recipient for Cause or (B) by such Participant's voluntary resignation, the Company (or its assignee, as applicable) shall be permitted to issue a promissory note equal to the aggregate Repurchase Price in lieu of a cash payment; *provided*, *however*, that such promissory note shall have a maturity date that does not exceed three (3) years from the date of such repurchase, shall bear simple interest of not less than the Prime Rate in effect on the date of such repurchase, and shall be payable as to interest in equal monthly installments during the term of the note and as to principal on the maturity date; *provided*, *further*, that if the Company (or its assignee, as applicable) does not issue a promissory note to exercise such Repurchase Right, the aggregate Repurchase Price shall be paid in a lump sum at the time of repurchase.

(c)     <u>Delay of Repurchase</u>.  Notwithstanding anything contained in this Section 7 to the contrary, in the event that any repurchase described herein would result in a default under any applicable financing documents of any member of the Company Group, or would otherwise be prohibited by applicable law (as applicable, a "<u>Prohibition Event</u>"), commencement of the

9

70678527.1

applicable Repurchase Right Exercise Period shall be delayed until the Prohibition Event ceases to exist, but in no event shall such delay extend for more than eighteen (18) months.

(d)     Participant Representations; Repayment Obligation.    In connection with any repurchase of Class A Units pursuant to this Section 7, the Company (or its assignee, as applicable) will be entitled to receive customary representations, warranties and releases from the Participant regarding the repurchase of such Class A Units as may be reasonably requested by the Company (or its assignee, as applicable), including, but not limited to, the representation that the Participant has good and marketable title to such Class A Units to be transferred free and clear of all liens, claims, and other encumbrances. If a Participant violates any restrictive covenant to which he or she is subject to with any member of the Company Group following the payment of the Repurchase Price, the Participant shall, promptly following demand from the Company (or its assignee, as applicable) and without prejudice to any other remedies available to the Company Group under applicable law in connection with such violation, repay to the Company (or its assignee, as applicable) an amount equal to the excess of (x) the Repurchase Price received by the Participant, and (y) the amount that would have been payable to the Participant had the Repurchase Right been exercised after such violation.

(e)     Failure to Deliver Certificates or Repurchase Agreement.    If a Participant (or any transferee) fails to deliver certificates representing the Class A Units to be repurchased or an agreement containing the representations, warranties and releases requested by the Company (or its assignee, as applicable) pursuant to Section 7(d) in a repurchase or similar agreement, in each case prior to the close of business on the date specified for the repurchase: (1) such Class A Units shall be deemed for all purposes (including the right to vote and receive payment for dividends) to have been transferred to the Company (or its assignee, as applicable); (2) to the extent such Class A Units are evidenced by certificates, such certificates shall be deemed cancelled; (3) the Company shall make an appropriate notation in its records to reflect the transfer of such Class A Units; and (4) the Participant (or any transferee) shall merely be an unsecured creditor of the Company (or its assignee, as applicable) with the right only to receive payment of the Repurchase Price, without interest.

8.    **COMPETITIVE ACTIVITIES.**

Notwithstanding anything contained in the Plan to the contrary and to the extent permitted by applicable law, except as otherwise provided by the Committee in an Award Agreement or otherwise, in the event that a Participant engages in any Competitive Activity during the term of such Participant's employment or service with the Service Recipient or during the six (6) month period following the Termination of such Participant for any reason, the Committee may determine, in its sole discretion, to (a) require all Awards held by such Participant to be immediately forfeited and returned to the Company without additional consideration, or (b) to the extent that such Participant received any profit from the Class A Units underlying an Award within the twelve (12) month period prior to the date of such Competitive Activity, require that such Participant promptly repay to the Company any profit received pursuant to such sale.

9.    **ADJUSTMENT FOR RECAPITALIZATION, MERGER, ETC.**

10

70678527.1

(a)    <u>Capitalization Adjustments</u>.  In the event of (1) changes in the outstanding Class A Units or in the capital structure of the Company by reason of unit dividends, unit splits, reverse unit splits, recapitalizations, reorganizations, mergers, amalgamations, consolidations, combinations, exchanges, or other relevant changes in capitalization occurring after the date of grant of any such Award (including any Corporate Event); (2) the declaration and payment of any extraordinary distribution in respect of Class A Units, whether payable in the form of cash, units, or any other form of consideration; or (3) any change in applicable laws or circumstances, in the case of clauses (1), (2) and (3) above, to the extent that the Committee in its sole discretion determines that such event results in or could reasonably be expected to result in any substantial dilution or enlargement of the rights intended to be granted to, or available for, Participants in the Plan, then the Committee shall: (A) equitably and proportionately adjust or substitute, as determined by the Committee in its sole discretion, (w) the aggregate number of Class A Units that may be delivered in connection with Awards (as set forth in Section 4 hereof), (x) the number of Class A Units covered by each outstanding Award, (y) the price per Class A Unit underlying each outstanding Award, and/or (z) the kind of unit or other consideration subject to each outstanding Award and available for future issuance pursuant to the Plan; (B) in respect of an outstanding Award, make one or more cash payments to the holder of an outstanding Award, which payment shall be subject to such terms and conditions (including timing of payment(s), vesting and forfeiture conditions) as the Committee may determine in its sole discretion, in an amount that the Committee determines in its sole discretion addresses the diminution in the value of such outstanding Award in connection with such event; or (C) any combination of clauses (A) and (B) above as determined appropriate by the Committee in its sole discretion.  The Committee will make such adjustments, substitutions or payment, and its determination will be final, binding and conclusive.  The Committee need not take the same action or actions with respect to all Awards or portions thereof or with respect to all Participants.  The Committee may take different actions with respect to the vested and unvested portions of an Award.

(b)    <u>Corporate Events</u>.  Notwithstanding the foregoing, except as provided by the Committee in an Award Agreement, Participant Agreement or otherwise, in connection with (1) a merger, amalgamation, or consolidation involving the Company in which the Company is not the surviving corporation, (2) a merger, amalgamation, or consolidation involving the Company in which the Company is the surviving corporation but the holders of Class A Units receive securities of another company or other property or cash, (3) a Change of Control, or (4) the reorganization, dissolution or liquidation of the Company (each, a "<u>Corporate Event</u>"), all Awards outstanding on the effective date of such Corporate Event shall be treated in the manner described in the definitive transaction agreement (or, in the event that the Corporate Event does not entail a definitive agreement to which the Company is party, in the manner determined by the Committee in its sole discretion), which agreement may provide, without limitation, for one or more of the following:

(1)    The assumption or substitution of any or all Awards in connection with such Corporate Event, in which case the Awards shall be subject to the adjustment set forth in subsection (a) above, and to the extent that such Awards vest subject to the achievement of performance objectives or criteria, such objectives or criteria shall be adjusted appropriately to reflect the Corporate Event;

70678527.1

(2)    The acceleration of vesting of any or all Awards, subject to the consummation of such Corporate Event;

(3)    The cancellation of any or all Awards (whether vested or unvested) as of the consummation of such Corporate Event, together with the payment to the Participants holding vested Awards (including any Awards that would vest upon the Corporate Event but for such cancellation) so canceled of an amount in respect of cancellation based upon the per-share consideration being paid for the Class A Units in connection with such Corporate Event; and/or

(4)    The replacement of any or all Awards with a cash incentive program that preserves the value of the Awards so replaced (determined as of the consummation of the Corporate Event), with subsequent payment of cash incentives subject to the same vesting conditions as applicable to the Awards so replaced and payment to be made within thirty (30) days of the applicable vesting date (or such later date on which the applicable consideration is payable for the Class A Units in connection with the Corporate Event, unless otherwise determined by the Committee).

Payments to holders pursuant to paragraph (3) above shall be made in cash or, in the sole discretion of the Committee, in the form of such other consideration necessary for a Participant to receive property, cash, or securities (or a combination thereof) as such Participant would have been entitled to receive upon the occurrence of the transaction if the Participant had been, immediately prior to such transaction, the holder of the number of Class A Units covered by the Award at such time. In addition, in connection with any Corporate Event, prior to any payment or adjustment contemplated under this subsection (b), the Committee may require a Participant to (A) represent and warrant as to the unencumbered title to his or her Awards, (B) bear such Participant's pro-rata share of any post-closing indemnity obligations and be subject to the same post-closing purchase price adjustments, escrow terms, offset rights, holdback terms, and similar conditions as the other holders of Class A Units, and (C) deliver customary transfer documentation as reasonably determined by the Committee.

The Committee need not take the same action or actions with respect to all Awards or portions thereof or with respect to all Participants.  The Committee may take different actions with respect to the vested and unvested portions of an Award.

(c)    <u>Fractional Class A Units</u>.  Any adjustment provided under this Section 9 may, in the Committee's discretion, provide for the elimination of any fractional units that might otherwise become subject to an Award.  No cash settlements shall be made with respect to fractional units so eliminated.

10.    **USE OF PROCEEDS.**

The proceeds received from the sale of Class A Units pursuant to the Plan shall be used for general corporate purposes.

70678527.1

11.    **EMPLOYMENT OR SERVICE RIGHTS.**

No individual shall have any claim or right to be granted an Award under the Plan or, having been selected for the grant of an Award, to be selected for the grant of any other Award. Neither the Plan nor any action taken hereunder shall be construed as giving any individual any right to be retained in the employ or service of any member of the Company Group.

12.    **COMPLIANCE WITH LAWS.**

(a)    <u>Delivery of Class A Units</u>.  The obligation of the Company to deliver Class A Units upon issuance or vesting of any Award shall be subject to all applicable laws, rules, and regulations, and to such approvals by governmental agencies as may be required.  Notwithstanding any terms or conditions of any Award to the contrary, the Company shall be under no obligation to offer to sell or to sell, and shall be prohibited from offering to sell or selling, any Class A Units pursuant to an Award unless such units have been properly registered for sale with the U.S. Securities and Exchange Commission pursuant to the Securities Act and any applicable state agency (or with a similar non–United States regulatory agency pursuant to a similar law or regulation) or unless the Company has received an opinion of counsel, satisfactory to the Company, that such units may be offered or sold without such registration pursuant to an available exemption therefrom and the terms and conditions of such exemption have been fully complied with.  The Company shall be under no obligation to register for sale or resale under the Securities Act or any applicable state laws any of the Class A Units to be offered or sold under the Plan.  If the Class A Units offered for sale or sold under the Plan are offered or sold pursuant to an exemption from registration under the Securities Act, the Company may restrict the transfer of such units and may legend the Class A Unit certificates representing such units in such manner as it deems advisable to ensure the availability of any such exemption.

(b)    <u>Investment Assurances</u>.  The Committee may require a Participant, as a condition of exercising or acquiring Class A Units, (1) to give written assurances satisfactory to the Committee as to the Participant's knowledge and experience in financial and business matters and/or to employ a purchaser representative reasonably satisfactory to the Committee who is knowledgeable and experienced in financial and business matters and that he or she is capable of evaluating, alone or together with the purchaser representative, the merits and risks of exercising the Award; and (2) to give written assurances satisfactory to the Committee stating that the Participant is acquiring Class A Units for the Participant's own account and not with any present intention of selling or otherwise distributing the Class A Units.  The foregoing requirements, and any assurances given pursuant to such requirements, will be inoperative if, as to any particular requirement, a determination is made by counsel for the Company that such requirement need not be met in the circumstances under the then applicable securities laws.

13.    **WITHHOLDING OBLIGATIONS.**

As a condition to the issuance or vesting of any Award (or upon the making of an election under Section 83(b) of the Code), the Committee may require that a Participant satisfy, through deduction or withholding from any payment of any kind otherwise due to the Participant, or through such other arrangements as are satisfactory to the Committee, the amount of all federal, state, and local income and other taxes of any kind required or permitted to be withheld in

70678527.1

connection with such issuance or vesting.  The Committee, in its discretion, may permit Class A Units to be used to satisfy tax withholding requirements, and such shares shall be valued at their Fair Market Value as of the issuance or vesting date of the Award, as applicable.

14.    **AMENDMENT OF THE PLAN OR AWARDS.**

(a)    <u>Amendment of Plan</u>.  The Board may amend the Plan at any time and from time to time.

(b)    <u>Amendment of Awards</u>.  The Board or the Committee may amend the terms of any one or more Awards or any Award Agreement at any time and from time to time.

(c)    <u>Addenda</u>.  The Board may approve such addenda to the Plan as it may consider necessary or appropriate for the purpose of granting Awards to Eligible Persons, which Awards may contain such terms and conditions as the Board deems necessary or appropriate to accommodate differences in local law, tax policy or custom, which, if so required under applicable laws, may deviate from the terms and conditions set forth in the Plan.  The terms of any such addenda shall supersede the terms of the Plan to the extent necessary to accommodate such differences but shall not otherwise affect the terms of the Plan as in effect for any other purpose.

(d)    <u>Member Approval</u>. Notwithstanding anything herein to the contrary, no amendment to the Plan or any Award shall be effective without member approval to the extent that such approval is required pursuant to applicable law or the applicable rules of each national securities exchange on which the units may be listed.

(e)    <u>No Impairment</u>.  No amendment to the Plan or any Award shall adversely impair a Participant's rights under any Award unless the Participant consents in writing (it being understood that no action taken by the Board or the Committee that is expressly permitted under the Plan, including, without limitation, any actions described in Section 9 hereof, shall constitute an amendment to the Plan or an Award for such purpose).  Notwithstanding the foregoing, subject to the limitations of applicable law, if any, and without an affected Participant's consent, the Board or the Committee may amend the terms of the Plan or any one or more Awards from time to time as necessary to bring such Awards into compliance with applicable law.

15.    **TERMINATION OR SUSPENSION OF THE PLAN.**

The Board may suspend or terminate the Plan at any time.  Unless sooner terminated or otherwise provided by the Board at any time, the Plan shall terminate on the day before the tenth (10th) anniversary of the date the Plan is adopted by the Board.  No Awards may be granted under the Plan while the Plan is suspended or after it is terminated; *provided, however*, that following any suspension or termination of the Plan, the Plan shall remain in effect for the purpose of governing all Awards then outstanding hereunder until such time as all Awards under the Plan have been terminated, forfeited, or otherwise canceled, or earned or otherwise paid out in accordance with their terms.

16.    **EFFECTIVE DATE OF THE PLAN.**

The Plan is effective as of the Effective Date.

70678527.1

17.    **MISCELLANEOUS.**

(a)    <u>Certificates</u>.  Class A Units acquired pursuant to Awards granted under the Plan may be evidenced in such a manner as the Committee shall determine.  If certificates representing Class A Units are registered in the name of the Participant, the Committee may require that (1) such certificates bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Class A Units, (2) the Company retain physical possession of the certificates, and (3) the Participant deliver an instrument of transfer to the Company, endorsed in blank, relating to the Class A Units.  Notwithstanding the foregoing, unless otherwise determined by the Committee, in its sole discretion, the Class A Units shall be held in book-entry form rather than delivered to the Participant pending the release of any applicable restrictions.

(b)    <u>Other Benefits</u>.  No Award granted or paid out under the Plan shall be deemed compensation for purposes of computing benefits under any retirement plan of any member of the Company Group nor affect any benefits under any other benefit plan now or subsequently in effect under which the availability or amount of benefits is related to the level of compensation.

(c)    <u>Corporate Action Constituting Grant of Awards</u>.  Corporate action constituting a grant by the Company of an Award to any Participant will be deemed completed as of the date of such corporate action, unless otherwise determined by the Committee, regardless of when the instrument, certificate, or letter evidencing the Award is communicated to, or actually received or accepted by, the Participant.  In the event that the corporate records (*e.g.*, Committee consents, resolutions or minutes) documenting the corporate action constituting the grant contain terms (*e.g.*, vesting schedule or number of Class A Units) that are inconsistent with those in the Award Agreement as a result of a clerical error in connection with the preparation of the Award Agreement, the corporate records will control and the Participant will have no legally binding right to the incorrect term in the Award Agreement.  Unless otherwise determined by the Committee, all Award Agreements must be signed by the applicable Eligible Person and returned to the Company within sixty (60) days following the date the Award Agreement is delivered to the applicable Eligible Person, and failure of an applicable Eligible Person to timely execute and return an Award Agreement to the Company will result in an immediate forfeiture of such Award.

(d)    <u>Clawback/Recoupment Policy</u>.  Notwithstanding anything contained herein to the contrary, all Awards granted under the Plan shall be and remain subject to any incentive compensation clawback or recoupment policy currently in effect or as may be adopted by the Board (or a committee or subcommittee of the Board) and, in each case, as may be amended from time to time.  No such policy, adoption, or amendment shall in any event require the prior consent of any Participant.  No recovery of compensation under such a clawback policy will be an event giving rise to a right to resign for "good reason" or "constructive termination" (or similar term) under any agreement with any member of the Company Group.  In the event that an Award is subject to more than one such policy, the policy with the most restrictive clawback or recoupment provisions shall govern such Award, subject to applicable law.

(e)    <u>Participants Outside of the United States</u>.  The Committee may modify the terms of any Award under the Plan made to or held by a Participant who is then a resident, or is primarily employed or providing services, outside of the United States in any manner deemed by

70678527.1

the Committee to be necessary or appropriate in order that such Award shall conform to laws, regulations, and customs of the country in which the Participant is then a resident or primarily employed or providing services, or so that the value and other benefits of the Award to the Participant, as affected by non–United States tax laws and other restrictions applicable as a result of the Participant's residence, employment, or providing services abroad, shall be comparable to the value of such Award to a Participant who is a resident, or is primarily employed or providing services, in the United States. An Award may be modified under this Section 17(e) in a manner that is inconsistent with the express terms of the Plan, so long as such modifications will not contravene any applicable law or regulation. Additionally, the Committee may adopt such procedures and sub-plans as are necessary or appropriate to permit participation in the Plan by Eligible Persons who are non–United States nationals or are primarily employed or providing services outside the United States.

(f)    <u>Electronic Delivery</u>. Any reference herein to a "written" agreement or document will include any agreement or document delivered electronically or posted on the Company's intranet (or other shared electronic medium controlled by the Company to which the Participant has access).

(g)    <u>Data Privacy</u>. As a condition of receipt of any Award, each Participant explicitly and unambiguously consents to the collection, use, and transfer, in electronic or other form, of personal data as described in this subsection by and among, as applicable, the Company Group for the exclusive purpose of implementing, administering, and managing the Plan and Awards and the Participant's participation in the Plan. In furtherance of such implementation, administration, and management, the Company Group may hold certain personal information about a Participant, including, but not limited to, the Participant's name, home address, telephone number, date of birth, social security or insurance number or other identification number, salary, nationality, job title(s), information regarding any securities of any member of the Company Group held by such Participant, and details of all Awards (the "<u>Data</u>"). In addition to transferring the Data amongst themselves as necessary for the purpose of implementation, administration, and management of the Plan and Awards and the Participant's participation in the Plan, each member of the Company Group may transfer the Data to any third parties assisting the Company in the implementation, administration, and management of the Plan and Awards and the Participant's participation in the Plan. Recipients of the Data may be located in the Participant's country or elsewhere, and the Participant's country and any given recipient's country may have different data privacy laws and protections. By accepting an Award, each Participant authorizes such recipients to receive, possess, use, retain, and transfer the Data, in electronic or other form, for the purposes of assisting the Company in the implementation, administration, and management of the Plan and Awards and the Participant's participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Company or the Participant may elect to deposit any Class A Units. The Data related to a Participant will be held only as long as is necessary to implement, administer, and manage the Plan and Awards and the Participant's participation in the Plan. A Participant may, at any time, view the Data held by the Company with respect to such Participant, request additional information about the storage and processing of the Data with respect to such Participant, recommend any necessary corrections to the Data with respect to the Participant, or refuse or withdraw the consents herein in writing, in any case without cost, by contacting his or her local human resources representative. The Company may cancel the Participant's eligibility to participate in the Plan, and, in the Committee's discretion, the

70678527.1

Participant may forfeit any outstanding Awards if the Participant refuses or withdraws the consents described herein.  For more information on the consequences of refusal to consent or withdrawal of consent, Participants may contact their local human resources representative.

(h)      No Liability of Committee Members.  No member of the Committee (nor any employee or director delegated authority pursuant to Section 3(b) hereof) shall be personally liable by reason of any contract or other instrument executed by such member or on his or her behalf in his or her capacity as a member of the Committee or for any mistake of judgment made in good faith, and the Company shall indemnify and hold harmless each member of the Committee and each other employee, officer, or director of the Company to whom any duty or power relating to the administration or interpretation of the Plan may be allocated or delegated, against all costs and expenses (including counsel fees) and liabilities (including sums paid in settlement of a claim) arising out of any act or omission to act in connection with the Plan, unless arising out of such person's own fraud or willful misconduct; *provided*, *however*, that approval of the Board shall be required for the payment of any amount in settlement of a claim against any such person.  The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled under the Company's certificate or articles of incorporation or bylaws, each as may be amended from time to time, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

(i)      Payments Following Accidents or Illness.  If the Committee shall find that any person to whom any amount is payable under the Plan is unable to care for his or her affairs because of illness or accident, or is a minor, or has died, then any payment due to such person or his or her estate (unless a prior claim therefor has been made by a duly appointed legal representative) may, if the Committee so directs the Company, be paid to his or her spouse, child, relative, an institution maintaining or having custody of such person, or any other person deemed by the Committee to be a proper recipient on behalf of such person otherwise entitled to payment. Any such payment shall be a complete discharge of the liability of the Committee and the Company therefor.

(j)      Governing Law.  The Plan shall be governed by and construed in accordance with the internal laws of the State of Delaware without reference to the principles of conflicts of laws thereof.

(k)      Arbitration.  All disputes and claims of any nature that a Participant (or such Participant's transferee or estate) may have against the Company or any other member of the Company Group arising out of or in any way related to the Plan or any Award Agreement must be submitted solely and exclusively to binding arbitration in accordance with the then-current employment arbitration rules and procedures of the American Arbitration Association (AAA) to be held in Delaware.  All information regarding the dispute or claim and arbitration proceedings, including any settlement, shall not be disclosed by the Participant or any arbitrator to any third party without the written consent of the Company, except with respect to judicial enforcement of any arbitration award.  Any arbitration claim must be brought solely in the Participant's (or such Participant's transferee's or estate's) individual capacity and not as a claimant or class member (or similar capacity) in any purported multiple-claimant, class, collective, representative or similar proceeding, and the arbitrator may not permit joinder of any multiple claimants and their claims without the express written consent of the Company.  Any arbitrator selected to adjudicate the

70678527.1

claim must be knowledgeable in the industry standards and practices, and, by signing an Award Agreement, each Participant will be deemed to agree that any claims pursuant to the Plan or an Award Agreement is inherently a matter involving interstate commerce and thus, notwithstanding the choice of law provision included herein, the Federal Arbitration Act shall govern the interpretation and enforcement of this arbitration provision.  The arbitrator shall not be permitted to award any punitive or similar damages, but may award attorney's fees and expenses to the prevailing party in any arbitration.  Any decision by the arbitrator shall be binding on all parties to the arbitration.

      (l)    <u>Statute of Limitations</u>.  A Participant or any other person filing a claim for benefits under the Plan must file the claim within one (1) year of the date the Participant or other person knew or should have known of the facts giving rise to the claim.  This one-year statute of limitations will apply in any forum where a Participant or any other person may file a claim and, unless the Company waives the time limits set forth above in its sole discretion, any claim not brought within the time periods specified shall be waived and forever barred.

      (m)    <u>Funding</u>.  No provision of the Plan shall require any member of the Company Group, for the purpose of satisfying any obligations under the Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made or otherwise to segregate any assets, nor shall any member of the Company Group be required to maintain separate bank accounts, books, records, or other evidence of the existence of a segregated or separately maintained or administered fund for such purposes.  Participants shall have no rights under the Plan other than as unsecured general creditors of the Company, except that insofar as they may have become entitled to payment of additional compensation by performance of services, they shall have the same rights as other employees and service providers under general law.

      (n)    <u>Reliance on Reports</u>.  Each member of the Committee and each member of the Board shall be fully justified in relying, acting, or failing to act, and shall not be liable for having so relied, acted, or failed to act, in good faith, upon any report made by any independent public accountant of any member of the Company Group and upon any other information furnished in connection with the Plan by any person or persons other than such member.

      (o)    <u>Titles and Headings</u>.  The titles and headings of the sections in the Plan are for convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.

*      *      *

The Plan was approved by the Board on January 19, 2024.

70678527.1

# APPENDIX A

## TO

## FREEDOM VCM HOLDINGS, LLC 2024 Restricted CLASS A UNIT PLAN

### (for California residents only, to the extent required by
### California Corporations Code Section 25102(o))

This Appendix A to the Freedom VCM Holdings, LLC 2024 Restricted Class A Unit Plan (the "Plan") shall apply only to the Participants who are residents of the State of California and who are receiving an Award under the Plan in reliance on California Corporations Code Section 25102(o) only. Capitalized terms contained herein shall have the same meanings given to them in the Plan, unless otherwise provided by this Appendix A. Notwithstanding any provisions contained in the Plan to the contrary and to the extent required by applicable laws, the following terms shall apply to all Awards granted to residents of the State of California, until the earlier to occur of (i) such time as the Committee amends this Appendix A or (ii) at such time as the Committee otherwise provides.

(a)     Unless determined otherwise by the Committee, set forth in the Plan, an Award Agreement or in the Operating Agreement, Awards may not be sold, transferred, pledged, assigned, hypothecated, or otherwise encumbered or disposed of in any manner other than by will or by the laws of descent and distribution. If the Committee makes an Award transferable, such Award may only be transferred (i) by will, (ii) by the laws of descent and distribution, (iii) to a revocable trust, or (iv) as permitted by Rule 701 of the Securities Act.

(b)     No Award shall be granted, nor shall any Class A Units be issued upon the vesting of any Award, to a resident of California more than ten (10) years after the earlier of the date of adoption of the Plan or the date the Plan is approved by the Company's security holders.

(c)     The Plan must be approved by a majority of the outstanding securities of the Company entitled to vote by the later of (1) within twelve (12) months before or after the date the Plan is adopted or (2) prior to or within twelve (12) months of the issuance of any security under the Plan in California. Any issuance of securities purchased before security holder approval is obtained must be rescinded if security holder approval is not obtained in the manner described in the preceding sentence. Such securities shall not be counted in determining whether such approval is obtained.

(d)     In the event of a unit split, reverse unit split, unit distribution, recapitalization, combination, reclassification or other distribution of the Company's equity securities without the receipt of consideration by the Company, of or on the Company's class of securities subject to the purchase right or underlying an Award, the Committee will make such proportionate adjustments, if any, to an Award as required by Section 25102(o) of the California Corporations Code to the extent the Company is relying upon the exemption afforded thereby with respect to the Award.

(e)     This Appendix A shall be deemed to be part of the Plan and the Committee shall have the authority to amend this Appendix A in accordance with Section 14 of the Plan.

## Exhibit H

**Limited Liability Company Agreement of Freedom VCM Holdings, LLC**

*EXECUTION VERSION*

**SECOND AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**FREEDOM VCM HOLDINGS, LLC**

---

**Dated as of January 19, 2024**

---

70677823.1

# TABLE OF CONTENTS

Page

ARTICLE I.        FORMATION AND OTHER ORGANIZATIONAL MATTERS ...................1

    Section 1.1.        Formation and Issuance .........................................................1
    Section 1.2.        Name.....................................................................................1
    Section 1.3.        Term......................................................................................1
    Section 1.4.        Business ................................................................................2
    Section 1.5.        Subsidiaries ..........................................................................2
    Section 1.6.        Names and Addresses of Members.......................................2
    Section 1.7.        Registered Office and Principal Place of Business................2

ARTICLE II.       UNITS ........................................................................................2

    Section 2.1.        Units; Class and Series ........................................................2
    Section 2.2.        Unit Designations; Effective Date Issuances.........................4
    Section 2.3.        Voting Rights........................................................................5
    Section 2.4.        Preemptive Rights................................................................5

ARTICLE III.      CONTRIBUTIONS BY MEMBERS ..........................................7

    Section 3.1.        Initial Capital Contributions ................................................7
    Section 3.2.        Return of Capital Contributions...........................................8
    Section 3.3.        Advances by Members..........................................................8
    Section 3.4.        Capital Accounts..................................................................8

ARTICLE IV.       DISTRIBUTIONS TO MEMBERS..............................................9

    Section 4.1.        Distributions.........................................................................9
    Section 4.2.        Other Distribution Provisions.............................................10
    Section 4.3.        Allocations of Net Profits and Net Losses...........................11
    Section 4.4.        Regulatory Allocations ......................................................11
    Section 4.5.        Curative Allocations ..........................................................13
    Section 4.6.        Income Tax Allocations......................................................13
    Section 4.7.        Limitation on Distributions.................................................13
    Section 4.8.        Offset..................................................................................14

ARTICLE V.        POWERS, RIGHTS AND DUTIES OF MEMBERS;
                        MANAGEMENT ......................................................................14

    Section 5.1.        Board of Directors ..............................................................14
    Section 5.2.        Quorum and Voting.............................................................16
    Section 5.3.        Committees of the Board ....................................................16
    Section 5.4.        Subsidiary Boards...............................................................17
    Section 5.5.        Board Meetings...................................................................17
    Section 5.6.        Waiver of Duties.................................................................17

Section 5.7.     Officers .................................................................................17
Section 5.8.     Other Activities .......................................................................17
Section 5.9.     Indemnification .......................................................................18

ARTICLE VI.     STATUS OF MEMBERS ........................................................21

Section 6.1.     Relationship of Members ........................................................21
Section 6.2.     Liability of Members ...............................................................21
Section 6.3.     Dissolution of Member ...........................................................21
Section 6.4.     Certain Member Approvals .....................................................21
Section 6.5.     Certain Limitations .................................................................24

ARTICLE VII.     TRANSFER OF UNITS ..........................................................25

Section 7.1.     Transfer Restrictions ..............................................................25
Section 7.2.     Tag-Along Right ......................................................................27
Section 7.3.     Drag Along Right ....................................................................29
Section 7.4.     [Intentionally Omitted] ...........................................................31
Section 7.5.     Substitute Member ..................................................................31
Section 7.6.     IPO Restructuring ...................................................................31

ARTICLE VIII.     CERTAIN REMEDIES ...........................................................32

Section 8.1.     No Partition .............................................................................32
Section 8.2.     Litigation Without Termination ..............................................32
Section 8.3.     Cumulative Remedies ..............................................................32
Section 8.4.     No Waiver ................................................................................32

ARTICLE IX.     DISSOLUTION OF COMPANY ...........................................33

Section 9.1.     Dissolution ..............................................................................33
Section 9.2.     Continuance of the Company ..................................................33
Section 9.3.     Winding-Up and Termination..................................................33
Section 9.4.     Deficit Capital Accounts.........................................................34
Section 9.5.     Certificate of Cancellation ......................................................34

ARTICLE X.     REPRESENTATIONS, WARRANTIES AND COVENANTS .....................35

Section 10.1.     Representations and Warranties of Members .........................35
Section 10.2.     Confidentiality .......................................................................36
Section 10.3.     Other Investor Information Rights..........................................37
Section 10.4.     Registration Rights .................................................................38

ARTICLE XI.     MISCELLANEOUS ................................................................39

Section 11.1.     Notices ....................................................................................39
Section 11.2.     Entire Agreement....................................................................39
Section 11.3.     Amendments ...........................................................................39

- ii -

70677823.1

Section 11.4.     Effect of Waiver or Consent ................................................................40
Section 11.5.     Binding Effect ..............................................................................................40
Section 11.6.     Governing Law; Venue ................................................................................40
Section 11.7.     Successors and Assigns ...............................................................................40
Section 11.8.     Captions ......................................................................................................40
Section 11.9.     Severability ..................................................................................................40
Section 11.10.    Further Assurances .....................................................................................41
Section 11.11.    Counterparts ...............................................................................................41
Section 11.12.    Deficit Restoration ......................................................................................41
Section 11.13.    Waiver of Right to Trial by Jury ................................................................41
Section 11.14.    Equitable Relief ..........................................................................................42
Section 11.15.    Power of Attorney .......................................................................................42
Section 11.16.    Independent Legal Advice ...........................................................................43

ARTICLE XII.    TAX MATTERS ...........................................................................................43

Section 12.1.     Consistency ..................................................................................................43
Section 12.2.     Tax Controversies ........................................................................................43
Section 12.3.     Accounting Methods; Elections ..................................................................44
Section 12.4.     Partnership Status .......................................................................................44
Section 12.5.     Tax Matters Member Indemnification .......................................................45
Section 12.6.     BR Member Consent Right .........................................................................45


Exhibit A      Definitions
Exhibit B      Registration Rights Term Sheet
Schedule 1     Names and Addresses of Members

70677823.1

# SECOND AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT
## OF
# FREEDOM VCM HOLDINGS, LLC

This Second Amended and Restated Limited Liability Company Agreement (this "Agreement") of Freedom VCM Holdings, LLC, a Delaware limited liability company (the "Company"), is made and entered into as of January 19, 2024 (the "Effective Date"), by and among the Company and each of the Persons listed on Schedule 1 hereto from time to time as Members (as defined herein). Capitalized terms used in this Agreement and not otherwise defined in the text of this Agreement are defined in Exhibit A and shall have the meanings set forth therein.

WHEREAS, a certificate of formation of the Company (the "Certificate") was filed with the Secretary of State of the State of Delaware on May 8, 2023 in accordance with the provisions of the Delaware Limited Liability Company Act, Del. Code tit. 6, Chapter 18 § 101, et seq., as amended from time to time (the "Act");

WHEREAS, the Company was governed by that certain Limited Liability Company Agreement, dated as of May 8, 2023, as amended and restated by that certain Amended and Restated Limited Liability Company Agreement, dated as of August 21, 2023 (the "A&R LLC Agreement"); and

WHEREAS, the Company and the Members desire to amend and restate the A&R LLC Agreement in its entirety on the terms hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I.
## FORMATION AND OTHER ORGANIZATIONAL MATTERS

Section 1.1.    Formation and Issuance.  The Company is a limited liability company formed under the Act. The Company and the Members hereby enter into this Agreement as of the Effective Date in order to set forth the rights and obligations of the Company and the Members and certain related matters. Except as expressly stated herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act. In the event of any conflict between any waivable provision of the Act and this Agreement, the provisions of this Agreement shall govern.

Section 1.2.    Name.  The business of the Company shall be conducted under the name "Freedom VCM Holdings, LLC" or such other name as the Board may hereafter determine.

Section 1.3.    Term.  The term of the Company commenced on the date of the filing of the Certificate pursuant to the Act, and shall continue until terminated or dissolved as hereinafter

70677823.1

provided.  Notwithstanding the dissolution of the Company, the existence of the Company shall continue until termination pursuant to <u>Section 9.3</u>.

Section 1.4.    <u>Business</u>.  Subject to the provisions of this Agreement, the business of the Company is to engage in any act or activity lawful under the Act.

Section 1.5.    <u>Subsidiaries</u>.  The Company may form, cause to be formed, acquire or otherwise invest in subsidiaries or affiliated entities owned either directly or indirectly by the Company (each a "<u>Subsidiary</u>") to own all or any part of the Company's assets or to conduct the Company's business.

Section 1.6.    <u>Names and Addresses of Members</u>.  The names and addresses of the Members as of the date hereof are set forth on <u>Schedule 1</u> hereof.  Schedule I shall be updated from time to time by the Board to reflect any new Members of the Company or other changes to the information set forth thereon so long as any such new Member has become a Member (or such other change is being effected) in accordance with the terms of this Agreement, and any such update shall not be deemed an amendment to this Agreement.

Section 1.7.    <u>Registered Office and Principal Place of Business</u>.  The registered office of the Company in the State of Delaware shall be 1209 Orange Street, Wilmington, Delaware 19801, and its registered agent for service of process on the Company at the registered office shall be The Corporation Trust Company.  The principal place of business of the Company shall be located at 109 Innovation Court, Suite J, Delaware, OH 43015, or such other location as may be determined by the Board.

## ARTICLE II.
## UNITS

Section 2.1.    <u>Units; Class and Series</u>.

(a)    The Membership Interests of the Company shall be issued in unit increments (each, a "<u>Unit</u>").  The Company may also issue Membership Interests in fractional Unit increments.  From time to time, the Company may, subject to the terms and conditions of this Agreement, issue such Units as the Board determines to cause the Company to issue from time to time.  Subject to the terms and conditions of this Agreement, Units may be issued from time to time in one or more classes or series, with such designations, preferences and rights as are set forth in <u>Section 2.2</u> or otherwise as shall be fixed by the Board by resolution thereof, in all cases at such price and for such consideration as the Board shall determine.  The Board, in so fixing the designations, rights and preferences of any class or series of Units, may, subject to the terms and conditions of this Agreement, designate such Units as "Common Units", "Preferred Units", "Incentive Units", or any other designation and may specify such Units to be senior, junior, or *pari passu* with any Units then outstanding or to be issued thereafter and the voting rights of such Units.  Except as otherwise provided herein, the Board may increase the number of authorized Units in any then-existing class or series.  Upon due authorization of such issuances, the Board is hereby authorized, subject to the terms and conditions of this Agreement, to take all actions that it deems necessary or appropriate in connection with the authorization (including the increase in number of authorized Units of any class or series), designation, creation and issuance of Units and the fixing of the designations,

70677823.1

preferences and rights applicable thereto, and designations, preferences and rights of any new class or series of Units relative to the designations, preferences and rights governing any other series or classes of Units including through the amendment of this Agreement to provide for such Units. The Members acknowledge and agree that any such amendment in connection with a duly authorized issuance of Units that is recommended and approved by the Board may modify (if, and to the extent, necessary to effect any such issuance of Units) the distribution, tax allocation and other provisions of this Agreement to the extent approved by the Board, subject to the terms and conditions of this Agreement.

(b)    Unit Certificates.    Each Unit in the Company shall constitute and shall remain a "security" within the meaning of Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of Delaware. The Units shall be represented by certificates and such certificate shall be promptly delivered by the Company to the applicable record owner of the Units represented by such certificate. Certificates evidencing Units will provide that the Units represented thereby are securities governed by Article 8 of the Delaware Uniform Commercial Code. Certificates need not bear a seal of the Company but shall be signed by the Chief Executive Officer, President, any Vice President or any other Person authorized by the Board to sign such certificates who shall certify the Units represented by such certificate. Books and records reflecting the record ownership of the Units shall be kept by the Secretary. In the event any Officer who shall have signed, or whose signature or signatures shall have been placed upon by electronic transmission, any such certificate or certificates shall have ceased to be an Officer before such certificate is issued by the Company, such certificate may nevertheless be issued by the Company with the same effect as if such person were an Officer at the date of issue. The Board may determine the conditions upon which a new certificate may be issued in place of a certificate which is alleged to have been lost, stolen or destroyed and may, in its discretion, require the owner of such certificate or its legal representative to give bond, with sufficient surety, to indemnify the Company against any and all losses or claims that may arise by reason of the issuance of a new certificate in the place of the one so lost, stolen or destroyed.  Any certificate shall bear a legend on the reverse side thereof substantially in the following form in addition to any other legend required by Law or by agreement with the Company:

THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " SECURITIES ACT" ), AND MAY NOT BE OFFERED OR SOLD, UNLESS THEY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE (AND, IN SUCH CASE, AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY MAY BE REQUESTED BY THE COMPANY TO THE EFFECT THAT SUCH OFFER OR SALE IS NOT REQUIRED TO BE REGISTERED UNDER THE SECURITIES ACT).

THE SECURITIES EVIDENCED HEREBY ARE SUBJECT TO CERTAIN RESTRICTIONS ON

70677823.1

TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF JANUARY 19, 2024 (AS FURTHER AMENDED OR RESTATED FROM TIME TO TIME), A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.

Section 2.2.    Unit Designations; Effective Date Issuances.

(a)    A class of Units designated as "Class A Units" is hereby created and a subclass of the Class A Unit designated as "Compensatory Units" is hereby created, and (unless otherwise expressly provided herein or the context otherwise requires, as determined by the Board in good faith), references herein to Class A Units shall include Compensatory Units. Compensatory Units shall be issued pursuant to an Award Agreement (as defined below) and shall be subject to vesting, forfeiture and other terms, in each case, as set forth therein, and no Capital Contributions will be required to be made by any Person issued Compensatory Units with respect to such Compensatory Units. The Company is authorized to issue as many Class A Units as the Board approves from time to time, subject to the terms and conditions of this Agreement. The Class A Units shall be deemed to be "Common Units" for purposes of this Agreement. Schedule 1 lists the Members holding Class A Units (each, a "Class A Member") and the number of Class A Units held by each of them as of the Effective Date. The Board, without any action by or the consent or approval of any Member or any other Person, is authorized to amend and/or restate Schedule 1 from time to time to reflect the admission of new Class A Members, the cessation of any Person as a Class A Member and Transfers and issuances of Class A Units made, in each case, in accordance with this Agreement. The holders of Compensatory Units may, in their sole discretion, make an election pursuant to Section 83(b) of the Code.

(a)    A class of Units designated as "Class B Units" is hereby created to be issued to Persons only in return for services provided (or to be provided) to or for the benefit of the Company or its Subsidiaries. The Class B Units shall be deemed to be "Incentive Units" for purposes of this Agreement. Class B Units shall be issued pursuant to a separate award agreement or other agreement approved by the Board (each, an "Award Agreement") between the Company and such Persons. No Capital Contributions will be required to be made by any Person issued Class B Units (each, a "Class B Member"), in his, her or its capacity as such, on the date of grant on account of the issuance of Class B Units to such Class B Member. The Class B Units shall be subject to the vesting, forfeiture and other terms set forth in the applicable Award Agreement pursuant to which such Class B Units are granted. The Company is authorized to issue as many Class B Units as the Board approves from time to time, subject to the terms and conditions of this Agreement. There are no Class B Units outstanding as of the Effective Date; the number of any Class B Units issued after the Effective date will be listed in the respective Award Agreement(s) of each Class B Member. In certain cases, as provided in the applicable Award Agreement, Class B Units issued from time to time will be issued for no consideration or *de minimis* consideration as such interests are intended to constitute "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43, or any successor Revenue Procedure, provision of the Code, Regulation or other pronouncement applicable as of the date hereof. Class B Units shall be subject to forfeiture without

70677823.1

consideration on the terms set forth in each Award Agreement. Each Class B Unit shall have a Threshold Amount assigned to it by the Board at its time of issuance, which such Threshold Amount shall be at least as equal to the hypothetical amount that would be distributed to the Members if (i) all the assets of the Company were sold for their Fair Market Value, (ii) the liabilities of the Company were satisfied according to their terms and (iii) the remaining amount were distributed to the Members pursuant to <u>Section 4.1</u> hereof (i.e., the equity value of the Company at the time of issuance of any such Class B Unit) immediately prior to the issuance of such Class B Unit (the amount deemed received by the Members the "<u>Threshold Amount</u>"). Notwithstanding the foregoing, the Board shall have the authority (A) to establish any Threshold Amount greater than or equal to zero and (B) to make adjustments to the Threshold Amount, to reflect capital contributions, distributions and other transactions of or involving the Company or its Subsidiaries that the Board determines warrants a modification to the Threshold Amount of any Class B Unit. The Threshold Amount established with respect to any Class B Units shall be set forth in the books and records of the Company. Each Class B Member shall make a timely election under Section 83(b) of the Code with respect to each issuance of Class B Units to such Class B Member within thirty (30) days of the issuance thereof. The Board may modify or amend outstanding Class B Units in order to ensure that the Incentive Units are treated as "profits interests" within the meaning of Rev. Proc. 93-27 and 2001-43. For the avoidance of doubt, neither the Company nor any Member is providing any covenant or guarantee that the characterization of the Class B Units as a "profits interest" as described in this <u>Section 2.2(b)</u> shall be accepted by any government authority or a court of law.

(b)    The Board is hereby authorized to cause the Company to make an election to value any Class B Units at liquidation value (the "<u>Safe Harbor Election</u>"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Proposed Regulations Section 1.83-3(l) and IRS Notice 2005-43. The Board may cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations under Proposed Regulations Section 1.704-1(b)(4)(xii)(c) and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.

Section 2.3.    <u>Voting Rights</u>.    Unless otherwise specified in this Agreement or the resolution of the Board creating any class or series of Voting Units, all classes and series of Voting Units shall vote together as a single class on all matters. Except as expressly provided in this Agreement or by non-waivable provisions of Law, no Members, other than Members holding Voting Units in their capacity as such, shall have any voting, approval or consent rights in their capacity as Members.

Section 2.4.    <u>Preemptive Rights</u>.

(a)    If, prior to an IPO, the Company proposes to issue Equity Securities of any kind, other than the issuance of Equity Securities (i) in connection with an IPO, (ii) pursuant to the acquisition of another Person by the Company or any Subsidiary, whether by purchase of stock, merger, consolidation, purchase of all or substantially all of the assets of such Person or otherwise, provided such acquisition has been approved by the Board, including in accordance with the terms and conditions hereof, (iii) pursuant to an employee stock option plan, stock bonus plan, stock purchase plan, employment agreement or other management equity program or arrangement approved by the Board, including in accordance with the terms and conditions hereof (*e.g.*, the

70677823.1

Compensatory Units), (iv) to vendors, lenders and customers of and consultants to the Company or any Subsidiary or in connection with a strategic partnership (provided such securities are being issued as consideration for the strategic partnership and not in connection with financing the strategic partnership), in each case, to the extent such issuance has been approved by the Board, or (v) by reason of a dividend, stock split or other distribution on shares of Units, then, subject to the provisions set forth below, as to each Significant Member (other than any such Significant Member that cannot demonstrate to the Company's reasonable satisfaction that such Significant Member is at the time of the proposed issuance of such securities an "accredited investor" as such term is defined in Regulation D of the Securities Act) (each a "<u>Preemptive Rights Member</u>"), the Company shall provide written notice (an "<u>Issuance Notice</u>"):

   (i) setting forth in reasonable detail (1) the designation and all of the terms and provisions of the Equity Securities proposed to be issued (the "<u>Proposed Securities</u>"), including, where applicable, the voting powers, preferences and relative participating, optional or other special rights, and the qualification, limitations or restrictions thereof and interest or dividend rate and maturity; (2) the price and other terms of the proposed issuance of such Equity Securities; (3) the amount of such Equity Securities proposed to be issued and the percentage of the Company's outstanding Equity Securities such issuance would represent; and (4) the proposed issuance date, which shall be at least thirty (30) days from the date of such notice; and

   (ii) offering to issue to each such Preemptive Rights Member a portion of the Proposed Securities equal to a percentage determined by dividing (x) the number of Class A Units (other than Compensatory Units) owned by such Preemptive Rights Member immediately prior to such Issuance Notice, by (y) the total number of Class A Units (other than Compensatory Units) then outstanding on such date immediately prior to such Issuance Notice (such portion of Proposed Securities in respect of Preemptive Rights Member, such Preemptive Rights Member's "<u>Full Allotment</u>").

  (b) Each such Preemptive Rights Member must exercise his, her or its purchase rights (which may be assigned to an Affiliate of such Preemptive Rights Member) hereunder by delivering an irrevocable written notice to the Company (each a "<u>Preemptive Rights Exercise Notice</u>") within twenty (20) days after receipt of such notice from the Company, which notice shall state the dollar amount of Proposed Securities such Preemptive Rights Member would like to purchase up to a maximum amount equal to such Preemptive Rights Member's Full Allotment. To the extent that the Company offers two or more securities to all prospective purchasers in a proposed issuance in units, such as convertible notes coupled with attached warrants (and only in such units), such Preemptive Rights Members must purchase such units as a whole and will not be given the opportunity to purchase only one of the securities making up such unit.

  (c) Upon the expiration of the offering periods described above, the Company will be free to sell such Proposed Securities that such Preemptive Rights Members have not elected to purchase (the "<u>Unclaimed Securities</u>") during the ninety (90) days following such expiration on terms not materially more favorable, taken as a whole, to the purchasers thereof than those offered to such Preemptive Rights Members (it being understood and agreed that the price at which such Unclaimed Securities are sold must be equal to or greater than the per unit purchase price set forth in the Issuance Notice), <u>provided</u> that such ninety (90) day period shall be subject to extension (not

70677823.1

to exceed ninety (90) additional days) if definitive documentation in respect of the issuance of the Proposed Securities has been entered into but such issuance has not been consummated pending the receipt of required third party or regulatory approvals.  Any Proposed Securities offered or sold by the Company after such ninety (90)-day period (as it may extended as provided herein) must be reoffered to such Preemptive Rights Members pursuant to this Section 2.4.

(d)     Except as set forth in this Section 2.4, the election by a Preemptive Rights Member not to exercise such Preemptive Rights Member's preemptive rights under this Section 2.4 in any one instance shall not affect such Preemptive Rights Member's right (other than in respect of a reduction in such Preemptive Rights Member's percentage holdings) as to any subsequent proposed issuance subject to this Section 2.4.  Notwithstanding anything contained herein to the contrary, if the Board determines in good faith that it is in the best interest of the Company to sell the Proposed Securities to one or more Persons or their respective Affiliates prior to compliance with the terms set forth in this Section 2.4, then the Company shall be permitted to sell such Proposed Securities to such Persons and/or their respective Affiliates without first complying with the terms set forth in this Section 2.4, provided that promptly following such sale, the Company permits each Preemptive Rights Member having rights under this Section 2.4 to purchase such Preemptive Rights Member's proportionate amount of such Proposed Securities in the manner contemplated by this Section 2.4, with such sale being consummated to put such Preemptive Rights Member in the same position he, she or it would have been had such Preemptive Rights Member been offered the opportunity to participate in such sale of Proposed Securities on the terms set forth herein prior to the issuance of such Proposed Securities and which sale may take the form of a secondary sale of such Proposed Securities, an issuance and redemption of Proposed Securities or such other structure as the Board shall determine to be appropriate to give effect to the intent of this Section 2.4.

(e)     Notwithstanding anything contained in this Section 2.4 to the contrary, if each of the BK Member and the BR Member agree to waive the application of the terms set forth in this Section 2.4 to any proposed issuance of Proposed Securities and none of the BK Member, the BR Member or any of their respective Affiliates participates in such proposed issuance, then such proposed issuance shall not be subject to the terms set forth in this Section 2.4.

**ARTICLE III.**
**CONTRIBUTIONS BY MEMBERS**

Section 3.1.    Initial Capital Contributions.  Each Member shall be deemed to have made a Capital Contribution to the Company prior to or as of the date hereof in the amount set forth opposite such Member's name on Schedule 1 attached hereto (the "Initial Capital Contributions") and, in consideration thereof, and in addition to any Compensatory Units, the Company has issued such Member the number of Class A Units set forth opposite such Member's name on Schedule 1.  The Board shall cause Schedule 1 to be amended from time to time, without any action by or approval or consent of any Member or any other Person, to reflect any issuance or Transfer of Units made in accordance with this Agreement.  For the avoidance of doubt, in no event shall any Member be required to make any Capital Contributions to the Company in excess of such Member's Initial Capital Contribution.

70677823.1

Section 3.2.  <u>Return of Capital Contributions</u>.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  An unrepaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

Section 3.3.  <u>Advances by Members</u>.  Advances of monies by any Member to the Company are not void or voidable but must be approved by the Board.

Section 3.4.  <u>Capital Accounts</u>.

(a)    A separate capital account (a "<u>Capital Account</u>") will be maintained for each Member other than a Member holding Compensatory Unit solely in its capacity as such until such time as such Compensatory Units become Vested Incentive Units or, if earlier, upon a timely election pursuant to Section 83(b) of the Code in respect of such Compensatory Units.  Each Member's Capital Account will be increased by: (i) the amount of money contributed by such Member to the Company; (ii) the Fair Market Value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Profits and other items of income and gain in accordance with the allocation provisions of this Agreement.  Each Member's Capital Account will be decreased by: (i) the amount of money distributed to such Member by the Company; (ii) the Fair Market Value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to as described in Section 1.704-1(b)(2)(iv)(c) of the Treasury Regulations); and (iii) allocations to such Member of Losses and other items of deduction and loss in accordance with the allocation provisions of this Agreement.  Notwithstanding the foregoing, no Capital Account will be maintained with respect to Compensatory Units and the Capital Account of any Member shall not be adjusted based on any distributions received by such Member in respect of Compensatory Units until such a Compensatory Unit becomes a Vested Incentive Unit, or, if earlier, upon a timely election pursuant to Section 83(b) of the Code in respect of such Compensatory Units.

(b)    In the event of a Transfer of a Unit, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the Transferred Membership Interest in accordance with Section 1.704-1(b)(2)(iv)(1) of the Treasury Regulations.

(c)    The manner in which Capital Accounts are to be maintained pursuant to this <u>Section 3.4</u> is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this <u>Section 3.4</u> should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this <u>Section 3.4</u>, the method in which Capital Accounts are maintained shall be so modified; <u>provided</u>, <u>however</u>, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in this Agreement.

70677823.1

# ARTICLE IV.
## DISTRIBUTIONS TO MEMBERS

Section 4.1.    <u>Distributions</u>.

(a)    Except as set forth in <u>Section 4.1(c)</u>, Available Cash shall be distributed (a "<u>Distribution</u>") to the Members solely at such times and in such amounts as the Board shall determine and approve. Subject to the remaining provisions of this <u>Article IV</u>, at any such time, Distributions shall be made according to the following methodology and the following order of priority:

(i)    <u>First,</u> 100% to the holders of Class A Units (including Compensatory Units), pro rata in proportion to their respective Class A Units immediately prior to the making of such Distribution, until such time as the Unreturned Capital Contributions of each Class A Member in respect of his, her or its Class A Units (other than Compensatory Units) have been reduced to zero; and

(ii)    <u>Second</u>, to the holders of Class A Units and, subject to <u>Section 4.1(b)</u> below, Class B Units, *pro rata* in proportion to their respective participating Units immediately prior to the making of such Distributions.

(b)    Notwithstanding the foregoing, no Distributions shall be payable with respect to Unvested Incentive Units, unless specifically approved by the Board, provided that, unless otherwise determined by the Board and set forth in the applicable Award Agreement, for purposes of Section 4.1(a) and this Section 4.1(b), Compensatory Units shall not be deemed Unvested Incentive Units (and references in this Section 4.1(b) to Unvested Incentive Units shall be limited to Class B Units).  All Distributions under <u>Section 4.1(a)</u> that would otherwise be made to any holder of Class B Units that are Unvested Incentive Units will be distributed to such holder of Unvested Incentive Units as soon as reasonably practicable, as determined by the Board, following the date such Unvested Incentive Units become Vested Incentive Units so long as the Company has Available Cash to make such distribution, it being understood that the Company shall not be required to set aside any amounts in respect of any amounts not distributed to the holder of Unvested Incentive Units which amounts may be used by the Company for any purpose, including to make distributions to other Members in accordance with the terms hereof; <u>provided</u>, <u>however</u>, for the avoidance of doubt, that if any holder of Unvested Incentive Units is required to forfeit such Unvested Incentive Units or such Unvested Incentive Units are terminated under the terms set forth in the applicable incentive plan or agreement pursuant to which such Unvested Incentive Units were issued, then any amounts that have not been distributed with respect to such Unvested Incentive Units will instead be distributed to the holders of Units as if (x) such Distribution were a new Distribution pursuant to <u>Section 4.1(a)</u>, and (y) such forfeited or terminated Unvested Incentive Units were never issued.  In the event the Board determines at any time that a Distribution has inadvertently been made to any Member in contravention of the limitation imposed by this <u>Section 4.1(b)</u>, such Distribution shall be treated as a loan, which, upon notice from the Board, shall be promptly repaid to the Company by the affected holders of Unvested Incentive Units, with interest, at such minimum rate of interest as may be required to prevent the imputation of interest under applicable tax Law.  Notwithstanding the foregoing, this <u>Section 4.1(b)</u> shall not apply or

70677823.1

otherwise restrict Distributions pursuant to Section 4.1(c) that relate to an assumed tax liability of a Member attributable to an Unvested Incentive Unit.

(c)    The Board may, to the extent of Available Cash, cause the Company to make cash distributions to the Members to enable such Members to satisfy their federal, state and local income tax liabilities arising due to allocations of income or gain in respect of the Company to such Member in accordance with the terms set forth in this Agreement, based on reasonable assumptions as the Board determines in its sole discretion to be appropriate and calculated using the maximum U.S. federal, state and local combined tax rate applicable to any Member that is an individual (it being understood that the rate will be the same for all Members), taking into account any taxable loss of the Company allocated to such Member for any prior taxable period, the character of the relevant income or loss and the deductibility, if any, of any state or local tax in computing any state or federal tax liability (such distribution, the "Tax Distribution").  Any amounts paid to each Member pursuant to this Section 4.1(c) shall be treated as advances on Distributions otherwise payable under this Section 4.1 or Section 9.3 so that the total amount distributed to each Member under such sections is the same as the amount that would have been distributed to such Member under such sections had this Section 4.1(c) not been included in the Agreement. Tax Distributions if any, shall be made only to the extent that all previous distributions from the Company in respect of a Fiscal Year (as reasonably determined by the Board) to each Member are less than such Member's Tax Distribution as calculated under this Section 4.1(c) for such Fiscal Year. In the event that the funds available for any Tax Distributions to be made hereunder are insufficient to pay the full amount of the Tax Distributions that would otherwise be permitted under this Section 4.1(c), the amount of funds available may be distributed to the Members on a pro rata basis (according to the amounts that would have been distributed to each Member pursuant to this Section 4.1(c) if available funds existed in a sufficient amount to make such Tax Distribution in full or as otherwise reasonably determined by the Board).

Section 4.2.    Other Distribution Provisions.

(a)    No Distribution shall be declared and paid unless, (i) after the Distribution is made, the fair value of the Company's assets is at least equal to all of the Company's liabilities and the Company is otherwise solvent, and (ii) the Distribution or payment would not cause the Company or any of its Subsidiaries to be in violation of any material agreement binding on the Company or any Subsidiary thereof, in each case as determined by the Board.

(b)    The Company is hereby authorized to make payments with respect to any Member in amounts required to discharge any obligation of the Company to withhold from amounts otherwise distributable to such Member or with respect to amounts allocable to such Member or to make any other payments to any governmental authority with respect to any foreign, federal, state, local or foreign tax or withholding liability arising as a result of such Member's interest in the Company (excluding, for the avoidance of doubt, penalties and interest for the Company's failure to withhold due to gross negligence or willful misconduct of the Company) (a "Withholding Payment").  Any Withholding Payment made from funds withheld upon a Distribution will be treated as amounts actually distributed to the affected Member under Section 4.1 for all purposes under this Agreement.  If any taxes are borne by the Company or any of its Subsidiaries (including taxes withheld for payments to the Company or its Subsidiaries by any other Person pursuant to Chapter 4 of the Code, and any taxes imposed on the Company pursuant

- 10 -

to Chapter 63 of the Code, but excluding any penalties and interest for the Company's failure to pay such taxes due to gross negligence or willful misconduct of the Company), and such taxes are specifically attributable to or on account of or attributable to, one or more of the Members, then the amount of such taxes shall be borne by the relevant Members and treated as if it were paid by the Company as a Withholding Payment with respect to such Members (as reasonably determined by the Board).

Section 4.3.    <u>Allocations of Net Profits and Net Losses</u>.

(a)    Net Profits and Net Losses for each Fiscal Year or other period shall be allocated among the Members, after giving effect to the allocations pursuant to <u>Section 4.4</u> for such Fiscal Year or other period, in such a manner as shall cause the Capital Accounts of the Members (as adjusted through the end of such Fiscal Year or other period) to equal, as nearly as possible, in the same proportionate amounts as (a) the amount such Members would receive if all assets of the Company on hand at the end of such Fiscal Year or other period were sold for cash equal to their Book Values, all liabilities of the Company were satisfied in cash in accordance with their terms (limited in the case of non-recourse liabilities to the Book Value of the property securing such liabilities), all outstanding Incentive Units vested as a result of such sale and all remaining or resulting cash was distributed to the Members under <u>Section 4.1</u> minus (b) such Member's share of Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.  Notwithstanding anything in this Agreement to the contrary, (i) no Profits or Losses (or items thereof) shall be allocated to any Member in respect of Compensatory Units held thereby until such Compensatory Units become Vested Incentive Units, or, if earlier, upon a timely election pursuant to Section 83(b) of the Code in respect of such Compensatory Units, and (ii) the Board may adjust the allocations made pursuant to this Agreement as it deems necessary to give economic effect to the provisions of this Agreement.

(b)    To the extent a timely election pursuant to Section 83(b) of the Code is not made in respect of a Compensatory Unit, such Compensatory Unit shall not be treated as partnership interests in the Company, and holders of such Compensatory Unit shall not be considered partners in the Company solely as a result of holding such unit, in each case, solely for federal income tax purposes, until such unit becomes a Vested Incentive Unit.  At the time that a Compensatory Unit becomes a Vested Incentive Unit (or, if a timely election pursuant to Section 83(b) of the Code is made, at the time of grant), the holder of such Unit shall be treated as receiving compensation from the Company equal to the fair market value of such Unit on the date such Unit becomes a Vested Incentive Unit (or, a timely election pursuant to Section 83(b) of the Code is made, at the time of grant), as determined in good faith by the Board, and such holder's Capital Account in the Company shall be increased by the amount of such compensation.

Section 4.4.    <u>Regulatory Allocations</u>.

(a)    Nonrecourse Deductions shall be allocated to the Members as determined by the Board.

(b)    Member Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated to the Members bearing the Economic Risk of Loss for such Member Nonrecourse Debt as determined under Treasury Regulation Section 1.704-2(b)(4).  If more than one Member

- 11 -

bears the Economic Risk of Loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the Economic Risk of Loss.  This <u>Section 4.4(b)</u> is intended to comply with the provisions of Treasury Regulation Section 1.704-2(i) and shall be interpreted consistently therewith.

(c)     Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for a Fiscal Year (or if there was a net decrease in Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior Fiscal Years to allocate among the Members under this <u>Section 4.4(c)</u>), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(g)(2)). This <u>Section 4.4(c)</u> is intended to constitute a minimum gain chargeback under Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(d)     Notwithstanding any provision hereof to the contrary except <u>Section 4.4(c)</u> (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum Gain for a Fiscal Year (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior Fiscal Year and the Company did not have sufficient amounts of income and gain during prior Fiscal Years to allocate among the Members under this <u>Section 4.4(d)</u>), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(i)(4)).  This <u>Section 4.4(d)</u> is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(e)     Notwithstanding any provision hereof to the contrary except <u>Section 4.4(c)</u> and <u>Section 4.4(d)</u> (dealing with Minimum Gain and Member Nonrecourse Debt Minimum Gain), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) shall be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain for the Fiscal Year) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible.  This <u>Section 4.4(e)</u> is intended to constitute a qualified income offset under Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(f)     In the event that any Member has a negative Adjusted Capital Account at the end of any Fiscal Year, such Member shall be allocated items of Company income and gain in the amount of such deficit as quickly as possible; <u>provided</u> that an allocation pursuant to this <u>Section 4.4(f)</u> shall be made only if and to the extent that such Member would have a negative Adjusted Capital Account after all other allocations provided for in this <u>Section 4.4(f)</u> have been tentatively made as if this <u>Section 4.4(f)</u> were not in this Agreement.

(g)     To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to any Member in complete liquidation

70677823.1

of such Member's Membership Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) if such Section applies, or to the Member to whom such distribution was made if Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

Section 4.5.    Curative Allocations.  The Regulatory Allocations are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2.  The Regulatory Allocations may be inconsistent with the manner in which the Members intend to divide Company distributions.  Accordingly, the Board is authorized to divide other allocations of Profits, Losses, and other items among the Members (other than to Members in respect of Compensatory Units held thereby), to the extent that they exist (such allocations, "Curative Allocations"), so that the net amount of the Regulatory Allocations and the Curative Allocations to each Member is zero.  The Board will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Treasury Regulations

Section 4.6.    Income Tax Allocations.

(a)    All items of income, gain, loss and deduction for Federal income tax purposes shall be allocated in the same manner as the corresponding item of Profits and Losses is allocated, except as otherwise provided in this Section 4.6.

(b)    In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members (other than to Members in respect of Compensatory Units held thereby) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.  In the event the Book Value of any property is adjusted pursuant to clause (b) or (d) of the definition of Book Value, subsequent allocations of income, gain, loss, and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the applicable Treasury Regulations thereunder (using such method as permitted by the Treasury Regulations and reasonably selected by the Board).

(c)    Section 754 Election. In the event of a Transfer of all or part of a Member's Membership Interest, at the request of such Member, the Company shall make a valid election pursuant to Section 754 of the Code prior to such Transfer.

(d)    Allocations pursuant to this Section 4.6 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

Section 4.7.    Limitation on Distributions.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of its Units if such distribution would violate Section 18-607 of the Act or other Law.

70677823.1

Section 4.8.    Offset.  Whenever the Company is to pay any sum to any Member, any amounts such Member owes the Company pursuant to this Agreement, as determined by the Board, may be deducted from such sum before payment, to the extent permitted by Law.

## ARTICLE V.
## POWERS, RIGHTS AND DUTIES OF MEMBERS; MANAGEMENT

Section 5.1.    Board of Directors.

(a)    The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a board of directors (the "Board") and the Board may make all decisions and cause the Company and its Subsidiaries to take (or not take) all actions, subject to the terms and conditions of this Agreement.  The Board shall be the manager of the Company within the meaning of Section 18-101 of the Act.  The Board must act as a board, and no individual director on the Board (a "Director"), as such, shall have any authority to bind or act for, or assume any obligation or responsibility on behalf of, the Company or any Subsidiary thereof unless expressly authorized to do so by action taken by the Board in accordance with this Agreement but without limitation of any authority or rights thereof in his or her capacity as an employee or Officer of the Company or any Subsidiary thereof.  The Board may act by unanimous written consent without a meeting pursuant to Section 18-404 of the Act.

(b)    The authorized number of persons comprising the Board shall be established as of the Effective Date at five (5), and the Board shall thereafter be comprised of such number of Directors as shall be determined from time to time by the Board (including the approval of the AL Member) but no less than the number of Directors designated pursuant to the terms of Section 5.1(c) below.

(c)    The following individuals shall be elected to the Board, each to hold such position until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as provided herein, and the Members and the Company shall take all action within their respective power, including the voting of (or acting by written consent with respect to) all Units entitled to voting rights, required to cause the Board to consist of the number of directors determined in accordance with the terms hereof and to be composed of the directors designated as set forth in this clause (c) or otherwise in this Agreement:

(i)    Four (4) Directors designated by the AL Member (the "AL Directors"), who initially shall be Andrew M. Laurence, Andrew Kaminsky, Tiffany McMillan-McWaters and one additional individual selected by the AL Member that satisfies the requirements set forth in the Holdco Credit Agreement (such additional individual, the "Independent Director"); and

(ii)    One (1) Director designated by the BR Member, who initially shall be Bryant R. Riley (the "BR Director").

(d)    If at any time any AL Director ceases to serve on the Board (whether due to resignation, removal or otherwise), the AL Member shall designate a replacement for such AL Director, provided that if such AL Director is the Independent Director, any such replacement must satisfy the requirements of the Holdco Credit Agreement. The AL Member (and only the AL

70677823.1

Member) may remove any AL Director, at any time and from time to time, with or without cause, in the AL Member's sole discretion, provided that any such removal of the Independent Director may only be effected in accordance with the terms set forth in the Holdco Credit Agreement. If at any time the BR Director ceases to serve on the Board (whether due to resignation, removal or otherwise), the BR Member shall designate a replacement for such BR Director. The BR Member (and only the BR Member) may remove the BR Director, at any time and from time to time, with or without cause, in the BR Member's sole discretion.

(e)    The right of the AL Member to designate the AL Directors pursuant to this Section 5.1 may be exercised by or on behalf of, and is assignable to, any Permitted Transferee of the AL Member so long as such Permitted Transferee constitutes a Permitted Holder. The right of the BR Member to designate the BR Director pursuant to this Section 5.1 may be exercised by or on behalf of, and is assignable to, any Permitted Transferee of the BR Member.

(f)    Notwithstanding anything to the contrary herein, upon the occurrence of a AL Incapacity Trigger Event and so long as a BR Incapacity Trigger Event has not previously occurred and unless otherwise elected by the BR Member, (i) the Permitted Holders will only have the right to appoint two (2) Directors one of whom shall be the Independent Director designated in a manner that satisfies the requirements of the Holdco Credit Agreement, (ii) all other Directors will be appointed by the BR Member, and (iii) the members of the governing bodies of the Company's Subsidiaries will be appointed by the Board.

(g)    In addition to their respective rights to appoint the members of the Board, the AL Member and the BR Member will each have the right to designate one (1) non-voting representative (each, an "Observer") to attend and observe all meetings of the Board; provided, (i) the Company reserves the right to withhold any information and exclude any Observer from any such meeting or portion thereof to the extent that such information or such meeting: (A) is reasonably likely to adversely affect any attorney-client or similar privilege between the Company or any of its Subsidiaries and its respective counsel, (B) is reasonably likely to result in a conflict of interest between the Company or any of its Subsidiaries and any Observer, any Affiliate of such Observer or any Member who shall have appointed such Observer, or (C) involves personnel decisions (e.g. selecting, hiring, compensating, promoting or terminating) or discussions regarding the capital structure of the Company and its Subsidiaries that, directly or indirectly, relate to the relationship between the Company and its Subsidiaries, on the one hand, and the applicable Observer or his or her Affiliates or any Member who shall have appointed such Observer, on the other hand (the matters referenced in this clause (i) are referred to herein as "Excluded Matters"), and (ii) any such Observer shall be required to enter into a customary observer agreement reasonably acceptable to the Company. Notice of the time and place of any such meeting will be given to each Observer in the same manner and at the same time as notice is given to the Directors. Each Observer will be given copies of all notices, reports, minutes, consents and other documents and materials related to such meetings at the time and in the manner as are provided to the Board, other than, if the Company chooses, to the extent covering any Excluded Matter.

(h)    Any Director or Observer shall be permitted to attend any meeting of the Board in person or by conference call, videoconference or similar technology. Notice of any meeting of the Board shall be given to each member of the Board at least twenty-four (24) hours in advance of such meeting, unless otherwise agreed by all members of the Board (provided that attendance at

such meeting shall serve to waive such notice unless attendance is solely to object to the absence of adequate notice).

Section 5.2.    <u>Quorum and Voting</u>.  At every meeting of the Board, the presence, either in person or through participation by conference call, videoconference or similar technology, of at least the number of Directors holding a majority of the votes of all Directors in office by reference to the then aggregate number of votes of the Directors will constitute a quorum, which quorum must include (i) (unless waived by the AL Member) the Directors designated by the AL Member, and (ii) (unless waived by the BR Member) the Director designated by the BR Member; <u>provided</u>, that, notwithstanding anything in this <u>Section 5.2</u> or <u>Section 5.4</u> to the contrary, if any such Director is absent from a properly noticed meeting (if such notice of meeting is required) of the Board or a committee thereof at which the presence of such Director is required for a quorum as herein provided, such meeting shall be adjourned until such time as determined by the Directors so present at such meeting and shall be set forth in a notice of the subsequent meeting (which shall not be scheduled for or occur until at least twenty-four (24) hours following such initial meeting) of the Board or such committee thereof delivered to all Directors entitled to attend such meeting (the "<u>Subsequent Meeting</u>"), and if such Director is not present at the Subsequent Meeting, such meeting shall not require the presence of such Director for purposes of establishing a quorum at such Subsequent Meeting.  Each member of the Board shall be entitled to one (1) vote (and, in the event of the absence or vacancy of any AL Director, each other AL Director shall be entitled to cast all of the votes to which the AL Directors are collectively entitled).  The affirmative vote of a majority of the members of the Board present at any meeting at which a quorum is present will be necessary for the adoption of any resolution or other action of the Board.

Section 5.3.    <u>Committees of the Board</u>.

(a)    The Board may, by resolution, designate one or more committees, with each such committee consisting of such number of committee members as the Board specifies from time to time. Any such designated committee shall have and may exercise such of the powers and authority of the Board in the management of the business and affairs of the Company as may be provided in such resolution.  Notwithstanding anything to the contrary contained herein, in the event that the Board establishes any committee thereof, the BR Director shall be entitled to sit on any such committee unless such committee is formed to consider or review a transaction or the Company's relationship with the BR Member or Affiliates thereof.

(b)    Any committee designated in accordance with this <u>Section 5.3</u> will keep regular minutes of its proceedings and report the same to the Board when requested by any Director, will fix its own rules or procedures, and will meet at such times and at such place or places as may be provided by such rules or procedures, or by resolution of such committee or Board. Each member of any such committee shall be entitled to one (1) vote (and, in the event of the absence or vacancy of any AL Director that is a member of such committee, each other AL Director shall be entitled to cast all of the votes to which the AL Directors are collectively entitled).  At every meeting of any such committee, the presence of a majority of all the members thereof will constitute a quorum, which quorum must, subject to <u>Section 5.2</u>, include (i) (unless waived by the AL Member) all of the Directors that are members of such committee and that were designated by the AL Member and (ii) (unless waived by the BR Member) if a member of such committee, the Director that is a member of such committee and that was designated by the BR Member, and the terms set forth in

70677823.1

the proviso to Section 5.2 shall apply to the terms set forth in this clause (b), *mutatis mutandis*. The affirmative vote of a majority of the members of any such committee present at any meeting at which a quorum is present will be necessary for the adoption of any resolution.

Section 5.4.    Subsidiary Boards.  The composition of the board of directors, board of managers or other applicable governing body, as applicable, of each of the Company's Subsidiaries shall be as determined by the AL Member, and the Company and other Members shall take such action as may be reasonably required to effect the foregoing; provided, however, that the BR Member, at its election, shall have the right to appoint a number of members to each such board of directors, board of managers or other applicable governing body, as applicable, proportionate to the BR Member's right to appoint members to the Board as provided in this Agreement; provided further, however, that in all cases the AL Member shall have the right to appoint a majority of the members of the board of any such board of directors, board of managers or other applicable governing body, as applicable.

Section 5.5.    Board Meetings.  Meetings of the Board shall be called (whether in person or remotely) as frequently as determined by any Director, but in all cases the Board shall hold quarterly meetings thereof.

Section 5.6.    Waiver of Duties.    To the fullest extent permitted by Law, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of Law or equity or otherwise, no Member nor any Director, acting in such Person's capacity as such, shall (i) be deemed to have any fiduciary or other duties (including the duty of loyalty or the duty of care) to the Company or any Member other than the duty to comply with the implied contractual covenant of good faith and fair dealing, or (ii) be obligated to do or perform any act or thing in connection with the Company or its Subsidiaries not expressly set forth in this Agreement.  Without limiting the foregoing, the provisions of this Agreement, to the extent that they restrict the duties and liabilities of any Member or a Director otherwise existing at Law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Persons, to the maximum extent not prohibited by Law.

Section 5.7.    Officers.  The Board may, from time to time as it deems advisable, appoint officers of the Company (each, an "Officer" and together, the "Officers") with or without such titles as it may elect, including the titles of Chief Executive Officer, President, Vice President, Treasurer and Secretary, to act on behalf of the Company with authority and duties that are customarily associated with such titles, or as otherwise delegated by the Board to any such persons. Subject to any applicable employment or other similar agreement or Law, (i) any Officer may be removed by the Board with or without cause and (ii) any delegation pursuant to this Section 5.7 may be revoked at any time by the Board.

Section 5.8.    Other Activities.  The parties expressly acknowledge and agree that, subject in all cases to any other agreement entered into with the Company or any Subsidiary thereof and the terms of any policies of the Company and its Subsidiaries that are applicable to, and duties owed by, employees or Officers, in their capacity as such, to the Company or its Subsidiaries: (i) each Member (including its Affiliates) and each AL Director and the BR Director has the right to (and shall have no fiduciary, contractual or other duty not to), directly or indirectly engage in and possess interests in other business ventures of every type and description, including those engaged

70677823.1

in the same or similar business activities or lines of business as the Company or any of its Subsidiaries or deemed to be competing with the Company or any of its Subsidiaries, on its own account, or in partnership with, or as an employee, officer, independent contractor, director, agent, partner, member or stockholder of any other Person, with no obligation to offer to the Company or any of its Subsidiaries or any Member the right to participate therein; (ii) each Member (including its Affiliates), each AL Director and the BR Director may invest in, or provide services to, any Person that directly or indirectly competes with the Company or any of its Subsidiaries; and (iii) in the event that any Member, an AL Director or the BR Director acquires knowledge of a potential transaction or matter that may be a corporate or other business opportunity for the Company or any of its Subsidiaries, such Person shall have no duty (fiduciary, contractual or otherwise) to communicate or present such corporate opportunity to the Company or any of its Subsidiaries or any other Member, as the case may be, and, notwithstanding any provision of this Agreement to the contrary, shall not be liable to the Company or any of its Subsidiaries or any other Member (or their respective Affiliates) for breach of any duty (fiduciary, contractual or otherwise) by reason of the fact that such Person, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person or does not present such opportunity to the Company or any of its Subsidiaries thereof or any other Member (or any Affiliate thereof). The parties acknowledge that this paragraph is (i) subject to Section 18-1101(e) of the Act and (ii) intended to disclaim and renounce, to the fullest extent permitted by Law, any right of the Company or any of its Subsidiaries or any Member with respect to the matters set forth in this Section and this clause (ii) shall be construed to effect such disclaimer and renunciation to the full extent permitted by Law. Each of the Company and the Members hereby acknowledge and agree, notwithstanding anything to the contrary in this Agreement or any other agreement or at Law or in equity, that when any Member takes any action under this Agreement to give or withhold its consent, none of such Person, its Affiliates or such Member shall have any duty to consider the interests of the Company, its Subsidiaries or any other Member or any of their respective Affiliates and may act exclusively in its own interest and shall have only the duty to act in good faith.

Section 5.9.    Indemnification.

(a)    No Director or Officer in his capacity as such and no Director or Officer who is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise (each, an "Indemnified Person") shall be liable to the Company or any Member for monetary damages arising from any actions taken, or actions failed to be taken, in his or her capacity as such except for (i) liability for acts that involve fraud, willful misconduct or bad faith and (ii) liability with respect to any transaction from which such Person derived a personal benefit in violation of this Agreement, in each case described in clauses (i) and (ii) preceding, as determined by a final, nonappealable order of a court of competent jurisdiction or arbitrator. Notwithstanding anything to the contrary in this Agreement, to the maximum extent permitted by Law, the Company or any Member, as applicable, shall bear the burden of establishing a prima facie case that a Director or Officer breached the standard of care set forth above in this.

(b)     Subject to the limitations set forth in this <u>Section 5.9</u>, each Indemnified Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "<u>Proceeding</u>"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Indemnified Person is or was a Director or while an Officer or Director is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be, except as permitted below in this <u>Section 5.9(b)</u>, indemnified by the Company to the fullest extent permitted by the Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment), against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees) actually incurred by such Indemnified Person in connection with such Proceeding, and indemnification under this <u>Section 5.9</u> shall continue as to an Indemnified Person who has ceased to serve in the capacity which initially entitled such Indemnified Person to indemnity hereunder.  Notwithstanding anything to the contrary in this <u>Section 5.9(b)</u>, an Indemnified Person shall not be entitled to indemnification hereunder if it is determined by a nonappealable order of a court of competent jurisdiction or arbitrator that, with respect to the matter for which such Indemnified Person seeks indemnification, such Indemnified Person did not act in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company, that such Indemnified Person's actions constituted fraud, willful misconduct or bad faith or, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful; <u>provided</u>, <u>however</u>, that such Indemnified Person's compliance with <u>Section 5.6</u> or <u>Section 5.8</u>, by itself, will not be deemed to limit such Indemnified Person's entitlement to indemnification hereunder.  The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or Proceeding, had reasonable cause to believe that his conduct was unlawful.

(c)     The right to indemnification conferred to an Indemnified Person in this <u>Section 5.9</u> shall include the right to be paid or reimbursed by the Company for the reasonable expenses incurred by an Indemnified Person entitled to be indemnified under <u>Section 5.9</u> who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Indemnified Person's ultimate entitlement to indemnification; <u>provided</u>, <u>however</u>, that the payment of such expenses incurred by any such Indemnified Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnified Person of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification under this <u>Section 5.9</u> and a written undertaking, by such Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under this <u>Section 5.9</u> or otherwise.

70677823.1

(d)    Notwithstanding any other provision of this Section 5.9, the Company may, by adoption of a resolution of the Board, pay or reimburse expenses incurred by a Member, Director, Officer, employee or other agent of the Company in connection with such Person's appearance as a witness or other participation in a Proceeding at a time when such Person is not a named defendant or respondent in such Proceeding.

(e)    The Company and the Members acknowledge that the BR Director, the BR Member and its Affiliates, and the direct and indirect equityholders, directors, officers, partners, members, co-investors, managers, employees and agents of the BR Member and its Affiliates (the "BR Indemnitees") may have certain rights to indemnification, advancement of expenses or insurance provided by one or more Persons with whom the BR Indemnitees may be associated (including B. Riley Financial, Inc.).   The Company and the Members acknowledge and agree that (i) the Company shall be the indemnitor of first resort with respect to any proceeding, expense, liability or matter that is the subject of the indemnification obligations described in this Agreement, (ii) the Company shall be primarily liable for all indemnification obligations described in this Agreement, (iii) any obligation of any other Persons with whom any BR Indemnitee may be associated (including the BR Member or any other affiliated investment fund) to indemnify such BR Indemnitee in respect of any proceeding shall be secondary to the obligations of the Company hereunder, (iv) the Company shall be required to indemnify any BR Indemnitee hereunder to the fullest extent provided herein without regard to any rights such BR Indemnitee may have against any such other Person or any insurer of any such Person and (v) the Company and the Members irrevocably waive, relinquish and release any such other Person from any claim of contribution, subrogation or any other recovery of any kind in respect of amounts paid by the Company hereunder.

(f)    In addition to any other indemnification rights of any Director has pursuant to any agreement with the Company, each Director shall have the right to enter into, and the Company agrees to enter into, an indemnification agreement with each such Director, which indemnification agreement shall be reasonably acceptable to the Company and consistent with indemnification agreements customarily entered into between companies and their independent board members.

(g)    Indemnification under this Section 5.9 shall continue as to each Indemnified Person who has ceased to serve in the capacity that initially entitled such Indemnified Person to indemnification hereunder, but only to the extent of actions or omissions taken or failed to be taken while such Indemnified Person was so entitled to indemnification hereunder.  The rights granted pursuant to this Section 5.9 shall be deemed contract rights, and no amendment, modification or repeal of this Section 5.9, or any portion hereof, shall have the effect of limiting, adversely affecting or denying any such rights with respect to actions or omissions or Proceedings arising prior to any such amendment, modification or repeal.  In the event that this Section 5.9 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, the Company shall nevertheless indemnify and hold harmless each Indemnified Person as to damages or losses with respect to any Proceeding to the fullest extent permitted by any applicable provision of this Section 5.9 that shall have not been invalidated to the fullest extent permitted by applicable Law.

(h)    The Company may maintain Director and Officer insurance coverage in amounts and on terms as reasonably determined by the Board in good faith.

70677823.1

## ARTICLE VI.
## STATUS OF MEMBERS

Section 6.1.    <u>Relationship of Members</u>.  Each Member agrees that, to the fullest extent permitted by the Act and except to the extent expressly stated in this Agreement or in any other agreement to which each applicable Member is a party:

(i)    no Member shall have any authority to bind or act for, or assume any obligation or responsibility on behalf of, a Director or any other Member;

(ii)    any consent, approval, determination or other action by a Member (solely in its capacity as such) shall be given or taken in the sole and absolute discretion of that Member (solely in its capacity as such) in its own best interests and without regard to the best interests of any other Member or the Company or any of their respective Affiliates or the financial, tax or other effect on a Director, any other Member or the Company or any of their respective Affiliates; and

(iii)    no Member is authorized to act as the agent, representative or attorney-in-fact for any other Member or Director.

Section 6.2.    <u>Liability of Members</u>.  No Member or Director shall have any personal liability whatsoever, whether to the Company or any of its Subsidiaries, to other Members or to the creditors of the Company or any of its Subsidiaries, for the debts of the Company or any of its Subsidiaries or any of its or their losses in excess of the amounts such Member or Director has contributed or agreed to contribute to the Company, unless any such Member or Director otherwise expressly consents in writing.  The foregoing shall not, however, limit the personal liability of a Member or Director for its obligations to the Company under this Agreement or to the Company or any of its Subsidiaries or other Members under any other agreement to which such Member or Director may be a party.

Section 6.3.    <u>Dissolution of Member</u>.  The dissolution of a Member shall not cause a dissolution of the Company, but the rights of such Member to share in the profits and losses of the Company and to receive distributions of Company funds shall, on the happening of such an event, devolve upon its trustee or successor, subject to the terms and conditions of this Agreement, and the Company shall continue as a limited liability company.  The successor of such Member shall be liable for all of the obligations of such Member under this Agreement.  However, in no event shall such trustee or successor become a substitute Member, except with the prior written consent of the Board.

Section 6.4.    <u>Certain Member Approvals</u>.  The Company shall not, and (as applicable) shall not permit any Subsidiary to, either directly or indirectly, take any of the following actions without the written consent or affirmative vote of the BK Member and the BR Member given in writing or by vote at a meeting (in addition to any other vote required by Law or this Agreement); <u>provided</u>, that (A) any such approval right of the BR Member shall no longer apply to the BR Member to the extent that such Member (together with its Affiliates) no longer directly or indirectly owns (in the aggregate) Class A Units (excluding any Compensatory Units) representing at least twenty-five percent (25%) of the outstanding Class A Units of the Company (excluding

- 21 -

70677823.1

any Compensatory Units), and (B) any such approval right of the BK Member shall no longer apply to the BK Member to the extent that such Member (together with its Affiliates) no longer directly or indirectly owns (in the aggregate) Class A Units (excluding any Compensatory Units) representing both (x) at least fifteen percent (15%) of the outstanding Class A Units of the Company (excluding any Compensatory Units), and (y) at least fifty percent (50%) of the Class A Units (excluding Compensatory Units) owned by the BK Member and its Affiliates as of the Effective Date, calculated in each case (for the avoidance of doubt) without regard to any Compensatory Units held by the BK Members or its Affiliates or by any other Person:

(a)     any amendment to or modification of this Agreement, other than any such amendment or modification that is effected in connection with the issuance of Membership Interests in accordance with the terms of this Agreement (including, for the avoidance of doubt, Section 6.4(b));

(b)     the issuance, redemption, or repurchase of any Units or the payment of any dividends or distributions in respect of any such Unit, except that approval pursuant to this Section 6.4(b) shall not be required for (i) the payment of any dividends or distributions that are made in accordance with the terms set forth in Section 4.1(a), Section 4.1(b) or Section 4.1(c) hereof, (ii) the issuance of any Units subject to (or is expressly exempt from) the terms set forth in Section 2.4 hereof and, if so subject, the Units are issued in accordance with the terms and conditions thereof, or (iii) repurchases or redemptions of Units from employees of the Company or any Subsidiary thereof in connection with the cessation of employment or to facilitate the making of tax payments thereby arising in connection with the issuance or vesting of any Equity Securities held thereby;

(c)     entering into any Related Party Transactions, provided that approval pursuant to this Section 6.4(c) shall not be required for any transaction on arm's length terms and approved by the Board, including a majority of the Directors designated by the Member that is not engaging in such Related Party Transaction or any transactions related to the appointment, removal, service, indemnification, expense reimbursement and other rights of Directors, in each case entered into in the ordinary course of business or in accordance with this Agreement;

(d)     voluntarily declaring bankruptcy, liquidating, or dissolving of the Company or any material Subsidiary thereof;

(e)     changing the entity type or tax classifications of the Company or any of its Subsidiaries (other than in connection with an IPO);

(f)     the increase or decrease in the number of Directors constituting the Board other than in connection with the issuance of Units effected in accordance with the terms of this Agreement (other than any decrease in the number of directors to the extent the Independent Director is no longer required pursuant to the Holdco Credit Agreement); provided that for purposes of increasing the number of Directors constituting the Board, the written consent or affirmative vote of the BK Member shall not be required;

(g)     any acquisition of a Person or business by the Company or any Subsidiary if the purchase price for such transaction exceeds (i) $25 million individually or (ii) $50 million in the aggregate during any fiscal year of the Company, with each of the foregoing thresholds being

deemed to increase on January 1 of each year following the date of the A&R LLC Agreement by an amount equal to the threshold in effect immediately prior to such increase multiplied by the increase (if any) in CPI most recently published as of January 1 of the applicable year relative to CPI that was most recently used to compute the increase to such thresholds (or, in the case of the first adjustment to such thresholds following the date of the A&R LLC Agreement, CPI most recently published prior to the date hereof);

(h)      the incurrence of any indebtedness by the Company or any Subsidiary thereof in respect of borrowed money or evidenced by bonds, notes, debentures or similar instruments of the Company or any Subsidiary thereof or any such obligation of any other Person guaranteed by the Company or any Subsidiary thereof (but excluding, in any event, indebtedness (if any) resulting from (i) any lease obligations (including capital leases) and (ii) any factoring, securitization or other accounts receivables financing arrangements) (collectively, "Indebtedness") if, after giving effect thereto, the ratio of (i) the aggregate principal amount of Indebtedness outstanding of the Company and its Subsidiaries (but excluding any portion of principal resulting from interest that has been paid-in-kind by adding such interest to the aggregate principal amount of any Indebtedness) to (ii) the aggregate Consolidated EBITDA of the Company and its Subsidiaries for the most recently completed four fiscal quarters thereof, in each case of the immediately preceding clauses (i) and (ii), computed on a pro forma basis giving effect to such incurrence and any related transaction being effected in connection therewith with such pro forma effect as determined in good faith by the Board, would be more than 5.6x, representing such ratio as in effect as of the date of the A&R LLC Agreement, it being understood and agreed that (A) "Consolidated EBITDA" shall, as of any relevant date of determination, have the meaning set forth in the senior secured credit facility of the Company and its Subsidiaries as currently in effect or in any replacement facility approved pursuant to this Section 6.4(h) (or, if there is more than one such senior secured credit facility then in effect, the senior secured credit facility that ranks highest as to lien priority at the operating company level, or if there is no such senior secured credit facility then in effect, "Consolidated EBITDA" shall have the definition utilized in the most recent such facility that was in effect prior to such date of determination), and (B) approval pursuant to this Section 6.4(h) shall not be required for the incurrence of Indebtedness by the Company or any Subsidiary thereof (x) pursuant to any asset-based or revolving credit facility approved in accordance with the terms of this Agreement or in effect as of the date hereof, (y) the incurrence of Indebtedness in connection with the refinancing of existing Indebtedness that does not materially increase the principal amount thereof being refinanced other than in respect of interest, fees and expenses (including original issue discount) incurred in connection therewith or (z) in connection with any Indebtedness incurred as a result of any interest payable thereon being paid-in-kind by adding such interest to the principal amount of any Indebtedness;

(i)      the adoption, amendment or alteration of the Company's annual budget for the 2025 Fiscal Year and beyond or the making of any expenditure which would cause aggregate expenditures in any fiscal year other than (i) emergency expenditures that are required to ensure continued ordinary course of business operations as determined in good faith by the Board, (ii) any other expenditures that were not contemplated by the annual budget then in effect but have been expressly approved by the Board and the relevant Members pursuant to this Section 6.4, and (iii) expenditures in respect of the acquisition of any Person or business that the Company or its Subsidiaries have acquired (or pursued the acquisition of) in any fiscal year that does not require the approval of the applicable Members pursuant to Section 6.4(g) to not exceed ten percent (10%)

- 23 -

70677823.1

of the aggregate amount of expenditures budgeted for such fiscal year in the annual budget that is then in effect, provided that (i) if any such budget is not approved, then the budget from the prior fiscal year would remain in effect with each line item thereof being increased by five percent (5%), and (ii) the foregoing would not impact the ability of the Company or its Subsidiaries to sell or otherwise dispose of (or require the approval of any Members except as otherwise required by Law in connection with the sale or disposition of) any Subsidiaries of the Company or any assets or businesses of the Company or any such Subsidiaries;

(j)  any Change of Control or IPO, in each case, other than any such Change of Control or IPO initiated pursuant to the exercise of the rights contained in Section 7.3 or Section 10.4;

(k)  any material change to the scope of the business of the Company and its Subsidiaries, taken as a whole, other than through acquisitions of franchise or franchisable businesses that are otherwise effected in accordance with Section 6.4(g) or exempt therefrom; and

any authorization of an equity incentive plan or the type, class, and number of Equity Securities reserved thereunder and any material change to such plan; provided that approval pursuant to this Section 6.4(l) shall not be required with respect to the issuance of any Class B Units or Compensatory Units or the allocation of either of the foregoing, subject (in the case of Class B Units) to approval of the related plan in accordance with this Section 6.4(l). Notwithstanding the foregoing, upon the occurrence of an Incapacity Trigger Event with respect to the BK Member or the BR Member, then the Member suffering such Incapacity Trigger Event, shall (i) no longer have the consent rights under:  Section 6.4(a) (other than with respect to amendments or modifications of this Agreement that affect the BK Member or the BR Member, as applicable, in a materially adverse manner or in a disproportionate manner relative to the effect thereof on such other Member and in respect (if applicable) to the same class and series of Units), Section 6.4(b) (other than with respect to non-pro rata dividends or redemptions), Section 6.4(c) (other than with respect to non-arms' length transactions) and Sections 6.4(f) through and including Section 6.4(j), and (ii) continue to have the consent rights set forth in Sections 6.4(d), (e),  (k) and (l).

Section 6.5.    Certain Limitations.

(a)  No Class B Member or Class A Member who solely owns Compensatory Units shall have any right to inspect or receive a copy of Schedule 1 in connection with such Member's entry into this Agreement, status as an Class B Member or applicable Class A Member or any other reason.

(b)  Each Member hereby irrevocably waives, to the fullest extent permitted by Law, any rights to information from the Company under Section 18-305 of the Act, it being acknowledged and agreed that each Member's sole right to information regarding the Company and its Subsidiaries shall be the information rights that are expressly set forth in this Agreement.

(c)  A holder of Unit(s) shall not have the status of, and is not entitled to the remedies available to, a creditor of the Company with regard to distributions that such holder of Unit(s) may become entitled to receive pursuant to this Agreement and the Act.  Except as otherwise provided

70677823.1

in this Agreement, no interest shall be paid to any Member on account of its interest in the capital of or on account of its investment in the Company.

## ARTICLE VII.
## TRANSFER OF UNITS

Section 7.1.    Transfer Restrictions.

(a)    Transfer Restrictions.  Until the occurrence of the IPO, no Member shall directly or indirectly Transfer any Units without the approval of the Board; provided, however, any Member shall be permitted to Transfer any Units (but only to the extent vested) owned by such Member without the consent of the Board in connection with the following: (i) Transfers pursuant to Sections 7.1(d), 7.2, and 7.3; (ii) any Transfer to the Company in connection with the cessation of employment or in a transaction, the purpose of which is to provide such Member cash proceeds sufficient to pay income taxes arising from the vesting or issuance of Membership Interests thereto, if applicable; (iii) Transfers to Permitted Transferees made in compliance with this Agreement; (iv) in case of the BK Member, any Vintage Member and the BR Member, as applicable, pursuant to a pledge of such Units to secure obligations pursuant to a bona fide financing, provided that (A) as a condition to any foreclosure on any such pledge or any other Transfer of the pledged Units pursuant to any other exercise of remedies by the lender, the lender (or its transferee) would be required to agree in writing to be bound by the terms of this Agreement pursuant to a joinder agreement in form and substance reasonably acceptable to a majority of the members of the Board (other than the members of the Board designated by the Member whose Units are subject to such pledge), (B) upon any such foreclosure or exercise of other remedies, the lender (or its transferee) would not have any right to designate one or more members to the Board pursuant to Section 5.1(c) or any of the express consent or approval rights of the BK Member or the BR Member, including those set forth in Section 6.4 hereof (unless such lender is the BK Member and the BR Member, as applicable, or one or more Affiliates of such Member) and (C) notwithstanding anything contained herein to the contrary, the lender shall have the right, as set forth and subject to the terms and conditions in the applicable pledge agreement, and without further approval of any Member and without becoming a Member, to exercise the voting rights of the Member granting such pledge; (v) in the case of the BK Member or the BR Member, following the occurrence of an Incapacity Trigger Event with respect to such Member; or (vi) an Approved Transfer (clauses (i)-(vi), each an "Exempted Transfer"); provided, further, that no Member may Transfer all or any portion of its Class B Units or Compensatory Units except in accordance with this Section 7.1 and, as applicable, the Award Agreement that applies to such Class B Units or Compensatory Units.

(b)    Certain Transfers by Permitted Transferees.  Each Permitted Transferee of any Member to which Units are Transferred shall, and such Member shall cause such Permitted Transferee to, Transfer back to such Member (or to another Permitted Transferee of such Member) the Units it acquired from such other if such Permitted Transferee ceases to be a Permitted Transferee of such Member.

(c)    Transfers – Generally.  No Transfer of Units owned by any Member may be made by such Member unless (i) as a condition precedent to the Transfer, the Transferee has agreed in writing to be bound by the terms and conditions of this Agreement pursuant to a joinder agreement in form and substance reasonably acceptable to a majority of the members of the Board (other than

- 25 -

70677823.1

the members of the Board, if any, designated by the Member engaging in such Transfer), other than if (1) the Transfer is conducted pursuant to and in accordance with <u>Sections 7.1(d)</u>, <u>7.2</u>, and <u>7.3</u>, or (2) the Transfer is to the Company or to another Member, (ii) if applicable, the Transferee executes and delivers a spousal consent in customary form, and (iii) the Transfer complies in all respects with the applicable provisions of this Agreement and any Award Agreement governing any Units owned by such Member.  Unless expressly approved by the Board, prior to the date on which the Company has a class of equity securities registered under Section 12(b) or Section 12(g) of the Exchange Act, no Units shall be Transferred if such Transfer would require the Company to register its Units under the Exchange Act (including Section 12(g) thereof) or any other applicable federal or state securities laws.

(d)    <u>Right of First Offer</u>.

(i)    In the event of an Approved Transfer (other than an Approved Transfer described in clause (b) of the definition thereof) of all or a portion of a Member's Units or any Transfer of all or a portion of the Units owned by the BK Member or the BR Member following the occurrence of an Incapacity Trigger Event with respect to such Member (the "<u>ROFO Units</u>") (subject to compliance with the provisions of this <u>Article VII</u>), such Transferring Member shall provide the Significant Members with prior written notice (a "<u>ROFO Transfer Notice</u>") of its desire to Transfer such ROFO Units, which shall specify the number of Units such Transferring Member desires to Transfer, the proposed purchase price for such ROFO Units, and any other terms and conditions material to such Approved Transfer or Transfer following the occurrence of an Incapacity Trigger Event.

(ii)    The Significant Members shall each have the right (which may be assigned to an Affiliate of such Significant Member) to elect to deliver to such Transferring Member an irrevocable written notice within twenty (20) Business Days after delivery of the ROFO Transfer Notice (the "<u>ROFO Election Period</u>"), indicating that one or more of such Significant Members (or their Affiliates) desires to acquire all or a portion of the ROFO Units on the same terms and conditions set forth in the ROFO Transfer Notice; <u>provided</u>, <u>that</u>, if more than one such Significant Member shall exercise the rights set forth in this <u>Section 7.1(d)</u> and the number of ROFO Units proposed to be acquired by such Significant Members exceeds the number of ROFO Units available for purchase, then the ROFO Units to be acquired shall be allocated on a pro rata basis among the Significant Members exercising such rights based on the relative number of Units (other than Compensatory Units) owned thereby (determined, if applicable, on an as converted basis) unless any such Significant Member shall have elected to purchase a lesser number of ROFO Units.

(iii)    Within thirty (30) days after the end of the ROFO Election Period (subject to extension to the extent necessary to obtain any required governmental approvals), the electing Significant Members shall consummate the Transfer of any ROFO Units to be purchased by such Persons in accordance with <u>Section 7.1(d)(i)</u> at the price and on the same terms and conditions set forth in the ROFO Transfer Notice, with the date of the consummation of such Transfer being the same for all such Significant Members and determined by the Significant Members that are purchasing a majority of the ROFO Units subject to such Transfer (which date must be within thirty (30) days after the end of the ROFO Election Period (subject to extension as herein provided)).

70677823.1

(iv)    If the Significant Members fail to elect to purchase or cause the purchase of all of the ROFO Units covered by the ROFO Transfer Notice before the end of the ROFO Election Period or if the Significant Members fails to actually purchase or cause the purchase of all such ROFO Units when required pursuant to Section 7.1(d)(iii) hereof, then the Transferring Member may within the ninety (90) day period (subject to extension to the extent necessary to obtain any required governmental approvals) following the later of the expiration of the ROFO Election Period or the failure of the Significant Members to consummate the purchase of ROFO Units pursuant to Section 7.1(d)(iii) to Transfer such ROFO Units not purchased by a Significant Member, at a price which is not less than the purchase price and on other terms and conditions no more favorable to such proposed Transferee than those specified in the ROFO Transfer Notice.  All ROFO Units so sold shall continue to be subject to the provisions of this Agreement in the same manner as before said Transfer and all Units not so sold shall again be subject to the right of first offer described in this Section 7.1(d).

Section 7.2.    Tag-Along Right.

(a)    Subject to Section 7.2(f) and Section 7.2(g), other than in the case of a Transfer to the Company or a Permitted Transferee or in the event of a Change of Control or the exercise of rights under Section 7.1(a)(iv) or Section 7.3 or an Approved Transfer described in clause (b) of the definition thereof, if, at any time after the date hereof and prior to the IPO, a Significant Member proposes to Transfer all or a portion of its Units (a "Tag-Along Sale") to another Person, such Significant Member (for purposes of this Section 7.2, the "Selling Significant Member") shall give written notice (a "Transfer Notice") of such proposed transfer to the Company and each other Significant Member with respect to such Tag-Along Sale at least twenty (20) Business Days prior to the consummation of such proposed Transfer, setting forth (i) the number of Units proposed to be transferred, (ii) the consideration for such Units, (iii) the identity of the purchaser (for the purposes of this Section 7.2, the "Tag-Along Transferee"), (iv) any other material terms and conditions of the proposed Transfer, (v) the fraction, expressed as a percentage, determined by dividing the number of Units to be purchased from the Selling Significant Member by the total number of Units held by such Selling Significant Member (the "Tag-Along Sale Percentage") and (vi) an invitation to each other Significant Member to irrevocably agree to include in the Tag-Along Sale a number of Units held by such Significant Member equal to the product of the total number of Units held by such Significant Member multiplied by the Tag-Along Sale Percentage (such amount with respect to each Significant Member, such Significant Member's "Tag-Along Units").

(b)    Upon delivery of a Transfer Notice, each other Significant Member shall each have the right to irrevocably elect to include such Significant Member's Tag-Along Units in such Tag-Along Sale (Significant Members who make such an election being "Tagging Members" and, together with the Selling Significant Member(s), the "Tag-Along Sellers"), at the same price per Unit and pursuant to the same terms and conditions as agreed to by the Selling Significant Member and otherwise in accordance with this Section 7.2, by sending an irrevocable written notice (a "Tag-Along Participation Notice") to the Selling Significant Member within ten (10) Business Days of the date of delivery of the Transfer Notice, indicating such Tagging Member's irrevocable election to include his, her or its Tag-Along Units in the Tag-Along Sale.  Each Member that receives a Transfer Notice and does not deliver a Tag-Along Participation Notice within such ten

70677823.1

(10) Business Day period shall have waived and be deemed to have waived all of such Significant Member's rights with respect to such Tag-Along Sale. Following such ten (10) Business Day period, each Tagging Member that has delivered a Tag-Along Participation Notice shall be entitled to sell its Tag-Along Units to such Tag-Along Transferee, in accordance with this Section 7.2. All costs and expenses incurred by the Company and the Tag-Along Sellers in connection with such Tag-Along Sale shall be borne by the Tag-Along Sellers on a pro rata basis in accordance with the number of Units being sold by each of the Tag-Along Sellers. Notwithstanding anything herein to the contrary, if the Selling Significant Member has not completed the proposed Tag-Along Sale within ninety (90) days following delivery of the Transfer Notice in accordance with this Section 7.2, the Selling Significant Member may not then effect such proposed Tag-Along Sale without again complying with the provisions of this Section 7.2; provided that such ninety (90) day period shall be extended for up to one-hundred eighty (180) days to the extent necessary to comply with any regulatory requirements applicable to such proposed Tag-Along Sale.

(c)　　In connection with any Tag-Along Sale pursuant to this Section 7.2, (A) such Tag-Along Sale shall be on the same terms and conditions as, and consummated concurrently with, the sale by the Selling Significant Member and the other Tagging Members, and (B) each Tagging Member shall agree to make the same representations, warranties, covenants, indemnities and agreements as made by the Significant Member(s) in connection with such Tag-Along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Significant Member(s), each Tagging Member shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself); provided, that (1) all representations, warranties, covenants, indemnities and agreements shall be made by the Selling Significant Member(s) and each Tagging Member severally and not jointly, (2) without limiting the generality of the foregoing, each Tagging Member shall at a minimum be required to make representations and warranties as to its authority to sell such Tag-Along Units and that such Tag-Along Units are to being sold free and clear of any liens, claims or encumbrances with such Tagging Member being the sole record and beneficial owner of such Tag-Along Units, (3) there be no requirement to agree to any obligations with respect to non-competition and (4) any indemnification obligation in respect of breaches of representations and warranties that relate to the Company, its Subsidiaries or their respective businesses (x) shall be apportioned among the Tag-Along Sellers on a pro rata basis to each such Person in accordance with the amount of consideration received by each such Person in such Tag-Along Sale, and (y) shall, as to a Tag-Along Seller, be in an amount not to exceed the aggregate proceeds received by such Tag-Along Seller in connection with any such Tag-Along Sale consummated pursuant to this Section 7.2.

(d)　　Notwithstanding anything in Section 7.2(b) to the contrary, each Tagging Member shall take or cause to be taken all such reasonable actions as reasonably necessary in order to consummate expeditiously such Tag-Along Sale pursuant to this Section 7.2, including (i) executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments, (ii) filing applications, reports, returns, filings and other documents or instruments with governmental authorities and (iii) otherwise cooperating with the Selling Significant Member(s) and the Tag-Along Transferee.

(e)　　Notwithstanding the delivery of any Transfer Notice, and subject to Section 7.2(c), all determinations as to whether to complete any Tag-Along Sale and as to the timing, manner,

price and other terms and conditions of any such Tag-Along Sale shall be at the sole discretion of the Selling Significant Member, and the Selling Significant Member and its Affiliates shall have no liability to any Member arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any proposed Tag-Along Sale except to the extent such Selling Significant Member fails to comply with the provisions of this Section 7.2.

(f)    In the event the consideration to be paid in a Tag-Along Sale includes any securities, and the receipt thereof by a Tagging Member would require (i) the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities, in each case under Law, where such registration or qualification is not otherwise required for the Tag-Along Sale by the Selling Significant Member or (ii) the provision to any Tagging Member of any specified information regarding such securities or the issuer thereof in order to obtain any exemption under securities laws or as otherwise required by Laws or the rules of any stock exchange where such information is not required to be provided to the Selling Significant Member, then such Tagging Member shall not have the option to Transfer such Tagging Member's Tag-Along Units in such Tag-Along Sale.

(g)    Notwithstanding anything to contrary herein, to the extent that the Company issues different classes of equity from that of the Class A Units that would otherwise be subject to a Tag-Along Sale, then, to the extent applicable, the Tag-Along Sellers, the Significant Members and the Company shall adjust the price payable in respect of such non-Class A Units to reflect the differential terms thereof.  The remaining provisions of this Section 7.2 shall otherwise apply *mutatis mutandis*.

Section 7.3.    Drag Along Right.

(a)    If, any time after the fifth (5th) anniversary of the date of the A&R LLC Agreement and prior to the IPO, if (i) no Incapacity Trigger Event has occurred with respect to a Dragging Member, (ii) such Dragging Member (together with its Affiliates) holds at least thirty percent (30%) of the then-issued and outstanding Class A Units (excluding any Compensatory Units) and (iii) such Dragging Member proposes to approve or effectuate (or cause the Company and/or its Subsidiaries to approve or effectuate) any IPO or a Change of Control (such Change of Control sometimes being referred to herein as a "Company Sale"), the Dragging Member shall have the right (the "Drag-Along Right"), but not the obligation, to require each other Member (each such Member, a "Non-Dragging Member") (A) in the case of a an equity sale, a recapitalization or any other transaction involving a Transfer of Units, to sell in such sale, in accordance with the terms set forth herein, all of such Non-Dragging Member's Units (the "Subject Units"), (B) in the case of a merger, amalgamation, asset sale or any other transaction that requires a vote of the Members, to vote (or act by written consent with respect to) all of such Non-Dragging Member's Subject Units in favor of such transaction and to waive (and by execution hereof do hereby waive and shall be deemed to have so waived, in connection with a transaction subject to this Section 7.3, such rights without the requirement of further action) any dissenters' rights, appraisal rights, or similar rights that such Non-Dragging Member may have under Law, or (C) in the case of an IPO, take all actions reasonably necessary to allow the Company or an Affiliate formed or utilized for such purpose to consummate (and thereafter to consummate) an IPO, including to convert all Equity Securities into securities of a corporate or other entity to give effect to an IPO and to agree to a

70677823.1

customary market-standoff agreement (not to exceed 180-days) on substantially the same terms that apply to the Dragging Members.  Each Non-Dragging Member agrees to take all steps reasonably necessary to enable such Non-Dragging Member to comply with the provisions of this Section 7.3 to facilitate the Dragging Member's exercise of a Drag-Along Right.   The consideration payable pursuant to a transaction referred to in clauses (A) or (B) immediately above that is initiated upon the exercise of the Drag-Along Right shall be allocated in accordance with, and the amount payable to the Dragging Member and the Non-Dragging Members in respect of the Subject Units held thereby in connection therewith shall be determined in accordance with, the distribution provisions in Section 4.1 of this Agreement; provided that (x) unless otherwise agreed by the BK Member and the BR Member, the proceeds paid to the Non-Dragging Members must be comprised solely of cash or marketable securities (or, in the case of an IPO, securities of the relevant IPO issuer), and (y) all Members must receive the same form of consideration or right to elect to receive the same form of consideration with respect to the same class and series of Units held thereby.

(b)     To exercise the rights granted under this Section 7.3, the Dragging Member shall give each Non-Dragging Member a written notice (a "Drag-Along Notice") containing, as applicable to the relevant transaction, the proposed consideration per Unit (calculated on an estimated basis and in accordance with the terms set forth herein) and the terms of payment and other material terms and conditions of the offer of the proposed transferee(s) or, in the case of a compelled IPO, the anticipated terms thereof.  Each Non-Dragging Member shall thereafter (and as applicable to the transaction) be obligated to sell his, her or its Subject Units to the proposed transferee(s) or vote (or act by written consent with respect to) his, her or its Subject Units in favor of the proposed transaction or otherwise take the actions required thereof, as the case may be, in accordance with Section 7.3(a) above.

(c)     Each Non-Dragging Member shall execute and deliver such instruments of conveyance and transfer and take such other actions, including executing any purchase agreement, merger agreement, amalgamation agreement, consolidation agreement, indemnity agreement, escrow agreement, or related documents, as may be required by the Dragging Member or the Company in order to carry out the terms and provisions of this Section 7.3, including (if applicable to the transaction initiated pursuant to this Section 7.3) that each Non-Dragging Member shall agree to make the same representations, warranties, covenants, indemnities and agreements as made by the Dragging Member in connection with such proposed transaction (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Dragging Member, each Non-Dragging Member shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself); provided, that (i) all representations, warranties, covenants, indemnities and agreements shall be made by the Dragging Member and each Non-Dragging Member severally and not jointly, (ii) without limiting the generality of the foregoing, each Non-Dragging Member shall at a minimum be required to make representations and warranties as to its authority to sell such Subject Units and that such Subject Units are to being sold free and clear of any liens, claims or encumbrances with such Non-Dragging Member being the sole record and beneficial owner of such Subject Units, (iii) there be no requirement to agree to any obligations with respect to non-competition, and (iv) any indemnification obligation in respect of breaches of representations and warranties that relate to the Company, its Subsidiaries or their respective businesses (A) shall be apportioned among the Dragging Members and Non-Dragging Members on a pro rata basis to each such Person in

70677823.1

accordance with the amount of consideration received by each such Person in the transaction initiated pursuant to this Section 7.3, and (B) shall, as to the Dragging Member and each Non-Dragging Member, be in an amount not to exceed the aggregate proceeds received by such Non-Dragging Member in connection with the transaction initiated pursuant to this Section 7.3.

(d)    If any Non-Dragging Member fails to transfer the Subject Units owned by such Non-Dragging Member required to be transferred or sold pursuant to this Section 7.3, the Dragging Member may, at its option, in addition to all other remedies it may have, deposit (or cause the deposit of) the purchase price (including any promissory note constituting all or any portion thereof) for such Subject Units with any national bank, paying agent or trust company or any other Person (the "Drag-Along Escrow Agent"), and, other than its right to receive the purchase price, thereupon all of such Non-Dragging Member's rights in and to such Subject Units shall terminate. Thereafter, upon delivery to the Company by such Non-Dragging Member of appropriate documentation evidencing the transfer of such Subject Units to the proposed transferee as required by this Section 7.3, the Dragging Member shall instruct the Drag-Along Escrow Agent to deliver the applicable amount deposited therewith to such Non-Dragging Member.

(e)    Notwithstanding anything contained in this Section 7.3, in the event that all or a portion of the purchase price for the Units being purchased consists of securities, and the sale of such securities to a Non-Dragging Member would require either a registration under the Securities Act or the preparation of a disclosure document pursuant to Regulation D under the Securities Act (or any successor regulation) or any similar requirement under similar provision of any state or non–United States securities Law, then, at the option of the Dragging Member, such Non-Dragging Members may proportionately receive, in lieu of such securities, the Fair Market Value of some or all of such securities in cash, as determined in good faith by the Board.

Section 7.4.    [Intentionally Omitted].

Section 7.5.    Substitute Member.  The transferee of a Member's Units in the Company shall be admitted to the Company as a substitute Member only if such Transfer is made in compliance with Sections 7.1 and 7.2 hereof.  Unless a transferee of Units is admitted as a substitute Member under this Section 7.5, it shall have none of the powers of a Member hereunder and shall have only such rights of an assignee under the Act as are consistent with the other terms and provisions of this Agreement.

Section 7.6.    IPO Restructuring

(a)    In connection with any proposed IPO approved by the Board (and any requisite approvals under Section 6.4 hereof, if applicable) or initiated pursuant to Section 7.3, the Company may effect an internal restructuring on such terms as the Board in good faith deems advisable (the "Internal Restructuring"); provided, however, that each Member is treated equitably and incurs no personal liability with respect to such Internal Restructuring.  Each Member agrees that it will consent to and raise no objections to such Internal Restructuring effected in accordance with this Section 7.6 that has been approved by the Board, including following a request by a Dragging Member pursuant to Section 7.3.  Each Member hereby agrees that it will execute and deliver, at the Company's expense, all agreements, instruments and documents as are required, in the reasonable judgment of the Board (and not in conflict with this Section 7.6), to be executed by

70677823.1

such Member in order to consummate the Internal Restructuring so long as all Members are required to sign substantially similar documents and no such documents.

(b)     In connection with any Internal Restructure effected pursuant to this <u>Section 7.6</u>, the outstanding Units shall be converted into equity securities of the IPO Issuer of the same class or series as the securities of the IPO Issuer proposed to be offered to the public in the IPO ("<u>IPO Securities</u>").  In connection therewith, each outstanding Unit will be converted into or exchanged for IPO Securities in a transaction or series of transactions that give effect to the provisions of <u>Section 4.1</u> (the "<u>IPO Exchange</u>") such that each holder of Units will receive IPO Securities having a value equal to the same proportion of the aggregate pre-IPO value that such holder would have received if all of the Company's cash and other property had been distributed by the Company pursuant to the rights and preferences set forth in <u>Section 4.1</u> as in effect immediately prior to such distribution, assuming that the value of the IPO Issuer immediately prior to such distribution was equal to the pre-IPO value of the Company as determined in good faith by the Board; <u>provided, however</u>, that the IPO Securities issued with respect to Unvested Incentive Units shall remain subject to vesting in accordance with, and to the extent provided in, the applicable Award Agreement entered into in connection with the issuance thereof.  The market value of any IPO Securities issued in connection with the IPO Exchange will be deemed to be the price at which the IPO Securities were initially sold by the underwriters.

## ARTICLE VIII.
## CERTAIN REMEDIES

Section 8.1.    <u>No Partition</u>.  Each Member hereby irrevocably waives any and all rights that it may have to maintain any action for partition of the Company's assets.  All assets of the Company shall be owned by the Company, subject to the terms and provisions of this Agreement. Title to the assets of the Company shall be held by the Company in the Company's name.

Section 8.2.    <u>Litigation Without Termination</u>.    Each Member shall be entitled to maintain, on its own behalf, any action or proceeding against any other Member or the Company (including any action for damages, specific performance or declaratory relief) for or by reason of the breach by such party of this Agreement or any other agreement entered into in connection with this Agreement or otherwise, notwithstanding the fact that any or all of the parties to such proceeding may then be Members of the Company, and without dissolving the Company as a limited liability company.

Section 8.3.    <u>Cumulative Remedies</u>.  No remedy conferred upon the Company or any Member pursuant to this Agreement is intended to be exclusive of any other remedy herein or by Law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at Law, in equity or by statute (subject, however, to the limitations expressly herein set forth).

Section 8.4.    <u>No Waiver</u>.  No waiver by a Member or the Company of any breach of this Agreement shall be deemed to be a waiver of any other breach of any kind or nature, and no acceptance of payment or performance by a Member or the Company after any such breach shall be deemed to be a waiver of any breach of this Agreement, whether or not such Member or the Company knows of such breach at the time it accepts such payment or performance.  Subject to

any applicable statutes of limitation and any provisions in this Agreement to the contrary, no failure or delay on the part of a Member or the Company to exercise any right it may have under this Agreement shall prevent the exercise thereof by such Member or the Company, and no such failure or delay shall operate as a waiver of any breach of, or default under, this Agreement.

# ARTICLE IX.
# DISSOLUTION OF COMPANY

Section 9.1.    Dissolution.

(a)    General.  Subject to Section 6.3, the Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "Dissolution Event"), and no other event shall cause the Company's dissolution:

(b)    the approval of the Board and any approvals required pursuant to Section 6.4; and

(c)    the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

Section 9.2.    Continuance of the Company.  To the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member shall not constitute a Dissolution Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company shall be continued without dissolution.

Section 9.3.    Winding-Up and Termination.  On the occurrence of a Dissolution Event, the Board may select one or more Persons to act as liquidator or may itself act as liquidator.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of winding up shall be borne as a Company expense, including reasonable compensation to the liquidator if approved by the Board.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidator are as follows:

(a)    As promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by the Company's accounting firm of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable.

(b)    The liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in Section 5.9); provided, however, that the liquidator may establish one or more cash escrow funds (in such amounts and for such terms as the liquidator may reasonably determine) for the payment of contingent liabilities.

(c)    All remaining assets of the Company shall be distributed to the Members as follows:

70677823.1

(i) the liquidator may sell any or all Company property, including to the Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of Members in accordance with the allocation provisions in this Agreement;

(ii) with respect to all Company property that has not been sold, the Fair Market Value of that property shall be determined and the Capital Accounts of Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among Members if there were a taxable disposition of that property for the Fair Market Value of that property on the date of distribution; and

(iii) the property of the Company shall be distributed in accordance with Section 4.1.

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 9.3; provided, however, that no Member shall be liable for any such Company cost, expense or liability in excess of the Fair Market Value of the property so distributed in kind to such Member.  The distribution of cash and/or property to a Member in accordance with the provisions of this Section 9.3 constitutes a complete return to the Member of its Capital Contributions and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act; provided, however, that no Member shall be deemed, under this Section 9.3(c), to have agreed to be liable for any such Company cost, expense or liability in excess of the Fair Market Value of the property so distributed in kind to such Member.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

(d) The Members intend that the allocations provided under Sections 4.4, 4.5 and 4.6 will produce final Capital Account balances for the Members that permit liquidating distributions pursuant to Section 9.3(c)(iii) to be made in the order and priorities set forth in Section 4.1 (after taking into account all previous distributions made to the Members pursuant to Section 4.1).  If the allocations otherwise made under Sections 4.4, 4.5 and 4.6 would fail to produce such final Capital Account balances, the Board shall cause the allocations of Profit and Loss (including items therein) and, to the extent necessary, guaranteed payments to be made in the final Fiscal Year of the Company in a manner that achieves the foregoing intent as close as possible.

Section 9.4. Deficit Capital Accounts.  No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

Section 9.5. Certificate of Cancellation.  On completion of the distribution of Company assets as provided herein, the Board (or any Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of the State of Delaware and take such other actions as may be necessary to terminate the existence of the Company.  Upon the

effectiveness of the certificate of cancellation, the existence of the Company shall cease, except as may be otherwise provided by the Act or other applicable Law.

## ARTICLE X.
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 10.1.    <u>Representations and Warranties of Members</u>.  Each Member (as applicable) represents and warrants to the Company and to the other Members as follows:

(a)    If the Member is a Person other than an individual, it is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation with all requisite power and authority to enter into this Agreement and to conduct the business of the Company.

(b)    This Agreement constitutes the legal, valid and binding obligation of the Member enforceable in accordance with its terms.

(c)    No consents or approvals are required from any governmental authority or other Person or entity for the Member to enter into this Agreement with the Company.  If the Member is a Person other than an individual, all limited liability company, corporate or partnership action on the part of the Member necessary for the authorization, execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, have been duly taken.

(d)    If the Member is a Person other than an individual, the execution and delivery of this Agreement by the Member, and the consummation of the transactions contemplated hereby, do not conflict with or contravene the provisions of its organizational documents.

(e)    The execution and delivery of this Agreement by the Member, and the consummation of the transactions contemplated hereby, do not conflict with or contravene the provisions of any material agreement or instrument by which it or its properties are bound or any Law, rule, regulation, order or decree to which it or its properties are subject.

(f)    It understands that (i) an investment in the Company involves a substantial and high degree of risk, (ii) it must bear the economic risk of its investment in the Company for an indefinite period of time, since its Units have not been registered for sale under the Securities Act and, therefore, cannot be sold or otherwise Transferred unless subsequently registered under the Securities Act or an exemption from such registration is available, and such Units cannot be sold or otherwise Transferred unless registered under applicable state securities or blue sky laws or an exemption from such registration is available, (iii) there is no established market for the Units and no public market will develop and (iv) it or its principals have such knowledge and experience in financial and business matters that it is or they are capable of evaluating the merits and risks of an investment in the Company.

(g)    All Capital Contributions and other moneys invested in the Company by the Members are not and will not be, and are not and will not be derived from, "plan assets" within the meaning of 29 C.F.R. 2510.3-101 (as modified by Section 3(42) of ERISA).

(h)    To the knowledge of such Member:  it is in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government

- 35 -

70677823.1

guidance, including the reporting, record keeping and compliance requirements of the Bank Secrecy Act, as amended by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, Title III of the USA PATRIOT Act, and other authorizing statutes, executive orders and regulations administered by OFAC, and related Securities and Exchange Commission, SRO or other agency rules and regulations, and has policies, procedures, internal controls and systems that are reasonably designed to ensure such compliance.

(i)      To the knowledge of such Member, neither:  (i) such Member or any Affiliate of such Member; nor (ii) any Person who owns a Controlling interest in or otherwise Controls such Member; nor (iii) if such Member is a privately held entity, any Person otherwise having a direct or indirect beneficial interest (other than with respect to an interest in a publicly traded entity) in such Member; nor (iv) any Person for whom such Member is acting as agent or nominee in connection with this investment, is a country, territory, Person, organization, or entity named on an OFAC List, nor is a prohibited country, territory, Person, organization or entity under any economic sanctions program administered or maintained by OFAC.

(j)      As a condition of any Transfer of any of its direct or indirect interest in the Company, the Board has the right to require full compliance with these representations, warranties and covenants, to the satisfaction of the Board, with respect to any transferee and any Person who owns or otherwise Controls the transferee.

(k)      It has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Company as contemplated by this Agreement, and is able to bear the economic risk of such investment for an indefinite period of time.  It has been furnished access to such information and documents as it has requested and has been afforded an opportunity to ask questions of and receive answers from representatives of the Company concerning the terms and conditions of this Agreement.  Other than certain service provider members, it is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act.

Section 10.2.  <u>Confidentiality</u>.  Each Member will keep confidential and will not disclose, divulge or use, other than for Company business or, with respect to any private equity fund or investment advisor, fund raising efforts, compliance requirements, investor relations (including reports to former or current limited partners), portfolio company management and for oversight responsibilities to such Member's equity holders, in each case so long as the recipient of such Confidential Information is subject to confidentiality obligations substantially similar to those contained herein, any Confidential Information except for disclosures (a) compelled by Law or required or requested by subpoena or request from a court, regulator or a stock exchange (but the Member shall (provided such is legally permitted) notify the Company or the Member affected by such disclosure, as applicable, promptly of any request for that information before disclosing it if practicable), (b) to Representatives of the Member (<u>provided</u> that each Representative is informed of the confidential nature of such information, and that the disclosing Member remains liable for any breach of this provision by its Representatives), (c) of information that the Members have received from a source or otherwise developed independent of the Company, (d) to any Person to whom such Member Transfers or offers to Transfer any of its Units or otherwise in connection with a transaction initiated pursuant to <u>Section 7.3</u> in compliance with this Agreement so long as the Transferring party first obtains a confidentiality agreement from the proposed transferee, in

form reasonably acceptable to the Company, (e) of information in connection with litigation against the Company or any Member to which the disclosing Member is a party; (f) permitted by the Company or Member affected by such disclosure; or (g) in respect of any Member that is a public company, to the extent required in connection with such Member's reporting obligations, including as required by the rules and regulations of the Securities and Exchange Commission or a national stock exchange, or as required for tax reporting purposes. The Members agree that breach of the provisions of this <u>Section 10.2</u> may cause irreparable injury to the Company or the other Members for which monetary damages (or other remedy at Law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (ii) the uniqueness of the Company's and each other Member's business and the confidential nature of the information described in this <u>Section 10.2</u>. Accordingly, the Members agree that the provisions of this <u>Section 10.2</u> may be enforced by specific performance. Notwithstanding anything to the contrary herein, no Member shall be required to initiate or participate in litigation in connection with such Member's obligations pursuant to this <u>Section 10.2</u>.

Section 10.3.    <u>Other Investor Information Rights</u>.

(a)    Prior to the consummation of an IPO, the Company shall make available to each Member all of the following information, provided that the Company shall not be required to make such information available to any Member that is a current or former employee of the Company:

(i)    quarterly unaudited financial statements of the Company and its Subsidiaries on the later of (A) the latest date on which the quarterly unaudited financial statements are delivered (including after giving effect to extensions thereunder) by the Company or any of its Subsidiaries pursuant to the senior secured credit facility of the Company and its Subsidiaries as in effect on the Effective Date or in any replacement facility (or, if there is more than one such senior secured credit facility then in effect, the senior secured credit facility that ranks highest as to lien priority at the operating company level) or (B) within thirty (30) days following the end of each fiscal quarter; and

(ii)    annual audited financial statements of the Company and its Subsidiaries on the later of (A) the latest date on which the annual audited financial statements are delivered (including after giving effect to extensions thereunder) by the Company or any of its subsidiaries pursuant to the senior secured credit facility of the Company and its Subsidiaries as in effect on the Effective Date or in any replacement facility (or, if there is more than one such senior secured credit facility then in effect, the senior secured credit facility that ranks highest as to lien priority at the operating company level) or (B) within ninety (90) days following the end of each fiscal year, provided that, notwithstanding subclause (A) or (B), if the BR Member informs the Company that within 10 days following the end of a fiscal year that it is required to file the audited financial statements of the Company with its annual report on Form 10-K pursuant to Rule 3-09 of Regulation S-X, the Company shall use reasonable best efforts to provide the BR Member annual audited financial statements of the Company and its Subsidiaries and such other data and information as may be required in connection therewith prior to seventy-five (75) days following the end of each fiscal year.

70677823.1

(b)    Prior to the consummation of an IPO, the Company shall make available to each Significant Member such other data and information as may reasonably be requested by a Significant Member from time to time.

(c)    In addition to the foregoing, the Company shall, upon request by the BR Member, provide to the BR Member such other data and information as may be reasonably required in connection with the BR Member's Securities and Exchange Commission and tax reporting obligations, and the Company shall reasonably cooperate with the BR Member in connection therewith, in each case, at the Company's sole cost and expense; provided, that in any given Fiscal Year that such costs and expenses do not exceed an amount equal to $200,000 in the aggregate.

(d)    The Company shall reasonably cooperate with the BR Member in connection with the implementation, testing and auditing of internal controls as may be reasonably requested by the BR Member, in each case, at the Company's expense up to an amount equal to $200,000 in the aggregate.

(e)    The Company will use commercially reasonable efforts to (a) as soon as reasonably practicable after the end of each Fiscal Year, but no later than March 31 following such Fiscal Year, deliver to each Person who was a Member at any time during such Fiscal Year, an estimated Schedule K-1 and estimates of such other information reasonably requested by such Member relating to the Company that is necessary for such Member to comply with its tax reporting obligations and (b) no later than June 30 of each Fiscal Year, the final information with respect to the items in the foregoing clause (a) (including a final Schedule K-1).

Section 10.4.    Registration Rights.    Each Member understands and agrees that the Units have not been registered under the Securities Act and are restricted securities within the meaning of the Securities Act; however, as a material condition to the Members acquiring the Class A Units (other than Compensatory Units), the Company has agreed to grant each holder of Class A Units (other than Compensatory Units) certain registration rights with respect to the Units held thereby or to cause such registration rights to be granted to the Class A Members (other than Compensatory Units) by the IPO Issuer.  The Company currently has no current plans to engage in an IPO but if it does it is unknown in which jurisdictions such offering will take place or on which exchanges or markets the Equity Securities of the Company will be listed and/or traded.  Furthermore, in connection with an IPO, it may be advisable to restructure the Company or one of its Subsidiaries into a corporation.  Accordingly, in light of these unknown factors, it would be impracticable to specify at this time the detailed registration rights that are being granted pursuant to this Agreement.  Nevertheless, because the granting of registration rights is a material condition to the Members' acquisition of the Class A Units (other than Compensatory Units), the parties hereto desire to indicate, in general terms that will need to be refined when the details of any IPO become known, the registration rights that each such Member will have, which are summarized in Exhibit B hereto.  Prior to an IPO, the terms of this Section 10.4 and as set forth in Exhibit B hereto shall be further developed into a customary registration rights agreement.  The form and substance of such registration rights agreement shall be subject to Board approval (which shall require the approval of the Director appointed by the BR Member).  This Section 10.4 shall survive the termination of this Agreement until the registration rights agreement contemplated hereby shall have been entered into by the Members and the successor to the Company.

70677823.1

## ARTICLE XI.
## MISCELLANEOUS

Section 11.1.  Notices.  Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail, by email transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it.  Notices and other communications given or made hereunder by one or more parties to one or more of the other parties shall be deemed to have been duly given or made on the date of receipt by the recipient thereof if received prior to 5:00 p.m. (New York time) (or otherwise on the next succeeding Business Day) if (x) served by personal delivery or by nationally recognized overnight courier service upon the party or parties for whom it is intended, (y) delivered by registered or certified mail, return receipt requested or (z) sent by email; provided that any email transmission is promptly confirmed by a responsive electronic communication by the recipient thereof or receipt is otherwise clearly evidenced (excluding out-of-office replies or other automatically generated responses) or is followed up within one Business Day after such email by dispatch pursuant to one of the methods described in the foregoing clauses (x) and (y) of this Section 11.1). All notices, requests and consents to be sent to (a) a Member, must be sent to or made at the addresses given for that Member on Schedule 1 or such other address as that Member may specify by notice to the other Members or (b) to the Company, must be sent to the principal place of business of the Company as set forth in Section 1.7 or such other address as the Company may specify by notice to the Members.  Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

Section 11.2.  Entire Agreement.   This Agreement, the Rollover Agreement, the Subscription Agreements, the Merger Agreement and any other agreements entered into in connection herewith or therewith or otherwise expressly mentioned herein constitute the entire agreement of the Members and their respective Affiliates and the Company relating to the matters covered hereby and supersede all prior contracts or agreements with respect to the Company, whether oral or written, with respect to the subject matter hereof.

Section 11.3.  Amendments.   The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the approval of the Board and any additional approvals required by Section 6.4 of this Agreement, provided that any modification or amendment that would have a disproportionate and materially adverse effect on the rights, benefits or obligations of a Member in a different manner than the other Members of the Company that hold the same class or series of Units as such Member shall require the written consent of (x) such affected Member or (y) the Majority Affected Members, it being understood and agreed that the issuance of Units that are senior to or pari passu with other Units shall not be deemed to be disproportionate and materially adverse for purposes hereof, and provided further that any modification or amendment that would require additional Capital Contributions by any Member shall require the written consent of such affected Member, regardless of whether such modification or amendment would have a disproportionate and materially adverse effect on the rights, benefits or obligations of a Member or a disproportionate effect on the rights, benefits or obligations of a Member in a different manner than the other Members of the Company that hold the same class or

70677823.1

series of Units as such Member. The signature page (or joinder) of a party to this Agreement (or any predecessor hereto) shall be evidence of such party's intention to be legally bound by this Agreement and any amendments or amendment and restatements of this Agreement hereafter approved in accordance with the Agreement, whether or not such party specifically executes such amendment or amendment and restatement of this Agreement (except if the approval of such amendment or amendment and restatement of this Agreement specifically requires approval by the undersigned, in accordance with the terms of the Agreement or Law).

Section 11.4.  Effect of Waiver or Consent.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

Section 11.5.  Binding Effect.  This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and permitted assigns.

Section 11.6.  Governing Law; Venue.

(a)   This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware, without regard to its conflict of Law provisions or principles that would result in the application of the laws of any other jurisdiction.

(b)   The Company and each Member agree that: (i) it shall bring any Proceeding against any other party in connection with, arising out of or otherwise relating to this Agreement exclusively in the Chosen Courts; and (ii) solely in connection with such Proceedings, (A) irrevocably and unconditionally submits to the exclusive jurisdiction of the Chosen Courts, (B) irrevocably waives any objection to the laying of venue in any such Proceeding in the Chosen Courts, (C) irrevocably waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party, (D) agrees that mailing of process or other papers in connection with any such Proceeding in the manner provided in Section 11.1 or in such other manner as may be permitted by applicable Law shall be valid and sufficient service thereof and (E) it shall not assert as a defense any matter or claim waived by the foregoing clauses (A) through (D) of this Section 11.6(b) or that any order issued by the Chosen Courts may not be enforced in or by the Chosen Courts.

Section 11.7.  Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, successors and permitted assigns.

Section 11.8.  Captions.  Captions contained in this Agreement in no way define, limit or extend the scope or intent of this Agreement.

Section 11.9.  Severability.  If a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate or (b) any mandatory, non-waivable provision of the Act,

70677823.1

such provision of the Certificate or the Act shall control.  If any provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the members or managers of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall be enforced to the greatest extent permitted by Law.

Section 11.10. <u>Further Assurances</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

Section 11.11. <u>Counterparts</u>.  This Agreement may be executed in several counterparts (including via email, .pdf, facsimile or other electronic transmission or execution), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 11.12. <u>Deficit Restoration</u>.  Notwithstanding any other provision of this Agreement to the contrary, upon liquidation of a Member's Units (whether or not in connection with a liquidation of the Company), no Member shall have any liability to restore any deficit in its Capital Account.  In addition, no allocation to any Member of any loss, whether attributable to depreciation or otherwise, shall create any asset of or obligation to the Company, even if such allocation reduces a Member's Capital Account or creates or increases a deficit in such Member's Capital Account; it is also the intent of the Members that no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company.  The provisions regarding the ability of the Members to make contributions pursuant to <u>Article II</u> is for the exclusive benefit of the Company and not of any creditor of the Company, and no such creditor is intended as a third party beneficiary of this Agreement nor shall any such creditor have any rights hereunder, including the right to enforce any Capital Contribution or other obligations of the Members.

Section 11.13. <u>Waiver of Right to Trial by Jury</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY AND IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH OR (2) IN ANY WAY CONNECTED WITH, OR RELATED OR INCIDENTAL TO, THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY.

70677823.1

Section 11.14. <u>Equitable Relief</u>.  The Company and each Member acknowledges and agrees that any breach of this Agreement by the Company or such Member or any transferee or any legal representative thereof may cause irreparable injury to the Company or the other Members for which monetary damages (or other remedy at Law) are inadequate in view of (a) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of the Company or a Member to comply with such provisions and (b) the uniqueness of the Company's and each other Member's business.  Accordingly, the Company and each Member consents to the issuance of an injunction or the enforcement of other equitable remedies against the Company and such Member at the suit of an aggrieved party to the extent the court of competent jurisdiction as herein provided determines to issue the same and waives any requirement for the posting of any bond or other security in connection therewith or any claim that monetary damages are a sufficient remedy.

Section 11.15. <u>Power of Attorney</u>.

(a)    Each other Member hereby irrevocably and unconditionally constitutes and appoints the AL Member, with full power of substitution, as his, her or its true and lawful agent and attorney-in-fact, with full power and authority in his, her or its name, place and stead, to: (i) execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (A) this Agreement, all certificates and other instruments and all amendments thereof which the  AL Member deems appropriate or necessary to form, qualify, or continue the qualification of, the Company as a limited liability company in the State of Delaware and in all other jurisdictions in which the Company may conduct business or own property; (B) all documents, agreements, certificates or instruments which the  AL Member deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement in accordance with its terms; (C) all conveyances and other instruments or documents which the BK Member or AL Member, as applicable, deems appropriate or necessary to reflect the dissolution and liquidation of the Company pursuant to the terms of this Agreement, including a certificate of cancellation; and (D) all instruments relating to the admission, withdrawal or substitution of any Member; (ii) sign, execute, swear to and acknowledge all ballots, consents, approvals, waivers, certificates and other instruments appropriate or necessary, in the  AL Member's sole judgment, to evidence, confirm or ratify any vote, consent, approval, agreement or other action which is made or given by the other Members hereunder or is consistent with the terms of this Agreement or appropriate or necessary (and not inconsistent with the terms of this Agreement), in the  AL Member's sole judgment, to effectuate the terms of this Agreement; and (iii) execute, swear to, acknowledge and deliver any and all instruments, agreements, certificates or other documents in connection with any and all matters contemplated by <u>Section 7.3</u>, take any and all action necessary to sell or otherwise transfer any Units (including Class B Units and/or Compensatory Units) owned by any other Member as contemplated by <u>Section 7.3</u> or waive all dissenters' rights, appraisal rights or similar rights that any other Member may have under applicable Law to the fullest extent permitted by Law consistent with the foregoing.

(b)    The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any other Member and the Transfer of all or any portion of his, her or its Units and shall extend to such holder's heirs, successors, assigns and personal representatives.

70677823.1

Section 11.16. Independent Legal Advice.  Each of the Members acknowledge that it has read and understands this Agreement, has consulted with legal counsel with respect to the terms and conditions hereof, is fully aware of its legal effect, has not acted in reliance upon any representations or promises made by the Company other than those contained in writing herein, and has entered into this Agreement freely based on its own judgment with the advice of legal counsel and other advisers as he, she or it has deemed necessary or advisable.

# ARTICLE XII.
# TAX MATTERS

Section 12.1.  Consistency.  Without the permission of the Tax Matters Member (as defined below), no Member shall file a petition under Section 6226 of the Code with respect to a "partnership item" of the Company or request an administrative adjustment under Section 6227 of the Code with respect to such an item.

Section 12.2.  Tax Controversies.  The AL  Member or its designee is hereby designated and shall serve as the "partnership representative" of the Company (the "Tax Matters Member") within the meaning of amended Section 6223(a) of the Code (or any successor thereto), and in any similar capacity under state, local or non-U.S. Law, as applicable, and is authorized and required to represent the Company (at the Company's expense), in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings. The Tax Matters Member may designate a natural person to serve as the "designated individual" as required by the applicable Treasury Regulations.

(a)     Each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and each such Member further agrees that such Member shall not treat any Company item inconsistently on such Member's income tax return with the treatment of the item on the Company's return and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company; provided that the Tax Matter Member shall promptly inform each Member of any tax audit or proceeding and shall keep each Member reasonably informed with respect to the foregoing. Notwithstanding the preceding sentence, a Member is not bound by any action taken by the Tax Matters Member in connection with audits of the Company if such action is prohibited by Law.

(b)     The Tax Matters Member shall have the right to make on behalf of the Company any and all elections and take any and all actions that are available to be made or taken by the partnership representative or the Company under the Partnership Tax Audit Rules and the Members shall take such actions requested by the partnership representative consistent with any such elections made and actions taken by the partnership representative, including filing amended tax returns and paying any tax due in accordance with Section 6225(c)(2) of the Code as amended by the Partnership Tax Audit Rules. The Tax Matters Member shall attempt to allocate the burden of (or any diminution in distributable proceeds resulting from) any taxes, penalties or interest imposed on the Company pursuant to the Partnership Tax Audit Rules to those Members to whom such amounts are specifically attributable (whether as a result of their status, actions, inactions or otherwise) where such allocation can be achieved without unwarranted expense and effort (as measured in relation to the aggregate amount in question) as determined by the AL  Member.

(c)     Under Section 6225 of the Code, in the case of any adjustment by the IRS in the amount of any item of income, gain, loss, deduction, or credit of the Company or any Member's distributive share thereof ("IRS Adjustment"), the Company may pay an imputed underpayment as calculated under Section 6225(b) of the Code with respect to the IRS Adjustment, including interest and penalties ("Imputed Tax Underpayment") in the adjustment year or otherwise take the IRS Adjustment into account in the adjustment year. Each Member agrees to amend its U.S. federal income tax return(s) to include (or reduce) its allocable share of the Company's income (or losses) resulting from an IRS Adjustment and pay any tax due with such return as required under Section 6225(c)(2) of the Code even if an Imputed Tax Underpayment liability of the Company or IRS Adjustment occurs after the Member's withdrawal from the Company. Each Member does hereby agree to indemnify and hold harmless the Company and Tax Matters Member from and against any liability with respect to the Member's proportionate share of any Imputed Tax Underpayment or other IRS Adjustment resulting in liability of the Company, regardless of whether such Member is a Member in the Company in an adjustment year, with such proportionate share as reasonably determined by the Tax Matters Member, including the Tax Matters Member's reasonable discretion to consider each Member's interest in the Company in the reviewed year and a Member's timely provision of information necessary to reduce the amount of Imputed Tax Underpayment set forth in Section 6225(c) of the Code. This obligation shall survive a Member's ceasing to be a Member of the Company and/or the termination, dissolution, liquidation and winding-up of the Company.

(d)     The Tax Matters Member may in its sole discretion elect under Section 6226 of the Code to cause the Company to issue adjusted IRS Schedules K-1 (or such other form as applicable) reflecting a Member's shares of any IRS Adjustment for the adjustment year as an alternative to the Company's payment of an Imputed Tax Underpayment for any tax year.

Section 12.3.     Accounting Methods; Elections.  Except as otherwise expressly provided in this Agreement in the case of any election that could reasonably be expected to have a material tax consequence for any Member, the AL Member shall determine the accounting methods and conventions to be used in the preparation of the Company's tax returns and shall make any and all elections under the tax laws of the United States and any other relevant jurisdictions as to the treatment of items of income, gain, loss, deduction and credit of the Company, or any other method or procedure related to the preparation of the Company's tax returns.

Section 12.4.     Partnership Status.  Except in connection with an IPO, the Members intend, and the Company shall take no position inconsistent with, treating the Company as a partnership for Federal, state and local income and franchise tax purposes. In furtherance of the foregoing, and except in connection with an IPO, the Company shall neither elect, pursuant to Treasury Regulations Section 301.7701-3(c), to be treated as an entity other than a partnership nor elect, pursuant to Code Section 761(a), to be excluded from the provisions of subchapter K of the Code. Each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  The Company will not make any election to be treated as a corporation for Federal and, if applicable, state income tax purposes, except with the approval of the BK Member and BR Member. To ensure that Units are not traded on an established securities market within the meaning of Treasury Regulations Section 1.7704-1(b) or readily tradable on a secondary market or the substantial equivalent thereof within the meaning of Treasury Regulations Section 1.7704-1(c) ("PTP Units"), notwithstanding anything to

70677823.1

the contrary contained herein and except in connection with an IPO, (a) the Company shall not participate in the establishment of any such market or the inclusion of its Units thereon, and (b) the Company shall not recognize or approve any Transfer made on any such market or that would result in the Units being treated as PTP Units and any such Transfer shall be null and void ab initio.

Section 12.5.   <u>Tax Matters Member Indemnification</u>.  The Company shall indemnify the Tax Matters Member (including the officers and directors of a corporate Tax Matters Member) against judgments, fines, amounts paid in settlement and expenses (including attorneys' fees) reasonably incurred in any civil, criminal or investigative proceeding in which the Tax Matters Member is involved or threatened to be involved by reason of being the Tax Matters Member except in the case of (a) the Tax Matters Member's fraud or gross negligence and/or (b) any willful material breach by the Tax Matters Member of the terms set forth in this Agreement; provided that the Tax Matters Member acted in good faith, within what it reasonably believed to be in the best interests of the Company or its Members. The indemnification provided in this <u>Section 12.5</u> shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any applicable status, agreement, vote of Members or otherwise.

Section 12.6.   <u>BR Member Consent Right</u>.  The Tax Matters Member shall not take any actions under this Article XII that would disproportionately, materially, and adversely impact the BR Member without the consent of the BR Member (such consent not to be unreasonably withheld, conditioned or delayed).

*[Remainder of Page Intentionally Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth in the introductory paragraph hereof.

**COMPANY:**

**FREEDOM VCM HOLDINGS, LLC**

By: _____
      Name: Andrew Laurence
      Title:   Authorized Signatory

*[Signature Page to Second Amended and Restated Limited Liability Company Agreement of Freedom VCM Holdings, LLC]*

**MEMBERS:**

**BRF INVESTMENTS, LLC**

By: _Bryant Riley_____

Name: Bryant R. Riley

Title:   Co-Chief Executive Officer

*[Signature Page to Second Amended and Restated Limited Liability Company Agreement of Freedom VCM*

*Holdings, LLC]*

By:

DocuSigned by:

*Eric Seeton*

1703A0AAEA6E4E5...

ERIC SEETON

By:  DocuSigned by:

Andrew kaminsky

913FEB05E8CD4CC...

ANDREW KAMINSKY

*[Signature Page to Second Amended and Restated Limited Liability Company Agreement of Freedom VCM Holdings, LLC]*

By:  
_____
TIFFANY MCMILLAN-MCWATERS

*[Signature Page to Second Amended and Restated Limited Liability Company Agreement of Freedom VCM Holdings, LLC]*

By:

DocuSigned by:

*Andrew Laurence*

7A0CF82F2D914B2...

ANDREW LAURENCE

By: _____
DocuSigned by:

*Brian Kahn*

4E0EDAEA4DE44EE...

BRIAN KAHN

**VINTAGE OPPORTUNITY PARTNERS, L.P.**

**By: Vintage Opportunity Partners GP, LLC**
**Its: General Partner**

By: _____
   *Brian Kahn*
   4E0FDAEA4DF44EF...
Name: Brian Kahn
Title:  Authorized Signatory

By: 

By:

BRIAN KAHN and LAUREN KAHN Joint
Tenants by Entirety

70677823.1

## EXHIBIT A

## DEFINITIONS

"A&R LLC Agreement" has the meaning set forth in the Recitals to this Agreement.

"Adjusted Capital Account" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore (or is treated as obligated to restore under Treasury Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704- 2(i)(5)), and (b) decreased by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by, or under direct or indirect common Control with, such Person. For the avoidance of doubt, Lauren Kahn shall be deemed to be an Affiliate of Brian Kahn.

"Agreement" has the meaning set forth in the Preamble of this Agreement.

"Approved Transfer" means, with respect to each Member, (a) a Transfer (or proposed Transfer) of Units to a third party with the prior written approval of (i) if the Transferring Member is the BR Member or an Affiliate thereof, the BK Member, (ii) if the Transferring Member is the BK Member or an Affiliate thereof, the BR Member, or (iii) if the Transferring Member is any other Member other than the BK Member or the BR Member (or an Affiliate of the BK Member or the BR Member), the Board or (b) any Transfer pursuant to that certain Put Right Agreement, dated as of August 17, 2023, by and between Continental General Insurance Company and BR Member.

"AL Directors" has the meaning set forth in Section 5.1(c)(i) of this Agreement.

"AL Incapacity Trigger Event" means the death or Disability of Andrew Laurence.

"AL Member" means Andrew Laurence and any one or more Affiliates thereof and any Permitted Holder, in each case, to whom the initial AL Member may transfer its Units, in accordance with the terms and conditions of this Agreement, provided that Andrew Laurence shall control (or designate another AL Member to control) any decisions of the AL Member hereunder.

"Available Cash" means all cash funds or other property of the Company determined by the Board to be available for distribution to its Members and that is permitted to be distributed to the Members in compliance with the debt facilities of the Company and its Subsidiaries and taking into account appropriate reserves determined by the Board.

"Award Agreement" has the meaning set forth in Section 2.4(b) of this Agreement.

"BK Incapacity Trigger Event" means the death or Disability of Brian R. Kahn.

"BK Member" means Brian Kahn and any one or more Affiliates thereof and any Permitted Holder, in each case, to whom the initial BK Member may transfer its Units, in accordance with

the terms and conditions of this Agreement, <u>provided</u> that Brian Kahn shall control (or designate another BK Member to control) any decisions of the BK Member hereunder.

"Board" has the meaning set forth in Section 5.1(a) of this Agreement.

"Book Liability Value" means, with respect to any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i), the amount of cash that a willing assignor would pay to a willing assignee to assume such liability in an arm's-length transaction, as determined by the Board.  The Book Liability Value of each liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) shall be adjusted at such times as provided in this Agreement for an adjustment to Book Values.

"Book Value" means, with respect to any property of the Company, such property's adjusted basis for Federal income tax purposes, except as follows:

(a)    The initial Book Value of any property contributed by a Member to the Company shall be the Fair Market Value of such property as of the date of such contribution as reasonably determined by the Board;

(b)    The Book Values of all properties shall be adjusted to equal their respective Fair Market Values as of the date hereof and otherwise as reasonably determined by the Board in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution (other than a Capital Contribution made by all Members in proportion to the relative number of Units held thereby) to the Company or in exchange for the performance of services to or for the benefit of the Company, (ii) the distribution by the Company to a Member of more than a de minimis amount of property (other than a distribution made to all Members in proportion to the relative number of Class A Units held by them) as consideration for an interest in the Company, or (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g)(1); provided that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)    The Book Value of property distributed to a Member shall be the Fair Market Value of such property as of the date of such distribution as reasonably determined by the Board;

(d)    The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and clause (g) of the definition of Profits and Losses; and

(e)    If the Book Value of property has been determined or adjusted pursuant to clause (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and other items allocated pursuant to Section 4.3.

"Act" has the meaning set forth in the Recitals to this Agreement.

70677823.1

"BR Director" has the meaning set forth in Section 5.1(c)(ii) of this Agreement.

"BR Incapacity Trigger Event" means the death or Disability of Bryant R. Riley.

"BR Indemnitees" has the meaning set forth in Section 5.9(e) of this Agreement.

"BR Member" means BRF Investments, LLC, a Delaware limited liability company, and any one or more Affiliates of B. Riley Financial, Inc. to whom the initial BR Member may transfer its Units, in accordance with the terms and conditions of this Agreement.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Delaware are authorized by Law to close.

"Capital Account" has the meaning set forth in Section 3.4 of this Agreement.

"Capital Contribution" means, with respect to any Member, unless otherwise determined by the Board and the applicable Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company (or deemed contributed to the Company) by such Member (provided that the Company may direct that any such Capital Contribution be made directly to a Subsidiary of the Company).  Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution of its predecessors in interest.

"Certificate" has the meaning set forth in the Recitals to this Agreement.

"Change of Control" means (A) any merger or consolidation of the Company into or with another entity (except one in which the holders of Class A Units or Affiliates thereof immediately prior to such merger or consolidation continue to hold interests in the surviving entity in the same proportion as held in the Company immediately prior to such merger or consolidation) (B) any sale of all or substantially all of the assets of the Company to a third party, (C) any other transaction or series of transactions pursuant to, or as a result of, which one or more third parties (other than the BK Member, the BR Member and their respective Affiliates) acquires (from the Company or directly from the Members of the Company) or holds Units of the Company, representing a majority of the Company's outstanding voting power or (D) a sale or multiple sales of one or more Subsidiaries of the Company or the assets thereof (whether by way of merger, consolidation, reorganization or otherwise) which Subsidiary or Subsidiaries and/or assets constitute all or substantially all of the consolidated assets of the Company and its Subsidiaries taken as a whole.

"Chosen Courts" means the Court of Chancery of the State of Delaware, or if such court finds it lacks subject matter jurisdiction, the Superior Court of the State of Delaware (Complex Commercial Division); provided that if subject matter jurisdiction over the matter that is the subject of the applicable Proceeding is vested exclusively in the U.S. federal courts, such Proceeding shall be heard in the U.S. District Court for the District of Delaware.

"Class A Member" has the meaning set forth in Section 2.2(a) of this Agreement.

"Class A Units" has the meaning set forth in Section 2.2(a) of this Agreement.

"Class B Member" has the meaning set forth in Section 2.2(b) of this Agreement.

70677823.1

"Class B Units" has the meaning set forth in Section 2.2(b) of this Agreement.

"Code" means the Internal Revenue Code of 1986.

"Company" has the meaning set forth in the Preamble of this Agreement.

"Company Sale" has the meaning set forth in Section 7.3(a).

"Confidential Information" means any information which is currently held by the Company or any Subsidiary thereof or is hereafter acquired, developed or used by the Company or its Subsidiaries relating to business opportunities or other operational, economic, financial, management or other aspects of the business, operations, properties or prospects of the Company or its Subsidiaries, whether oral or in written form.

"Control" means the possession, directly or indirectly, or the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings.  Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"CPI" means the means the Consumer Price Index for All Urban Consumers as published by the U.S. Bureau of Labor Statistics.

"Curative Allocations" has the meaning set forth in Section 4.5 of this Agreement.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for Federal income tax purposes with respect to property for such Fiscal Year or other period, except that with respect to any property the Book Value of which differs from its adjusted tax basis at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided that if the adjusted tax basis of any property at the beginning of such Fiscal Year or other period is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Board.

"Director" has the meaning set forth in Section 5.1(a) of this Agreement.

"Disability" means, with respect to Brian R. Kahn or Bryant R. Riley, any medically determinable physical or mental impairment that (i) is reasonably expected to result in death or (ii) lasts for a continuous period of not less than twelve (12) months and renders Brian R. Kahn or Bryant R. Riley, as applicable, unable to engage in any substantial gainful activity.

"Drag-Along Notice" has the meaning set forth in Section 7.3(b) of this Agreement.

"Drag-Along Right" has the meaning set forth in Section 7.3(a) of this Agreement.

70677823.1

"Dragging Member" means the BK Member or the BR Member, as applicable, together with their respective Affiliates and those persons identified in sub-clause (y) in the definition of "Permitted Transferee".

"Economic Risk of Loss" has the meaning set forth in Treasury Regulation Section 1.752-2(a).

"Effective Date" has the meaning set forth in the Preamble of this Agreement.

"Eligible Incentive Unit" means, as of any time of determination, each outstanding Class B Unit that has a Threshold Amount that is equal to or less than the amount of distributions that have been made to the Members pursuant to Section 4.1 hereof after such Class B Unit was issued. A Class B Unit shall be an Eligible Incentive Unit with respect to a portion of a distribution once the foregoing test is satisfied from the other portion of the distribution.

"Equity Securities" shall mean the equity securities of the Company or any Subsidiary thereof and any warrants, options or other rights to directly or indirectly acquire such equity securities (or securities (whether equity or debt) convertible or exchangeable into equity securities of the Company or any Subsidiary thereof).

"ERISA" means Employee Retirement Income Security Act of 1974,.

"Exchange Act" means the U.S. Securities Exchange Act of 1934.

"Excluded Matters" has the meaning set forth in Section 5.1(g) of this Agreement.

"Exempted Transfer" has the meaning set forth in Section 7.1(a).

"Fair Market Value" means with respect to any property, the price at which such property is likely to be sold in an arm's length transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and neither of which is an Affiliate of the other, based on the then-prevailing market conditions. The determination of Fair Market Value shall be made by the Person or Persons specified in the applicable provisions of this Agreement requiring such determination or, if not so specified, shall be made in good faith by the Board.

"Fiscal Year" means the fiscal year of the Company ending on the Saturday closest to December 31 (whether such Saturday occurs in the month of December or January) or such other date as shall be fixed from time to time by resolution of the Board of Directors. To the extent any computation or other provision hereof provides for an action to be taken on a Fiscal Year basis, an appropriate proration or other adjustment shall be made in respect of the initial and final Fiscal Years to reflect that such periods are less than full calendar year periods.

"FRG" means Franchise Group, Inc., a Delaware corporation and indirectly wholly-owned subsidiary of the Company.

"Full Allotment" has the meaning set forth in Section 2.4(a)(ii) of this Agreement.

70677823.1

"Holdco Credit Agreement" means that certain Credit Agreement, dated as of August 21, 2023, among Freedom VCM Interco, Inc. as Holdings, Freedom VCM Inc., as Borrower, each lender from time to time party thereto, and Alter Domus (US) LLC as administrative agent and collateral agent (as amended by that certain First Amendment to Credit Agreement, dated as of December 18, 2023, by and among Holdings, the Borrower, each lender party thereto, and Alter Domus (US) LLC, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"Imputed Tax Underpayment" has the meaning set forth in Section 12.2(c) of this Agreement.

"Incapacity Trigger Event" means a BR Incapacity Trigger Event, AL Incapacity Trigger Event or a BK Incapacity Trigger Event, as applicable.

"Incentive Units" means Class B Units that have been granted and issued by the Company to a Class B Member pursuant to an Award Agreement, incentive plan and/or other agreement approved by the Board.

"Indebtedness" has the meaning set forth in Section 6.4(h) of this Agreement.

"Initial Capital Contributions" means those capital contributions required pursuant to Section 3.1 of this Agreement.

"IPO" means an initial listing event, including by way of an initial public offering in a firm commitment underwriting, a direct listing or a de-SPAC transaction, of the Company or any Subsidiary, in each case, where such equity securities are subsequently primarily traded on the NASDAQ Stock market, the New York Stock Exchange or another comparable exchange or marketplace approved by the Board.

"IPO Issuer" means the Company or a successor to the Company that is an Affiliate of the Company or a Subsidiary of the Company or any of the Company's Affiliates and which will be the issuer in an IPO.

"IRS Adjustment" has the meaning set forth in Section 12.2(c) of this Agreement.

"Issuance Notice" has the meaning set forth in Section 2.4(a) of this Agreement.

"Law" means any applicable federal, state, provincial, municipal, local or foreign statute, law, treaty, ordinance, regulation, rule, code, order or rule of common law.

"Majority Affected Members" shall mean, with respect to any amendment or modification pursuant to Section 11.3, the applicable Members that own a majority of the Units (excluding for this purpose any Unvested Incentive Units) owned by all Members whose rights, benefits or obligations are so affected by such amendment or modification.

"Member Nonrecourse Debt" has the meaning assigned to the term "*partner nonrecourse debt*" in Treasury Regulation Section 1.704-2(b)(4).

70677823.1

"<u>Member Nonrecourse Debt Minimum Gain</u>" has the meaning assigned to the term "*partner nonrecourse debt minimum gain*" set forth in Treasury Regulation Section 1.704-2(i)(2).

"<u>Member Nonrecourse Deduction</u>" has the meaning assigned to the term "*partner nonrecourse deduction*" in Treasury Regulation Section 1.704-2(i)(1).

"<u>Members</u>" means any Person (a) executing this Agreement as of the Effective Date, (b) that executes an Award Agreement and agrees to be bound by this Agreement or (c) is hereafter admitted to the Company as a member as provided in this Agreement; <u>provided</u> that the term Member shall not include any Person who has ceased to be a Member in the Company as provided in this Agreement or who no longer holds any Units.

"<u>Membership Interest</u>" means the interest of a Member, in its capacity as such, in the Company, including rights to distributions (liquidating or otherwise), allocations, information, all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement or otherwise) in its capacity as a Member; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in its capacity as a Member.

"<u>Merger Agreement</u>" means that Agreement and Plan of Merger, dated as of May 10, 2023, among Franchise Group, Inc., a Delaware corporation, Parent, and FRG.

"<u>Minimum Gain</u>" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(d).

"<u>Net Loss</u>" means, for each Fiscal Year or other period, the excess of the Company's Loss over Profit.

"<u>Net Profit</u>" means, for each Fiscal Year or other period, the excess of the Company's Profit over Loss.

"<u>Non-Dragging Member</u>" has the meaning set forth in <u>Section 7.3(a)</u> of this Agreement.

"<u>Nonrecourse Deduction</u>" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(b)(1).

"<u>OFAC</u>" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"<u>OFAC List</u>" means any list of prohibited countries, individuals, organizations and entities that is administered or maintained by OFAC, including:  (i) Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001) issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), any related enabling legislation or any other similar executive orders, (ii) the List of Specially Designated Nationals and Blocked Persons maintained by OFAC, or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation or (iii) a "Designated National" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515.

70677823.1

"Officers" has the meaning set forth in Section 5.7 of this Agreement.

"Parent" means Freedom VCM, Inc., a Delaware corporation and indirect wholly-owned subsidiary of the Company.

"Permitted Holders" has the meaning set forth in the Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, among FRG, Valor Acquisition, LLC, Franchise Group Newco Intermediate AF, LLC, Franchise Group Newco PSP, LLC, W.S. Badcock Corporation, certain other subsidiaries of FRG party thereto from time to time, as borrowers and guarantors, the lenders party thereto from time to time and JP Morgan Chase Bank, N.A., in its capacities as administrative agent and collateral agent, as in effect on the date hereof.

"Permitted Transferee" means (x) with respect to each Member that is not an individual, any Affiliate of the Transferring Member; (y) with respect to each Member who is an individual, (i) his or her spouse and his or her lineal descendants (including children by adoption and stepchildren), (ii) any trust or custodianship, the beneficiaries of which include only such Member or the Persons described in the immediate foregoing clause (i), (iii) any limited liability company or partnership (A) with respect to which all of the outstanding equity interests are beneficially owned solely by such Member or his or her spouse and his or her lineal descendants (including children by adoption and step children) or any trust described in the immediate foregoing clause (ii) and (B) with respect to which such Member or the Persons described in the foregoing clause (i) is/are the sole or all of the manager(s) or managing member(s) (if a limited liability company) or the sole or all of the general partner(s) (if a limited partnership) and otherwise has/have the sole power to direct or cause the direction of the management and policies, directly or indirectly, of such limited liability company or partnership, whether through the ownership of voting securities, by contract or otherwise, and (iv) upon the death of such Member, his or her executors, administrators, testamentary trustees, legatees or beneficiaries or (z) with respect to the BR Member or an Affiliate thereof, the BK Member or with respect to the BK Member or an Affiliate thereof, the BR Member.

"Person" means an individual, corporation, partnership, limited liability company, trust, estate, unincorporated organization, association or other legally recognized entity.

"Preemptive Rights Exercise Notice" has the meaning set forth in Section 2.4(b) of this Agreement.

"Preemptive Rights Member" has the meaning set forth in Section 2.4 of this Agreement.

"Prime Rate" shall mean the rate from time to time published in the "Money Rates" section of The Wall Street Journal as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the average of such rates).

"Proceeding" has the meaning set forth in Section 5.9(b) of this Agreement.

"Profits" or "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required

to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(f)    In the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(g)    In the event the Book Liability Value of any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) is adjusted as required by this Agreement, the amount of such adjustment shall be treated as an item of loss (if the adjustment increases the Book Liability Value of such liability of the Company) or an item of gain (if the adjustment decreases the Book Liability Value of such liability of the Company) and shall be taken into account for purposes of computing Profits or Losses;

(h)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(i)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(j)    To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704- 1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(k)    Any items that are allocated pursuant to the Regulatory Allocations or the Curative Allocations shall not be taken into account in computing Profits and Losses.

"Proposed Securities" has the meaning set forth in Section 2.4(a)(i) of this Agreement.

"PTP Units" has the meaning set forth in Section 12.4 of this Agreement.

70677823.1

"Regulatory Allocations" means those provisions set forth in Section 4.4 of this Agreement.

"Related Party Transaction" shall mean transactions between the BK Member, AL Member, the BR Member or any of their respective Affiliates (other than the Company or any Subsidiary thereof), on the one hand, and the Company or any Subsidiary thereof, on the other hand, other than transactions (i) contemplated by this Agreement or any agreements or instruments executed in connection therewith or pursuant to the terms thereof or (ii) in respect of issuances of Proposed Securities that are subject to (or exempt from the application of) the terms set forth in Section 2.4 hereof and, if so subject, issued in accordance with the terms and conditions thereof.

"Representative" means (a) with respect to any Member, such Member's attorneys, accountants, tax advisors, consultants, financial advisors and other professionals but only to the extent necessary to provide services to such Member for purposes that are not competitive with the Company's business and (b) the Members together with their attorneys, accountants, tax advisors and financial advisors.

"ROFO Election Period" has the meaning set forth in Section 7.1(d)(ii) of this Agreement.

"ROFO Transfer Notice" has the meaning set forth in Section 7.1(d)(i) of this Agreement.

"ROFO Units" has the meaning set forth in Section 7.1(d)(i) of this Agreement.

"Rollover Agreement" means (a) the Rollover Contribution Agreement, dated as of May 10, 2023, by and among the Company, the Vintage Members, and Andrew Laurence and (b) any other Rollover Agreement entered into in accordance with the terms of the Merger Agreement.

"Safe Harbor Election" has the meaning set forth in Section 2.2(c) of this Agreement.

"Securities Act" means the Securities Act of 1933.

"Selling Significant Member" has the meaning set forth in Section 7.2(a) of this Agreement.

"Significant Member" means each Member, collectively with its Affiliates, that (a) owns at least ten percent (10%) of the outstanding Units (which for purposes of this definition shall exclude any and all Compensatory Units) or (b) in each case subject to any applicable terms and conditions, is designated as such by the Company.

"SRO" means a self-regulatory organization.

"Subject Units" has the meaning set forth in Section 7.3(a) of this Agreement.

"Subscription Agreements" means (a) the Subscription Agreement, dated as of the Effective Date, by and among the Company and the BR Member, and (b) any and all subscription agreements entered into by and between the Company and a subscriber of its Equity Securities.

"Subsequent Meeting" has the meaning set forth in Section 5.2 of this Agreement.

70677823.1

"Subsidiary" and "Subsidiaries" has the meaning set forth in Section 1.5 of this Agreement.

"Tag-Along Participation Notice" has the meaning set forth in Section 7.2(b) of this Agreement.

"Tag-Along Sale" has the meaning set forth in Section 7.2(a) of this Agreement.

"Tag-Along Sale Percentage" has the meaning set forth in Section 7.2(a) of this Agreement.

"Tag-Along Sellers" has the meaning set forth in Section 7.2(b) of this Agreement.

"Tag-Along Transferee" has the meaning set forth in Section 7.2(a) of this Agreement.

"Tag-Along Units" has the meaning set forth in Section 7.2(a) of this Agreement.

"Tagging Members" has the meaning set forth in Section 7.2(b) of this Agreement.

"Tax Distribution" has the meaning set forth in Section 4.1(c) of this Agreement.

"Tax Matters Member" has the meaning set forth in Section 12.2 of this Agreement.

"Threshold Amount" has the meaning set forth in Section 2.2(b) of this Agreement.

"Transfer" means any sale, pledge, hypothecation, assignment, encumbrance or other transfer or disposition of any obligation, right or interest to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of Law, pursuant to judicial process or otherwise, and "Transferred", "Transferring" and "Transferee" each have a correlative meaning. Notwithstanding the foregoing, a Transfer shall not include a sale, pledge, hypothecation, assignment, encumbrance or other transfer or disposition of any obligation, right or interest to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of Law, pursuant to judicial process or otherwise of equity interests in any publicly traded company or any Member or direct or indirect parent company thereof so long as such Member or direct or indirect parent company thereof has at least fifty percent of the fair market value of the assets thereof that are not Units or other interests in the Company and such transaction is not being undertaken or effected with the intent to circumvent the terms set forth in this Agreement.

"Transfer Notice" has the meaning set forth in Section 7.2(a) of this Agreement.

"Treasury Regulations" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code.

"Unit" has the meaning set forth in Section 2.1(a) of this Agreement.

"Unreturned Capital Contributions" means:

(a)    with respect to each Class A Member, at any time of determination, an amount equal to (i) the aggregate amount of such Member's Capital Contributions made on or prior to such date of determination, *minus* (ii) the amount of distributions received by such Member (or its

A-11

70677823.1

predecessors in interest) under <u>Section 4.1</u> (other than Tax Distributions pursuant to <u>Section 4.1(c)</u>), in each case in respect of the Class A Units held thereby; and

(b)     with respect to each other Member, at any time of determination, an amount equal to (i) the aggregate amount of such Member's Capital Contributions, if any, made on or prior to such date of determination, *minus* (ii) the amount of distributions received by such Member (or its predecessors in interest) under <u>Section 4.1</u> (other than Tax Distributions pursuant to <u>Section 4.1(c)</u>), in each case in respect of the Units (other than Class A Units or Class B Units) held thereby.

"<u>Unvested Incentive Unit</u>" means, as of any date of determination, each Class B Unit or Compensatory Unit that, as of such date, (a) has not been forfeited to the Company pursuant to the terms of such Award Agreement and (b) has not "vested" under the terms of such Award Agreement.

"<u>Vested Incentive Unit</u>" means, as of any date of determination, each Class B Unit or Compensatory Unit that has been granted and issued by the Company to an Member pursuant to an Award Agreement and which (a) has not been forfeited to the Company pursuant to the terms of such Award Agreement and (b) is, as of such date, "vested" under the terms of such Award Agreement.

"<u>Vintage Members</u>" means the BK Member, Vintage Opportunity Partners, L.P., and Brian Kahn and Lauren Kahn Joint Tenants by Entirety.

"<u>Voting Units</u>" means all Class A Units and all other classes of Units designated as "Voting Units" by the Board; <u>provided</u>, that the Class B Units shall not be Voting Units.

"<u>Withholding Payment</u>" has the meaning set forth in <u>Section 4.2(b)</u> of this Agreement.

## OTHER DEFINITIONAL PROVISIONS

A.     Any reference to any particular Code section or any other Law will be interpreted to include any revision of, amendment, supplement or, successor to that section or Law regardless of how it is numbered or classified, unless the context otherwise requires and any rules and regulations promulgated thereunder.

B.     All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. The table of contents and the titles appearing at the beginning of any Articles, Sections, subsections or other subdivisions of this Agreement and the Exhibits are for convenience only, do not constitute any part of this Agreement or such Exhibit, and will be disregarded in construing the language hereof.

C.     Exhibits and Schedules to this Agreement are incorporated herein for all purposes.

D.     The words "this Agreement", "herein", "hereby", "hereunder" and "hereof", and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The words "this Article", "this Section" and "this subsection",

70677823.1

and words of similar import, refer only to the Article, Section or subsection hereof in which such words occur.

E.    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

F.    Pronouns in masculine, feminine or neuter genders will be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.

G.    When calculating the period of time before which, within which or following which, any act is to be done or step taken under this Agreement, the date that is the reference date in calculating such period will be included.

H.    If the last day of a period measured hereunder is a non-Business Day, the period in question will end on the next succeeding Business Day.

I.    The words "include", "including" and "or" shall mean without limitation by reason of enumeration.

J.    All references to days or months will be deemed references to calendar days or months unless otherwise expressly specified.

70677823.1

## EXHIBIT B

## REGISTRATION RIGHTS TERM SHEET

*Registrable Securities:*

All Class A Units will be deemed "<u>Registrable Securities</u>."

*Demand Registration:*

Upon six (6) months following an IPO, each of the BK Member and the BR Member (each, a "<u>Demand Party</u>") shall be entitled to two (2) demand registrations (whether or not underwritten, with the managing underwriter, if any, to be chosen by the Company, which managing underwriter shall be reasonably acceptable to the Demand Party initiating such demand registration (the "<u>Demanding Holder</u>")); *provided that* the Company shall only be required to effect one (1) demand registration made by either Demand Party in any 12-month period. The aggregate offering price for the Registrable Securities to be offered by the Demanding Holder and (to the extent the other Demand Party exercises its piggyback registration rights with respect thereto) the other Demand Party for any such demand registration may not be less than $25 million. The Demanding Holder shall, subject to the proviso below (to the extent the other Demand Party exercises its piggyback registration rights with respect thereto), have first priority to register and to sell all of the securities that such Demanding Holder requested to be registered and/or sold pursuant to any of its demand rights before the Company or any Significant Member (exercising its piggyback rights) shall be entitled to participate in any such demand registration or sales pursuant to such demand registration; *provided that* the other Demand Party shall, to the extent it exercises its piggyback registration rights with respect thereto, be entitled to participate on a pro rata basis with such Demanding Holder based on their relative percentage interests in the Company.

*Shelf Registration:*

The Company shall file (but in no event earlier than six (6) months following an IPO) within sixty (60) days following any request of a Demand Party, and shall use its reasonable efforts to have declared effective by the SEC as soon as practicable, a shelf registration statement relating to the offer and sale of all Registrable Securities then held by the Demand Parties (or their respective affiliates and successors) to the public, from time to time, on a delayed or continuous basis on Form S-1 or (if and when available) Form S-3 ("<u>Shelf Registration Statement</u>"). Subject to the limitations above with respect to the number of demand registrations available to the Demand Parties (against which any demand for an underwritten offering under the Shelf Registration Statement shall count), the Company shall be required to effect an underwritten public offering (with the managing underwriter to be chosen by the Company, which managing underwriter shall be

70677823.1

reasonably acceptable to the Demanding Holder) pursuant to a Shelf Registration Statement if the Demanding Holder requests, or the Demand Parties collectively request, to sell not less than $25 million of Registrable Securities.

*Piggyback Registration:*    Each of the BK Member and the BR Member and each Significant Member (collectively, "Participating Members") will be entitled to "piggyback" registration rights on all registration statements of the Company, subject to the right, however, of the managing underwriter(s) to reduce the number of shares proposed to be registered on a pro rata basis among such holders (subject to the provisos set forth below) based on market conditions and to complete reduction on an IPO in the managing underwriter(s)' sole discretion; provided that, the party who initiated such offering (whether the Company, a Demand Party or another person entitled to registration rights) (the "Initiating Party") shall have first priority to register and sell all of such securities that such Initiating Party requested to be sold (and provided further that if the Initiating Party is a Demanding Holder, then the other Demand Party shall be entitled to participate on a pro rata basis with such Demanding Holder based on their relative percentage interests in the Company); and provided further that, in all events, the Registrable Securities to be registered by the BK Member and the BR Member will be reduced only after all Significant Members' shares are reduced.

*Expenses:*    The registration expenses (exclusive of transfer taxes, underwriting discounts and commissions) will be borne by the Company. The Company will also pay the reasonable fees and expenses of one special counsel to represent all the Participating Members.

*Lock-up:*    All Participating Members shall agree in connection with the IPO, if requested by the managing underwriter, not to sell or transfer any Registrable Securities held immediately before the effective date of the IPO for a period of up to 180 days following the IPO (provided all directors and officers of the Company agree to the same lock-up). Such lock-up agreement shall provide that any discretionary waiver or termination of the restrictions of such agreements by the Company or representatives of the underwriters shall apply to all Participating Members, pro rata, based on the number of Registrable Securities held.

**<u>Schedule 1</u>**

[On File with the Company]