**<u>Exhibit A</u>**

**New Organizational Documents**

This **<u>Exhibit A</u>** includes the following New Organizational Documents of the Reorganized Debtors:

| | |
|---|---|
| Exhibit A(iii): | Amended and Restated Limited Liability Company Agreement of New TopCo |
| Exhibit A(iv): | Amended and Restated Limited Liability Company Agreement of Fusion Intermediate, LLC |
| Exhibit A(v): | Amended and Restated Limited Liability Company Agreement of Fusion Buyer, LLC |
| Exhibit A(vi): | Amended and Restated Limited Liability Company Agreement of PSP Group, LLC |

Certain documents, or portions thereof, contained in this **<u>Exhibit A</u>** and the Plan Supplement remain subject to continuing review and discussions among the Debtors, the Ad Hoc Group, and the Freedom Lender Group consistent with their respective consent and consultation rights. The rights of the Debtors are expressly reserved, subject to the terms and conditions set forth in the Plan (including all applicable consultation, consent, and/or approval rights contained or contemplated therein), to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Global Settlement and the Plan, or by order of the Bankruptcy Court.

## <u>Exhibit A (iii)</u>

**Amended and Restated Limited
Liability Company Agreement of New TopCo**

**FUSION PARENT, LLC**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**TABLE OF CONTENTS**

Page

**ARTICLE 1 DEFINITIONS AND RULES OF CONSTRUCTION**...........................................1

    1.1    Certain Definitions.................................................................................2
    1.2    Rules of Construction ..........................................................................14

**ARTICLE 2 GENERAL** ..........................................................................................15

    2.1    Limited Liability Company Agreement................................................15
    2.2    Name....................................................................................................15
    2.3    Term.....................................................................................................15
    2.4    Business Offices...................................................................................15
    2.5    Registered Office and Agent................................................................15
    2.6    Qualification in Other Jurisdictions.....................................................15
    2.7    No State-Law Partnership....................................................................16

**ARTICLE 3 PURPOSE OF THE BUSINESS** ........................................................16

**ARTICLE 4 MEMBERS; MEETINGS**..................................................................16

    4.1    Members ..............................................................................................16
    4.2    Substituted Members and Additional Members ...................................17
    4.3    Member Meetings ................................................................................18
    4.4    Authority of the Members....................................................................20
    4.5    Limitation on Liability.........................................................................21
    4.6    AI Questionnaire..................................................................................21
    4.7    Beneficial Ownership Reporting..........................................................21

**ARTICLE 5 CAPITAL STRUCTURE**...................................................................23

    5.1    Units....................................................................................................23
    5.2    Issuance of Units.................................................................................23
    5.3    Certificated Units................................................................................25
    5.4    Voting Rights.......................................................................................25
    5.5    Record.................................................................................................25
    5.6    No Appraisal Rights.............................................................................26
    5.7    Lost, Destroyed or Mutilated Certificates............................................26
    5.8    Creditor Relationships.........................................................................26

**ARTICLE 6 MANAGEMENT; OPERATION OF THE COMPANY BUSINESS** .............26

    6.1    Management of the Company................................................................26
    6.2    Board...................................................................................................27
    6.3    Regular Meetings ................................................................................30
    6.4    Special Meetings.................................................................................30

6.5     Place of Meetings ................................................................................30
6.6     Notice of Meetings ..............................................................................30
6.7     Meetings by Remote Communication ................................................30
6.8     Quorum; Acts of Managers .................................................................30
6.9     Organization, Agenda and Procedures ...............................................31
6.10    Waiver of Notice .................................................................................31
6.11    Managers' Action By Written Consent ...............................................31
6.12    Removal ...............................................................................................31
6.13    Resignation ..........................................................................................33
6.14    Vacancies .............................................................................................33
6.15    Committees ..........................................................................................34
6.16    Compensation of Managers .................................................................34
6.17    Subsidiary Governing Bodies ..............................................................34
6.18    Affiliate Transactions ..........................................................................35
6.19    Required Approval of Board and Majority Members for Certain Actions ...........35

**ARTICLE 7 OFFICERS; POWERS OF OFFICERS ................................................35**

7.1     Election and Tenure .............................................................................35
7.2     Resignation, Removal and Vacancies .................................................36
7.3     Chairperson .........................................................................................36
7.4     Chief Executive Officer .......................................................................36
7.5     Chief Financial Officer ........................................................................36
7.6     Chief Operating Officer .......................................................................36
7.7     Vice Presidents ....................................................................................36
7.8     Secretary ..............................................................................................37
7.9     Treasurer ..............................................................................................37
7.10    Assistant Secretaries and Assistant Treasurers ..................................37
7.11    Salaries ................................................................................................37
7.12    Borrowing ............................................................................................37
7.13    Checks and Endorsements ...................................................................38
7.14    Deposits ...............................................................................................38
7.15    Proxies .................................................................................................38

**ARTICLE 8 EXCULPATION AND INDEMNIFICATION ...................................38**

8.1     Exculpation ..........................................................................................38
8.2     Indemnification ...................................................................................39
8.3     No Member Liability ...........................................................................41
8.4     Settlements ..........................................................................................41
8.5     Business Opportunities; Fiduciary Duties ..........................................41
8.6     Subrogation ..........................................................................................44
8.7     Insurance ..............................................................................................45
8.8     Amendments ........................................................................................45

**ARTICLE 9 TRANSFERS**................................................................................**45**

    9.1    Restrictions on Transfers ...................................................................45
    9.2    Transfer Agents; Regulations ............................................................51
    9.3    Drag-Along Transactions...................................................................51
    9.4    Tag-Along Transactions.....................................................................57
    9.5    Appointment of Purchaser Representative.........................................61
    9.6    Preemptive Rights .............................................................................61

**ARTICLE 10 FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS**...................**63**

    10.1    Fiscal Year ........................................................................................63
    10.2    Books and Records ...........................................................................64
    10.3    Tax Election ......................................................................................64
    10.4    Required Records ..............................................................................64
    10.5    Audits of Books and Accounts .........................................................64

**ARTICLE 11 DISTRIBUTIONS**.....................................................................**64**

    11.1    Distributions......................................................................................64
    11.2    Limitations on Distributions .............................................................66
    11.3    No Other Distributions......................................................................66
    11.4    Withholding Tax ...............................................................................66

**ARTICLE 12 WITHDRAWALS; ACTION FOR PARTITION** .............................**67**

    12.1    Waiver of Partition............................................................................67
    12.2    Covenant Not to Withdraw or Dissolve ...........................................67

**ARTICLE 13 DISSOLUTION AND LIQUIDATION** .........................................**67**

    13.1    Events Causing Dissolution ..............................................................67
    13.2    Liquidation and Winding Up .............................................................68

**ARTICLE 14 AMENDMENTS** .......................................................................**68**

    14.1    Amendments .....................................................................................68

**ARTICLE 15 INFORMATION RIGHTS** .........................................................**70**

    15.1    Information Rights.............................................................................70
    15.2    Delivery of Information ....................................................................71
    15.3    Quarterly Teleconference..................................................................71
    15.4    Board Information..............................................................................72
    15.5    Termination of Information Rights....................................................72

**ARTICLE 16 REPRESENTATIONS AND WARRANTIES OF THE MEMBERS ...........72**

16.1    Representations and Warranties of the Members ................................72
16.2    Survival of Representations and Warranties ................................75

**ARTICLE 17 MISCELLANEOUS ................................................75**

17.1    Entire Agreement ................................................75
17.2    Counterparts ................................................75
17.3    Severability ................................................75
17.4    Successors and Assigns ................................................75
17.5    Notices ................................................75
17.6    Headings ................................................76
17.7    **GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL**................................76
17.8    No Third-Party Beneficiaries ................................................76
17.9    Binding Effect ................................................76
17.10   Additional Actions and Documents ................................................77
17.11   Injunctive Relief ................................................77
17.12   Assignment ................................................77
17.13   Redaction ................................................77
17.14   Spousal Consent ................................................78
17.15   Financial Crimes Matters ................................................78
17.16   Termination ................................................78

**ARTICLE 18 CONFIDENTIALITY ................................................78**

18.1    Confidentiality ................................................78
18.2    Permitted Disclosure of Confidential Information ................................79

**ARTICLE 19 IPO ................................................80**

19.1    IPO Approval ................................................80
19.2    Required Actions ................................................81
19.3    Registration Rights Agreement ................................................81

SCHEDULES AND EXHIBITS

| Schedule A | Specified Members |
|---|---|
| Schedule B | Actions Requiring Approval of the Board and the Majority Members |
| Schedule C | Initial Officers |

| Exhibit A | Form of AI Questionnaire |
|---|---|

| Exhibit B | Form of Joinder Agreement |
|-----------|---------------------------|
| Exhibit C | Form of Transferee Confidentiality Agreement |

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**FUSION PARENT, LLC**

This **AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (as amended, supplemented, amended and restated or otherwise modified from time to time, together with all schedules, exhibits and annexes hereto, this "Agreement") of Fusion Parent, LLC (the "Company"), is made as of June [6], 2025 (the "Effective Date"), by and among (a) the Company and (b) each of the members of the Company from time to time (each, a "Member" and, collectively, the "Members").

**WHEREAS**, on May 28, 2025, the Company was formed under the name "Franchise Group Parent, LLC" as a Delaware limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101, *et seq*. (as amended from time to time, the "Act"), by filing with the Secretary of State of the State of Delaware a Certificate of Formation of the Company (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Certificate of Formation");

**WHEREAS**, on May 28, 2025, the sole member of the Company, Bradley Scher (the "Initial Member"), entered into a Limited Liability Company Agreement of the Company dated as of May 28, 2025 (as amended, supplemented, amended and restated or otherwise modified prior to the Effective Date, together with all schedules, exhibits and annexes thereto, the "Initial LLC Agreement");

**WHEREAS**, on May 29, 2025, the Company filed a Certificate of Amendment to the then-existing Certificate of Formation to change its name to "Fusion Parent, LLC"; and

**WHEREAS**, on the Effective Date, the Plan of Reorganization (as defined below) became effective and, pursuant thereto, or as contemplated thereby, (a) Fusion Buyer, LLC, a Delaware limited liability company, purchased 100% of the Equity Interests of Franchise Group New HoldCo, LLC from Franchise Group, Inc. ("FRG") in exchange for (among other things) 100% of the common limited liability company interests of the Company (the "Existing Common Units"), (b) FRG distributed the Existing Common Units to the recipients thereof as set forth in, or as contemplated by, the Plan of Reorganization, (c) the Initial LLC Agreement was amended and restated in its entirety as set forth in, and replaced by, this Agreement, (d) each of the Persons that received Existing Common Units became a party to this Agreement as a "Member" hereunder, became fully bound by, and subject to, all of the covenants, terms, conditions and provisions of this Agreement as a "Member" party hereto, and is deemed to have signed this Agreement, and (e) the Initial Member withdrew as a member of the Company.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual covenants and other obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**ARTICLE 1**
**DEFINITIONS AND RULES OF CONSTRUCTION**

    1.1    <u>Certain Definitions</u>.  As used herein:

"<u>Accredited Investor</u>" means an "accredited investor" as such term is defined in Rule 501 under the Securities Act.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include (a) any Related Fund of such Person and (b) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "<u>control</u>" (including, with its correlative meanings, "<u>controlling</u>," "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

"<u>AI Questionnaire</u>" means an Accredited Investor Questionnaire in the form of <u>Exhibit A</u> attached hereto.

"<u>Anti-Corruption Laws</u>" means the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act of 2010, and any other bribery, fraud, kickback or other similar applicable laws or regulations of any Governmental Authority in any jurisdiction in which the Company or any of its Subsidiaries is located or doing business.

"<u>Anti-Money Laundering Laws</u>" means applicable laws or regulations of any Governmental Authority that relate to money laundering, counter-terrorist financing, or record keeping and reporting requirements in any jurisdiction in which the Company or any of its Subsidiaries is located or doing business.

"<u>Award Agreement</u>" means any agreement, contract or other instrument or document evidencing or governing an award issued under any Management Incentive Plan, including any award consisting of Class B Units or any award that is convertible, exercisable or exchangeable for or into, or which provides for the delivery of, Class B Units.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Board Information</u>" means final drafts of materials (including minutes of Meetings and written consents in lieu of Meetings) and other information given to Managers or members of any committee of the Board, excluding any materials or information provided to Members pursuant to <u>Section 15.1</u> or <u>Section 15.3</u>.

"<u>BOI Laws</u>" means the Corporate Transparency Act, 31 U.S.C. § 5336, and all rules, regulations and guidance promulgated thereunder or in connection therewith, and any beneficial ownership reporting law, rule, regulation or guidance of any state or other applicable jurisdiction, as each may be amended, supplemented, updated or replaced from time to time.

"<u>Business Day</u>" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in the City of New York are authorized or obligated by law to close.

"Chairperson" means, as of any time of determination, the chairperson of the Board as of such time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competitor" means, as of any time of determination, (a) any Person that is identified by name on the Restricted List as of such time of determination, which may include one or more Investment Funds, (b) any Person that is engaged in competition with the Company or any of its Subsidiaries as of such time, as reasonably determined by the Board, and (c) any Person that is an Affiliate of any Person referred to in clause (a) or clause (b) that is reasonably identifiable as an Affiliate of any such Person on the basis of such Affiliate's name; provided, that, (x) solely with respect to clause (a), a Competitor shall not include (i) any Person that is a Member at the time the Board determines to identify such Person on the Restricted List or (ii) any Affiliate of any Person described in clause (x)(i), which Affiliate is an Investment Fund or any Entity that is formed by an Investment Fund and whose only assets are or will be (after giving effect to any proposed or contemplated transfer or assignment of Units or other securities or indebtedness of the Company or any of its Subsidiaries), directly or indirectly, Units or other securities or indebtedness of the Company or any of its Subsidiaries, and (y) solely with respect to clause (b), a Competitor shall not include (i) any Investment Fund or (ii) any Entity that is formed by an Investment Fund and whose only assets are or will be (after giving effect to any proposed or contemplated transfer or assignment of Units or other securities or indebtedness of the Company or any of its Subsidiaries), directly or indirectly, Units or other securities or indebtedness of the Company or any of its Subsidiaries (it being understood that a Person described in clause (y)(i) or clause (y)(ii) may be a Competitor under clause (a) or clause (c)).

"Covered Person" means (a) any Member, (b) any Affiliate of a Member, (c) any Person serving or having served as a Manager or a member of any committee of the Board, (d) any Person serving or having served as an officer of the Company, and (e) any Person who is or was a partner, shareholder, member, officer, director, manager, fund adviser, investment adviser, investment manager, controlling person, employee, consultant, counsel, representative or agent of a Member or any Affiliate of a Member (other than the Company or any of its Subsidiaries), in each of the foregoing cases, in any such Person's capacity as such.

"Designating Group" means any of the following groups of Members:  (a) the HG Vora Members and (b) any group of Members that are Affiliates of one another (and such group may comprise of a single Member) that acquires a Designation Right pursuant to Section 6.2(b)(ii); provided, that any group of Members described in clause (a) or clause (b) of this definition will cease to be a "Designating Group" once the Members in such group do not have a Designation Right.

"Designating Members" means, as of any time of determination, the Members that are included in any Designating Group as of such time; and "Designating Member" means any one of the Designating Members.

"Designation Right" means the right of any Member(s) to designate any Managers pursuant to Section 6.2(b)(i) or Section 6.2(b)(ii), as applicable.

"Distribution" means any distribution by the Company to any Member (in its capacity as such), including distributions payable in cash, property or securities and including by means of distribution, redemption, repurchase or liquidation, except that none of the following shall be a Distribution: (a) any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of all outstanding Units of any class or series, and (b) any repurchases by the Company of Units from a Management Holder following termination of his or her employment with the Company or any of its Subsidiaries or termination of his or her service as a Manager or any member of any Subsidiary Governing Body.

"Entity" means any corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, estate, association, trust, unincorporated organization or association, business trust, tenancy in common or other legal entity.

"Equity Interests" means, with respect to any Person, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, membership, beneficial or profits interests of such Person (however designated).

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time.

"Excepted Transaction" means (a) any transaction or agreement entered into, consummated or effected on the Effective Date pursuant to the Plan of Reorganization and (b) any transaction expressly permitted or required by this Agreement, including (i) any Distributions pursuant to Article 11 or Article 13, and (ii) issuances of Additional Securities in accordance with Section 9.6.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Issuance" means any issuance of Additional Securities (a) by means of a *pro rata* distribution to all holders of any class or series of Units, (b) pursuant to any Management Incentive Plan or other compensation, incentive or similar plan, agreement or arrangement approved by the Board to managers, officers, employees or consultants of the Company or any of its Subsidiaries in connection with their service as managers or directors of the Company or any of its Subsidiaries, their employment by the Company or any of its Subsidiaries, or their retention by the Company or any of its Subsidiaries in compliance with this Agreement, (c) in a public offering of equity securities of the Company or any of its Subsidiaries or any Reorganized Issuer, (d) pursuant to the conversion, exchange or exercise of any options, warrants or other securities granted after the Effective Date so long as the initial sale, issuance or grant of such options, warrants or other securities complied with the terms of Section 9.6, (e) as consideration for an acquisition (whether by equity sale, merger, recapitalization, asset purchase or otherwise) by the Company or any of its Subsidiaries of another Person (or portion thereof) so long as such Additional Securities are only issued to the counterparty to such acquisition (or to such counterparty's Affiliates) and in no event to any Member or any Affiliate of a Member, (f) in connection with the financing or refinancing of any indebtedness or debt securities of the Company or any of its Subsidiaries (including as an equity kicker in connection therewith) where

such lender or investor is not then a Member or an Affiliate of a Member, (g) in connection with a joint venture, partnership or strategic alliance by the Company or any of its Subsidiaries with another Person so long as such Additional Securities are only issued to such Person (or to such Person's Affiliates) and in no event to any Member or an Affiliate of a Member, or (h) by any Subsidiary of the Company to the Company or to another Subsidiary of the Company.

"Excluded Tag-Along Transfer" means, with respect to any Member, any Transfer of Class A Units made by such Member:  (a) to any Affiliate of such Member, (b) in the case of any Member that is an investment fund, account or other investment vehicle, as an in-kind distribution to its partners, members or accountholders (including any such distribution that is made in connection with a winding up or liquidation of such Member), (c) in the case of any Member that is a nominee, investment manager, advisor or subadvisor for a beneficial owner of Class A Units, to such beneficial owner or to a Person that will serve as a nominee, investment manager, advisor or subadvisor for such beneficial owner with respect to such Class A Units, (d) in connection with a Drag-Along Transaction pursuant to Section 9.3 and such Member is a Dragged Member or a Selling Member, and (e) in connection with a Tag-Along Transaction pursuant to Section 9.4 and such Member is a Tag-Along Seller.

"Fair Market Value" means, with respect to any property or asset, the amount at which a willing buyer would pay to a willing seller for such property or asset in an arms' length transaction, where neither party is under any compulsion to buy or sell, and both such parties are ready, willing and able to engage in such transaction and well informed about such property or asset, as reasonably determined by the Board.

"Family Member" means, with respect to any individual, (a) any Related Person of such individual or (b) any trust, limited partnership, limited liability company or other Entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

"FinCEN" means the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury, or any successor bureau or agency.

"Fiscal Quarter" means each quarterly accounting period as may be established by the Board or as required by the Code.

"GAAP" means generally accepted accounting principles in effect in the United States from time to time consistently applied.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"HG Vora Members" means, collectively, any Affiliates of HG Vora Capital Management, LLC that own or hold Class A Units, so long as any such Affiliate remains an Affiliate of HG Vora Capital Management, LLC.  Any consent, approval, decision (including

any decision as to whether a Person, action or thing is acceptable), determination, designation, identification, direction, specification, request, removal, instruction or other action to be provided, granted, given, made, performed, rendered or otherwise taken by the HG Vora Members pursuant to this Agreement at any time shall be provided, granted, given, made, performed, rendered or otherwise taken by the HG Vora Members that own or hold a majority of the Class A Units owned or held by all of the HG Vora Members at such time.  For the avoidance of doubt, a Person that does not own or hold Class A Units as of any time of determination shall not constitute a HG Vora Member as of such time.

"Holder Managers" means the individuals designated by any Designating Group to serve as a Manager pursuant to the Designation Right of such Designating Group; and each such individual shall be referred to, individually, as a "Holder Manager".

"Independent Manager" means any Manager who is not employed by (a) the Company or any of its Subsidiaries, or (b) any Member or any Affiliate of any Member (in either case) as of the time such Manager is designated or elected to the Board or at any time six (6) months prior to such time.

"Interest" means all or any part of a Member's equity, ownership, membership, profit or other right, title and interest in the Company in such Member's capacity as a Member, including all of such Member's rights in Distributions and all of such Member's rights under this Agreement.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investment Fund" means a *bona fide* investment fund or other investment vehicle, such as a hedge fund, private equity fund, an account, a share trust, an investment trust, an investment company, a pension fund or an insurance company, in each case, the business, operations or assets of which are held for investment purposes and the investments in which are professionally managed.

"IPO" means the first underwritten public offering of the common equity securities of the Company (or any successor or Subsidiary of the Company, including any Reorganized Issuer) following the Effective Date pursuant to an effective registration statement under the Securities Act filed with the SEC that results in such common equity being listed on a national securities exchange (or comparable non-U.S. securities exchange) or quoted on the Nasdaq Stock Market.

"Joinder Agreement" means a Joinder Agreement in the form of Exhibit B attached hereto.

"Liens" means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

"Major Member" means each Member (other than any Member that is a Competitor) that, as of the Effective Date (immediately after giving effect to the consummation of the

Restructuring Transactions to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date), owns or holds (together with its Affiliates) at least five percent (5.0%) of the issued and outstanding Class A Units as of the Effective Date (immediately after giving effect to the consummation of the Restructuring Transactions to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date); provided, however, that any such Member will permanently cease to be a "Major Member" once such Member owns or holds (together with its Affiliates) less than five percent (5.0%) of the issued and outstanding Class A Units at any time after the Effective Date; provided, that if any such Member owns or holds (together with its Affiliates) less than five percent (5.0%) of the issued and outstanding Class A Units at any time after the Effective Date as a result of the sale or issuance of Additional Securities pursuant to Section 9.6(d), then such Member shall not cease to be a Major Member as a result of such sale or issuance unless such Member owns or holds (together with its Affiliates) less than five percent (5.0%) of the issued and outstanding Class A Units after the consummation of the related process of offering and, if applicable, issuing or selling Additional Securities to Preemptive Members pursuant to Section 9.6(d).

"Majority Members" means, as of any time of determination, Members that collectively own or hold greater than fifty percent (50.0%) of the issued and outstanding Class A Units as of such time; provided, that, at any time there are two (2) or more Members that own or hold Class A Units that are not Affiliates of one another, then "Majority Members" shall include at least two (2) Members that own or hold Class A Units that are not Affiliates of one another; provided, further, that, solely for purposes of determining "Majority Members" under Section 13.1(a), the reference to "Class A Units" set forth in the portion of this definition preceding the first proviso in this definition shall be deemed to be a reference to "Class A Units and Class B Units (treated as one class of Units)".

"Management Holders" means (a) members of the Board or any of the Subsidiary Governing Bodies and (b) employees of or consultants to the Company or any of its Subsidiaries, in any such case who are selected by the Board (or any applicable committee thereof) to participate in any Management Incentive Plan.

"Management Incentive Plan" means any management incentive plan established by the Board to provide incentives to Management Holders in the form of Class B Units or other equity or equity-based awards (including options), as may be amended, supplemented, amended and restated or otherwise modified from time to time.

"Manager" means a manager serving on the Board at any given time.

"Permitted Liens" means Liens that are imposed (a) by this Agreement or (b) under applicable securities laws.

"Person" means an individual, an Entity, or a Governmental Authority.

"Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Member that is an individual.

"Plan Asset Regulation" means the regulation issued by the U.S. Department of Labor at 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.

"Plan of Reorganization" means the *Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates*, as confirmed by the Bankruptcy Court on June 2, 2025, and including all exhibits and supplements thereto.

"Regulations" or "Treasury Regulations" means the income tax regulations promulgated under the Code as such regulations may be amended from time to time (including Temporary Regulations).

"Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled, managed or advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, advisor or subadvisor that controls, manages or advises such Person or an Affiliate of such investment manager, advisor or subadvisor.

"Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

"Restricted List" means a schedule or list of disqualified Transferees as determined by the Board, as such schedule or list may be amended, supplemented, updated or modified from time to time by the Board.  Any reference in this Agreement to the Restricted List as of any time of determination shall mean the schedule or list referred to in the immediately preceding sentence that was most recently provided by the Company to the Members that own or hold Class A Units, including by posting any such schedule or list to the website referred to in Section 15.2.

"Restructuring Transactions" has the meaning given to such term in the Plan of Reorganization.

"Sale Transaction" means the sale, lease, transfer, issuance or other disposition, in one transaction or a series of related transactions, of (a) all or substantially all of the consolidated assets of the Company and its Subsidiaries (including by or through the issuance, sale, contribution, transfer or other disposition (including by way of reorganization, merger, share or unit exchange, consolidation or other business combination) of at least a majority of the aggregate voting power of the Voting Securities of any direct and/or indirect Subsidiary or Subsidiaries of the Company if substantially all of the consolidated assets of the Company and its Subsidiaries are held by such Subsidiary or Subsidiaries) or (b) at least a majority of the then-issued and outstanding Class A Units (whether directly or indirectly or by way of any merger, share or unit exchange, recapitalization, sale or contribution of equity, tender offer, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership) to (in either case of clause (a) or clause (b)) any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision).

"Sanctions" means any economic, trade, or financial sanctions laws, regulations, embargoes, restrictive measures or other similar measures enacted, administered, imposed or enforced by any Sanctions Authority.

"Sanctions Authority" means any relevant Governmental Authority in the United States, the United Kingdom, the European Union or its member States, or other relevant jurisdiction, including but not limited to:  the U.S. Treasury Department's Office of Foreign Asset Control (OFAC), the U.S. State Department, the United Nations Security Council, and His Majesty's Treasury.

"Sanctioned Person" means, at any time of determination, any Person that is the target of Sanctions as of such time or owned or controlled, directly or indirectly, by a Person that is the target of Sanctions as of such time.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Specified Members" means, as of any time of determination, Members who are Affiliates of any of the Persons listed on Schedule A attached hereto as of such time.

"Specified Vacancy" means any vacancy on the Board resulting from (a) the resignation or removal of a Holder Manager on account of the termination of the Designation Right pursuant to which such Holder Manager was designated, (b) the resignation or removal of a Holder Manager in connection with the exercise of a Springing Designation Right after the termination of the Designation Right pursuant to which such Holder Manager was designated, or (c) a Holder Manager becoming unable to serve on the Board as a result of death, disability or otherwise after the termination of the Designation Right pursuant to which such Holder Manager was designated.

"Subsidiary" means, as of any time of determination and with respect to any specified Person, any limited liability company, partnership, limited partnership, joint venture, association, or other Entity (a) more than a majority of the aggregate voting power of the Voting Securities of which is, as of such time, directly or indirectly owned by such Person, or (b) in which such Person, directly or indirectly, owns more than fifty percent (50.0%) of the equity economic interest thereof.

"Subsidiary Governing Body" means the board of directors, the board of managers or other governing body (including any committee of any such governing body) of each direct or indirect Subsidiary of the Company.

"Super-Majority Members" means, as of any time of determination, Members that collectively own or hold at least 66-2/3% of the issued and outstanding Class A Units as of such time; provided, that, at any time there are two (2) or more Members that own or hold Class A Units that are not Affiliates of one another, then "Super-Majority Members" shall include at least two (2) Members that own or hold Class A Units that are not Affiliates of one another.

"Tag-Along Transaction" means any transaction or series of related transactions involving a Transfer (excluding any Excluded Tag-Along Transfer) by one or more Members of Class A Units that represent, in the aggregate, fifty percent (50.0%) or more of all of the Class A Units that are issued and outstanding at the time of such transaction (or, in the case of a series of

related transactions, at the time of the first transaction in such series of related transactions) to any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision).

"Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Units (including (x) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien and (y) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Units), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, division, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, any transaction in which a Member lends, borrows or sells with an agreement to repurchase any Units to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges, hypothecates, grants a security interest in, lien on or otherwise encumbers Units in connection with such Member's or any of its Affiliates' financing arrangements, in any such case in the ordinary course of business of such Member, shall not constitute a Transfer of Units for purposes of this Agreement; provided, however, that any foreclosure (including the retention of Units in satisfaction of any obligations) on Units by any such broker, bank or other financial institution in accordance with such margin transactions and financing arrangements shall be deemed a Transfer of Units for purposes of this Agreement.  The terms "Transferee," "Transferring," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Transfer Agent" means any bank, trust company or other Person (including the Company or one of its Affiliates, or any officer of the Company) as shall be appointed from time to time by the Company to act as registrar and transfer agent (or a substantially similar capacity in all material respects acting in accordance with such Person's customary procedures) for the Units or any other Interests.

"United States" or "U.S." means the United States of America.

"Voting Securities" means, with respect to any Person, the Equity Interests of such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

Additional Definitions.  The following terms have the meanings set forth in the Sections set forth below:

| **Defined Term** | **Location** |
| --- | --- |
| "Accelerated Acquiror" | 9.6(d) |
| "Acceptance Notice" | 9.4(b) |
| "Act" | Recitals |

| **Defined Term** | **Location** |
|---|---|
| "Additional Securities" | 9.6(a) |
| "Affiliate Transaction" | 6.18 |
| "Agreement" | Preamble |
| "Assistant Treasurers" | 7.10 |
| "Assistant Secretaries" | 7.10 |
| "BB Act" | 10.5(a) |
| "Board" | 6.1(a) |
| "BOI Reports" | 4.7(a) |
| "CEO Manager" | 6.2(b)(iv) |
| "Certificate of Formation" | Recitals |
| "Chief Executive Officer" | 7.4 |
| "Chief Financial Officer" | 7.5 |
| "Class A Units" | 5.1 |
| "Class B Units" | 5.1 |
| "Company" | Preamble |
| "Company Securities" | 19.3 |
| "Confidential Information" | 18.1 |
| "Confidentiality Period" | 18.1 |
| "control" | Definition of "Affiliate" |
| "Controller" | 7.6 |
| "Conversion Units" | 9.1(a)(ii) |
| "Corporate Conversion" | 19.2 |
| "Counterparty" | 9.8 |
| "Counterparty Excluded Information" | 9.8 |

| **Defined Term** | **Location** |
|---|---|
| "Damages" | 8.2(a) |
| "Designation Notice" | 6.2(d) |
| "Disinterested Member" | 6.2(h) |
| "Drag-Along Transaction" | 9.3(a) |
| "Drag-Along Transaction Documents" | 9.3(b)(iv) |
| "Drag Notice" | 9.3(a) |
| "Dragged Members" | 9.3(a) |
| "Effective Date" | Preamble |
| "e-mail" | 17.5 |
| "Exercising Member" | 6.12(b) |
| "Exercise Notice" | 6.12(b) |
| "Fiscal Year" | 10.1 |
| "flow-through entity" | 16.1(g) |
| "Identified Person" | 8.5(a) |
| "Indebtedness" | 5.8 |
| "Initial LLC Agreement" | Recitals |
| "Initial Member" | Recitals |
| "Initial Units" | 5.2(a) |
| "Initiating Holders" | 9.4(a) |
| "Interested Member" | 6.2(h) |
| "Investment Documents" | 9.3(b)(v) |
| "LLC Interest Cancellation and Withdrawal" | 5.2(a) |
| "Meeting" | 6.20(a) |

| **Defined Term** | **Location** |
|---|---|
| "Member" | Preamble |
| "Member Beneficial Ownership Information" | 4.7(b) |
| "Non-Exercising Member" | 6.12(b) |
| "Opportunity" | 8.5(a) |
| "Other Entity" | 8.2(a) |
| "Preemptive Members" | 9.6(a) |
| "Preemptive Rights Notice" | 9.6(a) |
| "Principal Office" | 2.4 |
| "Pro Rata Portion" | 9.6(a) |
| "Proceeding" | 8.2(a) |
| "PSP Midco" | 6.2(b)(iv) |
| "Quarterly Teleconference" | 15.3 |
| "Register of Members" | 4.1 |
| "Registered Holder" | 19.3 |
| "Related Companies" | 8.5(c) |
| "Reorganized Issuer" | 19.2 |
| "Representatives" | 18.2(a)(i) |
| "Sale Notice" | 9.4(a) |
| "Secretary" | 7.8 |
| "Selling Members" | 9.3(a) |
| "Specified Insurance" | 8.7 |
| "Springing Designation Right" | 6.2(c) |
| "Surviving Entity" | 9.3(b)(v) |

| Defined Term | Location |
|---|---|
| "Tag-Along Sellers" | 9.4(a) |
| "Tag-Along Transaction Documents" | 9.4(c) |
| "Third Party Purchaser" | 9.3(a) |
| "Transfer Notice" | 9.1(c) |
| "Treasurer" | 7.9 |
| "Trigger Date" | 6.2(b)(ii) |
| "Unit Reclassification" | 5.2(a) |
| "Units" | 5.1 |
| "Vice Presidents" | 7.7 |

1.2    Rules of Construction.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    All references in this Agreement to Articles, Sections, clauses, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, Schedules and Exhibits to, or contained in, this Agreement.

(b)    All Exhibits and Schedules attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(d)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(e)    Any reference in this Agreement to Units being owned or held "collectively" by more than one Member and/or other Persons shall not require that such Members and/or other Persons own or hold such Units jointly or otherwise require that all such Members and/or other Persons have ownership interests in, or rights to, all such Units, but rather is intended to describe Units that are owned by all such Members or other Persons in combination with one another.

(f)     Any reference in this Agreement to "$" or "dollars" shall mean United States dollars.

(g)     Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(h)     The words "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

## ARTICLE 2
## GENERAL

2.1     <u>Limited Liability Company Agreement</u>.   The Members agree to continue the Company as a limited liability company under and pursuant to the provisions of the Act, and agree that this Agreement (a) constitutes the "limited liability company agreement" of the Company within the meaning of Section 18-101(9) of the Act, (b) shall be effective as of the Effective Date and (c) shall govern the rights, duties and obligations of the Members and the Managers, except as otherwise expressly required by the Act.

2.2     <u>Name</u>.   The name of the Company shall be, and the business of the Company shall be conducted under the name of, "Fusion Parent, LLC" or under such other name or names as the Board may determine from time to time.

2.3     <u>Term</u>.   The term of the Company commenced on May 28, 2025 and shall continue perpetually until a certificate of cancellation with respect to the Certificate of Formation shall be filed with the Secretary of State of the State of Delaware and become effective, and the Company is dissolved in accordance with <u>Article 13</u>.

2.4     <u>Business Offices</u>.   The location of the principal place of business of the Company shall be 2371 Liberty Way, Virginia Beach, VA 23456, or such other place as the Board may from time to time determine (the "<u>Principal Office</u>").   The Company may have one or more offices at such place or places, either within or outside the State of Delaware, as the Board may from time to time determine or as the business of the Company may require.

2.5     <u>Registered Office and Agent</u>.   The Company's registered agent and registered office in the State of Delaware is Corporation Service Company, located at 251 Little Falls Drive, in the City of Wilmington, County of New Castle, Delaware 19808.   At any time and from time to time, the Board may change the Company's registered agent and registered office in the State of Delaware.

2.6     <u>Qualification in Other Jurisdictions</u>.   The Board shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business and in which such qualification, formation or registration is required or as the Board determines to be desirable.   Any officer or other authorized person of the Company, each as duly authorized by the Board, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the

Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

2.7    <u>No State-Law Partnership</u>.    The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, and that neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise.

<div align="center">

**ARTICLE 3**
**PURPOSE OF THE BUSINESS**

</div>

The purpose and character of the business of the Company shall be to undertake and carry on any lawful business, purpose or activity for which limited liability companies may be formed under the Act, and engaging in any and all activities necessary, advisable, convenient or incidental thereto.

<div align="center">

**ARTICLE 4**
**MEMBERS; MEETINGS**

</div>

4.1    <u>Members</u>.    The name of each Member, its address, contact information, and class or series and number of Units shall be reflected in a register held and maintained by the Transfer Agent (the "<u>Register of Members</u>").  For the avoidance of doubt, the Company may serve as the Transfer Agent with respect to any of the Units or other Interests.  Upon the Effective Date, the Transfer Agent shall maintain the Register of Members.  The Transfer Agent upon the Effective Date shall be Kroll Restructuring Administration (d/b/a Kroll Issuer Services (US)).  The Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to amend and update the Register of Members from time to time to reflect the change(s) in any of the information contained therein (including the withdrawal of one or more Members, the admission of one or more additional Members, forfeitures of Units, Transfers and the issuance of additional Units) only to the extent that the actions resulting in such change(s) were taken pursuant to, and in accordance with, the terms and conditions of this Agreement, and, if applicable, any applicable Management Incentive Plan and Award Agreement, and that any consents of the Members to such actions required hereunder, if any, were obtained.  Any reference in this Agreement to the Register of Members shall be deemed to be a reference to the Register of Members, as amended and updated from time to time.  If the Transfer Agent is any Person other than the Company or one of its Affiliates or officers, and such Transfer Agent will not include any particular information in the Register of Members that the Company deems necessary or desirable to include, then the Company shall maintain a register or other record to reflect such information and shall amend and update such register or other record from time to time to reflect any change in any of the information contained therein to the same extent that the Register of Members would be required to be amended and updated by the Transfer Agent pursuant to this Agreement if such information was set forth therein and the Company served as the Transfer Agent, and any requirement or reference in this Agreement that such information shall be, or is, included or set forth in the Register of Members shall instead be a reference to any such register or other record.

4.2     Substituted Members and Additional Members.

(a)     In connection with a Transfer of Units that is permitted pursuant to, and is effected in compliance with, the applicable terms of this Agreement, the Transferee of the Units subject to such Transfer shall become a substitute Member, effective on the date of such Transfer (which effective date shall not be earlier than the date of compliance with or waiver of the conditions to such Transfer set forth herein), entitled to all of the rights (excluding any rights of a Member that are not assignable or otherwise transferable pursuant to the terms of this Agreement), and subject to all of the obligations and restrictions, of the transferor Member to the extent of the Units so Transferred.  Upon the substitution of a transferee Member, the Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to amend and update the Register of Members to reflect the substitution of such transferee Member.  Any duly substituted Member shall be considered a "Member" for all purposes of this Agreement and the Act. Notwithstanding the requirement that substituted Members execute a Joinder Agreement pursuant to Section 9.1(c), this Agreement shall bind all holders of Units, regardless of whether any such holder executes this Agreement or a Joinder Agreement and by acceptance of Units each holder agrees to be so bound.

(b)     Subject to the provisions of this Agreement (including Section 9.6 hereof), the Board may, from time to time in its sole discretion (and without the requirement of any consent or approval of any Member), admit additional Persons as Members and issue to such Persons Units on such terms and conditions (including the series and class of Units to be issued, the number of Units to be issued and, if applicable, the vesting schedule of such Units and any forfeiture provisions applicable thereto) as the Board shall determine in its sole discretion.  The admission of an additional Member to the Company, and the issuance to such Person by the Company of Units in connection with such admission as a Member, shall be subject to the satisfaction of the following conditions:  (i) such additional Member shall have become a party to this Agreement by executing and delivering to the Company a Joinder Agreement (duly completed) and such other written documentation as the Board may require in connection with such admission and issuance (including an AI Questionnaire and an IRS Form W-9 or appropriate IRS Form W-8, as applicable (or successor forms)), (ii) such issuance of Units shall not require the Company to register any Units under the Exchange Act (as a result of the number of holders of Units or otherwise), unless, at the time of such issuance, the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act, (iii) the compliance with all applicable laws and regulations (including securities laws) relating to such admission and issuance, (iv) such issuance of Units shall not cause the Company to be required to register as an "investment company" under the Investment Company Act, (v) such issuance of Units shall not cause the underlying assets of the Company to be deemed "plan assets" as defined under and pursuant to the Plan Asset Regulation or constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, and (vi) such additional Member shall not be a Competitor or a Sanctioned Person.  Upon the admission of a new Member, the Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to amend and update the Register of Members to reflect the addition of such new Member.  Any duly admitted new Member

shall be considered a "Member" for all purposes of this Agreement and the Act. Notwithstanding the requirement that additional Members execute a Joinder Agreement, this Agreement shall bind all holders of Units, regardless of whether any such holder executes this Agreement or a Joinder Agreement, and by acceptance of Units each holder agrees to be so bound.

4.3     Member Meetings.

(a)     *Meetings*.  Meetings of the Members may be called for any purpose at any time by the Board or by Members who collectively own or hold at least twenty-five percent (25.0%) of the issued and outstanding Class A Units (determined as of the time that such meeting is called).  Anything in this Agreement to the contrary notwithstanding, no regular, special or other meetings of the Members are required to be held.

(b)     *Place of Meetings*.  Member meetings may be held (i) at any place within or outside the State of Delaware designated by the Board or the Members calling any such meeting, and/or (ii) if the Board or the Members calling any such meeting so determine, by means of remote communication in accordance with Section 4.3(k).  In the absence of any other designation by the Board or the Members calling any such meeting, Member meetings shall be held at the Principal Office.

(c)     *Notice of Meetings*.  Not less than five (5) Business Days prior to any Member meeting, notice of the place, if any, the purpose and the date and time of such meeting shall be delivered by the Secretary to each Member entitled to vote at such meeting in accordance with Section 17.5.  Presence of a Member (in person or by duly authorized proxy) at a meeting shall constitute waiver of notice by such Member, except where a Member (in person or by duly authorized proxy) participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened and does not at such meeting vote for or assent to action taken at such meeting.

(d)     *Quorum*.  The holders of more than fifty percent (50.0%) of the aggregate voting power of the then-issued and outstanding Units entitled to vote on a matter to be presented at a Member meeting, either present in person or represented by proxy, shall constitute a quorum with respect to action on such matter, and action may be taken with respect to any matter presented at the meeting only if a quorum exists with respect to such matter.

(e)     *Voting*.  Every Member entitled to vote its Units on any matter to be presented at a Member meeting shall be entitled, with respect to such matter, to one (1) vote for each such Unit held of record by such Member on the record date designated for such meeting.  Whenever any action is to be taken with respect to any matter by vote of the Members, such action shall be authorized by the affirmative vote of holders of a majority of the aggregate voting power of the then-issued and outstanding Units entitled to vote on such matter, unless the express provisions of this Agreement require a different vote (including any provision of this Agreement that requires any matter to be approved

by the Majority Members or the Super-Majority Members), in which case such express provisions shall govern and control.

(f)     *Adjournment*.  Notwithstanding any other provision of this Agreement, if a quorum is not present at any Member meeting, such meeting may be adjourned by announcement of the chairperson of the meeting or by affirmative vote of the holders of a majority of the aggregate voting power of the Units that are present in person or represented by proxy at such meeting and are entitled to vote on one or more matters to be presented at such meeting.  Notice of an adjournment need not be given to the Members if the time and place of the adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, any business may be transacted which might have been transacted at the original meeting.  However, if the adjournment is for more than thirty (30) days from the date of the original meeting, or if after the adjournment a new record date is fixed for the adjourned meeting, a new notice of the adjourned meeting shall be given in accordance with Section 4.3(c) to each Member of record entitled to vote at such adjourned meeting.

(g)     *Record Date*.  Unless otherwise determined by the Board, the date on which notice of a Member meeting is first sent shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting (including any adjournment thereof).  The record date for determining Members entitled to express consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company.

(h)     *Proxies*.  Each Member may authorize another Person or Persons to act for him, her or it by proxy by an instrument executed in writing and delivered to the Company in accordance with Section 17.5 before or at the time of the meeting or execution of a written consent, as the case may be.  Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one such Person is present, then such powers may be exercised by that Person; or if an even number of such Persons attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.  The appointment of a proxy shall be effective for eleven (11) months from the date of such appointment unless a different period is expressly specified in the appointment form.  A proxy may only be voted or acted upon by its holder in accordance with written instructions of the Member granting such proxy.  Except as otherwise limited therein, proxies shall entitle the individuals authorized to vote at a meeting thereby to vote at any adjournment or postponement of such meeting.  A proxy purporting to be executed by or on behalf of a Member shall be deemed valid unless challenged at or prior to its exercise and the burden of proving invalidity shall rest on the challenger.  Subject to the above, any proxy may be revoked if an instrument revoking it or a proxy bearing a later date is delivered to the Company in accordance with Section 17.5.

(i)    *Conduct of Member Meetings*.  The Chairperson or, in the Chairperson's absence, the Chief Executive Officer (or, in the Chief Executive Officer's absence, any Vice President) shall call meetings of the Members to order and act as chairperson of such meetings.  In the absence of said officers, any Member entitled to vote at the meeting, or any proxy of any such Member, may call the meeting to order and a chairperson shall be elected by the affirmative vote of holders of a majority of the voting power of the Units present in person or represented by proxy and entitled to vote on any matter to be presented at such meeting.  The Secretary or any Assistant Secretary or any person appointed as secretary of a meeting of the Members by the chairperson at any meeting of the Members may act as secretary of such meeting.  The chairperson of any Member meeting shall determine the order of business and the procedure at such meeting, including such regulation of the manner of voting and the conduct of discussion.

(j)    *Action by Written Consent*.  Notwithstanding anything contained in this Agreement to the contrary, any action required or permitted by applicable law to be taken at any Member meeting may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members that own or hold Units representing not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all the Members entitled to vote thereon were present and voted and shall be delivered to the Company in accordance with Section 17.5.  An action by written consent of the Members shall become effective as of the time the last written consent necessary to effect the contemplated action is received by the Company, unless all consents necessary to effect the contemplated action specify a later time, in which case the later time shall be the effective time of such action.  Prompt notice (and in any event within five (5) Business Days after receipt of the written consent by the Company) of the taking of Member action without a meeting by less than unanimous written consent shall be given by the Company to those Members who have not consented in writing and were entitled to vote on the matters that were the subject of such action.  Without limiting the foregoing, any provision of this Agreement that requires any matter to be approved by, or permits any action to be taken by, the Majority Members or the Super-Majority Members may be approved or taken by such applicable Members by written consent.

(k)    *Meetings by Remote Communication*.  One or more, or all, Members may participate in any meeting of the Members through the use of any means of remote communication by which all Persons participating can hear each other at the same time.  Any Member participating in a meeting by any such means of remote communication is deemed to be present in person at such meeting, except as set forth in Section 4.3(c).

4.4    Authority of the Members.

(a)    Notwithstanding Section 18-402 of the Act, except as expressly authorized in writing by the Board or this Agreement (including Article 7 hereof), no Member, nor any officer, employee or agent of any Member, as such, shall have the authority or power to manage the Company or to act for the Company for any purpose, or to engage in any transaction, make any commitment, enter into any contract or incur any obligation or responsibility (whether as principal, surety or agent) on behalf of, or in the name of, the

Company, or bind the Company, or hold itself out to any third party as acting for or on behalf of the Company, all such powers being vested in the Board.  To the fullest extent permitted by applicable law, any attempted action in contravention of this <u>Section 4.4</u> shall be null and void *ab initio* and not binding upon the Company.  The Company shall not be responsible or liable for any indebtedness or obligation (including any legal and other professional fees or disbursements) of any Member incurred or arising either before, on or after the Effective Date, except as provided in <u>Article 8</u>.

(b)    Except (i) pursuant to a duly authorized proxy in accordance with <u>Section 4.3(h)</u>, and (ii) as set forth in <u>Section 9.3</u>, no Member shall have any authority to bind, to act for, to execute any document or instrument on behalf of or to assume any obligation or responsibility on behalf of, any other Member.  No Member shall, by virtue of being a Member, be responsible or liable for any indebtedness or obligation of any other Member incurred or arising either before, on or after the Effective Date.

4.5    <u>Limitation on Liability</u>.  Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising under contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.  The immediately preceding sentence shall constitute a compromise to which all the Members have consented within the meaning of the Act.  Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on a Covered Person.

4.6    <u>AI Questionnaire</u>.  If any Member that is an Accredited Investor on the date on which such Member became a party to this Agreement shall thereafter cease to be an Accredited Investor, then such Member shall promptly (but in any event no later than ten (10) Business Days after the date on which such Member ceased to be an Accredited Investor) inform the Company in writing of such fact.  In addition, the Company shall have the right, at any time and from time to time, to request that any Member complete, execute and deliver to the Company an AI Questionnaire.  The Company shall make any such request in writing delivered to the applicable Member in accordance with <u>Section 17.5</u>.  If any Member receives any such request, then such Member shall promptly (but in any event no later than ten (10) Business Days after the date on which such Member receives such written request) complete, execute and deliver to the Company an AI Questionnaire.  Nothing in this <u>Section 4.6</u> shall amend, alter or otherwise modify the restriction against Transferring Units to any Person that is not an Accredited Investor pursuant to <u>Section 9.1(a)(vii)</u>.

4.7    <u>Beneficial Ownership Reporting</u>.  The Members agree to cooperate in a commercially reasonable manner in connection with the compliance by the Company or any of its Subsidiaries with all applicable BOI Laws, including making any adjustments and/or amendments to this <u>Section 4.7</u> that may be reasonably necessary or appropriate in consideration of additional guidance issued by FinCEN or any other Governmental Authority in respect of the implementation of BOI Laws.  Without limitation of the preceding sentence:

(a)    The Board shall make or cause to be made any beneficial ownership or related filings or reports ("BOI Reports") required pursuant to any BOI Laws for the Company or any of its Subsidiaries.  The Board shall be entitled to rely on the Member Beneficial Ownership Information provided by the Member(s) pursuant to clause (b) (if any).  Each Member shall be entitled to review the portion of the BOI Report (or a summary thereof) of the Company or any of its Subsidiaries that relates to such Member upon reasonable request made at least fifteen (15) days before such BOI Report is due; provided, that a Member's entitlement to review the portion of the BOI Report relating to such Member will be limited if such review would result in a delay in the filing of the BOI Report beyond its due date.  For the avoidance of doubt, the Board (which may delegate the completion of any reporting requirements) shall make the final determination regarding the reporting requirements applicable to the Company and its Subsidiaries under BOI Laws, including the applicability of reporting under the BOI Laws to the Company and its Subsidiaries, the application of an exemption from such reporting for the Company or any of its Subsidiaries, the timing for filing a BOI Report, the contents of a BOI Report, and the need to update any BOI Report.

(b)    Each Member shall be responsible for (i) initially determining whether there are any reportable "beneficial owners" under any applicable BOI Laws in respect of the Company or any of its Subsidiaries as a result of such Member's direct or indirect ownership and/or control of the Company or any such Subsidiary, (ii) providing "FinCEN identifiers" and such other identifying information in each case to the extent such information is required to comply with any applicable BOI Laws (the "Member Beneficial Ownership Information") in respect of any such beneficial owners to the Company and the Board as is needed to enable the Company or any of its Subsidiaries to timely comply with its disclosure obligations under any applicable BOI Laws, and (iii) promptly responding to any information and other requests by the Company or the Board in connection with the Company's or any of its Subsidiaries' compliance with all applicable BOI Laws, including the Board's independent assessment to identify reportable beneficial owners under applicable BOI Laws.  Each Member further represents, warrants and agrees that (x) within a reasonable time after a request by the Company, but no later than five (5) Business Days after the Company makes such request, it will provide the Company and the Board with all of such Member's applicable Member Beneficial Ownership Information; provided, that if the Company requires a response within five (5) Business Days of such request, then the Company will provide notice to such Member in such request and such Member will use commercially reasonable efforts to provide the requested Member Beneficial Ownership Information within the timeframe set forth in such request, (y) it will notify the Company and the Board promptly of any updates to or changes to any of its Member Beneficial Ownership Information that would reasonably be expected to require an updated BOI Report in respect of the Company or any of its Subsidiaries under any applicable BOI Laws, and (z) it will use reasonable efforts to ensure that any filings or profiles associated with any Member Beneficial Ownership Information that it has provided in connection with the application for a "FinCEN identifier" will be kept current as and to the extent required by any applicable BOI Laws.  Each Member authorizes the disclosure by the Company or any of its Subsidiaries of its Member Beneficial Ownership Information provided

pursuant to this underline(b) to the extent necessary to comply with any applicable BOI Laws and in reasonable coordination with such Member.

(c)    To the extent legally permissible and reasonably practicable, the Members shall keep the Company promptly informed of each notice or other communication received from FinCEN or any other Governmental Authority concerning any BOI Reports relating to the Company and/or any of its Subsidiaries, and shall consult in a reasonable manner with the Company prior to communicating with FinCEN or any other Governmental Authority concerning any BOI Reports or compliance with any applicable BOI Laws by the Company and/or any of its Subsidiaries.

(d)    Each Member agrees, severally and not jointly, to indemnify and hold harmless the Company, its Subsidiaries, the Board and the other Members from and against any and all liability, damage, cost or expense (including reasonable attorneys' fees) incurred by them that directly results from any default by such Member in its representations, warranties and agreements under this Section 4.7.

## ARTICLE 5
## CAPITAL STRUCTURE

5.1    Units.  All of the Interests shall be issued in unit increments (each, a "Unit" and, collectively, the "Units").  The Units shall initially be divided into the following classes: (a) Class A Voting Common Units (the "Class A Units") and (b) Class B Limited-Voting Common Units (the "Class B Units").  The rights and privileges associated with the Units are as set forth in this Agreement and, in the case of the Class B Units, in any applicable Management Incentive Plan and Award Agreement.  References herein to any class or series of Units shall apply to limited liability company interests or other Equity Interests of the Company issued to Members in respect of, in exchange for, or in substitution of, such class or series of Units by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, split-up, sale of assets, distribution to unitholders or combination of such class or series of Units or any other change in the Company's capital structure (including shares or interests of a surviving corporation or other Entity or successor into which units or interests of the Company are exchanged).

5.2    Issuance of Units.

(a)    Effective as of the Effective Date, each of the Existing Common Units that were issued by the Company to the recipients thereof as set forth in the Plan of Reorganization are hereby reclassified as one (1) Class A Unit (the "Unit Reclassification") such that, effective as of the Effective Date immediately following the Unit Reclassification, there are [10,000,000] Class A Units issued and outstanding, all of which are duly authorized and validly issued, fully paid and non-assessable, and free and clear of any Liens, other than Permitted Liens and Liens created by the applicable Member.  Except for the [10,000,000] Class A Units referred to in the immediately preceding sentence, no other Units or Interests, or options, warrants or other securities that are convertible into, or exchangeable or exercisable for, Units or Interests shall be issued or outstanding on, or immediately after, the Effective Date after giving effect to

the consummation of the Restructuring Transactions to occur on or as of the Effective Date and the consummation of the Unit Reclassification.

(b)    Subject to compliance with its obligations under Section 9.6 hereof (to the extent applicable), the Board may from time to time cause the Company to authorize, create and/or issue additional Units (of existing or new classes or series) or other equity or equity-based securities of the Company (including creating additional classes or series thereof having such ranking, powers, designations, preferences, rights and obligations as may be determined by the Board in its sole discretion, including ranking, powers, preferences, rights and obligations different from, senior or junior to or more or less favorable than existing classes or series of Units or other equity or equity-based securities of the Company).  Such Units or other equity or equity-based securities may be issued for any amount and form of consideration as the Board may determine, including cash or other property, tangible or intangible, received or to be received by the Company or any of its Subsidiaries, or services rendered or to be rendered to the Company or any of its Subsidiaries.  In connection with the foregoing, the Board shall have the power to make such amendments or modifications to this Agreement (including any amendment and restatement of this Agreement) in order to provide for such additional Units or equity or equity-based securities (including any Class B Units), and such ranking, powers, designations, preferences, rights and obligations as the Board in its discretion deems necessary or appropriate to give effect to such authorization, creation and/or issuance (including amending this Agreement to incorporate the terms of such class or series of Units or other equity or equity-based securities of the Company, including economic and governance rights which may be different from, senior or junior to or more or less favorable than the other existing classes or series of Units or other equity or equity-based securities of the Company), all without further vote or action of the Members; provided, however, that if any such amendments or modifications would otherwise require any vote or consent pursuant to any of clauses (i)-(vi) of Section 14.1(a) (other than immaterial amendments or modifications), then such vote or consent shall be obtained as a condition to any such amendment or modification.

(c)    The Class B Units may be issued from time to time by the Company pursuant to grants to Management Holders under the terms of any Management Incentive Plan; provided, that no Units other than Class B Units can be designated as incentives under any Management Incentive Plan.  In addition to the terms and conditions set forth in this Agreement that are applicable to the Class B Units, the Class B Units shall be subject to all of the terms and conditions set forth in any applicable Management Incentive Plan and/or Award Agreement, including any terms relating to vesting and forfeiture, repurchase or redemption rights of the Company and restrictions on Transfer. The Members and the Company agree that in the event of any conflict or inconsistency between the terms of any Management Incentive Plan or any Award Agreement and this Agreement, the terms of this Agreement shall control; provided, however, that any Management Incentive Plan or any Award Agreement may impose greater restrictions on, and/or grant lesser rights to, the Class B Units and the holders thereof than the restrictions and rights set forth in this Agreement.

5.3     Certificated Units.  If the Board so elects, the Units shall be certificated in such form as the Board may from time to time determine; provided, however, that the Class A Units that are issued and outstanding on the Effective Date (after giving effect to the Unit Reclassification) shall not be certificated.  Such certificates shall be signed by any two (2) authorized officers of the Company, and may, but need not, be sealed with the seal of the Company.  Any or all of the signatures on the certificate may be by facsimile or electronic signature.  In case any officer of the Company who shall have signed, or whose facsimile or electronic signature shall have been placed on, any certificate evidencing Units shall cease for any reason to be such officer before such certificate shall have been issued or delivered by the Company, such certificate may nevertheless be issued and delivered by the Company as though the person who signed such certificate, or whose facsimile or electronic signature shall have been placed thereon, had not ceased to be such officer of the Company.

5.4     Voting Rights.

(a)     Except as otherwise provided by non-waivable provisions of applicable law or this Agreement, the holders of Class A Units (in their capacity as such) shall have full voting rights and powers to vote on all matters submitted to the Members for vote, consent or approval (including the matters listed on Schedule B attached hereto), and each holder of Class A Units shall be entitled to one (1) vote for each Class A Unit held of record by such holder on any matter submitted to the Members for approval.

(b)     Except as provided in Section 13.1(a), or as otherwise provided by non-waivable provisions of applicable law, the holders of Class B Units (in their capacity as such) shall have no right to vote on any matter submitted to the Members for vote, consent or approval, and the Class B Units shall not be included in determining the number of Units voting or entitled to vote on such matters (including for purposes of determining whether a quorum is present at any meeting of the Members or whether the requisite number of Member consents have been received for purposes of determining whether an action has been properly authorized by written consent of the Members).

(c)     Except as this Agreement expressly provides otherwise or as otherwise expressly provided by non-waivable provisions of applicable law, no holders of Units shall be entitled to any voting rights, and any action which would otherwise be subject to the vote or consent of Members under the Act may be taken by the Company by approval of the Board.

5.5     Record.  The Company shall keep and maintain, or cause to be kept and maintained, a record of the name of each Person holding Units, the class or series and number of Units held by each such Person, any Transfer thereof and, in case any Unit is represented by a certificate and such certificate is cancelled, the date of cancellation thereof.  Unless otherwise determined by the Board, the Register of Members shall serve as such record.  The Person in whose name Units are registered on the Register of Members or such other record as determined by the Board shall be deemed the owner thereof, and thus a holder of record of such Units, for all purposes as regards the Company.

5.6     No Appraisal Rights.  The Members agree that no appraisal rights, dissenter's rights or other similar rights shall be available with respect to the Units, and waive all such rights in connection with any amendment of this Agreement or the Certificate of Formation, any merger or consolidation in which the Company is a constituent party, any conversion of the Company to another business form, any division of the Company into two or more other Entities, any transfer to or domestication in any jurisdiction by the Company, the sale of all or substantially all of the Company's assets or otherwise.

5.7     Lost, Destroyed or Mutilated Certificates.  Upon receipt of evidence reasonably satisfactory to the Company (an affidavit of the registered holder in customary form will be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing Units, and in the case of any such loss, theft or destruction upon receipt of indemnity reasonably satisfactory to the Company, or, in the case of any such mutilation upon surrender of such certificate, the Company will (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the number of Units represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

5.8     Creditor Relationships.    Anything in this Agreement to the contrary notwithstanding (including Section 6.18), the Company and each of the Members hereby agree and acknowledge that certain Members and/or their Affiliates are also holders of indebtedness and debt securities of, and guarantees thereof by, the Company and its Subsidiaries (collectively, "Indebtedness"), and in such capacity may have interests that are divergent from the Company, its Subsidiaries and/or the other Members, and, that, to the fullest extent permitted by law, under no circumstances will any such Member or any such Affiliate be prohibited from taking any action or enforcing any right entitled to it under the terms of the documentation relating to or governing the Indebtedness held by such Member or such Affiliate or to which it is entitled under law.  To the fullest extent permitted by law, no holder of Indebtedness shall be liable to the Company, any of its Subsidiaries or the other Members for breach of this Agreement or any fiduciary duty by reason of any such activities of such holder, including exercising any rights of such holder under documentation relating to or governing such Indebtedness or to which such holder may be entitled under law, and the Company and each Member hereby irrevocably waive any and all rights to claim any such actions are a breach of this Agreement or the fiduciary duties (if any) of such holder.  In addition, any holder of Indebtedness, in exercising its rights as a lender or creditor of the Company or any of its Subsidiaries, including making its decision on whether to foreclose on any collateral security, will have no duty to consider (a) its status or the status of any of its Affiliates as a Member, (b) the interests of the Company, any of its Subsidiaries or any of the Members, or (c) any duty it may have to any other Member, except as may be required under the applicable financing documents relating to such Indebtedness.

## ARTICLE 6
## MANAGEMENT; OPERATION OF THE COMPANY BUSINESS

6.1     Management of the Company.

(a)     Subject to the terms and conditions of this Agreement, the business and affairs of the Company shall be managed by the board of managers of the Company (the

"Board"), which shall direct, manage and control the business of the Company.  Except where the approval of the Members (including the Majority Members or the Super-Majority Members) is expressly required by this Agreement or by non-waivable provisions of applicable law, the Board shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The enumeration of powers in this Agreement shall not limit the general or implied powers of the Board or any additional powers provided by applicable law.  Each Manager shall possess and may enjoy and exercise all of the rights and powers of a "manager" as provided in the Act, and each Manager shall be a "manager" as provided in the Act; provided, however, that (i) no individual Manager shall have the authority to act for or bind the Company without the requisite consent of the Board and (ii) each Manager will be subject only to the obligations, limitations and duties expressly set forth in this Agreement.  Except pursuant to a duly authorized delegation of authority by the Board, no Member shall have any right, power or authority to act (as agent or otherwise) for, or to bind, the Company in any manner.

(b)      Except as expressly provided for in this Agreement or expressly required by non-waivable provisions of applicable law, the Members shall not have voting rights with respect to the management of the Company and shall not be entitled to vote on or consent to or approve or disapprove actions or decisions regarding the Company.

6.2    Board.

(a)      The Board shall consist of seven (7) Managers.  Managers must be natural persons at least eighteen (18) years of age but need not be Members, residents of the State of Delaware or citizens of the United States.

(b)      The Board shall be comprised of the following individuals:

(i)      for so long as the HG Vora Members collectively own or hold fifteen percent (15.0%) or more of the issued and outstanding Class A Units, one (1) Manager designated by the HG Vora Members;

(ii)      one (1) Manager designated by each Specified Member that owns or holds (together with its Affiliates) twenty percent (20.0%) or more of the issued and outstanding Class A Units, but only for so long as such Specified Member owns or holds (together with its Affiliates) fifteen percent (15.0%) or more of the issued and outstanding Class A Units; provided, that no Specified Member shall be permitted to designate a Manager pursuant to this clause (ii) prior to the one year anniversary of the Effective Date (the "Trigger Date");

(iii)      the following number of individuals elected by vote of Members holding a plurality of the votes of the Class A Units present in person or represented by proxy at a meeting of Members held for purposes of electing any such individual as a Manager (or by the Majority Members acting by written

consent):  six (6) <u>minus</u> the total number of Designation Rights in effect as of the time of determination; and

(iv)    one (1) Manager who shall be the individual serving as the Chief Executive Officer of PSP Midco, LLC ("<u>PSP Midco</u>" and such Manager, the "<u>CEO Manager</u>").

(c)    No Member, together with its Affiliates, shall be entitled to more than one (1) Designation Right at any time (it being understood that if the HG Vora Members have a Designation Right under <u>Section 6.2(b)(i)</u> as of a particular time, then the HG Vora Members shall not be entitled to a Designation Right under <u>Section 6.2(b)(ii)</u> as of such time).  If any Specified Member obtains a Designation Right under <u>Section 6.2(b)(ii)</u> (a "<u>Springing Designation Right</u>") prior to the Trigger Date, then such Specified Member shall not be entitled to exercise such Springing Designation Right, and such Springing Designation Right shall not be in effect, until the Trigger Date and only if such Specified Member continues to own or hold (together with its Affiliates) fifteen percent (15.0%) or more of the issued and outstanding Class A Units as of the Trigger Date.  A Springing Designation Right of a Designating Group may only be exercised at any time by the Designating Members in such Designating Group that own or hold a majority of the Class A Units owned or held by all of the Designating Members in such Designating Group at such time.

(d)    The Designation Right of any Specified Member shall terminate if such Specified Member owns or holds (together with its Affiliates) less than fifteen percent (15.0%) of the issued and outstanding Class A Units at any time after such Specified Member obtains such Designation Right.  The termination of the HG Vora Members' Designation Right as set forth in <u>Section 6.2(b)(i)</u> shall be permanent upon the occurrence of such termination and shall not be reversed if the HG Vora Members shall thereafter own or hold fifteen percent (15.0%) or more of the issued and outstanding Class A Units; <u>provided</u>, that the foregoing shall not prevent the HG Vora Members from obtaining a Springing Designation Right at any time after any such termination. The termination of any Designating Group's Designation Right shall not adversely affect the Designation Right of any other Designating Group.  Anything herein to the contrary notwithstanding, if Additional Securities are issued or sold to an Accelerated Acquirer pursuant to <u>Section 9.6(d)</u>, then the determination as to whether a Designating Group's Designation Right is terminated shall not be made until after the consummation of the related process of offering and, if applicable, issuing or selling Additional Securities to Preemptive Members pursuant to <u>Section 9.6(d)</u>.

(e)    With respect to (i) any designation of a Manager by a Designating Group pursuant to the Designation Right of such Designating Group (including any such designation made pursuant to a Springing Designation Right from and after the Trigger Date or made following the removal of a Manager made by such Designating Group pursuant to <u>Section 6.12</u>) or (ii) any removal of a Manager from the Board that was previously designated by a Designating Group pursuant to the Designation Right of such Designating Group which removal is made by such Designating Group pursuant to <u>Section 6.12</u>, the applicable Designating Group shall execute and deliver to the Company

a written notice (a "Designation Notice") and such Designation Notice shall (A)(1) identify the individual that such Designating Group is designating or (2) specify the identity of the Manager to be removed from the Board, (B) certify to the Company that the Person(s) executing and delivering such Designation Notice own(s) or hold(s) a majority of the Class A Units owned or held by all of the Persons included within such Designating Group, and (C) include such additional information such that the Company can reasonably conclude that the certification in clause (B) is accurate (including the names of each Member included in such Designating Group and the number of Class A Units owned or held by each such Member). The Company shall confirm, based on the information set forth in the Register of Members that the Person(s) executing and delivering such Designation Notice own(s) or hold(s) a majority of the Class A Units owned or held by all of the Persons included within the applicable Designating Group. If the Company confirms that a Designation Notice has been executed and delivered by the Person(s) that own(s) or hold(s) a majority of the Class A Units owned or held by all of the Persons included within the applicable Designating Group, then the designation and/or removal specified in such Designation Notice shall be automatically effective, without a need for any action on the part of or notice to any Member or other Person, and the Company shall deliver notice thereof to the Members. If the Company confirms that a Designation Notice has not been executed and delivered by the Person(s) that own(s) or hold(s) a majority of the Class A Units owned or held by all of the Persons included within the applicable Designating Group, then such Designation Notice shall be deemed void and invalid.

(f)     The Designation Right of a Designating Group shall not be assignable or transferable to any Person.

(g)     The Chairperson shall be a Manager appointed, removed and/or replaced from time to time by a vote of the Board; provided that the initial Chairperson shall be selected by the Majority Members.

(h)     Each of the Managers (including any Manager designated or elected to fill any vacancy on the Board) shall be an Independent Manager. Notwithstanding the foregoing, a Manager may be an individual who is employed by any Member or any of its Affiliates at the time such individual is designated or elected to be a Manager or at any time six (6) months prior to such time (any such Member, an "Interested Member") if the designation or election of such individual to be a Manager is approved by the Members (excluding each of the Interested Members) (the "Disinterested Members") who collectively own or hold at least 66-2/3% of the issued and outstanding Class A Units owned or held by all Disinterested Members as of such time.

(i)     None of the Members, and no officer, director, manager, stockholder, partner, member, employee or agent of any Member, makes any representation or warranty as to the fitness or competence of the designee of any party hereunder to serve as a member on the Board (or any committee thereof) or any Subsidiary Governing Body by virtue of being a party to this Agreement.

(j)        Each Manager shall execute and deliver a confidentiality agreement that is acceptable to the Board (which may be in the form of an acknowledgment by a Manager that he or she is bound by and subject to the obligations of confidentiality and disclosure set forth in Article 18 of this Agreement as if such obligations applied to such Manager).

(k)        There shall be no cumulative voting for Managers, and the Board shall not be staggered or classified.

6.3        Regular Meetings.  Regular meetings of the Board shall be held at such time or times and with such frequencies as may be determined by the Board.

6.4        Special Meetings.  Special meetings of the Board may be called from time to time by (a) the Chairperson or (b) any two (2) Managers.

6.5        Place of Meetings.  Any meeting of the Board may be held at such place or places as shall from time to time be determined by the Board and as shall be designated in the notice of the meeting.  If no other place is designated in the notice of the meeting, such meeting shall be held at the Principal Office.

6.6        Notice of Meetings.  Notwithstanding Section 17.5, notice of each meeting of the Board, whether regular or special, shall be given to each Manager (unless such notice is waived by such Manager as provided in Section 6.10) (a) if such notice is sent by overnight delivery, at least two (2) Business Days prior to such meeting or, (b) if such notice is sent by electronic mail, at least one (1) day prior to such meeting; provided, however, if a special meeting of the Board is being called due to exigent circumstances, as reasonably determined by the Chairperson or the Managers calling such meeting, then notice of such meeting may be provided to each Manager (unless such notice is waived by such Manager as provided in Section 6.10) by electronic mail at least twelve (12) hours prior to such meeting.  Any such notice shall be sent to each Manager at such Manager's usual or last known business or residence address or electronic mail address, as applicable.  The notice shall state the date, time and location (if such location is not the Principal Office) of the meeting, but need not state the purposes of such meeting.

6.7        Meetings by Remote Communication.  One or more, or all, members of the Board or any committee designated by the Board may participate in a meeting of the Board or such committee through the use of any means of remote communication by which all persons participating can hear each other at the same time or by any other means permitted by the Act.  Any Manager or committee member participating in a meeting by any such means of remote communication or by any such other means permitted by the Act is deemed to be present in person at such meeting, except as set forth in Section 6.10.

6.8        Quorum; Acts of Managers.  A quorum for any meeting of the Board will require the attendance of Managers with a majority of the votes of all Managers then in office.  The vote of a majority of the votes of all of the Managers present and entitled to vote at a meeting of the Board at which a quorum is present shall be the act of the Board, unless the express provisions of this Agreement (including Sections 6.18 and 6.19) or applicable non-waivable law require a different vote, in which case such express provisions shall govern and control.  In the absence of a quorum at any meeting of the Board, a majority of the votes of the Managers present and

entitled to vote may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present. Each Manager shall have one (1) vote on all matters submitted to the Board for the vote, consent or approval of the Board (other than matters for which such Manager is not entitled to vote, as expressly set forth in this Agreement). Decisions of the Board shall be decisions of the "manager" for all purposes of the Act.

6.9    <u>Organization, Agenda and Procedures</u>. The Chairperson, if any, shall preside over the meetings of the Board; <u>provided</u>, <u>however</u>, if there shall not be a Chairperson or if the Chairperson shall not be present at a meeting of the Board or shall refuse to preside over a meeting of the Board, then the Managers with a majority of the votes of all Managers that are present at such meeting shall choose a chairperson to preside over such meeting. The Secretary, any Assistant Secretary, or any other person appointed as secretary of a meeting of the Board by the Chairperson or any such other chairperson of such meeting shall act as secretary of each meeting of the Board. The agenda of and procedure for such meetings shall be as determined by the Chairperson or any such other chairperson of such meeting.

6.10    <u>Waiver of Notice</u>. A Manager may waive any notice of a meeting of the Board, whether before or after the date or time stated in the notice as the date or time when any action will occur or has occurred. Any such waiver shall be in writing, be signed by the Manager entitled to the notice, and be delivered to the Company in accordance with <u>Section 17.5</u>, but such delivery shall not be a condition of the effectiveness of the waiver. Attendance or participation by a Manager at a meeting of the Board, (a) shall be deemed a waiver of objection to lack of required notice or defective notice of the meeting, unless the Manager, at the beginning of the meeting or promptly upon his or her later arrival, expressly objects to holding the meeting or transacting business at the meeting because of lack of notice or defective notice, and does not thereafter vote for or assent to action taken at the meeting, and (b) shall be deemed a waiver of objection to consideration of a particular matter at the meeting, unless the Manager expressly objects to considering the matter when it is presented and does not thereafter vote for or assent to action taken at the meeting with respect to such matter.

6.11    <u>Managers' Action By Written Consent</u>. Any action required or permitted to be taken at any meeting of the Board, or any committee thereof, may be taken without a meeting, without prior notice and without a vote if all members of the Board or any such committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or any such committee. Unless the Managers or committee members (as the case may be) specify a different effective time in such written consent, a written consent of the Board or any committee thereof, with respect to an action of the Board or such committee, shall become effective when the written consent to such action has been signed (and not revoked) by all then-serving Managers or committee members (as the case may be) and delivered to the Company in accordance with <u>Section 17.5</u>, unless before such time the Company has received a written revocation of the consent of any Manager or committee member (as the case may be).

6.12    <u>Removal</u>.

(a)      If at any time the Designation Right of any Designating Group terminates, then the Holder Manager previously designated by such Designating Group pursuant to such Designation Right shall be automatically removed from the Board at the request of the Majority Members delivered to the Company in accordance with Section 17.5 or shall be removed from the Board in connection with the exercise of a Springing Designation Right (as further described in Section 6.12(c)).

(b)      Except for the removal of a Holder Manager at the request of the Majority Members on account of the termination of a Designation Right (which removal shall be automatic at the time request is delivered by the Majority Members to the Company in accordance with Section 17.5) or the removal of a Holder Manager in connection with the exercise of a Springing Designation Right (as further described in Section 6.12(c)), the Designating Group holding a Designation Right shall have the exclusive right to remove, whether with or without cause, any Holder Manager designated by such Designating Group pursuant to such Designation Right (but not any other Manager).

(c)      If any Specified Member obtains a Springing Designation Right and elects to exercise such Springing Designation Right (any such Specified Member, an "Exercising Member"), then such Exercising Member shall deliver written notice of such exercise (an "Exercise Notice") to the Company (whereupon the Company shall promptly notify all Members (other than the Exercising Member and its Affiliates) that own or hold Class A Units (the "Non-Exercising Members") of such exercise); provided, that such Exercising Member shall not be entitled to deliver any such Exercise Notice until after the Trigger Date. If an Exercise Notice is delivered to the Company after the Trigger Date, then the Non-Exercising Members who collectively own or hold greater than fifty percent (50.0%) of the issued and outstanding Class A Units owned or held by all Non-Exercising Members as of the time of such delivery shall select a Manager to be removed from the Board. If the Non-Exercising Members fail to select a Manager to be removed from the Board within forty-five (45) days after the date on which the Exercise Notice was delivered to the Company, then the Exercising Member shall have the right to select a Manager to be removed from the Board (which removal shall occur automatically upon notice thereof being delivered by the Exercising Member to the Company in accordance with Section 17.5). Notwithstanding the foregoing, (i) none of the following Managers may be removed from the Board in connection with the exercise of a Springing Designation Right:  (A) any Manager that was designated pursuant to a Designation Right and such Designation Right is then in effect, or (B) the CEO Manager; and (ii) no Manager may be removed from the Board in connection with the exercise of a Springing Designation Right (A) if there is a vacancy on the Board at the time of the proposed removal and such vacancy was not created as a result of (x) a Manager that was designated pursuant to a Designation Right ceasing to serve on the Board and such Designation Right is then in effect or (y) the CEO Manager ceasing to serve on the Board, and (B) unless the Exercising Member has designated an individual to serve as a Manager immediately following the removal of such Manager proposed to be removed (which designation shall be made in the Exercise Notice delivered by such Exercising Member or may be made in a Designation Notice delivered by such Exercising Member).

(d)     Any Manager that is not designated pursuant to a Designation Right (other than the CEO Manager) may be removed, with or without cause, by the Majority Members at the time of such removal.  If for any reason the individual serving as the Chief Executive Officer of PSP Midco shall cease to serve as the Chief Executive Officer of PSP Midco (whether from termination, resignation, death, disability or otherwise), then such individual shall be automatically removed as the CEO Manager.

6.13     <u>Resignation</u>.  Any Manager may resign at any time by giving written notice of such Manager's resignation to the Company in accordance with <u>Section 17.5</u>.  Such resignation shall take effect on the date of delivery of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation by the Company shall not be necessary to make it effective.

6.14     <u>Vacancies</u>.

(a)     Except for any Specified Vacancy, any vacancy on the Board resulting from the resignation or removal of a Holder Manager, or resulting from a Holder Manager becoming unable to serve as a result of death, disability or otherwise, shall be filled by the Designating Group that holds the Designation Right pursuant to which such Holder Manager was designated to be a Manager.

(b)     Any vacancy on the Board resulting from the resignation or removal of any Manager that is not designated pursuant to a Designation Right (other than the CEO Manager or the resignation or removal of a Manager in connection with the exercise of a Springing Designation Right), or resulting from any such Manager becoming unable to serve as a result of death, disability or otherwise, shall be filled by vote of Members holding a plurality of the votes of the Class A Units present in person or represented by proxy at a meeting of Members held for purposes of filling such vacancy (or by the Majority Members acting by written consent); <u>provided</u>, that such vacancy may also be filled by an Exercising Member in connection with the exercise of a Springing Designation Right.

(c)     Any Specified Vacancy shall be filled by vote of Members holding a plurality of the votes of the Class A Units present in person or represented by proxy at a meeting of Members held for purposes of filling such vacancy (or by the Majority Members acting by written consent); <u>provided</u>, that such Specified Vacancy may also be filled by an Exercising Member in connection with the exercise of a Springing Designation Right.

(d)     Any vacancy on the Board resulting from the removal of a Manager in connection with the exercise of a Springing Designation Right shall be filled with an individual selected by the Exercising Member exercising such Springing Designation Right (which individual shall be identified in the Exercise Notice delivered by such Exercising Member or in a Designation Notice delivered by such Exercising Member).

(e)     Any vacancy on the Board resulting from the failure of the Members to fill a seat on the Board on the Effective Date shall be filled after the Effective Date by vote

of Members holding a plurality of the votes of the Class A Units present in person or represented by proxy at a meeting of Members held for purposes of filling such vacancy (or by the Majority Members acting by written consent); provided, that such vacancy may also be filled by an Exercising Member in connection with the exercise of a Springing Designation Right.

(f)    Any vacancy on the Board resulting from the individual serving as the Chief Executive Officer of PSP Midco ceasing to serve as the Chief Executive Officer of PSP Midco shall be automatically filled with the individual that is the successor Chief Executive Officer of PSP Midco when such individual becomes the Chief Executive Officer of PSP Midco.

6.15    Committees.  The Board, by resolution or written consent, may from time to time designate from among the Managers one or more committees to exercise the powers of the Board.  The Board may (and if the Board does not, a majority of the votes of the committee members may) designate a chairperson of each such committee from among its members.  Each such committee, to the extent provided in such resolution or written consent, shall have and may exercise all of the authority of the Board in the management of the Company, subject to the limitations set forth in the Act and in this Agreement.  Any or all members of any such committee may be removed, with or without cause, by a duly adopted resolution or written consent of the Board.   Rules governing the procedures for meetings of each committee designated by the Board shall be as established by the Board from time to time (or, if the Board does not establish such procedures, as established by a majority of the votes of the committee members).  For the avoidance of doubt, no committee of the Board shall be authorized to take any action that the Board could not take itself.

6.16    Compensation of Managers.    Each Independent Manager shall be paid compensation from the Company, in such form (which may be in the form of cash fees and/or equity incentives granted under any Management Incentive Plan) and amount as approved by the Majority Members, for the performance of such Independent Manager's duties as a Manager or a member of any committee of the Board.  Managers who are not Independent Managers shall not receive compensation from the Company for the performance of such Manager's duties as a Manager or a member of any committee of the Board.  Each Manager and committee member shall be reimbursed for the reasonable and documented out-of-pocket costs and expenses incurred by such Manager or committee member in connection with the performance of such Manager's or committee member's duties as a Manager or a member of any committee of the Board (including expenses incurred in attending meetings of the Board or any committee thereof).  Nothing herein contained shall be construed to preclude any Manager or committee member from serving the Company or any of its Subsidiaries in any other capacity and receiving proper compensation therefor.

6.17    Subsidiary Governing Bodies.  Each Subsidiary Governing Body (other than a Subsidiary Governing Body of any Subsidiary of the Company which is (a) a limited liability company that is managed by its member(s), (b) a limited partnership that is managed by its general partner or (c) required by Law or contract to have a different composition) shall be comprised of one or more executive employees of the Company or any of its Subsidiaries or other individuals selected by the Board that are not employees of any of the Members or any of

their respective Affiliates (other than the Company or any of its Subsidiaries).  The Company agrees to take all necessary and desirable actions to ensure that any such Subsidiary Governing Body does not adopt any resolutions, execute any consents, grant any approvals or take any other action, or otherwise cause or permit any such Subsidiary to do anything, that would be inconsistent with, or contrary to, any resolution, consent, approval or other action adopted, executed, granted or taken by the Board, or that would be in subversion of the rights of the Members under this Agreement or that would otherwise be a breach of this Agreement if the Company did the same.

6.18    <u>Affiliate Transactions</u>.  Other than any Excepted Transaction, any direct or indirect transaction or series of related transactions between the Company or any of its Subsidiaries, on the one hand, and any Member who, together with its Affiliates, owns or holds five percent (5.0%) or more of the issued and outstanding Class A Units, or any Affiliate of any such Member, on the other hand (an "<u>Affiliate Transaction</u>"), involving aggregate payments, fundings or other consideration in excess of $1,000,000.00 per annum shall require the approval of a majority of the votes of the Managers then in office that are disinterested with respect to such Affiliate Transaction, unless any such transaction or series of related transactions is a commercial transaction on an arm's length basis entered into in the ordinary course of business consistent with past practice.

6.19    <u>Required Approval of Board and Majority Members for Certain Actions</u>.  The Company shall not, and the Company shall not cause or permit any of its Subsidiaries to, take (whether by amendment, merger, consolidation, division, recapitalization or otherwise) any of the actions listed on <u>Schedule B</u> attached hereto without the prior approval or consent of the Board and the Majority Members.  The Company shall not, and the Company shall not cause or permit any of its Subsidiaries to, make any distributions or dividends to Members that own or hold Class A Units that are not made to such Members (a) on a *pro rata* basis (based on the number of Class A Units owned or held by such Members immediately prior to any such distribution or dividend), or (b) in the same form (unless all such Members are provided with the same option as to the form of such distribution or dividend) without the prior approval of the Board and each Member that owns or holds Class A Units.

## ARTICLE 7
## OFFICERS; POWERS OF OFFICERS

7.1    <u>Election and Tenure</u>.  The officers of the Company may (but shall not be required to) consist of the Chairperson, the Chief Executive Officer, the Chief Financial Officer, a Secretary, a Treasurer, a Chief Operating Officer, and such other officers and assistant officers as the Board may deem necessary or advisable, each of whom shall be appointed by the Board.  The persons holding officer positions with the Company as of the Effective Date are listed on <u>Schedule C</u> attached hereto.  The Board may expressly delegate to any such officer the power to appoint or remove subordinate officers, agents or employees.  Any two or more offices may be held by the same person.  Each officer so appointed shall continue in office until a successor shall be appointed and shall qualify, or until the officer's earlier death, resignation or removal.  Each officer shall be a natural person who is eighteen (18) years of age or older.

7.2    <u>Resignation, Removal and Vacancies</u>.    Any officer may resign at any time by giving written notice of resignation to the Company, to the attention of the Board or the Chief Executive Officer.  Such resignation shall take effect when the notice is delivered in accordance with <u>Section 17.5</u> unless the notice specifies a later date, and acceptance of the resignation shall not be necessary to render such resignation effective unless such resignation so states.  Any officer may at any time be removed by the Board.  If any office becomes vacant for any reason, the vacancy may be filled by the Board.  An officer appointed to fill a vacancy shall be appointed for the unexpired term of such officer's predecessor in office (if any) and shall continue in office until a successor shall be elected or appointed and shall qualify, or until such officer's earlier death, resignation or removal.  The appointment of an officer shall not itself create contract rights in favor of the officer, and the removal or resignation of an officer shall not affect the officer's contract rights, if any, with the Company or the Company's contract rights, if any, with the officer.

7.3    <u>Chairperson</u>.    The Chairperson shall preside over the meetings of the Members and the Board and have such powers and responsibilities as are incident thereto.  However, the Chairperson shall not have responsibility for the day-to-day business operations of the Company. The Chairperson shall be a Manager.

7.4    <u>Chief Executive Officer</u>.    The chief executive officer of the Company (the "<u>Chief Executive Officer</u>"), if any, shall (a) have general and active management of the business of the Company, and preside over the day-to-day business operations of the Company, (b) see that all orders and resolutions of the Board are carried into effect, and (c) perform all duties as may from time to time be assigned to him or her by the Board or as may be expressly set forth in this Agreement.  The Chief Executive Officer shall also be the President of the Company.

7.5    <u>Chief Financial Officer</u>.    The chief financial officer of the Company (the "<u>Chief Financial Officer</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Financial Officer.  In addition, the Chief Financial Officer shall have, along with the Chief Executive Officer, responsibility for the day-to-day business operations of the Company.

7.6    <u>Chief Operating Officer</u>.    The chief operating officer of the Company (the "<u>Chief Operating Officer</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Operating Officer.

7.7    <u>Vice Presidents</u>.    The vice presidents of the Company (the "<u>Vice Presidents</u>"), if any, shall perform such duties and possess such powers as may from time to time be assigned to them by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In the absence of the Chief Executive Officer or in the event of the inability or refusal of the Chief Executive Officer to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board, or in the absence of any designation, then in the order of the election or appointment of the Vice

Presidents) shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer.

7.8     Secretary.  The secretary of the Company (the "Secretary"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Secretary shall perform such duties and have such powers as are incident to the office of Secretary, including the duty and power to give notice of all meetings of Members (if any), the Board and any committee of the Board, to prepare and maintain minutes of any such meetings, to maintain other records and information of the Company, to authenticate records of the Company, to be custodian of the Company seal and to affix and attest to the Company seal on documents.

7.9     Treasurer.  The treasurer of the Company (the "Treasurer"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of Treasurer, including the duty and power to keep and be responsible for all funds and securities of the Company, to deposit funds of the Company in depositories selected in accordance with this Agreement, to disburse such funds as ordered by the Board, making proper accounts thereof, and to render as required by the Board statements of all such transactions and of the financial condition of the Company.

7.10    Assistant Secretaries and Assistant Treasurers.  The assistant secretaries and assistant treasurers of the Company (the "Assistant Secretaries" and the "Assistant Treasurers"), if any, shall perform such duties as may from time to time be assigned to them by the Secretary or the Treasurer, respectively, or by the Chief Executive Officer or the Board, or as may be expressly set forth in this Agreement.  In the absence, inability or refusal to act of the Secretary or the Treasurer, the Assistant Secretaries or the Assistant Treasurers, respectively, in the order designated by the Board, or in the absence of any designation, then in the order of their election or appointment, shall perform the duties and exercise the powers of the Secretary or Treasurer, as the case may be.

7.11    Salaries.  Officers of the Company shall be entitled to such salaries, emoluments, compensation or reimbursement, if any, as shall be fixed or allowed from time to time by the Board or in such manner as the Board shall provide.

7.12    Borrowing.  No loan shall be contracted on behalf of the Company, and no evidence of indebtedness shall be issued, endorsed or accepted in its name, unless authorized by the Board or a committee designated by the Board so to act.  Such authority may be general or confined to specific instances.  When so validly authorized, an officer may (a) effect loans at any time for the Company from any bank or other Entity and for such loans may execute and deliver promissory notes or other evidences of indebtedness of the Company, and (b) mortgage, pledge or otherwise encumber any real or personal property, or any interest therein, owned or held by the Company as security for the payment of any loans or obligations (including any guarantees) of the Company, and to that end may execute and deliver for the Company such instruments as may be necessary or proper in connection with such transaction.

7.13    <u>Checks and Endorsements</u>.  All checks, drafts or other orders for the payment of money, obligations, notes or other evidences of indebtedness, bills of lading, warehouse receipts, trade acceptances and other such instruments shall be signed or endorsed for the Company by such officers or agents of the Company as shall from time to time be determined by resolution of the Board, which resolution may provide for the use of facsimile or electronic signatures.

7.14    <u>Deposits</u>.  All funds of the Company not otherwise employed shall be deposited from time to time to the Company's credit in such banks or other depositories as shall from time to time be determined by resolution of the Board, which resolution may specify the officers or agents of the Company who shall have the power, and the manner in which such power shall be exercised, to make such deposits and to endorse, assign and deliver for collection and deposit checks, drafts and other orders for the payment of money payable to the Company or its order.

7.15    <u>Proxies</u>.  Unless otherwise provided by resolution adopted by the Board, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer or any Vice President: (a) may from time to time appoint one (1) or more agents of the Company, in the name and on behalf of the Company, (i) to cast the votes which the Company may be entitled to cast as the holder of Equity Interests or other securities in any other Entity whose Equity Interests or other securities may be held by the Company, at meetings of the holders of the Equity Interests or other securities of such other Entity, or (ii) to consent in writing to any action by such other Entity; (b) may instruct the person so appointed as to the manner of casting such votes or giving such consent; and (c) may execute or cause to be executed in the name and on behalf of the Company and under the Company's seal, or otherwise, all such written proxies or other instruments as may be deemed necessary or proper in connection with the foregoing <u>clauses (a)</u> and <u>(b)</u>.

## ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1    <u>Exculpation</u>.

(a)    Notwithstanding any other provisions of this Agreement (whether express or implied) or obligation or duty at law or in equity, to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Member, the Company or any other Person (including any creditor or claimant of the Company or any of its Subsidiaries) for any losses, claims, expenses, damages or liabilities arising from any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by a Covered Person in connection with the Company or any of its Subsidiaries, nor shall any Covered Person be liable to any Member, the Company or any other Person for any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by any employee or other agent of the Company or any of its Subsidiaries, except to the extent that any such losses, expenses, claims, damages or liabilities, (i) in any such case, are attributable to such Covered Person's material breach of this Agreement, and (ii) in the case of any current or former Manager or officer of the Company, (A) are attributable to such Manager's or officer's acts or omissions not in good faith, (B) are attributable to such Manager's or officer's breach of the duty of loyalty to the Members, the Company or any of its Subsidiaries, (C) arise from a

transaction in which such Manager or officer derived an improper personal benefit or (D) are attributable to acts or omissions of such Manager or officer that constitute a knowing violation of law.  No amendment to or repeal of this Section 8.1 shall apply to or have any effect on the liability or alleged liability of the Covered Persons for or with respect to their acts or omissions occurring prior to such amendment or repeal.

(b)    In accordance with the Act and the laws of the State of Delaware, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member.  It is the intent of the Members that no distribution to any Member pursuant to Article 11 or Article 13 shall be deemed a return of money or other property paid or distributed in violation of the Act or other applicable law.  The return of such money or distribution of any such property to a Member shall be deemed to be a compromise within the meaning of the Act, and the Member receiving any such money or property shall not be required to return to any Person any such money or property.  However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to return such money or property, such obligation shall be the obligation of such Member and not of any other Member.

8.2    Indemnification.

(a)    The Company shall, to the fullest extent permitted by applicable law (as now or hereafter in effect), indemnify, defend and hold harmless each Covered Person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding ("Proceeding"), whether civil, criminal, administrative or investigative, or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, (i) in connection with any matter arising out of or in connection with the Company's or any of its Subsidiaries' business or affairs, (ii) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "Covered Person", or (iii) by reason of the fact that such Covered Person, or a Person of whom such Covered Person is the legal representative, is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any other corporation, company, partnership, joint venture, trust, employee benefit plan or other Entity (an "Other Entity"), from and against any losses, claims, expenses, damages and liabilities (collectively, "Damages") suffered or incurred by, imposed on, or to which such Covered Person may become subject in connection with such Proceeding; provided, that no right of indemnification shall be available to a Covered Person under this Article 8 (A) to the extent that it shall have been determined by a final, non-appealable decision by a court of competent jurisdiction that any such Damages are attributable to such Covered Person's material breach of this Agreement, and, (B) in the case of any current or former Manager or officer of the Company, to the extent that any such Damages (1) are attributable to such Managers' or officer's acts or omissions not in good faith, (2) are attributable to such Managers' or officer's breach of the duty of loyalty to the Members, the Company or any of its Subsidiaries, (3) arise from a transaction in which such Manager or officer derived an improper personal benefit, (4) are attributable to acts or omissions of such Manager or officer that constitute a knowing violation of

law, (5) are attributable to any Proceeding (except an action to enforce the indemnification rights set forth in this <u>Section 8.2(a)</u> or to enforce the rights to advancement of expenses set forth in <u>Section 8.2(b))</u> initiated by such Covered Person unless if such Proceeding was authorized in the specific case by the Board, or (6) are attributable to any Proceeding by or in the right of the Company or any of its Subsidiaries unless if the Board authorizes the indemnification of any such Damages (except that, to the extent any such Covered Person has been successful on the merits or otherwise in the defense of any such Proceeding by or in the right of the Company or any of its Subsidiaries or in defense of any claim, issue or matter therein, then such Covered Person shall be indemnified against expenses actually and reasonably incurred by such Covered Person in connection therewith).  If for any reason the foregoing indemnification is unavailable to a Covered Person, or is insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Covered Person as a result of the applicable Damages in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Covered Person on the other hand or, if such allocation is not permitted by applicable law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations.

(b)    If a Covered Person is or was made, or threatened to be made, a party to or is involved in any threatened, pending or completed Proceeding, whether civil, criminal, administrative or investigative, or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, (i) in connection with any matter arising out of or in connection with the Company's or any of its Subsidiaries' business or affairs, (ii) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "Covered Person" or (iii) by reason of the fact that such Covered Person, or a Person of whom such Covered Person is the legal representative, is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any Other Entity, the Company shall pay, within a reasonable period of time following the Company's receipt of reasonably detailed supporting documentation, to such Covered Person such Covered Person's reasonable and documented out-of-pocket legal and other expenses (including legal and other professional fees and disbursements, and the cost of any investigation and preparation) incurred in connection therewith in advance of the final disposition of such Proceeding; <u>provided</u>, that such Covered Person shall promptly repay to the Company the amount of any such expenses paid to it if it shall be determined that such Covered Person is not entitled to be indemnified by the Company in connection with such Proceeding as provided in the proviso contained in <u>Section 8.2(a)</u>; <u>provided</u>, <u>further</u> that, with respect to a Covered Person described in <u>clause (B)</u> of <u>Section 8.2(a)</u>, the Company shall not be required to pay in advance or otherwise any such expenses incurred by any such Covered Person in connection with (A) any Proceeding initiated by such Covered Person unless if such Proceeding was authorized in the specific case by the Board or (B) any Proceeding by or in the right of the Company or any of its Subsidiaries unless if the Board authorizes the payment of any such expenses.

(c)    The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this <u>Section 8.2</u> shall not be deemed exclusive of any other rights to which a Covered Person seeking

indemnification, reimbursement or advancement of expenses, or contribution may have or hereafter be entitled under any statute, this Agreement, any other agreement (including any policy of insurance purchased or provided by the Company under which any Covered Person is covered), any vote of the Members or Managers, or otherwise.  The rights conferred upon any Covered Person in <u>Section 8.1</u> and <u>Section 8.2</u> shall be contract rights that vest upon the occurrence or alleged occurrence of any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, or any other fact, circumstance or matter, giving rise to any losses, claims, expenses, damages or liabilities (whether or not arising out of a Proceeding) that are covered by <u>Section 8.1</u> and/or <u>Section 8.2</u>, and such rights shall apply to a Person that was a Covered Person even after such Person ceases to be a Covered Person, but only with respect to any such losses, claims, expenses, damages or liabilities arising from any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, or any other fact, circumstance or matter that occurred, during the period in which such Person was a Covered Person.

(d)    The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this <u>Section 8.2</u> shall inure to the benefit of the successors, heirs, executors and administrators of a Covered Person.

(e)    The Company shall have the power to purchase and maintain insurance on behalf of any Covered Person to protect such Covered Person against any Damages, whether or not the Company would have the power to indemnify such Covered Person against any such Damages under the provisions of this <u>Section 8.2</u> or under any provision of law.

(f)    No amendment or repeal of any part of this <u>Section 8.2</u> shall apply to or have any effect on any right to indemnification, reimbursement and advancement of expenses, and contribution provided hereunder with respect to any acts or omissions occurring prior to such amendment or repeal.

8.3    <u>No Member Liability</u>.  Any indemnification, reimbursement and advancement of expenses, or contribution provided under this <u>Article 8</u> shall be satisfied solely out of assets of the Company, as an expense of the Company.  No Member shall be subject to personal liability by reason of the indemnification, reimbursement and advancement of expenses, or contribution provisions set forth in this <u>Article 8</u>.

8.4    <u>Settlements</u>.  The Company shall not be liable for any settlement by a Covered Person of any Proceeding effected without its written consent, but if settled with such written consent, or if there is a final judgment against such Covered Person in any such Proceeding, the Company agrees to indemnify and hold harmless such Covered Person to the extent provided above from and against any Damages by reason of such settlement or judgment.

8.5    <u>Business Opportunities; Fiduciary Duties</u>.

(a)     The Company and each Member acknowledge that (i) each Member (other than any Member who is a Manager or an officer or an employee of the Company or any of its Subsidiaries, any Member that is a Family Member of any Manager or any officer or employee of the Company or any of its Subsidiaries, or any Member that is controlled by any Manager or any officer or employee of the Company or any of its Subsidiaries or controlled by any such Manager's, officer's or employee's Family Members) and (ii) each Affiliate, manager, director, principal, officer, employee and other representative of any Member described in clause (i) (other than any such Person that is a Manager or an officer or employee of the Company or any of its Subsidiaries, any such Person that is a Family Member of any Manager or any officer or employee of the Company or any of its Subsidiaries, or any such Person that is controlled by any Manager or any officer or employee of the Company or any of its Subsidiaries or controlled by any such Manager's, officer's or employee's Family Members) (the foregoing Persons being referred to, collectively, as "Identified Persons" and, each individually, as an "Identified Person") may now engage, may continue to engage, and/or may, in the future, decide to engage, in the same or similar activities or lines of business as those in which the Company or any of its Subsidiaries, directly or indirectly, now engage or may engage and/or other business activities that overlap with, are complementary to, or compete with those in which the Company or any of its Subsidiaries, directly or indirectly, now engage or may engage (any such activity or line of business, an "Opportunity"). No Identified Person shall have any duty to refrain, directly or indirectly, from (x) engaging in any Opportunity, (y) offering or directing any Opportunity to another Person (including any Affiliate of such Identified Person) or (z) otherwise competing with the Company or any of its Subsidiaries. No Identified Person shall have any duty or obligation to refer or offer to the Company or any of its Subsidiaries any Opportunity, and the Company hereby renounces, on behalf of itself and each of its Subsidiaries, any interest or expectancy of the Company or any of its Subsidiaries in, or in being offered, an opportunity to participate in any Opportunity engaged in by any Identified Person which may be a corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries.

(b)     In the event that any Identified Person acquires knowledge of an Opportunity which may be a corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries, such Identified Person shall have no duty to communicate, offer or otherwise make available such Opportunity to the Company or any of its Subsidiaries and shall not be liable to the Company, any of its Subsidiaries or any of the Members for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself, or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person).

(c)     The Company, on behalf of itself and each of its Subsidiaries, and each Member (i) acknowledge that the Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other Entities (each such Entity, a "Related Company" and all such Entities, collectively, "Related Companies"), including Entities that are competitors of, or that otherwise may have interests that do or could conflict with those of, the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates, and (ii) agree that (A) the

-42-

enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Agreement shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Agreement (if any) shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (x) the ownership by an Identified Person of any interest in any Related Company, (y) the affiliation of any Related Company with an Identified Person or (z) any action taken or omitted by any Related Company or an Identified Person in respect of any Related Company, (B) no Identified Person shall, by reason of such ownership, affiliation, action or omission, become subject to any fiduciary duty to the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates, (C) nothing in this Agreement and none of the duties imposed on an Identified Person, whether by contract or law, if any, do or shall limit or impair the right of any Identified Person to, directly or indirectly, purchase or sell the securities or indebtedness of any other Entity or to compete with the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates as if the Identified Persons were not a party to this Agreement and (D) the Identified Persons are not and shall not be obligated to disclose to the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates in any such business or as to any such opportunities.

(d)     To the fullest extent permitted by law, this Agreement is not intended to, and does not, create or impose any fiduciary or other duty on any Identified Person, other than those non-fiduciary duties that are expressly set forth in this Agreement and a duty to act in accordance with the implied contractual covenant of good faith and fair dealing to the extent required by Delaware law.  Further, to the fullest extent permitted by law, the Company and each Member hereby irrevocably waive any and all fiduciary duties owed to the Company or such Member by any Identified Person (including those fiduciary duties that, absent such waiver, may be implied by law), and in doing so, the Company and each Member recognize, acknowledge and agree that the duties and obligations of the Identified Persons to the Company, each other Member and each other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement are only as expressly set forth in this Agreement.  To the fullest extent permitted by law, no Identified Person shall owe any duty (including any fiduciary duty) to the Company or to any Member or to any other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement other than those non-fiduciary duties that are expressly set forth in this Agreement and a duty to act in accordance with the implied contractual covenant of good faith and fair dealing to the extent required by Delaware law.  The parties acknowledge and agree that any Identified Person acting in accordance with this Agreement shall (i) be deemed to be acting in compliance with such implied contractual covenant, and (ii) not be liable to the Company, to any Member or to any other Person that is a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement for its reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that

they restrict or eliminate the duties and liabilities of an Identified Person otherwise existing at law or in equity in respect of the Company, any of the Members or any other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement, are agreed (and shall be deemed to have been agreed) by the Company, the Members or all such other Persons to replace fully and completely such other duties and liabilities.

(e)     Each Manager, in his or her capacity as such, shall have the same fiduciary duties as those of a member of a board of directors of a corporation organized under the laws of the State of Delaware, subject to the obligations of the Managers and the Company under this Agreement; <u>provided</u>, that no Manager shall be personally liable for any monetary damages to the Company or any of the Members for breach of the duty of care, subject to the same limitations on such limitation as contemplated by Section 102(b)(7) of the Delaware General Corporation Law.  Each employee and officer of the Company, in its capacity as such, shall have the same fiduciary duties as an employee or officer (as applicable) of a corporation organized under the laws of the State of Delaware, subject to the obligations of the employees and officers of the Company and the Company under this Agreement; <u>provided</u>, that, to the extent determined by the Board, no officer, shall be personally liable for any monetary damages to the Company or any of the Members for breach of the duty of care, subject to the same limitations on such limitation as contemplated by Section 102(b)(7) of the Delaware General Corporation Law.

(f)     Nothing in this <u>Section 8.5</u> shall be deemed to limit any Member's obligations under <u>Section 18.1</u>.

8.6     <u>Subrogation</u>.  In the event that any Covered Person who is or was a partner, shareholder, member, officer, director, manager, fund adviser, investment adviser, investment manager, controlling person, employee, consultant, counsel, representative or agent of a Member or any of its Affiliates is entitled to indemnification under <u>Section 8.2</u> for which such Covered Person is also entitled to indemnification from such Member or any of its Affiliates (other than the Company or any of its Subsidiaries), the Company hereby agrees that its duties to indemnify such Covered Person, whether pursuant to this Agreement or otherwise, shall be primary to those of such Member or such Affiliate, and to the extent that such Member or such Affiliate actually indemnifies any such Covered Person, such Member or such Affiliate shall be subrogated to the rights of such Covered Person against the Company for indemnification hereunder.  The Company hereby acknowledges the subrogation rights of each Member and its Affiliates under such circumstances and agrees to execute and deliver such further documents and/or instruments as such Member or its Affiliate may reasonably request in order to evidence any such subrogation rights, whether before or after such Member or its Affiliate makes any such indemnification payment.  The Company shall pay any amounts due under this <u>Section 8.6</u>, in cash, promptly, and in any event within fifteen (15) days, upon written demand therefor (accompanied by reasonably detailed supporting documentation) from a Member.  The Company hereby waives any right against each of the Members and their respective Affiliates to indemnification, subrogation, or contribution.  Furthermore, the Company and the Members expressly agree that each Covered Person is an intended third-party beneficiary as to the indemnification provisions of this Agreement and shall be entitled to bring suit against the Company to enforce said provisions.  The provisions of this <u>Section 8.6</u> shall equally apply to a

Covered Person's rights to reimbursement and advancement of expenses and contribution under Section 8.2.

8.7    Insurance.  The Company shall purchase and maintain, at the Company's expense, insurance (the "Specified Insurance") on behalf of all managers (including Managers), directors and officers of the Company and its Subsidiaries to protect any such Person against any expense, liability or loss suffered or incurred by, imposed on, or to which such Person may become subject (a) in connection with any matter arising out of or in connection with the Company's or any of its Subsidiaries' business or affairs, (b) by reason of the fact that such Person is serving or has served as an officer, manager or director of the Company or any of its Subsidiaries or (c) by reason of the fact that such Person is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any Other Entity, in any such case based on acts, omissions, facts, circumstances or matters occurring or arising on or after the Effective Date; provided, however, that the Specified Insurance shall be subject to (i) exclusions and exceptions that are customary for such insurance, and (ii) retentions and limitations as the Board determines to be reasonable in light of the premiums to be paid for the Specified Insurance.  Any Specified Insurance shall be satisfactory to the Board.

8.8    Amendments.  Notwithstanding anything herein to the contrary, no amendment, repeal or modification of this Article 8 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any Proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

**ARTICLE 9**
**TRANSFERS**

9.1    Restrictions on Transfers.

(a)    *Prohibited Transfers.*  Without limiting any other provisions, restrictions or conditions of this Article 9, unless otherwise waived by the Board in its sole discretion, no Units shall be Transferred by any Member (regardless of the manner in which the Transferor initially acquired such Units), if:

(i)    such Transfer would, if consummated, result in any violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Company or any of its Subsidiaries;

(ii)    such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers for which a notice thereof has been previously delivered to the Company, but not yet consummated), result in the Company having, in the aggregate, (A) 1,000 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act), or (B) 400 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) that are not Accredited Investors, of either (x) the class of Units proposed to be Transferred (assuming, for purposes of this clause (x), that all issued and outstanding securities of the Company that are

exercisable or exchangeable for, or convertible into, directly or indirectly, the class of Units proposed to be Transferred were exercised, exchanged or converted at the time of such Transfer) or (y) any class of Units into which the Units proposed to be Transferred are convertible (such Units, "Conversion Units") (assuming, for purposes of this clause (y), that all issued and outstanding securities of the Company that are exercisable or exchangeable for, or convertible into, directly or indirectly, Conversion Units were exercised, exchanged or converted at the time of such Transfer), unless at the time of such Transfer the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act; provided, that the numbers 1,000 and 400 as used in this Section 9.1(a)(ii) shall be increased by the number of such holders that acquire from the Company, after the Effective Date, Units of the class proposed to be Transferred, Conversion Units, or securities of the Company that are exercisable or exchangeable for, or convertible into, Units of the class proposed to be Transferred or Conversion Units, in any such case other than any such acquisition (1) that was made by a holder who held any such Units, Conversion Units or securities prior to such acquisition (including in connection with a distribution to all holders of any such Units, Conversion Units or securities) or (2) made through a distribution under the Plan of Reorganization;

(iii)    such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers for which a notice thereof has been previously delivered to the Company, but not yet consummated), require the Company to register any class of Units or other equity securities of the Company under the Exchange Act (as a result of the number of holders of such Units or equity securities or otherwise), unless, at the time of such Transfer, the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act;

(iv)    such Transfer would, in the judgment of the Board, cause the Company to be required to register as an "investment company" under the Investment Company Act;

(v)    such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers for which a notice thereof has been previously delivered to the Company, but not yet consummated), cause the underlying assets of the Company to be deemed "plan assets" as defined under and pursuant to the Plan Asset Regulation or constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code;

(vi)    such Transfer is not to an Accredited Investor;

(vii)    such Transfer is to any Competitor; or

(viii)    such Transfer is to any Sanctioned Person.

(b)    *Certificates; Legal Opinion.*  In addition to the restrictions set forth in Section 9.1(a), no Units shall be Transferred by any Member unless (i) the certificates (if any) representing such Units bear legends as provided in Section 9.1(e) (or, with respect to uncertificated Units, notice of such legends is provided in accordance with applicable law), for so long as such legends are applicable; (ii) either (A) the Transferee is an Affiliate of the Transferor or (B) prior to such Transfer (unless waived by the Company in its sole discretion), the Transferee and the Transferor shall have delivered to the Company representation letters in such form as may be approved from time to time by the Company (including a representation from the Transferee that the Transferee is an Accredited Investor); and (iii) in the case where the Transferee is not an Affiliate of the Transferor, if requested by the Company prior to five (5) Business Days after delivery of the Transfer Notice, the Transferor shall have delivered to the Company a legal opinion, reasonably acceptable to the Company, stating that the registration of the Units that are the subject of such proposed Transfer is not required under the Securities Act or any applicable state securities or "blue sky" laws.

(c)    *Notice of Transfer.*  Subject to Section 9.3, and unless otherwise waived by the Company, any Member proposing to effect a Transfer of Units must submit to the Company, not less than five (5) Business Days prior to such Transfer, a written notice (a "Transfer Notice") of such Transfer.  A Transfer Notice shall be delivered to the Company, to the attention of (i) the Secretary, the Chief Operating Officer or Chief Financial Officer, or any of their designees, and (ii) the Chairperson, in each case in accordance with Section 17.5.  A Transfer Notice shall include or be accompanied by (A) the name, address, e-mail address and telephone number of the Transferor and the Transferee, (B) a certification from the Transferee whether the Transferee is an Affiliate of the Transferor, (C) a certification from the Transferee that the Transferee is not a Sanctioned Person, (D) a certification from the Transferee that the Transferee is not a Competitor under clause (a) or clause (c) of the definition of "Competitor", (E) the number and class and/or series of Units proposed to be Transferred to, and acquired by, the Transferee, (F) the date on which the Transfer is proposed to be effective, (G) the percentage of the Transferor's total number of Units of the same class and/or series to be Transferred, (H) a Joinder Agreement, duly completed and executed by the Transferee to the extent such Transferee has not already signed a counterpart of this Agreement or executed a Joinder Agreement, (I) an AI Questionnaire, duly completed and executed by the Transferee, (J) an IRS Form W-9 or appropriate IRS Form W-8, as applicable, duly completed and executed by the Transferee to the extent such Transferee has not already delivered to the Company such a duly completed and executed tax form that is not obsolete, inaccurate or expired, and (K) a request that the Company instruct the Transfer Agent to register the Transfer in the Register of Members.  So long as the other provisions of this Section 9.1 are satisfied and complied with, the Company shall, within five (5) Business Days after a Transfer Notice is delivered to the Company (but in no event earlier than the proposed effective date of Transfer specified in the Transfer Notice), instruct and use commercially reasonable efforts to cause the Transfer Agent to register the Transfer in the Register of Members unless, (I) prior to the expiration of such five (5) Business Day period, the Company requests information demonstrating that the Transfer complies with this Section 9.1 (including information demonstrating that the Transferee is not a Competitor or a Sanctioned Person) or (II) the Transferor by written

notice to the Company withdraws the related Transfer Notice prior to registration of the Transfer.  If any such request for information is made, the Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to register the Transfer in the Register of Members no later than five (5) Business Days after the Company receives such information (but in no event earlier than the proposed effective date of Transfer specified in the Transfer Notice), unless the Company determines during any such five (5)-Business Day period that the Transfer is not permitted pursuant to the terms of this Section 9.1, in which case the Company shall promptly inform the Transferor of such determination.  Upon the closing of each Transfer that is permitted by this Agreement and the Transferee becoming a party to this Agreement, (x) such Transferee shall be admitted as, and deemed to be, a Member for purposes of this Agreement, (y) such Transferee shall be entitled to the rights (excluding any rights of a Member that are not assignable or otherwise transferable pursuant to the terms of this Agreement), and subject to the obligations, of a Member with respect to the Transferred Units and (z) the Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to amend and update the Register of Members to reflect such Transfer.

(d)    *Prohibited Transfers Void.*  The Company shall not instruct or cause the Transfer Agent to register the Transfer of any Units in the Register of Members except for Transfers that are consummated in accordance with the terms and provisions of this Agreement and, in the case of any Class B Units, the terms and provisions of any applicable Management Incentive Plan and/or Award Agreement.  Any purported Transfer of Units in violation of such terms and provisions shall be void *ab initio* and shall not be recognized by the Company.

(e)    *Legends*.

(i)    All certificates (if any) or statements related to book-entry accounts (if any) representing or otherwise evidencing any Units that were issued under the Plan of Reorganization shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to Section 9.1(e)(iv) below):

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. § 1145.  THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH LIMITED LIABILITY COMPANY INTERESTS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF

THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

(ii)    All certificates (if any) or statements related to book-entry accounts (if any) representing or otherwise evidencing any Units (excluding Units that were issued under the Plan of Reorganization) shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to Section 9.1(e)(iv) below):

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

(iii)    All certificates (if any) or statements related to book-entry accounts (if any) representing or otherwise evidencing any Units shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to Section 9.1(e)(iv) below):

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF FUSION PARENT, LLC (THE "COMPANY") DATED AS OF JUNE [6], 2025 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "LLC AGREEMENT") BY AND AMONG THE COMPANY AND THE MEMBERS OF THE COMPANY. NO REGISTRATION OR TRANSFER OF THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WILL BE MADE ON THE BOOKS OF THE COMPANY OR ITS TRANSFER AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH.  THE COMPANY OR ITS TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] A COPY OF THE LLC AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF LIMITED LIABILITY COMPANY INTERESTS, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS."

(iv)    In the event that any Units shall be registered for Transfer under the Securities Act, the Company shall, upon the written request of the holder of such Units, issue to such holder a new certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Units without the legend required by Section 9.1(e)(i) or Section 9.1(e)(ii). In the event that any Units shall cease to be subject to the restrictions on Transfer set forth in this Section 9.1, the Company shall, upon the written request of the holder of such Units, issue to such holder a new certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Units without the legend required by Section 9.1(e)(iii).

(v)    In the case of uncertificated Units, the Company shall provide notice to the Members of the applicable legends required by Sections 9.1(e)(i), 9.1(e)(ii) and 9.1(e)(iii) in accordance with applicable law.

(vi)    Each Member shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Agreement (including the restrictions on Transfer set forth in this Section 9.1) for all purposes of this Agreement and applicable law (including the Act and the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any certificate or statement of book-entry position, as applicable, representing or otherwise evidencing any Units owned or held by such Member bears the applicable legends set forth in Sections 9.1(e)(i), 9.1(e)(ii) and 9.1(e)(iii) and whether or not any such Member received a separate notice of such terms, provisions, restrictions and conditions.

(f)    *Transfers of Class B Units*.  Anything in this Agreement to the contrary notwithstanding, Class B Units shall not be Transferred by any Member unless such Transfer also complies with any restrictions on Transfer set forth in the applicable Management Incentive Plan and/or any applicable Award Agreement (which restrictions may be in addition to, and/or more restrictive than, the restrictions on Transfer of Units set forth in this Agreement).

(g)    *Certain Members*.  If any Member is an Entity that has no substantial assets other than Units and/or indebtedness of, or securities in, the Company or any of its Subsidiaries, then such Member agrees that no Equity Interests in such Member may be sold, transferred or otherwise disposed to any Person other than in accordance with the terms and provisions of this Section 9.1 as if such Equity Interests were Units; provided, that a sale, transfer or other disposition of Equity Interests in such Member to any Affiliate of such Member (other than to any Affiliate of such Member that is a portfolio company of such Member or any of its other Affiliates) shall not be subject to this Section 9.1(g).

(h)    *No Requirement to List*.  The Company shall have no obligation under this Agreement to list any of the Units or other Interests on any securities exchange, automated quotation system or over-the-counter marketplace.

(i)    *Transfers to the Company*.  A Transfer of Units to the Company shall not be subject to the requirements of this Section 9.1.

(j)    *Reimbursement of Company Expenses*.  The Transferor and the Transferee shall be jointly and severally obligated to reimburse the Company for all reasonable out-of-pocket third-party costs and expenses (including legal fees) incurred by the Company in connection with any Transfer or proposed Transfer of such Transferor's Units (excluding any Transfer or proposed Transfer pursuant to Section 9.3 or otherwise pursuant to a Sale Transaction).

(k)    *Modifications to Procedural Provisions*.    Notwithstanding anything herein to the contrary, the Company may, in its sole discretion, waive or modify the application of any term or provision of a procedural nature set forth herein to any Transfer so long as such waiver or modification (i) is for administrative convenience purposes to facilitate the consummation of such Transfer, (ii) does not adversely affect the rights of any of the Members, (iii) does not subject any of the Members to any additional obligations or liabilities, and (iv) is approved by the Transferor and the ultimate Transferee of such Transfer (which approval may be provided by e-mail to the Company in accordance with Section 17.5).  The right of the Company to make any such waiver or modification need not be uniform among Transfers and may be made by it selectively among any Transfers (whether or not such Transfers are similar in nature).  Any such waiver or modification shall not require any consents or approvals of the Members under Section 14.1.

9.2    Transfer Agents; Regulations.  The Company, by resolution or written consent of the Board, may from time to time appoint a Transfer Agent (which may be the Company) under such arrangements and upon such terms and conditions as the Board deems advisable.  Unless the Board has appointed some other Person as its Transfer Agent (and upon the revocation of any such appointment, thereafter until a new appointment is similarly made) the Secretary, or any Person designated by the Secretary, shall be the Transfer Agent without the necessity of any formal action of the Board, and the Secretary, or any Person designated by the Secretary, shall perform all of the duties of the Transfer Agent.  The Board may make such rules and regulations as it may deem expedient and as are not inconsistent with this Agreement, concerning the issue, registration and Transfer of certificates for Units.

9.3    Drag-Along Transactions.

(a)    In the event that the Majority Members at the time of the delivery of a Drag Notice (for purposes of this Section 9.3, each, a "Selling Member" and, collectively, the "Selling Members") determine to effect, approve or otherwise take any action that would cause the occurrence of, or desire to consummate, a Sale Transaction (whether or not a Member vote is required) to or with any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) other than the Selling Members or any Affiliates thereof (a "Third Party Purchaser") (any such Sale Transaction, a "Drag-Along Transaction"), the Company or the Selling Members (or a designated representative acting on behalf of the Selling Members) will have the right (but not the obligation) to deliver written notice thereof at least five (5)

Business Days prior to the consummation of the proposed Sale Transaction (a "<u>Drag Notice</u>") to all other Members (each, a "<u>Dragged Member</u>" and, collectively, the "<u>Dragged Members</u>"), including any holders of Class B Units.  Such written notice shall be delivered to the Dragged Members in accordance with <u>Section 17.5</u> and shall contain a reasonable description of the material terms and conditions of the Drag-Along Transaction, including the amount and form of consideration to be paid by the Third Party Purchaser, the identity of the proposed third Party Purchaser and copies of any Drag-Along Transaction Documents or Investment Documents that the Dragged Members will be required to execute and deliver in connection with such Drag-Along Transaction (to the extent such documents exist and are in substantially final form at the time such Drag Notice is delivered to the Dragged Members) and the proposed date (which may be an estimated date or range of dates) for the closing of the Drag-Along Transaction.

(b)    If a Drag Notice is delivered by the Company or by or on behalf of the Selling Members to the Dragged Members, each of the Dragged Members shall:

(i)    if such Drag-Along Transaction is structured as a Transfer of Units (including any Transfer of Units by way of a merger of the Company with any other Person), be obligated to Transfer to the Third Party Purchaser (subject to the other terms of this <u>Section 9.3(b)</u>), at the closing of such Drag-Along Transaction, all Units held by such Dragged Member (or the applicable portion of such Dragged Member's Units that are required to be Transferred in connection with such Drag-Along Transaction, as determined in accordance with <u>Section 9.3(c)</u>) on purchase terms and conditions that are substantially the same as those purchase terms and conditions applicable to the Units of the Selling Members of the same class or series (excluding any investment or reinvestment opportunity given to management of the Company or any of its Subsidiaries), free and clear of any Liens (other than Permitted Liens); <u>provided</u>, that if the Selling Members are given an option as to the form of consideration to be received in exchange for their Units of any class or series, then each of the Dragged Members need only be given the same option with respect to their Units of the same class or series;

(ii)    if such Drag-Along Transaction is structured as a sale or transfer of assets (including by or through the sale, issuance or other disposition of the Equity Interests of, or reorganization, merger, unit or share exchange, consolidation or other business combination involving, any direct and/or indirect Subsidiary or Subsidiaries of the Company), approve any subsequent dissolution and liquidation of the Company or any of its Subsidiaries in connection therewith and execute and/or deliver any applicable documents, instruments or agreements related thereto;

(iii)    (A) be required to vote (including by written consent) such Dragged Member's Units (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Drag-Along Transaction, and (B) not raise any objection against such Drag-Along Transaction (including

objections relating to the consideration being paid in connection therewith) or the process pursuant to which it was arranged, negotiated or consummated;

(iv)    execute and deliver any applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Drag-Along Transaction (on terms substantially the same as those terms applicable to the Selling Members) that the Company, the Selling Members or the Third Party Purchaser may request and which are executed and delivered by the Selling Members (the "Drag-Along Transaction Documents"), and (A) agree to or provide the same covenants, obligations, indemnities and agreements as agreed to or provided by the Selling Members set forth therein and (B) make the same representations and warranties as the Selling Members, on a several and not joint basis, regarding organization, existence and good standing of such Dragged Member, the power and authority of such Dragged Member to enter into the Drag-Along Transaction, due authorization, execution and delivery by such Dragged Member of the Drag-Along Transaction Documents and the Investment Documents, enforceability against such Dragged Member of the Drag-Along Transaction Documents and the Investment Documents, good and marketable title (free and clear of all Liens) of the Units of such Dragged Member, the consents and notices required to be obtained or made by such Dragged Member in connection with such Drag-Along Transaction, no conflicts with organizational documents, contracts or law applicable to such Dragged Member, no legal proceedings against such Dragged Member, no brokers' fees owed by such Dragged Member in connection with such Drag-Along Transaction, and other matters reasonably requested by the Third Party Purchaser with respect to such Dragged Member and related to such Drag-Along Transaction; provided, however, that (x) no Dragged Member shall be required to provide any indemnity relating to such Drag-Along Transaction that is in excess of the amount of proceeds payable to such Dragged Member in connection with such Drag-Along Transaction (other than on account of such Dragged Member's own fraud), (y) any escrow arrangement or indemnity shall be allocated among each Selling Member and Dragged Member *pro rata* based upon the allocation among each such Member of the consideration payable in respect of Units in the Drag-Along Transaction; provided, that, subject to the limitations set forth in clause (x), any indemnities on account of a Dragged Member's representations and warranties described in clause (B) above or a Dragged Member's own fraud or breach by such Dragged Member of covenants given by such Dragged Member shall be solely the responsibility of such Dragged Member, and (z) no Dragged Member shall be required to provide any non-competition, non-solicitation or similar covenant other than customary confidentiality covenants;

(v)    if the Members will receive any Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in the continuing, acquiring, resulting or surviving entity in the Drag-Along Transaction, or any Affiliate thereof (the "Surviving Entity"), execute and deliver any applicable limited liability company

agreement, stockholders agreement, partnership agreement, investor rights agreement, voting agreement or similar agreement which relates to the internal governance of the Surviving Entity and/or the rights or obligations of the owners of the Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in the Surviving Entity that the Company, the Selling Members or the Third Party Purchaser may request and which are executed and delivered by the Selling Members (the "Investment Documents"), and agree to or provide the same covenants, obligations and agreements as agreed to or provided by the Selling Members set forth therein; provided, that the Selling Members shall use commercially reasonable efforts to facilitate the granting to the Dragged Members of minority protections with respect to the Surviving Entity that are both customary and commensurate with its proportionate ownership in the Surviving Entity;

(vi)    use commercially reasonable efforts to obtain or make any consents or filings necessary to be obtained or made by such Dragged Member to effectuate such Drag-Along Transaction; provided, that no Dragged Member shall be required to agree to any material obligations or material restrictions in connection with obtaining regulatory approvals other than obligations to cooperate in the making thereof;

(vii)    without limiting the provisions of Section 5.6, waive and refrain from exercising any appraisal, dissenters or similar rights with respect to such Drag-Along Transaction;

(viii)    not (A) take any action that would reasonably be expected to impede or be prejudicial to such Drag-Along Transaction, (B) assert, at any time, any claim against the Company, any member of the Board (or any committee thereof), any member of any Subsidiary Governing Body or any other Member or any of its Affiliates (including any Selling Member and any of its Affiliates) in connection with such Drag-Along Transaction, or (C) except as permitted under and pursuant to Article 18, disclose to any Person any information related to such Drag-Along Transaction (including the identity of the Third Party Purchaser, the fact that discussions or negotiations are taking place concerning such Drag-Along Transaction, or any of the terms, conditions or other information with respect to such Drag-Along Transaction); and

(ix)    take all necessary or desirable actions reasonably requested by the Selling Members, the Third Party Purchaser and/or the Company in connection with the consummation of such Drag-Along Transaction, including voting such Dragged Member's Units (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Drag-Along Transaction and, if applicable, in favor of a Corporate Conversion in connection with such Drag-Along Transaction.

(c)     In the case of a Drag-Along Transaction pursuant to which the Selling Members are collectively Transferring less than one hundred percent (100%) of all of the Units owned or held by the Selling Members in the aggregate, each Dragged Member shall be required to Transfer a percentage of the Units owned or held by such Dragged Member equal to the quotient obtained by dividing (i) the total number of Units owned or held by the Selling Members that are proposed to be Transferred in such Drag-Along Transaction by (ii) the total number of Units owned or held by the Selling Members in the aggregate.

(d)     At the closing of any Drag-Along Transaction that is structured as a sale or other Transfer of Units in which the Selling Members have exercised their rights under this Section 9.3, each Dragged Member shall deliver at such closing, against payment of the purchase price therefor in accordance with the terms of the Drag-Along Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Third Party Purchaser) representing such Dragged Member's Units to be sold, duly endorsed for transfer or accompanied by duly endorsed instruments of transfer, and such other documents as are deemed reasonably necessary by any one or more of the Selling Members, the Third Party Purchaser and/or the Company for the proper transfer of such Units on the books of the Company or the Transfer Agent, free and clear of any Liens (other than Permitted Liens).

(e)     Each Selling Member and each Dragged Member will bear its *pro rata* share (based upon the allocation among each such Member of the consideration payable in respect of Units in the Drag-Along Transaction) of the costs and expenses of any Drag-Along Transaction to the extent such costs and expenses are incurred for the benefit of all Members or the Company and are not otherwise paid by the Company or the Third Party Purchaser.  Costs and expenses incurred by any Member on its own behalf will not be considered costs and expenses of the Drag-Along Transaction and will be borne solely by such Member.

(f)     The Company shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Drag-Along Transaction and not take any action which would reasonably be expected to impede or be prejudicial to any such Drag-Along Transaction.  Pending the completion of any proposed Drag-Along Transaction, the Company shall use commercially reasonable efforts to operate the Company and its Subsidiaries in the ordinary course of business and to maintain all existing business relationships in good standing (unless otherwise required by the Drag-Along Transaction Documents) and otherwise comply with the terms of the Drag-Along Transaction Documents to which it is a party.

(g)     The Company shall cooperate with the Selling Members to enter into a Drag-Along Transaction and to take any and all such further action in connection therewith as the Selling Members may deem reasonably necessary or reasonably appropriate in order to consummate (or, if directed by the Selling Members, abandon) any such Drag-Along Transaction.  Neither the Company, any of its Subsidiaries nor any of the Selling Members shall have any liability if any Drag-Along Transaction is not

consummated for any reason (including if the Selling Members elect to abandon such Drag-Along Transaction for any reason or for no reason). Subject to the provisions of this Section 9.3, the Selling Members, in exercising their rights under this Section 9.3, shall have complete discretion over the terms and conditions of any Drag-Along Transaction effected hereby, including price, payment terms, conditions to closing, timing of closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows. At the request of the Selling Members, the Board shall authorize and direct the Company and/or any now or hereafter created Subsidiary of the Company to execute such agreements, documents, applications, authorizations, registration statements and instruments as they may deem reasonably necessary or reasonably appropriate in connection with any Drag-Along Transaction.

(h)    IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED MEMBER TO VOTE SUCH DRAGGED MEMBER'S UNITS IN FAVOR OF A DRAG-ALONG TRANSACTION AND (WITHOUT LIMITING THE PROVISIONS OF SECTION 5.6) TO WAIVE ANY APPRAISAL, DISSENTERS OR SIMILAR RIGHTS THAT SUCH DRAGGED MEMBER HAS (OR MAY HAVE) WITH RESPECT TO ANY DRAG-ALONG TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 9.3(b), EACH DRAGGED MEMBER HEREBY IRREVOCABLY APPOINTS THE SELLING MEMBERS (AND EACH OF THEM) AS SUCH DRAGGED MEMBER'S TRUE AND LAWFUL PROXY AND ATTORNEY, WITH FULL POWER OF SUBSTITUTION, TO VOTE ALL UNITS OWNED OR HELD BY SUCH DRAGGED MEMBER OR OVER WHICH SUCH DRAGGED MEMBER HAS VOTING CONTROL TO EFFECTUATE SUCH VOTES AND WAIVERS FOR THE DURATION OF THE EXISTENCE OF THE COMPANY; PROVIDED, THAT SUCH PROXY AND ATTORNEY SHALL ONLY APPLY TO THE EXTENT SUCH DRAGGED MEMBER FAILS TO COMPLY WITH ANY OF ITS OBLIGATIONS PURSUANT TO THIS SECTION 9.3 WITHIN THREE (3) BUSINESS DAYS OF ANY OF THE SELLING MEMBERS MAKING A REQUEST IN WRITING IN RESPECT OF SUCH OBLIGATIONS. IN ADDITION, IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED MEMBER TO EXECUTE AND DELIVER THE DRAG-ALONG TRANSACTION DOCUMENTS AND, IF APPLICABLE, THE INVESTMENT DOCUMENTS, AND TO TAKE ACTIONS IN CONNECTION WITH THE CONSUMMATION OF A DRAG-ALONG TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 9.3(b), EACH DRAGGED MEMBER HEREBY IRREVOCABLY GRANTS TO THE SELLING MEMBERS (AND EACH OF THEM) A POWER-OF-ATTORNEY TO SIGN ANY AND ALL SUCH DRAG-ALONG TRANSACTION DOCUMENTS AND, IF APPLICABLE, INVESTMENT DOCUMENTS, AND TO TAKE ANY AND ALL SUCH ACTIONS, IN THE NAME AND ON BEHALF OF SUCH DRAGGED MEMBER; PROVIDED, THAT SUCH POWER OF ATTORNEY SHALL ONLY APPLY TO THE EXTENT SUCH DRAGGED MEMBER FAILS TO COMPLY WITH ANY OF ITS OBLIGATIONS PURSUANT TO THIS SECTION 9.3 WITHIN THREE (3) BUSINESS DAYS OF ANY OF THE SELLING MEMBERS MAKING A REQUEST IN WRITING IN RESPECT OF SUCH OBLIGATIONS. THE PROXIES AND POWERS OF ATTORNEY GRANTED BY EACH DRAGGED MEMBER PURSUANT TO THIS SECTION 9.3(h) ARE COUPLED WITH AN INTEREST, ARE

IRREVOCABLE, AND SHALL NOT BE AFFECTED BY AND SHALL SURVIVE THE DEATH, INCOMPETENCY, INCAPACITY, DISABILITY, MERGER, CONSOLIDATION, BANKRUPTCY, INSOLVENCY, LIQUIDATION OR DISSOLUTION OF ANY DRAGGED MEMBER.

(i)     Any Class B Units Transferred in a Drag-Along Transaction by a Selling Member or a Dragged Member shall immediately and automatically convert into Class A Units, subject to any vesting or other requirements of the applicable Management Incentive Plan and/or Award Agreement, upon the consummation of such Drag-Along Transaction, as determined by the Board.

(j)     A Transfer of Units in a Drag-Along Transaction by a Selling Member or a Dragged Member pursuant to this Section 9.3 shall not be subject to the requirements of Section 9.1 (other than Section 9.1(a)(i)).

(k)     For the avoidance of doubt, the obligations of the Company and the Dragged Members pursuant to this Section 9.3 shall apply irrespective of the amount of consideration (if any) to be paid to each Dragged Member pursuant to the Drag-Along Transaction.

9.4     Tag-Along Transactions.

(a)     In the event that one or more Members (acting alone or with other Members) who own or hold Class A Units (each, an "Initiating Holder" and, collectively, the "Initiating Holders") desire to effect a Tag-Along Transaction, the Initiating Holders (or a designated representative acting on their behalf) shall deliver written notice (a "Sale Notice") to all other Members that own or hold Class A Units (each, a "Tag-Along Seller" and, collectively, the "Tag-Along Sellers") and the Company, in accordance with Section 17.5, at least ten (10) Business Days prior to the consummation of such Tag-Along Transaction, offering the Tag-Along Sellers the opportunity to participate in such Tag-Along Transaction on the terms and conditions set forth in the Sale Notice (which terms and conditions shall be substantially the same as those terms and conditions (including at the same form of consideration and price) applicable to the Initiating Holders (except that if the Initiating Holders are given an option as to the form of consideration to be received in exchange for their Class A Units, each of the Tag-Along Sellers shall only need to be given the same option with respect to their Class A Units)); provided, however, that if the consideration to be paid in such Tag-Along Transaction consists, in whole or in part, of securities or any other non-cash consideration, then any Member that is not an Accredited Investor or any Member who does not, promptly following the request of the Initiating Holders or the Transferee in such Tag-Along Transaction (but in any event within three (3) Business Days after receipt of any such request), certify to the Initiating Holders and the Transferee in such Tag-Along Transaction that such Member is an Accredited Investor shall not be offered the opportunity to participate in such Tag-Along Transaction and shall not be deemed a Tag-Along Seller for purposes of such Tag-Along Transaction. The Sale Notice shall contain a reasonable description of the material terms and conditions of the Tag-Along Transaction, including the total number of Class A Units proposed to be Transferred, the

proposed amount and form of consideration for the Class A Units proposed to be Transferred, the identity of the proposed Transferee, and copies of any Tag-Along Transaction Documents that the Tag-Along Sellers will be required to execute and deliver in connection with such Tag-Along Transaction (to the extent such documents exist and are in substantially final form at the time such Sale Notice is delivered to the Tag-Along Sellers).

(b)    Each Tag-Along Seller may, by written notice (each, an "Acceptance Notice") delivered to the Initiating Holders (or their designated representative) within five (5) Business Days after delivery of the Sale Notice to such Tag-Along Seller, elect to Transfer Class A Units in such Tag-Along Transaction, on the terms and conditions set forth in the Sale Notice; provided, however, that if the proposed Transferee in the Tag-Along Transaction desires to purchase a number of Class A Units that is less than the aggregate number of Class A Units proposed to be Transferred by the Initiating Holders and all Tag-Along Sellers electing to Transfer Class A Units in the Tag-Along Transaction, then the Initiating Holders may elect to either (i) terminate such Tag-Along Transaction with respect to the Initiating Holders and each Tag-Along Seller or (ii) consummate such Tag-Along Transaction on the basis of such lesser number of Class A Units and, upon such election to consummate the Tag-Along Transaction, each Initiating Holder and each electing Tag-Along Seller shall be permitted to Transfer to such Transferee up to that number of Class A Units owned or held by such Initiating Holder or such Tag-Along Seller, as the case may be, equal to the product of (x) the total number of Class A Units to be acquired by the Transferee in the proposed Tag-Along Transaction and (y) such Initiating Holder's or such Tag-Along Seller's (as applicable) proportionate percentage of the issued and outstanding Class A Units collectively owned or held by the Initiating Holders and all electing Tag-Along Sellers; provided, further, that if at any time after delivery of a Sale Notice there is a change in the price or other material change in the terms or conditions of the proposed Tag-Along Transaction described in such Sale Notice, then the Initiating Holders shall deliver a revised Sale Notice to all Tag-Along Sellers indicating such revised price and/or other material change, and each Tag-Along Seller shall have an additional five (5) Business Days after delivery of the revised Sale Notice to indicate whether or not it elects to Transfer Class A Units in such Tag-Along Transaction, on the terms and conditions set forth in the revised Sale Notice (it being understood and agreed that if a Tag-Along Seller elected to Transfer Class A Units in such Tag-Along Transaction prior to the commencement of such additional five-Business Day period, then such election will remain in effect unless such Tag-Along Seller revokes, amends or otherwise modifies such election in writing prior to the expiration of such additional five-Business Day period).

(c)    In connection with any Tag-Along Transaction in which any Tag-Along Seller elects to participate pursuant to this Section 9.4, each such Tag-Along Seller shall take all necessary or desirable actions reasonably requested by the Initiating Holders and/or the Transferee in such Tag-Along Transaction in connection with the consummation of such Tag-Along Transaction, including (A) executing and delivering the applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Tag-Along Transaction that the Initiating Holders or the Transferee in

such Tag-Along Transaction may request (the "Tag-Along Transaction Documents"); provided, that (x) any escrow arrangement or indemnity shall be allocated among each Tag-Along Seller and Initiating Holders pro rata based upon the allocation among each such Member of the consideration payable in respect of Units in the Tag-Along Sale and (y) no Tag-Along Seller shall be required to provide any non-competition, non-solicitation or similar covenant (other than customary confidentiality covenants) pursuant to such Tag-Along Transaction Documents, and (B) if the Initiating Holders and the Tag-Along Sellers will receive any Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in the Transferee or any other Person in connection with such Tag-Along Transaction, executing and delivering any applicable limited liability company agreement, stockholders agreement, partnership agreement, investor rights agreement, voting agreement or similar agreement which relates to the internal governance of such Transferee or such other Person and/or the rights or obligations of the owners of the Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in such Transferee or such other Person that Initiating Holders or the Transferee may request and which are executed and delivered by the Initiating Holders.  In connection with any Tag-Along Transaction that complies with this Section 9.4, no Member (whether or not a Tag-Along Seller) shall (i) take any action that would reasonably be expected to impede or be prejudicial to such Tag-Along Transaction, (ii) assert, at any time, any claim against the Company, any member of the Board (or any committee thereof), any member of any Subsidiary Governing Body or any other Member or any of its Affiliates (including any Initiating Holder and any of its Affiliates) in connection with such Tag-Along Transaction, or (iii) except as permitted under and pursuant to Article 18, disclose to any Person any information related to such Tag-Along Transaction (including the identity of the Transferee, the fact that discussions or negotiations are taking place concerning such Tag-Along Transaction, or any of the terms, conditions or other information with respect to such Tag-Along Transaction).

(d)    At the closing of any Tag-Along Transaction in which any Tag-Along Seller has elected to participate under this Section 9.4, such Tag-Along Seller shall deliver at such closing, against payment of the consideration therefor in accordance with the terms of the Tag-Along Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Transferee in such Tag-Along Transaction) representing its Class A Units to be Transferred, duly endorsed for transfer or accompanied by duly endorsed instruments of transfer, and such other documents as are deemed reasonably necessary by the Initiating Holders, the Transferee in such Tag-Along Transaction and/or the Company for the proper Transfer of such Class A Units on the books of the Company or the Transfer Agent, free and clear of any Liens (other than Permitted Liens).

(e)    Each Initiating Holder and each Tag-Along Seller electing to participate in a Tag-Along Transaction under this Section 9.4 will bear its *pro rata* share (based upon the allocation among each such Member of the consideration payable in respect of Class A Units in the Tag-Along Transaction) of the costs and expenses of any such Tag-Along Transaction to the extent such costs and expenses are incurred for the benefit of all

such Members and are not otherwise paid by the Company or the Transferee. Costs and expenses incurred by any such Member on its own behalf will not be considered costs of the Tag-Along Transaction and will be borne solely by such Member.

(f)     Subject to the provisions of this <u>Section 9.4</u>, the Initiating Holders shall have complete discretion over the terms and conditions of any Tag-Along Transaction, including price, payment terms, conditions to closing, timing of closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows. Neither the Company, any of its Subsidiaries nor any of the Initiating Holders shall have any liability if any Tag-Along Transaction is not consummated for any reason (including if the Initiating Holders elect to abandon such Tag-Along Transaction for any reason or for no reason).

(g)     The Company shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Tag-Along Transaction and not take any action which would reasonably be expected to impede or be prejudicial to any such Tag-Along Transaction. Pending the completion of any proposed Tag-Along Transaction, the Company shall use commercially reasonable efforts to operate the Company and its Subsidiaries in the ordinary course of business and to maintain all existing business relationships in good standing (unless otherwise required by the Tag-Along Transaction Documents) and otherwise comply with the terms of the Tag-Along Transaction Documents to which it is a party.

(h)     If any Tag-Along Seller electing to participate in a Tag-Along Transaction materially breaches any of its obligations under this <u>Section 9.4</u> in respect of such Tag-Along Transaction or any of its representations or obligations under any of the Tag-Along Transaction Documents, then, (i) at the option of the Initiating Holders, such Tag-Along Seller will not be permitted to participate in such Tag-Along Transaction and the Initiating Holders can proceed to close such Tag-Along Transaction excluding the sale of such Tag-Along Seller's Class A Units therefrom and, (ii) at the option of the Initiating Holders, the number of Class A Units to be Transferred by the Initiating Holders and the Tag-Along Sellers (excluding the breaching Tag-Along Seller) shall be recalculated pursuant to <u>clause (ii)</u> of <u>Section 9.4(b)</u> excluding the breaching Tag-Along Seller from such calculation.

(i)     The Initiating Holders shall have the right for a period of ninety (90) days after the expiration of the latest five (5) Business Day period referred to in <u>Section 9.4(b)</u> to consummate the Tag-Along Transaction. In the event that the Initiating Holders have not consummated the Tag-Along Transaction within such ninety-day period, the Initiating Holders shall not thereafter consummate such Tag-Along Transaction unless the Initiating Holders again comply with the terms of this <u>Section 9.4</u>; <u>provided</u>, <u>however</u>, that if such Tag-Along Transaction is unable to be consummated within such ninety-day period as a result of antitrust or other regulatory delay, then such ninety-day period shall be extended on account of such delay as necessary to permit the Initiating Holders to effect such Tag-Along Transaction.

(j)    The exercise or non-exercise of the rights of any of the Members under this <u>Section 9.4</u> to participate in one or more Tag-Along Transactions shall not adversely affect their rights to participate in subsequent Tag-Along Transactions subject to this <u>Section 9.4</u>.

9.5    <u>Appointment of Purchaser Representative</u>.  If the Selling Members enter into any negotiation or transaction for which Rule 506 of Regulation D (or any similar rule then in effect) promulgated by the SEC may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), each Dragged Member who is not an Accredited Investor shall, at the request of the Company or the Selling Members, appoint a "purchaser representative" (as such term is defined in Rule 501 of Regulation D) reasonably acceptable to the Company and the Selling Members in connection with such negotiation or transaction.

9.6    <u>Preemptive Rights</u>.

(a)    After the Effective Date, the Company shall not, and the Company shall not permit any of its Subsidiaries to, sell or issue to any Person (including any then-current Member) any (i) Equity Interests of the Company or any of its Subsidiaries, or (ii) options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests of the Company or any of its Subsidiaries (any such Equity Interests, options, warrants or securities, collectively, the "<u>Additional Securities</u>") (other than pursuant to an Excluded Issuance), unless the Company or its applicable Subsidiary first submits written notice (a "<u>Preemptive Rights Notice</u>") to each Member that owns or holds Class A Common Units identifying the material terms of the Additional Securities (including the price, number or amount and type of Additional Securities, and all other material terms thereof) and offers to each such Member (other than holders of Class B Units) that also demonstrates to the Company's reasonable satisfaction that such Member is an Accredited Investor (any such Member, a "<u>Preemptive Member</u>" and, collectively, the "<u>Preemptive Members</u>") the opportunity to purchase up to a portion of the Additional Securities (a "<u>Pro Rata Portion</u>") on such terms and conditions set forth in the Preemptive Rights Notice.  A Preemptive Member's Pro Rata Portion shall be equal to the product of (1) the total number or amount of Additional Securities subject to the sale or issuance and (2) a fraction, (A) the numerator of which is the number of Class A Units then owned or held by such Preemptive Member, and (B) the denominator of which is the total number of Class A Units then owned or held by all Preemptive Members collectively.

(b)    The Company's or its applicable Subsidiary's offer to each Preemptive Member shall remain open for a period of thirty (30) days after the Preemptive Rights Notice is delivered to such Preemptive Member in accordance with <u>Section 17.5</u>.  A Preemptive Member may accept such offer by delivering written notice of such acceptance to the Company prior to the expiration of such thirty (30) day period, which notice shall set forth the number or amount of such Additional Securities to be purchased by such Preemptive Member (which, in any event, shall not exceed the number or amount equal to such Preemptive Member's Pro Rata Portion).  If not all Preemptive Members subscribe for their full respective Pro Rata Portions, then the Company shall notify in

writing the fully-subscribing Preemptive Members of such fact and shall offer, or cause its applicable Subsidiary to offer, such fully-subscribing Preemptive Members the right to acquire such unsubscribed Additional Securities on the terms set forth in the Preemptive Rights Notice. Each fully-subscribing Preemptive Member shall have the right to elect to purchase up to its pro rata share of such unsubscribed Additional Securities (in proportion to the Pro Rata Portions of all fully-subscribing Preemptive Members), by delivering written notice to the Company within two (2) Business Days from the date such offer from the Company or its applicable Subsidiary is delivered to such Preemptive Member. To the extent the procedure described in the preceding sentence does not result in the subscription of all unsubscribed Additional Securities, such procedure shall be repeated until there are no unsubscribed Additional Securities or until no Preemptive Member has elected to purchase additional unsubscribed Additional Securities. A Preemptive Member's failure to respond to the Company by the expiration of such thirty (30) day period shall constitute a waiver of its rights under this <u>Section 9.6</u> with respect to the purchase of Additional Securities, but shall not affect its rights with respect to any future issuances or sales of Additional Securities.

(c)     In the event that any Additional Securities are not subscribed for by the Preemptive Members in accordance with this <u>Section 9.6</u>, the Company or its applicable Subsidiary will have ninety (90) days after the expiration of the last period in which Preemptive Members are entitled to subscribe for Additional Securities to issue or sell the unsubscribed Additional Securities, at a price and upon other terms no more favorable to a purchaser of Additional Securities, in the aggregate, than those specified in the Preemptive Rights Notice delivered to the Preemptive Members pursuant to <u>Section 9.6(a)</u>. Following the earlier to occur of (i) the date the Company or its applicable Subsidiary issues or sells all such unsubscribed Additional Securities and (ii) the date of the expiration of the ninety (90) day period referred to in the immediately preceding sentence, the Company or its applicable Subsidiary will not issue or sell any Additional Securities (other than pursuant to an Excluded Issuance) without first offering such Additional Securities to each of the Preemptive Members in the manner provided in this <u>Section 9.6</u>.

(d)     Notwithstanding anything to the contrary set forth herein, the Company may comply with its obligations under this <u>Section 9.6</u> by first selling or issuing to (or causing its applicable Subsidiary to sell or issue to) one or more Persons (including any of the Preemptive Members and/or any of their respective Affiliates) (each, an "<u>Accelerated Acquirer</u>") all or any portion of the Additional Securities contemplated to be issued or sold, and, promptly thereafter, offering to issue or sell to the Preemptive Members the number or amount of such Additional Securities the Preemptive Members would have been entitled to purchase pursuant to this <u>Section 9.6</u> by applying <u>Sections 9.6(a)</u> and <u>9.6(b)</u> as if the Company or its applicable Subsidiary had not first issued or sold all or the applicable portion of such Additional Securities to the Accelerated Acquirer but rather had offered to issue or sell all of such Additional Securities to all Preemptive Members at the same time in accordance with the terms of those Sections (and the determination of the number or amount of such Additional Securities to be offered to any Preemptive Member in accordance with this sentence shall take into account any such Additional Securities that were previously purchased by such

Preemptive Member and/or any of its Affiliates if such Preemptive Member and/or any of its Affiliates is an Accelerated Acquirer). The Company or its applicable Subsidiary shall be permitted to pay the Accelerated Acquirer(s) a reasonable fee or premium (which may be nonrefundable) in connection with the issuance or sale of such Additional Securities to such Accelerated Acquirer(s), and it shall not be required that such fee or premium be shared with the Preemptive Members or taken into account in connection with the price to be paid by the Preemptive Members. In the event that any Preemptive Member purchases Additional Securities pursuant to any such offer referred to in the immediately preceding sentence and, as a result thereof, the Accelerated Acquirer(s) would not have been permitted to purchase all of the Additional Securities they had purchased if all of the Additional Securities contemplated to be issued or sold had instead been offered to all Preemptive Members at the same time in accordance with Sections 9.6(a) and 9.6(b), then the Accelerated Acquirer(s) shall sell or transfer to the Company or its applicable Subsidiary, for a price equal to the original cost thereof (plus any accrued and unpaid yield or interest thereon, if applicable, but without reducing such cost by any fee or premium received by the Accelerated Acquirer(s) in connection therewith), the excess number or amount of Additional Securities that had been acquired by the Accelerated Acquirer(s). If the Company issues or sells any Additional Securities to an Accelerated Acquirer pursuant to this Section 9.6(d), then the Company shall not make any Distributions on any of the Common Units (other than the issuance and sale of Additional Securities to Preemptive Members pursuant to this Section 9.6(d)) until after the consummation of the related process of offering and, if applicable, issuing or selling Additional Securities to Preemptive Members pursuant to this Section 9.6(d), unless a reserve is established that is sufficient to make Distributions on Additional Securities that may be issued or sold to Preemptive Members pursuant to this Section 9.6(d) and, if so issued to Preemptive Members, such Preemptive Members shall be entitled to receive such Distribution they would have received with respect to the applicable Additional Securities if they had actually held such Additional Securities on the record date of such Distribution.

(e)       If the Company and/or any of its Subsidiaries desires to sell or issue (other than in an Excluded Issuance) (i) any Additional Securities and (ii) any indebtedness or debt securities of the Company or any of its Subsidiaries that do not otherwise constitute Additional Securities, and the items described in clauses (i) and (ii) are to be sold or issued together in unit increments (or in any other stapled or attached form), then such unit increments shall be deemed Additional Securities for purposes of this Section 9.6 and the provisions of this Section 9.6 shall apply to such unit increments.

## ARTICLE 10
## FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS

10.1    Fiscal Year.    The fiscal year of the Company (the "Fiscal Year") shall be established by the Board.

10.2    Books and Records.  The books and records of the Company may be kept at such place or places as may be from time to time designated by the Board.  The Company shall keep correct and complete books and records of account, including the amount of its assets and liabilities, minutes of its proceedings of its Members and the Board (and any committee of the Board) and the names and places of residence of its officers.

10.3    Tax Election.  The Company intends to be treated as an association taxable as a corporation for U.S. federal, state and local income tax purposes under Treasury Regulation section 301.7701-3 and under any corresponding provision of state or local law.  The Company shall file an Entity Classification Election (IRS Form 8832) to be treated as an association taxable as a corporation for U.S. federal income tax purposes, effective as of the date the Certificate of Formation was filed even if made thereafter, and any officer of the Company is authorized and empowered to make any such election.

10.4    Required Records.  To the fullest extent permitted under applicable law, each Member hereby waives its rights under Section 18-305(a) of the Act to obtain the information specified therein; provided, however, that to the extent that, notwithstanding such waiver, any such Member is entitled to receive such information, the receipt thereof shall be subject to all of the limitations set forth in Section 18-305 of the Act (including the right of the Managers to keep certain information confidential from the Members pursuant to Section 18-305(c) of the Act), and shall be limited to review of the Company's general ledger and those financial statements derived from it; provided, further, that the review of such information shall be at the sole cost and expense of such Member, during regular business hours of the Company, upon reasonable advance notice, in a manner as would not be unreasonably disruptive to the business or operations of the Company or any of its Subsidiaries, and subject to such other standards as may be established by the Board from time to time.  Except as expressly required by non-waivable provisions of applicable law and except as expressly set forth in Section 15.1, the Members shall have no rights to obtain, examine or inspect, or make copies or extracts of, any documents, materials or information relating to the Company or any of its Subsidiaries or any of their respective businesses, assets, operations, properties, financial and other conditions, prospects, or members, partners or shareholders.

10.5    Audits of Books and Accounts.  The Company's books and accounts shall be audited at such times and by such auditors as shall be specified and designated by vote or written consent of the Board.

## ARTICLE 11
## DISTRIBUTIONS

11.1    Distributions.

(a)    Subject to (i) the terms of Section 6.19, (ii) the other terms of this Section 11.1, (iii) the terms of Section 11.2, and (iv) the then existing agreements of the Company or its Subsidiaries relating to indebtedness or debt securities of the Company or any of its Subsidiaries, the Board may (but shall not be obligated to) cause the Company to make Distributions to the Members, at such times and in such amounts as the Board may determine in its sole discretion, and each Distribution shall be made to the Members

that own or hold Class A Units and to the Members that own or hold Class B Units to the extent such Members owning or holding Class B Units are entitled to Distributions in respect of such Class B Units in accordance with this Agreement, the applicable Management Incentive Plan and/or any applicable Award Agreement (ratably among such Members based on their respective ownership, immediately prior to such Distribution, of the total number of issued and outstanding Class A Units and Class B Units entitled to Distributions in accordance with this Agreement, the applicable Management Incentive Plan and/or any applicable Award Agreement).

(b)     Anything in Sections 11.1(a) and 13.2 to the contrary notwithstanding, unless the Board otherwise approves, if any Member that owns or holds Class A Units shall not have (i) actually executed and delivered to the Company (A) a counterpart of this Agreement or a Joinder Agreement or (B) a completed AI Questionnaire as required pursuant to this Agreement, or (ii) provided the Company with such Member's Member Beneficial Ownership Information as required pursuant to this Agreement or any representations, forms, certificates or other information required by Section 11.4, in any such case at or prior to the time of any payment by the Company of any Distribution on account of Class A Units, then (x) such Member shall not receive, or be entitled to receive, any such Distribution on account of such Member's Class A Units until such Member executes and delivers or provides to the Company the applicable document(s) and/or information referred to in clause (i) or clause (ii) above, subject to the additional terms and provisions of this Section 11.1(b), and (y) the Company shall hold back any Distributions that, except for this Section 11.1(b), would otherwise have been paid or distributed to such Member in respect of such Member's Class A Units. The Company shall not be required to pay any interest in respect of any cash, assets, property, securities or other amounts held back pursuant to the immediately preceding sentence. The Company shall be free to use all such cash, assets, property, securities and other amounts as it sees fit and the Company shall not be under any obligation to pay such cash, assets, property, securities or other amounts into an escrow account (or any similar arrangement). In the event that (I) any Member that owns or holds Class A Units is not paid or distributed a Distribution on account of such Member's Class A Units as a result of this Section 11.1(b), and (II) such Member executes and delivers or provides the applicable document(s) and/or information referred to in clause (i) or clause (ii) above subsequent to the payment or distribution by the Company of such Distribution on account of other Class A Units, then, promptly following such execution and delivery or provision by such Member, the Company shall pay or distribute such Distribution to such Member that would have otherwise been payable or distributable pursuant to Section 11.1(a) or Section 13.2 on account of such Member's Class A Units as of the record date for such Distribution, but held back pursuant to this Section 11.1(b); provided, however, that the obligation of the Company to pay or distribute any such Distribution to such Member shall (X) terminate upon the consummation of a Sale Transaction, (Y) be subject to any limitations or restrictions under the Act or other applicable law, and (Z) be subject to any limitations or restrictions under the then existing agreements of the Company or its Subsidiaries relating to indebtedness or debt securities of the Company or any of its Subsidiaries.

(c)     To the extent the Company makes a Distribution pursuant to <u>Section 11.1(a)</u> in the form of any assets, property or securities (other than cash), such Distribution shall be equal to the Fair Market Value of such of assets, property or securities for purposes of <u>Section 11.1(a)</u>.

(d)     If the Company makes a Distribution pursuant to <u>Section 11.1(a)</u> of Equity Interests of any of its Subsidiaries or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests of any of its Subsidiaries (any such Distribution, a "<u>Spinoff Distribution</u>"), then, at the election of the Board, the Members that receive such Distribution shall be required to, at or prior to the time of such Distribution, execute and deliver a limited liability company agreement, stockholders agreement, partnership agreement, investor rights agreement, or similar agreement which relates to the internal governance of such Subsidiary and/or the rights or obligations of the owners of the Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in such Subsidiary that is substantially similar to this Agreement and in form and substance acceptable to the Majority Members (any such agreement, a "<u>Subsidiary Governing Document</u>").    Upon the making of any Spinoff Distribution, each of the Members that receives such Spinoff Distribution shall be deemed to have (i) executed and delivered the applicable Subsidiary Governing Document (even if any such Member shall not have actually executed and delivered such Subsidiary Governing Document), (ii) become a party to the applicable Subsidiary Governing Document as a "member," "partner," "stockholder" or similar party thereto (including, to the extent applicable, of a particular class), and (iii) become fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the applicable Subsidiary Governing Document as a "member," "partner," "stockholder" or similar party thereto (including, to the extent applicable, of a particular class), in each case of the foregoing, without any further action on the part of, or notice to, any Person.

(e)     Unless a different record date is established by the Board, any Distribution pursuant to or in accordance with this <u>Section 11.1</u> shall be made to the Persons shown on the Register of Members as holders of Units entitled to such Distribution as of the date of such Distribution.

11.2    <u>Limitations on Distributions</u>.    Notwithstanding any provision to the contrary in this <u>Article 11</u>, no Distribution shall be made if such Distribution would violate the Act or any other applicable law.

11.3    <u>No Other Distributions</u>.    Except as set forth in this <u>Article 11</u> or upon the dissolution and liquidation of the Company pursuant to, and subject to the terms and conditions of, <u>Article 13</u>, no Member shall have the right to demand or receive any Distribution or other return on capital in respect of its Units.

11.4    <u>Withholding Tax</u>.    The Company will at all times be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any federal, state, local or foreign taxing authority with respect to any distribution to such Member or otherwise with respect to such Member (including in

-66-

connection with a distribution in kind or as a result of a failure to provide materials necessary to prevent withholding under this <u>Section 11.4</u>) and to withhold (or deduct) the same from distributions to such Member, including in connection with an audit of the Company. Any funds withheld by reason of this <u>Section 11.4</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement and, to the extent such withholding has not offset a current distribution, shall reduce future distributions to which such Member is otherwise entitled pursuant to this Agreement. Each Member agrees to furnish the Company with any representations, forms, certificates or other information as shall be reasonably requested by the Company to assist the Company in determining the extent of, or in fulfilling or complying with, any withholding, reporting or compliance obligations the Company may have. The Company shall be entitled to withhold distributions from any Member that fails to provide the representations, forms, certificates and information referred to in the preceding sentence and to use such withheld distributions in order to satisfy any withholding obligations with respect to such Member.

<div align="center">

**ARTICLE 12**
**WITHDRAWALS; ACTION FOR PARTITION**

</div>

12.1    <u>Waiver of Partition</u>.  No Member shall, either directly or indirectly, take any action to require partition, file a bill for Company accounting or appraisement of the Company or of any of its assets or properties or, subject to the terms of <u>Section 9.3</u>, cause the sale of any Company property; and, notwithstanding any provisions of applicable law to the contrary, each Member (and each of such Member's legal representatives, successors, or assigns) hereby irrevocably waives any and all rights it may have to maintain any action for partition or to compel any sale with respect to such Member's Units, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

12.2    <u>Covenant Not to Withdraw or Dissolve</u>.  Notwithstanding any provision of the Act, but except as otherwise provided in this Agreement, each Member hereby covenants and agrees that such Member has entered into this Agreement based on its mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except as otherwise expressly required or permitted hereby, each Member hereby covenants and agrees not to (a) withdraw or attempt to withdraw from the Company (other than upon the permitted Transfer of all of its Units, so long as such withdrawal does not result in a dissolution of the Company), (b) exercise any power under the Act to dissolve the Company, (c) petition for judicial dissolution of the Company, or (d) demand a return of such Member's contributions to capital of the Company (or a bond or other security for the return of such contributions).  Anything herein to the contrary notwithstanding, no Member shall be entitled to abandon or surrender such Member's Units or other Interests.

<div align="center">

**ARTICLE 13**
**DISSOLUTION AND LIQUIDATION**

</div>

13.1    <u>Events Causing Dissolution</u>.  The Company shall be dissolved only upon the occurrence of any of the following events:

(a)      notwithstanding anything in Section 18-801(a)(3) of the Act to the contrary, the affirmative vote or written consent of the Board and the Majority Members;

(b)      the entry of a final decree of judicial dissolution of the Company under Section 18-802 of the Act; or

(c)      at any time there are no Members of the Company, unless the Company is continued in accordance with the Act.

Except as otherwise set forth in this <u>Section 13.1</u>, the Company is intended to have perpetual existence.  To the fullest extent permitted by law, any death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member (or the occurrence of any other event that terminates the continued membership of a Member in the Company) shall not, in and of itself, cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

13.2    <u>Liquidation and Winding Up</u>.    If the Company is dissolved pursuant to <u>Section 13.1</u>, the Company shall be liquidated and the Managers (or other Person or Persons designated by the Board or by a decree of court) shall wind up the affairs of the Company.  The Managers or other Persons winding up the affairs of the Company shall promptly proceed to the liquidation of the Company and, in settling the accounts of the Company, the assets and the property of the Company shall be distributed in the following order of priority:

(a)      First, to the payment of (or establishing reserves to pay) all debts and liabilities of the Company (including any debts or liabilities owed to any Member) in the order of priority as provided by law; and

(b)      The balance, if any, to the Members in accordance with <u>Section 11.1</u>.

## ARTICLE 14
## AMENDMENTS

14.1    <u>Amendments</u>.

(a)      Any term, condition or provision of this Agreement may be amended, modified or waived from time to time if, and only if, such amendment, modification or waiver is in writing and signed, (x) in the case of an amendment or modification, by the Company and the Majority Members at the time of such amendment or modification, or (y) in the case of a waiver, by the party against whom the waiver is to be effective. Notwithstanding the foregoing sentence, in addition to the affirmative vote or written consent of the Company and the Majority Members, no amendment or modification of any term, condition or provision of this Agreement shall be made (whether by merger, consolidation or reorganization of the Company, except in connection with a Sale Transaction) relating to:

(i)      <u>Sections 6.1</u>, <u>6.2(a)</u>, <u>6.2(b)</u>, <u>6.2(c)</u>, <u>6.2(d)</u>, <u>6.2(f)</u>, <u>6.2(g)</u>, <u>6.2(h)</u>, <u>6.2(k)</u>, <u>6.12</u>, <u>6.14</u>, <u>6.17</u>, <u>6.18</u>, <u>8.5</u>, <u>9.1</u>, <u>9.3</u>, <u>9.4</u> or <u>9.6</u>, <u>Article 15</u> or the definition of "Super-Majority Members" (including any of the defined terms used in any

such Section, Article or definition, solely to the extent such defined terms are used therein), in any such case, without the affirmative vote or written consent of the Super-Majority Members;

(ii)    Sections 6.2(b)(ii), 6.2(c), 6.2(d) (excluding the second sentence of Section 6.2(d)), 6.2(h), 6.12(b), 6.12(c), 6.14(a) or 6.14(d), or the proviso set forth in Section 6.14(b), Section 6.14(c) or Section 6.14(e) (including any of the defined terms used in any such Section or proviso, solely to the extent such defined terms are used therein), in any such case, without the affirmative vote or written consent of each Designating Group affected by such amendment or modification (it being understood that a Member shall only be entitled to vote on, or consent to, an amendment or modification of this Agreement pursuant to this clause (ii) if such Member has a Designation Right as of the time of such amendment or modification);

(iii)    the definition of "Specified Member" (including any of the defined terms used in such definition, solely to the extent such defined terms are used therein), without the affirmative vote or written consent of each Specified Member;

(iv)    Section 6.2(b)(i), the second sentence of Section 6.2(d) or the definition of "HG Vora Members" (including any of the defined terms used in such Section, sentence or definition, solely to the extent such defined terms are used therein) without the affirmative vote or written consent of the HG Vora Members;

(v)    Section 14.1(b)(i) (including any of the defined terms used in such Section, solely to the extent such defined terms are used therein) without the affirmative vote or written consent of each Member that owns or holds Class A Units;

(vi)    any of clauses (i)-(v) of this Section 14.1(a) without the prior written consent of the specific Member or Members, and/or the Member or Members that own or hold the requisite percentage of the Units, as applicable, that would be required to amend the underlying provision or definition of this Agreement to which such amendment or modification relates; provided, however, that no amendment or modification of this Section 14.1(a)(vi) shall be made without the affirmative vote or written consent of each Member that owns or holds Class A Units.

(b)    Anything in this Agreement to the contrary notwithstanding, (i) subject to clause (ii) of this Section 14.1(b), no amendment or modification of any provision of this Agreement (whether by merger, consolidation or reorganization of the Company, except in connection with a Sale Transaction with any Person other than the Selling Members or any Affiliates thereof) that would adversely affect the rights or increase the obligations of any Member set forth in this Agreement in a manner that is disproportionate in any material respect to the effect of such amendment or modification on the rights and

obligations of any of the other Members set forth in this Agreement (without regard to any effect resulting from (A) the individual circumstances of any such Member, (B) the differences in the respective percentages of ownership of Units of the Members or (C) amendments or modifications to the rights and obligations of a specific class or series of Equity Interests of the Company that do not have an adverse effect in any material respect on another class or series of Equity Interests of the Company) shall be made without the affirmative vote or written consent of such affected Member; provided, however, that, for the avoidance of doubt, neither the authorization or creation of a new class or series of Units or other Equity Interests or equity-based securities of the Company (including any amendments or modifications to this Agreement to incorporate the terms, rights, preferences and privileges of such new class or series of Units or other Equity Interests or equity-based securities of the Company in connection with the authorization or creation thereof), nor the issuance of any additional Units or any other Equity Interests or equity-based securities of the Company (including any amendments or modifications to this Agreement to incorporate the terms of any such additional issuance), in each case in accordance with the terms of this Agreement relating to the authorization, creation or issuance of Units or other Equity Interests or equity-based securities of the Company, shall be deemed to adversely affect the rights or obligations of any Member, and (ii) the Board is hereby authorized and empowered, acting alone and without further vote or action of any of the Members or any other Person, to amend or modify this Agreement (A) as provided in Section 5.2(b) hereof and (B) as may be required to give effect to the terms of a Management Incentive Plan or any Award Agreement, and each Member shall be deemed to have executed any such amendment to, or amendment and restatement of, this Agreement; provided, however, that if any such amendment or modification would otherwise require any vote or consent pursuant to any of clauses (i)-(vi) of Section 14.1(a) (other than immaterial amendments or modifications), then such vote or consent shall be obtained as a condition to any such amendment or modification.

(c)     Anything in this Section 14.1 or elsewhere in this Agreement to the contrary notwithstanding (except as contemplated in the second proviso in the definition of "Majority Members"), the holders of Class B Units (in their capacity as such) shall have no right to vote on, or right to consent to, any amendment, modification or waiver of or to this Agreement.

## ARTICLE 15
## INFORMATION RIGHTS

15.1     Information Rights.  Subject to the obligations of the Members under Article 18, the Company shall make available to each Member (other than Members that are Competitors or that own or hold Class B Units) the following information:

(a)     within ninety (90) days after the end of each Fiscal Year (or one hundred and twenty (120) days after the end of the Fiscal Year ending on or about December 31, 2025 (which may, at the Company' option, be limited to the period from the Effective Date to December 31, 2025 or be on a predecessor/successor basis)), copies of the audited consolidated financial statements of the Company and its Subsidiaries for such

Fiscal Year, including a consolidated balance sheet and consolidated statements of income or operations, members' equity and cash flows for such Fiscal Year, prepared in accordance with GAAP, together with the auditors' report on such audited consolidated financial statements;

(b)    within thirty (30) days after the end of each Fiscal Quarter in each of the Company's first three (3) Fiscal Quarters in each Fiscal Year, copies of the unaudited consolidated financial statements of the Company and its Subsidiaries for such Fiscal Quarter, including a consolidated balance sheet and consolidated statements of income or operations and cash flows for such Fiscal Quarter, prepared in accordance with GAAP, subject to the absence of footnotes and to year-end adjustments; and

(c)    any information that is posted to the "public" side of the platform for lenders under the senior credit documents of the Company and/or any of its Subsidiaries at substantially the same time as such information is posted to such platform;

provided, however, that if the Company does not produce consolidated financial statements required by this Section 15.1 at the Company level, but consolidated financial statements are produced at the level of one or more of its Subsidiaries that cover substantially the same information that would have been covered by consolidated financial statements of the Company and its Subsidiaries, then, in lieu of making available such consolidated financial statements of the Company and its Subsidiaries, the Company shall make available to each Member that owns or holds Units (other than Members that are Competitors or that own or hold Class B Units) the consolidated financial statements of its applicable Subsidiary or Subsidiaries, on the terms set forth in this Section 15.1.

15.2    Delivery of Information.    The Company may make available the information described in Section 15.1 (but, for the avoidance of doubt, not any Board Information), within the specified time periods, on a password-protected website that is only available to the Members (other than Members that are Competitors or that own or hold Class B Units) and any actual or prospective Transferees of Units (other than actual or prospective Transferees of Class B Units). The Company shall provide any password or other login information to the Members (other than Members that are Competitors or that own or hold Class B Units) and, upon request of any Member, any actual or prospective Transferees of Units (other than actual or prospective Transferees of Class B Units) so that any such Person shall be able to access such website.

As a condition to gaining access to the information posted on such website, each Person may be required to (a) "click through" certain confidentiality provisions or take other affirmative action pursuant to which such Person shall acknowledge its confidentiality obligations in respect of such information, (b) certify its status as a Member that owns or holds Class A Units or an actual or prospective *bona fide* Transferee of Class A Units, as applicable, and (c) in the case of any Person that is a Member, confirm and ratify that it is a party to, and bound by all of the terms and provisions of, this Agreement.

15.3    Quarterly Teleconference.    The Company shall hold one informational teleconference (each, a "Quarterly Teleconference") in each Fiscal Quarter for the Members (other than Members that are Competitors or that own or hold Class B Units).  Each Quarterly

Teleconference shall be held on such date and at such time as designated by the Board, which date and time shall occur after the date in the applicable Fiscal Quarter on which the Company delivers any of the financial statements described in <u>Section 15.1(a)</u> or <u>Section 15.1(b)</u>; <u>provided</u>, <u>however</u>, that, with respect to a Quarterly Teleconference in the second Fiscal Quarter in any Fiscal Year, such date shall occur after the later of (a) the date on which the Company delivers the financial statements described in <u>Section 15.1(b)</u> for the first Fiscal Quarter of such Fiscal Year and (b) the date on which the Company delivers the financial statements described in <u>Section 15.1(a)</u> for the prior Fiscal Year.  During each Quarterly Teleconference, the Company's or its applicable Subsidiary's officers will discuss the financial statements that were delivered by the Company immediately prior to such Quarterly Teleconference; <u>provided</u>, <u>however</u>, with respect to any Quarterly Teleconference in the second Fiscal Quarter in any Fiscal Year, such discussion shall cover the financial statements described in <u>clauses (a)</u> and <u>(b)</u> of the immediately preceding sentence.  Any such Quarterly Teleconference may be held jointly with any call for the lenders under the senior credit documents of the Company and/or any of its Subsidiaries.

15.4    <u>Board Information</u>.  At the request of any Major Member, Board Information shall be provided to such Major Member; <u>provided</u>, that a Major Member shall not be entitled to receive any Board Information that the Board or the applicable committee of the Board determines (a) would jeopardize or impair the ability of the Company or any of its Subsidiaries to take advantage of the attorney-client, work product or similar privilege if such Board Information was disclosed to such Major Member, (b) is necessary or advisable (in the judgment of the Board or the applicable committee of the Board, as the case may be) to be withheld to comply with the terms and conditions of confidentiality obligations with third parties or applicable law, or (c) such Major Member or any Affiliate of any such Major Member has a conflict of interest with respect to the subject matter of such Board Information.

15.5    <u>Termination of Information Rights</u>.  The requirements of this <u>Article 15</u> shall cease to apply at such time as the Company becomes obligated to file reports under Section 13 or Section 15(d) of the Exchange Act or as a voluntary filer pursuant to contractual obligations (so long as the Company makes such filings).  Nothing in this Agreement shall require, or shall be deemed or construed to require, the Company to file reports under Section 13 or Section 15(d) of the Exchange Act.

## ARTICLE 16
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

16.1    <u>Representations and Warranties of the Members</u>.  Each Member (including each Person, if any, admitted as a Member after the Effective Date) hereby represents, warrants and acknowledges to the Company and to each other Member on the Effective Date (or the date on which such Member executes and delivers a Joinder Agreement) as follows:

(a)    Such Member (if such Member is an Entity) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation and has all requisite power and authority to conduct its business as it is now being conducted and as proposed to be conducted.

(b)      Such Member has the full power, authority and legal right to execute, deliver and perform this Agreement, and, if such Member is an Entity, the execution, delivery and performance by such Member of this Agreement have been duly authorized by all necessary action of such Member.  This Agreement constitutes such Member's legal, valid and binding obligation, enforceable against it in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws relating to or affecting creditors' rights generally and the effect and application of general principles of equity and the availability of equitable remedies).

(c)      Such Member is not subject to, or obligated under, any provision of (i) its organizational documents (if such Member is an Entity), (ii) any agreement, contract, arrangement or understanding, (iii) any license, franchise or permit, or (iv) any law, regulation, order, judgment or decree, in any such case that would be breached or violated, or in respect of which a right of termination or acceleration or any Lien on any of such Member's assets (including its Units) would be created, by such Member's execution, delivery and/or performance of this Agreement or the consummation of the transactions contemplated hereby.

(d)      No authorization, consent or approval of, waiver or exemption by, or filing or registration with, any Governmental Authority or any other Person is necessary on such Member's part for such Member's execution, delivery and/or performance of this Agreement or the consummation of the transactions contemplated hereby, in any such case that has not previously been obtained by such Member.

(e)      No Person has or will have, as a result of any act or omission by such Member, any right, interest or valid claim against the Company or any other Member for any commission, fee or other compensation as a finder or broker, or in any similar capacity, in connection with any of the transactions contemplated by this Agreement.

(f)      Neither such Member nor any of its Affiliates (other than Related Funds) is, nor will the Company as a result of such Member holding an Interest be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act.

(g)      Except as expressly set forth in this Agreement, neither the Company, any Manager nor any other Member shall have any duty or responsibility to provide such Member with any documents, materials or other information concerning the business, operations, assets, properties, financial and other conditions, or prospects of the Company or any of its Subsidiaries which may come into the possession of the Company, any Manager, any other Member or any of their respective officers, directors, employees, agents, other representatives or Affiliates.

(h)      Except as expressly set forth in this Section 16.1, neither the Company, any Manager, any other Member nor any of their respective officers, directors, managers, employees, agents, other representatives or Affiliates has made any representations or warranties to such Member regarding the business, assets, operations, properties,

financial and other conditions, or prospects of the Company or any of its Subsidiaries, or otherwise, and no act by the Company, any Manager, any other Member or any of their respective officers, directors, managers, employees, agents, other representatives or Affiliates hereinafter taken, including any review of the affairs of the Company or any of its Subsidiaries, shall be deemed to constitute any such representation or warranty by the Company, any Manager, any other Member or any of their respective officers, directors, managers, employees, agents, other representatives or Affiliates.

(i)　　The Units acquired by such Member have been, or are being, acquired by such Member for its own account and not with a view to the sale or distribution of any part thereof (or any fractional or beneficial interest therein), and such Member has no present intention of selling, granting any participation in, or otherwise distributing any of the Units (or any fractional or beneficial interest therein).  Such Member does not have any contract, agreement or understanding with any Person to sell or Transfer any of the Units (or any fractional or beneficial interest therein), or grant any participation in any of the Units (or any fractional or beneficial interest therein), to such Person.

(j)　　(i) Such Member must bear the economic risk of such Member's investment in the Units acquired by such Member indefinitely unless the disposition of such Units is registered or qualified under the Securities Act and applicable state securities laws or an exemption from such registration or qualification is available, and that the Company has no obligation or intention of so registering or qualifying such Units, (ii) there is no assurance that any exemption from the Securities Act or applicable state securities laws will be available, or, if available, that such exemption will allow such Member to dispose of or otherwise Transfer any or all of such Member's Units in the amounts or at the times such Member might desire and (iii) the Company is not presently under any obligation to register the Units under Section 12 of the Exchange Act or to make publicly available the information specified in Rule 144 under the Securities Act and that it may never be required to do so.

(k)　　Such Member: (i) is an Accredited Investor, (ii) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in the Units acquired by such Member, (iii) has received all of the information about the Company and its Subsidiaries that it has requested and considers necessary or appropriate for deciding whether to acquire the Units acquired by such Member, (iv) is acquiring Units based upon such Member's own investigation, and the exercise by such Member of such Member's rights and the performance of such Member's obligations under this Agreement will be based upon such Member's own investigation, analysis and expertise, (v) has the ability to bear the economic risks inherent in its investment of the Units acquired by such Member, (vi) is able, without materially impairing its financial condition, to hold the Units acquired by such Member for an indefinite period of time and to suffer a complete loss of its investment, and (vii) understands and has fully considered for purposes of its investment in the Units acquired by such Member the risks of this investment and understands that: (A) the Units represent an extremely speculative investment that involves a high degree of risk of loss, (B) it may not be possible for such Member to liquidate its investment in any of the Units because of substantial restrictions on the transferability of the Units, (C) no public market

exists for the Units, and no representation has been made to such Member that any such public market will exist in the future, and (D) there have been no representations as to the possible future value, if any, of any of the Units.

16.2    Survival of Representations and Warranties.    Each of the representations, warranties and acknowledgements of each Member in Section 16.1 shall survive the Effective Date (or the date on which such Member executes and delivers a Joinder Agreement).

## ARTICLE 17
## MISCELLANEOUS

17.1    Entire Agreement.  This Agreement (including the exhibits and schedules to this Agreement) amends and restates the Initial LLC Agreement in its entirety and contains the entire understanding among the Members and the Company with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter of this Agreement among the Members and the Company.

17.2    Counterparts.  For the convenience of the parties hereto, this Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement. Delivery of an executed counterpart of this Agreement by portable document format (PDF) or other electronic transmission will be effective as delivery of a manually executed counterpart of this Agreement.

17.3    Severability.  If any provision hereof would be invalid or unenforceable in any respect under applicable law, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  The provisions hereof are severable, and if any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

17.4    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

17.5    Notices.    All notices, requests, waivers, document deliveries and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, sent, provided, delivered or received (a) when personally delivered to the party to be notified, (b) when sent by electronic mail ("e-mail") to the party to be notified, (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified, or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:  (i) in the case of any Member, to such Member at its address or e-mail address set forth in the Register of Members and (ii) in the case of the Company, to the Company at the Principal Office, Attention:  Andrew Kaminsky (akaminsky@franchisegrp.com) (or to another officer of the Company that is required to be provided with such notice, request, waiver, document or other

communication pursuant to the terms of this Agreement).  A party may change its address or e-mail address for purposes of notice hereunder by (x) in the case of the Company, giving notice of such change to all of the Members in the manner provided in this <u>Section 17.5</u> and (y) in the case of any Member, giving notice of such change to the Company in the manner provided in this <u>Section 17.5</u>.

17.6    <u>Headings</u>.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

17.7    <u>**GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL**</u>.  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE. EACH OF THE COMPANY AND EACH MEMBER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE COMPANY OR ANY MEMBER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS.  EACH OF THE COMPANY AND EACH MEMBER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE COMPANY AND EACH MEMBER HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN <u>SECTION 17.5</u>, OR IN ANY OTHER MANNER PERMITTED BY LAW. EACH OF THE COMPANY AND EACH MEMBER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING**.

17.8    <u>No Third-Party Beneficiaries</u>.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its legal representatives, heirs, administrators, executors, successors and permitted assigns, and it is not the intention of the parties hereto to confer third-party beneficiary rights upon any other Person other than (x) the Covered Persons (solely with respect to <u>Sections 8.1</u> and <u>8.2</u>), (y) the Identified Persons (solely with respect to <u>Section 8.5</u>), and (z) to the extent not already a party hereto, each Affiliate of any of the Members for purposes of <u>Section 8.6</u>.

17.9    <u>Binding Effect</u>.  By virtue of the Plan of Reorganization and the order of the Bankruptcy Court that confirmed the Plan of Reorganization, on the Effective Date, without any

further action on the part of, or notice to, any Person, each of the Persons that received Existing Common Units under, or as contemplated by, the Plan of Reorganization on or as of the Effective Date became a party to this Agreement as a "Member" hereunder, became fully bound by, and subject to, all of the covenants, terms, conditions and provisions of this Agreement as a "Member" party hereto, and is deemed to have signed this Agreement.  This Agreement shall apply to, and be binding upon, all holders of Units and Interests, whether or not such holder has executed a counterpart of this Agreement or a Joinder Agreement, and shall also apply to all Units and Interests no matter when acquired, and by acceptance of Units or Interests each holder agrees to be so bound.  This Agreement shall become effective on the Effective Date.

17.10   <u>Additional Actions and Documents</u>.  The parties agree to execute and deliver any further instruments and perform any additional acts that are or may become reasonably necessary to carry on the Company or to effectuate its purposes.

17.11   <u>Injunctive Relief</u>.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, a non-breaching party hereto will be irreparably damaged and will not have an adequate remedy at law.  Any such non-breaching party shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which such Person is entitled at law or in equity.  Each of the parties hereto hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the parties hereto hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Agreement.

17.12   <u>Assignment</u>.  No rights, interests or obligations of any Member herein may be assigned without the prior approval of the Board and the Majority Members, except assignments to Transferees of Units in connection with Transfers of Units that strictly comply with <u>Article 9</u>; <u>provided</u>, <u>however</u>, that (a) the Designation Right of a Designating Group shall not be assignable and (b) the rights of each Preemptive Member under <u>Section 9.6</u> shall not be assignable except to any Person that is an Affiliate of such Preemptive Member and an Accredited Investor at the time of such assignment (and any such assignment may be made in connection with, or not in connection with, a Transfer of Units to such Person); <u>provided</u>, that the assignment of such rights under <u>Section 9.6</u> to any such Person that is not then a Member shall only be permitted if the conditions set forth in <u>Section 4.2(b)</u> are satisfied in connection with the related purchase of Additional Securities by such Person.

17.13   <u>Redaction</u>.  Anything herein to the contrary notwithstanding, any copy of the Register of Members that is provided to a Member that holds Class B Units shall be redacted to remove all information relating to each other Member, including the class or series and number of Units held by each other Member (and, if applicable, any hurdles, vesting schedules, forfeiture provisions or other terms and conditions applicable thereto), and the Members that hold Class B Units shall not be entitled to such information.

17.14  <u>Spousal Consent</u>.  Unless waived by the Company, each married Member, and each Member who, subsequent to the Effective Date, marries or remarries, will concurrently with his or her execution hereof, or the consummation of such marriage, as applicable, deliver to the Company the written consent of his or her spouse in a form that is acceptable to the Company in its sole discretion; <u>provided</u>, <u>however</u>, that the failure of any such Member to do so will not affect the validity or enforceability of this Agreement.

17.15  <u>Financial Crimes Matters</u>.  The Company shall conduct its business in compliance in all material respects with applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

17.16  <u>Termination</u>.  This Agreement shall terminate automatically upon the occurrence of an IPO and, to the extent applicable, (a) the entry into of a stockholders agreement pursuant to, and as described in, <u>Section 19.2</u> by the Reorganized Issuer and the Members, and/or (b) the entry into of registration rights agreement pursuant to, and as described in, <u>Section 19.3</u> by the Company or the Reorganized Issuer, as applicable, and the Members; <u>provided</u>, <u>however</u>, that (i) any liability of any current or former Member for any breach of this Agreement prior to such termination shall survive any such termination, and (ii) the terms and provisions of the following Sections and Articles of this Agreement shall survive any such termination:  <u>Section 4.4(b)</u>, <u>Section 4.5</u>, <u>Article 8</u> (other than <u>Section 8.7</u>), <u>Section 17.7</u>, <u>Article 18</u> and <u>Article 19</u>.

## ARTICLE 18
## CONFIDENTIALITY

18.1  <u>Confidentiality</u>.  Each Member hereby agrees that, during the period commencing on the Effective Date (or, with respect to any Member that becomes a party hereto after the Effective Date, the date any such Member executes and delivers a Joinder Agreement) and ending on the first anniversary of the date on which such Member no longer beneficially owns or holds any Units (such period, the "<u>Confidentiality Period</u>"), such Member will keep strictly confidential and will not disclose or divulge to any other Person (other than as permitted by <u>Section 18.2</u>) any (x) confidential, business, financial or proprietary information regarding the Company or any of its Subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any other Member in respect of the Company or any of its Subsidiaries (in any such case, whether in written, oral or electronic form), that is obtained by, or on behalf of, such Member from the Company or any of its Subsidiaries (including, for all purposes of this <u>Article 18</u>, any such information obtained by such Member from any Manager), from the Company's or any such Subsidiary's legal or financial advisors or any other agents or advisors engaged by the Company or any of its Subsidiaries, from any other Member, or through the ownership of Interests and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by such Member or any of its Representatives which contain, reflect or are based upon the information referred to in <u>clause (x)</u> above (collectively, "<u>Confidential Information</u>").  Confidential Information shall not include information which (A) is known or becomes known to the public in general (other than as a result of a breach of this <u>Section 18.1</u> by a Member or any of its Representatives), (B) is or becomes available to a Member on a non-confidential basis from a source other than the Company, any other Member or any of their respective Affiliates or Representatives (<u>provided</u>, that such Member is not aware that such source is under an obligation to keep such information confidential) prior to such

information being provided to such Member by (or obtained from) the Company or any of its Subsidiaries, any other Member or any of their respective Affiliates or Representatives or (C) is independently developed by such Member or its Representatives without reference to the Confidential Information.

18.2    Permitted Disclosure of Confidential Information.

(a)    Notwithstanding Section 18.1, Confidential Information may be disclosed as follows:

(i)    Confidential Information may be provided by a Member, on a confidential basis, to such Member's Affiliates and the respective managers, officers, directors, employees, partners, investors, members, representatives, attorneys, accountants, auditors, trustees, insurers, other professional advisors and financing sources of such Member and such Member's Affiliates (collectively, "Representatives"), to the extent reasonably necessary in connection with such Member's investment in the Company; provided, however, that such Member shall direct its Representatives to comply with the restrictions in this Article 18 as if such Representatives were a party hereto and bound by such restrictions, and such Member shall be responsible for ensuring that its Representatives comply with such restrictions and shall be responsible and liable for any breach of any such restrictions by any of its Representatives.

(ii)    Confidential Information may be provided by a Member, on a confidential basis, to an actual or potential *bona fide* Transferee of all or a portion of the Units owned or held by such Member, to the extent reasonably necessary to consummate a sale or other Transfer of such Units permitted under this Agreement; provided, however, that (x) prior to such Member's delivery of Confidential Information to an actual or potential *bona fide* Transferee of Units pursuant to this clause (ii), such actual or potential *bona fide* Transferee shall have executed and delivered to such Member and the Company a Transferee confidentiality agreement substantially in the form attached hereto as Exhibit C, (y) in no event shall Confidential Information be provided to any Competitor and (z) in no event shall Board Information be provided to any such actual or prospective *bona fide* Transferee.

(iii)    In the event that a Member or any of its Representatives determines, in good faith upon the advice of counsel (including internal counsel), that disclosure of Confidential Information is required under applicable law or regulation, or by any Governmental Authority having jurisdiction over such Member or such Representative, such Member or such Representative will (x) use commercially reasonable efforts to preserve the confidentiality of the Confidential Information sought to be disclosed; and (y) to the extent legally permitted, promptly provide the Company with written notice so that the Company may seek (at the Company's expense) an appropriate protective order or other remedy and/or waive compliance with this Agreement and, if requested by the Company, assist the Company (at the Company's expense) to seek such a protective order or

other remedy.  Provided that such notice (to the extent legally permitted) is furnished, if, in the absence of a protective order or other remedy, such Member or any applicable Representative is, in the opinion of its counsel, legally compelled to disclose Confidential Information or else be held liable for contempt or suffer other censure or penalty, such Member or such Representative may disclose pursuant to this Section 18.2(a)(iii) only that portion of such Confidential Information, and only to those parties, that such counsel has advised is compelled or required to be disclosed, without liability under this Agreement.  In addition, any Member and any applicable Representative shall be entitled to share Confidential Information with Governmental Authorities in connection with routine regulatory audits and examinations that are conducted by such Governmental Authorities of such Member or any of its Affiliates, in each case, without providing the Company with notice of such sharing or disclosure.

(iv)    With the prior consent of the Company, any Member may provide Confidential Information of the Company (but not Confidential Information of any other Member in respect of the Company or any of its Subsidiaries) to any Person in connection with a potential Sale Transaction with such Person; provided that such Person has an obligation to the Company to keep such Confidential Information confidential.

(v)    Any Member that is an employee, consultant or other service provider of the Company or any of its Subsidiaries may disclose Confidential Information in the performance of such employment duties or services to the extent authorized by the Company's policies in respect thereof.

(b)    Termination.  All the rights and obligations of a Member set forth in this Article 18 shall terminate automatically upon the expiration of the Confidentiality Period applicable to such Member; provided, however, that no such termination shall relieve any Member from any liability relating to any breach of this Article 18.

## ARTICLE 19
## IPO

19.1    IPO Approval.  Subject to Section 9.3, the Company shall not initiate or undertake an IPO or effect a Corporate Conversion in connection therewith without the prior approval or written consent of the Board and the Majority Members.  The parties hereto agree that any IPO may be effected at the Company level or at a Subsidiary of the Company or by or through a successor Entity or effected through another form of recapitalization, reorganization, and/or exchange of the Units (as determined by the Board, with the approval of the Majority Members), and that in the event of a planned IPO, the Company shall convert all (or the appropriate portion) of the Units then held by any Members into an economically equivalent number of shares of the common stock of the Company or its applicable Subsidiary or successor Entity effecting such IPO.  If an IPO has been approved in accordance with this Section 19.1 and Section 6.19, or otherwise approved pursuant to Section 9.3, each Member hereby consents to such IPO and shall vote for (to the extent it has any voting right) and raise no objections against such IPO, and each

Member shall take all reasonable actions in connection with the consummation of such IPO as requested by the Company.

19.2    <u>Required Actions</u>.  In connection with an IPO, subject to the requisite approval set forth in <u>Section 19.1</u>, the Board may either (a) cause the Company to contribute all or substantially all of its assets to a corporation in a transaction qualified under Code Section 351(a), and thereupon liquidate and dissolve the Company, (b) elect to have all Members contribute their Units to a corporation, in a transaction qualifying under Code Section 351(a), as long as the Fair Market Value of the shares of the corporation received by all Members, as determined by the Board, is equal to the Fair Market Value of the Units Transferred, as reasonably determined by the Board, (c) cause the Company to distribute some or all of the shares of capital stock of one or more Subsidiaries of the Company to the Members, (d) cause the Company to transfer its assets, liabilities and operations to a corporation in exchange for any combination of cash, debt or capital stock in such corporation, (e) cause a corporation to be admitted as a Member of the Company, with such corporation purchasing interests in the Company from the Company or Members (as determined by the Board) with the proceeds of a public offering of the corporation's stock, or (f) otherwise cause the Company to convert into a corporation, by way of merger, consolidation or otherwise.  Each Member hereby consents to such actions and shall vote for (to the extent it has any voting right) and raise no objections against such actions, and each Member shall, at the request of the Board, take all actions reasonably necessary or desirable to effect such actions (including whether by conversion into a corporation, merger or consolidation into a corporation, recapitalization or reorganization, sale of securities, or otherwise), giving effect to the same economic (other than any tax effects resulting therefrom), voting and corporate governance provisions contained herein (any such transaction contemplated by this <u>Section 19.2</u>, a "<u>Corporate Conversion</u>").  Subject to the requisite approval set forth in <u>Section 19.1</u>, no Member shall have the right or power to veto, vote for or against, amend, modify or delay any such Corporate Conversion.  In connection with such Corporate Conversion, at the request of the Board, each Member hereby agrees to enter into a stockholders agreement (or equivalent) with the corporate successor (the "<u>Reorganized Issuer</u>") and each other Member which contains restrictions on the Transfer of such capital stock and other provisions (including with respect to the governance and control of such Reorganized Issuer) in form and substance (including with respect to the termination thereof) similar to the provisions and restrictions set forth herein to the extent reasonably requested by the Board.  Further, each Member shall (solely in its capacity as such) execute and deliver any documents and instruments and perform any additional acts that may be reasonably necessary or appropriate, as determined by the Board, to effectuate and perform any such IPO or Corporate Conversion.

19.3    <u>Registration Rights Agreement</u>.  In connection with (but prior to the consummation of) an IPO, the Company or any Reorganized Issuer, as applicable, shall enter into a registration rights agreement with, or for the benefit of, each Member, in form and substance reasonably satisfactory to the Majority Members, with respect to the registration of its common equity securities ("<u>Company Securities</u>") following the consummation of an IPO; <u>provided</u>, that such registration rights agreement shall provide that (a) any Member or group of Members party to such registration rights agreement (any such holder, a "<u>Registered Holder</u>") that own or hold at least five percent (5.0%) of all of the Company Securities that are issued and outstanding at the time of any such request may request that the Company or such Reorganized Issuer, as applicable, effect the registration under the Securities Act of a specified number of

"Registrable Securities" (as customarily defined) held by such Registered Holder(s), <u>provided</u>, that, subject to certain exceptions, the Company or such Reorganized Issuer, as applicable, will not be required to effect any such demand right more than three times, and (b) the Registered Holders shall be entitled to reasonable and customary piggyback registration rights.

[*Signature pages follow*]

**IN WITNESS WHEREOF**, the undersigned are a party to, bound by and subject to, and shall be deemed to have signed this Agreement as of the Effective Date.

**COMPANY**:

**FUSION PARENT, LLC**

By: _____
     Name:  Bradley E. Scher
     Title:  Authorized Person

**MEMBERS**:

[●]

By: _____
      Name:
      Title:

## **Schedule A**

<u>Specified Members</u>

1. Arena Capital Advisors, LLC

2. Fidelity Management & Research Company LLC

3. Garnett Station Partners

4. Guggenheim Partners Investment Management, LLC

5. HG Vora Capital Management, LLC

6. HPS Investment Partners, LLC

7. Oaktree Capital Management, L.P.

8. Octagon Credit Investors, LLC

## **Schedule B**

### Actions Requiring Approval of the Board and the Majority Members

1.      Consummate any acquisition (by merger, consolidation, or acquisition or disposition of stock or assets) of any business enterprise, business division or business unit in any transaction or series of related transactions for consideration in excess of $300.0 million (the amount of such consideration to be determined in good faith by the Board).

2.      Consummate any IPO.

3.      Consummate any Sale Transaction, other than (i) any Sale Transaction that is consummated as an internal restructuring transaction (including (x) the dissolution, consolidation or merger of any immaterial or dormant Subsidiary of the Company or (y) the consolidation, merger or other business combination of any Subsidiary of the Company with or into an Affiliate of any Subsidiary of the Company for the purpose of changing the legal domicile of such Subsidiary or changing the legal form of such Subsidiary), and (ii) a Drag-Along Transaction in which the Selling Members have exercised their rights under Section 9.3.

**Schedule C**

**Officers**

| Name | Title |
|------|-------|
| Andrew Laurence | President and Chief Executive Officer |
| Eric Seeton | Chief Financial Officer |
| Andrew Kaminsky | Chief Administrative Officer and Executive Vice President |
| Tiffany McMillan-McWaters | Executive Vice President and Secretary |
| Bradley Scher | Authorized Person[1] |

---

[1] Anything in this Agreement to the contrary notwithstanding, Bradley Scher shall be deemed to have resigned from his position as authorized person of the Company immediately after the execution and delivery of this Agreement by the Company.

<div align="right"><b><u>Exhibit A</u></b></div>

## FORM OF ACCREDITED INVESTOR QUESTIONNAIRE

Reference is hereby made to that certain Amended and Restated Limited Liability Company Agreement of Fusion Parent, LLC (the "<u>Company</u>"), dated as of June [6], 2025 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "<u>LLC Agreement</u>"), by and among the Company and the members of the Company from time to time party thereto.  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the LLC Agreement.

This Accredited Investor Questionnaire is being completed, executed and delivered by the undersigned pursuant to (a) Section 4.2(b) of the LLC Agreement in connection with the issuance of Units to the undersigned, (b) Section 4.6 of the LLC Agreement as required by, or in response to a request made by the Company to the undersigned pursuant to, Section 4.6 of the LLC Agreement, or (c) Section 9.1(c) of the LLC Agreement in connection with a Transfer of Units to the undersigned.

For purposes of this Accredited Investor Questionnaire, the term "Accredited Investor" (pursuant to clause (a) of Rule 501 promulgated under the Securities Act) means any Person who comes within any of the following categories:

(1)     Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any investment adviser registered pursuant to section 203 of the Investment Advisers Act of 1940 or registered pursuant to the laws of a state; any investment adviser relying on the exemption from registering with the SEC under section 203(l) or (m) of the Investment Advisers Act of 1940; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of the Investment Company Act of 1940; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any Rural Business Investment Company as defined in section 384A of the Consolidated Farm and Rural Development Act; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2)     Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

<div align="center">Exhibit A</div>

(3)     Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)     Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000 (provided, for purposes of calculating net worth under this paragraph (5), that (A) the person's primary residence shall not be included as an asset, (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability) and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability);

(6)     Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)     Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act;

(8)     Any entity in which all of the equity owners are Accredited Investors;

(9)     Any entity, of a type not listed in paragraph (1), (2), (3), (7), or (8), not formed for the specific purpose of acquiring the securities offered, owning investments in excess of $5,000,000;

(10)    Any natural person holding in good standing one or more professional certifications or designations or credentials from an accredited educational institution that the SEC has designated as qualifying an individual for accredited investor status;

(11)    Any natural person who is a "knowledgeable employee," as defined in rule 3c-5(a)(4) under the Investment Company Act of 1940 (17 CFR 270.3c-5(a)(4)), of the issuer of the securities being offered or sold where the issuer would be an investment company, as defined in section 3 of such act, but for the exclusion provided by either section 3(c)(1) or section 3(c)(7) of such act;

(12)    Any "family office," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1): (i) with assets under management in excess of $5,000,000, (ii) that is not formed for the specific purpose of acquiring the securities offered, and (iii) whose prospective investment is directed by a person who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment; and

(13)    Any "family client," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1), of a family office meeting the requirements in paragraph (12) above and whose prospective investment in the issuer is directed by such family office pursuant to paragraph (a)(12)(iii) above.

The undersigned hereby certifies to the Company that, as of the date of this Accredited Investor Questionnaire, the undersigned is an Accredited Investor under the following category set forth above (*e.g.*, (1) through (13) of the definition of "Accredited Investor" above): _____.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire on the date set forth above.

[                    ]

By: _____
     Name:
     Title:

## FORM OF JOINDER AGREEMENT

This Joinder Agreement (this "Joinder Agreement"), dated as of [●], is executed by the undersigned pursuant to the terms of the Amended and Restated Limited Liability Company Agreement of Fusion Parent, LLC (the "Company"), dated as of June [6], 2025 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "LLC Agreement"), by and among the Company and the members of the Company from time to time party thereto.  Capitalized terms used herein but not defined herein have the meanings ascribed to such terms in the LLC Agreement.

(1)    Acknowledgements.  The undersigned hereby acknowledges and agrees that (a) it has received and reviewed a complete copy of the LLC Agreement, (b) by executing and delivering this Joinder Agreement, it is agreeing to become a party to the LLC Agreement as a "Member" thereunder and shall be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the LLC Agreement as a "Member" party thereto, (c) it has had sufficient time to consider the LLC Agreement and to consult with an attorney if it wished to do so, or to consult with any other Person of its choosing, before signing this Joinder Agreement and (d) it has willingly executed and delivered this Joinder Agreement with full understanding of the legal and financial consequences of this Joinder Agreement and the LLC Agreement.

(2)    Agreements.  The undersigned hereby agrees that, upon execution and delivery to the Company of this Joinder Agreement, the undersigned (a) shall become a party to the LLC Agreement as a "Member" thereunder and shall be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the LLC Agreement as a "Member" party thereto, and (ii) makes the representations, warranties and acknowledgments set forth in Section 16.1 of the LLC Agreement to the Company and to each other Member as of the date of this Joinder Agreement.

(3)    Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.

(4)    Counterparts.  This Joinder Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.  Delivery of an executed counterpart of this Joinder Agreement by portable document format (PDF) or other electronic transmission will be effective as delivery of a manually executed counterpart of this Joinder Agreement.

(5)    Headings.  The headings of the various sections of this Joinder Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Joinder Agreement.

(6)    Register of Members.  For purposes of the Register of Members, the undersigned's address and e-mail address are as follows:

Address:

E-mail Address:

[_____]

Date: _____

_____

By:

Title:

**Exhibit C**

## FORM OF TRANSFEREE CONFIDENTIALITY AGREEMENT

[NAME OF POTENTIAL TRANSFEREE]
[ADDRESS]

Attention:

Re:             Confidentiality Agreement

Ladies and Gentlemen:

    In connection with a possible transaction (the "Transaction") involving the sale or transfer of limited liability company interests of Fusion Parent, LLC (the "Company") owned, held or controlled by [INSERT NAME OF TRANSFEROR] (the "Transferor") to [INSERT NAME OF POTENTIAL TRANSFEREE] (the "Potential Transferee"), the Transferor is prepared to make available to the Potential Transferee certain Confidential Information (as defined below).  As a condition to such Confidential Information being furnished to the Potential Transferee, the Potential Transferee hereby agrees that it will comply with the following terms of this letter agreement (this "Confidentiality Agreement"):

    1.    Confidential Information.    (a) "Confidential Information" means any (x) confidential, business, financial or proprietary information regarding the Company or any of its subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any member of the Company in respect of the Company or any of its subsidiaries (in any such case, whether in written, oral or electronic form), that has been obtained by, or on behalf of, the Potential Transferee or any of its Representatives from the Company or any of its subsidiaries, from the Transferor, or from any of their respective Representatives and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by the Potential Transferee or any of its managers, officers, directors, employees, partners, investors, members, representatives, attorneys, accountants, auditors, trustees, insurers, other professional advisors and financing sources (collectively, "Representatives"), which contain, reflect or are based upon the information referred to in clause (x) above.  Confidential Information shall not include information which (A) is known or becomes known to the public in general (other than as a result of a breach of the confidentiality obligations hereunder or otherwise by the Transferor, the Potential Transferee or any of their respective Representatives), (B) is or becomes available to the Potential Transferee on a non-confidential basis from a source other than the Company or any of its subsidiaries, the Transferor or any of their respective Representatives (provided, that the Potential Transferee is not aware that such source is under an obligation to keep such Confidential Information confidential) prior to such information being provided to the Potential Transferee by or on behalf of (or obtained from) the Company, any of its subsidiaries, the Transferor or any of their respective Representatives or (C) is independently developed by the Potential Transferee or any of its Representatives without reference to the Confidential Information.

    (b) The Potential Transferee recognizes and acknowledges the competitive value and confidential nature of the Confidential Information and the damage that could result to the

Exhibit C

Company, the Transferor and any other member of the Company if any Confidential Information is disclosed to a third party, and hereby agrees that it will keep strictly confidential and will not disclose, divulge or use for any purpose, other than to evaluate the Transaction, any of the Confidential Information; provided, however, that any of the Confidential Information may be disclosed, on a confidential basis, to any of the Potential Transferee's Representatives that need to know such information for the purpose of evaluating the Transaction. The Potential Transferee shall cause its Representatives to comply, and the Potential Transferee shall be responsible for ensuring that its Representatives comply, with the restrictions set forth in this Confidentiality Agreement as if such Representatives were a party hereto and bound by such restrictions, and shall be responsible and liable for any breach of any such restrictions by any of its Representatives.

2.     Disclosure of Confidential Information.  In the event that the Potential Transferee or any of its Representatives determines, in good faith upon the advice of counsel, that disclosure of Confidential Information is required under applicable law or regulation, or is required by governmental or by regulatory authorities having jurisdiction over the Potential Transferee or such Representative, the Potential Transferee or such Representative will, to the extent legally permitted and practicable under the circumstances, promptly provide the Transferor and the Company with written notice so that they may seek an appropriate protective order or other remedy and/or waive compliance with the provisions of this Confidentiality Agreement and, if requested by the Transferor or the Company, assist the Transferor or the Company to seek such a protective order or other remedy.  Provided that such foregoing notice (to the extent legally permitted and practicable under the circumstances) is furnished, if, in the absence of a protective order or other remedy, the Potential Transferee or any of its applicable Representatives is, in the opinion of its counsel, required to disclose Confidential Information, the Potential Transferee or such Representative may disclose pursuant to this Section 2 only that portion of such Confidential Information, and only to those parties, that such counsel has advised is required to be disclosed, without liability under this Confidentiality Agreement.

3.     Return and Destruction of Confidential Information.  In the event that the Potential Transferee decides not to proceed with the Transaction, the Potential Transferee will promptly inform the Transferor of that decision.  In that case, or at any time upon the request of the Transferor for any reason, the Potential Transferee will, as directed by the Transferor, promptly deliver to the Transferor or the Company all Confidential Information (and any copies thereof).  Upon the Transferor's request, the Potential Transferee shall provide the Transferor with prompt written confirmation of the Potential Transferee's compliance with this Section 3. Notwithstanding the return or destruction of the Confidential Information, the Potential Transferee and its Representatives shall continue to be bound by the obligations of confidentiality and other obligations and agreements hereunder.

4.     No Representations or Warranties.  The Potential Transferee understands, acknowledges and agrees that neither the Company nor any of its subsidiaries, the Transferor nor any other member of the Company makes any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information, and neither the Company nor any of its subsidiaries, the Transferor nor any other member of the Company shall have any liability to the Potential Transferee or to any of its Representatives relating to or resulting from the use of the Confidential Information or any errors therein or omissions therefrom.  Only those

Exhibit C

representations or warranties which are made in a final definitive agreement regarding any Transaction, when, as and if executed and delivered, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

5. _Injunctive Relief_.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered by the Company and the Transferor if the Potential Transferee fails to comply with any of the obligations imposed on it by this Confidentiality Agreement and that in the event of any such failure, the Transferor and the Company will be irreparably damaged and will not have an adequate remedy at law.  The Transferor and the Company shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which either the Transferor or the Company is entitled at law or in equity.  The Potential Transferee hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  The Potential Transferee hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Confidentiality Agreement.

6. _Governing Law_.  THIS CONFIDENTIALITY AGREEMENT AND ANY CONFLICTS ARISING HEREUNDER OR RELATED HERETO SHALL BE GOVERNED BY, AND CONSTRUED UNDER, THE LAWS OF THE STATE OF DELAWARE, ALL RIGHTS AND REMEDIES BEING GOVERNED BY SAID LAWS, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS.  EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE TRANSFEROR OR THE POTENTIAL TRANSFEREE WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS CONFIDENTIALITY AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS.  EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS ADDRESS SPECIFIED BELOW, OR IN ANY OTHER MANNER PERMITTED BY LAW.  EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

Exhibit C

7.      Term.  This Confidentiality Agreement will terminate on the earlier of (a) two (2) years from the date hereof and (b) the Potential Transferee executing a Joinder Agreement to the Amended and Restated Limited Liability Company Agreement of the Company, dated as of June [6], 2025, among the Company and its members, as amended, supplemented, amended and restated or otherwise modified from time to time; provided, however, that no such termination of this Confidentiality Agreement shall relieve the Potential Transferee from any liability relating to any breach of this Confidentiality Agreement.

8.      Notices.  All notices, requests, waivers and other communications made pursuant to this Confidentiality Agreement shall be in writing and shall be deemed to have been effectively given, delivered, provided or received (a) when personally delivered to the party to be notified; (b) when sent by electronic mail ("e-mail") to the party to be notified; (c) three (3) business days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) business day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-business day delivery guaranteed, in each case as follows:

to the Transferor, at:

[          ]

to the Potential Transferee, at:

[          ]

A party may change its address or e-mail address for purposes of notice hereunder by giving notice of such change to the other party in the manner provided in this Section 8.

9.      Miscellaneous.  This Confidentiality Agreement contains the entire agreement between the Transferor and the Potential Transferee regarding its subject matter and supersedes all prior agreements, understandings, arrangements and discussions between the Transferor and the Potential Transferee regarding such subject matter.  It is understood and agreed that no failure or delay by the Transferor or the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  No provision in this Confidentiality Agreement can be waived or amended except by written consent of the Transferor, the Potential Transferee and the Company, which consent shall specifically refer to the provision to be waived or amended and shall explicitly make such waiver or amendment.  This Confidentiality Agreement may be signed by electronic transmission and in one or more counterparts, each of which shall be deemed an original but all of which shall be deemed to constitute a single instrument.  If any provision of this Confidentiality Agreement is found to violate any statute, regulation, rule, order or decree of any governmental authority, such invalidity shall not be deemed to affect any other provision hereof or the validity of the remainder of this Confidentiality Agreement, and such invalid provision shall be deemed deleted herefrom to the minimum extent necessary to cure such violation.  The provisions of this Confidentiality Agreement shall inure to the benefit of and be binding upon the

Exhibit C

parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.  The Potential Transferee may not assign this Confidentiality Agreement without the prior written consent of the Transferor and the Company.  The Potential Transferee agrees and acknowledges that the Company shall be an express third-party beneficiary hereof, having all rights to enforce this Confidentiality Agreement.

[Remainder of Page Intentionally Left Blank]

Exhibit C

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Confidentiality Agreement as of this __ day of _____, 20__.

Very truly yours,

TRANSFEROR

[                    ]

By: _____
    Name:
    Title:

CONFIRMED    AND    AGREED
as of the date written above:

POTENTIAL TRANSFEREE

[        ]

By: _____
    Name:
    Title:

Exhibit C

**<u>Exhibit A (iv)</u>**
**Amended and Restated Limited**
**Liability Company Agreement of Fusion Intermediate, LLC**

**FUSION INTERMEDIATE, LLC**

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

## TABLE OF CONTENTS

<div align="right"><u>Page</u></div>

**ARTICLE 1 DEFINITIONS AND RULES OF CONSTRUCTION**..........................................1

    1.1     Certain Definitions ...................................................................1
    1.2     Rules of Construction ...............................................................4

**ARTICLE 2 GENERAL** .........................................................................................5

    2.1     Continuation of the Company; Limited Liability Company Agreement....................5
    2.2     Name............................................................................5
    2.3     Term.............................................................................5
    2.4     Business Offices ................................................................5
    2.5     Registered Office and Agent ....................................................5
    2.6     Qualification in Other Jurisdictions.............................................5

**ARTICLE 3 PURPOSE OF THE BUSINESS** .................................................................5

**ARTICLE 4 MEMBER; LIMITATION ON LIABILITY** .....................................................6

    4.1     Member..........................................................................6
    4.2     Limitation on Liability...........................................................6

**ARTICLE 5 CAPITAL STRUCTURE**........................................................................6

    5.1     Common Units...................................................................6
    5.2     Issuance of Common Units.......................................................6
    5.3     Certificated Common Units.......................................................7
    5.4     Legend on Certificates...........................................................7

**ARTICLE 6 MANAGEMENT; OPERATION OF THE COMPANY BUSINESS** ...............7

    6.1     Management of the Company.....................................................7

**ARTICLE 7 OFFICERS; POWERS OF OFFICERS**.......................................................8

    7.1     Election and Tenure..............................................................8
    7.2     Resignation, Removal and Vacancies .............................................8
    7.3     Chief Executive Officer..........................................................8
    7.4     Chief Financial Officer...........................................................8
    7.5     Chief Operating Officer..........................................................8
    7.6     Vice Presidents .................................................................9
    7.7     Secretary........................................................................9
    7.8     Treasurer........................................................................9
    7.9     Assistant Secretaries and Assistant Treasurers....................................9
    7.10    Salaries.........................................................................9

7.11    Borrowing ................................................................................................9
7.12    Checks and Endorsements ...................................................................10
7.13    Deposits ..............................................................................................10
7.14    Proxies ................................................................................................10

**ARTICLE 8 EXCULPATION AND INDEMNIFICATION** ....................................**10**

8.1    Exculpation ..........................................................................................10
8.2    Indemnification ....................................................................................11
8.3    No Member Liability ............................................................................13
8.4    Settlements ..........................................................................................13
8.5    Business Opportunities; Fiduciary Duties ...........................................13
8.6    Amendments ........................................................................................16

**ARTICLE 9 FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS** ........................**16**

9.1    Fiscal Year ..........................................................................................16
9.2    Books and Records ..............................................................................16
9.3    Tax Election ........................................................................................16
9.4    Audits of Books and Accounts ............................................................16

**ARTICLE 10 DISTRIBUTIONS** ....................................................................................**16**

10.1    Distributions ........................................................................................16

**ARTICLE 11 DISSOLUTION AND LIQUIDATION** ........................................................**16**

11.1    Events Causing Dissolution ................................................................16
11.2    Liquidation and Winding Up ..............................................................17

**ARTICLE 12 MISCELLANEOUS** ................................................................................**17**

12.1    Entire Agreement ................................................................................17
12.2    Counterparts ........................................................................................17
12.3    Amendments ........................................................................................17
12.4    Severability ........................................................................................17
12.5    Successors and Assigns ......................................................................18
12.6    Notices ................................................................................................18
12.7    Headings ..............................................................................................18
12.8    **GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL** ....................................18
12.9    No Third Party Beneficiaries ..............................................................19

SCHEDULES

| Schedule A | Initial Officers |
|------------|------------------|

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**FUSION INTERMEDIATE, LLC**

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, together with all schedules, exhibits and annexes hereto, this "Agreement") of Fusion Intermediate, LLC (the "Company"), dated as of June [●], 2025, is executed by Fusion Parent, LLC, as sole member of the Company (the "Member" or "Parent").

WHEREAS, the Company was formed as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101, *et seq.* (as amended from time to time, the "Act"), by the filing of a Certificate of Formation of the Company (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Certificate of Formation") with the Secretary of State of the State of Delaware pursuant to Section 18-201 of the Act on May 28, 2025;

WHEREAS, the Member entered into a Limited Liability Company Agreement of the Company dated as of May 28, 2025 (as amended, supplemented, amended and restated or otherwise modified to the Effective Date, together with all schedules, exhibits and annexes thereto, the "Initial LLC Agreement"); and

WHEREAS, the Member desires to amend and restate the Initial LLC Agreement and to replace the Initial LLC Agreement in its entirety with this Agreement in order to provide for the conduct of the business and affairs of the Company.

NOW, THEREFORE, the Member hereby agrees as follows:

## ARTICLE 1

## DEFINITIONS AND RULES OF CONSTRUCTION

1.1     Certain Definitions.  As used herein:

"Affiliate" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person and shall also include (a) any Related Fund of such Person and (b) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

"Board" has the meaning given to such term in the Parent LLC Agreement.

"Business Day" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in the City of New York are authorized or obligated by law to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Covered Person" means (a) the Member and any member of Parent, (b) any Affiliate of the Member or any member of Parent, (c) any Person serving or having served as a Manager or a member of any committee of the Board, (d) any Person serving or having served as an officer of the Company, and (e) any Person who is or was a partner, shareholder, member, officer, director, manager, fund adviser, investment adviser, investment manager, controlling person, employee, consultant, counsel, representative or agent of any member of Parent or any Affiliate of any such member of Parent (other than Parent or any of its Subsidiaries, including the Company), in each of the foregoing cases, in any such Person's capacity as such.

"Entity" means any corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, estate, association, trust, unincorporated organization or association, business trust, tenancy in common or other legal entity.

"Equity Interests" means, with respect to any Person, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, beneficial or profits interests of such Person (however designated).

"Family Member" means, with respect to any individual, (a) any Related Person of such individual or (b) any trust, limited partnership, limited liability company or other Entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"Interest" means all or any part of the Member's equity, ownership, membership, profit or other right, title and interest in the Company in the Member's capacity as a member of the Company, including all of the Member's rights in profits, losses and distributions and all of the Member's rights under this Agreement.

"Manager" has the meaning given to such term in the Parent LLC Agreement.

"Parent LLC Agreement" means that certain Amended and Restated Limited Liability Company Agreement of Parent (together with all schedules, exhibits and annexes thereto), dated as of June [●], 2025, by and among Parent and the other Persons parties thereto as "Members" thereunder, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.

"Person" means an individual, an Entity, or a Governmental Authority.

"<u>Personal Representative</u>" means, with respect to any individual, the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent individual.

"<u>Regulations</u>" or "<u>Treasury Regulations</u>" means the income tax regulations promulgated under the Code as such regulations may be amended from time to time (including Temporary Regulations).

"<u>Related Fund</u>" means, with respect to any Person, any fund, account or investment vehicle that is controlled, managed or advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, advisor or subadvisor that controls, manages or advises such Person or an Affiliate of such investment manager, advisor or subadvisor.

"<u>Related Person</u>" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

"<u>Subsidiary</u>" means, as of any time of determination and with respect to any specified Person, any limited liability company, partnership, limited partnership, joint venture, association, or other Entity (a) more than a majority of the aggregate voting power of the Voting Securities of which is, as of such time, directly or indirectly owned by such Person, or (b) in which such Person, directly or indirectly, owns more than fifty percent (50.0%) of the equity economic interest thereof.

"<u>Subsidiary Governing Body</u>" means the board of directors, the board of managers or other governing body (including any committee of any such governing body) of each Subsidiary of the Company.

"<u>Voting Securities</u>" means, with respect to any Person, the Equity Interests of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

<u>Additional Definitions</u>.  The following terms have the meanings set forth in the Sections set forth below:

| **Defined Term** | **Location** |
| --- | --- |
| "Act" | Recitals |
| "Agreement" | Preamble |
| "Assistant Secretaries" | 7.9 |
| "Assistant Treasurers" | 7.9 |
| "Certificate of Formation" | Recitals |
| "Chief Executive Officer" | 7.3 |
| "Chief Financial Officer" | 7.4 |
| "Chief Operating Officer" | 7.5 |
| "Common Units" | 5.1 |
| "Company" | Preamble |
| "control" | Definition of "Affiliate" |
| "Damages" | 8.2(a) |
| "e-mail" | 13.6 |
| "Effective Date" | 2.1 |

| Defined Term | Location |
|---|---|
| "Fiscal Year" | 9.1 |
| "Identified Person" | 8.5(a) |
| "Initial LLC Agreement" | Recitals |
| "Member" | Preamble |
| "Opportunity" | 8.5(a) |
| "Other Entity" | 8.2(a) |
| "Parent" | Preamble |
| "Principal Office" | 2.4 |
| "Proceeding" | 8.2(a) |
| "Related Companies" | 8.5(c) |
| "Secretary" | 7.7 |
| "Treasurer" | 7.8 |
| "Vice Presidents" | 7.6 |

1.2    <u>Rules of Construction</u>.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    All references in this Agreement to Articles, Sections, clauses, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, Schedules and Exhibits to, or contained in, this Agreement.

(b)    All Exhibits and Schedules attached hereto are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any such Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(d)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(e)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(f)    The words "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

## ARTICLE 2
## GENERAL

2.1     Continuation of the Company; Limited Liability Company Agreement.    The Member agrees to continue the Company as a limited liability company under and pursuant to the provisions of the Act, and agrees that this Agreement (a) constitutes the "limited liability company agreement" of the Company within the meaning of Section 18-101(9) of the Act, (b) shall be effective as of the date hereof (the "Effective Date") and (c) shall govern the rights, duties and obligations of the Member, except as otherwise expressly required by the Act.

2.2     Name.    The name of the Company shall be, and the business of the Company shall be conducted under the name of, "Fusion Intermediate, LLC" or under such other name or names as the Member may determine from time to time.

2.3     Term.    The term of the Company commenced on May 28, 2025 and shall continue perpetually until a certificate of cancellation with respect to the Certificate of Formation shall be filed with the Secretary of State of the State of Delaware and become effective, and the Company is dissolved in accordance with Article 12.

2.4     Business Offices.    The location of the principal place of business of the Company shall be 2371 Liberty Way, Virginia Beach, Virginia 23456, or such other place as the Member may from time to time determine (the "Principal Office").    The Company may have one or more offices at such place or places, either within or outside the State of Delaware, as the Member may from time to time determine or as the business of the Company may require.

2.5     Registered Office and Agent.    The Company's registered agent and registered office in the State of Delaware is Corporation Service Company, 251 Little Falls Drive, Wilmington, County of New Castle, Delaware 19808.    At any time and from time to time, the Member may change the Company's registered agent and registered office in the State of Delaware.

2.6     Qualification in Other Jurisdictions.    The Member shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business and in which such qualification, formation or registration is required or as the Member determines to be desirable.    Any officer or other authorized person of the Company, each as duly authorized by the Member, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

## ARTICLE 3
## PURPOSE OF THE BUSINESS

The purpose and character of the business of the Company shall be to undertake and carry on any lawful business, purpose or activity for which limited liability companies may be formed under the Act, and engaging in any and all activities necessary, advisable, convenient or incidental thereto.

## ARTICLE 4
## MEMBER; LIMITATION ON LIABILITY

4.1    <u>Member</u>.  As of the Effective Date, the Member is the sole member of the Company. The name and the business or mailing address of the Member are as follows:

| Name | Address |
|------|---------|
| Fusion Parent, LLC | 2371 Liberty Way |
| | Virginia Beach, Virginia 23456 |
| | Attn: Tiffany Mcmillan-Mcwaters |
| | Email:  tmcwaters@franchisegrp.com |

4.2    <u>Limitation on Liability</u>.  Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising under contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.  Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on a Covered Person.

## ARTICLE 5
## CAPITAL STRUCTURE

5.1    <u>Common Units</u>.  The limited liability company interests of the Company shall be issued in unit increments (each, a "<u>Common Unit</u>" and, collectively, the "<u>Common Units</u>").  The rights and privileges associated with the Common Units are as set forth in this Agreement. References herein to the Common Units shall apply to limited liability company interests or other Equity Interests of the Company issued to the Member in respect of, in exchange for, or in substitution of, the Common Units by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, unit dividend, split-up, sale of assets, distribution or combination of the Common Units or any other change in the Company's capital structure (including shares or interests of a surviving corporation or other Entity or successor into which units or interests of the Company are exchanged).

5.2    <u>Issuance of Common Units</u>.  On May 28, 2025, the Company was authorized, empowered and directed to issue to the Member, and on May 28, 2025 the Company issued to the Member, an aggregate of one hundred (100) units of limited liability company interests of the Company under the Initial LLC Agreement, which shall be deemed continued as one hundred (100) Common Units on the Effective Date.  Except as set forth in the immediately preceding sentence, no other Common Units or Interests, or options, warrants or other securities that are convertible into, or exchangeable or exercisable for, Common Units or Interests shall be issued or outstanding on, or immediately after, the Effective Date.  Subject to the terms and conditions set forth in this Agreement, the Member may from time to time cause the Company to issue additional Common Units for any consideration as the Member may determine, including cash or other property, tangible or intangible, received or to be received by the Company or any of its Subsidiaries, or services rendered or to be rendered to the Company or any of its Subsidiaries.

5.3     Certificated Common Units.  If the Member so elects, the Common Units shall be certificated in such form as the Member may from time to time determine.  Such certificates shall be signed by any two (2) authorized officers of the Company, and may, but need not, be sealed with the seal of the Company.  Any or all of the signatures on the certificate may be by facsimile or electronic signature.  In case any officer of the Company who shall have signed, or whose facsimile or electronic signature shall have been placed on, any certificate evidencing Common Units shall cease for any reason to be such officer before such certificate shall have been issued or delivered by the Company, such certificate may nevertheless be issued and delivered by the Company as though the person who signed such certificate, or whose facsimile or electronic signature shall have been placed thereon, had not ceased to be such officer of the Company.

5.4     Legend on Certificates.  All certificates, if any, evidencing Common Units shall conspicuously bear the following legend:

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

## ARTICLE 6
## MANAGEMENT; OPERATION OF THE COMPANY BUSINESS

6.1     Management of the Company.

(a)     Subject to the terms and conditions of this Agreement, the business and affairs of the Company shall be managed by the Member, which shall direct, manage and control the business of the Company.  The Member shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The enumeration of powers in this Agreement shall not limit the general or implied powers of the Member or any additional powers provided by applicable law.  The Member shall possess and may enjoy and exercise all of the rights and powers of a "manager" as provided in the Act, and the Member shall be a "manager" as provided in the Act.

(b)     In managing the Company and exercising its powers, the Member may elect to act through individuals to whom due power and authority have been delegated by the Member, including officers as further described in Article 7; provided, that the Member may rescind the delegation of any such powers to any such individual at any time in its sole discretion.  Without limiting the powers and authorities that may otherwise be delegated to any such individual, any such individual shall constitute an authorized person within the meaning of the Act.

## ARTICLE 7
## OFFICERS; POWERS OF OFFICERS.

7.1    <u>Election and Tenure</u>.  The officers of the Company may (but shall not be required to) consist of the Chief Executive Officer, the Chief Financial Officer, a Chief Operating Officer, a Secretary, a Treasurer, and such other officers and assistant officers as the Member may deem necessary or advisable, each of whom shall be appointed by the Member.  The persons holding officer positions with the Company as of the Effective Date are listed on <u>Schedule A</u> attached hereto.  The Member may expressly delegate to any such officer the power to appoint or remove subordinate officers, agents or employees.  Any two or more offices may be held by the same person.  Each officer so appointed shall continue in office until a successor shall be appointed and shall qualify, or until the officer's earlier death, resignation or removal.  Each officer shall be a natural person who is eighteen (18) years of age or older.

7.2    <u>Resignation, Removal and Vacancies</u>.  Any officer may resign at any time by giving written notice of resignation to the Company, to the attention of the Member or the Chief Executive Officer.  Such resignation shall take effect when the notice is delivered in accordance with <u>Section 12.6</u> unless the notice specifies a later date, and acceptance of the resignation shall not be necessary to render such resignation effective unless such resignation so states.  Any officer may at any time be removed by the Member.  If any office becomes vacant for any reason, the vacancy may be filled by the Member.  An officer appointed to fill a vacancy shall be appointed for the unexpired term of such officer's predecessor in office (if any) and shall continue in office until a successor shall be elected or appointed and shall qualify, or until such officer's earlier death, resignation or removal.  The appointment of an officer shall not itself create contract rights in favor of the officer, and the removal of an officer shall not affect the officer's contract rights, if any, with the Company, and the resignation of an officer does not affect the Company's contract rights, if any, with the officer.

7.3    <u>Chief Executive Officer</u>.  The chief executive officer of the Company (the "<u>Chief Executive Officer</u>"), if any, shall (a) have general and active management of the business of the Company, and preside over the day-to-day business operations of the Company, (b) see that all orders and resolutions of the Member are carried into effect, and (c) perform all duties as may from time to time be assigned to him or her by the Member or as may be expressly set forth in this Agreement.  The Chief Executive Officer shall also be the President of the Company.

7.4    <u>Chief Financial Officer</u>.  The chief financial officer of the Company (the "<u>Chief Financial Officer</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Member or the Chief Executive Officer or as may be expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Financial Officer.  In addition, the Chief Financial Officer shall have, along with the Chief Executive Officer, responsibility for the day-to-day business operations of the Company.

7.5    <u>Chief Operating Officer</u>.  The chief operating officer of the Company (the "<u>Chief Operating Officer</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Member or the Chief Executive Officer or as may be

-8-

expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Operating Officer.

7.6     Vice Presidents.  The vice presidents of the Company (the "Vice Presidents"), if any, shall perform such duties and possess such powers as may from time to time be assigned to them by the Member or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In the absence of the Chief Executive Officer or in the event of the inability or refusal of the Chief Executive Officer to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Member, or in the absence of any designation, then in the order of the election or appointment of the Vice Presidents) shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer.

7.7     Secretary.  The secretary of the Company (the "Secretary"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Member or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Secretary shall perform such duties and have such powers as are incident to the office of Secretary, including the duty and power to maintain the records and information of the Company, to authenticate records of the Company, to be custodian of the Company seal and to affix and attest to the Company seal on documents.

7.8     Treasurer.  The treasurer of the Company (the "Treasurer"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Member or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of Treasurer, including the duty and power to keep and be responsible for all funds and securities of the Company, to deposit funds of the Company in depositories selected in accordance with this Agreement, to disburse such funds as ordered by the Member, making proper accounts thereof, and to render as required by the Member statements of all such transactions and of the financial condition of the Company.

7.9     Assistant Secretaries and Assistant Treasurers.  The assistant secretaries and assistant treasurers of the Company (the "Assistant Secretaries" and the "Assistant Treasurers"), if any, shall perform such duties as shall be assigned to them by the Secretary or the Treasurer, respectively, or by the Chief Executive Officer or the Member or as may be expressly set forth in this Agreement.  In the absence, inability or refusal to act of the Secretary or the Treasurer, the Assistant Secretaries or the Assistant Treasurers, respectively, in the order designated by the Member, or in the absence of any designation, then in the order of their election or appointment, shall perform the duties and exercise the powers of the Secretary or Treasurer, as the case may be.

7.10    Salaries.  Officers of the Company shall be entitled to such salaries, emoluments, compensation or reimbursement as shall be fixed or allowed from time to time by the Member or in such manner as the Member shall provide.

7.11    Borrowing.  No loan shall be contracted on behalf of the Company, and no evidence of indebtedness shall be issued, endorsed or accepted in its name, unless authorized by the Member.  Such authority may be general or confined to specific instances.  When so authorized,

an officer may (a) effect loans or provide guarantees therefor at any time for the Company from any bank or other Entity and for such loans or guarantees may execute and deliver promissory notes, guarantees or other evidences of indebtedness of the Company, and (b) mortgage, pledge or otherwise encumber any real or personal property, or any interest therein, owned or held by the Company as security for the payment of any loans, guarantees or obligations of the Company, and to that end may execute and deliver for the Company such instruments as may be necessary or proper in connection with such transaction.

7.12    Checks and Endorsements.  All checks, drafts or other orders for the payment of money, obligations, notes or other evidences of indebtedness, bills of lading, warehouse receipts, trade acceptances and other such instruments shall be signed or endorsed for the Company by such officers or agents of the Company as shall from time to time be determined by resolution of the Member, which resolution may provide for the use of facsimile or electronic signatures.

7.13    Deposits.  All funds of the Company not otherwise employed shall be deposited from time to time to the Company's credit in such banks or other depositories as shall from time to time be determined by resolution of the Member, which resolution may specify the officers or agents of the Company who shall have the power, and the manner in which such power shall be exercised, to make such deposits and to endorse, assign and deliver for collection and deposit checks, drafts and other orders for the payment of money payable to the Company or its order.

7.14    Proxies.  Unless otherwise provided by resolution adopted by the Member, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer or any Vice President: (a) may from time to time appoint one (1) or more agents of the Company, in the name and on behalf of the Company, (i) to cast the votes which the Company may be entitled to cast as the holder of Equity Interests or other securities in any other Entity whose Equity Interests or other securities may be held by the Company, at meetings of the holders of the Equity Interests or other securities of such other Entity, or (ii) to consent in writing to any action by such other Entity; (b) may instruct the person so appointed as to the manner of casting such votes or giving such consent; and (c) may execute or cause to be executed in the name and on behalf of the Company and under the Company's seal, or otherwise, all such written proxies or other instruments as may be deemed necessary or proper in connection with the foregoing clauses (a) and (b).

# ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1    Exculpation.  Notwithstanding any other provisions of this Agreement (whether express or implied) or obligation or duty at law or in equity, to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Member, any member of Parent, the Company or any other Person (including any creditor or claimant of the Company or any of its Subsidiaries) for any losses, claims, expenses, damages or liabilities arising from any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by a Covered Person in connection with the Company, Parent or any of their respective Subsidiaries, nor shall any Covered Person be liable to the Member, any member of Parent, the Company or any other Person for any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by any employee or other agent of the Company, Parent or any of their respective Subsidiaries, except to the extent that any such losses, expenses, claims, damages or

-10-

liabilities (i) in any such case, are attributable to such Covered Person's material breach of this Agreement, and (ii) in the case of any current or former Manager or any current or former officer of the Company, (A) are attributable to such Manager's or officer's acts or omissions not in good faith, (B) are attributable to such Manager's or officer's breach of the duty of loyalty to the Member, the Company or any of their respective Subsidiaries, (C) arise from a transaction in which such Manager or officer derived an improper personal benefit or (D) are attributable to acts or omissions of such Manager or officer that constitute a knowing violation of law.  No amendment to or repeal of this Section 8.1 shall apply to or have any effect on the liability or alleged liability of the Covered Persons for or with respect to their acts or omissions occurring prior to such amendment or repeal.

8.2    Indemnification.

(a)    The Company shall, to the fullest extent permitted by applicable law (as now or hereafter in effect), indemnify, defend and hold harmless each Covered Person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding ("Proceeding"), whether civil, criminal, administrative or investigative, or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, (i) in connection with any matter arising out of or in connection with the Company's, Parent's or any of their respective Subsidiaries' business or affairs, (ii) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "Covered Person", or (iii) by reason of the fact that such Covered Person, or a Person of whom such Covered Person is the legal representative, is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any other corporation, company, partnership, joint venture, trust, employee benefit plan or other Entity (an "Other Entity"), from and against any losses, claims, expenses, damages and liabilities (collectively, "Damages") suffered or incurred by, imposed on, or to which such Covered Person may become subject in connection with such Proceeding; provided, that no right of indemnification shall be available to a Covered Person under this Article 8 (A) to the extent that it shall have been determined by a final, non-appealable decision by a court of competent jurisdiction that any such Damages are attributable to such Covered Person's material breach of this Agreement, and, (B) in the case of any current or former Manager or any current or former officer of the Company, to the extent that any such Damages (1) are attributable to such Managers' or officer's acts or omissions not in good faith, (2) are attributable to such Managers' or officer's breach of the duty of loyalty to the Member, the Company or any of their respective Subsidiaries, (3) arise from a transaction in which such Manager or officer derived an improper personal benefit, (4) are attributable to acts or omissions of such Manager or officer that constitute a knowing violation of law, (5) are attributable to any Proceeding (except an action to enforce the indemnification rights set forth in this Section 8.2(a) or to enforce the rights to advancement of expenses set forth in Section 8.2(b)) initiated by such Covered Person unless if such Proceeding was authorized in the specific case by the Member, or (6) are attributable to any Proceeding by or in the right of the Member, the Company or any of their respective Subsidiaries unless if the Member authorizes the indemnification of any such Damages (except that, to the extent any such Covered Person has been successful on the merits or otherwise in the defense of any such Proceeding by or in the right of the Member, the Company or any of

their respective Subsidiaries or in defense of any claim, issue or matter therein, then such Covered Person shall be indemnified against expenses actually and reasonably incurred by such Covered Person in connection therewith). If for any reason the foregoing indemnification is unavailable to a Covered Person, or is insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Covered Person as a result of the applicable Damages in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Covered Person on the other hand or, if such allocation is not permitted by applicable law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations.

(b)     If a Covered Person is or was made, or threatened to be made, a party to or is involved in any threatened, pending or completed Proceeding, whether civil, criminal, administrative or investigative, or any appeal in such Proceeding or any inquiry or investigation that could lead to such a Proceeding, (i) in connection with any matter arising out of or in connection with the Company's, Parent's or any of their respective Subsidiaries' business or affairs, (ii) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "Covered Person" or (iii) by reason of the fact that such Covered Person, or a Person of whom such Covered Person is the legal representative, is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any Other Entity, the Company shall pay, within a reasonable period of time following the Company's receipt of reasonably detailed supporting documentation, to such Covered Person such Covered Person's reasonable and documented out-of-pocket legal and other expenses (including legal and other professional fees and disbursements, and the cost of any investigation and preparation) incurred in connection therewith in advance of the final disposition of such Proceeding; provided, that such Covered Person shall promptly repay to the Company the amount of any such expenses paid to it if it shall be determined that such Covered Person is not entitled to be indemnified by the Company in connection with such Proceeding as provided in the proviso contained in Section 8.2(a); provided, further that, with respect to a Covered Person described in clause (B) of Section 8.2(a), the Company shall not be required to pay in advance or otherwise any such expenses incurred by any such Covered Person in connection with (A) any Proceeding initiated by such Covered Person unless if such Proceeding was authorized in the specific case by the Member or (B) any Proceeding by or in the right of the Member, the Company or any of their respective Subsidiaries unless if the Member authorizes the payment of any such expenses.

(c)     The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this Section 8.2 shall not be deemed exclusive of any other rights to which a Covered Person seeking indemnification, reimbursement or advancement of expenses, or contribution may have or hereafter be entitled under any statute, this Agreement, any other agreement (including any policy of insurance purchased or provided by Parent, the Company or any of their respective Subsidiaries under which any Covered Person is covered), any vote of the Member or the Board, or otherwise. The rights conferred upon any Covered Person in Section 8.1 and Section 8.2 shall be contract rights that vest upon the occurrence or alleged occurrence of any judgment, decision or action made, taken or performed, or omitted to be

-12-

made, taken or performed, or any other fact, circumstance or matter, giving rise to any losses, claims, expenses, damages or liabilities (whether or not arising out of a Proceeding) that are covered by <u>Section 8.1</u> and/or <u>Section 8.2</u>, and such rights shall apply to a Person that was a Covered Person even after such Person ceases to be a Covered Person, but only with respect to any such losses, claims, expenses, damages or liabilities arising from any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, or any other fact, circumstance or matter that occurred, during the period in which such Person was a Covered Person.

(d)    The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this <u>Section 8.2</u> shall inure to the benefit of the successors, heirs, executors and administrators of a Covered Person.

(e)    The Company shall have the power to purchase and maintain insurance on behalf of any Covered Person to protect such Covered Person against any Damages, whether or not the Company would have the power to indemnify such Covered Person against any such Damages under the provisions of this <u>Section 8.2</u> or under any provision of law.

(f)    No amendment or repeal of any part of this <u>Section 8.2</u> shall apply to or have any effect on any right to indemnification, reimbursement and advancement of expenses, and contribution provided hereunder with respect to any acts or omissions occurring prior to such amendment or repeal.

8.3    <u>No Member Liability</u>.  Any indemnification, reimbursement and advancement of expenses, or contribution provided under this <u>Article 8</u> shall be satisfied solely out of assets of the Company, as an expense of the Company.  The Member shall not be subject to personal liability by reason of the indemnification, reimbursement and advancement of expenses, or contribution provisions set forth in this <u>Article 8</u>.

8.4    <u>Settlements</u>.  The Company shall not be liable for any settlement by a Covered Person of any Proceeding effected without its written consent, but if settled with such written consent, or if there is a final judgment against such Covered Person in any such Proceeding, the Company agrees to indemnify and hold harmless such Covered Person to the extent provided above from and against any Damages by reason of such settlement or judgment.

8.5    <u>Business Opportunities; Fiduciary Duties</u>.

(a)    The Company and the Member acknowledge that (i) each member of Parent (other than any member of Parent who is a Manager or an officer or employee of the Company, Parent or any of their respective Subsidiaries, any member of Parent that is a Family Member of any Manager or any officer or employee of the Company, Parent or any of their respective Subsidiaries, or any member of Parent that is controlled by any Manager or any officer or employee of the Company, Parent or any of their respective Subsidiaries or controlled by any such Manager's, officer's or employee's Family Members), and (ii) each Affiliate, manager, director, principal, officer, employee and other representative of each member of Parent described in <u>clause (i)</u> (other than any such Person who is a

-13-

Manager or an officer or employee of the Company, Parent or any of their respective Subsidiaries, any such Person that is a Family Member of any Manager or any officer or employee of the Company, Parent or any of their respective Subsidiaries, or any such Person that is controlled by any Manager or any officer or employee of the Company, Parent or any of their respective Subsidiaries or controlled by any such Manager's, officer's or employee's Family Members) (the foregoing Persons being referred to, collectively, as "Identified Persons" and, each individually, as an "Identified Person") may now engage, may continue to engage, and/or may, in the future, decide to engage, in the same or similar activities or lines of business as those in which the Company, Parent or any of their respective Subsidiaries, directly or indirectly, now engage or may engage and/or other business activities that overlap with, are complementary to, or compete with those in which the Company, Parent or any of their respective Subsidiaries, directly or indirectly, now engage or may engage (any such activity or line of business, an "Opportunity").   No Identified Person shall have any duty to refrain, directly or indirectly, from (i) engaging in any Opportunity, (ii) offering or directing any Opportunity to another Person (including any Affiliate of such Identified Person) or (iii) otherwise competing with the Company, Parent or any of their respective Subsidiaries.  No Identified Person shall have any duty or obligation to refer or offer to the Company, Parent or any of their respective Subsidiaries any Opportunity, and the Company hereby renounces, on behalf of itself and each of its Subsidiaries, any interest or expectancy of the Company or any of its Subsidiaries in, or in being offered, an opportunity to participate in any Opportunity engaged in by any Identified Person which may be a corporate (or analogous) or business opportunity for the Company, Parent or any of their respective Subsidiaries.

(b)    In the event that any Identified Person acquires knowledge of an Opportunity which may be a corporate (or analogous) or business opportunity for the Company, Parent or any of their respective Subsidiaries, such Identified Person shall have no duty to communicate, offer or otherwise make available such Opportunity to the Company, Parent or any of their respective Subsidiaries and shall not be liable to the Company, Parent or any of their respective Subsidiaries or any of the members of Parent for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself, or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person).

(c)    The Company, on behalf of itself and each of its Subsidiaries, and the Member (i) acknowledge that the Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other Entities (each such Entity, a "Related Company" and all such Entities, collectively, "Related Companies"), including Entities that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates, and (ii) agree that (A) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Agreement shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Agreement (if any) shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (x) the ownership by an Identified Person of any

-14-

interest in any Related Company, (y) the affiliation of any Related Company with an Identified Person or (z) any action taken or omitted by any Related Company or an Identified Person in respect of any Related Company, (B) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates, (C) nothing in this Agreement and none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person to, directly or indirectly, purchase or sell the securities or indebtedness of any other Entity or to compete with the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates as if the Identified Persons were not a party to this Agreement and (D) the Identified Persons are not and shall not be obligated to disclose to the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates in any such business or as to any such opportunities.

(d)     To the fullest extent permitted by law, this Agreement is not intended to, and does not, create or impose any fiduciary or other duty on any Identified Person. Further, to the fullest extent permitted by law, the Company and the Member hereby waive any and all fiduciary duties owed to the Company or the Member by any Identified Person (including those fiduciary duties that, absent such waiver, may be implied by law), and in doing so, the Company and the Member recognize, acknowledge and agree that the duties and obligations of the Identified Persons to the Company, the Member (in its capacity as such) and each other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement are only as expressly set forth in this Agreement. To the fullest extent permitted by law, no Identified Person shall owe any duty (including any fiduciary duty) to the Company or to the Member (in its capacity as such) or to any other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement other than those non-fiduciary duties that are expressly set forth in this Agreement and a duty to act in accordance with the implied contractual covenant of good faith and fair dealing to the extent required by Delaware law.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of an Identified Person otherwise existing at law or in equity in respect of the Company or the Member (in its capacity as such), are agreed by all parties hereto (or any other Person that is or becomes a beneficiary of this Agreement) to replace fully and completely such other duties and liabilities.

(e)     Each employee and officer of the Company, in its capacity as such, shall have the same fiduciary duties as an employee or officer (as applicable) of a corporation organized under the laws of the State of Delaware; provided, that, to the extent determined by the Member, no officer shall be personally liable for any monetary damages to the Company or the Member for breach of the duty of care, subject to the same limitations on such limitation as contemplated by Section 102(b)(7) of the Delaware General Corporation Law.

8.6    Amendments.    Notwithstanding anything herein to the contrary, no amendment, repeal or modification of this Article 8 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

## ARTICLE 9
## FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS

9.1    Fiscal Year.    The fiscal year of the Company (the "Fiscal Year") shall be established by the Member.

9.2    Books and Records.    The books and records of the Company may be kept at such place or places as may be from time to time designated by the Member.  The Company shall keep correct and complete books and records of account, including the amount of its assets and liabilities and the names and places of residence of its officers.

9.3    Tax Election.    The Company intends to be treated as an association taxable as a corporation for U.S. federal, state and local income tax purposes under Treasury Regulation section 301.7701-3 and under any corresponding provision of state or local law.  The Company shall file an Entity Classification Election (IRS Form 8832) to be treated as an association taxable as a corporation for U.S. federal income tax purposes, effective as of the date the Certificate of Formation was filed even if made thereafter, and any officer of the Company is authorized and empowered to make any such election.

9.4    Audits of Books and Accounts.    The Company's books and accounts shall be audited at such times and by such auditors as shall be specified and designated by written consent of the Member.

## ARTICLE 10
## DISTRIBUTIONS

10.1    Distributions.    All distributions hereunder shall be made to the Member at such times and in such aggregate amounts as the Member may deem appropriate; provided, however, that no distribution shall be made if such distribution would violate the Act or any other applicable law.

## ARTICLE 11
## DISSOLUTION AND LIQUIDATION

11.1    Events Causing Dissolution.    The Company shall be dissolved only upon the occurrence of any of the following events:

(a)    the consent of the Member;

(b)    the entry of a final decree of judicial dissolution of the Company under Section 18-802 of the Act; or

(c)    at any time there are no members of the Company, unless the Company is continued in accordance with the Act.

Except as otherwise set forth in this <u>Section 11.1</u>, the Company is intended to have perpetual existence.  To the fullest extent permitted by law, any bankruptcy or dissolution of the Member cause the Member to cease to be a member of the Company.

11.2    <u>Liquidation and Winding Up</u>.    If the Company is dissolved pursuant to <u>Section 11.1</u>, the Company shall be liquidated and the Member (or other Person or Persons designated by the Member or by a decree of court) shall wind up the affairs of the Company.  The Member or other Persons winding up the affairs of the Company shall promptly proceed to the liquidation of the Company and, in settling the accounts of the Company, the assets and the property of the Company shall be distributed in the following order of priority:

(a)    First, to the payment of (or establishing reserves to pay) all debts and liabilities of the Company (including any debts or liabilities owed to the Member) in the order of priority as provided by law; and

(b)    The balance, if any, to the Member.

## ARTICLE 12
## MISCELLANEOUS

12.1    <u>Entire Agreement</u>.  This Agreement (including the exhibits and schedules to this Agreement) amends and restates the Initial LLC Agreement in its entirety and contains the entire understanding between the Member and the Company with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter of this Agreement.

12.2    <u>Counterparts</u>.  For the convenience of the parties hereto, this Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.  Delivery of an executed counterpart of this Agreement by portable document format (PDF) or other electronic transmission will be effective as delivery of a manually executed counterpart of this Agreement.

12.3    <u>Amendments</u>.  This Agreement may be amended, modified or waived from time to time only by a written instrument executed by the Member.

12.4    <u>Severability</u>.    In the event that any provision hereof would be invalid or unenforceable in any respect under applicable law, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

12.5    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

12.6    <u>Notices</u>.    All notices, requests, waivers, document deliveries and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, sent, provided, delivered or received (a) when personally delivered to the party to be notified, (b) when sent by electronic mail ("<u>e-mail</u>") to the party to be notified, (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified, or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:  (i) in the case of the Member, to the Member at its address or e-mail address set forth in <u>Section 4.1</u> and (ii) in the case of the Company, to the Secretary (or to another officer of the Company that is required to be provided with such notice, request, waiver, document or other communication pursuant to the terms of this Agreement) at the Principal Office.

12.7    <u>Headings</u>.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

12.8    **<u>GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE. EACH OF THE COMPANY AND THE MEMBER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE COMPANY OR THE MEMBER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS. EACH OF THE COMPANY AND THE MEMBER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH OF THE COMPANY AND THE MEMBER HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN <u>SECTION 12.6</u>, OR IN ANY OTHER MANNER PERMITTED BY LAW.  EACH OF THE COMPANY AND THE MEMBER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING.**

12.9    <u>No Third Party Beneficiaries</u>.    The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its legal representatives, heirs, administrators, executors, successors and permitted assigns, and it is not the intention of the parties hereto to confer third-party beneficiary rights upon any other Person other than (x) the Covered Persons (solely with respect to <u>Sections 8.1</u> and <u>8.2</u>) and (y) the Identified Persons (solely with respect to <u>Section 8.5</u>).

[*Signature pages follow*]

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the Effective Date.

**FUSION PARENT, LLC**

By: _____
　　　Name:
　　　Title:

## **Schedule A**

### Initial Officers

| Andrew Laurence | President and Chief Executive Officer |
|---|---|
| Eric Seeton | Chief Financial Officer |
| Andrew Kaminsky | Chief Administrative Officer and Executive Vice President |
| Tiffany McMillan-McWaters | Executive Vice President and Secretary |

**<u>Exhibit A (v)</u>**
**Amended and Restated Limited**
**Liability Company Agreement of Fusion Buyer, LLC**

**FUSION BUYER, LLC**

**AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT**

# TABLE OF CONTENTS

<u>Page</u>

**ARTICLE 1 DEFINITIONS AND RULES OF CONSTRUCTION**..........................................1

    1.1      Certain Definitions ........................................................................1
    1.2      Rules of Construction ....................................................................4

**ARTICLE 2 GENERAL** ....................................................................................5

    2.1      Continuation of the Company; Limited Liability Company Agreement....................5
    2.2      Name......................................................................................5
    2.3      Term......................................................................................5
    2.4      Business Offices ...........................................................................5
    2.5      Registered Office and Agent ............................................................5
    2.6      Qualification in Other Jurisdictions....................................................5

**ARTICLE 3 PURPOSE OF THE BUSINESS** ....................................................5

**ARTICLE 4 MEMBER; LIMITATION ON LIABILITY** ........................................6

    4.1      Member...................................................................................6
    4.2      Limitation on Liability...................................................................6

**ARTICLE 5 CAPITAL STRUCTURE**................................................................6

    5.1      Common Units...........................................................................6
    5.2      Issuance of Common Units .............................................................6
    5.3      Certificated Common Units.............................................................7
    5.4      Legend on Certificates .................................................................7

**ARTICLE 6 MANAGEMENT; OPERATION OF THE COMPANY BUSINESS** ...............7

    6.1      Management of the Company...........................................................7

**ARTICLE 7 OFFICERS; POWERS OF OFFICERS**..............................................8

    7.1      Election and Tenure .....................................................................8
    7.2      Resignation, Removal and Vacancies ..................................................8
    7.3      Chief Executive Officer .................................................................8
    7.4      Chief Financial Officer ..................................................................8
    7.5      Chief Operating Officer .................................................................8
    7.6      Vice Presidents ..........................................................................9
    7.7      Secretary.................................................................................9
    7.8      Treasurer ................................................................................9
    7.9      Assistant Secretaries and Assistant Treasurers......................................9
    7.10    Salaries..................................................................................9

7.11    Borrowing ......................................................................................9
7.12    Checks and Endorsements ...........................................................10
7.13    Deposits .....................................................................................10
7.14    Proxies ......................................................................................10

**ARTICLE 8 EXCULPATION AND INDEMNIFICATION** ...........................**10**

8.1    Exculpation .................................................................................10
8.2    Indemnification ...........................................................................11
8.3    No Member Liability ...................................................................13
8.4    Settlements .................................................................................13
8.5    Business Opportunities; Fiduciary Duties ...................................13
8.6    Amendments ...............................................................................16

**ARTICLE 9 FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS** ...................**16**

9.1    Fiscal Year .................................................................................16
9.2    Books and Records .....................................................................16
9.3    Tax Election ...............................................................................16
9.4    Audits of Books and Accounts ...................................................16

**ARTICLE 10 DISTRIBUTIONS** ...................................................................**16**

10.1    Distributions ...............................................................................16

**ARTICLE 11 DISSOLUTION AND LIQUIDATION** ...................................**16**

11.1    Events Causing Dissolution ........................................................16
11.2    Liquidation and Winding Up ......................................................17

**ARTICLE 12 MISCELLANEOUS** ................................................................**17**

12.1    Entire Agreement .......................................................................17
12.2    Counterparts ...............................................................................17
12.3    Amendments ...............................................................................17
12.4    Severability ................................................................................17
12.5    Successors and Assigns ..............................................................18
12.6    Notices .......................................................................................18
12.7    Headings .....................................................................................18
12.8    **GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL** .......................................18
12.9    No Third Party Beneficiaries .....................................................19

SCHEDULES

| Schedule A | Initial Officers |
|---|---|

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**FUSION BUYER, LLC**

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, together with all schedules, exhibits and annexes hereto, this "Agreement") of Fusion Buyer, LLC (the "Company"), dated as of June [●], 2025, is executed by Fusion Intermediate, LLC, as sole member of the Company (the "Member" or "Parent").

WHEREAS, the Company was formed as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101, *et seq*. (as amended from time to time, the "Act"), by the filing of a Certificate of Formation of the Company (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Certificate of Formation") with the Secretary of State of the State of Delaware pursuant to Section 18-201 of the Act on May 28, 2025;

WHEREAS, the Member entered into a Limited Liability Company Agreement of the Company dated as of May 28, 2025 (as amended, supplemented, amended and restated or otherwise modified to the Effective Date, together with all schedules, exhibits and annexes thereto, the "Initial LLC Agreement"); and

WHEREAS, the Member desires to amend and restate the Initial LLC Agreement and to replace the Initial LLC Agreement in its entirety with this Agreement in order to provide for the conduct of the business and affairs of the Company.

NOW, THEREFORE, the Member hereby agrees as follows:

## ARTICLE 1

## DEFINITIONS AND RULES OF CONSTRUCTION

1.1    Certain Definitions.  As used herein:

"Affiliate" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person and shall also include (a) any Related Fund of such Person and (b) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

"Board" has the meaning given to such term in the Parent LLC Agreement.

"Business Day" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in the City of New York are authorized or obligated by law to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Covered Person" means (a) the Member and any member of Parent, (b) any Affiliate of the Member or any member of Parent, (c) any Person serving or having served as a Manager or a member of any committee of the Board, (d) any Person serving or having served as an officer of the Company, and (e) any Person who is or was a partner, shareholder, member, officer, director, manager, fund adviser, investment adviser, investment manager, controlling person, employee, consultant, counsel, representative or agent of any member of Parent or any Affiliate of any such member of Parent (other than Parent or any of its Subsidiaries, including the Company), in each of the foregoing cases, in any such Person's capacity as such.

"Entity" means any corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, estate, association, trust, unincorporated organization or association, business trust, tenancy in common or other legal entity.

"Equity Interests" means, with respect to any Person, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, beneficial or profits interests of such Person (however designated).

"Family Member" means, with respect to any individual, (a) any Related Person of such individual or (b) any trust, limited partnership, limited liability company or other Entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"Interest" means all or any part of the Member's equity, ownership, membership, profit or other right, title and interest in the Company in the Member's capacity as a member of the Company, including all of the Member's rights in profits, losses and distributions and all of the Member's rights under this Agreement.

"Manager" has the meaning given to such term in the Parent LLC Agreement.

"Parent LLC Agreement" means that certain Amended and Restated Limited Liability Company Agreement of Parent (together with all schedules, exhibits and annexes thereto), dated as of June [●], 2025, by and among Parent and the other Persons parties thereto as "Members" thereunder, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.

"Person" means an individual, an Entity, or a Governmental Authority.

"<u>Personal Representative</u>" means, with respect to any individual, the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent individual.

"<u>Regulations</u>" or "<u>Treasury Regulations</u>" means the income tax regulations promulgated under the Code as such regulations may be amended from time to time (including Temporary Regulations).

"<u>Related Fund</u>" means, with respect to any Person, any fund, account or investment vehicle that is controlled, managed or advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, advisor or subadvisor that controls, manages or advises such Person or an Affiliate of such investment manager, advisor or subadvisor.

"<u>Related Person</u>" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

"<u>Subsidiary</u>" means, as of any time of determination and with respect to any specified Person, any limited liability company, partnership, limited partnership, joint venture, association, or other Entity (a) more than a majority of the aggregate voting power of the Voting Securities of which is, as of such time, directly or indirectly owned by such Person, or (b) in which such Person, directly or indirectly, owns more than fifty percent (50.0%) of the equity economic interest thereof.

"<u>Subsidiary Governing Body</u>" means the board of directors, the board of managers or other governing body (including any committee of any such governing body) of each Subsidiary of the Company.

"<u>Voting Securities</u>" means, with respect to any Person, the Equity Interests of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

<u>Additional Definitions</u>.  The following terms have the meanings set forth in the Sections set forth below:

| **Defined Term** | **Location** |
| --- | --- |
| "Act" | Recitals |
| "Agreement" | Preamble |
| "Assistant Secretaries" | 7.9 |
| "Assistant Treasurers" | 7.9 |
| "Certificate of Formation" | Recitals |
| "Chief Executive Officer" | 7.3 |
| "Chief Financial Officer" | 7.4 |
| "Chief Operating Officer" | 7.5 |
| "Common Units" | 5.1 |
| "Company" | Preamble |
| "control" | Definition of "Affiliate" |
| "Damages" | 8.2(a) |
| "e-mail" | 13.6 |
| "Effective Date" | 2.1 |

| **Defined Term** | **Location** |
|---|---|
| "Fiscal Year" | 9.1 |
| "Identified Person" | 8.5(a) |
| "Initial LLC Agreement" | Recitals |
| "Member" | Preamble |
| "Opportunity" | 8.5(a) |
| "Other Entity" | 8.2(a) |
| "Parent" | Preamble |
| "Principal Office" | 2.4 |
| "Proceeding" | 8.2(a) |
| "Related Companies" | 8.5(c) |
| "Secretary" | 7.7 |
| "Treasurer" | 7.8 |
| "Vice Presidents" | 7.6 |

1.2    <u>Rules of Construction</u>.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    All references in this Agreement to Articles, Sections, clauses, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, Schedules and Exhibits to, or contained in, this Agreement.

(b)    All Exhibits and Schedules attached hereto are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any such Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(d)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(e)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(f)    The words "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

## ARTICLE 2
## GENERAL

2.1 <u>Continuation of the Company; Limited Liability Company Agreement</u>. The Member agrees to continue the Company as a limited liability company under and pursuant to the provisions of the Act, and agrees that this Agreement (a) constitutes the "limited liability company agreement" of the Company within the meaning of Section 18-101(9) of the Act, (b) shall be effective as of the date hereof (the "<u>Effective Date</u>") and (c) shall govern the rights, duties and obligations of the Member, except as otherwise expressly required by the Act.

2.2 <u>Name</u>. The name of the Company shall be, and the business of the Company shall be conducted under the name of, "Fusion Buyer, LLC" or under such other name or names as the Member may determine from time to time.

2.3 <u>Term</u>. The term of the Company commenced on May 28, 2025 and shall continue perpetually until a certificate of cancellation with respect to the Certificate of Formation shall be filed with the Secretary of State of the State of Delaware and become effective, and the Company is dissolved in accordance with <u>Article 12</u>.

2.4 <u>Business Offices</u>. The location of the principal place of business of the Company shall be 2371 Liberty Way, Virginia Beach, Virginia 23456, or such other place as the Member may from time to time determine (the "<u>Principal Office</u>"). The Company may have one or more offices at such place or places, either within or outside the State of Delaware, as the Member may from time to time determine or as the business of the Company may require.

2.5 <u>Registered Office and Agent</u>. The Company's registered agent and registered office in the State of Delaware is Corporation Service Company, 251 Little Falls Drive, Wilmington, County of New Castle, Delaware 19808. At any time and from time to time, the Member may change the Company's registered agent and registered office in the State of Delaware.

2.6 <u>Qualification in Other Jurisdictions</u>. The Member shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business and in which such qualification, formation or registration is required or as the Member determines to be desirable. Any officer or other authorized person of the Company, each as duly authorized by the Member, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

## ARTICLE 3
## PURPOSE OF THE BUSINESS

The purpose and character of the business of the Company shall be to undertake and carry on any lawful business, purpose or activity for which limited liability companies may be formed under the Act, and engaging in any and all activities necessary, advisable, convenient or incidental thereto.

## ARTICLE 4
## MEMBER; LIMITATION ON LIABILITY

4.1     Member.  As of the Effective Date, the Member is the sole member of the Company. The name and the business or mailing address of the Member are as follows:

| Name | Address |
| --- | --- |
| Fusion Intermediate, LLC | 2371 Liberty Way |
| | Virginia Beach, Virginia 23456 |
| | Attn: Tiffany Mcmillan-Mcwaters |
| | Email:  tmcwaters@franchisegrp.com |

4.2     Limitation on Liability.  Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising under contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.  Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on a Covered Person.

## ARTICLE 5
## CAPITAL STRUCTURE

5.1     Common Units.  The limited liability company interests of the Company shall be issued in unit increments (each, a "Common Unit" and, collectively, the "Common Units").  The rights and privileges associated with the Common Units are as set forth in this Agreement. References herein to the Common Units shall apply to limited liability company interests or other Equity Interests of the Company issued to the Member in respect of, in exchange for, or in substitution of, the Common Units by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, unit dividend, split-up, sale of assets, distribution or combination of the Common Units or any other change in the Company's capital structure (including shares or interests of a surviving corporation or other Entity or successor into which units or interests of the Company are exchanged).

5.2     Issuance of Common Units.  On May 28, 2025, the Company was authorized, empowered and directed to issue to the Member, and on May 28, 2025 the Company issued to the Member, an aggregate of one hundred (100) units of limited liability company interests of the Company under the Initial LLC Agreement, which shall be deemed continued as one hundred (100) Common Units on the Effective Date.  Except as set forth in the immediately preceding sentence, no other Common Units or Interests, or options, warrants or other securities that are convertible into, or exchangeable or exercisable for, Common Units or Interests shall be issued or outstanding on, or immediately after, the Effective Date.  Subject to the terms and conditions set forth in this Agreement, the Member may from time to time cause the Company to issue additional Common Units for any consideration as the Member may determine, including cash or other property, tangible or intangible, received or to be received by the Company or any of its Subsidiaries, or services rendered or to be rendered to the Company or any of its Subsidiaries.

-6-

5.3     Certificated Common Units.  If the Member so elects, the Common Units shall be certificated in such form as the Member may from time to time determine.  Such certificates shall be signed by any two (2) authorized officers of the Company, and may, but need not, be sealed with the seal of the Company.  Any or all of the signatures on the certificate may be by facsimile or electronic signature.  In case any officer of the Company who shall have signed, or whose facsimile or electronic signature shall have been placed on, any certificate evidencing Common Units shall cease for any reason to be such officer before such certificate shall have been issued or delivered by the Company, such certificate may nevertheless be issued and delivered by the Company as though the person who signed such certificate, or whose facsimile or electronic signature shall have been placed thereon, had not ceased to be such officer of the Company.

5.4     Legend on Certificates.  All certificates, if any, evidencing Common Units shall conspicuously bear the following legend:

> "THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

## ARTICLE 6
## MANAGEMENT; OPERATION OF THE COMPANY BUSINESS

6.1     Management of the Company.

(a)     Subject to the terms and conditions of this Agreement, the business and affairs of the Company shall be managed by the Member, which shall direct, manage and control the business of the Company.  The Member shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The enumeration of powers in this Agreement shall not limit the general or implied powers of the Member or any additional powers provided by applicable law.  The Member shall possess and may enjoy and exercise all of the rights and powers of a "manager" as provided in the Act, and the Member shall be a "manager" as provided in the Act.

(b)     In managing the Company and exercising its powers, the Member may elect to act through individuals to whom due power and authority have been delegated by the Member, including officers as further described in Article 7; provided, that the Member may rescind the delegation of any such powers to any such individual at any time in its sole discretion.  Without limiting the powers and authorities that may otherwise be delegated to any such individual, any such individual shall constitute an authorized person within the meaning of the Act.

## ARTICLE 7
## OFFICERS; POWERS OF OFFICERS.

7.1    <u>Election and Tenure</u>.  The officers of the Company may (but shall not be required to) consist of the Chief Executive Officer, the Chief Financial Officer, a Chief Operating Officer, a Secretary, a Treasurer, and such other officers and assistant officers as the Member may deem necessary or advisable, each of whom shall be appointed by the Member.  The persons holding officer positions with the Company as of the Effective Date are listed on <u>Schedule A</u> attached hereto.  The Member may expressly delegate to any such officer the power to appoint or remove subordinate officers, agents or employees.  Any two or more offices may be held by the same person.  Each officer so appointed shall continue in office until a successor shall be appointed and shall qualify, or until the officer's earlier death, resignation or removal.  Each officer shall be a natural person who is eighteen (18) years of age or older.

7.2    <u>Resignation, Removal and Vacancies</u>.  Any officer may resign at any time by giving written notice of resignation to the Company, to the attention of the Member or the Chief Executive Officer.  Such resignation shall take effect when the notice is delivered in accordance with <u>Section 12.6</u> unless the notice specifies a later date, and acceptance of the resignation shall not be necessary to render such resignation effective unless such resignation so states.  Any officer may at any time be removed by the Member.  If any office becomes vacant for any reason, the vacancy may be filled by the Member.  An officer appointed to fill a vacancy shall be appointed for the unexpired term of such officer's predecessor in office (if any) and shall continue in office until a successor shall be elected or appointed and shall qualify, or until such officer's earlier death, resignation or removal.  The appointment of an officer shall not itself create contract rights in favor of the officer, and the removal of an officer shall not affect the officer's contract rights, if any, with the Company, and the resignation of an officer does not affect the Company's contract rights, if any, with the officer.

7.3    <u>Chief Executive Officer</u>.  The chief executive officer of the Company (the "<u>Chief Executive Officer</u>"), if any, shall (a) have general and active management of the business of the Company, and preside over the day-to-day business operations of the Company, (b) see that all orders and resolutions of the Member are carried into effect, and (c) perform all duties as may from time to time be assigned to him or her by the Member or as may be expressly set forth in this Agreement.  The Chief Executive Officer shall also be the President of the Company.

7.4    <u>Chief Financial Officer</u>.  The chief financial officer of the Company (the "<u>Chief Financial Officer</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Member or the Chief Executive Officer or as may be expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Financial Officer.  In addition, the Chief Financial Officer shall have, along with the Chief Executive Officer, responsibility for the day-to-day business operations of the Company.

7.5    <u>Chief Operating Officer</u>.  The chief operating officer of the Company (the "<u>Chief Operating Officer</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Member or the Chief Executive Officer or as may be

-8-

expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Operating Officer.

7.6    <u>Vice Presidents</u>.  The vice presidents of the Company (the "<u>Vice Presidents</u>"), if any, shall perform such duties and possess such powers as may from time to time be assigned to them by the Member or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In the absence of the Chief Executive Officer or in the event of the inability or refusal of the Chief Executive Officer to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Member, or in the absence of any designation, then in the order of the election or appointment of the Vice Presidents) shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer.

7.7    <u>Secretary</u>.  The secretary of the Company (the "<u>Secretary</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Member or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Secretary shall perform such duties and have such powers as are incident to the office of Secretary, including the duty and power to maintain the records and information of the Company, to authenticate records of the Company, to be custodian of the Company seal and to affix and attest to the Company seal on documents.

7.8    <u>Treasurer</u>.  The treasurer of the Company (the "<u>Treasurer</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Member or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of Treasurer, including the duty and power to keep and be responsible for all funds and securities of the Company, to deposit funds of the Company in depositories selected in accordance with this Agreement, to disburse such funds as ordered by the Member, making proper accounts thereof, and to render as required by the Member statements of all such transactions and of the financial condition of the Company.

7.9    <u>Assistant Secretaries and Assistant Treasurers</u>.    The assistant secretaries and assistant treasurers of the Company (the "<u>Assistant Secretaries</u>" and the "<u>Assistant Treasurers</u>"), if any, shall perform such duties as shall be assigned to them by the Secretary or the Treasurer, respectively, or by the Chief Executive Officer or the Member or as may be expressly set forth in this Agreement.  In the absence, inability or refusal to act of the Secretary or the Treasurer, the Assistant Secretaries or the Assistant Treasurers, respectively, in the order designated by the Member, or in the absence of any designation, then in the order of their election or appointment, shall perform the duties and exercise the powers of the Secretary or Treasurer, as the case may be.

7.10    <u>Salaries</u>.  Officers of the Company shall be entitled to such salaries, emoluments, compensation or reimbursement as shall be fixed or allowed from time to time by the Member or in such manner as the Member shall provide.

7.11    <u>Borrowing</u>.  No loan shall be contracted on behalf of the Company, and no evidence of indebtedness shall be issued, endorsed or accepted in its name, unless authorized by the Member.  Such authority may be general or confined to specific instances.  When so authorized,

an officer may (a) effect loans or provide guarantees therefor at any time for the Company from any bank or other Entity and for such loans or guarantees may execute and deliver promissory notes, guarantees or other evidences of indebtedness of the Company, and (b) mortgage, pledge or otherwise encumber any real or personal property, or any interest therein, owned or held by the Company as security for the payment of any loans, guarantees or obligations of the Company, and to that end may execute and deliver for the Company such instruments as may be necessary or proper in connection with such transaction.

7.12    Checks and Endorsements.  All checks, drafts or other orders for the payment of money, obligations, notes or other evidences of indebtedness, bills of lading, warehouse receipts, trade acceptances and other such instruments shall be signed or endorsed for the Company by such officers or agents of the Company as shall from time to time be determined by resolution of the Member, which resolution may provide for the use of facsimile or electronic signatures.

7.13    Deposits.  All funds of the Company not otherwise employed shall be deposited from time to time to the Company's credit in such banks or other depositories as shall from time to time be determined by resolution of the Member, which resolution may specify the officers or agents of the Company who shall have the power, and the manner in which such power shall be exercised, to make such deposits and to endorse, assign and deliver for collection and deposit checks, drafts and other orders for the payment of money payable to the Company or its order.

7.14    Proxies.  Unless otherwise provided by resolution adopted by the Member, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer or any Vice President: (a) may from time to time appoint one (1) or more agents of the Company, in the name and on behalf of the Company, (i) to cast the votes which the Company may be entitled to cast as the holder of Equity Interests or other securities in any other Entity whose Equity Interests or other securities may be held by the Company, at meetings of the holders of the Equity Interests or other securities of such other Entity, or (ii) to consent in writing to any action by such other Entity; (b) may instruct the person so appointed as to the manner of casting such votes or giving such consent; and (c) may execute or cause to be executed in the name and on behalf of the Company and under the Company's seal, or otherwise, all such written proxies or other instruments as may be deemed necessary or proper in connection with the foregoing clauses (a) and (b).

## ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1    Exculpation.  Notwithstanding any other provisions of this Agreement (whether express or implied) or obligation or duty at law or in equity, to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Member, any member of Parent, the Company or any other Person (including any creditor or claimant of the Company or any of its Subsidiaries) for any losses, claims, expenses, damages or liabilities arising from any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by a Covered Person in connection with the Company, Parent or any of their respective Subsidiaries, nor shall any Covered Person be liable to the Member, any member of Parent, the Company or any other Person for any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by any employee or other agent of the Company, Parent or any of their respective Subsidiaries, except to the extent that any such losses, expenses, claims, damages or

-10-

liabilities (i) in any such case, are attributable to such Covered Person's material breach of this Agreement, and (ii) in the case of any current or former Manager or any current or former officer of the Company, (A) are attributable to such Manager's or officer's acts or omissions not in good faith, (B) are attributable to such Manager's or officer's breach of the duty of loyalty to the Member, the Company or any of their respective Subsidiaries, (C) arise from a transaction in which such Manager or officer derived an improper personal benefit or (D) are attributable to acts or omissions of such Manager or officer that constitute a knowing violation of law.  No amendment to or repeal of this Section 8.1 shall apply to or have any effect on the liability or alleged liability of the Covered Persons for or with respect to their acts or omissions occurring prior to such amendment or repeal.

8.2    Indemnification.

(a)    The Company shall, to the fullest extent permitted by applicable law (as now or hereafter in effect), indemnify, defend and hold harmless each Covered Person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding ("Proceeding"), whether civil, criminal, administrative or investigative, or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, (i) in connection with any matter arising out of or in connection with the Company's, Parent's or any of their respective Subsidiaries' business or affairs, (ii) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "Covered Person", or (iii) by reason of the fact that such Covered Person, or a Person of whom such Covered Person is the legal representative, is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any other corporation, company, partnership, joint venture, trust, employee benefit plan or other Entity (an "Other Entity"), from and against any losses, claims, expenses, damages and liabilities (collectively, "Damages") suffered or incurred by, imposed on, or to which such Covered Person may become subject in connection with such Proceeding; provided, that no right of indemnification shall be available to a Covered Person under this Article 8 (A) to the extent that it shall have been determined by a final, non-appealable decision by a court of competent jurisdiction that any such Damages are attributable to such Covered Person's material breach of this Agreement, and, (B) in the case of any current or former Manager or any current or former officer of the Company, to the extent that any such Damages (1) are attributable to such Managers' or officer's acts or omissions not in good faith, (2) are attributable to such Managers' or officer's breach of the duty of loyalty to the Member, the Company or any of their respective Subsidiaries, (3) arise from a transaction in which such Manager or officer derived an improper personal benefit, (4) are attributable to acts or omissions of such Manager or officer that constitute a knowing violation of law, (5) are attributable to any Proceeding (except an action to enforce the indemnification rights set forth in this Section 8.2(a) or to enforce the rights to advancement of expenses set forth in Section 8.2(b)) initiated by such Covered Person unless if such Proceeding was authorized in the specific case by the Member, or (6) are attributable to any Proceeding by or in the right of the Member, the Company or any of their respective Subsidiaries unless if the Member authorizes the indemnification of any such Damages (except that, to the extent any such Covered Person has been successful on the merits or otherwise in the defense of any such Proceeding by or in the right of the Member, the Company or any of

their respective Subsidiaries or in defense of any claim, issue or matter therein, then such Covered Person shall be indemnified against expenses actually and reasonably incurred by such Covered Person in connection therewith).    If for any reason the foregoing indemnification is unavailable to a Covered Person, or is insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Covered Person as a result of the applicable Damages in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Covered Person on the other hand or, if such allocation is not permitted by applicable law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations.

(b)    If a Covered Person is or was made, or threatened to be made, a party to or is involved in any threatened, pending or completed Proceeding, whether civil, criminal, administrative or investigative, or any appeal in such Proceeding or any inquiry or investigation that could lead to such a Proceeding, (i) in connection with any matter arising out of or in connection with the Company's, Parent's or any of their respective Subsidiaries' business or affairs, (ii) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "Covered Person" or (iii) by reason of the fact that such Covered Person, or a Person of whom such Covered Person is the legal representative, is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any Other Entity, the Company shall pay, within a reasonable period of time following the Company's receipt of reasonably detailed supporting documentation, to such Covered Person such Covered Person's reasonable and documented out-of-pocket legal and other expenses (including legal and other professional fees and disbursements, and the cost of any investigation and preparation) incurred in connection therewith in advance of the final disposition of such Proceeding; provided, that such Covered Person shall promptly repay to the Company the amount of any such expenses paid to it if it shall be determined that such Covered Person is not entitled to be indemnified by the Company in connection with such Proceeding as provided in the proviso contained in Section 8.2(a); provided, further that, with respect to a Covered Person described in clause (B) of Section 8.2(a), the Company shall not be required to pay in advance or otherwise any such expenses incurred by any such Covered Person in connection with (A) any Proceeding initiated by such Covered Person unless if such Proceeding was authorized in the specific case by the Member or (B) any Proceeding by or in the right of the Member, the Company or any of their respective Subsidiaries unless if the Member authorizes the payment of any such expenses.

(c)    The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this Section 8.2 shall not be deemed exclusive of any other rights to which a Covered Person seeking indemnification, reimbursement or advancement of expenses, or contribution may have or hereafter be entitled under any statute, this Agreement, any other agreement (including any policy of insurance purchased or provided by Parent, the Company or any of their respective Subsidiaries under which any Covered Person is covered), any vote of the Member or the Board, or otherwise.    The rights conferred upon any Covered Person in Section 8.1 and Section 8.2 shall be contract rights that vest upon the occurrence or alleged occurrence of any judgment, decision or action made, taken or performed, or omitted to be

-12-

made, taken or performed, or any other fact, circumstance or matter, giving rise to any losses, claims, expenses, damages or liabilities (whether or not arising out of a Proceeding) that are covered by Section 8.1 and/or Section 8.2, and such rights shall apply to a Person that was a Covered Person even after such Person ceases to be a Covered Person, but only with respect to any such losses, claims, expenses, damages or liabilities arising from any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, or any other fact, circumstance or matter that occurred, during the period in which such Person was a Covered Person.

(d)     The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this Section 8.2 shall inure to the benefit of the successors, heirs, executors and administrators of a Covered Person.

(e)     The Company shall have the power to purchase and maintain insurance on behalf of any Covered Person to protect such Covered Person against any Damages, whether or not the Company would have the power to indemnify such Covered Person against any such Damages under the provisions of this Section 8.2 or under any provision of law.

(f)     No amendment or repeal of any part of this Section 8.2 shall apply to or have any effect on any right to indemnification, reimbursement and advancement of expenses, and contribution provided hereunder with respect to any acts or omissions occurring prior to such amendment or repeal.

8.3     No Member Liability.  Any indemnification, reimbursement and advancement of expenses, or contribution provided under this Article 8 shall be satisfied solely out of assets of the Company, as an expense of the Company.  The Member shall not be subject to personal liability by reason of the indemnification, reimbursement and advancement of expenses, or contribution provisions set forth in this Article 8.

8.4     Settlements.  The Company shall not be liable for any settlement by a Covered Person of any Proceeding effected without its written consent, but if settled with such written consent, or if there is a final judgment against such Covered Person in any such Proceeding, the Company agrees to indemnify and hold harmless such Covered Person to the extent provided above from and against any Damages by reason of such settlement or judgment.

8.5     Business Opportunities; Fiduciary Duties.

(a)     The Company and the Member acknowledge that (i) each member of Parent (other than any member of Parent who is a Manager or an officer or employee of the Company, Parent or any of their respective Subsidiaries, any member of Parent that is a Family Member of any Manager or any officer or employee of the Company, Parent or any of their respective Subsidiaries, or any member of Parent that is controlled by any Manager or any officer or employee of the Company, Parent or any of their respective Subsidiaries or controlled by any such Manager's, officer's or employee's Family Members), and (ii) each Affiliate, manager, director, principal, officer, employee and other representative of each member of Parent described in clause (i) (other than any such Person who is a

-13-

Manager or an officer or employee of the Company, Parent or any of their respective Subsidiaries, any such Person that is a Family Member of any Manager or any officer or employee of the Company, Parent or any of their respective Subsidiaries, or any such Person that is controlled by any Manager or any officer or employee of the Company, Parent or any of their respective Subsidiaries or controlled by any such Manager's, officer's or employee's Family Members) (the foregoing Persons being referred to, collectively, as "Identified Persons" and, each individually, as an "Identified Person") may now engage, may continue to engage, and/or may, in the future, decide to engage, in the same or similar activities or lines of business as those in which the Company, Parent or any of their respective Subsidiaries, directly or indirectly, now engage or may engage and/or other business activities that overlap with, are complementary to, or compete with those in which the Company, Parent or any of their respective Subsidiaries, directly or indirectly, now engage or may engage (any such activity or line of business, an "Opportunity"). No Identified Person shall have any duty to refrain, directly or indirectly, from (i) engaging in any Opportunity, (ii) offering or directing any Opportunity to another Person (including any Affiliate of such Identified Person) or (iii) otherwise competing with the Company, Parent or any of their respective Subsidiaries. No Identified Person shall have any duty or obligation to refer or offer to the Company, Parent or any of their respective Subsidiaries any Opportunity, and the Company hereby renounces, on behalf of itself and each of its Subsidiaries, any interest or expectancy of the Company or any of its Subsidiaries in, or in being offered, an opportunity to participate in any Opportunity engaged in by any Identified Person which may be a corporate (or analogous) or business opportunity for the Company, Parent or any of their respective Subsidiaries.

(b)    In the event that any Identified Person acquires knowledge of an Opportunity which may be a corporate (or analogous) or business opportunity for the Company, Parent or any of their respective Subsidiaries, such Identified Person shall have no duty to communicate, offer or otherwise make available such Opportunity to the Company, Parent or any of their respective Subsidiaries and shall not be liable to the Company, Parent or any of their respective Subsidiaries or any of the members of Parent for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself, or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person).

(c)    The Company, on behalf of itself and each of its Subsidiaries, and the Member (i) acknowledge that the Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other Entities (each such Entity, a "Related Company" and all such Entities, collectively, "Related Companies"), including Entities that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates, and (ii) agree that (A) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Agreement shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Agreement (if any) shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (x) the ownership by an Identified Person of any

-14-

interest in any Related Company, (y) the affiliation of any Related Company with an Identified Person or (z) any action taken or omitted by any Related Company or an Identified Person in respect of any Related Company, (B) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates, (C) nothing in this Agreement and none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person to, directly or indirectly, purchase or sell the securities or indebtedness of any other Entity or to compete with the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates as if the Identified Persons were not a party to this Agreement and (D) the Identified Persons are not and shall not be obligated to disclose to the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Company, Parent or any of their respective Subsidiaries, or any member of Parent or any of their respective Affiliates in any such business or as to any such opportunities.

(d)    To the fullest extent permitted by law, this Agreement is not intended to, and does not, create or impose any fiduciary or other duty on any Identified Person. Further, to the fullest extent permitted by law, the Company and the Member hereby waive any and all fiduciary duties owed to the Company or the Member by any Identified Person (including those fiduciary duties that, absent such waiver, may be implied by law), and in doing so, the Company and the Member recognize, acknowledge and agree that the duties and obligations of the Identified Persons to the Company, the Member (in its capacity as such) and each other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement are only as expressly set forth in this Agreement. To the fullest extent permitted by law, no Identified Person shall owe any duty (including any fiduciary duty) to the Company or to the Member (in its capacity as such) or to any other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement other than those non-fiduciary duties that are expressly set forth in this Agreement and a duty to act in accordance with the implied contractual covenant of good faith and fair dealing to the extent required by Delaware law.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of an Identified Person otherwise existing at law or in equity in respect of the Company or the Member (in its capacity as such), are agreed by all parties hereto (or any other Person that is or becomes a beneficiary of this Agreement) to replace fully and completely such other duties and liabilities.

(e)    Each employee and officer of the Company, in its capacity as such, shall have the same fiduciary duties as an employee or officer (as applicable) of a corporation organized under the laws of the State of Delaware; provided, that, to the extent determined by the Member, no officer shall be personally liable for any monetary damages to the Company or the Member for breach of the duty of care, subject to the same limitations on such limitation as contemplated by Section 102(b)(7) of the Delaware General Corporation Law.

-15-

8.6     Amendments.  Notwithstanding anything herein to the contrary, no amendment, repeal or modification of this Article 8 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

## ARTICLE 9
## FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS

9.1     Fiscal Year.  The fiscal year of the Company (the "Fiscal Year") shall be established by the Member.

9.2     Books and Records.  The books and records of the Company may be kept at such place or places as may be from time to time designated by the Member.  The Company shall keep correct and complete books and records of account, including the amount of its assets and liabilities and the names and places of residence of its officers.

9.3     Tax Election.  The Company intends to be treated as an association taxable as a corporation for U.S. federal, state and local income tax purposes under Treasury Regulation section 301.7701-3 and under any corresponding provision of state or local law.  The Company shall file an Entity Classification Election (IRS Form 8832) to be treated as an association taxable as a corporation for U.S. federal income tax purposes, effective as of the date the Certificate of Formation was filed even if made thereafter, and any officer of the Company is authorized and empowered to make any such election.

9.4     Audits of Books and Accounts.  The Company's books and accounts shall be audited at such times and by such auditors as shall be specified and designated by written consent of the Member.

## ARTICLE 10
## DISTRIBUTIONS

10.1     Distributions.  All distributions hereunder shall be made to the Member at such times and in such aggregate amounts as the Member may deem appropriate; provided, however, that no distribution shall be made if such distribution would violate the Act or any other applicable law.

## ARTICLE 11
## DISSOLUTION AND LIQUIDATION

11.1     Events Causing Dissolution.  The Company shall be dissolved only upon the occurrence of any of the following events:

(a)     the consent of the Member;

(b)     the entry of a final decree of judicial dissolution of the Company under Section 18-802 of the Act; or

(c)    at any time there are no members of the Company, unless the Company is continued in accordance with the Act.

Except as otherwise set forth in this Section 11.1, the Company is intended to have perpetual existence.  To the fullest extent permitted by law, any bankruptcy or dissolution of the Member cause the Member to cease to be a member of the Company.

11.2    Liquidation and Winding Up.    If the Company is dissolved pursuant to Section 11.1, the Company shall be liquidated and the Member (or other Person or Persons designated by the Member or by a decree of court) shall wind up the affairs of the Company.  The Member or other Persons winding up the affairs of the Company shall promptly proceed to the liquidation of the Company and, in settling the accounts of the Company, the assets and the property of the Company shall be distributed in the following order of priority:

(a)    First, to the payment of (or establishing reserves to pay) all debts and liabilities of the Company (including any debts or liabilities owed to the Member) in the order of priority as provided by law; and

(b)    The balance, if any, to the Member.

## ARTICLE 12
## MISCELLANEOUS

12.1    Entire Agreement.  This Agreement (including the exhibits and schedules to this Agreement) amends and restates the Initial LLC Agreement in its entirety and contains the entire understanding between the Member and the Company with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter of this Agreement.

12.2    Counterparts.  For the convenience of the parties hereto, this Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.  Delivery of an executed counterpart of this Agreement by portable document format (PDF) or other electronic transmission will be effective as delivery of a manually executed counterpart of this Agreement.

12.3    Amendments.  This Agreement may be amended, modified or waived from time to time only by a written instrument executed by the Member.

12.4    Severability.    In the event that any provision hereof would be invalid or unenforceable in any respect under applicable law, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

12.5    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

12.6    <u>Notices</u>.    All notices, requests, waivers, document deliveries and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, sent, provided, delivered or received (a) when personally delivered to the party to be notified, (b) when sent by electronic mail ("e-mail") to the party to be notified, (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified, or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:  (i) in the case of the Member, to the Member at its address or e-mail address set forth in <u>Section 4.1</u> and (ii) in the case of the Company, to the Secretary (or to another officer of the Company that is required to be provided with such notice, request, waiver, document or other communication pursuant to the terms of this Agreement) at the Principal Office.

12.7    <u>Headings</u>.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

12.8    **<u>GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE.  EACH OF THE COMPANY AND THE MEMBER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE COMPANY OR THE MEMBER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS.  EACH OF THE COMPANY AND THE MEMBER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE COMPANY AND THE MEMBER HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN <u>SECTION 12.6</u>, OR IN ANY OTHER MANNER PERMITTED BY LAW.  EACH OF THE COMPANY AND THE MEMBER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING.**

12.9    <u>No Third Party Beneficiaries</u>.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its legal representatives, heirs, administrators, executors, successors and permitted assigns, and it is not the intention of the parties hereto to confer third-party beneficiary rights upon any other Person other than (x) the Covered Persons (solely with respect to <u>Sections 8.1</u> and <u>8.2</u>) and (y) the Identified Persons (solely with respect to <u>Section 8.5</u>).

<center>[<em>Signature pages follow</em>]</center>

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement as of the Effective Date.

**FUSION INTERMEDIATE, LLC**

By: _____
　　　Name:
　　　Title:

**Schedule A**

Initial Officers

| Andrew Laurence | President and Chief Executive Officer |
|---|---|
| Eric Seeton | Chief Financial Officer |
| Andrew Kaminsky | Chief Administrative Officer and Executive Vice President |
| Tiffany McMillan-McWaters | Executive Vice President and Secretary |

**<u>Exhibit A (vi)</u>**
**Amended and Restated Limited**
**Liability Company Agreement of PSP Group, LLC**

## SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## PSP GROUP, LLC

THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**"), dated as of June [●], 2025 (the "**Effective Date**"), of PSP Group, LLC, a Delaware limited liability company (the "**Company**"), is entered into by PSP Parent, LLC, a Delaware limited liability company, as sole member of the Company (the "**Member**"), pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, *et seq.*) (as amended from time to time, the "**Act**").

## RECITALS

WHEREAS, the Company was previously governed pursuant to that certain Amended and Restated Limited Liability Company Agreement, dated September 13, 2010 (the "**Former Agreement**"), made by Pet Supplies "Plus", LLC (f/k/a PSP Parent, LLC), as the sole member;

WHEREAS, in accordance with the Act, it is the intention of the Member that this Agreement be effective as of the Effective Date; and

WHEREAS, the Member desires to amend and restate the Former Agreement in its entirety to, among other things, set forth its understandings regarding its rights, obligations and interests with respect to the affairs of the Company and the conduct of its business.

## AGREEMENT

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Member hereby agrees that the Former Agreement is amended and restated in its entirety as follows:

## ARTICLE I
### Definitions

Section 1.1    <u>Definitions</u>. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Act.

## ARTICLE II
### General

Section 2.1    <u>Company Name</u>. The name of the Company is "PSP Group, LLC." The business of the Company may be conducted upon compliance with all applicable laws under any other name designated by the Member.

Section 2.2    <u>Registered Agent</u>. The Company shall maintain a registered office in the State of Delaware. The name and address of the Company's registered agent in the State of

1

Delaware shall be as set forth in the Certificate of Formation of the Company on file with the Secretary of State of the State of Delaware, as amended or otherwise modified from time to time.

Section 2.3     Principal Office. The principal office of the Company shall be located at such location as may hereafter be determined by the Member.

Section 2.4     Purpose and Powers. The purpose of the Company is to engage in any activity for which limited liability companies may be organized in the State of Delaware. The Company shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

Section 2.5     Business Transactions of a Member with the Company. In accordance with the Act, the Member may transact business with the Company and, subject to applicable law and this Agreement, shall have the same rights and obligations with respect to any such matter as a person who is not a member.

Section 2.6     Fiscal Year. The Company's fiscal year shall end on the Saturday closest to December 31 of each year, until otherwise determined by the Member.

Section 2.7     Term. The term of the Company shall continue in perpetuity until the Company is dissolved in accordance with the provisions of this Agreement and the Act.

Section 2.8     Effective Date. This Agreement shall be effective as of the Effective Date.

## ARTICLE III
### Member(s)

Section 3.1     Admission of Member(s).

(a)     On the Effective Date, the Member is the sole member of the Company.

(b)     Additional members may only be admitted to the Company (i) upon the consent of all members, which consent may be evidenced by, among other things, the execution of an amendment to or an amendment and restatement of this Agreement or (ii) in accordance with Section 7.1 below.

Section 3.2     Interest.

(a)     The Company shall be authorized to issue a single class of limited liability company interest (as defined in the Act, the "**Interest**") that, unless otherwise determined by the Member, shall not be certificated, and shall include any and all benefits to which the holder of such Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement.

(b)     In the event that there is more than one member, each member's Interest shall be expressed as a percentage equal to the ratio on any date of such member's capital

2

contributions on such date to the aggregate capital contributions of all members on such date (as to any member, his or its "**Percentage Interest**"). In the event there shall only be one member, its "Percentage Interest" shall be 100% for purposes of this Agreement.

Section 3.3    Liability of the Member.

(a)    All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member.

(b)    Except as otherwise expressly required by law, a member shall not have any liability in excess of (i) the amount of its aggregate capital contributions to the Company; (ii) its share of any assets and undistributed profits of the Company; (iii) its obligation to make other payments, if any, expressly provided for in this Agreement or any amendment hereto; and (iv) the amount of any distributions wrongfully distributed to it.

Section 3.4    Access to and Confidentiality of Information; Records.

(a)    The Member shall have the right to obtain from the Company from time to time upon reasonable demand for any purpose reasonably related to the Member's Interest, the documents and other information described in the Act.

(b)    Any demand by the Member pursuant to this Section 3.4 shall be in writing and shall state the purpose of such demand.

Section 3.5    Meetings of the Member. Meetings of the Member shall be held at such places and at such times as the Member may from time to time determine.

Section 3.6    Action Without Meeting. Any action that the Member could take at a meeting may be taken without a meeting if one or more written consents, setting forth the action taken, shall be executed, before or after such action, by the Member. The consent(s) shall be delivered to the Company for filing with the Company's records.

Section 3.7    Withdrawals and Removals of Member(s). Except as provided in Section 7.1 below, no Member may resign, withdraw or be removed as a member of the Company without the written consent of the Member(s).

## ARTICLE IV
## Management

Section 4.1    General. Except as specifically set forth herein, the business and affairs of the Company shall be managed by and under the direction of the Member, or, if additional members are admitted, the members, who shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company as set forth herein. The Member or

3

members shall serve without compensation from the Company, and the Member or members shall bear the cost of participation in meetings and other activities of the Company.

Section 4.2    Officers. The Member may from time to time designate officers of the Company and delegate to such officers such authority and duties as the Member may deem advisable in its sole and absolute discretion. Unless the Member decides otherwise, if the title assigned to any officer is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.  Any delegation pursuant to this Section 4.2 may be revoked at any time by the Member.  As of the Effective Date, the following individuals hold the office(s) set opposite his name below:

| | |
|---|---|
| Christopher Rowland | Chief Executive Officer |
| Daniel McNamara | Chief Financial Officer |
| Andrew Kaminsky | Chief Administrative Officer and Executive Vice President |
| Kenneth Miles Tedder | Chief Operating Officer |
| Anthony Block-Belmonte | Vice President and Corporate Controller |

Section 4.3    Expenses. Except as otherwise provided in this Agreement or prohibited by law, the Company shall be responsible for and shall pay all expenses out of funds of the Company determined by the Member to be available for such purpose, provided that such expenses are those of the Company or are otherwise incurred by the Member in connection with this Agreement, including, without limitation:

(a)    all expenses related to the business of the Company and all routine administrative expenses of the Company, including the maintenance of books and records of the Company, the preparation and dispatch to the Member of checks, financial reports, tax returns and notices required pursuant to this Agreement or in connection with the holding of any meetings of the Member;

(b)    all expenses incurred in connection with any litigation or arbitration involving the Company (including the cost of any investigation and preparation) and the amount of any judgment or settlement paid in connection therewith;

(c)    all expenses for indemnity or contribution payable by the Company to any person;

(d)    all expenses incurred in connection with the collection of amounts due to the Company from any person;

(e)    all expenses incurred in connection with the preparation of amendments to this Agreement; and

(f)    all expenses incurred in connection with the liquidation, dissolution and winding up of the Company.

4

## ARTICLE V
## Finance

Section 5.1    Capital Contributions. The Member shall not be obligated to make a contribution to the capital of the Company in connection with the execution of this Agreement. The Member may make one or more contributions to the capital of the Company at such times and in such amounts as are determined by the Member in its sole, absolute and unfettered discretion.

Section 5.2    Allocation of Profits and Losses. Net losses and net profits of the Company shall be allocated one hundred percent (100%) to the Member.

Section 5.3    Distributions of Cash Flow. Distributions of cash flow shall be made to the Member at such times and in such amounts as are determined by the Member in its sole, absolute and unfettered discretion. Notwithstanding any other provision contained in this Agreement, the Company shall not make a distribution to the Member on account of its Interest in the Company if such distribution would violate Section 18-607 of the Act or other applicable law.

## ARTICLE VI
## Distribution

Section 6.1    Distribution in Kind. Notwithstanding the provisions of the Act, the Member may be compelled to accept distributions in-kind from the Company.

## ARTICLE VII
## Assignment of Limited Liability Company Interest

Section 7.1    Transfer of Interest. The Member may freely transfer or encumber its Interest. Any transferee shall be admitted into the Company as a substituted member upon the written consent of the Member, which it may grant or withhold in its sole, absolute and unfettered discretion, and any such transferee's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement.  Notwithstanding anything to the contrary herein, any successor or assignee of the assigning Member resulting from the foreclosure or other exercise of remedies with respect to the Interest in connection with any pledge or hypothecation by Member of all or any part of its Interest in connection with any credit facility shall automatically be admitted as a member and have all the rights and powers of the assigning Member under this Agreement, including, without limitation, all economic rights, voting rights, and control rights, and applicable law, in each case, without the need for further consents, written consent, amendment to or amendment and restatement of this Agreement, or any other actions of any other person, the Company, or Member.

## ARTICLE VIII
## Dissolution

Section 8.1    Dissolution. The admission of one (1) or more additional members shall not dissolve the Company.  However, the Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following:

       (a)     at any time there are no members of the Company, unless the Company is continued without dissolution in accordance with the Act;

       (b)     the election of the Member; or

       (c)     the entry of a decree of judicial dissolution under Section 18-802 of the Act.

Section 8.2   <u>Bankruptcy</u>. The bankruptcy or insolvency of the Member, or the occurrence of any event listed in Section 18-304 of the Act, shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution. For this purpose, "bankruptcy" has the definition ascribed to it in the Act.

Section 8.3   <u>Application of Assets</u>. In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

## ARTICLE IX
## Tax Characterization

Section 9.1   <u>Tax Treatment</u>. Until such time as the Company shall have more than one member, it is the intention of the Member that the Company be disregarded for federal and all relevant state income tax purposes and that the activities of the Company be deemed to be activities of the Member for such purposes. In the event that the Company shall have more than one member, it is the intention of the members that the Company be taxed as a partnership for federal and all relevant state tax purposes. All provisions of the Company's Certificate of Formation and this Agreement are to be construed so as to preserve that tax status. The Company shall timely make all necessary elections and filings for federal, state, and local tax purposes to accomplish the foregoing objective.

Section 9.2   <u>Company Tax Returns</u>. The Member shall cause to be prepared and timely filed all tax returns required to be filed for the Company. The Member may, in its sole discretion, make or refrain from making any federal, state or local income or other tax elections for the Company that it deems necessary or advisable.

## ARTICLE X
## Exculpation and Indemnification

Section 10.1   <u>Exculpation</u>. Notwithstanding any other provisions of this Agreement, whether express or implied, or obligation or duty at law or in equity, no member, or any officers, directors, stockholders, partners, employees, representatives or agents of any of the foregoing, nor any officer, employee, representative, manager or agent of the Company or any of its affiliates (individually, a "**Covered Person**" and collectively, the "**Covered Persons**") shall be liable to the Company or any other person bound by this Agreement for any act or omission (in relation to the Company, this Agreement, any related document or any transaction or investment contemplated hereby or thereby) taken or omitted in good faith by a Covered Person and in the reasonable belief that such act or omission is in or is not contrary to the best interests of the Company and is within

the scope of authority granted to such Covered Person by this Agreement, provided that such act or omission does not constitute fraud, willful misconduct, bad faith, or gross negligence.

Section 10.2    Indemnification. To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs. A Covered Person shall not be entitled to indemnification under this Section 10.2 with respect to any claim, issue or matter in which it has engaged in fraud, willful misconduct, bad faith or gross negligence.

## ARTICLE XI
## Miscellaneous

Section 11.1    Amendments. This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Member.

Section 11.2    Successors; Counterparts. This Agreement (a) shall be binding as to the executors, administrators, estates, heirs, assigns and legal successors, or nominees or representatives of the Member and (b) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

Section 11.3    Governing Law. This Agreement (and all of the rights and remedies hereunder) shall be governed by, and construed under, the laws of the State of Delaware (without regard to conflict of laws principles).

Section 11.4    Severability of Provisions. Each provision of this Agreement shall be considered separable and, if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 11.5    Entire Agreement. This Agreement constitutes the entire agreement of the Member with respect to the subject matter hereof.

Section 11.6    Filings. The Member shall, as an "authorized person" within the meaning of the Act, prepare or cause to be prepared any documents required to be filed and recorded under the Act, and the Member shall promptly cause each such document required to be filed and recorded in accordance with the Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Company may hereafter establish a place of business. The Member shall also promptly cause to be filed, recorded and published such statements of fictitious business name and any other notices, certificates, statements or other instruments required by any provision of any applicable law of the United States or any state or other jurisdiction which governs the Company's conduct of its business from time to time.

Section 11.7    <u>Headings</u>. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or intent of this Agreement or any provision hereof.

Section 11.8    <u>Further Assurances</u>. The Member agrees to perform all further acts and execute, acknowledge and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

Section 11.9    <u>No Third-Party Beneficiary</u>. Any agreement to pay any amount and any assumption of liability herein contained, express or implied, shall be only for the benefit of the Member and the other Covered Persons, and such agreements and assumptions shall not inure to the benefit of the obligees of any indebtedness or any other party; it being understood there are no third-party beneficiaries of this Agreement except for the Covered Persons not a signatory hereto (solely with respect to <u>Sections 10.1</u> and <u>10.2</u>).

Section 11.10    <u>Books and Records; Accounting</u>. The Member shall keep or cause to be kept at the address of the Company (or at such other place as the Member shall determine in its discretion) true and full books and records regarding the status of the business and financial condition of the Company.

[Signature Page to Follow]

8

**IN WITNESS WHEREOF**, the undersigned, being the sole Member of the Company, has caused this Agreement to be executed by its duly authorized officer as of the Effective Date.

MEMBER:

PET SUPPLIES "PLUS", LLC

_____

Name:
Title:

## **Exhibit A-1**

**Redline to Previously Filed
New Organizational Documents**

**Exhibit A-1(iii)**

**Redline to Previously Filed Amended and Restated
Limited Liability Company Agreement of New TopCo**

*Draft*

**[●]FUSION PARENT, LLC**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**[12]

---

[1] **Note to Draft**:  The rights and obligations set forth in this Amended and Restated Limited Liability Company Agreement are subject to change based on relative *pro forma* equity holdings of the institutions that will receive Class A Units pursuant to the Plan.

[2] **Note to Draft**:  To the extent the Debtors enter in the Restructuring Transactions described in Option B set forth in the Restructuring Transactions Memorandum, the Company will be a partnership for tax purposes and this Agreement will be revised accordingly.

# TABLE OF CONTENTS

Page

**ARTICLE 1 DEFINITIONS AND RULES OF CONSTRUCTION** .......................... **1**

    1.1    Certain Definitions .......................... 2
    1.2    Rules of Construction .......................... 14

**ARTICLE 2 GENERAL** .......................... **15**

    2.1    Limited Liability Company Agreement .......................... 15
    2.2    Name .......................... 15
    2.3    Term .......................... 15
    2.4    Business Offices .......................... 15
    2.5    Registered Office and Agent .......................... 15
    2.6    Qualification in Other Jurisdictions .......................... 15
    2.7    No State-Law Partnership .......................... 15

**ARTICLE 3 PURPOSE OF THE BUSINESS** .......................... **16**

**ARTICLE 4 MEMBERS; MEETINGS** .......................... **16**

    4.1    Members .......................... 16
    4.2    Substituted Members and Additional Members .......................... 16
    4.3    Member Meetings .......................... 17
    4.4    Authority of the Members .......................... 20
    4.5    Limitation on Liability .......................... 21
    4.6    AI Questionnaire .......................... 21
    4.7    Beneficial Ownership Reporting .......................... 21

**ARTICLE 5 CAPITAL STRUCTURE** .......................... **23**

    5.1    Units .......................... 23
    5.2    Issuance of Units .......................... 23
    5.3    Certificated Units .......................... 24
    5.4    Voting Rights .......................... 24
    5.5    Record .......................... 25
    5.6    No Appraisal Rights .......................... 25
    5.7    Lost, Destroyed or Mutilated Certificates .......................... 25
    5.8    Creditor Relationships .......................... 26

**ARTICLE 6 MANAGEMENT; OPERATION OF THE COMPANY BUSINESS** .......................... **26**

    6.1    Management of the Company .......................... 26
    6.2    Board .......................... 27
    6.3    Regular Meetings .......................... 29
    6.4    Special Meetings .......................... 29

6.5      Place of Meetings                                                                     29
6.6      Notice of Meetings                                                                    30
6.7      Meetings by Remote Communication                                      30
6.8      Quorum; Acts of Managers                                                       30
6.9      Organization, Agenda and Procedures                                  30
6.10     Waiver of Notice                                                                       30
6.11     Managers' Action By Written Consent                                  31
6.12     Removal                                                                                   31
6.13     Resignation                                                                              32
6.14     Vacancies                                                                                 32
6.15     Committees                                                                               33
6.16     Compensation of Managers                                                    34
6.17     Subsidiary Governing Bodies                                                34
6.18     Affiliate Transactions                                                             34
6.19     Required Approval of Board and Majority Members for Certain Actions    35

**ARTICLE 7 OFFICERS; POWERS OF OFFICERS                                   35**

7.1      Election and Tenure                                                                 35
7.2      Resignation, Removal and Vacancies                                   35
7.3      Chairperson                                                                              35
7.4      Chief Executive Officer                                                         35
7.5      Chief Financial Officer                                                          36
7.6      Chief Operating Officer                                                         36
7.7      Vice Presidents                                                                        36
7.8      Secretary                                                                                  36
7.9      Treasurer                                                                                 36
7.10     Assistant Secretaries and Assistant Treasurers                  37
7.11     Salaries                                                                                   37
7.12     Borrowing                                                                               37
7.13     Checks and Endorsements                                                     37
7.14     Deposits                                                                                  37
7.15     Proxies                                                                                    37

**ARTICLE 8 EXCULPATION AND INDEMNIFICATION                      38**

8.1      Exculpation                                                                             38
8.2      Indemnification                                                                      39
8.3      No Member Liability                                                             41
8.4      Settlements                                                                            41
8.5      Business Opportunities; Fiduciary Duties                           41
8.6      Subrogation                                                                            44
8.7      Insurance                                                                               44
8.8      Amendments                                                                           44

**ARTICLE 9 TRANSFERS**..........................................................................................**45**

    9.1    Restrictions on Transfers..............................................................45
    9.2    Transfer Agents; Regulations.......................................................50
    9.3    Drag-Along Transactions..............................................................51
    9.4    Tag-Along Transactions................................................................56
    9.5    Appointment of Purchaser Representative....................................60
    9.6    Preemptive Rights........................................................................60

**ARTICLE 10 FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS**..................**62**

    10.1    Fiscal Year..................................................................................62
    10.2    Books and Records.....................................................................62
    10.3    Tax Election...............................................................................62
    10.4    Required Records.......................................................................63
    10.5    Audits of Books and Accounts....................................................63

**ARTICLE 11 DISTRIBUTIONS**.........................................................................**63**

    11.1    Distributions..............................................................................63
    11.2    Limitations on Distributions.......................................................65
    11.3    No Other Distributions...............................................................65
    11.4    Withholding Tax.........................................................................65

**ARTICLE 12 WITHDRAWALS; ACTION FOR PARTITION**.......................**66**

    12.1    Waiver of Partition.....................................................................66
    12.2    Covenant Not to Withdraw or Dissolve......................................66

**ARTICLE 13 DISSOLUTION AND LIQUIDATION**.......................................**66**

    13.1    Events Causing Dissolution........................................................66
    13.2    Liquidation and Winding Up.......................................................67

**ARTICLE 14 AMENDMENTS**............................................................................**67**

    14.1    Amendments..............................................................................67

**ARTICLE 15 INFORMATION RIGHTS**...........................................................**69**

    15.1    Information Rights......................................................................69
    15.2    Delivery of Information..............................................................70
    15.3    Quarterly Teleconference...........................................................70
    15.4    Board Information......................................................................71
    15.5    Termination of Information Rights..............................................71

**ARTICLE 16 REPRESENTATIONS AND WARRANTIES OF THE MEMBERS** 71

16.1    Representations and Warranties of the Members ........................... 71
16.2    Survival of Representations and Warranties ............................ 73

**ARTICLE 17 MISCELLANEOUS** 73

17.1    Entire Agreement ...................................................... 73
17.2    Counterparts .......................................................... 74
17.3    Severability .......................................................... 74
17.4    Successors and Assigns ................................................ 74
17.5    Notices ............................................................... 74
17.6    Headings .............................................................. 74
17.7    **GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL** ........... 74
17.8    No Third-Party Beneficiaries .......................................... 75
17.9    Binding Effect ........................................................ 75
17.10    Additional Actions and Documents .................................... 75
17.11    Injunctive Relief .................................................... 76
17.12    Assignment ........................................................... 76
17.13    Redaction ............................................................ 76
17.14    Spousal Consent ...................................................... 76
17.15    Financial Crimes Matters ............................................. 76
17.16    Termination .......................................................... 76

**ARTICLE 18 CONFIDENTIALITY** 77

18.1    Confidentiality ....................................................... 77
18.2    Permitted Disclosure of Confidential Information ...................... 77

**ARTICLE 19 IPO** 79

19.1    IPO Approval .......................................................... 79
19.2    Required Actions ...................................................... 79
19.3    Registration Rights Agreement ......................................... 80

SCHEDULES AND EXHIBITS

| Schedule A | Specified Members |
|------------|-------------------|
| Schedule B | Actions Requiring Approval of the Board and the Majority Members |
| Schedule C | Initial Officers |

| Exhibit A | Form of AI Questionnaire |
|-----------|--------------------------|

| Exhibit B | Form of Joinder Agreement |
|-----------|---------------------------|
| Exhibit C | Form of Transferee Confidentiality Agreement |

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**[●]FUSION PARENT, LLC**

This **AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (as amended, supplemented, amended and restated or otherwise modified from time to time, together with all schedules, exhibits and annexes hereto, this "Agreement") of [●]Fusion Parent, LLC (the "Company"), is made as of June [●6], 2025 (the "Effective Date"), by and among (a) the Company and (b) each of the members of the Company from time to time (each, a "Member" and, collectively, the "Members").

**WHEREAS**, on [●]May 28, 2025, the Company was formed under the name "Franchise Group Parent, LLC" as a Delaware limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101, *et seq*. (as amended from time to time, the "Act"), by filing with the Secretary of State of the State of Delaware a Certificate of Formation of the Company (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Certificate of Formation");

**WHEREAS**, on [●]May 28, 2025, the sole member of the Company, Bradley Scher (the "Initial Member"), entered into a Limited Liability Company Agreement of the Company dated as of [●]May 28, 2025 (as amended, supplemented, amended and restated or otherwise modified prior to the Effective Date, together with all schedules, exhibits and annexes thereto, the "Initial LLC Agreement"); and

**WHEREAS**, on May 29, 2025, the Company filed a Certificate of Amendment to the then-existing Certificate of Formation to change its name to "Fusion Parent, LLC"; and

**WHEREAS**, on the Effective Date, the Plan of Reorganization (as defined below) became effective and, pursuant thereto, or as contemplated thereby, (a) [●]Fusion Buyer, LLC, a Delaware limited liability company, purchased 100% of the Equity Interests of Franchise Group New HoldCo, LLC from Franchise Group, Inc. ("FRG") in exchange for (among other things) 100% of the common limited liability company interests of the Company (the "Existing Common Units"), (b) FRG distributed the Existing Common Units to the recipients thereof as set forth in, or as contemplated by, the Plan of Reorganization, (c) the Initial LLC Agreement was amended and restated in its entirety as set forth in, and replaced by, this Agreement, (d) each of the Persons that received Existing Common Units became a party to this Agreement as a "Member" hereunder, became fully bound by, and subject to, all of the covenants, terms, conditions and provisions of this Agreement as a "Member" party hereto, and is deemed to have signed this Agreement, and (e) the Initial Member withdrew as a member of the Company.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual covenants and other obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**ARTICLE 1**
**DEFINITIONS AND RULES OF CONSTRUCTION**

     1.1    <u>Certain Definitions</u>.  As used herein:

"<u>Accredited Investor</u>" means an "accredited investor" as such term is defined in Rule 501 under the Securities Act.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include (a) any Related Fund of such Person and (b) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "<u>control</u>" (including, with its correlative meanings, "<u>controlling</u>," "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise).

"<u>AI Questionnaire</u>" means an Accredited Investor Questionnaire in the form of <u>Exhibit A</u> attached hereto.

"<u>Anti-Corruption Laws</u>" means the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act of 2010, and any other bribery, fraud, kickback or other similar applicable laws or regulations of any Governmental Authority in any jurisdiction in which the Company or any of its Subsidiaries is located or doing business.

"<u>Anti-Money Laundering Laws</u>" means applicable laws or regulations of any Governmental Authority that relate to money laundering, counter-terrorist financing, or record keeping and reporting requirements in any jurisdiction in which the Company or any of its Subsidiaries is located or doing business.

"<u>Award Agreement</u>" means any agreement, contract or other instrument or document evidencing or governing an award issued under any Management Incentive Plan, including any award consisting of Class B Units or any award that is convertible, exercisable or exchangeable for or into, or which provides for the delivery of, Class B Units.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Board Information</u>" means final drafts of materials (including minutes of Meetings and written consents in lieu of Meetings) and other information given to Managers or members of any committee of the Board, excluding any materials or information provided to Members pursuant to <u>Section 15.1</u> or <u>Section 15.3</u>.

"<u>BOI Laws</u>" means the Corporate Transparency Act, 31 U.S.C. § 5336, and all rules, regulations and guidance promulgated thereunder or in connection therewith, and any beneficial ownership reporting law, rule, regulation or guidance of any state or other applicable jurisdiction, as each may be amended, supplemented, updated or replaced from time to time.

"<u>Business Day</u>" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in the City of New York are authorized or obligated by law to close.

"Chairperson" means, as of any time of determination, the chairperson of the Board as of such time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competitor" means, as of any time of determination, (a) any Person that is identified by name on the Restricted List as of such time of determination, which may include one or more Investment Funds, (b) any Person that is engaged in competition with the Company or any of its Subsidiaries as of such time, as reasonably determined by the Board, and (c) any Person that is an Affiliate of any Person referred to in clause (a) or clause (b) that reasonably identifiable as an Affiliate of any such Person on the basis of such Affiliate's name; provided, that, (x) solely with respect to clause (a), a Competitor shall not include (i) any Person that is a Member at the time the Board determines to identify such Person on the Restricted List or (ii) any Affiliate of any Person described in clause (x)(i), which Affiliate is an Investment Fund or any Entity that is formed by an Investment Fund and whose only assets are or will be (after giving effect to any proposed or contemplated transfer or assignment of Units or other securities or indebtedness of the Company or any of its Subsidiaries), directly or indirectly, Units or other securities or indebtedness of the Company or any of its Subsidiaries, and (y) solely with respect to clause (b), a Competitor shall not include (i) any Investment Fund or (ii) any Entity that is formed by an Investment Fund and whose only assets are or will be (after giving effect to any proposed or contemplated transfer or assignment of Units or other securities or indebtedness of the Company or any of its Subsidiaries), directly or indirectly, Units or other securities or indebtedness of the Company or any of its Subsidiaries (it being understood that a Person described in clause (y)(i) or clause (y)(ii) may be a Competitor under clause (a) or clause (c)).

"Covered Person" means (a) any Member, (b) any Affiliate of a Member, (c) any Person serving or having served as a Manager or a member of any committee of the Board, (d) any Person serving or having served as an officer of the Company, and (e) any Person who is or was a partner, shareholder, member, officer, director, manager, fund adviser, investment adviser, investment manager, controlling person, employee, consultant, counsel, representative or agent of a Member or any Affiliate of a Member (other than the Company or any of its Subsidiaries), in each of the foregoing cases, in any such Person's capacity as such.

"Designating Group" means any of the following groups of Members: (a) the HG Vora Members and (b) any group of Members that are Affiliates of one another (and such group may comprise of a single Member) that acquires a Designation Right pursuant to Section 6.2(b)(ii); provided, that any group of Members described in clause (a) or clause (b) of this definition will cease to be a "Designating Group" once the Members in such group do not have a Designation Right.

"Designating Members" means, as of any time of determination, the Members that are included in any Designating Group as of such time; and "Designating Member" means any one of the Designating Members.

"Designation Right" means the right of any Member(s) to designate any Managers pursuant to Section 6.2(b)(i) or Section 6.2(b)(ii), as applicable.

"Distribution" means any distribution by the Company to any Member (in its capacity as such), including distributions payable in cash, property or securities and including by means of distribution, redemption, repurchase or liquidation, except that none of the following shall be a Distribution:  (a) any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of all outstanding Units of any class or series, and (b) any repurchases by the Company of Units from a Management Holder following termination of his or her employment with the Company or any of its Subsidiaries or termination of his or her service as a Manager or any member of any Subsidiary Governing Body.

"Entity" means any corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, estate, association, trust, unincorporated organization or association, business trust, tenancy in common or other legal entity.

"Equity Interests" means, with respect to any Person, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, membership, beneficial or profits interests of such Person (however designated).

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time.

"Excepted Transaction" means (a) any transaction or agreement entered into, consummated or effected on the Effective Date pursuant to the Plan of Reorganization and (b) any transaction expressly permitted or required by this Agreement, including (i) any Distributions pursuant to Article 11 or Article 13, and (ii) issuances of Additional Securities in accordance with Section 9.6.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Issuance" means any issuance of Additional Securities (a) by means of a *pro rata* distribution to all holders of any class or series of Units, (b) pursuant to any Management Incentive Plan or other compensation, incentive or similar plan, agreement or arrangement approved by the Board to managers, officers, employees or consultants of the Company or any of its Subsidiaries in connection with their service as managers or directors of the Company or any of its Subsidiaries, their employment by the Company or any of its Subsidiaries, or their retention by the Company or any of its Subsidiaries in compliance with this Agreement, (c) in a public offering of equity securities of the Company or any of its Subsidiaries or any Reorganized Issuer, (d) pursuant to the conversion, exchange or exercise of any options, warrants or other securities granted after the Effective Date so long as the initial sale, issuance or grant of such options, warrants or other securities complied with the terms of Section 9.6, (e) as consideration for an acquisition (whether by equity sale, merger, recapitalization, asset purchase or otherwise) by the Company or any of its Subsidiaries of another Person (or portion thereof) so long as such Additional Securities are only issued to the counterparty to such acquisition (or to such counterparty's Affiliates) and in no event to any Member or any Affiliate of a Member, (f) in connection with the financing or refinancing of any indebtedness or debt securities of the Company or any of its Subsidiaries (including as an equity kicker in connection therewith) where

such lender or investor is not then a Member or an Affiliate of a Member, (g) in connection with a joint venture, partnership or strategic alliance by the Company or any of its Subsidiaries with another Person so long as such Additional Securities are only issued to such Person (or to such Person's Affiliates) and in no event to any Member or an Affiliate of a Member, or (h) by any Subsidiary of the Company to the Company or to another Subsidiary of the Company.

"Excluded Tag-Along Transfer" means, with respect to any Member, any Transfer of Class A Units made by such Member: (a) to any Affiliate of such Member, (b) in the case of any Member that is an investment fund, account or other investment vehicle, as an in-kind distribution to its partners, members or accountholders (including any such distribution that is made in connection with a winding up or liquidation of such Member), (c) in the case of any Member that is a nominee, investment manager, advisor or subadvisor for a beneficial owner of Class A Units, to such beneficial owner or to a Person that will serve as a nominee, investment manager, advisor or subadvisor for such beneficial owner with respect to such Class A Units, (d) in connection with a Drag-Along Transaction pursuant to Section 9.3 and such Member is a Dragged Member or a Selling Member, and (e) in connection with a Tag-Along Transaction pursuant to Section 9.4 and such Member is a Tag-Along Seller.

"Fair Market Value" means, with respect to any property or asset, the amount at which a willing buyer would pay to a willing seller for such property or asset in an arms' length transaction, where neither party is under any compulsion to buy or sell, and both such parties are ready, willing and able to engage in such transaction and well informed about such property or asset, as reasonably determined by the Board.

"Family Member" means, with respect to any individual, (a) any Related Person of such individual or (b) any trust, limited partnership, limited liability company or other Entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

"FinCEN" means the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury, or any successor bureau or agency.

"Fiscal Quarter" means each quarterly accounting period as may be established by the Board or as required by the Code.

"GAAP" means generally accepted accounting principles in effect in the United States from time to time consistently applied.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

"HG Vora Members" means, collectively, any Affiliates of HG Vora Capital Management, LLC that own or hold Class A Units, so long as any such Affiliate remains an Affiliate of HG Vora Capital Management, LLC. Any consent, approval, decision (including

any decision as to whether a Person, action or thing is acceptable), determination, designation, identification, direction, specification, request, removal, instruction or other action to be provided, granted, given, made, performed, rendered or otherwise taken by the HG Vora Members pursuant to this Agreement at any time shall be provided, granted, given, made, performed, rendered or otherwise taken by the HG Vora Members that own or hold a majority of the Class A Units owned or held by all of the HG Vora Members at such time.  For the avoidance of doubt, a Person that does not own or hold Class A Units as of any time of determination shall not constitute a HG Vora Member as of such time.

"Holder Managers" means the individuals designated by any Designating Group to serve as a Manager pursuant to the Designation Right of such Designating Group; and each such individual shall be referred to, individually, as a "Holder Manager".

"Independent Manager" means any Manager who is not employed by (a) the Company or any of its Subsidiaries, or (b) any Member or any Affiliate of any Member (in either case) as of the time such Manager is designated or elected to the Board or at any time six (6) months prior to such time.

"Interest" means all or any part of a Member's equity, ownership, membership, profit or other right, title and interest in the Company in such Member's capacity as a Member, including all of such Member's rights in Distributions and all of such Member's rights under this Agreement.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investment Fund" means a *bona fide* investment fund or other investment vehicle, such as a hedge fund, private equity fund, an account, a share trust, an investment trust, an investment company, a pension fund or an insurance company, in each case, the business, operations or assets of which are held for investment purposes and the investments in which are professionally managed.

"IPO" means the first underwritten public offering of the common equity securities of the Company (or any successor or Subsidiary of the Company, including any Reorganized Issuer) following the Effective Date pursuant to an effective registration statement under the Securities Act filed with the SEC that results in such common equity being listed on a national securities exchange (or comparable non-U.S. securities exchange) or quoted on the Nasdaq Stock Market.

"Joinder Agreement" means a Joinder Agreement in the form of Exhibit B attached hereto.

"Liens" means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

"Major Member" means each Member (other than any Member that is a Competitor) that, as of the Effective Date (immediately after giving effect to the consummation of the

Restructuring Transactions to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date), owns or holds (together with its Affiliates) at least five percent (5.0%) of the issued and outstanding Class A Units as of the Effective Date (immediately after giving effect to the consummation of the Restructuring Transactions to occur on or as of the Effective Date, including all payments and distributions to be made on or as of the Effective Date); provided, however, that any such Member will permanently cease to be a "Major Member" once such Member owns or holds (together with its Affiliates) less than five percent (5.0%) of the issued and outstanding Class A Units at any time after the Effective Date; provided, that if any such Member owns or holds (together with its Affiliates) less than five percent (5.0%) of the issued and outstanding Class A Units at any time after the Effective Date as a result of the sale or issuance of Additional Securities pursuant to Section 9.6(d), then such Member shall not cease to be a Major Member as a result of such sale or issuance unless such Member owns or holds (together with its Affiliates) less than five percent (5.0%) of the issued and outstanding Class A Units after the consummation of the related process of offering and, if applicable, issuing or selling Additional Securities to Preemptive Members pursuant to Section 9.6(d).

"Majority Members" means, as of any time of determination, Members that collectively own or hold greater than fifty percent (50.0%) of the issued and outstanding Class A Units as of such time; provided, that, at any time there are two (2) or more Members that own or hold Class A Units that are not Affiliates of one another, then "Majority Members" shall include at least two (2) Members that own or hold Class A Units that are not Affiliates of one another; provided, further, that, solely for purposes of determining "Majority Members" under Section 13.1(a), the reference to "Class A Units" set forth in the portion of this definition preceding the first proviso in this definition shall be deemed to be a reference to "Class A Units and Class B Units (treated as one class of Units)".

"Management Holders" means (a) members of the Board or any of the Subsidiary Governing Bodies and (b) employees of or consultants to the Company or any of its Subsidiaries, in any such case who are selected by the Board (or any applicable committee thereof) to participate in any Management Incentive Plan.

"Management Incentive Plan" means any management incentive plan established by the Board to provide incentives to Management Holders in the form of Class B Units or other equity or equity-based awards (including options), as may be amended, supplemented, amended and restated or otherwise modified from time to time.

"Manager" means a manager serving on the Board at any given time.

"Permitted Liens" means Liens that are imposed (a) by this Agreement or (b) under applicable securities laws.

"Person" means an individual, an Entity, or a Governmental Authority.

"Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Member that is an individual.

"Plan Asset Regulation" means the regulation issued by the U.S. Department of Labor at 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.

"Plan of Reorganization" means the *Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates*, as confirmed by the Bankruptcy Court on [●]June 2, 2025, and including all exhibits and supplements thereto.

"Regulations" or "Treasury Regulations" means the income tax regulations promulgated under the Code as such regulations may be amended from time to time (including Temporary Regulations).

"Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled, managed or advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, advisor or subadvisor that controls, manages or advises such Person or an Affiliate of such investment manager, advisor or subadvisor.

"Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

"Restricted List" means a schedule or list of disqualified Transferees as determined by the Board, as such schedule or list may be amended, supplemented, updated or modified from time to time by the Board.  Any reference in this Agreement to the Restricted List as of any time of determination shall mean the schedule or list referred to in the immediately preceding sentence that was most recently provided by the Company to the Members that own or hold Class A Units, including by posting any such schedule or list to the website referred to in Section 15.2.

"Restructuring Transactions" has the meaning given to such term in the Plan of Reorganization.

"Sale Transaction" means the sale, lease, transfer, issuance or other disposition, in one transaction or a series of related transactions, of (a) all or substantially all of the consolidated assets of the Company and its Subsidiaries (including by or through the issuance, sale, contribution, transfer or other disposition (including by way of reorganization, merger, share or unit exchange, consolidation or other business combination) of at least a majority of the aggregate voting power of the Voting Securities of any direct and/or indirect Subsidiary or Subsidiaries of the Company if substantially all of the consolidated assets of the Company and its Subsidiaries are held by such Subsidiary or Subsidiaries) or (b) at least a majority of the then-issued and outstanding Class A Units (whether directly or indirectly or by way of any merger, share or unit exchange, recapitalization, sale or contribution of equity, tender offer, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership) to (in either case of clause (a) or clause (b)) any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision).

"<u>Sanctions</u>" means any economic, trade, or financial sanctions laws, regulations, embargoes, restrictive measures or other similar measures enacted, administered, imposed or enforced by any Sanctions Authority.

"<u>Sanctions Authority</u>" means any relevant Governmental Authority in the United States, the United Kingdom, the European Union or its member States, or other relevant jurisdiction, including but not limited to:  the U.S. Treasury Department's Office of Foreign Asset Control (OFAC), the U.S. State Department, the United Nations Security Council, and His Majesty's Treasury.

"<u>Sanctioned Person</u>" means, at any time of determination, any Person that is the target of Sanctions as of such time or owned or controlled, directly or indirectly, by a Person that is the target of Sanctions as of such time.

"<u>SEC</u>" means the United States Securities and Exchange Commission.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Specified Members</u>" means, as of any time of determination, Members who are Affiliates of any of the Persons listed on <u>Schedule A</u> attached hereto as of such time.

"<u>Specified Vacancy</u>" means any vacancy on the Board resulting from (a) the resignation or removal of a Holder Manager on account of the termination of the Designation Right pursuant to which such Holder Manager was designated, (b) the resignation or removal of a Holder Manager in connection with the exercise of a Springing Designation Right after the termination of the Designation Right pursuant to which such Holder Manager was designated, or (c) a Holder Manager becoming unable to serve on the Board as a result of death, disability or otherwise after the termination of the Designation Right pursuant to which such Holder Manager was designated.

"<u>Subsidiary</u>" means, as of any time of determination and with respect to any specified Person, any limited liability company, partnership, limited partnership, joint venture, association, or other Entity (a) more than a majority of the aggregate voting power of the Voting Securities of which is, as of such time, directly or indirectly owned by such Person, or (b) in which such Person, directly or indirectly, owns more than fifty percent (50.0%) of the equity economic interest thereof.

"<u>Subsidiary Governing Body</u>" means the board of directors, the board of managers or other governing body (including any committee of any such governing body) of each direct or indirect Subsidiary of the Company.

"<u>Super-Majority Members</u>" means, as of any time of determination, Members that collectively own or hold at least 66-2/3% of the issued and outstanding Class A Units as of such time; <u>provided</u>, that, at any time there are two (2) or more Members that own or hold Class A Units that are not Affiliates of one another, then "Super-Majority Members" shall include at least two (2) Members that own or hold Class A Units that are not Affiliates of one another.

"<u>Tag-Along Transaction</u>" means any transaction or series of related transactions involving a Transfer (excluding any Excluded Tag-Along Transfer) by one or more Members of Class A Units that represent, in the aggregate, fifty percent (50.0%) or more of all of the Class A Units that are issued and outstanding at the time of such transaction (or, in the case of a series of related transactions, at the time of the first transaction in such series of related transactions) to any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision).

"<u>Transfer</u>" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Units (including (x) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien and (y) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Units), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, division, liquidation, dissolution, dividend, distribution or otherwise.  Notwithstanding the foregoing, any transaction in which a Member lends, borrows or sells with an agreement to repurchase any Units to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges, hypothecates, grants a security interest in, lien on or otherwise encumbers Units in connection with such Member's or any of its Affiliates' financing arrangements, in any such case in the ordinary course of business of such Member, shall not constitute a Transfer of Units for purposes of this Agreement; <u>provided</u>, <u>however</u>, that any foreclosure (including the retention of Units in satisfaction of any obligations) on Units by any such broker, bank or other financial institution in accordance with such margin transactions and financing arrangements shall be deemed a Transfer of Units for purposes of this Agreement.  The terms "<u>Transferee</u>," "<u>Transferring</u>," "<u>Transferor</u>," "<u>Transferred</u>," and other forms of the word "Transfer" shall have the correlative meanings.

"<u>Transfer Agent</u>" means any bank, trust company or other Person (including the Company or one of its Affiliates, or any officer of the Company) as shall be appointed from time to time by the Company to act as registrar and transfer agent (or a substantially similar capacity in all material respects acting in accordance with such Person's customary procedures) for the Units or any other Interests.

"<u>United States</u>" or "<u>U.S.</u>" means the United States of America.

"<u>Voting Securities</u>" means, with respect to any Person, the Equity Interests of such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

<u>Additional Definitions</u>.  The following terms have the meanings set forth in the Sections set forth below:

| **Defined Term** | **Location** |
| --- | --- |
| "Accelerated Acquiror" | 9.6(d) |

| **Defined Term** | **Location** |
|---|---|
| "Acceptance Notice" | 9.4(b) |
| "Act" | Recitals |
| "Additional Securities" | 9.6(a) |
| "Affiliate Transaction" | 6.18 |
| "Agreement" | Preamble |
| "Assistant Treasurers" | 7.10 |
| "Assistant Secretaries" | 7.10 |
| "BB Act" | 10.5(a) |
| "Board" | 6.1(a) |
| "BOI Reports" | 4.7(a) |
| "CEO Manager" | 6.2(b)(iv) |
| "Certificate of Formation" | Recitals |
| "Chief Executive Officer" | 7.4 |
| "Chief Financial Officer" | 7.5 |
| "Class A Units" | 5.1 |
| "Class B Units" | 5.1 |
| "Company" | Preamble |
| "Company Securities" | 19.3 |
| "Confidential Information" | 18.1 |
| "Confidentiality Period" | 18.1 |
| "control" | Definition of "Affiliate" |
| "Controller" | 7.6 |
| "Conversion Units" | 9.1(a)(ii) |
| "Corporate Conversion" | 19.2 |

| **Defined Term** | **Location** |
|---|---|
| "Counterparty" | 9.8 |
| "Counterparty Excluded Information" | 9.8 |
| "Damages" | 8.2(a) |
| "Designation Notice" | 6.2(d) |
| "Disinterested Member" | 6.2(h) |
| "Drag-Along Transaction" | 9.3(a) |
| "Drag-Along Transaction Documents" | 9.3(b)(iv) |
| "Drag Notice" | 9.3(a) |
| "Dragged Members" | 9.3(a) |
| "Effective Date" | Preamble |
| "e-mail" | 17.5 |
| "Exercising Member" | 6.12(b) |
| "Exercise Notice" | 6.12(b) |
| "Fiscal Year" | 10.1 |
| "flow-through entity" | 16.1(g) |
| "Identified Person" | 8.5(a) |
| "Indebtedness" | 5.8 |
| "Initial LLC Agreement" | Recitals |
| "Initial Member" | Recitals |
| "Initial Units" | 5.2(a) |
| "Initiating Holders" | 9.4(a) |
| "Interested Member" | 6.2(h) |
| "Investment Documents" | 9.3(b)(v) |
| "LLC   Interest   Cancellation   and | 5.2(a) |

| **Defined Term** | **Location** |
|---|---|
| Withdrawal" | |
| "Meeting" | 6.20(a) |
| "Member" | Preamble |
| "Member Beneficial Ownership Information" | 4.7(b) |
| "Non-Exercising Member" | 6.12(b) |
| "Opportunity" | 8.5(a) |
| "Other Entity" | 8.2(a) |
| "Preemptive Members" | 9.6(a) |
| "Preemptive Rights Notice" | 9.6(a) |
| "Principal Office" | 2.4 |
| "Pro Rata Portion" | 9.6(a) |
| "Proceeding" | 8.2(a) |
| "PSP Midco" | 6.2(b)(iv) |
| "Quarterly Teleconference" | 15.3 |
| "Register of Members" | 4.1 |
| "Registered Holder" | 19.3 |
| "Related Companies" | 8.5(c) |
| "Reorganized Issuer" | 19.2 |
| "Representatives" | 18.2(a)(i) |
| "Sale Notice" | 9.4(a) |
| "Secretary" | 7.8 |
| "Selling Members" | 9.3(a) |
| "Specified Insurance" | 8.7 |

| **Defined Term** | **Location** |
|---|---|
| "Springing Designation Right" | 6.2(c) |
| "Surviving Entity" | 9.3(b)(v) |
| "Tag-Along Sellers" | 9.4(a) |
| "Tag-Along Transaction Documents" | 9.4(c) |
| "Third Party Purchaser" | 9.3(a) |
| "Transfer Notice" | 9.1(c) |
| "Treasurer" | 7.9 |
| "Trigger Date" | 6.2(b)(ii) |
| "Unit Reclassification" | 5.2(a) |
| "Units" | 5.1 |
| "Vice Presidents" | 7.7 |

1.2    Rules of Construction.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    All references in this Agreement to Articles, Sections, clauses, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, Schedules and Exhibits to, or contained in, this Agreement.

(b)    All Exhibits and Schedules attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(d)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(e)    Any reference in this Agreement to Units being owned or held "collectively" by more than one Member and/or other Persons shall not require that such Members and/or other Persons own or hold such Units jointly or otherwise require that

all such Members and/or other Persons have ownership interests in, or rights to, all such Units, but rather is intended to describe Units that are owned by all such Members or other Persons in combination with one another.

(f)    Any reference in this Agreement to "$" or "dollars" shall mean United States dollars.

(g)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(h)    The words "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

**ARTICLE 2**
**GENERAL**

2.1    <u>Limited Liability Company Agreement</u>.  The Members agree to continue the Company as a limited liability company under and pursuant to the provisions of the Act, and agree that this Agreement (a) constitutes the "limited liability company agreement" of the Company within the meaning of Section 18-101(9) of the Act, (b) shall be effective as of the Effective Date and (c) shall govern the rights, duties and obligations of the Members and the Managers, except as otherwise expressly required by the Act.

2.2    <u>Name</u>.  The name of the Company shall be, and the business of the Company shall be conducted under the name of, "[●]Fusion Parent, LLC" or under such other name or names as the Board may determine from time to time.

2.3    <u>Term</u>.  The term of the Company commenced on [●]May 28, 2025 and shall continue perpetually until a certificate of cancellation with respect to the Certificate of Formation shall be filed with the Secretary of State of the State of Delaware and become effective, and the Company is dissolved in accordance with <u>Article 13</u>.

2.4    <u>Business Offices</u>.  The location of the principal place of business of the Company shall be [●]2371 Liberty Way, Virginia Beach, VA 23456, or such other place as the Board may from time to time determine (the "<u>Principal Office</u>").  The Company may have one or more offices at such place or places, either within or outside the State of Delaware, as the Board may from time to time determine or as the business of the Company may require.

2.5    <u>Registered Office and Agent</u>.  The Company's registered agent and registered office in the State of Delaware is [●]Corporation Service Company, located at [●]251 Little Falls Drive, in the City of Wilmington, County of New Castle, Delaware 19808.  At any time and from time to time, the Board may change the Company's registered agent and registered office in the State of Delaware.

2.6    <u>Qualification in Other Jurisdictions</u>.  The Board shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business and in which such qualification, formation

or registration is required or as the Board determines to be desirable. Any officer or other authorized person of the Company, each as duly authorized by the Board, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

2.7     No State-Law Partnership. The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, and that neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise.

## ARTICLE 3
## PURPOSE OF THE BUSINESS

The purpose and character of the business of the Company shall be to undertake and carry on any lawful business, purpose or activity for which limited liability companies may be formed under the Act, and engaging in any and all activities necessary, advisable, convenient or incidental thereto.

## ARTICLE 4
## MEMBERS; MEETINGS

4.1     Members. The name of each Member, its address, contact information, and class or series and number of Units shall be reflected in a register held and maintained by the Transfer Agent (the "Register of Members"). For the avoidance of doubt, the Company may serve as the Transfer Agent with respect to any of the Units or other Interests. Upon the Effective Date, the Transfer Agent shall maintain the Register of Members. The Transfer Agent upon the Effective Date shall be Kroll Restructuring Administration (d/b/a Kroll Issuer Services (US)). The Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to amend and update the Register of Members from time to time to reflect the change(s) in any of the information contained therein (including the withdrawal of one or more Members, the admission of one or more additional Members, forfeitures of Units, Transfers and the issuance of additional Units) only to the extent that the actions resulting in such change(s) were taken pursuant to, and in accordance with, the terms and conditions of this Agreement, and, if applicable, any applicable Management Incentive Plan and Award Agreement, and that any consents of the Members to such actions required hereunder, if any, were obtained. Any reference in this Agreement to the Register of Members shall be deemed to be a reference to the Register of Members, as amended and updated from time to time. If the Transfer Agent is any Person other than the Company or one of its Affiliates or officers, and such Transfer Agent will not include any particular information in the Register of Members that the Company deems necessary or desirable to include, then the Company shall maintain a register or other record to reflect such information and shall amend and update such register or other record from time to time to reflect any change in any of the information contained therein to the same extent that the Register of Members would be required to be amended and updated by the Transfer Agent pursuant to this Agreement if such information was set forth therein and the Company served as the Transfer Agent, and any requirement or reference in this Agreement that such information

shall be, or is, included or set forth in the Register of Members shall instead be a reference to any such register or other record.

4.2    Substituted Members and Additional Members.

(a)    In connection with a Transfer of Units that is permitted pursuant to, and is effected in compliance with, the applicable terms of this Agreement, the Transferee of the Units subject to such Transfer shall become a substitute Member, effective on the date of such Transfer (which effective date shall not be earlier than the date of compliance with or waiver of the conditions to such Transfer set forth herein), entitled to all of the rights (excluding any rights of a Member that are not assignable or otherwise transferable pursuant to the terms of this Agreement), and subject to all of the obligations and restrictions, of the transferor Member to the extent of the Units so Transferred.  Upon the substitution of a transferee Member, the Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to amend and update the Register of Members to reflect the substitution of such transferee Member.  Any duly substituted Member shall be considered a "Member" for all purposes of this Agreement and the Act. Notwithstanding the requirement that substituted Members execute a Joinder Agreement pursuant to Section 9.1(c), this Agreement shall bind all holders of Units, regardless of whether any such holder executes this Agreement or a Joinder Agreement and by acceptance of Units each holder agrees to be so bound.

(b)    Subject to the provisions of this Agreement (including Section 9.6 hereof), the Board may, from time to time in its sole discretion (and without the requirement of any consent or approval of any Member), admit additional Persons as Members and issue to such Persons Units on such terms and conditions (including the series and class of Units to be issued, the number of Units to be issued and, if applicable, the vesting schedule of such Units and any forfeiture provisions applicable thereto) as the Board shall determine in its sole discretion.  The admission of an additional Member to the Company, and the issuance to such Person by the Company of Units in connection with such admission as a Member, shall be subject to the satisfaction of the following conditions:  (i) such additional Member shall have become a party to this Agreement by executing and delivering to the Company a Joinder Agreement (duly completed) and such other written documentation as the Board may require in connection with such admission and issuance (including an AI Questionnaire and an IRS Form W-9 or appropriate IRS Form W-8, as applicable (or successor forms)), (ii) such issuance of Units shall not require the Company to register any Units under the Exchange Act (as a result of the number of holders of Units or otherwise), unless, at the time of such issuance, the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act, (iii) the compliance with all applicable laws and regulations (including securities laws) relating to such admission and issuance, (iv) such issuance of Units shall not cause the Company to be required to register as an "investment company" under the Investment Company Act, (v) such issuance of Units shall not cause the underlying assets of the Company to be deemed "plan assets" as defined under and pursuant to the Plan Asset Regulation or constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, and (vi) such additional Member shall not be a Competitor or a Sanctioned Person.

Upon the admission of a new Member, the Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to amend and update the Register of Members to reflect the addition of such new Member.  Any duly admitted new Member shall be considered a "Member" for all purposes of this Agreement and the Act. Notwithstanding the requirement that additional Members execute a Joinder Agreement, this Agreement shall bind all holders of Units, regardless of whether any such holder executes this Agreement or a Joinder Agreement, and by acceptance of Units each holder agrees to be so bound.

4.3    <u>Member Meetings</u>.

(a)    *Meetings*.  Meetings of the Members may be called for any purpose at any time by the Board or by Members who collectively own or hold at least twenty-five percent (25.0%) of the issued and outstanding Class A Units (determined as of the time that such meeting is called).  Anything in this Agreement to the contrary notwithstanding, no regular, special or other meetings of the Members are required to be held.

(b)    *Place of Meetings*.  Member meetings may be held (i) at any place within or outside the State of Delaware designated by the Board or the Members calling any such meeting, and/or (ii) if the Board or the Members calling any such meeting so determine, by means of remote communication in accordance with <u>Section 4.3(k)</u>.  In the absence of any other designation by the Board or the Members calling any such meeting, Member meetings shall be held at the Principal Office.

(c)    *Notice of Meetings*.  Not less than five (5) Business Days prior to any Member meeting, notice of the place, if any, the purpose and the date and time of such meeting shall be delivered by the Secretary to each Member entitled to vote at such meeting in accordance with <u>Section 17.5</u>.  Presence of a Member (in person or by duly authorized proxy) at a meeting shall constitute waiver of notice by such Member, except where a Member (in person or by duly authorized proxy) participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened and does not at such meeting vote for or assent to action taken at such meeting.

(d)    *Quorum*.  The holders of more than fifty percent (50.0%) of the aggregate voting power of the then-issued and outstanding Units entitled to vote on a matter to be presented at a Member meeting, either present in person or represented by proxy, shall constitute a quorum with respect to action on such matter, and action may be taken with respect to any matter presented at the meeting only if a quorum exists with respect to such matter.

(e)    *Voting*.  Every Member entitled to vote its Units on any matter to be presented at a Member meeting shall be entitled, with respect to such matter, to one (1) vote for each such Unit held of record by such Member on the record date designated for such meeting.  Whenever any action is to be taken with respect to any matter by vote of the Members, such action shall be authorized by the affirmative vote of holders of a majority of the aggregate voting power of the then-issued and outstanding Units entitled

to vote on such matter, unless the express provisions of this Agreement require a different vote (including any provision of this Agreement that requires any matter to be approved by the Majority Members or the Super-Majority Members), in which case such express provisions shall govern and control.

(f)     *Adjournment*.  Notwithstanding any other provision of this Agreement, if a quorum is not present at any Member meeting, such meeting may be adjourned by announcement of the chairperson of the meeting or by affirmative vote of the holders of a majority of the aggregate voting power of the Units that are present in person or represented by proxy at such meeting and are entitled to vote on one or more matters to be presented at such meeting.  Notice of an adjournment need not be given to the Members if the time and place of the adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, any business may be transacted which might have been transacted at the original meeting.  However, if the adjournment is for more than thirty (30) days from the date of the original meeting, or if after the adjournment a new record date is fixed for the adjourned meeting, a new notice of the adjourned meeting shall be given in accordance with Section 4.3(c) to each Member of record entitled to vote at such adjourned meeting.

(g)     *Record Date*.  Unless otherwise determined by the Board, the date on which notice of a Member meeting is first sent shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting (including any adjournment thereof).  The record date for determining Members entitled to express consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company.

(h)     *Proxies*.  Each Member may authorize another Person or Persons to act for him, her or it by proxy by an instrument executed in writing and delivered to the Company in accordance with Section 17.5 before or at the time of the meeting or execution of a written consent, as the case may be.  Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one such Person is present, then such powers may be exercised by that Person; or if an even number of such Persons attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.  The appointment of a proxy shall be effective for eleven (11) months from the date of such appointment unless a different period is expressly specified in the appointment form.  A proxy may only be voted or acted upon by its holder in accordance with written instructions of the Member granting such proxy.  Except as otherwise limited therein, proxies shall entitle the individuals authorized to vote at a meeting thereby to vote at any adjournment or postponement of such meeting.  A proxy purporting to be executed by or on behalf of a Member shall be deemed valid unless challenged at or prior to its exercise and the burden of proving invalidity shall rest on the challenger.  Subject to the above, any proxy may be

-19-

revoked if an instrument revoking it or a proxy bearing a later date is delivered to the Company in accordance with Section 17.5.

(i)    *Conduct of Member Meetings*.  The Chairperson or, in the Chairperson's absence, the Chief Executive Officer (or, in the Chief Executive Officer's absence, any Vice President) shall call meetings of the Members to order and act as chairperson of such meetings.  In the absence of said officers, any Member entitled to vote at the meeting, or any proxy of any such Member, may call the meeting to order and a chairperson shall be elected by the affirmative vote of holders of a majority of the voting power of the Units present in person or represented by proxy and entitled to vote on any matter to be presented at such meeting.  The Secretary or any Assistant Secretary or any person appointed as secretary of a meeting of the Members by the chairperson at any meeting of the Members may act as secretary of such meeting.  The chairperson of any Member meeting shall determine the order of business and the procedure at such meeting, including such regulation of the manner of voting and the conduct of discussion.

(j)    *Action by Written Consent*.  Notwithstanding anything contained in this Agreement to the contrary, any action required or permitted by applicable law to be taken at any Member meeting may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members that own or hold Units representing not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all the Members entitled to vote thereon were present and voted and shall be delivered to the Company in accordance with Section 17.5.  An action by written consent of the Members shall become effective as of the time the last written consent necessary to effect the contemplated action is received by the Company, unless all consents necessary to effect the contemplated action specify a later time, in which case the later time shall be the effective time of such action.  Prompt notice (and in any event within five (5) Business Days after receipt of the written consent by the Company) of the taking of Member action without a meeting by less than unanimous written consent shall be given by the Company to those Members who have not consented in writing and were entitled to vote on the matters that were the subject of such action.  Without limiting the foregoing, any provision of this Agreement that requires any matter to be approved by, or permits any action to be taken by, the Majority Members or the Super-Majority Members may be approved or taken by such applicable Members by written consent.

(k)    *Meetings by Remote Communication*.  One or more, or all, Members may participate in any meeting of the Members through the use of any means of remote communication by which all Persons participating can hear each other at the same time. Any Member participating in a meeting by any such means of remote communication is deemed to be present in person at such meeting, except as set forth in Section 4.3(c).

4.4    Authority of the Members.

(a)    Notwithstanding Section 18-402 of the Act, except as expressly authorized in writing by the Board or this Agreement (including Article 7 hereof), no Member, nor any officer, employee or agent of any Member, as such, shall have the authority or power

to manage the Company or to act for the Company for any purpose, or to engage in any transaction, make any commitment, enter into any contract or incur any obligation or responsibility (whether as principal, surety or agent) on behalf of, or in the name of, the Company, or bind the Company, or hold itself out to any third party as acting for or on behalf of the Company, all such powers being vested in the Board. To the fullest extent permitted by applicable law, any attempted action in contravention of this Section 4.4 shall be null and void *ab initio* and not binding upon the Company. The Company shall not be responsible or liable for any indebtedness or obligation (including any legal and other professional fees or disbursements) of any Member incurred or arising either before, on or after the Effective Date, except as provided in Article 8.

(b)    Except (i) pursuant to a duly authorized proxy in accordance with Section 4.3(h), and (ii) as set forth in Section 9.3, no Member shall have any authority to bind, to act for, to execute any document or instrument on behalf of or to assume any obligation or responsibility on behalf of, any other Member. No Member shall, by virtue of being a Member, be responsible or liable for any indebtedness or obligation of any other Member incurred or arising either before, on or after the Effective Date.

4.5    Limitation on Liability.  Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising under contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.  The immediately preceding sentence shall constitute a compromise to which all the Members have consented within the meaning of the Act.  Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on a Covered Person.

4.6    AI Questionnaire.  If any Member that is an Accredited Investor on the date on which such Member became a party to this Agreement shall thereafter cease to be an Accredited Investor, then such Member shall promptly (but in any event no later than ten (10) Business Days after the date on which such Member ceased to be an Accredited Investor) inform the Company in writing of such fact.  In addition, the Company shall have the right, at any time and from time to time, to request that any Member complete, execute and deliver to the Company an AI Questionnaire.  The Company shall make any such request in writing delivered to the applicable Member in accordance with Section 17.5.  If any Member receives any such request, then such Member shall promptly (but in any event no later than ten (10) Business Days after the date on which such Member receives such written request) complete, execute and deliver to the Company an AI Questionnaire.  Nothing in this Section 4.6 shall amend, alter or otherwise modify the restriction against Transferring Units to any Person that is not an Accredited Investor pursuant to Section 9.1(a)(vii).

4.7    Beneficial Ownership Reporting.  The Members agree to cooperate in a commercially reasonable manner in connection with the compliance by the Company or any of its Subsidiaries with all applicable BOI Laws, including making any adjustments and/or amendments to this Section 4.7 that may be reasonably necessary or appropriate in consideration

of additional guidance issued by FinCEN or any other Governmental Authority in respect of the implementation of BOI Laws.  Without limitation of the preceding sentence:

(a)      The Board shall make or cause to be made any beneficial ownership or related filings or reports ("BOI Reports") required pursuant to any BOI Laws for the Company or any of its Subsidiaries.  The Board shall be entitled to rely on the Member Beneficial Ownership Information provided by the Member(s) pursuant to clause (b) (if any).  Each Member shall be entitled to review the portion of the BOI Report (or a summary thereof) of the Company or any of its Subsidiaries that relates to such Member upon reasonable request made at least fifteen (15) days before such BOI Report is due; provided, that a Member's entitlement to review the portion of the BOI Report relating to such Member will be limited if such review would result in a delay in the filing of the BOI Report beyond its due date.  For the avoidance of doubt, the Board (which may delegate the completion of any reporting requirements) shall make the final determination regarding the reporting requirements applicable to the Company and its Subsidiaries under BOI Laws, including the applicability of reporting under the BOI Laws to the Company and its Subsidiaries, the application of an exemption from such reporting for the Company or any of its Subsidiaries, the timing for filing a BOI Report, the contents of a BOI Report, and the need to update any BOI Report.

(b)      Each Member shall be responsible for (i) initially determining whether there are any reportable "beneficial owners" under any applicable BOI Laws in respect of the Company or any of its Subsidiaries as a result of such Member's direct or indirect ownership and/or control of the Company or any such Subsidiary, (ii) providing "FinCEN identifiers" and such other identifying information in each case to the extent such information is required to comply with any applicable BOI Laws (the "Member Beneficial Ownership Information") in respect of any such beneficial owners to the Company and the Board as is needed to enable the Company or any of its Subsidiaries to timely comply with its disclosure obligations under any applicable BOI Laws, and (iii) promptly responding to any information and other requests by the Company or the Board in connection with the Company's or any of its Subsidiaries' compliance with all applicable BOI Laws, including the Board's independent assessment to identify reportable beneficial owners under applicable BOI Laws.  Each Member further represents, warrants and agrees that (x) within a reasonable time after a request by the Company, but no later than five (5) Business Days after the Company makes such request, it will provide the Company and the Board with all of such Member's applicable Member Beneficial Ownership Information; provided, that if the Company requires a response within five (5) Business Days of such request, then the Company will provide notice to such Member in such request and such Member will use commercially reasonable efforts to provide the requested Member Beneficial Ownership Information within the timeframe set forth in such request, (y) it will notify the Company and the Board promptly of any updates to or changes to any of its Member Beneficial Ownership Information that would reasonably be expected to require an updated BOI Report in respect of the Company or any of its Subsidiaries under any applicable BOI Laws, and (z) it will use reasonable efforts to ensure that any filings or profiles associated with any Member Beneficial Ownership Information that it has provided in connection with the application for a "FinCEN identifier" will be kept current as and to the extent required by

any applicable BOI Laws.  Each Member authorizes the disclosure by the Company or any of its Subsidiaries of its Member Beneficial Ownership Information provided pursuant to this clause (b) to the extent necessary to comply with any applicable BOI Laws and in reasonable coordination with such Member.

(c)     To the extent legally permissible and reasonably practicable, the Members shall keep the Company promptly informed of each notice or other communication received from FinCEN or any other Governmental Authority concerning any BOI Reports relating to the Company and/or any of its Subsidiaries, and shall consult in a reasonable manner with the Company prior to communicating with FinCEN or any other Governmental Authority concerning any BOI Reports or compliance with any applicable BOI Laws by the Company and/or any of its Subsidiaries.

(d)     [Each Member agrees, severally and not jointly, to indemnify and hold harmless the Company, its Subsidiaries, the Board and the other Members from and against any and all liability, damage, cost or expense (including reasonable attorneys' fees) incurred by them that directly results from any default by such Member in its representations, warranties and agreements under this Section 4.7.]

## ARTICLE 5
## CAPITAL STRUCTURE

5.1     Units.  All of the Interests shall be issued in unit increments (each, a "Unit" and, collectively, the "Units").  The Units shall initially be divided into the following classes: (a) Class A Voting Common Units (the "Class A Units") and (b) Class B Limited-Voting Common Units (the "Class B Units").  The rights and privileges associated with the Units are as set forth in this Agreement and, in the case of the Class B Units, in any applicable Management Incentive Plan and Award Agreement.  References herein to any class or series of Units shall apply to limited liability company interests or other Equity Interests of the Company issued to Members in respect of, in exchange for, or in substitution of, such class or series of Units by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, split-up, sale of assets, distribution to unitholders or combination of such class or series of Units or any other change in the Company's capital structure (including shares or interests of a surviving corporation or other Entity or successor into which units or interests of the Company are exchanged).

5.2     Issuance of Units.

(a)     Effective as of the Effective Date, each of the Existing Common Units that were issued by the Company to the recipients thereof as set forth in the Plan of Reorganization are hereby reclassified as one (1) Class A Unit (the "Unit Reclassification") such that, effective as of the Effective Date immediately following the Unit Reclassification, there are [●10,000,000] Class A Units issued and outstanding, all of which are duly authorized and validly issued, fully paid and non-assessable, and free and clear of any Liens, other than Permitted Liens and Liens created by the applicable Member.  Except for the [●10,000,000] Class A Units referred to in the immediately preceding sentence, no other Units or Interests, or options, warrants or other securities

that are convertible into, or exchangeable or exercisable for, Units or Interests shall be issued or outstanding on, or immediately after, the Effective Date after giving effect to the consummation of the Restructuring Transactions to occur on or as of the Effective Date and the consummation of the Unit Reclassification.

(b)     Subject to compliance with its obligations under Section 9.6 hereof (to the extent applicable), the Board may from time to time cause the Company to authorize, create and/or issue additional Units (of existing or new classes or series) or other equity or equity-based securities of the Company (including creating additional classes or series thereof having such ranking, powers, designations, preferences, rights and obligations as may be determined by the Board in its sole discretion, including ranking, powers, preferences, rights and obligations different from, senior or junior to or more or less favorable than existing classes or series of Units or other equity or equity-based securities of the Company). Such Units or other equity or equity-based securities may be issued for any amount and form of consideration as the Board may determine, including cash or other property, tangible or intangible, received or to be received by the Company or any of its Subsidiaries, or services rendered or to be rendered to the Company or any of its Subsidiaries. In connection with the foregoing, the Board shall have the power to make such amendments or modifications to this Agreement (including any amendment and restatement of this Agreement) in order to provide for such additional Units or equity or equity-based securities (including any Class B Units), and such ranking, powers, designations, preferences, rights and obligations as the Board in its discretion deems necessary or appropriate to give effect to such authorization, creation and/or issuance (including amending this Agreement to incorporate the terms of such class or series of Units or other equity or equity-based securities of the Company, including economic and governance rights which may be different from, senior or junior to or more or less favorable than the other existing classes or series of Units or other equity or equity-based securities of the Company), all without further vote or action of the Members; provided, however, that if any such amendments or modifications would otherwise require any vote or consent pursuant to any of clauses (i)-(vi) of Section 14.1(a) (other than immaterial amendments or modifications), then such vote or consent shall be obtained as a condition to any such amendment or modification.

(c)     The Class B Units may be issued from time to time by the Company pursuant to grants to Management Holders under the terms of any Management Incentive Plan; provided, that no Units other than Class B Units can be designated as incentives under any Management Incentive Plan. In addition to the terms and conditions set forth in this Agreement that are applicable to the Class B Units, the Class B Units shall be subject to all of the terms and conditions set forth in any applicable Management Incentive Plan and/or Award Agreement, including any terms relating to vesting and forfeiture, repurchase or redemption rights of the Company and restrictions on Transfer. The Members and the Company agree that in the event of any conflict or inconsistency between the terms of any Management Incentive Plan or any Award Agreement and this Agreement, the terms of this Agreement shall control; provided, however, that any Management Incentive Plan or any Award Agreement may impose greater restrictions on,

-24-

and/or grant lesser rights to, the Class B Units and the holders thereof than the restrictions and rights set forth in this Agreement.

5.3    <u>Certificated Units</u>.  If the Board so elects, the Units shall be certificated in such form as the Board may from time to time determine; <u>provided</u>, <u>however</u>, that the Class A Units that are issued and outstanding on the Effective Date (after giving effect to the Unit Reclassification) shall not be certificated.  Such certificates shall be signed by any two (2) authorized officers of the Company, and may, but need not, be sealed with the seal of the Company.  Any or all of the signatures on the certificate may be by facsimile or electronic signature.  In case any officer of the Company who shall have signed, or whose facsimile or electronic signature shall have been placed on, any certificate evidencing Units shall cease for any reason to be such officer before such certificate shall have been issued or delivered by the Company, such certificate may nevertheless be issued and delivered by the Company as though the person who signed such certificate, or whose facsimile or electronic signature shall have been placed thereon, had not ceased to be such officer of the Company.

5.4    <u>Voting Rights</u>.

(a)    Except as otherwise provided by non-waivable provisions of applicable law or this Agreement, the holders of Class A Units (in their capacity as such) shall have full voting rights and powers to vote on all matters submitted to the Members for vote, consent or approval (including the matters listed on <u>Schedule B</u> attached hereto), and each holder of Class A Units shall be entitled to one (1) vote for each Class A Unit held of record by such holder on any matter submitted to the Members for approval.

(b)    Except as provided in <u>Section 13.1(a)</u>, or as otherwise provided by non-waivable provisions of applicable law, the holders of Class B Units (in their capacity as such) shall have no right to vote on any matter submitted to the Members for vote, consent or approval, and the Class B Units shall not be included in determining the number of Units voting or entitled to vote on such matters (including for purposes of determining whether a quorum is present at any meeting of the Members or whether the requisite number of Member consents have been received for purposes of determining whether an action has been properly authorized by written consent of the Members).

(c)    Except as this Agreement expressly provides otherwise or as otherwise expressly provided by non-waivable provisions of applicable law, no holders of Units shall be entitled to any voting rights, and any action which would otherwise be subject to the vote or consent of Members under the Act may be taken by the Company by approval of the Board.

5.5    <u>Record</u>.  The Company shall keep and maintain, or cause to be kept and maintained, a record of the name of each Person holding Units, the class or series and number of Units held by each such Person, any Transfer thereof and, in case any Unit is represented by a certificate and such certificate is cancelled, the date of cancellation thereof.  Unless otherwise determined by the Board, the Register of Members shall serve as such record.  The Person in whose name Units are registered on the Register of Members or such other record as determined

by the Board shall be deemed the owner thereof, and thus a holder of record of such Units, for all purposes as regards the Company.

5.6    <u>No Appraisal Rights</u>.  The Members agree that no appraisal rights, dissenter's rights or other similar rights shall be available with respect to the Units, and waive all such rights in connection with any amendment of this Agreement or the Certificate of Formation, any merger or consolidation in which the Company is a constituent party, any conversion of the Company to another business form, any division of the Company into two or more other Entities, any transfer to or domestication in any jurisdiction by the Company, the sale of all or substantially all of the Company's assets or otherwise.

5.7    <u>Lost, Destroyed or Mutilated Certificates</u>.  Upon receipt of evidence reasonably satisfactory to the Company (an affidavit of the registered holder in customary form will be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing Units, and in the case of any such loss, theft or destruction upon receipt of indemnity reasonably satisfactory to the Company, or, in the case of any such mutilation upon surrender of such certificate, the Company will (at its expense) execute and deliver in lieu of such certificate a new certificate of like kind representing the number of Units represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

5.8    <u>Creditor Relationships</u>.    Anything in this Agreement to the contrary notwithstanding (including <u>Section 6.18</u>), the Company and each of the Members hereby agree and acknowledge that certain Members and/or their Affiliates are also holders of indebtedness and debt securities of, and guarantees thereof by, the Company and its Subsidiaries (collectively, "<u>Indebtedness</u>"), and in such capacity may have interests that are divergent from the Company, its Subsidiaries and/or the other Members, and, that, to the fullest extent permitted by law, under no circumstances will any such Member or any such Affiliate be prohibited from taking any action or enforcing any right entitled to it under the terms of the documentation relating to or governing the Indebtedness held by such Member or such Affiliate or to which it is entitled under law.  To the fullest extent permitted by law, no holder of Indebtedness shall be liable to the Company, any of its Subsidiaries or the other Members for breach of this Agreement or any fiduciary duty by reason of any such activities of such holder, including exercising any rights of such holder under documentation relating to or governing such Indebtedness or to which such holder may be entitled under law, and the Company and each Member hereby irrevocably waive any and all rights to claim any such actions are a breach of this Agreement or the fiduciary duties (if any) of such holder.  In addition, any holder of Indebtedness, in exercising its rights as a lender or creditor of the Company or any of its Subsidiaries, including making its decision on whether to foreclose on any collateral security, will have no duty to consider (a) its status or the status of any of its Affiliates as a Member, (b) the interests of the Company, any of its Subsidiaries or any of the Members, or (c) any duty it may have to any other Member, except as may be required under the applicable financing documents relating to such Indebtedness.

# ARTICLE 6
## MANAGEMENT; OPERATION OF THE COMPANY BUSINESS

6.1    <u>Management of the Company</u>.

(a)    Subject to the terms and conditions of this Agreement, the business and affairs of the Company shall be managed by the board of managers of the Company (the "<u>Board</u>"), which shall direct, manage and control the business of the Company.  Except where the approval of the Members (including the Majority Members or the Super-Majority Members) is expressly required by this Agreement or by non-waivable provisions of applicable law, the Board shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The enumeration of powers in this Agreement shall not limit the general or implied powers of the Board or any additional powers provided by applicable law.  Each Manager shall possess and may enjoy and exercise all of the rights and powers of a "manager" as provided in the Act, and each Manager shall be a "manager" as provided in the Act; <u>provided</u>, <u>however</u>, that (i) no individual Manager shall have the authority to act for or bind the Company without the requisite consent of the Board and (ii) each Manager will be subject only to the obligations, limitations and duties expressly set forth in this Agreement.  Except pursuant to a duly authorized delegation of authority by the Board, no Member shall have any right, power or authority to act (as agent or otherwise) for, or to bind, the Company in any manner.

(b)    Except as expressly provided for in this Agreement or expressly required by non-waivable provisions of applicable law, the Members shall not have voting rights with respect to the management of the Company and shall not be entitled to vote on or consent to or approve or disapprove actions or decisions regarding the Company.

6.2    <u>Board</u>.

(a)    The Board shall consist of seven (7) Managers.  Managers must be natural persons at least eighteen (18) years of age but need not be Members, residents of the State of Delaware or citizens of the United States.

(b)    The Board shall be comprised of the following individuals:

(i)    for so long as the HG Vora Members collectively own or hold fifteen percent (15.0%) or more of the issued and outstanding Class A Units, one (1) Manager designated by the HG Vora Members;

(ii)    one (1) Manager designated by each Specified Member that owns or holds (together with its Affiliates) twenty percent (20.0%) or more of the issued and outstanding Class A Units, but only for so long as such Specified Member owns or holds (together with its Affiliates) fifteen percent (15.0%) or more of the issued and outstanding Class A Units; <u>provided</u>, that no Specified Member shall be permitted to designate a Manager pursuant to this <u>clause (ii)</u> prior to the one year anniversary of the Effective Date (the "<u>Trigger Date</u>");

-27-

(iii)    the following number of individuals elected by vote of Members holding a plurality of the votes of the Class A Units present in person or represented by proxy at a meeting of Members held for purposes of electing any such individual as a Manager (or by the Majority Members acting by written consent):  six (6) minus the total number of Designation Rights in effect as of the time of determination; and

(iv)    one (1) Manager who shall be the individual serving as the Chief Executive Officer of [PSP Midco, LLC] ("PSP Midco" and such Manager, the "CEO Manager").

(c)    No Member, together with its Affiliates, shall be entitled to more than one (1) Designation Right at any time (it being understood that if the HG Vora Members have a Designation Right under Section 6.2(b)(i) as of a particular time, then the HG Vora Members shall not be entitled to a Designation Right under Section 6.2(b)(ii) as of such time).  If any Specified Member obtains a Designation Right under Section 6.2(b)(ii) (a "Springing Designation Right") prior to the Trigger Date, then such Specified Member shall not be entitled to exercise such Springing Designation Right, and such Springing Designation Right shall not be in effect, until the Trigger Date and only if such Specified Member continues to own or hold (together with its Affiliates) fifteen percent (15.0%) or more of the issued and outstanding Class A Units as of the Trigger Date.  A Springing Designation Right of a Designating Group may only be exercised at any time by the Designating Members in such Designating Group that own or hold a majority of the Class A Units owned or held by all of the Designating Members in such Designating Group at such time.

(d)    The Designation Right of any Specified Member shall terminate if such Specified Member owns or holds (together with its Affiliates) less than fifteen percent (15.0%) of the issued and outstanding Class A Units at any time after such Specified Member obtains such Designation Right.  The termination of the HG Vora Members' Designation Right as set forth in Section 6.2(b)(i) shall be permanent upon the occurrence of such termination and shall not be reversed if the HG Vora Members shall thereafter own or hold fifteen percent (15.0%) or more of the issued and outstanding Class A Units; provided, that the foregoing shall not prevent the HG Vora Members from obtaining a Springing Designation Right at any time after any such termination.  The termination of any Designating Group's Designation Right shall not adversely affect the Designation Right of any other Designating Group.  Anything herein to the contrary notwithstanding, if Additional Securities are issued or sold to an Accelerated Acquirer pursuant to Section 9.6(d), then the determination as to whether a Designating Group's Designation Right is terminated shall not be made until after the consummation of the related process of offering and, if applicable, issuing or selling Additional Securities to Preemptive Members pursuant to Section 9.6(d).

(e)    With respect to (i) any designation of a Manager by a Designating Group pursuant to the Designation Right of such Designating Group (including any such designation made pursuant to a Springing Designation Right from and after the Trigger Date or made following the removal of a Manager made by such Designating Group

pursuant to Section 6.12) or (ii) any removal of a Manager from the Board that was previously designated by a Designating Group pursuant to the Designation Right of such Designating Group which removal is made by such Designating Group pursuant to Section 6.12, the applicable Designating Group shall execute and deliver to the Company a written notice (a "Designation Notice") and such Designation Notice shall (A)(1) identify the individual that such Designating Group is designating or (2) specify the identity of the Manager to be removed from the Board, (B) certify to the Company that the Person(s) executing and delivering such Designation Notice own(s) or hold(s) a majority of the Class A Units owned or held by all of the Persons included within such Designating Group, and (C) include such additional information such that the Company can reasonably conclude that the certification in clause (B) is accurate (including the names of each Member included in such Designating Group and the number of Class A Units owned or held by each such Member). The Company shall confirm, based on the information set forth in the Register of Members that the Person(s) executing and delivering such Designation Notice own(s) or hold(s) a majority of the Class A Units owned or held by all of the Persons included within the applicable Designating Group. If the Company confirms that a Designation Notice has been executed and delivered by the Person(s) that own(s) or hold(s) a majority of the Class A Units owned or held by all of the Persons included within the applicable Designating Group, then the designation and/or removal specified in such Designation Notice shall be automatically effective, without a need for any action on the part of or notice to any Member or other Person, and the Company shall deliver notice thereof to the Members. If the Company confirms that a Designation Notice has not been executed and delivered by the Person(s) that own(s) or hold(s) a majority of the Class A Units owned or held by all of the Persons included within the applicable Designating Group, then such Designation Notice shall be deemed void and invalid.

(f)     The Designation Right of a Designating Group shall not be assignable or transferable to any Person.

(g)     The Chairperson shall be a Manager appointed, removed and/or replaced from time to time by a vote of the Board. The; provided that the initial Chairperson as of the Effective Date shall be [●]selected by the Majority Members.

(h)     Each of the Managers (including any Manager designated or elected to fill any vacancy on the Board) shall be an Independent Manager. Notwithstanding the foregoing, a Manager may be an individual who is employed by any Member or any of its Affiliates at the time such individual is designated or elected to be a Manager or at any time six (6) months prior to such time (any such Member, an "Interested Member") if the designation or election of such individual to be a Manager is approved by the Members (excluding each of the Interested Members) (the "Disinterested Members") who collectively own or hold at least 66-2/3% of the issued and outstanding Class A Units owned or held by all Disinterested Members as of such time.

(i)     None of the Members, and no officer, director, manager, stockholder, partner, member, employee or agent of any Member, makes any representation or warranty as to the fitness or competence of the designee of any party hereunder to serve

as a member on the Board (or any committee thereof) or any Subsidiary Governing Body by virtue of being a party to this Agreement.

(j)     Each Manager shall execute and deliver a confidentiality agreement that is acceptable to the Board (which may be in the form of an acknowledgment by a Manager that he or she is bound by and subject to the obligations of confidentiality and disclosure set forth in Article 18 of this Agreement as if such obligations applied to such Manager).

(k)     There shall be no cumulative voting for Managers, and the Board shall not be staggered or classified.

6.3     Regular Meetings.  Regular meetings of the Board shall be held at such time or times and with such frequencies as may be determined by the Board.

6.4     Special Meetings.  Special meetings of the Board may be called from time to time by (a) the Chairperson or (b) any two (2) Managers.

6.5     Place of Meetings.  Any meeting of the Board may be held at such place or places as shall from time to time be determined by the Board and as shall be designated in the notice of the meeting.  If no other place is designated in the notice of the meeting, such meeting shall be held at the Principal Office.

6.6     Notice of Meetings.  Notwithstanding Section 17.5, notice of each meeting of the Board, whether regular or special, shall be given to each Manager (unless such notice is waived by such Manager as provided in Section 6.10) (a) if such notice is sent by overnight delivery, at least two (2) Business Days prior to such meeting or, (b) if such notice is sent by electronic mail, at least one (1) day prior to such meeting; provided, however, if a special meeting of the Board is being called due to exigent circumstances, as reasonably determined by the Chairperson or the Managers calling such meeting, then notice of such meeting may be provided to each Manager (unless such notice is waived by such Manager as provided in Section 6.10) by electronic mail at least twelve (12) hours prior to such meeting.  Any such notice shall be sent to each Manager at such Manager's usual or last known business or residence address or electronic mail address, as applicable.  The notice shall state the date, time and location (if such location is not the Principal Office) of the meeting, but need not state the purposes of such meeting.

6.7     Meetings by Remote Communication.  One or more, or all, members of the Board or any committee designated by the Board may participate in a meeting of the Board or such committee through the use of any means of remote communication by which all persons participating can hear each other at the same time or by any other means permitted by the Act.  Any Manager or committee member participating in a meeting by any such means of remote communication or by any such other means permitted by the Act is deemed to be present in person at such meeting, except as set forth in Section 6.10.

6.8     Quorum; Acts of Managers.  A quorum for any meeting of the Board will require attendance of Managers with a majority of the votes of all Managers then in office.  The vote of a majority of the votes of all of the Managers present and entitled to vote at a meeting of the Board at which a quorum is present shall be the act of the Board, unless the express provisions of this Agreement (including Sections 6.18 and 6.19) or applicable non-waivable law require a

different vote, in which case such express provisions shall govern and control. In the absence of a quorum at any meeting of the Board, a majority of the votes of the Managers present and entitled to vote may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present. Each Manager shall have one (1) vote on all matters submitted to the Board for the vote, consent or approval of the Board (other than matters for which such Manager is not entitled to vote, as expressly set forth in this Agreement). Decisions of the Board shall be decisions of the "manager" for all purposes of the Act.

6.9     Organization, Agenda and Procedures. The Chairperson, if any, shall preside over the meetings of the Board; provided, however, if there shall not be a Chairperson or if the Chairperson shall not be present at a meeting of the Board or shall refuse to preside over a meeting of the Board, then the Managers with a majority of the votes of all Managers that are present at such meeting shall choose a chairperson to preside over such meeting. The Secretary, any Assistant Secretary, or any other person appointed as secretary of a meeting of the Board by the Chairperson or any such other chairperson of such meeting shall act as secretary of each meeting of the Board. The agenda of and procedure for such meetings shall be as determined by the Chairperson or any such other chairperson of such meeting.

6.10     Waiver of Notice. A Manager may waive any notice of a meeting of the Board, whether before or after the date or time stated in the notice as the date or time when any action will occur or has occurred. Any such waiver shall be in writing, be signed by the Manager entitled to the notice, and be delivered to the Company in accordance with Section 17.5, but such delivery shall not be a condition of the effectiveness of the waiver. Attendance or participation by a Manager at a meeting of the Board, (a) shall be deemed a waiver of objection to lack of required notice or defective notice of the meeting, unless the Manager, at the beginning of the meeting or promptly upon his or her later arrival, expressly objects to holding the meeting or transacting business at the meeting because of lack of notice or defective notice, and does not thereafter vote for or assent to action taken at the meeting, and (b) shall be deemed a waiver of objection to consideration of a particular matter at the meeting, unless the Manager expressly objects to considering the matter when it is presented and does not thereafter vote for or assent to action taken at the meeting with respect to such matter.

6.11     Managers' Action By Written Consent. Any action required or permitted to be taken at any meeting of the Board, or any committee thereof, may be taken without a meeting, without prior notice and without a vote if all members of the Board or any such committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or any such committee. Unless the Managers or committee members (as the case may be) specify a different effective time in such written consent, a written consent of the Board or any committee thereof, with respect to an action of the Board or such committee, shall become effective when the written consent to such action has been signed (and not revoked) by all then-serving Managers or committee members (as the case may be) and delivered to the Company in accordance with Section 17.5, unless before such time the Company has received a written revocation of the consent of any Manager or committee member (as the case may be).

6.12    <u>Removal</u>.

(a)    If at any time the Designation Right of any Designating Group terminates, then the Holder Manager previously designated by such Designating Group pursuant to such Designation Right shall be automatically removed from the Board at the request of the Majority Members delivered to the Company in accordance with <u>Section 17.5</u> or shall be removed from the Board in connection with the exercise of a Springing Designation Right (as further described in <u>Section 6.12(c)</u>).

(b)    Except for the removal of a Holder Manager at the request of the Majority Members on account of the termination of a Designation Right (which removal shall be automatic at the time request is delivered by the Majority Members to the Company in accordance with <u>Section 17.5</u>) or the removal of a Holder Manager in connection with the exercise of a Springing Designation Right (as further described in <u>Section 6.12(c)</u>)), the Designating Group holding a Designation Right shall have the exclusive right to remove, whether with or without cause, any Holder Manager designated by such Designating Group pursuant to such Designation Right (but not any other Manager).

(c)    If any Specified Member obtains a Springing Designation Right and elects to exercise such Springing Designation Right (any such Specified Member, an "<u>Exercising Member</u>"), then such Exercising Member shall deliver written notice of such exercise (an "<u>Exercise Notice</u>") to the Company (whereupon the Company shall promptly notify all Members (other than the Exercising Member and its Affiliates) that own or hold Class A Units (the "<u>Non-Exercising Members</u>") of such exercise); <u>provided</u>, that such Exercising Member shall not be entitled to deliver any such Exercise Notice until after the Trigger Date. If an Exercise Notice is delivered to the Company after the Trigger Date, then the Non-Exercising Members who collectively own or hold greater than fifty percent (50.0%) of the issued and outstanding Class A Units owned or held by all Non-Exercising Members as of the time of such delivery shall select a Manager to be removed from the Board. If the Non-Exercising Members fail to select a Manager to be removed from the Board within forty-five (45) days after the date on which the Exercise Notice was delivered to the Company, then the Exercising Member shall have the right to select a Manager to be removed from the Board (which removal shall occur automatically upon notice thereof being delivered by the Exercising Member to the Company in accordance with <u>Section 17.5</u>). Notwithstanding the foregoing, (i) none of the following Managers may be removed from the Board in connection with the exercise of a Springing Designation Right: (A) any Manager that was designated pursuant to a Designation Right and such Designation Right is then in effect, or (B) the CEO Manager; and (ii) no Manager may be removed from the Board in connection with the exercise of a Springing Designation Right (A) if there is a vacancy on the Board at the time of the proposed removal and such vacancy was not created as a result of (x) a Manager that was designated pursuant to a Designation Right ceasing to serve on the Board and such Designation Right is then in effect or (y) the CEO Manager ceasing to serve on the Board, and (B) unless the Exercising Member has designated an individual to serve as a Manager immediately following the removal of such Manager proposed to be removed

(which designation shall be made in the Exercise Notice delivered by such Exercising Member or may be made in a Designation Notice delivered by such Exercising Member).

(d)      Any Manager that is not designated pursuant to a Designation Right (other than the CEO Manager) may be removed, with or without cause, by the Majority Members at the time of such removal.  If for any reason the individual serving as the Chief Executive Officer [of PSP Midco] shall cease to serve as the Chief Executive Officer [of PSP Midco] (whether from termination, resignation, death, disability or otherwise), then such individual shall be automatically removed as the CEO Manager.

6.13      Resignation.  Any Manager may resign at any time by giving written notice of such Manager's resignation to the Company in accordance with Section 17.5.  Such resignation shall take effect on the date of delivery of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation by the Company shall not be necessary to make it effective.

6.14      Vacancies.

(a)      Except for any Specified Vacancy, any vacancy on the Board resulting from the resignation or removal of a Holder Manager, or resulting from a Holder Manager becoming unable to serve as a result of death, disability or otherwise, shall be filled by the Designating Group that holds the Designation Right pursuant to which such Holder Manager was designated to be a Manager.

(b)      Any vacancy on the Board resulting from the resignation or removal of any Manager that is not designated pursuant to a Designation Right (other than the CEO Manager or the resignation or removal of a Manager in connection with the exercise of a Springing Designation Right), or resulting from any such Manager becoming unable to serve as a result of death, disability or otherwise, shall be filled by vote of Members holding a plurality of the votes of the Class A Units present in person or represented by proxy at a meeting of Members held for purposes of filling such vacancy (or by the Majority Members acting by written consent); provided, that such vacancy may also be filled by an Exercising Member in connection with the exercise of a Springing Designation Right.

(c)      Any Specified Vacancy shall be filled by vote of Members holding a plurality of the votes of the Class A Units present in person or represented by proxy at a meeting of Members held for purposes of filling such vacancy (or by the Majority Members acting by written consent); provided, that such Specified Vacancy may also be filled by an Exercising Member in connection with the exercise of a Springing Designation Right.

(d)      Any vacancy on the Board resulting from the removal of a Manager in connection with the exercise of a Springing Designation Right shall be filled with an individual selected by the Exercising Member exercising such Springing Designation Right (which individual shall be identified in the Exercise Notice delivered by such Exercising Member or in a Designation Notice delivered by such Exercising Member).

(e)    Any vacancy on the Board resulting from the failure of the Members to fill a seat on the Board on the Effective Date shall be filled after the Effective Date by vote of Members holding a plurality of the votes of the Class A Units present in person or represented by proxy at a meeting of Members held for purposes of filling such vacancy (or by the Majority Members acting by written consent); provided, that such vacancy may also be filled by an Exercising Member in connection with the exercise of a Springing Designation Right.

(f)    Any vacancy on the Board resulting from the individual serving as the Chief Executive Officer [of PSP Midco] ceasing to serve as the Chief Executive Officer [of PSP Midco] shall be automatically filled with the individual that is the successor Chief Executive Officer [of PSP Midco] when such individual becomes the Chief Executive Officer [of PSP Midco].

6.15    Committees.  The Board, by resolution or written consent, may from time to time designate from among the Managers one or more committees to exercise the powers of the Board.  The Board may (and if the Board does not, a majority of the votes of the committee members may) designate a chairperson of each such committee from among its members.  Each such committee, to the extent provided in such resolution or written consent, shall have and may exercise all of the authority of the Board in the management of the Company, subject to the limitations set forth in the Act and in this Agreement.   Any or all members of any such committee may be removed, with or without cause, by a duly adopted resolution or written consent of the Board.   Rules governing the procedures for meetings of each committee designated by the Board shall be as established by the Board from time to time (or, if the Board does not establish such procedures, as established by a majority of the votes of the committee members).  For the avoidance of doubt, no committee of the Board shall be authorized to take any action that the Board could not take itself.

6.16    Compensation of Managers.    Each Independent Manager shall be paid compensation from the Company, in such form (which may be in the form of cash fees and/or equity incentives granted under any Management Incentive Plan) and amount as approved by the Majority Members, for the performance of such Independent Manager's duties as a Manager or a member of any committee of the Board.  Managers who are not Independent Managers shall not receive compensation from the Company for the performance of such Manager's duties as a Manager or a member of any committee of the Board.  Each Manager and committee member shall be reimbursed for the reasonable and documented out-of-pocket costs and expenses incurred by such Manager or committee member in connection with the performance of such Manager's or committee member's duties as a Manager or a member of any committee of the Board (including expenses incurred in attending meetings of the Board or any committee thereof).  Nothing herein contained shall be construed to preclude any Manager or committee member from serving the Company or any of its Subsidiaries in any other capacity and receiving proper compensation therefor.

6.17    Subsidiary Governing Bodies.  Each Subsidiary Governing Body (other than a Subsidiary Governing Body of any Subsidiary of the Company which is (a) a limited liability company that is managed by its member(s), (b) a limited partnership that is managed by its general partner or (c) required by Law or contract to have a different composition) shall be

comprised of one or more executive employees of the Company or any of its Subsidiaries or other individuals selected by the Board that are not employees of any of the Members or any of their respective Affiliates (other than the Company or any of its Subsidiaries).  The Company agrees to take all necessary and desirable actions to ensure that any such Subsidiary Governing Body does not adopt any resolutions, execute any consents, grant any approvals or take any other action, or otherwise cause or permit any such Subsidiary to do anything, that would be inconsistent with, or contrary to, any resolution, consent, approval or other action adopted, executed, granted or taken by the Board, or that would be in subversion of the rights of the Members under this Agreement or that would otherwise be a breach of this Agreement if the Company did the same.

6.18    Affiliate Transactions.    Other than any Excepted Transaction, any direct or indirect transaction or series of related transactions between the Company or any of its Subsidiaries, on the one hand, and any Member who, together with its Affiliates, owns or holds five percent (5.0%) or more of the issued and outstanding Class A Units, or any Affiliate of any such Member, on the other hand (an "Affiliate Transaction"), involving aggregate payments, fundings or other consideration in excess of $1,000,000.00 per annum shall require the approval of a majority of the votes of the Managers then in office that are disinterested with respect to such Affiliate Transaction, unless any such transaction or series of related transactions is a commercial transaction on an arm's length basis entered into in the ordinary course of business consistent with past practice.

6.19    Required Approval of Board and Majority Members for Certain Actions.    The Company shall not, and the Company shall not cause or permit any of its Subsidiaries to, take (whether by amendment, merger, consolidation, division, recapitalization or otherwise) any of the actions listed on Schedule B attached hereto without the prior approval or consent of the Board and the Majority Members.  The Company shall not, and the Company shall not cause or permit any of its Subsidiaries to, make any distributions or dividends to Members that own or hold Class A Units that are not made to such Members (a) on a *pro rata* basis (based on the number of Class A Units owned or held by such Members immediately prior to any such distribution or dividend), or (b) in the same form (unless all such Members are provided with the same option as to the form of such distribution or dividend) without the prior approval of the Board and each Member that owns or holds Class A Units.

## ARTICLE 7
## OFFICERS; POWERS OF OFFICERS

7.1    Election and Tenure.    The officers of the Company may (but shall not be required to) consist of the Chairperson, the Chief Executive Officer, the Chief Financial Officer, a Secretary, a Treasurer, a Chief Operating Officer, and such other officers and assistant officers as the Board may deem necessary or advisable, each of whom shall be appointed by the Board.  The persons holding officer positions with the Company as of the Effective Date are listed on Schedule C attached hereto.  The Board may expressly delegate to any such officer the power to appoint or remove subordinate officers, agents or employees.  Any two or more offices may be held by the same person.  Each officer so appointed shall continue in office until a successor

shall be appointed and shall qualify, or until the officer's earlier death, resignation or removal. Each officer shall be a natural person who is eighteen (18) years of age or older.

7.2    <u>Resignation, Removal and Vacancies</u>.    Any officer may resign at any time by giving written notice of resignation to the Company, to the attention of the Board or the Chief Executive Officer.    Such resignation shall take effect when the notice is delivered in accordance with <u>Section 17.5</u> unless the notice specifies a later date, and acceptance of the resignation shall not be necessary to render such resignation effective unless such resignation so states.    Any officer may at any time be removed by the Board.    If any office becomes vacant for any reason, the vacancy may be filled by the Board.    An officer appointed to fill a vacancy shall be appointed for the unexpired term of such officer's predecessor in office (if any) and shall continue in office until a successor shall be elected or appointed and shall qualify, or until such officer's earlier death, resignation or removal.    The appointment of an officer shall not itself create contract rights in favor of the officer, and the removal or resignation of an officer shall not affect the officer's contract rights, if any, with the Company or the Company's contract rights, if any, with the officer.

7.3    <u>Chairperson</u>.    The Chairperson shall preside over the meetings of the Members and the Board and have such powers and responsibilities as are incident thereto.    However, the Chairperson shall not have responsibility for the day-to-day business operations of the Company. The Chairperson shall be a Manager.

7.4    <u>Chief Executive Officer</u>.    The chief executive officer of the Company (the "<u>Chief Executive Officer</u>"), if any, shall (a) have general and active management of the business of the Company, and preside over the day-to-day business operations of the Company, (b) see that all orders and resolutions of the Board are carried into effect, and (c) perform all duties as may from time to time be assigned to him or her by the Board or as may be expressly set forth in this Agreement.    The Chief Executive Officer shall also be the President of the Company.

7.5    <u>Chief Financial Officer</u>.    The chief financial officer of the Company (the "<u>Chief Financial Officer</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Financial Officer.    In addition, the Chief Financial Officer shall have, along with the Chief Executive Officer, responsibility for the day-to-day business operations of the Company.

7.6    <u>Chief Operating Officer</u>.    The chief operating officer of the Company (the "<u>Chief Operating Officer</u>"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Operating Officer.

7.7    <u>Vice Presidents</u>.    The vice presidents of the Company (the "<u>Vice Presidents</u>"), if any, shall perform such duties and possess such powers as may from time to time be assigned to them by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement.    In the absence of the Chief Executive Officer or in the event of the inability or

refusal of the Chief Executive Officer to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board, or in the absence of any designation, then in the order of the election or appointment of the Vice Presidents) shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer.

7.8     Secretary.  The secretary of the Company (the "Secretary"), if any, shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Secretary shall perform such duties and have such powers as are incident to the office of Secretary, including the duty and power to give notice of all meetings of Members (if any), the Board and any committee of the Board, to prepare and maintain minutes of any such meetings, to maintain other records and information of the Company, to authenticate records of the Company, to be custodian of the Company seal and to affix and attest to the Company seal on documents.

7.9     Treasurer.  The treasurer of the Company (the "Treasurer"), if any, shall perform such duties and have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of Treasurer, including the duty and power to keep and be responsible for all funds and securities of the Company, to deposit funds of the Company in depositories selected in accordance with this Agreement, to disburse such funds as ordered by the Board, making proper accounts thereof, and to render as required by the Board statements of all such transactions and of the financial condition of the Company.

7.10     Assistant Secretaries and Assistant Treasurers.  The assistant secretaries and assistant treasurers of the Company (the "Assistant Secretaries" and the "Assistant Treasurers"), if any, shall perform such duties as may from time to time be assigned to them by the Secretary or the Treasurer, respectively, or by the Chief Executive Officer or the Board, or as may be expressly set forth in this Agreement.  In the absence, inability or refusal to act of the Secretary or the Treasurer, the Assistant Secretaries or the Assistant Treasurers, respectively, in the order designated by the Board, or in the absence of any designation, then in the order of their election or appointment, shall perform the duties and exercise the powers of the Secretary or Treasurer, as the case may be.

7.11     Salaries.  Officers of the Company shall be entitled to such salaries, emoluments, compensation or reimbursement, if any, as shall be fixed or allowed from time to time by the Board or in such manner as the Board shall provide.

7.12     Borrowing.  No loan shall be contracted on behalf of the Company, and no evidence of indebtedness shall be issued, endorsed or accepted in its name, unless authorized by the Board or a committee designated by the Board so to act.  Such authority may be general or confined to specific instances.  When so validly authorized, an officer may (a) effect loans at any time for the Company from any bank or other Entity and for such loans may execute and deliver promissory notes or other evidences of indebtedness of the Company, and (b) mortgage, pledge or otherwise encumber any real or personal property, or any interest therein, owned or held by

the Company as security for the payment of any loans or obligations (including any guarantees) of the Company, and to that end may execute and deliver for the Company such instruments as may be necessary or proper in connection with such transaction.

7.13    Checks and Endorsements.  All checks, drafts or other orders for the payment of money, obligations, notes or other evidences of indebtedness, bills of lading, warehouse receipts, trade acceptances and other such instruments shall be signed or endorsed for the Company by such officers or agents of the Company as shall from time to time be determined by resolution of the Board, which resolution may provide for the use of facsimile or electronic signatures.

7.14    Deposits.  All funds of the Company not otherwise employed shall be deposited from time to time to the Company's credit in such banks or other depositories as shall from time to time be determined by resolution of the Board, which resolution may specify the officers or agents of the Company who shall have the power, and the manner in which such power shall be exercised, to make such deposits and to endorse, assign and deliver for collection and deposit checks, drafts and other orders for the payment of money payable to the Company or its order.

7.15    Proxies.  Unless otherwise provided by resolution adopted by the Board, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer or any Vice President: (a) may from time to time appoint one (1) or more agents of the Company, in the name and on behalf of the Company, (i) to cast the votes which the Company may be entitled to cast as the holder of Equity Interests or other securities in any other Entity whose Equity Interests or other securities may be held by the Company, at meetings of the holders of the Equity Interests or other securities of such other Entity, or (ii) to consent in writing to any action by such other Entity; (b) may instruct the person so appointed as to the manner of casting such votes or giving such consent; and (c) may execute or cause to be executed in the name and on behalf of the Company and under the Company's seal, or otherwise, all such written proxies or other instruments as may be deemed necessary or proper in connection with the foregoing clauses (a) and (b).

## ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1    Exculpation.

(a)    Notwithstanding any other provisions of this Agreement (whether express or implied) or obligation or duty at law or in equity, to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Member, the Company or any other Person (including any creditor or claimant of the Company or any of its Subsidiaries) for any losses, claims, expenses, damages or liabilities arising from any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by a Covered Person in connection with the Company or any of its Subsidiaries, nor shall any Covered Person be liable to any Member, the Company or any other Person for any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, by any employee or other agent of the Company or any of its Subsidiaries, except to the extent that any such losses, expenses, claims, damages or liabilities, (i) in any such case, are attributable to such Covered Person's material

breach of this Agreement, and (ii) in the case of any current or former Manager or officer of the Company, (A) are attributable to such Manager's or officer's acts or omissions not in good faith, (B) are attributable to such Manager's or officer's breach of the duty of loyalty to the Members, the Company or any of its Subsidiaries, (C) arise from a transaction in which such Manager or officer derived an improper personal benefit or (D) are attributable to acts or omissions of such Manager or officer that constitute a knowing violation of law.  No amendment to or repeal of this Section 8.1 shall apply to or have any effect on the liability or alleged liability of the Covered Persons for or with respect to their acts or omissions occurring prior to such amendment or repeal.

(b)     In accordance with the Act and the laws of the State of Delaware, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member.  It is the intent of the Members that no distribution to any Member pursuant to Article 11 or Article 13 shall be deemed a return of money or other property paid or distributed in violation of the Act or other applicable law.   The return of such money or distribution of any such property to a Member shall be deemed to be a compromise within the meaning of the Act, and the Member receiving any such money or property shall not be required to return to any Person any such money or property.  However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to return such money or property, such obligation shall be the obligation of such Member and not of any other Member.

8.2     Indemnification.

(a)     The Company shall, to the fullest extent permitted by applicable law (as now or hereafter in effect), indemnify, defend and hold harmless each Covered Person who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding ("Proceeding"), whether civil, criminal, administrative or investigative, or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, (i) in connection with any matter arising out of or in connection with the Company's or any of its Subsidiaries' business or affairs, (ii) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "Covered Person", or (iii) by reason of the fact that such Covered Person, or a Person of whom such Covered Person is the legal representative, is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any other corporation, company, partnership, joint venture, trust, employee benefit plan or other Entity (an "Other Entity"), from and against any losses, claims, expenses, damages and liabilities (collectively, "Damages") suffered or incurred by, imposed on, or to which such Covered Person may become subject in connection with such Proceeding; provided, that no right of indemnification shall be available to a Covered Person under this Article 8 (A) to the extent that it shall have been determined by a final, non-appealable decision by a court of competent jurisdiction that any such Damages are attributable to such Covered Person's material breach of this Agreement, and, (B) in the case of any current or former Manager or officer of the Company, to the extent that any such Damages (1) are attributable to such Managers' or officer's acts or omissions not in good

faith, (2) are attributable to such Managers' or officer's breach of the duty of loyalty to the Members, the Company or any of its Subsidiaries, (3) arise from a transaction in which such Manager or officer derived an improper personal benefit, (4) are attributable to acts or omissions of such Manager or officer that constitute a knowing violation of law, (5) are attributable to any Proceeding (except an action to enforce the indemnification rights set forth in this Section 8.2(a) or to enforce the rights to advancement of expenses set forth in Section 8.2(b)) initiated by such Covered Person unless if such Proceeding was authorized in the specific case by the Board, or (6) are attributable to any Proceeding by or in the right of the Company or any of its Subsidiaries unless if the Board authorizes the indemnification of any such Damages (except that, to the extent any such Covered Person has been successful on the merits or otherwise in the defense of any such Proceeding by or in the right of the Company or any of its Subsidiaries or in defense of any claim, issue or matter therein, then such Covered Person shall be indemnified against expenses actually and reasonably incurred by such Covered Person in connection therewith).  If for any reason the foregoing indemnification is unavailable to a Covered Person, or is insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Covered Person as a result of the applicable Damages in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Covered Person on the other hand or, if such allocation is not permitted by applicable law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations.

(b)　　If a Covered Person is or was made, or threatened to be made, a party to or is involved in any threatened, pending or completed Proceeding, whether civil, criminal, administrative or investigative, or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, (i) in connection with any matter arising out of or in connection with the Company's or any of its Subsidiaries' business or affairs, (ii) by reason of the fact that such Covered Person is serving or has served in one or more of the capacities set forth in the definition of "Covered Person" or (iii) by reason of the fact that such Covered Person, or a Person of whom such Covered Person is the legal representative, is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any Other Entity, the Company shall pay, within a reasonable period of time following the Company's receipt of reasonably detailed supporting documentation, to such Covered Person such Covered Person's reasonable and documented out-of-pocket legal and other expenses (including legal and other professional fees and disbursements, and the cost of any investigation and preparation) incurred in connection therewith in advance of the final disposition of such Proceeding; provided, that such Covered Person shall promptly repay to the Company the amount of any such expenses paid to it if it shall be determined that such Covered Person is not entitled to be indemnified by the Company in connection with such Proceeding as provided in the proviso contained in Section 8.2(a); provided, further that, with respect to a Covered Person described in clause (B) of Section 8.2(a), the Company shall not be required to pay in advance or otherwise any such expenses incurred by any such Covered Person in connection with (A) any Proceeding initiated by such Covered Person unless if such Proceeding was authorized in the specific case by the Board or (B) any Proceeding

by or in the right of the Company or any of its Subsidiaries unless if the Board authorizes the payment of any such expenses.

(c)    The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this Section 8.2 shall not be deemed exclusive of any other rights to which a Covered Person seeking indemnification, reimbursement or advancement of expenses, or contribution may have or hereafter be entitled under any statute, this Agreement, any other agreement (including any policy of insurance purchased or provided by the Company under which any Covered Person is covered), any vote of the Members or Managers, or otherwise.  The rights conferred upon any Covered Person in Section 8.1 and Section 8.2 shall be contract rights that vest upon the occurrence or alleged occurrence of any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, or any other fact, circumstance or matter, giving rise to any losses, claims, expenses, damages or liabilities (whether or not arising out of a Proceeding) that are covered by Section 8.1 and/or Section 8.2, and such rights shall apply to a Person that was a Covered Person even after such Person ceases to be a Covered Person, but only with respect to any such losses, claims, expenses, damages or liabilities arising from any judgment, decision or action made, taken or performed, or omitted to be made, taken or performed, or any other fact, circumstance or matter that occurred, during the period in which such Person was a Covered Person.

(d)    The rights to indemnification, reimbursement and advancement of expenses, and contribution provided by, or granted pursuant to, this Section 8.2 shall inure to the benefit of the successors, heirs, executors and administrators of a Covered Person.

(e)    The Company shall have the power to purchase and maintain insurance on behalf of any Covered Person to protect such Covered Person against any Damages, whether or not the Company would have the power to indemnify such Covered Person against any such Damages under the provisions of this Section 8.2 or under any provision of law.

(f)    No amendment or repeal of any part of this Section 8.2 shall apply to or have any effect on any right to indemnification, reimbursement and advancement of expenses, and contribution provided hereunder with respect to any acts or omissions occurring prior to such amendment or repeal.

8.3    No Member Liability.  Any indemnification, reimbursement and advancement of expenses, or contribution provided under this Article 8 shall be satisfied solely out of assets of the Company, as an expense of the Company.  No Member shall be subject to personal liability by reason of the indemnification, reimbursement and advancement of expenses, or contribution provisions set forth in this Article 8.

8.4    Settlements.  The Company shall not be liable for any settlement by a Covered Person of any Proceeding effected without its written consent, but if settled with such written consent, or if there is a final judgment against such Covered Person in any such Proceeding, the

Company agrees to indemnify and hold harmless such Covered Person to the extent provided above from and against any Damages by reason of such settlement or judgment.

    8.5    <u>Business Opportunities; Fiduciary Duties</u>.

    (a)    The Company and each Member acknowledge that (i) each Member (other than any Member who is a Manager or an <u>officer or an</u> employee of the Company or any of its Subsidiaries, any Member that is a Family Member of any Manager or any <u>officer or</u> employee of the Company or any of its Subsidiaries, or any Member that is controlled by any Manager or any <u>officer or</u> employee of the Company or any of its Subsidiaries or controlled by any such Manager's<u>, officer's</u> or employee's Family Members) and (ii) each Affiliate, manager, director, principal, officer, employee and other representative of any Member described in <u>clause (i)</u> (other than any such Person that is a Manager or an <u>officer or</u> employee of the Company or any of its Subsidiaries, any such Person that is a Family Member of any Manager or any <u>officer or</u> employee of the Company or any of its Subsidiaries, or any such Person that is controlled by any Manager or any <u>officer or</u> employee of the Company or any of its Subsidiaries or controlled by any such Manager's<u>, officer's</u> or employee's Family Members) (the foregoing Persons being referred to, collectively, as "<u>Identified Persons</u>" and, each individually, as an "<u>Identified Person</u>") may now engage, may continue to engage, and/or may, in the future, decide to engage, in the same or similar activities or lines of business as those in which the Company or any of its Subsidiaries, directly or indirectly, now engage or may engage and/or other business activities that overlap with, are complementary to, or compete with those in which the Company or any of its Subsidiaries, directly or indirectly, now engage or may engage (any such activity or line of business, an "<u>Opportunity</u>").  No Identified Person shall have any duty to refrain, directly or indirectly, from (x) engaging in any Opportunity, (y) offering or directing any Opportunity to another Person (including any Affiliate of such Identified Person) or (z) otherwise competing with the Company or any of its Subsidiaries.  No Identified Person shall have any duty or obligation to refer or offer to the Company or any of its Subsidiaries any Opportunity, and the Company hereby renounces, on behalf of itself and each of its Subsidiaries, any interest or expectancy of the Company or any of its Subsidiaries in, or in being offered, an opportunity to participate in any Opportunity engaged in by any Identified Person which may be a corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries.

    (b)    In the event that any Identified Person acquires knowledge of an Opportunity which may be a corporate (or analogous) or business opportunity for the Company or any of its Subsidiaries, such Identified Person shall have no duty to communicate, offer or otherwise make available such Opportunity to the Company or any of its Subsidiaries and shall not be liable to the Company, any of its Subsidiaries or any of the Members for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself, or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person).

    (c)    The Company, on behalf of itself and each of its Subsidiaries, and each Member (i) acknowledge that the Identified Persons may now own, may continue to own,

and from time to time may acquire and own, investments in one or more other Entities (each such Entity, a "Related Company" and all such Entities, collectively, "Related Companies"), including Entities that are competitors of, or that otherwise may have interests that do or could conflict with those of, the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates, and (ii) agree that (A) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Agreement shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Agreement (if any) shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (x) the ownership by an Identified Person of any interest in any Related Company, (y) the affiliation of any Related Company with an Identified Person or (z) any action taken or omitted by any Related Company or an Identified Person in respect of any Related Company, (B) no Identified Person shall, by reason of such ownership, affiliation, action or omission, become subject to any fiduciary duty to the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates, (C) nothing in this Agreement and none of the duties imposed on an Identified Person, whether by contract or law, if any, do or shall limit or impair the right of any Identified Person to, directly or indirectly, purchase or sell the securities or indebtedness of any other Entity or to compete with the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates as if the Identified Persons were not a party to this Agreement and (D) the Identified Persons are not and shall not be obligated to disclose to the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Company, any of its Subsidiaries, any of the Members or any of their respective Affiliates in any such business or as to any such opportunities.

(d)    To the fullest extent permitted by law, this Agreement is not intended to, and does not, create or impose any fiduciary or other duty on any Identified Person, other than those non-fiduciary duties that are expressly set forth in this Agreement and a duty to act in accordance with the implied contractual covenant of good faith and fair dealing to the extent required by Delaware law.  Further, to the fullest extent permitted by law, the Company and each Member hereby irrevocably waive any and all fiduciary duties owed to the Company or such Member by any Identified Person (including those fiduciary duties that, absent such waiver, may be implied by law), and in doing so, the Company and each Member recognize, acknowledge and agree that the duties and obligations of the Identified Persons to the Company, each other Member and each other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement are only as expressly set forth in this Agreement.  To the fullest extent permitted by law, no Identified Person shall owe any duty (including any fiduciary duty) to the Company or to any Member or to any other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement other than those non-fiduciary duties that are expressly set forth in this Agreement and a duty to act in accordance with the implied contractual covenant of good faith and fair dealing to the extent required by Delaware law.  The parties acknowledge and agree that any Identified Person acting in accordance with this Agreement shall (i) be

deemed to be acting in compliance with such implied contractual covenant, and (ii) not be liable to the Company, to any Member or to any other Person that is a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement for its reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of an Identified Person otherwise existing at law or in equity in respect of the Company, any of the Members or any other Person that is or becomes a party to or is otherwise bound by (or is or becomes a beneficiary of) this Agreement, are agreed (and shall be deemed to have been agreed) by the Company, the Members or all such other Persons to replace fully and completely such other duties and liabilities.

(e)     Each Manager, in his or her capacity as such, shall have the same fiduciary duties as those of a member of a board of directors of a corporation organized under the laws of the State of Delaware, subject to the obligations of the Managers and the Company under this Agreement; provided, that no Manager shall be personally liable for any monetary damages to the Company or any of the Members for breach of the duty of care, subject to the same limitations on such limitation as contemplated by Section 102(b)(7) of the Delaware General Corporation Law. Each employee and officer of the Company, in its capacity as such, shall have the same fiduciary duties as an employee or officer (as applicable) of a corporation organized under the laws of the State of Delaware, subject to the obligations of the employees and officers of the Company and the Company under this Agreement; provided, that, to the extent determined by the Board, no officer, shall be personally liable for any monetary damages to the Company or any of the Members for breach of the duty of care, subject to the same limitations on such limitation as contemplated by Section 102(b)(7) of the Delaware General Corporation Law.

(f)     Nothing in this Section 8.5 shall be deemed to limit any Member's obligations under Section 18.1.

8.6     Subrogation. In the event that any Covered Person who is or was a partner, shareholder, member, officer, director, manager, fund adviser, investment adviser, investment manager, controlling person, employee, consultant, counsel, representative or agent of a Member or any of its Affiliates is entitled to indemnification under Section 8.2 for which such Covered Person is also entitled to indemnification from such Member or any of its Affiliates (other than the Company or any of its Subsidiaries), the Company hereby agrees that its duties to indemnify such Covered Person, whether pursuant to this Agreement or otherwise, shall be primary to those of such Member or such Affiliate, and to the extent that such Member or such Affiliate actually indemnifies any such Covered Person, such Member or such Affiliate shall be subrogated to the rights of such Covered Person against the Company for indemnification hereunder. The Company hereby acknowledges the subrogation rights of each Member and its Affiliates under such circumstances and agrees to execute and deliver such further documents and/or instruments as such Member or its Affiliate may reasonably request in order to evidence any such subrogation rights, whether before or after such Member or its Affiliate makes any such indemnification payment. The Company shall pay any amounts due under this Section 8.6, in cash, promptly, and in any event within fifteen (15) days, upon written demand therefor (accompanied by reasonably detailed supporting documentation) from a Member. The Company hereby waives any right against each of the Members and their respective Affiliates to

indemnification, subrogation, or contribution.  Furthermore, the Company and the Members expressly agree that each Covered Person is an intended third-party beneficiary as to the indemnification provisions of this Agreement and shall be entitled to bring suit against the Company to enforce said provisions.  The provisions of this <u>Section 8.6</u> shall equally apply to a Covered Person's rights to reimbursement and advancement of expenses and contribution under <u>Section 8.2</u>.

8.7    <u>Insurance</u>.  The Company shall purchase and maintain, at the Company's expense, insurance (the "<u>Specified Insurance</u>") on behalf of all managers (including Managers), directors and officers of the Company and its Subsidiaries to protect any such Person against any expense, liability or loss suffered or incurred by, imposed on, or to which such Person may become subject (a) in connection with any matter arising out of or in connection with the Company's or any of its Subsidiaries' business or affairs, (b) by reason of the fact that such Person is serving or has served as an officer, manager or director of the Company or any of its Subsidiaries or (c) by reason of the fact that such Person is or was serving as a manager, officer, member, employee or agent or in any other capacity, at the request of the Company, for any Other Entity, in any such case based on acts, omissions, facts, circumstances or matters occurring or arising on or after the Effective Date; <u>provided</u>, <u>however</u>, that the Specified Insurance shall be subject to (i) exclusions and exceptions that are customary for such insurance, and (ii) retentions and limitations as the Board determines to be reasonable in light of the premiums to be paid for the Specified Insurance.  Any Specified Insurance shall be satisfactory to the Board.

8.8    <u>Amendments</u>.  Notwithstanding anything herein to the contrary, no amendment, repeal or modification of this <u>Article 8</u> shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any Proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

## ARTICLE 9
## TRANSFERS

9.1    <u>Restrictions on Transfers</u>.

(a)    *Prohibited Transfers*.  Without limiting any other provisions, restrictions or conditions of this <u>Article 9</u>, unless otherwise waived by the Board in its sole discretion, no Units shall be Transferred by any Member (regardless of the manner in which the Transferor initially acquired such Units), if:

(i)    such Transfer would, if consummated, result in any violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Company or any of its Subsidiaries;

(ii)    such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers for which a notice thereof has been previously delivered to the Company, but not yet consummated), result in the Company having, in the aggregate, (A) 1,000 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act), or

(B) 400 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) that are not Accredited Investors, of either (x) the class of Units proposed to be Transferred (assuming, for purposes of this clause (x), that all issued and outstanding securities of the Company that are exercisable or exchangeable for, or convertible into, directly or indirectly, the class of Units proposed to be Transferred were exercised, exchanged or converted at the time of such Transfer) or (y) any class of Units into which the Units proposed to be Transferred are convertible (such Units, "Conversion Units") (assuming, for purposes of this clause (y), that all issued and outstanding securities of the Company that are exercisable or exchangeable for, or convertible into, directly or indirectly, Conversion Units were exercised, exchanged or converted at the time of such Transfer), unless at the time of such Transfer the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act; provided, that the numbers 1,000 and 400 as used in this Section 9.1(a)(ii) shall be increased by the number of such holders that acquire from the Company, after the Effective Date, Units of the class proposed to be Transferred, Conversion Units, or securities of the Company that are exercisable or exchangeable for, or convertible into, Units of the class proposed to be Transferred or Conversion Units, in any such case other than any such acquisition (1) that was made by a holder who held any such Units, Conversion Units or securities prior to such acquisition (including in connection with a distribution to all holders of any such Units, Conversion Units or securities) or (2) made through a distribution under the Plan of Reorganization;

(iii)    such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers for which a notice thereof has been previously delivered to the Company, but not yet consummated), require the Company to register any class of Units or other equity securities of the Company under the Exchange Act (as a result of the number of holders of such Units or equity securities or otherwise), unless, at the time of such Transfer, the Company is already subject to the reporting obligations under Section 13 or Section 15(d) of the Exchange Act;

(iv)    such Transfer would, in the judgment of the Board, cause the Company to be required to register as an "investment company" under the Investment Company Act;

(v)    such Transfer would, if consummated (after taking into account the consummation of any other proposed Transfers for which a notice thereof has been previously delivered to the Company, but not yet consummated), cause the underlying assets of the Company to be deemed "plan assets" as defined under and pursuant to the Plan Asset Regulation or constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code;

(vi)    such Transfer is not to an Accredited Investor;

(vii)    such Transfer is to any Competitor; or

(viii)   such Transfer is to any Sanctioned Person.

(b)    *Certificates; Legal Opinion.*  In addition to the restrictions set forth in Section 9.1(a), no Units shall be Transferred by any Member unless (i) the certificates (if any) representing such Units bear legends as provided in Section 9.1(e) (or, with respect to uncertificated Units, notice of such legends is provided in accordance with applicable law), for so long as such legends are applicable; (ii) either (A) the Transferee is an Affiliate of the Transferor or (B) prior to such Transfer (unless waived by the Company in its sole discretion), the Transferee and the Transferor shall have delivered to the Company representation letters in such form as may be approved from time to time by the Company (including a representation from the Transferee that the Transferee is an Accredited Investor); and (iii) in the case where the Transferee is not an Affiliate of the Transferor, if requested by the Company prior to five (5) Business Days after delivery of the Transfer Notice, the Transferor shall have delivered to the Company a legal opinion, reasonably acceptable to the Company, stating that the registration of the Units that are the subject of such proposed Transfer is not required under the Securities Act or any applicable state securities or "blue sky" laws.

(c)    *Notice of Transfer.*  Subject to Section 9.3, and unless otherwise waived by the Company, any Member proposing to effect a Transfer of Units must submit to the Company, not less than five (5) Business Days prior to such Transfer, a written notice (a "Transfer Notice") of such Transfer.  A Transfer Notice shall be delivered to the Company, to the attention of (i) the Secretary, the Chief Operating Officer or Chief Financial Officer, or any of their designees, and (ii) the Chairperson, in each case in accordance with Section 17.5.  A Transfer Notice shall include or be accompanied by (A) the name, address, e-mail address and telephone number of the Transferor and the Transferee, (B) a certification from the Transferee whether the Transferee is an Affiliate of the Transferor, (C) a certification from the Transferee that the Transferee is not a Sanctioned Person, (D) a certification from the Transferee that the Transferee is not a Competitor under clause (a) or clause (c) of the definition of "Competitor", (E) the number and class and/or series of Units proposed to be Transferred to, and acquired by, the Transferee, (F) the date on which the Transfer is proposed to be effective, (G) the percentage of the Transferor's total number of Units of the same class and/or series to be Transferred, (H) a Joinder Agreement, duly completed and executed by the Transferee to the extent such Transferee has not already signed a counterpart of this Agreement or executed a Joinder Agreement, (I) an AI Questionnaire, duly completed and executed by the Transferee, (J) an IRS Form W-9 or appropriate IRS Form W-8, as applicable, duly completed and executed by the Transferee to the extent such Transferee has not already delivered to the Company such a duly completed and executed tax form that is not obsolete, inaccurate or expired, and (K) a request that the Company instruct the Transfer Agent to register the Transfer in the Register of Members.  So long as the other provisions of this Section 9.1 are satisfied and complied with, the Company shall, within five (5) Business Days after a Transfer Notice is delivered to the Company (but in no event earlier than the proposed effective date of Transfer specified in the Transfer Notice), instruct and use commercially reasonable efforts to cause the Transfer Agent to

register the Transfer in the Register of Members unless, (I) prior to the expiration of such five (5) Business Day period, the Company requests information demonstrating that the Transfer complies with this <u>Section 9.1</u> (including information demonstrating that the Transferee is not a Competitor or a Sanctioned Person) or (II) the Transferor by written notice to the Company withdraws the related Transfer Notice prior to registration of the Transfer.  If any such request for information is made, the Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to register the Transfer in the Register of Members no later than five (5) Business Days after the Company receives such information (but in no event earlier than the proposed effective date of Transfer specified in the Transfer Notice), unless the Company determines during any such five (5)-Business Day period that the Transfer is not permitted pursuant to the terms of this <u>Section 9.1</u>, in which case the Company shall promptly inform the Transferor of such determination.  Upon the closing of each Transfer that is permitted by this Agreement and the Transferee becoming a party to this Agreement, (x) such Transferee shall be admitted as, and deemed to be, a Member for purposes of this Agreement, (y) such Transferee shall be entitled to the rights (excluding any rights of a Member that are not assignable or otherwise transferable pursuant to the terms of this Agreement), and subject to the obligations, of a Member with respect to the Transferred Units and (z) the Company shall instruct and use commercially reasonable efforts to cause the Transfer Agent to amend and update the Register of Members to reflect such Transfer.

(d)      *Prohibited Transfers Void.*  The Company shall not instruct or cause the Transfer Agent to register the Transfer of any Units in the Register of Members except for Transfers that are consummated in accordance with the terms and provisions of this Agreement and, in the case of any Class B Units, the terms and provisions of any applicable Management Incentive Plan and/or Award Agreement.  Any purported Transfer of Units in violation of such terms and provisions shall be void *ab initio* and shall not be recognized by the Company.

(e)      *Legends*.

(i)      All certificates (if any) or statements related to book-entry accounts (if any) representing or otherwise evidencing any Units that were issued under the Plan of Reorganization shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to <u>Section 9.1(e)(iv)</u> below):

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. § 1145.  THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH LIMITED LIABILITY COMPANY INTERESTS IS AN "UNDERWRITER,"

AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

(ii)    All certificates (if any) or statements related to book-entry accounts (if any) representing or otherwise evidencing any Units (excluding Units that were issued under the Plan of Reorganization) shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to Section 9.1(e)(iv) below):

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

(iii)    All certificates (if any) or statements related to book-entry accounts (if any) representing or otherwise evidencing any Units shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to Section 9.1(e)(iv) below):

"THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF [●]FUSION PARENT, LLC (THE "COMPANY") DATED AS OF JUNE [●6], 2025 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "LLC AGREEMENT") BY AND AMONG THE COMPANY AND THE MEMBERS OF THE COMPANY. NO REGISTRATION OR TRANSFER OF THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WILL BE MADE ON THE BOOKS OF THE COMPANY OR ITS TRANSFER AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE COMPANY OR ITS TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] A COPY OF THE LLC AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING

RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF LIMITED LIABILITY COMPANY INTERESTS, UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS."

(iv)    In the event that any Units shall be registered for Transfer under the Securities Act, the Company shall, upon the written request of the holder of such Units, issue to such holder a new certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Units without the legend required by Section 9.1(e)(i) or Section 9.1(e)(ii).  In the event that any Units shall cease to be subject to the restrictions on Transfer set forth in this Section 9.1, the Company shall, upon the written request of the holder of such Units, issue to such holder a new certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Units without the legend required by Section 9.1(e)(iii).

(v)    In the case of uncertificated Units, the Company shall provide notice to the Members of the applicable legends required by Sections 9.1(e)(i), 9.1(e)(ii) and 9.1(e)(iii) in accordance with applicable law.

(vi)    Each Member shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Agreement (including the restrictions on Transfer set forth in this Section 9.1) for all purposes of this Agreement and applicable law (including the Act and the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any certificate or statement of book-entry position, as applicable, representing or otherwise evidencing any Units owned or held by such Member bears the applicable legends set forth in Sections 9.1(e)(i), 9.1(e)(ii) and 9.1(e)(iii) and whether or not any such Member received a separate notice of such terms, provisions, restrictions and conditions.

(f)    *Transfers of Class B Units*.  Anything in this Agreement to the contrary notwithstanding, Class B Units shall not be Transferred by any Member unless such Transfer also complies with any restrictions on Transfer set forth in the applicable Management Incentive Plan and/or any applicable Award Agreement (which restrictions may be in addition to, and/or more restrictive than, the restrictions on Transfer of Units set forth in this Agreement).

(g)    *Certain Members*.  If any Member is an Entity that has no substantial assets other than Units and/or indebtedness of, or securities in, the Company or any of its Subsidiaries, then such Member agrees that no Equity Interests in such Member may be sold, transferred or otherwise disposed to any Person other than in accordance with the terms and provisions of this Section 9.1 as if such Equity Interests were Units; provided, that a sale, transfer or other disposition of Equity Interests in such Member to any Affiliate of such Member (other than to any Affiliate of such Member that is a portfolio company of such Member or any of its other Affiliates) shall not be subject to this Section 9.1(g).

-50-

(h)     *No Requirement to List*.  The Company shall have no obligation under this Agreement to list any of the Units or other Interests on any securities exchange, automated quotation system or over-the-counter marketplace.

(i)     *Transfers to the Company*.  A Transfer of Units to the Company shall not be subject to the requirements of this Section 9.1.

(j)     *Reimbursement of Company Expenses*.  The Transferor and the Transferee shall be jointly and severally obligated to reimburse the Company for all reasonable out-of-pocket third-party costs and expenses (including legal fees) incurred by the Company in connection with any Transfer or proposed Transfer of such Transferor's Units (excluding any Transfer or proposed Transfer pursuant to Section 9.3 or otherwise pursuant to a Sale Transaction).

(k)     *Modifications to Procedural Provisions*.  Notwithstanding anything herein to the contrary, the Company may, in its sole discretion, waive or modify the application of any term or provision of a procedural nature set forth herein to any Transfer so long as such waiver or modification (i) is for administrative convenience purposes to facilitate the consummation of such Transfer, (ii) does not adversely affect the rights of any of the Members, (iii) does not subject any of the Members to any additional obligations or liabilities, and (iv) is approved by the Transferor and the ultimate Transferee of such Transfer (which approval may be provided by e-mail to the Company in accordance with Section 17.5).  The right of the Company to make any such waiver or modification need not be uniform among Transfers and may be made by it selectively among any Transfers (whether or not such Transfers are similar in nature).  Any such waiver or modification shall not require any consents or approvals of the Members under Section 14.1.

9.2     Transfer Agents; Regulations.  The Company, by resolution or written consent of the Board, may from time to time appoint a Transfer Agent (which may be the Company) under such arrangements and upon such terms and conditions as the Board deems advisable.  Unless the Board has appointed some other Person as its Transfer Agent (and upon the revocation of any such appointment, thereafter until a new appointment is similarly made) the Secretary, or any Person designated by the Secretary, shall be the Transfer Agent without the necessity of any formal action of the Board, and the Secretary, or any Person designated by the Secretary, shall perform all of the duties of the Transfer Agent.  The Board may make such rules and regulations as it may deem expedient and as are not inconsistent with this Agreement, concerning the issue, registration and Transfer of certificates for Units.

9.3     Drag-Along Transactions.

(a)     In the event that the Majority Members at the time of the delivery of a Drag Notice (for purposes of this Section 9.3, each, a "Selling Member" and, collectively, the "Selling Members") determine to effect, approve or otherwise take any action that would cause the occurrence of, or desire to consummate, a Sale Transaction (whether or not a Member vote is required) to or with any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision)

other than the Selling Members or any Affiliates thereof (a "Third Party Purchaser") (any such Sale Transaction, a "Drag-Along Transaction"), the Company or the Selling Members (or a designated representative acting on behalf of the Selling Members) will have the right (but not the obligation) to deliver written notice thereof at least five (5) Business Days prior to the consummation of the proposed Sale Transaction (a "Drag Notice") to all other Members (each, a "Dragged Member" and, collectively, the "Dragged Members"), including any holders of Class B Units.  Such written notice shall be delivered to the Dragged Members in accordance with Section 17.5 and shall contain a reasonable description of the material terms and conditions of the Drag-Along Transaction, including the amount and form of consideration to be paid by the Third Party Purchaser, the identity of the proposed third Party Purchaser and copies of any Drag-Along Transaction Documents or Investment Documents that the Dragged Members will be required to execute and deliver in connection with such Drag-Along Transaction (to the extent such documents exist and are in substantially final form at the time such Drag Notice is delivered to the Dragged Members) and the proposed date (which may be an estimated date or range of dates) for the closing of the Drag-Along Transaction.

(b)    If a Drag Notice is delivered by the Company or by or on behalf of the Selling Members to the Dragged Members, each of the Dragged Members shall:

(i)    if such Drag-Along Transaction is structured as a Transfer of Units (including any Transfer of Units by way of a merger of the Company with any other Person), be obligated to Transfer to the Third Party Purchaser (subject to the other terms of this Section 9.3(b)), at the closing of such Drag-Along Transaction, all Units held by such Dragged Member (or the applicable portion of such Dragged Member's Units that are required to be Transferred in connection with such Drag-Along Transaction, as determined in accordance with Section 9.3(c)) on purchase terms and conditions that are substantially the same as those purchase terms and conditions applicable to the Units of the Selling Members of the same class or series (excluding any investment or reinvestment opportunity given to management of the Company or any of its Subsidiaries), free and clear of any Liens (other than Permitted Liens); provided, that if the Selling Members are given an option as to the form of consideration to be received in exchange for their Units of any class or series, then each of the Dragged Members need only be given the same option with respect to their Units of the same class or series;

(ii)    if such Drag-Along Transaction is structured as a sale or transfer of assets (including by or through the sale, issuance or other disposition of the Equity Interests of, or reorganization, merger, unit or share exchange, consolidation or other business combination involving, any direct and/or indirect Subsidiary or Subsidiaries of the Company), approve any subsequent dissolution and liquidation of the Company or any of its Subsidiaries in connection therewith and execute and/or deliver any applicable documents, instruments or agreements related thereto;

(iii)    (A) be required to vote (including by written consent) such Dragged Member's Units (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Drag-Along Transaction, and (B) not raise any objection against such Drag-Along Transaction (including objections relating to the consideration being paid in connection therewith) or the process pursuant to which it was arranged, negotiated or consummated;

(iv)    execute and deliver any applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Drag-Along Transaction (on terms substantially the same as those terms applicable to the Selling Members) that the Company, the Selling Members or the Third Party Purchaser may request and which are executed and delivered by the Selling Members (the "Drag-Along Transaction Documents"), and (A) agree to or provide the same covenants, obligations, indemnities and agreements as agreed to or provided by the Selling Members set forth therein and (B) make the same representations and warranties as the Selling Members, on a several and not joint basis, regarding organization, existence and good standing of such Dragged Member, the power and authority of such Dragged Member to enter into the Drag-Along Transaction, due authorization, execution and delivery by such Dragged Member of the Drag-Along Transaction Documents and the Investment Documents, enforceability against such Dragged Member of the Drag-Along Transaction Documents and the Investment Documents, good and marketable title (free and clear of all Liens) of the Units of such Dragged Member, the consents and notices required to be obtained or made by such Dragged Member in connection with such Drag-Along Transaction, no conflicts with organizational documents, contracts or law applicable to such Dragged Member, no legal proceedings against such Dragged Member, no brokers' fees owed by such Dragged Member in connection with such Drag-Along Transaction, and other matters reasonably requested by the Third Party Purchaser with respect to such Dragged Member and related to such Drag-Along Transaction; provided, however, that (x) no Dragged Member shall be required to provide any indemnity relating to such Drag-Along Transaction that is in excess of the amount of proceeds payable to such Dragged Member in connection with such Drag-Along Transaction (other than on account of such Dragged Member's own fraud), (y) any escrow arrangement or indemnity shall be allocated among each Selling Member and Dragged Member pro rata based upon the allocation among each such Member of the consideration payable in respect of Units in the Drag-Along Transaction; provided, that, subject to the limitations set forth in clause (x), any indemnities on account of a Dragged Member's representations and warranties described in clause (B) above or a Dragged Member's own fraud or breach by such Dragged Member of covenants given by such Dragged Member shall be solely the responsibility of such Dragged Member, and (z) no Dragged Member shall be required to provide any non-competition, non-solicitation or similar covenant other than customary confidentiality covenants;

(v)     if the Members will receive any Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in the continuing, acquiring, resulting or surviving entity in the Drag-Along Transaction, or any Affiliate thereof (the "Surviving Entity"), execute and deliver any applicable limited liability company agreement, stockholders agreement, partnership agreement, investor rights agreement, voting agreement or similar agreement which relates to the internal governance of the Surviving Entity and/or the rights or obligations of the owners of the Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in the Surviving Entity that the Company, the Selling Members or the Third Party Purchaser may request and which are executed and delivered by the Selling Members (the "Investment Documents"), and agree to or provide the same covenants, obligations and agreements as agreed to or provided by the Selling Members set forth therein; provided, that the Selling Members shall use commercially reasonable efforts to facilitate the granting to the Dragged Members of minority protections with respect to the Surviving Entity that are both customary and commensurate with its proportionate ownership in the Surviving Entity;

(vi)     use commercially reasonable efforts to obtain or make any consents or filings necessary to be obtained or made by such Dragged Member to effectuate such Drag-Along Transaction; provided, that no Dragged Member shall be required to agree to any material obligations or material restrictions in connection with obtaining regulatory approvals other than obligations to cooperate in the making thereof;

(vii)     without limiting the provisions of Section 5.6, waive and refrain from exercising any appraisal, dissenters or similar rights with respect to such Drag-Along Transaction;

(viii)     not (A) take any action that would reasonably be expected to impede or be prejudicial to such Drag-Along Transaction, (B) assert, at any time, any claim against the Company, any member of the Board (or any committee thereof), any member of any Subsidiary Governing Body or any other Member or any of its Affiliates (including any Selling Member and any of its Affiliates) in connection with such Drag-Along Transaction, or (C) except as permitted under and pursuant to Article 18, disclose to any Person any information related to such Drag-Along Transaction (including the identity of the Third Party Purchaser, the fact that discussions or negotiations are taking place concerning such Drag-Along Transaction, or any of the terms, conditions or other information with respect to such Drag-Along Transaction); and

(ix)     take all necessary or desirable actions reasonably requested by the Selling Members, the Third Party Purchaser and/or the Company in connection with the consummation of such Drag-Along Transaction, including voting such Dragged Member's Units (to the extent of any voting rights), whether by proxy,

voting agreement or otherwise, in favor of such Drag-Along Transaction and, if applicable, in favor of a Corporate Conversion in connection with such Drag-Along Transaction.

(c)    In the case of a Drag-Along Transaction pursuant to which the Selling Members are collectively Transferring less than one hundred percent (100%) of all of the Units owned or held by the Selling Members in the aggregate, each Dragged Member shall be required to Transfer a percentage of the Units owned or held by such Dragged Member equal to the quotient obtained by dividing (i) the total number of Units owned or held by the Selling Members that are proposed to be Transferred in such Drag-Along Transaction by (ii) the total number of Units owned or held by the Selling Members in the aggregate.

(d)    At the closing of any Drag-Along Transaction that is structured as a sale or other Transfer of Units in which the Selling Members have exercised their rights under this Section 9.3, each Dragged Member shall deliver at such closing, against payment of the purchase price therefor in accordance with the terms of the Drag-Along Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Third Party Purchaser) representing such Dragged Member's Units to be sold, duly endorsed for transfer or accompanied by duly endorsed instruments of transfer, and such other documents as are deemed reasonably necessary by any one or more of the Selling Members, the Third Party Purchaser and/or the Company for the proper transfer of such Units on the books of the Company or the Transfer Agent, free and clear of any Liens (other than Permitted Liens).

(e)    Each Selling Member and each Dragged Member will bear its *pro rata* share (based upon the allocation among each such Member of the consideration payable in respect of Units in the Drag-Along Transaction) of the costs and expenses of any Drag-Along Transaction to the extent such costs and expenses are incurred for the benefit of all Members or the Company and are not otherwise paid by the Company or the Third Party Purchaser.  Costs and expenses incurred by any Member on its own behalf will not be considered costs and expenses of the Drag-Along Transaction and will be borne solely by such Member.

(f)    The Company shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Drag-Along Transaction and not take any action which would reasonably be expected to impede or be prejudicial to any such Drag-Along Transaction.  Pending the completion of any proposed Drag-Along Transaction, the Company shall use commercially reasonable efforts to operate the Company and its Subsidiaries in the ordinary course of business and to maintain all existing business relationships in good standing (unless otherwise required by the Drag-Along Transaction Documents) and otherwise comply with the terms of the Drag-Along Transaction Documents to which it is a party.

(g)    The Company shall cooperate with the Selling Members to enter into a Drag-Along Transaction and to take any and all such further action in connection

therewith as the Selling Members may deem reasonably necessary or reasonably appropriate in order to consummate (or, if directed by the Selling Members, abandon) any such Drag-Along Transaction.  Neither the Company, any of its Subsidiaries nor any of the Selling Members shall have any liability if any Drag-Along Transaction is not consummated for any reason (including if the Selling Members elect to abandon such Drag-Along Transaction for any reason or for no reason).  Subject to the provisions of this Section 9.3, the Selling Members, in exercising their rights under this Section 9.3, shall have complete discretion over the terms and conditions of any Drag-Along Transaction effected hereby, including price, payment terms, conditions to closing, timing of closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows.  At the request of the Selling Members, the Board shall authorize and direct the Company and/or any now or hereafter created Subsidiary of the Company to execute such agreements, documents, applications, authorizations, registration statements and instruments as they may deem reasonably necessary or reasonably appropriate in connection with any Drag-Along Transaction.

(h)     IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED MEMBER TO VOTE SUCH DRAGGED MEMBER'S UNITS IN FAVOR OF A DRAG-ALONG TRANSACTION AND (WITHOUT LIMITING THE PROVISIONS OF SECTION 5.6) TO WAIVE ANY APPRAISAL, DISSENTERS OR SIMILAR RIGHTS THAT SUCH DRAGGED MEMBER HAS (OR MAY HAVE) WITH RESPECT TO ANY DRAG-ALONG TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 9.3(b), EACH DRAGGED MEMBER HEREBY IRREVOCABLY APPOINTS THE SELLING MEMBERS (AND EACH OF THEM) AS SUCH DRAGGED MEMBER'S TRUE AND LAWFUL PROXY AND ATTORNEY, WITH FULL POWER OF SUBSTITUTION, TO VOTE ALL UNITS OWNED OR HELD BY SUCH DRAGGED MEMBER OR OVER WHICH SUCH DRAGGED MEMBER HAS VOTING CONTROL TO EFFECTUATE SUCH VOTES AND WAIVERS FOR THE DURATION OF THE EXISTENCE OF THE COMPANY; PROVIDED, THAT SUCH PROXY AND ATTORNEY SHALL ONLY APPLY TO THE EXTENT SUCH DRAGGED MEMBER FAILS TO COMPLY WITH ANY OF ITS OBLIGATIONS PURSUANT TO THIS SECTION 9.3 WITHIN THREE (3) BUSINESS DAYS OF ANY OF THE SELLING MEMBERS MAKING A REQUEST IN WRITING IN RESPECT OF SUCH OBLIGATIONS.  IN ADDITION, IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED MEMBER TO EXECUTE AND DELIVER THE DRAG-ALONG TRANSACTION DOCUMENTS AND, IF APPLICABLE, THE INVESTMENT DOCUMENTS, AND TO TAKE ACTIONS IN CONNECTION WITH THE CONSUMMATION OF A DRAG-ALONG TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 9.3(b), EACH DRAGGED MEMBER HEREBY IRREVOCABLY GRANTS TO THE SELLING MEMBERS (AND EACH OF THEM) A POWER-OF-ATTORNEY TO SIGN ANY AND ALL SUCH DRAG-ALONG TRANSACTION DOCUMENTS AND, IF APPLICABLE, INVESTMENT DOCUMENTS, AND TO TAKE ANY AND ALL SUCH ACTIONS, IN THE NAME AND ON BEHALF OF SUCH DRAGGED MEMBER; PROVIDED, THAT SUCH POWER OF ATTORNEY SHALL ONLY APPLY TO THE EXTENT SUCH DRAGGED MEMBER FAILS TO COMPLY WITH ANY OF ITS OBLIGATIONS PURSUANT TO THIS SECTION 9.3 WITHIN THREE

(3) BUSINESS DAYS OF ANY OF THE SELLING MEMBERS MAKING A REQUEST IN WRITING IN RESPECT OF SUCH OBLIGATIONS. THE PROXIES AND POWERS OF ATTORNEY GRANTED BY EACH DRAGGED MEMBER PURSUANT TO THIS SECTION 9.3(h) ARE COUPLED WITH AN INTEREST, ARE IRREVOCABLE, AND SHALL NOT BE AFFECTED BY AND SHALL SURVIVE THE DEATH, INCOMPETENCY, INCAPACITY, DISABILITY, MERGER, CONSOLIDATION, BANKRUPTCY, INSOLVENCY, LIQUIDATION OR DISSOLUTION OF ANY DRAGGED MEMBER.

(i)    Any Class B Units Transferred in a Drag-Along Transaction by a Selling Member or a Dragged Member shall immediately and automatically convert into Class A Units, subject to any vesting or other requirements of the applicable Management Incentive Plan and/or Award Agreement, upon the consummation of such Drag-Along Transaction, as determined by the Board.

(j)    A Transfer of Units in a Drag-Along Transaction by a Selling Member or a Dragged Member pursuant to this Section 9.3 shall not be subject to the requirements of Section 9.1 (other than Section 9.1(a)(i)).

(k)    For the avoidance of doubt, the obligations of the Company and the Dragged Members pursuant to this Section 9.3 shall apply irrespective of the amount of consideration (if any) to be paid to each Dragged Member pursuant to the Drag-Along Transaction.

9.4    Tag-Along Transactions.

(a)    In the event that one or more Members (acting alone or with other Members) who own or hold Class A Units (each, an "Initiating Holder" and, collectively, the "Initiating Holders") desire to effect a Tag-Along Transaction, the Initiating Holders (or a designated representative acting on their behalf) shall deliver written notice (a "Sale Notice") to all other Members that own or hold Class A Units (each, a "Tag-Along Seller" and, collectively, the "Tag-Along Sellers") and the Company, in accordance with Section 17.5, at least ten (10) Business Days prior to the consummation of such Tag-Along Transaction, offering the Tag-Along Sellers the opportunity to participate in such Tag-Along Transaction on the terms and conditions set forth in the Sale Notice (which terms and conditions shall be substantially the same as those terms and conditions (including at the same form of consideration and price) applicable to the Initiating Holders (except that if the Initiating Holders are given an option as to the form of consideration to be received in exchange for their Class A Units, each of the Tag-Along Sellers shall only need to be given the same option with respect to their Class A Units)); provided, however, that if the consideration to be paid in such Tag-Along Transaction consists, in whole or in part, of securities or any other non-cash consideration, then any Member that is not an Accredited Investor or any Member who does not, promptly following the request of the Initiating Holders or the Transferee in such Tag-Along Transaction (but in any event within three (3) Business Days after receipt of any such request), certify to the Initiating Holders and the Transferee in such Tag-Along Transaction that such Member is an Accredited Investor shall not be offered the

opportunity to participate in such Tag-Along Transaction and shall not be deemed a Tag-Along Seller for purposes of such Tag-Along Transaction.  The Sale Notice shall contain a reasonable description of the material terms and conditions of the Tag-Along Transaction, including the total number of Class A Units proposed to be Transferred, the proposed amount and form of consideration for the Class A Units proposed to be Transferred, the identity of the proposed Transferee, and copies of any Tag-Along Transaction Documents that the Tag-Along Sellers will be required to execute and deliver in connection with such Tag-Along Transaction (to the extent such documents exist and are in substantially final form at the time such Sale Notice is delivered to the Tag-Along Sellers).

(b)      Each Tag-Along Seller may, by written notice (each, an "Acceptance Notice") delivered to the Initiating Holders (or their designated representative) within five (5) Business Days after delivery of the Sale Notice to such Tag-Along Seller, elect to Transfer Class A Units in such Tag-Along Transaction, on the terms and conditions set forth in the Sale Notice; provided, however, that if the proposed Transferee in the Tag-Along Transaction desires to purchase a number of Class A Units that is less than the aggregate number of Class A Units proposed to be Transferred by the Initiating Holders and all Tag-Along Sellers electing to Transfer Class A Units in the Tag-Along Transaction, then the Initiating Holders may elect to either (i) terminate such Tag-Along Transaction with respect to the Initiating Holders and each Tag-Along Seller or (ii) consummate such Tag-Along Transaction on the basis of such lesser number of Class A Units and, upon such election to consummate the Tag-Along Transaction, each Initiating Holder and each electing Tag-Along Seller shall be permitted to Transfer to such Transferee up to that number of Class A Units owned or held by such Initiating Holder or such Tag-Along Seller, as the case may be, equal to the product of (x) the total number of Class A Units to be acquired by the Transferee in the proposed Tag-Along Transaction and (y) such Initiating Holder's or such Tag-Along Seller's (as applicable) proportionate percentage of the issued and outstanding Class A Units collectively owned or held by the Initiating Holders and all electing Tag-Along Sellers; provided, further, that if at any time after delivery of a Sale Notice there is a change in the price or other material change in the terms or conditions of the proposed Tag-Along Transaction described in such Sale Notice, then the Initiating Holders shall deliver a revised Sale Notice to all Tag-Along Sellers indicating such revised price and/or other material change, and each Tag-Along Seller shall have an additional five (5) Business Days after delivery of the revised Sale Notice to indicate whether or not it elects to Transfer Class A Units in such Tag-Along Transaction, on the terms and conditions set forth in the revised Sale Notice (it being understood and agreed that if a Tag-Along Seller elected to Transfer Class A Units in such Tag-Along Transaction prior to the commencement of such additional five-Business Day period, then such election will remain in effect unless such Tag-Along Seller revokes, amends or otherwise modifies such election in writing prior to the expiration of such additional five-Business Day period).

(c)      In connection with any Tag-Along Transaction in which any Tag-Along Seller elects to participate pursuant to this Section 9.4, each such Tag-Along Seller shall take all necessary or desirable actions reasonably requested by the Initiating Holders and/or the Transferee in such Tag-Along Transaction in connection with the

consummation of such Tag-Along Transaction, including (A) executing and delivering the applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Tag-Along Transaction that the Initiating Holders or the Transferee in such Tag-Along Transaction may request (the "Tag-Along Transaction Documents"); provided, that (x) any escrow arrangement or indemnity shall be allocated among each Tag-Along Seller and Initiating Holders pro rata based upon the allocation among each such Member of the consideration payable in respect of Units in the Tag-Along Sale and (y) no Tag-Along Seller shall be required to provide any non-competition, non-solicitation or similar covenant (other than customary confidentiality covenants) pursuant to such Tag-Along Transaction Documents, and (B) if the Initiating Holders and the Tag-Along Sellers will receive any Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in the Transferee or any other Person in connection with such Tag-Along Transaction, executing and delivering any applicable limited liability company agreement, stockholders agreement, partnership agreement, investor rights agreement, voting agreement or similar agreement which relates to the internal governance of such Transferee or such other Person and/or the rights or obligations of the owners of the Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in such Transferee or such other Person that Initiating Holders or the Transferee may request and which are executed and delivered by the Initiating Holders.  In connection with any Tag-Along Transaction that complies with this Section 9.4, no Member (whether or not a Tag-Along Seller) shall (i) take any action that would reasonably be expected to impede or be prejudicial to such Tag-Along Transaction, (ii) assert, at any time, any claim against the Company, any member of the Board (or any committee thereof), any member of any Subsidiary Governing Body or any other Member or any of its Affiliates (including any Initiating Holder and any of its Affiliates) in connection with such Tag-Along Transaction, or (iii) except as permitted under and pursuant to Article 18, disclose to any Person any information related to such Tag-Along Transaction (including the identity of the Transferee, the fact that discussions or negotiations are taking place concerning such Tag-Along Transaction, or any of the terms, conditions or other information with respect to such Tag-Along Transaction).

(d)    At the closing of any Tag-Along Transaction in which any Tag-Along Seller has elected to participate under this Section 9.4, such Tag-Along Seller shall deliver at such closing, against payment of the consideration therefor in accordance with the terms of the Tag-Along Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Transferee in such Tag-Along Transaction) representing its Class A Units to be Transferred, duly endorsed for transfer or accompanied by duly endorsed instruments of transfer, and such other documents as are deemed reasonably necessary by the Initiating Holders, the Transferee in such Tag-Along Transaction and/or the Company for the proper Transfer of such Class A Units on the books of the Company or the Transfer Agent, free and clear of any Liens (other than Permitted Liens).

(e)     Each Initiating Holder and each Tag-Along Seller electing to participate in a Tag-Along Transaction under this Section 9.4 will bear its *pro rata* share (based upon the allocation among each such Member of the consideration payable in respect of Class A Units in the Tag-Along Transaction) of the costs and expenses of any such Tag-Along Transaction to the extent such costs and expenses are incurred for the benefit of all such Members and are not otherwise paid by the Company or the Transferee.  Costs and expenses incurred by any such Member on its own behalf will not be considered costs of the Tag-Along Transaction and will be borne solely by such Member.

(f)     Subject to the provisions of this Section 9.4, the Initiating Holders shall have complete discretion over the terms and conditions of any Tag-Along Transaction, including price, payment terms, conditions to closing, timing of closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows.  Neither the Company, any of its Subsidiaries nor any of the Initiating Holders shall have any liability if any Tag-Along Transaction is not consummated for any reason (including if the Initiating Holders elect to abandon such Tag-Along Transaction for any reason or for no reason).

(g)     The Company shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Tag-Along Transaction and not take any action which would reasonably be expected to impede or be prejudicial to any such Tag-Along Transaction.  Pending the completion of any proposed Tag-Along Transaction, the Company shall use commercially reasonable efforts to operate the Company and its Subsidiaries in the ordinary course of business and to maintain all existing business relationships in good standing (unless otherwise required by the Tag-Along Transaction Documents) and otherwise comply with the terms of the Tag-Along Transaction Documents to which it is a party.

(h)     If any Tag-Along Seller electing to participate in a Tag-Along Transaction materially breaches any of its obligations under this Section 9.4 in respect of such Tag-Along Transaction or any of its representations or obligations under any of the Tag-Along Transaction Documents, then, (i) at the option of the Initiating Holders, such Tag-Along Seller will not be permitted to participate in such Tag-Along Transaction and the Initiating Holders can proceed to close such Tag-Along Transaction excluding the sale of such Tag-Along Seller's Class A Units therefrom and, (ii) at the option of the Initiating Holders, the number of Class A Units to be Transferred by the Initiating Holders and the Tag-Along Sellers (excluding the breaching Tag-Along Seller) shall be recalculated pursuant to clause (ii) of Section 9.4(b) excluding the breaching Tag-Along Seller from such calculation.

(i)     The Initiating Holders shall have the right for a period of ninety (90) days after the expiration of the latest five (5) Business Day period referred to in Section 9.4(b) to consummate the Tag-Along Transaction.  In the event that the Initiating Holders have not consummated the Tag-Along Transaction within such ninety-day period, the Initiating Holders shall not thereafter consummate such Tag-Along Transaction unless the Initiating Holders again comply with the terms of this Section 9.4; provided, however,

that if such Tag-Along Transaction is unable to be consummated within such ninety-day period as a result of antitrust or other regulatory delay, then such ninety-day period shall be extended on account of such delay as necessary to permit the Initiating Holders to effect such Tag-Along Transaction.

(j)    The exercise or non-exercise of the rights of any of the Members under this <u>Section 9.4</u> to participate in one or more Tag-Along Transactions shall not adversely affect their rights to participate in subsequent Tag-Along Transactions subject to this <u>Section 9.4</u>.

9.5    <u>Appointment of Purchaser Representative</u>.  If the Selling Members enter into any negotiation or transaction for which Rule 506 of Regulation D (or any similar rule then in effect) promulgated by the SEC may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), each Dragged Member who is not an Accredited Investor shall, at the request of the Company or the Selling Members, appoint a "purchaser representative" (as such term is defined in Rule 501 of Regulation D) reasonably acceptable to the Company and the Selling Members in connection with such negotiation or transaction.

9.6    <u>Preemptive Rights</u>.

(a)    After the Effective Date, the Company shall not, and the Company shall not permit any of its Subsidiaries to, sell or issue to any Person (including any then-current Member) any (i) Equity Interests of the Company or any of its Subsidiaries, or (ii) options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests of the Company or any of its Subsidiaries (any such Equity Interests, options, warrants or securities, collectively, the "<u>Additional Securities</u>") (other than pursuant to an Excluded Issuance), unless the Company or its applicable Subsidiary first submits written notice (a "<u>Preemptive Rights Notice</u>") to each Member that owns or holds Class A Common Units identifying the material terms of the Additional Securities (including the price, number or amount and type of Additional Securities, and all other material terms thereof) and offers to each such Member (other than holders of Class B Units) that also demonstrates to the Company's reasonable satisfaction that such Member is an Accredited Investor (any such Member, a "<u>Preemptive Member</u>" and, collectively, the "<u>Preemptive Members</u>") the opportunity to purchase up to a portion of the Additional Securities (a "<u>Pro Rata Portion</u>") on such terms and conditions set forth in the Preemptive Rights Notice.  A Preemptive Member's Pro Rata Portion shall be equal to the product of (1) the total number or amount of Additional Securities subject to the sale or issuance and (2) a fraction, (A) the numerator of which is the number of Class A Units then owned or held by such Preemptive Member, and (B) the denominator of which is the total number of Class A Units then owned or held by all Preemptive Members collectively.

(b)    The Company's or its applicable Subsidiary's offer to each Preemptive Member shall remain open for a period of thirty (30) days after the Preemptive Rights Notice is delivered to such Preemptive Member in accordance with <u>Section 17.5</u>.  A Preemptive Member may accept such offer by delivering written notice of such

acceptance to the Company prior to the expiration of such thirty (30) day period, which notice shall set forth the number or amount of such Additional Securities to be purchased by such Preemptive Member (which, in any event, shall not exceed the number or amount equal to such Preemptive Member's Pro Rata Portion).  If not all Preemptive Members subscribe for their full respective Pro Rata Portions, then the Company shall notify in writing the fully-subscribing Preemptive Members of such fact and shall offer, or cause its applicable Subsidiary to offer, such fully-subscribing Preemptive Members the right to acquire such unsubscribed Additional Securities on the terms set forth in the Preemptive Rights Notice.  Each fully-subscribing Preemptive Member shall have the right to elect to purchase up to its pro rata share of such unsubscribed Additional Securities (in proportion to the Pro Rata Portions of all fully-subscribing Preemptive Members), by delivering written notice to the Company within two (2) Business Days from the date such offer from the Company or its applicable Subsidiary is delivered to such Preemptive Member. To the extent the procedure described in the preceding sentence does not result in the subscription of all unsubscribed Additional Securities, such procedure shall be repeated until there are no unsubscribed Additional Securities or until no Preemptive Member has elected to purchase additional unsubscribed Additional Securities.   A Preemptive Member's failure to respond to the Company by the expiration of such thirty (30) day period shall constitute a waiver of its rights under this Section 9.6 with respect to the purchase of Additional Securities, but shall not affect its rights with respect to any future issuances or sales of Additional Securities.

(c)     In the event that any Additional Securities are not subscribed for by the Preemptive Members in accordance with this Section 9.6, the Company or its applicable Subsidiary will have ninety (90) days after the expiration of the last period in which Preemptive Members are entitled to subscribe for Additional Securities to issue or sell the unsubscribed Additional Securities, at a price and upon other terms no more favorable to a purchaser of Additional Securities, in the aggregate, than those specified in the Preemptive Rights Notice delivered to the Preemptive Members pursuant to Section 9.6(a).   Following the earlier to occur of (i) the date the Company or its applicable Subsidiary issues or sells all such unsubscribed Additional Securities and (ii) the date of the expiration of the ninety (90) day period referred to in the immediately preceding sentence, the Company or its applicable Subsidiary will not issue or sell any Additional Securities (other than pursuant to an Excluded Issuance) without first offering such Additional Securities to each of the Preemptive Members in the manner provided in this Section 9.6.

(d)     Notwithstanding anything to the contrary set forth herein, the Company may comply with its obligations under this Section 9.6 by first selling or issuing to (or causing its applicable Subsidiary to sell or issue to) one or more Persons (including any of the Preemptive Members and/or any of their respective Affiliates) (each, an "Accelerated Acquirer") all or any portion of the Additional Securities contemplated to be issued or sold, and, promptly thereafter, offering to issue or sell to the Preemptive Members the number or amount of such Additional Securities the Preemptive Members would have been entitled to purchase pursuant to this Section 9.6 by applying Sections 9.6(a) and 9.6(b) as if the Company or its applicable Subsidiary had not first issued or sold all or the applicable portion of such Additional Securities to the Accelerated

Acquirer but rather had offered to issue or sell all of such Additional Securities to all Preemptive Members at the same time in accordance with the terms of those Sections (and the determination of the number or amount of such Additional Securities to be offered to any Preemptive Member in accordance with this sentence shall take into account any such Additional Securities that were previously purchased by such Preemptive Member and/or any of its Affiliates if such Preemptive Member and/or any of its Affiliates is an Accelerated Acquirer).  The Company or its applicable Subsidiary shall be permitted to pay the Accelerated Acquirer(s) a reasonable fee or premium (which may be nonrefundable) in connection with the issuance or sale of such Additional Securities to such Accelerated Acquirer(s), and it shall not be required that such fee or premium be shared with the Preemptive Members or taken into account in connection with the price to be paid by the Preemptive Members.  In the event that any Preemptive Member purchases Additional Securities pursuant to any such offer referred to in the immediately preceding sentence and, as a result thereof, the Accelerated Acquirer(s) would not have been permitted to purchase all of the Additional Securities they had purchased if all of the Additional Securities contemplated to be issued or sold had instead been offered to all Preemptive Members at the same time in accordance with Sections 9.6(a) and 9.6(b), then the Accelerated Acquirer(s) shall sell or transfer to the Company or its applicable Subsidiary, for a price equal to the original cost thereof (plus any accrued and unpaid yield or interest thereon, if applicable, but without reducing such cost by any fee or premium received by the Accelerated Acquirer(s) in connection therewith), the excess number or amount of Additional Securities that had been acquired by the Accelerated Acquirer(s).  If the Company issues or sells any Additional Securities to an Accelerated Acquirer pursuant to this Section 9.6(d), then the Company shall not make any Distributions on any of the Common Units (other than the issuance and sale of Additional Securities to Preemptive Members pursuant to this Section 9.6(d)) until after the consummation of the related process of offering and, if applicable, issuing or selling Additional Securities to Preemptive Members pursuant to this Section 9.6(d), unless a reserve is established that is sufficient to make Distributions on Additional Securities that may be issued or sold to Preemptive Members pursuant to this Section 9.6(d) and, if so issued to Preemptive Members, such Preemptive Members shall be entitled to receive such Distribution they would have received with respect to the applicable Additional Securities if they had actually held such Additional Securities on the record date of such Distribution.

(e)    If the Company and/or any of its Subsidiaries desires to sell or issue (other than in an Excluded Issuance) (i) any Additional Securities and (ii) any indebtedness or debt securities of the Company or any of its Subsidiaries that do not otherwise constitute Additional Securities, and the items described in clauses (i) and (ii) are to be sold or issued together in unit increments (or in any other stapled or attached form), then such unit increments shall be deemed Additional Securities for purposes of this Section 9.6 and the provisions of this Section 9.6 shall apply to such unit increments.

## ARTICLE 10
## FISCAL YEAR; BOOKS OF ACCOUNT; REPORTS

10.1    Fiscal Year.   The fiscal year of the Company (the "Fiscal Year") shall be established by the Board.

10.2    Books and Records.  The books and records of the Company may be kept at such place or places as may be from time to time designated by the Board.  The Company shall keep correct and complete books and records of account, including the amount of its assets and liabilities, minutes of its proceedings of its Members and the Board (and any committee of the Board) and the names and places of residence of its officers.

10.3    Tax Election.  The Company intends to be treated as an association taxable as a corporation for U.S. federal, state and local income Ttax purposes under Treasury Regulation section 301.7701-3 and under any corresponding provision of state or local law.  The Company shall file an Entity Classification Election (IRS Form 8832) to be treated as an association taxable as a corporation for U.S. federal income Ttax purposes, effective as of the date the Certificate of Formation was filed even if made thereafter, and any officer of the Company is authorized and empowered to make any such election.

10.4    Required Records.  To the fullest extent permitted under applicable law, each Member hereby waives its rights under Section 18-305(a) of the Act to obtain the information specified therein; provided, however, that to the extent that, notwithstanding such waiver, any such Member is entitled to receive such information, the receipt thereof shall be subject to all of the limitations set forth in Section 18-305 of the Act (including the right of the Managers to keep certain information confidential from the Members pursuant to Section 18-305(c) of the Act), and shall be limited to review of the Company's general ledger and those financial statements derived from it; provided, further, that the review of such information shall be at the sole cost and expense of such Member, during regular business hours of the Company, upon reasonable advance notice, in a manner as would not be unreasonably disruptive to the business or operations of the Company or any of its Subsidiaries, and subject to such other standards as may be established by the Board from time to time.  Except as expressly required by non-waivable provisions of applicable law and except as expressly set forth in Section 15.1, the Members shall have no rights to obtain, examine or inspect, or make copies or extracts of, any documents, materials or information relating to the Company or any of its Subsidiaries or any of their respective businesses, assets, operations, properties, financial and other conditions, prospects, or members, partners or shareholders.

10.5    Audits of Books and Accounts.  The Company's books and accounts shall be audited at such times and by such auditors as shall be specified and designated by vote or written consent of the Board.

## ARTICLE 11
## DISTRIBUTIONS

11.1    Distributions.

(a)    Subject to (i) the terms of <u>Section 6.19</u>, (ii) the other terms of this <u>Section 11.1</u>, (iii) the terms of <u>Section 11.2</u>, and (iv) the then existing agreements of the Company or its Subsidiaries relating to indebtedness or debt securities of the Company or any of its Subsidiaries, the Board may (but shall not be obligated to) cause the Company to make Distributions to the Members, at such times and in such amounts as the Board may determine in its sole discretion, and each Distribution shall be made to the Members that own or hold Class A Units and to the Members that own or hold Class B Units to the extent such Members owning or holding Class B Units are entitled to Distributions in respect of such Class B Units in accordance with this Agreement, the applicable Management Incentive Plan and/or any applicable Award Agreement (ratably among such Members based on their respective ownership, immediately prior to such Distribution, of the total number of issued and outstanding Class A Units and Class B Units entitled to Distributions in accordance with this Agreement, the applicable Management Incentive Plan and/or any applicable Award Agreement).

(b)    Anything in <u>Sections 11.1(a)</u> and <u>13.2</u> to the contrary notwithstanding, unless the Board otherwise approves, if any Member that owns or holds Class A Units shall not have (i) actually executed and delivered to the Company (A) a counterpart of this Agreement or a Joinder Agreement or (B) a completed AI Questionnaire as required pursuant to this Agreement, or (ii) provided the Company with such Member's Member Beneficial Ownership Information as required pursuant to this Agreement <u>or any representations, forms, certificates or other information required by Section 11.4</u>, in any such case at or prior to the time of any payment by the Company of any Distribution on account of Class A Units, then (x) such Member shall not receive, or be entitled to receive, any such Distribution on account of such Member's Class A Units until such Member executes and delivers or provides to the Company the applicable document(s) <u>and/or information</u> referred to in <u>clause (i)</u> or <u>clause (ii)</u> above, subject to the additional terms and provisions of this <u>Section 11.1(b)</u>, and (y) the Company shall hold back any Distributions that, except for this <u>Section 11.1(b)</u>, would otherwise have been paid or distributed to such Member in respect of such Member's Class A Units.  The Company shall not be required to pay any interest in respect of any cash, assets, property, securities or other amounts held back pursuant to the immediately preceding sentence.   The Company shall be free to use all such cash, assets, property, securities and other amounts as it sees fit and the Company shall not be under any obligation to pay such cash, assets, property, securities or other amounts into an escrow account (or any similar arrangement).  In the event that (I) any Member that owns or holds Class A Units is not paid or distributed a Distribution on account of such Member's Class A Units as a result of this <u>Section 11.1(b)</u>, and (II) such Member executes and delivers or provides the applicable document(s) <u>and/or information</u> referred to in <u>clause (i)</u> or <u>clause (ii)</u> above subsequent to the payment or distribution by the Company of such Distribution on account of other Class A Units, then, promptly following such execution and delivery or provision by such Member, the Company shall pay or distribute such Distribution to such Member that would have otherwise been payable or distributable pursuant to <u>Section 11.1(a)</u> or <u>Section 13.2</u> on account of such Member's Class A Units as of the record date for such Distribution, but held back pursuant to this <u>Section 11.1(b)</u>; <u>provided</u>, <u>however</u>, that the obligation of the Company to pay or distribute any such Distribution to such Member shall (X) terminate upon the consummation of a Sale

Transaction, (Y) be subject to any limitations or restrictions under the Act or other applicable law, and (Z) be subject to any limitations or restrictions under the then existing agreements of the Company or its Subsidiaries relating to indebtedness or debt securities of the Company or any of its Subsidiaries.

(c)     To the extent the Company makes a Distribution pursuant to Section 11.1(a) in the form of any assets, property or securities (other than cash), such Distribution shall be equal to the Fair Market Value of such of assets, property or securities for purposes of Section 11.1(a).

(d)     If the Company makes a Distribution pursuant to Section 11.1(a) of Equity Interests of any of its Subsidiaries or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests of any of its Subsidiaries (any such Distribution, a "Spinoff Distribution"), then, at the election of the Board, the Members that receive such Distribution shall be required to, at or prior to the time of such Distribution, execute and deliver a limited liability company agreement, stockholders agreement, partnership agreement, investor rights agreement, or similar agreement which relates to the internal governance of such Subsidiary and/or the rights or obligations of the owners of the Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in such Subsidiary that is substantially similar to this Agreement and in form and substance acceptable to the Majority Members (any such agreement, a "Subsidiary Governing Document").  Upon the making of any Spinoff Distribution, each of the Members that receives such Spinoff Distribution shall be deemed to have (i) executed and delivered the applicable Subsidiary Governing Document (even if any such Member shall not have actually executed and delivered such Subsidiary Governing Document), (ii) become a party to the applicable Subsidiary Governing Document as a "member," "partner," "stockholder" or similar party thereto (including, to the extent applicable, of a particular class), and (iii) become fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the applicable Subsidiary Governing Document as a "member," "partner," "stockholder" or similar party thereto (including, to the extent applicable, of a particular class), in each case of the foregoing, without any further action on the part of, or notice to, any Person.

(e)     Unless a different record date is established by the Board, any Distribution pursuant to or in accordance with this Section 11.1 shall be made to the Persons shown on the Register of Members as holders of Units entitled to such Distribution as of the date of such Distribution.

11.2    Limitations on Distributions.  Notwithstanding any provision to the contrary in this Article 11, no Distribution shall be made if such Distribution would violate the Act or any other applicable law.

11.3    No Other Distributions.  Except as set forth in this Article 11 or upon the dissolution and liquidation of the Company pursuant to, and subject to the terms and conditions

of, Article 13, no Member shall have the right to demand or receive any Distribution or other return on capital in respect of its Units.

11.4    Withholding Tax.  The Company will at all times be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any federal, state, local or foreign taxing authority with respect to any distribution to such Member or otherwise with respect to such Member (including in connection with a distribution in kind or as a result of a failure to provide materials necessary to prevent withholding under this Section 11.4) and to withhold (or deduct) the same from distributions to such Member, including in connection with an audit of the Company.  Any funds withheld by reason of this Section 11.4 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement and, to the extent such withholding has not offset a current distribution, shall reduce future distributions to which such Member is otherwise entitled pursuant to this Agreement.  Each Member agrees to furnish the Company with any representations, forms, certificates or other information as shall be reasonably requested by the Company to assist the Company in determining the extent of, or in fulfilling or complying with, any withholding, reporting or compliance obligations the Company may have.  The Company shall be entitled to withhold distributions from any Member that fails to provide the representations, forms, certificates and information referred to in the preceding sentence and to use such withheld distributions in order to satisfy any withholding obligations with respect to such Member.

## ARTICLE 12
## WITHDRAWALS; ACTION FOR PARTITION

12.1    Waiver of Partition.  No Member shall, either directly or indirectly, take any action to require partition, file a bill for Company accounting or appraisement of the Company or of any of its assets or properties or, subject to the terms of Section 9.3, cause the sale of any Company property; and, notwithstanding any provisions of applicable law to the contrary, each Member (and each of such Member's legal representatives, successors, or assigns) hereby irrevocably waives any and all rights it may have to maintain any action for partition or to compel any sale with respect to such Member's Units, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

12.2    Covenant Not to Withdraw or Dissolve.  Notwithstanding any provision of the Act, but except as otherwise provided in this Agreement, each Member hereby covenants and agrees that such Member has entered into this Agreement based on its mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except as otherwise expressly required or permitted hereby, each Member hereby covenants and agrees not to (a) withdraw or attempt to withdraw from the Company (other than upon the permitted Transfer of all of its Units, so long as such withdrawal does not result in a dissolution of the Company), (b) exercise any power under the Act to dissolve the Company, (c) petition for judicial dissolution of the Company, or (d) demand a return of such Member's contributions to capital of the Company (or a bond or other security for the return of such contributions).  Anything herein to the contrary notwithstanding, no Member shall be entitled to abandon or surrender such Member's Units or other Interests.

## ARTICLE 13
## DISSOLUTION AND LIQUIDATION

13.1    Events Causing Dissolution.    The Company shall be dissolved only upon the occurrence of any of the following events:

(a)    notwithstanding anything in Section 18-801(a)(3) of the Act to the contrary, the affirmative vote or written consent of the Board and the Majority Members;

(b)    the entry of a final decree of judicial dissolution of the Company under Section 18-802 of the Act; or

(c)    at any time there are no Members of the Company, unless the Company is continued in accordance with the Act.

Except as otherwise set forth in this Section 13.1, the Company is intended to have perpetual existence.  To the fullest extent permitted by law, any death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member (or the occurrence of any other event that terminates the continued membership of a Member in the Company) shall not, in and of itself, cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

13.2    Liquidation and Winding Up.    If the Company is dissolved pursuant to Section 13.1, the Company shall be liquidated and the Managers (or other Person or Persons designated by the Board or by a decree of court) shall wind up the affairs of the Company.  The Managers or other Persons winding up the affairs of the Company shall promptly proceed to the liquidation of the Company and, in settling the accounts of the Company, the assets and the property of the Company shall be distributed in the following order of priority:

(a)    First, to the payment of (or establishing reserves to pay) all debts and liabilities of the Company (including any debts or liabilities owed to any Member) in the order of priority as provided by law; and

(b)    The balance, if any, to the Members in accordance with Section 11.1.

## ARTICLE 14
## AMENDMENTS

14.1    Amendments.

(a)    Any term, condition or provision of this Agreement may be amended, modified or waived from time to time if, and only if, such amendment, modification or waiver is in writing and signed, (x) in the case of an amendment or modification, by the Company and the Majority Members at the time of such amendment or modification, or (y) in the case of a waiver, by the party against whom the waiver is to be effective. Notwithstanding the foregoing sentence, in addition to the affirmative vote or written consent of the Company and the Majority Members, no amendment or modification of any term, condition or provision of this Agreement shall be made (whether by merger,

consolidation or reorganization of the Company, except in connection with a Sale Transaction) relating to:

(i)     Sections 6.1, 6.2(a), 6.2(b), 6.2(c), 6.2(d), 6.2(f), 6.2(g), 6.2(h), 6.2(k), 6.12, 6.14, 6.17, 6.18, 8.5, 9.1, 9.3, 9.4 or 9.6, Article 15 or the definition of "Super-Majority Members" (including any of the defined terms used in any such Section, Article or definition, solely to the extent such defined terms are used therein), in any such case, without the affirmative vote or written consent of the Super-Majority Members;

(ii)     Sections 6.2(b)(ii), 6.2(c), 6.2(d) (excluding the second sentence of Section 6.2(d)), 6.2(h), 6.12(b), 6.12(c), 6.14(a) or 6.14(d), or the proviso set forth in Section 6.14(b), Section 6.14(c) or Section 6.14(e) (including any of the defined terms used in any such Section or proviso, solely to the extent such defined terms are used therein), in any such case, without the affirmative vote or written consent of each Designating Group affected by such amendment or modification (it being understood that a Member shall only be entitled to vote on, or consent to, an amendment or modification of this Agreement pursuant to this clause (ii) if such Member has a Designation Right as of the time of such amendment or modification);

(iii)     the definition of "Specified Member" (including any of the defined terms used in such definition, solely to the extent such defined terms are used therein), without the affirmative vote or written consent of each Specified Member;

(iv)     Section 6.2(b)(i), the second sentence of Section 6.2(d) or the definition of "HG Vora Members" (including any of the defined terms used in such Section, sentence or definition, solely to the extent such defined terms are used therein) without the affirmative vote or written consent of the HG Vora Members;

(v)     Section 14.1(b)(i) (including any of the defined terms used in such Section, solely to the extent such defined terms are used therein) without the affirmative vote or written consent of each Member that owns or holds Class A Units;

(vi)     any of clauses (i)-(v) of this Section 14.1(a) without the prior written consent of the specific Member or Members, and/or the Member or Members that own or hold the requisite percentage of the Units, as applicable, that would be required to amend the underlying provision or definition of this Agreement to which such amendment or modification relates; provided, however, that no amendment or modification of this Section 14.1(a)(vi) shall be made without the affirmative vote or written consent of each Member that owns or holds Class A Units.

(b)       Anything in this Agreement to the contrary notwithstanding, (i) subject to clause (ii) of this Section 14.1(b), no amendment or modification of any provision of this Agreement (whether by merger, consolidation or reorganization of the Company, except in connection with a Sale Transaction with any Person other than the Selling Members or any Affiliates thereof) that would adversely affect the rights or increase the obligations of any Member set forth in this Agreement in a manner that is disproportionate in any material respect to the effect of such amendment or modification on the rights and obligations of any of the other Members set forth in this Agreement (without regard to any effect resulting from (A) the individual circumstances of any such Member, (B) the differences in the respective percentages of ownership of Units of the Members or (C) amendments or modifications to the rights and obligations of a specific class or series of Equity Interests of the Company that do not have an adverse effect in any material respect on another class or series of Equity Interests of the Company) shall be made without the affirmative vote or written consent of such affected Member; provided, however, that, for the avoidance of doubt, neither the authorization or creation of a new class or series of Units or other Equity Interests or equity-based securities of the Company (including any amendments or modifications to this Agreement to incorporate the terms, rights, preferences and privileges of such new class or series of Units or other Equity Interests or equity-based securities of the Company in connection with the authorization or creation thereof), nor the issuance of any additional Units or any other Equity Interests or equity-based securities of the Company (including any amendments or modifications to this Agreement to incorporate the terms of any such additional issuance), in each case in accordance with the terms of this Agreement relating to the authorization, creation or issuance of Units or other Equity Interests or equity-based securities of the Company, shall be deemed to adversely affect the rights or obligations of any Member, and (ii) the Board is hereby authorized and empowered, acting alone and without further vote or action of any of the Members or any other Person, to amend or modify this Agreement (A) as provided in Section 5.2(b) hereof and (B) as may be required to give effect to the terms of a Management Incentive Plan or any Award Agreement, and each Member shall be deemed to have executed any such amendment to, or amendment and restatement of, this Agreement; provided, however, that if any such amendment or modification would otherwise require any vote or consent pursuant to any of clauses (i)-(vi) of Section 14.1(a) (other than immaterial amendments or modifications), then such vote or consent shall be obtained as a condition to any such amendment or modification.

(c)       Anything in this Section 14.1 or elsewhere in this Agreement to the contrary notwithstanding (except as contemplated in the second proviso in the definition of "Majority Members"), the holders of Class B Units (in their capacity as such) shall have no right to vote on, or right to consent to, any amendment, modification or waiver of or to this Agreement.

## ARTICLE 15
## INFORMATION RIGHTS

15.1    <u>Information Rights</u>.  Subject to the obligations of the Members under <u>Article 18</u>, the Company shall make available to each Member (other than Members that are Competitors or that own or hold Class B Units) the following information:

(a)    within [•]ninety ([•]90)³ days after the end of each Fiscal Year (or one hundred and twenty (120) days after the end of the Fiscal Year ending on or about December 31, 2025 (which may, at the Company' option, be limited to the period from the Effective Date to December 31, 2025 or be on a predecessor/successor basis)), copies of the audited consolidated financial statements of the Company and its Subsidiaries for such Fiscal Year, including a consolidated balance sheet and consolidated statements of income or operations, members' equity and cash flows for such Fiscal Year, prepared in accordance with GAAP, together with the auditors' report on such audited consolidated financial statements;

(b)    within [•]thirty ([•]30)⁴ days after the end of each Fiscal Quarter in each of the Company's first three (3) Fiscal Quarters in each Fiscal Year, copies of the unaudited consolidated financial statements of the Company and its Subsidiaries for such Fiscal Quarter, including a consolidated balance sheet and consolidated statements of income or operations and cash flows for such Fiscal Quarter, prepared in accordance with GAAP, subject to the absence of footnotes and to year-end adjustments; and

(c)    any information that is posted to the "public" side of the platform for lenders under the senior credit documents of the Company and/or any of its Subsidiaries at substantially the same time as such information is posted to such platform;

<u>provided</u>, <u>however</u>, that if the Company does not produce consolidated financial statements required by this <u>Section 15.1</u> at the Company level, but consolidated financial statements are produced at the level of one or more of its Subsidiaries that cover substantially the same information that would have been covered by consolidated financial statements of the Company and its Subsidiaries, then, in lieu of making available such consolidated financial statements of the Company and its Subsidiaries, the Company shall make available to each Member that owns or holds Units (other than Members that are Competitors or that own or hold Class B Units) the consolidated financial statements of its applicable Subsidiary or Subsidiaries, on the terms set forth in this <u>Section 15.1</u>.

15.2    <u>Delivery of Information</u>.  The Company may make available the information described in <u>Section 15.1</u> (but, for the avoidance of doubt, not any Board Information), within the specified time periods, on a password-protected website that is only available to the Members (other than Members that are Competitors or that own or hold Class B Units) and any actual or prospective Transferees of Units (other than actual or prospective Transferees of Class B Units). The Company shall provide any password or other login information to the Members (other than Members that are Competitors or that own or hold Class B Units) and, upon request of any

---

³ **Note to Draft**:  To line up with timing under Credit Agreement.

⁴ **Note to Draft**:  To line up with timing under Credit Agreement.

Member, any actual or prospective Transferees of Units (other than actual or prospective Transferees of Class B Units) so that any such Person shall be able to access such website.

As a condition to gaining access to the information posted on such website, each Person may be required to (a) "click through" certain confidentiality provisions or take other affirmative action pursuant to which such Person shall acknowledge its confidentiality obligations in respect of such information, (b) certify its status as a Member that owns or holds Class A Units or an actual or prospective *bona fide* Transferee of Class A Units, as applicable, and (c) in the case of any Person that is a Member, confirm and ratify that it is a party to, and bound by all of the terms and provisions of, this Agreement.

15.3    <u>Quarterly Teleconference</u>.    The Company shall hold one informational teleconference (each, a "<u>Quarterly Teleconference</u>") in each Fiscal Quarter for the Members (other than Members that are Competitors or that own or hold Class B Units).  Each Quarterly Teleconference shall be held on such date and at such time as designated by the Board, which date and time shall occur after the date in the applicable Fiscal Quarter on which the Company delivers any of the financial statements described in <u>Section 15.1(a)</u> or <u>Section 15.1(b)</u>; <u>provided</u>, <u>however</u>, that, with respect to a Quarterly Teleconference in the second Fiscal Quarter in any Fiscal Year, such date shall occur after the later of (a) the date on which the Company delivers the financial statements described in <u>Section 15.1(b)</u> for the first Fiscal Quarter of such Fiscal Year and (b) the date on which the Company delivers the financial statements described in <u>Section 15.1(a)</u> for the prior Fiscal Year.  During each Quarterly Teleconference, the Company's or its applicable Subsidiary's officers will discuss the financial statements that were delivered by the Company immediately prior to such Quarterly Teleconference; <u>provided</u>, <u>however</u>, with respect to any Quarterly Teleconference in the second Fiscal Quarter in any Fiscal Year, such discussion shall cover the financial statements described in <u>clauses (a)</u> and <u>(b)</u> of the immediately preceding sentence.  Any such Quarterly Teleconference may be held jointly with any call for the lenders under the senior credit documents of the Company and/or any of its Subsidiaries.

15.4    <u>Board Information</u>.  At the request of any Major Member, Board Information shall be provided to such Major Member; <u>provided</u>, that a Major Member shall not be entitled to receive any Board Information that the Board or the applicable committee of the Board determines (a) would jeopardize or impair the ability of the Company or any of its Subsidiaries to take advantage of the attorney-client, work product or similar privilege if such Board Information was disclosed to such Major Member, (b) is necessary or advisable (in the judgment of the Board or the applicable committee of the Board, as the case may be) to be withheld to comply with the terms and conditions of confidentiality obligations with third parties or applicable law, or (c) such Major Member or any Affiliate of any such Major Member has a conflict of interest with respect to the subject matter of such Board Information.

15.5    <u>Termination of Information Rights</u>.  The requirements of this <u>Article 15</u> shall cease to apply at such time as the Company becomes obligated to file reports under Section 13 or Section 15(d) of the Exchange Act or as a voluntary filer pursuant to contractual obligations (so long as the Company makes such filings).  Nothing in this Agreement shall require, or shall be

deemed or construed to require, the Company to file reports under Section 13 or Section 15(d) of the Exchange Act.

## ARTICLE 16
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

16.1    <u>Representations and Warranties of the Members</u>.  Each Member (including each Person, if any, admitted as a Member after the Effective Date) hereby represents, warrants and acknowledges to the Company and to each other Member on the Effective Date (or the date on which such Member executes and delivers a Joinder Agreement) as follows:

(a)    Such Member (if such Member is an Entity) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation and has all requisite power and authority to conduct its business as it is now being conducted and as proposed to be conducted.

(b)    Such Member has the full power, authority and legal right to execute, deliver and perform this Agreement, and, if such Member is an Entity, the execution, delivery and performance by such Member of this Agreement have been duly authorized by all necessary action of such Member.  This Agreement constitutes such Member's legal, valid and binding obligation, enforceable against it in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws relating to or affecting creditors' rights generally and the effect and application of general principles of equity and the availability of equitable remedies).

(c)    Such Member is not subject to, or obligated under, any provision of (i) its organizational documents (if such Member is an Entity), (ii) any agreement, contract, arrangement or understanding, (iii) any license, franchise or permit, or (iv) any law, regulation, order, judgment or decree, in any such case that would be breached or violated, or in respect of which a right of termination or acceleration or any Lien on any of such Member's assets (including its Units) would be created, by such Member's execution, delivery and/or performance of this Agreement or the consummation of the transactions contemplated hereby.

(d)    No authorization, consent or approval of, waiver or exemption by, or filing or registration with, any Governmental Authority or any other Person is necessary on such Member's part for such Member's execution, delivery and/or performance of this Agreement or the consummation of the transactions contemplated hereby, in any such case that has not previously been obtained by such Member.

(e)    No Person has or will have, as a result of any act or omission by such Member, any right, interest or valid claim against the Company or any other Member for any commission, fee or other compensation as a finder or broker, or in any similar capacity, in connection with any of the transactions contemplated by this Agreement.

(f)    Neither such Member nor any of its Affiliates (other than Related Funds) is, nor will the Company as a result of such Member holding an Interest be, an

"investment company" as defined in, or subject to regulation under, the Investment Company Act.

(g)    Except as expressly set forth in this Agreement, neither the Company, any Manager nor any other Member shall have any duty or responsibility to provide such Member with any documents, materials or other information concerning the business, operations, assets, properties, financial and other conditions, or prospects of the Company or any of its Subsidiaries which may come into the possession of the Company, any Manager, any other Member or any of their respective officers, directors, employees, agents, other representatives or Affiliates.

(h)    Except as expressly set forth in this Section 16.1, neither the Company, any Manager, any other Member nor any of their respective officers, directors, managers, employees, agents, other representatives or Affiliates has made any representations or warranties to such Member regarding the business, assets, operations, properties, financial and other conditions, or prospects of the Company or any of its Subsidiaries, or otherwise, and no act by the Company, any Manager, any other Member or any of their respective officers, directors, managers, employees, agents, other representatives or Affiliates hereinafter taken, including any review of the affairs of the Company or any of its Subsidiaries, shall be deemed to constitute any such representation or warranty by the Company, any Manager, any other Member or any of their respective officers, directors, managers, employees, agents, other representatives or Affiliates.

(i)    The Units acquired by such Member have been, or are being, acquired by such Member for its own account and not with a view to the sale or distribution of any part thereof (or any fractional or beneficial interest therein), and such Member has no present intention of selling, granting any participation in, or otherwise distributing any of the Units (or any fractional or beneficial interest therein).  Such Member does not have any contract, agreement or understanding with any Person to sell or Transfer any of the Units (or any fractional or beneficial interest therein), or grant any participation in any of the Units (or any fractional or beneficial interest therein), to such Person.

(j)    (i) Such Member must bear the economic risk of such Member's investment in the Units acquired by such Member indefinitely unless the disposition of such Units is registered or qualified under the Securities Act and applicable state securities laws or an exemption from such registration or qualification is available, and that the Company has no obligation or intention of so registering or qualifying such Units, (ii) there is no assurance that any exemption from the Securities Act or applicable state securities laws will be available, or, if available, that such exemption will allow such Member to dispose of or otherwise Transfer any or all of such Member's Units in the amounts or at the times such Member might desire and (iii) the Company is not presently under any obligation to register the Units under Section 12 of the Exchange Act or to make publicly available the information specified in Rule 144 under the Securities Act and that it may never be required to do so.

(k)    Such Member: (i) is an Accredited Investor, (ii) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and

risks of its investment in the Units acquired by such Member, (iii) has received all of the information about the Company and its Subsidiaries that it has requested and considers necessary or appropriate for deciding whether to acquire the Units acquired by such Member, (iv) is acquiring Units based upon such Member's own investigation, and the exercise by such Member of such Member's rights and the performance of such Member's obligations under this Agreement will be based upon such Member's own investigation, analysis and expertise, (v) has the ability to bear the economic risks inherent in its investment of the Units acquired by such Member, (vi) is able, without materially impairing its financial condition, to hold the Units acquired by such Member for an indefinite period of time and to suffer a complete loss of its investment, and (vii) understands and has fully considered for purposes of its investment in the Units acquired by such Member the risks of this investment and understands that: (A) the Units represent an extremely speculative investment that involves a high degree of risk of loss, (B) it may not be possible for such Member to liquidate its investment in any of the Units because of substantial restrictions on the transferability of the Units, (C) no public market exists for the Units, and no representation has been made to such Member that any such public market will exist in the future, and (D) there have been no representations as to the possible future value, if any, of any of the Units.

16.2    <u>Survival of Representations and Warranties</u>.    Each of the representations, warranties and acknowledgements of each Member in <u>Section 16.1</u> shall survive the Effective Date (or the date on which such Member executes and delivers a Joinder Agreement).

<div align="center">

**ARTICLE 17**
**MISCELLANEOUS**

</div>

17.1    <u>Entire Agreement</u>.  This Agreement (including the exhibits and schedules to this Agreement) amends and restates the Initial LLC Agreement in its entirety and contains the entire understanding among the Members and the Company with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter of this Agreement among the Members and the Company.

17.2    <u>Counterparts</u>.  For the convenience of the parties hereto, this Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement. Delivery of an executed counterpart of this Agreement by portable document format (PDF) or other electronic transmission will be effective as delivery of a manually executed counterpart of this Agreement.

17.3    <u>Severability</u>.  If any provision hereof would be invalid or unenforceable in any respect under applicable law, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  The provisions hereof are severable, and if any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

17.4    _Successors and Assigns_.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

17.5    _Notices_.    All notices, requests, waivers, document deliveries and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, sent, provided, delivered or received (a) when personally delivered to the party to be notified, (b) when sent by electronic mail ("e-mail") to the party to be notified, (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified, or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows:  (i) in the case of any Member, to such Member at its address or e-mail address set forth in the Register of Members and (ii) in the case of the Company, to the Company at the Principal Office, Attention:  [●] ([●]Andrew Kaminsky (akaminsky@franchisegrp.com) (or to another officer of the Company that is required to be provided with such notice, request, waiver, document or other communication pursuant to the terms of this Agreement).  A party may change its address or e-mail address for purposes of notice hereunder by (x) in the case of the Company, giving notice of such change to all of the Members in the manner provided in this Section 17.5 and (y) in the case of any Member, giving notice of such change to the Company in the manner provided in this Section 17.5.

17.6    _Headings_.  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

17.7 **GOVERNING LAW; CONSENT TO JURISDICTION AND SERVICE OF PROCESS; WAIVER OF JURY TRIAL. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE. EACH OF THE COMPANY AND EACH MEMBER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE COMPANY OR ANY MEMBER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS. EACH OF THE COMPANY AND EACH MEMBER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH OF THE COMPANY AND EACH MEMBER HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN <u>SECTION 17.5</u>, OR IN ANY OTHER MANNER PERMITTED BY LAW. EACH OF THE COMPANY AND EACH MEMBER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING**.

17.8 <u>No Third-Party Beneficiaries</u>. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its legal representatives, heirs, administrators, executors, successors and permitted assigns, and it is not the intention of the parties hereto to confer third-party beneficiary rights upon any other Person other than (x) the Covered Persons (solely with respect to <u>Sections 8.1</u> and <u>8.2</u>), (y) the Identified Persons (solely with respect to <u>Section 8.5</u>), and (z) to the extent not already a party hereto, each Affiliate of any of the Members for purposes of <u>Section 8.6</u>.

17.9 <u>Binding Effect</u>. By virtue of the Plan of Reorganization and the order of the Bankruptcy Court that confirmed the Plan of Reorganization, on the Effective Date, without any further action on the part of, or notice to, any Person, each of the Persons that received Existing Common Units under, or as contemplated by, the Plan of Reorganization on or as of the Effective Date became a party to this Agreement as a "Member" hereunder, became fully bound by, and subject to, all of the covenants, terms, conditions and provisions of this Agreement as a "Member" party hereto, and is deemed to have signed this Agreement. This Agreement shall apply to, and be binding upon, all holders of Units and Interests, whether or not such holder has executed a counterpart of this Agreement or a Joinder Agreement, and shall also apply to all Units and Interests no matter when acquired, and by acceptance of Units or Interests each holder agrees to be so bound. This Agreement shall become effective on the Effective Date.

17.10   Additional Actions and Documents.  The parties agree to execute and deliver any further instruments and perform any additional acts that are or may become reasonably necessary to carry on the Company or to effectuate its purposes.

17.11   Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, a non-breaching party hereto will be irreparably damaged and will not have an adequate remedy at law.  Any such non-breaching party shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which such Person is entitled at law or in equity.  Each of the parties hereto hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  Each of the parties hereto hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Agreement.

17.12   Assignment.  No rights, interests or obligations of any Member herein may be assigned without the prior approval of the Board and the Majority Members, except assignments to Transferees of Units in connection with Transfers of Units that strictly comply with Article 9; provided, however, that (a) the Designation Right of a Designating Group shall not be assignable and (b) the rights of each Preemptive Member under Section 9.6 shall not be assignable except to any Person that is an Affiliate of such Preemptive Member and an Accredited Investor at the time of such assignment (and any such assignment may be made in connection with, or not in connection with, a Transfer of Units to such Person); provided, that the assignment of such rights under Section 9.6 to any such Person that is not then a Member shall only be permitted if the conditions set forth in Section 4.2(b) are satisfied in connection with the related purchase of Additional Securities by such Person.

17.13   Redaction.  Anything herein to the contrary notwithstanding, any copy of the Register of Members that is provided to a Member that holds Class B Units shall be redacted to remove all information relating to each other Member, including the class or series and number of Units held by each other Member (and, if applicable, any hurdles, vesting schedules, forfeiture provisions or other terms and conditions applicable thereto), and the Members that hold Class B Units shall not be entitled to such information.

17.14   Spousal Consent.  Unless waived by the Company, each married Member, and each Member who, subsequent to the Effective Date, marries or remarries, will concurrently with his or her execution hereof, or the consummation of such marriage, as applicable, deliver to the Company the written consent of his or her spouse in a form that is acceptable to the Company in its sole discretion; provided, however, that the failure of any such Member to do so will not affect the validity or enforceability of this Agreement.

17.15   Financial Crimes Matters.  The Company shall conduct its business in compliance in all material respects with applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

17.16   Termination.  This Agreement shall terminate automatically upon the occurrence of an IPO and, to the extent applicable, (a) the entry into of a stockholders agreement pursuant to, and as described in, Section 19.2 by the Reorganized Issuer and the Members, and/or (b) the entry into of registration rights agreement pursuant to, and as described in, Section 19.3 by the Company or the Reorganized Issuer, as applicable, and the Members; provided, however, that (i) any liability of any current or former Member for any breach of this Agreement prior to such termination shall survive any such termination, and (ii) the terms and provisions of the following Sections and Articles of this Agreement shall survive any such termination:   Section 4.4(b), Section 4.5, Article 8 (other than Section 8.7), Section 17.7, Article 18 and Article 19.

## ARTICLE 18
## CONFIDENTIALITY

18.1   Confidentiality.  Each Member hereby agrees that, during the period commencing on the Effective Date (or, with respect to any Member that becomes a party hereto after the Effective Date, the date any such Member executes and delivers a Joinder Agreement) and ending on the first anniversary of the date on which such Member no longer beneficially owns or holds any Units (such period, the "Confidentiality Period"), such Member will keep strictly confidential and will not disclose or divulge to any other Person (other than as permitted by Section 18.2) any (x) confidential, business, financial or proprietary information regarding the Company or any of its Subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any other Member in respect of the Company or any of its Subsidiaries (in any such case, whether in written, oral or electronic form), that is obtained by, or on behalf of, such Member from the Company or any of its Subsidiaries (including, for all purposes of this Article 18, any such information obtained by such Member from any Manager), from the Company's or any such Subsidiary's legal or financial advisors or any other agents or advisors engaged by the Company or any of its Subsidiaries, from any other Member, or through the ownership of Interests and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by such Member or any of its Representatives which contain, reflect or are based upon the information referred to in clause (x) above (collectively, "Confidential Information").   Confidential Information shall not include information which (A) is known or becomes known to the public in general (other than as a result of a breach of this Section 18.1 by a Member or any of its Representatives), (B) is or becomes available to a Member on a non-confidential basis from a source other than the Company, any other Member or any of their respective Affiliates or Representatives (provided, that such Member is not aware that such source is under an obligation to keep such information confidential) prior to such information being provided to such Member by (or obtained from) the Company or any of its Subsidiaries, any other Member or any of their respective Affiliates or Representatives or (C) is independently developed by such Member or its Representatives without reference to the Confidential Information.

18.2   Permitted Disclosure of Confidential Information.

(a)    Notwithstanding Section 18.1, Confidential Information may be disclosed as follows:

(i)    Confidential Information may be provided by a Member, on a confidential basis, to such Member's Affiliates and the respective managers, officers, directors, employees, partners, investors, members, representatives, attorneys, accountants, auditors, trustees, insurers, other professional advisors and financing sources of such Member and such Member's Affiliates (collectively, "Representatives"), to the extent reasonably necessary in connection with such Member's investment in the Company; provided, however, that such Member shall direct its Representatives to comply with the restrictions in this Article 18 as if such Representatives were a party hereto and bound by such restrictions, and such Member shall be responsible for ensuring that its Representatives comply with such restrictions and shall be responsible and liable for any breach of any such restrictions by any of its Representatives.

(ii)    Confidential Information may be provided by a Member, on a confidential basis, to an actual or potential *bona fide* Transferee of all or a portion of the Units owned or held by such Member, to the extent reasonably necessary to consummate a sale or other Transfer of such Units permitted under this Agreement; provided, however, that (x) prior to such Member's delivery of Confidential Information to an actual or potential *bona fide* Transferee of Units pursuant to this clause (ii), such actual or potential *bona fide* Transferee shall have executed and delivered to such Member and the Company a Transferee confidentiality agreement substantially in the form attached hereto as Exhibit C, (y) in no event shall Confidential Information be provided to any Competitor and (z) in no event shall Board Information be provided to any such actual or prospective *bona fide* Transferee.

(iii)    In the event that a Member or any of its Representatives determines, in good faith upon the advice of counsel (including internal counsel), that disclosure of Confidential Information is required under applicable law or regulation, or by any Governmental Authority having jurisdiction over such Member or such Representative, such Member or such Representative will (x) use commercially reasonable efforts to preserve the confidentiality of the Confidential Information sought to be disclosed; and (y) to the extent legally permitted, promptly provide the Company with written notice so that the Company may seek (at the Company's expense) an appropriate protective order or other remedy and/or waive compliance with this Agreement and, if requested by the Company, assist the Company (at the Company's expense) to seek such a protective order or other remedy.  Provided that such notice (to the extent legally permitted) is furnished, if, in the absence of a protective order or other remedy, such Member or any applicable Representative is, in the opinion of its counsel, legally compelled to disclose Confidential Information or else be held liable for contempt or suffer other censure or penalty, such Member or such Representative may disclose pursuant to this Section 18.2(a)(iii) only that portion of such Confidential Information, and only to those parties, that such counsel has advised is compelled

or required to be disclosed, without liability under this Agreement.  In addition, any Member and any applicable Representative shall be entitled to share Confidential Information with Governmental Authorities in connection with routine regulatory audits and examinations that are conducted by such Governmental Authorities of such Member or any of its Affiliates, in each case, without providing the Company with notice of such sharing or disclosure.

(iv)     With the prior consent of the Company, any Member may provide Confidential Information of the Company (but not Confidential Information of any other Member in respect of the Company or any of its Subsidiaries) to any Person in connection with a potential Sale Transaction with such Person; provided that such Person has an obligation to the Company to keep such Confidential Information confidential.

(v)     Any Member that is an employee, consultant or other service provider of the Company or any of its Subsidiaries may disclose Confidential Information in the performance of such employment duties or services to the extent authorized by the Company's policies in respect thereof.

(b)     Termination.  All the rights and obligations of a Member set forth in this Article 18 shall terminate automatically upon the expiration of the Confidentiality Period applicable to such Member; provided, however, that no such termination shall relieve any Member from any liability relating to any breach of this Article 18.

## ARTICLE 19
## IPO

19.1     IPO Approval.  Subject to Section 9.3, the Company shall not initiate or undertake an IPO or effect a Corporate Conversion in connection therewith without the prior approval or written consent of the Board and the Majority Members.  The parties hereto agree that any IPO may be effected at the Company level or at a Subsidiary of the Company or by or through a successor Entity or effected through another form of recapitalization, reorganization, and/or exchange of the Units (as determined by the Board, with the approval of the Majority Members), and that in the event of a planned IPO, the Company shall convert all (or the appropriate portion) of the Units then held by any Members into an economically equivalent number of shares of the common stock of the Company or its applicable Subsidiary or successor Entity effecting such IPO.  If an IPO has been approved in accordance with this Section 19.1 and Section 6.19, or otherwise approved pursuant to Section 9.3, each Member hereby consents to such IPO and shall vote for (to the extent it has any voting right) and raise no objections against such IPO, and each Member shall take all reasonable actions in connection with the consummation of such IPO as requested by the Company.

19.2     Required Actions.  In connection with an IPO, subject to the requisite approval set forth in Section 19.1, the Board may either (a) cause the Company to contribute all or substantially all of its assets to a corporation in a transaction qualified under Code Section 351(a), and thereupon liquidate and dissolve the Company, (b) elect to have all Members contribute their Units to a corporation, in a transaction qualifying under Code Section 351(a), as

long as the Fair Market Value of the shares of the corporation received by all Members, as determined by the Board, is equal to the Fair Market Value of the Units Transferred, as reasonably determined by the Board, (c) cause the Company to distribute some or all of the shares of capital stock of one or more Subsidiaries of the Company to the Members, (d) cause the Company to transfer its assets, liabilities and operations to a corporation in exchange for any combination of cash, debt or capital stock in such corporation, (e) cause a corporation to be admitted as a Member of the Company, with such corporation purchasing interests in the Company from the Company or Members (as determined by the Board) with the proceeds of a public offering of the corporation's stock, or (f) otherwise cause the Company to convert into a corporation, by way of merger, consolidation or otherwise.  Each Member hereby consents to such actions and shall vote for (to the extent it has any voting right) and raise no objections against such actions, and each Member shall, at the request of the Board, take all actions reasonably necessary or desirable to effect such actions (including whether by conversion into a corporation, merger or consolidation into a corporation, recapitalization or reorganization, sale of securities, or otherwise), giving effect to the same economic (other than any tax effects resulting therefrom), voting and corporate governance provisions contained herein (any such transaction contemplated by this Section 19.2, a "Corporate Conversion").  Subject to the requisite approval set forth in Section 19.1, no Member shall have the right or power to veto, vote for or against, amend, modify or delay any such Corporate Conversion.  In connection with such Corporate Conversion, at the request of the Board, each Member hereby agrees to enter into a stockholders agreement (or equivalent) with the corporate successor (the "Reorganized Issuer") and each other Member which contains restrictions on the Transfer of such capital stock and other provisions (including with respect to the governance and control of such Reorganized Issuer) in form and substance (including with respect to the termination thereof) similar to the provisions and restrictions set forth herein to the extent reasonably requested by the Board.  Further, each Member shall (solely in its capacity as such) execute and deliver any documents and instruments and perform any additional acts that may be reasonably necessary or appropriate, as determined by the Board, to effectuate and perform any such IPO or Corporate Conversion.

19.3    Registration Rights Agreement.    In connection with (but prior to the consummation of) an IPO, the Company or any Reorganized Issuer, as applicable, shall enter into a registration rights agreement with, or for the benefit of, each Member, in form and substance reasonably satisfactory to the Majority Members, with respect to the registration of its common equity securities ("Company Securities") following the consummation of an IPO; provided, that such registration rights agreement shall provide that (a) any Member or group of Members party to such registration rights agreement (any such holder, a "Registered Holder") that own or hold at least five percent (5.0%) of all of the Company Securities that are issued and outstanding at the time of any such request may request that the Company or such Reorganized Issuer, as applicable, effect the registration under the Securities Act of a specified number of "Registrable Securities" (as customarily defined) held by such Registered Holder(s), provided, that, subject to certain exceptions, the Company or such Reorganized Issuer, as applicable, will not be required to effect any such demand right more than three times, and (b) the Registered Holders shall be entitled to reasonable and customary piggyback registration rights.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the undersigned are a party to, bound by and subject to, and shall be deemed to have signed this Agreement as of the Effective Date.

**COMPANY**:

**[●] FUSION PARENT, LLC**

By: _____
    Name: Bradley E. Scher
    Title: Authorized Person

[*Signature Page to Amended & Restated LLC Agreement*]

**MEMBERS**:

[●]

By: _____
      Name:
      Title:

## Schedule A

### Specified Members

1.    Arena Capital Advisors, LLC

2.    Fidelity Management & Research Company LLC

3.    Garnett Station Partners

4.    Guggenheim Partners Investment Management, LLC

5.    HG Vora Capital Management, LLC

6.    HPS Investment Partners, LLC

7.    Oaktree Capital Management, L.P.

8.    Octagon Credit Investors, LLC

## **Schedule B**

### Actions Requiring Approval of the Board and the Majority Members

1.    Consummate any acquisition (by merger, consolidation, or acquisition or disposition of stock or assets) of any business enterprise, business division or business unit in any transaction or series of related transactions for consideration in excess of $300.0 million (the amount of such consideration to be determined in good faith by the Board).

2.    Consummate any IPO.

3.    Consummate any Sale Transaction, other than (i) any Sale Transaction that is consummated as an internal restructuring transaction (including (x) the dissolution, consolidation or merger of any immaterial or dormant Subsidiary of the Company or (y) the consolidation, merger or other business combination of any Subsidiary of the Company with or into an Affiliate of any Subsidiary of the Company for the purpose of changing the legal domicile of such Subsidiary or changing the legal form of such Subsidiary), and (ii) a Drag-Along Transaction in which the Selling Members have exercised their rights under Section 9.3.

**<u>Schedule C</u>**

**<u>Officers</u>**

| <u>Name</u> | <u>Title</u> |
|---|---|
| [●]Andrew Laurence | [●]President and Chief Executive Officer |
| [●]Eric Seeton | [●]Chief Financial Officer |
| [●]Andrew Kaminsky | [●]Chief Administrative Officer and Executive Vice President |
| Tiffany McMillan-McWaters | Executive Vice President and Secretary |
| Bradley Scher | Authorized Person[1] |

---

[1] Anything in this Agreement to the contrary notwithstanding, Bradley Scher shall be deemed to have resigned from his position as authorized person of the Company immediately after the execution and delivery of this Agreement by the Company.

**Exhibit A**

## FORM OF ACCREDITED INVESTOR QUESTIONNAIRE

Reference is hereby made to that certain Amended and Restated Limited Liability Company Agreement of [●]Fusion Parent, LLC (the "Company"), dated as of June [●]6], 2025 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "LLC Agreement"), by and among the Company and the members of the Company from time to time party thereto.  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the LLC Agreement.

This Accredited Investor Questionnaire is being completed, executed and delivered by the undersigned pursuant to (a) Section 4.2(b) of the LLC Agreement in connection with the issuance of Units to the undersigned, (b) Section 4.6 of the LLC Agreement as required by, or in response to a request made by the Company to the undersigned pursuant to, Section 4.6 of the LLC Agreement, or (c) Section 9.1(c) of the LLC Agreement in connection with a Transfer of Units to the undersigned.

For purposes of this Accredited Investor Questionnaire, the term "Accredited Investor" (pursuant to clause (a) of Rule 501 promulgated under the Securities Act) means any Person who comes within any of the following categories:

(1)     Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any investment adviser registered pursuant to section 203 of the Investment Advisers Act of 1940 or registered pursuant to the laws of a state; any investment adviser relying on the exemption from registering with the SEC under section 203(l) or (m) of the Investment Advisers Act of 1940; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of the Investment Company Act of 1940; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any Rural Business Investment Company as defined in section 384A of the Consolidated Farm and Rural Development Act; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2)     Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3)     Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)     Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000 (provided, for purposes of calculating net worth under this paragraph (5), that (A) the person's primary residence shall not be included as an asset, (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability) and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability);

(6)     Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)     Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act;

(8)     Any entity in which all of the equity owners are Accredited Investors;

(9)     Any entity, of a type not listed in paragraph (1), (2), (3), (7), or (8), not formed for the specific purpose of acquiring the securities offered, owning investments in excess of $5,000,000;

(10)    Any natural person holding in good standing one or more professional certifications or designations or credentials from an accredited educational institution that the SEC has designated as qualifying an individual for accredited investor status;

(11)    Any natural person who is a "knowledgeable employee," as defined in rule 3c-5(a)(4) under the Investment Company Act of 1940 (17 CFR 270.3c-5(a)(4)), of the issuer of the securities being offered or sold where the issuer would be an investment company, as

defined in section 3 of such act, but for the exclusion provided by either section 3(c)(1) or section 3(c)(7) of such act;

(12)    Any "family office," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1): (i) with assets under management in excess of $5,000,000, (ii) that is not formed for the specific purpose of acquiring the securities offered, and (iii) whose prospective investment is directed by a person who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment; and

(13)    Any "family client," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1), of a family office meeting the requirements in paragraph (12) above and whose prospective investment in the issuer is directed by such family office pursuant to paragraph (a)(12)(iii) above.

The undersigned hereby certifies to the Company that, as of the date of this Accredited Investor Questionnaire, the undersigned is an Accredited Investor under the following category set forth above (*e.g.*, (1) through (13) of the definition of "Accredited Investor" above): _____.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire on the date set forth above.

[                    ]

By: _____
    Name:
    Title:

<div align="right"><u>**Exhibit B**</u></div>

## FORM OF JOINDER AGREEMENT

This Joinder Agreement (this "<u>Joinder Agreement</u>"), dated as of [●], is executed by the undersigned pursuant to the terms of the Amended and Restated Limited Liability Company Agreement of [●]Fusion Parent, LLC (the "<u>Company</u>"), dated as of June [●]6, 2025 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "<u>LLC Agreement</u>"), by and among the Company and the members of the Company from time to time party thereto. Capitalized terms used herein but not defined herein have the meanings ascribed to such terms in the LLC Agreement.

(1)    <u>Acknowledgements</u>.  The undersigned hereby acknowledges and agrees that (a) it has received and reviewed a complete copy of the LLC Agreement, (b) by executing and delivering this Joinder Agreement, it is agreeing to become a party to the LLC Agreement as a "Member" thereunder and shall be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the LLC Agreement as a "Member" party thereto, (c) it has had sufficient time to consider the LLC Agreement and to consult with an attorney if it wished to do so, or to consult with any other Person of its choosing, before signing this Joinder Agreement and (d) it has willingly executed and delivered this Joinder Agreement with full understanding of the legal and financial consequences of this Joinder Agreement and the LLC Agreement.

(2)    <u>Agreements</u>.  The undersigned hereby agrees that, upon execution and delivery to the Company of this Joinder Agreement, the undersigned (a) shall become a party to the LLC Agreement as a "Member" thereunder and shall be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the LLC Agreement as a "Member" party thereto, and (ii) makes the representations, warranties and acknowledgments set forth in Section 16.1 of the LLC Agreement to the Company and to each other Member as of the date of this Joinder Agreement.

(3)    <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.

(4)    <u>Counterparts</u>.  This Joinder Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement. Delivery of an executed counterpart of this Joinder Agreement by portable document format (PDF) or other electronic transmission will be effective as delivery of a manually executed counterpart of this Joinder Agreement.

(5)    <u>Headings</u>.  The headings of the various sections of this Joinder Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Joinder Agreement.

(6)    <u>Register of Members</u>.    For purposes of the Register of Members, the undersigned's address and e-mail address are as follows:

Address:

E-mail Address:

[_____]

Date:

_____
By:

Title:

**Exhibit C**

**FORM OF TRANSFEREE CONFIDENTIALITY AGREEMENT**

[NAME OF POTENTIAL TRANSFEREE]
[ADDRESS]

Attention:

Re:          Confidentiality Agreement

Ladies and Gentlemen:

In connection with a possible transaction (the "Transaction") involving the sale or transfer of limited liability company interests of [•]Fusion Parent, LLC (the "Company") owned, held or controlled by [INSERT NAME OF TRANSFEROR] (the "Transferor") to [INSERT NAME OF POTENTIAL TRANSFEREE] (the "Potential Transferee"), the Transferor is prepared to make available to the Potential Transferee certain Confidential Information (as defined below).  As a condition to such Confidential Information being furnished to the Potential Transferee, the Potential Transferee hereby agrees that it will comply with the following terms of this letter agreement (this "Confidentiality Agreement"):

1.     Confidential Information.    (a) "Confidential Information" means any (x) confidential, business, financial or proprietary information regarding the Company or any of its subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any member of the Company in respect of the Company or any of its subsidiaries (in any such case, whether in written, oral or electronic form), that has been obtained by, or on behalf of, the Potential Transferee or any of its Representatives from the Company or any of its subsidiaries, from the Transferor, or from any of their respective Representatives and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by the Potential Transferee or any of its managers, officers, directors, employees, partners, investors, members, representatives, attorneys, accountants, auditors, trustees, insurers, other professional advisors and financing sources (collectively, "Representatives"), which contain, reflect or are based upon the information referred to in clause (x) above.  Confidential Information shall not include information which (A) is known or becomes known to the public in general (other than as a result of a breach of the confidentiality obligations hereunder or otherwise by the Transferor, the Potential Transferee or any of their respective Representatives), (B) is or becomes available to the Potential Transferee on a non-confidential basis from a source other than the Company or any of its subsidiaries, the Transferor or any of their respective Representatives (provided, that the Potential Transferee is not aware that such source is under an obligation to keep such Confidential Information confidential) prior to such information being provided to the Potential Transferee by or on behalf of (or obtained from) the Company, any of its subsidiaries, the Transferor or any of their respective Representatives or (C) is independently developed by the Potential Transferee or any of its Representatives without reference to the Confidential Information.

(b) The Potential Transferee recognizes and acknowledges the competitive value and confidential nature of the Confidential Information and the damage that could result to the

Exhibit C

Company, the Transferor and any other member of the Company if any Confidential Information is disclosed to a third party, and hereby agrees that it will keep strictly confidential and will not disclose, divulge or use for any purpose, other than to evaluate the Transaction, any of the Confidential Information; provided, however, that any of the Confidential Information may be disclosed, on a confidential basis, to any of the Potential Transferee's Representatives that need to know such information for the purpose of evaluating the Transaction. The Potential Transferee shall cause its Representatives to comply, and the Potential Transferee shall be responsible for ensuring that its Representatives comply, with the restrictions set forth in this Confidentiality Agreement as if such Representatives were a party hereto and bound by such restrictions, and shall be responsible and liable for any breach of any such restrictions by any of its Representatives.

2.      Disclosure of Confidential Information.  In the event that the Potential Transferee or any of its Representatives determines, in good faith upon the advice of counsel, that disclosure of Confidential Information is required under applicable law or regulation, or is required by governmental or by regulatory authorities having jurisdiction over the Potential Transferee or such Representative, the Potential Transferee or such Representative will, to the extent legally permitted and practicable under the circumstances, promptly provide the Transferor and the Company with written notice so that they may seek an appropriate protective order or other remedy and/or waive compliance with the provisions of this Confidentiality Agreement and, if requested by the Transferor or the Company, assist the Transferor or the Company to seek such a protective order or other remedy.  Provided that such foregoing notice (to the extent legally permitted and practicable under the circumstances) is furnished, if, in the absence of a protective order or other remedy, the Potential Transferee or any of its applicable Representatives is, in the opinion of its counsel, required to disclose Confidential Information, the Potential Transferee or such Representative may disclose pursuant to this Section 2 only that portion of such Confidential Information, and only to those parties, that such counsel has advised is required to be disclosed, without liability under this Confidentiality Agreement.

3.      Return and Destruction of Confidential Information.  In the event that the Potential Transferee decides not to proceed with the Transaction, the Potential Transferee will promptly inform the Transferor of that decision.  In that case, or at any time upon the request of the Transferor for any reason, the Potential Transferee will, as directed by the Transferor, promptly deliver to the Transferor or the Company all Confidential Information (and any copies thereof).  Upon the Transferor's request, the Potential Transferee shall provide the Transferor with prompt written confirmation of the Potential Transferee's compliance with this Section 3. Notwithstanding the return or destruction of the Confidential Information, the Potential Transferee and its Representatives shall continue to be bound by the obligations of confidentiality and other obligations and agreements hereunder.

4.      No Representations or Warranties.  The Potential Transferee understands, acknowledges and agrees that neither the Company nor any of its subsidiaries, the Transferor nor any other member of the Company makes any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information, and neither the Company nor any of its subsidiaries, the Transferor nor any other member of the Company shall have any liability to the Potential Transferee or to any of its Representatives relating to or resulting from the use of the Confidential Information or any errors therein or omissions therefrom.  Only those

Exhibit C

representations or warranties which are made in a final definitive agreement regarding any Transaction, when, as and if executed and delivered, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

5.      Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered by the Company and the Transferor if the Potential Transferee fails to comply with any of the obligations imposed on it by this Confidentiality Agreement and that in the event of any such failure, the Transferor and the Company will be irreparably damaged and will not have an adequate remedy at law.  The Transferor and the Company shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which either the Transferor or the Company is entitled at law or in equity.  The Potential Transferee hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.  The Potential Transferee hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason.  The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Confidentiality Agreement.

6.      Governing Law.   THIS CONFIDENTIALITY AGREEMENT AND ANY CONFLICTS ARISING HEREUNDER OR RELATED HERETO SHALL BE GOVERNED BY, AND CONSTRUED UNDER, THE LAWS OF THE STATE OF DELAWARE, ALL RIGHTS AND REMEDIES BEING GOVERNED BY SAID LAWS, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS.   EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE TRANSFEROR OR THE POTENTIAL TRANSFEREE WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS CONFIDENTIALITY AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS.  EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.   EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS ADDRESS SPECIFIED BELOW, OR IN ANY OTHER MANNER PERMITTED BY LAW.  EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

Exhibit C

7.      Term.  This Confidentiality Agreement will terminate on the earlier of (a) two (2) years from the date hereof and (b) the Potential Transferee executing a Joinder Agreement to the Amended and Restated Limited Liability Company Agreement of the Company, dated as of June [●6], 2025, among the Company and its members, as amended, supplemented, amended and restated or otherwise modified from time to time; provided, however, that no such termination of this Confidentiality Agreement shall relieve the Potential Transferee from any liability relating to any breach of this Confidentiality Agreement.

8.      Notices.  All notices, requests, waivers and other communications made pursuant to this Confidentiality Agreement shall be in writing and shall be deemed to have been effectively given, delivered, provided or received (a) when personally delivered to the party to be notified; (b) when sent by electronic mail ("e-mail") to the party to be notified; (c) three (3) business days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) business day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-business day delivery guaranteed, in each case as follows:

to the Transferor, at:

[          ]

to the Potential Transferee, at:

[          ]

A party may change its address or e-mail address for purposes of notice hereunder by giving notice of such change to the other party in the manner provided in this Section 8.

9.      Miscellaneous.  This Confidentiality Agreement contains the entire agreement between the Transferor and the Potential Transferee regarding its subject matter and supersedes all prior agreements, understandings, arrangements and discussions between the Transferor and the Potential Transferee regarding such subject matter.  It is understood and agreed that no failure or delay by the Transferor or the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  No provision in this Confidentiality Agreement can be waived or amended except by written consent of the Transferor, the Potential Transferee and the Company, which consent shall specifically refer to the provision to be waived or amended and shall explicitly make such waiver or amendment.  This Confidentiality Agreement may be signed by electronic transmission and in one or more counterparts, each of which shall be deemed an original but all of which shall be deemed to constitute a single instrument.  If any provision of this Confidentiality Agreement is found to violate any statute, regulation, rule, order or decree of any governmental authority, such invalidity shall not be deemed to affect any other provision hereof or the validity of the remainder of this Confidentiality Agreement, and such invalid provision shall be deemed deleted herefrom to the minimum extent necessary to cure such violation.  The provisions of this Confidentiality Agreement shall inure to the benefit of and be binding upon the

Exhibit C

parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.  The Potential Transferee may not assign this Confidentiality Agreement without the prior written consent of the Transferor and the Company.  The Potential Transferee agrees and acknowledges that the Company shall be an express third-party beneficiary hereof, having all rights to enforce this Confidentiality Agreement.

[Remainder of Page Intentionally Left Blank]

Exhibit C

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Confidentiality Agreement as of this __ day of _____, 20__.

Very truly yours,

TRANSFEROR

[                    ]

By: _____
     Name:
     Title:

CONFIRMED    AND    AGREED
as of the date written above:

POTENTIAL TRANSFEREE

[        ]

By: _____
     Name:
     Title:

Exhibit C

## Exhibit C

### Take-Back Debt Documents

This **Exhibit C** includes the following Take-Back Debt Documents of the Reorganized Debtors:

    Exhibit C(ii):           Take-Back Debt Credit Agreement

Certain documents, or portions thereof, contained in this **Exhibit C** and the Plan Supplement remain subject to continuing review and discussions among the Debtors and interested parties with respect thereto. The rights of the Debtors are expressly reserved, subject to the terms and conditions set forth in the Plan (including all applicable consultation, consent, and/or approval rights contained or contemplated therein), to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court.

**<u>Exhibit C(ii)</u>**

**Take-Back Debt Credit Agreement**

*Execution Version*

FIRST LIEN CREDIT AGREEMENT

dated as of

June 6, 2025

among

FUSION INTERMEDIATE, LLC,
as Parent,

FUSION BUYER, LLC,
as the Borrower,

the Lenders from time to time party hereto,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent and as Collateral Agent

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE I DEFINITIONS ........................................................................................................... 1

SECTION 1.01    Defined Terms. ........................................................................................ 1
SECTION 1.02    Classification of Loans and Borrowings............................................. 53
SECTION 1.03    Terms Generally..................................................................................... 53
SECTION 1.04    Accounting Terms; GAAP.................................................................... 54
SECTION 1.05    Effectuation of Transactions. ............................................................... 54
SECTION 1.06    Certain Determinations. ........................................................................ 54
SECTION 1.07    Divisions. ............................................................................................... 55
SECTION 1.08    Interest Rates.......................................................................................... 56

ARTICLE II THE CREDITS.......................................................................................................... 56

SECTION 2.01    Commitments. ........................................................................................ 56
SECTION 2.02    Loans and Borrowings. ......................................................................... 56
SECTION 2.03    Requests for Borrowings....................................................................... 57
SECTION 2.04    [Reserved]............................................................................................... 58
SECTION 2.05    [Reserved]............................................................................................... 58
SECTION 2.06    Funding of Borrowings.......................................................................... 58
SECTION 2.07    Interest Elections. .................................................................................. 58
SECTION 2.08    Termination and Reduction of Commitments....................................... 59
SECTION 2.09    Repayment of Loans; Evidence of Debt. .............................................. 60
SECTION 2.10    Repayment of Loans. ............................................................................. 60
SECTION 2.11    Prepayment of Loans. ............................................................................ 61
SECTION 2.12    Fees. ....................................................................................................... 64
SECTION 2.13    Interest. .................................................................................................. 64
SECTION 2.14    Benchmark Replacement Setting........................................................... 65
SECTION 2.15    Increased Costs. ..................................................................................... 66
SECTION 2.16    Break Funding Payments. ...................................................................... 67
SECTION 2.17    Taxes....................................................................................................... 68
SECTION 2.18    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.......... 71
SECTION 2.19    Mitigation Obligations; Replacement of Lenders................................. 73
SECTION 2.20    Incremental Credit Extensions. ............................................................. 73
SECTION 2.21    Illegality. ................................................................................................ 76

ARTICLE III REPRESENTATIONS AND WARRANTIES ......................................................... 76

SECTION 3.01    Organization; Powers............................................................................ 76
SECTION 3.02    Authorization; Enforceability. .............................................................. 77
SECTION 3.03    Governmental Approvals; No Conflicts. ............................................... 77
SECTION 3.04    No Material Adverse Effect. .................................................................. 77
SECTION 3.05    Properties. .............................................................................................. 77
SECTION 3.06    Litigation and Environmental Matters. ................................................. 77
SECTION 3.07    Compliance with Laws. ......................................................................... 78
SECTION 3.08    Investment Company Status. ................................................................. 78
SECTION 3.09    Taxes....................................................................................................... 78
SECTION 3.10    ERISA; Labor Matters. .......................................................................... 78
SECTION 3.11    Disclosure. ............................................................................................. 79
SECTION 3.12    Subsidiaries............................................................................................ 79
SECTION 3.13    Intellectual Property; Licenses, Etc. ..................................................... 79
SECTION 3.14    Solvency.................................................................................................. 80

# TABLE OF CONTENTS

(continued)

Page

SECTION 3.15    Federal Reserve Regulations.................................................. 80
SECTION 3.16    Use of Proceeds. .................................................................. 80
SECTION 3.17    Anti-Corruption Laws and Sanctions..................................... 80
SECTION 3.18    Security Documents............................................................... 81
SECTION 3.19    Insurance............................................................................... 81
SECTION 3.20    Franchise Agreements............................................................ 81

ARTICLE IV CONDITIONS .................................................................................... 82

SECTION 4.01    Effective Date. ...................................................................... 82

ARTICLE V AFFIRMATIVE COVENANTS ............................................................ 84

SECTION 5.01    Financial Statements and Other Information. ........................ 84
SECTION 5.02    Notices of Material Events. ................................................... 86
SECTION 5.03    Information Regarding Collateral. ......................................... 87
SECTION 5.04    Existence; Conduct of Business.............................................. 87
SECTION 5.05    Payment of Taxes, etc............................................................ 87
SECTION 5.06    Maintenance of Properties. .................................................... 88
SECTION 5.07    Insurance................................................................................ 88
SECTION 5.08    Books and Records; Inspection and Audit Rights. ................ 88
SECTION 5.09    Compliance with Laws. ......................................................... 89
SECTION 5.10    Use of Proceeds. .................................................................... 89
SECTION 5.11    Additional Subsidiaries. ........................................................ 89
SECTION 5.12    Further Assurances................................................................. 90
SECTION 5.13    Franchise Agreements............................................................ 90
SECTION 5.14    Certain Post-Closing Obligations. ........................................ 90
SECTION 5.15    Maintenance of Ratings. ........................................................ 91

ARTICLE VI NEGATIVE COVENANTS .................................................................. 91

SECTION 6.01    Indebtedness; Certain Equity Securities. ............................... 91
SECTION 6.02    Liens....................................................................................... 94
SECTION 6.03    Fundamental Changes............................................................ 97
SECTION 6.04    Investments, Loans, Advances, Guarantees and Acquisitions........................ 98
SECTION 6.05    Asset Sales........................................................................... 100
SECTION 6.06    Sale and Leaseback Transactions......................................... 102
SECTION 6.07    Restricted Payments; Certain Payments of Indebtedness. ............................. 102
SECTION 6.08    Transactions with Affiliates................................................. 105
SECTION 6.09    Restrictive Agreements........................................................ 106
SECTION 6.10    Subsidiaries.......................................................................... 107
SECTION 6.11    Changes in Fiscal Periods.................................................... 107
SECTION 6.12    Amendment of Financing Documents. ................................. 107
SECTION 6.13    Franchise Agreements.......................................................... 107
SECTION 6.14    Passive Status of Parent and Topco. .................................... 108

ARTICLE VII EVENTS OF DEFAULT..................................................................... 108

SECTION 7.01    Events of Default. ................................................................ 108
SECTION 7.02    Application of Proceeds........................................................ 111

ARTICLE VIII ADMINISTRATIVE AGENT ............................................................ 112

SECTION 8.01    Appointment and Authority. ................................................ 112

# TABLE OF CONTENTS
(continued)

Page

SECTION 8.02    Rights as a Lender............................................................ 113
SECTION 8.03    Exculpatory Provisions. .................................................. 113
SECTION 8.04    Reliance by Agents. ......................................................... 115
SECTION 8.05    Delegation of Duties. ....................................................... 117
SECTION 8.06    Resignation of Administrative Agent; Mergers. ............ 117
SECTION 8.07    Non-Reliance on Agents and Lenders. ........................... 118
SECTION 8.08    [Reserved]........................................................................ 119
SECTION 8.09    Administrative Agent May File Proofs of Claim............ 119
SECTION 8.10    No Waiver; Cumulative Remedies; Enforcement............ 119
SECTION 8.11    Withholding Taxes........................................................... 120
SECTION 8.12    Credit Bidding.................................................................. 120
SECTION 8.13    Erroneous Payments......................................................... 121

ARTICLE IX MISCELLANEOUS ......................................................... 124

SECTION 9.01    Notices.............................................................................. 124
SECTION 9.02    Waivers; Amendments..................................................... 126
SECTION 9.03    Expenses; Indemnity; Damage Waiver............................ 131
SECTION 9.04    Successors and Assigns.................................................... 133
SECTION 9.05    Survival............................................................................. 137
SECTION 9.06    Counterparts; Integration; Effectiveness......................... 137
SECTION 9.07    Severability. ..................................................................... 138
SECTION 9.08    Right of Setoff. ................................................................ 138
SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process. ..................... 139
SECTION 9.10    WAIVER OF JURY TRIAL............................................. 139
SECTION 9.11    Headings. .......................................................................... 140
SECTION 9.12    Confidentiality.................................................................. 140
SECTION 9.13    USA PATRIOT Act.......................................................... 141
SECTION 9.14    Release of Liens and Guarantees. .................................... 142
SECTION 9.15    No Advisory or Fiduciary Responsibility........................ 142
SECTION 9.16    Interest Rate Limitation.................................................... 143
SECTION 9.17    Intercreditor Agreements ................................................. 144
SECTION 9.18    Judgment Currency ........................................................... 144
SECTION 9.19    Acknowledgement and Consent to Bail-In of Affected Financial Institutions ................... 144
SECTION 9.20    Acknowledgement Regarding Any Supported QFCs ...................... 145
SECTION 9.21    Keepwell ........................................................................... 145

SCHEDULES:

Schedule 2.01        —        Commitments and Loans
Schedule 3.03        —        Government Approvals; No Conflicts
Schedule 3.06        —        Litigation and Environmental Matters
Schedule 3.12        —        Subsidiaries
Schedule 3.20        —        Franchise Agreements
Schedule 5.14        —        Certain Post-Closing Obligations
Schedule 6.01        —        Existing Indebtedness
Schedule 6.02        —        Existing Liens
Schedule 6.04(e)     —        Existing Investments
Schedule 6.08        —        Existing Affiliate Transactions
Schedule 6.09        —        Existing Restrictions
Schedule 9.01        —        Notices


EXHIBITS:

Exhibit A        —        Form of Assignment and Assumption
Exhibit B        —        Form of Guarantee Agreement
Exhibit C        —        Form of Perfection Certificate
Exhibit D        —        Form of Collateral Agreement
Exhibit E        —        Form of Compliance Certificate
Exhibit F        —        Form of Notice of Borrowing
Exhibit G        —        Form of Solvency Certificate
Exhibit H        —        Form of Closing Certificate
Exhibit I        —        Form of Master Intercompany Note
Exhibit J-1      —        Form of United States Tax Compliance Certificate 1
Exhibit J-2      —        Form of United States Tax Compliance Certificate 2
Exhibit J-3      —        Form of United States Tax Compliance Certificate 3
Exhibit J-4      —        Form of United States Tax Compliance Certificate 4
Exhibit K        —        Form of Note
Exhibit L        —        Form of PIK Interest Election Notice

FIRST LIEN CREDIT AGREEMENT, dated as of June 6, 2025 (this "<u>Agreement</u>"), among FUSION INTERMEDIATE, LLC, a Delaware limited liability company ("<u>Parent</u>"), FUSION BUYER, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), solely for purposes of <u>Section 6.14</u>, FUSION PARENT, LLC, a Delaware limited liability company (formerly known as Franchise Group Parent, LLC) ("<u>Topco</u>"), FRANCHISE GROUP, INC., a Delaware corporation ("<u>FRG</u>"), as the initial Lender, the other Lenders from time to time party hereto and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent and as Collateral Agent.

WHEREAS, on November 3, 2024 (the "<u>Petition Date</u>"), FRG and certain affiliates and direct and indirect Subsidiaries of FRG (each, a "<u>Chapter 11 Debtor</u>" and collectively, the "<u>Chapter 11 Debtors</u>") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") initiating their respective jointly administered case under Chapter 11 of Title 11 of the United States Code (Case No. 24-12480-LSS (Bankr. D. Del.)) (collectively, the "<u>Chapter 11 Cases</u>");

WHEREAS, FRG, the Guarantors (as defined therein), the lenders party thereto (the "<u>Existing DIP Lenders</u>") and Wilmington Trust, National Association, as administrative agent and as collateral agent (the "<u>Existing DIP Agent</u>") are party to that certain Senior Secured Super-Priority Priming Term Loan Debtor-in-Possession Credit Agreement, dated as of November 7, 2024 (as amended, restated, amended and restated or otherwise modified from time to time, the "<u>Existing DIP Credit Agreement</u>"), pursuant to which the Existing DIP Lenders issued senior secured super priority term loans consisting of (a) $250,000,000 of "new money" first-out delayed draw term loans (the "<u>First-Out DIP Term Loans</u>") and (b) a second-out roll-up term loan facility (the "<u>Second-Out DIP Term Loans</u>");

WHEREAS, the Borrower has asked the Lenders to provide the Borrower with a term loan credit facility (the "<u>Term Facility</u>") consisting of $433,772,002 of term loans;

WHEREAS, the Lenders are willing to make the foregoing term loans to the Borrower, subject to the terms and conditions set forth in this Agreement, the Plan of Reorganization (as defined below), and the Restructuring Support Agreement (as defined below);

WHEREAS, pursuant to the Plan of Reorganization, the Borrower will acquire all of the equity interests of Franchise Group New HoldCo, LLC from FRG in exchange for, among other consideration, the issuance of the Loans under this Agreement (the "<u>Acquisition</u>"); and

WHEREAS, pursuant to the Plan of Reorganization, immediately following the Acquisition, each Existing DIP Lender will exchange certain of its First-Out DIP Term Loans and all of its Second-Out DIP Term Loans on a dollar-for-dollar basis for Loans under this Agreement and other consideration set forth in the Restructuring Support Agreement, on the terms and subject to the conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for due and valuable consideration, the parties hereto covenant and agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01    <u>Defined Terms</u>.

As used in this Agreement, the following terms have the meanings specified below:

1

"ABL Agent" means JPM, as agent under the ABL Credit Agreement or any successor thereto acting in such capacities.

"ABL Credit Agreement" means (i) that certain Loan and Security Agreement, as in effect on the Effective Date and as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof (including by reference to the Intercreditor Agreement), among each Loan Party party thereto, certain lenders party thereto and the ABL Agent, and (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (subject to the limitations set forth herein (including by reference to the Intercreditor Agreement)) in whole or in part the Indebtedness and other obligations outstanding under (x) the credit agreement referred to in clause (i) or (y) any subsequent asset-based revolving credit facility, unless the agreement or instrument related thereto expressly provides that it is not intended to be and is not an ABL Credit Agreement hereunder.  Any reference to the ABL Credit Agreement hereunder shall be deemed a reference to any ABL Credit Agreement then in existence.

"ABL Lenders" means the "Lenders" under and as defined in the ABL Credit Agreement.

"ABL Loan Documents" shall have the meaning ascribed to the term "Financing Agreements" in the ABL Credit Agreement.

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acquired EBITDA" means, with respect to any Pro Forma Entity, for any period, the amount of Consolidated EBITDA of such Pro Forma Entity (determined as if references to the Borrower, any other Loan Party and their respective Subsidiaries in the definition of "Consolidated EBITDA" were references to such Pro Forma Entity and its subsidiaries that will become Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity.

"Acquired Entity or Business" has the meaning given such term in the definition of "Consolidated EBITDA."

"Acquisition" has the meaning set forth in the preamble.

"Additional Lender" means, at any time, any bank, financial institution or other institutional lender or investor that agrees to provide any portion of any Incremental Loans pursuant to an Incremental Facility Amendment in accordance with Section 2.20; provided that each Additional Lender shall be subject to the approval of the Administrative Agent if such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, to such bank, financial institution or other institutional lender or investor (such approval not to be unreasonably withheld, conditioned or delayed) and the Borrower.

"Adjusted Term SOFR" means, for purposes of any calculation and subject to the provisions of Section 2.14(b), the rate per annum equal to the sum of (a) Term SOFR for such calculation and (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"<u>Administrative Agent</u>" means Wilmington Trust, National Association in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in <u>Article VIII</u>.

"<u>Administrative Agent Fee Letter</u>" means that certain Fee Letter, dated as of June 6, 2025, by and among the Borrower and the Administrative Agent.

"<u>Administrative Questionnaire</u>" means an administrative questionnaire in a form supplied by the Administrative Agent.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified; <u>provided</u> that, notwithstanding the foregoing, for purposes of this Agreement and the other Loan Documents none of the Lenders as of the Effective Date (nor any of their respective managed or affiliated funds) shall be deemed an Affiliate of the Loan Parties.

"<u>Agent</u>" means the Administrative Agent and the Collateral Agent, and any successors and assigns in such capacity, and "<u>Agents</u>" means two or more of them.

"<u>Agent Parties</u>" has the meaning given to such term in <u>Section 9.01(c)</u>.

"<u>Agreement</u>" has the meaning given to such term in the preliminary statements hereto.

"<u>Agreement Currency</u>" has the meaning given to such term in <u>Section 9.18</u>.

"<u>Aggregate Add-Back Cap</u>" means an aggregate cap amount for all adjustments or add-backs to Consolidated EBITDA pursuant to <u>clauses (a)(vi)</u>, <u>(a)(vii)</u> and <u>(a)(xvii)</u> in the definition thereof and any adjustments pursuant to the definition of Pro Forma Basis not to exceed an aggregate amount no greater than the lesser of $15,000,000 and 15.0% of Consolidated EBITDA (before giving effect to all adjustments or add-backs to Consolidated EBITDA) for the most recently ended Test Period as of such time.

"<u>Alternate Base Rate</u>" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1.00% and (c) Adjusted Term SOFR for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1%; provided that for the purpose of this definition, Adjusted Term SOFR for any day shall be based on the Term SOFR Reference Rate at approximately 6:00 a.m. (New York City time) on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or Adjusted Term SOFR, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to <u>Section 2.14</u> hereof, then the Alternate Base Rate shall be the greater of clause <u>(a)</u> and <u>(b)</u> above and shall be determined without reference to clause <u>(c)</u> above.

"<u>Ancillary Document</u>" has the meaning assigned to such term in <u>Section 9.06</u>.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, and all other applicable laws, rules, and regulations concerning or relating to bribery or corruption.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Rate" means, (a) with respect to any Initial Loans maintained as ABR Loans, 7.00% per annum, and with respect to any Initial Loans maintained as SOFR Loans, 8.00% per annum and (b) with respect to Incremental Loans, as set forth in the Incremental Facility Amendment.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A or any other form reasonably approved by the Administrative Agent.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.14(e).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" has the meaning set forth in the preamble.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the

reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof; provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Basel III" means: (i) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision on 16 December 2010, each as amended, supplemented or restated; (ii) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and (iii) any further guidance or standards published by the Basel Committee on Banking Supervision relating to Basel III.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.14(b).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that is administratively feasible for the Administrative Agent and selected by the Required Lenders:

(a)    the sum of: (1) Daily Simple SOFR and (2) the related Benchmark Replacement Adjustment;

(b)    the sum of: (1) the alternate benchmark rate that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for dollar-denominated syndicated credit facilities and (2) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (b) any evolving or then-prevailing market

convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time; provided that such Benchmark Replacement Adjustment is administratively feasible for the Administrative Agent.

"Benchmark Replacement Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.14 and other technical, administrative or operational matters) that the Required Lenders decide may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders determine that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders decide is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents); provided that such Benchmark Replacement Conforming Changes implement changes that are administratively feasible for the Administrative Agent.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

6

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof), or if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an 'affiliate' (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing or any committee thereof duly authorized to act on behalf of such board, manager or managing member, (c) in the case of any

partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preliminary statements hereto.

"Borrower Materials" has the meaning assigned to such term in Section 5.01.

"Borrowing" means Loans of the same Class and Type, made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Minimum" means $1,000,000.

"Borrowing Multiple" means $500,000.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Buddy Reorganization Transaction" means the distribution of 100% of the Equity Interests of (a) Buddy's Newco, LLC, a Delaware limited liability company ("Buddy's Newco"), or (b) a newly formed direct parent entity of Buddy's Newco that is a Wholly Owned Subsidiary of Topco (or otherwise wholly owned by the holders of all outstanding Equity Interests of Topco) ("Buddy's Tax Blocker" and together with Buddy's Newco and Buddy's Franchising and Licensing LLC, a Florida limited liability company, collectively, the "Buddy's Entities"), in each case to a Person that is a Loan Party in connection with the whole business securitization of the PSP Loan Parties; provided that each such Buddy's Entity shall, in each case on or prior to the date that is at least five Business Days prior to the distribution, (x) have been joined as a Loan Party hereunder, (y) accede to the Security Documents in the same manner as an acquired Subsidiary as contemplated in Section 5.11(a) and (z) cause its Subsidiaries to accede to the Security Documents as contemplated in Section 5.11(a); provided, further that no other entities other than the Buddy's Entities shall be distributed, formed or otherwise acquired in connection with the Buddy Reorganization Transaction.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Requirements of Law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any Capitalized Leases; provided, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness, unless the corresponding leases would have been treated as Capitalized Leases under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases). For purposes of Section 6.02, a Capital Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Capitalized Lease" means, as applied to any Person, any lease of any property (whether real, personal, or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee which is a transaction of a type commonly known as a "synthetic lease" (i.e., a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of

principal and interest on a loan for U.S. federal income tax purposes); <u>provided</u>, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness, unless the corresponding leases would have been treated as Capitalized Leases under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases, and the interest component of such Capitalized Leases).

"<u>Capitalized Software Expenditures</u>" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower, the other Loan Parties and their respective Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrower, the other Loan Parties and their respective Subsidiaries.

"<u>Cash Equivalents</u>" means:

(a)    U.S. Dollars, euros, Swiss francs, Sterling, Canadian dollars, or such other currencies held by it from time to time in the ordinary course of business;

(b)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(c)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from a Credit Rating Agency;

(d)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

(e)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in <u>clause (b)</u> above and entered into with a financial institution satisfying the criteria described in <u>clause (d)</u> above; and

(f)    money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA and Aaa (or equivalent rating) by at least two Credit Rating Agencies and (iii) have portfolio assets of at least $5,000,000,000.

"<u>Cash Interest</u>" has the meaning assigned to such term in <u>Section 2.13(a)</u>.

"<u>Cash Management Obligations</u>" means (a) obligations of the Borrower, the other Loan Parties or any Subsidiary in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit or purchase card programs and similar arrangements.

"Cash Management Services" has the meaning assigned to such term in the definition of "Secured Cash Management Obligations".

"Casualty Event" means any event that gives rise to the receipt by the Borrower, the other Loan Parties or any Subsidiary of any insurance proceeds or condemnation awards, in each case, in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Change in Law" means: (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law," to the extent enacted, adopted, promulgated or issued after the date of this Agreement, but only to the extent such rules, regulations, or published interpretations or directives are applied to the Borrower and its Subsidiaries by the Administrative Agent or any Lender in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities, including for purposes of Section 2.15.

"Change of Control" means an event or series of events by which:

(a)     the acquisition of beneficial ownership, directly or indirectly, by any Person or group, other than the Permitted Holders (directly or indirectly, including through one or more holding companies), of Equity Interests representing 35.0% or more of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in Topco or Buddy's Newco (and if applicable, Buddy's Tax Blocker) and the percentage of the aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests in Topco or Buddy's Newco (and if applicable, Buddy's Tax Blocker), as the case may be, held by the Permitted Holders, unless the Permitted Holders (directly or indirectly, including through one or more holding companies) otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate, nominate or appoint (and do so designate, nominate or appoint) a majority of the Board of Topco;

(b)     Topco ceases to own, beneficially or of record, directly or indirectly, Equity Interests representing 100% of the outstanding voting and economic interests in the Equity Interests of Parent;

(c)     Parent ceases to own, beneficially or of record, directly or indirectly, Equity Interests representing 100% of the outstanding voting and economic interests in the Equity Interests of the Borrower;

(d)     [reserved];

(e)     during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of Topco cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in

10

clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(f)        any "change of control" or similar event under the ABL Credit Agreement.

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act, (ii) the phrase "Person or group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and (iii) if any Person or "group" includes one or more Permitted Holders, the issued and outstanding Equity Interests of Topco directly or indirectly owned by the Permitted Holders that are part of such Person or "group" shall not be treated as being owned by such Person or "group" for purposes of determining whether clause (a) of this definition is triggered.

"Chapter 11 Debtor" has the meaning set forth in the preamble.

"Chapter 11 Cases" has the meaning set forth in the preamble.

"Class" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Initial Loans or Incremental Loans and (b) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Secured Obligations.

"Collateral Agent" means Wilmington Trust, National Association, in its capacity as collateral agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Collateral Agreement" means the First Lien Collateral Agreement, dated as of the date hereof, among the Borrower, each other Loan Party and the Collateral Agent, substantially in the form of Exhibit D, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)        the Administrative Agent shall have received from:

(i)        Parent and each Subsidiary (other than the Excluded Subsidiary) either (x) in the case of any Person that is a Loan Party on the Effective Date, a counterpart of the Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Guarantee Agreement, in substantially the form specified therein, duly executed and delivered on behalf of such Person, and

11

(ii)    Parent, the Borrower and each Subsidiary (other than the Excluded Subsidiary) either (x) in the case of any Person that is a Loan Party on the Effective Date, a counterpart of the Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Collateral Agreement, in substantially the form specified therein, duly executed and delivered on behalf of such Person,

in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, to the extent reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders), opinions and documents of the type referred to in Sections 4.01(b) and 4.01(d);

(b)    subject to Section 5.14, all outstanding Equity Interests of the Borrower and each Subsidiary (other than (i) any Equity Interests constituting Excluded Assets and (ii) Equity Interests in any Person other than the Borrower or Subsidiary owned by or on behalf of any Loan Party, shall have been pledged pursuant to the Collateral Agreement, and, subject to the Intercreditor Agreements, the Collateral Agent shall have received certificates, if any, of such entity reflecting the pledge, or other instruments, if any, representing all such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)    subject to Section 5.14, (i) if any intercompany Indebtedness for borrowed money of the Borrower, any other Loan Party or any Subsidiary in a principal amount of $2,500,000 or more is owing by such obligor to any Loan Party and such Indebtedness shall be evidenced by a promissory note, such promissory note shall be pledged pursuant to the Collateral Agreement, and, subject to the Intercreditor Agreements, the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank; provided, however, that the foregoing delivery requirement with respect to any intercompany indebtedness may be satisfied by delivery of an omnibus or global intercompany note executed by all Loan Parties as payees and all such obligors as payors in the form of the Master Intercompany Note and (ii) if any Indebtedness for borrowed money of any Person that is not a Loan Party or a Subsidiary in a principal amount of $2,500,000 or more is owing by such obligor to any Loan Party and such Indebtedness is evidenced by a promissory note, such promissory note shall be pledged pursuant to the Collateral Agreement and, subject to the Intercreditor Agreements, the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)    with respect to any Collateral owned by any Loan Party, all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements and Intellectual Property Security Agreements required by this Agreement, the Security Documents, Requirements of Law and reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, this Agreement, the Security Documents, the Intercreditor Agreements and the other provisions of the term "Collateral and Guarantee Requirement," shall have been filed, registered or recorded;

(e)    all Secured Obligations shall have been unconditionally guaranteed by Parent and each Subsidiary; and

(f)    the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property duly executed and delivered by the record owner of such Mortgaged Property; provided, that, to the extent any Mortgaged Property is located in a jurisdiction that imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, the Agents

will cooperate with the Borrower or the applicable Loan Party in order to minimize the amount of tax payable in connection with such Mortgage as permitted by, and in accordance with, applicable law including, to the extent permitted by applicable law, limiting the amount secured by such Mortgage to the book value of such Mortgaged Property, as reasonably determined by the Borrower, if such limitation results in such mortgage tax being calculated based upon such book value, (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a first priority Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such customary lender's endorsements as the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates (it being agreed that the Administrative Agent (acting at the direction of the Required Lenders) shall accept zoning reports from a nationally recognized zoning company in lieu of zoning endorsements to such title insurance policies), in an amount equal to the book value of such Mortgaged Property or as otherwise reasonably agreed by the parties; provided that in no event will the Borrower be required to obtain independent appraisals of such Mortgaged Properties, unless required by FIRREA, (iii) a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Mortgaged Property, and if any Mortgaged Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, a duly executed notice about special flood hazard area status and flood disaster assistance and evidence of such flood insurance as provided in Section 5.07(b), (iv) opinions, addressed to the Administrative Agent and the Secured Parties, from counsel qualified to opine in each jurisdiction where a Mortgaged Property is located regarding the enforceability of the Mortgage and such other matters as may be in form and substance reasonably satisfactory to the Required Lenders, (v) a survey or existing survey together with a no change affidavit of such Mortgaged Property, in compliance with the 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys or such other ALTA/NSPS requirements as are in effect on the date of preparation of such survey and otherwise reasonably satisfactory to the Required Lenders, and (vi) evidence of payment of title insurance premiums and expenses and all recording, mortgage, transfer and stamp taxes and fees payable in connection with recording the Mortgage, any amendments thereto and any fixture filings in appropriate county land office(s).

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Subsidiary, if, and for so long as the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower reasonably agree in writing that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such Guarantees (taking into account any adverse tax consequences to the Borrower and its Affiliates (including the imposition of withholding or other material taxes)), outweighs the benefits to be obtained by the Lenders therefrom;

(b) Liens required to be granted from time to time pursuant to the term "Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in the Security Documents and the Intercreditor Agreements;

(c) control agreements or control or similar arrangements shall not be required with respect to deposit or securities accounts, except to the extent required under the Loan Documents with respect to an account in respect of which such a control agreement or control or similar arrangement is required under

the ABL Loan Documents; provided that, to the extent control agreements are entered into in favor of the ABL Agent on or after the Effective Date, the Collateral Agent must also be party thereto;

(d) [reserved];

(e) in no event shall any Loan Party be required to complete any filings or other action with respect to perfection of security interests in assets subject to certificates of title beyond the filing of UCC financing statements;

(f)(i) in the case of intercompany debt described in the first clause (c)(i) of this definition, other than the filing of UCC financing statements and the delivery of the Master Intercompany Note, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $2,500,000 and (ii) in the case of third party debt described in the first clause (c)(ii) of this definition, other than the filing of UCC financing statements, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $2,500,000;

(g) in no event shall any Loan Party be required to complete any filings or other action with respect to security interests in Intellectual Property beyond the filing of Intellectual Property Security Agreements with the United States Patent and Trademark Office or the United States Copyright Office;

(h) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of UCC financing statements), except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement;

(i) in no event shall the Collateral include any Excluded Assets;

(j) landlord lien waivers, bailee waivers, collateral access agreements or similar agreements shall not be required, except to the extent required under the Loan Documents;

(k) notices shall not be required to be sent to account debtors or other contractual third parties, except to the extent set forth in the Loan Documents following the occurrence and during the continuance of an Event of Default; and

(l) notices to, or acknowledgements from, counterparts under, or compliance with the Assignment of Claims Act (or any state or municipal equivalent) shall not be required. The Administrative Agent (acting at the direction of the Required Lenders) may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) and any other obligations under this definition where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

"Commitment" means, with respect to each Lender, the Initial Commitment, if any, of such Lender to make Loans hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the Loans to be made by such Lender hereunder, as such commitment may be reduced or increased from time to time pursuant to (a) assignments by or to such Lender pursuant to an Assignment and Assumption or (b) Incremental Facility Amendment. The amount of each Lender's Commitment is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 <u>et</u> <u>seq</u>.), as amended from time to time, and any successor statute.

"<u>Common Parent</u>" has the meaning given to such term in <u>Section 6.07(a)(vi)</u>.

"<u>Compliance Certificate</u>" has the meaning assigned to such term in <u>Section 5.01(d)</u>.

"<u>Confirmation Order</u>" means the final order entered by the Bankruptcy Court in the Chapter 11 Cases confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code, in form and substance reasonably acceptable to the Required Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Required Lenders (which may be provided via email by counsel to the Required Lenders).

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>Consolidated EBITDA</u>" means, for any period, Consolidated Net Income for such period, <u>plus</u>:

(a)    without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    total interest expense and, to the extent not reflected in such total interest expense, the sum of (A) premium payments, debt discount, fees, charges and related expenses incurred in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets <u>plus</u> (B) the portion of rent expense with respect to such period under Capitalized Leases that is treated as interest expense in accordance with GAAP <u>plus</u> (C) the implied interest component of synthetic leases with respect to such period <u>plus</u> (D) any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or such derivative instruments <u>plus</u> (E) bank and letter of credit fees and costs of surety bonds in connection with financing activities, <u>plus</u> (F) amortization or write-off of deferred financing fees, debt issuance costs, debt discount or premium, terminated hedging obligations and other commissions, financing fees and expenses and, adjusted, to the extent included, to exclude any refunds or similar credits received in connection with the purchasing or procurement of goods or services under any purchasing card or similar program;

(ii)    provision for taxes based on income, profits, revenue or capital and sales taxes, including federal, foreign, state, franchise, excise, and similar taxes paid or accrued during such period (including in respect of repatriated funds) including penalties and interest related to such taxes or arising from any tax examinations;

(iii)    Non-Cash Charges;

(iv)    [reserved];

(v)    [reserved];

(vi)    severance, relocation, integration and facilities' opening costs and expenses and other business optimization costs and expenses and operating improvements

(including related to new product introductions and any operating expenses, losses or charges related to the implementation of cost savings initiatives, operating expense reductions and other similar initiatives), recruiting fees, signing costs, reserve, retention, recruiting, relocation and signing bonuses and expenses, transition costs, costs related to closure/consolidation of facilities, internal costs in respect of strategic initiatives and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities), contract terminations, professional and consulting fees incurred in connection with any of the foregoing and other one-time and nonoperational costs and expenses; provided that the amounts added-back pursuant to this clause (vi) shall be subject to the Aggregate Add-Back Cap;

(vii)    restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves), whether or not classified as restructuring expense on the consolidated financial statements; provided that the amounts added-back pursuant to this clause (vii) shall be subject to the Aggregate Add-Back Cap;

(viii)    [reserved];

(ix)    [reserved];

(x)    any non-cash loss attributable to the mark to market movement in the valuation of any Equity Interests, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(xi)    any loss relating to amounts paid in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income for such period;

(xii)    any gain relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from Consolidated EBITDA pursuant to clause (c)(iv) below;

(xiii)    any non-cash net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of FASB Accounting Standards Codification 715, and any other items of a similar nature;

(xiv)    charges, losses, lost profits, expenses (including litigation expenses, fee and charges) or write-offs to the extent indemnified or insured by a third party, including expenses or losses covered by indemnification provisions or by any insurance provider in connection with the Transactions, a Permitted Acquisition or any other acquisition or Investment, disposition or any Casualty Event, in each case, to the extent that coverage has not been denied and so long as such amounts are actually reimbursed in cash within one year after the related amount is first added to Consolidated EBITDA pursuant to this clause (xiv) (and if not so reimbursed within one year, such amount shall be deducted from Consolidated EBITDA during the next measurement period);

(xv)    cash receipts (or any netting arrangements resulting in reduced cash expenses) not included in Consolidated EBITDA in any period to the extent non-cash gains relating to such receipts were deducted in the calculation of Consolidated EBITDA pursuant to clause (c) below for any previous period and not added back;

(xvi)    [reserved]; and

(xvii)    other adjustments (i) identified to the Lender Professionals prior to the Effective Date, or (ii) set forth in the quality of earnings report prepared by independent registered public accountants of recognized national standing or any other accounting firm reasonably acceptable to the Required Lenders and delivered to the Administrative Agent in connection with the Transactions; provided that the amounts added-back pursuant to this clause (xvii) shall be subject to the Aggregate Add-Back Cap; plus

(b)    [reserved]; less

(c)    without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period and any non-cash gains attributable to accrual of revenue or recording of receivables in the ordinary course of business);

(ii)    any non-cash gain attributable to the mark to market movement in the valuation of any Equity Interests, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(iii)    any gain relating to amounts received in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income in such period;

(iv)    any loss relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from Consolidated EBITDA pursuant to clauses (a)(xi) and (a)(xii) above;

(v)    [reserved];

(vi)    non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or cash reserve for a potential cash item that reduced Consolidated EBITDA in any prior period, any non-cash gains with respect to cash actually received in a prior period so long as such cash did not increase Consolidated EBITDA in such prior period, and any non-cash gains attributable to accrual of revenue or recording of receivables in the ordinary course of business; and

(vii)    any amount included in Consolidated Net Income of such Person for such period attributable to non-controlling interests pursuant to the application of FASB Accounting Standards Codification Topic 810-10-45;

in each case, as determined on a consolidated basis for the Borrower and its Subsidiaries in accordance with GAAP; provided that:

(I)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA currency translation gains and losses related to currency remeasurements of assets or liabilities (including the net loss or gain resulting from hedging agreements for currency exchange risk and revaluations of intercompany balances),

(II)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of Financial Accounting Standards Codification No. 815—Derivatives and Hedging,

(III)    there shall be included in determining Consolidated EBITDA for any period, without duplication, (A) to the extent not included in Consolidated Net Income, the Acquired EBITDA of any Person, property, business or asset acquired by any Loan Party or any Subsidiary during such period to the extent not subsequently sold, transferred or otherwise disposed of (but not including the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired) (each such Person, property, business or asset acquired, including pursuant to the Transactions, an "Acquired Entity or Business"), based on the Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) determined on a historical Pro Forma Basis and (B) in the case of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting, the Consolidated EBITDA of such Person multiplied by the ownership percentage of such Loan Party or applicable Subsidiary therein;

(IV)    there shall be (A) to the extent included in Consolidated Net Income, excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations in accordance with GAAP (other than (x) if so classified on the basis that it is being held for sale unless such sale has actually occurred during such period and (y) for periods prior to the applicable sale, transfer or other disposition, if the Disposed EBITDA of such Person, property, business or asset is positive (i.e., if such Disposed EBITDA is negative, it shall be added back in determining Consolidated EBITDA for any period)) by a Loan Party or any Subsidiary during such period (each such Person, property, business or asset so sold, transferred or otherwise disposed of, closed or classified, a "Sold Entity or Business"), based on the Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer, disposition, closure, classification or conversion) determined on a historical Pro Forma Basis and (B) to the extent not included in Consolidated Net Income, included in determining Consolidated EBITDA for any period in which a Sold Entity or Business is disposed, an adjustment equal to the Pro Forma Disposal Adjustment with respect to such Sold Entity or Business (including the portion thereof occurring prior to such disposal) as specified in the Pro Forma Disposal Adjustment certificate delivered to the Administrative Agent (for further delivery to the Lenders); and

(V)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA any non-cash expense (or income) as a result of adjustments recorded to contingent consideration liabilities relating to the Transaction or any Permitted Acquisition (or other Investment permitted hereunder).

"Consolidated Net Income" means, for any period, the net income (loss) of the Loan Parties and their respective Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(a)    extraordinary (as defined under GAAP as in effect prior to FASB Update No. 2015-01) unusual, or non-recurring gains or losses for such period,

(b)    the cumulative effect of a change in accounting principles during such period;

(c)    any Transaction Costs,

18

(d)        any fees, costs and expenses (including (x) any transaction or retention bonus or similar payment and (y) any indemnities) incurred during such period, or any amortization thereof for such period, in connection with or in relation to any acquisition (including any acquisition of a franchisee), non-recurring costs to acquire equipment to the extent not capitalized in accordance with GAAP, Investment, recapitalization, asset disposition, non-competition agreement, incurrence, issuance or repayment of debt or similar transaction, issuance of equity securities, option buyouts, refinancing transaction or amendment or other modification of or waiver or consent relating to any debt instrument or similar transaction and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt, the effects of expensing all transaction-related expenses in accordance with FASB Accounting Standards Codification 805 and gains or losses associated with FASB Accounting Standards Codification 460),

(e)        any income (loss) (and all fees and expenses or charges relating thereto) for such period attributable to the early extinguishment of Indebtedness, hedging agreements or other derivative instruments,

(f)        accruals and reserves that are established or adjusted as a result of any Permitted Acquisition or other Investment not prohibited under this Agreement in accordance with GAAP (including any adjustment of estimated payouts on Earn-Outs) or changes as a result of the adoption or modification of accounting policies during such period,

(g)        stock-based award compensation expenses (including any one-time compensation related to unvested options outstanding as of the Effective Date),

(h)        any income (loss) attributable to deferred compensation plans or trusts,

(i)        any income (loss) from Investments recorded using the equity method,

(j)        the amount of any expense required to be recorded as compensation expense related to contingent transaction consideration,

(k)        any unrealized gain or loss due solely to fluctuations in currency values and the related tax effects, determined in accordance with GAAP,

(l)        [Reserved],

(m)        [Reserved],

(n)        any costs or expenses incurred by the Loan Parties or any Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, any severance agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are non-cash or otherwise funded with cash proceeds contributed to the capital of the Loan Parties or Net Proceeds of an issuance of Equity Interests of the Loan Parties (other than Disqualified Equity Interests),

(o)        the Consolidated Net Income of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that Consolidated Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary or its stockholders, and

(p)     any non-cash goodwill impairment charges or other intangible asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of ASC 350 or other non-cash asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of SFAS 144.

There shall be included in Consolidated Net Income, without duplication, the amount of any cash tax benefits related to the tax amortization of intangible assets in such period. There shall be excluded from Consolidated Net Income for any period the effects from applying acquisition method accounting, including applying acquisition method accounting to inventory, property and equipment, loans and leases, software and other intangible assets and deferred revenue (including deferred costs related thereto and deferred rent) required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Loan Parties and their respective Subsidiaries), as a result of any Permitted Acquisitions (or other Investment not prohibited hereunder) or the amortization or write-off of any amounts thereof.

In addition, to the extent included in the Consolidated Net Income of such Person and its Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall (i) exclude any expenses and charges that are reimbursed by indemnification or other reimbursement provisions in connection with any acquisition or other investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder and (ii) include the amount of business interruption insurance proceeds received and, to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (A) not denied by the applicable carrier in writing within 180 days and (B) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), expenses with respect to liability or casualty events or business interruption.

"Consolidated Total Indebtedness" means, as of any date of determination, the aggregate amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of the acquisition method accounting in connection with the Transactions or any Permitted Acquisition (or other Investment not prohibited hereunder)) consisting only of third-party Indebtedness for borrowed money, drawn but unreimbursed obligations under letters of credit, letters of guaranty and bankers' acceptances and third-party debt obligations evidenced by bonds, debentures, loan agreements, promissory notes or similar instruments, and, in each case, without duplication, Guarantees by the Borrower and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP, in respect of any of the foregoing Indebtedness of any other Person.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b), (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b) or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning specified in Section 9.20.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent (acting at the direction of the Required Lenders) may establish another convention, provided that such convention is administratively feasible for the Administrative Agent.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Deposit Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Dispose" and "Disposition" each has the meaning assigned to such term in Section 6.05.

"Disposed EBITDA" means, with respect to any Sold Entity or Business for any period through (but not after) the date of such disposition, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the Loan Parties and their respective Subsidiaries in the definition of the term "Consolidated EBITDA" (and in the component financial definitions used therein) were references to such Sold Entity or Business and its subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)      matures or is mandatorily redeemable or contains any mandatory put, redemption or repayment provision (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)      is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests);

(c)      is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof; or

(d)      in the case of any preferred Equity Interest, provides for scheduled payments of dividends and/or distributions in cash;

in each case, on or prior to the date ninety-one (91) days after the Maturity Date; provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after, or payment thereunder is subject to the prior, repayment in full of all the Loans and all other Loan Document Obligations that are accrued and payable and the termination of the Commitments, (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of employees of the Borrower (or any direct or indirect parent thereof) or any of its subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Borrower or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) any Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for a requirement of payment of dividends or distributions in violation of clauses (a) or (b) above shall not constitute a Disqualified Equity Interest if the terms of such Equity Interest (x) give the applicable issuer the option to elect to pay such dividends or distributions on a non-cash basis and (y) do not require the cash payment of dividends or distributions at any time that such cash payment is not permitted under Section 6.07 of this Agreement or would result in an Event of Default hereunder.

"Disqualified Lenders" means (i) those Persons identified by the Borrower to the Administrative Agent in writing prior to the Effective Date as being "Disqualified Lenders", (ii) those Persons who are competitors of the Borrower and/or any of their Subsidiaries or Persons Controlling or Controlled by any of the foregoing, in each case, identified by the Borrower to the Administrative Agent from time to time in writing (including by email) which designation shall become effective three (3) Business Days after the delivery of each such written designation to the Administrative Agent, but which shall not apply retroactively to disqualify any persons that have previously acquired, or entered into a trade to acquire, an assignment or participation interest in the Loan and (iii) in the case of each Person identified pursuant to clauses (i) and (ii) above, any of their Affiliates (other than any such Affiliate that is primarily engaged in, or that advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which the primary Disqualified Lender does not possess the power to direct or cause the direction of the investment policies of such entity referenced in clause (ii) above, unless separately identified by the Borrower pursuant to clause (i) above) that are either (x) identified in writing by the Borrower to the Administrative Agent from time to time or (y) clearly identifiable as Affiliates on the basis of such Affiliate's name. Such list of Disqualified Lenders shall be available for inspection upon request by any Lender.

"dollars" or "$" or "U.S. Dollars" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"Earn-Outs" means, with respect to any Person, obligations of such Person arising from Permitted Acquisitions or other Investments permitted hereunder which are payable to the sellers thereunder in their capacity as such based on the achievement of specified financial results or other criteria or milestones over time.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary

of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Effective Date" means June 6, 2025.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than Parent, the Borrower, the Subsidiaries or any of their Affiliates), other than, in each case, (i) a natural person (or a holding company, investments vehicle, investment vehicle or trust for, or owned and operated by or for the primary benefit of a natural person) or (ii) a Disqualified Lender; provided that a Disqualified Lender will constitute an Eligible Assignee solely to the extent that such assignment is consented to in writing by the Borrower.  Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall have no liability with respect to any assignment made to a Disqualified Lender unless (i) the Administrative Agent has acted with gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment) and (ii) the Borrower has not consented to such assignment or is not deemed to have consented to such assignment to the extent required by Section 9.04(b).

"Environmental Laws" means all applicable treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, to preservation or reclamation of natural resources, to Release or threatened Release of any Hazardous Material or to the extent relating to exposure to Hazardous Materials, to health or safety matters.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities) directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Title IV and Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 4001(b) of ERISA or Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, in each case whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any Plan; (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by a Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA) with respect to the termination of any Plan or by application of Section 4069 of ERISA with respect to any terminated plan; (f) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or to an intention to terminate or to appoint a trustee to administer any plan or plans in respect of which such Loan Party or ERISA Affiliate would be deemed to be an employer under Section 4069 of ERISA; (g) the incurrence by a Loan Party or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Multiemployer Plan; (h) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability, or the failure of a Loan Party or any ERISA Affiliate to pay when due, after the expiration of any applicable grace period, any installment payment with respect to any Withdrawal Liability; or (i) the withdrawal of a Loan Party or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Accounts" means (a) Zero Balance Accounts (provided that, upon any such account ceasing to be a Zero Balance Account, such account shall cease to be an Excluded Account); (b) Store Accounts; (c) accounts into which government receivables and government reimbursement payments are deposited; (d) payroll accounts (including accounts used for the disbursement of payroll, payroll taxes and other employee wage and benefit payments, including 401(k) and other retirement plans, rabbi trusts for deferred compensation and health care benefits); (e) withholding and trust accounts, escrow and other fiduciary accounts; (f) Manual Sweeping Accounts; and (g) Deposit Accounts, Securities Accounts and commodity accounts that (x) individually have a daily balance of not more than $50,000 and (y) together with all other Deposit Accounts, Securities Accounts and commodity accounts constituting Excluded Accounts under this clause (g), have a daily balance of not more than $1,000,000 in the aggregate for all such Deposit Accounts, Securities Accounts or commodity accounts.

"Excluded Assets" means:

(a) any fee-owned real property that is not Material Real Property, all leasehold (including ground lease) interests in real property (including requirements to deliver landlord lien waivers, estoppels and collateral access letters) and any real property that contains improvements and is located in an area determined (as of the Effective Date with respect to real property owned on the Effective Date and as of the date of acquisition of any real property acquired after the Effective Date) by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area;

(b) motor vehicles, railcars, trailers, aircraft, aircraft engines, construction and earth moving equipment and other assets subject to certificates of title or ownership (except to the extent perfection of a security interest therein can be accomplished by filing of a UCC-1 financing statement or equivalent financing statement with a central registry);

(c) letter of credit rights (except to the extent constituting supporting obligations (as defined under the UCC) in which a security interest can be perfected with the filing of a UCC-1 financing statement or equivalent financing statement with a central registry);

(d) commercial tort claims with an individual value, as determined by the Borrower in good faith (and in the case of commercial tort claims with an individual value in excess of $2,500,000, after consultation with the Required Lenders), of less than $2,500,000; provided however, for the avoidance of doubt, any commercial tort claims listed on Schedule IV of the Collateral Agreement or any supplement to the Securities Documents do not constitute Excluded Assets;

(e) [reserved];

(f) [reserved];

(g) any lease, license or other agreement, government approval or franchise with any Person if, to the extent and for so long as, the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, such lease, license or other agreement, government approval or franchise (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or any applicable Requirements of Law), other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code;

(h) any asset subject to a Lien of the type permitted by Section 6.02(iv) (whether or not incurred pursuant to such Section) if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, any agreement pursuant to which such Lien has been created (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or any applicable Requirements of Law);

(i) any intent-to-use trademark applications filed in the United States Patent and Trademark Office, pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. Section 1051, prior to the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an accepted filing of an "Amendment to Allege Use" whereby such intent-to-use trademark application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act;

(j) any asset if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations is prohibited by any applicable Requirements of Law, rule or regulation, or agreements with any Governmental Authority or which would require consent, approval, license or authorization from any Governmental Authority or regulatory authority, unless such consent, approval, license or authorization

has been received in consultation with the Required Lenders (other than, in each case, to the extent that any such prohibition or requirement would be rendered ineffective pursuant to the Uniform Commercial Code or any other applicable Requirements of Law);

(k) margin stock (within the meaning of Regulation U of the Board of Governors, as in effect from time to time);

(l) Excluded Accounts;

(m) assets to the extent a security interest in such assets would result in material adverse tax consequences to any Loan Party (or any direct or indirect parent or beneficial owner thereof) or one of its Subsidiaries (to be determined by the Borrower and the Administrative Agent (acting at the direction of the Required Lenders);

(n) assets sold to any Person who is not a Loan Party in compliance with the Loan Documents;

(o) assets owned by a Loan Party after the release of the Guarantee of such Loan Party pursuant to the Loan Documents; and

(p) any assets with respect to which, in the reasonable judgment of the Required Lenders and the Borrower (as agreed to in writing), the cost or other consequences (including adverse tax consequences as determined by the Borrower and the Required Lenders in good faith) of pledging such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

"Excluded Party" has the meaning assigned to such term in Section 9.03(b).

"Excluded Subsidiary" means Franchise Group Intermediate 2, LLC, a Delaware limited liability company, so long as such Subsidiary is not a Guarantor as defined in and under the ABL Credit Agreement or any other Material Indebtedness.

"Excluded Swap Obligation" means, with respect to any Loan Party at any time, any Secured Swap Obligation under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Secured Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant," as defined in the Commodity Exchange Act (determined after giving effect to any "Keepwell", support or other agreement for the benefit of such Loan Party), at the time such guarantee or grant of a security interest becomes effective with respect to such related Secured Swap Obligation. If a Secured Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Secured Swap Obligation that is attributable to swaps that are or would be rendered illegal due to such guarantee or security interest.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S.

federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under <u>Section 2.19(b)</u>) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to <u>Section 2.17(a)</u>, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with <u>Section 2.17(e)</u> and (d) any withholding Taxes imposed under FATCA.

"<u>Existing ABL Credit Agreement</u>" means that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, by and among FRG, as a borrower, the other borrowers and guarantors from time to time party thereto, the lenders from time to time party thereto and the ABL Agent, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"<u>Existing DIP Credit Agreement</u>" has the meaning set forth in the preamble.

"<u>Existing First Lien Credit Agreement</u>" means that certain First Lien Credit Agreement, dated as of March 10, 2021, among FRG, as a borrower, the other borrowers and guarantors from time to time party thereto, the lenders from time to time party thereto and Wilmington Trust, National Association, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"<u>Existing HoldCo Credit Agreement</u>" means that certain Credit Agreement, dated as of August 21, 2023, by and among Freedom VCM, Inc., as borrower, Freedom VCM Interco, Inc., as holdings, the lenders from time to time part thereto and Alter Domus (US) LLC, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"<u>Existing Second Lien Credit Agreement</u>" means that certain Second Lien Credit Agreement, dated as of March 10, 2021, among FRG, as a borrower, the other borrowers and guarantors from time to time party thereto, the lenders from time to time party thereto and Alter Domus (US) LLC, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>Federal Funds Effective Rate</u>" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate and (b) 0%.

"<u>Federal Reserve Board</u>" means the Board of Governors of the Federal Reserve System of the United States.

"<u>Financial Officer</u>" means the chief financial officer, principal accounting officer, treasurer or corporate controller of the Borrower, another officer of the Borrower with similar responsibilities, or the chief executive officer or chief operating officer of the Borrower.

"<u>Financing Transactions</u>" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party and (b) the borrowing of Loans hereunder and the use of the proceeds thereof.

"<u>FIRREA</u>" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"<u>First Lien Net Leverage Ratio</u>" means, as of any date of determination, the ratio, on a Pro Forma Basis, of (a) Consolidated First Lien Indebtedness as of such date to (b) Consolidated EBITDA for the most recently completed Test Period.

"<u>First-Out DIP Term Loans</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>Fixed Amounts</u>" has the meaning assigned to such term in <u>Section 1.06(b)</u>.

"<u>Flood Insurance Laws</u>" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"<u>Floor</u>" means a rate of interest equal to 0.00% per annum.

"<u>Foreign Lender</u>" has the meaning assigned to such term in <u>Section 2.17(e)(ii)</u>.

"<u>Foreign Prepayment Event</u>" has the meaning assigned to such term in <u>Section 2.11(g)</u>.

"<u>Foreign Subsidiary</u>" means each Subsidiary that is organized under or incorporated in the laws of a jurisdiction other than the United States, any state thereof or the District of Columbia.

"<u>Franchise Agreement</u>" means a franchising agreement between any Loan Party or any Subsidiary thereof, as franchisor, and any other Person, as franchisee, pertaining to the establishment and operation of a business with operations comparable to the operations of the Borrower and its Subsidiaries.

"<u>Franchise Disclosure Documents</u>" means any uniform franchise offering circulars and franchise disclosure documents used by (and, to the extent required, filed by) any Loan Party or Subsidiary of a Loan Party to comply with any applicable law, rule, regulation or order of any Governmental Authority.

"<u>Franchise Laws</u>" means all applicable laws, rules, regulations, orders, binding guidance or other requirements of the United States Federal Trade Commission or any other Governmental Authority relating to the relationship between franchisor and franchisees or to the offer, sale, termination, non-renewal or transfer of a franchise.

"<u>Franchise Rights</u>" mean the rights of a franchisee of any Loan Party or Subsidiary within any specified geographic area.

"<u>FRG</u>" has the meaning set forth in the preamble.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, as in effect from time to time; <u>provided</u>, <u>however</u>, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capital Lease Obligations or Capitalized Leases shall be determined in accordance with the definitions of such terms.

"<u>Governmental Approvals</u>" means all authorizations, consents, approvals, permits, licenses and exemptions of, registrations and filings with, and reports to, Governmental Authorities.

"<u>Governmental Authority</u>" means any (i) federal, state, local, municipal, or other government, (ii) governmental or quasi-Governmental Authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"<u>Guarantee</u>" of or by any Person (the "<u>guarantor</u>") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; <u>provided</u> that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"<u>Guarantee Agreement</u>" means the First Lien Guarantee Agreement among the Loan Parties) and the Administrative Agent, substantially in the form of <u>Exhibit B</u>.

"Hazardous Materials" means all explosive, radioactive, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants of any nature and in any form regulated pursuant to any Environmental Law.

"Incremental Facility" has the meaning assigned to such term in Section 2.20(a).

"Incremental Facility Amendment" has the meaning assigned to such term in Section 2.20(d).

"Incremental Facility" has the meaning assigned to such term in Section 2.20(a).

"Incremental Loan" has the meaning assigned to such term in Section 2.20(a).

"Incurrence Based Amounts" has the meaning assigned to such term in Section 1.06(b).

"Indebtedness" of any Person means, without duplication:

(a) all obligations of such Person for borrowed money;

(b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP;

(c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person;

(d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (w) trade accounts payable in the ordinary course of business, (x) any Earn-Out obligation, purchase price adjustment or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid within thirty (30) days after being due and payable, (y) liabilities associated with customer prepayments and deposits and (z) expenses accrued in the ordinary course of business);

(e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed;

(f) all Guarantees by such Person of Indebtedness of others;

(g) all Capital Lease Obligations of such Person;

(h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty;

(i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; and

(j) Disqualified Equity Interests and other preferred equity issuances (and similar instruments);

provided that:

(i)    the term "Indebtedness" shall not include (A) deferred or prepaid revenue, (B) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty, indemnity or other unperformed obligations of the seller, (C) contingent indemnity and similar obligations incurred in the ordinary course of business, (D) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (E) Indebtedness of any Person that is a direct or indirect parent of a Loan Party appearing on the balance sheet of a Loan Party, or solely by reason of push down accounting under GAAP, (F) any non-compete or consulting obligations incurred in connection with a Permitted Acquisition, (G) any reimbursement obligations under pre-paid contracts entered into with clients in the ordinary course of business, (H) for the avoidance of doubt, any Qualified Equity Interests issued by a Loan Party;

(ii)    the Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor;

(iii)    the amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith;

(iv)    for all purposes hereof, the Indebtedness of any Loan Party and its Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms).

"Indemnified Taxes" means Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document, other than Excluded Taxes and Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information" has the meaning assigned to such term in Section 9.12(a).

"Initial Commitment" means the commitment of a Lender to make Initial Loans, and "Initial Commitments" means such commitments of all Lenders.  The aggregate amount of the Initial Commitments as of the Effective Date is $437,772,002.

"Initial Holder" has the meaning assigned to such term in the preliminary statements hereto.

"Initial Lender" means a Lender with an Initial Commitment or an outstanding Initial Loan.

"Initial Loans" means the Loans made on the Effective Date pursuant to Section 2.01.

"Insolvency Proceedings" has the meaning assigned to such term in Section 9.22(c).

"Intellectual Property" has the meaning assigned to such term in the Collateral Agreement.

"Intellectual Property Security Agreement" means security agreements, suitable for filing with the United States Patent and Trademark Office or the United States Copyright Office (as applicable), with respect to any Intellectual Property that is registered, issued, or applied for registration or issuance in the United States and that constitute Collateral that can be perfected by the filing of such security agreements.

"Intercreditor Agreement" means (a) that certain Intercreditor Agreement, dated as of the Effective Date, by and among the Collateral Agent and the ABL Agent (and any other Persons party thereto), and acknowledged by the Loan Parties, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof or (b) such other intercreditor agreement or arrangement among the ABL Agent (or other applicable representative on behalf of the holders of the Indebtedness incurred under the ABL Credit Agreement and the other ABL Loan Documents) and the Agents (or any of them), that is reasonably acceptable to the Administrative Agent and the Borrower, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof, as applicable.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.07.

"Interest Payment Date" means the last day of any Interest Period, upon any prepayment due to acceleration, and on the Maturity Date.

"Interest Period" means, with respect to any SOFR Borrowing, the period commencing on the date such Borrowing is disbursed or converted to or continued as a SOFR Borrowing and ending on the date that is three months thereafter other than the Interest Period commencing on the Effective Date; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period, (c) no Interest Period shall extend beyond the Maturity Date and (d) with respect to the Interest Period commencing on the Effective Date, such Interest Period shall end on June 30, 2025. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and the Subsidiaries (i) intercompany advances arising from their cash management, tax, and accounting operations and (ii) intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms)) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (a) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without

any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (b) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (c) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the fair market value (as determined in good faith by a Financial Officer) of such Equity Interests or other property as of the time of the transfer, <u>minus</u> any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (d) any Investment (other than any Investment referred to in clause <u>(a)</u>, <u>(b)</u> or <u>(c)</u> above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), <u>plus</u> (i) the cost of all additions thereto and <u>minus</u> (ii) the amount of any portion of such Investment that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (to the extent the amounts referred to in clause <u>(ii)</u> do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of <u>Section 6.04</u>, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; <u>provided</u> that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"<u>ISDA Definitions</u>" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"<u>JPM</u>" means JPMorgan Chase Bank, N.A.

"<u>Judgment Currency</u>" has the meaning assigned to such term in <u>Section 9.18</u>.

"<u>Legal Reservations</u>" has the meaning assigned to such term in <u>Section 3.02</u>.

"<u>Lender Professionals</u>" means, collectively, Paul Hastings LLP, as counsel, and Lazard Frères & Co. LLC, as financial advisor, to certain Lenders constituting the Required Lenders (and/or such other professionals as determined by the Required Lenders from time to time).

"<u>Lenders</u>" means the Persons listed on <u>Schedule 2.01</u> and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption or an Incremental Facility Amendment, in each case, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, ground lease, capital lease or title retention

agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Loan Document Obligations" means (a) the due and punctual payment in cash by the Borrower of (i) the principal of the Loans and all accrued and unpaid interest thereon at the Applicable Rate or rates provided in this Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents to which it is a party, including obligations to pay fees, expenses, reimbursement obligations and indemnification obligations and obligations to provide cash collateral, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment in cash and performance of all other monetary obligations of the Borrower under or pursuant to each of the Loan Documents to which it is a party and (c) the due and punctual payment and performance of all the monetary obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents to which it is a party (including interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Loan Documents" means this Agreement, any Incremental Facility Amendment, the Guarantee Agreement, the Collateral Agreement, the other Security Documents, each Intercreditor Agreement then in effect, the Administrative Agent Fee Letter and, except for purposes of Section 9.02, any Note delivered pursuant to Section 2.09(e).

"Loan Parties" means Parent, the Borrower and any Subsidiary Loan Parties.

"Loans" means individually or collectively as the context requires, Initial Loans and Incremental Loans. For the avoidance of doubt, the Loans shall include any increase in the principal amount of the Loans as a result of any payment of PIK Interest.

"Majority in Interest", when used in reference to Lenders of any Class, means, at any time, Lenders holding outstanding Loans of such Class representing more than 50% of all Loans of such Class outstanding at such time.

"Manual Sweeping Accounts" shall have the meaning ascribed to the term "Manual Sweeping Accounts" in the ABL Credit Agreement as in effect on the date hereof.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement".

"Master Intercompany Note" means the Master Intercompany Note, dated the Effective Date, pursuant to which the Borrower and its Subsidiaries are the "payees" and the Borrower and its Subsidiaries are the "payors" substantially in the form of Exhibit I.

"Material Adverse Effect" means a circumstance or condition that would materially and adversely affect (i) the business, results of operations or financial condition of the Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Loan Parties, taken as a whole, to perform their payment obligations under the applicable Loan Documents or (iii) the rights and remedies, taken as a whole, of the Agents and the Lenders under the Loan Documents, in each case, other than the commencement of the

Chapter 11 Cases, the events that lead to the commencement of the Chapter 11 Cases, and events that customarily and reasonably result from the commencement of the Chapter 11 Cases.

"<u>Material Indebtedness</u>" means Indebtedness for borrowed money (other than the Loan Document Obligations), Capital Lease Obligations, unreimbursed obligations for letter of credit drawings and financial guarantees (other than ordinary course of business contingent reimbursement obligations) or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $2,500,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"<u>Material Intellectual Property</u>" means any intellectual property owned by the Borrower or any of its Subsidiaries, the loss of which would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

"<u>Material Non-Public Information</u>" means material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing for purposes of United States Federal and state securities laws.

"<u>Material Real Property</u>" means real property (including fixtures) (i) located in the United States, (ii) first acquired by any Loan Party after the Effective Date and (iii) owned (but not leased or ground-leased) by any Loan Party with a book value, as reasonably determined by the Borrower in good faith on the date of acquisition thereof, greater than or equal to $5,000,000.

"<u>Maturity Date</u>" means (a) in the case of the Initial Loans, June 6, 2030 and (b) in the case of any Incremental Facility, the date set forth in the Incremental Facility Amendment.

"<u>Maximum Rate</u>" has the meaning assigned to such term in <u>Section 9.16</u>.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"<u>Mortgage</u>" means a mortgage, deed of trust, deed to secure debt or other security document granting a Lien on any Mortgaged Property in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Secured Obligations, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time. Each Mortgage shall be in form and substance reasonably satisfactory to the Collateral Agent and the Borrower.

"<u>Mortgaged Property</u>" means each parcel of Material Real Property with respect to which a Mortgage is granted pursuant to the "Collateral and Guarantee Requirement", <u>Section 5.11</u>, <u>Section 5.12</u> or <u>Section 5.14</u> (if any).

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Proceeds</u>" means, with respect to any event:

(a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment

receivable or purchase price adjustment or Earn-Out, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, <u>minus</u>

(b) the sum of (i) all fees and out-of-pocket expenses paid by the Borrower and its Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by the Borrower and its Subsidiaries as a result of such event to repay Indebtedness (other than the Loans ) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the *pro rata* portion of net cash proceeds thereof (calculated without regard to this clause <u>(y)</u>) attributable to minority interests and not available for distribution to or for the account of the Borrower or its Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by the Borrower or any Subsidiary and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established by the Borrower and its Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, <u>provided</u> that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of Net Proceeds in the amount of such reduction.

"<u>Non-Cash Charges</u>" means (a) any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles pursuant to GAAP (which, without limiting the foregoing, shall include any impairment charges resulting from the application of FASB Statements No. 142 and 144 and the amortization of intangibles arising pursuant to No. 141), (b) all losses from Investments recorded using the equity method, (c) all Non-Cash Compensation Expenses, (d) the non-cash impact of acquisition method accounting, (e) depreciation and amortization (including amortization of deferred financing fees or costs, Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pension and other post-employment benefits) and (f) other non-cash charges (including non-cash charges related to deferred rent) (<u>provided</u>, in each case, that if any non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period).

"<u>Non-Cash Compensation Expense</u>" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"<u>Non-Consenting Lender</u>" has the meaning assigned to such term in <u>Section 9.02(c)</u>.

"<u>Note</u>" means a promissory note of the Borrower, in substantially the form of <u>Exhibit K</u>, payable to a Lender in a principal amount equal to the principal amount of the Loans of such Lender.

"<u>NYFRB Rate</u>" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is

not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate (which rate shall be administratively feasible for the Administrative Agent) for a federal funds transaction quoted at 11:00 a.m. on such day received by a financial institution selected by the Required Lenders from a federal funds broker of recognized standing selected by such financial institution; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Organizational Documents" means, with respect to any Person, the charter, articles of association or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise  from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.19(b)).

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight SOFR Borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Parent" has the meaning assigned to such term in the preliminary statements hereto.

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(ii).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Perfection Certificate" means a certificate substantially in the form of Exhibit C.

"Perfection Requirements" means the need for appropriate filings, registrations, endorsements, notarizations, stampings and/or notifications of the Security Documents or the Collateral and any other steps or actions necessary in any jurisdiction or under any laws or regulations in order to (i) create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) achieve the relevant priority expressed therein or in the Intercreditor Agreements (including the delivery of any stock certificate or promissory note required to be delivered pursuant to the applicable Loan Documents).

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Permitted Acquisition" means the purchase or other acquisition, by merger, consolidation or otherwise, by any Loan Party or any Subsidiary of any Equity Interests in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person; provided that:

(a) in the case of any purchase or other acquisition of Equity Interests in a Person, (i) such Person, upon the consummation of such purchase or acquisition, will be a Subsidiary (including as a result of a merger or consolidation between any Subsidiary and such Person), or (ii) such Person is merged into or consolidated with a Subsidiary and such Subsidiary is the surviving entity of such merger or consolidation;

(b) the business of such Person, or such assets, as the case may be, constitute a Similar Business (or assets with respect thereto);

(c) with respect to each such purchase or other acquisition, all actions required to be taken with respect to such newly created or acquired Subsidiary (including each subsidiary thereof) or assets in order to satisfy the requirements set forth in clauses (a), (b), (c) and (d) of the definition of the term "Collateral and Guarantee Requirement" to the extent applicable shall have been taken to the extent required by Sections 5.11 or 5.12 (or shall be taken within the time periods set forth in this Agreement or such later date as agreed to by the Required Lenders);

(d) subject to Section 1.06, after giving effect to any such purchase or other acquisition no Event of Default shall have occurred and be continuing;

(e) all such purchases and acquisitions of the Equity Interests in any Person will result in such Person becoming a Loan Party (within the time periods set forth in this Agreement), or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of) such Person will become owned by a Loan Party (or a Person that will become a Loan Party within the time periods set forth in this Agreement); and

(f) after giving effect to such purchase or acquisition, on a Pro Forma Basis, the Total Net Leverage Ratio is no greater than 3.00 to 1.00.

"Permitted Encumbrances" means:

(a)     Liens for Taxes, assessments or governmental charges that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b)     Liens with respect to outstanding motor vehicle fines and Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

(c)     Liens incurred, pledges or deposits made in the ordinary course of business (i) in connection with payroll taxes, workers' compensation, unemployment insurance and other social security

legislation, public liability laws or similar legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance to a Loan Party or any Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause (i);

(d)    Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts, customer claims, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(e)    easements, licenses, servitudes, restrictive covenants, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Loan Parties and their Subsidiaries taken as a whole;

(f)    leases or subleases of real or personal property granted to other Persons (as lessee thereof) that do not materially interfere with the ordinary conduct of the business of the Loan Parties and their Subsidiaries taken as a whole;

(g)    rights of future tenants pursuant to written leases entered into in accordance with the terms hereof;

(h)    Liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 7.01(j) and any pledge and/or deposit securing any settlement of threatened litigation;

(i)    Liens on (i) goods the purchase price of which is financed by a documentary letter of credit issued for the account of a Loan Party or any of its Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such Lien secures only the obligations of the Borrower or such Subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 6.01 and (ii) specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(j)    Liens arising from precautionary Uniform Commercial Code financing statements or similar filings made in respect of operating leases entered into by a Loan Party or any of its Subsidiaries;

(k)    rights of recapture of unused real property (other than any Mortgaged Property) in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any Governmental Authority;

(l)    Liens in favor of deposit banks or securities intermediaries securing customary fees, expenses or charges in connection with the establishment, operation or maintenance of deposit accounts or securities accounts;

(m)    liens in favor of obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of

39

the Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(n)     Liens arising from grants of non-exclusive licenses or sublicenses of Intellectual Property, or covenants not to sue with respect to Intellectual Property, made in the ordinary course of business;

(o)     rights of setoff, banker's lien, netting agreements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(p)     Liens arising from the right of distress enjoyed by landlords or Liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent or performance of other obligations in respect of leased properties, so long as such Liens are not exercised or except where the exercise of such Liens would not reasonably be expected to have a Material Adverse Effect;

(q)     Liens or security given to public utilities or to any municipality or Governmental Authority when required by the utility, municipality or Governmental Authority in connection with the supply of services or utilities to the Borrower or any of its Subsidiaries;

(r)     servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other agreements pertaining to the use or development of any of the assets of the Person, provided the same do not result in (i) a substantial and prolonged interruption or disruption of the business activities of the Borrower and its Subsidiaries, taken as a whole, or (ii) a Material Adverse Effect; and

(s)     Liens securing Priority Obligations;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money other than Liens referred to in clauses (d) and (k) above securing obligations under letters of credit or bank guarantees or similar instruments related thereto and in clause (g) above, in each case to the extent any such Lien would constitute a Lien securing Indebtedness for borrowed money.

"Permitted Holders" means (x) each of (i) Arena Capital Advisors, LLC, (ii) FMR LLC, (iii) Garnett Station Partners, (iv) Guggenheim Investments, (v) HG Vora Capital Management, LLC, (vi) HPS Investment Partners, LLC, (vii) Oaktree Capital Management, L.P., (viii) Octagon Credit Investors, LLC, and (ix) Pacific Investment Management Company LLC and (y) subject to compliance with Section 5.01(f), each holder of at least 20% of the issued and outstanding Equity Interests of Topco from time to time, in each case together with any Affiliates (other than portfolio companies thereof) or any other account or fund that is under common management or for which a Permitted Holder has investment authority.

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Subsidiary:

(a)     dollars, euros, Swiss francs, Sterling, Canadian dollars, or such other currencies held by it from time to time in the ordinary course of business;

(b)     readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States, (ii) the United Kingdom, (iii)

Canada, (iv) Switzerland or (v) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of such country or such member nation of the European Union is pledged in support thereof;

(c)     time deposits with, or certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $250,000,000 in the case of U.S. banks and $100,000,000 (or the dollar equivalent as of the date of determination) in the case of foreign banks (any such bank in the foregoing clauses (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)     commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)     repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer covering securities described in clauses (b) and (c) above;

(f)     marketable short-term money market and similar highly liquid funds substantially all of the assets of which are comprised of securities of the types described in clauses (b) through (e) above;

(g)     securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, the United Kingdom, Canada, Switzerland, a member of the European Union or by any political subdivision or taxing authority of any such state, member, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)     investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(i)     instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized or incorporated in such jurisdiction;

(j)     investments, classified in accordance with GAAP as current assets of the Borrower, any other Loan Party or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000 or its equivalent, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k)     demand deposit accounts holding cash;

(l)     interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G7 government or other G7 governmental agency or a G7 financial institution with

credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof;

(m)     other short-term investments of a type analogous to the foregoing utilized by Foreign Subsidiaries;

(n)     investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (m) above; and

(o)     any guarantee or indemnity for the obligations of a Subsidiary in connection with a Subsidiary claiming exemption from audit, the preparation and filing of its accounts or other similar exemptions (including under section 394C, 448C or 479C of the Companies Act 2006 or other similar or equivalent provisions).

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal, exchange or extension of any Indebtedness of such Person; provided that:

(a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, exchanged or extended except (i) by an amount equal to unpaid accrued interest and premium thereon plus underwriting discounts, other amounts paid, and fees and expenses (including upfront fees, original issue discount or initial yield payments) incurred, in connection with such modification, refinancing, refunding, renewal or extension, (ii) by an amount equal to any existing revolving commitments unutilized thereunder to the extent that the portion of any existing and unutilized revolving commitment being refinanced was permitted to be drawn under Section 6.01 immediately prior to such refinancing (other than by reference to a Permitted Refinancing) and such drawing shall be deemed to have been made and (iii) to the extent such excess amounts is otherwise permitted to be incurred under Section 6.01;

(b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.01(a)(v) and (a)(xii), Indebtedness resulting from such modification, refinancing, refunding, renewal, exchange or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, exchanged or extended; provided that the foregoing requirements of this clause (b) shall not apply to the extent such Indebtedness constitutes a customary bridge facility, so long as the long-term Indebtedness into which any such bridge facility is to be converted or exchanged satisfies the requirements of this clause (b) and such conversion or exchange is subject only to conditions customary for similar conversions or exchanges;

 (c) if the Indebtedness being modified, refinanced, refunded, renewed, exchanged or extended is subordinated in right of payment to the Loan Document Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Loan Document Obligations on terms not materially less favorable, taken as a whole, to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, exchanged or extended;

(d) such Permitted Refinancing is not secured by a Lien on any assets other than the collateral securing, and, to the extent secured by the Collateral, with no higher priority than the Liens securing, the Indebtedness being refinanced, except for accessions and additions to such property and replacements and proceeds thereof (unless permitted to be secured by another provision of Section 6.02);

(e) if unsecured, such Indebtedness shall remain unsecured (unless permitted to be secured by another provision of <u>Section 6.02</u>); and

(f) no Loan Party that was not an obligor with respect to the Indebtedness being refinanced shall be an obligor under the Permitted Refinancing and if the Indebtedness being refinanced was (or was required to be) subject to an Intercreditor Agreement, the holders of such Permitted Refinancing (if such Indebtedness is secured) or their authorized representative on their behalf, shall become party to such Intercreditor Agreement, in each case providing for the same (or lesser) lien priority renewed, exchanged or extended. For the avoidance of doubt, it is understood that a Permitted Refinancing may constitute a portion of an issuance of Indebtedness in excess of the amount of such Permitted Refinancing; <u>provided</u> that such excess amount is otherwise permitted to be incurred under <u>Section 6.01</u>. For the avoidance of doubt, it is understood and agreed that a Permitted Refinancing includes successive Permitted Refinancings of the same Indebtedness to the extent such successive Permitted Refinancings satisfy the foregoing requirements.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity, whether existing as of the Effective Date or subsequently created or coming to exist.

"<u>Petition Date</u>" has the meaning set forth in the preamble.

"<u>PIK Interest</u>" means interest that accrued and is added to the outstanding principal balance of the Loans in accordance with <u>Section 2.13(a)</u>.

"<u>PIK Interest Election Notice</u>" has the meaning assigned to such term in <u>Section 2.13(a)</u>.

"<u>Plan</u>" means any employee pension benefit plan as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA.

"<u>Plan of Reorganization</u>" means that certain Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates, dated May 14, 2025 [Docket No. 1454], in the jointly administered Chapter 11 Cases of such entities that are pending in the Bankruptcy Court (Case No. 24-12480 (LSS)), as amended, restated, amended and restated supplement or otherwise modified from time to time.

"<u>Platform</u>" has the meaning assigned to such term in <u>Section 5.01</u>.

"<u>Pledged Equity Interests</u>" has the meaning set forth in the Collateral Agreement.

"<u>Post-Transaction Period</u>" means, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the eighth full consecutive fiscal quarter of the Borrower immediately following the date on which such Specified Transaction is consummated.

"<u>Prepayment Event</u>" means:

(a) any non-ordinary course sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries pursuant to <u>Section 6.05(r)</u> or the occurrence of any other Casualty Event, in each case of this <u>clause (a)</u> resulting in aggregate Net Proceeds exceeding (i) with respect to any

single transaction or series of related transactions, the greater of $2,500,000 and 1.0% of Consolidated EBITDA individually or (ii) with respect to all dispositions pursuant to Section 6.05(r) or Casualty Events in each case not excluded pursuant to previous clause (i), the greater of $5,000,000 and 2.0% of Consolidated EBITDA in the aggregate in  any fiscal year of the Borrower, other than dispositions constituting a sale and leaseback transaction to the extent consummated substantially contemporaneously with the acquisition by the Borrower or such Subsidiary of the property subject to such sale and leaseback transaction; provided that, for the avoidance of doubt, in each case of this clause (a), (x) only Net Proceeds in excess of such amount shall be subject to the mandatory prepayment provisions set forth in Section 2.11(c) and (y) no Prepayment Event shall occur in any fiscal year of the Borrower until the Net Proceeds received during such fiscal year that are subject to clause (ii) above exceed the amount set forth in clause (ii) above; or

(b)  the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness, other than Indebtedness permitted under Section 6.01 or permitted by the Required Lenders pursuant to Section 9.02.

"Prime Rate" means the rate of interest per annum last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such a rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Required Lenders) or any similar release by the Federal Reserve Board (as determined by the Required Lenders).  Any change in the Prime Rate shall take effect at the opening of business on the day such change is publicly announced or quoted as being effective.

"Priority Obligation" means any obligation that is secured by a Lien on any Collateral in favor of a Governmental Authority, which Lien ranks or is capable of ranking prior to or pari passu with the Liens created thereon by the applicable Security Documents including any such Lien securing amounts owing for wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, other Taxes, workers compensation, governmental royalties and stumpage or pension fund obligations.

"Pro Forma Basis," "Pro Forma Compliance" and "Pro Forma Effect" mean, as to any Person, for any events as described below that occur subsequent to the commencement of a period for which the effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the four (4) consecutive fiscal quarter of the Borrower period ended on or before the occurrence of such event (the "Reference Period"):

(a) in making any determination of Consolidated EBITDA or any component thereof or the determination of financial ratios and tests hereunder, effect shall be given to any Specified Transaction made during the applicable Test Period, in each case, that occurred during the Reference Period or with respect to any such event or transaction included in the definition of Specified Transactions and projected by the Borrower in good faith to result from actions that either have been taken, with respect to which substantial steps have been taken or that are expected to be taken within 18 months after the date of consummation of such Specified Transaction (including, in each case, actions initiated prior to the Effective Date) (in the good faith determination of the Borrower), net of the amount of actual benefits realized, and without duplication of any such amount included in Consolidated EBITDA pursuant to the definition thereof;

(b) in making any determination on a Pro Forma Basis, of Pro Forma Compliance or of Pro Forma Effect, (i) all Indebtedness (including Indebtedness issued, incurred or assumed as a result of, or to finance, any relevant transactions and for which the financial effect is being calculated, whether incurred

under the Loan Documents or otherwise) issued, incurred, assumed or repaid during the Reference Period (or with respect to Indebtedness repaid, during the Reference Period or subsequent to the end of the Reference Period and prior to, or simultaneously with, the event for which the calculation of any such ratio is made) shall be deemed to have been issued, incurred, assumed or repaid at the beginning of such period, (ii) such calculation shall be made without regard to the netting of any cash proceeds of Indebtedness incurred in connection with the relevant transactions, (iii) in the case of any Indebtedness in the nature of a revolving credit facility, the entire principal amount of such credit facility shall be deemed to have been fully drawn and (iv) interest expense of such Person attributable to interest on any Indebtedness for which pro forma effect is being given as provided in preceding <u>clause (i)</u> bearing floating interest rates shall be computed on a pro forma basis at the rate which is or would be in effect with respect to such Indebtedness as of the relevant date of determination,

(c) [Reserved], and

(d) income statement items (whether positive or negative) attributable to all property acquired or disposed of in such relevant transaction shall be included as if such transaction had occurred as of the first day of the relevant Test Period.  Whenever a financial ratio or test or covenant is to be calculated on a Pro Forma Basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Borrower were delivered pursuant to <u>Section 5.01(a)</u> or <u>(b).</u>

"<u>Pro Forma Disposal Adjustment</u>" means, for any Test Period that includes all or a portion of a fiscal quarter of the Borrower included in any Post-Transaction Period with respect to any Sold Entity or Business, the pro forma increase or decrease in Consolidated EBITDA projected by the Borrower in good faith as a result of contractual arrangements between the Borrower or any Subsidiary entered into with such Sold Entity or Business at the time of its disposal or within the Post-Transaction Period and which represent an increase or decrease in Consolidated EBITDA which is incremental to the Disposed EBITDA of such Sold Entity or Business for the most recent Test Period prior to its disposal.

"<u>Pro Forma Entity</u>" means any Acquired Entity or Business.

"<u>Proposed Change</u>" has the meaning assigned to such term in <u>Section 9.02(c)</u>.

"<u>PSP Loan Party</u>" means (a) Pet Supplies "Plus", LLC, a Delaware limited liability company ("<u>PSP</u>"), (b) Franchise Group Newco PSP, LLC, a Delaware limited liability company ("<u>PSP Newco</u>"), and (c) without duplication of clauses (a) or (b), each Loan Party this is a Subsidiary of either PSP or PSP Newco.

"<u>Public Lender</u>" has the meaning assigned to such term in <u>Section 5.01</u>.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"<u>QFC Credit Support</u>" has the meaning specified in <u>Section 9.20</u>.

"<u>Qualified ECP Guarantor</u>" means, in respect of any Secured Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes or would become effective with respect to such Secured Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract

participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Equity Interests" means Equity Interests of a Loan Party other than Disqualified Equity Interests.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Registered Equivalent Notes" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, trustees, agents, controlling persons, advisors and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns of each of the foregoing.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, emptying, escaping, pumping, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Relevant Governmental Body" means the Board of Governors or the NYFRB, or a committee officially endorsed or convened by the Board of Governors or the NYFRB, or any successor thereto.

"Removal Effective Date" has the meaning assigned to such term in Section 8.06.

"Representative" means, with respect to any series of Indebtedness permitted by this Agreement to be secured by the Collateral, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"Required Lenders" means, at any time, Lenders having Loans and unused Commitments representing more than 50.1% of the aggregate Loans and unused Commitments at such time.

"Required Supermajority Lenders" means, at any time, Lenders having Loans and unused Commitments representing more than 80.0% of the aggregate Loans and unused Commitments at such time.

"Requirements of Law" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date" has the meaning assigned to such term in Section 8.06.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, company secretary or other similar officer, manager or a member of the Board of Directors of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on the Effective Date or thereafter pursuant to paragraph <u>(a)(i)</u> of the definition of the term "Collateral and Guarantee Requirement," any secretary, assistant secretary, company secretary or director of a Loan Party, and as to the Borrower, any Financial Officer. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Subsidiary.

"<u>Restructuring Support Agreement</u>" means that certain Restructuring Support Agreement (including all exhibits, schedules and attachments thereto), dated as of November 1, 2024 (as may be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof), by and among the Chapter 11 Debtors and the Consenting First Lien Lenders (as defined therein).

"<u>S&P</u>" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"<u>Sanctioned Country</u>" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea Region of Ukraine, Cuba, Iran, North Korea and Syria).

"<u>Sanctioned Person</u>" means, any Person subject or target of any Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the U. S. government, including by Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, U.S. Department of Commerce, or by the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) (including, without limitation for purposes of defining a Sanctioned Person, as ownership and control may be defined and/or established in and/or by an applicable laws, rules, regulations or orders).

"<u>Sanctions</u>" means all economic or financial sanctions, trade embargoes or similar restrictions imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union any European member state, or His Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"<u>SEC</u>" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"<u>Second-Out DIP Term Loans</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>Secured Cash Management Obligations</u>" means the due and punctual payment and performance of all obligations of the Borrower and its Subsidiaries in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services, corporate credit and purchasing cards and related programs or any automated clearing house transfers of funds (collectively, "<u>Cash Management Services</u>") provided to the Borrower or any Subsidiary (whether absolute or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor)) that are (a) owed to the Administrative Agent or any of its Affiliates, (b) owed on the Effective Date to a Person that is a Lender or an Affiliate of a Lender as of the Effective Date and (c) owed to a Person that is an Agent, a Lender or an Affiliate of an Agent or Lender at the time such obligations are incurred, and that in each case has been designated as a "Secured Cash Management Obligation" in a writing executed by the Borrower and such counterparty and delivered to the Administrative Agent.  It is hereby understood that obligations in respect of any specific Cash Management Services may not be Secured Cash Management Obligations under this Agreement to the extent it is similarly treated as such under the ABL Credit Agreement.

"<u>Secured Obligations</u>" means (a) the Loan Document Obligations, (b) the Secured Cash Management Obligations and (c) the Secured Swap Obligations (excluding with respect to any Loan Party, Excluded Swap Obligations of such Loan Party).

"<u>Secured Parties</u>" means (a) each Lender, (b) the Administrative Agent, (c) the Collateral Agent, (d) each Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, Secured Swap Obligation or Secured Cash Management Obligation and (f) the permitted successors and assigns of each of the foregoing.

"<u>Secured Swap Obligations</u>" means the due and punctual payment and performance of all obligations of the Borrower and its Subsidiaries under each Swap Agreement that (a) is with a counterparty that is the Administrative Agent or any of its Affiliates, (b) is in effect on the Effective Date with a counterparty that is a Lender, an Agent or an Affiliate of a Lender or an Agent as of the Effective Date or (c) is entered into after the Effective Date with any counterparty that is a Lender, an Agent or an Affiliate of a Lender or an Agent at the time such Swap Agreement is entered into, and that in each case has been designated as a "Secured Swap Obligation" in a writing executed by the Borrower and such counterparty and delivered to the Administrative Agent. It is hereby understood that obligations in respect of any Swap Agreement may not be Secured Swap Obligations under this Agreement to the extent it is similarly treated as such under the ABL Credit Agreement.

"<u>Security Documents</u>" means the Collateral Agreement, the Mortgages (if any) and each other security agreement or pledge agreement executed and delivered pursuant to the "Collateral and Guarantee Requirement" and/or <u>Section 5.11</u>, Section <u>5.12(a)</u>, <u>Section 5.12(b)</u> or <u>Section 5.14</u> to secure any of the Secured Obligations.

"<u>Securities Accounts</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Similar Business</u>" means (1) any business conducted by the Borrower or any Subsidiary on the Effective Date or (2) any business or other activities that are reasonably similar, ancillary, incidental,

complementary or related to (including non-core incidental businesses acquired in connection with any permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Subsidiaries conduct or propose to conduct on the Effective Date.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Alternate Base Rate".

"Sold Entity or Business" has the meaning assigned to such term in the definition of the term "Consolidated EBITDA."

"Solvent" means, as to any Person as of any date of determination, that on such date (a) the fair value of the assets of such Person and its Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person and its Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent, or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business, (c) such Person and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities mature in the ordinary course of business and (d) such Person and its Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital. The amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual or matured liability.

"Specified Transaction" means, with respect to any period, any Investment, sale, transfer or other disposition of assets, incurrence or repayment of Indebtedness, Restricted Payment, subsidiary designation or other event that by the terms of the Loan Documents requires "Pro Forma Compliance" with a test or covenant hereunder or requires such test or covenant to be calculated on a Pro Forma Basis.

"Store Accounts" shall have the meaning ascribed to the term "Store Accounts" in the ABL Credit Agreement as in effect on the date hereof.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held (unless parent does not Control such entity), or (b) that is, as of such date, otherwise Controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent; in each case, whether existing as of the Effective Date or subsequently created or coming to exist.

"Subsidiary" means any subsidiary of the Borrower (unless otherwise specified or the context otherwise requires).

"Subsidiary Loan Party" means each Subsidiary of the Borrower.

"Supported QFC" has the meaning specified in Section 9.20.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Tax Group" has the meaning given to such term in Section 6.07(a)(vi).

"Tax Restructuring" means any reorganizations and other activities related to tax planning and tax reorganization (as determined by the Borrower in good faith) entered into after the Effective Date so long as (x) the Required Lenders have provided prior written consent in their sole discretion and (y) such Tax Restructuring does not materially impair the Guarantee, the security interests of the Agents and the Lenders under the Security Documents in the Collateral, taken as a whole, and the Loan Parties and their Subsidiaries otherwise comply with Sections 5.11 and 5.12.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Facility" has the meaning set forth in the preamble.

"Term SOFR" means:

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate and for a tenor comparable to the applicable Interest Period (which, for the avoidance of doubt, for the first the Interest Period commencing on the Effective Date shall be one month), on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S.

Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and.

(b)      for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day;

provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Adjustment" means with respect to any SOFR Loan, 0.10% per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means  the forward-looking term rate based on SOFR .

"Test Period" means, at any date of determination, the period of four consecutive fiscal quarters of the Borrower then last ended as of such time for which financial statements are delivered pursuant to Section 5.01(a) or (b); provided that for any date of determination before the delivery of the first financial statements pursuant to Section 5.01(a) or (b), the Test Period shall be the period of four consecutive fiscal quarters of the Borrower then last ended as of such time.

"Topco" has the meaning assigned to such term in the preliminary statements hereto.

"Transaction Costs" means all fees, premiums, costs and expenses incurred or payable by the Loan Parties or any of their Subsidiaries in connection with the Transactions prior to the Effective Date.

"Transactions" means:

(a) the exchange of First-Out DIP Term Loans and Second-Out DIP Term Loans on a dollar-for-dollar basis for, among other things, the Loans pursuant to the Plan of Reorganization;

(b) the execution and delivery of the Loan Documents, the creation of the Liens pursuant to the Security Documents and the incurrence of the Term Facility and the funding of the Loans on the Effective Date;

(c) the execution and delivery of the ABL Credit Agreement and the other ABL Loan Documents (to the extent entered into on or after the Effective Date or otherwise originally entered into in connection with the ABL Credit Agreement), the creation or continuation on or after the Effective Date of

the Liens pursuant to the Collateral Documents (as defined in the ABL Credit Agreement) and the incurrence or continuance of any borrowings thereunder to be incurred or continued on the Effective Date;

(d) the consummation of the other transactions contemplated by this Agreement on the Effective Date;

(e) the consummation of any other transactions in connection with the foregoing, including, without limitation, the consummation of the approved Plan of Reorganization; and

(f) the payment of the Transaction Costs related thereto.

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Alternate Base Rate.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Special Resolution Regimes" has the meaning specified in Section 9.20.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a U.S. jurisdiction other than the State of New York, the terms "UCC" and "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(e)(ii)(C).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Subsidiary" means any Subsidiary that is a wholly owned subsidiary.

"wholly owned subsidiary" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"Zero Balance Accounts" means Deposit Accounts in which a balance of zero is maintained by the depository institution at all times by automatically transferring funds from a master Deposit Account to such Zero Balance Account in an amount only large enough to cover checks presented and other debits to such account, such that any such Zero Balance Account maintains an overnight balance of zero dollars at all times.

SECTION 1.02     Classification of Loans and Borrowings.

For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Class (e.g. an "Initial Loan") or by Type (e.g., a "SOFR Loan" or "ABR Loan") or by Class and Type (e.g. "SOFR Initial Loan") Borrowings also may be classified and referred to by Class (e.g., and "Initial Loan Borrowing") or by Type (e.g., a "SOFR Borrowing") or by Class and Type (e.g. "SOFR Initial Loan Borrowing").

SECTION 1.03     Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect

as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document, including all schedules, exhibits and other attachments thereto and as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or other modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04    Accounting Terms; GAAP.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.

(b)    Notwithstanding anything to the contrary herein, but subject to Section 1.08, for purposes of determining compliance with any test contained in this Agreement, the Total Net Leverage Ratio and any other financial ratio or test that are calculated with respect to any Test Period during which a Specified Transaction occurs shall be calculated on a Pro Forma Basis. Further, if since the beginning of any such Test Period and on or prior to the date of any required calculation of any financial ratio or test (x) any Specified Transaction has occurred or (y) any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries or any joint venture since the beginning of such Test Period has consummated any Specified Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Test Period as if such Specified Transaction had occurred at the beginning of the applicable Test Period.

SECTION 1.05    Effectuation of Transactions.

All references herein to the Borrower and its Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of the Borrower and the other Loan Parties contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Transactions that occurred on the Effective Date, unless the context otherwise requires.

SECTION 1.06    Certain Determinations.

(a)    Notwithstanding anything to the contrary herein, for purposes of the covenants described in Article V or Article VI or in connection with any Incremental Facility, if any transaction or action would be permitted pursuant to one or more provisions described therein, the Borrower may divide and classify such transaction or action within the relevant covenant (or other provisions) in any manner that complies with such covenant (or other provision) set forth therein, and may later divide and reclassify any such transaction or action so long as the transaction or action (as so divided and/or reclassified) would be permitted to be made in reliance on the applicable exception (or other provisions) as of the date of such reclassification; provided, that such reclassification shall not be permitted with respect to (i) the Indebtedness consisting of the Loans, which shall only be permitted under Section 6.01(a)(i), or Liens with

respect to the Loans, which shall only be permitted under Section 6.02(i) and (ii) the Indebtedness under the ABL Credit Agreement and the other ABL Loan Documents, which shall only be permitted under Section 6.01(a)(xxxi), or Liens with respect to the Obligations (as defined in the ABL Credit Agreement), which shall only be permitted under Section 6.02(xvii). For the avoidance of doubt, if the applicable date for meeting any requirement hereunder or under any other Loan Document falls on a day that is not a Business Day, compliance with such requirement shall not be required until noon on the first Business Day following such applicable date.

(b)        Notwithstanding anything to the contrary herein, with respect to any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that does not require compliance with a financial ratio or test (including any Total Net Leverage Ratio) (any such amounts, the "Fixed Amounts") substantially concurrently with any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that requires compliance with any such financial ratio or test (any such amounts, the "Incurrence Based Amounts"), it is understood and agreed that the Fixed Amounts (and any cash proceeds thereof) shall be disregarded in the calculation of the financial ratio or test applicable to the Incurrence Based Amounts in connection with such substantially concurrent incurrence.

(c)        Notwithstanding the foregoing, for purposes of any determination under Article V, Article VI or Article VII or any determination under any other provision of this Agreement subject to any Dollar limitation, threshold or basket, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than Dollars shall be translated into Dollars based on the relevant currency exchange rate in effect on the applicable date of determination (rounded to the nearest currency unit, with 0.5 or more of a currency unit being rounded upward); provided, however, that for purposes of determining compliance with Article VI with respect to any amount in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness, Lien or Investment is incurred or Disposition, Restricted Payment or prepayment, redemption, purchase  or defeasance is made or such transaction with an Affiliate is entered into; provided, further, that, for the avoidance of doubt, the foregoing provisions of this Section 1.06(c) shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness, Lien or Investment may be incurred or Disposition, Restricted Payment or prepayment, redemption, purchase or defeasance may be made or such transaction with an Affiliate may be entered into at any time under such Sections. For purposes of any determination of Consolidated Total Indebtedness, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the most recently delivered financial statements pursuant to Section 5.01(a) or Section 5.01(b) adjusted to reflect the currency translation effects, determined in accordance with GAAP, of any Swap Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the dollar equivalent thereof. Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent (acting at the direction of the Required Lenders) may from time to time specify with the Borrower's consent (such consent not to be unreasonably withheld) to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

SECTION 1.07        Divisions.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized

and acquired on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.08    Interest Rates.

The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform. Upon the occurrence of a Benchmark Transition Event, Section 2.14(b) provides a mechanism for determining an alternative rate of interest. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability. The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

ARTICLE II

THE CREDITS

SECTION 2.01    Commitments.

(a)    Subject to the terms and conditions set forth herein, the Initial Lenders with Initial Commitments hereby severally, but not jointly, agree to make Initial Loans to the Borrower denominated in dollars on the Effective Date in a principal amount equal to its Initial Commitment by an exchange of its First-Out DIP Term Loans and certain Second-Out DIP Term Loans and accrued and unpaid interest in respect thereof, in accordance with Section 2.01(b) below. Upon such exchange, the Initial Commitment of such Lender shall terminate.

(b)    On the Effective Date and subject to the satisfaction of the conditions precedent set forth in Section 4.01 hereof, pursuant to the Plan of Reorganization and Confirmation Order, each Lender shall be deemed to have exchanged on a dollar-for-dollar basis, pro rata among all applicable Lenders in accordance with their elected First-Out DIP Term Loans and Second-Out DIP Term Loans, First-Out DIP Term Loans and Second-Out DIP Term Loans into Loans to be made by such Lender hereunder. Amounts repaid or prepaid in respect of Loans may not be reborrowed.

SECTION 2.02    Loans and Borrowings.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class. The failure of any Lender to make any Loan required to be made by it shall not relieve

any other Lender of its obligations hereunder, provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

(b)        Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or SOFR Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)        At the commencement of each Interest Period for any SOFR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that a SOFR Borrowing that results from a continuation of an outstanding SOFR Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of five (5) SOFR Borrowings outstanding.

SECTION 2.03        Requests for Borrowings.

To request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing by telecopy, electronic mail, facsimile or overnight courier (a) in the case of a SOFR Borrowing, not later than 12:00 p.m., New York City time, three (3) U.S. Government Securities Business Days before the date of the proposed Borrowing, (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, on the date of the proposed Borrowing; provided that any notice given in connection with Borrowings on the Effective Date (including SOFR Borrowings) may be given not later than 2:00 p.m., New York City time, one (1) Business Day before the Effective Date; provided further that, in each case, the Administrative Agent may in its discretion accept any later request. Each such written Borrowing Request shall be signed by the Borrower substantially in the form of Exhibit F and shall be irrevocable. Each such written Borrowing Request shall specify the following information:

(i)        whether the requested Borrowing is to be a Borrowing of Initial Loans and/or a Borrowing of any other Class (specifying the Class thereof);

(ii)        the aggregate amount of such Borrowing;

(iii)        the date of such Borrowing, which shall be a Business Day;

(iv)        whether such Borrowing is to be an ABR Borrowing or a SOFR Borrowing;

(v)        in the case of a SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(vi)        the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.06.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested SOFR Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04    [Reserved].

SECTION 2.05    [Reserved].

SECTION 2.06    Funding of Borrowings.

(a)    [Reserved.]

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.06 and may, in reliance on such assumption and in its sole discretion, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent. If such Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower agrees to pay such corresponding amount to the Administrative Agent forthwith on demand. The Administrative Agent shall also be entitled to recover from such Lender or Borrower interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrower, the interest rate applicable to such Borrowing in accordance with Section 2.13. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c)    The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 9.03(c).

SECTION 2.07    Interest Elections.

(a)    Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.07. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section 2.07, the Borrower shall notify the Administrative Agent of such election in writing by telecopy, electronic mail, facsimile or overnight courier

58

by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such written Interest Election Request shall be irrevocable and shall be signed by the Borrower.

(c)    Each written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a SOFR Borrowing; and

(iv)    if the resulting Borrowing is to be a SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a SOFR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request in accordance with this Section 2.07, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Borrowing and (ii) unless repaid, each SOFR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08    Termination and Reduction of Commitments.

(a)    On the Effective Date, the Commitments in effect on such date shall terminate upon the making of the relevant Loans.

(b)    The Borrower may at any time terminate, or from time to time reduce, the Commitments of any Class, provided that each reduction of the Commitments of any Class shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 unless such amount represents all of the remaining Commitments of such Class.

(c)    The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section 2.08 at least one (1) Business Day prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.

Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section 2.08 shall be irrevocable. Any termination or reduction of the Commitments of any Class shall be permanent. Each reduction of the Commitments of any Class shall be made ratably among the Lenders of such Class.

SECTION 2.09    Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.10.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section 2.09, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section 2.09 shall control.

(e)    Any Lender may request that Loans of any Class made by it be evidenced by a Note. In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns).

SECTION 2.10    Repayment of Loans.

(a)    To the extent not previously paid, all Loans shall be due and payable on the Maturity Date.

(b)    Prior to any repayment of any Borrowings of any Class hereunder, the Borrower shall select the Borrowing or Borrowings of the applicable Class to be repaid and shall notify the Administrative Agent in writing by telecopy, electronic mail, facsimile or overnight courier of such election not later than 2:00 p.m., New York City time, one (1) Business Day before the scheduled date of such repayment. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent may make (without obligation) such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing. Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid.

SECTION 2.11    Prepayment of Loans.

(a)    Subject to clause (b) below, the Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty.

(b)    (i) In the event that the Borrower prepays, repays, refinances, repurchases, substitutes or replaces all or any portion of the Loans at any time (including, without limitation, optional prepayments described in Section 2.11(a), mandatory prepayments described in Section 2.11(c) and any payments of the Loans occurring after acceleration of the Loans pursuant to Section 7.01, any payments made before or after a Default or an Event of Default, the satisfaction, release, payment, redemption, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any Loans (in whole or in part) in any proceeding under any Debtor Relief Law, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any proceeding under any Debtor Relief Law to the Lenders any payments made after a bankruptcy or insolvency event), the Borrower shall pay to the Administrative Agent, for the account of each applicable Lender:

(A) prior to the first anniversary of the Effective Date, a premium of 3.00% of the aggregate principal amount of the Loans so prepaid, repaid, refinanced, repurchased, substituted or replaced;

(B) during the period from and including the first anniversary of the Effective Date to but not including the second anniversary of the Effective Date, a premium of 2.00% of the aggregate principal amount of the Loans so prepaid, repaid, refinanced, repurchased, substituted or replaced; and

(C) during the period from and including the second anniversary of the Effective Date to but not including the third anniversary of the Effective Date, a premium of 1.00% of the aggregate principal amount of the Loans so prepaid, repaid, refinanced, repurchased, substituted or replaced. For the avoidance of doubt, no prepayment fee shall be payable with respect to the Loans at any time on or after the date that is the third anniversary of the Effective Date.

Each Loan Party acknowledges and agrees that if the payment of the Secured Obligations is accelerated or the principal on the Loans and other Secured Obligations otherwise becomes due in whole or in part prior to, on, or after the Maturity Date, in each case, in respect of any Event of Default (including upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the amounts payable pursuant to this Section 2.11(b)(i) will also be due and payable as though the events referred to therein had occurred and shall constitute part of the Secured Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof. Any amount payable above shall be presumed to be the liquidated damages sustained by each Lender as the result of the early prepayment and each Loan Party agrees that it is reasonable under the circumstances currently existing. The amounts due under this Section 2.11(b)(i) shall constitute liquidated damages, not unmatured interest or a penalty, as the actual amount of damages to the Lenders as a result of payment would be impracticable and extremely difficult to ascertain.  The amounts due under this Section 2.11(b)(i) shall also be payable in the event the Secured Obligations are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means including via a plan of reorganization, or otherwise. EACH LOAN PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBIT OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREMIUM IN

CONNECTION WITH ANY SUCH ACCELERATION OR FORECLOSURE OR DEED IN LIEU OF FORECLOSURE. Each Loan Party expressly agrees (to the fullest extent it may lawfully do so) that: (A) the call premium and payments due hereunder in respect thereof are reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) such payment shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay such amount; and (D) each Loan Party shall be estopped hereafter from claiming differently than as agreed to in this Section 2.11(b)(i). Each Loan Party expressly acknowledges that its agreements in this Section 2.11(b)(i) as herein described is a material inducement to the Lenders in making the Loans as provided herein.

(ii)    All voluntary prepayments shall be applied to the Term Facility or any Incremental Facility (or more than one of such facilities) as determined by the Borrower.

(c)    In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any of its Subsidiaries in respect of any Prepayment Event (other than any Prepayment Event in respect of ABL Priority Collateral (as defined in the Intercreditor Agreement), to the extent such Prepayment Event is in respect of ABL Priority Collateral, as determined by the Borrower in good faith) the Borrower shall, within five (5) Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (b) of the definition of "Prepayment Event", on the date of such Prepayment Event), prepay Borrowings (on a *pro rata* basis among all Borrowings) in an aggregate amount equal to 100% of the amount of such Net Proceeds (together with any amounts due pursuant to Section 2.11(b)(i)); provided that, in the case of any event described in clause (a) of the definition of the term "Prepayment Event", if the Borrower or any of the Subsidiaries invest (or commit to invest) the Net Proceeds from such event (or a portion thereof) within 180 days after receipt of such Net Proceeds in the business of the Borrower and the other Subsidiaries (including any acquisitions permitted under Section 6.04 and capital expenditures), then no prepayment shall be required pursuant to this paragraph in respect of such Net Proceeds in respect of such event (or the applicable portion of such Net Proceeds, if applicable) except to the extent of any such Net Proceeds therefrom that have not been so invested (or committed to be invested) by the end of such 180-day period, at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been so invested (or committed to be invested).

(d)    Notwithstanding anything herein to the contrary, in the event a mandatory prepayment described in Section 2.11(a) is not permitted under the ABL Credit Agreement, neither the Borrower nor any of its Subsidiaries shall undertake such Prepayment Event.

(e)    Prior to any optional prepayment of Borrowings pursuant to Section 2.11(a), the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (f) of this Section 2.11. In the event of any mandatory prepayment of Borrowings made at a time when Borrowings of more than one Class remain outstanding, the Borrower shall select Borrowings to be prepaid so that the aggregate amount of such prepayment is allocated between Borrowings *pro rata* based on the aggregate principal amount of outstanding Borrowings of each such Class; provided that any Lender may elect, by notice to the Administrative Agent in writing by telecopy, electronic mail, facsimile or overnight courier at least two (2) Business Days prior to the prepayment date, to decline all or any portion of any prepayment of its Loans of any such Class pursuant to this Section 2.11 (other than an optional prepayment pursuant to paragraph (a) of this Section or a mandatory prepayment as a result of the Prepayment Event set forth in clause (b) of the definition thereof, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Loans of any such Class but was so declined shall be offered on a pro rata basis to Lenders who did not decline such proceeds. Optional prepayments of Borrowings shall be allocated in direct order

of maturity, and subject to the foregoing, the Administrative Agent shall apply such prepayments in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16; provided that, in connection with any mandatory prepayments by the Borrower of the Loans pursuant to Section 2.11(c), such prepayments shall be applied on a *pro rata* basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are ABR Loans or SOFR Loans.

(f)    The Borrower shall notify the Administrative Agent of any optional prepayment pursuant to Section 2.11(a) in writing by telecopy, electronic mail, facsimile or overnight courier of any prepayment hereunder (i) in the case of prepayment of a SOFR Borrowing, not later than 11:00 a.m., New York City time, three (3) U.S. Government Securities Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one (1) Business Day before the date of prepayment (or, in each case, such later date or date which the Administrative Agent may agree to in its sole discretion). Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13, and subject to Section 2.11(b), shall be without premium or penalty.

(g)    Notwithstanding any other provisions of Section 2.11(c), (A) to the extent that any of or all the Net Proceeds of any Prepayment Event set forth in clause (a) of the definition thereof by a Foreign Subsidiary giving rise to a prepayment pursuant to Section 2.11(c) (a "Foreign Prepayment Event") are prohibited by, would violate or conflict with, or be delayed by, applicable local law from being repatriated to the Borrower, the portion of such Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in Section 2.11(c), as the case may be, and such amounts may be retained by such Subsidiary so long, but only so long, as the Borrower determined in good faith that the applicable local law will not permit repatriation to the Borrower and once the Borrower has determined in good faith that such repatriation of any of such affected Net Proceeds is permitted under the applicable local law, such repatriation will be effected as soon as practicable and such repatriated Net Proceeds will be applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to Section 2.11(c), as applicable, (B) to the extent that and for so long as the Borrower has determined in good faith that repatriation of any or all of the Net Proceeds of any Foreign Prepayment Event would have a material adverse tax or cost consequence with respect to such Net Proceeds, the Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in Section 2.11(c), as the case may be, and such amounts may be retained by such Subsidiary; provided that if the Borrower determines in good faith that repatriation of any of or all the Net Proceeds of any Foreign Prepayment Event so affected would no longer have a material adverse tax consequence with respect to such Net Proceeds, such Net Proceeds shall be applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to Section 2.11(c), as applicable, and (C) to the extent that and for so long as the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Prepayment Event would conflict with the fiduciary duties of a Subsidiary's directors, or result in, or could reasonably be expected to result in, a material risk of personal or criminal liability for any

officer, director, employee, manager, member or management or consultant of such Subsidiary, the Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in Section 2.11(c), as the case may be, and such amounts may be retained by such Subsidiary.

SECTION 2.12    Fees.

The Borrower agrees to pay to the Agents, for their own account, fees in respect of the Term Facility payable in the amounts and at the times separately agreed upon between the Borrower and the Agents in the Administrative Agent Fee Letter.

SECTION 2.13    Interest.

(a)    The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate. The Loans comprising each SOFR Borrowing shall bear interest at Adjusted Term SOFR for the Interest Period in effect for such Borrowing plus the Applicable Rate. Interest (whether Cash Interest or PIK Interest) accrues from and including (x) initially, the Effective Date, (y) following the deemed funding of the Loans on the Effective Date pursuant to Section 2.01, each Interest Payment Date to, but excluding the following Interest Payment Date; provided that:

(i)    interest shall be payable entirely in cash (such interest, "Cash Interest"), provided that, at the Borrower's election or deemed election as set forth in sub-clauses (ii) and (iii) below, up to 2.0% of such interest may be payable entirely as PIK Interest. Such PIK Interest shall become due and payable and be deemed capitalized on the applicable Interest Payment Date and constitute additional principal in respect of the Loans. Unless the context otherwise requires, for all purposes hereof, references to "principal amount" of Loans refers to the original face amount of the Loans plus any increase in the principal amount of the outstanding Loans as a result of payments of PIK Interest;

(ii)    the Borrower may elect to make a portion of interest payments in the form of PIK Interest by delivering to the Administrative Agent a written notice in the form of Exhibit L (a "PIK Interest Election Notice") by 11:00 a.m., New York City time at least five (5) Business Days prior to the applicable Interest Payment Date as provided in Section 2.13(c); and

(iii)    if the Borrower fails to deliver a PIK Interest Election Notice or a written revocation of a then-effective PIK Interest Election Notice not less than five (5) Business Days prior to the commencement of the relevant Interest Period, the Borrower shall be deemed to have made an election of 2.0% of interest related to such Interest Period to be payable as PIK Interest for the applicable interest rate period.

(b)    Notwithstanding the foregoing, if upon the occurrence and during the continuance of any Event of Default any principal of or interest on any Loan or any fee or other amount payable by any Loan Party under a Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, all overdue principal amounts of the Loans shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of the principal of any Loan, 2.00% per annum plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section 2.13 or (ii) in the case of any other amount, 2.00% per annum plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section 2.13.

(c)    Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan, provided that (i) interest accrued pursuant to paragraph (b) of this Section 2.13 shall

be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(d)    All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Adjusted Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.14    Benchmark Replacement Setting.

(a)    Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and the definition of "Adjusted Term SOFR" shall be deemed modified to delete the addition of the Term SOFR Adjustment to Term SOFR for any calculation and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders (or, if such Benchmark Replacement affects fewer than all Classes, the Majority in Interest Lenders of each affected Class).  If the Benchmark Replacement is based upon Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(b)    *Benchmark Replacement Conforming Changes*. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent (acting at the direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    *Notices; Standards for Decisions and Determinations*. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x)the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.14(d) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.14, including any determination with respect to a tenor, rate or

65

adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.14.

(d)     *Unavailability of Tenor of Benchmark*. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will no longer be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     *Benchmark Unavailability Period*. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any pending request for a SOFR Borrowing, of conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans and (ii) any outstanding affected SOFR Loans will be deemed to have been converted to ABR Loans at the end of the applicable Interest Period. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

SECTION 2.15    Increased Costs.

(a)     Increased Costs Generally. If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D)), special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount), then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 2.16    Break Funding Payments.

In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(f) and is revoked in accordance therewith) or (d) the assignment of any SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19 or Section 9.02(c), then, in any such event, the Borrower shall, after receipt of a written request by any Lender affected by any such event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the loss, cost and expense (excluding loss of profit) actually incurred by it as a result of such event. Such loss, cost or expense shall in no event exceed that which would have been incurred by such Lender had it funded each SOFR Loan made by it at Adjusted Term SOFR for such Loan by a matching borrowing for a comparable amount and for a comparable period, whether or not such SOFR Loan was in fact so funded. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 and the reasons therefor delivered to the

Borrower shall be prima facie evidence of such amounts. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt of such demand. Notwithstanding the foregoing, this Section 2.16 will not apply to losses, costs or expenses resulting from Taxes, as to which Section 2.17 shall govern. Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.16 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in similar circumstances under comparable provisions of other credit agreements.

SECTION 2.17    Taxes.

(a)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Requirements of Law. If the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct or withhold any Taxes from such payments, then the applicable withholding agent shall be entitled to make such deductions or withholdings and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law, and if such Taxes are Indemnified Taxes, then the amount payable by the applicable Loan Party shall be increased as necessary so that after all such required deductions or withholdings have been made (including such deductions and withholdings applicable to additional amounts payable under this Section 2.17), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholdings been made.

(b)    The Borrower shall timely pay to the relevant Governmental Authority in accordance with Requirements of Law or, at the option of the Administrative Agent, timely reimburse it for the payment of, any Other Taxes.

(c)    The Loan Parties, jointly and severally, shall indemnify the Administrative Agent and each Lender within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of any Loan Party under any Loan Document, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of any Taxes by a Loan Party to a Governmental Authority pursuant to this Section 2.17, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Each Lender shall, at such times as are reasonably requested by Borrower or the Administrative Agent, provide Borrower and the Administrative Agent with any properly completed and executed documentation prescribed by any Requirement of Law, or reasonably requested by Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under the Loan Documents. Each such Lender shall, whenever a lapse in time or change in circumstances renders any such documentation expired, obsolete or inaccurate in any respect (including any specific documentation

required below in this Section 2.17(e)), deliver promptly to Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify Borrower and the Administrative Agent in writing of its legal inability to do so.  Notwithstanding anything to the contrary in this Agreement, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.17(e)(i), (ii)(A), (ii)(B), (ii)(C), (ii)(D), (iii) and (iv) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Without limiting the generality of the foregoing:

(i)        Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) two properly completed and duly signed copies of IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax.

(ii)       Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) (such Lender, a "Foreign Lender") shall deliver (to the extent it is legally entitled to do so) to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the Administrative Agent) whichever of the following is applicable:

(A)        in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)        two properly completed and duly signed copies of IRS Form W-8ECI (or any successor forms),

(C)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of Exhibit J-1, J-2, J-3 or J-4, as applicable, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (any such certificate a "United States Tax Compliance Certificate"), and (y) two properly completed and duly signed copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(D)        to the extent a Foreign Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of IRS Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by an IRS Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax

Compliance Certificate, IRS Form W-9, IRS Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (provided that, if the Lender is a partnership and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)    any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(iii)    If a payment made to any Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Recipient has or has not complied with such Recipient's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iv)    If the Administrative Agent is a United States person (as defined in Section 7701(a)(30) of the Code), it shall provide the Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-9 or (B) if the Administrative Agent is not a United States person (as defined in Section 7701(a)(30) of the Code), then it shall provide the Borrower with two properly completed IRS Forms W-8ECI with respect to fees received on its own behalf and any such other documentation prescribed by applicable law and reasonably requested by the Borrower that would allow the applicable Borrower to make payments to such Administrative Agent without deduction or withholding of any U.S. federal withholding Taxes. If the Administrative Agent is not a United States person (as defined in Section 7701(a)(30) of the Code), such Administrative Agent shall provide the Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-8IMY (or successor form) certifying that it is either (i) a "qualified intermediary" and that it assumes primary withholding responsibility under Chapters 3 and 4 of the Code and primary Form 1099 reporting and backup withholding responsibility for payments it receives for the account of others or (ii) a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a United States person (as defined in Section 7701(a)(30) of the Code) with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a United States person (as defined in Section 7701(a)(30) of the Code) with respect to such payments as contemplated by U.S. Treasury Regulations Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States.

(f)        If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of Taxes as to which it has been indemnified pursuant to this Section 2.17 or with respect to which additional amounts have been paid pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrower pursuant to this Section 2.17(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential). Notwithstanding anything to the contrary in this Section 2.17(f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this Section 2.17(f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. Notwithstanding anything to the contrary, this Section 2.17(f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential) to any Loan Party or any other person.

(g)        The agreements in this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(h)        For purposes of this Section 2.17, the term "applicable Requirements of Law" includes FATCA.

SECTION 2.18        Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)        The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest or fees, or of amounts payable under Sections 2.15, 2.16 or 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend

71

such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan shall be made in dollars, all payments of accrued interest payable on a Loan shall be made in dollars, and all other payments under each Loan Document shall be made in dollars.

(b)        If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties.

(c)        If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any disproportionate payment obtained by a Lender of any Class as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)        Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)        If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.06(a) or Section 2.06(b), Section 2.18(d) or Section 9.03(c), then the Administrative Agent may, in its discretion and in the order determined by the Administrative Agent (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and to be applied to, any future funding obligations of such Lender under any such Section.

SECTION 2.19    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event gives rise to the operation of Section 2.21, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Sections 2.15 or 2.17 or mitigate the applicability of Section 2.21, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)    If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.21 or (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (C) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.21, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

SECTION 2.20    Incremental Credit Extensions.

(a)    The Borrower may at any time or from time to time on one or more occasions after the Effective Date, by written notice delivered to the Administrative Agent and subject to the prior written consent of the Required Lenders to be granted in their sole discretion, request to add one or more additional Classes of term loans or additional term loans of the same Class as any existing Class of term loans (an "Incremental Facility") and/or increase the principal amount of the Loans by requesting new term loan commitments to be added to such Loans (an "Incremental Increase", and together with any Incremental Facility, the "Incremental Loans" or the "Incremental Facilities"); provided that:

(i)        Incremental Facilities may be borrowed by any one or more Loan Parties, and

(ii)       notwithstanding anything to the contrary herein, the aggregate outstanding principal amount of the Incremental Facilities that can be incurred after the Effective Date shall not exceed $50,000,000.

Each Incremental Facility shall be in a minimum principal amount of $2,000,000 and integral multiples of $500,000 in excess thereof if such Incremental Facilities are denominated in dollars (unless the Borrower and the Lenders and Additional Lenders providing such Incremental Term Loans otherwise agree); provided that such amount may be less than $2,000,000 if such amount represents all the remaining availability under the aggregate principal amount of Incremental Facilities set forth above.

(b)

(i)        The Incremental Loans, in each case other than as permitted by Section 9.02(b)(vi):

(A)        shall rank equal in right of payment with the Loans, shall be secured only by the Collateral securing the Secured Obligations, shall be secured by the Collateral on a *pari passu* basis with the Term Facility, and shall not be guaranteed by any Person which is not a Loan Party;

(B)        shall not mature earlier than the Maturity Date with respect to the Initial Loans (except in the case of bridge loans the terms of which provide for an automatic extension of the maturity date thereof, subject to customary conditions, to a date that is not earlier than the Maturity Date with respect to the Initial Loans);

(C)        shall not have a shorter Weighted Average Life to Maturity (except in the case of bridge loans the terms of which provide for an automatic extension of the maturity date thereof, subject to customary conditions, to a date that is not earlier than the Maturity Date with respect to the Initial Loans) than the remaining Initial Loans;

(D)        shall have a maturity date (subject to clause (B)), an amortization schedule (subject to clause (C)), and interest rates (including through fixed interest rates), interest margins, rate floors, upfront fees, funding discounts, original issue discounts and prepayment terms and premiums for the Incremental Loans as determined by the Borrower and the Additional Lenders thereunder;

(E)        shall not participate on a greater than pro rata basis than the Initial Loans with respect to any mandatory prepayment (other than any scheduled amortization payment); provided that the Borrower and the lenders providing the relevant Incremental Loans shall be permitted, in their sole discretion, to elect to prepay or receive, as applicable, any such prepayment on a less than pro rata basis; and

(F)        may otherwise have terms and conditions different from those of the Loans (including currency denomination);

provided that, except with respect to matters contemplated by clauses (B), (C), (D) and (E) above, the covenants, events of default and guarantees of any such Incremental Loans shall not be materially more restrictive to the Borrower and the

Subsidiaries, when taken as a whole, than the covenants, events of default and guarantees of the Initial Loans, unless:

> (1)    the existing Initial Loans also receive the benefit of such more restrictive terms (it being understood that no consent shall be required from the Administrative Agent or any Lender to add such more restrictive terms for the benefit the existing Initial Loans);

> (2)    any such provisions apply after the Maturity Date with respect to the Initial Loans at the time of incurrence of such Incremental Facility;

> (3)    such terms reflect market terms and conditions (taken as a whole) at the time of establishment of such Incremental Facility, as determined in good faith by the Borrower; or

> (4)    such terms shall be reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower;

> (ii)    upon the incurrence of any Incremental Loans, (x) the representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respect and (y) no Event of Default shall have occurred and be continuing.

(c)    Each notice from the Borrower pursuant to this Section shall set forth the requested amount of the relevant Incremental Facility.

(d)    Commitments in respect of any Incremental Facility shall become Commitments under this Agreement pursuant to an amendment (an "Incremental Facility Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and the Administrative Agent (acting at the direction of such Lenders and Additional Lenders). An Incremental Facility may be provided, subject to the prior written consent of the Borrower (not to be unreasonably withheld), by any existing Lender (it being understood that no existing Lender shall, unless it agrees, be obligated to provide any Incremental Facilities) or by any Additional Lender; provided that the Administrative Agent shall have consent rights (not to be unreasonably withheld, conditioned or delayed) with respect to such Additional Lender, if such consent would be required pursuant to Section 9.04 for an assignment of Loans or Commitments, as applicable, to such Additional Lender. Incremental Loans shall be a "Loan" for all purposes of this Agreement and the other Loan Documents. The Incremental Facility Amendment may, subject to Section 2.20(b), without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent (acting at the direction of the applicable Lenders and Additional Lenders providing such Incremental Term Loans) and the Borrower, to effect the provisions of this Section 2.20. The effectiveness of any Incremental Facility Amendment and the occurrence of any credit event (including the making (but not the conversion or continuation) of a Loan thereunder) pursuant to such Incremental Facility Amendment shall be subject to the satisfaction of such conditions as the parties thereto shall agree and as required by this Section 2.20. The Borrower (or other applicable Loan Party) will use the proceeds of the Incremental Facilities for working capital and other general corporate purposes of the Borrower and its Subsidiaries, including capital expenditures, Permitted Acquisitions and other Investments, Restricted Payments and the refinancing of Indebtedness, and any other use not prohibited by the Loan Documents.

(e)    Notwithstanding anything to the contrary, this Section 2.20 shall supersede any provisions in Section 2.18 or Section 9.02 to the contrary.

SECTION 2.21    Illegality.

If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue SOFR Loans denominated in dollars or to convert ABR Loans denominated in dollars to SOFR Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Alternate Base Rate, the interest rate on such ABR Loans of such Lender shall be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower shall, upon three (3) Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans denominated in dollars of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate), either on the last day of the Interest Period  if the Administrative Agent is advised in writing by such Lender that it may lawfully continue to maintain such SOFR Loans to such day, or immediately, if the Administrative Agent is advised in writing by such Lender that it may not lawfully continue to maintain such SOFR Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Each Lender agrees to notify the Administrative Agent and the Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders and each Agent that:

SECTION 3.01    Organization; Powers.

Each of Parent, the Borrower and its Subsidiaries (a) is duly organized or incorporated, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization or incorporation, (b) has the corporate or other organizational power and authority to carry on its business as now conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdictions) in, every jurisdiction where such qualification is required, except, with respect to clause (a) above (other than with respect to Parent and the Borrower), clause (b) above (other than with respect to Parent and the Borrower) and clause (c) above, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.02    Authorization; Enforceability.

This Agreement has been duly authorized, executed and delivered by Parent and the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of the Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, (ii) general principles of equity, regardless of whether considered in a proceeding in equity or at law, and similar concepts under applicable law, (iii) any other matters which are set out as qualifications or reservations as to matters of law or general application in any legal opinion delivered to an Agent in connection with any Loan Document (together, the "Legal Reservations") and (iv) the Perfection Requirements.

SECTION 3.03    Governmental Approvals; No Conflicts.

Except as set forth in Schedule 3.03 and subject to the Legal Reservations and the Perfection Requirements, the execution, delivery and performance by any Loan Party of this Agreement or any other Loan Document (a) does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of Parent, the Borrower or any other Loan Party, or (ii) any Requirements of Law applicable to Parent, the Borrower or any other Loan Party, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon Parent, the Borrower or any Subsidiary or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by Parent, the Borrower or any Subsidiary, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of Parent, the Borrower or any Subsidiary, except Liens created under the Loan Documents or permitted by Section 6.02, except (in the case of each of clauses (a), (b)(ii), (c) and (d)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right, or imposition of Lien, as the case may be, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04    No Material Adverse Effect.

Since the Effective Date, there has been no Material Adverse Effect.

SECTION 3.05    Properties.

Each of Parent, the Borrower and its Subsidiaries has good title to, or valid interests in, all its real and personal property material to its business, if any (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, in each case, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06    Litigation and Environmental Matters.

(a)    Except as set forth in Schedule 3.06, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting Parent, the Borrower or any of its Subsidiaries that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

77

(b)    Except as set forth in Schedule 3.06, and except with respect to any other matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of Parent, the Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of the Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of the Borrower, any basis to reasonably expect that Parent, the Borrower or any of its Subsidiaries will become subject to any Environmental Liability.

SECTION 3.07    Compliance with Laws.

Each of Parent, the Borrower and its Subsidiaries is in compliance with all Requirements of Law applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.08    Investment Company Status.

None of the Loan Parties is required to register as an "investment company" under the Investment Company Act of 1940, as amended from time to time.

SECTION 3.09    Taxes.

Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and except to the extent such Taxes are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Effective Date, Parent, the Borrower and each Subsidiary (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all Taxes levied or imposed on their properties, income or assets otherwise due and payable (whether or not shown on a Tax return), except any Taxes that are being contested in good faith by appropriate proceedings, provided that Parent, the Borrower or such Subsidiary, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP. There is no proposed Tax assessment, deficiency or other claim against Parent, the Borrower or any Subsidiary that would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.10    ERISA; Labor Matters.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred during the six year period prior to the date on which this representation is made or deemed made or is reasonably expected to occur, and (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

(c)    Except as would not reasonably be expected, individually or in the aggregate to result in a Material Adverse Effect, (i) each employee benefit plan (as defined in Section 3(2) of ERISA) that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue

Service to be exempt from U.S. federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service; (ii) to the knowledge of the Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status; and (iii) there are no pending or, to the knowledge of the Borrower, threatened in writing claims, actions or lawsuits, or action by any Governmental Authority, with respect to any such plan.

(d)      Except as would not reasonably be expected to have a Material Adverse Effect, (i) none of Parent, the Borrower or its Subsidiaries has experienced any labor strike or work stoppage or other collective labor dispute by employees due to labor disagreements and (ii) each of Parent, the Borrower and its Subsidiaries is in compliance in all respects with any collective bargaining agreement to which it is a party.

SECTION 3.11      Disclosure.

(a)      As of the Effective Date, the written reports, financial statements, certificates or other written factual information (other than projections and information of a general economic or industry specific nature) furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished), when taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected and pro forma financial information, the Borrower represents only that such information, when taken as a whole, was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered, it being understood that (i) any such projected financial information is merely a prediction as to future events and is not to be viewed as fact, (ii) such projected financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of Parent, the Borrower or any of its Subsidiaries and (iii) no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material.

(b)      As of the Effective Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification (if any) provided pursuant to Section 4.01(l) is true and correct in all respects.

SECTION 3.12      Subsidiaries.

As of the Effective Date, Schedule 3.12 sets forth the name and jurisdiction of, and the ownership interest of Parent and each of its Subsidiaries in, the Borrower and each Subsidiary of the Borrower.  Each Subsidiary on Schedule 3.12 is a Wholly-Owned Subsidiary and is a Domestic Subsidiary.

SECTION 3.13      Intellectual Property; Licenses, Etc.

Except as would not reasonably be expected to have a Material Adverse Effect, to the knowledge of the Borrower, each of Parent, the Borrower and its Subsidiaries owns, licenses or possesses the right to use all Intellectual Property that is reasonably necessary for the operation of its business substantially as currently conducted. To the knowledge of the Borrower, no Intellectual Property owned by Parent, the Borrower or any Subsidiary and used in the operation of its business as currently conducted infringes upon the Intellectual Property of any Person except for such infringements that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No claim or litigation regarding any of the Intellectual Property is pending or, to the knowledge of the Borrower,

threatened in writing against Parent, the Borrower or any Subsidiary, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

SECTION 3.14        Solvency.

Immediately after the consummation of each of the Transactions that occurred on the Effective Date (including the execution and delivery of this Agreement, the making of the Loans and the use of proceeds of such Loans on the date hereof), the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

SECTION 3.15        Federal Reserve Regulations.

None of Parent, the Borrower or any of its Subsidiaries is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock. No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

SECTION 3.16        Use of Proceeds.

The Borrower will use the proceeds of the Initial Loans made on the Effective Date to directly or indirectly finance the Transactions and to fund any original issue discount or upfront fees payable in connection therewith.

SECTION 3.17        Anti-Corruption Laws and Sanctions.

(a)        Parent, the Borrower and each of its Subsidiaries will not, directly or to their knowledge indirectly, use the proceeds of the Loans to fund any activity or business with any Person, or in any country or territory that, at the time of such funding, is the subject of Sanctions, or in violation of any Anti-Corruption Laws, the USA PATRIOT Act, any sanctions administered by the Office of Foreign Assets Control of the U.S. Department of Treasury and any successor Governmental Authority, or other applicable anti-money laundering or anti-terrorism laws.

(b)        Parent, the Borrower and its Subsidiaries and, to the knowledge of the Borrower, the officers, directors, employees and agents of Parent, the Borrower and its Subsidiaries are in compliance in all material respects with applicable Anti-Corruption Laws and applicable Sanctions, the USA PATRIOT Act, and other applicable anti-money laundering and anti-terrorism laws.

(c)        (i) None of Parent, the Borrower or its Subsidiaries and (ii) to the knowledge of Parent, the Borrower or its Subsidiaries, none of their respective directors, officers, employees and agents that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

(d)        Parent, the Borrower has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance in all material respects by Parent, the Borrower and its Subsidiaries with applicable Anti-Corruption Laws and applicable Sanctions.

SECTION 3.18      Security Documents.

Subject to Section 5.14, the Legal Reservations and the Perfection Requirements, the Security Documents are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Collateral described therein and proceeds and products thereof. In the case of (i) Pledged Equity Interests a represented by certificates, (x) if and when such certificates are delivered to the Collateral Agent or (y) when financing statements in appropriate form are filed in the appropriate filing offices and (ii) the other Collateral described in the Collateral Agreement, which can be perfected by filing a financing statement, when financing statements in appropriate form are filed in the appropriate filing offices and such other filings as are required in the Collateral Agreement have been completed, the Lien created by the Collateral Agreement shall constitute, to the extent such perfection is required by the Collateral Agreement a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds and products thereof, as security for the Secured Obligations.

SECTION 3.19      Insurance.

Parent, the Borrower and each of its Subsidiaries maintain, with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) were financially sound and responsible at the time the relevant coverage was last placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment or the management of the Borrower) are reasonable and prudent in light of the size and nature of its business.

SECTION 3.20      Franchise Agreements.

(a)      Schedule 3.20 sets forth a complete and accurate list as of the Effective Date of all Franchise Agreements to which any Loan Party or any of their Subsidiaries is a party.

(b)      Except as set forth on Schedule 3.20, as of the Effective Date, to the knowledge of the Loan Parties, none of the Franchise Agreements contains any grant of exclusive rights to a territory designated therein which conflicts, or potentially conflicts, with any grant of exclusive rights to a territory granted under any other Franchise Agreement. Except as set forth in Schedule 3.20, as of the Effective Date, no current franchisee under a Franchise Agreement has given written notice to a Loan Party's management during the six (6) month period before the Effective Date of its intention to rescind or terminate (with or without cause) any Franchise Agreement.

(c)      Except as could not reasonably be expected to have a Material Adverse Effect, (i) each Loan Party has prepared and maintained each of its Franchise Disclosure Documents, in an accurate and correct manner, (ii) each Loan Party has filed all required Franchise Disclosure Documents required by law in all states and jurisdictions requiring registration and approval prior to any offers or sales of franchises in such states, and (iii) each Loan Party has filed all material changes, amendments, renewals thereto on a timely and accurate basis as required under, and required by applicable Requirements of Law. Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party's Franchise Disclosure Documents were prepared in compliance with applicable Franchise Laws and disclosure guidelines, and there were no misrepresentations or omissions of information in any Franchise Disclosure Documents at the time such Loan Party was using such Franchise Disclosure Documents. Each Franchise Agreement complies, and the offer and sale of such Franchise Agreement complied, in each case at the time

such offer and sale was made, with all Franchise Laws, except to the extent of any non-compliance therewith which could not reasonably be expected to have a Material Adverse Effect.

ARTICLE IV
CONDITIONS

SECTION 4.01    Effective Date.

The obligation of each Lender to make Loans hereunder on the Effective Date shall be subject to satisfaction of the following conditions (or waiver thereof in accordance with Section 9.02):

(a)    The Required Lenders and the Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    The Required Lenders (or their counsel) and the Administrative Agent shall have received a customary written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Kirkland & Ellis LLP, special counsel to the Loan Parties, and such local counsel as may be reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) in the jurisdictions of organization of any Loan Party, each in form and substance reasonably satisfactory to the Required Lenders.  The Borrower hereby requests such counsel to deliver such opinions.

(c)    The Required Lenders (or their counsel) and the Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Effective Date, with appropriate insertions, or otherwise in form and substance reasonably satisfactory to the Required Lenders, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in paragraph (d) of this Section 4.01, and (ii) a certificate of the Borrower, dated the Effective Date, substantially in the form of Exhibit H, executed by any Responsible Officer of the Borrower.

(d)    The Required Lenders (or their counsel) and the Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) with respect to each Loan Party executing the Loan Documents, an incumbency certificate identifying the name and title and bearing the signatures of the authorized signatories of such Loan Party, (iii) copies of resolutions of the Board of Directors of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Effective Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment and (iv) a good standing certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation.

(e)    (i) The Administrative Agent shall have received all fees required to be paid on the Effective Date pursuant to the Administrative Agent Fee Letter and (ii) all reasonable and documented out-of-pocket expenses required to be paid on the Effective Date shall have been received, including the reasonable and documented out-of-pocket expenses of Paul Hastings LLP, Seward & Kissel LLP and Lazard Frères & Co. LLC, to the extent invoiced (in the case of expenses) at least one (1) Business Day prior to the Effective Date (except as otherwise agreed to by the Borrower).

(f)    The Collateral and Guarantee Requirement (other than in accordance with Section 5.14) shall have been satisfied and the Required Lenders (or their counsel) and the Administrative Agent

shall have received a completed Perfection Certificate dated the Effective Date and signed by a Responsible Officer of the Borrower, together with all attachments contemplated thereby.  Notwithstanding the foregoing, no Collateral shall be subject to any other pledges, security interest or mortgages, except for the Liens permitted under this Agreement.

(g)    After giving effect to the transactions contemplated to be effective on the Effective Date, both (i) Excess Availability (as defined in the ABL Credit Agreement) shall be no less than $50,000,000 and (ii) the unrestricted cash and Cash Equivalents of the Borrower and the operating Subsidiaries of the Borrower shall be no less than $35,000,000.

(h)    The Required Lenders (or their counsel) and the Administrative Agent shall have received executed copies of the ABL Credit Agreement and all material ABL Loan Documents, each of which shall be in form and substance reasonably satisfactory to Required Lenders.

(i)    The Required Lenders (or their counsel) and the Administrative Agent shall have received (i) a certificate from the chief financial officer or equivalent Responsible Officer of the Borrower certifying as to the solvency (as of the Effective Date) of the Borrower and its Subsidiaries on a consolidated basis after giving effect to the Transactions, in substantially the form attached hereto as Exhibit G and (ii) certificates with respect to insurance policies of the Loan Parties as required under Section 5.07, all in form and substance reasonably satisfactory to the Required Lenders.

(j)    (i) All outstanding Indebtedness of the Chapter 11 Debtors pursuant to the Existing DIP Credit Agreement shall have been (or, substantially concurrently with the deemed funding hereunder will be) exchanged on a cashless basis for, among other things, the Loans, and (ii) the Required Lenders (or their counsel) and the Administrative Agent shall have evidence that the Indebtedness under the Existing DIP Credit Agreement, the Existing ABL Credit Agreement, the Existing First Lien Credit Agreement, the Existing Holdco Credit Agreement and the Existing Second Lien Credit Agreement have been, or concurrently with the Effective Date are being, terminated, and all Liens securing obligations thereunder have been, or concurrently with the Effective Date are being, released.

(k)    Prior to or substantially concurrently with the deemed funding of the Loans hereunder, the Transactions shall have been consummated and in accordance with the terms and conditions set forth in the Restructuring Support Agreement and the Plan of Reorganization.

(l)    Any amendment, modification or supplement to the Definitive Documents (as defined in the Plan of Reorganization), all related documentation, including without limitation any amendments, any subsequent plan of reorganization, the Plan Supplement (as defined in the Plan of Reorganization) and/or the Confirmation Order (collectively, the "Plan Documentation") shall be on terms and conditions reasonably satisfactory to the Required Lenders and all Plan Documentation shall have been executed, delivered or filed pursuant to the Plan of Reorganization in form and substance acceptable to Required Lenders.

(m)    (i) The Plan of Reorganization shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order and (ii) all conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or waived in accordance with the terms of the Plan of Reorganization).

(n)    (i) The Administrative Agent shall have received at least three (3) Business Days before the Effective Date all documentation and other information about the Loan Parties that the Administrative Agent reasonably determines is required by United States regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the USA

PATRIOT Act and (ii) if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Administrative Agent and each initial Lender that requests a Beneficial Ownership Certification will have received, at least three (3) Business Days prior to the Effective Date, a Beneficial Ownership Certification in relation to the Borrower, in each case of clauses (i) and (ii), to the extent that the Administrative Agent has reasonably requested such items in writing delivered to the Loan Parties at least ten (10) Business Days prior to the Effective Date.

(o)     The Administrative Agent shall have received a fully executed and delivered Borrowing Request in accordance with the requirements hereof.

(p)     The Required Lenders (or their counsel) and the Administrative Agent (or its counsel) shall have received from each party thereto a counterpart of the Intercreditor Agreement signed on behalf of such party.

ARTICLE V

AFFIRMATIVE COVENANTS

From and after the Effective Date and until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and other amounts (other than contingent amounts not yet due) payable under any Loan Document shall have been paid in full, the Borrower covenants and agrees with the Lenders that:

SECTION 5.01     Financial Statements and Other Information.

Borrower and its Subsidiaries will furnish to the Administrative Agent, on behalf of each Lender:

(a)     (i) on or before the date that is 90 days (or 120 days with respect to the fiscal year of the Borrower ending on or about December 31, 2025 (which may, at the Borrower's option, be limited to the period from the Effective Date to December 31, 2025 or be on a predecessor/successor basis)) after the end of each fiscal year of the Borrower, commencing with the fiscal year of the Borrower ending on or about December 31, 2025, the audited consolidated balance sheet and audited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of the Borrower, the other Loan Parties and their respective Subsidiaries as of the end of and for such year, and related notes thereto, setting forth in each case, in comparative form the figures for the previous fiscal year, all reported on by BDO, Deloitte or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any material qualification or exception as to the scope of such audit (other than with respect to, or resulting from, (A) an upcoming maturity date of any indebtedness for borrowed money or (B) any actual or potential breach or inability to satisfy a financial covenant under any indebtedness for borrowed money)) to the effect that such consolidated financial statements present fairly in all material respects the financial condition as of the end of and for such year and results of operations and cash flows of the Borrower, such other Loan Parties and their respective Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal year;

(b)     (i) on or before the date that is 30 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, commencing with the first fiscal quarter of the Borrower ended after the Effective Date (which may, at the Borrower's option, be limited to the period from the Effective Date to the first fiscal quarter of the Borrower ended after the Effective Date or be on a predecessor/successor basis), the unaudited consolidated balance sheet and unaudited consolidated

statements of operations and comprehensive income, shareholders' equity and cash flows of the Borrower, the other Loan Parties and their respective Subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case, in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition as of the end of and for such fiscal quarter and such portion of the fiscal year and results of operations and cash flows of the Borrower, the other Loan Parties and their Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal quarter;

(c)     not later than thirty (30) days of any delivery of financial statements under paragraph (a) above, a reasonably detailed annual budget for the Borrower, the other Loan Parties and their respective Subsidiaries on a consolidated basis, in a form customarily prepared by the Borrower or otherwise as may be reasonably agreed between the Borrower and the Administrative Agent (it being agreed that such annual budget shall not be provided to Public Lenders);

(d)     not later than five (5) days after any delivery of financial statements under paragraph (a) or (b) above, a certificate (a "Compliance Certificate") of a Financial Officer in the form of Exhibit E hereof certifying as to whether a Default then exists and, if a Default does then exist, specifying the details thereof and any action taken or proposed to be taken with respect thereto;

(e)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower, the other Loan Parties or any of their respective Subsidiaries, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing; and

(f)     on or prior to the date on which any Permitted Holder first acquires, directly or indirectly, 20% or more of the Equity Interests of Topco, furnish to the Administrative Agent all information required by the Beneficial Ownership Certification delivered to accurately account for the change(s) to the list of beneficial owners identified in such certification.

provided that:

(i)     Documents required to be delivered pursuant to Section 5.01(a) or (b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent). The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

(ii)     Notwithstanding anything to the contrary herein, neither the Borrower nor any Subsidiary shall be required to deliver, disclose, permit the inspection, examination or making of copies of or excerpts from, or any discussion of, any document, information, or other matter (A) that constitutes non-financial trade secrets or non-financial proprietary information, (B) in respect of which disclosure to the Administrative Agent (or any Lender (or their respective representatives or contractors)) is prohibited by applicable law, (C) that is subject to attorney-client or similar privilege or constitutes attorney work product or (D) with respect to which any Loan Party owes

confidentiality obligations (to the extent not created in contemplation of such Loan Party's obligations under this Section 5.01) to any third party.

(iii)    The Borrower hereby acknowledges that (A) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (B) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to the Borrower's or its Affiliates' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; provided that the Borrower's failure to comply with this sentence shall not constitute a Default or an Event of Default under this Agreement or the Loan Documents. Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials as "PUBLIC".

(iv)    Each Loan Party hereby acknowledges and agrees that, unless the Borrower notifies the Administrative Agent in advance, all financial statements and certificates furnished pursuant to Sections 5.01(a), (b) and (d) above are hereby deemed to be suitable for distribution, and to be made available, to all Lenders and may be treated by the Administrative Agent and the Lenders as not containing any Material Non-Public Information.

SECTION 5.02    Notices of Material Events.

Promptly after any Responsible Officer of the Borrower or any Subsidiary obtains knowledge thereof, the Borrower or the applicable Subsidiary will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)    the occurrence of any Default or Event of Default (other than any Default resulting from any non-compliance with Section 5.01);

(b)    the occurrence of any ERISA Event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(c)    any litigation, or governmental investigation or proceeding pending against the Borrower or any of its Subsidiaries which, either individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect;

(d)    the delivery of any financial statement, report or material notice under the ABL Loan Documents to or from the ABL Agent and not otherwise required to be delivered to the Administrative

Agent under Section 5.01 or this Section 5.01 and any amendments, waivers, or consents with respect to the ABL Loan Documents; and

(e)    any other development or event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (including, any default notice received by Borrower with respect to the ABL Credit Agreement).

Each notice delivered under this Section 5.02 shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03    Information Regarding Collateral.

(a)    The Borrower will furnish to the Administrative Agent prompt (and in any event within thirty (30) days or such longer period as reasonably agreed to by the Administrative Agent) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or incorporation or like document), (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number to the extent that such Loan Party is organized or owns Mortgaged Property in a jurisdiction where an organizational identification number is required to be included in a UCC financing statement for such jurisdiction.

(b)    Not later than five (5) Business Days after delivery of financial statements pursuant to Section 5.01(a), the Borrower shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of the Borrower setting forth any material changes to the information required pursuant to the Perfection Certificate or confirming that there has been no material change in such information since the date of the Perfection Certificate delivered on the Effective Date or the date of the most recent certificate delivered pursuant to this Section 5.03.

SECTION 5.04    Existence; Conduct of Business.

The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, Material Intellectual Property and Governmental Approvals used in the conduct of its business, except to the extent (other than with respect to the preservation of the existence of the Borrower) that the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any Disposition permitted by Section 6.05.

SECTION 5.05    Payment of Taxes, etc.

The Borrower will, and will cause each of its Subsidiaries to, pay all Taxes (whether or not shown on a Tax return) imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except where (a) the same are being contested in good faith by an appropriate proceeding diligently conducted by the Borrower or any of its Subsidiaries, (b) the failure to make payment would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (c) such Taxes are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Effective Date.

SECTION 5.06    <u>Maintenance of Properties</u>.

The Borrower will, and will cause each of its Subsidiaries to, keep and maintain all tangible property material to the conduct of its business in good working order and condition (subject to casualty, condemnation and ordinary wear and tear), except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.07    <u>Insurance</u>.

(a)    The Borrower will, and will cause each of its Subsidiaries to, maintain, with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment or the management of the Borrower) are reasonable and prudent in light of the size and nature of its business, and will furnish to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the insurance so carried. Each such general liability policy of insurance, to the extent covering Collateral and to the extent that the Collateral Agent can be granted an insurable interest therein, shall (i) in the case of each such general liability policy, name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each such casualty insurance policy, contain a loss payable clause or mortgagee endorsement that names the Collateral Agent, on behalf of the Secured Parties as the loss payee or mortgagee thereunder.

(b)    If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower shall, or shall cause each Loan Party to (i) if required by the Flood Insurance Laws or other applicable law, maintain, or cause to be maintained, with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) furnish to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the flood insurance so carried.

SECTION 5.08    <u>Books and Records; Inspection and Audit Rights</u>.

(a)    The Borrower will, and will cause each of its Subsidiaries to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP (or applicable local standards) consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or its Subsidiary, as the case may be. The Borrower will, and will cause each of its Subsidiaries that is a Loan Party to, permit any representatives designated by the Administrative Agent or any Lender, during normal business hours and upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; <u>provided</u> that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent (or its designees) on behalf of the Lenders may exercise visitation and inspection rights of the Administrative Agent and the Lenders under this <u>Section 5.08</u> and the Administrative Agent shall not

exercise such rights more often than one time during any calendar year absent the existence of an Event of Default and such time shall be at the Borrower's expense; provided, further that (a) when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

(b)     The Borrower will, within 30 days (or, after using commercially reasonable efforts to schedule such call at a later date agreed to by the Required Lenders, at their sole discretion) after the date of the delivery (or, if later, required delivery) of the quarterly and annual financial information pursuant to Sections 5.01(a) and (b), hold a conference call or teleconference, at a time selected by the Borrower and reasonably acceptable to the Required Lenders, with all of the Lenders that choose to participate, to review the financial results of the previous fiscal quarter or fiscal year of the Borrower, as the case may be, of the Borrower (it being understood that any such call may be combined with any similar call held for any of the Borrower's other lenders or security holders).

SECTION 5.09      Compliance with Laws.

(a)     The Borrower will, and will cause each of its Subsidiaries to, comply with its Organizational Documents and all Requirements of Law (including ERISA, Environmental Laws, the USA PATRIOT Act, Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the U.S. Foreign Corrupt Practices Act of 1977 and other anti-money laundering, anti-corruption, sanctions and anti-terrorism laws) with respect to it, its property and operations, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)     The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country except to the extent permissible for a Person required to comply with Sanctions, (ii) in any manner that would result in the violation of any Sanctions applicable to the Borrower and its Subsidiaries or to the knowledge of the Borrower, any other party hereto or (iii) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any legislation.

SECTION 5.10      Use of Proceeds.

The Borrower will use the proceeds of the Loans for the purposes set forth in Section 3.16.

SECTION 5.11      Additional Subsidiaries.

(a)     If (i) any additional Subsidiary is formed or acquired after the Effective Date or (ii) any Subsidiary ceases to be an Excluded Subsidiary, then, the Borrower will, within thirty (30) days (or such longer period as may be agreed to by the Required Lenders in their reasonable discretion) after such newly formed or acquired Subsidiary is formed or acquired or such Subsidiary ceases to be an Excluded Subsidiary, notify the Administrative Agent thereof, and will cause such Subsidiary (unless such Subsidiary is an Excluded Subsidiary) to satisfy the Collateral and Guarantee Requirement with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party within thirty (30) days after such notice (or such longer period as the Required Lenders shall reasonably agree) and the Administrative Agent shall have received a completed Perfection

Certificate (or supplement thereof) with respect to such Subsidiary signed by a Responsible Officer, together with all attachments contemplated thereby.

(b)     [Reserved].

(c)     Notwithstanding the foregoing, in the event any real property would be required to be mortgaged pursuant to this <u>Section 5.11</u>, the Borrower shall be required to comply with the "Collateral and Guarantee Requirement" as it relates to such real property within ninety (90) days, following the formation or acquisition of such real property or such Subsidiary or the identification of such new Subsidiary, or such longer time period as agreed by the Required Lenders in their  reasonable discretion.

SECTION 5.12     <u>Further Assurances</u>.

(a)     The Borrower will, and will cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Required Lenders may reasonably request, in each case, to cause the "Collateral and Guarantee Requirement" to be and remain satisfied, all at the expense of the Loan Parties.

(b)     If, after the Effective Date, any material assets (other than Excluded Assets), including any owned (but not leased or ground-leased) Material Real Property or improvements thereto or any interest therein, are acquired by the Borrower or any other Loan Party or are held by any Subsidiary of any Loan Party on or after the time it becomes a Loan Party pursuant to <u>Section 5.11</u> (other than assets constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof or constituting Excluded Assets), the Loan Parties will notify the Administrative Agent thereof, and, if requested by the Administrative Agent or the Required Lenders, the Borrower will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Administrative Agent or the Required Lenders to grant and perfect such Liens, including actions described in paragraph <u>(a)</u> of this Section and as required pursuant to the "Collateral and Guarantee Requirement", all at the expense of the Loan Parties and subject to the last paragraph of the definition of the term "Collateral and Guarantee Requirement". In the event any Material Real Property is mortgaged pursuant to this <u>Section 5.12(b)</u>, the Borrower or such other Loan Party, as applicable, shall be required to comply with the "Collateral and Guarantee Requirement" and paragraph <u>(a)</u> of this <u>Section 5.12</u> within ninety (90) days following the acquisition of such Material Real Property or such longer time period as agreed by the Required Lenders.

SECTION 5.13     <u>Franchise Agreements</u>.

The Borrower will, and will cause each Loan Party to, satisfy and perform in all material respects all obligations of each such Person under each Franchise Agreement, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.14     <u>Certain Post-Closing Obligations</u>.

As promptly as practicable, and in any event within the time periods after the Effective Date specified in <u>Schedule 5.14</u> or such later date as the Administrative Agent (acting at the direction of the Required Lenders) agrees to in writing, including to reasonably accommodate circumstances unforeseen on the Effective Date, the Borrower and each other Loan Party shall deliver the documents or take the

actions specified on Schedules 5.14(a) that, where such actions are to be taken to reasonably accommodate circumstances unforeseen on the Effective Date, would have been required to be delivered or taken on the Effective Date, in each case except to the extent otherwise agreed by the Agent (acting at the direction of the Required Lenders) pursuant to its authority as set forth in the definition of the term "Collateral and Guarantee Requirement".

SECTION 5.15    Maintenance of Ratings.

The Borrower shall use commercially reasonable efforts to maintain (i) a public corporate credit rating (but not any particular rating) from S&P and a public corporate family rating (but not any particular rating) from Moody's, in each case in respect of the Borrower, and (ii) subject to Section 5.14, shall use commercially reasonable efforts to obtain a public rating (but not any particular rating) in respect of the Loans made available under this Agreement from each of S&P and Moody's.

ARTICLE VI

NEGATIVE COVENANTS

From and after the Effective Date and until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable (other than (i) contingent amounts not yet due and (ii) Cash Management Obligations) under any Loan Document have been paid in full, the Borrower (and, in the case of Section 6.14, Parent) covenants and agrees with the Lenders that:

SECTION 6.01    Indebtedness; Certain Equity Securities.

(a)    The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(i)    Indebtedness of the Borrower and any of the Subsidiaries under the Loan Documents (including any Indebtedness incurred pursuant to Section 2.20);

(ii)    Indebtedness outstanding on the Effective Date and set forth on Schedule 6.01;

(iii)    Guarantees by the Loan Parties and their respective Subsidiaries in respect of Indebtedness of the Borrower or any of their respective Subsidiaries otherwise permitted hereunder; provided that (A) such Guarantee is otherwise permitted by Section 6.04, (B) no Guarantee by any Subsidiary of a Loan Party of any unsecured Indebtedness for borrowed money that constitutes Material Indebtedness shall be permitted unless such Subsidiary shall have also provided a Guarantee of the applicable Secured Obligations pursuant to the Guarantee Agreement and (C) if the Indebtedness being guaranteed is subordinated to the Secured Obligations, such Guarantee shall be subordinated to the Guarantee of the Secured Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(iv)    Indebtedness of the Loan Parties or any of their respective Subsidiaries owing to another Loan Party or any of its Subsidiaries, to the extent permitted by Section 6.04;

(v)    (A) Indebtedness (including Capital Lease Obligations and purchase money indebtedness) incurred, issued or assumed by the Borrower or any Subsidiary to finance the acquisition, purchase, lease, construction, repair, replacement or improvement of fixed or capital

property, equipment or other assets; <u>provided</u> that, in the case of any purchase money Indebtedness, such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, purchase, lease, construction, repair, replacement or improvement; <u>provided</u>, <u>further</u> that, at the time of any such incurrence of Indebtedness and after giving Pro Forma Effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding (excluding any Capital Leases incurred pursuant to any sale and leaseback transactions permitted by <u>Section 6.06</u>) shall not exceed $10,000,000 and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause <u>(A)</u> (or successive Permitted Refinancings thereof);

(vi)    Indebtedness in respect of Swap Agreements not incurred for speculative purposes;

(vii)    [reserved];

(viii)    [reserved];

(ix)    [reserved];

(x)    Indebtedness in respect of Cash Management Obligations and other Indebtedness in respect of netting services, automated clearinghouse arrangements, overdraft protections and similar arrangements, in each case, in connection with deposit accounts or from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(xi)    Indebtedness consisting of obligations under deferred compensation (including indemnification obligations, obligations in respect of purchase price adjustments, Earn-Outs, incentive non-competes and other contingent obligations) or other similar arrangements incurred or assumed in connection with any Permitted Acquisition, any other Investment or any Disposition, in each case, permitted under this Agreement;

(xii)    (A) Indebtedness of the Borrower or any of the Subsidiaries; <u>provided</u> that at the time of the incurrence thereof and after giving Pro Forma Effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause <u>(xii)</u> shall not exceed $5,000,000 and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause <u>(A)</u> (or successive Permitted Refinancings thereof);

(xiii)    [reserved];

(xiv)    [reserved];

(xv)    Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xvi)    Indebtedness supported by a letter of credit, in a principal amount not to exceed the face amount of such letter of credit;

(xvii)    (A) Indebtedness arising from an agreement providing for indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments incurred in any Permitted Acquisition, any other Investment or any Disposition, in

each case permitted under this Agreement, and (B) Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance pursuant to any such agreement described in clause (A);

(xviii)  [reserved];

(xix)  [reserved];

(xx)  [reserved];

(xxi)  [reserved];

(xxii)  Indebtedness incurred by the Borrower or any of the Subsidiaries in respect of letters of credit, bank guarantees, warehouse receipts, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xxiii)  obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case, in the ordinary course of business or consistent with past practice;

(xxiv)  (x) Indebtedness representing deferred compensation or stock-based compensation owed to employees, consultants or independent contractors of the Borrower or its Subsidiaries incurred in the ordinary course of business or consistent with past practice and (y) Indebtedness consisting of obligations of the Borrower (or any direct or indirect parent thereof) or its Subsidiaries under deferred compensation to employees, consultants or independent contractors of the Borrower (or any direct or indirect parent thereof) or its Subsidiaries or other similar arrangements incurred by such Persons in connection with the Transactions, any Permitted Acquisition or any other Investment not prohibited by Section 6.04;

(xxv)  Indebtedness consisting of unsecured promissory notes issued by the Borrower or any Subsidiary to future, current or former officers, directors, employees, managers and consultants or their respective estates, spouses or former spouses, successors, executors, administrators, heirs, legatees or distributees, in each case to finance the purchase or redemption of Equity Interests of the Borrower (or any direct or indirect parent thereof) to the extent permitted by Section 6.07(a);

(xxvi)  [reserved];

(xxvii)  Capital Lease Obligations arising under any sale and leaseback transaction permitted hereunder in reliance upon Section 6.05(f);

(xxviii) to the extent constituting Indebtedness, motor vehicle leases in the ordinary course of business;

(xxix)  [reserved];

(xxx)    [reserved];

(xxxi)    Indebtedness incurred pursuant to any ABL Credit Agreement and the other ABL Loan Documents (including incremental incurrences and increased amounts thereunder) in an aggregate principal amount not to exceed (A) $125,000,000 plus (B) other amounts not constituting principal, in each case, and any Permitted Refinancing thereof; provided that, to the extent such Indebtedness is secured, the ABL Agent (or other applicable representative on behalf of the holders of such Indebtedness) shall have entered into with the Agents (or any of them) the Intercreditor Agreement;

(xxxii)    [reserved]; and

(xxxiii) all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxxii) above;

provided that:

(A)    The Borrower will not, and will not permit any of its Subsidiaries to, issue any Disqualified Equity Interests.

(B)    For purposes of determining compliance with any dollar denominated restriction on the incurrence of Indebtedness, the dollar equivalent principal amount of Indebtedness denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided, however, that if such Indebtedness is a Permitted Refinancing incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable dollar denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance such dollar denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Permitted Refinancing does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased. Notwithstanding any other provision of this Section 6.01, the maximum amount of Indebtedness of the Borrower or any Subsidiary may incur pursuant to this Section 6.01 shall not be deemed exceeded by fluctuations in the exchange rate of currencies. The principal amount of any Permitted Refinancing shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of any extension, replacement, refunding, refinancing, renewal or defeasance of any Indebtedness.

SECTION 6.02    Liens.

The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned (but not leased or ground-leased) or hereafter acquired (but not leased or ground-leased) by it, except:

(i)    Liens created under the Loan Documents;

(ii)    Permitted Encumbrances;

(iii)    Liens existing on the Effective Date and set forth on <u>Schedule 6.02</u>;

(iv)    Liens securing Indebtedness permitted under <u>Section 6.01(a)(v)</u>; <u>provided</u> that (A) such Liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness except for replacements, additions, accessions and improvements to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Lease Obligations, such Liens do not at any time extend to or cover any assets (except for replacements, additions, accessions and improvements to or proceeds of such assets) other than the assets subject to such Capital Lease Obligations; <u>provided</u> <u>further</u> that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)    (i) easements, leases, licenses, subleases or sublicenses granted to others (including licenses and sublicenses of Intellectual Property) that do not (A) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (B) secure any Indebtedness and (ii) any interest or title of a lessor or licensee under any lease or license entered into by the Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased or licensed;

(vi)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)    Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, (B) attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business or (C) in favor of a banking or other financial institution or entity, or electronic payment service provider, arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking or finance industry;

(viii)    Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to <u>Section 6.04</u> to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under <u>Section 6.05</u> (including any letter of intent or purchase agreement with respect to such Investment or Disposition), or (B) consisting of an agreement to dispose of any property in a Disposition permitted under <u>Section 6.05</u>, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix)    Liens on cash collateral posted to secure insurance policy premiums or other obligations in respect of existing insurance policies in an amount not to exceed $3,000,000 in the aggregate;

(x)    [reserved];

(xi)    Liens existing on property or other assets at the time of its acquisition or existing on the property or other assets of any Person at the time such Person becomes a Subsidiary, in each case after the Effective Date and any modifications, replacements, renewals or extensions thereof; <u>provided</u> that (A) such Lien was not created in contemplation of such acquisition or such

Person becoming a Subsidiary and (B) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition);

(xii)     any interest or title of a lessor or sublessor under leases or subleases (other than leases constituting Capital Lease Obligations) entered into by the Borrower or any Subsidiary in the ordinary course of business;

(xiii)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by the Borrower or any Subsidiary in the ordinary course of business;

(xiv)     Liens deemed to exist in connection with Investments in repurchase agreements under clause (e) of the definition of the term "Permitted Investments";

(xv)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xvi)     Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(xvii)     Liens securing Obligations (as defined in the ABL Credit Agreement) under the ABL Credit Agreement and the other ABL Loan Documents; provided that the ABL Agent (or other applicable representative on behalf of the holders of such Indebtedness) shall have entered into with the Agents (or any of them) the Intercreditor Agreement;

(xviii)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)     [reserved];

(xx)     Liens on real property other than the Mortgaged Properties;

(xxi)     [reserved];

(xxii)     Liens on assets not constituting Collateral securing Indebtedness permitted under Section 6.01(a)(xii);

(xxiii)     Liens on cash and Permitted Investments to secure Indebtedness permitted under Section 6.01(a)(x);

(xxiv)  Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; provided such satisfaction or discharge is permitted hereunder;

(xxv)  Receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxvi)  [reserved];

(xxvii)  Capital Lease Obligations arising under any sale and leaseback transaction permitted hereunder in reliance upon Section 6.05(f);

(xxviii)  other Liens; provided that at the time of the granting of and after giving Pro Forma Effect to any such Lien and the obligations secured thereby (including the use of proceeds thereof) the lesser of (x) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xxviii) and (y) the fair market value of the assets securing such obligations shall not exceed $5,000,000;

(xxix)  Liens in favor of credit card issuers and credit card processors arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements; and

(xxx)  Liens on motor vehicles securing Indebtedness permitted by clause (xxviii) of Section 6.01.

With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any increased amount of such Indebtedness.

SECTION 6.03    Fundamental Changes.

(a)  The Borrower will not, and will not permit any of its Subsidiaries to, merge into or consolidate with any other Person (including pursuant to a division), or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that:

(i)  (A) any Subsidiary may merge or consolidate with the Borrower; provided that the Borrower shall be the continuing or surviving Person and (B) any Subsidiary may merge or consolidate with one or more other Subsidiaries; provided that when any Subsidiary Loan Party is merging or consolidating with another Subsidiary the continuing or surviving Person shall be a Subsidiary Loan Party;

(ii)  any Subsidiary may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Loan Party;

(iii)  subject to prior written consent by the Required Lenders in each case to be granted in their sole discretion, the Borrower, the other Loan Parties and their respective Subsidiaries may undertake or consummate any Tax Restructuring;

(iv)  any Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an Investment permitted pursuant to Section 6.04; provided that the

continuing or surviving Person shall be the Borrower or a Subsidiary, which together with each of the Subsidiaries, shall have complied with the requirements of Sections 5.11 and 5.12; and

(v)     any Subsidiary may effect a merger, dissolution, liquidation, consolidation or amalgamation to effect a Disposition permitted pursuant to Section 6.05.

(b)     Neither the Borrower, nor any other Loan Party, shall amend or permit any amendments to such Person's Organizational Documents after the Effective Date in any manner that (when taken as a whole) would be materially adverse to Lenders.

SECTION 6.04     Investments, Loans, Advances, Guarantees and Acquisitions.

The Borrower will not, and will not permit any of its Subsidiaries to, make or hold any Investment, except:

(a)     Permitted Investments at the time such Permitted Investment is made and purchases of assets in the ordinary course of business consistent with past practice;

(b)     loans or advances to officers, members of the Board of Directors and employees of the Borrower, any other Loan Party and their respective Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes and (ii) in connection with such Person's purchase of Equity Interests of the Borrower (or any direct or indirect parent thereof) (provided that the amount of such loans and advances made in cash to such Person shall be immediately contributed to the Borrower in cash as common equity or Qualified Equity Interests);

(c)     Investments by the Borrower or any Subsidiary in the Borrower or any Subsidiary;

(d)     Investments consisting of extensions of trade credit and accommodation guarantees in the ordinary course of business;

(e)     Investments existing or contemplated on the Effective Date and set forth on Schedule 6.04(e);

(f)     Investments in Swap Agreements incurred in the ordinary course of business and not for speculative purposes;

(g)     promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 6.05, subject to prior written consent by the Required Lenders in their sole discretion;

(h)     commencing on the date that is ninety (90) days after the Effective Date, (A) Permitted Acquisitions and (B) intercompany Investments required (as determined by the Borrower in good faith) to consummate Permitted Acquisitions; provided that all entities, businesses and assets (other than Excluded Assets) acquired through a Permitted Acquisition after the Effective Date shall become Loan Parties and Collateral, as applicable, pursuant to Sections 5.11 and 5.12;

(i)     Investments in connection with the Transactions;

(j)     Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers in the ordinary course of business;

(k)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)    [reserved];

(m)    additional Investments and other acquisitions; provided that:

(i)    the aggregate outstanding amount of such Investment or acquisition made in reliance on this clause (m), together with the aggregate amount of all consideration paid (excluding the Net Proceeds from the issuance of such Qualified Equity Interests) in connection with all other Investments and acquisitions made in reliance on this clause (m) (including the aggregate principal amount of all Indebtedness assumed in connection with any such other Investment or acquisition previously made under this clause (m)), shall not exceed $5,000,000 (in each case determined without regard to write-downs or write-offs); and

(ii)    any Investment made in reliance on this clause (m) shall be subject to (y) no Event of Default under paragraph (a), (b), (h) or (i) of Section 7.01 having occurred and be continuing or resulting therefrom and (z) before and after giving Pro Forma Effect to such Investment, on a Pro Forma Basis, the Total Net Leverage Ratio being less than or equal to 3.00 to 1.00 as of the end of the most recently ended Test Period as of such time;

(n)    advances of payroll payments to employees in the ordinary course of business;

(o)    Investments and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests;

(p)    commencing on the date that is ninety (90) days after the Effective Date, Investments of a Subsidiary acquired after the Effective Date or of a Person merged or consolidated with any Subsidiary in accordance with this Section 6.04 and Section 6.03 after the Effective Date or that otherwise becomes a Subsidiary (provided that if such Investment is made under Section 6.04(h), existing Investments in subsidiaries of such Subsidiary or Person shall comply with the requirements of Section 6.04(h)) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(q)    receivables owing to the Borrower, any other Loan Party or any of their respective Subsidiaries, if created or acquired in the ordinary course of business;

(r)    Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business;

(s)    Investments in the Borrower, any other Loan Party or any of their respective Subsidiaries in connection with any Tax Restructuring;

(t)    [reserved];

(u)    Investments consisting of Indebtedness, Liens, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this Section 6.04(u)) under Sections 6.01, 6.02, 6.03, 6.05 and 6.07, respectively;

(v)    contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Borrower;

(w)    to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property or other rights, in each case in the ordinary course of business;

(x)    [reserved];

(y)    [reserved];

(z)    [reserved];

(aa)    [reserved];

(bb)    Investments arising as a result of sale and leaseback transactions permitted by Section 6.06 hereto; and

(cc)    loans and advances to franchisees in the ordinary course of business (A) in connection with the sale of Franchise Rights or (B) to provide working capital to franchisees; provided that (i) such loans and advances in excess of $750,000 individually shall be evidenced by promissory notes and any such promissory notes shall be pledged to the Collateral Agent to the extent required by the Security Documents and (ii) the aggregate outstanding principal amount of such loans and advances made in reliance on this clause (cc) shall not exceed $2,000,000;

provided that:

(i)    notwithstanding anything to the contrary in this Section 6.04, other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries of the Loan Parties in a transaction not prohibited by this Agreement, no Material Intellectual Property (except for non-exclusive leases or non-exclusive licenses with respect thereto) as of the Effective Date owned or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be contributed and/or assigned as an Investment or otherwise transferred to any non-Loan Party; and

(ii)    for the avoidance of doubt, no Material Intellectual Property shall be owned by a non-Loan Party at any time on or after the Effective Date.

SECTION 6.05    Asset Sales.

The Borrower will not, and will not permit any of its Subsidiaries to, (i) sell, transfer, lease or otherwise dispose (including pursuant to a division) of any asset, including any Equity Interest owned by it or (ii) permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law and other than issuing Equity Interests to the Borrower or a Subsidiary in

100

compliance with Section 6.04(c)) (each, a "Disposition" and the term "Dispose" as a verb has the corresponding meaning), except:

(a)      Dispositions of obsolete, damaged, used, surplus or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable to maintain, in the conduct of the business of the Borrower and its Subsidiaries (including allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, be dedicated to the public domain or be invalidated);

(b)      Dispositions of inventory and other assets in the ordinary course of business and immaterial assets (considered in the aggregate) in the ordinary course of business;

(c)      Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) an amount equal to Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)      Dispositions of property to the Borrower or a Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then the transferee must be a Loan Party;

(e)      Dispositions permitted by Section 6.03 and Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.07 and Liens permitted by Section 6.02;

(f)      Dispositions of property pursuant to sale and leaseback transactions permitted by Section 6.06 hereto;

(g)      Dispositions of Permitted Investments;

(h)      Dispositions of accounts receivable in connection with the collection or compromise thereof (including sales to factors or other third parties);

(i)      leases, subleases, service agreements, product sales, abandonments, licenses, sublicenses or other disposals (including of Intellectual Property), in each case, (A) granted in the ordinary course of business or (B) that do not materially interfere with the business of the Loan Parties and their respective Subsidiaries, taken as a whole;

(j)      transfers of property subject to Casualty Events;

(k)      sales or other dispositions by the Borrower, the other Loan Parties or any respective Subsidiary of equipment and fixtures located at distribution centers in an aggregate amount not to exceed $100,000;

(l)      [reserved];

(m)      Dispositions or forgiveness of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(n)      Dispositions of any assets (including Equity Interests) (A) acquired in connection with any Permitted Acquisition or other Investment not prohibited hereunder, which assets are not used or useful to the core or principal business of the Borrower and its Subsidiaries and (B) made to obtain the approval of any applicable antitrust authority in connection with a Permitted Acquisition;

(o)      Dispositions of assets in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(p)      transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(q)      [reserved];

(r)      the sale or other disposition of retail store locations to a franchisee; provided that the aggregate fair market value of assets disposed pursuant to this clause (r) shall not exceed $1,000,000;

(s)      [reserved]; and

(t)      sales or other dispositions by the Borrower or any Subsidiary of assets in connection with the closing or sale of a retail store location (the closure of a store is not in and of itself the disposition of assets), warehouse, distribution center or corporate office of the Borrower or Subsidiary in the ordinary course of business of the Borrower or Subsidiary, which sale or disposition consists of leasehold interests in the premises of such store or distribution center, the equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such store or distribution center; provided, that, such sale shall be on commercially reasonable prices and terms in a bona fide arm's length transaction.

Notwithstanding anything to the contrary in this Section 6.05, other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries in a transaction not prohibited by this Agreement, no Loan Party shall, directly or indirectly, sell or otherwise transfer (except for non-exclusive leases or non-exclusive licenses with respect thereto) any Material Intellectual Property owned as of the Effective Date or thereafter acquired or any interest in any Franchise Agreement to any non-Loan Party.

SECTION 6.06      Sale and Leaseback Transactions.

The Borrower will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any tangible property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for any such sale of any fixed or capital assets by the Borrower or any Subsidiary that is made for cash consideration in an amount not less than the fair market value (as determined in good faith by the Borrower) of such fixed or capital asset and is consummated within 270 days after the Borrower or such Subsidiary, as applicable, acquires or completes the construction of such fixed or capital asset; provided that the aggregate amount of sale and leaseback transactions pursuant to this Section 6.06 shall not exceed $5,000,000.

SECTION 6.07      Restricted Payments; Certain Payments of Indebtedness.

(a)      The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(i)        each Subsidiary may make Restricted Payments to the Borrower or any other Subsidiary;

(ii)        the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person to the extent that such Equity Interests are not Disqualified Equity Interests;

(iii)        Restricted Payments made on or substantially contemporaneously with the Effective Date to consummate the Transactions, including to finance the payment of Transaction Costs;

(iv)        repurchases of Equity Interests in the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price or withholding Taxes payable in connection with the exercise of such options or warrants or other incentive interests;

(v)        Restricted Payments used to redeem, acquire, retire, repurchase or settle the Borrower's Equity Interests (or any options, warrants, restricted stock or stock appreciation rights or similar securities issued with respect to any such Equity Interests) held directly or indirectly by current or former officers, managers, consultants, members of the Board of Directors, employees or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of the Borrower (or any direct or indirect parent thereof), and its Subsidiaries (in each case, other than the executive management (i.e., the CEO, the CFO, any executive vice presidents and any similar executive management positions)), upon the death, disability, retirement or termination of employment of any such Person or otherwise in accordance with any stock option or stock appreciation rights plan, any management, director and/or employee stock ownership or incentive plan, stock subscription plan, employment termination agreement or any other employment agreements or equity holders' agreement in an aggregate amount not to exceed: (1) the cash proceeds of key man life insurance policies received by the Borrower, any other Loan Party or their respective Subsidiaries after the Effective Date, or (2) the amount of any bona fide cash bonuses otherwise payable to members of the Board of Directors, consultants, officers, employees, managers or independent contractors the Borrower, any other Loan Party or any of their respective Subsidiaries that are foregone in return for the receipt of Equity Interests, the fair market value of which is equal to or less than the amount of such cash bonuses, which, if not used in any year, may be carried forward solely to the next subsequent fiscal year; provided further that cancellation of Indebtedness owing to the Borrower, any other Loan Party or any of their respective Subsidiaries from members of the Board of Directors, consultants, officers, employees, managers or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of the Borrower, any other Loan Party or any of their respective Subsidiaries in connection with a repurchase of Equity Interests of the Borrower will not be deemed to constitute a Restricted Payment for purposes of this Section 6.07 or any other provisions of this Agreement.

(vi)        for any taxable period (or portion thereof) for which Parent, the Borrower and/or any other Subsidiary is treated as a corporation for U.S. federal or state income or similar tax purposes and is a member of a consolidated, combined, unitary or similar tax group (a "Tax Group") (or is treated as a disregarded entity that is wholly owned by a corporation that is a member of a Tax Group for U.S. federal or state income or similar tax purposes) of which Parent or any other direct or indirect parent of Parent is the common parent (the "Common Parent"), distributions to Parent, which Parent may further distribute, directly or indirectly, to the Common Parent (if

Parent is not the Common Parent), in an amount not to exceed: the amount of U.S. federal, state and local income taxes that Parent and its subsidiaries would have been required to pay if they were a stand-alone Tax Group with Parent as the common parent of such stand-alone Tax Group for such year (or portion thereof), with such taxes calculated at the maximum combined U.S. federal, state, and local income tax rates applicable to a corporation resident in any jurisdiction within the United States;

(vii)    on the date of consummating the Buddy Reorganization Transaction, the Borrower or its Subsidiaries may make the distributions expressly described in the definition therewith;

(viii)    [reserved];

(ix)    payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units; provided that if such payments are finally determined to be in excess of the withholding or similar Taxes, Borrower shall make best efforts to cause the return of such payments within thirty (30) days of such determination;

(x)    Restricted Payments to pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition (or other similar Investment) and (b) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms; and

(xi)    payments made or expected to be made by the Borrower, any other Loan Party or any of their respective Subsidiaries in respect of withholding or similar Taxes payable upon exercise of Equity Interests by any future, present or former employee, director, officer, manager or consultant (or their respective controlled Affiliates or permitted transferees) and any repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants or required withholding or similar Taxes; provided that if such payments are finally determined to be in excess of the withholding or similar Taxes, Borrower shall make best efforts to cause the return of such payments within thirty (30) days of such determination.

(b)    The Loan Parties will not, and will not permit any of their respective Subsidiaries to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness incurred pursuant to Section 6.01(a)(xii), or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase redemption, retirement, acquisition cancellation or termination of any Indebtedness incurred pursuant to Section 6.01(a)(xii) or any other payment (including any payment under any Swap Agreement) that has a substantially similar effect to any of the foregoing, in each case, except:

(i)    payment of regularly scheduled interest and principal payments, mandatory offers to repay, repurchase or redeem, mandatory prepayments of principal, premium and interest, and payment of fees, expenses and indemnification obligations, in each case with respect to such Indebtedness incurred pursuant to Section 6.01(a)(xii) (other than payments in

respect of any subordinated Indebtedness permitted hereunder that is prohibited by the subordination provisions thereof); and

(ii) refinancings of Indebtedness to the extent permitted by Section 6.01(a)(xii).

Notwithstanding anything to the contrary in this Agreement, no Material Intellectual Property (except for non-exclusive leases, non-exclusive licenses or Excluded Assets with respect thereto) owned as of the Effective Date or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be made as a Restricted Payment or Investment, or otherwise transferred to or held by, any non-Loan Party.

SECTION 6.08    Transactions with Affiliates.

The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(i) (A) transactions between or among the Borrower, any other Loan Party or any of their respective Subsidiaries or any entity that becomes a Subsidiary as a result of such transaction and (B) transactions involving aggregate payment or consideration of less than $2,500,000;

(ii) on terms not materially less favorable to the Borrower, such other Loan Party or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's length transaction with a Person other than an Affiliate (as determined by the majority of the members of the Board of Directors or a majority of the disinterested members of the Board of Directors of the Borrower in good faith);

(iii) the payment of Transaction Costs, fees and expenses related to the Transactions;

(iv) Dispositions in the form of a sale of furniture and assignment of lease agreements to franchisees in the ordinary course of business consistent with past practices, so long as the sale thereof is approved by disinterested members of the Board of Directors (or any committee thereof);

(v) issuances of Equity Interests;

(vi) employment and severance arrangements and other compensation arrangements between the Borrower, any other Loan Party and their respective Subsidiaries and their respective officers and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Sections 6.04(b) and 6.04(n));

(vii) investments by Affiliates in Indebtedness and preferred Equity Interests of the Loan Parties and their respective Subsidiaries;

(viii) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board of Directors, officers and employees of the Borrower (or any direct or indirect parent thereof) and the Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(ix) transactions pursuant to agreements in existence or contemplated on the Effective Date and set forth on <u>Schedule 6.08</u> or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(x) Restricted Payments permitted under <u>Section 6.07</u> and Investments permitted under <u>Section 6.04</u>;

(xi) payments to or from, and transactions with, any joint venture in the ordinary course of business (including any cash management activities related thereto);

(xii) transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services that are Affiliates, in each case in the ordinary course of business and which are fair to the Borrower, any other Loan Parties and their respective Subsidiaries, in the reasonable determination of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party; and

(xiii) the Buddy Reorganization Transaction.

SECTION 6.09    <u>Restrictive Agreements</u>.

The Borrower will not, and will not permit any of its Subsidiaries to enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties with respect to the Secured Obligations or under the Loan Documents; <u>provided</u> that the foregoing shall not apply to:

(a) restrictions and conditions imposed by (1) Requirements of Law, (2) any Loan Document, (3) the ABL Loan Documents or (4) any documentation governing any Permitted Refinancing incurred to refinance any such Indebtedness referenced in clauses <u>(1)</u> through <u>(3)</u> above;

(b) customary restrictions and conditions existing on the Effective Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c) restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; <u>provided</u> that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d) customary provisions in leases, licenses, sublicenses and other contracts restricting the assignment thereof;

(e) restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f) any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower or any other Subsidiary;

(g)    [reserved];

(h)    restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)    restrictions set forth on Schedule 6.09 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)    [reserved];

(k)    customary restrictions contained in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto;

(l)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary; and

(m)    customary provisions related to creditworthiness of the tenant contained in real property leases entered into by Subsidiaries, so long as the Borrower or other Loan Party has determined in good faith that such creditworthiness provisions could not reasonably be expected to impair the ability of the Borrower or such other Loan Party and its respective Subsidiaries to meet their ongoing obligations.

SECTION 6.10    Subsidiaries.

The Borrower will not, and will not permit any of its Subsidiaries to have any Subsidiary that is not a Domestic Subsidiary or a Wholly-Owned Subsidiary.

SECTION 6.11    Changes in Fiscal Periods.

The Borrower will not make any change in its fiscal year; provided, however, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent (acting at the direction of the Required Lenders) will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year, without any requirement of consent by any Lender or other Person (notwithstanding anything to the contrary in Section 9.02); and provided further that the limitation of this Section 6.11 shall not apply with respect to any short year resulting from the Transactions that occurred on the Effective Date.

SECTION 6.12    Amendment of Financing Documents.

The Borrower will not, and will not permit any of its Subsidiaries to, amend, modify, waive, terminate or release any ABL Loan Document  in a manner restricted by the terms of any applicable intercreditor or subordination agreement.

SECTION 6.13    Franchise Agreements.

The Borrower will not, and will not permit any of its Subsidiaries to, maintain or distribute any Franchise Disclosure Documents, or enter into any Franchise Agreements, in violation of Section 3.20(c).

SECTION 6.14    Passive Status of Parent and Topco.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, none of Parent or Topco:

(a) shall have any liabilities or Indebtedness and, in the case of Parent, shall only provide Guarantees of Indebtedness permitted under Section 6.01 by the Borrower and its Subsidiaries, including borrowings under this Agreement, the ABL Credit Agreement and any other Indebtedness permitted under Section 6.01;

(b) shall engage in any operating or business activities other than its direct or indirect, as applicable, ownership of the Borrower and indirect ownership of the Borrower's Subsidiaries, and activities incidental to the maintenance of its corporate existence and its direct or indirect, as applicable, ownership of the Borrower and indirect ownership of the Borrower's Subsidiaries; and

(c) shall own any property or assets other than the Equity Interests in the Borrower or Parent, as applicable, in each case, other than:

(i) performing its obligations and activities related thereto under its Organizational Documents, the Loan Documents, the ABL Loan Documents and the documents, agreements and other instruments entered into in connection therewith;

(ii) participating in tax, accounting and other administrative activities relating to the maintenance of its legal existence, including paying taxes, preparing reports to Governmental Authorities and to its shareholders, holding directors and shareholders meetings, as applicable, preparing corporate records and other corporate activities required to maintain its separate corporate structure;

(iii) providing reasonable and customary indemnification to its current and former officers, directors, managers, members of management, employees, advisors, consultants or independent contractors, as applicable;

(iv) financing activities, including issuing and offering its Qualified Equity Interests, payment of dividends and making contributions to the capital of any Loan Party, in each case, subject to the terms of this Agreement;

(v) (A) incurring and paying fees, costs and expenses related to the transactions permitted by this Section 6.14, and (B) otherwise incurring ordinary overhead costs and expenses (including administrative, legal, accounting and similar expenses);

(vi) activities reasonably incidental to the consummation of a Tax Restructuring; and

(vii) other activities incidental to each of the foregoing.

ARTICLE VII

EVENTS OF DEFAULT

SECTION 7.01    Events of Default.

If any of the following events (any such event, an "<u>Event of Default</u>") shall occur:

(a)    any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    any Loan Party shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) of this <u>Section 7.01</u>) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of Parent, the Borrower or any of the Subsidiaries in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect (or all respects to the extent already qualified by materiality) when made or deemed made, and such incorrect representation or warranty (if curable) shall remain incorrect for a period of thirty (30) days after the earlier of (i) any Loan Party's knowledge of such breach or (ii) written notice thereof from the Administrative Agent (which notice will be given at the request of the Required Lenders) to the Borrower;

(d)    Parent, the Borrower or any of the Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in (i) <u>Sections 5.02(a)</u>, <u>5.04</u> (with respect to the existence of the Borrower), <u>5.10</u>, <u>5.14</u>, or in <u>Article VI</u> or (ii) <u>Sections 5.01(a)</u>, <u>5.01(b)</u>, <u>5.01(c)</u>, <u>5.01(d)</u>, <u>5.01(f)</u> and such failure shall continue unremedied for a period of five (5) Business Days; provided that such five-Business Day period shall not apply in the case of: (A) any failure to observe any such covenant which is not capable of being cured at all or within such five-Business Day period or which has been the subject of a prior failure within a six-month period;

(e)    Parent, the Borrower or any of the Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this <u>Section 7.01</u>) and such failure shall continue unremedied for a period of thirty (30) days after written notice thereof from the Administrative Agent to the Borrower;

(f)    [reserved];

(g)    any event or condition occurs that results in any Material Indebtedness, Indebtedness under the ABL Loan Documents becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any such Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, <u>provided</u> that this paragraph (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness, other than on account of failure to make a payment required as a result of such termination or similar events;

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, court protection, reorganization or other relief in respect of any Loan Party or its debts, or of a material part of its assets, under any Federal, state or foreign bankruptcy, insolvency,

receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, examiner, sequestrator, conservator or similar official for any Loan Party or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in paragraph (h) of this Section 7.01, (iii) apply for or consent to the appointment of a receiver, trustee, examiner, custodian, sequestrator, conservator or similar official for any Loan Party or for a material part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(j)    one or more final, non-appealable, enforceable judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by insurance (including self-insurance) as to which the insurer has been notified of such judgment or order and has not denied coverage) shall be rendered against any Loan Party and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan Party that are material to the businesses and operations of the Loan Parties and their respective Subsidiaries, taken as a whole, to enforce any such judgment;

(k)    an ERISA Event occurs that has resulted or would reasonably be expected to result in a Material Adverse Effect;

(l)    any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Documents, except (i) as a result of the sale or other disposition of the applicable Collateral to a Person that is not a Loan Party in a transaction permitted under the Loan Documents, (ii) as a result of any Agent's (or any agent acting on its behalf pursuant to any applicable Intercreditor Agreement) failure to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Documents or (B) file Uniform Commercial Code continuation statements, (iii) as to Collateral consisting of real property to the extent that (x) such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (y) such deficiency arose through no fault of Borrower or its Subsidiaries, and such deficiency is corrected with reasonable diligence upon obtaining actual knowledge thereof, or (iv) as a result of acts or omissions of any Agent or any Secured Party;

(m)    any material provision of any Loan Document or any material Guarantee of the Loan Document Obligations shall for any reason be asserted in writing by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)    any material Guarantee of the Loan Document Obligations by any Loan Party pursuant to the Guarantee Agreement shall cease to be in full force and effect (other than in accordance with the terms of the Loan Documents); or

(o)    a Change of Control shall occur;

then, and in every such event (other than an event with respect to the Borrower described in paragraph (h) or (i) of this Section 7.01), and at any time thereafter during the continuance of such event, the

Administrative Agent, at the direction of the Required Lenders, shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:

(i)     terminate the Commitments, and thereupon the Commitments shall terminate immediately; and

(ii)    (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in paragraph (h) or (i) of this Section 7.01, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

SECTION 7.02     Application of Proceeds.

(a)     Subject to the terms of any applicable Intercreditor Agreement contemplated by this Agreement, in connection with the exercise of remedies provided for in Section 7.01, any amounts received on account of the Secured Obligations (including in respect of any sale of, collection from or other realization upon all or any part of the Collateral (including any Collateral consisting of cash) or the Guarantees) shall be applied by the Administrative Agent and/or the Collateral Agent, as applicable, to the payment of the Secured Obligations as follows:

(i)     to the payment of:

(A) first, all reasonable and documented or invoiced out of pocket costs and expenses incurred by the Agents in connection with such sale, collection, other realization or otherwise and to the payment of all other amounts owing to each of the Administrative Agent, and the Collateral Agent in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all reasonable and documented or invoiced out of pocket court costs and the fees and expenses of its agents, the repayment of all advances made by it under any Loan Document on behalf of any Loan Party and any other reasonable and documented out-of-pocket costs or expenses incurred in connection with the exercise of any right or remedy under any Loan Document, in each case, if and to the extent payable pursuant to the terms of the Loan Documents; and

(B) second, all reasonable and documented out-of-pocket costs and expenses incurred by the Lender Professionals in connection with such sale, collection, other realization or otherwise, in each case, to the extent required to be reimbursed pursuant to Section 9.03(a) of this Agreement;

(ii)    second, to the payment in full of the Secured Obligations (the amounts so applied to be distributed among such Secured Parties *pro rata* in accordance with the amounts of the Secured Obligations owed to them on the date of any such distribution) in accordance with this Agreement;

(iii)   third, to any agent of any other junior secured debt, in accordance with any applicable Intercreditor Agreement; and

(iv)     fourth, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

In the event that application of payments or Collateral proceeds is to be made after any bankruptcy or insolvency proceeding has been commenced, references in this Section 7.02(a) with respect to (i) interest shall include interest accruing after the commencement of such bankruptcy or insolvency proceeding whether or not such interest is an allowed claim in such bankruptcy or insolvency proceeding, and (ii) any other amounts shall only include amounts that are allowed claims in such bankruptcy or insolvency proceeding.

(b)     Notwithstanding anything to the contrary in Section 7.02(a), Excluded Swap Obligations with respect to any Loan Party shall not be paid with amounts received from such Loan Party or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Secured Obligations otherwise set forth in Section 7.02(a).

ARTICLE VIII

ADMINISTRATIVE AGENT

SECTION 8.01     Appointment and Authority.

(a)     Each of the Lenders hereby irrevocably (i) designates and appoints (A) Wilmington Trust, National Association to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and (B) Wilmington Trust, National Association  to act on its behalf as Collateral Agent hereunder and under the other Loan Documents and (ii) authorizes the Administrative Agent and the Collateral Agent (in their capacities as such), as applicable, to take such actions on such Lender's behalf and to exercise such powers as are expressly delegated to the Administrative Agent and the Collateral Agent, as applicable, by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents, hereby irrevocably appoints Wilmington Trust, National Association  to act on its behalf as Collateral Agent under the Security Documents and authorizes Wilmington Trust, National Association (in its capacity as Collateral Agent) to take such actions on such Secured Party's behalf and to exercise such powers as are expressly delegated to the Collateral Agent by the terms hereof or thereof together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirements of Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)     Each of the Lenders and each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents, hereby irrevocably appoints and authorizes the Collateral Agent, as applicable, to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers as are reasonably incidental thereto. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent and/or the Collateral Agent pursuant to Section 8.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article VIII

112

and Article IX (including Section 9.03 as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

SECTION 8.02      Rights as a Lender.

Any Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, own securities of, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 8.03      Exculpatory Provisions.

No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, each Agent:

(a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, and shall not be required to exercise any discretion or to take any action, but shall be required to act or refrain from acting (and shall be fully protected in so acting or refraining from acting) as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that such Agent shall not be required to take any action (i) unless it is furnished with an indemnification satisfactory to such Agent from the Lenders with respect thereto or (ii) that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law;

(c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity;

(d)      shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions;

(e)      shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment;

113

(f)        shall be deemed not to have knowledge of any Default unless and until written notice describing such Default conspicuously marked as a "notice of default" is given to such Agent by the Borrower or a Lender and received by an officer of such Agent responsible for the administration of this Agreement;

(g)        shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien or security interests purported to be granted to such Agent pursuant to this Agreement or any other Loan Document have been or will continue to be properly or sufficiently or lawfully created, perfected or enforced or are entitled to any particular priority, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article IV, or (vii) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents;

(h)        shall not be responsible for nor have any duty to monitor the performance or any action of the Borrower or other Loan Party, or any of their directors, members, officers, agents, affiliates or employees, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party, and may assume performance by all such Persons of their respective obligations and shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other Person;

(i)        shall not be liable for any action taken in good faith and reasonably believed by it to be within the powers conferred upon it, or taken by it pursuant to any direction or instruction by which it is governed, or omitted to be taken by it by reason of the lack of direction or instruction required hereby for such action (including without limitation for refusing to exercise discretion or for withholding its consent in the absence of its receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instructions to exercise such discretion or grant such consent from any such Lender, as applicable);

(j)        shall not be liable for any error of judgment made by it (or by an officer or other employee of such Agent) in good faith;

(k)        not be liable for any indirect, special, punitive or consequential damages (including, without limitation, lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action;

(l)        not be required to take any action under this Agreement, the other Loan Documents or any related document if taking such action would (A) subject such Agent to a tax in any jurisdiction where it is not then subject to a tax or (B) would require such Agent to qualify to do business in any jurisdiction where it is not then so qualified;

(m)        shall not have any duty as to any collateral in its possession or in the possession of someone under its control or in the possession or control of any agent or nominee of the Agents or any income thereon or as to the preservation of rights prior parties or any other rights pertaining thereto, except the duty to accord such of the collateral as may be in its possession substantially the same care as it accords similar assets held for the benefit of third parties and the duty to account for monies received by it. The

Agents shall not be under any obligation to independently request or examine insurance coverage with respect to any collateral nor shall the Agent's be liable for the acts or omissions of any bank, depositary bank, custodian, independent counsel of any other Person or any other party selected by the Agents with reasonable care or selected by any other party hereto that may hold or possess collateral or documents related to collateral, and the Agents shall not be required to monitor the performance of any such Persons holding collateral. For the avoidance of doubt, the Agents shall not be responsible to the Lenders for the perfection of any lien or for the filing, form, content or renewal of any UCC financing statements, fixture filings, mortgages, deeds of trust and such other documents or instruments;

(n)    notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, shall not be under any obligation (i) to monitor, determine or verify the unavailability or cessation of any Benchmark (or other applicable benchmark interest rate), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any date on which such rate may be required to be transitioned or replaced in accordance with the terms of the Loan Documents, applicable law or otherwise, (ii) to select, determine or designate any replacement to such rate, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied, (iii) to select, determine or designate any adjustment or modifier to any replacement or successor index, or (iv) to determine whether or what any amendments to this Agreement or the other Loan Documents are necessary or advisable, if any, in connection with any of the foregoing. The Agents shall not be liable for any inability, failure or delay on its part to perform any of its duties set forth in this Agreement or any other Loan Document as a result of the unavailability of any Benchmark (or other applicable benchmark interest rate), including as a result of any inability, delay, error or inaccuracy on the part of any other party, including without limitation any Lenders or Borrower, in providing any direction, instruction, notice or information required or contemplated by the terms of this Agreement and reasonably required for the performance of such duties. The Agents shall have no liability for any interest rate published by any publication that is the source for determining the interest rates of the Loans, including but not limited to Bloomberg (or any successor source) and the Bloomberg or Reuters screen (or any successor source), or for any rates published on any publicly available source, including without limitation the Federal Reserve Bank of New York's Website or any website administered by the Term SOFR Administrator, or in any of the foregoing cases for any delay, error or inaccuracy in the publication of any such rates, or for any subsequent correction or adjustment thereto; and

(o)    if at any time an Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any Collateral), such Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate, and if such Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, such Agent shall not be liable to any of the parties hereto or to any other Person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

The Agents' rights, protections, indemnities and immunities provided in this Agreement shall apply to such Agent for any actions taken or omitted to be taken under this agreement and any other Loan Documents and any other related agreements in any of its respective capacities.

SECTION 8.04    Reliance by Agents.

(a)    Each Agent shall be entitled to conclusively rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution)

believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may conclusively rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. As to any matters not expressly provided for in this Agreement and in the other Loan Documents (including enforcement or collection), the Administrative Agent and/or the Collateral Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Lender. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders. Notwithstanding anything herein or in any other Loan Document to the contrary, and without limiting any rights, protections, immunities or indemnities to the Agents hereunder, phrases such as "satisfactory to the [Administrative Agent][Collateral Agent]," "approved by the [Administrative Agent][Collateral Agent]," "acceptable to the [Administrative Agent][Collateral Agent]," "as determined by the [Administrative Agent][Collateral Agent]," "in the [Administrative Agent][Collateral Agent]'s discretion," "selected by the [Administrative Agent][Collateral Agent]," "elected by the [Administrative Agent][Collateral Agent]," "requested by the [Administrative Agent][Collateral Agent]," and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to take such action or to exercise such rights. Upon request by the Administrative Agent and/or the Collateral Agent, as the case may be, the Required Lenders shall confirm in writing the Administrative Agent's authority and/or the Collateral Agent's authority, as the case may be, to take any action in accordance with the terms of the Loan Documents and this Section 8.04 and may refrain from acting until such confirmation has been provided.

(b)    Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement, or any other Loan Document, to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent or the Collateral Agent, it is understood that in all cases the Administrative Agent or such Collateral Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document). The Administrative Agent and Collateral Agent shall have no liability for any failure or delay in taking any actions contemplated above as a result of a failure or delay on the part of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document) to provide such instruction, advice or concurrence. This provision is intended solely for the benefit of each of the Administrative Agent and the Collateral Agent and its successors and permitted

assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

(c)    The Administrative Agent and the Collateral Agent shall in all cases be fully justified in failing or refusing to act unless it shall receive further assurances to its reasonable satisfaction, including indemnification, from the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  No provision of this Agreement or any Loan Document shall require the Administrative Agent or the Collateral Agent to take any action that it reasonably believes to be contrary to applicable law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

SECTION 8.05    Delegation of Duties.

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent.  Any Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. No Agent shall be responsible for the acts or omissions of any sub-agents selected by it without gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of any Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Term Facility and the Incremental Facility as well as activities as such Agent.

SECTION 8.06    Resignation of Administrative Agent; Mergers.

(a)    Each Agent may resign upon thirty (30) days' notice to the Lenders and the Borrower, whether or not a successor Agent has been appointed. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Borrower's consent (such consent not to be unreasonably withheld or delayed) unless an Event of Default has occurred and is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may (but shall not be obligated to) on behalf of the Lenders, appoint, or petition a court of competent jurisdiction to appoint, a successor Agent, which shall be an Approved Bank with an office in New York, New York, or an Affiliate of any such Approved Bank (the date upon which the retiring Agent is replaced, the "Resignation Effective Date"); provided that if the retiring Agent shall notify the Borrower and the Lenders that no qualifying Person accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice.

(b)    If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except (i) that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed and (ii) with respect to any outstanding payment obligations) and (2) except for any

117

indemnity payments or other amounts then owed to the retiring or removed Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents as set forth in this Section. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 9.04 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

(d)     Any corporation or association into which an Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which an Agent is a party, will be and become the successor Agent under this Agreement and related Loan Documents and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

SECTION 8.07     <u>Non-Reliance on Agents and Lenders</u>.

(a)     Each Lender acknowledges that it has, independently and without reliance upon any Agent, any Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)     Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or Incremental Facility Amendment pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Agents and/or the Lenders on the Effective Date.

(c)     No Lender and no other Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent and the Collateral Agent on behalf of the Lenders and the other Secured Parties in accordance with the terms thereof. In the event of a foreclosure by the Administrative Agent or the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent or such Collateral Agent,

118

as agent for and representative of the Lenders and the other Secured Parties (but not any Lender, Lenders, Secured Party or Secured Parties in its or their respective individual capacities) (either directly or through one or more acquisition vehicles), upon instructions from Required Lenders, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations (other than Obligations owing to the Agents) as a credit on account of the purchase price for any collateral payable by the Administrative Agent or the Collateral Agent on behalf of the Lenders at such sale or other disposition. Each Lender, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral, and of the Guarantees of the Secured Obligations, to have agreed to the foregoing provisions.

SECTION 8.08    [Reserved].

SECTION 8.09    Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, and any Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and such Agent and their respective agents and counsel and all other amounts due the Lenders and each Agent under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and, by its acceptance of the benefits of the Security Documents , each Secured Party that is not a party hereto, to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of any Agent and its agents and counsel, and any other amounts due such Agent under Sections 2.12 and 9.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any Secured Party that is not a party hereto any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or any Secured Party that is not a party hereto to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

SECTION 8.10    No Waiver; Cumulative Remedies; Enforcement.

No failure by any Lender or any Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other

Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Article VII for the benefit of all the Secured Parties; provided, however, that the foregoing shall not prohibit (a) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 9.08 (subject to the terms of Section 2.18), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided further that if at any time there is no Person acting as an Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to such Agent pursuant to Article VII and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.18, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

SECTION 8.11    Withholding Taxes.

To the extent required by any applicable Requirements of Law (as determined in good faith by the Administrative Agent), the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Loan Parties pursuant to Section 2.17 and without limiting any obligation of the Loan Parties to do so pursuant to such Section) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 8.11. The agreements in this Section 8.11 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

SECTION 8.12    Credit Bidding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (other than any Secured Obligations owing to the Agents) (including by accepting some or all of the Collateral a in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the

Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, such Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid, (i) the Administrative Agent (or the Required Lenders on its behalf) shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Required Lenders shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) each of the Secured Parties shall be authorized to receive, ratably on account of the relevant Secured Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of Secured Obligations credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Secured Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Secured Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent or the Required Lenders may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

SECTION 8.13    Erroneous Payments.

(a)    If the Administrative Agent (x) notifies a Lender, Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were

erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all time remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 8.13 and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this Section 8.13 shall be conclusive, absent manifest error.

(b)    Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it (or a Payment Recipient on its behalf) receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)    it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)    such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.13(b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this Section 8.13(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 8.13(a) or on whether or not an Erroneous Payment has been made.

(c)    Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured

Party under any Loan Document or from any other source against any amount that the Administrative Agent has demanded to be returned under the immediately preceding clause (a).

(d)     The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event an Erroneous Payment (or portion thereof) are not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Secured Obligations owed by the Borrower or any other Loan Party; provided that this Section 8.13(d) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Secured Obligations of the Borrower relative to the amount of the Secured Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided further, that for the avoidance of doubt, the immediately preceding clauses, (x) and (y) shall not apply, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for purposes of making such Erroneous Payment.

(e)     Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, in no event shall the occurrence of an Erroneous Payment (or the existence of any Erroneous Payment Subrogation Rights or other rights of the Administrative Agent in respect of an Erroneous Payment) result in the Administrative Agent becoming, or being deemed to be, a Lender hereunder or the holder of any Loans hereunder.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(g)     Notwithstanding anything in this Section 8.13 to the contrary, the Borrower shall not be liable for the losses of any party due to an Erroneous Payment. Each party's obligations under this Section 8.13 shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Loan Document Obligations under any Loan Document.

SECTION 8.14 Secured Cash Management Obligations and Secured Swap Obligations.

(a)     Prior to being recognized as a Secured Party hereunder, each Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed, shall be required to execute and deliver to the Collateral Agent and the Borrower a written notice, and by receiving the benefits of this Agreement and the other Loan Documents, and the liens granted hereunder and thereunder, such Person shall be deemed to agree to, and acknowledge that it is bound by, the terms of this Agreement and any related Loan Documents, and to have agreed to each Agent's rights, protections, immunities and indemnities set forth in this Agreement and the Loan Documents, and such rights, protections, immunities and indemnities shall be equally applicable with respect to such Person. Upon the Administrative Agent's and the Borrower's receipt of such written notice, such entity shall become a Secured Party hereunder and the Loan Documents. Notwithstanding anything herein to the contrary, the rights, protections, immunities and indemnities afforded to the Agents in this Article VIII with respect to the Lenders shall also be

applicable to each Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed as if such Person were specifically set forth in this Article VIII.

(b)     Each Person to whom any Secured Cash Management Obligations and Secured Swap Obligations are owed hereby appoints each Agent as its agent; it being understood and agreed that the rights and benefits of each such Person under this Agreement and the Loan Documents consist exclusively of such Person's being a beneficiary of the liens and security interests (and, if applicable, guarantees) granted to the Collateral Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In connection with any action taken by an Agent, including, without limitation, with respect to any distribution of payments and collections, each Agent shall be entitled to assume (and shall have no liability for so assuming) no amounts are owing to any such Person (and no Secured Cash Management Obligations and Secured Swap Obligations are held by any such Person) unless such Person has provided written notification to the Agents of the amount that is owing to it (on which each Agent may conclusively rely) and such notification is received by the Agents within a reasonable period of time prior to the making of such distribution, which in any event shall be at least five (5) Business Days prior to such distribution.

(c)     Notwithstanding anything to the contrary contained herein or in any Loan Document, it is understood and agreed that only Lenders (which shall not include for this purpose any Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed) shall be entitled to instruct and direct an Agent to take, or omit to take, any action (including, without limitation, in connection with any default, Event of Default or enforcement of remedies) hereunder or under any Loan Document. Each Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed agrees that it shall not provide, nor shall it be entitled to provide, any direction or instruction to an Agent, and no Agent shall in any event be responsible or liable for failing to comply with any such direction or instruction.

(d)     For the avoidance of doubt and notwithstanding anything contained herein to the contrary, in the event that any Swap Agreement or any other agreement related to such Person, with respect to any Secured Cash Management Obligations or Secured Swap Obligations, has been terminated, such Person shall provide written notice to the Agents and the Borrower thereof and thereafter such Person shall have no rights under this Agreement and the Loan Documents, and in no event shall either Agent be responsible or liable to such Person for any act or omission or potential liabilities occurring during any such time.

ARTICLE IX

MISCELLANEOUS

SECTION 9.01     Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)     if to the Borrower, the Administrative Agent or the Collateral Agent, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)      if to any other Lender, to it at its address (or fax number, telephone number or e-mail address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain Material Non-Public Information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax or other electronic transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)      Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, provided, further, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)      Change of Address, Etc. Each of the Borrower and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto. Each other Lender may change its address, fax

or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Administrative Agent and Lenders. The Agents and the Lenders shall be entitled to conclusively rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent and each of the parties hereto hereby consents to such recording.

SECTION 9.02     Waivers; Amendments.

(a)     No failure or delay by the Agents or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agents or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)     Except as provided in Section 2.14 or Section 2.20 with respect to any Incremental Facility Amendment, neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Administrative Agent (to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of the Administrative Agent or the Collateral Agent under this Agreement, the Administrative Agent shall execute such waiver, amendment or other modification to the extent approved by the Required Lenders) and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent or the Collateral Agent, as the case may be, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; provided that no such agreement shall:

(i)     increase the Commitment of any Lender or change any ratable sharing or payment provision that directly and adversely affects any Lender (with only such Lenders whose entitlement to a payment under such provisions is reduced being "directly and adversely affected") without the written consent of such Lender (it being understood

that a waiver of any condition precedent set forth in <u>Section 4.02</u> or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender;

(ii) reduce the principal amount of any Loan (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute a reduction or forgiveness of principal) or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby, <u>provided</u> that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to <u>Section 2.13(b);</u>

(iii) postpone the maturity of any Loan, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension of any maturity date or the date for payment of any interest or fees), without the written consent of each Lender directly and adversely affected thereby;

(iv) change any of the provisions of this Section or <u>Section 9.02(d)</u> without the written consent of each Lender directly and adversely affected thereby; <u>provided</u> that any such change which is in favor of a Class of Lenders holding Loans maturing after the maturity of other Classes of Lenders (and only takes effect after the maturity of such other Classes of Loans or Commitments) will require the written consent of the Required Lenders with respect to each Class directly and adversely affected thereby;

(v) change the percentage set forth in the definition of "Required Lenders", "Required Supermajority Lenders", "Majority in Interest" or any other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (or each Lender of such Class, as the case may be);

(vi) subordinate or have the effect of subordinating (x) the Liens securing the Secured Obligations to the liens securing any other indebtedness or other obligations or (y) any obligations in contractual right of payment to any indebtedness or obligations, including without limitation by amending <u>Section 6.01</u> or <u>7.02</u> and related provisions providing for the priority of the Loans (any such indebtedness or obligations to which such liens securing any of the obligations or such obligations, as applicable, are subordinated, "<u>Senior Indebtedness</u>") in either case of <u>subclause (x)</u> or <u>(y)</u>, except:

    (i)    Indebtedness that is expressly permitted by this Agreement to be senior to the Secured Obligations hereunder (if any) and/or be secured by a Lien that is senior to the Lien securing the Secured Obligations, in each case, as of the Effective Date (including waivers, amendments or modifications to upsize capacity under this Agreement for such Indebtedness);

(ii) in connection with debtor-in-possession financing or use of cash collateral in accordance with the terms of the applicable Intercreditor Agreements; or

(iii) unless (1) the Required Lenders provide consent and (2) each Lender has been offered a bona fide opportunity to fund or otherwise provide its pro rata share of the Senior Indebtedness on the same terms as offered to all other providers (or their affiliates) of the Senior Indebtedness (other than backstop fees and similar fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction) and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its pro rata share of the fees and any other benefit of the Senior Indebtedness afforded to the providers of the Senior Indebtedness (or any of their affiliates) (other than backstop fees and similar fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction) in connection with providing the Senior Indebtedness pursuant to a written offer made to each such adversely affected Lender describing the material terms of the arrangements pursuant to which the Senior Indebtedness is to be provided, which offer shall remain open to each such adversely affected Lender for a period of not less than five (5) Business Days;

(vii) release (or have the effect of releasing) all or substantially all or any material portion of the value of the Guarantees under the Guarantee Agreement (except as expressly provided in the Loan Documents) without the written consent of each Lender;

(viii) release (or have the effect of releasing) all or substantially all or any material portion of the Collateral from the Liens of the Security Documents, without the written consent of each Lender except as expressly provided in the Loan Documents;

(ix) change any pro rata sharing and/or payment provisions or any payment "waterfall" herein or in any other Loan Document, without the written consent of each Lender directly and adversely affected thereby; provided that and for the avoidance of doubt, adding new obligations or other indebtedness that are senior in Lien and/or senior in contractual right of payment shall not require approval under this clause if approved in accordance with Section 9.02(b)(vi);

(x) change any provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of any Class differently than those holding Loans of any other Class, without the written consent of the Required Lenders with respect to any Class directly and adversely affected thereby; provided that and for the avoidance of doubt, adding new obligations or other indebtedness that are senior in Lien and/or senior in contractual right of payment shall not require approval under this clause if approved in accordance with Section 9.02(b)(vi);

(xi) introduce an "unrestricted subsidiary" or "excluded subsidiary" or any similar concept to this Agreement, without the written consent of the Required Supermajority Lenders to be granted in their sole discretion;

(xii)    modify or waive Section 9.14, without the written consent of the Required Supermajority Lenders to be granted in their sole discretion;

(xiii)    modify or waive Material Intellectual Property or Franchise Agreement transfer restrictions set forth in Section 6.04, Section 6.05 or Section 6.07, without the written consent of the Required Supermajority Lenders to be granted in their sole discretion;

(xiv)    modify the PIK Interest election amount set forth in Section 2.13(a) or otherwise increase the amount of interest that may be paid in kind, without the written consent of each Lender adversely affected thereby to be granted in their sole discretion; or

(xv)    modify or waive the grace period with respect to any Event of Default under Section 7.01(b) (it being understood and agreed that the extension of such grace period to a date not to exceed forty-five (45) days after the required payment date (for the avoidance of doubt such date may not be further extended) shall be permitted with the prior written consent of the Required Lenders), without the written consent of each Lender adversely affected thereby to be granted in their sole discretion;

provided further that

(A)    no such agreement shall amend, modify or otherwise affect the rights, duties, immunities, or indemnities of the Administrative Agent or the Collateral Agent without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable,

(B)    any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent in order x) to comply with local law or advice of local counsel, (y) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Borrower and counsel to the Required Lenders, so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof, or (z) to add any provisions to any Loan Documents that, in the reasonable judgment of counsel to the Required Lenders, are more favorable to the Lenders (or to the applicable subset thereof), so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof,

(C)    any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time and

(D)    no Lenders other than the Lenders holding a Majority in Interest of the applicable Class shall be required to waive, amend, supplement or modify the conditions precedent to any Borrowings of Loans of such Class; and

notwithstanding the foregoing:

(i)        this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (A) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents and (B) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion; and

(ii)       guarantees, Security Documents and related documents in connection with this Agreement may be in a form reasonably determined by the Administrative Agent (acting at the direction of the Required Lenders) and may be, together with this Agreement and the other Loan Documents, amended and waived with the consent of the Administrative Agent (acting at the direction of the Required Lenders) at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (A) to comply with local law or advice of local counsel, (B) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Borrower and counsel to the Required Lenders, so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof,(C) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents or (D) to integrate any Incremental Facility in a manner consistent with this Agreement and the other Loan Documents, including the relevant Intercreditor Agreement(s).

(c)        In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders (and, to the extent any Proposed Change requires the consent of Lenders holding Loans of any Class pursuant to clause (iv), (v) or (ix) of paragraph (b) of this Section 9.02, the consent of a Majority in Interest of the outstanding Loans and unused Commitments of such Class) to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section 9.02 being referred to as a "Non-Consenting Lender"), then, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, (i) if no Event of Default under Sections 7.01(a), (b), (h) or (i) exists, permanently prepay all of the Loans of any Class owing by it to, and terminate any Commitments of, such Non-Consenting Lender or (ii) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, conditioned or delayed, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding par principal amount of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder (including pursuant to Section 2.11(a)) from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other

amounts) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

(d)    Notwithstanding anything in this Agreement to the contrary, Loans may not be exchanged for other Indebtedness of the Borrower or its Affiliates or repaid from Indebtedness of the Borrower or its Subsidiaries, other than (y) a repayment of the Loans in full in cash or (z) pursuant to an offer to exchange such Loans for new Indebtedness that has been offered to all Lenders on a *pro rata* basis on the same terms as offered to all other providers of such new Indebtedness, and to the extent any Lender decides to participate in the new Indebtedness, such Lender shall receive its pro rata share of the fees and any other similar benefit of the new Indebtedness afforded to the providers of the new Indebtedness.

SECTION 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Borrower shall pay, if the Effective Date occurs and the Transactions have been consummated, (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Agents and the Lenders (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of (A) Seward & Kissel LLP, as counsel to the Administrative Agent and the Collateral Agent, and (B) one counsel to the Lenders (as designated by the Required Lenders) and, if reasonably necessary, of a single firm of local counsel to the Agents, taken as a whole and to a single firm of local counsel to the Required Lenders, taken as a whole, in each case, in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and of such other counsel retained with the Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), in each case incurred in connection with the Term Facility or Incremental Facility, and the preparation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof and including the reasonable and documented fees and expense of Lazard Frères & Co., as financial advisor to the Required Lenders) and (ii) all reasonable and documented out-of-pocket expenses incurred by each Agent or any Lender, including the fees, charges and disbursements of counsel for such Agent and the Lenders, in connection with the preservation, enforcement or protection of any rights or remedies (A) in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws), including its rights under this Section 9.03 or (B) in connection with the Loans made hereunder, including all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to one lead counsel and one local counsel to the Agents, taken as a whole, and one lead counsel and one local counsel to the Lenders, taken as a whole, in each case, in each applicable jurisdiction (exclusive of any reasonably necessary special counsel) (and, in the case of a conflict of interest, where each Agent or any Lender affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel, one additional counsel) and such other counsel as may be retained with the Borrower's consent (such consent not to be unreasonably withheld or delayed).  Notwithstanding the foregoing, the expenses of counsel shall not include any allocated costs of in-house counsel.

(b)    The Borrower shall indemnify each Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from (without duplication), any and all losses, claims, damages, liabilities and reasonable and documented out-of-pocket fees and expenses (limited, in the case of legal fees and expenses, to the reasonable and documented fees, charges and disbursements of one counsel for the Agents, to the extent reasonably necessary, a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for the Agents, taken as a whole, and one counsel for all other Indemnitees, to the extent reasonably necessary, a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions)

131

for all such Indemnitees, taken as a whole (and, solely in the case of an actual or potential conflict of interest, where the Indemnitee affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel after receipt of consent from the Borrower (not to be unreasonably withheld or delayed), of one additional firm of counsel for the affected Indemnitees, and, if reasonably necessary, one additional firm of local counsel in each appropriate material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for such affected Indemnitees, taken as a whole)), incurred by or asserted against any Indemnitee by any third party or by the Borrower or any Subsidiary arising out of, in connection with, or as a result of any claim, litigation, investigation or proceeding (including any inquiry or investigation), regardless of whether any such Indemnitee is a party thereto, whether based on contract, tort or any other theory, relating to (i) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder, the consummation of the Transactions or any other transactions contemplated thereby, the syndication of the Term Facility and the Incremental Facility or the enforcement of any obligations of a Loan Party hereunder or under any other Loan Document, (ii) any Loan or the use of the proceeds therefrom or (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any Mortgaged Property or any other property currently or formerly owned or operated by the Borrower or any Subsidiary, or any other Environmental Liability related in any way to the Borrower or any Subsidiary; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (w) resulted from the gross negligence or willful misconduct of such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitee (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment), (x) (other than with respect to the Agents and their Related Parties) resulted from a material breach of the Loan Documents by, or the bad faith of, such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitees (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (y) arise from disputes between or among Indemnitees (other than disputes involving claims by or against the Administrative Agent or the Collateral Agent, in such capacity) that does not arise from an act or omission by the Borrower or any Subsidiary. This Section 9.03 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent or any Lender under paragraph (a) or (b) of this Section 9.03, each Lender severally agrees to pay to such Agent or such Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent or such Lender in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate outstanding Loans and unused Commitments at such time (or if all such amounts have been reduced to zero, at the time immediately preceding such reduction). The obligations of the Lenders under this paragraph (c) are subject to the last sentence of Section 2.02(a) (which shall apply *mutatis mutandis* to the Lenders' obligations under this paragraph (c)).

(d)    To the extent permitted by applicable law, (i) the Borrower shall not assert, and each hereby waives, any claim against any Indemnitee for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such direct or actual damages are determined by a court of competent jurisdiction by final,

132

non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties and (ii) no Loan Party (or any Affiliate thereof), Investor (or any Affiliate thereof), or Indemnitee shall be liable for any special, indirect, consequential, incidental, exemplary or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Financing Transactions, any Loan or the use of the proceeds thereof; provided that nothing in this paragraph shall limit any Loan Party's (or any Affiliate thereof) or Investor's (or any Affiliate thereof) indemnity and reimbursement obligations to the extent that such indirect, special, punitive or consequential damages are included in any claim by a third party unaffiliated with the applicable Indemnitee with respect to which the applicable Indemnitee is entitled to indemnification as set forth in this Section 9.03.

(e)    All amounts due under this Section 9.03 shall be payable not later than thirty (30) Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

SECTION 9.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the acknowledgement of the Administrative Agent (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 9.04), the Indemnitees and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)

(i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent (except with respect to assignments to competitors of the Borrower) not to be unreasonably withheld, conditioned or delayed) of (A) the Borrower; provided that no consent of the Borrower shall be required for an assignment (x) by a Lender to any other Lender, any Affiliate of a Lender or any Approved Fund, or (y) if an Event of Default with respect to the Borrower has occurred and is continuing (other than in respect of a proposed assignment to a Disqualified Lender); provided further that no assignee contemplated by the immediately preceding proviso shall be entitled to receive any greater payment under Section 2.15 or Section 2.17 than the applicable assignor would have been entitled to receive with respect to the assignment made to such assignee, unless the assignment to such assignee is made with the Borrower's prior written consent; provided further that the Borrower shall have the right to withhold its consent to any assignment if in order for such assignment to comply with applicable law, the Borrower or any Subsidiary would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority and (B) the Administrative Agent; provided that

no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan or Commitment to a Lender, an Affiliate of a Lender or an Approved Fund. Notwithstanding anything in this <u>Section 9.04</u> to the contrary, if the Borrower has not given the Administrative Agent written notice of its objection to an assignment of Loans within five (5) Business Days after written notice of such assignment, the Borrower shall be deemed to have consented to such assignment (other than in respect of a proposed assignment to a Disqualified Lender).

(ii)     Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $2,500,000 (and integral multiples of $500,000 in excess thereof), unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld, conditioned or delayed), (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; <u>provided</u> that this clause <u>(B)</u> shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, and, in each case, together with a processing and recordation fee of $3,500; <u>provided</u> that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; <u>provided</u> <u>further</u> that any such Assignment and Assumption shall include a representation by the assignee that the assignee is not a Disqualified Lender or an Affiliate of a Disqualified Lender; <u>provided</u> <u>further</u> that assignments made pursuant to <u>Section 2.19(b)</u> or <u>Section 9.02(c)</u> shall not require the signature of the assigning Lender to become effective and (D) the assignee, if it shall not be a Lender, shall deliver to the Borrower and the Administrative Agent any tax forms required by <u>Section 2.17(e)</u> and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain Material Non-Public Information about the Borrower, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph <u>(b)(v)</u> of this <u>Section 9.04</u>, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>9.03</u> and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this <u>Section 9.04</u> shall be treated for purposes of this Agreement as a sale by

such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section 9.04.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice. No assignment shall be effective unless recorded in the Register.  The parties hereto agree and intend that the obligations hereunder shall be treated as being in "registered form" for the purposes of the Code (including Sections 163(f), 871(h)(2), and 881(c)(2) of the Code), and the Register shall be maintained in accordance with such intention.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms required by Section 2.17(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)     The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)     (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons (other than to a Person that is not an Eligible Assignee) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C)  the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. Subject to paragraph (c)(iii) of this Section, the Borrower agrees that each Participant shall

be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations thereof and Section 2.19, it being understood that any tax forms required by Section 2.17(e) shall be provided solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.04. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

(ii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related stated interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and the parties hereto shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of its Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or other obligations under the Loan Documents) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any Loan or other obligation under the Loan Documents is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury regulations.

(iii)    A Participant shall not be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld, conditioned or delayed).

(d)    Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    Notwithstanding the foregoing, no assignment may be made or participation sold to a Disqualified Lender without the prior written consent of the Borrower.  Upon inquiry by any Lender to the Administrative Agent as to whether a specified potential assignee or prospective participant is on the list of Disqualified Lenders, the Administrative Agent shall be permitted to make the list of Disqualified Lenders available to such Lender for inspection.  Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, if any Lender was a Disqualified Lender at the time of the assignment of any Loans or Commitments to such Lender, following written notice from the Borrower to such Lender and the Administrative Agent: (1) such Lender shall promptly assign all Loans and Commitments held by such Lender to an Eligible Assignee; provided that (A) the Administrative Agent shall not have any obligation to the Borrower, such Lender or any other Person to find such a replacement Lender, (B) the Borrower shall not have any obligation to such Disqualified Lender or any other Person to find such a replacement Lender or accept or consent to any such assignment to itself or any other Person subject to the Borrower's consent in accordance with Section 9.04(b)(i) and (C) the assignment of such Loans and/or Commitments, as the case may be, shall be at par plus accrued and unpaid interest and fees;

(2) such Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of any Class), all affected Lenders (or all affected Lenders of any Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 9.02); provided that (x) the Commitment of any Disqualified Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Disqualified Lender adversely and in a manner that is disproportionate to other affected Lenders shall require the consent of such Disqualified Lender; and (3) no Disqualified Lender is entitled to receive information provided solely to Lenders by the Administrative Agent or any Lender or will be permitted to attend or participate in meetings attended solely by the Lenders and the Administrative Agent, other than the right to receive notices or Borrowings, notices or prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Article II.

SECTION 9.05    Survival.

All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and all other amounts payable hereunder, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof or the resignation or removal of any Agent.

SECTION 9.06    Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Agents or the syndication of the Loans and Commitments constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of (x) this Agreement, (y) any other Loan Document and/or (z) any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document

and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Administrative Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of the Borrower or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (ii) upon the request of the Administrative Agent (whether on its own behalf or on behalf of any Lender), any Electronic Signature shall be promptly followed by a manually executed counterpart.  Without limiting the generality of the foregoing, the Borrower and each Loan Party hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and the Loan Parties, Electronic Signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (ii) the Administrative Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (iii) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (iv) waives any claim against the Administrative Agent, any Lender or any Affiliates or Related Parties of any of the foregoing for any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising solely from the Administrative Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

SECTION 9.07      Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08      Right of Setoff.

If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) (other than payroll, tax, or  tax withholding accounts) at any time held and other obligations (in whatever currency) at

any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness. The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have. Notwithstanding the foregoing, no amount set off from any Loan Party (other than the Borrower) shall be applied to any Excluded Swap Obligation of such Loan Party (other than the Borrower).

SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    This Agreement shall be construed in accordance with and governed by the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in any Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section 9.09. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10    WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF

LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.10</u>.

SECTION 9.11    <u>Headings</u>.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12    <u>Confidentiality</u>.

(a)    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors, in each case, who need to know such Information in connection with the Transactions (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons acting on behalf of the Administrative Agent or the relevant Lender to comply with this <u>Section 9.12</u> shall constitute a breach of this <u>Section 9.12</u> by the Administrative Agent or the relevant Lender, as applicable), (ii) to the extent requested by any governmental authority or self-regulatory authority having jurisdiction over the Administrative Agent, any Lender or any Affiliates of any of the foregoing, as applicable, or, based on reasonable advice of counsel, to the extent required by (A) an order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, (B) applicable law or by any subpoena or similar compulsory legal process or (C) in connection with the exercise of remedies or enforcement of rights hereunder in any suit, action or proceeding relating to this Agreement; <u>provided</u> that (x) solely to the extent permitted by law and other than in connection with routine audits and reviews by bank accountants or governmental or self-regulatory authorities exercising examination or regulatory authority, each Lender and the Administrative Agent shall notify the Borrower as promptly as practicable of any such requested or required disclosure and (y) in the case of clause <u>(ii)</u> only, each Lender and the Administrative Agent shall use commercially reasonable efforts to ensure that such Information is kept confidential in connection with the exercise of such remedies, and <u>provided further</u> that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any of its subsidiaries, (iii) to any other party to this Agreement, (iv) subject to an agreement containing confidentiality undertakings substantially similar to those of this <u>Section 9.12</u>, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any direct or indirect contractual counterparty to any Swap Agreement or derivative transaction relating to any Loan Party or its subsidiaries and its obligations under the Loan Documents or (C) any pledgee referred to in <u>Section 9.04(d)</u>, (v) if required by any rating agency in connection with obtaining a rating; <u>provided</u> that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information, (vi) to service providers (including any numbering, administration or settlement service providers) providing administrative and ministerial services solely in connection with the syndication and administration of the Loan Documents, the Term Facility and Incremental Facility (e.g., identities of parties, maturity dates, interest rates, etc.) on a confidential basis, (vii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this <u>Section 9.12</u> or otherwise by reason of improper disclosure by the Administrative Agent any Lender or any Affiliates or Related Parties of any of the foregoing (including the Persons referred to in clauses (i) above) in violation of any confidentiality obligations owing to the Loan Parties or any subsidiaries, Affiliates or Related Parties of any of the foregoing or (y) becomes available to the

Administrative Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower or any subsidiary, which source is not known by the recipient of such information to be subject to a confidentiality obligation, or (viii) to the extent that such information was already in the possession of the Administrative Agent or any Lender prior to any duty or other undertaking of confidentiality or is independently developed by the Administrative Agent or any Lender without the use of such information and without otherwise violating the terms of this Section 9.12. For the purposes hereof, "Information" means all information received from or on behalf of the Borrower or any of its subsidiaries relating to the Borrower, any of its subsidiaries or their business. Any Person required to maintain the confidentiality of Information as provided in this Section 9.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Notwithstanding the foregoing, other than as set forth in the proviso below, (x) no such information shall be disclosed to a Disqualified Lender or Excluded Party that constitutes a Disqualified Lender or Excluded Party, as applicable, at the time of such disclosure without the Borrower's prior written consent and (y) in connection with any proposed assignment of Loans and/or Commitments in accordance with Section 9.04, upon request by the applicable potential assignee therefor, the applicable potential assigning Lender may disclose the list of Disqualified Lenders to such potential assignee solely for purposes of enabling such assignee to make a representation in its applicable Assignment and Assumption that such prospective assignee is an Eligible Assignee, provided, however, that, subject to an agreement containing confidentiality undertakings substantially similar to those of this Section 9.12, the list of Disqualified Lenders may be disclosed to any bona fide potential assignee or Participant, so that such potential assignee or Participant can represent and warrant that it is neither a Disqualified Lender nor an Affiliate of a Disqualified Lender.

(b)       EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN THIS SECTION 9.12) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)       ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

SECTION 9.13       USA PATRIOT Act.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will

allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.

SECTION 9.14    Release of Liens and Guarantees.

(a)    A Subsidiary Loan Party shall automatically be released from its obligations under the Loan Documents (including its Guarantee of the Secured Obligations) and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary (other than in connection with the Buddy Reorganization Transaction). Upon any sale or other transfer by any Loan Party (other than to the Borrower or any Subsidiary Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral, the security interests in such Collateral created by the Security Documents shall be automatically released.  Upon the release of any Subsidiary Loan Party from its Guarantee in compliance with this Agreement, the security interest in any Collateral owned by such Subsidiary created by the Security Documents  shall be automatically released. Upon termination of the aggregate Commitments and payment in full of all Secured Obligations (other than contingent indemnification obligations), all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released. In connection with any termination or release pursuant to this Section 9.14,  each Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request and prepare to evidence such termination or release so long as the Borrower or applicable Loan Party shall have provided such Agent a certificate, upon which such Agent may conclusively rely and shall be fully protected in acting in reliance upon, of a Responsible Officer certifying that the release of such Subsidiary Loan Party or Lien or such other release and the transactions related thereto (and the execution and delivery of any instruments or documents by such Agent in connection therewith) are authorized or permitted by the terms of this Agreement and the other Loan Documents.

(b)    The Administrative Agent or the Collateral Agent, as the case may be, will, subject to such Agent's receipt of a certificate of a Responsible Officer of the Borrower as provided for in Section 9.14(a), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request and prepare to subordinate its Lien on any property granted to or held by the Administrative Agent or the Collateral Agent, as the case may be, under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv).

(c)    Each of the Lenders, and by accepting the benefits of the Security Documents, each Secured Party that is not a party hereto, irrevocably authorizes the Administrative Agent or the Collateral Agent, as the case may be, to provide any release or evidence of release, termination or subordination contemplated by this Section 9.14. Upon request by the Administrative Agent or the Collateral Agent, as the case may be, at any time, the Required Lenders will confirm in writing the Administrative Agent's authority or that Collateral Agent's authority, as the case may be, to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Documents and this Section 9.14.

SECTION 9.15    No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement

provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent and the Lenders on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, any of its Affiliates or any other Person and (B) none of the Administrative Agent and the Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent and the Lenders has any obligation to disclose any of such interests to the Borrower or any of its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.16    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

SECTION 9.17    Intercreditor Agreements. Each of the Lenders and, by accepting the benefits of the Security Documents, each Secured Party that is not a party hereto, hereby agrees that the Administrative Agent and/or the Collateral Agent may enter into any intercreditor agreement and/or subordination agreement pursuant to, or contemplated by, the terms of this Agreement (including with respect to Indebtedness permitted pursuant to Section 6.01 and defined terms referenced therein) on its behalf and agrees to be bound by the terms thereof and, in each case, consents and agrees to the appointment of the Administrative Agent and/or the Collateral Agent (and/or their affiliated designees, representatives or agents) on its behalf as collateral agent, respectively, thereunder.  In the event of any conflict between the provisions of this Agreement or any other Loan Document (other than any Intercreditor Agreement) and the provisions of any Intercreditor Agreement, the provisions of such Intercreditor Agreement shall govern and control.

SECTION 9.18    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or under any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with the normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from them to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or the relevant Lender of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or the relevant Lender may in accordance with the normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or such Lender from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent, or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or such Lender in such currency, the Administrative Agent or such Lender agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

SECTION 9.19    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

1.    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

2.    the effects of any Bail-In Action on any such liability, including, if applicable:

     i.    a reduction in full or in part or cancellation of any such liability;

    ii.    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge

institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

iii.     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 9.20     Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

SECTION 9.21     Keepwell. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Guarantee Agreement in respect of a Secured Swap Obligation (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 9.21 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 9.21 or otherwise under the Guarantee Agreement voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this Section 9.21 shall remain in full force and effect until the termination of all Secured Swap Obligations. Each Qualified ECP Guarantor intends that this Section 9.21 constitute, and this Section 9.21 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

145

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**PARENT:**                                      **FUSION INTERMEDIATE, LLC**


By: _____
Name:
Title:

**BORROWER:**                                **FUSION BUYER, LLC**


By: _____
Name:
Title:

**SOLELY FOR PURPOSES OF <u>SECTION 6.14</u>:**

**FUSION PARENT, LLC**


By: _____
Name:
Title:

[Signature Page to First Lien Credit Agreement]

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent and Collateral Agent


By: _____
Name:
Title:

**FRANCHISE GROUP, INC.,**
as the initial Lender


By: _____
Name:
Title:

[Signature Page to First Lien Credit Agreement]

[_____],
as a Lender


By: _____
Name:
Title:

## Exhibit C-1(ii)

**Redline to Previously Filed
Take-Back Debt Credit Agreement**

~~Draft~~*Execution Version*

FIRST LIEN CREDIT AGREEMENT

dated as of

[~~•~~]June 6, 2025

among

[FUSION INTERMEDIATE, LLC],
as Parent,

[FUSION BUYER, LLC],
as the Borrower,

the Lenders from time to time party hereto,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent and as Collateral Agent

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE I DEFINITIONS .................................................................................. 21

SECTION 1.01    Defined Terms. .......................................................... 21
SECTION 1.02    Classification of Loans and Borrowings. ................. 543
SECTION 1.03    Terms Generally. ....................................................... 543
SECTION 1.04    Accounting Terms; GAAP. ........................................ 54
SECTION 1.05    Effectuation of Transactions. ................................... 554
SECTION 1.06    Certain Determinations. ............................................ 554
SECTION 1.07    Divisions. ................................................................... 565
SECTION 1.08    Interest Rates. ........................................................... 565

ARTICLE II THE CREDITS ............................................................................... 576

SECTION 2.01    Commitments. ........................................................... 576
SECTION 2.02    Loans and Borrowings. .............................................. 576
SECTION 2.03    Requests for Borrowings. .......................................... 57
SECTION 2.04    [Reserved]. ................................................................ 58
SECTION 2.05    [Reserved]. ................................................................ 58
SECTION 2.06    Funding of Borrowings. ............................................. 58
SECTION 2.07    Interest Elections. ..................................................... 598
SECTION 2.08    Termination and Reduction of Commitments. .......... 6059
SECTION 2.09    Repayment of Loans; Evidence of Debt. ................. 60
SECTION 2.10    Repayment of Loans. ................................................ 610
SECTION 2.11    Prepayment of Loans. ............................................... 610
SECTION 2.12    Fees. .......................................................................... 64
SECTION 2.13    Interest. ..................................................................... 64
SECTION 2.14    Benchmark Replacement Setting. .............................. 65
SECTION 2.15    Increased Costs. ........................................................ 676
SECTION 2.16    Break Funding Payments. .......................................... 687
SECTION 2.17    Taxes. ........................................................................ 68
SECTION 2.18    Payments Generally; Pro Rata Treatment; Sharing of Setoffs. ... 721
SECTION 2.19    Mitigation Obligations; Replacement of Lenders. ..... 732
SECTION 2.20    Incremental Credit Extensions. ................................. 73
SECTION 2.201   Illegality. ................................................................... 745

ARTICLE III REPRESENTATIONS AND WARRANTIES ................................ 746

SECTION 3.01    Organization; Powers. ............................................... 746
SECTION 3.02    Authorization; Enforceability. ................................... 756
SECTION 3.03    Governmental Approvals; No Conflicts. .................. 757
SECTION 3.04    No Material Adverse Effect. ...................................... 757
SECTION 3.05    Properties. ................................................................. 757
SECTION 3.06    Litigation and Environmental Matters. ..................... 767
SECTION 3.07    Compliance with Laws. .............................................. 768
SECTION 3.08    Investment Company Status. ...................................... 768
SECTION 3.09    Taxes. ........................................................................ 768
SECTION 3.10    ERISA; Labor Matters. .............................................. 768
SECTION 3.11    Disclosure. ................................................................ 779
SECTION 3.12    Subsidiaries. .............................................................. 779
SECTION 3.13    Intellectual Property; Licenses, Etc. ........................ 789
SECTION 3.14    Solvency. ................................................................... 789

# TABLE OF CONTENTS
## (continued)

**Page**

SECTION 3.15    Federal Reserve Regulations. ......................................... 80

SECTION 3.16    Use of Proceeds. ........................................................... 80

SECTION 3.17    Anti-Corruption Laws and Sanctions. .......................... 80

SECTION 3.18    Security Documents. ...................................................... 80

SECTION 3.19    Insurance. ..................................................................... 81

SECTION 3.20    Franchise Agreements. .................................................. 81

ARTICLE IV CONDITIONS ...................................................................... 81

SECTION 4.01    Effective Date. .............................................................. 81

ARTICLE V AFFIRMATIVE COVENANTS ............................................ 84

SECTION 5.01    Financial Statements and Other Information. ................. 84

SECTION 5.02    Notices of Material Events. .......................................... 86

SECTION 5.03    Information Regarding Collateral. ................................ 86

SECTION 5.04    Existence; Conduct of Business. ................................... 87

SECTION 5.05    Payment of Taxes, etc. ................................................. 87

SECTION 5.06    Maintenance of Properties. ........................................... 87

SECTION 5.07    Insurance. ...................................................................... 87

SECTION 5.08    Books and Records; Inspection and Audit Rights. ....... 88

SECTION 5.09    Compliance with Laws. ................................................ 89

SECTION 5.10    Use of Proceeds. ........................................................... 89

SECTION 5.11    Additional Subsidiaries. ............................................... 89

SECTION 5.12    Further Assurances. ...................................................... 89

SECTION 5.13    Franchise Agreements. .................................................. 90

SECTION 5.14    Certain Post-Closing Obligations. ............................... 90

SECTION 5.15    Maintenance of Ratings. ............................................... 90

ARTICLE VI NEGATIVE COVENANTS ................................................. 91

SECTION 6.01    Indebtedness; Certain Equity Securities. ...................... 91

SECTION 6.02    Liens. ............................................................................ 94

SECTION 6.03    Fundamental Changes. .................................................. 97

SECTION 6.04    Investments, Loans, Advances, Guarantees and Acquisitions. ... 98

SECTION 6.05    Asset Sales. ................................................................... 100

SECTION 6.06    Sale and Leaseback Transactions. ................................ 102

SECTION 6.07    Restricted Payments; Certain Payments of Indebtedness. ... 102

SECTION 6.08    Transactions with Affiliates. ........................................ 105

SECTION 6.09    Restrictive Agreements. ................................................ 106

SECTION 6.10    Subsidiaries. .................................................................. 107

SECTION 6.11    Changes in Fiscal Periods. ........................................... 107

SECTION 6.12    Amendment of Financing Documents. ......................... 107

SECTION 6.13    Franchise Agreements. .................................................. 107

SECTION 6.14    Passive Status of Parent and Topco. ............................ 107

ARTICLE VII EVENTS OF DEFAULT ..................................................... 108

SECTION 7.01    Events of Default. ......................................................... 108

SECTION 7.02    Application of Proceeds. ............................................... 111

ARTICLE VIII ADMINISTRATIVE AGENT ........................................... 112

SECTION 8.01    Appointment and Authority. ......................................... 112

**TABLE OF CONTENTS**
(continued)

SECTION 8.02    Rights as a Lender. .............................................................. 11~~1~~2
SECTION 8.03    Exculpatory Provisions. ...................................................... 11~~1~~3
SECTION 8.04    Reliance by Agents. .............................................................. 11~~4~~5
SECTION 8.05    Delegation of Duties. ............................................................ 11~~5~~7
SECTION 8.06    Resignation of Administrative Agent; Mergers. ................. 11~~5~~7
SECTION 8.07    Non-Reliance on Agents and Lenders. ............................... 11~~6~~8
SECTION 8.08    [Reserved]. ............................................................................ 11~~7~~9
SECTION 8.09    Administrative Agent May File Proofs of Claim. .............. 11~~7~~9
SECTION 8.10    No Waiver; Cumulative Remedies; Enforcement. ............. 11~~8~~9
SECTION 8.11    Withholding Taxes. .............................................................. 1~~18~~20
SECTION 8.12    Credit Bidding. ..................................................................... 1~~19~~20
SECTION 8.13    Erroneous Payments. ............................................................ 120~~1~~

ARTICLE IX MISCELLANEOUS ............................................................................ 12~~3~~4

SECTION 9.01    Notices. .................................................................................. 12~~3~~4
SECTION 9.02    Waivers; Amendments. ......................................................... 124~~6~~
SECTION 9.03    Expenses; Indemnity; Damage Waiver. .............................. 12~~8~~30
SECTION 9.04    Successors and Assigns. ....................................................... 130~~3~~
SECTION 9.05    Survival. ................................................................................. 134~~6~~
SECTION 9.06    Counterparts; Integration; Effectiveness. ......................... 134~~7~~
SECTION 9.07    Severability. ........................................................................... 136~~8~~
SECTION 9.08    Right of Setoff. ..................................................................... 136~~8~~
SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process. ..... 136~~8~~
SECTION 9.10    WAIVER OF JURY TRIAL. ............................................... 137~~9~~
SECTION 9.11    Headings. ............................................................................... 137~~9~~
SECTION 9.12    Confidentiality. ..................................................................... 137~~9~~
SECTION 9.13    USA PATRIOT Act. .............................................................. 1~~39~~41
SECTION 9.14    Release of Liens and Guarantees. ...................................... 1~~39~~41
SECTION 9.15    No Advisory or Fiduciary Responsibility. ......................... 140~~2~~
SECTION 9.16    Interest Rate Limitation. ...................................................... 140~~3~~
SECTION 9.17    Intercreditor Agreements ..................................................... 141~~3~~
SECTION 9.18    Judgment Currency ............................................................... 141~~3~~
SECTION 9.19    Acknowledgement and Consent to Bail-In of Affected Financial Institutions ........................................................................ 141~~3~~
SECTION 9.20    Acknowledgement Regarding Any Supported QFCs ........ 142~~4~~
SECTION 9.21    Keepwell ................................................................................ 142~~5~~

Page

SCHEDULES:

| | | |
|---|---|---|
| Schedule 2.01 | — | Commitments and Loans |
| Schedule 3.03 | — | Government Approvals; No Conflicts |
| Schedule 3.06 | — | Litigation and Environmental Matters |
| Schedule 3.12 | — | Subsidiaries |
| Schedule 3.20 | — | Franchise Agreements |
| Schedule 5.14 | — | Certain Post-Closing Obligations |
| Schedule 6.01 | — | Existing Indebtedness |
| Schedule 6.02 | — | Existing Liens |
| Schedule 6.04(e) | — | Existing Investments |
| Schedule 6.08 | — | Existing Affiliate Transactions |
| Schedule 6.09 | — | Existing Restrictions |
| Schedule 9.01 | — | Notices |

EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | — | Form of Assignment and Assumption |
| Exhibit B | — | Form of Guarantee Agreement |
| Exhibit C | — | Form of Perfection Certificate |
| Exhibit D | — | Form of Collateral Agreement |
| Exhibit E | — | Form of Compliance Certificate |
| Exhibit F | — | Form of Notice of Borrowing |
| Exhibit G | — | Form of Solvency Certificate |
| Exhibit H | — | Form of Closing Certificate |
| Exhibit I | — | Form of Master Intercompany Note |
| Exhibit J-1 | — | Form of United States Tax Compliance Certificate 1 |
| Exhibit J-2 | — | Form of United States Tax Compliance Certificate 2 |
| Exhibit J-3 | — | Form of United States Tax Compliance Certificate 3 |
| Exhibit J-4 | — | Form of United States Tax Compliance Certificate 4 |
| Exhibit K | — | Form of Note |
| Exhibit L | — | Form of PIK Interest Election Notice |

FIRST LIEN CREDIT AGREEMENT, dated as of ~~[•]~~June 6, 2025 (this "Agreement"), among ~~[REORGANIZED FRANCHISE GROUP~~FUSION INTERMEDIATE, LLC~~]~~, a Delaware ~~[limited liability company]~~ ("Parent"), ~~[REORGANIZED FRANCHISE GROUP~~FUSION BUYER, LLC~~]~~, a Delaware ~~[limited liability company]~~ (the "Borrower")[1], solely for purposes of Section 6.14, ~~[~~FUSION PARENT, LLC~~]~~, a Delaware ~~[limited liability company]~~ (formerly known as Franchise Group Parent, LLC) ("Topco"), ~~[~~FRANCHISE GROUP, INC., a Delaware corporation ("FRG"), as the initial Lender~~]~~, the other Lenders from time to time party hereto and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent and as Collateral Agent.

WHEREAS, on November 3, 2024 (the "Petition Date"), FRG and certain affiliates and direct and indirect Subsidiaries of FRG (each, a "Chapter 11 Debtor" and collectively, the "Chapter 11 Debtors") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating their respective jointly administered case under Chapter 11 of Title 11 of the United States Code (Case No. 24-12480-LSS (Bankr. D. Del.)) (collectively, the "Chapter 11 Cases");

WHEREAS, FRG, the Guarantors (as defined therein), the lenders party thereto (the "Existing DIP Lenders") and Wilmington Trust, National Association, as administrative agent and as collateral agent (the "Existing DIP Agent") are party to that certain Senior Secured Super-Priority Priming Term Loan Debtor-in-Possession Credit Agreement, dated as of November 7, 2024 (as amended, restated, amended and restated or otherwise modified from time to time, the "Existing DIP Credit Agreement"), pursuant to which the Existing DIP Lenders issued senior secured super priority term loans consisting of (a) $250,000,000 of "new money" first-out delayed draw term loans (the "First-Out DIP Term Loans") and (b) a second-out roll-up term loan facility (the "Second-Out DIP Term Loans");

WHEREAS, the Borrower has asked the Lenders to provide the Borrower with a term loan credit facility (the "Term Facility") consisting of $~~[_____]~~[2]433,772,002 of term loans;

WHEREAS, the Lenders are willing to make the foregoing term loans to the Borrower, subject to the terms and conditions set forth in this Agreement, the Plan of Reorganization (as defined below), and the Restructuring Support Agreement (as defined below);

WHEREAS, pursuant to the Plan of Reorganization, the Borrower will acquire all of the equity interests of Franchise Group New HoldCo, LLC from FRG in exchange for, among other consideration, the issuance of the Loans under this Agreement (the "Acquisition"); and

WHEREAS, pursuant to the Plan of Reorganization, immediately following the Acquisition, each Existing DIP Lender will exchange certain of its First-Out DIP Term Loans and all of its Second-Out DIP Term Loans on a dollar-for-dollar basis for Loans under this Agreement and other consideration set forth in the Restructuring Support Agreement, on the terms and subject to the conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for due and valuable consideration, the parties hereto covenant and agree as follows:

---

[1] ~~[NTD: Final borrower parties subject to being updated.]~~

[2] ~~[NTD: To be an aggregate principal amount of the maximum amount necessary to ensure that the debtors are in compliance with the Pro Forma Leverage Cap (as defined in the Plan of Reorganization).]~~

ARTICLE I

DEFINITIONS

SECTION 1.01    Defined Terms.

As used in this Agreement, the following terms have the meanings specified below:

"ABL Agent" means JPM, as agent under the ABL Credit Agreement or any successor thereto acting in such capacities.

"ABL Credit Agreement" means (i) that certain Loan and Security Agreement, as in effect on the Effective Date and as the same may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof (including by reference to the Intercreditor Agreement), among each Loan Party party thereto, certain lenders party thereto and the ABL Agent, and (ii) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any Indebtedness or other financial accommodation that has been incurred to refinance (subject to the limitations set forth herein (including by reference to the Intercreditor Agreement)) in whole or in part the Indebtedness and other obligations outstanding under (x) the credit agreement referred to in clause (i) or (y) any subsequent asset-based revolving credit facility, unless the agreement or instrument related thereto expressly provides that it is not intended to be and is not an ABL Credit Agreement hereunder. Any reference to the ABL Credit Agreement hereunder shall be deemed a reference to any ABL Credit Agreement then in existence.

"ABL Lenders" means the "Lenders" under and as defined in the ABL Credit Agreement.

"ABL Loan Documents" shall have the meaning ascribed to the term "Financing Agreements" in the ABL Credit Agreement.

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acquired EBITDA" means, with respect to any Pro Forma Entity, for any period, the amount of Consolidated EBITDA of such Pro Forma Entity (determined as if references to the Borrower and its, any other Loan Party and their respective Subsidiaries in the definition of "Consolidated EBITDA" were references to such Pro Forma Entity and its subsidiaries that will become Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity.

"Acquired Entity or Business" has the meaning given such term in the definition of "Consolidated EBITDA."

"Acquisition" has the meaning set forth in the preamble.

"Additional Lender" means, at any time, any bank, financial institution or other institutional lender or investor that agrees to provide any portion of any Incremental Loans pursuant to an Incremental Facility Amendment in accordance with Section 2.20; provided that each Additional Lender shall be subject to the approval of the Administrative Agent if such consent would be required under

2

Section 9.04(b) for an assignment of Loans or Commitments, as applicable, to such bank, financial institution or other institutional lender or investor (such approval not to be unreasonably withheld, conditioned or delayed) and the Borrower.

"Adjusted Term SOFR" means, for purposes of any calculation and subject to the provisions of Section 2.14(b), the rate per annum equal to the sum of (a) Term SOFR for such calculation and (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" means Wilmington Trust, National Association in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain Fee Letter, dated as of [•]June 6, 2025, by and among the Borrower and the Administrative Agent.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified; provided that, notwithstanding the foregoing, for purposes of this Agreement and the other Loan Documents none of the Lenders as of the Effective Date (nor any of their respective managed or affiliated funds) shall be deemed an Affiliate of the Loan Parties.

"Agent" means the Administrative Agent and the Collateral Agent, and any successors and assigns in such capacity, and "Agents" means two or more of them.

"Agent Parties" has the meaning given to such term in Section 9.01(c).

"Agreement" has the meaning given to such term in the preliminary statements hereto.

"Agreement Currency" has the meaning given to such term in Section 9.18.

"Aggregate Add-Back Cap" means an aggregate cap amount for all adjustments or add-backs to Consolidated EBITDA pursuant to clauses (a)(vi), (a)(vii), and (a)(xvii) and (b) in the definition thereof and any adjustments pursuant to the definition of Pro Forma Basis not to exceed an aggregate amount no greater than the greaterlesser of $2015,000,000 and 2015.0% of Consolidated EBITDA (before giving effect to all adjustments or add-backs to Consolidated EBITDA) for the most recently ended Test Period as of such time.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1.00% and (c) Adjusted Term SOFR for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1%; provided that for the purpose of this definition, Adjusted Term SOFR for any day shall be based on the Term SOFR Reference Rate at approximately 6:00 a.m. (New York City time) on such day (or any amended publication time for the

Term SOFR Reference Rate, as specified by the Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or Adjusted Term SOFR, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.14 hereof, then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.

"Ancillary Document" has the meaning assigned to such term in Section 9.06.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, and all other applicable laws, rules, and regulations concerning or relating to bribery or corruption.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Rate" means, (a) with respect to any Initial Loans maintained as ABR Loans, 7.00% per annum, and with respect to any Initial Loans maintained as SOFR Loans, 8.00% per annum and (b) with respect to Incremental Loans, as set forth in the Incremental Facility Amendment.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A or any other form reasonably approved by the Administrative Agent.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.14(e).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing

banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" has the meaning set forth in the preamble.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof; provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Basel III" means: (i) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision on 16 December 2010, each as amended, supplemented or restated; (ii) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and (iii) any further guidance or standards published by the Basel Committee on Banking Supervision relating to Basel III.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.14(b).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that is administratively feasible for the Administrative Agent and selected by the Required Lenders:

(a)      the sum of: (1) Daily Simple SOFR and (2) the related Benchmark Replacement Adjustment;

(b)      the sum of: (1) the alternate benchmark rate that has been selected by the Required Lenders and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a

replacement to the then-current Benchmark for dollar-denominated syndicated credit facilities and (2) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Required Lenders and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body and/or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time; provided that such Benchmark Replacement Adjustment is administratively feasible for the Administrative Agent.

"Benchmark Replacement Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.14 and other technical, administrative or operational matters) that the Required Lenders decide may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders determine that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders decide is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents); provided that such Benchmark Replacement Conforming Changes implement changes that are administratively feasible for the Administrative Agent.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory

supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

(b)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof); or

(c)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof), or if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14 and (y) ending at the time that a Benchmark Replacement has replaced the

then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an 'affiliate' (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing or any committee thereof duly authorized to act on behalf of such board, manager or managing member, (c) in the case of any partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preliminary statements hereto.

"Borrower Materials" has the meaning assigned to such term in Section 5.01.

"Borrowing" means Loans of the same Class and Type, made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Minimum" means $1,000,000.

"Borrowing Multiple" means $500,000.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Buddy Reorganization Transaction" means the distribution of 100% of the Equity Interests of (a) Buddy's Newco, LLC, a Delaware limited liability company ("Buddy's Newco"), or (b) a newly formed direct parent entity of Buddy's Newco that is a Wholly Owned Subsidiary of Topco (or otherwise wholly owned by the holders of all outstanding Equity Interests of Topco) ("Buddy's Tax Blocker" and together with Buddy's Newco and Buddy's Franchising and Licensing LLC, a Florida limited liability company, collectively, the "Buddy's Entities"), in each case to a Person that is a Loan Party in connection with the whole business securitization of the PSP Loan Parties; provided that each such Buddy's Entity shall, in each case on or prior to the date that is at least five Business Days prior to the distribution, (x) have been joined as a Loan Party hereunder, (y) accede to the Security Documents in the same manner as an acquired Subsidiary as contemplated in Section 5.11(a) and (z) cause its Subsidiaries to accede to the Security Documents as contemplated in Section 5.11(a); provided, further that no other entities other than the Buddy's Entities shall be distributed, formed or otherwise acquired in connection with the Buddy Reorganization Transaction.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Requirements of Law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any Capitalized Leases; provided, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness, unless the corresponding leases would have been treated as Capitalized Leases under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases). For purposes of Section 6.02, a Capital Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Capitalized Lease" means, as applied to any Person, any lease of any property (whether real, personal, or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee which is a transaction of a type commonly known as a "synthetic lease" (i.e., a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for U.S. Ffederal income Ttax purposes); provided, that lease liabilities and associated expenses recorded by the Loan Parties (or any other applicable Persons) pursuant to ASU 2016-02, Leases, shall not be treated as Indebtedness, unless the corresponding leases would have been treated as Capitalized Leases under GAAP as in effect prior to the adoption of ASU 2016-02, Leases (in which case such leases shall be treated as Capitalized Leases, and the interest component of such Capitalized Leases).

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and its, the other Loan Parties and their respective Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrower and its, the other Loan Parties and their respective Subsidiaries.

"Cash Equivalents" means:

(a)    U.S. Dollars, euros, Swiss francs, Sterling, Canadian dollars, or such other currencies held by it from time to time in the ordinary course of business[3];

(b)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(c)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from a Credit Rating Agency;

(d)    investments in certificates of deposit, banker's acceptances and time deposits

---

[3] [NTD: Clause (a) conformed to the ABL.]

maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

(e)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in <u>clause (b)</u> above and entered into with a financial institution satisfying the criteria described in <u>clause (d)</u> above; and

(f)     money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA and Aaa (or equivalent rating) by at least two Credit Rating Agencies and (iii) have portfolio assets of at least $5,000,000,000.

"<u>Cash Interest</u>" has the meaning assigned to such term in <u>Section 2.13(a)</u>.

"<u>Cash Management Obligations</u>" means (a) obligations of the Borrower<u>, the other Loan Parties</u> or any Subsidiary in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit or purchase card programs and similar arrangements.

"<u>Cash Management Services</u>" has the meaning assigned to such term in the definition of "Secured Cash Management Obligations".

"<u>Casualty Event</u>" means any event that gives rise to the receipt by the Borrower<u>, the other Loan Parties</u> or any Subsidiary of any insurance proceeds or condemnation awards, in each case, in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"<u>Change in Law</u>" means: (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law," to the extent enacted, adopted, promulgated or issued after the date of this Agreement, but only to the extent such rules, regulations, or published interpretations or directives are applied to the Borrower and its Subsidiaries by the Administrative Agent or any Lender in substantially the same manner as applied to other similarly situated borrowers under comparable syndicated credit facilities, including for purposes of <u>Section 2.15</u>.

"<u>Change of Control</u>" means an event or series of events by which:

(a)     the acquisition of beneficial ownership, directly or indirectly, by any Person or group, other than the Permitted Holders (directly or indirectly, including through one or more holding companies), of Equity Interests representing <u>35</u>.0% or more of the aggregate ordinary voting power <s>or economic interests </s>represented by the issued and outstanding Equity Interests in Topco <u>or Buddy's</u>

Newco (and if applicable, Buddy's Tax Blocker) and the percentage of the aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests in Topco or Buddy's Newco (and if applicable, Buddy's Tax Blocker), as the case may be, held by the Permitted Holders, unless the Permitted Holders (directly or indirectly, including through one or more holding companies) otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate, nominate or appoint (and do so designate, nominate or appoint) a majority of the Board of Topco;

(b)    Topco ceases to own, beneficially or of record, directly or indirectly, Equity Interests representing 100% of the outstanding voting and economic interests in the Equity Interests of Parent;

(c)    Parent ceases to own, beneficially or of record, directly or indirectly, Equity Interests representing 100% of the outstanding voting and economic interests in the Equity Interests of the Borrower;

(d)    ~~Borrower ceases to own, beneficially or of record, directly or indirectly, Equity Interests representing 100% of the outstanding voting and economic interests in the Equity Interests of each other Loan Party (other than Parent), other than in connection with a transaction permitted under Section 6.05 resulting in the Borrower not owning any Equity Interests in such Loan Party;~~[reserved];

(e)    during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of ~~the [Borrower]~~Topco cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(f)    any "change of control" or similar event under the ABL Credit Agreement.

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act, (ii) the phrase "Person or group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and (iii) if any Person or "group" includes one or more Permitted Holders, the issued and outstanding Equity Interests of Topco directly or indirectly owned by the Permitted Holders that are part of such Person or "group" shall not be treated as being owned by such Person or "group" for purposes of determining whether clause (a) of this definition is triggered.

"Chapter 11 Debtor" has the meaning set forth in the preamble.

"Chapter 11 Cases" has the meaning set forth in the preamble.

"Class" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Initial Loans or Incremental Loans and (b) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Secured Obligations.

"Collateral Agent" means Wilmington Trust, National Association, in its capacity as collateral agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Collateral Agreement" means the First Lien Collateral Agreement, dated as of the date hereof, among the Borrower, each other Loan Party and the Collateral Agent, substantially in the form of Exhibit D, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received from:

(i)    Parent and each Subsidiary (other than the Excluded Subsidiary) either (x) in the case of any Person that is a Loan Party on the Effective Date, a counterpart of the Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Guarantee Agreement, in substantially the form specified therein, duly executed and delivered on behalf of such Person, and

(ii)    Parent, the Borrower and each Subsidiary (other than the Excluded Subsidiary) either (x) in the case of any Person that is a Loan Party on the Effective Date, a counterpart of the Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Collateral Agreement, in substantially the form specified therein, duly executed and delivered on behalf of such Person,

in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, to the extent reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders), opinions and documents of the type referred to in Sections 4.01(b) and 4.01(d);

(b)    subject to Section 5.14, all outstanding Equity Interests of the Borrower and each Subsidiary (other than (i) any Equity Interests constituting Excluded Assets and (ii) Equity Interests in any Person other than the Borrower or Subsidiary owned by or on behalf of any Loan Party), shall have been pledged pursuant to the Collateral Agreement, and, subject to the Intercreditor Agreements, the Collateral Agent shall have received certificates, if any, of such entity reflecting the pledge, or other instruments, if any, representing all such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)    subject to Section 5.14, (i) if any intercompany Indebtedness for borrowed money of the Borrower, any other Loan Party or any Subsidiary in a principal amount of $2,500,000 or more is owing by such obligor to any Loan Party and such Indebtedness shall be evidenced by a promissory note, such promissory note shall be pledged pursuant to the Collateral Agreement, and, subject to the Intercreditor Agreements, the Collateral Agent shall have received all such promissory

notes, together with undated instruments of transfer with respect thereto endorsed in blank; provided, however, that the foregoing delivery requirement with respect to any intercompany indebtedness may be satisfied by delivery of an omnibus or global intercompany note executed by all Loan Parties as payees and all such obligors as payors in the form of the Master Intercompany Note and (ii) if any Indebtedness for borrowed money of any Person that is not a Loan Party or a Subsidiary in a principal amount of $2,500,000 or more is owing by such obligor to any Loan Party and such Indebtedness is evidenced by a promissory note, such promissory note shall be pledged pursuant to the Collateral Agreement and, subject to the Intercreditor Agreements, the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)    with respect to any Collateral owned by any Loan Party, all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements and Intellectual Property Security Agreements required by this Agreement, the Security Documents, Requirements of Law and reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, this Agreement, the Security Documents, the Intercreditor Agreements and the other provisions of the term "Collateral and Guarantee Requirement," shall have been filed, registered or recorded;

(e)    all Secured Obligations shall have been unconditionally guaranteed by Parent and each Subsidiary; and

(f)    the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property duly executed and delivered by the record owner of such Mortgaged Property; provided, that, to the extent any Mortgaged Property is located in a jurisdiction that imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, the Agents will cooperate with the Borrower or the applicable Loan Party in order to minimize the amount of tax payable in connection with such Mortgage as permitted by, and in accordance with, applicable law including, to the extent permitted by applicable law, limiting the amount secured by such Mortgage to the book value of such Mortgaged Property, as reasonably determined by the Borrower, if such limitation results in such mortgage tax being calculated based upon such book value, (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a first priority Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such customary lender's endorsements as the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates (it being agreed that the Administrative Agent (acting at the direction of the Required Lenders) shall accept zoning reports from a nationally recognized zoning company in lieu of zoning endorsements to such title insurance policies), in an amount equal to the book value of such Mortgaged Property or as otherwise reasonably agreed by the parties; provided that in no event will the Borrower be required to obtain independent appraisals of such Mortgaged Properties, unless required by FIRREA, (iii) a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Mortgaged Property, and if any Mortgaged Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, a duly executed notice about special flood hazard area status and flood disaster assistance and evidence of such flood insurance as provided in Section 5.07(b), (iv) opinions, addressed to the Administrative Agent and the Secured Parties, from counsel qualified to opine in each jurisdiction where a Mortgaged Property is located regarding the enforceability of the Mortgage and such other matters as may be in form and substance reasonably satisfactory to the Required Lenders, (v) a survey or existing survey together with a no change affidavit

of such Mortgaged Property, in compliance with the 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys or such other ALTA/NSPS requirements as are in effect on the date of preparation of such survey and otherwise reasonably satisfactory to the Required Lenders, and (vi) evidence of payment of title insurance premiums and expenses and all recording, mortgage, transfer and stamp taxes and fees payable in connection with recording the Mortgage, any amendments thereto and any fixture filings in appropriate county land office(s).

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Subsidiary, if, and for so long as the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower reasonably agree in writing that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such Guarantees (taking into account any adverse tax consequences to the Borrower and its Affiliates (including the imposition of withholding or other material taxes)), outweighs the benefits to be obtained by the Lenders therefrom;

(b) Liens required to be granted from time to time pursuant to the term "Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in the Security Documents and the Intercreditor Agreements;

(c) control agreements or control or similar arrangements shall not be required with respect to deposit or securities accounts, except to the extent required under the Loan Documents with respect to an account in respect of which such a control agreement or control or similar arrangement is required under the ABL Loan Documents; provided that, to the extent control agreements are entered into in favor of the ABL Agent on or after the Effective Date, the Collateral Agent must also be party thereto;

(d) [reserved];

(e) in no event shall any Loan Party be required to complete any filings or other action with respect to perfection of security interests in assets subject to certificates of title beyond the filing of UCC financing statements;

(f)(i) in the case of intercompany debt described in the first clause (c)(i) of this definition, other than the filing of UCC financing statements and the delivery of the Master Intercompany Note, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $2,500,000 and (ii) in the case of third party debt described in the first clause (c)(ii) of this definition, other than the filing of UCC financing statements, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $2,500,000;

(g) in no event shall any Loan Party be required to complete any filings or other action with respect to security interests in Intellectual Property beyond the filing of Intellectual Property Security Agreements with the United States Patent and Trademark Office or the United States Copyright Office;

(h) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of UCC financing statements), except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement;

(i) in no event shall the Collateral include any Excluded Assets;

(j) landlord lien waivers, bailee waivers, collateral access agreements or similar agreements shall not be required, except to the extent required under the Loan Documents with respect to distribution centers of the Loan Parties;

(k) notices shall not be required to be sent to account debtors or other contractual third parties, except to the extent set forth in the Loan Documents following the occurrence and during the continuance of an Event of Default; and

(l) notices to, or acknowledgements from, counterparts under, or compliance with the Assignment of Claims Act (or any state or municipal equivalent) shall not be required. The Administrative Agent (acting at the direction of the Required Lenders) may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) and any other obligations under this definition where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

"Commitment" means, with respect to each Lender, the Initial cCommitment, if any, of such Lender to make Loans hereunder on the Effective Date, expressed as an amount representing the maximum principal amount of the Loans to be made by such Lender hereunder, as such commitment may be reduced or increased from time to time pursuant to (a) assignments by or to such Lender pursuant to an Assignment and Assumption or (b) Incremental Facility Amendment. The amount of each Lender's Commitment is set forth on Schedule 2.01. As of the date hereof, the aggregate amount of or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitments is $[_____]⁴.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Common Parent" has the meaning given to such term in Section 6.07(a)(vi).

"Compliance Certificate" has the meaning assigned to such term in Section 5.01(d).

"Confirmation Order" means the final order entered by the Bankruptcy Court in the Chapter 11 Cases confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code, in form and substance reasonably acceptable to the Required Lenders, which shall be in full force and effect and shall not be reversed, vacated, stayed, amended, supplemented or otherwise modified, in each case, without the prior written consent of the Required Lenders (which may be provided via email

---

⁴ [NTD: To be an aggregate principal amount of the maximum amount necessary to ensure that the debtors are in compliance with the Pro Forma Leverage Cap (as defined in the Plan of Reorganization).]

by counsel to the Required Lenders).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period, plus:

(a) without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i) total interest expense and, to the extent not reflected in such total interest expense, the sum of (A) premium payments, debt discount, fees, charges and related expenses incurred in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets plus (B) the portion of rent expense with respect to such period under Capitalized Leases that is treated as interest expense in accordance with GAAP plus (C) the implied interest component of synthetic leases with respect to such period plus (D) any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or such derivative instruments plus (E) bank and letter of credit fees and costs of surety bonds in connection with financing activities, plus (F) amortization or write-off of deferred financing fees, debt issuance costs, debt discount or premium, terminated hedging obligations and other commissions, financing fees and expenses and, adjusted, to the extent included, to exclude any refunds or similar credits received in connection with the purchasing or procurement of goods or services under any purchasing card or similar program;

(ii) provision for taxes based on income, profits, revenue or capital and sales taxes, including federal, foreign, state, franchise, excise, and similar taxes paid or accrued during such period (including in respect of repatriated funds) including penalties and interest related to such taxes or arising from any tax examinations;

(iii) Non-Cash Charges;

(iv) [~~the amount of any restructuring costs, integration costs, business optimization expenses or costs, retention, recruiting, relocation and signing bonuses and expenses, office closing costs, stock option and other equity-based compensation expenses, severance costs, transaction fees and expenses and management fees and expenses (other than fees and expenses of the type described in clause (v) above), including, without limitation, any one time expense relating to financial reporting or other information technology system implementations, enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company, in each case, without duplication of any other add-backs~~reserved][5];

(v) [reserved];

(vi) severance, relocation, integration and facilities' opening costs and expenses and other business optimization costs and expenses and operating improvements

---

(including related to new product introductions and any operating expenses, losses or charges related to the implementation of cost savings initiatives, operating expense reductions and other similar initiatives), recruiting fees, signing costs, reserve, retention, recruiting, relocation and signing bonuses and expenses, transition costs, costs related to closure/consolidation of facilities, internal costs in respect of strategic initiatives and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities), contract terminations, professional and consulting fees incurred in connection with any of the foregoing and other one-time and nonoperational costs and expenses; <u>provided</u> that the amounts added-back pursuant to this <u>clause (vi)</u> shall be subject to the Aggregate Add-Back Cap;

(vii)    restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves), whether or not classified as restructuring expense on the consolidated financial statements; <u>provided</u> that the amounts added-back pursuant to this <u>clause (vii)</u> shall be subject to the Aggregate Add-Back Cap;

(viii)    [reserved];

(ix)    [reserved];

(x)    any non-cash loss attributable to the mark to market movement in the valuation of any Equity Interests, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(xi)    any loss relating to amounts paid in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income for such period;

(xii)    any gain relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from Consolidated EBITDA pursuant to clause <u>(c)(iv)</u> below;

(xiii)    any <u>non-cash</u> net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of FASB Accounting Standards Codification 715, and any other items of a similar nature;

(xiv)    charges, losses, lost profits, expenses (including litigation expenses, fee and charges) or write-offs to the extent indemnified or insured by a third party, including expenses or losses covered by indemnification provisions or by any insurance provider in connection with the Transactions, a Permitted Acquisition or any other acquisition or Investment, disposition or any Casualty Event, in each case, to the extent that coverage has not been denied and so long as such amounts are actually reimbursed in cash within one year after the related amount is first added to Consolidated EBITDA pursuant to this <u>clause (xiv)</u> (and if not so reimbursed within one year, such amount shall be deducted from Consolidated EBITDA during the next measurement period);

(xv)    cash receipts (or any netting arrangements resulting in reduced cash expenses) not included in Consolidated EBITDA in any period to the extent non-cash gains

relating to such receipts were deducted in the calculation of Consolidated EBITDA pursuant to clause (c) below for any previous period and not added back;

(xvi) ~~Earn-Out payments, contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments incurred in connection with any acquisition or other investment (including any acquisition or other investment consummated prior to the Effective Date) which are paid or accrued during the applicable period; and~~[reserved]; and

(xvii) other adjustments (i) identified to the Lender Professionals prior to the Effective Date, or (ii) set forth in the quality of earnings report prepared by independent registered public accountants of recognized national standing or any other accounting firm reasonably acceptable to the Required Lenders and delivered to the Administrative Agent in connection with the Transactions; provided that the amounts added-back pursuant to this clause (xvii) shall be subject to the Aggregate Add-Back Cap; plus

~~(b) [without duplication, (i) the amount of "run rate" cost savings, operating expense reductions and synergies related to any of the Transactions, any Specified Transactions, any restructuring, any business optimization activities, cost saving initiatives and operating improvements or other initiatives, actions or events (each of the foregoing, an "Event") that are reasonably identifiable and projected by the Borrower in good faith to result from actions that either have been taken, with respect to which substantial steps have been taken or that are expected to be taken within 18 months after the date of consummation of such Event (or, if the underlying Event is any of the Transactions, within 18 months after the Effective Date) (including actions initiated prior to the Effective Date) (in the good faith determination of the Borrower) (which cost savings, operating expense reductions and synergies shall be added to Consolidated EBITDA until fully realized and calculated on a pro forma basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of the relevant period), net of the amount of actual benefits realized from such actions; provided that no cost savings, operating expense reductions or synergies shall be added pursuant to this clause (b) to the extent duplicative of any expenses or charges relating to such cost savings, operating expense reductions, other operating improvements or synergies that are included above or in the definition of "Pro Forma Basis" (it being understood and agreed that "run rate" shall mean the full recurring benefit that is associated with any action taken); provided, further that the aggregate amount of addbacks to Consolidated EBITDA pursuant this clause (b) for any period, excluding any addbacks for such period pursuant to this clause (b) where the underlying Event is any of the Transactions, shall be subject to the Aggregate Add-Back Cap]~~[6]~~; less~~

(b) [reserved]; less

(c) without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period and any non-cash gains attributable to accrual of revenue or recording of receivables in the ordinary course of business);

---

[6] ~~[NTD: Subject to conforming with the ABL.]~~

(ii)    any non-cash gain attributable to the mark to market movement in the valuation of any Equity Interests, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(iii)    any gain relating to amounts received in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income in such period;

(iv)    any loss relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from Consolidated EBITDA pursuant to clauses (a)(xi) and (a)(xii) above;

(v)    [reserved];

(vi)    non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or cash reserve for a potential cash item that reduced Consolidated EBITDA in any prior period, any non-cash gains with respect to cash actually received in a prior period so long as such cash did not increase Consolidated EBITDA in such prior period, and any non-cash gains attributable to accrual of revenue or recording of receivables in the ordinary course of business; and

(vii)    any amount included in Consolidated Net Income of such Person for such period attributable to non-controlling interests pursuant to the application of FASB Accounting Standards Codification Topic 810-10-45;

in each case, as determined on a consolidated basis for the Borrower and its Subsidiaries in accordance with GAAP; provided that:

(I)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA currency translation gains and losses related to currency remeasurements of assets or liabilities (including the net loss or gain resulting from hedging agreements for currency exchange risk and revaluations of intercompany balances),

(II)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of Financial Accounting Standards Codification No. 815—Derivatives and Hedging,

(III)    there shall be included in determining Consolidated EBITDA for any period, without duplication, (A) to the extent not included in Consolidated Net Income, the Acquired EBITDA of any Person, property, business or asset acquired by ~~the Borrower~~any Loan Party or any Subsidiary during such period to the extent not subsequently sold, transferred or otherwise disposed of (but not including the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired) (each such Person, property, business or asset acquired, including pursuant to the Transactions, an "Acquired Entity or Business"), based on the Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) determined on a historical Pro Forma Basis and (B) in the case of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting, the Consolidated EBITDA of such Person multiplied by the ownership percentage of ~~the Borrower~~such Loan Party or applicable Subsidiary therein;

(IV)    there shall be (A) to the extent included in Consolidated Net Income, excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations in accordance with GAAP (other than (x) if so classified on the basis that it is being held for sale unless such sale has actually occurred during such period and (y) for periods prior to the applicable sale, transfer or other disposition, if the Disposed EBITDA of such Person, property, business or asset is positive (i.e., if such Disposed EBITDA is negative, it shall be added back in determining Consolidated EBITDA for any period)) by ~~the Borrower~~a Loan Party or any Subsidiary during such period (each such Person, property, business or asset so sold, transferred or otherwise disposed of, closed or classified, a "Sold Entity or Business"), based on the Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer, disposition, closure, classification or conversion) determined on a historical Pro Forma Basis and (B) to the extent not included in Consolidated Net Income, included in determining Consolidated EBITDA for any period in which a Sold Entity or Business is disposed, an adjustment equal to the Pro Forma Disposal Adjustment with respect to such Sold Entity or Business (including the portion thereof occurring prior to such disposal) as specified in the Pro Forma Disposal Adjustment certificate delivered to the Administrative Agent (for further delivery to the Lenders); and

(V)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA any non-cash expense (or income) as a result of adjustments recorded to contingent consideration liabilities relating to the Transaction or any Permitted Acquisition (or other Investment permitted hereunder).

~~[Notwithstanding the foregoing, Consolidated EBITDA shall be deemed to equal [(a) $[ ] for the fiscal quarter of the Borrower ended on or about [ ], (b) $[ ] for the fiscal quarter of the Borrower ended on or about [ ], (c) $[ ] for the fiscal quarter of the Borrower ended on or about [ ] and (d) $[ ] for the fiscal quarter of the Borrower ended on or about [ ]] (it being understood that such amounts are subject to adjustments, as and to the extent otherwise contemplated in this Agreement, in connection with any calculation on a Pro Forma Basis); provided that such amounts of Consolidated EBITDA for any such fiscal quarter shall be adjusted to include, without duplication, any cost savings that would otherwise be included pursuant to clause (b) of this definition.]~~

"Consolidated Net Income" means, for any period, the net income (loss) of the ~~Borrower and its~~Loan Parties and their respective Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(a)    extraordinary (as defined under GAAP as in effect prior to FASB Update No. 2015-01) unusual, or non-recurring gains or losses for such period,

(b)    the cumulative effect of a change in accounting principles during such period;

(c)    any Transaction Costs,

(d)    any fees, costs and expenses (including (x) any transaction or retention bonus or similar payment and (y) any indemnities) incurred during such period, or any amortization thereof for such period, in connection with or in relation to any acquisition (including any acquisition of a franchisee), non-recurring costs to acquire equipment to the extent not capitalized in accordance with GAAP, Investment, recapitalization, asset disposition, non-competition agreement, incurrence, issuance or repayment of debt or similar transaction, issuance of equity securities, option buyouts, refinancing transaction or amendment or other modification of or waiver or consent relating to any debt instrument or

similar transaction and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt, the effects of expensing all transaction-related expenses in accordance with FASB Accounting Standards Codification 805 and gains or losses associated with FASB Accounting Standards Codification 460),

       (e)     any income (loss) (and all fees and expenses or charges relating thereto) for such period attributable to the early extinguishment of Indebtedness, hedging agreements or other derivative instruments,

       (f)     accruals and reserves that are established or adjusted as a result of any Permitted Acquisition or other Investment not prohibited under this Agreement in accordance with GAAP (including any adjustment of estimated payouts on Earn-Outs) or changes as a result of the adoption or modification of accounting policies during such period,

       (g)     stock-based award compensation expenses (including any one-time compensation related to unvested options outstanding as of the Effective Date),

       (h)     any income (loss) attributable to deferred compensation plans or trusts,

       (i)     any income (loss) from Investments recorded using the equity method,

       (j)     the amount of any expense required to be recorded as compensation expense related to contingent transaction consideration,

       (k)     any unrealized gain or loss due solely to fluctuations in currency values and the related tax effects, determined in accordance with GAAP,

       (l)     [Reserved],

       (m)     [Reserved],

       (n)     any costs or expenses incurred by the ~~Borrower~~Loan Parties or any Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, any severance agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are non-cash or otherwise funded with cash proceeds contributed to the capital of the ~~Borrower~~Loan Parties or Net Proceeds of an issuance of Equity Interests of the ~~Borrower~~Loan Parties (other than Disqualified Equity Interests),

       (o)     the Consolidated Net Income of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that Consolidated Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary or its stockholders, and

       (p)     any non-cash goodwill impairment charges or other intangible asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of ASC 350 or other non-cash asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of SFAS 144.

There shall be included in Consolidated Net Income, without duplication, the amount of any cash tax benefits related to the tax amortization of intangible assets in such period. There shall be excluded from Consolidated Net Income for any period the effects from applying acquisition method accounting, including applying acquisition method accounting to inventory, property and equipment, loans and leases, software and other intangible assets and deferred revenue (including deferred costs related thereto and deferred rent) required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the ~~Borrower and its~~Loan Parties and their respective Subsidiaries), as a result of any Permitted Acquisitions (or other Investment not prohibited hereunder) or the amortization or write-off of any amounts thereof.

In addition, to the extent included in the Consolidated Net Income of such Person and its Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall (i) exclude any expenses and charges that are reimbursed by indemnification or other reimbursement provisions in connection with any acquisition or other investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder and (ii) include the amount of business interruption insurance proceeds received and, to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (A) not denied by the applicable carrier in writing within 180 days and (B) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), expenses with respect to liability or casualty events or business interruption.

"Consolidated Total Indebtedness" means, as of any date of determination, the aggregate amount of Indebtedness of the Borrower and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of the acquisition method accounting in connection with the Transactions or any Permitted Acquisition (or other Investment not prohibited hereunder)) consisting only of third-party Indebtedness for borrowed money, drawn but unreimbursed obligations under letters of credit, letters of guaranty and bankers' acceptances and third-party debt obligations evidenced by bonds, debentures, loan agreements, promissory notes or similar instruments, and, in each case, without duplication, Guarantees by the Borrower and its Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP, in respect of any of the foregoing Indebtedness of any other Person.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b), (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b) or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning specified in Section 9.20.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the

Administrative Agent (acting at the direction of the Required Lenders) may establish another convention, provided that such convention is administratively feasible for the Administrative Agent.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Deposit Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Dispose" and "Disposition" each has the meaning assigned to such term in Section 6.05.

"Disposed EBITDA" means, with respect to any Sold Entity or Business for any period through (but not after) the date of such disposition, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the ~~Borrower and its~~Loan Parties and their respective Subsidiaries in the definition of the term "Consolidated EBITDA" (and in the component financial definitions used therein) were references to such Sold Entity or Business and its subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)     matures or is mandatorily redeemable or contains any mandatory put, redemption or repayment provision (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)     is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests);

(c)     is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof; or

(d)     in the case of any preferred Equity Interest, provides for scheduled payments of dividends and/or distributions in cash;

in each case, on or prior to the date ninety-one (91) days after the Maturity Date; provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change of control" or similar event shall not constitute a

Disqualified Equity Interest if any such requirement becomes operative only after, or payment thereunder is subject to the prior, repayment in full of all the Loans and all other Loan Document Obligations that are accrued and payable and the termination of the Commitments, (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of employees of the Borrower (or any direct or indirect parent thereof) or any of its subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Borrower or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) any Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for a requirement of payment of dividends or distributions in violation of clauses (a) or (b) above shall not constitute a Disqualified Equity Interest if the terms of such Equity Interest (x) give the applicable issuer the option to elect to pay such dividends or distributions on a non-cash basis and (y) do not require the cash payment of dividends or distributions at any time that such cash payment is not permitted under Section 6.07 of this Agreement or would result in an Event of Default hereunder.

[ "Disqualified Lenders" means (i) those Persons identified by the Borrower to the Administrative Agent in writing prior to the Effective Date as being "Disqualified Lenders", (ii) those Persons who are competitors of the Borrower and/or any of their Subsidiaries or Persons Controlling or Controlled by any of the foregoing, in each case, identified by the Borrower to the Administrative Agent from time to time in writing (including by email) which designation shall become effective three (3) Business Days after the delivery of each such written designation to the Administrative Agent, but which shall not apply retroactively to disqualify any persons that have previously acquired, or entered into a trade to acquire, an assignment or participation interest in the Loan and (iii) in the case of each Person identified pursuant to clauses (i) and (ii) above, any of their Affiliates (other than any such Affiliate that is primarily engaged in, or that advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which the primary Disqualified Lender does not possess the power to direct or cause the direction of the investment policies of such entity referenced in clause (ii) above, unless separately identified by the Borrower pursuant to clause (i) above) that are either (x) identified in writing by the Borrower to the Administrative Agent from time to time or (y) clearly identifiable as Affiliates on the basis of such Affiliate's name. Such list of Disqualified Lenders shall be available for inspection upon request by any Lender.][7]

"dollars" or "$" or "U.S. Dollars" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"Earn-Outs" means, with respect to any Person, obligations of such Person arising from Permitted Acquisitions or other Investments permitted hereunder which are payable to the sellers thereunder in their capacity as such based on the achievement of specified financial results or other criteria or milestones over time.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member

---

[7] NTD: Subject to further review.

Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Effective Date" means [•]June 6, 2025.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than Parent, the Borrower, the Subsidiaries or any of their Affiliates), other than, in each case, (i) a natural person (or a holding company, investments vehicle, investment vehicle or trust for, or owned and operated by or for the primary benefit of a natural person) or (ii) a Disqualified Lender; provided that a Disqualified Lender will constitute an Eligible Assignee solely to the extent that such assignment is consented to in writing by the Borrower.  Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall have no liability with respect to any assignment made to a Disqualified Lender unless (i) the Administrative Agent has acted with gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment) and (ii) the Borrower has not consented to such assignment or is not deemed to have consented to such assignment to the extent required by Section 9.04(b).

"Environmental Laws" means all applicable treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, to preservation or reclamation of natural resources, to Release or threatened Release of any Hazardous Material or to the extent relating to exposure to Hazardous Materials, to health or safety matters.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities) directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Title IV and Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 4001(b) of ERISA or Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) any failure by any Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, in each case whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any Plan; (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by a Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA) with respect to the termination of any Plan or by application of Section 4069 of ERISA with respect to any terminated plan; (f) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or to an intention to terminate or to appoint a trustee to administer any plan or plans in respect of which such Loan Party or ERISA Affiliate would be deemed to be an employer under Section 4069 of ERISA; (g) the incurrence by a Loan Party or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Multiemployer Plan; (h) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability, or the failure of a Loan Party or any ERISA Affiliate to pay when due, after the expiration of any applicable grace period, any installment payment with respect to any Withdrawal Liability; or (i) the withdrawal of a Loan Party or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Accounts" means (a) Zero Balance Accounts (provided that, upon any such account ceasing to be a Zero Balance Account, such account shall cease to be an Excluded Account); (b) Store Accounts; (c) accounts into which government receivables and government reimbursement payments are deposited; (d) payroll accounts (including accounts used for the disbursement of payroll, payroll taxes and other employee wage and benefit payments, including 401(k) and other retirement plans, rabbi trusts for deferred compensation and health care benefits); (e) withholding and trust accounts, escrow and other fiduciary accounts; (f) Manual Sweeping Accounts; and (g) Deposit Accounts, Securities Accounts and commodity accounts that (x) individually have a daily balance of not

more than $[50,000]⁸ and (y) together with all other Deposit Accounts, Securities Accounts and commodity accounts constituting Excluded Accounts under this clause (g), have a daily balance of not more than $[1,000,000] in the aggregate for all such Deposit Accounts, Securities Accounts or commodity accounts.

"Excluded Assets" means:

(a) any fee-owned real property that is not Material Real Property, all leasehold (including ground lease) interests in real property (including requirements to deliver landlord lien waivers, estoppels and collateral access letters) and any real property that contains improvements and is located in an area determined (as of the Effective Date with respect to real property owned on the Effective Date and as of the date of acquisition of any real property acquired after the Effective Date) by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area;

(b) motor vehicles, railcars, trailers, aircraft, aircraft engines, construction and earth moving equipment and other assets subject to certificates of title or ownership (except to the extent perfection of a security interest therein can be accomplished by filing of a UCC-1 financing statement or equivalent financing statement with a central registry);

(c) letter of credit rights (except to the extent constituting supporting obligations (as defined under the UCC) in which a security interest can be perfected with the filing of a UCC-1 financing statement or equivalent financing statement with a central registry);

(d) commercial tort claims with an individual value, as determined by the Borrower in good faith (and in the case of commercial tort claims with an individual value in excess of $2,500,000, after consultation with the Required Lenders), of less than $2,500,000; provided however, for the avoidance of doubt, any commercial tort claims listed on Schedule IV of the Collateral Agreement or any supplement to the Securities Documents do not constitute Excluded Assets;

(e) [reserved];

(f) [reserved];

(g) any lease, license or other agreement, government approval or franchise with any Person if, to the extent and for so long as, the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, such lease, license or other agreement, government approval or franchise (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or any applicable Requirements of Law), other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code;

(h) any asset subject to a Lien of the type permitted by Section 6.02(iv) (whether or not incurred pursuant to such Section) or a Lien permitted by Section 6.02(xi), in each case if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, any agreement pursuant to which such Lien has been created (but only to the extent any of the foregoing is

---

⁸ [NTD: De minimis thresholds to conform to the ABL.]

not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or any applicable Requirements of Law);

(i) any intent-to-use trademark applications filed in the United States Patent and Trademark Office, pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. Section 1051, prior to the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an accepted filing of an "Amendment to Allege Use" whereby such intent-to-use trademark application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act;

(j) any asset if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations is prohibited by any applicable Requirements of Law, rule or regulation, or agreements with any Governmental Authority (other than to the extent that any such prohibition would be rendered ineffective pursuant to the Uniform Commercial Code or any other applicable Requirements of Law) or which would require consent, approval, license or authorization from any Governmental Authority or regulatory authority, unless such consent, approval, license or authorization has been received in consultation with the Required Lenders (other than, in each case, to the extent that any such prohibition or requirement would be rendered ineffective pursuant to the Uniform Commercial Code or any other applicable Requirements of Law);

(k) margin stock (within the meaning of Regulation U of the Board of Governors, as in effect from time to time);

(l) Excluded Accounts;

(m) assets to the extent a security interest in such assets would result in material adverse tax consequences to the Borrowerany Loan Party (or any direct or indirect parent or beneficial owner thereof) or one of its sSubsidiaries (to be determined by the Borrower and the Administrative Agent (acting at the direction of the Required Lenders);

(n) assets sold to any Person who is not a Loan Party in compliance with the Loan Documents;

(o) assets owned by a Subsidiary Loan Party after the release of the Guarantee of such Subsidiary Loan Party pursuant to the Loan Documents; and

(p) any assets with respect to which, in the reasonable judgment of the Required Lenders and the Borrower (as agreed to in writing), the cost or other consequences (including adverse tax consequences as determined by the Borrower and the Required Lenders in good faith) of pledging such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

"Excluded Party" has the meaning assigned to such term in Section 9.03(b).

"Excluded Subsidiary" means Franchise Group Intermediate 2, LLC, a Delaware limited liability company, so long as such Subsidiary is not a Guarantor as defined in and under the ABL Credit Agreement or any other Material Indebtedness.

"Excluded Swap Obligation" means, with respect to any Loan Party at any time, any Secured Swap Obligation under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure,

such Secured Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant," as defined in the Commodity Exchange Act (determined after giving effect to any "Keepwell", support or other agreement for the benefit of such Loan Party), at the time such guarantee or grant of a security interest becomes effective with respect to such related Secured Swap Obligation. If a Secured Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Secured Swap Obligation that is attributable to swaps that are or would be rendered illegal due to such guarantee or security interest.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.19(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17(a), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(e) and (d) any withholding Taxes imposed under FATCA.

"Existing ABL Credit Agreement" means that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, by and among FRG, as a borrower, the other borrowers and guarantors from time to time party thereto, the lenders from time to time party thereto and the ABL Agent, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"Existing DIP Credit Agreement" has the meaning set forth in the preamble.

"Existing First Lien Credit Agreement" means that certain First Lien Credit Agreement, dated as of March 10, 2021, among FRG, as a borrower, the other borrowers and guarantors from time to time party thereto, the lenders from time to time party thereto and Wilmington Trust, National Association, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"Existing HoldCo Credit Agreement" means that certain Credit Agreement, dated as of August 21, 2023, by and among Freedom VCM, Inc., as borrower, Freedom VCM Interco, Inc., as holdings, the lenders from time to time part thereto and Alter Domus (US) LLC, as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"Existing Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of March 10, 2021, among FRG, as a borrower, the other borrowers and guarantors from time to time party thereto, the lenders from time to time party thereto and Alter Domus (US) LLC,

as administrative agent and collateral agent, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate and (b) 0%.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or corporate controller of the Borrower, another officer of the Borrower with similar responsibilities, or the chief executive officer or chief operating officer of the Borrower.

"Financing Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party and (b) the borrowing of Loans hereunder and the use of the proceeds thereof.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Lien Net Leverage Ratio" means, as of any date of determination, the ratio, on a Pro Forma Basis, of (a) Consolidated First Lien Indebtedness as of such date to (b) Consolidated EBITDA for the most recently completed Test Period.

"First-Out DIP Term Loans" has the meaning assigned to such term in the preliminary statements hereto.

"Fixed Amounts" has the meaning assigned to such term in Section 1.06(b).

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" means a rate of interest equal to 0.00% per annum.

"Foreign Lender" has the meaning assigned to such term in Section 2.17(e)(ii).

"Foreign Prepayment Event" has the meaning assigned to such term in Section 2.11(g).

"Foreign Subsidiary" means each Subsidiary that is organized under or incorporated in the laws of a jurisdiction other than the United States, any state thereof or the District of Columbia.

"Franchise Agreement" means a franchising agreement between any Loan Party or any Subsidiary thereof, as franchisor, and any other Person, as franchisee, pertaining to the establishment and operation of a business with operations comparable to the operations of the Borrower and its Subsidiaries.

"Franchise Disclosure Documents" means any uniform franchise offering circulars and franchise disclosure documents used by (and, to the extent required, filed by) any Loan Party or Subsidiary of a Loan Party to comply with any applicable law, rule, regulation or order of any Governmental Authority.

"Franchise Laws" means all applicable laws, rules, regulations, orders, binding guidance or other requirements of the United States Federal Trade Commission or any other Governmental Authority relating to the relationship between franchisor and franchisees or to the offer, sale, termination, non-renewal or transfer of a franchise.

"Franchise Rights" mean the rights of a franchisee of any Loan Party or Subsidiary within any specified geographic area.

"FRG" has the meaning set forth in the preamble.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capital Lease Obligations or Capitalized Leases shall be determined in accordance with the definitions of such terms.

"Governmental Approvals" means all authorizations, consents, approvals, permits, licenses and exemptions of, registrations and filings with, and reports to, Governmental Authorities.

"Governmental Authority" means any (i) federal, state, local, municipal, or other government, (ii) governmental or quasi-Governmental Authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantee Agreement" means the First Lien Guarantee Agreement among the Loan Parties) and the Administrative Agent, substantially in the form of Exhibit B.

"Hazardous Materials" means all explosive, radioactive, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants of any nature and in any form regulated pursuant to any Environmental Law.

"Incremental Facility" has the meaning assigned to such term in Section 2.20(a).

"Incremental Facility Amendment" has the meaning assigned to such term in Section 2.20(d).

"Incremental Facility" has the meaning assigned to such term in Section 2.20(a).

"Incremental Loan" has the meaning assigned to such term in Section 2.20(a).

"Incurrence Based Amounts" has the meaning assigned to such term in Section 1.06(b).

"Indebtedness" of any Person means, without duplication:

(a) all obligations of such Person for borrowed money;

(b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP;

(c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person;

(d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (w) trade accounts payable in the ordinary course of business, (x) any Earn-Out obligation, purchase price adjustment or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid within thirty (30) days after being due and payable, (y) liabilities associated with customer prepayments and deposits and (z) expenses accrued in the ordinary course of business);

(e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed;

(f) all Guarantees by such Person of Indebtedness of others;

(g) all Capital Lease Obligations of such Person;

(h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty;

(i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; and

(j) Disqualified Equity Interests and other preferred equity issuances (and similar instruments);

provided that:

(i)    the term "Indebtedness" shall not include (A) deferred or prepaid revenue, (B) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty, indemnity or other unperformed obligations of the seller, (C) contingent indemnity and similar obligations incurred in the ordinary course of business, (D) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (E) Indebtedness of any Person that is a direct or indirect parent of ~~the Borrower~~a Loan Party appearing on the balance sheet of ~~the Borrower~~a Loan Party, or solely by reason of push down accounting under GAAP, (F) any non-compete or consulting obligations incurred in connection with a Permitted Acquisition, (G) any reimbursement obligations under pre-paid contracts entered into with clients in the ordinary course of business, (H) for the avoidance of doubt, any Qualified Equity Interests issued by ~~the Borrower~~a Loan Party;

(ii)    the Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor;

(iii)    the amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith;

(iv)    for all purposes hereof, the Indebtedness of ~~the Borrower~~any Loan Party and its Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms).

"Indemnified Taxes" means Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document, other than Excluded Taxes and Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information" has the meaning assigned to such term in Section 9.12(a).

"Initial Commitment" means the commitment of a Lender to make Initial Loans, and "Initial Commitments" means such commitments of all Lenders.  The aggregate amount of the Initial Commitments as of the Effective Date is $437,772,002.

"Initial Holder" has the meaning assigned to such term in the preliminary statements hereto.

"Initial Lender" means a Lender with an Initial Commitment or an outstanding Initial Loan.

"Initial Loans" means the Loans made on the Effective Date pursuant to Section 2.01.

"Insolvency Proceedings" has the meaning assigned to such term in Section 9.22(c).

"Intellectual Property" has the meaning assigned to such term in the Collateral Agreement.

"Intellectual Property Security Agreement" means security agreements, suitable for filing with the United States Patent and Trademark Office or the United States Copyright Office (as applicable), with respect to any Intellectual Property that is registered, issued, or applied for registration or issuance in the United States and that constitute Collateral that can be perfected by the filing of such security agreements.

"Intercreditor Agreement" means (a) that certain Intercreditor Agreement, dated as of the Effective Date, by and among the Collateral Agent and the ABL Agent (and any other Persons party thereto), and acknowledged by the Loan Parties, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof or (b) such other intercreditor agreement or arrangement among the ABL Agent (or other applicable representative on behalf of the holders of the Indebtedness incurred under the ABL Credit Agreement and the other ABL Loan Documents) and the Agents (or any of them), that is reasonably acceptable to the Administrative Agent and the Borrower, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof, as applicable.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.07.

"Interest Payment Date" means the last ~~Business D~~day of ~~each March, June, September and December~~any Interest Period, upon any prepayment due to acceleration, and on the Maturity Date.

"Interest Period" means, with respect to any SOFR Borrowing, the period commencing on the date such Borrowing is disbursed or converted to or continued as a SOFR Borrowing and ending on the date that is three months thereafter other than the Interest Period commencing on the Effective Date; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period, (c) no Interest Period shall extend beyond the Maturity Date and (d) with respect to the Interest Period commencing on the Effective Date, such Interest Period shall end on ~~the Interest Payment Date occurring in~~ June 30, 2025. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and the Subsidiaries (i) intercompany advances arising from their cash management, tax, and accounting operations and (ii) intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms)) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (a) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (b) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (c) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the fair market value (as determined in good faith by a Financial Officer) of such Equity Interests or other property as of the time of the transfer, minus any payments actually received by such investor representing a return of capital of, or dividends or other distributions in respect of, such Investment (to the extent such payments do not exceed, in the aggregate, the original amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (d) any Investment (other than any Investment referred to in clause (a), (b) or (c) above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), plus (i) the cost of all additions thereto and minus (ii) the amount of any portion of such Investment that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing

interest, dividends or other distributions in respect of such Investment (to the extent the amounts referred to in clause (ii) do not, in the aggregate, exceed the original cost of such Investment plus the costs of additions thereto), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of Section 6.04, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; provided that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"JPM" means JPMorgan Chase Bank, N.A.

"Judgment Currency" has the meaning assigned to such term in Section 9.18.

"Legal Reservations" has the meaning assigned to such term in Section 3.02.

"Lender Professionals" means, collectively, Paul Hastings LLP, as counsel, and Lazard Frères & Co. LLC, as financial advisor, to certain Lenders constituting the Required Lenders (and/or such other professionals as determined by the Required Lenders from time to time).

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption or an Incremental Facility Amendment, in each case, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, ground lease, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Loan Document Obligations" means (a) the due and punctual payment in cash by the Borrower of (i) the principal of the Loans and all accrued and unpaid interest thereon at the Applicable Rate or rates provided in this Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents to which it is a party, including obligations to pay fees, expenses, reimbursement obligations and indemnification obligations and obligations to provide cash collateral, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment in cash and performance of all other monetary obligations of the Borrower under or pursuant to each of the Loan Documents to which it is a party and (c) the due and punctual payment and performance of all the monetary obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents to which it is a party (including

interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Loan Documents" means this Agreement, any Incremental Facility Amendment, the Guarantee Agreement, the Collateral Agreement, the other Security Documents, each Intercreditor Agreement then in effect, the Administrative Agent Fee Letter and, except for purposes of Section 9.02, any Note delivered pursuant to Section 2.09(e).

"Loan Parties" means Parent, the Borrower and any Subsidiary Loan Parties.

"Loans" means ~~the loans made by the Lenders to the Borrower pursuant to this Agreement~~individually or collectively as the context requires, Initial Loans and Incremental Loans.  For the avoidance of doubt, the Loans shall include any increase in the principal amount of the Loans as a result of any payment of PIK Interest.

"Majority in Interest", when used in reference to Lenders of any Class, means, at any time, Lenders holding outstanding Loans of such Class representing more than 50% of all Loans of such Class outstanding at such time.

"Manual Sweeping Accounts" shall have the meaning ascribed to the term "Manual Sweeping Accounts" in the ABL Credit Agreement as in effect on the date hereof.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement".

"Master Intercompany Note" means the Master Intercompany Note, dated the Effective Date, pursuant to which the Borrower and its Subsidiaries are the "payees" and the Borrower and its Subsidiaries are the "payors" substantially in the form of Exhibit I.

"Material Adverse Effect" means  a circumstance or condition that would materially and adversely affect (i) the business, results of operations or financial condition of the Borrower and its Subsidiaries, taken as a whole, (ii) the ability of the Loan Parties, taken as a whole, to perform their payment obligations under the applicable Loan Documents or (iii) the rights and remedies, taken as a whole, of the Agents and the Lenders under the Loan Documents, in each case, other than the commencement of the Chapter 11 Cases, the events that lead to the commencement of the Chapter 11 Cases, and events that customarily and reasonably result from the commencement of the Chapter 11 Cases.

"Material Indebtedness" means Indebtedness for borrowed money (other than the Loan Document Obligations), Capital Lease Obligations, unreimbursed obligations for letter of credit drawings and financial guarantees (other than ordinary course of business contingent reimbursement obligations) or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $[2,500,000][9]. For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

---

[9] [NTD: To be conformed to debt cross default in ABL.]

"Material Intellectual Property" means any intellectual property owned by the Borrower or any of its Subsidiaries, the loss of which would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

"Material Non-Public Information" means material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing for purposes of United States Federal and state securities laws.

"Material Real Property" means real property (including fixtures) (i) located in the United States, (ii) first acquired by any Loan Party after the Effective Date and (iii) owned (but not leased or ground-leased) by any Loan Party with a book value, as reasonably determined by the Borrower in good faith on the date of acquisition thereof, greater than or equal to $5,000,000.

"Maturity Date" means [•], 2030[10](a) in the case of the Initial Loans, June 6, 2030 and (b) in the case of any Incremental Facility, the date set forth in the Incremental Facility Amendment.

"Maximum Rate" has the meaning assigned to such term in Section 9.16.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means a mortgage, deed of trust, deed to secure debt or other security document granting a Lien on any Mortgaged Property in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Secured Obligations, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time. Each Mortgage shall be in form and substance reasonably satisfactory to the Collateral Agent and the Borrower.

"Mortgaged Property" means each parcel of Material Real Property with respect to which a Mortgage is granted pursuant to the "Collateral and Guarantee Requirement", Section 5.11, Section 5.12 or Section 5.14 (if any).

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event:

(a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or Earn-Out, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, minus

(b) the sum of (i) all fees and out-of-pocket expenses paid by the Borrower and its Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and

[10] [NTD: To be the date that is five (5) years after the Effective Date.]

brokerage, consultant, accountant and other customary fees), (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by the Borrower and its Subsidiaries as a result of such event to repay Indebtedness (other than the Loans ) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the *pro rata* portion of net cash proceeds thereof (calculated without regard to this clause (y)) attributable to minority interests and not available for distribution to or for the account of the Borrower or its Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by the Borrower or any Subsidiary and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established by the Borrower and its Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, provided that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of Net Proceeds in the amount of such reduction.

"Non-Cash Charges" means (a) any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles pursuant to GAAP (which, without limiting the foregoing, shall include any impairment charges resulting from the application of FASB Statements No. 142 and 144 and the amortization of intangibles arising pursuant to No. 141), (b) all losses from Investments recorded using the equity method, (c) all Non-Cash Compensation Expenses, (d) the non-cash impact of acquisition method accounting, (e) depreciation and amortization (including amortization of deferred financing fees or costs, Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pension and other post-employment benefits) and (f) other non-cash charges (including non-cash charges related to deferred rent) (provided, in each case, that if any non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period).

"Non-Cash Compensation Expense" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Note" means a promissory note of the Borrower, in substantially the form of Exhibit K, payable to a Lender in a principal amount equal to the principal amount of the Loans of such Lender.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate (which rate shall be administratively feasible for the Administrative Agent) for a federal funds transaction quoted at 11:00 a.m. on such day received by a financial institution selected by the Required Lenders from a federal funds broker of recognized standing selected by such financial institution; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"<u>Organizational Documents</u>" means, with respect to any Person, the charter, articles of association or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise  from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.19(b)</u>).

"<u>Overnight Bank Funding Rate</u>" means, for any day, the rate comprised of both overnight federal funds and overnight SOFR Borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"<u>Parent</u>" has the meaning assigned to such term in the preliminary statements hereto.

"<u>Participant</u>" has the meaning assigned to such term in <u>Section 9.04(c)(i)</u>.

"<u>Participant Register</u>" has the meaning assigned to such term in <u>Section 9.04(c)(ii)</u>.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"<u>Perfection Certificate</u>" means a certificate substantially in the form of <u>Exhibit C</u>.

"<u>Perfection Requirements</u>" means the need for appropriate filings, registrations, endorsements, notarizations, stampings and/or notifications of the Security Documents or the Collateral and any other steps or actions necessary in any jurisdiction or under any laws or regulations in order to (i) create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) achieve the relevant priority expressed therein or in the Intercreditor Agreements (including the delivery of any stock certificate or promissory note required to be delivered pursuant to the applicable Loan Documents).

"<u>Periodic Term SOFR Determination Day</u>" has the meaning specified in the definition of "Term SOFR".

"<u>Permitted Acquisition</u>" means the purchase or other acquisition, by merger, consolidation or otherwise, by ~~the Borrower~~any Loan Party or any Subsidiary of any Equity Interests in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person; <u>provided</u> that:

40

(a) in the case of any purchase or other acquisition of Equity Interests in a Person, (i) such Person, upon the consummation of such purchase or acquisition, will be a Subsidiary (including as a result of a merger or consolidation between any Subsidiary and such Person), or (ii) such Person is merged into or consolidated with a Subsidiary and such Subsidiary is the surviving entity of such merger or consolidation;

(b) the business of such Person, or such assets, as the case may be, constitute a Similar Business (or assets with respect thereto);

(c) with respect to each such purchase or other acquisition, all actions required to be taken with respect to such newly created or acquired Subsidiary (including each subsidiary thereof) or assets in order to satisfy the requirements set forth in clauses (a), (b), (c) and (d) of the definition of the term "Collateral and Guarantee Requirement" to the extent applicable shall have been taken to the extent required by Sections 5.11 or 5.12 (or shall be taken within the time periods set forth in this Agreement or such later date as agreed to by the Required Lenders);

(d) subject to Section 1.06, after giving effect to any such purchase or other acquisition no Event of Default shall have occurred and be continuing;

(e) all such purchases and acquisitions of the Equity Interests in any Person will result in such Person becoming a Loan Party (within the time periods set forth in this Agreement), or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of) such Person will become owned by a Loan Party (or a Person that will become a Loan Party within the time periods set forth in this Agreement); and

(f) after giving effect to such purchase or acquisition, on a Pro Forma Basis, the Total Net Leverage Ratio is no greater than [3.00] to 1.00.

"Permitted Encumbrances" means:

(a)     Liens for Taxes, assessments or governmental charges that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b)     Liens with respect to outstanding motor vehicle fines and Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

(c)     Liens incurred, pledges or deposits made in the ordinary course of business (i) in connection with payroll taxes, workers' compensation, unemployment insurance and other social security legislation, public liability laws or similar legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance

to ~~the Borrower~~a Loan Party or any Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause (i);

(d)    Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts, customer claims, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(e)    easements, licenses, servitudes, restrictive covenants, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the ~~Borrower and its~~Loan Parties and their Subsidiaries taken as a whole;

(f)    leases or subleases of real or personal property granted to other Persons (as lessee thereof) that do not materially interfere with the ordinary conduct of the business of the ~~Borrower and its~~Loan Parties and their Subsidiaries taken as a whole;

(g)    rights of future tenants pursuant to written leases entered into in accordance with the terms hereof;

(h)    Liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 7.01(j) and any pledge and/or deposit securing any settlement of threatened litigation;

(i)    Liens on (i) goods the purchase price of which is financed by a documentary letter of credit issued for the account of ~~the Borrower~~a Loan Party or any of its Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such Lien secures only the obligations of the Borrower or such Subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 6.01 and (ii) specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(j)    Liens arising from precautionary Uniform Commercial Code financing statements or similar filings made in respect of operating leases entered into by ~~the Borrower~~a Loan Party or any of its Subsidiaries;

(k)    rights of recapture of unused real property (other than any Mortgaged Property) in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any Governmental Authority;

(l)    Liens in favor of deposit banks or securities intermediaries securing customary fees, expenses or charges in connection with the establishment, operation or maintenance of deposit accounts or securities accounts;

(m)    liens in favor of obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar

instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(n)      Liens arising from grants of non-exclusive licenses or sublicenses of Intellectual Property, or covenants not to sue with respect to Intellectual Property, made in the ordinary course of business;

(o)      rights of setoff, banker's lien, netting agreements and other Liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(p)      Liens arising from the right of distress enjoyed by landlords or Liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent or performance of other obligations in respect of leased properties, so long as such Liens are not exercised or except where the exercise of such Liens would not reasonably be expected to have a Material Adverse Effect;

(q)      Liens or security given to public utilities or to any municipality or Governmental Authority when required by the utility, municipality or Governmental Authority in connection with the supply of services or utilities to the Borrower or any of its Subsidiaries;

(r)      servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other agreements pertaining to the use or development of any of the assets of the Person, provided the same do not result in (i) a substantial and prolonged interruption or disruption of the business activities of the Borrower and its Subsidiaries, taken as a whole, or (ii) a Material Adverse Effect; and

(s)      Liens securing Priority Obligations;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money other than Liens referred to in clauses (d) and (k) above securing obligations under letters of credit or bank guarantees or similar instruments related thereto and in clause (g) above, in each case to the extent any such Lien would constitute a Lien securing Indebtedness for borrowed money.

["Permitted Holders" means each of the holders of the Equity Interests of Topco as of the Effective Date immediately after giving effect to the consummation of the Plan of Reorganization.]

"Permitted Holders" means (x) each of (i) Arena Capital Advisors, LLC, (ii) FMR LLC, (iii) Garnett Station Partners, (iv) Guggenheim Investments, (v) HG Vora Capital Management, LLC, (vi) HPS Investment Partners, LLC, (vii) Oaktree Capital Management, L.P., (viii) Octagon Credit Investors, LLC, and (ix) Pacific Investment Management Company LLC and (y) subject to compliance with Section 5.01(f), each holder of at least 20% of the issued and outstanding Equity Interests of Topco from time to time, in each case together with any Affiliates (other than portfolio companies thereof) or any other account or fund that is under common management or for which a Permitted Holder has investment authority.

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Subsidiary:

(a)        dollars, euros, Swiss francs, Sterling, Canadian dollars, or such other currencies held by it from time to time in the ordinary course of business;

(b)        readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States, (ii) the United Kingdom, (iii) Canada, (iv) Switzerland or (v) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of such country or such member nation of the European Union is pledged in support thereof;

(c)        time deposits with, or certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $250,000,000 in the case of U.S. banks and $100,000,000 (or the dollar equivalent as of the date of determination) in the case of foreign banks (any such bank in the foregoing clauses (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)        commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)        repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer covering securities described in clauses (b) and (c) above;

(f)        marketable short-term money market and similar highly liquid funds substantially all of the assets of which are comprised of securities of the types described in clauses (b) through (e) above;

(g)        securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, the United Kingdom, Canada, Switzerland, a member of the European Union or by any political subdivision or taxing authority of any such state, member, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)        investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(i)        instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized or incorporated in such jurisdiction;

(j)        investments, classified in accordance with GAAP as current assets of the Borrower, any other Loan Party or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000 or its equivalent, and, in either case, the portfolios of which are

44

limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k)      demand deposit accounts holding cash;

(l)       interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G7 government or other G7 governmental agency or a G7 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof;

(m)      other short-term investments of a type analogous to the foregoing utilized by Foreign Subsidiaries;

(n)      investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (m) above; and

(o)      any guarantee or indemnity for the obligations of a Subsidiary in connection with a Subsidiary claiming exemption from audit, the preparation and filing of its accounts or other similar exemptions (including under section 394C, 448C or 479C of the Companies Act 2006 or other similar or equivalent provisions).

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal, exchange or extension of any Indebtedness of such Person; provided that:

(a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, exchanged or extended except (i) by an amount equal to unpaid accrued interest and premium thereon plus underwriting discounts, other amounts paid, and fees and expenses (including upfront fees, original issue discount or initial yield payments) incurred, in connection with such modification, refinancing, refunding, renewal or extension, (ii) by an amount equal to any existing revolving commitments unutilized thereunder to the extent that the portion of any existing and unutilized revolving commitment being refinanced was permitted to be drawn under Section 6.01 immediately prior to such refinancing (other than by reference to a Permitted Refinancing) and such drawing shall be deemed to have been made and (iii) to the extent such excess amounts is otherwise permitted to be incurred under Section 6.01;

(b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.01(a)(v) and (a)(xii), Indebtedness resulting from such modification, refinancing, refunding, renewal, exchange or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, exchanged or extended; provided that the foregoing requirements of this clause (b) shall not apply to the extent such Indebtedness constitutes a customary bridge facility, so long as the long-term Indebtedness into which any such bridge facility is to be converted or exchanged satisfies the requirements of this clause (b) and such conversion or exchange is subject only to conditions customary for similar conversions or exchanges;

(c) if the Indebtedness being modified, refinanced, refunded, renewed, exchanged or extended is subordinated in right of payment to the Loan Document Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment

to the Loan Document Obligations on terms not materially less favorable, taken as a whole, to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, exchanged or extended;

(d) such Permitted Refinancing is not secured by a Lien on any assets other than the collateral securing, and, to the extent secured by the Collateral, with no higher priority than the Liens securing, the Indebtedness being refinanced, except for accessions and additions to such property and replacements and proceeds thereof (unless permitted to be secured by another provision of <u>Section 6.02</u>);

(e) if unsecured, such Indebtedness shall remain unsecured (unless permitted to be secured by another provision of <u>Section 6.02</u>); and

(f) no Loan Party that was not an obligor with respect to the Indebtedness being refinanced shall be an obligor under the Permitted Refinancing and if the Indebtedness being refinanced was (or was required to be) subject to an Intercreditor Agreement, the holders of such Permitted Refinancing (if such Indebtedness is secured) or their authorized representative on their behalf, shall become party to such Intercreditor Agreement, in each case providing for the same (or lesser) lien priority renewed, exchanged or extended. For the avoidance of doubt, it is understood that a Permitted Refinancing may constitute a portion of an issuance of Indebtedness in excess of the amount of such Permitted Refinancing; <u>provided</u> that such excess amount is otherwise permitted to be incurred under <u>Section 6.01</u>. For the avoidance of doubt, it is understood and agreed that a Permitted Refinancing includes successive Permitted Refinancings of the same Indebtedness to the extent such successive Permitted Refinancings satisfy the foregoing requirements.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity, whether existing as of the Effective Date or subsequently created or coming to exist.

"<u>Petition Date</u>" has the meaning set forth in the preamble.

"<u>PIK Interest</u>" means interest that accrued and is added to the outstanding principal balance of the Loans in accordance with <u>Section 2.13(a)</u>.

"<u>PIK Interest Election Notice</u>" has the meaning assigned to such term in <u>Section 2.13(a)</u>.

"<u>Plan</u>" means any employee pension benefit plan as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is an "employer" as defined in Section 3(5) of ERISA.

"<u>Plan of Reorganization</u>" means that certain [━━━━━]<u>Ninth</u> Amended Joint Chapter 11 Plan of Franchise Group, Inc. and its Debtor Affiliates, dated [•]<u>May 14</u>, 2025 [Docket No. [•]<u>1454</u>], in the jointly administered Chapter 11 Cases of such entities that are pending in the Bankruptcy Court (Case No. 24-12480 (LSS)), as amended, restated, amended and restated supplement or otherwise modified from time to time.

"<u>Platform</u>" has the meaning assigned to such term in <u>Section 5.01</u>.

"<u>Pledged Equity Interests</u>" has the meaning set forth in the Collateral Agreement.

"<u>Post-Transaction Period</u>" means, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the eighth full consecutive fiscal quarter of the Borrower immediately following the date on which such Specified Transaction is consummated.

"<u>Prepayment Event</u>" means:

(a)       any non-ordinary course sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries pursuant to <u>Section 6.05(r)</u> or the occurrence of any other Casualty Event, in each case of this <u>clause (a)</u> resulting in aggregate Net Proceeds exceeding (i) with respect to any single transaction or series of related transactions, the greater of $2,500,000 and 1.0% of Consolidated EBITDA individually or (ii) with respect to all dispositions pursuant to <u>Section 6.05(r)</u> or Casualty Events in each case not excluded pursuant to previous <u>clause (i)</u>, the greater of $5,000,000 and 2.0% of Consolidated EBITDA in the aggregate in   any fiscal year of the Borrower, other than dispositions constituting a sale and leaseback transaction to the extent consummated substantially contemporaneously with the acquisition by the Borrower or such Subsidiary of the property subject to such sale and leaseback transaction; <u>provided</u> that, for the avoidance of doubt, in each case of this <u>clause (a)</u>, (x) only Net Proceeds in excess of such amount shall be subject to the mandatory prepayment provisions set forth in <u>Section 2.11(c)</u> and (y) no Prepayment Event shall occur in any fiscal year of the Borrower until the Net Proceeds received during such fiscal year that are subject to <u>clause (ii)</u> above exceed the amount set forth in <u>clause (ii)</u> above; or

(b)       the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness, other than Indebtedness permitted under <u>Section 6.01</u> or permitted by the Required Lenders pursuant to <u>Section 9.02</u>.

"<u>Prime Rate</u>" means the rate of interest per annum last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such a rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Required Lenders) or any similar release by the Federal Reserve Board (as determined by the Required Lenders).  Any change in the Prime Rate shall take effect at the opening of business on the day such change is publicly announced or quoted as being effective.

"<u>Priority Obligation</u>" means any obligation that is secured by a Lien on any Collateral in favor of a Governmental Authority, which Lien ranks or is capable of ranking prior to or *pari passu* with the Liens created thereon by the applicable Security Documents including any such Lien securing amounts owing for wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, other Taxes, workers compensation, governmental royalties and stumpage or pension fund obligations.

"<u>Pro Forma Basis</u>," "<u>Pro Forma Compliance</u>" and "<u>Pro Forma Effect</u>" mean, as to any Person, for any events as described below that occur subsequent to the commencement of a period for which the effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the four (4) consecutive fiscal quarter of the Borrower period ended on or before the occurrence of such event (the "<u>Reference Period</u>"):

(a) in making any determination of Consolidated EBITDA or any component thereof or the determination of financial ratios and tests hereunder, effect shall be given to any Specified Transaction made during the applicable Test Period, in each case, that occurred during the Reference

Period or with respect to any such event or transaction included in the definition of Specified Transactions and projected by the Borrower in good faith to result from actions that either have been taken, with respect to which substantial steps have been taken or that are expected to be taken within 18 months after the date of consummation of such Specified Transaction (including, in each case, actions initiated prior to the Effective Date) (in the good faith determination of the Borrower), net of the amount of actual benefits realized, and without duplication of any such amount included in Consolidated EBITDA pursuant to the definition thereof;

(b) in making any determination on a Pro Forma Basis, of Pro Forma Compliance or of Pro Forma Effect, (i) all Indebtedness (including Indebtedness issued, incurred or assumed as a result of, or to finance, any relevant transactions and for which the financial effect is being calculated, whether incurred under the Loan Documents or otherwise) issued, incurred, assumed or repaid during the Reference Period (or with respect to Indebtedness repaid, during the Reference Period or subsequent to the end of the Reference Period and prior to, or simultaneously with, the event for which the calculation of any such ratio is made) shall be deemed to have been issued, incurred, assumed or repaid at the beginning of such period, (ii) such calculation shall be made without regard to the netting of any cash proceeds of Indebtedness incurred in connection with the relevant transactions, (iii) in the case of any Indebtedness in the nature of a revolving credit facility, the entire principal amount of such credit facility shall be deemed to have been fully drawn and (iv) interest expense of such Person attributable to interest on any Indebtedness for which pro forma effect is being given as provided in preceding clause (i) bearing floating interest rates shall be computed on a pro forma basis at the rate which is or would be in effect with respect to such Indebtedness as of the relevant date of determination,

(c) [Reserved], and

(d) income statement items (whether positive or negative) attributable to all property acquired or disposed of in such relevant transaction shall be included as if such transaction had occurred as of the first day of the relevant Test Period. Whenever a financial ratio or test or covenant is to be calculated on a Pro Forma Basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which financial statements of the Borrower were delivered pursuant to Section 5.01(a) or (b).

"Pro Forma Disposal Adjustment" means, for any Test Period that includes all or a portion of a fiscal quarter of the Borrower included in any Post-Transaction Period with respect to any Sold Entity or Business, the pro forma increase or decrease in Consolidated EBITDA projected by the Borrower in good faith as a result of contractual arrangements between the Borrower or any Subsidiary entered into with such Sold Entity or Business at the time of its disposal or within the Post-Transaction Period and which represent an increase or decrease in Consolidated EBITDA which is incremental to the Disposed EBITDA of such Sold Entity or Business for the most recent Test Period prior to its disposal.

"Pro Forma Entity" means any Acquired Entity or Business.

"Proposed Change" has the meaning assigned to such term in Section 9.02(c).

"PSP Loan Party" means (a) Pet Supplies "Plus", LLC, a Delaware limited liability company ("PSP"), (b) Franchise Group Newco PSP, LLC, a Delaware limited liability company ("PSP Newco"), and (c) without duplication of clauses (a) or (b), each Loan Party this is a Subsidiary of either PSP or PSP Newco.

"Public Lender" has the meaning assigned to such term in Section 5.01.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning specified in Section 9.20.

"Qualified ECP Guarantor" means, in respect of any Secured Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes or would become effective with respect to such Secured Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Equity Interests" means Equity Interests of ~~the Borrower~~a Loan Party other than Disqualified Equity Interests.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Registered Equivalent Notes" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, trustees, agents, controlling persons, advisors and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns of each of the foregoing.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, emptying, escaping, pumping, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Relevant Governmental Body" means the Board of Governors or the NYFRB, or a committee officially endorsed or convened by the Board of Governors or the NYFRB, or any successor thereto.

"Removal Effective Date" has the meaning assigned to such term in Section 8.06.

"Representative" means, with respect to any series of Indebtedness permitted by this Agreement to be secured by the Collateral, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"<u>Required Lenders</u>" means, at any time, Lenders having Loans and unused Commitments representing more than 50.1% of the aggregate Loans and unused Commitments at such time.

"<u>Required Supermajority Lenders</u>" means, at any time, Lenders having Loans and unused cCommitments representing more than 80.0% of the aggregate Loans and unused Commitments at such time.

"<u>Requirements of Law</u>" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Resignation Effective Date</u>" has the meaning assigned to such term in <u>Section 8.06</u>.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, company secretary or other similar officer, manager or a member of the Board of Directors of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on the Effective Date or thereafter pursuant to paragraph <u>(a)(i)</u> of the definition of the term "Collateral and Guarantee Requirement," any secretary, assistant secretary, company secretary or director of a Loan Party, and as to the Borrower, any Financial Officer. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Subsidiary.

"<u>Restructuring Support Agreement</u>" means that certain Restructuring Support Agreement (including all exhibits, schedules and attachments thereto), dated as of November 1, 2024 (as may be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof), by and among the Chapter 11 Debtors and the Consenting First Lien Lenders (as defined therein).

"<u>S&P</u>" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"<u>Sanctioned Country</u>" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea Region of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, any Person subject or target of any Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the U. S. government, including by Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, U.S. Department of Commerce, or by the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) (including, without limitation for purposes of defining a Sanctioned Person, as ownership and control may be defined and/or established in and/or by an applicable laws, rules, regulations or orders).

"Sanctions" means all economic or financial sanctions, trade embargoes or similar restrictions imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union any European member state, or His Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Second-Out DIP Term Loans" has the meaning assigned to such term in the preliminary statements hereto.

"Secured Cash Management Obligations" means the due and punctual payment and performance of all obligations of the Borrower and its Subsidiaries in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services, corporate credit and purchasing cards and related programs or any automated clearing house transfers of funds (collectively, "Cash Management Services") provided to the Borrower or any Subsidiary (whether absolute or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor)) that are (a) owed to the Administrative Agent or any of its Affiliates, (b) owed on the Effective Date to a Person that is a Lender or an Affiliate of a Lender as of the Effective Date and (c) owed to a Person that is an Agent, a Lender or an Affiliate of an Agent or Lender at the time such obligations are incurred, and that in each case has been designated as a "Secured Cash Management Obligation" in a writing executed by the Borrower and such counterparty and delivered to the Administrative Agent.  It is hereby understood that obligations in respect of any specific Cash Management Services may not be Secured Cash Management Obligations under this Agreement to the extent it is similarly treated as such under the ABL Credit Agreement.

"Secured Obligations" means (a) the Loan Document Obligations, (b) the Secured Cash Management Obligations and (c) the Secured Swap Obligations (excluding with respect to any Loan Party, Excluded Swap Obligations of such Loan Party).

"Secured Parties" means (a) each Lender, (b) the Administrative Agent, (c) the Collateral Agent, (d) each Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, Secured Swap Obligation or Secured Cash Management Obligation and (f) the permitted successors and assigns of each of the foregoing.

"Secured Swap Obligations" means the due and punctual payment and performance of all obligations of the Borrower and its Subsidiaries under each Swap Agreement that (a) is with a counterparty that is the Administrative Agent or any of its Affiliates, (b) is in effect on the Effective Date

with a counterparty that is a Lender, an Agent or an Affiliate of a Lender or an Agent as of the Effective Date or (c) is entered into after the Effective Date with any counterparty that is a Lender, an Agent or an Affiliate of a Lender or an Agent at the time such Swap Agreement is entered into, and that in each case has been designated as a "Secured Swap Obligation" in a writing executed by the Borrower and such counterparty and delivered to the Administrative Agent. It is hereby understood that obligations in respect of any Swap Agreement may not be Secured Swap Obligations under this Agreement to the extent it is similarly treated as such under the ABL Credit Agreement.

"Security Documents" means the Collateral Agreement, the Mortgages (if any) and each other security agreement or pledge agreement executed and delivered pursuant to the "Collateral and Guarantee Requirement" and/or Section 5.11, Section 5.12(a), Section 5.12(b) or Section 5.14 to secure any of the Secured Obligations.

"Securities Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Similar Business" means (1) any business conducted by the Borrower or any Subsidiary on the Effective Date or (2) any business or other activities that are reasonably similar, ancillary, incidental, complementary or related to (including non-core incidental businesses acquired in connection with any permitted Investment), or a reasonable extension, development or expansion of, the businesses that the Borrower and its Subsidiaries conduct or propose to conduct on the Effective Date.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Alternate Base Rate".

"Sold Entity or Business" has the meaning assigned to such term in the definition of the term "Consolidated EBITDA."

"Solvent" means, as to any Person as of any date of determination, that on such date (a) the fair value of the assets of such Person and its Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person and its Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent, or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business, (c) such Person and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities mature in the ordinary course of business and (d) such Person and its Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital.  The amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual or matured liability.

"Specified Transaction" means, with respect to any period, any Investment, sale, transfer or other disposition of assets, incurrence or repayment of Indebtedness, Restricted Payment, subsidiary

designation or other event that by the terms of the Loan Documents requires "Pro Forma Compliance" with a test or covenant hereunder or requires such test or covenant to be calculated on a Pro Forma Basis.

"Store Accounts" shall have the meaning ascribed to the term "Store Accounts" in the ABL Credit Agreement as in effect on the date hereof.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held (unless parent does not Control such entity), or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent; in each case, whether existing as of the Effective Date or subsequently created or coming to exist.

"Subsidiary" means any subsidiary of the Borrower (unless otherwise specified or the context otherwise requires).

"Subsidiary Loan Party" means each Subsidiary of the Borrower.

"Supported QFC" has the meaning specified in Section 9.20.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Tax Group" has the meaning given to such term in Section 6.07(a)(vi).

"Tax Restructuring" means any reorganizations and other activities related to tax planning and tax reorganization (as determined by the Borrower in good faith) entered into after the Effective Date so long as (x) the Required Lenders have provided prior written consent in their sole discretion and (y) such Tax Restructuring does not materially impair the Guarantee, the security interests of the Agents and the Lenders under the Security Documents in the Collateral, taken as a whole, and ~~Borrower and its~~the Loan Parties and their Subsidiaries otherwise comply with Sections 5.11 and 5.12.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Facility" has the meaning set forth in the preamble.

"Term SOFR" means:

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate and for a tenor comparable to the applicable Interest Period (which, for the avoidance of doubt, for the first the Interest Period commencing on the Effective Date shall be one month), on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and.

(b)    for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day;

provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Adjustment" means with respect to any SOFR Loan, 0.10% per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means  the forward-looking term rate based on SOFR .

"Test Period" means, at any date of determination, the period of four consecutive fiscal quarters of the Borrower then last ended as of such time for which financial statements are delivered pursuant to Section 5.01(a) or (b); provided that for any date of determination before the delivery of the first financial statements pursuant to Section 5.01(a) or (b), the Test Period shall be the period of four consecutive fiscal quarters of the Borrower then last ended as of such time.

"Topco" has the meaning assigned to such term in the preliminary statements hereto.

"Transaction Costs" means all fees, premiums, costs and expenses incurred or payable by the ~~Borrower~~Loan Parties or any ~~of~~ ~~o~~their Subsidiar~~y~~ies in connection with the Transactions prior to the Effective Date.

"Transactions" means:

(a) the exchange of First-Out DIP Term Loans and Second-Out DIP Term Loans on a dollar-for-dollar basis for, among other things, the Loans pursuant to the Plan of Reorganization;

(b) the execution and delivery of the Loan Documents, the creation of the Liens pursuant to the Security Documents and the incurrence of the Term Facility and the funding of the Loans on the Effective Date;

(c) the execution and delivery of the ABL Credit Agreement and the other ABL Loan Documents (to the extent entered into on or after the Effective Date or otherwise originally entered into in connection with the ABL Credit Agreement), the creation or continuation on or after the Effective Date of the Liens pursuant to the Collateral Documents (as defined in the ABL Credit Agreement) and the incurrence or continuance of any borrowings thereunder to be incurred or continued on the Effective Date;

(d) the consummation of the other transactions contemplated by this Agreement on the Effective Date;

(e) the consummation of any other transactions in connection with the foregoing, including, without limitation, the consummation of the approved Plan of Reorganization; and

(f) the payment of the Transaction Costs related thereto.

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Alternate Base Rate.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Special Resolution Regimes" has the meaning specified in Section 9.20.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect

in a U.S. jurisdiction other than the State of New York, the terms "UCC" and "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(e)(ii)(C).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Subsidiary" means any Subsidiary that is a wholly owned subsidiary.

"wholly owned subsidiary" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or

instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"Zero Balance Accounts" means Deposit Accounts in which a balance of zero is maintained by the depository institution at all times by automatically transferring funds from a master Deposit Account to such Zero Balance Account in an amount only large enough to cover checks presented and other debits to such account, such that any such Zero Balance Account maintains an overnight balance of zero dollars at all times.

SECTION 1.02    Classification of Loans and Borrowings.

For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Class (e.g. an "Initial Loan") or by Type (e.g., a "SOFR Loan" or "ABR Loan"). or by Class and Type (e.g. "SOFR Initial Loan") Borrowings also may be classified and referred to by Class (e.g., and "Initial Loan Borrowing") or by Type (e.g., a "SOFR Borrowing"). or by Class and Type (e.g. "SOFR Initial Loan Borrowing").

SECTION 1.03    Terms Generally.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document, including all schedules, exhibits and other attachments thereto and as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or other modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04    Accounting Terms; GAAP.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.

(b)    Notwithstanding anything to the contrary herein, but subject to Section 1.08, for purposes of determining compliance with any test contained in this Agreement, the Total Net Leverage Ratio and any other financial ratio or test that are calculated with respect to any Test Period during which

57

a Specified Transaction occurs shall be calculated on a Pro Forma Basis. Further, if since the beginning of any such Test Period and on or prior to the date of any required calculation of any financial ratio or test (x) any Specified Transaction has occurred or (y) any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries or any joint venture since the beginning of such Test Period has consummated any Specified Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Test Period as if such Specified Transaction had occurred at the beginning of the applicable Test Period.

SECTION 1.05    Effectuation of Transactions.

All references herein to the Borrower and its Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of the Borrower and the other Loan Parties contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Transactions that occurred on the Effective Date, unless the context otherwise requires.

SECTION 1.06    Certain Determinations.

(a)    Notwithstanding anything to the contrary herein, for purposes of the covenants described in Article V or Article VI or in connection with any Incremental Facility, if any transaction or action would be permitted pursuant to one or more provisions described therein, the Borrower may divide and classify such transaction or action within the relevant covenant (or other provisions) in any manner that complies with such covenant (or other provision) set forth therein, and may later divide and reclassify any such transaction or action so long as the transaction or action (as so divided and/or reclassified) would be permitted to be made in reliance on the applicable exception (or other provisions) as of the date of such reclassification; provided, that such reclassification shall not be permitted with respect to (i) the Indebtedness consisting of the Loans, which shall only be permitted under Section 6.01(a)(i), or Liens with respect to the Loans, which shall only be permitted under Section 6.02(i) and (ii) the Indebtedness under the ABL Credit Agreement and the other ABL Loan Documents, which shall only be permitted under Section 6.01(a)(xxxi), or Liens with respect to the Obligations (as defined in the ABL Credit Agreement), which shall only be permitted under Section 6.02(xvii). For the avoidance of doubt, if the applicable date for meeting any requirement hereunder or under any other Loan Document falls on a day that is not a Business Day, compliance with such requirement shall not be required until noon on the first Business Day following such applicable date.

(b)    Notwithstanding anything to the contrary herein, with respect to any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that does not require compliance with a financial ratio or test (including any Total Net Leverage Ratio) (any such amounts, the "Fixed Amounts") substantially concurrently with any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that requires compliance with any such financial ratio or test (any such amounts, the "Incurrence Based Amounts"), it is understood and agreed that the Fixed Amounts (and any cash proceeds thereof) shall be disregarded in the calculation of the financial ratio or test applicable to the Incurrence Based Amounts in connection with such substantially concurrent incurrence.

(c)    Notwithstanding the foregoing, for purposes of any determination under Article V, Article VI or Article VII or any determination under any other provision of this Agreement subject to any Dollar limitation, threshold or basket, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than Dollars shall be translated into Dollars based on the relevant currency exchange rate in effect on the applicable date of determination (rounded to the nearest currency unit, with 0.5 or more of a currency unit being rounded upward); provided, however, that for purposes of

determining compliance with <u>Article VI</u> with respect to any amount in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness, Lien or Investment is incurred or Disposition, Restricted Payment or prepayment, redemption, purchase or defeasance is made or such transaction with an Affiliate is entered into; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, the foregoing provisions of this <u>Section 1.06(c)</u> shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness, Lien or Investment may be incurred or Disposition, Restricted Payment or prepayment, redemption, purchase or defeasance may be made or such transaction with an Affiliate may be entered into at any time under such Sections. For purposes of any determination of Consolidated Total Indebtedness, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the most recently delivered financial statements pursuant to <u>Section 5.01(a)</u> or <u>Section 5.01(b)</u> adjusted to reflect the currency translation effects, determined in accordance with GAAP, of any Swap Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the dollar equivalent thereof. Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent (acting at the direction of the Required Lenders) may from time to time specify with the Borrower's consent (such consent not to be unreasonably withheld) to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

SECTION 1.07    <u>Divisions</u>.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.08    <u>Interest Rates</u>.

The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform. Upon the occurrence of a Benchmark Transition Event, <u>Section 2.14(b)</u> provides a mechanism for determining an alternative rate of interest. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability. The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at

59

law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

ARTICLE II

THE CREDITS

SECTION 2.01        Commitments.

(a)        Subject to the terms and conditions set forth herein, the Initial Lenders with Initial Commitments hereby severally, but not jointly, agree to make Initial Loans to the Borrower denominated in dollars on the Effective Date in a principal amount equal to its Initial Commitment by an exchange of its First-Out DIP Term Loans and certain Second-Out DIP Term Loans and accrued and unpaid interest in respect thereof, in accordance with Section 2.01(b) below.  Upon such exchange, the Initial Commitment of such Lender shall terminate.

(b)        On the Effective Date and subject to the satisfaction of the conditions precedent set forth in Section 4.01 hereof, pursuant to the Plan of Reorganization and Confirmation Order, each Lender shall be deemed to have exchanged on a dollar-for-dollar basis, pro rata among all applicable Lenders in accordance with their elected First-Out DIP Term Loans and Second-Out DIP Term Loans, First-Out DIP Term Loans and Second-Out DIP Term Loans into Loans to be made by such Lender hereunder. Amounts repaid or prepaid in respect of Loans may not be reborrowed.

SECTION 2.02        Loans and Borrowings.

(a)        Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

(b)        Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or SOFR Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)        At the commencement of each Interest Period for any SOFR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that a SOFR Borrowing that results from a continuation of an outstanding SOFR Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of five (5) SOFR Borrowings outstanding.

SECTION 2.03        Requests for Borrowings.

To request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing by telecopy, electronic mail, facsimile or overnight courier (a) in the case of a SOFR Borrowing, not later than 12:00 p.m., New York City time, three (3) U.S. Government Securities

60

Business Days before the date of the proposed Borrowing, (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, on the date of the proposed Borrowing; provided that any notice given in connection with Borrowings on the Effective Date (including SOFR Borrowings) may be given not later than 2:00 p.m., New York City time, one (1) Business Day before the Effective Date; provided further that, in each case, the Administrative Agent may in its discretion accept any later request. Each such written Borrowing Request shall be signed by the Borrower substantially in the form of Exhibit F and shall be irrevocable. Each such written Borrowing Request shall specify the following information:

> (i)     whether the requested Borrowing is to be a Borrowing of Initial Loans and/or a Borrowing of any other Class (specifying the Class thereof);

> (ii)     (i) the aggregate amount of such Borrowing;

> (iii)     (ii) the date of such Borrowing, which shall be a Business Day;

> (iv)     (iii) whether such Borrowing is to be an ABR Borrowing or a SOFR Borrowing;

> (v)     (iv) in the case of a SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

> (vi)     (v) the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.06.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested SOFR Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

> SECTION 2.04     [Reserved].

> SECTION 2.05     [Reserved].

> SECTION 2.06     Funding of Borrowings.

> (a)     [Reserved.]

> (b)     Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.06 and may, in reliance on such assumption and in its sole discretion, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent. If such Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower agrees to pay such corresponding amount to the Administrative Agent forthwith on demand. The Administrative Agent

shall also be entitled to recover from such Lender or Borrower interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrower, the interest rate applicable to such Borrowing in accordance with Section 2.13. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c)     The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 9.03(c).

SECTION 2.07     Interest Elections.

(a)     Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.07. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section 2.07, the Borrower shall notify the Administrative Agent of such election in writing by telecopy, electronic mail, facsimile or overnight courier by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such written Interest Election Request shall be irrevocable and shall be signed by the Borrower.

(c)     Each written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a SOFR Borrowing; and

(iv)    if the resulting Borrowing is to be a SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a SOFR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request in accordance with this Section 2.07, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Borrowing and (ii) unless repaid, each SOFR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08    Termination and Reduction of Commitments.

(a)    On the Effective Date, the Commitments in effect on such date shall terminate upon the making of the relevant Loans.

(b)    The Borrower may at any time terminate, or from time to time reduce, the Commitments of any Class, provided that each reduction of the Commitments of any Class shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 unless such amount represents all of the remaining Commitments of such Class.

(c)    The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section 2.08 at least one (1) Business Day prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section 2.08 shall be irrevocable. Any termination or reduction of the Commitments of any Class shall be permanent. Each reduction of the Commitments of any Class shall be made ratably among the Lenders of such Class.

SECTION 2.09    Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.10.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable

thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)        The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section 2.09, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section 2.09 shall control.

(e)        Any Lender may request that Loans of any Class made by it be evidenced by a Note. In such event, the Borrower shall execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns).

SECTION 2.10        Repayment of Loans.

(a)        To the extent not previously paid, all Loans shall be due and payable on the Maturity Date.

(b)        Prior to any repayment of any Borrowings of any Class hereunder, the Borrower shall select the Borrowing or Borrowings of the applicable Class to be repaid and shall notify the Administrative Agent in writing by telecopy, electronic mail, facsimile or overnight courier of such election not later than 2:00 p.m., New York City time, one (1) Business Day before the scheduled date of such repayment. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shallmay make (without obligation) such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing. Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid.

SECTION 2.11        Prepayment of Loans.

(a)        Subject to clause (b) below, the Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty.

(b)        (i) In the event that the Borrower prepays, repays, refinances, repurchases, substitutes or replaces all or any portion of the Loans at any time (including, without limitation, optional prepayments described in Section 2.11(a), mandatory prepayments described in Section 2.11(c) and any payments of the Loans occurring after acceleration of the Loans pursuant to Section 7.01, any payments made before or after a Default or an Event of Default, the satisfaction, release, payment, redemption, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any Loans (in whole or in part) in any proceeding under any Debtor Relief Law, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any proceeding under any Debtor Relief Law to the Lenders any payments made after a bankruptcy or insolvency event), the Borrower shall pay to the Administrative Agent, for the account of each applicable Lender:

(A) prior to the first anniversary of the Effective Date, a premium of 3.00% of the aggregate principal amount of the Loans so prepaid, repaid, refinanced, repurchased, substituted or replaced;

(B) during the period from and including the first anniversary of the Effective Date to but not including the second anniversary of the Effective Date, a premium of 2.00% of the aggregate principal amount of the Loans so prepaid, repaid, refinanced, repurchased, substituted or replaced; and

(C) during the period from and including the second anniversary of the Effective Date to but not including the third anniversary of the Effective Date, a premium of 1.00% of the aggregate principal amount of the Loans so prepaid, repaid, refinanced, repurchased, substituted or replaced. For the avoidance of doubt, no prepayment fee shall be payable with respect to the Loans at any time on or after the date that is the third anniversary of the Effective Date.

Each Loan Party acknowledges and agrees that if the payment of the Secured Obligations is accelerated or the principal on the Loans and other Secured Obligations otherwise becomes due in whole or in part prior to, on, or after the Maturity Date, in each case, in respect of any Event of Default (including upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the amounts payable pursuant to this Section 2.11(b)(i) will also be due and payable as though the events referred to therein had occurred and shall constitute part of the Secured Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof. Any amount payable above shall be presumed to be the liquidated damages sustained by each Lender as the result of the early prepayment and each Loan Party agrees that it is reasonable under the circumstances currently existing. The amounts due under this Section 2.11(b)(i) shall constitute liquidated damages, not unmatured interest or a penalty, as the actual amount of damages to the Lenders as a result of payment would be impracticable and extremely difficult to ascertain. The amounts due under this Section 2.11(b)(i) shall also be payable in the event the Secured Obligations are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means including via a plan of reorganization, or otherwise. EACH LOAN PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBIT OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION OR FORECLOSURE OR DEED IN LIEU OF FORECLOSURE. Each Loan Party expressly agrees (to the fullest extent it may lawfully do so) that: (A) the call premium and payments due hereunder in respect thereof are reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) such payment shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay such amount; and (D) each Loan Party shall be estopped hereafter from claiming differently than as agreed to in this Section 2.11(b)(i). Each Loan Party expressly acknowledges that its agreements in this Section 2.11(b)(i) as herein described is a material inducement to the Lenders in making the Loans as provided herein.

(ii)    All voluntary prepayments shall be applied to the Term Facility or any Incremental Facility (or more than one of such facilities) as determined by the Borrower.

(c)    In the event and on each occasion that any Net Proceeds are received by or on behalf of the Borrower or any of its Subsidiaries in respect of any Prepayment Event (other than any

Prepayment Event in respect of ABL Priority Collateral (as defined in the Intercreditor Agreement), to the extent such Prepayment Event is in respect of ABL Priority Collateral, as determined by the Borrower in good faith) the Borrower shall, within five (5) Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (b) of the definition of "Prepayment Event", on the date of such Prepayment Event), prepay Borrowings (on a *pro rata* basis among all Borrowings) in an aggregate amount equal to 100% of the amount of such Net Proceeds (together with any amounts due pursuant to Section 2.11(b)(i)); provided that, in the case of any event described in clause (a) of the definition of the term "Prepayment Event", if the Borrower or any of the Subsidiaries invest (or commit to invest) the Net Proceeds from such event (or a portion thereof) within 180 days after receipt of such Net Proceeds in the business of the Borrower and the other Subsidiaries (including any acquisitions permitted under Section 6.04 and capital expenditures), then no prepayment shall be required pursuant to this paragraph in respect of such Net Proceeds in respect of such event (or the applicable portion of such Net Proceeds, if applicable) except to the extent of any such Net Proceeds therefrom that have not been so invested (or committed to be invested) by the end of such 180-day period, at which time a prepayment shall be required in an amount equal to such Net Proceeds that have not been so invested (or committed to be invested).

(d)    [Reserved].Notwithstanding anything herein to the contrary, in the event a mandatory prepayment described in Section 2.11(a) is not permitted under the ABL Credit Agreement, neither the Borrower nor any of its Subsidiaries shall undertake such Prepayment Event.

(e)    Prior to any optional prepayment of Borrowings pursuant to Section 2.11(a), the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (f) of this Section 2.11. AnyIn the event of any mandatory prepayment of Borrowings made at a time when Borrowings of more than one Class remain outstanding, the Borrower shall select Borrowings to be prepaid so that the aggregate amount of such prepayment is allocated between Borrowings *pro rata* based on the aggregate principal amount of outstanding Borrowings of each such Class; provided that any Lender may elect, by notice to the Administrative Agent in writing by telecopy, electronic mail, facsimile or overnight courier at least two (2) Business Days prior to the prepayment date, to decline all or any portion of any prepayment of its Loans of any such Class pursuant to this Section 2.11 (other than an optional prepayment pursuant to paragraph (a) of this Section or a mandatory prepayment as a result of the Prepayment Event set forth in clause (b) of the definition thereof, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Loans of any such Class but was so declined shall be offered on a pro rata basis to Lenders who did not decline such proceeds. Optional prepayments of Borrowings shall be allocated in direct order of maturity, and subject to the foregoing, the Administrative Agent shall apply such prepayments in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16; provided that, in connection with any mandatory prepayments by the Borrower of the Loans pursuant to Section 2.11(c), such prepayments shall be applied on a *pro rata* basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are ABR Loans or SOFR Loans.

(f)    The Borrower shall notify the Administrative Agent of any optional prepayment pursuant to Section 2.11(a) in writing by telecopy, electronic mail, facsimile or overnight courier of any prepayment hereunder (i) in the case of prepayment of a SOFR Borrowing, not later than 11:00 a.m., New York City time, three (3) U.S. Government Securities Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one (1) Business Day before the date of prepayment (or, in each case, such later date or date which the Administrative Agent may agree to in its sole discretion). Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such

prepayment; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13, and subject to Section 2.11(b), shall be without premium or penalty.

(g)    Notwithstanding any other provisions of Section 2.11(c), (A) to the extent that any of or all the Net Proceeds of any Prepayment Event set forth in clause (a) of the definition thereof by a Foreign Subsidiary giving rise to a prepayment pursuant to Section 2.11(c) (a "Foreign Prepayment Event") are prohibited by, would violate or conflict with, or be delayed by, applicable local law from being repatriated to the Borrower, the portion of such Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in Section 2.11(c), as the case may be, and such amounts may be retained by such Subsidiary so long, but only so long, as the Borrower determined in good faith that the applicable local law will not permit repatriation to the Borrower and once the Borrower has determined in good faith that such repatriation of any of such affected Net Proceeds is permitted under the applicable local law, such repatriation will be effected as soon as practicable and such repatriated Net Proceeds will be applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to Section 2.11(c), as applicable, (B) to the extent that and for so long as the Borrower has determined in good faith that repatriation of any or all of the Net Proceeds of any Foreign Prepayment Event would have a material adverse tax or cost consequence with respect to such Net Proceeds, the Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in Section 2.11(c), as the case may be, and such amounts may be retained by such Subsidiary; provided that if the Borrower determines in good faith that repatriation of any of or all the Net Proceeds of any Foreign Prepayment Event so affected would no longer have a material adverse tax consequence with respect to such Net Proceeds, such Net Proceeds shall be applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to Section 2.11(c), as applicable, and (C) to the extent that and for so long as the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Prepayment Event would conflict with the fiduciary duties of a Subsidiary's directors, or result in, or could reasonably be expected to result in, a material risk of personal or criminal liability for any officer, director, employee, manager, member or management or consultant of such Subsidiary, the Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in Section 2.11(c), as the case may be, and such amounts may be retained by such Subsidiary.

SECTION 2.12    Fees.

The Borrower agrees to pay to the Agents, for their own account, fees in respect of the Term Facility payable in the amounts and at the times separately agreed upon between the Borrower and the Agents in the Administrative Agent Fee Letter.

SECTION 2.13    Interest.

(a)    The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate. The Loans comprising each SOFR Borrowing shall bear interest at Adjusted Term SOFR for the Interest Period in effect for such Borrowing plus the Applicable Rate.

Interest (whether Cash Interest or PIK Interest) accrues from and including (x) initially, the Effective Date, (y) following the deemed funding of the Loans on the Effective Date pursuant to Section 2.01, each Interest Payment Date to, but excluding the following Interest Payment Date; provided that:

      (i)    interest shall be payable entirely in cash (such interest, "Cash Interest"), provided that, at the Borrower's election or deemed election as set forth in sub-clauses (ii) and (iii) below, up to 2.0% of such interest may be payable entirely as PIK Interest. Such PIK Interest shall become due and payable and be deemed capitalized on the applicable Interest Payment Date and constitute additional principal in respect of the Loans. Unless the context otherwise requires, for all purposes hereof, references to "principal amount" of Loans refers to the original face amount of the Loans plus any increase in the principal amount of the outstanding Loans as a result of payments of PIK Interest;

      (ii)   the Borrower may elect to make a portion of interest payments in the form of PIK Interest by delivering to the Administrative Agent a written notice in the form of Exhibit L (a "PIK Interest Election Notice") by 11:00 a.m., New York City time at least [three]five (35) Business Days][11] prior to the applicable Interest Payment Date as provided in Section 2.13(c); and

      (iii) if the Borrower fails to deliver a PIK Interest Election Notice or a written revocation of a then-effective PIK Interest Election Notice not less than [three]five (35) Business Days] prior to the commencement of the relevant iInterest pPeriod, the Borrower shall be deemed to have made an election of 2.0% of interest related to such Interest Period to be payable as PIK Interest for the applicable interest rate period.

      (b)     Notwithstanding the foregoing, if upon the occurrence and during the continuance of any Event of Default any principal of or interest on any Loan or any fee or other amount payable by any Loan Party under a Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, all overdue principal amounts of the Loans shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of the principal of any Loan, 2.00% per annum plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section 2.13 or (ii) in the case of any other amount, 2.00% per annum plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section 2.13.

      (c)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan, provided that (i) interest accrued pursuant to paragraph (b) of this Section 2.13 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

      (d)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or

---

[11] [NTD: Confirm necessary election notice period.]

Adjusted Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.14    Benchmark Replacement Setting.

(a)    Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and the definition of "Adjusted Term SOFR" shall be deemed modified to delete the addition of the Term SOFR Adjustment to Term SOFR for any calculation and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders (or, if such Benchmark Replacement affects fewer than all Classes, the Majority in Interest Lenders of each affected Class).  If the Benchmark Replacement is based upon Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(b)    *Benchmark Replacement Conforming Changes*. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent (acting at the direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    *Notices; Standards for Decisions and Determinations*. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.14(d) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.14, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.14.

(d)    *Unavailability of Tenor of Benchmark*. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other

information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will no longer be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     *Benchmark Unavailability Period*. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans and (ii) any outstanding affected SOFR Loans will be deemed to have been converted to ABR Loans at the end of the applicable Interest Period. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

SECTION 2.15     Increased Costs.

(a)     Increased Costs Generally. If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D)), special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount), then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.    If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)    Delay in Requests.    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except  that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 2.16    Break Funding Payments.

In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(f) and is revoked in accordance therewith) or (d) the assignment of any SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19 or Section 9.02(c), then, in any such event, the Borrower shall, after receipt of a written request by any Lender affected by any such event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the loss, cost and expense (excluding loss of profit) actually incurred by it as a result of such event. Such loss, cost or expense shall in no event exceed that which would have been incurred by such Lender had it funded each SOFR Loan made by it at Adjusted Term SOFR for such Loan by a matching borrowing for a comparable amount and for a comparable period, whether or not such SOFR Loan was in fact so funded. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 and the reasons therefor delivered to the Borrower shall be prima facie evidence of such amounts. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt of such demand. Notwithstanding the foregoing, this Section 2.16 will not apply to losses, costs or expenses resulting from Taxes, as to which Section 2.17 shall govern. Notwithstanding the foregoing, no Lender shall demand compensation pursuant to this Section 2.16 if it shall not at the time be the general policy or practice of such Lender to demand such compensation in similar circumstances under comparable provisions of other credit agreements.

SECTION 2.17    Taxes.[12]

(a)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Requirements of Law. If the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct or withhold any Taxes from such payments, then the applicable withholding agent shall be entitled to make such deductions or withholdings and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law, and if such Taxes are Indemnified Taxes, then the amount payable by the applicable Loan Party shall be increased as necessary so that after all such required deductions or withholdings have been made (including such deductions and withholdings applicable to additional amounts payable under this Section 2.17), each Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholdings been made.

(b)    The Borrower shall timely pay to the relevant Governmental Authority in accordance with Requirements of Law or, at the option of the Administrative Agent, timely reimburse it for the payment of, any Other Taxes.

(c)    The ~~Borrower~~Loan Parties, jointly and severally, shall indemnify the Administrative Agent and each Lender within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent or such Lender as the case may be, on or with respect to any payment by or on account of any obligation of any Loan Party under any Loan Document, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of any Taxes by a Loan Party to a Governmental Authority pursuant to this Section 2.17, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Each Lender shall, at such times as are reasonably requested by Borrower or the Administrative Agent, provide Borrower and the Administrative Agent with any properly completed and executed documentation prescribed by any Requirement of Law, or reasonably requested by Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under the Loan Documents. Each such Lender shall, whenever a lapse in time or change in circumstances renders any such documentation expired, obsolete or inaccurate in any respect (including any specific documentation required below in this Section 2.17(e)), deliver promptly to Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify Borrower and the

---

[12] [NTD: Subject to review.]

Administrative Agent in writing of its legal ~~ineligibility to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding tax or are subject to Tax at a rate reduced by an applicable tax treaty, Borrower, Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable law from such payments at the applicable statutory rate.~~inability to do so.  Notwithstanding anything to the contrary in this Agreement, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.17(e)(i), (ii)(A), (ii)(B), (ii)(C), (ii)(D), (iii) and (iv) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Without limiting the generality of the foregoing:

(i)        Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) two properly completed and duly signed copies of ~~Internal Revenue Service~~IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax.

(ii)        Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) (such Lender, a "Foreign Lender") shall deliver (to the extent it is legally entitled to do so) to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the Administrative Agent) whichever of the following is applicable:

(A)        in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)        two properly completed and duly signed copies of IRS Form W-8ECI (or any successor forms),

(C)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of Exhibit J-1, J-2, J-3 or J-4, as applicable, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (any such certificate a "United States Tax Compliance Certificate"), and (y) two properly completed and duly signed copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(D)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of ~~Internal Revenue Service~~IRS Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by ~~a~~an IRS Form W-8ECI, W-8BEN or W-8BEN-E, United States Tax Compliance Certificate, IRS Form W-9, IRS Form W-8IMY (or other successor forms) or any other required information from each beneficial owner, as applicable (<u>provided</u> that, if the Lender is a partnership and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)    any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding ~~t~~Tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(iii)    If a payment made to any Recipient under any Loan Document would be subject to U.S. federal withholding ~~t~~Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Recipient has or has not complied with such Recipient's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (<u>iii</u>), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iv)    If the Administrative Agent is a ~~U.S. Person~~<u>United States person (as defined in Section 7701(a)(30) of the Code)</u>, it shall provide the Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-9 or (B) if the Administrative Agent is not a ~~U.S. Person~~<u>United States person (as defined in Section 7701(a)(30) of the Code)</u>, then it shall provide the Borrower with two properly completed IRS Forms W-8ECI with respect to fees received on its own behalf and any such other documentation prescribed by applicable law and reasonably requested by the Borrower that would allow the applicable Borrower to make payments to such Administrative Agent without deduction or withholding of any U.S. federal withholding Taxes. If the Administrative Agent is not a ~~U.S. Person~~<u>United States person (as defined in Section 7701(a)(30) of the Code)</u>, such Administrative Agent shall provide the Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-8IMY (or successor form) certifying that it is either (i) a "qualified intermediary" and that it assumes primary withholding responsibility under Chapters 3 and 4 of the Code and primary Form 1099 reporting and backup withholding responsibility for payments it receives for the account of others or (ii) a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a ~~U.S. Person~~<u>United States person (as defined in Section 7701(a)(30) of the Code)</u> with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a ~~U.S. Person~~<u>United</u>

States person (as defined in Section 7701(a)(30) of the Code) with respect to such payments as contemplated by U.S. Treasury Regulations Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Borrower can make payments to the Administrative Agent without deduction or withholding of any Taxes imposed by the United States.

(f)      If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of Taxes as to which it has been indemnified pursuant to this Section 2.17 or with respect to which additional amounts have been paid pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrower pursuant to this Section 2.17(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential). Notwithstanding anything to the contrary in this Section 2.17(f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this Section 2.17(f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. Notwithstanding anything to the contrary, this Section 2.17(f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential) to any Loan Party or any other person.

(g)      The agreements in this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(h)      For purposes of this Section 2.17, the term "applicable Requirements of Law" includes FATCA.

SECTION 2.18      Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)      The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest or fees, or of amounts payable under Sections 2.15, 2.16 or 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any

such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan shall be made in dollars, all payments of accrued interest payable on a Loan shall be made in dollars, and all other payments under each Loan Document shall be made in dollars.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties.

(c)    If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any disproportionate payment obtained by a Lender of any Class as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.06(a) or Section 2.06(b), Section 2.18(d) or Section 9.03(c), then the Administrative Agent may, in its discretion and in the order determined by the Administrative Agent (notwithstanding any

contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and to be applied to, any future funding obligations of such Lender under any such Section.

SECTION 2.19    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event gives rise to the operation of Section 2.2~~0~~1, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Sections 2.15 or 2.17 or mitigate the applicability of Section 2.2~~0~~1, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)    If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.2~~0~~1 or (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (C) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.2~~0~~1, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

SECTION 2.20    Incremental Credit Extensions.

(a)    The Borrower may at any time or from time to time on one or more occasions after the Effective Date, by written notice delivered to the Administrative Agent and subject to the prior written consent of the Required Lenders to be granted in their sole discretion, request to add one or more additional Classes of term loans or additional term loans of the same Class as any existing Class of term

loans (an "Incremental Facility") and/or increase the principal amount of the Loans by requesting new term loan commitments to be added to such Loans (an "Incremental Increase", and together with any Incremental Facility, the "Incremental Loans" or the "Incremental Facilities"); provided that:

(i)    Incremental Facilities may be borrowed by any one or more Loan Parties, and

(ii)    notwithstanding anything to the contrary herein, the aggregate outstanding principal amount of the Incremental Facilities that can be incurred after the Effective Date shall not exceed $50,000,000.

Each Incremental Facility shall be in a minimum principal amount of $2,000,000 and integral multiples of $500,000 in excess thereof if such Incremental Facilities are denominated in dollars (unless the Borrower and the Lenders and Additional Lenders providing such Incremental Term Loans otherwise agree); provided that such amount may be less than $2,000,000 if such amount represents all the remaining availability under the aggregate principal amount of Incremental Facilities set forth above.

(b)

(i)    The Incremental Loans, in each case other than as permitted by Section 9.02(b)(vi):

(A)    shall rank equal in right of payment with the Loans, shall be secured only by the Collateral securing the Secured Obligations, shall be secured by the Collateral on a *pari passu* basis with the Term Facility, and shall not be guaranteed by any Person which is not a Loan Party;

(B)    shall not mature earlier than the Maturity Date with respect to the Initial Loans (except in the case of bridge loans the terms of which provide for an automatic extension of the maturity date thereof, subject to customary conditions, to a date that is not earlier than the Maturity Date with respect to the Initial Loans);

(C)    shall not have a shorter Weighted Average Life to Maturity (except in the case of bridge loans the terms of which provide for an automatic extension of the maturity date thereof, subject to customary conditions, to a date that is not earlier than the Maturity Date with respect to the Initial Loans) than the remaining Initial Loans;

(D)    shall have a maturity date (subject to clause (B)), an amortization schedule (subject to clause (C)), and interest rates (including through fixed interest rates), interest margins, rate floors, upfront fees, funding discounts, original issue discounts and prepayment terms and premiums for the Incremental Loans as determined by the Borrower and the Additional Lenders thereunder;

(E)    shall not participate on a greater than pro rata basis than the Initial Loans with respect to any mandatory prepayment (other than any scheduled amortization payment); provided that the Borrower and the lenders providing the relevant Incremental Loans shall be permitted, in their sole discretion, to elect to prepay or receive, as applicable, any such prepayment on a less than pro rata basis; and

(F)    may otherwise have terms and conditions different from those of the Loans (including currency denomination);

provided that, except with respect to matters contemplated by clauses (B), (C), (D) and (E) above, the covenants, events of default and guarantees of any such Incremental Loans shall not be materially more restrictive to the Borrower and the Subsidiaries, when taken as a whole, than the covenants, events of default and guarantees of the Initial Loans, unless:

(1)    the existing Initial Loans also receive the benefit of such more restrictive terms (it being understood that no consent shall be required from the Administrative Agent or any Lender to add such more restrictive terms for the benefit the existing Initial Loans);

(2)    any such provisions apply after the Maturity Date with respect to the Initial Loans at the time of incurrence of such Incremental Facility;

(3)    such terms reflect market terms and conditions (taken as a whole) at the time of establishment of such Incremental Facility, as determined in good faith by the Borrower; or

(4)    such terms shall be reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower;

(ii)    upon the incurrence of any Incremental Loans, (x) the representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respect and (y) no Event of Default shall have occurred and be continuing.

(c)    Each notice from the Borrower pursuant to this Section shall set forth the requested amount of the relevant Incremental Facility.

(d)    Commitments in respect of any Incremental Facility shall become Commitments under this Agreement pursuant to an amendment (an "Incremental Facility Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower,  each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and the Administrative Agent (acting at the direction of such Lenders and Additional Lenders). An Incremental Facility may be provided, subject to the prior written consent of the Borrower (not to be unreasonably withheld), by any existing Lender (it being understood that no existing Lender shall, unless it agrees, be obligated to provide any Incremental Facilities) or by any Additional Lender; provided that the Administrative Agent shall have consent rights (not to be unreasonably withheld, conditioned or delayed) with respect to such Additional Lender, if such consent would be required pursuant to Section 9.04 for an assignment of Loans or Commitments, as applicable, to such Additional Lender. Incremental Loans shall be a "Loan" for all purposes of this Agreement and the other Loan Documents. The Incremental Facility Amendment may, subject to Section 2.20(b), without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent (acting at the direction of the applicable Lenders and Additional Lenders providing such Incremental Term Loans) and the Borrower, to effect the provisions of this Section 2.20. The effectiveness of any Incremental Facility Amendment and the occurrence of any credit event (including the making (but not the conversion or continuation) of a Loan thereunder) pursuant to such Incremental Facility Amendment shall be subject to the satisfaction of such conditions as the parties thereto shall agree and as required by this Section 2.20. The Borrower (or other applicable Loan Party) will use the

proceeds of the Incremental Facilities for working capital and other general corporate purposes of the Borrower and its Subsidiaries, including capital expenditures, Permitted Acquisitions and other Investments, Restricted Payments and the refinancing of Indebtedness, and any other use not prohibited by the Loan Documents.

(e)    Notwithstanding anything to the contrary, this Section 2.20 shall supersede any provisions in Section 2.18 or Section 9.02 to the contrary.

SECTION 2.21    ~~SECTION 2.20~~ Illegality.

If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue SOFR Loans denominated in dollars or to convert ABR Loans denominated in dollars to SOFR Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Alternate Base Rate, the interest rate on such ABR Loans of such Lender shall be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower shall, upon three (3) Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans denominated in dollars of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate), either on the last day of the Interest Period  if the Administrative Agent is advised in writing by such Lender that it may lawfully continue to maintain such SOFR Loans to such day, or immediately, if the Administrative Agent is advised in writing by such Lender that it may not lawfully continue to maintain such SOFR Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Each Lender agrees to notify the Administrative Agent and the Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders and each Agent that:

SECTION 3.01    Organization; Powers.

Each of Parent, the Borrower and its Subsidiaries (a) is duly organized or incorporated, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization or incorporation, (b) has the corporate or other organizational power and authority to carry on its business as now conducted and to execute, deliver and

perform its obligations under each Loan Document to which it is a party and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdictions) in, every jurisdiction where such qualification is required, except, with respect to clause (a) above (other than with respect to Parent and the Borrower), clause (b) above (other than with respect to Parent and the Borrower) and clause (c) above, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.02     Authorization; Enforceability.

This Agreement has been duly authorized, executed and delivered by Parent and the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of the Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, (ii) general principles of equity, regardless of whether considered in a proceeding in equity or at law, and similar concepts under applicable law, (iii) any other matters which are set out as qualifications or reservations as to matters of law or general application in any legal opinion delivered to an Agent in connection with any Loan Document (together, the "Legal Reservations") and (iv) the Perfection Requirements.

SECTION 3.03     Governmental Approvals; No Conflicts.

Except as set forth in Schedule 3.03 and subject to the Legal Reservations and the Perfection Requirements, the execution, delivery and performance by any Loan Party of this Agreement or any other Loan Document (a) does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of Parent, the Borrower or any other Loan Party, or (ii) any Requirements of Law applicable to Parent, the Borrower or any other Loan Party, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon Parent, the Borrower or any Subsidiary or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by Parent, the Borrower or any Subsidiary, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of Parent,  the Borrower or any Subsidiary, except Liens created under the Loan Documents or permitted by Section 6.02, except (in the case of each of clauses (a), (b)(ii), (c) and (d)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right, or imposition of Lien, as the case may be, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04     No Material Adverse Effect.

Since the Effective Date, there has been no Material Adverse Effect.

SECTION 3.05     Properties.

Each of Parent, the Borrower and its Subsidiaries has good title to, or valid interests in, all its real and personal property material to its business, if any (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such

properties for their intended purposes, in each case, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06        Litigation and Environmental Matters.

(a)        Except as set forth in Schedule 3.06, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting Parent, the Borrower or any of its Subsidiaries that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)        Except as set forth in Schedule 3.06, and except with respect to any other matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of Parent, the Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of the Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of the Borrower, any basis to reasonably expect that Parent, the Borrower or any of its Subsidiaries will become subject to any Environmental Liability.

SECTION 3.07        Compliance with Laws.

Each of Parent, the Borrower and its Subsidiaries is in compliance with all Requirements of Law applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.08        Investment Company Status.

None of the Loan Parties is required to register as an "investment company" under the Investment Company Act of 1940, as amended from time to time.

SECTION 3.09        Taxes.

Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and except to the extent such Taxes are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Effective Date, Parent, the Borrower and each Subsidiary (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all Taxes levied or imposed on their properties, income or assets otherwise due and payable (whether or not shown on a Tax return), except any Taxes that are being contested in good faith by appropriate proceedings, provided that Parent, the Borrower or such Subsidiary, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP. There is no proposed Tax assessment, deficiency or other claim against Parent, the Borrower or any Subsidiary that would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.10        ERISA; Labor Matters.

(a)        Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)      Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred during the six year period prior to the date on which this representation is made or deemed made or is reasonably expected to occur, and (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

(c)      Except as would not reasonably be expected, individually or in the aggregate to result in a Material Adverse Effect, (i) each employee benefit plan (as defined in Section 3(2) of ERISA) that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from U.S. federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service; (ii) to the knowledge of the Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status; and (iii) there are no pending or, to the knowledge of the Borrower, threatened in writing claims, actions or lawsuits, or action by any Governmental Authority, with respect to any such plan.

(d)      Except as would not reasonably be expected to have a Material Adverse Effect, (i) none of Parent, the Borrower or its Subsidiaries has experienced any labor strike or work stoppage or other collective labor dispute by employees due to labor disagreements and (ii) each of Parent, the Borrower and its Subsidiaries is in compliance in all respects with any collective bargaining agreement to which it is a party.

SECTION 3.11      Disclosure.

(a)      As of the Effective Date, the written reports, financial statements, certificates or other written factual information (other than projections and information of a general economic or industry specific nature) furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished), when taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected and pro forma financial information, the Borrower represents only that such information, when taken as a whole, was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered, it being understood that (i) any such projected financial information is merely a prediction as to future events and is not to be viewed as fact, (ii) such projected financial information is subject to significant uncertainties and contingencies, many of which are beyond the control of Parent, the Borrower or any of its Subsidiaries and (iii) no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material.

(b)      As of the Effective Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification (if any) provided pursuant to Section 4.01(l) is true and correct in all respects.

SECTION 3.12      Subsidiaries.

As of the Effective Date, Schedule 3.12 sets forth the name and jurisdiction of, and the ownership interest of Parent and each of its Subsidiaries in, the Borrower and each Subsidiary of the

Borrower.  Each Subsidiary on Schedule 3.12 is a Wholly-Owned Subsidiary and is a Domestic Subsidiary.

SECTION 3.13    Intellectual Property; Licenses, Etc.

Except as would not reasonably be expected to have a Material Adverse Effect, to the knowledge of the Borrower, each of Parent, the Borrower and its Subsidiaries owns, licenses or possesses the right to use all Intellectual Property that is reasonably necessary for the operation of its business substantially as currently conducted. To the knowledge of the Borrower, no Intellectual Property owned by Parent, the Borrower or any Subsidiary and used in the operation of its business as currently conducted infringes upon the Intellectual Property of any Person except for such infringements that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No claim or litigation regarding any of the Intellectual Property is pending or, to the knowledge of the Borrower, threatened in writing against Parent, the Borrower or any Subsidiary, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

SECTION 3.14    Solvency.

Immediately after the consummation of each of the Transactions that occurred on the Effective Date (including the execution and delivery of this Agreement, the making of the Loans and the use of proceeds of such Loans on the date hereof), the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

SECTION 3.15    Federal Reserve Regulations.

None of Parent, the Borrower or any of its Subsidiaries is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

SECTION 3.16    Use of Proceeds.

The Borrower will use the proceeds of the Initial Loans made on the Effective Date to directly or indirectly finance the Transactions and to fund any original issue discount or upfront fees payable in connection therewith.

SECTION 3.17    Anti-Corruption Laws and Sanctions.

(a)    Parent, the Borrower and each of its Subsidiaries will not, directly or to their knowledge indirectly, use the proceeds of the Loans to fund any activity or business with any Person, or in any country or territory that, at the time of such funding, is the subject of Sanctions, or in violation of any Anti-Corruption Laws, the USA PATRIOT Act, any sanctions administered by the Office of Foreign Assets Control of the U.S. Department of Treasury and any successor Governmental Authority, or other applicable anti-money laundering or anti-terrorism laws.

(b)    Parent, the Borrower and its Subsidiaries and, to the knowledge of the Borrower, the officers, directors, employees and agents of Parent, the Borrower and its Subsidiaries are in

compliance in all material respects with applicable Anti-Corruption Laws and applicable Sanctions, the USA PATRIOT Act, and other applicable anti-money laundering and anti-terrorism laws.

(c)      (i) None of Parent, the Borrower or its Subsidiaries and (ii) to the knowledge of Parent, the Borrower or its Subsidiaries, none of their respective directors, officers, employees and agents that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

(d)      Parent, the Borrower has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance in all material respects by Parent, the Borrower and its Subsidiaries with applicable Anti-Corruption Laws and applicable Sanctions.

SECTION 3.18      Security Documents.

Subject to Section 5.14, the Legal Reservations and the Perfection Requirements, the Security Documents are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Collateral described therein and proceeds and products thereof. In the case of (i) Pledged Equity Interests a represented by certificates, (x) if and when such certificates are delivered to the Collateral Agent or (y) when financing statements in appropriate form are filed in the appropriate filing offices and (ii) the other Collateral described in the Collateral Agreement, which can be perfected by filing a financing statement, when financing statements in appropriate form are filed in the appropriate filing offices and such other filings as are required in the Collateral Agreement have been completed, the Lien created by the Collateral Agreement shall constitute, to the extent such perfection is required by the Collateral Agreement a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds and products thereof, as security for the Secured Obligations.

SECTION 3.19      Insurance.

Parent, the Borrower and each of its Subsidiaries maintain, with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) were financially sound and responsible at the time the relevant coverage was last placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment or the management of the Borrower) are reasonable and prudent in light of the size and nature of its business.

SECTION 3.20      Franchise Agreements.

(a)      Schedule 3.20 sets forth a complete and accurate list as of the Effective Date of all Franchise Agreements to which any Loan Party or any of their Subsidiaries is a party.

(b)      Except as set forth on Schedule 3.20, as of the Effective Date, to the knowledge of the Loan Parties, none of the Franchise Agreements contains any grant of exclusive rights to a territory designated therein which conflicts, or potentially conflicts, with any grant of exclusive rights to a territory granted under any other Franchise Agreement. Except as set forth in Schedule 3.20, as of the Effective Date, no current franchisee under a Franchise Agreement has given written notice to a Loan Party's management during the six (6) month period before the Effective Date of its intention to rescind or terminate (with or without cause) any Franchise Agreement.

(c)     Except as could not reasonably be expected to have a Material Adverse Effect, (i) each Loan Party has prepared and maintained each of its Franchise Disclosure Documents, in an accurate and correct manner, (ii) each Loan Party has filed all required Franchise Disclosure Documents required by law in all states and jurisdictions requiring registration and approval prior to any offers or sales of franchises in such states, and (iii) each Loan Party has filed all material changes, amendments, renewals thereto on a timely and accurate basis as required under, and required by applicable Requirements of Law.  Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party's Franchise Disclosure Documents were prepared in compliance with applicable Franchise Laws and disclosure guidelines, and there were no misrepresentations or omissions of information in any Franchise Disclosure Documents at the time such Loan Party was using such Franchise Disclosure Documents.  Each Franchise Agreement complies, and the offer and sale of such Franchise Agreement complied, in each case at the time such offer and sale was made, with all Franchise Laws, except to the extent of any non-compliance therewith which could not reasonably be expected to have a Material Adverse Effect.

<div align="center">

ARTICLE IV
CONDITIONS

</div>

SECTION 4.01     Effective Date.

The obligation of each Lender to make Loans hereunder on the Effective Date shall be subject to satisfaction of the following conditions (or waiver thereof in accordance with Section 9.02):

(a)     The Required Lenders and the Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)     The Required Lenders (or their counsel) and the Administrative Agent shall have received a customary written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Kirkland & Ellis LLP, special counsel to the Loan Parties, and such local counsel as may be reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) in the jurisdictions of organization of any Loan Party, each in form and substance reasonably satisfactory to the Required Lenders.  The Borrower hereby requests such counsel to deliver such opinions.

(c)     The Required Lenders (or their counsel) and the Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Effective Date, with appropriate insertions, or otherwise in form and substance reasonably satisfactory to the Required Lenders, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in paragraph (d) of this Section 4.01, and (ii) a certificate of the Borrower, dated the Effective Date, substantially in the form of Exhibit H, executed by any Responsible Officer of the Borrower.

(d)     The Required Lenders (or their counsel) and the Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) with respect to each Loan Party executing the Loan Documents, an incumbency certificate identifying the name and title and bearing the signatures of the authorized signatories of such Loan Party, (iii) copies of resolutions of the Board of Directors of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Effective Date by its secretary,

<div align="center">86</div>

an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment and (iv) a good standing certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation.

(e)    (i) The Administrative Agent shall have received all fees required to be paid on the Effective Date pursuant to the Administrative Agent Fee Letter and (ii) all reasonable and documented out-of-pocket expenses required to be paid on the Effective Date shall have been received, including the reasonable and documented out-of-pocket expenses of Paul Hastings LLP, Seward & Kissel LLP and Lazard Frères & Co. LLC, to the extent invoiced (in the case of expenses) at least one (1) Business Day prior to the Effective Date (except as otherwise agreed to by the Borrower).

(f)    The Collateral and Guarantee Requirement (other than in accordance with Section 5.14) shall have been satisfied and the Required Lenders (or their counsel) and the Administrative Agent shall have received a completed Perfection Certificate dated the Effective Date and signed by a Responsible Officer of the Borrower, together with all attachments contemplated thereby. Notwithstanding the foregoing, no Collateral shall be subject to any other pledges, security interest or mortgages, except for the Liens permitted under this Agreement.

(g)    After giving effect to the transactions contemplated to be effective on the Effective Date, both (i) Excess Availability (as defined in the ABL Credit Agreement) shall be no less than $50,000,000 and (ii) the unrestricted cash and Cash Equivalents of the Borrower and the operating Subsidiaries of the Borrower shall be no less than $35,000,000.

(h)    The Required Lenders (or their counsel) and the Administrative Agent shall have received executed copies of the ABL Credit Agreement and all material ABL Loan Documents, each of which shall be in form and substance reasonably satisfactory to Required Lenders.

(i)    The Required Lenders (or their counsel) and the Administrative Agent shall have received (i) a certificate from the chief financial officer or equivalent Responsible Officer of the Borrower certifying as to the solvency (as of the Effective Date) of the Borrower and its Subsidiaries on a consolidated basis after giving effect to the Transactions, in substantially the form attached hereto as Exhibit G and (ii) certificates with respect to insurance policies of the Loan Parties as required under Section 5.07, all in form and substance reasonably satisfactory to the Required Lenders.

(j)    (i) All outstanding Indebtedness of the Chapter 11 Debtors pursuant to the Existing DIP Credit Agreement shall have been (or, substantially concurrently with the deemed funding hereunder will be) exchanged on a cashless basis for, among other things, the Loans, and (ii) the Required Lenders (or their counsel) and the Administrative Agent shall have evidence that the Indebtedness under the Existing DIP Credit Agreement, the Existing ABL Credit Agreement, the Existing First Lien Credit Agreement, the Existing Holdco Credit Agreement and the Existing Second Lien Credit Agreement have been, or concurrently with the Effective Date are being, terminated, and all Liens securing obligations thereunder have been, or concurrently with the Effective Date are being, released.

(k)    Prior to or substantially concurrently with the deemed funding of the Loans hereunder, the Transactions shall have been consummated and in accordance with the terms and conditions set forth in the Restructuring Support Agreement and the Plan of Reorganization.

(l)    Any amendment, modification or supplement to the Definitive Documents (as defined in the Plan of Reorganization), all related documentation, including without limitation any amendments, any subsequent plan of reorganization, the Plan Supplement (as defined in the Plan of

Reorganization) and/or the Confirmation Order (collectively, the "Plan Documentation") shall be on terms and conditions reasonably satisfactory to the Required Lenders and all Plan Documentation shall have been executed, delivered or filed pursuant to the Plan of Reorganization in form and substance acceptable to Required Lenders.

(m)     (i) The Plan of Reorganization shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order and (ii) all conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or waived in accordance with the terms of the Plan of Reorganization).

(n)     (i) The Administrative Agent shall have received at least three (3) Business Days before the Effective Date all documentation and other information about the Loan Parties that the Administrative Agent reasonably determines is required by United States regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the USA PATRIOT Act and (ii) if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Administrative Agent and each initial Lender that requests a Beneficial Ownership Certification will have received, at least three (3) Business Days prior to the Effective Date, a Beneficial Ownership Certification in relation to the Borrower, in each case of clauses (i) and (ii), to the extent that the Administrative Agent has reasonably requested such items in writing delivered to the Loan Parties at least ten (10) Business Days prior to the Effective Date.

(o)     The Administrative Agent shall have received a fully executed and delivered Borrowing Request in accordance with the requirements hereof.

(p)     The Required Lenders (or their counsel) and the Administrative Agent (or its counsel) shall have received from each party thereto a counterpart of the Intercreditor Agreement signed on behalf of such party.

## ARTICLE V

## AFFIRMATIVE COVENANTS

From and after the Effective Date and until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and other amounts (other than contingent amounts not yet due) payable under any Loan Document shall have been paid in full, the Borrower covenants and agrees with the Lenders that:

SECTION 5.01     Financial Statements and Other Information.

Borrower and its Subsidiaries will furnish to the Administrative Agent, on behalf of each Lender:

(a)     (i) on or before the date that is 90 days (or 120 days with respect to the fiscal year of the Borrower ending on or about December 31, 2025 (which may, at the Borrower's option, be limited to the period from the Effective Date to December 31, 2025 or be on a predecessor/successor basis)) after the end of each fiscal year of the Borrower, commencing with the fiscal year of the Borrower ending on or about December 31, 2025, the audited consolidated balance sheet and audited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of the Borrower and its, the other Loan Parties and their respective Subsidiaries as of the end of and for such year, and related notes thereto, setting forth in each case, in comparative form the figures for the previous fiscal year, all reported on by BDO, Deloitte or other independent public accountants of recognized

national standing (without a "going concern" or like qualification or exception and without any material qualification or exception as to the scope of such audit (other than with respect to, or resulting from, (A) an upcoming maturity date of any indebtedness for borrowed money or (B) any actual or potential breach or inability to satisfy a financial covenant under any indebtedness for borrowed money)) to the effect that such consolidated financial statements present fairly in all material respects the financial condition as of the end of and for such year and results of operations and cash flows of the Borrower and such, such other Loan Parties and their respective Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal year;

(b)    (i) on or before the date that is [30 days ]after the end of each of the [first three] fiscal quarters of each fiscal year of the Borrower, commencing with the first fiscal quarter of the Borrower ended after the Effective Date (which may, at the Borrower's option, be limited to the period from the Effective Date to the first fiscal quarter of the Borrower ended after the Effective Date or be on a predecessor/successor basis), the unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, shareholders' equity and cash flows of the Borrower and its, the other Loan Parties and their respective Subsidiaries as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case, in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition as of the end of and for such fiscal quarter and such portion of the fiscal year and results of operations and cash flows of the Borrower and its, the other Loan Parties and their Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal quarter;

(c)    not later than [ten]thirty (130) Business Ddays] of any delivery of financial statements under paragraph (a) above, a reasonably detailed annual budget for the Borrower and its, the other Loan Parties and their respective Subsidiaries on a consolidated basis, in a form customarily prepared by the Borrower or otherwise as may be reasonably agreed between the Borrower and the Administrative Agent (it being agreed that such annual budget shall not be provided to Public Lenders);

(d)    not later than [five (5) days] after any delivery of financial statements under paragraph (a) or (b) above, a certificate (a "Compliance Certificate") of a Financial Officer in the form of Exhibit E hereof certifying as to whether a Default then exists and, if a Default does then exist, specifying the details thereof and any action taken or proposed to be taken with respect thereto; and

(e)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower, the other Loan Parties or any of their respective Subsidiaryies, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing; and

(f)    on or prior to the date on which any Permitted Holder first acquires, directly or indirectly, 20% or more of the Equity Interests of Topco, furnish to the Administrative Agent all information required by the Beneficial Ownership Certification delivered to accurately account for the change(s) to the list of beneficial owners identified in such certification.

provided that:

(i)        Documents required to be delivered pursuant to Section 5.01(a) or (b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent). The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

(ii)       Notwithstanding anything to the contrary herein, neither the Borrower nor any Subsidiary shall be required to deliver, disclose, permit the inspection, examination or making of copies of or excerpts from, or any discussion of, any document, information, or other matter (A) that constitutes non-financial trade secrets or non-financial proprietary information, (B) in respect of which disclosure to the Administrative Agent (or any Lender (or their respective representatives or contractors)) is prohibited by applicable law, (C) that is subject to attorney-client or similar privilege or constitutes attorney work product or (D) with respect to which any Loan Party owes confidentiality obligations (to the extent not created in contemplation of such Loan Party's obligations under this Section 5.01) to any third party.

(iii)      The Borrower hereby acknowledges that (A) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (B) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive Material Non-Public Information and who may be engaged in investment and other market-related activities with respect to the Borrower's or its Affiliates' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; provided that the Borrower's failure to comply with this sentence shall not constitute a Default or an Event of Default under this Agreement or the Loan Documents. Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials as "PUBLIC".

(iv)       Each Loan Party hereby acknowledges and agrees that, unless the Borrower notifies the Administrative Agent in advance, all financial statements and certificates furnished pursuant to Sections 5.01(a), (b) and (d) above are hereby deemed to be suitable for distribution, and to be made available, to all Lenders and may be treated by the Administrative Agent and the Lenders as not containing any Material Non-Public Information.

SECTION 5.02    Notices of Material Events.

Promptly after any Responsible Officer of the Borrower or any Subsidiary obtains knowledge thereof, the Borrower or the applicable Subsidiary will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)    the occurrence of any Default or Event of Default (other than any Default resulting from any non-compliance with Section 5.01);

(b)    the occurrence of any ERISA Event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect;

(c)    any litigation, or governmental investigation or proceeding pending against the Borrower or any of its Subsidiaries which, either individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect;

(d)    the delivery of any financial statement, report or material notice under the ABL Loan Documents to or from the ABL Agent and not otherwise required to be delivered to the Administrative Agent under Section 5.01 or this Section 5.01 and any amendments, waivers, or consents with respect to the ABL Loan Documents; and

(e)    any other development or event that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (including, any default notice received by Borrower with respect to the ABL Credit Agreement).

Each notice delivered under this Section 5.02 shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03    Information Regarding Collateral.

(a)    The Borrower will furnish to the Administrative Agent prompt (and in any event within thirty (30) days or such longer period as reasonably agreed to by the Administrative Agent) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or incorporation or like document), (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number to the extent that such Loan Party is organized or owns Mortgaged Property in a jurisdiction where an organizational identification number is required to be included in a UCC financing statement for such jurisdiction.

(b)    Not later than five (5) Business Days after delivery of financial statements pursuant to Section 5.01(a), the Borrower shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of the Borrower setting forth any material changes to the information required pursuant to the Perfection Certificate or confirming that there has been no material change in such information since the date of the Perfection Certificate delivered on the Effective Date or the date of the most recent certificate delivered pursuant to this Section 5.03.

SECTION 5.04    Existence; Conduct of Business.

The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the

rights, licenses, permits, privileges, franchises, Material Intellectual Property and Governmental Approvals used in the conduct of its business, except to the extent (other than with respect to the preservation of the existence of the Borrower) that the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 or any Disposition permitted by Section 6.05.

SECTION 5.05    Payment of Taxes, etc.

The Borrower will, and will cause each of its Subsidiaries to, pay all Taxes (whether or not shown on a Tax return) imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except where (a) the same are being contested in good faith by an appropriate proceeding diligently conducted by the Borrower or any of its Subsidiaries, (b) the failure to make payment would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (c) such Taxes are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Effective Date.

SECTION 5.06    Maintenance of Properties.

The Borrower will, and will cause each of its Subsidiaries to, keep and maintain all tangible property material to the conduct of its business in good working order and condition (subject to casualty, condemnation and ordinary wear and tear), except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.07    Insurance.

(a)    The Borrower will, and will cause each of its Subsidiaries to, maintain, with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment or the management of the Borrower) are reasonable and prudent in light of the size and nature of its business, and will furnish to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the insurance so carried. Each such general liability policy of insurance, to the extent covering Collateral and to the extent that the Collateral Agent can be granted an insurable interest therein, shall (i) in the case of each such general liability policy, name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each such casualty insurance policy, contain a loss payable clause or mortgagee endorsement that names the Collateral Agent, on behalf of the Secured Parties as the loss payee or mortgagee thereunder.

(b)    If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower shall, or shall cause each Loan Party to (i) if required by the Flood Insurance Laws or other applicable law, maintain, or cause to be maintained, with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, flood insurance in an amount and otherwise sufficient to comply

with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) furnish to the Lenders, upon written request from the Collateral Agent, information presented in reasonable detail as to the flood insurance so carried.

SECTION 5.08    Books and Records; Inspection and Audit Rights.

(a)    The Borrower will, and will cause each of its Subsidiaries to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP (or applicable local standards) consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or its Subsidiary, as the case may be. The Borrower will, and will cause each of its Subsidiaries that is a Loan Party to, permit any representatives designated by the Administrative Agent or any Lender, during normal business hours and upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent (or its designees) on behalf of the Lenders may exercise visitation and inspection rights of the Administrative Agent and the Lenders under this Section 5.08 and the Administrative Agent shall not exercise such rights more often than one time during any calendar year absent the existence of an Event of Default and such time shall be at the Borrower's expense; provided, further that (a) when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

(b)    The Borrower will, within 30 days (or, after using commercially reasonable efforts to schedule such call at a later date agreed to by the Required Lenders, at their sole discretion) after the date of the delivery (or, if later, required delivery) of the quarterly and annual financial information pursuant to Sections 5.01(a) and (b), hold a conference call or teleconference, at a time selected by the Borrower and reasonably acceptable to the Required Lenders, with all of the Lenders that choose to participate, to review the financial results of the previous fiscal quarter or fiscal year of the Borrower, as the case may be, of the Borrower (it being understood that any such call may be combined with any similar call held for any of the Borrower's other lenders or security holders).

SECTION 5.09    Compliance with Laws.

(a)    The Borrower will, and will cause each of its Subsidiaries to, comply with its Organizational Documents and all Requirements of Law (including ERISA, Environmental Laws, the USA PATRIOT Act, Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the U.S. Foreign Corrupt Practices Act of 1977 and other anti-money laundering, anti-corruption, sanctions and anti-terrorism laws) with respect to it, its property and operations, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)    The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country except to the extent permissible for a Person required to comply with Sanctions, (ii) in any manner that would result in the violation of any Sanctions applicable to the Borrower and its Subsidiaries or to the

knowledge of the Borrower, any other party hereto or (iii) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any legislation.

SECTION 5.10    Use of Proceeds.

The Borrower will use the proceeds of the Loans for the purposes set forth in Section 3.16.

SECTION 5.11    Additional Subsidiaries.

(a)    If (i) any additional Subsidiary is formed or acquired after the Effective Date or (ii) any Subsidiary ceases to be an Excluded Subsidiary, then, the Borrower will, within [sixty]thirty ([6 30])[13] days (or such longer period as may be agreed to by the Required Lenders in their reasonable discretion) after such newly formed or acquired Subsidiary is formed or acquired or such Subsidiary ceases to be an Excluded Subsidiary, notify the Administrative Agent thereof, and will cause such Subsidiary (unless such Subsidiary is an Excluded Subsidiary) to satisfy the Collateral and Guarantee Requirement with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party within [sixty]thirty ([6 30]) days after such notice (or such longer period as the Required Lenders shall reasonably agree) and the Administrative Agent shall have received a completed Perfection Certificate (or supplement thereof) with respect to such Subsidiary signed by a Responsible Officer, together with all attachments contemplated thereby.

(b) Within sixty (60) days (or, to the extent any new Subsidiary is organized or incorporated under the laws of a jurisdiction in which no existing Loan Party is organized or incorporated, within ninety (90) days) (or, in each case, such longer period as otherwise provided in this Agreement or as the Required Lenders may reasonably agree) after the Borrower identifies any new Subsidiary pursuant to Section 5.03(b), all actions (if any) required to be taken with respect to such Subsidiary in order to satisfy the Collateral and Guarantee Requirement shall have been taken with respect to such Subsidiary, to the extent not already satisfied pursuant to Section 5.11(a).

(b)    [Reserved].

(c)    Notwithstanding the foregoing, in the event any real property would be required to be mortgaged pursuant to this Section 5.11, the Borrower shall be required to comply with the "Collateral and Guarantee Requirement" as it relates to such real property within ninety (90) days, following the formation or acquisition of such real property or such Subsidiary or the identification of such new Subsidiary, or such longer time period as agreed by the Required Lenders in their  reasonable discretion.

SECTION 5.12    Further Assurances.

(a)    The Borrower will, and will cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or

---

[13] [NTD: Subject to conforming with the ABL.]

the Required Lenders may reasonably request, in each case, to cause the "Collateral and Guarantee Requirement" to be and remain satisfied, all at the expense of the Loan Parties.

(b)    If, after the Effective Date, any material assets (other than Excluded Assets), including any owned (but not leased or ground-leased) Material Real Property or improvements thereto or any interest therein, are acquired by the Borrower or any other Loan Party or are held by any Subsidiary of any Loan Party on or after the time it becomes a Loan Party pursuant to Section 5.11 (other than assets constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof or constituting Excluded Assets), the Loan Parties will notify the Administrative Agent thereof, and, if requested by the Administrative Agent or the Required Lenders, the Borrower will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Administrative Agent or the Required Lenders to grant and perfect such Liens, including actions described in paragraph (a) of this Section and as required pursuant to the "Collateral and Guarantee Requirement", all at the expense of the Loan Parties and subject to the last paragraph of the definition of the term "Collateral and Guarantee Requirement". In the event any Material Real Property is mortgaged pursuant to this Section 5.12(b), the Borrower or such other Loan Party, as applicable, shall be required to comply with the "Collateral and Guarantee Requirement" and paragraph (a) of this Section 5.12 within ninety (90) days following the acquisition of such Material Real Property or such longer time period as agreed by the Required Lenders.

SECTION 5.13    Franchise Agreements.

The Borrower will, and will cause each Loan Party to, satisfy and perform in all material respects all obligations of each such Person under each Franchise Agreement, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.14    Certain Post-Closing Obligations.[14]

As promptly as practicable, and in any event within the time periods after the Effective Date specified in Schedule 5.14 or such later date as the Administrative Agent (acting at the direction of the Required Lenders) agrees to in writing, including to reasonably accommodate circumstances unforeseen on the Effective Date, the Borrower and each other Loan Party shall deliver the documents or take the actions specified on Schedules 5.14(a) that, where such actions are to be taken to reasonably accommodate circumstances unforeseen on the Effective Date, would have been required to be delivered or taken on the Effective Date, in each case except to the extent otherwise agreed by the Agent (acting at the direction of the Required Lenders) pursuant to its authority as set forth in the definition of the term "Collateral and Guarantee Requirement".

SECTION 5.15    Maintenance of Ratings.

The Borrower shall use commercially reasonable efforts to maintain (i) a public corporate credit rating (but not any particular rating) from S&P and a public corporate family rating (but not any particular rating) from Moody's, in each case in respect of the Borrower, and (ii) subject to

---

[14] NTD: To include delivery of DACAs and possessory collateral and obtaining a public rating in respect of the Loans.

Section 5.14, shall use commercially reasonable efforts to obtain a public rating (but not any particular rating) in respect of the Loans made available under this Agreement from each of S&P and Moody's.

ARTICLE VI

NEGATIVE COVENANTS

From and after the Effective Date and until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable (other than (i) contingent amounts not yet due and (ii) Cash Management Obligations) under any Loan Document have been paid in full, the Borrower (and, in the case of Section 6.14, Parent) covenants and agrees with the Lenders that:

SECTION 6.01    Indebtedness; Certain Equity Securities.

(a)    The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(i)    Indebtedness of the Borrower and any of the Subsidiaries under the Loan Documents (including any Indebtedness incurred pursuant to Section 2.20);

(ii)    Indebtedness outstanding on the Effective Date and set forth on Schedule 6.01;

(iii)    Guarantees by the Loan Parties and their respective Subsidiaries in respect of Indebtedness of the Borrower or any of their respective Subsidiaries otherwise permitted hereunder; provided that (A) such Guarantee is otherwise permitted by Section 6.04, (B) no Guarantee by any Subsidiary of a Loan Party of any unsecured Indebtedness for borrowed money that constitutes Material Indebtedness shall be permitted unless such Subsidiary shall have also provided a Guarantee of the applicable Secured Obligations pursuant to the Guarantee Agreement and (C) if the Indebtedness being guaranteed is subordinated to the Secured Obligations, such Guarantee shall be subordinated to the Guarantee of the Secured Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(iv)    Indebtedness of the Loan Parties or any of their respective Subsidiaries owing to another Loan Party or any of its Subsidiaries, to the extent permitted by Section 6.04;

(v)    (A) Indebtedness (including Capital Lease Obligations and purchase money indebtedness) incurred, issued or assumed by the Borrower or any Subsidiary to finance the acquisition, purchase, lease, construction, repair, replacement or improvement of fixed or capital property, equipment or other assets; provided that, in the case of any purchase money Indebtedness, such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, purchase, lease, construction, repair, replacement or improvement; provided, further that, at the time of any such incurrence of Indebtedness and after giving Pro Forma Effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (v) ((excluding any Capital Leases incurred pursuant to any sale and leaseback transactions permitted by Section 6.06) shall not exceed $10,000,000 and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof);

96

(vi)    Indebtedness in respect of Swap Agreements not incurred for speculative purposes;

(vii)    [reserved];

(viii)    [reserved];

(ix)    [reserved];

(x)    Indebtedness in respect of Cash Management Obligations and other Indebtedness in respect of netting services, automated clearinghouse arrangements, overdraft protections and similar arrangements, in each case, in connection with deposit accounts or from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(xi)    Indebtedness consisting of obligations under deferred compensation (including indemnification obligations, obligations in respect of purchase price adjustments, Earn-Outs, incentive non-competes and other contingent obligations) or other similar arrangements incurred or assumed in connection with any Permitted Acquisition, any other Investment or any Disposition, in each case, permitted under this Agreement;

(xii)    (A) Indebtedness of the Borrower or any of the Subsidiaries; provided that at the time of the incurrence thereof and after giving Pro Forma Effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xii) shall not exceed $5,000,000~~and~~ and  (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof);

(xiii)    [reserved];

(xiv)    [reserved];

(xv)    Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xvi)    Indebtedness supported by a letter of credit, in a principal amount not to exceed the face amount of such letter of credit;

(xvii)    (A) Indebtedness arising from an agreement providing for indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments incurred in any Permitted Acquisition, any other Investment or any Disposition, in each case permitted under this Agreement, and (B) Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance pursuant to any such agreement described in clause (A);

(xviii)    [reserved];

(xix)    [reserved];

~~(xx) (A)(I) Indebtedness of any Person that becomes a Subsidiary (or of any Person not previously a Subsidiary that is merged or consolidated with or into the Borrower or~~

any Subsidiary) after the Effective Date as a result of any Permitted Acquisition or any other Investment not prohibited by Section 6.04, or (II) Indebtedness of any Person that is assumed by the Borrower or any Subsidiary in connection with an acquisition of assets by the Borrower or such Subsidiary in any Permitted Acquisition or any other Investment not prohibited by Section 6.04; provided that such Indebtedness is not incurred in contemplation of such Permitted Acquisition or other Investment and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A) (or successive Permitted Refinancings thereof); provided, further, that the aggregate principal amount of Indebtedness at any time outstanding under this clause (xx) shall not exceed the greater of $[5,000,000] and [2.5]% of Consolidated EBITDA for the most recently ended Test Period as of such time of determination;

(xx)    [reserved];

(xxi)    [reserved];

(xxii)    Indebtedness incurred by the Borrower or any of the Subsidiaries in respect of letters of credit, bank guarantees, warehouse receipts, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xxiii)    obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case, in the ordinary course of business or consistent with past practice;

(xxiv)    (x) Indebtedness representing deferred compensation or stock-based compensation owed to employees, consultants or independent contractors of the Borrower or its Subsidiaries incurred in the ordinary course of business or consistent with past practice and (y) Indebtedness consisting of obligations of the Borrower (or any direct or indirect parent thereof) or its Subsidiaries under deferred compensation to employees, consultants or independent contractors of the Borrower (or any direct or indirect parent thereof) or its Subsidiaries or other similar arrangements incurred by such Persons in connection with the Transactions, any Permitted Acquisition or any other Investment not prohibited by Section 6.04;

(xxv)    Indebtedness consisting of unsecured promissory notes issued by the Borrower or any Subsidiary to future, current or former officers, directors, employees, managers and consultants or their respective estates, spouses or former spouses, successors, executors, administrators, heirs, legatees or distributees, in each case to finance the purchase or redemption of Equity Interests of the Borrower (or any direct or indirect parent thereof) to the extent permitted by Section 6.07(a);

(xxvi)    [reserved];

(xxvii)    Capital Lease Obligations arising under any sale and leaseback transaction permitted hereunder in reliance upon Section 6.05(f);

(xxviii) to the extent constituting Indebtedness, motor vehicle leases in the ordinary course of business;

(xxix) [reserved];

(xxx) [reserved];

(xxxi) Indebtedness incurred pursuant to any ABL Credit Agreement and the other ABL Loan Documents (including incremental incurrences and increased amounts thereunder) in an aggregate principal amount not to exceed (A) $[125,000,000] plus (B) other amounts not constituting principal, in each case, and any Permitted Refinancing thereof; provided that, to the extent such Indebtedness is secured, the ABL Agent (or other applicable representative on behalf of the holders of such Indebtedness) shall have entered into with the Agents (or any of them) the Intercreditor Agreement;

(xxxii) [reserved]; and

(xxxiii) all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxxii) above;

provided that:

(A)     The Borrower will not, and will not permit any of its Subsidiaries to, issue any ~~preferred Equity Interests or any~~ Disqualified Equity Interests.

(B)     For purposes of determining compliance with any dollar denominated restriction on the incurrence of Indebtedness, the dollar equivalent principal amount of Indebtedness denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided, however, that if such Indebtedness is a Permitted Refinancing incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable dollar denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance such dollar denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Permitted Refinancing does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased. Notwithstanding any other provision of this Section 6.01, the maximum amount of Indebtedness of the Borrower or any Subsidiary may incur pursuant to this Section 6.01 shall not be deemed exceeded by fluctuations in the exchange rate of currencies. The principal amount of any Permitted Refinancing shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of any extension, replacement, refunding, refinancing, renewal or defeasance of any Indebtedness.

SECTION 6.02    Liens.

The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned (but not leased or ground-leased) or hereafter acquired (but not leased or ground-leased) by it, except:

(i)    Liens created under the Loan Documents;

(ii)    Permitted Encumbrances;

(iii)    Liens existing on the Effective Date and set forth on Schedule 6.02;

(iv)    Liens securing Indebtedness permitted under Section 6.01(a)(v); provided that (A) such Liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness except for replacements, additions, accessions and improvements to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Lease Obligations, such Liens do not at any time extend to or cover any assets (except for replacements, additions, accessions and improvements to or proceeds of such assets) other than the assets subject to such Capital Lease Obligations; provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)    (i) easements, leases, licenses, subleases or sublicenses granted to others (including licenses and sublicenses of Intellectual Property) that do not (A) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (B) secure any Indebtedness and (ii) any interest or title of a lessor or licensee under any lease or license entered into by the Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased or licensed;

(vi)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)    Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, (B) attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business or (C) in favor of a banking or other financial institution or entity, or electronic payment service provider, arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking or finance industry;

(viii)    Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.04 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under Section 6.05 (including any letter of intent or purchase agreement with respect to such Investment or Disposition), or (B) consisting of an agreement to dispose of any property in a Disposition

permitted under Section 6.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix)    Liens on cash collateral posted to secure insurance policy premiums or other obligations in respect of existing insurance policies in an amount not to exceed $3,000,000 in the aggregate;

(x)    [reserved];

(xi)    Liens existing on property or other assets at the time of its acquisition or existing on the property or other assets of any Person at the time such Person becomes a Subsidiary, in each case after the Effective Date and any modifications, replacements, renewals or extensions thereof; provided that (A) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary and (B) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition);

(xii)    any interest or title of a lessor or sublessor under leases or subleases (other than leases constituting Capital Lease Obligations) entered into by the Borrower or any Subsidiary in the ordinary course of business;

(xiii)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by the Borrower or any Subsidiary in the ordinary course of business;

(xiv)    Liens deemed to exist in connection with Investments in repurchase agreements under clause (e) of the definition of the term "Permitted Investments";

(xv)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xvi)    Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(xvii)    Liens securing Obligations (as defined in the ABL Credit Agreement) under the ABL Credit Agreement and the other ABL Loan Documents; provided that the ABL Agent (or other applicable representative on behalf of the holders of such Indebtedness) shall have entered into with the Agents (or any of them) the Intercreditor Agreement;

(xviii)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)    [reserved];

(xx)    Liens on real property other than the Mortgaged Properties;

(xxi)    [reserved];

(xxii)    Liens on assets not constituting Collateral securing Indebtedness permitted under Section 6.01(a)(xii);

(xxiii)    Liens on cash and Permitted Investments to secure Indebtedness permitted under Section 6.01(a)(x);

(xxiv)    Liens on cash and Permitted Investments used to satisfy or discharge Indebtedness; provided such satisfaction or discharge is permitted hereunder;

(xxv)    Receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxvi)    [reserved];

(xxvii)    Capital Lease Obligations arising under any sale and leaseback transaction permitted hereunder in reliance upon Section 6.05(f);

(xxviii) other Liens; provided that at the time of the granting of and after giving Pro Forma Effect to any such Lien and the obligations secured thereby (including the use of proceeds thereof) the lesser of (x) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xxviii) and (y) the fair market value of the assets securing such obligations shall not exceed $5,000,000;

(xxix)    Liens in favor of credit card issuers and credit card processors arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements; and

(xxx)    Liens on motor vehicles securing Indebtedness permitted by clause (xxviii) of Section 6.01.

With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any increased amount of such Indebtedness.

SECTION 6.03    Fundamental Changes.

(a)    The Borrower will not, and will not permit any of its Subsidiaries to, merge into or consolidate with any other Person (including pursuant to a division), or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that:

(i)    (A) any Subsidiary may merge or consolidate with the Borrower; provided that the Borrower shall be the continuing or surviving Person and (B) any Subsidiary may merge or consolidate with one or more other Subsidiaries; provided that when any

Subsidiary Loan Party is merging or consolidating with another Subsidiary the continuing or surviving Person shall be a Subsidiary Loan Party;

(ii)     any Subsidiary may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Loan Party;

(iii)     subject to prior written consent by the Required Lenders in each case to be granted in their sole discretion, the Borrower and its, the other Loan Parties and their respective Subsidiaries may undertake or consummate any Tax Restructuring;

(iv)     any Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an Investment permitted pursuant to Section 6.04; provided that the continuing or surviving Person shall be the Borrower or a Subsidiary, which together with each of the Subsidiaries, shall have complied with the requirements of Sections 5.11 and 5.12; and

(v)     any Subsidiary may effect a merger, dissolution, liquidation, consolidation or amalgamation to effect a Disposition permitted pursuant to Section 6.05.

(b)     Neither the Borrower, nor any other Loan Party, shall amend or permit any amendments to such Person's Organizational Documents after the Effective Date in any manner that (when taken as a whole) would be materially adverse to Lenders.

SECTION 6.04     Investments, Loans, Advances, Guarantees and Acquisitions.

The Borrower will not, and will not permit any of its Subsidiaries to, make or hold any Investment, except:

(a)     Permitted Investments at the time such Permitted Investment is made and purchases of assets in the ordinary course of business consistent with past practice;

(b)     loans or advances to officers, members of the Board of Directors and employees of the Borrower and its, any other Loan Party and their respective Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes and (ii) in connection with such Person's purchase of Equity Interests of the Borrower (or any direct or indirect parent thereof) (provided that the amount of such loans and advances made in cash to such Person shall be immediately contributed to the Borrower in cash as common equity or Qualified Equity Interests);

(c)     Investments by the Borrower or any Subsidiary in the Borrower or any Subsidiary;

(d)     Investments consisting of extensions of trade credit and accommodation guarantees in the ordinary course of business;

(e)     Investments existing or contemplated on the Effective Date and set forth on Schedule 6.04(e);

(f)     Investments in Swap Agreements incurred in the ordinary course of business and not for speculative purposes;

(g)    promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 6.05, subject to prior written consent by the Required Lenders in their sole discretion;

(h)    commencing on the date that is ninety (90) days after the Effective Date, (A) Permitted Acquisitions and (B) intercompany Investments required (as determined by the Borrower in good faith) to consummate Permitted Acquisitions; provided that all entities, businesses and assets (other than Excluded Assets) acquired through a Permitted Acquisition after the Effective Date shall become Loan Parties and Collateral, as applicable, pursuant to Sections 5.11 and 5.12;

(i)    Investments in connection with the Transactions;

(j)    Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers in the ordinary course of business;

(k)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)    [reserved];

(m)    additional Investments and other acquisitions; provided that:

(i)    the aggregate outstanding amount of such Investment or acquisition made in reliance on this clause (m), together with the aggregate amount of all consideration paid (excluding the Net Proceeds from the issuance of such Qualified Equity Interests) in connection with all other Investments and acquisitions made in reliance on this clause (m) (including the aggregate principal amount of all Indebtedness assumed in connection with any such other Investment or acquisition previously made under this clause (m)), shall not exceed $5,000,000 (in each case determined without regard to write-downs or write-offs); and

(ii)    any Investment made in reliance on this clause (m) shall be subject to (y) no Event of Default under paragraph (a), (b), (h) or (i) of Section 7.01 having occurred and be continuing or resulting therefrom and (z) before and after giving Pro Forma Effect to such Investment, on a Pro Forma Basis, the Total Net Leverage Ratio being less than or equal to [3.00] to 1.00 as of the end of the most recently ended Test Period as of such time;

(n)    advances of payroll payments to employees in the ordinary course of business;

(o)    Investments and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests;

(p)    commencing on the date that is ninety (90) days after the Effective Date, Investments of a Subsidiary acquired after the Effective Date or of a Person merged or consolidated with any Subsidiary in accordance with this Section 6.04 and Section 6.03 after the Effective Date or that otherwise becomes a Subsidiary (provided that if such Investment is made under Section 6.04(h), existing Investments in subsidiaries of such Subsidiary or Person shall comply with the requirements of Section 6.04(h)) to the extent that such Investments were not made in contemplation of or in connection with

such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(q)     receivables owing to the Borrower, any other Loan Party or any of their respective Subsidiaryies, if created or acquired in the ordinary course of business;

(r)     Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business;

(s)     Investments in the Borrower, any other Loan Party or any of their respective Subsidiaryies in connection with any Tax Restructuring;

(t)     [reserved];

(u)     Investments consisting of Indebtedness, Liens, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this Section 6.04(u)) under Sections 6.01, 6.02, 6.03, 6.05 and 6.07, respectively;

(v)     contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Borrower;

(w)     to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property or other rights, in each case in the ordinary course of business;

(x)     [reserved];

(y)     [reserved];

(z)     [reserved];

(aa)     [reserved];

(bb)     Investments arising as a result of sale and leaseback transactions permitted by Section 6.06 hereto; and

(cc)     loans and advances to franchisees in the ordinary course of business (A) in connection with the sale of Franchise Rights or (B) to provide working capital to franchisees; provided that (i) such loans and advances in excess of $2750,000 individually shall be evidenced by promissory notes and any such promissory notes shall be pledged to the Collateral Agent to the extent required by the Security Documents and (ii) the aggregate outstanding principal amount of such loans and advances made in reliance on this clause (cc) shall not exceed $[2,5000,000] for the most recently ended Test Period at any time.;

provided that:

(i)     Nnotwithstanding anything to the contrary in this Section 6.04, other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries of the Loan Parties in a transaction not prohibited by this Agreement, no

105

Material Intellectual Property (except for non-exclusive leases or non-exclusive licenses with respect thereto) as of the Effective Date owned or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be contributed and/or assigned as an Investment or otherwise transferred to any non-Loan Party. For ; and

(ii) for the avoidance of doubt, no Material Intellectual Property shall be owned by a non-Loan Party at any time on or after the Effective Date.

SECTION 6.05    Asset Sales.

The Borrower will not, and will not permit any of its Subsidiaries to, (i) sell, transfer, lease or otherwise dispose (including pursuant to a division) of any asset, including any Equity Interest owned by it or (ii) permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law and other than issuing Equity Interests to the Borrower or a Subsidiary in compliance with Section 6.04(c)) (each, a "Disposition" and the term "Dispose" as a verb has the corresponding meaning), except:

(a)    Dispositions of obsolete, damaged, used, surplus or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable to maintain, in the conduct of the business of the Borrower and its Subsidiaries (including allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, be dedicated to the public domain or be invalidated);

(b)    Dispositions of inventory and other assets in the ordinary course of business and immaterial assets (considered in the aggregate) in the ordinary course of business;

(c)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) an amount equal to Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)    Dispositions of property to the Borrower or a Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then the transferee must be a Loan Party;

(e)    Dispositions permitted by Section 6.03 and Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.07 and Liens permitted by Section 6.02;

(f)    Dispositions of property pursuant to sale and leaseback transactions permitted by Section 6.06 hereto;

(g)    Dispositions of Permitted Investments;

(h)    Dispositions of accounts receivable in connection with the collection or compromise thereof (including sales to factors or other third parties);

(i)    leases, subleases, service agreements, product sales, abandonments, licenses, sublicenses or other disposals (including of Intellectual Property), in each case, (A) granted in the ordinary course of business or (B) that do not materially interfere with the business of the Borrower and itsLoan Parties and their respective Subsidiaries, taken as a whole;

(j)        transfers of property subject to Casualty Events;

(k) Dispositions of property to Persons other than Subsidiaries (including the sale or issuance of Equity Interests of a Subsidiary and including the sale of real property) for fair market value (as determined by a Responsible Officer of the Borrower in good faith) not otherwise permitted under this Section 6.05 in an aggregate amount not to exceed $[10,000,000]; provided that with respect to any Disposition pursuant to this clause (k) for a purchase price in excess of $1,000,000 with respect to any single transaction or series of related transactions, the Borrower or any Subsidiary shall receive not less than 75% of such consideration in the form of cash or Permitted Investments; provided, however, that solely for the purposes of this clause (k), (A) any liabilities (as shown on the most recent balance sheet of the Borrower or such Subsidiary or in the footnotes thereto) of the Borrower or such Subsidiary, other than liabilities that are by their terms subordinated in right of payment to the Loan Document Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of the Subsidiaries shall have been validly released by all applicable creditors in writing, shall be deemed to be cash, (B) any securities, notes or other obligations or assets received by the Borrower or such Subsidiary from such transferee that are converted by the Borrower or such Subsidiary into cash or Permitted Investments (to the extent of the cash or Permitted Investments received) within one hundred and eighty (180) days following the closing of the applicable Disposition, shall be deemed to be cash, and (C) Indebtedness of any Subsidiary that ceases to be a Subsidiary as a result of such Disposition (other than intercompany debt owed to the Borrower or its Subsidiaries), to the extent that the Borrower and all of the Subsidiaries (to the extent previously liable thereunder) are released from any guarantee of payment of the principal amount of such Indebtedness in connection with such Disposition, shall be deemed to be cash; provided, further, that no Event of Default shall have occurred and be continuing at the time of, and after giving effect to, any Disposition made pursuant to this clause (k);

(k)        sales or other dispositions by the Borrower, the other Loan Parties or any respective Subsidiary of equipment and fixtures located at distribution centers in an aggregate amount not to exceed $100,000;

(l)        [reserved];

(m)        Dispositions or forgiveness of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(n)        Dispositions of any assets (including Equity Interests) (A) acquired in connection with any Permitted Acquisition or other Investment not prohibited hereunder, which assets are not used or useful to the core or principal business of the Borrower and its Subsidiaries and (B) made to obtain the approval of any applicable antitrust authority in connection with a Permitted Acquisition;

(o) [reserved];

(o)        Dispositions of assets in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(p)        transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from

foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(q)    [reserved];

(r)    the sale or other D~~d~~ispositions ~~in an aggregate amount not to exceed the greater of $[5,000,000] and 2.5% of Consolidated EBITDA for the most recently ended Test Period; provided that, no Event of Default shall have occurred and be continuing at the time of, and after giving effect to, any Disposition made~~of retail store locations to a franchisee; provided that the aggregate fair market value of assets disposed pursuant to this clause (r) shall not exceed $1,000,000;

(s)    [reserved]; and

(t)    sales or other dispositions by the Borrower or any Subsidiary of assets in connection with the closing or sale of a retail store location (the closure of a store is not in and of itself the disposition of assets), warehouse, distribution center or corporate office of the Borrower or Subsidiary in the ordinary course of business of the Borrower or Subsidiary, which sale or disposition consists of leasehold interests in the premises of such store or distribution center, the equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such store or distribution center; provided, that, such sale shall be on commercially reasonable prices and terms in a bona fide arm's length transaction.

Notwithstanding anything to the contrary in this Section 6.05, other than by virtue of the sale of the Equity Interests of, or all or substantially all of the assets of, one or more Subsidiaries in a transaction not prohibited by this Agreement, no Loan Party shall, directly or indirectly, sell or otherwise transfer (except for non-exclusive leases or non-exclusive licenses with respect thereto) any Material Intellectual Property owned as of the Effective Date or thereafter acquired or any interest in any Franchise Agreement to any non-Loan Party.

SECTION 6.06    Sale and Leaseback Transactions.

The Borrower will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any tangible property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for ~~(i) sale and leaseback transactions in an aggregate amount not to exceed $5,000,000 and (ii)~~ any such sale of any fixed or capital assets by the Borrower or any Subsidiary that is made for cash consideration in an amount not less than the fair market value (as determined in good faith by the Borrower) of such fixed or capital asset and is consummated within 270 days after the Borrower or such Subsidiary, as applicable, acquires or completes the construction of such fixed or capital asset; provided that the aggregate amount of sale and leaseback transactions pursuant to this Section 6.06 shall not exceed $5,000,000.

SECTION 6.07    Restricted Payments; Certain Payments of Indebtedness.

(a)    The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(i)    each Subsidiary may make Restricted Payments to the Borrower or any other Subsidiary;

(ii)    the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person to the extent that such Equity Interests are not Disqualified Equity Interests;

(iii)    Restricted Payments made on or substantially contemporaneously with the Effective Date to consummate the Transactions, including to finance the payment of Transaction Costs;

(iv)    repurchases of Equity Interests in the Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price or withholding tTaxes payable in connection with the exercise of such options or warrants or other incentive interests;

(v)    Restricted Payments used to redeem, acquire, retire, repurchase or settle the Borrower's Equity Interests (or any options, warrants, restricted stock or stock appreciation rights or similar securities issued with respect to any such Equity Interests) held directly or indirectly by current or former officers, managers, consultants, members of the Board of Directors, employees or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of the Borrower (or any direct or indirect parent thereof), and its Subsidiaries (in each case, other than the executive management (i.e., the CEO, the CFO, any executive vice presidents and any similar executive management positions)), upon the death, disability, retirement or termination of employment of any such Person or otherwise in accordance with any stock option or stock appreciation rights plan, any management, director and/or employee stock ownership or incentive plan, stock subscription plan, employment termination agreement or any other employment agreements or equity holders' agreement in an aggregate amount not to exceed: (1) the cash proceeds of key man life insurance policies received by the Borrower or the, any other Loan Party or their respective Subsidiaries after the Effective Date, or (2) the amount of any bona fide cash bonuses otherwise payable to members of the Board of Directors, consultants, officers, employees, managers or independent contractors the Borrower, any other Loan Party or any of their respective Subsidiaryies that are foregone in return for the receipt of Equity Interests, the fair market value of which is equal to or less than the amount of such cash bonuses, which, if not used in any year, may be carried forward solely to the next subsequent fiscal year; provided further that cancellation of Indebtedness owning to the Borrower, any other Loan Party or any of their respective Subsidiaryies from members of the Board of Directors, consultants, officers, employees, managers or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of the Borrower, any other Loan Party or any of their respective Subsidiaryies in connection with a repurchase of Equity Interests of the Borrower will not be deemed to constitute a Restricted Payment for purposes of this Section 6.07 or any other provisions of this Agreement.

(vi)    for any taxable period (or portion thereof) for which Parent, the Borrower and/or any other Subsidiary is treated as a corporation for U.S. federal or state income or similar tax purposes and is a member of a consolidated, combined, unitary or similar tax group (a "Tax Group") (or is treated as a disregarded entity that is wholly owned by a corporation that is a member of a Tax Group for U.S. federal or state income or similar tax purposes) of which Parent or any other direct or indirect parent of Parent is the common parent (the "Common Parent"), distributions to Parent, which Parent may further distribute, directly or indirectly, to the Common Parent (if Parent is not the Common Parent), in an amount not to exceed: the amount of U.S. federal, state and local income taxes that Parent and its subsidiaries would have been required to pay if they were a stand-alone Tax Group with Parent as the common parent of such

stand-alone Tax Group for such year (or portion thereof), with such taxes calculated at the maximum combined U.S. federal, state, and local income tax rates applicable to a corporation resident in any jurisdiction within the United States;

(vii)    on the date of consummating the Buddy Reorganization Transaction, the Borrower ~~and~~or its Subsidiaries may make ~~Restricted Payments consisting of~~the distributions ~~of the Equity Interests of [Buddy's Newco, LLC, a Delaware limited liability company]~~expressly described in the definition therewith;

(viii)    [reserved];

(ix)    payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units;~~[~~ provided that if such payments are finally determined to be in excess of the withholding or similar Taxes, Borrower shall make best efforts to cause the return of such payments within thirty (30) days of such determination;~~]~~

(x)    Restricted Payments to pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition (or other similar Investment) and (b) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms; and

(xi)    payments made or expected to be made by the Borrower, any other Loan Party or any of their respective Subsidiar~~y~~ies in respect of withholding or similar Taxes payable upon exercise of Equity Interests by any future, present or former employee, director, officer, manager or consultant (or their respective controlled Affiliates or permitted transferees) and any repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants or required withholding or similar ~~t~~Taxes~~[~~; provided that if such payments are finally determined to be in excess of the withholding or similar Taxes, Borrower shall make best efforts to cause the return of such payments within thirty (30) days of such determination.~~]~~[15]

(b)    The Loan Parties will not, and will not permit any of their respective Subsidiaries to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness incurred pursuant to Section 6.01(a)(xii), or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase redemption, retirement, acquisition cancellation or termination of any Indebtedness incurred pursuant to Section 6.01(a)(xii) or any other payment (including any payment under any Swap Agreement) that has a substantially similar effect to any of the foregoing, in each case, except:

(i)    payment of regularly scheduled interest and principal payments, mandatory offers to repay, repurchase or redeem, mandatory prepayments of principal, premium and interest, and payment of fees, expenses and indemnification obligations, in each case with

---

[15] ~~Note to Draft:  To confirm.~~

respect to such Indebtedness incurred pursuant to Section 6.01(a)(xii) (other than payments in respect of any subordinated Indebtedness permitted hereunder that is prohibited by the subordination provisions thereof); and

(ii)    refinancings of Indebtedness to the extent permitted by Section 6.01(a)(xii).

Notwithstanding anything to the contrary in this Agreement, no Material Intellectual Property (except for non-exclusive leases, non-exclusive licenses or Excluded Assets with respect thereto) owned as of the Effective Date or thereafter acquired by any Loan Party or any interest in any Franchise Agreement may be made as a Restricted Payment or Investment, or otherwise transferred to or held by, any non-Loan Party.

SECTION 6.08    Transactions with Affiliates.

The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(i)    (A) transactions between or among the Borrower, any other Loan Party or any of their respective Subsidiaryies or any entity that becomes a Subsidiary as a result of such transaction and (B) transactions involving aggregate payment or consideration of less than $2,500,000;

(ii)    on terms not materially less favorable to the Borrower, such other Loan Party or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's length transaction with a Person other than an Affiliate (as determined by the majority of the members of the Board of Directors or a majority of the disinterested members of the Board of Directors of the Borrower in good faith);

(iii)    the payment of Transaction Costs, fees and expenses related to the Transactions;

(iv)    Dispositions in the form of a sale of furniture and assignment of lease agreements to franchisees in the ordinary course of business consistent with past practices, so long as the sale thereof is approved by disinterested members of the Board of Directors (or any committee thereof);

(v)    issuances of Equity Interests of the Borrower and the Subsidiaries to the extent otherwise permitted by this Agreement;

(vi)    employment and severance arrangements and other compensation arrangements between the Borrower and its, any other Loan Party and their respective Subsidiaries and their respective officers and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Sections 6.04(b) and 6.04(n));

(vii)    investments by Affiliates in Indebtedness and preferred Equity Interests of the Borrower and the Loan Parties and their respective Subsidiaries;

(viii)    the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board of Directors, officers and

employees of the Borrower (or any direct or indirect parent thereof)  and the Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(ix) transactions pursuant to agreements in existence or contemplated on the Effective Date and set forth on Schedule 6.08 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(x)  Restricted Payments permitted under Section 6.07 and Investments permitted under Section 6.04;

(xi) payments to or from, and transactions with, any joint venture in the ordinary course of business (including any cash management activities related thereto); ~~and~~

(xii) transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services that are Affiliates, in each case in the ordinary course of business and which are fair to the Borrower ~~and the~~, any other Loan Parties and their respective Subsidiaries, in the reasonable determination of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party; ~~provided that, each such transaction (other than any transaction pursuant to clauses (i)(A), (ii), (iii), (iv), (vi) and (x)) shall be on terms not materially less favorable to the Borrower or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's length transaction with a Person other than an Affiliate.~~and

(xiii) the Buddy Reorganization Transaction.

SECTION 6.09        Restrictive Agreements.

The Borrower will not, and will not permit any of its Subsidiaries to enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Secured Parties with respect to the Secured Obligations or under the Loan Documents; provided that the foregoing shall not apply to:

(a)        restrictions and conditions imposed by (1) Requirements of Law, (2) any Loan Document, (3) the ABL Loan Documents or (4) any documentation governing any Permitted Refinancing incurred to refinance any such Indebtedness referenced in clauses (1) through (3) above;

(b)        customary restrictions and conditions existing on the Effective Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)        restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)        customary provisions in leases, licenses, sublicenses and other contracts restricting the assignment thereof;

(e)    restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f)    any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); _provided_ that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower or any other Subsidiary;

(g)    [reserved];

(h)    restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)    restrictions set forth on Schedule 6.09 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)    [reserved];

(k)    customary restrictions contained in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto;

(l)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary; and

(m)    customary provisions related to creditworthiness of the tenant contained in real property leases entered into by Subsidiaries, so long as the Borrower or other Loan Party has determined in good faith that such creditworthiness provisions could not reasonably be expected to impair the ability of the Borrower or such other Loan Party and its respective Subsidiaries to meet their ongoing obligations.

SECTION 6.10    Subsidiaries.

The Borrower will not, and will not permit any of its Subsidiaries to have any Subsidiary that is not a Domestic Subsidiary or a Wholly-Owned Subsidiary.

SECTION 6.11    Changes in Fiscal Periods.

The Borrower will not make any change in its fiscal year; provided, however, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent (acting at the direction of the Required Lenders) will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year, without any requirement of consent by any Lender or other Person (notwithstanding anything to the contrary in Section 9.02); and provided further that the limitation of this Section 6.11 shall not apply with respect to any short year resulting from the Transactions that occurred on the Effective Date.

SECTION 6.12        Amendment of Financing Documents.

The Borrower will not, and will not permit any of its Subsidiaries to, amend, modify, waive, terminate or release any ABL Loan Document  in a manner restricted by the terms of any applicable intercreditor or subordination agreement.

SECTION 6.13        Franchise Agreements.

The Borrower will not, and will not permit any of its Subsidiaries to, maintain or distribute any Franchise Disclosure Documents, or enter into any Franchise Agreements, in violation of Section 3.20(c).

SECTION 6.14        Passive Status of Parent and Topco.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, none of Parent or Topco:

(a) shall have any liabilities or Indebtedness and, in the case of Parent, shall only provide Guarantees of Indebtedness permitted under Section 6.01 by the Borrower and its Subsidiaries, including borrowings under this Agreement, the ABL Credit Agreement and any other Indebtedness permitted under Section 6.01;

(b) shall engage in any operating or business activities other than its direct or indirect, as applicable, ownership of the Borrower and indirect ownership of the Borrower's Subsidiaries, and activities incidental to the maintenance of its corporate existence and its direct or indirect, as applicable, ownership of the Borrower and indirect ownership of the Borrower's Subsidiaries; and

(c) shall own any property or assets other than the Equity Interests in the Borrower or Parent, as applicable, in each case, other than:

(i)  performing its obligations and activities related thereto under its Organizational Documents, the Loan Documents, the ABL Loan Documents and the documents, agreements and other instruments entered into in connection therewith;

(ii) participating in tax, accounting and other administrative activities relating to the maintenance of its legal existence, including paying taxes, preparing reports to Governmental Authorities and to its shareholders, holding directors and shareholders meetings, as applicable, preparing corporate records and other corporate activities required to maintain its separate corporate structure;

(iii) providing reasonable and customary indemnification to its current and former officers, directors, managers, members of management, employees, advisors, consultants or independent contractors, as applicable;

(iv) financing activities, including issuing and offering its Qualified Equity Interests, payment of dividends and making contributions to the capital of any Loan Party, in each case, subject to the terms of this Agreement;

(v) (A) incurring and paying fees, costs and expenses related to the transactions permitted by this Section 6.14, and (B) otherwise incurring ordinary overhead costs and expenses

114

(including administrative, legal, accounting and similar expenses);

(vi) activities reasonably incidental to the consummation of a Tax Restructuring; and

(vii) other activities incidental to each of the foregoing.

ARTICLE VII

EVENTS OF DEFAULT

SECTION 7.01       Events of Default.

If any of the following events (any such event, an "Event of Default") shall occur:

(a)       any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)       any Loan Party shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) of this Section 7.01) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days;

(c)       any representation or warranty made or deemed made by or on behalf of Parent, the Borrower or any of the Subsidiaries in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect (or all respects to the extent already qualified by materiality) when made or deemed made, and such incorrect representation or warranty (if curable) shall remain incorrect for a period of thirty (30) days after the earlier of (i) any Loan Party's knowledge of such breach or (ii) written notice thereof from the Administrative Agent (which notice will be given at the request of the Required Lenders) to the Borrower;

(d)       Parent, the Borrower or any of the Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in (i) Sections 5.02(a), 5.04 (with respect to the existence of the Borrower), 5.10, 5.14, or in Article VI, or (ii) Sections 5.01(a), 5.01(b), 5.01(c), 5.01(d), 5.01(f) and such failure shall continue unremedied for a period of five (5) Business Days; provided that such five-Business Day period shall not apply in the case of: (A) any failure to observe any such covenant which is not capable of being cured at all or within such five-Business Day period or which has been the subject of a prior failure within a six-month period;

(e)       Parent, the Borrower or any of the Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section 7.01) and such failure shall continue unremedied for a period of thirty (30) days after written notice thereof from the Administrative Agent to the Borrower;

(f)       [reserved];

(g)    any event or condition occurs that results in any Material Indebtedness, Indebtedness under the ABL Loan Documents becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any such Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, provided that this paragraph (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness, other than on account of failure to make a payment required as a result of such termination or similar events;

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, court protection, reorganization or other relief in respect of any Loan Party or its debts, or of a material part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, examiner, sequestrator, conservator or similar official for any Loan Party or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in paragraph (h) of this Section 7.01, (iii) apply for or consent to the appointment of a receiver, trustee, examiner, custodian, sequestrator, conservator or similar official for any Loan Party or for a material part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(j)    one or more final, non-appealable, enforceable judgments for the payment of money in an aggregate amount in excess of $10,000,000[16] (to the extent not covered by insurance (including self-insurance) as to which the insurer has been notified of such judgment or order and has not denied coverage) shall be rendered against any Loan Party and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan Party that are material to the businesses and operations of the ~~Borrower and its~~ Loan Parties and their respective Subsidiaries, taken as a whole, to enforce any such judgment;

(k)    an ERISA Event occurs that has resulted or would reasonably be expected to result in a Material Adverse Effect;

(l)    any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Documents, except (i) as a result of the sale or other disposition of the applicable Collateral to a Person that is not a Loan Party in a transaction permitted under the Loan Documents, (ii) as a result of any Agent's (or any agent acting on its behalf

---

[16] ~~[NTD: To conform with the ABL.]~~

pursuant to any applicable Intercreditor Agreement) failure to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Documents or (B) file Uniform Commercial Code continuation statements, (iii) as to Collateral consisting of real property to the extent that (x) such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (y) such deficiency arose through no fault of Borrower or its Subsidiaries, and such deficiency is corrected with reasonable diligence upon obtaining actual knowledge thereof, or (iv) as a result of acts or omissions of any Agent or any Secured Party;

(m)      any material provision of any Loan Document or any material Guarantee of the Loan Document Obligations shall for any reason be asserted in writing by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)      any material Guarantee of the Loan Document Obligations by any Loan Party pursuant to the Guarantee Agreement shall cease to be in full force and effect (other than in accordance with the terms of the Loan Documents); or

(o)      a Change of Control shall occur;

then, and in every such event (other than an event with respect to the Borrower described in paragraph (h) or (i) of this Section 7.01), and at any time thereafter during the continuance of such event, the Administrative Agent, at the direction of the Required Lenders, shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:

(i)     terminate the Commitments, and thereupon the Commitments shall terminate immediately; and

(ii)    (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in paragraph (h) or (i) of this Section 7.01, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

SECTION 7.02      Application of Proceeds.

(a)      Subject to the terms of any applicable Intercreditor Agreement contemplated by this Agreement, in connection with the exercise of remedies provided for in Section 7.01, any amounts received on account of the Secured Obligations (including in respect of any sale of, collection from or other realization upon all or any part of the Collateral (including any Collateral consisting of cash) or the Guarantees) shall be applied by the Administrative Agent and/or the Collateral Agent, as applicable, to the payment of the Secured Obligations as follows:

(i)　　　　to the payment of:

(A) first, all reasonable and documented or invoiced out of pocket costs and expenses incurred by the Agents in connection with such sale, collection, other realization or otherwise and to the payment of all other amounts owing to each of the Administrative Agent, and the Collateral Agent in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all reasonable and documented or invoiced out of pocket court costs and the fees and ~~reasonable~~ expenses of its agents ~~and counsel (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of Seward & Kissel LLP, as counsel to the Agents and, if reasonably necessary, of a single firm of local counsel to the Agents, in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions))~~, the repayment of all advances made by it under any Loan Document on behalf of any Loan Party and any other reasonable and documented out-of-pocket costs or expenses incurred in connection with the exercise of any right or remedy under any Loan Document, in each case, if and to the extent payable pursuant to the terms of the Loan Documents; and

(B) second, all reasonable and documented out-of-pocket costs and expenses incurred by the Lender Professionals in connection with such sale, collection, other realization or otherwise, in each case, to the extent required to be reimbursed pursuant to Section 9.03(a) of this Agreement;

(ii)　　　　second, to the payment in full of the Secured Obligations (the amounts so applied to be distributed among such Secured Parties *pro rata* in accordance with the amounts of the Secured Obligations owed to them on the date of any such distribution) in accordance with this Agreement;

(iii)　　　　third, to any agent of any other junior secured debt, in accordance with any applicable Intercreditor Agreement; and

(iv)　　　　fourth, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

In the event that application of payments or Collateral proceeds is to be made after any bankruptcy or insolvency proceeding has been commenced, references in this Section 7.02(a) with respect to (i) interest shall include interest accruing after the commencement of such bankruptcy or insolvency proceeding whether or not such interest is an allowed claim in such bankruptcy or insolvency proceeding, and (ii) any other amounts shall only include amounts that are allowed claims in such bankruptcy or insolvency proceeding.

(b)　　　　Notwithstanding anything to the contrary in Section 7.02(a), Excluded Swap Obligations with respect to any Loan Party shall not be paid with amounts received from such Loan Party or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Secured Obligations otherwise set forth in Section 7.02(a).

ARTICLE VIII

ADMINISTRATIVE AGENT

SECTION 8.01　　　　Appointment and Authority.

(a)　　　　Each of the Lenders hereby irrevocably (i) designates and appoints (A) Wilmington Trust, National Association to act on its behalf as the Administrative Agent hereunder and

118

under the other Loan Documents and (B) Wilmington Trust, National Association  to act on its behalf as Collateral Agent hereunder and under the other Loan Documents and (ii) authorizes the Administrative Agent and the Collateral Agent (in their capacities as such), as applicable, to take such actions on such Lender's behalf and to exercise such powers as are expressly delegated to the Administrative Agent and the Collateral Agent, as applicable, by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents, hereby irrevocably appoints Wilmington Trust, National Association to act on its behalf as Collateral Agent under the Security Documents and authorizes Wilmington Trust, National Association (in its capacity as Collateral Agent) to take such actions on such Secured Party's behalf and to exercise such powers as are expressly delegated to the Collateral Agent by the terms hereof or thereof together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirements of Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)    Each of the Lenders and each Secured Party that is not a party hereto, by accepting the benefits of the Security Documents, hereby irrevocably appoints and authorizes the Collateral Agent, as applicable, to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers as are reasonably incidental thereto. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent and/or the Collateral Agent pursuant to Section 8.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article VIII and Article IX (including Section 9.03 as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

SECTION 8.02    Rights as a Lender.

Any Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, own securities of, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 8.03    Exculpatory Provisions.

No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, each Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, and shall not be required to exercise any discretion or to take any action, but shall be required to act or refrain from acting (and shall be fully protected in so acting or refraining from acting) as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that such Agent shall not be required to take any action (i) unless it is furnished with an indemnification satisfactory to such Agent from the Lenders with respect thereto or (ii) that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law;

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity;

(d)    shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions;

(e)    shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment;

(f)    shall be deemed not to have knowledge of any Default unless and until written notice describing such Default conspicuously marked as a "notice of default" is given to such Agent by the Borrower or a Lender and received by an officer of such Agent responsible for the administration of this Agreement;

(g)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien or security interests purported to be granted to such Agent pursuant to this Agreement or any other Loan Document have been or will continue to be properly or sufficiently or lawfully created, perfected or enforced or are entitled to any particular priority, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article IV, or (vii) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents;

(h)    shall not be responsible for nor have any duty to monitor the performance or any action of the Borrower or other Loan Party, or any of their directors, members, officers, agents, affiliates

or employees, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party, and may assume performance by all such Persons of their respective obligations and shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other Person;

(i)        shall not be liable for any action taken in good faith and reasonably believed by it to be within the powers conferred upon it, or taken by it pursuant to any direction or instruction by which it is governed, or omitted to be taken by it by reason of the lack of direction or instruction required hereby for such action (including without limitation for refusing to exercise discretion or for withholding its consent in the absence of its receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instructions to exercise such discretion or grant such consent from any such Lender, as applicable);

(j)        shall not be liable for any error of judgment made by it (or by an officer or other employee of such Agent) in good faith;

(k)        not be liable for any indirect, special, punitive or consequential damages (including, without limitation, lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action;

(l)        not be required to take any action under this Agreement, the other Loan Documents or any related document if taking such action would (A) subject such Agent to a tax in any jurisdiction where it is not then subject to a tax or (B) would require such Agent to qualify to do business in any jurisdiction where it is not then so qualified;

(m)        shall not have any duty as to any collateral in its possession or in the possession of someone under its control or in the possession or control of any agent or nominee of the Agents or any income thereon or as to the preservation of rights prior parties or any other rights pertaining thereto, except the duty to accord such of the collateral as may be in its possession substantially the same care as it accords similar assets held for the benefit of third parties and the duty to account for monies received by it. The Agents shall not be under any obligation to independently request or examine insurance coverage with respect to any collateral nor shall the Agent's be liable for the acts or omissions of any bank, depositary bank, custodian, independent counsel of any other Person or any other party selected by the Agents with reasonable care or selected by any other party hereto that may hold or possess collateral or documents related to collateral, and the Agents shall not be required to monitor the performance of any such Persons holding collateral. For the avoidance of doubt, the Agents shall not be responsible to the Lenders for the perfection of any lien or for the filing, form, content or renewal of any UCC financing statements, fixture filings, mortgages, deeds of trust and such other documents or instruments;

(n)        notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, shall not be under any obligation (i) to monitor, determine or verify the unavailability or cessation of any Benchmark (or other applicable benchmark interest rate), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any date on which such rate may be required to be transitioned or replaced in accordance with the terms of the Loan Documents, applicable law or otherwise, (ii) to select, determine or designate any replacement to such rate, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied, (iii) to select, determine or designate any adjustment or modifier to any replacement or successor index, or (iv) to determine whether or what any amendments to this Agreement or the other Loan Documents are necessary or advisable, if any, in connection with any of the foregoing. The Agents shall not be liable for any inability, failure or delay on its part to perform any of its duties set forth in this Agreement or any other Loan Document as a result of the unavailability of any Benchmark

(or other applicable benchmark interest rate), including as a result of any inability, delay, error or inaccuracy on the part of any other party, including without limitation any Lenders or Borrower, in providing any direction, instruction, notice or information required or contemplated by the terms of this Agreement and reasonably required for the performance of such duties. The Agents shall have no liability for any interest rate published by any publication that is the source for determining the interest rates of the Loans, including but not limited to Bloomberg (or any successor source) and the Bloomberg or Reuters screen (or any successor source), or for any rates published on any publicly available source, including without limitation the Federal Reserve Bank of New York's Website or any website administered by the Term SOFR Administrator, or in any of the foregoing cases for any delay, error or inaccuracy in the publication of any such rates, or for any subsequent correction or adjustment thereto; and

(o)        if at any time an Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process (including orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of any Collateral), such Agent is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate, and if such Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, such Agent shall not be liable to any of the parties hereto or to any other Person even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

The Agents' rights, protections, indemnities and immunities provided in this Agreement shall apply to such Agent for any actions taken or omitted to be taken under this agreement and any other Loan Documents and any other related agreements in any of its respective capacities.

SECTION 8.04        Reliance by Agents.

(a)        Each Agent shall be entitled to conclusively rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may conclusively rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. As to any matters not expressly provided for in this Agreement and in the other Loan Documents (including enforcement or collection), the Administrative Agent and/or the Collateral Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Lender.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders. Notwithstanding anything herein or in any other Loan Document to the contrary, and without limiting any rights, protections,

immunities or indemnities to the Agents hereunder, phrases such as "satisfactory to the [Administrative Agent][Collateral Agent]," "approved by the [Administrative Agent][Collateral Agent]," "acceptable to the [Administrative Agent][Collateral Agent]," "as determined by the [Administrative Agent][Collateral Agent]," "in the [Administrative Agent][Collateral Agent]'s discretion," "selected by the [Administrative Agent][Collateral Agent]," "elected by the [Administrative Agent][Collateral Agent]," "requested by the [Administrative Agent][Collateral Agent]," and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to take such action or to exercise such rights. Upon request by the Administrative Agent and/or the Collateral Agent, as the case may be, the Required Lenders shall confirm in writing the Administrative Agent's authority and/or the Collateral Agent's authority, as the case may be, to take any action in accordance with the terms of the Loan Documents and this Section 8.04 and may refrain from acting until such confirmation has been provided.

(b)     Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement, or any other Loan Document, to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent or the Collateral Agent, it is understood that in all cases the Administrative Agent or such Collateral Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document). The Administrative Agent and Collateral Agent shall have no liability for any failure or delay in taking any actions contemplated above as a result of a failure or delay on the part of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document) to provide such instruction, advice or concurrence. This provision is intended solely for the benefit of each of the Administrative Agent and the Collateral Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

(c)     The Administrative Agent and the Collateral Agent shall in all cases be fully justified in failing or refusing to act unless it shall receive further assurances to its reasonable satisfaction, including indemnification, from the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  No provision of this Agreement or any Loan Document shall require the Administrative Agent or the Collateral Agent to take any action that it reasonably believes to be contrary to applicable law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

SECTION 8.05     Delegation of Duties.

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent.  Any Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. No Agent shall be responsible for the acts or omissions of any sub-agents selected by it without gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. The exculpatory

provisions of this Article shall apply to any such sub-agent and to the Related Parties of any Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Term Facility and the Incremental Facility as well as activities as such Agent.

SECTION 8.06     Resignation of Administrative Agent; Mergers.

(a)     Each Agent may resign upon thirty (30) days' notice to the Lenders and the Borrower, whether or not a successor Agent has been appointed. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Borrower's consent (such consent not to be unreasonably withheld or delayed) unless an Event of Default has occurred and is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may (but shall not be obligated to) on behalf of the Lenders, appoint, or petition a court of competent jurisdiction to appoint, a successor Agent, which shall be an Approved Bank with an office in New York, New York, or an Affiliate of any such Approved Bank (the date upon which the retiring Agent is replaced, the "Resignation Effective Date"); provided that if the retiring Agent shall notify the Borrower and the Lenders that no qualifying Person accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice.

(b)     If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except (i) that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed and (ii) with respect to any outstanding payment obligations) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents as set forth in this Section. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 9.04 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

(d)     Any corporation or association into which an Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or

association resulting from any such conversion, sale, merger, consolidation or transfer to which an Agent is a party, will be and become the successor Agent under this Agreement and related Loan Documents and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

SECTION 8.07    Non-Reliance on Agents and Lenders.

(a)    Each Lender acknowledges that it has, independently and without reliance upon any Agent, any Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)    Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or Incremental Facility Amendment pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Agents and/or the Lenders on the Effective Date.

(c)    No Lender and no other Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent and the Collateral Agent on behalf of the Lenders and the other Secured Parties in accordance with the terms thereof. In the event of a foreclosure by the Administrative Agent or the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent or such Collateral Agent, as agent for and representative of the Lenders and the other Secured Parties (but not any Lender, Lenders, Secured Party or Secured Parties in its or their respective individual capacities) (either directly or through one or more acquisition vehicles), upon instructions from Required Lenders, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations (other than Obligations owing to the Agents) as a credit on account of the purchase price for any collateral payable by the Administrative Agent or the Collateral Agent on behalf of the Lenders at such sale or other disposition. Each Lender, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral, and of the Guarantees of the Secured Obligations, to have agreed to the foregoing provisions.

SECTION 8.08    [Reserved].

SECTION 8.09    Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise

125

and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, and any Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and such Agent and their respective agents and counsel and all other amounts due the Lenders and each Agent under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and, by its acceptance of the benefits of the Security Documents , each Secured Party that is not a party hereto, to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of any Agent and its agents and counsel, and any other amounts due such Agent under Sections 2.12 and 9.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or any Secured Party that is not a party hereto any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or any Secured Party that is not a party hereto to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

SECTION 8.10    No Waiver; Cumulative Remedies; Enforcement.

No failure by any Lender or any Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Article VII for the benefit of all the Secured Parties; provided, however, that the foregoing shall not prohibit (a) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 9.08 (subject to the terms of Section 2.18), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided further that if at any time there is no Person acting as an Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to such Agent pursuant to Article VII and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the

126

preceding proviso and subject to <u>Section 2.18</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

SECTION 8.11    <u>Withholding Taxes</u>.

To the extent required by any applicable Requirements of Law (as determined in good faith by the Administrative Agent), the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Loan Parties pursuant to <u>Section 2.17</u> and without limiting any obligation of the Loan Parties to do so pursuant to such Section) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this <u>Section 8.11</u>. The agreements in this <u>Section 8.11</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

SECTION 8.12    <u>Credit Bidding</u>.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (other than any Secured Obligations owing to the Agents) (including by accepting some or all of the Collateral a in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, such Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid, (i) the Administrative Agent (or the Required Lenders on its behalf) shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Required Lenders shall

be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) each of the Secured Parties shall be authorized to receive, ratably on account of the relevant Secured Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of Secured Obligations credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Secured Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Secured Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent or the Required Lenders may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

SECTION 8.13    Erroneous Payments.

(a)    If the Administrative Agent (x) notifies a Lender, Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all time remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 8.13 and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank

128

compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this Section 8.13 shall be conclusive, absent manifest error.

(b)    Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it (or a Payment Recipient on its behalf) receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)    it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)    such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.13(b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this Section 8.13(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 8.13(a) or on whether or not an Erroneous Payment has been made.

(c)    Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party under any Loan Document or from any other source against any amount that the Administrative Agent has demanded to be returned under the immediately preceding clause (a).

(d)    The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event an Erroneous Payment (or portion thereof) are not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Secured Obligations owed by the Borrower or any other Loan Party; provided that this Section 8.13(d) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Secured Obligations of the Borrower relative to the amount of the Secured Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided further, that for the avoidance of doubt, the immediately preceding clauses, (x) and (y) shall not apply, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous

Payment that is, comprised of funds received by the Administrative Agent from the Borrower for purposes of making such Erroneous Payment.

(e)     Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, in no event shall the occurrence of an Erroneous Payment (or the existence of any Erroneous Payment Subrogation Rights or other rights of the Administrative Agent in respect of an Erroneous Payment) result in the Administrative Agent becoming, or being deemed to be, a Lender hereunder or the holder of any Loans hereunder.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(g)     Notwithstanding anything in this Section 8.13 to the contrary, the Borrower shall not be liable for the losses of any party due to an Erroneous Payment. Each party's obligations under this Section 8.13 shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Loan Document Obligations under any Loan Document.

SECTION 8.14 <u>Secured Cash Management Obligations and Secured Swap Obligations</u>.

(a)     Prior to being recognized as a Secured Party hereunder, each Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed, shall be required to execute and deliver to the Collateral Agent and the Borrower a written notice, and by receiving the benefits of this Agreement and the other Loan Documents, and the liens granted hereunder and thereunder, such Person shall be deemed to agree to, and acknowledge that it is bound by, the terms of this Agreement and any related Loan Documents, and to have agreed to each Agent's rights, protections, immunities and indemnities set forth in this Agreement and the Loan Documents, and such rights, protections, immunities and indemnities shall be equally applicable with respect to such Person. Upon the Administrative Agent's and the Borrower's receipt of such written notice, such entity shall become a Secured Party hereunder and the Loan Documents. Notwithstanding anything herein to the contrary, the rights, protections, immunities and indemnities afforded to the Agents in this Article VIII with respect to the Lenders shall also be applicable to each Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed as if such Person were specifically set forth in this Article VIII.

(b)     Each Person to whom any Secured Cash Management Obligations and Secured Swap Obligations are owed hereby appoints each Agent as its agent; it being understood and agreed that the rights and benefits of each such Person under this Agreement and the Loan Documents consist exclusively of such Person's being a beneficiary of the liens and security interests (and, if applicable, guarantees) granted to the Collateral Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In connection with any action taken by an Agent, including, without limitation, with respect to any distribution of payments and collections, each Agent shall be entitled to assume (and shall have no liability for so assuming) no amounts are owing to any such Person (and no Secured Cash Management Obligations and Secured Swap Obligations are held by any such Person) unless such Person has provided written notification to the Agents of the amount that is owing to it (on which each Agent may conclusively rely) and such notification is received by the Agents within a reasonable period of time prior to the making of such distribution, which in any event shall be at least five (5) Business Days prior to such distribution.

(c)     Notwithstanding anything to the contrary contained herein or in any Loan Document, it is understood and agreed that only Lenders (which shall not include for this purpose any Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed) shall be entitled to instruct and direct an Agent to take, or omit to take, any action (including, without limitation, in connection with any default, Event of Default or enforcement of remedies) hereunder or under any Loan Document. Each Person to whom any Secured Cash Management Obligations or Secured Swap Obligations are owed agrees that it shall not provide, nor shall it be entitled to provide, any direction or instruction to an Agent, and no Agent shall in any event be responsible or liable for failing to comply with any such direction or instruction.

(d)     For the avoidance of doubt and notwithstanding anything contained herein to the contrary, in the event that any Swap Agreement or any other agreement related to such Person, with respect to any Secured Cash Management Obligations or Secured Swap Obligations, has been terminated, such Person shall provide written notice to the Agents and the Borrower thereof and thereafter such Person shall have no rights under this Agreement and the Loan Documents, and in no event shall either Agent be responsible or liable to such Person for any act or omission or potential liabilities occurring during any such time.

## ARTICLE IX

### MISCELLANEOUS

SECTION 9.01     Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)     if to the Borrower, the Administrative Agent or the Collateral Agent, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)     if to any other Lender, to it at its address (or fax number, telephone number or e-mail address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain Material Non-Public Information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax or other electronic transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)     Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has

notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, provided, further, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc. Each of the Borrower and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto. Each other Lender may change its address, fax or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    Reliance by Administrative Agent and Lenders. The Agents and the Lenders shall be entitled to conclusively rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent and each of the parties hereto hereby consents to such recording.

SECTION 9.02        Waivers; Amendments.

(a)        No failure or delay by the Agents or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Agents or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)        Except as provided in Section 2.14 or Section 2.20 with respect to any Incremental Facility Amendment, neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Administrative Agent (to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of the Administrative Agent or the Collateral Agent under this Agreement, the Administrative Agent shall execute such waiver, amendment or other modification to the extent approved by the Required Lenders) and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent or the Collateral Agent, as the case may be, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; provided that no such agreement shall:

(i)    increase the Commitment of any Lender or change any ratable sharing or payment provision that directly and adversely affects any Lender (with only such Lenders whose entitlement to a payment under such provisions is reduced being "directly and adversely affected") without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender;

(ii)    reduce the principal amount of any Loan (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute a reduction or forgiveness of principal) or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby, provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to Section 2.13(b);

(iii)   postpone the maturity of any Loan, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment (it being understood that a waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension of any

maturity date or the date for payment of any interest or fees), without the written consent of each Lender directly and adversely affected thereby;

(iv) change any of the provisions of this Section or Section 9.02(d) without the written consent of each Lender directly and adversely affected thereby; provided that any such change which is in favor of a Class of Lenders holding Loans maturing after the maturity of other Classes of Lenders (and only takes effect after the maturity of such other Classes of Loans or Commitments) will require the written consent of the Required Lenders with respect to each Class directly and adversely affected thereby;

(v) change the percentage set forth in the definition of "Required Lenders", "Required Supermajority Lenders", "Majority in Interest" or any other provision of any Loan Document specifying the number or percentage of Lenders (or Lenders of any Class) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (or each Lender of such Class, as the case may be);

(vi) subordinate or have the effect of subordinating (x) the Liens securing the Secured Obligations to the liens securing any other indebtedness or other obligations or (y) any obligations in contractual right of payment to any indebtedness or obligations, including without limitation by amending Section 6.01 or 7.02 and related provisions providing for the priority of the Loans (any such indebtedness or obligations to which such liens securing any of the obligations or such obligations, as applicable, are subordinated, "Senior Indebtedness") in either case of subclause (x) or (y), (i) except in :

> (i)    Indebtedness that is expressly permitted by this Agreement to be senior to the Secured Obligations hereunder (if any) and/or be secured by a Lien that is senior to the Lien securing the Secured Obligations, in each case, as of the Effective Date (including waivers, amendments or modifications to upsize capacity under this Agreement for such Indebtedness);

> (ii)    in connection with debtor-in-possession financing or use of cash collateral in accordance with the terms of the applicable Intercreditor Agreements,; or

> (iii)    (ii) unless (1) the Required Lenders provide consent and (2) each Lender has been offered a bona fide opportunity to fund or otherwise provide its pro rata share of the Senior Indebtedness on the same terms as offered to all other providers (or their affiliates) of the Senior Indebtedness [(other than backstop fees and similar fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction)] and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its pro rata share of the fees and any other benefit of the Senior Indebtedness afforded to the providers of the Senior Indebtedness (or any of their affiliates) [(other than backstop fees and similar fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction)] in connection with providing the Senior Indebtedness pursuant to a written offer made to each such adversely affected Lender describing the material terms of the arrangements pursuant to which the Senior Indebtedness is to be provided,

which offer shall remain open to each such adversely affected Lender for a period of not less than five (5) Business Days;

(vii)    release (or have the effect of releasing) all or substantially all or any material portion of the value of the Guarantees under the Guarantee Agreement (except as expressly provided in the Loan Documents) without the written consent of each Lender;

(viii)    release (or have the effect of releasing) all or substantially all or any material portion of the Collateral from the Liens of the Security Documents, without the written consent of each Lender except as expressly provided in the Loan Documents;

(ix)    change any pro rata sharing and/or payment provisions or any payment "waterfall" herein or in any other Loan Document, without the written consent of each Lender directly and adversely affected thereby; provided that and for the avoidance of doubt, adding new obligations or other indebtedness that are senior in Lien and/or senior in contractual right of payment shall not require approval under this clause if approved in accordance with Section 9.02(b)(vi);

(x)    change any provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of any Class differently than those holding Loans of any other Class, without the written consent of the Required Lenders with respect to any Class directly and adversely affected thereby; provided that and for the avoidance of doubt, adding new obligations or other indebtedness that are senior in Lien and/or senior in contractual right of payment shall not require approval under this clause if approved in accordance with Section 9.02(b)(vi);

(xi) (x) introduce an "unrestricted subsidiary" or "excluded subsidiary" or any similar concept to this Agreement, without the written consent of the Required Supermajority Lenders to be granted in their sole discretion;

(xii)    (xi) modify or waive Section 9.14, without the written consent of the Required Supermajority Lenders to be granted in their sole discretion;

(xiii)    (xii) modify or waive Material Intellectual Property or Franchise Agreement transfer restrictions set forth in Section 6.04, Section 6.05 or Section 6.07, without the written consent of the Required Supermajority Lenders to be granted in their sole discretion;

(xiv)    (xiii) modify the PIK Interest election amount set forth in Section 2.13(a) or otherwise increase the amount of interest that may be paid in kind, without the written consent of each Lender adversely affected thereby to be granted in their sole discretion; or

(xv)    (xiv) modify or waive the grace period with respect to any Event of Default under Section 7.01(b) (it being understood and agreed that the extension of such grace period to a date not to exceed [forty-five (45) days] after the required payment date (for the avoidance of doubt such date may not be further extended) shall be permitted with the prior written consent of the Required Lenders), without the

written consent of each Lender adversely affected thereby to be granted in their sole discretion;

_provided_ _further_ that

(A)    no such agreement shall amend, modify or otherwise affect the rights, duties, immunities, or indemnities of the Administrative Agent or the Collateral Agent without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable and .,

(B)    any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent in order x) to comply with local law or advice of local counsel, (y) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Borrower and counsel to the Required Lenders, so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof, or (z) to add any provisions to any Loan Documents that, in the reasonable judgment of counsel to the Required Lenders, are more favorable to the Lenders (or to the applicable subset thereof), so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof . ,

(C)    any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time and

(D)    no Lenders other than the Lenders holding a Majority in Interest of the applicable Class shall be required to waive, amend, supplement or modify the conditions precedent to any Borrowings of Loans of such Class; and

Nnotwithstanding the foregoing:

(i)    this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (A) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents and (B) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion; and

(ii)    guarantees, Security Documents and related documents in connection with this Agreement may be in a form reasonably determined by the

Administrative Agent (acting at the direction of the Required Lenders) and may be, together with this Agreement and the other Loan Documents, amended and waived with the consent of the Administrative Agent (acting at the direction of the Required Lenders) at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (A) to comply with local law or advice of local counsel, (B) to cure any (1) ambiguity, omission, defect or inconsistency or technical or obvious error or (2) mistake, the cure of which mistake would not be adverse to the Lenders, in the good faith determination of the Borrower and counsel to the Required Lenders, so long as the Required Lenders shall not have provided written objection thereto to the Administrative Agent within five days of receipt of notice thereof or, (C) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents or (D) to integrate any Incremental Facility in a manner consistent with this Agreement and the other Loan Documents, including the relevant Intercreditor Agreement(s).

(c)        In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders (and, to the extent any Proposed Change requires the consent of Lenders holding Loans of any Class pursuant to clause (iv), (v) or (ix) of paragraph (b) of this Section 9.02, the consent of a Majority in Interest of the outstanding Loans and unused Commitments of such Class) to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section 9.02 being referred to as a "Non-Consenting Lender"), then, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, (i) if no Event of Default under Sections 7.01(a), (b), (h) or (i) exists, permanently prepay all of the Loans of any Class owing by it to, and terminate any Commitments of, such Non-Consenting Lender or (ii) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, conditioned or delayed, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding par principal amount of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder (including pursuant to Section 2.11(a)) from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

(d)        Notwithstanding anything in this Agreement to the contrary, Loans may not be exchanged for other Indebtedness of the Borrower or its Affiliates or repaid from Indebtedness of the Borrower or its Subsidiaries, other than (y) a repayment of the Loans in full in cash or (z) pursuant to an offer to exchange such Loans for new Indebtedness that has been offered to all Lenders on a *pro rata* basis on the same terms as offered to all other providers of such new Indebtedness, and to the extent any Lender decides to participate in the new Indebtedness, such Lender shall receive its pro rata share of the fees and any other similar benefit of the new Indebtedness afforded to the providers of the new Indebtedness.

SECTION 9.03        Expenses; Indemnity; Damage Waiver.

(a)        The Borrower shall pay, if the Effective Date occurs and the Transactions have been consummated, (i) all reasonable and documented out-of-pocket costs and expenses incurred by the Agents and the ~~Required~~ Lenders (limited, in the case of legal fees and expenses, to the reasonable and documented fees, disbursements and other charges of (A) Seward & Kissel LLP, as counsel to the Administrative Agent and the Collateral Agent, and (B) one counsel to the Lenders (as designated by the Required Lenders) and, if reasonably necessary, of a single firm of local counsel to the Agents, taken as a whole and to a single firm of local counsel to the Required Lenders, taken as a whole, in each case, in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and of such other counsel retained with the Borrower's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), in each case incurred in connection with the Term Facility or Incremental Facility, and the preparation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof and including the reasonable and documented fees and expense of Lazard Frères & Co., as financial advisor to the Required Lenders) and (ii)  all reasonable and documented out-of-pocket expenses incurred by each Agent or any Lender, including the fees, charges and disbursements of counsel for such Agent and the Lenders, in connection with the preservation, enforcement or protection of any rights or remedies (A) in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws), including its rights under this Section 9.03 or (B) in connection with the Loans made hereunder, including all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to one lead counsel and one local counsel to the Agents, taken as a whole, and one lead counsel and one local counsel to the Lenders, taken as a whole, in each case, in each applicable jurisdiction (exclusive of any reasonably necessary special counsel) (and, in the case of a conflict of interest, where each Agent or any Lender affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel, one additional counsel) and such other counsel as may be retained with the Borrower's consent (such consent not to be unreasonably withheld or delayed).  Notwithstanding the foregoing, the expenses of counsel shall not include any allocated costs of in-house counsel.

(b)        The Borrower shall indemnify each Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from (without duplication), any and all losses, claims, damages, liabilities and reasonable and documented out-of-pocket fees and expenses (limited, in the case of legal fees and expenses, to the reasonable and documented fees, charges and disbursements of one counsel for the Agents, to the extent reasonably necessary, a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for the Agents, taken as a whole, and one counsel for all other Indemnitees, to the extent reasonably necessary, a single firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Indemnitees, taken as a whole (and, solely in the case of an actual or potential conflict of interest, where the Indemnitee affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retains its own counsel after receipt of consent from the Borrower (not to be unreasonably withheld or delayed), of one additional firm of counsel for the affected Indemnitees, and, if reasonably necessary, one additional firm of local counsel in each appropriate material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for such affected Indemnitees, taken as a whole)), incurred by or asserted against any Indemnitee by any third party or by the Borrower or any Subsidiary arising out of, in connection with, or as a result of any claim, litigation, investigation or proceeding (including any inquiry or investigation), regardless of whether any such Indemnitee is a party thereto, whether based on contract, tort or any other theory, relating to (i) the execution or delivery of this Agreement, any Loan Document or any other

agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder, the consummation of the Transactions or any other transactions contemplated thereby, the syndication of the Term Facility and the Incremental Facility or the enforcement of any obligations of a Loan Party hereunder or under any other Loan Document, (ii) any Loan or the use of the proceeds therefrom or (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any Mortgaged Property or any other property currently or formerly owned or operated by the Borrower or any Subsidiary, or any other Environmental Liability related in any way to the Borrower or any Subsidiary; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (w) resulted from the gross negligence or willful misconduct of such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitee (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment), (x) (other than with respect to the Agents and their Related Parties) resulted from a material breach of the Loan Documents by, or the bad faith of, such Indemnitee or its Related Parties acting on behalf of, or at the direction of, the Indemnitees (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (y) arise from disputes between or among Indemnitees (other than disputes involving claims by or against the Administrative Agents or the Collateral Agent, in such capacity) that does not arise from an act or omission by the Borrower or any Subsidiary. This Section 9.03 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent or any Lender under paragraph (a) or (b) of this Section 9.03, each Lender severally agrees to pay to such Agent or such Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent or such Lender in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate outstanding Loans and unused Commitments at such time (or if all such amounts have been reduced to zero, at the time immediately preceding such reduction). The obligations of the Lenders under this paragraph (c) are subject to the last sentence of Section 2.02(a) (which shall apply *mutatis mutandis* to the Lenders' obligations under this paragraph (c)).

(d)     To the extent permitted by applicable law, (i) the Borrower shall not assert, and each hereby waives, any claim against any Indemnitee for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such direct or actual damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties and (ii) no Loan Party (or any Affiliate thereof), Investor (or any Affiliate thereof), or Indemnitee shall be liable for any special, indirect, consequential, incidental, exemplary or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Financing Transactions, any Loan or the use of the proceeds thereof; provided that nothing in this paragraph shall limit any Loan Party's (or any Affiliate thereof) or Investor's (or any Affiliate thereof) indemnity and reimbursement obligations to the extent that such indirect, special, punitive or consequential damages are

included in any claim by a third party unaffiliated with the applicable Indemnitee with respect to which the applicable Indemnitee is entitled to indemnification as set forth in this Section 9.03.

(e)    All amounts due under this Section 9.03 shall be payable not later than thirty (30) Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

SECTION 9.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the acknowledgement of the Administrative Agent (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 9.04), the Indemnitees and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)

(i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent (except with respect to assignments to competitors of the Borrower) not to be unreasonably withheld, conditioned or delayed) of (A) the Borrower; provided that no consent of the Borrower shall be required for an assignment (x) by a Lender to any other Lender, any Affiliate of a Lender or any Approved Fund, or (y) if an Event of Default with respect to the Borrower has occurred and is continuing (other than in respect of a proposed assignment to a Disqualified Lender); provided further that no assignee contemplated by the immediately preceding proviso shall be entitled to receive any greater payment under Section 2.15 or Section 2.17 than the applicable assignor would have been entitled to receive with respect to the assignment made to such assignee, unless the assignment to such assignee is made with the Borrower's prior written consent; provided further that the Borrower shall have the right to withhold its consent to any assignment if in order for such assignment to comply with applicable law, the Borrower or any Subsidiary would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority and (B) the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan or Commitment to a Lender, an Affiliate of a Lender or an Approved Fund. Notwithstanding anything in this Section 9.04 to the contrary, if the Borrower has not given the Administrative Agent written notice of its objection to an assignment of Loans within five (5) Business Days after written notice of such assignment, the Borrower shall be deemed to have consented to such assignment (other than in respect of a proposed assignment to a Disqualified Lender).

(ii)    Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved

Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $2,500,000 (and integral multiples of $500,000 in excess thereof), unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld, conditioned or delayed), (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided that this clause (B) shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Class of Commitments or Loans, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, and, in each case, together with a processing and recordation fee of $3,500; provided that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided further that any such Assignment and Assumption shall include a representation by the assignee that the assignee is not a Disqualified Lender or an Affiliate of a Disqualified Lender; provided further that assignments made pursuant to Section 2.19(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective and (D) the assignee, if it shall not be a Lender, shall deliver to the Borrower and the Administrative Agent any tax forms required by Section 2.17(e) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain Material Non-Public Information about the Borrower, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 9.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) Sections 2.15, 2.16, 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section 9.04.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the

terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice. No assignment shall be effective unless recorded in the Register.  The parties hereto agree and intend that the obligations hereunder shall be treated as being in "registered form" for the purposes of the Code (including Sections 163(f), 871(h)(2), and 881(c)(2) of the Code), and the Register shall be maintained in accordance with such intention.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms required by Section 2.17(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)    The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)    (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons (other than to a Person that is not an Eligible Assignee) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. Subject to paragraph (c)(iii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations thereof and Section 2.19, it being understood that any tax forms required by Section 2.17(e) shall be provided solely to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.04. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

(ii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related stated interest amounts) of

each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and the parties hereto shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of its Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or other obligations under the Loan Documents) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any Loan or other obligation under the Loan Documents is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury regulations.

(iii)    A Participant shall not be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld, conditioned or delayed).

(d)    Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    Notwithstanding the foregoing, no assignment may be made or participation sold to a Disqualified Lender without the prior written consent of the Borrower. Upon inquiry by any Lender to the Administrative Agent as to whether a specified potential assignee or prospective participant is on the list of Disqualified Lenders, the Administrative Agent shall be permitted to make the list of Disqualified Lenders available to such Lender for inspection. Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, if any Lender was a Disqualified Lender at the time of the assignment of any Loans or Commitments to such Lender, following written notice from the Borrower to such Lender and the Administrative Agent: (1) such Lender shall promptly assign all Loans and Commitments held by such Lender to an Eligible Assignee; provided that (A) the Administrative Agent shall not have any obligation to the Borrower, such Lender or any other Person to find such a replacement Lender, (B) the Borrower shall not have any obligation to such Disqualified Lender or any other Person to find a replacement Lender or accept or consent to any such assignment to itself or any other Person subject to the Borrower's consent in accordance with Section 9.04(b)(i) and (C) the assignment of such Loans and/or Commitments, as the case may be, shall be at par plus accrued and unpaid interest and fees; (2) such Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders (or all Lenders of any Class), all affected Lenders (or all affected Lenders of any Class), a Majority in Interest of Lenders of any Class or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 9.02); provided that (x) the Commitment of any Disqualified Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Disqualified Lender adversely and in a manner that is disproportionate to other affected Lenders shall require the consent of such Disqualified Lender; and (3) no Disqualified Lender is entitled to receive information provided solely to Lenders by the Administrative Agent or any Lender or will be permitted

to attend or participate in meetings attended solely by the Lenders and the Administrative Agent, other than the right to receive notices or Borrowings, notices or prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Article II.

SECTION 9.05    Survival.

All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and all other amounts payable hereunder, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof or the resignation or removal of any Agent.

SECTION 9.06    Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Agents or the syndication of the Loans and Commitments constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of (x) this Agreement, (y) any other Loan Document and/or (z) any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Administrative Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of the Borrower

or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (ii) upon the request of the Administrative Agent (whether on its own behalf or on behalf of any Lender), any Electronic Signature shall be promptly followed by a manually executed counterpart.  Without limiting the generality of the foregoing, the Borrower and each Loan Party hereby (i) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders and the Loan Parties, Electronic Signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (ii) the Administrative Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (iii) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (iv) waives any claim against the Administrative Agent, any Lender or any Affiliates or Related Parties of any of the foregoing for any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising solely from the Administrative Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any losses, claims (including intraparty claims), demands, damages or liabilities of any kind arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

SECTION 9.07    Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08    Right of Setoff.

If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) (other than payroll, tax, or tax withholding accounts) at any time held and other obligations (in whatever currency) at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness. The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have. Notwithstanding the foregoing, no amount

set off from any Loan Party (other than the Borrower) shall be applied to any Excluded Swap Obligation of such Loan Party (other than the Borrower).

SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    This Agreement shall be construed in accordance with and governed by the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in any Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section 9.09. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10    WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

SECTION 9.11        Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12        Confidentiality.

(a)        Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors, in each case, who need to know such Information in connection with the Transactions (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons acting on behalf of the Administrative Agent or the relevant Lender to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent or the relevant Lender, as applicable), (ii) to the extent requested by any governmental authority or self-regulatory authority having jurisdiction over the Administrative Agent, any Lender or any Affiliates of any of the foregoing, as applicable, or, based on reasonable advice of counsel, to the extent required by (A) an order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, (B) applicable law or by any subpoena or similar compulsory legal process or (C) in connection with the exercise of remedies or enforcement of rights hereunder in any suit, action or proceeding relating to this Agreement; provided that (x) solely to the extent permitted by law and other than in connection with routine audits and reviews by bank accountants or governmental or self-regulatory authorities exercising examination or regulatory authority, each Lender and the Administrative Agent shall notify the Borrower as promptly as practicable of any such requested or required disclosure and (y) in the case of clause (ii) only, each Lender and the Administrative Agent shall use commercially reasonable efforts to ensure that such Information is kept confidential in connection with the exercise of such remedies, and provided further that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any of its subsidiaries, (iii) to any other party to this Agreement, (iv) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section 9.12, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any direct or indirect contractual counterparty to any Swap Agreement or derivative transaction relating to any Loan Party or its subsidiaries and its obligations under the Loan Documents or (C) any pledgee referred to in Section 9.04(d), (v) if required by any rating agency in connection with obtaining a rating; provided that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information, (vi) to service providers (including any numbering, administration or settlement service providers) providing administrative and ministerial services solely in connection with the syndication and administration of the Loan Documents and, the Term Facility and Incremental Facility (e.g., identities of parties, maturity dates, interest rates, etc.) on a confidential basis, (vii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 9.12 or otherwise by reason of improper disclosure by the Administrative Agent any Lender or any Affiliates or Related Parties of any of the foregoing (including the Persons referred to in clauses (i) above) in violation of any confidentiality obligations owing to the Loan Parties or any subsidiaries, Affiliates or Related Parties of any of the foregoing or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower or any subsidiary, which source is not known by the recipient of such information to be subject to a confidentiality obligation, or (viii) to the extent that such information was already in the possession of the Administrative Agent or any Lender prior to any duty or other undertaking of confidentiality or is independently developed by the

147

Administrative Agent or any Lender without the use of such information and without otherwise violating the terms of this Section 9.12. For the purposes hereof, "Information" means all information received from or on behalf of the Borrower or any of its subsidiaries relating to the Borrower, any of its subsidiaries or their business. Any Person required to maintain the confidentiality of Information as provided in this Section 9.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding the foregoing, other than as set forth in the proviso below, (x) no such information shall be disclosed to a Disqualified Lender or Excluded Party that constitutes a Disqualified Lender or Excluded Party, as applicable, at the time of such disclosure without the Borrower's prior written consent and (y) in connection with any proposed assignment of Loans and/or Commitments in accordance with Section 9.04, upon request by the applicable potential assignee therefor, the applicable potential assigning Lender may disclose the list of Disqualified Lenders to such potential assignee solely for purposes of enabling such assignee to make a representation in its applicable Assignment and Assumption that such prospective assignee is an Eligible Assignee, provided, however, that, subject to an agreement containing confidentiality undertakings substantially similar to those of this Section 9.12, the list of Disqualified Lenders may be disclosed to any bona fide potential assignee or Participant, so that such potential assignee or Participant can represent and warrant that it is neither a Disqualified Lender nor an Affiliate of a Disqualified Lender.

(b)    EACH LENDER ACKNOWLEDGES THAT INFORMATION (AS DEFINED IN THIS SECTION 9.12) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

SECTION 9.13    USA PATRIOT Act.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.

SECTION 9.14      Release of Liens and Guarantees.

(a)      A Subsidiary Loan Party shall automatically be released from its obligations under the Loan Documents (including its Guarantee of the Secured Obligations) and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, upon the consummation of any transaction permitted by this Agreement (including, for the avoidance of doubt, pursuant to a Restricted Payment permitted by Section 6.07(a)(vii)) as a result of which such Subsidiary Loan Party ceases to be a Subsidiary (other than in connection with the Buddy Reorganization Transaction). Upon any sale or other transfer by any Loan Party (other than to the Borrower or any Subsidiary Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral, the security interests in such Collateral created by the Security Documents shall be automatically released. Upon the release of any Subsidiary Loan Party from its Guarantee in compliance with this Agreement, the security interest in any Collateral owned by such Subsidiary created by the Security Documents shall be automatically released. Upon termination of the aggregate Commitments and payment in full of all Secured Obligations (other than contingent indemnification obligations), all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released. In connection with any termination or release pursuant to this Section 9.14, each Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request and prepare to evidence such termination or release so long as the Borrower or applicable Loan Party shall have provided such Agent a certificate, upon which such Agent may conclusively rely and shall be fully protected in acting in reliance upon, of a Responsible Officer certifying that the release of such Subsidiary Loan Party or Lien or such other release and the transactions related thereto (and the execution and delivery of any instruments or documents by such Agent in connection therewith) are authorized or permitted by the terms of this Agreement and the other Loan Documents.

(b)      The Administrative Agent or the Collateral Agent, as the case may be, will, subject to such Agent's receipt of a certificate of a Responsible Officer of the Borrower as provided for in Section 9.14(a), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request and prepare to subordinate its Lien on any property granted to or held by the Administrative Agent or the Collateral Agent, as the case may be, under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv).

(c)      Each of the Lenders, and by accepting the benefits of the Security Documents, each Secured Party that is not a party hereto, irrevocably authorizes the Administrative Agent or the Collateral Agent, as the case may be, to provide any release or evidence of release, termination or subordination contemplated by this Section 9.14. Upon request by the Administrative Agent or the Collateral Agent, as the case may be, at any time, the Required Lenders will confirm in writing the Administrative Agent's authority or that Collateral Agent's authority, as the case may be, to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Documents and this Section 9.14.

SECTION 9.15      No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial

transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent and the Lenders on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, any of its Affiliates or any other Person and (B) none of the Administrative Agent and the Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Administrative Agent and the Lenders has any obligation to disclose any of such interests to the Borrower or any of its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.16    Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

SECTION 9.17    Intercreditor Agreements. Each of the Lenders and, by accepting the benefits of the Security Documents, each Secured Party that is not a party hereto, hereby agrees that the Administrative Agent and/or the Collateral Agent may enter into any intercreditor agreement and/or subordination agreement pursuant to, or contemplated by, the terms of this Agreement (including with respect to Indebtedness permitted pursuant to Section 6.01 and defined terms referenced therein) on its behalf and agrees to be bound by the terms thereof and, in each case, consents and agrees to the appointment of the Administrative Agent and/or the Collateral Agent (and/or their affiliated designees, representatives or agents) on its behalf as collateral agent, respectively, thereunder.  In the event of any conflict between the provisions of this Agreement or any other Loan Document (other than any Intercreditor Agreement) and the provisions of any Intercreditor Agreement, the provisions of such Intercreditor Agreement shall govern and control.

SECTION 9.18    Judgment Currency. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or under any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with the normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from them to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or the relevant Lender of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or the relevant Lender may in accordance with the normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or such Lender from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent, or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or such Lender in such currency, the Administrative Agent or such Lender agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

SECTION 9.19    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

1.    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

2.    the effects of any Bail-In Action on any such liability, including, if applicable:

    i.    a reduction in full or in part or cancellation of any such liability;

ii.      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

iii.      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 9.20      <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

SECTION 9.21     Keepwell. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Guarantee Agreement in respect of a Secured Swap Obligation (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 9.21 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 9.21or otherwise under the Guarantee Agreement voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this Section 9.21 shall remain in full force and effect until the termination of all Secured Swap Obligations. Each Qualified ECP Guarantor intends that this Section 9.21 constitute, and this Section 9.21 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**PARENT:**                                   **FUSION INTERMEDIATE, LLC**

By: _____
Name:
Title:

**BORROWER:**                                 **FUSION BUYER, LLC**

By: _____
Name:
Title:

**SOLELY FOR PURPOSES OF <u>SECTION 6.14</u>:**

**FUSION PARENT, LLC**

By: _____
Name:
Title:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**, as Administrative Agent and Collateral Agent


By: _____
Name:
Title:

**FRANCHISE GROUP, INC.,**
as the initial Lender


By: _____
Name:
Title:

[_____],
as a Lender


By: _____
Name:
Title:

[Signature Page to First Lien Credit Agreement]

**<u>Exhibit D</u>**

**Restructuring Transactions Memorandum**

In accordance with the Plan, the steps set forth in the Restructuring Transactions Memorandum remain subject to modification until the Effective Date.

Certain documents, or portions thereof, contained in this **<u>Exhibit D</u>** and the Plan Supplement remain subject to continuing review and discussions among the Debtors and interested parties with respect thereto. The rights of the Debtors are expressly reserved, subject to the terms and conditions set forth in the Plan (including all applicable consultation, consent, and/or approval rights contained or contemplated therein), to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court.

Unless otherwise set forth below, the following steps shall occur in the order set forth below.

## Restructuring Transactions Memorandum

This Restructuring Transactions Memorandum sets forth a summary description of the material components of the Restructuring Transactions to be effectuated prior to, on, or following the Effective Date in connection with the *Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1454] (as may be amended, supplemented or modified from time to time, the "Plan"). The Debtors reserve all rights to modify, amend, supplement, or restate any part of this Restructuring Transactions Memorandum as necessary or appropriate, subject to the Definitive Document Consent Rights. Capitalized terms used but not defined herein shall have the definitions set forth in the Plan. In the event of an inconsistency between the Plan and the terms hereof, the terms of the Plan shall control.

The definitive documentation necessary or appropriate to implement the transaction steps set forth herein may include, among other things and without limitation, merger, purchase, sale, assignment, transfer, novation, release, amendment, distribution, agency, transition services and/or contribution agreements.

The Restructuring Transactions are intended to be effectuated in the following order unless otherwise set forth below.

### Step 1.

**Prior to the Effective Date**:

    A. A third party forms a new Delaware limited liability company ("Reorganized Parent"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

    B. Immediately after Step 1A, Reorganized Parent forms a new Delaware limited liability company ("Reorganized Intermediate"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

    C. Immediately after Step 1B, Reorganized Intermediate forms a new Delaware limited liability company ("Reorganized Buyer"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

    D. Franchise Group Intermediate Holdco, LLC forms Franchise Group Intermediate 2, LLC, a Delaware limited liability company.

**On the Effective Date:**

    E. Reorganized Parent issues and contributes to Reorganized Intermediate common limited liability company interests of Reorganized Parent ("Reorganized Common Equity"). The Reorganized Common Equity represents 100% of the issued and outstanding Equity Interests of Reorganized Parent.

    F. Immediately after Step 1E, Reorganized Intermediate contributes the Reorganized Common Equity to Reorganized Buyer. Following this Step 1F, Reorganized Buyer owns 100% of the issued and outstanding Equity Interests of Reorganized Parent, resulting in momentary circular ownership.

### Step 2.

**On the Effective Date:**

A. The OpCo Debtors and the Freedom HoldCo Debtors form the Litigation Trust.

B. TopCo contributes all of the Cash it has on hand (approximately $13.25 million) to Freedom VCM Interco Holdings, Inc., as a capital contribution.

C. Each of Freedom VCM Receivables, Inc. and Freedom Receivables II, LLC distributes all of its rights, title and interest in and to all Accounts Receivable (as defined below) and all Tax Refunds (as defined below), to Freedom VCM Interco Holdings, Inc.

As used herein, "Accounts Receivable" means, with respect to any person or entity, (i) any and all accounts receivable, notes receivable, trade accounts receivable, and other amounts receivable (including any residual interests) owed to such person or entity and any other rights of such person or entity to payment from third parties, including those reflected (or required to be reflected under United States generally accepted accounting principles as in effect from time to time) in the books and records of such person or entity, (ii) any and all principal, interest, fees, charges, proceeds and other amounts on or in respect of any of the receivables or other items described in clause (i) of this definition, and (iii) any and all claims, remedies or other rights, and any and all files or records, relating to any of the receivables or other items described in clause (i) or clause (ii) of this definition.

As used herein, "Tax Refunds" means any tax refund, tax credit, tax rebate or other recovery for taxes, in each case together with any interest or other amounts payable thereon.

D. Freedom VCM Interco Holdings Inc. contributes all of its rights, title and interest in and to all Cash, Accounts Receivable, and Tax Refunds to Freedom VCM Interco, Inc. Freedom VCM Interco, Inc. contributes all of its rights, title and interest in and to all Cash, Accounts Receivable, and Tax Refunds to Freedom VCM, Inc.

E. The OpCo Debtors and the Freedom HoldCo Debtors transfer the Litigation Trust Assets to the Litigation Trust.

**Step 3.** On the Effective Date, Freedom VCM, Inc. contributes all of its rights, title and interest in and to all Cash, Accounts Receivable, and Tax Refunds to Franchise Group, Inc. Franchise Group, Inc. contributes all of its rights, title and interest in and to all of its assets and properties (other than Excluded Assets (as defined below)) to Franchise Group New HoldCo, LLC. Franchise Group New HoldCo, LLC assumes the liabilities of Franchise Group, Inc. to the extent arising out of or relating to such assets or properties and that are continuing or being Reinstated, solely to the extent applicable and in accordance with the Plan.

As used herein, "Excluded Assets" means the following that are owned or held by Franchise Group, Inc. as of the Effective Date: (i) all Equity Interests, (ii) all Litigation Trust Units, (iii) all Executory Contracts and Unexpired Leases of Franchise Group, Inc. that are not assumed by Franchise Group, Inc. pursuant to the Plan, (iv) Cash on hand intended to fund distributions under the Plan, and (v) all files, documents, instruments and records relating to incorporation, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, its certificate of incorporation and bylaws, and other documents relating to the incorporation, organization and existence of Franchise Group, Inc. as a corporation.

**Step 4.** As of the Effective Date, the following entities are dissolved, their affairs are wound up, and their certificates of formation are cancelled: Franchise Group Acquisition TM, LLC, Franchise Group Intermediate L, LLC, Vitamin Shoppe Global, LLC, Vitamin Shoppe Mariner, LLC, Vitamin Shoppe

Franchising, LLC, Vitamin Shoppe Florida, LLC, Betancourt Sports Nutrition, LLC, American Freight FFO, LLC, American Freight Franchising, LLC, American Freight Franchisor, LLC, and Home & Appliance Outlet, LLC.

**Step 5.** On the Effective Date, Reorganized Buyer enters into the Exit ABL Facility with the third-party lenders thereunder in accordance with the Plan and receives Cash from the loans made to Reorganized Buyer thereunder.

**Step 6.**

**On the Effective Date, following the prior Steps 1 through 5:**

    A.   Reorganized Buyer purchases from Franchise Group, Inc., 100% of the Equity Interests of Franchise Group New HoldCo, LLC in exchange for (i) the Reorganized Common Equity received by Reorganized Buyer in Step 1F, (ii) the Cash proceeds of the Exit ABL Facility, and (iii) the issuance of the Take-Back Term Loans.

  **On the Effective Date, following the prior Step 6A:**

    B.   Pursuant to the Plan, (i) Franchise Group, Inc. distributes the Reorganized Common Equity, Cash proceeds from the Exit ABL Facility, any Cash on hand, and Take-Back Term Loans, and (ii) Franchise Group Inc. and the Freedom HoldCo Debtors transfer the Litigation Trust Units, in each case, to the applicable Holders of Claims under the Plan in full and final satisfaction, settlement, release, and discharge of their Claims pursuant to the Plan.

    C.   Pursuant to the Plan, the Holders of DIP Claims waive their right to assert any DIP Claims against the Freedom HoldCo Debtors. All Claims between and among TopCo, the Freedom HoldCo Debtors, and the OpCo Debtors are waived.

    D.   Pursuant to the Plan, all Existing Intercompany Equity Interests of Freedom VCM Interco Holdings, Inc. are cancelled and retired without any distribution on account thereof.

**On the Effective Date, following the prior Step 6D:**

    E.   Pursuant to this Restructuring Transactions Memorandum, without any further action, (i) the limited liability company agreement of Reorganized Parent is deemed amended and restated in its entirety as set forth in, and replaced by, the Amended and Restated Limited Liability Company Agreement of Reorganized Parent (the "A&R LLC Agreement"), (ii) each of the Persons that receives Reorganized Common Equity is deemed to be a party to the A&R LLC Agreement as a "Member" thereunder, and deemed to be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the A&R LLC Agreement as a "Member" party thereto, and is deemed to have signed such agreement, and (iii) the initial member of Reorganized Parent shall be deemed to have withdrawn from, and shall cease to be a member of, Reorganized Parent for all purposes, including for all purposes of the Delaware Limited Liability Company Act and the A&R LLC Agreement.

    F.   Franchise Group, Inc. and certain of its direct or indirect parent entities that are Debtors enter into an agency agreement (the "Agency Agreement") with Franchise Group New HoldCo, LLC and/or certain of its subsidiaries pursuant to which Franchise Group, Inc. and such parent entities will provide certain agency and other services to Franchise Group New HoldCo, LLC

and/or any of its subsidiaries, upon terms and subject to conditions to be mutually agreed upon by the Debtors and the Required Consenting First Lien Lenders.

***Step 7***.  On or after the Effective Date, Franchise Group Intermediate Holdco, LLC contributes $1,000,000 to Franchise Group Intermediate 2, LLC.

***Step 8.***  Franchise Group, Inc. and any of its direct or indirect parent entities that are Debtors shall not be dissolved and shall remain in existence following the Effective Date until the termination of the arrangements and services contemplated by the Agency Agreement.

***General Authority With Respect to Intercompany Claims and Other Restructuring Transactions Steps***:

At any point following the entry of the Confirmation Order, but subject to the terms of the Agency Agreement, the Debtors or the Reorganized Debtors, as applicable, may, but will not be required to: (i) merge out of existence, liquidate, dissolve, convert into different entity forms, and/or make tax elections; (ii) set off, settle, distribute, contribute, cancel, or release without any distribution with respect to the Intercompany Claims; or (iii) transfer assets, rights, obligations, personnel, and similar items among the Debtors or Reorganized Debtors, as applicable, in each case, in furtherance of the transactions contemplated by the Plan, subject to the applicable consent rights under the Plan and the Restructuring Support Agreement.

**<u>Exhibit D-1</u>**

**Redline to Previously Filed
Restructuring Transactions Memorandum**

*Draft*

## Restructuring Transactions Memorandum[‡]

This Restructuring Transactions Memorandum sets forth a summary description of the material components of the Restructuring Transactions to be effectuated prior to, on, or following the Effective Date in connection with the *Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1454] (as may be amended, supplemented or modified from time to time, the "Plan"). The Debtors reserve all rights to modify, amend, supplement, or restate any part of this Restructuring Transactions Memorandum as necessary or appropriate, subject to the Definitive Document Consent Rights. Capitalized terms used but not defined herein shall have the definitions set forth in the Plan. In the event of an inconsistency between the Plan and the terms hereof, the terms of the Plan shall control.

The definitive documentation necessary or appropriate to implement the transaction steps set forth herein may include, among other things and without limitation, merger, purchase, sale, assignment, transfer, novation, release, amendment, distribution, agency, transition services and/or contribution agreements.

As of the date hereof, the Debtors are considering two different sets of Restructuring Transactions, with each set forth below as Option A and Option B. The Debtors, with the consent of the Required Consenting First Lien Lenders, reserve all rights to determine whether to enter into the Restructuring Transactions described in Option A or Option B prior to the Effective Date (or otherwise modify, amend, supplement, or restate any of the steps described herein).

### OPTION A

If the Debtors, with the consent of the Required First Lien Lenders, elect to consummate the Restructuring Transactions pursuant to Option A, the The Restructuring Transactions are intended to be effectuated in the following order unless otherwise set forth below.

### *Step 1.*

**Prior to the Effective Date**:

A. A third party forms a new Delaware limited liability company ("Reorganized ~~Franchise Group~~ Parent"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

B. Immediately after Step 1A, Reorganized ~~Franchise Group~~ Parent forms a new Delaware limited liability company ("Reorganized ~~Franchise Group~~ Intermediate"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

C. Immediately after Step 1B, Reorganized ~~Franchise Group~~ Intermediate forms a new Delaware limited liability company ("Reorganized ~~Franchise Group~~ Buyer"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

D. Franchise Group Intermediate Holdco, LLC forms Franchise Group Intermediate 2, LLC, a Delaware limited liability company.

---

[‡] This Restructuring Transactions Memorandum remains subject to further review and comment in all respects. In the event that there are any further amendments to the Plan or changes to the contemplated transaction steps necessary to complete the Plan, then these transaction steps set forth herein will be updated and an amended Restructuring Transactions Memorandum will be filed setting forth such modified transaction steps.

**On the Effective Date:**

E. ~~D.~~ Reorganized ~~Franchise Group~~ Parent issues and contributes to Reorganized ~~Franchise Group~~ Intermediate common limited liability company interests of Reorganized ~~Franchise Group~~ Parent ("Reorganized Common Equity"). The Reorganized Common Equity represents 100% of the issued and outstanding Equity Interests of Reorganized ~~Franchise Group~~ Parent.

F. ~~E.~~ Immediately after Step ~~1D~~1E, Reorganized ~~Franchise Group~~ Intermediate contributes the Reorganized Common Equity to Reorganized ~~Franchise Group~~ Buyer. Following this Step ~~1E~~1F, Reorganized ~~Franchise Group~~ Buyer owns 100% of the issued and outstanding Equity Interests of Reorganized ~~Franchise Group~~ Parent, resulting in momentary circular ownership.

*Step 2.*

**On the Effective Date:**

A. The OpCo Debtors and the Freedom HoldCo Debtors form the Litigation Trust.

B. TopCo contributes all of the Cash it has on hand (approximately $13.25 million) to Freedom VCM Interco Holdings, Inc., as a capital contribution.

C. Each of Freedom VCM Receivables, Inc. and Freedom Receivables II, LLC distributes ~~any assets it holds, other than any Executory Contracts and Unexpired Leases that are not assumed by it~~all of its rights, title and interest in and to all Accounts Receivable (as defined below) and all Tax Refunds (as defined below), to Freedom VCM Interco Holdings, Inc. ~~Freedom VCM Interco Holdings, Inc. assumes the liabilities of each of Freedom VCM Receivables, Inc. and Freedom Receivables II, LLC associated with such distributed assets.~~

As used herein, "Accounts Receivable" means, with respect to any person or entity, (i) any and all accounts receivable, notes receivable, trade accounts receivable, and other amounts receivable (including any residual interests) owed to such person or entity and any other rights of such person or entity to payment from third parties, including those reflected (or required to be reflected under United States generally accepted accounting principles as in effect from time to time) in the books and records of such person or entity, (ii) any and all principal, interest, fees, charges, proceeds and other amounts on or in respect of any of the receivables or other items described in clause (i) of this definition, and (iii) any and all claims, remedies or other rights, and any and all files or records, relating to any of the receivables or other items described in clause (i) or clause (ii) of this definition.

As used herein, "Tax Refunds" means any tax refund, tax credit, tax rebate or other recovery for taxes, in each case together with any interest or other amounts payable thereon.

D. Freedom VCM Interco Holdings Inc. contributes ~~any assets it holds (and any assets received in Step 2C), other than Equity Interests in subsidiaries and any Executory Contracts and Unexpired Leases that are not assumed by Freedom VCM Interco Holdings Inc.,~~all of its rights, title and interest in and to all Cash, Accounts Receivable, and Tax Refunds to Freedom VCM Interco, Inc.~~, which also assumes any liabilities that were previously assumed in Step 2C.~~ Freedom VCM Interco, Inc. contributes ~~any assets it holds, other than Equity Interests in subsidiaries, Litigation Trust Units and any Executory Contracts and Unexpired Leases that are not assumed by Freedom VCM Interco, Inc.,~~all of its rights, title and interest

in and to all Cash, Accounts Receivable, and Tax Refunds to Freedom VCM, Inc., which also assumes any liabilities that were previously assumed by Freedom VCM Interco, Inc.

E. The OpCo Debtors and the Freedom VCM, Inc. HoldCo Debtors transfer the Litigation Trust Assets to the Litigation Trust.

**Step 3.** On the Effective Date, Freedom VCM, Inc. contributes any assets it holds (and any assets received in Step 2D), other than Equity Interests in subsidiaries, Litigation Trust Units and any Executory Contracts and Unexpired Leases that are not assumed by Freedom VCM, Inc., all of its rights, title and interest in and to all Cash, Accounts Receivable, and Tax Refunds to Franchise Group, Inc., which also assumes any liabilities that were previously assumed by Freedom VCM, Inc. Franchise Group, Inc. contributes any assets it holds other than Equity Interests in subsidiaries, Litigation Trust Units, and any Cash on hand intended to fund distributions under the Plan all of its rights, title and interest in and to all of its assets and properties (other than Excluded Assets (as defined below)) to Franchise Group New HoldCo, LLC. Franchise Group New HoldCo, LLC assumes the liabilities of Franchise Group, Inc. to the extent arising out of or relating to such assets or properties and that are continuing or being Reinstated, solely to the extent applicable and in accordance with the Plan.

As used herein, "Excluded Assets" means the following that are owned or held by Franchise Group, Inc. as of the Effective Date: (i) all Equity Interests, (ii) all Litigation Trust Units, (iii) all Executory Contracts and Unexpired Leases of Franchise Group, Inc. that are not assumed by Franchise Group, Inc. pursuant to the Plan, (iv) Cash on hand intended to fund distributions under the Plan, and (v) all files, documents, instruments and records relating to incorporation, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, its certificate of incorporation and bylaws, and other documents relating to the incorporation, organization and existence of Franchise Group, Inc. as a corporation.

**Step 4.** On the Effective Date, Reorganized Franchise Group Buyer enters into the Exit ABL Facility with the third party lenders thereunder in accordance with the Plan and receives Cash from the loans made to Reorganized Franchise Group Buyer thereunder.

**Step 5.**

**On the Effective Date, following the prior Steps 1 through 4:**

A. Reorganized Franchise Group Buyer purchases from Franchise Group, Inc., 100% of the Equity Interests of Franchise Group New HoldCo, LLC in exchange for (i) the Reorganized Common Equity received by Reorganized Franchise Group Buyer in Step 1E, (ii) the Cash proceeds of the Exit ABL Facility, and (iii) the issuance of the Take Back Term Loans ((i) (iii) collectively, the "Franchise Group Purchase Consideration").

**On the Effective Date, following the prior Step 5A:**

B. Pursuant to the Plan, (i) Franchise Group, Inc. distributes the Reorganized Common Equity, Cash proceeds from the Exit ABL Facility, any Cash on hand, and Take Back Term Loans, and (ii) Franchise Group Inc. and the Freedom HoldCo Debtors transfer the Litigation Trust Units, in each case, to the applicable Holders of Claims under the Plan in full and final satisfaction, settlement, release, and discharge of their Claims pursuant to the Plan.

C. Pursuant to the Plan, the Holders of DIP Claims waive their right to assert any DIP Claims against the Freedom HoldCo Debtors. All Claims between and among TopCo, the Freedom HoldCo Debtors, and the OpCo Debtors are waived. All Existing TopCo Equity Interests are canceled, released, and extinguished.

**On the Effective Date, following the prior Step 5C:**

A. Pursuant to this Restructuring Transactions Memorandum, without any further action, (i) the limited liability company agreement of Reorganized Franchise Group Parent is deemed amended and restated in its entirety as set forth in, and replaced by, the Amended and Restated Limited Liability Company Agreement of Reorganized Franchise Group Parent (the "A&R LLC Agreement"), (ii) each of the Persons that receives Reorganized Common Equity is deemed to be a party to the A&R LLC Agreement as a "Member" thereunder, and deemed to be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the A&R LLC Agreement as a "Member" party thereto, and is deemed to have signed such agreement, and (iii) the initial member of Reorganized Franchise Group Parent shall be deemed to have withdrawn from, and shall cease to be a member of, Reorganized Franchise Group Parent for all purposes, including for all purposes of the Delaware Limited Liability Company Act and the A&R LLC Agreement.

B. Franchise Group, Inc. and certain of its direct or indirect parent entities that are Debtors enter into an agency agreement (the "Agency Agreement") with Franchise Group New HoldCo, LLC and/or certain of its subsidiaries pursuant to which Franchise Group, Inc. and such parent entities will provide certain agency and other services to Franchise Group New HoldCo, LLC and/or such subsidiaries, upon terms and subject to conditions to be mutually agreed upon by the Debtors and the Required Consenting First Lien Lenders.

*Step 4.* As of the Effective Date, the following entities are dissolved, their affairs are wound up, and their certificates of formation are cancelled: Franchise Group Acquisition TM, LLC, Franchise Group Intermediate L, LLC, Vitamin Shoppe Global, LLC, Vitamin Shoppe Mariner, LLC, Vitamin Shoppe Franchising, LLC, Vitamin Shoppe Florida, LLC, Betancourt Sports Nutrition, LLC, American Freight FFO, LLC, American Freight Franchising, LLC, American Freight Franchisor, LLC, and Home & Appliance Outlet, LLC.

*Step 6.* Franchise Group, Inc. and any of its direct or indirect parent entities that are Debtors shall be liquidated, dissolved, or otherwise wound down as soon as reasonably practicable following the Effective Date and the termination of the arrangements and services contemplated by the Agency Agreement.

**OPTION B**

If the Debtors, with the consent of the Required First Lien Lenders, elect to consummate the Restructuring Transactions pursuant to Option B, the Restructuring Transactions are intended to be effectuated in the following order unless otherwise set forth below.

*Step 1.*

**Prior to the Effective Date:**

A. A third party forms a new Delaware limited liability company ("Reorganized PSP Parent"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

B. Immediately after Step 1A, Reorganized PSP Parent forms a new Delaware limited liability company ("Reorganized PSP Intermediate"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

C. Immediately after Step 1B, Reorganized PSP Intermediate forms a new Delaware limited liability company ("Reorganized PSP Buyer"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

D. A third party forms a new Delaware limited liability company ("Reorganized Buddy's Parent"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

E. Immediately after Step 1D, Reorganized Buddy's Parent forms a new Delaware limited liability company ("Reorganized Buddy's Intermediate"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

F. Immediately after Step 1E, Reorganized Buddy's Intermediate forms a new Delaware limited liability company ("Reorganized Buddy's Buyer"), which is intended to be treated as a corporation for U.S. federal income tax purposes.

**On the Effective Date:**

G. Reorganized PSP Parent issues and contributes to Reorganized PSP Intermediate common limited liability company interests of Reorganized PSP Parent ("Reorganized PSP Parent Equity"). The Reorganized PSP Parent Equity represents 100% of the issued and outstanding Equity Interests of Reorganized PSP Parent.

H. Immediately after Step 1G, Reorganized PSP Intermediate contributes the Reorganized PSP Parent Equity to Reorganized PSP Buyer. Following this Step 1H, Reorganized PSP Buyer owns 100% of the issued and outstanding Equity Interests of Reorganized PSP Parent, resulting in momentary circular ownership.

I. Reorganized Buddy's Parent issues and contributes to Reorganized Buddy's Intermediate common limited liability company interests of Reorganized Buddy's Parent ("Reorganized Buddy's Parent Equity"). The Reorganized Buddy's Parent Equity represents 100% of the issued and outstanding Equity Interests of Reorganized Buddy's Parent.

J. Immediately after Step 1I, Reorganized Buddy's Intermediate contributes the Reorganized Buddy's Parent Equity to Reorganized Buddy's Buyer. Following this Step 1J, Reorganized Buddy's Buyer owns 100% of the issued and outstanding Equity Interests of Reorganized Buddy's Parent, resulting in momentary circular ownership.

*Step 2.*

**On the Effective Date:**

A. The OpCo Debtors and the Freedom HoldCo Debtors form the Litigation Trust.

5

B. TopCo contributes all of the Cash it has on hand (approximately $13.25 million) to Freedom VCM Interco Holdings, Inc., as a capital contribution.

C. Each of Freedom VCM Receivables, Inc. and Freedom Receivables II, LLC distributes any assets it holds, other than any Executory Contracts and Unexpired Leases that are not assumed by it, to Freedom VCM Interco Holdings, Inc. Freedom VCM Interco Holdings, Inc. assumes the liabilities of each of Freedom VCM Receivables, Inc. and Freedom Receivables II, LLC associated with such distributed assets.

D. Freedom VCM Interco Holdings Inc. contributes any assets it holds (and any assets received in Step 2C), other than Equity Interests in subsidiaries and any Executory Contracts and Unexpired Leases that are not assumed by Freedom VCM Interco Holdings Inc., to Freedom VCM Interco, Inc., which also assumes any liabilities that were previously assumed in Step 2C. Freedom VCM Interco, Inc. contributes any assets it holds, other than Equity Interests in subsidiaries, Litigation Trust Units and any Executory Contracts and Unexpired Leases that are not assumed by Freedom VCM Interco, Inc., to Freedom VCM, Inc., which also assumes any liabilities that were previously assumed by Freedom VCM Interco, Inc.

E. The OpCo Debtors and Freedom VCM, Inc. transfer the Litigation Trust Assets to the Litigation Trust.

***Step 3.***

On the Effective Date, Freedom VCM, Inc. contributes any assets it holds (and any assets received in Step 2D), other than Equity Interests in subsidiaries, Litigation Trust Units and any Executory Contracts and Unexpired Leases that are not assumed by Freedom VCM, Inc., to Franchise Group, Inc., which also assumes any liabilities that were previously assumed by Freedom VCM, Inc. Franchise Group, Inc. contributes any assets it holds other than Equity Interests in subsidiaries, Litigation Trust Units, and any Cash on hand intended to fund distributions under the Plan to Franchise Group New HoldCo, LLC. Franchise Group New HoldCo, LLC assumes the liabilities of Franchise Group, Inc. that are continuing or being Reinstated, solely to the extent applicable and in accordance with the Plan.

***Step 4.*** **On the Effective Date:**

A. Franchise Group Intermediate Holdco, LLC distributes 100% of its Equity Interests in Franchise Group Intermediate PSP, LLC to Franchise Group New Holdco, LLC.

B. Franchise Group New Holdco, LLC distributes the Equity Interests in Franchise Group Intermediate PSP, LLC received in Step 4A to Franchise Group, Inc.

***Step 5.*** On the Effective Date, ~~both~~ Reorganized ~~PSP~~ Buyer ~~and Reorganized Buddy's Buyer~~ enters into the Exit ABL Facility~~, as co-borrowers,~~ with the third-party lenders thereunder in accordance with the Plan and receives Cash from the loans made to Reorganized ~~PSP Buyer and Reorganized Buddy's~~ Buyer thereunder.

***Step 6.***

**On the Effective Date, following the prior Steps 1 through 5:**

A. ~~C.~~ Reorganized ~~Buddy's~~ Buyer purchases from Franchise Group, Inc., 100% of the Equity Interests of Franchise Group New HoldCo, LLC in exchange for (i) the Reorganized ~~Buddy's Parent~~Common Equity received by Reorganized ~~Buddy's~~ Buyer in Step ~~1J~~1F, (ii) the Cash

proceeds of the Exit ABL Facility ~~received by Reorganized Buddy's Buyer~~, and (iii) the ~~co-~~issuance of the Take-Back Term Loans ~~((i) (iii) collectively, the "Buddy's Purchase Consideration"). Reorganized PSP Buyer purchases from Franchise Group, Inc., 100% of the Equity Interests of Franchise Group Intermediate PSP, LLC in exchange for (x) the Reorganized PSP Parent Equity received by Reorganized PSP Buyer in Step 1H, (y) the Cash proceeds of the Exit ABL Facility received by Reorganized PSP Buyer, and (z) the co-issuance of the Take-Back Term Loans ((x) (z) collectively, the "PSP Purchase Consideration").~~.

**On the Effective Date, following the prior Step 6A:**

B.  ~~D.~~ Pursuant to the Plan, (i) Franchise Group, Inc. distributes the Reorganized ~~PSP Parent Equity, Reorganized Buddy's Parent~~Common Equity, Cash proceeds from the Exit ABL Facility, any Cash on hand, and Take-Back Term Loans, and (ii) Franchise Group Inc. and the Freedom HoldCo Debtors transfer the Litigation Trust Units, in each case, to the applicable Holders of Claims under the Plan in full and final satisfaction, settlement, release, and discharge of their Claims pursuant to the Plan.

C.  ~~E.~~ Pursuant to the Plan, the Holders of DIP Claims waive their right to assert any DIP Claims against the Freedom HoldCo Debtors. All Claims between and among TopCo, the Freedom HoldCo Debtors, and the OpCo Debtors are waived. ~~All Existing TopCo Equity Interests are canceled, released, and extinguished.~~

D.  Pursuant to the Plan, all Existing Intercompany Equity Interests of Freedom VCM Interco Holdings, Inc. are cancelled and retired without any distribution on account thereof.

**On the Effective Date, following the prior Step ~~6C~~6D:**

E.  ~~F.~~ Pursuant to this Restructuring Transactions Memorandum, without any further action, (i) ~~each of (X) the holders of Reorganized PSP Parent Equity and (Y) the holders of Reorganized Buddy's Parent Equity, immediately following Step 6C, transfer (and shall be deemed to have transferred) such Reorganized PSP Parent Equity or Reorganized Buddy's Parent Equity, as applicable, to Reorganized Franchise Group Topco, LLC, a newly formed Delaware limited liability company ("New TopCo"), in exchange for all of the common limited liability company interests of New TopCo (such common limited liability company interests are referred to as the "Reorganized Common Equity" in the Plan), (ii)~~ the limited liability company agreement of ~~New TopCo~~Reorganized Parent is deemed amended and restated in its entirety as set forth in, and replaced by, the Amended and Restated Limited Liability Company Agreement of ~~New TopCo~~Reorganized Parent (the "A&R LLC Agreement"), (ii~~i~~) each of the Persons that receives Reorganized Common Equity is deemed to be a party to the A&R LLC Agreement as a "Member" thereunder, and deemed to be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the A&R LLC Agreement as a "Member" party thereto, and is deemed to have signed such agreement, and (~~iv~~iii) the initial member of ~~New TopCo~~Reorganized Parent shall be deemed to have withdrawn from, and shall cease to be a member of, ~~New TopCo~~Reorganized Parent for all purposes, including for all purposes of the Delaware Limited Liability Company Act and the A&R LLC Agreement.

~~G. Pursuant to this Restructuring Transactions Memorandum, without any further action, (i) the initial member of Reorganized PSP Parent shall be deemed to have withdrawn from, and shall cease to be a member of, Reorganized PSP Parent for all purposes, including for all~~

~~purposes of the Delaware Limited Liability Company Act and the limited liability company agreement of Reorganized PSP Parent (the "PSP Parent LLC Agreement"), and (ii) the PSP Parent LLC Agreement is deemed amended and restated in its entirety such that, among other things, Reorganized PSP Parent shall be managed by its member.~~

~~H. Pursuant to this Restructuring Transactions Memorandum, without any further action, (i) the initial member of Reorganized Buddy's Parent shall be deemed to have withdrawn from, and shall cease to be a member of, Reorganized Buddy's Parent for all purposes, including for all purposes of the Delaware Limited Liability Company Act and the limited liability company agreement of Reorganized Buddy's Parent (the "Buddy's Parent LLC Agreement"), and (ii) the Buddy's Parent LLC Agreement is deemed amended and restated in its entirety such that, among other things, Reorganized Buddy's Parent shall be managed by its member.~~

F. ~~I.~~ Franchise Group, Inc. and certain of its direct or indirect parent entities that are Debtors enter into an agency agreement (the "Agency Agreement") with ~~(i) Reorganized PSP Parent and/or certain of its subsidiaries and (ii) Reorganized Buddy's Parent~~ Franchise Group New HoldCo, LLC and/or certain of its subsidiaries pursuant to which Franchise Group, Inc. and such parent entities will provide certain agency and other services to ~~such other entities~~ Franchise Group New HoldCo, LLC and/or any of its subsidiaries, upon terms and subject to conditions to be mutually agreed upon by the Debtors and the Required Consenting First Lien Lenders.

~~J. Reorganized PSP Parent and/or certain of its subsidiaries, on the one hand, and Reorganized Buddy's Parent and/or certain of its subsidiaries, on the other hand, enter into a transition services agreement (the "Transition Services Agreement") pursuant to which certain transition services are provided, upon terms and subject to conditions to be mutually agreed upon by the Debtors and the Required Consenting First Lien Lenders.~~

***Step 7***. On or after the Effective Date, Franchise Group Intermediate Holdco, LLC contributes $1,000,000 to Franchise Group Intermediate 2, LLC.

***Step 7~~8~~***. Franchise Group, Inc. and any of its direct or indirect parent entities that are Debtors shall ~~be liquidated,~~ not be dissolved~~, or otherwise wound down as soon as reasonably practicable~~ and shall remain in existence following the Effective Date ~~and~~ until the termination of the arrangements and services contemplated by the Agency Agreement.

***General Authority With Respect to Intercompany Claims and Other Restructuring Transactions Steps***:

At any point following the entry of the Confirmation Order, but subject to the terms of the Agency Agreement ~~and the Transition Services Agreement~~, the Debtors or the Reorganized Debtors, as applicable, may, but will not be required to: (i) merge out of existence, liquidate, dissolve, convert into different entity forms, and/or make tax elections; (ii) set off, settle, distribute, contribute, cancel, or release without any distribution with respect to the Intercompany Claims; or (iii) transfer assets, rights, obligations, personnel, and similar items among the Debtors or Reorganized Debtors, as applicable, in each case, in furtherance of the transactions contemplated by the Plan, subject to the applicable consent rights under the Plan and the Restructuring Support Agreement.

## Exhibit E

### Rejected Contracts/Lease List[1]

Section 10.1 of the Plan provides the following:  Except as otherwise provided herein, any Executory Contracts and Unexpired Leases (a) not previously assumed, (b) not previously assumed and assigned in accordance with the Sale Order or other order approving such assumption and assignment, (c) not previously rejected pursuant to an order of the Bankruptcy Court, and (d) identified on the Assumed Contracts List, will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order, except any Executory Contract or Unexpired Lease (i) identified on the Rejected Contracts/Lease List, (ii) that is the subject of (A) a separate motion or notice to reject, assume, or assume and assign or a Cure Dispute that is pending as of the Confirmation Date or (B) an order of the Bankruptcy Court that is not yet a Final Order, (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code), (iv) of the American Freight Debtors that is not otherwise assumed or included on the Assumed Contracts List, (v) that relates to the Vitamin Shoppe Debtors and is not otherwise assumed pursuant to the Sale Order or included on the Assumed Contracts List, or (vi) of Franchise Group, Inc. that is not otherwise assumed or included on the Assumed Contracts List.  For the avoidance of doubt, except as otherwise set forth herein or as included on the Assumed Contracts List, all Executory Contracts and Unexpired Leases of the American Freight Debtors, Franchise Group, Inc., and the Vitamin Shoppe Debtors shall be rejected as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such other date as may be identified on the Rejected Contracts/Lease List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party (including the Buyer pursuant to the Partial Sale Transaction) on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by an order of the Bankruptcy Court.  To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, increases, accelerates or otherwise alters any obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder as a result of, gives rise to any rights or benefits to any non-Debtor party to any such Executory Contract or Unexpired Lease, or creates any Lien on any asset or property of the Debtors or the Reorganized Debtors as a result of, the assumption of such

---

[1]    For the avoidance of doubt, the rejections of the Executory Contracts and Unexpired Leases listed in this **Exhibit E** shall include the rejection of any and all ancillary documents executed in connection with, or as part of, such Executory Contract or Unexpired Lease, including any ancillary document that any counterparty may assert as executory, whether or not such ancillary document is expressly listed herein.

Executory Contract or Unexpired Lease or the execution or consummation of the Plan or any other Restructuring Transaction (including any change of control, sale of business, assignment, vesting, termination, acceleration, or similar provisions therein), then such provision shall be deemed unenforceable and modified (solely for purposes of the transactions contemplated under the Plan) such that the transactions contemplated by the Plan or any other Restructuring Transaction shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder, to be entitled to any rights or benefits thereunder, or create or impose a Lien on any asset or property of the Debtors or the Reorganized Debtors. For the avoidance of doubt, Confirmation of the Plan shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary contained in the Plan (other than Section 10.8 of the Plan) and in the Restructuring Support Agreement, except as otherwise agreed to by the Debtors and any applicable counterparty to an Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts/Lease List in their discretion prior to the later of (a) Effective Date and (b) seven (7) days after the date on which the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts List (or, in either case, such later date as may be agreed with a counterparty); provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

Additionally, Section 10.7 of the Plan provides the following: Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts/Lease List or Assumed Contracts List, as applicable, nor anything contained in the Plan or Sale Documents, nor the Debtors' delivery of a notice of the proposed assumption and proposed Cure Cost to any contract and lease counterparties set forth in the Assumed Contracts List shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article XIII of the Plan. If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts List, the Debtors shall have the right to reject such Executory Contract or Unexpired Lease, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Certain documents, or portions thereof, contained in this **Exhibit E** and the Plan Supplement remain subject to continuing review and discussions among the Debtors and interested

parties with respect thereto.  The rights of the Debtors are expressly reserved, subject to the terms and conditions set forth in the Plan (including all applicable consultation, consent, and/or approval rights contained or contemplated therein), to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court.

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 1 | 1 Haul Takes It All | 1 Haul Takes It All<br>500 Catawba Trail<br>Lima, OH 45806 | American Freight, LLC | Contract (Other), dated December 18, 2023 | | |
| 2 | 1010data Retail Solutions LLC | 1010data Retail Solutions LLC<br>750 Third Avenue, 4th Floor<br>New York, NY 10017 | Vitamin Shoppe Industries LLC | 1010data Managed Services Statement of Work 8 to 1010data Dedicated Server Hosting and Analysis Agreement, dated March 24, 2010 | | |
| 3 | 1010data, Inc. | 1010data, Inc.<br>750 Third Avenue, 4th Floor<br>New York, NY 10017 | Vitamin Shoppe Industries LLC | 1010data Managed Services Statement of Work 8 to 1010data Dedicated Server Hosting and Analysis Agreement, dated March 24, 2010 | | |
| 4 | 123.Net, Inc. | 123.Net, Inc.<br>24700 Northwestern Hwy, 5th Floor<br>Southfield, MI 48075 | PSP Group, LLC | 123.Net Service Agreement | | |
| 5 | 123NET | 123NET<br>24700 Northwestern Hwy, 5th Floor<br>Southfield, MI 48075 | PSP Group, LLC | Scope of Work for Enterprise Data Center, Network & Voice Services | | |
| 6 | 1584 Flatbush Avenue Partners, LLC | 1584 Flatbush Avenue Partners, LLC<br>539 Eastern Parkway Third Floor<br>Brooklyn, NY 11216 | Vitamin Shoppe Industries LLC | Lease, dated February 14, 2015 | 0810 | 4/30/2025 |
| 7 | 1st Choice Home Furnishings of Baton Rouge, LLC | 1st Choice Home Furnishings of Baton Rouge, LLC<br>662 Howard Avenue<br>Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC<br>Franchise Group Inc. | Settlement Agreement and Release,  dated May 10, 2024 | | |
| 8 | 1st Choice Home Furnishings of Donaldsonville, LLC | 1st Choice Home Furnishings of Donaldsonville, LLC<br>662 Howard Avenue<br>Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC<br>Franchise Group Inc. | Settlement Agreement and Release,  dated May 10, 2024 | | |
| 9 | A360 Enterprises, LLC | A360 Enterprises, LLC<br>4600 W. 77th Street Suite 295<br>Edina, MN 5543 | Franchise Group. Inc. | Master Subscription and Services Agreement, dated September 19, 2022 | | |
| 10 | A360 Enterprises, LLC | A360 Enterprises, LLC<br>4600 W. 77th Street Suite 295<br>Edina, MN 55435 | Franchise Group. Inc. | Digital Accessibility Audit, Remediation Support & QA Testing Statement of Work, dated August 26, 2021 | | |
| 11 | Aaron Granger | Aaron Granger<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 1, 2024 | | |
| 12 | Aaron Granger | Aaron Granger<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated January 31, 2024 | | |
| 13 | Adam Vincentini | Adam Vincentini<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 13, 2021 | | |
| 14 | ADP, Inc. | ADP, Inc.<br>One ADP Boulevard<br>Roseland, NJ 07068 | Franchise Group. Inc. | Referral Agreement, dated October 23, 2023 | | |
| 15 | AEI National Income Property Fund VII LP | AEI National Income Property Fund VII LP<br>1300 Wells Fargo Place<br>Saint Paul, MN 55101 | Vitamin Shoppe Industries LLC | Guaranty of Lease by VSI, dated January 28, 2022 | 203 | 3/31/2025 |
| 16 | Alex Mondlak | Alex Mondlak<br>[Address on File] | Franchise Group, Inc. | Offer Letter, dated April 17, 2023 | | |
| 17 | All Purpose Hauling and Removing LLC | All Purpose Hauling and Removing LLC<br>3218 Lincoln Street<br>Lorain, OH 44052 | American Freight, LLC | Contract (Other), dated March 17, 2022 | | |
| 18 | AllWright Franchise Consulting, Inc DBA The You Network | AllWright Franchise Consulting, Inc DBA The You Network<br>93 Hayden Rowe St<br>Hopkinton, MA 01748 | Pet Supplies "Plus", LLC | Addendum to AllWright Franchise Consulting, Inc DBA The You Network Referral Agreement | | |
| 19 | Alpha Solutions USA LLC | Alpha Solutions USA LLC<br>120 East 23rd Street<br>5th Floor<br>New York, NY 10010 | Pet Supplies "Plus", LLC | Statement of Work #1 for Phase 2 Assistance | | |
| 20 | Alpha Solutions USA LLC | Alpha Solutions USA LLC<br>120 East 23rd Street<br>5th Floor<br>New York, NY 10010 | Pet Supplies "Plus", LLC | Statement of Work #4 for Alpha Solutions USA LLC and Pet Supplies Plus | | |
| 21 | Alpha Solutions USA LLC | Alpha Solutions USA LLC<br>120 East 23rd Street<br>5th Floor<br>New York, NY 10010 | Pet Supplies "Plus", LLC | Master Services Agreement | | |
| 22 | Alpha Solutions USA LLC | Alpha Solutions USA LLC<br>120 East 23rd Street<br>5th Floor<br>New York, NY 10010 | PSP Stores, LLC | Statement of Work #3 | | |
| 23 | Alturas Metro Towne Center LLC | Alturas Metro Towne Center LLC<br>500 E. Shore Dr., Suite 120<br>Eagle, ID 83616 | Vitamin Shoppe Industries LLC | Lease, dated September 21, 2004 | 0210 | 4/30/2025 |
| 24 | American Express Travel Related Services Company, Inc. | American Express Travel Related Services Company, Inc.<br>200 Vesey Street<br>New York, NY 10285 | American Freight, LLC | Master Services Agreement 01, dated March 31, 2022 | | |
| 25 | American First Finance Inc. | American First Finance Inc.<br>8585 N. Stemmons Fwy, Suite N-1000<br>Dallas, TX 75247 | American Freight Outlet Stores, LLC | Referral Agreement, dated July 15, 2022 | | |
| 26 | American First Finance Inc. | American First Finance Inc.<br>PO Box 565848<br>Dallas, TX 75356 | American Freight, LLC | Authorized Dealer Agreement, dated July 15, 2022 | | |
| 27 | American First Finance Inc. | American First Finance Inc.<br>8585 N. Stemmons Fwy, Suite N-1000<br>Dallas, TX 75247 | American Freight, LLC | Referral Agreement, dated July 15, 2022 | | |
| 28 | American First Finance Inc. | American First Finance Inc.<br>8585 N. Stemmons Fwy, Suite N-1000<br>Dallas, TX 75247 | Franchise Group. Inc. | Referral Agreement | | |
| 29 | Amy Ficken | Amy Ficken<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 28, 2024 | | |
| 30 | Amy Ficken | Amy Ficken<br>[Address on File] | Franchise Group, Inc. | Offer Letter, dated August 5, 2021 | | |
| 31 | Amy Redin | Amy Redin<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 7, 2024 | | |
| 32 | Amy Redin | Amy Redin<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 7, 2024 | | |
| 33 | Andrea S Jones | Andrea S Jones<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated March 5, 2020 | | |
| 34 | Andrew Kaminsky | Andrew Kaminsky<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2024 | | |
| 35 | Andrew Kaminsky | Andrew Kaminsky<br>[Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated October 2, 2019 | | |
| 36 | Andrew Laudato | Andrew Laudato<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated June 15, 2020 | | |
| 37 | Andrew Laurence | Andrew Laurence<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2024 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 38 | Andrew Laurence | Andrew Laurence [Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated October 2, 2019 | | |
| 39 | Angle Gully LLC | Angle Gully LLC c/o Newcastle Retail Management, LLC 150 North Michigan Ave. Chicago, IL 60601 | Vitamin Shoppe Industries LLC | Lease, dated December 20, 2014 | 0756 | 4/30/2025 |
| 40 | Anthony Block-Belmonte | Anthony Block-Belmonte [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 14, 2021 | | |
| 41 | ArcVision, Inc. | ArcVision, Inc. 1950 Craig Road, #300 St. Louis, MO 63146 | PSP Stores, LLC | Pet Supplies Plus Architect Agreement | | |
| 42 | Armory Racine Corporation | Armory Racine Corporation 1210 S. Indiana Ave, #5907 Chicago, IL 60605 | American Freight, LLC | Assignment of Lease Agreement, dated November 9, 2022 | 286 | 4/30/2025 |
| 43 | Asset Strategies Group, LLC | Asset Strategies Group, LLC 501 W Schrock Rd, Suite 201 Westerville, OH 43081 | American Freight, LLC | Master Services Agreement, dated October 24, 2023 | | |
| 44 | Asset Strategies Group, LLC | Asset Strategies Group, LLC 501 West Schrock Road, Suite 201 Westerville, OH 43081 | American Freight, LLC | Lease Management Services Agreement, dated October 24, 2023 | | |
| 45 | Assurant Service Protection, Inc. | Assurant Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Amendment No. 3 to Statement of Work No. 1, dated October 06, 2021 | | |
| 46 | Assurant Service Protection, Inc. | Assurant Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Statement of Work No. 2 to Master Services Agreement - Aftermarket Service Contract Program, dated July 23, 2021 | | |
| 47 | Assurant Service Protection, Inc. | Assurant Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 48 | Assurant Service Protection, Inc. | Assurant Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Amendment No. 2 to Statement of Work No. 1, dated September 23, 2021 | | |
| 49 | Atlanticus Services Corporation | Atlanticus Services Corporation Five Concourse Parkway, Suite 300 Atlanta, GA 30328 | Franchise Group. Inc. | Reconciliation Agreement, dated May 4, 2022 | | |
| 50 | Atlas Security Service, Inc. | Atlas Security Service, Inc. 1309 E. Republic Road, Suite B Springfield, MO 65804 | American Freight, LLC | Standard Commercial Security Agreement, dated October 06, 2021 | | |
| 51 | Baker Bunch Inc. | Baker Bunch Inc. 15348 9th Ave. Phoenix, IL 60426 | American Freight, LLC | Preferred Delivery Services Agreement, dated May 2, 2024 | | |
| 52 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Newco, LLC | Sublease Agreement | 17<br><br>55<br><br>65 | 5/20/2025 |
| 53 | BC Deliveries LLC | BC Deliveries LLC 1712 Peardale Rd Columbus, OH 43229 | American Freight, LLC | Preferred Delivery Services Agreement, dated May 10, 2024 | | |
| 54 | BCDC Portfolio Owner LLC | BCDC Portfolio Owner LLC c/o Oak Street Capital, LLC 30 N. LaSalle St., Suite 4140 Chicago, IL 60602 Attn: Asset Management<br><br>BCDC Portfolio Owner LLC c/o Oak Street Capital, LLC 30 N. LaSalle St., Suite 4140 Chicago, IL 60602 Attn: Heba Elayan<br><br>Kelley Drye & Warren LLP 3 World Trade Center 175 Greenwich Street New York, NY 10007 Attn: Robert L. LeHane | Franchise Group. Inc. | Unconditional Guaranty of Payment and Performance, dated June 17, 2022 | | 3/31/2025 |
| 55 | BCHQ Owner LLC | BCHQ Owner LLC c/o Oak Street Capital, LLC 30 N. LaSalle St., Suite 4140 Chicago, IL 60602 Attn: Asset Management<br><br>BCHQ Owner LLC c/o Oak Street Capital, LLC 30 N. LaSalle St., Suite 4140 Chicago, IL 60602 Attn: Heba Elayan<br><br>Kelley Drye & Warren LLP 3 World Trade Center 175 Greenwich Street New York, NY 10007 Attn: Robert L. LeHane | Franchise Group. Inc. | Unconditional Guaranty of Payment and Performance, dated August 2, 2022 | | 3/31/2025 |
| 56 | Big Buddy's Moving Company LLC | Big Buddy's Moving Company LLC 7870 Axton Rd. Axton, VA 24054 | American Freight, LLC | Preferred Delivery Services Agreement, dated December 29, 2023 | | |
| 57 | Big Burns Moving LLC | Big Burns Moving LLC 3140 Jackson Dr Holiday, FL 34691 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 14, 2024 | | |
| 58 | Bi-Rite Holdings, LLC | Bi-Rite Holdings, LLC 662 Howard Avenue Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC Franchise Group Inc. | Settlement Agreement and Release, dated May 10, 2024 | | |
| 59 | BMA Springhurst LLC | BMA Springhurst LLC c/o Marquee Capital 301 N Broadway, Suite 300 Milwaukee, WI 53202 | Vitamin Shoppe Industries, LLC | Agreement of Lease dated,  November 17, 2011 | 590 | 5/1/2025 |
| 60 | BMH PRIME 97, LLC | BMH PRIME 97, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 23, 2022 | 645 | |
| 61 | BMH-FAN 43, LLC | BMH-FAN 43, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated January 30, 2020 | 612 | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 62 | BMH-FAN 44, LLC | BMH-FAN 44, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated January 30,  2020 | 603 | |
| 63 | BMH-FAN 51, LLC | BMH-FAN 51, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated January 30, 2020 | 609 | |
| 64 | BMH-NEW 58, LLC | BMH-NEW 58, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 17, 2021 | 620 | |
| 65 | BMH-NEW 61, LLC | BMH-NEW 61, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated March 5, 2021 | 617 | |
| 66 | BMH-NEW 62, LLC | BMH-NEW 62, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated February 21, 2022 | 641 | |
| 67 | BMH-NEW 69, LLC | BMH-NEW 69, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated March 1, 2022 | 640 | |
| 68 | BMH-NEW 92, LLC | BMH-NEW 92, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated November 1, 2022 | 648 | |
| 69 | BMH-RCL 34, LLC | BMH-RCL 34, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 23, 2019 | 311 | |
| 70 | BMH-RCL 36, LLC | BMH-RCL 36, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 23, 2019 | 310 | |
| 71 | BMH-RCL 41, LLC | BMH-RCL 41, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 23, 2019 | 305 | |
| 72 | BMH-TB 73, LLC | BMH-TB 73, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020 | 5 | |
| 73 | BMH-TB 77, LLC | BMH-TB 77, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020 | 13 | |
| 74 | BMH-TNM 31, LLC | BMH-TNM 31, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated February 20, 2017 | 377 | |
| 75 | BMH-WF TX 67, LLC | BMH-WF TX 67, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 23, 2022 | 643 | |
| 76 | BoardVantage, Inc. | BoardVantage, Inc.<br>4300 Bohannon Drive, Suite 110<br>Menlo Park, CA 94025 | Vitamin Shoppe Industries LLC | Services Agreement, dated August 5, 2016 | | |
| 77 | Boswell Avenue I, LLC | Boswell Avenue I, LLC<br>c/o Marx Realty & Improvement Co. Inc.,<br>155 East 44th Street , 7th Floor<br>New York, NY 10017 | Vitamin Shoppe Industries, LLC | Lease Agreement, dated November 2, 2012 | 650 | 4/30/2025 |
| 78 | Bradford D Gooch | Bradford D Gooch<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 1, 2020 | | |
| 79 | Brain Simpkins | Brain Simpkins<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 80 | Brandon Finkes | Brandon Finkes<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 81 | Brent Jeffrey | Brent Jeffrey<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated February 20, 2024 | | |
| 82 | Brent Jeffrey | Brent Jeffrey<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 17, 2021 | | |
| 83 | Brian Benge | Brian Benge<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 12, 2024 | | |
| 84 | Brian Hoke | Brian Hoke<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 30, 2023 | | |
| 85 | Brian Hoke | Brian Hoke<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated February 23, 2021 | | |
| 86 | Brian Kahn | Brian Kahn<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated January 19, 2024 | | |
| 87 | Brixmor Burlington Square LLC | Brixmor Burlington Square LLC c/o Brixmor<br>Property Group<br>200 Ridge Pike, Suite 100C<br>Conshohocken, PA 19428 | Vitamin Shoppe Industries LLC | Lease, dated December 30, 2015 | 0861 | 5/31/2025 |
| 88 | Brown's Moving & Delivery Service LLC | Brown's Moving & Delivery Service LLC<br>623 Steger Drive<br>Duncanville, TX 75116 | American Freight, LLC | Preferred Delivery Services Agreement, dated April 18, 2024 | | |
| 89 | Bryn Mawr Plaza Associates | Bryn Mawr Plaza Associates<br>c/o Baker Properties, Inc.<br>One Town Place, Suite 100<br>Bryn Mawr, PA 19010 | Vitamin Shoppe Industries LLC | Lease, dated February 09, 1999 | 0049 | 4/30/2025 |
| 90 | Buddy Mac Four, LLC | Buddy Mac Four, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 31, 2015 | 491 | |
| 91 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 E Centre Park Blvd., Suite 101<br>Desoto, TX 75115 | Buddy's Newco, LLC | Sublease Agreement, dated July, 1 2021 | 4<br>5<br>8<br>13 | 5/20/2025 |
| 92 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Development Agreement, dated July 1, 2014 | | |
| 93 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Second Amendment to Buddy's Franchising and Licensing Development Agreement, dated May 10, 2019 | | |
| 94 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Third Amendment to Buddy's Franchising and Licensing Development Agreement, dated October 6, 2019 | | |
| 95 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Fourth Amendment to Buddy's Franchising and Licensing Development Agreement, dated December 1, 2019 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 96 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX | Buddy's Franchising and Licensing LLC | Fifth Amendment to Buddy's Franchising and Licensing Development Agreement, dated January 27, 2020 | | |
| 97 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX | Buddy's Franchising and Licensing LLC | Sixth Amendment to Buddy's Franchising and Licensing Development Agreement, dated December 10, 2020 | | |
| 98 | Buddy Mac Nine, LLC | Buddy Mac Nine, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated May 13, 2016 | 494 | |
| 99 | Buddy Mac Nineteen, LLC | Buddy Mac Nineteen, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated June 26, 2020 | 615 | |
| 100 | Buddy Mac One, LLC | Buddy Mac One, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated February 2, 2015 | 488 | |
| 101 | Buddy MAC Seventeen, LLC | Buddy MAC Seventeen, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated May 16, 2019 | 339 | |
| 102 | Buddy Mac Twelve, LLC | Buddy Mac Twelve, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 1, 2016 | 497 | |
| 103 | Buddy Mac Twenty-One, LLC | Buddy Mac Twenty-One, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated October 4, 2019 | 432 | |
| 104 | Buddy Mac Two, LLC | Buddy Mac Two, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 21, 2015 | 489 | |
| 105 | Buddy's Rolico, LLC | Buddy's Rolico, LLC 662 Howard Avenue Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC Franchise Group Inc. | Settlement Agreement and Release, dated May 10, 2024 | | |
| 106 | Buddy's Northwest, LLC | Buddy's Northwest, LLC c/o Vintage Partners 4705 S. Apopka Vineland Road, Suite 210 Orlando, FL 32819<br><br>Davis Gillet Mottern & Sims LLC 1230 Peachtree Street N.E., Suite 2445 Atlanta, GA 30309 Attn: Jerry Sims | Buddy's Newco, LLC | Guaranty of Second Amended and Restated Master Lease Agreement by and between Store Master Funding IV, LLC and Buddy's Northwest, LLC, dated November 3, 2015 | | 5/12/2025 |
| 107 | Bund Scenery USA, LLC | Bund Scenery USA, LLC c/o Realty Advisors International 904 Silver Spur Road, No. 266 Palos Verdes Peninsula, CA 90274 | Vitamin Shoppe Industries LLC | Lease, dated April 24, 2006 | 0322 | 5/19/2025 |
| 108 | Buxton Company, LLC | Buxton Company, LLC 2651 S. Polaris Dr. Fort Worth, TX 76137 | American Freight, LLC | Statement of Work, dated September 05, 2023 | | |
| 109 | Cambridge Goods, LLC | Cambridge Goods, LLC 3001 W. Big Beaver Road, Suite 324 Troy, MI 48084 | American Freight, LLC | Assignment of Lease Agreement, dated September 26, 2022 | 283 | 4/30/2025 |
| 110 | Care N Errands, LLC | Care N Errands, LLC 2345 Maxon Road Extension Schenectady, NY 12308 | American Freight, LLC | Preferred Delivery Services Agreement, dated January 10, 2024 | | |
| 111 | Carlos Lopez | Carlos Lopez [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated June 23, 2020 | | |
| 112 | Cates Moving LLC | Cates Moving LLC 205 Westside Dr. Tullahoma, TN 37388 | American Freight, LLC | Contract (Other), dated January 02, 2024 | | |
| 113 | Causeway Square, LLC | Causeway Square, LLC 1601 NE 123rd St., Suite 300 North Miami, FL 33181 | Vitamin Shoppe Industries LLC | Lease, dated August 10, 2010 | 0355 | 4/30/2025 |
| 114 | Chadds Ford Investors LP c/o Carlino Development | Chadds Ford Investors LP c/o Carlino Development, c/o Carlino Commercial Development, 100 Front Street, Suite 560 Conshohocken, PA 19428 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated May 8 2015 | 818 | 4/30/2025 |
| 115 | Chalet East, Inc. | Chalet East, Inc. 22936 NE 15th Place Sammamish, WA 98074 Attn: Barbara Blumenthal | Vitamin Shoppe Industries LLC | Lease, dated April 21, 2011 | 1025 | 4/30/2025 |
| 116 | Chris Matuska | Chris Matuska [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 5, 2024 | | |
| 117 | Chris Matuska | Chris Matuska [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated March 5, 2024 | | |
| 118 | Chris Rowland | Chris Rowland [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated November 16, 2021 | | |
| 119 | Christopher Ardelea | Christopher Ardelea [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 7, 2024 | | |
| 120 | Chuck's Delivery Services LLC | Chuck's Delivery Services LLC 1545 W 44th Street Erie, PA 16509 | American Freight, LLC | Preferred Delivery Services Agreement, dated February 27, 2024 | | |
| 121 | Cintas Fire Protection | Cintas Fire Protection 2929 W. Clarendon Ave. Phoenix, AZ 85017 | Vitamin Shoppe Industries LLC | Fire Protection Services Agreement, dated June 30, 2017 | | |
| 122 | Colonel Sun LLC | Colonel Sun LLC 3718 N 36th St. Tacoma, WA 98407 | Vitamin Shoppe Industries, LLC | Commercial Lease dated, February 21, 2003 | 1006 | 4/30/2025 |
| 123 | Concur Technologies, Inc. | Concur Technologies, Inc. 62157 COLLECTIONS CENTER DRIVE Chicago, IL 60693 | American Freight, LLC | Order Form for Cloud Services, dated September 29, 2020 | | |
| 124 | Connectria, LLC | Connectria, LLC 10845 Olive Blvd, Suite 300 St. Louis, MO 63141 | American Freight, LLC | Connectria Statement of Work Managed AWS Services, dated March 31, 2023 | | |
| 125 | Corporation Service Company | Corporation Service Company 2711 Centerville Road Wilmington, DE 19808 | Pet Supplies "Plus", LLC | Non-Disclosure Agreement, dated May 30, 2013 | | |
| 126 | Corporation Service Company | Corporation Service Company 2711 Centerville Road Wilmington, DE 19808 | Pet Supplies "Plus", LLC | Proposal Acceptance, dated June 3, 2013 | | |
| 127 | CVB, Inc. (Malouf) | CVB, Inc. (Malouf) 1525 West 2960 South Nibley, UT 84321 | American Freight, LLC | Limited Reseller Agreement, dated February 03, 2021 | | |
| 128 | Cylindo LLC | Cylindo LLC 44 Tehama Street San Francisco, CA 94105 | American Freight, LLC | Statement of Work 01, dated April 01, 2023 | | |
| 129 | Cylindo LLC | Cylindo LLC 44 Tehama Street San Francisco, CA 94105 | American Freight, LLC | Master Services Agreement, dated April 01, 2023 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 130 | Daniel Kim | Daniel Kim [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 12, 2024 | | |
| 131 | Daniel McNamara | Daniel McNamara [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 8, 2021 | | |
| 132 | Daniel Meyer | Daniel Meyer [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 3, 2024 | | |
| 133 | Daniel Meyer | Daniel Meyer [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 6, 2024 | | |
| 134 | Daryl Trumpy SP | Daryl Trumpy SP [Address on File] | American Freight, LLC | Preferred Delivery Services Agreement, dated December 29, 2023 | | |
| 135 | Deanna Heck | Deanna Heck [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 6, 2024 | | |
| 136 | Diane Galante | Diane Galante [Address on File] | WNW Franchising, LLC | Franchise Agreement, dated October 20, 2022 | | |
| 137 | Diane Galante | Diane Galante [Address on File] | WNW Franchising, LLC | Addendum to the Franchise Agreement, dated October 20, 2022 | | |
| 138 | Dina Trama | Dina Trama [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated June 26, 2023 | | |
| 139 | Dina Trama | Dina Trama [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 2, 2022 | | |
| 140 | DMCK Installation Inc. | DMCK Installation Inc. 942 N Marquette St Davenport, IA 52804 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 20, 2024 | | |
| 141 | DocuSign, Inc | DocuSign, Inc 221 Main Street, Suite1000 San Francisco, CA 94105 | American Freight Outlet Stores, LLC | Statement of Work, dated October 09, 2024 | | |
| 142 | Donna Taucher | Donna Taucher [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 9, 2024 | | |
| 143 | Donna Taucher | Donna Taucher [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 9, 2024 | | |
| 144 | DP Contour, LLC | DP Contour, LLC 511 W. French Place San Antonio, TX 78212 | American Freight Franchisor, LLC | Franchise Agreement, dated September 8, 2022 | | |
| 145 | DP Contour, LLC | DP Contour, LLC 511 W. French Place San Antonio, TX 78212 | American Freight Franchisor, LLC | Development Agreement, dated September 8, 2022 | | |
| 146 | dunnhumby Inc. | dunnhumby Inc. 3825 Edwards Road, Suite 600 Cincinnati, OH 45209 | Vitamin Shoppe Procurement Services, LLC | Master Software License and Service Agreement, dated August 24, 2018 | | |
| 147 | Elite Metro Corp | Elite Metro Corp [Address on File] | Buddy's Newco, LLC | Lease Renewal Agreement, dated March 1, 2025 | | |
| 148 | Elizabeth O Levy | Elizabeth O Levy [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 4, 2020 | | |
| 149 | Ellis Moving Company | Ellis Moving Company 3200 California Ave. Pittburgh, PA 15212 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 7,2024 | | |
| 150 | ENA SOLUTIONS INC. | ENA SOLUTIONS INC. 622 5 Avenue S.W., Suite 200 City of Calgary, Alberta | American Freight, LLC | ENA Solution Service Contract, dated February 24, 2023 | | |
| 151 | enVista Interactive Solutions, LLC | enVista Interactive Solutions, LLC 11555 N. Meridian Street, Suite 300 Carmel, IN 46032 | American Freight, LLC | Master Software as a Service Agreement, dated September 08, 2016 | | |
| 152 | Eric Seeton | Eric Seeton [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 28, 2024 | | |
| 153 | Eric Seeton | Eric Seeton [Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated October 2, 2019, as amended | | |
| 154 | Eric Seeton | Eric Seeton [Address on File] | Franchise Group, Inc. | Amendment to Executive Employment and Severance Agreement, dated February 2, 2024 | | |
| 155 | Eustis Covenant Group LLC | Eustis Covenant Group LLC 2460 Paseo Verde Parkway, Suite 145 Henderson, NV 89074 | Vitamin Shoppe Industries LLC | Lease, dated March 25, 2015 | 0764 | 5/19/2025 |
| 156 | EZ Wireless of Central Florida, Inc. | EZ Wireless of Central Florida, Inc. | Buddy's Newco, LLC | Lease Agreement, dated March 1, 2013 | | |
| 157 | Feasterville Realty Associates, LP | Feasterville Realty Associates, LP c/o Abrams Realty & Development 310 Yorktown Plaza Elkins Park, PA 19027 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated May 7, 2015 | 835 | 4/30/2025 |
| 158 | Federal Warranty Service Corporation | Federal Warranty Service Corporation 260 Interstate North Circle, SE Atlanta, GA 30339 | American Freight, LLC | Statement of Work No. 2 to Master Services Agreement - Aftermarket Service Contract Program, dated November 12, 2021 | | |
| 159 | Federal Warranty Service Corporation | Federal Warranty Service Corporation 260 Interstate North Circle, SE Atlanta, GA 30339 | American Freight, LLC | Amendment No. 2 to the Master Services Agreement, dated October 6, 2021 | | |
| 160 | Federal Warranty Service Corporation | Federal Warranty Service Corporation 260 Interstate North Circle, SE Atlanta, GA 30339 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 161 | Federal Warranty Service Corporation | Federal Warranty Service Corporation 260 Interstate North Circle, SE Atlanta, GA 30339 | American Freight, LLC | Amendment No. 2 to Statement of Work No. 1, dated August 1, 2023 | | |
| 162 | Federal Warranty Service Corporation | Federal Warranty Service Corporation 260 Interstate North Circle, SE Atlanta, GA 30339 | American Freight, LLC | Amendment No. 1 to the Master Services Agreement and Statement of Work No. 1, dated September 23, 2021 | | |
| 163 | Federal Warranty Service Corporation | Federal Warranty Service Corporation 260 Interstate North Circle Atlanta, GA 30339 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 164 | Federal Warranty Service Corporation | Federal Warranty Service Corporation 260 Interstate North Circle, SE Atlanta, GA 30339 | American Freight, LLC | Amendment No. 3 to Statement of Work No. 1, dated November 27, 2023 | | |
| 165 | Federal Warranty Service Corporation | Federal Warranty Service Corporation 260 Interstate North Circle, SE Atlanta, GA 30339 | American Freight, LLC | Statement of Work No. 1 to Master Services Agreement Service Contract Program, dated July 23, 2021 | | |
| 166 | Fire Movers of Raleigh LLC | Fire Movers of Raleigh LLC 401 Point View Court Wilmington, NC 28411 | American Freight, LLC | Preferred Delivery Services Agreement, dated January 29,2024 | | |
| 167 | Fivetran Inc | Fivetran Inc 1221 Broadway, Suite 2400 Oakland, CA 94612 | American Freight, LLC | Master Subscription Agreement, dated February 1, 2023 | | |
| 168 | Fivetran Inc | Fivetran Inc 1221 Broadway, Suite 2400 Oakland, CA 94612 | American Freight, LLC | Statement of Work, dated January 31, 2024 | | |
| 169 | FM Integrated | FM Integrated 15974 Frederick Road Woodbine, MD 21797 | American Freight, LLC | Master Services Agreement, dated September 28,2023 | | |
| 170 | Fordham Retail Associates, LLC | Fordham Retail Associates, LLC 999 Waterside Drive Suite 2300 Norfolk, VA 23510 | Vitamin Shoppe Industries LLC | Lease, dated January 11, 2010 | 0512 | 5/19/2025 |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 171 | FreedomPay, Inc. | FreedomPay, Inc.<br>100 Matsonford Road, Building 5, Suite 100<br>Radnor, PA 19087 | American Freight Outlet Stores, LLC | FreedomPay Secure Switching Product Agreement, dated October 05, 2016 | | |
| 172 | Full Faith Moving Services, LLC | Full Faith Moving Services, LLC<br>1537 Salt Spring Road<br>Youngstown, OH 44509 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 7, 2024 | | |
| 173 | FullContact, Inc. | FullContact, Inc.<br>1580 N. Logan St., Ste. 660, PMB 45057<br>Denver, CO 80203 | American Freight, LLC | FullContact Data Services Agreement, dated December 1,2023 | | |
| 174 | Galleria Alpha Plaza, Ltd. | Galleria Alpha Plaza, Ltd.<br>2001 Preston Road<br>Plano, TX 75093 | Vitamin Shoppe Industries LLC | Lease, 0905-Alpha Road, as amended by and between Vitamin Shoppe Industries LLC and Galleria Alpha Plaza, Ltd. | 0905 | 5/19/2025 |
| 175 | GBTWORLD1 | GBTWORLD1<br>10126 Challenger Circle<br>Spring Valley, CA 91978 | PSP Franchising, LLC | Assignment and Assumption of Mult-Unit Agreement and Franchise Agreement, dated December 21, 2021 | | 5/14/2025 |
| 176 | GBTWORLD1 | GBTWORLD1<br>10126 Challenger Circle<br>Spring Valley, CA 91978 | PSP Franchising, LLC | Equipment Sublease Agreement, dated March 9, 2024 | | 5/14/2025 |
| 177 | Gearhearts Moving & Storage Inc. | Gearhearts Moving & Storage Inc.<br>812 N 7th Ave.<br>Altoona, PA 16601 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 18, 2024 | | |
| 178 | Geostar Communications, LLC | Geostar Communications, LLC<br>Attn: John Fartelly | American Freight, LLC | Master Service Agreement, dated December 22, 2020 | | |
| 179 | Gexa Energy, LP | Gexa Energy, LP<br>601 Travis St., Ste 1400<br>Houston, TX 77002 | American Freight, LLC | Business Electricity Authorization, dated July 08, 2024 | | |
| 180 | Global Amici, Inc. | Global Amici, Inc.<br>8996 Miramar Rd.<br>Suite #304<br>San Diego, CA 92126 | PSP Group, LLC | Private Brand Products Agreement | | |
| 181 | Granite Telecommunications, LLC | Granite Telecommunications, LLC<br>100 Newport Avenue Extension<br>Quincy, MA 02171 | American Freight, LLC | Master Services Agreement, dated September 30, 2011 | | 4/30/2025 |
| 182 | Great Hills Retail Inc. | Great Hills Retail Inc. c/o Heitman LLC<br>191 N. Wacker Dr., Suite 2500<br>Chicago, IL 60606 | Vitamin Shoppe Industries LLC | Lease, dated December 19, 2007 | 0386 | 5/31/2025 |
| 183 | Greg Frye | Greg Frye<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 5, 2024 | | |
| 184 | Halo Service Solutions Ltd | Halo Service Solutions Ltd<br>86 Eastburn Tower Eastburn Drive<br>Falkirk, Scotland FK1 1TX | American Freight, LLC | Terms and Conditions of Business, dated November 18, 2021 | | |
| 185 | HAMC College Center LLC | HAMC College Center LLC<br>c/o Colliers International<br>3 Park Plaza, Suite 1200<br>Irvine, CA 92614 | Vitamin Shoppe Industries LLC | Lease, dated November 15, 2007 | 0359 | 4/30/2025 |
| 186 | Harley's Home, LLC | Harley's Home, LLC<br>7230 171st Street, #651<br>Tinley Park, IL 60477 | WNW Franchising, LLC | Assignment and Assumption of Franchise Agreement, dated November 2, 2022 | | |
| 187 | Hayley Henderly | Hayley Henderly<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 9, 2024 | | |
| 188 | Hays Companies | Hays Companies<br>6711 Columbia Gateway Drive, Suite 450<br>Columbia, MD 21046 | Vitamin Shoppe Industries LLC | Delegate Agreement, dated June 13, 2014 | | |
| 189 | Hays Companies | Hays Companies BMO-88<br>PO BOX 1414<br>Minneapolis, MN 55402-1414 | Vitamin Shoppe Industries LLC | HIPAA Business Associate Agreement, dated September 6, 2013 | | |
| 190 | Hector Vega | Hector Vega<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 12, 2024 | | |
| 191 | Heidi Char | Heidi Char<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 4, 2021 | | |
| 192 | Herlihy Moving and Storage Inc. | Herlihy Moving and Storage Inc.<br>747 Marietta Rd.<br>Chillicothe, OH 45601 | American Freight, LLC | Contract (Other), dated January 16, 2024 | | |
| 193 | HireRight, LLC | HireRight, LLC<br>3349 Michelson Dr, Suite 150<br>Irvine, CA 92612 | American Freight Management Company, LLC | Amendment to Contract, dated December 28, 2022 | | |
| 194 | HireRight, LLC | HireRight, LLC<br>3349 Michelson Dr, Suite 150<br>Irvine, CA 92612 | American Freight Management Company, LLC | Master Services Agreement, dated November 22, 2016 | | |
| 195 | HM Hillcroft Westheimer Ltd. | HM Hillcroft Westheimer Ltd.<br>3810 Westheimer<br>Houston, TX 77027 | Vitamin Shoppe Industries, LLC | Sublease Agreement  dated, May 30, 2003 | 185 | 4/30/2025 |
| 196 | Hudson Hot Shots Moving LLC | Hudson Hot Shots Moving LLC<br>8619 Bolton Ave.<br>Hudson, FL 34667 | American Freight, LLC | Contract (Other), dated January 11, 2024 | | |
| 197 | Incentify, LLC | Incentify, LLC<br>125 Sierra St<br>El Segundo, CA 90245 | Franchise Group, Inc. | Service Agreement, dated April 20, 2022 | | |
| 198 | Insight Global, LLC | Insight Global, LLC<br>4170 Ashford Dunwoody Road, Suite 250<br>Atlanta, GA 30319 | American Freight, LLC | Amendment to Contract, dated February 08, 2023 | | |
| 199 | Insight Global, LLC | Insight Global, LLC<br>4170 Ashford Dunwoody Road, Suite 250<br>Atlanta, GA 30319 | American Freight, LLC | Master Services Agreement 01, dated June 14, 2019 | | |
| 200 | ISG Transportation LLC | ISG Transportation LLC<br>194 Rock Terrace Circle<br>Helena, AL 35080 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 9, 2024 | | |
| 201 | Jack Rabbit Transportation, LLC | Jack Rabbit Transportation, LLC<br>505 Frederick Ave<br>Las Vegas, NV 89106 | American Freight, LLC | Contract (Other), dated February 15, 2024 | | |
| 202 | James C Abbatemarco | James C Abbatemarco<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 5, 2020 | | |
| 203 | Jason Mattes | Jason Mattes<br>[Address on File] | Franchise Group, Inc. | Independent Contractor Services Agreement, dated April 12, 2024 | | |
| 204 | Jason Mattes | Jason Mattes<br>[Address on File] | Franchise Group, Inc. | Agreement and General Release, dated April 12, 2024 | | |
| 205 | Jason Springer | Jason Springer<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 17, 2021 | | |
| 206 | Jason's Delivery SP | Jason's Delivery SP<br>7718 Teal Glen Dr.<br>Mooringsport, LA 71060 | American Freight, LLC | Contract (Other), dated January 10, 2024 | | |
| 207 | Jay Khan | Jay Khan<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 208 | Jeff Seghi | Jeff Seghi<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 209 | Jeff Seghi | Jeff Seghi<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 210 | Jeff Suttle | Jeff Suttle [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 1, 2021 | | |
| 211 | Jeffery Gross | Jeffery Gross [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 4, 2021 | | |
| 212 | Jeffrey M Van Orden | Jeffrey M Van Orden [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 21, 2023 | | |
| 213 | Jeffrey Rayes | Jeffrey Rayes [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 7, 2021 | | |
| 214 | Jenkins Rental LLC | Jenkins Rental LLC 2 Steeplechase Trail Longview, TX 75605 | American Freight, LLC | Assignment of Lease Agreement, dated July 10, 2021 | | 3/31/2025 |
| 215 | Jerry Troupe II | Jerry Troupe II [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 8, 2021 | | |
| 216 | Jim Brownell | Jim Brownell [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 217 | JJ Global Solutions Corp | JJ Global Solutions Corp 6868 Washington Ave. S Eden Prairie, MN 55344 | American Freight, LLC | Contract (Other), dated January 16, 2024 | | |
| 218 | JN Harris Enterprises, LLC | JN Harris Enterprises, LLC 4624 Warrensville Center Road North Randall, OH 44128 | American Freight, LLC | Contract (Other), dated February 26, 2024 | | |
| 219 | Joe Kaminski | Joe Kaminski [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 220 | Joe Spires | Joe Spires [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 20, 2024 | | |
| 221 | John Batten | John Batten [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 222 | John Dandash | John Dandash [Address on File] | PSP Franchising, LLC | Multi-Unit Agreement, dated July 20, 2021 | | 5/14/2025 |
| 223 | John Dandash | John Dandash [Address on File] | PSP Franchising, LLC | Franchise Agreement, dated July 20, 2021 | | 5/14/2025 |
| 224 | John Dandash | John Dandash [Address on File] | PSP Franchising, LLC | Addendum to the PSP Franchising, LLC Franchise Agreement, dated July 20, 2021 | | 5/14/2025 |
| 225 | John Gayton | John Gayton [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated April 2, 2024 | | |
| 226 | John Sessoms | John Sessoms [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 8, 2024 | | |
| 227 | Jon Phillips | Jon Phillips [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 228 | Jonathan Arsenault | Jonathan Arsenault [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated January 19, 2024 | | |
| 229 | Jonathan Arsenault | Jonathan Hugh Arsenault [Address on File] | Franchise Group, Inc. | Incremental Severance Agreement, dated October 10, 2023 | | |
| 230 | Jonathan Waters | Jonathan Waters [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 231 | Jonathan Waters | Jonathan Waters [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 1, 2024 | | |
| 232 | Joseph Gazzo | Joseph Gazzo [Address on File] | Buddy's Franchising and Licensing, LLC Franchise Group Inc. | Settlement Agreement and Release, dated May 10, 2024 | | |
| 233 | Josh Goldstein | Josh Goldstein [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 7, 2021 | | |
| 234 | K&M Moving and Logistics LLC | K&M Moving and Logistics LLC 1727 Brookhurst Way Grants Pass, OR 97527 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 6, 2024 | | |
| 235 | Kamerade Group, LLC | Kamerade Group, LLC 58 Brookfield Lenox Road Tifton, GA 31794 | Buddy's Newco, LLC | Consent to Sublease Agreement, dated March 26, 2014 | 386 | 5/31/2025 |
| 236 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Newco, LLC | Sublease Agreement | 1061 | 5/20/2025 |
| 237 | Karl Finley | Karl Finley [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 238 | Katie McComiskey | Katie McComiskey [Address on File] | Franchise Group, Inc. | Independent Contractor Services Agreement, dated July 24, 2024 | | |
| 239 | KAWIPS Delaware Cuyahoga Falls, LLC | KAWIPS Delaware Cuyahoga Falls, LLC 1590-D Rosecrans Ave. PMB#259 Manhattan Beach, CA 90266 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated December 19, 2014 | 788 | 5/1/2025 |
| 240 | Ken Peters | Ken Peters [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 4, 2024 | | |
| 241 | Kenneth Todd Evans | Kenneth Todd Evans [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2024 | | |
| 242 | Kenneth Todd Evans | Kenneth Todd Evans [Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated August 1, 2020, as amended | | |
| 243 | Keshia Rodriguez | Keshia Rodriguez [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 244 | Kishore Patel | Kishore Patel [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 245 | KK-BTC LLC | KK-BTC LLC C/O The Summit Commercial Group Inc. 5839 Via Verona View Colorado Springs, CO 80919 | Vitamin Shoppe Industries LLC | Lease, dated April 21, 2006 | 0321 | 5/19/2025 |
| 246 | Knight and Day Delivery | Knight and Day Delivery 104 Pinewood Sq. Pittsburgh, PA 15235 | American Freight, LLC | Preferred Delivery Services Agreement, dated July 10, 2024 | | |
| 247 | Korpack, Inc. | Korpack, Inc. 290 Madsen Drive Bloomingdale, IL 60108 | American Freight Outlet Stores, LLC | Procurement Terms and Conditions, dated July 01, 2019 | | |
| 248 | Kris Harris | Kris Harris [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated June 21, 2024 | | |
| 249 | Kriser's Feeding Pets For Life, LLC | Kriser's Feeding Pets For Life, LLC 1906 Olympic Blvd. Santa Monica, CA 90404 Attn: Ken Grouf with a copy to: The Law Offices of William M. Holzman 666 Dundee Road, Suite 1904 Northbrook, IL 60062 Attn: William M. Holzman | Vitamin Shoppe Industries LLC | Sublease, dated June 8, 2016 | 0386 | 5/31/2025 |
| 250 | Kristen Barrett | Kristen Barrett [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 13, 2021 | | |
| 251 | Kroll Information Assurance, LLC | Kroll Information Assurance, LLC 55 East 52nd Street, 31st Floor New York, NY 10055 | American Freight, LLC | Master Services Agreement 01, dated August 15, 2022 | | |
| 252 | Kyle Scholes | Kyle Scholes [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated March 5, 2024 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 253 | Kyle Scholes | Kyle Scholes [Address on File] | Franchise Group, Inc. | Offer Letter, dated April 12, 2023 | | |
| 254 | Lahaina Gateway Property Owner, L.P. | Lahaina Gateway Property Owner, L.P. 5743 Corsa Avenue, Suite 215 Westlake Village, CA 91362 | Vitamin Shoppe Industries LLC | Lease, dated October 14, 2008 | 0397 | 4/30/2025 |
| 255 | Laura Coffey | Laura Coffey [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated November 30, 2020 | | |
| 256 | Laurel Lakes, LLC | Laurel Lakes, LLC 2800 Quarry LakeDrive, Suite 340 Baltimore, MD 21209 | Vitamin Shoppe Industries LLC | Lease, 0903-Laurel (Relocation), as amended by and between Vitamin Shoppe Industries LLC and Laurel Lakes, LLC | 0903 | 5/19/2025 |
| 257 | Lauren Pollard | Lauren Pollard [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 258 | Lauri Joffe Turjeman | Lauri Joffe Turjeman [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 7, 2024 | | |
| 259 | Lauri Joffe Turjeman | Lauri Joffe Turjeman [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 7, 2024 | | |
| 260 | Lee Wright | Lee Wright [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated March 5, 2020 | | |
| 261 | Lee Wright | Lee Wright [Address on File] | Vitamin Shoppe Industries, LLC | Executive Employment and Severance Agreement, dated May 24, 2023 | | |
| 262 | Lisa J O'Dougherty | Lisa J O'Dougherty [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated November 23, 2020 | | |
| 263 | Lori Wagner | Lori Wagner [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated April 28, 2020 | | |
| 264 | Lustig Realty Corp | Lustig Realty Corp 312 Washington Street, Suite # 2, Hoboken, NJ 070730 | Vitamin Shoppe Industries LLC | Lease, dated March 7, 2023 | 0894 | 4/30/2025 |
| 265 | Lydia Brown | Lydia Brown [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated March 1, 2024 | | |
| 266 | Lydia Brown | Lydia Brown [Address on File] | Franchise Group, Inc. | Offer Letter, dated March 1, 2022 | | |
| 267 | M&M Trucking 7 | M&M Trucking 7 820 Hawkins Blvd, Ste O El Paso, TX 79915 | American Freight, LLC | Contract (Other), dated December 26, 2023 | | |
| 268 | Mason Dixon Movers, LLC | Mason Dixon Movers, LLC 4790 Tom Cat Rd. Gadsden, AL 35903 | American Freight, LLC | Preferred Delivery Services Agreement, dated January 1, 2024 | | |
| 269 | Matthew Devitt | Matthew Devitt [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 5, 2021 | | |
| 270 | McGriff Insurance Services, Inc. | McGriff Insurance Services, Inc. 4309 Emperor Blvd, Ste 300 Durham, NC 27703-8046 | Franchise Group. Inc. | First Amendment to Services Agreement, dated June 1, 2021 | | |
| 271 | MDJ Logistica LLC | MDJ Logistica LLC 300 Crabapple Lane Beaver Falls, PA 15010 | American Freight, LLC | Preferred Delivery Services Agreement, dated February 29, 2024 | | |
| 272 | Meadowlands Fire Protection | Meadowlands Fire Protection 348 New County Road Secaucus, NJ 07094 | Vitamin Shoppe Industries LLC | Proposal for 2014 Quarterly Inspection, dated May 22, 2014 | | |
| 273 | Meadowlands Fire Protection | Meadowlands Fire Protection 348 New County Road Secaucus, NJ 07094 | Vitamin Shoppe Industries LLC | Proposal for 2017 Quarterly Inspection | | |
| 274 | Meadowlands Fire Protection Corp. | Meadowlands Fire Protection Corp. 348 New County Road Secaucus, NJ 07094 | Vitamin Shoppe Industries LLC | Service Agreement Renewal Quote, dated January 16, 2018 | | |
| 275 | Meadowlands Fire Protection Corp. | Meadowlands Fire Protection Corp. 348 New County Rd Secaucus, NJ 07094 | Vitamin Shoppe Industries, LLC | Proposal for 2017 Quarterly Inspection | | |
| 276 | MEDIA WORKS, LTD. | MEDIA WORKS, LTD. 1425 Clarkview Road, Suite 500 Baltimore, MD 21209 | American Freight, LLC | Master Services Agreement, dated June 09, 2023 | | |
| 277 | Michael A. Jaffe | Michael A. Jaffe [Address on File] | Vitamin Shoppe Industries LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 2, 2020 | | |
| 278 | Michael Gray | Michael Gray [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 279 | Michael Gray | Michael Gray [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 280 | Michael Jordison | Michael Jordison [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 281 | Michelle Harding | Michelle Harding [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated November 21, 2021 | | |
| 282 | Michelle Wildman | Michelle Wildman [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 11, 2021 | | |
| 283 | MicroStrategy Services Corporation | MicroStrategy Services Corporation 1850 Towers Crescent Plaza Tysons Corner, VA 22182 | American Freight, LLC | Statement of Work, dated June 10, 2024 | | |
| 284 | Mightee Movers LLC | Mightee Movers LLC 102 Arlington Heights Dr. Lynchburg, VA 24501 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 20, 2024 | | |
| 285 | Mike Albert Leasing Inc. | Mike Albert Leasing Inc. 10340 Evendale Drive Cincinnati, OH 45241 | PSP Stores, LLC | Disposal Agreement, dated April 16, 2015 | | |
| 286 | Mike Albert Leasing Inc. | Mike Albert Leasing Inc. 10340 Evendale Drive Cincinnati, OH 45241 | PSP Stores, LLC | Services Agreement, dated April 16, 2015 | | |
| 287 | Mike Albert Leasing Inc. | Mike Albert Leasing Inc. 10340 Evendale Drive Cincinnati, OH 45241 | PSP Stores, LLC | Scheduled Services Maintenance Management Program, dated April 16, 2015 | | |
| 288 | Mike Albert Leasing Inc. | Mike Albert Leasing Inc. 10340 Evendale Drive Cincinnati, OH 45241 | PSP Stores, LLC | Specified Services Title & Licenses Programs, dated April 16, 2015 | | |
| 289 | Mike Albert, LLC | Mike Albert, LLC 90 Lighthouse Point Road Longboat Key, FL 34228 | PSP Stores, LLC | Master Purchase Agreement, dated February 21, 2019 | | |
| 290 | Mike Albert, LLC | Mike Albert, LLC 90 Lighthouse Point Road Longboat Key, FL 34228 | PSP Stores, LLC | Internal Statement of Work Specified Services, dated July 12, 2023 | | |
| 291 | Mike Albert, LLC | Mike Albert, LLC 90 Lighthouse Point Road Longboat Key, FL 34228 | PSP Stores, LLC | Internal Statement of Work Specified Services, dated July 29, 2024 | | |
| 292 | Mike Jordison | Mike Jordison [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 293 | Mike Lesso | Mike Lesso [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 294 | Mike Lesso | Mike Lesso [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 295 | Mike Ponkey | Mike Ponkey [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 7, 2021 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|------|--------------|---------------------|--------|--------------------|-------|----------------|
| 296 | Miles Tedder | Miles Tedder [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 6, 2021 | | |
| 297 | Milliman, Inc. | Milliman, Inc. 150 Clove Rd, 10th Fl Little Falls, NJ 07424 | Franchise Group. Inc. | Services Agreement, dated June 9, 2021 | | |
| 298 | MMS Group, LLC | MMS Group, LLC 662 Howard Avenue Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC Franchise Group Inc. | Settlement Agreement and Release, dated May 10, 2024 | | |
| 299 | Mood Media | Mood Media 2100 S. H. 35 Ste. 200 Austin, TX 18104 | PSP Stores, LLC | Mood Media Multi Territory Account Service Agreement, dated December 20, 2018 | | |
| 300 | Moovin & Groovin LLC | Moovin & Groovin LLC 2105 Neptune Court Bartlesville, OK 74006 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 9, 2024 | | |
| 301 | Movable, Inc. | Movable, Inc. 5 Bryant Park (1065 6th Avenue), 9th Floor New York, NY 10018 | Vitamin Shoppe Industries LLC | Movable, Inc. Standard Terms, dated May 5, 2017 | | |
| 302 | Muriel Gonzalez | Muriel Gonzalez [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 24, 2023 | | |
| 303 | Muriel Gonzalez | Muriel Gonzalez [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated November 28, 2020 | | |
| 304 | Mursi Kawasmy | Mursi Kawasmy [Address on File] | Buddy's Newco, LLC | Lease Extension Request, dated January 8, 2025 | | |
| 305 | Nadina Guglielmetti | Nadina Guglielmetti [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 1, 2020 | | |
| 306 | Neal P Panza | Neal P Panza [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated March 5, 2020 | | |
| 307 | Needham Chestnut Realty, LLC | Needham Chestnut Realty, LLC 1234 Boylston St. Chestnut Hill, MA 02467 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated March 26, 2014 | 754 | 4/30/2025 |
| 308 | Neil Rosen | Neil Rosen [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated August 16, 2020 | | |
| 309 | Nick Russo | Nick Russo [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 6, 2021 | | |
| 310 | Nick Russo | Nick Russo [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated February 24, 2023 | | |
| 311 | NISC UBP, LLC | NISC UBP, LLC 3131 Technology Drive NW Mandan, ND 58554 | American Freight, LLC | Professional Services Agreement, Utility Bills, dated November 9, 2020 | | |
| 312 | NISC UBP, LLC dba Capturis | NISC UBP, LLC dba Capturis 3131 Technology Drive NW Mandan, ND 58554 | American Freight, LLC | Confidential Amendment to Professional Services Agreement, dated January 31, 2018 | | |
| 313 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 314 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 315 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 316 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 317 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 318 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 319 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 320 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 321 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 322 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 323 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 324 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 325 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 326 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 327 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 328 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|------|-------------|---------------------|--------|--------------------|-------|----------------|
| 329 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 330 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 331 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 332 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 333 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 334 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 335 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 336 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 337 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 338 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 339 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 340 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 341 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 342 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 343 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 344 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 345 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 346 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 347 | NNN REIT, LP f/k/a National Retail Properties, LP | NNN REIT, LP 450 S. Orange Avenue Orlando, FL 32801 Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guaranty, dated March 31, 2022 | | |
| 348 | Noe Flores Sergio De La Cruz | Noe Flores [Address on File] Sergio De La Cruz [Address on File] | Buddy's Newco, LLC | Lease Agreement, dated March 7, 2013 | | |
| 349 | Oak Forest Group, LTD | Oak Forest Group, LTD P.O. Box 3449 Longview, TX 75606 | American Freight, LLC | Franchise Lease Agreement, dated 03/30/2021, as amended | | 3/31/2025 |
| 350 | ODP Business Solutions, LLC | ODP Business Solutions, LLC 6600 North Military Trail Boca Raton, FL 33496 | American Freight, LLC | ODP Business Solutions Supply Agreement, dated June 30, 2022 | | |
| 351 | On Demand Technologies, Inc dba OneRail | On Demand Technologies, Inc. dba OneRail 8427 Sothpark Circle SE, Ste 200 Orlando, FL 32819 | American Freight, LLC | PO or Purchase Agreement, dated June 18, 2024 | | |
| 352 | On Demand Technologies, Inc. (d/b/a OneRail) | On Demand Technologies, Inc. (d/b/a OneRail) 8427 Southpark Circle SW, Suite 200 Orlando, FL 32819 | American Freight, LLC | OneRail / American Freight, LLC Master Services Agreement, dated June 18, 2024 | | |
| 353 | OneTrust | OneTrust 1200 Abernathy Rd NE, Bldg 600 Atlanta, GA 30328 | American Freight, LLC | Statement of Work 01, dated March 06, 2023 | | |
| 354 | Onix Networking Corp | Onix Networking Corp 485 Lexington Avenue New York, NY 10017 | American Freight, LLC | Amendment to Onix Networking Customer Agreement, dated May 16, 2024 | | |
| 355 | Onix Networking Corp | Onix Networking Corp 1991 Crocker Road Westlake, OH 44145 | American Freight, LLC | Onix Enterprise Customer Agreement Google Cloud Services, dated May 16, 2024 | | |
| 356 | OnPoint Warranty Solutions LLC | OnPoint Warranty Solutions LLC 1400 Main St., Suite 132 Clarksville, IN 47129 | American Freight, LLC | Master Services Agreement, dated November 17, 2023 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 357 | OSOT Transportation LLC | OSOT Transportation LLC<br>3929 Baumberger Rd<br>Stow, OH 44224 | American Freight, LLC | Contract (Other), dated July 12, 2024 | | |
| 358 | OUTFRONT Media, LLC | OUTFRONT Media, LLC<br>405 Lexington Avenue, 17th Floor<br>New York, NY 10174 | Buddy's Newco, LLC | Sign Location Lease, dated June 13, 2017 | | |
| 359 | Paul Seeds | Paul Seeds<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated February 23, 2021 | | |
| 360 | Paychex, Inc. | Paychex, Inc.<br>911 Panorama Trail South<br>Rochester, NY 14625 | Franchise Group. Inc. | Paychex Strategic Account Partnership Agreement, dated October 14, 2022 | | |
| 361 | Pendleton Expediting, Inc. | Pendleton Expediting, Inc.<br>13201 E Oreil Rd.<br>Louisville, KY 40272 | American Freight, LLC | Contract (Other) dated January 31, 2024 | | |
| 362 | Philip Etter | Philip Etter<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 363 | Philip Etter | Philip Etter<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 364 | Rabih Awad | Rabih Awad<br>[Address on File] | American Freight, LLC | Assignment and Assumption of Subtenant's Interest and Obligations in Sublease, dated December 21, 2021 | 276 | 4/30/2025 |
| 365 | Races Working Men, RTR Inc. | Races Working Men, RTR Inc.<br>1619 Archer City Hwy 79<br>Wichita Falls, TX 76302 | American Freight, LLC | Contract (Other), dated January 16, 2024 | | |
| 366 | Rancho Dos Hermanos, LLC | Rancho Dos Hermanos, LLC<br>2655 First Street, Suite 245,<br>Simi Valley, CA 93065 | Vitamin Shoppe Industries, LLC | Agreement of Lease dated,  July 23, 2014 | 803 | 4/30/2025 |
| 367 | Randy Schoemann | Randy Schoemann<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 368 | RCG-PSC Camp Creek Owner, LLC | RCG-PSC Camp Creek Owner, LLC c/o RCG-Ventures LLC,<br>3060 Peachtree Road NW, Suite 400<br>Atlanta, GA 30305 | Vitamin Shoppe Industries LLC | Lease, dated August 27, 2003 | 0197 | 5/19/2025 |
| 369 | Reina VanDelft | Reina VanDelft<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 14, 2021 | | |
| 370 | Retail Logistics Excellence - RELEX Oy | Retail Logistics Excellence - RELEX Oy<br>Postintaival 7<br>00230 Helsinki, Finland | American Freight, LLC | RELEX Master Service Agreement, dated June 07, 2019 | | |
| 371 | RetailNext, Inc | RetailNext, Inc<br>60 S Market, Suite 310<br>San Jose, CA 95113 | American Freight, LLC | Statement of Work, dated May 15, 2023 | | |
| 372 | RetailNext, Inc. | RetailNext, Inc.<br>60 S. Market St.<br>San Jose, CA 95113 | American Freight, LLC | Master Services Agreement, dated May 15, 2023 | | |
| 373 | Ring Central, Inc. | Ring Central, Inc.<br>20 Davis Drive<br>Belmont, CA 94002 | American Freight, LLC | Master Services Agreement, dated June 20,2018 | | |
| 374 | Riskified Inc. | Riskified Inc.<br>220 5th Ave.,2nd Floor<br>New York, NY 10001 | American Freight Outlet Stores, LLC | Software as a Service Agreement, dated March 28, 2019 | | |
| 375 | Riverdale Square, LLC | Riverdale Square, LLC<br>61 West Palisade Avenue<br>Englewood, NJ 07631 | Vitamin Shoppe Industries, LLC | Lease, dated November 24, 2020 | 893 | 4/30/2025 |
| 376 | Robert Depew | Robert Depew<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 377 | Robert Depew | Robert Depew<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 14, 2024 | | |
| 378 | Roe Lawn Care, SP | Roe Lawn Care, SP<br>117 E 11th Street<br>Elmira Heights, NY 14093 | American Freight, LLC | Contract (Other), dated January 03, 2024 | | |
| 379 | Ron Allender | Ron Allender<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 380 | Rosebud VS Boca One, LLC | Rosebud VS Boca One, LLC<br>c/o Investments Limited,<br>215 North Federal Highway, Suite 1<br>Boca Raton, FL 33432 | Vitamin Shoppe Industries LLC | Lease, dated August 18, 2013 | 0618 | 4/30/2025 |
| 381 | Ryan Maietta | Ryan Maietta<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated October 24, 2024 | | |
| 382 | Salvatore Bruno | Salvatore Bruno<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated June 18, 2024 | | |
| 383 | Salvatore Bruno | Salvatore Bruno<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 18, 2021 | | |
| 384 | Samir Patel<br>Roshan Patel | Samir Patel<br>[Address on File]<br>Roshan Patel<br>[Address on File] | WNW Franchising, LLC | Multi-Unit Agreement, dated July 12, 2024 | | |
| 385 | Samir Patel<br>Roshan Patel | Samir Patel<br>[Address on File]<br>Roshan Patel<br>[Address on File] | WNW Franchising, LLC | Addendum to the WNW Franchising, LLC Multi Unit Agreement, dated July 12, 2024 | | |
| 386 | Samir Patel<br>Roshan Patel | Samir Patel<br>[Address on File]<br>Roshan Patel<br>[Address on File] | WNW Franchising, LLC | Franchise Agreement, dated July 12, 2024 | | |
| 387 | Samir Patel<br>Roshan Patel | Samir Patel<br>[Address on File]<br>Roshan Patel<br>[Address on File] | WNW Franchising, LLC | Addendum to the WNW Franchising, LLC Franchise Agreement, dated July 12, 2024 | | |
| 388 | Sanjiv Divatia | Sanjiv Divatia<br>[Address on File] | Freedom VCM Holdings, LLC | Incentive Unit Award Agreement, dated as of February 22, 2044 | | |
| 389 | Sara Ranson | Sara Ranson<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated August 21, 2022 | | |
| 390 | Sara Ranson | Sara Ranson<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 4, 2021 | | |
| 391 | Scott Devlin | Scott Devlin<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated March 5, 2020 | | |
| 392 | Scott Harvey | Scott Harvey<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2014 | | |
| 393 | Scott Harvey | Scott Harvey<br>[Address on File] | Franchise Group, Inc. | Offer Letter, dated September 10, 2020 | | |
| 394 | Sharon Leite | Sharon Leite<br>[Address on File] | Vitamin Shoppe Industries, LLC | Employment and Non-Competition Agreement dated of April 16, 2020, by and between Sharon Leite and Vitamin Shoppe Industries LLC | | |
| 395 | Sharon M Leite | Sharon M Leite<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated April 20, 2020 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 396 | Shops at Rayford Crossing LLC | Shops at Rayford Crossing LLC<br>c/o Willmann Companies<br>9601 Katy Freeway, Suite 480<br>Houston, TX 77024<br>Attn: Karl D. Willman | PSP Stores, LLC | Lease, dated June 6, 2012 | 4646 | 4/30/2025 |
| 397 | SignUp Software, Inc. | SignUp Software, Inc.<br>3500 South DuPont Highway, Suite DN 101<br>Dover, DE 19901 | PSP Group, LLC | Subscription Agreement ExFlow, dated April 1, 2024 | | |
| 398 | SignUp Software, Inc. | SignUp Software, Inc.<br>3500 South DuPont Highway, Suite DN 101<br>Dover, DE 19901 | PSP Group, LLC | Subscription Agreement ExFlow Data Capture, dated April 1, 2024 | | |
| 399 | SITS, LLC | SITS, LLC<br>35 Olympic Dr<br>South Barrington, IL 60010 | American Freight, LLC | Agreement and Statement of Work for Security Assessment Services, dated March 6, 2023 | | |
| 400 | SK Global Software, LLC | SK Global Software, LLC<br>940 Gemini Street<br>Houston, TX 77058 | PSP Group, LLC | Software License and Support Agreement, dated April 5, 2024 | | |
| 401 | Slim and Goldie, LLC[1] | Slim and Goldie, LLC<br>[Address on File] | PSP Franchising, LLC | Addendum to the PSP Franchising, LLC Franchise Agreement, dated August 17, 2015 | | |
| 402 | Slim and Goldie, LLC[1] | Slim and Goldie, LLC<br>[Address on File] | PSP Franchising, LLC | Addendum to the PSP Franchising, LLC Franchise Agreement, dated December 18, 2024 | | |
| 403 | Slim and Goldie, LLC[1]<br>Keith R. Bogans[1] | Slim and Goldie, LLC<br>[Address on File]<br><br>Keith R. Bogans<br>[Address on File] | PSP Franchising, LLC | Franchise Agreement, dated December 18, 2014 | | |
| 404 | Small Movers LLC | Small Movers LLC<br>6178 Howdershell Road<br>Hazelwood, MO 63042 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 8, 2024 | | |
| 405 | Solstice Sleep Products, Inc. | Solstice Sleep Products, Inc.<br>3720 W Broad Street<br>Columbus, OH 43228 | American Freight, LLC | Amendment to the Supply Agreement, dated July 1, 2022 | | |
| 406 | Southpark Retail LLC | Southpark Retail LLC<br>c/o Carnegie Companies<br>6190 Cochran Rd, Suite A<br>Solon, OH 44139 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated December 3, 2015 | 854 | 4/30/2025 |
| 407 | Spark Communications Group, LLC | Spark Communications Group, LLC<br>P.O. Box 49745<br>Athens, GA 30604 | Franchise Group, Inc. | See.Spark.Go Services Agreement, dated February 1, 2021 | | |
| 408 | Spark Data Solutions Inc | Spark Data Solutions Inc<br>26077 Nelson Way, Suite 1102<br>Katy, TX 77494 | American Freight, LLC | Master Services Agreement, dated June 20, 2023 | | |
| 409 | Spark Data Solutions Inc | Spark Data Solutions Inc<br>26077 Nelson Way, Suite 1102<br>Katy, TX 77494 | American Freight, LLC | Master Services Agreement, dated June 20, 2023 | | |
| 410 | SPS Commerce | SPS Commerce<br>333 South Seventh Street, Suite 1000<br>Minneapolis, MN 55402 | American Freight, LLC | Statement of Work, dated January 16, 2024 | | |
| 411 | SPS Commerce | SPS Commerce<br>333 South Seventh Street, Suite 1000<br>Minneapolis, MN 55402 | American Freight, LLC | Statement of Work, dated January 16, 2024 | | |
| 412 | STAG Industrial Holdings, LLC | STAG Industrial Holdings, LLC<br>c/o STAG Avondale<br>One Federal Street<br>23rd floor<br>Boston, MA 02110 | Vitamin Shoppe Procurement Services, LLC | Landlord Agreement, by and between STAG Industrial Holdings, LLC, Vitamin Shoppe Procurement Services, LLC, JPMorgan Chase Bank, N.A., and GACP Finance CO., LLC | | |
| 413 | Stan Mac | Stan Mac<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 4, 2021 | | |
| 414 | Starting A New LLC | Starting A New LLC<br>3157 O'Neal Lane<br>Baton Rouge, LA 70816 | American Freight, LLC | Preferred Delivery Services Agreement dated January 19, 2024 | | |
| 415 | Stephanie Koda | Stephanie Koda<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 7, 2024 | | |
| 416 | Steve Marada | Steve Marada<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 31, 2023 | | |
| 417 | Store Master Funding IV, LLC | Store Master Funding IV, LLC<br>8501 E Princess Drive, Suite 190<br>Scottsdale, AZ 85255 | Buddy's Newco, LLC | Master Lease Agreement, dated September 24, 2013 | 4<br>5<br>8<br>13<br>17<br>55<br>65<br>1061<br>386<br>16<br>18<br>19<br>35 | 5/20/2025 |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 418 | Store Master Funding IV, LLC | Store Master Funding IV, LLC<br>8501 E. Princess Drive, Suite 190<br>Scottsdale, AZ 85255<br><br>Kutak Rock LLP<br>1801 California Street, Suite 3000<br>Denver, CO 80202<br>Attn: Whitney A. Kopicky, Esq. | Buddy's Newco, LLC | Guaranty of Second Amended and Restated Master Lease Agreement by and between Store Master Funding IV, LLC and Buddy's Northwest, LLC, dated November 3, 2015 | | 5/12/2025 |
| 419 | Sue Hilsenbeck | Sue Hilsenbeck<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 420 | Sugarland Plaza, Inc. | Sugarland Plaza, Inc.<br>802 NW 1st Street<br>South Bay, FL 33493 | Buddy's Newco, LLC | Lease, dated November 29, 2007 | 30 | 5/12/2025 |
| 421 | Sun Life Assurance Company of Canada | Sun Life Assurance Company of Canada<br>MetroNorth Retail Center, c/o JLL<br>3344  Peachtree Road, Suite 1200<br>Atlanta, GA 30326 | Vitamin Shoppe Industries LLC | Lease, dated September 28, 2013 | 0688 | 4/30/2025 |
| 422 | T Voorhees GPL NJ, LLC, T Voorhees BER NJ, LLC, and T Voorhees AMC NJ, LLC | T Voorhees GPL NJ, LLC, T Voorhees BER NJ, LLC, and T Voorhees AMC NJ, LLC<br>16600 Dallas Parkway, Suite 300<br>Dallas, TX 75248 | Vitamin Shoppe Industries LLC | Lease, dated August 21, 2015 | 0724 | 4/30/2025 |
| 423 | TALX Corporation | TALX Corporation<br>11432 Lackland Road<br>St. Louis, MO 63146 | American Freight Management Company, LLC | Master Services Agreement, dated April 01, 2022 | | |
| 424 | Tamara J Pircz | Tamara J Pircz<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated November 23, 2020 | | |
| 425 | Ted M Vasquez | Ted M Vasquez<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 2, 2020 | | |
| 426 | Teresa M Orth | Teresa M Orth<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated August 21, 2023 | | |
| 427 | The Hertz Corporation | The Hertz Corporation<br>8501 Williams Road,<br>Estero, FL 33928 | Franchise Group. Inc. | Corporate Account Agreement & Exhibits Agreement, dated November 15, 2023 | | |
| 428 | The Home Moving Solutions LLC | The Home Moving Solutions LLC<br>1209 N Slappey Blvd., Suite B<br>Albany, GA 31701 | American Freight, LLC | Preferred Delivery Services Agreement dated January 4, 2024 | | |
| 429 | The Procter & Gamble Distributing LLC | The Procter & Gamble Distributing LLC<br>2 P&G Plaza<br>Cincinnati, OH 45202 | Vitamin Shoppe Industries LLC | Procter & Gamble Trade Fund Program, dated December 13, 2016 | | |
| 430 | The Procter & Gamble Distributing LLC | The Procter & Gamble Distributing LLC<br>2 P&G Plaza<br>Cincinnati, OH 45202 | Vitamin Shoppe Industries LLC | Worldwide Confidential Disclosure Agreement, dated May 11, 2016 | | |
| 431 | The Procter & Gamble Distributing LLC | The Procter & Gamble Distributing LLC<br>2 P&G Plaza<br>Cincinnati, OH 45202 | Vitamin Shoppe Industries LLC | Logistics Development Incentive Agreement, dated December 13, 2016 | | |
| 432 | The Shoppes at North Brunswick, L.L.C. | The Shoppes at North Brunswick, L.L.C.<br>c/o The Azarian Group, L.L.C<br>6 Prospect Street, Suite 2<br>Midland Park, NJ 07432 | Vitamin Shoppe Industries, LLC | Shopping Center Lease, dated December 23, 2019 | 886 | 4/30/2025 |
| 433 | The Shubert Organization, Inc. | The Shubert Organization, Inc.<br>234 West 44th Street<br>New York, NY 10036 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated August 19, 2014 | 763 | 4/30/2025 |
| 434 | The Transport Boss LLC | The Transport Boss LLC<br>9855 E Coronado Dr<br>Baton Rouge, LA 70815 | American Freight, LLC | Contract (Other), dated February 26, 2024 | | |
| 435 | The Ultimate Software Group, Inc. | The Ultimate Software Group, Inc.<br>2000 Ultimate Way<br>Weston, FL 33326 | American Freight Outlet Stores, LLC | Master Terms and Conditions for Procurement of Software Rights and Services, dated February 11, 2016 | | |
| 436 | Thomas N Merrihew | Thomas N Merrihew<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated August 1, 2020 | | |
| 437 | Thomas Will | Thomas Will<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 28, 2024 | | |
| 438 | Thomas Will | Thomas Will<br>[Address on File] | Franchise Group, Inc. | Offer Letter, dated October 31, 2020 | | |
| 439 | Thomson Reuters Inc. | Thomson Reuters Inc.<br>P.O. Box 115008<br>Carrolton, TX 75011-5008 | PSP Group, LLC | Multi Year Order Form, dated May 18,2023 | | |
| 440 | Tiffany McMillan-McWaters | Tiffany McMillan-McWaters<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2024 | | |
| 441 | Tiffany McMillan-McWaters | Tiffany McMillan-McWaters<br>[Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated January 29, 2019 | | |
| 442 | Tim Metzgar | Tim Metzgar<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 21, 2023 | | |
| 443 | Tmakit Moving Company, LLC | Tmakit Moving Company, LLC<br>5860  Russell Topton Rd.<br>Toomsuba, MS 39364 | American Freight, LLC | Contract (Other), dated January 02, 2024 | | |
| 444 | Todd D Northcutt | Todd D Northcutt<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated April 30, 2020 | | |
| 445 | Tom Arigi | Tom Arigi<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 446 | Tom Lee | Tom Lee<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 447 | Tri-County Movers SP | Tri-County Movers SP<br>PO Box 7716452<br>Ocala, FL 34477 | American Freight, LLC | Contract (Other), dated February 29, 2024 | | |
| 448 | Troy Bischoff | Troy Bischoff<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 449 | Troy Bischoff | Troy Bischoff<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 450 | UKG Inc | UKG Inc<br>2000 Ultimate Way<br>Weston, FL 33326<br>Attn: General Counsel | American Freight, LLC | Amendment to the Agreement, dated December 31, 2015 | | |
| 451 | United Parcel Service, Inc. | United Parcel Service, Inc.<br>700 W 16th Street<br>Indianapolis, IN 46202 | American Freight, LLC | Amendment to Contract, dated April 25, 2023 | | |
| 452 | United Service Protection, Inc. | United Service Protection, Inc.<br>11222 Quail Roost Drive<br>Miami, FL 33157 | American Freight, LLC | Amendment No. 3 to Statement of Work No. 1, dated November 27, 2023 | | |
| 453 | United Service Protection, Inc. | United Service Protection, Inc.<br>11222 Quail Roost Drive<br>Miami, FL 33157 | American Freight, LLC | Statement of Work No. 2 to Master Services Agreement - Aftermarket Service Contract Program | | |
| 454 | United Service Protection, Inc. | United Service Protection, Inc.<br>11222 Quail Roost Drive<br>Miami, FL 33157 | American Freight, LLC | Amendment No. 2 to the Master Services Agreement, dated October 6, 2021 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 455 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Statement of Work No. 1 to Master Services Agreement Service Contract Program, dated July 23, 2021 | | |
| 456 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 457 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Amendment No. 2 to Statement of Work No. 1, dated August 1, 2023 | | |
| 458 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Amendment No. 1 to the Master Services Agreement and Statement of Work No. 1, dated September 23, 2021 | | |
| 459 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 460 | Vantage One Tax Solutions, Inc. | Vantage One Tax Solutions, Inc. 6310 LBJ Freeway Dallas, TX 75240 | American Freight Outlet Stores, LLC | Consulting Agreement for Property Tax Services, dated April 10, 2023 | | |
| 461 | Vantage One Tax Solutions, Inc. | Vantage One Tax Solutions, Inc. 6310 LBJ Freeway, Ste. 208 Dallas, TX 75240 | American Freight, LLC | Consulting Agreement for Property Tax Services, dated April 10, 2023 | | |
| 462 | Varis, LLC | Varis, LLC 6600 N. Military Tr. Boca Raton, FL 33496 | American Freight, LLC | Master Services Agreement, dated May 20, 2022 | | |
| 463 | Ventura Petit LLC and La Cienga Shopping Center Development LLC | Ventura Petit LLC and La Cienga Shopping Center Development LLC 2121 Avenue of the Stars, Ste. 1100 Los Angeles, CA 90067 | Vitamin Shoppe Industries LLC | Lease, dated January 02, 2012 | 0578 | 4/30/2025 |
| 464 | VF9 Matt2, LLC | VF9 Matt2, LLC 2330 Ponce de Leon Blvd Coral Gables, FL 33134 | Vitamin Shoppe Industries LLC | Lease, dated January 20, 2010 | 472 | 4/30/2025 |
| 465 | Viral Patel | Viral Patel (Address on File) | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 466 | VRC Companies, LLC dba Vital Records Control f.k.a. Fireproof Records Center | VRC Companies, LLC dba Vital Records Control 5384 Poplar Avenue, Suite 500 Memphis, TN 38119 | American Freight, LLC | Storage & Service Agreement, dated August 3, 2016 | | |
| 467 | WBR 27810 Chagrin II, LLC, WRB 27810 Chagrin III, LLC & RRR Ohio, LLC | WBR 27810 Chagrin II, LLC, WRB 27810 Chagrin III, LLC & RRR Ohio, LLC 2400 Chagrin Blvd., Suite 100 Chagrin Falls, OH 44022 | Vitamin Shoppe Industries LLC | Lease, dated July 25, 2012 as amended | 0629 | 5/19/2025 |
| 468 | Westgate Marketplace Developers, LLC | Westgate Marketplace Developers, LLC 7725 W. Reno Ave., Suite 398 Oklahoma City, OK 73127 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated December 31, 2014 | 823 | 4/30/2025 |
| 469 | White Glove Delivery & Moving LLC | White Glove Delivery & Moving LLC 57477 Goodman Dr. Colcord, OK 74338 | American Freight, LLC | Preferred Delivery Services Agreement, dated January 2, 2024 | | |
| 470 | Will Powell | Will Powell (Address on File) | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 471 | Wireless America LLC, d/b/a Viva Wireless | Wireless America LLC, d/b/a Viva Wireless 7003 Presidents Dr., Suite 300 Orlando, FL 32809 | Buddy's Newco, LLC | Sublease, dated December 29, 2017 | | |
| 472 | Worry Free Moving Inc. | Worry Free Moving Inc. 1421 Turnberry Dr Youngstown, OH 44512 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 21, 2024 | | |
| 473 | Wrike Inc. | Wrike Inc. 9171 Towne Center Drive, Suite 200 San Diego, CA 92122, | American Freight, LLC | PO or Purchase Agreement, dated February 07, 2024 | | |
| 474 | WSG Arundel One LLC | WSG Arundel One LLC 75 Hook Road Bayonne, NJ 07002 | Vitamin Shoppe Industries LLC | Lease, dated November 11, 2003 | 0143 | 4/30/2025 |
| 475 | Xpress Delivery 2U | Xpress Delivery 2U 2406 Pine Street Texarkana, TX 75503 | American Freight, LLC | Preferred Delivery Services Agreement, dated April 1, 2024 | | |
| 476 | YTC Movers LLC | YTC Movers LLC 760 Star Ridge Street Massillon, OH 44646 | American Freight, LLC | Preferred Delivery Services Agreement, dated April 15, 2024 | | |
| 477 | ZipRecruiter Inc. | ZipRecruiter Inc. 604 Arizona Avenue Santa Monica, CA 90401 | Franchise Group, Inc. | Services Agreement, dated September 20, 2023 | | |
| 478 | | | Pet Supplies "Plus", LLC | Pet Supplies Plus Incentive Plan, dated September 26, 2021 | | |
| 479 | | | Freedom VCM Holdings, LLC | Freedom VCM Holdings, LLC 2024 Restricted Class A Unit Plan | | |
| 480 | | | Vitamin Shoppe Industries LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan, effective as of March 5, 2020 | | |
| 481 | | | American Freight, LLC | American Freight Incentive Unit Plan, effective as of January 1, 2024 | | |
| 482 | | | American Freight, LLC | American Freight Incentive Unit Plan, effective as of November 18, 2020 | | |

The Debtors have determined that this agreement is not an Executory Contract that is capable of assumption and assignment pursuant to section 365 of the Bankruptcy Code.  However, if the Bankruptcy Court or another court of competent jurisdiction disagrees and determines that this document (i) is an

**Exhibit E-1**

**Redline to Previously Filed
Rejected Contracts/Lease List**

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 1 | 1 Haul Takes It All | 1 Haul Takes It All<br>500 Catawba Trail<br>Lima, OH 45806 | American Freight, LLC | Contract (Other), dated December 18, 2023 | | |
| 2 | 1010data Retail Solutions LLC | 1010data Retail Solutions LLC<br>750 Third Avenue, 4th Floor<br>New York, NY 10017 | Vitamin Shoppe Industries LLC | 1010data Managed Services Statement of Work 8 to 1010data Dedicated Server Hosting and Analysis Agreement, dated March 24, 2010 | | |
| 3 | 1010data, Inc. | 1010data, Inc.<br>750 Third Avenue, 4th Floor<br>New York, NY 10017 | Vitamin Shoppe Industries LLC | 1010data Managed Services Statement of Work 8 to 1010data Dedicated Server Hosting and Analysis Agreement, dated March 24, 2010 | | |
| 4 | 123.Net, Inc. | 123.Net, Inc.<br>24700 Northwestern Hwy, 5th Floor<br>Southfield, MI 48075 | PSP Group, LLC | 123.Net Service Agreement | | |
| 5 | 123NET | 123NET<br>24700 Northwestern Hwy, 5th Floor<br>Southfield, MI 48075 | PSP Group, LLC | Scope of Work for Enterprise Data Center, Network & Voice Services | | |
| 6 | 1584 Flatbush Avenue Partners, LLC | 1584 Flatbush Avenue Partners, LLC<br>539 Eastern Parkway Third Floor<br>Brooklyn, NY 11216 | Vitamin Shoppe Industries LLC | Lease, dated February 14, 2015 | 0810 | 4/30/2025 |
| 7 | 1st Choice Home Furnishings of Baton Rouge, LLC | 1st Choice Home Furnishings of Baton Rouge, LLC<br>662 Howard Avenue<br>Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC<br>Franchise Group Inc. | Settlement Agreement and Release, dated May 10, 2024 | | |
| 8 | 1st Choice Home Furnishings of Donaldsonville, LLC | 1st Choice Home Furnishings of Donaldsonville, LLC<br>662 Howard Avenue<br>Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC<br>Franchise Group Inc. | Settlement Agreement and Release, dated May 10, 2024 | | |
| 9 | A360 Enterprises, LLC | A360 Enterprises, LLC<br>4600 W. 77th Street Suite 295<br>Edina, MN 5543 | Franchise Group, Inc. | Master Subscription and Services Agreement, dated September 19, 2022 | | |
| 10 | A360 Enterprises, LLC | A360 Enterprises, LLC<br>4600 W. 77th Street Suite 295<br>Edina, MN 55435 | Franchise Group. Inc. | Digital Accessibility Audit, Remediation Support & QA Testing Statement of Work, dated August 26, 2022 | | |
| 11 | Aaron Granger | Aaron Granger<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 1, 2024 | | |
| 12 | Aaron Granger | Aaron Granger<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated January 31, 2024 | | |
| 13 | Adam Vincentini | Adam Vincentini<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 13, 2021 | | |
| 14 | ADP, Inc. | ADP, Inc.<br>One ADP Boulevard<br>Roseland, NJ 07068 | Franchise Group, Inc. | Referral Agreement, dated October 23, 2023 | | |
| 15 | AEI National Income Property Fund VII LP | AEI National Income Property Fund VII LP<br>1300 Wells Fargo Place<br>Saint Paul, MN 55101 | Vitamin Shoppe Industries LLC | Guaranty of Lease by VSI, dated January 28, 2022 | 203 | 3/31/2025 |
| 16 | Alex Mondlak | Alex Mondlak<br>[Address on File] | Franchise Group, Inc. | Offer Letter, dated April 17, 2023 | | |
| 17 | All Purpose Hauling and Removing LLC | All Purpose Hauling and Removing LLC<br>3218 Lincoln Street<br>Lorain, OH 44052 | American Freight, LLC | Contract (Other), dated March 17, 2022 | | |
| 18 | AllWright Franchise Consulting, Inc DBA The You Network | AllWright Franchise Consulting, Inc DBA The You Network<br>93 Hayden Rowe St<br>Hopkinton, MA 01748 | Pet Supplies "Plus", LLC | Addendum to AllWright Franchise Consulting, Inc DBA The You Network Referral Agreement | | |
| 19 | Alpha Solutions USA LLC | Alpha Solutions USA LLC<br>120 East 23rd Street<br>5th Floor<br>New York, NY 10010 | Pet Supplies "Plus", LLC | Statement of Work #1 for Phase 2 Assistance | | |
| 20 | Alpha Solutions USA LLC | Alpha Solutions USA LLC<br>120 East 23rd Street<br>5th Floor<br>New York, NY 10010 | Pet Supplies "Plus", LLC | Statement of Work #4 for Alpha Solutions USA LLC and Pet Supplies Plus | | |
| 21 | Alpha Solutions USA LLC | Alpha Solutions USA LLC<br>120 East 23rd Street<br>5th Floor<br>New York, NY 10010 | Pet Supplies "Plus", LLC | Master Services Agreement | | |
| 22 | Alpha Solutions USA LLC | Alpha Solutions USA LLC<br>120 East 23rd Street<br>5th Floor<br>New York, NY 10010 | PSP Stores, LLC | Statement of Work #3 | | |
| 23 | Alturas Metro Towne Center LLC | Alturas Metro Towne Center LLC<br>500 E. Shore Dr, Suite 120<br>Eagle, ID 83616 | Vitamin Shoppe Industries LLC | Lease, dated September 21, 2004 | 0210 | 4/30/2025 |
| 24 | American Express Travel Related Services Company, Inc. | American Express Travel Related Services Company, Inc.<br>200 Vesey Street<br>New York, NY 10285 | American Freight, LLC | Master Services Agreement 01, dated March 31, 2022 | | |
| 25 | American First Finance Inc. | American First Finance Inc.<br>8585 N. Stemmons Fwy, Suite N-1000<br>Dallas, TX 75247 | American Freight Outlet Stores, LLC | Referral Agreement, dated July 15, 2022 | | |
| 26 | American First Finance Inc. | American First Finance Inc.<br>PO Box 565848<br>Dallas, TX 75356 | American Freight, LLC | Authorized Dealer Agreement, dated July 15, 2022 | | |
| 27 | American First Finance Inc. | American First Finance Inc.<br>8585 N. Stemmons Fwy, Suite N-1000<br>Dallas, TX 75247 | American Freight, LLC | Referral Agreement, dated July 15, 2022 | | |
| 28 | American First Finance Inc. | American First Finance Inc.<br>8585 N. Stemmons Fwy, Suite N-1000<br>Dallas, TX 75247 | Franchise Group. Inc. | Referral Agreement | | |
| 29 | Amy Ficken | Amy Ficken<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 28, 2024 | | |
| 30 | Amy Ficken | Amy Ficken<br>[Address on File] | Franchise Group, Inc. | Offer Letter, dated August 5, 2021 | | |
| 31 | Amy Redin | Amy Redin<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 7, 2024 | | |
| 32 | Amy Redin | Amy Redin<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 7, 2024 | | |
| 33 | Andrea S Jones | Andrea S Jones<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated March 5, 2020 | | |
| 34 | Andrew Kaminsky | Andrew Kaminsky<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2024 | | |
| 35 | Andrew Kaminsky | Andrew Kaminsky<br>[Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated October 2, 2019 | | |
| 36 | Andrew Laudato | Andrew Laudato<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated June 15, 2020 | | |
| 37 | Andrew Laurence | Andrew Laurence<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2024 | | |
| 38 | Andrew Laurence | Andrew Laurence<br>[Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated October 2, 2019 | | |
| 39 | Angle Gully LLC | Angle Gully LLC<br>c/o Newcastle Retail Management, LLC<br>150 North Michigan Ave.<br>Chicago, IL 60601 | Vitamin Shoppe Industries LLC | Lease, dated December 20, 2014 | 0756 | 4/30/2025 |
| 40 | Anthony Block-Belmonte | Anthony Block-Belmonte<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 14, 2021 | | |
| 41 | ArcVision, Inc. | ArcVision, Inc.<br>1950 Craig Road, #300<br>St. Louis, MO 63146 | PSP Stores, LLC | Pet Supplies Plus Architect Agreement | | |
| 42 | Armory Racine Corporation | Armory Racine Corporation<br>1210 S. Indiana Ave, #5907<br>Chicago, IL 60605 | American Freight, LLC | Assignment of Lease Agreement, dated November 9, 2022 | 286 | 4/30/2025 |
| 43 | Asset Strategies Group, LLC | Asset Strategies Group, LLC<br>501 W Schrock Rd, Suite 201<br>Westerville, OH 43081 | American Freight, LLC | Master Services Agreement, dated October 24, 2023 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 44 | Asset Strategies Group, LLC | Asset Strategies Group, LLC<br>501 West Schrock Road, Suite 201<br>Westerville, OH 43081 | American Freight, LLC | Lease Management Services Agreement, dated October 24, 2023 | | |
| 45 | Assurant Service Protection, Inc. | Assurant Service Protection, Inc.<br>11222 Quail Roost Drive<br>Miami, FL 33157 | American Freight, LLC | Amendment No. 3 to Statement of Work No. 1, dated October 06, 2021 | | |
| 46 | Assurant Service Protection, Inc. | Assurant Service Protection, Inc.<br>11222 Quail Roost Drive<br>Miami, FL 33157 | American Freight, LLC | Statement of Work No. 2 to Master Services Agreement - Aftermarket Service Contract Program, dated July 23, 2021 | | |
| 47 | Assurant Service Protection, Inc. | Assurant Service Protection, Inc.<br>11222 Quail Roost Drive<br>Miami, FL 33157 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 48 | Assurant Service Protection, Inc. | Assurant Service Protection, Inc.<br>11222 Quail Roost Drive<br>Miami, FL 33157 | American Freight, LLC | Amendment No. 2 to Statement of Work No. 1, dated September 23, 2021 | | |
| 49 | Atlanticus Services Corporation | Atlanticus Services Corporation<br>Five Concourse Parkway, Suite 300<br>Atlanta, GA 30328 | Franchise Group. Inc. | Reconciliation Agreement, dated May 4, 2022 | | |
| 50 | Atlas Security Service, Inc. | Atlas Security Service, Inc.<br>1309 E. Republic Road, Suite B<br>Springfield, MO 65804 | American Freight, LLC | Standard Commercial Security Agreement, dated October 06, 2021 | | |
| 51 | Baker Bunch Inc. | Baker Bunch Inc.<br>15348 9th Ave.<br>Phoenix, IL 60426 | American Freight, LLC | Preferred Delivery Services Agreement, dated May 2, 2024 | | |
| 52 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Newco, LLC | Sublease Agreement | 17<br><br>55<br><br>65 | 5/20/2025 |
| 53 | BC Deliveries LLC | BC Deliveries LLC<br>1712 Peardale Rd<br>Columbus, OH 43229 | American Freight, LLC | Preferred Delivery Services Agreement, dated May 10, 2024 | | |
| 54 | BCDC Portfolio Owner LLC | BCDC Portfolio Owner LLC<br>c/o Oak Street Capital, LLC<br>30 N. LaSalle St., Suite 4140<br>Chicago, IL 60602<br>Attn: Asset Management<br><br>BCDC Portfolio Owner LLC<br>c/o Oak Street Capital, LLC<br>30 N. LaSalle St., Suite 4140<br>Chicago, IL 60602<br>Attn: Heba Elayan<br><br>Ketley Drye & Warren LLP<br>3 World Trade Center<br>175 Greenwich Street<br>New York, NY 10007<br>Attn: Robert L. LeHane | Franchise Group. Inc. | Unconditional Guaranty of Payment and Performance, dated June 17, 2022 | | 3/31/2025 |
| 55 | BCHQ Owner LLC | BCHQ Owner LLC<br>c/o Oak Street Capital, LLC<br>30 N. LaSalle St., Suite 4140<br>Chicago, IL 60602<br>Attn: Asset Management<br><br>BCHQ Owner LLC<br>c/o Oak Street Capital, LLC<br>30 N. LaSalle St., Suite 4140<br>Chicago, IL 60602<br>Attn: Heba Elayan<br><br>Ketley Drye & Warren LLP<br>3 World Trade Center<br>175 Greenwich Street<br>New York, NY 10007<br>Attn: Robert L. LeHane | Franchise Group. Inc. | Unconditional Guaranty of Payment and Performance, dated August 2, 2022 | | 3/31/2025 |
| 56 | Big Buddy's Moving Company LLC | Big Buddy's Moving Company LLC<br>7870 Axton Rd.<br>Axton, VA 24054 | American Freight, LLC | Preferred Delivery Services Agreement, dated December 29, 2023 | | |
| 57 | Big Burns Moving LLC | Big Burns Moving LLC<br>3140 Jackson Dr<br>Holiday, FL 34691 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 14, 2024 | | |
| 58 | Bi-Rite Holdings, LLC | Bi-Rite Holdings, LLC<br>662 Howard Avenue<br>Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC<br>Franchise Group Inc. | Settlement Agreement and Release, dated May 10, 2024 | | |
| 59 | BMA Springhurst LLC | BMA Springhurst LLC<br>c/o Marquee Capital<br>301 N Broadway, Suite 300<br>Milwaukee, WI 53202 | Vitamin Shoppe Industries, LLC | Agreement of Lease dated,  November 17, 2011 | 590 | 5/1/2025 |
| 60 | BMH PRIME 97, LLC | BMH PRIME 97, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 23, 2022 | 645 | |
| 61 | BMH-FAN 43, LLC | BMH-FAN 43, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated January 30, 2020 | 612 | |
| 62 | BMH-FAN 44, LLC | BMH-FAN 44, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated January 30,  2020 | 603 | |
| 63 | BMH-FAN 51, LLC | BMH-FAN 51, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated January 30, 2020 | 609 | |
| 64 | BMH-NEW 58, LLC | BMH-NEW 58, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 17, 2021 | 620 | |
| 65 | BMH-NEW 61, LLC | BMH-NEW 61, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated March 5, 2021 | 617 | |
| 66 | BMH-NEW 62, LLC | BMH-NEW 62, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated February 21, 2022 | 640 | |
| 67 | BMH-NEW 69, LLC | BMH-NEW 69, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated March 1, 2022 | 640 | |
| 68 | BMH-NEW 92, LLC | BMH-NEW 92, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated November 1, 2022 | 648 | |
| 69 | BMH-RCL 34, LLC | BMH-RCL 34, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 23, 2019 | 311 | |
| 70 | BMH-RCL 36, LLC | BMH-RCL 36, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 23, 2019 | 310 | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 71 | BMH-RCL 41, LLC | BMH-RCL 41, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 23, 2019 | 305 | |
| 72 | BMH-TB 72, LLC | BMH-TB 72, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020 | 4 | |
| 7372 | BMH-TB 73, LLC | BMH-TB 73, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020 | 5 | |
| 74 | BMH-TB 75, LLC | BMH-TB 75, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020 | 7 | |
| 75 | BMH-TB 76, LLC | BMH-TB 76, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020 | 8 | |
| 7673 | BMH-TB 77, LLC | BMH-TB 77, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020 | 13 | |
| 7774 | BMH-TNM 31, LLC | BMH-TNM 31, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated February 20, 2017 | 377 | |
| 7875 | BMH-WF TX 67, LLC | BMH-WF TX 67, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 23, 2022 | 643 | |
| 7976 | BoardVantage, Inc. | BoardVantage, Inc.<br>4300 Bohannon Drive, Suite 110<br>Menlo Park, CA 94025 | Vitamin Shoppe Industries, LLC | Services Agreement, dated August 5, 2016 | | |
| 8077 | Boswell Avenue I, LLC | Boswell Avenue I, LLC<br>c/o Marx Realty & Improvement Co. Inc.,<br>155 East 44th Street, 7th Floor<br>New York, NY 10017 | Vitamin Shoppe Industries, LLC | Lease Agreement, dated November 2, 2012 | 650 | 4/30/2025 |
| 8178 | Bradford D Gooch | Bradford D Gooch<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 1, 2020 | | |
| 8279 | Brain Simpkins | Brain Simpkins<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 8380 | Brandon Finkes | Brandon Finkes<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 8481 | Brent Jeffrey | Brent Jeffrey<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated February 20, 2024 | | |
| 8582 | Brent Jeffrey | Brent Jeffrey<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 17, 2021 | | |
| 8683 | Brian Benge | Brian Benge<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 12, 2024 | | |
| 8784 | Brian Hoke | Brian Hoke<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 30, 2023 | | |
| 8885 | Brian Hoke | Brian Hoke<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated February 23, 2021 | | |
| 8986 | Brian Kahn | Brian Kahn<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated January 19, 2024 | | |
| 9087 | Brixmor Burlington Square LLC | Brixmor Burlington Square LLC c/o Brixmor Property Group<br>200 Ridge Pike, Suite 100C<br>Conshohocken, PA 19428 | Vitamin Shoppe Industries, LLC | Lease, dated December 30, 2015 | 0861 | 5/31/2025 |
| 9188 | Brown's Moving & Delivery Service LLC | Brown's Moving & Delivery Service LLC<br>623 Steger Drive<br>Duncanville, TX 75116 | American Freight, LLC | Preferred Delivery Services Agreement, dated April 18, 2024 | | |
| 9289 | Bryn Mawr Plaza Associates | Bryn Mawr Plaza Associates<br>c/o Bakter Properties, Inc.<br>One Town Place, Suite 100<br>Bryn Mawr, PA 19010 | Vitamin Shoppe Industries, LLC | Lease, dated February 09, 1999 | 0049 | 4/30/2025 |
| 9390 | Buddy Mac Four, LLC | Buddy Mac Four, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 31, 2015 | 491 | |
| 9491 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 E Centre Park Blvd., Suite 101<br>Desoto, TX 75115 | Buddy's Newco, LLC | Sublease Agreement, dated July, 1 2021 | 4<br><br>5<br><br>8<br><br>13 | 5/20/2025 |
| 9592 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Development Agreement, dated July 1, 2014 | | |
| 9693 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Second Amendment to Buddy's Franchising and Licensing Development Agreement, dated May 10, 2019 | | |
| 9794 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Third Amendment to Buddy's Franchising and Licensing Development Agreement, dated October 6, 2019 | | |
| 9895 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Fourth Amendment to Buddy's Franchising and Licensing Development Agreement, dated December 1, 2019 | | |
| 9996 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Fifth Amendment to Buddy's Franchising and Licensing Development Agreement, dated January 27, 2020 | | |
| 10097 | Buddy Mac Holdings, LLC | Buddy Mac Holdings, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX | Buddy's Franchising and Licensing LLC | Sixth Amendment to Buddy's Franchising and Licensing Development Agreement, dated December 10, 2020 | | |
| 10198 | Buddy Mac Nine, LLC | Buddy Mac Nine, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated May 13, 2016 | 494 | |
| 10299 | Buddy Mac Nineteen, LLC | Buddy Mac Nineteen, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated June 26, 2020 | 615 | |
| 103100 | Buddy Mac One, LLC | Buddy Mac One, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated February 2, 2015 | 488 | |
| 104101 | Buddy MAC Seventeen, LLC | Buddy MAC Seventeen, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated May 16, 2019 | 339 | |
| 105102 | Buddy Mac Twelve, LLC | Buddy Mac Twelve, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 1, 2016 | 497 | |
| 106103 | Buddy Mac Twenty-One, LLC | Buddy Mac Twenty-One, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated October 4, 2019 | 432 | |
| 107104 | Buddy Mac Two, LLC | Buddy Mac Two, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated August 21, 2015 | 489 | |
| 108105 | Buddy's Rollco, LLC | Buddy's Rollco, LLC<br>662 Howard Avenue<br>Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC<br>Franchise Group Inc. | Settlement Agreement and Release, dated May 10, 2024 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|------|-------------|---------------------|--------|-------------------|-------|---------------|
| 109106 | Buddy's Northwest, LLC | Buddy's Northwest, LLC<br>c/o Vintage Partners<br>4705 S. Apopka Vineland Road, Suite 210<br>Orlando, FL 32819<br>Davis Gillet Mottern & Sims LLC<br>1230 Peachtree Street N.E., Suite 2445<br>Atlanta, GA 30309<br>Attn: Jerry Sims | Buddy's Newco, LLC | Guaranty of Second Amended and Restated Master Lease Agreement by and between Store Master Funding IV, LLC and Buddy's Northwest, LLC, dated November 3, 2015 | | 5/12/2025 |
| 110107 | Bund Scenery USA, LLC | Bund Scenery USA, LLC<br>c/o Realty Advisors International<br>904 Silver Spur Road, No. 266<br>Palos Verdes Peninsula, CA 90274 | Vitamin Shoppe Industries LLC | Lease, dated April 24, 2006 | 0322 | 5/19/2025 |
| 111108 | Buxton Company, LLC | Buxton Company, LLC<br>2651 S. Polaris Dr.<br>Fort Worth, TX 76137 | American Freight, LLC | Statement of Work, dated September 05, 2023 | | |
| 112109 | Cambridge Goods, LLC | Cambridge Goods, LLC<br>3001 W. Big Beaver Road, Suite 324<br>Troy, MI 48084 | American Freight, LLC | Assignment of Lease Agreement, dated September 26, 2022 | 283 | 4/30/2025 |
| 113110 | Care N Errands, LLC | Care N Errands, LLC<br>2345 Maxon Road Extension<br>Schenectady, NY 12308 | American Freight, LLC | Preferred Delivery Services Agreement, dated January 10, 2024 | | |
| 114111 | Carlos Lopez | Carlos Lopez<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated June 23, 2020 | | |
| 115112 | Cates Moving LLC | Cates Moving LLC<br>205 Westside Dr.<br>Tullahoma, TN 37388 | American Freight, LLC | Contract (Other), dated January 02, 2024 | | |
| 116113 | Causeway Square, LLC | Causeway Square, LLC<br>1801 NE 123rd St., Suite 300<br>North Miami, FL 33181 | Vitamin Shoppe Industries LLC | Lease, dated August 10, 2010 | 0355 | 4/30/2025 |
| 117114 | Chadds Ford Investors LP c/o Carlino Development | Chadds Ford Investors LP c/o Carlino Development,<br>c/o Carlino Commercial Development,<br>100 Front Street, Suite 560<br>Conshohocken, PA 19428 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated May 8 2015 | 818 | 4/30/2025 |
| 118115 | Chalet East, Inc. | Chalet East, Inc.<br>22936 NE 15th Place<br>Sammamish, WA 98074<br>Attn: Barbara Blumenthal | Vitamin Shoppe Industries, LLC | Lease, dated April 21, 2011 | 1025 | 4/30/2025 |
| 119116 | Chris Matuska | Chris Matuska<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 5, 2024 | | |
| 120117 | Chris Matuska | Chris Matuska<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated March 5, 2024 | | |
| 121118 | Chris Rowland | Chris Rowland<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated November 16, 2021 | | |
| 122119 | Christopher Ardelea | Christopher Ardelea<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 7, 2024 | | |
| 123120 | Chuck's Delivery Services LLC | Chuck's Delivery Services LLC<br>1545 W 44th Street<br>Erie, PA 16509 | American Freight, LLC | Preferred Delivery Services Agreement, dated February 27, 2024 | | |
| 124121 | Cintas Fire Protection | Cintas Fire Protection<br>2929 W. Clarendon Ave.<br>Phoenix, AZ 85017 | Vitamin Shoppe Industries LLC | Fire Protection Services Agreement, dated June 30, 2017 | | |
| 125122 | Colonel Sun LLC | Colonel Sun LLC<br>3718 N 36th St.<br>Tacoma, WA 98407 | Vitamin Shoppe Industries, LLC | Commercial Lease Agreement, dated February 21, 2003 | 1006 | 4/30/2025 |
| 126123 | Concur Technologies, Inc. | Concur Technologies, Inc.<br>62157 COLLECTIONS CENTER DRIVE<br>Chicago, IL 60693 | American Freight, LLC | Order Form for Cloud Services, dated September 29, 2020 | | |
| 127124 | Connectria, LLC | Connectria, LLC<br>10845 Olive Blvd, Suite 300<br>St. Louis, MO 63141 | American Freight, LLC | Connectria Statement of Work Managed AWS Services, dated March 31, 2023 | | |
| 128125 | Corporation Service Company | Corporation Service Company<br>2711 Centerville Road<br>Wilmington, DE 19808 | Pet Supplies "Plus", LLC | Non-Disclosure Agreement, dated May 30, 2013 | | |
| 129126 | Corporation Service Company | Corporation Service Company<br>2711 Centerville Road<br>Wilmington, DE 19808 | Pet Supplies "Plus", LLC | Proposal Acceptance, dated June 3, 2013 | | |
| 130127 | CVB, Inc. (Malouf) | CVB, Inc. (Malouf)<br>1525 West 2960 South<br>Nibley, UT 84321 | American Freight, LLC | Limited Reseller Agreement, dated February 03, 2021 | | |
| 131128 | Cylindo LLC | Cylindo LLC<br>44 Tehama Street<br>San Francisco, CA 94105 | American Freight, LLC | Statement of Work 01, dated April 01, 2023 | | |
| 132129 | Cylindo LLC | Cylindo LLC<br>44 Tehama Street<br>San Francisco, CA 94105 | American Freight, LLC | Master Services Agreement, dated April 01, 2023 | | |
| 133130 | Daniel Kim | Daniel Kim<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 12, 2024 | | |
| 134131 | Daniel McNamara | Daniel McNamara<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 8, 2021 | | |
| 135132 | Daniel Meyer | Daniel Meyer<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 3, 2024 | | |
| 136133 | Daniel Meyer | Daniel Meyer<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 6, 2024 | | |
| 137134 | Daryl Trumpy SP | Daryl Trumpy SP<br>[Address on File] | American Freight, LLC | Preferred Delivery Services Agreement, dated December 29, 2023 | | |
| 138135 | Deanna Heck | Deanna Heck<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 6, 2024 | | |
| 139136 | Diane Galante | Diane Galante<br>[Address on File] | WNW Franchising, LLC | Franchise Agreement, dated October 20, 2022 | | |
| 140137 | Diane Galante | Diane Galante<br>[Address on File] | WNW Franchising, LLC | Addendum to the Franchise Agreement, dated October 20, 2022 | | |
| 141138 | Dina Trama | Dina Trama<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 26, 2023 | | |
| 142139 | Dina Trama | Dina Trama<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 2, 2022 | | |
| 143140 | DMCK Installation Inc. | DMCK Installation Inc.<br>942 N Marquette St<br>Davenport, IA 52804 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 20, 2024 | | |
| 144141 | DocuSign, Inc | DocuSign, Inc<br>221 Main Street, Suite1000<br>San Francisco, CA 94105 | American Freight Outlet Stores, LLC | Statement of Work, dated October 09, 2024 | | |
| 145142 | Donna Taucher | Donna Taucher<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 9, 2024 | | |
| 146143 | Donna Taucher | Donna Taucher<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 9, 2024 | | |
| 147144 | DP Contour, LLC | DP Contour, LLC<br>511 W. French Place<br>San Antonio, TX 78212 | American Freight Franchisor, LLC | Franchise Agreement, dated September 8, 2022 | | |
| 148145 | DP Contour, LLC | DP Contour, LLC<br>511 W. French Place<br>San Antonio, TX 78212 | American Freight Franchisor, LLC | Development Agreement, dated September 8, 2022 | | |
| 149146 | dunnhumby Inc. | dunnhumby Inc.<br>3825 Edwards Road, Suite 600<br>Cincinnati, OH 45209 | Vitamin Shoppe Procurement Services, LLC | Master Software License and Services Agreement, dated August 24, 2018 | | |
| 150147 | Elite Metro Corp | Elite Metro Corp | Buddy's Newco, LLC | Lease Renewal Agreement, dated March 1, 2025 | | |
| 151148 | Elizabeth O Levy | Elizabeth O Levy<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 4, 2020 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|------|--------------|---------------------|--------|--------------------|-------|----------------|
| 152149 | Ellis Moving Company | Ellis Moving Company<br>3200 California Ave.<br>Pittsburgh, PA 15212 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 7,2024 | | |
| 153150 | ENA SOLUTIONS INC. | ENA SOLUTIONS INC.<br>622 S Avenue S.W., Suite 200<br>City of Calgary, Alberta | American Freight, LLC | ENA Solution Service Contract, dated February 24, 2023 | | |
| 154151 | enVista Interactive Solutions, LLC | enVista Interactive Solutions, LLC<br>11555 N. Meridian Street, Suite 300<br>Carmel, IN 46032 | American Freight, LLC | Master Software as a Service Agreement, dated September 08, 2016 | | |
| 154152 | Eric Seeton | Eric Seeton<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 28, 2024 | | |
| 155153 | Eric Seeton | Eric Seeton<br>[Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated October 2, 2019, as amended | | |
| 157154 | Eric Seeton | Eric Seeton<br>[Address on File] | Franchise Group, Inc. | Amendment to Executive Employment and Severance Agreement, dated February 2, 2024 | | |
| 158155 | Eustis Covenant Group LLC | Eustis Covenant Group LLC<br>2460 Paseo Verde Parkway, Suite 145<br>Henderson, NV 89074 | Vitamin Shoppe Industries LLC | Lease, dated March 25, 2015 | 0764 | 5/19/2025 |
| 159156 | EZ Wireless of Central Florida, Inc. | EZ Wireless of Central Florida, Inc. | Buddy's Newco, LLC | Lease Agreement, dated March 1, 2013 | | |
| 160157 | Feasterville Realty Associates, LP | Feasterville Realty Associates, LP<br>c/o Abrams Realty & Development<br>310 Yorktown Plaza<br>Elkins Park, PA 19027 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated May 7, 2015 | 835 | 4/30/2025 |
| 161158 | Federal Warranty Service Corporation | Federal Warranty Service Corporation<br>260 Interstate North Circle, SE<br>Atlanta, GA 30339 | American Freight, LLC | Statement of Work No. 2 to Master Services Agreement - Aftermarket Service Contract Program, dated November 12, 2021 | | |
| 162159 | Federal Warranty Service Corporation | Federal Warranty Service Corporation<br>260 Interstate North Circle, SE<br>Atlanta, GA 30339 | American Freight, LLC | Amendment No. 2 to the Master Services Agreement, dated October 6, 2021 | | |
| 163160 | Federal Warranty Service Corporation | Federal Warranty Service Corporation<br>260 Interstate North Circle, SE<br>Atlanta, GA 30339 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 164161 | Federal Warranty Service Corporation | Federal Warranty Service Corporation<br>260 Interstate North Circle, SE<br>Atlanta, GA 30339 | American Freight, LLC | Amendment No. 2 to Statement of Work No. 1, dated August 1, 2023 | | |
| 165162 | Federal Warranty Service Corporation | Federal Warranty Service Corporation<br>260 Interstate North Circle, SE<br>Atlanta, GA 30339 | American Freight, LLC | Amendment No. 1 to the Master Services Agreement and Statement of Work No. 1, dated September 23, 2021 | | |
| 166163 | Federal Warranty Service Corporation | Federal Warranty Service Corporation<br>260 Interstate North Circle<br>Atlanta, GA 30339 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 167164 | Federal Warranty Service Corporation | Federal Warranty Service Corporation<br>260 Interstate North Circle, SE<br>Atlanta, GA 30339 | American Freight, LLC | Amendment No. 3 to Statement of Work No. 1, dated November 27, 2023 | | |
| 168165 | Federal Warranty Service Corporation | Federal Warranty Service Corporation<br>260 Interstate North Circle, SE<br>Atlanta, GA 30339 | American Freight, LLC | Statement of Work No. 1 to Master Services Agreement Service Contract Program, dated July 23, 2021 | | |
| 169166 | Fire Movers of Raleigh LLC | Fire Movers of Raleigh LLC<br>401 Point View Court<br>Wilmington, NC 28411 | American Freight, LLC | Preferred Delivery Services Agreement, dated January 29,2024 | | |
| 170167 | Fivetran Inc | Fivetran Inc<br>1221 Broadway, Suite 2400<br>Oakland, CA 94612 | American Freight, LLC | Master Subscription Agreement, dated February 1, 2023 | | |
| 171168 | Fivetran Inc | Fivetran Inc<br>1221 Broadway, Suite 2400,<br>Oakland, CA 94612 | American Freight, LLC | Statement of Work, dated January 31, 2024 | | |
| 172169 | FM Integrated | FM Integrated<br>15974 Frederick Road<br>Woodbine, MD 21797 | American Freight, LLC | Master Services Agreement, dated September 28,2023 | | |
| 173170 | Fordham Retail Associates, LLC | Fordham Retail Associates, LLC<br>999 Waterside Drive<br>Suite 2300<br>Norfolk, VA 23510 | Vitamin Shoppe Industries LLC | Lease, dated  January 11, 2010 | 0512 | 5/19/2025 |
| 174171 | FreedomPay, Inc. | FreedomPay, Inc.<br>100 Matsonford Road, Building 5, Suite 100<br>Radnor, PA 19087 | American Freight Outlet Stores, LLC | FreedomPay Secure Switching Product Agreement, dated October 05, 2016 | | |
| 175172 | Full Faith Moving Services, LLC | Full Faith Moving Services, LLC<br>1537 Salt Spring Road<br>Youngstown, OH 44509 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 7, 2024 | | |
| 176173 | FullContact, Inc. | FullContact, Inc.<br>1580 N. Logan St., Ste. 660, PMB 45057<br>Denver, CO 80203 | American Freight, LLC | FullContact Data Services Agreement, dated December 1,2023 | | |
| 177174 | Galleria Alpha Plaza, Ltd. | Galleria Alpha Plaza, Ltd.<br>2001 Preston Road<br>Plano, TX 75093 | Vitamin Shoppe Industries LLC | Lease, 0905-Alpha Road, as amended by and between Vitamin Shoppe Industries LLC and Galleria Alpha Plaza, Ltd | 0905 | 5/19/2025 |
| 178175 | GBTWORLD1 | GBTWORLD1<br>10126 Challenger Circle<br>Spring Valley, CA 91978 | PSP Franchising, LLC | Assignment and Assumption of Muti-Unit Agreement and Franchise Agreement, dated December 21, 2021 | | 5/14/2025 |
| 179176 | GBTWORLD1 | GBTWORLD1<br>10126 Challenger Circle<br>Spring Valley, CA 91978 | PSP Franchising, LLC | Equipment Sublease Agreement, dated March 9, 2024 | | 5/14/2025 |
| 180177 | Gearhearts Moving & Storage Inc. | Gearhearts Moving & Storage Inc.<br>812 N 7th Ave.<br>Altoona, PA 16601 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 18, 2024 | | |
| 181178 | Geostar Communications, LLC | Geostar Communications, LLC<br>Attn: John Fartedy | American Freight, LLC | Master Service Agreement, dated December 22, 2020 | | |
| 182179 | Gexa Energy, LP | Gexa Energy, LP<br>601 Travis St., Ste 1400<br>Houston, TX 77002 | American Freight, LLC | Business Electricity Authorization, dated July 08, 2024 | | |
| 183180 | Global Amici, Inc. | Global Amici, Inc.<br>8996 Miramar Rd.<br>Suite #304<br>San Diego, CA 92126 | PSP Group, LLC | Private Brand Products Agreement | | |
| 184181 | Granite Telecommunications, LLC | Granite Telecommunications, LLC<br>100 Newport Avenue Extension<br>Quincy, MA 02171 | American Freight, LLC | Master Services Agreement September 30, 2011 | | 4/30/2025 |
| 185182 | Great Hills Retail Inc. | Great Hills Retail Inc. c/o Heitman LLC<br>191 N. Wacker Dr., Suite 2500<br>Chicago, IL 60606 | Vitamin Shoppe Industries LLC | Lease, dated December 19, 2007 | 0386 | 5/31/2025 |
| 186183 | Greg Frye | Greg Frye<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 5, 2024 | | |
| 187184 | Halo Service Solutions Ltd | Halo Service Solutions Ltd<br>86 Eastburn Tower Eastburn Drive<br>Falkirk, Scotland FK1 1TX | American Freight, LLC | Terms and Conditions of Business, dated November 18, 2021 | | |
| 188185 | HAMC College Center LLC | HAMC College Center LLC<br>c/o Colliers International<br>3 Park Plaza, Suite 1200<br>Irvine, CA 92614 | Vitamin Shoppe Industries LLC | Lease, dated November 15, 2007 | 0359 | 4/30/2025 |
| 189186 | Harley's Home, LLC | Harley's Home, LLC<br>7230 171st Street, #651<br>Tinley Park, IL 60477 | WNW Franchising, LLC | Assignment and Assumption of Franchise Agreement, dated November 2, 2022 | | |
| 190187 | Hayley Henderly | Hayley Henderly<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 9, 2024 | | |
| 191188 | Hays Companies | Hays Companies<br>6711 Columbia Gateway Drive, Suite 450<br>Columbia, MD 21046 | Vitamin Shoppe Industries LLC | Delegate Agreement, dated June 13, 2014 | | |
| 192189 | Hays Companies | Hays Companies BMO-88<br>PO BOX 1414<br>Minneapolis, MN 55402-1414 | Vitamin Shoppe Industries LLC | HIPAA Business Associate Agreement, dated September 6, 2013 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 190190 | Hector Vega | Hector Vega [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 12, 2024 | | |
| 191191 | Heidi Char | Heidi Char [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 4, 2021 | | |
| 192192 | Herlihy Moving and Storage Inc. | Herlihy Moving and Storage Inc. 747 Marietta Rd. Chillicothe, OH 45601 | American Freight, LLC | Contract (Other), dated January 16, 2024 | | |
| 193193 | HireRight, LLC | HireRight, LLC 3349 Michelson Dr, Suite 150 Irvine, CA 92612 | American Freight Management Company, LLC | Amendment to Contract, dated December 28, 2022 | | |
| 194194 | HireRight, LLC | HireRight, LLC 3349 Michelson Dr, Suite 150 Irvine, CA 92612 | American Freight Management Company, LLC | Master Services Agreement, dated November 22, 2016 | | |
| 195195 | HM Hillcroft Westheimer Ltd. | HM Hillcroft Westheimer Ltd. 3810 Westheimer Houston, TX 77027 | Vitamin Shoppe Industries, LLC | Sublease Agreement  dated, May 30, 2003 | 185 | 4/30/2025 |
| 196196 | Hudson Hot Shots Moving LLC | Hudson Hot Shots Moving LLC 8619 Bolton Ave. Hudson, FL 34667 | American Freight, LLC | Contract (Other), dated January 11, 2024 | | |
| 197197 | Incentify, LLC | Incentify, LLC 125 Sierra St El Segundo, CA 90245 | Franchise Group. Inc. | Service Agreement, dated April 20, 2022 | | |
| 198198 | Insight Global, LLC | Insight Global, LLC 4170 Ashford Dunwoody Road, Suite 250 Atlanta, GA 30319 | American Freight, LLC | Amendment to Contract, dated February 08, 2023 | | |
| 199199 | Insight Global, LLC | Insight Global, LLC 4170 Ashford Dunwoody Road, Suite 250 Atlanta, GA 30319 | American Freight, LLC | Master Services Agreement 01, dated June 14, 2019 | | |
| 200200 | ISG Transportation LLC | ISG Transportation LLC 194 Rock Terrace Circle Helena, AL 35080 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 9, 2024 | | |
| 201201 | Jack Rabbit Transportation, LLC | Jack Rabbit Transportation, LLC 505 Frederick Ave Las Vegas, NV 89106 | American Freight, LLC | Contract (Other), dated February 15, 2024 | | |
| 202202 | James C Abbatemarco | James C Abbatemarco [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 5, 2020 | | |
| 203203 | Jason Mattes | Jason Mattes [Address on File] | Franchise Group, Inc. | Independent Contractor Services Agreement, dated April 12, 2024 | | |
| 204204 | Jason Mattes | Jason Mattes [Address on File] | Franchise Group, Inc. | Agreement and General Release, dated April 12, 2024 | | |
| 205205 | Jason Springer | Jason Springer [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 17, 2021 | | |
| 206206 | Jason's Delivery SP | Jason's Delivery SP 7718 Teal Glen Dr. Mooringsport, LA 71060 | American Freight, LLC | Contract (Other), dated January 10, 2024 | | |
| 207207 | Jay Khan | Jay Khan [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 208208 | Jeff Seghi | Jeff Seghi [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 209209 | Jeff Seghi | Jeff Seghi [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 210210 | Jeff Suttle | Jeff Suttle [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 1, 2021 | | |
| 211211 | Jeffery Gross | Jeffery Gross [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 4, 2021 | | |
| 212212 | Jeffrey M Van Orden | Jeffrey M Van Orden [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 21, 2023 | | |
| 213213 | Jeffrey Rayes | Jeffrey Rayes [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 7, 2021 | | |
| 214214 | Jenkins Rental LLC | Jenkins Rental LLC 2 Steeplechase Trail Longview, TX 75605 | American Freight, LLC | Assignment of Lease Agreement, dated July 10, 2021 | | 3/31/2025 |
| 215215 | Jerry Troupe II | Jerry  Troupe II [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 8, 2021 | | |
| 216216 | Jim Brownell | Jim Brownell [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 217217 | JJ Global Solutions Corp | JJ Global Solutions Corp 6868 Washington Ave. S Eden Prairie, MN 55344 | American Freight, LLC | Contract (Other), dated January 16, 2024 | | |
| 218218 | JN Harris Enterprises, LLC | JN Harris Enterprises, LLC 4624 Warrensville Center Road North Randall, OH 44128 | American Freight, LLC | Contract (Other), dated February 26, 2024 | | |
| 219219 | Joe Kaminski | Joe Kaminski [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 220220 | Joe Spires | Joe Spires [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 20, 2024 | | |
| 221221 | John Batten | John Batten [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 222222 | John Dandash | John Dandash [Address on File] | PSP Franchising, LLC | Multi-Unit Agreement, dated July 20, 2021 | | 5/14/2025 |
| 223223 | John Dandash | John Dandash [Address on File] | PSP Franchising, LLC | Franchise Agreement, dated July 20, 2021 | | 5/14/2025 |
| 224224 | John Dandash | John Dandash [Address on File] | PSP Franchising, LLC | Addendum to the PSP Franchising, LLC Franchise Agreement, dated July 20, 2021 | | 5/14/2025 |
| 225225 | John Gayton | John Gayton [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated April 2, 2024 | | |
| 226226 | John Sessoms | John Sessoms [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated March 8, 2024 | | |
| 227227 | Jon Phillips | Jon Phillips [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 228228 | Jonathan Arsenault | Jonathan Arsenault [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated January 19, 2024 | | |
| 229229 | Jonathan Arsenault | Jonathan Hugh Arsenault [Address on File] | Franchise Group, Inc. | Incremental Severance Agreement, dated October 10, 2023 | | |
| 230230 | Jonathan Waters | Jonathan Waters [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 231231 | Jonathan Waters | Jonathan Waters [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 1, 2024 | | |
| 232232 | Joseph Gazzo | Joseph Gazzo [Address on File] | Buddy's Franchising and Licensing, LLC Franchise Group Inc. | Settlement Agreement and Release, dated  May 10, 2024 | | |
| 233233 | Josh Goldstein | Josh Goldstein [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 7, 2021 | | |
| 234234 | K&M Moving and Logistics LLC | K&M Moving and Logistics LLC 1727 Brookhurst Way Grants Pass, OR 97527 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 6, 2024 | | |
| 235235 | Kamerade Group, LLC | Kamerade Group, LLC 58 Brookfield Lenox Road Tifton, GA 31794 | Buddy's Newco, LLC | Consent to Sublease Agreement, dated March 26, 2014 | 386 | 5/31/2025 |
| 236236 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Newco, LLC | Sublease Agreement | 1061 | 5/20/2025 |
| 237237 | Karl Finley | Karl Finley [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 238238 | Katie McComiskey | Katie McComiskey [Address on File] | Franchise Group, Inc. | Independent Contractor Services Agreement, dated July 24, 2024 | | |
| 239239 | KAWIPS Delaware Cuyahoga Falls, LLC | KAWIPS Delaware Cuyahoga Falls, LLC 1590-D Rosecrans Ave. PMB#259 Manhattan Beach, CA 90266 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated December 19, 2014 | 788 | 5/1/2025 |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 244240 | Ken Peters | Ken Peters [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 4, 2024 | | |
| 244241 | Kenneth Todd Evans | Kenneth Todd Evans [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2024 | | |
| 244242 | Kenneth Todd Evans | Kenneth Todd Evans [Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated August 1, 2020, as amended | | |
| 244243 | Keshia Rodriguez | Keshia Rodriguez [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 244244 | Kishore Patel | Kishore Patel [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 244245 | KK-BTC  LLC | KK-BTC  LLC C/O The Summit Commercial Group Inc. 5639 Via Verona View Colorado Springs, CO 80919 | Vitamin Shoppe Industries LLC | Lease,  dated April 21, 2006 | 0321 | 5/19/2025 |
| 244246 | Knight and Day Delivery | Knight and Day Delivery 104 Pinewood Sq. Pittsburgh, PA 15235 | American Freight, LLC | Preferred Delivery Services Agreement, dated July 10, 2024 | | |
| 244247 | Korpack, Inc. | Korpack, Inc. 290 Madsen Drive Bloomingdale, IL 60108 | American Freight Outlet Stores, LLC | Procurement Terms and Conditions, dated July 01, 2019 | | |
| 244248 | Kris Harris | Kris Harris [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated June 21, 2024 | | |
| 244249 | Kriser's Feeding Pets For Life, LLC | Kriser's Feeding Pets For Life, LLC 1906 Olympic Blvd. Santa Monica, CA 90404 Attn: Ken Grouf  with a copy to: The Law Offices of William M. Holzman 666 Dundee Road, Suite 1904 Northbrook, IL 60062 Attn: William M. Holzman | Vitamin Shoppe Industries LLC | Sublease, dated June 8, 2016 | 0386 | 5/31/2025 |
| 244250 | Kristen Barrett | Kristen Barrett [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 13, 2021 | | |
| 244251 | Kroll Information Assurance, LLC | Kroll Information Assurance, LLC 55 East 52nd Street, 31st Floor New York, NY 10055 | American Freight, LLC | Master Services Agreement 01, dated August 15, 2022 | | |
| 244252 | Kyle Scholes | Kyle Scholes [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated March 5, 2024 | | |
| 244253 | Kyle Scholes | Kyle Scholes [Address on File] | Franchise Group, Inc. | Offer Letter, dated April 12, 2023 | | |
| 244254 | Lahaina Gateway Property Owner, L.P. | Lahaina Gateway Property Owner, L.P. 5743 Corsa Avenue, Suite 215 Westlake Village, CA 91362 | Vitamin Shoppe Industries LLC | Lease, dated October 14, 2008 | 0397 | 4/30/2025 |
| 244255 | Laura Coffey | Laura Coffey [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated November 30, 2020 | | |
| 244256 | Laurel Lakes, LLC | Laurel Lakes, LLC 2800 Quarry LakeDrive, Suite 340 Baltimore, MD 21209 | Vitamin Shoppe Industries LLC | Lease, 0903-Laurel (Relocation), as amended by and between Vitamin Shoppe Industries LLC and Laurel Lakes, LLC | 0903 | 5/19/2025 |
| 244257 | Lauren Pollard | Lauren Pollard [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 244258 | Lauri Joffe Turjeman | Lauri Joffe Turjeman [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 7, 2024 | | |
| 244259 | Lauri Joffe Turjeman | Lauri Joffe Turjeman [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 7, 2024 | | |
| 244260 | Lee Wright | Lee Wright [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated March 5, 2020 | | |
| 244261 | Lee Wright | Lee Wright [Address on File] | Vitamin Shoppe Industries, LLC | Executive Employment and Severance Agreement, dated May 24, 2023 | | |
| 244262 | Lisa J O'Dougherty | Lisa J O'Dougherty [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated November 23, 2020 | | |
| 244263 | Lori Wagner | Lori Wagner [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated April 28, 2020 | | |
| 244264 | Lustig Realty Corp | Lustig Realty Corp 312 Washington Street, Suite # 2, Hoboken, NJ 070730 | Vitamin Shoppe Industries, LLC | Lease, dated March 7, 2023 | 0894 | 4/30/2025 |
| 244265 | Lydia Brown | Lydia Brown [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated March 1, 2024 | | |
| 244266 | Lydia Brown | Lydia Brown [Address on File] | Franchise Group, Inc. | Offer Letter, dated March 1, 2022 | | |
| 244267 | M&M Trucking 7 | M&M Trucking 7 820 Hawkins Blvd, Ste O El Paso, TX 79915 | American Freight, LLC | Contract (Other), dated December 26, 2023 | | |
| 244268 | Mason Dixon Movers, LLC | Mason Dixon Movers, LLC 4790 Tom Cat Rd. Gadsden, AL 35903 | American Freight, LLC | Preferred Delivery Services Agreement, dated June 26, 2024 | | |
| 244269 | Matthew Devitt | Matthew Devitt [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 5, 2021 | | |
| 244270 | McGriff Insurance Services, Inc. | McGriff Insurance Services, Inc. 4309 Emperor Blvd, Ste 300 Durham, NC 27703-8046 | Franchise Group, Inc. | First Amendment to Services Agreement, dated June 1, 2021 | | |
| 244271 | MDI Logistica LLC | MDI Logistica LLC 300 Crabapple Lane Beaver Falls, PA 15010 | American Freight, LLC | Preferred Delivery Services Agreement, dated February 29, 2024 | | |
| 244272 | Meadowlands Fire Protection | Meadowlands Fire Protection 348 New County Road Secaucus, NJ 07094 | Vitamin Shoppe Industries LLC | Proposal for 2014 Quarterly Inspection, dated May 22, 2014 | | |
| 244273 | Meadowlands Fire Protection | Meadowlands Fire Protection 348 New County Road Secaucus, NJ 07094 | Vitamin Shoppe Industries LLC | Proposal for 2017 Quarterly Inspection | | |
| 244274 | Meadowlands Fire Protection Corp. | Meadowlands Fire Protection Corp. 348 New County Road Secaucus, NJ 07094 | Vitamin Shoppe Industries LLC | Service Agreement Renewal Quote, dated January 16, 2018 | | |
| 244275 | Meadowlands Fire Protection Corp. | Meadowlands Fire Protection Corp. 348 New County Rd Secaucus, NJ 07094 | Vitamin Shoppe Industries LLC | Proposal for 2017 Quarterly Inspection | | |
| 244276 | MEDIA WORKS, LTD. | MEDIA WORKS, LTD. 1425 Clarkview Road, Suite 500 Baltimore, MD 21209 | American Freight, LLC | Master Services Agreement, dated June 09, 2023 | | |
| 244277 | Michael A. Jaffe | Michael A. Jaffe [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 2, 2020 | | |
| 244278 | Michael Gray | Michael Gray [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 244279 | Michael Gray | Michael Gray [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 244280 | Michael Jordison | Michael Jordison [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 244281 | Michelle Harding | Michelle Harding [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated November 21, 2021 | | |
| 244282 | Michelle Wildman | Michelle Wildman [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 11, 2021 | | |
| 244283 | MicroStrategy Services Corporation | MicroStrategy Services Corporation 1850 Towers Crescent Plaza Tysons Corner, VA 22182 | American Freight, LLC | Statement of Work, dated June 10, 2024 | | |
| 244284 | Mightee Movers LLC | Mightee Movers LLC 102 Arlington Heights Dr. Lynchburg, VA 24501 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 20, 2024 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 290285 | Mike Albert Leasing Inc. | Mike Albert Leasing Inc.<br>10340 Evendale Drive<br>Cincinnati, OH 45241 | PSP Stores, LLC | Disposal Agreement, dated April 16, 2015 | | |
| 290286 | Mike Albert Leasing Inc. | Mike Albert Leasing Inc.<br>10340 Evendale Drive<br>Cincinnati, OH 45241 | PSP Stores, LLC | Services Agreement, dated April 16, 2015 | | |
| 290287 | Mike Albert Leasing Inc. | Mike Albert Leasing Inc.<br>10340 Evendale Drive<br>Cincinnati, OH 45241 | PSP Stores, LLC | Scheduled Services Maintenance Management Program, dated April 16, 2015 | | |
| 290288 | Mike Albert Leasing Inc. | Mike Albert Leasing Inc.<br>10340 Evendale Drive<br>Cincinnati, OH 45241 | PSP Stores, LLC | Specified Services Title & Licenses Programs, dated April 16, 2015 | | |
| 290289 | Mike Albert, LLC | Mike Albert, LLC<br>90 Lighthouse Point Road<br>Longboat Key, FL 34228 | PSP Stores, LLC | Master Purchase Agreement, dated February 21, 2019 | | |
| 290290 | Mike Albert, LLC | Mike Albert, LLC<br>90 Lighthouse Point Road<br>Longboat Key, FL 34228 | PSP Stores, LLC | Internal Statement of Work Specified Services, dated July 12, 2023 | | |
| 290291 | Mike Albert, LLC | Mike Albert, LLC<br>90 Lighthouse Point Road<br>Longboat Key, FL 34228 | PSP Stores, LLC | Internal Statement of Work Specified Services, dated July 29, 2024 | | |
| 290292 | Mike Jordison | Mike Jordison<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 290293 | Mike Lesso | Mike Lesso<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 290294 | Mike Lesso | Mike Lesso<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 290295 | Mike Ponkey | Mike Ponkey<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 7, 2021 | | |
| 290296 | Miles Tedder | Miles Tedder<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 6, 2021 | | |
| 290297 | Milliman, Inc. | Milliman, Inc.<br>150 Clove Rd, 10th Fl<br>Little Falls, NJ 07424 | Franchise Group, Inc. | Services Agreement, dated June 9, 2021 | | |
| 290298 | MMS Group, LLC | MMS Group, LLC<br>662 Howard Avenue<br>Biloxi, MS 39530 | Buddy's Franchising and Licensing, LLC<br>Franchise Group Inc. | Settlement Agreement and Release, dated May 10, 2024 | | |
| 290299 | Mood Media | Mood Media<br>2100 S. H-35<br>Ste. 200<br>Austin, TX 18104 | PSP Stores, LLC | Mood Media Multi Territory Account Service Agreement, dated December 20, 2018 | | |
| 303300 | Moovin & Groovin LLC | Moovin & Groovin LLC<br>2105 Neptune Court<br>Bartlesville, OK 74006 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 9, 2024 | | |
| 304301 | Movable, Inc. | Movable, Inc.<br>5 Bryant Park (1065 6th Avenue), 9th Floor New York, NY 10018 | Vitamin Shoppe Industries LLC | Movable, Inc. Standard Terms, dated May 5, 2017 | | |
| 305302 | Muriel Gonzalez | Muriel Gonzalez<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 24, 2023 | | |
| 306303 | Muriel Gonzalez | Muriel Gonzalez<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated November 28, 2020 | | |
| 307304 | Mursi Kawasmy | Mursi Kawasmy<br>[Address on File] | Buddy's Newco, LLC | Lease Extension Request, dated January 8, 2025 | | |
| 308305 | Nadina Guglielmetti | Nadina Guglielmetti<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 1, 2020 | | |
| 309306 | Neal P Panza | Neal P Panza<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated March 5, 2020 | | |
| 310307 | Needham Chestnut Realty, LLC | Needham Chestnut Realty, LLC<br>1234 Boylston St.<br>Chestnut Hill, MA 02467 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated March 26, 2014 | 754 | 4/30/2025 |
| 311308 | Neil Rosen | Neil Rosen<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated August 16, 2020 | | |
| 312309 | Nick Russo | Nick Russo<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 6, 2021 | | |
| 313310 | Nick Russo | Nick Russo<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated February 24, 2023 | | |
| 314311 | NISC UBP, LLC | NISC UBP, LLC<br>3131 Technology Drive NW<br>Mandan, ND 58554 | American Freight, LLC | Professional Services Agreement, Utility Bills, dated November 9, 2020 | | |
| 315312 | NISC UBP, LLC dba Capturis | NISC UBP, LLC dba Capturis<br>3131 Technology Drive NW<br>Mandan, ND 58554 | American Freight, LLC | Confidential Amendment to Professional Services Agreement, dated January 31, 2018 | | |
| 316313 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 317314 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 318315 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 319316 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 320317 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 321318 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 322319 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 323320 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 324321 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 325322 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 326323 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 327324 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 509325 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509326 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509327 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509328 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509329 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509330 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509331 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509332 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509333 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509334 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509335 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509336 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509337 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509338 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509339 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509340 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509341 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509342 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509343 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509344 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509345 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509346 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guarantee, dated March 31, 2022 | | 3/31/2025 |
| 509347 | NNN REIT, LP<br>f/k/a National Retail Properties, LP | NNN REIT, LP<br>450 S. Orange Avenue<br>Orlando, FL 32801<br>Attn: David G. Byrnes, Jr. | Franchise Group. Inc. | Lease Guaranty, dated March 31, 2022 | | 3/31/2025 |
| 509348 | Noe Flores<br>Sergio De La Cruz | Noe Flores<br>[Address on File]<br>Sergio De La Cruz<br>[Address on File] | Buddy's Newco, LLC | Lease Agreement, dated March 7, 2013 | | |
| 509349 | Oak Forest Group, LTD | Oak Forest Group, LTD<br>P.O. Box 3449<br>Longview, TX 75606 | American Freight, LLC | Franchise Lease Agreement, dated 03/30/2021, as amended | | 3/31/2025 |
| 509350 | ODP Business Solutions, LLC | ODP Business Solutions, LLC<br>6600 North Military Trail<br>Boca Raton, FL 33496 | American Freight, LLC | ODP Business Solutions Supply Agreement, dated June 30, 2022 | | |
| 509351 | On Demand Technologies, Inc dba OneRail | On Demand Technologies, Inc dba OneRail<br>8427 Southpark Circle SE, Ste 200<br>Orlando, FL 32819 | American Freight, LLC | PO or Purchase Agreement, dated June 18, 2024 | | |
| 509352 | On Demand Technologies, Inc. (d/b/a OneRail) | On Demand Technologies, Inc. (d/b/a OneRail)<br>8427 Southpark Circle SW, Suite 200<br>Orlando, FL 32819 | American Freight, LLC | OneRail / American Freight, LLC Master Services Agreement, dated June 18, 2024 | | |
| 509353 | OneTrust | OneTrust<br>1200 Abernathy Rd NE, Bldg 600<br>Atlanta, GA 30328 | American Freight, LLC | Statement of Work 01, dated March 06, 2023 | | |
| 509354 | Onix Networking Corp | Onix Networking Corp<br>485 Lexington Avenue<br>New York, NY 10017 | American Freight, LLC | Amendment to Onix Networking Customer Agreement, dated May 16, 2024 | | |
| 509355 | Onix Networking Corp | Onix Networking Corp<br>1991 Crocker Road<br>Westlake, OH 44145 | American Freight, LLC | Onix Enterprise Customer Agreement Google Cloud Services, dated May 16, 2024 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 356 | OnPoint Warranty Solutions LLC | OnPoint Warranty Solutions LLC<br>1400 Main St., Suite 132<br>Clarksville, IN 47129 | American Freight, LLC | Master Services Agreement, dated November 17, 2023 | | |
| 357 | OSOT Transportation LLC | OSOT Transportation LLC<br>3929 Baumberger Rd<br>Stow, OH 44224 | American Freight, LLC | Contract (Other), dated July 12, 2024 | | |
| 358 | OUTFRONT Media, LLC | OUTFRONT Media, LLC<br>405 Lexington Avenue, 17th Floor<br>New York, NY 10174 | Buddy's Newco, LLC | Sign Location Lease, dated June 13, 2017 | | |
| 359 | Paul Seeds | Paul Seeds<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated February 23, 2021 | | |
| 360 | Paychex, Inc. | Paychex, Inc.<br>911 Panorama Trail South<br>Rochester, NY 14625 | Franchise Group, Inc. | Paychex Strategic Account Partnership Agreement, dated October 14, 2022 | | |
| 361 | Pendleton Expediting, Inc. | Pendleton Expediting, Inc.<br>13201 E Oreli Rd.<br>Louisville, KY 40272 | American Freight, LLC | Contract (Other), dated January 31, 2024 | | |
| 362 | Philip Etter | Philip Etter<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 363 | Philip Etter | Philip Etter<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 364 | Rabih Awad | Rabih Awad<br>[Address on File] | American Freight, LLC | Assignment and Assumption of Subtenant's Interest and Obligations in Sublease, dated December 21, 2021 | 276 | 4/30/2025 |
| 365 | Races Working Men, RTR Inc. | Races Working Men, RTR Inc.<br>1619 Archer City Hwy 79<br>Wichita Falls, TX 76302 | American Freight, LLC | Contract (Other), dated January 16, 2024 | | |
| 366 | Rancho Dos Hermanos, LLC | Rancho Dos Hermanos, LLC<br>2655 First Street, Suite 245,<br>Simi Valley, CA 93065 | Vitamin Shoppe Industries, LLC | Agreement of Lease dated, July 23, 2014 | 803 | 4/30/2025 |
| 367 | Randy Schoemann | Randy Schoemann<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 368 | RCG-PSC Camp Creek Owner, LLC | RCG-PSC Camp Creek Owner, LLC c/o RCG-Ventures LLC.<br>3060 Peachtree Road NW, Suite 400<br>Atlanta, GA 30305 | Vitamin Shoppe Industries, LLC | Lease, dated August 27, 2003 | 0197 | 5/19/2025 |
| 369 | Reina VanDelft | Reina VanDelft<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Award Agreement, dated October 14, 2021 | | |
| 370 | Retail Logistics Excellence - RELEX Oy | Retail Logistics Excellence - RELEX Oy<br>Postintaival 7<br>00230 Helsinki, Finland | American Freight, LLC | RELEX Master Service Agreement, dated June 07, 2019 | | |
| 371 | RetailNext, Inc | RetailNext, Inc.<br>60 S Market, Suite 310<br>San Jose, CA 95113 | American Freight, LLC | Statement of Work, dated May 15, 2023 | | |
| 372 | RetailNext, Inc. | RetailNext, Inc.<br>60 S. Market St.<br>San Jose, CA 95113 | American Freight, LLC | Master Services Agreement, dated May 15, 2023 | | |
| 373 | Ring Central, Inc. | Ring Central, Inc.<br>20 Davis Drive<br>Belmont, CA 94002 | American Freight, LLC | Master Services Agreement, dated June 20,2018 | | |
| 374 | Riskified Inc. | Riskified Inc.<br>220 5th Ave., 2nd Floor<br>New York, NY 10001 | American Freight Outlet Stores, LLC | Software as a Service Agreement, dated March 28, 2019 | | |
| 375 | Riverdale Square, LLC | Riverdale Square, LLC<br>61 West Palisade Avenue<br>Englewood, NJ 07631 | Vitamin Shoppe Industries, LLC | Lease, dated November 24, 2020 | 893 | 4/30/2025 |
| 376 | Robert Depew | Robert Depew<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 377 | Robert Depew | Robert Depew<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 14, 2024 | | |
| 378 | Roe Lawn Care, SP | Roe Lawn Care, SP<br>117 E 11th Street<br>Elmira Heights, NY 14093 | American Freight, LLC | Contract (Other), dated January 03, 2024 | | |
| 379 | Ron Allender | Ron Allender<br>[Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 380 | Rosebud VS Boca One, LLC | Rosebud VS Boca One, LLC<br>c/o Investments Limited,<br>215 North Federal Highway, Suite 1<br>Boca Raton, FL 33432 | Vitamin Shoppe Industries, LLC | Lease, dated August 18, 2013 | 0618 | 4/30/2025 |
| 381 | Ryan Maietta | Ryan Maietta<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated October 24, 2024 | | |
| 382 | Salvatore Bruno | Salvatore Bruno<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Award Agreement, dated June 18, 2024 | | |
| 383 | Salvatore Bruno | Salvatore Bruno<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Award Agreement, dated October 18, 2021 | | |
| 384 | Samir Patel<br>Roshan Patel | Samir Patel<br>[Address on File]<br>Roshan Patel<br>[Address on File] | WNW Franchising, LLC | Multi-Unit Agreement, dated July 12, 2024 | | |
| 385 | Samir Patel<br>Roshan Patel | Samir Patel<br>[Address on File]<br>Roshan Patel<br>[Address on File] | WNW Franchising, LLC | Addendum to the WNW Franchising, LLC Multi Unit Agreement, dated July 12, 2024 | | |
| 386 | Samir Patel<br>Roshan Patel | Samir Patel<br>[Address on File]<br>Roshan Patel<br>[Address on File] | WNW Franchising, LLC | Franchise Agreement, dated July 12, 2024 | | |
| 387 | Samir Patel<br>Roshan Patel | Samir Patel<br>[Address on File]<br>Roshan Patel<br>[Address on File] | WNW Franchising, LLC | Addendum to the WNW Franchising, LLC Franchise Agreement, dated July 12, 2024 | | |
| 388 | Sanjiv Divatia | Sanjiv Divatia<br>[Address on File] | Freedom VCM Holdings, LLC | Incentive Unit Award Agreement, dated as of February 22, 2024 | | |
| 389 | Sara Ranson | Sara Ranson<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Award Agreement, dated August 21, 2022 | | |
| 390 | Sara Ranson | Sara Ranson<br>[Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Award Agreement, dated October 4, 2021 | | |
| 391 | Scott Devlin | Scott Devlin<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated March 5, 2020 | | |
| 392 | Scott Harvey | Scott Harvey<br>[Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2024 | | |
| 393 | Scott Harvey | Scott Harvey<br>[Address on File] | Franchise Group, Inc. | Offer Letter, dated September 10, 2020 | | |
| 394 | Sharon Leite | Sharon Leite<br>[Address on File] | Vitamin Shoppe Industries, LLC | Employment and Non-Competition Agreement dated of April 16, 2020, by and between Sharon Leite and Vitamin Shoppe Industries LLC | | |
| 395 | Sharon M Leite | Sharon M Leite<br>[Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated April 20, 2020 | | |
| 396 | Shops at Rayford Crossing LLC | Shops at Rayford Crossing LLC<br>c/o Wilmann Companies<br>9601 Katy Freeway, Suite 400<br>Houston, TX 77024<br>Attn: Karl D. Wilman | PSP Stores, LLC | Lease, dated June 6, 2012 | 4646 | 4/30/2025 |
| 397 | SignUp Software, Inc. | SignUp Software, Inc.<br>3500 South DuPont Highway, Suite DN 101<br>Dover, DE 19901 | PSP Group, LLC | Subscription Agreement ExFlow, dated April 1, 2024 | | |
| 398 | SignUp Software, Inc. | SignUp Software, Inc.<br>3500 South DuPont Highway, Suite DN 101<br>Dover, DE 19901 | PSP Group, LLC | Subscription Agreement ExFlow Data Capture, dated April 1, 2024 | | |
| 399 | SITS, LLC | SITS, LLC<br>35 Olympic Dr<br>South Barrington, IL 60010 | American Freight, LLC | Agreement and Statement of Work for Security Assessment Services, dated March 6, 2023 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 400400 | SK Global Software, LLC | SK Global Software, LLC / 940 Gemini Street / Houston, TX 77058 | PSP Group, LLC | Software License and Support Agreement, dated April 5, 2024 | | |
| 401401 | Slim and Goldie, LLC[1] | Slim and Goldie, LLC / [Address on File] | PSP Franchising, LLC | Addendum to the PSP Franchising, LLC Franchise Agreement, dated August 17, 2015 | | |
| 402402 | Slim and Goldie, LLC[1] | Slim and Goldie, LLC / [Address on File] | PSP Franchising, LLC | Addendum to the PSP Franchising, LLC Franchise Agreement, dated December 18, 2024 | | |
| 403403 | Slim and Goldie, LLC[1] / Keith R. Bogans[1] | Slim and Goldie, LLC / [Address on File] / Keith R. Bogans / [Address on File] | PSP Franchising, LLC | Franchise Agreement, dated December 18, 2014 | | |
| 404404 | Small Movers LLC | Small Movers LLC / 6178 Howdershell Road / Hazelwood, MO 63042 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 8, 2024 | | |
| 405405 | Solstice Sleep Products, Inc. | Solstice Sleep Products, Inc. / 3720 W Broad Street / Columbus, OH 43228 | American Freight, LLC | Amendment to the Supply Agreement, dated July 1, 2022 | | |
| 406406 | Southpark Retail LLC | Southpark Retail LLC / c/o Carnegie Companies / 6190 Cochran Rd, Suite A / Solon, OH 44139 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated December 3, 2015 | 854 | 4/30/2025 |
| 407407 | Spark Communications Group, LLC | Spark Communications Group, LLC / P.O. Box 48745 / Athens, GA 30604 | Franchise Group, Inc. | See.Spark.Go Services Agreement, dated February 1, 2021 | | |
| 408408 | Spark Data Solutions Inc | Spark Data Solutions Inc / 26077 Nelson Way, Suite 1102 / Katy, TX 77494 | American Freight, LLC | Master Services Agreement, dated June 20, 2023 | | |
| 409409 | Spark Data Solutions Inc | Spark Data Solutions Inc / 26077 Nelson Way, Suite 1102 / Katy, TX 77494 | American Freight, LLC | Master Services Agreement, dated June 20, 2023 | | |
| 410410 | SPS Commerce | SPS Commerce / 333 South Seventh Street, Suite 1000 / Minneapolis, MN 55402 | American Freight, LLC | Statement of Work, dated January 16, 2024 | | |
| 411411 | SPS Commerce | SPS Commerce / 333 South Seventh Street, Suite 1000 / Minneapolis, MN 55402 | American Freight, LLC | Statement of Work, dated January 16, 2024 | | |
| 412412 | STAG Industrial Holdings, LLC | STAG Industrial Holdings, / c/o STAG Avondale / One Federal Street / 23rd floor / Boston, MA 02110 | Vitamin Shoppe Procurement Services, LLC | Landlord Agreement, by and between STAG Industrial Holdings, LLC, Vitamin Shoppe Procurement Services, LLC, JPMorgan Chase Bank, N.A., and GACP Finance CO., LLC | | |
| 413413 | Stan Mac | Stan Mac / [Address on File] | Franchise Group Intermediate PSP, LLC | Pet Supplies Plus Incentive Unit Plan Award Agreement, dated October 4, 2021 | | |
| 414414 | Starting A New LLC | Starting A New LLC / 3157 O'Neal Lane / Baton Rouge, LA 70816 | American Freight, LLC | Preferred Delivery Services Agreement dated January 19, 2024 | | |
| 415415 | Stephanie Koda | Stephanie Koda / [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 7, 2024 | | |
| 416416 | Steve Marada | Steve Marada / [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 31, 2023 | | |
| 417417 | Store Master Funding IV, LLC | Store Master Funding IV, LLC / 8501 E Princess Drive, Suite 190 / Scottsdale, AZ 85255 | Buddy's Newco, LLC | Master Lease Agreement, dated September 24, 2013 | 4 / 5 / 8 / 13 / 17 / 55 / 65 / 1061 / 386 / 16 / 18 / 19 / 35 | 5/20/2025 |
| 418418 | Store Master Funding IV, LLC | Store Master Funding IV, LLC / 8501 E. Princess Drive, Suite 190 / Scottsdale, AZ 85255 / Kutak Rock LLP / 1801 California Street, Suite 3000 / Denver, CO 80202 / Attn: Whitney A. Kopicky, Esq. | Buddy's Newco, LLC | Guaranty of Second Amended and Restated Master Lease Agreement by and between Store Master Funding IV, LLC and Buddy's Northwest, LLC, dated November 3, 2015 | | 5/12/2025 |
| 419419 | Sue Hilsenbeck | Sue Hilsenbeck / [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 420420 | Sugarland Plaza, Inc. | Sugarland Plaza, Inc. / 802 NW 1st Street / South Bay, FL 33493 | Buddy's Newco, LLC | Lease, dated November 29, 2007 | 30 | 5/12/2025 |
| 421421 | Sun Life Assurance Company of Canada | Sun Life Assurance Company of Canada / MetroNorth Retail Center, c/o JLL / 3344 Peachtree Road, Suite 1200 / Atlanta, GA 30326 | Vitamin Shoppe Industries LLC | Lease, dated September 28, 2013 | 0688 | 4/30/2025 |
| 422422 | T Voorhees GPI, NI, LLC, T Voorhees BER NI, LLC, and T Voorhees AMC NI, LLC | T Voorhees GPI, NI, LLC, T Voorhees BER NI, LLC, and T Voorhees AMC NI, LLC / 19600 Dallas Parkway, Suite 300 / Dallas, TX 75248 | Vitamin Shoppe Industries LLC | Lease, dated August 21, 2015 | 0724 | 4/30/2025 |
| 423423 | TALX Corporation | TALX Corporation / 11432 Lackland Road / St. Louis, MO 63146 | American Freight Management Company, LLC | Master Services Agreement, dated April 01, 2022 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 424424 | Tamara J Pircz | Tamara J Pircz [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated November 23, 2020 | | |
| 424425 | Ted M Vasquez | Ted M Vasquez [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated May 2, 2020 | | |
| 424426 | Teresa M Orth | Teresa M Orth [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated April 28, 2020 | | |
| 434427 | The Hertz Corporation | The Hertz Corporation 8501 Williams Road, Estero, FL 33928 | Franchise Group, Inc. | Corporate Account Agreement & Exhibits Agreement, dated November 15, 2023 | | |
| 434428 | The Home Moving Solutions LLC | The Home Moving Solutions LLC 1209 N Slappey Blvd., Suite B Albany, GA 31701 | American Freight, LLC | Preferred Delivery Services Agreement dated January 4, 2024 | | |
| 434429 | The Procter & Gamble Distributing LLC | The Procter & Gamble Distributing LLC 2 P&G Plaza Cincinnati, OH 45202 | Vitamin Shoppe Industries, LLC | Procter & Gamble Trade Fund Program, dated December 13, 2016 | | |
| 434430 | The Procter & Gamble Distributing LLC | The Procter & Gamble Distributing LLC 2 P&G Plaza Cincinnati, OH 45202 | Vitamin Shoppe Industries, LLC | Worldwide Confidential Disclosure Agreement, dated May 11, 2016 | | |
| 434431 | The Procter & Gamble Distributing LLC | The Procter & Gamble Distributing LLC 2 P&G Plaza Cincinnati, OH 45202 | Vitamin Shoppe Industries, LLC | Logistics Development Incentive Agreement, dated December 13, 2016 | | |
| 434432 | The Shoppes at North Brunswick, L.L.C. | The Shoppes at North Brunswick, L.L.C. c/o The Azarian Group, L.L.C. 6 Prospect Street, Suite 2 Midland Park, NJ 07432 | Vitamin Shoppe Industries, LLC | Shopping Center Lease, dated December 23, 2019 | 886 | 4/30/2025 |
| 434433 | The Shubert Organization, Inc. | The Shubert Organization, Inc. 234 West 44th Street New York, NY 10036 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated August 19, 2014 | 763 | 4/30/2025 |
| 434434 | The Transport Boss LLC | The Transport Boss LLC 9855 E Coronado Dr Baton Rouge, LA 70815 | American Freight, LLC | Contract (Other), dated February 26, 2024 | | |
| 434435 | The Ultimate Software Group, Inc. | The Ultimate Software Group, Inc. 2000 Ultimate Way Weston, FL 33326 | American Freight Outlet Stores, LLC | Master Terms and Conditions for Procurement of Software Rights and Services, dated February 11, 2016 | | |
| 434436 | Thomas N Merrihew | Thomas N Merrihew [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated August 1, 2020 | | |
| 444437 | Thomas Will | Thomas Will [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 28, 2024 | | |
| 444438 | Thomas Will | Thomas Will [Address on File] | Franchise Group, Inc. | Offer Letter, dated October 31, 2020 | | |
| 444439 | Thomson Reuters Inc. | Thomson Reuters Inc. P.O. Box 115008 Carrolton, TX 75011-5008 | PSP Group, LLC | Multi Year Order Form, dated May 18,2023 | | |
| 444440 | Tiffany McMillan-McWaters | Tiffany McMillan-McWaters [Address on File] | Freedom VCM Holdings, LLC | Restricted Class A Unit Grant Notice and Agreement, dated February 26, 2024 | | |
| 444441 | Tiffany McMillan-McWaters | Tiffany McMillan-McWaters [Address on File] | Franchise Group, Inc. | Executive Employment and Severance Agreement, dated January 29, 2019 | | |
| 444442 | Tim Metzgar | Tim Metzgar [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated July 21, 2023 | | |
| 444443 | Tmakt Moving Company, LLC | Tmakt Moving Company, LLC 5860 Russell Topton Rd. Toomsubo, MS 39364 | American Freight, LLC | Contract (Other), dated January 02, 2024 | | |
| 444444 | Todd D Northcutt | Todd D Northcutt [Address on File] | Vitamin Shoppe Industries, LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan Award Agreement, dated April 30, 2020 | | |
| 444445 | Tom Arigi | Tom Arigi [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 444446 | Tom Lee | Tom Lee [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 454447 | Tri-County Movers SP | Tri-County Movers SP PO Box 7716452 Ocala, FL 34477 | American Freight, LLC | Contract (Other), dated February 29, 2024 | | |
| 454448 | Troy Bischoff | Troy Bischoff [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated February 5, 2024 | | |
| 454449 | Troy Bischoff | Troy Bischoff [Address on File] | Franchise Group Newco Intermediate AF, LLC | Incentive Unit Plan Waiver Agreement, dated February 5, 2024 | | |
| 454450 | UKG Inc | UKG Inc 2000 Ultimate Way Weston, FL 33326 Attn: General Counsel | American Freight, LLC | Amendment to the Agreement, dated December 31, 2015 | | |
| 454451 | United Parcel Service, Inc. | United Parcel Service, Inc. 700 W 16th Street Indianapolis, IN 46202 | American Freight, LLC | Amendment to Contract, dated April 25, 2023 | | |
| 454452 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Amendment No. 3 to Statement of Work No. 1, dated November 27, 2023 | | |
| 454453 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Statement of Work No. 2 to Master Services Agreement - Aftermarket Service Contract Program | | |
| 454454 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Amendment No. 2 to the Master Services Agreement, dated October 6, 2021 | | |
| 454455 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Statement of Work No. 1 to Master Services Agreement Service Contract Program, dated July 23, 2021 | | |
| 454456 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 454457 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Amendment No. 2 to Statement of Work No. 1, dated August 1, 2023 | | |
| 454458 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Amendment No. 1 to the Master Services Agreement and Statement of Work No. 1, dated September 23, 2021 | | |
| 454459 | United Service Protection, Inc. | United Service Protection, Inc. 11222 Quail Roost Drive Miami, FL 33157 | American Freight, LLC | Master Services Agreement, dated July 23, 2021 | | |
| 464460 | Vantage One Tax Solutions, Inc. | Vantage One Tax Solutions, Inc. 6310 LBJ Freeway Dallas, TX 75240 | American Freight Outlet Stores, LLC | Consulting Agreement for Property Tax Services, dated April 10, 2023 | | |
| 464461 | Vantage One Tax Solutions, Inc. | Vantage One Tax Solutions, Inc. 6310 LBJ Freeway, Ste. 208 Dallas, TX 75240 | American Freight, LLC | Consulting Agreement for Property Tax Services, dated April 10, 2023 | | |
| 464462 | Varis, LLC | Varis, LLC 6600 N. Military Tr. Boca Raton, FL 33496 | American Freight, LLC | Master Services Agreement, dated May 20, 2022 | | |
| 464463 | Ventura Petit LLC and La Cienga Shopping Center Development LLC | Ventura Petit LLC and La Cienga Shopping Center Development LLC 2121 Avenue of the Stars, Ste. 1100 Los Angeles, CA 90067 | Vitamin Shoppe Industries, LLC | Lease, dated January 02, 2012 | 0578 | 4/30/2025 |
| 464464 | VF9 Matt2, LLC | VF9 Matt2, LLC 2330 Ponce de Leon Blvd Coral Gables, FL 33134 | Vitamin Shoppe Industries, LLC | Lease, dated January 20, 2010 | 472 | 4/30/2025 |
| 464465 | Viral Patel | Viral Patel [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 464466 | VRC Companies, LLC dba Vital Records Control f.k.a. Fireproof Records Center | VRC Companies, LLC dba Vital Records Control 5384 Poplar Avenue, Suite 500 Memphis, TN 38119 | American Freight, LLC | Storage & Service Agreement, dated August 3, 2016 | | |

**Rejected Contracts / Lease List**

| ID # | Counterparty | Counterparty Address | Debtor | Rejected Agreement | Store | Rejection Date |
|---|---|---|---|---|---|---|
| 474467 | WBR 27810 Chagrin II, LLC, WRB 27810 Chagrin III, LLC & RRR Ohio, LLC | WBR 27810 Chagrin II, LLC, WRB 27810 Chagrin III, LLC & RRR Ohio, LLC 2400 Chagrin Blvd., Suite 100 Chagrin Falls, OH 44022 | Vitamin Shoppe Industries LLC | Lease, dated July 25, 2012 as amended | 0629 | 5/19/2025 |
| 474468 | Westgate Marketplace Developers, LLC | Westgate Marketplace Developers, LLC 7725 W. Reno Ave., Suite 398 Oklahoma City, OK 73127 | Vitamin Shoppe Industries, LLC | Agreement of Lease, dated December 31, 2014 | 823 | 4/30/2025 |
| 474469 | White Glove Delivery & Moving LLC | White Glove Delivery & Moving LLC 57477 Goodman Dr. Colcord, OK 74338 | American Freight, LLC | Preferred Delivery Services Agreement, dated January 2, 2024 | | |
| 474470 | Will Powell | Will Powell [Address on File] | Franchise Group Newco Intermediate AF, LLC | American Freight Incentive Unit Plan Award Agreement, dated January 1, 2024 | | |
| 474471 | Wireless America LLC, d/b/a Viva Wireless | Wireless America LLC, d/b/a Viva Wireless 7003 Presidents Dr., Suite 300 Orlando, FL 32809 | Buddy's Newco, LLC | Sublease, dated December 29, 2017 | | |
| 474472 | Worry Free Moving Inc. | Worry Free Moving Inc. 1421 Turnberry Dr Youngstown, OH 44512 | American Freight, LLC | Preferred Delivery Services Agreement, dated March 21, 2024 | | |
| 474473 | Wrike Inc. | Wrike Inc. 9171 Towne Center Drive, Suite 200 San Diego, CA 92121 | American Freight, LLC | PO or Purchase Agreement, dated February 07, 2024 | | |
| 474474 | WSG Arundel One LLC | WSG Arundel One LLC 75 Hook Road Bayonne, NJ 07002 | Vitamin Shoppe Industries LLC | Lease, dated November 11, 2003 | 0143 | 4/30/2025 |
| 474475 | Xpress Delivery 2U | Xpress Delivery 2U 2406 Pine Street Texarkana, TX 75503 | American Freight, LLC | Preferred Delivery Services Agreement, dated April 1, 2024 | | |
| 474476 | YTC Movers LLC | YTC Movers LLC 760 Star Ridge Street Massillon, OH 44646 | American Freight, LLC | Preferred Delivery Services Agreement, dated April 15, 2024 | | |
| 460477 | ZipRecruiter Inc. | ZipRecruiter Inc. 604 Arizona Avenue Santa Monica, CA 90401 | Franchise Group, Inc. | Services Agreement, dated September 20, 2023 | | |
| 460478 | | | Pet Supplies "Plus", LLC | Pet Supplies Plus Incentive Unit Plan, dated September 26, 2021 | | |
| 460479 | | | Freedom VCM Holdings, LLC | Freedom VCM Holdings, LLC 2024 Restricted Class A Unit Plan | | |
| 460480 | | | Vitamin Shoppe Industries LLC | Vitamin Shoppe Industries LLC Incentive Unit Plan, effective as of March 5, 2020 | | |
| 460481 | | | American Freight, LLC | American Freight Incentive Unit Plan, effective as of January 1, 2024 | | |
| 460482 | | | American Freight, LLC | American Freight Incentive Unit Plan, effective as of November 18, 2020 | | |

The Debtors have determined that this agreement is not an Executory Contract that is capable of assumption and assignment pursuant to section 365 of the Bankruptcy Code.  However, if the Bankruptcy Court or another court of competent jurisdiction disagrees and determines that this document (i) is an Executory Contract and (ii) may be assumed the the

## Exhibit F

### New ABL Facility Documents

This **Exhibit F** includes the following New ABL Facility Documents of the Reorganized Debtors:

Exhibit F(ii):          New ABL Credit Agreement

Certain documents, or portions thereof, contained in this **Exhibit F** and the Plan Supplement remain subject to continuing review and discussions among the Debtors and interested parties with respect thereto. The rights of the Debtors are expressly reserved, subject to the terms and conditions set forth in the Plan (including all applicable consultation, consent, and/or approval rights contained or contemplated therein), to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court.

**<u>Exhibit F(ii)</u>**

**New ABL Credit Agreement**

*Execution Version*

# J.P.Morgan

**LOAN AND SECURITY AGREEMENT**

**by and among**

**FUSION BUYER, LLC,**
**as Administrative Borrower**

**THE OTHER BORROWERS FROM TIME TO TIME PARTY HERETO**

**THE OTHER LOAN PARTIES FROM TIME TO TIME PARTY HERETO**

**THE LENDERS AND ISSUING BANK FROM TIME TO TIME PARTY HERETO**

**JPMORGAN CHASE BANK, N.A.,**
**as Agent**

**and**

**BMO BANK N.A.,**
**as Documentation Agent**

_____

**JPMORGAN CHASE BANK, N.A. and CITIZENS BANK, N.A.**
**as Lead Arrangers and Bookrunners**

**Dated:  June 6, 2025**

# TABLE OF CONTENTS

Page

**SECTION 1.**   DEFINITIONS ................................................................ 1
    1.1   Definitions .................................................................................. 1

**SECTION 2.**   CREDIT FACILITIES ................................................ 76
    2.1   Revolving Loans ....................................................................... 76
    2.2   Overadvances ............................................................................ 77
    2.3   Letters of Credit ........................................................................ 78
    2.4   Termination, Reductions or Increases of Aggregate Revolving Commitment Amounts ............................................................... 83
    2.5   Revolving Commitments ........................................................... 84
    2.6   Bank Products ........................................................................... 84
    2.7   Joint and Several Liability ........................................................ 85
    2.8   Defaulting Lenders .................................................................... 86
    2.9   Prepayment of Loans ................................................................ 88
    2.10  Loans and Borrowings. ............................................................. 88
    2.11  Requests for Borrowings ........................................................... 89
    2.12  Interest Elections ...................................................................... 90

**SECTION 3.**   INTEREST AND FEES ............................................... 91
    3.1   Interest Payments ...................................................................... 91
    3.2   Fees ........................................................................................... 92
    3.3   Increased Costs .......................................................................... 93
    3.4   Alternate Rate of Interest; Illegality. ....................................... 94
    3.5   Withholding of Taxes; Gross-Up. .............................................. 97
    3.6   Mitigation of Obligations; Replacement of Lenders. ............... 101
    3.7   Break Funding Payments .......................................................... 102

**SECTION 4.**   CONDITIONS PRECEDENT ..................................... 103
    4.1   Conditions Precedent to Effectiveness ...................................... 103
    4.2   Conditions Precedent to All Loans and Letters of Credit .......... 106

**SECTION 5.**   GRANT AND PERFECTION OF SECURITY INTEREST ...................... 107
    5.1   Grant of Security Interest .......................................................... 107
    5.2   Perfection of Security Interests ................................................. 108

**SECTION 6.**   COLLECTION AND ADMINISTRATION ............... 113
    6.1   Borrowers' Loan Accounts ....................................................... 113
    6.2   Statements ................................................................................. 113
    6.3   Collection of Accounts .............................................................. 114
    6.4   Payments ................................................................................... 116
    6.5   [Reserved] ................................................................................. 118
    6.6   Authorization to Make Loans .................................................... 118
    6.7   Use of Proceeds ........................................................................ 118

i

6.8     Appointment of Administrative Borrower as Agent for Requesting Loans and Receipts of Loans and Statements ................................................119
6.9     Pro Rata Treatment ................................................................120
6.10    Sharing of Payments, Etc ........................................................120
6.11    Settlement Procedures............................................................121
6.12    Obligations Several; Independent Nature of Lenders' Rights ......................123

**SECTION 7.**     COLLATERAL REPORTING AND COVENANTS ................................. 123
7.1     Collateral Reporting................................................................123
7.2     Accounts Covenants................................................................125
7.3     Inventory Covenants................................................................126
7.4     Equipment and Real Property Covenants .........................................127
7.5     Delivery of Instruments, Chattel Paper and Documents............................128
7.6     [Reserved]..........................................................................128
7.7     Power of Attorney..................................................................128
7.8     Right to Cure.......................................................................130
7.9     Access to Premises.................................................................130

**SECTION 8.**     REPRESENTATIONS AND WARRANTIES.......................................... 131
8.1     Corporate Existence, Power and Authority ......................................131
8.2     Name; State of Organization; Chief Executive Office; Collateral Locations 132
8.3     Financial Statements; No Material Adverse Change ..............................132
8.4     Priority of Liens; Title to Properties ...........................................133
8.5     Tax Returns.........................................................................133
8.6     Litigation...........................................................................133
8.7     Compliance with Applicable Laws ................................................134
8.8     Environmental Compliance ........................................................134
8.9     Employee Benefits..................................................................135
8.10    Bank Accounts......................................................................136
8.11    Intellectual Property................................................................136
8.12    Subsidiaries; Capitalization; Solvency ...........................................136
8.13    Labor Disputes......................................................................137
8.14    Restrictions on Subsidiaries.......................................................137
8.15    Material Contracts..................................................................137
8.16    Credit Card Agreements............................................................138
8.17    Investment Company Status .......................................................138
8.18    Accuracy and Completeness of Information......................................138
8.19    Survival of Warranties; Cumulative .............................................139
8.20    Reaffirmation of Financing Agreements .........**Error! Bookmark not defined.**
8.21    Anti-Corruption Laws and Sanctions..............................................139
8.22    Regulatory Compliance ............................................................139
8.23    Franchise Agreements..............................................................141
8.24    Affected Financial Institutions.....................................................141
8.25    Dealer Agreements..........................................**Error! Bookmark not defined.**

**SECTION 9.**     AFFIRMATIVE AND NEGATIVE COVENANTS................................... 141
9.1     Maintenance of Existence .........................................................141

| | | | |
|---|---|---|---|
| 9.2 | [Reserved] | 142 |
| 9.3 | Compliance with Laws, Regulations, Etc | 142 |
| 9.4 | Payment of Taxes and Claims | 143 |
| 9.5 | Insurance | 144 |
| 9.6 | Financial Statements and Other Information | 145 |
| 9.7 | Sale of Assets, Consolidation, Merger, Dissolution, Etc | 148 |
| 9.8 | Encumbrances | 153 |
| 9.9 | Indebtedness | 157 |
| 9.10 | Loans, Investments, Etc | 163 |
| 9.11 | Dividends and Redemptions | 167 |
| 9.12 | Transactions with Affiliates | 169 |
| 9.13 | Compliance with ERISA | 171 |
| 9.14 | Fiscal Year | 172 |
| 9.15 | Change in Business | 172 |
| 9.16 | Limitation of Restrictions Affecting Subsidiaries | 172 |
| 9.17 | Financial Covenant | 174 |
| 9.18 | Credit Card Agreements | 174 |
| 9.19 | License Agreements. | 175 |
| 9.20 | Foreign Assets Control Regulations, Etc | 176 |
| 9.21 | After-Acquired Real Property. | 176 |
| 9.22 | Costs and Expenses | 177 |
| 9.23 | Further Assurances. | 178 |
| 9.24 | Permitted Payments of Indebtedness | 181 |
| 9.25 | Commodity Exchange Act Keepwell Provisions | 182 |
| 9.26 | Disbursement Cash Management Systems | 183 |
| 9.27 | Amendments to Financing Documents | 183 |
| 9.28 | [Reserved] | 183 |
| 9.29 | Anti-Commingling. | 183 |
| 9.30 | Designation of Securitization Entities. | 183 |
| 9.31 | Post-Closing Obligations. | 183 |
| 9.32 | Dealer Agreements. | 183 |
| 9.33 | Covenant Relief Period Affirmative Covenants. | **Error! Bookmark not defined.** |
| 9.34 | Minimum Excess Availability.. | **Error! Bookmark not defined.** |
| 9.35 | Sale and Leaseback Transactions | 183 |
| 9.36 | Changes to Treasury Management and Bank Structure | 183 |
| 9.37 | Medical Cash Account. | 184 |
| **SECTION 10.** | EVENTS OF DEFAULT AND REMEDIES | 184 |
| 10.1 | Events of Default | 184 |
| 10.2 | Remedies | 186 |
| 10.3 | Borrowers' and Guarantors' Obligations Upon Default | 190 |
| 10.4 | Sale of Inventory and Use of Intellectual Property | 190 |
| **SECTION 11.** | JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW | 190 |
| 11.1 | Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver | 190 |

11.2     Waiver of Notices ..............................................................................192
11.3     Collateral Waivers ............................................................................192
11.4     Amendments and Waivers ................................................................192
11.5     Waiver of Counterclaims ..................................................................195
11.6     Indemnification; Limitation of Liability ..........................................195
11.7     Right of Setoff ..................................................................................196

**SECTION 12.**     THE AGENT ......................................................................... 197
12.1     Appointment, Powers and Immunities...............................................197
12.2     Reliance by Agent .............................................................................198
12.3     Events of Default ..............................................................................198
12.4     Chase in its Individual Capacity .......................................................199
12.5     Indemnification .................................................................................199
12.6     Acknowledgments of Lenders and Issuing Bank; Non-Reliance on Agent and
         Other Lenders....................................................................................200
12.7     Failure to Act ....................................................................................202
12.8     Additional Loans...............................................................................202
12.9     Concerning the Collateral and the Related Financing Agreements.............202
12.10    Field Audit, Examination Reports and other Information; Disclaimer by
         Lenders..............................................................................................203
12.11    Collateral Matters.............................................................................203
12.12    Agency for Perfection .......................................................................205
12.13    Successor Agent ................................................................................205
12.14    Other Agent Designations .................................................................206
12.15    Intercreditor Agreement ...................................................................206
12.16    Posting of Communications ..............................................................207
12.17    Certain ERISA Matters .....................................................................208

**SECTION 13.**     TERM OF AGREEMENT; MISCELLANEOUS ...................... 209
13.1     Term...................................................................................................209
13.2     Interpretative Provisions ..................................................................210
13.3     Notices ..............................................................................................213
13.4     Partial Invalidity...............................................................................214
13.5     Confidentiality ..................................................................................215
13.6     Successors .........................................................................................216
13.7     Assignments; Participations..............................................................216
13.8     Entire Agreement ..............................................................................219
13.9     USA Patriot Act ................................................................................219
13.10    Counterparts; Integration; Effectiveness; Electronic Execution...................219
13.11    Restatement...................................................................**Error! Bookmark not defined.**
13.12    Acknowledgment Regarding Any Supported QFCs...........................221
13.13    Acknowledgement and Consent to Bail-In of Affected Financial Institutions
         ...........................................................................................................221
13.14    Intercreditor Agreement....................................................................222
13.15    Release of Liens and Guarantees. .....................................................222

# INDEX
## TO
## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Form of Assignment and Assumption |
| Exhibit B | Information Certificate |
| Exhibit C | Form of Compliance Certificate |
| Exhibit D | Form of Borrowing Base Certificate |
| Exhibit E-1 | Form of U.S. Tax Certificate |
| Exhibit E-2 | Form of U.S. Tax Certificate |
| Exhibit E-3 | Form of U.S. Tax Certificate |
| Exhibit E-4 | Form of U.S. Tax Certificate |
| Exhibit F | Form of Commitment Increase Agreement |
| Exhibit G | Form of Additional Lender Agreement |
| Exhibit H | Form of Borrower Joinder Agreement |
| Exhibit I | Forms of Trademark Security Agreement, Copyright Security Agreement and Patent Security Agreement |
| | |
| Schedule 1A | Revolving Commitments |
| Schedule 1B | Franchisees |
| Schedule 1C | [Reserved] |
| Schedule 1D | [Reserved] |
| Schedule 1E | [Reserved] |
| Schedule 1F | [Reserved] |
| Schedule 2.3 | Existing Letters of Credit |
| Schedule 5.2(g) | Commercial Tort Claims |
| Schedule 8.2(a) | Chief Executive Offices and Mailing Addresses |
| Schedule 8.2(b) | Other Locations |
| Schedule 8.4 | Liens |
| Schedule 8.6 | Litigation |
| Schedule 8.10 | Bank Accounts |
| Schedule 8.11(a) | Intellectual Property |
| Schedule 8.11(c) | Intellectual Property Exceptions |
| Schedule 8.12 | Affiliates and Subsidiaries, etc. |
| Schedule 8.13 | Collective Bargaining Agreements |
| Schedule 8.15 | Material Contracts |
| Schedule 8.16 | Credit Card Agreements |
| Schedule 8.23 | [Reserved] |
| Schedule 8.25 | Franchise Agreements |
| Schedule 9.7(U) | Specified Disposition |
| Schedule 9.9 | Existing Indebtedness |
| Schedule 9.10 | Loans and Advances |
| Schedule 9.12 | Transactions with Affiliates |
| Schedule 9.16 | Existing Restrictions |
| Schedule 9.31 | Post-Closing Obligations |

# LOAN AND SECURITY AGREEMENT

This  Loan and Security Agreement dated June 6, 2025 (this "<u>Agreement</u>") is by and among Fusion Buyer, LLC, a Delaware limited liability company ("<u>Fusion Buyer</u>"), and certain Subsidiaries of Fusion Buyer, as Borrowers, the parties hereto from time to time as Guarantors, the parties hereto from time to time as lenders (each individually, a "<u>Lender</u>" and collectively, "<u>Lenders</u>" as hereinafter further defined) and JPMorgan Chase Bank, N.A., a national banking association, in its capacity as agent for the Lenders (in such capacity, "<u>Agent</u>" as hereinafter further defined).

WITNESSETH:

WHEREAS, on November 3, 2024 (the "<u>Petition Date</u>"), FRG and certain affiliates and direct and indirect Subsidiaries of FRG (each, a "<u>Chapter 11 Debtor</u>" and collectively, the "<u>Chapter 11 Debtors</u>") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") initiating their cases under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") (collectively, the "<u>Chapter 11 Cases</u>");

WHEREAS, on June 2, 2025, the Bankruptcy Court entered the Confirmation Order (as hereinafter defined) approving the Chapter 11 Debtors' Plan of Reorganization (the "<u>Approved Plan</u>");

WHEREAS, the Borrowers have requested that the Lenders enter into this Agreement to provide financing to the Chapter 11 Debtors in connection with their emergence from the Chapter 11 Cases, pursuant to the Approved Plan and on the terms and conditions set forth herein;

WHEREAS, the Lenders are willing to make Loans (as defined below) and issue Letters of Credit (as defined below) to the Borrowers, subject to the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises, the representations, warranties, covenants and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to the satisfaction of each condition precedent contained in <u>Section 4.1</u> hereof, the parties hereto further agree as follows:

## SECTION 1.    DEFINITIONS

1.1    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

"<u>ABL Priority Collateral</u>" has the meaning assigned to such term in the Intercreditor Agreement.

"<u>ABR Borrowing</u>" shall mean a Borrowing of ABR Loans.

"<u>ABR Loans</u>" shall mean any Loans or portion thereof on which interest is payable based on the Alternate Base Rate in accordance with the terms thereof.

1

"<u>Accounts</u>" shall have the meaning set forth in Article 9 of the UCC and includes, without limitation, as to each Borrower and Guarantor, all present and future rights of such Borrower and Guarantor to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by Chattel Paper or an Instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, (d) arising out of the use of a credit or charge card or information contained on or for use with the card or (e) arising out of franchising agreements.

"<u>Account Debtor</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>ACH Transactions</u>" shall mean the automatic clearing house transfer of funds by Agent, any Lender or any of their respective Affiliates for the account of any Borrower, Guarantor or its respective Subsidiaries, in each case pursuant to agreements entered into with any Borrower or any of its Subsidiaries.

"<u>Acquired EBITDA</u>" means, with respect to any Pro Forma Entity, for any period, the amount of EBITDA of such Pro Forma Entity (determined as if references to the Borrowers, Guarantors and their respective Subsidiaries in the definition of "EBITDA" were references to such Pro Forma Entity and its subsidiaries that will become Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity.

"<u>Acquired Entity or Business</u>" has the meaning given such term in the definition of "EBITDA."

"<u>Adjusted Daily Simple SOFR</u>" means an interest rate per annum equal to (a) the Daily Simple SOFR, <u>plus</u> (b) 0.10%; <u>provided</u> that if the Adjusted Daily Simple SOFR as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor  for the purposes of this Agreement.

"<u>Adjusted Term SOFR Rate</u>" means, for any Interest Period, an interest rate per annum equal to (a) the Term SOFR Rate for such Interest Period, <u>plus</u> (b) 0.10%; <u>provided</u> that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"<u>Administrative Borrower</u>" shall mean Fusion Buyer, in its capacity as Administrative Borrower on behalf of itself and the other Borrowers pursuant to <u>Section 6.8</u> hereof and its successors and assigns in such capacity.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" shall mean, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For the purposes of this definition, the term "<u>control</u>" (including with correlative meanings, the terms "<u>controlled by</u>" and "<u>under common control with</u>"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of

Voting Stock, by agreement or otherwise. Without limiting the foregoing, any Subsidiary of Fusion Buyer or any Guarantor shall be considered an Affiliate of the Borrowers for purposes of this Agreement.

"Agent" shall mean JPMorgan Chase Bank, N.A., in its capacity as agent on behalf of Lenders pursuant to the terms hereof and any replacement or successor agent hereunder.

"Agent Fee Letter" shall mean the agent fee letter, dated as of the date hereof, by and among the Administrative Borrower and the Agent as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Agent Payment Account" shall mean such other account of Agent as Agent may from time to time designate to Administrative Borrower as the Agent Payment Account for purposes of this Agreement and the other Financing Agreements.

"Aggregate Add-Back Cap" means an aggregate amount for all adjustments or add-backs to EBITDA pursuant to clauses (a)(vi), (a)(vii) and (a)(xvii) in the definition thereof and any adjustments pursuant to the definition of pro forma basis not to exceed an aggregate amount no greater than the lesser of $15,000,000 and 15.0% of EBITDA (before giving effect to all adjustments or add backs to EBITDA) for the most recently ended Test Period as of such time.

"Aggregate Revolving Commitment Amounts" shall mean, at any time, the sum of the Revolving Commitments, as the same may be adjusted pursuant to Section 2.4.  As of the Closing Date, the Aggregate Revolving Commitment Amounts are $100,000,000.

"Aggregate Revolving Exposure" shall mean, at any time, the aggregate amount of Revolving Exposure of all Revolving Lenders.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Adjusted Term SOFR Rate for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, provided that, for the purpose of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the CME Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate, respectively.  If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 3.4 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 3.4(c)), then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.  For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"Ancillary Document" has the meaning assigned to it in Section 13.10(b).

"<u>Anti-Corruption Laws</u>" means all laws, rules, and regulations of any jurisdiction applicable to the Borrowers, the Guarantors or any of their respective Subsidiaries from time to time concerning or relating to bribery or corruption.

"<u>Applicable Margin</u>" means, for any day, with respect to any Revolving Loan, the applicable rate per annum set forth below under the caption "Revolver ABR Spread", "Revolver Term Benchmark Spread" or "Revolver RFR Spread", as the case may be, based upon the Loan Parties' Average Excess Availability for the prior fiscal month as of the most recent determination date, provided that until the delivery to Agent, pursuant to <u>Section 7.1(a)(i)</u>, of the Loan Parties' Borrowing Base Certificate for the fiscal month ended November 30, 2025, the "Applicable Margin" shall be the applicable rate per annum set forth below in Category 3:

| **Average Excess Availability** | **Revolver ABR Spread** | **Revolver Term Benchmark Spread** | **Revolver RFR Spread** |
|---|---|---|---|
| <u>Category 1</u>:<br><br>Average Excess Availability greater than or equal to 66% of the Borrowing Cap | 1.75% | 2.75% | 2.75% |
| <u>Category 2</u>:<br><br>Average Excess Availability less than 66% but greater than or equal to 33% of the Borrowing Cap | 2.00% | 3.00% | 3.00% |
| <u>Category 3</u>:<br><br>Average Excess Availability less than 33% of the Borrowing Cap | 2.25% | 3.25% | 3.25% |

For purposes of the foregoing, (a) the Applicable Margin shall be determined as of the end of each fiscal month of the Loan Parties based upon the Loan Parties' Average Excess Availability for the prior fiscal month upon Agent's receipt of the Loan Parties' Borrowing Base Certificate delivered pursuant to <u>Section 7.1(a)(i)</u> and (b) each change in the Applicable Margin resulting from a change in the Loan Parties' Average Excess Availability for the prior fiscal month shall be effective during the period commencing on and including the date of delivery to Agent of such Borrowing Base Certificate indicating such change and ending on the date immediately preceding the effective date of the next such change, provided that the Loan Parties' Average Excess Availability shall be deemed to be in Category 3 at the option of Agent or at the request of the Required Lenders if the Loan Parties fail to deliver the Borrowing Base Certificate required to be delivered by them pursuant to <u>Section 7.1(a)(i)</u>, during the period from the expiration of the time for delivery thereof until such Borrowing Base Certificate is delivered.

"<u>Approved Bank</u>" has the meaning assigned to such term in the definition of the term "Cash Equivalents."

"Approved Electronic Platform" has the meaning assigned to it in Section 12.16(a).

"Arrangers" means each of JPMorgan Chase Bank, N.A. and Citizens Bank, N.A., in its capacity as a joint bookrunner and a joint lead arranger hereunder.

"Asset Sale" shall mean:

(a)      the sale, lease, conveyance or other disposition of any assets or rights; and

(b)      the issuance of Capital Stock in any of the Borrowers or the Guarantors or the sale of Capital Stock in any of the Borrowers or the Guarantors (in each case other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirement of Law and other than issuing Capital Stock to the Administrative Borrower or a Subsidiary).

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(i)      any single transaction or series of related transactions that involves assets having a fair market value of less than $5,000,000 (for the avoidance of doubt, subject to clause (i) of the last paragraph of Section 9.7);

(ii)      a transfer of assets between or among any Loan Parties;

(iii)      an issuance of Capital Stock by a Loan Party to a Loan Party;

(iv)      the sale or lease of products, services, inventory, equipment, leasehold improvements, fixtures or accounts receivable in the ordinary course of business and any sale or other disposition of damaged, worn-out or obsolete assets, and assets that are no longer used or useful, or economically impracticable to maintain, in the ordinary course of business (including allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, be dedicated to the public domain or be invalidated);

(v)      the sale or other disposition of cash or Cash Equivalents;

(vi)      any license, sublicense, covenant not to sue, or similar agreement with respect to patents, trademarks, registrations thereof and other Intellectual Property (a) made in the ordinary course of business or (b) that do not materially interfere with the business of the Borrowers or Guarantors, taken as a whole;

(vii)      any release of intangible claims or rights in connection with the loss or settlement of a bona-fide lawsuit, dispute or other controversy;

(viii)      leases or subleases in the ordinary course of business to third persons not interfering in any material respect with the business of the Borrowers or any of the Guarantors; or

(ix)    an Investment permitted under Section 9.10 and any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of the Borrowers and the Guarantors that are expressly permitted under Section 9.11.

"Assignment and Assumption" shall mean an Assignment and Assumption substantially in the form of Exhibit A attached hereto (with blanks appropriately completed) delivered to Agent in connection with an assignment of a Lender's interest hereunder in accordance with the provisions of Section 13.7 hereof.

"Authorized Officer" shall mean the individuals holding the position of president, treasurer, vice president of finance, chief executive officer, chief financial officer or controller of Administrative Borrower, or if no such officers have been appointed or elected, the sole member of the Administrative Borrower.

"Availability Reserves" shall mean all Reserves other than Inventory Reserves.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark (or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (f) of Section 3.4.

"Average Excess Availability" means, for any period, the average daily Excess Availability during such period, as determined by the Agent's system of records.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bank Products" shall mean any one or more of the following types of services or facilities provided to any Loan Party or its Subsidiaries by a Bank Product Provider:  (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) treasury management services (including, without limitation, controlled disbursement, ACH Transactions, return items, overdrafts and interstate depository network services), (d) foreign exchange contracts, and (e) Hedge Agreements and coin and currency lines.

"Bank Product Providers" shall mean Agent, any Lender and any of their respective Affiliates that may, from time to time, provide any Bank Products to a Loan Party or any Subsidiary of a Loan Party; each sometimes being referred to herein individually as a "Bank Product Provider".

"Bank Product Reserve" shall mean any and all reserves that Agent may establish from time to time with the written consent of the Administrative Borrower, to reflect any obligations, liabilities or indebtedness (contingent or otherwise) of any Loan Party or its Subsidiaries to Agent or any Bank Product Provider arising under or in connection with any Bank Products or as such Bank Product Provider may otherwise require in connection therewith to the extent that such obligations, liabilities or indebtedness constitute Obligations as such term is defined herein or otherwise receive the benefit of the security interest of Agent in the Collateral. The Administrative Borrower hereby consents to the establishment of a Bank Product Reserve with respect to any obligations, liabilities or indebtedness (contingent or otherwise) of any Loan Party or its Subsidiaries to Agent, any Lender or any of their respective Affiliates (whether outstanding on the Closing Date or incurred thereafter) arising under or in connection with any Bank Products existing on the Closing Date, and Agent agrees to maintain such Bank Product Reserve to the extent Agent is notified of such Bank Products and the amounts thereof in accordance with the requirements of this Agreement.

"Benchmark" means, initially, with respect to any (i) RFR Loan, the Daily Simple SOFR or (ii) Term Benchmark Loan, the Term SOFR Rate; provided that if a Benchmark Transition Event and the related Benchmark Replacement Date have occurred with respect to the Daily Simple SOFR or Term SOFR Rate, as applicable, or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (c) of Section 3.4.

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Agent for the applicable Benchmark Replacement Date:

(1) the Adjusted Daily Simple SOFR; or

(2) the sum of: (a) the alternate benchmark rate that has been selected by the Agent and the Administrative Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for dollar-denominated syndicated credit facilities at such time in the United States and (b) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Financing Agreements.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Agent and the Administrative Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement and/or any Term Benchmark Loan, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark and to permit the administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of such Benchmark exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Financing Agreements).

"Benchmark Replacement Date" means, with respect to any Benchmark, the earliest to occur of the following events with respect to such then-current Benchmark:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

8

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Financing Agreement in accordance with Section 3.4 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Financing Agreement in accordance with Section 3.4.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Blocked Accounts" shall have the meaning set forth in Section 6.3 hereof.

"Board" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing or any committee thereof duly authorized to act on behalf of such board, manager or managing member, (c) in the case of any partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Borrower Joinder Agreement" shall mean a joinder agreement in substantially the form of Exhibit H hereto and otherwise in form and substance acceptable to Agent.

"Borrowers" shall mean, collectively, the following (together with their respective successors and assigns): (a) the Administrative Borrower; (b) [reserved]; (c) [reserved]; (d) [reserved]; (e) [reserved]; and (f) any other Person that at any time after the Closing Date becomes a Borrower pursuant to the terms hereof, including, without limitation, Section 9.23 hereof and by the execution of a Borrower Joinder Agreement; each sometimes being referred to herein individually as a "Borrower".

"Borrowing" means (a) Revolving Loans of the same Type, made, converted or continued on the same date and, in the case of Term Benchmark Loans, as to which a single Interest Period is in effect and (b) Overadvances.

"Borrowing Base" shall mean, at any time, the amount equal to:

    (a)    the amount equal to:

        (i)    90% of the amount of Eligible Credit Card Receivables of the Loan Parties at such time, plus

        (ii)    85% of the amount of Eligible Accounts of the Loan Parties at such time, plus

(iii)    90% of the Net Recovery Percentage multiplied by the Value of the Eligible Inventory of the Loan Parties, net of any Inventory Reserves, in each case, at such time, minus

(b)    the Availability Reserves;

provided that the aggregate amount of Eligible Accounts of the Loan Parties in respect of Franchisee Receivables shall not exceed the amount equal to 10% of the Borrowing Base at any time; provided, further that notwithstanding anything to the contrary herein, none of assets of the Buddy's Entities shall be included for purposes of calculating the Borrowing Base.

(A)    The amounts of Eligible Inventory of the Loan Parties shall be determined based on the amount of applicable Inventory set forth in the inventory record maintained by the Loan Parties.

(B)    Agent shall have the right to establish Reserves against or sublimits in the Borrowing Base in such amounts and with respect to such matters as Agent shall deem reasonably necessary or appropriate in its Permitted Discretion, based on new information received by Agent and after Agent has completed its updated field audits, examinations and appraisals of the Collateral; provided, however, that, so long as no Event of Default has occurred and is continuing, Agent shall give to Administrative Borrower five Business Days' telephonic or electronic notice if (x) Agent establishes new categories of Reserves, (y) Agent changes the methodology of calculating Reserves or (z) Agent establishes new categories of sublimits in the Borrowing Base; provided further that, during such five Business Day-period, no Borrowing may be drawn or Letter of Credit issued to the extent any Revolving Exposure Limitations would be exceeded after giving effect to any such Reserves or sublimit modifications.  The foregoing notwithstanding, in the event Agent establishes Reserves to preserve or protect or maximize the value of the Collateral during the continuance of an Event of Default, Agent shall only provide Administrative Borrower with notice at the time such Reserves are established.

(C)    Accounts, Credit Card Receivables and Inventory of the Loan Parties shall only be Eligible Accounts, Eligible Credit Card Receivables and Eligible Inventory, as applicable, to the extent that (x) Agent has conducted and completed a field examination, appraisal and other due diligence with respect thereto and (y) the criteria for Eligible Accounts, Eligible Credit Card Receivables and Eligible Inventory set forth herein, as applicable, are satisfied with respect thereto in accordance with this Agreement (or such other or additional criteria as Agent may, at its option, establish with respect thereto in accordance with this Agreement and subject to such Reserves as Agent may establish in its Permitted Discretion).

(D)    The Borrowing Base shall be determined at any time by Agent, on the basis of the most recently delivered Borrowing Base Certificate, as adjusted by Agent for any changes in Reserves or otherwise in accordance with the terms hereof.

"Borrowing Base Certificate" shall mean a certificate substantially in the form of Exhibit D hereto, as such form may from time to time be modified by Agent to reflect modifications to the Borrowing Base and the reporting requirements pursuant to the terms of this Agreement, which is duly completed (including all schedules thereto) and executed by the chief financial officer, a vice president of finance, a controller or other appropriate financial officer of Administrative Borrower

(or if no such officer has been appointed or elected, the sole member of Administrative Borrower) reasonably acceptable to Agent and delivered to Agent.

"Borrowing Cap" shall mean, the amount, calculated at any date, equal to the lesser of (i) the Aggregate Revolving Commitment Amounts and (ii) the Borrowing Base, in each case, in effect at such time.

"Borrowing Request" means a request by the Administrative Borrower for a Borrowing in accordance with Section 2.11.

"Buddy Reorganization Transaction" means the distribution of 100% of the Capital Stock of (a) Buddy's Newco, LLC, a Delaware limited liability company ("Buddy's Newco") or (b) a newly formed direct parent entity of Buddy's Newco that is a Wholly Owned Subsidiary of Fusion Parent, LLC (or otherwise wholly owned by the holders of all outstanding Capital Stock of Fusion Parent, LLC) ("Buddy's Tax Blocker" and together with Buddy's Newco and Buddy's Franchising and Licensing LLC, a Florida limited liability company, collectively, the "Buddy's Entities"), in each case to a Person that is a Guarantor, in connection with the whole business securitization of the PSP Loan Parties; provided that each such Buddy's Entities shall, in each case on or prior to the date that is at least five Business Days prior to the distribution, (x) have been joined as a Guarantor hereunder, (y) accede to the Collateral Documents in the same manner as an acquired Subsidiary as contemplated in Section 9.23(a) and (z) cause its Subsidiaries to accede to the Collateral Documents as contemplated in Section 9.23(a); provided, further that no other entities other than the Buddy's Entities shall distributed, formed or otherwise acquired in connection with the Buddy Reorganization Transaction.

"Buddy Top Parent" means Franchise Group Intermediate B, LLC, a Delaware limited liability company.

"Business Day" shall mean any day (other than a Saturday or a Sunday) on which banks are open for business in New York City or Chicago; provided that in relation to RFR Loans and any interest rate settings, fundings, disbursements, settlements or payments of any such RFR Loan, or any other dealings of such RFR Loan, any such day that is only a U.S. Government Securities Business Day.

"Capital Expenditures" shall mean, for any period, any expenditure of money under a Capital Lease or for the lease, purchase or other acquisition of any capital asset, or for the purchase or construction of assets, or for improvements or additions thereto, which are capitalized on a Person's balance sheet, but excluding (i) any such expenditure to the extent of trade-ins thereon and (ii) reimbursed leasehold improvements.

"Capital Leases" shall mean, as applied to any Person, any lease of any property (whether real, personal, or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee which is a transaction of a type commonly known as a "synthetic lease" (i.e., a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income Tax purposes); provided, that lease liabilities and associated expenses recorded by the Loan Parties and their

respective Subsidiaries (or any other applicable Persons) pursuant to Financial Accounting Standards Board Accounting Standards Update No. 2016-02, Leases (Topic 842) ("FAS 842"), shall not be treated as Indebtedness and shall not be included in Interest Expense or Fixed Charges, unless the corresponding leases would have been treated as Capital Leases under GAAP as in effect prior to the adoption of FAS 842 (in which case such leases shall be treated as Capital Leases, and the interest component of such Capital Leases shall be included in Interest Expense and Fixed Charges); provided further, that, to the extent requested by Agent, the Borrowers shall provide to Agent and, as applicable, the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such amounts or ratio made before and after giving effect to FAS 842.

"Capital Stock" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company or other equity interests at any time outstanding, and any and all rights, warrants or options exchangeable for or convertible into such capital stock or other interests (but excluding any debt security that is exchangeable for or convertible into such capital stock).

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrowers, Guarantors and their respective Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrowers, Guarantors and their respective Subsidiaries.

"Cash Equivalents" shall mean, at any time:

 (a) dollars, euros, Swiss francs, Sterling, Canadian dollars, or such other currencies held by it from time to time in the ordinary course of business;

(b) readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States, (ii) the United Kingdom, (iii) Canada, (iv) Switzerland or (v) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of such country or such member nation of the European Union is pledged in support thereof;

(c) time deposits with, or certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $250,000,000 in the case of U.S. banks and $100,000,000 (or the dollar equivalent as of the date of determination) in the case of foreign banks (any such bank in the foregoing clauses (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d) commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a

corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e) repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer covering securities described in clauses (b) and (c) above;

(f) marketable short-term money market and similar highly liquid funds substantially all of the assets of which are comprised of securities of the types described in clauses (b) through (e) above;

(g) securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, the United Kingdom, Canada, Switzerland, a member of the European Union or by any political subdivision or taxing authority of any such state, member, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h) investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(i) instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized or incorporated in such jurisdiction;

(j) investments, classified in accordance with GAAP as current assets of the Administrative Borrower, Guarantors or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000 or its equivalent, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k) demand deposit accounts holding cash;

(l) interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G7 government or other G7 governmental agency or a G7 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof;

(m) other short-term investments of a type analogous to the foregoing utilized by Foreign Subsidiaries;

(n) investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (m) above; and

(o) any guarantee or indemnity for the obligations of a Subsidiary in connection with a Subsidiary claiming exemption from audit, the preparation and filing of its accounts or other similar exemptions (including under section 394C, 448C or 479C of the Companies Act 2006 or other similar or equivalent provisions).

"Cash Management Obligations" means (a) obligations of a Borrower, a Guarantor or any Subsidiary in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit or purchase card programs and similar arrangements.

"Casualty Event" means any event that gives rise to the receipt by a Borrower, a Guarantor or any Subsidiary of any insurance proceeds or condemnation awards, in each case, in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Change in Law" means the occurrence after the date of this Agreement (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement) of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 3.3(b), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Change of Control" means:

(a) the acquisition of beneficial ownership, directly or indirectly, by any Person or group, other than the Permitted Holders (directly or indirectly, including through one or more holding companies), of Capital Stock representing 35.0% or more of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock in the Administrative Borrower or Buddy's Newco (and if applicable, Buddy's Tax Blocker) and the percentage of the aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Capital Stock in the Administrative Borrower or Buddy's Newco (and if applicable, Buddy's Tax Blocker), as the case may be, held by the Permitted Holders, unless the Permitted Holders (directly or indirectly, including through one or more holding companies) otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to

15

designate, nominate or appoint (and do so designate, nominate or appoint) a majority of the Board of the Administrative Borrower;

(b) other than as a result of a disposition permitted hereunder, the failure of Fusion Buyer to own directly or indirectly 100% of the total outstanding Capital Stock of any other Borrower or any Person that becomes a Borrower after the date hereof; or

(c) any "change of control" or similar event under the First Lien Credit Agreement.

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act, (ii) the phrase "Person or group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and (iii) if any Person or "group" includes one or more Permitted Holders, the issued and outstanding Capital Stock of the Administrative Borrower directly or indirectly owned by the Permitted Holders that are part of such Person or "group" shall not be treated as being owned by such Person or "group" for purposes of determining whether clause (a) of this definition is triggered.

"Chase" shall mean JPMorgan Chase Bank, N.A., a national banking association, in its individual capacity, and its successors.

"Chattel Paper" shall have the meaning set forth in Article 9 of the UCC.

"Closing Date" shall mean June 6, 2025.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Code" shall mean the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Collateral" shall have the meaning set forth in Section 5.1 hereof.

"Collateral Access Agreement" shall mean an agreement in writing, in form and substance reasonably satisfactory to Agent, from any lessor of premises to any Borrower or Guarantor, or any other Person to whom any Collateral is consigned or who has custody, control or possession of any such Collateral or is otherwise the owner or operator of any premises on which any of such Collateral is located, in favor of Agent (or in favor of Agent and the First Lien Agent) with respect to the Collateral at such premises or otherwise in the custody, control or possession of such lessor, consignee or other Person, inter alia, acknowledges the first priority security interest of Agent in such Collateral, agrees to waive (or subordinate on terms acceptable to Agent) any and all claims such lessor, consignee, processor or other person may, at any time, have against such Collateral, whether for storage or otherwise, and agrees to permit Agent access to, and the right to remain on, the premises of such lessor, consignee, processor or other person so as to exercise Agent's rights and remedies and otherwise deal with such Collateral, and in the case of any customs broker, cargo

consolidator, freight forwarder, consignee or other person who at any time has custody, control or possession of any bills of lading or other documents of title, agrees to hold such Collateral, acknowledges that it holds and will hold possession of the Collateral for the benefit of the Agent and the First Lien Agent and agrees to follow all instructions of Agent or the First Lien Agent (as the case may be) with respect thereto.

"Collateral Documents" shall mean, collectively, this Agreement, the Intercreditor Agreement, the Pledge Agreement, each Guaranty, the Deposit Account Control Agreements, the Investment Property Control Agreements and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence liens to secure the Obligations, including, without limitation, all other security agreements, deposit account control agreements, pledge agreements, subordination agreements, pledges, powers of attorney, assignments, financing statements and all other written matter whether theretofore, now or hereafter executed by any Borrower or any Guarantor and delivered to Agent, in each case as may be amended, restated, supplemented or otherwise modified from time to time.

"Collateral Reporting Trigger Event" means any Asset Sale or other transaction (whether pursuant to the sale of Capital Stock in a Subsidiary, an Investment, a dividend or other distribution, a merger or consolidation or otherwise, but excluding any transaction that is expressly excluded pursuant to the definition of "Asset Sale" other than pursuant to clause (ix) therein) that would result in the elimination of Collateral from the Borrowing Base (on a net basis, after giving effect to all applicable advance rates, Net Recovery Percentages and any Reserves applicable to such assets) in effect immediately prior to giving effect to such Asset Sale or other transaction.

"Commercial Tort Claims" shall have the meaning set forth in Article 9 of the UCC.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute, and any regulations promulgated thereunder.

"Common Parent" has the meaning assigned to it in Section 9.11(d).

"Compliance Period" shall mean any period commencing on the first date on which Excess Availability is less than the greater of (a) 12.5% of the Borrowing Cap or (b) $18,000,000, in each case for three consecutive days, and continuing until the date that both (x) Excess Availability exceeds the greater of (i) 12.5% of the Borrowing Cap or (ii) $18,000,000, in each case for 60 consecutive days and (y) no Default or Event of Default then exists and is continuing.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Approved Plan.

"Consolidated Cash Interest Charges" means, for any period, the total interest expense of the Loan Parties and their respective Subsidiaries for such period determined on a consolidated basis net of any interest income, which shall be determined on a cash basis only and solely in respect of Indebtedness of the type described in the definition of Total Indebtedness and excluding, for the avoidance of doubt:

(i) any non-cash interest expense and any capitalized interest, whether paid or accrued;

(ii) the amortization of original issue discount resulting from the issuance of Indebtedness at less than par;

(iii) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses (including agency costs, amendment, consent or other front end, one-off or similar non-recurring fees);

(iv) any expenses resulting from discounting of indebtedness in connection with the application of recapitalization accounting or purchase accounting;

(v) penalties or interest related to taxes and any other amounts of non-cash interest resulting from the effects of acquisition method accounting or pushdown accounting;

(vi) the accretion or accrual of, or accrued interest on, discounted liabilities (other than Indebtedness) during such period;

(vii) non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under hedging agreements or other derivative instruments pursuant to FASB Accounting Standards Codification No. 815-Derivatives and Hedging;

(viii) any one-time cash costs associated with breakage in respect of Hedge Agreements for interest rates;

(ix) any payments with respect to make whole premiums, commissions or other breakage costs of any Indebtedness;

(x) all non-recurring interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with GAAP;

(xi) expensing of bridge, arrangement, structuring, commitment, fronting or other financing fees;

(xii) fees and expenses constituting Transaction Costs;

(xiii) agency fees paid to the administrative agents and collateral agents under any credit facilities or other debt instruments or documents; and

(xiv) fees (including any ticking fees) and expenses (including any penalties and interest relating to Taxes) associated with any Investment not prohibited by Section 9.10 or the issuance of Capital Stock or Indebtedness (in each case excluding any bona fide interest expense);

provided that with respect to each joint venture or minority investee of any Loan Party or any of its Subsidiaries, for purposes of calculating Consolidated Cash Interest Charges solely with respect to calculating the Fixed Charge Coverage Ratio pursuant to Section 9.17 hereof, the amount of Consolidated Cash Interest Charges (calculated in accordance with this definition) attributable to such joint venture or minority investee, as applicable, that shall be counted for such purposes shall equal the product of (x) such Loan Party's or such Subsidiary's direct and/or indirect

percentage ownership of such joint venture or minority investee and (y) Consolidated Cash Interest Charges (calculated in accordance with this definition) of such joint venture or minority investee; provided further that the adjustments to Consolidated Cash Interest Charges pursuant to the preceding proviso shall be proportionate to the amount of EBITDA that is contributed by such joint venture or minority investee  pursuant to the definition of "EBITDA" hereunder.

"Consolidated Net Income" means, for any period, the net income (loss) of the Loan Parties and their respective Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(a)     extraordinary (as defined under GAAP as in effect prior to FASB Update No. 2015-01), unusual, or non-recurring gains or losses for such period,

(b)     the cumulative effect of a change in accounting principles during such period;

(c)     any Transaction Costs,

(d)     any fees, costs and expenses (including (x) any transaction or retention bonus or similar payment and (y) any indemnities) incurred during such period, or any amortization thereof for such period, in connection with or in relation to any acquisition (including any acquisition of a franchisee), non-recurring costs to acquire equipment to the extent not capitalized in accordance with GAAP, Investment, recapitalization, asset disposition, non-competition agreement, incurrence, issuance or repayment of debt or similar transaction, issuance of equity securities, option buyouts, refinancing transaction or amendment or other modification of or waiver or consent relating to any debt instrument or similar transaction and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt, the effects of expensing all transaction-related expenses in accordance with FASB Accounting Standards Codification 805 and gains or losses associated with FASB Accounting Standards Codification 460),

(e)     any income (loss) (and all fees and expenses or charges relating thereto) for such period attributable to the early extinguishment of Indebtedness, hedging agreements or other derivative instruments,

(f)     accruals and reserves that are established or adjusted as a result of any Permitted Acquisition or other Investment not prohibited under this Agreement in accordance with GAAP (including any adjustment of estimated payouts on Earn-Outs) or changes as a result of the adoption or modification of accounting policies during such period,

(g)     stock-based award compensation expenses (including any one-time compensation related to unvested options outstanding as of the Closing Date),

(h)     any income (loss) attributable to deferred compensation plans or trusts,

(i)     any income (loss) from Investments recorded using the equity method,

(j)    the amount of any expense required to be recorded as compensation expense related to contingent transaction consideration,

(k)    any unrealized gain or loss due solely to fluctuations in currency values and the related tax effects, determined in accordance with GAAP,

(l)    [Reserved],

(m)    [Reserved],

(n)    any costs or expenses incurred by the Loan Parties or any Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, any severance agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are non-cash or otherwise funded with cash proceeds contributed to the capital of the Loan Parties or net proceeds received in cash or Cash Equivalents of an issuance of Capital Stock of the Loan Parties (other than Disqualified Equity Interests),

(o)    the Consolidated Net Income of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that Consolidated Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary or its stockholders, and

(p)    any non-cash goodwill impairment charges or other intangible asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of ASC 350 or other non-cash asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of SFAS 144.

There shall be included in Consolidated Net Income, without duplication, the amount of any cash tax benefits related to the tax amortization of intangible assets in such period. There shall be excluded from Consolidated Net Income for any period the effects from applying acquisition method accounting, including applying acquisition method accounting to inventory, property and equipment, loans and leases, software and other intangible assets and deferred revenue (including deferred costs related thereto and deferred rent) required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the Loan Parties and their respective Subsidiaries), as a result of any Permitted Acquisitions (or other Investment not prohibited hereunder) or the amortization or write-off of any amounts thereof.

In addition, to the extent included in the Consolidated Net Income of such Person and its Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall (i) exclude any expenses and charges that are reimbursed by indemnification or other reimbursement provisions in connection with any acquisition or other investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder and (ii) include the amount of business interruption insurance proceeds received and, to the extent covered by insurance and actually reimbursed, or, so long as the Administrative Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and

20

only to the extent that such amount is (A) not denied by the applicable carrier in writing within 180 days and (B) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), expenses with respect to liability or casualty events or business interruption.

"Control" shall have the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"Copyright License" means any written agreement or license now or hereafter in effect, granting to or from any Person any use right under any Copyright now or hereafter owned by any other Person or that such other Person otherwise has the right to license, and all rights of any such Person under any such agreement or license.

"Copyrights" means (a) all copyright rights in any work arising under the copyright laws of the United States or any other jurisdiction, whether as author, assignee, transferee or otherwise, (b) all registrations and applications for registration of any such copyright, including registrations, supplemental registrations and pending applications for registration in the United States Copyright Office and (c) all extensions, renewals, and restorations thereof.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Covered Entity" means any of the following:

(a)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to it in Section 13.12.

"Credit Card Acknowledgments" shall mean, collectively, the agreements by Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements in favor of Agent acknowledging Agent's first priority security interest, for and on behalf of Lenders, in the monies due and to become due to a Borrower or a Guarantor(including, without limitation, credits and reserves) under the Credit Card Agreements, and agreeing to transfer all such amounts to the Blocked Accounts, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced pursuant to their terms, sometimes being referred to herein individually as a "Credit Card Acknowledgment".

"Credit Card Agreements" shall mean all agreements entered into on, prior and after the date hereof by any Borrower or for the benefit of any Borrower or Guarantor, in each case with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be

amended, modified, supplemented, extended, renewed, restated or replaced, including, but not limited to, the agreements set forth on <u>Schedule 8.16</u> hereto.

"<u>Credit Card Issuer</u>" shall mean any Person (other than any Loan Party or its Subsidiaries) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Japan Credit Bureau (a/k/a JCB Co.), Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc., and other issuers approved by the Agent.

"<u>Credit Card Processor</u>" shall mean any servicing or processing agent or any factor or financial intermediary (other than any Loan Party or its Subsidiaries) who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Loan Party's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"<u>Credit Card Receivables</u>" shall mean, collectively, (a) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer or Credit Card Processor arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party in connection with the sale or transfer of Credit Card Receivables arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise which, in the case of both <u>clause (a)</u> and <u>(b)</u> above, have been earned by performance by such Borrower or Guarantor but not yet been paid to such Borrower by the Credit Card Issuer or the Credit Card Processor, as applicable.

"<u>Credit Facility</u>" shall mean the Loans and Letters of Credit provided to or for the benefit of any Borrower pursuant to <u>Sections 2.1</u>, <u>2.2</u> and <u>2.3</u> hereof.

"<u>Daily Average Liquidity</u>" means for any period, the result obtained by dividing (i) the sum of the Daily Liquidity for each Business Day in such period by (ii) the number of Business Days in such period.

"<u>Daily Liquidity</u>" means, for any day, an amount equal to the sum of (i) daily unrestricted (except for any restrictions pursuant to the collateral and security documents in connection with the First Lien Term Loan Documents or the Financing Agreements; provided that (x) any cash collateral posted to secure obligations with respect to any Bank Products or Cash Management Obligations and (y) any account control agreements in favor of any Person other than the Agent (excluding, to the extent party to any control agreement in favor the Agent, the First Lien Agent) shall, in each case, be considered restricted) cash and Cash Equivalents of the Administrative Borrower and the operating Subsidiaries of the Administrative Borrower and (ii) any Excess Availability.

22

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to SOFR for the day that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website.  Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Administrative Borrower.

"Default" shall mean an act, condition or event which with notice or passage of time or both would constitute an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" shall mean any Revolving Lender, as determined by Agent, that has (a) failed to fund any portion of its Revolving Loans or participations in Letters of Credit within three Business Days of the date required to be funded by it hereunder, (b) notified any Borrower, Guarantor, Agent, the Issuing Bank or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) failed, within three Business Days after request by Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Revolving Loans and participations in then outstanding Letters of Credit, (d) otherwise failed to pay over Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, or (e) (i) become or is insolvent or has a parent company that has become or is insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Deposit Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Deposit Account Control Agreement" shall mean an agreement in writing, in form and substance reasonably satisfactory to Agent, by and among Agent, the First Lien Agent (if a party thereto), Borrowers or Guarantor with a Deposit Account at any bank and the bank at which such Deposit Account is at any time maintained which provides that such bank will comply with instructions originated by Agent directing disposition of the funds in the Deposit Account without further consent by such Borrower or Guarantor upon the occurrence of an Event of Default or upon the commencement of a Compliance Period and at all times during the continuance of such Event of Default or Compliance Period, and has such other terms and conditions as Agent may reasonably require including as to any such agreement with respect to any Blocked Account, providing that all items received or deposited in the Blocked Accounts are the property of Agent, for itself and

the ratable benefit of the Lenders and the Bank Product Providers and, except as otherwise agreed with the corresponding bank and with such other appropriate or customary exceptions for agreements of this kind, that the bank has no lien upon, or right to set off against, the Blocked Accounts, the items received for deposit therein, or the funds from time to time on deposit therein and that the bank will upon the occurrence of an Event of Default or upon the commencement of a Compliance Period and at all times during the continuance of such Event of Default or Compliance Period, wire, or otherwise transfer, in immediately available funds, on a daily basis to the Agent Payment Account all funds received or deposited into the Blocked Accounts.

"Disposed EBITDA" means, with respect to any Sold Entity or Business for any period through (but not after) the date of such disposition, the amount for such period of EBITDA of such Sold Entity or Business (determined as if references to the Loan Parties and their respective Subsidiaries in the definition of the term "EBITDA" (and in the component financial definitions used therein) were references to such Sold Entity or Business and its subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"Disqualified Equity Interest" means, with respect to any Person, any Capital Stock in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)    matures or is mandatorily redeemable or contains any mandatory put, redemption or repayment provision (other than solely for Capital Stock in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Capital Stock), whether pursuant to a sinking fund obligation or otherwise;

(b)    is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Capital Stock (other than solely for Capital Stock in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Capital Stock);

(c)    is redeemable (other than solely for Capital Stock in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Capital Stock) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof; or

(d)    in the case of any preferred Capital Stock, provides for scheduled payments of dividends and/or distributions in cash;

in each case, on or prior to the date ninety-one (91) days after the Maturity Date; provided, however, that (i) an Capital Stock in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Capital Stock upon the occurrence of an "asset sale" or a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after, or payment thereunder is subject to the prior, repayment in full of all the Loans and all other Obligations that are accrued and payable and the termination of the Revolving Commitments, (ii) if an Capital Stock in any Person is issued pursuant to any plan for the benefit

of employees of the Administrative Borrower or any of its subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Administrative Borrower or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) any Capital Stock in any Person that would not constitute a Disqualified Equity Interest but for a requirement of payment of dividends or distributions in violation of clauses (a) or (b) above shall not constitute a Disqualified Equity Interest if the terms of such Capital Stock (x) give the applicable issuer the option to elect to pay such dividends or distributions on a non-cash basis and (y) do not require the cash payment of dividends or distributions at any time that such cash payment is not permitted under Section 9.11 or Section 9.24 or would result in an Event of Default hereunder.

"Dividing Person" has the meaning assigned to it in the definition of "Division."

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Division Successor" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"Documents" shall have the meaning set forth in Article 9 of the UCC.

"dollars" or "$" refers to lawful money of the U.S., unless the context clearly otherwise indicates.

"Earn-Outs" means, with respect to any Person, obligations of such Person arising from Permitted Acquisitions or other Investments permitted hereunder which are payable to the sellers thereunder in their capacity as such based on the achievement of specified financial results or other criteria or milestones over time.

"EBITDA" means, for any period, Consolidated Net Income for such period, plus:

(a)    without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    total Interest Expense and, to the extent not reflected in such total Interest Expense, the sum of (A) premium payments, debt discount, fees, charges and related expenses incurred in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets plus (B) the portion of rent expense with respect to such period under Capital Leases that are treated as interest expense in accordance with GAAP plus (C) the implied interest component of synthetic leases with respect to such period plus (D) any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or such derivative instruments plus

(E) bank and letter of credit fees and costs of surety bonds in connection with financing activities, plus (F) amortization or write-off of deferred financing fees, debt issuance costs, debt discount or premium, terminated hedging obligations and other commissions, financing fees and expenses and, adjusted, to the extent included, to exclude any refunds or similar credits received in connection with the purchasing or procurement of goods or services under any purchasing card or similar program;

(ii)    provision for taxes based on income, profits, revenue or capital and sales taxes, including federal, foreign, state, franchise, excise, and similar taxes paid or accrued during such period (including in respect of repatriated funds) including penalties and interest related to such taxes or arising from any tax examinations;

(iii)    Non-Cash Charges;

(iv)    [reserved];

(v)    [reserved];

(vi)    severance, relocation, integration and facilities' opening costs and expenses and other business optimization costs and expenses and operating improvements (including related to new product introductions and any operating expenses, losses or charges related to the implementation of cost savings initiatives, operating expense reductions and other similar initiatives), recruiting fees, signing costs, reserve, retention, recruiting, relocation and signing bonuses and expenses, transition costs, costs related to closure/consolidation of facilities, internal costs in respect of strategic initiatives and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities), contract terminations, professional and consulting fees incurred in connection with any of the foregoing and other one-time and nonoperational costs and expenses; provided that the amounts added-back pursuant to this clause (vi) shall be subject to the Aggregate Add-Back Cap;

(vii)    restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves), whether or not classified as restructuring expense on the consolidated financial statements; provided that the amounts added-back pursuant to this clause (vii) shall be subject to the Aggregate Add-Back Cap;

(viii)    [reserved];

(ix)    [reserved];

(x)    any non-cash loss attributable to the mark to market movement in the valuation of any Capital Stock, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(xi)    any loss relating to amounts paid in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income for such period;

(xii)    any gain relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from EBITDA pursuant to clause (c)(iv) below;

(xiii)    any non-cash net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of FASB Accounting Standards Codification 715, and any other items of a similar nature;

(xiv)    charges, losses, lost profits, expenses (including litigation expenses, fee and charges) or write-offs to the extent indemnified or insured by a third party, including expenses or losses covered by indemnification provisions or by any insurance provider in connection with a Permitted Acquisition or any other acquisition or Investment, disposition or any Event of Loss, in each case, to the extent that coverage has not been denied and so long as such amounts are actually reimbursed in cash within one year after the related amount is first added to EBITDA pursuant to this clause (xiv) (and if not so reimbursed within one year, such amount shall be deducted from EBITDA during the next measurement period);

(xv)    cash receipts (or any netting arrangements resulting in reduced cash expenses) not included in EBITDA in any period to the extent non-cash gains relating to such receipts were deducted in the calculation of EBITDA pursuant to clause (c) below for any previous period and not added back;

(xvi)    [reserved];

(xvii)    other adjustments (i) identified to Agent and the Lenders prior to the Closing Date or (ii) set forth in the quality of earnings report prepared by independent registered public accountants of recognized national standing or any other accounting firm reasonably acceptable to the Agent and the Lenders and delivered in connection with the Transactions; provided that the amounts added-back pursuant to this clause (xvii) shall be subject to the Aggregate Add-Back Cap; and

(xviii)    [reserved]; plus

(b)    [reserved]; less

(c)    without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or EBITDA in any prior period and any non-cash gains

attributable to accrual of revenue or recording of receivables in the ordinary course of business);

(ii)     any non-cash gain attributable to the mark to market movement in the valuation of any Capital Stock, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(iii)     any gain relating to amounts received in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income in such period;

(iv)     any loss relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from EBITDA pursuant to clauses (a)(xi) and (a)(xii) above;

(v)     [reserved];

(vi)     non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or cash reserve for a potential cash item that reduced EBITDA in any prior period, any non-cash gains with respect to cash actually received in a prior period so long as such cash did not increase EBITDA in such prior period, and any non-cash gains attributable to accrual of revenue or recording of receivables in the ordinary course of business; and

(vii)     any amount included in Consolidated Net Income of such Person for such period attributable to non-controlling interests pursuant to the application of FASB Accounting Standards Codification Topic 810-10-45;

in each case, as determined on a consolidated basis for the Loan Parties and their respective Subsidiaries in accordance with GAAP; provided that:

(I)     to the extent included in Consolidated Net Income, there shall be excluded in determining EBITDA currency translation gains and losses related to currency remeasurements of assets or liabilities (including the net loss or gain resulting from hedging agreements for currency exchange risk and revaluations of intercompany balances),

(II)     to the extent included in Consolidated Net Income, there shall be excluded in determining EBITDA for any period any adjustments resulting from the application of Financial Accounting Standards Codification No. 815—Derivatives and Hedging,

(III)     there shall be included in determining EBITDA for any period, without duplication, to the extent not included in Consolidated Net Income, the Acquired EBITDA of any Person, property, business or asset acquired by any Loan Party or any Subsidiary during such period to the extent not subsequently sold, transferred or otherwise disposed of (but not including the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired) (each such Person, property, business or asset acquired,

an "Acquired Entity or Business"), based on the Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) determined on a historical pro forma basis and (B) in the case of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting, the EBITDA of such Person multiplied by the ownership percentage of such Loan Party or applicable Subsidiary therein; provided that, in each case, any joint venture or minority investment shall be subject to clause (VI) below;

(IV)    there shall be (A) to the extent included in Consolidated Net Income, excluded in determining EBITDA for any period the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations in accordance with GAAP (other than (x) if so classified on the basis that it is being held for sale unless such sale has actually occurred during such period and (y) for periods prior to the applicable sale, transfer or other disposition, if the Disposed EBITDA of such Person, property, business or asset is positive (i.e., if such Disposed EBITDA is negative, it shall be added back in determining EBITDA for any period)) by a Loan Party or any Subsidiary during such period (each such Person, property, business or asset so sold, transferred or otherwise disposed of, closed or classified, a "Sold Entity or Business"), based on the Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer, disposition, closure, classification or conversion) determined on a historical pro forma basis and (B) to the extent not included in Consolidated Net Income, included in determining EBITDA for any period in which a Sold Entity or Business is disposed, an adjustment equal to the Pro Forma Disposal Adjustment with respect to such Sold Entity or Business (including the portion thereof occurring prior to such disposal) as specified in the Pro Forma Disposal Adjustment certificate delivered to the Agent (for further delivery to the Lenders);

(V)    to the extent included in Consolidated Net Income, there shall be excluded in determining EBITDA any non-cash expense (or income) as a result of adjustments recorded to contingent consideration liabilities relating to any Permitted Acquisition (or other Investment permitted hereunder); and

(VI)    with respect to each joint venture or minority investee of a Loan Party or any of its Subsidiaries, for purposes of calculating EBITDA solely with respect to calculating the Fixed Charge Coverage Ratio pursuant to Section 9.17 hereof, the amount of EBITDA (calculated in accordance with this definition) attributable to such joint venture or minority investee, as applicable, that shall be counted for such purposes (without duplication of amounts already included in Consolidated Net Income) shall equal the product of (x) such Loan Party's or such Subsidiary's direct and/or indirect percentage ownership of such joint venture or minority investee and (y) the EBITDA (calculated in accordance with this definition) of such joint venture or minority investee; provided that the aggregate amount of adjustments or add-backs to EBITDA pursuant to this clause (VI) shall not exceed 10.0% of EBITDA (prior to giving effect to such adjustments).

"ECP" shall mean an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act and the applicable rules and regulations issued by the Commodity Futures Trading Commission and/or the Securities and Exchange Commission.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Electronic Signature</u>" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"<u>Electronic System</u>" means any electronic system, including e-mail, e-fax, web portal access for such Loan Party and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Agent or the Issuing Bank and any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"<u>Eligible Accounts</u>" shall mean, at any time, the Accounts of a Loan Party which Agent determines in its Permitted Discretion are eligible as the basis for the extension of Loans and the issuance of Letters of Credit.  Eligible Accounts shall be calculated, without duplication of any Reserves, net of customer deposits, unapplied cash, taxes, finance charges, service charges, discounts, credits, allowances, and rebates.  Without limiting Agent's Permitted Discretion provided herein, Eligible Accounts shall not include any Account of a Loan Party:

(a)    which is not subject to a first priority perfected security interest in favor of Agent;

(b)    which is subject to any lien other than (i) a lien in favor of Agent and (ii) a Permitted Encumbrance or a Lien permitted pursuant to <u>Section 9.8(s)</u>, in each case, which does not have priority over the lien in favor of Agent;

(c)    (i) with respect to which the scheduled due date is more than 60 days after the date of the original invoice therefor, (ii) which, is unpaid more than 90 days after the date of the original invoice therefor or more than 60 days after the original due date, therefor ("<u>Overage</u>") (when calculating the amount under this <u>clause (ii)</u>, for the same Account Debtor, Agent shall include the net amount of such Overage and add back any credits, but only to the extent that such credits do not exceed the total gross receivables from such Account Debtor, or (iii) which has been written off the books of such Loan Party or otherwise designated as uncollectible;

(d)    which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder;

(e)     which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to  such Loan Party exceeds 10% of the aggregate amount of Eligible Accounts of such Loan Party;

(f)     with respect to which any covenant, representation, or warranty contained in this Agreement or any other Financing Agreement has been breached in any material respect or is not true in any material respect;

(g)     which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to Agent in its Permitted Discretion which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon such Loan Party's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, (vi) relates to payments of interest or (vii) constitutes a Franchisee Receivable other than a Franchisee Receivable arising after the Closing Date owing by a franchisee that has been approved by Agent in its Permitted Discretion;

(h)     for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such Loan Party or if such Account was invoiced more than once;

(i)     with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j)     which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws (other than post-petition accounts payable of an Account Debtor that is a debtor-in-possession under the United States Bankruptcy Code and reasonably acceptable to Agent), (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent or (vi) ceased operation of its business;

(k)     which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)     which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or (ii) is not organized under applicable law of the U.S. or any state of the U.S. unless, in either case, such Account is backed by a Letter of Credit acceptable to Agent which is in the possession of, and is directly drawable by, Agent;

(m)     which is owed in any currency other than U.S. dollars;

(n)     which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is

backed by a Letter of Credit acceptable to Agent which is in the possession of, and is directly drawable by, Agent, or (ii) the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect the lien of Agent in such Account have been complied with to Agent's satisfaction;

(o)     which is owed by any Affiliate of any Borrower or any Guarantor or any employee, officer, director, agent or stockholder of any Borrower, any Guarantor or any of their Affiliates;

(p)     which, for any Account Debtor, exceeds a credit limit determined by Agent in its Permitted Discretion, to the extent of such excess;

(q)     which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Borrower or any Guarantor is indebted, but only to the extent of such indebtedness, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r)     which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent of any such counterclaim, deduction, defense, setoff or dispute;

(s)     which is evidenced by any promissory note, chattel paper, or instrument;

(t)     which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Loan Party to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Loan Party has filed such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(u)     with respect to which such Loan Party has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such Loan Party created a new receivable for the unpaid portion of such Account;

(v)     which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Federal Reserve Board;

(w)     which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than such Loan Party has or has had an ownership interest in such goods, or which indicates any party other than such Loan Party as payee or remittance party;

(x)     which was created on cash on delivery terms;

(y)     which is (i) a Credit Card Receivable or (ii) an Account generated by a consumer lease or rental agreement or arrangement (including a Rental Agreement); or

(z)      which is owing to Buddy Top Parent or any of its Subsidiaries.

In the event that an Account of a Loan Party which was previously an Eligible Account ceases to be an Eligible Account hereunder, such Loan Party or Administrative Borrower shall notify thereof on and at the time of submission to Agent of the next Borrowing Base Certificate.  In determining the amount of an Eligible Account of a Loan Party, the face amount of an Account may, in Agent's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Loan Party may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Loan Party to reduce the amount of such Account.

"Eligible Credit Card Receivables" shall mean, the gross amount of Credit Card Receivables of the Loan Parties that are subject to a valid, first priority and fully perfected security interest in favor of the Agent for itself and the Secured Parties, which conform to all applicable warranties contained herein, less, without duplication:

(a)      the sum of all Credit Card Receivables:

(i)      for which Agent has not received a Credit Card Acknowledgment pursuant to Section 9.31 if the Credit Card Agreement exists on the Closing Date (or if the Credit Card Agreement is entered into after the Closing Date, no later than 90 days after the date of such Credit Card Agreement or such later date as is acceptable to Agent);

(ii)      which are unpaid more than five Business Days after the date of the sale of Inventory giving rise to such Credit Card Receivable;

(iii)      arising from any private label credit card program or other similar credit arrangement of a Loan Party or any of its Subsidiaries, except as otherwise approved by Agent in its Permitted Discretion;

(iv)      which are generated by a consumer lease or rental agreement or arrangement (including a Rental Agreement);

(v)      which are owing to Buddy Top Parent or any of its Subsidiaries; and

(b)      amounts owing to Credit Card Issuers or Credit Card Processors in connection with the Credit Card Agreements.

Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, a Credit Card Receivable shall indicate no Person other than a Loan Party as payee or remittance party.

"Eligible Depository Bank" means:

(a)      Any Lender or any of its Affiliates; or

33

(b)      Any other Person who is a commercial bank or financial institution having total assets in excess of $1,000,000,000; organized under the laws of any country that is a member of the Basel Accord and the Organization of Economic Cooperation and Development, or a political subdivision of any such country, so long as such bank or financial institution is acting through a branch or agency located in the United States.

"Eligible Inventory" shall mean, as to each Loan Party, Inventory of such Loan Party consisting of finished goods held for resale in the ordinary course of the business of such Loan Party that satisfy the criteria set forth below as reasonably determined by Agent. Eligible Inventory shall not include:

(a)      work-in-process;

(b)      raw materials;

(c)      spare parts for Equipment;

(d)      packaging and shipping materials;

(e)      supplies used or consumed in such Loan Party's business;

(f)      Inventory located (i) (A) at premises other than a premise which is owned or leased by any Loan Party or (B) without limiting subclause (ii) of this clause (f) below, in any third party warehouse or in the possession of a bailee (other than a third party processor) unless Agent has received, subject to Section 9.31, a Collateral Access Agreement in respect of such premises on terms and conditions reasonably satisfactory to Agent (it being understood that Inventory of the Loan Parties which is in-transit (other than in-transit Inventory between domestic locations of the Loan Parties for less than 10 consecutive days) shall not be considered Eligible Inventory) or (ii) at a location owned or leased by a dealer;

(g)      Inventory subject to a security interest or lien in favor of any Person other than Agent except those permitted in this Agreement that are subject to an intercreditor agreement in form and substance satisfactory to Agent between the holder of such security interest or lien and Agent and those liens described in clause (j) below;

(h)      bill and hold goods;

(i)      Inventory which is past its expiration date;

(j)      Inventory that is not subject to the first priority, valid and perfected security interest of Agent except in the case of those non-consensual statutory liens described in clause (i) of the definition of "Permitted Encumbrances", liens permitted under Section 9.8(ff) and (gg) so long as such liens are subject to the Intercreditor Agreement and landlord, warehouseman or similar liens (i) in respect of which Agent has established a Reserve (if and only to the extent establishment of a Reserve is permitted by the terms hereof), (ii) for which no Reserve is provided by the terms hereof, or (iii) in respect of which premises Agent has received a Collateral Access Agreement pursuant to which the landlord, warehouseman or bailee, as applicable, has either waived or subordinated its lien on terms and conditions reasonably satisfactory to Agent;

(k)    returned Inventory which is not held for sale in the ordinary course of business;

(l)    damaged and/or defective Inventory;

(m)    Inventory (i) purchased or sold on consignment, (ii) that is consigned by a Loan Party to a Person which is not a Loan Party or a Subsidiary of a Loan Party or (iii) Inventory that is consigned to franchisees;

(n)    Inventory located outside the United States of America, unless approved by Agent in writing;

(o)    Inventory that is subject to any licensing arrangement or any other Intellectual Property or other proprietary rights of any Person, the effect of which would be to limit the ability of the Agent, or any Person selling the Inventory on behalf of the Agent, to sell such Inventory in enforcement of the Agent's Liens without further consent or payment to the licensor or such other Person (unless such consent has then been obtained);

(p)    Inventory which has been acquired from a Sanctioned Person;

(q)    Inventory that is subject to any consumer lease or rental agreement or arrangement (including any Rental Agreement); and

(r)    Inventory of Buddy Top Parent or any of its Subsidiaries.

The criteria for Eligible Inventory set forth above may only be changed and any new criteria for Eligible Inventory may only be established by Agent in its good faith based on either:  (i) an event, condition or other circumstance arising after the date hereof, or (ii) an event, condition or other circumstance existing on the date hereof to the extent Agent has no written notice thereof from a Loan Party prior to the date hereof in either case under <u>clause (i)</u> or <u>(ii)</u> which materially and adversely affects or could reasonably be expected to materially and adversely affect the Inventory, its value or the amount that would be received by Agent from the sale or other disposition or realization upon such Inventory as determined by Agent in its good faith and commercially reasonable determination.  Any Inventory that is not Eligible Inventory shall nevertheless be part of the Collateral.

"<u>Eligible Transferee</u>" shall mean:

(a) any Lender;

(b) the parent company of any Lender and/or any Affiliate of such Lender which is at least 50% owned by such Lender or its parent company;

(c) any Person that is engaged in the business of making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and is administered or managed by a Lender or with respect to any Lender that is a fund which invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor, in each case is approved by Agent, the Issuing Bank and,

unless an Event of Default under <u>Section 10.1(a)</u>, <u>Section 10.1(g)</u> or <u>Section 10.1(h)</u> has occurred and is continuing at the time any assignment is effected hereunder, Administrative Borrower (such approval not to be unreasonably withheld, conditioned or delayed by Administrative Borrower, <u>provided</u>, that, (i) Administrative Borrower's failure to consent to an assignment to a "distressed debt" purchaser, a "vulture" fund or other similar assignee or buyer shall not be deemed unreasonable and (ii) no such consent shall be required in connection with any assignment to another Lender or to an Affiliate of any Lender); and

(d) any other commercial bank, financial institution or "accredited investor" (as defined in Regulation D under the Securities Act of 1933) approved by Agent, the Issuing Bank (each such approval not to be unreasonably withheld, conditioned or delayed) and, unless an Event of Default under <u>Section 10.1(a)</u>, <u>Section 10.1(g)</u> or <u>Section 10.1(h)</u> has occurred and is continuing at the time any assignment is effected hereunder, Administrative Borrower, <u>provided</u> that (i) neither any Borrower nor any Guarantor or any Affiliate of any Borrower or Guarantor shall qualify as an Eligible Transferee; (ii) no Person to whom any Indebtedness which is in any way subordinated in right of payment to any other Indebtedness of any Borrower or Guarantor shall qualify as an Eligible Transferee, except, in each case, as Agent may otherwise specifically agree; and (iii) a competitor of Borrowers shall not be deemed an "Eligible Transferee" under any circumstances except after the occurrence of either (A) an Event of Default for non-payment of any principal amount of Obligations owing hereunder or (B) the occurrence of an Event of Default with respect to any Borrower or Guarantor set forth in <u>Section 10.1(g)</u> or <u>Section 10.1(h)</u> hereof.

"<u>Environmental Events</u>" shall have the meaning set forth in <u>Section 9.3(b)</u> hereof.

"<u>Environmental Laws</u>" shall mean all foreign, Federal, State and local laws (including common law), rules, codes, licenses, permits (including any conditions imposed therein), authorizations, legally binding judicial or administrative decisions, injunctions or agreements between a Loan Party and any Governmental Authority, (a) relating to pollution and the protection, preservation or restoration of the environment (including air, water vapor, surface water, ground water, drinking water, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), (b) relating to the exposure of humans to, or the use, storage, recycling, treatment, generation, manufacture, processing, distribution, transportation, handling, labeling, production, release or disposal, or threatened release, of hazardous, toxic or dangerous substances, materials, and wastes, or (c) imposing requirements with regard to recordkeeping, notification, disclosure and reporting respecting hazardous, toxic or dangerous substances, materials, and wastes. The term "Environmental Laws" includes (i) the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Federal Superfund Amendments and Reauthorization Act, the Federal Water Pollution Control Act of 1972, the Federal Clean Water Act, the Federal Clean Air Act, the Federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the Federal Solid Waste Disposal and the Federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Federal Safe Drinking Water Act of 1974, (ii) applicable state counterparts to such laws and (iii) any common law or equitable doctrine that imposes liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any hazardous, toxic or dangerous substances, materials, and wastes.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities) directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" shall have the meaning set forth in Article 9 of the UCC and includes, without limitation, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA" shall mean the United States Employee Retirement Income Security Act of 1974, as amended, together with all rules, regulations and interpretations thereunder or related thereto.

"ERISA Affiliate" shall mean any Person required to be aggregated with any Borrower, any Guarantor or any of its or their respective Subsidiaries under Sections 414(b), 414(c), 414(m) or 414(o) of the Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan, except for any such event with respect to which notice has been waived pursuant to applicable regulations; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412 of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the occurrence of a non-exempt "prohibited transaction" with respect to which the Loan Parties or any of their respective Subsidiaries is a "disqualified Person" (within the meaning of Section 4975 of the Code); (f) a complete or partial withdrawal by any Loan Party, or any ERISA Affiliate from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the Pension Benefit Guaranty Corporation to terminate a Plan; (h) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (i) the imposition of any liability under Title IV of ERISA, other than the Pension Benefit Guaranty Corporation premiums due but not delinquent under Section 4007 of ERISA, upon such Loan Party, or any ERISA Affiliate in an amount that could reasonably be expected to have a Material Adverse Effect.

"Event of Default" shall mean the occurrence or existence of any event or condition described in Section 10.1 hereof.

"Event of Loss" means, with respect to any property, any of the following: (a) any loss, destruction or damage of such property; or (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such property, or confiscation of such property or the requisition of the use of such property; which for the avoidance of doubt, shall not include store closings or liquidations.

"Excess Availability" shall mean, the amount, as determined by Agent, calculated at any date, equal to: (a) the Borrowing Cap minus (b) the Aggregate Revolving Exposure.

"Exchange Act" shall mean the Securities Exchange Act of 1934, together with all rules, regulations and interpretations thereunder or related thereto.

"Excluded Accounts" means:

(a) Zero Balance Accounts (provided that, upon any such account ceasing to be a Zero Balance Account, such account shall cease to be an Excluded Account);

(b) Store Accounts;

(c) accounts into which government receivables and government reimbursement payments are deposited;

(d) payroll accounts (including accounts used for the disbursement of payroll, payroll taxes and other employee wage and benefit payments, including 401(k) and other retirement plans, rabbi trusts for deferred compensation and health care benefits);

(e) withholding and trust accounts, escrow and other fiduciary accounts;

(f) Manual Sweeping Accounts; and

(g) Deposit Accounts, Securities Accounts and commodity accounts that (x) individually have a daily balance of not more than $50,000 and (y) together with all other Deposit Accounts, Securities Accounts and commodity accounts constituting Excluded Accounts under this clause (g), have a daily balance of not more than $1,000,000 in the aggregate for all such Deposit Accounts, Securities Accounts or commodity accounts.

"Excluded Assets" means:

(a) any fee-owned real property that is not Material Real Property, all leasehold (including ground lease) interests in real property and any real property that contains improvements and is located in an area determined (as of the Closing Date with respect to real property owned on the Closing Date and as of the date of acquisition of any real property acquired after the Closing Date) by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area;

(b) motor vehicles, railcars, trailers, aircraft, aircraft engines, construction and earth moving equipment and other assets subject to certificates of title or ownership (except to the extent perfection of a security interest therein can be accomplished by filing of a UCC-1 financing statement or equivalent financing statement with a central registry);

(c) letter of credit rights (except to the extent constituting supporting obligations (as defined under the UCC) in which a security interest can be perfected with the filing of a UCC-1 financing statement or equivalent financing statement with a central registry);

(d) commercial tort claims with an individual value, as determined by the Administrative Borrower in good faith of less than $2,500,000 and commercial tort claims for which no complaint or counterclaim has been filed in a court of competent jurisdiction;

(e) [reserved];

(f) [reserved];

(g) [reserved];

(h) [reserved];

(i) any lease, license or other agreement, government approval or franchise with any Person if, to the extent and for so long as, the grant of a Lien thereon to secure the Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, such lease, license or other agreement, government approval or franchise (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the UCC or any applicable Requirements of Law), other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC;

(j) any asset subject to a Lien of the type permitted by Section 9.8(e) (whether or not incurred pursuant to such Section) if, to the extent and for so long as the grant of a Lien thereon to secure the Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, any agreement pursuant to which such Lien has been created (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the UCC Code or any applicable Requirements of Law);

(k) any intent-to-use trademark applications filed in the United States Patent and Trademark Office, pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. Section 1051, prior to the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an accepted filing of an "Amendment to Allege Use" whereby such intent-to-use trademark application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act;

(l) any asset if, to the extent and for so long as the grant of a Lien thereon to secure the Obligations is prohibited by any applicable Requirements of Law, rule or regulation, or agreements with any Governmental Authority or which would require consent, approval, license or authorization from any Governmental Authority or regulatory authority, unless such consent, approval, license or authorization has been received in consultation with Agent (other than, in each

case, to the extent that any such prohibition or requirement would be rendered ineffective pursuant to the UCC or any other applicable Requirements of Law);

(m) margin stock (within the meaning of Regulation U of the Board of Governors, as in effect from time to time);

(n) Excluded Accounts;

(o) assets to the extent a security interest in such assets would result in material adverse tax consequences to any Loan Party (or any direct or indirect parent or beneficial owner thereof) or one of its Subsidiaries (as determined in good faith by the Administrative Borrower and with the prior written consent of the Required Lenders to be granted in their sole discretion);

(p) assets sold to any Person who is not a Loan Party in compliance with the Financing Agreements;

(q) assets owned by a Loan Party after the release of the guarantee of such Loan Party pursuant to the Financing Agreements;

(r) [reserved]; and

(s) any assets with respect to which, in the reasonable judgment of Agent and the Administrative Borrower (as agreed to in writing), the cost or other consequences (including material adverse tax consequences as determined by the Administrative Borrower and Agent in good faith) of pledging such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom; provided, that, notwithstanding the foregoing, no asset that secures the obligations under the First Lien Credit Agreement shall be an "Excluded Asset" hereunder and no asset shall constitute an "Excluded Asset" unless it also constitutes an "Excluded Asset" (or equivalent term) for purposes of the First Lien Credit Agreement.

"Excluded Hedge Obligation" shall mean, with respect to any Borrower or Guarantor, any Hedge Obligation if, and to the extent that, all or a portion of the guarantee of such Borrower or Guarantor of, or the grant by such Borrower or Guarantor of a security interest to secure, such Hedge Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) (a) by virtue of such Borrower's or Guarantor's failure for any reason to constitute an ECP at the time the guarantee of such Borrower or Guarantor or the grant of such security interest becomes effective with respect to such Hedge Obligation or (b) in the case of a Hedge Obligation subject to a clearing requirement pursuant to Section 2(h) of the Commodity Exchange Act (or any successor provision thereto), because such Borrower or Guarantor is a "financial entity," as defined in Section 2(h)(7)(C)(i) of the Commodity Exchange Act (or any successor provision thereto), at the time the guarantee of such Borrower or Guarantor becomes effective with respect to such related Hedge Obligation. If a Hedge Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedge Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Subsidiary" means Franchise Group Intermediate 2, LLC, a Delaware limited liability company, so long as such Subsidiary is not a Guarantor as defined in and under the First Lien Credit Agreement or any other Indebtedness for borrowed money in an aggregate principal amount in excess of $2,500,000.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan, Letter of Credit or Revolving Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan, Letter of Credit or Revolving Commitment (other than pursuant to an assignment request by the Borrowers under Section 3.6(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.5, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan, Letter of Credit or Revolving Commitment or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Lender's failure to comply with Section 3.5(f); and (d) any withholding Taxes imposed under FATCA.

"Existing Debt Agreements" means (a) that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, by and among the Administrative Borrower, PSP Newco, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, JPMorgan Chase Bank, N.A., as agent, and the lenders party from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, (b) that certain First Lien Credit Agreement, dated as of March 10, 2021, by and among the Administrative Borrower, PSP Newco, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, Wilmington Trust, National Association (as successor to JPMorgan Chase Bank, N.A.), as administrative agent and collateral agent, and the lenders from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, (c) that certain Second Lien Credit Agreement, dated as of March 10, 2021, by and among the Administrative Borrower, PSP Newco, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, Alter Domus (US) LLC, as administrative agent and collateral agent, and the lenders party from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, (d) that certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, by and among the Administrative Borrower, PSP Newco, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, Alter Domus (US) LLC, as administrative agent and collateral agent, and the lenders party from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof and (e) that certain Credit Agreement, dated as of August 21, 2023, by and among Freedom VCM Interco, Inc. as holdings, Freedom VCM, Inc., as borrower, Alter Domus (US) LLC, as administrative agent and collateral agent and certain lenders from time to time party thereto, as

amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof.

"Existing Letter of Credit" means each letter of credit issued prior to the Closing Date by a Person that shall be an Issuing Bank and listed on Schedule 2.3.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions (as determined in such manner as shall be set forth on the NYFRB's Website from time to time) and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that, if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Fee Letter" shall mean the fee letter, dated as of June 6, 2025, by and among Fusion Buyer and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Financing Agreements" shall mean, collectively, this Agreement, the Intercreditor Agreement, the Collateral Documents and all notes, guarantees, security agreements, intercreditor agreements, the Agent Fee Letter, the Fee Letter and all other agreements, documents and instruments now or at any time hereafter executed and/or delivered by any Borrower or Guarantor in connection with this Agreement.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Lien Agent" means the "Administrative Agent" and "Collateral Agent" (or analogous terms) under the First Lien Credit Agreement, including any successors and permitted assigns thereof.

"First Lien Credit Agreement" means (i) that certain First Lien Credit Agreement, dated as of the Closing Date, among Fusion Intermediate, LLC, as parent, Fusion Buyer, LLC, as borrower, Wilmington Trust, National Association, as administrative agent and collateral agent, and the lenders from time to time party thereto, as the same may be amended, restated, supplemented or otherwise modified, superseded or replaced from time to time in accordance with the Intercreditor Agreement and/or (ii) any credit agreement, loan agreement, or other financing that replaces or refinances the Credit Agreement described in the preceding clause (i) so long as the security

interests securing such credit agreement, loan agreement or other financing are subject to the Intercreditor Agreement, as the same may be amended, restated, supplemented or otherwise modified, superseded or replaced from time to time in accordance with the Intercreditor Agreement.

"First Lien Lender" means a "Lender" under and as defined in the First Lien Credit Agreement.

"First Lien Obligations" means all Indebtedness of the Borrowers and the Guarantors incurred or owing under the First Lien Term Loan Documents, including all obligations in respect of the payment of principal, interest, fees, prepayment premiums and indemnification obligations, and any refinancing or replacement of such Indebtedness permitted under this Agreement and under the Intercreditor Agreement; provided that such Indebtedness is subject to the Intercreditor Agreement.

"First Lien Required Lenders" means, at any time, the "Required Lenders" under and as defined in the First Lien Credit Agreement at such time.

"First Lien Term Loan Documents" means the "Loan Documents" or analogous term as defined in the First Lien Credit Agreement or the agreements and other documents governing other Indebtedness incurred under Section 9.9(s).

"Fixed Charge Coverage Ratio" means, for any period of twelve fiscal months of the Administrative Borrower, the ratio of (a) EBITDA for such period minus (i) all Unfinanced Capital Expenditures for such period and (ii) cash taxes paid (including in the form of tax distributions) for such period (net of cash refunds received during such period, provided that the amount pursuant to this subclause (ii) shall not be less than zero) to (b) Fixed Charges.

Notwithstanding anything to the contrary herein, for the first twelve (12) fiscal months after the Closing Date, each component of calculating the Fixed Charge Coverage Ratio shall be based off the financial statements that are actually delivered pursuant to Section 9.6(a)(i) (for example, the calculation for Fixed Charge Coverage Ratio for the first, second and third fiscal months after the Closing Date will be based off financials for the periods ending with respect to the first, second and third fiscal months, respectively).

"Fixed Charges" shall mean, for any period, the sum of (i) Consolidated Cash Interest Charges paid or payable currently for such period plus (ii) scheduled amortization of Funded Debt (including Capital Leases) paid or payable currently in cash for such period plus (iii) dividends or distributions made in reliance on Section 9.11(l) which are paid in cash (net of tax distributions) for such period plus (iv) prepayments of Indebtedness (including, for the avoidance of doubt, mandatory prepayments) and any premiums in connection therewith made in reliance on Section 9.24(m) which are paid in cash for such period; provided that for purposes of the foregoing subclause (iv), mandatory prepayments with the proceeds of Term Priority Collateral shall be excluded.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood

Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" means the benchmark rate floor, if any, provided in this Agreement (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Adjusted Term SOFR Rate or the Adjusted Daily Simple SOFR, as applicable.  For the avoidance of doubt, as of the Closing Date, the Floor for each of the Adjusted Term SOFR Rate and the Adjusted Daily Simple SOFR shall be 0%.

"Foreign Lender" shall mean any Lender that is not a U.S. Person.

"Foreign Subsidiary" shall mean a Subsidiary of any Loan Party that is organized or incorporated under the laws of any jurisdiction outside of the United States of America; sometimes being referred to herein collectively as "Foreign Subsidiaries".

"Franchise Agreement" means a franchising agreement between any Borrower or Guarantor, as franchisor, and any other Person, as franchisee, pertaining to the establishment and operation of a business with operations comparable to the operations of the PSP Borrowers and their Subsidiaries.

"Franchise Disclosure Documents" means any uniform franchise offering circulars and franchise disclosure documents used by (and, to the extent required, filed by) any Borrower or Guarantor to comply with any applicable law, rule, regulation or order of any Governmental Authority.

"Franchise Fees" shall mean each Borrower's right to payment under any franchising agreement (including any Franchise Agreement) between any Borrower or Guarantor, as franchisor, and any other Person, as franchisee, pertaining to the establishment and operation of a business with operations comparable to the operations of such Borrower, Guarantor and its Subsidiaries, including, without limitation, all fees, royalties, revenues, charges, penalties and/or interest; provided that Franchise Fees shall not include any Account or other rights to payment arising from the sale of Inventory by a Loan Party to a franchisee.

"Franchise Laws" means all applicable laws, rules, regulations, orders, binding guidance or other requirements of the United States Federal Trade Commission or any other Governmental Authority relating to the relationship between franchisor and franchisees or to the offer, sale, termination, non-renewal or transfer of a franchise.

"Franchisee Receivable" shall mean an Account or credit card receivable of a Loan Party owed by an Account Debtor that is a franchisee arising from the sale of Inventory by a Loan Party to such Account Debtor (including any Account or credit card receivable to the extent arising from the sale of Inventory under a Franchise Agreement other than any such Account or credit card receivable (or portion thereof) that consists of fees, royalties, penalties and interest payable under any Franchise Agreement).

"FRG" means Franchise Group, Inc., a Delaware corporation.

"<u>Funded Debt</u>" means all Indebtedness of the Administrative Borrower and its Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"<u>Fusion Buyer</u>" has the meaning specified in the recitals hereto.

"<u>Fusion Intermediate</u>" means Fusion Intermediate, LLC, a Delaware limited liability company.

"<u>GAAP</u>" shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board  or such other principles as may be approved by a significant segment of the accounting profession in the United States (including any principles required by the Securities and Exchange Commission), that are applicable to the circumstances as of the date of determination, consistently applied.  If there occurs after the date of this Agreement any change in GAAP that affects the calculation of any requirements, terms or covenants set forth in this Agreement or any other Financing Agreement (whether contained in <u>Section 9.24</u> or otherwise), Agent and Borrowers shall negotiate in good faith to amend the provisions of this Agreement and the other Financing Agreements that relate to the calculation of such requirements, terms and covenants with the intent of having the respective positions of the Lenders and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the implicated requirements and covenants shall be calculated as if no such change in GAAP has occurred; <u>provided,</u> that, for the avoidance of doubt, the parties agree that all financial statements required to be delivered hereunder shall and will be delivered giving effect to any such change in GAAP.

"<u>General Intangibles</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Goods</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Governmental Authority</u>" shall mean any nation or government, any state, province, or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"<u>Guarantors</u>" shall mean, collectively and together with their respective successors and assigns), each party to the Guaranty on the Closing Date and any Person that at any time after the date hereof becomes party to a Guaranty in favor of Agent for the benefit of the Secured Parties or otherwise liable on or with respect to the Obligations (other than Borrowers) (each a "<u>Guarantor</u>").

"<u>Guaranty</u>" shall mean (a) that certain Guaranty Agreement dated as of the Closing Date, by each of Loan Parties from time to time party thereto in favor of Agent, Lenders and the other Secured Parties, and (b) any other guaranty agreement executed by a Subsidiary of a Loan Party

that at any time after the date hereof becomes a Guarantor under this Agreement in favor of Agent, Lenders and the other Secured Parties, in each case, as the same may be amended, restated or otherwise modified from time to time.

"Hazardous Materials" shall mean any hazardous, toxic or dangerous substances, materials and wastes, including petroleum hydrocarbons, flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants, sewage, sludge, industrial slag, solvents and/or any other substances, materials or wastes that are or become regulated under any Environmental Law (including any that are or become classified as hazardous or toxic under any Environmental Law).

"Hedge Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement; sometimes being collectively referred to herein as "Hedge Agreements".

"Hedge Obligations" of any Borrower or Guarantor means any and all obligations of such Borrower or Guarantor, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Hedge Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Hedge Agreement transaction, in each case, solely under Hedge Agreements entered into with a Bank Product Provider and which are deemed to be Obligations under clause (b) (other than clause (b)(ii)) of the definition of Obligations.

"Immaterial Subsidiary" means any Subsidiary other than a Material Subsidiary.

"Immediate Family Member" means with respect to any individual, such individual's child, stepchild, grandchild or one or more remote descendent, parent, stepparent, grandparents, spouse, sibling, mother in law, father in law, son in law and/or daughter in law (including any adoptive relationship), any trust, partnership, or other bona fide estate planning vehicle, the only beneficiaries of which are any of the foregoing individuals, such individual's estate (or an executor or administrator working on its behalf), heirs or legatees or ay private foundation or fund that is controlled by any of the foregoing individuals or any donor advised fund of which any such individual is the donor.

"Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness or in the form of Qualified Equity Interests of a Loan Party or any of its direct or indirect parent entities, the accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

"Increased Reporting Period" shall mean any period commencing on the first date on which Excess Availability is less than the greater of (a) 15% of the Borrowing Cap or (b) $21,500,000, in each case for three consecutive days, and continuing until the date that both (x) Excess Availability exceeds the greater of (i) 15% of the Borrowing Cap or (ii) $21,500,000 for 60 consecutive days and (y) no Default or Event of Default then exists and is continuing.

"Indebtedness" of any Person means, without duplication:

(a) all obligations of such Person for borrowed money;

(b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP;

(c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person;

(d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (w) trade accounts payable in the ordinary course of business, (x) any Earn-Out obligation, purchase price adjustment or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid within thirty (30) days after being due and payable, (y) liabilities associated with customer prepayments and deposits and (z) expenses accrued in the ordinary course of business);

(e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed;

(f) all Guarantees by such Person of Indebtedness of others;

(g) all obligations with respect to Capital Leases of such Person;

(h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty;

(i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; and

(j) Disqualified Equity Interests and other preferred equity interests (and similar interests);

provided that the term "Indebtedness" shall not include (i) deferred or prepaid revenue, (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty, indemnity or other unperformed obligations of the seller, (iii) contingent indemnity and similar obligations incurred in the ordinary course of business (iv) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (v) Indebtedness of any Person that is a direct or indirect parent of a Loan Party appearing on the balance sheet of a Loan Party, or solely by reason of push down accounting under GAAP, (vi) any non-compete or consulting obligations incurred in connection with a Permitted Acquisition, (vii) any reimbursement obligations under pre-paid contracts entered into with clients in the ordinary course of business, (viii) for the avoidance of doubt, any Qualified Equity Interests issued by a Loan Party.

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of any Loan Party and its Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by, or on account of any obligation of any Loan Party under any Financing Agreement and (b) to the extent not otherwise described in the foregoing clause (a) hereof, Other Taxes.

"Indemnitee" shall have the meaning set forth in Section 11.6(a) hereof.

"Information Certificate" shall mean that certain Information Certificate in the form of Exhibit B hereto (or such other form reasonably acceptable to the Agent) delivered by the Borrowers and Guarantors on the Closing Date.

"Instruments" shall have the meaning set forth in Article 9 of the UCC.

"Intellectual Property" means all intellectual property rights of every kind and nature, including rights in inventions, Patents, Copyrights, Licenses, Trademarks, rights in Trade Secrets, and rights in Software all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, a Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and all other rights of any kind accruing thereunder or pertaining thereto throughout the world, in each case of the Borrowers and the Guarantors.

"Intercreditor Agreement" means  that certain Intercreditor Agreement, dated as of the Closing Date, by and among the Agent and the First Lien Agent, and acknowledged by the Borrowers and the Guarantors, as the same may be amended, restated, amended and restated, supplemented, replaced or otherwise modified from time to time in accordance with the provisions hereof and thereof or (b) such other intercreditor agreement or arrangement among the Agent (or other applicable representative on behalf of the holders of the Indebtedness incurred under this Agreement and the other Financing Agreements) and the First Lien Agent  (and any other Persons party thereto), that is reasonably acceptable to the Agent and the Administrative Borrower, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof, as applicable.

"Interest Election Request" means a request by the Administrative Borrower to convert or continue a Borrowing in accordance with Section 2.12.

"Interest Expense" shall mean, for any period, as to any Person, as determined on a consolidated basis in accordance with GAAP, the total interest expense of such Person, whether paid or accrued during such period (including the interest component of Capital Leases for such period), including, discounts in connection with the sale of any Accounts and bank fees, commissions, discounts and other fees and charges owed with respect to letters of credit, banker's acceptances or similar instruments, losses, fees, net costs and early termination costs under Hedge Agreements, amortization or write-off of debt discounts and debt issuance costs and commissions, and other discounts and other fees and charges associated with Indebtedness.

"Interest Payment Date" means (a) with respect to any ABR Loan, the first Business Day of each calendar quarter and the Maturity Date, (b) with respect to any RFR Loan, each date that is on the numerically corresponding day in each calendar month that is one month after the Borrowing of such RFR Loan (or, if there is no numerically corresponding day in such month, then the last day of such month) and the Maturity Date and (c) with respect to any Term Benchmark Loan, the last day of each Interest Period applicable to the Borrowing of which such Loan is a part (and, in the case of a Term Benchmark Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period) and the Maturity Date.

"Interest Period" means, with respect to any Term Benchmark Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six thereafter (in each case, subject to the availability for the Benchmark applicable to the relevant Loan or Revolving Commitment), as the Administrative Borrower may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (c) no tenor that has been removed from this definition pursuant to Section 3.4(f) shall be available for specification in such Borrowing Request or Interest Election Request.  For purposes hereof, the date of a Borrowing

initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Inventory" shall have the meaning set forth in Article 9 of the UCC and includes, without limitation, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's now owned and hereafter existing or acquired goods, wherever located, which (a) are leased by such Borrower or Guarantor as lessor; (b) are held by such Borrower or Guarantor for sale or lease or to be furnished under a contract of service; (c) are furnished by such Borrower or Guarantor under a contract of service; or (d) consist of raw materials, work in process, finished goods or materials used or consumed in its business.

"Inventory Reserves" shall mean the reserves described in clauses (i), (ii), (viii), (x), (xi) and (xii) of the definition of "Reserves".

"Investment" shall have the meaning set forth in Section 9.10.

"Investment Property" shall have the meaning set forth in Article 9 of the UCC.

"Investment Property Control Agreement" shall mean an agreement in writing, in form and substance reasonably satisfactory to Agent, by and among Agent (and the First Lien Agent, if a party), any Borrower or Guarantor (as the case may be) and any securities intermediary, commodity intermediary or other Person who has custody, control or possession of any Investment Property of such Borrower or Guarantor acknowledging that such securities intermediary, commodity intermediary or other Person has custody, control or possession of such Investment Property on behalf of Agent (and the First Lien Agent, if a party) that it will comply with entitlement orders originated by Agent (or the First Lien Agent, as applicable) after the occurrence and during the continuance of an Event of Default with respect to such Investment Property, or other instructions of Agent (or the First Lien Agent, as applicable), and has such other terms and conditions as Agent may reasonably require.

"Investors" means the one or more co-investors and other investors (which may include existing shareholders, board members, management or other rollover investors of the Acquired Company) who are holders of Capital Stock in the Administrative Borrower (or any direct or indirect parent thereof) on the Closing Date after giving effect to the Transactions, together with their Affiliates.

"Issuing Bank" shall mean Chase.

"Landlord Lien States" shall mean the States of Washington and Virginia and the Commonwealth of Pennsylvania and such other states, provinces or jurisdictions in which a landlord's claim for rent (including a portion of rent) has or may have priority by operation of applicable law over the lien of the Agent on behalf of the Secured Parties in any of the Collateral.

"LC Disbursement" means any payment made by an Issuing Bank pursuant to a Letter of Credit.

"Lender-Related Person" shall have the meaning set forth in Section 11.6(b) hereof.

"<u>Lenders</u>" shall mean the financial institutions who are signatories hereto as Lenders and other Persons made a party to this Agreement as a Lender in accordance with <u>Section 13.7</u> hereof, and their respective successors and assigns, including the Revolving Lenders; each sometimes being referred to herein individually as a "<u>Lender</u>". Unless the context otherwise requires, the term "Lenders" includes the Issuing Bank.

"<u>Letter of Credit Documents</u>" shall mean, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefor, and any agreements, instruments, guarantees or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (a) the rights and obligations of the parties concerned or at risk or (b) any collateral security for such obligations.

"<u>Letter of Credit Limit</u>" shall mean $12,000,000.

"<u>Letter of Credit Obligations</u>" shall mean, at any time and without duplication, the sum of (a) the aggregate undrawn amount of all Letters of Credit outstanding at such time, <u>plus</u> (b) the aggregate amount of all drawings under Letters of Credit for which Issuing Bank has not at such time been reimbursed, <u>plus</u> (c) the aggregate amount of all payments made by each Revolving Lender to Issuing Bank with respect to such Revolving Lender's participation in Letters of Credit as provided in <u>Section 2.3</u> for which Borrowers have not at such time reimbursed the Revolving Lenders, whether by way of a Revolving Loan or otherwise.

"<u>Letter-of-Credit Rights</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Letters of Credit</u>" shall mean all letters of credit (whether documentary or stand-by and whether for the purchase of Inventory, Equipment or otherwise) issued by an Issuing Bank for the account of any Loan Party pursuant to this Agreement and shall include each Existing Letter of Credit, and all amendments, extensions or replacements thereof, and the term "<u>Letter of Credit</u>" means any one of them or each of them singularly, as the context may require.

"<u>Liabilities</u>" means any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"<u>License</u>" means any Patent License, Trademark License or Copyright License.

"<u>License Agreements</u>" means (a) all agreements or other arrangements of Borrowers and Guarantors pursuant to which such Borrower or Guarantor has a license, option, or other right to use any trademarks, logos, designs or other intellectual property that is material to such Borrower's or Guarantor's business and owned by another Person as in effect on the Closing Date and (b) all such agreements or other arrangements as may be entered into by any Borrower or Guarantor after the Closing Date.

"<u>Lien</u>" and "<u>lien</u>" mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the

foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Loan Parties</u>" means, collectively, the Borrowers and the Guarantors and their respective successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.

"<u>Loans</u>" shall mean, collectively, all of the Revolving Loans (including Overadvances) and "<u>Loan</u>" shall mean any one of the Revolving Loans (including Overadvances).

"<u>Manual Sweeping Accounts</u>" shall mean the Deposit Accounts maintained by the Borrowers and Guarantors as of the Closing Date that are identified as "Manual Sweeping Accounts" on <u>Schedule 8.10</u> hereto, and any replacement or additional accounts of the Borrowers and Guarantors.

"<u>Master Agreement</u>" has the meaning assigned to such term in the definition of "Hedge Agreement".

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the financial condition, business, performance or operations of the Borrowers taken as a whole or of Borrowers and the Guarantors taken as a whole; (b) the legality, validity or enforceability of this Agreement, any Collateral Document, the Intercreditor Agreement or any of the other material Financing Agreements; (c) the legality, validity, enforceability, perfection or priority of the security interests and liens of Agent upon the Collateral; (d) the Collateral (taken as a whole) or its value; (e) the ability of Borrowers (taken as a whole) to repay the Obligations or of Borrowers (taken as a whole) to perform their obligations under this Agreement or any of the other Financing Agreements as and when to be performed; or (f) the ability of Agent or any Lender to enforce the Obligations or realize upon the Collateral or otherwise with respect to the material rights and remedies of Agent and Lenders under this Agreement or any of the other Financing Agreements.

"<u>Material Contract</u>" shall mean the First Lien Credit Agreement and any other contract or other agreement (other than the Financing Agreements and the Credit Card Agreements), whether written or oral, to which any Borrower or Guarantor is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto (unless a replacement Material Contract has been entered into either prior to or contemporaneously with the date of such termination or cancellation) would reasonably be expected have a Material Adverse Effect.

"<u>Material Real Property</u>" means real property (including fixtures) (i) located in the United States, (ii) first acquired by any Loan Party after the Closing Date and (iii) owned (but not leased or ground-leased) by any Loan Party with a book value, as reasonably determined by the Administrative Borrower in good faith on the date of acquisition thereof, greater than or equal to $5,000,000.

"<u>Material Subsidiary</u>" means each Wholly Owned Subsidiary that, as of the last day of the fiscal month of the Administrative Borrower most recently ended, had net revenues or total assets for such month in excess of 1.25% of the consolidated net revenues or total assets, as applicable, of the Loan Parties and their respective Subsidiaries for such fiscal month; <u>provided</u> that in the event that the Immaterial Subsidiaries, taken together, had as of the last day of the fiscal month of

the Administrative Borrower most recently ended net revenues or total assets in excess of 2.5% of the consolidated net revenues or total assets, as applicable, of the Loan Parties and their respective Subsidiaries for such fiscal month, the Administrative Borrower shall designate at its sole discretion one or more Immaterial Subsidiaries to be a Material Subsidiary as may be necessary such that the foregoing 2.5% limit shall not be exceeded, and any such Subsidiary shall thereafter be deemed to be a Material Subsidiary hereunder; provided, further, that the Administrative Borrower may re-designate Material Subsidiaries as Immaterial Subsidiaries so long as Borrower is in compliance with the foregoing; provided, further, that notwithstanding the foregoing, (a) to the extent that the First Lien Credit Agreement does not have a "Material Subsidiary" (or equivalent term) concept, all Subsidiaries will be deemed Material Subsidiaries hereunder and, (b) to the extent that a Subsidiary is a "Material Subsidiary" (or equivalent term) under the First Lien Credit Agreement, such Subsidiary shall be a Material Subsidiary hereunder.

"Maturity Date" shall mean the earliest of (a) the fourth anniversary of the Closing Date, (b) the date that is 91 days prior to the maturity date of any Indebtedness of any Borrower or Guarantor with an aggregate outstanding principal amount in excess of $25,000,000 (including the First Lien Obligations) and in each case any Refinancing Indebtedness in respect thereof and (c) any date on which the Revolving Commitments are reduced to zero or otherwise terminated pursuant to the terms hereof; provided that, in each case, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately preceding such day.

"Medical Cash Account" means the Deposit Account maintained by the Administrative Borrower at Canadian Imperial Bank of Commerce with the account number ending in x9922 and x0508, holding cash to be used solely for the purpose of covering expenses incurred in connection with the self-insurance policies maintained by the Administrative Borrower in accordance with the terms thereof.

"Moneys" shall have the meaning set forth in the UCC.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business

"Mortgage" means a mortgage, deed of trust, deed to secure debt or other security document granting a Lien on any Mortgaged Property in favor of Agent for the benefit of the Secured Parties to secure the Obligations, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time. Each Mortgage shall be in form and substance reasonably satisfactory to Agent and the Administrative Borrower.

"Mortgaged Property" means each parcel of Material Real Property with respect to which a Mortgage is granted pursuant to Section 9.21.

"Multiemployer Plan" shall mean a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is contributed to by any Borrower, Guarantor or any ERISA Affiliate or with respect to which any Borrower, Guarantor or any ERISA Affiliate may reasonably be expected to incur any liability.

"Net Cash Proceeds" means the aggregate cash proceeds (using the fair market value (as determined in good faith by the Administrative Borrower) of any Cash Equivalents) received by

the any Loan Party or any Subsidiary in respect of any Asset Sale, net of the fees, costs and expenses relating to such Asset Sale (including, but not limited to, legal, accounting and investment banking fees, and brokerage and sales commissions), taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions pursuant to Section 9.11(d)), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required to be paid as a result of such transaction that is secured by a Lien permitted hereunder to be prior or senior to the Lien securing the Obligations) and any deduction of appropriate amounts to be provided by the Loan Parties or any of the Subsidiaries (and subject to the reasonable satisfaction of the Required Lenders) as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Loan Parties or any of the Subsidiaries after such sale or other disposition thereof.

"Net Recovery Percentage" shall mean with respect to finished goods Inventory or raw materials Inventory, as applicable, the fraction, expressed as a percentage, (a) the numerator of which is the amount equal to the amount of the recovery in respect of the applicable Inventory at such time on a "net orderly liquidation value" basis as set forth in the most recent acceptable appraisal of such Inventory received by Agent in accordance with Section 7.3, net of operating expenses, liquidation expenses and commissions, and (b) the denominator of which is the applicable original cost of the aggregate amount of such Inventory subject to such appraisal.

"Non-Cash Charges" means (a) any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles pursuant to GAAP (which, without limiting the foregoing, shall include any impairment charges resulting from the application of FASB Statements No. 142 and 144 and the amortization of intangibles arising pursuant to No. 141), (b) all losses from Investments recorded using the equity method, (c) all Non-Cash Compensation Expenses, (d) the non-cash impact of acquisition method accounting, (e) depreciation and amortization (including amortization of deferred financing fees or costs, Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pension and other post-employment benefits) and (f) other non-cash charges (including non-cash charges related to deferred rent) (provided, in each case, that if any non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period).

"Non-Cash Compensation Expense" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"Non-Wholly Owned Subsidiary" means any Subsidiary other than a Wholly Owned Subsidiary.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day(or for any day that is not a Business Day, for the immediately preceding Business Day); provided that, if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Agent from a federal funds broker of recognized standing selected by it; provided further that, if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations" shall mean:

(a)    any and all Loans, Letter of Credit Obligations and all other obligations, liabilities and indebtedness of every kind, nature and description owing by any or all of Borrowers and Guarantors to Agent or any Lender, including principal, interest, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under this Agreement or any of the other Financing Agreements, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of this Agreement or after the commencement of any case with respect to such Borrower or Guarantor under the United States Bankruptcy Code or any similar statute (including the payment of interest and other amounts which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, or secured or unsecured; and

(b)    for purposes only of Section 5.1 hereof and subject to the priority in right of payment set forth in Section 6.4 hereof, all obligations, liabilities and indebtedness of every kind, nature and description owing by any or all of Borrowers or Guarantors and each of their respective Subsidiaries to Agent or any Bank Product Provider arising under or pursuant to any Bank Products, in each case whether now existing or hereafter arising to the extent such obligations, liabilities and indebtedness would not cause the total amount of the Obligations to exceed the value of the Collateral; provided that:

(i)    solely with respect to any Borrower or Guarantor that is not an ECP, Excluded Hedge Obligations of any such Borrower or Guarantor shall in any event be excluded from "Obligations" owing by such Borrower or Guarantor,

(ii)    [reserved],

(iii)    any Bank Product Provider (other than Chase and its Affiliates), shall have delivered written notice to Agent that (A) such Bank Product Provider has entered into a transaction to provide Bank Products to a Borrower and Guarantor and (B) the obligations arising pursuant to such Bank Products provided to Borrowers and Guarantors constitute Obligations entitled to the benefits of the security interest of Agent granted hereunder, and Agent shall have accepted such notice in writing, and

55

(iv)    in no event shall any Bank Product Provider to whom such obligations, liabilities or indebtedness are owing, be deemed a Lender for purposes hereof to the extent of and as to such obligations, liabilities or indebtedness other than for purposes of Section 5.1 hereof and other than for purposes of Sections 12.1, 12.2, 12.3(b), 12.6, 12.7, 12.9, 12.12 and 13.6 hereof, as applicable, and in no event shall such obligations be included in the Obligations to the extent that the effect is that the value of the Collateral (as determined by Agent) is less than the amount of the Obligations and in no event shall the approval of any such Person be required in connection with the release or termination of any security interest or lien of Agent.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Financing Agreement, or sold or assigned an interest in any Loan, Letter of Credit or any Financing Agreement).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Financing Agreement, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.6(b)).

"Overadvances" has the meaning assigned to such term in Section 2.2(b).

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in dollars by U.S.-managed banking offices of depository institutions (as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Paid in Full" or "Payment in Full" means, (a) the payment in full in cash of all outstanding Loans and LC Disbursements, together with accrued and unpaid interest thereon, (b) the termination, expiration, or cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to the Agent of a cash deposit, or at the discretion of the Agent a backup standby letter of credit satisfactory to the Agent and the Issuing Bank, in an amount equal to 105% of the Letter of Credit Obligations as of the date of such payment), (c) the payment in full in cash of the accrued and unpaid fees, (d) the payment in full in cash of all reimbursable expenses and all other Obligations (other than Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this Agreement for which no claims have been made), together with accrued and unpaid interest thereon, (e) the termination of all Revolving Commitments, and (f) the termination of the Hedge Obligations and the Bank Products or entering into other arrangements satisfactory to the Secured Parties counterparties thereto.

"Participant" shall mean any Person that acquires and holds a participation in the interest of any Lender in any of the Loans and Letters of Credit in conformity with the provisions of Section 13.7 of this Agreement governing participations.

"Participant Register" has the meaning assigned to such term in Section 13.7(e).

"Patent License" means any written agreement or license now or hereafter in effect, granting to or from any Person any right to manufacture, use or sell any invention claimed in a Patent, now or hereafter owned by any other Person or that any other Person now or hereafter otherwise has the right to license, and all rights of any such Person under any such agreement or license.

"Patents" means (a) all patents and patent applications, for letters patent of the United States or any other jurisdiction, including issued patents and pending patent applications in the United States Patent and Trademark Office, and (b) all reissues, substitutes, divisionals, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof.

"Payment" has the meaning assigned to such term in Section 12.6(b)(i).

"Payment Conditions" means, at any time of determination, with respect to any Specified Payment, that:

(a) no Default or Event of Default exists or would arise as a result of the making of the subject Specified Payment;

(b) after giving effect to such Specified Payment on a pro forma basis (i) immediately after such Specified Payment and (ii) for the 90-day period immediately preceding such Specified Payment, Excess Availability shall be greater than the greater of (A) 20% of the Borrowing Cap and (B) $30,000,000 (or with respect to any Specified Payment pursuant to clauses (ii) or (iii) of the definition thereof prior to the date that is the one year anniversary of the Closing Date, (X) Excess Availability shall be greater than $50,000,000 and (Y) Daily Average Liquidity shall be greater than $85,000,000); and

(c) after giving effect to such Specified Payment on a pro forma basis, the Fixed Charge Coverage Ratio shall be greater than 1.0 to 1.0.  In each case with respect to the above conditions, the Administrative Borrower shall have delivered to the Agent evidence reasonably satisfactory to the Agent that the conditions in the foregoing clauses (a), (b) and (c), as applicable, have been satisfied.

"Payment Notice" has the meaning assigned to such term in Section 12.6(b)(ii).

"Permitted Acquisitions" shall mean the purchase or other acquisition, by merger, consolidation or otherwise, by any Loan Party or any Subsidiary of any Capital in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person (the "Acquired Business"); provided that:

(a) in the case of any purchase or other acquisition of Capital Stock in a Person, (i) such Person, upon the consummation of such purchase or acquisition, will be a Subsidiary (including

as a result of a merger or consolidation between any Subsidiary and such Person), or (ii) such Person is merged into or consolidated with a Subsidiary and such Subsidiary is the surviving entity of such merger or consolidation;

(b) the business of such Person, or such assets, as the case may be, constitute a Permitted Business (or assets with respect thereto);

(c) with respect to each such purchase or other acquisition, all actions required to be taken with respect to such newly created or acquired Subsidiary (including each subsidiary thereof) or assets in order to satisfy the requirements set forth in Section 9.23 (other than with respect to any Subsidiary of such newly created or acquired Subsidiary that is an Excluded Subsidiary);

(d) subject to Section 1.2, after giving effect to any such purchase or other acquisition no Event of Default shall have occurred and be continuing;

(e) all such purchases and acquisitions of the Capital Stock in any Person which will result in such Person becoming a Loan Party (within the time periods set forth in this Agreement), or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of) such Person will become owned by a Loan Party (or a Person that will become a Loan Party within the time periods set forth in this Agreement);

(f) Accounts, Credit Card Receivables and Inventory of the Acquired Business shall only be Eligible Accounts, Eligible Credit Card Receivables, and Eligible Inventory to the extent that (I) the Lenders have consented to such inclusion in the Borrowing Base; provided that if such Permitted Acquisition is relating to assets of any Loan Party's or any Subsidiary's existing franchisees or related businesses or independent operators, then such assets will be Eligible Accounts, Eligible Credit Card Receivables and Eligible Inventory without Lender consent or (II)(i) such Accounts, Credit Card Receivables and Inventory are owned by a Loan Party, (ii) Agent has conducted and completed a field examination and inventory appraisal with respect thereto and (iii) the criteria for Eligible Accounts, Eligible Credit Card Receivables, and Eligible Inventory set forth herein are satisfied with respect thereto in accordance with this Agreement (or such other or additional criteria as Agent may, at its option, establish with respect thereto in accordance with this Agreement and subject to such Reserves as Agent may establish in connection with the Acquired Business);

(g) no Default or Event of Default shall exist or occur as a result of such Permitted Acquisition;

(h) the EBITDA of any such acquired Person shall not be negative; and

(i) the Loan Parties shall be in compliance with the Payment Conditions.

"Permitted Business" shall mean any business engaged in by any of the Loan Parties on the date hereof, and any business or other activities that are reasonably similar, ancillary, complementary or related to, or a reasonable extension, development or expansion of, the businesses in which the Loan Parties are engaged as of the Closing Date.

"<u>Permitted Discretion</u>" shall mean a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"<u>Permitted Encumbrances</u>" means:

(i)     liens for Taxes, assessments or governmental charges that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(ii)     liens with respect to outstanding motor vehicle fines and liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' liens and other similar liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such liens do not individually or in the aggregate have a Material Adverse Effect;

(iii)     liens incurred, pledges or deposits made in the ordinary course of business (i) in connection with payroll taxes, workers' compensation, unemployment insurance and other social security legislation, public liability laws or similar legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance to a Loan Party or any Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause <u>(i)</u>;

(iv)     liens incurred or deposits made to secure the performance of tenders, bids, trade contracts, customer claims, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(v)     easements, licenses, servitudes, restrictive covenants, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Loan Parties and their Subsidiaries taken as a whole;

(vi)     leases or subleases of real or personal property granted to other Persons (as lessee thereof) that do not materially interfere with the ordinary conduct of the business of the Loan Parties and their Subsidiaries taken as a whole;

(vii)     rights of future tenants pursuant to written leases entered into in accordance with the terms hereof;

(viii)    liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 10.1(d) and any pledge and/or deposit securing any settlement of threatened litigation;

(ix)    liens on (i) goods the purchase price of which is financed by a documentary letter of credit issued for the account of a Loan Party or any of its Subsidiaries or liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such lien secures only the obligations of a Borrower or such Subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 9.9 and (ii) specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(x)    liens arising from precautionary UCC financing statements or similar filings made in respect of operating leases entered into by a Loan Party or any of its Subsidiaries;

(xi)    rights of recapture of unused real property (other than any Mortgaged Property) in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any Governmental Authority;

(xii)    liens in favor of deposit banks or securities intermediaries securing customary fees, expenses or charges in connection with the establishment, operation or maintenance of deposit accounts or securities accounts;

(xiii)    liens in favor of obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by a Borrower or any of the Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(xiv)    liens arising from grants of non-exclusive licenses or sublicenses of Intellectual Property, or covenants not to sue with respect to Intellectual Property, made in the ordinary course of business;

(xv)    rights of setoff, banker's lien, netting agreements and other liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(xvi)    liens arising from the right of distress enjoyed by landlords or liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent or performance of other obligations in respect of leased properties, so long as such liens are not exercised or except where the exercise of such liens would not reasonably be expected to have a Material Adverse Effect;

(xvii) liens or security given to public utilities or to any municipality or Governmental Authority when required by the utility, municipality or Governmental Authority in connection with the supply of services or utilities to the Administrative Borrower or any of its Subsidiaries;

(xviii) servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other agreements pertaining to the use or development of any of the assets of the Person, provided the same do not result in (i) a substantial and prolonged interruption or disruption of the business activities of the Loan Parties and their respective Subsidiaries, taken as a whole, or (ii) a Material Adverse Effect; and

(xix)    liens securing Priority Obligations;

provided that the term "Permitted Encumbrances" shall not include any lien securing Indebtedness for borrowed money other than liens referred to in clauses (iv) and (xiii) above securing obligations under letters of credit or bank guarantees or similar instruments related thereto and in clause (viii) above, in each case to the extent any such lien would constitute a lien securing Indebtedness for borrowed money.

"Permitted Holders" shall mean (x) each of (i) Arena Capital Advisors, LLC, (ii) FMR LLC, (iii) Garnett Station Partners, (iv) Guggenheim Investments, (v) HG Vora Capital Management, LLC, (vi) HPS Investment Partners, LLC, (vii) Oaktree Capital Management, L.P., (viii) Octagon Credit Investors, LLC, and (ix) Pacific Investment Management Company LLC and (y) subject to compliance with Section 9.6(i)(ii), each holder of at least 20% of the issued and outstanding Capital Stock of Topco from time to time, in each case together with any Affiliates (other than portfolio companies thereof) or any other account or fund that is under common management or for which a Permitted Holder has investment authority.

"Person" or "person" shall mean any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Code), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

"Petition Date" has the meaning specified in the recitals hereto.

"Plan" shall mean an employee pension benefit plan (as defined in Section 3(2) of ERISA) which Borrower or any Guarantor or, solely with respect to an employee benefit plan subject to Title IV of ERISA, an ERISA Affiliate sponsors or to which it contributes, or a Multiemployer Plan.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"Pledge Agreement" shall mean that certain Stock Pledge Agreement dated as of the Closing Date, by and among the Loan Parties and Agent, as the same may be amended, restated or otherwise modified from time to time.

"<u>Post-Transaction Period</u>" means, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the twelfth (12th) full fiscal month of the Administrative Borrower immediately following the date on which such Specified Transaction is consummated.

"<u>Prime Rate</u>" shall mean the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Agent) or any similar release by the Federal Reserve Board (as determined by the Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"<u>Priority Obligation</u>" means any obligation that is secured by a Lien on any Collateral in favor of a Governmental Authority, which Lien ranks or is capable of ranking prior to or *pari passu* with the Liens created thereon by the applicable Collateral Documents including any such Lien securing amounts owing for wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, other Taxes, workers compensation, governmental royalties and stumpage or pension fund obligations.

"<u>pro forma basis</u>" means, with respect to compliance with any test hereunder for an applicable period of measurement, that all Specified Transactions and the following transactions in connection therewith that have been made during the applicable period of measurement or subsequent to such period and prior to or simultaneously with the event for which the calculation is made shall be deemed to have occurred as of the first day of the applicable measurement period with respect to such covenant or condition: (a) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, (i) in the case of a sale, transfer or other disposition of all or substantially all Capital Stock in any Loan Party or any of its Subsidiaries or any division or product line of any Loan Party or any its Subsidiaries, shall be excluded, and (ii) in the case of an Investment described in the definition of the term "Specified Transaction", shall be included, (b) any retirement of Indebtedness and (c) any Indebtedness incurred or assumed by any Loan Party or any of its Subsidiaries in connection with such Specified Transaction, and assuming all Indebtedness so incurred or assumed to be outstanding shall be deemed to have borne interest (i) in the case of fixed rate Indebtedness, at the rate applicable thereto or (ii) in the case of floating rate Indebtedness, at the rates which were or would have been applicable thereto during the period when such Indebtedness was or was deemed to be outstanding.

"<u>Pro Forma Disposal Adjustment</u>" means, for any Test Period that includes all or a portion of a fiscal month of the Administrative Borrower included in any Post-Transaction Period with respect to any Sold Entity or Business, the pro forma increase or decrease in EBITDA projected by the Administrative Borrower in good faith as a result of contractual arrangements between the Borrowers or any Subsidiary entered into with such Sold Entity or Business at the time of its disposal or within the Post-Transaction Period and which represent an increase or decrease in EBITDA which is incremental to the Disposed EBITDA of such Sold Entity or Business for the most recent Test Period prior to its disposal.

"Pro Forma Entity" means any Acquired Entity or Business.

"Pro Rata Share" shall mean as to any Lender, the fraction (expressed as a percentage) the numerator of which is such Revolving Lender's Revolving Commitment and the denominator of which is the aggregate amount of the Revolving Commitments of all Revolving Lenders, as adjusted from time to time in accordance with the provisions of Section 13.7 hereof; provided, that, if the Revolving Commitments have terminated, the numerator shall be the unpaid amount of such Revolving Lender's Revolving Exposure and the denominator shall be the aggregate amount of Revolving Exposure of all Revolving Lenders.

"Proceeding" means any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Pledged Securities, collections thereon and distributions or payments with respect thereto.

"Promissory note" shall have the meaning set forth in Article 9 of the UCC.

"PSP" means Pet Supplies "Plus", LLC, a Delaware limited liability company.

"PSP Borrowers" means (a) PSP and (b) PSP Newco.

"PSP Loan Party" means (a) each PSP Borrower and (b) without duplication of clause (a), each Loan Party that is a Subsidiary of a PSP Borrower.

"PSP Newco" means Franchise Group Newco PSP, LLC, a Delaware limited liability company and an indirect subsidiary of Fusion Buyer.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 13.12.

"Qualified ECP Guarantor" shall mean, in respect of any Hedge Obligation, each Borrower or Guarantor that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Hedge Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Equity Interests" means Capital Stock of a Loan Party other than Disqualified Equity Interests.

"Real Property" shall mean all now owned and hereafter acquired real property of each Borrower and Guarantor, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located.

"Receivables" shall mean all of the following now owned or hereafter arising or acquired property of each Borrower and Guarantor:

(a) all Accounts;

(b) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account;

(c) all payment intangibles of such Borrower or Guarantor;

(d) letters of credit, indemnities, guarantees, security or other deposits and proceeds thereof issued payable to any Borrower or Guarantor or otherwise in favor of or delivered to any Borrower or Guarantor in connection with any Account; or

(e) all other Accounts, contract rights, Chattel Paper, Documents, Instruments, notes, General Intangibles and other forms of obligations owing to any Borrower or Guarantor, whether from the sale and lease of goods or other property, licensing of any property (including Intellectual Property or other General Intangibles), franchising, rendition of services or from loans or advances by any Borrower or Guarantor or to or for the benefit of any third Person (including loans or advances to any Affiliates or Subsidiaries of any Borrower or Guarantor) or otherwise associated with any Accounts, Inventory or General Intangibles of any Borrower or Guarantor (including choices in action, causes of action, tax refunds, tax refund claims, any funds which may become payable to any Borrower or Guarantor in connection with the termination of any Plan or other employee benefit plan and any other amounts payable to any Borrower or Guarantor from any Plan or other employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, casualty or any similar types of insurance and any proceeds thereof and proceeds of insurance covering the lives of employees on which any Borrower or Guarantor is a beneficiary).

"Recipient" means, as applicable, (a) the Agent, (b) any Lender and (c) the Issuing Bank, or any combination thereof (as the context requires).

"Records" shall mean, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any Account Debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of any Borrower or Guarantor with respect to the foregoing maintained with or by any other Person).

"Reference Time" with respect to any setting of the then-current Benchmark means (i) if such Benchmark is the Term SOFR Rate, 5:00 a.m., Chicago time, on the day that is two (2) Business Days preceding the date of such setting, (ii) if such Benchmark is the Daily Simple SOFR,

then four (4) Business Days prior to such setting, and (iii) if such Benchmark is none of the Term SOFR Rate or Daily Simple SOFR, the time determined by the Agent in its reasonable discretion.

"Refinanced Indebtedness" shall have the meaning set forth in Section 9.9(p) hereof.

"Refinancing Indebtedness" shall have the meaning set forth in Section 9.9(p) hereof.

"Register" shall have the meaning set forth in Section 13.7 hereof.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, emptying, escaping, pumping, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Relevant Governmental Body" means the Federal Reserve Board, the NYFRB and/or the CME Term SOFR Administrator, as applicable, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Relevant Rate" means (i) with respect to any Term Benchmark Borrowing, the Adjusted Term SOFR Rate or (ii) with respect to any RFR Borrowing, the Adjusted Daily Simple SOFR, as applicable.

"Rental Agreements" means each rental agreement entered into by any Loan Party or any of its Subsidiaries.

"Required Lenders" shall mean, at any time, those Lenders whose Pro Rata Shares aggregate 50.1% or more of the aggregate of the Revolving Commitments of all Lenders, or if the Revolving Commitments shall have been terminated, Lenders to whom at least 50.1% of the then outstanding Obligations are owing; provided that (x) if there are only two non-affiliated Lenders at such time, then Required Lenders shall mean all Lenders and (y) if there are only three non-affiliated Lenders at such time, then Required Lenders must include at least two non-affiliated Lenders.

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" shall mean as of any date of determination, such amounts as Agent may from time to time in its Permitted Discretion establish and revise reasonably and in good faith reducing

the amount of Revolving Loans and Letters of Credit which would otherwise be available to any Borrower under the lending formula(s) provided for herein.

Without limiting the generality of the foregoing, Reserves may, at Agent's option (or shall, to the extent so required under this Agreement), be established to reflect any of the following:

(i)        Inventory shrinkage,

(ii)       reserves in respect of markdowns and cost variances (pursuant to discrepancies between the purchase order price of Inventory and the actual cost thereof),

(iii)      outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the Pension Benefit Guaranty Corporation (or any successor thereto) and other Taxes which may have priority over the interests of Agent in the Collateral,

(iv)      any amounts which are past due in respect of rental payments, service charges or other amounts which are past due to (i) lessors of real property other than retail store locations ("Non-Retail Store Locations") or (ii) consignees, warehousemen or bailees of Inventory or personal property ("Warehouse Locations"),  to the extent Inventory or Records are located in or on such property (but not in respect of Non-Retail Store Locations or Warehouse Locations (A) where Agent has received a Collateral Access Agreement executed and delivered by the owner and lessor of such real property that Agent has acknowledged in writing is in form and substance satisfactory to Agent or (B) which do not (1) contain Records relating to Receivables or Inventory or (2) in which either no Inventory or Inventory having a Value of less than $2,500,000 is located, provided that, notwithstanding the foregoing, Agent may, at its option, establish Reserves in respect of amounts at any time due or to become due to the owner and operator of such Non-Retail Store Location and Warehouse Location as Agent shall reasonably determine in the event that any of the following shall occurred:  (A) an Event of Default shall have occurred and be continuing, (B) any Borrower, Guarantor or Agent shall have received notice of any event of default under (i) the lease with respect to such Non-Retail Store Location or (ii) the bailee or warehouse agreement with respect to such Warehouse Location or (C) any Borrower or Guarantor has granted to the lessor, consignee, warehousemen or bailee a consensual security interest or lien upon any assets of such Borrower or Guarantor (unless such security interest is waived or subordinated to the security interest of Agent on terms and conditions reasonably satisfactory to Agent)),

(v)       any rental payments, service charges or other amounts owing to lessors of retail store locations,

(A)       which are past due and owing to lessors of retail store locations in states other than Landlord Lien States (but not in respect of retail store locations where Agent has received a Collateral Access Agreement executed and delivered by the owner and lessor of such real property that Agent has acknowledged in writing is in form and substance satisfactory to Agent), provided, that, Agent may, at its option, establish Reserves in respect of amounts at any time due or to become due to the owner and lessor of such a retail store location as Agent shall reasonably determine in the event that any of the following shall occurred:  (1) an Event of Default shall have occurred and be continuing, (2) any Borrower, Guarantor or Agent shall have received

notice of any event of default under the lease with respect to such location, or (3) any Borrower or Guarantor has granted to the lessor a security interest or lien upon any assets of such Borrower or Guarantor (unless such security interest is waived or subordinated to the security interest of Agent on terms and conditions reasonably satisfactory to Agent), and

(B)    which are due or to become due to lessors of retail store locations located in Landlord Lien States (but not in respect of retail store locations where Agent has received a Collateral Access Agreement executed and delivered by the owner and lessor of such real property that Agent has acknowledged in writing is in form and substance satisfactory to Agent), provided, that, the Reserves established pursuant to this clause (v)(B) as to any particular retail store location shall not exceed at any time the aggregate of such amounts payable for the next two months to the lessors of such retail store locations, provided, that, such limitation on the amount of the Reserves which may be established by Agent pursuant to this clause (v)(B) shall only apply so long as:  (1) no Event of Default shall have occurred and be continuing, (2) neither a Borrower, Guarantor nor Agent shall have received notice of any event of default under the lease with respect to such location or (3) any Borrower or Guarantor has granted a consensual lien or security interest upon any assets of such Borrower or Guarantor (unless such security interest is waived or subordinated to the security interest of Agent on terms and conditions reasonably satisfactory to Agent),

(vi)    any rental payments, service charges or other amounts which are past due to lessors of personal property,

(vii)    [reserved],

(viii)    an adverse change in the number of days of the turnover of Inventory or a material change in the mix of the Inventory that results in an overall decrease in the value thereof or a material deterioration in its nature or quality that results in an overall decrease in the value thereof (but only to the extent not addressed by the lending formulas in a manner satisfactory to Agent),

(ix)    variances between the perpetual inventory records of the Loan Parties and the results of test counts of Inventory conducted by Agent or at the request of Agent pursuant to the terms of this Agreement, with respect thereto in excess of the percentage reasonably acceptable to Agent but only to the extent that such variances are not accounted for as Inventory shrinkage,

(x)    Inventory that may become obsolete, based on prior twelve months expired product expenses or Inventory currently in retail store locations that was subject to previous store "giveaways" within the prior twelve months,

(xi)    the aggregate amount of deposits, if any, received by any Loan Party from its retail customers in respect of unfilled orders for merchandise,

(xii)    [reserved],

(xiii)    (i) commissions and other amounts due to franchisees  and (ii) commissions and other amounts due to dealers,

(xiv)    customs duties, and other costs to release Inventory which is being imported into the United States,

(xv)    the aggregate remaining value at such time of outstanding merchandise credits of the Loan Parties,

(xvi)    rebates, discounts, deposits, warranty claims and returns,

(xvii)   Bank Product Reserve, and

(xviii)  to the extent paragraph 2 of Schedule 9.31 is not satisfied, the reinstatement of  Reserves equal to $15,000,000.

Agent will not establish new Reserves after the date hereof on account of any circumstances, conditions, events or contingencies of which Agent has actual knowledge as of the Closing Date. To the extent Agent may establish new criteria or revise existing criteria (including percentages applied to determine the amount of) for Eligible Credit Card Receivables, Eligible Accounts, or Eligible Inventory so as to address any circumstances, condition, event or contingency in a manner reasonably satisfactory to Agent, Agent shall not establish or increase a Reserve for the same purpose. The amount of any Reserve established or increased by Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such Reserve as reasonably determined by Agent in good faith and to the extent that such Reserve is in respect of amounts that may be payable to third parties or is in respect of Bank Product Reserves, Agent may, at its option, deduct such Reserve from the Aggregate Revolving Commitments Amount at any time that such limit is less than the amount of the Borrowing Base.  Agent shall provide prior written notice to Administrative Borrower of any material change in the categories of Reserves established after the date hereof or in the manner such Reserves are calculated or any other change to any item for the calculation thereof.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Reuters" means, as applicable, Thomson Reuters Corp, Refinitiv, or any successor thereto.

"Revolving Commitment" means, with respect to each Revolving Lender, the commitment, if any, of such Revolving Lender to make Revolving Loans and to acquire participations in Letters of Credit, expressed as an amount representing the maximum possible aggregate amount of such Revolving Lender's Revolving Exposure hereunder, as such commitment may be reduced or increased from time to time pursuant to (a) Section 2.4 and (b) assignments by or to such Revolving Lender pursuant to Section 13.7.  Each Revolving Lender's Revolving Commitment as of the Closing Date is the amount set forth opposite such Revolving Lender's name on Schedule 1A under the caption "Revolving Commitment".

"Revolving Exposure" means, with respect to any Revolving Lender at any time, the sum of the outstanding principal amount of such Revolving Lender's unpaid Revolving Loans and its outstanding Letter of Credit Obligations.

"Revolving Exposure Limitations" has the meaning assigned to it in Section 2.1(a).

"Revolving Lender" means, as of any date of determination, a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.  Unless the context otherwise requires, the term "Revolving Lenders" includes the Issuing Bank.

"Revolving Loans" shall mean the loans now or hereafter made by or on behalf of any Revolving Lender or by Agent for the account of any Revolving Lender on a revolving basis pursuant to the Credit Facility (involving advances, repayments, readvances and Overadvances) as set forth in Section 2.1, Section 2.2, Section 12.8 and Section 12.11 hereof.

"RFR Borrowing" means, as to any Borrowing, the RFR Loans comprising such Borrowing.

"RFR Loan" means a Loan that bears interest at a rate based on the Adjusted Daily Simple SOFR.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (as of the Closing Date, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, Cuba, Iran, North Korea, Syria and the Crimea, Zaporizhzhia and Kherson regions of Ukraine).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b) or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) any other relevant sanctions authority.

"Secured Parties" shall mean, collectively, (a) Agent, (b) Lenders, (c) the Issuing Bank and (d) any Bank Product Provider; provided, that (i) as to any Bank Product Provider, only to the extent of the Obligations owing to such Bank Product Provider, as provided, in subsection (b) of the Obligations set forth herein and (ii) such parties are sometimes referred to herein individually as a "Secured Party".

"Secured Term Debt Cap" means the sum of (a) $437,772,002 plus (b) an additional amount not to exceed the greater of (i) 10% of the foregoing clause (a) and (ii) $50,000,000.

"Securities Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Securities and Exchange Commission" means the Securities and Exchange Commission of the United States.

"Security" shall have the meaning set forth in Article 8 of the UCC.

"Settlement" has the meaning assigned to such term in Section 2.2(d).

"Settlement Date" has the meaning assigned to such term in Section 2.2(d).

"Settlement Period" has the meaning assigned to such term in Section 6.1(b).

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the NYFRB's Website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Rate Day" has the meaning specified in the definition of "Daily Simple SOFR".

"Sold Entity or Business" has the meaning assigned to such term in the definition of the term "EBITDA."

"Solvent" shall mean, at any time with respect to any Person, that at such time such Person (a) is able to pay its debts as they mature and has (and has a reasonable basis to believe it will continue to have) sufficient capital (and not unreasonably small capital) to carry on its business consistent with its practices as of the Closing Date, and (b) the assets and properties of such Person at a fair valuation on a going concern basis (and including as assets for this purpose at a fair valuation all rights of subrogation, contribution or indemnification arising pursuant to any guarantees given by such Person) are greater than the Indebtedness of such Person, and including subordinated and contingent liabilities computed at the amount which, such Person has a reasonable basis to believe, represents an amount which can reasonably be expected to become an actual or matured liability (and including as to contingent liabilities arising pursuant to any guarantee the face amount of such liability as reduced to reflect the probability of it becoming a matured liability).

"Special Agent Advances" shall have the meaning set forth in Section 12.11 hereof.

"Specified Payment" means (i) any Investment (including any Permitted Acquisition), (ii) any payment made pursuant to Section 9.11 or (iii) any payment (including, for the avoidance of doubt, payment of premiums) made pursuant to Section 9.24, that, in each case, is expressly subject to the satisfaction of the Payment Conditions.

"Specified Transaction" means any (a) disposition of all or substantially all the assets of or all the Capital Stock of any Subsidiary of a Loan Party or of any business unit, line of business or

division of any Loan Party or any of its Subsidiaries for which historical financial statements are available, (b) Permitted Acquisitions, (c) Investment that results in a Person becoming a Loan Party or Subsidiary, or (d) the making of an Investment, dividend or distribution or repurchase of Capital Stock or prepayment in respect of which compliance with any financial ratio is by the terms of this Agreement is required to be calculated on a pro forma basis.

"Store Accounts" shall have the meaning set forth in Section 6.3; provided that the Store Accounts maintained by the Loan Parties as of the Closing Date are identified as "Store Accounts" on Schedule 8.10 hereto, and any replacement or additional accounts of the Loan Parties.

"Subsidiary" or "subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, limited liability partnership or other limited or general partnership, trust, association or other business entity of which an aggregate of at least a majority of the outstanding Capital Stock or other interests entitled to vote in the election of the board of directors of such corporation (irrespective of whether, at the time, Capital Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), managers, trustees or other controlling Persons, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more subsidiaries of such Person.

"Subsidiary Guarantors" shall have the meaning assigned to such term in the definition of "Guarantors".

"Successor Borrower" shall have the meaning set forth in Section 9.7(a)(iv) hereof.

"Supermajority Revolving Lenders" means, at any time, Lenders (other than Defaulting Lenders) having Revolving Exposures and unused Revolving Commitments representing at least 66 2/3% of the sum of the Aggregate Revolving Exposure and unused Revolving Commitments at such time; provided that (x) if there are only two non-affiliated Lenders at such time, then Supermajority Revolving Lenders shall mean all Lenders and (y) if there are only three non-affiliated Lenders at such time, then Supermajority Revolving Lenders must include at least two non-affiliated Lenders.

"Supported QFC" has the meaning assigned to it in Section 13.12.

"Supporting Obligations" shall have the meaning set forth in Article 9 of the UCC.

"Tax Group" has the meaning set forth in Section 9.11(d).

"Tax Restructuring" means any reorganizations and other activities related to tax planning and tax reorganization (as determined by Administrative Borrower in good faith) entered into after the Closing Date so long as (x) the Required Lenders have provided prior written consent in their sole discretion and (y) such Tax Restructuring does not materially impair the Guaranty or the security interests of the Agent and the Lenders under the Collateral Documents in the Collateral, taken as a whole, and the Loan Parties and their Subsidiaries otherwise comply with Sections 9.23.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Benchmark Borrowing" shall mean a Borrowing of Term Benchmark Loans.

"Term Benchmark Loans" shall mean any Loan or portion thereof on which interest is payable based on the Adjusted Term SOFR Rate in accordance with the terms hereof.

"Term Loan Priority Collateral" has the meaning assigned to such term in the Intercreditor Agreement.

"Term SOFR Determination Day" has the meaning assigned to it under the definition of Term SOFR Reference Rate.

"Term SOFR Rate" means, with respect to any Term Benchmark Borrowing and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate" means, for any day and time (such day, the "Term SOFR Determination Day"), with respect to any Term Benchmark Borrowing and for any tenor comparable to the applicable Interest Period, the rate per annum determined by the Agent as the forward-looking term rate based on SOFR. If by 5:00 pm (New York City time) on such Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Rate has not occurred, then the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding Business Day is not more than five (5) Business Days prior to such Term SOFR Determination Day.

"Test Period" means the most recent period of twelve consecutive months of the Administrative Borrower ended on or prior to such time (taken as one accounting period) in respect of which financial statements for each month or fiscal year period have been (or have been required to be) delivered pursuant to Section 9.6.

"Topco" means Fusion Parent, LLC, a Delaware limited liability company.

"Total Indebtedness" means, as of any date of determination:

(a) the aggregate amount of Indebtedness of the Loan parties and their respective Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of the acquisition method accounting in connection with any Permitted Acquisition (or other Investment not prohibited hereunder)) consisting only of third-party Indebtedness for borrowed

money, drawn but unreimbursed obligations under letters of credit, letters of guaranty and bankers' acceptances and third-party debt obligations evidenced by bonds, debentures, loan agreements, promissory notes or similar instruments, and, in each case, without duplication, guarantees by the Loan Parties and their respective Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP, in respect of any of the foregoing Indebtedness of any other Person <u>minus</u>

(b) the sum of (x) unrestricted cash and Cash Equivalents of the Loan Parties and their respective Subsidiaries and (y) cash and Cash Equivalents restricted in favor of Agent or any Lender (which may also include cash and Cash Equivalents securing other indebtedness (including Indebtedness under the First Lien Term Loan Documents) secured by a Lien on the Collateral) on the Closing Date.

"<u>Trade Secrets</u>" means any trade secrets or other proprietary and confidential information, including unpatented inventions, invention disclosures, engineering or other technical data, financial data, procedures, know-how, designs, supplier lists, customer lists, business, production or marketing plans, formulae, methods (whether or not patentable), processes, compositions, schematics, algorithms, techniques, analyses, source code, object code and data collections.

"<u>Trademark License</u>" means any written agreement or license now or hereafter in effect, granting to or from any Person any right to use any Trademark now or hereafter owned by any other Person or that any other Person otherwise has the right to license and all rights of any such Person under any such agreement or license.

"<u>Trademarks</u>" means (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade dress, logos, domain names and other source identifiers, in each case whether arising under the trademark laws of the United States or any other jurisdiction, (b) all registrations and applications for the registration thereof, including all registrations and applications for registration filed in the United States Patent and Trademark Office, and (c) all of the goodwill of the applicable business connected with the use of and symbolized by any of the foregoing.

"<u>Transaction Costs</u>" means all fees, premiums, costs and expenses incurred or payable by the Loan Parties or any of their Subsidiaries in connection with the Transactions prior to the Closing Date.

"<u>Transactions</u>" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the Loans and issuance (or deemed issuance) of the Letters of Credit under this Agreement on the Closing Date, the funding (or deemed funding) of the loans by the First Lien Lenders on the Closing Date, the consummation of the other transactions contemplated by this Agreement, the First Lien Term Loan Documents, the Approved Plan or the Confirmation Order, the consummation of any other transactions in connection with the foregoing and the payment of the fees and expenses incurred in connection with any of the foregoing.

"<u>Type</u>" when used in reference to any Revolving Loan or Borrowing, refers to whether the rate of interest on such Revolving Loan, or on the Revolving Loans comprising such Borrowing,

is determined by reference to the Adjusted Term SOFR Rate, the Adjusted Daily Simple SOFR or the Alternate Base Rate.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York, and any successor statute, as in effect from time to time (except that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Agent may otherwise determine); provided that, if, with respect to any financing statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Agent pursuant to applicable Financing Agreement is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than the State of New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Financing Agreement and any financing statement relating to such perfection or effect of perfection or non-perfection.

"UK Financial Institutions" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unfinanced Capital Expenditures" means, for any period, capital expenditures paid in cash (other than cash constituting proceeds of long-term Indebtedness (other than revolving Indebtedness)) during such period, other than:

(a) the purchase price paid in connection with a Permitted Acquisition or other similar Investment not prohibited by this Agreement;

(b) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for such existing equipment being traded in at such time;

(c) expenditures made with the proceeds of dispositions, Casualty Events or similar dispositions or events that are not required to be applied to repay Indebtedness pursuant to the terms of this Agreement, the First Lien Credit Agreement;

(d) expenditures made in leasehold improvements, to the extent reimbursed by the landlord;

(e) expenditures to the extent actually paid for by any Person other than any Borrower, Guarantor or Subsidiary and for which no Borrower, Guarantor or Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation in respect of the relevant expenditures to such Person;

(f) property, plant and equipment taken in settlement of accounts; and

(g) that portion of interest on Indebtedness incurred for capital expenditures which is capitalized in accordance with GAAP; provided that with respect to each joint venture or minority investee of the any Loan Party or any of its Subsidiaries, for purposes of calculating Unfinanced Capital Expenditures solely with respect to calculating the Fixed Charge Coverage Ratio pursuant to Section 9.17 hereof, the amount of Unfinanced Capital Expenditures (calculated in accordance with this definition) attributable to such joint venture or minority investee, as applicable, that shall be counted for such purposes shall equal the product of (x) such Loan Party's or such Subsidiary's direct and/or indirect percentage ownership of such joint venture or minority investee and (y) Unfinanced Capital Expenditures (calculated in accordance with this definition) of such joint venture or minority investee; provided further that the adjustments to Unfinanced Capital Expenditures pursuant to the preceding proviso shall be proportionate to the amount of EBITDA that is contributed by such joint venture or minority investee  pursuant to the definition of "EBITDA" hereunder.

"Unliquidated Obligations" means, at any time, any Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Obligation that is: (a) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (b) any other obligation (including any guarantee) that is contingent in nature at such time; or (c) an obligation to provide collateral to secure any of the foregoing types of obligations.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means a Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regime" has the meaning assigned to it in Section 13.12.

"Value" shall mean, as reasonably determined by Agent in good faith, with respect to Inventory, the lower of (a) cost determined on the weighted average cost basis in accordance with GAAP or (b) market value, provided that, for purposes of the calculation of the Borrowing Base, (i) the Value of the Inventory shall not include: (A) the portion of the value of Inventory equal to the profit earned by any Affiliate on the sale thereof to any Borrower or Guarantor unless the sale by such Affiliate is a bona fide arm's length transaction consistent with the most recent appraisal received and accepted by Agent for the Inventory and consistent with the prices previously paid by such Borrower or Guarantor in comparable dealings with non-Affiliates, or (B) write-ups or write-downs in value with respect to currency exchange rates and (ii) notwithstanding anything to the contrary contained herein, the cost of the Inventory shall be computed in the same manner and

consistent with the most recent appraisal of the Inventory received and accepted by Agent prior to the date hereof, if any.

"Voting Stock" shall mean with respect to any Person, (a) one or more classes of Capital Stock of such Person having general voting powers to elect at least a majority of the board of directors, managers or trustees of such Person, irrespective of whether at the time Capital Stock of any other class or classes have or might have voting power by reason of the happening of any contingency, and (b) any Capital Stock of such Person convertible or exchangeable without restriction at the option of the holder thereof into Capital Stock of such Person described in clause (a) of this definition.

"Wholly Owned Subsidiary" means any Subsidiary that is a wholly owned subsidiary.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"Zero Balance Accounts" shall mean Deposit Accounts in which a balance of zero is maintained by the depository institution at all times by automatically transferring funds from a master Deposit Account to such Zero Balance Account in an amount only large enough to cover checks presented and other debits to such account, such that any such Zero Balance Account maintains an overnight balance of zero dollars at all times.

## SECTION 2.    CREDIT FACILITIES

2.1    Revolving Loans.

(a)    Subject to and upon the terms and conditions contained herein, each Revolving Lender severally (and not jointly) agrees to make its Pro Rata Share of Revolving Loans to each Borrower from time to time in amounts requested by Administrative Borrower on behalf of such Borrower in an aggregate principal amount outstanding at any one time that will not result, immediately after giving effect to such proposed Revolving Loan, in (i) such Revolving Lender's Pro Rata Share of the aggregate amount of Revolving Loans and Letter of Credit Obligations then outstanding exceeding such Revolving Lender's Revolving Commitment and (ii) the Aggregate Revolving Exposure exceeding the Borrowing Cap at such time, (such limitations in clauses (i) and (ii), the "Revolving Exposure Limitations").  Subject to and upon the terms and conditions contained herein, each Revolving Loan shall be comprised entirely of ABR Loans or Term Benchmark Loans as each Borrower (or Administrative Borrower on behalf of such Borrower) may from time to time request in accordance herewith.

(b)     To the extent that any facts or circumstances (i) have led to Agent establishing a Reserve pursuant to one provision of this Agreement, Agent shall not establish any Reserves based on the same such facts or circumstances pursuant to any other provision of this Agreement and (ii) were taken into account in calculating any component of the Borrowing Base, Agent shall not establish any Reserves based on the same such facts or circumstances.

(c)     Except in Agent's discretion, with the consent of all Revolving Lenders, or as otherwise provided in Section 2.2, Section 12.8 or Section 12.11 herein, the Borrowers shall be in compliance with the Revolving Exposure Limitations at all times.

(d)     In the event that the Aggregate Revolving Exposure at any time exceeds the Borrowing Cap at such time or the Borrowers are otherwise not in compliance with the Revolving Exposure Limitations at any time, (i) such event shall not limit, waive or otherwise affect any rights of Agent or Lenders in such circumstances or on any future occasions and (ii) Borrowers shall immediately repay to Agent the entire amount of any such excess.

2.2     Overadvances.

(a)     Any provision of this Agreement to the contrary notwithstanding, at the request of the Administrative Borrower, Agent may in its sole discretion (but with absolutely no obligation), on behalf of the Revolving Lenders, (x) make Revolving Loans to the Borrowers in amounts that exceed the Borrowing Cap or that would otherwise cause the Borrowers to not be in compliance with the Revolving Exposure Limitations (any such excess Revolving Loans are herein referred to collectively as "Overadvances") or (y) deem the amount of Revolving Loans outstanding to the Borrowers that are in excess of the Borrowing Cap or that otherwise cause the Borrowers to not be in compliance with the Revolving Exposure Limitations to be Overadvances; provided that no Overadvance shall result in a Default due to Borrowers' failure to comply with Section 2.1 for so long as such Overadvance remains outstanding in accordance with the terms of this paragraph, but solely with respect to the amount of such Overadvance.  In addition, Overadvances may be made even if the condition precedent set forth in Section 4.2(d) has not been satisfied.  All Overadvances shall constitute ABR Borrowings.  The making of an Overadvance on any one occasion shall not obligate Agent to make any Overadvance on any other occasion.  The authority of Agent to make Overadvances is limited to an aggregate amount not to exceed $4,000,000 at any time, no Overadvance may remain outstanding for more than thirty days and no Overadvance shall cause any Revolving Lender's Revolving Exposure to exceed its Revolving Commitment; provided that the Required Lenders may at any time revoke Agent's authorization to make Overadvances.  Any such revocation must be in writing and shall become effective prospectively upon Agent's receipt thereof.  The Borrowers hereby unconditionally promise to pay to Agent the then unpaid principal amount of each Overadvance on the earlier of the Maturity Date and demand by Agent.

(b)     Upon the making an Overadvance (whether before or after the occurrence of a Default and regardless of whether a Settlement has been requested with respect to such Overadvance), each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Agent, without recourse or warranty, an undivided interest and participation in such Overadvance in proportion to its Pro Rata Share of the Revolving Commitment.   The Agent may, at any time, require the Revolving Lenders to fund

77

their participations.  From and after the date, if any, on which any Revolving Lender is required to fund its participation in any Overadvance purchased hereunder, Agent shall promptly distribute to such Lender, such Lender's Pro Rata Share of all payments of principal and interest and all proceeds of Collateral received by Agent in respect of such Overadvance.

2.3    <u>Letters of Credit</u>.

(a)    Subject to and upon the terms and conditions contained herein and in the Letter of Credit Documents, at the request of a Borrower (or Administrative Borrower on behalf of such Borrower), Agent agrees to cause Issuing Bank to issue, and Issuing Bank agrees to issue, for the account of such Borrower or a Subsidiary or Affiliate of such Borrower one or more Letters of Credit, for the ratable risk of each Revolving Lender according to its Pro Rata Share of Revolving Loans, containing terms and conditions acceptable to Agent and Issuing Bank; provided no Issuing Bank shall be under any obligation to issue a Letter of Credit that would result in more than a total of 20 Letters of Credit outstanding.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrowers to, or entered into by the Borrowers with, Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.  Notwithstanding anything herein to the contrary, the Issuing Bank shall have no obligation hereunder to issue, and shall not issue, any Letter of Credit the proceeds of which would be made available to any Person (i) to fund any activity or business of or with any Sanctioned Person, or in any country or territory that, at the time of such funding, is the subject of any Sanctions except to the extent permissible for a Person required to comply with Sanctions or (ii) in any manner that would result in a violation of any Sanctions by any party to this Agreement.

(b)    The Administrative Borrower requesting such Letter of Credit (or Administrative Borrower on behalf of such Borrower) shall hand deliver or facsimile (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to Issuing Bank and Agent (prior to 10:00 a.m., New York time, at least three Business Days prior to the requested date of issuance, amendment or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended or extended, and specifying the date of issuance, amendment or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with <u>paragraph (c)</u> of this Section), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be reasonably necessary to prepare, amend and extend such Letter of Credit.  The form and terms of the proposed Letter of Credit shall be reasonably satisfactory to Agent and Issuing Bank, and as of the date of issuance, no order of any court, arbitrator or other Governmental Authority shall purport by its terms to enjoin or restrain money center banks relevant to the proposed issuance generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no law, rule or regulation applicable to money center banks generally and no request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over money center banks relevant to the proposed issuance generally shall prohibit, or request that Issuing Bank refrain from, the issuance of letters of credit generally or the issuance of such Letter of Credit.  If requested by Issuing Bank, the applicable Borrower also shall submit a letter of credit application on Issuing Bank's standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended or extended only if (and upon issuance, amendment or extension of each Letter of Credit the

78

Borrowers shall be deemed to represent and warrant that), after giving effect to such issuance, amendment or extension (i) the Letter of Credit Obligations with respect to stand-by Letters of Credit shall not exceed the Letter of Credit Limit, (ii) the terms and conditions of <u>Section 2.1</u> hereof shall be satisfied, (iii) Excess Availability, prior to giving effect to any Reserves with respect to such Letter of Credit, on the date of the proposed issuance of any Letter of Credit shall be equal to or greater than: (A) if the proposed Letter of Credit is for the purpose of purchasing Eligible Inventory and the documents of title with respect thereto are consigned to Issuing Bank, the sum of (1) the percentage equal to 100% <u>minus</u> the then applicable percentage with respect to Eligible Inventory set forth in the definition of the term Borrowing Base multiplied by the Value of such Eligible Inventory, <u>plus</u> (2) freight, taxes, duty and other amounts which Agent estimates must be paid in connection with such Inventory upon arrival and for delivery to one of such Borrower's locations for Eligible Inventory within the United States of America and (B) if the proposed Letter of Credit is for any other purpose or the documents of title are not consigned to Issuing Bank in connection with a Letter of Credit for the purpose of purchasing Inventory, an amount equal to 100% of the Letter of Credit Obligations with respect thereto and (iv) the Borrowers shall be in compliance with the Revolving Exposure Limitations.  Effective on the issuance of each Letter of Credit, Reserves shall be established in the applicable amount set forth in <u>Section 2.3(b)(iii)(A)</u> or <u>Section 2.3(b)(iii)(B)</u>.

(c)     Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any extension thereof, one year after such extension) unless otherwise agreed by the Issuing Bank (including automatic or "evergreen" extension) and (ii) the date that is five Business Days prior to the Maturity Date.

(d)     Except in Agent's discretion, with the consent of all Revolving Lenders, the amount of all outstanding Letter of Credit Obligations with respect to stand-by Letters of Credit shall not at any time exceed the Letter of Credit Limit.

(e)     If Issuing Bank shall make any payment in respect of a Letter of Credit, Borrowers shall reimburse such payment by paying to Agent an amount equal to such payment not later than 12:00 p.m., New York time, on the date that such payment is made, if Administrative Borrower shall have received notice of such payment prior to 10:00 a.m., New York time, on such date, or, if such notice has not been received by Administrative Borrower prior to such time on such date, then not later than 12:00 p.m., New York time, on (i) the Business Day that Administrative Borrower receives such notice, if such notice is received prior to 10:00 a.m., New York time, on the day of receipt, or (ii) the Business Day immediately following the day that Administrative Borrower receives such notice, if such notice is not received prior to such time on the day of receipt.  Each drawing under any Letter of Credit or other amount payable in connection therewith when due shall constitute a request by the Administrative Borrower for whose account such Letter of Credit was issued to Agent for an ABR Loan in the amount of such drawing or other amount then due, and shall be made by Agent on behalf of Revolving Lenders as a Revolving Loan (or Special Agent Advance, as the case may be) (which Revolving Loan shall be deemed to reimburse the Issuing Bank for such amount due).  The date of such Revolving Loan shall be the date of the drawing or as to other amounts, the due date therefor.  Any payments made by or on behalf of Agent or any Revolving Lender to Issuing Bank and/or related parties in connection with

any Letter of Credit shall constitute additional Revolving Loans to such Borrower pursuant to this <u>Section 2</u> (or Special Agent Advances as the case may be).

(f)    Borrowers' joint and several obligation to reimburse Issuing Bank for any payment under any Letter of Credit as provided in <u>paragraph (e)</u> of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, Borrowers' obligations hereunder.  Neither Agent, Revolving Lenders nor Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms, any error in translation or any consequence arising from causes beyond the control of Issuing Bank; <u>provided</u> that the foregoing shall not be construed to excuse Issuing Bank from liability to Borrowers to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by Borrowers to the extent permitted by applicable law) suffered by any Borrower that are caused by Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence, bad faith or willful misconduct on the part of Issuing Bank (as finally determined by a court of competent jurisdiction), Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    Borrowers and Guarantors shall indemnify and hold Agent and Lenders harmless from and against any and all losses, claims, damages, liabilities, costs and expenses which Agent or any Lender may suffer or incur in connection with any Letter of Credit and any documents, drafts or acceptances relating thereto, including any losses, claims, damages, liabilities, costs and expenses due to any action taken by Issuing Bank or correspondent with respect to any Letter of Credit, except for such losses, claims, damages, liabilities, costs or expenses that are a direct result of the gross negligence, bad faith or willful misconduct of Agent or any Lender.  Each Borrower and Guarantor assumes all risks with respect to the acts or omissions of the drawer under or beneficiary of any Letter of Credit and for such purposes the drawer or beneficiary shall be deemed such Borrower's agent.  Each Borrower and Guarantor

assumes all risks for, and agrees to pay, all foreign, Federal, State and local taxes, duties and levies relating to any goods subject to any Letter of Credit or any documents, drafts or acceptances thereunder. Each Borrower and Guarantor hereby releases and holds Agent and Lenders harmless from and against any acts, waivers, errors, delays or omissions with respect to or relating to any Letter of Credit, except for the gross negligence, bad faith or willful misconduct of Agent or any Lender. The provisions of this Section 2.3(g) shall survive the payment of Obligations and the termination of this Agreement.

(h)     At any time after the occurrence and during the continuance of an Event of Default,

(i)     in connection with Inventory purchased pursuant to any Letter of Credit, Borrowers and Guarantors shall, at Agent's reasonable request, instruct all suppliers, carriers, forwarders, customs brokers, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest that upon Agent's request, such items are to be delivered to Agent and/or subject to Agent's order, and if they shall come into such Borrower's or Guarantor's possession, to deliver them, upon Agent's reasonable request, to Agent in their original form; and

(ii)     within three Business Days that Administrative Borrower receives notice from Agent or Required Lenders demanding the deposit of cash collateral pursuant to this paragraph, Borrowers shall deposit in an account with Agent, in the name of Agent and for the benefit of the Revolving Lenders (the "LC Collateral Account"), an amount in cash equal to 105% of the Letter of Credit Obligations as of such date plus accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to any Borrower described in clause (g) or (h) of Section 10.1. Such deposit shall be held by Agent as collateral for the payment and performance of the Letter of Credit Obligations. In addition, and without limiting the foregoing or paragraph (c) of this Section, if any Letter of Credit Obligations remain outstanding after the expiration date specified in said paragraph (c), the Borrowers shall immediately deposit in the LC Collateral Account an amount in cash equal to 105% of such Letter of Credit Obligations as of such date plus any accrued and unpaid interest thereon. Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account for so long as the Event of Default which triggered the requirement for such funds to be deposited is continuing and Borrowers hereby grant Agent a security interest in the LC Collateral Account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole but reasonable discretion of Agent and at Borrowers' risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by Agent to reimburse Issuing Bank for any draws under any Letter of Credit for which it has not been reimbursed, together with related fees, costs and customary processing charges and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of Borrowers for the Letter of Credit Obligations at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Revolving Lenders with Letter of Credit Obligations representing greater than 50% of the total Letter of Credit Obligations), be applied to satisfy other Obligations. If Borrowers are required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such

amount (to the extent not applied as aforesaid) shall be returned to Borrowers within three Business Days after all such Events of Default have been cured or waived.

Except as otherwise provided herein, Agent shall not exercise any such rights pursuant to this clause so long as no Event of Default shall have occurred and be continuing. Borrowers and Guarantors shall, at Agent's reasonable request, designate Issuing Bank with respect to a Letter of Credit as the consignee on all bills of lading and other negotiable and non-negotiable documents under such Letter of Credit.

(i)      Each Borrower and Guarantor hereby irrevocably authorizes and directs Issuing Bank to name such Borrower or Guarantor as the account party therein and to deliver to Agent all instruments, documents and other writings and property received by Issuing Bank pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the Letter of Credit Documents with respect thereto. Nothing contained herein shall be deemed or construed to grant any Borrower or Guarantor any right or authority to pledge the credit of Agent or any Revolving Lender in any manner. Borrowers and Guarantors shall be bound by any reasonable interpretation made in good faith by Agent or Issuing Bank under or in connection with any Letter of Credit or any documents, drafts or acceptances thereunder, notwithstanding that such interpretation may be inconsistent with any instructions of any Borrower or Guarantor.

(j)      Immediately upon the issuance or amendment of any Letter of Credit, each Revolving Lender shall be deemed to have irrevocably and unconditionally purchased and received, without recourse or warranty, an undivided interest and participation to the extent of such Revolving Lender's Pro Rata Share of the liability with respect to such Letter of Credit and the obligations of Borrowers with respect thereto (including all Letter of Credit Obligations with respect thereto). Each Revolving Lender shall absolutely, unconditionally and irrevocably assume, as primary obligor and not as surety, and be obligated to pay to Issuing Bank therefor and discharge when due, its Pro Rata Share of all of such obligations arising under such Letter of Credit. Without limiting the scope and nature of each Revolving Lender's participation in any Letter of Credit, to the extent that Issuing Bank has not been reimbursed or otherwise paid as required hereunder or under any such Letter of Credit, each such Revolving Lender shall pay to Issuing Bank its Pro Rata Share of such unreimbursed drawing or other amounts then due to Issuing Bank in connection therewith.

(k)      The obligations of Borrowers to pay Letter of Credit Obligations and the obligations of Revolving Lenders to make payments to Agent for the account of Issuing Bank with respect to Letters of Credit shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances, whatsoever, notwithstanding the occurrence or continuance of any Default, Event of Default, the failure to satisfy any other condition set forth in Section 4 or any other event or circumstance. If such amount is not made available by a Revolving Lender when due, Agent shall be entitled to recover such amount on demand from such Revolving Lender with interest thereon, for each day from the date such amount was due until the date such amount is paid to Agent at the interest rate then payable by any Borrower in respect of Revolving Loans that are ABR Loans. Any such reimbursement shall not relieve or otherwise impair the obligation of Borrowers to reimburse Issuing Bank under any Letter of Credit or make any other payment in connection therewith.

(l)     If Issuing Bank shall make any payment under any Letter of Credit, then, unless Borrowers shall reimburse such payment in full on the date such payment is made, the unpaid amount thereof shall bear interest, for each day from and including the date such payment is made to but excluding the date that the Borrowers reimburse such payment including a reimbursement pursuant to any ABR Loan made by Agent in accordance with paragraph (e) of this Section, at the rate per annum then applicable to ABR Loans; provided that, if Borrowers fail to reimburse such payment when due pursuant to paragraph (e) of this Section, then Agent may, at its option, and Agent shall, at the direction of the Required Lenders, increase the Applicable Margin otherwise used to calculate the interest rate for ABR Loans by 2% per annum; provided that such increased Applicable Margins shall only apply to such unpaid amount and not to any other Obligations, outstanding hereunder.  Interest accrued pursuant to this paragraph shall be for the account of Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Lender pursuant to paragraph (e) of this Section to reimburse Issuing Bank shall be for the account of such Revolving Lender to the extent of such payment.

(m)     Issuing Bank may be replaced at any time by written agreement among the Administrative Borrower, Agent, the replaced Issuing Bank and the successor Issuing Bank. Agent shall notify Lenders of any such replacement of Issuing Bank.  At the time any such replacement shall become effective, Borrowers shall pay all unpaid fees accrued for the account of the replaced Issuing Bank as described in Section 3.2(b) hereof.  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of Issuing Bank under this Agreement with respect to Letter of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit or extend or otherwise amend any existing Letter of Credit.

2.4     Termination or Reduction of Aggregate Revolving Commitment Amounts.

(a)     The Borrowers may at any time terminate the Revolving Commitments upon the Payment in Full of the Obligations.

(b)     The Borrowers may from time to time reduce the Revolving Commitments; provided that (i) each reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and (ii) the Borrowers shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.4(e) and Section 2.9, (x) the Aggregate Revolving Exposure would exceed the Borrowing Cap then in effect or (y) the Borrowers would not be in compliance with the Revolving Exposure Limitations.

(c)     The Borrowers shall notify Agent of any election or requirement to terminate or reduce the Aggregate Revolving Commitment Amounts pursuant to Section 2.4(a) or (b), as applicable, at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof; provided that the Borrowers

shall not reduce the Aggregate Revolving Commitment Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.4(e) and/or 2.9, the Aggregate Revolving Exposure then outstanding would exceed the Borrowing Cap.  Promptly following receipt of any such notice, Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrowers pursuant to this Section 2.4(c) shall be irrevocable; provided that a notice of termination of the Aggregate Revolving Commitment Amounts may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by Administrative Borrower (by notice to Agent on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Aggregate Revolving Commitment Amounts shall be permanent and may not be reinstated.  Each reduction of the Aggregate Revolving Commitment Amounts shall be made ratably among the Lenders in accordance with each Lender's Pro Rata Share.

(d)    [Reserved].

(e)    Mandatory Prepayments Related to Reduction of Aggregate Revolving Commitment Amounts.  If, after giving effect to any termination or reduction of the Aggregate Revolving Commitment Amounts pursuant to Section 2.4(a) or (b), the Aggregate Revolving Exposure exceeds the Aggregate Revolving Commitment Amounts, then the Borrowers shall (i) prepay the Loans as provided in Section 2.9 on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (ii) if any excess remains after prepaying all of the Loans as a result of a Letter of Credit Obligation, pay to Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.3(h).

2.5    Revolving Commitments.  The aggregate amount of each Revolving Lender's Pro Rata Share of the Revolving Loans and Letter of Credit Obligations shall not exceed the amount of such Revolving Lender's Revolving Commitment, as the same may from time to time be amended in accordance with the provisions hereof.

2.6    Bank Products.  The Loan Parties, or any of their Subsidiaries, may (but no such Person is required to) request that the Bank Product Providers provide or arrange for such Person to obtain Bank Products from Bank Product Providers, and each Bank Product Provider may, in its sole discretion, provide or arrange for such Person to obtain the requested Bank Products.  The Loan Parties and any of their Subsidiaries that obtain Bank Products shall indemnify and hold Agent, each Lender and their respective Affiliates harmless from any and all obligations now or hereafter owing to any other Person by any Bank Product Provider in connection with any Bank Products other than for gross negligence or willful misconduct on the part of any such indemnified Person.  This Section 2.6 shall survive the payment of the Obligations and the termination of this Agreement.  Borrower and its Subsidiaries acknowledge and agree that the obtaining of Bank Products from Bank Product Providers (a) is in the sole discretion of such Bank Product Provider, and (b) is subject to all rules and regulations of such Bank Product Provider.  Upon the request by the Loan Parties and the acceptance by such Bank Product Provider in the first sentence of this Section 2.6, such Bank Product Provider shall be deemed a party hereto for purposes of any reference in a Financing Agreement to the parties for whom Agent is acting, provided, that, the rights of such Bank Product Provider hereunder and under any of the other Financing Agreements shall consist exclusively of such Bank Product Provider's right to share in payments and collections out of the Collateral as set forth herein.  Each Lender or Affiliate thereof providing

Bank Products for, or having Hedge Agreements with, any Loan Party or any Subsidiary of a Loan Party shall deliver to Agent, promptly after entering into such Hedge Agreement or Bank Product, written notice setting forth the aggregate amount of all Hedge Obligations or Obligations arising under or pursuant to any Bank Products of such Loan Party or Subsidiary to such Lender or Affiliate (whether matured or unmatured, absolute or contingent).  In addition, each such Lender or Affiliate thereof shall deliver to Agent, from time to time after a significant change therein or upon a request therefor, a summary of the amounts due or to become due in respect of such Hedge Obligations and Obligations arising under or pursuant to any Bank Products.  The most recent information provided to Agent shall be used in determining the amounts to be applied in respect of such Hedge Obligations and/or Obligations arising under or pursuant to any Bank Products pursuant to Section 6.4(a) and which tier of the waterfall, contained in Section 6.4(a), such Hedge Obligations and/or Obligations arising under or pursuant to any Bank Products will be placed.  For the avoidance of doubt, so long as Chase or its Affiliate is the Agent, neither Chase nor any of its Affiliates providing Bank Products for, or having Hedge Agreements with, any Loan Party or any Subsidiary of a Loan Party shall be required to provide any notice described in this Section 2.6 in respect of such Bank Products or Hedge Agreements.

   2.7 Joint and Several Liability.  Each Borrower hereby unconditionally and irrevocably agrees it is jointly and severally liable to the Agent, the Issuing Bank and the Lenders for the Obligations.  In furtherance thereof, each Borrower agrees that wherever in this Agreement it is provided that a Borrower is liable for a payment, such obligation is the joint and several obligation of each Borrower.  Each Borrower acknowledges and agrees that its joint and several liability under this Agreement and the Financing Agreements is absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever by the Agent, the Issuing Bank, any Lender or any other Person.  Each Borrower's liability for the Obligations shall not in any manner be impaired or affected by who receives or uses the proceeds of the credit extended hereunder or for what purposes such proceeds are used, and each Borrower waives notice of borrowing requests issued by, and loans or other extensions of credit made to, other Borrowers.  Each Borrower hereby agrees not to exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to such Borrower against any party liable for payment under this Agreement and the Financing Agreements unless and until the Agent, the Issuing Bank and each Lender have been paid in full and all of the Obligations are satisfied and discharged following termination or expiration of all commitments of the Lenders to extend credit to the Borrowers.  Each Borrower's joint and several liability hereunder with respect to the Obligations shall, to the fullest extent permitted by applicable law, be the unconditional liability of such Borrower irrespective of (i) the validity, enforceability, avoidance or subordination of any of the Obligations or of any other document evidencing all or any part of the Obligations, (ii) the absence of any attempt to collect any of the Obligations from any other Loan Party or any Collateral or other security therefor, or the absence of any other action to enforce the same, (iii) the amendment, modification, waiver, consent, extension, forbearance or granting of any indulgence by the Agent or any Lender with respect to any provision of any instrument executed by any other Loan Party evidencing or securing the payment of any of the Obligations, or any other agreement now or hereafter executed by any other Loan Party and delivered to the Agent, (iv) the failure by the Agent or any Lender to take any steps to perfect or maintain the perfected status of its Lien upon, or to preserve its rights to, any of the Collateral or other security for the payment or performance of any of the Obligations or the Agent's release of any Collateral or of its Liens upon any Collateral, (v) the release or compromise, in whole or in part, of the liability of any other Loan

Party for the payment of any of the Obligations, (vi) any increase in the amount of the Obligations beyond any limits imposed herein or in the amount of any interest, fees or other charges payable in connection therewith, in each case, if consented to by any other Borrower, or any decrease in the same, or (vii) any other circumstance that might constitute a legal or equitable discharge or defense of any Loan Party, other than the payment in full of the Obligations.  After the occurrence and during the continuance of any Event of Default, the Agent may proceed directly and at once, without notice to any Loan Party, against any or all of Loan Parties to collect and recover all or any part of the Obligations, without first proceeding against any other Loan Party or against any Collateral or other security for the payment or performance of any of the Obligations, and each Borrower waives any provision that might otherwise require the Agent or the Lenders under applicable law to pursue or exhaust remedies against any Collateral or other Loan Party before pursuing such Borrower or its property.  Each Borrower and Guarantor consents and agrees that neither the Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or against or in payment of any or all of the Obligations.

2.8     Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Revolving Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Revolving Lender is a Defaulting Lender:

(a)     fees shall cease to accrue on the unfunded portion of the Revolving Commitment of such Defaulting Lender pursuant to Section 3.2(a);

(b)     the Revolving Commitment and the Pro Rata Share of the then outstanding Obligations of such Defaulting Lender shall not be included in determining whether all Lenders, the Required Lenders or the Supermajority Revolving Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 11.4), provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately than other affected Lenders shall require the consent of such Defaulting Lender;

(c)     if any Letter of Credit Obligation exists at the time a Revolving Lender becomes a Defaulting Lender then:

(i)     all or any part of the Letter of Credit Obligations shall be reallocated among the Revolving Lenders (other than those that are also Defaulting Lenders) in accordance with their respective Pro Rata Share of Revolving Loans but only to the extent (x) the sum of all Revolving Lenders' (other than those that are also Defaulting Lenders) Pro Rata Share of the then outstanding Obligations consisting of Revolving Loans plus such Defaulting Lender's Letter of Credit Obligations does not exceed the total of all Revolving Lenders' (other than those that are also Defaulting Lenders) Revolving Commitments and (y) the conditions set forth in Section 4.2 are satisfied at such time;

(ii)     if the reallocation described in clause (i) above cannot, or can only partially, be effected, Borrowers shall within three Business Days following notice by Agent, cash collateralize such Defaulting Lender's pro rata share of the Letter of Credit Obligations (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the

procedures set forth in Section 2.3(h)(i) for so long as such Letter of Credit Obligation are outstanding;

(iii)    if Borrowers cash collateralize any portion of such Defaulting Lender's pro rata share of the Letter of Credit Obligations pursuant to Section 2.8(c), Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.2 with respect to such Defaulting Lender's Letter of Credit Obligations during the period such Defaulting Lender's pro rata share of the Letter of Credit Obligations is cash collateralized;

(iv)    if the Letter of Credit Obligations of the non-Defaulting Lenders is reallocated pursuant to Section 2.8(c), then the fees payable to the Revolving Lenders pursuant to Section 3.2 shall be adjusted in accordance with such non-Defaulting Lenders' Pro Rata Share; and

(v)    if any Defaulting Lender's Letter of Credit Obligations are neither cash collateralized nor reallocated pursuant to Section 2.8(c), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all facility fees that otherwise would have been payable to such Defaulting Lender (solely with respect to the portion of such Defaulting Lender's Revolving Commitment that was utilized by such Letter of Credit Obligations) and letter of credit fees payable under Section 3.2 with respect to such Defaulting Lender's pro rata share of the Letter of Credit Obligations shall be payable to the Issuing Bank until such pro rata share of the Letter of Credit Obligations is cash collateralized and/or reallocated;

(d)    the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Revolving Commitments of the Revolving Lenders (other than those that are also Defaulting Lenders) and/or cash collateral will be provided by Borrowers in accordance with Section 2.8(c), and participating interests in any such newly issued or increased Letters of Credit shall be allocated among Revolving Lenders (other than those that are also Defaulting Lenders) in a manner consistent with Section 2.8(c)(i) (and Defaulting Lenders shall not participate therein);

(e)    in the event and on the date that each of Agent, Borrowers and the Issuing Bank agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Letter of Credit Obligations of the other Revolving Lenders shall be readjusted to reflect the inclusion of such Revolving Lender's Revolving Commitment and on such date such Revolving Lender shall purchase at par such of the Revolving Loans and Letter of Credit Obligations of the other Revolving Lenders as Agent shall determine may be necessary in order for such Revolving Lender to hold such Revolving Loans in accordance with its Pro Rata Share of Revolving Loans; and

(f)    Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for the Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees).  Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent. Agent may hold and, in its discretion, relend to a Borrower the amount of all such payments received or retained by it for the account of such Defaulting Lender.  The operation of this Section shall not be construed to

increase or otherwise affect the Revolving Commitment of any Revolving Lender, or relieve or excuse the performance by any Borrower or Guarantor of their duties and obligations hereunder.

2.9     Prepayment of Loans.

(a)     Borrowers shall have the right at any time and from time to time to prepay any Loan in whole or in part, subject to prior notice in accordance with paragraph (b) of this Section.

(b)     Administrative Borrower shall notify Agent by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a Term Benchmark Loan, not later than 11:00 a.m., New York time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Loan, not later than 11:00 a.m., New York time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Loan or portion thereof to be prepaid. Promptly following receipt of any such notice relating to a Loan, Agent shall advise the Lenders of the contents thereof. Each prepayment of the Revolving Loans shall be applied ratably to the Revolving Loans.  Prepayments shall be accompanied by accrued interest to the extent required by Section 3.1.

(c)     In the event that the Aggregate Revolving Exposure at any time exceeds the Borrowing Cap then in effect, the Borrowers shall, promptly after Agent's written demand, apply an amount equal to such excess first, to the prepayment of outstanding Revolving Loans and second, to the cash collateralization of the Letter of Credit Obligations as set forth in Section 2.3(h), in an amount sufficient to eliminate such excess.

(d)     All Net Cash Proceeds of ABL Priority Collateral received by a Loan Party in connection with any Asset Sales, sales excluded from the definition of "Asset Sale" pursuant to clause (ix) therein, investments, transfers or other dispositions or securitizations shall be promptly applied pursuant to this Section 2.9(d) and in no event to exceed five (5) Business Days after such Net Cash Proceeds are received. Notwithstanding anything to the contrary in this Agreement, the First Lien Credit Agreement, or any other agreement, Net Cash Proceeds of the ABL Priority Collateral shall be used for first, the prepayment of outstanding Revolving Loans and second, to the cash collateralization of the Letter of Credit Obligations as set forth in Section 2.3(h)(ii), before such proceeds can be used to make any payments due under the First Lien Credit Agreement or any other indebtedness.

2.10     Loans and Borrowings.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Revolving Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Revolving Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.  Each Overadvance shall be made in accordance with the procedures set forth in Section 2.2.

(b)    Subject to Section 3.4, each Borrowing shall be comprised entirely of ABR Loans or Term Benchmark Loans as the Administrative Borrower may request in accordance herewith.  Each Lender at its option may make any Term Benchmark Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan (and in the case of an Affiliate, the provisions of Sections 3.3, 3.4, 3.5 and 3.6 shall apply to such Affiliate to the same extent as to such Lender); provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)    At the commencement of each Interest Period for any Term Benchmark Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000 and not less than $3,000,000.  ABR Borrowings may be in any amount.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of 10 Term Benchmark Borrowings outstanding.

(d)    Notwithstanding any other provision of this Agreement, the Administrative Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

2.11    Requests for Borrowings.

(a)    To request a Borrowing, the Administrative Borrower shall notify the Agent of such request either in writing (delivered by hand or fax) by delivering a Borrowing Request signed by an Authorized Officer of the Administrative Borrower or through Electronic System if arrangements for doing so have been approved by the Agent not later than (a) in the case of a Term Benchmark Borrowing, 11:00 am., New York time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, 1:00 p.m., New York time, on the date of the proposed Borrowing; provided that any such notice of an ABR Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.3(e) may be given not later than 10:00 a.m., New York time, on the date of such proposed Borrowing.  Each such Borrowing Request shall be irrevocable.  Each such written (or if permitted, telephonic) Borrowing Request shall specify the following information:

(i)    the name of the applicable Borrower(s);

(ii)    the aggregate principal amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing;

(iii)    the date of such Borrowing, which shall be a Business Day;

(iv)    whether such Borrowing is to be an ABR Borrowing or a Term Benchmark Borrowing; and

(v)    in the case of a Term Benchmark Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period."

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Term Benchmark

Borrowing, then the applicable Borrower(s) shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

2.12    <u>Interest Elections</u>.

(a)    Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Term Benchmark Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Administrative Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Term Benchmark Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Administrative Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.  This <u>Section 2.12</u> shall not apply to Overadvances, which may not be converted or continued.

(b)    To make an election pursuant to this Section, the Administrative Borrower shall notify the Agent of such election either in writing (delivered by hand or fax) by delivering an Interest Election Request signed by an Authorized Officer of the Administrative Borrower or through Electronic System if arrangements for doing so have been approved by the Agent by the time that a Borrowing Request would be required under <u>Section 2.11</u> if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable.

(c)    Each written Interest Election Request (including requests submitted through Electronic System) shall specify the following information:

(i)    the name of the applicable Borrower and the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Term Benchmark Borrowing; and

(iv)    if the resulting Borrowing is a Term Benchmark Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Term Benchmark Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(d)     Promptly following receipt of an Interest Election Request, the Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Administrative Borrower fails to deliver a timely Interest Election Request with respect to a Term Benchmark Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Agent, at the request of the Required Lenders, so notifies the Administrative Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Term Benchmark Borrowing and (ii) unless repaid, (A) each Term Benchmark Borrowing and (B) each RFR Borrowing shall be converted to an ABR Borrowing (in the case of a Term Benchmark Borrowing) at the end of the Interest Period applicable thereto or (in the case of an RFR Borrowing) on the next Interest Payment Date in respect thereof.

## SECTION 3.     INTEREST AND FEES

3.1     <u>Interest Payments</u>.

(a)     The Loans comprising ABR Borrowings shall bear interest at the Alternate Base Rate plus the Applicable Margin.

(b)     The Loans comprising each Term Benchmark Borrowing shall bear interest at the Adjusted Term SOFR Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)     Each RFR Loan shall bear interest at a rate per annum equal to the Adjusted Daily Simple SOFR plus the Applicable Margin.

(d)     Notwithstanding the foregoing, (i) during the occurrence and continuance of an Event of Default, the Agent or the Required Lenders may, at their option, by notice to the Administrative Borrower, declare that (A) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section and (B) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder and (ii) during the occurrence and continuance of an Event of Default described in <u>Section 10.1(a)</u>, <u>Section 10.1(g)</u> or <u>Section 10.1(h)</u>, (A) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section and (B) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder, in each case under this clause (c) without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Guarantor for the period from and after the date of the occurrence of such Event of Default and for so long as such Event of Default is continuing.

(e)     Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Revolving Commitments; <u>provided</u> that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand, (ii) in the event of any

repayment or prepayment of any Loan (other than a prepayment of an ABR Loan prior to the Maturity Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Term Benchmark Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(f)    All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year). In each case interest shall be payable for the actual number of days elapsed (including the first day but excluding the last day). All interest hereunder on any Loan shall be computed on a daily basis based upon the outstanding principal amount of such Loan as of the applicable date of determination. The applicable Alternate Base Rate, Adjusted Term SOFR Rate, Term SOFR Rate, Adjusted Daily Simple SOFR or Daily Simple SOFR shall be determined by the Agent, and such determination shall be conclusive absent manifest error.

3.2    <u>Fees</u>.

(a)    Borrowers shall pay to Agent, for the account of Revolving Lenders, monthly an unused line fee at a rate equal to, determined on the first day of each calendar month 0.375% per annum, in each case calculated upon the amount by which the Aggregate Revolving Commitment Amounts exceeds the average daily principal balance of the outstanding Revolving Loans and Letters of Credit during the immediately preceding calendar month (or part thereof, in which case it shall be calculated on the basis of days actually elapsed during such calendar month) while this Agreement is in effect and for so long thereafter as any of the Obligations (other than indemnities and contingent Obligations which survive the termination of this Agreement and the other Financing Agreements) are outstanding, which fee shall be payable on the first day of each calendar month in arrears. Such unused line fees shall be calculated on the basis of a 360-day year and actual days elapsed and the obligation of Borrowers to pay such fee shall survive the termination or non-renewal of this Agreement.

(b)    In the case of all Letters of Credit, Borrowers shall pay to Agent, for the account of Revolving Lenders, a fee at a rate equal to Applicable Margin for Term Benchmark Loans (then in effect) per annum on the average daily maximum amount available to be drawn under all of such Letters of Credit for the immediately preceding calendar month (or part thereof), in which case it shall be calculated on the basis of days actually elapsed during such calendar month) payable in arrears as of the first day of each succeeding calendar month, computed for each day from the date of issuance to the date of expiration; <u>provided</u> that Borrowers shall pay, at Agent's option, with notice, such fee at a rate 2% greater than the otherwise applicable rate on such average daily maximum amount for: (i) the period from and after the date of termination or non-renewal of this Agreement until Revolving Lenders have received full and final payment of all Obligations (other than contingent Obligations not yet accrued) notwithstanding entry of a judgment against any Borrower or Guarantor and (ii) the period from and after the date of the occurrence of an Event of Default for so long as such Event of Default is continuing. Such letter of credit fees shall be calculated on the basis of a 360-day year and actual days elapsed and the obligation of Borrowers to pay such fee shall survive the termination or non-renewal of this Agreement. In addition to the letter of credit fees provided above, Borrowers shall pay to Issuing

Bank for its own account (without sharing with Lenders), a letter of credit fronting fee equal to 0.25% (on a per annum basis) calculated upon the daily outstanding balance of the Letter of Credit Obligations for the immediately preceding calendar month (or part thereof), payable in arrears as of the first day of each succeeding calendar month and negotiation fees agreed to by Borrowers and Issuing Bank from time to time and the customary charges from time to time of Issuing Bank with respect to the issuance, amendment, transfer, administration, cancellation and conversion of, and drawings under, such Letters of Credit.

(c)     Borrowers shall pay to Agent the other fees and amounts set forth in the Agent Fee Letter and the Fee Letter in the amounts and at the times specified therein.  To the extent payment in full of the applicable fee is received by Agent from Borrowers on or about the date hereof, Agent shall pay to each Lender its share of such fees in accordance with the terms of the arrangements of Agent with such Lender.

3.3     Increased Costs.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted Term SOFR Rate) or the Issuing Bank;

(ii)     impose on any Lender or the Issuing Bank or the applicable offshore interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein; or

(iii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes covered by Section 3.5 or (B) Taxes covered in clauses (b) through (d) of the definition of Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender, the Issuing Bank or such other Recipient of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender, the Issuing Bank or such other Recipient hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to such Lender, the Issuing Bank or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, the Issuing Bank or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     If any Lender or the Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement, the Revolving Commitments of, or the Loans made by, or participations in Letters of Credit held by, such Lender

or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy and liquidity), then from time to time the Borrowers will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)     A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Agent and shall be conclusive absent manifest error.  The Borrowers shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within ten days after receipt thereof.

(d)     Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

3.4     Alternate Rate of Interest; Illegality.

(a)     Subject to clauses (c), (d), (e), (f) and (g) of this Section 3.4, if:

(i)     the Agent determines (which determination shall be conclusive and binding absent manifest error) (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate or the Term SOFR Rate (including, without limitation, because the Term SOFR Reference Rate is not available or published on a current basis) for such Interest Period or (B) at any time, that adequate and reasonable means do not exist for ascertaining the applicable Adjusted Daily Simple SOFR or Daily Simple SOFR; or

(ii)     the Agent is advised by the Required Lenders that (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, the Adjusted Term SOFR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period or (B) at any time, the Adjusted Daily Simple SOFR will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing;

then the Agent shall give notice thereof to the Administrative Borrower and the Lenders through Electronic System as provided in Section 13.3 as promptly as practicable thereafter and, until (x) the Agent notifies the Administrative Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Administrative Borrower delivers a new Interest Election Request in accordance with the terms of Section 2.12 or a new Borrowing Request in accordance with the terms of Section 2.11, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Term Benchmark Borrowing, and any Borrowing Request that requests a Term Benchmark Borrowing shall instead be deemed to be an Interest Election Request or a Borrowing Request, as applicable, for (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not also the subject of Section 3.4(a)(i) or (ii) above or (y) an ABR Borrowing if the Adjusted Daily Simple SOFR also is the subject of Section 3.4(a)(i) or (ii) above; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then all other Types of Borrowings shall be permitted. Furthermore, if any Term Benchmark Loan or RFR Loan is outstanding on the date of the Administrative Borrower's receipt of the notice from the Agent referred to in this Section 3.4(a) with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until (x) the Agent notifies the Administrative Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Administrative Borrower delivers a new Interest Election Request in accordance with the terms of Section 2.12 or a new Borrowing Request in accordance with the terms of Section 2.11, (1) any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), be converted by the Agent to, and shall constitute, (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not also the subject of Section 3.4(a)(i) or (ii) above or (y) an ABR Loan if the Adjusted Daily Simple SOFR also is the subject of Section 3.4(a)(i) or (ii) above, on such day, and (2) any RFR Loan shall on and from such day be converted by the Agent to, and shall constitute, an ABR Loan.

(b)     If any Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, fund or continue any Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR, Adjusted Daily Simple SOFR or Daily Simple SOFR, or to determine or charge interest based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR, Adjusted Daily Simple SOFR or Daily Simple SOFR, then, upon notice thereof by such Lender to the Administrative Borrower through the Agent, (i) any obligations of such Lender to make, maintain, fund or continue Term Benchmark Loans or to convert ABR Borrowings to Term Benchmark Borrowings will be suspended and (ii) the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Agent without reference to clause (c) of the definition of "Alternate Base Rate", in each case, until such Lender notifies the Agent and the Administrative Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrowers will upon demand from such Lender (with a copy to the Agent), either convert or prepay all Term Benchmark Borrowings of such Lender to ABR Borrowings (the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Agent without reference to clause (c) of the definition of "Alternate Base Rate"), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term Benchmark Borrowings to such day, or immediately, if such Lender may not lawfully continue to

maintain such Loans.  Upon any such conversion or prepayment, the Borrowers will also pay accrued interest on the amount so converted or prepaid, together with any additional amounts required pursuant to Section 3.7.

(c)    Notwithstanding anything to the contrary herein or in any other Financing Agreement (and any Hedge Agreement shall be deemed not to be a "Financing Agreement" for purposes of this Section 3.4, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Financing Agreement in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Financing Agreement and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Financing Agreement in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Financing Agreement so long as the Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(d)    Notwithstanding anything to the contrary herein or in any other Financing Agreement, the Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Financing Agreement, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Financing Agreement.

(e)    The Agent will promptly notify the Administrative Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and (v) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.4, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Financing Agreement, except, in each case, as expressly required pursuant to this Section 3.4.

(f)    Notwithstanding anything to the contrary herein or in any other Financing Agreement, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information

service that publishes such rate from time to time as selected by the Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(g)    Upon the Administrative Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrowers may revoke any request for a Term Benchmark Borrowing of, conversion to or continuation of Term Benchmark Borrowings to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrowers will be deemed to have converted any request for a Term Benchmark Borrowing into a request for a Borrowing of or conversion to (A) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (B) an ABR Borrowing if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate. Furthermore, if any Term Benchmark Loan or RFR Loan is outstanding on the date of the Administrative Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until such time as a Benchmark Replacement is implemented pursuant to this Section 3.4, (1) any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), be converted by the Agent to, and shall constitute, (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (y) an ABR Loan if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event, on such day and (2) any RFR Loan shall on and from such day be converted by the Agent to, and shall constitute, an ABR Loan.

3.5    Withholding of Taxes; Gross-Up.

(a)    Payment Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Financing Agreement shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under

this Section 3.5) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Agent timely reimburse it for, Other Taxes.

(c)    Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.5, such Loan Party shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(d)    Indemnification by the Loan Parties.   The Loan Parties shall jointly and severally indemnify each Recipient, within thirty days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Administrative Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Agent, within ten days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.7(b) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Financing Agreement, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Agent to setoff and apply any and all amounts at any time owing to such Lender under any Financing Agreement or otherwise payable by the Agent to such Lender from any other source against any amount due to the Agent under this paragraph (e).

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Financing Agreement shall deliver to the Administrative Borrower and the Agent, at the time or times reasonably requested by the Administrative Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Administrative Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Administrative Borrower or the Agent, shall deliver such other

documentation prescribed by applicable law reasonably requested by the Administrative Borrower or the Agent as will enable the Administrative Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.5(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is a U.S. Person shall deliver to the Administrative Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Agent), an executed copy of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Financing Agreement, an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Financing Agreement, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    in the case of a Foreign Lender claiming that its extension of credit will generate U.S. effectively connected income, an executed copy of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance

Certificate") and (y) an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4)    to the extent a Foreign Lender is not the beneficial owner, an executed copy of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Administrative Borrower or the Agent to determine the withholding or deduction required to be made; and; and

(D)    if a payment made to a Recipient under any Financing Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Administrative Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Administrative Borrower or the Agent as may be necessary for the Administrative Borrower and the Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(E) If the Agent is a U.S. Person, it shall provide the Administrative Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-9 or (B) if the Agent is not a U.S. Person, then it shall provide the Administrative Borrower with two properly completed IRS Forms W-8ECI with respect to fees received on its own behalf and any such other documentation prescribed by applicable law and reasonably requested by the Administrative Borrower that would allow the applicable Borrower to make payments to such Agent without deduction or withholding of any U.S. federal withholding Taxes. If the Agent is not a U.S. Person, such Agent shall provide the Administrative Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies

of IRS Form W-8IMY (or successor form) certifying that it is either (i) a "qualified intermediary" and that it assumes primary withholding responsibility under Chapters 3 and 4 of the Code and primary Form 1099 reporting and backup withholding responsibility for payments it receives for the account of others or (ii) a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Administrative Borrower to be treated as a U.S. Person with respect to such payments (and the Administrative Borrower and the Agent agree to so treat the Agent as a U.S. Person with respect to such payments as contemplated by U.S. Treasury Regulations Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Administrative Borrower can make payments

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Administrative Borrower and the Agent in writing of its legal inability to do so.

(g)    Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Survival.  Each party's obligations under this Section shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Revolving Commitments and the repayment, satisfaction or discharge of all obligations under any Financing Agreement (including the Payment in Full of the Obligations).

(i)    Defined Terms.  For purposes of this Section 3.5, the term "Lender" includes the Issuing Bank.

3.6    Mitigation of Obligations; Replacement of Lenders.

(a)      If any Lender requests compensation under Section 3.3, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.5, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.3 or 3.5, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      If any Lender requests compensation under Section 3.3, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.5, and such Lender has declined or is unable to designate a different lending or issuing office in accordance with paragraph (a) of this Section, or if any Lender becomes a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 13.7), all its interests, rights (other than its existing rights to payments pursuant to Section 3.3 or 3.5) and obligations under this Agreement and other Financing Agreements to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrowers shall have received the prior written consent of the Agent (and in circumstances where its consent would be required under Section 13.7, the Issuing Bank), which consent shall not unreasonably be withheld, (ii) the Borrowers shall have paid the Agent the assignment fee (if any) specified in Section 13.7, (iii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iv) in the case of any such assignment resulting from a claim for compensation under Section 3.3 or payments required to be made pursuant to Section 3.5, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.  Each party hereto agrees that (x) an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Administrative Borrower, the Agent and the assignee, and (y) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to an be bound by the terms thereof; provided that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender, provided that any such documents shall be without recourse to or warranty by the parties thereto.

3.7      Break Funding Payments.

(a)      With respect to Loans that are not RFR Loans, in the event of (i) the payment of any principal of any Term Benchmark Loan other than on the last day of an Interest

Period applicable thereto (including as a result of an Event of Default or as a result of any prepayment pursuant to Section 2.1(d), 2.4(e) or 2.9), (ii) the conversion of any Term Benchmark Loan other than on the last day of the Interest Period applicable thereto, (iii) the failure to borrow, convert, continue or prepay any Term Benchmark Loan on the date specified in any notice delivered pursuant hereto, or (iv) the assignment of any Term Benchmark Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Administrative Borrower pursuant to Section 3.6, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 3.7(a) shall be delivered to the Administrative Borrower and shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

(b)     With respect to RFR Loans, in the event of (i) the payment of any principal of any RFR Loan other than on the Interest Payment Date applicable thereto (including as a result of an Event of Default or as a result of any prepayment pursuant to Section 2.1(d), 2.4(e) or 2.9), (ii) the failure to borrow or prepay any RFR Loan on the date specified in any notice delivered pursuant hereto, or (iii) the assignment of any RFR Loan other than on the Interest Payment Date applicable thereto as a result of a request by the Administrative Borrower pursuant to Section 3.6, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 3.7(b) shall be delivered to the Administrative Borrower and shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

**SECTION 4.     CONDITIONS PRECEDENT**

4.1     Conditions Precedent to Closing Date. The effectiveness of this Agreement and the obligation of Lenders to make the initial Loans under this Agreement and of the Issuing Bank to issue Letters of Credit hereunder is subject to the satisfaction of, or waiver (in accordance with Section 11.4) of, each of the following conditions precedent:

(a)     Loan Agreement and other Financing Agreements. The Agent (or its counsel) shall have received (i) from each party hereto a counterpart of this Agreement signed on behalf of such party (which, subject to Section 13.10(b), may include any Electronic Signatures transmitted by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page), (ii) either (A) a counterpart of each other Financing Agreement signed on behalf of each party thereto or (B) written evidence satisfactory to the Agent (which may include facsimile or other electronic transmission of a signed signature page thereof) that each such party has signed a counterpart of such Financing Agreement and (iii) such other certificates, documents, instruments and agreements as the Agent shall reasonably request in connection with the transactions contemplated by this Agreement and the other Financing Agreements, all in form and substance satisfactory to the Agent and its counsel.

(b)     Officer's Certificates. Agent shall have received (i) a certificate of each Loan Party (including the Administrative Borrower), dated as of the Closing Date and executed by its secretary, assistant secretary or other appropriate officer, which shall (ii) certify the

resolutions of its board of directors, members or other governing body authorizing the execution, delivery and performance of this Agreement and the other Financing Agreements to which it is a party, (iii) identify by name and title and bear the signatures of the Authorized Officers and any other officers of such Loan Party authorized to sign the Financing Agreements to which it is a party, and (iv) contain appropriate attachments, including the certificate or articles of incorporation or formation (or equivalent constitutional documents) of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its bylaws or operating, limited liability company or partnership agreement (or equivalent governing documents), and (v) a good standing certificate or equivalent certification for each Loan Party from its jurisdiction of organization as of a recent date.

(c)    <u>Representations and Warranties</u>.    All representations and warranties contained herein and in the other Financing Agreements shall be true and correct in all material respects as of the Closing Date and after giving effect of the Transactions, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date).

(d)    <u>Information Certificate</u>.  Agent shall have received an executed copy of the Information Certificate.

(e)    <u>Closing Certificate</u>.  Agent shall have received a duly executed certificate from an Authorized Officer of the Administrative Borrower certifying that the conditions precedent set forth in <u>clauses (l)</u> and <u>(o)</u> of this <u>Section 4.1</u> have been satisfied as of the Closing Date.

(f)    <u>Transactions</u>.    The Transactions, including the Approved Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Approved Plan, shall have been (or concurrently with the occurrence of the Closing Date, shall be) substantially consummated in accordance with applicable Law, the Bankruptcy Court, and the Bankruptcy Code.

(g)    <u>Opinions of Counsel</u>.  Agent shall have received customary written opinions of (i) Kirkland & Ellis LLP, special counsel to the Loan Parties and (ii) Gordon Rees Scully Mansukhani LLP, special Florida and Ohio counsel to the Loan Parties, in each case, to Agent, the Issuing Bank, the Lenders and the other holders of the Obligations.

(h)    <u>Fees and Expenses</u>.  The Lenders and Agent shall have received all fees required to be paid, including fees payable pursuant to the Agent Fee Letter and the Fee Letter, and all costs and expenses required to be paid by the Loan Parties pursuant to <u>Section 9.22</u> for which invoices have been presented to the Administrative Borrower at least three Business Days prior to the Closing Date (including, without limitation, the reasonable fees, disbursements and other charges of Latham & Watkins LLP, counsel to Agent), on or before the Closing Date.

(i)    [Reserved].

(j)    <u>Borrowing Base Certificate</u>.  Agent shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of last Business Day of the week prior to the Closing Date.

(k)    Existing Debt Agreements.  Agent shall have received evidence reasonably satisfactory to it that the facilities evidenced by the Existing Debt Agreements shall have been terminated and cancelled and all indebtedness thereunder shall have been fully repaid (except to the extent being so repaid with the initial Loans) and, if applicable, any and all liens thereunder shall have been terminated.

(l)    Excess Availability.  After giving effect to the transactions contemplated to be effective on the Closing Date, both (i) Excess Availability shall be no less than $50,000,000 and (ii).the unrestricted cash and Cash Equivalents of the Loan Parties and their respective operating Subsidiaries shall be no less than $35,000,000.

(m)    First Lien Credit Facility. Agent shall have received (a) evidence reasonably satisfactory to it that substantially contemporaneously with the effectiveness of the First Lien Credit Agreement the First Lien Lenders will have been deemed to have funded to the Borrowers loan proceeds in an aggregate gross principal amount equal to $437,772,002 pursuant to the terms of the First Lien Credit Agreement  and (b) executed copies of the First Lien Credit Agreement and all material First Lien Term Loan Documents, each of which shall be in form and substance reasonably satisfactory to Agent.

(n)    Pledged Capital Stock; Stock Powers; Pledged Notes.  The First Lien Agent shall have received (i) if applicable, the certificates representing the Capital Stock pledged pursuant to the Pledge Agreement, together with an undated stock power for each such certificate executed in blank by an Authorized Officer of the pledgor thereof and (ii) each promissory note (if any) pledged to Agent pursuant to this Agreement, endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(o)    Defaults.  No Default or Event of Default shall exist or have occurred and be continuing on the Closing Date after giving effect to the Transactions.

(p)    Indebtedness.  No Loan Party shall have any outstanding Indebtedness for borrowed money other than Indebtedness permitted under Section 9.9.

(q)    "Know Your Customer"; USA PATRIOT ACT.  (i) Agent and the Lenders shall have received, at least three Business Days prior to the Closing Date, all documentation and other information regarding the Loan Parties requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT ACT, to the extent reasonably requested in writing of the Loan Parties at least ten Business Days prior to the Closing Date and (ii) to the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least three Business Days prior to the Closing Date, any Lender that has requested, a Beneficial Ownership Certification in relation to each Loan Party shall have received such Beneficial Ownership Certification.

(r)    Intercreditor Agreement.  Agent shall have received a copy of the Intercreditor Agreement, in form and substance reasonably satisfactory to Agent, executed by the First Lien Agent and the Loan Parties.

(s)    Guaranty.  Agent shall have received a Guaranty in form and substance reasonably satisfactory to Agent and executed by each of the Loan Parties.

(t)    Borrowing Notice.    Agent shall have received a Borrowing Request executed by an Authorized Officer of the Administrative Borrower in accordance with Section 2.11 with respect to any Borrowings to be made on the Closing Date.

(u)    Appraisals.    Agent and each Lender shall have received a completed inventory appraisal in form and substance reasonably satisfactory to the Agent each Lender (it being understood and agreed that, notwithstanding anything to the contrary herein, upon satisfaction of this clause (u), no additional inventory appraisal shall be required to be delivered within 90 days after the Closing Date unless Excess Availability is less than the greater of 20% of the Borrowing Cap and $30,000,000).

(v)    Initial Draw.    The aggregate principal amount of Loans borrowed on the Closing Date shall not exceed $16,000,000.

(w)    Total Net Debt.    After giving effect to the Transactions on the Closing Date, Total Indebtedness shall not exceed $405,000,000.

(x )    Insurance.    Agent shall have received satisfactory evidence that all insurance required to be maintained hereunder and the Financing Agreements has been obtained and is in effect and that the Agent has been named as lender loss payee and/or additional insured, as applicable, under each insurance policy with respect to such insurance as to which the Collateral Agent shall have requested to be so named.

Notwithstanding anything in this Section 4.1 to the contrary, the Borrowers shall be deemed to have made all representations and warranties herein and the other Financing Agreements on the Closing Date.

4.2    Conditions Precedent to All Loans and Letters of Credit.    The obligation of Lenders to make the Loans, or of Issuing Bank to issue any Letter of Credit, including the initial Letters of Credit, is subject to the further satisfaction of, or waiver of, immediately prior to or concurrently with the making of each such Loan or the issuance of such Letter of Credit of each of the following conditions precedent:

(a)    all representations and warranties contained herein and in the other Financing Agreements shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan or providing each such Letter of Credit and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date);

(b)    no Default or Event of Default shall exist or have occurred and be continuing on and as of the date of the making of such Loan or providing each such Letter of Credit and immediately after giving effect thereto;

(c)    [reserved]; and

(d)      after giving effect to any Revolving Loan or the issuance of any Letter of Credit, (i) Excess Availability is not less than zero and (ii) the Borrowers shall be in compliance with the Revolving Exposure Limitations.

Each Loan made after the Closing Date and each issuance, increase or extension (other than automatic extensions of evergreen Letters of Credit) of a Letter of Credit shall be deemed to constitute a representation and warranty by Borrowers on the date thereof as to the matters specified in paragraphs (a), (b), (c) and (d) of this Section.

**SECTION 5.      GRANT AND PERFECTION OF SECURITY INTEREST**

5.1      Grant of Security Interest.  To secure payment and performance in full of the Obligations, each Borrower and Guarantor hereby grants to Agent, together with its permitted successors and assigns, for the benefit of the Secured Parties, a security interest in all of its right, title and interest in, to and under any and all of the following assets now owned or existing or at any time hereafter arising or acquired by such Borrower or Guarantor or in which such Borrower or Guarantor now has or at any time in the future may acquire any right, title or interest, regardless of where located (but in all cases excluding any Excluded Assets) (together with all other collateral security for the Obligations at any time granted to or held or acquired by Agent or any Secured Party, collectively, the "Collateral"), including:

(a)      all Accounts;

(b)      all Chattel Paper;

(c)      all Deposit Accounts;

(d)      all Documents;

(e)      all Equipment;

(f)      all General Intangibles, including all Intellectual Property and all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation or other violation or impairment of any such Intellectual Property, and all Proceeds of such Intellectual Property, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto;

(g)      all Instruments and Promissory Notes;

(h)      all Inventory;

(i)      all other Goods;

(j)      all Investment Property;

(k)      all Letter-of-Credit Rights;

(l)      all cash and Money;

107

(m)    all Securities Accounts;

(n)    all Commercial Tort Claims specifically described on Schedule 5.2(g) hereto, as such schedule may be supplemented from time to time;

(o)    all books and records pertaining to the Article 9 Collateral; and

(p)    to the extent not otherwise included, all Proceeds, substitutions, replacements and products of any and all of the foregoing and all Supporting Obligations, collateral security and guarantees given by any Person with respect to any of the foregoing.

It is understood that Collateral shall not include any Excluded Asset; provided, however, that Collateral shall include any Proceeds, substitutions or replacements of any of the foregoing (unless such Proceeds, substitutions or replacements would constitute an Excluded Asset).

5.2    Perfection of Security Interests.

(a)    Each Borrower and Guarantor irrevocably and unconditionally authorizes Agent (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming Agent or its designee as the secured party and such Borrower or Guarantor as debtor, as Agent may reasonably require, and including any other information with respect to such Borrower or Guarantor or otherwise required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction, as Agent may reasonably determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the date hereof.  Any such financing statements may indicate the Collateral as (i) all assets of the debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (ii) by any other description which reasonably approximates the description contained herein.  Each Borrower and Guarantor hereby ratifies and approves all financing statements naming Agent or its designee as secured party and such Borrower or Guarantor, as the case may be, as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of Agent prior to the date hereof and ratifies and confirms the authorization of Agent to file such financing statements (and amendments, if any). Each Borrower and Guarantor hereby authorizes Agent to adopt on behalf of such Borrower and Guarantor any symbol required for authenticating any electronic filing.  In the event that the description of the collateral in any financing statement naming Agent or its designee as the secured party and any Borrower or Guarantor as debtor includes assets and properties of such Borrower or Guarantor that do not at any time constitute Collateral, whether hereunder, under any of the other Financing Agreements or otherwise, the filing of such financing statement shall nonetheless be deemed authorized by such Borrower or Guarantor to the extent of the Collateral included in such description and it shall not render the financing statement ineffective as to any of the Collateral or otherwise affect the financing statement as it applies to any of the Collateral, provided, that, the inclusion of the description of assets and properties of such Borrower or Guarantor that do not constitute Collateral in any financing statement shall not be deemed a grant of a security interest in such asset of such Borrower or Guarantor in favor of Agent and Secured Parties.  In no event shall any Borrower or Guarantor at any time file, or permit or cause to be filed, any correction statement or termination statement with respect to any financing statement (or amendment with

108

respect thereto) naming Agent or its designee as secured party and such Borrower or Guarantor as debtor without the prior written consent of Agent.  Each Borrower and Guarantor acknowledges that it is not authorized to file any financing statement, amendment, termination statement or correction statement with respect to any financing statement without the prior written consent of Agent.

(b)    Each Borrower and Guarantor does not have any Chattel Paper (whether tangible or electronic) or Instruments as of the Closing Date, in each case with an individual face amount in excess of $2,500,000, except as set forth in the Information Certificate.  In the event that any Borrower or Guarantor shall be entitled to or shall receive any Chattel Paper or Instrument after the date hereof with an individual face amount in excess of $2,500,000, such Borrower or Guarantor shall promptly notify Agent thereof in writing.  Promptly upon the receipt thereof by or on behalf of any Borrower or Guarantor (including by any agent or representative), such Borrower or Guarantor shall deliver, or cause to be delivered to Agent, all such tangible Chattel Paper and Instruments that such Borrower or Guarantor has or may at any time acquire, accompanied by such instruments of transfer or assignment duly executed in blank as Agent may from time to time specify, in each case except as Agent may otherwise agree.

(c)    In the event that any Borrower or Guarantor shall at any time hold or acquire an interest in any electronic Chattel Paper or any "transferable record" (as such term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, or any similar or successor act, law or statute) with an individual face amount in excess of $2,500,000, such Borrower or Guarantor shall promptly notify Agent thereof in writing.  Promptly upon Agent's request, such Borrower or Guarantor shall take, or cause to be taken, such actions as Agent may request to give Agent control of such electronic Chattel Paper under Section 9-105 of the UCC and control of such transferable record under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction, or any similar or successor act, law or statute.

(d)    Each Borrower and Guarantor does not have any Deposit Accounts as of the Closing Date, except (x) Store Accounts or (y) as set forth in the Information Certificate. Borrowers and Guarantors shall not, directly or indirectly, after the date hereof open, establish or maintain any Deposit Account unless each of the following conditions is satisfied: (i) Agent shall have received prompt written notice of the intention of any Borrower or Guarantor to open or establish such account which notice shall specify in reasonable detail and specificity reasonably acceptable to Agent the name of the account, the owner of the account, the name and address of the bank at which such account is to be opened or established, the individual at such bank with whom such Borrower or Guarantor is dealing and the purpose of the account and (ii) within thirty (30) Business Days after the opening of such Deposit Account (or such later date as Agent may agree), such Borrower or Guarantor shall as Agent may reasonably specify either (A) deliver to Agent a Deposit Account Control Agreement with respect to such Deposit Account duly authorized, executed and delivered by such Borrower or Guarantor and the bank at which such Deposit Account is opened and maintained or (B) arrange for Agent to become the customer of the bank with respect to the Deposit Account on terms and conditions reasonably acceptable to Agent; provided, that to the extent a Deposit Account Control Agreement has not been delivered

to Agent as of the Closing Date for any Deposit Account in existence at such time, Borrowers shall deliver a Deposit Account Control Agreement for such Deposit Account pursuant to Section 9.31. The terms of this subsection (d) shall not apply to Excluded Accounts.  Agent shall not exercise exclusive control over any Deposit Account until an Event of Default has occurred or a Compliance Period has commenced, and thereafter for only so long as it is continuing; and Agent shall cease to exercise exclusive control over any Deposit Accounts at such time as no Event of Default and no Compliance Period is then continuing.

(e)    No Borrower or Guarantor owns or holds, directly or indirectly, beneficially or as record owner or both, any Investment Property, as of the Closing Date, with an individual face amount in excess of $2,500,000, or have any investment account, Securities account, commodity account or other similar account with any bank or other financial institution or other securities intermediary or commodity intermediary as of the Closing Date, in each case except as set forth in the Information Certificate.  Such Borrower or Guarantor shall promptly, upon Agent's reasonable request, cause Agent to obtain "control" (within the meaning of Section 8-106 or 9-106, as applicable, of the UCC) of such Investment Property or, if applicable, comply with Section 5.2(e)(ii) with respect thereto.

(i)    In the event that any Borrower or Guarantor shall be entitled to or shall at any time after the date hereof hold or acquire any certificated Securities, with an individual fair market value in excess of $2,500,000, such Borrower or Guarantor shall promptly endorse, assign and deliver the same to Agent, accompanied by such instruments of transfer or assignment duly executed in blank as Agent may from time to time specify.  If any Securities, now or hereafter acquired by any Borrower or Guarantor are uncertificated and are issued to such Borrower or Guarantor or its nominee directly by the issuer thereof, and such Securities with an individual fair market value in excess of $2,500,000, such Borrower or Guarantor shall immediately notify Agent thereof and shall as Agent may reasonably specify, either (A) cause the issuer to agree to comply with instructions from Agent as to such Securities, without further consent of any Borrower or Guarantor or such nominee (it being understood that Agent shall not give any such issuer any such instructions unless an Event of Default has occurred and is continuing), or (B) arrange for Agent to become the registered owner of the Securities.

(ii)    Borrowers and Guarantors shall not, directly or indirectly, after the date hereof open, establish or maintain any investment account, securities account, commodity account or any other similar account (other than a Deposit Account) with any securities intermediary or commodity intermediary unless each of the following conditions is satisfied:  (A) Agent shall have received not less than five Business Days' prior written notice of the intention of such Borrower or Guarantor to open or establish such account which notice shall specify in reasonable detail and specificity reasonably acceptable to Agent the name of the account, the owner of the account, the name and address of the securities intermediary or commodity intermediary at which such account is to be opened or established, the individual at such intermediary with whom such Borrower or Guarantor is dealing and the purpose of the account, (B) the securities intermediary or commodity intermediary (as the case may be) where such account is opened or maintained shall be acceptable to Agent, and (C) within fifteen (15) Business Days after the opening of such investment account, securities account or other similar account with a securities intermediary or commodity intermediary, such Borrower or Guarantor shall as Agent may specify either (1) execute and deliver, and cause to be executed and delivered to Agent, an

Investment Property Control Agreement with respect thereto duly authorized, executed and delivered by such Borrower or Guarantor and such securities intermediary or commodity intermediary or (2) arrange for Agent to become the entitlement holder with respect to such Investment Property on terms and conditions reasonably acceptable to Agent; provided, that to the extent an Investment Property Control Agreement has not been delivered to Agent as of the Closing Date for any investment account, securities account or other similar account with a securities intermediary or commodity intermediary in existence at such time, Borrowers shall deliver an Investment Property Control Agreement pursuant to Section 9.31.  Agent shall not exercise exclusive control over any investment account, securities account, commodity account or other similar account (other than any Deposit Accounts which shall be governed by Section 5.2(d) above) unless an Event of Default has occurred or a Compliance Period has commenced, and thereafter for only so long as it is continuing; and Agent shall cease to exercise exclusive control over any investment account, securities account, commodity account or other similar account at such time as no Event of Default and no Compliance Period is then continuing.

(f)       Borrowers and Guarantors are not the beneficiary or otherwise entitled to any right to payment under any letter of credit, banker's acceptance or similar instrument as of the Closing Date, in each case with an individual face amount in excess of $2,500,000, except as set forth in the Information Certificate.  In the event that any Borrower or Guarantor shall be entitled to or shall receive any right to payment under any letter of credit, banker's acceptance or any similar instrument, whether as beneficiary thereof or otherwise after the date hereof, with an individual face amount in excess of $2,500,000, such Borrower or Guarantor shall promptly notify Agent thereof in writing.  Such Borrower or Guarantor shall promptly, as Agent may reasonably specify, either (i) deliver, or cause to be delivered to Agent, with respect to any such letter of credit, banker's acceptance or similar instrument, the written agreement of the issuer and any other nominated Person obligated to make any payment in respect thereof (including any confirming or negotiating bank), in form and substance reasonably satisfactory to Agent, consenting to the assignment of the proceeds of the letter of credit to Agent by such Borrower or Guarantor and agreeing to make all payments thereon directly to Agent or as Agent may otherwise direct upon the occurrence and during the continuance of an Event of Default or (ii) cause Agent to become, at Borrowers' expense, the transferee beneficiary of the letter of credit, banker's acceptance or similar instrument (as the case may be) upon the occurrence and during the continuance of an Event of Default).

(g)       Except as set forth in Schedule 5.2(g) hereto, on the date hereof, Borrowers and Guarantors do not hold any commercial tort claims seeking damages in an amount reasonably estimated to exceed $2,500,000 (as determined by the Administrative Borrower in good faith) and either a written demand therefor has been made or legal action has commenced.  In the event that any Borrower or Guarantor shall at any time after the date hereof hold or acquire any commercial tort claims seeking damages in an amount reasonably estimated to exceed $2,500,000 (as determined by the Administrative Borrower in good faith) and either a written demand therefor has been made or legal action has commenced, or if any Event of Default exists, upon Agent's request, such Borrower or Guarantor shall promptly notify Agent thereof in writing, which notice shall (i) set forth in reasonable detail the basis for and nature of such commercial tort claim and (ii) include the express grant by such Borrower or Guarantor to Agent of a security interest in such commercial tort claim (and the proceeds thereof).  In the event that such notice does not include such grant of a security interest, the sending thereof by such Borrower or Guarantor to Agent shall

be deemed to constitute such grant to Agent.  Upon the sending of such notice, any commercial tort claim described therein shall constitute such part of the Collateral and shall be deemed included therein, and Schedule 5.2(g) hereto shall be deemed to be supplemented to include such description of such commercial tort claim as set forth in such notice.  Without limiting the authorization of Agent provided in Section 5.2(a) hereof or otherwise arising by the execution by such Borrower or Guarantor of this Agreement or any of the other Financing Agreements, Agent is hereby irrevocably authorized from time to time and at any time to file such financing statements naming Agent or its designee as secured party and such Borrower or Guarantor as debtor, or any amendments to any financing statements, covering any such commercial tort claim as Collateral.  In addition, each Borrower and Guarantor shall promptly upon Agent's reasonable request, execute and deliver, or cause to be executed and delivered, to Agent such other agreements, documents and instruments as Agent may require in connection with such commercial tort claim.

(h)     Borrowers and Guarantors do not have any Goods, documents of title or other Collateral in the custody, control or possession of a third party as of the Closing Date, except as set forth in the Information Certificate and except for Goods located in the United States in transit to a location of a Borrower or Guarantor permitted herein in the ordinary course of business of such Borrower or Guarantor in the possession of any carrier transporting such Goods.  In the event that any Goods covered by documents of title or other Collateral with a fair market value in excess of $2,500,000 are at any time after the date hereof in the custody, control or possession of any other Person not referred to in the Information Certificate or such carriers, Borrowers and Guarantors shall promptly notify Agent thereof in writing.  Promptly upon Agent's reasonable request, Borrowers and Guarantors shall use commercially reasonable efforts to deliver to Agent a Collateral Access Agreement, subject to Section 9.31 hereof, duly authorized, executed and delivered by such Person and the Administrative Borrower or Guarantor that is the owner of such Collateral, except where the fair market value of the Collateral involved is less than $2,500,000 so long as the aggregate Value of all Collateral located at such locations without a Collateral Access Agreement shall not exceed $5,000,000.

(i)     Except as otherwise determined in a Borrower's or Guarantor's reasonable business judgment, each Borrower and Guarantor will use commercially reasonable efforts to maintain the Intellectual Property owned by it, defend the Intellectual Property against the claims of all persons, and will maintain and renew all registrations of the Intellectual Property, if applicable; provided, that, Borrowers and Guarantors shall not be required to maintain, defend or renew any Intellectual Property where the failure to do so would not reasonably be expected to have a Material Adverse Effect or where such Intellectual Property has no material economic value.  If, before the Obligations have been satisfied in full and the Financing Agreements have been terminated, any Borrower or Guarantor shall obtain or acquire any new Intellectual Property issuance or registration or file or acquire any new Intellectual Property application (excluding any "intent-to-use" trademark applications), Administrative Borrower shall give Agent notice thereof in the compliance certificate delivered to Agent pursuant to Section 9.6(a)(i) hereof.  Together with the delivery of each such compliance certificate (or such longer period as the Agent may agree in its sole discretion), each applicable Borrower or Guarantor will sign and deliver to the Agent an appropriate intellectual property security agreement, substantially in the form set forth on Exhibit I, covering any such recordable Intellectual Property owned by it that, in each case, is not covered by any then-effective intellectual property security agreement.

(j)     Subject to <u>Section 9.2</u> hereof, it is understood that Borrowers and Guarantors are not required by this Agreement to better assure, preserve, protect or perfect the security interest created hereunder by any means other than  (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that any Borrower's or Guarantor's signature thereon is required therefor, (ii) upon Agent's request after the occurrence and during the continuance of an Event of Default, causing Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of Agent to enforce, the security interest of Agent in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Agent to enforce, the security interest of Agent in such Collateral, (iv) obtaining the required consents and approvals of any Governmental Authority or third party, including, any consent of any licensor, lessor or other Person obligated on Collateral, and taking all actions required by other law, as applicable in any relevant jurisdiction and (v) other actions reasonably requested by Agent from time to time to cause the attachment, perfection and first priority of, and the ability of Agent to enforce, the security interest of Agent in any and all of the Collateral, to the extent required by <u>Section 5</u> or <u>Section 9</u> hereunder or otherwise expressly provided under this Agreement. No Borrower or Guarantor shall be required to complete any filings or other action with respect to the better assurance, preservation, protection or perfection of the security interests created hereby in any jurisdiction outside of the United States.

(k)     The security interests granted pursuant to this Section 5 are granted as security only and shall not subject the Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Borrower or Guarantor with respect to or arising out of the Collateral.

**SECTION 6.       COLLECTION AND ADMINISTRATION**

6.1     <u>Borrowers' Loan Accounts</u>.  Agent shall maintain one or more loan account(s) on its books in which shall be recorded (a) all Loans, Letters of Credit and other Obligations and the Collateral, (b) all payments made by or on behalf of any Borrower or Guarantor and (c) all other appropriate debits and credits as provided in this Agreement, including fees, charges, costs, expenses and interest.  All entries in the loan account(s) shall be made in accordance with Agent's customary practices as in effect from time to time and shall be deemed conclusive absent manifest error or omissions.

6.2     <u>Statements</u>.  Agent may from time to time provide the Borrowers with account statements or invoices with respect to any of the Obligations (the "Statements").  Agent is under no duty or obligation to provide Statements, which, if provided, will solely be for the Borrowers' convenience.  Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Obligations.  If the Borrowers pay the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrowers shall not be in default of payment with respect to the billing period indicated on such Statement; <u>provided</u>, that acceptance by Agent, on behalf of the Lenders, of any payment that is less than the total amount actually due at that time (including but not limited to any past due

amounts) shall not constitute a waiver of Agent's or the Lenders' right to receive payment in full at another time.

6.3    Collection of Accounts.

(a)    Each Borrower and Guarantor shall establish and maintain, at its expense, deposit account arrangements and merchant payment arrangements with the banks set forth on Schedule 8.10 hereto and subject to Section 5.2(d) hereof such other banks as such Borrower or Guarantor may hereafter select.  The banks set forth on Schedule 8.10 hereto constitute all of the banks with which Borrowers and Guarantors have deposit account arrangements and merchant payment arrangements as of the Closing Date, as applicable, and identifies each of the Deposit Accounts at such banks that are used solely for receiving store receipts from a retail store location of a Borrower or a Guarantor (together with any other Deposit Accounts at any time established or used by any Borrower or Guarantor for receiving such store receipts from any retail store location, collectively, the "Store Accounts" and each individually, a "Store Account") or otherwise describes the nature of the use of such Deposit Account by such Borrower or Guarantor.

(i)    Each Borrower and Guarantor shall deposit all proceeds from sales of Inventory in every form, including, without limitation, cash, checks, credit card sales drafts, credit card sales or charge slips or receipts and other forms of daily store receipts, from each retail store location of such Borrower or Guarantor into the Store Account of such Borrower or Guarantor used solely for such purpose in accordance with the current and prior practices of such Borrower, but in any event no less frequently than once every three Business Days; provided that each retail store of a Borrower or Guarantor may retain in such store funds of up to $40,000 immediately after each deposit of funds from such store into the applicable Store Account.  All such funds deposited into the Store Accounts shall be sent by wire transfer or other electronic funds transfer on each Business Day to the Blocked Accounts as provided in Section 6.3(a)(ii) below, except for (A) nominal amounts which are required to be maintained in such Store Accounts under the terms of such Borrower's or Guarantor's arrangements with the bank at which such Store Accounts are maintained, (B) [reserved] or (C) with respect to funds deposited in Manual Sweeping Accounts, which shall be sent to the Blocked Accounts not less than twice every month (and which amounts, together with all amounts held at the retail store locations and not yet deposited in the Store Accounts and amounts in Store Accounts, shall not in the aggregate exceed $2,500,000 at any one time, except (1) to the extent from time to time additional amounts may be held in the retail stores or the Store Accounts on Saturday, Sunday or other days where the applicable depository bank is closed, which additional amounts are to be, and shall be, transferred on the next Business Day to the Blocked Accounts, and (2) except as Agent may otherwise agree.

(ii)    Each Borrower and Guarantor shall establish and maintain, at its expense, Deposit Accounts with such banks as are reasonably acceptable to Agent (the "Blocked Accounts") into which each Borrower and Guarantor shall promptly either cause all amounts on deposit in the Store Accounts of such Borrower or Guarantor to be sent as provided in Section 6.3(a)(i) above or shall itself deposit or cause to be deposited all proceeds of Collateral, including all proceeds from sales of Inventory, all amounts payable to each Borrower and Guarantor  from Credit Card Issuers and Credit Card Processors, and all other proceeds of Collateral.  Subject to Section 9.26, any Eligible Depository Bank shall be deemed acceptable to Agent.

114

(iii)    Borrowers and Guarantors shall deliver, or cause to be delivered to Agent a Deposit Account Control Agreement duly authorized, executed and delivered by each bank where a Blocked Account is maintained as provided in Section 5.2 hereof.  Without limiting any other rights or remedies of Agent or Lenders, Agent may, at its option, and shall (at the direction of Required Lenders), instruct the depository banks at which the Blocked Accounts are maintained to transfer all available funds received or deposited into the Blocked Accounts to the Agent Payment Account at any time that an Event of Default is continuing or a Compliance Period is continuing and Agent shall send to Administrative Borrower a copy of any such written instruction sent by Agent to the depository bank promptly thereafter.  At all times that Agent shall have notified any depository bank to transfer funds from a Blocked Account to the Agent Payment Account, all payments made to such Blocked Accounts, whether in respect of the Receivables, as proceeds of Inventory or other Collateral or otherwise shall be treated as payments to Agent in respect of the Obligations and therefore shall constitute the property of Agent and Lenders to the extent of the then outstanding Obligations.

(b)    Borrowers shall make each payment or prepayment required to be made by them hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Sections 3.3, 3.5 or 3.7, or otherwise) prior to 2:00 p.m., New York time, on the date when due or the date fixed for any prepayment hereunder, in immediately available funds, without setoff, recoupment or counterclaim.  Any amounts received after such time on any date may, in the discretion of Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to Agent in the Agent Payment Account, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to Sections 3.3, 3.5, 3.7 and 9.22 shall be made directly to the Persons entitled thereto.  Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(c)    Upon the occurrence and during the continuance of an Event of Default or upon the commencement of any Compliance Period and during any Compliance Period, each Borrower and Guarantor and their respective employees, agents and Subsidiaries or other Affiliates shall receive and promptly remit to Agent, as the property of Agent, any monies, checks, notes, drafts or any other payment relating to and/or proceeds of Accounts or other Collateral which come into their possession or under their control and promptly upon receipt thereof, shall deposit or cause the same to be deposited in the Blocked Accounts, or remit the same or cause the same to be remitted, in kind, to Agent.  In no event shall the same be commingled with any Borrower's or Guarantor's own funds.  The Loan Parties agree to reimburse Agent on demand for any amounts owed or paid to any bank or other financial institution at which a Blocked Account or any other Deposit Account or investment account is established or any other bank, financial institution or other Person involved in the transfer of funds to or from the Blocked Accounts arising out of Agent's payments to or indemnification of such bank, financial institution or other Person.  The obligations of Borrowers to reimburse Agent for such amounts pursuant to this Section 6.3 shall survive the termination or non-renewal of this Agreement.

6.4    <u>Payments</u>.

(a)    All Obligations shall be payable to the Agent Payment Account as provided in <u>Section 6.3</u> or such other place as Agent may designate from time to time. Agent shall apply payments received or collected from any Borrower or Guarantor or for the account of any Borrower or Guarantor (including the monetary proceeds of collections or of realization upon any Collateral) as follows, with respect to any payments received or collected from any Loan Party:

(i)    <u>first</u>, to pay any fees, indemnities or expense reimbursements then due to Agent from any Loan Party;

(ii)    <u>second</u>, to pay any fees, indemnities, or expense reimbursements then due to Lenders from any Loan Party;

(iii)    <u>third</u>, to pay interest due in respect of any Loans owing by any Loan Party (and including any Special Agent Advances owing by any Loan Party);

(iv)    <u>fourth</u>, to pay or prepay principal in respect of Special Agent Advances owing by any Loan Party;

(v)    <u>fifth</u>, to pay or prepay principal in respect of the Loans owing by any Loan Party and to pay or prepay Hedge Obligations and Obligations arising under or pursuant to any Bank Products, in each case, of any Loan Party or any Subsidiary thereof then due (up to the amount of any then effective Reserve established in respect of such Obligations), on a pro rata basis;

(vi)    <u>sixth</u>, to pay or prepay any other Obligations of any Loan Party whether or not then due, in such order and manner as Agent determines or, at any time that an Event of Default has occurred and is continuing, to be held as cash collateral in connection with any Letter of Credit Obligations of any Loan Party (or any other Letter of Credit Obligations utilizing the Borrowing Base) or other contingent Obligations of any Loan Party (but not including for this purpose any such other contingent Obligations arising under or pursuant to any Bank Products); and

(vii)    <u>seventh</u>, at any time that an Event of Default has occurred and is continuing, to pay or prepay any Obligations of any Loan Party or any Subsidiary thereof arising under or pursuant to any Bank Products (other than to the extent provided for above) on a pro rata basis.

Notwithstanding anything to the contrary contained in this Agreement, (A) [reserved] (B) unless so directed by Administrative Borrower or if an Event of Default exists, Agent shall not apply any payments which it receives to any Loans that are Term Benchmark Loans except on the expiration date of the Interest Period applicable to any such Loans that are Term Benchmark Loans and if payments are received or collected from Borrowers that otherwise would be applied to Term Benchmark Loans, provided no Event of Default or Compliance Period exists, Administrative Borrower may instruct Agent to remit such funds to Administrative Borrower, otherwise, such payments shall be held by Agent and shall bear interest at the NYFRB Rate per annum commencing on the second Business Day following the date such payments are received or

collected from Borrowers and continuing through the date such payments are applied to the Obligations, which shall be upon the expiration of the first Interest Period after receipt or collection of such payments, to the extent of the principal amount of the applicable Term Benchmark Loan or otherwise, in Agent's sole discretion, remitted to Administrative Borrower and (C) to the extent any Borrower uses any proceeds of the Loans or Letters of Credit to acquire rights in or the use of any Collateral or to repay any Indebtedness used to acquire rights in or the use of any Collateral, payments in respect of the Obligations shall be deemed applied first to the Obligations arising from Loans and Letter of Credit Obligations that were not used for such purposes and second to the Obligations arising from Loans and Letter of Credit Obligations the proceeds of which were used to acquire rights in or the use of any Collateral in the chronological order in which such Borrower acquired such rights in or the use of such Collateral.  Notwithstanding the foregoing, amounts received from any Borrower or any Guarantor that is not an ECP shall not be applied to any Excluded Hedge Obligations.

(b)     During the continuance of an Event of Default, at the election of Agent, all payments of principal, interest, LC Disbursements, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 9.22), and other sums payable under the Financing Agreements, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Administrative Borrower pursuant to Section 2.11 or a deemed request as provided in this Section or may be deducted from any deposit account of any Borrower maintained with Agent.  The Borrowers hereby irrevocably authorize, during the continuance of an Event of Default, (i) Agent to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Financing Agreements and agrees that all such amounts charged shall constitute Loans (including Overadvances) and that all such Borrowings shall be deemed to have been requested pursuant to Section 2.11 and (ii) Agent to charge any deposit account of any Borrower maintained with Agent for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Financing Agreements.

(c)     Unless Agent shall have received, prior to any date on which any payment is due to Agent for the account of the Lenders or the Issuing Bank pursuant to the terms hereof or any other Financing Agreement, notice from the Administrative Borrower that the Borrowers will not make such payment, Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it but excluding the date of payment to Agent, at the greater of the NYFRB Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation.

(d)     Borrowers shall make all payments to Agent and Lenders on the Obligations free and clear of, and without deduction or withholding for or on account of, any setoff, counterclaim, defense, restrictions or conditions of any kind.  If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Agent, any Lender or Issuing Bank is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be

reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by Agent or such Lender. Borrowers and Guarantors shall be liable to pay to Agent and Lenders, and do hereby indemnify and hold Agent and Lenders harmless for the amount of any payments or proceeds so surrendered or returned and to the extent thereof. This <u>Section 6.4(d)</u> shall remain effective notwithstanding any contrary action which may be taken by Agent or any Lender in reliance upon such payment or proceeds. This <u>Section 6.4</u> shall survive the payment of the Obligations and the termination of this Agreement.

6.5     [Reserved].

6.6     <u>Authorization to Make Loans</u>. Agent and Lenders are authorized to make the Loans and Issuing Bank is authorized to issue Letters of Credit based upon telephonic or other instructions received from anyone purporting to be an Authorized Officer of Administrative Borrower or any Borrower or other authorized Person or, at the discretion of Agent, if such Loans are necessary to satisfy any Obligations; <u>provided</u>, that, Agent and Lenders shall direct the Loans only into those accounts of Borrowers authorized in writing by an Authorized Officer. The foregoing sentence notwithstanding, if Agent or a Lender makes a Loan into an account of any Borrower designated by a Person who no longer is an Authorized Officer and Agent did not receive prior written notice that such Person is no longer an Authorized Officer, such Loan will still be considered an Obligation hereunder. All Loans and Letters of Credit under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, any Borrower or Guarantor when deposited to the credit of any Borrower or Guarantor or otherwise disbursed or established in accordance with the instructions of any Borrower or Guarantor or in accordance with the terms and conditions of this Agreement.

6.7     <u>Use of Proceeds</u>.

(a)     Borrowers shall use the initial proceeds of the Revolving Loans and Letters of Credit hereunder only for costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Financing Agreements and consummation of any other permitted transactions contemplated hereby which will take place on or about the date hereof and costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Financing Agreements. All other Revolving Loans made or Letters of Credit provided to or for the benefit of any Borrower pursuant to the provisions hereof shall be used by such Borrower only to finance Permitted Acquisitions and for general operating, working capital and other proper corporate purposes of such Borrower (including the intercompany funding of Borrowers and Guarantors) not otherwise prohibited by the terms hereof. None of the proceeds of any Loans or Letters of Credit will be used, directly or indirectly, for the purpose of purchasing or carrying any margin security or for the purposes of reducing or retiring any Indebtedness which was originally incurred to purchase or carry any margin security or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation U of the Federal Reserve Board, as amended.

(b)     No Borrower will request any Loan or Letter of Credit, and no Borrower or Guarantor shall use, and each Borrower and Guarantor shall procure that its Subsidiaries and its and their respective directors, officers, employees and agents shall not use, the proceeds of any

Loan or Letter of Credit (i) directly or, to the Knowledge of such Borrower or Guarantor, indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent that such activities, businesses or transaction would be prohibited by applicable Sanctions, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

6.8     Appointment of Administrative Borrower as Agent for Requesting Loans and Receipts of Loans and Statements.

(a)     Each Borrower hereby irrevocably appoints Fusion Buyer as Administrative Borrower and, as such, constitutes Administrative Borrower as its agent and attorney-in-fact to request and receive Loans and Letters of Credit pursuant to this Agreement and the other Financing Agreements from Agent or any Lender in the name or on behalf of such Borrower.  Agent and Lenders may disburse the Loans to such bank account of Administrative Borrower or a Borrower or otherwise make such Loans to a Borrower and provide such Letter of Credit to a Borrower as Administrative Borrower may designate or direct, without notice to any other Borrower or Guarantor.  Notwithstanding anything to the contrary contained herein, Agent may at any time and from time to time require that Loans to or for the account of any Borrower be disbursed directly to an operating account of such Borrower.

(b)     Administrative Borrower hereby accepts the appointment by Borrowers to act as the agent and attorney-in-fact of Borrowers pursuant to this Section 6.8.  Administrative Borrower shall have and may exercise such powers under the Financing Agreements as are specifically delegated to Administrative Borrower by the terms of each thereof, including, but not limited to ensuring that the disbursement of any Loans to each Borrower requested by or paid to or for the account of a Borrower, or the issuance of any Letter of Credit for a Borrower hereunder, shall be paid to or for the account of such Borrower, together with such powers as are reasonably incidental thereto.

(c)     Each Borrower and other Guarantor hereby irrevocably appoints and constitutes Administrative Borrower as its agent to receive statements on account and all other notices from Agent and Lenders with respect to the Obligations or otherwise under or in connection with this Agreement and the other Financing Agreements.

(d)     Any notice, election, representation, warranty, agreement or undertaking by or on behalf of any other Borrower or any Guarantor by Administrative Borrower shall be deemed for all purposes to have been made by such Borrower or Guarantor, as the case may be, and shall be binding upon and enforceable against such Borrower or Guarantor to the same extent as if made directly by such Borrower or Guarantor.

(e)     The Administrative Borrower may execute any of its duties as the Administrative Borrower hereunder and under any other Financing Agreements by or through Authorized Officers.

119

(f)    No purported termination of the appointment of Administrative Borrower as agent as aforesaid shall be effective, except after ten days' prior written notice to Agent.

6.9    <u>Pro Rata Treatment</u>.  Except to the extent otherwise provided in this Agreement or as otherwise agreed by Lenders:  (a) the making and conversion of Revolving Loans shall be made among the Revolving Lenders based on their respective Pro Rata Shares as to the Revolving Loans and (b) each payment on account of any Obligations to or for the account of one or more of Lenders in respect of any Obligations due on a particular day shall be allocated among the Lenders entitled to such payments based on their respective Pro Rata Shares of such Loans, as applicable, and shall be distributed accordingly.

6.10    <u>Sharing of Payments, Etc.</u>

(a)    Each Borrower and Guarantor agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim Agent or any Lender may otherwise have, each Lender shall be entitled, at its option (but subject, as among Agent and Lenders, to the provisions of Section 12.3(b) hereof), to offset balances held by it for the account of such Borrower or Guarantor at any of its offices, in dollars or in any other currency, against any principal of or interest on any Loans owed to such Lender or any other amount payable to such Lender hereunder, that is not paid when due (regardless of whether such balances are then due to such Borrower or Guarantor), in which case it shall promptly notify Administrative Borrower and Agent thereof; provided, that, such Lender's failure to give such notice shall not affect the validity thereof.

(b)    If, except as otherwise expressly provided herein, any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other similarly situated Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders ratably in accordance with their respective Pro Rata Shares; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered,  such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrowers or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

(c)    Each Borrower and Guarantor agrees that any Lender purchasing a participation (or direct interest) as provided in this Section may exercise, in a manner consistent

with this Section, all rights of setoff, banker's lien, counterclaim or similar rights with respect to such participation as fully as if such Lender were a direct holder of Loans or other amounts (as the case may be) owing to such Lender in the amount of such participation.

(d)     Nothing contained herein shall require any Lender to exercise any right of setoff, banker's lien, counterclaims or similar rights or shall affect the right of any Lender to exercise, and retain the benefits of exercising, any such right with respect to any other Indebtedness or obligation of any Borrower or Guarantor.  If, under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this Section applies, such Lender shall, to the extent practicable, assign such rights to Agent for the benefit of Secured Parties and, in any event, exercise its rights in respect of such secured claim in a manner consistent with the rights of Lenders entitled under this Section to share in the benefits of any recovery on such secured claim.

6.11    <u>Settlement Procedures</u>.

(a)     In order to administer the Credit Facility in an efficient manner and to minimize the transfer of funds between Agent and Lenders, Agent may, at its option, subject to the terms of this Section, make available, on behalf of Lenders, the full amount of the Revolving Loans requested or charged to any Borrower's loan account(s) or otherwise to be advanced by Lenders pursuant to the terms hereof, without requirement of prior notice to Lenders of the proposed Revolving Loans.

(b)     With respect to all Revolving Loans made by Agent on behalf of Lenders as provided in this Section, the amount of each Lender's Pro Rata Share of the outstanding Revolving Loans shall be computed weekly, and shall be adjusted upward or downward on the basis of the amount of the outstanding Revolving Loans as of 5:00 p.m. New York time on the Business Day immediately preceding the date of each settlement computation; provided, that, Agent retains the absolute right at any time or from time to time to make the above described adjustments at intervals more frequent than weekly, but in no event more than twice in any week. Agent shall deliver to each of the Lenders after the end of each week, or at such lesser period or periods as Agent shall determine, a summary statement of the amount of outstanding Revolving Loans for such period (such week or lesser period or periods being hereinafter referred to as a "<u>Settlement Period</u>").  If the summary statement is sent by Agent and received by a Lender prior to 11:00 a.m. New York time, then such Lender shall make the settlement transfer described in this Section by no later than 3:00 p.m. New York time on the same Business Day and if received by a Lender after 11:00 a.m. New York time, then such Lender shall make the settlement transfer by not later than 3:00 p.m. New York time on the next Business Day following the date of receipt. If, as of the end of any Settlement Period, the amount of a Lender's Pro Rata Share of the outstanding Revolving Loans is more than such Lender's Pro Rata Share of the outstanding Revolving Loans as of the end of the previous Settlement Period, then, if the summary statement is prepared and delivered to Lenders by Agent prior to 11:00 a.m. New York City time, then Agent shall make the transfer described in this Section by no later than 3:00 p.m. New York City time on the same Business Day and if prepared and delivered to Lenders by Agent after 11:00 a.m. New York City time, then Agent shall make the transfer by no later than 3:00 p.m. New York City time on the next Business Day following the date of receipt, then such Lender shall forthwith (but in no event later than the time set forth in the preceding sentence) transfer to Agent by wire transfer in

immediately available funds the amount of the increase. Alternatively, if the amount of a Lender's Pro Rata Share of the outstanding Revolving Loans in any Settlement Period is less than the amount of such Lender's Pro Rata Share of the outstanding Revolving Loans for the previous Settlement Period, Agent shall forthwith transfer to such Lender by wire transfer in immediately available funds the amount of the decrease. The obligation of each of the Lenders to transfer such funds and effect such settlement shall be irrevocable and unconditional and without recourse to or warranty by Agent. Agent and each Lender agrees to mark its books and records at the end of each Settlement Period to show at all times the dollar amount of its Pro Rata Share of the outstanding Revolving Loans and Letters of Credit. Each Lender shall only be entitled to receive interest on its Pro Rata Share of the Revolving Loans to the extent such Revolving Loans have been funded by such Lender. Because the Agent on behalf of Lenders may be advancing and/or may be repaid Revolving Loans prior to the time when Lenders will actually advance and/or be repaid such Revolving Loans, interest with respect to Revolving Loans shall be allocated by Agent in accordance with the amount of Revolving Loans actually advanced by and repaid to each Lender and the Agent and shall accrue from and including the date such Revolving Loans are so advanced to but excluding the date such Revolving Loans are either repaid by Borrowers or actually settled with the applicable Lender as described in this Section.

(c)    To the extent that Agent has made any such amounts available and the settlement described above shall not yet have occurred, upon repayment of any Revolving Loans by a Borrower, Agent may apply such amounts repaid directly to any amounts made available by Agent pursuant to this Section. In lieu of weekly or more frequent settlements, Agent may, at its option, at any time require each Lender to provide Agent with immediately available funds representing its Pro Rata Share of each Revolving Loan, prior to Agent's disbursement of such Revolving Loan to a Borrower (or Administrative Borrower on behalf of such Borrower). In such event, all Revolving Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares of Loans. No Lender shall be responsible for any default by any other Lender in the other Lender's obligation to make a Revolving Loan requested hereunder nor shall the Revolving Commitment of any Lender be increased or decreased as a result of the default by any other Lender in the other Lender's obligation to make a Revolving Loan hereunder.

(d)    If Agent is not funding a particular Revolving Loan to a Borrower (or Administrative Borrower for the benefit of such Borrower) pursuant to Sections 6.11(a) and 6.11(b) above on any day, but is requiring each Lender to provide Agent with immediately available funds on the date of such Revolving Loan as provided in Section 6.11(c) above, Agent may assume that each Lender will make available to Agent such Lender's Pro Rata Share of the Revolving Loan requested or otherwise made on such day and Agent may, in its discretion, but shall not be obligated to, cause a corresponding amount to be made available to or for the benefit of such Borrower on such day. If Agent makes such corresponding amount available to a Borrower and such corresponding amount is not in fact made available to Agent by such Lender, Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon for each day from the date such payment was due until the date such amount is paid to Agent at the NYFRB Rate for each day during such period (as published by the Federal Reserve Bank of New York or at Agent's option based on the arithmetic mean determined by Agent of the rates for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York City time) on that day by each of the three leading brokers of Federal funds transactions

in New York City selected by Agent) and if such amounts are not paid within three days of Agent's demand, at the highest interest rate provided for in <u>Section 3.1</u> hereof applicable to ABR Loans. During the period in which such Lender has not paid such corresponding amount to Agent, notwithstanding anything to the contrary contained in this Agreement or any of the other Financing Agreements, the amount so advanced by Agent to or for the benefit of any Borrower shall, for all purposes hereof, be a Revolving Loan made by Agent for its own account.  Upon any such failure by a Lender to pay Agent, Agent shall promptly thereafter notify Administrative Borrower of such failure and Borrowers shall pay such corresponding amount to Agent for its own account within five Business Days of Administrative Borrower's receipt of such notice, which shall constitute a payment on account of Obligations.

(e)     Nothing in this Section or elsewhere in this Agreement or the other Financing Agreements shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Revolving Commitment hereunder or to prejudice any rights that any Borrower may have against any Lender as a result of any default by any Lender hereunder in fulfilling its Revolving Commitment.

6.12   <u>Obligations Several; Independent Nature of Lenders' Rights</u>.  The obligation of each Lender hereunder is several, and no Lender shall be responsible for the obligation or Revolving Commitment of any other Lender hereunder.  Nothing contained in this Agreement or any of the other Financing Agreements and no action taken by the Lenders pursuant hereto or thereto shall be deemed to constitute the Lenders to be a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and subject to Section 12.3 hereof, each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**SECTION 7.     COLLATERAL REPORTING AND COVENANTS**

7.1   <u>Collateral Reporting</u>.

(a)     Borrowers and Guarantors shall maintain complete and accurate books and records in all material respects with respect to the Collateral owned by it.  Borrowers and Guarantors shall provide Agent with the following documents in a form reasonably satisfactory to Agent:

(i)     (A) so long as no Event of Default has occurred and is continuing and no Increased Reporting Period is then in effect, promptly after the end of each fiscal month (but in no event more than twenty (20) days thereafter), a Borrowing Base Certificate setting forth the calculation of the Borrowing Base as of the last Business Day of the immediately preceding fiscal month and (B) no more than three Business Days following the last Business Day of each calendar week at any time an Event of Default has occurred and is continuing or an Increased Reporting Period is then in effect, a Borrowing Base Certificate setting forth the calculation of the Borrowing Base as of the last Business Day of the immediately preceding calendar week, in each case, duly completed and executed by the chief financial officer, vice president of finance, treasurer, controller or other similar financial officer of Administrative Borrower, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed,

including but not limited to an inventory summary report by category as determined by the Loan Parties in accordance with their current and prior inventory management policies (and upon Agent's reasonable request, upon the occurrence and during the continuance of an Event of Default letter of credit inventory summary) and identifying where such Inventory is located;

(ii)    at least three (3) Business Days prior to the occurrence of each Collateral Reporting Trigger Event, an updated Borrowing Base Certificate reflecting such Collateral Reporting Trigger Event on a pro forma basis and demonstrating that upon giving effect to such Collateral Reporting Trigger Event, the Borrowers will be in compliance with the Revolving Exposure Limitations and no Event of Default under the covenant set forth in Section 9.17 shall exist or would result from such transaction on a Pro Forma Basis;

(iii)    promptly after the end of each fiscal month (but in no event more than twenty (20) calendar days thereafter) (and more frequently as Agent may reasonably require at any time an Event of Default has occurred and is continuing or an Increased Reporting Period is then in effect), a schedule and aging of the Loan Parties' accounts payable  and a listing and aging of Franchisee Receivables of the PSP Borrowers, in each case delivered electronically in a text formatted file acceptable to Agent;

(iv)    promptly after the end of each fiscal month (but in no event more than twenty (20) calendar days thereafter) (and more frequently as Agent may reasonably require at any time an Event of Default has occurred and is continuing or an Increased Reporting Period is then in effect), inventory summary reports by location and category of Inventory (including the amounts of Inventory and the aggregate value thereof at each retail store location and at premises of warehouses or other third parties or is consigned Inventory); and

(v)    in connection with the delivery of the financial statements pursuant to Section 9.6(a)(i) and Section 9.6(a)(ii), a compliance certificate by the chief financial officer, vice president of finance, treasurer or controller or other similar financial or senior officer of Administrative Borrower (or if no such  officer has been appointed or elected, the sole member of Administrative Borrower) consisting of: (1) a statement confirming there are no material past due amounts owing to owners and lessors of leased premises (including retail store locations), warehouses, fulfillment centers, processors, custom brokers, freight forwarders and other third parties from time to time in possession of any Collateral having a Value equal to or greater than $2,500,000, (2) the addresses of all new retail store or distribution center locations of Borrowers and Guarantors opened and existing retail store or distribution center locations closed or sold, in each case since the date of the most recent certificate delivered to Agent containing the information required under this clause, (3) a list of any new Deposit Account established by any Borrower or Guarantor with any bank or other financial institution, including the Administrative Borrower or Guarantor in whose name the account is maintained, the account number, the name and address of the financial institution at which such account is maintained, the purpose of such account and, if any, the amount held in such account on or about the date of such compliance certificate and (4) a statement that all sales and use taxes have been paid when due as of the date of the compliance certificate, except as specifically described in such compliance certificate and except where the non-payment of such sales and use taxes involves an aggregate amount of less than $2,500,000.

(b)     Upon Agent's reasonable request, the Loan Parties shall provide Agent with the following documents in a form reasonably satisfactory to Agent: (i) perpetual inventory summary reports by sku for each retail store location, (ii) summary reports on sales and use tax collections, deposits and payments, including monthly sales and use tax accruals, (iii) a report of aggregate credit card sales for the requested period, including the amount of the chargebacks, fees, and credits with respect thereto and providing an aging of such related Receivables identifying those outstanding more than five Business Days since the sale date giving rise thereto, (iv) a report with franchisee commission payable accruals, (v) [reserved] and (vi) true, correct and complete copies of all agreements, documents and instruments relating to any Permitted Acquisition which Agent has not otherwise received; and

(c)     Upon Agent's reasonable request, the Loan Parties shall provide such other reports as to the Collateral as Agent shall reasonably request from time to time. If any Borrower's or Guarantor's records or reports of the Collateral are prepared or maintained by an accounting service, contractor, shipper or other agent, such Borrower and Guarantor hereby irrevocably authorizes such service, contractor, shipper or agent to deliver such records, reports, and related documents to Agent and to follow Agent's instructions with respect to further reasonable services, in each case, at any time that an Event of Default has occurred and is continuing.

7.2     <u>Accounts Covenants</u>.

(a)     The Loan Parties shall notify Agent promptly of the assertion of any claims, offsets, defenses or counterclaims by any Account Debtor, Credit Card Issuer or Credit Card Processor or any disputes with any of such Persons or any settlement, adjustment or compromise thereof, to the extent any of the foregoing exceeds $500,000 in any one case or $2,000,000 in the aggregate. No credit, discount, allowance or extension or agreement for any of the foregoing shall be granted to any Account Debtor, Credit Card Issuer or Credit Card Processor except in the ordinary course of a Loan Party's business in accordance with the current and prior practices of such Loan Party. So long as an Event of Default has occurred and is continuing, no Loan Party shall, without the prior written consent of Agent, settle, adjust or compromise any material claim, offset, counterclaim or dispute with any Account Debtor, Credit Card Issuer or Credit Card Processor. At any time that an Event of Default has occurred and is continuing, Agent shall, at its option, have the exclusive right to approve, settle, adjust or compromise any claim, offset, counterclaim or dispute with Account Debtors, Credit Card Issuers or Credit Card Processors or grant any credits, discounts or allowances.

(b)     Each Loan Party shall notify Agent promptly of: (i) any notice of a material default by such Loan Party under any of the Credit Card Agreements, (ii) of any default by such Borrower which has a reasonable likelihood of resulting in the Credit Card Issuer or Credit Card Processor ceasing to make payments or suspending payments to such Loan Party and (iii) any notice from any Credit Card Issuer or Credit Card Processor that such Person is ceasing or suspending, or will or may cease or suspend, any present or future payments due or to become due to any Loan Party from such Person, or that such Person is terminating or will or may terminate any of the Credit Card Agreements.

(c)     Agent shall have the right at any time or times, in Agent's name or in the name of a nominee of Agent, to verify the validity, amount or any other matter relating to any Receivables or other Collateral, by mail, telephone, facsimile transmission or otherwise.

7.3     <u>Inventory Covenants</u>.  With respect to the Inventory:

(a) each Borrower and Guarantor shall at all times maintain inventory records reasonably satisfactory to Agent, keeping correct and accurate records itemizing and describing the kind, type, quality and quantity of Inventory, such Borrower's or Guarantor's cost therefor and daily withdrawals therefrom and additions thereto;

(b) Borrowers and Guarantors shall conduct physical counts of the Inventory (excluding Inventory located in retail stores that have not been open for more than twelve months) either through periodic cycle counts or wall to wall counts, so that all Inventory located at distribution centers and retail stores that have been open for more than twelve months is subject to such counts at least once each year but at any time or times as Agent may request upon the occurrence and during the continuance of an Event of Default, and promptly following such physical counts of the Inventory (whether through periodic cycle counts or wall to wall counts) shall supply Agent with a report in the form and with such specificity as may be reasonably satisfactory to Agent concerning such physical count;

(c) Borrowers and Guarantors shall not remove any Inventory from the locations set forth or permitted herein, without the prior written consent of Agent, except (i) for sales of Inventory in the ordinary course of its business, (ii) for sales, returns and exchanges of Inventory to manufacturers and suppliers in the ordinary course of business; (iii) to move Inventory directly from one location set forth or permitted herein to another such permitted location and (iv) for Inventory shipped from the manufacturer thereof to such Borrower or Guarantor which is in transit to the locations set forth or permitted herein;

(d) upon Agent's request, the Loan Parties shall, at their expense, no more than one time in any twelve-month period (and one additional time in any twelve-month period as Agent may request and at the Loan Parties' expense if Excess Availability is less than the greater of $30,000,000 and 20% of the Borrowing Cap at any time during such period), but at any time or times as Agent may reasonably request upon the occurrence and during the continuance of an Event of Default or if there is a Material Adverse Effect (at the Loan Parties' sole expense), deliver or cause to be delivered to Agent written appraisals in respect of the Borrowing Base as to the Inventory in form, scope and methodology reasonably acceptable to Agent and by an appraiser reasonably acceptable to Agent, addressed to Agent and Lenders and upon which Agent and Lenders are expressly permitted to rely;

(e) Borrowers and Guarantors shall produce, use, store and maintain the Inventory with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with applicable laws (including, to the extent applicable, the requirements of the Federal Fair Labor Standards Act of 1938, as amended and all rules, regulations and orders related thereto);

(f) none of the Inventory or other Collateral constitutes farm products or the proceeds thereof;

(g) as between Agent and Secured Parties and Borrowers and Guarantors, each Borrower and Guarantor assumes all responsibility and liability arising from or relating to the production, use, sale or other disposition of the Inventory;

(h) Borrowers and Guarantors shall not sell Inventory to any customer on approval, or any other basis which entitles the customer to return or may obligate any Borrower or Guarantor to repurchase such Inventory other than returns and exchanges of Inventory from customers in the ordinary course business of such Borrower or Guarantor consistent with the then current return policy of such Borrower or Guarantor;

(i) Borrowers and Guarantors shall keep the Inventory in good and marketable condition; and

(j) Borrowers and Guarantors shall not, without prior written notice to Agent or the specific identification of such Inventory in a report with respect thereto provided by Administrative Borrower to Agent pursuant to <u>Section 7.1(a)</u> hereof, acquire or accept any Inventory on consignment or approval except for (x) magazines, stationery and greeting cards, and (y) perishable food stuffs of a de minimis value.

7.4     <u>Equipment and Real Property Covenants</u>.  With respect to the Equipment and Real Property:

(a) upon Agent's request, Borrowers and Guarantors shall, at their expense, no more than one time as Agent may request upon the occurrence and during the continuance of an Event of Default, deliver or cause to be delivered to Agent written appraisals as to the Equipment in form, scope and methodology reasonably acceptable to Agent and by an appraiser reasonably acceptable to Agent, addressed to Agent and upon which Agent is expressly permitted to rely;

(b) Borrowers and Guarantors shall keep the Equipment in good order, repair, running and marketable condition (ordinary wear and tear and casualty and condemnation excepted);

(c) Borrowers and Guarantors shall use the Equipment with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with all applicable laws except where the failure to so use would not result in a Material Adverse Effect;

(d) the Equipment is and shall be used in the business of Borrowers and Guarantors and not for personal, family, household or farming use;

(e) Borrowers and Guarantors shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of its business or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of motor vehicles used by or for the benefit of such Borrower or Guarantor in the ordinary course of business;

(f) the Equipment is now and shall remain personal property and Borrowers and Guarantors shall not permit any part of the Equipment to be or become a part of or affixed to real property except where the failure to do so would not have a Material Adverse Effect; and

(g) each Borrower and Guarantor assumes all responsibility and liability arising from the use of the Equipment.

7.5     Delivery of Instruments, Chattel Paper and Documents. In the event that any Borrower or Guarantor shall be entitled to or shall at any time after the date hereof hold or acquire any Chattel Paper or Instruments constituting Collateral or any Documents evidencing or constituting Collateral with an individual face amount in excess of $2,500,000, such Borrower or Guarantor shall promptly deliver to Agent any such Chattel Paper, Instruments and/or Documents along with such other documents as Agent may reasonably require pursuant to which such Borrower or Guarantor will pledge such additional Collateral.  Such Borrower or Guarantor herby authorizes Agent to attach such supplemental documents to this Agreement and agrees that all additional Collateral owned by it set forth in such supplemental documents shall be considered to be part of the Collateral.

7.6     [Reserved].

7.7     Power of Attorney.Each Borrower and Guarantor hereby irrevocably designates and appoints Agent (and all Persons reasonably designated by Agent) as such Borrower's and Guarantor's true and lawful attorney-in-fact for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that Agent may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of an Event of Default, which appointment is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, subject to the Intercreditor Agreements, each Borrower and Guarantor authorizes Agent, in such Borrower's, Guarantor's or Agent's name, to:  (i) at any time after an Event of Default has occurred and is continuing and written notice by the Agent to the Administrative Borrower of its intent to exercise such rights (provided that such notice is not required if (x) an Event of Default under Section 10.1(g) or (h) shall have occurred and is continuing or (y) payment of the Loans shall be due by acceleration or final maturity) (A) demand payment on Receivables or other Collateral, (B) clear Inventory the purchase of which was financed with Letters of Credit through U.S. Customs or foreign export control authorities in any Borrower's or Guarantor's name, Agent's name or the name of Agent's designee, and to sign and deliver to customs officials powers of attorney in such Borrower's or Guarantor's name for such purpose, and to complete in Borrower's, Guarantor's or Agent's name, any order, sale or transaction, obtain the necessary documents in connection therewith and collect the proceeds thereof, (C) enforce payment of Receivables by legal proceedings or otherwise, (D) exercise all of such Borrower's or Guarantor's rights and remedies to collect any Receivable or other Collateral, (E) in a commercially reasonable manner, sell or assign any Receivable upon such terms, for such amount and at such time or times as the Agent deems advisable, (F) settle, adjust, compromise, extend or renew an Account, (G) discharge and release any Receivable, (H) prepare, file and sign such Borrower's or Guarantor's name on any proof of claim in bankruptcy or other similar document against an Account Debtor or other such Borrower or Guarantor in respect of any Receivables or other Collateral, (I) notify the post office authorities to change the address for delivery of remittances from Account Debtors or other Borrowers or Guarantors in respect of

Receivables or other proceeds of Collateral to an address designated by Agent, and open and dispose of all mail addressed to any Borrower or Guarantor and handle and store all mail relating to the Collateral, <u>provided</u>, that Agent shall turn over to such Borrower or Guarantor any such mail that that does not constitute a remittance from an Account Debtor or other Borrower or Guarantor in respect of Receivables or other proceeds of Collateral; (J) do all acts and things which are necessary, in Agent's determination, to fulfill such Borrower's or Guarantor's obligations under this Agreement and the other Financing Agreements and (K) subject to the Intercreditor Agreement, with respect to Intellectual Property, execute, deliver and record, any and all agreements, instruments, documents and papers to evidence the Agent's security interest in such Intellectual Property and the goodwill and general intangibles of Borrowers and Guarantors relating thereto or represented thereby, assign any Intellectual Property or license, throughout the world, (ii) at any time an Event of Default has occurred and is continuing and during any Compliance Period, (A) have access to any lockbox or postal box into which remittances from Account Debtors or other Borrowers or Guarantors in respect of Receivables or other proceeds of Collateral are sent or received, (B) endorse such Borrower's or Guarantor's name upon any items of payment in respect of Receivables or constituting Collateral or otherwise received by Agent and any Lender and deposit the same in Agent's account for application to the Obligations, (C) take control in any manner of any item of payment in respect of Receivables or constituting collateral or otherwise received in or for deposit in the Blocked Accounts or otherwise received by Agent or any Lender, (D) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement (which does not add new collateral or add a debtor) in such offices as Agent in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of Agent's security interest in the Collateral, (E) to contact and enter into one or more agreements with the issuers of uncertificated Securities which are Collateral or with securities intermediaries holding Collateral as may be necessary or advisable to give Agent Control over such Collateral, (F) to demand payment or enforce payment of the Receivables in the name of Agent or such Borrower or Guarantor and to endorse any and all checks, drafts, and other instruments for the payment of money relating to the Receivables, (G) to sign such Borrower's or Guarantor's name on any invoice or bill of lading relating to the Receivables, drafts against any Account Debtor of the Administrative Borrower or Guarantor, assignments and verifications of Receivables, (H) to settle, adjust, compromise, extend or renew the Receivables, (I) to settle, adjust or compromise any legal proceedings brought to collect Receivables, (J) to prepare, file and sign such Borrower's or Guarantor's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables, and (K) to change the address for delivery of mail addressed to such Borrower or Guarantor to such address as Agent may designate and to receive, open and dispose of all mail addressed to such Borrower or Guarantor, (iii) at any time to (A) endorse Borrower's name upon any Chattel Paper, document, Instrument, invoice, or similar document or agreement relating to any Receivable or any Goods pertaining thereto or any other Collateral, including any warehouse or other receipts, or bills of lading and other negotiable or non-negotiable documents, and (B) sign such Borrower's or Guarantor's name on any verification of Receivables and notices thereof to Account Debtors or any secondary Guarantors or other Guarantors in respect thereof.  Such Borrower or Guarantor agrees to reimburse Agent on demand for any payment made or any expense incurred by Agent in connection with any of the foregoing; <u>provided</u> that, this authorization shall not relieve such Borrower or Guarantor of any of its obligations under this

Agreement.  All acts of said attorney or designee are hereby ratified and approved.  The powers conferred on Agent, for the benefit of the Agent and Lenders under this Section 7.7 are solely to protect Agent's interests in the Collateral and shall not impose any duty upon Agent or any Lender to exercise any such powers.  Each Borrower and Guarantor hereby releases Agent and Lenders and their respective officers, employees and designees from any liabilities arising from any act or acts under this power of attorney and in furtherance thereof, whether of omission or commission, except as a result of Agent's or any Lender's own gross negligence, bad faith or willful misconduct or that of any of their controlled Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact.

(b)    Nature of Appointment; Limitation of Duty.  THE APPOINTMENT OF AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS SECTION 7.7 IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS AGREEMENT IS TERMINATED IN ACCORDANCE WITH SECTION 13. NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER AGENT, NOR ANY LENDER, NOR ANY OF THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION; PROVIDED THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

7.8    Right to Cure.  Agent may, at its option, upon written notice to Administrative Borrower, (a) cure any default by any Borrower or Guarantor under any material agreement with a third party that materially and adversely affects the Collateral, its value or the ability of Agent to collect, sell or otherwise dispose of the Collateral or the rights and remedies of Agent or any Lender therein or the ability of any Borrower or Guarantor to perform its obligations hereunder or under any of the other Financing Agreements, (b) pay or bond on appeal any judgment entered against any Borrower or Guarantor, (c) discharge taxes, liens, security interests or other encumbrances at any time levied on or existing with respect to the Collateral and (d) pay any amount, incur any expense or perform any act which, in Agent's reasonable judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Agent and Lenders with respect thereto.  Agent may add any amounts so expended to the Obligations and charge any Borrower's account therefor, such amounts to be repayable by Borrowers on demand.  Agent and Lenders shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of any Borrower or Guarantor.  Any payment made or other action taken by Agent or any Lender under this Section shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

7.9    Access to Premises.  From time to time as reasonably requested by Agent, at the cost and expense (subject to Section 9.22 hereof) of the Loan Parties, (a) Agent or its designee (including employees of the Agent, any Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Agent) shall have reasonable access, so as (if no Event of Default has occurred and is continuing) not to interfere with the operations of such Borrower or Guarantor

to all of each Borrower's and Guarantor's premises during normal business hours and after notice to Administrative Borrower, or at any time and without notice to any Borrower or any Guarantor if an Event of Default has occurred and is continuing, for the purposes of inspecting, verifying and auditing the Collateral and all of each Borrower's and Guarantor's leases, books and records, including the Records, visiting and inspecting each Borrower's and Guarantor's properties and conducting at each Borrower's and Guarantor's premises field examinations of such Borrower's and Guarantor's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, (b) each Borrower and Guarantor shall permit any representatives designated by the Agent or any Lender (including employees of the Agent, any Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Agent), upon reasonable prior notice, to discuss its affairs, finances and condition with its officers and independent accountants (and hereby authorizes the Agent and each Lender to contact its independent accountants directly) and to provide contact information for each bank where each Borrower or Guarantor has a depository and/or securities account and each such Borrower and Guarantor hereby authorizes the Agent and each Lender to contact the bank(s) in order to request bank statements and/or balances, all at such reasonable times and as often as reasonably requested and (c) each Borrower and Guarantor shall promptly furnish to Agent such copies of such leases, books and records or extracts therefrom as Agent may request (subject to the confidentiality agreement set forth in <u>Section 13.5</u> hereof), and Agent or any Lender or Agent's designee (including employees of the Agent, any Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Agent) may use during normal business hours such of any Borrower's and Guarantor's personnel, Equipment, supplies and premises as may be reasonably necessary for the foregoing (and as will not materially interfere with the business of the Loan Parties) and if an Event of Default has occurred and is continuing for the collection of Receivables and realization of other Collateral.  Borrowers and Guarantors further agree that, during the course of such on-site Record examinations, Agent may review reports by retail store location of sales and operating profits of Borrowers and Guarantors, but may not make copies of such reports or remove them from such Borrower's or Guarantor's premises.

## SECTION 8.    REPRESENTATIONS AND WARRANTIES

Each Borrower and Guarantor hereby represents and warrants to Agent, Lenders and Issuing Bank the following, the truth and accuracy of which are a continuing condition of the making of Loans and Issuing Bank's providing of Letters of Credit:

8.1    <u>Corporate Existence, Power and Authority</u>.  Each Borrower and Guarantor is (x) a corporation duly organized and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of its jurisdiction of incorporation and (y) is duly qualified as a foreign corporation and in good standing (to the extent such concept exists in the relevant jurisdictions) in all states or other jurisdictions where such qualification is required, except for those other jurisdictions in which the failure to so qualify would not reasonably be expected to result in a Material Adverse Effect.  The execution, delivery and performance of this Agreement, the other Financing Agreements and the transactions contemplated hereunder and thereunder (a) are all within each Borrower's and Guarantor's company powers, (b) have been duly authorized, (c) are not in contravention of law or the terms of any Borrower's or Guarantor's certificate of formation, operating agreement, or other organizational documentation, or any indenture, agreement or undertaking to which any Borrower or Guarantor is a party or by which any Borrower or Guarantor

or its property are bound and (d) will not result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of any Borrower or Guarantor, except, (i) with respect to clause (a) above (other than with respect to any Borrower) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, (ii) with respect to clause (c) above, where such contravention of law would not reasonably be expected to result in a Material Adverse Effect and (iii) with respect to (d) above, the creation of the security interest in the Collateral in favor of Agent and Secured Parties pursuant to the terms of the Financing Agreements and to the extent that the imposition  of such lien, security interest, charge or other encumbrance, as the case may be, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  This Agreement and the other Financing Agreements to which any Borrower or Guarantor is a party constitute legal, valid and binding obligations of such Borrower and Guarantor enforceable in accordance with their respective terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws limiting creditors' rights generally or by general equitable principles.

8.2    Name; State of Organization; Chief Executive Office; Collateral Locations.

(a)    The exact legal name, as of the Closing Date, of each Borrower and Guarantor is as set forth on the signature page of this Agreement and in the Information Certificate. No Borrower or Guarantor has, during the five years prior to the Closing Date, been known by or used any other corporate or fictitious name or been a party to any merger or consolidation, or acquired all or substantially all of the assets of any Person, or acquired any of its property or assets out of the ordinary course of business, except as set forth in the Information Certificate.

(b)    Each Borrower and Guarantor is an organization of the type and organized in the jurisdiction set forth, as of the Closing Date, in the Information Certificate.  The Information Certificate accurately sets forth, as of the Closing Date, the organizational identification number of each Borrower and Guarantor or accurately states that such Borrower or Guarantor has none and accurately sets forth, as of the Closing Date, the federal employer identification number of each Borrower and Guarantor.

(c)    As of the Closing Date, the chief executive office and mailing address of each Borrower and Guarantor and each Borrower's and Guarantor's Records concerning Accounts are located only at the address identified as such in Schedule 8.2(a) hereto and the only other places of business and other locations (if different from the locations listed in Schedule 8.2(a)) where any Borrower or Guarantor maintains any tangible personal property with a value in excess of $2,500,000 (including Inventory and Equipment), if any, are the addresses set forth in Schedule 8.2(b) hereto, subject to the rights of any Borrower or Guarantor to establish new locations in accordance with Section 9.2 below.  The Information Certificate correctly identifies, as of the Closing Date, any of such locations which are not owned by a Borrower or Guarantor and sets forth the owners and/or operators of all locations which are not retail store locations.

8.3    Financial Statements; No Material Adverse Change.  All financial statements relating to any Borrower or Guarantor which have been or may hereafter be delivered by any Borrower or Guarantor to Agent and Lenders have been prepared in accordance with GAAP (except as otherwise disclosed in any notes thereto and as indicated in the notes thereto and as to

any interim financial statements, to the extent such statements are subject to normal year-end adjustments and do not include any notes) and fairly present in all material respects the financial condition and the results of operation of such Borrower and Guarantor as at the dates and for the periods set forth therein.  Except as disclosed in any interim financial statements furnished by Borrowers and Guarantors to Agent prior to the date of this Agreement, there has been no act, condition or event which has had or is reasonably likely to have a Material Adverse Effect since the date of the most recent audited financial statements of any Borrower or Guarantor furnished by any Borrower or Guarantor to Agent prior to the date of this Agreement.

8.4    Priority of Liens; Title to Properties.    Upon the filing of the UCC financing statements required pursuant to the Financing Agreements and the recording of the forms of trademark security agreements, copyright security agreement and patent security agreements, as applicable, in the forms set forth on Exhibit I with the United States Patent and Trademark Office and United States Copyright Office, as applicable, the security interests and liens granted to Agent under this Agreement and the other Financing Agreements shall constitute valid and perfected liens and security interests in and upon the Collateral in accordance with the terms hereof and with the priority required by the Financing Agreements, subject only to the liens indicated on Schedule 8.4 hereto and the other liens permitted under Section 9.8 hereof (a) except for Borrower's money, and vehicles and other assets the perfection of a security interest in which is governed by Section 9-303 of the Uniform Commercial Code, (b) subject to, with respect to Deposit Accounts, Section 5.2(d) hereof, and (c) with respect to Intellectual Property registrations and applications (but not including "intent-to-use") applications) in the United States only, and only if and to the extent perfection may be achieved by the filing of security interests in the United States Patent and Trademark Office and United States Copyright Office), except that additional filings may have to be made in the United States Patent and Trademark Office and United States Copyright Office, as applicable, to perfect the security interest and lien of Agent in any issuances, registrations, or applications for registration of any Intellectual Property acquired by any Borrower or Guarantor after the date hereof.  Each Borrower and Guarantor has good fee simple title to, or valid leasehold interests in, all of its Real Property that is material to its business, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

8.5    Tax Returns.    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and except to the extent such Taxes are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Closing Date, each Borrower and Guarantor and their Subsidiaries (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all Taxes levied or imposed on their properties, income or assets otherwise due and payable (whether or not shown on a Tax return), except any Taxes that are being contested in good faith by appropriate proceedings, provided that such Borrower, such Guarantor or such Subsidiary, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP. There is no proposed Tax assessment, deficiency or other claim against the Administrative Borrower, Guarantor or any Subsidiary that would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect

8.6    Litigation.    Except as set forth on Schedule 8.6 hereto, there is no action, suit, proceeding or claim by any Governmental Authority or Person pending, or to the best of any

Borrower's or Guarantor's knowledge threatened in writing, against or affecting any Borrower or Guarantor, its or their assets or business, or against or affecting any transactions contemplated by this Agreement that (i) is not covered by insurance (except for normal deductibles) as to which there is a reasonable possibility of an adverse determination that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) involves any challenge to the validity or enforceability of any material provision of any Financing Agreement (including, without limitation, any provision relating to the Borrowers' or Guarantors' obligations to repay the Obligations or any provision relating to the validity or perfection of any lien created by any Financing Agreement) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

8.7    <u>Compliance with Applicable Laws</u>.  Except as could not reasonably be expected to have a Material Adverse Effect, Borrowers and Guarantors are in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority relating to their businesses.

8.8    <u>Environmental Compliance</u>.

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) Borrowers, Guarantors and any Subsidiary of any Borrower or Guarantor have not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates in any material respect any applicable Environmental Law or any permit issued to Borrower under Environmental Law, and (ii) the operations of Borrowers, Guarantors and any Subsidiary of any Borrower or Guarantor complies in all material respects with all Environmental Laws and all permits issued to Borrowers and Guarantors under Environmental Law.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, none of any Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of any Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of any Borrower, any basis to reasonably expect that any Borrower or any of its Subsidiaries will become subject to any Environmental Liability.

(c)    Except as would not reasonably be expected to have a Material Adverse Effect, Borrowers, Guarantors and their Subsidiaries have no material liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

(d)    Except as would not reasonably be expected to have a Material Adverse Effect, Guarantors and their Subsidiaries have all permits required to be obtained or filed in connection with the operations of Borrowers and Guarantors under any Environmental Law and all of such licenses, certificates, approvals or similar authorizations and other permits are valid and in full force and effect.

134

(e)     This Section 8.8 sets forth the sole representations and warranties of Borrower with respect to Environmental Laws and Hazardous Materials and, notwithstanding any other provision in this Agreement to the contrary, no other representation or warranty is made in this Agreement with respect to environmental matters.

8.9     Employee Benefits.

(a)     Except as could not reasonably be expected to have a Material Adverse Effect, each Plan has been established, maintained, funded, operated and administrated in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or State law and each Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter (or a favorable opinion letter) from the Internal Revenue Service or is still within the remedial amendment period (as defined in Section 401(b) of the Code) to obtain a favorable determination letter and, to the best of each Borrower's and Guarantor's knowledge, nothing has occurred that could reasonably be expected to cause the revocation of such letter or the unavailability of reliance on such letter.  Each Borrower and Guarantor and its respective ERISA Affiliates have made all required contributions to any Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any such Plan.

(b)     Except as could not reasonably be expected to have a Material Adverse Effect, (i) there are no pending, or to the best of each Borrower's and Guarantor's knowledge, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan, and (ii) there has been no non-exempt prohibited transaction under Section 406 of ERISA or violation of the fiduciary responsibility rules under Section 404(a)(1) of ERISA with respect to any Plan.

(c)     Except as could not reasonably be expected to have a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) the current value of the assets of each Plan (determined in accordance with the assumptions used for funding such Plan pursuant to Section 412 of the Code) are not exceeded by such Plan's liabilities under Section 4001(a)(16) of ERISA in an amount that could reasonably be expected to have a Material Adverse Effect; (iii) no Borrower or Guarantor nor any of its respective ERISA Affiliates have incurred nor do any of them reasonably expect to incur any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither Borrower nor any of its ERISA Affiliates have incurred nor do any of them reasonably expect to incur any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (v) neither Borrower nor any of its ERISA Affiliates has engaged in a transaction that would be subject to Section 4069 or 4212(c) of ERISA; and (vi) no Plan is a "welfare benefit plan" (as defined in Section 3(1) of ERISA that provides post-termination or retiree life insurance, health or other welfare benefits to any person, except pursuant to Section 4980B of the Code or any other applicable law and with respect to which the recipient pays the full premium cost of such coverage.

135

8.10    <u>Bank Accounts</u>.    All of the Deposit Accounts, investment accounts or other accounts in the name of or used by any Borrower or Guarantor maintained at any bank or other financial institution are set forth in <u>Schedule 8.10</u> hereto, subject to the right of each Borrower and Guarantor to establish new accounts in accordance with <u>Section 5.2</u> hereof.

8.11    <u>Intellectual Property</u>.    Except as would not reasonably be expected to have a Material Adverse Effect, to the knowledge of Borrowers, each Borrower and Guarantor owns or licenses or otherwise has the right to use all Intellectual Property necessary for the operation of its business as presently conducted (collectively, "<u>IP Rights</u>").    On the Closing Date, no Borrower or Guarantor owns any Intellectual Property registered, or subject to pending applications, in the United States Patent and Trademark Office other than those described in <u>Schedule 8.11(a)</u> hereto. Each Borrower and Guarantor is the sole and exclusive owner of the entire and unencumbered right, title, and interest in and to all Intellectual Property used in the operation of its business, or, in the case of Intellectual Property used in the operation of their business and wholly or partly owned by other Persons, each Borrower or Guarantor, as the case may be, has a valid and enforceable license, option or other right, as the case may be, to use such Intellectual Property, except in each case as would not reasonably be expected to have a Material Adverse Effect; and except as could not reasonably be expected to have a Material Adverse Effect, to the knowledge of Borrowers, the Intellectual Property owned by each Borrower or Guarantor is valid, subsisting, and enforceable and has not been abandoned or adjudged invalid or unenforceable, in whole or part.    Except as described in <u>Schedule 8.11(c)</u> hereto, to each Borrowers' and Guarantor's knowledge, no event has occurred which could reasonably be expected to result in after notice or passage of time or both, the revocation, suspension or termination of Intellectual Property rights included in the Collateral, the revocation, suspension or termination of which could reasonably be expected to have a Material Adverse Effect.    To Borrowers' knowledge, except as could not reasonably be expected to have a Material Adverse Effect, no IP Rights owned by the Borrowers or Guarantors and used in the operation of their respective businesses as currently conducted infringes upon any Intellectual Property rights held by any Person, except for such infringements that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No written claim or litigation regarding any of the IP Rights, is pending or, to the knowledge of any Loan Party, threatened against any Loan Party or Subsidiary, and which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

8.12    <u>Subsidiaries; Capitalization; Solvency</u>.

(a)    Each Borrower and Guarantor does not have any direct or indirect Subsidiaries and is not engaged in any joint venture or partnership except as set forth in <u>Schedule 8.12</u> hereto and except as may be acquired, formed or entered into in connection with a Permitted Acquisition or otherwise and in accordance with <u>Section 9.20</u> hereof.

(b)    Each Borrower and Guarantor is the record and beneficial owner of all of the issued and outstanding shares of Capital Stock of each of the Subsidiaries listed on <u>Schedule 8.12</u> hereto as being owned by such Borrower or Guarantor and except as described on <u>Schedule 8.12</u> hereto, there are no proxies, irrevocable or otherwise, with respect to such shares and no equity Securities of any of the Subsidiaries are or may become required to be issued by reason of any options, warrants, rights to subscribe to, calls or commitments of any kind or nature and there are no contracts, commitments, understandings or arrangements by which any Subsidiary

is or may become bound to issue additional shares of its Capital Stock or Securities convertible into or exchangeable for such shares.

(c)     As of the Closing Date, the issued and outstanding shares of Capital Stock of each Borrower and Guarantor are directly and beneficially owned and held by the Persons indicated in the Information Certificate, and in each case all of such shares have been duly authorized and are fully paid and non-assessable, free and clear of all claims, liens, pledges and encumbrances of any kind, except for liens created hereunder and under the other Financing Agreements or as permitted by Section 9.8 hereof.

(d)     The Loan Parties, taken as a whole, are Solvent and will continue to be Solvent immediately after giving effect to the creation of the Obligations, the granting of security interests of Agent and the other transactions contemplated hereunder, or in connection with any of the foregoing.

8.13    Labor Disputes.

(a)     Set forth on Schedule 8.13 hereto is a list of all collective bargaining or similar agreements between or applicable to each Borrower and Guarantor and any union, labor organization or other bargaining agent in respect of the employees of any Borrower or Guarantor in force on the Closing Date.

(b)     Except as could not reasonably be expected to have a Material Adverse Effect, (i) there is no unfair labor practice complaint pending against any Borrower or Guarantor or, to the best of any Borrower's or Guarantor's knowledge, threatened against it, before the National Labor Relations Board, and no grievance or significant arbitration proceeding arising out of or under any collective bargaining agreement is pending on the Closing Date against any Borrower or Guarantor or, to best of any Borrower's or Guarantor's knowledge, threatened against it, (ii) there is no strike, labor dispute, slowdown or stoppage is pending against any Borrower or Guarantor or, to the best of any Borrower's or Guarantor's knowledge, threatened against any Borrower or Guarantor, and (iii) each Borrower and Guarantor is in compliance with all applicable laws and orders with respect to employment (including applicable laws regarding wage and hour requirements, immigration status, discrimination in employment, employee health and safety, and collective bargaining).

8.14    Restrictions on Subsidiaries.  Except for restrictions contained in this Agreement, the other Financing Agreements or any other agreement with respect to Indebtedness of any Borrower or Guarantor permitted hereunder, there are no contractual restrictions binding on any Subsidiary of any Borrower or Guarantor which prohibit or otherwise materially restrict (unless permitted pursuant to Section 9.16) (a) the transfer of cash or other assets (i) between any Borrower or Guarantor and any of its or their Subsidiaries or (ii) between any Subsidiaries of any Borrower or Guarantor or (b) the ability of any Borrower or Guarantor or any of its or their Subsidiaries to incur Indebtedness or grant security interests to Agent or any Lender in the Collateral.

8.15    Material Contracts.  Schedule 8.15 hereto sets forth all Material Contracts to which any Borrower or Guarantor is a party or is bound as of the Closing Date.  Borrowers and Guarantors have delivered true, correct and complete copies of such Material Contracts to Agent on or before

the date hereof. Borrowers and Guarantors are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract except as would not result in a Material Adverse Effect.

8.16    Credit Card Agreements.    Set forth in Schedule 8.16 hereto is a correct and complete list of all of the Credit Card Agreements existing as of the Closing Date between or among any Borrower, Guarantor or any of its Subsidiaries, the Credit Card Issuers and/or the Credit Card Processors. The Credit Card Agreements constitute all of such agreements necessary for each Borrower to operate its business as presently conducted with respect to credit cards and debit cards and no Receivables of any Borrower arise from purchases by customers of Inventory with credit cards or debit cards, other than those which are issued by Credit Card Issuers with whom such Borrower has entered into one of the Credit Card Agreements set forth on Schedule 8.16 hereto or with whom such Borrower has entered into a Credit Card Agreement in accordance with Section 9.18 hereof. Each of the Credit Card Agreements constitutes the legal, valid and binding obligations of the Administrative Borrower that is party thereto and, to the best of each Borrower's and Guarantor's knowledge, the other parties thereto, enforceable in accordance with their respective terms and is in full force and effect. Except as could not reasonably be expected to (a) have a Material Adverse Effect or (b) result in the cessation of the transfer of payments under any Credit Card Agreement to Blocked Accounts as required under this Agreement, no default or event of default, or act, condition or event which after notice or passage of time or both, would constitute a material default or a material event of default under any of the Credit Card Agreements has occurred and is continuing. The applicable Borrower and the other parties thereto have complied with all of the terms and conditions of the Credit Card Agreements to the extent necessary for such Borrower to be entitled to receive all payments thereunder which constitute proceeds of Eligible Credit Card Receivables. As of the Closing Date, Borrowers have delivered, or caused to be delivered to Agent, true, correct and complete copies of all of the Credit Card Agreements.

8.17    Investment Company Status.    No Borrower or Guarantor is required to register as an "investment company" under the Investment Company Act of 1940, as amended from time to time.

8.18    Accuracy and Completeness of Information.    All information furnished by or on behalf of any Borrower or Guarantor in writing to Agent or any Lender in connection with this Agreement or any of the other Financing Agreements or any transaction, when taken as a whole, contemplated hereby or thereby, including all information on the Information Certificate is true and correct in all material respects on the date as of which such information is dated or certified and does not omit any material fact necessary in order to make such information not materially misleading. Since the date of the most recently delivered audited financial statements, described in Section 8.3, no event or circumstance has occurred which has had or could reasonably be expected to have a Material Adverse Effect, which has not been fully and accurately disclosed to Agent in writing prior to the date hereof. As of the Closing Date, to the best knowledge of any Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects as of the date so furnished.

8.19    <u>Survival of Warranties; Cumulative</u>.  All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall be deemed to have been made again to Agent and Lenders on the date of each additional borrowing or other credit accommodation hereunder and shall be conclusively presumed to have been relied on by Agent and Lenders regardless of any investigation made or information possessed by Agent or any Lender.  The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which any Borrower or Guarantor shall now or hereafter give, or cause to be given, to Agent or any Lender.

8.20    <u>Insurance</u>].  Each Borrower, each Guarantor and each of its Subsidiaries maintain, with insurance companies that the Administrative Borrower believes (in the good faith judgment of the management of the Administrative Borrower) were financially sound and responsible at the time the relevant coverage was last placed or renewed, insurance  in at least such amounts (after giving effect to any self-insurance which the Administrative Borrower believes (in the good faith judgment of management of the Administrative Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Administrative Borrower believes (in the good faith judgment or the management of the Administrative Borrower) are reasonable and prudent in light of the size and nature of its business.

8.21    <u>Anti-Corruption Laws and Sanctions</u>.  Each Borrower or Guarantor, their respective Subsidiaries and to the Knowledge of such Borrower or Guarantor, their respective officers, directors employees and agents, are in compliance with applicable Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Borrower or Guarantor being designated as a Sanctioned Person.  None of (a) any Borrower or Guarantor, any Subsidiary or any of their respective directors or officers, or (b) to the knowledge of any such Borrower or Guarantor or Subsidiary, any employee or agent of such Borrower or Guarantor or any Subsidiary that will act in any capacity in connection with or benefit from the Credit Facility established hereby, is a Sanctioned Person.  No Loan or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement or the other Financing Agreements will directly or, to the Knowledge of the Administrative Borrower or Guarantor, indirectly, violate applicable violate Anti-Corruption Laws or applicable Sanctions.

8.22    <u>Regulatory Compliance</u>.

(a)    Each Borrower and Guarantor possesses all licenses, permits, approvals, notifications, exemptions, certifications and registrations (collectively, "<u>Permits</u>") that are required to be obtained for the operation of its business subject to renewal in the ordinary course of business, except where the failure to possess such Permits would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.  All such Permits are in full force and effect, and there are no actions pending or threatened in writing or, to each Borrower's or Guarantor's knowledge, otherwise threatened by any Governmental Authority that seek the revocation, cancellation, suspension or adverse modification thereof, except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. Each Borrower or Guarantor is in compliance with the terms of all such Permits, except for such non-compliance as

would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(b)     Each Borrower and Guarantor is in compliance with, and at all times during the last three years has complied in all respects with, all applicable provisions of the Federal Food, Drug and Cosmetic Act and the rules and regulations promulgated thereunder (collectively, the "FDCA") and with all other applicable laws enforced by the Food and Drug Administration ("FDA") or any comparable Governmental Authority, except for such non-compliance as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. Each Borrower and Guarantor has in effect standard operating procedures governing, for its private label products, recalls, product ingredient safety reviews and regulatory filings, product claims and claim substantiation, adverse event reporting and complaint handlings. To each Borrower's and Guarantor's knowledge, during the three years prior to the Closing Date, no products sold by such Borrower or Guarantor were adulterated or misbranded as defined in the applicable provisions of the FDCA; except to the extent that any liability to the Borrowers and Guarantors that could reasonably be expected to result from such adulterations or misbrandings would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     No Borrower or Guarantor has received any written or oral notice from the FDA during the three years prior to the Closing Date of any violation or alleged violation of the FDCA, except to the extent such violations or alleged violations would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Borrower or Guarantor has received any written or oral notice during the last three years that the products it has sold have been the subject of any warning letter, notice of violation, seizure, recall, injunction, regulatory enforcement action, or criminal action issued, initiated, threatened in writing, or to any Borrower's or Guarantor's knowledge, otherwise threatened by the FDA or any comparable Governmental Authority, except to the extent such actions or notices would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, no Borrower or Guarantor has any open, pending or planned product recalls, market withdrawals or other post-market actions relating to product quality or safety, except to the extent that the liability to the Borrowers and Guarantors that could reasonably be expected to result from such product recalls, market withdrawals or other post-market actions would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)     In the three years prior to the Closing Date, each Borrower and Guarantor has been in compliance with the Federal Trade Commission Act with respect to the advertising and promotion, product descriptions, and claims for the products it sells, except to the extent that such non-compliance would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.  No Borrower or Guarantor has received written notice of and, to each Borrower's and Guarantor's knowledge, there is no written claim filed by the Federal Trade Commission against such Borrower or Guarantor, alleging any violation of any of the laws implemented by it, except to the extent that such violations would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(e)     To each Borrower's or Guarantor's knowledge, during the past three years, all products sold by such Borrower or Guarantor were manufactured in compliance with all applicable laws and regulations enforced by FDA or any comparable Governmental Authority with

respect to the manufacture of such products, including without limitation, FDA's current good manufacturing practice regulations set forth at 21 C.F.R. Parts 110 and 111, where relevant, except for such non-compliance that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

8.23    Franchise Agreements.

(a)    Schedule 8.23 sets forth a complete and accurate list as of the Closing Date of all Franchise Agreements to which any Loan Party or any of their Subsidiaries is a party.

(b)    Except as set forth on Schedule 8.23, as of the Closing Date, to the knowledge of the Loan Parties, none of the Franchise Agreements contains any grant of exclusive rights to a territory designated therein which conflicts, or potentially conflicts, with any grant of exclusive rights to a territory granted under any other Franchise Agreement.

(c)    Except as could not reasonably be expected to have a Material Adverse Effect, (i) each Loan Party has prepared and maintained each of its Franchise Disclosure Documents, in an accurate and correct manner, (ii) each Loan Party has filed all required Franchise Disclosure Documents required by law in all states and jurisdictions requiring registration and approval prior to any offers or sales of franchises in such states and (iii) each Loan Party has filed all material changes, amendments, renewals thereto on a timely and accurate basis as required under, and required by applicable Requirements of Law.  Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party's Franchise Disclosure Documents were prepared in compliance with applicable Franchise Laws and disclosure guidelines, and there were no misrepresentations or omissions of information in any Franchise Disclosure Documents at the time such Loan Party was using such Franchise Disclosure Documents. Each Franchise Agreement complies, and the offer and sale of such Franchise Agreement complied, in each case at the time such offer and sale was made, with all Franchise Laws, except to the extent of any non-compliance therewith which could not reasonably be expected to have a Material Adverse Effect.

8.24    Affected Financial Institutions.  No Loan Party is an Affected Financial Institution.

**SECTION 9.    AFFIRMATIVE AND NEGATIVE COVENANTS**

Until the Obligations have been Paid in Full, each Borrower and each Guarantor on behalf of themselves and their Subsidiaries covenants and agrees, jointly and severally with all of the other Borrowers and Guarantors and the Lenders, to the covenants contained in this Section 9; provided that, notwithstanding anything to the contrary in this Section 9, all references to the defined terms "Subsidiaries" or "Subsidiary" in this Section 9 shall exclude any Foreign Subsidiary.

9.1    Maintenance of Existence.

(a)    Except as permitted by Section 9.7, each Borrower and Guarantor shall at all times preserve, renew and keep in full force and effect its corporate existence and material rights and franchises with respect thereto and maintain in full force and effect all material governmental licenses, approvals, authorizations, leases, contracts and permits necessary to carry

141

on the business as presently conducted, except where the failure to so preserve, renew or keep in full force and effect would not reasonably be expected to have a Material Adverse Effect.

(b)　No Borrower or Guarantor shall change its name, type of organization, jurisdiction of organization or other legal structure unless each of the following conditions is satisfied:  (i) Agent shall have received prompt (and in any event within thirty (30) days or such longer period as reasonably agreed to by Agent)  written notice from Administrative Borrower of such change, which notice shall accurately set forth the new name; (ii) Agent shall have received a copy of the amendment to the certificate of formation of such Borrower or Guarantor providing for the name change certified by the Secretary of State of the jurisdiction of incorporation or organization of such Borrower or Guarantor as soon as it is available; and (iii) Agent shall have acknowledged in writing that either (A) such change will not adversely affect the validity, perfection or priority of Agent's security interest in the Collateral, or (B) any action reasonably necessary to continue the perfection of any liens in favor of Agent, on behalf of Lenders, has been completed.

(c)　No Borrower or Guarantor shall change its chief executive office or its mailing address or organizational identification number (or if it does not have one, shall not acquire one) unless Agent shall have received prompt (and in any event within thirty (30) days or such longer period as reasonably agreed to by Agent) written notice from Administrative Borrower of such change, which notice shall set forth such information with respect thereto as Agent may require and Agent shall have received such agreements as Agent may reasonably require in connection therewith.

9.2　[Reserved].

9.3　Compliance with Laws, Regulations, Etc.

(a)　Except as could not reasonably be expected to cause a Material Adverse Effect, each Borrower and Guarantor shall, and shall cause any Subsidiary to, at all times, comply in all material respects with all laws, rules, regulations, licenses, approvals, orders and other permits applicable to it and duly observe all applicable requirements of any foreign, Federal, State or local Governmental Authority, the Code, the Fair Labor Standards Act of 1938, as amended, all Federal, State and local statutes, regulations, rules and orders pertaining to sales of consumer goods (including the Federal Trade Commission Act of 1914, as amended, and all regulations, rules and orders promulgated thereunder, and the Federal Food, Drug, and Cosmetic Act, as amended, and all regulations, rules, guidance and orders promulgated thereunder) and all statutes, rules, regulations, orders, permits and stipulations relating to environmental pollution and employee health and safety, including all of the Environmental Laws.

(b)　Administrative Borrower shall give written notice to Agent promptly upon any Borrower's or Guarantor's receipt of any notice of the following, except if the condition giving rise to such notice could not reasonably be expected to have a Material Adverse Effect (collectively, "Environmental Events"), (i) the occurrence of any event involving the unpermitted release, spill or discharge, threatened or actual, of any Hazardous Material by any Borrower or Guarantor or (ii) any investigation, proceeding, complaint, order, directive, claims, citation or notice with respect to:  (A) any non-compliance with or violation of any Environmental Law by

any Borrower or Guarantor or (B) the release, spill or discharge, threatened or actual, of any Hazardous Material by any Borrower or Guarantor (as applicable) other than in the ordinary course of business and other than as permitted under any applicable Environmental Law. Copies of all non-privileged environmental surveys, audits, assessments, feasibility studies and results of remedial investigations conducted in connection with an Environmental Event shall be promptly furnished, or caused to be furnished, by such Borrower or Guarantor to Agent. Each Borrower and Guarantor shall take prompt action to respond to any material non-compliance with any of the Environmental Events and shall regularly report to Agent on such response.

(c)    Without limiting the generality of the foregoing, whenever Agent reasonably determines that there is material non-compliance, or any condition which requires any action by or on behalf of any Borrower or Guarantor in order to avoid any non-compliance, with any Environmental Law except with respect to such non-compliance that could not reasonably be expected to have a Material Adverse Effect, Borrowers shall, at Agent's reasonable request and Borrowers' expense: (i) cause an independent environmental consultant reasonably acceptable to Agent to conduct such tests of the site where non-compliance or alleged non-compliance with such Environmental Laws (including sampling and analysis, if necessary) has occurred as to such non-compliance and prepare and deliver to Agent a report as to such non-compliance setting forth the results of such tests, a proposed plan for responding to any environmental problems described therein, and an estimate of the costs thereof and (ii) provide to Agent a supplemental report of such consultant whenever the scope of such non-compliance, or such Borrower's or Guarantor's response thereto or the estimated costs thereof, shall change in any material respect.

(d)    Each Borrower and Guarantor shall indemnify and hold harmless Agent and Lenders and their respective directors, officers, employees, agents, invitees, representatives, successors and assigns, from and against any and all losses, claims, damages, liabilities, costs, and expenses (including reasonable attorneys' fees and expenses) directly or indirectly arising out of or attributable to the use, generation, manufacture, reproduction, storage, release, threatened release, spill, discharge, disposal or presence of a Hazardous Material on any property of a Borrower or resulting from a Borrower's conduct, including the costs of any required or necessary repair, cleanup or other remedial work with respect to any property of any Borrower or Guarantor and the preparation and implementation of any closure, remedial or other required plans relating to such Hazardous Materials except to the extent such losses, claims, damages, liabilities, costs, and expenses arise out of or are attributable to the gross negligence or willful misconduct of Agent or any Lender. All indemnifications in this <u>Section 9.3</u> shall survive the payment of the Obligations and the termination of this Agreement.

9.4    <u>Payment of Taxes and Claims</u>. Each Borrower and Guarantor shall, and shall cause each of its Subsidiaries to, pay all Taxes (whether or not shown on a Tax return) imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except where (a) the same are being contested in good faith by an appropriate proceeding diligently conducted by the Administrative Borrower or such Guarantor or any of its Subsidiaries, (b) the failure to make payment would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (c) such Taxes are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Closing Date.

143

9.5    <u>Insurance</u>.

(a)    Each Borrower and Guarantor shall, and shall cause any Subsidiary to, at all times, maintain with financially sound and reputable (in the good faith judgement of the management of such Borrower or Guarantor) insurers insurance in at least such amounts (after giving effect to any self-insurance which each Borrower and Guarantor believes (in the good faith judgment of management of such Borrower and Guarantor) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as each Borrower and Guarantor believes (in the good faith judgment or the management of such Borrower and Guarantor) are reasonable and prudent in light of the size and nature of its business. Such policies of insurance shall be reasonably satisfactory to Agent as to form, amount and insurer. Borrowers and Guarantor shall pay all premiums on any such insurance when due. Borrowers and Guarantors shall furnish certificates, policies or endorsements to Agent as Agent shall reasonably require as proof of such general liability policy of insurance (other than directors and officers policies, workers compensation policies and business interruption insurance), to the extent covering Collateral and to the extent that Agent can be granted an insurable interest therein. All such insurance policies shall provide for at least 30 days' prior written notice to Agent of any cancellation, amendment or reduction of coverage and that Agent may act as attorney for each Borrower and Guarantor in obtaining, and at any time an Event of Default has occurred and is continuing, adjusting, settling, amending and canceling such insurance. Borrowers and Guarantors shall cause Agent to be named as a lender loss payee and/or an additional insured, as applicable (but without any liability for any premiums) under all casualty and property insurance policies (but not any business interruption insurance policies) and, subject to <u>Section 9.31</u>, Borrowers and Guarantors shall obtain non-contributory lender's loss payable endorsements to all property and casualty insurance policies in form and substance reasonably satisfactory to Agent, which provide that all proceeds thereunder with respect to any Collateral shall be payable to Agent, and that no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy.

(b)    Except upon (i) the occurrence and during the continuance of an Event of Default, or (ii) during a Compliance Period solely to the extent the insurance proceeds relate to any Collateral which at the time of loss was included in the calculation of the Borrowing Base, insurance proceeds may be applied by a Loan Party in its discretion to the repair or replacement of any lost or damaged Collateral that gave rise to such insurance proceeds so long as (A) in the context of replacing lost or damaged Collateral, the insurance proceeds are used to replace such lost or damaged Collateral with like Collateral, and (B) such repair or replacement is completed within 180 days of the receipt of insurance proceeds, or if such Loan Party commits in writing to undertake such repair or replacement within such 180-day period, within 270 days of the date of the receipt of insurance proceeds. Such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to Agent, for itself and the ratable benefit of the Secured Parties, Lenders and the Bank Product Providers, as its interests may appear and further specify that Agent and Lenders shall be paid regardless of any act or omission by any Borrower, Guarantor or any of its or their Affiliates. Without limiting any other rights of Agent or Lenders, and subject to the Loan Parties' right to otherwise use insurance proceeds as provided in this <u>Section 9.5</u>, any insurance proceeds received by Agent at any time may be applied to payment of the Obligations, whether or not then due, in any order and in such manner as Agent may determine, subject to the requirements of <u>Section 6.4</u>. Upon application of such proceeds to the Revolving

Loans, Revolving Loans may be available subject and pursuant to the terms hereof to be used for the costs of repair or replacement of the Collateral lost or damages resulting in the payment of such insurance proceeds.

(c)     If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Administrative Borrower shall, or shall cause each Loan Party to (i) if required by the Flood Insurance Laws or other applicable law, maintain, or cause to be maintained, with insurance companies that the Administrative Borrower believes (in the good faith judgment of the management of the Administrative Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) furnish to the Lenders, upon written request from Agent, information presented in reasonable detail as to the flood insurance so carried.

9.6     <u>Financial Statements and Other Information</u>.

(a)     Each Borrower and Guarantor shall, and shall cause any Subsidiary to, keep proper books and records in which true and complete entries shall be made of all dealings or transactions of or in relation to the Collateral and the business of such Borrower, Guarantor and its Subsidiaries in accordance with GAAP.  Borrowers and Guarantors shall promptly furnish to Agent and Lenders all such financial and other information as Agent shall reasonably request in writing relating to the Collateral and the assets, business and operations of Borrowers and Guarantors, and the Administrative Borrower shall notify the auditors and accountants of Borrowers and Guarantors that Agent is authorized to obtain such information directly from them. Without limiting the foregoing, Administrative Borrower shall furnish or cause to be furnished to Agent, the following:

(i)     within 30 days after the end of each fiscal month, monthly unaudited consolidated financial statements of Fusion Buyer, the Guarantors and their respective Subsidiaries (including in each case balance sheets, statements of income and loss, and statements of cash flow) and the related (X) consolidated statements of income or operations for such fiscal month and for the portion of the fiscal year then ended and (Y) consolidated statements of cash flows for such fiscal month and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal month of the previous fiscal year and the corresponding portion of the previous fiscal year, in each case, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of Fusion Buyer, the Guarantors and their respective Subsidiaries as of the end of and through such fiscal month, certified to be correct in all material respects by the chief financial officer, treasurer or other similar officer of Administrative Borrower, subject to normal year-end adjustments and accompanied by a compliance certificate substantially in the form of <u>Exhibit C</u> hereto, along with a schedule in form reasonably satisfactory to Agent of the calculations used in determining the Fixed Charge Coverage Ratio as of the end of such fiscal month for the relevant measurement period (as described in the definition of Fixed Charge Coverage Ratio), in each case, whether or not compliance with the  Fixed Charge Coverage Ratio is then required,

(ii)    within 90 days (or 120 days with respect to the fiscal year of the Administrative Borrower ending on or about December 31, 2025 (which may, at the Administrative Borrower's option, be limited to the period from the Closing Date to December 31, 2025 or be on a predecessor/successor basis)) after the end of each fiscal year, audited consolidated financial statements of Fusion Buyer, the Guarantors and their respective Subsidiaries (including in each case balance sheets, statements of income and loss, statements of cash flow and statements of shareholders' equity), and the accompanying notes thereto, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of Fusion Buyer, the Guarantors and their respective Subsidiaries as of the end of and for such fiscal year, together with the unqualified opinion of independent certified public accountants with respect to the audited consolidated financial statements, which accountants shall be an independent accounting firm selected by Administrative Borrower and reasonably acceptable to Agent, that such audited consolidated financial statements have been prepared in accordance with GAAP, and present fairly in all material respects the results of operations and financial condition of Fusion Buyer, the Guarantors and their respective Subsidiaries as of the end of and for the fiscal year then ended, and accompanied by a compliance certificate substantially in the form of Exhibit C hereto (to include the calculation of the Fixed Charge Coverage Ratio for the relevant measurement period covered by such financial statements (as described in the definition of Fixed Charge Coverage Ratio), in each case, whether or not compliance with the Fixed Charge Coverage Ratio is then required, and

(iii)    (A) at such time as available, but in no event later than 30 days after the end of each fiscal year (commencing with the fiscal year of Fusion Buyer ending December 31, 2025), projected consolidated financial statements (including in each case, forecasted balance sheets and statements of income and loss, statements of cash flow and projected Borrowing Base availability) of Fusion Buyer, the Guarantors and their respective Subsidiaries for the next fiscal year, all in reasonable detail, and in a format consistent with the projections delivered by Borrowers to Agent prior to the date hereof, together with such supporting information as Agent may reasonably request. Such projected financial statements shall be prepared on a monthly basis for the next succeeding year. Such projections shall represent the reasonable best estimate by Administrative Borrower of the future financial performance of Fusion Buyer, the Guarantors and their respective Subsidiaries for the periods set forth therein and shall have been prepared on the basis of the assumptions set forth therein which Administrative Borrower believes is fair and reasonable as of the date of preparation in light of current and reasonably foreseeable business conditions (it being understood that actual results may differ from those set forth in such projected financial statements), and

(B)    at such time as the aggregate amount of consideration paid by Borrowers and Guarantors in respect of Permitted Acquisitions equals or exceeds $12,500,000 since the date that the last projections were received by Agent pursuant to Section 9.6(a)(iii)(A) hereof or this Section 9.6(a)(iii)(B), Administrative Borrower shall deliver updated (from the date of the last projections received) projected financial statements on or prior to the date of consummation of such Permitted Acquisition, in form and substance as required in Section 9.6(a)(iii)(A) hereof.

(b)    Administrative Borrower shall, and shall cause the other Borrower(s) to notify Administrative Borrower so that it may, promptly notify Agent in writing of the details of

(i) any loss, damage, investigation, action, suit, proceeding or claim relating to Collateral having a value of more than $1,000,000 or which if adversely determined would result in a Material Adverse Effect, (ii) any Material Contract being terminated or materially amended or any new Material Contract entered into (in which event Administrative Borrower shall provide Agent with a copy of such Material Contract to the extent permitted by any applicable confidentiality provisions contained in such Material Contract, provided that Borrowers shall use commercially reasonable efforts to get any appropriate consent necessary to provide Agent with such a copy), (iii) any order, judgment or decree in excess of $1,000,000 shall have been entered against any Borrower or Guarantor any of its or their properties or assets, (iv) any notification of a material violation of laws or regulations received by any Borrower or Guarantor from a Governmental Authority, (v) any ERISA Event that could be reasonably expected to have a Material Adverse Effect, (vi) the occurrence of any Default or Event of Default, (vii) any material breach or material non-performance of, or any material default under, any agreements with any franchisee that would materially and adversely impact the ability of Agent to realize upon the Collateral and (viii) any material breach or material non-performance of, or any material default under, any agreements with any dealer that would materially and adversely impact the ability of Agent to realize upon the Collateral.  Each notice delivered under this Section 9.6(b) (i) shall be in writing, (ii) shall contain a heading or a reference line that reads "Notice under Section 9.6(b) of Fusion Buyer Credit Agreement dated June 6, 2025" and (iii) shall be accompanied by a statement of an Authorized Officer of Administrative Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

(c)     Promptly after the sending or filing thereof, Administrative Borrower shall send to Agent copies of all reports and registration statements which any Loan Party or any of its Subsidiaries files with the Securities and Exchange Commission, any national or foreign securities exchange or the National Association of Securities Dealers, Inc., and such other reports as Agent may hereafter specifically identify to Administrative Borrower that Agent will require be provided to Agent.

(d)     Administrative Borrower shall furnish or cause to be furnished to Agent such budgets, forecasts, projections and other information respecting the Collateral and the business of Borrowers and Guarantors, as Agent may, from time to time, reasonably request. Agent is hereby authorized to deliver a copy of any financial statement or any other information relating to the business of Borrowers and Guarantors to any court or other Governmental Authority or to any Lender or Participant or prospective Lender or Participant or any Affiliate of any Lender or Participant.  Each Borrower and Guarantor hereby irrevocably authorizes and directs all accountants or auditors to deliver to Agent, at Borrowers' expense and without affecting any confidentiality obligations of such accountants and auditors to Persons other than Agent, copies of the financial statements of any Borrower and Guarantor and any reports or management letters prepared by such accountants or auditors on behalf of any Borrower or Guarantor and to disclose to Agent and Lenders such information as they may have regarding the business of any Borrower and Guarantor.  Any documents, schedules, invoices or other papers delivered to Agent or any Lender may be destroyed or otherwise disposed of by Agent or such Lender one year after the same are delivered to Agent or such Lender, except as otherwise designated by Administrative Borrower to Agent or such Lender in writing.

(e)     Administrative Borrower shall furnish to Agent all material notices or demands in connection with Indebtedness incurred pursuant to <u>Section 9.9(e)</u>, <u>Section 9.9(g)</u>, <u>Section 9.9(j)</u> and <u>Section 9.9(q)</u> and the loans and advances made pursuant to <u>Section 9.10(i)</u>, in each case either received by any Borrower or Guarantor or on its behalf promptly after the receipt thereof, or sent by any Borrower or Guarantor or on its behalf concurrently with the sending thereof, as the case may be.

(f)     Administrative Borrower shall furnish to Agent, promptly, but in any event within one Business Day after the furnishing, receipt or execution thereof, copies of (i) any amendment, waiver, consent or other written modification of the First Lien Term Loan Documents , (ii) any notice of default or any notice related to the exercise of remedies under the First Lien Term Loan Documents and (iii) any other material notice, certificate or other information or document provided to, or received from, the First Lien Agent and the First Lien Lenders, (including, any default notice received by the Administrative Borrower with respect to the First Lien Credit Agreement).

(g)     Administrative Borrower shall furnish to Agent, promptly, but in any event prior to or concurrently with the consummation of any Specified Payment, an officer's certificate confirming that the requirements set forth in the definition of "Payment Conditions" has been satisfied.

(h)     Administrative Borrower shall furnish promptly following any request therefor, (i) such other information regarding the operations, material changes in ownership of Capital Stock, business affairs and financial condition of any Borrower or Guarantor, or compliance with the terms of this Agreement, as the Agent or any Lender may reasonably request, and (ii) information and documentation reasonably requested by the Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

(i)     Administrative Borrower shall (i) promptly furnish to any Lender any change in the information provided in the Beneficial Ownership Certification delivered to such Lender that would result in a change to the list of beneficial owners identified in such certification and (ii) on or prior to the date on which any Permitted Holder first acquires, directly or indirectly, 20% or more of the Capital Stock of Topco, furnish to each Lender all information required by the Beneficial Ownership Certification delivered to accurately account for the change(s) to the list of beneficial owners identified in such certification.

(j)     Administrative Borrower shall furnish to Agent copies of (i) any Franchise Agreements not previously delivered to Agent prior to any related Franchisee Receivables being included in the Borrowing Base and (ii) any material amendments or modifications to any Franchise Agreement to which any Franchisee Receivables included in the Borrowing Base are attributable.

9.7     <u>Sale of Assets, Consolidation, Merger, Dissolution, Etc</u>.  Borrowers and Guarantors shall not and shall not permit any Subsidiary to, directly or indirectly:

(a)    merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it; provided, however, upon prior written notice to Agent:

(i)    a Subsidiary (other than a Borrower) may merge into or with or consolidate with or dissolve or liquidate into another Subsidiary (other than a Loan Party);

(ii)    a Subsidiary may liquidate or dissolve or change its legal form if the Administrative Borrower determines in good faith that such action is in the best interests of the Loan Parties and their respective Subsidiaries and is not materially disadvantageous to all Lenders; provided that if such liquidating or dissolving Subsidiary is a Borrower, its assets shall be distributed to another Borrower;

(iii)    a Subsidiary (other than a Borrower) may merge into or with or consolidate with or dissolve or liquidate into a Borrower or Guarantor so long as (A) if Fusion Buyer is a party to such transaction, Fusion Buyer is the surviving entity with respect thereto and (B) subject to clause (A), a Borrower (in the case of any such event involving a Borrower) or Guarantor is the surviving entity with respect thereto and such Borrower or Guarantor has otherwise complied with Section 9.1(b) of this Agreement (if applicable) and all other terms of this Agreement;

(iv)    a Borrower may merge into or with or consolidate with or dissolve or liquidate into any other Person (including another Borrower); provided that (A) a Borrower shall be the continuing or surviving Person (or, if one of the parties to such merger, consolidation or disposal is the Administrative Borrower, then the Administrative Borrower shall be the continuing or surviving Person) or (B) if the Person formed by or surviving any such merger or consolidation (or, in connection with a disposition of all or substantially all of the such Borrower's assets, if the transferee of such assets) is not a Borrower or is a Person into which such Borrower has been liquidated (any such Person, the "Successor Borrower"), (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any State thereof or the District of Columbia, (2) the Successor Borrower shall expressly assume all the obligations of a Borrower under this Agreement and the other Financing Agreements to which such Borrower is a party, pursuant to a supplement hereto or thereto in form and substance reasonably satisfactory to the Agent, (3) each Loan Party other than such Borrower, unless it is the other party to such merger or consolidation, shall have reaffirmed, pursuant to an agreement in form and substance reasonably satisfactory to the Agent, that its guarantee of and grant of any Liens as security for the Obligations shall apply to the Successor Borrower's obligations under this Agreement, (4) such Borrower shall have delivered to the Agent a certificate of an Authorized Officer and an opinion of counsel, each stating that such merger or consolidation complies with this Agreement, (5) no Default or Event of Default then exists or would occur, (6) no liens, other than those permitted under the terms of this Agreement with regard to such Borrower, on the assets of the Successor Borrower then exist and (7) the Successor Borrower would not, as a result of such transaction, be liable for any Indebtedness or other obligations of any Guarantor or any other Borrower, other than Indebtedness or other obligations which are permitted under the terms of this Agreement with regard to such Borrower; provided further that if the foregoing requirements are satisfied, the Successor Borrower will succeed to, and be substituted for, such Borrower under this Agreement and the other Financing Agreements; provided further that such Borrower will use commercially reasonable

efforts to provide any documentation and other information about the Successor Borrower as shall have been reasonably requested in writing by any Lender through the Agent that such Lender shall have reasonably determined is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Title III of the USA PATRIOT Act; provided, further, that a Successor Borrower may not succeed to or be substituted for the Administrative Borrower pursuant to this clause (iv); and

(v)    the Loan Parties and their respective Subsidiaries may undertake or consummate any Tax Restructuring;

(vi)    any Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an investment permitted pursuant to Section 9.10; provided that the continuing or surviving Person shall be a Borrower or a Subsidiary, which together with each of the Subsidiaries, shall have complied with the requirements of Sections 9.23; and

(vii)    any Subsidiary may effect a merger, dissolution, liquidation, consolidation or amalgamation to effect a disposition permitted pursuant to Section 9.7;

(b)    consummate any Asset Sale, except for:

(A)    sales of Inventory and other assets in the ordinary course of business and immaterial assets (considered in the aggregate) in the ordinary course of business;

(B)    returns and exchanges of Inventory to vendors in the ordinary course of business of a Borrower on terms and conditions consistent with the current or prior practices of such Borrower;

(C)    the sale or other disposition of assets (other than Collateral and other than assets subject to clause (D) of this Section below) by a Borrower or Guarantor or any Subsidiary in the ordinary course of its business that are no longer necessary or required, worn out, non-core or obsolete, in the conduct of such Borrower's or Guarantor's business;

(D)    sales or other dispositions by any Borrower or Guarantor or any Subsidiary of assets in connection with the closing or sale of a retail store location (the closure of a store is not in and of itself the disposition of assets), warehouse, distribution center or corporate office of such Borrower, Guarantor or Subsidiary in the ordinary course of business of such Borrower, Guarantor or Subsidiary, which sale or disposition consists of leasehold interests in the premises of such store or distribution center, the Equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such store or distribution center; provided that, as to each and all such sales and closings, (1) Agent shall have received written notice of such sale or closing in accordance with Section 7.1(a) hereof, (2) after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, and (3) such sale shall be on commercially reasonable prices and terms in a bona fide arm's length transaction;

(E)    in addition to the dispositions permitted in subclause (D) above, the sale or other disposition of Equipment (including worn-out, non-core or obsolete Equipment or Equipment no longer used or useful in the business of such Borrower or Guarantor)

so long as the value of such Equipment sold in any fiscal year is equal to or less than the value of all Equipment acquired in such year;

(F)    sales, assignments, licenses, transfers, abandonments or other dispositions with respect to Intellectual Property made in the ordinary course of business or that do not interfere in any material respect with the business of the Borrowers or the Guarantors, taken as a whole;

(G)    (i) sales, transfers and dispositions of assets of (1) a Borrower to another Borrower, or (2) by a Guarantor to a Borrower or another Guarantor, provided, that, in each case such sale, transfer or disposition is otherwise consummated (and the lien and security interest of Agent and Secured Parties continues in such assets) in accordance with the terms of this Agreement and the other Financing Agreements and (ii) sales, transfers and dispositions of assets of a Subsidiary that is not a Loan Party to a Loan Party or another Subsidiary that is not a Loan Party;

(H)    the issuance and sale by any Borrower or Guarantor of Capital Stock of such Borrower or Guarantor after the date hereof; provided that (1) Agent shall have received not less than ten Business Days' prior written notice of such issuance and sale by such Borrower, Guarantor or Subsidiary, which notice shall specify whether such shares are to be sold pursuant to a public offering or if not a public offering, then the parties to whom such shares are to be sold, the terms of such sale, the total amount which it is anticipated will be realized from the issuance and sale of such stock and the net cash proceeds which it is anticipated will be received by such Borrower or Guarantor from such sale, (2) such Borrower or Guarantor shall not be required to pay any cash dividends or repurchase or redeem such Capital Stock or make any other payments in respect thereof, (3) the terms of such Capital Stock, and the terms and conditions of the purchase and sale thereof, shall not include any terms that include any limitation on the right of any Borrower to request or receive Loans or Letters of Credit or the right of any Borrower and Guarantor to amend or modify any of the terms and conditions of this Agreement or any of the other Financing Agreements or otherwise in any way relate to or affect the arrangements of Borrowers and Guarantors with Agent and Lenders or are more restrictive or burdensome to any Borrower or Guarantor than the terms of any Capital Stock in effect on the date hereof, (4) except as Agent may otherwise agree in writing, upon the occurrence and continuance of an Event of Default or during a Compliance Period, all of the proceeds of the sale and issuance of such Capital Stock shall be paid to Agent for application to the Obligations in accordance with Section 6.4(a) or at Agent's option, to be held as cash collateral for the Obligations provided, that, in no event shall any Borrower or Guarantor issue any Capital Stock which would result in a Change of Control or other Event of Default; provided, further, that conditions (1) through (3) above shall not apply to issuances and sales of Capital Stock by any Borrower or Guarantor to any other Borrower or Guarantor (so long as such issued Capital Stock is pledged as Collateral);

(I)    licenses granted to franchisees in the ordinary course of business and consistent with past practices;

(J)    the abandonment, non-renewal, failure to maintain, cancellation or sale, transfer or other disposition of Intellectual Property which do not materially interfere with the Borrowers' and Guarantors' business, taken as a whole;

(K)    (i) leases and subleases and other agreements related to Real Property in the ordinary course of business and (ii) leases, subleases, service agreements, product sales, abandonments, licenses, sublicenses or other disposals (including of Intellectual Property), in each case, (A) granted in the ordinary course of business or (B) that do not materially interfere with the business of the Loan Parties and their respective Subsidiaries, taken as a whole;

(L)    the transactions permitted under Sections 9.9, 9.10(h) and 9.11 hereof;

(M)    dispositions of cash and Cash Equivalents subject to compliance with Section 9.10(b) hereof;

(N)    [reserved];

(O)    dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) an amount equal to net proceeds of such disposition received in cash or Cash Equivalents are promptly applied to the purchase price of such replacement property;

(P)    dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(Q)    dispositions of any assets (including Capital Stock) (A) acquired in connection with any Permitted Acquisition or other Investment not prohibited hereunder, which assets are not used or useful to the core or principal business of any Borrower and its Subsidiaries and (B) made to obtain the approval of any applicable antitrust authority in connection with a Permitted Acquisition;

(R)    [reserved];

(S)    transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(T)    sales or other dispositions by any Borrower or Guarantor or any Subsidiary of Equipment and fixtures located at distribution centers in an aggregate amount not to exceed $100,000;

(U)    any sale and leaseback transactions permitted by Section 9.33;

(V)    any disposition of the Capital Stock of any Immaterial Subsidiary;

(W)    the sale or other disposition of retail store locations to a franchisee; provided that the aggregate fair market value of assets disposed pursuant to this clause (W) shall not exceed $1,000,000;

(X)    [reserved]; and

(Y)    [reserved];

(c)    wind up, liquidate or dissolve, except (i) as permitted in clause (a) above or (ii) if such Person is a Subsidiary of any Borrower with assets having an aggregate fair market value of less than or equal to $2,500,000; or

(d)    consummate a Division as a Dividing Person without the prior written consent of the Agent. Without limiting the foregoing, if any Borrower or Guarantor that is a limited liability company consummates a Division (with or without the prior consent of the Agent as required above), each Division Successor shall be required to comply with the obligations set forth in Section 9.23 and the other further assurances obligations set forth in the Financing Agreements and become a Borrower or Guarantor, as applicable, under this Agreement and the other Financing Agreements.

Notwithstanding anything herein to the contrary, (i) any Asset Sales, sales or dispositions (including any sale and leaseback transaction) by any Borrower or any Subsidiary outside the ordinary course of business of ABL Priority Collateral in excess of $2,500,000 in the aggregate shall not be permitted without the written consent of all Lenders, to be granted in their sole discretion and (ii) the Administrative Borrower shall not, and shall not permit any other Loan Party to, sell any of its businesses or undertake any receivables securitization, any whole business securitization or any other securitization transaction with respect to the ABL Priority Collateral, its assets or businesses, in each case, that would not otherwise result in Payment in Full hereunder without the written consent of all Lenders, to be granted in their sole discretion.

9.8    Encumbrances.  Each Borrower and Guarantor shall not, and shall not permit any Subsidiary to, create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or lien with respect to any such assets or properties, except:

(a)    the security interests and liens of Agent for itself and the benefit of the Secured Parties and the rights of setoff of Secured Parties provided for herein or under applicable law;

(b)    (i) easements, leases, licenses, subleases or sublicenses granted to others (including licenses and sublicenses of Intellectual Property) that do not (A) interfere in any material respect with the business of the Borrowers and their Subsidiaries, taken as a whole, or (B) secure any Indebtedness and (ii) any interest or title of a lessor or licensee under any lease or license entered into by a Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased or licensed;

(c)        liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(d)        liens (A) of a collection bank arising under Section 4-210 of the UCC, or any comparable or successor provision, on items in the course of collection, (B) attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business or (C) in favor of a banking or other financial institution or entity, or electronic payment service provider, arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking or finance industry;

(e)        liens securing Indebtedness permitted under Section 9.9(b); provided that (A) such liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such liens, (B) such liens do not at any time encumber any property other than the property financed by such Indebtedness except for replacements, additions, accessions and improvements to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Leases, such liens do not at any time extend to or cover any assets (except for replacements, additions, accessions and improvements to or proceeds of such assets) other than the assets subject to such Capital Leases; provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(f)        liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 9.10 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any disposition permitted under Section 9.7 (including any letter of intent or purchase agreement with respect to such Investment or disposition), or (B) consisting of an agreement to dispose of any property in a disposition permitted under Section 9.7, in each case, solely to the extent such Investment or disposition, as the case may be, would have been permitted on the date of the creation of such lien;

(g)        liens or rights of setoff against credit balances of Borrowers, Guarantors or any of their Subsidiaries with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to Borrower in the ordinary course of business, but not liens on or rights of setoff against any other property or assets of Borrowers, pursuant to the Credit Card Agreements to secure the obligations of Borrowers to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks;

(h)        [reserved];

(i)        liens arising from (i) [reserved] and (ii) Equipment or other materials which are not owned by any Borrower, Guarantor or Subsidiary located on the premises of such Borrower, Guarantor or Subsidiary (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business of such Borrower, Guarantor or Subsidiary and the precautionary UCC financing statement or fixture filings in respect thereof;

154

(j)        deposits of cash with the owner or lessor of premises leased and operated by any Borrower, Guarantor or Subsidiary in the ordinary course of the business of such Borrower, Guarantor or Subsidiary to secure the performance by such Borrower, Guarantor or Subsidiary of its obligations under the terms of the Real Property lease for such premises;

(k)        liens on motor vehicles securing Indebtedness permitted by Section 9.9(hh).

(l)        liens granted by a Subsidiary that is not a Loan Party in favor of any Subsidiary or any Borrower and liens granted by a Loan Party in favor of any other Loan Party;

(m)        security interests in assets of a Borrower, Guarantor or Subsidiary existing at the time such Borrower, Guarantor or Subsidiary is acquired pursuant to a Permitted Acquisition after the date hereof and any modifications, replacements, renewals or extensions thereof; provided that each of the following conditions is satisfied as determined by Agent: (i) such security interests were not granted and did not arise in connection with, or in anticipation or contemplation of, such Permitted Acquisition and (ii) the assets subject to such security interests do not include any assets of the type or categories that constitute Collateral other than Equipment or Real Property and do not apply to any assets or properties of any Borrower or other Guarantor other than Equipment and Real Property of the Borrower, Guarantor or Subsidiary so acquired;

(n)        other liens not otherwise permitted under any other subsection of this Section 9.8 with respect to property or assets of any Borrower, Guarantor or Subsidiary; provided that (i) the aggregate principal amount of the Indebtedness or other obligations secured by such liens does not exceed $5,000,000 and (ii) to the extent such liens encumber Collateral, they shall be subordinated to the security interests and liens of Agent on such Collateral in a manner substantially consistent with the terms of the Intercreditor Agreement or another intercreditor agreement reasonably acceptable to Agent;

(o)        liens or security interests arising by law or granted by any Borrower or any Guarantor in favor of a lessor, landlord, consignee, warehouseman or bailee of a retail store location, Non-Retail Store Location or Warehouse Location, as applicable, on personal property and/or trade fixtures owned by any Borrower or Guarantor located at such locations granted pursuant to a lease agreement between such Borrower or Guarantor and such lessor, landlord, consignee, warehouseman or bailee, as applicable, entered into in the ordinary course of business, in each case granted to secure obligations owed by such Borrower or Guarantor with respect to any rental payments, service charges or other amounts owing to such lessor, landlord, consignee, warehouseman or bailee, as applicable, pursuant to such lease agreement; provided, that, in the event that Administrative Borrower does not obtain a Collateral Access Agreement with respect to such locations, Agent at its option, may establish a Reserve with respect to each such location in respect of amounts at any time due or to become due to the lessor, landlord, consignee, warehouseman or bailee, as applicable, of such location as Agent shall reasonably determine but in no event shall any Reserve with respect to rent be maintained in respect of any location for which a Collateral Access Agreement has been delivered to Agent;

(p)        [reserved];

(q)     liens incurred by any Borrower or Guarantor on any unearned premiums paid by any Borrower or Guarantor or any return of the premium for such policy; pursuant to the Indebtedness described in <u>Section 9.9(j)</u> hereof;

(r)     liens existing on the Closing Date and set forth on <u>Schedule 8.4</u>) and any modifications, replacements, renewals or extensions thereof; provided that (A) such modified, replacement, renewal or extension lien does not extend to any additional property other than (1) after-acquired property that is affixed or incorporated into the property covered by such lien and (2) proceeds and products thereof, and (B) the obligations secured or benefited by such modified, replacement, renewal or extension lien are permitted by Section 9.9;

(s)     [reserved];

(t)     Permitted Encumbrances;

(u)     any interest or title of a lessor or sublessor under leases or subleases (other than Capital Leases) entered into by a Borrower or any Subsidiary in the ordinary course of business;

(v)     liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by a Borrower or any Subsidiary in the ordinary course of business;

(w)     liens deemed to exist in connection with Investments in repurchase agreements under clauses <u>(d)</u> or <u>(e)</u> of the definition of the term "Cash Equivalents";

(x)     liens encumbering reasonable customary initial deposits and margin deposits and similar liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(y)     liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of a Borrower and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of a Borrower or any Subsidiary in the ordinary course of business;

(z)     liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(aa)     liens on real property other than the Mortgaged Properties;

(bb)     liens on cash and Cash Equivalents used to satisfy or discharge Indebtedness; provided such satisfaction or discharge is permitted hereunder;

(cc)     receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a lien on the related inventory and proceeds thereof;

(dd)    liens on Capital Stock of any joint venture (a) securing obligations of such joint venture or (b) pursuant to the relevant joint venture agreement or arrangement;

(ee)    liens in favor of credit card issuers and credit card processors arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(ff)    liens securing the First Lien Obligations to the extent permitted to be incurred pursuant to Section 9.9(s); provided that such liens are at all times subject to the Intercreditor Agreement;

(gg)    [reserved];

(hh)    Liens securing Indebtedness permitted under Section 9.9(w) and Section 9.9(aa); and

(ii)    Liens on cash and Permitted Investments to secure Indebtedness permitted under Section 9.9(m) or Section 9.9(ff).

With respect to any lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such lien shall also be permitted to secure any Increased Amount of such Indebtedness.

9.9    Indebtedness.  Each Borrower and Guarantor shall not, and shall not permit any Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except:

(a)    the Obligations;

(b)    Indebtedness (including Capital Leases and purchase money indebtedness) incurred, issued or assumed by a Borrower or any Subsidiary to finance the acquisition, purchase, lease, construction, repair, replacement or improvement of fixed or capital property, equipment or other assets; provided that, in the case of any purchase money Indebtedness, such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, purchase, lease, construction, repair, replacement or improvement; provided, further that, at the time of any such incurrence of Indebtedness and after giving pro forma effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding (excluding any Capital Leases incurred pursuant to any sale and leaseback transactions permitted by Section 9.33) shall not exceed $10,000,000;

(c)    (1) guarantees by any Loan Party of the Indebtedness or other obligations of any Loan Party, in each case so long as such Indebtedness is otherwise permitted under this Section 9.9 and such other obligations are not prohibited by the terms of this Agreement and (2) guarantees by the any Subsidiaries (which are not Loan Parties) in respect of Indebtedness of a Borrower, Guarantor or other Subsidiary otherwise permitted hereunder; provided that:

157

(i)      no guarantee by any Subsidiary of a Loan Party of any unsecured Indebtedness for borrowed money in a principal amount in excess of $2,500,000 shall be permitted unless such Subsidiary shall have also provided a guarantee of the applicable Obligations pursuant to the Guaranty Agreement; and

(ii)      provided, further that if the Indebtedness being guaranteed is subordinated to the Obligations, such guarantee shall be subordinated to the guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(d)      the Indebtedness of any Borrower, Guarantor or other Subsidiary to any other Borrower or Guarantor or other Subsidiary arising after the date hereof to the extent permitted by 9.10(h) hereof;

(e)      unsecured Indebtedness of any Borrower, Guarantor or Subsidiary arising after the date hereof to any third Person (but not to any other Borrower or Guarantor); provided that each of the following conditions is satisfied as determined by Agent:

(i)      such Indebtedness shall be on terms and conditions acceptable to Agent and shall be subject and subordinate in right of payment to the right of Agent and Lenders to receive the prior payment and satisfaction in full payment of all of the Obligations pursuant to the terms of an intercreditor and subordination agreement between Agent and such third party, in form and substance satisfactory to Agent;

(ii)      Agent shall have received not less than ten days' prior written notice of the intention of such Borrower or Guarantor to incur such Indebtedness, which notice shall set forth in reasonable detail satisfactory to Agent the amount of such Indebtedness, the Person or Persons to whom such Indebtedness will be owed, the interest rate, the schedule of repayments and maturity date with respect thereto and such other information as Agent may request with respect thereto;

(iii)      Agent shall have received true, correct and complete copies of all agreements, documents and instruments evidencing or otherwise related to such Indebtedness;

(iv)      except as Agent may otherwise agree in writing, upon the occurrence and continuance of an Event of Default or during a Compliance Period, all of the cash proceeds of such loans or other accommodations incurred during the occurrence of such Event of Default or during such Compliance Period shall be, subject to the Intercreditor Agreement, paid to Agent for application to the Obligations in such order and manner as Agent may determine or at Agent's option, to be held as cash collateral for the Obligations;

(v)      in no event shall the aggregate principal amount of such Indebtedness incurred during the term of this Agreement exceed $10,000,000;

(vi)      as of the date of incurring such Indebtedness and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing; and

(vii)    such Borrower and Guarantor shall not, directly or indirectly, (A) amend, modify, alter or change the terms of such Indebtedness or any agreement, document or instrument related thereto, except, that, such Borrower or Guarantor may, after prior written notice to Agent, amend, modify, alter or change the terms thereof so as to extend the maturity thereof, or defer the timing of any payments in respect thereof, or to forgive or cancel any portion of such Indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith or (B) redeem, retire, defease, purchase or otherwise acquire such Indebtedness (except as permitted by Section 9.24), or set aside or otherwise deposit or invest any sums for such purpose, in each case without the written consent of Agent;

(f)    Indebtedness in respect of Hedge Agreement not incurred for speculative purposes;

(g)    Indebtedness outstanding on the Closing Date; provided that any Indebtedness shall only be permitted if set forth on Schedule 9.9;

(h)    [reserved];

(i)    [reserved];

(j)    Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business ;

(k)    Indebtedness incurred by a Borrower or any of the Subsidiaries in respect of letters of credit, bank guarantees, warehouse receipts, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(l)    [reserved];

(m)    Indebtedness in respect of Cash Management Obligations and other Indebtedness in respect of netting services, automated clearinghouse arrangements, overdraft protections and similar arrangements, in each case, in connection with deposit accounts or from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(n)    (i) Indebtedness arising from an agreement providing for indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments incurred in any Permitted Acquisition, any other Investment or any disposition, in each case permitted under this Agreement, and (ii) Indebtedness arising from guaranties, letters of credit, bank guarantees, surety bonds, performance bonds or similar instruments securing the performance pursuant to any such agreement described in clause (i);

(o)    Indebtedness of any Loan Party owing to any other Loan Party, in each case arising after the date hereof pursuant to Investments consisting of loans and advances permitted

under Section 9.10 hereof, provided that, as to any such Indebtedness at any time owing by a Borrower to a Guarantor or another Borrower, (x) the Indebtedness arising pursuant to such Investment shall be subject to, and subordinate in right of payment to, the right of Agent and Lenders to receive the prior final payment and satisfaction in full of all of the Obligations on terms and conditions acceptable to Agent, and (y) any such Indebtedness arising pursuant to any such loan shall not be evidenced by a promissory note or other instrument, unless the single original of such note or other instrument is promptly delivered to Agent upon its request to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as Agent may require;

(p)     Indebtedness ("Refinancing Indebtedness") incurred to refinance Indebtedness incurred pursuant to subsections (b), (c), (d), (e), (f), (g), (j), (s) or (w) of this Section 9.9 (or this subsection (p)) or any successive Refinancing Indebtedness (such Indebtedness being refinanced being referred to herein as the "Refinanced Indebtedness") so long as (i) such Indebtedness continues to comply with all provisions of such subsections (b), (c), (d), (e), (f), (g), (j), (s) or (w) as applicable, (ii) the incurrence of such Indebtedness would not otherwise cause a Default or Event of Default to occur, and (iii) the terms of such Indebtedness (including subordination terms, if applicable) are not on terms which, taken as a whole, are materially more adverse to Borrowers, Guarantors, Agent or any Lender than the Refinanced Indebtedness, (iv) the principal amount of such Indebtedness as refinanced does not exceed the outstanding principal balance of the Refinanced Indebtedness plus costs, fees, expenses, and accrued interest, and (v) the final maturity date of such Refinancing Indebtedness is a maturity date that is not earlier than ninety days after the scheduled Maturity Date; provided that, with respect to the maturity date of any Refinancing Indebtedness in respect of the First Lien Obligations, such maturity date shall not be required to be subject to this clause (v) so long as such Indebtedness is subject to clause (b) of the definition of "Maturity Date";

(q)     [reserved];

(r)     [reserved];

(s)     the First Lien Obligations in an aggregate principal amount not to exceed, together with or in each case any refinancing or replacement thereof, the Secured Term Debt Cap; provided that any Liens securing the First Lien Obligations are at all times subject to the terms of the Intercreditor Agreement;

(t)     [reserved];

(u)     [reserved];

(v)     Indebtedness consisting of obligations under deferred compensation (including indemnification obligations, obligations in respect of purchase price adjustments, Earn-Outs, incentive non-competes and other contingent obligations) or other similar arrangements incurred or assumed in connection with any Permitted Acquisition, any other Investment or any disposition, in each case, permitted under this Agreement;

(w)     Indebtedness of the Administrative Borrower or any of the Subsidiaries; provided that at the time of the incurrence thereof and after giving pro forma effect thereto, the

aggregate principal amount of Indebtedness outstanding in reliance on this clause (w) shall not exceed $5,000,000;

(x)    [reserved];

(y)    Indebtedness supported by a letter of credit, in a principal amount not to exceed the face amount of such letter of credit;

(z)    [reserved];

(aa)    [reserved];

(bb)    [reserved];

(cc)    obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by a Borrower or any Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case, in the ordinary course of business or consistent with past practice;

(dd)    (x) Indebtedness representing deferred compensation or stock-based compensation owed to employees, consultants or independent contractors of a Borrower or its Subsidiaries incurred in the ordinary course of business or consistent with past practice and (y) Indebtedness consisting of obligations of a Borrower (or any direct or indirect parent thereof) or its Subsidiaries under deferred compensation to employees, consultants or independent contractors of a Borrower (or any direct or indirect parent thereof) or its Subsidiaries or other similar arrangements incurred by such Persons in connection with any Permitted Acquisition or any other Investment not prohibited by Section 9.10;

(ee)    Indebtedness consisting of unsecured promissory notes issued by the Administrative Borrower or any Subsidiary to future, current or former officers, directors, employees, managers and consultants or their respective estates, spouses or former spouses, successors, executors, administrators, heirs, legatees or distributees, in each case to finance the purchase or redemption of Capital Stock of a Borrower (or any direct or indirect parent thereof);

(ff)    [reserved];

(gg)    obligations with respect to Capital Leases arising under any sale and leaseback transactions permitted by Section 9.33;

(hh)    to the extent constituting Indebtedness, motor vehicle leases in the ordinary course of business;

(ii)    [reserved];

(jj)    [reserved]; and

(kk)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (jj) above;

provided that; notwithstanding anything in this Section 9.9 to the contrary:

(a)    The aggregate amount of any refinancing Indebtedness incurred pursuant to subsection (p) of this Section 9.9 in respect of Refinanced Indebtedness originally incurred under (b), (c), (d), (e), (f), (g), (j), (s) or (w) shall be subject to, and shall continue to count towards, the dollar limitations applicable to Indebtedness set forth in the applicable subsection pursuant to which the Refinanced Indebtedness was incurred, First Lien Obligations may only be incurred under Section 9.9(s).

(b)    For purposes of determining compliance with any dollar denominated restriction on the incurrence of Indebtedness, the dollar equivalent principal amount of Indebtedness denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided, however, that if such Indebtedness is Refinancing Indebtedness incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable dollar denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance such dollar denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased. Notwithstanding any other provision of this Section 9.9, the maximum amount of Indebtedness the Administrative Borrower or any Subsidiary may incur pursuant to this Section 9.9 shall not be deemed exceeded by fluctuations in the exchange rate of currencies. The principal amount of any Refinancing Indebtedness shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of any extension, replacement, refunding, refinancing, renewal or defeasance of any Indebtedness.

(c)    With respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence.

(d)    This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

(e)    Each Borrower and Guarantor will not, and will not permit any of its Subsidiaries to, issue any Disqualified Equity Interests.

9.10    <u>Loans, Investments, Etc</u>.  Each Borrower and Guarantor shall not, and shall not permit any Subsidiary to, directly or indirectly, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary immediately prior to such merger) any Capital Stock, evidences of Indebtedness or other Securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, or guarantee the Indebtedness or other obligations of, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit or all or a substantial part of the assets or property of any other Person (whether through purchase of assets, merger or otherwise), or form or acquire any Subsidiaries, or agree to do any of the foregoing (each of the foregoing, an "<u>Investment</u>"), except:

(a)    the endorsement of instruments for collection or deposit in the ordinary course of business;

(b)    Investments in cash or Cash Equivalents; <u>provided</u>, that, the terms and conditions of <u>Section 5.2</u> and <u>Section 6.3</u> hereof shall have been satisfied with respect to the Deposit Account, investment account or other account in which such cash or Cash Equivalents are held;

(c)    (i)    the existing equity Investments of each Borrower and Guarantor as of the Closing Date in its Subsidiaries, provided that no Borrower or Guarantor shall have any further obligations or liabilities to make any capital contributions or other additional investments or other payments to or in or for the benefit of any of such Subsidiaries;

(ii)    a Borrower or Guarantor may form a Subsidiary; <u>provided</u> that:

(A)    Agent shall have received promptly upon any such formation or acquisition all of the agreements, documents and instruments required by the terms of <u>Sections 5.2</u> and <u>9.23</u> hereof,

(B)    as of the date of the organization, formation or acquisition of any such Subsidiary and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing,

(C)    in the event that Administrative Borrower requests that any such new Subsidiary that is directly or indirectly wholly owned by a Loan Party be designated a Borrower hereunder, in no event shall any Inventory, Accounts or Credit Card Receivables of such Subsidiary be deemed Eligible Inventory, Eligible Accounts or Eligible Credit Card Receivables until Agent shall have conducted a field examination and inventory appraisal with respect to such assets and the results of such field examination, inventory appraisal and other due diligence shall be reasonably satisfactory to Agent, and then only to the extent the criteria for Eligible Inventory, Eligible Accounts and Eligible Credit Card Receivables set forth herein are satisfied with respect thereto (as such criteria may be reasonably modified by Agent to reflect the results of Agent's field examination and appraisal including any separate advance percentage with respect to such Credit Card Receivables as Agent may reasonably determine), and

163

(D)    such Subsidiary shall be an operating company that engages in a Permitted Business or an operating company or a holding company formed to make a Permitted Acquisition;

(d)    [reserved];

(e)    loans or advances to officers, members (other than a Loan Party) of the Board and employees of any Borrower, any Guarantor and their respective Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes and (ii) in connection with such Person's purchase of Capital Stock of the Administrative Borrower (or any direct or indirect parent thereof) (provided that the amount of such loans and advances made in cash to such Person shall be immediately contributed to the Administrative Borrower in cash as common equity or Qualified Equity Interests);

(f)    Investments (including debt obligations and Capital Stock) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(g)    obligations of Account Debtors to any Borrower, Guarantor or Subsidiary arising from Accounts which are past due whether or not evidenced by a promissory note made by such Account Debtor payable to such Borrower or Guarantor; provided that, promptly upon the receipt of the original of any such promissory note by such Borrower or Guarantor, such promissory note shall be endorsed to the order of Agent by such Borrower or Guarantor and promptly delivered to Agent as so endorsed;

(h)    investments by any Loan Party to any other Loan Party, in each case after the date hereof; provided that as to any Investments in the form of loans, (A) the Indebtedness arising pursuant to any such loan shall not be evidenced by a promissory note or other instrument, unless the single original of such note or other instrument is promptly delivered to Agent upon its request to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as Agent may require, (B) as of the date of any such loan and after giving effect thereto, the Administrative Borrower or Guarantor making such loan shall be Solvent, (C) as of the date of any such loan and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (D) the Indebtedness arising pursuant to such loan shall be subject to, and subordinate in right of payment to, the right of Agent and Lenders to receive the prior final payment and satisfaction in full of all of the Obligations on terms and conditions reasonably acceptable to Agent, (E) promptly upon Agent's request, Agent shall have received a subordination agreement, in form and substance reasonably satisfactory to Agent, providing for the terms of the subordination in right of payment of such loans to the prior final payment and satisfaction in full of all of the Obligations, duly authorized, executed and delivered by such Loan Parties, and (F) such Loan Parties shall not, directly or indirectly make, or be required to make, any payments in respect of such loans prior to the end of the then current term of this Agreement;

(i)    Investments existing or contemplated on the Closing Date (provided that any Investment shall only be permitted if set forth on Schedule 9.10) and any modification,

replacement, renewal, reinvestment or extension thereof; provided that the amount of the Investment as of the Closing Date is not increased except by the terms of such Investment to the extent set forth on Schedule 9.10 or as otherwise permitted by this Section 9.10;

(j)    [reserved];

(k)    commencing on the date that is ninety (90) days after the Closing Date, (A) Permitted Acquisitions and (B) intercompany Investments required (as determined by the Administrative Borrower in good faith) to consummate Permitted Acquisitions; provided that all entities, businesses and assets (other than Excluded Assets) acquired through a Permitted Acquisition after the Closing Date shall become Loan Parties and Collateral, as applicable, pursuant to Sections 9.21 and 9.23;

(l)    [reserved];

(m)    commencing on the date that is ninety (90) days after the Closing Date, Investments of a Subsidiary acquired after the Closing Date or of a Person merged or consolidated with any Subsidiary in accordance with this Section 9.10 and Section 9.7(a) after the Closing Date or that otherwise becomes a Subsidiary (provided that if such Investment is made under Section 9.10(k), existing Investments in subsidiaries of such Subsidiary or Person shall comply with the requirements of Section 9.10(k)) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(n)    commencing on the date that is ninety (90) days after the Closing Date, Investments arising as a result of sale and leaseback transactions permitted by Section 9.33;

(o)    [reserved];

(p)    [reserved];

(q)    loans and advances to franchisees in the ordinary course of business and consistent with past practices; provided that (i) such loans and advances in excess of $750,000 individually shall be evidenced by promissory notes and any such promissory notes shall be pledged to Agent, for the benefit of the Secured Parties, to the extent required by the Collateral Documents and (ii) the aggregate outstanding principal amount of such loans and advances made in reliance on this clause (q) shall not exceed $2,000,000;

(r)    Investments consisting of extensions of trade credit and accommodation guarantees in the ordinary course of business;

(s)    Investments in Swap Agreements incurred in the ordinary course of business and not for speculative purposes;

(t)    promissory notes and other non-cash consideration received in connection with dispositions permitted by Section 9.7, subject to prior written consent by the Required Lenders in their sole discretion;

(u)    [reserved];

(v)    Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers in the ordinary course of business;

(w)    subject to prior written consent by the Required Lenders to be granted in their sole discretion, loans and advances to officers or members of the Board of any equity holder of the Administrative Borrower (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances, dividends or distributions in respect thereof), dividends and distributions to the extent permitted to be made to such holder (or such parent) in accordance with Section 9.11;

(x)    advances of payroll payments to employees in the ordinary course of business;

(y)    Investments and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests;

(z)    receivables owing to a Borrower, a Guarantor or any Subsidiary, if created or acquired in the ordinary course of business;

(aa)    Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business;

(bb)    Investments in a Borrower, a Guarantor or any Subsidiary in connection with any Tax Restructuring;

(cc)    Investments consisting of Indebtedness, liens, fundamental changes, dispositions, dividends and distributions permitted (other than by reference to this Section 9.10(cc)) under Sections 9.7, 9.8, 9.9 and 9.11, respectively;

(dd)    contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of a Borrower;

(ee)    to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, or other rights, in each case in the ordinary course of business;

(ff)    [reserved];

(gg)    [reserved];

(hh)    [reserved];

(ii)      commencing on the date that is ninety (90) days after the Closing Date, other Investments so long as the Payment Conditions are satisfied; and

(jj)      commencing on the date that is ninety (90) days after the Closing Date, other Investments by Borrowers and Guarantors and their Subsidiaries not otherwise permitted pursuant to subsections (a) through (ii) of this Section 9.10, including, without limitation, any Investments by such Borrower or such Guarantor in any Foreign Subsidiary, provided that (i) the aggregate outstanding amount of all such Investments (valued at cost) shall not exceed $5,000,000 at any time (in each case determined without regard to any write-downs or write offs), and (ii) at the time of making any such Investment and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing.

9.11    Dividends and Redemptions.  Each Borrower and Guarantor shall not, directly or indirectly, declare or pay any dividends on account of any shares of class of any Capital Stock of such Borrower or Guarantor now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Capital Stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing, except that:

(a)      commencing on the date that is ninety (90) days after the Closing Date, any Borrower or Guarantor may declare and pay such dividends or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Capital Stock for consideration in the form of shares of Capital Stock (other than capital stock described in clause (e) of the definition of "Indebtedness") or with proceeds from substantially concurrent equity contributions;

(b)      on the date of consummating the Buddy Reorganization Transaction, the Administrative Borrower or its Subsidiaries may make the distributions expressly described in the definition therewith;

(c)      each Subsidiary may pay dividends or make distributions to any Borrower, any Guarantor or any other Subsidiary of a Borrower or a Guarantor; provided that in the case of any such dividends or distributions by a Subsidiary that is not a Wholly Owned Subsidiary of a Borrower or Guarantor, such dividend is paid or distribution is made to any Borrower, any Guarantor and/or any Subsidiary of such Borrower or Guarantor on a ratable basis;

(d)      for any taxable period for which Fusion Intermediate, any Borrower and/or any other Subsidiary is treated as a corporation for U.S. federal or state income or similar tax purposes and is a member of a consolidated, combined, unitary or similar tax group (a "Tax Group") (or is treated as a disregarded entity that is wholly owned by a corporation that is a member of a Tax Group for U.S. federal or state income or similar tax purposes) of which Fusion Intermediate or any other direct or indirect parent of Fusion Intermediate is the common parent that reports the income of such Tax Group on an income tax return (the "Common Parent"), such Borrower may make distributions to Fusion Intermediate, which Fusion Intermediate may further distribute, directly or indirectly, to the Common Parent (if Fusion Intermediate is not the Common Parent), in an amount not to exceed the lesser of: (i) the amount of U.S. federal, state and local

income taxes that Fusion Intermediate and its subsidiaries would have been required to pay if they were a stand-alone Tax Group with Fusion Intermediate as the common parent of such stand-alone Tax Group for such year, with such taxes calculated at the maximum combined U.S. federal, state, and local income tax rates applicable to a corporation resident in the applicable jurisdictions where such income taxes are payable and (ii) such consolidated group's actual income tax liability;

(e)     [reserved];

(f)     dividends paid or distributions made on or substantially contemporaneously with the Closing Date to finance the payment of Transaction Costs;

(g)     commencing on the date that is ninety (90) days after the Closing Date, repurchases of Capital Stock in a Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Capital Stock represent a portion of the exercise price or withholding taxes payable in connection with the exercise of such options or warrants or other incentive interests;

(h)     commencing on the date that is ninety (90) days after the Closing Date, dividends or distributions used to redeem, acquire, retire, repurchase or settle a Borrower's Capital Stock (or any options, warrants, restricted stock or stock appreciation rights or similar securities issued with respect to any such Capital Stock) held directly or indirectly by current or former officers, managers, consultants, members of the Board, employees or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of the Administrative Borrower (or any direct or indirect parent thereof), and its Subsidiaries (in each case, other than the executive management (i.e., the CEO, the CFO, any executive vice presidents and any similar executive management positions)), upon the death, disability, retirement or termination of employment of any such Person or otherwise in accordance with any stock option or stock appreciation rights plan, any management, director and/or employee stock ownership or incentive plan, stock subscription plan, employment termination agreement or any other employment agreements or equity holders' agreement in an aggregate amount not to exceed (1) the cash proceeds of key man life insurance policies received by a Borrower, a Guarantor or the Subsidiaries after the Closing Date, or (2) the amount of any bona fide cash bonuses otherwise payable to members of the Board, consultants, officers, employees, managers or independent contractors the Administrative Borrower, any other Borrower, Guarantor or any Subsidiary that are foregone in return for the receipt of Capital Stock, the fair market value of which is equal to or less than the amount of such cash bonuses, which, if not used in any year, may be carried forward solely to the next subsequent fiscal year; provided further that cancellation of Indebtedness owing to a Borrower, a Guarantor or any Subsidiary from members of the Board, consultants, officers, employees, managers or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of a Borrower, a Guarantor or any Subsidiary in connection with a repurchase of Capital Stock of a Borrower will not be deemed to constitute a dividend or distribution for purposes of this Section 9.11 or any other provisions of this Agreement; provided further that any dividend or distribution pursuant to this clause (h) shall be subject to satisfaction of the Payment Conditions;

(i)     payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any

168

repurchases of Capital Stock in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units; provided that if such payments are finally determined to be in excess of the withholding or similar Taxes, the Administrative Borrower shall make best efforts to cause the return of such payments within thirty (30) days of such determination;

(j)        commencing on the date that is ninety (90) days after the Closing Date, dividends or distributions to pay cash in lieu of fractional Capital Stock in connection with any dividend, split or combination thereof or any Permitted Acquisition (or other similar Investment) and (b) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

(k)        payments made or expected to be made by a Borrower, a Guarantor or any Subsidiary in respect of withholding or similar Taxes payable upon exercise of Capital Stock by any future, present or former employee, director, officer, manager or consultant (or their respective controlled Affiliates or permitted transferees) and any repurchases of Capital Stock deemed to occur upon exercise of stock options or warrants if such Capital Stock represent a portion of the exercise price of such options or warrants or required withholding or similar taxes; provided that if such payments are finally determined to be in excess of the withholding or similar Taxes, Borrower shall make best efforts to cause the return of such payments thirty (30) days of such determination; and

(l)        commencing on the date that is ninety (90) days after the Closing Date, additional dividends or distributions so long as the Payment Conditions are satisfied.

Transactions with Affiliates.  Each Borrower and Guarantor shall not, directly or indirectly:

(a)        purchase, acquire or lease any property from, or sell, transfer or lease any property or provide services to, any officer, director or other Affiliate of such Borrower or Guarantor (other than another Borrower or Guarantor), except:

(i)        (A) in the ordinary course of (except with respect to transactions permitted under Sections 9.7, 9.8, 9.9, 9.10 or 9.11) and pursuant to the reasonable requirements of such Borrower's or Guarantor's business (as the case may be) and (B) on terms not materially less favorable to such Borrower or such Guarantor or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(ii)        transactions permitted under Section 9.7(a) hereof;

(iii)        transactions permitted under Section 9.12(b) hereof;

(iv)        transactions involving payment or consideration in an aggregate amount not to exceed $2,500,000;

(v)        any Indebtedness permitted by Section 9.9;

(vi)  any Investments permitted by Section 9.10;

(vii)  issuances of Capital Stock;

(viii)  the Buddy Reorganization Transaction;

(ix)  the payment of Transaction Costs;

(x)  dispositions in the form of a sale of furniture and assignment of lease agreements to franchisees in the ordinary course of business consistent with past practices, so long as the sale thereof is approved by disinterested members of the Board (or any committee thereof);

(xi)  employment and severance arrangements and other compensation arrangements between a Borrower, a Guarantor and its respective Subsidiaries and their respective officers and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Section 9.10(e) and 9.10(x));

(xii)  investments by Affiliates in Indebtedness and preferred Capital Stock of the Loan Parties and their respective Subsidiaries;

(xiii)  the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board, officers and employees of the Administrative Borrower (or any direct or indirect parent thereof) and the Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Administrative Borrower and its Subsidiaries;

(xiv)  transactions pursuant to agreements in existence or contemplated on the Closing Date and set forth on Schedule 9.12 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(xv)  dividends and distributions permitted under Section 9.11 and loans and advances in lieu thereof pursuant to Section 9.10(w);

(xvi)  payments to or from, and transactions with, any joint venture in the ordinary course of business (including any cash management activities related thereto);

(xvii)  transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services that are Affiliates, in each case in the ordinary course of business and which are fair to the Borrowers, Guarantors and their respective Subsidiaries, in the reasonable determination of the Administrative Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(xviii)  [reserved];

(xix)  [reserved];

(xx)  [reserved]; and

(xxi)    [reserved]; or

(b)    make any payments (whether by dividend, loan or otherwise) of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, shareholder, director or any other Affiliate of such Borrower or Guarantor, except:

(i)    licenses, sublicenses, covenants not to sue, or similar agreement with respect to Intellectual Property made in the ordinary course of business;

(ii)    reasonable compensation to officers, employees and directors for services rendered to such Borrower or Guarantor and reimbursement of expenses in the ordinary course of business of such Borrower or Guarantor;

(iii)    payments to any Person that owns, directly or indirectly, the Capital Stock of a Borrower or a Guarantor for actual and necessary reasonable out-of-pocket legal and accounting, insurance, marketing, payroll and similar types of services (other than management or sponsor fees) paid by such Person on behalf of such Borrower or Guarantor, in the ordinary course of their respective businesses or as the same may be directly attributable to such Borrower or Guarantor, provided that the aggregate amount of all such payments in any fiscal year shall not exceed $3,000,000; and

(iv)    payments permitted under Section 9.24 hereof;

provided that, each such transaction (other than any transaction pursuant to clauses (a) (excluding (a)(xi), (xii) and (xiv)) and (b)(iv)) shall be on terms not materially less favorable to the Administrative Borrower or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate.

9.13    Compliance with ERISA.  Except as could not reasonably be expected to have a Material Adverse Effect, each Borrower and Guarantor shall, and shall with respect to any Plan cause each of its ERISA Affiliates to:  (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal and State law; (b) cause each Plan which is qualified under Section 401(a) of the Code to maintain such qualification; (c) not terminate any Plan so as to incur any material liability to the Pension Benefit Guaranty Corporation; (d) not allow or suffer to exist any non-exempt "prohibited transaction" (within the meaning of Section 4975 of the Code) which would be reasonably likely to subject Borrower or any ERISA Affiliate to a material tax or penalty or other liability on prohibited transactions imposed under Section 4975 of the Code or ERISA; (e) make all required contributions to any Plan under Section 302 of ERISA, Section 412 of the Code or the terms of such Plan; (f) not allow or suffer to exist any "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, with respect to any Plan; or (g) allow or suffer to exist any occurrence of a "reportable event" (as defined in Section 4043(c) of ERISA or the regulations issued thereunder, except for any such event with respect to which notice has been waived pursuant to applicable regulations) or any other event or condition which presents a material risk of termination by the Pension Benefit Guaranty Corporation of any Plan that is a

single employer plan, which termination could reasonably be expected to result in any material liability to any Borrower or Guarantor.

9.14    <u>Fiscal Year</u>.  The Administrative Borrower will not make any change in its fiscal year; provided, however, that the Administrative Borrower may, upon written notice to Agent, change its fiscal year to any other fiscal year reasonably acceptable to Agent, in which case, the Administrative Borrower and Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year, without any requirement of consent by any Lender or other Person (notwithstanding anything to the contrary in <u>Section 11.4</u>).

9.15    <u>Change in Business</u>.  Each Borrower and Guarantor shall not engage in any business other than the Permitted Business.

9.16    <u>Limitation of Restrictions Affecting Subsidiaries</u>.  Each Borrower and Guarantor shall not, directly, or indirectly, create or otherwise cause or suffer to exist any encumbrance or restriction which prohibits or materially limits the ability of any Subsidiary of such Borrower or Guarantor to:

(a)    pay dividends or make other distributions or pay any Indebtedness owed to such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor;

(b)    make loans or advances to such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor;

(c)    transfer any of its properties or assets to such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor; or

(d)    create, incur, assume or suffer to exist any lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than encumbrances and restrictions arising under:

(i)    Requirements of Law;

(ii)    this Agreement and  Financing Agreements, the First Lien Credit Agreement, and any documentation governing Indebtedness incurred pursuant to <u>Section 9.9(aa)</u> or <u>Section 9.9(ff)</u>;

(iii)    customary provisions restricting subletting or assignment of any lease (or hypothecation thereof) governing a leasehold interest of such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor;

(iv)    customary restrictions on dispositions of real property interests found in reciprocal easement agreements of such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor;

(v)    any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the

scope of any such restriction or condition); <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Administrative Borrower or any other Subsidiary;

(vi)    the extension or continuation of contractual obligations in existence on the date hereof and otherwise permitted hereunder; <u>provided</u> that any such encumbrances or restrictions contained in such extension or continuation are no less favorable to Agent and Lenders than those encumbrances and restrictions under or pursuant to the contractual obligations so extended or continued;

(vii)    any agreement related to an otherwise permitted refinancing of Indebtedness permitted under the terms of this Agreement;

(viii)    Indebtedness permitted to be incurred under the terms of this Agreement with terms no more restrictive than those set forth herein;

(ix)    customary restrictions and conditions existing on the Closing Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(x)    restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; <u>provided</u> that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(xi)    customary provisions in leases, licenses, sublicenses and other contracts restricting the assignment thereof;

(xii)    restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(xiii)    restrictions or conditions in any Indebtedness permitted pursuant to <u>Section 9.9</u> that is incurred or assumed by Subsidiaries that are not Loan Parties to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Financing Agreement;

(xiv)    restrictions on cash (or Cash Equivalent) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(xv)    restrictions set forth on <u>Schedule 9.16</u> and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(xvi)    customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by <u>Section 9.10</u>;

(xvii) customary restrictions contained in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto; and

(xviii) customary provisions related to creditworthiness of the tenant contained in real property leases entered into by Subsidiaries, so long as a Borrower or Guarantor has determined in good faith that such creditworthiness provisions could not reasonably be expected to impair the ability of such Borrower or Guarantor and its Subsidiaries to meet their ongoing obligations.

9.17    Financial Covenant.

(a)    As of the end of any fiscal month, commencing with the most recent fiscal month for which Borrowers' and Guarantors' financial statements have been (or should have been) delivered prior to the date on which Excess Availability is less than the greater of (x) 12.5% of the Borrowing Cap or (y) $18,000,000, Borrowers and Guarantors will not permit the Fixed Charge Coverage Ratio to be less than 1.0 to 1.0.

(b)    Once such covenant is in effect, compliance with the covenant will be discontinued on the first day immediately succeeding the last day of the fiscal month which includes the 30th consecutive day on which Excess Availability remains in excess of the greater of (x) 12.5% of the Borrowing Cap and (y) $18,000,000, so long as no Event of Default shall have occurred and be continuing.

9.18    Credit Card Agreements.  Each Borrower and Guarantor shall:

(a)    observe and perform in all material respects all material terms, covenants, conditions and provisions of the Credit Card Agreements to be observed and performed by it at the times set forth therein;

(b)    not do or permit, suffer or refrain from doing anything, as a result of which there could be a default or breach of any of the terms of the Credit Card Agreements and at all times maintain in full force and effect the Credit Card Agreements and not terminate, cancel, surrender, modify, amend, waive or release any of the Credit Card Agreements, or consent to or permit to occur any of the foregoing; except, that, any Borrower or Guarantor may terminate or cancel any of the Credit Card Agreements in the ordinary course of the business of such Borrower or Guarantor; provided, that, such Borrower or Guarantor shall give Agent not less than ten days' prior written notice of its intention to so terminate or cancel any of the Credit Card Agreements;

(c)    not enter into any new Credit Card Agreements with any new Credit Card Issuer unless (i) Agent shall have received not less than ten days' prior written notice of the intention of such Borrower or Guarantor to enter into such agreement (together with such other information with respect thereto as Agent may reasonably request) and (ii) such Borrower delivers, or causes to be delivered to Agent, subject to Section 9.31, a Credit Card Acknowledgment in favor of Agent;

(d)    give Agent prompt written notice of any Credit Card Agreement or material amendment or other material modification of any Credit Card Agreement entered into by such

Borrower after the date hereof, together with a true, correct and complete copy thereof and such other information with respect thereto as Agent may reasonably request;

(e)    furnish to Agent, promptly upon the request of Agent, such material information and evidence as Agent may require from time to time concerning the observance, performance and compliance by such Borrower or the other party or parties thereto with the terms, covenants or provisions of the Credit Card Agreements, and

(f)    not modify in any material respect any payment instruction given by Agent to any Credit Card Issuer or Credit Card Processor provided for in any Credit Card Acknowledgment to the extent given in accordance with the terms thereof or otherwise direct the remittance of payments under any Credit Card Agreement to any account other than the Blocked Accounts.

9.19    License Agreements.

(a)    Except as could not reasonably be expected to have a Material Adverse Effect, the Borrowers and Guarantors shall:

(i)    promptly and faithfully observe and perform all of the material terms, covenants, conditions and provisions of the material License Agreements to which it is a party to be observed and performed by it, at the times set forth therein, if any;

(ii)    not do, permit, suffer or refrain from doing anything that could reasonably be expected to result in a default under or breach of any of the terms of any material License Agreement;

(iii)    not cancel, surrender, modify, amend, waive or release any material License Agreement in any material respect or any term, provision or right of the licensee thereunder in any material respect, or consent to or permit to occur any of the foregoing except as permitted pursuant to Section 9.19(b) below;

(iv)    give Agent prompt written notice of any material License Agreement (other than Promotional Agreements or licenses by a Borrower, Guarantor or any of their Subsidiaries to a private label manufacturer entered into in the ordinary course of business for the production of Inventory on behalf of a Borrower or "click through" licenses to website hosts or providers in connection with on-line purchasing or licenses to a Borrower by a customer to use such customer's trademarks or service marks for purposes of goods or services provided by such Borrower to or for such customer or licenses for commercially available off the shelf software) entered into by any Borrower, Guarantor or any of their Subsidiaries after the date hereof, together with (A) either (x) a description of such License Agreement listing the Intellectual Property subject thereto, the name and address of the parties thereto, the term of the license arrangement and the products and territory subject to such license, or (y) a true, correct and complete copy of such License Agreement, and (B) such other information with respect thereto as Agent may reasonably request (subject to any obligation of confidentiality contained therein);

(v)    give Agent prompt written notice of any notice of default sent to another party to a material License Agreement by any Borrower or any Guarantor of any material

breach of any obligation, or any default, by any party under any material License Agreement, and deliver to Agent (promptly upon the receipt thereof by such Borrower or Guarantor in the case of a notice to any Borrower or any Guarantor and concurrently with the sending thereof in the case of a notice from any Borrower or any Guarantor) a copy of each notice of default and every other notice and other communication received or delivered by such Borrower or Guarantor in connection with any material License Agreement which relates to the right of such Borrower or Guarantor to continue to use the property subject to such License Agreement, and

      (vi) furnish to Agent, promptly upon the request of Agent, such information and evidence as Agent may reasonably require from time to time concerning the observance, performance and compliance by Borrower or the other party or parties thereto with the material terms, covenants or provisions of any material License Agreement.

    (b) Except as could not reasonably be expected to have a Material Adverse Effect, each Borrower will either exercise any option to renew or extend the term of each material License Agreement to which it is a party in such manner as will cause the term of such material License Agreement to be effectively renewed or extended for the period provided by such option.

    9.20 <u>Foreign Assets Control Regulations, Etc</u>. None of the requesting or borrowing of the Loans or the requesting or issuance or extension of any Letter of Credit or the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. §1 et seq., as amended) (the "<u>Trading With the Enemy Act</u>") or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) (the "<u>Foreign Assets Control Regulations</u>") or any enabling legislation or executive order relating thereto (including, but not limited to (a) Executive order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "<u>Executive Order</u>") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). None of Borrowers or any of their Subsidiaries or other Affiliates is or will become a "<u>blocked person</u>" as described in the Executive Order, the Trading with the Enemy Act or the Foreign Assets Control Regulations or engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person".

    9.21 <u>After-Acquired Real Property</u>. If, after the Closing Date, any owned (but not leased or ground-leased) Material Real Property or improvements thereto or any interest therein is acquired by any Borrower or any Guarantor or is held by any Subsidiary on or after the time it becomes a Borrower or Guarantor pursuant to <u>Section 9.23</u>, the Administrative Borrower will notify Agent thereof, and, if requested by Agent, within ninety (90) days following the acquisition of such Material Real Property or such longer time period as agreed by Agent in its reasonable discretion, Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property duly executed and delivered by the record owner of such Mortgaged Property; <u>provided</u> that, to the extent any Mortgaged Property is located in a jurisdiction that imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, Agent will cooperate with the applicable Borrower or Guarantor in order to minimize the amount of tax payable in connection with such Mortgage as permitted by, and in accordance with, applicable law including, to the extent permitted by applicable law, limiting the amount secured by such Mortgage to the book value of such Mortgaged Property, as reasonably determined by the

Administrative Borrower, if such limitation results in such mortgage tax being calculated based upon such book value, (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a third priority Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 9.8, together with such customary lender's endorsements as Agent may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates (it being agreed that Agent shall accept zoning reports from a nationally recognized zoning company in lieu of zoning endorsements to such title insurance policies), in an amount equal to the fair market value of such Mortgaged Property or as otherwise reasonably agreed by the parties; provided that in no event will any Borrower or Guarantor be required to obtain independent appraisals of such Mortgaged Properties, unless required by FIRREA, (iii) a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Mortgaged Property and, if any Mortgaged Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, a duly executed notice about special flood hazard area status and flood disaster assistance and evidence of such flood insurance as provided in Section 9.5, (iv) opinions, addressed to Agent and the Secured Parties, from counsel qualified to opine in each jurisdiction where a Mortgaged Property is located regarding the enforceability of the Mortgage and such other matters as may be in form and substance reasonably satisfactory to Agent, (v) a survey or existing survey together with a no change affidavit of such Mortgaged Property, in compliance with the 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys or such other ALTA/NSPS requirements as are in effect on the date of preparation of such survey and otherwise reasonably satisfactory to Agent and (vi) evidence of payment of title insurance premiums and expenses and all recording, mortgage, transfer and stamp taxes and fees payable in connection with recording the Mortgage, any amendments thereto and any fixture filings in appropriate county land office(s).

9.22    Costs and Expenses.  Borrowers and Guarantors shall pay to Agent on demand all costs, expenses and filing fees paid or payable in connection with the preparation, negotiation, execution, delivery, recording, syndication, administration, collection, liquidation, enforcement and defense of the Obligations, Agent's rights in the Collateral, this Agreement, the other Financing Agreements and all other documents related hereto or thereto, including any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including:  (a) all costs and expenses of filing or recording (including UCC financing statement filing fees, if applicable); (b) costs and expenses and fees for insurance premiums, environmental audits, title insurance premiums, surveys, assessments, engineering reports and inspections, appraisal fees and search fees, background checks, costs and expenses of remitting loan proceeds, collecting checks and other items of payment, and establishing and maintaining the Blocked Accounts, together with Agent's customary charges and fees with respect thereto; (c) charges, fees or expenses charged by the Issuing Bank in connection with any Letter of Credit; (d) costs and expenses of preserving and protecting the Collateral; (e) costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Agent, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Financing Agreements or defending any claims made or threatened against Agent or any Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (f) after an Event of Default has occurred and is

continuing, reasonable attorneys' fees of any Lender incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Agent, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Financing Agreements or defending any claims made or threatened against Agent or any Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations and inventory appraisals in respect of the Borrowing Base and such Borrower's or Guarantor's operations for no more than two periodic field exams and two inventory appraisals, in each case in respect of the Borrowing Base, during a consecutive twelve-month period; provided that, unless an Event of Default shall have occurred and is continuing or a Material Adverse Effect has occurred, only one periodic field exam and one inventory appraisal, in respect of the Borrowing Base, will be conducted at the Borrowers' expense during such consecutive twelve-month period unless Excess Availability is less than the greater of (i) 20% of the Borrowing Cap and (ii) $30,000,000 at any time during such period, in which case one additional field exam and one additional inventory appraisal, in respect of the Borrowing Base, in such twelve-month period as Agent may request shall be at Borrowers' expense; and (h)(1) the reasonable fees and disbursements of counsel (including legal assistants) to Agent in connection with any of the foregoing and (2) to the extent events or circumstances occur after the Closing Date that, in the Administrative Agent's Permitted Discretion, would be advisable to hire a financial advisor, the reasonable fees, expenses, disbursements and other charges of M-III Partners, LP or another financial advisor reasonably satisfactory to the Administrative Agent (each of which shall be paid within thirty (30) days after written request thereof). Additionally, there shall be no limitation on the number or frequency of field exams if an Event of Default or a Material Adverse Effect has occurred and is continuing, and the Borrowers shall be responsible for the costs and expenses of any such field exams conducted while an Event of Default or a Material Adverse Effect has occurred and is continuing.

9.23    Further Assurances.

(a)    In the case of the formation or acquisition by a Borrower or Guarantor of any Subsidiary (other than a Foreign Subsidiary) after the date hereof:

(i)    as to any such Subsidiary, the Administrative Borrower or Guarantor forming such Subsidiary shall, within thirty (30) days (or such longer period as may be agreed to by Agent in its reasonable discretion) after such formation or acquisition, cause any such Subsidiary to execute and deliver to Agent, the following (each in form and substance reasonably satisfactory to Agent), (A) a Guaranty pursuant to which such Subsidiary gives an absolute and unconditional guarantee of the payment of the Obligations or a joinder or assumption agreement to an existing Guaranty, in each case in form and substance reasonably satisfactory to Agent, (B) a security agreement substantially in the form of the security provisions herein granting to Agent a first security interest and lien (except as otherwise consented to in writing by Agent) upon all of the assets of any such Subsidiary to the extent such assets constitute Collateral hereunder and subject to and in accordance with the terms hereof, (C) joinders to the Intercreditor Agreement, in each case in form and substance reasonably satisfactory to Agent, and (D) such other agreements, documents and instruments as Agent may require in connection with the documents referred to above in order to make such Subsidiary a party to this Agreement as a

178

"Borrower" (to the extent directly or indirectly wholly owned by a Loan Party) or as a "Guarantor" as Agent may determine, including, but not limited to, supplements and amendments hereto, a Borrower Joinder Agreement with respect to a Subsidiary that is to become a party hereto as a "Borrower", an assumption agreement with respect to an existing Guaranty, an authorization to file UCC financing statements, Collateral Access Agreements (subject to the requirements of <u>Section 9.2</u> hereof), filings with respect to intellectual property and other consents, waivers, acknowledgments and other agreements from third persons which Agent may deem necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the assets purchased, corporate resolutions and other organization and authorizing documents of such Person, and favorable opinions of counsel to such person and

(ii)    as to any such Subsidiary, the Administrative Borrower or Guarantor forming such Subsidiary shall, within thirty (30) days (or such longer period as may be agreed to by Agent in its reasonable discretion) after such formation, (A) execute and deliver to Agent, a supplement to the applicable Financing Agreements, in form and substance reasonably satisfactory to Agent, granting to Agent a pledge of and lien on all of the issued and outstanding shares of Capital Stock of any such Subsidiary (but no more than 65% of the Voting Stock of any Foreign Subsidiary) with the lien priority required by the Financing Agreements, and (B) deliver the original stock certificates evidencing such shares of Capital Stock (or such other evidence as may be issued in the case of a limited liability company), together with stock powers with respect thereto duly executed in blank (or the equivalent thereof in the case of a limited liability company in which such interests are certificated, or otherwise take such actions as Agent shall require with respect to Agent's security interests therein).    Each Loan Party shall cause any Person that guarantees the First Lien Obligations to become a Guarantor (if it is not already a Guarantor) pursuant to this <u>Section 9.23(a)</u>.

(b)    In the case of an acquisition of assets (other than Capital Stock and Real Property) by a Borrower or Guarantor after the date hereof, the Administrative Borrower will notify Agent thereof, and, if requested by Agent, after such acquisition of assets, Agent shall have received, in form and substance satisfactory to Agent (i) evidence that Agent has valid and perfected security interests in and liens upon all purchased assets to the extent such assets constitute Collateral hereunder and subject to and in accordance with the terms hereof, and (ii) subject to <u>Section 9.2</u> hereof, all Collateral Access Agreements and other consents, waivers, acknowledgments and other agreements from third persons which Agent may deem necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the assets purchased, (iii) at the option of Agent, the agreement of the seller consenting to the collateral assignment by the Administrative Borrower or Guarantor purchasing such assets of all rights and remedies and claims for damages of such Borrower or Guarantor relating to the Collateral (including, without limitation, any bulk sales indemnification) under the agreements, documents and instruments relating to such acquisition and (iv) such other agreements, documents and instruments as Agent may require in connection with the documents referred to above, including, but not limited to, supplements and amendments hereto, corporate resolutions and other organization and authorizing documents and favorable opinions of counsel to such person.

(c)    At the request of Agent at any time and from time to time, Borrowers and Guarantors shall, at their expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments, and do or cause to be done such

further acts as may be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement or any of the other Financing Agreements.  Agent may at any time and from time to time request a certificate from an officer of any Borrower or Guarantor representing that all conditions precedent to the making of Revolving Loans and providing Letters of Credit contained herein are satisfied.  In the event of such request by Agent, Agent and Lenders may, at Agent's option, cease to make any further Revolving Loans or provide any further Letters of Credit until Agent has received such certificate and, in addition, Agent has determined that such conditions are satisfied.

(d)     Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Financing Agreement to the contrary:

(i)     the foregoing provisions of this <u>Section 9.23</u> shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, or the provision of guarantees by any Subsidiary, if, solely for purposes of this clause (d)(i), and for so long as Agent and the Administrative Borrower reasonably agree in writing that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such guarantees (taking into account any material adverse tax consequences to Fusion Buyer and its Affiliates (including the imposition of material withholding or other material taxes)), outweighs the benefits to be obtained by the Lenders therefrom;

(ii)     Liens required to be granted from time to time pursuant to this <u>Section 9.23</u> shall be subject to exceptions and limitations set forth in the Collateral Documents;

(iii)     [reserved];

(iv)     in no event shall any Loan Party be required to complete any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States, and no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken, nor shall Agent be authorized to take any such action, to create any security interests or to perfect or make enforceable any security interests in any such assets;

(v)     in no event shall any Loan Party be required to complete any filings or other action with respect to perfection of security interests in assets subject to certificates of title beyond the filing of UCC financing statements;

(vi)     (A) in the case of intercompany debt, other than the filing of UCC financing statements and the delivery of a master intercompany note upon reasonable request from Agent, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $3,250,000 and (B) in the case of third party debt, other than the filing of UCC financing statements, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $3,250,000;

180

(vii)    in no event shall any Loan Party be required to complete any filings or other action with respect to security interests in Intellectual Property beyond the filing of trademark security agreements, copyright security agreement and patent security agreements, as applicable, substantially in the forms set forth on Exhibit I with the United States Patent and Trademark Office or the United States Copyright Office;

(viii)    no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of UCC financing statements), except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement;

(ix)    in no event shall the Collateral include any Excluded Assets;

(x)    landlord lien waivers, bailee waivers, collateral access agreements or similar agreements shall not be required, except to the extent required under the Financing Agreements;

(xi)    notices shall not be required to be sent to account debtors or other contractual third parties, except to the extent set forth in the Financing Agreements following the occurrence and during the continuance of an Event of Default; and

(xii)    notices to, or acknowledgements from, counterparts under, or compliance with the Assignment of Claims Act (or any state or municipal equivalent) shall not be required. Agent may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any guarantee by any Subsidiary (including extensions beyond the Closing Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Closing Date) and any other obligations under this definition where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Collateral Documents.

9.24    <u>Permitted Payments of Indebtedness</u>.  No Borrower and no Guarantor will, nor will it permit any Subsidiary to, make, directly or indirectly, any payment or other distribution (whether in cash, Securities or other property) of or in respect of principal of or interest on any Indebtedness (other than Indebtedness between any Borrower or Guarantor and Indebtedness permitted under <u>Sections 9.9(j)</u>, <u>9.9(k)</u>, or <u>9.9(m)</u>), or any payment or other distribution (whether in cash, Securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Indebtedness, except:

(a)    payment of Indebtedness created under the Financing Agreements;

(b)    payment of regularly scheduled (including, for the avoidance of doubt, under the First Lien Credit Agreement ) interest and principal payments (excluding, for the avoidance of doubt, any mandatory prepayments or offers to repay, repurchase or redeem any Indebtedness) and payment of fees, expenses and indemnification obligations (excluding any premiums in connection with the prepayment of any Indebtedness), in each case, as and when due in respect of any Indebtedness permitted under <u>Section 9.9</u> (other than payments in respect of any

subordinated Indebtedness permitted hereunder that is prohibited by the subordination provisions thereof);

(c)     commencing on the date that is ninety (90) days after the Closing Date, refinancings of Indebtedness to the extent permitted by Section 9.9(p);

(d)     payment of secured Indebtedness permitted under Section 9.9(b) that becomes due as a result of any sale or transfer of, or casualty, condemnation or taking with respect to, the property or assets securing such Indebtedness;

(e)     [reserved];

(f)     [reserved];

(g)     [reserved];

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

(k)     [reserved];

(l)     [reserved];

(m)     commencing on the date that is ninety (90) days after the Closing Date, other payments of indebtedness so long as the Payment Conditions are satisfied; and

(n)     [reserved].

9.25    Commodity Exchange Act Keepwell Provisions.  Each Qualified ECP Guarantor hereby absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Borrower or Guarantor in order for each such other Borrower or Guarantor to honor its obligations under this Agreement and the other Financing Agreements including Hedge Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 9.25 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 9.25, or otherwise under this Agreement or any other Financing Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 9.25 shall remain in full force and effect until all Obligations are paid in full to the Lenders and Agent, and all of the Lenders' Revolving Commitments are terminated.  Each Qualified ECP Guarantor intends that this Section 9.25 constitute, and this Section 9.25 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Borrower and each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

9.26    <u>Disbursement Cash Management Systems</u>.  Each of Borrowers, Guarantors and each of their Subsidiaries will maintain Chase as its principal depository bank for its disbursement business, including for the maintenance of operating, administrative, cash management, collection activity and other deposit accounts for the conduct of its disbursement business.

9.27    <u>Amendments to Financing Documents</u>.  The Borrowers and the Guarantors will not amend, waive, modify or supplement or consent to any amendment, waiver, modification or supplement of any First Lien Term Loan Documents, if such amendment, waiver or other modification would contravene any provision of the Intercreditor Agreement.

9.28    <u>[Reserved]</u>.

9.29    <u>Anti-Commingling</u>.  No Loan Party shall commingle any amount of Franchise Fees with the proceeds of ABL Priority Collateral.

9.30    <u>Franchise Agreements</u>.

(a)    Each Borrower will, and will cause each Loan Party to, satisfy and perform in all material respects all obligations of each such Person under each Franchise Agreement, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    The Borrowers and Guarantors will not, and will not permit any of its Subsidiaries to, maintain or distribute any Franchise Disclosure Documents, or enter into any Franchise Agreements, in violation of Section 8.23(c).

9.31    <u>Post-Closing Obligations</u>.  Borrowers shall deliver, or cause to be delivered, to Agent each of the agreements, documents, instruments and other items set forth on <u>Schedule 9.31</u> hereto, in each case within the periods provided for therein (subject, in each case, to Agent's right to extend such period in its sole discretion).

9.32    <u>[Reserved]</u>.

9.33    <u>Sale and Leaseback Transactions</u>. The Borrowers and Guarantors will not, and will not permit any of their Subsidiaries to, enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any tangible property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred except for sale of any fixed or capital assets by a Borrower or any Subsidiary that is made for cash consideration in an amount not less than the fair market value (as determined in good faith by the Administrative Borrower) of such fixed or capital asset and is consummated within 270 days after such Borrower or such Subsidiary, as applicable, acquires or completes the construction of such fixed or capital asset; provided that the aggregate amount of sale and leaseback transaction pursuant to this Section 9.33 shall not exceed $5,000,000.

9.34    <u>Changes to Treasury Management and Bank Structure</u>. The Borrowers and Guarantors will not, and will not permit any of their Subsidiaries to, make any changes to their treasury management and bank structure without the prior written consent of the Agent, including

changing the nature of any Deposit Accounts, investment accounts or other accounts in the name of or used by any Borrower or Subsidiary maintained at any bank or other financial institution, or disabling the sweep mechanism from any existing Zero Balance Accounts.

9.35    <u>Medical Cash Account</u>. The Loan Parties will not use any cash in the Medical Cash Account for any purpose other than the payment of expenses incurred in connection with the self-insurance policies maintained by the Administrative Borrower.

## SECTION 10.    EVENTS OF DEFAULT AND REMEDIES

10.1    <u>Events of Default</u>.  The occurrence or existence of any one or more of the following events are referred to herein individually as an "<u>Event of Default</u>", and collectively as "<u>Events of Default</u>":

(a)    (i) any Borrower fails to make any principal payment (including any payment required under <u>Section 2.9(c)</u>) after the same becomes due and payable, or any Borrower fails to pay any of the other Obligations (other than with respect to principal payments) within five (5) Business Days after the same becomes due and payable, (ii) any Borrower or Guarantor fails to perform any of the covenants contained in <u>Sections 6.3</u>, <u>6.7</u>, <u>9.1(a)</u>, <u>9.6(b)(vi)</u>, <u>9.7</u>, <u>9.8</u>, <u>9.9</u>, <u>9.10</u>, <u>9.11</u>, <u>9.12</u>, <u>9.15</u>, <u>9.17</u>, <u>9.24</u>, <u>9.27</u>, <u>9.29</u>, <u>9.31</u> or <u>9.33</u> of this Agreement, (iii) any Borrower or Guarantor fails to perform any of the covenants contained in <u>Sections 5.2</u>, <u>7.1</u>, <u>7.2</u>, <u>7.3</u>, <u>9.3</u>, <u>9.4</u>, <u>9.5</u>, <u>9.6(a)</u>, <u>9.6(e)</u>, <u>9.6(f)</u>, <u>9.6(i)(ii)</u>, <u>9.13</u>, <u>9.16</u>, <u>9.18</u>, <u>9.20</u>, <u>9.22</u>, <u>9.25</u>, <u>9.26</u> or <u>9.30</u> of this Agreement and such failure shall continue for five (5) Business Days; provided that such five-Business Day period shall not apply in the case of:  (A) any failure to observe any such covenant which is not capable of being cured at all or within such five-Business Day period or which has been the subject of a prior failure within a six-month period or (B) an intentional breach by Borrower or any Guarantor of any such covenant or (iv) any Borrower or Guarantor fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements other than those described in <u>Sections 10.1(a)(i)</u> and <u>10.1(a)(ii)</u> above and <u>Section 10.1(m)</u> below and such failure shall continue unremedied for thirty (30) days after notice thereof from the Agent;

(b)    any representation or warranty made by any Borrower or Guarantor to Agent or any Secured Party in this Agreement, the other Financing Agreements or any other written agreement, schedule, confirmatory assignment or otherwise shall when made or deemed made be false or misleading in any material respect, and such incorrect representation or warranty (if curable) shall remain incorrect for a period of thirty (30) days after the earlier of (i) any Loan Party's knowledge of such breach and (ii) notice thereof from the Agent to the Administrative Borrower;

(c)    any Guarantor revokes or terminates or attempts to revoke or terminate any guarantee in favor of Agent or any Lender;

(d)    any final, non-appealable, enforceable judgment for the payment of money is rendered against any Borrower or Guarantor in excess of $10,000,000 in the aggregate (to the extent not covered by insurance (including self-insurance) as to which the insurer has been notified of such judgment or order and has not denied coverage) and shall remain undischarged or

unvacated for a period in excess of 60 consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan Party that are material to the businesses and operations of the Loan Parties and their respective Subsidiaries, taken as a whole, to enforce any such judgment;

(e)    [Reserved];

(f)    any Borrower or Guarantor makes a general assignment for the benefit of creditors, makes or sends notice of a bulk transfer or calls a meeting of its creditors or principal creditors in connection with a moratorium or adjustment of the Indebtedness due to them;

(g)    a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity) is filed against any Borrower or Guarantor or all or any substantial part of its properties and such petition or application is not dismissed within 60 days after the date of its filing or any Borrower or Guarantor by corporate action shall file any answer admitting or not contesting such petition or application or indicates its consent to, acquiescence in or approval of, any such action or proceeding or the relief requested is granted sooner;

(h)    a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at a law or equity) is filed by any Borrower or Guarantor or for all or any substantial part of its property;

(i)    any default in respect of the (i) First Lien Obligations or (ii) any other Indebtedness of any Borrower or Guarantor in an amount in excess of $2,500,000, in each case the effect of which default is to cause, or to permit the holder or beneficiary of such Indebtedness to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity (other than Indebtedness owing to Agent and Lenders hereunder); provided that this clause shall not apply (x) to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and (y) if any such default (other than a default in respect of the First Lien Credit Agreement) is remedied or waived by the holders of such Indebtedness prior to any termination of all of the Revolving Commitments and acceleration of all of the Loans pursuant to this Section 10.1;

(j)    any material provision hereof or of any of the other Financing Agreements shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than Agent) in accordance with its terms, or any such party shall challenge the enforceability hereof or thereof, or shall assert in writing, or take any action or fail to take any action based on the assertion that any provision hereof or of any of the other Financing Agreements has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for herein or in any of the other Financing Agreements shall cease to be a valid and perfected first priority (subject only to Permitted Encumbrances and Liens

185

permitted under Section 9.8(s)) security interest in any of the Collateral purported to be subject thereto (except as expressly otherwise permitted herein or therein);

(k)    an ERISA Event shall occur which results in liability of any Borrower or Guarantor in an amount which could reasonably be expected to have a Material Adverse Effect;

(l)    any Change of Control; or

(m)    any Borrower or Guarantor fails at any time to comply with Section 6.7(b) of this Agreement.

10.2    Remedies.

(a)    At any time an Event of Default exists or has occurred and is continuing, Agent and Lenders shall have all rights and remedies provided in this Agreement, the other Financing Agreements, the UCC and other applicable law, all of which rights and remedies may be exercised without notice to or consent by any Borrower or Guarantor, except as such notice or consent is expressly provided for hereunder or required by applicable law. All rights, remedies and powers granted to Agent and Lenders hereunder, under any of the other Financing Agreements, the UCC or other applicable law, are cumulative, not exclusive and enforceable, in Agent's discretion, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by any Borrower or Guarantor of this Agreement or any of the other Financing Agreements. Subject to Section 12 hereof, Agent may, and at the direction of the Required Lenders shall, at any time or times, proceed directly against any Borrower or Guarantor to collect the Obligations without prior recourse to the Collateral.

(b)    Without limiting the foregoing, at any time an Event of Default has occurred and is continuing, Agent may, in its discretion, and upon the direction of the Required Lenders, shall:

(i)    accelerate the payment of all Obligations and demand immediate payment thereof to Agent, for itself and the benefit of the Secured Parties (provided, that, upon the occurrence of any Event of Default described in Sections 10.1(g) and 10.1(h), all Obligations shall automatically become immediately due and payable);

(ii)    with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral;

(iii)    require any Borrower or Guarantor, at Borrowers' expense, to assemble and make available to Agent any part or all of the Collateral at any place and time designated by Agent;

(iv)    collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral;

(v)     remove any or all of the Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose;

(vi)     sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral (including entering into contracts with respect thereto, public or private sales at any exchange, broker's board, at any office of Agent or elsewhere) at such prices or terms as Agent may deem reasonable, for cash, upon credit or for future delivery, with the Agent having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of any Borrower or Guarantor, which right or equity of redemption is hereby expressly waived and released by Borrowers and Guarantors;

(vii)     give notice of sole control or any other instruction under any Deposit Account Control Agreement; and/or

(viii)     terminate this Agreement.  If any of the Collateral is sold or leased by Agent upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment therefor is finally collected by Agent.

(c)     If notice of disposition of Collateral is required by law, ten days prior notice by Agent to Administrative Borrower designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and Borrowers and Guarantors waive any other notice.  In the event Agent institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy, each Borrower and Guarantor waives the posting of any bond which might otherwise be required.  At any time an Event of Default exists or has occurred and is continuing, upon Agent's request, Borrowers will either, as Agent shall specify, furnish cash collateral to the Issuing Bank to be used to secure and fund Agent's reimbursement obligations to the Issuing Bank in connection with any Letter of Credit Obligations or furnish cash collateral to Agent for the Letter of Credit Obligations.  Such cash collateral shall be in the amount equal to 105% of the amount of the Letter of Credit Obligations plus the amount of any fees and expenses payable in connection therewith through the end of the latest expiration date of such Letter of Credit Obligations.  Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  Agent and each Lender shall use reasonable care with respect to the Collateral in its possession or under its control.  The Agent shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Agent accords its own property.  Neither Agent nor any Lender shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of Agent or such Lender, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

(d)     At any time or times that an Event of Default has occurred and is continuing, Agent may, in its discretion, and upon the direction of the Required Lenders, Agent shall, enforce the rights of any Borrower or any Guarantor against any Account Debtor, secondary obligor or other obligor in respect of any of the Accounts or other Receivables.  Without limiting the generality of the foregoing, Agent may, in its discretion, and upon the direction of the Required Lenders, Agent shall, at such time or times (i) notify any or all Account Debtors, secondary

obligors or other obligor in respect thereof that the Receivables have been assigned to Agent and that Agent has a security interest therein and Agent may direct any or all Account Debtors, secondary obligors and other obligors to make payment of Receivables directly to Agent, (ii) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any and all Receivables or other obligations included in the Collateral and thereby discharge or release the Account Debtor or any secondary obligors or other obligors in respect thereof without affecting any of the Obligations, (iii) demand, collect or enforce payment of any Receivables or such other obligations, but without any duty to do so, and Agent and Lenders shall not be liable for any failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto and (iv) take whatever other action Agent may deem necessary or desirable for the protection of its interests and the interests of Lenders.  At any time that an Event of Default exists or has occurred and is continuing, at Agent's request, all invoices and statements sent to any Account Debtor shall state that the Accounts and such other obligations have been assigned to Agent and are payable directly and only to Agent and any Borrower shall deliver to Agent such originals of documents evidencing the sale and delivery of goods or the performance of services giving rise to any Accounts as Agent may require.  In the event any Account Debtor returns Inventory when an Event of Default exists or has occurred and is continuing, Borrower shall, upon Agent's request, hold the returned Inventory in trust for Agent, segregate all returned Inventory from all of its other property, dispose of the returned Inventory solely according to Agent's instructions, and not issue any credits, discounts or allowances with respect thereto without Agent's prior written consent.

(e)     To the extent that applicable law imposes duties on Agent or any Lender to exercise remedies in a commercially reasonable manner (which duties cannot be waived under such law), each Borrower and Guarantor acknowledges and agrees that it is not commercially unreasonable for Agent or any Lender (i) to fail to incur expenses reasonably deemed significant by Agent or any Lender to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain consents of any Governmental Authority or other third party for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Account Debtors, secondary obligors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (iv) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as any Borrower or Guarantor, for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure Agent or Lenders against risks of loss, collection or disposition of Collateral or to provide to Agent or Lenders a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by Agent, to obtain the services of other brokers, investment

bankers, consultants and other professionals to assist Agent in the collection or disposition of any of the Collateral.  Each Borrower and Guarantor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Agent or any Lender would not be commercially unreasonable in the exercise by Agent or any Lender of remedies against the Collateral and that other actions or omissions by Agent or any Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section.  Without limitation of the foregoing, nothing contained in this Section shall be construed to grant any rights to any Borrower or Guarantor or to impose any duties on Agent or Lenders that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.  Agent, on behalf of the Lenders, may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(f)     For the purpose of enabling Agent to exercise rights and remedies under this Agreement upon the occurrence and during the continuance of an Event of Default, at such time as, and to the extent that, Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Borrower and each Guarantor hereby grants to Agent an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to any Borrower or Guarantor) to use or sublicense (to its contractors, agents or representatives, or otherwise exercising its remedies hereunder) any Intellectual Property now owned or hereafter acquired by such Borrower or Guarantor, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, to the extent that such nonexclusive license (i) does not violate the express terms of any agreement between a Borrower or Guarantor and a third party governing such Intellectual Property (and shall be subject to any such licenses), or gives such third party any right of acceleration, modification, termination or cancellation therein and (ii) is not prohibited by any Requirements of Law; <u>provided</u> that such license and sublicenses with respect to trademarks shall be subject to the maintenance of quality standards with respect to the goods and services on which such trademarks are used sufficient to preserve the validity of such trademarks.  The use of such license by Agent may be exercised solely during the continuation of an Event of Default; <u>provided</u> that any license, sublicense or other transaction entered into by Agent in accordance with the provisions of this Agreement shall be binding upon the Borrowers and Guarantors, notwithstanding any subsequent cure of an Event of Default.

(g)     Subject to the requirements of <u>Section 6.4</u>, Agent may apply the cash proceeds of Collateral actually received by Agent from any sale, lease, foreclosure or other disposition of the Collateral to payment of the Obligations, in whole or in part and in such order as Agent may elect, whether or not then due.  Borrower and Guarantors shall remain liable to Agent and Lenders for the payment of any deficiency with interest at the highest rate provided for herein and all costs and expenses of collection or enforcement, including attorneys' fees and expenses.

(h)     Without limiting the foregoing, (i) Agent and Lenders may, at Agent's option, and upon the occurrence of an Event of Default, at the direction of the Required Lenders, Agent and Lenders shall, without notice, terminate any provision of this Agreement providing for any future Revolving Loans to be made by Agent and Lenders or Letters of Credit to be issued by

189

Issuing Bank, and (ii) upon the occurrence of an Event of Default, Agent may, at its option, establish such Reserves as Agent determines without limitation or restriction, notwithstanding anything to the contrary provided herein.

10.3    <u>Borrowers' and Guarantors' Obligations Upon Default</u>.  Upon the request of Agent after the occurrence and during the continuance of an Event of Default, each Borrower and Guarantor will:

(a)    assemble and make available to Agent the Collateral and all books and records relating thereto at any place or places specified by Agent, whether at a Borrower's or Guarantor's premises or elsewhere;

(b)    permit Agent, by Agent's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay the Administrative Borrower or Guarantor for such use and occupancy.

10.4    <u>Sale of Inventory and Use of Intellectual Property</u>.  For the purpose of enabling the Agent to exercise the rights and remedies under this <u>Section 10</u> at such time as Agent shall be lawfully entitled to exercise such rights and remedies, each Borrower and Guarantor hereby irrevocably agrees that Agent may sell any of such Borrower's or Guarantor's Inventory directly to any person, including without limitation persons who have previously purchased such Borrower's or Guarantor's Inventory from such Borrower or Guarantor and, in connection with any such sale or other enforcement of Agent's rights under this Agreement, may sell Inventory which bears any trademark owned by or licensed to such Borrower or Guarantor and any Inventory that is covered by any copyright owned by or licensed to such Borrower or Guarantor and Agent may finish any work in process and affix any trademark owned by or licensed to such Borrower or Guarantor and sell such Inventory as provided herein.

## SECTION 11.    JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW

11.1    <u>Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver</u>.

(a)    The validity, interpretation and enforcement of this Agreement and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York.

(b)    Borrowers, Guarantors, Agent, Lenders and Issuing Bank irrevocably consent and submit to the non-exclusive jurisdiction of the State of New York and the State and Federal courts located in the Borough of Manhattan, County of New York, State of New York and the United States District Court for the Southern District of New York whichever Agent may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Financing Agreements or in any

way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Agent and Lenders shall have the right to bring any action or proceeding against any Borrower or Guarantor or its or their property in the courts of any other jurisdiction which Agent deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against any Borrower or Guarantor or its or their property).

(c)     Each Borrower and Guarantor hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five days after the same shall have been so deposited in the U.S. mails, or, at Agent's option, by service upon any Borrower or Guarantor (or Administrative Borrower on behalf of such Borrower or Guarantor) in any other manner provided under the rules of any such courts.  Within 30 days after such service, such Borrower or Guarantor shall appear in answer to such process, failing which such Borrower or Guarantor shall be deemed in default and judgment may be entered by Agent against such Borrower or Guarantor for the amount of the claim and other relief requested.

(d)     BORROWERS, GUARANTORS, AGENT, LENDERS AND ISSUING BANK EACH HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  BORROWERS, GUARANTORS, AGENT, LENDERS AND ISSUING BANK EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT ANY BORROWER, ANY GUARANTOR, AGENT, ANY LENDER OR ISSUING BANK MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)     Agent and Secured Parties shall not have any liability to any Borrower or Guarantor (whether in tort, contract, equity or otherwise) for losses suffered by such Borrower or Guarantor in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Agent, such Lender and Issuing Bank, that the losses were the result of acts or omissions constituting gross negligence or willful misconduct.  In any such litigation, Agent, Lenders and Issuing Bank shall be entitled to the benefit of the rebuttable presumption that it acted in good faith and with the exercise of ordinary care in the performance by it of the terms of this Agreement.  Each Borrower and Guarantor: (i) certifies that neither Agent, any Lender, Issuing Bank nor any representative, agent or attorney acting for or on behalf of Agent, any Lender or

Issuing Bank has represented, expressly or otherwise, that Agent, Lenders and Issuing Bank would not, in the event of litigation, seek to enforce any of the waivers provided for in this Agreement or any of the other Financing Agreements and (ii) acknowledges that in entering into this Agreement and the other Financing Agreements, Agent, Lenders and Issuing Bank are relying upon, among other things, the waivers and certifications set forth in this <u>Section 11.1</u> and elsewhere herein and therein.

11.2    <u>Waiver of Notices</u>.    Each Borrower and Guarantor hereby expressly waives demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all Instruments and Chattel Paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein.  No notice to or demand on any Borrower or Guarantor which Agent or any Lender may elect to give shall entitle such Borrower or Guarantor to any other or further notice or demand in the same, similar or other circumstances.  Each Borrower and Guarantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to the Borrowers and Guarantors, addressed as set forth in <u>Section 13.3</u>, at least ten days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made.

11.3    <u>Collateral Waivers</u>.    To the maximum extent permitted by applicable law, each Borrower and Guarantor waives all claims, damages, and demands against Agent or any Lender arising out of the repossession, retention or sale of the Collateral, except such as arise solely out of the gross negligence, bad faith or willful misconduct of Agent or such Lender as finally determined by a court of competent jurisdiction.  To the extent it may lawfully do so, each Borrower and Guarantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against Agent or any Lender, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise.

11.4    <u>Amendments and Waivers</u>.

(a)    Except as provided in <u>Section 2.4(c)(i)</u> (with respect to any increase in the Revolving Commitments) and subject to <u>Section 3.4(c)</u> and <u>(d)</u>, neither this Agreement nor any other Financing Agreement nor any terms hereof or thereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by Agent and the Required Lenders or at Agent's option, by Agent with the authorization or consent of the Required Lenders, and as to amendments to any of the Financing Agreements (other than with respect to any provision of <u>Section 12</u> hereof), by each Borrower and such amendment, waiver, discharge or termination shall be effective and binding as to all Lenders and Issuing Bank only in the specific instance and for the specific purpose for which given; except, that, no such amendment, waiver, discharge or termination shall:

(i)      reduce the interest rate or any fees hereunder or extend the time of payment of principal, interest or any fees or reduce the principal amount hereunder of any Loan or Letters of Credit, in each case without the written consent of each Lender directly affected thereby;

(ii)     release all or substantially all of the Collateral (except as expressly permitted or required hereunder or under any of the other Financing Agreements or applicable law and except as permitted under Section 12.11(b) hereof), without the written consent of Agent and all of the Lenders;

(iii)    change any of the provisions of this Section or the definition of "Required Lenders", "Supermajority Revolving Lenders" or any other provision of any Financing Agreement specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (other than any Defaulting Lender) directly affected thereby;

(iv)     consent to the assignment or transfer by any Borrower or Guarantor of any of their rights and obligations under this Agreement, without the written consent of Agent and all of the Lenders;

(v)      increase the advance rates set forth in the definition of Borrowing Base or add new categories of eligible assets, without the written consent of the Supermajority Revolving Lenders;

(vi)     amend, modify or waive any provision of Section 6.4 in a manner that would alter the ratable reduction of Revolving Commitments or the manner in which payments are shared, without the written consent of Agent and all of the Lenders; or

(vii)    except as authorized pursuant to Section 12.15, subordinate the Obligations hereunder or the liens granted hereunder or under the other Financing Agreements, to any other Indebtedness or lien, as the case may be (except for the liens permitted in Section 9.8 hereof having priority by operation of law), without the consent of Agent and all of the Lenders; or

(viii)   amend, modify or waive any provision of this Agreement that requires a unanimous Lender consent (including by reference to "all of the Lenders," "Lenders," or otherwise) without the written consent of the Lenders;

(b)      Notwithstanding anything to the contrary contained in Section 11.4(a) above, Agent may, in its discretion and without the consent of the any Lenders, amend or otherwise modify the Borrowing Base, the Reserves or any of their respective components which amendments or modifications have the effect of increasing the Borrowing Base, decreasing the Reserves or otherwise increasing the amounts available for borrowing hereunder to the extent that such amendment or modification is made to undo changes made after the date hereof and restore the Borrowing Base, Reserves or other components thereof back to a level or standard, as applicable, that exists on the date hereof if the reason for such reduction or increase established after the date hereof no longer exists, as determined by Agent.

(c)    Agent, Lenders and Issuing Bank shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its or their rights, powers and/or remedies unless such waiver shall be in writing and signed as provided herein.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Agent, any Lender or Issuing Bank of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Agent, any Lender or Issuing Bank would otherwise have on any future occasion, whether similar in kind or otherwise.

(d)    Notwithstanding anything to the contrary contained in Section 11.4(a) above, in connection with any amendment, waiver, discharge or termination, in the event that any Lender whose consent thereto is required shall fail to consent or fail to consent in a timely manner (such Lender being referred to herein as a "Non-Consenting Lender"), but the consent of any other Lenders to such amendment, waiver, discharge or termination that is required are obtained, if any, then Chase shall have the right, but not the obligation, at any time thereafter, and upon the exercise by Chase of such right, such Non-Consenting Lender shall have the obligation, to sell, assign and transfer to Chase or such Eligible Transferee as Chase may specify, the Revolving Commitment of such Non-Consenting Lender and all rights and interests of such Non-Consenting Lender pursuant thereto provided, that, if Chase does not exercise such right, and Administrative Borrower presents an Eligible Transferee and requests in writing that Chase replace such Non-Consenting Lender with such Eligible Transferee, then, subject to Chase's consent rights as Agent contained in the within definition of "Eligible Transferee", such Non-Consenting Lender shall have the obligation, to sell, assign and transfer to such Eligible Transferee as Administrative Borrower has specified, the Revolving Commitment of such Non-Consenting Lender and all rights and interests of such Non-Consenting Lender pursuant thereto.  Chase shall provide the Non-Consenting Lender with prior written notice of its intent to exercise its right under this Section, which notice shall specify the date on which such purchase and sale shall occur.  Such purchase and sale shall be pursuant to the terms of an Assignment and Assumption (whether or not executed by the Non-Consenting Lender), except that on the date of such purchase and sale, Chase, or such Eligible Transferee specified by Chase, shall pay to the Non-Consenting Lender (except as Chase and such Non-Consenting Lender may otherwise agree) the amount equal to:  (i) the principal balance of the Revolving Loans held by the Non-Consenting Lender outstanding as of the close of business on the business day immediately preceding the effective date of such purchase and sale, plus (ii) amounts accrued and unpaid in respect of interest and fees payable to the Non-Consenting Lender to the effective date of the purchase (but in no event shall the Non-Consenting Lender be deemed entitled to any early termination fee).  Such purchase and sale shall be effective on the date of the payment of such amount to the Non-Consenting Lender and the Revolving Commitment of the Non-Consenting Lender shall terminate on such date.

(e)    The consent of Agent shall be required for any amendment, waiver or consent affecting the rights or duties of Agent hereunder or under any of the other Financing Agreements, in addition to the consent of the Lenders otherwise required by this Section and the exercise by Agent of any of its rights hereunder with respect to Reserves or Eligible Accounts or Eligible Inventory shall not be deemed an amendment to the advance rates provided for in this Section 11.4.  The consent of Issuing Bank shall be required for any amendment, waiver or consent affecting the rights or duties of Issuing Bank hereunder or under any of the other Financing Agreements, in addition to the consent of the Lenders otherwise required by this Section; provided

that the consent of Issuing Bank shall not be required for any other amendments, waivers or consents.  Notwithstanding anything to the contrary contained in <u>Section 11.4(a)</u> above, (i) in the event that Agent shall agree that any items otherwise required to be delivered to Agent as a condition of the initial Loans and Letters of Credit hereunder may be delivered after the date hereof, Agent may, in its reasonable discretion, agree to extend the date for delivery of such items or take such other action as Agent may deem appropriate as a result of the failure to receive such items as Agent may determine or may waive any Event of Default as a result of the failure to receive such items, in each case without the consent of any Lender and (ii) Agent may consent to any change in the type of organization, jurisdiction of organization or other legal structure of any Borrower, Guarantor or any of their Subsidiaries and amend the terms hereof or of any of the other Financing Agreements as may be necessary or desirable to reflect any such change, in each case without the approval of any Lender.

      11.5   <u>Waiver of Counterclaims</u>.  Each Borrower and Guarantor waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

      11.6   <u>Indemnification; Limitation of Liability</u>.

      (a)   Each Borrower and Guarantor shall, jointly and severally, indemnify and hold Agent, each Arranger, each Lender and Issuing Bank, and their respective officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such Person being an "<u>Indemnitee</u>"), harmless from and against any and all losses, claims, damages, liabilities, costs or expenses (including attorneys' reasonable fees and expenses) imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Financing Agreements, or any undertaking or proceeding related to any of the transactions contemplated hereby, any action taken in connection with this Agreement, including, but not limited to, the payment of principal, interest and fees or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the fees and expenses of counsel except that Borrowers and Guarantors shall not have any obligation under this <u>Section 11.6(a)</u> to indemnify an Indemnitee with respect to a matter covered hereby resulting from the gross negligence, bad faith or willful misconduct of such Indemnitee (but without limiting the obligations of Borrowers or Guarantors as to any other Indemnitee).  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrowers and Guarantors shall pay the maximum portion which it is permitted to pay under applicable law to Agent and Lenders in satisfaction of indemnified matters under this Section.  To the extent permitted by applicable law, no Borrower or Guarantor shall assert, and each Borrower and Guarantor hereby waives, any claim against any Indemnitee, on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Financing Agreements or any undertaking or transaction contemplated hereby.  Absent gross negligence, bad faith or willful misconduct, no Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection

with this Agreement or any of the other Financing Agreements or the transaction contemplated hereby or thereby.  All amounts due under this Section shall be payable upon demand.  The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement. This <u>Section 11.6(a)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)    To the extent permitted by applicable law (i) neither any Borrower nor any Loan Party shall assert, and each Borrower and each Loan Party hereby waives, any claim against the Agent, any Arranger, any Syndication Agent, any Documentation Agent, the Issuing Bank and any Lender, and any Related Party of any of the foregoing Persons (each such Person being called a "<u>Lender-Related Person</u>") for any Liabilities arising from the use by others of information or other materials (including, without limitation, any personal data) obtained through telecommunications, electronic or other information transmission systems (including the Internet), and (ii) no party hereto shall assert, and each such party hereby waives, any Liabilities against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Financing Agreement, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof; <u>provided</u> that nothing in this <u>Section 11.6(b)</u> shall relieve any Borrower or any Loan Party of any obligation it may have to indemnify an Indemnitee, as provided in <u>Section 11.6(a)</u>, against any special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

11.7    <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, each Lender, the Issuing Bank and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and other obligations at any time owing, by such Lender, the Issuing Bank or any such Affiliate, to or for the credit or the account of any Loan Party against any and all of the Obligations held by such Lender, the Issuing Bank or their respective Affiliates, irrespective of whether or not such Lender, the Issuing Bank or their respective Affiliates shall have made any demand under the Financing Agreement  and although such obligations may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender or the Issuing Bank different from the branch office or Affiliate holding such deposit or obligated on such indebtedness; <u>provided</u> that, in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to Agent for further application in accordance with the provisions of <u>Section 2.8</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Agent, the Issuing Bank and the Lenders and (y) the Defaulting Lender shall provide promptly to Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The applicable Lender, the Issuing Bank or such Affiliate shall notify the Administrative Borrower and Agent of such setoff or application; <u>provided</u> that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff or application under this Section.  The rights of each Lender, the Issuing Bank and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the Issuing Bank or their respective Affiliates may have.

11.8    <u>Payments from Borrowings</u>.  At the election of the Administrative Agent, the following may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Administrative Borrower pursuant to <u>Section 2.11</u> or a deemed request as provided herein:

(a)    all payments of principal,

(b)    interest, LC Disbursements,

(c)    fees,

(d)    premiums,

(e)    reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to <u>Section 9.22</u> and <u>11.6</u>), and

(f)    other sums payable under the Loan Documents.

The Borrowers hereby irrevocably (i) authorize the Administrative Agent to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents, (ii) agree that all such amounts charged shall constitute Loans and (iii) agree that all such Borrowings shall be deemed to have been requested pursuant to <u>Section 2.2</u> or <u>2.11</u>, as applicable.

## SECTION 12.    THE AGENT

12.1    <u>Appointment, Powers and Immunities</u>.  Each Secured Party irrevocably designates, appoints and authorizes Chase to act as Agent hereunder and under the other Financing Agreements, including the Intercreditor Agreement, with such powers as are specifically delegated to Agent by the terms of this Agreement and of the other Financing Agreements, together with such other powers as are reasonably incidental thereto.  Agent (a) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Financing Agreements, and shall not by reason of this Agreement or any other Financing Agreement be a trustee or fiduciary for any Secured Party; (b) shall not be responsible to Secured Parties for any recitals, statements, representations or warranties contained in this Agreement or in any of the other Financing Agreements, or in any certificate or other document referred to or provided for in, or received by any of them under, this Agreement or any other Financing Agreement, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Financing Agreement or any other document referred to or provided for herein or therein or for any failure by any Borrower or any Guarantor or any other Person to perform any of its obligations hereunder or thereunder; and (c) shall not be responsible to Secured Parties for any action taken or omitted to be taken by it hereunder or under any other Financing Agreement or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for its own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  Agent may employ agents and attorneys in fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys in fact selected by it in good faith.  Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until the assignment

197

thereof pursuant to an agreement (if and to the extent permitted herein) in form and substance satisfactory to Agent shall have been delivered to and acknowledged by Agent.

Notwithstanding anything to the contrary in the Financing Agreements, each of the Lenders hereby authorize and empower Agent to (i) execute all documents and (ii) make all acknowledgements.

12.2    Reliance by Agent.  Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telex, telegram or cable) reasonably believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by Agent.  As to any matters not expressly provided for by this Agreement or any other Financing Agreement, Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions given by the Required Lenders or all of Lenders as is required in such circumstance, and such instructions of such Agents and any action taken or failure to act pursuant thereto shall be binding on all Lenders.  Neither the Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by such party, the Agent or any of its Related Parties under or in connection with this Agreement or the other Financing Agreements (x) with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith to be necessary, under the circumstances as provided in the Financing Agreements) or (y) in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and non-appealable judgment) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Financing Agreement or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Financing Agreement or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Financing Agreement (including, for the avoidance of doubt, in connection with the Agent's reliance on any Electronic Signature transmitted by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page) or for any failure of any Loan Party to perform its obligations hereunder or thereunder.

12.3    Events of Default.

(a)    The Agent shall be deemed not to have knowledge of any (i) notice of any of the events or circumstances set forth or described in Section 9.6(b) unless and until written notice thereof stating that it is a "notice under Section 9.6(b)" in respect of this Agreement and identifying the specific clause under said Section is given to the Agent by the Administrative Borrower, or (ii) notice of any Default or Event of Default unless and until written notice thereof (stating that it is a "notice of Default" or a "notice of an Event of Default") is given to the Agent by the Administrative Borrower, a Lender or the Issuing Bank (each a "Notice of Default or Failure of Condition").  In the event that Agent obtains actual knowledge or receives such a Notice of Default or Failure of Condition, Agent shall give prompt notice thereof to the Lenders.  Agent shall (subject to Section 12.7) take such action with respect to any such Event of Default or failure of condition precedent as shall be directed by the Required Lenders to the extent provided for herein; provided, that, unless and until Agent shall have received such directions, Agent may (but

shall not be obligated to) take such action, or refrain from taking such action, with respect to or by reason of such Event of Default or failure of condition precedent, as it shall deem advisable in the best interest of Lenders. Without limiting the foregoing, and notwithstanding the existence or occurrence and continuance of an Event of Default or any other failure to satisfy any of the conditions precedent set forth in <u>Section 4</u> of this Agreement to the contrary, subject to the limitations set forth in <u>Section 12.8</u>, Agent may, but shall have no obligation to, continue to make Revolving Loans and Issuing Bank may, but shall have no obligation to, issue or cause to be issued any Letter of Credit for the ratable account and risk of Lenders from time to time if Agent reasonably and in good faith, believes making such Loans or issuing or causing to be issued such Letter of Credit is in the best interests of Lenders.

(b)    Except with the prior written consent of Agent, no Secured Party may assert or exercise any enforcement right or remedy in respect of the Loans, Letter of Credit Obligations or other Obligations, as against any Borrower or Guarantor or any of the Collateral or other property of any Borrower or Guarantor.

12.4    <u>Chase in its Individual Capacity</u>. At any time Chase is a Lender or Issuing Bank hereunder, as applicable, then with respect to its Revolving Commitments and the Loans made and Letters of Credit issued or caused to be issued by it (and any successor acting as Agent) hereunder from time to time, if any, so long as Chase shall be a Lender hereunder, it shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as Agent, and the term "<u>Lender</u>" or "<u>Lenders</u>" shall, unless the context otherwise indicates, include Chase in its individual capacity as Lender hereunder. Chase (and any successor acting as Agent) and its Affiliates may (without having to account therefor to any Lender) lend money to, make investments in and generally engage in any kind of business with Borrowers (and any of their Subsidiaries or Affiliates) as if it were not acting as Agent, and Chase and its Affiliates may accept fees and other consideration from any Borrower or Guarantor and any of its Subsidiaries and Affiliates for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

12.5    <u>Indemnification</u>.

(a)    Neither the Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by such party, the Agent or any of its Related Parties under or in connection with this Agreement or the other Financing Agreements (x) with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith to be necessary, under the circumstances as provided in the Financing Agreements) or (y) in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and non-appealable judgment) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Financing Agreement or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Financing Agreement or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Financing Agreement or for any failure of any Loan Party to perform its obligations hereunder or thereunder.

(b)    Lenders agree to indemnify Agent and Issuing Bank (to the extent not reimbursed by Borrowers hereunder and without limiting any obligations of Borrowers hereunder) ratably, in accordance with their Pro Rata Shares of Loans, for any and all claims of any kind and nature whatsoever that may be imposed on, incurred by or asserted against Agent (including by any Lender) arising out of or by reason of any investigation in or in any way relating to or arising out of this Agreement or any other Financing Agreement or any other documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby (including the costs and expenses that Agent is obligated to pay hereunder) or the enforcement of any of the terms hereof or thereof or of any such other documents, provided, that, no Lender shall be liable for any of the foregoing to the extent it arises from the gross negligence or willful misconduct of the party to be indemnified as determined by a final non-appealable judgment of a court of competent jurisdiction.   The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

12.6    Acknowledgments of Lenders and Issuing Bank; Non-Reliance on Agent and Other Lenders.

(a)    Each Lender and the Issuing Bank represents and warrants that (i) the Financing Agreements set forth the terms of a commercial lending facility, (ii) it is engaged in making, acquiring or holding commercial loans and in providing other facilities set forth herein as may be applicable to such Lender or Issuing Bank, in each case in the ordinary course of business, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument (and each Lender and the Issuing Bank agrees not to assert a claim in contravention of the foregoing), (iii) it has, independently and without reliance upon the Agent, any Arranger, any Syndication Agent, any Documentation Agent or any other Lender or Issuing Bank, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder and (iv) it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender or such Issuing Bank, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.  Each Lender and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Agent, any Arranger, any Syndication Agent, any Documentation Agent or any other Lender or Issuing Bank, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrowers and their Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Financing Agreement or any related agreement or any document furnished hereunder or thereunder.  Agent shall not be required to keep itself informed as to the performance or observance by any Borrower or Guarantor of any term or provision of this Agreement or any of the other Financing Agreements or any other document referred to or provided for herein or therein or to inspect the properties or books of any Borrower or Guarantor.  Agent will use reasonable efforts to provide Lenders with any information received by Agent from any Borrower or Guarantor which is required to be provided to Lenders or deemed to be requested by Lenders hereunder and with a copy of any Notice of Default or Failure of Condition received by Agent from any Borrower

or any Lender; <u>provided</u>, that, Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to Agent's own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. Except for notices, reports and other documents expressly required to be furnished to Lenders by Agent or deemed requested by Lenders hereunder (including the documents provided for in <u>Section 12.10</u> hereof), Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of any Borrower or Guarantor that may come into the possession of Agent.

(b)      (i) Each Lender and Issuing Bank hereby agrees that (x) if Agent notifies such Lender or Issuing Bank that Agent has determined in its sole discretion that any funds received by such Lender or Issuing Bank from Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "<u>Payment</u>") were erroneously transmitted to such Lender (whether or not known to such Lender or Issuing Bank), and demands the return of such Payment (or a portion thereof), such Lender or Issuing Bank shall promptly, but in no event later than one Business Day thereafter, return to Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender or Issuing Bank to the date such amount is repaid to Agent at the greater of the NYFRB Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender or Issuing Bank shall not assert, and hereby waives, as to Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine. A notice of Agent to any Lender or Issuing Bank under this Section 12.6(b) shall be conclusive, absent manifest error.

(ii)      Each Lender and Issuing Bank hereby further agrees that if it receives a Payment from Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by Agent (or any of its Affiliates) with respect to such Payment (a "<u>Payment Notice</u>") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment. Each Lender and Issuing Bank agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender or Issuing Bank shall promptly notify Agent of such occurrence and, upon demand from Agent, it shall promptly, but in no event later than one Business Day thereafter, return to Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender or Issuing Bank to the date such amount is repaid to Agent at the greater of the NYFRB Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii)      Each Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) are not recovered from any Lender or Issuing Bank that has received such Payment (or portion thereof) for any reason, Agent shall be subrogated to all the rights of such Lender or Issuing Bank with respect to such amount and (y) an erroneous

Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by any Borrower or any other Loan Party.

(iv)    Each party's obligations under this Section 12.6(b) shall survive the resignation or replacement of Agent or any transfer of rights or obligations by, or the replacement of, a Lender or Issuing Bank, the termination of the Revolving Commitments or the repayment, satisfaction or discharge of all Obligations under any Financing Agreement.

12.7    <u>Failure to Act</u>.  Except for action expressly required of Agent hereunder and under the other Financing Agreements, Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless it shall receive further assurances to its satisfaction from Lenders of their indemnification obligations under <u>Section 12.5</u> hereof against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.

12.8    <u>Additional Loans</u>.  Agent shall not make any Revolving Loans or Issuing Bank provide any Letter of Credit to any Borrower on behalf of Revolving Lenders intentionally and with actual knowledge that such Revolving Loans or Letters of Credit would cause the aggregate amount of the total outstanding Revolving Loans and Letters of Credit to such Borrower to exceed the Borrowing Base, without the prior consent of the Required Lenders; except that Agent may make such additional Revolving Loans or Issuing Bank may provide such additional Letters of Credit on behalf of Revolving Lenders, intentionally and with actual knowledge that such Revolving Loans or Letters of Credit will cause the total outstanding Revolving Loans and Letters of Credit to exceed the Borrowing Base, as Agent may deem necessary or advisable in its discretion; <u>provided</u> that: (a) the total principal amount of the additional Revolving Loans or additional Letters of Credit to any Borrower which Agent may make or provide after obtaining such actual knowledge that the aggregate principal amount of the Revolving Loans equal or exceed the Borrowing Base, <u>plus</u> the amount of Special Agent Advances made pursuant to <u>Sections 12.11(a)(i)</u> and <u>(ii)</u> hereof then outstanding, shall not exceed the aggregate amount equal to 10% of the Borrowing Cap and shall not cause the total principal amount of the Revolving Loans and Letter of Credit Obligations to exceed the Aggregate Revolving Commitment Amounts and (b) no such additional Revolving Loan or Letters of Credit shall be outstanding more than 90 days after the date such additional Revolving Loan or Letters of Credit is made or issued (as the case may be), except as the Required Lenders may otherwise agree.  Each Revolving Lender shall be obligated to pay Agent the amount of its Pro Rata Share of any such additional Revolving Loans or Letters of Credit.

12.9    <u>Concerning the Collateral and the Related Financing Agreements</u>.  Each Secured Party authorizes and directs Agent to enter into this Agreement, the Intercreditor Agreement and the other Financing Agreements.  Each Secured Party agrees that any action taken by Agent or Required Lenders in accordance with the terms of this Agreement, the Intercreditor Agreement or the other Financing Agreements and the exercise by Agent or Required Lenders of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Secured Parties.

12.10    <u>Field Audit, Examination Reports and other Information; Disclaimer by Lenders</u>. By signing this Agreement, each Lender:

(a)    is deemed to have requested that Agent furnish such Lender (and Agent agrees that it will furnish to such Lender), promptly after it becomes available, a copy of each field audit or examination report and report with respect to the Borrowing Base prepared or received by Agent (each field audit or examination report and report with respect to the Borrowing Base being referred to herein as a "<u>Report</u>" and collectively, "<u>Reports</u>"), appraisals with respect to the Collateral and financial statements with respect to the Loan Parties and their respective Subsidiaries received by Agent;

(b)    expressly agrees and acknowledges that Agent (i) does not make any representation or warranty as to the accuracy of any Report, appraisal or financial statement or (ii) shall not be liable for any information contained in any Report, appraisal or financial statement;

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or any other party performing any audit or examination will inspect only specific information regarding Borrowers and Guarantors and will rely significantly upon Borrowers' and Guarantors' books and records, as well as on representations of Borrowers' and Guarantors' personnel; and

(d)    agrees to keep all Reports confidential and strictly for its internal use in accordance with the terms of <u>Section 13.5</u> hereof, and not to distribute or use any Report in any other manner.

12.11    <u>Collateral Matters</u>.

(a)    Agent may, at its option, from time to time, at any time on or after an Event of Default and for so long as the same is continuing or upon any other failure of a condition precedent to the Revolving Loans and Letters of Credit hereunder, make such disbursements and advances ("<u>Special Agent Advances</u>") which Agent, in its sole discretion:

(i)    deems necessary or desirable either to preserve or protect the Collateral or any portion thereof or

(ii)    to enhance the likelihood or maximize the amount of repayment by Borrowers and Guarantors of the Loans and other Obligations, <u>provided</u>, that, (A) the aggregate principal amount of the Special Agent Advances pursuant to <u>clauses (i)</u> and <u>(ii)</u> hereof outstanding at any time, <u>plus</u> the then outstanding principal amount of the additional Revolving Loans and Letters of Credit which Agent may make or provide as set forth in <u>Section 12.8</u> hereof, shall not exceed the amount equal to 10% of the Borrowing Cap, (B) the aggregate principal amount of the Special Agent Advances pursuant to <u>clauses (i)</u> and <u>(ii)</u> hereof outstanding at any time, <u>plus</u> the then total outstanding principal amount of the Revolving Loans and Letter of Credit Obligations, shall not exceed the Aggregate Revolving Commitment Amounts, except at Agent's option, <u>provided</u>, that, to the extent that the aggregate principal amount of Special Agent Advances <u>plus</u> the then total outstanding principal amount of the Revolving Loans and Letter of Credit Obligations exceed the Aggregate Revolving Commitment Amounts the Special Agent Advances that are in excess of the Borrowing Cap shall be for the sole account and risk of Agent and

notwithstanding anything to the contrary set forth below, no Lender shall have any obligation to provide its share of such Special Agent Advances in excess of the Aggregate Revolving Commitment Amounts, and (C) no such Special Agent Advances made pursuant to this clause (ii) shall be outstanding more than 90 days after the date such Special Agent Advance is made, except as Required Lenders may otherwise agree, or

(iii)     to pay any other amount chargeable to any Borrower or Guarantor pursuant to the terms of this Agreement or any of the other Financing Agreements consisting of (A) costs, fees and expenses and (B) payments to Issuing Bank in respect of any Letter of Credit Obligations.  The Special Agent Advances shall be repayable on demand and together with all interest thereon shall constitute Obligations secured by the Collateral.  Special Agent Advances shall not constitute Revolving Loans but shall otherwise constitute Obligations hereunder.  Interest on Special Agent Advances shall be payable at the interest rate then applicable to ABR Loans and shall be payable on demand.  Without limitation of its obligations pursuant to Section 6.11, each Lender agrees that it shall make available to Agent, upon Agent's demand, in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Special Agent Advance.  If such funds are not made available to Agent by such Lender, such Lender shall be deemed a Defaulting Lender and Agent shall be entitled to recover such funds, on demand from such Lender together with interest thereon for each day from the date such payment was due until the date such amount is paid to Agent at the NYFRB Rate for each day during such period (as published by the Federal Reserve Bank of New York or at Agent's option based on the arithmetic mean determined by Agent of the rates for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York City time) on that day by each of the three leading brokers of Federal funds transactions in New York City selected by Agent) and if such amounts are not paid within three days of Agent's demand, at the highest interest rate provided for in Section 3.1 hereof applicable to ABR Loans.

(b)     Lenders hereby irrevocably authorize Agent, at its option and in its discretion, to release any security interest in, mortgage or lien upon, any of the Collateral (i) upon Payment in Full, (ii) constituting property being sold or disposed of, other than to a Borrower or a Guarantor, if Administrative Borrower or any Borrower or Guarantor certifies to Agent that the sale or disposition is made in compliance with Section 9.6 hereof (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which any Borrower or Guarantor did not have any right, title or interest at the time the security interest, mortgage or lien was granted or at any time thereafter, (iv) [reserved], (v) if required or permitted under the terms of any of the other Financing Agreements, including any intercreditor agreement or subordination agreement or (vi) approved, authorized or ratified in writing by all of Lenders.  Except as provided above, Agent will not release any security interest in, mortgage or lien upon, any of the Collateral without the prior written authorization of all of Lenders.  Upon request by Agent at any time, Lenders will promptly confirm in writing Agent's authority to release particular types or items of Collateral pursuant to this Section.  In no event shall the consent or approval of Issuing Bank to any release of Collateral be required.  Nothing contained herein shall be construed to require the consent of any Bank Product Provider to any release of Collateral or termination of security interests in any Collateral.

(c)     Without any manner limiting Agent's authority to act without any specific or further authorization or consent by the Required Lenders, each Lender agrees to confirm in

204

writing, upon request by Agent, the authority to release Collateral conferred upon Agent under this Section. Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of the security interest, mortgage or liens granted to Agent upon any Collateral to the extent set forth above; provided, that, (i) Agent shall not be required to execute any such document on terms which, in Agent's opinion, would expose Agent to liability or create any obligations or entail any consequence other than the release of such security interest, mortgage or liens without recourse or warranty and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any security interest, mortgage or lien upon (or obligations of any Borrower or Guarantor in respect of) the Collateral retained by such Borrower or Guarantor.

(d)     Agent shall have no obligation whatsoever to any Secured Party or any other Person to investigate, confirm or assure that the Collateral exists or is owned by any Borrower or Guarantor or is cared for, protected or insured or has been encumbered, or that any particular items of Collateral meet the eligibility criteria applicable in respect of the Revolving Loans or Letters of Credit hereunder, or whether any particular Reserves are appropriate, or that the liens and security interests granted to Agent pursuant hereto or any of the Financing Agreements or otherwise have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent in this Agreement or in any of the other Financing Agreements, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, subject to the other terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its discretion, given Agent's own interest in the Collateral as a Lender and that Agent shall have no duty or liability whatsoever to any other Lender or Issuing Bank.

12.12   Agency for Perfection.  Each Secured Party hereby appoints Agent and each other Secured Party as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral of Agent in assets which, in accordance with Article 9 of the UCC can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and Agent and each Secured Party hereby acknowledges that it holds possession or control of any such Collateral for the benefit of Agent as secured party.  Should any Secured Party obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver such Collateral to Agent or in accordance with Agent's instructions.

12.13   Successor Agent.  Agent may resign as Agent upon 30 days' notice to Lenders and Administrative Borrower.  If Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for Lenders.  If no successor agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with Lenders and the Administrative Borrower, a successor agent from among the Lenders.  Upon the acceptance by the Lender so selected of its appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Agent and the term "Agent" as used herein and in the other Financing Agreements shall mean such successor agent and the retiring Agent's appointment, powers and duties as Agent shall be terminated.  After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 12 shall inure

to its benefit as to any actions taken or omitted by it while it was Agent under this Agreement. If no successor agent has accepted appointment as Agent by the date which is 30 days after the date of a retiring Agent's notice of resignation, the retiring Agent's resignation shall nonetheless thereupon become effective and Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

12.14   <u>Other Agent Designations</u>.  Agent may at any time and from time to time determine that a Lender may, in addition, be a "Co-Agent", "Syndication Agent", "Documentation Agent" or similar designation hereunder and enter into an agreement with such Lender to have it so identified for purposes of this Agreement. Any such designation shall be effective upon written notice by Agent to Administrative Borrower of any such designation. Any Lender that is so designated as a Co-Agent, Syndication Agent, Documentation Agent or such similar designation by Agent shall have no right, power, obligation, liability, responsibility or duty under this Agreement or any of the other Financing Agreements other than those applicable to all Lenders as such. Without limiting the foregoing, the Lenders so identified shall not have or be deemed to have any fiduciary relationship with any Lender and no Lender shall be deemed to have relied, nor shall any Lender rely, on a Lender so identified as a Co-Agent, Syndication Agent, Documentation Agent or such similar designation in deciding to enter into this Agreement or in taking or not taking action hereunder.

12.15   <u>Intercreditor Agreement</u>.  Each Lender, in its capacity as a Lender and in its capacity as a Bank Product Provider, as applicable, and each other Secured Party, by its acceptance of the benefits of the Collateral Documents creating Liens to secure the Obligations:

(a)      acknowledges that it has received a copy of the Intercreditor Agreement and is satisfied with the terms and provisions thereof;

(b)      authorizes and instructs Agent to (i) enter into the Intercreditor Agreement, as Agent and on behalf of such Secured Party, (ii) to exercise all of Agent's rights and to comply with all of its obligations under the Intercreditor Agreement and to take all other actions necessary to carry out the provisions and intent thereof and (iii) to take actions on its behalf in accordance with the terms of the Intercreditor Agreement;

(c)      agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement as if it was a signatory thereto;

(d)      consents to the treatment of Liens to be provided for under the Intercreditor Agreement and in furtherance thereof authorizes the Agent to subordinate the liens on the Collateral securing the Obligations (other than liens on ABL Priority Collateral) in accordance with the terms set forth in the Intercreditor Agreement;

(e)      authorizes and directs Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent or authorization from such Secured Party, any amendments, supplements or other modifications of the Intercreditor Agreement that the Borrowers may from time to time request to give effect to any incurrence, amendment, or refinancing of any Indebtedness incurred pursuant to <u>Section 9.9(t)</u>; and

206

(f)      agrees that no Secured Party shall have any right of action whatsoever against Agent as a result of any action taken by Agent pursuant to this Section 12.15(a) or in accordance with the terms of the Intercreditor Agreement.

12.16    Posting of Communications.

(a)      The Borrowers agree that the Agent may, but shall not be obligated to, make any Communications available to the Lenders and the Issuing Bank by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic system chosen by the Agent to be its electronic transmission system (the "Approved Electronic Platform").

(b)      Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders, the Issuing Bank and each Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agent is not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Approved Electronic Platform, and that there may be confidentiality and other risks associated with such distribution. Each of the Lenders, the Issuing Bank and each Borrower hereby approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)      THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM. IN NO EVENT SHALL THE AGENT, ANY ARRANGER OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "APPLICABLE PARTIES") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER, THE ISSUING BANK OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM.

"<u>Communications</u>" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Financing Agreement or the transactions contemplated therein which is distributed by the Agent, any Lender or Issuing Bank by means of electronic communications pursuant to this Section, including through an Approved Electronic Platform.

(d)    Each Lender and Issuing Bank agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Financing Agreements. Each Lender and Issuing Bank agrees (i) to notify the Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's or Issuing Bank's (as applicable) email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)    Each of the Lenders, Issuing Bank and each Borrower agrees that the Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Agent's generally applicable document retention procedures and policies.

(f)    Nothing herein shall prejudice the right of the Agent, any Lender or Issuing Bank to give any notice or other communication pursuant to any Financing Agreement in any other manner specified in such Financing Agreement.

12.17    <u>Certain ERISA Matters</u>.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agent, each Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Revolving Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified

Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, or

        (iv)     such other representation, warranty and covenant as may be agreed in writing between the Agent, in its sole discretion, and such Lender.

        (b)     In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agent, each Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that none of the Agent, any Arranger, any Syndication Agent, any Documentation Agent or any of their respective Affiliates is a fiduciary with respect to the Collateral or the assets of such Lender (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Financing Agreement or any documents related to hereto or thereto).

        (c)     Each of the Agent, any Arranger, any Syndication Agent and any Documentation Agent hereby informs the Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Revolving Commitments, this Agreement and any other Financing Agreements, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Revolving Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Revolving Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Financing Agreements or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

## SECTION 13.    TERM OF AGREEMENT; MISCELLANEOUS

    13.1   <u>Term</u>.

        (a)     This Agreement and the other Financing Agreements shall become effective as of the date set forth on the first page hereof and shall continue in full force and effect for a term

ending on the Maturity Date, unless sooner terminated pursuant to the terms hereof.  In addition, Borrowers may terminate this Agreement at any time upon ten days' prior written notice to Agent (which notice shall be irrevocable) and Agent may, at its option, and shall at the direction of Required Lenders, terminate this Agreement at any time upon the occurrence and during the continuation of an Event of Default.  Upon the Maturity Date or any other effective date of termination of the Financing Agreements, Borrowers shall pay all amounts and take all other actions necessary to cause Payment in Full to occur.  All such payments required to cause Payment in Full to occur in respect of the Obligations and cash collateral shall be remitted by wire transfer in Federal funds to the Agent Payment Account or such other bank account of Agent, as Agent may, in its discretion, designate in writing to Administrative Borrower for such purpose.  Interest shall be due until and including the next Business Day, if the amounts so paid by Borrowers to the Agent Payment Account or other bank account designated by Agent are received in such bank account later than 12:00 noon, New York City time.

(b)     No termination of the Revolving Commitments, this Agreement or any of the other Financing Agreements shall relieve or discharge any Borrower or Guarantor of its respective duties, obligations and covenants under this Agreement or any of the other Financing Agreements until all Obligations have been fully and finally discharged and paid, and Agent's continuing security interest in the Collateral and the rights and remedies of Agent and Lenders hereunder, under the other Financing Agreements and applicable law, shall remain in effect until all such Obligations (other than indemnities and contingent Obligations which survive the termination of this Agreement and the other Financing Agreements) have been fully and finally discharged and paid and Lenders have no further obligations hereunder (following which all security interests and liens shall be released).  Accordingly, each Borrower and Guarantor waives any rights it may have under the UCC to demand the filing of termination statements with respect to the Collateral and Agent shall not be required to send such termination statements to Borrowers or Guarantors, or to file them with any filing office, unless and until this Agreement and all Revolving Commitments of all Lenders shall have been terminated in accordance with its terms and all Obligations (other than indemnities and contingent Obligations which survive the termination of this Agreement and the other Financing Agreements) paid and satisfied in full in immediately available funds.  Upon such termination, Agent will contemporaneously provide (assuming Agent has received written notice a reasonable amount of time prior to such termination) an appropriate payoff instrument, in form and substance reasonably satisfactory to Agent, which shall, among other things, give Borrowers and Guarantors authority to file appropriate UCC-3 termination statements.

13.2    <u>Interpretative Provisions</u>.

(a)     All terms used herein which are defined in Article 1, Article 8 or Article 9 of the UCC shall have the meanings given therein unless otherwise defined in this Agreement.

(b)     All references to the plural herein shall also mean the singular and to the singular shall also mean the plural unless the context otherwise requires.

(c)     All references to any Borrower, Guarantor, Agent and Lenders pursuant to the definitions set forth in the recitals hereto, or to any other Person herein, shall include their respective successors and assigns.

(d)     The words "hereof", "herein", "hereunder", "this Agreement" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement and as this Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(e)     The word "including" when used in this Agreement shall mean "including, without limitation" and the word "will" when used in this Agreement shall be construed to have the same meaning and effect as the word "shall".

(f)     A Default or an Event of Default shall continue or be continuing until such Default or Event of Default is waived in accordance with Section 11.4 or is cured in a manner satisfactory to Agent; provided that, such Event of Default is capable of being cured as determined by Agent.

(g)     All references to the term "good faith" used herein when applicable to Agent or any Lender shall mean, notwithstanding anything to the contrary contained herein or in the UCC, honesty in fact in the conduct or transaction concerned.  Borrowers and Guarantors shall have the burden of proving any lack of good faith on the part of Agent or any Lender alleged by any Borrower or Guarantor at any time.

(h)     Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed unless otherwise specifically provided herein, in accordance with GAAP as consistently applied and using the same method for inventory valuation as used in the preparation of the financial statements of the Loan Parties and their respective Subsidiaries most recently received by Agent prior to the date hereof.  Notwithstanding anything to the contrary contained in GAAP or any interpretations or other pronouncements by the Financial Accounting Standards Board or otherwise, the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is unqualified and also does not include any explanation, supplemental comment or other comment concerning the ability of the applicable Person to continue as a going concern or the scope of the audit.

(i)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including".

(j)     Unless otherwise expressly provided herein, (i) references herein to any agreement, document or instrument shall be deemed to include all subsequent amendments, modifications, supplements, extensions, renewals, restatements or replacements with respect thereto, but only to the extent the same are not prohibited by the terms hereof or of any other Financing Agreement, and (ii) references to any statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, recodifying, supplementing or interpreting the statute or regulation.

(k)     The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(l)        This Agreement and other Financing Agreements may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.

(m)        This Agreement and the other Financing Agreements are the result of negotiations among and have been reviewed by counsel to Agent and the other parties, and are the products of all parties.  Accordingly, this Agreement and the other Financing Agreements shall not be construed against Agent or Lenders merely because of Agent's or any Lender's involvement in their preparation.

(n)        Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or any Subsidiary at "fair value", as defined therein, and (ii) without giving effect to any treatment of Indebtedness under Financial Accounting Standards Board Accounting Standards Codification 470-20 or 2105-03 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(o)        The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 3.4(b) provides a mechanism for determining an alternative rate of interest.  The Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrowers.  The Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrowers, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

(p)      Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the amount of such Letter of Credit available to be drawn at such time; provided that, with respect to any Letter of Credit that, by its terms or the terms of any continuing agreement (or other letter of credit agreement) for the issuance of letters of credit or letter of credit application, in each case related to such Letter of Credit, provides for one or more automatic increases in the available amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is available to be drawn at such time.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Article 29(a) of the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the applicable time) or Rule 3.13 or Rule 3.14 of the International Standby Practices, International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the applicable time) or similar terms of the Letter of Credit itself, or if compliant documents have been presented but not yet honored, such Letter of Credit shall be deemed to be "outstanding" and "undrawn" in the amount so remaining available to be paid, and the obligations of the Borrowers and each Lender shall remain in full force and effect until the Issuing Bank and the Lenders shall have no further obligations to make any payments or disbursements under any circumstances with respect to any Letter of Credit.

(q)      For all purposes under the Financing Agreements, in connection with any Division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its equity interests at such time.

13.3    Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

If to any Borrower or Guarantor:

Fusion Buyer, LLC.
2371 Liberty Way
Virginia Beach (Virginia Beach City County)
VA 23456
Attention: Andrew Kaminsky
Email: akaminsky@franchisegrp.com

If to Agent or Issuing Bank:

JPMorgan Chase Bank, N.A.
383 Madison Ave, Floor 23
New York, NY 10179
Attn: Alexandra Mills; Pallavi Jha
Facsimile: (917) 464-7000
Email: alexandra.c.mills@jpmorgan.com; pallavi.jha@jpmorgan.com

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent, provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (iii) delivered through Electronic Systems or Approved Electronic Platforms, as applicable, to the extent provided in paragraph (b) below shall be effective as provided in such paragraph; provided, further, that notices of Default or Event of Default may only be given as set forth in clause (i) above.

(b)        Notices and other communications to the Lenders hereunder may be delivered or furnished by using Electronic Systems or Approved Electronic Platforms, as applicable, or pursuant to procedures approved by the Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Agent and the applicable Lender.  Each of the Agent and the Administrative Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by Electronic Systems or Approved Electronic Platforms, as applicable, pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Agent otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)        Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

13.4    Partial Invalidity.  If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

13.5    <u>Confidentiality</u>.

(a)    Agent, each Lender and Issuing Bank shall use all reasonable efforts to keep confidential, and shall use reasonable efforts to cause its agents (including accountants, auditors and filed examiners) to keep confidential, in accordance with its customary procedures for handling confidential information and safe and sound lending practices, any non-public information supplied to it by any Borrower pursuant to this Agreement, <u>provided</u>, that, nothing contained herein shall limit the disclosure of any such information: (i) to the extent required by statute, rule, regulation, subpoena or court order, (ii) to bank examiners and other regulators, auditors and/or accountants, in connection with any litigation to which Agent, such Lender or Issuing Bank is a party, (iii) to any Lender or Participant (or prospective Lender or Participant) or Issuing Bank or to any Affiliate of any Lender so long as such Lender, Participant (or prospective Lender or Participant), Issuing Bank or Affiliate shall have been instructed to treat such information as confidential in accordance with this <u>Section 13.5</u>, or (iv) to counsel for Agent, any Lender, Participant (or prospective Lender or Participant).  Agent and Lenders shall not publicly disclose consummation of this Agreement prior to a public disclosure of the same by Fusion Buyer or any of its Affiliates.

(b)    In the event that Agent, any Lender or Issuing Bank receives a request or demand to disclose any confidential information pursuant to any subpoena or court order, Agent or such Lender or Issuing Bank, as the case may be, agrees (i) to the extent permitted by applicable law or if permitted by applicable law, to the extent Agent or such Lender or Issuing Bank determines in good faith that it will not create any risk of liability to Agent or such Lender or Issuing Bank, Agent or such Lender or Issuing Bank will promptly notify Administrative Borrower of such request so that Administrative Borrower may seek a protective order or other appropriate relief or remedy and (ii) if disclosure of such information is required, disclose such information and, subject to reimbursement by Borrowers of Agent's or such Lender's or Issuing Bank's expenses, cooperate with Administrative Borrower in the reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the disclosed information which Administrative Borrower so designates, to the extent permitted by applicable law or if permitted by applicable law, to the extent Agent or such Lender or Issuing Bank determines in good faith that it will not create any risk of liability to Agent or such Lender or Issuing Bank.

(c)    In no event shall this <u>Section 13.5</u> or any other provision of this Agreement, any of the other Financing Agreements or applicable law be deemed:  (i) to apply to or restrict disclosure of information that has been or is made public by any Borrower, Guarantor or any third party or otherwise becomes generally available to the public other than as a result of a disclosure in violation hereof, (ii) to apply to or restrict disclosure of information that was or becomes available to Agent, any Lender (or any Affiliate of any Lender) or Issuing Bank on a non-confidential basis from a Person other than a Borrower or Guarantor, (iii) to require Agent, any Lender or Issuing Bank to return any materials furnished by a Borrower or Guarantor to Agent, a Lender or Issuing Bank or prevent Agent, a Lender or Issuing Bank from responding to routine informational requests in accordance with the Code of Ethics for the Exchange of Credit Information promulgated by The Robert Morris Associates or other applicable industry standards relating to the exchange of credit information.  The obligations of Agent, Lenders and Issuing Bank under this <u>Section 13.5</u> shall supersede and replace the obligations of Agent, Lenders and

215

Issuing Bank under any confidentiality letter signed prior to the date hereof or any other arrangements concerning the confidentiality of information provided by any Borrower or Guarantor to Agent or any Lender.

(d)    Agent and Lenders may share with their respective Affiliates any information relating to the Credit Facility and Borrowers and Guarantors.  Agent and Lenders may disclose information relating to the Credit Facility to data service providers, including league table providers, that serve the lending industry and other similar bank trade publications with such information to consist of deal terms and other information customarily found in such publications. In addition, Agent and Lenders and their respective Affiliates may otherwise use the corporate names, logos and other insignia of Borrowers and Guarantors in "tombstones" or other advertisements or public statements or other marketing materials of Agent and Lenders and their respective Affiliates.

13.6    <u>Successors</u>.  This Agreement, the other Financing Agreements and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by Agent, Secured Parties, Borrowers, Guarantors and their respective successors and assigns, except that no Borrower may assign its rights under this Agreement, the other Financing Agreements and any other document referred to herein or therein without the prior written consent of Agent and Lenders.  Any such purported assignment without such express prior written consent shall be void.  No Secured Party may assign its rights and obligations under this Agreement without the prior written consent of Agent, except as provided in <u>Section 13.7</u> below.  The terms and provisions of this Agreement and the other Financing Agreements are for the purpose of defining the relative rights and obligations of Borrowers, Guarantors, Agent and Secured Parties with respect to the transactions contemplated hereby and there shall be no third party beneficiaries of any of the terms and provisions of this Agreement or any of the other Financing Agreements.

13.7    <u>Assignments; Participations</u>.

(a)    Each Lender may, with the prior written consent of Agent as required pursuant to the within definition of "Eligible Transferee", assign all or, if less than all, a portion equal to at least $5,000,000 in the aggregate for the assigning Lender, of such rights and obligations under this Agreement to one or more Eligible Transferees (but not including for this purpose any assignments in the form of a participation), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption; <u>provided</u> that (i) such transfer or assignment will not be effective until recorded by Agent on the Register and (ii) Agent shall have received for its sole account payment of a processing fee from the assigning Lender or the assignee in the amount of $5,000.

(b)    Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices a register of the names and addresses of the Lenders, the Lenders' Revolving Commitments and Pro Rata Share of the Aggregate Revolving Commitment Amounts and the principal amount of the Loans and Letter of Credit Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  Agent shall also maintain a copy of each Assignment and Assumption delivered to and accepted by it and shall modify the Register to give effect to each Assignment and Assumption.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and any Borrowers, Guarantors, Agent and Lenders

may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Administrative Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.  No assignment shall be effective unless recorded in the Register. The parties hereto agree and intend that the Obligations shall be treated as being in "registered form" for the purposes of the Code (including Sections 163(f), 871(h)(2), and 881(c)(2) of the Code), and the Register shall be maintained in accordance with such intention.

(c)     Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and to the other Financing Agreements and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption, have the rights and obligations (including, without limitation, the obligation to participate in Letter of Credit Obligations) of a Lender hereunder and thereunder and the assigning Lender shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights and be released from its obligations under this Agreement but shall continue to be entitled to the benefits of Sections 3.4, 3.5 and 11.6).

(d)     By execution and delivery of an Assignment and Assumption, the assignor and assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Assumption, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any of the other Financing Agreements or the execution, legality, enforceability, genuineness, sufficiency or value of this Agreement or any of the other Financing Agreements furnished pursuant hereto, (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower, Guarantor or any of their Subsidiaries or the performance or observance by any Borrower or Guarantor of any of the Obligations; (iii) such assignee confirms that it has received a copy of this Agreement and the other Financing Agreements, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption, (iv) such assignee will, independently and without reliance upon the assigning Lender, Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Financing Agreements, (v) such assignee appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Financing Agreements as are delegated to Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Financing Agreements are required to be performed by it as a Lender.  Agent and Lenders may furnish any information concerning any Borrower or Guarantor in the possession of Agent or any Lender from time to time to assignees and Participants.

(e)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Financing Agreements (including, all or a portion of its Revolving Commitments and the Loans owing to it and its participation in the Letter of Credit Obligations, without the consent of Agent, the Issuing

Bank or the other Lenders); provided, that, (i) such Lender's obligations under this Agreement (including, without limitation, its Revolving Commitment hereunder) and the other Financing Agreements shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and Borrowers, Guarantors, the other Lenders and Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Financing Agreements, and (iii) the Participant shall not have any rights under this Agreement or any of the other Financing Agreements (the Participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the Participant relating thereto) and all amounts payable by any Borrower or Guarantor hereunder shall be determined as if such Lender had not sold such participation. Each Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.3 and 3.5 (subject to the requirements and limitations therein, including the requirements under Section 3.5(f) (it being understood that the documentation required under Section 3.5(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to this Section; provided that such shall not be entitled to receive any greater payment under Section 3.3 and 3.5, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Financing Agreements (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Financing Agreement) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(f)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans hereunder to a Federal Reserve Bank in support of borrowings made by such Lenders from such Federal Reserve Bank; provided, that, no such pledge shall release such Lender from any of its obligations hereunder or substitute any such pledgee for such Lender as a party hereto.

(g)     Borrowers and Guarantors shall assist Agent or any Lender permitted to sell assignments or participations under this Section 13.7 in whatever manner reasonably necessary in order to enable or effect any such assignment or participation, including (but not limited to) the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and the delivery of informational materials, appraisals or other documents for, and the participation of relevant management in meetings and conference calls with, potential Lenders or Participants. Borrowers shall certify the correctness, completeness and accuracy, in all

material respects, of all descriptions of Borrowers and Guarantors and their affairs provided, prepared or reviewed by any Borrower or Guarantor that are contained in any selling materials and all other information provided by it and included in such materials.

(h)    Any Lender that is an Issuing Bank may at any time assign all of its Revolving Commitments pursuant to this Section 13.7.  If such Issuing Bank ceases to be Lender, it may, at its option, resign as Issuing Bank and such Issuing Bank's obligations to issue Letters of Credit shall terminate but it shall retain all of the rights and obligations of Issuing Bank hereunder with respect to Letters of Credit outstanding as of the effective date of its resignation and all Letter of Credit Obligations with respect thereto (including the right to require Revolving Lenders to make Revolving Loans or fund risk participations in outstanding Letter of Credit Obligations), shall continue.

13.8    Entire Agreement.    This Agreement, the other Financing Agreements, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.  In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

13.9    USA Patriot Act.  Each Lender subject to the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Act") hereby notifies Borrowers and Guarantors that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each Person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of Borrowers and Guarantors and other information that will allow such Lender to identify such Person in accordance with the Act and any other applicable law.  Borrowers and Guarantors are hereby advised that any Loans or Letters of Credit hereunder are subject to satisfactory results of such verification.

13.10    Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    This Agreement or any of the other Financing Agreements may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement.  This Agreement, the other Financing Agreements and any separate letter agreements with respect to (i) fees payable to the Agent and (ii) increases or reductions of the Letter of Credit Limit of the Issuing Bank constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.1, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)    Delivery of an executed counterpart of a signature page of (x) this Agreement, (y) any other Financing Agreement and/or (z) any document, amendment, approval,

consent, information, notice (including, for the avoidance of doubt, any notice delivered pursuant to Section 13.3), certificate, request, statement, disclosure or authorization related to this Agreement, any other Financing Agreement and/or the transactions contemplated hereby and/or thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Financing Agreement or such Ancillary Document, as applicable.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Financing Agreement and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Agent has agreed to accept any Electronic Signature, the Agent and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of any Borrower or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (ii) upon the request of the Agent or any Lender, any Electronic Signature shall be promptly followed by a manually executed counterpart.  Without limiting the generality of the foregoing, each Borrower and each Loan Party hereby (A) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Agent, the Lenders, the Borrowers and the Loan Parties, Electronic Signatures transmitted by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Financing Agreement and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (B) the Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Financing Agreement and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (C) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Financing Agreement and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Financing Agreement and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (D) waives any claim against any Lender-Related Person for any Liabilities arising solely from the Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page, including any Liabilities arising as a result of the failure of any Borrower and/or any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

13.11    [Reserved].

13.12  <u>Acknowledgment Regarding Any Supported QFCs</u>.   To the extent that the Financing Agreements provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Financing Agreements and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Financing Agreements that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Financing Agreements were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

13.13  <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Financing Agreement or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Financing Agreement may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Agreement; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

13.14    <u>Intercreditor Agreement</u>.  This Agreement and the other Financing Agreements are subject to the terms and conditions set forth in the Intercreditor Agreement in all respects and, in the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern. Notwithstanding anything herein to the contrary, the lien and security interest granted to the Agent or the First Lien Agent , as applicable, pursuant to any Financing Agreement or First Lien Term Loan Document , and the exercise of any right or remedy in respect of the Collateral by the Agent or the First Lien Agent, as applicable hereunder, under any other Financing Agreement or the First Lien Credit Agreement  and any other agreement entered into in connection therewith are subject to the provisions of the Intercreditor Agreement and in the event of any conflict between the terms of the Intercreditor Agreement, this Agreement, any other Financing Agreement or the First Lien Credit Agreement and any other agreement entered into in connection therewith, the terms of the Intercreditor Agreement shall govern and control with respect to the exercise of any such right or remedy or the Loan Parties' covenants and obligations.

13.15    <u>Release of Liens and Guarantees</u>.

(a)      A Loan Party shall automatically be released from its obligations under the Financing Agreements (including its guarantee of the Obligations) and all security interests created by the Collateral Documents in Collateral owned by such Loan Party shall be automatically released, (1) upon the consummation of any transaction or designation permitted by this Agreement as a result of which such Loan Party ceases to be a Subsidiary (including pursuant to a permitted merger with a Subsidiary that is not a Loan Party) (other than in connection with the Buddy Reorganization Transaction) or becomes an Excluded Subsidiary (other than solely as a result of such Subsidiary Loan Party ceasing to be a Wholly Owned Subsidiary) or (2) upon the request of the Administrative Borrower, in connection with a transaction permitted under this Agreement (but only a transaction (x) in which such Loan Party becomes a bona fide joint venture and the other Person taking an equity interest in such Loan Party takes such equity interest for fair market value (as determined in good faith by the Administrative Borrower) and is not an Investor, an Affiliate of an Investor or an Affiliate of a Borrower (other than as a result of such joint venture) and (y) the primary purpose (as determined by the Administrative Borrower in good faith) of which is not the release of any guarantee of or Lien on the assets of such Loan Party) as a result of which such Loan Party ceases to be a Wholly Owned Subsidiary. Upon any sale or other transfer by any Loan Party (other than to the Administrative Borrower or any Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under this Agreement or any Collateral Document in any Collateral, the security interests in such Collateral created by this Agreement or the Collateral Documents shall be automatically released.  Upon the release of any Loan Party from its guarantee

in compliance with this Agreement, the security interest in any Collateral owned by such Subsidiary created by this Agreement or the Collateral Documents shall be automatically released. Upon Payment in Full, all obligations under the Financing Agreements and all security interests created by this Agreement or the Collateral Documents shall be automatically released. In connection with any termination or release pursuant to this <u>Section 13.15</u>, Agent, as the case may be, shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release so long as the Administrative Borrower or applicable Loan Party shall have provided the Agent such certifications or documents as Agent shall reasonably request in order to demonstrate compliance with this Agreement.

(b)     Agent will, at the Administrative Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to subordinate its Lien on any property granted to or held by Agent under any Financing Agreement to the holder of any Lien on such property that is permitted by <u>Section 9.8(e)</u>.

(c)     Each of the Lenders, and by accepting the benefits of this Agreement or the Collateral Documents, each Secured Party that is not a party hereto, irrevocably authorizes Agent to provide any release or evidence of release, termination or subordination contemplated by this <u>Section 13.15</u>. Upon request by Agent at any time, the Required Lenders will confirm in writing Agent's authority release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Financing Agreement, in each case in accordance with the terms of the Financing Agreement and this <u>Section 13.15</u>.

[SIGNATURE PAGES OMITTED]

223

Schedule 1A

<u>REVOLVING COMMITMENTS</u>

| Lenders | Revolving Commitment |
|---|---|
| JPMorgan Chase Bank, N.A. | $45,000,000.00 |
| Citizens Bank, N.A. | $30,000,000.00 |
| BMO Bank N.A. | $25,000,000.00 |
| **TOTAL COMMITMENTS:** | $100,000,000.00 |

## **Exhibit F-1(ii)**

**Redline to Previously Filed**
**New ABL Credit Agreement**

~~Draft~~Execution Version


(Mod)

**LOAN AND SECURITY AGREEMENT**

**by and among**

~~[FRANCHISE GROUP, INC.,~~
~~VALOR ACQUISITION~~FUSION BUYER, LLC,
~~and~~
~~FRANCHISE GROUP NEWCO PSP, LLC],~~
**as** Administrative **Borrower~~s~~**

**THE OTHER BORROWERS FROM TIME TO TIME PARTY HERETO**

**THE OTHER LOAN PARTIES FROM TIME TO TIME PARTY HERETO**

**THE LENDERS AND ISSUING BANK FROM TIME TO TIME PARTY HERETO**

**JPMORGAN CHASE BANK, N.A.,**
**as Agent**

**and**

**BMO BANK N.A.,**
**as Documentation Agent**

———————————————

**JPMORGAN CHASE BANK, N.A. and CITIZENS BANK, N.A.**
**as Lead Arrangers and Bookrunners**

**Dated:  ~~[ ]~~June 6, 2025**

# TABLE OF CONTENTS

**Page**

**SECTION 1.**    DEFINITIONS ........................................................................................ 1
    1.1    Definitions. ...................................................................................... 1

**SECTION 2.**    CREDIT FACILITIES ......................................................................... 84
    2.1    Revolving Loans ............................................................................. 84
    2.2    Overadvances ................................................................................. 85
    2.3    Letters of Credit ............................................................................. 87
    2.4    Termination, Reductions or Increases of Aggregate Revolving Commitment Amounts ........................................................................................ 92
    2.5    Revolving Commitments ................................................................ 95
    2.6    Bank Products ................................................................................ 95
    2.7    Joint and Several Liability ............................................................. 96
    2.8    Defaulting Lenders ......................................................................... 97
    2.9    Prepayment of Loans ..................................................................... 98
    2.10   Loans and Borrowings. .................................................................. 99
    2.11   Requests for Borrowings. ............................................................ 100
    2.12   Interest Elections ......................................................................... 100

**SECTION 3.**    INTEREST AND FEES ...................................................................... 102
    3.1    Interest Payments ........................................................................ 102
    3.2    Fees ............................................................................................. 103
    3.3    Increased Costs ........................................................................... 104
    3.4    Alternate Rate of Interest; Illegality. .......................................... 105
    3.5    Withholding of Taxes; Gross-Up. ................................................ 109
    3.6    Mitigation of Obligations; Replacement of Lenders. ................... 112
    3.7    Break Funding Payments ............................................................. 113

**SECTION 4.**    CONDITIONS PRECEDENT .............................................................. 114
    4.1    Conditions Precedent to Effectiveness ........................................ 114
    4.2    Conditions Precedent to All Loans and Letters of Credit ............ 117

**SECTION 5.**    GRANT AND PERFECTION OF SECURITY INTEREST ............. 118
    5.1    Grant of Security Interest ............................................................ 118
    5.2    Perfection of Security Interests ................................................... 119

**SECTION 6.**    COLLECTION AND ADMINISTRATION .......................................... 124
    6.1    Borrowers' Loan Accounts .......................................................... 124
    6.2    Statements ................................................................................... 124
    6.3    Collection of Accounts ................................................................ 125
    6.4    Payments ..................................................................................... 127
    6.5    [Reserved] ................................................................................... 129
    6.6    Authorization to Make Loans ...................................................... 129
    6.7    Use of Proceeds .......................................................................... 129

i

6.8      Appointment of Administrative Borrower as Agent for Requesting Loans and Receipts of Loans and Statements ........................................................................ 130

6.9      Pro Rata Treatment ......................................................................................... 131

6.10    Sharing of Payments, Etc ................................................................................ 131

6.11    Settlement Procedures .................................................................................... 132

6.12    Obligations Several; Independent Nature of Lenders' Rights ........................ 134

**SECTION 7.**     COLLATERAL REPORTING AND COVENANTS ............................ 135

7.1      Collateral Reporting ....................................................................................... 135

7.2      Accounts Covenants ....................................................................................... 136

7.3      Inventory Covenants ....................................................................................... 137

7.4      Equipment and Real Property Covenants ...................................................... 138

7.5      Delivery of Instruments, Chattel Paper and Documents ................................ 138

7.6      [Reserved]. ....................................................................................................... 139

7.7      Power of Attorney .......................................................................................... 139

7.8      Right to Cure ................................................................................................... 141

7.9      Access to Premises ......................................................................................... 141

**SECTION 8.**     REPRESENTATIONS AND WARRANTIES ........................................ 142

8.1      Corporate Existence, Power and Authority ................................................... 142

8.2      Name; State of Organization; Chief Executive Office; Collateral Locations 143

8.3      Financial Statements; No Material Adverse Change ...................................... 143

8.4      Priority of Liens; Title to Properties .............................................................. 144

8.5      Tax Returns ..................................................................................................... 144

8.6      Litigation ......................................................................................................... 144

8.7      Compliance with Applicable Laws ................................................................. 145

8.8      Environmental Compliance ............................................................................ 145

8.9      Employee Benefits .......................................................................................... 145

8.10    Bank Accounts ................................................................................................ 146

8.11    Intellectual Property ....................................................................................... 146

8.12    Subsidiaries; Capitalization; Solvency .......................................................... 147

8.13    Labor Disputes ................................................................................................ 148

8.14    Restrictions on Subsidiaries .......................................................................... 148

8.15    Material Contracts .......................................................................................... 148

8.16    Credit Card Agreements ................................................................................. 148

8.17    Investment Company Status ........................................................................... 149

8.18    Accuracy and Completeness of Information .................................................. 149

8.19    Survival of Warranties; Cumulative .............................................................. 149

8.20    Reaffirmation of Financing Agreements ....................................................... 149

8.21    Anti-Corruption Laws and Sanctions ............................................................ 150

8.22    Regulatory Compliance ................................................................................. 150

8.23    Franchise Agreements .................................................................................... 152

8.24    Affected Financial Institutions ...................................................................... 152

8.25    Dealer Agreements ......................................................................................... 152

**SECTION 9.**     AFFIRMATIVE AND NEGATIVE COVENANTS ............................. 152

9.1      Maintenance of Existence .............................................................................. 153

ii

| | | |
|---|---|---|
| 9.2 | [Reserved] | 153 |
| 9.3 | Compliance with Laws, Regulations, Etc | 153 |
| 9.4 | Payment of Taxes and Claims | 154 |
| 9.5 | Insurance | 155 |
| 9.6 | Financial Statements and Other Information | 156 |
| 9.7 | Sale of Assets, Consolidation, Merger, Dissolution, Etc | 159 |
| 9.8 | Encumbrances | 164 |
| 9.9 | Indebtedness | 169 |
| 9.10 | Loans, Investments, Etc | 174 |
| 9.11 | Dividends and Redemptions | 179 |
| 9.12 | Transactions with Affiliates | 181 |
| 9.13 | Compliance with ERISA | 184 |
| 9.14 | Fiscal Year | 184 |
| 9.15 | Change in Business | 184 |
| 9.16 | Limitation of Restrictions Affecting Subsidiaries | 184 |
| 9.17 | Financial Covenant | 186 |
| 9.18 | Credit Card Agreements | 186 |
| 9.19 | License Agreements. | 186 |
| 9.20 | Foreign Assets Control Regulations, Etc | 187 |
| 9.21 | After-Acquired Real Property. | 188 |
| 9.22 | Costs and Expenses | 188 |
| 9.23 | Further Assurances | 190 |
| 9.24 | Permitted Payments of Indebtedness | 192 |
| 9.25 | Commodity Exchange Act Keepwell Provisions | 193 |
| 9.26 | Disbursement Cash Management Systems | 194 |
| 9.27 | Amendments to Financing Documents | 194 |
| 9.28 | [Reserved] | 194 |
| 9.29 | Anti-Commingling. | 194 |
| 9.30 | Designation of Securitization Entities. | 194 |
| 9.31 | Post-Closing Obligations. | 195 |
| 9.32 | Dealer Agreements. | 195 |
| 9.33 | Covenant Relief Period Affirmative Covenants. | 195 |
| 9.34 | Minimum Excess Availability.. | 199 |
| 9.35 | Sale and Leaseback Transactions.. | 199 |
| 9.36 | Changes to Treasury Management and Bank Structure. | 199 |
| 9.37 | Medical Cash Account. | 199 |
| **SECTION 10.** | EVENTS OF DEFAULT AND REMEDIES | 199 |
| 10.1 | Events of Default | 199 |
| 10.2 | Remedies | 202 |
| 10.3 | Borrowers' and Guarantors' Obligations Upon Default | 205 |
| 10.4 | Sale of Inventory and Use of Intellectual Property | 205 |
| **SECTION 11.** | JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW | 206 |
| 11.1 | Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver | 206 |
| 11.2 | Waiver of Notices | 207 |

| | | |
|---|---|---|
| 11.3 | Collateral Waivers | 207 |
| 11.4 | Amendments and Waivers | 208 |
| 11.5 | Waiver of Counterclaims | 210 |
| 11.6 | Indemnification; Limitation of Liability | 210 |
| 11.7 | Right of Setoff | 211 |

**SECTION 12.    THE AGENT** ............................................................................ 212

| | | |
|---|---|---|
| 12.1 | Appointment, Powers and Immunities | 212 |
| 12.2 | Reliance by Agent | 213 |
| 12.3 | Events of Default | 213 |
| 12.4 | Chase in its Individual Capacity | 214 |
| 12.5 | Indemnification | 214 |
| 12.6 | Acknowledgments of Lenders and Issuing Bank; Non-Reliance on Agent and Other Lenders | 215 |
| 12.7 | Failure to Act | 217 |
| 12.8 | Additional Loans | 217 |
| 12.9 | Concerning the Collateral and the Related Financing Agreements | 217 |
| 12.10 | Field Audit, Examination Reports and other Information; Disclaimer by Lenders | 218 |
| 12.11 | Collateral Matters | 218 |
| 12.12 | Agency for Perfection | 220 |
| 12.13 | Successor Agent | 220 |
| 12.14 | Other Agent Designations | 221 |
| 12.15 | Intercreditor Agreement | 221 |
| 12.16 | Posting of Communications | 221 |
| 12.17 | Certain ERISA Matters | 223 |

**SECTION 13.    TERM OF AGREEMENT; MISCELLANEOUS** .......................... 224

| | | |
|---|---|---|
| 13.1 | Term | 224 |
| 13.2 | Interpretative Provisions | 225 |
| 13.3 | Notices | 228 |
| 13.4 | Partial Invalidity | 229 |
| 13.5 | Confidentiality | 229 |
| 13.6 | Successors | 231 |
| 13.7 | Assignments; Participations | 231 |
| 13.8 | Entire Agreement | 234 |
| 13.9 | USA Patriot Act | 234 |
| 13.10 | Counterparts; Integration; Effectiveness; Electronic Execution | 234 |
| 13.11 | Restatement | 235 |
| 13.12 | Acknowledgment Regarding Any Supported QFCs | 235 |
| 13.13 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 236 |
| 13.14 | Intercreditor Agreement. | 236 |
| 13.15 | Release of Liens and Guarantees. | 237 |

**INDEX**
**TO**
**EXHIBITS AND SCHEDULES**

Exhibit A            Form of Assignment and Assumption
Exhibit B            Information Certificate
Exhibit C            Form of Compliance Certificate
Exhibit D            Form of Borrowing Base Certificate
Exhibit E-1          Form of U.S. Tax Certificate
Exhibit E-2          Form of U.S. Tax Certificate
Exhibit E-3          Form of U.S. Tax Certificate
Exhibit E-4          Form of U.S. Tax Certificate
Exhibit F            Form of Commitment Increase Agreement
Exhibit G            Form of Additional Lender Agreement
Exhibit H            Form of Borrower Joinder Agreement
Exhibit I            Forms of Trademark Security Agreement, Copyright Security Agreement
                     and Patent Security Agreement

Schedule 1A          Revolving Commitments
Schedule 1B          Franchisees
Schedule 1C          ~~List of Names (Franchises)~~[Reserved]
Schedule 1D          [~~Dealers~~][1][Reserved]
Schedule 1E          [~~List of Names (Dealers)~~Reserved]
Schedule 1F          [Reserved]
Schedule 2.3         Existing Letters of Credit
Schedule 5.2(g)      Commercial Tort Claims
Schedule 8.2(a)      Chief Executive Offices and Mailing Addresses
Schedule 8.2(b)      Other Locations
Schedule 8.4         Liens
Schedule 8.6         Litigation
Schedule 8.10        Bank Accounts
Schedule 8.11(a)     Intellectual Property
Schedule 8.11(c)     Intellectual Property Exceptions
Schedule 8.12        Affiliates and Subsidiaries, etc.
Schedule 8.13        Collective Bargaining Agreements
Schedule 8.15        Material Contracts
Schedule 8.16        Credit Card Agreements
Schedule 8.23        [Reserved]
Schedule 8.2~~3~~5   Franchise Agreements
~~Schedule 8.25~~    [~~Dealer Agreements~~]
Schedule 9.7(U)      Specified Disposition
Schedule 9.9         Existing Indebtedness
Schedule 9.10        Loans and Advances
Schedule 9.12        Transactions with Affiliates

---

[1] ~~NTD: confirm if Dealer concept is still relevant going forward.~~

Schedule 9.16          Existing Restrictions
Schedule 9.31          Post-Closing Obligations

**LOAN AND SECURITY AGREEMENT**

This Loan and Security Agreement dated [—]June 6, 2025 (this "Agreement") is by and among ~~Franchise Group, Inc., a Delaware corporation, [Valor Acquisition~~Fusion Buyer, LLC, a Delaware limited liability company~~, a Delaware limited liability company, Franchise Group Newco PSP, LLC, a Delaware limited liability company,]~~ ("Fusion Buyer"), and certain Subsidiaries of ~~each of the foregoing~~Fusion Buyer, as Borrowers, the parties hereto from time to time as Guarantors, the parties hereto from time to time as lenders (each individually, a "Lender" and collectively, "Lenders" as hereinafter further defined) and JPMorgan Chase Bank, N.A., a national banking association, in its capacity as agent for the Lenders (in such capacity, "Agent" as hereinafter further defined).

WITNESSETH:

WHEREAS, on November 3, 2024 (the "Petition Date"), ~~the Borrowers~~FRG and certain affiliates and direct and indirect Subsidiaries of ~~the Borrowers~~FRG (each, a "Chapter 11 Debtor" and collectively, the "Chapter 11 Debtors") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating their cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") (collectively, the "Chapter 11 Cases");

WHEREAS, on [—]June 2, 2025, the Bankruptcy Court entered the Confirmation Order (as hereinafter defined) approving the Chapter 11 Debtors' [Plan of Reorganization]~~ ~~ (the "Approved Plan");

WHEREAS, the Borrowers have requested that the Lenders enter into this Agreement to provide financing to the Chapter 11 Debtors in connection with their emergence from the Chapter 11 Cases, pursuant to the Approved Plan and on the terms and conditions set forth herein;

WHEREAS, the Lenders are willing to make Loans (as defined below) and issue Letters of Credit (as defined below) to the Borrowers, subject to the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises, the representations, warranties, covenants and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to the satisfaction of each condition precedent contained in Section 4.1 hereof, the parties hereto further agree as follows:

**SECTION 1.    DEFINITIONS**

1.1    Definitions. For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

"ABL Priority Collateral" has the meaning assigned to such term in the Intercreditor Agreement.

1

"ABR Borrowing" shall mean a Borrowing of ABR Loans.

"ABR Loans" shall mean any Loans or portion thereof on which interest is payable based on the Alternate Base Rate in accordance with the terms thereof.

"Accounts" shall have the meaning set forth in Article 9 of the UCC and includes, without limitation, as to each Borrower and Guarantor, all present and future rights of such Borrower and Guarantor to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by Chattel Paper or an Instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, (d) arising out of the use of a credit or charge card or information contained on or for use with the card or (e) arising out of franchising agreements.

"Account Debtor" shall have the meaning set forth in Article 9 of the UCC.

"ACH Transactions" shall mean the automatic clearing house transfer of funds by Agent, any Lender or any of their respective Affiliates for the account of any Borrower, Guarantor or its respective Subsidiaries, in each case pursuant to agreements entered into with any Borrower or any of its Subsidiaries.

"Acquired EBITDA" means, with respect to any Pro Forma Entity, for any period, the amount of EBITDA of such Pro Forma Entity (determined as if references to the Borrowers, Guarantors and their respective Subsidiaries in the definition of "EBITDA" were references to such Pro Forma Entity and its subsidiaries that will become Subsidiaries), all as determined on a consolidated basis for such Pro Forma Entity.

"Acquired Entity or Business" has the meaning given such term in the definition of "EBITDA."

"Adjusted Daily Simple SOFR" means an interest rate per annum equal to (a) the Daily Simple SOFR, plus (b) 0.10%; provided that if the Adjusted Daily Simple SOFR as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor  for the purposes of this Agreement.

"Adjusted Term SOFR Rate" means, for any Interest Period, an interest rate per annum equal to (a) the Term SOFR Rate for such Interest Period, plus (b) 0.10%; provided that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Administrative Borrower" shall mean ~~FRG~~Fusion Buyer, in its capacity as Administrative Borrower on behalf of itself and the other Borrowers pursuant to Section 6.8 hereof and its successors and assigns in such capacity.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" shall mean, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by agreement or otherwise. Without limiting the foregoing, any Subsidiary of ~~FRG~~Fusion Buyer or any Guarantor shall be considered an Affiliate of the Borrowers for purposes of this Agreement.

"Agent" shall mean JPMorgan Chase Bank, N.A., in its capacity as agent on behalf of Lenders pursuant to the terms hereof and any replacement or successor agent hereunder.

"Agent Fee Letter" shall mean the agent fee letter, dated as of the date hereof, by and among ~~[   ]~~the Administrative Borrower and the Agent as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Agent Payment Account" shall mean ~~account no. [   ] of Agent at Chase, or~~ such other account of Agent as Agent may from time to time designate to Administrative Borrower as the Agent Payment Account for purposes of this Agreement and the other Financing Agreements.

"Aggregate Add-Back Cap" means an aggregate amount for all adjustments or add-backs to EBITDA pursuant to clauses (a)(vi), (a)(vii) and (a)(xvii) in the definition thereof and any adjustments pursuant to the definition of pro forma basis not to exceed an aggregate amount no greater than the ~~greater~~lesser of $~~20~~15,000,000[2] and ~~20~~15.0% of EBITDA (before giving effect to all adjustments or add backs to EBITDA) for the most recently ended Test Period as of such time.

"Aggregate Revolving Commitment Amounts" shall mean, at any time, the sum of the Revolving Commitments, as the same may be adjusted pursuant to Section 2.4.  As of the Closing Date, the Aggregate Revolving Commitment Amounts are $[100,000,000~~]~~.

"Aggregate Revolving Exposure" shall mean, at any time, the aggregate amount of Revolving Exposure of all Revolving Lenders.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Adjusted Term SOFR Rate for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, provided that, for the purpose of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the CME Term SOFR Administrator in the Term SOFR Reference Rate methodology).  Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate shall be effective from and

---

[2] ~~NTD: based off assumed $100 mm closing EBITDA~~

including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 3.4 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 3.4(c)), then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above. For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"Ancillary Document" has the meaning assigned to it in Section 13.10(b).

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrowers, the Guarantors or any of their respective Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Margin" means, for any day, with respect to any Revolving Loan, the applicable rate per annum set forth below under the caption "Revolver ABR Spread", "Revolver Term Benchmark Spread" or "Revolver RFR Spread", as the case may be, based upon the ~~Borrowers~~Loan Parties' Average Excess Availability for the prior fiscal month as of the most recent determination date, provided that until the delivery to Agent, pursuant to Section 7.1(a)(i), of the ~~Borrowers~~Loan Parties' Borrowing Base Certificate for the fiscal month ended [—]³November 30, 2025, the "Applicable Margin" shall be the applicable rate per annum set forth below in Category 3:

| Average Excess Availability | Revolver ABR Spread | Revolver Term Benchmark Spread | Revolver RFR Spread |
|---|---|---|---|
| Category 1: <br><br> Average Excess Availability greater than or equal to 66% of the Borrowing Cap | 1.75% | 2.75% | 2.75% |
| Category 2: <br><br> Average Excess Availability less than 66% but greater than or equal to 33% of the Borrowing Cap | 2.00% | 3.00% | 3.00% |
| Category 3: <br><br> Average Excess Availability less than 33% of the Borrowing Cap | 2.25% | 3.25% | 3.25% |

---

³ ~~NTD: sixth month after close~~

For purposes of the foregoing, (a) the Applicable Margin shall be determined as of the end of each fiscal month of the ~~Borrowers~~Loan Parties based upon the ~~Borrowers~~Loan Parties' Average Excess Availability for the prior fiscal month upon Agent's receipt of the ~~Borrowers~~Loan Parties' Borrowing Base Certificate delivered pursuant to Section 7.1(a)(i) and (b) each change in the Applicable Margin resulting from a change in the ~~Borrowers~~Loan Parties' Average Excess Availability for the prior fiscal month shall be effective during the period commencing on and including the date of delivery to Agent of such Borrowing Base Certificate indicating such change and ending on the date immediately preceding the effective date of the next such change, provided that the ~~Borrowers~~Loan Parties' Average Excess Availability shall be deemed to be in Category 3 at the option of Agent or at the request of the Required Lenders if the ~~Borrowers~~Loan Parties fail to deliver the Borrowing Base Certificate required to be delivered by them pursuant to Section 7.1(a)(i), during the period from the expiration of the time for delivery thereof until such Borrowing Base Certificate is delivered.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Cash Equivalents."

"Approved Electronic Platform" has the meaning assigned to it in Section 12.16(a).

"Arrangers" means each of JPMorgan Chase Bank, N.A.~~,~~ and Citizens Bank, N.A.~~ and BMO Harris Bank, N.A.~~, in its capacity as a joint bookrunner and a joint lead arranger hereunder.

"Asset Sale" shall mean:

(a)    the sale, lease, conveyance or other disposition of any assets or rights; and

(b)    the issuance of Capital Stock in any of the Borrowers or the ~~Subsidiary~~ Guarantors or the sale of Capital Stock in any of the Borrowers or the ~~Subsidiary~~ Guarantors (in each case other than issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirement of Law and other than issuing Capital Stock to the Administrative Borrower or a Subsidiary).

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(i)    any single transaction or series of related transactions that involves assets having a fair market value of less than $5,000,000 (for the avoidance of doubt, subject to clause (i) of the last paragraph of Section 9.7);

(ii)    a transfer of assets between or among any Loan Parties;

(iii)    an issuance of Capital Stock by a Loan Party to a Loan Party;

(iv)    the sale or lease of products, services, inventory, equipment, leasehold improvements, fixtures or accounts receivable in the ordinary course of business and any sale or other disposition of damaged, worn-out or obsolete assets, and assets that are no longer used or useful, or economically impracticable to maintain, in the ordinary course of business (including

allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, be dedicated to the public domain or be invalidated);

(v)    the sale or other disposition of cash or Cash Equivalents;

(vi)    any license, sublicense, covenant not to sue, or similar agreement with respect to patents, trademarks, registrations thereof and other Intellectual Property (a) made in the ordinary course of business or (b) that do not materially interfere with the business of the Borrowers or Guarantors, taken as a whole;

(vii)    any release of intangible claims or rights in connection with the loss or settlement of a bona-fide lawsuit, dispute or other controversy;

(viii)    leases or subleases in the ordinary course of business to third persons not interfering in any material respect with the business of the Borrowers or any of the Guarantors; or

(ix)    an Investment permitted under <u>Section 9.10</u> and any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of the Borrowers and the ~~Subsidiary~~ Guarantors that are expressly permitted under <u>Section 9.11</u>.

"<u>Assignment and Assumption</u>" shall mean an Assignment and Assumption substantially in the form of <u>Exhibit A</u> attached hereto (with blanks appropriately completed) delivered to Agent in connection with an assignment of a Lender's interest hereunder in accordance with the provisions of <u>Section 13.7</u> hereof.

"<u>Authorized Officer</u>" shall mean the individuals holding the position of president, treasurer, vice president of finance, chief executive officer, chief financial officer or controller of Administrative Borrower, or if no such officers have been appointed or elected, the sole member of the Administrative Borrower.

"<u>Availability Reserves</u>" shall mean all Reserves other than Inventory Reserves.

"<u>Available Tenor</u>" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark (or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (f) of <u>Section 3.4</u>.

"<u>Average Excess Availability</u>" means, for any period, the average daily Excess Availability during such period, as determined by the Agent's system of records.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bank Products" shall mean any one or more of the following types of services or facilities provided to any Loan Party or its Subsidiaries by a Bank Product Provider:  (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) treasury management services (including, without limitation, controlled disbursement, ACH Transactions, return items, overdrafts and interstate depository network services), (d) foreign exchange contracts, and (e) Hedge Agreements and coin and currency lines.

"Bank Product Providers" shall mean Agent, any Lender and any of their respective Affiliates that may, from time to time, provide any Bank Products to a Loan Party or any Subsidiary of a Loan Party; each sometimes being referred to herein individually as a "Bank Product Provider".

"Bank Product Reserve" shall mean any and all reserves that Agent may establish from time to time with the written consent of the Administrative Borrower, to reflect any obligations, liabilities or indebtedness (contingent or otherwise) of any Loan Party or its Subsidiaries to Agent or any Bank Product Provider arising under or in connection with any Bank Products or as such Bank Product Provider may otherwise require in connection therewith to the extent that such obligations, liabilities or indebtedness constitute Obligations as such term is defined herein or otherwise receive the benefit of the security interest of Agent in the Collateral. The Administrative Borrower hereby consents to the establishment of a Bank Product Reserve with respect to any obligations, liabilities or indebtedness (contingent or otherwise) of any Loan Party or its Subsidiaries to Agent, any Lender or any of their respective Affiliates (whether outstanding on the Closing Date or incurred thereafter) arising under or in connection with any Bank Products existing on the Closing Date, and Agent agrees to maintain such Bank Product Reserve to the extent Agent is notified of such Bank Products and the amounts thereof in accordance with the requirements of this Agreement.

"Benchmark" means, initially, with respect to any (i) RFR Loan, the Daily Simple SOFR or (ii) Term Benchmark Loan, the Term SOFR Rate; provided that if a Benchmark Transition Event and the related Benchmark Replacement Date have occurred with respect to the Daily Simple SOFR or Term SOFR Rate, as applicable, or the then-current Benchmark, then

"Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (c) of Section 3.4.

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Agent for the applicable Benchmark Replacement Date:

(1) the Adjusted Daily Simple SOFR; or

(2) the sum of: (a) the alternate benchmark rate that has been selected by the Agent and the Administrative Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for dollar-denominated syndicated credit facilities at such time in the United States and (b) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Financing Agreements.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Agent and the Administrative Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement and/or any Term Benchmark Loan, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark and to permit the administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if

the Agent determines that no market practice for the administration of such Benchmark exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Financing Agreements).

"Benchmark Replacement Date" means, with respect to any Benchmark, the earliest to occur of the following events with respect to such then-current Benchmark:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2) in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the

9

administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Financing Agreement in accordance with Section 3.4 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Financing Agreement in accordance with Section 3.4.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Blocked Accounts" shall have the meaning set forth in Section 6.3 hereof.

"Board" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing or any committee thereof duly authorized to act on behalf of such board, manager or managing member, (c) in the case of any partnership, the board of directors or board of managers of the

general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Borrower Joinder Agreement" shall mean a joinder agreement in substantially the form of Exhibit H hereto and otherwise in form and substance acceptable to Agent.

"Borrowers" shall mean, collectively, the following (together with their respective successors and assigns): (a) the Administrative Borrower; (b) [reserved]; (c) [reserved]; (d) the PSP Borrowers;[reserved]; (e) [reserved]; and (f) any other Person that at any time after the Closing Date becomes a Borrower pursuant to the terms hereof, including, without limitation, Section 9.23 hereof and by the execution of a Borrower Joinder Agreement; each sometimes being referred to herein individually as a "Borrower".

"Borrowing" means (a) Revolving Loans of the same Type, made, converted or continued on the same date and, in the case of Term Benchmark Loans, as to which a single Interest Period is in effect and (b) Overadvances.

"Borrowing Base" shall mean, at any time, the amount equal to:

(a)    the amount equal to:

(i)    90% of the amount of Eligible Credit Card Receivables of the Borrowers Loan Parties at such time, plus

(ii)    85% of the amount of Eligible Accounts of the Borrowers Loan Parties at such time, plus

(iii)    90% of the Net Recovery Percentage multiplied by the Value of the Eligible Inventory of the Borrowers Loan Parties, net of any Inventory Reserves, in each case, at such time, minus

(b)    the Availability Reserves;

provided that the aggregate amount of Eligible Accounts of the Borrowers Loan Parties in respect of Franchisee Receivables shall not exceed the amount equal to 10% of the Borrowing Base at any time; provided, further that notwithstanding anything to the contrary herein, none of assets of the Buddy's Entities shall be included for purposes of calculating the Borrowing Base.

(A)    The amounts of Eligible Inventory of the Borrowers Loan Parties shall be determined based[4] on the amount of applicable Inventory set forth in the inventory record maintained by the Borrowers Loan Parties.

(B)    Agent shall have the right to establish Reserves against or sublimits in the Borrowing Base in such amounts and with respect to such matters as Agent shall deem reasonably necessary or appropriate in its Permitted Discretion, based on new information received by Agent and after Agent has completed its updated field audits, examinations and

---

[4] NTD: confirm that inventory location/consignment with dealers/franchisees is no longer relevant.

appraisals of the Collateral; provided, however, that, so long as no Event of Default has occurred and is continuing, Agent shall give to Administrative Borrower five Business Days' telephonic or electronic notice if (A~x~) Agent establishes new categories of Reserves, (B~y~) Agent changes the methodology of calculating Reserves or (C~z~) Agent establishes new categories of sublimits in the Borrowing Base; provided further that, during such five Business Day-period, no Borrowing may be drawn or Letter of Credit issued to the extent any Revolving Exposure Limitations would be exceeded after giving effect to any such Reserves or sublimit modifications. The foregoing notwithstanding, in the event Agent establishes Reserves to preserve or protect or maximize the value of the Collateral during the continuance of an Event of Default, Agent shall only provide Administrative Borrower with notice at the time such Reserves are established.

(C) Accounts, Credit Card Receivables and Inventory of the ~Borrowers~Loan Parties shall only be Eligible Accounts, Eligible Credit Card Receivables and Eligible Inventory, as applicable, to the extent that (x) Agent has conducted and completed a field examination, appraisal and other due diligence with respect thereto and (y) the criteria for Eligible Accounts, Eligible Credit Card Receivables and Eligible Inventory set forth herein, as applicable, are satisfied with respect thereto in accordance with this Agreement (or such other or additional criteria as Agent may, at its option, establish with respect thereto in accordance with this Agreement and subject to such Reserves as Agent may establish in its Permitted Discretion).

(D) The Borrowing Base shall be determined at any time by Agent, on the basis of the most recently delivered Borrowing Base Certificate, as adjusted by Agent for any changes in Reserves or otherwise in accordance with the terms hereof.

"Borrowing Base Certificate" shall mean a certificate substantially in the form of Exhibit D hereto, as such form may from time to time be modified by Agent to reflect modifications to the Borrowing Base and the reporting requirements pursuant to the terms of this Agreement, which is duly completed (including all schedules thereto) and executed by the chief financial officer, a vice president of finance, a controller or other appropriate financial officer of Administrative Borrower (or if no such officer has been appointed or elected, the sole member of Administrative Borrower) reasonably acceptable to Agent and delivered to Agent.

"Borrowing Cap" shall mean, the amount, calculated at any date, equal to the lesser of (i) the Aggregate Revolving Commitment Amounts and (ii) the Borrowing Base, in each case, in effect at such time.

"Borrowing Request" means a request by the Administrative Borrower for a Borrowing in accordance with Section 2.11.

"Buddy Reorganization Transaction" means the distribution of 100% of the Capital Stock of (a) Buddy's Newco, LLC, a Delaware limited liability company ("Buddy's Newco") or (b) a newly formed direct parent entity of Buddy's Newco that is a Wholly Owned Subsidiary of Fusion Parent, LLC (or otherwise wholly owned by the holders of all outstanding Capital Stock of Fusion Parent, LLC) ("Buddy's Tax Blocker" and together with Buddy's Newco and Buddy's Franchising and Licensing LLC, a Florida limited liability company, collectively, the "Buddy's Entities"), in each case to a Person that is a Guarantor, in connection with the whole business securitization of the PSP Loan Parties; provided that each such Buddy's Entities shall, in each

12

case on or prior to the date that is at least five Business Days prior to the distribution, (x) have been joined as a Guarantor hereunder, (y) accede to the Collateral Documents in the same manner as an acquired Subsidiary as contemplated in Section 9.23(a) and (z) cause its Subsidiaries to accede to the Collateral Documents as contemplated in Section 9.23(a); provided, further that no other entities other than the Buddy's Entities shall distributed, formed or otherwise acquired in connection with the Buddy Reorganization Transaction.

"Buddy Top Parent" means Franchise Group Intermediate B, LLC, a Delaware limited liability company.

"Business Day" shall mean any day (other than a Saturday or a Sunday) on which banks are open for business in New York City or Chicago; provided that in relation to RFR Loans and any interest rate settings, fundings, disbursements, settlements or payments of any such RFR Loan, or any other dealings of such RFR Loan, any such day that is only a U.S. Government Securities Business Day.

"Capital Expenditures" shall mean, for any period, any expenditure of money under a Capital Lease or for the lease, purchase or other acquisition of any capital asset, or for the purchase or construction of assets, or for improvements or additions thereto, which are capitalized on a Person's balance sheet, but excluding (i) any such expenditure to the extent of trade-ins thereon and (ii) reimbursed leasehold improvements.

"Capital Leases" shall mean, as applied to any Person, any lease of any property (whether real, personal, or mixed) by that Person (a) as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person or (b) as lessee which is a transaction of a type commonly known as a "synthetic lease" (i.e., a transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income Tax purposes); provided, that lease liabilities and associated expenses recorded by FRG and itsthe Loan Parties and their respective Subsidiaries (or any other applicable Persons) pursuant to Financial Accounting Standards Board Accounting Standards Update No. 2016-02, Leases (Topic 842) ("FAS 842"), shall not be treated as Indebtedness and shall not be included in Interest Expense or Fixed Charges, unless the corresponding leases would have been treated as Capital Leases under GAAP as in effect prior to the adoption of FAS 842 (in which case such leases shall be treated as Capital Leases, and the interest component of such Capital Leases shall be included in Interest Expense and Fixed Charges); provided further, that, to the extent requested by Agent, the Borrowers shall provide to Agent and, as applicable, the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such amounts or ratio made before and after giving effect to FAS 842.

"Capital Stock" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company or other equity interests at any time outstanding, and any and all rights, warrants or options exchangeable for or convertible into such capital stock or other

interests (but excluding any debt security that is exchangeable for or convertible into such capital stock).

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by the Borrowers, Guarantors and their respective Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of the Borrowers, Guarantors and their respective Subsidiaries.

"Cash Equivalents" shall mean, at any time:

"Cash Equivalents" shall mean, at any time, (a) dollars, euros, Swiss francs, Sterling, Canadian dollars, or such other currencies held by it from time to time in the ordinary course of business;

(b) readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States, (ii) the United Kingdom, (iii) Canada, (iv) Switzerland or (v) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of such country or such member nation of the European Union is pledged in support thereof;

(c) time deposits with, or certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $250,000,000 in the case of U.S. banks and $100,000,000 (or the dollar equivalent as of the date of determination) in the case of foreign banks (any such bank in the foregoing clauses (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d) commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e) repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer covering securities described in clauses (b) and (c) above;

(f) marketable short-term money market and similar highly liquid funds substantially all of the assets of which are comprised of securities of the types described in clauses (b) through (e) above;

(g) securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, the United Kingdom, Canada, Switzerland, a member of the European Union or by any political

subdivision or taxing authority of any such state, member, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h) investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(i) instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized or incorporated in such jurisdiction;

(j) investments, classified in accordance with GAAP as current assets of the Administrative Borrower, Guarantors or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000 or its equivalent, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k) demand deposit accounts holding cash;

(l) interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G7 government or other G7 governmental agency or a G7 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof;

(m) other short-term investments of a type analogous to the foregoing utilized by Foreign Subsidiaries;

(n) investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (m) above; and

(o) any guarantee or indemnity for the obligations of a Subsidiary in connection with a Subsidiary claiming exemption from audit, the preparation and filing of its accounts or other similar exemptions (including under section 394C, 448C or 479C of the Companies Act 2006 or other similar or equivalent provisions).

"Cash Management Obligations" means (a) obligations of a Borrower, a Guarantor or any Subsidiary in respect of any overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit or purchase card programs and similar arrangements.

"Casualty Event" means any event that gives rise to the receipt by a Borrower, a Guarantor or any Subsidiary of any insurance proceeds or condemnation awards, in each case, in

respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Change in Law" means the occurrence after the date of this Agreement (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement) of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 3.3(b), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Change of Control" means:

"Change of Control" means (xa) the acquisition of beneficial ownership, directly or indirectly, by any Person or group, other than the Permitted Holders (directly or indirectly, including through one or more holding companies), of Capital Stock representing 35.0% or more of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock in the Administrative Borrower or Buddy's Newco (and if applicable, Buddy's Tax Blocker) and the percentage of the aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity InterestsCapital Stock in the Administrative Borrower or Buddy's Newco (and if applicable, Buddy's Tax Blocker), as the case may be, held by the Permitted Holders, unless the Permitted Holders (directly or indirectly, including through one or more holding companies) otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate, nominate or appoint (and do so designate, nominate or appoint) a majority of the Board of the Administrative Borrower;;

(yb) other than as a result of a disposition permitted hereunder, the failure of FRGFusion Buyer to own directly or indirectly 100% of the total outstanding Capital Stock of any other Borrower or any Person that becomes a Borrower after the date hereof; or

(zc) any "change of control" or similar event under the First Lien Credit Agreement.

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act, (ii) the phrase "Person or group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee,

agent or other fiduciary or administrator of any such plan, and (iii) if any Person or "group" includes one or more Permitted Holders, the issued and outstanding ~~Equity Interests~~Capital Stock of the Administrative Borrower directly or indirectly owned by the Permitted Holders that are part of such Person or "group" shall not be treated as being owned by such Person or "group" for purposes of determining whether clause (~~e~~a) of this definition is triggered.

"Chase" shall mean JPMorgan Chase Bank, N.A., a national banking association, in its individual capacity, and its successors.

"Chattel Paper" shall have the meaning set forth in Article 9 of the UCC.

"Closing Date" shall mean ~~[   ]~~June 6, 2025.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Code" shall mean the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Collateral" shall have the meaning set forth in Section 5.1 hereof.

"Collateral Access Agreement" shall mean an agreement in writing, in form and substance reasonably satisfactory to Agent, from any lessor of premises to any Borrower or Guarantor, or any other Person to whom any Collateral is consigned or who has custody, control or possession of any such Collateral or is otherwise the owner or operator of any premises on which any of such Collateral is located, in favor of Agent (or in favor of Agent and the First Lien Agent) with respect to the Collateral at such premises or otherwise in the custody, control or possession of such lessor, consignee or other Person, inter alia, acknowledges the first priority security interest of Agent in such Collateral, agrees to waive (or subordinate on terms acceptable to Agent) any and all claims such lessor, consignee, processor or other person may, at any time, have against such Collateral, whether for storage or otherwise, and agrees to permit Agent access to, and the right to remain on, the premises of such lessor, consignee, processor or other person so as to exercise Agent's rights and remedies and otherwise deal with such Collateral, and in the case of any customs broker, cargo consolidator, freight forwarder, consignee or other person who at any time has custody, control or possession of any bills of lading or other documents of title, agrees to hold such Collateral, acknowledges that it holds and will hold possession of the Collateral for the benefit of the Agent and the First Lien Agent and agrees to follow all instructions of Agent or the First Lien Agent (as the case may be) with respect thereto.

"Collateral Documents" shall mean, collectively, ~~the~~this Agreement, the Intercreditor Agreement, the Pledge Agreement, each Guaranty, the Deposit Account Control Agreements, the Investment Property Control Agreements and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence liens to secure the Obligations, including, without limitation, all other security agreements, deposit account control agreements, pledge agreements, subordination agreements, pledges, powers of attorney, assignments, financing statements and all other written matter whether theretofore, now

or hereafter executed by any Borrower or any Guarantor and delivered to Agent, in each case as may be amended, restated, supplemented or otherwise modified from time to time.

"Collateral Reporting Trigger Event" means any Asset Sale or other transaction (whether pursuant to the sale of Capital Stock in a Subsidiary, an Investment, a dividend or other distribution, a merger or consolidation or otherwise, but excluding any transaction that is expressly excluded pursuant to the definition of "Asset Sale" other than pursuant to clause (ix) therein) that would result in the elimination of Collateral from the Borrowing Base (on a net basis, after giving effect to all applicable advance rates, Net Recovery Percentages and any Reserves applicable to such assets) in effect immediately prior to giving effect to such Asset Sale or other transaction.

"Commercial Tort Claims" shall have the meaning set forth in Article 9 of the UCC.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute, and any regulations promulgated thereunder.

"Common Parent" has the meaning assigned to it in Section 9.11(d).

"Compliance Period" shall mean any period commencing on the first date on which Excess Availability is less than the greater of (a) 12.5% of the Borrowing Cap or (b) $18,000,000, in each case for three consecutive days, and continuing until the date that both (x) Excess Availability exceeds the greater of (i) 12.5% of the Borrowing Cap or (ii) $18,000,000, in each case for 60 consecutive days and (y) no Default or Event of Default then exists and is continuing.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Approved Plan.

"Consolidated Cash Interest Charges" means, for any period, the total interest expense of the ~~Administrative Borrower and its~~ Loan Parties and their respective Subsidiaries for such period determined on a consolidated basis net of any interest income, which shall be determined on a cash basis only and solely in respect of Indebtedness of the type described in the definition of Total Indebtedness and excluding, for the avoidance of doubt~~,~~:

(i) any non-cash interest expense and any capitalized interest, whether paid or accrued~~,~~;

(ii) the amortization of original issue discount resulting from the issuance of Indebtedness at less than par~~,~~;

(iii) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses (including agency costs, amendment, consent or other front end, one-off or similar non-recurring fees)~~,~~;

(iv) any expenses resulting from discounting of indebtedness in connection with the application of recapitalization accounting or purchase accounting~~,~~;

(v) penalties or interest related to taxes and any other amounts of non-cash interest resulting from the effects of acquisition method accounting or pushdown accounting~~,~~;

(vi) the accretion or accrual of, or accrued interest on, discounted liabilities (other than Indebtedness) during such period~~,~~;

(vii) non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under hedging agreements or other derivative instruments pursuant to FASB Accounting Standards Codification No. 815-Derivatives and Hedging~~,~~;

(viii) any one-time cash costs associated with breakage in respect of Hedge Agreements for interest rates~~,~~;

(ix) any payments with respect to make whole premiums, commissions or other breakage costs of any Indebtedness~~,~~;

(x) all non-recurring interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with GAAP~~,~~;

(xi) expensing of bridge, arrangement, structuring, commitment, fronting or other financing fees~~,~~;

(xii) fees and expenses constituting Transaction Costs~~,~~;

(xiii) agency fees paid to the administrative agents and collateral agents under any credit facilities or other debt instruments or documents; and

(xiv) fees (including any ticking fees) and expenses (including any penalties and interest relating to Taxes) associated with any Investment not prohibited by Section 9.10 or the issuance of Capital Stock or Indebtedness (in each case excluding any bona fide interest expense);

provided that with respect to each joint venture or minority investee of ~~the Administrative Borrower~~any Loan Party or any of its Subsidiaries, for purposes of calculating Consolidated Cash Interest Charges solely with respect to calculating the Fixed Charge Coverage Ratio pursuant to Section 9.1~~8~~7 hereof, the amount of Consolidated Cash Interest Charges (calculated in accordance with this definition) attributable to such joint venture or minority investee, as applicable, that shall be counted for such purposes shall equal the product of (x) ~~the Administrative Borrower's~~such Loan Party's or such Subsidiary's direct and/or indirect percentage ownership of such joint venture or minority investee and (y) Consolidated Cash Interest Charges (calculated in accordance with this definition) of such joint venture or minority investee; provided further that the adjustments to Consolidated Cash Interest Charges pursuant to the preceding proviso shall be proportionate to the amount of EBITDA that is contributed by such joint venture or minority investee  pursuant to the definition of "EBITDA" hereunder.

"Consolidated Net Income" means, for any period, the net income (loss) of the ~~Borrowers~~<u>Loan Parties</u> and their <u>respective</u> Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(a)    extraordinary (as defined under GAAP as in effect prior to FASB Update No. 2015-01), unusual, or non-recurring gains or losses for such period,

(b)    the cumulative effect of a change in accounting principles during such period;

(c)    any Transaction Costs,

(d)    any fees, costs and expenses (including (x) any transaction or retention bonus or similar payment and (y) any indemnities) incurred during such period, or any amortization thereof for such period, in connection with or in relation to any acquisition (including any acquisition of a franchisee), non-recurring costs to acquire equipment to the extent not capitalized in accordance with GAAP, Investment, recapitalization, asset disposition, non-competition agreement, incurrence, issuance or repayment of debt or similar transaction, issuance of equity securities, option buyouts, refinancing transaction or amendment or other modification of or waiver or consent relating to any debt instrument or similar transaction and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt, the effects of expensing all transaction-related expenses in accordance with FASB Accounting Standards Codification 805 and gains or losses associated with FASB Accounting Standards Codification 460),

(e)    any income (loss) (and all fees and expenses or charges relating thereto) for such period attributable to the early extinguishment of Indebtedness, hedging agreements or other derivative instruments,

(f)    accruals and reserves that are established or adjusted as a result of any Permitted Acquisition or other Investment not prohibited under this Agreement in accordance with GAAP (including any adjustment of estimated payouts on Earn-Outs) or changes as a result of the adoption or modification of accounting policies during such period,

(g)    stock-based award compensation expenses (including any one-time compensation related to unvested options outstanding as of the Closing Date),

(h)    any income (loss) attributable to deferred compensation plans or trusts,

(i)    any income (loss) from Investments recorded using the equity method,

(j)    the amount of any expense required to be recorded as compensation expense related to contingent transaction consideration,

(k)    any unrealized gain or loss due solely to fluctuations in currency values and the related tax effects, determined in accordance with GAAP,

(l)     [Reserved],

(m)     [Reserved],

(n)     any costs or expenses incurred by the ~~Borrowers~~Loan Parties or any Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, any severance agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are non-cash or otherwise funded with cash proceeds contributed to the capital of the ~~Borrowers~~Loan Parties or net proceeds received in cash or Cash Equivalents of an issuance of Capital Stock of the ~~Borrowers~~Loan Parties (other than Disqualified Equity Interests),

(o)     the Consolidated Net Income of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that Consolidated Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary or its stockholders, and

(p)     any non-cash goodwill impairment charges or other intangible asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of ASC 350 or other non-cash asset impairment charges incurred subsequent to the date of this Agreement resulting from the application of SFAS 144.

There shall be included in Consolidated Net Income, without duplication, the amount of any cash tax benefits related to the tax amortization of intangible assets in such period. There shall be excluded from Consolidated Net Income for any period the effects from applying acquisition method accounting, including applying acquisition method accounting to inventory, property and equipment, loans and leases, software and other intangible assets and deferred revenue (including deferred costs related thereto and deferred rent) required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to the ~~Borrowers~~Loan Parties and their respective Subsidiaries), as a result of any Permitted Acquisitions (or other Investment not prohibited hereunder) or the amortization or write-off of any amounts thereof.

In addition, to the extent included in the Consolidated Net Income of such Person and its Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall (i) exclude any expenses and charges that are reimbursed by indemnification or other reimbursement provisions in connection with any acquisition or other investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder and (ii) include the amount of business interruption insurance proceeds received and, to the extent covered by insurance and actually reimbursed, or, so long as the Administrative Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (A) not denied by the applicable carrier in writing within 180 days and (B) in fact reimbursed within 365 days of the date of such

evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), expenses with respect to liability or casualty events or business interruption.

"Control" shall have the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"Copyright License" means any written agreement or license now or hereafter in effect, granting to or from any Person any use right under any Copyright now or hereafter owned by any other Person or that such other Person otherwise has the right to license, and all rights of any such Person under any such agreement or license.

"Copyrights" means (a) all copyright rights in any work arising under the copyright laws of the United States or any other jurisdiction, whether as author, assignee, transferee or otherwise, (b) all registrations and applications for registration of any such copyright, including registrations, supplemental registrations and pending applications for registration in the United States Copyright Office and (c) all extensions, renewals, and restorations thereof.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Covered Entity" means any of the following:

(a)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to it in Section 13.12.

"Credit Card Acknowledgments" shall mean, collectively, the agreements by Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements in favor of Agent acknowledging Agent's first priority security interest, for and on behalf of Lenders, in the monies due and to become due to a Borrower or a Guarantor(including, without limitation, credits and reserves) under the Credit Card Agreements, and agreeing to transfer all such amounts to the Blocked Accounts, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced pursuant to their terms, sometimes being referred to herein individually as a "Credit Card Acknowledgment".

"Credit Card Agreements" shall mean all agreements entered into on, prior and after the date hereof by any Borrower or for the benefit of any Borrower or Guarantor, in each case with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be

amended, modified, supplemented, extended, renewed, restated or replaced, including, but not limited to, the agreements set forth on Schedule 8.16 hereto.

"Credit Card Issuer" shall mean any Person (other than ~~FRG and~~any Loan Party or its Subsidiaries) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Japan Credit Bureau (a/k/a JCB Co.), Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc., and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary (other than ~~FRG and~~any Loan Party or its Subsidiaries) who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any ~~Borrower's~~Loan Party's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Receivables" shall mean, collectively, (a) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer or Credit Card Processor arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party in connection with the sale or transfer of Credit Card Receivables arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise which, in the case of both clause (a) and (b) above, have been earned by performance by such Borrower or Guarantor but not yet been paid to such Borrower by the Credit Card Issuer or the Credit Card Processor, as applicable.

"Credit Facility" shall mean the Loans and Letters of Credit provided to or for the benefit of any Borrower pursuant to Sections 2.1, 2.2 and 2.3 hereof.

"Daily Average Liquidity" means for any period, the result obtained by dividing (i) the sum of the Daily Liquidity for each Business Day in such period by (ii) the number of Business Days in such period.

"Daily Liquidity" means, for any day, an amount equal to the sum of (i) daily unrestricted (except for any restrictions pursuant to the collateral and security documents in connection with the First Lien Term Loan Documents or the Financing Agreements; provided that (x) any cash collateral posted to secure obligations with respect to any Bank Products or Cash Management Obligations and (y) any account control agreements in favor of any Person other than the Agent (excluding, to the extent party to any control agreement in favor the Agent, the First Lien Agent) shall, in each case, be considered restricted) cash and Cash Equivalents of the Administrative

Borrower and the operating Subsidiaries of the Administrative Borrower and (ii) any Excess Availability.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to SOFR for the day that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website.  Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Administrative Borrower.

["Dealer Agreement" means a dealer agreement between any Borrower, as owner, and any other Person, as dealer, pertaining to the establishment and operation of a business with operations comparable to the operations of the PSP Borrowers and their Subsidiaries.]

["Dealer Eligibility Requirements" means, collectively, each of the following:

(a) the applicable Borrower has executed an agreement with the applicable Dealer to operate a dealership under one of the brands as listed on Schedule 1E hereto, or any subsequent rebranding of such dealership, at a location owned or leased and operated by such Dealer, substantially on the standard form agreements containing terms and conditions established by the Borrowers from time to time, which shall include (A) an acknowledgement from such Dealer that the Borrowers, or Agent acting on behalf of the Borrowers, are authorized to transfer proceeds of the Inventory consigned by such Borrower to such Dealer from the bank account maintained by such Dealer to an account in the name of a Borrower and (B) an acknowledgement by the Dealer that the applicable Borrower has granted a Lien to Agent on the Inventory consigned by such Borrower to the Dealer and an agreement by the Dealer to reasonably cooperate with Agent in the event of the exercise by Agent of its rights and remedies with respect to such Lien; provided that this clause (a) shall be deemed to be satisfied if both (x) the applicable Borrower and the applicable Dealer have entered into a Dealer Agreement substantially in the form of the "Dealership Agreement Template" provided to Agent prior to the Closing Date (and such Dealer Agreement shall have been delivered by the applicable Borrower to Agent) and (y) the applicable Borrower shall have (I) delivered a written notice (which shall include notice by electronic means) executed by such Borrower to the applicable Dealer that such Borrower has irrevocably designated Agent as an express third-party beneficiary of the applicable Dealer Agreement, that Agent irrevocably has all of the rights of such a beneficiary under such Dealer Agreement and that such Borrower retains all right, title and interest in and to the Inventory subject to such Dealer Agreement and (II) provided written evidence (including by electronic means) to Agent of such delivery;

(b) the applicable Borrower has provided Agent with evidence that such Borrower has filed appropriate UCC financing statements against the applicable Dealer evidencing the consignment arrangement between such Borrower and the applicable Dealer with respect to the Inventory consigned by such Borrower to the applicable Dealer, and has taken all other action required under applicable Requirements of Law to obtain a valid, first priority perfected (subject to the same Liens permitted in clause (j) of the definition of "Eligible Inventory") security

interest (or a pre-existing Lien) in such Inventory (including, without limitation, providing notification to other secured parties of the applicable Dealer as required by the UCC);

(c) if requested by Agent, the applicable Borrower has provided the Agent with an assignment of the UCC financing statements set forth in clause (b) above;

(d) [reserved]; and

(e) the agreements between the applicable Borrower and the applicable Dealer provide that all amounts owed by such Dealer to such Borrower shall be swept or deposited (including by the applicable Dealer) at least daily (provided that such deposits will only be required to be daily with respect to any Business Day) into (i) an account of a Borrower which is subject to a Deposit Account Control Agreement or (ii) a Store Account with respect to which the Loan Parties are in compliance with Section 6.3.

For the purposes of paragraph (a) above, "reasonably cooperate with Agent" means that the Dealer will, at Agent's expense and with reasonable prior notice from Agent, (i) give Agent and its representatives access during normal business hours to all Inventory consigned by the applicable Borrower to the Dealer, (ii) permit Agent and its representatives to take possession and control of the Inventory consigned by the applicable Borrower to the Dealer, and to remove the Inventory from the premises of the Dealer, (iii) to the extent not prohibited by applicable location occupancy agreements (including leases), conduct "going-out-of business sales" and engage in similar activities with respect to the Inventory consigned by the applicable Borrower to the Dealer, and (iv) take all other commercially reasonable actions with respect to the Inventory consigned by the applicable Borrower to the Dealer that, upon Agent's request, may be reasonably necessary to permit Agent to exercise all of its rights and remedies with respect to the Lien on the Inventory consigned by such Borrower to the Dealer.]

["Dealers" means the individuals and entities listed in Schedule 1D as "dealers", and thereafter, such entities and any additional individual or entity that meets the Dealer Eligibility Requirements.]

"Default" shall mean an act, condition or event which with notice or passage of time or both would constitute an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" shall mean any Revolving Lender, as determined by Agent, that has (a) failed to fund any portion of its Revolving Loans or participations in Letters of Credit within three Business Days of the date required to be funded by it hereunder, (b) notified any Borrower, Guarantor, Agent, the Issuing Bank or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) failed, within three Business Days after request by Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Revolving Loans and participations in then outstanding Letters of Credit, (d) otherwise failed to pay over Agent or any other Lender any

other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, or (e) (i) become or is insolvent or has a parent company that has become or is insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Deposit Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Deposit Account Control Agreement" shall mean an agreement in writing, in form and substance reasonably satisfactory to Agent, by and among Agent, the First Lien Agent (if a party thereto), Borrowers or Guarantor with a Deposit Account at any bank and the bank at which such Deposit Account is at any time maintained which provides that such bank will comply with instructions originated by Agent directing disposition of the funds in the Deposit Account without further consent by such Borrower or Guarantor upon the occurrence of an Event of Default or upon the commencement of a Compliance Period and at all times during the continuance of such Event of Default or Compliance Period, and has such other terms and conditions as Agent may reasonably require including as to any such agreement with respect to any Blocked Account, providing that all items received or deposited in the Blocked Accounts are the property of Agent, for itself and the ratable benefit of the Lenders and the Bank Product Providers and, except as otherwise agreed with the corresponding bank and with such other appropriate or customary exceptions for agreements of this kind, that the bank has no lien upon, or right to set off against, the Blocked Accounts, the items received for deposit therein, or the funds from time to time on deposit therein and that the bank will upon the occurrence of an Event of Default or upon the commencement of a Compliance Period and at all times during the continuance of such Event of Default or Compliance Period, wire, or otherwise transfer, in immediately available funds, on a daily basis to the Agent Payment Account all funds received or deposited into the Blocked Accounts.

"Disposed EBITDA" means, with respect to any Sold Entity or Business for any period through (but not after) the date of such disposition, the amount for such period of EBITDA of such Sold Entity or Business (determined as if references to the ~~Borrowers~~Loan Parties and their respective Subsidiaries in the definition of the term "EBITDA" (and in the component financial definitions used therein) were references to such Sold Entity or Business and its subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"Disqualified Equity Interest" means, with respect to any Person, any Capital Stock in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)      matures or is mandatorily redeemable or contains any mandatory put, redemption or repayment provision (other than solely for Capital Stock in such Person that do

not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Capital Stock), whether pursuant to a sinking fund obligation or otherwise;

        (b)     is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Capital Stock (other than solely for Capital Stock in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Capital Stock);

        (c)     is redeemable (other than solely for Capital Stock in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Capital Stock) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof; or

        (d)     in the case of any preferred Capital Stock, provides for scheduled payments of dividends and/or distributions in cash;

in each case, on or prior to the date ninety-one (91) days after the Maturity Date; provided, however, that (i) an Capital Stock in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Capital Stock upon the occurrence of an "asset sale" or a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after, or payment thereunder is subject to the prior, repayment in full of all the Loans and all other Obligations that are accrued and payable and the termination of the Revolving Commitments, (ii) if an Capital Stock in any Person is issued pursuant to any plan for the benefit of employees of the Administrative Borrower or any of its subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Administrative Borrower or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) any Capital Stock in any Person that would not constitute a Disqualified Equity Interest but for a requirement of payment of dividends or distributions in violation of clauses (a) or (b) above shall not constitute a Disqualified Equity Interest if the terms of such Capital Stock (x) give the applicable issuer the option to elect to pay such dividends or distributions on a non-cash basis and (y) do not require the cash payment of dividends or distributions at any time that such cash payment is not permitted under Section 9.11 or Section 9.24 or would result in an Event of Default hereunder.

"Dividing Person" has the meaning assigned to it in the definition of "Division."

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Division Successor" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A

Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"Documents" shall have the meaning set forth in Article 9 of the UCC.

"dollars" or "$" refers to lawful money of the U.S., unless the context clearly otherwise indicates.

"Earn-Outs" means, with respect to any Person, obligations of such Person arising from Permitted Acquisitions or other Investments permitted hereunder which are payable to the sellers thereunder in their capacity as such based on the achievement of specified financial results or other criteria or milestones over time.

"EBITDA" means, for any period, Consolidated Net Income for such period, plus:

(a)     without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)     total Interest Expense and, to the extent not reflected in such total Interest Expense, the sum of (A) premium payments, debt discount, fees, charges and related expenses incurred in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets plus (B) the portion of rent expense with respect to such period under Capital Leases that are treated as interest expense in accordance with GAAP plus (C) the implied interest component of synthetic leases with respect to such period plus (D) any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or such derivative instruments plus (E) bank and letter of credit fees and costs of surety bonds in connection with financing activities, plus (F) amortization or write-off of deferred financing fees, debt issuance costs, debt discount or premium, terminated hedging obligations and other commissions, financing fees and expenses and, adjusted, to the extent included, to exclude any refunds or similar credits received in connection with the purchasing or procurement of goods or services under any purchasing card or similar program;

(ii)     provision for taxes based on income, profits, revenue or capital and sales taxes, including federal, foreign, state, franchise, excise, and similar taxes paid or accrued during such period (including in respect of repatriated funds) including penalties and interest related to such taxes or arising from any tax examinations;

(iii)     Non-Cash Charges;

(iv)     [reserved];

(v)     [reserved];

(vi)     severance, relocation, integration and facilities' opening costs and expenses and other business optimization costs and expenses and operating

28

improvements (including related to new product introductions and any operating expenses, losses or charges related to the implementation of cost savings initiatives, operating expense reductions and other similar initiatives), recruiting fees, signing costs, reserve, retention, recruiting, relocation and signing bonuses and expenses, transition costs, costs related to closure/consolidation of facilities, internal costs in respect of strategic initiatives and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities), contract terminations, professional and consulting fees incurred in connection with any of the foregoing and other one-time and nonoperational costs and expenses; provided that the amounts added-back pursuant to this clause (vi) shall be subject to the Aggregate Add-Back Cap;

(vii)    restructuring costs, charges, accruals or reserves (including restructuring and integration costs related to acquisitions and adjustments to existing reserves), whether or not classified as restructuring expense on the consolidated financial statements; provided that the amounts added-back pursuant to this clause (vii) shall be subject to the Aggregate Add-Back Cap;

(viii)    [reserved];

(ix)    [reserved];

(x)    any non-cash loss attributable to the mark to market movement in the valuation of any Capital Stock, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(xi)    any loss relating to amounts paid in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income for such period;

(xii)    any gain relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from EBITDA pursuant to clause (c)(iv) below;

(xiii)    any non-cash net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of FASB Accounting Standards Codification 715, and any other items of a similar nature;

(xiv)    charges, losses, lost profits, expenses (including litigation expenses, fee and charges) or write-offs to the extent indemnified or insured by a third party, including expenses or losses covered by indemnification provisions or by any insurance provider in connection with a Permitted Acquisition or any other acquisition or Investment, disposition or any Event of Loss, in each case, to the extent that coverage has not been denied and so long as such amounts are actually reimbursed in cash within one year after the related amount is first added to EBITDA pursuant to this clause (xiv) (and

if not so reimbursed within one year, such amount shall be deducted from EBITDA during the next measurement period);

(xv)   cash receipts (or any netting arrangements resulting in reduced cash expenses) not included in EBITDA in any period to the extent non-cash gains relating to such receipts were deducted in the calculation of EBITDA pursuant to clause (c) below for any previous period and not added back;

(xvi)   [reserved];

(xvii)   other adjustments (i) identified to Agent and the Lenders prior to the Closing Date or (ii) set forth in the quality of earnings report prepared by independent registered public accountants of recognized national standing or any other accounting firm reasonably acceptable to the Agent and the Lenders and delivered in connection with the Transactions; provided that the amounts added-back pursuant to this clause (xvii) shall be subject to the Aggregate Add-Back Cap; and

(xviii)   [reserved]; plus

(b)      [reserved]; less

(c)      without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)      non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or EBITDA in any prior period and any non-cash gains attributable to accrual of revenue or recording of receivables in the ordinary course of business);

(ii)      any non-cash gain attributable to the mark to market movement in the valuation of any Capital Stock, and hedging obligations or other derivative instruments (in each case, including pursuant to Financial Accounting Standards Codification No. 815—Derivatives and Hedging);

(iii)      any gain relating to amounts received in cash prior to the stated settlement date of any hedging obligation that has been reflected in Consolidated Net Income in such period;

(iv)      any loss relating to hedging obligations that has been reflected in Consolidated Net Income in prior periods and excluded from EBITDA pursuant to clauses (a)(xi) and (a)(xii) above;

(v)      [reserved];

(vi)      non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or cash reserve for a potential cash item that reduced EBITDA in any prior

period, any non-cash gains with respect to cash actually received in a prior period so long as such cash did not increase EBITDA in such prior period, and any non-cash gains attributable to accrual of revenue or recording of receivables in the ordinary course of business; and

(vii)    any amount included in Consolidated Net Income of such Person for such period attributable to non-controlling interests pursuant to the application of FASB Accounting Standards Codification Topic 810-10-45;

in each case, as determined on a consolidated basis for ~~FRG and its~~the Loan Parties and their respective Subsidiaries in accordance with GAAP; provided that:

(I)    to the extent included in Consolidated Net Income, there shall be excluded in determining EBITDA currency translation gains and losses related to currency remeasurements of assets or liabilities (including the net loss or gain resulting from hedging agreements for currency exchange risk and revaluations of intercompany balances),

(II)    to the extent included in Consolidated Net Income, there shall be excluded in determining EBITDA for any period any adjustments resulting from the application of Financial Accounting Standards Codification No. 815—Derivatives and Hedging,

(III)    there shall be included in determining EBITDA for any period, without duplication, to the extent not included in Consolidated Net Income, the Acquired EBITDA of any Person, property, business or asset acquired by ~~the Administrative Borrower~~any Loan Party or any Subsidiary during such period to the extent not subsequently sold, transferred or otherwise disposed of (but not including the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired) (each such Person, property, business or asset acquired, an "Acquired Entity or Business"), based on the Acquired EBITDA of such Pro Forma Entity for such period (including the portion thereof occurring prior to such acquisition or conversion) determined on a historical pro forma basis and (B) in the case of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting, the EBITDA of such Person multiplied by the ownership percentage of ~~the Administrative Borrower~~such Loan Party or applicable Subsidiary therein; provided that, in each case, any joint venture or minority investment shall be subject to clause (VI) below;

(IV)    there shall be (A) to the extent included in Consolidated Net Income, excluded in determining EBITDA for any period the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations in accordance with GAAP (other than (x) if so classified on the basis that it is being held for sale unless such sale has actually occurred during such period and (y) for periods prior to the applicable sale, transfer or other disposition, if the Disposed EBITDA of such Person, property, business or asset is positive (i.e., if such Disposed EBITDA is negative, it shall be added back in determining EBITDA for any period)) by ~~the Administrative Borrower~~a Loan Party or any Subsidiary during such period (each such Person, property, business or asset so sold, transferred or otherwise

disposed of, closed or classified, a "Sold Entity or Business") based on the Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer, disposition, closure, classification or conversion) determined on a historical pro forma basis and (B) to the extent not included in Consolidated Net Income, included in determining EBITDA for any period in which a Sold Entity or Business is disposed, an adjustment equal to the Pro Forma Disposal Adjustment with respect to such Sold Entity or Business (including the portion thereof occurring prior to such disposal) as specified in the Pro Forma Disposal Adjustment certificate delivered to the Agent (for further delivery to the Lenders);

(V)     to the extent included in Consolidated Net Income, there shall be excluded in determining EBITDA any non-cash expense (or income) as a result of adjustments recorded to contingent consideration liabilities relating to any Permitted Acquisition (or other Investment permitted hereunder); and

(VI)     with respect to each joint venture or minority investee of ~~the Administrative Borrower~~a Loan Party or any of its Subsidiaries, for purposes of calculating EBITDA solely with respect to calculating the Fixed Charge Coverage Ratio pursuant to Section 9.1~~8~~7 hereof, the amount of EBITDA (calculated in accordance with this definition) attributable to such joint venture or minority investee, as applicable, that shall be counted for such purposes (without duplication of amounts already included in Consolidated Net Income) shall equal the product of (x) ~~the Administrative Borrower's~~such Loan Party's or such Subsidiary's direct and/or indirect percentage ownership of such joint venture or minority investee and (y) the EBITDA (calculated in accordance with this definition) of such joint venture or minority investee; provided that the aggregate amount of adjustments or add-backs to EBITDA pursuant to this clause (VI) shall not exceed 10.0% of EBITDA (prior to giving effect to such adjustments).

"ECP" shall mean an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act and the applicable rules and regulations issued by the Commodity Futures Trading Commission and/or the Securities and Exchange Commission.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Electronic System" means any electronic system, including e-mail, e-fax, web portal access for such ~~Borrower~~Loan Party and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Agent or the Issuing Bank and any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"Eligible Accounts" shall mean, at any time, the Accounts of a ~~Borrower~~Loan Party which Agent determines in its Permitted Discretion are eligible as the basis for the extension of Loans and the issuance of Letters of Credit. Eligible Accounts shall be calculated, without duplication of any Reserves, net of customer deposits, unapplied cash, taxes, finance charges, service charges, discounts, credits, allowances, and rebates. Without limiting Agent's Permitted Discretion provided herein, Eligible Accounts shall not include any Account of a ~~Borrower~~Loan Party:

(a)     which is not subject to a first priority perfected security interest in favor of Agent;

(b)     which is subject to any lien other than (i) a lien in favor of Agent and (ii) a Permitted Encumbrance or a Lien permitted pursuant to Section 9.8(s), in each case, which does not have priority over the lien in favor of Agent;

(c)     (i) with respect to which the scheduled due date is more than 60 days after the date of the original invoice therefor, (ii) which, is unpaid more than 90 days after the date of the original invoice therefor or more than 60 days after the original due date, therefor ("Overage") (when calculating the amount under this clause (ii), for the same Account Debtor, Agent shall include the net amount of such Overage and add back any credits, but only to the extent that such credits do not exceed the total gross receivables from such Account Debtor, or (iii) which has been written off the books of such ~~Borrower~~Loan Party or otherwise designated as uncollectible;

(d)     which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder;

(e)     which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to  such ~~Borrower~~Loan Party exceeds 10% of the aggregate amount of Eligible Accounts of such ~~Borrower~~Loan Party;

(f)     with respect to which any covenant, representation, or warranty contained in this Agreement or any other Financing Agreement has been breached in any material respect or is not true in any material respect;

(g)     which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to Agent in its Permitted Discretion which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon such ~~Borrower's~~Loan Party's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale,

sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, (vi) relates to payments of interest ~~and~~or (vii) constitutes a Franchisee Receivable~~,~~ other than a Franchisee Receivable arising after the Closing Date owing by a franchisee that has been approved by Agent in its Permitted Discretion;

(h)    for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such ~~Borrower~~Loan Party or if such Account was invoiced more than once;

(i)    with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j)    which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws (other than post-petition accounts payable of an Account Debtor that is a debtor-in-possession under the United States Bankruptcy Code and reasonably acceptable to Agent), (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent or (vi) ceased operation of its business;

(k)    which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)    which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or (ii) is not organized under applicable law of the U.S. or any state of the U.S. unless, in either case, such Account is backed by a Letter of Credit acceptable to Agent which is in the possession of, and is directly drawable by, Agent;

(m)    which is owed in any currency other than U.S. dollars;

(n)    which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a Letter of Credit acceptable to Agent which is in the possession of, and is directly drawable by, Agent, or (ii) the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect the lien of Agent in such Account have been complied with to Agent's satisfaction;

(o)    which is owed by any Affiliate of any Borrower or any Guarantor or any employee, officer, director, agent or stockholder of any Borrower, any Guarantor or any of their Affiliates;

(p)    which, for any Account Debtor, exceeds a credit limit determined by Agent in its Permitted Discretion, to the extent of such excess;

(q)        which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Borrower or any Guarantor is indebted, but only to the extent of such indebtedness, or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r)        which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent of any such counterclaim, deduction, defense, setoff or dispute;

(s)        which is evidenced by any promissory note, chattel paper, or instrument;

(t)        which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such ~~Borrower~~Loan Party to seek judicial enforcement in such jurisdiction of payment of such Account, unless such ~~Borrower~~Loan Party has filed such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(u)        with respect to which such ~~Borrower~~Loan Party has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such ~~Borrower~~Loan Party created a new receivable for the unpaid portion of such Account;

(v)        which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Federal Reserve Board;

(w)        which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than such ~~Borrower~~Loan Party has or has had an ownership interest in such goods, or which indicates any party other than such ~~Borrower~~Loan Party as payee or remittance party;

(x)        which was created on cash on delivery terms;

(y)        which is (i) a Credit Card Receivable or (ii) an Account generated by a consumer lease or rental agreement or arrangement (including a Rental Agreement); or

(z)        which is owing to Buddy Top Parent or any of its Subsidiaries.

In the event that an Account of a ~~Borrower~~Loan Party which was previously an Eligible Account ceases to be an Eligible Account hereunder, such ~~Borrower~~Loan Party or Administrative Borrower shall notify thereof on and at the time of submission to Agent of the next Borrowing Base Certificate.  In determining the amount of an Eligible Account of a ~~Borrower~~Loan Party, the face amount of an Account may, in Agent's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such ~~Borrower~~Loan Party may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or

understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such ~~Borrower~~Loan Party to reduce the amount of such Account.

"Eligible Credit Card Receivables" shall mean, the gross amount of Credit Card Receivables of ~~Borrowers~~the Loan Parties that are subject to a valid, first priority and fully perfected security interest in favor of the Agent for itself and the Secured Parties, which conform to all applicable warranties contained herein, less, without duplication:

(a)    the sum of all Credit Card Receivables:

(i)    for which Agent has not received a Credit Card Acknowledgment pursuant to Section 9.31 if the Credit Card Agreement exists on the Closing Date (or if the Credit Card Agreement is entered into after the Closing Date, no later than 90 days after the date of such Credit Card Agreement or such later date as is acceptable to Agent);

(ii)    which are unpaid more than five Business Days after the date of the sale of Inventory giving rise to such Credit Card Receivable;

(iii)    arising from any private label credit card program or other similar credit arrangement of a Loan Party or any of its Subsidiaries, except as otherwise approved by Agent in its Permitted Discretion;

(iv)    which are generated by a consumer lease or rental agreement or arrangement (including a Rental Agreement);

(v)    which are owing to Buddy Top Parent or any of its Subsidiaries; and

(b)    amounts owing to Credit Card Issuers or Credit Card Processors in connection with the Credit Card Agreements.

Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, a Credit Card Receivable shall indicate no Person other than a ~~Borrower~~Loan Party as payee or remittance party.

"Eligible Depository Bank" means:

(a)    Any Lender or any of its Affiliates; or

(b)    Any other Person who is a commercial bank or financial institution having total assets in excess of $1,000,000,000; organized under the laws of any country that is a member of the Basel Accord and the Organization of Economic Cooperation and Development, or a political subdivision of any such country, so long as such bank or financial institution is acting through a branch or agency located in the United States.

"Eligible Inventory" shall mean, as to each ~~Borrower~~Loan Party, Inventory of such ~~Borrower~~Loan Party consisting of finished goods held for resale in the ordinary course of the

business of such ~~Borrower~~Loan Party that satisfy the criteria set forth below as reasonably determined by Agent. Eligible Inventory shall not include:

(a)     work-in-process;

(b)     raw materials;

(c)     spare parts for Equipment;

(d)     packaging and shipping materials;

(e)     supplies used or consumed in such ~~Borrower's~~Loan Party's business;

(f)     Inventory located (i) (A) at premises other than a premise which is owned or leased by any ~~Borrower~~Loan Party or (B) without limiting subclause (ii) of this clause (f) below, in any third party warehouse or in the possession of a bailee (other than a third party processor) unless Agent has received, subject to Section 9.31, a Collateral Access Agreement in respect of such premises on terms and conditions reasonably satisfactory to Agent (it being understood that Inventory of the ~~Borrowers~~Loan Parties which is in-transit (other than in-transit Inventory between domestic locations of the ~~Borrowers~~Loan Parties for less than 10 consecutive days) shall not be considered Eligible Inventory) or (ii) ~~[at a location owned or leased by a D~~dealer~~, other than Inventory for which the Borrowers have met the Dealer Eligibility Requirements]~~;

(g)     Inventory subject to a security interest or lien in favor of any Person other than Agent except those permitted in this Agreement that are subject to an intercreditor agreement in form and substance satisfactory to Agent between the holder of such security interest or lien and Agent and those liens described in clause (j) below;

(h)     bill and hold goods;

(i)     Inventory which is past its expiration date;

(j)     Inventory that is not subject to the first priority, valid and perfected security interest of Agent except in the case of those non-consensual statutory liens described in clause (i) of the definition of "Permitted Encumbrances", liens permitted under Section 9.8(ff) and (gg) so long as such liens are subject to the Intercreditor Agreement and landlord, warehouseman or similar liens (i) in respect of which Agent has established a Reserve (if and only to the extent establishment of a Reserve is permitted by the terms hereof), (ii) for which no Reserve is provided by the terms hereof, or (iii) in respect of which premises Agent has received a Collateral Access Agreement pursuant to which the landlord, warehouseman or bailee, as applicable, has either waived or subordinated its lien on terms and conditions reasonably satisfactory to Agent;

(k)     returned Inventory which is not held for sale in the ordinary course of business;

(l)     damaged and/or defective Inventory;

(m)    Inventory (i) purchased or sold on consignment ~~or,~~ (ii) that is consigned by a ~~Borrower~~Loan Party to a Person which is not a ~~Borrower~~Loan Party or a Subsidiary of a ~~Borrower, other than~~Loan Party or (iii) Inventory that is consigned to ~~F~~franchisees ~~for which the Borrowers have met the Franchisee Eligibility Requirements~~;

(n)    Inventory located outside the United States of America, unless approved by Agent in writing;

(o)    Inventory that is subject to any licensing arrangement or any other Intellectual Property or other proprietary rights of any Person, the effect of which would be to limit the ability of the Agent, or any Person selling the Inventory on behalf of the Agent, to sell such Inventory in enforcement of the Agent's Liens without further consent or payment to the licensor or such other Person (unless such consent has then been obtained);

(p)    Inventory which has been acquired from a Sanctioned Person;

(q)    Inventory that is subject to any consumer lease or rental agreement or arrangement (including any Rental Agreement); and

(r)    Inventory of Buddy Top Parent or any of its Subsidiaries.

The criteria for Eligible Inventory set forth above may only be changed and any new criteria for Eligible Inventory may only be established by Agent in its good faith based on either:  (i) an event, condition or other circumstance arising after the date hereof, or (ii) an event, condition or other circumstance existing on the date hereof to the extent Agent has no written notice thereof from a ~~Borrower~~Loan Party prior to the date hereof in either case under clause (i) or (ii) which materially and adversely affects or could reasonably be expected to materially and adversely affect the Inventory, its value or the amount that would be received by Agent from the sale or other disposition or realization upon such Inventory as determined by Agent in its good faith and commercially reasonable determination.  Any Inventory that is not Eligible Inventory shall nevertheless be part of the Collateral.

"Eligible Transferee" shall mean ~~(a) any Lender;~~:

(a) any Lender;

(b) the parent company of any Lender and/or any Affiliate of such Lender which is at least 50% owned by such Lender or its parent company;

(c) any Person that is engaged in the business of making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and is administered or managed by a Lender or with respect to any Lender that is a fund which invests in bank loans and similar extensions of credit, any other fund that invests in bank loans and similar extensions of credit and is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor, in each case as approved by Agent, the Issuing Bank and, unless an Event of Default under Section 10.1(a), Section 10.1(g) or Section 10.1(h) has occurred and is continuing at the time any assignment is effected hereunder, Administrative Borrower (such approval not to be unreasonably withheld, conditioned or delayed

by Administrative Borrower, <u>provided</u>, that, (i) Administrative Borrower's failure to consent to an assignment to a "distressed debt" purchaser, a "vulture" fund or other similar assignee or buyer shall not be deemed unreasonable and (ii) no such consent shall be required in connection with any assignment to another Lender or to an Affiliate of any Lender); and

(d) any other commercial bank, financial institution or "accredited investor" (as defined in Regulation D under the Securities Act of 1933) approved by Agent, the Issuing Bank (each such approval not to be unreasonably withheld, conditioned or delayed) and, unless an Event of Default under <u>Section 10.1(a)</u>, <u>Section 10.1(g)</u> or <u>Section 10.1(h)</u> has occurred and is continuing at the time any assignment is effected hereunder, Administrative Borrower, <u>provided</u> that (i) neither any Borrower nor any Guarantor or any Affiliate of any Borrower or Guarantor shall qualify as an Eligible Transferee; (ii) no Person to whom any Indebtedness which is in any way subordinated in right of payment to any other Indebtedness of any Borrower or Guarantor shall qualify as an Eligible Transferee, except, in each case, as Agent may otherwise specifically agree; and (iii) a competitor of Borrowers shall not be deemed an "Eligible Transferee" under any circumstances except after the occurrence of either (A) an Event of Default for non-payment of any principal amount of Obligations owing hereunder or (B) the occurrence of an Event of Default with respect to any Borrower or Guarantor set forth in <u>Section 10.1(g)</u> or <u>Section 10.1(h)</u> hereof.

"<u>Environmental Events</u>" shall have the meaning set forth in <u>Section 9.3(b)</u> hereof.

"<u>Environmental Laws</u>" shall mean all foreign, Federal, State and local laws (including common law), rules, codes, licenses, permits (including any conditions imposed therein), authorizations, legally binding judicial or administrative decisions, injunctions or agreements between ~~Borrower~~a Loan Party and any Governmental Authority, (a) relating to pollution and the protection, preservation or restoration of the environment (including air, water vapor, surface water, ground water, drinking water, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), (b) relating to the exposure of humans to, or the use, storage, recycling, treatment, generation, manufacture, processing, distribution, transportation, handling, labeling, production, release or disposal, or threatened release, of hazardous, toxic or dangerous substances, materials, and wastes, or (c) imposing requirements with regard to recordkeeping, notification, disclosure and reporting respecting hazardous, toxic or dangerous substances, materials, and wastes.  The term "Environmental Laws" includes (i) the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Federal Superfund Amendments and Reauthorization Act, the Federal Water Pollution Control Act of 1972, the Federal Clean Water Act, the Federal Clean Air Act, the Federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the Federal Solid Waste Disposal and the Federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Federal Safe Drinking Water Act of 1974, (ii) applicable state counterparts to such laws and (iii) any common law or equitable doctrine that imposes liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any hazardous, toxic or dangerous substances, materials, and wastes.

"<u>Environmental Liability</u>" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring,

costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities) directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" shall have the meaning set forth in Article 9 of the UCC and includes, without limitation, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA" shall mean the United States Employee Retirement Income Security Act of 1974, as amended, together with all rules, regulations and interpretations thereunder or related thereto.

"ERISA Affiliate" shall mean any Person required to be aggregated with any Borrower, any Guarantor or any of its or their respective Subsidiaries under Sections 414(b), 414(c), 414(m) or 414(o) of the Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan, except for any such event with respect to which notice has been waived pursuant to applicable regulations; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412 of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the occurrence of a non-exempt "prohibited transaction" with respect to which ~~Borrower,~~the Loan Parties or any of their respective Subsidiaries is a "disqualified Person" (within the meaning of Section 4975 of the Code); (f) a complete or partial withdrawal by ~~Borrower~~any Loan Party, or any ERISA Affiliate from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the Pension Benefit Guaranty Corporation to terminate a Plan; (h) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (i) the imposition of any liability under Title IV of ERISA, other than the Pension Benefit Guaranty Corporation premiums due but not delinquent under Section 4007 of ERISA, upon ~~Borrower~~such Loan Party,

or any ERISA Affiliate in an amount that could reasonably be expected to have a Material Adverse Effect.

"Event of Default" shall mean the occurrence or existence of any event or condition described in Section 10.1 hereof.

"Event of Loss" means, with respect to any property, any of the following: (a) any loss, destruction or damage of such property; or (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such property, or confiscation of such property or the requisition of the use of such property; which for the avoidance of doubt, shall not include store closings or liquidations.

"Excess Availability" shall mean, the amount, as determined by Agent, calculated at any date, equal to: (a) the Borrowing Cap minus (b) the Aggregate Revolving Exposure.

"Exchange Act" shall mean the Securities Exchange Act of 1934, together with all rules, regulations and interpretations thereunder or related thereto.

"Excluded Accounts" means:

 (a) Zero Balance Accounts (provided that, upon any such account ceasing to be a Zero Balance Account, such account shall cease to be an Excluded Account).;

(b) Store Accounts.;

(c) accounts into which government receivables and government reimbursement payments are deposited.;

(d) payroll accounts (including accounts used for the disbursement of payroll, payroll taxes and other employee wage and benefit payments, including 401(k) and other retirement plans, rabbi trusts for deferred compensation and health care benefits).;

(e) withholding and trust accounts, escrow and other fiduciary accounts.;

(f) Manual Sweeping Accounts.; and

(g) Deposit Accounts, Securities Accounts and commodity accounts that (x) individually have a daily balance of not more than $50,000 and (y) together with all other Deposit Accounts, Securities Accounts and commodity accounts constituting Excluded Accounts under this clause (g), have a daily balance of not more than $1,000,000 in the aggregate for all such Deposit Accounts, Securities Accounts or commodity accounts and (h) consisting solely of cash or Cash Equivalents securing Indebtedness permitted by Section 9.9(ff) to the extent such security constitutes liens permitted by Section 9.8(ii).

"Excluded Assets" means.:

(a) any fee-owned real property that is not Material Real Property, all leasehold (including ground lease) interests in real property and any real property that contains

41

improvements and is located in an area determined (as of the Closing Date with respect to real property owned on the Closing Date and as of the date of acquisition of any real property acquired after the Closing Date) by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area~~.~~;

(b) motor vehicles, railcars, trailers, aircraft, aircraft engines, construction and earth moving equipment and other assets subject to certificates of title or ownership (except to the extent perfection of a security interest therein can be accomplished by filing of a UCC-1 financing statement or equivalent financing statement with a central registry)~~.~~;

(c) letter of credit rights (except to the extent constituting supporting obligations (as defined under the UCC) in which a security interest can be perfected with the filing of a UCC-1 financing statement or equivalent financing statement with a central registry)~~.~~;

(d) commercial tort claims with an individual value, as determined by the Administrative Borrower in good faith of less than $~~3~~2,5~~0~~00,000 and commercial tort claims for which no complaint or counterclaim has been filed in a court of competent jurisdiction~~, (e) Capital Stock in any Person (other than any Wholly Owned Subsidiaries) to the extent the pledge thereof to Agent is not permitted by the terms of such Person's organizational, incorporation or joint venture documents, (f) [reserved], (g) captive insurance companies, (h) [reserved],~~;

(e) [reserved];

(f) [reserved];

(g) [reserved];

(h) [reserved];

(i) any lease, license or other agreement, government approval or franchise with any Person if, to the extent and for so long as, the grant of a Lien thereon to secure the Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, such lease, license or other agreement, government approval or franchise (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the UCC or any applicable Requirements of Law), other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC~~.~~;

(j) any asset subject to a Lien of the type permitted by Section 9.8(e) (whether or not incurred pursuant to such Section) ~~or a Lien permitted by Section 9.9(m), in each case~~ if, to the extent and for so long as the grant of a Lien thereon to secure the Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, any agreement pursuant to which such Lien has been created (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the UCC Code or any applicable Requirements of Law)~~.~~;

(k) any intent-to-use trademark applications filed in the United States Patent and Trademark Office, pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. Section 1051, prior to

the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an accepted filing of an "Amendment to Allege Use" whereby such intent-to-use trademark application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act~~,~~;

(l) any asset if, to the extent and for so long as the grant of a Lien thereon to secure the Obligations is prohibited by any applicable Requirements of Law, rule or regulation, or agreements with any Governmental Authority ~~(other than to the extent that any such prohibition would be rendered ineffective pursuant to the UCC or any other applicable Requirements of Law)~~ or which would require consent, approval, license or authorization from any Governmental Authority or regulatory authority, unless such consent, approval, license or authorization has been received in consultation with Agent~~,~~ (other than, in each case, to the extent that any such prohibition or requirement would be rendered ineffective pursuant to the UCC or any other applicable Requirements of Law);

(m) margin stock (within the meaning of Regulation U of the Board of Governors, as in effect from time to time)~~ and, to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than the Administrative Borrower or any Material Subsidiary of the Administrative Borrower), under the terms of any applicable organizational or incorporation documents, joint venture agreement or shareholders' agreement, equity interests in any person other than Material Subsidiaries that are Wholly-Owned Subsidiaries after giving effect to the anti-assignment provisions of the UCC or any other applicable Requirements of Law, (n) Excluded Accounts,~~ ;

(n) Excluded Accounts;

(o) assets to the extent a security interest in such assets would result in material adverse tax consequences to any ~~Borrower~~Loan Party (or any direct or indirect parent or beneficial owner thereof) or one of its ~~s~~Subsidiaries (as determined in good faith by the Administrative Borrower and with the prior written consent of the Required Lenders to be granted in their sole discretion)~~,~~;

(p) assets sold to any Person who is not a Loan Party in compliance with the Financing Agreements~~,~~;

(q) assets owned by a ~~Subsidiary~~ Loan Party after the release of the guarantee of such ~~Subsidiary~~ Loan Party pursuant to the Financing Agreements~~, (r) reserved] and~~ ;

(r) [reserved]; and

(s) any assets with respect to which, in the reasonable judgment of Agent and the Administrative Borrower (as agreed to in writing), the cost or other consequences (including material adverse tax consequences as determined by the Administrative Borrower and Agent in good faith) of pledging such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom; provided, that, notwithstanding the foregoing, no asset that secures the obligations under the First Lien Credit Agreement shall be an "Excluded Asset" hereunder and

no asset shall constitute an "Excluded Asset" unless it also constitutes an "Excluded Asset" (or equivalent term) for purposes of the First Lien Credit Agreement.

"Excluded Hedge Obligation" shall mean, with respect to any Borrower or Guarantor, any Hedge Obligation if, and to the extent that, all or a portion of the guarantee of such Borrower or Guarantor of, or the grant by such Borrower or Guarantor of a security interest to secure, such Hedge Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) (a) by virtue of such Borrower's or Guarantor's failure for any reason to constitute an ECP at the time the guarantee of such Borrower or Guarantor or the grant of such security interest becomes effective with respect to such Hedge Obligation or (b) in the case of a Hedge Obligation subject to a clearing requirement pursuant to Section 2(h) of the Commodity Exchange Act (or any successor provision thereto), because such Borrower or Guarantor is a "financial entity," as defined in Section 2(h)(7)(C)(i) of the Commodity Exchange Act (or any successor provision thereto), at the time the guarantee of such Borrower or Guarantor becomes effective with respect to such related Hedge Obligation.  If a Hedge Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedge Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Subsidiary" means (a) [reserved], (b) any Subsidiary that is prohibited by applicable law, rule or regulation or contractual obligation (so long as any such contractual prohibition is not incurred in contemplation of the acquisition of such Subsidiary, and only for so long as such contractual prohibition shall be continuing) existing on the Closing Date or, if later, the date such Subsidiary first becomes a Subsidiary, from guaranteeing the Obligations or which would require any governmental or regulatory consent, approval, license or authorization to do so, unless such consent, approval, license or authorization has been obtained, (c) any Subsidiary acquired pursuant to a Permitted Acquisition or similar Investment financed with secured Indebtedness permitted to be incurred pursuant to Section 9.9(h) or Section 9.9(z) (and not incurred in contemplation of such Permitted Acquisition or similar Investment) and any subsidiary thereof that guarantees such Indebtedness, in each case to the extent, and so long as, such secured Indebtedness prohibits such Subsidiary from becoming a Loan Party, providing a guarantee of the Obligations or granting Liens on its assets as security for the Obligations, (d) [reserved], (e) any Immaterial Subsidiary, (f) any other Subsidiary with respect to which, in the reasonable judgment of Agent and the Administrative Borrower (as agreed in writing), the cost or other consequences (including any material adverse tax consequences as determined in good faith by the Administrative Borrower and Agent) of providing the guaranty shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (g) any Subsidiary if the provision of a guaranty by such Subsidiary would result in material adverse tax consequences to the Administrative Borrower (or any direct or indirect parent or beneficial owner thereof) or one of its subsidiaries (as determined in good faith by the Administrative Borrower in consultation with the Required Lenders), (h) any other Subsidiary excused from becoming a Loan Party pursuant to the last paragraph of Section 9.23, (i) any Subsidiary that is (or, if it were a Loan Party, would be) an "investment company" under the Investment Company Act of 1940, as amended, (j) any not-for-profit Subsidiaries, captive insurance companies or other special purpose subsidiaries, and (k) any Foreign Subsidiary; provided that any Immaterial Subsidiary that is a signatory to the Guaranty Agreement shall be deemed not to be an Excluded Subsidiary for purposes of this

~~Agreement and the other Financing Agreements unless the Administrative Borrower has otherwise notified Agent; provided further that the Administrative Borrower may at any time and in its sole discretion, with the consent of Agent (such consent not to be unreasonably withheld, conditioned or delayed), cause any Subsidiary to not be an Excluded Subsidiary for purposes of this Agreement and the other Financing Agreements; provided, further, that notwithstanding the foregoing, no Subsidiary or Affiliate of the Administrative Borrower that Guarantees the obligations under the First Lien Credit Agreement shall be an Excluded Subsidiary hereunder and, to the extent any Subsidiary or Affiliate of the Administrative Borrower is required to Guarantee the obligations under the First Lien Credit Agreement, such Subsidiary or Affiliate shall not be an Excluded Subsidiary hereunder.~~

"Excluded Subsidiary" means Franchise Group Intermediate 2, LLC, a Delaware limited liability company, so long as such Subsidiary is not a Guarantor as defined in and under the First Lien Credit Agreement or any other Indebtedness for borrowed money in an aggregate principal amount in excess of $2,500,000.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan, Letter of Credit or Revolving Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan, Letter of Credit or Revolving Commitment (other than pursuant to an assignment request by the Borrowers under Section 3.6(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.5, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan, Letter of Credit or Revolving Commitment or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Lender's failure to comply with Section 3.5(f); and (d) any withholding Taxes imposed under FATCA.

"Existing Debt Agreements" means (a) that certain Third Amended and Restated Loan and Security Agreement, dated as of March 10, 2021, by and among the Administrative Borrower, PSP Newco, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, JPMorgan Chase Bank, N.A., as agent, and the lenders party from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, (b) that certain First Lien Credit Agreement, dated as of March 10, 2021, by and among the Administrative Borrower, PSP Newco, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, Wilmington Trust, National Association (as successor to JPMorgan Chase Bank, N.A.), as administrative agent and collateral agent, and the lenders from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, (c) that certain Second Lien Credit Agreement, dated as of March 10, 2021, by and among the Administrative Borrower, PSP Newco, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, Alter Domus (US) LLC, as

45

administrative agent and collateral agent, and the lenders party from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, ~~and~~ (d) that certain Sidecar Pari Passu Second Lien Credit Agreement, dated as of August 21, 2023, by and among the Administrative Borrower, PSP Newco, Valor Acquisition, LLC, and Franchise Group Newco Intermediate AF, LLC, as borrowers, Alter Domus (US) LLC, as administrative agent and collateral agent, and the lenders party from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof and (e) that certain Credit Agreement, dated as of August 21, 2023, by and among Freedom VCM Interco, Inc. as holdings, Freedom VCM, Inc., as borrower, Alter Domus (US) LLC, as administrative agent and collateral agent and certain lenders from time to time party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof.

"Existing Letter of Credit" means each letter of credit issued prior to the Closing Date by a Person that shall be an Issuing Bank and listed on Schedule 2.3.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions (as determined in such manner as shall be set forth on the NYFRB's Website from time to time) and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that, if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Fee Letter" shall mean the fee letter, dated as of [    ]June 6, 2025, by and among ~~FRG~~Fusion Buyer and [    ]the Agent, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Financing Agreements" shall mean, collectively, this Agreement, the Intercreditor Agreement, the Collateral Documents and all notes, guarantees, security agreements, intercreditor agreements, the Agent Fee Letter, the Fee Letter and all other agreements, documents and instruments now or at any time hereafter executed and/or delivered by any Borrower or Guarantor in connection with this Agreement.

"FIRREA" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"First Lien Agent" means the "Administrative Agent" and "Collateral Agent" (or analogous terms) under the First Lien Credit Agreement, including any successors and permitted assigns thereof.

"First Lien Credit Agreement" means (i) that certain First Lien Credit Agreement, dated as of the Closing Date, among [Reorganized Franchise Group]Fusion Intermediate, LLC], as parent, [Reorganized Franchise Group]Fusion Buyer, LLC], as borrower, Wilmington Trust, National Association, as administrative agent and collateral agent, and the lenders from time to time party thereto, as the same may be amended, restated, supplemented or otherwise modified, superseded or replaced from time to time in accordance with the Intercreditor Agreement and/or (ii) any credit agreement, loan agreement, or other financing that replaces or refinances the Credit Agreement described in the preceding clause (i) so long as the security interests securing such credit agreement, loan agreement or other financing are subject to the Intercreditor Agreement, as the same may be amended, restated, supplemented or otherwise modified, superseded or replaced from time to time in accordance with the Intercreditor Agreement.

"First Lien Lender" means a "Lender" under and as defined in the First Lien Credit Agreement.

"First Lien Obligations" means all Indebtedness of the Borrowers and the Guarantors incurred or owing under the First Lien Term Loan Documents, including all obligations in respect of the payment of principal, interest, fees, prepayment premiums and indemnification obligations, and any refinancing or replacement of such Indebtedness permitted under this Agreement and under the Intercreditor Agreement; provided that such Indebtedness is subject to the Intercreditor Agreement.

"First Lien Required Lenders" means, at any time, the "Required Lenders" under and as defined in the First Lien Credit Agreement at such time.

"First Lien Term Loan Documents" means the "Loan Documents" or analogous term as defined in the First Lien Credit Agreement or the agreements and other documents governing other Indebtedness incurred under Section 9.9(s).

"Fixed Charge Coverage Ratio" means, for any period of twelve fiscal months of the Administrative Borrower, the ratio of (a) EBITDA for such period minus (i) all Unfinanced Capital Expenditures for such period and (ii) cash taxes paid (including in the form of tax distributions) for such period (net of cash refunds received during such period, provided that the amount pursuant to this subclause (ii) shall not be less than zero) to (b) Fixed Charges.

Notwithstanding anything to the contrary herein, for the first twelve (12) fiscal months after the Closing Date, each component of calculating the Fixed Charge Coverage Ratio shall be based off the financial statements that are actually delivered pursuant to Section 9.6(a)(i). (for example, the calculation for Fixed Charge Coverage Ratio for the first, second and third fiscal months after the Closing Date will be based off financials for the periods ending with respect to the first, second and third fiscal months, respectively).

"Fixed Charges" shall mean, for any period, the sum of (i) Consolidated Cash Interest Charges paid or payable currently for such period plus (ii) scheduled amortization of Funded

Debt (including Capital Leases) paid or payable currently in cash for such period plus (iii) dividends or distributions made in reliance on Section 9.11(l) which are paid in cash (net of tax distributions) for such period plus (iv) prepayments of Indebtedness (including, for the avoidance of doubt, mandatory prepayments) and any premiums in connection therewith made in reliance on Section 9.24(m) which are paid in cash for such period; provided that for purposes of the foregoing subclause (iv), mandatory prepayments with the proceeds of Term Priority Collateral shall be excluded.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" means the benchmark rate floor, if any, provided in this Agreement (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Adjusted Term SOFR Rate or the Adjusted Daily Simple SOFR, as applicable.  For the avoidance of doubt, as of the Closing Date, the Floor for each of the Adjusted Term SOFR Rate and the Adjusted Daily Simple SOFR shall be 0%.

"Foreign Lender" shall mean any Lender that is not a U.S. Person.

"Foreign Subsidiary" shall mean a Subsidiary of FRGany Loan Party that is organized or incorporated under the laws of any jurisdiction outside of the United States of America; sometimes being referred to herein collectively as "Foreign Subsidiaries".

"Franchise Agreement" means a franchising agreement between any Borrower or Guarantor, as franchisor, and any other Person, as franchisee, pertaining to the establishment and operation of a business with operations comparable to the operations of the PSP Borrowers and their Subsidiaries.

"Franchise Disclosure Documents" means any uniform franchise offering circulars and franchise disclosure documents used by (and, to the extent required, filed by) any Borrower or Guarantor to comply with any applicable law, rule, regulation or order of any Governmental Authority.

"Franchise Fees" shall mean each Borrower's right to payment under any franchising agreement (including any Franchise Agreement) between any Borrower or Guarantor, as franchisor, and any other Person, as franchisee, pertaining to the establishment and operation of a business with operations comparable to the operations of such Borrower, Guarantor and its Subsidiaries, including, without limitation, all fees, royalties, revenues, charges, penalties and/or interest; provided that Franchise Fees shall not include any Account or other rights to payment arising from the sale of Inventory by a Loan Party to a franchisee.

"Franchise Laws" means all applicable laws, rules, regulations, orders, binding guidance or other requirements of the United States Federal Trade Commission or any other Governmental

Authority relating to the relationship between franchisor and franchisees or to the offer, sale, termination, non-renewal or transfer of a franchise.

"Franchisee Eligibility Requirements" means, collectively, each of the following:

(a) the applicable Borrower has executed an agreement with the applicable Franchisee to operate a franchise under one of the brands as listed on Schedule 1C hereto, or any subsequent rebranding of such franchise, at a location owned or leased and operated by such Franchisee, substantially on the standard form agreements containing terms and conditions established by the Borrowers from time to time, which shall include (A) an acknowledgement from such Franchisee that the Borrowers, or Agent acting on behalf of the Borrowers, are authorized to transfer proceeds of the Inventory consigned by such Borrower to such Franchisee from the bank account maintained by such Franchisee to an account in the name of a Borrower and (B) an acknowledgement by the Franchisee that the applicable Borrower has granted a Lien to Agent on the Inventory consigned by such Borrower to the Franchisee and an agreement by the Franchisee to reasonably cooperate with Agent in the event of the exercise by Agent of its rights and remedies with respect to such Lien;

(b) the applicable Borrower has provided Agent with evidence that such Borrower has filed appropriate UCC financing statements against the applicable Franchisee evidencing the consignment arrangement between such Borrower and the applicable Franchisee with respect to the Inventory consigned by such Borrower to the applicable Franchisee, and has taken all other action required under applicable Requirements of Law to obtain a valid, first priority perfected security interest in such Inventory (including, without limitation, providing notification to other secured parties of the applicable Franchisee as required by the UCC);

(c) if requested by Agent, the applicable Borrower has provided the Agent with an assignment of the UCC financing statements set forth in clause (b) above;

(d) the applicable Borrower has complied in all material respects with all representations, warranties and covenants set forth herein and in the other Financing Agreements relating to federal and state franchise and other regulatory Requirements of Law in connection with the operation of a franchise under one of the brands as listed on Schedule 1C (or any subsequent rebranding of such franchises) by the applicable Franchisee; and

(e) the agreements between the applicable Borrower and the applicable Franchisee provide that all amounts owed by such Franchisee to such Borrower shall be swept at least daily into an account of a Borrower which is subject to a Deposit Account Control Agreement.

For the purposes of paragraph (a) above, "reasonably cooperate with Agent" means that the Franchisee will, at Agent's expense and with reasonable prior notice from Agent, (i) give Agent and its representatives access during normal business hours to all Inventory consigned by the applicable Borrower to the Franchisee, (ii) permit Agent and its representatives to take possession and control of the Inventory consigned by the applicable Borrower to the Franchisee, and to remove the Inventory from the premises of the Franchisee, (iii) to the extent not prohibited by applicable location occupancy agreements (including leases), conduct "going out of business sales" and engage in similar activities with respect to the Inventory consigned by the applicable

~~Borrower to the Franchisee, and (iv) take all other commercially reasonable actions with respect to the Inventory consigned by the applicable Borrower to the Franchisee that, upon Agent's request, may be reasonably necessary to permit Agent to exercise all of its rights and remedies with respect to the Lien on the Inventory consigned by such Borrower to the Franchisee.~~

~~"Franchisee Loan Program Agreement" means that certain Franchisee Loan Program Agreement, dated August 18, 2020, between JTH Tax, LLC and MetaBank, N.A., a copy of which has been provided to Agent, as in effect on the date hereof.[5]~~

"Franchisee Receivable" shall mean an Account or credit card receivable of a Loan Party owed by an Account Debtor that is a franchisee arising from the sale of Inventory by a Loan Party to such Account Debtor (including any Account or credit card receivable to the extent arising from the sale of Inventory under a Franchise Agreement other than any such Account or credit card receivable (or portion thereof) that consists of fees, royalties, penalties and interest payable under any Franchise Agreement).

~~"Franchisees" means the individuals and entities listed in Schedule 1B as "franchisees", and thereafter, such entities and any additional individual or entity that meets the Franchisee Eligibility Requirements.~~

"FRG" means Franchise Group, Inc., a Delaware corporation.

"Funded Debt" means all Indebtedness of the Administrative Borrower and its Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"Fusion Buyer" has the meaning specified in the recitals hereto.

"Fusion Intermediate" means Fusion Intermediate, LLC, a Delaware limited liability company.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board  or such other principles as may be approved by a significant segment of the accounting profession in the United States (including any principles required by the Securities and Exchange Commission), that are applicable to the circumstances as of the date of determination, consistently applied.  If there occurs after the date of this Agreement any change in GAAP that affects the calculation of any requirements, terms or covenants set forth in this Agreement or any other Financing Agreement (whether contained in Section 9.24 or otherwise), Agent and Borrowers shall negotiate in good faith to amend the provisions of this Agreement and the other Financing Agreements that relate to the calculation of such requirements, terms and covenants with the

---

[5] ~~NTD: updates/relevance to be confirmed.~~

intent of having the respective positions of the Lenders and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the implicated requirements and covenants shall be calculated as if no such change in GAAP has occurred; provided, that, for the avoidance of doubt, the parties agree that all financial statements required to be delivered hereunder shall and will be delivered giving effect to any such change in GAAP.

"General Intangibles" shall have the meaning set forth in Article 9 of the UCC.

"Goods" shall have the meaning set forth in Article 9 of the UCC.

"Governmental Authority" shall mean any nation or government, any state, province, or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Guarantors" shall mean, collectively and together with their respective successors and assigns), each party to the Guaranty on the Closing Date and any ~~Subsidiary of FRG~~ Person that at any time after the date hereof becomes party to a Guaranty in favor of Agent for the benefit of the Secured Parties or otherwise liable on or with respect to the Obligations (other than Borrowers) (each a "~~Subsidiary  Guarantor~~"); ~~each sometimes being referred to herein individually as a "Guarantor"; provided that, if at any time after the date hereof, a Guarantor which is directly or indirectly wholly owned by FRG shall own any assets that would constitute Eligible Inventory if owned by a Borrower, upon Administrative Borrower's request, such Guarantor shall cease to be a Guarantor hereunder and shall be deemed a Borrower effective on the date of the confirmation by Agent to Administrative Borrower that (i) Agent has received such request and that Agent has received an appraisal with respect to such Inventory and conducted a field examination with respect thereto, the results of which are satisfactory to Agent in good faith, or alternatively, at Agent's option, Agent shall have received such information with respect thereto as Agent may in its good faith require and (ii) Agent and each Lender have received all information and documentation reasonably requested by the Agent and the Lenders for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation with respect to such Guarantor.~~.

"Guaranty" shall mean (a) that certain Guaranty Agreement dated as of the Closing Date, by each of Loan Parties from time to time party thereto in favor of Agent, Lenders and the other Secured Parties, and (b) any other guaranty agreement executed by a Subsidiary of ~~FRG~~a Loan Party that at any time after the date hereof becomes a Guarantor under this Agreement in favor of Agent, Lenders and the other Secured Parties, in each case, as the same may be amended, restated or otherwise modified from time to time.

"Hazardous Materials" shall mean any hazardous, toxic or dangerous substances, materials and wastes, including petroleum hydrocarbons, flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants, sewage, sludge, industrial slag, solvents and/or any other substances, materials or wastes that are or become regulated under any

Environmental Law (including any that are or become classified as hazardous or toxic under any Environmental Law).

"Hedge Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement; sometimes being collectively referred to herein as "Hedge Agreements".

"Hedge Obligations" of any Borrower or Guarantor means any and all obligations of such Borrower or Guarantor, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Hedge Agreements, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Hedge Agreement transaction, in each case, solely under Hedge Agreements entered into with a Bank Product Provider and which are deemed to be Obligations under clause (b) (other than clause (b)(ii)) of the definition of Obligations.

"Immaterial Subsidiary" means any Subsidiary other than a Material Subsidiary.

"Immediate Family Member" means with respect to any individual, such individual's child, stepchild, grandchild or one or more remote descendent, parent, stepparent, grandparents, spouse, sibling, mother in law, father in law, son in law and/or daughter in law (including any adoptive relationship), any trust, partnership, or other bona fide estate planning vehicle, the only beneficiaries of which are any of the foregoing individuals, such individual's estate (or an executor or administrator working on its behalf), heirs or legatees or ay private foundation or fund that is controlled by any of the foregoing individuals or any donor advised fund of which any such individual is the donor.

"Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness or in the form of Qualified Equity Interests of a ~~Borrower~~Loan Party or any of its direct or indirect parent entities, the accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

"Increased Reporting Period" shall mean any period commencing on the first date on which Excess Availability is less than the greater of (a) 15% of the Borrowing Cap or (b) $21,500,000, in each case for three consecutive days, and continuing until the date that both (x) Excess Availability exceeds the greater of (i) 15% of the Borrowing Cap or (ii) $21,500,000 for 60 consecutive days and (y) no Default or Event of Default then exists and is continuing.

"Indebtedness" of any Person means, without duplication~,~:

(a) all obligations of such Person for borrowed money~,~;

(b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP~,~;

(c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person~,~;

(d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (w) trade accounts payable in the ordinary course of business, (x) any Earn-Out obligation, purchase price adjustment or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid within thirty (30) days after being due and payable, (y) liabilities associated with customer prepayments and deposits and (z) expenses accrued in the ordinary course of business)~,~;

(e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed~,~;

(f) all Guarantees by such Person of Indebtedness of others~,~;

(g) all obligations with respect to Capital Leases of such Person~,~;

(h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty~,~;

(i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; and

(j) Disqualified Equity Interests and other preferred equity interests (and similar interests);

provided that the term "Indebtedness" shall not include (i) deferred or prepaid revenue, (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty, indemnity or other unperformed obligations of the seller, (iii) contingent indemnity and similar obligations incurred in the ordinary course of business (iv) any obligations attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, (v) Indebtedness of any Person that is a direct or indirect parent of a ~Borrower~Loan Party appearing on the balance sheet of a ~Borrower~Loan

53

Party, or solely by reason of push down accounting under GAAP, (vi) any non-compete or consulting obligations incurred in connection with a Permitted Acquisition, (vii) any reimbursement obligations under pre-paid contracts entered into with clients in the ordinary course of business, (viii) for the avoidance of doubt, any Qualified Equity Interests issued by the Borrower a Loan Party.

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of any BorrowerLoan Party and its Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by, or on account of any obligation of any Loan Party under any Financing Agreement and (b) to the extent not otherwise described in the foregoing clause (a) hereof, Other Taxes.

"Indemnitee" shall have the meaning set forth in Section 11.6(a) hereof.

"Information Certificate" shall mean that certain Information Certificate in the form of Exhibit B hereto (or such other form reasonably acceptable to the Agent) delivered by the Borrowers and Guarantors on the Closing Date.

"Instruments" shall have the meaning set forth in Article 9 of the UCC.

"Intellectual Property" means all intellectual property rights of every kind and nature, including rights in inventions, Patents, Copyrights, Licenses, Trademarks, rights in Trade Secrets, and rights in Software all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, a Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and all other rights of any kind accruing thereunder or pertaining thereto throughout the world, in each case of the Borrowers and the Guarantors.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the Closing Date, by and among the Agent and the First Lien Agent, and acknowledged by the Borrowers and the Guarantors, as the same may be amended, restated, amended and restated, supplemented, replaced or otherwise modified from time to time in accordance with the provisions hereof and thereof or (b) such other intercreditor agreement or arrangement among the Agent (or other applicable representative on behalf of the holders of the Indebtedness incurred

under this Agreement and the other Financing Agreements) and the First Lien Agent (and any other Persons party thereto), that is reasonably acceptable to the Agent and the Administrative Borrower, as may be amended, amended and restated, modified, supplemented, extended or renewed from time to time not in violation of the terms hereof or thereof, as applicable.

"Interest Election Request" means a request by the Administrative Borrower to convert or continue a Borrowing in accordance with Section 2.12.

"Interest Expense" shall mean, for any period, as to any Person, as determined on a consolidated basis in accordance with GAAP, the total interest expense of such Person, whether paid or accrued during such period (including the interest component of Capital Leases for such period), including, discounts in connection with the sale of any Accounts and bank fees, commissions, discounts and other fees and charges owed with respect to letters of credit, banker's acceptances or similar instruments, losses, fees, net costs and early termination costs under Hedge Agreements, amortization or write-off of debt discounts and debt issuance costs and commissions, and other discounts and other fees and charges associated with Indebtedness.

"Interest Payment Date" means (a) with respect to any ABR Loan, the first Business Day of each calendar quarter and the Maturity Date, (b) with respect to any RFR Loan, each date that is on the numerically corresponding day in each calendar month that is one month after the Borrowing of such RFR Loan (or, if there is no numerically corresponding day in such month, then the last day of such month) and the Maturity Date and (c) with respect to any Term Benchmark Loan, the last day of each Interest Period applicable to the Borrowing of which such Loan is a part (and, in the case of a Term Benchmark Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period) and the Maturity Date.

"Interest Period" means, with respect to any Term Benchmark Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six thereafter (in each case, subject to the availability for the Benchmark applicable to the relevant Loan or Revolving Commitment), as the Administrative Borrower may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (c) no tenor that has been removed from this definition pursuant to Section 3.4(f) shall be available for specification in such Borrowing Request or Interest Election Request. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Inventory" shall have the meaning set forth in Article 9 of the UCC and includes, without limitation, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's now owned and hereafter existing or acquired goods, wherever located, which (a) are leased by

such Borrower or Guarantor as lessor; (b) are held by such Borrower or Guarantor for sale or lease or to be furnished under a contract of service; (c) are furnished by such Borrower or Guarantor under a contract of service; or (d) consist of raw materials, work in process, finished goods or materials used or consumed in its business.

"Inventory Reserves" shall mean the reserves described in clauses (i), (ii), (viii), (x), (xi) and (xii) of the definition of "Reserves".

"Investment" shall have the meaning set forth in Section 9.10.

"Investment Property" shall have the meaning set forth in Article 9 of the UCC.

"Investment Property Control Agreement" shall mean an agreement in writing, in form and substance reasonably satisfactory to Agent, by and among Agent (and the First Lien Agent, if a party), any Borrower or Guarantor (as the case may be) and any securities intermediary, commodity intermediary or other Person who has custody, control or possession of any Investment Property of such Borrower or Guarantor acknowledging that such securities intermediary, commodity intermediary or other Person has custody, control or possession of such Investment Property on behalf of Agent (and the First Lien Agent, if a party) that it will comply with entitlement orders originated by Agent (or the First Lien Agent, as applicable) after the occurrence and during the continuance of an Event of Default with respect to such Investment Property, or other instructions of Agent (or the First Lien Agent, as applicable), and has such other terms and conditions as Agent may reasonably require.

"Investors" means the one or more co-investors and other investors (which may include existing shareholders, board members, management or other rollover investors of the Acquired Company) who are holders of Capital Stock in the Administrative Borrower (or any direct or indirect parent thereof) on the Closing Date after giving effect to the Transactions, together with their Affiliates.

"Issuing Bank" shall mean Chase.

"Landlord Lien States" shall mean the States of Washington and Virginia and the Commonwealth of Pennsylvania and such other states, provinces or jurisdictions in which a landlord's claim for rent (including a portion of rent) has or may have priority by operation of applicable law over the lien of the Agent on behalf of the Secured Parties in any of the Collateral.

"LC Disbursement" means any payment made by an Issuing Bank pursuant to a Letter of Credit.

"Lender-Related Person" shall have the meaning set forth in Section 11.6(b) hereof.

"Lenders" shall mean the financial institutions who are signatories hereto as Lenders and other Persons made a party to this Agreement as a Lender in accordance with Section 13.7 hereof, and their respective successors and assigns, including the Revolving Lenders; each

56

sometimes being referred to herein individually as a "<u>Lender</u>".  Unless the context otherwise requires, the term "Lenders" includes the Issuing Bank.

"<u>Letter of Credit Documents</u>" shall mean, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefor, and any agreements, instruments, guarantees or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (a) the rights and obligations of the parties concerned or at risk or (b) any collateral security for such obligations.

"<u>Letter of Credit Limit</u>" shall mean $12,000,000.

"<u>Letter of Credit Obligations</u>" shall mean, at any time and without duplication, the sum of (a) the aggregate undrawn amount of all Letters of Credit outstanding at such time, <u>plus</u> (b) the aggregate amount of all drawings under Letters of Credit for which Issuing Bank has not at such time been reimbursed, <u>plus</u> (c) the aggregate amount of all payments made by each Revolving Lender to Issuing Bank with respect to such Revolving Lender's participation in Letters of Credit as provided in <u>Section 2.3</u> for which Borrowers have not at such time reimbursed the Revolving Lenders, whether by way of a Revolving Loan or otherwise.

"<u>Letter-of-Credit Rights</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Letters of Credit</u>" shall mean all letters of credit (whether documentary or stand-by and whether for the purchase of Inventory, Equipment or otherwise) issued by an Issuing Bank for the account of any ~~Borrower~~<u>Loan Party</u> pursuant to this Agreement and shall include each Existing Letter of Credit, and all amendments, extensions or replacements thereof, and the term "<u>Letter of Credit</u>" means any one of them or each of them singularly, as the context may require.

"<u>Liabilities</u>" means any losses, claims (including intraparty claims), demands, damages or liabilities of any kind.

"<u>License</u>" means any Patent License, Trademark License or Copyright License.

"<u>License Agreements</u>" means (a) all agreements or other arrangements of Borrowers and Guarantors pursuant to which such Borrower or Guarantor has a license, option, or other right to use any trademarks, logos, designs or other intellectual property that is material to such Borrower's or Guarantor's business and owned by another Person as in effect on the Closing Date and (b) all such agreements or other arrangements as may be entered into by any Borrower or Guarantor after the Closing Date.

"<u>Lien</u>" and "<u>lien</u>" mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Parties" means, collectively, the Borrowers and the Guarantors and their respective successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.

"Loans" shall mean, collectively, all of the Revolving Loans (including Overadvances) and "Loan" shall mean any one of the Revolving Loans (including Overadvances).

"Manual Sweeping Accounts" shall mean the Deposit Accounts maintained by the Borrowers and Guarantors as of the Closing Date that are identified as "Manual Sweeping Accounts" on Schedule 8.10 hereto, and any replacement or additional accounts of the Borrowers and Guarantors.

"Master Agreement" has the meaning assigned to such term in the definition of "Hedge Agreement".

"Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, business, performance or operations of the Borrowers taken as a whole or of Borrowers and the Guarantors taken as a whole; (b) the legality, validity or enforceability of this Agreement, any Collateral Document, the Intercreditor Agreement or any of the other material Financing Agreements; (c) the legality, validity, enforceability, perfection or priority of the security interests and liens of Agent upon the Collateral; (d) the Collateral (taken as a whole) or its value; (e) the ability of Borrowers (taken as a whole) to repay the Obligations or of Borrowers (taken as a whole) to perform their obligations under this Agreement or any of the other Financing Agreements as and when to be performed; or (f) the ability of Agent or any Lender to enforce the Obligations or realize upon the Collateral or otherwise with respect to the material rights and remedies of Agent and Lenders under this Agreement or any of the other Financing Agreements.

"Material Contract" shall mean the First Lien Credit Agreement and any other contract or other agreement (other than the Financing Agreements and the Credit Card Agreements), whether written or oral, to which any Borrower or Guarantor is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto (unless a replacement Material Contract has been entered into either prior to or contemporaneously with the date of such termination or cancellation) would reasonably be expected have a Material Adverse Effect.

"Material Real Property" means real property (including fixtures) (i) located in the United States, (ii) first acquired by any Loan Party after the Closing Date and (iii) owned (but not leased or ground-leased) by any Loan Party with a book value, as reasonably determined by the Administrative Borrower in good faith on the date of acquisition thereof, greater than or equal to $5,000,000.

"Material Subsidiary" means each Wholly Owned Subsidiary that, as of the last day of the fiscal month of the Administrative Borrower most recently ended, had net revenues or total assets for such month in excess of 1.25% of the consolidated net revenues or total assets, as applicable, of the Administrative Borrower and its Loan Parties and their respective Subsidiaries for such fiscal month; provided that in the event that the Immaterial Subsidiaries, taken together, had as of the last day of the fiscal month of the Administrative Borrower most recently ended net

revenues or total assets in excess of 2.5% of the consolidated net revenues or total assets, as applicable, of ~~FRG and its~~ the Loan Parties and their respective Subsidiaries for such fiscal month, the Administrative Borrower shall designate at its sole discretion one or more Immaterial Subsidiaries to be a Material Subsidiary as may be necessary such that the foregoing 2.5% limit shall not be exceeded, and any such Subsidiary shall thereafter be deemed to be a Material Subsidiary hereunder; provided, further, that the Administrative Borrower may re-designate Material Subsidiaries as Immaterial Subsidiaries so long as Borrower is in compliance with the foregoing; provided, further, that notwithstanding the foregoing, (a) to the extent that the First Lien Credit Agreement does not have a "Material Subsidiary" (or equivalent term) concept, all Subsidiaries will be deemed Material Subsidiaries hereunder and, (b) to the extent that a Subsidiary is a "Material Subsidiary" (or equivalent term) under the First Lien Credit Agreement, such Subsidiary shall be a Material Subsidiary hereunder.

"Maturity Date" shall mean the earliest of (a) the fourth anniversary of the Closing Date, (b) the date that is 91 days prior to the maturity date of any Indebtedness of any Borrower or Guarantor with an aggregate outstanding principal amount in excess of $25,000,000 (including the First Lien Obligations) and in each case any Refinancing Indebtedness in respect thereof and (c) any date on which the Revolving Commitments are reduced to zero or otherwise terminated pursuant to the terms hereof; provided that, in each case, if such day is not a Business Day, the Maturity Date shall be the Business Day immediately preceding such day.

"Medical Cash Account" means the Deposit Account maintained by the Administrative Borrower at Canadian Imperial Bank of Commerce with the account number ending in ~~[x9922]~~ and ~~[x0508]~~, holding cash to be used solely for the purpose of covering expenses incurred in connection with the self-insurance policies maintained by the  Administrative Borrower in accordance with the terms thereof.[6]

"Moneys" shall have the meaning set forth in the UCC.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business

"Mortgage" means a mortgage, deed of trust, deed to secure debt or other security document granting a Lien on any Mortgaged Property in favor of Agent for the benefit of the Secured Parties to secure the Obligations, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time. Each Mortgage shall be in form and substance reasonably satisfactory to Agent and the Administrative Borrower.

"Mortgaged Property" means each parcel of Material Real Property with respect to which a Mortgage is granted pursuant to Section 9.21.

"Multiemployer Plan" shall mean a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is contributed to by any Borrower, Guarantor or any ERISA

---

[6] ~~NTD: to confirm.~~

Affiliate or with respect to which any Borrower, Guarantor or any ERISA Affiliate may reasonably be expected to incur any liability.

"Net Cash Proceeds" means the aggregate cash proceeds (using the fair market value (as determined in good faith by the Administrative Borrower) of any Cash Equivalents) received by the ~~Administrative Borrower~~any Loan Party or any Subsidiary in respect of any Asset Sale, net of the ~~direct cash~~fees, costs and expenses relating to such Asset Sale (including, but not limited to, legal, accounting and investment banking fees, and brokerage and sales commissions), taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions ~~and any tax sharing arrangements related thereto~~pursuant to Section 9.11(d))), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required to be paid as a result of such transaction that is secured by a Lien permitted hereunder to be prior or senior to the Lien securing the Obligations) and any deduction of appropriate amounts to be provided by the ~~Administrative Borrower~~Loan Parties or any of the Subsidiaries (and subject to the reasonable satisfaction of the Required Lenders) as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the ~~Administrative Borrower~~Loan Parties or any of the Subsidiaries after such sale or other disposition thereof.

"Net Recovery Percentage" shall mean with respect to finished goods Inventory or raw materials Inventory, as applicable, the fraction, expressed as a percentage, (a) the numerator of which is the amount equal to the amount of the recovery in respect of the applicable Inventory at such time on a "net orderly liquidation value" basis as set forth in the most recent acceptable appraisal of such Inventory received by Agent in accordance with Section 7.3, net of operating expenses, liquidation expenses and commissions, and (b) the denominator of which is the applicable original cost of the aggregate amount of such Inventory subject to such appraisal.

"Non-Cash Charges" means (a) any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles pursuant to GAAP (which, without limiting the foregoing, shall include any impairment charges resulting from the application of FASB Statements No. 142 and 144 and the amortization of intangibles arising pursuant to No. 141), (b) all losses from Investments recorded using the equity method, (c) all Non-Cash Compensation Expenses, (d) the non-cash impact of acquisition method accounting, (e) depreciation and amortization (including amortization of deferred financing fees or costs, Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pension and other post-employment benefits) and (f) other non-cash charges (including non-cash charges related to deferred rent) (provided, in each case, that if any non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period).

"Non-Cash Compensation Expense" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"Non-Wholly Owned Subsidiary" means any Subsidiary other than a Wholly Owned Subsidiary.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day(or for any day that is not a Business Day, for the immediately preceding Business Day); provided that, if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Agent from a federal funds broker of recognized standing selected by it; provided further that, if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations" shall mean:

(a)      any and all Loans, Letter of Credit Obligations and all other obligations, liabilities and indebtedness of every kind, nature and description owing by any or all of Borrowers and Guarantors to Agent or any Lender, including principal, interest, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under this Agreement or any of the other Financing Agreements, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of this Agreement or after the commencement of any case with respect to such Borrower or Guarantor under the United States Bankruptcy Code or any similar statute (including the payment of interest and other amounts which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, or secured or unsecured; and

(b)      for purposes only of Section 5.1 hereof and subject to the priority in right of payment set forth in Section 6.4 hereof, all obligations, liabilities and indebtedness of every kind, nature and description owing by any or all of Borrowers or Guarantors and each of their respective Subsidiaries to Agent or any Bank Product Provider arising under or pursuant to any Bank Products, in each case whether now existing or hereafter arising to the extent such obligations, liabilities and indebtedness would not cause the total amount of the Obligations to exceed the value of the Collateral; provided that:

(i)      solely with respect to any Borrower or Guarantor that is not an ECP, Excluded Hedge Obligations of any such Borrower or Guarantor shall in any event be excluded from "Obligations" owing by such Borrower or Guarantor,

(ii)     [reserved],

(iii)     any Bank Product Provider (other than Chase and its Affiliates), shall have delivered written notice to Agent that (A) such Bank Product Provider has entered into a transaction to provide Bank Products to a Borrower and Guarantor and (B) the obligations arising pursuant to such Bank Products provided to Borrowers and Guarantors constitute Obligations entitled to the benefits of the security interest of Agent granted hereunder, and Agent shall have accepted such notice in writing, and

(iv)     in no event shall any Bank Product Provider to whom such obligations, liabilities or indebtedness are owing, be deemed a Lender for purposes hereof to the extent of and as to such obligations, liabilities or indebtedness other than for purposes of Section 5.1 hereof and other than for purposes of Sections 12.1, 12.2, 12.3(b), 12.6, 12.7, 12.9, 12.12 and 13.6 hereof, as applicable, and in no event shall such obligations be included in the Obligations to the extent that the effect is that the value of the Collateral (as determined by Agent) is less than the amount of the Obligations and in no event shall the approval of any such Person be required in connection with the release or termination of any security interest or lien of Agent.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Financing Agreement, or sold or assigned an interest in any Loan, Letter of Credit or any Financing Agreement).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Financing Agreement, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.6(b)).

"Overadvances" has the meaning assigned to such term in Section 2.2(b).

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in dollars by U.S.-managed banking offices of depository institutions (as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Paid in Full" or "Payment in Full" means, (a) the payment in full in cash of all outstanding Loans and LC Disbursements, together with accrued and unpaid interest thereon, (b) the termination, expiration, or cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to the Agent of a cash deposit, or at the discretion of the Agent a backup standby letter of credit satisfactory to the Agent and the Issuing Bank, in an amount equal to 105% of the Letter of Credit Obligations as of

the date of such payment), (c) the payment in full in cash of the accrued and unpaid fees, (d) the payment in full in cash of all reimbursable expenses and all other Obligations (other than Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this Agreement for which no claims have been made), together with accrued and unpaid interest thereon, (e) the termination of all Revolving Commitments, and (f) the termination of the Hedge Obligations and the Bank Products or entering into other arrangements satisfactory to the Secured Parties counterparties thereto.

"Participant" shall mean any Person that acquires and holds a participation in the interest of any Lender in any of the Loans and Letters of Credit in conformity with the provisions of Section 13.7 of this Agreement governing participations.

"Participant Register" has the meaning assigned to such term in Section 13.7(e).

"Patent License" means any written agreement or license now or hereafter in effect, granting to or from any Person any right to manufacture, use or sell any invention claimed in a Patent, now or hereafter owned by any other Person or that any other Person now or hereafter otherwise has the right to license, and all rights of any such Person under any such agreement or license.

"Patents" means (a) all patents and patent applications, for letters patent of the United States or any other jurisdiction, including issued patents and pending patent applications in the United States Patent and Trademark Office, and (b) all reissues, substitutes, divisionals, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof.

"Payment" has the meaning assigned to such term in Section 12.6(b)(i).

"Payment Conditions" means, at any time of determination, with respect to any Specified Payment, that:

(xa) no Default or Event of Default exists or would arise as a result of the making of the subject Specified Payment.;

(yb) after giving effect to such Specified Payment on a pro forma basis (i) immediately after such Specified Payment and (ii) for the 90-day period immediately preceding such Specified Payment, Excess Availability shall be greater than the greater of (A) 20% of the Borrowing Cap and (B) $30,000,000 (or with respect to any Specified Payment pursuant to clauses (ii) or (iii) of the definition thereof prior to the date that is the one year anniversary of the Closing Date, (X) Excess Availability shall be greater than $50,000,000 and (Y) Daily Average Liquidity shall be greater than $85,000,000); and

(zc) after giving effect to such Specified Payment on a pro forma basis, the Fixed Charge Coverage Ratio shall be greater than 1.0 to 1.0.  In each case with respect to the above conditions, the Administrative Borrower shall have delivered to the Agent evidence reasonably satisfactory to the Agent that the conditions in the foregoing clauses (xa), (yb) and (zc), as applicable, have been satisfied.

"Payment Notice" has the meaning assigned to such term in Section 12.6(b)(ii).

"Permitted Acquisitions" shall mean the purchase or other acquisition, by merger, consolidation or otherwise, by any ~~Borrower~~Loan Party or any Subsidiary of any Capital in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of), any Person (the "Acquired Business"); provided that:

(a) in the case of any purchase or other acquisition of Capital Stock in a Person, (i) such Person, upon the consummation of such purchase or acquisition, will be a Subsidiary (including as a result of a merger or consolidation between any Subsidiary and such Person), or (ii) such Person is merged into or consolidated with a Subsidiary and such Subsidiary is the surviving entity of such merger or consolidation~~,~~;

(b) the business of such Person, or such assets, as the case may be, constitute a Permitted Business (or assets with respect thereto)~~,~~;

(c) with respect to each such purchase or other acquisition, all actions required to be taken with respect to such newly created or acquired Subsidiary (including each subsidiary thereof) or assets in order to satisfy the requirements set forth in Section 9.23 (other than with respect to any Subsidiary of such newly created or acquired Subsidiary that is an Excluded Subsidiary)~~,~~;

(d) subject to Section 1.2, after giving effect to any such purchase or other acquisition no Event of Default shall have occurred and be continuing~~,~~;

(e) all such purchases and acquisitions of the Capital Stock in any Person which will result in such Person becoming a Loan Party (within the time periods set forth in this Agreement), or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of) such Person will become owned by a Loan Party (or a Person that will become a Loan Party within the time periods set forth in this Agreement)~~,~~;

(f) Accounts, Credit Card Receivables and Inventory of the Acquired Business shall only be Eligible Accounts, Eligible Credit Card Receivables, and Eligible Inventory to the extent that (I) the Lenders have consented to such inclusion in the Borrowing Base; provided that if such Permitted Acquisition is relating to assets of any ~~Borrower's~~Loan Party's or any Subsidiary's existing franchisees or related businesses or independent operators, then such assets will be Eligible Accounts, Eligible Credit Card Receivables and Eligible Inventory without Lender consent or (II)(i) such Accounts, Credit Card Receivables and Inventory are owned by a ~~Borrower~~Loan Party, (ii) Agent has conducted and completed a field examination and inventory appraisal with respect thereto and (iii) the criteria for Eligible Accounts, Eligible Credit Card Receivables, and Eligible Inventory set forth herein are satisfied with respect thereto in accordance with this Agreement (or such other or additional criteria as Agent may, at its option, establish with respect thereto in accordance with this Agreement and subject to such Reserves as Agent may establish in connection with the Acquired Business)~~,~~;

(g) no Default or Event of Default shall exist or occur as a result of such Permitted Acquisition~~,~~:.

(h) the EBITDA of any such acquired Person shall not be negative~~;~~ and ~~(g) the Borrowers shall be in compliance with the Payment Conditions.~~

(i) the Loan Parties shall be in compliance with the Payment Conditions.

"Permitted Business" shall mean any business engaged in by any of the ~~Borrowers~~Loan Parties on the date hereof, and any business or other activities that are reasonably similar, ancillary, complementary or related to, or a reasonable extension, development or expansion of, the businesses in which the ~~Borrowers~~Loan Parties are engaged as of the Closing Date.

"Permitted Discretion" shall mean a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Encumbrances" means:

(i)    liens for Taxes, assessments or governmental charges that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(ii)    liens with respect to outstanding motor vehicle fines and liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' liens and other similar liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such liens do not individually or in the aggregate have a Material Adverse Effect;

(iii)    liens incurred, pledges or deposits made in the ordinary course of business (i) in connection with payroll taxes, workers' compensation, unemployment insurance and other social security legislation, public liability laws or similar legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instrument for the benefit of) insurance carriers providing property, casualty or liability insurance to a ~~Borrower~~Loan Party or any Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause (i);

(iv)    liens incurred or deposits made to secure the performance of tenders, bids, trade contracts, customer claims, governmental contracts and leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers' acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(v)    easements, licenses, servitudes, restrictive covenants, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the ~~Borrowers~~Loan Parties and their Subsidiaries taken as a whole;

(vi)    leases or subleases of real or personal property granted to other Persons (as lessee thereof) that do not materially interfere with the ordinary conduct of the business of the ~~Borrowers~~Loan Parties and their Subsidiaries taken as a whole;

(vii)    rights of future tenants pursuant to written leases entered into in accordance with the terms hereof;

(viii)    liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 10.1(d) and any pledge and/or deposit securing any settlement of threatened litigation;

(ix)    liens on (i) goods the purchase price of which is financed by a documentary letter of credit issued for the account of a ~~Borrower~~Loan Party or any of its Subsidiaries or liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such lien secures only the obligations of a Borrower or such Subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 9.9 and (ii) specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(x)    liens arising from precautionary UCC financing statements or similar filings made in respect of operating leases entered into by a ~~Borrower~~Loan Party or any of its Subsidiaries;

(xi)    rights of recapture of unused real property (other than any Mortgaged Property) in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any Governmental Authority;

(xii)    liens in favor of deposit banks or securities intermediaries securing customary fees, expenses or charges in connection with the establishment, operation or maintenance of deposit accounts or securities accounts;

(xiii)    liens in favor of obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by a Borrower or any of the Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(xiv)    liens arising from grants of non-exclusive licenses or sublicenses of Intellectual Property, or covenants not to sue with respect to Intellectual Property, made in the ordinary course of business;

(xv)    rights of setoff, banker's lien, netting agreements and other liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts, cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(xvi)    liens arising from the right of distress enjoyed by landlords or liens otherwise granted to landlords, in either case, to secure the payment of arrears of rent or performance of other obligations in respect of leased properties, so long as such liens are not exercised or except where the exercise of such liens would not reasonably be expected to have a Material Adverse Effect;

(xvii)    liens or security given to public utilities or to any municipality or Governmental Authority when required by the utility, municipality or Governmental Authority in connection with the supply of services or utilities to the Administrative Borrower or any of its Subsidiaries;

(xviii)    servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other agreements pertaining to the use or development of any of the assets of the Person, provided the same do not result in (i) a substantial and prolonged interruption or disruption of the business activities of ~~FRG and its~~the Loan Parties and their respective Subsidiaries, taken as a whole, or (ii) a Material Adverse Effect; and

(xix)    liens securing Priority Obligations;

provided that the term "Permitted Encumbrances" shall not include any lien securing Indebtedness for borrowed money other than liens referred to in clauses (iv) and (xiii) above securing obligations under letters of credit or bank guarantees or similar instruments related thereto and in clause (viii) above, in each case to the extent any such lien would constitute a lien securing Indebtedness for borrowed money.

"Permitted Holders" shall mean (x) each of ~~the holders of the Equity Interests of Topco as of the Closing Date immediately after giving effect to the consummation of the Approved Plan.~~(i) Arena Capital Advisors, LLC, (ii) FMR LLC, (iii) Garnett Station Partners, (iv) Guggenheim Investments, (v) HG Vora Capital Management, LLC, (vi) HPS Investment Partners, LLC, (vii) Oaktree Capital Management, L.P., (viii) Octagon Credit Investors, LLC, and (ix) Pacific Investment Management Company LLC and (y) subject to compliance with Section 9.6(i)(ii), each holder of at least 20% of the issued and outstanding Capital Stock of Topco from time to time, in each case together with any Affiliates (other than portfolio companies thereof) or any other account or fund that is under common management or for which a Permitted Holder has investment authority.

"<u>Person</u>" or "<u>person</u>" shall mean any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Code), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

"<u>Petition Date</u>" has the meaning specified in the recitals hereto.

"<u>Plan</u>" shall mean an employee pension benefit plan (as defined in Section 3(2) of ERISA) which Borrower or any Guarantor or, solely with respect to an employee benefit plan subject to Title IV of ERISA, an ERISA Affiliate sponsors or to which it contributes, or a Multiemployer Plan.

"<u>Plan Asset Regulations</u>" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"<u>Pledge Agreement</u>" shall mean that certain Stock Pledge Agreement dated as of the Closing Date, by and among the Loan Parties and Agent, as the same may be amended, restated or otherwise modified from time to time.

"<u>Post-Transaction Period</u>" means, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the twelfth (12th) full fiscal month of the Administrative Borrower immediately following the date on which such Specified Transaction is consummated.

"<u>Prime Rate</u>" shall mean the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Agent) or any similar release by the Federal Reserve Board (as determined by the Agent).  Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"<u>Priority Obligation</u>" means any obligation that is secured by a Lien on any Collateral in favor of a Governmental Authority, which Lien ranks or is capable of ranking prior to or *pari passu* with the Liens created thereon by the applicable Collateral Documents including any such Lien securing amounts owing for wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, other Taxes, workers compensation, governmental royalties and stumpage or pension fund obligations.

"<u>pro forma basis</u>" means, with respect to compliance with any test hereunder for an applicable period of measurement, that all Specified Transactions and the following transactions in connection therewith that have been made during the applicable period of measurement or subsequent to such period and prior to or simultaneously with the event for which the calculation is made shall be deemed to have occurred as of the first day of the applicable measurement period with respect to such covenant or condition: (a) income statement items (whether positive

or negative) attributable to the property or Person subject to such Specified Transaction, (i) in the case of a sale, transfer or other disposition of all or substantially all Capital Stock in ~~FRG~~any Loan Party or any of its Subsidiaries or any division or product line of ~~FRG~~any Loan Party or any ~~of~~ its Subsidiaries, shall be excluded, and (ii) in the case of an Investment described in the definition of the term "Specified Transaction", shall be included, (b) any retirement of Indebtedness and (c) any Indebtedness incurred or assumed by ~~FRG~~any Loan Party or any of its Subsidiaries in connection with such Specified Transaction, and assuming all Indebtedness so incurred or assumed to be outstanding shall be deemed to have borne interest (i) in the case of fixed rate Indebtedness, at the rate applicable thereto or (ii) in the case of floating rate Indebtedness, at the rates which were or would have been applicable thereto during the period when such Indebtedness was or was deemed to be outstanding.

"Pro Forma Disposal Adjustment" means, for any Test Period that includes all or a portion of a fiscal month of the Administrative Borrower included in any Post-Transaction Period with respect to any Sold Entity or Business, the pro forma increase or decrease in EBITDA projected by the Administrative Borrower in good faith as a result of contractual arrangements between the Borrowers or any Subsidiary entered into with such Sold Entity or Business at the time of its disposal or within the Post-Transaction Period and which represent an increase or decrease in EBITDA which is incremental to the Disposed EBITDA of such Sold Entity or Business for the most recent Test Period prior to its disposal.

"Pro Forma Entity" means any Acquired Entity or Business.

"Pro Rata Share" shall mean as to any Lender, the fraction (expressed as a percentage) the numerator of which is such Revolving Lender's Revolving Commitment and the denominator of which is the aggregate amount of the Revolving Commitments of all Revolving Lenders, as adjusted from time to time in accordance with the provisions of Section 13.7 hereof; provided, that, if the Revolving Commitments have terminated, the numerator shall be the unpaid amount of such Revolving Lender's Revolving Exposure and the denominator shall be the aggregate amount of Revolving Exposure of all Revolving Lenders.

"Proceeding" means any claim, litigation, investigation, action, suit, arbitration or administrative, judicial or regulatory action or proceeding in any jurisdiction.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Pledged Securities, collections thereon and distributions or payments with respect thereto.

"Promissory note" shall have the meaning set forth in Article 9 of the UCC.

"PSP" means Pet Supplies "Plus", LLC, a Delaware limited liability company.

"PSP Borrowers" means (a) PSP and (b) PSP Newco.

"PSP Loan Party" means (a) each PSP Borrower and (b) without duplication of clause (a), each Loan Party that is a Subsidiary of a PSP Borrower.

"PSP Newco" means Franchise Group Newco PSP, LLC, a Delaware limited liability company and an indirect subsidiary of ~~FRG~~Fusion Buyer.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 13.12.

"Qualified ECP Guarantor" shall mean, in respect of any Hedge Obligation, each Borrower or Guarantor that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Hedge Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Equity Interests" means Capital Stock of a ~~Borrower~~Loan Party other than Disqualified Equity Interests.

"Real Property" shall mean all now owned and hereafter acquired real property of each Borrower and Guarantor, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located.

"Receivables" shall mean all of the following now owned or hereafter arising or acquired property of each Borrower and Guarantor: ~~(a) all Accounts;~~

(a) all Accounts;

(b) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account;

(c) all payment intangibles of such Borrower or Guarantor;

(d) letters of credit, indemnities, guarantees, security or other deposits and proceeds thereof issued payable to any Borrower or Guarantor or otherwise in favor of or delivered to any Borrower or Guarantor in connection with any Account; or

(e) all other Accounts, contract rights, Chattel Paper, Documents, Instruments, notes, General Intangibles and other forms of obligations owing to any Borrower or Guarantor, whether from the sale and lease of goods or other property, licensing of any property (including Intellectual Property or other General Intangibles), franchising, rendition of services or from loans or advances by any Borrower or Guarantor or to or for the benefit of any third Person (including loans or advances to any Affiliates or Subsidiaries of any Borrower or Guarantor) or otherwise associated with any Accounts, Inventory or General Intangibles of any Borrower or

Guarantor (including choices in action, causes of action, tax refunds, tax refund claims, any funds which may become payable to any Borrower or Guarantor in connection with the termination of any Plan or other employee benefit plan and any other amounts payable to any Borrower or Guarantor from any Plan or other employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, casualty or any similar types of insurance and any proceeds thereof and proceeds of insurance covering the lives of employees on which any Borrower or Guarantor is a beneficiary).

"Recipient" means, as applicable, (a) the Agent, (b) any Lender and (c) the Issuing Bank, or any combination thereof (as the context requires).

"Records" shall mean, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any Account Debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of any Borrower or Guarantor with respect to the foregoing maintained with or by any other Person).

"Reference Time" with respect to any setting of the then-current Benchmark means (i) if such Benchmark is the Term SOFR Rate, 5:00 a.m., Chicago time, on the day that is two (2) Business Days preceding the date of such setting, (ii) if such Benchmark is the Daily Simple SOFR, then four (4) Business Days prior to such setting, and (iii) if such Benchmark is none of the Term SOFR Rate or Daily Simple SOFR, the time determined by the Agent in its reasonable discretion.

"Refinanced Indebtedness" shall have the meaning set forth in Section 9.9(p) hereof.

"Refinancing Indebtedness" shall have the meaning set forth in Section 9.9(p) hereof.

"Register" shall have the meaning set forth in Section 13.7 hereof.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, emptying, escaping, pumping, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Relevant Governmental Body" means the Federal Reserve Board, the NYFRB and/or the CME Term SOFR Administrator, as applicable, or a committee officially endorsed or

convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Relevant Rate" means (i) with respect to any Term Benchmark Borrowing, the Adjusted Term SOFR Rate or (ii) with respect to any RFR Borrowing, the Adjusted Daily Simple SOFR, as applicable.

"Rental Agreements" means each rental agreement entered into by ~~FRG~~any Loan Party or any of its Subsidiaries.

"Required Lenders" shall mean, at any time, those Lenders whose Pro Rata Shares aggregate 50.1% or more of the aggregate of the Revolving Commitments of all Lenders, or if the Revolving Commitments shall have been terminated, Lenders to whom at least 50.1% of the then outstanding Obligations are owing; provided that (x) if there are only two non-affiliated Lenders at such time, then Required Lenders shall mean all Lenders and (y) if there are only three non-affiliated Lenders at such time, then Required Lenders must include at least two non-affiliated Lenders.

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" shall mean as of any date of determination, such amounts as Agent may from time to time in its Permitted Discretion establish and revise reasonably and in good faith reducing the amount of Revolving Loans and Letters of Credit which would otherwise be available to any Borrower under the lending formula(s) provided for herein.

Without limiting the generality of the foregoing, Reserves may, at Agent's option (or shall, to the extent so required under this Agreement), be established to reflect any of the following:

(i)      Inventory shrinkage,

(ii)      reserves in respect of markdowns and cost variances (pursuant to discrepancies between the purchase order price of Inventory and the actual cost thereof),

(iii)      outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the Pension Benefit Guaranty Corporation (or any successor thereto) and other Taxes which may have priority over the interests of Agent in the Collateral,

(iv)      any amounts which are past due in respect of rental payments, service charges or other amounts which are past due to (i) lessors of real property other than retail store locations ("Non-Retail Store Locations") or (ii) consignees, warehousemen or bailees of

Inventory or personal property ("Warehouse Locations"),  to the extent Inventory or Records are located in or on such property (but not in respect of Non-Retail Store Locations or Warehouse Locations (A) where Agent has received a Collateral Access Agreement executed and delivered by the owner and lessor of such real property that Agent has acknowledged in writing is in form and substance satisfactory to Agent or (B) which do not (1) contain Records relating to Receivables or Inventory or (2) in which either no Inventory or Inventory having a Value of less than $2,500,000 is located, provided that, notwithstanding the foregoing, Agent may, at its option, establish Reserves in respect of amounts at any time due or to become due to the owner and operator of such Non-Retail Store Location and Warehouse Location as Agent shall reasonably determine in the event that any of the following shall occurred:  (A) an Event of Default shall have occurred and be continuing, (B) any Borrower, Guarantor or Agent shall have received notice of any event of default under (i) the lease with respect to such Non-Retail Store Location or (ii) the bailee or warehouse agreement with respect to such Warehouse Location or (C) any Borrower or Guarantor has granted to the lessor, consignee, warehousemen or bailee a consensual security interest or lien upon any assets of such Borrower or Guarantor (unless such security interest is waived or subordinated to the security interest of Agent on terms and conditions reasonably satisfactory to Agent)),

(v)	any rental payments, service charges or other amounts owing to lessors of retail store locations,

(A)	which are past due and owing to lessors of retail store locations in states other than Landlord Lien States (but not in respect of retail store locations where Agent has received a Collateral Access Agreement executed and delivered by the owner and lessor of such real property that Agent has acknowledged in writing is in form and substance satisfactory to Agent), provided, that, Agent may, at its option, establish Reserves in respect of amounts at any time due or to become due to the owner and lessor of such a retail store location as Agent shall reasonably determine in the event that any of the following shall occurred:  (1) an Event of Default shall have occurred and be continuing, (2) any Borrower, Guarantor or Agent shall have received notice of any event of default under the lease with respect to such location, or (3) any Borrower or Guarantor has granted to the lessor a security interest or lien upon any assets of such Borrower or Guarantor (unless such security interest is waived or subordinated to the security interest of Agent on terms and conditions reasonably satisfactory to Agent), and

(B)	which are due or to become due to lessors of retail store locations located in Landlord Lien States (but not in respect of retail store locations where Agent has received a Collateral Access Agreement executed and delivered by the owner and lessor of such real property that Agent has acknowledged in writing is in form and substance satisfactory to Agent), provided, that, the Reserves established pursuant to this clause (v)(B) as to any particular retail store location shall not exceed at any time the aggregate of such amounts payable for the next two months to the lessors of such retail store locations, provided, that, such limitation on the amount of the Reserves which may be established by Agent pursuant to this clause (v)(B) shall only apply so long as: (1) no Event of Default shall have occurred and be continuing, (2) neither a Borrower, Guarantor nor Agent shall have received notice of any event of default under the lease with respect to such location or (3) any Borrower or Guarantor has granted a consensual lien or security interest upon any assets of such Borrower or Guarantor (unless such security

interest is waived or subordinated to the security interest of Agent on terms and conditions reasonably satisfactory to Agent),

(vi)    any rental payments, service charges or other amounts which are past due to lessors of personal property,

(vii)    [reserved],

(viii)    an adverse change in the number of days of the turnover of Inventory or a material change in the mix of the Inventory that results in an overall decrease in the value thereof or a material deterioration in its nature or quality that results in an overall decrease in the value thereof (but only to the extent not addressed by the lending formulas in a manner satisfactory to Agent),

(ix)    variances between the perpetual inventory records of ~~Borrowers~~the Loan Parties and the results of test counts of Inventory conducted by Agent or at the request of Agent pursuant to the terms of this Agreement, with respect thereto in excess of the percentage reasonably acceptable to Agent but only to the extent that such variances are not accounted for as Inventory shrinkage,

(x)    Inventory that may become obsolete, based on prior twelve months expired product expenses or Inventory currently in retail store locations that was subject to previous store "giveaways" within the prior twelve months,

(xi)    the aggregate amount of deposits, if any, received by any ~~Borrower~~Loan Party from its retail customers in respect of unfilled orders for merchandise,

(xii)    [~~Inventory located at locations owned or leased by Dealers~~reserved],

(xiii)    (i) commissions and other amounts due to franchisees ~~(including Franchisees)~~ and (ii) commissions and other amounts ~~(including rent)~~ due to dealers ~~[(including Dealers)]~~,

(xiv)    customs duties, and other costs to release Inventory which is being imported into the United States,

(xv)    the aggregate remaining value at such time of outstanding merchandise credits of the Loan Parties,

(xvi)    rebates, discounts, deposits, warranty claims and returns,

(xvii)    Bank Product Reserve, and

(xviii)    to the extent ~~clause [  ]~~paragraph 2 of Schedule 9.3~~3~~1 is not satisfied, the reinstatement of  Reserves equal to $15,000,000.

Agent will not establish new Reserves after the date hereof on account of any circumstances, conditions, events or contingencies of which Agent has actual knowledge as of the Closing Date.

To the extent Agent may establish new criteria or revise existing criteria (including percentages applied to determine the amount of) for Eligible Credit Card Receivables, Eligible Accounts, or Eligible Inventory so as to address any circumstances, condition, event or contingency in a manner reasonably satisfactory to Agent, Agent shall not establish or increase a Reserve for the same purpose. The amount of any Reserve established or increased by Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such Reserve as reasonably determined by Agent in good faith and to the extent that such Reserve is in respect of amounts that may be payable to third parties or is in respect of Bank Product Reserves, Agent may, at its option, deduct such Reserve from the Aggregate Revolving Commitments Amount at any time that such limit is less than the amount of the Borrowing Base. Agent shall provide prior written notice to Administrative Borrower of any material change in the categories of Reserves established after the date hereof or in the manner such Reserves are calculated or any other change to any item for the calculation thereof.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Reuters" means, as applicable, Thomson Reuters Corp, Refinitiv, or any successor thereto.

"Revolving Commitment" means, with respect to each Revolving Lender, the commitment, if any, of such Revolving Lender to make Revolving Loans and to acquire participations in Letters of Credit, expressed as an amount representing the maximum possible aggregate amount of such Revolving Lender's Revolving Exposure hereunder, as such commitment may be reduced or increased from time to time pursuant to (a) Section 2.4 and (b) assignments by or to such Revolving Lender pursuant to Section 13.7. Each Revolving Lender's Revolving Commitment as of the Closing Date is the amount set forth opposite such Revolving Lender's name on Schedule 1A under the caption "Revolving Commitment".

"Revolving Exposure" means, with respect to any Revolving Lender at any time, the sum of the outstanding principal amount of such Revolving Lender's unpaid Revolving Loans and its outstanding Letter of Credit Obligations.

"Revolving Exposure Limitations" has the meaning assigned to it in Section 2.1(a).

"Revolving Lender" means, as of any date of determination, a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure. Unless the context otherwise requires, the term "Revolving Lenders" includes the Issuing Bank.

"Revolving Loans" shall mean the loans now or hereafter made by or on behalf of any Revolving Lender or by Agent for the account of any Revolving Lender on a revolving basis pursuant to the Credit Facility (involving advances, repayments, readvances and Overadvances) as set forth in Section 2.1, Section 2.2, Section 12.8 and Section 12.11 hereof.

"RFR Borrowing" means, as to any Borrowing, the RFR Loans comprising such Borrowing.

"RFR Loan" means a Loan that bears interest at a rate based on the Adjusted Daily Simple SOFR.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (as of the Closing Date, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, Cuba, Iran, North Korea, Syria and the Crimea, Zaporizhzhia and Kherson regions of Ukraine).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b) or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) any other relevant sanctions authority.

"Secured Parties" shall mean, collectively, (a) Agent, (b) Lenders, (c) the Issuing Bank and (d) any Bank Product Provider; provided, that (i) as to any Bank Product Provider, only to the extent of the Obligations owing to such Bank Product Provider, as provided, in subsection (b) of the Obligations set forth herein and (ii) such parties are sometimes referred to herein individually as a "Secured Party".

"Secured Term Debt Cap" means the sum of (a) $[   ]437,772,002 plus (b) an additional amount not to exceed the greater of (i) 10% of the foregoing clause (a) and (ii) $50,000,000.

"Securities Accounts" shall have the meaning set forth in Article 9 of the UCC.

"Securities and Exchange Commission" means the Securities and Exchange Commission of the United States.

"Security" shall have the meaning set forth in Article 8 of the UCC.

"Settlement" has the meaning assigned to such term in Section 2.2(d).

"Settlement Date" has the meaning assigned to such term in Section 2.2(d).

"Settlement Period" has the meaning assigned to such term in Section 6.1(b).

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the NYFRB's Website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Rate Day" has the meaning specified in the definition of "Daily Simple SOFR".

"Sold Entity or Business" has the meaning assigned to such term in the definition of the term "EBITDA."

"Solvent" shall mean, at any time with respect to any Person, that at such time such Person (a) is able to pay its debts as they mature and has (and has a reasonable basis to believe it will continue to have) sufficient capital (and not unreasonably small capital) to carry on its business consistent with its practices as of the Closing Date, and (b) the assets and properties of such Person at a fair valuation on a going concern basis (and including as assets for this purpose at a fair valuation all rights of subrogation, contribution or indemnification arising pursuant to any guarantees given by such Person) are greater than the Indebtedness of such Person, and including subordinated and contingent liabilities computed at the amount which, such Person has a reasonable basis to believe, represents an amount which can reasonably be expected to become an actual or matured liability (and including as to contingent liabilities arising pursuant to any guarantee the face amount of such liability as reduced to reflect the probability of it becoming a matured liability).

"Special Agent Advances" shall have the meaning set forth in Section 12.11 hereof.

"Specified Payment" means (i) any Investment (including any Permitted Acquisition), (ii) any payment made pursuant to Section 9.11 or (iii) any payment (including, for the avoidance of doubt, payment of premiums) made pursuant to Section 9.24, that, in each case, is expressly subject to the satisfaction of the Payment Conditions.

"Specified Transaction" means any (a) disposition of all or substantially all the assets of or all the Capital Stock of any Subsidiary of ~~FRG~~a Loan Party or of any business unit, line of business or division of ~~FRG~~any Loan Party or any of its Subsidiaries for which historical financial statements are available, (b) Permitted Acquisitions, (c) Investment that results in a Person becoming a ~~Borrower~~Loan Party or Subsidiary, or (d) the making of an Investment, dividend or distribution or repurchase of Capital Stock or prepayment in respect of which compliance with any financial ratio is by the terms of this Agreement is required to be calculated on a pro forma basis.

"Store Accounts" shall have the meaning set forth in Section 6.3; provided that the Store Accounts maintained by the ~~Borrowers~~Loan Parties as of the Closing Date are identified as "Store Accounts" on Schedule 8.10 hereto, and any replacement or additional accounts of the ~~Borrowers~~Loan Parties.

"Subsidiary" or "subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, limited liability partnership or other limited or general partnership,

trust, association or other business entity of which an aggregate of at least a majority of the outstanding Capital Stock or other interests entitled to vote in the election of the board of directors of such corporation (irrespective of whether, at the time, Capital Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), managers, trustees or other controlling Persons, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more subsidiaries of such Person.

"<u>Subsidiary Guarantors</u>" shall have the meaning assigned to such term in the definition of "Guarantors".

"<u>Successor Borrower</u>" shall have the meaning set forth in <u>Section 9.7(a)(iv)</u> hereof.

"<u>Supermajority Revolving Lenders</u>" means, at any time, Lenders (other than Defaulting Lenders) having Revolving Exposures and unused Revolving Commitments representing at least 66 2/3% of the sum of the Aggregate Revolving Exposure and unused Revolving Commitments at such time; <u>provided</u> that (x) if there are only two non-affiliated Lenders at such time, then Supermajority Revolving Lenders shall mean all Lenders and (y) if there are only three non-affiliated Lenders at such time, then Supermajority Revolving Lenders must include at least two non-affiliated Lenders.

"<u>Supported QFC</u>" has the meaning assigned to it in <u>Section 13.12</u>.

"<u>Supporting Obligations</u>" shall have the meaning set forth in Article 9 of the UCC.

"<u>Tax Group</u>" has the meaning set forth in Section 9.11(d).

"<u>Tax Restructuring</u>" means any reorganizations and other activities related to tax planning and tax reorganization (as determined by Administrative Borrower in good faith) entered into after the Closing Date so long as (x) the Required Lenders have provided prior written consent in their sole discretion and (y) such Tax Restructuring does not materially impair the Guaranty or the security interests of the Agent and the Lenders under the Collateral Documents in the Collateral, taken as a whole, and ~~Borrower and its~~the Loan Parties and their Subsidiaries otherwise comply with <u>Sections 9.23</u>.

"<u>Taxes</u>" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Benchmark Borrowing</u>" shall mean a Borrowing of Term Benchmark Loans.

"<u>Term Benchmark Loans</u>" shall mean any Loan or portion thereof on which interest is payable based on the Adjusted Term SOFR Rate in accordance with the terms hereof.

"<u>Term Loan Priority Collateral</u>" has the meaning assigned to such term in the Intercreditor Agreement.

"Term SOFR Determination Day" has the meaning assigned to it under the definition of Term SOFR Reference Rate.

"Term SOFR Rate" means, with respect to any Term Benchmark Borrowing and for any tenor comparable to the applicable Interest Period, the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such tenor comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate" means, for any day and time (such day, the "Term SOFR Determination Day"), with respect to any Term Benchmark Borrowing and for any tenor comparable to the applicable Interest Period, the rate per annum determined by the Agent as the forward-looking term rate based on SOFR. If by 5:00 pm (New York City time) on such Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Rate has not occurred, then the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding Business Day is not more than five (5) Business Days prior to such Term SOFR Determination Day.

"Test Period" means the most recent period of twelve consecutive months of ~~FRG~~the Administrative Borrower ended on or prior to such time (taken as one accounting period) in respect of which financial statements for each month or fiscal year period have been (or have been required to be) delivered pursuant to Section 9.6.

"Topco" means [~~Reorganized Franchise Group Topco~~Fusion Parent, LLC], a Delaware limited liability company.

"Total Indebtedness" means, as of any date of determination:

~~"Total Indebtedness" means, as of any date of determination,~~ (~~i~~a) the aggregate amount of Indebtedness of the ~~Administrative Borrower and its~~Loan parties and their respective Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of the acquisition method accounting in connection with any Permitted Acquisition (or other Investment not prohibited hereunder)) consisting only of third-party Indebtedness for borrowed money, drawn but unreimbursed obligations under letters of credit, letters of guaranty and bankers' acceptances and third-party debt obligations evidenced by bonds, debentures, loan agreements, promissory notes or similar instruments, and, in each case, without duplication, guarantees by the ~~Administrative Borrower and its~~Loan Parties and their respective Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP, in respect of any of the foregoing Indebtedness of any other Person minus

(~~ii~~b) the sum of (x) unrestricted cash and Cash Equivalents of the ~~Administrative Borrower and its~~Loan Parties and their respective Subsidiaries and (y) cash and Cash

Equivalents restricted in favor of Agent or any Lender (which may also include cash and Cash Equivalents securing other indebtedness (including Indebtedness under the First Lien Term Loan Documents) secured by a Lien on the Collateral) on the Closing Date.[7]

"Trade Secrets" means any trade secrets or other proprietary and confidential information, including unpatented inventions, invention disclosures, engineering or other technical data, financial data, procedures, know-how, designs, supplier lists, customer lists, business, production or marketing plans, formulae, methods (whether or not patentable), processes, compositions, schematics, algorithms, techniques, analyses, source code, object code and data collections.

"Trademark License" means any written agreement or license now or hereafter in effect, granting to or from any Person any right to use any Trademark now or hereafter owned by any other Person or that any other Person otherwise has the right to license and all rights of any such Person under any such agreement or license.

"Trademarks" means (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade dress, logos, domain names and other source identifiers, in each case whether arising under the trademark laws of the United States or any other jurisdiction, (b) all registrations and applications for the registration thereof, including all registrations and applications for registration filed in the United States Patent and Trademark Office, and (c) all of the goodwill of the applicable business connected with the use of and symbolized by any of the foregoing.

"Transaction Costs" means all fees, premiums, costs and expenses incurred or payable by the ~~Administrative Borrower~~Loan Parties or any of ~~its~~their ~~s~~Subsidiaries in connection with the Transactions prior to the Closing Date.

"Transactions" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the Loans and issuance (or deemed issuance) of the Letters of Credit under this Agreement on the Closing Date, the funding (or deemed funding) of the loans by the First Lien Lenders on the Closing Date, the consummation of the other transactions contemplated by this Agreement, the First Lien Term Loan Documents, the Approved Plan or the Confirmation Order, the consummation of any other transactions in connection with the foregoing and the payment of the fees and expenses incurred in connection with any of the foregoing.

"Type" when used in reference to any Revolving Loan or Borrowing, refers to whether the rate of interest on such Revolving Loan, or on the Revolving Loans comprising such Borrowing, is determined by reference to the Adjusted Term SOFR Rate, the Adjusted Daily Simple SOFR or the Alternate Base Rate.

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York, and any successor statute, as in effect from time to time (except that terms used herein which are

---

[7] ~~NTD: net debt concept is only used for purposes of CPs and intended to include unrestricted cash on balance sheet as of the date of close.~~

defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Agent may otherwise determine); provided that, if, with respect to any financing statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Agent pursuant to applicable Financing Agreement is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than the State of New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Financing Agreement and any financing statement relating to such perfection or effect of perfection or non-perfection.

"UK Financial Institutions" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unfinanced Capital Expenditures" means, for any period, capital expenditures paid in cash (other than cash constituting proceeds of long-term Indebtedness (other than revolving Indebtedness)) during such period, other than:

(a) the purchase price paid in connection with a Permitted Acquisition or other similar Investment not prohibited by this Agreement;

(b) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for such existing equipment being traded in at such time;

(c) expenditures made with the proceeds of dispositions, Casualty Events or similar dispositions or events that are not required to be applied to repay Indebtedness pursuant to the terms of this Agreement, the First Lien Credit Agreement;

(d) expenditures made in leasehold improvements, to the extent reimbursed by the landlord;

(e) expenditures to the extent actually paid for by any Person other than any Borrower, Guarantor or Subsidiary and for which no Borrower, Guarantor or Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation in respect of the relevant expenditures to such Person;

(f) property, plant and equipment taken in settlement of accounts; and

(g) that portion of interest on Indebtedness incurred for capital expenditures which is capitalized in accordance with GAAP; provided that with respect to each joint venture or minority investee of the ~~Administrative Borrower~~any Loan Party or any of its Subsidiaries, for purposes of calculating Unfinanced Capital Expenditures solely with respect to calculating the Fixed Charge Coverage Ratio pursuant to Section 9.1~~8~~7 hereof, the amount of Unfinanced Capital Expenditures (calculated in accordance with this definition) attributable to such joint venture or minority investee, as applicable, that shall be counted for such purposes shall equal the product of (x) ~~the Administrative Borrower's~~such Loan Party's or such Subsidiary's direct and/or indirect percentage ownership of such joint venture or minority investee and (y) Unfinanced Capital Expenditures (calculated in accordance with this definition) of such joint venture or minority investee; provided further that the adjustments to Unfinanced Capital Expenditures pursuant to the preceding proviso shall be proportionate to the amount of EBITDA that is contributed by such joint venture or minority investee  pursuant to the definition of "EBITDA" hereunder.

"Unliquidated Obligations" means, at any time, any Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Obligation that is: (a) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (b) any other obligation (including any guarantee) that is contingent in nature at such time; or (c) an obligation to provide collateral to secure any of the foregoing types of obligations.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means a Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regime" has the meaning assigned to it in Section 13.12.

"Value" shall mean, as reasonably determined by Agent in good faith, with respect to Inventory, the lower of (a) cost determined on the weighted average cost basis in accordance with GAAP or (b) market value, provided that, for purposes of the calculation of the Borrowing Base, (i) the Value of the Inventory shall not include:  (A) the portion of the value of Inventory equal to the profit earned by any Affiliate on the sale thereof to any Borrower or Guarantor unless the sale by such Affiliate is a bona fide arm's length transaction consistent with the most recent appraisal received and accepted by Agent for the Inventory and consistent with the prices previously paid by such Borrower or Guarantor in comparable dealings with non-Affiliates, or (B) write-ups or write-downs in value with respect to currency exchange rates and (ii) notwithstanding anything to the contrary contained herein, the cost of the Inventory shall be computed in the same manner and consistent with the most recent appraisal of the Inventory received and accepted by Agent prior to the date hereof, if any.

"<u>Voting Stock</u>" shall mean with respect to any Person, (a) one or more classes of Capital Stock of such Person having general voting powers to elect at least a majority of the board of directors, managers or trustees of such Person, irrespective of whether at the time Capital Stock of any other class or classes have or might have voting power by reason of the happening of any contingency, and (b) any Capital Stock of such Person convertible or exchangeable without restriction at the option of the holder thereof into Capital Stock of such Person described in <u>clause (a)</u> of this definition.

"<u>Wholly Owned Subsidiary</u>" means any Subsidiary that is a wholly owned subsidiary.

"<u>Write-Down and Conversion Powers</u>" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"<u>Zero Balance Accounts</u>" shall mean Deposit Accounts in which a balance of zero is maintained by the depository institution at all times by automatically transferring funds from a master Deposit Account to such Zero Balance Account in an amount only large enough to cover checks presented and other debits to such account, such that any such Zero Balance Account maintains an overnight balance of zero dollars at all times.

## SECTION 2.    CREDIT FACILITIES

2.1    <u>Revolving Loans</u>.

(a)    Subject to and upon the terms and conditions contained herein, each Revolving Lender severally (and not jointly) agrees to make its Pro Rata Share of Revolving Loans to each Borrower from time to time in amounts requested by Administrative Borrower on behalf of such Borrower in an aggregate principal amount outstanding at any one time that will not result, immediately after giving effect to such proposed Revolving Loan, in (i) such Revolving Lender's Pro Rata Share of the aggregate amount of Revolving Loans and Letter of Credit Obligations then outstanding exceeding such Revolving Lender's Revolving Commitment and (ii) the Aggregate Revolving Exposure exceeding the Borrowing Cap at such time, (such limitations in clauses (i) and (ii), the "<u>Revolving Exposure Limitations</u>").  Subject to and upon the terms and conditions contained herein, each Revolving Loan shall be comprised entirely of ABR Loans or Term Benchmark Loans as each Borrower (or Administrative Borrower on behalf of such Borrower) may from time to time request in accordance herewith.

(b)    To the extent that any facts or circumstances (i) have led to Agent establishing a Reserve pursuant to one provision of this Agreement, Agent shall not establish any

Reserves based on the same such facts or circumstances pursuant to any other provision of this Agreement and (ii) were taken into account in calculating any component of the Borrowing Base, Agent shall not establish any Reserves based on the same such facts or circumstances.

(c)　　Except in Agent's discretion, with the consent of all Revolving Lenders, or as otherwise provided in Section 2.2, Section 12.8 or Section 12.11 herein, the Borrowers shall be in compliance with the Revolving Exposure Limitations at all times.

(d)　　In the event that the Aggregate Revolving Exposure at any time exceeds the Borrowing Cap at such time or the Borrowers are otherwise not in compliance with the Revolving Exposure Limitations at any time, (i) such event shall not limit, waive or otherwise affect any rights of Agent or Lenders in such circumstances or on any future occasions and (ii) Borrowers shall immediately repay to Agent the entire amount of any such excess.

2.2　　Overadvances.

(a)　　Any provision of this Agreement to the contrary notwithstanding, at the request of the Administrative Borrower, Agent may in its sole discretion (but with absolutely no obligation), on behalf of the Revolving Lenders, (x) make Revolving Loans to the Borrowers in amounts that exceed the Borrowing Cap or that would otherwise cause the Borrowers to not be in compliance with the Revolving Exposure Limitations (any such excess Revolving Loans are herein referred to collectively as "Overadvances") or (y) deem the amount of Revolving Loans outstanding to the Borrowers that are in excess of the Borrowing Cap or that otherwise cause the Borrowers to not be in compliance with the Revolving Exposure Limitations to be Overadvances; provided that no Overadvance shall result in a Default due to Borrowers' failure to comply with Section 2.1 for so long as such Overadvance remains outstanding in accordance with the terms of this paragraph, but solely with respect to the amount of such Overadvance.  In addition, Overadvances may be made even if the condition precedent set forth in Section 4.2(d) has not been satisfied.  All Overadvances shall constitute ABR Borrowings.  The making of an Overadvance on any one occasion shall not obligate Agent to make any Overadvance on any other occasion.  The authority of Agent to make Overadvances is limited to an aggregate amount not to exceed $4,000,000 at any time, no Overadvance may remain outstanding for more than thirty days and no Overadvance shall cause any Revolving Lender's Revolving Exposure to exceed its Revolving Commitment; provided that the Required Lenders may at any time revoke Agent's authorization to make Overadvances.  Any such revocation must be in writing and shall become effective prospectively upon Agent's receipt thereof.  The Borrowers hereby unconditionally promise to pay to Agent the then unpaid principal amount of each Overadvance on the earlier of the Maturity Date and demand by Agent.

(b)　　Upon the making an Overadvance (whether before or after the occurrence of a Default and regardless of whether a Settlement has been requested with respect to such Overadvance), each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Agent, without recourse or warranty, an undivided interest and participation in such Overadvance in proportion to its Pro Rata Share of the Revolving Commitment.   The Agent may, at any time, require the Revolving Lenders to fund their participations.  From and after the date, if any, on which any Revolving Lender is required to fund its participation in any Overadvance purchased hereunder, Agent shall

promptly distribute to such Lender, such Lender's Pro Rata Share of all payments of principal and interest and all proceeds of Collateral received by Agent in respect of such Overadvance.

2.3    Letters of Credit.

(a)    Subject to and upon the terms and conditions contained herein and in the Letter of Credit Documents, at the request of a Borrower (or Administrative Borrower on behalf of such Borrower), Agent agrees to cause Issuing Bank to issue, and Issuing Bank agrees to issue, for the account of such Borrower or a Subsidiary or Affiliate of such Borrower one or more Letters of Credit, for the ratable risk of each Revolving Lender according to its Pro Rata Share of Revolving Loans, containing terms and conditions acceptable to Agent and Issuing Bank; provided no Issuing Bank shall be under any obligation to issue a Letter of Credit that would result in more than a total of [20] Letters of Credit outstanding[8].  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrowers to, or entered into by the Borrowers with, Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.  Notwithstanding anything herein to the contrary, the Issuing Bank shall have no obligation hereunder to issue, and shall not issue, any Letter of Credit the proceeds of which would be made available to any Person (i) to fund any activity or business of or with any Sanctioned Person, or in any country or territory that, at the time of such funding, is the subject of any Sanctions except to the extent permissible for a Person required to comply with Sanctions or (ii) in any manner that would result in a violation of any Sanctions by any party to this Agreement.

(b)    The Administrative Borrower requesting such Letter of Credit (or Administrative Borrower on behalf of such Borrower) shall hand deliver or facsimile (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to Issuing Bank and Agent (prior to 10:00 a.m., New York time, at least three Business Days prior to the requested date of issuance, amendment or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended or extended, and specifying the date of issuance, amendment or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be reasonably necessary to prepare, amend or extend such Letter of Credit.  The form and terms of the proposed Letter of Credit shall be reasonably satisfactory to Agent and Issuing Bank, and as of the date of issuance, no order of any court, arbitrator or other Governmental Authority shall purport by its terms to enjoin or restrain money center banks relevant to the proposed issuance generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no law, rule or regulation applicable to money center banks generally and no request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over money center banks relevant to the proposed issuance generally shall prohibit, or request that Issuing Bank refrain from, the issuance of letters of credit generally or the issuance of such Letter of Credit.  If requested by Issuing Bank, the applicable Borrower also shall submit a letter of credit application on Issuing Bank's

---

[8] [Note to K&E team: Please confirm that this cap on the number of L/Cs outstanding works for the Company operationally.]

standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended or extended only if (and upon issuance, amendment or extension of each Letter of Credit the Borrowers shall be deemed to represent and warrant that), after giving effect to such issuance, amendment or extension (i) the Letter of Credit Obligations with respect to stand-by Letters of Credit shall not exceed the Letter of Credit Limit, (ii) the terms and conditions of Section 2.1 hereof shall be satisfied, (iii) Excess Availability, prior to giving effect to any Reserves with respect to such Letter of Credit, on the date of the proposed issuance of any Letter of Credit shall be equal to or greater than: (A) if the proposed Letter of Credit is for the purpose of purchasing Eligible Inventory and the documents of title with respect thereto are consigned to Issuing Bank, the sum of (1) the percentage equal to 100% minus the then applicable percentage with respect to Eligible Inventory set forth in the definition of the term Borrowing Base multiplied by the Value of such Eligible Inventory, plus (2) freight, taxes, duty and other amounts which Agent estimates must be paid in connection with such Inventory upon arrival and for delivery to one of such Borrower's locations for Eligible Inventory within the United States of America and (B) if the proposed Letter of Credit is for any other purpose or the documents of title are not consigned to Issuing Bank in connection with a Letter of Credit for the purpose of purchasing Inventory, an amount equal to 100% of the Letter of Credit Obligations with respect thereto and (iv) the Borrowers shall be in compliance with the Revolving Exposure Limitations.  Effective on the issuance of each Letter of Credit, Reserves shall be established in the applicable amount set forth in Section 2.3(b)(iii)(A) or Section 2.3(b)(iii)(B).

(c)     Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any extension thereof, one year after such extension) unless otherwise agreed by the Issuing Bank (including automatic or "evergreen" extension) and (ii) the date that is five Business Days prior to the Maturity Date.

(d)     Except in Agent's discretion, with the consent of all Revolving Lenders, the amount of all outstanding Letter of Credit Obligations with respect to stand-by Letters of Credit shall not at any time exceed the Letter of Credit Limit.

(e)     If Issuing Bank shall make any payment in respect of a Letter of Credit, Borrowers shall reimburse such payment by paying to Agent an amount equal to such payment not later than 12:00 p.m., New York time, on the date that such payment is made, if Administrative Borrower shall have received notice of such payment prior to 10:00 a.m., New York time, on such date, or, if such notice has not been received by Administrative Borrower prior to such time on such date, then not later than 12:00 p.m., New York time, on (i) the Business Day that Administrative Borrower receives such notice, if such notice is received prior to 10:00 a.m., New York time, on the day of receipt, or (ii) the Business Day immediately following the day that Administrative Borrower receives such notice, if such notice is not received prior to such time on the day of receipt.  Each drawing under any Letter of Credit or other amount payable in connection therewith when due shall constitute a request by the Administrative Borrower for whose account such Letter of Credit was issued to Agent for an ABR Loan in the amount of such drawing or other amount then due, and shall be made by Agent on behalf of Revolving Lenders as a Revolving Loan (or Special Agent Advance, as the case may be) (which Revolving Loan shall be deemed to reimburse the Issuing Bank for such amount due).  The date of such Revolving Loan shall be the date of the drawing or as to other amounts,

the due date therefor.  Any payments made by or on behalf of Agent or any Revolving Lender to Issuing Bank and/or related parties in connection with any Letter of Credit shall constitute additional Revolving Loans to such Borrower pursuant to this <u>Section 2</u> (or Special Agent Advances as the case may be).

(f)     Borrowers' joint and several obligation to reimburse Issuing Bank for any payment under any Letter of Credit as provided in <u>paragraph (e)</u> of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, Borrowers' obligations hereunder.  Neither Agent, Revolving Lenders nor Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms, any error in translation or any consequence arising from causes beyond the control of Issuing Bank; <u>provided</u> that the foregoing shall not be construed to excuse Issuing Bank from liability to Borrowers to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by Borrowers to the extent permitted by applicable law) suffered by any Borrower that are caused by Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence, bad faith or willful misconduct on the part of Issuing Bank (as finally determined by a court of competent jurisdiction), Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     Borrowers and Guarantors shall indemnify and hold Agent and Lenders harmless from and against any and all losses, claims, damages, liabilities, costs and expenses which Agent or any Lender may suffer or incur in connection with any Letter of Credit and any documents, drafts or acceptances relating thereto, including any losses, claims, damages, liabilities, costs and expenses due to any action taken by Issuing Bank or correspondent with respect to any Letter of Credit, except for such losses, claims, damages, liabilities, costs or expenses that are a direct result of the gross negligence, bad faith or willful misconduct of Agent

or any Lender.  Each Borrower and Guarantor assumes all risks with respect to the acts or omissions of the drawer under or beneficiary of any Letter of Credit and for such purposes the drawer or beneficiary shall be deemed such Borrower's agent.  Each Borrower and Guarantor assumes all risks for, and agrees to pay, all foreign, Federal, State and local taxes, duties and levies relating to any goods subject to any Letter of Credit or any documents, drafts or acceptances thereunder.  Each Borrower and Guarantor hereby releases and holds Agent and Lenders harmless from and against any acts, waivers, errors, delays or omissions with respect to or relating to any Letter of Credit, except for the gross negligence, bad faith or willful misconduct of Agent or any Lender.  The provisions of this Section 2.3(g) shall survive the payment of Obligations and the termination of this Agreement.

(h)     At any time after the occurrence and during the continuance of an Event of Default,

(i)     in connection with Inventory purchased pursuant to any Letter of Credit, Borrowers and Guarantors shall, at Agent's reasonable request, instruct all suppliers, carriers, forwarders, customs brokers, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest that upon Agent's request, such items are to be delivered to Agent and/or subject to Agent's order, and if they shall come into such Borrower's or Guarantor's possession, to deliver them, upon Agent's reasonable request, to Agent in their original form; and

(ii)     within three Business Days that Administrative Borrower receives notice from Agent or Required Lenders demanding the deposit of cash collateral pursuant to this paragraph, Borrowers shall deposit in an account with Agent, in the name of Agent and for the benefit of the Revolving Lenders (the "LC Collateral Account"), an amount in cash equal to 105% of the Letter of Credit Obligations as of such date plus accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to any Borrower described in clause (g) or (h) of Section 10.1.  Such deposit shall be held by Agent as collateral for the payment and performance of the Letter of Credit Obligations.  In addition, and without limiting the foregoing or paragraph (c) of this Section, if any Letter of Credit Obligations remain outstanding after the expiration date specified in said paragraph (c), the Borrowers shall immediately deposit in the LC Collateral Account an amount in cash equal to 105% of such Letter of Credit Obligations as of such date plus any accrued and unpaid interest thereon.  Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account for so long as the Event of Default which triggered the requirement for such funds to be deposited is continuing and Borrowers hereby grant Agent a security interest in the LC Collateral Account.  Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole but reasonable discretion of Agent and at Borrowers' risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in such account.  Moneys in such account shall be applied by Agent to reimburse Issuing Bank for any draws under any Letter of Credit for which it has not been reimbursed, together with related fees, costs and customary processing charges and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of Borrowers for the Letter of Credit Obligations at such time or, if the maturity of the Loans has

been accelerated (but subject to the consent of Revolving Lenders with Letter of Credit Obligations representing greater than 50% of the total Letter of Credit Obligations), be applied to satisfy other Obligations.  If Borrowers are required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to Borrowers within three Business Days after all such Events of Default have been cured or waived.

Except as otherwise provided herein, Agent shall not exercise any such rights pursuant to this clause so long as no Event of Default shall have occurred and be continuing.  Borrowers and Guarantors shall, at Agent's reasonable request, designate Issuing Bank with respect to a Letter of Credit as the consignee on all bills of lading and other negotiable and non-negotiable documents under such Letter of Credit.

(i)    Each Borrower and Guarantor hereby irrevocably authorizes and directs Issuing Bank to name such Borrower or Guarantor as the account party therein and to deliver to Agent all instruments, documents and other writings and property received by Issuing Bank pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the Letter of Credit Documents with respect thereto.  Nothing contained herein shall be deemed or construed to grant any Borrower or Guarantor any right or authority to pledge the credit of Agent or any Revolving Lender in any manner.  Borrowers and Guarantors shall be bound by any reasonable interpretation made in good faith by Agent or Issuing Bank under or in connection with any Letter of Credit or any documents, drafts or acceptances thereunder, notwithstanding that such interpretation may be inconsistent with any instructions of any Borrower or Guarantor.

(j)    Immediately upon the issuance or amendment of any Letter of Credit, each Revolving Lender shall be deemed to have irrevocably and unconditionally purchased and received, without recourse or warranty, an undivided interest and participation to the extent of such Revolving Lender's Pro Rata Share of the liability with respect to such Letter of Credit and the obligations of Borrowers with respect thereto (including all Letter of Credit Obligations with respect thereto).  Each Revolving Lender shall absolutely, unconditionally and irrevocably assume, as primary obligor and not as surety, and be obligated to pay to Issuing Bank therefor and discharge when due, its Pro Rata Share of all of such obligations arising under such Letter of Credit.  Without limiting the scope and nature of each Revolving Lender's participation in any Letter of Credit, to the extent that Issuing Bank has not been reimbursed or otherwise paid as required hereunder or under any such Letter of Credit, each such Revolving Lender shall pay to Issuing Bank its Pro Rata Share of such unreimbursed drawing or other amounts then due to Issuing Bank in connection therewith.

(k)    The obligations of Borrowers to pay Letter of Credit Obligations and the obligations of Revolving Lenders to make payments to Agent for the account of Issuing Bank with respect to Letters of Credit shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances, whatsoever, notwithstanding the occurrence or continuance of any Default, Event of Default, the failure to satisfy any other condition set forth in Section 4 or any other event or circumstance. If such amount is not made available by a Revolving Lender when due, Agent shall be entitled to recover such amount on demand from such Revolving Lender with interest

thereon, for each day from the date such amount was due until the date such amount is paid to Agent at the interest rate then payable by any Borrower in respect of Revolving Loans that are ABR Loans. Any such reimbursement shall not relieve or otherwise impair the obligation of Borrowers to reimburse Issuing Bank under any Letter of Credit or make any other payment in connection therewith.

(l)     If Issuing Bank shall make any payment under any Letter of Credit, then, unless Borrowers shall reimburse such payment in full on the date such payment is made, the unpaid amount thereof shall bear interest, for each day from and including the date such payment is made to but excluding the date that the Borrowers reimburse such payment including a reimbursement pursuant to any ABR Loan made by Agent in accordance with paragraph (e) of this Section, at the rate per annum then applicable to ABR Loans; provided that, if Borrowers fail to reimburse such payment when due pursuant to paragraph (e) of this Section, then Agent may, at its option, and Agent shall, at the direction of the Required Lenders, increase the Applicable Margin otherwise used to calculate the interest rate for ABR Loans by 2% per annum; provided that such increased Applicable Margins shall only apply to such unpaid amount and not to any other Obligations, outstanding hereunder.  Interest accrued pursuant to this paragraph shall be for the account of Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Lender pursuant to paragraph (e) of this Section to reimburse Issuing Bank shall be for the account of such Revolving Lender to the extent of such payment.

(m)     Issuing Bank may be replaced at any time by written agreement among the Administrative Borrower, Agent, the replaced Issuing Bank and the successor Issuing Bank. Agent shall notify Lenders of any such replacement of Issuing Bank.  At the time any such replacement shall become effective, Borrowers shall pay all unpaid fees accrued for the account of the replaced Issuing Bank as described in Section 3.2(b) hereof.  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of Issuing Bank under this Agreement with respect to Letter of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit or extend or otherwise amend any existing Letter of Credit.

2.4     Termination or Reduction of Aggregate Revolving Commitment Amounts.

(a)     The Borrowers may at any time terminate the Revolving Commitments upon the Payment in Full of the Obligations.

(b)     The Borrowers may from time to time reduce the Revolving Commitments; provided that (i) each reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and (ii) the Borrowers shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.4(e) and Section

2.9, (x) the Aggregate Revolving Exposure would exceed the Borrowing Cap then in effect or (y) the Borrowers would not be in compliance with the Revolving Exposure Limitations.

(c)　　The Borrowers shall notify Agent of any election or requirement to terminate or reduce the Aggregate Revolving Commitment Amounts pursuant to Section 2.4(a) or (b), as applicable, at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof; provided that the Borrowers shall not reduce the Aggregate Revolving Commitment Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.4(e) and/or 2.9, the Aggregate Revolving Exposure then outstanding would exceed the Borrowing Cap.  Promptly following receipt of any such notice, Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrowers pursuant to this Section 2.4(c) shall be irrevocable; provided that a notice of termination of the Aggregate Revolving Commitment Amounts may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by Administrative Borrower (by notice to Agent on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Aggregate Revolving Commitment Amounts shall be permanent and may not be reinstated.  Each reduction of the Aggregate Revolving Commitment Amounts shall be made ratably among the Lenders in accordance with each Lender's Pro Rata Share.

(d)　　[Reserved].

(e)　　Mandatory Prepayments Related to Reduction of Aggregate Revolving Commitment Amounts.  If, after giving effect to any termination or reduction of the Aggregate Revolving Commitment Amounts pursuant to Section 2.4(a) or (b), the Aggregate Revolving Exposure exceeds the Aggregate Revolving Commitment Amounts, then the Borrowers shall (i) prepay the Loans as provided in Section 2.9 on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (ii) if any excess remains after prepaying all of the Loans as a result of a Letter of Credit Obligation, pay to Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.3(h).

2.5　　Revolving Commitments.  The aggregate amount of each Revolving Lender's Pro Rata Share of the Revolving Loans and Letter of Credit Obligations shall not exceed the amount of such Revolving Lender's Revolving Commitment, as the same may from time to time be amended in accordance with the provisions hereof.

2.6　　Bank Products.  The Loan Parties, or any of their Subsidiaries, may (but no such Person is required to) request that the Bank Product Providers provide or arrange for such Person to obtain Bank Products from Bank Product Providers, and each Bank Product Provider may, in its sole discretion, provide or arrange for such Person to obtain the requested Bank Products. The Loan Parties and any of their Subsidiaries that obtain Bank Products shall indemnify and hold Agent, each Lender and their respective Affiliates harmless from any and all obligations now or hereafter owing to any other Person by any Bank Product Provider in connection with any Bank Products other than for gross negligence or willful misconduct on the part of any such indemnified Person.  This Section 2.6 shall survive the payment of the Obligations and the termination of this Agreement.  Borrower and its Subsidiaries acknowledge and agree that the obtaining of Bank Products from Bank Product Providers (a) is in the sole discretion of such

Bank Product Provider, and (b) is subject to all rules and regulations of such Bank Product Provider. Upon the request by the Loan Parties and the acceptance by such Bank Product Provider in the first sentence of this <u>Section 2.6</u>, such Bank Product Provider shall be deemed a party hereto for purposes of any reference in a Financing Agreement to the parties for whom Agent is acting, <u>provided</u>, that, the rights of such Bank Product Provider hereunder and under any of the other Financing Agreements shall consist exclusively of such Bank Product Provider's right to share in payments and collections out of the Collateral as set forth herein. Each Lender or Affiliate thereof providing Bank Products for, or having Hedge Agreements with, any Loan Party or any Subsidiary of a Loan Party shall deliver to Agent, promptly after entering into such Hedge Agreement or Bank Product, written notice setting forth the aggregate amount of all Hedge Obligations or Obligations arising under or pursuant to any Bank Products of such Loan Party or Subsidiary to such Lender or Affiliate (whether matured or unmatured, absolute or contingent). In addition, each such Lender or Affiliate thereof shall deliver to Agent, from time to time after a significant change therein or upon a request therefor, a summary of the amounts due or to become due in respect of such Hedge Obligations and Obligations arising under or pursuant to any Bank Products. The most recent information provided to Agent shall be used in determining the amounts to be applied in respect of such Hedge Obligations and/or Obligations arising under or pursuant to any Bank Products pursuant to <u>Section 6.4(a)</u> and which tier of the waterfall, contained in <u>Section 6.4(a)</u>, such Hedge Obligations and/or Obligations arising under or pursuant to any Bank Products will be placed. For the avoidance of doubt, so long as Chase or its Affiliate is the Agent, neither Chase nor any of its Affiliates providing Bank Products for, or having Hedge Agreements with, any Loan Party or any Subsidiary or Affiliate of a Loan Party shall be required to provide any notice described in this <u>Section 2.6</u> in respect of such Bank Products or Hedge Agreements.

2.7    <u>Joint and Several Liability</u>. Each Borrower hereby unconditionally and irrevocably agrees it is jointly and severally liable to the Agent, the Issuing Bank and the Lenders for the Obligations. In furtherance thereof, each Borrower agrees that wherever in this Agreement it is provided that a Borrower is liable for a payment, such obligation is the joint and several obligation of each Borrower. Each Borrower acknowledges and agrees that its joint and several liability under this Agreement and the Financing Agreements is absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever by the Agent, the Issuing Bank, any Lender or any other Person. Each Borrower's liability for the Obligations shall not in any manner be impaired or affected by who receives or uses the proceeds of the credit extended hereunder or for what purposes such proceeds are used, and each Borrower waives notice of borrowing requests issued by, and loans or other extensions of credit made to, other Borrowers. Each Borrower hereby agrees not to exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to such Borrower against any party liable for payment under this Agreement and the Financing Agreements unless and until the Agent, the Issuing Bank and each Lender have been paid in full and all of the Obligations are satisfied and discharged following termination or expiration of all commitments of the Lenders to extend credit to the Borrowers. Each Borrower's joint and several liability hereunder with respect to the Obligations shall, to the fullest extent permitted by applicable law, be the unconditional liability of such Borrower irrespective of (i) the validity, enforceability, avoidance or subordination of any of the Obligations or of any other document evidencing all or any part of the Obligations, (ii) the absence of any attempt to collect any of the Obligations from any other Loan Party or any Collateral or other security therefor, or the absence

of any other action to enforce the same, (iii) the amendment, modification, waiver, consent, extension, forbearance or granting of any indulgence by the Agent or any Lender with respect to any provision of any instrument executed by any other Loan Party evidencing or securing the payment of any of the Obligations, or any other agreement now or hereafter executed by any other Loan Party and delivered to the Agent, (iv) the failure by the Agent or any Lender to take any steps to perfect or maintain the perfected status of its Lien upon, or to preserve its rights to, any of the Collateral or other security for the payment or performance of any of the Obligations or the Agent's release of any Collateral or of its Liens upon any Collateral, (v) the release or compromise, in whole or in part, of the liability of any other Loan Party for the payment of any of the Obligations, (vi) any increase in the amount of the Obligations beyond any limits imposed herein or in the amount of any interest, fees or other charges payable in connection therewith, in each case, if consented to by any other Borrower, or any decrease in the same, or (vii) any other circumstance that might constitute a legal or equitable discharge or defense of any Loan Party, other than the payment in full of the Obligations.  After the occurrence and during the continuance of any Event of Default, the Agent may proceed directly and at once, without notice to any Loan Party, against any or all of Loan Parties to collect and recover all or any part of the Obligations, without first proceeding against any other Loan Party or against any Collateral or other security for the payment or performance of any of the Obligations, and each Borrower waives any provision that might otherwise require the Agent or the Lenders under applicable law to pursue or exhaust remedies against any Collateral or other Loan Party before pursuing such Borrower or its property.  Each Borrower and Guarantor consents and agrees that neither the Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or against or in payment of any or all of the Obligations.

2.8     Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Revolving Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Revolving Lender is a Defaulting Lender:

(a)     fees shall cease to accrue on the unfunded portion of the Revolving Commitment of such Defaulting Lender pursuant to Section 3.2(a);

(b)     the Revolving Commitment and the Pro Rata Share of the then outstanding Obligations of such Defaulting Lender shall not be included in determining whether all Lenders, the Required Lenders or the Supermajority Revolving Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 11.4), provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately than other affected Lenders shall require the consent of such Defaulting Lender;

(c)     if any Letter of Credit Obligation exists at the time a Revolving Lender becomes a Defaulting Lender then:

(i)     all or any part of the Letter of Credit Obligations shall be reallocated among the Revolving Lenders (other than those that are also Defaulting Lenders) in accordance with their respective Pro Rata Share of Revolving Loans but only to the extent (x) the sum of all Revolving Lenders' (other than those that are also Defaulting Lenders) Pro Rata Share of the then outstanding Obligations consisting of Revolving Loans plus such Defaulting Lender's

Letter of Credit Obligations does not exceed the total of all Revolving Lenders' (other than those that are also Defaulting Lenders) Revolving Commitments and (y) the conditions set forth in Section 4.2 are satisfied at such time;

(ii)     if the reallocation described in clause (i) above cannot, or can only partially, be effected, Borrowers shall within three Business Days following notice by Agent, cash collateralize such Defaulting Lender's pro rata share of the Letter of Credit Obligations (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 2.3(h)(i) for so long as such Letter of Credit Obligation are outstanding;

(iii)     if Borrowers cash collateralize any portion of such Defaulting Lender's pro rata share of the Letter of Credit Obligations pursuant to Section 2.8(c), Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.2 with respect to such Defaulting Lender's Letter of Credit Obligations during the period such Defaulting Lender's pro rata share of the Letter of Credit Obligations is cash collateralized;

(iv)     if the Letter of Credit Obligations of the non-Defaulting Lenders is reallocated pursuant to Section 2.8(c), then the fees payable to the Revolving Lenders pursuant to Section 3.2 shall be adjusted in accordance with such non-Defaulting Lenders' Pro Rata Share; and

(v)     if any Defaulting Lender's Letter of Credit Obligations are neither cash collateralized nor reallocated pursuant to Section 2.8(c), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all facility fees that otherwise would have been payable to such Defaulting Lender (solely with respect to the portion of such Defaulting Lender's Revolving Commitment that was utilized by such Letter of Credit Obligations) and letter of credit fees payable under Section 3.2 with respect to such Defaulting Lender's pro rata share of the Letter of Credit Obligations shall be payable to the Issuing Bank until such pro rata share of the Letter of Credit Obligations is cash collateralized and/or reallocated;

(d)     the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Revolving Commitments of the Revolving Lenders (other than those that are also Defaulting Lenders) and/or cash collateral will be provided by Borrowers in accordance with Section 2.8(c), and participating interests in any such newly issued or increased Letters of Credit shall be allocated among Revolving Lenders (other than those that are also Defaulting Lenders) in a manner consistent with Section 2.8(c)(i) (and Defaulting Lenders shall not participate therein);

(e)     in the event and on the date that each of Agent, Borrowers and the Issuing Bank agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Letter of Credit Obligations of the other Revolving Lenders shall be readjusted to reflect the inclusion of such Revolving Lender's Revolving Commitment and on such date such Revolving Lender shall purchase at par such of the Revolving Loans and Letter of Credit Obligations of the other Revolving Lenders as Agent shall

determine may be necessary in order for such Revolving Lender to hold such Revolving Loans in accordance with its Pro Rata Share of Revolving Loans; and

(f)    Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for the Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees). Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent. Agent may hold and, in its discretion, relend to a Borrower the amount of all such payments received or retained by it for the account of such Defaulting Lender.  The operation of this Section shall not be construed to increase or otherwise affect the Revolving Commitment of any Revolving Lender, or relieve or excuse the performance by any Borrower or Guarantor of their duties and obligations hereunder.

2.9    Prepayment of Loans.

(a)    Borrowers shall have the right at any time and from time to time to prepay any Loan in whole or in part, subject to prior notice in accordance with paragraph (b) of this Section.

(b)    Administrative Borrower shall notify Agent by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a Term Benchmark Loan, not later than 11:00 a.m., New York time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Loan, not later than 11:00 a.m., New York time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Loan or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to a Loan, Agent shall advise the Lenders of the contents thereof. Each prepayment of the Revolving Loans shall be applied ratably to the Revolving Loans.  Prepayments shall be accompanied by accrued interest to the extent required by Section 3.1.

(c)    In the event that the Aggregate Revolving Exposure at any time exceeds the Borrowing Cap then in effect, the Borrowers shall, promptly after Agent's written demand, apply an amount equal to such excess first, to the prepayment of outstanding Revolving Loans and second, to the cash collateralization of the Letter of Credit Obligations as set forth in Section 2.3(h), in an amount sufficient to eliminate such excess.

(d)    All Net Cash Proceeds of ABL Priority Collateral received by a Loan Party in connection with any Asset Sales, sales excluded from the definition of "Asset Sale" pursuant to clause (ix) therein, investments, transfers or other dispositions or securitizations shall be promptly applied pursuant to this Section 2.9(d) and in no event to exceed five (5) Business Days after such Net Cash Proceeds are received. Notwithstanding anything to the contrary in this Agreement, the First Lien Credit Agreement, or any other agreement, Net Cash Proceeds of the ABL Priority Collateral shall be used for first, the prepayment of outstanding Revolving Loans and second, to the cash collateralization of the Letter of Credit Obligations as set forth in Section 2.3(h)(ii), before such proceeds can be used to make any payments due under the First Lien Credit Agreement or any other indebtedness.

95

2.10    Loans and Borrowings.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Revolving Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Revolving Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.  Each Overadvance shall be made in accordance with the procedures set forth in Section 2.2.

(b)    Subject to Section 3.4, each Borrowing shall be comprised entirely of ABR Loans or Term Benchmark Loans as the Administrative Borrower may request in accordance herewith.  Each Lender at its option may make any Term Benchmark Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan (and in the case of an Affiliate, the provisions of Sections 3.3, 3.4, 3.5 and 3.6 shall apply to such Affiliate to the same extent as to such Lender); provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)    At the commencement of each Interest Period for any Term Benchmark Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000 and not less than $3,000,000.  ABR Borrowings may be in any amount.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of 10 Term Benchmark Borrowings outstanding.

(d)    Notwithstanding any other provision of this Agreement, the Administrative Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

2.11    Requests for Borrowings.

(a)    To request a Borrowing, the Administrative Borrower shall notify the Agent of such request either in writing (delivered by hand or fax) by delivering a Borrowing Request signed by an Authorized Officer of the Administrative Borrower or through Electronic System if arrangements for doing so have been approved by the Agent not later than (a) in the case of a Term Benchmark Borrowing, 11:00 am., New York time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, 1:00 p.m., New York time, on the date of the proposed Borrowing; provided that any such notice of an ABR Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.3(e) may be given not later than 10:00 a.m., New York time, on the date of such proposed Borrowing. Each such Borrowing Request shall be irrevocable. Each such written (or if permitted, telephonic) Borrowing Request shall specify the following information:

(i)    the name of the applicable Borrower(s);

(ii)     the aggregate principal amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing;

(iii)     the date of such Borrowing, which shall be a Business Day;

(iv)     whether such Borrowing is to be an ABR Borrowing or a Term Benchmark Borrowing; and

(v)     in the case of a Term Benchmark Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period."

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Term Benchmark Borrowing, then the applicable Borrower(s) shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

2.12    <u>Interest Elections</u>.

(a)     Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Term Benchmark Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Administrative Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Term Benchmark Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Administrative Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.  This <u>Section 2.12</u> shall not apply to Overadvances, which may not be converted or continued.

(b)     To make an election pursuant to this Section, the Administrative Borrower shall notify the Agent of such election either in writing (delivered by hand or fax) by delivering an Interest Election Request signed by an Authorized Officer of the Administrative Borrower or through Electronic System if arrangements for doing so have been approved by the Agent by the time that a Borrowing Request would be required under <u>Section 2.11</u> if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable.

(c)     Each written Interest Election Request (including requests submitted through Electronic System) shall specify the following information:

(i)     the name of the applicable Borrower and the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in

which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Term Benchmark Borrowing; and

(iv)    if the resulting Borrowing is a Term Benchmark Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Term Benchmark Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request, the Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Administrative Borrower fails to deliver a timely Interest Election Request with respect to a Term Benchmark Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Agent, at the request of the Required Lenders, so notifies the Administrative Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Term Benchmark Borrowing and (ii) unless repaid, (A) each Term Benchmark Borrowing and (B) each RFR Borrowing shall be converted to an ABR Borrowing (in the case of a Term Benchmark Borrowing) at the end of the Interest Period applicable thereto or (in the case of an RFR Borrowing) on the next Interest Payment Date in respect thereof.

## SECTION 3.    INTEREST AND FEES

3.1    Interest Payments.

(a)    The Loans comprising ABR Borrowings shall bear interest at the Alternate Base Rate plus the Applicable Margin.

(b)    The Loans comprising each Term Benchmark Borrowing shall bear interest at the Adjusted Term SOFR Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)    Each RFR Loan shall bear interest at a rate per annum equal to the Adjusted Daily Simple SOFR plus the Applicable Margin.

(d)      Notwithstanding the foregoing, (i) during the occurrence and continuance of an Event of Default, the Agent or the Required Lenders may, at their option, by notice to the Administrative Borrower, declare that (A) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section and (B) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder and (ii) during the occurrence and continuance of an Event of Default described in <u>Section 10.1(a)</u>, <u>Section 10.1(g)</u> or <u>Section 10.1(h)</u>, (A) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section and (B) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder, in each case under this clause (c) without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Guarantor for the period from and after the date of the occurrence of such Event of Default and for so long as such Event of Default is continuing.

(e)      Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Revolving Commitments; <u>provided</u> that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Loan prior to the Maturity Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Term Benchmark Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(f)      All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).  In each case interest shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  All interest hereunder on any Loan shall be computed on a daily basis based upon the outstanding principal amount of such Loan as of the applicable date of determination.  The applicable Alternate Base Rate, Adjusted Term SOFR Rate, Term SOFR Rate, Adjusted Daily Simple SOFR or Daily Simple SOFR shall be determined by the Agent, and such determination shall be conclusive absent manifest error.

3.2      <u>Fees</u>.

(a)      Borrowers shall pay to Agent, for the account of Revolving Lenders, monthly an unused line fee at a rate equal to, determined on the first day of each calendar month 0.375% per annum, in each case calculated upon the amount by which the Aggregate Revolving Commitment Amounts exceeds the average daily principal balance of the outstanding Revolving Loans and Letters of Credit during the immediately preceding calendar month (or part thereof, in which case it shall be calculated on the basis of days actually elapsed during such calendar month) while this Agreement is in effect and for so long thereafter as any of the Obligations (other than indemnities and contingent Obligations which survive the termination of this Agreement and the other Financing Agreements) are outstanding, which fee shall be payable on the first day of each calendar month in arrears.  Such unused line fees shall be calculated on the

basis of a 360-day year and actual days elapsed and the obligation of Borrowers to pay such fee shall survive the termination or non-renewal of this Agreement.

(b)    In the case of all Letters of Credit, Borrowers shall pay to Agent, for the account of Revolving Lenders, a fee at a rate equal to Applicable Margin for Term Benchmark Loans (then in effect) per annum on the average daily maximum amount available to be drawn under all of such Letters of Credit for the immediately preceding calendar month (or part thereof), in which case it shall be calculated on the basis of days actually elapsed during such calendar month) payable in arrears as of the first day of each succeeding calendar month, computed for each day from the date of issuance to the date of expiration; provided that Borrowers shall pay, at Agent's option, with notice, such fee at a rate 2% greater than the otherwise applicable rate on such average daily maximum amount for:  (i) the period from and after the date of termination or non-renewal of this Agreement until Revolving Lenders have received full and final payment of all Obligations (other than contingent Obligations not yet accrued) notwithstanding entry of a judgment against any Borrower or Guarantor and (ii) the period from and after the date of the occurrence of an Event of Default for so long as such Event of Default is continuing.  Such letter of credit fees shall be calculated on the basis of a 360-day year and actual days elapsed and the obligation of Borrowers to pay such fee shall survive the termination or non-renewal of this Agreement.  In addition to the letter of credit fees provided above, Borrowers shall pay to Issuing Bank for its own account (without sharing with Lenders), a letter of credit fronting fee equal to 0.25% (on a per annum basis) calculated upon the daily outstanding balance of the Letter of Credit Obligations for the immediately preceding calendar month (or part thereof), payable in arrears as of the first day of each succeeding calendar month and negotiation fees agreed to by Borrowers and Issuing Bank from time to time and the customary charges from time to time of Issuing Bank with respect to the issuance, amendment, transfer, administration, cancellation and conversion of, and drawings under, such Letters of Credit.

(c)    Borrowers shall pay to Agent the other fees and amounts set forth in the Agent Fee Letter and the Fee Letter in the amounts and at the times specified therein.  To the extent payment in full of the applicable fee is received by Agent from Borrowers on or about the date hereof, Agent shall pay to each Lender its share of such fees in accordance with the terms of the arrangements of Agent with such Lender.

3.3    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted Term SOFR Rate) or the Issuing Bank;

(ii)    impose on any Lender or the Issuing Bank or the applicable offshore interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein; or

(iii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes covered by Section 3.5 or (B) Taxes covered in clauses (b) through (d) of the definition of Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender, the Issuing Bank or such other Recipient of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender, the Issuing Bank or such other Recipient hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to such Lender, the Issuing Bank or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, the Issuing Bank or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Lender or the Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement, the Revolving Commitments of, or the Loans made by, or participations in Letters of Credit held by, such Lender or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy and liquidity), then from time to time the Borrowers will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)    A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Agent and shall be conclusive absent manifest error.  The Borrowers shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within ten days after receipt thereof.

(d)    Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to

claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

      3.4    Alternate Rate of Interest; Illegality.

      (a)    Subject to clauses (c), (d), (e), (f) and (g) of this Section 3.4, if:

      (i)    the Agent determines (which determination shall be conclusive and binding absent manifest error) (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate or the Term SOFR Rate (including, without limitation, because the Term SOFR Reference Rate is not available or published on a current basis) for such Interest Period or (B) at any time, that adequate and reasonable means do not exist for ascertaining the applicable Adjusted Daily Simple SOFR or Daily Simple SOFR; or

      (ii)    the Agent is advised by the Required Lenders that (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, the Adjusted Term SOFR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period or (B) at any time, the Adjusted Daily Simple SOFR will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing;

then the Agent shall give notice thereof to the Administrative Borrower and the Lenders through Electronic System as provided in Section 13.3 as promptly as practicable thereafter and, until (x) the Agent notifies the Administrative Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Administrative Borrower delivers a new Interest Election Request in accordance with the terms of Section 2.12 or a new Borrowing Request in accordance with the terms of Section 2.11, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Term Benchmark Borrowing, and any Borrowing Request that requests a Term Benchmark Borrowing shall instead be deemed to be an Interest Election Request or a Borrowing Request, as applicable, for (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not also the subject of Section 3.4(a)(i) or (ii) above or (y) an ABR Borrowing if the Adjusted Daily Simple SOFR also is the subject of Section 3.4(a)(i) or (ii) above; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then all other Types of Borrowings shall be permitted.  Furthermore, if any Term Benchmark Loan or RFR Loan is outstanding on the date of the Administrative Borrower's receipt of the notice from the Agent referred to in this Section 3.4(a) with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until (x) the Agent notifies the Administrative Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Administrative Borrower delivers a new Interest Election Request in accordance with the terms of Section 2.12 or a new Borrowing Request in accordance with the terms of Section 2.11, (1) any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), be converted by the Agent to, and shall constitute, (x) an RFR Borrowing

so long as the Adjusted Daily Simple SOFR is not also the subject of Section 3.4(a)(i) or (ii) above or (y) an ABR Loan if the Adjusted Daily Simple SOFR also is the subject of Section 3.4(a)(i) or (ii) above, on such day, and (2) any RFR Loan shall on and from such day be converted by the Agent to, and shall constitute, an ABR Loan.

(b)     If any Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, fund or continue any Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR, Adjusted Daily Simple SOFR or Daily Simple SOFR, or to determine or charge interest based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR, Adjusted Daily Simple SOFR or Daily Simple SOFR, then, upon notice thereof by such Lender to the Administrative Borrower through the Agent, (i) any obligations of such Lender to make, maintain, fund or continue Term Benchmark Loans or to convert ABR Borrowings to Term Benchmark Borrowings will be suspended and (ii) the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Agent without reference to clause (c) of the definition of "Alternate Base Rate", in each case, until such Lender notifies the Agent and the Administrative Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers will upon demand from such Lender (with a copy to the Agent), either convert or prepay all Term Benchmark Borrowings of such Lender to ABR Borrowings (the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Agent without reference to clause (c) of the definition of "Alternate Base Rate"), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term Benchmark Borrowings to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans.  Upon any such conversion or prepayment, the Borrowers will also pay accrued interest on the amount so converted or prepaid, together with any additional amounts required pursuant to Section 3.7.

(c)     Notwithstanding anything to the contrary herein or in any other Financing Agreement (and any Hedge Agreement shall be deemed not to be a "Financing Agreement" for purposes of this Section 3.4, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Financing Agreement in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Financing Agreement and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Financing Agreement in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Financing Agreement so long as the Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(d)     Notwithstanding anything to the contrary herein or in any other Financing Agreement, the Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Financing Agreement, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Financing Agreement.

(e)     The Agent will promptly notify the Administrative Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and (v) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.4, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Financing Agreement, except, in each case, as expressly required pursuant to this Section 3.4.

(f)     Notwithstanding anything to the contrary herein or in any other Financing Agreement, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(g)     Upon the Administrative Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrowers may revoke any request for a Term Benchmark Borrowing of, conversion to or continuation of Term Benchmark Borrowings to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrowers will be deemed to have converted any request for a Term Benchmark Borrowing into a request for a Borrowing of or conversion to (A) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (B) an ABR Borrowing if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will

not be used in any determination of the Alternate Base Rate. Furthermore, if any Term Benchmark Loan or RFR Loan is outstanding on the date of the Administrative Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until such time as a Benchmark Replacement is implemented pursuant to this Section 3.4, (1) any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), be converted by the Agent to, and shall constitute, (x) an RFR Borrowing so long as the Adjusted Daily Simple SOFR is not the subject of a Benchmark Transition Event or (y) an ABR Loan if the Adjusted Daily Simple SOFR is the subject of a Benchmark Transition Event, on such day and (2) any RFR Loan shall on and from such day be converted by the Agent to, and shall constitute, an ABR Loan.

3.5     Withholding of Taxes; Gross-Up.

(a)     Payment Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Financing Agreement shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.5) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Agent timely reimburse it for, Other Taxes.

(c)     Evidence of Payment. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.5, such Loan Party shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(d)     Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify each Recipient, within thirty days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Administrative Borrower by a Lender (with a copy to the Agent), or

by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Agent, within ten days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.7(b) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Financing Agreement, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Agent to setoff and apply any and all amounts at any time owing to such Lender under any Financing Agreement or otherwise payable by the Agent to such Lender from any other source against any amount due to the Agent under this paragraph (e).

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Financing Agreement shall deliver to the Administrative Borrower and the Agent, at the time or times reasonably requested by the Administrative Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Administrative Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Administrative Borrower or the Agent, shall deliver such other documentation prescribed by applicable law reasonably requested by the Administrative Borrower or the Agent as will enable the Administrative Borrowers or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.5(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is a U.S. Person shall deliver to the Administrative Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Agent), an executed copy of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Agent (in such number of copies as

106

shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Financing Agreement, an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Financing Agreement, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    in the case of a Foreign Lender claiming that its extension of credit will generate U.S. effectively connected income, an executed copy of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) an executed copy of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4)    to the extent a Foreign Lender is not the beneficial owner, an executed copy of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Agent), executed copies of any other form

107

prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Administrative Borrowers or the Agent to determine the withholding or deduction required to be made; and; and

(D)    if a payment made to a LenderRecipient under any Financing Agreement would be subject to U.S. federal withholding Tax imposed by FATCA if such LenderRecipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such LenderRecipient shall deliver to the Administrative Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Administrative Borrower or the Agent as may be necessary for the Administrative Borrowers and the Agent to comply with their obligations under FATCA and to determine that such LenderRecipient has complied with such Lender'sRecipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(E) If the Agent is a U.S. Person, it shall provide the Administrative Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-9 or (B) if the Agent is not a U.S. Person, then it shall provide the Administrative Borrower with two properly completed IRS Forms W-8ECI with respect to fees received on its own behalf and any such other documentation prescribed by applicable law and reasonably requested by the Administrative Borrower that would allow the applicable Borrower to make payments to such Agent without deduction or withholding of any U.S. federal withholding Taxes. If the Agent is not a U.S. Person, such Agent shall provide the Administrative Borrower, on or prior to the date that it becomes a party to this Agreement, with two duly completed copies of IRS Form W-8IMY (or successor form) certifying that it is either (i) a "qualified intermediary" and that it assumes primary withholding responsibility under Chapters 3 and 4 of the Code and primary Form 1099 reporting and backup withholding responsibility for payments it receives for the account of others or (ii) a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of a trade or business in the United States and that it is using such form as evidence of its agreement with the Administrative Borrower to be treated as a U.S. Person with respect to such payments (and the Administrative Borrower and the Agent agree to so treat the Agent as a U.S. Person with respect to such payments as contemplated by U.S. Treasury Regulations Section 1.1441-1(b)(2)(iv)(A)), with the effect that the Administrative Borrower can make payments

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Administrative Borrower and the Agent in writing of its legal inability to do so.

(g)    Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts

pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Survival.  Each party's obligations under this Section shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Revolving Commitments and the repayment, satisfaction or discharge of all obligations under any Financing Agreement (including the Payment in Full of the Obligations).

(i)    Defined Terms.  For purposes of this Section 3.5, the term "Lender" includes the Issuing Bank.

3.6    Mitigation of Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 3.3, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.5, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.3 or 3.5, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under Section 3.3, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.5, and such Lender has declined or is unable to designate a different lending or issuing office in accordance with paragraph (a) of this Section, or if any Lender becomes a Defaulting Lender, then the Borrowers

may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 13.7), all its interests, rights (other than its existing rights to payments pursuant to Section 3.3 or 3.5) and obligations under this Agreement and other Financing Agreements to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrowers shall have received the prior written consent of the Agent (and in circumstances where its consent would be required under Section 13.7, the Issuing Bank), which consent shall not unreasonably be withheld, (ii) the Borrowers shall have paid the Agent the assignment fee (if any) specified in Section 13.7, (iii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iv) in the case of any such assignment resulting from a claim for compensation under Section 3.3 or payments required to be made pursuant to Section 3.5, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply. Each party hereto agrees that (x) an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Administrative Borrower, the Agent and the assignee, and (y) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to an be bound by the terms thereof; provided that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender, provided that any such documents shall be without recourse to or warranty by the parties thereto.

3.7    Break Funding Payments.

(a)    With respect to Loans that are not RFR Loans, in the event of (i) the payment of any principal of any Term Benchmark Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default or as a result of any prepayment pursuant to Section 2.1(d), 2.4(e) or 2.9), (ii) the conversion of any Term Benchmark Loan other than on the last day of the Interest Period applicable thereto, (iii) the failure to borrow, convert, continue or prepay any Term Benchmark Loan on the date specified in any notice delivered pursuant hereto, or (iv) the assignment of any Term Benchmark Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Administrative Borrower pursuant to Section 3.6, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 3.7(a) shall be delivered to the Administrative Borrower and shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

(b)    With respect to RFR Loans, in the event of (i) the payment of any principal of any RFR Loan other than on the Interest Payment Date applicable thereto (including

as a result of an Event of Default or as a result of any prepayment pursuant to <u>Section 2.1(d)</u>, <u>2.4(e)</u> or <u>2.9</u>), (ii) the failure to borrow or prepay any RFR Loan on the date specified in any notice delivered pursuant hereto, or (iii) the assignment of any RFR Loan other than on the Interest Payment Date applicable thereto as a result of a request by the Administrative Borrower pursuant to <u>Section 3.6</u>, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this <u>Section 3.7(b)</u> shall be delivered to the Administrative Borrower and shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

## SECTION 4.    CONDITIONS PRECEDENT

4.1    <u>Conditions Precedent to Closing Date</u>.  The effectiveness of this Agreement and the obligation of Lenders to make the initial Loans under this Agreement and of the Issuing Bank to issue Letters of Credit hereunder is subject to the satisfaction of, or waiver (in accordance with <u>Section 11.4</u>) of, each of the following conditions precedent:

(a)    <u>Loan Agreement and other Financing Agreements</u>.  The Agent (or its counsel) shall have received (i) from each party hereto a counterpart of this Agreement signed on behalf of such party (which, subject to <u>Section 13.10(b)</u>, may include any Electronic Signatures transmitted by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page), (ii) either (A) a counterpart of each other Financing Agreement signed on behalf of each party thereto or (B) written evidence satisfactory to the Agent (which may include facsimile or other electronic transmission of a signed signature page thereof) that each such party has signed a counterpart of such Financing Agreement and (iii) such other certificates, documents, instruments and agreements as the Agent shall reasonably request in connection with the transactions contemplated by this Agreement and the other Financing Agreements, all in form and substance satisfactory to the Agent and its counsel.

(b)    <u>Officer's Certificates</u>.  Agent shall have received (i) a certificate of each Loan Party (including ~~FRG~~<u>the Administrative Borrower</u>), dated as of the Closing Date and executed by its secretary, assistant secretary or other appropriate officer, which shall (ii) certify the resolutions of its board of directors, members or other governing body authorizing the execution, delivery and performance of this Agreement and the other Financing Agreements to which it is a party, (iii) identify by name and title and bear the signatures of the Authorized Officers and any other officers of such Loan Party authorized to sign the Financing Agreements to which it is a party, and (iv) contain appropriate attachments, including the certificate or articles of incorporation or formation (or equivalent constitutional documents) of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its bylaws or operating, limited liability company or partnership agreement (or equivalent governing documents), and (v) a good standing certificate or equivalent certification for each Loan Party from its jurisdiction of organization as of a recent date.

(c)    <u>Representations and Warranties</u>.  All representations and warranties contained herein and in the other Financing Agreements shall be true and correct in all material respects as of the Closing Date and after giving effect of the Transactions, except to the extent

111

that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date).

(d)    <u>Information Certificate</u>.  Agent shall have received an executed copy of the Information Certificate.

(e)    <u>Closing Certificate</u>.  Agent shall have received a duly executed certificate from an Authorized Officer of the Administrative Borrower certifying that the conditions precedent set forth in <u>clauses</u> (~~m~~l) and (~~p~~o) of this <u>Section 4.1</u> have been satisfied as of the Closing Date.

(f)    <u>Transactions</u>.  The Transactions, including the Approved Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Approved Plan, shall have been (or concurrently with the occurrence of the Closing Date, shall be) substantially consummated in accordance with applicable Law, the Bankruptcy Court, and the Bankruptcy Code.

(g)    <u>Opinions of Counsel</u>.  Agent shall have received customary written opinions of (i) Kirkland & Ellis LLP, special counsel to the Loan Parties~~, and~~ (ii) ~~[Foley & Lardner LLP]~~<span style="color:blue">Gordon Rees Scully Mansukhani LLP</span>, special Florida ~~counsel to the Loan Parties, and (iii)  [Taft Stettinius & Hollister LLP], special~~and Ohio counsel to the Loan Parties, ~~addressed,~~ in each case, to Agent, the Issuing Bank, the Lenders and the other holders of the Obligations.[9]

(h)    <u>Fees and Expenses</u>.  The Lenders and Agent shall have received all fees required to be paid, including fees payable pursuant to the Agent Fee Letter and the Fee Letter, and all costs and expenses required to be paid by the Loan Parties pursuant to <u>Section 9.22</u> for which invoices have been presented to the Administrative Borrower at least three Business Days prior to the Closing Date (including, without limitation, the reasonable fees, disbursements and other charges of Latham & Watkins LLP, counsel to Agent), on or before the Closing Date.

(i)    [Reserved].

(j)    <u>Borrowing Base Certificate</u>.  Agent shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of last Business Day of the week prior to the Closing Date.[10]

(k)    <u>Existing Debt Agreements</u>.  Agent shall have received evidence reasonably satisfactory to it that the facilities evidenced by the Existing Debt Agreements shall have been terminated and cancelled and all indebtedness thereunder shall have been fully repaid (except to the extent being so repaid with the initial Loans) and, if applicable, any and all liens thereunder shall have been terminated.

---

[9] ~~[NTD: K&E to confirm whether any of the local counsel have been contacted and to discuss generally the feasibility of getting FL and OH legal opinions prior to the targeted June 2 emergence.]~~
[10] ~~[Note to K&E: Please confirm with the Company on what they can deliver for this CP.]~~

(l)    Excess Availability.  After giving effect to the transactions contemplated to be effective on the Closing Date, both (i) Excess Availability shall be no less than $50,000,000 and (ii).the unrestricted cash and Cash Equivalents of the ~~Administrative Borrower and the~~Loan Parties and their respective operating Subsidiaries ~~of the Administrative Borrower~~ shall be no less than $35,000,000.

(m)    First Lien Credit Facility.  Agent shall have received (a) evidence reasonably satisfactory to it that substantially contemporaneously with the effectiveness of the First Lien Credit Agreement the First Lien Lenders will have been deemed to have funded to the Borrowers loan proceeds in an aggregate gross principal amount equal to $~~[    ]~~437,772,002 pursuant to the terms of the First Lien Credit Agreement  and (b) executed copies of the First Lien Credit Agreement and all material First Lien Term Loan Documents, each of which shall be in form and substance reasonably satisfactory to Agent.

(n)    Pledged Capital Stock; Stock Powers; Pledged Notes.  The First Lien Agent shall have received (i) if applicable, the certificates representing the Capital Stock pledged pursuant to the Pledge Agreement, together with an undated stock power for each such certificate executed in blank by an Authorized Officer of the pledgor thereof and (ii) each promissory note (if any) pledged to Agent pursuant to this Agreement, endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(o)    Defaults.  No Default or Event of Default shall exist or have occurred and be continuing on the Closing Date after giving effect to the Transactions.

(p)    Indebtedness.  No Loan Party shall have any outstanding Indebtedness for borrowed money other than Indebtedness permitted under Section 9.9.

(q)    "Know Your Customer"; USA PATRIOT ACT.  (i) Agent and the Lenders shall have received, at least three Business Days prior to the Closing Date, all documentation and other information regarding the Loan Parties requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT ACT, to the extent reasonably requested in writing of the Loan Parties at least ten Business Days prior to the Closing Date and (ii) to the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least three Business Days prior to the Closing Date, any Lender that has requested, a Beneficial Ownership Certification in relation to each Loan Party shall have received such Beneficial Ownership Certification.

(r)    Intercreditor Agreement.  Agent shall have received a copy of the Intercreditor Agreement, in form and substance reasonably satisfactory to Agent, executed by the First Lien Agent and the Loan Parties.

(s)    Guaranty.  Agent shall have received a Guaranty in form and substance reasonably satisfactory to Agent and executed by each of the Loan Parties.

(t)    Borrowing Notice.  Agent shall have received a Borrowing Request executed by an Authorized Officer of the Administrative Borrower in accordance with Section 2.11 with respect to any Borrowings to be made on the Closing Date.

(u)    ~~Field Exam and~~ Appraisals.  Agent and each Lender shall have received a completed ~~field exam and~~ inventory appraisal in form and substance reasonably satisfactory to the Agent each Lender (it being understood and agreed that, notwithstanding anything to the contrary herein, upon satisfaction of this clause (u), no additional ~~field exam or~~ inventory appraisal shall be required to be delivered within 90 days after the Closing Date unless Excess Availability is less than the greater of 20% of the Borrowing Cap and $30,000,000).[11]

(v)    Initial Draw.  The aggregate principal amount of Loans borrowed on the Closing Date shall not exceed $[16,000,000].

(~~vi~~w)    Total Net Debt.  After giving effect to the Transactions on the Closing Date, Total Indebtedness shall not exceed $405,000,000.

(~~vii~~)(x )    Insurance.  Agent shall have received satisfactory evidence that all insurance required to be maintained hereunder and the Financing Agreements has been obtained and is in effect and that the Agent has been named as lender loss payee and/or additional insured, as applicable, under each insurance policy with respect to such insurance as to  which the Collateral Agent shall have requested to be so named.[12]

Notwithstanding anything in this Section 4.1 to the contrary, the Borrowers shall be deemed to have made all representations and warranties herein and the other Financing Agreements on the Closing Date.

4.2    Conditions Precedent to All Loans and Letters of Credit.  The obligation of Lenders to make the Loans, or of Issuing Bank to issue any Letter of Credit, including the initial Letters of Credit, is subject to the further satisfaction of, or waiver of, immediately prior to or concurrently with the making of each such Loan or the issuance of such Letter of Credit of each of the following conditions precedent:

(a)    all representations and warranties contained herein and in the other Financing Agreements shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan or providing each such Letter of Credit and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date);

(b)    no Default or Event of Default shall exist or have occurred and be continuing on and as of the date of the making of such Loan or providing each such Letter of Credit and immediately after giving effect thereto;

(c)    [reserved]; and

---

[11] ~~NTD: to be moved to post-closing schedule.~~
[12] ~~NTD: endorsements may be post-close.~~

(d)      after giving effect to any Revolving Loan or the issuance of any Letter of Credit, (i) Excess Availability is not less than zero and (ii) the Borrowers shall be in compliance with the Revolving Exposure Limitations.

Each Loan made after the Closing Date and each issuance, increase or extension (other than automatic extensions of evergreen Letters of Credit) of a Letter of Credit shall be deemed to constitute a representation and warranty by Borrowers on the date thereof as to the matters specified in paragraphs (a), (b), (c) and (d) of this Section.

**SECTION 5.      GRANT AND PERFECTION OF SECURITY INTEREST**

5.1      Grant of Security Interest.   To secure payment and performance in full of the Obligations, each Borrower and Guarantor hereby grants to Agent, together with its permitted successors and assigns, for the benefit of the Secured Parties, a security interest in all of its right, title and interest in, to and under any and all of the following assets now owned or existing or at any time hereafter arising or acquired by such Borrower or Guarantor or in which such Borrower or Guarantor now has or at any time in the future may acquire any right, title or interest, regardless of where located (but in all cases excluding any Excluded Assets) (together with all other collateral security for the Obligations at any time granted to or held or acquired by Agent or any Secured Party, collectively, the "Collateral"), including:

(a)      all Accounts;

(b)      all Chattel Paper;

(c)      all Deposit Accounts;

(d)      all Documents;

(e)      all Equipment;

(f)      all General Intangibles, including all Intellectual Property and all rights to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation or other violation or impairment of any such Intellectual Property, and all Proceeds of such Intellectual Property, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto;

(g)      all Instruments and Promissory nNotes;

(h)      all Inventory;

(i)      all other Goods;

(j)      all Investment Property;

(k)      all Letter-of-Credit Rights;

(l)      all cash and Moneys;

(m)    all Securities Accounts;

(n)    all Commercial Tort Claims specifically described on Schedule 5.2(g) hereto, as such schedule may be supplemented from time to time;

(o)    all books and records pertaining to the Article 9 Collateral; and

(p)    to the extent not otherwise included, all Proceeds, substitutions, replacements and products of any and all of the foregoing and all Supporting Obligations, collateral security and guarantees given by any Person with respect to any of the foregoing.

It is understood that Collateral shall not include any Excluded Asset; provided, however, that Collateral shall include any Proceeds, substitutions or replacements of any of the foregoing (unless such Proceeds, substitutions or replacements would constitute an Excluded Asset).

5.2    Perfection of Security Interests.

(a)    Each Borrower and Guarantor irrevocably and unconditionally authorizes Agent (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming Agent or its designee as the secured party and such Borrower or Guarantor as debtor, as Agent may reasonably require, and including any other information with respect to such Borrower or Guarantor or otherwise required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction, as Agent may reasonably determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the date hereof. Any such financing statements may indicate the Collateral as (i) all assets of the debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (ii) by any other description which reasonably approximates the description contained herein. Each Borrower and Guarantor hereby ratifies and approves all financing statements naming Agent or its designee as secured party and such Borrower or Guarantor, as the case may be, as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of Agent prior to the date hereof and ratifies and confirms the authorization of Agent to file such financing statements (and amendments, if any). Each Borrower and Guarantor hereby authorizes Agent to adopt on behalf of such Borrower and Guarantor any symbol required for authenticating any electronic filing. In the event that the description of the collateral in any financing statement naming Agent or its designee as the secured party and any Borrower or Guarantor as debtor includes assets and properties of such Borrower or Guarantor that do not at any time constitute Collateral, whether hereunder, under any of the other Financing Agreements or otherwise, the filing of such financing statement shall nonetheless be deemed authorized by such Borrower or Guarantor to the extent of the Collateral included in such description and it shall not render the financing statement ineffective as to any of the Collateral or otherwise affect the financing statement as it applies to any of the Collateral, provided, that, the inclusion of the description of assets and properties of such Borrower or Guarantor that do not constitute Collateral in any financing statement shall not be deemed a grant of a security interest in such asset of such Borrower or Guarantor in favor of Agent and Secured Parties. In no event shall any Borrower or Guarantor at any time file, or permit or cause to be filed, any correction statement or termination statement

with respect to any financing statement (or amendment ~~or continuation~~ with respect thereto) naming Agent or its designee as secured party and such Borrower or Guarantor as debtor without the prior written consent of Agent.  Each Borrower and Guarantor acknowledges that it is not authorized to file any financing statement, amendment, termination statement or correction statement with respect to any financing statement without the prior written consent of Agent.

(b)    Each Borrower and Guarantor does not have any Chattel Paper (whether tangible or electronic) or Instruments as of the Closing Date, in each case with an individual face amount in excess of $2,500,000, except as set forth in the Information Certificate.  In the event that any Borrower or Guarantor shall be entitled to or shall receive any Chattel Paper or Instrument after the date hereof with an individual face amount in excess of $2,500,000, such Borrower or Guarantor shall promptly notify Agent thereof in writing.  Promptly upon the receipt thereof by or on behalf of any Borrower or Guarantor (including by any agent or representative), such Borrower or Guarantor shall deliver, or cause to be delivered to Agent, all such tangible Chattel Paper and Instruments that such Borrower or Guarantor has or may at any time acquire, accompanied by such instruments of transfer or assignment duly executed in blank as Agent may from time to time specify, in each case except as Agent may otherwise agree.

(c)    In the event that any Borrower or Guarantor shall at any time hold or acquire an interest in any electronic Chattel Paper or any "transferable record" (as such term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, or any similar or successor act, law or statute) with an individual face amount in excess of $2,500,000, such Borrower or Guarantor shall promptly notify Agent thereof in writing.  Promptly upon Agent's request, such Borrower or Guarantor shall take, or cause to be taken, such actions as Agent may request to give Agent control of such electronic Chattel Paper under Section 9-105 of the UCC and control of such transferable record under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction, or any similar or successor act, law or statute.

(d)    Each Borrower and Guarantor does not have any Deposit Accounts as of the Closing Date, except (x) Store Accounts or (y) as set forth in the Information Certificate.  Borrowers and Guarantors shall not, directly or indirectly, after the date hereof open, establish or maintain any Deposit Account unless each of the following conditions is satisfied:  (i) Agent shall have received prompt written notice of the intention of any Borrower or Guarantor to open or establish such account which notice shall specify in reasonable detail and specificity reasonably acceptable to Agent the name of the account, the owner of the account, the name and address of the bank at which such account is to be opened or established, the individual at such bank with whom such Borrower or Guarantor is dealing and the purpose of the account and (ii) within thirty (30) Business Days after the opening of such Deposit Account (or such later date as Agent may agree), such Borrower or Guarantor shall as Agent may reasonably specify either (A) deliver to Agent a Deposit Account Control Agreement with respect to such Deposit Account duly authorized, executed and delivered by such Borrower or Guarantor and the bank at which such Deposit Account is opened and maintained or (B) arrange for Agent to become the customer of the bank with respect to the Deposit Account on terms and conditions reasonably acceptable to Agent; provided, that to the extent a Deposit Account Control Agreement has not

been delivered to Agent as of the Closing Date for any Deposit Account in existence at such time, Borrowers shall deliver a Deposit Account Control Agreement for such Deposit Account pursuant to Section 9.31. The terms of this subsection (d) shall not apply to Excluded Accounts. Agent shall not exercise exclusive control over any Deposit Account until an Event of Default has occurred or a Compliance Period has commenced, and thereafter for only so long as it is continuing; and Agent shall cease to exercise exclusive control over any Deposit Accounts at such time as no Event of Default and no Compliance Period is then continuing.

(e)    No Borrower or Guarantor owns or holds, directly or indirectly, beneficially or as record owner or both, any Investment Property, as of the Closing Date, with an individual face amount in excess of $2,500,000, or have any investment account, Securities account, commodity account or other similar account with any bank or other financial institution or other securities intermediary or commodity intermediary as of the Closing Date, in each case except as set forth in the Information Certificate.  Such Borrower or Guarantor shall promptly, upon Agent's reasonable request, cause Agent to obtain "control" (within the meaning of Section 8-106 or 9-106, as applicable, of the UCC) of such Investment Property or, if applicable, comply with Section 5.2(e)(ii) with respect thereto.

(i)    In the event that any Borrower or Guarantor shall be entitled to or shall at any time after the date hereof hold or acquire any certificated Securities, with an individual fair market value in excess of $2,500,000, such Borrower or Guarantor shall promptly endorse, assign and deliver the same to Agent, accompanied by such instruments of transfer or assignment duly executed in blank as Agent may from time to time specify.  If any Securities, now or hereafter acquired by any Borrower or Guarantor are uncertificated and are issued to such Borrower or Guarantor or its nominee directly by the issuer thereof, and such Securities with an individual fair market value in excess of $2,500,000, such Borrower or Guarantor shall immediately notify Agent thereof and shall as Agent may reasonably specify, either (A) cause the issuer to agree to comply with instructions from Agent as to such Securities, without further consent of any Borrower or Guarantor or such nominee (it being understood that Agent shall not give any such issuer any such instructions unless an Event of Default has occurred and is continuing), or (B) arrange for Agent to become the registered owner of the Securities.

(ii)    Borrowers and Guarantors shall not, directly or indirectly, after the date hereof open, establish or maintain any investment account, securities account, commodity account or any other similar account (other than a Deposit Account) with any securities intermediary or commodity intermediary unless each of the following conditions is satisfied:  (A) Agent shall have received not less than five Business Days' prior written notice of the intention of such Borrower or Guarantor to open or establish such account which notice shall specify in reasonable detail and specificity reasonably acceptable to Agent the name of the account, the owner of the account, the name and address of the securities intermediary or commodity intermediary at which such account is to be opened or established, the individual at such intermediary with whom such Borrower or Guarantor is dealing and the purpose of the account, (B) the securities intermediary or commodity intermediary (as the case may be) where such account is opened or maintained shall be acceptable to Agent, and (C) within fifteen (15) Business Days after the opening of such investment account, securities account or other similar account with a securities intermediary or commodity intermediary, such Borrower or Guarantor shall as Agent may specify either (1) execute and deliver, and cause to be executed and delivered

118

to Agent, an Investment Property Control Agreement with respect thereto duly authorized, executed and delivered by such Borrower or Guarantor and such securities intermediary or commodity intermediary or (2) arrange for Agent to become the entitlement holder with respect to such Investment Property on terms and conditions reasonably acceptable to Agent; provided, that to the extent an Investment Property Control Agreement has not been delivered to Agent as of the Closing Date for any investment account, securities account or other similar account with a securities intermediary or commodity intermediary in existence at such time, Borrowers shall deliver an Investment Property Control Agreement pursuant to Section 9.31.  Agent shall not exercise exclusive control over any investment account, securities account, commodity account or other similar account (other than any Deposit Accounts which shall be governed by Section 5.2(d) above) unless an Event of Default has occurred or a Compliance Period has commenced, and thereafter for only so long as it is continuing; and Agent shall cease to exercise exclusive control over any investment account, securities account, commodity account or other similar account at such time as no Event of Default and no Compliance Period is then continuing.

(f)     Borrowers and Guarantors are not the beneficiary or otherwise entitled to any right to payment under any letter of credit, banker's acceptance or similar instrument as of the Closing Date, in each case with an individual face amount in excess of $2,500,000, except as set forth in the Information Certificate.  In the event that any Borrower or Guarantor shall be entitled to or shall receive any right to payment under any letter of credit, banker's acceptance or any similar instrument, whether as beneficiary thereof or otherwise after the date hereof, with an individual face amount in excess of $2,500,000, such Borrower or Guarantor shall promptly notify Agent thereof in writing.  Such Borrower or Guarantor shall promptly, as Agent may reasonably specify, either (i) deliver, or cause to be delivered to Agent, with respect to any such letter of credit, banker's acceptance or similar instrument, the written agreement of the issuer and any other nominated Person obligated to make any payment in respect thereof (including any confirming or negotiating bank), in form and substance reasonably satisfactory to Agent, consenting to the assignment of the proceeds of the letter of credit to Agent by such Borrower or Guarantor and agreeing to make all payments thereon directly to Agent or as Agent may otherwise direct upon the occurrence and during the continuance of an Event of Default or (ii) cause Agent to become, at Borrowers' expense, the transferee beneficiary of the letter of credit, banker's acceptance or similar instrument (as the case may be) upon the occurrence and during the continuance of an Event of Default).

(g)     Except as set forth in Schedule 5.2(g) hereto, on the date hereof, Borrowers and Guarantors do not hold any commercial tort claims seeking damages in an amount reasonably estimated to exceed $2,500,000 (as determined by the Administrative Borrower in good faith) and either a written demand therefor has been made or legal action has commenced.  In the event that any Borrower or Guarantor shall at any time after the date hereof hold or acquire any commercial tort claims seeking damages in an amount reasonably estimated to exceed $2,500,000 (as determined by the Administrative Borrower in good faith) and either a written demand therefor has been made or legal action has commenced, or if any Event of Default exists, upon Agent's request, such Borrower or Guarantor shall promptly notify Agent thereof in writing, which notice shall (i) set forth in reasonable detail the basis for and nature of such commercial tort claim and (ii) include the express grant by such Borrower or Guarantor to Agent of a security interest in such commercial tort claim (and the proceeds thereof).  In the

event that such notice does not include such grant of a security interest, the sending thereof by such Borrower or Guarantor to Agent shall be deemed to constitute such grant to Agent. Upon the sending of such notice, any commercial tort claim described therein shall constitute part of the Collateral and shall be deemed included therein, and Schedule 5.2(g) hereto shall be deemed to be supplemented to include such description of such commercial tort claim as set forth in such notice. Without limiting the authorization of Agent provided in Section 5.2(a) hereof or otherwise arising by the execution by such Borrower or Guarantor of this Agreement or any of the other Financing Agreements, Agent is hereby irrevocably authorized from time to time and at any time to file such financing statements naming Agent or its designee as secured party and such Borrower or Guarantor as debtor, or any amendments to any financing statements, covering any such commercial tort claim as Collateral. In addition, each Borrower and Guarantor shall promptly upon Agent's reasonable request, execute and deliver, or cause to be executed and delivered, to Agent such other agreements, documents and instruments as Agent may require in connection with such commercial tort claim.

(h)    Borrowers and Guarantors do not have any Goods, documents of title or other Collateral in the custody, control or possession of a third party as of the Closing Date, except as set forth in the Information Certificate and except for Goods located in the United States in transit to a location of a Borrower or Guarantor permitted herein in the ordinary course of business of such Borrower or Guarantor in the possession of any carrier transporting such Goods. In the event that any Goods covered by documents of title or other Collateral with a fair market value in excess of $2,500,000 are at any time after the date hereof in the custody, control or possession of any other Person not referred to in the Information Certificate or such carriers, Borrowers and Guarantors shall promptly notify Agent thereof in writing. Promptly upon Agent's reasonable request, Borrowers and Guarantors shall use commercially reasonable efforts to deliver to Agent a Collateral Access Agreement, subject to Section 9.31 hereof, duly authorized, executed and delivered by such Person and the Administrative Borrower or Guarantor that is the owner of such Collateral, except where the fair market value of the Collateral involved is less than $2,500,000 so long as the aggregate Value of all Collateral located at such locations without a Collateral Access Agreement shall not exceed $5,000,000.

(i)    Except as otherwise determined in a Borrower's or Guarantor's reasonable business judgment, each Borrower and Guarantor will use commercially reasonable efforts to maintain the Intellectual Property owned by it, defend the Intellectual Property against the claims of all persons, and will maintain and renew all registrations of the Intellectual Property, if applicable; provided, that, Borrowers and Guarantors shall not be required to maintain, defend or renew any Intellectual Property where the failure to do so would not reasonably be expected to have a Material Adverse Effect or where such Intellectual Property has no material economic value. If, before the Obligations have been satisfied in full and the Financing Agreements have been terminated, any Borrower or Guarantor shall obtain or acquire any new ~~trademark~~Intellectual Property issuance or registration or file or acquire any new ~~trademark~~Intellectual Property application (excluding any "intent-to-use" trademark applications), Administrative Borrower shall give Agent notice thereof in the compliance certificate delivered to Agent pursuant to Section 9.6(a)(i) hereof. Together with the delivery of each such compliance certificate (or such longer period as the Agent may agree in its sole discretion), each applicable Borrower or Guarantor will sign and deliver to the Agent an appropriate intellectual property security agreement, substantially in the form set forth on Exhibit

I, covering any such recordable Intellectual Property owned by it that, in each case, is not covered by any then-effective intellectual property security agreement.

(j)     Subject to Section 9.2 hereof, it is understood that Borrowers and Guarantors are not required by this Agreement to better assure, preserve, protect or perfect the security interest created hereunder by any means other than (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that any Borrower's or Guarantor's signature thereon is required therefor, (ii) upon Agent's request after the occurrence and during the continuance of an Event of Default, causing Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of Agent to enforce, the security interest of Agent in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Agent to enforce, the security interest of Agent in such Collateral, (iv) obtaining the required consents and approvals of any Governmental Authority or third party, including, any consent of any licensor, lessor or other Person obligated on Collateral, and taking all actions required by other law, as applicable in any relevant jurisdiction and (v) other actions reasonably requested by Agent from time to time to cause the attachment, perfection and first priority of, and the ability of Agent to enforce, the security interest of Agent in any and all of the Collateral, to the extent required by Section 5 or Section 9 hereunder or otherwise expressly provided under this Agreement. No Borrower or Guarantor shall be required to complete any filings or other action with respect to the better assurance, preservation, protection or perfection of the security interests created hereby in any jurisdiction outside of the United States.

(k)     The security interests granted pursuant to this Section 5 are granted as security only and shall not subject the Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Borrower or Guarantor with respect to or arising out of the Collateral.

## SECTION 6.     COLLECTION AND ADMINISTRATION

6.1     Borrowers' Loan Accounts.  Agent shall maintain one or more loan account(s) on its books in which shall be recorded (a) all Loans, Letters of Credit and other Obligations and the Collateral, (b) all payments made by or on behalf of any Borrower or Guarantor and (c) all other appropriate debits and credits as provided in this Agreement, including fees, charges, costs, expenses and interest.  All entries in the loan account(s) shall be made in accordance with Agent's customary practices as in effect from time to time and shall be deemed conclusive absent manifest error or omissions.

6.2     Statements.  Agent may from time to time provide the Borrowers with account statements or invoices with respect to any of the Obligations (the "Statements").  Agent is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrowers' convenience.  Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Obligations.  If the Borrowers pay the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrowers shall not be in default of payment with respect to the billing period indicated on such

Statement; provided, that acceptance by Agent, on behalf of the Lenders, of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of Agent's or the Lenders' right to receive payment in full at another time.

6.3    Collection of Accounts.

(a)    Each Borrower and Guarantor shall establish and maintain, at its expense, deposit account arrangements and merchant payment arrangements with the banks set forth on Schedule 8.10 hereto and subject to Section 5.2(d) hereof such other banks as such Borrower or Guarantor may hereafter select.  The banks set forth on Schedule 8.10 hereto constitute all of the banks with which Borrowers and Guarantors have deposit account arrangements and merchant payment arrangements as of the Closing Date, as applicable, and identifies each of the Deposit Accounts at such banks that are used solely for receiving store receipts from a retail store location of a Borrower or a Guarantor [or any store owned or leased and operated by a Dealer] (together with any other Deposit Accounts at any time established or used by any Borrower or Guarantor for receiving such store receipts from any retail store location, collectively, the "Store Accounts" and each individually, a "Store Account") or otherwise describes the nature of the use of such Deposit Account by such Borrower or Guarantor. [13]

(i)    Each Borrower and Guarantor shall deposit all proceeds from sales of Inventory in every form, including, without limitation, cash, checks, credit card sales drafts, credit card sales or charge slips or receipts and other forms of daily store receipts, from each retail store location of such Borrower or Guarantor into the Store Account of such Borrower or Guarantor used solely for such purpose in accordance with the current and prior practices of such Borrower, but in any event no less frequently than once every three Business Days; provided that each retail store of a Borrower or Guarantor may retain in such store funds of up to $40,000 immediately after each deposit of funds from such store into the applicable Store Account.  All such funds deposited into the Store Accounts shall be sent by wire transfer or other electronic funds transfer on each Business Day to the Blocked Accounts as provided in Section 6.3(a)(ii) below, except for (A) nominal amounts which are required to be maintained in such Store Accounts under the terms of such Borrower's or Guarantor's arrangements with the bank at which such Store Accounts are maintained, (B) [reserved] or (C) with respect to funds deposited in Manual Sweeping Accounts, which shall be sent to the Blocked Accounts not less than twice every month (and which amounts, together with all amounts held at the retail store locations and not yet deposited in the Store Accounts and amounts in Store Accounts, shall not in the aggregate exceed $2,500,000[14] at any one time, except (1) to the extent from time to time additional amounts may be held in the retail stores or the Store Accounts on Saturday, Sunday or other days where the applicable depository bank is closed, which additional amounts are to be, and shall be, transferred on the next Business Day to the Blocked Accounts, and (2) except as Agent may otherwise agree.

(ii)    Each Borrower and Guarantor shall establish and maintain, at its expense, Deposit Accounts with such banks as are reasonably acceptable to Agent (the "Blocked

---

[13] [Note to K&E: Please confirm if this decrease from $5mm to $2.5mm would work for the Company.]
[14] [Note to K&E: Please confirm if this works for the Company operationally.]

Accounts") into which each Borrower and Guarantor shall promptly either cause all amounts on deposit in the Store Accounts of such Borrower or Guarantor to be sent as provided in Section 6.3(a)(i) above or shall itself deposit or cause to be deposited all proceeds of Collateral, including all proceeds from sales of Inventory, all amounts payable to each Borrower and Guarantor from Credit Card Issuers and Credit Card Processors, and all other proceeds of Collateral. Subject to Section 9.26, any Eligible Depository Bank shall be deemed acceptable to Agent.

(iii)    Borrowers and Guarantors shall deliver, or cause to be delivered to Agent a Deposit Account Control Agreement duly authorized, executed and delivered by each bank where a Blocked Account is maintained as provided in Section 5.2 hereof. Without limiting any other rights or remedies of Agent or Lenders, Agent may, at its option, and shall (at the direction of Required Lenders), instruct the depository banks at which the Blocked Accounts are maintained to transfer all available funds received or deposited into the Blocked Accounts to the Agent Payment Account at any time that an Event of Default is continuing or a Compliance Period is continuing and Agent shall send to Administrative Borrower a copy of any such written instruction sent by Agent to the depository bank promptly thereafter. At all times that Agent shall have notified any depository bank to transfer funds from a Blocked Account to the Agent Payment Account, all payments made to such Blocked Accounts, whether in respect of the Receivables, as proceeds of Inventory or other Collateral or otherwise shall be treated as payments to Agent in respect of the Obligations and therefore shall constitute the property of Agent and Lenders to the extent of the then outstanding Obligations.

(b)    Borrowers shall make each payment or prepayment required to be made by them hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Sections 3.3, 3.5 or 3.7, or otherwise) prior to 2:00 p.m., New York time, on the date when due or the date fixed for any prepayment hereunder, in immediately available funds, without setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to Agent in the Agent Payment Account, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to Sections 3.3, 3.5, 3.7 and 9.22 shall be made directly to the Persons entitled thereto. Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(c)    Upon the occurrence and during the continuance of an Event of Default or upon the commencement of any Compliance Period and during any Compliance Period, each Borrower and Guarantor and their respective employees, agents and Subsidiaries or other Affiliates shall receive and promptly remit to Agent, as the property of Agent, any monies, checks, notes, drafts or any other payment relating to and/or proceeds of Accounts or other Collateral which come into their possession or under their control and promptly upon receipt thereof, shall deposit or cause the same to be deposited in the Blocked Accounts, or remit the

same or cause the same to be remitted, in kind, to Agent. In no event shall the same be commingled with any Borrower's or Guarantor's own funds. ~~Borrowers~~The Loan Parties agree to reimburse Agent on demand for any amounts owed or paid to any bank or other financial institution at which a Blocked Account or any other Deposit Account or investment account is established or any other bank, financial institution or other Person involved in the transfer of funds to or from the Blocked Accounts arising out of Agent's payments to or indemnification of such bank, financial institution or other Person. The obligations of Borrowers to reimburse Agent for such amounts pursuant to this <u>Section 6.3</u> shall survive the termination or non-renewal of this Agreement.

6.4    <u>Payments</u>.

(a)    All Obligations shall be payable to the Agent Payment Account as provided in <u>Section 6.3</u> or such other place as Agent may designate from time to time. Agent shall apply payments received or collected from any Borrower or Guarantor or for the account of any Borrower or Guarantor (including the monetary proceeds of collections or of realization upon any Collateral) as follows, with respect to any payments received or collected from any Loan Party:

(i)    <u>first</u>, to pay any fees, indemnities or expense reimbursements then due to Agent from any Loan Party;

(ii)    <u>second</u>, to pay any fees, indemnities, or expense reimbursements then due to Lenders from any Loan Party;

(iii)    <u>third</u>, to pay interest due in respect of any Loans owing by any Loan Party (and including any Special Agent Advances owing by any Loan Party);

(iv)    <u>fourth</u>, to pay or prepay principal in respect of Special Agent Advances owing by any Loan Party;

(v)    <u>fifth</u>, to pay or prepay principal in respect of the Loans owing by any Loan Party and to pay or prepay Hedge Obligations and Obligations arising under or pursuant to any Bank Products, in each case, of any Loan Party or any Subsidiary thereof then due (up to the amount of any then effective Reserve established in respect of such Obligations), on a pro rata basis;

(vi)    <u>sixth</u>, to pay or prepay any other Obligations of any Loan Party whether or not then due, in such order and manner as Agent determines or, at any time that an Event of Default has occurred and is continuing, to be held as cash collateral in connection with any Letter of Credit Obligations of any Loan Party (or any other Letter of Credit Obligations utilizing the Borrowing Base) or other contingent Obligations of any Loan Party (but not including for this purpose any such other contingent Obligations arising under or pursuant to any Bank Products); and

(vii)    <u>seventh</u>, at any time that an Event of Default has occurred and is continuing, to pay or prepay any Obligations of any Loan Party or any Subsidiary thereof arising

under or pursuant to any Bank Products (other than to the extent provided for above) on a pro rata basis.

Notwithstanding anything to the contrary contained in this Agreement, (A) [reserved] (B) unless so directed by Administrative Borrower or if an Event of Default exists, Agent shall not apply so any payments which it receives to any Loans that are Term Benchmark Loans except on the expiration date of the Interest Period applicable to any such Loans that are Term Benchmark Loans and if payments are received or collected from Borrowers that otherwise would be applied to Term Benchmark Loans, provided no Event of Default or Compliance Period exists, Administrative Borrower may instruct Agent to remit such funds to Administrative Borrower, otherwise, such payments shall be held by Agent and shall bear interest at the NYFRB Rate per annum commencing on the second Business Day following the date such payments are received or collected from Borrowers and continuing through the date such payments are applied to the Obligations, which shall be upon the expiration of the first Interest Period after receipt or collection of such payments, to the extent of the principal amount of the applicable Term Benchmark Loan or otherwise, in Agent's sole discretion, remitted to Administrative Borrower and (C) to the extent any Borrower uses any proceeds of the Loans or Letters of Credit to acquire rights in or the use of any Collateral or to repay any Indebtedness used to acquire rights in or the use of any Collateral, payments in respect of the Obligations shall be deemed applied first to the Obligations arising from Loans and Letter of Credit Obligations that were not used for such purposes and second to the Obligations arising from Loans and Letter of Credit Obligations the proceeds of which were used to acquire rights in or the use of any Collateral in the chronological order in which such Borrower acquired such rights in or the use of such Collateral. Notwithstanding the foregoing, amounts received from any Borrower or any Guarantor that is not an ECP shall not be applied to any Excluded Hedge Obligations.

(b)     During the continuance of an Event of Default, at the election of Agent, all payments of principal, interest, LC Disbursements, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 9.22), and other sums payable under the Financing Agreements, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Administrative Borrower pursuant to Section 2.11 or a deemed request as provided in this Section or may be deducted from any deposit account of any Borrower maintained with Agent.  The Borrowers hereby irrevocably authorize, during the continuance of an Event of Default, (i) Agent to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Financing Agreements and agrees that all such amounts charged shall constitute Loans (including Overadvances) and that all such Borrowings shall be deemed to have been requested pursuant to Section 2.11 and (ii) Agent to charge any deposit account of any Borrower maintained with Agent for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Financing Agreements.

(c)     Unless Agent shall have received, prior to any date on which any payment is due to Agent for the account of the Lenders or the Issuing Bank pursuant to the terms hereof or any other Financing Agreement, notice from the Administrative Borrower that the Borrowers will not make such payment, Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrowers

have not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it but excluding the date of payment to Agent, at the greater of the NYFRB Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation.

(d)     Borrowers shall make all payments to Agent and Lenders on the Obligations free and clear of, and without deduction or withholding for or on account of, any setoff, counterclaim, defense, restrictions or conditions of any kind.  If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Agent, any Lender or Issuing Bank is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by Agent or such Lender.  Borrowers and Guarantors shall be liable to pay to Agent and Lenders, and do hereby indemnify and hold Agent and Lenders harmless for the amount of any payments or proceeds so surrendered or returned and to the extent thereof.  This Section 6.4(d) shall remain effective notwithstanding any contrary action which may be taken by Agent or any Lender in reliance upon such payment or proceeds.  This Section 6.4 shall survive the payment of the Obligations and the termination of this Agreement.

6.5     [Reserved].

6.6     Authorization to Make Loans.  Agent and Lenders are authorized to make the Loans and Issuing Bank is authorized to issue Letters of Credit based upon telephonic or other instructions received from anyone purporting to be an Authorized Officer of Administrative Borrower or any Borrower or other authorized Person or, at the discretion of Agent, if such Loans are necessary to satisfy any Obligations; provided, that, Agent and Lenders shall direct the Loans only into those accounts of Borrowers authorized in writing by an Authorized Officer.  The foregoing sentence notwithstanding, if Agent or a Lender makes a Loan into an account of any Borrower designated by a Person who no longer is an Authorized Officer and Agent did not receive prior written notice that such Person is no longer an Authorized Officer, such Loan will still be considered an Obligation hereunder.  All Loans and Letters of Credit under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, any Borrower or Guarantor when deposited to the credit of any Borrower or Guarantor or otherwise disbursed or established in accordance with the instructions of any Borrower or Guarantor or in accordance with the terms and conditions of this Agreement.

6.7     Use of Proceeds.

(a)     Borrowers shall use the initial proceeds of the Revolving Loans and Letters of Credit hereunder only for costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Financing Agreements and consummation of any other permitted transactions contemplated hereby which will take place on or about the date hereof and costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Financing Agreements.  All

other Revolving Loans made or Letters of Credit provided to or for the benefit of any Borrower pursuant to the provisions hereof shall be used by such Borrower only to finance Permitted Acquisitions and for general operating, working capital and other proper corporate purposes of such Borrower (including the intercompany funding of Borrowers and Guarantors) not otherwise prohibited by the terms hereof. None of the proceeds of any Loans or Letters of Credit will be used, directly or indirectly, for the purpose of purchasing or carrying any margin security or for the purposes of reducing or retiring any Indebtedness which was originally incurred to purchase or carry any margin security or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation U of the Federal Reserve Board, as amended.

(b)     No Borrower will request any Loan or Letter of Credit, and no Borrower or Guarantor shall use, and each Borrower and Guarantor shall procure that its Subsidiaries and its and their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or Letter of Credit (i) directly or, to the Knowledge of such Borrower or Guarantor, indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent that such activities, businesses or transaction would be prohibited by applicable Sanctions, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

6.8     Appointment of Administrative Borrower as Agent for Requesting Loans and Receipts of Loans and Statements.

(a)     Each Borrower hereby irrevocably appoints ~~FRG~~Fusion Buyer as Administrative Borrower and, as such, constitutes Administrative Borrower as its agent and attorney-in-fact to request and receive Loans and Letters of Credit pursuant to this Agreement and the other Financing Agreements from Agent or any Lender in the name or on behalf of such Borrower.  Agent and Lenders may disburse the Loans to such bank account of Administrative Borrower or a Borrower or otherwise make such Loans to a Borrower and provide such Letter of Credit to a Borrower as Administrative Borrower may designate or direct, without notice to any other Borrower or Guarantor.  Notwithstanding anything to the contrary contained herein, Agent may at any time and from time to time require that Loans to or for the account of any Borrower be disbursed directly to an operating account of such Borrower.

(b)     Administrative Borrower hereby accepts the appointment by Borrowers to act as the agent and attorney-in-fact of Borrowers pursuant to this Section 6.8.  Administrative Borrower shall have and may exercise such powers under the Financing Agreements as are specifically delegated to Administrative Borrower by the terms of each thereof, including, but not limited to ensuring that the disbursement of any Loans to each Borrower requested by or paid to or for the account of a Borrower, or the issuance of any Letter of Credit for a Borrower hereunder, shall be paid to or for the account of such Borrower, together with such powers as are reasonably incidental thereto.

(c)    Each Borrower and other Guarantor hereby irrevocably appoints and constitutes Administrative Borrower as its agent to receive statements on account and all other notices from Agent and Lenders with respect to the Obligations or otherwise under or in connection with this Agreement and the other Financing Agreements.

(d)    Any notice, election, representation, warranty, agreement or undertaking by or on behalf of any other Borrower or any Guarantor by Administrative Borrower shall be deemed for all purposes to have been made by such Borrower or Guarantor, as the case may be, and shall be binding upon and enforceable against such Borrower or Guarantor to the same extent as if made directly by such Borrower or Guarantor.

(e)    The Administrative Borrower may execute any of its duties as the Administrative Borrower hereunder and under any other Financing Agreements by or through Authorized Officers.

(f)    No purported termination of the appointment of Administrative Borrower as agent as aforesaid shall be effective, except after ten days' prior written notice to Agent.

6.9    Pro Rata Treatment.  Except to the extent otherwise provided in this Agreement or as otherwise agreed by Lenders:  (a) the making and conversion of Revolving Loans shall be made among the Revolving Lenders based on their respective Pro Rata Shares as to the Revolving Loans and (b) each payment on account of any Obligations to or for the account of one or more of Lenders in respect of any Obligations due on a particular day shall be allocated among the Lenders entitled to such payments based on their respective Pro Rata Shares of such Loans, as applicable, and shall be distributed accordingly.

6.10    Sharing of Payments, Etc.

(a)    Each Borrower and Guarantor agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim Agent or any Lender may otherwise have, each Lender shall be entitled, at its option (but subject, as among Agent and Lenders, to the provisions of Section 12.3(b) hereof), to offset balances held by it for the account of such Borrower or Guarantor at any of its offices, in dollars or in any other currency, against any principal of or interest on any Loans owed to such Lender or any other amount payable to such Lender hereunder, that is not paid when due (regardless of whether such balances are then due to such Borrower or Guarantor), in which case it shall promptly notify Administrative Borrower and Agent thereof; provided, that, such Lender's failure to give such notice shall not affect the validity thereof.

(b)    If, except as otherwise expressly provided herein, any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other similarly situated Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments

shall be shared by all such Lenders ratably in accordance with their respective Pro Rata Shares; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered,  such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrowers or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

(c)     Each Borrower and Guarantor agrees that any Lender purchasing a participation (or direct interest) as provided in this Section may exercise, in a manner consistent with this Section, all rights of setoff, banker's lien, counterclaim or similar rights with respect to such participation as fully as if such Lender were a direct holder of Loans or other amounts (as the case may be) owing to such Lender in the amount of such participation.

(d)     Nothing contained herein shall require any Lender to exercise any right of setoff, banker's lien, counterclaims or similar rights or shall affect the right of any Lender to exercise, and retain the benefits of exercising, any such right with respect to any other Indebtedness or obligation of any Borrower or Guarantor.  If, under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this Section applies, such Lender shall, to the extent practicable, assign such rights to Agent for the benefit of Secured Parties and, in any event, exercise its rights in respect of such secured claim in a manner consistent with the rights of Lenders entitled under this Section to share in the benefits of any recovery on such secured claim.

6.11    Settlement Procedures.

(a)     In order to administer the Credit Facility in an efficient manner and to minimize the transfer of funds between Agent and Lenders, Agent may, at its option, subject to the terms of this Section, make available, on behalf of Lenders, the full amount of the Revolving Loans requested or charged to any Borrower's loan account(s) or otherwise to be advanced by Lenders pursuant to the terms hereof, without requirement of prior notice to Lenders of the proposed Revolving Loans.

(b)     With respect to all Revolving Loans made by Agent on behalf of Lenders as provided in this Section, the amount of each Lender's Pro Rata Share of the outstanding Revolving Loans shall be computed weekly, and shall be adjusted upward or downward on the basis of the amount of the outstanding Revolving Loans as of 5:00 p.m. New York time on the Business Day immediately preceding the date of each settlement computation; provided, that, Agent retains the absolute right at any time or from time to time to make the above described adjustments at intervals more frequent than weekly, but in no event more than twice in any week.

Agent shall deliver to each of the Lenders after the end of each week, or at such lesser period or periods as Agent shall determine, a summary statement of the amount of outstanding Revolving Loans for such period (such week or lesser period or periods being hereinafter referred to as a "Settlement Period").  If the summary statement is sent by Agent and received by a Lender prior to 11:00 a.m. New York time, then such Lender shall make the settlement transfer described in this Section by no later than 3:00 p.m. New York time on the same Business Day and if received by a Lender after 11:00 a.m. New York time, then such Lender shall make the settlement transfer by not later than 3:00 p.m. New York time on the next Business Day following the date of receipt.  If, as of the end of any Settlement Period, the amount of a Lender's Pro Rata Share of the outstanding Revolving Loans is more than such Lender's Pro Rata Share of the outstanding Revolving Loans as of the end of the previous Settlement Period, then, if the summary statement is prepared and delivered to Lenders by Agent prior to 11:00 a.m. New York City time, then Agent shall make the transfer described in this Section by no later than 3:00 p.m. New York City time on the same Business Day and if prepared and delivered to Lenders by Agent after 11:00 a.m. New York City time, then Agent shall make the transfer by no later than 3:00 p.m. New York City time on the next Business Day following the date of receipt, then such Lender shall forthwith (but in no event later than the time set forth in the preceding sentence) transfer to Agent by wire transfer in immediately available funds the amount of the increase.  Alternatively, if the amount of a Lender's Pro Rata Share of the outstanding Revolving Loans in any Settlement Period is less than the amount of such Lender's Pro Rata Share of the outstanding Revolving Loans for the previous Settlement Period, Agent shall forthwith transfer to such Lender by wire transfer in immediately available funds the amount of the decrease.  The obligation of each of the Lenders to transfer such funds and effect such settlement shall be irrevocable and unconditional and without recourse to or warranty by Agent.  Agent and each Lender agrees to mark its books and records at the end of each Settlement Period to show at all times the dollar amount of its Pro Rata Share of the outstanding Revolving Loans and Letters of Credit.  Each Lender shall only be entitled to receive interest on its Pro Rata Share of the Revolving Loans to the extent such Revolving Loans have been funded by such Lender.  Because the Agent on behalf of Lenders may be advancing and/or may be repaid Revolving Loans prior to the time when Lenders will actually advance and/or be repaid such Revolving Loans, interest with respect to Revolving Loans shall be allocated by Agent in accordance with the amount of Revolving Loans actually advanced by and repaid to each Lender and the Agent and shall accrue from and including the date such Revolving Loans are so advanced to but excluding the date such Revolving Loans are either repaid by Borrowers or actually settled with the applicable Lender as described in this Section.

(c)      To the extent that Agent has made any such amounts available and the settlement described above shall not yet have occurred, upon repayment of any Revolving Loans by a Borrower, Agent may apply such amounts repaid directly to any amounts made available by Agent pursuant to this Section.  In lieu of weekly or more frequent settlements, Agent may, at its option, at any time require each Lender to provide Agent with immediately available funds representing its Pro Rata Share of each Revolving Loan, prior to Agent's disbursement of such Revolving Loan to a Borrower (or Administrative Borrower on behalf of such Borrower).  In such event, all Revolving Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares of Loans.  No Lender shall be responsible for any default by any other Lender in the other Lender's obligation to make a Revolving Loan requested hereunder nor shall the Revolving Commitment of any Lender be

increased or decreased as a result of the default by any other Lender in the other Lender's obligation to make a Revolving Loan hereunder.

(d)    If Agent is not funding a particular Revolving Loan to a Borrower (or Administrative Borrower for the benefit of such Borrower) pursuant to Sections 6.11(a) and 6.11(b) above on any day, but is requiring each Lender to provide Agent with immediately available funds on the date of such Revolving Loan as provided in Section 6.11(c) above, Agent may assume that each Lender will make available to Agent such Lender's Pro Rata Share of the Revolving Loan requested or otherwise made on such day and Agent may, in its discretion, but shall not be obligated to, cause a corresponding amount to be made available to or for the benefit of such Borrower on such day.    If Agent makes such corresponding amount available to a Borrower and such corresponding amount is not in fact made available to Agent by such Lender, Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon for each day from the date such payment was due until the date such amount is paid to Agent at the NYFRB Rate for each day during such period (as published by the Federal Reserve Bank of New York or at Agent's option based on the arithmetic mean determined by Agent of the rates for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York City time) on that day by each of the three leading brokers of Federal funds transactions in New York City selected by Agent) and if such amounts are not paid within three days of Agent's demand, at the highest interest rate provided for in Section 3.1 hereof applicable to ABR Loans.    During the period in which such Lender has not paid such corresponding amount to Agent, notwithstanding anything to the contrary contained in this Agreement or any of the other Financing Agreements, the amount so advanced by Agent to or for the benefit of any Borrower shall, for all purposes hereof, be a Revolving Loan made by Agent for its own account.    Upon any such failure by a Lender to pay Agent, Agent shall promptly thereafter notify Administrative Borrower of such failure and Borrowers shall pay such corresponding amount to Agent for its own account within five Business Days of Administrative Borrower's receipt of such notice, which shall constitute a payment on account of Obligations.

(e)    Nothing in this Section or elsewhere in this Agreement or the other Financing Agreements shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Revolving Commitment hereunder or to prejudice any rights that any Borrower may have against any Lender as a result of any default by any Lender hereunder in fulfilling its Revolving Commitment.

6.12    Obligations Several; Independent Nature of Lenders' Rights.    The obligation of each Lender hereunder is several, and no Lender shall be responsible for the obligation or Revolving Commitment of any other Lender hereunder.    Nothing contained in this Agreement or any of the other Financing Agreements and no action taken by the Lenders pursuant hereto or thereto shall be deemed to constitute the Lenders to be a partnership, an association, a joint venture or any other kind of entity.    The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and subject to Section 12.3 hereof, each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**SECTION 7.        COLLATERAL REPORTING AND COVENANTS**

7.1    Collateral Reporting.

(a)    Borrowers and Guarantors shall maintain complete and accurate books and records in all material respects with respect to the Collateral owned by it.  Borrowers and Guarantors shall provide Agent with the following documents in a form reasonably satisfactory to Agent:

(i)    (A) so long as no Event of Default has occurred and is continuing and no Increased Reporting Period is then in effect, promptly after the end of each fiscal month (but in no event more than twenty (20) days thereafter), a Borrowing Base Certificate setting forth the calculation of the Borrowing Base as of the last Business Day of the immediately preceding fiscal month and (B) no more than three Business Days following the last Business Day of each calendar week at any time an Event of Default has occurred and is continuing or an Increased Reporting Period is then in effect, a Borrowing Base Certificate setting forth the calculation of the Borrowing Base as of the last Business Day of the immediately preceding calendar week, in each case, duly completed and executed by the chief financial officer, vice president of finance, treasurer, controller or other similar financial officer of Administrative Borrower, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed, including but not limited to an inventory summary report by category as determined by ~~Borrowers~~the Loan Parties in accordance with their current and prior inventory management policies (and upon Agent's reasonable request, upon the occurrence and during the continuance of an Event of Default letter of credit inventory summary) and identifying where such Inventory is located;

(ii)    at least three (3) Business Days prior to the occurrence of each Collateral Reporting Trigger Event, an updated Borrowing Base Certificate reflecting such Collateral Reporting Trigger Event on a pro forma basis and demonstrating that upon giving effect to such Collateral Reporting Trigger Event, the Borrowers will be in compliance with the Revolving Exposure Limitations and no Event of Default under the covenant set forth in Section 9.17 shall exist or would result from such transaction on a Pro Forma Basis;

(iii)    promptly after the end of each fiscal month (but in no event more than twenty (20) calendar days thereafter) (and more frequently as Agent may reasonably require at any time an Event of Default has occurred and is continuing or an Increased Reporting Period is then in effect), a schedule and aging of the ~~Borrowers~~Loan Parties' accounts payable  and a listing and aging of Franchisee Receivables of the PSP Borrowers, in each case delivered electronically in a text formatted file acceptable to Agent;

(iv)    promptly after the end of each fiscal month (but in no event more than twenty (20) calendar days thereafter) (and more frequently as Agent may reasonably require at any time an Event of Default has occurred and is continuing or an Increased Reporting Period is then in effect), inventory summary reports by location and category of Inventory (including the amounts of Inventory and the aggregate value thereof at each retail store location and at premises of warehouses or other third parties or is consigned Inventory); and

(v)    in connection with the delivery of the financial statements pursuant to Section 9.6(a)(i) and Section 9.6(a)(ii), a compliance certificate by the chief financial officer, vice president of finance, treasurer or controller or other similar financial or senior officer of Administrative Borrower (or if no such  officer has been appointed or elected, the sole member of Administrative Borrower) consisting of: (1) a statement confirming there are no material past due amounts owing to owners and lessors of leased premises (including retail store locations), warehouses, fulfillment centers, processors, custom brokers, freight forwarders and other third parties from time to time in possession of any Collateral having a Value equal to or greater than $2,500,000, (2) the addresses of all new retail store or distribution center locations of Borrowers and Guarantors opened and existing retail store or distribution center locations closed or sold, in each case since the date of the most recent certificate delivered to Agent containing the information required under this clause, (3) a list of any new Deposit Account established by any Borrower or Guarantor with any bank or other financial institution, including the Administrative Borrower or Guarantor in whose name the account is maintained, the account number, the name and address of the financial institution at which such account is maintained, the purpose of such account and, if any, the amount held in such account on or about the date of such compliance certificate and (4) a statement that all sales and use taxes have been paid when due as of the date of the compliance certificate, except as specifically described in such compliance certificate and except where the non-payment of such sales and use taxes involves an aggregate amount of less than $2,500,000.

(b)    Upon Agent's reasonable request, ~~Borrowers~~the Loan Parties shall provide Agent with the following documents in a form reasonably satisfactory to Agent: (i) perpetual inventory summary reports by sku for each retail store location, (ii) summary reports on sales and use tax collections, deposits and payments, including monthly sales and use tax accruals, (iii) a report of aggregate credit card sales for the requested period, including the amount of the chargebacks, fees, and credits with respect thereto and providing an aging of such related Receivables identifying those outstanding more than five Business Days since the sale date giving rise thereto, (iv) a report with franchisee commission payable accruals, (v) [~~a report with Dealer commission payable accruals~~reserved] and (vi) true, correct and complete copies of all agreements, documents and instruments relating to any Permitted Acquisition which Agent has not otherwise received; and

(c)    Upon Agent's reasonable request, ~~Borrowers~~the Loan Parties shall provide such other reports as to the Collateral as Agent shall reasonably request from time to time. If any Borrower's or Guarantor's records or reports of the Collateral are prepared or maintained by an accounting service, contractor, shipper or other agent, such Borrower and Guarantor hereby irrevocably authorizes such service, contractor, shipper or agent to deliver such records, reports, and related documents to Agent and to follow Agent's instructions with respect to further reasonable services, in each case, at any time that an Event of Default has occurred and is continuing.

7.2    Accounts Covenants.

(a)    ~~Borrowers~~The Loan Parties shall notify Agent promptly of the assertion of any claims, offsets, defenses or counterclaims by any Account Debtor, Credit Card Issuer or Credit Card Processor or any disputes with any of such Persons or any settlement, adjustment or

compromise thereof, to the extent any of the foregoing exceeds $500,000 in any one case or $2,000,000 in the aggregate.  No credit, discount, allowance or extension or agreement for any of the foregoing shall be granted to any Account Debtor, Credit Card Issuer or Credit Card Processor except in the ordinary course of a ~~Borrower's~~Loan Party's business in accordance with the current and prior practices of such ~~Borrower~~Loan Party.  So long as an Event of Default has occurred and is continuing, no ~~Borrower~~Loan Party shall, without the prior written consent of Agent, settle, adjust or compromise any material claim, offset, counterclaim or dispute with any Account Debtor, Credit Card Issuer or Credit Card Processor.  At any time that an Event of Default has occurred and is continuing, Agent shall, at its option, have the exclusive right to approve, settle, adjust or compromise any claim, offset, counterclaim or dispute with Account Debtors, Credit Card Issuers or Credit Card Processors or grant any credits, discounts or allowances.

(b)     Each ~~Borrower~~Loan Party shall notify Agent promptly of: (i) any notice of a material default by such ~~Borrower~~Loan Party under any of the Credit Card Agreements, (ii) of any default by such Borrower which has a reasonable likelihood of resulting in the Credit Card Issuer or Credit Card Processor ceasing to make payments or suspending payments to such ~~Borrower~~Loan Party and (iii) any notice from any Credit Card Issuer or Credit Card Processor that such Person is ceasing or suspending, or will or may cease or suspend, any present or future payments due or to become due to any ~~Borrower~~Loan Party from such Person, or that such Person is terminating or will or may terminate any of the Credit Card Agreements.

(c)     Agent shall have the right at any time or times, in Agent's name or in the name of a nominee of Agent, to verify the validity, amount or any other matter relating to any Receivables or other Collateral, by mail, telephone, facsimile transmission or otherwise.

7.3     Inventory Covenants.  With respect to the Inventory:

~~. With respect to the Inventory:~~ (a) each Borrower and Guarantor shall at all times maintain inventory records reasonably satisfactory to Agent, keeping correct and accurate records itemizing and describing the kind, type, quality and quantity of Inventory, such Borrower's or Guarantor's cost therefor and daily withdrawals therefrom and additions thereto;

(b) Borrowers and Guarantors shall conduct physical counts of the Inventory (excluding Inventory located in retail stores that have not been open for more than twelve months) either through periodic cycle counts or wall to wall counts, so that all Inventory located at distribution centers and retail stores that have been open for more than twelve months is subject to such counts at least once each year but at any time or times as Agent may request upon the occurrence and during the continuance of an Event of Default, and promptly following such physical counts of the Inventory (whether through periodic cycle counts or wall to wall counts) shall supply Agent with a report in the form and with such specificity as may be reasonably satisfactory to Agent concerning such physical count;

(c) Borrowers and Guarantors shall not remove any Inventory from the locations set forth or permitted herein, without the prior written consent of Agent, except (i) for sales of Inventory in the ordinary course of its business, (ii) for sales, returns and exchanges of Inventory to manufacturers and suppliers in the ordinary course of business; (iii) to move Inventory directly

from one location set forth or permitted herein to another such permitted location and (iv) for Inventory shipped from the manufacturer thereof to such Borrower or Guarantor which is in transit to the locations set forth or permitted herein;

(d) upon Agent's request, ~~Borrowers~~the Loan Parties shall, at their expense, no more than one time in any twelve-month period (and one additional time in any twelve-month period as Agent may request and at ~~Borrowers~~the Loan Parties' expense if Excess Availability is less than the greater of $30,000,000 and 20% of the Borrowing Cap at any time during such period), but at any time or times as Agent may reasonably request upon the occurrence and during the continuance of an Event of Default or if there is a Material Adverse Effect (at ~~Borrowers~~the Loan Parties' sole expense), deliver or cause to be delivered to Agent written appraisals in respect of the Borrowing Base as to the Inventory in form, scope and methodology reasonably acceptable to Agent and by an appraiser reasonably acceptable to Agent, addressed to Agent and Lenders and upon which Agent and Lenders are expressly permitted to rely;

(e) Borrowers and Guarantors shall produce, use, store and maintain the Inventory with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with applicable laws (including, to the extent applicable, the requirements of the Federal Fair Labor Standards Act of 1938, as amended and all rules, regulations and orders related thereto);

(f) none of the Inventory or other Collateral constitutes farm products or the proceeds thereof;

(g) as between Agent and Secured Parties and Borrowers and Guarantors, each Borrower and Guarantor assumes all responsibility and liability arising from or relating to the production, use, sale or other disposition of the Inventory;

(h) Borrowers and Guarantors shall not sell Inventory to any customer on approval, or any other basis which entitles the customer to return or may obligate any Borrower or Guarantor to repurchase such Inventory other than returns and exchanges of Inventory from customers in the ordinary course business of such Borrower or Guarantor consistent with the then current return policy of such Borrower or Guarantor;

(i) Borrowers and Guarantors shall keep the Inventory in good and marketable condition; and

(j) Borrowers and Guarantors shall not, without prior written notice to Agent or the specific identification of such Inventory in a report with respect thereto provided by Administrative Borrower to Agent pursuant to Section 7.1(a) hereof, acquire or accept any Inventory on consignment or approval except for (x) magazines, stationery and greeting cards, and (y) perishable food stuffs of a de minimis value.

7.4    Equipment and Real Property Covenants.  With respect to the Equipment and Real Property:

(a) upon Agent's request, Borrowers and Guarantors shall, at their expense, no more than one time as Agent may request upon the occurrence and during the continuance of an Event of

Default, deliver or cause to be delivered to Agent written appraisals as to the Equipment in form, scope and methodology reasonably acceptable to Agent and by an appraiser reasonably acceptable to Agent, addressed to Agent and upon which Agent is expressly permitted to rely;

(b) Borrowers and Guarantors shall keep the Equipment in good order, repair, running and marketable condition (ordinary wear and tear and casualty and condemnation excepted);

(c) Borrowers and Guarantors shall use the Equipment with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with all applicable laws except where the failure to so use would not result in a Material Adverse Effect;

(d) the Equipment is and shall be used in the business of Borrowers and Guarantors and not for personal, family, household or farming use;

(e) Borrowers and Guarantors shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of its business or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of motor vehicles used by or for the benefit of such Borrower or Guarantor in the ordinary course of business;

(f) the Equipment is now and shall remain personal property and Borrowers and Guarantors shall not permit any part of the Equipment to be or become a part of or affixed to real property except where the failure to do so would not have a Material Adverse Effect; and

(g) each Borrower and Guarantor assumes all responsibility and liability arising from the use of the Equipment.

7.5    <u>Delivery of Instruments, Chattel Paper and Documents</u>. In the event that any Borrower or Guarantor shall be entitled to or shall at any time after the date hereof hold or acquire any Chattel Paper or Instruments constituting Collateral or any Documents evidencing or constituting Collateral with an individual face amount in excess of $2,500,000, such Borrower or Guarantor shall promptly deliver to Agent any such Chattel Paper, Instruments and/or Documents along with such other documents as Agent may reasonably require pursuant to which such Borrower or Guarantor will pledge such additional Collateral.  Such Borrower or Guarantor herby authorizes Agent to attach such supplemental documents to this Agreement and agrees that all additional Collateral owned by it set forth in such supplemental documents shall be considered to be part of the Collateral.

7.6    [Reserved].

7.7    <u>Power of Attorney</u>.

(a)    Each Borrower and Guarantor hereby irrevocably designates and appoints Agent (and all Persons reasonably designated by Agent) as such Borrower's and Guarantor's true and lawful attorney-in-fact for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that Agent may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of an Event of

Default, which appointment is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, subject to the Intercreditor Agreements, each Borrower and Guarantor authorizes Agent, in such Borrower's, Guarantor's or Agent's name, to: (i) at any time after an Event of Default has occurred and is continuing and written notice by the Agent to the Administrative Borrower of its intent to exercise such rights (provided that such notice is not required if (x) an Event of Default under Section 10.1(g) or (h) shall have occurred and is continuing or (y) payment of the Loans shall be due by acceleration or final maturity) (A) demand payment on Receivables or other Collateral, (B) clear Inventory the purchase of which was financed with Letters of Credit through U.S. Customs or foreign export control authorities in any Borrower's or Guarantor's name, Agent's name or the name of Agent's designee, and to sign and deliver to customs officials powers of attorney in such Borrower's or Guarantor's name for such purpose, and to complete in Borrower's, Guarantor's or Agent's name, any order, sale or transaction, obtain the necessary documents in connection therewith and collect the proceeds thereof, (C) enforce payment of Receivables by legal proceedings or otherwise, (D) exercise all of such Borrower's or Guarantor's rights and remedies to collect any Receivable or other Collateral, (E) in a commercially reasonable manner, sell or assign any Receivable upon such terms, for such amount and at such time or times as the Agent deems advisable, (F) settle, adjust, compromise, extend or renew an Account, (G) discharge and release any Receivable, (H) prepare, file and sign such Borrower's or Guarantor's name on any proof of claim in bankruptcy or other similar document against an Account Debtor or other such Borrower or Guarantor in respect of any Receivables or other Collateral, (I) notify the post office authorities to change the address for delivery of remittances from Account Debtors or other Borrowers or Guarantors in respect of Receivables or other proceeds of Collateral to an address designated by Agent, and open and dispose of all mail addressed to any Borrower or Guarantor and handle and store all mail relating to the Collateral, provided, that Agent shall turn over to such Borrower or Guarantor any such mail that that does not constitute a remittance from an Account Debtor or other Borrower or Guarantor in respect of Receivables or other proceeds of Collateral; (J) do all acts and things which are necessary, in Agent's determination, to fulfill such Borrower's or Guarantor's obligations under this Agreement and the other Financing Agreements and (K) subject to the Intercreditor Agreement, with respect to Intellectual Property, execute, deliver and record, any and all agreements, instruments, documents and papers to evidence the Agent's security interest in such Intellectual Property and the goodwill and general intangibles of Borrowers and Guarantors relating thereto or represented thereby, assign any Intellectual Property or license, throughout the world, (ii) at any time an Event of Default has occurred and is continuing and during any Compliance Period, (A) have access to any lockbox or postal box into which remittances from Account Debtors or other Borrowers or Guarantors in respect of Receivables or other proceeds of Collateral are sent or received, (B) endorse such Borrower's or Guarantor's name upon any items of payment in respect of Receivables or constituting Collateral or otherwise received by Agent and any Lender and deposit the same in Agent's account for application to the Obligations, (C) take control in any manner of any item of payment in respect of Receivables or constituting collateral or otherwise received in or for deposit in the Blocked Accounts or otherwise received by Agent or any Lender, (D) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement (which does not add new collateral or add a debtor) in such offices as Agent in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of

Agent's security interest in the Collateral, (E) to contact and enter into one or more agreements with the issuers of uncertificated Securities which are Collateral or with securities intermediaries holding Collateral as may be necessary or advisable to give Agent Control over such Collateral, (F) to demand payment or enforce payment of the Receivables in the name of Agent or such Borrower or Guarantor and to endorse any and all checks, drafts, and other instruments for the payment of money relating to the Receivables, (G) to sign such Borrower's or Guarantor's name on any invoice or bill of lading relating to the Receivables, drafts against any Account Debtor of the Administrative Borrower or Guarantor, assignments and verifications of Receivables, (H) to settle, adjust, compromise, extend or renew the Receivables, (I) to settle, adjust or compromise any legal proceedings brought to collect Receivables, (J) to prepare, file and sign such Borrower's or Guarantor's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables, and (K) to change the address for delivery of mail addressed to such Borrower or Guarantor to such address as Agent may designate and to receive, open and dispose of all mail addressed to such Borrower or Guarantor, (iii) at any time to (A) endorse Borrower's name upon any Chattel Paper, document, Instrument, invoice, or similar document or agreement relating to any Receivable or any Goods pertaining thereto or any other Collateral, including any warehouse or other receipts, or bills of lading and other negotiable or non-negotiable documents, and (B) sign such Borrower's or Guarantor's name on any verification of Receivables and notices thereof to Account Debtors or any secondary Guarantors or other Guarantors in respect thereof.  Such Borrower or Guarantor agrees to reimburse Agent on demand for any payment made or any expense incurred by Agent in connection with any of the foregoing; provided that, this authorization shall not relieve such Borrower or Guarantor of any of its obligations under this Agreement.  All acts of said attorney or designee are hereby ratified and approved.  The powers conferred on Agent, for the benefit of the Agent and Lenders under this Section 7.7 are solely to protect Agent's interests in the Collateral and shall not impose any duty upon Agent or any Lender to exercise any such powers. Each Borrower and Guarantor hereby releases Agent and Lenders and their respective officers, employees and designees from any liabilities arising from any act or acts under this power of attorney and in furtherance thereof, whether of omission or commission, except as a result of Agent's or any Lender's own gross negligence, bad faith or willful misconduct or that of any of their controlled Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact.

(b)    Nature of Appointment; Limitation of Duty.  THE APPOINTMENT OF AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS SECTION 7.7 IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS AGREEMENT IS TERMINATED IN ACCORDANCE WITH SECTION 13. NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER AGENT, NOR ANY LENDER, NOR ANY OF THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION; PROVIDED THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

7.8    <u>Right to Cure</u>.  Agent may, at its option, upon written notice to Administrative Borrower, (a) cure any default by any Borrower or Guarantor under any material agreement with a third party that materially and adversely affects the Collateral, its value or the ability of Agent to collect, sell or otherwise dispose of the Collateral or the rights and remedies of Agent or any Lender therein or the ability of any Borrower or Guarantor to perform its obligations hereunder or under any of the other Financing Agreements, (b) pay or bond on appeal any judgment entered against any Borrower or Guarantor, (c) discharge taxes, liens, security interests or other encumbrances at any time levied on or existing with respect to the Collateral and (d) pay any amount, incur any expense or perform any act which, in Agent's reasonable judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Agent and Lenders with respect thereto.  Agent may add any amounts so expended to the Obligations and charge any Borrower's account therefor, such amounts to be repayable by Borrowers on demand.  Agent and Lenders shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of any Borrower or Guarantor.  Any payment made or other action taken by Agent or any Lender under this Section shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

7.9    <u>Access to Premises</u>.  From time to time as reasonably requested by Agent, at the cost and expense (subject to <u>Section 9.22</u> hereof) of ~~Borrowers~~the Loan Parties, (a) Agent or its designee (including employees of the Agent, any Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Agent) shall have reasonable access, so as (if no Event of Default has occurred and is continuing) not to interfere with the operations of such Borrower or Guarantor to all of each Borrower's and Guarantor's premises during normal business hours and after notice to Administrative Borrower, or at any time and without notice to any Borrower or any Guarantor if an Event of Default has occurred and is continuing, for the purposes of inspecting, verifying and auditing the Collateral and all of each Borrower's and Guarantor's leases, books and records, including the Records, visiting and inspecting each Borrower's and Guarantor's properties and conducting at each Borrower's and Guarantor's premises field examinations of such Borrower's and Guarantor's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, (b) each Borrower and Guarantor shall permit any representatives designated by the Agent or any Lender (including employees of the Agent, any Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Agent), upon reasonable prior notice, to discuss its affairs, finances and condition with its officers and independent accountants (and hereby authorizes the Agent and each Lender to contact its independent accountants directly) and to provide contact information for each bank where each Borrower or Guarantor has a depository and/or securities account and each such Borrower and Guarantor hereby authorizes the Agent and each Lender to contact the bank(s) in order to request bank statements and/or balances, all at such reasonable times and as often as reasonably requested and (c) each Borrower and Guarantor shall promptly furnish to Agent such copies of such leases, books and records or extracts therefrom as Agent may request (subject to the confidentiality agreement set forth in <u>Section 13.5</u> hereof), and Agent or any Lender or Agent's designee (including employees of the Agent, any Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Agent) may use during normal business hours such of any Borrower's and Guarantor's personnel, Equipment, supplies and premises as may be reasonably necessary for the foregoing (and as will not materially interfere with the business of

the Loan Parties) and if an Event of Default has occurred and is continuing for the collection of Receivables and realization of other Collateral.  Borrowers and Guarantors further agree that, during the course of such on-site Record examinations, Agent may review reports by retail store location of sales and operating profits of Borrowers and Guarantors, but may not make copies of such reports or remove them from such Borrower's or Guarantor's premises.

## SECTION 8.    REPRESENTATIONS AND WARRANTIES

Each Borrower and Guarantor hereby represents and warrants to Agent, Lenders and Issuing Bank the following, the truth and accuracy of which are a continuing condition of the making of Loans and Issuing Bank's providing of Letters of Credit:

8.1    <u>Corporate Existence, Power and Authority</u>.  Each Borrower and Guarantor is (x) a corporation duly organized and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of its jurisdiction of incorporation and (y) is duly qualified as a foreign corporation and in good standing (to the extent such concept exists in the relevant jurisdictions) in all states or other jurisdictions where such qualification is required, except for those other jurisdictions in which the failure to so qualify would not reasonably be expected to result in a Material Adverse Effect.  The execution, delivery and performance of this Agreement, the other Financing Agreements and the transactions contemplated hereunder and thereunder (a) are all within each Borrower's and Guarantor's company powers, (b) have been duly authorized, (c) are not in contravention of law or the terms of any Borrower's or Guarantor's certificate of formation, operating agreement, or other organizational documentation, or any indenture, agreement or undertaking to which any Borrower or Guarantor is a party or by which any Borrower or Guarantor or its property are bound and (d) will not result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of any Borrower or Guarantor, except, (i) with respect to clause (a) above (other than with respect to any Borrower) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, (ii) with respect to clause (c) above, where such contravention of law would not reasonably be expected to result in a Material Adverse Effect and (iii) with respect to (d) above, the creation of the security interest in the Collateral in favor of Agent and Secured Parties pursuant to the terms of the Financing Agreements and to the extent that the imposition  of such lien, security interest, charge or other encumbrance, as the case may be, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  This Agreement and the other Financing Agreements to which any Borrower or Guarantor is a party constitute legal, valid and binding obligations of such Borrower and Guarantor enforceable in accordance with their respective terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws limiting creditors' rights generally or by general equitable principles.

8.2    <u>Name; State of Organization; Chief Executive Office; Collateral Locations</u>.

(a)    The exact legal name, as of the Closing Date, of each Borrower and Guarantor is as set forth on the signature page of this Agreement and in the Information Certificate.  No Borrower or Guarantor has, during the five years prior to the Closing Date, been known by or used any other corporate or fictitious name or been a party to any merger or

consolidation, or acquired all or substantially all of the assets of any Person, or acquired any of its property or assets out of the ordinary course of business, except as set forth in the Information Certificate.

(b)    Each Borrower and Guarantor is an organization of the type and organized in the jurisdiction set forth, as of the Closing Date, in the Information Certificate.  The Information Certificate accurately sets forth, as of the Closing Date, the organizational identification number of each Borrower and Guarantor or accurately states that such Borrower or Guarantor has none and accurately sets forth, as of the Closing Date, the federal employer identification number of each Borrower and Guarantor.

(c)    As of the Closing Date, the chief executive office and mailing address of each Borrower and Guarantor and each Borrower's and Guarantor's Records concerning Accounts are located only at the address identified as such in Schedule 8.2(a) hereto and the only other places of business and other locations (if different from the locations listed in Schedule 8.2(a)) where any Borrower or Guarantor maintains any tangible personal property with a value in excess of $2,500,000 (including Inventory and Equipment), if any, are the addresses set forth in Schedule 8.2(b) hereto, subject to the rights of any Borrower or Guarantor to establish new locations in accordance with Section 9.2 below.  The Information Certificate correctly identifies, as of the Closing Date, any of such locations which are not owned by a Borrower or Guarantor and sets forth the owners and/or operators of all locations which are not retail store locations.

8.3    Financial Statements; No Material Adverse Change.  All financial statements relating to any Borrower or Guarantor which have been or may hereafter be delivered by any Borrower or Guarantor to Agent and Lenders have been prepared in accordance with GAAP (except as otherwise disclosed in any notes thereto and as indicated in the notes thereto and as to any interim financial statements, to the extent such statements are subject to normal year-end adjustments and do not include any notes) and fairly present in all material respects the financial condition and the results of operation of such Borrower and Guarantor as at the dates and for the periods set forth therein.  Except as disclosed in any interim financial statements furnished by Borrowers and Guarantors to Agent prior to the date of this Agreement, there has been no act, condition or event which has had or is reasonably likely to have a Material Adverse Effect since the date of the most recent audited financial statements of any Borrower or Guarantor furnished by any Borrower or Guarantor to Agent prior to the date of this Agreement.

8.4    Priority of Liens; Title to Properties.  Upon the filing of the UCC financing statements required pursuant to the Financing Agreements and the recording of the forms of trademark security agreements, copyright security agreement and patent security agreements, as applicable, in the forms set forth on Exhibit I with the United States Patent and Trademark Office and United States Copyright Office, as applicable, the security interests and liens granted to Agent under this Agreement and the other Financing Agreements shall constitute valid and perfected liens and security interests in and upon the Collateral in accordance with the terms hereof and with the priority required by the Financing Agreements, subject only to the liens indicated on Schedule 8.4 hereto and the other liens permitted under Section 9.8 hereof (a) except for Borrower's money, and vehicles and other assets the perfection of a security interest in which is governed by Section 9-303 of the Uniform Commercial Code, (b) subject to, with respect to Deposit Accounts, Section 5.2(d) hereof, and (c) with respect to Intellectual Property

141

registrations and applications (but not including "intent-to-use") applications) in the United States only, and only if and to the extent perfection may be achieved by the filing of security interests in the United States Patent and Trademark Office and United States Copyright Office), except that additional filings may have to be made in the United States Patent and Trademark Office and United States Copyright Office, as applicable, to perfect the security interest and lien of Agent in any issuances, registrations, or applications for registration of any Intellectual Property acquired by any Borrower or Guarantor after the date hereof. Each Borrower and Guarantor has good fee simple title to, or valid leasehold interests in, all of its Real Property that is material to its business, except where the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

8.5    Tax Returns. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and except to the extent such Taxes are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Closing Date, each Borrower and Guarantor and their Subsidiaries (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all Taxes levied or imposed on their properties, income or assets otherwise due and payable (whether or not shown on a Tax return), except any Taxes that are being contested in good faith by appropriate proceedings, provided that such Borrower, such Guarantor or such Subsidiary, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP. There is no proposed Tax assessment, deficiency or other claim against the Administrative Borrower, Guarantor or any Subsidiary that would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect

8.6    Litigation. Except as set forth on Schedule 8.6 hereto, there is no action, suit, proceeding or claim by any Governmental Authority or Person pending, or to the best of any Borrower's or Guarantor's knowledge threatened in writing, against or affecting any Borrower or Guarantor, its or their assets or business, or against or affecting any transactions contemplated by this Agreement that (i) is not covered by insurance (except for normal deductibles) as to which there is a reasonable possibility of an adverse determination that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) involves any challenge to the validity or enforceability of any material provision of any Financing Agreement (including, without limitation, any provision relating to the Borrowers' or Guarantors' obligations to repay the Obligations or any provision relating to the validity or perfection of any lien created by any Financing Agreement) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

8.7    Compliance with Applicable Laws. Except as could not reasonably be expected to have a Material Adverse Effect, Borrowers and Guarantors are in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority relating to their businesses.

8.8    Environmental Compliance.

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) Borrowers, Guarantors and any Subsidiary of any Borrower or Guarantor have not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any

Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates in any material respect any applicable Environmental Law or any permit issued to Borrower under Environmental Law, and (ii) the operations of Borrowers, Guarantors and any Subsidiary of any Borrower or Guarantor complies in all material respects with all Environmental Laws and all permits issued to Borrowers and Guarantors under Environmental Law.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, none of any Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of any Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of any Borrower, any basis to reasonably expect that any Borrower or any of its Subsidiaries will become subject to any Environmental Liability.

(c)    Except as would not reasonably be expected to have a Material Adverse Effect, Borrowers, Guarantors and their Subsidiaries have no material liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

(d)    Except as would not reasonably be expected to have a Material Adverse Effect, Guarantors and their Subsidiaries have all permits required to be obtained or filed in connection with the operations of Borrowers and Guarantors under any Environmental Law and all of such licenses, certificates, approvals or similar authorizations and other permits are valid and in full force and effect.

(e)    This <u>Section 8.8</u> sets forth the sole representations and warranties of Borrower with respect to Environmental Laws and Hazardous Materials and, notwithstanding any other provision in this Agreement to the contrary, no other representation or warranty is made in this Agreement with respect to environmental matters.

8.9    <u>Employee Benefits</u>.

(a)    Except as could not reasonably be expected to have a Material Adverse Effect, each Plan has been established, maintained, funded, operated and administered in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or State law and each Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter (or a favorable opinion letter) from the Internal Revenue Service or is still within the remedial amendment period (as defined in Section 401(b) of the Code) to obtain a favorable determination letter and, to the best of each Borrower's and Guarantor's knowledge, nothing has occurred that could reasonably be expected to cause the revocation of such letter or the unavailability of reliance on such letter.  Each Borrower and Guarantor and its respective ERISA Affiliates have made all required contributions to any Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of

any amortization period pursuant to Section 412 of the Code has been made with respect to any such Plan.

(b)    Except as could not reasonably be expected to have a Material Adverse Effect, (i) there are no pending, or to the best of each Borrower's and Guarantor's knowledge, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan, and (ii) there has been no non-exempt prohibited transaction under Section 406 of ERISA or violation of the fiduciary responsibility rules under Section 404(a)(1) of ERISA with respect to any Plan.

(c)    Except as could not reasonably be expected to have a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) the current value of the assets of each Plan (determined in accordance with the assumptions used for funding such Plan pursuant to Section 412 of the Code) are not exceeded by such Plan's liabilities under Section 4001(a)(16) of ERISA in an amount that could reasonably be expected to have a Material Adverse Effect; (iii) no Borrower or Guarantor nor any of its respective ERISA Affiliates have incurred nor do any of them reasonably expect to incur any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither Borrower nor any of its ERISA Affiliates have incurred nor do any of them reasonably expect to incur any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (v) neither Borrower nor any of its ERISA Affiliates has engaged in a transaction that would be subject to Section 4069 or 4212(c) of ERISA; and (vi) no Plan is a "welfare benefit plan" (as defined in Section 3(1) of ERISA that provides post-termination or retiree life insurance, health or other welfare benefits to any person, except pursuant to Section 4980B of the Code or any other applicable law and with respect to which the recipient pays the full premium cost of such coverage.

8.10    <u>Bank Accounts</u>.    All of the Deposit Accounts, investment accounts or other accounts in the name of or used by any Borrower or Guarantor maintained at any bank or other financial institution are set forth in <u>Schedule 8.10</u> hereto, subject to the right of each Borrower and Guarantor to establish new accounts in accordance with <u>Section 5.2</u> hereof.

8.11    <u>Intellectual Property</u>.    Except as would not reasonably be expected to have a Material Adverse Effect, to the knowledge of Borrowers, each Borrower and Guarantor owns or licenses or otherwise has the right to use all Intellectual Property necessary for the operation of its business as presently conducted (collectively, "<u>IP Rights</u>").    On the Closing Date, no Borrower or Guarantor owns any Intellectual Property registered, or subject to pending applications, in the United States Patent and Trademark Office other than those described in <u>Schedule 8.11(a)</u> hereto.    Each Borrower and Guarantor is the sole and exclusive owner of the entire and unencumbered right, title, and interest in and to all Intellectual Property used in the operation of its business, or, in the case of Intellectual Property used in the operation of their business and wholly or partly owned by other Persons, each Borrower or Guarantor, as the case may be, has a valid and enforceable license, option or other right, as the case may be, to use such Intellectual Property, except in each case as would not reasonably be expected to have a Material Adverse Effect; and except as could not reasonably be expected to have a Material Adverse Effect, to the knowledge of Borrowers, the Intellectual Property owned by each Borrower or

Guarantor is valid, subsisting, and enforceable and has not been abandoned or adjudged invalid or unenforceable, in whole or part.  Except as described in Schedule 8.11(c) hereto, to each Borrowers' and Guarantor's knowledge, no event has occurred which could reasonably be expected to result in after notice or passage of time or both, the revocation, suspension or termination of Intellectual Property rights included in the Collateral, the revocation, suspension or termination of which could reasonably be expected to have a Material Adverse Effect.  To Borrowers' knowledge, except as could not reasonably be expected to have a Material Adverse Effect, no IP Rights owned by the Borrowers or Guarantors and used in the operation of their respective businesses as currently conducted infringes upon any Intellectual Property rights held by any Person, except for such infringements that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No written claim or litigation regarding any of the IP Rights, is pending or, to the knowledge of any Loan Party, threatened against any Loan Party or Subsidiary, and which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

8.12    Subsidiaries; Capitalization; Solvency.

(a)    Each Borrower and Guarantor does not have any direct or indirect Subsidiaries and is not engaged in any joint venture or partnership except as set forth in Schedule 8.12 hereto and except as may be acquired, formed or entered into in connection with a Permitted Acquisition or otherwise and in accordance with Section 9.20 hereof.

(b)    Each Borrower and Guarantor is the record and beneficial owner of all of the issued and outstanding shares of Capital Stock of each of the Subsidiaries listed on Schedule 8.12 hereto as being owned by such Borrower or Guarantor and except as described on Schedule 8.12 hereto, there are no proxies, irrevocable or otherwise, with respect to such shares and no equity Securities of any of the Subsidiaries are or may become required to be issued by reason of any options, warrants, rights to subscribe to, calls or commitments of any kind or nature and there are no contracts, commitments, understandings or arrangements by which any Subsidiary is or may become bound to issue additional shares of its Capital Stock or Securities convertible into or exchangeable for such shares.

(c)    As of the Closing Date, the issued and outstanding shares of Capital Stock of each Borrower and ~~Subsidiary~~ Guarantor are directly and beneficially owned and held by the Persons indicated in the Information Certificate, and in each case all of such shares have been duly authorized and are fully paid and non-assessable, free and clear of all claims, liens, pledges and encumbrances of any kind, except for liens created hereunder and under the other Financing Agreements or as permitted by Section 9.8 hereof.

(d)    The Loan Parties, taken as a whole, are Solvent and will continue to be Solvent immediately after giving effect to the creation of the Obligations, the granting of security interests of Agent and the other transactions contemplated hereunder, or in connection with any of the foregoing.

8.13    Labor Disputes.

(a)    Set forth on Schedule 8.13 hereto is a list of all collective bargaining or similar agreements between or applicable to each Borrower and Guarantor and any union, labor organization or other bargaining agent in respect of the employees of any Borrower or Guarantor in force on the Closing Date.

(b)    Except as could not reasonably be expected to have a Material Adverse Effect, (i) there is no unfair labor practice complaint pending against any Borrower or Guarantor or, to the best of any Borrower's or Guarantor's knowledge, threatened against it, before the National Labor Relations Board, and no grievance or significant arbitration proceeding arising out of or under any collective bargaining agreement is pending on the Closing Date against any Borrower or Guarantor or, to best of any Borrower's or Guarantor's knowledge, threatened against it, (ii) there is no strike, labor dispute, slowdown or stoppage is pending against any Borrower or Guarantor or, to the best of any Borrower's or Guarantor's knowledge, threatened against any Borrower or Guarantor, and (iii) each Borrower and Guarantor is in compliance with all applicable laws and orders with respect to employment (including applicable laws regarding wage and hour requirements, immigration status, discrimination in employment, employee health and safety, and collective bargaining).

8.14    Restrictions on Subsidiaries.  Except for restrictions contained in this Agreement, the other Financing Agreements or any other agreement with respect to Indebtedness of any Borrower or Guarantor permitted hereunder, there are no contractual restrictions binding on any Subsidiary of any Borrower or Guarantor which prohibit or otherwise materially restrict (unless permitted pursuant to Section 9.16) (a) the transfer of cash or other assets (i) between any Borrower or Guarantor and any of its or their Subsidiaries or (ii) between any Subsidiaries of any Borrower or Guarantor or (b) the ability of any Borrower or Guarantor or any of its or their Subsidiaries to incur Indebtedness or grant security interests to Agent or any Lender in the Collateral.

8.15    Material Contracts.  Schedule 8.15 hereto sets forth all Material Contracts to which any Borrower or Guarantor is a party or is bound as of the Closing Date.  Borrowers and Guarantors have delivered true, correct and complete copies of such Material Contracts to Agent on or before the date hereof.  Borrowers and Guarantors are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract except as would not result in a Material Adverse Effect.

8.16    Credit Card Agreements.  Set forth in Schedule 8.16 hereto is a correct and complete list of all of the Credit Card Agreements existing as of the Closing Date between or among any Borrower, Guarantor or any of its Subsidiaries, the Credit Card Issuers and/or the Credit Card Processors.  The Credit Card Agreements constitute all of such agreements necessary for each Borrower to operate its business as presently conducted with respect to credit cards and debit cards and no Receivables of any Borrower arise from purchases by customers of Inventory with credit cards or debit cards, other than those which are issued by Credit Card Issuers with whom such Borrower has entered into one of the Credit Card Agreements set forth on Schedule 8.16 hereto or with whom such Borrower has entered into a Credit Card Agreement

146

in accordance with Section 9.18 hereof.  Each of the Credit Card Agreements constitutes the legal, valid and binding obligations of the Administrative Borrower that is party thereto and, to the best of each Borrower's and Guarantor's knowledge, the other parties thereto, enforceable in accordance with their respective terms and is in full force and effect.  Except as could not reasonably be expected to (a) have a Material Adverse Effect or (b) result in the cessation of the transfer of payments under any Credit Card Agreement to Blocked Accounts as required under this Agreement, no default or event of default, or act, condition or event which after notice or passage of time or both, would constitute a material default or a material event of default under any of the Credit Card Agreements has occurred and is continuing.  The applicable Borrower and the other parties thereto have complied with all of the terms and conditions of the Credit Card Agreements to the extent necessary for such Borrower to be entitled to receive all payments thereunder which constitute proceeds of Eligible Credit Card Receivables.  As of the Closing Date, Borrowers have delivered, or caused to be delivered to Agent, true, correct and complete copies of all of the Credit Card Agreements.

8.17    Investment Company Status.  No Borrower or Guarantor is required to register as an "investment company" under the Investment Company Act of 1940, as amended from time to time.

8.18    Accuracy and Completeness of Information.  All information furnished by or on behalf of any Borrower or Guarantor in writing to Agent or any Lender in connection with this Agreement or any of the other Financing Agreements or any transaction, when taken as a whole, contemplated hereby or thereby, including all information on the Information Certificate is true and correct in all material respects on the date as of which such information is dated or certified and does not omit any material fact necessary in order to make such information not materially misleading.  Since the date of the most recently delivered audited financial statements, described in Section 8.3, no event or circumstance has occurred which has had or could reasonably be expected to have a Material Adverse Effect, which has not been fully and accurately disclosed to Agent in writing prior to the date hereof.  As of the Closing Date, to the best knowledge of any Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects as of the date so furnished.

8.19    Survival of Warranties; Cumulative.  All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall be deemed to have been made again to Agent and Lenders on the date of each additional borrowing or other credit accommodation hereunder and shall be conclusively presumed to have been relied on by Agent and Lenders regardless of any investigation made or information possessed by Agent or any Lender.  The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which any Borrower or Guarantor shall now or hereafter give, or cause to be given, to Agent or any Lender.

8.20    [ReservedInsurance].

.  Each Borrower, each Guarantor and each of its Subsidiaries maintain, with insurance companies that the Administrative Borrower believes (in the good faith judgment of the

management of the Administrative Borrower) were financially sound and responsible at the time the relevant coverage was last placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Administrative Borrower believes (in the good faith judgment of management of the Administrative Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Administrative Borrower believes (in the good faith judgment or the management of the Administrative Borrower) are reasonable and prudent in light of the size and nature of its business.

8.21    Anti-Corruption Laws and Sanctions.    Each Borrower or Guarantor, their respective Subsidiaries and to the Knowledge of such Borrower or Guarantor, their respective officers, directors employees and agents, are in compliance with applicable Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Borrower or Guarantor being designated as a Sanctioned Person.  None of (a) any Borrower or Guarantor, any Subsidiary or any of their respective directors or officers, or (b) to the knowledge of any such Borrower or Guarantor or Subsidiary, any employee or agent of such Borrower or Guarantor or any Subsidiary that will act in any capacity in connection with or benefit from the Credit Facility established hereby, is a Sanctioned Person.  No Loan or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement or the other Financing Agreements will directly or, to the Knowledge of the Administrative Borrower or Guarantor, indirectly, violate applicable violate Anti-Corruption Laws or applicable Sanctions.

8.22    Regulatory Compliance.

(a)    Each Borrower and ~~Subsidiary~~ Guarantor possesses all licenses, permits, approvals, notifications, exemptions, certifications and registrations (collectively, "Permits") that are required to be obtained for the operation of its business subject to renewal in the ordinary course of business, except where the failure to possess such Permits would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.  All such Permits are in full force and effect, and there are no actions pending or threatened in writing or, to each Borrower's or ~~Subsidiary~~ Guarantor's knowledge, otherwise threatened by any Governmental Authority that seek the revocation, cancellation, suspension or adverse modification thereof, except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.  Each Borrower or ~~Subsidiary~~ Guarantor is in compliance with the terms of all such Permits, except for such non-compliance as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(b)    Each Borrower and ~~Subsidiary~~ Guarantor is in compliance with, and at all times during the last three years has complied in all respects with, all applicable provisions of the Federal Food, Drug and Cosmetic Act and the rules and regulations promulgated thereunder (collectively, the "FDCA") and with all other applicable laws enforced by the Food and Drug Administration ("FDA") or any comparable Governmental Authority, except for such non-compliance as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. Each Borrower and ~~Subsidiary~~ Guarantor has in effect standard operating procedures governing, for its private label products, recalls, product ingredient safety reviews and regulatory filings, product claims and claim substantiation, adverse event reporting

and complaint handlings. To each Borrower's and ~~Subsidiary~~ Guarantor's knowledge, during the three years prior to the Closing Date, no products sold by such Borrower or ~~Subsidiary~~ Guarantor were adulterated or misbranded as defined in the applicable provisions of the FDCA; except to the extent that any liability to the Borrowers and ~~Subsidiary~~ Guarantors that could reasonably be expected to result from such adulterations or misbrandings would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    No Borrower or ~~Subsidiary~~ Guarantor has received any written or oral notice from the FDA during the three years prior to the Closing Date of any violation or alleged violation of the FDCA, except to the extent such violations or alleged violations would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Borrower or ~~Subsidiary~~ Guarantor has received any written or oral notice during the last three years that the products it has sold have been the subject of any warning letter, notice of violation, seizure, recall, injunction, regulatory enforcement action, or criminal action issued, initiated, threatened in writing, or to any Borrower's or ~~Subsidiary~~ Guarantor's knowledge, otherwise threatened by the FDA or any comparable Governmental Authority, except to the extent such actions or notices would not, in the aggregate, reasonably be expected to have a Material Adverse Effect. As of the Closing Date, no Borrower or ~~Subsidiary~~ Guarantor has any open, pending or planned product recalls, market withdrawals or other post-market actions relating to product quality or safety, except to the extent that the liability to the Borrowers and ~~Subsidiary~~ Guarantors that could reasonably be expected to result from such product recalls, market withdrawals or other post-market actions would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)    In the three years prior to the Closing Date, each Borrower and ~~Subsidiary~~ Guarantor has been in compliance with the Federal Trade Commission Act with respect to the advertising and promotion, product descriptions, and claims for the products it sells, except to the extent that such non-compliance would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. No Borrower or ~~Subsidiary~~ Guarantor has received written notice of and, to each Borrower's and ~~Subsidiary~~ Guarantor's knowledge, there is no written claim filed by the Federal Trade Commission against such Borrower or ~~Subsidiary~~ Guarantor, alleging any violation of any of the laws implemented by it, except to the extent that such violations would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(e)    To each Borrower's or ~~Subsidiary~~ Guarantor's knowledge, during the past three years, all products sold by such Borrower or ~~Subsidiary~~ Guarantor were manufactured in compliance with all applicable laws and regulations enforced by FDA or any comparable Governmental Authority with respect to the manufacture of such products, including without limitation, FDA's current good manufacturing practice regulations set forth at 21 C.F.R. Parts 110 and 111, where relevant, except for such non-compliance that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

8.23    <u>Franchise Agreements.</u>

149

(a)  Schedule 8.23 sets forth a complete and accurate list as of the Closing Date of all Franchise Agreements to which any Loan Party or any of their Subsidiaries is a party.

(b)  Except as set forth on Schedule 8.23, as of the Closing Date, to the knowledge of the Loan Parties, none of the Franchise Agreements contains any grant of exclusive rights to a territory designated therein which conflicts, or potentially conflicts, with any grant of exclusive rights to a territory granted under any other Franchise Agreement.

(c)  Except as could not reasonably be expected to have a Material Adverse Effect, (i) each Loan Party has prepared and maintained each of its Franchise Disclosure Documents, in an accurate and correct manner, (ii) each Loan Party has filed all required Franchise Disclosure Documents required by law in all states and jurisdictions requiring registration and approval prior to any offers or sales of franchises in such states and (iii) each Loan Party has filed all material changes, amendments, renewals thereto on a timely and accurate basis as required under, and required by applicable Requirements of Law.  Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party's Franchise Disclosure Documents were prepared in compliance with applicable Franchise Laws and disclosure guidelines, and there were no misrepresentations or omissions of information in any Franchise Disclosure Documents at the time such Loan Party was using such Franchise Disclosure Documents. Each Franchise Agreement complies, and the offer and sale of such Franchise Agreement complied, in each case at the time such offer and sale was made, with all Franchise Laws, except to the extent of any non-compliance therewith which could not reasonably be expected to have a Material Adverse Effect.

8.24  Affected Financial Institutions.  No Loan Party is an Affected Financial Institution.

8.25 [Dealer Agreements.

(a) Schedule 8.25 sets forth a complete and accurate list as of the Closing Date of all Dealer Agreements to which any Loan Party or any of their Subsidiaries is a party.

(b) Except as set forth on Schedule 8.25, as of the Closing Date, to the knowledge of the Loan Parties, none of the Dealer Agreements contains any grant of exclusive rights to a territory designated therein which conflicts, or potentially conflicts, with any grant of exclusive rights to a territory granted under any other Dealer Agreement.]

## SECTION 9.    AFFIRMATIVE AND NEGATIVE COVENANTS

Until the Obligations have been Paid in Full, each Borrower and each Guarantor on behalf of themselves and their Subsidiaries covenants and agrees, jointly and severally with all of the other Borrowers and Guarantors and the Lenders, to the covenants contained in this Section 9; provided that, notwithstanding anything to the contrary in this Section 9, all references to the defined terms "Subsidiaries" or "Subsidiary" in this Section 9 shall exclude any Foreign Subsidiary.

9.1     Maintenance of Existence.

(a)     Except as permitted by Section 9.7, each Borrower and Guarantor shall at all times preserve, renew and keep in full force and effect its corporate existence and material rights and franchises with respect thereto and maintain in full force and effect all material governmental licenses, approvals, authorizations, leases, contracts and permits necessary to carry on the business as presently conducted, except where the failure to so preserve, renew or keep in full force and effect would not reasonably be expected to have a Material Adverse Effect.

(b)     No Borrower or Guarantor shall change its name, type of organization, jurisdiction of organization or other legal structure unless each of the following conditions is satisfied:  (i) Agent shall have received prompt (and in any event within thirty (30) days or such longer period as reasonably agreed to by Agent)  written notice from Administrative Borrower of such change, which notice shall accurately set forth the new name; (ii) Agent shall have received a copy of the amendment to the certificate of formation of such Borrower or Guarantor providing for the name change certified by the Secretary of State of the jurisdiction of incorporation or organization of such Borrower or Guarantor as soon as it is available; and (iii) Agent shall have acknowledged in writing that either (A) such change will not adversely affect the validity, perfection or priority of Agent's security interest in the Collateral, or (B) any action reasonably necessary to continue the perfection of any liens in favor of Agent, on behalf of Lenders, has been completed.

(c)     No Borrower or Guarantor shall change its chief executive office or its mailing address or organizational identification number (or if it does not have one, shall not acquire one) unless Agent shall have received prompt (and in any event within thirty (30) days or such longer period as reasonably agreed to by Agent) written notice from Administrative Borrower of such change, which notice shall set forth such information with respect thereto as Agent may require and Agent shall have received such agreements as Agent may reasonably require in connection therewith.

9.2     [Reserved].

9.3     Compliance with Laws, Regulations, Etc.

(a)     Except as could not reasonably be expected to cause a Material Adverse Effect, each Borrower and Guarantor shall, and shall cause any Subsidiary to, at all times, comply in all material respects with all laws, rules, regulations, licenses, approvals, orders and other permits applicable to it and duly observe all applicable requirements of any foreign, Federal, State or local Governmental Authority, the Code, the Fair Labor Standards Act of 1938, as amended, all Federal, State and local statutes, regulations, rules and orders pertaining to sales of consumer goods (including the Federal Trade Commission Act of 1914, as amended, and all regulations, rules and orders promulgated thereunder, and the Federal Food, Drug, and Cosmetic Act, as amended, and all regulations, rules, guidance and orders promulgated thereunder) and all statutes, rules, regulations, orders, permits and stipulations relating to environmental pollution and employee health and safety, including all of the Environmental Laws.

(b)     Administrative Borrower shall give written notice to Agent promptly upon any Borrower's or Guarantor's receipt of any notice of the following, except if the condition giving rise to such notice could not reasonably be expected to have a Material Adverse Effect (collectively, "Environmental Events"), (i) the occurrence of any event involving the unpermitted release, spill or discharge, threatened or actual, of any Hazardous Material by any Borrower or Guarantor or (ii) any investigation, proceeding, complaint, order, directive, claims, citation or notice with respect to:  (A) any non-compliance with or violation of any Environmental Law by any Borrower or Guarantor or (B) the release, spill or discharge, threatened or actual, of any Hazardous Material by any Borrower or Guarantor (as applicable) other than in the ordinary course of business and other than as permitted under any applicable Environmental Law.  Copies of all non-privileged environmental surveys, audits, assessments, feasibility studies and results of remedial investigations conducted in connection with an Environmental Event shall be promptly furnished, or caused to be furnished, by such Borrower or Guarantor to Agent.  Each Borrower and Guarantor shall take prompt action to respond to any material non-compliance with any of the Environmental Events and shall regularly report to Agent on such response.

(c)     Without limiting the generality of the foregoing, whenever Agent reasonably determines that there is material non-compliance, or any condition which requires any action by or on behalf of any Borrower or Guarantor in order to avoid any non-compliance, with any Environmental Law except with respect to such non-compliance that could not reasonably be expected to have a Material Adverse Effect, Borrowers shall, at Agent's reasonable request and Borrowers' expense:  (i) cause an independent environmental consultant reasonably acceptable to Agent to conduct such tests of the site where non-compliance or alleged non-compliance with such Environmental Laws (including sampling and analysis, if necessary) has occurred as to such non-compliance and prepare and deliver to Agent a report as to such non-compliance setting forth the results of such tests, a proposed plan for responding to any environmental problems described therein, and an estimate of the costs thereof and (ii) provide to Agent a supplemental report of such consultant whenever the scope of such non-compliance, or such Borrower's or Guarantor's response thereto or the estimated costs thereof, shall change in any material respect.

(d)     Each Borrower and Guarantor shall indemnify and hold harmless Agent and Lenders and their respective directors, officers, employees, agents, invitees, representatives, successors and assigns, from and against any and all losses, claims, damages, liabilities, costs, and expenses (including reasonable attorneys' fees and expenses) directly or indirectly arising out of or attributable to the use, generation, manufacture, reproduction, storage, release, threatened release, spill, discharge, disposal or presence of a Hazardous Material on any property of a Borrower or resulting from a Borrower's conduct, including the costs of any required or necessary repair, cleanup or other remedial work with respect to any property of any Borrower or Guarantor and the preparation and implementation of any closure, remedial or other required plans relating to such Hazardous Materials except to the extent such losses, claims, damages, liabilities, costs, and expenses arise out of or are attributable to the gross negligence or willful misconduct of Agent or any Lender.  All indemnifications in this Section 9.3 shall survive the payment of the Obligations and the termination of this Agreement.

9.4     Payment of Taxes and Claims.  Each Borrower and Guarantor shall, and shall cause each of its Subsidiaries to, pay all Taxes (whether or not shown on a Tax return) imposed upon it or its income or properties or in respect of its property or assets, before the same shall

become delinquent or in default, except where (a) the same are being contested in good faith by an appropriate proceeding diligently conducted by the Administrative Borrower or such Guarantor or any of its Subsidiaries or, (b) the failure to make payment would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (c) such Taxes are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Closing Date.

9.5    Insurance.

(a)    Each Borrower and Guarantor shall, and shall cause any Subsidiary to, at all times, maintain with financially sound and reputable (in the good faith judgement of the management of such Borrower or Guarantor) insurers insurance in at least such amounts (after giving effect to any self-insurance which each Borrower and Guarantor believes (in the good faith judgment of management of such Borrower and Guarantor) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as each Borrower and Guarantor believes (in the good faith judgment or the management of such Borrower and Guarantor) are reasonable and prudent in light of the size and nature of its business. Such policies of insurance shall be reasonably satisfactory to Agent as to form, amount and insurer. Borrowers and Guarantor shall pay all premiums on any such insurance when due. Borrowers and Guarantors shall furnish certificates, policies or endorsements to Agent as Agent shall reasonably require as proof of such general liability policy of insurance (other than directors and officers policies, workers compensation policies and business interruption insurance), to the extent covering Collateral and to the extent that Agent can be granted an insurable interest therein. All such insurance policies shall provide for at least 30 days' prior written notice to Agent of any cancellation, amendment or reduction of coverage and that Agent may act as attorney for each Borrower and Guarantor in obtaining, and at any time an Event of Default has occurred and is continuing, adjusting, settling, amending and canceling such insurance. Borrowers and Guarantors shall cause Agent to be named as a lender loss payee and/or an additional insured, as applicable (but without any liability for any premiums) under all casualty and property insurance policies (but not any business interruption insurance policies) and, subject to Section 9.31, Borrowers and Guarantors shall obtain non-contributory lender's loss payable endorsements to all property and casualty insurance policies in form and substance reasonably satisfactory to Agent, which provide that all proceeds thereunder with respect to any Collateral shall be payable to Agent, and that no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy.

(b)    Except upon (ai) the occurrence and during the continuance of an Event of Default, or (bii) during a Compliance Period solely to the extent the insurance proceeds relate to any Collateral which at the time of loss was included in the calculation of the Borrowing Base, insurance proceeds may be applied by Borrowera Loan Party in its discretion to the repair or replacement of any lost or damaged Collateral that gave rise to such insurance proceeds so long as (iA) in the context of replacing lost or damaged Collateral, the insurance proceeds are used to replace such lost or damaged Collateral with like Collateral, and (iiB) such repair or replacement is completed within 180 days of the receipt of insurance proceeds, or if Borrowersuch Loan Party commits in writing to undertake such repair or replacement within such 180-day period, within 270 days of the date of the receipt of insurance proceeds. Such lender's loss payable

endorsements shall specify that the proceeds of such insurance shall be payable to Agent, for itself and the ratable benefit of the Secured Parties, Lenders and the Bank Product Providers, as its interests may appear and further specify that Agent and Lenders shall be paid regardless of any act or omission by any Borrower, Guarantor or any of its or their Affiliates.  Without limiting any other rights of Agent or Lenders, and subject to ~~Borrowers~~the Loan Parties' right to otherwise use insurance proceeds as provided in this <u>Section 9.5</u>, any insurance proceeds received by Agent at any time may be applied to payment of the Obligations, whether or not then due, in any order and in such manner as Agent may determine, subject to the requirements of <u>Section 6.4</u>.  Upon application of such proceeds to the Revolving Loans, Revolving Loans may be available subject and pursuant to the terms hereof to be used for the costs of repair or replacement of the Collateral lost or damages resulting in the payment of such insurance proceeds.

(c)    ~~(b)~~ If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Administrative Borrower shall, or shall cause each Loan Party to (i) if required by the Flood Insurance Laws or other applicable law, maintain, or cause to be maintained, with insurance companies that the Administrative Borrower believes (in the good faith judgment of the management of the Administrative Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) furnish to the Lenders, upon written request from Agent, information presented in reasonable detail as to the flood insurance so carried.

9.6    <u>Financial Statements and Other Information</u>.

(a)    Each Borrower and Guarantor shall, and shall cause any Subsidiary to, keep proper books and records in which true and complete entries shall be made of all dealings or transactions of or in relation to the Collateral and the business of such Borrower, Guarantor and its Subsidiaries in accordance with GAAP.  Borrowers and Guarantors shall promptly furnish to Agent and Lenders all such financial and other information as Agent shall reasonably request in writing relating to the Collateral and the assets, business and operations of Borrowers and Guarantors, and the Administrative Borrower shall notify the auditors and accountants of Borrowers and Guarantors that Agent is authorized to obtain such information directly from them.  Without limiting the foregoing, Administrative Borrower shall furnish or cause to be furnished to Agent, the following:

(i)    within 30 days after the end of each fiscal month, monthly unaudited consolidated financial statements of ~~FRG and its~~Fusion Buyer, the Guarantors and their respective Subsidiaries (including in each case balance sheets, statements of income and loss, and statements of cash flow) and the related (X) consolidated statements of income or operations for such fiscal month and for the portion of the fiscal year then ended and (Y) consolidated statements of cash flows for such fiscal month and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal month of the previous fiscal year and the corresponding portion of the previous fiscal year, in

154

each case, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of ~~FRG and its~~Fusion Buyer, the Guarantors and their respective Subsidiaries as of the end of and through such fiscal month, certified to be correct in all material respects by the chief financial officer, treasurer or other similar officer of Administrative Borrower, subject to normal year-end adjustments and accompanied by a compliance certificate substantially in the form of <u>Exhibit C</u> hereto, along with a schedule in form reasonably satisfactory to Agent of the calculations used in determining the Fixed Charge Coverage Ratio as of the end of such fiscal month~~,~~ for the relevant measurement period (as described in the definition of Fixed Charge Coverage Ratio), in each case, whether or not compliance with the Fixed Charge Coverage Ratio is then required,

        (ii)     within 90 days (or 120 days with respect to the fiscal year of the Administrative Borrower ending on or about December 31, 2025 (which may, at the Administrative Borrower's option, be limited to the period from the Closing Date to December 31, 2025 or be on a predecessor/successor basis)) after the end of each fiscal year, audited consolidated financial statements of ~~FRG and its~~Fusion Buyer, the Guarantors and their respective Subsidiaries (including in each case balance sheets, statements of income and loss, statements of cash flow and statements of shareholders' equity), and the accompanying notes thereto, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of ~~FRG and its~~Fusion Buyer, the Guarantors and their respective Subsidiaries as of the end of and for such fiscal year, together with the unqualified opinion of independent certified public accountants with respect to the audited consolidated financial statements, which accountants shall be an independent accounting firm selected by Administrative Borrower and reasonably acceptable to Agent, that such audited consolidated financial statements have been prepared in accordance with GAAP, and present fairly in all material respects the results of operations and financial condition of ~~FRG and its~~Fusion Buyer, the Guarantors and their respective Subsidiaries as of the end of and for the fiscal year then ended, and accompanied by a compliance certificate substantially in the form of <u>Exhibit C</u> hereto~~, and~~ (to include the calculation of the Fixed Charge Coverage Ratio for the relevant measurement period covered by such financial statements (as described in the definition of Fixed Charge Coverage Ratio), in each case, whether or not compliance with the Fixed Charge Coverage Ratio is then required, and

        (iii)    (A) at such time as available, but in no event later than 30 days after the end of each fiscal year (commencing with the fiscal year of ~~FRG~~Fusion Buyer ending December 31, 2025), projected consolidated financial statements (including in each case, forecasted balance sheets and statements of income and loss, statements of cash flow and projected Borrowing Base availability) of ~~FRG and its~~Fusion Buyer, the Guarantors and their respective Subsidiaries for the next fiscal year, all in reasonable detail, and in a format consistent with the projections delivered by Borrowers to Agent prior to the date hereof, together with such supporting information as Agent may reasonably request.  Such projected financial statements shall be prepared on a monthly basis for the next succeeding year.  Such projections shall represent the reasonable best estimate by Administrative Borrower of the future financial performance of ~~FRG and its~~Fusion Buyer, the Guarantors and their respective Subsidiaries for the periods set forth therein and shall have been prepared on the basis of the assumptions set forth therein which Administrative Borrower believes is fair and reasonable as of the date of preparation in light of current and reasonably foreseeable business conditions (it being

understood that actual results may differ from those set forth in such projected financial statements), and

(B)    at such time as the aggregate amount of consideration paid by Borrowers and Guarantors in respect of Permitted Acquisitions equals or exceeds $12,500,000 since the date that the last projections were received by Agent pursuant to Section 9.6(a)(iii)(A) hereof or this Section 9.6(a)(iii)(B), Administrative Borrower shall deliver updated (from the date of the last projections received) projected financial statements on or prior to the date of consummation of such Permitted Acquisition, in form and substance as required in Section 9.6(a)(iii)(A) hereof.

(b)    Administrative Borrower shall, and shall cause the other Borrower(s) to notify Administrative Borrower so that it may, promptly notify Agent in writing of the details of (i) any loss, damage, investigation, action, suit, proceeding or claim relating to Collateral having a value of more than $1,000,000 or which if adversely determined would result in a Material Adverse Effect, (ii) any Material Contract being terminated or materially amended or any new Material Contract entered into (in which event Administrative Borrower shall provide Agent with a copy of such Material Contract to the extent permitted by any applicable confidentiality provisions contained in such Material Contract, provided that Borrowers shall use commercially reasonable efforts to get any appropriate consent necessary to provide Agent with such a copy), (iii) any order, judgment or decree in excess of $1,000,000 shall have been entered against any Borrower or Guarantor any of its or their properties or assets, (iv) any notification of a material violation of laws or regulations received by any Borrower or Guarantor from a Governmental Authority, (v) any ERISA Event that could be reasonably expected to have a Material Adverse Effect, (vi) the occurrence of any Default or Event of Default, (vii) any material breach or material non-performance of, or any material default under, any agreements with any franchisee (including any Franchisee) that would materially and adversely impact the ability of Agent to realize upon the Collateral and (viii) any material breach or material non-performance of, or any material default under, any agreements with any dealer [(including any Dealer)] that would materially and adversely impact the ability of Agent to realize upon the Collateral.  Each notice delivered under this Section 9.6(b) (i) shall be in writing, (ii) shall contain a heading or a reference line that reads "Notice under Section 9.6(b) of Franchise GroupFusion Buyer Credit Agreement dated [   ]June 6, 2025" and (iii) shall be accompanied by a statement of an Authorized Officer of Administrative Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

(c)    Promptly after the sending or filing thereof, Administrative Borrower shall send to Agent copies of all reports and registration statements which FRGany Loan Party or any of its Subsidiaries files with the Securities and Exchange Commission, any national or foreign securities exchange or the National Association of Securities Dealers, Inc., and such other reports as Agent may hereafter specifically identify to Administrative Borrower that Agent will require be provided to Agent.

(d)    Administrative Borrower shall furnish or cause to be furnished to Agent such budgets, forecasts, projections and other information respecting the Collateral and the business of Borrowers and Guarantors, as Agent may, from time to time, reasonably request.

156

Agent is hereby authorized to deliver a copy of any financial statement or any other information relating to the business of Borrowers and Guarantors to any court or other Governmental Authority or to any Lender or Participant or prospective Lender or Participant or any Affiliate of any Lender or Participant.  Each Borrower and Guarantor hereby irrevocably authorizes and directs all accountants or auditors to deliver to Agent, at Borrowers' expense and without affecting any confidentiality obligations of such accountants and auditors to Persons other than Agent, copies of the financial statements of any Borrower and Guarantor and any reports or management letters prepared by such accountants or auditors on behalf of any Borrower or Guarantor and to disclose to Agent and Lenders such information as they may have regarding the business of any Borrower and Guarantor.  Any documents, schedules, invoices or other papers delivered to Agent or any Lender may be destroyed or otherwise disposed of by Agent or such Lender one year after the same are delivered to Agent or such Lender, except as otherwise designated by Administrative Borrower to Agent or such Lender in writing.

(e)     Administrative Borrower shall furnish to Agent all material notices or demands in connection with Indebtedness incurred pursuant to <u>Section 9.9(e)</u>, <u>Section 9.9(g)</u>, <u>Section 9.9(j)</u> and <u>Section 9.9(q)</u> and the loans and advances made pursuant to <u>Section 9.10(i)</u>, in each case either received by any Borrower or Guarantor or on its behalf promptly after the receipt thereof, or sent by any Borrower or Guarantor or on its behalf concurrently with the sending thereof, as the case may be.

(f)     Administrative Borrower shall furnish to Agent, promptly, but in any event within one Business Day after the furnishing, receipt or execution thereof, copies of (i) any amendment, waiver, consent or other written modification of the First Lien Term Loan Documents , (ii) any notice of default or any notice related to the exercise of remedies under the First Lien Term Loan Documents and (iii) any other material notice, certificate or other information or document provided to, or received from, the First Lien Agent and the First Lien Lenders,  (including, any default notice received by the Administrative Borrower with respect to the First Lien Credit Agreement).

(g)     Administrative Borrower shall furnish to Agent, promptly, but in any event prior to or concurrently with the consummation of any Specified Payment, an officer's certificate confirming that the requirements set forth in the definition of "Payment Conditions" has been satisfied.

(h)     Administrative Borrower shall furnish promptly following any request therefor, (i) such other information regarding the operations, material changes in ownership of Capital Stock, business affairs and financial condition of any Borrower or Guarantor, or compliance with the terms of this Agreement, as the Agent or any Lender may reasonably request, and (ii) information and documentation reasonably requested by the Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

(i)     Administrative Borrower shall <u>(i)</u> promptly furnish to any Lender any change in the information provided in the Beneficial Ownership Certification delivered to such Lender that would result in a change to the list of beneficial owners identified in such

157

certification. and (ii) on or prior to the date on which any Permitted Holder first acquires, directly or indirectly, 20% or more of the Capital Stock of Topco, furnish to each Lender all information required by the Beneficial Ownership Certification delivered to accurately account for the change(s) to the list of beneficial owners identified in such certification.

(j)     Administrative Borrower shall furnish to Agent copies of (i) any Franchise Agreements not previously delivered to Agent prior to any related Franchisee Receivables being included in the Borrowing Base, and (ii) any material amendments or modifications to any Franchise Agreement to which any Franchisee Receivables included in the Borrowing Base are attributable, (iii) [any Dealer Agreements not previously delivered to Agent prior to any related Inventory located at a location owned or leased by a Dealer being included in the Borrowing Base; provided that, so long as Administrative Borrower shall have provided written notice to Agent of the name of the new or changed Dealer together with the next Borrowing Base Certificate delivered pursuant to Section 7.1(a)(i) after such new or changed name, this requirement shall not apply to any Dealer Agreement where the Dealer is changed but the Inventory subject to such Dealer Agreement has previously been included in the Borrowing Base and (iv) any amendments or modifications to any Dealer Agreement that would materially and adversely impact the ability of Agent to realize upon the Collateral with respect to which any Inventory located at a location owned or leased by a Dealer included in the Borrowing Base is attributable].

9.7     Sale of Assets, Consolidation, Merger, Dissolution, Etc. Borrowers and Guarantors shall not and shall not permit any Subsidiary to, directly or indirectly:

(a)     merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it; provided, however, upon prior written notice to Agent:

(i)     a Subsidiary (other than a Borrower) may merge into or with or consolidate with or dissolve or liquidate into another Subsidiary (other than a Loan Party);

(ii)     a Subsidiary may liquidate or dissolve or change its legal form if the Administrative Borrower determines in good faith that such action is in the best interests of FRG and its the Loan Parties and their respective Subsidiaries and is not materially disadvantageous to the all Lenders; provided that if such liquidating or dissolving Subsidiary is a Borrower, its assets shall be distributed to another Borrower;

(iii)     a Subsidiary (other than a Borrower) may merge into or with or consolidate with or dissolve or liquidate into a Borrower or Guarantor so long as (A) if FRG Fusion Buyer is a party to such transaction, FRG Fusion Buyer is the surviving entity with respect thereto and (B) subject to clause (A), a Borrower (in the case of any such event involving a Borrower) or Guarantor is the surviving entity with respect thereto and such Borrower or Guarantor has otherwise complied with Section 9.1(b) of this Agreement (if applicable) and all other terms of this Agreement;

(iv)     a Borrower may merge into or with or consolidate with or dissolve or liquidate into any other Person (including another Borrower); provided that (A) a Borrower

shall be the continuing or surviving Person (or, if one of the parties to such merger, consolidation or disposal is the Administrative Borrower, then the Administrative Borrower shall be the continuing or surviving Person) or (B) if the Person formed by or surviving any such merger or consolidation (or, in connection with a disposition of all or substantially all of the such Borrower's assets, if the transferee of such assets) is not a Borrower or is a Person into which such Borrower has been liquidated (any such Person, the "Successor Borrower"), (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any State thereof or the District of Columbia, (2) the Successor Borrower shall expressly assume all the obligations of a Borrower under this Agreement and the other Financing Agreements to which such Borrower is a party, pursuant to a supplement hereto or thereto in form and substance reasonably satisfactory to the Agent, (3) each Loan Party other than such Borrower, unless it is the other party to such merger or consolidation, shall have reaffirmed, pursuant to an agreement in form and substance reasonably satisfactory to the Agent, that its guarantee of and grant of any Liens as security for the Obligations shall apply to the Successor Borrower's obligations under this Agreement, (4) such Borrower shall have delivered to the Agent a certificate of an Authorized Officer and an opinion of counsel, each stating that such merger or consolidation complies with this Agreement, (5) no Default or Event of Default then exists or would occur, (6) no liens, other than those permitted under the terms of this Agreement with regard to such Borrower, on the assets of the Successor Borrower then exist and (7) the Successor Borrower would not, as a result of such transaction, be liable for any Indebtedness or other obligations of any Guarantor or any other Borrower, other than Indebtedness or other obligations which are permitted under the terms of this Agreement with regard to such Borrower; provided further that if the foregoing requirements are satisfied, the Successor Borrower will succeed to, and be substituted for, such Borrower under this Agreement and the other Financing Agreements; provided further that such Borrower will use commercially reasonable efforts to provide any documentation and other information about the Successor Borrower as shall have been reasonably requested in writing by any Lender through the Agent that such Lender shall have reasonably determined is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Title III of the USA PATRIOT Act; provided, further, that a Successor Borrower may not succeed to or be substituted for the Administrative Borrower pursuant to this clause (iv); and

(v)      FRG and itsthe Loan Parties and their respective Subsidiaries may undertake or consummate any Tax Restructuring;

(vi)      any Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an investment permitted pursuant to Section 9.10; provided that the continuing or surviving Person shall be a Borrower or a Subsidiary, which together with each of the Subsidiaries, shall have complied with the requirements of Sections 9.23; and

(vii)      any Subsidiary may effect a merger, dissolution, liquidation, consolidation or amalgamation to effect a disposition permitted pursuant to Section 9.7;

(b)      consummate any Asset Sale, except for:

(A)    sales of Inventory and other assets in the ordinary course of business and immaterial assets (considered in the aggregate) in the ordinary course of business;

(B)    returns and exchanges of Inventory to vendors in the ordinary course of business of a Borrower on terms and conditions consistent with the current or prior practices of such Borrower;

(C)    the sale or other disposition of assets (other than Collateral and other than assets subject to clause (D) of this Section below) by a Borrower or Guarantor or any Subsidiary in the ordinary course of its business that are no longer necessary or required, worn out, non-core or obsolete, in the conduct of such Borrower's or Guarantor's business;

(D)    sales or other dispositions by any Borrower or Guarantor or any Subsidiary of assets in connection with the closing or sale of a retail store location (the closure of a store is not in and of itself the disposition of assets), warehouse, distribution center or corporate office of such Borrower, Guarantor or Subsidiary in the ordinary course of business of such Borrower, Guarantor or Subsidiary, which sale or disposition consists of leasehold interests in the premises of such store or distribution center, the Equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such store or distribution center; provided that, as to each and all such sales and closings, (1) Agent shall have received written notice of such sale or closing in accordance with Section 7.1(a) hereof, (2) after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, and (3) such sale shall be on commercially reasonable prices and terms in a bona fide arm's length transaction;

(E)    in addition to the dispositions permitted in subclause (D) above, the sale or other disposition of Equipment (including worn-out, non-core or obsolete Equipment or Equipment no longer used or useful in the business of such Borrower or Guarantor) so long as the value of such Equipment sold in any fiscal year is equal to or less than the value of all Equipment acquired in such year;

(F)    sales, assignments, licenses, transfers, abandonments or other dispositions with respect to Intellectual Property made in the ordinary course of business or that do not interfere in any material respect with the business of the Borrowers or the Guarantors, taken as a whole;

(G)    (i) sales, transfers and dispositions of assets of (1) a Borrower to another Borrower, or (2) by a Guarantor to a Borrower or another Guarantor, provided, that, in each case such sale, transfer or disposition is otherwise consummated (and the lien and security interest of Agent and Secured Parties continues in such assets) in accordance with the terms of this Agreement and the other Financing Agreements and (ii) sales, transfers and dispositions of assets of a Subsidiary that is not a Loan Party to a Loan Party or another Subsidiary that is not a Loan Party;

(H)    the issuance and sale by any Borrower or Guarantor of Capital Stock of such Borrower or Guarantor after the date hereof; provided that (1) Agent shall have received not less than ten Business Days' prior written notice of such issuance and sale by

160

such Borrower, Guarantor or Subsidiary, which notice shall specify whether such shares are to be sold pursuant to a public offering or if not a public offering, then the parties to whom such shares are to be sold, the terms of such sale, the total amount which it is anticipated will be realized from the issuance and sale of such stock and the net cash proceeds which it is anticipated will be received by such Borrower or Guarantor from such sale, (2) such Borrower or Guarantor shall not be required to pay any cash dividends or repurchase or redeem such Capital Stock or make any other payments in respect thereof, (3) the terms of such Capital Stock, and the terms and conditions of the purchase and sale thereof, shall not include any terms that include any limitation on the right of any Borrower to request or receive Loans or Letters of Credit or the right of any Borrower and Guarantor to amend or modify any of the terms and conditions of this Agreement or any of the other Financing Agreements or otherwise in any way relate to or affect the arrangements of Borrowers and Guarantors with Agent and Lenders or are more restrictive or burdensome to any Borrower or Guarantor than the terms of any Capital Stock in effect on the date hereof, (4) except as Agent may otherwise agree in writing, upon the occurrence and continuance of an Event of Default or during a Compliance Period, all of the proceeds of the sale and issuance of such Capital Stock shall be paid to Agent for application to the Obligations in accordance with Section 6.4(a) or at Agent's option, to be held as cash collateral for the Obligations provided, that, in no event shall any Borrower or Guarantor issue any Capital Stock which would result in a Change of Control or other Event of Default; provided, further, that conditions (1) through (3) above shall not apply to issuances and sales of Capital Stock by any Borrower or Guarantor to any other Borrower or Guarantor (so long as such issued Capital Stock is pledged as Collateral);

(I)     licenses granted to franchisees in the ordinary course of business and consistent with past practices;

(J)     the abandonment, non-renewal, failure to maintain, cancellation or sale, transfer or other disposition of Intellectual Property which do not materially interfere with the Borrowers' and Guarantors' business, taken as a whole;

(K)     (i) leases and subleases and other agreements related to Real Property in the ordinary course of business and (ii) leases, subleases, service agreements, product sales, abandonments, licenses, sublicenses or other disposals (including of Intellectual Property), in each case, (A) granted in the ordinary course of business or (B) that do not materially interfere with the business of ~~FRG and its~~ the Loan Parties and their respective Subsidiaries, taken as a whole;

(L)     the transactions permitted under Sections 9.9, 9.10(h) and 9.11 hereof;

(M)     dispositions of cash and Cash Equivalents subject to compliance with Section 9.10(b) hereof;

(N)     [reserved];

(O)     dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) an

amount equal to net proceeds of such disposition received in cash or Cash Equivalents are promptly applied to the purchase price of such replacement property;

(P)    dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(Q)    dispositions of any assets (including Capital Stock) (A) acquired in connection with any Permitted Acquisition or other Investment not prohibited hereunder, which assets are not used or useful to the core or principal business of any Borrower and its Subsidiaries and (B) made to obtain the approval of any applicable antitrust authority in connection with a Permitted Acquisition;

(R)    [reserved];

(S)    transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(T)    [reserved]sales or other dispositions by any Borrower or Guarantor or any Subsidiary of Equipment and fixtures located at distribution centers in an aggregate amount not to exceed $100,000;

(U)    [any sale and leaseback transactions permitted by Section 9.33;

(V)    any disposition of the Equity InterestsCapital Stock of any Immaterial Subsidiary;

(W)    [reserved];the sale or other disposition of retail store locations to a franchisee; provided that the aggregate fair market value of assets disposed pursuant to this clause (W) shall not exceed $1,000,000;

(X)    [reserved]; and

(Y)    [reserved];

(c)    wind up, liquidate or dissolve, except (i) as permitted in clause (a) above or (ii) if such Person is a Subsidiary of any Borrower with assets having an aggregate fair market value of less than or equal to $2,500,000; or

(d)    consummate a Division as a Dividing Person without the prior written consent of the Agent. Without limiting the foregoing, if any Borrower or Guarantor that is a limited liability company consummates a Division (with or without the prior consent of the Agent as required above), each Division Successor shall be required to comply with the obligations set forth in Section 9.23 and the other further assurances obligations set forth in the

Financing Agreements and become a Borrower or Guarantor, as applicable, under this Agreement and the other Financing Agreements.

Notwithstanding anything herein to the contrary, (i) any Asset Sales, sales or dispositions (including any sale and leaseback transaction) by any Borrower ~~of~~or any Subsidiary outside the ordinary course of business of ABL Priority Collateral in excess of $2,500,000 in the aggregate shall not be permitted without the written consent of ~~the Required~~all Lenders, to be granted in their sole discretion and (ii) the Administrative Borrower shall not, and shall not permit any other Loan Party to, sell any of its businesses or undertake any receivables securitization, any whole business securitization or any other securitization transaction with respect to the ABL Priority Collateral, its assets or businesses, in each case, that would not otherwise result in Payment in Full hereunder without the written consent of ~~the~~all Lenders, to be granted in their sole discretion.

9.8    <u>Encumbrances</u>.  Each Borrower and Guarantor shall not, and shall not permit any Subsidiary to, create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or lien with respect to any such assets or properties, except:

(a)    the security interests and liens of Agent for itself and the benefit of the Secured Parties and the rights of setoff of Secured Parties provided for herein or under applicable law;

(b)    (i) easements, leases, licenses, subleases or sublicenses granted to others (including licenses and sublicenses of Intellectual Property) that do not (A) interfere in any material respect with the business of the Borrowers and their Subsidiaries, taken as a whole, or (B) secure any Indebtedness and (ii) any interest or title of a lessor or licensee under any lease or license entered into by a Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased or licensed;

(c)    liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(d)    liens (A) of a collection bank arising under Section 4-210 of the UCC, or any comparable or successor provision, on items in the course of collection, (B) attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business or (C) in favor of a banking or other financial institution or entity, or electronic payment service provider, arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking or finance industry;

(e)    liens securing Indebtedness permitted under <u>Section 9.9(b)</u>; <u>provided</u> that (A) such liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such liens, (B) such liens do not at any time encumber any property other than the property financed by such

Indebtedness except for replacements, additions, accessions and improvements to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Leases, such liens do not at any time extend to or cover any assets (except for replacements, additions, accessions and improvements to or proceeds of such assets) other than the assets subject to such Capital Leases; provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(f)    liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 9.10 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any disposition permitted under Section 9.7 (including any letter of intent or purchase agreement with respect to such Investment or disposition), or (B) consisting of an agreement to dispose of any property in a disposition permitted under Section 9.7, in each case, solely to the extent such Investment or disposition, as the case may be, would have been permitted on the date of the creation of such lien;

(g)    liens or rights of setoff against credit balances of Borrowers, Guarantors or any of their Subsidiaries with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to Borrower in the ordinary course of business, but not liens on or rights of setoff against any other property or assets of Borrowers, pursuant to the Credit Card Agreements to secure the obligations of Borrowers to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks;

(h)    [reserved];

(i)    liens arising from (i) [reserved] and (ii) Equipment or other materials which are not owned by any Borrower, Guarantor or Subsidiary located on the premises of such Borrower, Guarantor or Subsidiary (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business of such Borrower, Guarantor or Subsidiary and the precautionary UCC financing statement or fixture filings in respect thereof;

(j)    deposits of cash with the owner or lessor of premises leased and operated by any Borrower, Guarantor or Subsidiary in the ordinary course of the business of such Borrower, Guarantor or Subsidiary to secure the performance by such Borrower, Guarantor or Subsidiary of its obligations under the terms of the Real Property lease for such premises;

(k)    liens on motor vehicles securing Indebtedness permitted by Section 9.9(hh).

(l)    liens granted by a Subsidiary that is not a Loan Party in favor of any Subsidiary or any Borrower and liens granted by a Loan Party in favor of any other Loan Party;

(m)    security interests in assets of a Borrower, Guarantor or Subsidiary existing at the time such Borrower, Guarantor or Subsidiary is acquired pursuant to a Permitted Acquisition after the date hereof and any modifications, replacements, renewals or extensions thereof; provided that each of the following conditions is satisfied as determined by Agent:  (i) such security interests were not granted and did not arise in connection with, or in anticipation or

contemplation of, such Permitted Acquisition and (ii) the assets subject to such security interests do not include any assets of the type or categories that constitute Collateral other than Equipment or Real Property and do not apply to any assets or properties of any Borrower or other Guarantor other than Equipment and Real Property of the Borrower, Guarantor or Subsidiary so acquired;

(n)     other liens not otherwise permitted under any other subsection of this Section 9.8 with respect to property or assets of any Borrower, Guarantor or Subsidiary; provided that (i) the aggregate principal amount of the Indebtedness or other obligations secured by such liens does not exceed $5,000,000 and (ii) to the extent such liens encumber Collateral, they shall be subordinated to the security interests and liens of Agent on such Collateral in a manner substantially consistent with the terms of the Intercreditor Agreement or another intercreditor agreement reasonably acceptable to Agent;

(o)     liens or security interests arising by law or granted by any Borrower or any Guarantor in favor of a lessor, landlord, consignee, warehouseman or bailee of a retail store location, Non-Retail Store Location or Warehouse Location, as applicable, on personal property and/or trade fixtures owned by any Borrower or Guarantor located at such locations granted pursuant to a lease agreement between such Borrower or Guarantor and such lessor, landlord, consignee, warehouseman or bailee, as applicable, entered into in the ordinary course of business, in each case granted to secure obligations owed by such Borrower or Guarantor with respect to any rental payments, service charges or other amounts owing to such lessor, landlord, consignee, warehouseman or bailee, as applicable, pursuant to such lease agreement; provided, that, in the event that Administrative Borrower does not obtain a Collateral Access Agreement with respect to such locations, Agent at its option, may establish a Reserve with respect to each such location in respect of amounts at any time due or to become due to the lessor, landlord, consignee, warehouseman or bailee, as applicable, of such location as Agent shall reasonably determine but in no event shall any Reserve with respect to rent be maintained in respect of any location for which a Collateral Access Agreement has been delivered to Agent;

(p)     [reserved];

(q)     liens incurred by any Borrower or Guarantor on any unearned premiums paid by any Borrower or Guarantor or any return of the premium for such policy; pursuant to the Indebtedness described in Section 9.9(j) hereof;

(r)     liens existing on the Closing Date and set forth on Schedule 8.4) and any modifications, replacements, renewals or extensions thereof; provided that (A) such modified, replacement, renewal or extension lien does not extend to any additional property other than (1) after-acquired property that is affixed or incorporated into the property covered by such lien and (2) proceeds and products thereof, and (B) the obligations secured or benefited by such modified, replacement, renewal or extension lien are permitted by Section 9.9;

(s)     [reserved];

(t)     Permitted Encumbrances;

(u)     any interest or title of a lessor or sublessor under leases or subleases (other than Capital Leases) entered into by a Borrower or any Subsidiary in the ordinary course of business;

(v)     liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by a Borrower or any Subsidiary in the ordinary course of business;

(w)      liens deemed to exist in connection with Investments in repurchase agreements under clauses (d) or (e) of the definition of the term "Cash Equivalents";

(x)     liens encumbering reasonable customary initial deposits and margin deposits and similar liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(y)     liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of a Borrower and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of a Borrower or any Subsidiary in the ordinary course of business;

(z)     liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(aa)    liens on real property other than the Mortgaged Properties;

(bb)    liens on cash and Cash Equivalents used to satisfy or discharge Indebtedness; provided such satisfaction or discharge is permitted hereunder;

(cc)    receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a lien on the related inventory and proceeds thereof;

(dd)    liens on Capital Stock of any joint venture (a) securing obligations of such joint venture or (b) pursuant to the relevant joint venture agreement or arrangement;

(ee)    liens in favor of credit card issuers and credit card processors arising in the ordinary course of business securing the obligation to pay customary fees and expenses in connection with credit card arrangements;

(ff)    liens securing the First Lien Obligations to the extent permitted to be incurred pursuant to Section 9.9(s); provided that such liens are at all times subject to the Intercreditor Agreement;

(gg)    [reserved];

(hh)    Liens securing Indebtedness permitted under Section 9.9(w) and Section 9.9(aa); and

(ii)    Liens on cash and Permitted Investments to secure Indebtedness permitted under Section 9.9(m) or Section 9.9(ff).

With respect to any lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such lien shall also be permitted to secure any Increased Amount of such Indebtedness.

9.9    Indebtedness.  Each Borrower and Guarantor shall not, and shall not permit any Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except:

(a)    the Obligations;

(b)    Indebtedness (including Capital Leases and purchase money indebtedness) incurred, issued or assumed by a Borrower or any Subsidiary to finance the acquisition, purchase, lease, construction, repair, replacement or improvement of fixed or capital property, equipment or other assets; provided that, in the case of any purchase money Indebtedness, such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, purchase, lease, construction, repair, replacement or improvement; provided, further that, at the time of any such incurrence of Indebtedness and after giving pro forma effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding (excluding any Capital Leases incurred pursuant to any sale and leaseback transactions permitted by Section 9.33) shall not exceed $10,000,000;

(c)    (1) guarantees by any Loan Party of the Indebtedness or other obligations of any Loan Party, in each case so long as such Indebtedness is otherwise permitted under this Section 9.9 and such other obligations are not prohibited by the terms of this Agreement and (2) guarantees by the any Subsidiaries (which are not Loan Parties) in respect of Indebtedness of a Borrower, Guarantor or other Subsidiary otherwise permitted hereunder; provided that:

(i)    no guarantee by any Subsidiary of a Loan Party of any unsecured Indebtedness for borrowed money in a principal amount in excess of $2,500,000 shall be permitted unless such Subsidiary shall have also provided a guarantee of the applicable Obligations pursuant to the Guaranty Agreement; and

(ii)    provided, further that if the Indebtedness being guaranteed is subordinated to the Obligations, such guarantee shall be subordinated to the guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(d)     the Indebtedness of any Borrower, Guarantor or other Subsidiary to any other Borrower or Guarantor or other Subsidiary arising after the date hereof to the extent permitted by 9.10(h) hereof;

(e)     unsecured Indebtedness of any Borrower, Guarantor or Subsidiary arising after the date hereof to any third Person (but not to any other Borrower or Guarantor); provided that each of the following conditions is satisfied as determined by Agent:

(i)     (i) such Indebtedness shall be on terms and conditions acceptable to Agent and shall be subject and subordinate in right of payment to the right of Agent and Lenders to receive the prior payment and satisfaction in full payment of all of the Obligations pursuant to the terms of an intercreditor and subordination agreement between Agent and such third party, in form and substance satisfactory to Agent,;

(ii)     (ii) Agent shall have received not less than ten days' prior written notice of the intention of such Borrower or Guarantor to incur such Indebtedness, which notice shall set forth in reasonable detail satisfactory to Agent the amount of such Indebtedness, the Person or Persons to whom such Indebtedness will be owed, the interest rate, the schedule of repayments and maturity date with respect thereto and such other information as Agent may request with respect thereto,;

(iii)     (iii) Agent shall have received true, correct and complete copies of all agreements, documents and instruments evidencing or otherwise related to such Indebtedness,;

(iv)     (iv) except as Agent may otherwise agree in writing, upon the occurrence and continuance of an Event of Default or during a Compliance Period, all of the cash proceeds of such loans or other accommodations incurred during the occurrence of such Event of Default or during such Compliance Period shall be, subject to the Intercreditor Agreement, paid to Agent for application to the Obligations in such order and manner as Agent may determine or at Agent's option, to be held as cash collateral for the Obligations,;

(v)     (v) in no event shall the aggregate principal amount of such Indebtedness incurred during the term of this Agreement exceed $10,000,000,;

(vi)     (vi) as of the date of incurring such Indebtedness and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing; and

(vii)     (vii) such Borrower and Guarantor shall not, directly or indirectly, (A) amend, modify, alter or change the terms of such Indebtedness or any agreement, document or instrument related thereto, except, that, such Borrower or Guarantor may, after prior written notice to Agent, amend, modify, alter or change the terms thereof so as to extend the maturity thereof, or defer the timing of any payments in respect thereof, or to forgive or cancel any portion of such Indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith or (B) redeem, retire, defease, purchase or otherwise acquire such Indebtedness (except as permitted by Section 9.24), or set aside or otherwise deposit or invest any sums for such purpose, in each case without the written consent of Agent;

(f)      Indebtedness in respect of Hedge Agreement not incurred for speculative purposes;

(g)      Indebtedness outstanding on the Closing Date; <u>provided</u> that any Indebtedness shall only be permitted if set forth on Schedule 9.9;

(h)      [reserved];

(i)      [reserved];

(j)      Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business ;

(k)      Indebtedness incurred by a Borrower or any of the Subsidiaries in respect of letters of credit, bank guarantees, warehouse receipts, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(l)      [reserved];

(m)      Indebtedness in respect of Cash Management Obligations and other Indebtedness in respect of netting services, automated clearinghouse arrangements, overdraft protections and similar arrangements, in each case, in connection with deposit accounts or from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(n)      (i) Indebtedness arising from an agreement providing for indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments incurred in any Permitted Acquisition, any other Investment or any disposition, in each case permitted under this Agreement, and (ii) Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance pursuant to any such agreement described in clause (i);

(o)      Indebtedness of any Loan Party owing to any other Loan Party, in each case arising after the date hereof pursuant to Investments consisting of loans and advances permitted under Section 9.10 hereof, provided that, as to any such Indebtedness at any time owing by a Borrower to a Guarantor or another Borrower, (x) the Indebtedness arising pursuant to such Investment shall be subject to, and subordinate in right of payment to, the right of Agent and Lenders to receive the prior final payment and satisfaction in full of all of the Obligations on terms and conditions acceptable to Agent, and (y) any such Indebtedness arising pursuant to any such loan shall not be evidenced by a promissory note or other instrument, unless the single original of such note or other instrument is promptly delivered to Agent upon its request to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as Agent may require;

169

(p)      Indebtedness ("Refinancing Indebtedness") incurred to refinance Indebtedness incurred pursuant to subsections (b), (c), (d), (e), (f), (g), (j), (s) or (w) of this Section 9.9 (or this subsection (p)) or any successive Refinancing Indebtedness (such Indebtedness being refinanced being referred to herein as the "Refinanced Indebtedness") so long as (i) such Indebtedness continues to comply with all provisions of such subsections (b), (c), (d), (e), (f), (g), ~~(h), (i), (j), (l),~~ (s), or (w)~~, or (ff)~~ as applicable, (ii) the incurrence of such Indebtedness would not otherwise cause a Default or Event of Default to occur, and (iii) the terms of such Indebtedness (including subordination terms, if applicable) are not on terms which, taken as a whole, are materially more adverse to Borrowers, Guarantors, Agent or any Lender than the Refinanced Indebtedness, (iv) the principal amount of such Indebtedness as refinanced does not exceed the outstanding principal balance of the Refinanced Indebtedness plus costs, fees, expenses, and accrued interest, and (v) the final maturity date of such Refinancing Indebtedness is a maturity date that is not earlier than ninety days after the scheduled Maturity Date; provided that, with respect to the maturity date of any Refinancing Indebtedness in respect of the First Lien Obligations, such maturity date shall not be required to be subject to this clause (v) so long as such Indebtedness is subject to clause (b) of the definition of "Maturity Date";

(q)      [reserved];

(r)      [reserved];

(s)      the First Lien Obligations in an aggregate principal amount not to exceed, together with or in each case any refinancing or replacement thereof, the Secured Term Debt Cap; provided that any Liens securing the First Lien Obligations are at all times subject to the terms of the Intercreditor Agreement;

(t)      [reserved];

(u)      [reserved];

(v)      Indebtedness consisting of obligations under deferred compensation (including indemnification obligations, obligations in respect of purchase price adjustments, Earn-Outs, incentive non-competes and other contingent obligations) or other similar arrangements incurred or assumed in connection with any Permitted Acquisition, any other Investment or any disposition, in each case, permitted under this Agreement;

(w)      Indebtedness of the Administrative Borrower or any of the Subsidiaries; provided that at the time of the incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (w) shall not exceed $5,000,000;

(x)      [reserved];

(y)      Indebtedness supported by a letter of credit, in a principal amount not to exceed the face amount of such letter of credit;

(z)      [reserved];

(aa)    [reserved];

(bb)    [reserved];

(cc)    obligations in respect of self-insurance and obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by a Borrower or any Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case, in the ordinary course of business or consistent with past practice;

(dd)    (x) Indebtedness representing deferred compensation or stock-based compensation owed to employees, consultants or independent contractors of a Borrower or its Subsidiaries incurred in the ordinary course of business or consistent with past practice and (y) Indebtedness consisting of obligations of a Borrower (or any direct or indirect parent thereof) or its Subsidiaries under deferred compensation to employees, consultants or independent contractors of a Borrower (or any direct or indirect parent thereof) or its Subsidiaries or other similar arrangements incurred by such Persons in connection with any Permitted Acquisition or any other Investment not prohibited by Section 9.10;

(ee)    Indebtedness consisting of unsecured promissory notes issued by the Administrative Borrower or any Subsidiary to future, current or former officers, directors, employees, managers and consultants or their respective estates, spouses or former spouses, successors, executors, administrators, heirs, legatees or distributees, in each case to finance the purchase or redemption of Capital Stock of a Borrower (or any direct or indirect parent thereof);

(ff)    [reserved];

(gg)    obligations with respect to Capital Leases arising under any sale and leaseback transactions permitted by Section 9.33;

(hh)    to the extent constituting Indebtedness, motor vehicle leases in the ordinary course of business;

(ii)    [reserved];

(jj)    [reserved]; and

(kk)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (jj) above.;

provided that; notwithstanding anything in this Section 9.9 to the contrary:

(a)    Notwithstanding anything in this Section 9.9 to the contrary, (w) theThe aggregate amount of any refinancing Indebtedness incurred pursuant to subsection (p) of this Section 9.9 in respect of Refinanced Indebtedness originally incurred under (b), (c), (d), (e), (f), (g), (j), (s) or (w) shall be subject to, and shall continue to count towards, the dollar limitations applicable to Indebtedness set forth in the applicable subsection pursuant to which the

171

Refinanced Indebtedness was incurred, First Lien Obligations may only be incurred under Section 9.9(s).

(b)     For purposes of determining compliance with any dollar denominated restriction on the incurrence of Indebtedness, the dollar equivalent principal amount of Indebtedness denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided, however, that if such Indebtedness is Refinancing Indebtedness incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable dollar denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance such dollar denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased. Notwithstanding any other provision of this Section 9.9, the maximum amount of Indebtedness the Administrative Borrower or any Subsidiary may incur pursuant to this Section 9.9 shall not be deemed exceeded by fluctuations in the exchange rate of currencies. The principal amount of any Refinancing Indebtedness shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of any extension, replacement, refunding, refinancing, renewal or defeasance of any Indebtedness.

(c)     With respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence.

(d)     This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

(e)     Each Borrower and Guarantor will not, and will not permit any of its Subsidiaries to, issue any Disqualified Equity Interests.

9.10    Loans, Investments, Etc.  Each Borrower and Guarantor shall not, and shall not permit any Subsidiary to, directly or indirectly, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary immediately prior to such merger) any Capital Stock, evidences of Indebtedness or other Securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, or guarantee the Indebtedness or other obligations of, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit or all or a substantial part of the assets or property of any other Person (whether through purchase of assets, merger or otherwise), or form or acquire any Subsidiaries, or agree to do any of the foregoing (each of the foregoing, [but for the avoidance of doubt excluding the

acquisition, for no consideration, by JTH Tax, LLC, of loans due from franchisees under the Franchisee Loan Program Agreement][15], an "Investment"), except:

      (a)    the endorsement of instruments for collection or deposit in the ordinary course of business;

      (b)    Investments in cash or Cash Equivalents; provided, that, the terms and conditions of Section 5.2 and Section 6.3 hereof shall have been satisfied with respect to the Deposit Account, investment account or other account in which such cash or Cash Equivalents are held;

      (c)    (i)    the existing equity Investments of each Borrower and Guarantor as of the Closing Date in its Subsidiaries, provided that no Borrower or Guarantor shall have any further obligations or liabilities to make any capital contributions or other additional investments or other payments to or in or for the benefit of any of such Subsidiaries;

      (ii)    a Borrower or Guarantor may form a Subsidiary; provided that:

      (A)    Agent shall have received promptly upon any such formation or acquisition all of the agreements, documents and instruments required by the terms of Sections 5.2 and 9.23 hereof,

      (B)    as of the date of the organization, formation or acquisition of any such Subsidiary and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing,

      (C)    in the event that Administrative Borrower requests that any such new Subsidiary that is directly or indirectly wholly owned by FRGa Loan Party be designated a Borrower hereunder, in no event shall any Inventory, Accounts or Credit Card Receivables of such Subsidiary be deemed Eligible Inventory, Eligible Accounts or Eligible Credit Card Receivables until Agent shall have conducted a field examination and inventory appraisal with respect to such assets and the results of such field examination, inventory appraisal and other due diligence shall be reasonably satisfactory to Agent, and then only to the extent the criteria for Eligible Inventory, Eligible Accounts and Eligible Credit Card Receivables set forth herein are satisfied with respect thereto (as such criteria may be reasonably modified by Agent to reflect the results of Agent's field examination and appraisal including any separate advance percentage with respect to such Credit Card Receivables as Agent may reasonably determine), and

      (D)    such Subsidiary shall be an operating company that engages in a Permitted Business or an operating company or a holding company formed to make a Permitted Acquisition;

---

[15] NTD: confirm if still relevant

(d)    [reserved];¹⁶

(e)    loans or advances to officers, members (other than a Loan Party) of the Board and employees of any Borrower and its, any Guarantor and their respective Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes and (ii) in connection with such Person's purchase of Capital Stock of the Administrative Borrower (or any direct or indirect parent thereof) (provided that the amount of such loans and advances made in cash to such Person shall be immediately contributed to the Administrative Borrower in cash as common equity or Qualified Equity Interests);

(f)    Investments (including debt obligations and Capital Stock) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(g)    obligations of Account Debtors to any Borrower, Guarantor or Subsidiary arising from Accounts which are past due whether or not evidenced by a promissory note made by such Account Debtor payable to such Borrower or Guarantor; provided that, promptly upon the receipt of the original of any such promissory note by such Borrower or Guarantor, such promissory note shall be endorsed to the order of Agent by such Borrower or Guarantor and promptly delivered to Agent as so endorsed;

(h)    investments by any Loan Party to any other Loan Party, in each case after the date hereof; provided that as to any Investments in the form of loans, (A) the Indebtedness arising pursuant to any such loan shall not be evidenced by a promissory note or other instrument, unless the single original of such note or other instrument is promptly delivered to Agent upon its request to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as Agent may require, (B) as of the date of any such loan and after giving effect thereto, the Administrative Borrower or Guarantor making such loan shall be Solvent, (C) as of the date of any such loan and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (D) the Indebtedness arising pursuant to such loan shall be subject to, and subordinate in right of payment to, the right of Agent and Lenders to receive the prior final payment and satisfaction in full of all of the Obligations on terms and conditions reasonably acceptable to Agent;, (E) promptly upon Agent's request, Agent shall have received a subordination agreement, in form and substance reasonably satisfactory to Agent, providing for the terms of the subordination in right of payment of such loans to the prior final payment and satisfaction in full of all of the Obligations, duly authorized, executed and delivered by such Loan Parties, and (F) such Loan Parties shall not, directly or indirectly make, or be required to make, any payments in respect of such loans prior to the end of the then current term of this Agreement;

(i)    Investments existing or contemplated on the Closing Date (provided that any Investment shall only be permitted if set forth on Schedule 9.10) and any modification,

---

¹⁶ NTD: overlaps with (h) below

replacement, renewal, reinvestment or extension thereof; provided that the amount of the Investment as of the Closing Date is not increased except by the terms of such Investment to the extent set forth on Schedule 9.10 or as otherwise permitted by this Section 9.10;

(j)    [reserved];

(k)    commencing on the date that is ninety (90) days after the Closing Date, (A) Permitted Acquisitions and (B) intercompany Investments required (as determined by the Administrative Borrower in good faith) to consummate Permitted Acquisitions; provided that all entities, businesses and assets (other than Excluded Assets) acquired through a Permitted Acquisition after the Closing Date shall become Loan Parties and Collateral, as applicable, pursuant to Sections 9.21 and 9.23;

(l)    [reserved];

(m)    commencing on the date that is ninety (90) days after the Closing Date, Investments of a Subsidiary acquired after the Closing Date or of a Person merged or consolidated with any Subsidiary in accordance with this Section 9.10 and Section 9.7(a) after the Closing Date or that otherwise becomes a Subsidiary (provided that if such Investment is made under Section 9.10(k), existing Investments in subsidiaries of such Subsidiary or Person shall comply with the requirements of Section 9.10(k)) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(n)    commencing on the date that is ninety (90) days after the Closing Date, Investments arising as a result of sale and leaseback transactions permitted by Section 9.33;

(o)    [reserved];

(p)    [reserved];

(q)    [reserved]; loans and advances to franchisees in the ordinary course of business and consistent with past practices; provided that (i) such loans and advances in excess of $750,000 individually shall be evidenced by promissory notes and any such promissory notes shall be pledged to Agent, for the benefit of the Secured Parties, to the extent required by the Collateral Documents and (ii) the aggregate outstanding principal amount of such loans and advances made in reliance on this clause (q) shall not exceed $2,000,000;

(r)    Investments consisting of extensions of trade credit and accommodation guarantees in the ordinary course of business;

(s)    Investments in Swap Agreements incurred in the ordinary course of business and not for speculative purposes;

(t)    promissory notes and other non-cash consideration received in connection with dispositions permitted by Section 9.7, subject to prior written consent by the Required Lenders in their sole discretion;

(u)     [reserved];

(v)     Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers in the ordinary course of business;

(w)     subject to prior written consent by the Required Lenders to be granted in their sole discretion, loans and advances to officers or members of the Board of any equity holder of the Administrative Borrower (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances, dividends or distributions in respect thereof), dividends and distributions to the extent permitted to be made to such holder (or such parent) in accordance with Section 9.11;

(x)     advances of payroll payments to employees in the ordinary course of business;

(y)     Investments and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests;

(z)     receivables owing to a Borrower, a Guarantor or any Subsidiary, if created or acquired in the ordinary course of business;

(aa)    Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business;

(bb)    Investments in a Borrower, a Guarantor or any Subsidiary in connection with any Tax Restructuring;

(cc)    Investments consisting of Indebtedness, liens, fundamental changes, dispositions, dividends and distributions permitted (other than by reference to this Section 9.10(cc)) under Sections 9.7, 9.8, 9.9 and 9.11, respectively;

(dd)    contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of a Borrower;

(ee)    to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, or other rights, in each case in the ordinary course of business;

(ff)    [reserved];

(gg)    [reserved];

(hh)    [reserved];

(ii)     commencing on the date that is ninety (90) days after the Closing Date, other Investments so long as the Payment Conditions are satisfied; and

(jj)     commencing on the date that is ninety (90) days after the Closing Date, other Investments by Borrowers and Guarantors and their Subsidiaries not otherwise permitted pursuant to subsections (a) through (ii) of this Section 9.10, including, without limitation, any Investments by such Borrower or such Guarantor in any Foreign Subsidiary, provided that (i) the aggregate outstanding amount of all such Investments (valued at cost) shall not exceed $5,000,000 at any time (in each case determined without regard to any write-downs or write offs), and (ii) at the time of making any such Investment and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing.

9.11     Dividends and Redemptions.  Each Borrower and Guarantor shall not, directly or indirectly, declare or pay any dividends on account of any shares of class of any Capital Stock of such Borrower or Guarantor now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Capital Stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing, except that:

(a)     commencing on the date that is ninety (90) days after the Closing Date, any Borrower or Guarantor may declare and pay such dividends or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Capital Stock for consideration in the form of shares of Capital Stock (other than capital stock described in clause (e) of the definition of "Indebtedness") or with proceeds from substantially concurrent equity contributions;

(b)     [reserved]on the date of consummating the Buddy Reorganization Transaction, the Administrative Borrower or its Subsidiaries may make the distributions expressly described in the definition therewith;

(c)     each Subsidiary may pay dividends or make distributions to the Administrativeany Borrower, any Guarantor or any other Subsidiary of a Borrower or a Guarantor; provided that in the case of any such dividends or distributions by a Subsidiary that is not a Wholly Owned Subsidiary of thea Borrower or Guarantor, such dividend is paid or distribution is made to any Borrower, any Guarantor and/or any Subsidiary of such Borrower or Guarantor on a ratable basis;

(d) [reserved];

(d)     for any taxable period for which Fusion Intermediate, any Borrower and/or any other Subsidiary is treated as a corporation for U.S. federal or state income or similar tax purposes and is a member of a consolidated, combined, unitary or similar tax group (a "Tax Group") (or is treated as a disregarded entity that is wholly owned by a corporation that is a member of a Tax Group for U.S. federal or state income or similar tax purposes) of which Fusion Intermediate or any other direct or indirect parent of Fusion Intermediate is the common parent that reports the income of such Tax Group on an income tax return (the "Common Parent"), such

177

Borrower may make distributions to Fusion Intermediate, which Fusion Intermediate may further distribute, directly or indirectly, to the Common Parent (if Fusion Intermediate is not the Common Parent), in an amount not to exceed the lesser of: (i) the amount of U.S. federal, state and local income taxes that Fusion Intermediate and its subsidiaries would have been required to pay if they were a stand-alone Tax Group with Fusion Intermediate as the common parent of such stand-alone Tax Group for such year, with such taxes calculated at the maximum combined U.S. federal, state, and local income tax rates applicable to a corporation resident in the applicable jurisdictions where such income taxes are payable and (ii) such consolidated group's actual income tax liability;

(e)    [reserved];

(f)    dividends paid or distributions made on or substantially contemporaneously with the Closing Date to finance the payment of Transaction Costs;

(g)    commencing on the date that is ninety (90) days after the Closing Date, repurchases of Capital Stock in a Borrower or any Subsidiary deemed to occur upon exercise of stock options or warrants if such Capital Stock represent a portion of the exercise price or withholding taxes payable in connection with the exercise of such options or warrants or other incentive interests;

(h)    commencing on the date that is ninety (90) days after the Closing Date, dividends or distributions used to redeem, acquire, retire, repurchase or settle a Borrower's Capital Stock (or any options, warrants, restricted stock or stock appreciation rights or similar securities issued with respect to any such Capital Stock) held directly or indirectly by current or former officers, managers, consultants, members of the Board, employees or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of the Administrative Borrower (or any direct or indirect parent thereof), and its Subsidiaries (in each case, other than the executive management (i.e., the CEO, the CFO, any executive vice presidents and any similar executive management positions)), upon the death, disability, retirement or termination of employment of any such Person or otherwise in accordance with any stock option or stock appreciation rights plan, any management, director and/or employee stock ownership or incentive plan, stock subscription plan, employment termination agreement or any other employment agreements or equity holders' agreement in an aggregate amount not to exceed (1) the cash proceeds of key man life insurance policies received by a Borrower, a Guarantor or the Subsidiaries after the Closing Date, or (2) the amount of any bona fide cash bonuses otherwise payable to members of the Board, consultants, officers, employees, managers or independent contractors the Administrative Borrower, any other Borrower, Guarantor or any Subsidiary that are foregone in return for the receipt of Capital Stock, the fair market value of which is equal to or less than the amount of such cash bonuses, which, if not used in any year, may be carried forward solely to the next subsequent fiscal year; provided further that cancellation of Indebtedness owing to a Borrower, a Guarantor or any Subsidiary from members of the Board, consultants, officers, employees, managers or independent contractors (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) of a Borrower, a Guarantor or any Subsidiary in connection with a repurchase of Capital Stock of a Borrower will not be deemed to constitute a dividend or distribution for purposes of this Section 9.11 or any other provisions of this

Agreement; provided further that any dividend or distribution pursuant to this clause (h) shall be subject to satisfaction of the Payment Conditions;

(i)       payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any repurchases of Capital Stock in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units; provided that if such payments are finally determined to be in excess of the withholding or similar Taxes, the Administrative Borrower shall make best efforts to cause the return of such payments within thirty (30) days of such determination;

(j)       commencing on the date that is ninety (90) days after the Closing Date, dividends or distributions to pay cash in lieu of fractional Capital Stock in connection with any dividend, split or combination thereof or any Permitted Acquisition (or other similar Investment) and (b) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

(k)       payments made or expected to be made by a Borrower, a Guarantor or any Subsidiary in respect of withholding or similar Taxes payable upon exercise of Capital Stock by any future, present or former employee, director, officer, manager or consultant (or their respective controlled Affiliates or permitted transferees) and any repurchases of Capital Stock deemed to occur upon exercise of stock options or warrants if such Capital Stock represent a portion of the exercise price of such options or warrants or required withholding or similar taxes; provided that if such payments are finally determined to be in excess of the withholding or similar Taxes, Borrower shall make best efforts to cause the return of such payments thirty (30) days of such determination; and

(l)       commencing on the date that is ninety (90) days after the Closing Date, additional dividends or distributions so long as the Payment Conditions are satisfied.

9.12    Transactions with Affiliates.  Each Borrower and Guarantor shall not, directly or indirectly:

(a)       purchase, acquire or lease any property from, or sell, transfer or lease any property or provide services to, any officer, director or other Affiliate of such Borrower or Guarantor (other than another Borrower or Guarantor), except:

(i)       (A) in the ordinary course of (except with respect to transactions permitted under Sections 9.7, 9.8, 9.9, 9.10 or 9.11) and pursuant to the reasonable requirements of such Borrower's or Guarantor's business (as the case may be) and (B) on terms not materially less favorable to the Administrativesuch Borrower or such Guarantor or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(ii)       transactions permitted under Section 9.7(a) hereof;

(iii)    transactions permitted under Section 9.12(b) hereof;

(iv)    ~~(A) transactions between or among any Borrower or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction and (B) aggregate~~ transactions involving payment or consideration ~~of less than~~in an aggregate amount not to exceed $2,500,000;

(v)    any Indebtedness permitted by Section 9.9;

(vi)    any Investments permitted by Section 9.10;

(vii)   issuances of Capital Stock;

(viii)  ~~[reserved]~~the Buddy Reorganization Transaction;

(ix)    the payment of Transaction Costs;

(x)     dispositions in the form of a sale of furniture and assignment of lease agreements to franchisees in the ordinary course of business consistent with past practices, so long as the sale thereof is approved by disinterested members of the Board (or any committee thereof);

(xi)    employment and severance arrangements and other compensation arrangements between a Borrower, a Guarantor and its respective Subsidiaries and their respective officers and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Section 9.10(e) and 9.10(x))~~.~~;

(xii)   investments by Affiliates in Indebtedness and preferred Capital Stock of ~~FRG and the~~the Loan Parties and their respective Subsidiaries;

(xiii)  the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board, officers and employees of the Administrative Borrower (or any direct or indirect parent thereof) and the Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Administrative Borrower and its Subsidiaries;

(xiv)   transactions pursuant to agreements in existence or contemplated on the Closing Date and set forth on Schedule 9.12 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(xv)    dividends and distributions permitted under Section 9.11 and loans and advances in lieu thereof pursuant to Section 9.10(w);

(xvi)   payments to or from, and transactions with, any joint venture in the ordinary course of business (including any cash management activities related thereto);

(xvii)  transactions with customers, clients, suppliers, contractors, joint venture partners or purchasers or sellers of goods or services that are Affiliates, in each case in

180

the ordinary course of business and which are fair to the Borrowers, Guarantors and their respective Subsidiaries, in the reasonable determination of the Administrative Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

        (xviii)  [reserved];

        (xix)    [reserved];

        (xx)     [reserved]; and

        (xxi)    [reserved]; or

    (b)    make any payments (whether by dividend, loan or otherwise) of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, shareholder, director or any other Affiliate of such Borrower or Guarantor, except:

        (i)      licenses, sublicenses, covenants not to sue, or similar agreement with respect to Intellectual Property made in the ordinary course of business;

        (ii)     reasonable compensation to officers, employees and directors for services rendered to such Borrower or Guarantor and reimbursement of expenses in the ordinary course of business of such Borrower or Guarantor;

        (iii)    payments to any Person that owns, directly or indirectly, the Capital Stock of ~~FRG~~a Borrower or a Guarantor for actual and necessary reasonable out-of-pocket legal and accounting, insurance, marketing, payroll and similar types of services (other than management or sponsor fees) paid by such Person on behalf of such Borrower or Guarantor, in the ordinary course of their respective businesses or as the same may be directly attributable to such Borrower or Guarantor, provided that the aggregate amount of all such payments in any fiscal year shall not exceed $[3,000,000][17]; and

        (iv)    payments permitted under Section 9.24 hereof;

provided that, each such transaction (other than any transaction pursuant to clauses (a) (excluding (a)(xi), (xii) and (xiv)) and (b)(iv)) shall be on terms not materially less favorable to the Administrative Borrower or such Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate.

    9.13   Compliance with ERISA.  Except as could not reasonably be expected to have a Material Adverse Effect, each Borrower and Guarantor shall, and shall with respect to any Plan cause each of its ERISA Affiliates, to:  (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal and State law; (b) cause each Plan which is qualified under Section 401(a) of the Code to maintain such qualification; (c) not terminate any Plan so as to incur any material liability to the Pension

---

[17] ~~NTD: actual amount needed to be confirmed.~~

Benefit Guaranty Corporation; (d) not allow or suffer to exist any non-exempt "prohibited transaction" (within the meaning of Section 4975 of the Code) which would be reasonably likely to subject Borrower or any ERISA Affiliate to a material tax or penalty or other liability on prohibited transactions imposed under Section 4975 of the Code or ERISA; (e) make all required contributions to any Plan under Section 302 of ERISA, Section 412 of the Code or the terms of such Plan; (f) not allow or suffer to exist any "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, with respect to any Plan; or (g) allow or suffer to exist any occurrence of a "reportable event" (as defined in Section 4043(c) of ERISA or the regulations issued thereunder, except for any such event with respect to which notice has been waived pursuant to applicable regulations) or any other event or condition which presents a material risk of termination by the Pension Benefit Guaranty Corporation of any Plan that is a single employer plan, which termination could reasonably be expected to result in any material liability to any Borrower or Guarantor.

9.14    Fiscal Year.  The Administrative Borrower will not make any change in its fiscal year; provided, however, that the Administrative Borrower may, upon written notice to Agent, change its fiscal year to any other fiscal year reasonably acceptable to Agent, in which case, the Administrative Borrower and Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year, without any requirement of consent by any Lender or other Person (notwithstanding anything to the contrary in Section 11.4).

9.15    Change in Business.  Each Borrower and Guarantor shall not engage in any business other than the Permitted Business.

9.16    Limitation of Restrictions Affecting Subsidiaries.  Each Borrower and Guarantor shall not, directly, or indirectly, create or otherwise cause or suffer to exist any encumbrance or restriction which prohibits or materially limits the ability of any Subsidiary of such Borrower or Guarantor to:

(a)    pay dividends or make other distributions or pay any Indebtedness owed to such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor,;

(b)    make loans or advances to such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor,;

(c)    transfer any of its properties or assets to such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor,; or

(d)    create, incur, assume or suffer to exist any lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than encumbrances and restrictions arising under (i) Requirements of Law,:

(i)    Requirements of Law;

182

(ii)    (ii) this Agreement and  Financing Agreements, the First Lien Credit Agreement, and any documentation governing Indebtedness incurred pursuant to Section 9.9(aa) or Section 9.9(ff),;

(iii)    (iii) customary provisions restricting subletting or assignment of any lease (or hypothecation thereof) governing a leasehold interest of such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor,;

(iv)    (iv) customary restrictions on dispositions of real property interests found in reciprocal easement agreements of such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor,;

(v)    (v) any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); provided that such agreement was not entered into in contemplation of such Person becoming a Subsidiary and the restriction or condition set forth in such agreement does not apply to the Administrative Borrower or any other Subsidiary,;

(vi)    (vi) the extension or continuation of contractual obligations in existence on the date hereof and otherwise permitted hereunder; provided that any such encumbrances or restrictions contained in such extension or continuation are no less favorable to Agent and Lenders than those encumbrances and restrictions under or pursuant to the contractual obligations so extended or continued,;

(vii)    (vii) any agreement related to an otherwise permitted refinancing of Indebtedness permitted under the terms of this Agreement,;

(viii)    (viii) Indebtedness permitted to be incurred under the terms of this Agreement with terms no more restrictive than those set forth herein,;

(ix)    (ix) customary restrictions and conditions existing on the Closing Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition,;

(x)    (x) restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale; provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder,;

(xi)    (xi) customary provisions in leases, licenses, sublicenses and other contracts restricting the assignment thereof,;

(xii)    (xii) restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness,;

(xiii)  (xiii) restrictions or conditions in any Indebtedness permitted pursuant to Section 9.9 that is incurred or assumed by Subsidiaries that are not Loan Parties to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Financing Agreement, ;

(xiv)  (xiv) restrictions on cash (or Cash Equivalent) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances), ;

(xv)  (xv) restrictions set forth on Schedule 9.16 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition, ;

(xvi)  (xvi) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted by Section 9.10. ;

(xvii)  (xvii) customary restrictions contained in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto; and

(xviii)  (xviii) customary provisions related to creditworthiness of the tenant contained in real property leases entered into by Subsidiaries, so long as a Borrower or Guarantor has determined in good faith that such creditworthiness provisions could not reasonably be expected to impair the ability of such Borrower or Guarantor and its Subsidiaries to meet their ongoing obligations.

9.17  Financial Covenant.

(a)  . As of the end of any fiscal month, commencing with the most recent fiscal month for which Borrowers' and Guarantors' financial statements have been (or should have been) delivered prior to the date on which Excess Availability is less than the greater of (x) 12.5% of the Borrowing Cap or (y) $18,000,000, Borrowers and Guarantors will not permit the Fixed Charge Coverage Ratio to be less than 1.0 to 1.0.

(b)  Once such covenant is in effect, compliance with the covenant will be discontinued on the first day immediately succeeding the last day of the fiscal month which includes the 30th consecutive day on which Excess Availability remains in excess of the greater of (x) 12.5% of the Borrowing Cap and (y) $18,000,000, so long as no Event of Default shall have occurred and be continuing.

9.18  Credit Card Agreements. Each Borrower and Guarantor shall:

(a)  . Each Borrower shall (a) observe and perform in all material respects all material terms, covenants, conditions and provisions of the Credit Card Agreements to be observed and performed by it at the times set forth therein; and

(b)     (b) not do or permit, suffer or refrain from doing anything, as a result of which there could be a default or breach of any of the terms of the Credit Card Agreements and at all times maintain in full force and effect the Credit Card Agreements and not terminate, cancel, surrender, modify, amend, waive or release any of the Credit Card Agreements, or consent to or permit to occur any of the foregoing; except, that, any Borrower or Guarantor may terminate or cancel any of the Credit Card Agreements in the ordinary course of the business of such Borrower or Guarantor; provided, that, such Borrower or Guarantor shall give Agent not less than ten days' prior written notice of its intention to so terminate or cancel any of the Credit Card Agreements;

(c)     (c) not enter into any new Credit Card Agreements with any new Credit Card Issuer unless (i) Agent shall have received not less than ten days' prior written notice of the intention of such Borrower or Guarantor to enter into such agreement (together with such other information with respect thereto as Agent may reasonably request) and (ii) such Borrower delivers, or causes to be delivered to Agent, subject to Section 9.31, a Credit Card Acknowledgment in favor of Agent.;

(d)     (d) give Agent prompt written notice of any Credit Card Agreement or material amendment or other material modification of any Credit Card Agreement entered into by such Borrower after the date hereof, together with a true, correct and complete copy thereof and such other information with respect thereto as Agent may reasonably request;

(e)     (e) furnish to Agent, promptly upon the request of Agent, such material information and evidence as Agent may require from time to time concerning the observance, performance and compliance by such Borrower or the other party or parties thereto with the terms, covenants or provisions of the Credit Card Agreements, and

(f)     (f) not modify in any material respect any payment instruction given by Agent to any Credit Card Issuer or Credit Card Processor provided for in any Credit Card Acknowledgment to the extent given in accordance with the terms thereof or otherwise direct the remittance of payments under any Credit Card Agreement to any account other than the Blocked Accounts.

9.19    License Agreements.

(a)     Except as could not reasonably be expected to have a Material Adverse Effect, the Borrowers and Guarantors shall:

(i)     (i) promptly and faithfully observe and perform all of the material terms, covenants, conditions and provisions of the material License Agreements to which it is a party to be observed and performed by it, at the times set forth therein, if any.;

(ii)     (ii) not do, permit, suffer or refrain from doing anything that could reasonably be expected to result in a default under or breach of any of the terms of any material License Agreement.;

(iii)     (iii) not cancel, surrender, modify, amend, waive or release any material License Agreement in any material respect or any term, provision or right of the licensee

185

thereunder in any material respect, or consent to or permit to occur any of the foregoing except as permitted pursuant to Section 9.19(b) below~~,~~:

(iv) ~~(iv)~~ give Agent prompt written notice of any material License Agreement (other than Promotional Agreements or licenses by a Borrower, Guarantor or any of their Subsidiaries to a private label manufacturer entered into in the ordinary course of business for the production of Inventory on behalf of a Borrower or "click through" licenses to website hosts or providers in connection with on-line purchasing or licenses to a Borrower by a customer to use such customer's trademarks or service marks for purposes of goods or services provided by such Borrower to or for such customer or licenses for commercially available off the shelf software) entered into by any Borrower, Guarantor or any of their Subsidiaries after the date hereof, together with (A) either (x) a description of such License Agreement listing the Intellectual Property subject thereto, the name and address of the parties thereto, the term of the license arrangement and the products and territory subject to such license, or (y) a true, correct and complete copy of such License Agreement, and (B) such other information with respect thereto as Agent may reasonably request (subject to any obligation of confidentiality contained therein)~~,~~:

(v) ~~(v)~~ give Agent prompt written notice of any notice of default sent to another party to a material License Agreement by any Borrower or any Guarantor of any material breach of any obligation, or any default, by any party under any material License Agreement, and deliver to Agent (promptly upon the receipt thereof by such Borrower or Guarantor in the case of a notice to any Borrower or any Guarantor and concurrently with the sending thereof in the case of a notice from any Borrower or any Guarantor) a copy of each notice of default and every other notice and other communication received or delivered by such Borrower or Guarantor in connection with any material License Agreement which relates to the right of such Borrower or Guarantor to continue to use the property subject to such License Agreement, and

(vi) ~~(vi)~~ furnish to Agent, promptly upon the request of Agent, such information and evidence as Agent may reasonably require from time to time concerning the observance, performance and compliance by Borrower or the other party or parties thereto with the material terms, covenants or provisions of any material License Agreement.

(b)     Except as could not reasonably be expected to have a Material Adverse Effect, each Borrower will either exercise any option to renew or extend the term of each material License Agreement to which it is a party in such manner as will cause the term of such material License Agreement to be effectively renewed or extended for the period provided by such option.

9.20    Foreign Assets Control Regulations, Etc.  None of the requesting or borrowing of the Loans or the requesting or issuance or extension of any Letter of Credit or the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. §1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (including, but not limited to (a) Executive order 13224 of September 21, 2001 Blocking

Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). None of Borrowers or any of their Subsidiaries or other Affiliates is or will become a "blocked person" as described in the Executive Order, the Trading with the Enemy Act or the Foreign Assets Control Regulations or engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person".

9.21    After-Acquired Real Property. If, after the Closing Date, any owned (but not leased or ground-leased) Material Real Property or improvements thereto or any interest therein is acquired by any Borrower or any Guarantor or is held by any Subsidiary on or after the time it becomes a Borrower or Guarantor pursuant to Section 9.23, ~~FRG~~the Administrative Borrower will notify Agent thereof, and, if requested by Agent, within ninety (90) days following the acquisition of such Material Real Property or such longer time period as agreed by Agent in its reasonable discretion, Agent shall have received (i) counterparts of a Mortgage with respect to each Material Real Property duly executed and delivered by the record owner of such Mortgaged Property; provided that, to the extent any Mortgaged Property is located in a jurisdiction that imposes mortgage recording taxes, intangibles tax, documentary tax or similar recording fees or taxes, Agent will cooperate with the applicable Borrower or Guarantor in order to minimize the amount of tax payable in connection with such Mortgage as permitted by, and in accordance with, applicable law including, to the extent permitted by applicable law, limiting the amount secured by such Mortgage to the book value of such Mortgaged Property, as reasonably determined by ~~FRG~~the Administrative Borrower, if such limitation results in such mortgage tax being calculated based upon such book value, (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a third priority Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 9.8, together with such customary lender's endorsements as Agent may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates (it being agreed that Agent shall accept zoning reports from a nationally recognized zoning company in lieu of zoning endorsements to such title insurance policies), in an amount equal to the fair market value of such Mortgaged Property or as otherwise reasonably agreed by the parties; provided that in no event will any Borrower or Guarantor be required to obtain independent appraisals of such Mortgaged Properties, unless required by FIRREA, (iii) a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Mortgaged Property and, if any Mortgaged Property is located in an area determined by the Federal Emergency Management Agency (or any successor agency) to be a special flood hazard area, a duly executed notice about special flood hazard area status and flood disaster assistance and evidence of such flood insurance as provided in Section 9.5, (iv) opinions, addressed to Agent and the Secured Parties, from counsel qualified to opine in each jurisdiction where a Mortgaged Property is located regarding the enforceability of the Mortgage and such other matters as may be in form and substance reasonably satisfactory to Agent, (v) a survey or existing survey together with a no change affidavit of such Mortgaged Property, in compliance with the 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys or such other ALTA/NSPS requirements as are in effect on the date of preparation of such survey and otherwise reasonably satisfactory to Agent and (vi) evidence of

payment of title insurance premiums and expenses and all recording, mortgage, transfer and stamp taxes and fees payable in connection with recording the Mortgage, any amendments thereto and any fixture filings in appropriate county land office(s).

9.22    Costs and Expenses.  Borrowers and Guarantors shall pay to Agent on demand all costs, expenses and filing fees paid or payable in connection with the preparation, negotiation, execution, delivery, recording, syndication, administration, collection, liquidation, enforcement and defense of the Obligations, Agent's rights in the Collateral, this Agreement, the other Financing Agreements and all other documents related hereto or thereto, including any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including:  (a) all costs and expenses of filing or recording (including UCC financing statement filing fees, if applicable); (b) costs and expenses and fees for insurance premiums, environmental audits, title insurance premiums, surveys, assessments, engineering reports and inspections, appraisal fees and search fees, background checks, costs and expenses of remitting loan proceeds, collecting checks and other items of payment, and establishing and maintaining the Blocked Accounts, together with Agent's customary charges and fees with respect thereto; (c) charges, fees or expenses charged by the Issuing Bank in connection with any Letter of Credit; (d) costs and expenses of preserving and protecting the Collateral; (e) costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Agent, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Financing Agreements or defending any claims made or threatened against Agent or any Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (f) after an Event of Default has occurred and is continuing, reasonable attorneys' fees of any Lender incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Agent, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Financing Agreements or defending any claims made or threatened against Agent or any Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations and inventory appraisals in respect of the Borrowing Base and such Borrower's or Guarantor's operations for no more than two periodic field exams and two inventory appraisals, in each case in respect of the Borrowing Base, during a consecutive twelve-month period; provided that, unless an Event of Default shall have occurred and is continuing or a Material Adverse Effect has occurred, only one periodic field exam and one inventory appraisal, in respect of the Borrowing Base, will be conducted at the Borrowers' expense during such consecutive twelve-month period unless Excess Availability is less than the greater of (i) 20% of the Borrowing Cap and (ii) $30,000,000 at any time during such period, in which case one additional field exam and one additional inventory appraisal, in respect of the Borrowing Base, in such twelve-month period as Agent may request shall be at Borrowers' expense; and (h)(1) the reasonable fees and disbursements of counsel (including legal assistants) to Agent in connection with any of the foregoing and (2) to the extent events or circumstances occur after the Closing Date that require hiring, in the Administrative Agent's Permitted Discretion, would be advisable to hire a financial advisors, the reasonable fees, expenses, disbursements and other charges of M-III Partners, LP or another financial advisor reasonably satisfactory to the Administrative Agent (each of which shall be paid within thirty (30) days after

written request thereof). Additionally, there shall be no limitation on the number or frequency of field exams if an Event of Default or a Material Adverse Effect has occurred and is continuing, and the Borrowers shall be responsible for the costs and expenses of any such field exams conducted while an Event of Default or a Material Adverse Effect has occurred and is continuing.

9.23    Further Assurances.

(a)    In the case of the formation or acquisition by a Borrower or Guarantor of any Subsidiary (other than a Foreign Subsidiary) after the date hereof—:

(i)    (A)  as to any such Subsidiary, the Administrative Borrower or Guarantor forming such Subsidiary shall, within thirty (30) days (or such longer period as may be agreed to by Agent in its reasonable discretion) after such formation or acquisition,  cause any such Subsidiary to execute and deliver to Agent, the following (each in form and substance reasonably satisfactory to Agent), (1A) a Guaranty pursuant to which such Subsidiary gives an absolute and unconditional guarantee of the payment of the Obligations or a joinder or assumption agreement to an existing Guaranty, in each case in form and substance reasonably satisfactory to Agent, (2B) a security agreement substantially in the form of the security provisions herein granting to Agent a first security interest and lien (except as otherwise consented to in writing by Agent) upon all of the assets of any such Subsidiary to the extent such assets constitute Collateral hereunder and subject to and in accordance with the terms hereof, (3C) joinders to the Intercreditor Agreement, in each case in form and substance reasonably satisfactory to Agent, and (4D) such other agreements, documents and instruments as Agent may require in connection with the documents referred to above in order to make such Subsidiary a party to this Agreement as a "Borrower" (to the extent directly or indirectly wholly owned by FRGa Loan Party) or as a "Guarantor" as Agent may determine, including, but not limited to, supplements and amendments hereto, a Borrower Joinder Agreement with respect to a Subsidiary that is to become a party hereto as a "Borrower", an assumption agreement with respect to an existing Guaranty, an authorization to file UCC financing statements, Collateral Access Agreements (subject to the requirements of Section 9.2 hereof), filings with respect to intellectual property and other consents, waivers, acknowledgements and other agreements from third persons which Agent may deem necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the assets purchased, corporate resolutions and other organization and authorizing documents of such Person, and favorable opinions of counsel to such person and

(ii)    (B)  as to any such Subsidiary, the Administrative Borrower or Guarantor forming such Subsidiary shall, within thirty (30) days (or such longer period as may be agreed to by Agent in its reasonable discretion) after such formation, (1A) execute and deliver to Agent, a supplement to the applicable Financing Agreements, in form and substance reasonably satisfactory to Agent, granting to Agent a pledge of and lien on all of the issued and outstanding shares of Capital Stock of any such Subsidiary (but no more than 65% of the Voting Stock of any Foreign Subsidiary) with the lien priority required by the Financing Agreements, and (2B) deliver the original stock certificates evidencing such shares of Capital Stock (or such other evidence as may be issued in the case of a limited liability company), together with stock powers with respect thereto duly executed in blank (or the equivalent thereof in the case of a

limited liability company in which such interests are certificated, or otherwise take such actions as Agent shall require with respect to Agent's security interests therein). Each Loan Party shall cause any Person that guarantees the First Lien Obligations to become a Guarantor (if it is not already a Guarantor) pursuant to this Section 9.23(a).

(b)     In the case of an acquisition of assets (other than Capital Stock and Real Property) by a Borrower or Guarantor after the date hereof, the Administrative Borrower will notify Agent thereof, and, if requested by Agent, after such acquisition of assets, Agent shall have received, in form and substance satisfactory to Agent (i) evidence that Agent has valid and perfected security interests in and liens upon all purchased assets to the extent such assets constitute Collateral hereunder and subject to and in accordance with the terms hereof, and (ii) subject to Section 9.2 hereof, all Collateral Access Agreements and other consents, waivers, acknowledgments and other agreements from third persons which Agent may deem necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the assets purchased, (iii) at the option of Agent, the agreement of the seller consenting to the collateral assignment by the Administrative Borrower or Guarantor purchasing such assets of all rights and remedies and claims for damages of such Borrower or Guarantor relating to the Collateral (including, without limitation, any bulk sales indemnification) under the agreements, documents and instruments relating to such acquisition and (iv) such other agreements, documents and instruments as Agent may require in connection with the documents referred to above, including, but not limited to, supplements and amendments hereto, corporate resolutions and other organization and authorizing documents and favorable opinions of counsel to such person.

(c)     At the request of Agent at any time and from time to time, Borrowers and Guarantors shall, at their expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments, and do or cause to be done such further acts as may be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement or any of the other Financing Agreements. Agent may at any time and from time to time request a certificate from an officer of any Borrower or Guarantor representing that all conditions precedent to the making of Revolving Loans and providing Letters of Credit contained herein are satisfied. In the event of such request by Agent, Agent and Lenders may, at Agent's option, cease to make any further Revolving Loans or provide any further Letters of Credit until Agent has received such certificate and, in addition, Agent has determined that such conditions are satisfied.

(d)     Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Financing Agreement to the contrary:

(i)     (a) the foregoing provisions of this Section 9.23 shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, or the provision of guarantees by any Subsidiary, if, solely for purposes of this clause (ad)(iii), and for so long as Agent and the Administrative Borrower reasonably agree in writing that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such guarantees (taking into account any material adverse tax

190

consequences to FRGFusion Buyer and its Affiliates (including the imposition of material withholding or other material taxes)), outweighs the benefits to be obtained by the Lenders therefrom;

(ii) (b) Liens required to be granted from time to time pursuant to this Section 9.23 shall be subject to exceptions and limitations set forth in the Collateral Documents; (c) [reserved];

(iii) [reserved];

(iv) (d) in no event shall any Loan Party be required to complete any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States, and no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken, nor shall Agent be authorized to take any such action, to create any security interests or to perfect or make enforceable any security interests in any such assets;

(v) (e) in no event shall any Loan Party be required to complete any filings or other action with respect to perfection of security interests in assets subject to certificates of title beyond the filing of UCC financing statements;

(vi) (f)(iA) in the case of intercompany debt, other than the filing of UCC financing statements and the delivery of a master intercompany note upon reasonable request from Agent, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $3,250,000 and (iiB) in the case of third party debt, other than the filing of UCC financing statements, no perfection shall be required with respect to promissory notes evidencing such debt for borrowed money in a principal amount (individually) of less than $3,250,000;

(vii) (g) in no event shall any Loan Party be required to complete any filings or other action with respect to security interests in Intellectual Property beyond the filing of trademark security agreements, copyright security agreement and patent security agreements, as applicable, substantially in the forms set forth on Exhibit I with the United States Patent and Trademark Office or the United States Copyright Office;

(viii) (h) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of UCC financing statements), except to the extent constituting a supporting obligation for other Collateral as to which perfection is accomplished by the filing of a UCC financing statement;

(ix) (i) in no event shall the Collateral include any Excluded Assets;

(x) (j) landlord lien waivers, bailee waivers, collateral access agreements or similar agreements shall not be required, except to the extent required under the Financing Agreements with respect to distribution centers and customs brokers of the Loan Parties; ;

(xi)    (k) notices shall not be required to be sent to account debtors or other contractual third parties, except to the extent set forth in the Financing Agreements following the occurrence and during the continuance of an Event of Default; and

(xii)    (l) notices to, or acknowledgements from, counterparts under, or compliance with the Assignment of Claims Act (or any state or municipal equivalent) shall not be required. Agent may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any guarantee by any Subsidiary (including extensions beyond the Closing Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Closing Date) and any other obligations under this definition where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Collateral Documents.

9.24    Permitted Payments of Indebtedness.  No Borrower and no Guarantor will, nor will it permit any Subsidiary to, make, directly or indirectly, any payment or other distribution (whether in cash, Securities or other property) of or in respect of principal of or interest on any Indebtedness (other than Indebtedness between any Borrower or Guarantor and Indebtedness permitted under Sections 9.9(j), 9.9(k), or 9.9(m)), or any payment or other distribution (whether in cash, Securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Indebtedness, except:

(a)    payment of Indebtedness created under the Financing Agreements;

(b)    payment of regularly scheduled (including, for the avoidance of doubt, under the First Lien Credit Agreement ) interest and principal payments (excluding, for the avoidance of doubt, any mandatory prepayments or offers to repay, repurchase or redeem any Indebtedness) and payment of fees, expenses and indemnification obligations (excluding any premiums in connection with the prepayment of any Indebtedness), in each case, as and when due in respect of any Indebtedness permitted under Section 9.9 (other than payments in respect of any subordinated Indebtedness permitted hereunder that is prohibited by the subordination provisions thereof);

(c)    commencing on the date that is ninety (90) days after the Closing Date, refinancings of Indebtedness to the extent permitted by Section 9.9(p);

(d)    payment of secured Indebtedness permitted under Section 9.9(b) that becomes due as a result of any sale or transfer of, or casualty, condemnation or taking with respect to, the property or assets securing such Indebtedness;

(e)    [reserved];

(f)    [reserved];

(g)    [reserved];

(h)       [reserved];

(i)       [reserved];

(j)       [reserved];

(k)       [reserved];

(l)       [reserved];

(m)       commencing on the date that is ninety (90) days after the Closing Date, other payments of indebtedness so long as the Payment Conditions are satisfied; and

(n)       [reserved].

9.25    <u>Commodity Exchange Act Keepwell Provisions</u>.  Each Qualified ECP Guarantor hereby absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Borrower or Guarantor in order for each such other Borrower or Guarantor to honor its obligations under this Agreement and the other Financing Agreements including Hedge Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this <u>Section 9.25</u> for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this <u>Section 9.25</u>, or otherwise under this Agreement or any other Financing Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this <u>Section 9.25</u> shall remain in full force and effect until all Obligations are paid in full to the Lenders and Agent, and all of the Lenders' Revolving Commitments are terminated.  Each Qualified ECP Guarantor intends that this <u>Section 9.25</u> constitute, and this <u>Section 9.25</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Borrower and each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

9.26    <u>Disbursement Cash Management Systems</u>.  Each of Borrowers, Guarantors and each of their Subsidiaries will maintain Chase as its principal depository bank for its disbursement business, including for the maintenance of operating, administrative, cash management, collection activity and other deposit accounts for the conduct of its disbursement business.

9.27    <u>Amendments to Financing Documents</u>.  The Borrowers and the Guarantors will not amend, waive, modify or supplement or consent to any amendment, waiver, modification or supplement of any First Lien Term Loan Documents, if such amendment, waiver or other modification would contravene any provision of the Intercreditor Agreement.

9.28    <u>[Reserved]</u>.

9.29    <u>Anti-Commingling</u>.  No Loan Party shall commingle any amount of Franchise Fees with the proceeds of ABL Priority Collateral.

193

9.30    Franchise Agreements.

(a)    Each Borrower will, and will cause each Loan Party to, satisfy and perform in all material respects all obligations of each such Person under each Franchise Agreement, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    The Borrowers and Guarantors will not, and will not permit any of its Subsidiaries to, maintain or distribute any Franchise Disclosure Documents, or enter into any Franchise Agreements, in violation of Section 8.23(c).

9.31    9.32 Post-Closing Obligations.  Borrowers shall deliver, or cause to be delivered, to Agent each of the agreements, documents, instruments and other items set forth on Schedule 9.31 hereto, in each case within the periods provided for therein (subject, in each case, to Agent's right to extend such period in its sole discretion).

9.32    9.33 [Dealer Agreements[Reserved].

Each Borrower will, and will cause each Loan Party to, satisfy and perform in all material respects all obligations of each such Person under each Dealer Agreement, except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.]

9.33    9.34 Sale and Leaseback Transactions. The Borrowers and Guarantors will not, and will not permit any of their Subsidiaries to, enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any tangible property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred except for (i) sale and leaseback transactions in an aggregate amount not to exceed $5,000,000 and (ii) any such sale of any fixed or capital assets by a Borrower or any Subsidiary that is made for cash consideration in an amount not less than the fair market value (as determined in good faith by the Administrative Borrower) of such fixed or capital asset and is consummated within 270 days after such Borrower or such Subsidiary, as applicable, acquires or completes the construction of such fixed or capital asset; provided that the aggregate amount of sale and leaseback transaction pursuant to this Section 9.33 shall not exceed $5,000,000.

9.34    9.35 Changes to Treasury Management and Bank Structure. The Borrowers and Guarantors will not, and will not permit any of their Subsidiaries to, make any changes to their treasury management and bank structure without the prior written consent of the Agent, including changing the nature of any Deposit Accounts, investment accounts or other accounts in the name of or used by any Borrower or Subsidiary maintained at any bank or other financial institution, or disabling the sweep mechanism from any existing Zero Balance Accounts.

194

9.35 ~~9.36~~ Medical Cash Account. The Loan Parties will not use any cash in the Medical Cash Account for any purpose other than the payment of expenses incurred in connection with the self-insurance policies maintained by the Administrative Borrower.

## SECTION 10.    EVENTS OF DEFAULT AND REMEDIES

10.1    Events of Default.    The occurrence or existence of any one or more of the following events are referred to herein individually as an "Event of Default", and collectively as "Events of Default":

(a)    (i) any Borrower fails to make any principal payment (including any payment required under Section 2.9(c)) after the same becomes due and payable, or any Borrower fails to pay any of the other Obligations (other than with respect to principal payments) within five (5) Business Days after the same becomes due and payable, (ii) any Borrower or Guarantor fails to perform any of the covenants contained in Sections 6.3, 6.7, 9.1(a), 9.6(b)(vi), 9.7, 9.8, 9.9, 9.10, 9.11, 9.12, 9.15, 9.17, 9.24, 9.27, ~~9.28,~~ 9.29, 9.31 or 9.33 of this Agreement, (iii) any Borrower or Guarantor fails to perform any of the covenants contained in Sections 9~~5.12(a)~~, 7.1, 9~~7~~2, 7.3, 9.3, 9.4, 9.5, 9.6(a), 9.6(e), 9.6(f), 9.6(i)(ii), 9.13, 9.16, 9.18, 9.20, 9.22, 9.25, 9.26 or 9.30 of this Agreement and such failure shall continue for five (5) Business Days; provided that such five-Business Day period shall not apply in the case of:  (A) any failure to observe any such covenant which is not capable of being cured at all or within such five-Business Day period or which has been the subject of a prior failure within a six-month period or (B) an intentional breach by Borrower or any Guarantor of any such covenant or (iv) any Borrower or Guarantor fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements other than those described in Sections 10.1(a)(i) and 10.1(a)(ii) above and Section 10.1(m) below and such failure shall continue unremedied for ~~5 Business~~thirty (30) ~~D~~days after notice thereof from the Agent;

(b)    any representation or warranty made by any Borrower or Guarantor to Agent or any Secured Party in this Agreement, the other Financing Agreements or any other written agreement, schedule, confirmatory assignment or otherwise shall when made or deemed made be false or misleading in any material respect, and such incorrect representation or warranty (if curable) shall remain incorrect for a period of thirty (30) days after the earlier of (i) any Loan Party's knowledge of such breach and (ii) notice thereof from the Agent to the Administrative Borrower;

(c)    any Guarantor revokes or terminates or attempts to revoke or terminate any guarantee in favor of Agent or any Lender;

(d)    any final, non-appealable, enforceable judgment for the payment of money is rendered against any Borrower or Guarantor in excess of $10,000,000 in the aggregate (to the extent not covered by insurance (including self-insurance) as to which the insurer has been notified of such judgment or order and has not denied coverage) and shall remain undischarged or unvacated for a period in excess of 60 consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan

Party that are material to the businesses and operations of ~~FRG and its~~the Loan Parties and their respective Subsidiaries, taken as a whole, to enforce any such judgment;

(e)        [Reserved];

(f)        any Borrower or Guarantor makes a general assignment for the benefit of creditors, makes or sends notice of a bulk transfer or calls a meeting of its creditors or principal creditors in connection with a moratorium or adjustment of the Indebtedness due to them;

(g)        a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity) is filed against any Borrower or Guarantor or all or any substantial part of its properties and such petition or application is not dismissed within 60 days after the date of its filing or any Borrower or Guarantor by corporate action shall file any answer admitting or not contesting such petition or application or indicates its consent to, acquiescence in or approval of, any such action or proceeding or the relief requested is granted sooner;

(h)        a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at a law or equity) is filed by any Borrower or Guarantor or for all or any substantial part of its property;

(i)        any default in respect of the (i) First Lien Obligations or (ii) any other Indebtedness of any Borrower or Guarantor in an amount in excess of $2,500,000, in each case the effect of which default is to cause, or to permit the holder or beneficiary of such Indebtedness to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity (other than Indebtedness owing to Agent and Lenders hereunder); provided that this clause shall not apply (x) to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and (y) if any such default (other than a default in respect of the First Lien Credit Agreement) is remedied or waived by the holders of such Indebtedness prior to any termination of all of the Revolving Commitments and acceleration of all of the Loans pursuant to this Section 10.1;

(j)        any material provision hereof or of any of the other Financing Agreements shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than Agent) in accordance with its terms, or any such party shall challenge the enforceability hereof or thereof, or shall assert in writing, or take any action or fail to take any action based on the assertion that any provision hereof or of any of the other Financing Agreements has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for herein or in any of the other Financing Agreements shall cease to be a valid and perfected first priority (subject only to Permitted Encumbrances and Liens permitted under Section 9.8(s)) security interest in any of the Collateral purported to be subject thereto (except as expressly otherwise permitted herein or therein);

196

(k)    an ERISA Event shall occur which results in liability of any Borrower or Guarantor in an amount which could reasonably be expected to have a Material Adverse Effect;

(l)    any Change of Control; or

(m)    any Borrower or Guarantor fails at any time to comply with Section 6.7(b) of this Agreement.

10.2    Remedies.

(a)    At any time an Event of Default exists or has occurred and is continuing, Agent and Lenders shall have all rights and remedies provided in this Agreement, the other Financing Agreements, the UCC and other applicable law, all of which rights and remedies may be exercised without notice to or consent by any Borrower or Guarantor, except as such notice or consent is expressly provided for hereunder or required by applicable law.  All rights, remedies and powers granted to Agent and Lenders hereunder, under any of the other Financing Agreements, the UCC or other applicable law, are cumulative, not exclusive and enforceable, in Agent's discretion, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by any Borrower or Guarantor of this Agreement or any of the other Financing Agreements.  Subject to Section 12 hereof, Agent may, and at the direction of the Required Lenders shall, at any time or times, proceed directly against any Borrower or Guarantor to collect the Obligations without prior recourse to the Collateral.

(b)    Without limiting the foregoing, at any time an Event of Default has occurred and is continuing, Agent may, in its discretion, and upon the direction of the Required Lenders, shall:

(i)    accelerate the payment of all Obligations and demand immediate payment thereof to Agent, for itself and the benefit of the Secured Parties (provided, that, upon the occurrence of any Event of Default described in Sections 10.1(g) and 10.1(h), all Obligations shall automatically become immediately due and payable);

(ii)    with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral;

(iii)    require any Borrower or Guarantor, at Borrowers' expense, to assemble and make available to Agent any part or all of the Collateral at any place and time designated by Agent;

(iv)    collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral;

(v)   remove any or all of the Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose;

(vi)   sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral (including entering into contracts with respect thereto, public or private sales at any exchange, broker's board, at any office of Agent or elsewhere) at such prices or terms as Agent may deem reasonable, for cash, upon credit or for future delivery, with the Agent having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of any Borrower or Guarantor, which right or equity of redemption is hereby expressly waived and released by Borrowers and Guarantors;

(vii)   give notice of sole control or any other instruction under any Deposit Account Control Agreement; and/or

(viii)   terminate this Agreement.  If any of the Collateral is sold or leased by Agent upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment therefor is finally collected by Agent.

(c)   If notice of disposition of Collateral is required by law, ten days prior notice by Agent to Administrative Borrower designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and Borrowers and Guarantors waive any other notice.  In the event Agent institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy, each Borrower and Guarantor waives the posting of any bond which might otherwise be required.  At any time an Event of Default exists or has occurred and is continuing, upon Agent's request, Borrowers will either, as Agent shall specify, furnish cash collateral to the Issuing Bank to be used to secure and fund Agent's reimbursement obligations to the Issuing Bank in connection with any Letter of Credit Obligations or furnish cash collateral to Agent for the Letter of Credit Obligations.  Such cash collateral shall be in the amount equal to 105% of the amount of the Letter of Credit Obligations plus the amount of any fees and expenses payable in connection therewith through the end of the latest expiration date of such Letter of Credit Obligations.  Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  Agent and each Lender shall use reasonable care with respect to the Collateral in its possession or under its control.  The Agent shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Agent accords its own property.  Neither Agent nor any Lender shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of Agent or such Lender, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

(d)   At any time or times that an Event of Default has occurred and is continuing, Agent may, in its discretion, and upon the direction of the Required Lenders, Agent shall, enforce the rights of any Borrower or any Guarantor against any Account Debtor, secondary obligor or other obligor in respect of any of the Accounts or other Receivables.

Without limiting the generality of the foregoing, Agent may, in its discretion, and upon the direction of the Required Lenders, Agent shall, at such time or times (i) notify any or all Account Debtors, secondary obligors or other obligor in respect thereof that the Receivables have been assigned to Agent and that Agent has a security interest therein and Agent may direct any or all Account Debtors, secondary obligors and other obligors to make payment of Receivables directly to Agent, (ii) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any and all Receivables or other obligations included in the Collateral and thereby discharge or release the Account Debtor or any secondary obligors or other obligors in respect thereof without affecting any of the Obligations, (iii) demand, collect or enforce payment of any Receivables or such other obligations, but without any duty to do so, and Agent and Lenders shall not be liable for any failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto and (iv) take whatever other action Agent may deem necessary or desirable for the protection of its interests and the interests of Lenders.  At any time that an Event of Default exists or has occurred and is continuing, at Agent's request, all invoices and statements sent to any Account Debtor shall state that the Accounts and such other obligations have been assigned to Agent and are payable directly and only to Agent and any Borrower shall deliver to Agent such originals of documents evidencing the sale and delivery of goods or the performance of services giving rise to any Accounts as Agent may require.  In the event any Account Debtor returns Inventory when an Event of Default exists or has occurred and is continuing, Borrower shall, upon Agent's request, hold the returned Inventory in trust for Agent, segregate all returned Inventory from all of its other property, dispose of the returned Inventory solely according to Agent's instructions, and not issue any credits, discounts or allowances with respect thereto without Agent's prior written consent.

(e)    (d)  To the extent that applicable law imposes duties on Agent or any Lender to exercise remedies in a commercially reasonable manner (which duties cannot be waived under such law), each Borrower and Guarantor acknowledges and agrees that it is not commercially unreasonable for Agent or any Lender (i) to fail to incur expenses reasonably deemed significant by Agent or any Lender to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain consents of any Governmental Authority or other third party for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Account Debtors, secondary obligors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (iv) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as any Borrower or Guarantor, for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet

enjoyment, (xi) to purchase insurance or credit enhancements to insure Agent or Lenders against risks of loss, collection or disposition of Collateral or to provide to Agent or Lenders a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Agent in the collection or disposition of any of the Collateral. Each Borrower and Guarantor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Agent or any Lender would not be commercially unreasonable in the exercise by Agent or any Lender of remedies against the Collateral and that other actions or omissions by Agent or any Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section.  Without limitation of the foregoing, nothing contained in this Section shall be construed to grant any rights to any Borrower or Guarantor or to impose any duties on Agent or Lenders that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.  Agent, on behalf of the Lenders, may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(f)    (e) For the purpose of enabling Agent to exercise rights and remedies under this Agreement upon the occurrence and during the continuance of an Event of Default, at such time as, and to the extent that, Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Borrower and each Guarantor hereby grants to Agent an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to any Borrower or Guarantor) to use or sublicense (to its contractors, agents or representatives, or otherwise exercising its remedies hereunder) any Intellectual Property now owned or hereafter acquired by such Borrower or Guarantor, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, to the extent that such nonexclusive license (i) does not violate the express terms of any agreement between a Borrower or Guarantor and a third party governing such Intellectual Property (and shall be subject to any such licenses), or gives such third party any right of acceleration, modification, termination or cancellation therein and (ii) is not prohibited by any Requirements of Law; provided that such license and sublicenses with respect to trademarks shall be subject to the maintenance of quality standards with respect to the goods and services on which such trademarks are used sufficient to preserve the validity of such trademarks.  The use of such license by Agent may be exercised solely during the continuation of an Event of Default; provided that any license, sublicense or other transaction entered into by Agent in accordance with the provisions of this Agreement shall be binding upon the Borrowers and Guarantors, notwithstanding any subsequent cure of an Event of Default.

(g)    (f) Subject to the requirements of Section 6.4, Agent may apply the cash proceeds of Collateral actually received by Agent from any sale, lease, foreclosure or other disposition of the Collateral to payment of the Obligations, in whole or in part and in such order as Agent may elect, whether or not then due.  Borrower and Guarantors shall remain liable to Agent and Lenders for the payment of any deficiency with interest at the highest rate provided for herein and all costs and expenses of collection or enforcement, including attorneys' fees and expenses.

(h)    (g) Without limiting the foregoing, (i) Agent and Lenders may, at Agent's option, and upon the occurrence of an Event of Default, at the direction of the Required Lenders, Agent and Lenders shall, without notice, terminate any provision of this Agreement providing for any future Revolving Loans to be made by Agent and Lenders or Letters of Credit to be issued by Issuing Bank, and (ii) upon the occurrence of an Event of Default, Agent may, at its option, establish such Reserves as Agent determines without limitation or restriction, notwithstanding anything to the contrary provided herein.

10.3    <u>Borrowers' and Guarantors' Obligations Upon Default</u>.  Upon the request of Agent after the occurrence and during the continuance of an Event of Default, each Borrower and Guarantor will:

(a)    assemble and make available to Agent the Collateral and all books and records relating thereto at any place or places specified by Agent, whether at a Borrower's or Guarantor's premises or elsewhere;

(b)    permit Agent, by Agent's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay the Administrative Borrower or Guarantor for such use and occupancy.

10.4    <u>Sale of Inventory and Use of Intellectual Property</u>.  For the purpose of enabling the Agent to exercise the rights and remedies under this <u>Section 10</u> at such time as Agent shall be lawfully entitled to exercise such rights and remedies, each Borrower and Guarantor hereby irrevocably agrees that Agent may sell any of such Borrower's or Guarantor's Inventory directly to any person, including without limitation persons who have previously purchased the such Borrower's or Guarantor's Inventory from such Borrower or Guarantor and, in connection with any such sale or other enforcement of Agent's rights under this Agreement, may sell Inventory which bears any trademark owned by or licensed to such Borrower or Guarantor and any Inventory that is covered by any copyright owned by or licensed to such Borrower or Guarantor and Agent may finish any work in process and affix any trademark owned by or licensed to such Borrower or Guarantor and sell such Inventory as provided herein.

## SECTION 11.    JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW

11.1    <u>Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver</u>.

(a)    The validity, interpretation and enforcement of this Agreement and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York.

(b)     Borrowers, Guarantors, Agent, Lenders and Issuing Bank irrevocably consent and submit to the non-exclusive jurisdiction of the State of New York and the State and Federal courts located in the Borough of Manhattan, County of New York, State of New York and the United States District Court for the Southern District of New York whichever Agent may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Agent and Lenders shall have the right to bring any action or proceeding against any Borrower or Guarantor or its or their property in the courts of any other jurisdiction which Agent deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against any Borrower or Guarantor or its or their property).

(c)     Each Borrower and Guarantor hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five days after the same shall have been so deposited in the U.S. mails, or, at Agent's option, by service upon any Borrower or Guarantor (or Administrative Borrower on behalf of such Borrower or Guarantor) in any other manner provided under the rules of any such courts.  Within 30 days after such service, such Borrower or Guarantor shall appear in answer to such process, failing which such Borrower or Guarantor shall be deemed in default and judgment may be entered by Agent against such Borrower or Guarantor for the amount of the claim and other relief requested.

(d)     BORROWERS, GUARANTORS, AGENT, LENDERS AND ISSUING BANK EACH HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  BORROWERS, GUARANTORS, AGENT, LENDERS AND ISSUING BANK EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT ANY BORROWER, ANY GUARANTOR, AGENT, ANY LENDER OR ISSUING BANK MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)     Agent and Secured Parties shall not have any liability to any Borrower or Guarantor (whether in tort, contract, equity or otherwise) for losses suffered by such Borrower or Guarantor in connection with, arising out of, or in any way related to the transactions or

relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Agent, such Lender and Issuing Bank, that the losses were the result of acts or omissions constituting gross negligence or willful misconduct.  In any such litigation, Agent, Lenders and Issuing Bank shall be entitled to the benefit of the rebuttable presumption that it acted in good faith and with the exercise of ordinary care in the performance by it of the terms of this Agreement.  Each Borrower and Guarantor:  (i) certifies that neither Agent, any Lender, Issuing Bank nor any representative, agent or attorney acting for or on behalf of Agent, any Lender or Issuing Bank has represented, expressly or otherwise, that Agent, Lenders and Issuing Bank would not, in the event of litigation, seek to enforce any of the waivers provided for in this Agreement or any of the other Financing Agreements and (ii) acknowledges that in entering into this Agreement and the other Financing Agreements, Agent, Lenders and Issuing Bank are relying upon, among other things, the waivers and certifications set forth in this <u>Section 11.1</u> and elsewhere herein and therein.

11.2    <u>Waiver of Notices</u>.    Each Borrower and Guarantor hereby expressly waives demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all Instruments and Chattel Paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein.  No notice to or demand on any Borrower or Guarantor which Agent or any Lender may elect to give shall entitle such Borrower or Guarantor to any other or further notice or demand in the same, similar or other circumstances.  Each Borrower and Guarantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to the Borrowers and Guarantors, addressed as set forth in <u>Section 13.3</u>, at least ten days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made.

11.3    <u>Collateral Waivers</u>.    To the maximum extent permitted by applicable law, each Borrower and Guarantor waives all claims, damages, and demands against Agent or any Lender arising out of the repossession, retention or sale of the Collateral, except such as arise solely out of the gross negligence, bad faith or willful misconduct of Agent or such Lender as finally determined by a court of competent jurisdiction.  To the extent it may lawfully do so, each Borrower and Guarantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against Agent or any Lender, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise.

11.4    <u>Amendments and Waivers</u>.

(a)    Except as provided in <u>Section 2.4(c)(i)</u> (with respect to any increase in the Revolving Commitments) and subject to <u>Section 3.4(c)</u> and <u>(d)</u>, neither this Agreement nor any other Financing Agreement nor any terms hereof or thereof may be amended, waived, discharged

or terminated unless such amendment, waiver, discharge or termination is in writing signed by Agent and the Required Lenders or at Agent's option, by Agent with the authorization or consent of the Required Lenders, and as to amendments to any of the Financing Agreements (other than with respect to any provision of <u>Section 12</u> hereof), by each Borrower and such amendment, waiver, discharge or termination shall be effective and binding as to all Lenders and Issuing Bank only in the specific instance and for the specific purpose for which given; except, that, no such amendment, waiver, discharge or termination shall:

(i)    reduce the interest rate or any fees hereunder or extend the time of payment of principal, interest or any fees or reduce the principal amount hereunder of any Loan or Letters of Credit, in each case without the written consent of each Lender directly affected thereby;

(ii)    release all or substantially all of the Collateral (except as expressly permitted or required hereunder or under any of the other Financing Agreements or applicable law and except as permitted under <u>Section 12.11(b)</u> hereof), without the written consent of Agent and all of the Lenders;

(iii)    change any of the provisions of this Section or the definition of "Required Lenders", "Supermajority Revolving Lenders" or any other provision of any Financing Agreement specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender (other than any Defaulting Lender) directly affected thereby;

(iv)    consent to the assignment or transfer by any Borrower or Guarantor of any of their rights and obligations under this Agreement, without the written consent of Agent and all of the Lenders;

(v)    increase the advance rates set forth in the definition of Borrowing Base or add new categories of eligible assets, without the written consent of the Supermajority Revolving Lenders;

(vi)    amend, modify or waive any provision of <u>Section 6.4</u> in a manner that would alter the ratable reduction of Revolving Commitments or the manner in which payments are shared, without the written consent of Agent and all of the Lenders; or

(vii)    except as authorized pursuant to <u>Section 12.15</u>, subordinate the Obligations hereunder or the liens granted hereunder or under the other Financing Agreements, to any other Indebtedness or lien, as the case may be (except for the liens permitted in <u>Section 9.8</u> hereof having priority by operation of law), without the consent of Agent and all of the Lenders; or

(viii)    amend, modify or waive any provision of this Agreement that ~~expressly~~ requires a unanimous Lender consent <u>(including by reference to "all of the Lenders," "Lenders," or otherwise)</u> without the written consent of ~~all~~ the Lenders;

(b)    Notwithstanding anything to the contrary contained in Section 11.4(a) above, Agent may, in its discretion and without the consent of the any Lenders, amend or otherwise modify the Borrowing Base, the Reserves or any of their respective components which amendments or modifications have the effect of increasing the Borrowing Base, decreasing the Reserves or otherwise increasing the amounts available for borrowing hereunder to the extent that such amendment or modification is made to undo changes made after the date hereof and restore the Borrowing Base, Reserves or other components thereof back to a level or standard, as applicable, that exists on the date hereof if the reason for such reduction or increase established after the date hereof no longer exists, as determined by Agent.

(c)    Agent, Lenders and Issuing Bank shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its or their rights, powers and/or remedies unless such waiver shall be in writing and signed as provided herein.  Any such waiver shall be enforceable only to the extent specifically set forth therein.  A waiver by Agent, any Lender or Issuing Bank of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Agent, any Lender or Issuing Bank would otherwise have on any future occasion, whether similar in kind or otherwise.

(d)    Notwithstanding anything to the contrary contained in Section 11.4(a) above, in connection with any amendment, waiver, discharge or termination, in the event that any Lender whose consent thereto is required shall fail to consent or fail to consent in a timely manner (such Lender being referred to herein as a "Non-Consenting Lender"), but the consent of any other Lenders to such amendment, waiver, discharge or termination that is required are obtained, if any, then Chase shall have the right, but not the obligation, at any time thereafter, and upon the exercise by Chase of such right, such Non-Consenting Lender shall have the obligation, to sell, assign and transfer to Chase or such Eligible Transferee as Chase may specify, the Revolving Commitment of such Non-Consenting Lender and all rights and interests of such Non-Consenting Lender pursuant thereto provided, that, if Chase does not exercise such right, and Administrative Borrower presents an Eligible Transferee and requests in writing that Chase replace such Non-Consenting Lender with such Eligible Transferee, then, subject to Chase's consent rights as Agent contained in the within definition of "Eligible Transferee", such Non-Consenting Lender shall have the obligation, to sell, assign and transfer to such Eligible Transferee as Administrative Borrower has specified, the Revolving Commitment of such Non-Consenting Lender and all rights and interests of such Non-Consenting Lender pursuant thereto.  Chase shall provide the Non-Consenting Lender with prior written notice of its intent to exercise its right under this Section, which notice shall specify the date on which such purchase and sale shall occur.  Such purchase and sale shall be pursuant to the terms of an Assignment and Assumption (whether or not executed by the Non-Consenting Lender), except that on the date of such purchase and sale, Chase, or such Eligible Transferee specified by Chase, shall pay to the Non-Consenting Lender (except as Chase and such Non-Consenting Lender may otherwise agree) the amount equal to:  (i) the principal balance of the Revolving Loans held by the Non-Consenting Lender outstanding as of the close of business on the business day immediately preceding the effective date of such purchase and sale, plus (ii) amounts accrued and unpaid in respect of interest and fees payable to the Non-Consenting Lender to the effective date of the purchase (but in no event shall the Non-Consenting Lender be deemed entitled to any early termination fee).  Such purchase and sale shall be effective on the date of the payment of such

amount to the Non-Consenting Lender and the Revolving Commitment of the Non-Consenting Lender shall terminate on such date.

(e) The consent of Agent shall be required for any amendment, waiver or consent affecting the rights or duties of Agent hereunder or under any of the other Financing Agreements, in addition to the consent of the Lenders otherwise required by this Section and the exercise by Agent of any of its rights hereunder with respect to Reserves or Eligible Accounts or Eligible Inventory shall not be deemed an amendment to the advance rates provided for in this Section 11.4. The consent of Issuing Bank shall be required for any amendment, waiver or consent affecting the rights or duties of Issuing Bank hereunder or under any of the other Financing Agreements, in addition to the consent of the Lenders otherwise required by this Section; provided that the consent of Issuing Bank shall not be required for any other amendments, waivers or consents. Notwithstanding anything to the contrary contained in Section 11.4(a) above, (i) in the event that Agent shall agree that any items otherwise required to be delivered to Agent as a condition of the initial Loans and Letters of Credit hereunder may be delivered after the date hereof, Agent may, in its reasonable discretion, agree to extend the date for delivery of such items or take such other action as Agent may deem appropriate as a result of the failure to receive such items as Agent may determine or may waive any Event of Default as a result of the failure to receive such items, in each case without the consent of any Lender and (ii) Agent may consent to any change in the type of organization, jurisdiction of organization or other legal structure of any Borrower, Guarantor or any of their Subsidiaries and amend the terms hereof or of any of the other Financing Agreements as may be necessary or desirable to reflect any such change, in each case without the approval of any Lender.

11.5    Waiver of Counterclaims.  Each Borrower and Guarantor waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

11.6    Indemnification; Limitation of Liability.

(a) Each Borrower and Guarantor shall, jointly and severally, indemnify and hold Agent, each Arranger, each Lender and Issuing Bank, and their respective officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such Person being an "Indemnitee"), harmless from and against any and all losses, claims, damages, liabilities, costs or expenses (including attorneys' reasonable fees and expenses) imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Financing Agreements, or any undertaking or proceeding related to any of the transactions contemplated hereby, any action taken in connection with this Agreement, including, but not limited to, the payment of principal, interest and fees or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the fees and expenses of counsel except that Borrowers and Guarantors shall not have any obligation under this Section 11.6(a) to indemnify an Indemnitee with respect to a matter covered hereby resulting from the gross negligence, bad faith or willful misconduct of such Indemnitee (but without limiting the obligations of Borrowers or Guarantors as to any other Indemnitee). To the extent

that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrowers and Guarantors shall pay the maximum portion which it is permitted to pay under applicable law to Agent and Lenders in satisfaction of indemnified matters under this Section.  To the extent permitted by applicable law, no Borrower or Guarantor shall assert, and each Borrower and Guarantor hereby waives, any claim against any Indemnitee, on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Financing Agreements or any undertaking or transaction contemplated hereby.  Absent gross negligence, bad faith or willful misconduct, no Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or any of the other Financing Agreements or the transaction contemplated hereby or thereby.  All amounts due under this Section shall be payable upon demand.  The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement. This Section 11.6(a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)     To the extent permitted by applicable law (i) neither any Borrower nor any Loan Party shall assert, and each Borrower and each Loan Party hereby waives, any claim against the Agent, any Arranger, any Syndication Agent, any Documentation Agent, the Issuing Bank and any Lender, and any Related Party of any of the foregoing Persons (each such Person being called a "Lender-Related Person") for any Liabilities arising from the use by others of information or other materials (including, without limitation, any personal data) obtained through telecommunications, electronic or other information transmission systems (including the Internet), and (ii) no party hereto shall assert, and each such party hereby waives, any Liabilities against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Financing Agreement, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof; provided that nothing in this Section 11.6(b) shall relieve any Borrower or any Loan Party of any obligation it may have to indemnify an Indemnitee, as provided in Section 11.6(a), against any special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

11.7     Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender, the Issuing Bank and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, and other obligations at any time owing, by such Lender, the Issuing Bank or any such Affiliate, to or for the credit or the account of any Loan Party against any and all of the Obligations held by such Lender, the Issuing Bank or their respective Affiliates, irrespective of whether or not such Lender, the Issuing Bank or their respective Affiliates shall have made any demand under the Financing Agreement  and although such obligations may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender or the Issuing Bank different from the branch office or Affiliate holding such deposit or obligated on such indebtedness; provided that, in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off

shall be paid over immediately to Agent for further application in accordance with the provisions of Section 2.8 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Agent, the Issuing Bank and the Lenders and (y) the Defaulting Lender shall provide promptly to Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The applicable Lender, the Issuing Bank or such Affiliate shall notify the Administrative Borrower and Agent of such setoff or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff or application under this Section. The rights of each Lender, the Issuing Bank and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the Issuing Bank or their respective Affiliates may have.

11.8    ~~11.8~~    Payments from Borrowings.  At the election of the Administrative Agent, ~~all payments of principal,~~ the following may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Administrative Borrower pursuant to Section 2.11 or a deemed request as provided herein:

(a)    all payments of principal,

(b)    interest, LC Disbursements, ~~fees, premiums,~~

(c)    fees,

(d)    premiums,

(e)    reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 9.22 and 11.6), and

(f)    other sums payable under the Loan Documents~~, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Administrative Borrower pursuant to Section 2.11 or a deemed request as provided herein.~~.

The Borrowers hereby irrevocably (i) authorize the Administrative Agent to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents ~~and~~, (ii) agree~~s~~ that all such amounts charged shall constitute Loans and (iii) agree that all such Borrowings shall be deemed to have been requested pursuant to Section 2.2 or 2.11, as applicable.

## SECTION 12.    THE AGENT

12.1    Appointment, Powers and Immunities.    Each Secured Party irrevocably designates, appoints and authorizes Chase to act as Agent hereunder and under the other Financing Agreements, including the Intercreditor Agreement, with such powers as are specifically delegated to Agent by the terms of this Agreement and of the other Financing Agreements, together with such other powers as are reasonably incidental thereto. Agent (a) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Financing Agreements, and shall not by reason of this Agreement or any other Financing Agreement be a trustee or fiduciary for any Secured Party; (b) shall not be responsible

to Secured Parties for any recitals, statements, representations or warranties contained in this Agreement or in any of the other Financing Agreements, or in any certificate or other document referred to or provided for in, or received by any of them under, this Agreement or any other Financing Agreement, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Financing Agreement or any other document referred to or provided for herein or therein or for any failure by any Borrower or any Guarantor or any other Person to perform any of its obligations hereunder or thereunder; and (c) shall not be responsible to Secured Parties for any action taken or omitted to be taken by it hereunder or under any other Financing Agreement or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for its own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  Agent may employ agents and attorneys in fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys in fact selected by it in good faith.  Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until the assignment thereof pursuant to an agreement (if and to the extent permitted herein) in form and substance satisfactory to Agent shall have been delivered to and acknowledged by Agent.

Notwithstanding anything to the contrary in the Financing Agreements, each of the Lenders hereby authorize and empower Agent to (i) execute all documents and (ii) make all acknowledgements.

12.2    Reliance by Agent.  Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telex, telegram or cable) reasonably believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by Agent.  As to any matters not expressly provided for by this Agreement or any other Financing Agreement, Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions given by the Required Lenders or all of Lenders as is required in such circumstance, and such instructions of such Agents and any action taken or failure to act pursuant thereto shall be binding on all Lenders.  Neither the Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by such party, the Agent or any of its Related Parties under or in connection with this Agreement or the other Financing Agreements (x) with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith to be necessary, under the circumstances as provided in the Financing Agreements) or (y) in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and non-appealable judgment) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Financing Agreement or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Financing Agreement or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Financing Agreement (including, for the avoidance of doubt, in connection with the Agent's reliance on any Electronic Signature transmitted by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual

executed signature page) or for any failure of any Loan Party to perform its obligations hereunder or thereunder.

12.3   ~~12.2~~ Events of Default.

(a)     The Agent shall be deemed not to have knowledge of any (i) notice of any of the events or circumstances set forth or described in Section 9.6(b) unless and until written notice thereof stating that it is a "notice under Section 9.6(b)" in respect of this Agreement and identifying the specific clause under said Section is given to the Agent by the Administrative Borrower, or (ii) notice of any Default or Event of Default unless and until written notice thereof (stating that it is a "notice of Default" or a "notice of an Event of Default") is given to the Agent by the Administrative Borrower, a Lender or the Issuing Bank (each a "Notice of Default or Failure of Condition").  In the event that Agent obtains actual knowledge or receives such a Notice of Default or Failure of Condition, Agent shall give prompt notice thereof to the Lenders. Agent shall (subject to Section 12.7) take such action with respect to any such Event of Default or failure of condition precedent as shall be directed by the Required Lenders to the extent provided for herein; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to or by reason of such Event of Default or failure of condition precedent, as it shall deem advisable in the best interest of Lenders.   Without limiting the foregoing, and notwithstanding the existence or occurrence and continuance of an Event of Default or any other failure to satisfy any of the conditions precedent set forth in Section 4 of this Agreement to the contrary, subject to the limitations set forth in Section 12.8, Agent may, but shall have no obligation to, continue to make Revolving Loans and Issuing Bank may, but shall have no obligation to, issue or cause to be issued any Letter of Credit for the ratable account and risk of Lenders from time to time if Agent reasonably and in good faith, believes making such Loans or issuing or causing to be issued such Letter of Credit is in the best interests of Lenders.

(b)     Except with the prior written consent of Agent, no Secured Party may assert or exercise any enforcement right or remedy in respect of the Loans, Letter of Credit Obligations or other Obligations, as against any Borrower or Guarantor or any of the Collateral or other property of any Borrower or Guarantor.

12.4   ~~12.3~~ Chase in its Individual Capacity.  At any time Chase is a Lender or Issuing Bank hereunder, as applicable, then with respect to its Revolving Commitments and the Loans made and Letters of Credit issued or caused to be issued by it (and any successor acting as Agent) hereunder from time to time, if any, so long as Chase shall be a Lender hereunder, it shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as Agent, and the term "Lender" or "Lenders" shall, unless the context otherwise indicates, include Chase in its individual capacity as Lender hereunder.  Chase (and any successor acting as Agent) and its Affiliates may (without having to account therefor to any Lender) lend money to, make investments in and generally engage in any kind of business with Borrowers (and any of their Subsidiaries or Affiliates) as if it were not acting as Agent, and Chase and its Affiliates may accept fees and other consideration from any Borrower or Guarantor and any of its Subsidiaries and Affiliates for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

12.5    ~~12.4~~ Indemnification.

(a)    Neither the Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by such party, the Agent or any of its Related Parties under or in connection with this Agreement or the other Financing Agreements (x) with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith to be necessary, under the circumstances as provided in the Financing Agreements) or (y) in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and non-appealable judgment) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Financing Agreement or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Financing Agreement or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Financing Agreement or for any failure of any Loan Party to perform its obligations hereunder or thereunder.

(b)    Lenders agree to indemnify Agent and Issuing Bank (to the extent not reimbursed by Borrowers hereunder and without limiting any obligations of Borrowers hereunder) ratably, in accordance with their Pro Rata Shares of Loans, for any and all claims of any kind and nature whatsoever that may be imposed on, incurred by or asserted against Agent (including by any Lender) arising out of or by reason of any investigation in or in any way relating to or arising out of this Agreement or any other Financing Agreement or any other documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby (including the costs and expenses that Agent is obligated to pay hereunder) or the enforcement of any of the terms hereof or thereof or of any such other documents, provided, that, no Lender shall be liable for any of the foregoing to the extent it arises from the gross negligence or willful misconduct of the party to be indemnified as determined by a final non-appealable judgment of a court of competent jurisdiction.  The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

12.6    ~~12.5~~ Acknowledgments of Lenders and Issuing Bank; Non-Reliance on Agent and Other Lenders.

(a)    Each Lender and the Issuing Bank represents and warrants that (i) the Financing Agreements set forth the terms of a commercial lending facility, (ii) it is engaged in making, acquiring or holding commercial loans and in providing other facilities set forth herein as may be applicable to such Lender or Issuing Bank, in each case in the ordinary course of business, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument (and each Lender and the Issuing Bank agrees not to assert a claim in contravention of the foregoing), (iii) it has, independently and without reliance upon the Agent, any Arranger, any Syndication Agent, any Documentation Agent or any other Lender or Issuing Bank, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder and (iv) it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities

211

set forth herein, as may be applicable to such Lender or such Issuing Bank, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.  Each Lender and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Agent, any Arranger, any Syndication Agent, any Documentation Agent or any other Lender or Issuing Bank, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrowers and their Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Financing Agreement or any related agreement or any document furnished hereunder or thereunder.  Agent shall not be required to keep itself informed as to the performance or observance by any Borrower or Guarantor of any term or provision of this Agreement or any of the other Financing Agreements or any other document referred to or provided for herein or therein or to inspect the properties or books of any Borrower or Guarantor.  Agent will use reasonable efforts to provide Lenders with any information received by Agent from any Borrower or Guarantor which is required to be provided to Lenders or deemed to be requested by Lenders hereunder and with a copy of any Notice of Default or Failure of Condition received by Agent from any Borrower or any Lender; provided, that, Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to Agent's own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  Except for notices, reports and other documents expressly required to be furnished to Lenders by Agent or deemed requested by Lenders hereunder (including the documents provided for in Section 12.10 hereof), Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of any Borrower or Guarantor that may come into the possession of Agent.

(b)      (i) Each Lender and Issuing Bank hereby agrees that (x) if Agent notifies such Lender or Issuing Bank that Agent has determined in its sole discretion that any funds received by such Lender or Issuing Bank from Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Payment") were erroneously transmitted to such Lender (whether or not known to such Lender or Issuing Bank), and demands the return of such Payment (or a portion thereof), such Lender or Issuing Bank shall promptly, but in no event later than one Business Day thereafter, return to Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender or Issuing Bank to the date such amount is repaid to Agent at the greater of the NYFRB Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender or Issuing Bank shall not assert, and hereby waives, as to Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine.  A notice of Agent to any Lender or Issuing Bank under this Section 12.6(b) shall be conclusive, absent manifest error.

(ii)     Each Lender and Issuing Bank hereby further agrees that if it receives a Payment from Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by Agent (or any of its Affiliates) with respect to such Payment (a "Payment Notice") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment.  Each Lender and Issuing Bank agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender or Issuing Bank shall promptly notify Agent of such occurrence and, upon demand from Agent, it shall promptly, but in no event later than one Business Day thereafter, return to Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender or Issuing Bank to the date such amount is repaid to Agent at the greater of the NYFRB Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii)     Each Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) are not recovered from any Lender or Issuing Bank that has received such Payment (or portion thereof) for any reason, Agent shall be subrogated to all the rights of such Lender or Issuing Bank with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by any Borrower or any other Loan Party.

(iv)     Each party's obligations under this Section 12.6(b) shall survive the resignation or replacement of Agent or any transfer of rights or obligations by, or the replacement of, a Lender or Issuing Bank, the termination of the Revolving Commitments or the repayment, satisfaction or discharge of all Obligations under any Financing Agreement.

12.7     12.6 Failure to Act.  Except for action expressly required of Agent hereunder and under the other Financing Agreements, Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless it shall receive further assurances to its satisfaction from Lenders of their indemnification obligations under Section 12.5 hereof against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.

12.8     12.7 Additional Loans.  Agent shall not make any Revolving Loans or Issuing Bank provide any Letter of Credit to any Borrower on behalf of Revolving Lenders intentionally and with actual knowledge that such Revolving Loans or Letters of Credit would cause the aggregate amount of the total outstanding Revolving Loans and Letters of Credit to such Borrower to exceed the Borrowing Base, without the prior consent of the Required Lenders; except that Agent may make such additional Revolving Loans or Issuing Bank may provide such additional Letters of Credit on behalf of Revolving Lenders, intentionally and with actual knowledge that such Revolving Loans or Letters of Credit will cause the total outstanding Revolving Loans and Letters of Credit to exceed the Borrowing Base, as Agent may deem necessary or advisable in its discretion; provided that: (a) the total principal amount of the additional Revolving Loans or additional Letters of Credit to any Borrower which Agent may make or provide after obtaining such actual knowledge that the aggregate principal amount of the Revolving Loans equal or exceed the Borrowing Base, plus the amount of Special Agent

Advances made pursuant to Sections 12.11(a)(i) and (ii) hereof then outstanding, shall not exceed the aggregate amount equal to 10% of the Borrowing Cap and shall not cause the total principal amount of the Revolving Loans and Letter of Credit Obligations to exceed the Aggregate Revolving Commitment Amounts and (b) no such additional Revolving Loan or Letters of Credit shall be outstanding more than 90 days after the date such additional Revolving Loan or Letters of Credit is made or issued (as the case may be), except as the Required Lenders may otherwise agree.  Each Revolving Lender shall be obligated to pay Agent the amount of its Pro Rata Share of any such additional Revolving Loans or Letters of Credit.

12.9  12.8 Concerning the Collateral and the Related Financing Agreements.  Each Secured Party authorizes and directs Agent to enter into this Agreement, the Intercreditor Agreement and the other Financing Agreements.  Each Secured Party agrees that any action taken by Agent or Required Lenders in accordance with the terms of this Agreement, the Intercreditor Agreement or the other Financing Agreements and the exercise by Agent or Required Lenders of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Secured Parties.

12.10  12.9 Field Audit, Examination Reports and other Information; Disclaimer by Lenders.  By signing this Agreement, each Lender:

(a)    is deemed to have requested that Agent furnish such Lender (and Agent agrees that it will furnish to such Lender), promptly after it becomes available, a copy of each field audit or examination report and report with respect to the Borrowing Base prepared or received by Agent (each field audit or examination report and report with respect to the Borrowing Base being referred to herein as a "Report" and collectively, "Reports"), appraisals with respect to the Collateral and financial statements with respect to FRG and itsthe Loan Parties and their respective Subsidiaries received by Agent;

(b)    expressly agrees and acknowledges that Agent (i) does not make any representation or warranty as to the accuracy of any Report, appraisal or financial statement or (ii) shall not be liable for any information contained in any Report, appraisal or financial statement;

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or any other party performing any audit or examination will inspect only specific information regarding Borrowers and Guarantors and will rely significantly upon Borrowers' and Guarantors' books and records, as well as on representations of Borrowers' and Guarantors' personnel; and

(d)    agrees to keep all Reports confidential and strictly for its internal use in accordance with the terms of Section 13.5 hereof, and not to distribute or use any Report in any other manner.

12.11  12.10 Collateral Matters.

(a)    Agent may, at its option, from time to time, at any time on or after an Event of Default and for so long as the same is continuing or upon any other failure of a

condition precedent to the Revolving Loans and Letters of Credit hereunder, make such disbursements and advances ("Special Agent Advances") which Agent, in its sole discretion:

(i) deems necessary or desirable either to preserve or protect the Collateral or any portion thereof or

(ii) to enhance the likelihood or maximize the amount of repayment by Borrowers and Guarantors of the Loans and other Obligations, provided, that, (A) the aggregate principal amount of the Special Agent Advances pursuant to clauses (i) and (ii) hereof outstanding at any time, plus the then outstanding principal amount of the additional Revolving Loans and Letters of Credit which Agent may make or provide as set forth in Section 12.8 hereof, shall not exceed the amount equal to 10% of the Borrowing Cap, (B) the aggregate principal amount of the Special Agent Advances pursuant to clauses (i) and (ii) hereof outstanding at any time, plus the then total outstanding principal amount of the Revolving Loans and Letter of Credit Obligations, shall not exceed the Aggregate Revolving Commitment Amounts, except at Agent's option, provided, that, to the extent that the aggregate principal amount of Special Agent Advances plus the then total outstanding principal amount of the Revolving Loans and Letter of Credit Obligations exceed the Aggregate Revolving Commitment Amounts the Special Agent Advances that are in excess of the Borrowing Cap shall be for the sole account and risk of Agent and notwithstanding anything to the contrary set forth below, no Lender shall have any obligation to provide its share of such Special Agent Advances in excess of the Aggregate Revolving Commitment Amounts, and (C) no such Special Agent Advances made pursuant to this clause (ii) shall be outstanding more than 90 days after the date such Special Agent Advance is made, except as Required Lenders may otherwise agree, or

(iii) to pay any other amount chargeable to any Borrower or Guarantor pursuant to the terms of this Agreement or any of the other Financing Agreements consisting of (A) costs, fees and expenses and (B) payments to Issuing Bank in respect of any Letter of Credit Obligations. The Special Agent Advances shall be repayable on demand and together with all interest thereon shall constitute Obligations secured by the Collateral. Special Agent Advances shall not constitute Revolving Loans but shall otherwise constitute Obligations hereunder. Interest on Special Agent Advances shall be payable at the interest rate then applicable to ABR Loans and shall be payable on demand. Without limitation of its obligations pursuant to Section 6.11, each Lender agrees that it shall make available to Agent, upon Agent's demand, in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Special Agent Advance. If such funds are not made available to Agent by such Lender, such Lender shall be deemed a Defaulting Lender and Agent shall be entitled to recover such funds, on demand from such Lender together with interest thereon for each day from the date such payment was due until the date such amount is paid to Agent at the NYFRB Rate for each day during such period (as published by the Federal Reserve Bank of New York or at Agent's option based on the arithmetic mean determined by Agent of the rates for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York City time) on that day by each of the three leading brokers of Federal funds transactions in New York City selected by Agent) and if such amounts are not paid within three days of Agent's demand, at the highest interest rate provided for in Section 3.1 hereof applicable to ABR Loans.

(b)        Lenders hereby irrevocably authorize Agent, at its option and in its discretion, to release any security interest in, mortgage or lien upon, any of the Collateral (i) upon Payment in Full, (ii) constituting property being sold or disposed of, other than to a Borrower or a Guarantor, if Administrative Borrower or any Borrower or Guarantor certifies to Agent that the sale or disposition is made in compliance with Section 9.6 hereof (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which any Borrower or Guarantor did not own anhave any right, title or interest at the time the security interest, mortgage or lien was granted or at any time thereafter, (iv) [reserved], (v) if required or permitted under the terms of any of the other Financing Agreements, including any intercreditor agreement or subordination agreement or (vi) approved, authorized or ratified in writing by all of Lenders.  Except as provided above, Agent will not release any security interest in, mortgage or lien upon, any of the Collateral without the prior written authorization of all of Lenders.  Upon request by Agent at any time, Lenders will promptly confirm in writing Agent's authority to release particular types or items of Collateral pursuant to this Section.  In no event shall the consent or approval of Issuing Bank to any release of Collateral be required.  Nothing contained herein shall be construed to require the consent of any Bank Product Provider to any release of Collateral or termination of security interests in any Collateral.

(c)        Without any manner limiting Agent's authority to act without any specific or further authorization or consent by the Required Lenders, each Lender agrees to confirm in writing, upon request by Agent, the authority to release Collateral conferred upon Agent under this Section.  Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of the security interest, mortgage or liens granted to Agent upon any Collateral to the extent set forth above; provided, that, (i) Agent shall not be required to execute any such document on terms which, in Agent's opinion, would expose Agent to liability or create any obligations or entail any consequence other than the release of such security interest, mortgage or liens without recourse or warranty and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any security interest, mortgage or lien upon (or obligations of any Borrower or Guarantor in respect of) the Collateral retained by such Borrower or Guarantor.

(d)        Agent shall have no obligation whatsoever to any Secured Party or any other Person to investigate, confirm or assure that the Collateral exists or is owned by any Borrower or Guarantor or is cared for, protected or insured or has been encumbered, or that any particular items of Collateral meet the eligibility criteria applicable in respect of the Revolving Loans or Letters of Credit hereunder, or whether any particular Reserves are appropriate, or that the liens and security interests granted to Agent pursuant hereto or any of the Financing Agreements or otherwise have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent in this Agreement or in any of the other Financing Agreements, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, subject to the other terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its discretion, given Agent's own interest in the Collateral as a Lender and that Agent shall have no duty or liability whatsoever to any other Lender or Issuing Bank.

12.12   12.11 Agency for Perfection.  Each Secured Party hereby appoints Agent and each other Secured Party as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral of Agent in assets which, in accordance with Article 9 of the UCC can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and Agent and each Secured Party hereby acknowledges that it holds possession or control of any such Collateral for the benefit of Agent as secured party.  Should any Secured Party obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver such Collateral to Agent or in accordance with Agent's instructions.

12.13   12.12 Successor Agent.  Agent may resign as Agent upon 30 days' notice to Lenders and Administrative Borrower.  If Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for Lenders.  If no successor agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with Lenders and FRGthe Administrative Borrower, a successor agent from among the Lenders.  Upon the acceptance by the Lender so selected of its appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Agent and the term "Agent" as used herein and in the other Financing Agreements shall mean such successor agent and the retiring Agent's appointment, powers and duties as Agent shall be terminated.  After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 12 shall inure to its benefit as to any actions taken or omitted by it while it was Agent under this Agreement.  If no successor agent has accepted appointment as Agent by the date which is 30 days after the date of a retiring Agent's notice of resignation, the retiring Agent's resignation shall nonetheless thereupon become effective and Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

12.14   12.13 Other Agent Designations.  Agent may at any time and from time to time determine that a Lender may, in addition, be a "Co-Agent", "Syndication Agent", "Documentation Agent" or similar designation hereunder and enter into an agreement with such Lender to have it so identified for purposes of this Agreement.  Any such designation shall be effective upon written notice by Agent to Administrative Borrower of any such designation.  Any Lender that is so designated as a Co-Agent, Syndication Agent, Documentation Agent or such similar designation by Agent shall have no right, power, obligation, liability, responsibility or duty under this Agreement or any of the other Financing Agreements other than those applicable to all Lenders as such.  Without limiting the foregoing, the Lenders so identified shall not have or be deemed to have any fiduciary relationship with any Lender and no Lender shall be deemed to have relied, nor shall any Lender rely, on a Lender so identified as a Co-Agent, Syndication Agent, Documentation Agent or such similar designation in deciding to enter into this Agreement or in taking or not taking action hereunder.

12.15   12.14 Intercreditor Agreement.  Each Lender, in its capacity as a Lender and in its capacity as a Bank Product Provider, as applicable, and each other Secured Party, by its acceptance of the benefits of the Collateral Documents creating Liens to secure the Obligations:

(a)     acknowledges that it has received a copy of the Intercreditor Agreement and is satisfied with the terms and provisions thereof;

(b)     authorizes and instructs Agent to (i) enter into the Intercreditor Agreement, as Agent and on behalf of such Secured Party, (ii) to exercise all of Agent's rights and to comply with all of its obligations under the Intercreditor Agreement and to take all other actions necessary to carry out the provisions and intent thereof and (iii) to take actions on its behalf in accordance with the terms of the Intercreditor Agreement;

(c)     agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement as if it was a signatory thereto;

(d)     consents to the treatment of Liens to be provided for under the Intercreditor Agreement and in furtherance thereof authorizes the Agent to subordinate the liens on the Collateral securing the Obligations (other than liens on ABL Priority Collateral) in accordance with the terms set forth in the Intercreditor Agreement;

(e)     authorizes and directs Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent or authorization from such Secured Party, any amendments, supplements or other modifications of the Intercreditor Agreement that the Borrowers may from time to time request to give effect to any incurrence, amendment, or refinancing of any Indebtedness incurred pursuant to Section 9.9(t); and

(f)     agrees that no Secured Party shall have any right of action whatsoever against Agent as a result of any action taken by Agent pursuant to this Section 12.15(a) or in accordance with the terms of the Intercreditor Agreement.

12.16   ~~12.15~~ Posting of Communications.

(a)     The Borrowers agree that the Agent may, but shall not be obligated to, make any Communications available to the Lenders and the Issuing Bank by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic system chosen by the Agent to be its electronic transmission system (the "Approved Electronic Platform").

(b)     Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Agent from time to time (including, as of the Closing Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders, the Issuing Bank and each Borrower acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agent is not responsible for approving or vetting the representatives or contacts of any Lender that are added to the Approved Electronic Platform, and that there may be confidentiality and other risks associated with such distribution. Each of the Lenders, the Issuing Bank and each Borrower hereby approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)    THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM. IN NO EVENT SHALL THE AGENT, ANY ARRANGER OR ANY OF THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "APPLICABLE PARTIES") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER, THE ISSUING BANK OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM.

"Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Financing Agreement or the transactions contemplated therein which is distributed by the Agent, any Lender or Issuing Bank by means of electronic communications pursuant to this Section, including through an Approved Electronic Platform.

(d)    Each Lender and Issuing Bank agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Financing Agreements. Each Lender and Issuing Bank agrees (i) to notify the Agent in writing (which could be in the form of electronic communication) from time to time of such Lender's or Issuing Bank's (as applicable) email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)    Each of the Lenders, Issuing Bank and each Borrower agrees that the Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Agent's generally applicable document retention procedures and policies.

(f)    Nothing herein shall prejudice the right of the Agent, any Lender or Issuing Bank to give any notice or other communication pursuant to any Financing Agreement in any other manner specified in such Financing Agreement.

12.17    ~~12.16~~ Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agent, each Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Revolving Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agent, each Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that none of the Agent, any Arranger, any Syndication Agent, any Documentation Agent or any of their respective Affiliates is a fiduciary with respect to the

Collateral or the assets of such Lender (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Financing Agreement or any documents related to hereto or thereto).

(c)     Each of the Agent, any Arranger, any Syndication Agent and any Documentation Agent hereby informs the Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Revolving Commitments, this Agreement and any other Financing Agreements, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Revolving Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Revolving Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Financing Agreements or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

## SECTION 13.     TERM OF AGREEMENT; MISCELLANEOUS

13.1    Term.

(a)     This Agreement and the other Financing Agreements shall become effective as of the date set forth on the first page hereof and shall continue in full force and effect for a term ending on the Maturity Date, unless sooner terminated pursuant to the terms hereof.  In addition, Borrowers may terminate this Agreement at any time upon ten days' prior written notice to Agent (which notice shall be irrevocable) and Agent may, at its option, and shall at the direction of Required Lenders, terminate this Agreement at any time upon the occurrence and during the continuation of an Event of Default.  Upon the Maturity Date or any other effective date of termination of the Financing Agreements, Borrowers shall pay all amounts and take all other actions necessary to cause Payment in Full to occur.  All such payments required to cause Payment in Full to occur in respect of the Obligations and cash collateral shall be remitted by wire transfer in Federal funds to the Agent Payment Account or such other bank account of Agent, as Agent may, in its discretion, designate in writing to Administrative Borrower for such purpose.  Interest shall be due until and including the next Business Day, if the amounts so paid by Borrowers to the Agent Payment Account or other bank account designated by Agent are received in such bank account later than 12:00 noon, New York City time.

(b)     No termination of the Revolving Commitments, this Agreement or any of the other Financing Agreements shall relieve or discharge any Borrower or Guarantor of its respective duties, obligations and covenants under this Agreement or any of the other Financing Agreements until all Obligations have been fully and finally discharged and paid, and Agent's continuing security interest in the Collateral and the rights and remedies of Agent and Lenders hereunder, under the other Financing Agreements and applicable law, shall remain in effect until

all such Obligations (other than indemnities and contingent Obligations which survive the termination of this Agreement and the other Financing Agreements) have been fully and finally discharged and paid and Lenders have no further obligations hereunder (following which all security interests and liens shall be released).  Accordingly, each Borrower and Guarantor waives any rights it may have under the UCC to demand the filing of termination statements with respect to the Collateral and Agent shall not be required to send such termination statements to Borrowers or Guarantors, or to file them with any filing office, unless and until this Agreement and all Revolving Commitments of all Lenders shall have been terminated in accordance with its terms and all Obligations (other than indemnities and contingent Obligations which survive the termination of this Agreement and the other Financing Agreements) paid and satisfied in full in immediately available funds.  Upon such termination, Agent will contemporaneously provide (assuming Agent has received written notice a reasonable amount of time prior to such termination) an appropriate payoff instrument, in form and substance reasonably satisfactory to Agent, which shall, among other things, give Borrowers and Guarantors authority to file appropriate UCC-3 termination statements.

13.2    <u>Interpretative Provisions</u>.

(a)    All terms used herein which are defined in Article 1, Article 8 or Article 9 of the UCC shall have the meanings given therein unless otherwise defined in this Agreement.

(b)    All references to the plural herein shall also mean the singular and to the singular shall also mean the plural unless the context otherwise requires.

(c)    All references to any Borrower, Guarantor, Agent and Lenders pursuant to the definitions set forth in the recitals hereto, or to any other Person herein, shall include their respective successors and assigns.

(d)    The words "<u>hereof</u>", "<u>herein</u>", "<u>hereunder</u>", "<u>this Agreement</u>" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement and as this Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(e)    The word "<u>including</u>" when used in this Agreement shall mean "including, without limitation" and the word "<u>will</u>" when used in this Agreement shall be construed to have the same meaning and effect as the word "shall".

(f)    A Default or an Event of Default shall continue or be continuing until such Default or Event of Default is waived in accordance with <u>Section 11.4</u> or is cured in a manner satisfactory to Agent; provided that, such Event of Default is capable of being cured as determined by Agent.

(g)    All references to the term "<u>good faith</u>" used herein when applicable to Agent or any Lender shall mean, notwithstanding anything to the contrary contained herein or in the UCC, honesty in fact in the conduct or transaction concerned.  Borrowers and Guarantors shall have the burden of proving any lack of good faith on the part of Agent or any Lender alleged by any Borrower or Guarantor at any time.

(h)    Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed unless otherwise specifically provided herein, in accordance with GAAP as consistently applied and using the same method for inventory valuation as used in the preparation of the financial statements of ~~FRG~~the Loan Parties and their respective Subsidiaries most recently received by Agent prior to the date hereof. Notwithstanding anything to the contrary contained in GAAP or any interpretations or other pronouncements by the Financial Accounting Standards Board or otherwise, the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is unqualified and also does not include any explanation, supplemental comment or other comment concerning the ability of the applicable Person to continue as a going concern or the scope of the audit.

(i)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including".

(j)    Unless otherwise expressly provided herein, (i) references herein to any agreement, document or instrument shall be deemed to include all subsequent amendments, modifications, supplements, extensions, renewals, restatements or replacements with respect thereto, but only to the extent the same are not prohibited by the terms hereof or of any other Financing Agreement, and (ii) references to any statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, recodifying, supplementing or interpreting the statute or regulation.

(k)    The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(l)    This Agreement and other Financing Agreements may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.

(m)    This Agreement and the other Financing Agreements are the result of negotiations among and have been reviewed by counsel to Agent and the other parties, and are the products of all parties.  Accordingly, this Agreement and the other Financing Agreements shall not be construed against Agent or Lenders merely because of Agent's or any Lender's involvement in their preparation.

(n)    Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or any Subsidiary at "fair value", as defined therein, and (ii) without giving effect to any treatment of Indebtedness under Financial Accounting Standards Board Accounting Standards Codification 470-20 or

2105-03 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(o)     The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 3.4(b) provides a mechanism for determining an alternative rate of interest.  The Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrowers.  The Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrowers, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

(p)     Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the amount of such Letter of Credit available to be drawn at such time; provided that, with respect to any Letter of Credit that, by its terms or the terms of any continuing agreement (or other letter of credit agreement) for the issuance of letters of credit or letter of credit application, in each case related to such Letter of Credit, provides for one or more automatic increases in the available amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is available to be drawn at such time.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Article 29(a) of the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the applicable time) or Rule 3.13 or Rule 3.14 of the International Standby Practices, International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the applicable time) or similar terms of the Letter of Credit itself, or if compliant documents have been presented but not yet honored, such Letter of Credit shall be deemed to be "outstanding" and "undrawn" in the amount so remaining available to be paid, and the obligations of the Borrowers and each Lender shall remain in full force and effect until the Issuing Bank and the

Lenders shall have no further obligations to make any payments or disbursements under any circumstances with respect to any Letter of Credit.

(q)    For all purposes under the Financing Agreements, in connection with any Division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its equity interests at such time.

13.3    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

If to any Borrower or Guarantor:

Franchise Group, Inc.
109 Innovation Court, Suite J
Delaware, Ohio 43015
Fusion Buyer, LLC.
2371 Liberty Way
Virginia Beach (Virginia Beach City County)
VA 23456
Attention: [  ]Andrew Kaminsky
Email: [  ]akaminsky@franchisegrp.com


If to Agent or Issuing Bank:

JPMorgan Chase Bank, N.A.
383 Madison Ave, Floor 23
New York, NY 10179
Attn: Alexandra Mills; Pallavi Jha
Facsimile: (917) 464-7000
Email: alexandra.c.mills@jpmorgan.com; pallavi.jha@jpmorgan.com

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent, provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (iii) delivered through Electronic Systems or Approved Electronic Platforms, as applicable, to the

extent provided in paragraph (b) below shall be effective as provided in such paragraph; provided, further, that notices of Default or Event of Default may only be given as set forth in clause (i) above.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by using Electronic Systems or Approved Electronic Platforms, as applicable, or pursuant to procedures approved by the Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Agent and the applicable Lender.  Each of the Agent and the Administrative Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by Electronic Systems or Approved Electronic Platforms, as applicable, pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Agent otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)    Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

13.4    Partial Invalidity.  If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

13.5    Confidentiality.

(a)    Agent, each Lender and Issuing Bank shall use all reasonable efforts to keep confidential, and shall use reasonable efforts to cause its agents (including accountants, auditors and filed examiners) to keep confidential, in accordance with its customary procedures for handling confidential information and safe and sound lending practices, any non-public information supplied to it by any Borrower pursuant to this Agreement, provided, that, nothing contained herein shall limit the disclosure of any such information:  (i) to the extent required by statute, rule, regulation, subpoena or court order, (ii) to bank examiners and other regulators, auditors and/or accountants, in connection with any litigation to which Agent, such Lender or Issuing Bank is a party, (iii) to any Lender or Participant (or prospective Lender or Participant) or Issuing Bank or to any Affiliate of any Lender so long as such Lender, Participant (or prospective

Lender or Participant), Issuing Bank or Affiliate shall have been instructed to treat such information as confidential in accordance with this Section 13.5, or (iv) to counsel for Agent, any Lender, Participant (or prospective Lender or Participant).  Agent and Lenders shall not publicly disclose consummation of this Agreement prior to a public disclosure of the same by ~~FRG~~Fusion Buyer or any of its Affiliates.

(b)    In the event that Agent, any Lender or Issuing Bank receives a request or demand to disclose any confidential information pursuant to any subpoena or court order, Agent or such Lender or Issuing Bank, as the case may be, agrees (i) to the extent permitted by applicable law or if permitted by applicable law, to the extent Agent or such Lender or Issuing Bank determines in good faith that it will not create any risk of liability to Agent or such Lender or Issuing Bank, Agent or such Lender or Issuing Bank will promptly notify Administrative Borrower of such request so that Administrative Borrower may seek a protective order or other appropriate relief or remedy and (ii) if disclosure of such information is required, disclose such information and, subject to reimbursement by Borrowers of Agent's or such Lender's or Issuing Bank's expenses, cooperate with Administrative Borrower in the reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the disclosed information which Administrative Borrower so designates, to the extent permitted by applicable law or if permitted by applicable law, to the extent Agent or such Lender or Issuing Bank determines in good faith that it will not create any risk of liability to Agent or such Lender or Issuing Bank.

(c)    In no event shall this Section 13.5 or any other provision of this Agreement, any of the other Financing Agreements or applicable law be deemed:  (i) to apply to or restrict disclosure of information that has been or is made public by any Borrower, Guarantor or any third party or otherwise becomes generally available to the public other than as a result of a disclosure in violation hereof, (ii) to apply to or restrict disclosure of information that was or becomes available to Agent, any Lender (or any Affiliate of any Lender) or Issuing Bank on a non-confidential basis from a Person other than a Borrower or Guarantor, (iii) to require Agent, any Lender or Issuing Bank to return any materials furnished by a Borrower or Guarantor to Agent, a Lender or Issuing Bank or prevent Agent, a Lender or Issuing Bank from responding to routine informational requests in accordance with the Code of Ethics for the Exchange of Credit Information promulgated by The Robert Morris Associates or other applicable industry standards relating to the exchange of credit information.  The obligations of Agent, Lenders and Issuing Bank under this Section 13.5 shall supersede and replace the obligations of Agent, Lenders and Issuing Bank under any confidentiality letter signed prior to the date hereof or any other arrangements concerning the confidentiality of information provided by any Borrower or Guarantor to Agent or any Lender.

(d)    Agent and Lenders may share with their respective Affiliates any information relating to the Credit Facility and Borrowers and Guarantors.  Agent and Lenders may disclose information relating to the Credit Facility to data service providers, including league table providers, that serve the lending industry and other similar bank trade publications with such information to consist of deal terms and other information customarily found in such publications.  In addition, Agent and Lenders and their respective Affiliates may otherwise use the corporate names, logos and other insignia of Borrowers and Guarantors in "tombstones" or

other advertisements or public statements or other marketing materials of Agent and Lenders and their respective Affiliates.

13.6    <u>Successors</u>.  This Agreement, the other Financing Agreements and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by Agent, Secured Parties, Borrowers, Guarantors and their respective successors and assigns, except that no Borrower may assign its rights under this Agreement, the other Financing Agreements and any other document referred to herein or therein without the prior written consent of Agent and Lenders.  Any such purported assignment without such express prior written consent shall be void.  No Secured Party may assign its rights and obligations under this Agreement without the prior written consent of Agent, except as provided in <u>Section 13.7</u> below.  The terms and provisions of this Agreement and the other Financing Agreements are for the purpose of defining the relative rights and obligations of Borrowers, Guarantors, Agent and Secured Parties with respect to the transactions contemplated hereby and there shall be no third party beneficiaries of any of the terms and provisions of this Agreement or any of the other Financing Agreements.

13.7    <u>Assignments; Participations</u>.

(a)    Each Lender may, with the prior written consent of Agent as required pursuant to the within definition of "Eligible Transferee", assign all or, if less than all, a portion equal to at least $5,000,000 in the aggregate for the assigning Lender, of such rights and obligations under this Agreement to one or more Eligible Transferees (but not including for this purpose any assignments in the form of a participation), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption; <u>provided</u> that (i) such transfer or assignment will not be effective until recorded by Agent on the Register and (ii) Agent shall have received for its sole account payment of a processing fee from the assigning Lender or the assignee in the amount of $5,000.

(b)    Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices a register of the names and addresses of the Lenders, the Lenders' Revolving Commitments and Pro Rata Share of the Aggregate Revolving Commitment Amounts and the principal amount of the Loans and Letter of Credit Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  Agent shall also maintain a copy of each Assignment and Assumption delivered to and accepted by it and shall modify the Register to give effect to each Assignment and Assumption.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and any Borrowers, Guarantors, Agent and Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Administrative Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.  No assignment shall be effective unless recorded in the Register. The parties hereto agree and intend that the Obligations shall be treated as being in "registered form" for the purposes of the Code (including Sections 163(f), 871(h)(2), and 881(c)(2) of the Code), and the Register shall be maintained in accordance with such intention.

(c)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be

a party hereto and to the other Financing Agreements and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption, have the rights and obligations (including, without limitation, the obligation to participate in Letter of Credit Obligations) of a Lender hereunder and thereunder and the assigning Lender shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights and be released from its obligations under this Agreement but shall continue to be entitled to the benefits of Sections 3.4, 3.5 and 11.6).

(d)        By execution and delivery of an Assignment and Assumption, the assignor and assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Assumption, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any of the other Financing Agreements or the execution, legality, enforceability, genuineness, sufficiency or value of this Agreement or any of the other Financing Agreements furnished pursuant hereto, (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower, Guarantor or any of their Subsidiaries or the performance or observance by any Borrower or Guarantor of any of the Obligations; (iii) such assignee confirms that it has received a copy of this Agreement and the other Financing Agreements, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption, (iv) such assignee will, independently and without reliance upon the assigning Lender, Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Financing Agreements, (v) such assignee appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Financing Agreements as are delegated to Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Financing Agreements are required to be performed by it as a Lender.  Agent and Lenders may furnish any information concerning any Borrower or Guarantor in the possession of Agent or any Lender from time to time to assignees and Participants.

(e)        Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Financing Agreements (including, all or a portion of its Revolving Commitments and the Loans owing to it and its participation in the Letter of Credit Obligations, without the consent of Agent, the Issuing Bank or the other Lenders); provided, that, (i) such Lender's obligations under this Agreement (including, without limitation, its Revolving Commitment hereunder) and the other Financing Agreements shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and Borrowers, Guarantors, the other Lenders and Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Financing Agreements, and (iii) the Participant shall not have any rights under this Agreement or any of the other Financing Agreements (the Participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the

Participant relating thereto) and all amounts payable by any Borrower or Guarantor hereunder shall be determined as if such Lender had not sold such participation. Each Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.3 and 3.5 (subject to the requirements and limitations therein, including the requirements under Section 3.5(f) (it being understood that the documentation required under Section 3.5(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to this Section; provided that such shall not be entitled to receive any greater payment under Section 3.3 and 3.5, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Financing Agreements (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Financing Agreement) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

(f)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans hereunder to a Federal Reserve Bank in support of borrowings made by such Lenders from such Federal Reserve Bank; provided, that, no such pledge shall release such Lender from any of its obligations hereunder or substitute any such pledgee for such Lender as a party hereto.

(g)    Borrowers and Guarantors shall assist Agent or any Lender permitted to sell assignments or participations under this Section 13.7 in whatever manner reasonably necessary in order to enable or effect any such assignment or participation, including (but not limited to) the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and the delivery of informational materials, appraisals or other documents for, and the participation of relevant management in meetings and conference calls with, potential Lenders or Participants.  Borrowers shall certify the correctness, completeness and accuracy, in all material respects, of all descriptions of Borrowers and Guarantors and their affairs provided, prepared or reviewed by any Borrower or Guarantor that are contained in any selling materials and all other information provided by it and included in such materials.

(h)    Any Lender that is an Issuing Bank may at any time assign all of its Revolving Commitments pursuant to this Section 13.7.  If such Issuing Bank ceases to be Lender, it may, at its option, resign as Issuing Bank and such Issuing Bank's obligations to issue Letters of Credit shall terminate but it shall retain all of the rights and obligations of Issuing

Bank hereunder with respect to Letters of Credit outstanding as of the effective date of its resignation and all Letter of Credit Obligations with respect thereto (including the right to require Revolving Lenders to make Revolving Loans or fund risk participations in outstanding Letter of Credit Obligations), shall continue.

13.8    Entire Agreement.    This Agreement, the other Financing Agreements, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.    In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

13.9    USA Patriot Act.    Each Lender subject to the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Act") hereby notifies Borrowers and Guarantors that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each Person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of Borrowers and Guarantors and other information that will allow such Lender to identify such Person in accordance with the Act and any other applicable law.    Borrowers and Guarantors are hereby advised that any Loans or Letters of Credit hereunder are subject to satisfactory results of such verification.

13.10    Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    This Agreement or any of the other Financing Agreements may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement.    This Agreement, the other Financing Agreements and any separate letter agreements with respect to (i) fees payable to the Agent and (ii) increases or reductions of the Letter of Credit Limit of the Issuing Bank constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.1, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)    Delivery of an executed counterpart of a signature page of (x) this Agreement, (y) any other Financing Agreement and/or (z) any document, amendment, approval, consent, information, notice (including, for the avoidance of doubt, any notice delivered pursuant to Section 13.3), certificate, request, statement, disclosure or authorization related to this Agreement, any other Financing Agreement and/or the transactions contemplated hereby and/or thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this

Agreement, such other Financing Agreement or such Ancillary Document, as applicable. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Financing Agreement and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Agent has agreed to accept any Electronic Signature, the Agent and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of any Borrower or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (ii) upon the request of the Agent or any Lender, any Electronic Signature shall be promptly followed by a manually executed counterpart. Without limiting the generality of the foregoing, each Borrower and each Loan Party hereby (A) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Agent, the Lenders, the Borrowers and the Loan Parties, Electronic Signatures transmitted by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Financing Agreement and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (B) the Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Financing Agreement and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (C) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Financing Agreement and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Financing Agreement and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (D) waives any claim against any Lender-Related Person for any Liabilities arising solely from the Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by facsimile, emailed .pdf or any other electronic means that reproduces an image of an actual executed signature page, including any Liabilities arising as a result of the failure of any Borrower and/or any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

13.11   [Reserved].

13.12   Acknowledgment Regarding Any Supported QFCs.   To the extent that the Financing Agreements provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act

(together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Financing Agreements and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Financing Agreements that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Financing Agreements were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

13.13    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Financing Agreement or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Financing Agreement may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Agreement; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

13.14    <u>Intercreditor Agreement</u>.  This Agreement and the other Financing Agreements are subject to the terms and conditions set forth in the Intercreditor Agreement in all respects and, in the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern. Notwithstanding anything herein to the contrary, the lien and security interest granted to the Agent or the First Lien Agent , as applicable, pursuant to any Financing Agreement or First Lien Term Loan Document , and the exercise of any right or remedy in respect of the Collateral by the Agent or the First Lien Agent, as applicable hereunder, under any other Financing Agreement or the First Lien Credit Agreement  and any other agreement entered into in connection therewith are subject to the provisions of the Intercreditor Agreement and in the event of any conflict between the terms of the Intercreditor Agreement, this Agreement, any other Financing Agreement or the First Lien Credit Agreement and any other agreement entered into in connection therewith, the terms of the Intercreditor Agreement shall govern and control with respect to the exercise of any such right or remedy or the Loan Parties' covenants and obligations.

13.15    <u>Release of Liens and Guarantees</u>.

(a)            A Loan Party shall automatically be released from its obligations under the Financing Agreements (including its guarantee of the Obligations) and all security interests created by the Collateral Documents in Collateral owned by such Loan Party shall be automatically released, (1) upon the consummation of any transaction or designation permitted by this Agreement as a result of which such Loan Party ceases to be a Subsidiary (including pursuant to a permitted merger with a Subsidiary that is not a Loan Party) <u>(other than in connection with the Buddy Reorganization Transaction)</u> or becomes an Excluded Subsidiary (other than solely as a result of such Subsidiary Loan Party ceasing to be a Wholly Owned Subsidiary) or (2) upon the request of the Administrative Borrower, in connection with a transaction permitted under this Agreement (but only a transaction (x) in which such Loan Party becomes a bona fide joint venture and the other Person taking an equity interest in such Loan Party takes such equity interest for fair market value (as determined in good faith by the Administrative Borrower) and is not an Investor, an Affiliate of an Investor or an Affiliate of a Borrower (other than as a result of such joint venture) and (y) the primary purpose (as determined by the Administrative Borrower in good faith) of which is not the release of any guarantee of or Lien on the assets of such Loan Party) as a result of which such Loan Party ceases to be a Wholly Owned Subsidiary. Upon any sale or other transfer by any Loan Party (other than to the Administrative Borrower or any Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under this Agreement or any Collateral Document in any Collateral, the security interests in such Collateral created by this Agreement or the Collateral Documents shall be automatically released.  Upon the release of any Loan Party from its guarantee in compliance with this Agreement, the security interest in any Collateral owned by such Subsidiary created by this Agreement or the Collateral Documents shall be automatically released. Upon ~~termination of the aggregate Revolving Commitments and p~~Payment in ~~f~~Full~~ of all Obligations (other than contingent indemnification obligations)~~, all obligations under the Financing Agreements and all security interests created by this Agreement or the Collateral

Documents shall be automatically released. In connection with any termination or release pursuant to this Section 13.15, Agent, as the case may be, shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release so long as the Administrative Borrower or applicable Loan Party shall have provided the Agent such certifications or documents as Agent shall reasonably request in order to demonstrate compliance with this Agreement.

(b)      Agent will, at the Administrative Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to subordinate its Lien on any property granted to or held by Agent under any Financing Agreement to the holder of any Lien on such property that is permitted by Section 9.8(e).

(c)      Each of the Lenders, and by accepting the benefits of this Agreement or the Collateral Documents, each Secured Party that is not a party hereto, irrevocably authorizes Agent to provide any release or evidence of release, termination or subordination contemplated by this Section 13.15. Upon request by Agent at any time, the Required Lenders will confirm in writing Agent's authority release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Financing Agreement, in each case in accordance with the terms of the Financing Agreement and this Section 13.15.

[SIGNATURE PAGES OMITTED]

Schedule 1A

<u>REVOLVING COMMITMENTS</u>

| Lenders | Revolving Commitment |
|---------|---------------------|
| JPMorgan Chase Bank, N.A. | $[ ]45,000,000.00 |
| Citizens Bank, N.A. | $[ ]30,000,000.00 |
| BMO Bank N.A. | $[ ]25,000,000.00 |
| **TOTAL COMMITMENTS:** | $[100],100,000,000.00 |

**Exhibit H**

**Litigation Trust Agreement**

Certain documents, or portions thereof, contained in this **Exhibit H** and the Plan Supplement remain subject to continuing review and discussions among the Debtors, the Ad Hoc Group, the Freedom Lender Group, and the Creditors' Committee consistent with their respective consent and consultation rights. The rights of the Debtors are expressly reserved, subject to the terms and conditions set forth in the Plan (including all applicable consultation, consent, and/or approval rights contained or contemplated therein), to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained herein in accordance with the terms of the Global Settlement and the Plan, or by order of the Bankruptcy Court.

# LITIGATION TRUST AGREEMENT
# AND DECLARATION OF LITIGATION TRUST

This Litigation Trust Agreement and Declaration of Litigation Trust (this "<u>Agreement</u>"), dated as of June [●], 2025, is made by and among Freedom VCM, Inc., Freedom VCM Interco, Inc. (together with Freedom VCM, Inc., the "<u>Freedom HoldCo Debtors</u>"), Franchise Group, Inc. and its subsidiary debtors and debtors in possession listed on **Schedule 1** attached hereto (the "<u>OpCo Debtors</u>")[1] in the Chapter 11 Cases,[2] Lawrence R. Hirsh (the "<u>Initial Litigation Trustee</u>" and together with any successor trustee appointed in accordance with the terms hereof, the "<u>Litigation Trustee</u>"),[3] and Robert LeHane, Michael Schwarzmann, and Seth Zeleznik, as members of the committee which shall have oversight over the litigation trust contemplated by

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

[2]    As set forth in Section 1.2, capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable, unless otherwise noted.

[3]    If Lawrence Hirsh cannot serve as Litigation Trustee on the Effective Date for any reason, Initial Litigation Trustee will be an individual selected by the Freedom Lender Group, with the reasonable consent of the Ad Hoc Group and the Creditors' Committee.

this Agreement (the "<u>Litigation Trust Advisory Board</u>," and, together with the Freedom HoldCo Debtors, the OpCo Debtors, and the Litigation Trustee, the "<u>Parties</u>," and each, a "<u>Party</u>").

## RECITALS

1.      On November 3, 2024 (the "<u>Petition Date</u>"), each of the Freedom HoldCo Debtors and the OpCo Debtors (together, with their affiliated debtors and debtors in possession, the "<u>Debtors</u>") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), and their chapter 11 cases are being jointly administered under the caption *In re Franchise Group, Inc., et al.*, Case No. 24-12480 (LSS) (Bankr. D. Del.) (the "<u>Chapter 11 Cases</u>").

2.      On November 19, 2024, the Office of the United States Trustee, Region 3 (the "<u>U.S. Trustee</u>") appointed the Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>") to represent the interests of all general unsecured creditors in the Chapter 11 Cases and filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 188].

3.      On April 25, 2025, the Debtors filed the *Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1312] (as amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>").  The Plan incorporates the terms of a Global Settlement that includes, among other things, the Litigation Trust Units Allocations, which is comprised of (a) the Prepetition First Lien Loan Claims Litigation Trust Allocation, (b) the General Unsecured Creditors Litigation Trust Allocation, and (c) the Prepetition OpCo 2L/HoldCo Loan Claims Litigation Trust Allocation.  Pursuant to the Litigation Trust Units Allocations, the Litigation Trust Units shall be distributed as follows: 58% to Holders of Allowed Prepetition Second Lien Loan Claims and Allowed Prepetition HoldCo

Loan Claims, 30% to the Holders of Allowed Prepetition First Lien Loan Claims, and 12% to Holders of Allowed Freedom HoldCo General Unsecured Claims and Allowed OpCo General Unsecured Claims (excluding, for the avoidance of doubt, any Litigation Trust Units allocated to the Holders of Allowed Prepetition First Lien Loan Claims or Holders of Allowed Prepetition Second Lien Loan Claims), collectively.

4.                    On June 2, 2025, the Bankruptcy Court entered an order [Docket No. 1596] (the "Confirmation Order") confirming the Plan, which became effective on [●], 2025 (the "Effective Date").

5.        Section 7.10 of the Plan provides for the creation of the Litigation Trust on the Effective Date in connection and consistent with the Global Settlement.

6.        The Litigation Trust is established for the sole purpose of receiving, holding, administering, liquidating, and distributing the Litigation Trust Assets, including the (i) Litigation Trust Escrow Account, which includes, for the avoidance of doubt, the Litigation Trust Escrow Amount, funded in accordance with the Plan, and (ii) Permitted Litigation Claims, *plus* any additional amounts funded into the Litigation Trust Escrow Account following the Effective Date, for the benefit of the Holders of Allowed Prepetition First Lien Loan Claims, Allowed Prepetition Second Lien Loan Claims, Allowed Prepetition HoldCo Loan Claims, Allowed OpCo General Unsecured Claims, and Allowed Freedom HoldCo General Unsecured Claims (collectively, the "Litigation Trust Beneficiaries").

7.        The Litigation Trustee shall, in consultation with the Litigation Trust Advisory Board and in accordance with the terms hereof:  (i) be the exclusive administrator of the assets of the Litigation Trust, including the Litigation Trust Assets; and (ii) except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, have the power and authority to (a) reconcile

OpCo General Unsecured Claims and Freedom HoldCo General Unsecured Claims, including asserting any objections thereto in each case, *provided, however,* that all parties in interest shall also have the right to object to any General Unsecured Claim or join in any objection by the Litigation Trust or any other party, (b) investigate, pursue, prosecute, compromise and/or settle the Permitted Litigation Claims, and (c) distribute the Litigation Trust Assets in accordance with the terms of the Plan (including the Global Settlement incorporated therein) and this Agreement, in each case with no objective or authority to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with, the liquidating purpose of the Litigation Trust.  Subject to the Conversion of the Litigation Trust as described in Section 8.7 hereof, the Litigation Trust is intended to be classified for United States federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 674, and, thus, as a "grantor trust" within the meaning of Internal Revenue Code sections 671 through 679 for United States federal income tax purposes, other than any Litigation Trust Disputed Claims Reserve (as defined herein) treated as a disputed ownership fund ("DOF") or other separate Entity.

8.        Pursuant to the Plan, for all United States federal income tax purposes, all parties shall treat the transfer of the Litigation Trust Assets to the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, whether such Holder's Claims are Allowed on or after the Effective Date, including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) as (i) a transfer of the Litigation Trust Assets (subject to any obligations relating to such Litigation Trust Assets, including, but not limited to, the Litigation Trust Expenses) to the Litigation Trust Beneficiaries and, to the extent the Litigation

Trust Assets are allocable to Disputed General Unsecured Claims that are the responsibility of the Litigation Trust, acting by and through its agents and representatives, to resolve, to the Litigation Trust Disputed Claims Reserve (as defined herein), followed by (ii) the transfer by the Litigation Trust Beneficiaries of the Litigation Trust Assets (other than the Litigation Trust Assets allocable to the Litigation Trust Disputed Claims Reserve) to the Litigation Trust in exchange for their non-transferable (subject to certain limited exceptions) Litigation Trust Units that will entitle the respective holder thereof to its *pro rata* share of the proceeds of the Litigation Trust Assets *less* the Litigation Trust Expenses (the "Litigation Trust Net Assets").  Accordingly, the Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective shares of the Litigation Trust Assets (other than such Litigation Trust Assets as are allocable to the Litigation Trust Disputed Claims Reserve).  The foregoing treatment shall also apply, to the extent permitted by applicable Law, for applicable United States state and local income tax purposes.

9.        The Litigation Trust is further intended to be exempt from the requirements of (i) pursuant to section 1145 of the Bankruptcy Code, the Securities Exchange Act of 1933, as amended, and any applicable state and local Laws requiring registration of securities, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

NOW, THEREFORE, in accordance with the Plan and the Confirmation Order, and in consideration of the promises, and the mutual covenants and agreements of the Parties contained in the Plan and herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

## DECLARATION OF LITIGATION TRUST

The Freedom HoldCo Debtors, the OpCo Debtors, the Litigation Trustee, and the members of the Litigation Trust Advisory Board enter into this Agreement to effectuate the distribution of the Litigation Trust Net Assets to the Litigation Trust Beneficiaries pursuant to the Plan and the Confirmation Order;

Pursuant to Section 7.10 of the Plan and Section 2.3.2 of this Agreement, on the Effective Date, all of the Litigation Trust Assets shall automatically and irrevocably be transferred to, and vest in or deem to be vested in, the Litigation Trust free and clear of all Claims, Liens, Interests, encumbrances, and contractually imposed restrictions, except as otherwise provided in the Plan;

TO HAVE AND TO HOLD unto the Litigation Trustee and its successors in trust; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED, that the Litigation Trust Assets are to be held by the Litigation Trust and applied on behalf of the Litigation Trust by the Litigation Trustee (such Litigation Trustee to be a "United States person" within the meaning of Internal Revenue Code section 7701(a)(30) and established within the United States) on the terms and conditions set forth herein and the Plan (including, for the avoidance of doubt, the Global Settlement incorporated therein), solely for the benefit of the Litigation Trust Beneficiaries, as more fully set forth in the Plan and this Agreement, and for no other party.

## ARTICLE I

### RECITALS, PLAN DEFINITIONS, OTHER
### DEFINITIONS, INTERPRETATION, AND CONSTRUCTION

1.1    Recitals.  The Recitals are incorporated into and made terms of this Agreement.

1.2    Definitions.  All capitalized terms used in this Agreement but not defined herein shall have the meanings set forth in the Plan or the Confirmation Order, as applicable, or as otherwise set forth herein.  For the avoidance of doubt, the "Litigation Trust Assets" shall mean

the Litigation Trust Assets (as defined in the Plan) and any and all other property held from time to time by the Litigation Trust under this Agreement and any proceeds thereof and earnings thereon.

1.3    Conflict Among Plan Documents.  In the event of any inconsistency between the Plan, the Confirmation Order, and/or this Agreement, each such document shall have controlling effect in the following rank order:  (i) the Confirmation Order; (ii) the Plan (including, for the avoidance of doubt, the Global Settlement incorporated herein); and (iii) this Agreement; *provided*, *however*, that to the extent that the Plan and the Confirmation Order are silent as to a particular issue, the terms of the relevant provision of this Agreement shall control so long as not otherwise inconsistent with the clear intent of the Plan and/or the Confirmation Order.

## ARTICLE II

## ESTABLISHMENT OF LITIGATION TRUST

2.1    Effectiveness of Agreement; Name of Litigation Trust.  The Freedom HoldCo Debtors, the OpCo Debtors and the Litigation Trustee, pursuant to the Plan and in accordance with the Bankruptcy Code, hereby create the Litigation Trust in furtherance of the compromises and agreements more fully set forth in the Plan.  This Agreement shall become effective on the Effective Date.  The Litigation Trust shall be officially known as the "Franchise Group Litigation Trust."

2.2    Purpose of Litigation Trust.  Further to the establishment and purpose of the Litigation Trust as declared in Recital 8 of this Agreement, the Litigation Trust is established for the primary purpose of collecting, holding, administering, liquidating, and distributing the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries in accordance with the terms and conditions of this Agreement, Treasury Regulations Section 301.7701-4(d), and the Plan

(including, for the avoidance of doubt, the Global Settlement incorporated therein), and with no objective or authority to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust.

    2.3    <u>Transfer of Litigation Trust Assets</u>.

    2.3.1    <u>Conveyance of Litigation Trust Assets</u>.  Pursuant to the Plan, the Freedom HoldCo Debtors and the OpCo Debtors hereby irrevocably grant, release, assign, transfer, convey, and deliver, on behalf of the Litigation Trust Beneficiaries, all of such Debtors' rights, title, and interest in and to the Litigation Trust Assets to the Litigation Trust as of the Effective Date in trust for the benefit of the Litigation Trust Beneficiaries, which shall constitute Litigation Trust Assets for all purposes and shall be administered and applied as specified in this Agreement and the Plan. Upon the transfer of the Litigation Trust Assets to the Litigation Trust in accordance with the Plan, none of the Debtors or the Reorganized Debtors shall have any further obligations with respect to the distribution or payment of any proceeds of the Litigation Trust Assets to any of the Litigation Trust Beneficiaries, except that the Debtors or the Reorganized Debtors, as applicable, as reasonably requested by the Litigation Trustee, shall, at the Litigation Trust's sole cost and expense, from time to time, (i) execute and deliver or cause to be executed and delivered any such documents (in recordable form where necessary or appropriate) and (ii) take or cause to be taken such further commercially reasonable action, in each case as the Litigation Trustee may reasonably deem necessary or appropriate, to vest in the Litigation Trust or confirm to the Litigation Trustee title to and possession of the Litigation Trust Assets; *provided* that neither the Debtors nor Reorganized Debtors shall be required to incur any unreimbursed liability for any fees or expenses (including any indemnification obligations) in connection with such actions.  The Litigation Trustee shall have no duty to arrange for any of the transfers of any Litigation Trust Assets

contemplated under this Agreement or by the Plan or to ensure their compliance with the terms of the Plan and/or the Confirmation Order and shall be conclusively entitled to rely on the legality and validity of such transfers. Under no circumstance shall the Debtors, the Reorganized Debtors, or any other party be required to contribute any additional assets to or for the benefit of the Litigation Trust other than the Litigation Trust Assets, except as otherwise set forth in the Plan.

2.3.2    <u>Title to Litigation Trust Assets</u>. Pursuant to the Plan, all of the Freedom HoldCo Debtors' and the OpCo Debtors' rights, title, and interest in and to the Litigation Trust Assets, including all such assets held or controlled by third parties (if any), are hereby irrevocably transferred to, and automatically vested in, or deemed to be automatically vested in, the Litigation Trust on the Effective Date and shall comprise assets of the Litigation Trust for all purposes, free and clear of all Liens, Claims, encumbrances, Interests, contractually-imposed restrictions, and other interests, and such transfer is on behalf of the Litigation Trust Beneficiaries to establish the Litigation Trust. Subject to any applicable consultation rights set forth in this Agreement, the Litigation Trust shall be authorized, among other things, to (i) obtain possession or control of, collect, receive, hold, administer, liquidate, and distribute all of the Litigation Trust Assets, (ii) investigate, pursue, prosecute, compromise, settle, and/or otherwise resolve the Permitted Litigation Claims, and (iii) other than as provided under the Plan, assert and/or exercise any and all rights, including, without limitation, setoff and recoupment, defenses, counterclaims, and cross-claims, whether arising at law or in equity, of the Freedom HoldCo Debtors, the OpCo Debtors, or their respective Estates to any claims, Causes of Action, or counterclaims that may be asserted by (a) any and all Persons and/or Entities that are or may become defendants, sued, or a party in or the subject of any lawsuit, proceeding, or litigation in connection with the Permitted Litigation Claims or (b) the Holders of Disputed OpCo General Unsecured Claims or Freedom

HoldCo General Unsecured Claims.  Without limiting the generality of the foregoing, the Litigation Trust shall have the right to (i) invoke section 542 of the Bankruptcy Code to pursue turnover of Litigation Trust Assets and (ii) enforce any of provisions of the Plan and/or Confirmation Order against any Persons or Entities that seek or seeks to interfere with the administration of the Litigation Trust and/or the Litigation Trust Assets.  On the Effective Date, the Litigation Trust, acting by and through the Litigation Trustee, shall be substituted for the Freedom HoldCo Debtors and the OpCo Debtors for all purposes with respect to the Litigation Trust Assets and the administration of the Litigation Trust Units.  To the extent any Law or regulation prohibits the transfer of ownership of any of the Litigation Trust Assets from the Freedom HoldCo Debtors and/or the OpCo Debtors to the Litigation Trust and such Law is not superseded by the Bankruptcy Code, the Litigation Trust's interest in such Litigation Trust Assets shall be a Lien upon, and security interest in, such Litigation Trust Assets, in trust, nevertheless, for the sole use and purposes set forth in Section 2.2 of this Agreement, and this Agreement shall be deemed a security agreement granting such Lien upon, and interest therein, without need to file any financing statement(s), mortgage(s), or other documentation evincing such Lien and security interest.  By executing this Agreement, the Litigation Trustee on behalf of the Litigation Trust hereby accepts all of such property and Liens (if any) as Litigation Trust Assets, to be held in trust for Litigation Trust Beneficiaries, subject to the terms of this Agreement, the Confirmation Order, and the Plan.

2.4    <u>Litigation Trust Funding</u>.  On the Effective Date, the Litigation Trust Escrow Account shall be funded with the Litigation Trust Escrow Amount.  The Litigation Trust Escrow Amount shall be used for the administration of the Litigation Trust, to pay Litigation Trust

Expenses, and to pursue the Permitted Litigation Claims.  The Litigation Trust Escrow Amount shall be primarily reserved for Litigation Trust Expenses.

2.5    <u>Capacity of Litigation Trust</u>.  Notwithstanding any state or federal Law to the contrary or anything herein, the Litigation Trust shall itself have the capacity, in its own right and name, to act or refrain from acting, including the capacity to sue and be sued and to enter into contracts.  The Litigation Trust may alone be the named movant, respondent, party plaintiff or defendant, or the like in all adversary proceedings, contested matters, and other state or federal proceedings brought by or against it, and may settle and compromise all such matters in its own name.

2.6    <u>Cooperation</u>.  On or after the Effective Date, at the sole cost and expense of the Litigation Trust, the Reorganized Debtors shall use commercially reasonable efforts to cooperate with the Litigation Trust and the Litigation Trustee and any professionals retained by the Litigation Trust in effecting the transition from the Reorganized Debtors to the Litigation Trust and of the administration of the Litigation Trust Assets; *provided* that the Reorganized Debtors shall not be required to incur any unreimbursed liability for any fees or expenses (including any indemnification obligations) that may result from any such cooperation.  Such cooperation shall include, but not be limited to, from and after the Effective Date, using commercially reasonable efforts to identify and make available (i) any evidence and information the Litigation Trustee reasonably requests in connection with the Litigation Trust's investigation, prosecution, other pursuit, or defense, as applicable, of the Permitted Litigation Claims and objections to Disputed OpCo General Unsecured Claims and Disputed Freedom HoldCo General Unsecured Claims, to the extent the Reorganized Debtors have such evidence and/or information and such evidence and/or information has not already been provided to the Litigation Trust by the Debtors, (ii) to the

extent known by the Reorganized Debtors, the identity and contact information of the former officers, directors, and employees and Professionals of the Debtors who may have knowledge regarding the Permitted Litigation Claims, Disputed OpCo General Unsecured Claims, or Disputed Freedom HoldCo General Unsecured Claims; and (iii) current officers, directors, and employees of the Reorganized Debtors that the Litigation Trustee, in consultation with the Reorganized Debtors, determines may have knowledge regarding the Permitted Litigation Claims, Disputed OpCo General Unsecured Claims, or Disputed Freedom HoldCo General Unsecured Claims, subject to (a) consultation and cooperation between the Reorganized Debtors and the Litigation Trustee regarding the reasonable availability of such individuals and (b) counsel for the Reorganized Debtors and the current officer, director or employee having the right to attend and participate in any meetings, discussions, or communications; *provided* that, the Litigation Trust shall be responsible to pay fifty percent (50%) of the reasonable and documented fees and expenses of counsel to the Reorganized Debtors in connection with the Reorganized Debtors exercising its rights under this section 2.6(b) (which shall, in each case, constitute Litigation Trust Expenses hereunder).

2.6.1    Prior to the Effective Date, the Debtors shall, at the cost and expense of the Debtors, and on or after the Effective Date, the Reorganized Debtors shall, at the sole cost and expense of the Litigation Trust (which shall, in each case, constitute Litigation Trust Expenses hereunder), use commercially reasonable efforts to preserve (including through device imaging)

and provide to the Litigation Trust the following: (a) all documents,[4] communications,[5] and other information (or copies thereof) (collectively, "Information") provided to Petrillo Klein + Boxer LLP or Akin Gump Strauss Hauer & Feld LLP in connection with the Freedom HoldCo Independent Investigation and the independent investigations conducted by Petrillo Klein + Boxer LLP, as well as complete and unredacted versions of the reports prepared by the Freedom HoldCo Independent Director and Petrillo Klein + Boxer LLP (which unredacted reports may be provided to the Litigation Trustee and the members of the Litigation Trust Advisory Board on a confidential basis), (b) all Information produced, or that are otherwise ready to be produced, by the Debtors in discovery in the Chapter 11 Cases, and (c) such other Information relating to the Permitted Litigation Claims in the possession, custody and control of the Reorganized Debtors that the Reorganized Debtors and the Litigation Trust may agree upon after conferring in good faith,

---

[4]    For the avoidance of doubt, for the purposes of this Section 2.6, "documents" shall include any printed, written, typed, recorded, transcribed, taped, photographic, or graphic mater, in draft or final form, including, but not limited to: any letter, correspondence, or Communication of any sort; photograph; sound recording; video recording; note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; telex, telegram, or cable; summary, report or record of telephone conversation, voice mail or voice mail back-up, Bloomberg messages, discussion, interview, meeting, conference, investigation, negotiation, act, or activity; projection, work paper, or draft; computer or computer network output or input, portable storage devices, e-mail, magnetic and/or optical medias, archived or back up data on any of these medias on the cloud or otherwise, and documents that have been deleted but are recoverable from any of these medias; opinion or report of consultant; request, order, invoice, or bill of lading; analysis, diagram, map, index, sketch, drawing, plan, chart, manual, brochure, pamphlet, advertisement, circular, newspaper or magazine clipping, or press release; receipt, journal, ledger, schedule, bill, or voucher; financial statement, statement of account, bank statement, checkbook, stubs, register, canceled check, deposit slip, charge slip, tax return (income or other), requisition, file, study, graph, or tabulation, and any and all other writings and recordings of whatever nature, and any other data compilation from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonable usable form; including, without limitation, all things meeting the definition of "documents" or "electronically stored information" set forth in Rule 34 of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, or meeting the definition of "writing" or "recording" set forth in Rule 1001 of the Federal Rules of Evidence.  Any document with any marks such as initials, comments, or notations of any kind is not deemed to be identical to one without such marks and is a separate document within the meaning of this term.

[5]    For the avoidance of doubt, for purposes of this Section 2.6, "communications" shall include any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more Persons, by or to whomsoever made, and including without limitation, correspondence, documents, conversations, dialogues, discussions, e-mail, interviews, text messages, consultations, agreements, and other understandings.

*provided* that the Reorganized Debtors shall preserve all Information subject to existing litigation holds, which shall remain in effect; *provided further* that, notwithstanding anything to the contrary herein, the Reorganized Debtors shall not be required to (i) incur any liability for any fees or expenses (including any indemnification obligations) that may result from any such preservation or production and any documented costs and expenses incurred by the Reorganized Debtors in connection therewith shall be borne or promptly reimbursed by Litigation Trust (which shall, in each case, constitute Litigation Trust Expenses hereunder), or (ii) take any actions in connection with any of the Reorganized Debtor's cooperation obligations hereunder that the Reorganized Debtors reasonably determine would harm the merits of, create defenses to, or otherwise prejudice the Reorganized Debtors' Retained Causes of Action following good-faith consultation and coordination between the Reorganized Debtors and the Litigation Trustee or subject to any further court order requiring production.[6]

2.6.2    The Reorganized Debtors (or their respective Professionals) shall arrange for the Litigation Trustee to receive (i) an updated Claims Register of OpCo General Unsecured Claims and Freedom HoldCo General Unsecured Claims from the Claims Agent within thirty (30) days after the Effective Date and, if applicable, (ii) a register of Holders of any Prepetition First Lien Loan Claims, any Prepetition Second Lien Loan Claims, and any Prepetition HoldCo Loan Claims.

2.7    <u>Duties of the Debtors and the Reorganized Debtors</u>.    The Debtors and the Reorganized Debtors, as applicable, shall have no responsibility or obligation with respect to the Litigation Trust or Litigation Trust Assets after the Effective Date, other than to comply with

---

[6]    Capitalized terms in Section 2.6 not otherwise defined in the Plan or Confirmation Order, as set forth in Section 1.2, shall have the meanings ascribed to them in the Disclosure Statement [Docket No. 151].

Sections 2.3 and 2.6 of this Agreement.  To the extent the Reorganized Debtors are obligated to take any action pursuant to this Agreement, unless otherwise expressly set forth herein, the Reorganized Debtors shall only be required to use commercially reasonable efforts in taking such action and the Reorganized Debtors shall not be required to take any such action if the Reorganized Debtors reasonably believe that taking such action will materially burden the Reorganized Debtors, their employees, and/or their operations; *provided* that, prior to making such a determination, the Reorganized Debtors shall coordinate and consult with the Litigation Trustee, in good faith, regarding such burden or subject to any further court order requiring production.  For the avoidance of doubt, the Reorganized Debtors shall not be required to incur any liability for any fees or expenses (including any indemnification obligations) that may result from such compliance and any documented costs and expenses incurred by the Reorganized Debtors in connection therewith shall be borne or promptly reimbursed by Litigation Trust (which shall, in each case, constitute Litigation Trust Expenses hereunder).

2.8     <u>No Retention of Excess Cash</u>.  Notwithstanding anything in this Agreement to the contrary, but subject to any applicable consultation rights set forth in this Agreement, under no circumstances shall the Litigation Trust or the Litigation Trustee retain Cash in excess of a reasonable amount to meet Claims, expenses (including any litigation expenses incurred in connection with prosecuting the Permitted Litigation Claims), and contingent liabilities or to maintain the value of the Litigation Trust Assets during liquidation other than reserves established pursuant to Article III and/or Section 5.1.1 of this Agreement, and shall distribute all amounts not required to be retained for such purposes and not otherwise required to be distributed to the Litigation Trust Beneficiaries as promptly as reasonably practicable in accordance with the Plan and this Agreement.

2.9    <u>Acceptance by Litigation Trustee</u>.  The Litigation Trustee accepts its appointment as Litigation Trustee of the Litigation Trust.

2.10    <u>Appointment of the Litigation Trust Advisory Board</u>.  The members of the Litigation Trust Advisory Board are hereby appointed, effective as of the Effective Date, pursuant to the terms and conditions set forth in Section 4.1 of this Agreement.

2.11    <u>Privileges</u>.

2.11.1  All attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "<u>Privileges</u>") held by any one or more of the applicable Debtors (including any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their respective predecessors) related to the Litigation Trust Assets are hereby transferred and assigned to the Litigation Trust.  The Debtors and/or the Reorganized Debtors shall not withhold any Information required to be provided to the Litigation Trustee under this Agreement on the basis that it is subject to any Privileges.  Information transferred by the Debtors and/or the Reorganized Debtors that is subject to such Privileges (the "<u>Transferred Privileged Information</u>") shall include documents and information of all manners, whether oral, written, or digital, and whether or not previously disclosed or discussed.  For the avoidance of doubt, the Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the Debtors.

2.11.2  The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information in the Litigation Trust, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust Beneficiaries.  The Litigation Trust shall have the authority and discretion

16

to maintain the Privileges and keep the Transferred Privileged Information confidential or waive any Privileges and/or disclose and/or use in litigation or any proceeding any or all of the Transferred Privileged Information; *provided, however,* that the Litigation Trust may not, without good-faith consultation and coordination between the Litigation Trustee and the Reorganized Debtors, (i) waive any Privileges in respect of Transferred Privileged Information, or (ii) use or disclose any Transferred Privileged Information.  The Reorganized Debtors may not make disclosure in a manner that could effectuate a waiver of any Privileges in respect of Transferred Privileged Information without good-faith consultation and coordination between the Litigation Trustee and the Reorganized Debtors.  If the Litigation Trustee or the Reorganized Debtors object to an action proposed to be taken by the other with regard to records, documents, or information related to the Litigation Trust Assets that are covered by the Privileges (or a disclosure that would result in a waiver), the parties shall be permitted to raise the issue with the Bankruptcy Court.  The objecting party shall bear the burden of proof.  Each of the parties shall bear its own costs and expenses, including attorneys' fees, incurred in connection with such dispute.  Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall operate as a waiver of any privileges held and retained by the Reorganized Debtors, including, but not limited to, the Privileges that are transferred to the Litigation Trust hereunder.

## ARTICLE III

## ADMINISTRATION OF LITIGATION TRUST

3.1     <u>Rights, Powers, and Privileges of Litigation Trustee Generally</u>.    Except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, as of the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, may, subject to the oversight of the Litigation Trust Advisory Board, control and exercise authority and dominion over the Litigation

Trust Assets, over the acquisition, management, and disposition thereof, and over the management and conduct of the affairs of the Litigation Trust in accordance with the Plan and this Agreement. Subject to the oversight of the Litigation Trust Advisory Board set forth herein, in administering the Litigation Trust Assets, the Litigation Trustee shall, among other things, in an expeditious but commercially reasonable manner, (i) liquidate and convert to Cash the Litigation Trust Assets, (ii) make timely distributions in accordance with this Agreement and the Plan, and (iii) exercise reasonable business judgment and not unduly prolong the Litigation Trust's duration. Notwithstanding anything in the Plan or this Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in this Agreement and the Plan.

3.2     Power to Contract.  In consultation with the Litigation Trust Advisory Board, in furtherance of the purpose of the Litigation Trust, and except as otherwise specifically restricted in the Plan, the Confirmation Order, or this Agreement, the Litigation Trustee shall have the right and power on behalf of the Litigation Trust and also may cause the Litigation Trust to enter into any covenants or agreements binding the Litigation Trust, and to execute, acknowledge, and deliver any and all instruments that are necessary or deemed by the Litigation Trustee to be consistent with, and advisable in, furthering the purpose of the Litigation Trust, including, without limitation, with respect to the Permitted Litigation Claims.

3.3     Ultimate Right to Act Based on Advice of Counsel or Other Professionals.  In consultation with the Litigation Trust Advisory Board, nothing in this Agreement shall be deemed to prevent the Litigation Trustee from taking or refraining to take any action on behalf of the Litigation Trust that, based upon the advice of counsel or other professionals, the Litigation Trustee determines it is obligated to take or to refrain from taking in the performance of any duty

that the Litigation Trustee may owe the Litigation Trust Beneficiaries or any other Person under the Plan, the Confirmation Order, or this Agreement.

3.4     Powers of Litigation Trustee.    Without limiting the generality of the above Section 3.1, in furtherance of, consistent with, and unless otherwise specifically limited or restricted by the purpose, terms, and conditions of the Plan, the Confirmation Order, or this Agreement, the Litigation Trustee shall, in consultation with the Litigation Trust Advisory Board, in addition to the powers granted in the Plan and the Confirmation Order, and those powers set forth herein, at the sole cost and expense of the Litigation Trust, have the power to take the following actions on behalf of the Litigation Trust and any powers reasonably incidental thereto that the Litigation Trustee, in its reasonable discretion, deems necessary or appropriate to fulfill the purpose of the Litigation Trust:

3.4.1    hold legal title to the Litigation Trust Assets and to any and all rights of the Freedom HoldCo Debtors and the OpCo Debtors (including as Reorganized Debtors, as applicable) and the Litigation Trust Beneficiaries in or arising from the Litigation Trust Assets;

3.4.2    receive, maintain, conserve, supervise, prosecute, collect, settle, manage, adjust, invest, protect, enforce, and, where appropriate, cause the Litigation Trust to abandon the Litigation Trust Assets, including causing the Litigation Trust to invest any monies held as Litigation Trust Assets in accordance with the terms of Section 3.9 hereof;

3.4.3    cause the Litigation Trust to investigate, pursue, litigate, and/or settle the Permitted Litigation Claims;

3.4.4    open and maintain bank accounts or any other accounts on behalf of, or in the name of, the Litigation Trust;

3.4.5    cause the Litigation Trust to enter into any agreement or execute any document or instrument required by or consistent with the Plan, the Confirmation Order, or this Agreement, and to perform all obligations thereunder;

3.4.6    receive, collect, hold, administer, and liquidate any and all of the Litigation Trust Assets, including, without limitation, the sale of any Litigation Trust Assets;

3.4.7    protect and enforce the rights to the Litigation Trust Assets (including, without limitation, the Permitted Litigation Claims) vested in the Litigation Trust and the Litigation Trustee by this Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

3.4.8    investigate any potential Permitted Litigation Claims and cause the Litigation Trust to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004 in relation to the Permitted Litigation Claims;

3.4.9    investigate any Permitted Litigation Claims and review, reconcile, compromise, settle or object to OpCo General Unsecured Claims and Freedom HoldCo General Unsecured Claims as set forth in the Plan, and cause the Litigation Trust to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004 in relation to the Permitted Litigation Claims; *provided*, *however*, that the Litigation Trust shall not be permitted to seek relief under Bankruptcy Rule 2004 as against (i) any current employees, officers, or directors of the Reorganized Debtors, (ii) the DIP Agent and the DIP Lenders, (iii) the Freedom Lender Group, and (iv) the Ad Hoc Group;

3.4.10    cause the Litigation Trust to employ or retain professionals, including without limitation, a distribution agent, and other agents, attorneys, financial advisors, independent contractors, and third parties pursuant to this Agreement and pay the reasonable compensation

thereof as Litigation Trust Expenses; *provided, however*, that none of Paul Hastings LLP, White & Case LLP or Pachulski Stang Ziehl & Jones LLP shall serve as counsel to the Litigation Trust, the Litigation Trustee, or the Litigation Trust Advisory Board;

3.4.11  cause the Litigation Trust to pay all of its lawful expenses, debts, charges, taxes, and other liabilities, and make all other payments relating to the Litigation Trust Assets as Litigation Trust Expenses, solely out of the Litigation Trust Assets;

3.4.12  cause the Litigation Trust to review, reconcile, investigate, pursue, prosecute, enforce, collect, compromise, settle, abandon, or elect not to pursue all Disputed OpCo General Unsecured Claims, Disputed Freedom HoldCo General Unsecured Claims and the Permitted Litigation Claims;

3.4.13  calculate, authorize, and make all distributions to holders of Litigation Trust Units as provided for in, or contemplated by, the Plan and this Agreement;

3.4.14  establish, adjust, and maintain a Litigation Trust Disputed Claims Reserve;

3.4.15  cause the Litigation Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Litigation Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such distribution under the income tax or other Laws of the United States or of any state or political subdivision thereof;

3.4.16  in reliance upon the Debtors' Schedules and the official Claims Register maintained in the Chapter 11 Cases, review, and, where appropriate, cause the Litigation Trust to Allow or object to OpCo General Unsecured Claims or Freedom HoldCo General Unsecured Claims, and supervise and administer the Litigation Trust's commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to the Disputed OpCo General

Unsecured Claims and Disputed Freedom HoldCo General Unsecured Claims permitted to be administered by the Litigation Trust in accordance with the Plan; *provided, however,* that the Litigation Trustee shall not be permitted to object to any Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, or Prepetition HoldCo Loan Claims;

3.4.17  in reliance upon the Debtors' Schedules and the Claims Register maintained in the Chapter 11 Cases, maintain a register evidencing the Litigation Trust Units held by each Litigation Trust Beneficiary and, in accordance with Section 3.10 of this Agreement, such register may be the official Claims Register maintained in the Chapter 11 Cases;

3.4.18  without limitation of, and as set forth in Section 3.4.15 of this Agreement, cause the Litigation Trust to make all tax withholdings, file tax information returns, file and prosecute tax refund claims, make tax elections by and on behalf of the Litigation Trust, and file tax returns for the Litigation Trust as a grantor trust under Internal Revenue Code section 671 and Treasury Regulation section 1.671-4 pursuant to and in accordance with the Plan and Article VIII hereof (subject to the treatment of any portion of the Litigation Trust as a DOF or other separate Entity), and pay taxes, if any, payable for and on behalf of the Litigation Trust; *provided*, *however*, neither the Litigation Trust nor the Litigation Trustee shall have any responsibility or liability in any capacity whatsoever for the filing of Debtors' income tax returns for any period either prior to or after the Effective Date;

3.4.19  cause the Litigation Trust to abandon or donate to a charitable organization that qualifies for non-profit status under Internal Revenue Code section 501(c)(3) any Litigation Trust Assets that the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, determines to be too impractical to distribute to the Litigation Trust Beneficiaries or of inconsequential value to the Litigation Trust and the Litigation Trust Beneficiaries;

3.4.20  cause the Litigation Trust to send annually to Litigation Trust Beneficiaries, in accordance with the applicable tax Laws, a separate statement stating a Litigation Trust Beneficiary's interest in the Litigation Trust and its share of the Litigation Trust's income, gain, loss, deduction, or credit, and to instruct all such Litigation Trust Beneficiaries to report such items on their United States federal tax returns, as applicable;

3.4.21  cause the Litigation Trust to seek a determination of tax liability or refund of the Litigation Trust (including any Litigation Trust Disputed Claims Reserve treated as a DOF (if elected) or other separate Entity) under section 505 of the Bankruptcy Code;

3.4.22  cause the Litigation Trust to establish such reserves for taxes, assessments and other Litigation Trust Expenses as may be necessary and appropriate for the proper operation of matters incident to the Litigation Trust;

3.4.23  cause the Litigation Trust to purchase and carry all insurance policies that the Litigation Trustee deems reasonably necessary or advisable and to pay all associated insurance premiums and costs;

3.4.24  undertake all administrative functions of the Litigation Trust, including overseeing the winding down and termination of the Litigation Trust;

3.4.25 exercise, implement, enforce, and discharge all of the applicable and relevant terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement; and

3.4.26 take all other actions consistent with this Agreement, the Plan, and the Confirmation Order, that the Litigation Trustee deems reasonably necessary or desirable to administer the Litigation Trust.

3.4.27  Notwithstanding anything to the contrary herein, the Litigation Trustee shall not invest any Litigation Trust Assets, proceeds thereof, or any income earned by the Litigation Trust unless such investment is permitted to be made by a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities, including Revenue Procedure 94-45, 1994-2 C.B. 684.  The Litigation Trustee shall not be liable for interest or obligated to produce income on any moneys received by the Litigation Trust hereunder and held for distribution or payment, except as such interest or other income shall actually be received by the Litigation Trustee.

3.5    Limitations on Power and Authority of Litigation Trustee.  Notwithstanding anything to the contrary contained herein, the Litigation Trustee shall not have the authority to (i) take any action in contravention of the Plan, the Confirmation Order, or this Agreement; (ii) take any action that would make it impossible to carry on the activities of the Litigation Trust; (iii) possess property of the Litigation Trust or assign the Litigation Trust's rights in specific property for any purpose other than as provided herein; (iv) raise any financing, including any litigation financing, unless such financing is on market terms, and an equal opportunity to participate in such financing is offered on the same terms and on a *pro rata* basis to all Litigation Trust Beneficiaries; or (v) make any distribution to Litigation Trust Beneficiaries, unless such distributions are made on *pro rata* basis subject to the Litigation Trust Units Allocations.

3.6    Authority to Pursue the Permitted Litigation Claims.  In consultation with the Litigation Trust Advisory Board, the Litigation Trust shall have sole and absolute discretion with respect to the right, power, and interest to investigate, review, pursue, reconcile, prosecute, enforce, collect, compromise, settle, or elect not to pursue the Permitted Litigation Claims.  Except

24

as otherwise provided in the Plan or the Confirmation Order, the Litigation Trust shall be vested with, and shall be entitled to assert all setoffs, cross-claims, defenses, and Causes of Action, whether arising at law or in equity, of the Freedom HoldCo Debtors, the OpCo Debtors or the Litigation Trust to any counterclaims that may be asserted by any defendant with respect to the Permitted Litigation Claims.  The Litigation Trust, acting by and through the Litigation Trustee, shall be the sole representative of the Freedom HoldCo Debtors' and OpCo Debtors' Estates under section 1123(b)(3) of the Bankruptcy Code with respect to the Permitted Litigation Claims.

3.6.1    Notwithstanding the Debtors or Reorganized Debtors providing any privileged information to the Litigation Trust or the Litigation Trustee, such privileged information shall be without waiver in recognition of the joint and/or successor interest in investigating and prosecuting the Permitted Litigation Claims and shall remain privileged.

3.6.2    The Litigation Trustee will exercise its reasonable business judgment in prosecuting the causes of action held by the Litigation Trust.  Except as otherwise expressly set forth in this Agreement, the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, shall have sole discretion with respect to the prosecution, settlement, or other resolution of Permitted Litigation Claims as it determines are in the best interests of the holders of the Litigation Trust Units and consistent with its fiduciary duties and the purposes of the Litigation Trust, and shall have no liability for the outcome of its decision.

3.7    <u>Responsibility for Administration of Claims</u>.  From and after the Effective Date, the Litigation Trust shall, subject to any applicable consultation rights set forth in this Agreement, become responsible for administering and paying distributions to Holders of Litigation Trust Units *on a pro rata* basis, subject to the Litigation Trust Units Allocation.  The Litigation Trust, acting by and through the Litigation Trustee, shall have the right after the Effective Date to object to the

allowance of any OpCo General Unsecured Claim or Freedom HoldCo General Unsecured Claim on any ground, to file, withdraw, or litigate to judgment objections to such Claims, to settle or compromise any Disputed OpCo General Unsecured Claims or Freedom HoldCo General Unsecured Claims without any further notice to or action, order or approval by the Bankruptcy Court, and to assert all defenses of the Freedom HoldCo Debtors, the OpCo Debtors, and their respective Estates; *provided* that the Litigation Trust shall consult with the Reorganized Debtors prior to taking such action to the extent such action may have an adverse impact on the Reorganized Debtors' Retained Causes of Action.  Except as set forth herein or in the Plan, the Litigation Trust, acting by and through the Litigation Trustee, shall also be entitled to assert all of the Freedom HoldCo Debtors', the OpCo Debtors', and their respective Estates' rights under, without limitation, section 558 of the Bankruptcy Code, and may seek estimation of any OpCo General Unsecured Claims or Freedom HoldCo General Unsecured Claims under and subject to section 502(c) of the Bankruptcy Code.

3.8     <u>Agents and Professionals</u>.   Subject to Section 3.5.3 and this Section 3.8, the Litigation Trustee may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants, appraisers, and other professionals the Litigation Trustee believes have qualifications necessary to assist in the administration of the Litigation Trust.  For the avoidance of doubt, and without limitation of applicable Law, nothing in this Agreement (other than Section 3.5.3 and this Section 3.8) shall limit the Litigation Trustee from engaging counsel or other professionals, including the Litigation Trustee itself or the Litigation Trustee's firm or their affiliates, to do work for the Litigation Trust; *provided* that, none of Paul Hastings LLP, White & Case LLP or Pachulski Stang Ziehl & Jones LLP shall serve as counsel to the Litigation Trust, the Litigation Trustee, or the Litigation Trust Advisory Board.  The Litigation Trustee shall pay the

reasonable salaries, fees, and/or expenses of such Persons out of the Litigation Trust Assets in the ordinary course of business as Litigation Trust Expenses without the need for Bankruptcy Court approval.

3.9    <u>Safekeeping and Investment of the Litigation Trust Assets</u>.  All monies and other assets received by the Litigation Trustee shall, until distributed or paid over as provided herein and in the Plan, be held in trust for the benefit of the Litigation Trust Beneficiaries, but need not be segregated in separate accounts from other Litigation Trust Assets, unless and to the extent required by Law or the Plan.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, neither the Litigation Trust nor the Litigation Trustee shall have any liability for interest or producing income on any monies received by them and held for distribution on account of the Litigation Trust Beneficiaries except as such interest shall actually be received by the Litigation Trust or the Litigation Trustee, which shall be distributed as provided herein and in the Plan.  Except as otherwise provided by the Plan, the powers of the Litigation Trustee to invest any monies held by the Litigation Trust, other than those powers reasonably necessary to maintain the value of the assets and to further the Litigation Trust's liquidating purpose, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as treasury bills or money market funds that invest exclusively in United States Treasury bills and United States Treasury notes; *provided*, *however*, that the scope of permissible investments shall be limited to include only those investments that a "liquidating trust," within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold pursuant to the Treasury Regulations, or any Internal Revenue Service guidelines, whether set forth in Internal Revenue Service rulings, Internal Revenue Service pronouncements, or otherwise.  For the

avoidance of doubt, the provisions of section 11-2.3 of the Estates, Powers, and Trusts Law of New York shall not apply to this Agreement.  Notwithstanding the foregoing, the Litigation Trustee shall not be prohibited from engaging in any trade or business on its own account, *provided that* such activity does not interfere or conflict with the Litigation Trustee's administration of the Litigation Trust (including the Litigation Trust's status as a "liquidating trust" for tax purposes).

3.10    <u>Maintenance and Disposition of Litigation Trust and Debtor Records</u>.    The Litigation Trustee shall maintain accurate records of the administration of the Litigation Trust Assets, including receipts and disbursements and other activity of the Litigation Trust.  The Litigation Trust may (at its sole cost and expense), but has no obligation to, engage a claims agent (including, but not limited to, the Debtors' Claims Agent) to continue to maintain and update the Claims Register maintained in the Chapter 11 Cases throughout the administration of the Litigation Trust.  To the extent of any General Unsecured Claims reflected thereon, the Claims Register may serve as the Litigation Trustee's register of Litigation Trust Units held by Litigation Trust Beneficiaries.  The books and records maintained by the Litigation Trustee and any records of the Debtors transferred to the Litigation Trust may be disposed of by the Litigation Trustee at the later of (i) such time as the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Litigation Trust or the Litigation Trust Beneficiaries and (ii) upon the termination and completion of the winding down or dissolution of the Litigation Trust.

3.11    <u>Reporting Requirements</u>.  The Litigation Trustee shall provide the Reorganized Debtors, U.S. Trustee, the Litigation Trust Advisory Board, and the Bankruptcy Court the information and reports they may reasonably request concerning the administration of the Litigation Trust.

3.12    <u>No Bond Required; Procurement of Insurance</u>.  Notwithstanding any state or other applicable Law to the contrary, the Litigation Trustee (including any successor Litigation Trustee) shall be exempt from giving any bond or other security in any jurisdiction and shall serve hereunder without bond.  The Litigation Trustee is hereby authorized, but not required, to obtain all reasonable insurance coverage for itself, the Litigation Trust Advisory Board, or their respective agents, representatives, employees, or independent contractors, including, without limitation, coverage with respect to the liabilities, duties, and obligations of the Litigation Trustee and its agents, representatives, employees, or independent contractors under this Agreement.  The cost of any such insurance coverage shall be an expense of the Litigation Trust, constitute Litigation Trust Expenses, and be paid out of the Litigation Trust Assets.

3.13    <u>Fiduciary and Other Duties</u>.  The Litigation Trustee shall have fiduciary duties (including the duties of care and loyalty) to the Litigation Trust Beneficiaries (which shall not include, for the avoidance of doubt, the Debtors or the Reorganized Debtors); *provided*, *however*, that the Litigation Trustee shall not owe fiduciary obligations to the Debtors, the Reorganized Debtors, or any defendants of Permitted Litigation Claims in their capacities as such, it being the intent of such fiduciary duties to ensure that the Litigation Trustee's obligations are to maximize the value of the Litigation Trust Assets, including the Permitted Litigation Claims (consistent with their duties of care and loyalty).  In all circumstances, notwithstanding anything in the Plan or this Agreement to the contrary, the Litigation Trustee shall always act in the best interests of the Litigation Trust Beneficiaries and in furtherance of the purpose of the Litigation Trust.  This Agreement does not eliminate the implied contractual covenant of good faith and fair dealing.

## **ARTICLE IV**

## **THE LITIGATION TRUST ADVISORY BOARD**

4.1     <u>Appointment of the Litigation Trust Advisory Board</u>.  On or prior to the Effective Date, a three-person Litigation Trust Advisory Board shall be appointed and include: (i) two designees of the Freedom HoldCo Debtors (which designees shall be selected by the Freedom Lender Group) and (ii) one designee of the OpCo Debtors (which designee shall be selected by the Creditors' Committee with the consent of the Required Consenting First Lien Lenders) (each designee, a "<u>Member</u>").  The initial Members of the Litigation Trust Advisory Board are Parties to this Agreement.  No Member of the Litigation Trust Advisory Board shall be the Litigation Trustee.

4.2     <u>Authority and Responsibilities</u>.

4.2.1   The Litigation Trust Advisory Board shall have the authority and responsibility to (i) monitor and oversee the administration of the Litigation Trust, (ii) monitor and oversee the activities and performance of the Litigation Trustee, (iii) designate another Person to become the Litigation Trustee in the event of the resignation or removal for Cause (as defined in Section 9.3 herein), liquidation, dissolution, death, or incapacity of the Litigation Trustee in accordance with Section 9.5 hereof, and (iv) perform such other tasks as expressly set forth in the Plan, the Confirmation Order, and this Agreement.

4.2.2   The Litigation Trust Advisory Board shall, as and when requested by the Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or this Agreement, consult with and advise the Litigation Trustee as to the administration and management of the Litigation Trust in accordance with the Plan, the Confirmation Order, and this Agreement.

4.3     <u>Regular Meetings of the Litigation Trust Advisory Board</u>.  The first meeting of the Litigation Trust Advisory Board shall occur no later than thirty (30) calendar days after the

Effective Date.  Meetings of the Litigation Trust Advisory Board are to be held at least quarterly.

4.4    <u>Special Meetings of the Litigation Trust Advisory Board</u>.  Special meetings of the Litigation Trust Advisory Board may be held whenever and wherever called for by any Member; *provided* that notice of any such special meeting shall be duly given in writing no less than 48 hours prior to such special meeting (such notice being subject to waiver by the Members).

4.5    <u>Litigation Trust Advisory Board's Action Without a Meeting</u>.  Any action required or permitted to be taken by the Litigation Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Litigation Trust Advisory Board as evidenced by a written consent describing the action taken, signed by all Members.

4.6    <u>Regular Meetings of the Litigation Trustee and the Litigation Trust Advisory Board</u>.  Meetings of the Litigation Trustee and the Litigation Trust Advisory Board are to be held with such frequency and at such place as the Litigation Trustee and the Litigation Trust Advisory Board may determine in their sole discretion, but in no event shall such meetings be held less frequently than quarterly.

4.7    <u>Special Meetings of the Litigation Trustee and the Litigation Trust Advisory Board</u>.  Special meetings of the Litigation Trustee and the Litigation Trust Advisory Board may be held whenever and wherever called for by the Litigation Trustee or any Member; *provided* that notice of any such special meeting shall be duly given in writing no less than 48 hours prior to such special meeting (such notice being subject to waiver by the Litigation Trustee and the Members).

4.8    <u>Manner of Acting</u>.

4.8.1    A majority of the total number of Members of the Litigation Trust Advisory Board then in office shall constitute a quorum for the transaction of business at any meeting of the Litigation Trust Advisory Board; *provided, however,* that a quorum any meeting of the Litigation

Trust Advisory Board will require the attendance of the Member designated by the OpCo Debtors pursuant to their designation right (subject to the applicable consent rights). The affirmative vote of a majority of the votes of all Members present and entitled to vote at a meeting of the Litigation Trust Advisory Board at which a quorum is present shall be the act of the Litigation Trust Advisory Board, except as otherwise required by Law or as provided in this Agreement. In the absence of a quorum at any meeting of the Litigation Trust Advisory Board, a majority of the votes of the Members present and entitled to vote may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present. Each Member shall have one (1) vote on all matters submitted to the Litigation Trust Advisory Board for the vote, consent or approval of the Litigation Trust Advisory Board (other than matters for which such Member is not entitled to vote, as expressly set forth in this Agreement).

4.8.2   Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting may hear each other. Any Member participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may be conducted by e-mail or individual communications by the Litigation Trustee and each Member.

4.8.3   Any Member who is present and entitled to vote at a meeting of the Litigation Trust Advisory Board (including any meeting of the Litigation Trustee and the Litigation Trust Advisory Board) when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Litigation Trust Advisory Board, unless: (i) such Member of the Litigation Trust Advisory Board objects at the beginning of the meeting (or promptly upon his/her arrival) to holding or transacting business at the meeting; (ii) his/her dissent or abstention

from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Litigation Trust Advisory Board before its adjournment.  The right of dissent or abstention is not available to any Member of the Litigation Trust Advisory Board who votes in favor of the action taken.

4.8.4    Prior to the taking of a vote on any matter or issue or the taking of any action with respect to any matter or issue, each Member of the Litigation Trust Advisory Board shall report to the Litigation Trust Advisory Board any conflict of interest such Member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such Member may have with respect to or in connection with such matter or issue, other than solely as a holder of Litigation Trust Units).  A Member who, with respect to a matter or issue, has or who may have a conflict of interest whereby such Member's interests are adverse to the interests of the Litigation Trust (i) shall be deemed to be a "Conflicted Member" who shall not be entitled to vote or take part in any action with respect to such matter or issue, (ii) the vote or action with respect to such matter or issue shall be undertaken only by Members of the Litigation Trust Advisory Board who are not Conflicted Members; and (iii) notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the Members of the Litigation Trust Advisory Board who are not Conflicted Members shall be required to approve of such matter or issue and the same shall be the act of the Litigation Trust Advisory Board; *provided* that a Member shall not be deemed to be a Conflicted Member with respect to a particular matter or issue if such Member merely has an economic interest in the outcome of such matter or issue solely as a holder of Litigation Trust Units.

4.8.5    The Members of the Litigation Trust Advisory Board shall have the

authority to designate any Person to act on their behalf, including, without limitation, to attend, participate in and vote at meetings of the Litigation Trust Advisory Board.

4.8.6    Compensation.  Unless determined by the Litigation Trust Advisory Board, no Member shall be entitled to compensation in connection with his/her service to the Litigation Trust Advisory Board.

4.9    Reimbursement of Expenses.  The Litigation Trust shall reimburse all reasonable and documented out-of-pocket expenses incurred by the Members of the Litigation Trust Advisory Board in connection with the performance of each of their duties hereunder and shall reimburse all such Members for any and all losses, liabilities, expenses, or damages that such Members may, in good faith and without willful misconduct, gross negligence, or fraud, sustain in the exercise and performance of any of the powers and duties of the Litigation Trust Advisory Board under this Agreement.

4.9.1    The Litigation Trust Advisory Board shall have no obligation or responsibility to retain, engage or consult any attorneys, professionals or other advisors, and in the event the Litigation Trust Advisory Board elects to retain, engage or consult any such persons, the Litigation Trust shall have no obligation to pay any of the fees, costs or expenses of such persons, except that the Litigation Trust shall pay an amount jointly agreed by the Litigation Trustee and the unanimous vote of the Litigation Trust Advisory Board for the fees, costs or expenses of any attorneys engaged by unanimous vote of the Litigation Trust Advisory Board at reasonable rates to advise the Litigation Trust Advisory Board on its rights and responsibilities under this Agreement; *provided, however*, that none of Paul Hastings LLP, White & Case LLP or Pachulski Stang Ziehl & Jones LLP shall serve as counsel to the Litigation Trust Advisory Board.

4.9.2    The Litigation Trust Advisory Board shall have the right to cause the

Litigation Trust to purchase insurance coverage with respect to the liabilities and obligations of its Members under this Agreement, except to the extent that such liabilities and obligations are covered by other insurance applicable to the service of such Members of the Litigation Trust Advisory Board.

4.10    Tenure of the Members of the Litigation Trust Advisory Board.  The authority of the Members of the Litigation Trust Advisory Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation Trust is terminated in accordance with Section 10.3.  The Members will serve until such Member's successor is duly appointed or until such Member's earlier resignation, removal, death (in the case of a Member that is a natural Person), or dissolution (in the case of a Member that is not a natural Person).

4.11    Resignation of the Members of the Litigation Trust Advisory Board.  A Member may resign by giving not less than thirty (30) days' prior written notice of resignation to the Litigation Trustee and the other Members.  Such resignation shall become effective on the later to occur of: (i) the day specified in such notice and (ii) the appointment of a successor.

4.12    Removal of the Members of the Litigation Trust Advisory Board.  A Member may be removed from the Litigation Trust Advisory Board for Cause by motion in the Bankruptcy Court made either by (a) the Litigation Trustee;(b) any Litigation Trust Beneficiary, or (c) *sua sponte* by the Bankruptcy Court.

4.13    Appointment of a Successor Member of the Litigation Trust Advisory Board.

4.13.1  In the event of a vacancy on the Litigation Trust Advisory Board (whether by resignation, removal, death or dissolution), the Litigation Trust Beneficiary that originally appointed the vacating Member shall be entitled to appoint a Person or Entity as a successor to the vacating Member; *provided*, that the Ad Hoc Group will be substituted for the Creditors'

Committee for this purpose after the Creditors' Committee is disbanded pursuant to the Plan.

4.13.2  Immediately upon the appointment of any successor Member, all rights, powers, duties, authority and privileges of the predecessor Member hereunder will be vested in and undertaken by the successor Member without any further act, and such successor Member will not be liable personally for any act or omission of the predecessor Member.

4.13.3  Every successor Member appointed hereunder shall execute, acknowledge, and deliver to the Litigation Trustee and other Members an instrument accepting the appointment under this Agreement and agreeing to be bound hereto, and thereupon the successor Member without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Member.

4.14  Confidentiality.  Each Member shall, during the period that such Member serves as a Member under this Agreement and following the termination of this Agreement or following such Member's removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person or Entity to which any of the Litigation Trust Assets relates or of which such Member has become aware in their capacity as Member of the Litigation Trust Advisory Board, until (i) such information is made public other than by disclosure by such Member in violation of this Agreement; (ii) the Litigation Trust is required by Law to disclose such information (in which case the Litigation Trust shall provide the relevant Person or Entity reasonable advance notice and an opportunity to protect his, her, or its rights); or (iii) the Litigation Trust obtains a waiver of such confidentiality from the applicable Person or Entity; *provided, however,* notwithstanding the foregoing, upon reasonable request, the Ad Hoc Group (and it counsel) and the Freedom Lender Group (and its counsel) shall be entitled to receive any reasonable information that it may request relating to the Litigation Trust

and the Litigation Trust Assets, and the Member designated by the OpCo Debtors and the Members designated by the Freedom HoldCo Debtors, respectively, may disclose any information relating to the Litigation Trust and the Litigation Trust Assets on a confidential basis to the Ad Hoc Group (and/or its counsel) and the Freedom Lender Group (and/or its counsel), respectively, and shall have the right to confer on a confidential basis with the Ad Hoc Group (and/or its counsel) and the Freedom Lender Group (and/or its counsel), respectively, regarding the same.

## ARTICLE V

## DISTRIBUTIONS

5.1    Distribution and Reserve of Litigation Trust Assets.  Following the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall, in consultation with the Litigation Trust Advisory Board, make continuing efforts on behalf of the Litigation Trust to collect, liquidate, and distribute all Litigation Trust Assets, subject to the reserves deemed necessary by the Litigation Trustee pursuant to this Agreement, in accordance with the Plan.

5.1.1    Distributions.  The Litigation Trustee shall make distributions to the extent of the Litigation Trust Net Assets, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, to Holders of Allowed Prepetition First Lien Loan Claims, Allowed Prepetition Second Lien Loan Claims, Allowed Prepetition HoldCo Loan Claims, Allowed OpCo General Unsecured Claims, and Allowed Freedom HoldCo General Unsecured Claims, on a *pro rata* basis and subject to the Litigation Trust Units Allocations.  The Litigation Trustee, in consultation with the Litigation Trust Advisory Board, shall cause the Litigation Trust to make distributions to Litigation Trust Beneficiaries at least annually but as often as reasonably possible, so long as the Litigation Trustee determines, in good faith, that the retention of certain of the Litigation Trust Assets, including the Litigation Trust Escrow Amount, is no longer necessary to

(i) meet contingent liabilities, (ii) maintain the Litigation Trust Disputed Claims Reserve, (iii) maintain the value of the Litigation Trust Assets pending their liquidation during the term of the Litigation Trust, or (iv) pay or be reserved for reasonably incurred or anticipated expenses or claims of the Litigation Trust and the Litigation Trustee, including, but not limited to, the Litigation Trust Expenses.  The retention of such amount may preclude distributions to Litigation Trust Beneficiaries in accordance with the terms of the Plan and this Agreement.  The Litigation Trust may engage disbursing agents and other Persons as reasonably necessary to assist in making such distributions.

      5.1.2    <u>No Payment Over the Full Amount</u>.  In no event shall the Holder of an Allowed Claim receive distributions on account of its Allowed Claim for more than the full payment on account of such Claim.

      5.1.3    <u>Reserves; Pooling of Reserved Funds</u>.  Before any distribution can be made, the Litigation Trustee shall, in its reasonable discretion, but subject to any applicable consultation and/or consent rights expressly set forth in this Agreement, establish, supplement, and maintain a reserve in an amount sufficient to meet any and all liabilities and Litigation Trust Expenses, including attorneys' fees and expenses and the fees and expenses of other professionals.  In accordance with the Plan and Section 3.4.14 of this Agreement, the Litigation Trust may also maintain as necessary one or more reserves (including the Litigation Trust Disputed Claims Reserve) with respect to the OpCo General Unsecured Claims and Freedom HoldCo General Unsecured claims required to be administered by the Litigation Trust.  For the avoidance of doubt, subject to the Plan and Confirmation Order, the Litigation Trustee may withhold any distribution pending the Litigation Trust's determination of whether to object to any OpCo General Unsecured Claim or Freedom HoldCo General Unsecured Claim.  Any such withheld distribution shall

become part of a reserve (the "Litigation Trust Disputed Claims Reserve") and shall be distributed to the appropriate Litigation Trust Beneficiary no later than the first Distribution Record Date after a decision is made not to object to the pertinent General Unsecured Claim or such General Unsecured Claim becomes Allowed. The Litigation Trustee need not maintain any of the Litigation Trust's reserves in segregated bank accounts and may pool funds in the reserves with each other and other funds of the Litigation Trust; *provided*, *however*, that the Litigation Trust shall treat all such reserved funds as being held in a segregated manner in its books and records.

        5.1.4   Distributions Net of Reserves and Costs. Distributions shall be made net of reserves in accordance with the Plan and this Agreement, and also net of the actual and reasonable costs of making the distributions. The Litigation Trustee may, subject to any applicable consultation and/or approval rights expressly set forth in this Agreement, sell or otherwise dispose of Litigation Trust Assets in order to pay such costs. The Litigation Trust Escrow Amount shall be primarily reserved for the costs and expenses (including, any advisor fees and expenses) of the Litigation Trust; *provided,* that, if the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, determines in good faith that the Litigation Trust Escrow Amount is no longer necessary to cover such costs and expenses (including, any advisor fees and expenses) of the Litigation Trust, then the Litigation Trustee shall be entitled to distribute the Cash to Litigation Trust Beneficiaries in accordance with the terms of this Agreement and consistent with its fiduciary duties.

        5.1.5   Right to Rely on Professionals. Without limitation of the generality of Section 7.6 of this Agreement, in determining the amount of any distribution or reserves, the Litigation Trustee may rely on, and shall be fully protected in relying on the advice and opinion of, the Litigation Trust's attorneys, financial advisors, accountants, or other professionals.

5.2     <u>Withholding from Distributions</u>.  The Litigation Trustee, in its discretion, may cause the Litigation Trust to deduct and withhold from amounts distributable from the Litigation Trust to any Litigation Trust Beneficiaries any and all amounts as may be sufficient to pay the maximum amount of any tax or other charge that has been or might be assessed or imposed by any Law, regulation, rule, ruling, directive, or other governmental requirement on such Litigation Trust Beneficiary or the Litigation Trust, including with respect to the amount to be distributed to such Litigation Trust Beneficiary, any amounts received by, collections of, or earnings of the Litigation Trust and any proceeds from the Litigation Trust Assets.  The Litigation Trustee shall determine such maximum amount to be withheld by the Litigation Trust in its sole, reasonable discretion and shall cause the Litigation Trust to distribute to such Litigation Trust Beneficiary any excess amount withheld.  The Litigation Trustee may, if necessary or appropriate to comply with applicable withholding requirements, withhold the entire distribution due to any Litigation Trust Beneficiary until such Litigation Trust Beneficiary provides the necessary information to comply with any withholding requirements of any governmental unit.  All such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be treated as amounts distributed to such Litigation Trust Beneficiaries for all purposes of the Plan and this Agreement, to the extent permitted by applicable Law.

5.3     <u>Internal Revenue Service Forms</u>.  The Litigation Trustee may require the Holder of a Claim entitling the Holder to receive a Litigation Trust Unit to, and each such Holder shall, properly complete and execute the appropriate Internal Revenue Service Form W-8 (including any supporting documents) or Internal Revenue Service Form W-9, or such other documentation, as a prerequisite to receiving any distribution under the Plan or this Agreement.  If a Holder of such Claim does not provide to the Litigation Trustee within ninety (90) days of first written request

with all documentation that in the Litigation Trustee's reasonable business judgment is necessary to determine the tax withholding and reporting requirements for such Claim, then any current or future distribution on such Claim shall be deemed forfeited, and the underlying Claim and the funds shall in respect of such present and future distribution(s) shall revert to the Litigation Trust for all purposes, including but not limited to, redistribution to other Litigation Trust Beneficiaries, in accordance with the terms of the Confirmation Order, the Plan, and Section 5.4 of this Agreement; *provided*, *however*, that no additional ninety (90) day period under Section 5.4 of this Agreement shall be required to pass before such distributions become unrestricted funds of the Litigation Trust.

   5.4 <u>Unclaimed and Undeliverable Distributions</u>.  Unclaimed property (including, but not limited to, uncashed checks), together with any distributions to Litigation Trust Beneficiaries returned as undeliverable, shall be held by the Litigation Trustee in an unclaimed property reserve (the "<u>Unclaimed Property Reserve</u>") for a period of ninety (90) days from the date of first issuance, and may be released by the Litigation Trustee prior to the expiration of such time period if presentation of proper proof by such Litigation Trust Beneficiary of its entitlement thereto is presented to the Litigation Trustee.  After the expiration of the applicable time period set forth in this Section 5.4, all unclaimed property or interest in property otherwise payable to a Holder of a Litigation Trust Unit or its successors shall revert to the Litigation Trust for all purposes including, but not limited to, for redistribution in accordance with the terms of the Plan, the Confirmation Order, and this Agreement.  Upon such revesting, the Holder's Allowed Claim entitling such Holder to Litigation Trust Units shall be cancelled, released, discharged and forever barred and the Allowed Claim of any other Holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal, state or provincial escheat, abandoned,

or unclaimed property Laws, or any provisions in any document governing the distribution that is an unclaimed distribution to the contrary.

5.5    No Responsibility to Attempt to Locate Litigation Trust Beneficiaries.    If a distribution is returned to the Litigation Trust as undeliverable, or otherwise remains unclaimed, no further distribution shall be made to a Holder of an applicable Allowed Claim unless and until such Holder notifies the Litigation Trustee of such Holder's then-current address and taxpayer identification number.    The Litigation Trustee may, in its sole discretion, attempt to determine a Holder of an applicable Allowed Claim's current address or otherwise locate such Holder, but nothing in this Agreement or the Plan shall require the Litigation Trustee to do so.

5.5.1    Inapplicability of Escheat, Abandoned or Unclaimed Property Laws. Unclaimed property held by the Litigation Trust shall not be subject to the escheat, abandoned or unclaimed property Laws of the United States, or any state, provincial, or local governmental unit.

5.6    Request for Reissuance.    Distribution checks shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.    Distribution checks not cashed within such 90-day period shall be treated as unclaimed property that has been held in the Unclaimed Property Reserve as set forth above in Section 5.4.    Requests for reissuance of any check shall be made in writing directly to the Litigation Trustee by the Holder of the applicable Allowed Claim that was originally issued such check.    All such requests shall be made promptly and in time for the check to be reissued and cashed before the funds for the checks become unrestricted Litigation Trust Assets under Section 5.4 of this Agreement.    The Holder of an Allowed Claim shall bear all the risk that, and shall indemnify and hold the Litigation Trust, the Litigation Trustee, and the Litigation Trust Advisory Board harmless against any loss that may arise if, the Litigation Trustee does not reissue a check promptly after receiving a request for its reissuance.

5.7    <u>Conflicting Claims of Litigation Trust Units</u>.  If any conflicting claims or demands are made or asserted with respect to the Litigation Trust Unit of a Litigation Trust Beneficiary, or if there is any disagreement between the assignees, transferees, heirs, representatives, or legatees succeeding to all or a part of such an interest resulting in adverse claims or demands being made in connection with such interest, then, in any of such events, the Litigation Trustee shall be entitled, in its sole discretion, to refuse to comply with any such conflicting claims or demands.

5.7.1    The Litigation Trustee may, in consultation with the Litigation Trust Advisory Board, elect to cause the Litigation Trust to make no payment or distribution with respect to the Litigation Trust Unit subject to the conflicting claims or demand, or any part thereof, and to refer such conflicting claims or demands to the Bankruptcy Court, which shall have continuing jurisdiction over resolution of such conflicting claims or demands in accordance with Article XIII of the Plan. Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, neither the Litigation Trust, nor the Litigation Trustee, nor the Litigation Trust Advisory Board shall be or become liable to any of such parties for their refusal to comply with any such conflicting claims or demands, nor shall the Litigation Trust, Litigation Trustee, or the Litigation Trust Advisory Board be liable for interest on any funds which may be so withheld.

5.7.2    The Litigation Trustee shall be entitled to refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction adjudicating the matter or (ii) all differences have been resolved by a valid written agreement among all such parties to the satisfaction of the Litigation Trustee, which agreement shall include a complete release of the Litigation Trust and Litigation Trustee.  Until the Litigation Trustee receives written notice that one of the conditions of the

preceding sentence is met, the Litigation Trustee may deem and treat as the absolute owner under this Agreement of the Litigation Trust Units in the Litigation Trust the Litigation Trust Beneficiary identified as the owner of that interest in the books and records maintained by the Litigation Trustee.  The Litigation Trustee may deem and treat such Litigation Trust Beneficiary as the absolute owner for purposes of receiving distributions and any payments on account thereof for federal and state income tax purposes, and for all other purposes whatsoever.

5.8    <u>Limitation on Liability</u>.    Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, in acting or refraining from acting under and in accordance with this the Agreement, the Litigation Trustee shall be fully protected and incur no liability to any purported claimant or any other Person pursuant to Article VII of this Agreement.

5.9    <u>Priority of Expenses of Litigation Trust</u>.  The Litigation Trust shall pay or reserve for all necessary Litigation Trust Expenses before making any distributions, including but not limited to, any distribution to Litigation Trust Beneficiaries.

5.10    <u>Minimum Distributions</u>.  If any distribution under the Plan to the Holder of an Allowed Claim would be less than $250.00, the Litigation Trust may hold such distribution until the time of a subsequent or final distribution.  If the final distribution under the Plan to the Holder of an Allowed Claim would be less than $250.00, the Litigation Trust may cancel such distribution. Any cancelled distributions pursuant to this Section 5.10 shall revert to the Litigation Trust for all purposes, including distributions to other Holders of Allowed Claims.

**ARTICLE VI**

**LITIGATION TRUST BENEFICIARIES**

6.1    <u>Interest Beneficial Only</u>.  The ownership of a Litigation Trust Unit shall not entitle any Litigation Trust Beneficiary or the Debtors to any title in or to the Litigation Trust Assets or to any right to call for a partition or division of such assets or to require an accounting.

6.2    <u>Ownership of Litigation Trust Beneficial Interests Hereunder</u>.  Each Litigation Trust Beneficiary shall own a Litigation Trust Unit herein which shall, subject to Article V of this Agreement and the Plan, be entitled to a distribution in the amounts, and at the times, set forth in the Plan and hereunder.

6.3    <u>Evidence of Litigation Trust Beneficial Interest</u>.  Ownership of a Litigation Trust Unit shall not be evidenced by any certificate, security, or receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Litigation Trust by the Litigation Trustee.

6.4    <u>No Right to Accounting</u>.  Except as otherwise provided in this Agreement, neither the Litigation Trust Beneficiaries nor their successors, assigns, creditors, nor any other Person shall have any right to an accounting by the Litigation Trustee, and the Litigation Trustee shall not be obligated to provide any accounting to any Person.  Nothing in this Agreement is intended to require the Litigation Trustee at any time or for any purpose to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust or as a condition for making any advance, payment, or distribution out of proceeds of Litigation Trust Assets.

6.5    <u>Requirement of Undertaking</u>.  The Litigation Trustee may request the Bankruptcy Court to require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Litigation Trustee for any action taken or omitted by it as Litigation Trustee,

the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, including reasonable attorneys' fees, against any party litigant in such suit; *provided*, *however*, that the provisions of this Section 6.5 shall not apply to any suit by the Litigation Trust or Litigation Trustee.

6.6    <u>Limitation on Transferability</u>.  It is understood and agreed that the Litigation Trust Units shall be non-transferable and non-assignable during the term of this Agreement except if transferred by will, intestate succession, if required to be transferred as part of a liquidation or winding up of a holder, or otherwise by operation of Law.  An assignment by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the Litigation Trustee, and the Litigation Trustee may continue to cause the Litigation Trust to pay all amounts to or for the benefit of the assigning Litigation Trust Beneficiaries until receipt of proper notification and proof of assignment by operation of law.  The Litigation Trustee may rely upon such proof without the requirement of any further investigation.

6.7    <u>Exemption from Registration</u>.   The rights of the Litigation Trust Beneficiaries arising under this Agreement may be deemed "securities" under applicable Law.  However, such rights have not been defined as "securities" under the Plan because (i) the Parties hereto intend that such rights shall not be securities and (ii) if the rights arising under this Agreement in favor of the Litigation Trust Beneficiaries are deemed to be "securities," the exemption from registration under section 1145 of the Bankruptcy Code is intended to be applicable to such securities. No Party to or beneficiary of this Agreement shall make a contrary or different contention.

6.8    <u>Delivery of Distributions</u>.  Subject to the terms of this Agreement, the Litigation Trustee shall cause the Litigation Trust to make distributions to Litigation Trust Beneficiaries in the manner provided in the Plan and in this Agreement.

6.9    <u>Limited Liability</u>.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, any breach of the terms of this Agreement, or any claim or cause of action for fraud, willful misconduct, or gross negligence, no provision of this Agreement, the Plan, or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any Litigation Trust Beneficiary, shall give rise to any liability to such Litigation Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, creditors, successors, representatives, employees, or Holders of Interests of any Debtor, or by any other Person.  Litigation Trust Beneficiaries are deemed to receive the Litigation Trust Assets in accordance with the provisions of this Agreement, the Plan, and the Confirmation Order in exchange for their Allowed Prepetition First Lien Loan Claims, Allowed Prepetition Second Lien Loan Claims, Allowed Prepetition HoldCo Loan Claims, Allowed OpCo General Unsecured Claims, and Allowed Freedom HoldCo General Unsecured Claims, as applicable, as set forth in the Plan without further obligation or liability of any kind, but subject to the provisions of this Agreement.

<div align="center">

**ARTICLE VII**

**THIRD-PARTY RIGHTS AND LIMITATION OF LIABILITY**

</div>

7.1    <u>Parties Dealing with the Litigation Trustee</u>.  In the absence of actual knowledge to the contrary, any Person dealing with the Litigation Trust or the Litigation Trustee shall be entitled to rely on the authority of the Litigation Trustee or any of the Litigation Trustee's agents to act in connection with the Litigation Trust Assets.  There is no obligation of any Person dealing with the Litigation Trustee to inquire into the validity or expediency or propriety of any transaction by the Litigation Trustee or any agent of the Litigation Trustee.

7.2     <u>Limitation of Litigation Trustee Liability</u>.  In exercising the rights granted herein, the Litigation Trustee shall exercise its best judgment in accordance with its fiduciary duties, to the end that the affairs of the Litigation Trust shall be properly managed and the interests of all of the Litigation Trust Beneficiaries safeguarded.  However, notwithstanding anything herein to the contrary, other than any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, neither the Litigation Trustee nor any of its respective firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, or disbursing agents, or agents, and any of such Person's successors and assigns, shall incur any responsibility or liability by reason of any error of Law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with this Agreement, whether sounding in tort, contract, or otherwise, except for fraud, gross negligence, or willful misconduct that is found by a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered by the Litigation Trust.  Other than any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, in no event shall the Litigation Trustee be liable for indirect, punitive, special, incidental, or consequential damage or loss (including, but not limited to, lost profits) whatsoever, even if the Litigation Trustee has been informed of the likelihood of such loss or damages and regardless of the form of action.  Without limiting the foregoing, the Litigation Trustee shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in the Plan and the Litigation Trustee shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in the Confirmation Order.

7.3    <u>No Liability for Acts of Other Persons</u>.  None of the Persons identified in the immediately preceding Section 7.2 of this Agreement shall be liable for the act or omission of any other Person identified in that Section.

7.4    <u>No Liability for Acts of Predecessors</u>.  No successor Litigation Trustee shall be in any way responsible for the acts or omissions of any Litigation Trustee in office prior to the date on which such successor becomes the Litigation Trustee, unless a successor Litigation Trustee expressly assumes such responsibility.

7.5    <u>No Liability for Good Faith Error of Judgment</u>.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, the Litigation Trustee shall not be liable for any error of judgment made in good faith, unless it shall be finally and ultimately determined by a court of competent jurisdiction that the Litigation Trustee was grossly negligent.

7.6    <u>Reliance by Litigation Trustee on Documents and Advice of Counsel or Other Persons</u>.  Except as otherwise provided herein, the Litigation Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.  The Litigation Trustee also may engage and consult with its respective legal counsel and other agents and advisors, and shall not be liable for any action taken, omitted, or suffered in good faith reliance upon the advice of such counsel, agents, or advisors to the extent permitted by Law, except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein.

7.7    <u>No Liability For Acts Approved by Bankruptcy Court</u>. The Litigation Trustee shall have the right at any time to seek an order from the Bankruptcy Court concerning the

administration or disposition of the Litigation Trust, Permitted Litigation Claims, OpCo General Unsecured Claims, Freedom HoldCo General Unsecured Claims, and Litigation Trust Assets required to be administered by the Litigation Trust.  Following the entry of any such order of the Bankruptcy Court, the Litigation Trustee shall not be liable for any act or omission expressly taken in accordance with, and not inconsistent with, any such order, and all such actions or omissions shall be deemed not to constitute fraud, gross negligence, or willful misconduct.

7.8    No Personal Obligation for Litigation Trust Liabilities.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, Persons dealing with the Litigation Trustee shall have recourse only to the Litigation Trust Assets to satisfy any liability incurred by the Litigation Trustee to any such Person in carrying out the terms of this Agreement, and the Litigation Trustee shall have no personal, individual obligation to satisfy any such liability.

7.9    Indemnification.  The Litigation Trustee, the Litigation Trust Advisory Board, and each of their or the Litigation Trust's respective accountants, agents, assigns, attorneys, consultants, directors, employees, executors, financial advisors, transfer agents, independent contractors, managers, members, officers, partners, predecessors, principals, professional persons, the employees of the Litigation Trust, and their respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives, affiliate, employer and successors and principals  (each, an "Indemnified Party") shall be indemnified for, and defended and held harmless against, by the Litigation Trust solely from the Litigation Trust Assets, for any losses, liability, claims, damages, judgment, fine, penalty, claim, demand, settlement, cost, or expenses occurring on or after the Effective Date (including reasonable attorneys' fees and expenses which the Indemnified Party may incur in connection therewith) for any act or omission in their capacity

as, or on behalf of, the Litigation Trust or Litigation Trustee in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or this Agreement, as applicable if the applicable Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Litigation Trust or the Litigation Trust Beneficiaries, except if such loss, liability, or damage is ultimately and finally determined by a court of competent jurisdiction to have resulted from the fraud, gross negligence, or willful misconduct of the Indemnified Party asserting indemnification.  An act or omission taken by the Litigation Trustee pursuant to Section 7.7 of this Agreement will be deemed not to constitute gross negligence, willful misconduct, or fraud.  The amounts necessary for the indemnification provided in this Section (including, but not limited to, any costs and expenses incurred in enforcing the right of indemnification in this Section) shall be paid by the Litigation Trustee out of the Litigation Trust Assets; *provided*, *however*, that that the Litigation Trust shall not be liable to indemnify, (x) the Litigation Trustee for any breach of its fiduciary duty set forth herein, or (y) any Indemnified Party for any act or omission arising out of such Indemnified Party's respective gross negligence, fraud, or willful misconduct as is ultimately and finally determined by a court of competent jurisdiction.  The Indemnified Parties shall be entitled to obtain advances from the Litigation Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an Indemnified Party in its capacity as such, except for any actions or omissions arising from their own respective willful misconduct, fraud, or gross negligence; *provided*, *however*, that the Indemnified Parties receiving such advances shall repay the amounts so advanced to the Litigation Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Indemnified Parties were not entitled to any indemnity under the provisions of this Section 7.9 of this Agreement.  Except for any liability

51

arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, the Litigation Trustee shall not be personally liable for the payment of any Litigation Trust Expense or claim or other liability of the Litigation Trust, and no Person shall look to the Litigation Trustee personally for the payment of any such expense or liability.  Notwithstanding anything herein to the contrary, nothing contained in this Section 7.9 shall require the Debtors, the Reorganized Debtors, or any Litigation Trust Beneficiary to indemnify any Indemnified Persons pursuant to this Agreement.

      7.9.1    Expense of Litigation Trust; Limitation on Source of Payment of Indemnification.  All indemnification liabilities of the Litigation Trust under this Section 7.9 shall be expenses of the Litigation Trust and constitute Litigation Trust Expenses.  The amounts necessary for such indemnification and reimbursement shall be paid by the Litigation Trust out of the available Litigation Trust Assets after reserving for all actual and anticipated expenses and liabilities of the Litigation Trust.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, the Litigation Trustee shall not be personally liable for the payment of any Litigation Trust Expenses or claim or other liability of the Litigation Trust, and no Person shall look to the Litigation Trustee or other Indemnified Parties personally for the payment of any such Litigation Trust Expenses or liability, unless it is ultimately and finally determined by a court of competent jurisdiction that such payment was the result of fraud, gross negligence, or willful misconduct.

    7.10    Limitation of Liability of the Reorganized Debtors.  Except as expressly provided in this Agreement, the Reorganized Debtors and each of their respective boards of directors, management, employees, and professionals shall have no liability for any action taken or omitted to be taken by the Litigation Trustee in performing its duties under this Agreement.

7.11    <u>Confirmation of Survival of Provisions</u>.  Without limitation in any way of any provision of this Agreement, the provisions of this Article VII shall survive the death, dissolution, liquidation, incapacity, resignation, replacement, or removal, as may be applicable, of the Litigation Trustee or, as it relates to Section 7.9, an Indemnified Party, or the termination of the Litigation Trust or this Agreement, and shall inure to the benefit of the Litigation Trustee's and each Indemnified Party's heirs and assigns.

## ARTICLE VIII

### TAX MATTERS

8.1    <u>Tax Treatment of Litigation Trust</u>.  Pursuant to and in accordance with the Plan, for all United States federal income tax purposes, the Debtors, the Litigation Trust Beneficiaries, the Litigation Trustee, and the Litigation Trust shall treat (i) the Litigation Trust as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Internal Revenue Service Revenue Procedure 94-45, 1994-2 C.B. 684 and, thus, as a "grantor trust" within the meaning of Internal Revenue Code sections 671 through 677 consistent with the terms of the Plan (unless the Litigation Trust has undergone the Conversion (as defined herein)) and (ii) the transfer of the Litigation Trust Assets to the Litigation Trust as (a) a transfer of the Litigation Trust Assets by the Freedom HoldCo Debtors and the OpCo Debtors to the Litigation Trust Beneficiaries in satisfaction of their Allowed Prepetition First Lien Loan Claims, Allowed Prepetition Second Lien Loan Claims, Allowed Prepetition HoldCo Loan Claims, Allowed OpCo General Unsecured Claims, and Allowed Freedom HoldCo General Unsecured Claims, as applicable (other than any Litigation Trust Disputed Claims Reserve treated as a DOF (if elected) or other separate Entity), followed by (b) a transfer of such Litigation Trust Assets by such Litigation Trust Beneficiaries to the Litigation Trust in exchange for their *pro rata*

share of Litigation Trust Units (subject to the Litigation Trust Units Allocations).  The Litigation Trust Beneficiaries shall be treated as the grantors and owners of the Litigation Trust for United States federal (and, to the extent permitted, state and local) income tax purposes.

8.2    Annual Reporting and Filing Requirements.  Pursuant to and in accordance with the terms of the Plan and this Agreement, the Litigation Trustee shall file tax returns (including applicable state, local and foreign tax returns, if any) for the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) to the extent required by applicable Law and subject to the treatment of the Litigation Trust Disputed Claims Reserve as a DOF or other separate Entity.

8.3    Tax Treatment of Reserves for Disputed Claims.  The Litigation Trustee may, in the Litigation Trustee's sole discretion, determine the best way to report for United States tax purposes with respect to the Litigation Trust Disputed Claims Reserve, if applicable, including (i) filing a tax election to treat the Litigation Trust Disputed Claims Reserve as a DOF or other separate Entity within the meaning of Treasury Regulation section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Litigation Trust (and, to the extent permitted by applicable Law, report consistently with the foregoing for United States federal, state, and local income tax purposes) or (ii) electing to report as a separate trust or sub-trust or other entity.  If an election is made to report the Litigation Trust Disputed Claims Reserve as a DOF or other separate entity, the Litigation Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF or other separate entity, including, but not limited to, the filing of a separate federal tax return for the DOF or other separate entity and the payment of federal and/or state income tax due.

8.3.1    If an election is made to report the Litigation Trust Disputed Claims Reserve as a DOF or other separate Entity, all parties (including the Debtors, the Reorganized Debtors, the Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall be bound by such election and report for United States federal, state, and local income tax purposes consistently with the foregoing.  The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any taxes (including with respect to earned interest, if any) imposed on the Litigation Trust or the Litigation Trust Assets, including the Litigation Trust Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of a Disputed General Unsecured Claim in the Litigation Trust Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such Disputed General Unsecured Claims, the Litigation Trustee may, in its discretion, (i) sell any non-Cash assets relating to such Claim (including any assets distributable as a result of disallowance of such Claim) to pay such taxes or (ii) reimburse the Litigation Trust for the payment of such taxes from any subsequent Cash amounts allocable to, or retained on account of such Disputed General Unsecured Claim (including any Cash distributable by the Litigation Trustee as a result of disallowance of such Disputed General Unsecured Claim).

8.4    <u>Valuation of Litigation Trust Assets</u>.  As soon as practicable following the Effective Date, but in no event later than the due date for timely filing of the Litigation Trust's first United States federal income tax return (taking into account applicable tax filing extensions), the Litigation Trustee shall determine the fair market value of the Litigation Trust Assets as of the Effective Date, based on the Litigation Trustee's good faith determination and subject in all respects to Section 8.4, and the Litigation Trustee shall apprise, in writing, the Litigation Trust Beneficiaries and the Reorganized Debtors of such valuation.  The valuation shall be used

consistently by all parties (including, without limitation, the Debtors and/or the Reorganized Debtors, as applicable, the Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries) for all applicable United States federal, state, and local income tax purposes.

8.4.1    In the event the Reorganized Debtors disagree with the Litigation Trustee's good faith determination of the valuation of the Litigation Trust Assets, the Litigation Trustee and the Reorganized Debtors shall attempt to reconcile any such differences. The valuation agreed to by the Reorganized Debtors and the Litigation Trustee shall be used consistently by all parties for all tax purposes unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Internal Revenue Code (or any equivalent provision of state, local, or non-U.S. Law).

8.5    In the event that the Litigation Trustee determines that the Litigation Trust may be required to withhold from amounts distributable from the Litigation Trust pursuant to Section 5.2 above, it shall endeavor to promptly notify the relevant Litigation Trust Beneficiary.

8.6    Allocations of Litigation Trust taxable income among the Litigation Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the holders of Litigation Trust Units, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purposes of this Section 8.6 shall equal their fair market value on the

Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

8.7     If, in the reasonable judgment of the Litigation Trustee, the Litigation Trust is expected to survive for a period of more than five (5) years from the Effective Date, the Parties agree that the Litigation Trustee, in the exercise of its reasonable discretion, shall either (i) seek to extend the term of the Litigation Trust for a reasonable period of time in a manner consistent with Section 10.3 hereof and Revenue Procedure 94-45 § 3.06, or (ii) convert the Litigation Trust from a liquidating trust described in Treasury Regulation § 301.7701-4(d) to an investment trust described in Treasury Regulation § 301.7701-4(c), taxable as a grantor trust for U.S. federal income tax purposes under Sections 671 through 679 of the IRC (the process described in this clause (ii), the "Conversion").  In the event of a Conversion, the Parties (x) agree that, unless otherwise required by applicable Law, the Litigation Trust shall file or cause to be filed any annual or other necessary returns, reports and other forms consistent with the characterization of the converted entity as an investment trust for U.S. federal income tax purposes, (y) shall cooperate to amend this Agreement to reflect such Conversion, and (z) shall take no position on any tax return inconsistent with such treatment.

## ARTICLE IX

### SELECTION, REMOVAL, REPLACEMENT, AND COMPENSATION OF LITIGATION TRUSTEE

9.1     Initial Litigation Trustee.  The Initial Litigation Trustee is appointed effective as of the Effective Date, and shall serve as the trustee of the Litigation Trust.  The initial trustee of the Litigation Trust shall be the Initial Litigation Trustee.

9.2    <u>Term of Service</u>.  The Litigation Trustee shall serve until the earliest of (i) the completion of the administration of the Litigation Trust Assets and the Litigation Trust, including the winding up of the Litigation Trust, in accordance with this Agreement and the Plan, (ii) termination and dissolution of the Litigation Trust in accordance with the terms of this Agreement and the Plan, or (iii) the Litigation Trustee's resignation, death, dissolution, incapacity, liquidation, or removal.  In the event that the Litigation Trustee's appointment terminates by reason of resignation, death, dissolution, incapacity, liquidation, or removal, the Litigation Trustee shall be immediately compensated for all reasonable, documented fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced.  The provisions of Article VI of this Agreement shall survive the resignation or removal of any Litigation Trustee.

9.3    <u>Removal of Litigation Trustee</u>.  Any party in interest (including the Litigation Trust Advisory Board), with notice and a hearing before the Bankruptcy Court, may seek removal of the Litigation Trustee for Cause (as defined below).  As used herein, "Cause" shall mean the Litigation Trustee's (A) commission of an act of fraud, theft or embezzlement during the performance its duties hereunder; (B) conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (C) gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of its duties hereunder; (D) commission of any negligence, even if not rising to the level of gross negligence, that risks materially adversely affecting the value or successful liquidation and distribution of the Litigation Trust Assets; or (E) violation of the provisions of this Agreement, the Plan, or the Confirmation Order.  Such removal shall become effective on the date action is taken.  The Bankruptcy Court shall have exclusive jurisdiction to hear and finally determine any dispute arising out of this Section 9.3 except as otherwise provided in the Plan or Confirmation Order.

9.4     <u>Resignation of Litigation Trustee</u>.  The Litigation Trustee may resign at any time on thirty (30) days' written notice to the Litigation Trust Advisory Board, counsel to the Debtors, counsel to the Ad Hoc Group, counsel to the Freedom Lender Group, the U.S. Trustee, and the Bankruptcy Court.  The resignation shall be effective on the later of (i) the date specified in the notice of resignation and (ii) the date that is thirty (30) days after the date such notice is filed with the Bankruptcy Court.  In the event of a resignation, the resigning Litigation Trustee shall file a full and complete accounting of monies and assets received, disbursed, and held during the term of that Litigation Trustee.

9.5     <u>Appointment of Successor Litigation Trustee</u>.    Upon the resignation, death, dissolution, incapacity, liquidation, or removal of a Litigation Trustee, a successor trustee shall be selected by the Litigation Trust Advisory Board by majority vote of the Members or at a meeting of the Litigation Trust Advisory Board called for of replacing the Litigation Trustee, *provided* that the successor trustee shall be reasonably acceptable to holders of a majority of Prepetition First Lien Loan Claims.  Any successor Litigation Trustee so appointed (i) shall consent to and accept his, her, or its appointment as successor Litigation Trustee, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of his, her, or its appointment as successor Litigation Trustee, and (ii) shall not have any liability or responsibility for the acts or omissions of any predecessor(s).  Any successor Litigation Trustee may be appointed to serve only on an interim basis.

9.6     <u>Powers and Duties of Successor Litigation Trustee</u>.  A successor Litigation Trustee shall have all the rights, privileges, powers, and duties of his, her, or its predecessor under this Agreement, the Plan, and the Confirmation Order.

9.7    <u>Litigation Trust Continuance</u>.    The resignation, death, dissolution, incapacity, liquidation, or removal of the Litigation Trustee shall not terminate the Litigation Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Litigation Trustee.

9.8    <u>Compensation of Litigation Trustee and Costs of Administration</u>.    The Litigation Trustee shall receive fair and reasonable compensation for its services in accordance with the terms and conditions of the Plan, which shall be a charge solely against and solely paid out of the Litigation Trust Assets as Litigation Trust Expenses.    All costs, expenses, and obligations incurred by the Litigation Trustee (or professionals who may be employed by the Litigation Trustee in administering the Litigation Trust, in carrying out its other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Litigation Trust solely from the Litigation Trust Assets.

9.9    <u>Appointment of Supplemental Litigation Trustee</u>.    If the Litigation Trustee has a conflict or any of the Litigation Trust Assets are situated in any state or other jurisdiction in which the Litigation Trustee is not qualified to act as trustee, the Litigation Trustee shall, upon written notice to counsel to the Debtors, counsel to the Ad Hoc Group (email being sufficient), and counsel to the Freedom Lender Group (email being sufficient), nominate and appoint a Person duly qualified to act as trustee (the "<u>Supplemental Litigation Trustee</u>") with respect to such conflict, or in such state or jurisdiction, and require from each such Supplemental Litigation Trustee such security as may be designated by the Litigation Trustee in its reasonable discretion.    In the event the Litigation Trustee is unwilling or unable to appoint a disinterested Person to act as Supplemental Litigation Trustee to handle any such matter, the Bankruptcy Court, with notice and a hearing, may do so.    The Litigation Trustee or the Bankruptcy Court, as applicable, may confer

upon such Supplemental Litigation Trustee any or all of the rights, powers, privileges, and duties of the Litigation Trustee hereunder, subject to the conditions and limitations of this Agreement, the Plan, and the Confirmation Order, except as modified or limited by the Laws of the applicable state or other jurisdiction (in which case, the Laws of the state or other jurisdiction in which such Supplemental Litigation Trustee is acting shall prevail to the extent necessary).  To the extent the Supplemental Litigation Trustee is appointed by the Litigation Trustee, the Litigation Trustee shall require such Supplemental Litigation Trustee to be answerable to the Litigation Trustee for all monies, assets, and other property that may be received in connection with the administration of all property.  The Litigation Trustee or the Bankruptcy Court, as applicable, may remove such Supplemental Litigation Trustee, with or without cause, and appoint a successor Supplemental Litigation Trustee at any time by executing a written instrument declaring such Supplemental Litigation Trustee removed from office and specifying the effective date and time of removal.

## ARTICLE X

## DURATION OF DEBTOR LITIGATION TRUST

10.1    Duration.  Once the Litigation Trust becomes effective upon the Effective Date of the Plan, the Litigation Trust and this Agreement shall remain and continue in full force and effect until the Litigation Trust is terminated in accordance with the terms hereof.

10.2    Termination on Payment of Litigation Trust Expenses and Distribution of Litigation Trust Assets.  Upon the payment of all Litigation Trust Expenses, and the distribution of all Litigation Trust Assets in accordance with the provisions of the Plan, the Confirmation Order, and this Agreement, the Litigation Trust shall automatically terminate and dissolve and the Litigation Trustee shall have no further responsibility in connection therewith except as may be required to effectuate such termination under relevant Law.

10.3    <u>Termination after Five Years Unless Extended</u>.  If the Litigation Trust has not been previously terminated and dissolved pursuant to Section 10.2 hereof, on the fifth anniversary of the Effective Date, the Litigation Trustee shall distribute all of the Litigation Trust Assets to the Litigation Trust Beneficiaries in accordance with the Plan, and immediately thereafter the Litigation Trust shall terminate and the Litigation Trustee shall have no further responsibility in connection therewith except to the limited extent set forth in Section 10.5 of this Agreement, unless the Litigation Trust Advisory Board within the six-month period before such fifth anniversary (and, in the event of further extension, within the six-month period before the end of the preceding extension) determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

10.4    <u>No Termination by Litigation Trust Beneficiaries</u>.  The Litigation Trust may not be terminated and dissolved at any time by the Litigation Trust Beneficiaries.

10.5    <u>Continuance of Litigation Trust for Winding Up; Discharge and Release of Litigation Trustee</u>.  After the termination of the Litigation Trust and solely for the purpose of liquidating and winding up the affairs of the Litigation Trust, the Litigation Trustee shall continue to act as such until its responsibilities have been fully performed.  Except as otherwise specifically provided herein, upon the distribution of the Litigation Trust Assets, including all excess reserves, the Litigation Trustee and the Litigation Trust's professionals and agents shall be deemed discharged and have no further duties or obligations hereunder.  In connection with the foregoing, upon a motion by the Litigation Trustee, the Bankruptcy Court may enter an order relieving the

Litigation Trustee and its employees, professionals, and agents of any further duties, discharging and releasing the Litigation Trustee and its employees, professionals, and agents from all liability related to the Litigation Trust.

## ARTICLE XI

## MISCELLANEOUS

11.1    <u>Cumulative Rights and Remedies</u>.    The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

11.2    <u>Notices</u>.  All notices to be given to Litigation Trust Beneficiaries may be given by email, ordinary mail, or may be delivered personally, at the addresses for such Litigation Trust Beneficiaries appearing on the books kept by the Litigation Trust.    Any notice or other communication which may be or is required to be given, served, or sent to the Litigation Trust shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by email, hand delivery, or facsimile (if receipt is confirmed) addressed as follows:

> If to the Litigation Trust or the Litigation Trustee:
>
> Lawrence Hirsh
> c/o LRHirsh, LLC
>
> With a copy to:
> Raines Feldman Littrell LLP
> c/o Hamid Rafatjoo
> 4675 MacArthur Ct, Suite 1550
> Newport Beach, CA 92660
> hrafatjoo@raineslaw.com
> meckard@raineslaw.com
> dforsh@raineslaw.com

or to such other address as may from time to time be provided in written notice by the Litigation Trustee.

11.2.1  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to rules governing the conflict of laws.

11.2.2  Successors and Assigns.  This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

11.2.3  Particular Words.  Reference in this Agreement to any Article or Section is, unless otherwise specified, to that such Article or Section (inclusive of any subsections), as applicable, under this Agreement.  The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Article or Section of this Agreement.

11.2.4  Execution.  All funds in the Litigation Trust shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Litigation Trust Beneficiary, and no Litigation Trust Beneficiary or any other Person can execute upon, garnish or attach the Litigation Trust Assets or the Litigation Trustee in any manner or compel payment from the Litigation Trust except by Final Order of the Bankruptcy Court.  Payments will be solely governed by the Plan, the Confirmation Order, and this Agreement.

11.2.5  Amendment.  This Agreement may be amended by written agreement of the Litigation Trustee (in consultation with the Litigation Trust Advisory Board), the Ad Hoc Group, and the Freedom Lender Group (which, in each case, may be provided by email from counsel), or by order of the Bankruptcy Court; *provided*, *however*, that such amendment may not be inconsistent with the Plan or the Confirmation Order.

11.2.6  No Waiver.  No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

11.2.7  <u>No Relationship Created</u>.  Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership, or joint venture of any kind.

11.2.8  <u>Severability</u>.  If any term, provision, covenant, or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable, or against its regulatory policy, the remainder of the terms, provisions, covenants, and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

11.2.9  <u>Further Assurances</u>.  Without limitation of the generality of Section 2.6 of this Agreement, the Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan and to consummate the transactions contemplated hereby.

11.2.10  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.2.11  <u>Jurisdiction</u>.  The Bankruptcy Court shall have jurisdiction regarding the Debtors, the Reorganized Debtors, the Litigation Trust, the Litigation Trustee, and the Litigation Trust Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Litigation Trust; *provided*, *however*, that this Section 11.2.11 shall not conflict with the provisions of the Plan, including, without limitation, Article XIII of the Plan.  The Bankruptcy Court shall have continuing jurisdiction and venue to hear and finally determine all disputes and related matters among the Parties arising out of or

related to this Agreement or the administration of the Litigation Trust.  The Parties expressly consent to the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Agreement, the provisions of this Agreement shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction.

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this Agreement as of the day and year written above.

**FREEDOM VCM, INC.**

By: _____
    Name:  [●]
    Title:  [●]

**FREEDOM VCM INTERCO, INC.**

By: _____
    Name:  [●]
    Title:   [●]

**FRANCHISE GROUP, INC. AND ITS OPCO DEBTOR
AFFILIATES SET FORTH ON <u>SCHEDULE 1</u>**

By: _____
    Name:  David Orlofsky
    Title:   Chief Restructuring Officer

Lawrence Hirsh, not individually, but solely in its capacity as Litigation Trustee of the Franchise Group Litigation Trust

By: _____

    Name:  Lawrence Hirsh

## Schedule 1

1. FRANCHISE GROUP, INC.
2. AMERICAN FREIGHT FFO, LLC
3. AMERICAN FREIGHT FRANCHISING, LLC
4. AMERICAN FREIGHT FRANCHISOR, LLC
5. AMERICAN FREIGHT GROUP, LLC
6. AMERICAN FREIGHT HOLDINGS, LLC
7. AMERICAN FREIGHT MANAGEMENT COMPANY, LLC
8. AMERICAN FREIGHT OUTLET STORES, LLC
9. AMERICAN FREIGHT, LLC
10. BETANCOURT SPORTS NUTRITION, LLC
11. BUDDY'S FRANCHISING AND LICENSING LLC
12. BUDDY'S NEWCO, LLC
13. EDUCATE, INC.
14. FRANCHISE GROUP ACQUISITION TM, LLC
15. FRANCHISE GROUP INTERMEDIATE B, LLC
16. FRANCHISE GROUP INTERMEDIATE BHF, LLC
17. FRANCHISE GROUP INTERMEDIATE HOLDCO, LLC
18. FRANCHISE GROUP INTERMEDIATE L, LLC
19. FRANCHISE GROUP INTERMEDIATE PSP, LLC
20. FRANCHISE GROUP INTERMEDIATE S, LLC
21. FRANCHISE GROUP INTERMEDIATE SL, LLC
22. FRANCHISE GROUP INTERMEDIATE V, LLC
23. FRANCHISE GROUP NEW HOLDCO, LLC
24. FRANCHISE GROUP NEWCO BHF, LLC
25. FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC
26. FRANCHISE GROUP NEWCO PSP, LLC
27. FRANCHISE GROUP NEWCO S, LLC
28. FRANCHISE GROUP NEWCO SL, LLC
29. FRANCHISE GROUP NEWCO V, LLC
30. HOME & APPLIANCE OUTLET, LLC
31. PET SUPPLIES "PLUS", LLC
32. PSP DISTRIBUTION, LLC
33. PSP FRANCHISING, LLC
34. PSP GROUP, LLC
35. PSP MIDCO, LLC
36. PSP SERVICE NEWCO, LLC
37. PSP STORES, LLC
38. PSP SUBCO, LLC
39. VALOR ACQUISITION, LLC
40. VITAMIN SHOPPE FLORIDA, LLC
41. VITAMIN SHOPPE FRANCHISING, LLC
42. VITAMIN SHOPPE GLOBAL, LLC
43. VITAMIN SHOPPE INDUSTRIES LLC
44. VITAMIN SHOPPE MARINER, LLC

45. VITAMIN SHOPPE PROCUREMENT SERVICES, LLC
46. WNW FRANCHISING, LLC
47. WNW STORES, LLC

**<u>Exhibit H-1</u>**

**Redline to Previously Filed
Litigation Trust Agreement**

*Draft*

# LITIGATION TRUST AGREEMENT
# AND DECLARATION OF LITIGATION TRUST

This Litigation Trust Agreement and Declaration of Litigation Trust (this "Agreement"), dated as of June [●], 2025, is made by and among Freedom VCM, Inc., Freedom VCM Interco, Inc. (together with Freedom VCM, Inc., the "Freedom HoldCo Debtors"), Franchise Group, Inc. and its subsidiary debtors and debtors in possession listed on **Schedule 1** attached hereto (the "OpCo Debtors")[1] in the Chapter 11 Cases,[2] Lawrence R. Hirsh (the "Initial Litigation Trustee" and together with any successor trustee appointed in accordance with the terms hereof, the "Litigation Trustee"),[3] and [●]Robert LeHane, Michael Schwarzmann, and Seth Zeleznik, as members of the committee which shall have oversight over the litigation trust contemplated by

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722).  The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

[2]    As set forth in Section 1.2, capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable, unless otherwise noted.

[3]    If Lawrence Hirsh cannot serve as Litigation Trustee on the Effective Date for any reason, Initial Litigation Trustee will be an individual selected by the Freedom Lender Group, with the reasonable consent of the Ad Hoc Group and the Creditors' Committee.

this Agreement (the "Litigation Trust Advisory Board," and, together with the Freedom HoldCo Debtors, the OpCo Debtors, and the Litigation Trustee, the "Parties," and each, a "Party").

## RECITALS

1.      On November 3, 2024 (the "Petition Date"), each of the Freedom HoldCo Debtors and the OpCo Debtors (together, with their affiliated debtors and debtors in possession, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and their chapter 11 cases are being jointly administered under the caption *In re Franchise Group, Inc., et al.*, Case No. 24-12480 (LSS) (Bankr. D. Del.) (the "Chapter 11 Cases").

2.      On November 19, 2024, the Office of the United States Trustee, Region 3 (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") to represent the interests of all general unsecured creditors in the Chapter 11 Cases and filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 188].

3.      On April 25, 2025, the Debtors filed the *Eighth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1312] (as amended, supplemented, or otherwise modified from time to time, the "Plan").  The Plan incorporates the terms of a Global Settlement that includes, among other things, the Litigation Trust Units Allocations, which is comprised of (a) the Prepetition First Lien Loan Claims Litigation Trust Allocation, (b) the General Unsecured Creditors Litigation Trust Allocation, and (c) the Prepetition OpCo 2L/HoldCo Loan Claims Litigation Trust Allocation.   Pursuant to the Litigation Trust Units Allocations, the Litigation Trust Units shall be distributed as follows: 58% to Holders of Allowed Prepetition Second Lien Loan Claims and Allowed Prepetition HoldCo

Loan Claims, 30% to the Holders of Allowed Prepetition First Lien Loan Claims, and 12% to Holders of Allowed Freedom HoldCo General Unsecured Claims and Allowed OpCo General Unsecured Claims (excluding, for the avoidance of doubt, any Litigation Trust Units allocated to the Holders of Allowed Prepetition First Lien Loan Claims or Holders of Allowed Prepetition Second Lien Loan Claims), collectively.

4.     On [●]June 2, 2025, the Bankruptcy Court entered an order [Docket No. [●]1596] (the "Confirmation Order") confirming the Plan, which became effective on [●], 2025 (the "Effective Date").

5.     Section 7.10 of the Plan provides for the creation of the Litigation Trust on the Effective Date in connection and consistent with the Global Settlement.

6.     The Litigation Trust is established for the sole purpose of receiving, holding, administering, liquidating, and distributing the Litigation Trust Assets, including the (i) Litigation Trust Escrow Account, which includes, for the avoidance of doubt, the Litigation Trust Escrow Amount, funded in accordance with the Plan, and (ii) Permitted Litigation Claims, *plus* any additional amounts funded into the Litigation Trust Escrow Account following the Effective Date, for the benefit of the Holders of Allowed Prepetition First Lien Loan Claims, Allowed Prepetition Second Lien Loan Claims, Allowed Prepetition HoldCo Loan Claims, Allowed OpCo General Unsecured Claims, and Allowed Freedom HoldCo General Unsecured Claims (collectively, the "Litigation Trust Beneficiaries").

7.     The Litigation Trustee shall, in consultation with the Litigation Trust Advisory Board and in accordance with the terms hereof:  (i) be the exclusive administrator of the assets of the Litigation Trust, including the Litigation Trust Assets; and (ii) except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, have the power and authority to

(a) reconcile OpCo General Unsecured Claims and Freedom HoldCo General Unsecured Claims, including asserting any objections thereto in each case, *provided, however,* that all parties in interest shall also have the right to object to any General Unsecured Claim or join in any objection by the Litigation Trust or any other party, (b) investigate, pursue, prosecute, compromise and/or settle the Permitted Litigation Claims, and (c) distribute the Litigation Trust Assets in accordance with the terms of the Plan (including the Global Settlement incorporated therein) and this Agreement, in each case with no objective or authority to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with, the liquidating purpose of the Litigation Trust.  Subject to the Conversion of the Litigation Trust as described in Section 8.7 hereof, the Litigation Trust is intended to be classified for United States federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Revenue Procedure 94-45, 1994-2 C.B. 674, and, thus, as a "grantor trust" within the meaning of Internal Revenue Code sections 671 through 679 for United States federal income tax purposes, other than any Litigation Trust Disputed Claims Reserve (as defined herein) treated as a disputed ownership fund ("DOF") or other separate Entity.

8.        Pursuant to the Plan, for all United States federal income tax purposes, all parties shall treat the transfer of the Litigation Trust Assets to the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, whether such Holder's Claims are Allowed on or after the Effective Date, including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) as (i) a transfer of the Litigation Trust Assets (subject to any obligations relating to such Litigation Trust Assets, including, but not limited to, the Litigation Trust Expenses) to the Litigation Trust Beneficiaries and, to the extent the

Litigation Trust Assets are allocable to Disputed General Unsecured Claims that are the responsibility of the Litigation Trust, acting by and through its agents and representatives, to resolve, to the Litigation Trust Disputed Claims Reserve (as defined herein), followed by (ii) the transfer by the Litigation Trust Beneficiaries of the Litigation Trust Assets (other than the Litigation Trust Assets allocable to the Litigation Trust Disputed Claims Reserve) to the Litigation Trust in exchange for their non-transferable (subject to certain limited exceptions) Litigation Trust Units that will entitle the respective holder thereof to its *pro rata* share of the proceeds of the Litigation Trust Assets *less* the Litigation Trust Expenses (the "Litigation Trust Net Assets").  Accordingly, the Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective shares of the Litigation Trust Assets (other than such Litigation Trust Assets as are allocable to the Litigation Trust Disputed Claims Reserve).  The foregoing treatment shall also apply, to the extent permitted by applicable Law, for applicable United States state and local income tax purposes.

9.    The Litigation Trust is further intended to be exempt from the requirements of (i) pursuant to section 1145 of the Bankruptcy Code, the Securities Exchange Act of 1933, as amended, and any applicable state and local Laws requiring registration of securities, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

NOW, THEREFORE, in accordance with the Plan and the Confirmation Order, and in consideration of the promises, and the mutual covenants and agreements of the Parties contained in the Plan and herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

## DECLARATION OF LITIGATION TRUST

The Freedom HoldCo Debtors, the OpCo Debtors, the Litigation Trustee, and the members of the Litigation Trust Advisory Board enter into this Agreement to effectuate the distribution of the Litigation Trust Net Assets to the Litigation Trust Beneficiaries pursuant to the Plan and the Confirmation Order;

Pursuant to Section 7.10 of the Plan and Section 2.3.2 of this Agreement, on the Effective Date, all of the Litigation Trust Assets shall automatically and irrevocably be transferred to, and vest in or deem to be vested in, the Litigation Trust free and clear of all Claims, Liens, Interests, encumbrances, and contractually imposed restrictions, except as otherwise provided in the Plan;

TO HAVE AND TO HOLD unto the Litigation Trustee and its successors in trust; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED, that the Litigation Trust Assets are to be held by the Litigation Trust and applied on behalf of the Litigation Trust by the Litigation Trustee (such Litigation Trustee to be a "United States person" within the meaning of Internal Revenue Code section 7701(a)(30) and established within the United States) on the terms and conditions set forth herein and the Plan (including, for the avoidance of doubt, the Global Settlement incorporated therein), solely for the benefit of the Litigation Trust Beneficiaries, as more fully set forth in the Plan and this Agreement, and for no other party.

## ARTICLE I

### RECITALS, PLAN DEFINITIONS, OTHER
### DEFINITIONS, INTERPRETATION, AND CONSTRUCTION

1.1     <u>Recitals</u>.  The Recitals are incorporated into and made terms of this Agreement.

1.2     <u>Definitions</u>.  All capitalized terms used in this Agreement but not defined herein shall have the meanings set forth in the Plan or the Confirmation Order, as applicable, or as

otherwise set forth herein.  For the avoidance of doubt, the "Litigation Trust Assets" shall mean the Litigation Trust Assets (as defined in the Plan) and any and all other property held from time to time by the Litigation Trust under this Agreement and any proceeds thereof and earnings thereon.

1.3    Conflict Among Plan Documents.  In the event of any inconsistency between the Plan, the Confirmation Order, and/or this Agreement, each such document shall have controlling effect in the following rank order:  (i) the Confirmation Order; (ii) the Plan (including, for the avoidance of doubt, the Global Settlement incorporated herein); and (iii) this Agreement; *provided*, *however*, that to the extent that the Plan and the Confirmation Order are silent as to a particular issue, the terms of the relevant provision of this Agreement shall control so long as not otherwise inconsistent with the clear intent of the Plan and/or the Confirmation Order.

## ARTICLE II

## ESTABLISHMENT OF LITIGATION TRUST

2.1    Effectiveness of Agreement; Name of Litigation Trust.  The Freedom HoldCo Debtors, the OpCo Debtors and the Litigation Trustee, pursuant to the Plan and in accordance with the Bankruptcy Code, hereby create the Litigation Trust in furtherance of the compromises and agreements more fully set forth in the Plan.  This Agreement shall become effective on the Effective Date.  The Litigation Trust shall be officially known as the "Franchise Group Litigation Trust."

2.2    Purpose of Litigation Trust.  Further to the establishment and purpose of the Litigation Trust as declared in Recital 8 of this Agreement, the Litigation Trust is established for the primary purpose of collecting, holding, administering, liquidating, and distributing the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries in accordance with the

terms and conditions of this Agreement, Treasury Regulations Section 301.7701-4(d), and the Plan (including, for the avoidance of doubt, the Global Settlement incorporated therein), and with no objective or authority to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust.

      2.3    <u>Transfer of Litigation Trust Assets</u>.

      2.3.1    <u>Conveyance of Litigation Trust Assets</u>.  Pursuant to the Plan, the Freedom HoldCo Debtors and the OpCo Debtors hereby irrevocably grant, release, assign, transfer, convey, and deliver, on behalf of the Litigation Trust Beneficiaries, all of such Debtors' rights, title, and interest in and to the Litigation Trust Assets to the Litigation Trust as of the Effective Date in trust for the benefit of the Litigation Trust Beneficiaries, which shall constitute Litigation Trust Assets for all purposes and shall be administered and applied as specified in this Agreement and the Plan.  Upon the transfer of the Litigation Trust Assets to the Litigation Trust in accordance with the Plan, none of the Debtors or the Reorganized Debtors shall have any further obligations with respect to the distribution or payment of any proceeds of the Litigation Trust Assets to any of the Litigation Trust Beneficiaries, except that the Debtors or the Reorganized Debtors, as applicable, as reasonably requested by the Litigation Trustee, shall, at the Litigation Trust's sole cost and expense, from time to time, (i) execute and deliver or cause to be executed and delivered any such documents (in recordable form where necessary or appropriate) and (ii) take or cause to be taken such further commercially reasonable action, in each case as the Litigation Trustee may reasonably deem necessary or appropriate, to vest in the Litigation Trust or confirm to the Litigation Trustee title to and possession of the Litigation Trust Assets; *provided* that neither the Debtors nor Reorganized Debtors shall be required to incur any

unreimbursed liability for any fees or expenses (including any indemnification obligations) in connection with such actions. The Litigation Trustee shall have no duty to arrange for any of the transfers of any Litigation Trust Assets contemplated under this Agreement or by the Plan or to ensure their compliance with the terms of the Plan and/or the Confirmation Order and shall be conclusively entitled to rely on the legality and validity of such transfers. Under no circumstance shall the Debtors, the Reorganized Debtors, or any other party be required to contribute any additional assets to or for the benefit of the Litigation Trust other than the Litigation Trust Assets, except as otherwise set forth in the Plan.

2.3.2    <u>Title to Litigation Trust Assets</u>.  Pursuant to the Plan, all of the Freedom HoldCo Debtors' and the OpCo Debtors' rights, title, and interest in and to the Litigation Trust Assets, including all such assets held or controlled by third parties (if any), are hereby irrevocably transferred to, and automatically vested in, or deemed to be automatically vested in, the Litigation Trust on the Effective Date and shall comprise assets of the Litigation Trust for all purposes, free and clear of all Liens, Claims, encumbrances, Interests, contractually-imposed restrictions, and other interests, and such transfer is on behalf of the Litigation Trust Beneficiaries to establish the Litigation Trust.  Subject to any applicable consultation rights set forth in this Agreement, the Litigation Trust shall be authorized, among other things, to (i) obtain possession or control of, collect, receive, hold, administer, liquidate, and distribute all of the Litigation Trust Assets, (ii) investigate, pursue, prosecute, compromise, settle, and/or otherwise resolve the Permitted Litigation Claims, and (iii) other than as provided under the Plan, assert and/or exercise any and all rights, including, without limitation, setoff and recoupment, defenses, counterclaims, and cross-claims, whether arising at law or in equity, of the Freedom HoldCo Debtors, the OpCo Debtors, or their respective Estates to any claims, Causes of Action, or

counterclaims that may be asserted by (a) any and all Persons and/or Entities that are or may become defendants, sued, or a party in or the subject of any lawsuit, proceeding, or litigation in connection with the Permitted Litigation Claims or (b) the Holders of Disputed OpCo General Unsecured Claims or Freedom HoldCo General Unsecured Claims. Without limiting the generality of the foregoing, the Litigation Trust shall have the right to (i) invoke section 542 of the Bankruptcy Code to pursue turnover of Litigation Trust Assets and (ii) enforce any of provisions of the Plan and/or Confirmation Order against any Persons or Entities that seek or seeks to interfere with the administration of the Litigation Trust and/or the Litigation Trust Assets. On the Effective Date, the Litigation Trust, acting by and through the Litigation Trustee, shall be substituted for the Freedom HoldCo Debtors and the OpCo Debtors for all purposes with respect to the Litigation Trust Assets and the administration of the Litigation Trust Units. To the extent any Law or regulation prohibits the transfer of ownership of any of the Litigation Trust Assets from the Freedom HoldCo Debtors and/or the OpCo Debtors to the Litigation Trust and such Law is not superseded by the Bankruptcy Code, the Litigation Trust's interest in such Litigation Trust Assets shall be a Lien upon, and security interest in, such Litigation Trust Assets, in trust, nevertheless, for the sole use and purposes set forth in Section 2.2 of this Agreement, and this Agreement shall be deemed a security agreement granting such Lien upon, and interest therein, without need to file any financing statement(s), mortgage(s), or other documentation evincing such Lien and security interest. By executing this Agreement, the Litigation Trustee on behalf of the Litigation Trust hereby accepts all of such property and Liens (if any) as Litigation Trust Assets, to be held in trust for Litigation Trust Beneficiaries, subject to the terms of this Agreement, the Confirmation Order, and the Plan.

2.4    <u>Litigation Trust Funding</u>.  On the Effective Date, the Litigation Trust Escrow Account shall be funded with the Litigation Trust Escrow Amount.  The Litigation Trust Escrow Amount shall be used for the administration of the Litigation Trust, to pay Litigation Trust Expenses, and to pursue the Permitted Litigation Claims.  The Litigation Trust Escrow Amount shall be primarily reserved for Litigation Trust Expenses.

2.5    <u>Capacity of Litigation Trust</u>.  Notwithstanding any state or federal Law to the contrary or anything herein, the Litigation Trust shall itself have the capacity, in its own right and name, to act or refrain from acting, including the capacity to sue and be sued and to enter into contracts.  The Litigation Trust may alone be the named movant, respondent, party plaintiff or defendant, or the like in all adversary proceedings, contested matters, and other state or federal proceedings brought by or against it, and may settle and compromise all such matters in its own name.

2.6    <u>Cooperation</u>.  On or after the Effective Date, at the sole cost and expense of the Litigation Trust, the Reorganized Debtors shall use commercially reasonable efforts to cooperate with the Litigation Trust and the Litigation Trustee and any professionals retained by the Litigation Trust in effecting the transition from the Reorganized Debtors to the Litigation Trust and of the administration of the Litigation Trust Assets; *provided* that the Reorganized Debtors shall not be required to incur any unreimbursed liability for any fees or expenses (including any indemnification obligations) that may result from any such cooperation.  Such cooperation shall include, but not be limited to, from and after the Effective Date, using commercially reasonable efforts to identify and make available (i) any evidence and information the Litigation Trustee reasonably requests in connection with the Litigation Trust's investigation, prosecution, other pursuit, or defense, as applicable, of the Permitted Litigation Claims and objections to Disputed

OpCo General Unsecured Claims and Disputed Freedom HoldCo General Unsecured Claims, to the extent the Reorganized Debtors have such evidence and/or information and such evidence and/or information has not already been provided to the Litigation Trust by the Debtors, (ii) to the extent known by the Reorganized Debtors, the identity and contact information of the former officers, directors, and employees and Professionals of the Debtors who may have knowledge regarding the Permitted Litigation Claims, Disputed OpCo General Unsecured Claims, or Disputed Freedom HoldCo General Unsecured Claims; and (iii) current officers, directors, and employees of the Reorganized Debtors that the Litigation Trustee, in consultation with the Reorganized Debtors, determines may have knowledge regarding the Permitted Litigation Claims, Disputed OpCo General Unsecured Claims, or Disputed Freedom HoldCo General Unsecured Claims, subject to (a) consultation and cooperation between the Reorganized Debtors and the Litigation Trustee regarding the reasonable availability of such individuals and (b) counsel for the Reorganized Debtors and the current officer, director or employee having the right to attend and participate in any meetings, discussions, or communications; *provided* that, the Litigation Trust shall be responsible to pay fifty percent (50%) of the reasonable and documented fees and expenses of counsel to the Reorganized Debtors in connection with the Reorganized Debtors exercising its rights under this section 2.6(b) (which shall, in each case, constitute Litigation Trust Expenses hereunder).

      2.6.1   Prior to the Effective Date, the Debtors shall, at the cost and expense of the Debtors, and on or after the Effective Date, the Reorganized Debtors shall, at the sole cost and expense of the Litigation Trust (which shall, in each case, constitute Litigation Trust Expenses hereunder), use commercially reasonable efforts to preserve (including through device imaging) and provide to the Litigation Trust the following: (a) all documents,[4] communications,[5]

---

[4]   For the avoidance of doubt, for the purposes of this Section 2.6, "documents" shall include any printed, written, typed, recorded, transcribed, taped, photographic, or graphic mater, in draft or final form, including, but not

and other information (or copies thereof) (collectively, "Information") provided to Petrillo Klein + Boxer LLP or Akin Gump Strauss Hauer & Feld LLP in connection with the Freedom HoldCo Independent Investigation and the independent investigations conducted by Petrillo Klein + Boxer LLP, as well as complete and unredacted versions of the reports prepared by the Freedom HoldCo Independent Director and Petrillo Klein + Boxer LLP (which unredacted reports may be provided to the Litigation Trustee and the members of the Litigation Trust Advisory Board on a confidential basis), (b) all Information produced, or that are otherwise ready to be produced, by the Debtors in discovery in the Chapter 11 Cases, and (c) such other Information relating to the Permitted Litigation Claims in the possession, custody and control of the Reorganized Debtors that the Reorganized Debtors and the Litigation Trust may agree upon after conferring in good faith, *provided* that the Reorganized Debtors shall preserve all Information subject to existing

---

typed, recorded, transcribed, taped, photographic, or graphic mater, in draft or final form, including, but not limited to: any letter, correspondence, or Communication of any sort; photograph; sound recording; video recording; note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; telex, telegram, or cable; summary, report or record of telephone conversation, voice mail or voice mail back-up, Bloomberg messages, discussion, interview, meeting, conference, investigation, negotiation, act, or activity; projection, work paper, or draft; computer or computer network output or input, portable storage devices, e-mail, magnetic and/or optical medias, archived or back up data on any of these medias on the cloud or otherwise, and documents that have been deleted but are recoverable from any of these medias; opinion or report of consultant; request, order, invoice, or bill of lading; analysis, diagram, map, index, sketch, drawing, plan, chart, manual, brochure, pamphlet, advertisement, circular, newspaper or magazine clipping, or press release; receipt, journal, ledger, schedule, bill, or voucher; financial statement, statement of account, bank statement, checkbook, stubs, register, canceled check, deposit slip, charge slip, tax return (income or other), requisition, file, study, graph, or tabulation, and any and all other writings and recordings of whatever nature, and any other data compilation from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonable usable form; including, without limitation, all things meeting the definition of "documents" or "electronically stored information" set forth in Rule 34 of the Federal Rules of Civil Procedure, as incorporated by Rules 7034 and 9014 of the Federal Rules of Bankruptcy Procedure, as applicable, or meeting the definition of "writing" or "recording" set forth in Rule 1001 of the Federal Rules of Evidence. Any document with any marks such as initials, comments, or notations of any kind is not deemed to be identical to one without such marks and is a separate document within the meaning of this term.

[5] For the avoidance doubt, for purposes of this Section 2.6, "communications" shall include any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more Persons, by or to whomsoever made, and including without limitation, correspondence, documents, conversations, dialogues, discussions, e-mail, interviews, text messages, consultations, agreements, and other understandings.

litigation holds, which shall remain in effect;~~;~~ *provided further* that, notwithstanding anything to the contrary herein, the Reorganized Debtors shall not be required to (i) incur any liability for any fees or expenses (including any indemnification obligations) that may result from any such preservation or production and any documented costs and expenses incurred by the Reorganized Debtors in connection therewith shall be borne or promptly reimbursed by Litigation Trust (which shall, in each case, constitute Litigation Trust Expenses hereunder), or (ii) take any actions in connection with any of the Reorganized Debtor's cooperation obligations hereunder that the Reorganized Debtors reasonably determine would harm the merits of, create defenses to, or otherwise prejudice the Reorganized Debtors' Retained Causes of Action following good-faith consultation and coordination between the Reorganized Debtors and the Litigation Trustee or subject to any further court order requiring production.[6]

2.6.2    The Reorganized Debtors (or their respective Professionals) shall arrange for the Litigation Trustee to receive (i) an updated Claims Register of OpCo General Unsecured Claims and Freedom HoldCo General Unsecured Claims from the Claims Agent within thirty (30) days after the Effective Date and, if applicable, (ii) a register of Holders of any Prepetition First Lien Loan Claims, any Prepetition Second Lien Loan Claims, and any Prepetition HoldCo Loan Claims.

2.7    <u>Duties of the Debtors and the Reorganized Debtors</u>.    The Debtors and the Reorganized Debtors, as applicable, shall have no responsibility or obligation with respect to the Litigation Trust or Litigation Trust Assets after the Effective Date, other than to comply with Sections 2.3 and 2.6 of this Agreement.    To the extent the Reorganized Debtors are obligated to

---

[6]    Capitalized terms in Section 2.6 not otherwise defined in the Plan or Confirmation Order, as set forth in Section 1.2, shall have the meanings ascribed to them in the Disclosure Statement [Docket No. 151].

take any action pursuant to this Agreement, unless otherwise expressly set forth herein, the Reorganized Debtors shall only be required to use commercially reasonable efforts in taking such action and the Reorganized Debtors shall not be required to take any such action if the Reorganized Debtors reasonably believe that taking such action will materially burden the Reorganized Debtors, their employees, and/or their operations; *provided* that, prior to making such a determination, the Reorganized Debtors shall coordinate and consult with the Litigation Trustee, in good faith, regarding such burden or subject to any further court order requiring production.  For the avoidance of doubt, the Reorganized Debtors shall not be required to incur any liability for any fees or expenses (including any indemnification obligations) that may result from such compliance and any documented costs and expenses incurred by the Reorganized Debtors in connection therewith shall be borne or promptly reimbursed by Litigation Trust (which shall, in each case, constitute Litigation Trust Expenses hereunder).

      2.8    No Retention of Excess Cash.  Notwithstanding anything in this Agreement to the contrary, but subject to any applicable consultation rights set forth in this Agreement, under no circumstances shall the Litigation Trust or the Litigation Trustee retain Cash in excess of a reasonable amount to meet Claims, expenses (including any litigation expenses incurred in connection with prosecuting the Permitted Litigation Claims), and contingent liabilities or to maintain the value of the Litigation Trust Assets during liquidation other than reserves established pursuant to Article III and/or Section 5.1.1 of this Agreement, and shall distribute all amounts not required to be retained for such purposes and not otherwise required to be distributed to the Litigation Trust Beneficiaries as promptly as reasonably practicable in accordance with the Plan and this Agreement.

2.9    <u>Acceptance by Litigation Trustee</u>.  The Litigation Trustee accepts its appointment as Litigation Trustee of the Litigation Trust.

2.10    <u>Appointment of the Litigation Trust Advisory Board</u>.  The members of the Litigation Trust Advisory Board are hereby appointed, effective as of the Effective Date, pursuant to the terms and conditions set forth in Section 4.1 of this Agreement.

2.11    <u>Privileges</u>.

2.11.1 All attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "<u>Privileges</u>") held by any one or more of the applicable Debtors (including any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their respective predecessors) related to the Litigation Trust Assets are hereby transferred and assigned to the Litigation Trust.  The Debtors and/or the Reorganized Debtors shall not withhold any Information required to be provided to the Litigation Trustee under this Agreement on the basis that it is subject to any Privileges.  Information transferred by the Debtors and/or the Reorganized Debtors that is subject to such Privileges (the "<u>Transferred Privileged Information</u>") shall include documents and information of all manners, whether oral, written, or digital, and whether or not previously disclosed or discussed.  For the avoidance of doubt, the Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the Debtors.

2.11.2 The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information in the Litigation Trust, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust Beneficiaries.  The Litigation Trust shall have the authority and

16

discretion to maintain the Privileges and keep the Transferred Privileged Information confidential or waive any Privileges and/or disclose and/or use in litigation or any proceeding any or all of the Transferred Privileged Information; *provided, however,* that the Litigation Trust may not, without good-faith consultation and coordination between the Litigation Trustee and the Reorganized Debtors, (i) waive any Privileges in respect of Transferred Privileged Information, or (ii) use or disclose any Transferred Privileged Information.  The Reorganized Debtors may not make disclosure in a manner that could effectuate a waiver of any Privileges in respect of Transferred Privileged Information without good-faith consultation and coordination between the Litigation Trustee and the Reorganized Debtors.  If the Litigation Trustee or the Reorganized Debtors object to an action proposed to be taken by the other with regard to records, documents, or information related to the Litigation Trust Assets that are covered by the Privileges (or a disclosure that would result in a waiver), the parties shall be permitted to raise the issue with the Bankruptcy Court.  The objecting party shall bear the burden of proof.  Each of the parties shall bear its own costs and expenses, including attorneys' fees, incurred in connection with such dispute.  Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall operate as a waiver of any privileges held and retained by the Reorganized Debtors, including, but not limited to, the Privileges that are transferred to the Litigation Trust hereunder.

## ARTICLE III

### ADMINISTRATION OF LITIGATION TRUST

3.1 <u>Rights, Powers, and Privileges of Litigation Trustee Generally</u>.  Except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, as of the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, may, subject to the oversight of the

Litigation Trust Advisory Board, control and exercise authority and dominion over the Litigation Trust Assets, over the acquisition, management, and disposition thereof, and over the management and conduct of the affairs of the Litigation Trust in accordance with the Plan and this Agreement.  Subject to the oversight of the Litigation Trust Advisory Board set forth herein, in administering the Litigation Trust Assets, the Litigation Trustee shall, among other things, in an expeditious but commercially reasonable manner, (i) liquidate and convert to Cash the Litigation Trust Assets, (ii) make timely distributions in accordance with this Agreement and the Plan, and (iii) exercise reasonable business judgment and not unduly prolong the Litigation Trust's duration.  Notwithstanding anything in the Plan or this Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in this Agreement and the Plan.

3.2    Power to Contract.  In consultation with the Litigation Trust Advisory Board, in furtherance of the purpose of the Litigation Trust, and except as otherwise specifically restricted in the Plan, the Confirmation Order, or this Agreement, the Litigation Trustee shall have the right and power on behalf of the Litigation Trust and also may cause the Litigation Trust to enter into any covenants or agreements binding the Litigation Trust, and to execute, acknowledge, and deliver any and all instruments that are necessary or deemed by the Litigation Trustee to be consistent with, and advisable in, furthering the purpose of the Litigation Trust, including, without limitation, with respect to the Permitted Litigation Claims.

3.3    Ultimate Right to Act Based on Advice of Counsel or Other Professionals.  In consultation with the Litigation Trust Advisory Board, nothing in this Agreement shall be deemed to prevent the Litigation Trustee from taking or refraining to take any action on behalf of the Litigation Trust that, based upon the advice of counsel or other professionals, the Litigation

Trustee determines it is obligated to take or to refrain from taking in the performance of any duty that the Litigation Trustee may owe the Litigation Trust Beneficiaries or any other Person under the Plan, the Confirmation Order, or this Agreement.

3.4    Powers of Litigation Trustee.    Without limiting the generality of the above Section 3.1, in furtherance of, consistent with, and unless otherwise specifically limited or restricted by the purpose, terms, and conditions of the Plan, the Confirmation Order, or this Agreement, the Litigation Trustee shall, in consultation with the Litigation Trust Advisory Board, in addition to the powers granted in the Plan and the Confirmation Order, and those powers set forth herein, at the sole cost and expense of the Litigation Trust, have the power to take the following actions on behalf of the Litigation Trust and any powers reasonably incidental thereto that the Litigation Trustee, in its reasonable discretion, deems necessary or appropriate to fulfill the purpose of the Litigation Trust:

3.4.1    hold legal title to the Litigation Trust Assets and to any and all rights of the Freedom HoldCo Debtors and the OpCo Debtors (including as Reorganized Debtors, as applicable) and the Litigation Trust Beneficiaries in or arising from the Litigation Trust Assets;

3.4.2    receive, maintain, conserve, supervise, prosecute, collect, settle, manage, adjust, invest, protect, enforce, and, where appropriate, cause the Litigation Trust to abandon the Litigation Trust Assets, including causing the Litigation Trust to invest any monies held as Litigation Trust Assets in accordance with the terms of Section 3.9 hereof;

3.4.3    cause the Litigation Trust to investigate, pursue, litigate, and/or settle the Permitted Litigation Claims;

3.4.4    open and maintain bank accounts or any other accounts on behalf of, or in the name of, the Litigation Trust;

3.4.5    cause the Litigation Trust to enter into any agreement or execute any document or instrument required by or consistent with the Plan, the Confirmation Order, or this Agreement, and to perform all obligations thereunder;

3.4.6    receive, collect, hold, administer, and liquidate any and all of the Litigation Trust Assets, including, without limitation, the sale of any Litigation Trust Assets;

3.4.7    protect and enforce the rights to the Litigation Trust Assets (including, without limitation, the Permitted Litigation Claims) vested in the Litigation Trust and the Litigation Trustee by this Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

3.4.8    investigate any potential Permitted Litigation Claims and cause the Litigation Trust to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004 in relation to the Permitted Litigation Claims;

3.4.9    investigate any Permitted Litigation Claims and review, reconcile, compromise, settle or object to OpCo General Unsecured Claims and Freedom HoldCo General Unsecured Claims as set forth in the Plan, and cause the Litigation Trust to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004 in relation to the Permitted Litigation Claims; *provided*, *however*, that the Litigation Trust shall not be permitted to seek relief under Bankruptcy Rule 2004 as against (i) any current employees, officers, or directors of the Reorganized Debtors, (ii) the DIP Agent and the DIP Lenders, (iii) the Freedom Lender Group, and (iv) the Ad Hoc Group;

3.4.10  cause the Litigation Trust to employ or retain professionals, including without limitation, a distribution agent, and other agents, attorneys, financial advisors, independent contractors, and third parties pursuant to this Agreement and pay the reasonable

compensation thereof as Litigation Trust Expenses; *provided, however*, that none of Paul Hastings LLP, White & Case LLP or Pachulski Stang Ziehl & Jones LLP shall serve as counsel to the Litigation Trust, the Litigation Trustee, or the Litigation Trust Advisory Board;

3.4.11  cause the Litigation Trust to pay all of its lawful expenses, debts, charges, taxes, and other liabilities, and make all other payments relating to the Litigation Trust Assets as Litigation Trust Expenses, solely out of the Litigation Trust Assets;

3.4.12  cause the Litigation Trust to review, reconcile, investigate, pursue, prosecute, enforce, collect, compromise, settle, abandon, or elect not to pursue all Disputed OpCo General Unsecured Claims, Disputed Freedom HoldCo General Unsecured Claims and the Permitted Litigation Claims;

3.4.13  calculate, authorize, and make all distributions to holders of Litigation Trust Units as provided for in, or contemplated by, the Plan and this Agreement;

3.4.14  establish, adjust, and maintain a Litigation Trust Disputed Claims Reserve;

3.4.15  cause the Litigation Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Litigation Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such distribution under the income tax or other Laws of the United States or of any state or political subdivision thereof;

3.4.16  in reliance upon the Debtors' Schedules and the official Claims Register maintained in the Chapter 11 Cases, review, and, where appropriate, cause the Litigation Trust to Allow or object to OpCo General Unsecured Claims or Freedom HoldCo General Unsecured Claims, and supervise and administer the Litigation Trust's commencement, prosecution,

settlement, compromise, withdrawal, or resolution of all objections to the Disputed OpCo General Unsecured Claims and Disputed Freedom HoldCo General Unsecured Claims permitted to be administered by the Litigation Trust in accordance with the Plan; *provided, however,* that the Litigation Trustee shall not be permitted to object to any Prepetition First Lien Loan Claims, Prepetition Second Lien Loan Claims, or Prepetition HoldCo Loan Claims;

3.4.17 in reliance upon the Debtors' Schedules and the Claims Register maintained in the Chapter 11 Cases, maintain a register evidencing the Litigation Trust Units held by each Litigation Trust Beneficiary and, in accordance with Section 3.10 of this Agreement, such register may be the official Claims Register maintained in the Chapter 11 Cases;

3.4.18 without limitation of, and as set forth in Section 3.4.15 of this Agreement, cause the Litigation Trust to make all tax withholdings, file tax information returns, file and prosecute tax refund claims, make tax elections by and on behalf of the Litigation Trust, and file tax returns for the Litigation Trust as a grantor trust under Internal Revenue Code section 671 and Treasury Regulation section 1.671-4 pursuant to and in accordance with the Plan and Article VIII hereof (subject to the treatment of any portion of the Litigation Trust as a DOF or other separate Entity), and pay taxes, if any, payable for and on behalf of the Litigation Trust; *provided*, *however*, neither the Litigation Trust nor the Litigation Trustee shall have any responsibility or liability in any capacity whatsoever for the filing of Debtors' income tax returns for any period either prior to or after the Effective Date;

3.4.19 cause the Litigation Trust to abandon or donate to a charitable organization that qualifies for non-profit status under Internal Revenue Code section 501(c)(3) any Litigation Trust Assets that the Litigation Trustee, in consultation with the Litigation Trust

Advisory Board, determines to be too impractical to distribute to the Litigation Trust Beneficiaries or of inconsequential value to the Litigation Trust and the Litigation Trust Beneficiaries;

3.4.20  cause the Litigation Trust to send annually to Litigation Trust Beneficiaries, in accordance with the applicable tax Laws, a separate statement stating a Litigation Trust Beneficiary's interest in the Litigation Trust and its share of the Litigation Trust's income, gain, loss, deduction, or credit, and to instruct all such Litigation Trust Beneficiaries to report such items on their United States federal tax returns, as applicable;

3.4.21  cause the Litigation Trust to seek a determination of tax liability or refund of the Litigation Trust (including any Litigation Trust Disputed Claims Reserve treated as a DOF (if elected) or other separate Entity) under section 505 of the Bankruptcy Code;

3.4.22  cause the Litigation Trust to establish such reserves for taxes, assessments and other Litigation Trust Expenses as may be necessary and appropriate for the proper operation of matters incident to the Litigation Trust;

3.4.23  cause the Litigation Trust to purchase and carry all insurance policies that the Litigation Trustee deems reasonably necessary or advisable and to pay all associated insurance premiums and costs;

3.4.24   undertake all administrative functions of the Litigation Trust, including overseeing the winding down and termination of the Litigation Trust;

3.4.25  exercise, implement, enforce, and discharge all of the applicable and relevant terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement; and

3.4.26 take all other actions consistent with this Agreement, the Plan, and the Confirmation Order, that the Litigation Trustee deems reasonably necessary or desirable to administer the Litigation Trust.

3.4.27 Notwithstanding anything to the contrary herein, the Litigation Trustee shall not invest any Litigation Trust Assets, proceeds thereof, or any income earned by the Litigation Trust unless such investment is permitted to be made by a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities, including Revenue Procedure 94-45, 1994-2 C.B. 684.  The Litigation Trustee shall not be liable for interest or obligated to produce income on any moneys received by the Litigation Trust hereunder and held for distribution or payment, except as such interest or other income shall actually be received by the Litigation Trustee.

3.5     Limitations on Power and Authority of Litigation Trustee.  Notwithstanding anything to the contrary contained herein, the Litigation Trustee shall not have the authority to (i) take any action in contravention of the Plan, the Confirmation Order, or this Agreement; (ii) take any action that would make it impossible to carry on the activities of the Litigation Trust; (iii) possess property of the Litigation Trust or assign the Litigation Trust's rights in specific property for any purpose other than as provided herein; (iv) raise any financing, including any litigation financing, unless such financing is on market terms, and an equal opportunity to participate in such financing is offered on the same terms and on a *pro rata* basis to all Litigation Trust Beneficiaries; or (v) make any distribution to Litigation Trust Beneficiaries, unless such distributions are made on *pro rata* basis subject to the Litigation Trust Units Allocations.

3.6    <u>Authority to Pursue the Permitted Litigation Claims</u>.  In consultation with the Litigation Trust Advisory Board, the Litigation Trust shall have sole and absolute discretion with respect to the right, power, and interest to investigate, review, pursue, reconcile, prosecute, enforce, collect, compromise, settle, or elect not to pursue the Permitted Litigation Claims. Except as otherwise provided in the Plan or the Confirmation Order, the Litigation Trust shall be vested with, and shall be entitled to assert all setoffs, cross-claims, defenses, and Causes of Action, whether arising at law or in equity, of the Freedom HoldCo Debtors, the OpCo Debtors or the Litigation Trust to any counterclaims that may be asserted by any defendant with respect to the Permitted Litigation Claims.  The Litigation Trust, acting by and through the Litigation Trustee, shall be the sole representative of the Freedom HoldCo Debtors' and OpCo Debtors' Estates under section 1123(b)(3) of the Bankruptcy Code with respect to the Permitted Litigation Claims.

3.6.1    Notwithstanding the Debtors or Reorganized Debtors providing any privileged information to the Litigation Trust or the Litigation Trustee, such privileged information shall be without waiver in recognition of the joint and/or successor interest in investigating and prosecuting the Permitted Litigation Claims and shall remain privileged.

3.6.2    The Litigation Trustee will exercise its reasonable business judgment in prosecuting the causes of action held by the Litigation Trust.  Except as otherwise expressly set forth in this Agreement, the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, shall have sole discretion with respect to the prosecution, settlement, or other resolution of Permitted Litigation Claims as it determines are in the best interests of the holders of the Litigation Trust Units and consistent with its fiduciary duties and the purposes of the Litigation Trust, and shall have no liability for the outcome of its decision.

3.7     <u>Responsibility for Administration of Claims</u>.  From and after the Effective Date, the Litigation Trust shall, subject to any applicable consultation rights set forth in this Agreement, become responsible for administering and paying distributions to Holders of Litigation Trust Units *on a pro rata* basis, subject to the Litigation Trust Units Allocation.  The Litigation Trust, acting by and through the Litigation Trustee, shall have the right after the Effective Date to object to the allowance of any OpCo General Unsecured Claim or Freedom HoldCo General Unsecured Claim on any ground, to file, withdraw, or litigate to judgment objections to such Claims, to settle or compromise any Disputed OpCo General Unsecured Claims or Freedom HoldCo General Unsecured Claims without any further notice to or action, order or approval by the Bankruptcy Court, and to assert all defenses of the Freedom HoldCo Debtors, the OpCo Debtors, and their respective Estates; *provided* that the Litigation Trust shall consult with the Reorganized Debtors prior to taking such action to the extent such action may have an adverse impact on the Reorganized Debtors' Retained Causes of Action.  Except as set forth herein or in the Plan, the Litigation Trust, acting by and through the Litigation Trustee, shall also be entitled to assert all of the Freedom HoldCo Debtors', the OpCo Debtors', and their respective Estates' rights under, without limitation, section 558 of the Bankruptcy Code, and may seek estimation of any OpCo General Unsecured Claims or Freedom HoldCo General Unsecured Claims under and subject to section 502(c) of the Bankruptcy Code.

3.8     <u>Agents and Professionals</u>.  Subject to Section 3.5.3 and this Section 3.8, the Litigation Trustee may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants, appraisers, and other professionals the Litigation Trustee believes have qualifications necessary to assist in the administration of the Litigation Trust.  For the avoidance of doubt, and without limitation of applicable Law, nothing in this Agreement (other than

Section 3.5.3 and this Section 3.8) shall limit the Litigation Trustee from engaging counsel or other professionals, including the Litigation Trustee itself or the Litigation Trustee's firm or their affiliates, to do work for the Litigation Trust; *provided* that, none of Paul Hastings LLP, White & Case LLP or Pachulski Stang Ziehl & Jones LLP shall serve as counsel to the Litigation Trust, the Litigation Trustee, or the Litigation Trust Advisory Board. The Litigation Trustee shall pay the reasonable salaries, fees, and/or expenses of such Persons out of the Litigation Trust Assets in the ordinary course of business as Litigation Trust Expenses without the need for Bankruptcy Court approval.

3.9     <u>Safekeeping and Investment of the Litigation Trust Assets</u>. All monies and other assets received by the Litigation Trustee shall, until distributed or paid over as provided herein and in the Plan, be held in trust for the benefit of the Litigation Trust Beneficiaries, but need not be segregated in separate accounts from other Litigation Trust Assets, unless and to the extent required by Law or the Plan. Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, neither the Litigation Trust nor the Litigation Trustee shall have any liability for interest or producing income on any monies received by them and held for distribution on account of the Litigation Trust Beneficiaries except as such interest shall actually be received by the Litigation Trust or the Litigation Trustee, which shall be distributed as provided herein and in the Plan. Except as otherwise provided by the Plan, the powers of the Litigation Trustee to invest any monies held by the Litigation Trust, other than those powers reasonably necessary to maintain the value of the assets and to further the Litigation Trust's liquidating purpose, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as treasury bills or money market funds that invest

exclusively in United States Treasury bills and United States Treasury notes; *provided*, *however*, that the scope of permissible investments shall be limited to include only those investments that a "liquidating trust," within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold pursuant to the Treasury Regulations, or any Internal Revenue Service guidelines, whether set forth in Internal Revenue Service rulings, Internal Revenue Service pronouncements, or otherwise.  For the avoidance of doubt, the provisions of section 11-2.3 of the Estates, Powers, and Trusts Law of New York shall not apply to this Agreement. Notwithstanding the foregoing, the Litigation Trustee shall not be prohibited from engaging in any trade or business on its own account, *provided that* such activity does not interfere or conflict with the Litigation Trustee's administration of the Litigation Trust (including the Litigation Trust's status as a "liquidating trust" for tax purposes).

3.10    <u>Maintenance and Disposition of Litigation Trust and Debtor Records</u>.  The Litigation Trustee shall maintain accurate records of the administration of the Litigation Trust Assets, including receipts and disbursements and other activity of the Litigation Trust.  The Litigation Trust may (at its sole cost and expense), but has no obligation to, engage a claims agent (including, but not limited to, the Debtors' Claims Agent) to continue to maintain and update the Claims Register maintained in the Chapter 11 Cases throughout the administration of the Litigation Trust.  To the extent of any General Unsecured Claims reflected thereon, the Claims Register may serve as the Litigation Trustee's register of Litigation Trust Units held by Litigation Trust Beneficiaries.  The books and records maintained by the Litigation Trustee and any records of the Debtors transferred to the Litigation Trust may be disposed of by the Litigation Trustee at the later of (i) such time as the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, determines that the continued possession or maintenance of

such books and records is no longer necessary for the benefit of the Litigation Trust or the Litigation Trust Beneficiaries and (ii) upon the termination and completion of the winding down or dissolution of the Litigation Trust.

3.11    Reporting Requirements.  The Litigation Trustee shall provide the Reorganized Debtors, U.S. Trustee, the Litigation Trust Advisory Board, and the Bankruptcy Court the information and reports they may reasonably request concerning the administration of the Litigation Trust.

3.12    No Bond Required; Procurement of Insurance.  Notwithstanding any state or other applicable Law to the contrary, the Litigation Trustee (including any successor Litigation Trustee) shall be exempt from giving any bond or other security in any jurisdiction and shall serve hereunder without bond.  The Litigation Trustee is hereby authorized, but not required, to obtain all reasonable insurance coverage for itself, the Litigation Trust Advisory Board, or their respective agents, representatives, employees, or independent contractors, including, without limitation, coverage with respect to the liabilities, duties, and obligations of the Litigation Trustee and its agents, representatives, employees, or independent contractors under this Agreement.  The cost of any such insurance coverage shall be an expense of the Litigation Trust, constitute Litigation Trust Expenses, and be paid out of the Litigation Trust Assets.

3.13    Fiduciary and Other Duties.  The Litigation Trustee shall have fiduciary duties (including the duties of care and loyalty) to the Litigation Trust Beneficiaries (which shall not include, for the avoidance of doubt, the Debtors or the Reorganized Debtors); *provided*, *however*, that the Litigation Trustee shall not owe fiduciary obligations to the Debtors, the Reorganized Debtors, or any defendants of Permitted Litigation Claims in their capacities as such, it being the intent of such fiduciary duties to ensure that the Litigation Trustee's obligations are to maximize

the value of the Litigation Trust Assets, including the Permitted Litigation Claims (consistent with their duties of care and loyalty).  In all circumstances, notwithstanding anything in the Plan or this Agreement to the contrary, the Litigation Trustee shall always act in the best interests of the Litigation Trust Beneficiaries and in furtherance of the purpose of the Litigation Trust.  This Agreement does not eliminate the implied contractual covenant of good faith and fair dealing.

## ARTICLE IV

## THE LITIGATION TRUST ADVISORY BOARD

4.1    Appointment of the Litigation Trust Advisory Board.  On or prior to the Effective Date, a three-person Litigation Trust Advisory Board shall be appointed and include: (i) two designees of the Freedom HoldCo Debtors (which designees shall be selected by the Freedom Lender Group) and (ii) one designee of the OpCo Debtors (which designee shall be selected by the Creditors' Committee with the consent of the Required Consenting First Lien Lenders) (each designee, a "Member").  The initial Members of the Litigation Trust Advisory Board are Parties to this Agreement.  No Member of the Litigation Trust Advisory Board shall be the Litigation Trustee.

4.2    Authority and Responsibilities.

4.2.1    The Litigation Trust Advisory Board shall have the authority and responsibility to (i) monitor and oversee the administration of the Litigation Trust, (ii) monitor and oversee the activities and performance of the Litigation Trustee, (iii) designate another Person to become the Litigation Trustee in the event of the resignation or removal for Cause (as defined in Section 9.3 herein), liquidation, dissolution, death, or incapacity of the Litigation Trustee in accordance with Section 9.5 hereof, and (iv) perform such other tasks as expressly set forth in the Plan, the Confirmation Order, and this Agreement.

4.2.2    The Litigation Trust Advisory Board shall, as and when requested by the Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or this Agreement, consult with and advise the Litigation Trustee as to the administration and management of the Litigation Trust in accordance with the Plan, the Confirmation Order, and this Agreement.

4.3    <u>Regular Meetings of the Litigation Trust Advisory Board</u>.  The first meeting of the Litigation Trust Advisory Board shall occur no later than thirty (30) calendar days after the Effective Date.  Meetings of the Litigation Trust Advisory Board are to be held at least quarterly.

4.4    <u>Special Meetings of the Litigation Trust Advisory Board</u>.  Special meetings of the Litigation Trust Advisory Board may be held whenever and wherever called for by any Member; *provided* that notice of any such special meeting shall be duly given in writing no less than 48 hours prior to such special meeting (such notice being subject to waiver by the Members).

4.5    <u>Litigation Trust Advisory Board's Action Without a Meeting</u>.  Any action required or permitted to be taken by the Litigation Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Litigation Trust Advisory Board as evidenced by a written consent describing the action taken, signed by all Members.

4.6    <u>Regular Meetings of the Litigation Trustee and the Litigation Trust Advisory Board</u>.  Meetings of the Litigation Trustee and the Litigation Trust Advisory Board are to be held with such frequency and at such place as the Litigation Trustee and the Litigation Trust Advisory Board may determine in their sole discretion, but in no event shall such meetings be held less frequently than quarterly.

4.7    Special Meetings of the Litigation Trustee and the Litigation Trust Advisory Board.  Special meetings of the Litigation Trustee and the Litigation Trust Advisory Board may be held whenever and wherever called for by the Litigation Trustee or any Member; *provided* that notice of any such special meeting shall be duly given in writing no less than 48 hours prior to such special meeting (such notice being subject to waiver by the Litigation Trustee and the Members).

4.8    Manner of Acting.

4.8.1    A majority of the total number of Members of the Litigation Trust Advisory Board then in office shall constitute a quorum for the transaction of business at any meeting of the Litigation Trust Advisory Board; *provided, however,* that a quorum any meeting of the Litigation Trust Advisory Board will require the attendance of the Member designated by the OpCo Debtors pursuant to their designation right (subject to the applicable consent rights). The affirmative vote of a majority of the votes of all Members present and entitled to vote at a meeting of the Litigation Trust Advisory Board at which a quorum is present shall be the act of the Litigation Trust Advisory Board, except as otherwise required by Law or as provided in this Agreement.  In the absence of a quorum at any meeting of the Litigation Trust Advisory Board, a majority of the votes of the Members present and entitled to vote may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present.  Each Member shall have one (1) vote on all matters submitted to the Litigation Trust Advisory Board for the vote, consent or approval of the Litigation Trust Advisory Board (other than matters for which such Member is not entitled to vote, as expressly set forth in this Agreement).

4.8.2    Any or all of the Members may participate in a regular or special meeting

32

by, or conduct the meeting through the use of, conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting may hear each other.  Any Member participating in a meeting by this means is deemed to be present in person at the meeting.  Voting (including on negative notice) may be conducted by e-mail or individual communications by the Litigation Trustee and each Member.

4.8.3    Any Member who is present and entitled to vote at a meeting of the Litigation Trust Advisory Board (including any meeting of the Litigation Trustee and the Litigation Trust Advisory Board) when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Litigation Trust Advisory Board, unless: (i) such Member of the Litigation Trust Advisory Board objects at the beginning of the meeting (or promptly upon his/her arrival) to holding or transacting business at the meeting; (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Litigation Trust Advisory Board before its adjournment.  The right of dissent or abstention is not available to any Member of the Litigation Trust Advisory Board who votes in favor of the action taken.

4.8.4    Prior to the taking of a vote on any matter or issue or the taking of any action with respect to any matter or issue, each Member of the Litigation Trust Advisory Board shall report to the Litigation Trust Advisory Board any conflict of interest such Member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such Member may have with respect to or in connection with such matter or issue, other than solely as a holder of Litigation Trust Units).  A Member who, with respect to

33

a matter or issue, has or who may have a conflict of interest whereby such Member's interests are adverse to the interests of the Litigation Trust (i) shall be deemed to be a "Conflicted Member" who shall not be entitled to vote or take part in any action with respect to such matter or issue, (ii) the vote or action with respect to such matter or issue shall be undertaken only by Members of the Litigation Trust Advisory Board who are not Conflicted Members; and (iii) notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the Members of the Litigation Trust Advisory Board who are not Conflicted Members shall be required to approve of such matter or issue and the same shall be the act of the Litigation Trust Advisory Board; *provided* that a Member shall not be deemed to be a Conflicted Member with respect to a particular matter or issue if such Member merely has an economic interest in the outcome of such matter or issue solely as a holder of Litigation Trust Units.

4.8.5    The Members of the Litigation Trust Advisory Board shall have the authority to designate any Person to act on their behalf, including, without limitation, to attend, participate in and vote at meetings of the Litigation Trust Advisory Board.

4.8.6    Compensation.    Unless determined by the Litigation Trust Advisory Board, no Member shall be entitled to compensation in connection with his/her service to the Litigation Trust Advisory Board.

4.9     <u>Reimbursement of Expenses</u>.  The Litigation Trust shall reimburse all reasonable and documented out-of-pocket expenses incurred by the Members of the Litigation Trust Advisory Board in connection with the performance of each of their duties hereunder and shall reimburse all such Members for any and all losses, liabilities, expenses, or damages that such Members may, in good faith and without willful misconduct, gross negligence, or fraud, sustain in the exercise and performance of any of the powers and duties of the Litigation Trust Advisory Board under this Agreement.

4.9.1     The Litigation Trust Advisory Board shall have no obligation or responsibility to retain, engage or consult any attorneys, professionals or other advisors, and in the event the Litigation Trust Advisory Board elects to retain, engage or consult any such persons, the Litigation Trust shall have no obligation to pay any of the fees, costs or expenses of such persons, except that the Litigation Trust shall pay an amount jointly agreed by the Litigation Trustee and the unanimous vote of the Litigation Trust Advisory Board for the fees, costs or expenses of any attorneys engaged by unanimous vote of the Litigation Trust Advisory Board at reasonable rates to advise the Litigation Trust Advisory Board on its rights and responsibilities under this Agreement; *provided, however*, that none of Paul Hastings LLP, White & Case LLP or Pachulski Stang Ziehl & Jones LLP shall serve as counsel to the Litigation Trust Advisory Board.

4.9.2     The Litigation Trust Advisory Board shall have the right to cause the Litigation Trust to purchase insurance coverage with respect to the liabilities and obligations of its Members under this Agreement, except to the extent that such liabilities and obligations are covered by other insurance applicable to the service of such Members of the Litigation Trust Advisory Board.

4.10    <u>Tenure of the Members of the Litigation Trust Advisory Board</u>.  The authority of the Members of the Litigation Trust Advisory Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation Trust is terminated in accordance with Section 10.3.  The Members will serve until such Member's successor is duly appointed or until such Member's earlier resignation, removal, death (in the case of a Member that is a natural Person), or dissolution (in the case of a Member that is not a natural Person).

4.11    <u>Resignation of the Members of the Litigation Trust Advisory Board</u>.  A Member may resign by giving not less than thirty (30) days' prior written notice of resignation to the Litigation Trustee and the other Members.  Such resignation shall become effective on the later to occur of: (i) the day specified in such notice and (ii) the appointment of a successor.

4.12    <u>Removal of the Members of the Litigation Trust Advisory Board</u>.  A Member may be removed from the Litigation Trust Advisory Board for Cause by motion in the Bankruptcy Court made either by (a) the Litigation Trustee;(b) any Litigation Trust Beneficiary, or (c) *sua sponte* by the Bankruptcy Court.

4.13    <u>Appointment of a Successor Member of the Litigation Trust Advisory Board</u>.

4.13.1  In the event of a vacancy on the Litigation Trust Advisory Board (whether by resignation, removal, death or dissolution), the Litigation Trust Beneficiary that originally appointed the vacating Member shall be entitled to appoint a Person or Entity as a successor to the vacating Member; *provided*, that the Ad Hoc Group will be substituted for the Creditors' Committee for this purpose after the Creditors' Committee is disbanded pursuant to the Plan.

4.13.2  Immediately upon the appointment of any successor Member, all rights, powers, duties, authority and privileges of the predecessor Member hereunder will be vested in and undertaken by the successor Member without any further act, and such successor Member

will not be liable personally for any act or omission of the predecessor Member.

4.13.3 Every successor Member appointed hereunder shall execute, acknowledge, and deliver to the Litigation Trustee and other Members an instrument accepting the appointment under this Agreement and agreeing to be bound hereto, and thereupon the successor Member without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Member.

4.14    <u>Confidentiality</u>.  Each Member shall, during the period that such Member serves as a Member under this Agreement and following the termination of this Agreement or following such Member's removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person or Entity to which any of the Litigation Trust Assets relates or of which such Member has become aware in their capacity as Member of the Litigation Trust Advisory Board, until (i) such information is made public other than by disclosure by such Member in violation of this Agreement; (ii) the Litigation Trust is required by Law to disclose such information (in which case the Litigation Trust shall provide the relevant Person or Entity reasonable advance notice and an opportunity to protect his, her, or its rights); or (iii) the Litigation Trust obtains a waiver of such confidentiality from the applicable Person or Entity; *provided, however,* notwithstanding the foregoing, upon reasonable request, the Ad Hoc Group (and it counsel) and the Freedom Lender Group (and its counsel) shall be entitled to receive any reasonable information that it may request relating to the Litigation Trust and the Litigation Trust Assets, and the Member designated by the OpCo Debtors and the Members designated by the Freedom HoldCo Debtors, respectively, may disclose any information relating to the Litigation Trust and the Litigation Trust Assets on a confidential basis to the Ad Hoc Group (and/or its counsel) and the Freedom Lender Group

(and/or its counsel), respectively, and shall have the right to confer on a confidential basis with the Ad Hoc Group (and/or its counsel) and the Freedom Lender Group (and/or its counsel), respectively, regarding the same.

<div align="center">

**ARTICLE V**

**DISTRIBUTIONS**

</div>

5.1    <u>Distribution and Reserve of Litigation Trust Assets</u>.  Following the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall, in consultation with the Litigation Trust Advisory Board, make continuing efforts on behalf of the Litigation Trust to collect, liquidate, and distribute all Litigation Trust Assets, subject to the reserves deemed necessary by the Litigation Trustee pursuant to this Agreement, in accordance with the Plan.

5.1.1    <u>Distributions</u>.  The Litigation Trustee shall make distributions to the extent of the Litigation Trust Net Assets, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, to Holders of Allowed Prepetition First Lien Loan Claims, Allowed Prepetition Second Lien Loan Claims, Allowed Prepetition HoldCo Loan Claims, Allowed OpCo General Unsecured Claims, and Allowed Freedom HoldCo General Unsecured Claims, on a *pro rata* basis and subject to the Litigation Trust Units Allocations.  The Litigation Trustee, in consultation with the Litigation Trust Advisory Board, shall cause the Litigation Trust to make distributions to Litigation Trust Beneficiaries at least annually but as often as reasonably possible, so long as the Litigation Trustee determines, in good faith, that the retention of certain of the Litigation Trust Assets, including the Litigation Trust Escrow Amount, is no longer necessary to (i) meet contingent liabilities, (ii) maintain the Litigation Trust Disputed Claims Reserve, (iii) maintain the value of the Litigation Trust Assets pending their liquidation during the term of the Litigation Trust, or (iv) pay or be reserved for reasonably

incurred or anticipated expenses or claims of the Litigation Trust and the Litigation Trustee, including, but not limited to, the Litigation Trust Expenses.  The retention of such amount may preclude distributions to Litigation Trust Beneficiaries in accordance with the terms of the Plan and this Agreement.  The Litigation Trust may engage disbursing agents and other Persons as reasonably necessary to assist in making such distributions.

       5.1.2   No Payment Over the Full Amount.  In no event shall the Holder of an Allowed Claim receive distributions on account of its Allowed Claim for more than the full payment on account of such Claim.

       5.1.3   Reserves; Pooling of Reserved Funds.  Before any distribution can be made, the Litigation Trustee shall, in its reasonable discretion, but subject to any applicable consultation and/or consent rights expressly set forth in this Agreement, establish, supplement, and maintain a reserve in an amount sufficient to meet any and all liabilities and Litigation Trust Expenses, including attorneys' fees and expenses and the fees and expenses of other professionals.  In accordance with the Plan and Section 3.4.14 of this Agreement, the Litigation Trust may also maintain as necessary one or more reserves (including the Litigation Trust Disputed Claims Reserve) with respect to the OpCo General Unsecured Claims and Freedom HoldCo General Unsecured claims required to be administered by the Litigation Trust.  For the avoidance of doubt, subject to the Plan and Confirmation Order, the Litigation Trustee may withhold any distribution pending the Litigation Trust's determination of whether to object to any OpCo General Unsecured Claim or Freedom HoldCo General Unsecured Claim.  Any such withheld distribution shall become part of a reserve (the "Litigation Trust Disputed Claims Reserve") and shall be distributed to the appropriate Litigation Trust Beneficiary no later than the first Distribution Record Date after a decision is made not to object to the pertinent General

Unsecured Claim or such General Unsecured Claim becomes Allowed. The Litigation Trustee need not maintain any of the Litigation Trust's reserves in segregated bank accounts and may pool funds in the reserves with each other and other funds of the Litigation Trust; *provided*, *however*, that the Litigation Trust shall treat all such reserved funds as being held in a segregated manner in its books and records.

5.1.4    <u>Distributions Net of Reserves and Costs</u>. Distributions shall be made net of reserves in accordance with the Plan and this Agreement, and also net of the actual and reasonable costs of making the distributions. The Litigation Trustee may, subject to any applicable consultation and/or approval rights expressly set forth in this Agreement, sell or otherwise dispose of Litigation Trust Assets in order to pay such costs. The Litigation Trust Escrow Amount shall be primarily reserved for the costs and expenses (including, any advisor fees and expenses) of the Litigation Trust; *provided,* that, if the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, determines in good faith that the Litigation Trust Escrow Amount is no longer necessary to cover such costs and expenses (including, any advisor fees and expenses) of the Litigation Trust, then the Litigation Trustee shall be entitled to distribute the Cash to Litigation Trust Beneficiaries in accordance with the terms of this Agreement and consistent with its fiduciary duties.

5.1.5    <u>Right to Rely on Professionals</u>. Without limitation of the generality of Section 7.6 of this Agreement, in determining the amount of any distribution or reserves, the Litigation Trustee may rely on, and shall be fully protected in relying on the advice and opinion of, the Litigation Trust's attorneys, financial advisors, accountants, or other professionals.

5.2    <u>Withholding from Distributions</u>. The Litigation Trustee, in its discretion, may cause the Litigation Trust to deduct and withhold from amounts distributable from the Litigation

Trust to any Litigation Trust Beneficiaries any and all amounts as may be sufficient to pay the maximum amount of any tax or other charge that has been or might be assessed or imposed by any Law, regulation, rule, ruling, directive, or other governmental requirement on such Litigation Trust Beneficiary or the Litigation Trust, including with respect to the amount to be distributed to such Litigation Trust Beneficiary, any amounts received by, collections of, or earnings of the Litigation Trust and any proceeds from the Litigation Trust Assets.  The Litigation Trustee shall determine such maximum amount to be withheld by the Litigation Trust in its sole, reasonable discretion and shall cause the Litigation Trust to distribute to such Litigation Trust Beneficiary any excess amount withheld.  The Litigation Trustee may, if necessary or appropriate to comply with applicable withholding requirements, withhold the entire distribution due to any Litigation Trust Beneficiary until such Litigation Trust Beneficiary provides the necessary information to comply with any withholding requirements of any governmental unit.  All such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be treated as amounts distributed to such Litigation Trust Beneficiaries for all purposes of the Plan and this Agreement, to the extent permitted by applicable Law.

     5.3   <u>Internal Revenue Service Forms</u>.  The Litigation Trustee may require the Holder of a Claim entitling the Holder to receive a Litigation Trust Unit to, and each such Holder shall, properly complete and execute the appropriate Internal Revenue Service Form W-8 (including any supporting documents) or Internal Revenue Service Form W-9, or such other documentation, as a prerequisite to receiving any distribution under the Plan or this Agreement.  If a Holder of such Claim does not provide to the Litigation Trustee within ninety (90) days of first written request with all documentation that in the Litigation Trustee's reasonable business judgment is necessary to determine the tax withholding and reporting requirements for such Claim, then any

current or future distribution on such Claim shall be deemed forfeited, and the underlying Claim and the funds shall in respect of such present and future distribution(s) shall revert to the Litigation Trust for all purposes, including but not limited to, redistribution to other Litigation Trust Beneficiaries, in accordance with the terms of the Confirmation Order, the Plan, and Section 5.4 of this Agreement; *provided*, *however*, that no additional ninety (90) day period under Section 5.4 of this Agreement shall be required to pass before such distributions become unrestricted funds of the Litigation Trust.

5.4    <u>Unclaimed and Undeliverable Distributions</u>.  Unclaimed property (including, but not limited to, uncashed checks), together with any distributions to Litigation Trust Beneficiaries returned as undeliverable, shall be held by the Litigation Trustee in an unclaimed property reserve (the "<u>Unclaimed Property Reserve</u>") for a period of ninety (90) days from the date of first issuance, and may be released by the Litigation Trustee prior to the expiration of such time period if presentation of proper proof by such Litigation Trust Beneficiary of its entitlement thereto is presented to the Litigation Trustee.  After the expiration of the applicable time period set forth in this Section 5.4, all unclaimed property or interest in property otherwise payable to a Holder of a Litigation Trust Unit or its successors shall revert to the Litigation Trust for all purposes including, but not limited to, for redistribution in accordance with the terms of the Plan, the Confirmation Order, and this Agreement.  Upon such revesting, the Holder's Allowed Claim entitling such Holder to Litigation Trust Units shall be cancelled, released, discharged and forever barred and the Allowed Claim of any other Holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal, state or provincial escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an unclaimed distribution to the contrary.

5.5    <u>No Responsibility to Attempt to Locate Litigation Trust Beneficiaries</u>.    If a distribution is returned to the Litigation Trust as undeliverable, or otherwise remains unclaimed, no further distribution shall be made to a Holder of an applicable Allowed Claim unless and until such Holder notifies the Litigation Trustee of such Holder's then-current address and taxpayer identification number.    The Litigation Trustee may, in its sole discretion, attempt to determine a Holder of an applicable Allowed Claim's current address or otherwise locate such Holder, but nothing in this Agreement or the Plan shall require the Litigation Trustee to do so.

5.5.1    <u>Inapplicability of Escheat, Abandoned or Unclaimed Property Laws</u>. Unclaimed property held by the Litigation Trust shall not be subject to the escheat, abandoned or unclaimed property Laws of the United States, or any state, provincial, or local governmental unit.

5.6    <u>Request for Reissuance</u>.    Distribution checks shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.    Distribution checks not cashed within such 90-day period shall be treated as unclaimed property that has been held in the Unclaimed Property Reserve as set forth above in Section 5.4.    Requests for reissuance of any check shall be made in writing directly to the Litigation Trustee by the Holder of the applicable Allowed Claim that was originally issued such check.    All such requests shall be made promptly and in time for the check to be reissued and cashed before the funds for the checks become unrestricted Litigation Trust Assets under Section 5.4 of this Agreement.    The Holder of an Allowed Claim shall bear all the risk that, and shall indemnify and hold the Litigation Trust, the Litigation Trustee, and the Litigation Trust Advisory Board harmless against any loss that may arise if, the Litigation Trustee does not reissue a check promptly after receiving a request for its reissuance.

5.7    <u>Conflicting Claims of Litigation Trust Units</u>.    If any conflicting claims or demands are made or asserted with respect to the Litigation Trust Unit of a Litigation Trust Beneficiary, or if there is any disagreement between the assignees, transferees, heirs, representatives, or legatees succeeding to all or a part of such an interest resulting in adverse claims or demands being made in connection with such interest, then, in any of such events, the Litigation Trustee shall be entitled, in its sole discretion, to refuse to comply with any such conflicting claims or demands.

5.7.1    The Litigation Trustee may, in consultation with the Litigation Trust Advisory Board, elect to cause the Litigation Trust to make no payment or distribution with respect to the Litigation Trust Unit subject to the conflicting claims or demand, or any part thereof, and to refer such conflicting claims or demands to the Bankruptcy Court, which shall have continuing jurisdiction over resolution of such conflicting claims or demands in accordance with Article XIII of the Plan. Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, neither the Litigation Trust, nor the Litigation Trustee, nor the Litigation Trust Advisory Board shall be or become liable to any of such parties for their refusal to comply with any such conflicting claims or demands, nor shall the Litigation Trust, Litigation Trustee, or the Litigation Trust Advisory Board be liable for interest on any funds which may be so withheld.

5.7.2    The Litigation Trustee shall be entitled to refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction adjudicating the matter or (ii) all differences have been resolved by a valid written agreement among all such parties to the satisfaction of the Litigation Trustee, which agreement shall include a complete release of the Litigation Trust and

Litigation Trustee.  Until the Litigation Trustee receives written notice that one of the conditions of the preceding sentence is met, the Litigation Trustee may deem and treat as the absolute owner under this Agreement of the Litigation Trust Units in the Litigation Trust the Litigation Trust Beneficiary identified as the owner of that interest in the books and records maintained by the Litigation Trustee.  The Litigation Trustee may deem and treat such Litigation Trust Beneficiary as the absolute owner for purposes of receiving distributions and any payments on account thereof for federal and state income tax purposes, and for all other purposes whatsoever.

5.8     Limitation on Liability.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, in acting or refraining from acting under and in accordance with this the Agreement, the Litigation Trustee shall be fully protected and incur no liability to any purported claimant or any other Person pursuant to Article VII of this Agreement.

5.9     Priority of Expenses of Litigation Trust.  The Litigation Trust shall pay or reserve for all necessary Litigation Trust Expenses before making any distributions, including but not limited to, any distribution to Litigation Trust Beneficiaries.

5.10     Minimum Distributions.  If any distribution under the Plan to the Holder of an Allowed Claim would be less than $250.00, the Litigation Trust may hold such distribution until the time of a subsequent or final distribution.  If the final distribution under the Plan to the Holder of an Allowed Claim would be less than $250.00, the Litigation Trust may cancel such distribution.  Any cancelled distributions pursuant to this Section 5.10 shall revert to the Litigation Trust for all purposes, including distributions to other Holders of Allowed Claims.

## ARTICLE VI

## LITIGATION TRUST BENEFICIARIES

6.1     Interest Beneficial Only.  The ownership of a Litigation Trust Unit shall not entitle any Litigation Trust Beneficiary or the Debtors to any title in or to the Litigation Trust Assets or to any right to call for a partition or division of such assets or to require an accounting.

6.2     Ownership of Litigation Trust Beneficial Interests Hereunder.  Each Litigation Trust Beneficiary shall own a Litigation Trust Unit herein which shall, subject to Article V of this Agreement and the Plan, be entitled to a distribution in the amounts, and at the times, set forth in the Plan and hereunder.

6.3     Evidence of Litigation Trust Beneficial Interest.  Ownership of a Litigation Trust Unit shall not be evidenced by any certificate, security, or receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Litigation Trust by the Litigation Trustee.

6.4     No Right to Accounting.  Except as otherwise provided in this Agreement, neither the Litigation Trust Beneficiaries nor their successors, assigns, creditors, nor any other Person shall have any right to an accounting by the Litigation Trustee, and the Litigation Trustee shall not be obligated to provide any accounting to any Person.  Nothing in this Agreement is intended to require the Litigation Trustee at any time or for any purpose to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust or as a condition for making any advance, payment, or distribution out of proceeds of Litigation Trust Assets.

6.5     Requirement of Undertaking.  The Litigation Trustee may request the Bankruptcy Court to require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Litigation Trustee for any action taken or omitted by it as Litigation

Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, including reasonable attorneys' fees, against any party litigant in such suit; *provided*, *however*, that the provisions of this Section 6.5 shall not apply to any suit by the Litigation Trust or Litigation Trustee.

6.6 <u>Limitation on Transferability</u>.  It is understood and agreed that the Litigation Trust Units shall be non-transferable and non-assignable during the term of this Agreement except if transferred by will, intestate succession, if required to be transferred as part of a liquidation or winding up of a holder, or otherwise by operation of Law.  An assignment by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the Litigation Trustee, and the Litigation Trustee may continue to cause the Litigation Trust to pay all amounts to or for the benefit of the assigning Litigation Trust Beneficiaries until receipt of proper notification and proof of assignment by operation of law.  The Litigation Trustee may rely upon such proof without the requirement of any further investigation.

6.7 <u>Exemption from Registration</u>.  The rights of the Litigation Trust Beneficiaries arising under this Agreement may be deemed "securities" under applicable Law.  However, such rights have not been defined as "securities" under the Plan because (i) the Parties hereto intend that such rights shall not be securities and (ii) if the rights arising under this Agreement in favor of the Litigation Trust Beneficiaries are deemed to be "securities," the exemption from registration under section 1145 of the Bankruptcy Code is intended to be applicable to such securities.  No Party to or beneficiary of this Agreement shall make a contrary or different contention.

6.8     <u>Delivery of Distributions</u>.  Subject to the terms of this Agreement, the Litigation Trustee shall cause the Litigation Trust to make distributions to Litigation Trust Beneficiaries in the manner provided in the Plan and in this Agreement.

6.9     <u>Limited Liability</u>.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, any breach of the terms of this Agreement, or any claim or cause of action for fraud, willful misconduct, or gross negligence, no provision of this Agreement, the Plan, or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any Litigation Trust Beneficiary, shall give rise to any liability to such Litigation Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, creditors, successors, representatives, employees, or Holders of Interests of any Debtor, or by any other Person.  Litigation Trust Beneficiaries are deemed to receive the Litigation Trust Assets in accordance with the provisions of this Agreement, the Plan, and the Confirmation Order in exchange for their Allowed Prepetition First Lien Loan Claims, Allowed Prepetition Second Lien Loan Claims, Allowed Prepetition HoldCo Loan Claims, Allowed OpCo General Unsecured Claims, and Allowed Freedom HoldCo General Unsecured Claims, as applicable, as set forth in the Plan without further obligation or liability of any kind, but subject to the provisions of this Agreement.

## **ARTICLE VII**

### **THIRD-PARTY RIGHTS AND LIMITATION OF LIABILITY**

7.1     <u>Parties Dealing with the Litigation Trustee</u>.  In the absence of actual knowledge to the contrary, any Person dealing with the Litigation Trust or the Litigation Trustee shall be entitled to rely on the authority of the Litigation Trustee or any of the Litigation Trustee's agents to act in connection with the Litigation Trust Assets.  There is no obligation of any Person

dealing with the Litigation Trustee to inquire into the validity or expediency or propriety of any transaction by the Litigation Trustee or any agent of the Litigation Trustee.

      7.2    <u>Limitation of Litigation Trustee Liability</u>.  In exercising the rights granted herein, the Litigation Trustee shall exercise its best judgment in accordance with its fiduciary duties, to the end that the affairs of the Litigation Trust shall be properly managed and the interests of all of the Litigation Trust Beneficiaries safeguarded.  However, notwithstanding anything herein to the contrary, other than any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, neither the Litigation Trustee nor any of its respective firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, or disbursing agents, or agents, and any of such Person's successors and assigns, shall incur any responsibility or liability by reason of any error of Law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with this Agreement, whether sounding in tort, contract, or otherwise, except for fraud, gross negligence, or willful misconduct that is found by a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered by the Litigation Trust. Other than any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, in no event shall the Litigation Trustee be liable for indirect, punitive, special, incidental, or consequential damage or loss (including, but not limited to, lost profits) whatsoever, even if the Litigation Trustee has been informed of the likelihood of such loss or damages and regardless of the form of action.  Without limiting the foregoing, the Litigation Trustee shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in the Plan and the Litigation Trustee shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in the Confirmation Order.

7.3    <u>No Liability for Acts of Other Persons</u>.  None of the Persons identified in the immediately preceding Section 7.2 of this Agreement shall be liable for the act or omission of any other Person identified in that Section.

7.4    <u>No Liability for Acts of Predecessors</u>.  No successor Litigation Trustee shall be in any way responsible for the acts or omissions of any Litigation Trustee in office prior to the date on which such successor becomes the Litigation Trustee, unless a successor Litigation Trustee expressly assumes such responsibility.

7.5    <u>No Liability for Good Faith Error of Judgment</u>.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, the Litigation Trustee shall not be liable for any error of judgment made in good faith, unless it shall be finally and ultimately determined by a court of competent jurisdiction that the Litigation Trustee was grossly negligent.

7.6    <u>Reliance by Litigation Trustee on Documents and Advice of Counsel or Other Persons</u>.  Except as otherwise provided herein, the Litigation Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.  The Litigation Trustee also may engage and consult with its respective legal counsel and other agents and advisors, and shall not be liable for any action taken, omitted, or suffered in good faith reliance upon the advice of such counsel, agents, or advisors to the extent permitted by Law, except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein.

7.7    <u>No Liability For Acts Approved by Bankruptcy Court</u>.  The Litigation Trustee shall have the right at any time to seek an order from the Bankruptcy Court concerning the

administration or disposition of the Litigation Trust, Permitted Litigation Claims, OpCo General Unsecured Claims, Freedom HoldCo General Unsecured Claims, and Litigation Trust Assets required to be administered by the Litigation Trust.  Following the entry of any such order of the Bankruptcy Court, the Litigation Trustee shall not be liable for any act or omission expressly taken in accordance with, and not inconsistent with, any such order, and all such actions or omissions shall be deemed not to constitute fraud, gross negligence, or willful misconduct.

7.8    No Personal Obligation for Litigation Trust Liabilities.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, Persons dealing with the Litigation Trustee shall have recourse only to the Litigation Trust Assets to satisfy any liability incurred by the Litigation Trustee to any such Person in carrying out the terms of this Agreement, and the Litigation Trustee shall have no personal, individual obligation to satisfy any such liability.

7.9    Indemnification.  The Litigation Trustee, the Litigation Trust Advisory Board, and each of their or the Litigation Trust's respective accountants, agents, assigns, attorneys, consultants, directors, employees, executors, financial advisors, transfer agents, independent contractors, managers, members, officers, partners, predecessors, principals, professional persons, the employees of the Litigation Trust, and their respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives, affiliate, employer and successors and principals  (each, an "Indemnified Party") shall be indemnified for, and defended and held harmless against, by the Litigation Trust solely from the Litigation Trust Assets, for any losses, liability, claims, damages, judgment, fine, penalty, claim, demand, settlement, cost, or expenses occurring on or after the Effective Date (including reasonable attorneys' fees and expenses which the Indemnified Party may incur in connection therewith) for any act or omission

in their capacity as, or on behalf of, the Litigation Trust or Litigation Trustee in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or this Agreement, as applicable if the applicable Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Litigation Trust or the Litigation Trust Beneficiaries, except if such loss, liability, or damage is ultimately and finally determined by a court of competent jurisdiction to have resulted from the fraud, gross negligence, or willful misconduct of the Indemnified Party asserting indemnification.  An act or omission taken by the Litigation Trustee pursuant to Section 7.7 of this Agreement will be deemed not to constitute gross negligence, willful misconduct, or fraud.  The amounts necessary for the indemnification provided in this Section (including, but not limited to, any costs and expenses incurred in enforcing the right of indemnification in this Section) shall be paid by the Litigation Trustee out of the Litigation Trust Assets; *provided*, *however*, that that the Litigation Trust shall not be liable to indemnify, (x) the Litigation Trustee for any breach of its fiduciary duty set forth herein, or (y) any Indemnified Party for any act or omission arising out of such Indemnified Party's respective gross negligence, fraud, or willful misconduct as is ultimately and finally determined by a court of competent jurisdiction.  The Indemnified Parties shall be entitled to obtain advances from the Litigation Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an Indemnified Party in its capacity as such, except for any actions or omissions arising from their own respective willful misconduct, fraud, or gross negligence; *provided*, *however*, that the Indemnified Parties receiving such advances shall repay the amounts so advanced to the Litigation Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Indemnified Parties were not entitled to any indemnity under the

provisions of this Section 7.9 of this Agreement.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, the Litigation Trustee shall not be personally liable for the payment of any Litigation Trust Expense or claim or other liability of the Litigation Trust, and no Person shall look to the Litigation Trustee personally for the payment of any such expense or liability.  Notwithstanding anything herein to the contrary, nothing contained in this Section 7.9 shall require the Debtors, the Reorganized Debtors, or any Litigation Trust Beneficiary to indemnify any Indemnified Persons pursuant to this Agreement.

7.9.1    Expense of Litigation Trust; Limitation on Source of Payment of Indemnification.  All indemnification liabilities of the Litigation Trust under this Section 7.9 shall be expenses of the Litigation Trust and constitute Litigation Trust Expenses.  The amounts necessary for such indemnification and reimbursement shall be paid by the Litigation Trust out of the available Litigation Trust Assets after reserving for all actual and anticipated expenses and liabilities of the Litigation Trust.  Except for any liability arising from the Litigation Trustee's breach of its fiduciary duties expressly preserved herein, the Litigation Trustee shall not be personally liable for the payment of any Litigation Trust Expenses or claim or other liability of the Litigation Trust, and no Person shall look to the Litigation Trustee or other Indemnified Parties personally for the payment of any such Litigation Trust Expenses or liability, unless it is ultimately and finally determined by a court of competent jurisdiction that such payment was the result of fraud, gross negligence, or willful misconduct.

7.10    Limitation of Liability of the Reorganized Debtors.  Except as expressly provided in this Agreement, the Reorganized Debtors and each of their respective boards of directors,

management, employees, and professionals shall have no liability for any action taken or omitted to be taken by the Litigation Trustee in performing its duties under this Agreement.

7.11    Confirmation of Survival of Provisions.  Without limitation in any way of any provision of this Agreement, the provisions of this Article VII shall survive the death, dissolution, liquidation, incapacity, resignation, replacement, or removal, as may be applicable, of the Litigation Trustee or, as it relates to Section 7.9, an Indemnified Party, or the termination of the Litigation Trust or this Agreement, and shall inure to the benefit of the Litigation Trustee's and each Indemnified Party's heirs and assigns.

## ARTICLE VIII

### TAX MATTERS

8.1    Tax Treatment of Litigation Trust.  Pursuant to and in accordance with the Plan, for all United States federal income tax purposes, the Debtors, the Litigation Trust Beneficiaries, the Litigation Trustee, and the Litigation Trust shall treat (i) the Litigation Trust as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and guidance promulgated in respect thereof, including Internal Revenue Service Revenue Procedure 94-45, 1994-2 C.B. 684 and, thus, as a "grantor trust" within the meaning of Internal Revenue Code sections 671 through 677 consistent with the terms of the Plan (unless the Litigation Trust has undergone the Conversion (as defined herein)) and (ii) the transfer of the Litigation Trust Assets to the Litigation Trust as (a) a transfer of the Litigation Trust Assets by the Freedom HoldCo Debtors and the OpCo Debtors to the Litigation Trust Beneficiaries in satisfaction of their Allowed Prepetition First Lien Loan Claims, Allowed Prepetition Second Lien Loan Claims, Allowed Prepetition HoldCo Loan Claims, Allowed OpCo General Unsecured Claims, and Allowed Freedom HoldCo General Unsecured Claims, as applicable (other than any Litigation

Trust Disputed Claims Reserve treated as a DOF (if elected) or other separate Entity), followed by (b) a transfer of such Litigation Trust Assets by such Litigation Trust Beneficiaries to the Litigation Trust in exchange for their *pro rata* share of Litigation Trust Units (subject to the Litigation Trust Units Allocations).  The Litigation Trust Beneficiaries shall be treated as the grantors and owners of the Litigation Trust for United States federal (and, to the extent permitted, state and local) income tax purposes.

8.2     <u>Annual Reporting and Filing Requirements</u>.  Pursuant to and in accordance with the terms of the Plan and this Agreement, the Litigation Trustee shall file tax returns (including applicable state, local and foreign tax returns, if any) for the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) to the extent required by applicable Law and subject to the treatment of the Litigation Trust Disputed Claims Reserve as a DOF or other separate Entity.

8.3     <u>Tax Treatment of Reserves for Disputed Claims</u>.  The Litigation Trustee may, in the Litigation Trustee's sole discretion, determine the best way to report for United States tax purposes with respect to the Litigation Trust Disputed Claims Reserve, if applicable, including (i) filing a tax election to treat the Litigation Trust Disputed Claims Reserve as a DOF or other separate Entity within the meaning of Treasury Regulation section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Litigation Trust (and, to the extent permitted by applicable Law, report consistently with the foregoing for United States federal, state, and local income tax purposes) or (ii) electing to report as a separate trust or sub-trust or other entity.  If an election is made to report the Litigation Trust Disputed Claims Reserve as a DOF or other separate entity, the Litigation Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF or other separate entity, including, but not

limited to, the filing of a separate federal tax return for the DOF or other separate entity and the payment of federal and/or state income tax due.

8.3.1   If an election is made to report the Litigation Trust Disputed Claims Reserve as a DOF or other separate Entity, all parties (including the Debtors, the Reorganized Debtors, the Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall be bound by such election and report for United States federal, state, and local income tax purposes consistently with the foregoing.   The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any taxes (including with respect to earned interest, if any) imposed on the Litigation Trust or the Litigation Trust Assets, including the Litigation Trust Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of a Disputed General Unsecured Claim in the Litigation Trust Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such Disputed General Unsecured Claims, the Litigation Trustee may, in its discretion, (i) sell any non-Cash assets relating to such Claim (including any assets distributable as a result of disallowance of such Claim) to pay such taxes or (ii) reimburse the Litigation Trust for the payment of such taxes from any subsequent Cash amounts allocable to, or retained on account of such Disputed General Unsecured Claim (including any Cash distributable by the Litigation Trustee as a result of disallowance of such Disputed General Unsecured Claim).

8.4   <u>Valuation of Litigation Trust Assets</u>.   As soon as practicable following the Effective Date, but in no event later than the due date for timely filing of the Litigation Trust's first United States federal income tax return (taking into account applicable tax filing extensions), the Litigation Trustee shall determine the fair market value of the Litigation Trust

Assets as of the Effective Date, based on the Litigation Trustee's good faith determination and subject in all respects to Section 8.4, and the Litigation Trustee shall apprise, in writing, the Litigation Trust Beneficiaries and the Reorganized Debtors of such valuation. The valuation shall be used consistently by all parties (including, without limitation, the Debtors and/or the Reorganized Debtors, as applicable, the Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries) for all applicable United States federal, state, and local income tax purposes.

8.4.1 In the event the Reorganized Debtors disagree with the Litigation Trustee's good faith determination of the valuation of the Litigation Trust Assets, the Litigation Trustee and the Reorganized Debtors shall attempt to reconcile any such differences. The valuation agreed to by the Reorganized Debtors and the Litigation Trustee shall be used consistently by all parties for all tax purposes unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Internal Revenue Code (or any equivalent provision of state, local, or non-U.S. Law).

8.5 In the event that the Litigation Trustee determines that the Litigation Trust may be required to withhold from amounts distributable from the Litigation Trust pursuant to Section 5.2 above, it shall endeavor to promptly notify the relevant Litigation Trust Beneficiary.

8.6 Allocations of Litigation Trust taxable income among the Litigation Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the holders of Litigation Trust Units, adjusted for prior taxable income and loss and taking into account all prior and concurrent

distributions from the Litigation Trust.  Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets.  The tax book value of the Litigation Trust Assets for purposes of this Section 8.6 shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

8.7    If, in the reasonable judgment of the Litigation Trustee, the Litigation Trust is expected to survive for a period of more than five (5) years from the Effective Date, the Parties agree that the Litigation Trustee, in the exercise of its reasonable discretion, shall either (i) seek to extend the term of the Litigation Trust for a reasonable period of time in a manner consistent with Section 10.3 hereof and Revenue Procedure 94-45 § 3.06, or (ii) convert the Litigation Trust from a liquidating trust described in Treasury Regulation § 301.7701-4(d) to an investment trust described in Treasury Regulation § 301.7701-4(c), taxable as a grantor trust for U.S. federal income tax purposes under Sections 671 through 679 of the IRC (the process described in this clause (ii), the "Conversion").  In the event of a Conversion, the Parties (x) agree that, unless otherwise required by applicable Law, the Litigation Trust shall file or cause to be filed any annual or other necessary returns, reports and other forms consistent with the characterization of the converted entity as an investment trust for U.S. federal income tax purposes, (y) shall cooperate to amend this Agreement to reflect such Conversion, and (z) shall take no position on any tax return inconsistent with such treatment.

## ARTICLE IX

## SELECTION, REMOVAL, REPLACEMENT,
## AND COMPENSATION OF LITIGATION TRUSTEE

9.1    Initial Litigation Trustee.  The Initial Litigation Trustee is appointed effective as of the Effective Date, and shall serve as the trustee of the Litigation Trust.  The initial trustee of the Litigation Trust shall be the Initial Litigation Trustee.

9.2    Term of Service.  The Litigation Trustee shall serve until the earliest of (i) the completion of the administration of the Litigation Trust Assets and the Litigation Trust, including the winding up of the Litigation Trust, in accordance with this Agreement and the Plan, (ii) termination and dissolution of the Litigation Trust in accordance with the terms of this Agreement and the Plan, or (iii) the Litigation Trustee's resignation, death, dissolution, incapacity, liquidation, or removal.  In the event that the Litigation Trustee's appointment terminates by reason of resignation, death, dissolution, incapacity, liquidation, or removal, the Litigation Trustee shall be immediately compensated for all reasonable, documented fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced.  The provisions of Article VI of this Agreement shall survive the resignation or removal of any Litigation Trustee.

9.3    Removal of Litigation Trustee.  Any party in interest (including the Litigation Trust Advisory Board), with notice and a hearing before the Bankruptcy Court, may seek removal of the Litigation Trustee for Cause (as defined below).  As used herein, "Cause" shall mean the Litigation Trustee's (A) commission of an act of fraud, theft or embezzlement during the performance its duties hereunder; (B) conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (C) gross negligence, bad faith, willful misconduct, or

knowing violation of law in the performance of its duties hereunder; (D) commission of any negligence, even if not rising to the level of gross negligence, that risks materially adversely affecting the value or successful liquidation and distribution of the Litigation Trust Assets; or (E) violation of the provisions of this Agreement, the Plan, or the Confirmation Order. Such removal shall become effective on the date action is taken. The Bankruptcy Court shall have exclusive jurisdiction to hear and finally determine any dispute arising out of this Section 9.3 except as otherwise provided in the Plan or Confirmation Order.

9.4     <u>Resignation of Litigation Trustee</u>. The Litigation Trustee may resign at any time on thirty (30) days' written notice to the Litigation Trust Advisory Board, counsel to the Debtors, counsel to the Ad Hoc Group, counsel to the Freedom Lender Group, the U.S. Trustee, and the Bankruptcy Court. The resignation shall be effective on the later of (i) the date specified in the notice of resignation and (ii) the date that is thirty (30) days after the date such notice is filed with the Bankruptcy Court. In the event of a resignation, the resigning Litigation Trustee shall file a full and complete accounting of monies and assets received, disbursed, and held during the term of that Litigation Trustee.

9.5     <u>Appointment of Successor Litigation Trustee</u>. Upon the resignation, death, dissolution, incapacity, liquidation, or removal of a Litigation Trustee, a successor trustee shall be selected by the Litigation Trust Advisory Board by majority vote of the Members or at a meeting of the Litigation Trust Advisory Board called for of replacing the Litigation Trustee, *provided* that the successor trustee shall be reasonably acceptable to holders of a majority of Prepetition First Lien Loan Claims. Any successor Litigation Trustee so appointed (i) shall consent to and accept his, her, or its appointment as successor Litigation Trustee, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of his, her, or

its appointment as successor Litigation Trustee, and (ii) shall not have any liability or responsibility for the acts or omissions of any predecessor(s).  Any successor Litigation Trustee may be appointed to serve only on an interim basis.

9.6    Powers and Duties of Successor Litigation Trustee.    A successor Litigation Trustee shall have all the rights, privileges, powers, and duties of his, her, or its predecessor under this Agreement, the Plan, and the Confirmation Order.

9.7    Litigation Trust Continuance.    The resignation, death, dissolution, incapacity, liquidation, or removal of the Litigation Trustee shall not terminate the Litigation Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Litigation Trustee.

9.8    Compensation of Litigation Trustee and Costs of Administration.    The Litigation Trustee shall receive fair and reasonable compensation for its services in accordance with the terms and conditions of the Plan, which shall be a charge solely against and solely paid out of the Litigation Trust Assets as Litigation Trust Expenses.    All costs, expenses, and obligations incurred by the Litigation Trustee (or professionals who may be employed by the Litigation Trustee in administering the Litigation Trust, in carrying out its other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Litigation Trust solely from the Litigation Trust Assets.

9.9    Appointment of Supplemental Litigation Trustee.    If the Litigation Trustee has a conflict or any of the Litigation Trust Assets are situated in any state or other jurisdiction in which the Litigation Trustee is not qualified to act as trustee, the Litigation Trustee shall, upon written notice to counsel to the Debtors, counsel to the Ad Hoc Group (email being sufficient), and counsel to the Freedom Lender Group (email being sufficient), nominate and appoint a

Person duly qualified to act as trustee (the "Supplemental Litigation Trustee") with respect to such conflict, or in such state or jurisdiction, and require from each such Supplemental Litigation Trustee such security as may be designated by the Litigation Trustee in its reasonable discretion. In the event the Litigation Trustee is unwilling or unable to appoint a disinterested Person to act as Supplemental Litigation Trustee to handle any such matter, the Bankruptcy Court, with notice and a hearing, may do so. The Litigation Trustee or the Bankruptcy Court, as applicable, may confer upon such Supplemental Litigation Trustee any or all of the rights, powers, privileges, and duties of the Litigation Trustee hereunder, subject to the conditions and limitations of this Agreement, the Plan, and the Confirmation Order, except as modified or limited by the Laws of the applicable state or other jurisdiction (in which case, the Laws of the state or other jurisdiction in which such Supplemental Litigation Trustee is acting shall prevail to the extent necessary). To the extent the Supplemental Litigation Trustee is appointed by the Litigation Trustee, the Litigation Trustee shall require such Supplemental Litigation Trustee to be answerable to the Litigation Trustee for all monies, assets, and other property that may be received in connection with the administration of all property. The Litigation Trustee or the Bankruptcy Court, as applicable, may remove such Supplemental Litigation Trustee, with or without cause, and appoint a successor Supplemental Litigation Trustee at any time by executing a written instrument declaring such Supplemental Litigation Trustee removed from office and specifying the effective date and time of removal.

## ARTICLE X

### DURATION OF DEBTOR LITIGATION TRUST

10.1    <u>Duration</u>.  Once the Litigation Trust becomes effective upon the Effective Date of the Plan, the Litigation Trust and this Agreement shall remain and continue in full force and effect until the Litigation Trust is terminated in accordance with the terms hereof.

10.2    <u>Termination on Payment of Litigation Trust Expenses and Distribution of Litigation Trust Assets</u>.  Upon the payment of all Litigation Trust Expenses, and the distribution of all Litigation Trust Assets in accordance with the provisions of the Plan, the Confirmation Order, and this Agreement, the Litigation Trust shall automatically terminate and dissolve and the Litigation Trustee shall have no further responsibility in connection therewith except as may be required to effectuate such termination under relevant Law.

10.3    <u>Termination after Five Years Unless Extended</u>.  If the Litigation Trust has not been previously terminated and dissolved pursuant to Section 10.2 hereof, on the fifth anniversary of the Effective Date, the Litigation Trustee shall distribute all of the Litigation Trust Assets to the Litigation Trust Beneficiaries in accordance with the Plan, and immediately thereafter the Litigation Trust shall terminate and the Litigation Trustee shall have no further responsibility in connection therewith except to the limited extent set forth in Section 10.5 of this Agreement, unless the Litigation Trust Advisory Board within the six-month period before such fifth anniversary (and, in the event of further extension, within the six-month period before the end of the preceding extension) determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation

63

Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

      10.4    <u>No Termination by Litigation Trust Beneficiaries</u>.  The Litigation Trust may not be terminated and dissolved at any time by the Litigation Trust Beneficiaries.

      10.5    <u>Continuance of Litigation Trust for Winding Up; Discharge and Release of Litigation Trustee</u>.  After the termination of the Litigation Trust and solely for the purpose of liquidating and winding up the affairs of the Litigation Trust, the Litigation Trustee shall continue to act as such until its responsibilities have been fully performed.  Except as otherwise specifically provided herein, upon the distribution of the Litigation Trust Assets, including all excess reserves, the Litigation Trustee and the Litigation Trust's professionals and agents shall be deemed discharged and have no further duties or obligations hereunder.  In connection with the foregoing, upon a motion by the Litigation Trustee, the Bankruptcy Court may enter an order relieving the Litigation Trustee and its employees, professionals, and agents of any further duties, discharging and releasing the Litigation Trustee and its employees, professionals, and agents from all liability related to the Litigation Trust.

## ARTICLE XI

## MISCELLANEOUS

      11.1    <u>Cumulative Rights and Remedies</u>.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

      11.2    <u>Notices</u>.  All notices to be given to Litigation Trust Beneficiaries may be given by email, ordinary mail, or may be delivered personally, at the addresses for such Litigation Trust Beneficiaries appearing on the books kept by the Litigation Trust.  Any notice or other communication which may be or is required to be given, served, or sent to the Litigation Trust

shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by email, hand delivery, or facsimile (if receipt is confirmed) addressed as follows:

If to the Litigation Trust or the Litigation Trustee:

Lawrence Hirsh
c/o LRHirsh, LLC
[ADDRESS]
[ADDRESS LINE 2]
[CITY, STATE ZIP CODE]
With a copy to:
Raines Feldman Littrell LLP
c/o Hamid Rafatjoo
4675 MacArthur Ct, Suite 1550
Newport Beach, CA 92660
hrafatjoo@raineslaw.com
meckard@raineslaw.com
dforsh@raineslaw.com

or to such other address as may from time to time be provided in written notice by the Litigation Trustee.

11.2.1  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to rules governing the conflict of laws.

11.2.2  <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

11.2.3  <u>Particular Words</u>.  Reference in this Agreement to any Article or Section is, unless otherwise specified, to that such Article or Section (inclusive of any subsections), as applicable, under this Agreement.  The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Article or Section of this Agreement.

11.2.4  <u>Execution</u>.  All funds in the Litigation Trust shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Litigation Trust Beneficiary, and no Litigation Trust Beneficiary or any other Person can execute upon, garnish or attach the Litigation Trust Assets or the Litigation Trustee in any manner or compel payment from the Litigation Trust except by Final Order of the Bankruptcy Court.  Payments will be solely governed by the Plan, the Confirmation Order, and this Agreement.

11.2.5  <u>Amendment</u>.  This Agreement may be amended by written agreement of the Litigation Trustee (in consultation with the Litigation Trust Advisory Board), the Ad Hoc Group, and the Freedom Lender Group (which, in each case, may be provided by email from counsel), or by order of the Bankruptcy Court; *provided*, *however*, that such amendment may not be inconsistent with the Plan or the Confirmation Order.

11.2.6  <u>No Waiver</u>.  No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

11.2.7  <u>No Relationship Created</u>.  Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership, or joint venture of any kind.

11.2.8  <u>Severability</u>.  If any term, provision, covenant, or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable, or against its regulatory policy, the remainder of the terms, provisions, covenants, and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

11.2.9  <u>Further Assurances</u>.  Without limitation of the generality of Section 2.6 of this Agreement, the Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan and to consummate the transactions contemplated hereby.

11.2.10    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

11.2.11    <u>Jurisdiction</u>.    The Bankruptcy Court shall have jurisdiction regarding the Debtors, the Reorganized Debtors, the Litigation Trust, the Litigation Trustee, and the Litigation Trust Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Litigation Trust; *provided*, *however*, that this Section 11.2.11 shall not conflict with the provisions of the Plan, including, without limitation, Article XIII of the Plan.  The Bankruptcy Court shall have continuing jurisdiction and venue to hear and finally determine all disputes and related matters among the Parties arising out of or related to this Agreement or the administration of the Litigation Trust.  The Parties expressly consent to the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Agreement, the provisions of this Agreement shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or

decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction.

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this Agreement as of the day and year written above.

**FREEDOM VCM, INC.**

By: _____
    Name:  [●]
    Title:   [●]

**FREEDOM VCM INTERCO, INC.**

By: _____
    Name:  [●]
    Title:   [●]

**FRANCHISE GROUP, INC. AND ITS OPCO DEBTOR AFFILIATES SET FORTH ON <u>SCHEDULE 1</u>**

By: _____
    Name:  David Orlofsky
    Title:   Chief Restructuring Officer

Lawrence Hirsh, not individually, but solely in its capacity as Litigation Trustee of the Franchise Group Litigation Trust

By: _____

    Name:  Lawrence Hirsh

## Schedule 1

1.  FRANCHISE GROUP, INC.
2.  AMERICAN FREIGHT FFO, LLC
3.  AMERICAN FREIGHT FRANCHISING, LLC
4.  AMERICAN FREIGHT FRANCHISOR, LLC
5.  AMERICAN FREIGHT GROUP, LLC
6.  AMERICAN FREIGHT HOLDINGS, LLC
7.  AMERICAN FREIGHT MANAGEMENT COMPANY, LLC
8.  AMERICAN FREIGHT OUTLET STORES, LLC
9.  AMERICAN FREIGHT, LLC
10. BETANCOURT SPORTS NUTRITION, LLC
11. BUDDY'S FRANCHISING AND LICENSING LLC
12. BUDDY'S NEWCO, LLC
13. EDUCATE, INC.
14. FRANCHISE GROUP ACQUISITION TM, LLC
15. FRANCHISE GROUP INTERMEDIATE B, LLC
16. FRANCHISE GROUP INTERMEDIATE BHF, LLC
17. FRANCHISE GROUP INTERMEDIATE HOLDCO, LLC
18. FRANCHISE GROUP INTERMEDIATE L, LLC
19. FRANCHISE GROUP INTERMEDIATE PSP, LLC
20. FRANCHISE GROUP INTERMEDIATE S, LLC
21. FRANCHISE GROUP INTERMEDIATE SL, LLC
22. FRANCHISE GROUP INTERMEDIATE V, LLC
23. FRANCHISE GROUP NEW HOLDCO, LLC
24. FRANCHISE GROUP NEWCO BHF, LLC
25. FRANCHISE GROUP NEWCO INTERMEDIATE AF, LLC
26. FRANCHISE GROUP NEWCO PSP, LLC
27. FRANCHISE GROUP NEWCO S, LLC
28. FRANCHISE GROUP NEWCO SL, LLC
29. FRANCHISE GROUP NEWCO V, LLC
30. HOME & APPLIANCE OUTLET, LLC
31. PET SUPPLIES "PLUS", LLC
32. PSP DISTRIBUTION, LLC
33. PSP FRANCHISING, LLC
34. PSP GROUP, LLC
35. PSP MIDCO, LLC
36. PSP SERVICE NEWCO, LLC
37. PSP STORES, LLC
38. PSP SUBCO, LLC
39. VALOR ACQUISITION, LLC
40. VITAMIN SHOPPE FLORIDA, LLC
41. VITAMIN SHOPPE FRANCHISING, LLC
42. VITAMIN SHOPPE GLOBAL, LLC
43. VITAMIN SHOPPE INDUSTRIES LLC
44. VITAMIN SHOPPE MARINER, LLC

45. VITAMIN SHOPPE PROCUREMENT SERVICES, LLC
46. WNW FRANCHISING, LLC
47. WNW STORES, LLC

## Exhibit K

## Assumed Contracts List

Section 10.1 of the Plan provides the following:  Except as otherwise provided herein, any Executory Contracts and Unexpired Leases (a) not previously assumed, (b) not previously assumed and assigned in accordance with the Sale Order or other order approving such assumption and assignment, (c) not previously rejected pursuant to an order of the Bankruptcy Court, and (d) identified on the Assumed Contracts List, will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order, except any Executory Contract or Unexpired Lease (i) identified on the Rejected Contracts/Lease List, (ii) that is the subject of (A) a separate motion or notice to reject, assume, or assume and assign or a Cure Dispute that is pending as of the Confirmation Date or (B) an order of the Bankruptcy Court that is not yet a Final Order, (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code), (iv) of the American Freight Debtors that is not otherwise assumed or included on the Assumed Contracts List, (v) that relates to the Vitamin Shoppe Debtors and is not otherwise assumed pursuant to the Sale Order or included on the Assumed Contracts List, or (vi) of Franchise Group, Inc. that is not otherwise assumed or included on the Assumed Contracts List.  For the avoidance of doubt, except as otherwise set forth herein or as included on the Assumed Contracts List, all Executory Contracts and Unexpired Leases of the American Freight Debtors, Franchise Group, Inc., and the Vitamin Shoppe Debtors shall be rejected as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such other date as may be identified on the Rejected Contracts/Lease List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party (including the Buyer pursuant to the Partial Sale Transaction) on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by an order of the Bankruptcy Court.  To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, increases, accelerates or otherwise alters any obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder as a result of, gives rise to any rights or benefits to any non-Debtor party to any such Executory Contract or Unexpired Lease, or creates any Lien on any asset or property of the Debtors or the Reorganized Debtors as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of the Plan or any other Restructuring Transaction (including any change of control, sale of business, assignment, vesting, termination, acceleration, or similar provisions therein), then such provision shall be deemed unenforceable and modified (solely for purposes of the transactions contemplated under the Plan) such that the transactions contemplated by the Plan or any other Restructuring Transaction shall

not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder, to be entitled to any rights or benefits thereunder, or create or impose a Lien on any asset or property of the Debtors or the Reorganized Debtors. For the avoidance of doubt, Confirmation of the Plan shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary contained in the Plan (other than Section 10.8 of the Plan) and in the Restructuring Support Agreement, except as otherwise agreed to by the Debtors and any applicable counterparty to an Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts/Lease List in their discretion prior to the later of (a) Effective Date and (b) seven (7) days after the date on which the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts List (or, in either case, such later date as may be agreed with a counterparty); provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

Section 10.2 of the Plan provides the following: Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors on the Assumed Contracts List, as applicable, to a counterparty must be Filed, served, and actually received by the Debtors on or before fourteen (14) days after such notice (together with any outstanding objections to the amount proposed on the Assumed Contracts List, a "Cure Dispute"). Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, Reorganized Debtor, or Buyer, without the need for any objection by the Debtors or the Reorganized Debtors or any other party in interest, or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure Costs; provided, however, that nothing herein shall prevent (if applicable) the Reorganized Debtors or the Buyer from paying any Cure Costs despite the failure of the relevant counterparty to File such request for payment of such Cure Costs. The Reorganized Debtors also may settle any Cure Costs without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that a non-Debtor contract counterparty Files a timely Cure Dispute and the Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard on at least seven (7) days' notice to the applicable non-Debtor contract counterparty, or such date as the parties agree, subject to the Bankruptcy Court's calendar. Any objection by a contract or lease counterparty to (a) the ability of the applicable Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned, or (b) any other matter pertaining to the proposed assumption or proposed assumption and assignment must be Filed, served, and actually received by the Debtors by the date on which objections to Confirmation of the Plan are due. The Reorganized Debtors may settle any Cure Dispute without any further notice to or action, order,

or approval of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment, as applicable.

Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, the Debtors shall pay any Cure Costs, if monetary, in full in Cash either (a) on the Effective Date or as soon as reasonably practicable thereafter, or (b) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (i) the Effective Date or as soon as reasonably practicable thereafter and (ii) seven (7) days after the date on which such Cure Dispute has been resolved. The Debtors and the Reorganized Debtors, as applicable, reserve the right at any time (including, with respect to the Reorganized Debtors, after the Effective Date) to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts List, the Debtors or the Reorganized Debtors, as applicable, shall have the right to reject such Executory Contract or Unexpired Lease by amending the Rejected Contracts/Lease List to include such Executory Contract or Unexpired Lease and providing prompt notice of any such amendment to any applicable counterparty, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan and payment or performance of the applicable Cure Costs shall result in the full release and satisfaction of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid pursuant to <u>Section 10.2</u> of the Plan, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court; <u>provided</u>, <u>however</u>, that nothing herein shall affect the allowance of any Claims or any Cure Costs agreed to by the Debtors in any written agreement amending or modifying any Executory Contract or Unexpired Lease prior to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan or otherwise.**

To the extent applicable, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases and the Debtors are entitled to all the rights provided under section 365 of the Bankruptcy Code.

Additionally, <u>Section 10.7</u> of the Plan provides the following: Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts/Lease List or Assumed Contracts List, as applicable, nor anything contained in the Plan or Sale Documents, nor the Debtors' delivery of a notice of the proposed assumption and proposed Cure Cost to any contract and lease counterparties set forth in the Assumed Contracts List shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article XIII of the Plan. If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts List, the Debtors shall have the right to reject such Executory Contract or Unexpired Lease, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Certain documents, or portions thereof, contained in this **Exhibit K** and the Plan Supplement remain subject to continuing review and discussions among the Debtors and interested parties with respect thereto. The rights of the Debtors are expressly reserved, subject to the terms and conditions set forth in the Plan (including all applicable consultation, consent, and/or approval rights contained or contemplated therein), to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court.

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900223 | 1170 Northern Boulevard LLC | 1170 Northern Boulevard LLC<br>40 Harbor Park Drive North<br>Port Washington, NY 11050 | PSP Stores, LLC | Lease, dated 03/30/2002, as amended<br>(Manhasset, NY) | Manhasset, NY<br>(9036) | $0.00 |
| 122000027 | 12550 LLC | 12550 LLC<br>PO BOX 300439<br>BROOKLYN, NY 11230 | Buddy's Newco, LLC | Lease dated in July 2005 with a term<br>commencing on September 1, 2005, as<br>amended (Store 48) | 48 | $418.01 |
| 121800022 | 1480 Cafe LLC | 1480 Cafe LLC<br>10 East 120th Avenue<br>Northglenn, CO 80233 | PSP Franchising, LLC | Franchise Agreement, dated 07/10/2020,<br>as renewed or amended (Store #4328 -<br>Denver) | | $0.00 |
| 121900224 | 1515 Lititz Partners, LLC | 1515 Lititz Partners, LLC<br>c/o Burkwood Associates<br>255 Butler Avenue<br>Suite 203<br>Lancaster, PA 17601 | PSP Stores, LLC | Lease, dated 01/06/2012, as amended<br>(Lancaster, PA) | Lancaster, PA<br>(9037) | $0.00 |
| 121900032 | 175 Memorial Ave., LLC | 175 Memorial Ave., LLC<br>c/o Century Investment Co.<br>181 Park Ave.<br>Suite 1<br>West Springfield, MA 01089 | Pet Supplies "Plus",<br>LLC | Lease Agreement, dated 09/12/1995, as<br>amended<br>(West Springfield, MA) | West<br>Springfield, MA<br>(9015) | $0.00 |
| 121900205 | 250 Three Springs, LP | 250 Three Springs, LP<br>4041 Liberty Avenue<br>Suite 201<br>Pittsburgh, PA 15224 | PSP Stores, LLC | Lease, dated 09/25/2022, as amended<br>(Weirton, WV) | Weirton, WV<br>(4556) | $695.16 |
| 121900202 | 27386 Carronade, LLC | 27386 Carronade, LLC<br>2600 West Big Beaver Rd<br>Suite 410<br>Troy, MI 48084 | PSP Stores, LLC | Lease Agreement, dated 08/18/2021, as<br>amended<br>(Perrysburg, OH) | Perrysburg, OH<br>(4465) | $0.00 |
| 121800042 | 2nd Watch, Inc.<br>Aptitive | 2nd Watch, Inc.<br>Aptitive<br>2310 N Molter Suite 340<br>Liberty Lake, WA 99019 | PSP Group, LLC | Acquisition Announcement and Payment<br>Details Update | | $0.00 |
| 121800047 | 313 Presents, LLC | 313 Presents, LLC<br>2525 Woodward Avenue<br>Detroit, MI 48201 | PSP Midco, LLC | First Amendment to Sponsorship<br>Agreement | | $0.00 |
| 121800046 | 313 Presents, LLC | 313 Presents, LLC<br>2525 Woodward Avenue<br>Detroit, MI 48201 | PSP Group, LLC | Sponsorship Agreement | | $0.00 |
| 121900222 | 3644 Long Beach Road, LLC | 3644 Long Beach Road, LLC<br>c/o Serota Properties<br>70 East Sunrise Hwy.<br>Suite 610<br>Valley Stream, NY 11581 | PSP Stores, LLC | Lease, dated 05/16/2003, as amended<br>(Oceanside, NY) | Oceanside, NY<br>(9031) | $0.00 |
| 121800058 | 3Deez, LLC | 3Deez, LLC<br>4712 Ocean Blvd.<br>Destin, FL 32541 | PSP Franchising, LLC | Franchise Agreement, dated 03/18/2021,<br>as renewed or amended (Store #4433 -<br>Destin) | | $0.00 |
| 121800059 | 4 Healthy Paws, Inc. | 4 Healthy Paws, Inc.<br>11040 Pinevale Lane<br>Franktown, CO 80116 | WNW Franchising,<br>LLC | Franchise Agreement, dated 10/17/2015<br>(Store #3008 - Aurora) | | $0.00 |
| 121800060 | 4 Paws Partners, LLC | 4 Paws Partners, LLC<br>1100 US Highway 287, Suite 1400<br>Broomfield, CO 80020 | WNW Franchising,<br>LLC | Franchise Agreement, dated 08/29/2022,<br>as renewed (Store #3011 - Broomfield) | | $0.00 |
| 121800061 | 4 Pets Enterprises, LLC | 4 Pets Enterprises, LLC<br>10705 NE. 156th Avenue<br>Vancouver, WA 98682 | PSP Franchising, LLC | Franchise Agreement, dated 08/28/2020,<br>as renewed or amended (Store #4104 -<br>Gresham) | | $0.00 |
| 121900013 | 4405 Milestrip HD Lessee LLC | 4405 Milestrip HD Lessee LLC<br>c/o Northpath Investments<br>144 East 44th Street<br>Suite 601<br>New York, NY 10017 | Pet Supplies "Plus",<br>LLC | Lease Agreement, dated 01/08/2009, as<br>amended<br>(Blasdell, NY) | Blasdell, NY<br>(0192) | $0.00 |
| 121900033 | 470 French Road L.L.C. | 470 French Road L.L.C.<br>P.O. Box 213<br>Yorkville, NY 13495 | Pet Supplies "Plus",<br>LLC | Lease Agreement, dated 05/21/1997, as<br>amended<br>(New Hartford, NY) | New Hartford,<br>NY (9027) | $0.00 |
| 121900154 | 4968 Transit Road LLC | 4968 Transit Road LLC<br>c/o Gold Seal Equity Partnership<br>2 Wendling Court<br>Lancaster, NY 14086 | PSP Stores, LLC | Lease, dated 02/02/2016, as amended<br>(Depew, NY) | Depew, NY<br>(4055) | $763.18 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900108 | 570 Associates III, LLC | 570 Associates III, LLC<br>c/o Benderson Development<br>7978 Cooper Creek Blvd.<br>Suite 100<br>University Park, FL 34201 | PSP Stores, LLC | Lease, dated 05/05/2006, as amended<br>(East Amherst, NY) | East Amherst,<br>NY (0174) | $5,637.80 |
| 121800094 | 6 Wags, Inc. | 6 Wags, Inc.<br>900 Nina Court<br>Mendota Heights, MN 55118 | WNW Franchising,<br>LLC | Franchise Agreement, dated 01/28/2023,<br>as renewed (Store #3014 - Lakeville) | | $0.00 |
| 121900103 | 601 Plaza, LLC | 601 Plaza, LLC<br>1000 Grand Central Mall<br>Vienna,, WV 26105 | PSP Stores, LLC | Lease, dated 08/27/2009, as amended<br>(Vienna, WV) | Vienna, WV<br>(0153) | $0.00 |
| 121900153 | 8246 Delaware, Inc. | 8246 Delaware, Inc.<br>295 Main Street<br>Suite 210<br>Buffalo, NY 14203 | PSP Stores, LLC | Lease, dated 02/10/2016, as amended<br>(Rochester, NY) | Rochester, NY<br>(Monroe Ave)<br>(4054) | $0.00 |
| 121800109 | 8x8, Inc. | 8x8, Inc.<br>675 Creekside Way<br>Campbell, CA 95008 | PSP Group, LLC | 8X8, Inc. Business Terms and Conditions | | $0.00 |
| 121800108 | 8x8, Inc. | 8x8, Inc.<br>675 Creekside Way<br>Campbell, CA 95008 | PSP Group, LLC | 8X8 UCAAS/CCAAS SERVICE TERMS | | $0.00 |
| 121800107 | 8x8, Inc. | 8x8, Inc.<br>675 Creekside Way<br>Campbell, CA 95008 | PSP Group, LLC | Service Agreement (Replacement) | | $0.00 |
| 121800106 | 8x8, Inc. | 8x8, Inc.<br>675 Creekside Way<br>Campbell, CA 95008 | PSP Group, LLC | Corporate Renewal Agreement | | $0.00 |
| 121800105 | 8x8, inc. | 8x8, inc.<br>1350 Broadway<br>New York, NY 10018 | Buddy's Newco, LLC | Second Amendment To Service<br>Agreement | | $0.00 |
| 121900178 | 9-27 NATICK LLC | 9-27 NATICK LLC<br>c/o Crosspoint Associates, Inc.<br>300 Third Avenue<br>Waltham, MA 02451 | PSP Stores, LLC | Lease, dated 04/03/2018, as amended<br>(Natick, MA) | Natick, MA<br>(4186) | $0.00 |
| 121900086 | 95 NYRPT, LLC | 95 NYRPT, LLC<br>c/o Benderson Development<br>7978 Cooper Creek Blvd<br>Suite 100<br>University Park, FL 34201 | PSP Stores, LLC | Lease Agreement, dated 02/17/1999, as<br>amended<br>(Buffalo, NY) | Buffalo, NY<br>(0116) | $5,064.52 |
| 121900014 | 95 NYRPT, LLC | 95 NYRPT, LLC<br>c/o Benderson Development<br>7978 Cooper Creek Blvd<br>Suite 100<br>University Park, FL 34201 | Pet Supplies "Plus",<br>LLC | Lease Agreement, dated 01/05/2010, as<br>amended<br>(Amherst, NY) | Amherst, NY<br>(0197) | $5,479.33 |
| 121800119 | A Pet's Life, LLC | A Pet's Life, LLC<br>16915 Turkey Point Street<br>San Antonio, TX 78232-1830 | PSP Franchising, LLC | Franchise Agreement, dated 01/12/2018,<br>as renewed or amended (Store #4169 -<br>San Antonio) | | $0.00 |
| 121800126 | A&F Distributors 786, Inc. | A&F Distributors 786, Inc.<br>15 Stirrup Lane<br>Salonga, NY 11768 | PSP Franchising, LLC | Franchise Agreement, dated 08/22/2022,<br>as renewed or amended (Store #4621 -<br>Port Jefferson Station) | | $0.00 |
| 121800143 | Aanjaney LLC | Aanjaney LLC<br>11132 Ashbury Meadows Drive<br>Dayton, OH 45458 | PSP Franchising, LLC | Franchise Agreement, dated 07/23/2024,<br>as renewed or amended (Store #4650 -<br>Dayton) | | $0.00 |
| 121900021 | Aberdeen Marketplace, LLC | Aberdeen Marketplace, LLC<br>c/o Carl M. Freeman Companies<br>111 Rockville Pike<br>Suite 1100<br>Rockville, MD 20850 | Pet Supplies "Plus",<br>LLC | Lease, dated 01/17/1997, as amended<br>(Aberdeen, MD) | Aberdeen, MD<br>(4398) | $0.00 |
| 121900027 | Aberfeldy Properties, Inc. | Aberfeldy Properties, Inc.<br>c/o TIG Real Estate Services<br>901 South MoPac<br>Suite 285<br>Austin, TX 78746 | Pet Supplies "Plus",<br>LLC | Lease, dated 02/01/2009, as amended<br>(San Antonio, TX) | San Antonio,TX<br>(7009) | $0.00 |
| 121802289 | Abhishek Singla (Entity Pending) | Abhishek Singla (Entity Pending)<br>Address on File | PSP Franchising, LLC | Franchise Agreement, dated 10/30/2023,<br>as renewed or amended (Store #N/A -<br>Dulles) | | $0.00 |
| 121800154 | Absorb Software Inc. | Absorb Software Inc.<br>#2500 - 685 Centre St. S<br>Calgary, AB T2G 1S5 | PSP Group, LLC | Service Terms and Conditions | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121800153 | Absorb Software Inc. | Absorb Software Inc. #2500 - 685 Centre St. S Calgary, AB T2G 1S5 | PSP Group, LLC | Order Form for Absorb LMS Service | | $0.00 |
| 121800167 | Accruent, LLC | Accruent, LLC 11500 Alterra Pkwy Suite 110 Austin, TX 78758 | PSP Group, LLC | Accruent Order Document #90037823 | | $0.00 |
| 121800165 | Accruent, LLC | Accruent, LLC 11500 Alterra Pkwy Suite 110 Austin, TX 78758 | PSP Group, LLC | SaaS Services Agreement | | $0.00 |
| 121800187 | Ace Host | Ace Host 412 E Madison St STE 1010 Tampa,, FL 33602 | Buddy's Newco, LLC | MASTER SERVICE AGREEMENT | | $0.00 |
| 121800248 | Advanced Business Solutions | Advanced Business Solutions 801 W Big Beaver Rd Ste 300 Troy, MI 48084 | PSP Group, LLC | Purchase Order for New Office - SOW for Cabling | | $0.00 |
| 121800247 | Advanced Business Solutions | Advanced Business Solutions 801 W Big Beaver Rd Ste 300 Troy, MI 48084 | PSP Group, LLC | Purchase Order for Sound Masking Design and Installation Services | | $825.00 |
| 121800277 | Adyen N.V. | Adyen N.V. Simon Carmiggeltstraat 6-50 1011 DJ Amsterdam, | PSP Group, LLC | Adyen for Platforms Agreement | | $0.00 |
| 121800276 | Adyen N.V. | Adyen N.V. Simon Carmiggeltstraat 6-50 1011 DJ Amsterdam, | PSP Group, LLC | Addendum to Adyen for Platforms Agreement | | $0.00 |
| 121800309 | Afzal Lokhandwala (Entity Pending) | Afzal Lokhandwala (Entity Pending) Address on File | WNW Franchising, LLC | Franchise Agreement, dated 12/09/2022 (Store #N/A - Chicago) | | $0.00 |
| 121800308 | Afzal Lokhandwala (Entity Pending) | Afzal Lokhandwala (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2022, as renewed or amended (Store #N/A - Cedar Rapids) | | $0.00 |
| 121800313 | Agilence, Inc. | Agilence, Inc. 309 Fellowship Road - Suite 200 Mt. Laurel, NJ 08054 | PSP Group, LLC | Master Agreement | | $0.00 |
| 121800355 | AL/Fred Food Enterprises, LLC | AL/Fred Food Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 10/29/2004, as renewed or amended (Store #155 - Iron Mountain) | | $0.00 |
| 121900068 | Albert Hans, LLC | Albert Hans, LLC 7240 West Foster Avenue Chicago, IL 60656 | PSP Stores, LLC | Lease, dated 09/16/2005, as amended (Chicago, IL) | Chicago, IL (0053) | $1,231.31 |
| 121800365 | AlejCo Holdings, Inc. | AlejCo Holdings, Inc. 2081 Paseo Ynez San Dimas, CA 91773 | PSP Franchising, LLC | Franchise Agreement, dated 03/28/2016, as renewed or amended (Store #4073 - Upland) | | $0.00 |
| 121900087 | Alpine Income Property OP, LP | Alpine Income Property OP, LP 1140 N. Williamson Blvd. Suite 140 Daytona Beach, FL 32114 | PSP Stores, LLC | Lease, dated 02/15/2000, as amended (North Canton, OH) | North Canton, OH (0117) | $0.00 |
| 122000011 | American Plaza Group, LLC | American Plaza Group, LLC 106 Satsuma Drive ATTN CARMEN CUELLO Altamonte Springs, FL 32714 | Buddy's Newco, LLC | Lease Agreement dated May 6, 1991, as amended (Store 24) | 24 | $0.00 |
| 121800491 | Amin Sarfani (Entity Pending) | Amin Sarfani (Entity Pending) Address on File | WNW Franchising, LLC | Franchise Agreement, dated 04/24/2024 (Store #N/A - Wheeling) | | $0.00 |
| 121800563 | AOG Enterprises, LLC | AOG Enterprises, LLC 11173 Loveland Trace Court Loveland, OH 45140 | PSP Franchising, LLC | Franchise Agreement, dated 01/11/2024, as renewed or amended (Store #4629 - Maineville) | | $0.00 |
| 121800573 | APC Plus, LLC | APC Plus, LLC 2204 Camden Circle Southlake, TX 76092 | PSP Franchising, LLC | Franchise Agreement, dated 01/07/2022, as renewed or amended (Store #4490 - Wichita Falls) | | $0.00 |
| 121800582 | APL Ventures I, LLC | APL Ventures I, LLC 16915 Turkey Point Street San Antonio, TX 78230-1830 | PSP Franchising, LLC | Franchise Agreement, dated 02/19/2021, as renewed or amended (Store #4231 - New Braunfels) | | $0.00 |
| 121900109 | Arlington Ridge Market Place, LLC | Arlington Ridge Market Place, LLC c/o DeVille Developments 3951 Convenience Circle NW Suite 301 Canton, OH 44718 | PSP Stores, LLC | Lease, dated 09/19/2007, as amended (Akron, OH) | Akron, OH (0182) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900179 | Arsenal Plaza Associates, LLC | Arsenal Plaza Associates, LLC c/o Nigro Companies 20 Corporate Woods Blvd Albany, NY 12211 | PSP Stores, LLC | Lease Agreement, dated 08/02/2018, as amended (Watertown, NY) | Watertown, NY (4193) | $699.62 |
| 121800666 | Ascential Inc. | Ascential Inc. 1801 Porter Street Suite 300 Baltimore, MD 21230 | PSP Group, LLC | WGSN Terms of Business | | $0.00 |
| 121800667 | ASG Group, LLC | ASG Group, LLC 9818 Ricaby Drive Houston, TX 77064 | PSP Franchising, LLC | Franchise Agreement, dated 06/14/2021, as renewed or amended (Store #4470 - Houston) | | $0.00 |
| 121800698 | AT&T Corp. | AT&T Corp. One AT&T Way Bedminster, NJ 07921-0752 | PSP Group, LLC | AT&T Dedicated Internet Service Pricing Schedule | | $0.00 |
| 121800697 | AT&T Corp. | AT&T Corp. One AT&T Way Bedminster, NJ 07921-0752 | Pet Supplies "Plus", LLC | AT&T Dedicated Internet Pricing Schedule | | $0.00 |
| 121800696 | AT&T Corp. | AT&T Corp. One AT&T Way Bedminster, NJ 07921-0752 | Pet Supplies "Plus", LLC | AT&T Managed Internet Service Pricing Schedule | | $0.00 |
| 122000050 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 535) | 535 | $0.00 |
| 122000049 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 534) | 534 | $0.00 |
| 122000048 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 533) | 533 | $0.00 |
| 122000047 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 531) | 531 | $0.00 |
| 122000046 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 529) | 529 | $0.00 |
| 122000045 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 528) | 528 | $0.00 |
| 122000044 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 527) | 527 | $0.00 |
| 122000043 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 525) | 525 | $0.00 |
| 122000042 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 524) | 524 | $0.00 |
| 122000041 | A-Team Leasing, LLC | A-Team Leasing, LLC 2232 Kodiak Drive NE Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 523) | 523 | $27,120.00 |
| 121900184 | Atlantic Plaza Station LLC | Atlantic Plaza Station LLC c/o Phillips Edison & Company 11501 Northlake Drive Cincinnati, OH 45249 | PSP Stores, LLC | Lease, dated 02/17/2021, as amended (North Reading, MA) | North Reading, MA (4230) | $0.00 |
| 121800716 | Attentive Mobile Inc. | Attentive Mobile Inc. 221 River Street Suite 9047 Hoboken, NJ 07030 | PSP Group, LLC | Attentive Mobile Order Form and Master Subscription Agreement | | $68,633.02 |
| 121800719 | AudioEye, Inc. | AudioEye, Inc. 5210 E. Williams Circle Suite 750 Tucson, AZ 85711 | Pet Supplies "Plus", LLC | Master Services Agreement | | $0.00 |
| 121800718 | AudioEye, Inc. | AudioEye, Inc. 5210 E. Williams Circle Suite 750 Tucson, AZ 85711 | Pet Supplies "Plus", LLC | Enterprise Order PET-00607 | | $18,545.47 |
| 121800730 | Austin Pets, LLC | Austin Pets, LLC 2295 Spring Rose Road Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 11/08/2018, as renewed or amended (Store #4108 - Austin) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121800741 | Avalara, Inc. | Avalara, Inc.<br>Dept CH 16781<br>Palatine, IL 60055 | PSP Group, LLC | Avalara Order for D365 Upgrade at Renewal | | $0.00 |
| 121800736 | Avalara, Inc. | Avalara, Inc.<br>Dept CH 16781<br>Palatine, IL 60055 | PSP Group, LLC | Sales Order for Avalara Services | | $0.00 |
| 121800735 | Avalara, Inc. | Avalara, Inc.<br>Dept CH 16781<br>Palatine, IL 60055 | PSP Group, LLC | Avalara Professional Services Statement of Work | | $0.00 |
| 121800734 | Avalara, Inc. | Avalara, Inc.<br>Dept CH 16781<br>Palatine, IL 60055 | PSP Group, LLC | Addendum to Terms and Conditions | | $0.00 |
| 121800743 | Avalon Risk Management | Avalon Risk Management<br>200 N. Martingale Rd<br>Suite 700<br>Schaumburg, IL 60173 | PSP Distribution, LLC | Customs Bond Application & Indemnity | | $0.00 |
| 121900088 | Aveni-Chardon, Ltd. | Aveni-Chardon, Ltd.<br>6690 Beta Drive, Suite 220<br>Mayfield Village, 44143 44143 | PSP Stores, LLC | Lease, dated 10/06/2000, as amended (Chardon, OH) | Chardon, OH (0119) | $2,389.46 |
| 121800744 | Avenue 34, LLC | Avenue 34, LLC<br>22651 E Twin Acres Drive<br>Queen Creek, AZ 85142 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2023, as renewed or amended (Store #4568 - Queen Creek) | | $0.00 |
| 121800745 | AVMH Ventures of Albany, LLC | AVMH Ventures of Albany, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 03/19/2021, as renewed or amended (Store #4283 - Albany) | | $0.00 |
| 121800747 | AVMH Ventures of Baytowne, LLC | AVMH Ventures of Baytowne, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2023, as renewed or amended (Store #4264 - Webster) | | $0.00 |
| 121800748 | AVMH Ventures of Bluefield, LLC | AVMH Ventures of Bluefield, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/17/2023, as renewed or amended (Store #4617 - Bluefield) | | $0.00 |
| 121800749 | AVMH Ventures of Brighton, LLC | AVMH Ventures of Brighton, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2023, as renewed or amended (Store #4276 - Rochester) | | $0.00 |
| 121800750 | AVMH Ventures of Bristol, LLC | AVMH Ventures of Bristol, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4113 - Bristol) | | $0.00 |
| 121800751 | AVMH Ventures of Camarillo, LLC | AVMH Ventures of Camarillo, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2022, as renewed or amended (Store #4313 - Camarillo) | | $0.00 |
| 121800752 | AVMH Ventures of Casselberry, LLC | AVMH Ventures of Casselberry, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2023, as renewed or amended (Store #4605 - Casselberry) | | $0.00 |
| 121800753 | AVMH Ventures of Charlottesville, LLC | AVMH Ventures of Charlottesville, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 11/01/2022, as renewed or amended (Store #8013 - Charlottesville) | | $0.00 |
| 121800754 | AVMH Ventures of Chattanooga, LLC | AVMH Ventures of Chattanooga, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 02/04/2022, as renewed or amended (Store #4492 - Chattanooga) | | $0.00 |
| 121800755 | AVMH Ventures of Clearwater, LLC | AVMH Ventures of Clearwater, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #8046 - Clearwater) | | $0.00 |
| 121800756 | AVMH Ventures of Concord Mills, LLC | AVMH Ventures of Concord Mills, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #4128 - Concord) | | $0.00 |
| 121800757 | AVMH Ventures of Concord, LLC | AVMH Ventures of Concord, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #8057 - Concord) | | $0.00 |
| 121800758 | AVMH Ventures of Covington, LLC | AVMH Ventures of Covington, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 12/02/2023, as renewed or amended (Store #4624 - Covington) | | $0.00 |
| 121800759 | AVMH Ventures of Durham, LLC | AVMH Ventures of Durham, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #4145 - Durham) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121800761 | AVMH Ventures of Gainesville, LLC | AVMH Ventures of Gainesville, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2022, as renewed or amended (Store #4416 - Gainesville) | | $0.00 |
| 121800760 | AVMH Ventures of Gainesville, LLC | AVMH Ventures of Gainesville, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 12/19/2022, as renewed or amended (Store #4371 - Alpharetta) | | $0.00 |
| 121800762 | AVMH Ventures of Greece, LLC | AVMH Ventures of Greece, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2023, as renewed or amended (Store #4275 - Greece) | | $0.00 |
| 121800763 | AVMH Ventures of Greer, LLC | AVMH Ventures of Greer, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 03/09/2022, as renewed or amended (Store #4502 - Greer) | | $0.00 |
| 121800764 | AVMH Ventures of Groton, LLC | AVMH Ventures of Groton, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4114 - Groton) | | $0.00 |
| 121800765 | AVMH Ventures of Hickory, LLC | AVMH Ventures of Hickory, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #4058 - Hickory) | | $0.00 |
| 121800766 | AVMH Ventures of Lilburn, LLC | AVMH Ventures of Lilburn, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 08/16/2022, as renewed or amended (Store #4538 - Lilburn) | | $0.00 |
| 121800767 | AVMH Ventures of Manchester, LLC | AVMH Ventures of Manchester, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4111 - Manchester) | | $0.00 |
| 121800768 | AVMH Ventures of Manhattan, LLC | AVMH Ventures of Manhattan, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 09/06/2023, as renewed or amended (Store #4611 - Manhattan) | | $0.00 |
| 121800769 | AVMH Ventures of North Durham, LLC | AVMH Ventures of North Durham, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/01/2023, as renewed or amended (Store #4604 - North Durham) | | $0.00 |
| 121800770 | AVMH Ventures of Olathe, LLC | AVMH Ventures of Olathe, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2023, as renewed or amended (Store #4606 - Olathe) | | $0.00 |
| 121800771 | AVMH Ventures of Pinellas Park, LLC | AVMH Ventures of Pinellas Park, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #8039 - Pinellas Park) | | $0.00 |
| 121800772 | AVMH Ventures of Richmond IN, LLC | AVMH Ventures of Richmond IN, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/04/2023, as renewed or amended (Store #4615 - Richmond) | | $0.00 |
| 121800773 | AVMH Ventures of Sacramento, LLC | AVMH Ventures of Sacramento, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/24/2022, as renewed or amended (Store #4536 - Sacramento) | | $0.00 |
| 121800774 | AVMH Ventures of Sarasota, LLC | AVMH Ventures of Sarasota, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #4177 - Sarasota) | | $0.00 |
| 121800775 | AVMH Ventures of Virginia Beach, LLC | AVMH Ventures of Virginia Beach, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 11/01/2022, as renewed or amended (Store #8016 - Virginia Beach) | | $0.00 |
| 121800776 | AVMH Ventures of Webster, LLC | AVMH Ventures of Webster, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2023, as renewed or amended (Store #4278 - Webster) | | $0.00 |
| 121800777 | AVMH Ventures of West Hartford, LLC | AVMH Ventures of West Hartford, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #9020 - West Hartford) | | $0.00 |
| 121800778 | AVMH Ventures of West Union, LLC | AVMH Ventures of West Union, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 07/19/2021, as renewed or amended (Store #4442 - Seneca) | | $0.00 |
| 121800779 | AVMH Ventures of Wethersfield, LLC | AVMH Ventures of Wethersfield, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4117 - Wethersfield) | | $0.00 |
| 121800780 | AVMH Ventures of Wilmington, LLC | AVMH Ventures of Wilmington, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 04/04/2023, as renewed or amended (Store #4593 - Wilmington) | | $0.00 |
| 121800781 | AVMH Ventures of Woodland, LLC | AVMH Ventures of Woodland, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/24/2022, as renewed or amended (Store #4537 - Woodland) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121800783 | AVMH Ventures, LLC | AVMH Ventures, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2023, as renewed or amended (Store #4603 - Virginia Beach) | | $0.00 |
| 121800782 | AVMH Ventures, LLC | AVMH Ventures, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 04/19/2022, as renewed or amended (Store #4519 - Auburn) | | $0.00 |
| 121800785 | AW22 Franchise LLC | AW22 Franchise LLC<br>8354 Cupertino Heights Way<br>Las Vegas, NV 89178 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2019, as renewed or amended (Store #4297 - Las Vegas) | | $0.00 |
| 121800791 | AWPets2 Franchise LLC | AWPets2 Franchise LLC<br>8354 Cupertino Heights Way<br>Las Vegas, NV 89178 | PSP Franchising, LLC | Franchise Agreement, dated 03/01/2023, as renewed or amended (Store #4587 - Albuquerque) | | $0.00 |
| 121800801 | B & B Pet Products, LLC | B & B Pet Products, LLC<br>1611 E. Dove Rd.<br>Southlake, TX 76092 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2016, as renewed or amended (Store #4075 - Lenexa) | | $0.00 |
| 121800802 | B Pawsitive LLC | B Pawsitive LLC<br>1282 Winfield Court<br>Greenfield, IN 46143 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2024, as renewed or amended (Store #4649 - Indianapolis) | | $0.00 |
| 121800826 | Banana Machine, LLC | Banana Machine, LLC<br>1809 Avenida Alturas Northeast<br>Albuquerque, NM 87110 | PSP Franchising, LLC | Franchise Agreement, dated 02/20/2024, as renewed or amended (Store #4633 - Brookhaven) | | $0.00 |
| 121800849 | BASK Pet Supply, LLC | BASK Pet Supply, LLC<br>6609 Yawkey Way Northeast<br>Albuquerque, NM 87113 | PSP Franchising, LLC | Franchise Agreement, dated 01/18/2022, as renewed or amended (Store #4600 - Albuquerque) | | $0.00 |
| 121800851 | Battle Creek Pets, LLC | Battle Creek Pets, LLC<br>5062 Colony Woods Dr.<br>Kalamazoo, MI 49009 | PSP Franchising, LLC | Franchise Agreement, dated 09/25/2012, as renewed or amended (Store #212 - Battle Creek) | | $0.00 |
| 121800855 | Bazaarvoice, Inc. | Bazaarvoice, Inc.<br>10901 Stonelake Blvd.<br>Austin, TX 78759 | PSP Group, LLC | bazaarvoice® Amendment Service Order # 00114546 | | $0.00 |
| 121800854 | Bazaarvoice, Inc. | Bazaarvoice, Inc.<br>10901 Stonelake Blvd.<br>Austin, TX 78759 | PSP Group, LLC | Bazaarvoice Service Order | | $0.00 |
| 121800853 | Bazaarvoice, Inc. | Bazaarvoice, Inc.<br>10901 Stonelake Blvd.<br>Austin, TX 78759 | PSP Group, LLC | bazaarvoice® Renewal and Additional Products Service Order # 00198864 | | $0.00 |
| 122000112 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 76) | 76 | $0.00 |
| 122000111 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 66) | 66 | $0.00 |
| 122000110 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 65) | 65 | $0.00 |
| 122000109 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 61) | 61 | $0.00 |
| 122000108 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 59) | 59 | $0.00 |
| 122000107 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 577) | 577 | $0.00 |
| 122000106 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 574) | 574 | $0.00 |
| 122000105 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 57) | 57 | $0.00 |
| 122000104 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 566) | 566 | $0.00 |
| 122000103 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 565) | 565 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 122000102 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 563) | 563 | $0.00 |
| 122000101 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 562) | 562 | $0.00 |
| 122000100 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 561) | 561 | $0.00 |
| 122000099 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 560) | 560 | $0.00 |
| 122000098 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 559) | 559 | $0.00 |
| 122000097 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/02/2022, as amended or extended (Store 558) | 558 | $0.00 |
| 122000096 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/02/2022, as amended or extended (Store 557) | 557 | $0.00 |
| 122000095 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 556) | 556 | $0.00 |
| 122000094 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 552) | 552 | $0.00 |
| 122000093 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 55) | 55 | $0.00 |
| 122000092 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 546) | 546 | $0.00 |
| 122000091 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 545) | 545 | $0.00 |
| 122000090 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 544) | 544 | $0.00 |
| 122000089 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 543) | 543 | $0.00 |
| 122000088 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 542) | 542 | $0.00 |
| 122000087 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 538) | 538 | $0.00 |
| 122000086 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 537) | 537 | $0.00 |
| 122000085 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 522) | 522 | $0.00 |
| 122000084 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 519) | 519 | $0.00 |
| 122000083 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 518) | 518 | $0.00 |
| 122000082 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 511) | 511 | $0.00 |
| 122000081 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 510) | 510 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 122000080 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 509) | 509 | $0.00 |
| 122000079 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 508) | 508 | $0.00 |
| 122000078 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 507) | 507 | $0.00 |
| 122000077 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 505) | 505 | $0.00 |
| 122000076 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/18/2022, as amended or extended (Store 475) | 475 | $0.00 |
| 122000075 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 45) | 45 | $0.00 |
| 122000074 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 37) | 37 | $0.00 |
| 122000073 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 17) | 17 | $0.00 |
| 122000072 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1056) | 1056 | $0.00 |
| 122000071 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1049) | 1049 | $0.00 |
| 122000070 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1040) | 1040 | $0.00 |
| 122000069 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1039) | 1039 | $0.00 |
| 122000068 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1038) | 1038 | $0.00 |
| 122000067 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1032) | 1032 | $0.00 |
| 122000066 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1031) | 1031 | $0.00 |
| 122000065 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1010) | 1010 | $0.00 |
| 122000064 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1009) | 1009 | $0.00 |
| 122000063 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1008) | 1008 | $0.00 |
| 122000062 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1005) | 1005 | $0.00 |
| 122000061 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1004) | 1004 | $0.00 |
| 122000060 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1003) | 1003 | $0.00 |
| 122000059 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1002) | 1002 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 122000058 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1001) | 1001 | $0.00 |
| 122000057 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 02) | 02 | $0.00 |
| 122000056 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/01/2020, as amended or extended (Store 597) | 597 | $0.00 |
| 122000055 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/17/2022, as amended or extended (Store 596) | 596 | $0.00 |
| 122000054 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 07/15/2022, as amended or extended (Store 595) | 595 | $0.00 |
| 122000053 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 04/15/2022, as amended or extended (Store 594) | 594 | $0.00 |
| 122000052 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/15/2022, as amended or extended (Store 591) | 591 | $0.00 |
| 122000051 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/15/2021, as amended or extended (Store 590) | 590 | $0.00 |
| 121900242 | BCDPF Radar Distribution Center LLC | BCDPF Radar Distribution Center LLC<br>c/o Ares<br>1200 17th Street<br>Suite 2900<br>Denver, CO 80202 | PSP Stores, LLC | Lease, dated July 31, 2020, as amended (PA Distribution Center) | PA Distribution Center | $0.00 |
| 121800862 | BE Pets, LLC | BE Pets, LLC<br>120 Palencia Village Drive, PMB 105 Box 177<br>St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 05/01/2024, as renewed or amended (Store #4304 - Yulee) | | $0.00 |
| 121800868 | Beatrice Home Fashions, Inc. | Beatrice Home Fashions, Inc.<br>151 Helen Street<br>South Plainfield, NJ 07080 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121900053 | Bell Tower Associates | Bell Tower Associates<br>3555 Washington Road<br>McMurray, PA 15317 | PSP Stores, LLC | Lease, dated 07/02/2015, as amended (McMurray, PA) | McMurray, PA (4379) | $878.00 |
| 121800895 | Bellrock Holdings Inc | Bellrock Holdings Inc<br>1908 Oakhurst Dr.<br>Allison Park, PA 15101 | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2020, as renewed or amended (Store #4370 - Allison Park) | | $0.00 |
| 121800894 | Bellrock Holdings Inc | Bellrock Holdings Inc<br>1908 Oakhurst Dr.<br>Allison Park, PA 15101 | PSP Franchising, LLC | Franchise Agreement, dated 11/21/2016, as renewed or amended (Store #4123 - Beaver Falls) | | $0.00 |
| 121800897 | Benefit Marketing Solutions, L.L.C. | Benefit Marketing Solutions, L.L.C.<br>PO Box 803507<br>Dallas, TX 75380 | Buddy's Newco, LLC | Benefit Program Agreement | | $0.00 |
| 121800901 | BEO Enterprises, Inc. | BEO Enterprises, Inc.<br>401 S 198th Street<br>Omaha, NE 68022 | WNW Franchising, LLC | Franchise Agreement, dated 06/01/2023 (Store #3035 - Elkhorn) | | $0.00 |
| 121900170 | Berkshire Crossing Retail LLC | Berkshire Crossing Retail LLC<br>c/o Brixmor Property Group<br>450 Lexington Ave<br>13th Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease, dated 03/29/2019, as amended (Pittsfield, MA) | Pittsfield, MA (4152) | $0.00 |
| 121800907 | Best Friends Animal Society | Best Friends Animal Society<br>5001 Angel Canyon Road<br>Kanab, UT 84741 | PSP Group, LLC | Corporate Sponsorship and Licensing Agreement | | $0.00 |
| 121800935 | Big Puppy Holdings, Inc. | Big Puppy Holdings, Inc.<br>18378 Poplar Stand Place<br>Purcellville, VA 20132 | PSP Franchising, LLC | Franchise Agreement, dated 12/21/2020, as renewed or amended (Store #4404 - Purcellville) | | $0.00 |
| 121800936 | Big Sky 77, LLC | Big Sky 77, LLC<br>196 High Road<br>Kalispell, MT 59901 | PSP Franchising, LLC | Franchise Agreement, dated 11/06/2020, as renewed or amended (Store #4357 - Birmingham) | | $0.00 |
| 121800986 | Bitmantitle Incorporated | Bitmantitle Incorporated<br>791 Remington Lane<br>North Aurora, IL 60542 | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2023, as renewed or amended (Store #4602 - Venice) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121800987 | BJ, Inc. | BJ, Inc.<br>14240 Imboden Rd.<br>Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 12/03/2018, as renewed or amended (Store #4209 - Littleton) | | $0.00 |
| 121900172 | Black Creek Diversified Property Operating Partnership LP | Black Creek Diversified Property Operating Partnership LP<br>518-17th Street<br>17th Floor<br>Denver, Co 80202 | PSP Stores, LLC | Lease, dated 09/26/2017, as amended (Narragansett, RI) | Narragansett, RI (4159) | $0.00 |
| 121800991 | BlackLine Systems, Inc. | BlackLine Systems, Inc.<br>21300 Victory Blvd.<br>12th Floor<br>Woodland Hills, CA 91367 | PSP Group, LLC | BlackLine Order Form | | $165.00 |
| 140000223 | Blackline Systems, Inc. | Blackline Systems, Inc.<br>21300 Victory Blvd., 12th Floor<br>Woodland Hills, CA 91367 | Franchise Group New Holdco, LLC | Renewal Order Form | | $0.00 |
| 140000281 | Blackline Systems, Inc. | Blackline Systems, Inc.<br>21300 Victory Blvd., 12th Floor<br>Woodland Hills, CA 91367 | Franchise Group New Holdco, LLC | Assignment and Assumption Agreement by and among American Freight LLC, Franchise Group New Holdco, LLC, and Blackline Systems, Inc. | | $0.00 |
| 121801001 | Blain, Inc. | Blain, Inc.<br>14240 Imboden Rd.<br>Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 07/30/2021, as renewed or amended (Store #4462 - Aurora) | | $0.00 |
| 121900123 | Blue Ash OH Center LLC | Blue Ash OH Center LLC<br>c/o Gershenson Realty & Investment<br>31500 Northwestern Hwy.<br>Suite 100<br>Farmington Hills, MI 48334 | PSP Stores, LLC | Lease, dated 07/23/2013, as amended (Blue Ash, OH) | Blue Ash, OH (0218) | $0.00 |
| 121801009 | Blue Chip Talent | Blue Chip Talent<br>43252 Woodward Suite 240<br>Bloomfield Hills, MI 48302 | Pet Supplies "Plus", LLC | Direct Placement Search Agreement | | $0.00 |
| 121900037 | Blue Mountain IPG Associates, LP | Blue Mountain IPG Associates, LP<br>c/o Stonehenge Advisors<br>4328-42 Ridge Ave<br>Unit 104<br>Philadelphia, PA 19129 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/29/2010, as amended (Hamburg, PA) | Hamburg, PA (9048) | $0.00 |
| 121801013 | Blue Sky Pet Supplies LLC | Blue Sky Pet Supplies LLC<br>606 Liberty Avenue, 3rd Floor Suite #107<br>Pittsburgh, PA 15222 | PSP Franchising, LLC | Franchise Agreement, dated 07/17/2019, as renewed or amended (Store #4263 - State College) | | $0.00 |
| 121801015 | Blue Yonder, Inc. | Blue Yonder, Inc.<br>15059 N. Scottsdale Rd.<br>Suite 400<br>Scottsdale, AZ 85254 | PSP Group, LLC | SaaS and Professional Services Agreement | | $0.00 |
| 122000150 | BMH PRIME 95, LLC | BMH PRIME 95, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/23/2022, between Buddy's Franchising and Licensing LLC and BMH PRIME 95, LLC | 646 | $0.00 |
| 122000148 | BMH PRIME 96, LLC | BMH PRIME 96, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/23/2022, between Buddy's Franchising and Licensing LLC and BMH PRIME 96, LLC | 644 | $0.00 |
| 122000114 | BMH-FAN 45, LLC | BMH-FAN 45, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 45, LLC | 604 | $0.00 |
| 122000115 | BMH-FAN 46, LLC | BMH-FAN 46, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 46, LLC | 605 | $0.00 |
| 122000124 | BMH-FAN 47, LLC | BMH-FAN 47, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 47, LLC | 614 | $0.00 |
| 122000116 | BMH-FAN 48, LLC | BMH-FAN 48, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 48, LLC | 606 | $0.00 |
| 122000117 | BMH-FAN 49, LLC | BMH-FAN 49, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 49, LLC | 607 | $0.00 |
| 122000118 | BMH-FAN 50, LLC | BMH-FAN 50, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 50, LLC | 608 | $0.00 |
| 122000120 | BMH-FAN 52, LLC | BMH-FAN 52, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 52, LLC | 610 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000123 | BMH-FAN 53, LLC | BMH-FAN 53, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 53, LLC | 613 | $0.00 |
| 122000121 | BMH-FAN 54, LLC | BMH-FAN 54, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 54, LLC | 611 | $0.00 |
| 122000133 | BMH-NEW 55, LLC | BMH-NEW 55, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/14/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 55, LLC | 626 | $0.00 |
| 122000132 | BMH-NEW 56, LLC | BMH-NEW 56, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 56, LLC | 625 | $0.00 |
| 122000135 | BMH-NEW 57, LLC | BMH-NEW 57, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/31/2020, between Buddy's Franchising and Licensing LLC and BMH-NEW 57, LLC | 630 | $0.00 |
| 122000128 | BMH-NEW 59, LLC | BMH-NEW 59, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/05/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 59, LLC | 618 | $0.00 |
| 122000129 | BMH-NEW 60, LLC | BMH-NEW 60, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/05/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 60, LLC | 619 | $0.00 |
| 122000134 | BMH-NEW 63, LLC | BMH-NEW 63, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 07/01/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 63, LLC | 627 | $0.00 |
| 122000144 | BMH-NEW 65, LLC | BMH-NEW 65, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/15/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 65, LLC | 639 | $0.00 |
| 122000126 | BMH-NEW 70, LLC | BMH-NEW 70, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/01/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 70, LLC | 616 | $0.00 |
| 122000131 | BMH-NEW 71, LLC | BMH-NEW 71, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 71, LLC | 624 | $0.00 |
| 122000165 | BMH-RCL 35, LLC | BMH-RCL 35, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 35, LLC | 312 | $0.00 |
| 122000160 | BMH-RCL 37, LLC | BMH-RCL 37, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 37, LLC | 307 | $0.00 |
| 122000161 | BMH-RCL 38, LLC | BMH-RCL 38, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 38, LLC | 308 | $0.00 |
| 122000166 | BMH-RCL 39, LLC | BMH-RCL 39, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 39, LLC | 313 | $0.00 |
| 122000162 | BMH-RCL 40, LLC | BMH-RCL 40, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 40, LLC | 309 | $0.00 |
| 122000158 | BMH-RCL 42, LLC | BMH-RCL 42, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 42, LLC | 304 | $0.00 |
| 122000136 | BMH-SM 79, LLC | BMH-SM 79, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 79, LLC | 631 | $0.00 |
| 122000137 | BMH-SM 80, LLC | BMH-SM 80, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 80, LLC | 632 | $0.00 |
| 122000138 | BMH-SM 81, LLC | BMH-SM 81, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 81, LLC | 633 | $0.00 |
| 122000139 | BMH-SM 82, LLC | BMH-SM 82, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 82, LLC | 634 | $0.00 |
| 122000140 | BMH-SM 83, LLC | BMH-SM 83, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 83, LLC | 635 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000141 | BMH-SM 85, LLC | BMH-SM 85, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 85, LLC | 636 | $0.00 |
| 122000142 | BMH-SM 86, LLC | BMH-SM 86, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 86, LLC | 637 | $0.00 |
| 122000143 | BMH-SM 87, LLC | BMH-SM 87, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 87, LLC | 638 | $0.00 |
| 122000152 | BMH-TB 72, LLC | BMH-TB 72, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020, between Buddy's Franchising and Licensing LLC and BMH-TB 72, LLC | 04 | $0.00 |
| 122000154 | BMH-TB 74, LLC | BMH-TB 74, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/10/2020, between Buddy's Franchising and Licensing LLC and BMH-TB 74, LLC | 06 | $0.00 |
| 122000155 | BMH-TB 75, LLC | BMH-TB 75, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020, between Buddy's Franchising and Licensing LLC and BMH-TB 75, LLC | 07 | $0.00 |
| 122000156 | BMH-TB 76, LLC | BMH-TB 76, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020, between Buddy's Franchising and Licensing LLC and BMH-TB 76, LLC | 08 | $0.00 |
| 122000173 | BMH-TB 78, LLC | BMH-TB 78, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/10/2020, between Buddy's Franchising and Licensing LLC and BMH-TB 78, LLC | 39 | $0.00 |
| 122000169 | BMH-TNM 28, LLC | BMH-TNM 28, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/20/2017, between Buddy's Franchising and Licensing LLC and BMH-TNM 28, LLC | 375 | $0.00 |
| 122000192 | BMH-TNM 29, LLC | BMH-TNM 29, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/13/2016, between Buddy's Franchising and Licensing LLC and BMH-TNM 29, LLC | 568 | $0.00 |
| 122000170 | BMH-TNM 30, LLC | BMH-TNM 30, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/20/2017, between Buddy's Franchising and Licensing LLC and BMH-TNM 30, LLC | 376 | $0.00 |
| 122000172 | BMH-TNM 32, LLC | BMH-TNM 32, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/20/2017, between Buddy's Franchising and Licensing LLC and BMH-TNM 32, LLC | 378 | $0.00 |
| 122000194 | BMH-TNM 33, LLC | BMH-TNM 33, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2017, between Buddy's Franchising and Licensing LLC and BMH-TNM 33, LLC | 592 | $0.00 |
| 121801032 | BNG Phoebe, LLC | BNG Phoebe, LLC<br>109 Persnickety Place<br>Kiel, WI 53042 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121900067 | Boardman Plaza Associates LLC | Boardman Plaza Associates LLC<br>20950 Libby Road<br>Maple Heights, GA 30363 | PSP Stores, LLC | Lease, dated 04/12/1993, as amended (Youngstown, OH) | Youngstown, OH (0051) | $0.00 |
| 121801037 | BoBo's Pantry, LLC | BoBo's Pantry, LLC<br>14090 FM 2920, Ste. G551<br>Tomball, TX 77377 | PSP Franchising, LLC | Lease, dated 05/18/2022, as renewed or amended (Store #4540 - Conroe) | | $0.00 |
| 121900030 | Bobson Portfolio Holdings LLC | Bobson Portfolio Holdings LLC<br>c/o Davis Management Company, LLC<br>125 High Street<br>Suite 2111<br>Boston, MA 02110-2704 | Pet Supplies "Plus", LLC | Lease Agreement, dated 06/29/1995, as amended (Quincy, MA) | Quincy, MA (9013) | $0.00 |
| 121801047 | BoeFly, LLC | BoeFly, LLC<br>50 West 72nd Street<br>New York, NY 10023 | PSP Midco, LLC | BoeFly Franchise Sales & Financing System Agreement | | $0.00 |
| 121801061 | Boomi, Inc. | Boomi, Inc.<br>1400 Liberty Ridge Drive<br>Chesterbrook, PA 19087 | Pet Supplies "Plus", LLC | Boomi Services Order Form | | $0.00 |
| 121801068 | Boudreaux Operating Acquisitions LLC | Boudreaux Operating Acquisitions LLC<br>100 Four Paws Lane<br>Maumelle, AR 72113 | PSP Group, LLC | PSP Private Brand Agreement Consumables | | $0.00 |
| 121900070 | Boulevard Centre LLC | Boulevard Centre LLC<br>Attn: Legal Dept<br>5577 Youngstown-Warren Road<br>Niles, OH 44446 | PSP Stores, LLC | Lease, dated 08/21/1996, as amended (Niles, OH) | Niles, OH (0056) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900243 | Bradley Boulevard Shopping Center | Bradley Boulevard Shopping Center 12510 Property Drive Suite 150 Silver Spring, MA 20904-1639 | PSP Stores, LLC | Lease, dated 10/05/2018, as amended (Bethesda, MD) | Bethesda, MD | $1,866.67 |
| 121900226 | BRE DDR IVA Southmont PA LLC | BRE DDR IVA Southmont PA LLC c/o DDR Corp. 3300 Enterprise Parkway Beachwood, OH 44122 | PSP Stores, LLC | Lease, dated 05/09/2003, as amended (Easton, PA) | Easton, PA (9041) | $13,048.68 |
| 140000277 | BRE Retail Residual Owner 1 LLC | BRE Retail Residual Owner 1 LLC c/o Brixmor Property Group 450 Lexington Ave 13th Floor New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated March 31, 2014, as amended (Cincinnati, OH - Delhi) | Cincinnati, OH (Delhi) (0233) | $0.00 |
| 121900131 | BRE Retail Residual Owner 2 LLC | BRE Retail Residual Owner 2 LLC c/o Brixmor Property Group 450 Lexington Ave 13th Floor New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 03/31/2014, as amended (Cincinnati, OH) | Cincinnati, OH (Symmes Twp) (0234) | $0.00 |
| 121801103 | BreakthroughFuel LLC | BreakthroughFuel LLC 1175 Lombardi Avenue Green Bay, WI 54304 | PSP Distribution, LLC | Master Services Agreement | | $9,000.00 |
| 121801102 | BreakthroughFuel LLC | BreakthroughFuel LLC 1175 Lombardi Avenue Green Bay, WI 54304 | PSP Distribution, LLC | Statement of Work #1 to Master Services Agreement (Fuel Recovery Services) | | $0.00 |
| 121900031 | Brian J. McLaughlin | Brian J. McLaughlin c/o D'Angelo, Inc. 323 Manley Street West Bridgewater, MA 02379 | Pet Supplies "Plus", LLC | Lease, dated 06/06/2002, as amended (Raynham, MA) | Raynham, MA (9014) | $0.00 |
| 121900201 | Brixmor / IA Bennets Mills Plaza, LLC | Brixmor / IA Bennets Mills Plaza, LLC c/o Brixmor Property Group 450 Lexington Ave, 13Th Floor New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 11/01/2021, as amended (Jackson Township, NJ) | Jackson, NJ (4439) | $0.00 |
| 121900069 | Brixmor GA Arlington Heights LLC | Brixmor GA Arlington Heights LLC c/o Brixmor Property Group 450 Lexington Ave. 13th Floor New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 01/25/2017, as amended (Arlington Heights, IL) | Arlington Heights, IL (Ridge Plaza) (0054) | $0.00 |
| 121900158 | Brixmor GA Lunenburg Crossing LLC | Brixmor GA Lunenburg Crossing LLC c/o Brixmor Property Group 450 Lexington Ave 13th Floor New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 06/30/2016, as amended (Lunenburg, MA) | Lunenburg, MA (4078) | $0.00 |
| 121900218 | Brixmor GA Wilkes-Barre LP | Brixmor GA Wilkes-Barre LP c/o Brixmor Property Group 450 Lexington Ave 13th Floor New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 06/03/2020, as amended (Wilkes-Barre Township, PA) | Wilkes Barre, PA (9012) | $0.00 |
| 121900245 | Brixmor Holdings 1 SPE, LLC | Brixmor Holdings 1 SPE, LLC c/o Brixmor Property Group 450 Lexington Ave 13th Floor New York, NY 10017 | WNW Stores, LLC | Lease, dated 02/28/2022, as amended (Ann Arbor, MI) | Ann Arbor, MI (3022) | $0.00 |
| 121900186 | Brixmor SPE 5 LLC | Brixmor SPE 5 LLC c/o Brixmor Property Group 450 Lexington Ave 13th Floor New York, NY 10017 | PSP Stores, LLC | Lease, dated 08/08/2019, as amended (Roseville, MN) | Roseville, MN (4265) | $0.00 |
| 121900185 | Brixmor Sunshine Square LLC | Brixmor Sunshine Square LLC c/o Brixmor Property Group 200 Ridge Pike Suite 100 Conshohocken, PA 19428 | PSP Stores, LLC | Lease, dated 03/28/2019, as amended (Medford, NY) | Medford, NY (4249) | $0.00 |
| 121900115 | Brookdale Shopping Center, L.L.C. | Brookdale Shopping Center, L.L.C. 31713 Northwestern Hwy Suite 250W Farmington Hills, MI 48334 | PSP Stores, LLC | Lease Agreement, dated 07/25/2012, as amended (South Lyon, MI) | South Lyon, MI (0207) | $0.00 |
| 122000010 | Brooksville Square Plaza, LLC | Brooksville Square Plaza, LLC RE: BROOKSVILLE SQUARE PLAZA LLC PO BOX 47952 TAMPA, FL 33646 | Buddy's Newco, LLC | Lease Agreement dated October 3, 2019, as amended (Store 23) | 23 | $384.41 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121801132 | Brother International Corporation | Brother International Corporation<br>200 Crossing Blvd<br>Bridgewater, NJ 08807 | PSP Group, LLC | Priority Plus Support, Warranty and Portal Exchange Service Agreement | | $0.00 |
| 121801134 | Brother International Corporation | Brother International Corporation<br><br>200 Crossing Blvd<br>Bridgewater, NJ 08807 | Pet Supplies "Plus", LLC | Priority Exchange Service Agreement | | $0.00 |
| 121801138 | Broven, Inc. | Broven, Inc.<br>49 Friend St.<br>East Weymouth, MA 02189 | PSP Franchising, LLC | Franchise Agreement, dated 08/23/2018, as renewed or amended (Store #4207 - Plymouth) | | $0.00 |
| 121801139 | Brownfield Enterprises, LLC | Brownfield Enterprises, LLC<br>211 Fantasy Lane<br>Ligonier, PA 15658 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4181 - Johnston) | | $0.00 |
| 121900147 | Brunswick Center Associates, L.L.C. | Brunswick Center Associates, L.L.C.<br>c/o Nigro Companies<br>20 Corporate Woods Blvd.<br>Albany, NY 12211 | PSP Stores, LLC | Lease, dated 08/28/2015, as amended (Troy, NY) | Brunswick, NY (Troy) (4032) | $837.61 |
| 121801149 | Bryte, Inc. | Bryte, Inc.<br>880 Georgetowne Lane<br>Barrington, IL 60010 | PSP Franchising, LLC | Franchise Agreement, dated 11/28/2016, as renewed or amended (Store #4120 - Evanston) | | $0.00 |
| 121801150 | B-Scott, Inc. | B-Scott, Inc.<br>750 General Motors Rd<br>Milford, MI 48381-2220 | PSP Franchising, LLC | Franchise Agreement, dated 06/09/2005, as renewed or amended (Store #167 - Milford) | | $0.00 |
| 122000196 | Buddy Mac Eight, LLC | Buddy Mac Eight, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/01/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Eight, LLC | 602 | $0.00 |
| 122000174 | Buddy Mac Eighteen, LLC | Buddy Mac Eighteen, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/16/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Eighteen, LLC | 430 | $0.00 |
| 122000195 | Buddy Mac Eleven, LLC | Buddy Mac Eleven, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/25/2018, between Buddy's Franchising and Licensing LLC and Buddy Mac Eleven, LLC | 601 | $0.00 |
| 122000181 | Buddy Mac Fifteen, LLC | Buddy Mac Fifteen, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/16/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Fifteen, LLC | 471 | $0.00 |
| 122000193 | Buddy Mac Fourteen, LLC | Buddy Mac Fourteen, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2016, between Buddy's Franchising and Licensing LLC and Buddy Mac Fourteen, LLC | 579 | $0.00 |
| 122000186 | Buddy Mac Seven, LLC | Buddy Mac Seven, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/13/2016, between Buddy's Franchising and Licensing LLC and Buddy Mac Seven, LLC | 492 | $0.00 |
| 122000189 | Buddy Mac Six, LLC | Buddy Mac Six, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 07/06/2016, between Buddy's Franchising and Licensing LLC and Buddy Mac Six, LLC | 496 | $0.00 |
| 122000188 | Buddy Mac Ten, LLC | Buddy Mac Ten, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/13/2016, between Buddy's Franchising and Licensing LLC and Buddy Mac Ten, LLC | 495 | $0.00 |
| 122000184 | Buddy Mac Three, LLC | Buddy Mac Three, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/03/2015, between Buddy's Franchising and Licensing LLC and Buddy Mac Three, LLC | 490 | $0.00 |
| 122000179 | Buddy Mac Twenty-Five, LLC | Buddy Mac Twenty-Five, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Five, LLC | 436 | $0.00 |
| 122000178 | Buddy Mac Twenty-Four, LLC | Buddy Mac Twenty-Four, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Four, LLC | 435 | $0.00 |
| 122000191 | Buddy Mac Twenty-Seven, LLC | Buddy Mac Twenty-Seven, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Seven, LLC | 515 | $0.00 |
| 122000180 | Buddy Mac Twenty-Six, LLC | Buddy Mac Twenty-Six, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Six, LLC | 437 | $0.00 |
| 122000177 | Buddy Mac Twenty-Three, LLC | Buddy Mac Twenty-Three, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Three, LLC | 434 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 122000176 | Buddy Mac Twenty-Two, LLC | Buddy Mac Twenty-Two, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Two, LLC | 433 | $0.00 |
| 122000198 | Buddy West LLC | Buddy West LLC 144 Overlook Court Henderson, NV 89074 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 04/25/2024, as amended or extended (Store 141) | 141 | $0.00 |
| 122000197 | Buddy West LLC | Buddy West LLC 144 Overlook Court Henderson, NV 89074 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/02/2024, as amended or extended (Store 140) | 140 | $0.00 |
| 121801165 | Buffalo Newspress, Inc | Buffalo Newspress, Inc 200 Broadway Buffalo, NY 14204 | PSP Stores, LLC | Printing Agreement | | $0.00 |
| 121801169 | BUFFALO NEWSPRESS, INC. | BUFFALO NEWSPRESS, INC. 200 Broadway Buffalo, NY 14204 | PSP Group, LLC | Addendum to Printing Agreement | | $0.00 |
| 121900139 | Burlington Development, LLC | Burlington Development, LLC 3101 Ingersoll Avenue Suite 300 Des Moines, IA 50312 | PSP Stores, LLC | Lease Agreement, dated 09/26/2014, as amended (Burlington, IA) | Burlington, IA (0244) | $0.00 |
| 121900072 | BWI Westwood LLC | BWI Westwood LLC 731 E. Palisade Avenue Suite 201 Englewood Cliffs, NJ 07632 | PSP Stores, LLC | Lease, dated 05/02/1994, as amended (Alliance, OH) | Alliance, OH (0067) | $0.00 |
| 121801195 | C.J. Foods, Inc. | C.J. Foods, Inc. 322 Main Street Bern, KS 66408 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121801194 | C.J. Foods, Inc. | C.J. Foods, Inc. 322 Main Street Bern, KS 66408 | PSP Franchising, LLC | Private Brand Agreement | | $0.00 |
| 121801206 | Callie Enterprises, LLC | Callie Enterprises, LLC c/o Pet Supplies Plus, 1300 MacDade Boulevard Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 09/01/2020, as renewed or amended (Store #4345 - Philadelphia) | | $0.00 |
| 121900004 | Canton Aires Shopping Plaza, LLC | Canton Aires Shopping Plaza, LLC 361 17th Street NW Unit 2601 Atlanta, GA 30363 | Pet Supplies "Plus", LLC | Lease Agreement, dated 04/21/1993, as amended (Canton, OH) | Canton, OH (0049) | $0.00 |
| 121900233 | Capital Enterprises, Inc. | Capital Enterprises, Inc. 555 City Avenue Suite 1130 Bala Cynwyd, PA 19004 | PSP Stores, LLC | Lease, dated 08/13/2012, as amended (West Chester, PA) | West Chester, PA (9059) | $0.00 |
| 121801254 | Cardinal Path LLC | Cardinal Path LLC 515 N. State Street 19th Floor Chicago, IL 60654 | PSP Group, LLC | Master Services Agreement | | $9,250.82 |
| 121801251 | Cardinal Path LLC | Cardinal Path LLC 515 N. State Street 19th Floor Chicago, IL 60654 | PSP Group, LLC | Google Analytics 4 License & Services Order Form | | $0.00 |
| 121801250 | Cardinal Path LLC | Cardinal Path LLC 515 N. State Street 19th Floor Chicago, IL 60654 | PSP Group, LLC | Statement of Work #1 | | $0.00 |
| 121801292 | Carros, Inc. | Carros, Inc. 7585 Juniper Drive Colorado Springs, CO 80908 | WNW Franchising, LLC | Franchise Agreement, dated 08/29/2022, as renewed (Store #3000 - Monument) | | $0.00 |
| 121801299 | Cascade Enterprises, LLC | Cascade Enterprises, LLC 16915 El Camino Real Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 07/30/2021, as renewed or amended (Store #4463 - Houston ) | | $0.00 |
| 121801298 | Cascade Enterprises, LLC | Cascade Enterprises, LLC 16915 El Camino Real Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2020, as renewed or amended (Store #4317 - Houston) | | $0.00 |
| 121801297 | Cascade Enterprises, LLC | Cascade Enterprises, LLC 16915 El Camino Real Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 09/26/2018, as renewed or amended (Store #4202 - Houston) | | $0.00 |
| 121801296 | Cascade Enterprises, LLC | Cascade Enterprises, LLC 16915 El Camino Real Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 07/19/2017, as renewed or amended (Store #4149 - League City) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801295 | Cascade Enterprises, LLC | Cascade Enterprises, LLC<br>16915 El Camino Real<br>Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 09/27/2024, as renewed or amended (Store #4072 - Houston) | | $0.00 |
| 121801294 | Cascade Enterprises, LLC | Cascade Enterprises, LLC<br>16915 El Camino Real<br>Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4476 - Cypress) | | $0.00 |
| 121801301 | Catchpoint Systems, Inc. | Catchpoint Systems, Inc.<br>228 Park Ave S #28080<br>New York, NY 10003-1502 | Pet Supplies "Plus", LLC | Catchpoint Systems, Inc. Service Order | | $0.00 |
| 121900211 | CBL & Associates Management, Inc. | CBL & Associates Management, Inc.<br>CBL Center<br>Suite 500<br>2030 Hamilton Place Blvd<br>Chattanooga, TN 37421-6000 | PSP Stores, LLC | Lease, dated 09/09/2010, as amended (Robinson Township, PA) | Robinson Twp, PA (Pittsburgh) (4647) | $0.00 |
| 121801313 | CBS Ventures, LLC | CBS Ventures, LLC<br>PO Box 8543<br>Omaha, NE 68108-0543 | PSP Franchising, LLC | Franchise Agreement, dated 06/01/2021, as renewed or amended (Store #4440 - Omaha) | | $0.00 |
| 121900036 | CCP&FSG, L.P. | CCP&FSG, L.P.<br>c/o U.S. Realty Associates, Inc.<br>120 E. Lancaster Ave.<br>Suite 101<br>Ardmore, PA 19003 | Pet Supplies "Plus", LLC | Lease Agreement, dated 09/12/2003, as amended (Telford, PA) | Telford, PA (9040) | $0.00 |
| 121801320 | cdbell LLC | cdbell LLC<br>116 Five Oaks Drive<br>Greer, SC 29651 | WNW Franchising, LLC | Franchise Agreement, dated 11/04/2022 (Store #3021 - Greer) | | $0.00 |
| 121900142 | CEA Beverly LLC | CEA Beverly LLC<br>1105 Massachusetts Avenue<br>Suite 2F<br>Cambridge, MA 02138 | PSP Stores, LLC | Lease, dated 02/23/2017, as amended (Beverly, MA) | Beverly, MA (3024) | $0.00 |
| 121801324 | Cellco Partnership doing business as Verizon Wireless | Cellco Partnership doing business as Verizon Wireless<br>PO Box 15062<br>Albany, NY 12212 | PSP Group, LLC | Amendment No. 1 to Contract No. 4100002 | | $0.00 |
| 121900075 | Centerpointe Plaza Associates LP | Centerpointe Plaza Associates LP<br>c/o Carnegie Management & Development Corp.<br>27500 Detroit Road,<br>Suite 300<br>Westlake, OH 44145 | PSP Stores, LLC | Lease, dated 06/05/2002, as amended (Medina, OH) | Medina, OH (0092) | $0.00 |
| 121900164 | Central Islip Holdings LLC | Central Islip Holdings LLC<br>1299-B North Avenue<br>New Rochelle, NY 10804 | PSP Stores, LLC | Lease, dated 01/18/2016, as amended (Central Islip, NY) | Central Islip, NY (4098) | $0.00 |
| 121900101 | Central Rock, LLC | Central Rock, LLC<br>5215 Monroe Street<br>Suite 8<br>Toledo, OH 43623 | PSP Stores, LLC | Lease, dated 06/15/2023, as amended (Sylvania, OH) | Sylvania, OH (0148) | $0.00 |
| 121801362 | ChainXY Solutions Inc. | ChainXY Solutions Inc.<br>318-1788 5th Ave W<br>Vancouver, BC BC V6J 1P2 | Pet Supplies "Plus", LLC | End User License Agreement | | $0.00 |
| 129900051 | Chandon Enterprise, LLC | Chandon Enterprise, LLC<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19801 | PSP Franchising, LLC | Franchise Agreement, dated 01/31/2019, as renewed or amended (Store #4431 - Doylestown ) | | $0.00 |
| 121801372 | CHARJON Enterprises, LLC | CHARJON Enterprises, LLC<br>PO Box 42<br>Bullard, TX 75757 | PSP Franchising, LLC | Franchise Agreement, dated 04/25/2019, as renewed or amended (Store #4254 - Shreveport) | | $0.00 |
| 121801371 | CHARJON Enterprises, LLC | CHARJON Enterprises, LLC<br>PO Box 42<br>Bullard, TX 75757 | PSP Franchising, LLC | Franchise Agreement, dated 06/07/2018, as renewed or amended (Store #4194 - Tyler) | | $0.00 |
| 121801378 | Charlottes House, LLC | Charlottes House, LLC<br>10767 Adams Road<br>Galena, OH 43021 | PSP Franchising, LLC | Franchise Agreement, dated 07/01/2024, as renewed or amended (Store #4443 - Marysville) | | $0.00 |
| 121801383 | CHEP USA | CHEP USA<br>5897 Windward Parkway<br>Alpharetta, GA 30005 | Pet Supplies "Plus", LLC | Participating Distributor Agreement with CHEP | | $0.00 |
| 121801392 | Chiara Investments, Inc. | Chiara Investments, Inc.<br>3956 Ivy Road NE<br>Atlanta, GA 30342 | PSP Franchising, LLC | Franchise Agreement, dated 07/17/2023, as renewed or amended (Store #4608 - Buford) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|-------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900182 | Chili MZL, LLC | Chili MZL, LLC c/o KPR Centers LLC 535 Fifth Ave 12th Floor New York, NY 10017 | PSP Stores, LLC | Lease, dated 09/12/2018, as amended (Rochester, NY) | Chili (Rochester), NY (4200) | $779.78 |
| 121802286 | Chinmay Patel (Entity Pending) | Chinmay Patel (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2023, as renewed or amended (Store #N/A - Freehold Twp.) | | $0.00 |
| 140000275 | Chris Rowland | Chris Rowland Address on File | Franchise Group Newco PSP, LLC | Employment Agreement, dated as of January 2021, by and between Franchise Group Newco PSP, LLC and Christopher Rowland, as amended | | $0.00 |
| 121801414 | Church & Dwight Co., Inc. | Church & Dwight Co., Inc. 500 Charles Ewing Boulevard Ewing, NJ 08628 | PSP Distribution, LLC | Church & Dwight Customer Backhaul Allowance Agreement | | $0.00 |
| 121801430 | Cintas Corporation | Cintas Corporation 4310 Metro Parkway Ft. Myers, FL 33916 | Pet Supplies "Plus", LLC | Standard Uniform Rental Service Agreement | | $18,575.52 |
| 121801423 | Cintas Corporation No. 2 | Cintas Corporation No. 2 4310 Metro Parkway Ft. Myers, FL 33916 | PSP Stores, LLC | Third Amendment of the National Fire Protection Agreement | | $0.00 |
| 121801432 | Cintas First Aid & Safety, a division of Cintas Corporation | Cintas First Aid & Safety, a division of Cintas Corporation 4310 Metro Parkway Ft. Myers, FL 33916 | Pet Supplies "Plus", LLC | ReviveR™ View Service Agreement | | $0.00 |
| 121801440 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation 1111 Old Eagle School Road Wayne, PA 19087 | PSP Stores, LLC | Master Lease Agreement | | $0.00 |
| 121801438 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation 1111 Old Eagle School Road Wayne, PA 19087 | Pet Supplies "Plus", LLC | Lease Agreement | | $0.00 |
| 121801437 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation 1111 Old Eagle School Road Wayne, PA 19087 | Buddy's Newco, LLC | Lease Agreement | | $0.00 |
| 121801436 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation 1111 Old Eagle School Road Wayne, PA 19087 | Buddy's Newco, LLC | Lease Agreement | | $0.00 |
| 121801435 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation 1111 Old Eagle School Road Wayne, PA 19087 | Buddy's Newco, LLC | Lease Agreement | | $0.00 |
| 121801434 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation 1111 Old Eagle School Road Wayne, PA 19087 | Buddy's Newco, LLC | Cisco Meraki License | | $7,111.57 |
| 121801448 | CK Designs LLC | CK Designs LLC 930 E 42nd Place Chicago, IL 60653 | PSP Franchising, LLC | Franchise Agreement, dated 07/26/2021, as renewed or amended (Store #4457 - LaGrange) | | $0.00 |
| 121801468 | Cleveland Browns Football Company LLC Cleveland Browns Stadium Company LLC | Cleveland Browns Football Company LLC Cleveland Browns Stadium Company LLC 76 Lou Groza BLVD Berea, OH 44017 | PSP Group, LLC | Sponsorship Agreement between Pet Supplies Plus and Cleveland Browns | | $0.00 |
| 121900078 | Clocktower Plaza, LLC | Clocktower Plaza, LLC c/o CTW Development Corp 970 Windham Court, Suite 7 Boardman, OH 44512 | PSP Stores, LLC | Lease, dated 07/01/1997, as amended (Lima, OH) | Lima, OH (0101) | $0.00 |
| 121801476 | Club Drive Investments Company | Club Drive Investments Company 6030 Pennsylvania Ave. Lansing, MI 48911 | PSP Franchising, LLC | Franchise Agreement, dated 02/23/1991, as renewed or amended (Store #9 - Lansing) | | $0.00 |
| 121801478 | CMQ Enterprises, Inc. | CMQ Enterprises, Inc. 2501 Pennington Place Valparaiso, IN 46383 | PSP Franchising, LLC | Franchise Agreement, dated 01/27/2006, as renewed or amended (Store #169 - Dyer) | | $0.00 |
| 121801484 | Coastal Pet Products Inc. | Coastal Pet Products Inc. 911 Lead Way Alliance, OH 44601 | PSP Group, LLC | Coastal Pet Products Inc. and Pet Supplies Plus Contract | | $0.00 |
| 121801488 | Coborn's Inc. | Coborn's Inc. 1921 Coborn Blvd St. Cloud, MN 56301 | PSP Franchising, LLC | Franchise Agreement, dated 02/07/2024, as renewed or amended (Store #4630 - Otsego) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801499 | Columbia Banking System, Inc. Gupton Marrs International, Inc. | Columbia Banking System, Inc. Gupton Marrs International, Inc. 1301 A Street Suite 800 Tacoma, WA 98402-2156 | PSP Group, LLC | Order Form for WorkItem.com Services | | $0.00 |
| 121801506 | COMCAST | COMCAST PO Box 8587 Philadelphia, PA 19101 | PSP Group, LLC | Move / Upgrade of Service Form | | $0.00 |
| 121801505 | Comcast | Comcast PO Box 8587 Philadelphia, PA 19101 | PSP Group, LLC | Comcast Enterprise Services Sales Order Form | | $0.00 |
| 121801509 | Comcast Cable Communications Management, LLC | Comcast Cable Communications Management, LLC PO Box 8587 Philadelphia, PA 19101 | PSP Group, LLC | Comcast Business Service Order Agreement | | $0.00 |
| 121801508 | Comcast Cable Communications Management, LLC | Comcast Cable Communications Management, LLC PO Box 8587 Philadelphia, PA 19101 | PSP Group, LLC | Comcast Enterprise Services Master Services Agreement | | $0.00 |
| 121801539 | Community Veterinary Clinics, LLC | Community Veterinary Clinics, LLC 5813 Skylane Blvd. Windsor, CA 95492 | Pet Supplies "Plus", LLC | Master Service Agreement | | $0.00 |
| 121801541 | Comm-Works, LLC | Comm-Works, LLC 1405 Xenium Lane N Suite 120 Minneapolis, MN 55441 | PSP Stores, LLC | Pet Supplies Plus Hosted IP Phone Deployment Scope of Work | | $0.00 |
| 121801559 | Concur Technologies, Inc. | Concur Technologies, Inc. 601 108th Ave NE Suite 1000 Bellevue, WA 98004 | Pet Supplies "Plus", LLC | Concur Technologies, Inc. Order Form | | $0.00 |
| 121801558 | Concur Technologies, Inc. | Concur Technologies, Inc. 601 108Th Ave Ne Suite 1000 Bellevue, WA 98004 | Buddy's Newco, LLC | Order Form for Services | | $0.00 |
| 121801566 | ConnectWise, LLC | ConnectWise, LLC 400 N Tampa St Suite 130 Tampa, FL 33602 | Buddy's Newco, LLC | Software License Agreement Update | | $0.00 |
| 121801565 | ConnectWise, LLC | ConnectWise, LLC 400 N Tampa St Suite 130 Tampa, FL 33602 | Buddy's Newco, LLC | Software License Agreement Update | | $0.00 |
| 121801564 | ConnectWise, LLC | ConnectWise, LLC 400 N Tampa St Suite 130 Tampa, FL 33602 | Buddy's Newco, LLC | Software License Agreement | | $0.00 |
| 140000227 | Constellation NewEnergy, Inc. | Constellation NewEnergy, Inc. 1001 Louisiana St., Constellation Suite 2300 Houston, TX 77002 | PSP Stores, LLC | New Jersey Electricity Supply Agreement, dated January 1, 2022 | | $0.00 |
| 140000226 | Constellation NewEnergy, Inc. | Constellation NewEnergy, Inc. 1001 Louisiana St., Constellation Suite 2300 Houston, TX 77002 | PSP Stores, LLC | New Jersey Electricity Supply Agreement, dated January 1, 2022 | | $0.00 |
| 140000225 | Constellation NewEnergy, Inc. | Constellation NewEnergy, Inc. 1001 Louisiana St., Constellation Suite 2300 Houston, TX 77002 | PSP Stores, LLC | Electricity Supply Agreement - Fixed Price Solutions, dated April 18, 2023 | | $0.00 |
| 121801612 | Continental Services | Continental Services 1578 Reliable Parkway Chicago, IL 60686 | PSP Group, LLC | Market Twenty 4 Seven Agreement - Terms and Conditions | | $9,437.13 |
| 121801637 | Coop Enterprises, LLC | Coop Enterprises, LLC 820 Bella Vista Court S Jupiter, FL 33477 | PSP Franchising, LLC | Franchise Agreement, dated 06/08/2022, as renewed or amended (Store #4528 - Boca Raton) | | $0.00 |
| 121801636 | Coop Enterprises, LLC | Coop Enterprises, LLC 820 Bella Vista Court S Jupiter, FL 33477 | PSP Franchising, LLC | Franchise Agreement, dated 04/12/2022, as renewed or amended (Store #4518 - Loxahatchee) | | $0.00 |
| 121801635 | Coop Enterprises, LLC | Coop Enterprises, LLC 820 Bella Vista Court S Jupiter, FL 33477 | PSP Franchising, LLC | Franchise Agreement, dated 04/12/2022, as renewed or amended (Store #4517 - Greenacres) | | $0.00 |
| 121801634 | Coop Enterprises, LLC | Coop Enterprises, LLC 820 Bella Vista Court S Jupiter, FL 33477 | PSP Franchising, LLC | Franchise Agreement, dated 05/14/2019, as renewed or amended (Store #4257 - Royal Palm Beach) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121801654 | CoreTrust Purchasing Group | CoreTrust Purchasing Group<br>155 Franklin Road<br>Suite 400<br>Brentwood, TN 37027 | Pet Supplies "Plus", LLC | Participation Agreement | | $0.00 |
| 121801696 | Couet Corp. | Couet Corp.<br>4083 Ledgestone Dr.<br>Troy, MI 48098 | PSP Franchising, LLC | Franchise Agreement, dated 04/23/1991, as renewed or amended (Store #5 - Royal Oak) | | $0.00 |
| 121900015 | County Line Crossing Assoc. L.L.C. | County Line Crossing Assoc. L.L.C.<br>8910 Purdue Rd<br>Suite 350<br>Indianapolis, IN 46260 | Pet Supplies "Plus", LLC | Lease Agreement, dated 06/24/2002, as amended (Indianapolis, IN) | Indianapolis, IN (Greenwood) (4099) | $0.00 |
| 121900174 | CPEG MALTA, L.L.C | CPEG MALTA, L.L.C<br>c/o Nigro Companies<br>20 Corporate Woods Boulevard<br>Albany, NY 12211 | PSP Stores, LLC | Lease Agreement, dated 10/27/2017, as amended (Rensselaer, NY) | Rensselaer, NY (East Greenbush) (4162) | $1,499.69 |
| 121900025 | CPRK-II Limited Partnership | CPRK-II Limited Partnership<br>c/o DuWest Management, LLC<br>8522 Broadway<br>Ste. 209<br>San Antonio, TX 78217 | Pet Supplies "Plus", LLC | Lease, dated 06/23/2006, as amended (San Antonio, TX) | San Antonio, TX (7006) | $0.00 |
| 122000018 | CR Mango, LLC | CR Mango, LLC<br>C/O CONTINENTAL REALTY CORP<br>PO BOX 69475 -695<br>BALTIMORE, MD 21264-9475 | Buddy's Newco, LLC | Shopping Center Lease dated November 26, 2001, as amended (Store 29) | 29 | $435.09 |
| 121900105 | Cranberry Creek Plaza, LLC | Cranberry Creek Plaza, LLC<br>c/o Paramount Development Corp.<br>607 Briarwood Drive<br>Suite 5<br>Myrtle Beach, SC 29572 | PSP Stores, LLC | Lease, dated 10/07/2004, as amended (Beckley, WV) | Beckley, WV (0165) | $916.30 |
| 121900207 | Crest Properties, LLC | Crest Properties, LLC<br>Attn: David Shenton, Managing Member<br>3134 Sycamore, Lane<br>Billings, MT 59102 | PSP Stores, LLC | Lease, dated 06/25/2019, as amended (Buda, TX) | Buda, TX (4561) | $0.00 |
| 121900096 | CRI New Albany Square, LLC | CRI New Albany Square, LLC<br>c/o Casto<br>250 Civic Center Dr<br>Suite 500<br>Columbus, OH 43215 | PSP Stores, LLC | Lease, dated 05/16/2002, as amended (Columbus/New Albany, OH) | Columbus, OH (0140) | $0.00 |
| 121900210 | Cross Grand Plaza LLC | Cross Grand Plaza LLC<br>3155 West Big Beaver Road<br>Suite 110<br>Troy, MI 48084 | PSP Stores, LLC | Lease, dated 1.3.95, as amended (Brighton, MI) | Brighton, MI (4645) | $854.86 |
| 121900177 | Crossroads-Holt Drive Associates, LLC | Crossroads-Holt Drive Associates, LLC<br>20 Ridge Road<br>Suite 210<br>Mahwah, NJ 07430 | PSP Stores, LLC | Lease, dated 03/08/2018, as amended (Stony Point, NY) | Stony Point, NY (4175) | $0.00 |
| 121900039 | CSHV 20/35, LLC | CSHV 20/35, LLC<br>c/o Principal Real Estate Investors<br>801 Grand Avenue<br>Des Moines, IA 50392-1370 | PSP Distribution, LLC | Commercial Industrial Lease Agreement, dated November 18, 2020 (TX Distribution Center) | TX Distribution Center | $3,542.54 |
| 121801808 | Daisy 1, LLC | Daisy 1, LLC<br>3314 Highlands Bridge Road<br>Sarasota, FL 34235 | PSP Franchising, LLC | Franchise Agreement, dated 02/14/2019, as renewed or amended (Store #4241 - Port Charlotte) | | $0.00 |
| 121801812 | Dalian Jinyu Metal Products Co., Ltd | Dalian Jinyu Metal Products Co., Ltd<br>Room 1708, B Tower,peace Modern Town<br>No. 554, Zhongshan Road<br>116023 Dalian, Liaoning Province<br>, | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121801814 | Dallas Manufacturing | Dallas Manufacturing<br>12111 Ford Rd<br>Dallas, TX 75234 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121801821 | Dandy Ventures, Inc. | Dandy Ventures, Inc.<br>2307 South Saginaw St.<br>Flint, MI 48503 | PSP Franchising, LLC | Franchise Agreement, dated 05/24/2016, as renewed or amended (Store #4068 - Arvada) | | $0.00 |
| 121801820 | Dandy Ventures, Inc. | Dandy Ventures, Inc.<br>2307 South Saginaw St.<br>Flint, MI 48503 | PSP Franchising, LLC | Franchise Agreement, dated 02/25/2016, as renewed or amended (Store #4063 - Ft. Collins) | | $0.00 |
| 121801819 | Dandy Ventures, Inc. | Dandy Ventures, Inc.<br>2307 South Saginaw St.<br>Flint, MI 48503 | PSP Franchising, LLC | Franchise Agreement, dated 07/14/2015, as renewed or amended (Store #4017 - Golden) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801840 | Data Axle, Inc. | Data Axle, Inc.<br>13155 Noel Road<br>Suite 1750<br>Dallas, TX 75240 | PSP Group, LLC | Amendment No. 5 to Services Agreement | | $0.00 |
| 121802288 | David Powell (Entity Pending) | David Powell (Entity Pending)<br>Address on File | PSP Franchising, LLC | Franchise Agreement, dated 03/18/2024, as renewed or amended (Store #N/A - Charlotte) | | $0.00 |
| 121900165 | Dawnbury Inc. | Dawnbury Inc.<br>7899 High Dr.<br>Indianapolis, IN 46248 | PSP Stores, LLC | Lease, dated 08/10/1992, as amended (Indianapolis, IN) | Indianapolis, IN (Broad Ripple) (4100) | $1,076.78 |
| 121801857 | DCHPETS LLC | DCHPETS LLC<br>108 Holly Grove<br>Williamsburg, VA 23185 | PSP Franchising, LLC | Franchise Agreement, dated 08/28/2020, as renewed or amended (Store #4339 - Williamsburg) | | $0.00 |
| 121900073 | DDR Ohio Opportunity II LLC | DDR Ohio Opportunity II LLC<br>Attn: Executive VP - Leasing<br>3300 Enterprise Parkway<br>Beachwood, OH 44122 | PSP Stores, LLC | Lease, dated 01/22/2014, as amended (Stow, OH) | Stow, OH (0068) | $12,500.00 |
| 121801870 | Dell Financial Services L.L.C. | Dell Financial Services L.L.C.<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Technology Equipment Lease Agreement | | $0.00 |
| 121801869 | Dell Financial Services L.L.C. | Dell Financial Services L.L.C.<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Technology Equipment Lease Agreement | | $0.00 |
| 121801868 | Dell Financial Services L.L.C. | Dell Financial Services L.L.C.<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Technology Lease | | $0.00 |
| 121801867 | Dell Financial Services L.L.C. | Dell Financial Services L.L.C.<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Master Lease And Financing Agreement | | $318.38 |
| 121801871 | Dell Financial Services LLC | Dell Financial Services LLC<br>ONE DELL WAY<br>Round Rock, TX 78682 | PSP Stores, LLC | Master Lease Agreement | | $59,115.93 |
| 121801873 | DELL Marketing L.P | DELL Marketing L.P<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Equipment Lease Agreement | | $0.00 |
| 121801872 | DELL Marketing L.P | DELL Marketing L.P<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Equipment Lease Agreement | | $6,816.60 |
| 121801899 | design LAB, Inc. | design LAB, Inc.<br>19210 S. Vermont Ave<br>Building E<br>Gardena, CA 90248 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121801916 | Detroit Belle Isle Grand Prix, Inc. | Detroit Belle Isle Grand Prix, Inc.<br>300 Renaissance Tower<br>Suite 2311<br>Detroit, MI 48243 | PSP Group, LLC | 2025 Sponsorship Agreement | | $0.00 |
| 121801919 | Development Dimensions International, Inc. | Development Dimensions International, Inc.<br>1225 Washington Pike<br>Bridgeville, PA 15017 | PSP Group, LLC | Master Products and Services Agreement | | $0.00 |
| 121801917 | Development Dimensions International, Inc. | Development Dimensions International, Inc.<br>1225 Washington Pike<br>Bridgeville, PA 15017 | PSP Group, LLC | Statement of Work for Subscription Services | | $0.00 |
| 121801921 | Devil Dog Pets Inc. | Devil Dog Pets Inc.<br>334 Francis Drive<br>Jackson, MO 63755 | PSP Franchising, LLC | Franchise Agreement, dated 02/10/2023, as renewed or amended (Store #4585 - Cape Girardeau) | | $0.00 |
| 121900124 | DeVille Developments, LLC | DeVille Developments, LLC<br>3951 Convenience Circle NW<br>Suite 301<br>Canton, OH 44718 | PSP Stores, LLC | Lease, dated 07/12/2002, as amended (Akron, OH) | Akron, OH (0141) | $0.00 |
| 121900097 | DeVille Developments, LLC | DeVille Developments, LLC<br>3951 Convenience Circle NW<br>Suite 301<br>Canton, OH 44718 | PSP Stores, LLC | Lease Agreement, dated 01/16/1994, as amended (Canton, OH) | Canton, OH (0086) | $0.00 |
| 121900048 | DeVille Developments, LLC | DeVille Developments, LLC<br>3951 Convenience Circle NW<br>Suite 301<br>Canton, OH 44718 | PSP Stores, LLC | Lease, dated 05/17/2013, as amended (Lorain, OH) | Lorain, OH (0219) | $97.06 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|-------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121801928 | Differt Management Group 1, LLC | Differt Management Group 1, LLC 7611 County Road O Hartford, WI 53027 | PSP Franchising, LLC | Franchise Agreement, dated 11/10/2021, as renewed or amended (Store #4506 - Oconomowoc ) | | $0.00 |
| 121900197 | DILLON CENTER, LLC, | DILLON CENTER, LLC, 933 Columbia Boulevard Bloomsburg, PA 18815 | PSP Stores, LLC | Lease, dated 01/08/2015, as amended (Bloomsburg, PA) | Bloomsburg, PA (4396) | $0.00 |
| 121801943 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4583 - Stratham) | | $0.00 |
| 121801942 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4582 - Salem) | | $0.00 |
| 121801941 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4581 - South Portland) | | $0.00 |
| 121801940 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4580 - Sanford) | | $0.00 |
| 121801939 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4579 - Portland) | | $0.00 |
| 121801938 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4578 - North Windham) | | $0.00 |
| 121801937 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4577 - Sudbury) | | $0.00 |
| 121801947 | DIRIGO-WNW, LLC | DIRIGO-WNW, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 03/02/2023 (Store #3028 - Scarborough) | | $0.00 |
| 121801946 | DIRIGO-WNW, LLC | DIRIGO-WNW, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 03/02/2023 (Store #3027 - Saco) | | $0.00 |
| 121801945 | DIRIGO-WNW, LLC | DIRIGO-WNW, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 03/02/2023 (Store #3025 - Concord) | | $0.00 |
| 121801944 | DIRIGO-WNW, LLC | DIRIGO-WNW, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 03/02/2023 (Store #3023 - Acton) | | $0.00 |
| 121801955 | Diverse Staffing Services, Inc. | Diverse Staffing Services, Inc. 7135 Waldemar Drive Indianapolis, IN 46268 | PSP Distribution, LLC | Client Services Agreement | | $0.00 |
| 121801961 | DJ & Sons LLC | DJ & Sons LLC 200 Old Mountain Road Marion, CT 06444 | PSP Franchising, LLC | Franchise Agreement, dated 12/12/2019, as renewed or amended (Store #4301 - Springfield) | | $0.00 |
| 121801962 | DLI Properties, LLC | DLI Properties, LLC 2000 Brush Street Detroit, MI 48226 | PSP Group, LLC | The Detroit Lions Sponsorship Agreement Amendment | | $0.00 |
| 121801968 | DLP Enterprises, LLC | DLP Enterprises, LLC 2537 La Rochelle Court Seabrook, TX 77586 | PSP Franchising, LLC | Franchise Agreement, dated 03/19/2022, as renewed or amended (Store #4507 - Pasadena) | | $0.00 |
| 121801967 | DLP Enterprises, LLC | DLP Enterprises, LLC 2537 La Rochelle Court Seabrook, TX 77586 | PSP Franchising, LLC | Franchise Agreement, dated 03/05/2019, as renewed or amended (Store #4242 - Friendswood) | | $0.00 |
| 121801985 | DocuSign Inc. | DocuSign Inc. 3003 Tasman Drive Santa Clara, CA 95054 | PSP Group, LLC | DocuSign Subscription for Pet Supplies Plus | | $0.00 |
| 121801983 | DocuSign Inc. | DocuSign Inc. 3003 Tasman Drive Santa Clara, CA 95054 | PSP Group, LLC | DocuSign Master Services Agreement | | $0.00 |
| 121801982 | DocuSign Inc. | DocuSign Inc. 3003 Tasman Drive Santa Clara, CA 95054 | PSP Group, LLC | DocuSign Order Form for PSP Group, LLC Notary | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121801989 | Donmar, Inc. | Donmar, Inc.<br>382 Adams St.<br>Plymouth, MI 48170 | PSP Franchising, LLC | Franchise Agreement, dated 04/22/1991, as renewed or amended (Store #12 - Jackson) | | $0.00 |
| 121801993 | DoorDash G&C, LLC | DoorDash G&C, LLC<br>303 2nd Street<br>South Tower<br>San Francisco CA 94107, CA 94107 | PSP Group, LLC | DoorDash Marketplace Addendum | | $0.00 |
| 129990006 | DoorDash, Inc. | DoorDash, Inc.<br>303 2nd Street<br>San Francisco, CA 94107 | PSP Group, LLC | Subsidiary Amendment to the DoorDash Drive Fulfillment Agreement | | $0.00 |
| 121801994 | DoorDash, Inc. | DoorDash, Inc.<br>303 2nd Street<br>South Tower<br>Suite 800<br>San Francisco, CA 94107 | PSP Group, LLC | DoorDash Drive Fulfillment Agreement | | $793,571.11 |
| 121801995 | Dorroh Pet Enterprises, LLC | Dorroh Pet Enterprises, LLC<br>4531 Fountain View Trace<br>Owensboro, KY 42303 | PSP Franchising, LLC | Franchise Agreement, dated 05/24/2019, as renewed or amended (Store #4261 - Owensboro) | | $0.00 |
| 121802274 | Douglas Campbell (Entity Pending) | Douglas Campbell (Entity Pending)<br>Address on File | PSP Franchising, LLC | Franchise Agreement, dated 07/18/2022, as renewed or amended (Store #N/A - Austin) | | $0.00 |
| 121900181 | DSM MB II LLC | DSM MB II LLC<br>875 East Street<br>Tewksbury, MA 01876 | PSP Stores, LLC | Lease, dated 10/28/2016, as amended (Ashland, MA) | Ashland, MA (4088) | $0.00 |
| 121900160 | DSM MB II LLC | DSM MB II LLC<br>875 East Street<br>Tewksbury, MA 01876 | PSP Stores, LLC | Lease, dated 09/05/2018, as amended (Athol, MA) | Athol, MA (4198) | $0.00 |
| 121802059 | E.V.P. Enterprises, Inc. | E.V.P. Enterprises, Inc.<br>323 Neptunes Bight<br>Naples, FL 34103 | PSP Franchising, LLC | Franchise Agreement, dated 03/17/2014, as renewed or amended (Store #232 - Glen Ellyn) | | $0.00 |
| 121802058 | E.V.P. Enterprises, Inc. | E.V.P. Enterprises, Inc.<br>323 Neptunes Bight<br>Naples, FL 34103 | PSP Franchising, LLC | Franchise Agreement, dated 09/07/1994, as renewed or amended (Store #62 - Westmont) | | $0.00 |
| 121900076 | Echo Solon, LLC | Echo Solon, LLC<br>c/o ECHO Real Estate Services Co.<br>560 Epsilon Drive<br>Pittsburgh, PA 15238 | PSP Stores, LLC | Lease, dated 07/30/2012, as amended (Solon, OH) | Solon, OH (0098) | $0.00 |
| 121802112 | Ecova, Inc. | Ecova, Inc.<br>1313 North Atlantic<br>5th Floor<br>Spokane, WA 99201 | Pet Supplies "Plus", LLC | Client Joinder Agreement | | $0.00 |
| 121900152 | Edgewood Station LLC | Edgewood Station LLC<br>c/o Phillips Edison & Company<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | PSP Stores, LLC | Lease Agreement, dated 01/28/2016, as amended (Pittsburgh, PA) | Pittsburgh, PA (Edgewood) (4053) | $0.00 |
| 121900117 | EGAP Crawfordsville I, LLC | EGAP Crawfordsville I, LLC<br>c/o 1045, LLC<br>1045 South Woods Mill Rd.<br>Suite One<br>Town and Country, MO 63017 | PSP Stores, LLC | Lease, dated 01/31/2014, as amended (Crawfordsville, IN) | Crawfordsville, IN (0209) | $520.21 |
| 122000007 | EGP Gainesville II, LLC | EGP Gainesville II, LLC<br>c/o 1045 LLC<br>1045 S WOODS MILL RD #1<br>TOWN & COUNTRY, MO 63017 | Buddy's Newco, LLC | Lease dated October 9, 2009, as amended (Store 20) | 20 | $0.00 |
| 121802144 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 03/14/2023, as renewed or amended (Store #4590 - Bettendorf) | | $0.00 |
| 121802143 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 01/24/2023, as renewed or amended (Store #4571 - West Des Moines) | | $0.00 |
| 121802142 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 01/12/2021, as renewed or amended (Store #4421 - Ankeny) | | $0.00 |
| 121802141 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 01/12/2021, as renewed or amended (Store #4420 - Ames) | | $0.00 |
| 121802140 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2019, as renewed or amended (Store #4303 - Fort Dodge) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121802139 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2019, as renewed or amended (Store #4302 - Johnson County) | | $0.00 |
| 121802138 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 11/08/2018, as renewed or amended (Store #4270 - Des Moines) | | $0.00 |
| 121802137 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 07/28/2017, as renewed or amended (Store #4148 - Davenport) | | $0.00 |
| 121802136 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 06/29/2017, as renewed or amended (Store #4146 - Altoona) | | $0.00 |
| 121802135 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 10/14/2016, as renewed or amended (Store #4096 - Des Moines) | | $0.00 |
| 121802134 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 04/13/2016, as renewed or amended (Store #4077 - Cedar Falls) | | $0.00 |
| 140000214 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated July 1, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 1065 1067 1068 1069 1070 | $0.00 |
| 140000213 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated October 23, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000212 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated August 23, 2019, to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 570 571 572 573 576 588 593 600 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 | $0.00 |
| 140000207 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Termination Agreement and Release dated August 1, 2024, by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 360 405 | $0.00 |
| 140000203 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated March 1, 2022, to the Franchise Agreement dated March 1, 2022 between Buddy's Franchising and Licensing and EightSixThree RTO, LLC | 106 | $0.00 |
| 140000202 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated March 1, 2022 between Buddy's Franchising and Licensing and EightSixThree RTO, LLC | 106 | $0.00 |
| 140000201 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 1, 2017, to that certain Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 622 623 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 140000200 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 570 571 572 573 576 588 593 600 622 623 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 1065 1067 1068 1069 1070 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 121802149 | Elanco US Inc. | Elanco US Inc.<br>28576 Network Place<br>Chicago, IL 60673 | PSP Franchising, LLC | Amendment 5 to the Vendor Master Purchase Agreement | | $0.00 |
| 129990002 | Electronic Imaging Services, Inc., d/b/a Vestcom Retail Solutions | Electronic Imaging Services, Inc., d/b/a Vestcom Retail Solutions<br>2800 Cantrell Road, Suite 500<br>Little Rock, AR 72202 | PSP Group, LLC | Addendum A - Shelf Edge Products Service Agreement By and Between PSP Group, LLC And Electronic Imagine Services, Inc., d/b/a Vestcom Retail Solutions dated October 1st, 2024 | | $0.00 |
| 129990001 | Electronic Imaging Services, Inc., d/b/a Vestcom Retail Solutions | Electronic Imaging Services, Inc., d/b/a Vestcom Retail Solutions<br>2800 Cantrell Road, Suite 500<br>Little Rock, AR 72202 | PSP Group, LLC | Master Services Agreement By and Between PSP Group, LLC And Electronic Imagine Services, Inc., d/b/a Vestcom Retail Solutions dated October 1st, 2024 | | $0.00 |
| 121802173 | Elvis & Emmett, LLC | Elvis & Emmett, LLC<br>15730 Willows Dr.<br>Spring Lake, MI 49465 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2017, as renewed or amended (Store #4164 - Norton Shores) | | $0.00 |
| 121802178 | EmBark One Eleven, LLC | EmBark One Eleven, LLC<br>6476 Dausman Park<br>Clarkville, MI 48815 | PSP Franchising, LLC | Franchise Agreement, dated 11/29/2022, as renewed or amended (Store #4616 - Easley) | | $0.00 |
| 121802188 | Emicity | Emicity<br>5455 Corporate Drive Suite 120<br>Troy, MI 48098-2620 | Pet Supplies "Plus", LLC | Brand Awareness & Usage Study Research Proposal | | $0.00 |
| 121802194 | Empyr, Inc. | Empyr, Inc.<br>11010 Roselle St Ste 150<br>San Diego, CA 92121 | Pet Supplies "Plus", LLC | Insertion Order for Empyr's Card Linked Offer Program | | $0.00 |
| 121802206 | ENGIE Insight Services Inc dba ENGIE Impact | ENGIE Insight Services Inc dba ENGIE Impact<br>PO Box 74008380<br>Chicago, IL 60674 | Pet Supplies "Plus", LLC | Total Energy & Sustainability Service Agreement | | $0.00 |
| 121802210 | Engreat Pet Products (Shenzhen) Co., Ltd. | Engreat Pet Products (Shenzhen) Co., Ltd.<br>BLDG 2<br>SHENZHEN, 518116 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121802213 | Entara Corporation | Entara Corporation<br>227 W Monroe St<br>Suite 2100<br>Chicago, IL 60606 | PSP Group, LLC | Incident Response Retainer Order Form | | $0.00 |
| 121802273 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RX7 | | $0.00 |
| 121802272 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RWZ | | $0.00 |
| 121802271 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RWT | | $0.00 |
| 121802270 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RWS | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121802269 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RWP | | $0.00 |
| 121802268 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RV6 | | $0.00 |
| 121802267 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RV4 | | $0.00 |
| 121802266 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RTW | | $0.00 |
| 121802265 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RTS | | $0.00 |
| 121802264 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RTL | | $0.00 |
| 121802263 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCH | | $0.00 |
| 121802262 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCF | | $0.00 |
| 121802261 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCD | | $0.00 |
| 121802260 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCC | | $0.00 |
| 121802259 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCB | | $0.00 |
| 121802258 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC9 | | $0.00 |
| 121802257 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC7 | | $0.00 |
| 121802256 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC5 | | $0.00 |
| 121802255 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC4 | | $0.00 |
| 121802254 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC3 | | $0.00 |
| 121802253 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC2 | | $0.00 |
| 121802252 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CBZ | | $0.00 |
| 121802251 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CBX | | $0.00 |
| 121802250 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CB5 | | $0.00 |
| 121802249 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CB3 | | $0.00 |
| 121802248 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9Z | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|-------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121802247 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9X | | $0.00 |
| 121802246 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9P | | $0.00 |
| 121802245 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9L | | $0.00 |
| 121802244 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9G | | $0.00 |
| 121802243 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 256255 | | $0.00 |
| 121802242 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 25WCGV | | $0.00 |
| 121802241 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 25CS3L | | $0.00 |
| 121802240 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 2562JR | | $0.00 |
| 121802239 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 256252 | | $0.00 |
| 121802238 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 255ZXJ | | $0.00 |
| 121802237 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRPT | | $0.00 |
| 121802236 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRP3 | | $0.00 |
| 121802235 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNW | | $0.00 |
| 121802234 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNR | | $0.00 |
| 121802233 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNM | | $0.00 |
| 121802232 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNH | | $0.00 |
| 121802231 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNF | | $0.00 |
| 121802230 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRN2 | | $0.00 |
| 121802229 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23QNSZ | | $0.00 |
| 121802228 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NJNF | | $0.00 |
| 121802227 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NJND | | $0.00 |
| 121802226 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NJNC | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121802225 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NHQW | | $0.00 |
| 121802224 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NHQ7 | | $0.00 |
| 121802223 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NHMM | | $0.00 |
| 121802222 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23N2ZF | | $0.00 |
| 121802221 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23MPJ4 | | $0.00 |
| 121802220 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23M56V | | $0.00 |
| 121802219 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23LH6Q | | $0.00 |
| 121802218 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23CVW7 | | $0.00 |
| 121802217 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open - End (Equity) Lease Schedule - 263CC9 | | $0.00 |
| 121802216 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open - End (Equity) Lease Schedule - 263C9P | | $0.00 |
| 121802215 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NHLH | | $0.00 |
| 121802214 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open - End (Equity) Lease Schedule - 23B3Z5 | | $0.00 |
| 121802319 | Epsilon Data Management, LLC | Epsilon Data Management, LLC 35 W Wacker Drive 29th Floor Chicago, IL 60601 | PSP Group, LLC | PeopleCloud Suite of Products Master Services Agreement | | $0.00 |
| 121802321 | Epsilon Data Management, LLC Conversant LLC | Epsilon Data Management, LLC Conversant LLC 35 W Wacker Drive 29th Floor Chicago, IL 60601 | PSP Group, LLC | Addendum to PeopleCloud Digital Offsite Retail Media Statement of Work | | $0.00 |
| 121802320 | Epsilon Data Management, LLC Conversant LLC | Epsilon Data Management, LLC Conversant LLC 2525 Arapahoe Ave Suite E4-902 Boulder, CO 80302 | PSP Group, LLC | PeopleCloud Digital Offsite Retail Media Statement of Work | | $0.00 |
| 129990008 | Equifax Workforce Solutions LLC | Equifax Workforce Solutions LLC 4076 Paysphere Circle Chicago, IL 60674 | PSP Group, LLC | Amendment to the Universal Service Agreement | | $0.00 |
| 121802323 | Equifax Workforce Solutions LLC | Equifax Workforce Solutions LLC 4076 Paysphere Circle Chicago, IL 60674 | PSP Group, LLC | Service Provider, Term and Fees for Services | | $2,981.31 |
| 121900093 | ExchangeRight Value-Add Portfolio 1 DST | ExchangeRight Value-Add Portfolio 1 DST c/o ExchangeRight Real Estate, LLC 1055 E. Colorado, Blvd. Suite 310 Pasadena, CA 91106 | PSP Stores, LLC | Lease, dated 10/05/2001, as amended (Streetsboro, OH) | Streetsboro, OH (0131) | $997.42 |
| 121802430 | Exel Inc. d/b/a DHL Supply Chain (USA) | Exel Inc. d/b/a DHL Supply Chain (USA) 360 Westar Boulevard Westerville, OH 43082 | Pet Supplies "Plus", LLC | Master Operating Services Agreement | | $0.00 |
| 121802429 | Exel Inc. d/b/a DHL Supply Chain (USA) | Exel Inc. d/b/a DHL Supply Chain (USA) 360 Westar Boulevard Westerville, OH 43082 | Pet Supplies "Plus", LLC | Site Operating Agreement #1 Northeast Forwarding Distribution Center | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121802441 | Experience More in Store, LLC | Experience More in Store, LLC<br>8978 Wildlife Loop<br>Sarasota, FL 34238 | PSP Franchising, LLC | Franchise Agreement, dated 10/30/2018, as renewed or amended (Store #4008 - North Port ) | | $0.00 |
| 121900126 | Fairfield Station LLC | Fairfield Station LLC<br>c/o Phillips Edison and Co.<br>11501 Northlake Drive<br>Cincinnati, OH 45209 | PSP Stores, LLC | Lease, dated 09/09/2013, as amended (Beavercreek, OH) | Beavercreek, OH (0221) | $0.00 |
| 121900091 | Fairlawn Station, LLC | Fairlawn Station, LLC<br>c/o Phillips Edison & Co.<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | PSP Stores, LLC | Lease, dated 07/24/1996, as amended (Fairlawn, OH) | Fairlawn, OH (0124) | $0.00 |
| 121900044 | Fairview Realty Investors, Ltd. | Fairview Realty Investors, Ltd.<br>P.O. Box 16452<br>Rocky River, OH 44116 | PSP Stores, LLC | Lease, dated 05/09/1992, as amended (Fairview Park, OH) | Fairview Park, OH (0027) | $954.98 |
| 121802477 | Family Foundation Pets, Inc. | Family Foundation Pets, Inc.<br>3860 Maiden Street<br>Waterford, MI 48329 | WNW Franchising, LLC | Franchise Agreement, dated 04/28/2023 (Store #3012 - Rochester Hills) | | $0.00 |
| 121900083 | FBBT/US Properties, LLC | FBBT/US Properties, LLC<br>c/o Benderson Development Co. LLC<br>570 Delaware Ave<br>Buffalo, NY 14202 | PSP Stores, LLC | Lease, dated 03/15/1999, as amended (West Seneca, NY) | West Seneca, NY (0113) | $5,238.03 |
| 121802482 | FBMR Waite Park, LLC | FBMR Waite Park, LLC<br>1404 Calvin Avenue<br>Nashville, TN 37206 | PSP Franchising, LLC | Franchise Agreement, dated 09/12/2022, as renewed or amended (Store #4563 - Waite) | | $0.00 |
| 121900099 | FDI Management | FDI Management<br>12145 Summit Ct.<br>Beverly Hills, CA 90210 | PSP Stores, LLC | Lease, dated 06/07/2003, as amended (Sandusky, OH) | Sandusky, OH (0144) | $0.00 |
| 121900238 | Federal Realty Investment Trust | Federal Realty Investment Trust<br>909 Rose Avenue<br>Suite 200<br>North Bethesda, MD 20852 | PSP Stores, LLC | Lease, dated 10/28/2013, as amended (Levittown, PA) | Levittown, PA (9070) | $0.00 |
| 122000008 | Festival Properties, Inc. | Festival Properties, Inc.<br>1215 GESSNER ROAD<br>HOUSTON, TX 77055 | Buddy's Newco, LLC | Lease dated February 11, 2021 (Store 21) | 21 | $300.99 |
| 121802511 | Fetch ... For Cool Pets, LLC | Fetch ... For Cool Pets, LLC<br>1407 Broadway<br>Suite 601<br>New York, NY 10018 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121802540 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 04/29/2022, as renewed or amended (Store #8062 - Valrico) | | $0.00 |
| 121802539 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 10/08/2021, as renewed or amended (Store #4475 - ) | | $0.00 |
| 121802535 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/03/2021, as renewed or amended (Store #4410 - Port St. Lucie) | | $0.00 |
| 121802534 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 01/21/2019, as renewed or amended (Store #4216 - Zephryhills) | | $0.00 |
| 121802533 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 08/08/2018, as renewed or amended (Store #4191 - St. Petersburg) | | $0.00 |
| 121802532 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/10/2015, as renewed or amended (Store #4011 - Land O'Lakes) | | $0.00 |
| 121802545 | First Data Merchant Services LLC | First Data Merchant Services LLC<br>2900 Westside Parkway<br>Alpharetta, GA 30004 | PSP Group, LLC | Affiliated Issuer Addendum to the Premium Gift Card Processing Addendum to Master Services Agreement | | $0.00 |
| 121802547 | First Data Services, LLC | First Data Services, LLC<br>1307 Walt Whitman Road<br>Melville, NY 11747 | PSP Stores, LLC | Premium Gift Card Processing Addendum to Master Services Agreement | | $5,794.70 |
| 121802550 | First Data Services, LLC Bank of America, NA | First Data Services, LLC Bank of America, NA<br>PO Box 1256<br>Englewood, CO 80150 | PSP Stores, LLC | Master Service Agreement | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121802549 | First Data Services, LLC Bank of America, N.A. | First Data Services, LLC Bank of America, N.A. PO Box 1256 Englewood, CO 80150 | PSP Stores, LLC | TransArmor Services Addendum and Amendment of the Master Services Agreement | | $0.00 |
| 121802560 | Fischer Pet Stores, Inc. | Fischer Pet Stores, Inc. c/o Paracorp Incorporated, 106 5th Avenue SE Olympia, WA 98501 | PSP Franchising, LLC | Franchise Agreement, dated 03/10/2022, as renewed or amended (Store #4505 - Seattle) | | $0.00 |
| 121802559 | Fischer Pet Stores, Inc. | Fischer Pet Stores, Inc. c/o Paracorp Incorporated, 106 5th Avenue SE Olympia, WA 98501 | PSP Franchising, LLC | Franchise Agreement, dated 07/24/2021, as renewed or amended (Store #4445 - Bellevue) | | $0.00 |
| 121802558 | Fischer Pet Stores, Inc. | Fischer Pet Stores, Inc. c/o Paracorp Incorporated, 106 5th Avenue SE Olympia, WA 98501 | PSP Franchising, LLC | Franchise Agreement, dated 07/24/2021, as renewed or amended (Store #4444 - Federal Way) | | $0.00 |
| 121802557 | Fischer Pet Stores, Inc. | Fischer Pet Stores, Inc. c/o Paracorp Incorporated, 106 5th Avenue SE Olympia, WA 98501 | PSP Franchising, LLC | Franchise Agreement, dated 07/01/2020, as renewed or amended (Store #4173 - Seattle) | | $0.00 |
| 121900058 | Fishkill Plaza Partners LP | Fishkill Plaza Partners LP c/o Mosbacher Properties Group 18 E. 48th St 19 Floor New York, NY 10017 | PSP Stores, LLC | Lease agreement dated 08/01/2021, as amended (Fishkill, NY) | Fishkill, NY (9034) | $1,235.01 |
| 121802561 | Fishman PR & Marketing | Fishman PR & Marketing 3400 Dundee Road Suite 300 Northbrook, IL 60062 | Pet Supplies "Plus", LLC | Public Relations Service Agreement | | $0.00 |
| 121802563 | Fishman Public Relations | Fishman Public Relations 3400 Dundee Road Suite 300 Northbrook, IL 60062 | Pet Supplies "Plus", LLC | Franchise Development PR Program Agreement | | $0.00 |
| 121802565 | Fishman Public Relations, Inc. | Fishman Public Relations, Inc. 3400 Dundee Road Suite 300 Northbrook, IL 60062 | PSP Group, LLC | Letter of Agreement for Public Relations Services | | $0.00 |
| 121802564 | Fishman Public Relations, Inc. | Fishman Public Relations, Inc. 3400 Dundee Road Suite 300 Northbrook, IL 60062 | PSP Group, LLC | Addendum to Letter of Agreement between Fishman Public Relations, Inc. and PSP Group, LLC | | $0.00 |
| 121802640 | Focused Pets, LLC | Focused Pets, LLC 1207 W Hawthorne Street Arlington Heights, IL 60005 | PSP Franchising, LLC | Franchise Agreement, dated 10/03/2022, as renewed or amended (Store #4573 - Cumming) | | $0.00 |
| 121900066 | Ford Road Ventures, LLC | Ford Road Ventures, LLC c/o Vision Investment Partners 700 N. Old Woodward Ave Suite 300 Birmingham, MI 48009 | PSP Stores, LLC | Lease, dated 04/02/1993, as amended (Livonia, MI) | Livonia, MI (0044) | $0.00 |
| 121900100 | Fort Steuben Mall Holdings LLC | Fort Steuben Mall Holdings LLC 4996 Indiana Avenue Winston Salem, NC 27106 | PSP Stores, LLC | Lease, dated 01/17/2003, as amended (Steubenville, OH) | Steubenville, OH (0145) | $0.00 |
| 121802744 | ForUsAll, Inc. | ForUsAll, Inc. 665 3rd St San Francisco, CA 94107 | Pet Supplies "Plus", LLC | Plan Services Agreement | | $0.00 |
| 121802754 | FOXMO, Inc. | FOXMO, Inc. 3860 Wabeek Lake Drive E Bloomfield Hills, MI 48302 | PSP Franchising, LLC | Franchise Agreement, dated 09/14/2006, as renewed or amended (Store #171 - White Lake) | | $0.00 |
| 121802762 | FranConnect Inc. | FranConnect Inc. 11800 Sunrise Valley Dr. Suite 150 Reston, VA 20191 | PSP Franchising, LLC | FranConnect Online Business Applications Agreement | | $0.00 |
| 121802764 | FranConnect LLC | FranConnect LLC 11800 Sunrise Valley Dr. Suite 900 Reston, VA 20191 | Pet Supplies "Plus", LLC | Master Subscription Agreement | | $0.00 |
| 121802763 | FranConnect LLC | FranConnect LLC 11800 Sunrise Valley Dr. Suite 900 Reston, VA 20191 | Pet Supplies "Plus", LLC | BoeFly bVerify Integration Consent Form | | $0.00 |
| 121802773 | Franks House, LLC | Franks House, LLC 10767 Adams Road Galena, OH 43021 | PSP Franchising, LLC | Franchise Agreement, dated 12/15/2022, as renewed or amended (Store #4562 - Marion) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121802776 | FranNet, LLC | FranNet, LLC<br>10302 Brookridge Village Blvd<br>Suite 201<br>Louisville, KY 40291 | PSP Franchising, LLC | Amendment to Franchise Referral and Commission Agreement | | $0.00 |
| 121802774 | FranNet, LLC | FranNet, LLC<br>10302 Brookridge Village Blvd<br>Suite 201<br>Louisville, KY 40291 | PSP Franchising, LLC | Franchise Referral and Commission Amendment Agreement | | $0.00 |
| 121802777 | Freedom 45 Corporation | Freedom 45 Corporation<br>2925 NE Lotno Drive<br>Bend, OR 97701 | PSP Franchising, LLC | Franchise Agreement, dated 01/07/2021, as renewed or amended (Store #4418 - Bend) | | $0.00 |
| 121802780 | Freeport Pets, LLC | Freeport Pets, LLC<br>2295 Spring Rose Road<br>Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement dated 03/28/2022, as renewed or amended (Store #4513 - Freeport) | | $0.00 |
| 121900169 | FW IL Riverside/Rivers Edge, LLC | FW IL Riverside/Rivers Edge, LLC<br>3040 Solutions Center<br>Chicago, IL 60677-3000 | PSP Stores, LLC | Lease, dated 05/12/2017, as amended (Chicago, IL) | Chicago, IL (Archer-Ashland) (4139) | $12,000.00 |
| 122000017 | FWI 2, LLC | FWI 2, LLC<br>197 EIGHTH ST, SUITE 800<br>BOSTON, MA 02129 | Buddy's Newco, LLC | Lease dated June 1, 2023 (Store 27) | 27 | $634.85 |
| 122000029 | FWI 23, LLC | FWI 23, LLC<br>c/o Flag Wharf LLC<br>197 Eighth Street Suite 800<br>Boston, MA 02129 | Buddy's Newco, LLC | Lease dated August 7, 2014, as amended (Store 50) | 50 | $0.00 |
| 121900204 | G & I IX Empire Williamsville Place LLC | G & I IX Empire Williamsville Place LLC<br>c/o DLC Management Corporation<br>565 Taxter Road<br>Elmsford, NY 10523 | PSP Stores, LLC | Lease, dated 05/03/2019, as amended (Buffalo, NY) | Williamsville, NY (4526) | $0.00 |
| 121802822 | G UNITED, LLC | G UNITED, LLC<br>556 Parkview Drive<br>Grand Prairie, TX 75052 | PSP Franchising, LLC | Franchise Agreement, dated 04/16/2019, as renewed or amended (Store #4255 - Waxahachie) | | $0.00 |
| 121900216 | Garden City Leasehold Properties LLC | Garden City Leasehold Properties LLC<br>33 Boylston Street<br>Suite 3000<br>Chestnut Hill, MA 02467 | PSP Stores, LLC | Lease, dated 08/08/1994, as amended (Cranston, RI) | Cranston, RI (9005) | $0.00 |
| 121802857 | Garner Ventures, LLC | Garner Ventures, LLC<br>556 Parkview Drive<br>Grand Prairie, TX 75052 | WNW Franchising, LLC | Franchise Agreement, dated 01/09/2024 (Store #3039 - Mansfield) | | $0.00 |
| 121802859 | Gartner, Inc. | Gartner, Inc.<br>56 Top Gallant Road<br>Stamford, CT 06902-7700 | Pet Supplies "Plus", LLC | Gartner Service Order Q-00206771 | | $0.00 |
| 122000201 | Gator Elite RTO LLC | Gator Elite RTO LLC<br>9003 Classic Court<br>Orlando, FL 32819 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/26/2020, as amended or extended (Store 1055) | 1055 | $0.00 |
| 122000200 | Gator Elite RTO LLC | Gator Elite RTO LLC<br>9003 Classic Court<br>Orlando, FL 32819 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/26/2020, as amended or extended (Store 1053) | 1053 | $0.00 |
| 122000199 | Gator Elite RTO LLC | Gator Elite RTO LLC<br>9003 Classic Court<br>Orlando, FL 32819 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/26/2020, as amended or extended (Store 1020) | 1020 | $0.00 |
| 121802873 | GCM Management LLC | GCM Management LLC<br>382 Adams St.<br>Plymouth, MI 48170 | PSP Franchising, LLC | Franchise Agreement, dated 11/07/2022, as renewed or amended (Store #15 - Canton) | | $0.00 |
| 121900176 | George Street LLC | George Street LLC<br>151 Haggetts Pond Rd.<br>Andover, MA 01810 | PSP Stores, LLC | Lease, dated 02/09/2018, as amended (Olean, NY) | Olean, NY (4171) | $8,657.18 |
| 121900045 | Georgetown Square Properties | Georgetown Square Properties<br>29010 Chardon Road<br>Willoughby Hills, OH 44092 | PSP Stores, LLC | Lease, dated 04/24/1992, as amended (Middleburg Heights, OH) | Middleburg Heights, OH (0028) | $991.56 |
| 121900190 | GFS Realty LLC | GFS Realty LLC<br>Attn: Director of Real Estate<br>1385 Hancock Street<br>10th Floor<br>Quincy, MA 02169 | PSP Stores, LLC | Lease, dated 06/11/2007, as amended (Annapolis, MD) | Annapolis, MD (4372) | $0.00 |
| 121802932 | GFX International | GFX International<br>333 Barron Blvd.<br>Grayslake, IL 60030 | Pet Supplies "Plus", LLC | Master Services Agreement | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121900082 | GG Garfield Commons 2012 LP | GG Garfield Commons 2012 LP c/o Glimcher Group Inc. 500 Grant Street Suite 2000 Pittsburgh, PA 15219 | PSP Stores, LLC | Lease, dated 02/11/2013, as amended (Garfield Heights, OH) | Garfield Heights, OH (0112) | $455.99 |
| 121900200 | GGCAL Edgewater, LLC | GGCAL Edgewater, LLC c/o Greenberg Gibbons Commercial 10096 Red Run Blvd Suite 100 Owings Mills, MD 21117 | PSP Stores, LLC | Lease, dated 03/30/2006, as amended (Edgewater, MD) | Edgewater, MD (4415) | $0.00 |
| 121802943 | Gino Animal Health Services, LLC | Gino Animal Health Services, LLC 29 Long Hill Road New Vernon, NJ 07976 | PSP Franchising, LLC | Franchise Agreement, dated 01/08/2021, as renewed or amended (Store #4374 - Hillsborough) | | $0.00 |
| 121900019 | Glassboro Properties, LLC | Glassboro Properties, LLC 14000 Horizon Way Suite 100 Mount Laurel, NJ 08054 | Pet Supplies "Plus", LLC | Lease Agreement, dated 10/27/2011, as amended (Glassboro, NJ) | Glassboro, NJ (4391) | $0.00 |
| 121802986 | GNK Enterprises, LLC | GNK Enterprises, LLC 6540 North Range Line Rd. Glendale, WI 53209 | PSP Franchising, LLC | Franchise Agreement, dated 03/27/2020, as renewed or amended (Store #4315 - Germantown) | | $0.00 |
| 121802985 | GNK Enterprises, LLC | GNK Enterprises, LLC 6540 North Range Line Rd. Glendale, WI 53209 | PSP Franchising, LLC | Franchise Agreement, dated 10/03/2018, as renewed or amended (Store #4203 - Mequon) | | $0.00 |
| 121802991 | Go Fetch, LLC | Go Fetch, LLC 22 Susan Drive Newburgh, NY 12550 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2017, as renewed or amended (Store #4130 - New Windsor) | | $0.00 |
| 121900046 | Gold Star Properties | Gold Star Properties c/o 606 Realty Team 4653 N. Milwaukee Ave Chicago, IL 60630 | PSP Stores, LLC | Store Lease, dated 11/01/2008, as amended (Des Plaines, IL) | Des Plaines, IL (0042) | $1,115.15 |
| 121803010 | Golden Rule Enterprises, LLC | Golden Rule Enterprises, LLC 1102 Thomas Rd. Rineyville, KY 40162 | PSP Franchising, LLC | Franchise Agreement, dated 03/12/2015, as renewed or amended (Store #4012 - Elizabethtown) | | $0.00 |
| 121803023 | Good Dog Karma, LLC | Good Dog Karma, LLC 3180 W South Airport Road Traverse City, MI 49684-8995 | PSP Franchising, LLC | Franchise Agreement, dated 07/04/2020, as renewed or amended (Store #4333 - Traverse City) | | $0.00 |
| 121803024 | Gooddog Services, LLC | Gooddog Services, LLC 3115 N. Government Way #3 Coeur D'Alene, ID 83815 | PSP Franchising, LLC | Franchise Agreement, dated 12/04/2019, as renewed or amended (Store #4251 - Coeur D'Alene) | | $0.00 |
| 121803025 | Goodest Boys LLC | Goodest Boys LLC 145 Romeria Drive Cedar Creek, TX 78612 | PSP Franchising, LLC | Franchise Agreement, dated 07/21/2022, as renewed or amended (Store #4567 - Victoria) | | $0.00 |
| 121803027 | Goodwin & Goodwin Pet Supplies, Inc. | Goodwin & Goodwin Pet Supplies, Inc. 999 Haynes St., Suite 385 Birmingham, MI 48009 | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2002, as renewed or amended (Store #4 - Waterford) | | $0.00 |
| 129990017 | Google, Inc. | Google, Inc. c/o James C. Vandermark 810 Seventh Avenue Suite 500 New York, NY 10019 | Buddy's Newco, LLC | Google Advertising Service Agreement | | $0.00 |
| 129990004 | Google, Inc. | Google, Inc. 1600 Amphitheatre Parkway Mountain View, CA 94043 | PSP Group, LLC | Google Advertising Service Agreement | | $1,041,042.04 |
| 121900118 | Gosula Realty, LTD | Gosula Realty, LTD 6028 Trent Ct Lewis Center, OH 43035 | PSP Stores, LLC | Lease Agreement, dated 08/29/2012, as amended (Delaware, OH) | Delaware, OH (0210) | $681.78 |
| 121803038 | GR PSP, LLC | GR PSP, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 01/29/2023, as renewed or amended (Store #4572 - Rockford) | | $0.00 |
| 121900138 | Grand Avenue Associates L.L.C. | Grand Avenue Associates L.L.C. c/o Shiner Management Group, Inc. 3201 Old Glenview Road Suite 235 Wilmette, IL 60091 | PSP Stores, LLC | Lease, dated 10/03/2014, as amended (Gurnee, IL) | Gurnee, IL (0243) | $0.00 |
| 121900002 | Greenwood Plaza Corp. of Delaware | Greenwood Plaza Corp. of Delaware 2400 Miracle Lane Mishawaka, IN 46545 | Pet Supplies "Plus", LLC | Lease, dated 06/03/1992, as amended (South Bend, IN) | South Bend, IN (0025) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121803094 | Griffield Enterprises, LLC | Griffield Enterprises, LLC<br>31778 N 123rd Ave<br>Peoria, AZ 85383 | PSP Franchising, LLC | Franchise Agreement, dated 09/02/2020, as renewed or amended (Store #4347 - Surprise) | | $0.00 |
| 121900119 | Grove City Plaza, L.P. | Grove City Plaza, L.P.<br>c/o Casto<br>250 Civic Center Dr.<br>Suite 500<br>Columbus, OH 43215 | PSP Stores, LLC | Lease, dated 10/23/2012, as amended (Grove City, OH) | Grove City, OH (0211) | $0.00 |
| 121803104 | Grubhub Holdings Inc. | Grubhub Holdings Inc.<br>111 W. Washington St.<br>Ste. 2100<br>Chicago, IL 60602 | PSP Group, LLC | Grubhub Franchisor Agreement | | $0.00 |
| 121803112 | Gupton Marrs International, Inc. | Gupton Marrs International, Inc.<br>100 Park Avenue<br>New York, NY 10017 | PSP Group, LLC | Master Subscription Agreement | | $0.00 |
| 121900125 | Gustine BV Associates, Ltd. | Gustine BV Associates, Ltd.<br>c/o Armstrong Development Properties, Inc.<br>One Armstrong Place<br>Butler, PA 16001 | PSP Stores, LLC | Lease Agreement, dated 08/22/2013, as amended (Belle Vernon, PA) | Belle Vernon, PA (0220) | $0.00 |
| 121803122 | Gutrich, LLC | Gutrich, LLC<br><br>16121 Haddam Ln<br>Westfield, IN 46062 | PSP Franchising, LLC | Franchise Agreement, dated 09/02/2020, as renewed or amended (Store #4411 - Brownsburg) | | $0.00 |
| 121803121 | Gutrich, LLC | Gutrich, LLC<br><br>16121 Haddam Ln<br>Westfield, IN 46062 | PSP Franchising, LLC | Franchise Agreement, dated 06/14/2017, as renewed or amended (Store #4143 - Columbus) | | $0.00 |
| 122000024 | Haines City Mall LLC | Haines City Mall LLC<br>20200 W DIXIE HWY STE 15G<br>AVENTURA, FL 33810 | Buddy's Newco, LLC | Lease dated on or about August 6, 2003, as amended (Store 36) | 36 | $520.32 |
| 121803148 | Halico Gold LLC | Halico Gold LLC<br>5912 Edinger Avenue<br>Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4455 - Turlock) | | $0.00 |
| 121803147 | Halico Gold LLC | Halico Gold LLC<br>5912 Edinger Avenue<br>Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4452 - Clovis) | | $0.00 |
| 121803146 | Halico Gold LLC | Halico Gold LLC<br>5912 Edinger Avenue<br>Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4451 - Lodi) | | $0.00 |
| 121803145 | Halico Gold LLC | Halico Gold LLC<br>5912 Edinger Avenue<br>Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4450 - Stockton) | | $0.00 |
| 121803144 | Halico Gold LLC | Halico Gold LLC<br>19406 Merion Circle<br>Huntington Beach, CA 92648 | PSP Franchising, LLC | Franchise Agreement, dated 09/17/2020, as renewed or amended (Store #4350 - Laguna Niguel) | | $0.00 |
| 121803143 | Halico Gold LLC | Halico Gold LLC<br>19406 Merion Circle<br>Huntington Beach, CA 92648 | PSP Franchising, LLC | Franchise Agreement, dated 10/07/2016, as renewed or amended (Store #4118 - Huntington Beach) | | $0.00 |
| 121803164 | HangZhou TianYuan Pet Products Co., Ltd | HangZhou TianYuan Pet Products Co., Ltd<br>No.10-1<br>Xing Ling Road<br>XingQiaoTown YuHang District<br>Hangzhou, 311100 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121803170 | Hapa Unlimited, Inc. | Hapa Unlimited, Inc.<br>18017 Chatsworth Street<br>Suite 450<br>Granado Hills, CA 91344 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121802278 | Hardeep Dhaliwal (Entity Pending) | Hardeep Dhaliwal (Entity Pending)<br>Address on File | PSP Franchising, LLC | Franchise Agreement, dated 09/22/2023, as renewed or amended (Store #N/A - Sherman) | | $0.00 |
| 122000015 | Harmony Shopping Plaza, LLC | Harmony Shopping Plaza, LLC<br>3980 TAMPA RD #205<br>OLDSMAR, FL 34677 | Buddy's Newco, LLC | Lease Agreement dated November 20, 2009, as amended (Store 25) | 25 | $469.13 |
| 140000278 | Harper's Station LLC | Harper's Station LLC<br>c/o Phillips Edison & Co<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | PSP Stores, LLC | Lease | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------|------|------|------|------|------|
| 121900018 | Hartville Station, LLC | Hartville Station, LLC Attn: Robert F. Meyers, COO 11501 Northlake Drive Cincinnati, OH 45249 | Pet Supplies "Plus", LLC | Lease Agreement, dated 09/30/2016, as amended (Hartville, OH) | Hartville, OH (4380) | $0.00 |
| 121900085 | Harvest Station LLC | Harvest Station LLC c/o Phillips Edison & Company 11501 Northlake Drive Cincinnati,, OH 45249 | PSP Stores, LLC | Lease, dated 04/26/2016, as amended (Akron, OH) | Akron, OH (Springfield Twp) (0115) | $0.00 |
| 121803198 | Hawkeye Enterprises, LLC | Hawkeye Enterprises, LLC 853 Bluff Brook Drive O'Fallon, MO 63366 | PSP Franchising, LLC | Franchise Agreement, dated 01/15/2021, as renewed or amended (Store #4226 - St. Charles) | | $0.00 |
| 121803254 | Healthy Pets, LLC | Healthy Pets, LLC 4105 Sky Ranch Drive Glenwood Springs, CO 81601 | WNW Franchising, LLC | Franchise Agreement dated 09/18/2023 (Store #3036 - Falcon) | | $0.00 |
| 121803284 | Heather Management, LLC | Heather Management, LLC 1165 Lakeview Rd. West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2019, as renewed or amended (Store #4325 - Racine) | | $0.00 |
| 121803283 | Heather Management, LLC | Heather Management, LLC 1165 Lakeview Rd. West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2019, as renewed or amended (Store #4299 - Neenah) | | $0.00 |
| 121803282 | Heather Management, LLC | Heather Management, LLC 1165 Lakeview Rd. West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 06/09/2020, as renewed or amended (Store #4298 - Sheboygan) | | $0.00 |
| 121803281 | Heather Management, LLC | Heather Management, LLC 1165 Lakeview Rd. West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 09/04/2018, as renewed or amended (Store #4204 - West Bend) | | $0.00 |
| 121803280 | Heather Management, LLC | Heather Management, LLC 1165 Lakeview Rd. West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2022, as renewed or amended (Store #4086 - Green Bay) | | $0.00 |
| 121803279 | Heather Management, LLC | Heather Management, LLC 1165 Lakeview Rd. West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2022, as renewed or amended (Store #247 - Green Bay) | | $0.00 |
| 121805996 | Heritage Seymour I, LLC | Heritage Seymour I, LLC c/o Heritage Capital Management LLC 123 Prospect Street PO Box 627 Ridgewood, NJ 07451 | PSP Distribution, LLC | Commercial Industrial Lease Agreement, dated January 1, 2012, as amended (Seymour, IN) | IN Distribution Center | $0.00 |
| 121803318 | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY 200 Connell Drive 5th Floor Berkley Heights, NJ 07922 | Buddy's Newco, LLC | Master Lease And Financing Agreement Schedule Number 5343918198000006 | | $0.00 |
| 121803317 | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY 200 Connell Drive 5th Floor Berkley Heights, NJ 07922 | Buddy's Newco, LLC | Master Lease And Financing Agreement Schedule Number 5343918198000008 | | $0.00 |
| 121803316 | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY 200 Connell Drive 5th Floor Berkley Heights, NJ 07922 | Buddy's Newco, LLC | Master Lease And Financing Agreement Schedule Number 5343918198000007 | | $0.00 |
| 121900081 | Hickory Plaza Shopping Center, Inc. | Hickory Plaza Shopping Center, Inc. c/o JJ Gumberg Co. 1051 Brinton Road Pittsburgh, PA 15221 | PSP Stores, LLC | Lease, dated 09/25/1998, as amended (Hermitage, PA) | Hermitage, PA (0111) | $1,031.87 |
| 121803339 | High Point Estates Inc. | High Point Estates Inc. 210 Ellis Rd. Westminster, MA 01473 | PSP Franchising, LLC | Franchise Agreement, dated 08/12/2019, as renewed or amended (Store #4269 - Franklin) | | $0.00 |
| 121803340 | High Youth Limited | High Youth Limited No.616 , | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121900214 | Highland Commons-Boone, LLC | Highland Commons-Boone, LLC c/o Aston Properties, Inc. 610 E. Morehead St. Suite 100 Charlotte, NC 28202 | PSP Stores, LLC | Lease, dated 06/30/2011, as amended (Boone, NC) | Boone, NC (8048) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121803347 | Highland Traders, LLC | Highland Traders, LLC 853 Highway 35 Middleton, NJ 07748 | PSP Franchising, LLC | Franchise Agreement, dated 08/23/2012, as renewed or amended (Store #9065 - Wall Township) | | $0.00 |
| 121803346 | Highland Traders, LLC | Highland Traders, LLC 853 Highway 35 Middleton, NJ 07748 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2011, as renewed or amended (Store #9050 - Berkeley Heights) | | $0.00 |
| 121803345 | Highland Traders, LLC | Highland Traders, LLC 853 Highway 35 Middleton, NJ 07748 | PSP Franchising, LLC | Franchise Agreement, dated 04/20/2009, as renewed or amended (Store #9046 - Hazlet) | | $0.00 |
| 121803344 | Highland Traders, LLC | Highland Traders, LLC 853 Highway 35 Middleton, NJ 07748 | PSP Franchising, LLC | Franchise Agreement, dated 01/07/2020, as renewed or amended (Store #4305 - Middletown) | | $0.00 |
| 121803352 | Hill's Pet Nutrition Sales, Inc. | Hill's Pet Nutrition Sales, Inc. P.O. Box 148 Topeka, KS 66601-0148 | PSP Group, LLC | Trailer Wrapping Memorandum of Understanding | | $0.00 |
| 121803351 | Hill's Pet Nutrition Sales, Inc. | Hill's Pet Nutrition Sales, Inc. P.O. Box 148 Topeka, KS 66601-0148 | Pet Supplies "Plus", LLC | Amendment No. 1 to 2024 Pet Supplies Joint Business Plan Agreement | | $0.00 |
| 122000210 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/02/2024, as amended or extended (Store 158) | 158 | $0.00 |
| 122000209 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/16/2023, as amended or extended (Store 157) | 157 | $0.00 |
| 122000208 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/04/2023, as amended or extended (Store 156) | 156 | $0.00 |
| 122000207 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 155) | 155 | $0.00 |
| 122000206 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 154) | 154 | $0.00 |
| 122000205 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 153) | 153 | $0.00 |
| 122000204 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 152) | 152 | $0.00 |
| 122000203 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 151) | 151 | $0.00 |
| 122000202 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 150) | 150 | $0.00 |
| 121803372 | Hoffman Unlimited LLC | Hoffman Unlimited LLC 866 Prairie Drive Milliken, CO 80543 | PSP Franchising, LLC | Franchise Agreement, dated 02/19/2020, as renewed or amended (Store #4314 - Thornton) | | $0.00 |
| 121803374 | Hogan, Inc. | Hogan, Inc. 14240 Imboden Rd. Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 09/01/2020, as renewed or amended (Store #4344 - Wheat Ridge) | | $0.00 |
| 121803386 | Horizontal Integration, Inc. | Horizontal Integration, Inc. 1660 S. Highway 100 Suite 200 St. Louis Park, MN 55416 | PSP Group, LLC | Managed Services SOW | | $0.00 |
| 121803385 | Horizontal Integration, Inc. | Horizontal Integration, Inc. 1660 S. Highway 100 Suite 200 St. Louis Park, MN 55416 | PSP Group, LLC | Master Service Agreement | | $0.00 |
| 121803384 | Horizontal Integration, Inc. | Horizontal Integration, Inc. 1660 S. Highway 100 Suite 200 St. Louis Park, MN 55416 | PSP Group, LLC | Statement of Work for Salesforce Data Cloud, Marketing Cloud, Personalization Design & Implement Ph 1 | | $0.00 |
| 121803383 | HORIZONTAL Integration, Inc. | HORIZONTAL Integration, Inc. 1660 S. Highway 100 Suite 200 St. Louis Park, MN 55416 | PSP Group, LLC | Statement of Work for Retained Team Support 2024 | | $124,915.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------|------|------|------|------|------|
| 121803388 | Horizontal, Inc. | Horizontal, Inc.<br>1660 S. Hwy 100 Suite 200<br>St. Louis Park, MN 55416 | PSP Group, LLC | Statement of Work Change Order 1 - Pet Supplies Plus Commerce Modernization: Design, Develop, Deliver | | $0.00 |
| 121803406 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4248 - Clarksville) | | $0.00 |
| 121803405 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4218 - Lexington) | | $0.00 |
| 121803404 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4183 - Florissant) | | $0.00 |
| 121803403 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4182 - Fort Wayne) | | $0.00 |
| 121803402 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4156 - Orlando) | | $0.00 |
| 121803401 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4155 - Waukesha) | | $0.00 |
| 121803400 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4147 - Normal) | | $0.00 |
| 121803399 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/14/2023, as renewed or amended (Store #4081 - Evansville) | | $0.00 |
| 121803398 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/23/2023, as renewed or amended (Store #187 - Ballwin) | | $0.00 |
| 121803397 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/01/1997, as renewed or amended (Store #97 - Appleton) | | $0.00 |
| 121803407 | HSN Enterprise, Inc. | HSN Enterprise, Inc.<br>1361 Watertree Rd.<br>Terre Haute, IN 47803 | PSP Franchising, LLC | Franchise Agreement, dated 09/02/2016, as renewed or amended (Store #4085 - Terre Haute) | | $0.00 |
| 121900098 | Huber Management Corporation | Huber Management Corporation<br>7333 Paragon Rd.<br>Suite 150<br>Dayton, OH 45459 | PSP Stores, LLC | Lease, dated 01/30/2003, as amended (Centerville, OH) | Centerville, OH (0143) | $0.00 |
| 121803411 | Hugfun International Hong Kong Ltd. | Hugfun International Hong Kong Ltd.<br>18/F.<br>GINZA SQUARE<br>565-567 NATHAN ROAD<br>KOWLOON, | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 122000014 | Hundred Fires Ltd | Hundred Fires Ltd<br>106 Satsuma Drive<br>ATTN CARMEN CUELLO<br>Altamonte Springs, FL 32714 | Buddy's Newco, LLC | Lease Agreement dated May 6, 1991, as amended (Store 24) | 24 | $0.00 |
| 121803429 | Hutchison Enterprises, Inc. | Hutchison Enterprises, Inc.<br>5360 Shoreview Avenue<br>Minneapolis, MN 55417 | WNW Franchising, LLC | Franchise Agreement, dated 08/13/2024, as renewed (Store #3007 - Eagan) | | $0.00 |
| 121900104 | Iacono Family LP | Iacono Family LP<br>c/o Kohr Royer Griffith Inc<br>1480 Dublin Rd.<br>Columbus, Oh 43215 | PSP Stores, LLC | Lease, dated 05/18/2004, as amended (Upper Arlington, OH) | Upper Arlington, OH (0158) | $0.00 |
| 121803461 | iCIMS, Inc. | iCIMS, Inc.<br>101 Crawfords Corner Road<br>Suite 3-100<br>Holmdel, NJ 07733 | Pet Supplies "Plus", LLC | Pet Supplies Plus Renewal Order Form | | $0.00 |
| 121803472 | Ideal Software Systems Inc | Ideal Software Systems Inc<br>3839 Highway 45 North<br>Meridian, MS 39301 | Buddy's Newco, LLC | Customer App Service Agreement | | $0.00 |
| 121803490 | IKPM Pet Supply, LLC | IKPM Pet Supply, LLC<br>1515 Ralston Branch Way<br>Sugar Land, TX 77479 | PSP Franchising, LLC | Franchise Agreement, dated 04/26/2021, as renewed or amended (Store #4437 - Sugar Land) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121803498 | Illumis, Inc. | Illumis, Inc.<br>975 Johnnie Dodds Blvd. Ste B<br>Mt. Pleasant, SC 29464 | PSP Group, LLC | Master Services Agreement | | $0.00 |
| 121803500 | IMG College, LLC | IMG College, LLC<br>P.O. Box 843038<br>Kansas City, MO 64184-3038 | PSP Group, LLC | Amendment to Marketing Agreement | | $0.00 |
| 121803514 | IncWorx, Inc. d/b/a IncWorx Consulting | IncWorx, Inc. d/b/a IncWorx Consulting<br>1901 N. Roselle Rd<br>Suite 800<br>Schaumburg, IL 60195 | PSP Group, LLC | Master Services Agreement for Consulting Services | | $0.00 |
| 121900130 | Independence Town Center, LLC | Independence Town Center, LLC<br>6111A Burgundy Hill Drive<br>Burlington, KY 41005 | PSP Stores, LLC | Lease, dated 04/24/2014, as amended (Independence, KY) | Independence, KY (0228) | $0.00 |
| 121900135 | Indian Creek Commons LLC | Indian Creek Commons LLC<br>c/o Realty Resource Capital Corp<br>7600 Jericho Turnpike<br>Suite 402<br>Woodbury, NY 11797 | PSP Stores, LLC | Lease, dated 06/17/2014, as amended (Indianapolis, IN) | Indianapolis, IN (Lawrence) (0239) | $0.00 |
| 121803518 | Indiana Economic Development Corporation | Indiana Economic Development Corporation<br>One North Capitol Avenue<br>Suite 700<br>Indianapolis, IN 46204-2288 | PSP Distribution, LLC | Economic Development For A Growing Economy (Edge) Tax Credit Agreement | | $0.00 |
| 121803520 | IndiTex Ventures LLC | IndiTex Ventures LLC<br>6742 FM 2187 Road<br>Sealy, TX 77474 | PSP Franchising, LLC | Franchise Agreement, dated 12/30/2020, as renewed or amended (Store #4225 - Houston) | | $0.00 |
| 121900146 | Inserra Supermarkets, Inc. | Inserra Supermarkets, Inc.<br>20 Ridge Road<br>Mahwah, NJ 07430 | PSP Stores, LLC | Lease, dated 09/01/2015, as amended (Wallington, NJ) | Wallington, NJ (4028) | $0.00 |
| 121803613 | International Franchise Professionals Group, Inc. | International Franchise Professionals Group, Inc.<br>499 Ernston Road<br>Suite B9<br>Parlin, NJ 08859 | PSP Franchising, LLC | Non Exclusive Referral Agreement | | $395.00 |
| 121803618 | Intersand America Corp. | Intersand America Corp.<br>1880 Great Western Drive<br>Windsor, CO 80550 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121803617 | Intersand America Corp. | Intersand America Corp.<br>1880 Great Western Drive<br>Windsor, CO 80550 | Pet Supplies "Plus", LLC | OdourLock® Technology Study Agreement | | $0.00 |
| 121803643 | Iron Mountain Information Management, Inc. | Iron Mountain Information Management, Inc.<br>1101 Enterprise Drive<br>Royersford, PA 19468 | Pet Supplies "Plus", LLC | Customer Agreement | | $0.00 |
| 121803661 | Iscott Enterprises, Inc. | Iscott Enterprises, Inc.<br>2649 E Grand River Ave<br>Howell, MI 48843-8589 | PSP Franchising, LLC | Franchise Agreement, dated 12/12/2002, as renewed or amended (Store #135 - Howell) | | $0.00 |
| 122000211 | J & M Franchising, LLC | J & M Franchising, LLC<br>400 Union Avenue SE, Suite 200<br>Olympia, WA 98501 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/06/2024, as amended or extended (Store 340) | 340 | $0.00 |
| 121803677 | J&C Pet Supply, LLC | J&C Pet Supply, LLC<br>1095 A Towbin Ave.<br>Lakewood, NJ 08701 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121803683 | J.B. Hunt Transport, Inc. | J.B. Hunt Transport, Inc.<br>9101 Tonnelle Ave<br>North Bergen, NJ 07047 | PSP Distribution, LLC | Dedicated Contract Services Carrier Agreement | | $0.00 |
| 129990010 | JA Adventurers, LLC | JA Adventurers, LLC<br><br>16121 Haddam Ln<br>Westfield, IN 46062 | PSP Franchising, LLC | Franchise Agreement, dated 05/03/2008, as renewed or amended (Store #8036 - St. Mary's) | | $0.00 |
| 121803696 | JA Adventurers, LLC | JA Adventurers, LLC<br>120 East Commons Dr.<br>St. Simon's Island, GA 31522 | PSP Franchising, LLC | Franchise Agreement, dated 11/08/2005, as renewed or amended (Store #8032 - Brunswick) | | $0.00 |
| 121900050 | Jack W. Eichelberger Trust | Jack W. Eichelberger Trust<br>Address on File | PSP Stores, LLC | Lease, dated 04/03/1995, as amended (Kettering, OH) | Kettering, OH (0088) | $959.93 |
| 121803709 | Jackson Investors, Inc. | Jackson Investors, Inc.<br>c/o Pet Supplies Plus, 1300 MacDade Boulevard<br>Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 12/12/2014, as renewed or amended (Store #4009 - Woodlyn) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121803713 | Jacquard Group Limited | Jacquard Group Limited<br>82 St John Street<br>London,  EC1M 4JN | PSP Group, LLC | Order Form #12 | | $0.00 |
| 121802284 | James Long (Entity Pending) | James Long (Entity Pending)<br>Address on File | PSP Franchising, LLC | Franchise Agreement, dated 07/21/2021, as renewed or amended (Store #N/A - San Marcos) | | $0.00 |
| 121802282 | Jamison Liggett (Entity Pending) | Jamison Liggett (Entity Pending)<br>Address on File | PSP Franchising, LLC | Franchise Agreement, dated 08/09/2021, as renewed or amended (Store #N/A - Stonegate/Parker) | | $0.00 |
| 122000032 | Jensen Beach Station LLC | Jensen Beach Station LLC<br>Attn: Leasing Department<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | Buddy's Newco, LLC | Lease, executed on or about September 2024 (Store 68) | 68 | $0.00 |
| 121803770 | JFI Enterprises, Inc. | JFI Enterprises, Inc.<br>1366 Whitehouse Ct.<br>Rochester Hills, MI 48306 | PSP Franchising, LLC | Franchise Agreement, dated 02/11/1992, as renewed or amended (Store #23 - Oxford) | | $0.00 |
| 121803781 | JJ International, LLC | JJ International, LLC<br>24784 High Plateau Court<br>Stone Ridge, VA 20105 | PSP Franchising, LLC | Franchise Agreement, dated 12/28/2021, as renewed or amended (Store #4487 - Sterling ) | | $0.00 |
| 121900173 | JLIX Milford Crossing Master Tenant, LLC | JLIX Milford Crossing Master Tenant, LLC<br>PO Box 412638<br>Boston, MA 02241-2638 | PSP Stores, LLC | Lease, dated 10/30/2017, as amended (Milford, MA) | Milford, MA (4161) | $0.00 |
| 122000012 | Jochi Investments LLC | Jochi Investments LLC<br>106 Satsuma Drive<br>ATTN CARMEN CUELLO<br>Altamonte Springs, FL 32714 | Buddy's Newco, LLC | Lease Agreement dated May 6, 1991, as amended (Store 24) | 24 | $0.00 |
| 121803794 | Johanneson's of North Dakota | Johanneson's of North Dakota<br>2301 Johanneson Drive NW<br>Bemidji, MN 56601-4101 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2023, as renewed or amended (Store #4612 - Bemidji) | | $0.00 |
| 121803793 | Johanneson's of North Dakota | Johanneson's of North Dakota<br>2301 Johanneson Drive NW<br>Bemidji, MN 56601-4101 | PSP Franchising, LLC | Franchise Agreement, dated 09/02/2020, as renewed or amended (Store #4348 - Minot) | | $0.00 |
| 121803799 | John Squared Capital LLC | John Squared Capital LLC<br>5 Tennis Terrace<br>Sparta, NJ 07871 | PSP Franchising, LLC | Franchise Agreement, dated 11/12/2020, as renewed or amended (Store #4359 - Stanhope) | | $0.00 |
| 121803811 | Jones Naturals, LLC | Jones Naturals, LLC<br>4960 28th Ave<br>Rockford, IL 61109 | PSP Group, LLC | Private Label Agreement | | $0.00 |
| 121900062 | Joseph Plaza, LLC | Joseph Plaza, LLC<br>c/o Joseph Brothers Company<br>4133 Talmadge Road<br>Toledo, OH 43623 | PSP Stores, LLC | Business Property Lease, dated 01/31/2012, as amended (Toledo, OH) | Toledo, OH (0014) | $1,187.36 |
| 121803845 | JTSS Enterprises, Inc. | JTSS Enterprises, Inc.<br>15060 Eureka Rd.<br>Southgate, MI 48124 | PSP Franchising, LLC | Franchise Agreement, dated 01/22/2014, as renewed or amended (Store #231 - Southgate) | | $0.00 |
| 122000223 | Kamerade Group, LLC | Kamerade Group, LLC<br>58 Brookfield Lenox Road<br>Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 472) | 472 | $0.00 |
| 122000222 | Kamerade Group, LLC | Kamerade Group, LLC<br>58 Brookfield Lenox Road<br>Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 387) | 387 | $0.00 |
| 122000221 | Kamerade Group, LLC | Kamerade Group, LLC<br>58 Brookfield Lenox Road<br>Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 386) | 386 | $0.00 |
| 122000220 | Kamerade Group, LLC | Kamerade Group, LLC<br>58 Brookfield Lenox Road<br>Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 385) | 385 | $0.00 |
| 122000219 | Kamerade Group, LLC | Kamerade Group, LLC<br>58 Brookfield Lenox Road<br>Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 384) | 384 | $0.00 |
| 122000003 | Kancov Investment Limited Partnership | Kancov Investment Limited Partnership<br>27750 STANSBURY, STE 200<br>FARMINGTON, MI 48334 | Buddy's Newco, LLC | Lease Agreement dated February 10, 2014, as amended (Store 15) | 15 | $0.00 |
| 122000218 | KAPPA Investments LLC | KAPPA Investments LLC<br>1099 Jefferson Drive West<br>Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/17/2022, as amended or extended (Store 438) | 438 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000217 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/10/2022, as amended or extended (Store 429) | 429 | $0.00 |
| 122000216 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/13/2016, as amended or extended (Store 419) | 419 | $0.00 |
| 122000215 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/13/2016, as amended or extended (Store 418) | 418 | $0.00 |
| 122000214 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/13/2016, as amended or extended (Store 1061) | 1061 | $0.00 |
| 122000213 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/13/2016, as amended or extended (Store 1051) | 1051 | $0.00 |
| 122000212 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2023, as amended or extended (Store 1026) | 1026 | $0.00 |
| 121803895 | KC's House, LLC | KC's House, LLC 208 St. James Avenue, Suite B Goose Creek, SC 29445 | PSP Franchising, LLC | Franchise Agreement, dated 08/05/2019, as renewed or amended (Store #4295 - Charleston East/Mount Pleasant) | | $0.00 |
| 121803921 | Kenbo, LLC | Kenbo, LLC 20525 N Plumwood Drive Kildeer, IL 60047 | PSP Franchising, LLC | Franchise Agreement, dated 05/15/2024, as renewed or amended (Store #4319 - Wauconda) | | $0.00 |
| 121802275 | Kenneth Crowder (Entity Pending) | Kenneth Crowder (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 10/16/2024, as renewed or amended (Store #N/A - Charlotte) | | $0.00 |
| 121900137 | Kercheval Owner LLC | Kercheval Owner LLC c/o Versa Real Estate, LLC 326 E. Fourth Street Suite 200 Rotal Oak, MI 48067 | PSP Stores, LLC | Lease Agreement, dated 08/25/2014, as amended (Grosse Pointe, MI) | Grosse Pointe, MI (0242) | $1,981.75 |
| 121900024 | Kerrville Dorado Partners, LLC | Kerrville Dorado Partners, LLC c/o Dorado Development Co. 19787 West Interstate 10 Suite 201 San Antonio, TX 78257 | Pet Supplies "Plus", LLC | Lease, dated 04/20/2005, as amended (Kerrville, TX) | Kerrville, TX | $637.16 |
| 121803930 | Kessel Enterprises, LLC | Kessel Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 08/22/2007, as renewed or amended (Store #177 - Petoskey) | | $0.00 |
| 121803929 | Kessel Enterprises, LLC | Kessel Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 10/18/2001, as renewed or amended (Store #127 - Saginaw) | | $0.00 |
| 121803928 | Kessel Enterprises, LLC | Kessel Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 05/04/1998, as renewed or amended (Store #105 - Bay City) | | $0.00 |
| 121803927 | Kessel Enterprises, LLC | Kessel Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 07/03/1992, as renewed or amended (Store #24 - Mount Morris) | | $0.00 |
| 121803926 | Kessel Enterprises, LLC | Kessel Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 04/02/1992, as renewed or amended (Store #21 - Grand Blanc) | | $0.00 |
| 121803925 | Kessel Enterprises, LLC | Kessel Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 04/02/1992, as renewed or amended (Store #19 - Owosso) | | $0.00 |
| 121803934 | Kessel Investment Company, LLC | Kessel Investment Company, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 03/31/2014, as renewed or amended (Store #236 - Gaylord) | | $0.00 |
| 121803933 | Kessel Investment Company, LLC | Kessel Investment Company, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2010, as renewed or amended (Store #201 - Sault Ste Marie) | | $0.00 |
| 121803932 | Kessel Investment Company, LLC | Kessel Investment Company, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2017, as renewed or amended (Store #175 - Rochester Hills) | | $0.00 |
| 121803931 | Kessel Investment Company, LLC | Kessel Investment Company, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 07/16/2018, as renewed or amended (Store #130 - Washington Twp.) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121803960 | Kids First Toys Co., Ltd | Kids First Toys Co., Ltd<br>No.39 Dazhou Road<br>Yuhuatai District<br>Nanjing City,  210012 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121900056 | KIN Properties, Inc. | KIN Properties, Inc.<br>Attn: General Counsel<br>185 NW Spanish River Blvd.<br>Suite 100<br>Boca Raton, FL 33431 | PSP Stores, LLC | Lease, dated 04/21/1997, as amended<br>(Whitehall, PA) | Whitehall, PA<br>(9026) | $167.20 |
| 121900171 | King City Improvements, LLC | King City Improvements, LLC<br>c/o DLC Management Corporation<br>565 Taxter Road<br>Suite 400<br>Elmsford, NY 10523 | PSP Stores, LLC | Lease Agreement, dated 08/04/2017, as amended<br>(Mount Vernon, IL) | Mount Vernon, IL (4153) | $0.00 |
| 121803988 | King Hammy I, LLC | King Hammy I, LLC<br>12505 Memorial Drive, Suite 330<br>Houston, TX 77024-6051 | PSP Franchising, LLC | Franchise Agreement, dated 03/12/2021, as renewed or amended (Store #4427 - Missouri City) | | $0.00 |
| 121803989 | King Hammy II, LLC | King Hammy II, LLC<br>12505 Memorial Drive, Suite 330<br>Houston, TX 77024-6051 | PSP Franchising, LLC | Franchise Agreement, dated 05/27/2021, as renewed or amended (Store #4434 - Pearland) | | $0.00 |
| 122000036 | Kingsville Retail Group, LP | Kingsville Retail Group, LP<br>PO Box 204391<br>Attn: John O'Shaughnessy<br>Austin, TX 78720 | Buddy's Newco, LLC | Commercial Lease dated August 9, 2013, as amended (Store 1024) | 1024 | $300.00 |
| 121802287 | Kiran Patel (Entity Pending) | Kiran Patel (Entity Pending)<br>Address on File | PSP Franchising, LLC | Franchise Agreement, dated 01/10/2023, as renewed or amended (Store #N/A - Woodbridge) | | $0.00 |
| 121804025 | KLS Pets, LLC | KLS Pets, LLC<br>602 Bainbridge Drive<br>Mullica Hill, NJ 08062 | PSP Franchising, LLC | Franchise Agreement, dated 01/17/2024, as renewed or amended (Store #4634 - West Deptford) | | $0.00 |
| 121900079 | KNM Lee Properties LLC | KNM Lee Properties LLC<br>999 High Street<br>Wadsworth , OH 44281 | PSP Stores, LLC | Lease, dated 07/01/2008, as amended<br>(Mansfield, OH) | Mansfield, OH<br>(0106) | $0.00 |
| 121804039 | KonaTex Ventures, LLC | KonaTex Ventures, LLC<br>7911 Appomattox Drive<br>Austin, TX 78745 | PSP Franchising, LLC | Franchise Agreement, dated 05/13/2021, as renewed or amended (Store #4432 - Austin) | | $0.00 |
| 121804084 | KS Pet Retail Five, LLC | KS Pet Retail Five, LLC<br>770 W. Bedford Euless Rd.<br>Hurst, TX 76053 | PSP Franchising, LLC | Franchise Agreement, dated 01/11/2018, as renewed or amended (Store #4168 - Overland Park) | | $0.00 |
| 121900217 | KSL Realty North Providence LLC | KSL Realty North Providence LLC<br>1403 Douglas Avenue<br>North Providence, RI 02908 | PSP Stores, LLC | Lease, dated 10/01/2006, as amended<br>(North Providence, RI) | North Providence, RI (9010) | $0.00 |
| 121804089 | Kuhl Business Concepts, LLC | Kuhl Business Concepts, LLC<br>8286 E Tumbleweed Drive<br>Scottsdale, AZ 85266 | PSP Franchising, LLC | Franchise Agreement, dated 12/21/2022, as renewed or amended (Store #4406 - Phoenix) | | $0.00 |
| 121804105 | K-Zoo Pet, Inc. | K-Zoo Pet, Inc.<br>5062 Colony Woods Dr.<br>Kalamazoo, MI 49009 | PSP Franchising, LLC | Franchise Agreement, dated 02/10/2006, as renewed or amended (Store #170 - Kalamazoo) | | $0.00 |
| 121900092 | Lakewood (Ohio) Station LLC | Lakewood (Ohio) Station LLC<br>c/o Phillips Edison & Co.<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | PSP Stores, LLC | Retail Space Lease, dated 02/16/2011, as amended<br>(Lakewood, OH) | Lakewood, OH (0128) | $0.00 |
| 121804174 | Ledgers Pantry, LLC | Ledgers Pantry, LLC<br>14090 FM 2920, Ste. G551<br>Tomball, TX 77377 | PSP Franchising, LLC | Franchise Agreement, dated 10/14/2022, as renewed or amended (Store #4542 - Eldersburg) | | $0.00 |
| 121804175 | LeFort Pet Supplies, Inc. | LeFort Pet Supplies, Inc.<br>1548 Breezeridge Dr.<br>Des Peres, MO 63131 | PSP Franchising, LLC | Franchise Agreement, dated 02/28/2014, as renewed or amended (Store #241 - Warson Woods) | | $0.00 |
| 121804182 | Left Moon Consulting Group LLC | Left Moon Consulting Group LLC<br>478 Sylvester Trail<br>Highlands Ranch, CO 80129 | WNW Franchising, LLC | Franchise Agreement, dated 10/10/2022, as renewed (Store #3009 - Highlands Ranch) | | $0.00 |
| 121804183 | LegacyPets Inc. | LegacyPets Inc.<br>98 N Floral Leaf Cir<br>The Woodlands, TX 77381 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2020, as renewed or amended (Store #4321 - Conroe) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121804186 | Lehigh Valley Industrial Park Lot 4 Owner, LLC | Lehigh Valley Industrial Park Lot 4 Owner, LLC<br><br>BCDPF Radar Distribution Center LLC<br>c/o Ares<br>1200 17th Street Suite 2900<br>Denver, CO 80202 | Pet Supplies "Plus", LLC | First Amedment to Lease | PA Distribution Center | $0.00 |
| 121804187 | Lehigh Valley Industrial Park Lot 4 Owner, LLC<br>BCDPF Radar Distribution Center LLC<br>Miles Tedder<br>Matt Devitt | Lehigh Valley Industrial Park Lot 4 Owner, LLC<br>BCDPF Radar Distribution Center LLC<br>Miles Tedder<br>Matt Devitt<br>P.O. Box 9183433<br>Chicago, IL 60691-3433 | Pet Supplies "Plus", LLC | Property Sale and Lease Assignment Notification | PA Distribution Center | $0.00 |
| 121804227 | Level 10, LLC | Level 10, LLC<br>2495 Pembroke Ave.<br>Hoffman Estates, IL 60169 | PSP Stores, LLC | Sales Order Confirmation | | $0.00 |
| 121804203 | Level 10, LLC | Level 10, LLC<br>2495 Pembroke Ave.<br>Hoffman Estates, IL 60169 | Pet Supplies "Plus", LLC | Project Change Request | | $22,289.78 |
| 121900219 | LGM Equities, LLC | LGM Equities, LLC<br>c/o Milbrook Properties Ltd.<br>42 Bayview Ave.<br>Manhasset, NY 11030 | PSP Stores, LLC | Lease, dated 10/01/2009, as amended (West Hempstead, NY) | West Hempstead , NY (9016) | $0.00 |
| 121804236 | LH Bolingbrook Weber, L.L.C. | LH Bolingbrook Weber, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 03/30/2022, as renewed or amended (Store #4515 - Bolingbrook) | | $0.00 |
| 121804239 | LH Crystal Lake, L.L.C. | LH Crystal Lake, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 10/09/2017, as renewed or amended (Store #4160 - Crystal Lake) | | $0.00 |
| 121804240 | LH Grayslake, L.L.C. | LH Grayslake, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 03/30/2022, as renewed or amended (Store #4516 - Grayslake) | | $0.00 |
| 121804241 | LH Homer Glen, L.L.C. | LH Homer Glen, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 08/28/2018, as renewed or amended (Store #4196 - Homer Glen) | | $0.00 |
| 121804242 | LH LaPorte, L.L.C. | LH LaPorte, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 09/26/2016, as renewed or amended (Store #4087 - La Porte) | | $0.00 |
| 121804243 | LH Plainfield, L.L.C | LH Plainfield, L.L.C<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 11/17/2015, as renewed or amended (Store #4037 - Plainfield) | | $0.00 |
| 121804244 | LH Villa Park, L.L.C. | LH Villa Park, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 09/17/2007, as renewed or amended (Store #72 - Villa Park) | | $0.00 |
| 121804245 | Li & FUNG (TRADING) LIMITED | Li & FUNG (TRADING) LIMITED<br>LiFung Tower<br>888 Cheung Sha Wan Road<br>Kowloon, | PSP Group, LLC | Buying Agency Agreement | | $0.00 |
| 121900113 | Lincoln Grace Investments, LLC | Lincoln Grace Investments, LLC<br>c/o Washington Properties, Inc.<br>400 Skokie Blvd.<br>Suite 425<br>Northbrook, IL 60062 | PSP Stores, LLC | Lease Agreement, dated 09/15/2011, as amended (Chicago, IL) | Chicago, IL (0205) | $2,518.87 |
| 121900167 | Linear Retail #9 LLC | Linear Retail #9 LLC<br>c/o Linear Retail Properties, LLC<br>77 South Bedford Street<br>Suite 401<br>Burlington, MA 01803 | PSP Stores, LLC | Lease, dated 04/10/2017, as amended (Nashua, NH) | Nashua, NH (4137) | $652.60 |
| 121900235 | Linear Retail Waltham #1 LLC | Linear Retail Waltham #1 LLC<br>c/o Linear Retail Properties, LLC<br>77 South Bedford Street<br>Suite 401<br>Burlington, MA 01803 | PSP Stores, LLC | Lease, dated 03/20/2013, as amended (Waltham, MA) | Waltham, MA (9064) | $722.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121804312 | Little Paws, LLC | Little Paws, LLC<br>7911 Platinum Ct.<br>Boerne, TX 78015 | PSP Franchising, LLC | Franchise Agreement, dated 08/23/2021, as renewed or amended (Store #4472 - Boerne) | | $0.00 |
| 122000224 | Lively Holdings, LLC | Lively Holdings, LLC<br>1170 Clover Hill Lane<br>Elgin, IL 60120 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/20/2024, as amended or extended (Store 482) | 482 | $0.00 |
| 121804392 | Love Your Neighbor Well, LLC | Love Your Neighbor Well, LLC<br>10804 Bridgeport Drive<br>Temple, TX 76502 | PSP Franchising, LLC | Franchise Agreement, dated 03/09/2024, as renewed or amended (Store #4635 - Temple) | | $0.00 |
| 121804409 | Lucid Software Inc. | Lucid Software Inc.<br>10355 S Jordan Gateway #150<br>South Jordan, UT 84095 | PSP Group, LLC | Lucid Order Form | | $0.00 |
| 121804411 | Lukaluk, LLC | Lukaluk, LLC<br>5985 Chester Way<br>Denver, CO 80238 | PSP Franchising, LLC | Franchise Agreement, dated 03/28/2023, as renewed or amended (Store #4597 - Green Valley Ranch) | | $0.00 |
| 121804423 | M & A Ventures | M & A Ventures<br>c/o REPAY<br>3 West Paces Ferry Road<br>Suite 200<br>Atlanta, GA 30309 | Buddy's Newco, LLC | Electronic Payment Contract | | $0.00 |
| 122000001 | M&S Investment Group, LLC | M&S Investment Group, LLC<br>4985 West Colonial Drive<br>Orlando, FL 32808 | Buddy's Newco, LLC | Assignment of Lease, dated October 27, 2014 (Store 3) | 03 | $854.39 |
| 121804432 | M.I. Industries, Incorporated | M.I. Industries, Incorporated<br>55 Westport Drive<br>Suite 200<br>St. Louis, MO 63145 | PSP Group, LLC | Freezer Agreement | | $0.00 |
| 121804434 | M3 Ventures #4091, LLC | M3 Ventures #4091, LLC<br>c/o 191 Alps Rd., Suite 13-A<br>Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 12/15/2016, as renewed or amended (Store #4091 - Warner Robins) | | $0.00 |
| 121804435 | M3 Ventures #4105, LLC | M3 Ventures #4105, LLC<br>c/o 191 Alps Rd., Suite 13-A<br>Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 03/21/2017, as renewed or amended (Store #4105 - Macon) | | $0.00 |
| 121804436 | M3 Ventures #8024, LLC | M3 Ventures #8024, LLC<br>c/o 191 Alps Rd., Suite 13-A<br>Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 10/06/2010, as renewed or amended (Store #8024 - Asheville) | | $0.00 |
| 121804437 | M3 Ventures #8029, LLC | M3 Ventures #8029, LLC<br>c/o 191 Alps Rd., Suite 13-A<br>Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2004, as renewed or amended (Store #8029 - Athens) | | $0.00 |
| 121804438 | M3 Ventures #8034, LLC | M3 Ventures #8034, LLC<br>c/o 191 Alps Rd., Suite 13-A<br>Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 06/07/2007, as renewed or amended (Store #8034 - Carrollton) | | $0.00 |
| 121804440 | MAAK Corp. | MAAK Corp.<br>7907 Sendero Ridge<br>Fair Oaks Ranch, TX 78015 | WNW Franchising, LLC | Franchise Agreement dated 10/25/2024 (Store #3041 - San Antonio) | | $0.00 |
| 121804454 | Madison Avery Partners , LLC | Madison Avery Partners , LLC<br>c/o Pet Supplies Plus, 1300 MacDade Boulevard<br>Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 12/10/2019, as renewed or amended (Store #4286 - Cherry Hill) | | $0.00 |
| 121804455 | Madjef, Inc. | Madjef, Inc.<br>45 Longview Dr.<br>Scarsdale, NY 10583 | PSP Franchising, LLC | Franchise Agreement, dated 08/25/2014, as renewed or amended (Store #4056 - Yorktown Heights) | | $0.00 |
| 121804461 | Magnifico Pet Holdings, LLC | Magnifico Pet Holdings, LLC<br>c/o Pet Supplies Plus, 1300 MacDade Boulevard<br>Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 09/13/2022, as renewed or amended (Store #4545 - Bradenton) | | $0.00 |
| 122000226 | Magnolia Furniture, Inc. | Magnolia Furniture, Inc.<br>8848 Dawes Lake Road South<br>Mobile, AL 36619 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 04/16/2015, as amended or extended (Store 499) | 499 | $0.00 |
| 122000225 | Magnolia Furniture, Inc. | Magnolia Furniture, Inc.<br>8848 Dawes Lake Road South<br>Mobile, AL 36619 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/27/2013, as amended or extended (Store 380) | 380 | $0.00 |
| 121804477 | Main Street Pet Supply, LLC | Main Street Pet Supply, LLC<br>31500 Northwestern Highway, Suite 175<br>Farmington Hills, MI 48334 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2020, as renewed or amended (Store #65 - Ann Arbor) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121804523 | Manhattan Associates, Inc. | Manhattan Associates, Inc. 2300 Windy Ridge Parkway 10th Floor Atlanta, GA 30339 | PSP Distribution, LLC | SaaS Services Agreement | | $279,448.55 |
| 121804545 | MANNimals, Inc. | MANNimals, Inc. 2517 2nd Avenue West Seattle, WA 98119 | PSP Franchising, LLC | Franchise Agreement, dated 02/14/2023, as renewed or amended (Store #4628 - Burlington) | | $0.00 |
| 121804552 | Marchan Enterprise, LLC | Marchan Enterprise, LLC Corporation Trust Center, 1209 Orange Street Wilmington, DE 19801 | PSP Franchising, LLC | Franchise Agreement, dated 05/13/2019, as renewed or amended (Store #4246 - Berwyn) | | $0.00 |
| 121900231 | Margand Enterprises, LLC | Margand Enterprises, LLC 1680 Route 23 Suite 330 Wayne, NJ 07470 | PSP Stores, LLC | Lease, dated 06/18/2012, as amended (Fair Lawn, NJ) | Fair Lawn, NJ (9056) | $0.00 |
| 121804557 | MaRick Inc. | MaRick Inc. 566 Fiesta Court Fairfield, CA 94533 | PSP Franchising, LLC | Franchise Agreement, dated 12/31/2020, as renewed or amended (Store #4229 - Vacaville) | | $0.00 |
| 121804573 | MarketSpark, Inc. | MarketSpark, Inc. 750 B Street Suite 2750 San Diego, CA 92101 | PSP Group, LLC | MarketSpark Master Service Agreement | | $0.00 |
| 121804575 | Marla Enterprise, LLC | Marla Enterprise, LLC Corporation Trust Center, 1209 Orange Street Wilmington, DE 19801 | PSP Franchising, LLC | Franchise Agreement, dated 03/12/2019, as renewed or amended (Store #4245 - Southampton) | | $0.00 |
| 121804582 | Marmaduke's Munchies, LLC | Marmaduke's Munchies, LLC 9011 Sendera Dr. Magnolia, TX 77354 | PSP Franchising, LLC | Franchise Agreement, dated 11/06/2020, as renewed or amended (Store #4358 - Kingwood) | | $0.00 |
| 121804586 | Marshfield Pets, LLC | Marshfield Pets, LLC 2295 Spring Rose Road Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 04/07/2021, as renewed or amended (Store #4428 - Marshfield) | | $0.00 |
| 121804632 | Maverick Pets, LLC | Maverick Pets, LLC 4068 Lenox Drive Cincinnati, OH 45245 | PSP Franchising, LLC | Franchise Agreement, dated 03/23/2023, as renewed or amended (Store #4592 - Milford) | | $0.00 |
| 121804633 | Max Bull, Inc. | Max Bull, Inc. 14240 Imboden Rd. Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 10/02/2019, as renewed or amended (Store #4281 - Arvada) | | $0.00 |
| 121804634 | Max Pets Supplies, LLC | Max Pets Supplies, LLC 2214 Cortona Mist San Antonio, TX 78260 | PSP Franchising, LLC | Franchise Agreement, dated 02/15/2024, as renewed or amended (Store #4638 - San Antonio) | | $0.00 |
| 121900047 | Mayrich III, Ltd. | Mayrich III, Ltd. 761 East 200th Street Euclid, OH 44119 | PSP Stores, LLC | Lease Agreement, dated 03/31/2009, as amended (Lyndhurst, OH) | Lyndhurst, OH (0083) | $2,112.62 |
| 122000026 | MBABJB Holdings LLC | MBABJB Holdings LLC 2425 Pineapple Ave #108 Melbourne, FL 32935 | Buddy's Newco, LLC | Lease Agreement dated March 3, 2011, as amended (Store 47) | 47 | $0.00 |
| 121804648 | McCabe Way Irvine LLC Mileski Living Trust | McCabe Way Irvine LLC Mileski Living Trust 1971 W 190TH STREET SUITE 100 TORRANCE, CA 90504 | PSP Distribution, LLC | Amended and Restated Building Lease | | $0.00 |
| 121804650 | McCabe Way Irvine, LLC | McCabe Way Irvine, LLC 1971 W 190TH STREET SUITE 100 TORRANCE, CA 90504 | PSP Distribution, LLC | HVAC Replacement Agreement | | $0.00 |
| 121804649 | MCCABE WAY IRVINE, LLC | MCCABE WAY IRVINE, LLC 1971 W 190TH STREET SUITE 100 TORRANCE, CA 90504 | PSP Distribution, LLC | First Amendment to the Amended and Restated Building Lease | | $0.00 |
| 121804658 | McPetsol, Inc. | McPetsol, Inc. 33300 Five Mile Road, Suite 200 Livonia, MI 48154 | PSP Franchising, LLC | Franchise Agreement, dated 11/29/2000, as renewed or amended (Store #118 - Fenton) | | $0.00 |
| 121900206 | Meadowbrook Shopping Center Associates, LLC | Meadowbrook Shopping Center Associates, LLC 30600 Northwestern Suite 430 Farmington Hills, MI 48334 | PSP Stores, LLC | Lease, dated 06/24/2013, as amended (Novi, MI) | Novi, MI (4557) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121804689 | Mega Kyon Inc. | Mega Kyon Inc.<br>64 N Mill Street<br>Hopkinton, MA 01748 | PSP Franchising, LLC | Franchise Agreement, dated 08/03/2021, as renewed or amended (Store #4471 - Attleboro) | | $0.00 |
| 121804693 | Melian Labs Inc. dba MyTime | Melian Labs Inc. dba MyTime<br>600 California Street<br>11F<br>San Francisco, CA 94108 | PSP Group, LLC | First Amendment to Master Services Agreement | | $0.00 |
| 121804715 | Metro East PSP | Metro East PSP<br>664 Royal Crest Way<br>O'Fallon, IL 62269 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2023, as renewed or amended (Store #4619 - O'Fallon) | | $0.00 |
| 121900241 | MFB Glenville, LLC | MFB Glenville, LLC<br>RD Management LLC<br>810 Seventh Avenue<br>10th floor<br>New York, NY 10019 | PSP Stores, LLC | Lease, dated 02/23/2014, as amended (Glenville, NY) | Glenville, NY (9076) | $919.34 |
| 121804720 | MIA of South Carolina, LLC | MIA of South Carolina, LLC<br>208 St. James Avenue, Suite B<br>Goose Creek, SC 29445 | PSP Franchising, LLC | Franchise Agreement, dated 07/10/2020, as renewed or amended (Store #4329 - Murrell's Inlet) | | $0.00 |
| 129900061 | Michelle Lambert (Entity Pending) | Michelle Lambert (Entity Pending)<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19081 | PSP Franchising, LLC | Franchise Agreement, dated 03/04/2019, as renewed or amended (Store #N/A - N/A) | | $0.00 |
| 121804732 | Michiana Pets, Inc. | Michiana Pets, Inc.<br>5062 Colony Woods Dr.<br>Kalamazoo, MI 49009 | PSP Franchising, LLC | Franchise Agreement, dated 10/14/2005, as renewed or amended (Store #166 - Goshen) | | $0.00 |
| 121804733 | Michigan Office Solutions (MOS) | Michigan Office Solutions (MOS)<br>40000 Grand River Ave. Ste 500<br>Novi, MI 48375 | PSP Stores, LLC | Guaranteed Maintenance Agreement (GMA) | | $0.00 |
| 121804737 | Michigan Office Solutions Integrity One Technologies | Michigan Office Solutions Integrity One Technologies<br>801 N Capitol Ave<br>Indianapolis, IN 46204 | PSP Stores, LLC | Customer Authorization for Equipment Removal, Disposal, Freight Return and Buyout Expectations | | $0.00 |
| 121804738 | Michigan Office Solutions, Inc. (Xerox Business Solutions Midwest) | Michigan Office Solutions, Inc. (Xerox Business Solutions Midwest)<br><br>40000 Grand River Ave. Ste 500<br>Novi, MI 48375 | Pet Supplies "Plus", LLC | Sales and Service Agreement | | $0.00 |
| 121804744 | Microsoft | Microsoft<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Enterprise Update Statement | | $0.00 |
| 121804742 | Microsoft | Microsoft<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Enterprise Renewal Form | | $0.00 |
| 121804741 | Microsoft | Microsoft<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Amendment to Contract Documents | | $0.00 |
| 121804740 | Microsoft | Microsoft<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Microsoft Enterprise Enrollment | | $0.00 |
| 121804746 | Microsoft Corporation | Microsoft Corporation<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Microsoft Volume Licensing Agreement | | $1,095,666.86 |
| 121804745 | Microsoft Corporation | Microsoft Corporation<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | Pet Supplies "Plus", LLC | Purchase Order for Additional Premier Support Hours | | $0.00 |
| 121804750 | Microsoft Licensing, GP | Microsoft Licensing, GP<br>1401 Elm Street<br>5th Floor<br>Dallas, TX 75202 | PSP Group, LLC | Purchase Order for True-Up EA for Additional Licenses | | $0.00 |
| 122000228 | MID Atlantic RTO, LLC | MID Atlantic RTO, LLC<br>106 Umbrella Place<br>Jupiter, FL 33458 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/03/2015, as amended or extended (Store 501) | 501 | $0.00 |
| 122000227 | MID Atlantic RTO, LLC | MID Atlantic RTO, LLC<br>106 Umbrella Place<br>Jupiter, FL 33458 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/16/2022, as amended or extended (Store 502) | 502 | $0.00 |
| 121804757 | Midtown Business Partners LLC | Midtown Business Partners LLC<br>1218 Hazel<br>Tulsa, OK 74114 | PSP Franchising, LLC | Franchise Agreement, dated 10/04/2022, as renewed or amended (Store #4355 - Tulsa) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900090 | Midway Market Square Elyria LLC | Midway Market Square Elyria LLC c/o Madison Properties 3611 14th Ave. Suite 420 Brooklyn, NY 11218 | PSP Stores, LLC | Lease, dated 04/16/2001, as amended (Elyria, OH) | Elyria, OH (0123) | $0.00 |
| 121804758 | Midwestern Pet Foods, Inc. | Midwestern Pet Foods, Inc. 9634 Hedden Road Evansville, IN 47725 | PSP Group, LLC | Limited Channel Exclusivity Agreement | | $0.00 |
| 121804774 | Mission Pets | Mission Pets 986 Mission Street 5th Floor San Francisco, CA 94103 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121804781 | MJC Enterprises, Inc. | MJC Enterprises, Inc. 42241 Garfield Rd. Clinton Township, MI 48038 | PSP Franchising, LLC | Franchise Agreement, dated 02/20/1991, as renewed or amended (Store #8 - Clinton Twp) | | $0.00 |
| 121804784 | MJQ Enterprises, Inc. | MJQ Enterprises, Inc. 2501 Pennington Place Valparaiso, IN 46383 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2002, as renewed or amended (Store #129 - Valparaiso) | | $0.00 |
| 121804795 | MO Pet Retail Three, LLC | MO Pet Retail Three, LLC 770 W. Bedford Euless Rd. Hurst, TX 76053 | PSP Franchising, LLC | Franchise Agreement, dated 08/30/2017, as renewed or amended (Store #4158 - Lee's Summit) | | $0.00 |
| 121804796 | MO Pet Retail Two, LLC | MO Pet Retail Two, LLC 770 W. Bedford Euless Rd. Hurst, TX 76053 | PSP Franchising, LLC | Franchise Agreement, dated 01/11/2018, as renewed or amended (Store #4167 - Kansas City) | | $0.00 |
| 121804807 | Monona Pets, LLC | Monona Pets, LLC 2295 Spring Rose Road Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2023, as renewed or amended (Store #4595 - Monona) | | $0.00 |
| 121900080 | Monroe Triple Net, LLC | Monroe Triple Net, LLC c/o Epic Property Management 12863 Eureka Rd. Southgate, MI 48195 | PSP Stores, LLC | Lease, dated 03/05/2004, as amended (Monroe, MI) | Monroe, MI (0108) | $0.00 |
| 121900009 | Mount Pleasant Investments, LLC | Mount Pleasant Investments, LLC c/o Synergy Property Management 5007 S Howell Avenue Suite 115 Milwaukee, WI 53207 | Pet Supplies "Plus", LLC | Lease Agreement, dated 09/08/1994, as amended (Racine, WI) | Racine, WI (0075) | $0.00 |
| 121804828 | Mountain Country Pet Care-LLC | Mountain Country Pet Care-LLC 201 Industrial Okeene, OK 73763 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121900163 | MOUNTAIN LAUREL PLAZA ASSOCIATES | MOUNTAIN LAUREL PLAZA ASSOCIATES c/o Oxford Development Company, Property Manager 301 Grant Street Suite 4500 Pittsburgh, PA 15219 | PSP Stores, LLC | Lease, dated 01/11/2016, as amended (Latrobe, PA) | Latrobe, PA (4097) | $0.00 |
| 121804831 | Movable, Inc. | Movable, Inc. 5 Bryant Park (1065 Sixth Avenue) 9th Floor New York, NY 10018 | PSP Franchising, LLC | Movable, Inc. Change Order Form | | $0.00 |
| 121804835 | Moysestra Enterprises, Inc. | Moysestra Enterprises, Inc. 80 Valley View Terrace Montvale, NJ 07645 | PSP Franchising, LLC | Franchise Agreement, dated 04/07/2015, as renewed or amended (Store #4003 - Hillsdale) | | $0.00 |
| 121804836 | MPM Belmont,, LLC | MPM Belmont,, LLC 19154 Rosemary Road Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2023, as renewed or amended (Store #4289 - Belmont) | | $0.00 |
| 121804837 | MPM Gastonia, LLC | MPM Gastonia, LLC 19154 Rosemary Road Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2023, as renewed or amended (Store #4272 - Gastonia) | | $0.00 |
| 121804838 | MPM Greensboro, LLC | MPM Greensboro, LLC 19154 Rosemary Road Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/29/2021, as renewed or amended (Store #4461 - Greensboro) | | $0.00 |
| 121804839 | MPM Pecan, LLC | MPM Pecan, LLC 19154 Rosemary Road Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/21/2017, as renewed or amended (Store #4109 - Charlotte) | | $0.00 |
| 121804840 | MPM Retail Holdings, LLC | MPM Retail Holdings, LLC 19154 Rosemary Road Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/13/2011, as renewed or amended (Store #8052 - Charlotte) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121804841 | MPMFM, LLC | MPMFM, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/02/2018, as renewed or amended (Store #4189 - Fort Mill) | | $0.00 |
| 121804842 | MPMRH, LLC | MPMRH, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/31/2018, as renewed or amended (Store #4107 - Rock Hill) | | $0.00 |
| 121804843 | MPMSC, LLC | MPMSC, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/14/2015, as renewed or amended (Store #4018 - Charlotte) | | $0.00 |
| 121804845 | Mr Dark PSP, LLC | Mr Dark PSP, LLC<br>4688 N. Arrow Villa Way<br>Boise, ID 83703 | PSP Franchising, LLC | Franchise Agreement, dated 03/19/2021, as renewed or amended (Store #4423 - Garden City) | | $0.00 |
| 121804844 | Mr Dark PSP, LLC | Mr Dark PSP, LLC<br>4688 N. Arrow Villa Way<br>Boise, ID 83703 | PSP Franchising, LLC | Franchise Agreement, dated 10/30/2022, as renewed or amended (Store #4331 - Lehi) | | $0.00 |
| 121900220 | MRV Dickson City, LLC | MRV Dickson City, LLC<br>c/o Integrated Properties, Inc.<br>P.O. Box 988<br>Sudbury, MA 01776 | PSP Stores, LLC | Lease, dated 1/7/2020, as amended (Scranton, PA) | Scranton, PA (9022) | $0.00 |
| 122000235 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/10/2020, as amended or extended (Store 554) | 554 | $0.00 |
| 122000234 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/10/2020, as amended or extended (Store 551) | 551 | $0.00 |
| 122000233 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/10/2020, as amended or extended (Store 550) | 550 | $0.00 |
| 122000232 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/10/2020, as amended or extended (Store 547) | 547 | $0.00 |
| 122000231 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/26/2015, as amended or extended (Store 498) | 498 | $0.00 |
| 122000230 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/03/2014, as amended or extended (Store 473) | 473 | $0.00 |
| 122000229 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/16/2022, as amended or extended (Store 474) | 474 | $0.00 |
| 121900112 | Muffrey LLC | Muffrey LLC<br>c/o Kin Properties<br>185 NW Spanish River Blvd.<br>Suite 100<br>Boca Raton, FL 33431 | PSP Stores, LLC | Lease Agreement, dated 09/19/2011, as amended (Lincolnwood, IL) | Lincolnwood, IL (0204) | $0.00 |
| 121804855 | Mun Pets, LLC | Mun Pets, LLC<br><br>16121 Haddam Ln<br>Westfield, IN 46062 | PSP Franchising, LLC | Franchise Agreement, dated 07/28/2022, as renewed or amended (Store #4530 - Muncie) | | $0.00 |
| 121900006 | Mundelein 83 LLC | Mundelein 83 LLC<br>c/o Shiner Group LLC<br>3201 Old Glenview Road<br>Suite 235<br>Wilmette, IL 60091 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/17/2005, as amended (Mundelein, IL) | Mundelein, IL (0063) | $0.00 |
| 122000237 | MW Management, Inc. | MW Management, Inc.<br>600 South Jefferson Street, Suite M<br>Athens, AL 35611 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/02/2024, as amended or extended (Store 442) | 442 | $0.00 |
| 122000236 | MW Management, Inc. | MW Management, Inc.<br>600 South Jefferson Street, Suite M<br>Athens, AL 35611 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/07/2023, as amended or extended (Store 441) | 441 | $0.00 |
| 121804877 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 11/14/2022, as renewed or amended (Store #4559) | | $0.00 |
| 121804876 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 08/08/2022, as renewed or amended (Store #4535) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121804875 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 08/08/2022, as renewed or amended (Store #4534) | | $0.00 |
| 121804874 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 09/01/2023, as renewed or amended (Store #4409 - Berea) | | $0.00 |
| 121804873 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 12/17/2020, as renewed or amended (Store #4375 - Twinsburg) | | $0.00 |
| 121804872 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 11/13/2020, as renewed or amended (Store #4362 - Brunswick) | | $0.00 |
| 121804871 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 11/13/2020, as renewed or amended (Store #4361 - Round Rock) | | $0.00 |
| 121804870 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 10/29/2020, as renewed or amended (Store #4360 - Killeen) | | $0.00 |
| 121804888 | N&S Developments 1, LLC | N&S Developments 1, LLC<br>7216 Southampton Lane<br>West Chester Township, OH 45069 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2021, as renewed or amended (Store #4237 - Liberty Township) | | $0.00 |
| 121804890 | N&S Developments 3, LLC | N&S Developments 3, LLC<br>7216 Southampton Lane<br>West Chester Township, OH 45069 | PSP Franchising, LLC | Franchise Agreement, dated 06/18/2021, as renewed or amended (Store #4239 - Beavercreek) | | $0.00 |
| 121804902 | NARS Capital LLC | NARS Capital LLC<br>3 Grace Court<br>Plainsboro Township, NJ 08536 | PSP Franchising, LLC | Franchise Agreement, dated 10/24/2023, as renewed or amended (Store #4632 - Hamilton Township) | | $0.00 |
| 121804910 | Nationwide Litho, Inc. | Nationwide Litho, Inc.<br>11728 Goldring Road<br>Arcadia, CA 91006 | PSP Group, LLC | Cardboard Carriers for Canned Pet Food Agreement | | $0.00 |
| 121804974 | NDM Enterprises, LLC | NDM Enterprises, LLC<br>45243 Daniels Court<br>Hollywood, MD 20636 | WNW Franchising, LLC | Franchise Agreement, dated 10/17/2023, as renewed (Store #3001 - California) | | $0.00 |
| 121804989 | Netsertive, Inc. | Netsertive, Inc.<br>2450 Perimeter Park Drive<br>Suite 105<br>Morrisville, NC 27560 | PSP Group, LLC | Master Services Agreement | | $0.00 |
| 121900232 | New Creek II LLC | New Creek II LLC<br>500 N. Broadway<br>Suite 201<br>PO Box 9010<br>Jericho, NY 11753 | PSP Stores, LLC | Lease, dated 08/29/2012, as amended (Short Hills, NJ) | Short Hills, NJ (9058) | $0.00 |
| 121900034 | New Creek LLC | New Creek LLC<br>500 N. Broadway<br>Suite 201<br>P.O. Box 9010<br>Jericho, NY 11753 | Pet Supplies "Plus", LLC | Lease, dated 04/27/1998, as amended (Medford, MA) | Medford, MA (9028) | $0.00 |
| 121900239 | New Westgate Mall LLC | New Westgate Mall LLC<br>c/o New England Development<br>75 Park Plaza<br>Boston, MA 02116 | PSP Stores, LLC | Lease, dated 10/28/2013, as amended (Brockton, MA) | Brockton, MA (9072) | $0.00 |
| 121805048 | Niemann Foods, Inc. | Niemann Foods, Inc.<br>1501 N. 12th St.<br>Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 03/10/2022, as renewed or amended (Store #4504 - Whitewater) | | $0.00 |
| 121805047 | Niemann Foods, Inc. | Niemann Foods, Inc.<br>1501 N. 12th St.<br>Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 02/10/2022, as renewed or amended (Store #4496 - Troy) | | $0.00 |
| 121805046 | Niemann Foods, Inc. | Niemann Foods, Inc.<br>1501 N. 12th St.<br>Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 02/10/2022, as renewed or amended (Store #4495 - Portage) | | $0.00 |
| 121805045 | Niemann Foods, Inc. | Niemann Foods, Inc.<br>1501 N. 12th St.<br>Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 11/17/2021, as renewed or amended (Store #4480 - Sauk City) | | $0.00 |
| 121805044 | Niemann Foods, Inc. | Niemann Foods, Inc.<br>1501 N. 12th St.<br>Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 12/15/2020, as renewed or amended (Store #4408 - Chatham) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------|------|------|------|------|------|
| 121805043 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 09/19/2018, as renewed or amended (Store #4187 - Macomb) | | $0.00 |
| 121805042 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 06/11/2014, as renewed or amended (Store #230 - Dixon) | | $0.00 |
| 121805041 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2011, as renewed or amended (Store #198 - Pekin) | | $0.00 |
| 121805040 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 08/27/2009, as renewed or amended (Store #194 - Danville) | | $0.00 |
| 121805039 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 10/02/2008, as renewed or amended (Store #189 - Jacksonville) | | $0.00 |
| 121805038 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 04/15/2008, as renewed or amended (Store #185 - Champaign) | | $0.00 |
| 121805037 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 06/18/2007, as renewed or amended (Store #179 - Quincy) | | $0.00 |
| 121900064 | Nine & Mack Enterprises, LLC | Nine & Mack Enterprises, LLC 42475 Garfield Road Clinton Twp., MI 48038 | PSP Stores, LLC | Lease, dated 06/30/2008, as amended (St. Clair Shores, MI) | St. Clair Shores, MI (0032) | $0.00 |
| 121900017 | Noble Creek Partners LLC | Noble Creek Partners LLC PO Box 6147 Fishers, IN 46038 | Pet Supplies "Plus", LLC | Lease Agreement, dated 04/06/2004, as amended (Noblesville, IN) | Noblesville, IN (4102) | $0.00 |
| 121900134 | Norcor-Cadwell Associates LLC | Norcor-Cadwell Associates LLC c/o Horizon Realty Services 1540 E Dundee Rd Suite 240 Palatine, IL 60074 | PSP Stores, LLC | Lease Agreement, dated 06/05/2014, as amended (Deerfield, IL) | Deerfield, IL (0237) | $0.00 |
| 121900111 | Northcliff I-480 LLC | Northcliff I-480 LLC 30000 Chagrin Blvd. Ste 100 Cleveland, OH 44124 | PSP Stores, LLC | Lease, dated 08/14/2009, as amended (Brooklyn, OH) | Brooklyn, OH (0195) | $0.00 |
| 129990011 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 11/18/2017, as renewed or amended (Store #4256 - St Augustine) | | $0.00 |
| 129990005 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 02/28/2017, as renewed or amended (Store #4125 - Orange Park) | | $0.00 |
| 121805079 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 11/12/2021, as renewed or amended (Store #4479 - Gainesville) | | $0.00 |
| 121805078 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 02/17/2024, as renewed or amended (Store #4417 - Parrish) | | $0.00 |
| 121805077 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 03/27/2020, as renewed or amended (Store #4316 - Jacksonville) | | $0.00 |
| 121805076 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 05/19/2015, as renewed or amended (Store #4000 - Atlantic Beach) | | $0.00 |
| 122000021 | NORTHLAKE VILLAGE OWNER, LLC dba HIFFMAN | NORTHLAKE VILLAGE OWNER, LLC dba HIFFMAN C/O HIFFMAN ASSET MGMT ONE OAKBROOK TER #400 OAKBROOK TERRACE, IL 60181 | Buddy's Newco, LLC | Lease dated January 9, 1998, as amended (Store 33) | 33 | $466.23 |
| 121805080 | Northridge Crossing L.P. | Northridge Crossing L.P. c/o Casto 250 Civic Center Drive Suite 500 Columbus, OH 43215 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/19/2003, as amended (Westerville, OH) | Westerville, OH (0159) | $0.00 |
| 121805081 | Northtowne Associates | Northtowne Associates c/o J.J. Gumberg Co. 1051 Brinton Road Pittsburgh, PA 15221 | Pet Supplies "Plus", LLC | Lease Agreement, dated 03/24/2008, as amended (Defiance, OH) | Defiance, OH (0186) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 129990009 | Novi Pet Expo | Novi Pet Expo<br>1207 W Hawthorne Street<br>Arlington Heights, IL 60005 | Pet Supplies "Plus", LLC | 2 Year Title Sponsorship Agreement | | $0.00 |
| 121805171 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 12/12/2012, as renewed or amended (Store #8058 - Irmo) | | $0.00 |
| 121805170 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 12/14/2004, as renewed or amended (Store #8031 - Columbia) | | $0.00 |
| 121805169 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 02/06/1998, as renewed or amended (Store #8001 - West Columbia) | | $0.00 |
| 121805168 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 03/26/2024, as renewed or amended (Store #4636 - Lexington) | | $0.00 |
| 121805167 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 06/30/2020, as renewed or amended (Store #4327 - Columbia) | | $0.00 |
| 121805166 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2016, as renewed or amended (Store #4059 - Taylors) | | $0.00 |
| 121805175 | Nyla's Pantry, LLC | Nyla's Pantry, LLC<br>14090 FM 2920, Ste. G551<br>Tomball, TX 77377 | PSP Franchising, LLC | Franchise Agreement, dated 10/12/2022, as renewed or amended (Store #4541 - Nottingham) | | $0.00 |
| 121900016 | Oak Lawn Joint Venture I, L.L.C | Oak Lawn Joint Venture I, L.L.C<br>Attn: Gregory Moross<br>302 Datura Street<br>Suite 100<br>West Palm Beach, FL 33401 | Pet Supplies "Plus", LLC | Lease, dated 04/27/1993, as amended (Oak Lawn, IL) | Oak Lawn, IL (4101) | $0.00 |
| 121900141 | Oak Park Associates, Inc. | Oak Park Associates, Inc.<br>8954 Hill Drive<br>North Huntington<br>North Huntington, PA 15642 | PSP Stores, LLC | Lease, dated 03/05/2015, as amended (White Oak, PA) | White Oak, PA (0248) | $660.19 |
| 121805181 | Oakville Partners, LLC | Oakville Partners, LLC<br>3012 Oakville Woods Court<br>St. Louis, MO 63121 | PSP Franchising, LLC | Franchise Agreement, dated 06/28/2018, as renewed or amended (Store #4188 - St. Louis) | | $0.00 |
| 121805180 | Oakville Partners, LLC | Oakville Partners, LLC<br>3012 Oakville Woods Court<br>St. Louis, MO 63121 | PSP Franchising, LLC | Franchise Agreement, dated 10/06/2015, as renewed or amended (Store #4051 - St. Louis) | | $0.00 |
| 122000009 | Ocala SC Company, Ltd. | Ocala SC Company, Ltd.<br>c/o RMC PROPERTY GROUP<br>8902 N DALE MABRY HWY<br>TAMPA, FL 33614 | Buddy's Newco, LLC | Lease Agreement dated December 30, 2009, as amended (Store 22) | 22 | $528.49 |
| 121805186 | Octopus Deploy Pty. Ltd. | Octopus Deploy Pty. Ltd.<br>Level 4<br>199 Grey St<br>South Brisbane, QLD 4101 | Pet Supplies "Plus", LLC | Octopus Deploy License Agreement | | $0.00 |
| 121900159 | Odenton Shopping Center Limited Partnership | Odenton Shopping Center Limited Partnership<br>c/o Nellis Corporation<br>7811 Montrose Road<br>Suite 420<br>Potomac, MD 20854 | PSP Stores, LLC | Lease, dated 07/26/2016, as amended (Odenton, MD) | Odenton, MD (4082) | $0.00 |
| 121900180 | OGR Tanglewood LLC | OGR Tanglewood LLC<br>141 Robert E. Lee Blvd - 253<br>New Orleans, LA 70124 | PSP Stores, LLC | Lease, dated 08/13/2018, as amended (Elizabeth City, NC) | Elizabeth City, NC (4195) | $770.71 |
| 121805199 | Oil-Dri Corporation of America | Oil-Dri Corporation of America<br>410 N. Michigan Ave.<br>4th Floor<br>Chicago, IL 60611 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121805227 | One Source Technology, LLC dba Asurint | One Source Technology, LLC dba Asurint<br>1111 Superior Avenue<br>Suite 2100<br>Cleveland, OH 44114 | PSP Group, LLC | Background Screening Services Agreement | | $0.00 |
| 121805254 | Opterus Inc. | Opterus Inc.<br>525 Adelaide St. W<br>Suite 1235<br>Toronto, ON M5V ON7 | PSP Group, LLC | Amendment to Opterus Store Ops-Center Standard Agreement | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|-------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121805269 | Optiv Security Inc. | Optiv Security Inc.<br>17197 N. Laural Park Drive<br>Suite #402<br>Livonia, MI 48152 | PSP Group, LLC | Optiv Terms of Purchase | | $0.00 |
| 121805268 | Optiv Security Inc. | Optiv Security Inc.<br>17197 N. Laural Park Drive<br>Suite #402<br>Livonia, MI 48152 | PSP Group, LLC | Statement of Work PCI Report on Compliance | | $0.00 |
| 121805267 | Optiv Security Inc. | Optiv Security Inc.<br>17197 N. Laural Park Drive<br>Suite #402<br>Livonia, MI 48152 | PSP Group, LLC | Purchase Order for PCI Compliance | | $0.00 |
| 121805266 | Optiv Security Inc. | Optiv Security Inc.<br>17197 N. Laural Park Drive<br>Suite #402<br>Livonia, MI 48152 | PSP Group, LLC | Purchase Order for PCI 4.0 Delta Assessment | | $0.00 |
| 121805277 | Optiv, Inc. | Optiv, Inc.<br>1144 15th St.<br>Denver, CO 80202 | PSP Group, LLC | PSP Group - PCI ROC and QSA Retainer SOW | | $0.00 |
| 121805281 | Oracle America, Inc. | Oracle America, Inc.<br>500 Oracle Parkway<br>Redwood Shores, CA 94065 | PSP Group, LLC | Oracle Cloud Services Agreement | | $64,280.00 |
| 121805292 | Orange-WNW, LLC | Orange-WNW, LLC<br>26 Carriage Lane<br>Troutville, VA 24011 | WNW Franchising, LLC | Franchise Agreement, dated 12/07/2023 (Store #3038 - Roanoke) | | $0.00 |
| 121900042 | Orchard ParkTK Owner LLC | Orchard ParkTK Owner LLC<br>Attn: David Dworkin<br>c/o JADD Management LLC<br>415 Park Avenue<br>Rochester, NY 14607 | PSP Franchising, LLC | Lease Agreement, dated 02/11/2019, as amended (Orchard Park, NY) | Orchard Park, NY (4527) | $0.00 |
| 121900157 | ORF IX Freedom Plaza, LLC | ORF IX Freedom Plaza, LLC<br>c/o Parth Munshi, General Counsel<br>5865 North Point PKWY<br>Ste 345<br>Alpharetta, GA 30022 | PSP Stores, LLC | Lease, dated 04/22/2016, as amended (Rome, NY) | Rome, NY (4065) | $0.00 |
| 121805311 | Orion, LLC | Orion, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/30/2003, as renewed or amended (Store #8028 - Homewood) | | $0.00 |
| 121805310 | Orion, LLC | Orion, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/17/2000, as renewed or amended (Store #8020 - Tuscaloosa) | | $0.00 |
| 121805309 | Orion, LLC | Orion, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 05/07/2007, as renewed or amended (Store #8017 - Mobile) | | $0.00 |
| 121805308 | Orion, LLC | Orion, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/30/1998, as renewed or amended (Store #8015 - Pelham) | | $0.00 |
| 121805323 | Otava | Otava<br>825 Victors Way<br>Suite 200<br>Ann Arbor, MI 48108 | PSP Group, LLC | PSP Group | Cloud + Backup (v-8) | | $0.00 |
| 121805322 | Otava | Otava<br>825 Victors Way<br>Suite 200<br>Ann Arbor, MI 48108 | PSP Group, LLC | PSP Group - Colocation Renewal - AA2 (v-2) | | $0.00 |
| 121805321 | Otava | Otava<br>825 Victors Way<br>Suite 200<br>Ann Arbor, MI 48108 | PSP Group, LLC | PSP Group - Colocation Renewal - AA2 (v-1) | | $0.00 |
| 121900150 | Oxford Crossing LLC | Oxford Crossing LLC<br>c/o Capital Group Properties LLC<br>259 Turnpike Road<br>Suite 100<br>Southborough, MA 01772 | PSP Stores, LLC | Lease, dated 12/03/2015, as amended (Oxford, MA) | Oxford, MA (4039) | $987.76 |
| 121805349 | Pahrump Group, LLC | Pahrump Group, LLC<br>8901 Tierra Santa Ave.<br>Las Vegas, NV 89129 | PSP Franchising, LLC | Franchise Agreement, dated 07/17/2023, as renewed or amended (Store #4640 - Pahrump) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900183 | Paint Creek South LLC | Paint Creek South LLC<br>24255 West 13 Mile Road<br>Suite 220<br>Bingham Farms, MI 48025 | PSP Stores, LLC | Lease Agreement, dated 01/21/2021, as amended<br>(Ypsilanti, MI) | Ypsilanti, MI<br>(4227) | $0.00 |
| 121805360 | Panther Pets LLC | Panther Pets LLC<br>4343 Logan Ferry Road<br>Murrysville, PA 15668 | PSP Franchising, LLC | Franchise Agreement, dated 07/09/2021, as renewed or amended (Store #4468 - North Huntingdon) | | $0.00 |
| 121805369 | Paragon Pet Supplies, LLC | Paragon Pet Supplies, LLC<br>30570 Park Vista Dr.<br>Castaic, CA 91384 | PSP Franchising, LLC | Franchise Agreement, dated 07/05/2018, as renewed or amended (Store #4197 - Valencia) | | $0.00 |
| 121805371 | Paragon School of Pet Grooming, Inc. | Paragon School of Pet Grooming, Inc.<br>110 Chicago Drive<br>Jenison, MI 49428 | PSP Stores, LLC | Distance Learning Program Amendment and Renewal Extension Agreement | | $0.00 |
| 121900188 | Paramount Crossroads at Pasadena, LLC | Paramount Crossroads at Pasadena, LLC<br>c/o Paramount Newco Realty<br>1195 Rt 70<br>Suite 2000<br>Lakewood, NH 08701 | PSP Stores, LLC | Lease, dated 08/26/2019, as amended<br>(Pasadena, MD) | Pasadena, MD<br>(4268) | $0.00 |
| 121805375 | Paridiso 2911 LLC | Paridiso 2911 LLC<br>241 McKinley Ave.<br>Grosse Pointe Farms, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 11/04/2020, as renewed or amended (Store #4287 - Chesterfield Twp.) | | $0.00 |
| 122000033 | Park Boulevard Shopping Center Ltd. | Park Boulevard Shopping Center Ltd.<br>C/O: SSG Commercial LLC<br>204 N Howard Ave<br>Tampa, FL 33606 | Buddy's Newco, LLC | Lease Agreement dated March 31, 1994, as amended (Store 1017) | 1017 | $564.47 |
| 121805384 | Patts Pets, Inc. | Patts Pets, Inc.<br>9290 Cherry Brook Lane<br>Frisco, TX 75034 | PSP Franchising, LLC | Franchise Agreement, dated 10/11/2022, as renewed or amended (Store #4570 - Cedar Hill) | | $0.00 |
| 122000238 | Pauhana Associates Limited | Pauhana Associates Limited<br>194 Pugua Street<br>Dededo, Guam 96929 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/01/2020, as amended or extended (Store 439 and 440) | 439<br>440 | $0.00 |
| 121805391 | Pawfect Pals, LLC | Pawfect Pals, LLC<br>9420 Red Spruce Way<br>Elk Grove, CA 95624 | PSP Franchising, LLC | Franchise Agreement, dated 10/25/2023, as renewed or amended (Store #4637 - Gold River) | | $0.00 |
| 121805392 | Pawsitive Return - Marietta, LLC | Pawsitive Return - Marietta, LLC<br>2037 Towne Lake Hills West<br>Woodstock, GA 30189 | PSP Franchising, LLC | Franchise Agreement, dated 10/08/2008, as renewed or amended (Store #8041 - Marietta) | | $0.00 |
| 121805393 | Pawsitive Return, LLC | Pawsitive Return, LLC<br>2037 Towne Lake Hills West<br>Woodstock, GA 30189 | PSP Franchising, LLC | Franchise Agreement, dated 03/25/2016, as renewed or amended (Store #4083 - Acworth) | | $0.00 |
| 121805394 | Pawsitively Pets LLC | Pawsitively Pets LLC<br>103 S. 29th St.<br>Wilmington, NC 28403 | PSP Franchising, LLC | Franchise Agreement, dated 11/12/2019, as renewed or amended (Store #4307 - Chapel Hill) | | $0.00 |
| 121805395 | Pawsome Pets Okemos, LLC | Pawsome Pets Okemos, LLC<br>541 Wenonah Drive<br>Okemos, MI 48864 | PSP Franchising, LLC | Franchise Agreement, dated 12/29/2020, as renewed or amended (Store #4292 - Okemos) | | $0.00 |
| 121805396 | Pawsome Pets Plus, LLC | Pawsome Pets Plus, LLC<br>541 Wenonah Drive<br>Okemos, MI 48864 | PSP Franchising, LLC | Franchise Agreement, dated 03/21/2019, as renewed or amended (Store #4306 - Holland) | | $0.00 |
| 121805400 | PAYCOM PAYROLL, LLC | PAYCOM PAYROLL, LLC<br>7501 W Memorial Road<br>Oklahoma City, OK 73142 | Buddy's Newco, LLC | Payroll and Human Capital Management Services Agreement | | $0.00 |
| 121900212 | PBC Seguin, LLC | PBC Seguin, LLC<br>PO Box 19831<br>Houston, TX 77224 | PSP Stores, LLC | Lease, dated 02/07/2008, as amended<br>(Seguin, TX) | Seguin, TX<br>(7008) | $415.12 |
| 121805414 | PC Connection Sales Corp. | PC Connection Sales Corp.<br>730 Milford Road<br>Merrimack, NH 03054-4631 | Buddy's Newco, LLC | Equipment Lease Agreement | | $0.00 |
| 121900063 | PDQ Israel Family Northtowne, LLC | PDQ Israel Family Northtowne, LLC<br>5300 W. Atlantic Avenue<br>Suite 509<br>Delray Beach, FL 33484 | PSP Stores, LLC | Lease, dated 06/03/1992, as amended<br>(Toledo, OH) | Toledo, OH<br>(0029) | $0.00 |
| 140000214 | Pentex 1848, LLC | Pentex 1848, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated July 1, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 1065 1067<br>1068 1069<br>1070 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 140000213 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated October 23, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000212 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated August 23, 2019, to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 570 571 572 573 576 588 593 600 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 | $0.00 |
| 140000211 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 2, 2021 to the Franchise Agreement dated December 2, 2021, between Buddy's Franchising and Licensing LLC and Pentex 1848, LLC | 513 | $0.00 |
| 140000210 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 2, 2021, between Buddy's Franchising and Licensing LLC and Pentex 1848, LLC | 513 | $0.00 |
| 140000209 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 2, 2021 to the Franchise Agreement dated December 2, 2021, between Buddy's Franchising and Licensing LLC and Pentex 1848, LLC | 445 | $0.00 |
| 140000208 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 2, 2021, between Buddy's Franchising and Licensing LLC and Pentex 1848, LLC | 445 | $0.00 |
| 140000207 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Termination Agreement and Release dated August 1, 2024, by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 360 405 | $0.00 |
| 140000201 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 1, 2017, to that certain Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 622 623 | $0.00 |
| 140000200 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 570 571 572 573 576 588 593 600 622 623 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 1065 1067 1068 1069 1070 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000214 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated July 1, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 1065 1067 1068 1069 1070 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 140000213 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated October 23, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000212 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated August 23, 2019, to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 570 571 572 573 576 588 593 600 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 | $0.00 |
| 140000207 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Termination Agreement and Release dated August 1, 2024, by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 360 405 | $0.00 |
| 140000206 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated June 17, 2022 to the Franchise Agreement dated June 17, 2022, between Buddy's Franchising and Licensing LLC and Pentex RTO, LLC | 405 | $0.00 |
| 140000205 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated June 17, 2022, between Buddy's Franchising and Licensing LLC and Pentex RTO, LLC | 405 | $0.00 |
| 140000201 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 1, 2017, to that certain Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 622 623 | $0.00 |
| 140000200 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 570 571 572 573 576 588 593 600 622 623 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 1065 1067 1068 1069 1070 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000214 | Pentex Top Left, LLC | Pentex Top Left, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated July 1, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 1065 1067 1068 1069 1070 | $0.00 |
| 140000213 | Pentex Top Left, LLC | Pentex Top Left, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated October 23, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 140000212 | Pentex Top Left, LLC | Pentex Top Left, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated August 23, 2019, to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 570 571 572<br>573 576 588<br>593 600 1021<br>1037 1041<br>1042 1043<br>1045 1057<br>1058 1060<br>1063 | $0.00 |
| 140000207 | Pentex Top Left, LLC | Pentex Top Left, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Termination Agreement and Release dated August 1, 2024, by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 360<br>405 | $0.00 |
| 140000204 | Pentex Top Left, LLC | Pentex Top Left, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated August 10, 2020, between Buddy's Franchising and Licensing LLC and Pentex Top Left, LLC | 368 | $0.00 |
| 140000201 | Pentex Top Left, LLC | Pentex Top Left, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 1, 2017, to that certain Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91<br>92 93 94 95 96<br>100 102 104<br>105 352 353<br>354 357 359<br>360 361 363<br>365 366 367<br>369 370 392<br>393 395 396<br>397 398 399<br>400 401 402<br>403 404 567<br>622 623 | $0.00 |
| 140000200 | Pentex Top Left, LLC | Pentex Top Left, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91<br>92 93 94 95 96<br>100 102 104<br>105 352 353<br>354 357 359<br>360 361 363<br>365 366 367<br>369 370 392<br>393 395 396<br>397 398 399<br>400 401 402<br>403 404 567<br>570 571 572<br>573 576 588<br>593 600 622<br>623 1021 1037<br>1041 1042<br>1043 1045<br>1057 1058<br>1060 1063<br>1065  1067<br>1068 1069<br>1070  2110<br>2111 2112<br>2113 2114<br>2116 2117<br>2118 | $0.00 |
| 121805450 | Personal Zoo Supply, Inc. | Personal Zoo Supply, Inc.<br>1517 Lakeview Ave.<br>Sylvan Lake, MI 48320 | PSP Franchising, LLC | Franchise Agreement, dated 06/27/2007, as renewed or amended (Store #8035 - New Port Richey) | | $0.00 |
| 121805453 | Pestell Pet Products | Pestell Pet Products<br>141 Hamilton Road<br>New Hamburg, N3A 2H1 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121802276 | Pet Blitz, LLC | Pet Blitz, LLC<br>326 N Meramec Avenue<br>Clayton, MO 63105 | PSP Franchising, LLC | Franchise Agreement, dated 04/01/2024, as renewed or amended (Store #4644 - Creve Coeur) | | $0.00 |
| 121805457 | Pet Brands, LLC | Pet Brands, LLC<br>425 Metro Place North<br>Suite 690<br>Dublin, OH 43017 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121805458 | Pet Bridge, Inc. | Pet Bridge, Inc.<br>521 Potomac Road<br>Joppatowne, MD 21085 | PSP Franchising, LLC | Franchise Agreement, dated 04/07/2022, as renewed or amended (Store #4543 - Bel Air) | | $0.00 |
| 121805459 | PET FACTORY, INC. | PET FACTORY, INC.<br>845 EAST HIGH STREET<br>MUNDELEIN, IL 60060 | PSP Group, LLC | PRIVATE BRAND PET FOODS AGREEMENT | | $0.00 |
| 121805460 | Pet Joy Baytown, LLC | Pet Joy Baytown, LLC<br>4618 Stoney Ridge Court<br>Sugar Land, TX 77479 | PSP Franchising, LLC | Franchise Agreement, dated 02/15/2019, as renewed or amended (Store #4219 - Baytown) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------|------|------|------|------|------|
| 121805462 | Pet Maab, Inc | Pet Maab, Inc<br>15 Stirrup Lane<br>Salonga, NY 11768 | PSP Franchising, LLC | Franchise Agreement, dated 04/27/2024, as renewed or amended (Store #4643 - Massapequa) | | $0.00 |
| 121805463 | Pet Plus Love, L.L.C | Pet Plus Love, L.L.C<br>21 Cedar Grove Court<br>Rosedale, MD 21237 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2023, as renewed or amended (Store #4631 - Dundalk) | | $0.00 |
| 121805464 | Pet Stark LLC | Pet Stark LLC<br>134 Derby Lane<br>Bensalem, PA 19020 | PSP Franchising, LLC | Franchise Agreement, dated 11/17/2021, as renewed or amended (Store #4529 - Bensalem) | | $0.00 |
| 121805469 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/13/2022, as renewed or amended (Store #4558 - Irving ) | | $0.00 |
| 121805468 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/06/2022, as renewed or amended (Store #4544 - Allen) | | $0.00 |
| 121805467 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/24/2022, as renewed or amended (Store #4509 - Irving) | | $0.00 |
| 121805466 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/07/2022, as renewed or amended (Store #4493 - Frisco) | | $0.00 |
| 121805465 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/27/2019, as renewed or amended (Store #4247 - Arlington) | | $0.00 |
| 121805477 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 11/13/2011, as renewed or amended (Store #7014 - Lewisville) | | $0.00 |
| 121805476 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/13/2011, as renewed or amended (Store #7013 - Dallas) | | $0.00 |
| 121805475 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/11/2011, as renewed or amended (Store #7011 - Dallas) | | $0.00 |
| 121805474 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/24/2022, as renewed or amended (Store #4510 - Prosper) | | $0.00 |
| 121805473 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/03/2021, as renewed or amended (Store #4482 - Dallas) | | $0.00 |
| 121805472 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/14/2020, as renewed or amended (Store #4386 - Mesquite) | | $0.00 |
| 121805471 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2020, as renewed or amended (Store #4369 - Crowley) | | $0.00 |
| 121805470 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/26/2021, as renewed or amended (Store #4235 - Fort Worth) | | $0.00 |
| 121805479 | Pet Supplies Plus of Connecticut 203, LLC | Pet Supplies Plus of Connecticut 203, LLC<br>60 Orchard Road<br>Woodbridge, CT 06525 | PSP Franchising, LLC | Franchise Agreement, dated 10/10/2011, as renewed or amended (Store #4214 - Shelton) | | $0.00 |
| 121805478 | Pet Supplies Plus of Connecticut 203, LLC | Pet Supplies Plus of Connecticut 203, LLC<br>60 Orchard Road<br>Woodbridge, CT 06525 | PSP Franchising, LLC | Franchise Agreement, dated 02/11/1998, as renewed or amended (Store #4213 - Orange) | | $0.00 |
| 121805480 | Petcetera, Inc. | Petcetera, Inc.<br>Registered Agents, Inc., 7901 4th Street N, Suite 300<br>St. Petersburg, FL 33702 | PSP Franchising, LLC | Franchise Agreement, dated 06/20/2019, as renewed or amended (Store #4266 - Spring Hill) | | $0.00 |
| 121805484 | PetIQ, LLC | PetIQ, LLC<br>230 East Riverside Drive<br>Eagle, ID 83616 | PSP Stores, LLC | Community Clinic Agreement | | $0.00 |
| 121805485 | Pets, Inc. | Pets, Inc.<br>3858 Wabeek Lake Drive E<br>Bloomfield Hills, MI 48302 | PSP Franchising, LLC | Franchise Agreement, dated 08/08/1991, as renewed or amended (Store #13 - White Lake) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805486 | Pets4ever LLC | Pets4ever LLC<br>5541 Satinleaf Way<br>San Ramon, CA 94582 | PSP Franchising, LLC | Franchise Agreement, dated 07/26/2024, as renewed or amended (Store #4132 - Pleasanton) | | $0.00 |
| 121805490 | Petsway, Inc. | Petsway, Inc.<br>1669 St. Louis St.<br>Springfield, MO 65802 | PSP Franchising, LLC | Franchise Agreement, dated 08/17/2020, as renewed or amended (Store #4338 - Springfield) | | $0.00 |
| 121805489 | Petsway, Inc. | Petsway, Inc.<br>1669 St. Louis St.<br>Springfield, MO 65802 | PSP Franchising, LLC | Franchise Agreement, dated 08/17/2020, as renewed or amended (Store #4337 - Springfield) | | $0.00 |
| 121805488 | Petsway, Inc. | Petsway, Inc.<br>1669 St. Louis St.<br>Springfield, MO 65802 | PSP Franchising, LLC | Franchise Agreement, dated 08/17/2020, as renewed or amended (Store #4336 - Springfield) | | $0.00 |
| 121805487 | Petsway, Inc. | Petsway, Inc.<br>1669 St. Louis St.<br>Springfield, MO 65802 | PSP Franchising, LLC | Franchise Agreement, dated 08/17/2020, as renewed or amended (Store #4334 - Nixa) | | $0.00 |
| 121900228 | Pettinaro Management LLC | Pettinaro Management LLC<br>234 North James St.<br>Newport, DE 19804 | PSP Stores, LLC | Lease, dated 08/11/2008, as amended (Avondale, PA) | Avondale, PA (9044) | $0.00 |
| 121900059 | Phoenixville Town Center LP | Phoenixville Town Center LP<br>c/o Longview Management LP<br>1055 Westlakes Dr.<br>Ste 170<br>Berwyn, PA 19312 | PSP Stores, LLC | Lease, dated 09/17/2001, as amended (Phoenixville, PA) | Phoenixville, PA (9035) | $1,122.55 |
| 121805505 | Phrasee Limited | Phrasee Limited<br>Tintagel House<br>92 Albert Embankment<br>London, SE1 7TY | PSP Stores, LLC | Master Services Agreement | | $0.00 |
| 122000241 | Pierce RTO of Commerce, LLC | Pierce RTO of Commerce, LLC<br>106B Rock Quarry Road<br>Stockbridge, GA 30281 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/04/2023, as amended or extended (Store 241) | 241 | $0.00 |
| 122000242 | Pierce RTO of Dublin, LLC | Pierce RTO of Dublin, LLC<br>106B Rock Quarry Road<br>Stockbridge, GA 30281 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/18/2023, as amended or extended (Store 243) | 243 | $0.00 |
| 122000243 | Pierce RTO, LLC | Pierce RTO, LLC<br>106B Rock Quarry Road<br>Stockbridge, GA 30281 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/03/2024, as amended or extended (Store 242) | 242 | $0.00 |
| 122000240 | Pierce RTO, LLC | Pierce RTO, LLC<br>106B Rock Quarry Road<br>Stockbridge, GA 30281 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/24/2022, as amended or extended (Store 240) | 240 | $0.00 |
| 121805525 | PJJD L.L.C. | PJJD L.L.C.<br>1401 Wilderness Dr.<br>Schererville, IN 46375 | PSP Franchising, LLC | Franchise Agreement, dated 12/24/2020, as renewed or amended (Store #4388 - Kokomo) | | $0.00 |
| 121805524 | PJJD L.L.C. | PJJD L.L.C.<br>1401 Wilderness Dr.<br>Schererville, IN 46375 | PSP Franchising, LLC | Franchise Agreement, dated 04/06/2017, as renewed or amended (Store #4136 - Whitestown) | | $0.00 |
| 121805523 | PJJD L.L.C. | PJJD L.L.C.<br>1401 Wilderness Dr.<br>Schererville, IN 46375 | PSP Franchising, LLC | Franchise Agreement, dated 04/30/2013, as renewed or amended (Store #223 - Crown Point) | | $0.00 |
| 121805522 | PJJD L.L.C. | PJJD L.L.C.<br>1401 Wilderness Dr.<br>Schererville, IN 46375 | PSP Franchising, LLC | Franchise Agreement, dated 10/29/2010, as renewed or amended (Store #200 - Lafayette) | | $0.00 |
| 121805532 | Placer Labs, Inc. | Placer Labs, Inc.<br>340 S Lemon Ave #1277<br>Walnut<br>Walnut, CA 91789 | PSP Group, LLC | Amendment to Order Form | | $4,383.56 |
| 121805536 | planitretail, LLC | planitretail, LLC<br>360 Bloomfield Ave<br>Suite 406<br>Windsor, CT 06095 | PSP Group, LLC | Professional Services Agreement | | $0.00 |
| 121805544 | Platinum Pet Supply, LLC | Platinum Pet Supply, LLC<br>310 Pinnacle Way, Suite 300<br>Eau Claire, WI 54701 | PSP Franchising, LLC | Franchise Agreement, dated 04/12/2013, as renewed or amended (Store #215 - Rice Lake) | | $0.00 |
| 121805549 | PlayNetwork, Inc. | PlayNetwork, Inc.<br>8727 148th Avenue NE<br>Redmond, WA 98052 | PSP Stores, LLC | Master Services Agreement Equipment Lease/Purchase | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805547 | PlayNetwork, Inc. | PlayNetwork, Inc.<br>8727 148th Avenue NE<br>Redmond, WA 98052 | PSP Stores, LLC | Master Services Agreement | | $0.00 |
| 121900199 | Plaza 15 Realty, LLC | Plaza 15 Realty, LLC<br>One Hospital Drive<br>Lewisburg, PA 17837 | PSP Stores, LLC | Lease, dated 09/23/2014, as amended<br>(Lewisburg, PA) | Lewisburg, PA<br>(4401) | $0.00 |
| 121900140 | Plaza at Northwood, LLC | Plaza at Northwood, LLC<br>c/o WP Glimcher Inc.<br>180 East Broad Street<br>Attn: General Counsel<br>Columbus, OH 43215 | PSP Stores, LLC | Lease Agreement, dated 10/30/2014, as amended<br>(Fort Wayne, IN) | Fort Wayne, IN<br>(Northwood<br>Plaza) (0246) | $0.00 |
| 122000028 | Plaza West Shopping Center, LLC | Plaza West Shopping Center, LLC<br>c/o Edmund Terry<br>211 Alexander Palm Road<br>Boca Raton, FL 33432 | Buddy's Newco, LLC | Lease dated June 25, 2021 (Store 49) | 49 | $413.80 |
| 121900089 | Pleasant Valley Shopping Center Ltd. | Pleasant Valley Shopping Center Ltd.<br>c/o Visconsi Companies Ltd.<br>30050 Chagrin Blvd.<br>Suite 360<br>Pepper Pike, OH 44124 | PSP Stores, LLC | Lease, dated 10/19/2000, as amended<br>(Parma, OH) | Parma, OH<br>(0120) | $0.00 |
| 121805566 | Pluto's Pantry, LLC | Pluto's Pantry, LLC<br>9011 Sendera Dr.<br>Magnolia, TX 77354 | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2021, as renewed or amended (Store #4483 - Magnolia) | | $0.00 |
| 121805575 | PNebel, Inc. | PNebel, Inc.<br>9500 Dorchester Road, Suite 350<br>Summerville, SC 29485 | PSP Franchising, LLC | Franchise Agreement, dated 04/27/2011, as renewed or amended (Store #8051 - Summerville) | | $0.00 |
| 121805574 | PNebel, Inc. | PNebel, Inc.<br>9500 Dorchester Road, Suite 350<br>Summerville, SC 29485 | PSP Franchising, LLC | Franchise Agreement, dated 07/31/2019, as renewed or amended (Store #4296 - James Island) | | $0.00 |
| 121900035 | Pocono Retail Associates, LLC | Pocono Retail Associates, LLC<br>c/o Riverview Management Co.<br>1765 Merriman Road<br>Akron, OH 44313 | Pet Supplies "Plus", LLC | Lease Agreement dated 06/23/2000, as amended<br>(Stroudsburg, PA) | Stroudsburg, PA (9032) | $0.00 |
| 121900071 | Points East, LLC | Points East, LLC<br>7743 Mentor Avenue<br>Mentor, OH 44060 | PSP Stores, LLC | Lease, dated 01/02/1998, as amended<br>(Mentor, OH) | Mentor, OH<br>(0059) | $0.00 |
| 121900122 | Portage Commons LLC | Portage Commons LLC<br>c/o Cambridge Management, LTD.<br>15941 S. Harlem Ave.<br>PMB #108<br>Tinley Park, IL 60477 | PSP Stores, LLC | Lease Agreement, dated 04/03/2013, as amended<br>(Portage, IN) | Portage, IN<br>(0217) | $0.00 |
| 121900114 | Portage Crossing, LLC | Portage Crossing, LLC<br>c/o Robert L. Stark Enterprises, Inc.<br>629 Euclid Avenue<br>Suite 1300<br>Cleveland, OH 44114 | PSP Stores, LLC | Lease, dated 05/31/2012, as amended<br>(Cuyahoga Falls, OH) | Cuyahoga<br>Falls, OH<br>(0206) | $0.00 |
| 121805587 | Portier, LLC ("Uber") | Portier, LLC ("Uber")<br>PO Box 743080<br>Los Angeles, CA 90074 | PSP Group, LLC | Uber Eats and PSP Group, LLC Agreement | | $152,827.54 |
| 121805586 | Portier, LLC ("Uber") | Portier, LLC ("Uber")<br>PO Box 743080<br>Los Angeles, CA 90074 | PSP Group, LLC | Amendment to Agreement between Portier and PSP Group, LLC | | $0.00 |
| 121900168 | Portland Fixture Limited Partnership | Portland Fixture Limited Partnership<br>c/o Woodsonia Real Estate, Inc.<br>20010 Manderson St.<br>Suite 101<br>Elkhorn, NE 68022 | PSP Stores, LLC | Lease, dated 03/31/2017, as amended<br>(Omaha, NE) | Omaha, NE<br>(4138) | $0.00 |
| 121805591 | Posh Pets Acquisitions, LLC | Posh Pets Acquisitions, LLC<br>9300 Shelbyville Rd., Suite 204<br>Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/03/2023, as renewed or amended (Store #4367 - Lexington) | | $0.00 |
| 121805590 | Posh Pets Acquisitions, LLC | Posh Pets Acquisitions, LLC<br>9300 Shelbyville Rd., Suite 204<br>Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/02/2023, as renewed or amended (Store #4366 - Cold Spring) | | $0.00 |
| 121805589 | Posh Pets Acquisitions, LLC | Posh Pets Acquisitions, LLC<br>9300 Shelbyville Rd., Suite 204<br>Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2023, as renewed or amended (Store #4332 - Surf City) | | $0.00 |
| 121805593 | Posh Pets MN, LLC | Posh Pets MN, LLC<br>9300 Shelbyville Rd., Suite 204<br>Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/31/2022, as renewed or amended (Store #4021 - Vadnais Heights) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121805592 | Posh Pets MN, LLC | Posh Pets MN, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/31/2022, as renewed or amended (Store #4002 - Crystal) | | $0.00 |
| 121805602 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 06/03/2022, as renewed or amended (Store #4525 - Anderson) | | $0.00 |
| 121805601 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 10/06/2021, as renewed or amended (Store #4469 - Shelbyville) | | $0.00 |
| 121805600 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 12/22/2020, as renewed or amended (Store #4382 - Hamilton) | | $0.00 |
| 121805599 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 12/22/2020, as renewed or amended (Store #4364 - Cincinnati) | | $0.00 |
| 121805598 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 12/22/2020, as renewed or amended (Store #4363 - Harrison) | | $0.00 |
| 121805597 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2021, as renewed or amended (Store #4273 - Wilmington) | | $0.00 |
| 121805596 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 10/25/2018, as renewed or amended (Store #4210 - Wilmington) | | $0.00 |
| 121805595 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 08/20/2018, as renewed or amended (Store #4208 - St. Albans) | | $0.00 |
| 121805594 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/20/2018, as renewed or amended (Store #4010 - Wilmington) | | $0.00 |
| 121805603 | Posh Pets WV, LLC | Posh Pets WV, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 09/16/2019, as renewed or amended (Store #4467 - Barboursville) | | $0.00 |
| 121805604 | Postmates Inc. | Postmates Inc. 201 3rd St San Francisco, CA 94103 | Pet Supplies "Plus", LLC | Postmates API Merchant Agreement | | $0.00 |
| 121805612 | Powerhouse Dynamics, Inc. | Powerhouse Dynamics, Inc. 1 Bridge St Newton, MA 02458 | Pet Supplies "Plus", LLC | SiteSage License Agreement | | $51,271.40 |
| 121805614 | Powerhouse Dynamics, LLC | Powerhouse Dynamics, LLC 1 Bridge St Newton, MA 02458 | PSP Stores, LLC | Amendment 6 to SiteSage License Agreement | | $0.00 |
| 121805618 | PPG ARCHITECTURAL FINISHES, INC. | PPG ARCHITECTURAL FINISHES, INC. 400 Bertha Lamme Drive Cranberry Township, PA 16066 | PSP Group, LLC | PPG ARCHITECTURAL FINISHES, INC. PSP GROUP, LLC D/B/A PET SUPPLIES PLUS SALES AGREEMENT | | $0.00 |
| 121805624 | Pradhans Pets Empire 2, LLC | Pradhans Pets Empire 2, LLC 1039 Pitch Pine Street Hickory Creek, TX 75065 | PSP Franchising, LLC | Franchise Agreement, dated 01/02/2024, as renewed or amended (Store #4627 - Greenville) | | $0.00 |
| 121805625 | Pradhans Pets Empire, LLC | Pradhans Pets Empire, LLC 1039 Pitch Pine Street Hickory Creek, TX 75065 | PSP Franchising, LLC | Franchise Agreement, dated 12/19/2023, as renewed or amended (Store #4626 - Decatur) | | $0.00 |
| 121805626 | Pradhan's Pets, Inc. | Pradhan's Pets, Inc. 1039 Pitch Pine Street Hickory Creek, TX 75065 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2019, as renewed or amended (Store #4222 - Fate) | | $0.00 |
| 121805628 | Prairie Dog Pet Products, LLC | Prairie Dog Pet Products, LLC 907 Avenue R Grand Prairie, TX 75050 | PSP Group, LLC | Addendum to Private Brand Pet Foods Agreement | | $0.00 |
| 121805641 | Premer Enterprises, Inc. | Premer Enterprises, Inc. 15330 Lynndale St. Goddard, KS 67052 | PSP Franchising, LLC | Franchise Agreement, dated 12/30/2020, as renewed or amended (Store #4414 - Wichita) | | $0.00 |
| 121805640 | Premer Enterprises, Inc. | Premer Enterprises, Inc. 15330 Lynndale St. Goddard, KS 67052 | PSP Franchising, LLC | Franchise Agreement, dated 01/20/2016, as renewed or amended (Store #4084 - Wichita) | | $0.00 |
| 121805648 | Preston Elizabeth T Squared Alpha, LLC | Preston Elizabeth T Squared Alpha, LLC 5 Sherwood Ave. Madison, NJ 07940 | PSP Franchising, LLC | Franchise Agreement, dated 04/14/2016, as renewed or amended (Store #4095 - Garwood) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121805649 | Preston Elizabeth T Squared Beta, LLC | Preston Elizabeth T Squared Beta, LLC<br>5 Sherwood Ave.<br>Madison, NJ 07940 | PSP Franchising, LLC | Franchise Agreement, dated 05/02/2018, as renewed or amended (Store #4184 - Cedar Knolls) | | $0.00 |
| 121805650 | Preston Elizabeth T Squared Gamma, LLC | Preston Elizabeth T Squared Gamma, LLC<br>5 Sherwood Ave.<br>Madison, NJ 07940 | PSP Franchising, LLC | Franchise Agreement, dated 12/02/2019, as renewed or amended (Store #4293 - Florham Park) | | $0.00 |
| 121805652 | Pretty Puppy, LLC | Pretty Puppy, LLC<br>3309 Post View Drive<br>O'Fallon, MO 63368 | WNW Franchising, LLC | Franchise Agreement, dated 11/27/2023, as renewed (Store #3010 - O'Fallon) | | $0.00 |
| 121805664 | PrimePay, LLC | PrimePay, LLC<br>1487 Dunwoody Dr<br>West Chester, PA 19380 | Buddy's Newco, LLC | Master Services Agreement for Franchisor Services Pricing | | $2,621.90 |
| 121805672 | PrintComm, Inc | PrintComm, Inc<br>2929 Davison Road<br>Flint, MI 48506 | PSP Group, LLC | Proposal for Prospect Data and Data Work for PSP Group Direct Mail Effort | | $0.00 |
| 121805687 | ProKarma, Inc. | ProKarma, Inc.<br>8705 SW Nimbus Avenue<br>Beaverton, OR 97008 | PSP Group, LLC | Master Services Agreement | | $0.00 |
| 121805700 | Protection One Alarm Monitoring, Inc. | Protection One Alarm Monitoring, Inc.<br>800 E. Waterman<br>Wichita, KS 67202 | Pet Supplies "Plus", LLC | Commercial Schedule of Protection Proposal and Sales Agreement | | $0.00 |
| 121805709 | PRP Pet Supplies Inc. | PRP Pet Supplies Inc.<br>900 Green Sea Trail<br>Chesapeake, VA 23323 | PSP Franchising, LLC | Franchise Agreement, dated 12/10/2021, as renewed or amended (Store #4560 - Chesapeake ) | | $0.00 |
| 121805710 | PS1 Rocky LLC | PS1 Rocky LLC<br>167 Route 9<br>Englishtown, NJ 07726 | PSP Franchising, LLC | Franchise Agreement, dated 03/06/2023, as renewed or amended (Store #4588 - Tinton Falls) | | $0.00 |
| 121805711 | PSP 7 Detroit LLC | PSP 7 Detroit LLC<br>8508 Golfside Dr.<br>Commerce Township, MI 48382 | PSP Franchising, LLC | Franchise Agreement, dated 09/14/2004, as renewed or amended (Store #7 - Detroit) | | $0.00 |
| 121805712 | PSP Anthem, LLC | PSP Anthem, LLC<br>710 East Desert Ranch Rd.<br>Phoenix, AZ 85086 | PSP Franchising, LLC | Franchise Agreement, dated 09/29/2021, as renewed or amended (Store #4454 - Phoenix) | | $0.00 |
| 121805714 | PSP Bolingbrook, L.L.C. | PSP Bolingbrook, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 07/18/2007, as renewed or amended (Store #180 - Bolingbrook) | | $0.00 |
| 121805715 | PSP Collins, LLC | PSP Collins, LLC<br>3620 Cole Drive<br>Baton Rouge, LA 70806 | PSP Franchising, LLC | Franchise Agreement, dated 12/30/2021, as renewed or amended (Store #4486 - Baton Rouge) | | $0.00 |
| 121805733 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/22/2015, as renewed or amended (Store #7018 - Hurst) | | $0.00 |
| 121805732 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/02/2014, as renewed or amended (Store #7017 - Dallas) | | $0.00 |
| 121805731 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #7016 - Arlington) | | $0.00 |
| 121805730 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #7015 - Garland) | | $0.00 |
| 121805729 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/24/2010, as renewed or amended (Store #7010 - Richardson) | | $0.00 |
| 121805728 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/27/2006, as renewed or amended (Store #7005 - Plano) | | $0.00 |
| 121805727 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 01/04/2002, as renewed or amended (Store #7002 - Dallas) | | $0.00 |
| 121805726 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/21/2020, as renewed or amended (Store #4318 - North Richland Hills) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121805725 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/26/2019, as renewed or amended (Store #4274 - Denton) | | $0.00 |
| 121805724 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/21/2019, as renewed or amended (Store #4234 - Dallas) | | $0.00 |
| 121805723 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/01/2019, as renewed or amended (Store #4220 - McKinney) | | $0.00 |
| 121805722 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/19/2019, as renewed or amended (Store #4170 - Forney) | | $0.00 |
| 121805721 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/18/2017, as renewed or amended (Store #4150 - Dallas ) | | $0.00 |
| 121805720 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2017, as renewed or amended (Store #4140 - Wylie) | | $0.00 |
| 121805719 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/18/2016, as renewed or amended (Store #4064 - Dallas) | | $0.00 |
| 121805718 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/22/2016, as renewed or amended (Store #4060 - Ft. Worth) | | $0.00 |
| 121805717 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/12/2016, as renewed or amended (Store #4057 - Carrollton) | | $0.00 |
| 121805716 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/14/2015, as renewed or amended (Store #4025 - Fort Worth) | | $0.00 |
| 121805734 | PSP Fargo, LLC | PSP Fargo, LLC<br>428 N. Highway 218, Suite #3<br>Aberdeen, SD 57401 | PSP Franchising, LLC | Franchise Agreement, dated 07/25/2021, as renewed or amended (Store #4609 - West Fargo) | | $0.00 |
| 121805735 | PSP Fort Myers, LLC | PSP Fort Myers, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2015, as renewed or amended (Store #4004 - Fort Myers) | | $0.00 |
| 121900007 | PSP Investments LLC | PSP Investments LLC<br>c/o James Antonopoulos<br>4117 Blake Lane<br>Glenview, IL 60026 | Pet Supplies "Plus", LLC | Lease Agreement, dated 03/12/1993, as amended<br>(Elmwood Park, IL) | Elmwood Park, IL (0064) | $0.00 |
| 121805737 | PSP Lapeer, LLC | PSP Lapeer, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 12/05/1997, as renewed or amended (Store #103 - Lapeer) | | $0.00 |
| 121805738 | PSP LITH, L.L.C. | PSP LITH, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 07/03/2012, as renewed or amended (Store #213 - Lake in the Hills) | | $0.00 |
| 121805739 | PSP Montgomery, L.L.C. | PSP Montgomery, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 01/08/2014, as renewed or amended (Store #227 - Montgomery) | | $0.00 |
| 121805740 | PSP Moon Valley, LLC | PSP Moon Valley, LLC<br>3814 S. Brush Arbor<br>Flagstaff, AZ 86005 | PSP Franchising, LLC | Franchise Agreement, dated 12/11/2019, as renewed or amended (Store #4294 - Phoenix) | | $0.00 |
| 121805741 | PSP Naperville Ogden, L.L.C. | PSP Naperville Ogden, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 11/15/2009, as renewed or amended (Store #184 - Naperville) | | $0.00 |
| 121805742 | PSP Naperville South, L.L.C. | PSP Naperville South, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 02/04/2008, as renewed or amended (Store #183 - Naperville) | | $0.00 |
| 121805743 | PSP North Aurora, L.L.C. | PSP North Aurora, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 11/16/2009, as renewed or amended (Store #188 - North Aurora) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805744 | PSP North Scottsdale, LLC | PSP North Scottsdale, LLC<br>3814 S. Brush Arbor<br>Flagstaff, AZ 86005 | PSP Franchising, LLC | Franchise Agreement, dated 07/16/2018, as renewed or amended (Store #4190 - Scottsdale) | | $0.00 |
| 121805745 | PSP of Hollywood, LLC | PSP of Hollywood, LLC<br>3719 Condor Ct.<br>Weston, FL 33331 | PSP Franchising, LLC | Franchise Agreement, dated 05/04/2011, as renewed or amended (Store #8047 - Hollywood) | | $0.00 |
| 121805746 | PSP Orland Park, L.L.C. | PSP Orland Park, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 02/27/2014, as renewed or amended (Store #229 - Orland Park) | | $0.00 |
| 121805747 | PSP Oro Valley, LLC | PSP Oro Valley, LLC<br>3814 S. Brush Arbor<br>Flagstaff, AZ 86005 | PSP Franchising, LLC | Franchise Agreement, dated 09/18/2023, as renewed or amended (Store #4614 - Oro Valley) | | $0.00 |
| 121805748 | PSP Ortonville, LLC | PSP Ortonville, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 05/08/2008, as renewed or amended (Store #178 - Ortonville) | | $0.00 |
| 121805749 | PSP Redford, LLC | PSP Redford, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2022, as renewed or amended (Store #1 - Redford Township) | | $0.00 |
| 121805750 | PSP Rockies, LLC | PSP Rockies, LLC<br>336 Morning Star Way<br>Castle Rock, CO 80108 | PSP Franchising, LLC | Franchise Agreement, dated 07/29/2022, as renewed or amended (Store #4531 - Denver) | | $0.00 |
| 121805751 | PSP Streamwood, L.L.C. | PSP Streamwood, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2013, as renewed or amended (Store #222 - Streamwood) | | $0.00 |
| 121805752 | PSP TS, LLC | PSP TS, LLC<br>16409 Lucia Gardens Lane<br>Tampa, FL 33625 | PSP Franchising, LLC | Franchise Agreement, dated 02/14/2022, as renewed or amended (Store #4308 - Holiday) | | $0.00 |
| 121805753 | PSP Yorkville, L.L.C. | PSP Yorkville, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 06/12/2014, as renewed or amended (Store #238 - Yorkville) | | $0.00 |
| 121900129 | PZ Southern Limited Partnership | PZ Southern Limited Partnership<br>c/o Pearson Partners, Inc.<br>630 Fifth Avenue<br>Suite 2820<br>New York, NY 10111-0202 | PSP Stores, LLC | Lease, dated 01/14/2014, as amended (Bridgeville, PA) | Bridgeville, PA (0226) | $0.00 |
| 121900151 | Quaker Malls, LLC | Quaker Malls, LLC<br>1680 Route 23<br>Suite 330<br>Wayne, NJ 07470 | PSP Stores, LLC | Lease, dated 02/14/2015, as amended (Bayville, NJ) | Bayville, NJ (4040) | $0.00 |
| 121805789 | Quality Pet Food and Supply, LLC | Quality Pet Food and Supply, LLC<br>5543 Mahoning Avenue<br>Austintown, OH 44515-2316 | PSP Franchising, LLC | Franchise Agreement, dated 06/10/2020, as renewed or amended (Store #4326 - Austintown) | | $0.00 |
| 121805804 | Quikly®, Inc. | Quikly®, Inc.<br>1505 Woodward Ave<br>4th Floor<br>Detroit, MI 48226 | PSP Group, LLC | Quikly Master Services Agreement | | $3,600.00 |
| 121805815 | R&R's Dog House, LLC | R&R's Dog House, LLC<br>505 S Forest Ridge<br>Broken Arrow, OK 74014 | PSP Franchising, LLC | Franchise Agreement, dated 10/05/2023, as renewed or amended (Store #4623 - Richmond) | | $0.00 |
| 121805814 | R&R's Dog House, LLC | R&R's Dog House, LLC<br>505 S Forest Ridge<br>Broken Arrow, OK 74014 | PSP Franchising, LLC | Franchise Agreement, dated 09/21/2021, as renewed or amended (Store #4221 - Owasso) | | $0.00 |
| 121805813 | R&R's Dog House, LLC | R&R's Dog House, LLC<br>505 S Forest Ridge<br>Broken Arrow, OK 74014 | PSP Franchising, LLC | Franchise Agreement, dated 09/21/2021, as renewed or amended (Store #4092 - Tulsa) | | $0.00 |
| 121900029 | R.K. West Roxbury, LLC | R.K. West Roxbury, LLC<br>c/o RK Centers<br>50 Cabot St.<br>Suite 200<br>Needham, MA 02494 | Pet Supplies "Plus", LLC | Lease, dated 08/01/2006, as amended (West Roxbury, MA) | West Roxbury, MA (9003) | $0.00 |
| 121805823 | Radiant Pets Holdings, LLC | Radiant Pets Holdings, LLC<br>220 Newport Center Drive 11-252<br>Newport Beach, CA 92660 | PSP Franchising, LLC | Franchise Agreement, dated 10/25/2023, as renewed or amended (Store #4622 - Wichita) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900127 | RAR2 - Wicker Park Commons, LLC | RAR2 - Wicker Park Commons, LLC c/o Mid-America Asset Management, Inc. One Parkview Plaza 9th Floor Oakbrook Terrace, IL 60181 | PSP Stores, LLC | Lease, dated 09/12/2013, as amended (Chicago, IL) | Chicago, IL (Wicker Park) (0224) | $0.00 |
| 122000020 | RB Seminole LLC | RB Seminole LLC c/o RD MGT 810 7TH AVE, FLOOR 10 NEW YORK, NY 10019 | Buddy's Newco, LLC | Lease dated June 12, 1992, as amended (Store 32) | 32 | $491.75 |
| 121805851 | RBL Enterprise, LTD | RBL Enterprise, LTD 5062 Colony Woods Dr. Kalamazoo, MI 49009 | PSP Franchising, LLC | Franchise Agreement, dated 10/14/2005, as renewed or amended (Store #77 - Portage) | | $0.00 |
| 121900227 | RD Branch Associates, L.P. | RD Branch Associates, L.P. c/o Acadia Realty Trust 411 Theodore Fremd Ave. Suite 300 Rye, NY 10580 | PSP Stores, LLC | Lease, dated 08/27/2001, as amended (Smithtown, NY) | Smithtown, NY (9043) | $0.00 |
| 121900065 | Realty Income Corporation | Realty Income Corporation Attn: Legal Dept. 11995 El Camino Real San Diego, CA 92130 | PSP Stores, LLC | Lease, dated 05/15/2009, as amended (Warren, MI) | Warren, MI (0043) | $0.00 |
| 129990900 | REBIS, LLC dba Property Works | REBIS, LLC dba Property Works 708 Church St Decatur, GA 30030 | Pet Supplies "Plus", LLC | Consent and Approval Engagement Letter | | $15,700.00 |
| 121805870 | Red Bull North America, Inc. | Red Bull North America, Inc. 1630 Stewart Street Santa Monica, ia 90404 | PSP Stores, LLC | Merchandiser Agreement | | $0.00 |
| 121805871 | Red Canary, Inc. | Red Canary, Inc. 1501 South Mo-Pac Expressway Suite 400 Austin, TX 78746 | Pet Supplies "Plus", LLC | Red Canary Managed Detection and Response Services Agreement | | $0.00 |
| 122000013 | Red Investments Corp | Red Investments Corp 106 Satsuma Drive ATTN CARMEN CUELLO Altamonte Springs, FL 32714 | Buddy's Newco, LLC | Lease Agreement dated May 6, 1991, as amended (Store 24) | 24 | $0.00 |
| 121900225 | Regency Centers | Regency Centers 28 Church Lane Suite 200 Westport, CT 06880 | PSP Stores, LLC | Lease, dated 05/16/2003, as amended (Valley Stream, NY) | Valley Stream, NY (9038) | $17,359.21 |
| 121805889 | Reiber, Inc. | Reiber, Inc. 14240 Imboden Rd. Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 05/08/2015, as renewed or amended (Store #4001 - Englewood) | | $0.00 |
| 129990012 | Retail Services WIS Corporation, d/b/a WIS International | Retail Services WIS Corporation, d/b/a WIS International PO BOX 200081 DALLAS       , TX 753200081 | WNW Stores, LLC | Master Services Agreement | | $0.00 |
| 121900028 | Reynolda Manor, LLC | Reynolda Manor, LLC c/o Meridian Realty Services P.O. Box 20429 Winston-Salem, NC 27120 | Pet Supplies "Plus", LLC | Lease Agreement, dated 02/04/1998, as amended (Winston-Salem, NC) | Winston-Salem, NC (8014) | $0.00 |
| 121805998 | RGIS, LLC | RGIS, LLC 2000 Taylor Road Suite #200 Auburn Hills, MI 48326-1771 | PSP Stores, LLC | Master Services Agreement | | $0.00 |
| 121806009 | Ricoh USA, Inc. | Ricoh USA, Inc. 300 Eagleview Blvd Ste 200 Exton, PA 19341 | PSP Group, LLC | Lease Agreement | | $0.00 |
| 121806015 | Rightpoint Consulting, LLC | Rightpoint Consulting, LLC 29 North Wacker Drive 4th Floor Chicago, IL 60606 | Pet Supplies "Plus", LLC | Master Services Agreement | | $0.00 |
| 121806046 | RJSB Pet Group II, LLC | RJSB Pet Group II, LLC 5218 Rio Grande Drive Raleigh, NC 27616 | PSP Franchising, LLC | Franchise Agreement, dated 10/25/2019, as renewed or amended (Store #4284 - Wake Forest) | | $0.00 |
| 121806047 | RJSB Pet Group, LLC | RJSB Pet Group, LLC 5218 Rio Grande Drive Raleigh, NC 27616 | PSP Franchising, LLC | Franchise Agreement, dated 10/04/2019, as renewed or amended (Store #4282 - Cary) | | $0.00 |
| 122000317 | RKR Ventures LLC | RKR Ventures LLC 701 Mike's Pike Street, Suite B Winslow, AZ 86047 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/01/2021, as amended or extended (Store 416) | 416 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900020 | RLGVS Partners, LLC | RLGVS Partners, LLC c/o Bennet Williams Realty, Inc. 3528 Concord rd. York, PA 17402 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/23/2012, as amended (Etters, PA) | Etters, PA (4395) | $0.00 |
| 121806051 | RNU, Inc. | RNU, Inc. 3859 Wabeek Lake Drive E Bloomfield Hills, MI 48302 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2003, as renewed or amended (Store #48 - Bloomfield Hills) | | $0.00 |
| 121806054 | Rocam, Inc. | Rocam, Inc. 1437 Cantoria Avenue Coral Gables, FL 33146 | PSP Franchising, LLC | Franchise Agreement, dated 01/05/2021, as renewed or amended (Store #4224 - Miami) | | $0.00 |
| 121806079 | RRR and B, LLC | RRR and B, LLC 124 Featherstone Lane SE Owens Cross Roads, AL 35763 | PSP Franchising, LLC | Franchise Agreement, dated 11/22/2018, as renewed or amended (Store #4212 - Huntsville) | | $0.00 |
| 121806078 | RRR and B, LLC | RRR and B, LLC 124 Featherstone Lane SE Owens Cross Roads, AL 35763 | PSP Franchising, LLC | Franchise Agreement, dated 11/28/2016, as renewed or amended (Store #4119 - Madison) | | $0.00 |
| 121806085 | Rudra Pet Supplies Inc | Rudra Pet Supplies Inc 900 Green Sea Trail Chesapeake, VA 23323 | PSP Franchising, LLC | Franchise Agreement, dated 09/24/2024, as renewed or amended (Store #4642 - Chesapeake) | | $0.00 |
| 121806087 | Rumpke of Indiana, LLC | Rumpke of Indiana, LLC 1510 E 4h Street Seymour, IN 47274 | PSP Distribution, LLC | Customer Service Agreement for Waste & Recycling Services | | $0.00 |
| 121806090 | Rush Direct, Inc. | Rush Direct, Inc. 890 North Wood Dale Road Wood Dale IL 60191 Wood Dale, IL 60191 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121806104 | S & A Investment CO. | S & A Investment CO. 620 S. Wayfare Tr. Oconomowoc, WI 53066 | PSP Franchising, LLC | Franchise Agreement, dated 01/29/1998, as renewed or amended (Store #81 - Greenfield) | | $0.00 |
| 121806103 | S & A Investment CO. | S & A Investment CO. 620 S. Wayfare Tr. Oconomowoc, WI 53066 | PSP Franchising, LLC | Franchise Agreement, dated 02/04/1998, as renewed or amended (Store #60 - Glendale) | | $0.00 |
| 121806102 | S & A Investment CO. | S & A Investment CO. 620 S. Wayfare Tr. Oconomowoc, WI 53066 | PSP Franchising, LLC | Franchise Agreement, dated 05/10/1993, as renewed or amended (Store #41 - Brookfield) | | $0.00 |
| 121900194 | S&S Singh Partners | S&S Singh Partners 555 East 28th Division Highway Lititz, PA 17543 | PSP Stores, LLC | Lease, dated 02/10/2005, as amended (Ephrata, PA) | Ephrata, PA (4389) | $0.00 |
| 121806128 | Sageflo, Inc. | Sageflo, Inc. 4111 E. Madison Street Suite 87 Seattle, WA 98112 | PSP Group, LLC | Pet Supplies Plus Radiate Event Template Order Document | | $0.00 |
| 121806125 | Sageflo, Inc. | Sageflo, Inc. 4111 E. Madison Street Suite 87 Seattle, WA 98112 | Pet Supplies "Plus", LLC | Solution Subscriptions + Custom Enhancements Order Document | | $0.00 |
| 121806124 | Sageflo, Inc. | Sageflo, Inc. 4111 E. Madison Street Suite 87 Seattle, WA 98112 | Pet Supplies "Plus", LLC | Pet Supplies Plus Wag N Wash Applications Order Document | | $0.00 |
| 121806133 | Salesforce, Inc. | Salesforce, Inc. Salesforce Tower 415 Mission Street 3rd Floor San Francisco, CA 94105 | Pet Supplies "Plus", LLC | Salesforce Order Form for Pet Supplies Plus | | $0.00 |
| 121806135 | Samaya Capital Group, Inc. | Samaya Capital Group, Inc. 14 Sunrise Hill Road Orinda, CA 94563 | PSP Franchising, LLC | Franchise Agreement, dated 09/15/2023, as renewed or amended (Store #4613 - Walnut Creek) | | $0.00 |
| 121900162 | Sangamon North, LLC | Sangamon North, LLC c/o Carnegie Companies Inc 6190 Cochran Rd Suite A Solon, OH 44139 | PSP Stores, LLC | Lease, dated 10/31/2016, as amended (Springfield, IL) | Springfield, IL (4090) | $0.00 |
| 121806148 | Sanvi Pet Supplies, Inc. | Sanvi Pet Supplies, Inc. 19 Madison Ave. New Hyde Park, NY 11040 | PSP Franchising, LLC | Franchise Agreement, dated 12/10/2021, as renewed or amended (Store #4610 - East Meadow) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121806157 | Savills, Inc. | Savills, Inc.<br>520 Newport Center Drive<br>8th Floor<br>Newport Beach, CA 92660 | Pet Supplies "Plus", LLC | Real Estate Strategy and Brokerage Agreement | | $0.00 |
| 121806159 | SB Fateh LLC | SB Fateh LLC<br>8355 Cinnamon Ridge Lane<br>Reno, NV 89523 | PSP Franchising, LLC | Franchise Agreement, dated 06/29/2023, as renewed or amended (Store #4252 - Reno) | | $0.00 |
| 121806160 | SBB Sterling Heights, LLC | SBB Sterling Heights, LLC<br>31500 Northwestern Highway, Suite 175<br>Farmington Hills, MI 48334 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2017, as renewed or amended (Store #4144 - Sterling Heights) | | $0.00 |
| 121806161 | SC Department of Commerce | SC Department of Commerce<br>1201 Main Street<br>Suite 1600<br>Columbia, SC 29201 | Pet Supplies "Plus", LLC | Grant Application for Project Gigi - Pet Supplies Plus LLC | | $0.00 |
| 121806164 | SCB Global Ltd | SCB Global Ltd<br>37th floor<br>1 Canada Square<br>Canary Wharf<br>London, E14 5AA | PSP Group, LLC | SCB Global Ltd Standard Contract V4.2 | | $0.00 |
| 121806163 | SCB GLOBAL Ltd | SCB GLOBAL Ltd<br>37th floor<br>1 Canada Square<br>Canary Wharf<br>London, E14 5AA | Pet Supplies "Plus", LLC | Pet Supplies Plus OPTO4Teams Cloud Calling Scope of Work | | $0.00 |
| 121900043 | Schoolcraft Commons Unit 9, L.L.C. | Schoolcraft Commons Unit 9, L.L.C.<br>150 W. 2nd Street<br>Ste. 200<br>Royal Oak, MI 48067 | PSP Group, LLC | Sublease, dated 06/01/2023, as amended (Livonia, MI) | Livonia, MI (0000) | $0.00 |
| 121806173 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 08/25/2022, as renewed or amended (Store #4539 - McAllen) | | $0.00 |
| 121806172 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 03/25/2022, as renewed or amended (Store #4512 - Portland) | | $0.00 |
| 121806171 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 07/15/2020, as renewed or amended (Store #4330 - Waco) | | $0.00 |
| 121806170 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 03/17/2017, as renewed or amended (Store #4134 - Montgomery) | | $0.00 |
| 121806169 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2014, as renewed or amended (Store #4016 - Bryan) | | $0.00 |
| 121802283 | Schwinge Village Plaza, LLC | Schwinge Village Plaza, LLC<br>c/o NEI Management & Development<br>P.O. Box 1838<br>McHenry, IL 60051 | Pet Supplies "Plus", LLC | Lease, dated 10/19/2005, as amended (Morton Grove, IL) | Morton Grove, IL (0038) | $0.00 |
| 121806184 | Scottcin Enterprises, Inc. | Scottcin Enterprises, Inc.<br>15060 Eureka Rd.<br>Southgate, MI 48124 | PSP Franchising, LLC | Franchise Agreement, dated 01/05/1996, as renewed or amended (Store #90 - Dearborn) | | $0.00 |
| 121806183 | Scottcin Enterprises, Inc. | Scottcin Enterprises, Inc.<br>15060 Eureka Rd.<br>Southgate, MI 48124 | PSP Franchising, LLC | Franchise Agreement, dated 04/22/1991, as renewed or amended (Store #18 - Taylor) | | $0.00 |
| 121806182 | Scottcin Enterprises, Inc. | Scottcin Enterprises, Inc.<br>2621 S. Telegraph Rd.<br>Dearborn, MI 48124 | PSP Franchising, LLC | Franchise Agreement, dated 06/23/2003, as renewed or amended (Store #2 - Woodhaven) | | $0.00 |
| 121806186 | Scribcor Global Lease Administration, LLC | Scribcor Global Lease Administration, LLC<br>2 Mid America Plaza, Suite 650<br>Oakbrook Terrace, IL 60181 | PSP Stores, LLC | First Amendment to Lease Abstract Services Agreement | | $2,725.37 |
| 121806187 | Scully Dog Enterprises, Inc. | Scully Dog Enterprises, Inc.<br>3150 Woodwalk Dr SE, Unit 3201<br>Atlanta, GA 30339-8495 | PSP Franchising, LLC | Franchise Agreement, dated 08/12/2015, as renewed or amended (Store #4020 - Smyrna) | | $0.00 |
| 121900102 | Sea Mist I, LLC | Sea Mist I, LLC<br>Attn: George K. Gesouras<br>PO Box 21381<br>Columbus, OH 43211 | PSP Stores, LLC | Lease, dated 10/01/2003, as amended (Newark, OH) | Newark, OH (0151) | $1,168.66 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 140000260 | Sealy Mattress Manufacturing Company, LLC | Sealy Mattress Manufacturing Company, LLC 1000 Tempur Way Lexington, KY 40511-1386 | Buddy's Newco, LLC | Retailer Agreement | | $0.00 |
| 121806196 | SecureWorks, Inc. | SecureWorks, Inc. 1 Concourse Pkwy NE #500 Atlanta, GA 30328 | PSP Group, LLC | Customer Relationship Agreement | | $0.00 |
| 121806203 | Security 101 LLC | Security 101 LLC 1450 Centrepark Blvd. Ste 210 West Palm Beach, FL 33401 | Buddy's Newco, LLC | Security Service Contract | | $0.00 |
| 122000016 | Sembler Family Land Trust | Sembler Family Land Trust C/O THE SEMBLER COMPANY 5858 CENTRAL AVENUE ST PETERSBURG, FL 33707 | Buddy's Newco, LLC | Lease Agreement dated December 17, 2012, as amended (Store 26) | 26 | $380.83 |
| 121806251 | Service Express | Service Express 3854 Broadmoor Ave. SE Grand Rapids MI 49512, MI 49512 | Pet Supplies "Plus", LLC | Service Agreement 33427 | | $0.00 |
| 121900005 | Set Point Properties, LLC | Set Point Properties, LLC c/o Watermark Property Management, LLC 1030 W. Chicago Ave Suite 300 Chicago, IL 60642 | Pet Supplies "Plus", LLC | Lease Agreement, dated 09/02/1993, as amended (Arlington Heights, IL) | Arlington Heights, IL (0057) | $0.00 |
| 121806256 | Shaina Fishman Photography LLC | Shaina Fishman Photography LLC 149 Huron Street #2D Brooklyn, NY 11222 | PSP Group, LLC | Intellectual Property Rights License Agreement | | $0.00 |
| 121900040 | Shamrock A Owner, LLC | Shamrock A Owner, LLC 101 East Washington Street Suite 400 Greenville, SC 29601 | PSP Distribution, LLC | Lease, dated on August 1, 2022, as amended (Orangeburg, SC) | Orangeburg, SC | $46,704.98 |
| 121806257 | SHAMROCK A OWNER, LLC | SHAMROCK A OWNER, LLC 122 Palmetto Commerce Parkway Orangeburg, SC 29115 | Pet Supplies "Plus", LLC | COMMENCEMENT DATE AGREEMENT | | $0.00 |
| 122000022 | Shanri Holdings Corp | Shanri Holdings Corp Post Office Box 160403 Mobile, AL 36616-1403 | Buddy's Newco, LLC | Lease Agreement dated October 19, 2020, as amended (Store 34) | 34 | $0.00 |
| 121806271 | Shaw + Scott, Inc. | Shaw + Scott, Inc. 1513 33rd Ave. Seattle, WA 98122 | Pet Supplies "Plus", LLC | Master Services Agreement | | $0.00 |
| 121806269 | Shaw + Scott, Inc. | Shaw + Scott, Inc. 1513 33rd Ave. Seattle, WA 98122 | Pet Supplies "Plus", LLC | Professional Services Statement of Work | | $0.00 |
| 121806281 | Shenzhen XingRisheng Industrial Co., Ltd | Shenzhen XingRisheng Industrial Co., Ltd Baolong Ind. City Longgang Shenzhen Shenzhen, China | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121900094 | Sheridan Center, LLC | Sheridan Center, LLC 6120 Lendell Road Sanborn, NY 14132 | PSP Stores, LLC | Lease, dated 09/05/2002, as amended (Amherst, NY) | Amherst, NY (0134) | $0.00 |
| 122000025 | SHERWIN-WILLIAMS COMPANY | SHERWIN-WILLIAMS COMPANY 101 West Prospect Avenue Cleveland, OH 44115 | Buddy's Newco, LLC | Lease dated February 29, 2000, as amended (Store 43) | 43 | $432.35 |
| 121900221 | Shillington Partners, LLC. | Shillington Partners, LLC. c/o Realty Resource Capital Corp. 7600 Jericho Turnpike Suite 402 Woodbury, NY 11797 | PSP Stores, LLC | Lease, dated 08/29/2006, as amended (Shillington, PA) | Shillington, PA (9025) | $1,619.00 |
| 121806295 | Shine Holdings Ken Caryl, LLC | Shine Holdings Ken Caryl, LLC 15741 W Eureka Avenue Morrison, CO 80465 | PSP Franchising, LLC | Franchise Agreement, dated 09/30/2024, as renewed or amended (Store #4654 - Ken Caryl) | | $0.00 |
| 121806296 | Shine Holdings, LLC | Shine Holdings, LLC 15741 W Eureka Avenue Morrison, CO 80465 | PSP Franchising, LLC | Franchise Agreement, dated 05/03/2024, as renewed or amended (Store #4641 - Lakewood) | | $0.00 |
| 121900229 | Shoppes at Bedford 15 A, LLC | Shoppes at Bedford 15 A, LLC c/o ACF Property Management 12411 Ventura Blvd Studio City, CA 91604 | PSP Stores, LLC | Lease, dated 01/08/2011, as amended (Bedford, NH) | Bedford, NH (9052) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900012 | Shoregate Station LLC | Shoregate Station LLC<br>c/o Phillips Edison and Co.<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | Pet Supplies "Plus", LLC | Lease, dated 12/31/2008, as amended<br>(Willowick, OH) | Willowick, OH (0191) | $0.00 |
| 121900198 | Shrewsbury Commons, L.P. | Shrewsbury Commons, L.P.<br>c/o Chesapeake Commercial Properties, Inc.<br>4750 Owings Mills Blvd.<br>Owings Mills, MD 21117 | PSP Stores, LLC | Lease, dated 09/07/2005, as amended<br>(Shrewsbury, PA) | Shrewsbury, PA (4400) | $0.00 |
| 121806316 | Siemens Industry, Inc. | Siemens Industry, Inc.<br>1000 Deerfield Parkway<br>Buffalo Grove, IL 60089 | PSP Stores, LLC | EQUIPMENT PURCHASE, RELATED DATA SERVICES AND PROFESSIONAL SERVICES AGREEMENT | | $434.56 |
| 121806328 | Simmons Pet Food, Inc. | Simmons Pet Food, Inc.<br>601 N. Hico Street<br>Siloam Springs, AR 72761 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121806341 | Singh Pets, LLC | Singh Pets, LLC<br>7548 Morris Street #2<br>Fulton, MD 20759 | PSP Franchising, LLC | Franchise Agreement, dated 11/15/2022, as renewed or amended (Store #4503 - Beltsville) | | $0.00 |
| 121806369 | Sitecore USA, Inc. | Sitecore USA, Inc.<br>101 California St Suite 1600<br>San Francisco, CA 94111 | Pet Supplies "Plus", LLC | Sitecore Source Code License Agreement | | $39,702.13 |
| 121806371 | Siterra, LLC | Siterra, LLC<br>10801-2 N. Mopac Expressway<br>Suite 400<br>Austin, TX 78759 | Pet Supplies "Plus", LLC | Master Subscription Agreement | | $0.00 |
| 121900128 | SJSS Powell, LLC | SJSS Powell, LLC<br>c/o MGM Management<br>485 Metro Place South<br>Suite 270<br>Dublin, OH 43017 | PSP Stores, LLC | Lease, dated 02/20/2013, as amended<br>(Powell, OH) | Powell, OH (0225) | $0.00 |
| 121806378 | Skol Haus Pets L.L.C. | Skol Haus Pets L.L.C.<br>8917 W Lakeside Drive<br>Sioux Falls, SD 57107 | PSP Franchising, LLC | Franchise Agreement, dated 11/13/2019, as renewed or amended (Store #4300 - Sioux Falls) | | $0.00 |
| 121900203 | Sky Cortland, LLC | Sky Cortland, LLC<br>Attn: Avi Metchik<br>10101 Fondren Rd.<br>Suite 545<br>Houston, TX 77096 | PSP Stores, LLC | Lease Agreement, dated 08/17/2021, as amended<br>(Cortland, NY) | Cortland, NY (4466) | $0.00 |
| 121806381 | Skyepets, LLC | Skyepets, LLC<br>20619 Shadow Mill Court<br>Katy, TX 77450 | PSP Franchising, LLC | Franchise Agreement, dated 03/05/2019, as renewed or amended (Store #4243 - Spring) | | $0.00 |
| 121900116 | SL Yorkhouse Commons LLC | SL Yorkhouse Commons LLC<br>c/o Cambridge Management, Ltd.<br>15941 S. Harlem Ave. PMB 108<br>Tinley Park, IL 60477 | PSP Stores, LLC | Lease Agreement, dated 07/30/2012, as amended<br>(Waukegan, IL) | Waukegan, IL (0208) | $0.00 |
| 121900215 | SLN Bellgrade, L.L.C. | SLN Bellgrade, L.L.C.<br>c/o S.L. Nusbaum realty Co.<br>7200 Glen Forest Dr.<br>Suite 300<br>Richmond, VA 23226 | PSP Stores, LLC | Lease Agreement, dated 01/26/2012, as amended<br>(Midlothian, VA) | Midlothian, VA (8059) | $0.00 |
| 121806386 | Sloans of PSP, LLC | Sloans of PSP, LLC<br>5771 Myers Road<br>Akron, OH 43319 | PSP Franchising, LLC | Franchise Agreement, dated 10/27/2021, as renewed or amended (Store #4485 - Norton) | | $0.00 |
| 121900195 | Smith Land & Improvement Corporation | Smith Land & Improvement Corporation<br>1810 Market Street<br>Camp Hill, PA 17011 | PSP Stores, LLC | Lease, dated 09/08/2010, as amended<br>(Lemoyne, PA) | Lemoyne, PA (4393) | $0.00 |
| 121806410 | SOCi, Inc. | SOCi, Inc.<br>8605 Santa Monica Blvd PMB 47149<br>West Hollywood, CA 90069-4109 | PSP Group, LLC | SOCi Order Form and Master Subscription Agreement | | $0.00 |
| 121806421 | SocialWise, Inc., d.b.a. Rallio | SocialWise, Inc., d.b.a. Rallio<br>400 Spectrum Center Drive Suite 1250<br>Irvine, CA 92618 | Pet Supplies "Plus", LLC | Rallio Local Agreement | | $0.00 |
| 121806416 | SocialWise, Inc., d.b.a. Rallio | SocialWise, Inc., d.b.a. Rallio<br>400 Spectrum Center Drive Suite 1250<br>Irvine, CA 92618 | Pet Supplies "Plus", LLC | REVV AGREEMENT | | $0.00 |
| 121806425 | SOEMI Pet Supplies, Inc. | SOEMI Pet Supplies, Inc.<br>2027 Mackenzie Place<br>Wheaton, IL 60187 | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2022, as renewed or amended (Store #4565 - Kenosha) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121806427 | Sole Pet, LLC | Sole Pet, LLC<br>29 Long Hill Road<br>New Vernon, NJ 07976 | PSP Franchising, LLC | Franchise Agreement, dated 08/23/2023, as renewed or amended (Store #4157 - Pen Argyl) | | $0.00 |
| 121806439 | South River Mills Investments, LLC | South River Mills Investments, LLC<br>56 Mills Gap Road<br>Asheville, NC 28803 | PSP Franchising, LLC | Franchise Agreement, dated 05/20/2023, as renewed or amended (Store #4601 - Hendersonville) | | $0.00 |
| 121806441 | South State Bank | South State Bank<br>c/o REPAY<br>3 West Paces Ferry Road<br>Suite 200<br>Atlanta, GA 30309 | Buddy's Newco, LLC | Electronic Payment Contract | | $0.00 |
| 121806444 | Southbay Ventures, LLC | Southbay Ventures, LLC<br>1231 Horseshoe Drive<br>Greensboro, GA 30642 | PSP Franchising, LLC | Franchise Agreement, dated 02/19/2019, as renewed or amended (Store #4233 - Oklahoma City) | | $0.00 |
| 121806443 | Southbay Ventures, LLC | Southbay Ventures, LLC<br>1231 Horseshoe Drive<br>Greensboro, GA 30642 | PSP Franchising, LLC | Franchise Agreement, dated 06/21/2016, as renewed or amended (Store #4094 - Edmond) | | $0.00 |
| 121900145 | Spartan Square Limited Partnership | Spartan Square Limited Partnership<br>1463 West Main Street<br>Suite P3<br>Salem, VA 24153 | PSP Stores, LLC | Lease, dated 08/21/2015, as amended (Salem, VA) | Salem, VA (4027) | $854.70 |
| 121806459 | Special D Events, Inc. | Special D Events, Inc.<br>1420 Washington Boulevard<br>Suite 301<br>Detroit, MI 48220 | PSP Stores, LLC | Special D Events Contract | | $0.00 |
| 121806472 | Spike Enterprises, Inc. | Spike Enterprises, Inc.<br>18914 IH 20<br>Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 03/24/2022, as renewed or amended (Store #4511 - Lubbock) | | $0.00 |
| 121806471 | Spike Enterprises, Inc. | Spike Enterprises, Inc.<br>18914 IH 20<br>Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 03/22/2022, as renewed or amended (Store #4508 - Midland) | | $0.00 |
| 121806470 | Spike Enterprises, Inc. | Spike Enterprises, Inc.<br>18914 IH 20<br>Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 09/09/2020, as renewed or amended (Store #4349 - Abilene) | | $0.00 |
| 121806469 | Spike Enterprises, Inc. | Spike Enterprises, Inc.<br>18914 IH 20<br>Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 01/31/2021, as renewed or amended (Store #4228 - Lubbock) | | $0.00 |
| 121806468 | Spike Enterprises, Inc. | Spike Enterprises, Inc.<br>18914 IH 20<br>Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 03/12/2018, as renewed or amended (Store #4174 - Weatherford) | | $0.00 |
| 121806467 | Spike Enterprises, Inc. | Spike Enterprises, Inc.<br>18914 IH 20<br>Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 05/24/2016, as renewed or amended (Store #4070 - Copperas Cove) | | $0.00 |
| 121806466 | Spike Enterprises, Inc. | Spike Enterprises, Inc.<br>18914 IH 20<br>Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 01/27/2015, as renewed or amended (Store #4013 - Stephenville) | | $0.00 |
| 121900049 | SPS Properties LP | SPS Properties LP<br>11 Cleveland Circle<br>Skillman, NJ 08558 | PSP Stores, LLC | Lease, dated 07/24/2008, as amended (Bethel Park, PA) | Bethel Park, PA (0087) | $0.00 |
| 121900136 | SRK Painesville Associates, LLC | SRK Painesville Associates, LLC<br>c/o Benchmark Management Corp.<br>4053 Maple Road<br>Amherst, NY 14226 | PSP Stores, LLC | Lease, dated 06/26/2014, as amended (Painesville, OH) | Painesville, OH (0240) | $0.00 |
| 121900061 | SSC Associates Limited Partnership | SSC Associates Limited Partnership<br>c/o Professional Property Mgmt. Co. of Michigan, Inc.<br>115 W. Brown<br>Birmingham, MI 48003 | PSP Stores, LLC | Lease, dated 04/02/2009, as amended (St. Clair Shores, MI) | St. Clair Shores, MI (0003) | $806.20 |
| 121806503 | SSSCR, Inc. | SSSCR, Inc.<br>208 St. James Avenue, Suite B<br>Goose Creek, SC 29445 | PSP Franchising, LLC | Franchise Agreement, dated 01/19/2016, as renewed or amended (Store #4262 - Goose Creek) | | $0.00 |
| 121806506 | St. Croix Valley Holdings, Inc. | St. Croix Valley Holdings, Inc.<br>4751 Hiawatha Avenue<br>Minneapolis, MN 55406 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2010, as renewed or amended (Store #199 - Minneapolis) | | $0.00 |
| 121806505 | St. Croix Valley Holdings, Inc. | St. Croix Valley Holdings, Inc.<br>4751 Hiawatha Avenue<br>Minneapolis, MN 55406 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2002, as renewed or amended (Store #138 - Bloomington) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------|------|------|------|------|------|
| 121806504 | St. Croix Valley Holdings, Inc. | St. Croix Valley Holdings, Inc. 4751 Hiawatha Avenue Minneapolis, MN 55406 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2002, as renewed or amended (Store #136 - Burnsville) | | $0.00 |
| 121806510 | StackAdapt Inc. | StackAdapt Inc. 210 King St East - Suite 500 Toronto, ON M5A 1J7 | PSP Group, LLC | StackAdapt Digital Advertising Services Agreement | | $0.00 |
| 121806524 | Stardust Partners, LLC | Stardust Partners, LLC c/o Pet Supplies Plus, 1300 MacDade Boulevard Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 01/13/2021, as renewed or amended (Store #4223 - Philadelphia) | | $0.00 |
| 121806533 | Stealth Dog, Inc. | Stealth Dog, Inc. 382 Adams St. Plymouth, MI 48170 | PSP Franchising, LLC | Franchise Agreement, dated 02/20/2004, as renewed or amended (Store #152 - Adrian) | | $0.00 |
| 121806547 | Stevens Point Pets, LLC | Stevens Point Pets, LLC 2295 Spring Rose Road Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2023, as renewed or amended (Store #4596 - Stevens Point) | | $0.00 |
| 121806554 | STM Investments, LLC | STM Investments, LLC 3106 Southern Hills Drive Des Moines, IA 50321 | PSP Franchising, LLC | Franchise Agreement, dated 11/17/2022, as renewed or amended (Store #4599 - Kendall) | | $0.00 |
| 121900213 | Store Property Marble, LLC | Store Property Marble, LLC 110 Hidden Pass San Antonio, TX 78323 | PSP Stores, LLC | Lease, dated 04/01/2011, as amended (Marble Falls, TX) | Marble Falls, TX (7012) | $0.00 |
| 121806563 | STRAIGHT PATH IT SOLUTIONS, LLC | STRAIGHT PATH IT SOLUTIONS, LLC 12 E. Side Road Sanbornville, NH 03872 | PSP Group, LLC | Professional Services Agreement | | $0.00 |
| 121806566 | Strategic Defense Corporation | Strategic Defense Corporation 30 N Gould St Ste R Sheridan, WY 82801 | PSP Group, LLC | Statement of Work for Adversarial Testing Services | | $0.00 |
| 121806569 | Strategic Pharmaceutical Solutions Inc., dba Vetsource | Strategic Pharmaceutical Solutions Inc., dba Vetsource 2005 SE 192nd Ave. Suite 200 Camas, WA 98607 | PSP Group, LLC | Master Services Agreement | | $0.00 |
| 121806570 | Strategic Pharmaceutical Solutions Inc., dba Vetsource Vet Success Inc. V2P2, LLC dba Vet2Pet | Strategic Pharmaceutical Solutions Inc., dba Vetsource Vet Success Inc. V2P2, LLC dba Vet2Pet 2005 SE 192nd Ave. Suite 200 Camas, WA 98607 | PSP Group, LLC | Amendment No. 1 to Statement of Work Prescription Medication and Diet Nutrition Services | | $0.00 |
| 121806602 | Sun Print Management | Sun Print Management 1101 N. Ward St. Tampa, FL 33607 | Buddy's Newco, LLC | Master Service Agreement | | $125.00 |
| 121806619 | Sunrise Technologies, Inc. | Sunrise Technologies, Inc. 525 Vine Street Suite 210 Winston Salem, NC 27101 | PSP Group, LLC | Sunrise Master Services Agreement | | $0.00 |
| 121900038 | Sunshine Lake Shore Associates, LLC | Sunshine Lake Shore Associates, LLC c/o Milbrook Properties Ltd. 42 Bayview Ave. Manhasset, NY 11030 | Pet Supplies "Plus", LLC | Lease Agreement, dated 02/11/2010, as amended (Lake Ronkonkoma, NY) | Lake Ronkonkoma, NY (9049) | $0.00 |
| 121806624 | Super Design Manufacture Co., Ltd | Super Design Manufacture Co., Ltd 3rd Floor Building 52 Yonger New Industrial Area Zhongshan City,  528467 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121806627 | Superior Consulting Services, LLC | Superior Consulting Services, LLC 350 W Burnsville Pkwy Ste 550 Burnsville, MN 55337-4900 | PSP Group, LLC | Superior Consulting Services, LLC Professional Services Agreement | | $0.00 |
| 121806630 | SupplyLogic, LLC | SupplyLogic, LLC 1400 Universal Avenue Kansas City, MO 64120 | PSP Group, LLC | Second Amendment to the Agreement | | $0.00 |
| 121806637 | Surf City Pets, LLC | Surf City Pets, LLC 16152 Whitecap Lane Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 02/12/2019, as renewed or amended (Store #4240 - Long Beach ) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000038 | Surveying and Mapping, LLC | Surveying and Mapping, LLC 4801 SOUTHWEST PARKWAY BUILDING 2, STE 100 AUSTIN, TX 78735 | Buddy's Newco, LLC | Office Lease dated June 14, 2021, as amended (Orlando) | Orlando | $945.24 |
| 121900191 | SUSO 1 Summit Ridge, LP | SUSO 1 Summit Ridge, LP c/o Slate Asset Management L.P. 121 King Street West Suite 200 Toronto, ON M5H 3T9 | PSP Stores, LLC | Lease, dated 10/06/2015, as amended (Mount Pleasant, PA) | Mount Pleasant, PA (4381) | $0.00 |
| 122000002 | Swamp Land Acquisitions, LLC | Swamp Land Acquisitions, LLC PO BOX 141105 GAINESVILLE, FL 32614-1105 | Buddy's Newco, LLC | Lease Agreement dated August 9, 2013, as amended (Store 9) | 09 | $522.19 |
| 121806663 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4555 - Scottsboro) | | $0.00 |
| 121806662 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4554 - Hazel Green) | | $0.00 |
| 121806660 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4552 - Fort Payne) | | $0.00 |
| 121806659 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4551 - Hartselle) | | $0.00 |
| 121806658 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4550 - Guntersville) | | $0.00 |
| 121806656 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4548 - Cullman) | | $0.00 |
| 121806655 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4547 - Athens) | | $0.00 |
| 121806654 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4546 - Florence) | | $0.00 |
| 121900106 | SWG-Reynoldsburg, LLC | SWG-Reynoldsburg, LLC c/o Garner Group 3715 Northside Parkway Suite 4-325 Atlanta, GA 30327 | PSP Stores, LLC | Lease, dated 01/29/2004, as amended (Reynoldsburg, OH) | Reynoldsburg, OH (0168) | $0.00 |
| 121806675 | Sydney's Pantry, LLC | Sydney's Pantry, LLC 14090 FM 2920, Ste. G551 Tomball, TX 77377 | PSP Franchising, LLC | Franchise Agreement, dated 07/05/2023, as renewed or amended (Store #4607 - Cypress) | | $0.00 |
| 121806684 | Synergy Franchising Corp. d/b/a Jani-King of Columbia | Synergy Franchising Corp. d/b/a Jani-King of Columbia 720 Gracern Road Suite 116 Columbia, SC 29210 | PSP Distribution, LLC | JANI-KING MAINTENANCE AGREEMENT | | $3,025.00 |
| 121900175 | T PITTSTON PA CROSSINGS, LLC | T PITTSTON PA CROSSINGS, LLC T Pittston Crossings P A, LLC 16600 Dallas Parkway Suite 300 Dallas, TX 75248 | PSP Stores, LLC | Lease Agreement, dated 02/21/2017, as amended (Pittston, PA) | Pittston, PA (4165) | $0.00 |
| 121806688 | T&C Stillwaters, Inc. | T&C Stillwaters, Inc. 11930 Partridge Road Court N Stillwater, MN 55082 | PSP Franchising, LLC | Franchise Agreement, dated 06/18/2021, as renewed or amended (Store #4438 - Blaine) | | $0.00 |
| 121806687 | T&C Stillwaters, Inc. | T&C Stillwaters, Inc. 11930 Partridge Road Court N Stillwater, MN 55082 | PSP Franchising, LLC | Franchise Agreement, dated 08/03/2020, as renewed or amended (Store #4412 - Fridley) | | $0.00 |
| 121806696 | Tahoe Capital, LLC | Tahoe Capital, LLC 1410 Curtin St. Houston, TX 77018 | PSP Franchising, LLC | Franchise Agreement, dated 02/26/2021, as renewed or amended (Store #4232 - Corpus Christi) | | $0.00 |
| 121802285 | Talal Maatouk (Entity Pending) | Talal Maatouk (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 09/15/2023, as renewed or amended (Store #N/A - Foley) | | $0.00 |
| 121806710 | Tallwave LLC | Tallwave LLC 4110 N. Scottsdale Rd. Suite 300 Scottsdale, AZ 85251 | PSP Group, LLC | Pet Supplies Plus Competitor Strike - Statement of Work | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121806716 | Tar Hong Melamine USA Inc. | Tar Hong Melamine USA Inc. 780 S. Nogales City of Industry, CA 91748 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121806726 | Tayney Store 2 L.L.C. | Tayney Store 2 L.L.C. 8703 Black Cherry Crossing Katy, TX 77494 | PSP Franchising, LLC | Franchise Agreement, dated 08/29/2016, as renewed or amended (Store #4129 - Katy) | | $0.00 |
| 121806727 | Tayney Store 3, LLC | Tayney Store 3, LLC 8703 Black Cherry Crossing Katy, TX 77494 | PSP Franchising, LLC | Franchise Agreement, dated 04/15/2019, as renewed or amended (Store #4253 - Katy) | | $0.00 |
| 121806728 | Tayney Ventures, LP | Tayney Ventures, LP 8703 Black Cherry Crossing Katy, TX 77494 | PSP Franchising, LLC | Franchise Agreement, dated 08/05/2014, as renewed or amended (Store #7019 - Katy) | | $0.00 |
| 121900149 | TCB-Stonebrook, LLC | TCB-Stonebrook, LLC c/o Newport Capital Partners 353 N. Clark Street Suite 3625 Chicago, IL 60654 | PSP Stores, LLC | Lease, dated 12/01/2015, as amended (Merrionette Park, IL) | Merrionette Park, IL (4038) | $0.00 |
| 121802281 | Ted Lewis (Entity Pending) | Ted Lewis (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 02/23/2023, as renewed or amended (Store #N/A - Yuba City) | | $0.00 |
| 121806744 | TEKsystems, Inc. | TEKsystems, Inc. 7437 Race Road Hanover, MD 21076 | PSP Stores, LLC | Staffing Services Agreement - Modified | | $0.00 |
| 121806750 | Tempur-Pedic North America, LLC | Tempur-Pedic North America, LLC 1000 Tempur Way Lexington, KY 40511-1386 | Buddy's Newco, LLC | Incentive Agreement | | $0.00 |
| 121806751 | Tempus Technologies, Inc. | Tempus Technologies, Inc. 120 E. Seventh St. Auburn, IN 46706 | Pet Supplies "Plus", LLC | PaymentMate® Master Agreement | | $0.00 |
| 121806754 | Tennessee Yankee, LLC | Tennessee Yankee, LLC 401 Old Pleasant Grove Road, Apartment 821 Mount Juliet, TN 37122-7315 | PSP Franchising, LLC | Franchise Agreement, dated 10/09/2020, as renewed or amended (Store #4354 - Mt. Juliet) | | $0.00 |
| 121806757 | TerraCycle US LLC | TerraCycle US LLC 121 New York Ave Trenton, NJ 8638 | PSP Group, LLC | TerraCycle Program Master Agreement | | $0.00 |
| 121806759 | TETRAD COMPUTER APPLICATIONS INC. | TETRAD COMPUTER APPLICATIONS INC. Suite 318 - 1788 West 5th Avenue Vancouver, BC V6J1P2 | Pet Supplies "Plus", LLC | AMENDMENT #2 TO SITEWISE SOFTWARE AS A SERVICE (SAAS) LICENSE AGREEMENT | | $0.00 |
| 121806761 | Texas Pet Supplies Inc. | Texas Pet Supplies Inc. 9672 E Balancing Rock Rd Scottsdale, AZ 85262 | PSP Franchising, LLC | Franchise Agreement, dated 02/24/2020, as renewed or amended (Store #4311 - Amarillo) | | $0.00 |
| 121805454 | Thakur Dangal (Entity Pending) | Thakur Dangal (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 01/22/2024, as renewed or amended (Store #N/A - Harrisburg) | | $0.00 |
| 122000318 | The Fort Companies, LLC | The Fort Companies, LLC 12512 Gracie Lane Spanish Fort, AL 36527 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/01/2024, as amended or extended (Store 1011) | 1011 | $0.00 |
| 121806793 | The Garmon Corporation dba NaturVet | The Garmon Corporation dba NaturVet 27461 Via Industrial St Temecula, CA 92590 | PSP Group, LLC | Consent Agreement | | $0.00 |
| 121806797 | The Grocery Pup, LLC | The Grocery Pup, LLC 1401 Lavaca Street #204 Austin, TX 78701 | PSP Group, LLC | PSP Group, LLC Pet Partner Manual and Addendum | | $0.00 |
| 121806804 | The Hillman Group, Inc. | The Hillman Group, Inc. 10590 Hamilton Avenue Cincinnati, OH 45231 | PSP Midco, LLC | ID Spot Engraver Agreement | | $0.00 |
| 121806813 | The J Austria Project, LLC | The J Austria Project, LLC 10705 Seneca Spring Way Gaithersburg, MD 20886 | PSP Franchising, LLC | Franchise Agreement, dated 07/17/2023, as renewed or amended (Store #4655 - Gaithersburg) | | $0.00 |
| 121900060 | The Shoppes, LP | The Shoppes, LP c/o The Broadbent Company 117 E. Washington St Suite 300 Indianapolis, IN 46204 | PSP Stores, LLC | Lease Agreement, dated 08/10/1993, as amended (Fort Wayne, IN) | Fort Wayne, IN (0052) | $0.00 |
| 121900008 | The Taxman Corporation | The Taxman Corporation 5125 Old Orchard Rd Suite 130 Skokie, IL 60077 | Pet Supplies "Plus", LLC | Lease Agreement, dated 07/29/1993, as amended (Chicago, IL) | Chicago, IL (0066) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 122000037 | The Triple M Partnership 2, LLC | The Triple M Partnership 2, LLC<br>PO BOX 2550<br>VICTORIA, TX 77902-2550 | Buddy's Newco, LLC | First amendment to Lease Agreement dated February 28, 2024 (Store 1025) | 1025 | $455.77 |
| 121806858 | The Ultimate Software Group Inc. | The Ultimate Software Group Inc.<br>2000 Ultimate Way<br>Weston, FL 33326 | PSP Group, LLC | The Ultimate Software Group, Inc. SaaS Agreement | | $0.00 |
| 121900244 | The Vienna Shopping Center Limited Partnership | The Vienna Shopping Center Limited Partnership<br>c/o Rappaport Management Company<br>8405 Greensboro Drive<br>8th Floor<br>McLean, VA 22102-5121 | WNW Stores, LLC | Lease, dated 12/07/2016, as amended (Vienna, VA) | Vienna, VA (3032) | $129.59 |
| 121806869 | Thermopylae Sciences & Technology, LLC Intergraph Corporation Hexagon Geospatial | Thermopylae Sciences & Technology, LLC Intergraph Corporation Hexagon Geospatial<br>1911 N. Fort Myer Dr. Suite 700<br>Arlington, VA 22209 | Pet Supplies "Plus", LLC | Novation Agreement | | $0.00 |
| 121900095 | THF Clarksburg Development Two, LLC | THF Clarksburg Development Two, LLC<br>c/o THF Realty<br>2127 Innerbelt Business Center Dr<br>Suite 200<br>St. Louis, MO 63114 | PSP Stores, LLC | Lease, dated 07/11/2002, as amended (Clarksburg, WV) | Clarksburg, WV (0139) | $0.00 |
| 121900110 | TIA Holdings ETY LLC | TIA Holdings ETY LLC<br>c/o Realty Invest<br>4263 Gavin Lane<br>Columbus, OH 43220 | PSP Stores, LLC | Lease, dated 06/25/2008, as amended (Lancaster, OH) | Lancaster, OH (0190) | $1,042.39 |
| 121900192 | TIA Holdings Mill Run, LLC | TIA Holdings Mill Run, LLC<br>2503 East Broad Street<br>Columbus, OH 43209 | PSP Stores, LLC | Lease, dated 07/17/1997, as amended (Hilliard, OH) | Hilliard, OH (4383) | $551.64 |
| 121900074 | Tiffin Ave 2023 LLC | Tiffin Ave 2023 LLC<br>2407 Columbia Pike<br>Suite 200<br>Arlington, VA 22204 | PSP Stores, LLC | Lease, dated 11/30/1998, as amended (Findlay, OH) | Findlay, OH (0089) | $0.00 |
| 121806895 | TiLu Pets, Inc. | TiLu Pets, Inc.<br>1517 Lakeview Ave.<br>Sylvan Lake, MI 48320 | PSP Franchising, LLC | Franchise Agreement, dated 01/12/2015, as renewed or amended (Store #4024 - Tampa) | | $0.00 |
| 121900193 | Timber Springfield Properties, LLC | Timber Springfield Properties, LLC<br>1060 W State Rd. 434<br>Suite 156<br>Longwood, FL 32750 | PSP Stores, LLC | Lease, dated 09/15/2004, as amended (Springfield, OH) | Springfield, OH (4387) | $0.00 |
| 121900166 | TKG Management, Inc | TKG Management, Inc<br>211 N. Stadium Boulevard<br>Suite 201<br>Columbia, MO 65203 | PSP Stores, LLC | Lease Agreement, dated 02/22/2016, as amended (Fairhaven, MA) | Fairhaven, MA (4106) | $0.00 |
| 121806914 | T-Mobile USA, Inc. | T-Mobile USA, Inc.<br>12920 S.E. 38th Street<br>Bellevue, WA 98006 | PSP Group, LLC | T-Mobile Master Corporate Services Agreement | | $0.00 |
| 121900187 | Tolson Investments, LLC | Tolson Investments, LLC<br>c/o Tolson Enterprises<br>7150 W. Central Ave<br>Suite 200<br>Toledo, OH 43617 | PSP Stores, LLC | Lease, dated 08/19/2019, as amended (Fremont, OH) | Fremont, OH (4267) | $0.00 |
| 121806943 | Torberg Holdings, LLC | Torberg Holdings, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 12/19/2016, as renewed or amended (Store #4124 - Naples) | | $0.00 |
| 121806944 | Total Pet Supply Depot Inc. | Total Pet Supply Depot Inc.<br>9601 Humboldt Avenue South<br>Bloomington, MN 55431 | PSP Franchising, LLC | Franchise Agreement, dated 02/24/2021, as renewed or amended (Store #4488 - Apple Valley) | | $0.00 |
| 122000323 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/23/2024, as amended or extended (Store 164) | 164 | $0.00 |
| 122000322 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/21/2024, as amended or extended (Store 163) | 163 | $0.00 |
| 122000321 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/20/2023, as amended or extended (Store 162) | 162 | $0.00 |
| 122000320 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/20/2023, as amended or extended (Store 161) | 161 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 122000319 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/20/2023, as amended or extended (Store 160) | 160 | $0.00 |
| 121806951 | Tradesmen International, LLC | Tradesmen International, LLC<br>9760 Shepard Rd<br>Macedonia, OH 44056 | PSP Distribution, LLC | Master Services Agreement | | $0.00 |
| 121806965 | Transplace Texas, LP | Transplace Texas, LP<br>3010 Gaylord Parkway<br>Suite 200<br>Frisco, TX 75034 | Pet Supplies "Plus", LLC | Transportation Logistics Management Services Agreement - Amendment No. 6 | | $0.00 |
| 121900189 | Traver Village Limited Partnership | Traver Village Limited Partnership<br>c/o First Martin Corporation<br>115 Depot Street<br>Ann Arbor, MI 48104 | PSP Stores, LLC | Lease, dated 09/30/1991, as amended (Ann Arbor, MI) | Ann Arbor, MI (4324) | $8,411.37 |
| 121900057 | Treeco/Elwood Limited Partnership | Treeco/Elwood Limited Partnership<br>10 E. Palisade Avenue<br>Englewood, NJ 07631 | PSP Stores, LLC | Lease, dated 11/02/1998, as amended (East Northport, NY) | East Northport, NY (9030) | $0.00 |
| 121806972 | Trident4, Inc. | Trident4, Inc.<br>4885 Ketchum Court<br>Granite Bay, CA 95746 | PSP Franchising, LLC | Franchise Agreement, dated 06/07/2023, as renewed or amended (Store #4625 - Roseville) | | $0.00 |
| 121900196 | Triple Bar Kendig Square, LLC | Triple Bar Kendig Square, LLC<br>c/o J.C. Bar<br>224 St. Charles Way<br>Suite 290<br>York, PA 17402 | PSP Stores, LLC | Lease, dated 08/24/2012, as amended (Willow St, PA) | Willow St, PA (4394) | $0.00 |
| 122000327 | TryBudCoLLC | TryBudCoLLC<br>6200 Mountain Brook Lane NW<br>Atlanta, GA 30328 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/01/2021, as amended or extended (Store 120) | 120 | $0.00 |
| 122000326 | TryBudCoLLC | TryBudCoLLC<br>6200 Mountain Brook Lane NW<br>Atlanta, GA 30328 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/31/2023, as amended or extended (Store 123) | 123 | $0.00 |
| 122000325 | TryBudCoLLC | TryBudCoLLC<br>6200 Mountain Brook Lane NW<br>Atlanta, GA 30328 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 07/07/2022, as amended or extended (Store 122) | 122 | $0.00 |
| 122000324 | TryBudCoLLC | TryBudCoLLC<br>6200 Mountain Brook Lane NW<br>Atlanta, GA 30328 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/21/2022, as amended or extended (Store 121) | 121 | $0.00 |
| 121900054 | TT Mt. Airy, LLC | TT Mt. Airy, LLC<br>c/o Rappaport Management Company<br>8405 Greensboro Drive<br>Suite 830<br>Mclean, VA 22102 | PSP Stores, LLC | Lease Agreement, dated 09/05/2013, as amended (Mt Airy, MD) | Mt. Airy, MD (4405) | $618.96 |
| 122000035 | Tuscany Town Center Management, LLC | Tuscany Town Center Management, LLC<br>7420 GOLDEN POND<br>SUITE 100<br>ARMARILLO, TX 79121 | Buddy's Newco, LLC | Commercial Lease dated July 1, 2022 (Store 1023) | 1023 | $353.04 |
| 121807008 | Twin Holdings Corp. | Twin Holdings Corp.<br>10547 Meridian Place Northeast<br>Lake Stevens, WA 98258 | PSP Franchising, LLC | Franchise Agreement, dated 09/21/2021, as renewed or amended (Store #4521 - Kennewick) | | $0.00 |
| 121807023 | UKG Inc. | UKG Inc.<br>900 Chelmsford St<br>Lowell, MA 01851 | PSP Group, LLC | UKG Order | | $0.00 |
| 121807032 | Unforgettable Pets Corp. | Unforgettable Pets Corp.<br>217 Copperwood Loop<br>Conway, SC 29526-5036 | PSP Franchising, LLC | Franchise Agreement, dated 05/19/2022, as renewed or amended (Store #4524 - Conway) | | $0.00 |
| 121900107 | Union Consumer Improvements, LLC | Union Consumer Improvements, LLC<br>c/o DLC Management Corp.<br>565 Taxter Road<br>Suite 400<br>Elmsford, NY 10523 | PSP Stores, LLC | Lease, dated 09/30/2005, as amended (Cheektowaga, NY) | Cheektowaga, NY (0172) | $0.00 |
| 121807036 | Unique Petz Treatz, LLC | Unique Petz Treatz, LLC<br>10 West 33rd Street<br>Suite 220<br>New York, NY 10001 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121900055 | University Plaza Associates, LLC | University Plaza Associates, LLC<br>c/o Nigro Companies<br>20 Corporate Woods Blvd.<br>Albany, NY 12211 | PSP Stores, LLC | Lease Agreement, dated 09/13/1996, as amended (Albany, NY) | Albany, NY (9024) | $13,848.25 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121807079 | Upstream Commerce Inc. | Upstream Commerce Inc. 228 Park Ave S. #89632 New York, NY 10003-1502 | Pet Supplies "Plus", LLC | Upstream Commerce Master Agreement | | $0.00 |
| 121807082 | Upstream Commerce Client | Upstream Commerce Client 228 Park Ave S. #89632 New York, NY 10003-1502 | PSP Group, LLC | Service Level Agreement | | $0.00 |
| 121807087 | US Pet Goods LLC | US Pet Goods LLC 3535 Inland Empire Blvd. Ontario, CA 91764 | PSP Franchising, LLC | Franchise Agreement, dated 02/01/2023, as renewed or amended (Store #4584 - Corona) | | $0.00 |
| 121807092 | US Retail, Inc. | US Retail, Inc. 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #150 - Grand Rapids) | | $0.00 |
| 121807091 | US Retail, Inc. | US Retail, Inc. 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #121 - Grandville) | | $0.00 |
| 121807090 | US Retail, Inc. | US Retail, Inc. 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #94 - Caledonia) | | $0.00 |
| 121807089 | US Retail, Inc. | US Retail, Inc. 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #45 - Grand Rapids) | | $0.00 |
| 121807088 | US Retail, Inc. | US Retail, Inc. 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #11 - Wyoming) | | $0.00 |
| 129990014 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/08/2021, as renewed or amended (Store #4430 - Johnson City) | | $0.00 |
| 121807106 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/26/2013, as renewed or amended (Store #8061 - Cookeville) | | $0.00 |
| 121807105 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 01/19/2012, as renewed or amended (Store #8049 - Knoxville) | | $0.00 |
| 121807104 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2011, as renewed or amended (Store #8045 - Knoxville) | | $0.00 |
| 121807103 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/02/2002, as renewed or amended (Store #8033 - Oak Ridge) | | $0.00 |
| 121807102 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/02/2002, as renewed or amended (Store #8006 - Knoxville) | | $0.00 |
| 121807101 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/29/2023, as renewed or amended (Store #4598 - Hermitage) | | $0.00 |
| 121807100 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/18/2021, as renewed or amended (Store #4477 - Murfreesboro) | | $0.00 |
| 121807099 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/16/2021, as renewed or amended (Store #4473 - Kingsport) | | $0.00 |
| 121807098 | USR Tennessee, LLC | USR Tennessee, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/19/2015, as renewed or amended (Store #4026 - Maryville) | | $0.00 |
| 121807110 | USR Virginia, LLC | USR Virginia, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2015, as renewed or amended (Store #8060 - Ashburn) | | $0.00 |
| 121807109 | USR Virginia, LLC | USR Virginia, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2015, as renewed or amended (Store #8056 - Centreville) | | $0.00 |
| 121807108 | USR Virginia, LLC | USR Virginia, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2015, as renewed or amended (Store #8055 - Franconia) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|-------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121807114 | USRH JV3, LLC | USRH JV3, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/17/2023, as renewed or amended (Store #4591 - Richardson) | | $0.00 |
| 121807113 | USRH JV3, LLC | USRH JV3, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/06/2017, as renewed or amended (Store #4151 - Fort Worth) | | $0.00 |
| 121807112 | USRH JV3, LLC | USRH JV3, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/15/2017, as renewed or amended (Store #4133 - Frisco) | | $0.00 |
| 121807111 | USRH JV3, LLC | USRH JV3, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/07/2017, as renewed or amended (Store #4131 - Manassas) | | $0.00 |
| 121807123 | VALASSIS COMMUNICATIONS, INC. | VALASSIS COMMUNICATIONS, INC. 275 7th Ave #1701 New York, NY 10018 | PSP Group, LLC | AMENDMENT #1 to VALASSIS SERVICES AGREEMENT | | $0.00 |
| 121900237 | Valley Properties, Inc. | Valley Properties, Inc. 875 East Street Tewksbury, MA 01876 | PSP Stores, LLC | Lease, dated 08/13/2013, as amended (Haverhill, MA) | Haverhill, MA (9068) | $0.00 |
| 121900236 | Valley Properties, Inc. | Valley Properties, Inc. 875 East Street Tewksbury, MA 01876 | PSP Stores, LLC | Lease, dated 08/13/2013, as amended (Billerica, MA) | Billerica, MA (9069) | $782.36 |
| 121807145 | Vatic Outsourcing, LLC | Vatic Outsourcing, LLC 1827 Powers Ferry Road SE Building 3 Atlanta, GA 30339 | Pet Supplies "Plus", LLC | Amendment #1 to Agreement | | $0.00 |
| 121807144 | Vatic Outsourcing, LLC | Vatic Outsourcing, LLC 1827 Powers Ferry Road SE Building 3 Atlanta, GA 30339 | Pet Supplies "Plus", LLC | Statement of Work Ongoing Consulting/Outsourcing Maintenance Function | | $0.00 |
| 121807164 | Vector Intelligent Solutions, LLC, d/b/a Vector Security Networks | Vector Intelligent Solutions, LLC, d/b/a Vector Security Networks 2000 Ericsson Dr Warrendale, PA 15086 | Pet Supplies "Plus", LLC | Amendment to Statement of Work for IRG Services | | $0.00 |
| 121807156 | Vector Intelligent Solutions, LLC, d/b/a Vector Security Networks | Vector Intelligent Solutions, LLC, d/b/a Vector Security Networks 2000 Ericsson Dr Warrendale, PA 15086 | Pet Supplies "Plus", LLC | Sales Order for Managed Services | | $0.00 |
| 121807167 | Vector Security, Inc. | Vector Security, Inc. 2000 Ericsson Dr Warrendale, PA 15086 | PSP Group, LLC | Second Amendment to Statement of Work for IRG Services | | $0.00 |
| 122000030 | Vero Beach Investment Group II | Vero Beach Investment Group II 701 Devonshire Drive Champaign, IL 61820 | Buddy's Newco, LLC | Lease Agreement dated October 23, 2018, as amended or assigned (Store 58) | 58 | $529.57 |
| 121900161 | VILLAGE MOORESVILLE STATION LLC | VILLAGE MOORESVILLE STATION LLC c/o Phillips Edison & Company 11501 Northlake Drive Cincinnati, OH 45249 | PSP Stores, LLC | Lease Agreement, dated 10/31/2016, as amended (Mooresville, IN) | Mooresville, IN (4089) | $0.00 |
| 121807238 | Violet's Pet Domain, LLC | Violet's Pet Domain, LLC 208 St. James Avenue, Suite B Goose Creek, SC 29445 | WNW Franchising, LLC | Franchise Agreement, dated 09/12/2022 (Store #3040 - ) | | $0.00 |
| 121807244 | Vitakraft Sun Seed, Inc. | Vitakraft Sun Seed, Inc. 20584 Long Judson Road Weston, OH 43569 | PSP Group, LLC | PSP Private Brand Agreement Consumables | | $0.00 |
| 121807309 | Wagging Tails, LLC | Wagging Tails, LLC 18336 Santa Belinda Circle Fountain Valley, CA 92708 | PSP Franchising, LLC | Franchise Agreement, dated 12/27/2018, as renewed or amended (Store #4019 - Yorba Linda) | | $0.00 |
| 121807310 | Wagsalot, LLC | Wagsalot, LLC 61 Boxwood Lane Dover, NH 03820 | PSP Franchising, LLC | Franchise Agreement, dated 04/16/2019, as renewed or amended (Store #4260 - Somersworth) | | $0.00 |
| 121807324 | Ware Manufacturing Inc. | Ware Manufacturing Inc. 1439 S 40th Ave Ste 400 Phoenix, AZ 85009 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900022 | Warwick Devco, LP | Warwick Devco, LP c/o Waters Retail Group 200 Old Forge Lane Suite 201 Kennett Square, PA 19348 | Pet Supplies "Plus", LLC | Lease, dated 07/02/2015, as amended (Lititz, PA) | Lititz, PA (4403) | $0.00 |
| 121900051 | Wayne Towne Enterprises, Ltd. | Wayne Towne Enterprises, Ltd. c/o Omega Real Estate Management 6151 Wilson Mills Road Suite 100 Highland Heights, OH 44143 | PSP Stores, LLC | Lease Agreement, dated 07/01/1997, as amended (Wooster, OH) | Wooster, OH (0102) | $4,134.27 |
| 121807340 | WdR Investments, LLC | WdR Investments, LLC 6 Stone Chimney Drive Wildwood, MO 63038 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2020, as renewed or amended (Store #4351 - St. Peters ) | | $0.00 |
| 121807341 | We Heart Pets II, LLC | We Heart Pets II, LLC 18184 Shinnecock Hills Place Leesburg, VA 20176 | PSP Franchising, LLC | Franchise Agreement, dated 10/18/2023, as renewed or amended (Store #4618 - Glenarden) | | $0.00 |
| 121807342 | We Heart Pets, LLC | We Heart Pets, LLC 18184 Shinnecock Hills Place Leesburg, VA 20176 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2023, as renewed or amended (Store #4620 - Suffolk) | | $0.00 |
| 121807346 | Weber Group Pets, LLC | Weber Group Pets, LLC 4277 Murfreesboro Rd. Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 03/31/2022, as renewed or amended (Store #4514 - Gallatin) | | $0.00 |
| 121807345 | Weber Group Pets, LLC | Weber Group Pets, LLC 4277 Murfreesboro Rd. Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2020, as renewed or amended (Store #4342 - Panama City) | | $0.00 |
| 121807344 | Weber Group Pets, LLC | Weber Group Pets, LLC 4277 Murfreesboro Rd. Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2020, as renewed or amended (Store #4340 - Cabot) | | $0.00 |
| 121807351 | WebNoz Pets, Inc. | WebNoz Pets, Inc. 4277 Murfreesboro Rd. Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2020, as renewed or amended (Store #4343 - Pensacola) | | $0.00 |
| 121807350 | WebNoz Pets, Inc. | WebNoz Pets, Inc. 4277 Murfreesboro Rd. Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2020, as renewed or amended (Store #4341 - Franklin) | | $0.00 |
| 121807349 | WebNoz Pets, Inc. | WebNoz Pets, Inc. 4277 Murfreesboro Rd. Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/12/2015, as renewed or amended (Store #4023 - Rogers) | | $0.00 |
| 121807348 | WebNoz Pets, Inc. | WebNoz Pets, Inc. 4277 Murfreesboro Rd. Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/12/2015, as renewed or amended (Store #4022 - Hendersonville) | | $0.00 |
| 121807354 | Wee Pets 1, LLC | Wee Pets 1, LLC 118 Galvin Circle Kennett Square, PA 19348 | PSP Franchising, LLC | Franchise Agreement, dated 01/22/2021, as renewed or amended (Store #4377 - Thorndale) | | $0.00 |
| 121807355 | Wee Pets 2, LLC | Wee Pets 2, LLC 118 Galvin Circle Kennett Square, PA 19348 | PSP Franchising, LLC | Franchise Agreement, dated 01/22/2021, as renewed or amended (Store #4376 - Kennett Square) | | $0.00 |
| 121900148 | Wegmans Food Markets, Inc. | Wegmans Food Markets, Inc. Attn: Senior VP - Real Estate & Development 1500 Brooks Ave. Box 30844 New York, NY 14603 | Pet Supplies "Plus", LLC | Lease, dated 07/31/2007, as amended (Fairport, NY) | Fairport, NY (0181) | $0.00 |
| 121900120 | Wegmans Food Markets, Inc. | Wegmans Food Markets, Inc. Attn: Senior VP - Real Estate & Development 1500 Brooks Ave. Box 30844 New York, NY 14603 | PSP Stores, LLC | Lease, dated 03/29/2013, as amended (Penfield, NY) | Penfield, NY (0214) | $0.00 |
| 121900052 | Wegmans Food Markets, Inc. | Wegmans Food Markets, Inc. Attn: Senior VP, Real Estate Development 1500 Brooks Avenue P.O. Box 30844 Rochester, NY 14603-0844 | PSP Stores, LLC | Lease, dated 12/01/2015, as amended (Greece, NY) | Greece, NY (4035) | $499.73 |
| 121807391 | Wells Fargo Financial Leasing, Inc. | Wells Fargo Financial Leasing, Inc. 800 Walnut 4th floor Des Moines, IA 50309 | PSP Stores, LLC | Addendum to Master Equipment Lease Agreement | | $0.00 |
| 121807383 | Wells Fargo Financial Leasing, Inc. | Wells Fargo Financial Leasing, Inc. 800 Walnut 4th floor Des Moines, IA 50309 | PSP Stores, LLC | Master Equipment Lease Agreement and Related Schedules | | $1,463.84 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121807396 | Wenzhou Yuanfei Pet Toy Products Co; Ltd. | Wenzhou Yuanfei Pet Toy Products Co; Ltd. No.1 Chongle Road Shuitou Town Pingyang Zhejiang, 325405 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121807400 | West Orlando Pets, LLC | West Orlando Pets, LLC 2502 Lake Debra Drive, Apartment 304 Orlando, FL 32835 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2024, as renewed or amended (Store #4648 - Horizon West) | | $0.00 |
| 121900084 | WestBay Plaza, LLC | WestBay Plaza, LLC c/o Carter Properties, LLC 13 West Hanna Lane Bratenahl, Ohio 44108 | PSP Stores, LLC | Lease, dated 10/18/2017, as amended (Westlake, OH) | Westlake,OH (0114) | $0.00 |
| 121900077 | Western Skies Management, Inc. | Western Skies Management, Inc. c/o The Kroenke Group 211 N. Stadium Blvd. Suite 201 Columbia, MO 65103 | PSP Stores, LLC | Lease, dated 07/02/1997, as amended (St. Clairsville, OH) | St. Clairsville, OH (0099) | $0.00 |
| 140000272 | WEX Health, Inc. d/b/a WEX, formerly known as Discovery Benefits, LLC | WEX Health, Inc. 82 Hopmeadow Street Simsbury, CT 06089 | Pet Supplies "Plus", LLC | Administration Services Agreement by and between Pet Supplies "Plus", LLC and Wex Health, Inc. | | $0.00 |
| 140000271 | WEX Health, Inc. d/b/a WEX, formerly known as Discovery Benefits, LLC | WEX Health, Inc. 82 Hopmeadow Street Simsbury, CT 06089 | Buddy's Newco, LLC | Administration Services Agreement by and between Buddy's Newco, LLC and Wex Health, Inc. | | $0.00 |
| 121807420 | Whirlpool Corporation | Whirlpool Corporation 553 Benson Road Benton Harbor, MI 49022 | Buddy's Newco, LLC | Whirlpool Corporation Sales Agreement | | $0.00 |
| 121807422 | Whiskers & Tails, LLC | Whiskers & Tails, LLC c/o Corporation Service Company, 251 Little Falls Drive Wilmington, DE 19808 | PSP Franchising, LLC | Franchise Agreement, dated 10/19/2020, as renewed or amended (Store #4365 - ) | | $0.00 |
| 121807429 | WIDEN ENTERPRISES, INC. | WIDEN ENTERPRISES, INC. 6911 Mangrove Lane Madison, WI 53713 | Pet Supplies "Plus", LLC | MASTER SERVICE AGREEMENT | | $0.00 |
| 121900234 | Widewaters Country Squire Company, LLC | Widewaters Country Squire Company, LLC c/o The Widewaters Group 5845 Widewaters Parkway Suite 100 East Syracuse, NY 13057 | PSP Stores, LLC | Lease, dated 04/26/2013, as amended (Cicero, NY) | Cicero, NY (9061) | $0.00 |
| 121807434 | Wildcat Pets NC, LLC | Wildcat Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 01/15/2019, as renewed or amended (Store #4215 - Hope Mills) | | $0.00 |
| 121807433 | Wildcat Pets NC, LLC | Wildcat Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2018, as renewed or amended (Store #4007 - Greenville) | | $0.00 |
| 121900023 | Wilmann Companies | Wilmann Companies 9601 Katy Freeway Suite 480 Houston, TX 77024 | Pet Supplies "Plus", LLC | Lease Agreement, dated 10/05/2015, as amended (Spring, TX) | | $0.00 |
| 121807443 | Wilson PSP, LLC | Wilson PSP, LLC 4135 W 9860 North Street Cedar Hills, UT 84062 | PSP Franchising, LLC | Franchise Agreement, dated 06/03/2022, as renewed or amended (Store #4533 - Sandy) | | $0.00 |
| 121807444 | Wilson Wags & Whiskers, LLC | Wilson Wags & Whiskers, LLC 28419 Wild Mustang Lane Fulshear, TX 77441 | PSP Franchising, LLC | Franchise Agreement, dated 12/19/2023, as renewed or amended (Store #4290 - Pearland) | | $0.00 |
| 121807445 | Wilson, Inc. | Wilson, Inc. 14240 Imboden Rd. Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 04/26/2022, as renewed or amended (Store #4520 - Brighton) | | $0.00 |
| 121807455 | Winner Field Development Limited | Winner Field Development Limited Flat/ RM B BLK 8 10/F Sea Crest Villa Phase 318 Castle Peak Road Tsing Lung Tau , 999077 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121807459 | Wisconsin Pets, LLC | Wisconsin Pets, LLC 2295 Spring Rose Road Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2015, as renewed or amended (Store #4031 - Fitchburg) | | $0.00 |
| 121900240 | WKA Fairfax LLC | WKA Fairfax LLC 2213 Concord Pike Wilmington, DE 19803 | PSP Stores, LLC | Lease, dated 10/30/2013, as amended (Wilmington, DE) | Wilmington, DE (9073) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|-------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121807470 | WNW Pet, LLC | WNW Pet, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3006 - Colorado Springs) | | $0.00 |
| 121807469 | WNW Pet, LLC | WNW Pet, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3005 - Colorado Springs) | | $0.00 |
| 121807468 | WNW Pet, LLC | WNW Pet, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3004 - Colorado Springs) | | $0.00 |
| 121807467 | WNW Pet, LLC | WNW Pet, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3003 - Littleton) | | $0.00 |
| 121807466 | WNW Pet, LLC | WNW Pet, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3002 - Castle Rock) | | $0.00 |
| 121807486 | World Wide Imports Enterprises, Inc. | World Wide Imports Enterprises, Inc. 5315 NW 10th Terrace Fort Lauderdale, FL 33309 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121807488 | WorQFlow Solutions | WorQFlow Solutions 650 California St 7th Floor San Francisco, CA 94108 | PSP Group, LLC | Client Services Agreement | | $0.00 |
| 122000334 | WRCT Investments, LLC | WRCT Investments, LLC 1036 Glendalyn Circle Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/29/2023, as amended or extended (Store 583) | 583 | $0.00 |
| 122000333 | WRCT Investments, LLC | WRCT Investments, LLC 1036 Glendalyn Circle Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/08/2016, as amended or extended (Store 581) | 581 | $0.00 |
| 122000332 | WRCT Investments, LLC | WRCT Investments, LLC 1036 Glendalyn Circle Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/31/2018, as amended or extended (Store 465) | 465 | $0.00 |
| 122000331 | WRCT Investments, LLC | WRCT Investments, LLC 1036 Glendalyn Circle Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/31/2018, as amended or extended (Store 464) | 464 | $0.00 |
| 122000330 | WRCT Investments, LLC | WRCT Investments, LLC 1036 Glendalyn Circle Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/31/2018, as amended or extended (Store 463) | 463 | $0.00 |
| 122000329 | WRCT Investments, LLC | WRCT Investments, LLC 1036 Glendalyn Circle Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/29/2022, as amended or extended (Store 414) | 414 | $0.00 |
| 122000328 | WRCT Investments, LLC | WRCT Investments, LLC 1036 Glendalyn Circle Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/27/2021, as amended or extended (Store 582) | 582 | $0.00 |
| 121807492 | Wrike, Inc. | Wrike, Inc. 9171 Towne Center Drive Suite 200 San Diego, CA 82122 | Pet Supplies "Plus", LLC | Wrike Subscription Order Form | | $0.00 |
| 121807491 | Wrike, Inc. | Wrike, Inc. 9171 Towne Center Drive Suite 200 San Diego, CA 82122 | Pet Supplies "Plus", LLC | Amendment to the Agreement | | $0.00 |
| 121807520 | Yong Zhen Rubber & Plastic Co., Ltd. | Yong Zhen Rubber & Plastic Co., Ltd. No. 2 Hong Teng Road Industry (S) Park Qing Yang Town , 214403 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 122000031 | Zephyr, LLC | Zephyr, LLC 7162 Reading Road Ste 730 Attn: Mark D. Ayer Cincinnati, OH 45327 | Buddy's Newco, LLC | Lease, executed on or about August 2018, as amended or extended (Store 60) | 60 | $346.97 |
| 121807539 | Zhong Bi (Entity Pending) | Zhong Bi (Entity Pending) Address on File | WNW Franchising, LLC | Franchise Agreement, dated 01/19/2024 (Store #N/A - Barrington) | | $0.00 |
| 121807546 | ZippyApp | ZippyApp 440 N Wolfe Rd # Ms177 Sunnyvale, CA 94085 | Buddy's Newco, LLC | Software Subscription | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121807548 | Zmags | Zmags<br>332 Congress St<br>2nd Floor<br>Boston, MA 02210 | Pet Supplies "Plus", LLC | Order and Master Subscription Agreement | | $0.00 |
| 121807549 | Zmags Corporation | Zmags Corporation<br>332 Congress St<br>2nd Floor<br>Boston, MA 02210 | Pet Supplies "Plus", LLC | Zmags Services Order Form | | $0.00 |
| 121807552 | Zoetis US LLC | Zoetis US LLC<br>10 Sylvan Way<br>Parsippany, NJ 07054 | PSP Group, LLC | Retail M&P Funds Agreement | | $0.00 |
| 121807562 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 10/28/2021, as renewed or amended (Store #4478) | | $0.00 |
| 121807561 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 06/12/2018, as renewed or amended (Store #4460 - Willoughby) | | $0.00 |
| 121807560 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 07/28/2021, as renewed or amended (Store #4459 - Hamburg) | | $0.00 |
| 121807559 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 12/31/2020, as renewed or amended (Store #4378 - Ashtabula) | | $0.00 |
| 121807558 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 12/05/2016, as renewed or amended (Store #4103 - Erie) | | $0.00 |
| 121807557 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 05/17/2016, as renewed or amended (Store #4074 - Erie) | | $0.00 |
| 121900121 | ZRP Fishers Crossing LLC | ZRP Fishers Crossing LLC<br>c/o Ziff Properties, Inc.<br>200 Wingo Way<br>Suite 100<br>MT. Pleasant, SC 29464 | PSP Stores, LLC | Lease, dated 04/02/2013, as amended (Fishers, IN) | Fishers, IN (0216) | $0.00 |

**<u>Exhibit K-1</u>**

**Redline to Previously Filed
Assumed Contracts List**

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121800022 | 1480 Cafe LLC | 1480 Cafe LLC<br>10 East 120th Avenue<br>Northglenn, CO 80233 | PSP Franchising, LLC | Franchise Agreement, dated 07/10/2020, as renewed or amended (Store #4328 - Denver) | | $0.00 |
| 121800042 | 2nd Watch, Inc.<br>Aptitive | 2nd Watch, Inc.<br>Aptitive<br>2310 N Molter Suite 340<br>Liberty Lake, WA 99019 | PSP Group, LLC | Acquisition Announcement and Payment Details Update | | $0.00 |
| 121800046 | 313 Presents, LLC | 313 Presents, LLC<br>2525 Woodward Avenue<br>Detroit, MI 48201 | PSP Group, LLC | Sponsorship Agreement | | $0.00 |
| 121800047 | 313 Presents, LLC | 313 Presents, LLC<br>2525 Woodward Avenue<br>Detroit, MI 48201 | PSP Midco, LLC | First Amendment to Sponsorship Agreement | | $0.00 |
| 121800058 | 3Deez, LLC | 3Deez, LLC<br>4712 Ocean Blvd.<br>Destin, FL 32541 | PSP Franchising, LLC | Franchise Agreement, dated 03/18/2021, as renewed or amended (Store #4433 - Destin) | | $0.00 |
| 121800059 | 4 Healthy Paws, Inc. | 4 Healthy Paws, Inc.<br>11040 Pinevale Lane<br>Franktown, CO 80116 | WNW Franchising, LLC | Franchise Agreement, dated 10/17/2015 (Store #3008 - Aurora) | | $0.00 |
| 121800060 | 4 Paws Partners, LLC | 4 Paws Partners, LLC<br>1100 US Highway 287, Suite 1400<br>Broomfield, CO 80020 | WNW Franchising, LLC | Franchise Agreement, dated 08/29/2022, as renewed (Store #3011 - Broomfield) | | $0.00 |
| 121800061 | 4 Pets Enterprises, LLC | 4 Pets Enterprises, LLC<br>10705 NE. 156th Avenue<br>Vancouver, WA 98682 | PSP Franchising, LLC | Franchise Agreement, dated 08/28/2020, as renewed or amended (Store #4104 - Gresham) | | $0.00 |
| 121800094 | 6 Wags, Inc. | 6 Wags, Inc.<br>900 Nina Court<br>Mendota Heights, MN 55118 | WNW Franchising, LLC | Franchise Agreement, dated 01/28/2023, as renewed (Store #3014 - Lakeville) | | $0.00 |
| 121800105 | 8x8, inc. | 8x8, inc.<br>1350 Broadway<br>New York, NY 10018 | Buddy's Newco, LLC | Second Amendment To Service Agreement | | $0.00 |
| 121800106 | 8x8, Inc. | 8x8, Inc.<br>675 Creekside Way<br>Campbell, CA 95008 | PSP Group, LLC | Corporate Renewal Agreement | | $0.00 |
| 121800107 | 8x8, Inc. | 8x8, Inc.<br>675 Creekside Way<br>Campbell, CA 95008 | PSP Group, LLC | Service Agreement (Replacement) | | $0.00 |
| 121800108 | 8x8, Inc. | 8x8, Inc.<br>675 Creekside Way<br>Campbell, CA 95008 | PSP Group, LLC | 8x8 UCAAS/CCAAS SERVICE TERMS | | $0.00 |
| 121800109 | 8x8, Inc. | 8x8, Inc.<br>675 Creekside Way<br>Campbell, CA 95008 | PSP Group, LLC | 8X8, Inc. Business Terms and Conditions | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121800119 | A Pet's Life, LLC | A Pet's Life, LLC<br>16915 Turkey Point Street<br>San Antonio, TX 78232-1830 | PSP Franchising, LLC | Franchise Agreement, dated 01/12/2018, as renewed or amended (Store #4169 - San Antonio) | | $0.00 |
| 121800126 | A&F Distributors 786, Inc. | A&F Distributors 786, Inc.<br>15 Stirrup Lane<br>Salonga, NY 11768 | PSP Franchising, LLC | Franchise Agreement, dated 08/22/2022, as renewed or amended (Store #4621 - Port Jefferson Station) | | $0.00 |
| 121800143 | Aanjaney LLC | Aanjaney LLC<br>11132 Ashbury Meadows Drive<br>Dayton, OH 45458 | PSP Franchising, LLC | Franchise Agreement, dated 07/23/2024, as renewed or amended (Store #4650 - Dayton) | | $0.00 |
| 121800153 | Absorb Software Inc. | Absorb Software Inc.<br>#2500 - 685 Centre St. S<br>Calgary, AB T2G 1S5 | PSP Group, LLC | Order Form for Absorb LMS Service | | $0.00 |
| 121800154 | Absorb Software Inc. | Absorb Software Inc.<br>#2500 - 685 Centre St. S<br>Calgary, AB T2G 1S5 | PSP Group, LLC | Service Terms and Conditions | | $0.00 |
| 121800165 | Accruent, LLC | Accruent, LLC<br>11500 Alterra Pkwy Suite 110<br>Austin, TX 78758 | PSP Group, LLC | SaaS Services Agreement | | $0.00 |
| 121800167 | Accruent, LLC | Accruent, LLC<br>11500 Alterra Pkwy Suite 110<br>Austin, TX 78758 | PSP Group, LLC | Accruent Order Document #90037823 | | $0.00 |
| 121800187 | Ace Host | Ace Host<br>412 E Madison St<br>STE 1010<br>Tampa, FL 33602 | Buddy's Newco, LLC | MASTER SERVICE AGREEMENT | | $0.00 |
| 121800247 | Advanced Business Solutions | Advanced Business Solutions<br>801 W Big Beaver Rd Ste 300<br>Troy, MI 48084 | PSP Group, LLC | Purchase Order for Sound Masking Design and Installation Services | | $825.00 |
| 121800248 | Advanced Business Solutions | Advanced Business Solutions<br>801 W Big Beaver Rd Ste 300<br>Troy, MI 48084 | PSP Group, LLC | Purchase Order for New Office - SOW for Cabling | | $0.00 |
| 121800276 | Adyen N.V. | Adyen N.V.<br>Simon Carmiggeltstraat 6-50<br>1011 DJ<br>Amsterdam, | PSP Group, LLC | Addendum to Adyen for Platforms Agreement | | $0.00 |
| 121800277 | Adyen N.V. | Adyen N.V.<br>Simon Carmiggeltstraat 6-50<br>1011 DJ<br>Amsterdam, | PSP Group, LLC | Adyen for Platforms Agreement | | $0.00 |
| 121800308 | Afzal Lokhandwala (Entity Pending) | Afzal Lokhandwala (Entity Pending)<br>Address on File | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2022, as renewed or amended (Store #N/A - Cedar Rapids) | | $0.00 |
| 121800309 | Afzal Lokhandwala (Entity Pending) | Afzal Lokhandwala (Entity Pending)<br>Address on File | WNW Franchising, LLC | Franchise Agreement, dated 12/09/2022 (Store #N/A - Chicago) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121800313 | Agilence, Inc. | Agilence, Inc.<br>309 Fellowship Road - Suite 200<br>Mt. Laurel, NJ 08054 | PSP Group, LLC | Master Agreement | | $0.00 |
| 121800355 | AL/Fred Food Enterprises, LLC | AL/Fred Food Enterprises, LLC<br>G-7750 South Saginaw St., Suite #5<br>Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 10/29/2004, as renewed or amended (Store #155 - Iron Mountain) | | $0.00 |
| 121800365 | AlejCo Holdings, Inc. | AlejCo Holdings, Inc.<br>2081 Paseo Ynez<br>San Dimas, CA 91773 | PSP Franchising, LLC | Franchise Agreement, dated 03/28/2016, as renewed or amended (Store #4073 - Upland) | | $0.00 |
| 121800368 | Alera Group Inc. & Subsidiaries | Alera Group Inc. & Subsidiaries<br>3 Parkway North<br>Suite 500<br>Deerfield, IL 60015 | Franchise Group, Inc. | Business Associate Agreement | | $0.00 |
| 121800491 | Amin Sarfani (Entity Pending) | Amin Sarfani (Entity Pending)<br>Address on File | WNW Franchising, LLC | Franchise Agreement, dated 04/24/2024 (Store #N/A - Wheeling) | | $0.00 |
| 121800563 | AOG Enterprises, LLC | AOG Enterprises, LLC<br>11173 Loveland Trace Court<br>Loveland, OH 45140 | PSP Franchising, LLC | Franchise Agreement, dated 01/11/2024, as renewed or amended (Store #4629 - Maineville) | | $0.00 |
| 121800573 | APC Plus, LLC | APC Plus, LLC<br>2204 Camden Circle<br>Southlake, TX 76092 | PSP Franchising, LLC | Franchise Agreement, dated 01/07/2022, as renewed or amended (Store #4490 - Wichita Falls) | | $0.00 |
| 121800582 | APL Ventures I, LLC | APL Ventures I, LLC<br>16915 Turkey Point Street<br>San Antonio, TX 78232-1830 | PSP Franchising, LLC | Franchise Agreement, dated 02/19/2021, as renewed or amended (Store #4231 - New Braunfels) | | $0.00 |
| 121800666 | Ascential Inc. | Ascential Inc.<br>1801 Porter Street<br>Suite 300<br>Baltimore, MD 21230 | PSP Group, LLC | WGSN Terms of Business | | $0.00 |
| 121800667 | ASG Group, LLC | ASG Group, LLC<br>9818 Ricaby Drive<br>Houston, TX 77064 | PSP Franchising, LLC | Franchise Agreement, dated 06/14/2021, as renewed or amended (Store #4470 - Houston) | | $0.00 |
| 121800668 | ASG Group, LLC | ASG Group, LLC<br>9818 Ricaby Drive<br>Houston, TX 77064 | PSP Franchising, LLC | Franchise Agreement, dated 01/05/2023, as renewed or amended (Store #4564 - Bridgeland) | | $0.00 |
| 121800696 | AT&T Corp. | AT&T Corp.<br>One AT&T Way<br>Bedminster, NJ 07921-0752 | Pet Supplies "Plus", LLC | AT&T Managed Internet Service Pricing Schedule | | $0.00 |
| 121800697 | AT&T Corp. | AT&T Corp.<br>One AT&T Way<br>Bedminster, NJ 07921-0752 | Pet Supplies "Plus", LLC | AT&T Dedicated Internet Pricing Schedule | | $0.00 |
| 121800698 | AT&T Corp. | AT&T Corp.<br>One AT&T Way<br>Bedminster, NJ 07921-0752 | PSP Group, LLC | AT&T Dedicated Internet Service Pricing Schedule | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121800716 | Attentive Mobile Inc. | Attentive Mobile Inc.<br>221 River Street | PSP Group, LLC | Attentive Mobile Order Form and Master Subscription Agreement | | ~~$74,175.56~~$68,633.02 |
| 121800718 | AudioEye, Inc. | AudioEye, Inc.<br>5210 E. Williams Circle Suite 750<br>Tucson, AZ 85711 | Pet Supplies "Plus", LLC | Enterprise Order PET-00607 | | $18,545.47 |
| 121800719 | AudioEye, Inc. | AudioEye, Inc.<br>5210 E. Williams Circle Suite 750<br>Tucson, AZ 85711 | Pet Supplies "Plus", LLC | Master Services Agreement | | $0.00 |
| 121800730 | Austin Pets, LLC | Austin Pets, LLC<br>2295 Spring Rose Road<br>Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 11/08/2018, as renewed or amended (Store #4108 - Austin) | | $0.00 |
| 121800734 | Avalara, Inc. | Avalara, Inc.<br>Dept CH 16781<br>Palatine, IL 60055 | PSP Group, LLC | Addendum to Terms and Conditions | | $0.00 |
| 121800735 | Avalara, Inc. | Avalara, Inc.<br>Dept CH 16781<br>Palatine, IL 60055 | PSP Group, LLC | Avalara Professional Services Statement of Work | | $0.00 |
| 121800736 | Avalara, Inc. | Avalara, Inc.<br>Dept CH 16781<br>Palatine, IL 60055 | PSP Group, LLC | Sales Order for Avalara Services | | $0.00 |
| 121800741 | Avalara, Inc. | Avalara, Inc.<br>Dept CH 16781<br>Palatine, IL 60055 | PSP Group, LLC | Avalara Order for D365 Upgrade at Renewal | | $0.00 |
| 121800743 | Avalon Risk Management | Avalon Risk Management<br>200 N. Martingale Rd<br>Suite 700<br>Schaumburg, IL 60173 | PSP Distribution, LLC | Customs Bond Application & Indemnity | | $0.00 |
| 121800744 | Avenue 34, LLC | Avenue 34, LLC<br>22651 E Twin Acres Drive<br>Queen Creek, AZ 85142 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2023, as renewed or amended (Store #4568 - Queen Creek) | | $0.00 |
| 121800745 | AVMH Ventures of Albany, LLC | AVMH Ventures of Albany, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 03/19/2021, as renewed or amended (Store #4283 - Albany) | | $0.00 |
| 121800747 | AVMH Ventures of Baytowne, LLC | AVMH Ventures of Baytowne, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2023, as renewed or amended (Store #4264 - Webster) | | $0.00 |
| 121800748 | AVMH Ventures of Bluefield, LLC | AVMH Ventures of Bluefield, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/17/2023, as renewed or amended (Store #4617 - Bluefield) | | $0.00 |
| 121800749 | AVMH Ventures of Brighton, LLC | AVMH Ventures of Brighton, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2023, as renewed or amended (Store #4276 - Rochester) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121800750 | AVMH Ventures of Bristol, LLC | AVMH Ventures of Bristol, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4113 - Bristol) | | $0.00 |
| 121800751 | AVMH Ventures of Camarillo, LLC | AVMH Ventures of Camarillo, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2022, as renewed or amended (Store #4313 - Camarillo) | | $0.00 |
| 121800752 | AVMH Ventures of Casselberry, LLC | AVMH Ventures of Casselberry, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2023, as renewed or amended (Store #4605 - Casselberry) | | $0.00 |
| 121800753 | AVMH Ventures of Charlottesville, LLC | AVMH Ventures of Charlottesville, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 11/01/2022, as renewed or amended (Store #8013 - Charlottesville) | | $0.00 |
| 121800754 | AVMH Ventures of Chattanooga, LLC | AVMH Ventures of Chattanooga, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 02/04/2022, as renewed or amended (Store #4492 - Chattanooga) | | $0.00 |
| 121800755 | AVMH Ventures of Clearwater, LLC | AVMH Ventures of Clearwater, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #8046 - Clearwater) | | $0.00 |
| 121800756 | AVMH Ventures of Concord Mills, LLC | AVMH Ventures of Concord Mills, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #4128 - Concord) | | $0.00 |
| 121800757 | AVMH Ventures of Concord, LLC | AVMH Ventures of Concord, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #8057 - Concord) | | $0.00 |
| 121800758 | AVMH Ventures of Covington, LLC | AVMH Ventures of Covington, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 12/02/2023, as renewed or amended (Store #4624 - Covington) | | $0.00 |
| 121800759 | AVMH Ventures of Durham, LLC | AVMH Ventures of Durham, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #4145 - Durham) | | $0.00 |
| 121800760 | AVMH Ventures of Gainesville, LLC | AVMH Ventures of Gainesville, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 12/19/2022, as renewed or amended (Store #4371 - Alpharetta) | | $0.00 |
| 121800761 | AVMH Ventures of Gainesville, LLC | AVMH Ventures of Gainesville, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2022, as renewed or amended (Store #4416 - Gainesville) | | $0.00 |
| 121800762 | AVMH Ventures of Greece, LLC | AVMH Ventures of Greece, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2023, as renewed or amended (Store #4275 - Greece) | | $0.00 |
| 121800763 | AVMH Ventures of Greer, LLC | AVMH Ventures of Greer, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 03/09/2022, as renewed or amended (Store #4502 - Greer) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121800764 | AVMH Ventures of Groton, LLC | AVMH Ventures of Groton, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4114 - Groton) | | $0.00 |
| 121800765 | AVMH Ventures of Hickory, LLC | AVMH Ventures of Hickory, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #4058 - Hickory) | | $0.00 |
| 121800766 | AVMH Ventures of Lilburn, LLC | AVMH Ventures of Lilburn, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 08/16/2022, as renewed or amended (Store #4538 - Lilburn) | | $0.00 |
| 121800767 | AVMH Ventures of Manchester, LLC | AVMH Ventures of Manchester, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4111 - Manchester) | | $0.00 |
| 121800768 | AVMH Ventures of Manhattan, LLC | AVMH Ventures of Manhattan, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 09/06/2023, as renewed or amended (Store #4611 - Manhattan) | | $0.00 |
| 121800769 | AVMH Ventures of North Durham, LLC | AVMH Ventures of North Durham, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/01/2023, as renewed or amended (Store #4604 - North Durham) | | $0.00 |
| 121800770 | AVMH Ventures of Olathe, LLC | AVMH Ventures of Olathe, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2023, as renewed or amended (Store #4606 - Olathe) | | $0.00 |
| 121800771 | AVMH Ventures of Pinellas Park, LLC | AVMH Ventures of Pinellas Park, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #8039 - Pinellas Park) | | $0.00 |
| 121800772 | AVMH Ventures of Richmond IN, LLC | AVMH Ventures of Richmond IN, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/04/2023, as renewed or amended (Store #4615 - Richmond) | | $0.00 |
| 121800773 | AVMH Ventures of Sacramento, LLC | AVMH Ventures of Sacramento, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/24/2022, as renewed or amended (Store #4536 - Sacramento) | | $0.00 |
| 121800774 | AVMH Ventures of Sarasota, LLC | AVMH Ventures of Sarasota, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2023, as renewed or amended (Store #4177 - Sarasota) | | $0.00 |
| 121800775 | AVMH Ventures of Virginia Beach, LLC | AVMH Ventures of Virginia Beach, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 11/01/2022, as renewed or amended (Store #8016 - Virginia Beach) | | $0.00 |
| 121800776 | AVMH Ventures of Webster, LLC | AVMH Ventures of Webster, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2023, as renewed or amended (Store #4278 - Webster) | | $0.00 |
| 121800777 | AVMH Ventures of West Hartford, LLC | AVMH Ventures of West Hartford, LLC<br>2545 Lafayette Plaza Drive, Suite B<br>Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #9020 - West Hartford) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121800778 | AVMH Ventures of West Union, LLC | AVMH Ventures of West Union, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 07/19/2021, as renewed or amended (Store #4442 - Seneca) | | $0.00 |
| 121800779 | AVMH Ventures of Wethersfield, LLC | AVMH Ventures of Wethersfield, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4117 - Wethersfield) | | $0.00 |
| 121800780 | AVMH Ventures of Wilmington, LLC | AVMH Ventures of Wilmington, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 04/04/2023, as renewed or amended (Store #4593 - Wilmington) | | $0.00 |
| 121800781 | AVMH Ventures of Woodland, LLC | AVMH Ventures of Woodland, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 10/24/2022, as renewed or amended (Store #4537 - Woodland) | | $0.00 |
| 121800782 | AVMH Ventures, LLC | AVMH Ventures, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 04/19/2022, as renewed or amended (Store #4519 - Auburn) | | $0.00 |
| 121800783 | AVMH Ventures, LLC | AVMH Ventures, LLC 2545 Lafayette Plaza Drive, Suite B Albany, GA 31707 | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2023, as renewed or amended (Store #4603 - Virginia Beach) | | $0.00 |
| 121800785 | AW22 Franchise LLC | AW22 Franchise LLC 8354 Cupertino Heights Way Las Vegas, NV 89178 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2019, as renewed or amended (Store #4297 - Las Vegas) | | $0.00 |
| 121800791 | AWPets2 Franchise LLC | AWPets2 Franchise LLC 8354 Cupertino Heights Way Las Vegas, NV 89178 | PSP Franchising, LLC | Franchise Agreement, dated 03/01/2023, as renewed or amended (Store #4587 - Las Vegas) | | $0.00 |
| 121800801 | B & B Pet Products, LLC | B & B Pet Products, LLC 1611 E. Dove Rd. Southlake, TX 76092 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2016, as renewed or amended (Store #4075 - Lenexa) | | $0.00 |
| 121800802 | B Pawsitive LLC | B Pawsitive LLC 1282 Winfield Court Greenfield, IN 46143 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2024, as renewed or amended (Store #4649 - Indianapolis) | | $0.00 |
| 121800826 | Banana Machine, LLC | Banana Machine, LLC 1809 Avenida Alturas Northeast Albuquerque, NM 87110 | PSP Franchising, LLC | Franchise Agreement, dated 02/20/2024, as renewed or amended (Store #4633 - Brookhaven) | | $0.00 |
| 121800849 | BASK Pet Supply, LLC | BASK Pet Supply, LLC 6609 Yawkey Way Northeast Albuquerque, NM 87113 | PSP Franchising, LLC | Franchise Agreement, dated 01/18/2022, as renewed or amended (Store #4600 - Albuquerque) | | $0.00 |
| 121800851 | Battle Creek Pets, LLC | Battle Creek Pets, LLC 5062 Colony Woods Dr. Kalamazoo, MI 49009 | PSP Franchising, LLC | Franchise Agreement, dated 09/25/2012, as renewed or amended (Store #212 - Battle Creek) | | $0.00 |
| 121800853 | Bazaarvoice, Inc. | Bazaarvoice, Inc. 10901 Stonelake Blvd. Austin, TX 78759 | PSP Group, LLC | bazaarvoice® Renewal and Additional Products Service Order # 00198864 | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121800854 | Bazaarvoice, Inc. | Bazaarvoice, Inc. 10901 Stonelake Blvd. Austin, TX 78759 | PSP Group, LLC | Bazaarvoice Service Order | | $0.00 |
| 121800855 | Bazaarvoice, Inc. | Bazaarvoice, Inc. 10901 Stonelake Blvd. Austin, TX 78759 | PSP Group, LLC | bazaarvoice® Amendment Service Order # 00114546 | | $0.00 |
| 121800862 | BE Pets, LLC | BE Pets, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 05/01/2024, as renewed or amended (Store #4304 - Yulee) | | $0.00 |
| 121800868 | Beatrice Home Fashions, Inc. | Beatrice Home Fashions, Inc. 151 Helen Street South Plainfield, NJ 07080 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121800894 | Bellrock Holdings Inc | Bellrock Holdings Inc 1908 Oakhurst Dr. Allison Park, PA 15101 | PSP Franchising, LLC | Franchise Agreement, dated 11/21/2016, as renewed or amended (Store #4123 - Beaver Falls) | | $0.00 |
| 121800895 | Bellrock Holdings Inc | Bellrock Holdings Inc 1908 Oakhurst Dr. Allison Park, PA 15101 | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2020, as renewed or amended (Store #4370 - Allison Park) | | $0.00 |
| 121800897 | Benefit Marketing Solutions, L.L.C. | Benefit Marketing Solutions, L.L.C. PO Box 803507 Dallas, TX 75380 | Buddy's Newco, LLC | Benefit Program Agreement | | $0.00 |
| 121800901 | BEO Enterprises, Inc. | BEO Enterprises, Inc. 401 S 198th Street Omaha, NE 68022 | WNW Franchising, LLC | Franchise Agreement, dated 06/01/2023 (Store #3035 - Elkhorn) | | $0.00 |
| 121800907 | Best Friends Animal Society | Best Friends Animal Society 5001 Angel Canyon Road Kanab, UT 84741 | PSP Group, LLC | Corporate Sponsorship and Licensing Agreement | | $0.00 |
| 121800935 | Big Puppy Holdings, Inc. | Big Puppy Holdings, Inc. 18378 Poplar Stand Place Purcellville, VA 20132 | PSP Franchising, LLC | Franchise Agreement, dated 12/21/2020, as renewed or amended (Store #4404 - Purcellville) | | $0.00 |
| 121800936 | Big Sky 77, LLC | Big Sky 77, LLC 196 High Road Kalispell, MT 59901 | PSP Franchising, LLC | Franchise Agreement, dated 11/06/2020, as renewed or amended (Store #4357 - Birmingham) | | $0.00 |
| 121800986 | Bitmantitle Incorporated | Bitmantitle Incorporated 791 Remington Lane North Aurora, IL 60542 | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2023, as renewed or amended (Store #4602 - Venice) | | $0.00 |
| 121800987 | BJ, Inc. | BJ, Inc. 14240 Imboden Rd. Hudson, OH 80642 | PSP Franchising, LLC | Franchise Agreement, dated 12/03/2018, as renewed or amended (Store #4209 - Littleton) | | $0.00 |
| ~~121800990~~ | ~~BlackLine Systems, Inc.~~ | ~~BlackLine Systems, Inc. 21300 Victory Blvd., 12th Floor Woodland Hills, CA 91367~~ | ~~American Freight, LLC~~ | ~~Order Form for Blackline Products and Services~~ | | ~~$608.86~~ |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121800991 | BlackLine Systems, Inc. | BlackLine Systems, Inc.<br>21300 Victory Blvd.<br>12th Floor<br>Woodland Hills, CA 91367 | PSP Group, LLC | BlackLine Order Form | | $165.00 |
| 121801001 | Blain, Inc. | Blain, Inc.<br>14240 Imboden Rd.<br>Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 07/30/2021, as renewed or amended (Store #4462 - Aurora) | | $0.00 |
| 121801009 | Blue Chip Talent | Blue Chip Talent<br>43252 Woodward Suite 240<br>Bloomfield Hills, MI 48302 | Pet Supplies "Plus", LLC | Direct Placement Search Agreement | | $0.00 |
| 121801013 | Blue Sky Pet Supplies LLC | Blue Sky Pet Supplies LLC<br>606 Liberty Avenue, 3rd Floor Suite #107<br>Pittsburgh, PA 15222 | PSP Franchising, LLC | Franchise Agreement, dated 07/17/2019, as renewed or amended (Store #4263 - State College) | | $0.00 |
| 121801015 | Blue Yonder, Inc. | Blue Yonder, Inc.<br>15059 N. Scottsdale Rd.<br>Suite 400<br>Scottsdale, AZ 85254 | PSP Group, LLC | SaaS and Professional Services Agreement | | $0.00 |
| 121801032 | BNG Phoebe, LLC | BNG Phoebe, LLC<br>109 Persnickety Place<br>Kiel, WI 53042 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121801037 | BoBo's Pantry, LLC | BoBo's Pantry, LLC<br>14090 FM 2920, Ste. G551<br>Tomball, TX 77377 | PSP Franchising, LLC | Franchise Agreement, dated 05/18/2022, as renewed or amended (Store #4540 - Conroe) | | $0.00 |
| 121801047 | BoeFly, LLC | BoeFly, LLC<br>50 West 72nd Street<br>New York, NY 10023 | PSP Midco, LLC | BoeFly Franchise Sales & Financing System Agreement | | $0.00 |
| 121801061 | Boomi, Inc. | Boomi, Inc.<br>1400 Liberty Ridge Drive<br>Chesterbrook, PA 19087 | Pet Supplies "Plus", LLC | Boomi Services Order Form | | $0.00 |
| 121801068 | Boudreaux Operating Acquisitions LLC | Boudreaux Operating Acquisitions LLC<br>100 Four Paws Lane<br>Maumelle, AR 72113 | PSP Group, LLC | PSP Private Brand Agreement Consumables | | $0.00 |
| 121801102 | BreakthroughFuel LLC | BreakthroughFuel LLC<br>1175 Lombardi Avenue<br>Green Bay, WI 54304 | PSP Distribution, LLC | Statement of Work #1 to Master Services Agreement (Fuel Recovery Services) | | $0.00 |
| 121801103 | BreakthroughFuel LLC | BreakthroughFuel LLC<br>1175 Lombardi Avenue<br>Green Bay, WI 54304 | PSP Distribution, LLC | Master Services Agreement | | $9,000.00 |
| 121801132 | Brother International Corporation | Brother International Corporation<br>200 Crossing Blvd<br>Bridgewater, NJ 08807 | PSP Group, LLC | Priority Plus Support, Warranty and Portal Exchange Service Agreement | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121801134 | Brother International Corporation | Brother International Corporation<br><br>200 Crossing Blvd<br>Bridgewater, NJ 08807 | Pet Supplies "Plus", LLC | Priority Exchange Service Agreement | | $0.00 |
| 121801138 | Broven, Inc. | Broven, Inc.<br>49 Friend St.<br>East Weymouth, MA 02189 | PSP Franchising, LLC | Franchise Agreement, dated 08/23/2018, as renewed or amended (Store #4207 - Plymouth) | | $0.00 |
| 121801139 | Brownfield Enterprises, LLC | Brownfield Enterprises, LLC<br>211 Fantasy Lane<br>Ligonier, PA 15658 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2023, as renewed or amended (Store #4181 - Johnston) | | $0.00 |
| 121801149 | Bryte, Inc. | Bryte, Inc.<br>880 Georgetowne Lane<br>Barrington, IL 60010 | PSP Franchising, LLC | Franchise Agreement, dated 11/28/2016, as renewed or amended (Store #4120 - Evanston) | | $0.00 |
| 121801150 | B-Scott, Inc. | B-Scott, Inc.<br>750 General Motors Rd<br>Milford, MI 48381-2220 | PSP Franchising, LLC | Franchise Agreement, dated 06/09/2005, as renewed or amended (Store #167 - Milford) | | $0.00 |
| 121801165 | Buffalo Newspress, Inc | Buffalo Newspress, Inc<br>200 Broadway<br>Buffalo, NY 14204 | PSP Stores, LLC | Printing Agreement | | $0.00 |
| 121801169 | BUFFALO NEWSPRESS, INC. | BUFFALO NEWSPRESS, INC.<br>200 Broadway<br>Buffalo, NY 14204 | PSP Group, LLC | Addendum to Printing Agreement | | $0.00 |
| 121801194 | C.J. Foods, Inc. | C.J. Foods, Inc.<br>322 Main Street<br>Bern, KS 66408 | PSP Franchising, LLC | Private Brand Agreement | | $0.00 |
| 121801195 | C.J. Foods, Inc. | C.J. Foods, Inc.<br>322 Main Street<br>Bern, KS 66408 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121801206 | Callie Enterprises, LLC | Callie Enterprises, LLC<br>c/o Pet Supplies Plus, 1300 MacDade Boulevard<br>Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 09/01/2020, as renewed or amended (Store #4345 - Philadelphia) | | $0.00 |
| 121801250 | Cardinal Path LLC | Cardinal Path LLC<br>515 N. State Street<br>19th Floor<br>Chicago, IL 60654 | PSP Group, LLC | Statement of Work #1 | | $0.00 |
| 121801251 | Cardinal Path LLC | Cardinal Path LLC<br>515 N. State Street<br>19th Floor<br>Chicago, IL 60654 | PSP Group, LLC | Google Analytics 4 License & Services Order Form | | $0.00 |
| 121801254 | Cardinal Path LLC | Cardinal Path LLC<br>515 N. State Street<br>19th Floor<br>Chicago, IL 60654 | PSP Group, LLC | Master Services Agreement | | $9,250.82 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801292 | Carros, Inc. | Carros, Inc.<br>7585 Juniper Drive<br>Colorado Springs, CO 80908 | WNW Franchising, LLC | Franchise Agreement, dated 08/29/2022, as renewed (Store #3000 - Monument) | | $0.00 |
| 121801294 | Cascade Enterprises, LLC | Cascade Enterprises, LLC<br>16915 El Camino Real<br>Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4476 - Cypress) | | $0.00 |
| 121801295 | Cascade Enterprises, LLC | Cascade Enterprises, LLC<br>16915 El Camino Real<br>Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 09/27/2024, as renewed or amended (Store #4072 - Houston) | | $0.00 |
| 121801296 | Cascade Enterprises, LLC | Cascade Enterprises, LLC<br>16915 El Camino Real<br>Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 07/19/2017, as renewed or amended (Store #4149 - League City) | | $0.00 |
| 121801297 | Cascade Enterprises, LLC | Cascade Enterprises, LLC<br>16915 El Camino Real<br>Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 09/26/2018, as renewed or amended (Store #4202 - Houston) | | $0.00 |
| 121801298 | Cascade Enterprises, LLC | Cascade Enterprises, LLC<br>16915 El Camino Real<br>Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2020, as renewed or amended (Store #4317 - Houston) | | $0.00 |
| 121801299 | Cascade Enterprises, LLC | Cascade Enterprises, LLC<br>16915 El Camino Real<br>Houston, TX 77058 | PSP Franchising, LLC | Franchise Agreement, dated 07/30/2021, as renewed or amended (Store #4463 - Houston ) | | $0.00 |
| 121801301 | Catchpoint Systems, Inc. | Catchpoint Systems, Inc.<br>228 Park Ave S #28080<br>New York, NY 10003-1502 | Pet Supplies "Plus", LLC | Catchpoint Systems, Inc. Service Order | | $0.00 |
| 121801313 | CBS Ventures, LLC | CBS Ventures, LLC<br>PO Box 8543<br>Omaha, NE 68108-0543 | PSP Franchising, LLC | Franchise Agreement, dated 06/01/2021, as renewed or amended (Store #4440 - Omaha) | | $0.00 |
| 121801320 | cdbell LLC | cdbell LLC<br>116 Five Oaks Drive<br>Greer, SC 29651 | WNW Franchising, LLC | Franchise Agreement, dated 11/04/2022 (Store #3021 - Greer) | | $0.00 |
| 121801324 | Cellco Partnership doing business as Verizon Wireless | Cellco Partnership doing business as Verizon Wireless<br>PO Box 15062<br>Albany, NY 12212 | PSP Group, LLC | Amendment No. 1 to Contract No. 4100002 | | $0.00 |
| 121801362 | ChainXY Solutions Inc. | ChainXY Solutions Inc.<br>318-1788 5th Ave W<br>Vancouver, BC BC V6J 1P2 | Pet Supplies "Plus", LLC | End User License Agreement | | $0.00 |
| 121801371 | CHARJON Enterprises, LLC | CHARJON Enterprises, LLC<br>PO Box 42<br>Bullard, TX 75757 | PSP Franchising, LLC | Franchise Agreement, dated 06/07/2018, as renewed or amended (Store #4194 - Tyler) | | $0.00 |
| 121801372 | CHARJON Enterprises, LLC | CHARJON Enterprises, LLC<br>PO Box 42<br>Bullard, TX 75757 | PSP Franchising, LLC | Franchise Agreement, dated 04/25/2019, as renewed or amended (Store #4254 - Shreveport) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801378 | Charlottes House, LLC | Charlottes House, LLC<br>10767 Adams Road<br>Galena, OH 43021 | PSP Franchising, LLC | Franchise Agreement, dated 07/01/2024, as renewed or amended (Store #4443 - Marysville) | | $0.00 |
| 121801383 | CHEP USA | CHEP USA<br>5897 Windward Parkway<br>Alpharetta, GA 30005 | Pet Supplies "Plus", LLC | Participating Distributor Agreement with CHEP | | $0.00 |
| 121801392 | Chiara Investments, Inc. | Chiara Investments, Inc.<br>3956 Ivy Road NE<br>Atlanta, GA 30342 | PSP Franchising, LLC | Franchise Agreement, dated 07/17/2023, as renewed or amended (Store #4608 - Buford) | | $0.00 |
| 121801414 | Church & Dwight Co., Inc. | Church & Dwight Co., Inc.<br>500 Charles Ewing Boulevard<br>Ewing, NJ 08628 | PSP Distribution, LLC | Church & Dwight Customer Backhaul Allowance Agreement | | $0.00 |
| 121801423 | Cintas Corporation No. 2 | Cintas Corporation No. 2<br>4310 Metro Parkway<br>Ft. Myers, FL 33916 | PSP Stores, LLC | Third Amendment of the National Fire Protection Agreement | | $0.00 |
| 121801430 | Cintas Corporation | Cintas Corporation<br>4310 Metro Parkway<br>Ft. Myers, FL 33916 | Pet Supplies "Plus", LLC | Standard Uniform Rental Service Agreement | | $18,575.52 |
| 121801432 | Cintas First Aid & Safety, a division of Cintas Corporation | Cintas First Aid & Safety, a division of Cintas Corporation<br>4310 Metro Parkway<br>Ft. Myers, FL 33916 | Pet Supplies "Plus", LLC | ReviveR™ View Service Agreement | | $0.00 |
| 121801434 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation<br>1111 Old Eagle School Road<br>Wayne, PA 19087 | Buddy's Newco, LLC | Cisco Meraki License | | $7,111.57 |
| 121801435 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation<br>1111 Old Eagle School Road<br>Wayne, PA 19087 | Buddy's Newco, LLC | Lease Agreement | | $0.00 |
| 121801436 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation<br>1111 Old Eagle School Road<br>Wayne, PA 19087 | Buddy's Newco, LLC | Lease Agreement | | $0.00 |
| 121801437 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation<br>1111 Old Eagle School Road<br>Wayne, PA 19087 | Buddy's Newco, LLC | Lease Agreement | | $0.00 |
| 121801438 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation<br>1111 Old Eagle School Road<br>Wayne, PA 19087 | Pet Supplies "Plus", LLC | Lease Agreement | | $0.00 |
| 121801440 | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation<br>1111 Old Eagle School Road<br>Wayne, PA 19087 | PSP Stores, LLC | Master Lease Agreement | | $0.00 |
| 121801448 | CK Designs LLC | CK Designs LLC<br>930 E 42nd Place<br>Chicago, IL 60653 | PSP Franchising, LLC | Franchise Agreement, dated 07/26/2021, as renewed or amended (Store #4457 - LaGrange) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801468 | Cleveland Browns Football Company LLC<br>Cleveland Browns Stadium Company LLC | Cleveland Browns Football Company LLC<br>Cleveland Browns Stadium Company LLC<br>76 Lou Groza BLVD<br>Berea, OH 44017 | PSP Group, LLC | Sponsorship Agreement between Pet Supplies Plus and Cleveland Browns | | $0.00 |
| 121801476 | Club Drive Investments Company | Club Drive Investments Company<br>6030 Pennsylvania Ave.<br>Lansing, MI 48911 | PSP Franchising, LLC | Franchise Agreement, dated 02/23/1991, as renewed or amended (Store #9 - Lansing) | | $0.00 |
| 121801478 | CMQ Enterprises, Inc. | CMQ Enterprises, Inc.<br>2501 Pennington Place<br>Valparaiso, IN 46383 | PSP Franchising, LLC | Franchise Agreement, dated 01/27/2006, as renewed or amended (Store #169 - Dyer) | | $0.00 |
| 121801484 | Coastal Pet Products Inc. | Coastal Pet Products Inc.<br><br>911 Lead Way<br>Alliance, OH 44601 | PSP Group, LLC | Coastal Pet Products Inc. and Pet Supplies Plus Contract | | $0.00 |
| 121801488 | Coborn's Inc. | Coborn's Inc.<br>1921 Coborn Blvd<br>St. Cloud, MN 56301 | PSP Franchising, LLC | Franchise Agreement, dated 02/07/2024, as renewed or amended (Store #4630 - Otsego) | | $0.00 |
| 121801499 | Columbia Banking System, Inc.<br>Gupton Marrs International, Inc. | Columbia Banking System, Inc.<br>Gupton Marrs International, Inc.<br>1301 A Street<br>Suite 800<br>Tacoma, WA 98402-2156 | PSP Group, LLC | Order Form for WorkItem.com Services | | $0.00 |
| 121801505 | Comcast | Comcast<br>PO Box 8587<br>Philadelphia, PA 19101 | PSP Group, LLC | Comcast Enterprise Services Sales Order Form | | $0.00 |
| 121801506 | COMCAST | COMCAST<br>PO Box 8587<br>Philadelphia, PA 19101 | PSP Group, LLC | Move / Upgrade of Service Form | | $0.00 |
| 121801508 | Comcast Cable Communications Management, LLC | Comcast Cable Communications Management, LLC<br>PO Box 8587<br>Philadelphia, PA 19101 | PSP Group, LLC | Comcast Enterprise Services Master Services Agreement | | $0.00 |
| 121801509 | Comcast Cable Communications Management, LLC | Comcast Cable Communications Management, LLC<br>PO Box 8587<br>Philadelphia, PA 19101 | PSP Group, LLC | Comcast Business Service Order Agreement | | $0.00 |
| 121801539 | Community Veterinary Clinics, LLC | Community Veterinary Clinics, LLC<br>5813 Skylane Blvd.<br>Windsor, CA 95492 | Pet Supplies "Plus", LLC | Master Service Agreement | | $0.00 |
| 121801541 | Comm-Works, LLC | Comm-Works, LLC<br>1405 Xenium Lane N Suite 120<br>Minneapolis, MN 55441 | PSP Stores, LLC | Pet Supplies Plus Hosted IP Phone Deployment Scope of Work | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801558 | Concur Technologies, Inc. | Concur Technologies, Inc.<br>601 108Th Ave Ne<br>Suite 1000<br>Bellevue, WA 98004 | Buddy's Newco, LLC | Order Form for Services | | $0.00 |
| 121801559 | Concur Technologies, Inc. | Concur Technologies, Inc.<br>601 108th Ave NE<br>Suite 1000<br>Bellevue, WA 98004 | Pet Supplies "Plus", LLC | Concur Technologies, Inc. Order Form | | $0.00 |
| 121801564 | ConnectWise, LLC | ConnectWise, LLC<br>400 N Tampa St<br>Suite 130<br>Tampa, FL 33602 | Buddy's Newco, LLC | Software License Agreement | | $0.00 |
| 121801565 | ConnectWise, LLC | ConnectWise, LLC<br>400 N Tampa St<br>Suite 130<br>Tampa, FL 33602 | Buddy's Newco, LLC | Software License Agreement Update | | $0.00 |
| 121801566 | ConnectWise, LLC | ConnectWise, LLC<br>400 N Tampa St<br>Suite 130<br>Tampa, FL 33602 | Buddy's Newco, LLC | Software License Agreement Update | | $0.00 |
| 121801612 | Continental Services | Continental Services<br>1578 Reliable Parkway<br>Chicago, IL 60686 | PSP Group, LLC | Market Twenty 4 Seven Agreement - Terms and Conditions | | $9,437.13 |
| 121801634 | Coop Enterprises, LLC | Coop Enterprises, LLC<br>820 Bella Vista Court S<br>Jupiter, FL 33477 | PSP Franchising, LLC | Franchise Agreement, dated 05/14/2019, as renewed or amended (Store #4257 - Royal Palm Beach) | | $0.00 |
| 121801635 | Coop Enterprises, LLC | Coop Enterprises, LLC<br>820 Bella Vista Court S<br>Jupiter, FL 33477 | PSP Franchising, LLC | Franchise Agreement, dated 04/12/2022, as renewed or amended (Store #4517 - Greenacres) | | $0.00 |
| 121801636 | Coop Enterprises, LLC | Coop Enterprises, LLC<br>820 Bella Vista Court S<br>Jupiter, FL 33477 | PSP Franchising, LLC | Franchise Agreement, dated 04/12/2022, as renewed or amended (Store #4518 - Loxahatchee) | | $0.00 |
| 121801637 | Coop Enterprises, LLC | Coop Enterprises, LLC<br>820 Bella Vista Court S<br>Jupiter, FL 33477 | PSP Franchising, LLC | Franchise Agreement, dated 06/08/2022, as renewed or amended (Store #4528 - Boca Raton) | | $0.00 |
| 121801654 | CoreTrust Purchasing Group | CoreTrust Purchasing Group<br>155 Franklin Road<br>Suite 400<br>Brentwood, TN 37027 | Pet Supplies "Plus", LLC | Participation Agreement | | $0.00 |
| 121801683 | CorVel Enterprise Comp, Inc. | CorVel Enterprise Comp, Inc.<br>1920 Main Street, Suite 900<br>Irvine, CA 92614 | Franchise Group, Inc. | CorVel Enterprise Comp Services Agreement | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801696 | Couet Corp. | Couet Corp.<br>4083 Ledgestone Dr.<br>Troy, MI 48098 | PSP Franchising, LLC | Franchise Agreement, dated 04/23/1991, as renewed or amended (Store #5 - Royal Oak) | | $0.00 |
| 121801808 | Daisy 1, LLC | Daisy 1, LLC<br>3314 Highlands Bridge Road<br>Sarasota, FL 34235 | PSP Franchising, LLC | Franchise Agreement, dated 02/14/2019, as renewed or amended (Store #4241 - Port Charlotte) | | $0.00 |
| 121801812 | Dalian Jinyu Metal Products Co., Ltd | Dalian Jinyu Metal Products Co., Ltd<br>Room 1708, B Tower,peace Modern Town<br>No. 554, Zhongshan Road<br>116023 Dalian, Liaoning Province<br>, | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121801814 | Dallas Manufacturing | Dallas Manufacturing<br>12111 Ford Rd<br>Dallas, TX 75234 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121801819 | Dandy Ventures, Inc. | Dandy Ventures, Inc.<br>2307 South Saginaw St.<br>Flint, MI 48503 | PSP Franchising, LLC | Franchise Agreement, dated 07/14/2015, as renewed or amended (Store #4017 - Golden) | | $0.00 |
| 121801820 | Dandy Ventures, Inc. | Dandy Ventures, Inc.<br>2307 South Saginaw St.<br>Flint, MI 48503 | PSP Franchising, LLC | Franchise Agreement, dated 02/25/2016, as renewed or amended (Store #4063 - Ft. Collins) | | $0.00 |
| 121801821 | Dandy Ventures, Inc. | Dandy Ventures, Inc.<br>2307 South Saginaw St.<br>Flint, MI 48503 | PSP Franchising, LLC | Franchise Agreement, dated 05/24/2016, as renewed or amended (Store #4068 - Arvada) | | $0.00 |
| 121801840 | Data Axle, Inc. | Data Axle, Inc.<br>13155 Noel Road<br>Suite 1750<br>Dallas, TX 75240 | PSP Group, LLC | Amendment No. 5 to Services Agreement | | $0.00 |
| 121801857 | DCHPETS LLC | DCHPETS LLC<br>108 Holly Grove<br>Williamsburg, VA 23185 | PSP Franchising, LLC | Franchise Agreement, dated 08/28/2020, as renewed or amended (Store #4339 - Williamsburg) | | $0.00 |
| 121801867 | Dell Financial Services L.L.C. | Dell Financial Services L.L.C.<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Master Lease And Financing Agreement | | $318.38 |
| 121801868 | Dell Financial Services L.L.C. | Dell Financial Services L.L.C.<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Technology Lease | | $0.00 |
| 121801869 | Dell Financial Services L.L.C. | Dell Financial Services L.L.C.<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Technology Equipment Lease Agreement | | $0.00 |
| 121801870 | Dell Financial Services L.L.C. | Dell Financial Services L.L.C.<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Technology Equipment Lease Agreement | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801871 | Dell Financial Services LLC | Dell Financial Services LLC<br>ONE DELL WAY<br>Round Rock, TX 78682 | PSP Stores, LLC | Master Lease Agreement | | $59,115.93 |
| 121801872 | DELL Marketing L.P | DELL Marketing L.P<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Equipment Lease Agreement | | $6,816.60 |
| 121801873 | DELL Marketing L.P | DELL Marketing L.P<br>One Dell Way<br>Round Rock, TX 78682 | Buddy's Newco, LLC | Equipment Lease Agreement | | $0.00 |
| 121801899 | design LAB, Inc. | design LAB, Inc.<br>19210 S. Vermont Ave<br>Building E<br>Gardena, CA 90248 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121801916 | Detroit Belle Isle Grand Prix, Inc. | Detroit Belle Isle Grand Prix, Inc.<br>300 Renaissance Tower<br>Suite 2311<br>Detroit, MI 48243 | PSP Group, LLC | 2025 Sponsorship Agreement | | $0.00 |
| 121801917 | Development Dimensions International, Inc. | Development Dimensions International, Inc.<br>1225 Washington Pike<br>Bridgeville, PA 15017 | PSP Group, LLC | Statement of Work for Subscription Services | | $0.00 |
| 121801919 | Development Dimensions International, Inc. | Development Dimensions International, Inc.<br>1225 Washington Pike<br>Bridgeville, PA 15017 | PSP Group, LLC | Master Products and Services Agreement | | $0.00 |
| 121801921 | Devil Dog Pets Inc. | Devil Dog Pets Inc.<br>334 Francis Drive<br>Jackson, MO 63755 | PSP Franchising, LLC | Franchise Agreement, dated 02/10/2023, as renewed or amended (Store #4585 - Cape Girardeau) | | $0.00 |
| 121801928 | Differt Management Group 1, LLC | Differt Management Group 1, LLC<br>7611 County Road O<br>Hartford, WI 53027 | PSP Franchising, LLC | Franchise Agreement, dated 11/10/2021, as renewed or amended (Store #4506 - Oconomowoc ) | | $0.00 |
| 121801937 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4577 - Sudbury) | | $0.00 |
| 121801938 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4578 - North Windham) | | $0.00 |
| 121801939 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4579 - Portland) | | $0.00 |
| 121801940 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4580 - Sanford) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121801941 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4581 - South Portland) | | $0.00 |
| 121801942 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4582 - Salem) | | $0.00 |
| 121801943 | DIRIGO-Pets, LLC | DIRIGO-Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2023, as renewed or amended (Store #4583 - Stratham) | | $0.00 |
| 121801944 | DIRIGO-WNW, LLC | DIRIGO-WNW, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 03/02/2023 (Store #3023 - Acton) | | $0.00 |
| 121801945 | DIRIGO-WNW, LLC | DIRIGO-WNW, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 03/02/2023 (Store #3025 - Concord) | | $0.00 |
| 121801946 | DIRIGO-WNW, LLC | DIRIGO-WNW, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 03/02/2023 (Store #3027 - Saco) | | $0.00 |
| 121801947 | DIRIGO-WNW, LLC | DIRIGO-WNW, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 03/02/2023 (Store #3028 - Scarborough) | | $0.00 |
| 121801955 | Diverse Staffing Services, Inc. | Diverse Staffing Services, Inc.<br>7135 Waldemar Drive<br>Indianapolis, IN 46268 | PSP Distribution, LLC | Client Services Agreement | | $0.00 |
| 121801961 | DJ & Sons LLC | DJ & Sons LLC<br>200 Old Mountain Road<br>Marion, CT 06444 | PSP Franchising, LLC | Franchise Agreement, dated 12/12/2019, as renewed or amended (Store #4301 - Springfield) | | $0.00 |
| 121801962 | DLI Properties, LLC | DLI Properties, LLC<br>2000 Brush Street<br>Detroit, MI 48226 | PSP Group, LLC | The Detroit Lions Sponsorship Agreement Amendment | | $0.00 |
| 121801967 | DLP Enterprises, LLC | DLP Enterprises, LLC<br>2537 La Rochelle Court<br>Seabrook, TX 77586 | PSP Franchising, LLC | Franchise Agreement, dated 03/05/2019, as renewed or amended (Store #4242 - Friendswood) | | $0.00 |
| 121801968 | DLP Enterprises, LLC | DLP Enterprises, LLC<br>2537 La Rochelle Court<br>Seabrook, TX 77586 | PSP Franchising, LLC | Franchise Agreement, dated 03/19/2022, as renewed or amended (Store #4507 - Pasadena) | | $0.00 |
| 121801982 | DocuSign Inc. | DocuSign Inc.<br>3003 Tasman Drive<br>Santa Clara, CA 95054 | PSP Group, LLC | DocuSign Order Form for PSP Group, LLC Notary | | $0.00 |
| 121801983 | DocuSign Inc. | DocuSign Inc.<br>3003 Tasman Drive<br>Santa Clara, CA 95054 | PSP Group, LLC | DocuSign Master Services Agreement | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121801985 | DocuSign Inc. | DocuSign Inc.<br>3003 Tasman Drive<br>Santa Clara, CA 95054 | PSP Group, LLC | DocuSign Subscription for Pet Supplies Plus | | $0.00 |
| 121801989 | Donmar, Inc. | Donmar, Inc.<br>382 Adams St.<br>Plymouth, MI 48170 | PSP Franchising, LLC | Franchise Agreement, dated 04/22/1991, as renewed or amended (Store #12 - Jackson) | | $0.00 |
| 121801993 | DoorDash G&C, LLC | DoorDash G&C, LLC<br>303 2nd Street<br>South Tower<br>San Francisco CA 94107, CA 94107 | PSP Group, LLC | DoorDash Marketplace Addendum | | $0.00 |
| 121801994 | DoorDash, Inc. | DoorDash, Inc.<br>303 2nd Street<br>South Tower<br>Suite 800<br>San Francisco, CA 94107 | PSP Group, LLC | DoorDash Drive Fulfillment Agreement | | ~~$788,507.74~~793,571.11 |
| 121801995 | Dorroh Pet Enterprises, LLC | Dorroh Pet Enterprises, LLC<br>4531 Fountain View Trace<br>Owensboro, KY 42303 | PSP Franchising, LLC | Franchise Agreement, dated 05/24/2019, as renewed or amended (Store #4261 - Owensboro) | | $0.00 |
| ~~121802030~~ | ~~DSMK Wag 1, LLC~~ | ~~DSMK Wag 1, LLC~~<br>~~5815 Prospect Lane~~<br>~~Westerville, OH 43082~~ | ~~WNW Franchising, LLC~~ | ~~Franchise Agreement, dated 07/12/2024 (Store #N/A - Columbus)~~ | | ~~$0.00~~ |
| 121802058 | E.V.P. Enterprises, Inc. | E.V.P. Enterprises, Inc.<br>323 Neptunes Bight<br>Naples, FL 34103 | PSP Franchising, LLC | Franchise Agreement, dated 09/07/1994, as renewed or amended (Store #62 - Westmont) | | $0.00 |
| 121802059 | E.V.P. Enterprises, Inc. | E.V.P. Enterprises, Inc.<br>323 Neptunes Bight<br>Naples, FL 34103 | PSP Franchising, LLC | Franchise Agreement, dated 03/17/2014, as renewed or amended (Store #232 - Glen Ellyn) | | $0.00 |
| 121802112 | Ecova, Inc. | Ecova, Inc.<br>1313 North Atlantic<br>5th Floor<br>Spokane, WA 99201 | Pet Supplies "Plus", LLC | Client Joinder Agreement | | $0.00 |
| 121802134 | Eight Mile, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 04/13/2016, as renewed or amended (Store #4077 - Cedar Falls) | | $0.00 |
| 121802135 | Eight Mile, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 10/14/2016, as renewed or amended (Store #4096 - Des Moines) | | $0.00 |
| 121802136 | Eight Mile, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 06/29/2017, as renewed or amended (Store #4146 - Altoona) | | $0.00 |
| 121802137 | Eight Mile, Inc. | Eight Mile Pets, Inc.<br>1001 Grand Avenue<br>West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 07/28/2017, as renewed or amended (Store #4148 - Davenport) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121802138 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc. 1001 Grand Avenue West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 11/08/2018, as renewed or amended (Store #4270 - Des Moines) | | $0.00 |
| 121802139 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc. 1001 Grand Avenue West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2019, as renewed or amended (Store #4302 - Johnson County) | | $0.00 |
| 121802140 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc. 1001 Grand Avenue West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2019, as renewed or amended (Store #4303 - Fort Dodge) | | $0.00 |
| 121802141 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc. 1001 Grand Avenue West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 01/12/2021, as renewed or amended (Store #4420 - Ames) | | $0.00 |
| 121802142 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc. 1001 Grand Avenue West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 01/12/2021, as renewed or amended (Store #4421 - Ankeny) | | $0.00 |
| 121802143 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc. 1001 Grand Avenue West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 01/24/2023, as renewed or amended (Store #4571 - West Des Moines) | | $0.00 |
| 121802144 | Eight Mile Pets, Inc. | Eight Mile Pets, Inc. 1001 Grand Avenue West Des Moines, IA 50265 | PSP Franchising, LLC | Franchise Agreement, dated 03/14/2023, as renewed or amended (Store #4590 - Bettendorf) | | $0.00 |
| 121802149 | Elanco US Inc. | Elanco US Inc. 28576 Network Place Chicago, IL 60673 | PSP Franchising, LLC | Amendment 5 to the Vendor Master Purchase Agreement | | $0.00 |
| 121802173 | Elvis & Emmett, LLC | Elvis & Emmett, LLC 15730 Willows Dr. Spring Lake, MI 49465 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2017, as renewed or amended (Store #4164 - Norton Shores) | | $0.00 |
| 121802178 | EmBark One Eleven, LLC | EmBark One Eleven, LLC 6476 Dausman Park Clarkville, MI 48815 | PSP Franchising, LLC | Franchise Agreement, dated 11/29/2022, as renewed or amended (Store #4616 - Easley) | | $0.00 |
| 121802188 | Emicity | Emicity 5455 Corporate Drive Suite 120 Troy, MI 48098-2620 | Pet Supplies "Plus", LLC | Brand Awareness & Usage Study Research Proposal | | $0.00 |
| 121802194 | Empyr, Inc. | Empyr, Inc. 11010 Roselle St Ste 150 San Diego, CA 92121 | Pet Supplies "Plus", LLC | Insertion Order for Empyr's Card Linked Offer Program | | $0.00 |
| 121802199 | Empyrean Benefit Solutions, Inc. | Empyrean Benefit Solutions, Inc. 3010 Briarpark Drive, Suite 8000 Houston, TX 77042 | Franchise Group, Inc. | Empyrean Benefit Solutions Master Services Agreement | | $0.00 |
| 121802206 | ENGIE Insight Services Inc dba ENGIE Impact | ENGIE Insight Services Inc dba ENGIE Impact PO Box 74008380 Chicago, IL 60674 | Pet Supplies "Plus", LLC | Total Energy & Sustainability Service Agreement | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121802210 | Engreat Pet Products (Shenzhen) Co., Ltd. | Engreat Pet Products (Shenzhen) Co., Ltd.<br>BLDG 2<br>SHENZHEN, 518116 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121802213 | Entara Corporation | Entara Corporation<br>227 W Monroe St<br>Suite 2100<br>Chicago, IL 60606 | PSP Group, LLC | Incident Response Retainer Order Form | | $0.00 |
| 121802214 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open - End (Equity) Lease Schedule - 23B3Z5 | | $0.00 |
| 121802215 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open - End (Equity) Lease Schedule - 23NHLH | | $0.00 |
| 121802216 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open - End (Equity) Lease Schedule - 263C9P | | $0.00 |
| 121802217 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open - End (Equity) Lease Schedule - 263CC9 | | $0.00 |
| 121802218 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23CVW7 | | $0.00 |
| 121802219 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23LH6Q | | $0.00 |
| 121802220 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23M56V | | $0.00 |
| 121802221 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23MPJ4 | | $0.00 |
| 121802222 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23N2ZF | | $0.00 |
| 121802223 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NHMM | | $0.00 |
| 121802224 | Enterprise FM Trust | Enterprise FM Trust<br>600 Corporate Park Dr<br>Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NHQ7 | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121802225 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NHQW | | $0.00 |
| 121802226 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NJNC | | $0.00 |
| 121802227 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NJND | | $0.00 |
| 121802228 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23NJNF | | $0.00 |
| 121802229 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23QNSZ | | $0.00 |
| 121802230 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRN2 | | $0.00 |
| 121802231 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNF | | $0.00 |
| 121802232 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNH | | $0.00 |
| 121802233 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNM | | $0.00 |
| 121802234 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNR | | $0.00 |
| 121802235 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRNW | | $0.00 |
| 121802236 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRP3 | | $0.00 |
| 121802237 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 23RRPT | | $0.00 |
| 121802238 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 255ZXJ | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121802239 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 256252 | | $0.00 |
| 121802240 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 2562JR | | $0.00 |
| 121802241 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 25CS3L | | $0.00 |
| 121802242 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 25WCGV | | $0.00 |
| 121802243 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 256255 | | $0.00 |
| 121802244 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9G | | $0.00 |
| 121802245 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9L | | $0.00 |
| 121802246 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9P | | $0.00 |
| 121802247 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9X | | $0.00 |
| 121802248 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263C9Z | | $0.00 |
| 121802249 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CB3 | | $0.00 |
| 121802250 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CB5 | | $0.00 |
| 121802251 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CBX | | $0.00 |
| 121802252 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CBZ | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121802253 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC2 | | $0.00 |
| 121802254 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC3 | | $0.00 |
| 121802255 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC4 | | $0.00 |
| 121802256 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC5 | | $0.00 |
| 121802257 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC7 | | $0.00 |
| 121802258 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CC9 | | $0.00 |
| 121802259 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCB | | $0.00 |
| 121802260 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCC | | $0.00 |
| 121802261 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCD | | $0.00 |
| 121802262 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCF | | $0.00 |
| 121802263 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 263CCH | | $0.00 |
| 121802264 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RTL | | $0.00 |
| 121802265 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RTS | | $0.00 |
| 121802266 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RTW | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121802267 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RV4 | | $0.00 |
| 121802268 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RV6 | | $0.00 |
| 121802269 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RWP | | $0.00 |
| 121802270 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RWS | | $0.00 |
| 121802271 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RWT | | $0.00 |
| 121802272 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RWZ | | $0.00 |
| 121802273 | Enterprise FM Trust | Enterprise FM Trust 600 Corporate Park Dr Saint Louis, MO 63105 | Buddy's Newco, LLC | Open-End (Equity) Lease Schedule - 279RX7 | | $0.00 |
| 121802274 | Douglas Campbell (Entity Pending) | Douglas Campbell (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 07/18/2022, as renewed or amended (Store #N/A - Austin) | | $0.00 |
| 121802275 | Kenneth Crowder (Entity Pending) | Kenneth Crowder (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 10/16/2024, as renewed or amended (Store #N/A - Charlotte) | | $0.00 |
| 121802276 | Pet Blitz, LLC | Pet Blitz, LLC 326 N Meramec Avenue Clayton, MO 63105 | PSP Franchising, LLC | Franchise Agreement, dated 04/01/2024, as renewed or amended (Store #4644 - Creve Coeur) | | $0.00 |
| 121802278 | Hardeep Dhaliwal (Entity Pending) | Hardeep Dhaliwal (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 09/22/2023, as renewed or amended (Store #N/A - Sherman) | | $0.00 |
| 121802281 | Ted Lewis (Entity Pending) | Ted Lewis (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 02/23/2023, as renewed or amended (Store #N/A - Yuba City) | | $0.00 |
| 121802282 | Jamison Liggett (Entity Pending) | Jamison Liggett (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 08/09/2021, as renewed or amended (Store #N/A - Stonegate/Parker) | | $0.00 |
| 121802283 | Schwinge Village Plaza, LLC | Schwinge Village Plaza, LLC c/o NEI Management & Development P.O. Box 1838 McHenry, IL 60051 | Pet Supplies "Plus", LLC | Lease, dated 10/19/2005, as amended (Morton Grove, IL) | Morton Grove, IL (0038) | $0.00 |
| 121802284 | James Long (Entity Pending) | James Long (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 07/21/2021, as renewed or amended (Store #N/A - San Marcos) | | $0.00 |
| 121802285 | Talal Maatouk (Entity Pending) | Talal Maatouk (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 09/15/2023, as renewed or amended (Store #N/A - Foley) | | $0.00 |
| 121802286 | Chinmay Patel (Entity Pending) | Chinmay Patel (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2023, as renewed or amended (Store #N/A - Freehold Twp.) | | $0.00 |
| 121802287 | Kiran Patel (Entity Pending) | Kiran Patel (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 01/10/2023, as renewed or amended (Store #N/A - Woodbridge) | | $0.00 |
| 121802288 | David Powell (Entity Pending) | David Powell (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 03/18/2024, as renewed or amended (Store #N/A - Charlotte) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121802289 | Abhishek Singla (Entity Pending) | Abhishek Singla (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 10/30/2023, as renewed or amended (Store #N/A - Dulles) | | $0.00 |
| 121802290 | Vishal Sudera (Entity Pending) | Vishal Sudera (Entity Pending) Address on File | PSP Franchising, LLC | Franchise Agreement, dated 04/09/2022, as renewed or amended (Store #N/A - Syracuse) | | $0.00 |
| 121802319 | Epsilon Data Management, LLC | Epsilon Data Management, LLC 35 W Wacker Drive 29th Floor Chicago, IL 60601 | PSP Group, LLC | PeopleCloud Suite of Products Master Services Agreement | | $0.00 |
| 121802320 | Epsilon Data Management, LLC Conversant LLC | Epsilon Data Management, LLC Conversant LLC 2525 Arapahoe Ave Suite E4-902 Boulder, CO 80302 | PSP Group, LLC | PeopleCloud Digital Offsite Retail Media Statement of Work | | $0.00 |
| 121802321 | Epsilon Data Management, LLC Conversant LLC | Epsilon Data Management, LLC Conversant LLC 35 W Wacker Drive 29th Floor Chicago, IL 60601 | PSP Group, LLC | Addendum to PeopleCloud Digital Offsite Retail Media Statement of Work | | $0.00 |
| 121802323 | Equifax Workforce Solutions LLC | Equifax Workforce Solutions LLC 4076 Paysphere Circle Chicago, IL 60674 | PSP Group, LLC | Service Provider, Term and Fees for Services | | $2,981.31 |
| 121802429 | Exel Inc. d/b/a DHL Supply Chain (USA) | Exel Inc. d/b/a DHL Supply Chain (USA) 360 Westar Boulevard Westerville, OH 43082 | Pet Supplies "Plus", LLC | Site Operating Agreement #1 Northeast Forwarding Distribution Center | | $0.00 |
| 121802430 | Exel Inc. d/b/a DHL Supply Chain (USA) | Exel Inc. d/b/a DHL Supply Chain (USA) 360 Westar Boulevard Westerville, OH 43082 | Pet Supplies "Plus", LLC | Master Operating Services Agreement | | $0.00 |
| 121802441 | Experience More in Store, LLC | Experience More in Store, LLC 8978 Wildlife Loop Sarasota, FL 34238 | PSP Franchising, LLC | Franchise Agreement, dated 10/30/2018, as renewed or amended (Store #4008 - North Port ) | | $0.00 |
| 121802477 | Family Foundation Pets, Inc. | Family Foundation Pets, Inc. 3860 Maiden Street Waterford, MI 48329 | WNW Franchising, LLC | Franchise Agreement, dated 04/28/2023 (Store #3012 - Rochester Hills) | | $0.00 |
| 121802482 | FBMR Waite Park, LLC | FBMR Waite Park, LLC 1404 Calvin Avenue Nashville, TN 37206 | PSP Franchising, LLC | Franchise Agreement, dated 09/12/2022, as renewed or amended (Store #4563 - Waite) | | $0.00 |
| 121802511 | Fetch ... For Cool Pets, LLC | Fetch ... For Cool Pets, LLC 1407 Broadway Suite 601 New York, NY 10018 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121802532 | Finnegan Dexter, LLC | Finnegan Dexter, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/10/2015, as renewed or amended (Store #4011 - Land O'Lakes) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121802533 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 08/08/2018, as renewed or amended (Store #4191 - St. Petersburg) | | $0.00 |
| 121802534 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 01/21/2019, as renewed or amended (Store #4216 - Zephyrhills) | | $0.00 |
| 121802535 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 03/03/2021, as renewed or amended (Store #4410 - Port St. Lucie) | | $0.00 |
| 121802539 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 10/08/2021, as renewed or amended (Store #4475 - ) | | $0.00 |
| 121802540 | Finnegan Dexter, LLC | Finnegan Dexter, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 04/29/2022, as renewed or amended (Store #8062 - Valrico) | | $0.00 |
| 121802545 | First Data Merchant Services LLC | First Data Merchant Services LLC<br>2900 Westside Parkway<br>Alpharetta, GA 30004 | PSP Group, LLC | Affiliated Issuer Addendum to the Premium Gift Card Processing Addendum to Master Services Agreement | | $0.00 |
| 121802547 | First Data Services, LLC | First Data Services, LLC<br>1307 Walt Whitman Road<br>Melville, NY 11747 | PSP Stores, LLC | Premium Gift Card Processing Addendum to Master Services Agreement | | $5,794.70 |
| 121802549 | First Data Services, LLC<br>Bank of America, N.A. | First Data Services, LLC<br>Bank of America, N.A.<br>PO Box 1256<br>Englewood, CO 80150 | PSP Stores, LLC | TransArmor Services Addendum and Amendment of the Master Services Agreement | | $0.00 |
| 121802550 | First Data Services, LLC Bank of America, NA | First Data Services, LLC Bank of America, NA<br>PO Box 1256<br>Englewood, CO 80150 | PSP Stores, LLC | Master Service Agreement | | $0.00 |
| 121802557 | Fischer Pet Stores, Inc. | Fischer Pet Stores, Inc.<br>c/o Paracorp Incorporated, 106 5th Avenue SE<br>Olympia, WA 98501 | PSP Franchising, LLC | Franchise Agreement, dated 07/01/2020, as renewed or amended (Store #4173 - Seattle) | | $0.00 |
| 121802558 | Fischer Pet Stores, Inc. | Fischer Pet Stores, Inc.<br>c/o Paracorp Incorporated, 106 5th Avenue SE<br>Olympia, WA 98501 | PSP Franchising, LLC | Franchise Agreement, dated 07/24/2021, as renewed or amended (Store #4444 - Federal Way) | | $0.00 |
| 121802559 | Fischer Pet Stores, Inc. | Fischer Pet Stores, Inc.<br>c/o Paracorp Incorporated, 106 5th Avenue SE<br>Olympia, WA 98501 | PSP Franchising, LLC | Franchise Agreement, dated 07/24/2021, as renewed or amended (Store #4445 - Bellevue) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121802560 | Fischer Pet Stores, Inc. | Fischer Pet Stores, Inc.<br>c/o Paracorp Incorporated, 106 5th Avenue SE<br>Olympia, WA 98501 | PSP Franchising, LLC | Franchise Agreement, dated 03/10/2022, as renewed or amended (Store #4505 - Seattle) | | $0.00 |
| 121802561 | Fishman PR & Marketing | Fishman PR & Marketing<br>3400 Dundee Road Suite 300<br>Northbrook, IL 60062 | Pet Supplies "Plus", LLC | Public Relations Service Agreement | | ~~$6,040.00~~ $0.00 |
| 121802563 | Fishman Public Relations | Fishman Public Relations<br>3400 Dundee Road Suite 300<br>Northbrook, IL 60062 | Pet Supplies "Plus", LLC | Franchise Development PR Program Agreement | | $0.00 |
| 121802564 | Fishman Public Relations, Inc. | Fishman Public Relations, Inc.<br>3400 Dundee Road Suite 300<br>Northbrook, IL 60062 | PSP Group, LLC | Addendum to Letter of Agreement between Fishman Public Relations, Inc. and PSP Group, LLC | | $0.00 |
| 121802565 | Fishman Public Relations, Inc. | Fishman Public Relations, Inc.<br>3400 Dundee Road Suite 300<br>Northbrook, IL 60062 | PSP Group, LLC | Letter of Agreement for Public Relations Services | | $0.00 |
| 121802640 | Focused Pets, LLC | Focused Pets, LLC<br>1207 W Hawthorne Street<br>Arlington Heights, IL 60005 | PSP Franchising, LLC | Franchise Agreement, dated 10/03/2022, as renewed or amended (Store #4573 - Cumming) | | $0.00 |
| 121802744 | ForUsAll, Inc. | ForUsAll, Inc.<br>665 3rd St<br>San Francisco, CA 94107 | Pet Supplies "Plus", LLC | Plan Services Agreement | | $0.00 |
| 121802754 | FOXMO, Inc. | FOXMO, Inc.<br>3860 Wabeek Lake Drive E<br>Bloomfield Hills, MI 48302 | PSP Franchising, LLC | Franchise Agreement, dated 09/14/2006, as renewed or amended (Store #171 - White Lake) | | $0.00 |
| 121802762 | FranConnect Inc. | FranConnect Inc.<br>11800 Sunrise Valley Dr.<br>Suite 150<br>Reston, VA 20191 | PSP Franchising, LLC | FranConnect Online Business Applications Agreement | | $0.00 |
| 121802763 | FranConnect LLC | FranConnect LLC<br>11800 Sunrise Valley Dr.<br>Suite 900<br>Reston, VA 20191 | Pet Supplies "Plus", LLC | BoeFly bVerify Integration Consent Form | | $0.00 |
| 121802764 | FranConnect LLC | FranConnect LLC<br>11800 Sunrise Valley Dr.<br>Suite 900<br>Reston, VA 20191 | Pet Supplies "Plus", LLC | Master Subscription Agreement | | $0.00 |
| 121802773 | Franks House, LLC | Franks House, LLC<br>10767 Adams Road<br>Galena, OH 43021 | PSP Franchising, LLC | Franchise Agreement, dated 12/15/2022, as renewed or amended (Store #4562 - Marion) | | $0.00 |
| 121802774 | FranNet, LLC | FranNet, LLC<br>10302 Brookridge Village Blvd<br>Suite 201<br>Louisville, KY 40291 | PSP Franchising, LLC | Franchise Referral and Commission Amendment Agreement | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|-------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121802776 | FranNet, LLC | FranNet, LLC<br>10302 Brookridge Village Blvd<br>Suite 201<br>Louisville, KY 40291 | PSP Franchising, LLC | Amendment to Franchise Referral and Commission Agreement | | $0.00 |
| 121802777 | Freedom 45 Corporation | Freedom 45 Corporation<br>2925 NE Lotno Drive<br>Bend, OR 97701 | PSP Franchising, LLC | Franchise Agreement, dated 01/07/2021, as renewed or amended (Store #4418 - Bend) | | $0.00 |
| 121802780 | Freeport Pets, LLC | Freeport Pets, LLC<br>2295 Spring Rose Road<br>Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 03/28/2022, as renewed or amended (Store #4513 - Freeport) | | $0.00 |
| 121802822 | G UNITED, LLC | G UNITED, LLC<br>556 Parkview Drive<br>Grand Prairie, TX 75052 | PSP Franchising, LLC | Franchise Agreement, dated 04/16/2019, as renewed or amended (Store #4255 - Waxahachie) | | $0.00 |
| 121802857 | Garner Ventures, LLC | Garner Ventures, LLC<br>556 Parkview Drive<br>Grand Prairie, TX 75052 | WNW Franchising, LLC | Franchise Agreement, dated 01/09/2024 (Store #3039 - Mansfield) | | $0.00 |
| 121802859 | Gartner, Inc. | Gartner, Inc.<br>56 Top Gallant Road<br>Stamford, CT 06902-7700 | Pet Supplies "Plus", LLC | Gartner Service Order Q-00206771 | | $0.00 |
| 121802873 | GCM Management LLC | GCM Management LLC<br>382 Adams St.<br>Plymouth, MI 48170 | PSP Franchising, LLC | Franchise Agreement, dated 11/07/2022, as renewed or amended (Store #15 - Canton) | | $0.00 |
| 121802932 | GFX International | GFX International<br>333 Barron Blvd.<br>Grayslake, IL 60030 | Pet Supplies "Plus", LLC | Master Services Agreement | | $0.00 |
| 121802943 | Gino Animal Health Services, LLC | Gino Animal Health Services, LLC<br>29 Long Hill Road<br>New Vernon, NJ 07976 | PSP Franchising, LLC | Franchise Agreement, dated 01/08/2021, as renewed or amended (Store #4374 - Hillsborough) | | $0.00 |
| ~~121802981~~ | ~~Globalization Partners LLC~~ | ~~Globalization Partners LLC~~<br>~~175 Federal Street~~<br>~~17th Floor~~<br>~~Boston, MA 02110~~ | ~~Franchise Group, Inc.~~ | ~~Globalization Partners Master Agreement~~ | | ~~$0.00~~ |
| 121802985 | GNK Enterprises, LLC | GNK Enterprises, LLC<br>6540 North Range Line Rd.<br>Glendale, WI 53209 | PSP Franchising, LLC | Franchise Agreement, dated 10/03/2018, as renewed or amended (Store #4203 - Mequon) | | $0.00 |
| 121802986 | GNK Enterprises, LLC | GNK Enterprises, LLC<br>6540 North Range Line Rd.<br>Glendale, WI 53209 | PSP Franchising, LLC | Franchise Agreement, dated 03/27/2020, as renewed or amended (Store #4315 - Germantown) | | $0.00 |
| 121802991 | Go Fetch, LLC | Go Fetch, LLC<br>22 Susan Drive<br>Newburgh, NY 12550 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2017, as renewed or amended (Store #4130 - New Windsor) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121803010 | Golden Rule Enterprises, LLC | Golden Rule Enterprises, LLC<br>1102 Thomas Rd.<br>Rineyville, KY 40162 | PSP Franchising, LLC | Franchise Agreement, dated 03/12/2015, as renewed or amended (Store #4012 - Elizabethtown) | | $0.00 |
| 121803023 | Good Dog Karma, LLC | Good Dog Karma, LLC<br>3180 W South Airport Road<br>Traverse City, MI 49684-8995 | PSP Franchising, LLC | Franchise Agreement, dated 07/04/2020, as renewed or amended (Store #4333 - Traverse City) | | $0.00 |
| 121803024 | Gooddog Services, LLC | Gooddog Services, LLC<br>3115 N. Government Way #3<br>Coeur D'Alene, ID 83815 | PSP Franchising, LLC | Franchise Agreement, dated 12/04/2019, as renewed or amended (Store #4251 - Coeur D'Alene) | | $0.00 |
| 121803025 | Goodest Boys LLC | Goodest Boys LLC<br>145 Romeria Drive<br>Cedar Creek, TX 78612 | PSP Franchising, LLC | Franchise Agreement, dated 07/21/2022, as renewed or amended (Store #4567 - Victoria) | | $0.00 |
| 121803027 | Goodwin & Goodwin Pet Supplies, Inc. | Goodwin & Goodwin Pet Supplies, Inc.<br>999 Haynes St., Suite 385<br>Birmingham, MI 48009 | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2002, as renewed or amended (Store #4 - Waterford) | | $0.00 |
| 121803038 | GR PSP, LLC | GR PSP, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 01/29/2023, as renewed or amended (Store #4572 - Rockford) | | $0.00 |
| 121803064 | Green Imaging, LLC | Green Imaging, LLC<br>2020 Albans<br>Houston, TX 77005 | Franchise Group, Inc. | Medical Diagnostic Testing Services Agreement | | $0.00 |
| 121803094 | Griffield Enterprises, LLC | Griffield Enterprises, LLC<br>31778 N 123rd Ave<br>Peoria, AZ 85383 | PSP Franchising, LLC | Franchise Agreement, dated 09/02/2020, as renewed or amended (Store #4347 - Surprise) | | $0.00 |
| 121803104 | Grubhub Holdings Inc. | Grubhub Holdings Inc.<br>111 W. Washington St.<br>Ste. 2100<br>Chicago, IL 60602 | PSP Group, LLC | Grubhub Franchisor Agreement | | $0.00 |
| 121803112 | Gupton Marrs International, Inc. | Gupton Marrs International, Inc.<br>100 Park Avenue<br>New York, NY 10017 | PSP Group, LLC | Master Subscription Agreement | | $0.00 |
| 121803121 | Gutrich, LLC | Gutrich, LLC<br><br>16121 Haddam Ln<br>Westfield, IN 46062 | PSP Franchising, LLC | Franchise Agreement, dated 06/14/2017, as renewed or amended (Store #4143 - Columbus) | | $0.00 |
| 121803122 | Gutrich, LLC | Gutrich, LLC<br><br>16121 Haddam Ln<br>Westfield, IN 46062 | PSP Franchising, LLC | Franchise Agreement, dated 09/02/2020, as renewed or amended (Store #4411 - Brownsburg) | | $0.00 |
| 121803143 | Halico Gold LLC | Halico Gold LLC<br>19406 Merion Circle<br>Huntington Beach, CA 92648 | PSP Franchising, LLC | Franchise Agreement, dated 10/07/2016, as renewed or amended (Store #4118 - Huntington Beach) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121803144 | Halico Gold LLC | Halico Gold LLC<br>19406 Merion Circle<br>Huntington Beach, CA 92648 | PSP Franchising, LLC | Franchise Agreement, dated 09/17/2020, as renewed or amended (Store #4350 - Laguna Niguel) | | $0.00 |
| 121803145 | Halico Gold LLC | Halico Gold LLC<br>5912 Edinger Avenue<br>Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4450 - Stockton) | | $0.00 |
| 121803146 | Halico Gold LLC | Halico Gold LLC<br>5912 Edinger Avenue<br>Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4451 - Lodi) | | $0.00 |
| 121803147 | Halico Gold LLC | Halico Gold LLC<br>5912 Edinger Avenue<br>Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4452 - Clovis) | | $0.00 |
| 121803148 | Halico Gold LLC | Halico Gold LLC<br>5912 Edinger Avenue<br>Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 12/01/2021, as renewed or amended (Store #4455 - Turlock) | | $0.00 |
| 121803164 | HangZhou TianYuan Pet Products Co., Ltd | HangZhou TianYuan Pet Products Co., Ltd<br>No.10-1<br>Xing Ling Road<br>XingQiaoTown YuHang District<br>Hangzhou, 311100 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121803170 | Hapa Unlimited, Inc. | Hapa Unlimited, Inc.<br>18017 Chatsworth Street<br>Suite 450<br>Granado Hills, CA 91344 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121803198 | Hawkeye Enterprises, LLC | Hawkeye Enterprises, LLC<br>853 Bluff Brook Drive<br>O'Fallon, MO 63366 | PSP Franchising, LLC | Franchise Agreement, dated 01/15/2021, as renewed or amended (Store #4226 - St. Charles) | | $0.00 |
| 121803254 | Healthy Pets, LLC | Healthy Pets, LLC<br>4105 Sky Ranch Drive<br>Glenwood Springs, CO 81601 | WNW Franchising, LLC | Franchise Agreement, dated 09/18/2023 (Store #3036 - Falcon) | | $0.00 |
| 121803279 | Heather Management, LLC | Heather Management, LLC<br>1165 Lakeview Rd.<br>West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2022, as renewed or amended (Store #247 - Green Bay) | | $0.00 |
| 121803280 | Heather Management, LLC | Heather Management, LLC<br>1165 Lakeview Rd.<br>West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2022, as renewed or amended (Store #4086 - Green Bay) | | $0.00 |
| 121803281 | Heather Management, LLC | Heather Management, LLC<br>1165 Lakeview Rd.<br>West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 09/04/2018, as renewed or amended (Store #4204 - West Bend) | | $0.00 |
| 121803282 | Heather Management, LLC | Heather Management, LLC<br>1165 Lakeview Rd.<br>West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 06/09/2020, as renewed or amended (Store #4298 - Sheboygan) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121803283 | Heather Management, LLC | Heather Management, LLC<br>1165 Lakeview Rd.<br>West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2019, as renewed or amended (Store #4299 - Neenah) | | $0.00 |
| 121803284 | Heather Management, LLC | Heather Management, LLC<br>1165 Lakeview Rd.<br>West Bend, WI 53090 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2019, as renewed or amended (Store #4325 - Racine) | | $0.00 |
| 121803316 | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY<br>200 Connell Drive<br>5th Floor<br>Berkley Heights, NJ 07922 | Buddy's Newco, LLC | Master Lease And Financing Agreement Schedule Number 5343918198000007 | | $0.00 |
| 121803317 | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY<br>200 Connell Drive<br>5th Floor<br>Berkley Heights, NJ 07922 | Buddy's Newco, LLC | Master Lease And Financing Agreement Schedule Number 5343918198000008 | | $0.00 |
| 121803318 | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY<br>200 Connell Drive<br>5th Floor<br>Berkley Heights, NJ 07922 | Buddy's Newco, LLC | Master Lease And Financing Agreement Schedule Number 5343918198000006 | | $0.00 |
| 121803339 | High Point Estates Inc. | High Point Estates Inc.<br>210 Ellis Rd.<br>Westminster, MA 01473 | PSP Franchising, LLC | Franchise Agreement, dated 08/12/2019, as renewed or amended (Store #4269 - Franklin) | | $0.00 |
| 121803340 | High Youth Limited | High Youth Limited<br>No.616<br>, | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121803344 | Highland Traders, LLC | Highland Traders, LLC<br>853 Highway 35<br>Middleton, NJ 07748 | PSP Franchising, LLC | Franchise Agreement, dated 01/07/2020, as renewed or amended (Store #4305 - Middletown) | | $0.00 |
| 121803345 | Highland Traders, LLC | Highland Traders, LLC<br>853 Highway 35<br>Middleton, NJ 07748 | PSP Franchising, LLC | Franchise Agreement, dated 04/20/2009, as renewed or amended (Store #9046 - Hazlet) | | $0.00 |
| 121803346 | Highland Traders, LLC | Highland Traders, LLC<br>853 Highway 35<br>Middleton, NJ 07748 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2011, as renewed or amended (Store #9050 - Berkeley Heights) | | $0.00 |
| 121803347 | Highland Traders, LLC | Highland Traders, LLC<br>853 Highway 35<br>Middleton, NJ 07748 | PSP Franchising, LLC | Franchise Agreement, dated 08/23/2012, as renewed or amended (Store #9065 - Wall Township) | | $0.00 |
| 121803351 | Hill's Pet Nutrition Sales, Inc. | Hill's Pet Nutrition Sales, Inc.<br>P.O. Box 148<br>Topeka, KS 66601-0148 | Pet Supplies "Plus", LLC | Amendment No. 1 to 2024 Pet Supplies Joint Business Plan Agreement | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121803352 | Hill's Pet Nutrition Sales, Inc. | Hill's Pet Nutrition Sales, Inc. P.O. Box 148 Topeka, KS 66601-0148 | PSP Group, LLC | Trailer Wrapping Memorandum of Understanding | | $0.00 |
| 121803372 | Hoffman Unlimited LLC | Hoffman Unlimited LLC 866 Prairie Drive Milliken, CO 80543 | PSP Franchising, LLC | Franchise Agreement, dated 02/19/2020, as renewed or amended (Store #4314 - Thornton) | | $0.00 |
| 121803374 | Hogan, Inc. | Hogan, Inc. 14240 Imboden Rd. Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 09/01/2020, as renewed or amended (Store #4344 - Wheat Ridge) | | $0.00 |
| 121803383 | HORIZONTAL Integration, Inc. | HORIZONTAL Integration, Inc. 1660 S. Highway 100 Suite 200 St. Louis Park, MN 55416 | PSP Group, LLC | Statement of Work for Retained Team Support 2024 | | $124,915.00 |
| 121803384 | Horizontal Integration, Inc. | Horizontal Integration, Inc. 1660 S. Highway 100 Suite 200 St. Louis Park, MN 55416 | PSP Group, LLC | Statement of Work for Salesforce Data Cloud, Marketing Cloud, Personalization Design & Implement Ph 1 | | $0.00 |
| 121803385 | Horizontal Integration, Inc. | Horizontal Integration, Inc. 1660 S. Highway 100 Suite 200 St. Louis Park, MN 55416 | PSP Group, LLC | Master Service Agreement | | $0.00 |
| 121803386 | Horizontal Integration, Inc. | Horizontal Integration, Inc. 1660 S. Highway 100 Suite 200 St. Louis Park, MN 55416 | PSP Group, LLC | Managed Services SOW | | $0.00 |
| 121803388 | Horizontal, Inc. | Horizontal, Inc. 1660 S. Hwy 100 Suite 200 St. Louis Park, MN 55416 | PSP Group, LLC | Statement of Work Change Order 1 - Pet Supplies Plus Commerce Modernization: Design, Develop, Deliver | | $0.00 |
| 121803397 | HSA Corporation | HSA Corporation 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/01/1997, as renewed or amended (Store #97 - Appleton) | | $0.00 |
| 121803398 | HSA Corporation | HSA Corporation 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/23/2023, as renewed or amended (Store #187 - Ballwin) | | $0.00 |
| 121803399 | HSA Corporation | HSA Corporation 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/14/2023, as renewed or amended (Store #4081 - Evansville) | | $0.00 |
| 121803400 | HSA Corporation | HSA Corporation 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4147 - Normal) | | $0.00 |
| 121803401 | HSA Corporation | HSA Corporation 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4155 - Waukesha) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121803402 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4156 - Orlando) | | $0.00 |
| 121803403 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4182 - Fort Wayne) | | $0.00 |
| 121803404 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4183 - Florissant) | | $0.00 |
| 121803405 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4218 - Lexington) | | $0.00 |
| 121803406 | HSA Corporation | HSA Corporation<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2023, as renewed or amended (Store #4248 - Clarksville) | | $0.00 |
| 121803407 | HSN Enterprise, Inc. | HSN Enterprise, Inc.<br>1361 Watertree Rd.<br>Terre Haute, IN 47803 | PSP Franchising, LLC | Franchise Agreement, dated 09/02/2016, as renewed or amended (Store #4085 - Terre Haute) | | $0.00 |
| 121803411 | Hugfun International Hong Kong Ltd. | Hugfun International Hong Kong Ltd.<br>18/F.<br>GINZA SQUARE<br>565-567 NATHAN ROAD<br>KOWLOON, | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121803429 | Hutchison Enterprises, Inc. | Hutchison Enterprises, Inc.<br>5360 Shoreview Avenue<br>Minneapolis, MN 55417 | WNW Franchising, LLC | Franchise Agreement, dated 08/13/2024, as renewed (Store #3007 - Eagan) | | $0.00 |
| 121803461 | iCIMS, Inc. | iCIMS, Inc.<br>101 Crawfords Corner Road<br>Suite 3-100<br>Holmdel, NJ 07733 | Pet Supplies "Plus", LLC | Pet Supplies Plus Renewal Order Form | | $0.00 |
| 121803472 | Ideal Software Systems Inc | Ideal Software Systems Inc<br>3839 Highway 45 North<br>Meridian, MS 39301 | Buddy's Newco, LLC | Customer App Service Agreement | | $0.00 |
| 121803490 | IKPM Pet Supply, LLC | IKPM Pet Supply, LLC<br>1515 Ralston Branch Way<br>Sugar Land, TX 77479 | PSP Franchising, LLC | Franchise Agreement, dated 04/26/2021, as renewed or amended (Store #4437 - Sugar Land) | | $0.00 |
| 121803498 | Illumis, Inc. | Illumis, Inc.<br>975 Johnnie Dodds Blvd. Ste B<br>Mt. Pleasant, SC 29464 | PSP Group, LLC | Master Services Agreement | | $0.00 |
| 121803500 | IMG College, LLC | IMG College, LLC<br>P.O. Box 843038<br>Kansas City, MO 64184-3038 | PSP Group, LLC | Amendment to Marketing Agreement | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121803514 | IncWorx, Inc. d/b/a IncWorx Consulting | IncWorx, Inc. d/b/a IncWorx Consulting 1901 N. Roselle Rd Suite 800 Schaumburg, IL 60195 | PSP Group, LLC | Master Services Agreement for Consulting Services | | $0.00 |
| 121803518 | Indiana Economic Development Corporation | Indiana Economic Development Corporation One North Capitol Avenue Suite 700 Indianapolis, IN 46204-2288 | PSP Distribution, LLC | Economic Development For A Growing Economy (Edge) Tax Credit Agreement | | $0.00 |
| 121803520 | IndiTex Ventures LLC | IndiTex Ventures LLC 6742 FM 2187 Road Sealy, TX 77474 | PSP Franchising, LLC | Franchise Agreement, dated 12/30/2020, as renewed or amended (Store #4225 - Houston) | | $0.00 |
| ~~121803577~~ | ~~Intelligent Direct, Inc.~~ | ~~Intelligent Direct, Inc. 10 First Street Wellsboro, PA 16801~~ | ~~Franchise Group, Inc.~~ | ~~Web Application Agreement~~ | | ~~$0.00~~ |
| 121803613 | International Franchise Professionals Group, Inc. | International Franchise Professionals Group, Inc. 499 Ernston Road Suite B9 Parlin, NJ 08859 | PSP Franchising, LLC | Non Exclusive Referral Agreement | | $395.00 |
| 121803617 | Intersand America Corp. | Intersand America Corp. 1880 Great Western Drive Windsor, CO 80550 | Pet Supplies "Plus", LLC | OdourLock® Technology Study Agreement | | $0.00 |
| 121803618 | Intersand America Corp. | Intersand America Corp. 1880 Great Western Drive Windsor, CO 80550 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121803643 | Iron Mountain Information Management, Inc. | Iron Mountain Information Management, Inc. 1101 Enterprise Drive Royersford, PA 19468 | Pet Supplies "Plus", LLC | Customer Agreement | | $0.00 |
| 121803661 | Iscott Enterprises, Inc. | Iscott Enterprises, Inc. 2649 E Grand River Ave Howell, MI 48843-8589 | PSP Franchising, LLC | Franchise Agreement, dated 12/12/2002, as renewed or amended (Store #135 - Howell) | | $0.00 |
| 121803677 | J&C Pet Supply, LLC | J&C Pet Supply, LLC 1095 A Towbin Ave. Lakewood, NJ 08701 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121803683 | J.B. Hunt Transport, Inc. | J.B. Hunt Transport, Inc. 9101 Tonnelle Ave North Bergen, NJ 07047 | PSP Distribution, LLC | Dedicated Contract Services Carrier Agreement | | $0.00 |
| 121803696 | JA Adventurers, LLC | JA Adventurers, LLC 120 East Commons Dr. St. Simon's Island, GA 31522 | PSP Franchising, LLC | Franchise Agreement, dated 11/08/2005, as renewed or amended (Store #8032 - Brunswick) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121803709 | Jackson Investors, Inc. | Jackson Investors, Inc. c/o Pet Supplies Plus, 1300 MacDade Boulevard Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 12/12/2014, as renewed or amended (Store #4009 - Woodlyn) | | $0.00 |
| 121803713 | Jacquard Group Limited | Jacquard Group Limited 82 St John Street London,  EC1M 4JN | PSP Group, LLC | Order Form #12 | | $0.00 |
| 121803770 | JFI Enterprises, Inc. | JFI Enterprises, Inc. 1366 Whitehouse Ct. Rochester Hills, MI 48306 | PSP Franchising, LLC | Franchise Agreement, dated 02/11/1992, as renewed or amended (Store #23 - Oxford) | | $0.00 |
| 121803781 | JJ International, LLC | JJ International, LLC 24784 High Plateau Court Stone Ridge, VA 20105 | PSP Franchising, LLC | Franchise Agreement, dated 12/28/2021, as renewed or amended (Store #4487 - Sterling ) | | $0.00 |
| 121803793 | Johanneson's of North Dakota | Johanneson's of North Dakota 2301 Johanneson Drive NW Bemidji, MN 56601-4101 | PSP Franchising, LLC | Franchise Agreement, dated 09/02/2020, as renewed or amended (Store #4348 - Minot) | | $0.00 |
| 121803794 | Johanneson's of North Dakota | Johanneson's of North Dakota 2301 Johanneson Drive NW Bemidji, MN 56601-4101 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2023, as renewed or amended (Store #4612 - Bemidji) | | $0.00 |
| 121803799 | John Squared Capital LLC | John Squared Capital LLC 5 Tennis Terrace Sparta, NJ 07871 | PSP Franchising, LLC | Franchise Agreement, dated 11/12/2020, as renewed or amended (Store #4359 - Stanhope) | | $0.00 |
| 121803811 | Jones Naturals, LLC | Jones Naturals, LLC 4960 28th Ave Rockford, IL 61109 | PSP Group, LLC | Private Label Agreement | | $0.00 |
| 121803845 | JTSS Enterprises, Inc. | JTSS Enterprises, Inc. 15060 Eureka Rd. Southgate, MI 48124 | PSP Franchising, LLC | Franchise Agreement, dated 01/22/2014, as renewed or amended (Store #231 - Southgate) | | $0.00 |
| 121803895 | KC's House, LLC | KC's House, LLC 208 St. James Avenue, Suite B Goose Creek, SC 29445 | PSP Franchising, LLC | Franchise Agreement, dated 08/05/2019, as renewed or amended (Store #4295 - Charleston East/Mount Pleasant) | | $0.00 |
| 121803921 | Kenbo, LLC | Kenbo, LLC 20525 N Plumwood Drive Kildeer, IL 60047 | PSP Franchising, LLC | Franchise Agreement, dated 05/15/2024, as renewed or amended (Store #4319 - Wauconda) | | $0.00 |
| 121803925 | Kessel Enterprises, LLC | Kessel Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 04/02/1992, as renewed or amended (Store #19 - Owosso) | | $0.00 |
| 121803926 | Kessel Enterprises, LLC | Kessel Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 04/02/1992, as renewed or amended (Store #21 - Grand Blanc) | | $0.00 |
| 121803927 | Kessel Enterprises, LLC | Kessel Enterprises, LLC G-7750 South Saginaw St., Suite #5 Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 07/03/1992, as renewed or amended (Store #24 - Mount Morris) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121803928 | Kessel Enterprises, LLC | Kessel Enterprises, LLC<br>G-7750 South Saginaw St., Suite #5<br>Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 05/04/1998, as renewed or amended (Store #105 - Bay City) | | $0.00 |
| 121803929 | Kessel Enterprises, LLC | Kessel Enterprises, LLC<br>G-7750 South Saginaw St., Suite #5<br>Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 10/18/2001, as renewed or amended (Store #127 - Saginaw) | | $0.00 |
| 121803930 | Kessel Enterprises, LLC | Kessel Enterprises, LLC<br>G-7750 South Saginaw St., Suite #5<br>Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 08/22/2007, as renewed or amended (Store #177 - Petoskey) | | $0.00 |
| 121803931 | Kessel Investment Company, LLC | Kessel Investment Company, LLC<br>G-7750 South Saginaw St., Suite #5<br>Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 07/16/2018, as renewed or amended (Store #130 - Washington Twp.) | | $0.00 |
| 121803932 | Kessel Investment Company, LLC | Kessel Investment Company, LLC<br>G-7750 South Saginaw St., Suite #5<br>Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2017, as renewed or amended (Store #175 - Rochester Hills) | | $0.00 |
| 121803933 | Kessel Investment Company, LLC | Kessel Investment Company, LLC<br>G-7750 South Saginaw St., Suite #5<br>Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2010, as renewed or amended (Store #201 - Sault Ste Marie) | | $0.00 |
| 121803934 | Kessel Investment Company, LLC | Kessel Investment Company, LLC<br>G-7750 South Saginaw St., Suite #5<br>Grand Blanc, MI 48439 | PSP Franchising, LLC | Franchise Agreement, dated 03/31/2014, as renewed or amended (Store #236 - Gaylord) | | $0.00 |
| 121803960 | Kids First Toys Co., Ltd | Kids First Toys Co., Ltd<br>No.39 Dazhou Road<br>Yuhuatai District<br>Nanjing City,  210012 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121803988 | King Hammy I, LLC | King Hammy I, LLC<br>12505 Memorial Drive, Suite 330<br>Houston, TX 77024-6051 | PSP Franchising, LLC | Franchise Agreement, dated 03/12/2021, as renewed or amended (Store #4427 - Missouri City) | | $0.00 |
| 121803989 | King Hammy II, LLC | King Hammy II, LLC<br>12505 Memorial Drive, Suite 330<br>Houston, TX 77024-6051 | PSP Franchising, LLC | Franchise Agreement, dated 05/27/2021, as renewed or amended (Store #4434 - Pearland) | | $0.00 |
| 121804025 | KLS Pets, LLC | KLS Pets, LLC<br>602 Bainbridge Drive<br>Mullica Hill, NJ 08062 | PSP Franchising, LLC | Franchise Agreement, dated 01/17/2024, as renewed or amended (Store #4634 - West Deptford) | | $0.00 |
| 121804039 | KonaTex Ventures, LLC | KonaTex Ventures, LLC<br>7911 Appomattox Drive<br>Austin, TX 78745 | PSP Franchising, LLC | Franchise Agreement, dated 05/13/2021, as renewed or amended (Store #4432 - Austin) | | $0.00 |
| 121804084 | KS Pet Retail Five, LLC | KS Pet Retail Five, LLC<br>770 W. Bedford Euless Rd.<br>Hurst, TX 76053 | PSP Franchising, LLC | Franchise Agreement, dated 01/11/2018, as renewed or amended (Store #4168 - Overland Park) | | $0.00 |
| 121804089 | Kuhl Business Concepts, LLC | Kuhl Business Concepts, LLC<br>8286 E Tumbleweed Drive<br>Scottsdale, AZ 85266 | PSP Franchising, LLC | Franchise Agreement, dated 12/21/2022, as renewed or amended (Store #4406 - Phoenix) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121804105 | K-Zoo Pet, Inc. | K-Zoo Pet, Inc.<br>5062 Colony Woods Dr.<br>Kalamazoo, MI 49009 | PSP Franchising, LLC | Franchise Agreement, dated 02/10/2006, as renewed or amended (Store #170 - Kalamazoo) | | $0.00 |
| 121804174 | Ledgers Pantry, LLC | Ledgers Pantry, LLC<br>14090 FM 2920, Ste. G551<br>Tomball, TX 77377 | PSP Franchising, LLC | Franchise Agreement, dated 10/14/2022, as renewed or amended (Store #4542 - Eldersburg) | | $0.00 |
| 121804175 | LeFort Pet Supplies, Inc. | LeFort Pet Supplies, Inc.<br>1548 Breezeridge Dr.<br>Des Peres, MO 63131 | PSP Franchising, LLC | Franchise Agreement, dated 02/28/2014, as renewed or amended (Store #241 - Warson Woods) | | $0.00 |
| 121804182 | Left Moon Consulting Group LLC | Left Moon Consulting Group LLC<br>478 Sylvester Trail<br>Highlands Ranch, CO 80129 | WNW Franchising, LLC | Franchise Agreement, dated 10/10/2022, as renewed (Store #3009 - Highlands Ranch) | | $0.00 |
| 121804183 | LegacyPets Inc. | LegacyPets Inc.<br>98 N Floral Leaf Cir<br>The Woodlands, TX 77381 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2020, as renewed or amended (Store #4321 - Conroe) | | $0.00 |
| 121804186 | Lehigh Valley Industrial Park Lot 4 Owner, LLC | Lehigh Valley Industrial Park Lot 4 Owner, LLC<br><br>BCDPF Radar Distribution Center LLC<br>c/o Ares<br>1200 17th Street Suite 2900<br>Denver, CO 80202 | Pet Supplies "Plus", LLC | First Amednment to Lease | PA Distribution Center | $0.00 |
| 121804187 | Lehigh Valley Industrial Park Lot 4 Owner, LLC<br>BCDPF Radar Distribution Center LLC<br>Miles Tedder<br>Matt Devitt | Lehigh Valley Industrial Park Lot 4 Owner, LLC<br>BCDPF Radar Distribution Center LLC<br>Miles Tedder<br>Matt Devitt<br>P.O. Box 9183433<br>Chicago, IL 60691-3433 | Pet Supplies "Plus", LLC | Property Sale and Lease Assignment Notification | PA Distribution Center | $0.00 |
| 121804203 | Level 10, LLC | Level 10, LLC<br>2495 Pembroke Ave.<br>Hoffman Estates, IL 60169 | Pet Supplies "Plus", LLC | Project Change Request | | $22,289.78 |
| 121804227 | Level 10, LLC | Level 10, LLC<br>2495 Pembroke Ave.<br>Hoffman Estates, IL 60169 | PSP Stores, LLC | Sales Order Confirmation | | $0.00 |
| 121804236 | LH Bolingbrook Weber, L.L.C. | LH Bolingbrook Weber, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 03/30/2022, as renewed or amended (Store #4515 - Bolingbrook) | | $0.00 |
| 121804239 | LH Crystal Lake, L.L.C. | LH Crystal Lake, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 10/09/2017, as renewed or amended (Store #4160 - Crystal Lake) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121804240 | LH Grayslake, L.L.C. | LH Grayslake, L.L.C. c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200 Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 03/30/2022, as renewed or amended (Store #4516 - Grayslake) | | $0.00 |
| 121804241 | LH Homer Glen, L.L.C. | LH Homer Glen, L.L.C. c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200 Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 08/28/2018, as renewed or amended (Store #4196 - Homer Glen) | | $0.00 |
| 121804242 | LH LaPorte, L.L.C. | LH LaPorte, L.L.C. c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200 Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 09/26/2016, as renewed or amended (Store #4087 - La Porte) | | $0.00 |
| 121804243 | LH Plainfield, L.L.C | LH Plainfield, L.L.C c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200 Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 11/17/2015, as renewed or amended (Store #4037 - Plainfield) | | $0.00 |
| 121804244 | LH Villa Park, L.L.C. | LH Villa Park, L.L.C. c/o National Shopping Plazas, Inc., 200 W. Madison St., Suite 4200 Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 09/17/2007, as renewed or amended (Store #72 - Villa Park) | | $0.00 |
| 121804245 | Li & FUNG (TRADING) LIMITED | Li & FUNG (TRADING) LIMITED LiFung Tower 888 Cheung Sha Wan Road Kowloon, | PSP Group, LLC | Buying Agency Agreement | | $0.00 |
| 121804312 | Little Paws, LLC | Little Paws, LLC 7911 Platinum Ct. Boerne, TX 78015 | PSP Franchising, LLC | Franchise Agreement, dated 08/23/2021, as renewed or amended (Store #4472 - Boerne) | | $0.00 |
| 121804392 | Love Your Neighbor Well, LLC | Love Your Neighbor Well, LLC 10804 Bridgeport Drive Temple, TX 76502 | PSP Franchising, LLC | Franchise Agreement, dated 03/09/2024, as renewed or amended (Store #4635 - Temple) | | $0.00 |
| 121804409 | Lucid Software Inc. | Lucid Software Inc. 10355 S Jordan Gateway #150 South Jordan, UT 84095 | PSP Group, LLC | Lucid Order Form | | $0.00 |
| 121804411 | Lukaluk, LLC | Lukaluk, LLC 5985 Chester Way Denver, CO 80238 | PSP Franchising, LLC | Franchise Agreement, dated 03/28/2023, as renewed or amended (Store #4597 - Green Valley Ranch) | | $0.00 |
| 121804423 | M & A Ventures | M & A Ventures c/o REPAY 3 West Paces Ferry Road Suite 200 Atlanta, GA 30309 | Buddy's Newco, LLC | Electronic Payment Contract | | $0.00 |
| 121804432 | M.I. Industries, Incorporated | M.I. Industries, Incorporated 55 Westport Drive Suite 200 St. Louis, MO 63145 | PSP Group, LLC | Freezer Agreement | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121804434 | M3 Ventures #4091, LLC | M3 Ventures #4091, LLC c/o 191 Alps Rd., Suite 13-A Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 12/15/2016, as renewed or amended (Store #4091 - Warner Robins) | | $0.00 |
| 121804435 | M3 Ventures #4105, LLC | M3 Ventures #4105, LLC c/o 191 Alps Rd., Suite 13-A Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 03/21/2017, as renewed or amended (Store #4105 - Macon) | | $0.00 |
| 121804436 | M3 Ventures #8024, LLC | M3 Ventures #8024, LLC c/o 191 Alps Rd., Suite 13-A Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 10/06/2010, as renewed or amended (Store #8024 - Asheville) | | $0.00 |
| 121804437 | M3 Ventures #8029, LLC | M3 Ventures #8029, LLC c/o 191 Alps Rd., Suite 13-A Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2004, as renewed or amended (Store #8029 - Athens) | | $0.00 |
| 121804438 | M3 Ventures #8034, LLC | M3 Ventures #8034, LLC c/o 191 Alps Rd., Suite 13-A Athens, GA 30606 | PSP Franchising, LLC | Franchise Agreement, dated 06/07/2007, as renewed or amended (Store #8034 - Carrollton) | | $0.00 |
| 121804440 | MAAK Corp. | MAAK Corp. 7907 Sendero Ridge Fair Oaks Ranch, TX 78015 | WNW Franchising, LLC | Franchise Agreement, dated 10/25/2024 (Store #3041 - San Antonio) | | $0.00 |
| 121804454 | Madison Avery Partners , LLC | Madison Avery Partners , LLC c/o Pet Supplies Plus, 1300 MacDade Boulevard Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 12/10/2019, as renewed or amended (Store #4286 - Cherry Hill) | | $0.00 |
| 121804455 | Madjef, Inc. | Madjef, Inc. 45 Longview Dr. Scarsdale, NY 10583 | PSP Franchising, LLC | Franchise Agreement, dated 08/25/2014, as renewed or amended (Store #4056 - Yorktown Heights) | | $0.00 |
| 121804461 | Magnifico Pet Holdings, LLC | Magnifico Pet Holdings, LLC c/o Pet Supplies Plus, 1300 MacDade Boulevard Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 09/13/2022, as renewed or amended (Store #4545 - Bradenton) | | $0.00 |
| 121804477 | Main Street Pet Supply, LLC | Main Street Pet Supply, LLC 31500 Northwestern Highway, Suite 175 Farmington Hills, MI 48334 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2020, as renewed or amended (Store #65 - Ann Arbor) | | $0.00 |
| 121804523 | Manhattan Associates, Inc. | Manhattan Associates, Inc. 2300 Windy Ridge Parkway 10th Floor Atlanta, GA 30339 | PSP Distribution, LLC | SaaS Services Agreement | | $279,448.55 |
| 121804545 | MANNimals, Inc. | MANNimals, Inc. 2517 2nd Avenue West Seattle, WA 98119 | PSP Franchising, LLC | Franchise Agreement, dated 02/14/2023, as renewed or amended (Store #4628 - Burlington) | | $0.00 |
| 121804552 | Marchan Enterprise, LLC | Marchan Enterprise, LLC Corporation Trust Center, 1209 Orange Street Wilmington, DE 19801 | PSP Franchising, LLC | Franchise Agreement, dated 05/13/2019, as renewed or amended (Store #4246 - Berwyn) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121804557 | MaRick Inc. | MaRick Inc.<br>566 Fiesta Court<br>Fairfield, CA 94533 | PSP Franchising, LLC | Franchise Agreement, dated 12/31/2020, as renewed or amended (Store #4229 - Vacaville) | | $0.00 |
| 121804573 | MarketSpark, Inc. | MarketSpark, Inc.<br>750 B Street<br>Suite 2750<br>San Diego, CA 92101 | PSP Group, LLC | MarketSpark Master Service Agreement | | $0.00 |
| 121804575 | Marla Enterprise, LLC | Marla Enterprise, LLC<br>Corporation Trust Center, 1209 Orange Street<br>Wilmington, DE 19801 | PSP Franchising, LLC | Franchise Agreement, dated 03/12/2019, as renewed or amended (Store #4245 - Southampton) | | $0.00 |
| 121804582 | Marmaduke's Munchies, LLC | Marmaduke's Munchies, LLC<br>9011 Sendera Dr.<br>Magnolia, TX 77354 | PSP Franchising, LLC | Franchise Agreement, dated 11/06/2020, as renewed or amended (Store #4358 - Kingwood) | | $0.00 |
| 121804586 | Marshfield Pets, LLC | Marshfield Pets, LLC<br>2295 Spring Rose Road<br>Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 04/07/2021, as renewed or amended (Store #4428 - Marshfield) | | $0.00 |
| 121804632 | Maverick Pets, LLC | Maverick Pets, LLC<br>4068 Lenox Drive<br>Cincinnati, OH 45245 | PSP Franchising, LLC | Franchise Agreement, dated 03/23/2023, as renewed or amended (Store #4592 - Milford) | | $0.00 |
| 121804633 | Max Bull, Inc. | Max Bull, Inc.<br>14240 Imboden Rd.<br>Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 10/02/2019, as renewed or amended (Store #4281 - Arvada) | | $0.00 |
| 121804634 | Max Pets Supplies, LLC | Max Pets Supplies, LLC<br>2214 Cortona Mist<br>San Antonio, TX 78260 | PSP Franchising, LLC | Franchise Agreement, dated 02/15/2024, as renewed or amended (Store #4638 - San Antonio) | | $0.00 |
| 121804648 | McCabe Way Irvine LLC<br>Mileski Living Trust | McCabe Way Irvine LLC<br>Mileski Living Trust<br>1971 W 190TH STREET<br>SUITE 100<br>TORRANCE, CA 90504 | PSP Distribution, LLC | Amended and Restated Building Lease | | $0.00 |
| 121804649 | MCCABE WAY IRVINE, LLC | MCCABE WAY IRVINE, LLC<br>1971 W 190TH STREET<br>SUITE 100<br>TORRANCE, CA 90504 | PSP Distribution, LLC | First Amendment to the Amended and Restated Building Lease | | $0.00 |
| 121804650 | McCabe Way Irvine, LLC | McCabe Way Irvine, LLC<br>1971 W 190TH STREET<br>SUITE 100<br>TORRANCE, CA 90504 | PSP Distribution, LLC | HVAC Replacement Agreement | | $0.00 |
| 121804658 | McPetsol, Inc. | McPetsol, Inc.<br>33300 Five Mile Road, Suite 200<br>Livonia, MI 48154 | PSP Franchising, LLC | Franchise Agreement, dated 11/29/2000, as renewed or amended (Store #118 - Fenton) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121804689 | Mega Kyon Inc. | Mega Kyon Inc.<br>64 N Mill Street<br>Hopkinton, MA 01748 | PSP Franchising, LLC | Franchise Agreement, dated 08/03/2021, as renewed or amended (Store #4471 - Attleboro) | | $0.00 |
| 121804693 | Melian Labs Inc. dba MyTime | Melian Labs Inc. dba MyTime<br>600 California Street<br>11F<br>San Francisco, CA 94108 | PSP Group, LLC | First Amendment to Master Services Agreement | | $0.00 |
| 121804715 | Metro East PSP | Metro East PSP<br>664 Royal Crest Way<br>O'Fallon, IL 62269 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2023, as renewed or amended (Store #4619 - O'Fallon) | | $0.00 |
| 121804720 | MIA of South Carolina, LLC | MIA of South Carolina, LLC<br>208 St. James Avenue, Suite B<br>Goose Creek, SC 29445 | PSP Franchising, LLC | Franchise Agreement, dated 07/10/2020, as renewed or amended (Store #4329 - Murrell's Inlet) | | $0.00 |
| 121804732 | Michiana Pets, Inc. | Michiana Pets, Inc.<br>5062 Colony Woods Dr.<br>Kalamazoo, MI 49009 | PSP Franchising, LLC | Franchise Agreement, dated 10/14/2005, as renewed or amended (Store #166 - Goshen) | | $0.00 |
| 121804733 | Michigan Office Solutions (MOS) | Michigan Office Solutions (MOS)<br>40000 Grand River Ave. Ste 500<br>Novi, MI 48375 | PSP Stores, LLC | Guaranteed Maintenance Agreement (GMA) | | $0.00 |
| 121804737 | Michigan Office Solutions<br>Integrity One Technologies | Michigan Office Solutions<br>Integrity One Technologies<br>801 N Capitol Ave<br>Indianapolis, IN 46204 | PSP Stores, LLC | Customer Authorization for Equipment Removal, Disposal, Freight Return and Buyout Expectations | | $0.00 |
| 121804738 | Michigan Office Solutions, Inc. (Xerox Business Solutions Midwest) | Michigan Office Solutions, Inc. (Xerox Business Solutions Midwest)<br><br>40000 Grand River Ave. Ste 500<br>Novi, MI 48375 | Pet Supplies "Plus", LLC | Sales and Service Agreement | | $0.00 |
| 121804740 | Microsoft | Microsoft<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Microsoft Enterprise Enrollment | | $0.00 |
| 121804741 | Microsoft | Microsoft<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Amendment to Contract Documents | | $0.00 |
| 121804742 | Microsoft | Microsoft<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Enterprise Renewal Form | | $0.00 |
| 121804744 | Microsoft | Microsoft<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Enterprise Update Statement | | $0.00 |
| 121804745 | Microsoft Corporation | Microsoft Corporation<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | Pet Supplies "Plus", LLC | Purchase Order for Additional Premier Support Hours | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121804746 | Microsoft Corporation | Microsoft Corporation<br>6880 Sierra Center Parkway<br>Reno, NV 89511 | PSP Group, LLC | Microsoft Volume Licensing Agreement | | $1,095,666.86 |
| 121804750 | Microsoft Licensing, GP | Microsoft Licensing, GP<br>1401 Elm Street<br>5th Floor<br>Dallas, TX 75202 | PSP Group, LLC | Purchase Order for True-Up EA for Additional Licenses | | $0.00 |
| 121804757 | Midtown Business Partners LLC | Midtown Business Partners LLC<br>1218 Hazel<br>Tulsa, OK 74114 | PSP Franchising, LLC | Franchise Agreement, dated 10/04/2022, as renewed or amended (Store #4355 - Tulsa) | | $0.00 |
| 121804758 | Midwestern Pet Foods, Inc. | Midwestern Pet Foods, Inc.<br>9634 Hedden Road<br>Evansville, IN 47725 | PSP Group, LLC | Limited Channel Exclusivity Agreement | | $0.00 |
| 121804774 | Mission Pets | Mission Pets<br>986 Mission Street<br>5th Floor<br>San Francisco, CA 94103 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121804781 | MJC Enterprises, Inc. | MJC Enterprises, Inc.<br>42241 Garfield Rd.<br>Clinton Township, MI 48038 | PSP Franchising, LLC | Franchise Agreement, dated 02/20/1991, as renewed or amended (Store #8 - Clinton Twp) | | $0.00 |
| 121804784 | MJQ Enterprises, Inc. | MJQ Enterprises, Inc.<br>2501 Pennington Place<br>Valparaiso, IN 46383 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2002, as renewed or amended (Store #129 - Valparaiso) | | $0.00 |
| 121804795 | MO Pet Retail Three, LLC | MO Pet Retail Three, LLC<br>770 W. Bedford Euless Rd.<br>Hurst, TX 76053 | PSP Franchising, LLC | Franchise Agreement, dated 08/30/2017, as renewed or amended (Store #4158 - Lee's Summit) | | $0.00 |
| 121804796 | MO Pet Retail Two, LLC | MO Pet Retail Two, LLC<br>770 W. Bedford Euless Rd.<br>Hurst, TX 76053 | PSP Franchising, LLC | Franchise Agreement, dated 01/11/2018, as renewed or amended (Store #4167 - Kansas City) | | $0.00 |
| 121804807 | Monona Pets, LLC | Monona Pets, LLC<br>2295 Spring Rose Road<br>Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2023, as renewed or amended (Store #4595 - Monona) | | $0.00 |
| 121804828 | Mountain Country Pet Care-LLC | Mountain Country Pet Care-LLC<br>201 Industrial<br>Okeene, OK 73763 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121804831 | Movable, Inc. | Movable, Inc.<br>5 Bryant Park (1065 Sixth Avenue)<br>9th Floor<br>New York, NY 10018 | PSP Franchising, LLC | Movable, Inc. Change Order Form | | $0.00 |
| 121804835 | Moysestra Enterprises, Inc. | Moysestra Enterprises, Inc.<br>80 Valley View Terrace<br>Montvale, NJ 07645 | PSP Franchising, LLC | Franchise Agreement, dated 04/07/2015, as renewed or amended (Store #4003 - Hillsdale) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121804836 | MPM Belmont,, LLC | MPM Belmont,, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2023, as renewed or amended (Store #4289 - Belmont) | | $0.00 |
| 121804837 | MPM Gastonia, LLC | MPM Gastonia, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2023, as renewed or amended (Store #4272 - Gastonia) | | $0.00 |
| 121804838 | MPM Greensboro, LLC | MPM Greensboro, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/29/2021, as renewed or amended (Store #4461 - Greensboro) | | $0.00 |
| 121804839 | MPM Pecan, LLC | MPM Pecan, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/21/2017, as renewed or amended (Store #4109 - Charlotte) | | $0.00 |
| 121804840 | MPM Retail Holdings, LLC | MPM Retail Holdings, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/13/2011, as renewed or amended (Store #8052 - Charlotte) | | $0.00 |
| 121804841 | MPMFM, LLC | MPMFM, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/02/2018, as renewed or amended (Store #4189 - Fort Mill) | | $0.00 |
| 121804842 | MPMRH, LLC | MPMRH, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/31/2018, as renewed or amended (Store #4107 - Rock Hill) | | $0.00 |
| 121804843 | MPMSC, LLC | MPMSC, LLC<br>19154 Rosemary Road<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/14/2015, as renewed or amended (Store #4018 - Charlotte) | | $0.00 |
| 121804844 | Mr Dark PSP, LLC | Mr Dark PSP, LLC<br>4688 N. Arrow Villa Way<br>Boise, ID 83703 | PSP Franchising, LLC | Franchise Agreement, dated 10/30/2022, as renewed or amended (Store #4331 - Lehi) | | $0.00 |
| 121804845 | Mr Dark PSP, LLC | Mr Dark PSP, LLC<br>4688 N. Arrow Villa Way<br>Boise, ID 83703 | PSP Franchising, LLC | Franchise Agreement, dated 03/19/2021, as renewed or amended (Store #4423 - Garden City) | | $0.00 |
| 121804855 | Mun Pets, LLC | Mun Pets, LLC<br><br>16121 Haddam Ln<br>Westfield, IN 46062 | PSP Franchising, LLC | Franchise Agreement, dated 07/28/2022, as renewed or amended (Store #4530 - Muncie) | | $0.00 |
| 121804870 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 10/29/2020, as renewed or amended (Store #4360 - Killeen) | | $0.00 |
| 121804871 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 11/13/2020, as renewed or amended (Store #4361 - Round Rock) | | $0.00 |
| 121804872 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 11/13/2020, as renewed or amended (Store #4362 - Brunswick) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121804873 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 12/17/2020, as renewed or amended (Store #4375 - Twinsburg) | | $0.00 |
| 121804874 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 09/01/2023, as renewed or amended (Store #4409 - Berea) | | $0.00 |
| 121804875 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 08/08/2022, as renewed or amended (Store #4534) | | $0.00 |
| 121804876 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 08/08/2022, as renewed or amended (Store #4535) | | $0.00 |
| 121804877 | MYA Ventures, Inc. | MYA Ventures, Inc.<br>43 Village Way, Suite 204<br>Hudson, OH 44236 | PSP Franchising, LLC | Franchise Agreement, dated 11/14/2022, as renewed or amended (Store #4559) | | $0.00 |
| 121804888 | N&S Developments 1, LLC | N&S Developments 1, LLC<br>7216 Southampton Lane<br>West Chester Township, OH 45069 | PSP Franchising, LLC | Franchise Agreement, dated 03/02/2021, as renewed or amended (Store #4237 - Liberty Township) | | $0.00 |
| 121804890 | N&S Developments 3, LLC | N&S Developments 3, LLC<br>7216 Southampton Lane<br>West Chester Township, OH 45069 | PSP Franchising, LLC | Franchise Agreement, dated 06/18/2021, as renewed or amended (Store #4239 - Beavercreek) | | $0.00 |
| 121804902 | NARS Capital LLC | NARS Capital LLC<br>3 Grace Court<br>Plainsboro Township, NJ 08536 | PSP Franchising, LLC | Franchise Agreement, dated 10/24/2023, as renewed or amended (Store #4632 - Hamilton Township) | | $0.00 |
| 121804910 | Nationwide Litho, Inc. | Nationwide Litho, Inc.<br>11728 Goldring Road<br>Arcadia, CA 91006 | PSP Group, LLC | Cardboard Carriers for Canned Pet Food Agreement | | $0.00 |
| 121804974 | NDM Enterprises, LLC | NDM Enterprises, LLC<br>45243 Daniels Court<br>Hollywood, MD 20636 | WNW Franchising, LLC | Franchise Agreement, dated 10/17/2023, as renewed (Store #3001 - California) | | $0.00 |
| 121804989 | Netsertive, Inc. | Netsertive, Inc.<br>2450 Perimeter Park Drive<br>Suite 105<br>Morrisville, NC 27560 | PSP Group, LLC | Master Services Agreement | | $0.00 |
| 121805037 | Niemann Foods, Inc. | Niemann Foods, Inc.<br>1501 N. 12th St.<br>Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 06/18/2007, as renewed or amended (Store #179 - Quincy) | | $0.00 |
| 121805038 | Niemann Foods, Inc. | Niemann Foods, Inc.<br>1501 N. 12th St.<br>Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 04/15/2008, as renewed or amended (Store #185 - Champaign) | | $0.00 |
| 121805039 | Niemann Foods, Inc. | Niemann Foods, Inc.<br>1501 N. 12th St.<br>Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 10/02/2008, as renewed or amended (Store #189 - Jacksonville) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121805040 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 08/27/2009, as renewed or amended (Store #194 - Danville) | | $0.00 |
| 121805041 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2011, as renewed or amended (Store #198 - Pekin) | | $0.00 |
| 121805042 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 06/11/2014, as renewed or amended (Store #230 - Dixon) | | $0.00 |
| 121805043 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 09/19/2018, as renewed or amended (Store #4187 - Macomb) | | $0.00 |
| 121805044 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 12/15/2020, as renewed or amended (Store #4408 - Chatham) | | $0.00 |
| 121805045 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 11/17/2021, as renewed or amended (Store #4480 - Sauk City) | | $0.00 |
| 121805046 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 02/10/2022, as renewed or amended (Store #4495 - Portage) | | $0.00 |
| 121805047 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 02/10/2022, as renewed or amended (Store #4496 - Troy) | | $0.00 |
| 121805048 | Niemann Foods, Inc. | Niemann Foods, Inc. 1501 N. 12th St. Quincy, IL 62301 | PSP Franchising, LLC | Franchise Agreement, dated 03/10/2022, as renewed or amended (Store #4504 - Whitewater) | | $0.00 |
| 121805076 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 05/19/2015, as renewed or amended (Store #4000 - Atlantic Beach) | | $0.00 |
| 121805077 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 03/27/2020, as renewed or amended (Store #4316 - Jacksonville) | | $0.00 |
| 121805078 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 02/17/2024, as renewed or amended (Store #4417 - Parrish) | | $0.00 |
| 121805079 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 11/12/2021, as renewed or amended (Store #4479 - Gainesville) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805080 | Northridge Crossing L.P. | Northridge Crossing L.P.<br>c/o Casto<br>250 Civic Center Drive<br>Suite 500<br>Columbus, OH 43215 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/19/2003, as amended<br>(Westerville, OH) | Westerville, OH (0159) | $0.00 |
| 121805081 | Northtowne Associates | Northtowne Associates<br>c/o J.J. Gumberg Co.<br>1051 Brinton Road<br>Pittsburgh, PA 15221 | Pet Supplies "Plus", LLC | Lease Agreement, dated 03/24/2008, as amended<br>(Defiance, OH) | Defiance, OH (0186) | $0.00 |
| 121805166 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2016, as renewed or amended (Store #4059 - Taylors) | | $0.00 |
| 121805167 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 06/30/2020, as renewed or amended (Store #4327 - Columbia) | | $0.00 |
| 121805168 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 03/26/2024, as renewed or amended (Store #4636 - Lexington) | | $0.00 |
| 121805169 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 02/06/1998, as renewed or amended (Store #8001 - West Columbia) | | $0.00 |
| 121805170 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 12/14/2004, as renewed or amended (Store #8031 - Columbia) | | $0.00 |
| 121805171 | NuVest Enterprises, LLC | NuVest Enterprises, LLC<br>2670 W. Maple<br>Troy, MI 48084 | PSP Franchising, LLC | Franchise Agreement, dated 12/12/2012, as renewed or amended (Store #8058 - Irmo) | | $0.00 |
| 121805175 | Nyla's Pantry, LLC | Nyla's Pantry, LLC<br>14090 FM 2920, Ste. G551<br>Tomball, TX 77377 | PSP Franchising, LLC | Franchise Agreement, dated 10/12/2022, as renewed or amended (Store #4541 - Nottingham) | | $0.00 |
| 121805180 | Oakville Partners, LLC | Oakville Partners, LLC<br>3012 Oakville Woods Court<br>St. Louis, MO 63121 | PSP Franchising, LLC | Franchise Agreement, dated 10/06/2015, as renewed or amended (Store #4051 - St. Louis) | | $0.00 |
| 121805181 | Oakville Partners, LLC | Oakville Partners, LLC<br>3012 Oakville Woods Court<br>St. Louis, MO 63121 | PSP Franchising, LLC | Franchise Agreement, dated 06/28/2018, as renewed or amended (Store #4188 - St. Louis) | | $0.00 |
| 121805186 | Octopus Deploy Pty. Ltd. | Octopus Deploy Pty. Ltd.<br>Level 4<br>199 Grey St<br>South Brisbane, QLD 4101 | Pet Supplies "Plus", LLC | Octopus Deploy License Agreement | | $0.00 |
| 121805199 | Oil-Dri Corporation of America | Oil-Dri Corporation of America<br>410 N. Michigan Ave.<br>4th Floor<br>Chicago, IL 60611 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805227 | One Source Technology, LLC dba Asurint | One Source Technology, LLC dba Asurint<br>1111 Superior Avenue<br>Suite 2100<br>Cleveland, OH 44114 | PSP Group, LLC | Background Screening Services Agreement | | $0.00 |
| ~~121805230~~ | ~~OneStream Software LLC~~ | ~~OneStream Software LLC~~<br>~~362 South Street~~<br>~~Rochester, MI 48307~~ | ~~Franchise Group, Inc.~~ | ~~SaaS Agreement~~ | | ~~$0.00~~ |
| 121805254 | Opterus Inc. | Opterus Inc.<br>525 Adelaide St. W<br>Suite 1235<br>Toronto, ON M5V ON7 | PSP Group, LLC | Amendment to Opterus Store Ops-Center Standard Agreement | | $0.00 |
| 121805266 | Optiv Security Inc. | Optiv Security Inc.<br>17197 N. Laural Park Drive<br>Suite #402<br>Livonia, MI 48152 | PSP Group, LLC | Purchase Order for PCI 4.0 Delta Assessment | | $0.00 |
| 121805267 | Optiv Security Inc. | Optiv Security Inc.<br>17197 N. Laural Park Drive<br>Suite #402<br>Livonia, MI 48152 | PSP Group, LLC | Purchase Order for PCI Compliance | | $0.00 |
| 121805268 | Optiv Security Inc. | Optiv Security Inc.<br>17197 N. Laural Park Drive<br>Suite #402<br>Livonia, MI 48152 | PSP Group, LLC | Statement of Work PCI Report on Compliance | | $0.00 |
| 121805269 | Optiv Security Inc. | Optiv Security Inc.<br>17197 N. Laural Park Drive<br>Suite #402<br>Livonia, MI 48152 | PSP Group, LLC | Optiv Terms of Purchase | | $0.00 |
| 121805277 | Optiv, Inc. | Optiv, Inc.<br>1144 15th St.<br>Denver, CO 80202 | PSP Group, LLC | PSP Group - PCI ROC and QSA Retainer SOW | | $0.00 |
| 121805281 | Oracle America, Inc. | Oracle America, Inc.<br>500 Oracle Parkway<br>Redwood Shores, CA 94065 | PSP Group, LLC | Oracle Cloud Services Agreement | | $64,280.00 |
| 121805292 | Orange-WNW, LLC | Orange-WNW, LLC<br>26 Carriage Lane<br>Troutville, VA 24011 | WNW Franchising, LLC | Franchise Agreement, dated 12/07/2023 (Store #3038 - Roanoke) | | |
| 121805308 | Orion, LLC | Orion, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/30/1998, as renewed or amended (Store #8015 - Pelham) | | $0.00 |
| 121805309 | Orion, LLC | Orion, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 05/07/2007, as renewed or amended (Store #8017 - Mobile) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121805310 | Orion, LLC | Orion, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/17/2000, as renewed or amended (Store #8020 - Tuscaloosa) | | $0.00 |
| 121805311 | Orion, LLC | Orion, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/30/2003, as renewed or amended (Store #8028 - Homewood) | | $0.00 |
| 121805321 | Otava | Otava<br>825 Victors Way<br>Suite 200<br>Ann Arbor, MI 48108 | PSP Group, LLC | PSP Group - Colocation Renewal - AA2 (v-1) | | $0.00 |
| 121805322 | Otava | Otava<br>825 Victors Way<br>Suite 200<br>Ann Arbor, MI 48108 | PSP Group, LLC | PSP Group - Colocation Renewal - AA2 (v-2) | | $0.00 |
| 121805323 | Otava | Otava<br>825 Victors Way<br>Suite 200<br>Ann Arbor, MI 48108 | PSP Group, LLC | PSP Group \| Cloud + Backup (v-8) | | $0.00 |
| 121805349 | Pahrump Group, LLC | Pahrump Group, LLC<br>8901 Tierra Santa Ave.<br>Las Vegas, NV 89129 | PSP Franchising, LLC | Franchise Agreement, dated 07/17/2023, as renewed or amended (Store #4640 - Pahrump) | | $0.00 |
| 121805360 | Panther Pets LLC | Panther Pets LLC<br>4343 Logan Ferry Road<br>Murrysville, PA 15668 | PSP Franchising, LLC | Franchise Agreement, dated 07/09/2021, as renewed or amended (Store #4468 - North Huntingdon) | | $0.00 |
| 121805369 | Paragon Pet Supplies, LLC | Paragon Pet Supplies, LLC<br>30570 Park Vista Dr.<br>Castaic, CA 91384 | PSP Franchising, LLC | Franchise Agreement, dated 07/05/2018, as renewed or amended (Store #4197 - Valencia) | | $0.00 |
| 121805371 | Paragon School of Pet Grooming, Inc. | Paragon School of Pet Grooming, Inc.<br>110 Chicago Drive<br>Jenison, MI 49428 | PSP Stores, LLC | Distance Learning Program Amendment and Renewal Extension Agreement | | $0.00 |
| 121805375 | Paridiso 2911 LLC | Paridiso 2911 LLC<br>241 McKinley Ave.<br>Grosse Pointe Farms, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 11/04/2020, as renewed or amended (Store #4287 - Chesterfield Twp.) | | $0.00 |
| 121805384 | Patts Pets, Inc. | Patts Pets, Inc.<br>9290 Cherry Brook Lane<br>Frisco, TX 75034 | PSP Franchising, LLC | Franchise Agreement, dated 10/11/2022, as renewed or amended (Store #4570 - Cedar Hill) | | $0.00 |
| 121805391 | Pawfect Pals, LLC | Pawfect Pals, LLC<br>9420 Red Spruce Way<br>Elk Grove, CA 95624 | PSP Franchising, LLC | Franchise Agreement, dated 10/25/2023, as renewed or amended (Store #4637 - Gold River) | | $0.00 |
| 121805392 | Pawsitive Return - Marietta, LLC | Pawsitive Return - Marietta, LLC<br>2037 Towne Lake Hills West<br>Woodstock, GA 30189 | PSP Franchising, LLC | Franchise Agreement, dated 10/08/2008, as renewed or amended (Store #8041 - Marietta) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805393 | Pawsitive Return, LLC | Pawsitive Return, LLC<br>2037 Towne Lake Hills West<br>Woodstock, GA 30189 | PSP Franchising, LLC | Franchise Agreement, dated 03/25/2016, as renewed or amended (Store #4083 - Acworth) | | $0.00 |
| 121805394 | Pawsitively Pets LLC | Pawsitively Pets LLC<br>103 S. 29th St.<br>Wilmington, NC 28403 | PSP Franchising, LLC | Franchise Agreement, dated 11/12/2019, as renewed or amended (Store #4307 - Chapel Hill) | | $0.00 |
| 121805395 | Pawsome Pets Okemos, LLC | Pawsome Pets Okemos, LLC<br>541 Wenonah Drive<br>Okemos, MI 48864 | PSP Franchising, LLC | Franchise Agreement, dated 12/29/2020, as renewed or amended (Store #4292 - Okemos) | | $0.00 |
| 121805396 | Pawsome Pets Plus, LLC | Pawsome Pets Plus, LLC<br>541 Wenonah Drive<br>Okemos, MI 48864 | PSP Franchising, LLC | Franchise Agreement, dated 03/21/2019, as renewed or amended (Store #4306 - Holland) | | $0.00 |
| 121805400 | PAYCOM PAYROLL, LLC | PAYCOM PAYROLL, LLC<br>7501 W Memorial Road<br>Oklahoma City, OK 73142 | Buddy's Newco, LLC | Payroll and Human Capital Management Services Agreement | | $0.00 |
| 121805414 | PC Connection Sales Corp. | PC Connection Sales Corp.<br>730 Milford Road<br>Merrimack, NH 03054-4631 | Buddy's Newco, LLC | Equipment Lease Agreement | | $0.00 |
| 121805450 | Personal Zoo Supply, Inc. | Personal Zoo Supply, Inc.<br>1517 Lakeview Ave.<br>Sylvan Lake, MI 48320 | PSP Franchising, LLC | Franchise Agreement, dated 06/27/2007, as renewed or amended (Store #8035 - New Port Richey) | | $0.00 |
| 121805453 | Pestell Pet Products | Pestell Pet Products<br>141 Hamilton Road<br>New Hamburg,  N3A 2H1 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121805454 | Thakur Dangal (Entity Pending) | Thakur Dangal (Entity Pending)<br>Address on File | PSP Franchising, LLC | Franchise Agreement, dated 01/22/2024, as renewed or amended (Store #N/A - Harrisburg) | | $0.00 |
| 121805457 | Pet Brands, LLC | Pet Brands, LLC<br>425 Metro Place North<br>Suite 690<br>Dublin, OH 43017 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121805458 | Pet Bridge, Inc. | Pet Bridge, Inc.<br>521 Potomac Road<br>Joppatowne, MD 21085 | PSP Franchising, LLC | Franchise Agreement, dated 04/07/2022, as renewed or amended (Store #4543 - Bel Air) | | $0.00 |
| 121805459 | PET FACTORY, INC. | PET FACTORY, INC.<br>845 EAST HIGH STREET<br>MUNDELEIN, IL 60060 | PSP Group, LLC | PRIVATE BRAND PET FOODS AGREEMENT | | $0.00 |
| 121805460 | Pet Joy Baytown, LLC | Pet Joy Baytown, LLC<br>4618 Stoney Ridge Court<br>Sugar Land, TX 77479 | PSP Franchising, LLC | Franchise Agreement, dated 02/15/2019, as renewed or amended (Store #4219 - Baytown) | | $0.00 |
| 121805462 | Pet Maab, Inc | Pet Maab, Inc<br>15 Stirrup Lane<br>Salonga, NY 11768 | PSP Franchising, LLC | Franchise Agreement, dated 04/27/2024, as renewed or amended (Store #4643 - Massapequa) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121805463 | Pet Plus Love, L.L.C | Pet Plus Love, L.L.C 21 Cedar Grove Court Rosedale, MD 21237 | PSP Franchising, LLC | Franchise Agreement, dated 12/18/2023, as renewed or amended (Store #4631 - Dundalk) | | $0.00 |
| 121805464 | Pet Stark LLC | Pet Stark LLC 134 Derby Lane Bensalem, PA 19020 | PSP Franchising, LLC | Franchise Agreement, dated 11/17/2021, as renewed or amended (Store #4529 - Bensalem) | | $0.00 |
| 121805465 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/27/2019, as renewed or amended (Store #4247 - Arlington) | | $0.00 |
| 121805466 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/07/2022, as renewed or amended (Store #4493 - Frisco) | | $0.00 |
| 121805467 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/24/2022, as renewed or amended (Store #4509 - Irving) | | $0.00 |
| 121805468 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/06/2022, as renewed or amended (Store #4544 - Allen) | | $0.00 |
| 121805469 | Pet Supplies Plus Dallas II, LLC | Pet Supplies Plus Dallas II, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/13/2022, as renewed or amended (Store #4558 - Irving ) | | $0.00 |
| 121805470 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/26/2021, as renewed or amended (Store #4235 - Fort Worth) | | $0.00 |
| 121805471 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2020, as renewed or amended (Store #4369 - Crowley) | | $0.00 |
| 121805472 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/14/2020, as renewed or amended (Store #4386 - Mesquite) | | $0.00 |
| 121805473 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/03/2021, as renewed or amended (Store #4482 - Dallas) | | $0.00 |
| 121805474 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/24/2022, as renewed or amended (Store #4510 - Prosper) | | $0.00 |
| 121805475 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/11/2011, as renewed or amended (Store #7011 - Dallas) | | $0.00 |
| 121805476 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 12/13/2011, as renewed or amended (Store #7013 - Dallas) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121805477 | Pet Supplies Plus Dallas, LLC | Pet Supplies Plus Dallas, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 11/13/2011, as renewed or amended (Store #7014 - Lewisville) | | $0.00 |
| 121805478 | Pet Supplies Plus of Connecticut 203, LLC | Pet Supplies Plus of Connecticut 203, LLC<br>60 Orchard Road<br>Woodbridge, CT 06525 | PSP Franchising, LLC | Franchise Agreement, dated 02/11/1998, as renewed or amended (Store #4213 - Orange) | | $0.00 |
| 121805479 | Pet Supplies Plus of Connecticut 203, LLC | Pet Supplies Plus of Connecticut 203, LLC<br>60 Orchard Road<br>Woodbridge, CT 06525 | PSP Franchising, LLC | Franchise Agreement, dated 10/10/2011, as renewed or amended (Store #4214 - Shelton) | | $0.00 |
| 121805480 | Petcetera, Inc. | Petcetera, Inc.<br>Registered Agents, Inc., 7901 4th Street N,<br>Suite 300<br>St. Petersburg, FL 33702 | PSP Franchising, LLC | Franchise Agreement, dated 06/20/2019, as renewed or amended (Store #4266 - Spring Hill) | | $0.00 |
| 121805484 | PetIQ, LLC | PetIQ, LLC<br>230 East Riverside Drive<br>Eagle, ID 83616 | PSP Stores, LLC | Community Clinic Agreement | | $0.00 |
| 121805485 | Pets, Inc. | Pets, Inc.<br>3858 Wabeek Lake Drive E<br>Bloomfield Hills, MI 48302 | PSP Franchising, LLC | Franchise Agreement, dated 08/08/1991, as renewed or amended (Store #13 - White Lake) | | $0.00 |
| 121805486 | Pets4ever LLC | Pets4ever LLC<br>5541 Satinleaf Way<br>San Ramon, CA 94582 | PSP Franchising, LLC | Franchise Agreement, dated 07/26/2024, as renewed or amended (Store #4132 - Pleasanton) | | $0.00 |
| 121805487 | Petsway, Inc. | Petsway, Inc.<br>1669 St. Louis St.<br>Springfield, MO 65802 | PSP Franchising, LLC | Franchise Agreement, dated 08/17/2020, as renewed or amended (Store #4334 - Nixa) | | $0.00 |
| 121805488 | Petsway, Inc. | Petsway, Inc.<br>1669 St. Louis St.<br>Springfield, MO 65802 | PSP Franchising, LLC | Franchise Agreement, dated 08/17/2020, as renewed or amended (Store #4336 - Springfield) | | $0.00 |
| 121805489 | Petsway, Inc. | Petsway, Inc.<br>1669 St. Louis St.<br>Springfield, MO 65802 | PSP Franchising, LLC | Franchise Agreement, dated 08/17/2020, as renewed or amended (Store #4337 - Springfield) | | $0.00 |
| 121805490 | Petsway, Inc. | Petsway, Inc.<br>1669 St. Louis St.<br>Springfield, MO 65802 | PSP Franchising, LLC | Franchise Agreement, dated 08/17/2020, as renewed or amended (Store #4338 - Springfield) | | $0.00 |
| 121805505 | Phrasee Limited | Phrasee Limited<br>Tintagel House<br>92 Albert Embankment<br>London, SE1 7TY | PSP Stores, LLC | Master Services Agreement | | $0.00 |
| 121805522 | PJJD L.L.C. | PJJD L.L.C.<br>1401 Wilderness Dr.<br>Schererville, IN 46375 | PSP Franchising, LLC | Franchise Agreement, dated 10/29/2010, as renewed or amended (Store #200 - Lafayette) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805523 | PJJD L.L.C. | PJJD L.L.C. 1401 Wilderness Dr. Schererville, IN 46375 | PSP Franchising, LLC | Franchise Agreement, dated 04/30/2013, as renewed or amended (Store #223 - Crown Point) | | $0.00 |
| 121805524 | PJJD L.L.C. | PJJD L.L.C. 1401 Wilderness Dr. Schererville, IN 46375 | PSP Franchising, LLC | Franchise Agreement, dated 04/06/2017, as renewed or amended (Store #4136 - Whitestown) | | $0.00 |
| 121805525 | PJJD L.L.C. | PJJD L.L.C. 1401 Wilderness Dr. Schererville, IN 46375 | PSP Franchising, LLC | Franchise Agreement, dated 12/24/2020, as renewed or amended (Store #4388 - Kokomo) | | $0.00 |
| 121805532 | Placer Labs, Inc. | Placer Labs, Inc. 340 S Lemon Ave #1277 Walnut Walnut, CA 91789 | PSP Group, LLC | Amendment to Order Form | | $4,383.56 |
| 121805536 | planitretail, LLC | planitretail, LLC 360 Bloomfield Ave Suite 406 Windsor, CT 06095 | PSP Group, LLC | Professional Services Agreement | | $10,000.00 $0.00 |
| 121805544 | Platinum Pet Supply, LLC | Platinum Pet Supply, LLC 310 Pinnacle Way, Suite 300 Eau Claire, WI 54701 | PSP Franchising, LLC | Franchise Agreement, dated 04/12/2013, as renewed or amended (Store #215 - Rice Lake) | | $0.00 |
| 121805547 | PlayNetwork, Inc. | PlayNetwork, Inc. 8727 148th Avenue NE Redmond, WA 98052 | PSP Stores, LLC | Master Services Agreement | | $0.00 |
| 121805549 | PlayNetwork, Inc. | PlayNetwork, Inc. 8727 148th Avenue NE Redmond, WA 98052 | PSP Stores, LLC | Master Services Agreement Equipment Lease/Purchase | | $0.00 |
| 121805566 | Pluto's Pantry, LLC | Pluto's Pantry, LLC 9011 Sendera Dr. Magnolia, TX 77354 | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2021, as renewed or amended (Store #4483 - Magnolia) | | $0.00 |
| 121805574 | PNebel, Inc. | PNebel, Inc. 9500 Dorchester Road, Suite 350 Summerville, SC 29485 | PSP Franchising, LLC | Franchise Agreement, dated 07/31/2019, as renewed or amended (Store #4296 - James Island) | | $0.00 |
| 121805575 | PNebel, Inc. | PNebel, Inc. 9500 Dorchester Road, Suite 350 Summerville, SC 29485 | PSP Franchising, LLC | Franchise Agreement, dated 04/27/2011, as renewed or amended (Store #8051 - Summerville) | | $0.00 |
| 121805586 | Portier, LLC ("Uber") | Portier, LLC ("Uber") PO Box 743080 Los Angeles, CA 90074 | PSP Group, LLC | Amendment to Agreement between Portier and PSP Group, LLC | | $0.00 |
| 121805587 | Portier, LLC ("Uber") | Portier, LLC ("Uber") PO Box 743080 Los Angeles, CA 90074 | PSP Group, LLC | Uber Eats and PSP Group, LLC Agreement | | $152,827.54 |
| 121805589 | Posh Pets Acquisitions, LLC | Posh Pets Acquisitions, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2023, as renewed or amended (Store #4332 - Surf City) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121805590 | Posh Pets Acquisitions, LLC | Posh Pets Acquisitions, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/02/2023, as renewed or amended (Store #4366 - Cold Spring) | | $0.00 |
| 121805591 | Posh Pets Acquisitions, LLC | Posh Pets Acquisitions, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/03/2023, as renewed or amended (Store #4367 - Lexington) | | $0.00 |
| 121805592 | Posh Pets MN, LLC | Posh Pets MN, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/31/2022, as renewed or amended (Store #4002 - Crystal) | | $0.00 |
| 121805593 | Posh Pets MN, LLC | Posh Pets MN, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/31/2022, as renewed or amended (Store #4021 - Vadnais Heights) | | $0.00 |
| 121805594 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 05/20/2018, as renewed or amended (Store #4010 - Wilmington) | | $0.00 |
| 121805595 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 08/20/2018, as renewed or amended (Store #4208 - St. Albans) | | $0.00 |
| 121805596 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 10/25/2018, as renewed or amended (Store #4210 - Wilmington) | | $0.00 |
| 121805597 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2021, as renewed or amended (Store #4273 - Wilmington) | | $0.00 |
| 121805598 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 12/22/2020, as renewed or amended (Store #4363 - Harrison) | | $0.00 |
| 121805599 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 12/22/2020, as renewed or amended (Store #4364 - Cincinnati) | | $0.00 |
| 121805600 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 12/22/2020, as renewed or amended (Store #4382 - Hamilton) | | $0.00 |
| 121805601 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 10/06/2021, as renewed or amended (Store #4469 - Shelbyville) | | $0.00 |
| 121805602 | Posh Pets NC, LLC | Posh Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 06/03/2022, as renewed or amended (Store #4525 - Anderson) | | $0.00 |
| 121805603 | Posh Pets WV, LLC | Posh Pets WV, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 09/16/2019, as renewed or amended (Store #4467 - Barboursville) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121805604 | Postmates Inc. | Postmates Inc.<br>201 3rd St<br>San Francisco, CA 94103 | Pet Supplies "Plus", LLC | Postmates API Merchant Agreement | | $0.00 |
| 121805612 | Powerhouse Dynamics, Inc. | Powerhouse Dynamics, Inc.<br>1 Bridge St<br>Newton, MA 02458 | Pet Supplies "Plus", LLC | SiteSage License Agreement | | $51,271.40 |
| 121805614 | Powerhouse Dynamics, LLC | Powerhouse Dynamics, LLC<br>1 Bridge St<br>Newton, MA 02458 | PSP Stores, LLC | Amendment 6 to SiteSage License Agreement | | $0.00 |
| 121805618 | PPG ARCHITECTURAL FINISHES, INC. | PPG ARCHITECTURAL FINISHES, INC.<br>400 Bertha Lamme Drive<br>Cranberry Township, PA 16066 | PSP Group, LLC | PPG ARCHITECTURAL FINISHES, INC. PSP GROUP, LLC D/B/A PET SUPPLIES PLUS SALES AGREEMENT | | $0.00 |
| 121805624 | Pradhans Pets Empire 2, LLC | Pradhans Pets Empire 2, LLC<br>1039 Pitch Pine Street<br>Hickory Creek, TX 75065 | PSP Franchising, LLC | Franchise Agreement, dated 01/02/2024, as renewed or amended (Store #4627 - Greenville) | | $0.00 |
| 121805625 | Pradhans Pets Empire, LLC | Pradhans Pets Empire, LLC<br>1039 Pitch Pine Street<br>Hickory Creek, TX 75065 | PSP Franchising, LLC | Franchise Agreement, dated 12/19/2023, as renewed or amended (Store #4626 - Decatur) | | $0.00 |
| 121805626 | Pradhan's Pets, Inc. | Pradhan's Pets, Inc.<br>1039 Pitch Pine Street<br>Hickory Creek, TX 75065 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2019, as renewed or amended (Store #4222 - Fate) | | $0.00 |
| 121805628 | Prairie Dog Pet Products, LLC | Prairie Dog Pet Products, LLC<br>907 Avenue R<br>Grand Prairie, TX 75050 | PSP Group, LLC | Addendum to Private Brand Pet Foods Agreement | | $0.00 |
| 121805640 | Premer Enterprises, Inc. | Premer Enterprises, Inc.<br>15330 Lynndale St.<br>Goddard, KS 67052 | PSP Franchising, LLC | Franchise Agreement, dated 01/20/2016, as renewed or amended (Store #4084 - Wichita) | | $0.00 |
| 121805641 | Premer Enterprises, Inc. | Premer Enterprises, Inc.<br>15330 Lynndale St.<br>Goddard, KS 67052 | PSP Franchising, LLC | Franchise Agreement, dated 12/30/2020, as renewed or amended (Store #4414 - Wichita) | | $0.00 |
| 121805648 | Preston Elizabeth T Squared Alpha, LLC | Preston Elizabeth T Squared Alpha, LLC<br>5 Sherwood Ave.<br>Madison, NJ 07940 | PSP Franchising, LLC | Franchise Agreement, dated 04/14/2016, as renewed or amended (Store #4095 - Garwood) | | $0.00 |
| 121805649 | Preston Elizabeth T Squared Beta, LLC | Preston Elizabeth T Squared Beta, LLC<br>5 Sherwood Ave.<br>Madison, NJ 07940 | PSP Franchising, LLC | Franchise Agreement, dated 05/02/2018, as renewed or amended (Store #4184 - Cedar Knolls) | | $0.00 |
| 121805650 | Preston Elizabeth T Squared Gamma, LLC | Preston Elizabeth T Squared Gamma, LLC<br>5 Sherwood Ave.<br>Madison, NJ 07940 | PSP Franchising, LLC | Franchise Agreement, dated 12/02/2019, as renewed or amended (Store #4293 - Florham Park) | | $0.00 |
| 121805652 | Pretty Puppy, LLC | Pretty Puppy, LLC<br>3309 Post View Drive<br>O'Fallon, MO 63368 | WNW Franchising, LLC | Franchise Agreement, dated 11/27/2023, as renewed (Store #3010 - O'Fallon) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805664 | PrimePay, LLC | PrimePay, LLC<br>1487 Dunwoody Dr<br>West Chester, PA 19380 | Buddy's Newco, LLC | Master Services Agreement for Franchisor Services Pricing | | $2,621.90 |
| 121805672 | PrintComm, Inc | PrintComm, Inc<br>2929 Davison Road<br>Flint, MI 48506 | PSP Group, LLC | Proposal for Prospect Data and Data Work for PSP Group Direct Mail Effort | | $0.00 |
| 121805687 | ProKarma, Inc. | ProKarma, Inc.<br>8705 SW Nimbus Avenue<br>Beaverton, OR 97008 | PSP Group, LLC | Master Services Agreement | | $0.00 |
| 121805700 | Protection One Alarm Monitoring, Inc. | Protection One Alarm Monitoring, Inc.<br>800 E. Waterman<br>Wichita, KS 67202 | Pet Supplies "Plus", LLC | Commercial Schedule of Protection Proposal and Sales Agreement | | $0.00 |
| 121805709 | PRP Pet Supplies Inc. | PRP Pet Supplies Inc.<br>900 Green Sea Trail<br>Chesapeake, VA 23323 | PSP Franchising, LLC | Franchise Agreement, dated 12/10/2021, as renewed or amended (Store #4560 - Chesapeake ) | | $0.00 |
| 121805710 | PS1 Rocky LLC | PS1 Rocky LLC<br>167 Route 9<br>Englishtown, NJ 07726 | PSP Franchising, LLC | Franchise Agreement, dated 03/06/2023, as renewed or amended (Store #4588 - Tinton Falls) | | $0.00 |
| 121805711 | PSP 7 Detroit LLC | PSP 7 Detroit LLC<br>8508 Golfside Dr.<br>Commerce Township, MI 48382 | PSP Franchising, LLC | Franchise Agreement, dated 09/14/2004, as renewed or amended (Store #7 - Detroit) | | $0.00 |
| 121805712 | PSP Anthem, LLC | PSP Anthem, LLC<br>710 East Desert Ranch Rd.<br>Phoenix, AZ 85086 | PSP Franchising, LLC | Franchise Agreement, dated 09/29/2021, as renewed or amended (Store #4454 - Phoenix) | | $0.00 |
| 121805714 | PSP Bolingbrook, L.L.C. | PSP Bolingbrook, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 07/18/2007, as renewed or amended (Store #180 - Bolingbrook) | | $0.00 |
| 121805715 | PSP Collins, LLC | PSP Collins, LLC<br>3620 Cole Drive<br>Baton Rouge, LA 70806 | PSP Franchising, LLC | Franchise Agreement, dated 12/30/2021, as renewed or amended (Store #4486 - Baton Rouge) | | $0.00 |
| 121805716 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/14/2015, as renewed or amended (Store #4025 - Fort Worth) | | $0.00 |
| 121805717 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/12/2016, as renewed or amended (Store #4057 - Carrollton) | | $0.00 |
| 121805718 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/22/2016, as renewed or amended (Store #4060 - Ft. Worth) | | $0.00 |
| 121805719 | PSP Dallas, LP | PSP Dallas, LP<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/18/2016, as renewed or amended (Store #4064 - Dallas) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121805720 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 05/30/2017, as renewed or amended (Store #4140 - Wylie) | | $0.00 |
| 121805721 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/18/2017, as renewed or amended (Store #4150 - Dallas ) | | $0.00 |
| 121805722 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/19/2019, as renewed or amended (Store #4170 - Forney) | | $0.00 |
| 121805723 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/01/2019, as renewed or amended (Store #4220 - McKinney) | | $0.00 |
| 121805724 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/21/2019, as renewed or amended (Store #4234 - Dallas) | | $0.00 |
| 121805725 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/26/2019, as renewed or amended (Store #4274 - Denton) | | $0.00 |
| 121805726 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/21/2020, as renewed or amended (Store #4318 - North Richland Hills) | | $0.00 |
| 121805727 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 01/04/2002, as renewed or amended (Store #7002 - Dallas) | | $0.00 |
| 121805728 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/27/2006, as renewed or amended (Store #7005 - Plano) | | $0.00 |
| 121805729 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/24/2010, as renewed or amended (Store #7010 - Richardson) | | $0.00 |
| 121805730 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #7015 - Garland) | | $0.00 |
| 121805731 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #7016 - Arlington) | | $0.00 |
| 121805732 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 07/02/2014, as renewed or amended (Store #7017 - Dallas) | | $0.00 |
| 121805733 | PSP Dallas, LP | PSP Dallas, LP 17863 170th Avenue, Suite 101 Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/22/2015, as renewed or amended (Store #7018 - Hurst) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121805734 | PSP Fargo, LLC | PSP Fargo, LLC<br>428 N. Highway 218, Suite #3<br>Aberdeen, SD 57401 | PSP Franchising, LLC | Franchise Agreement, dated 07/25/2021, as renewed or amended (Store #4609 - West Fargo) | | $0.00 |
| 121805735 | PSP Fort Myers, LLC | PSP Fort Myers, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2015, as renewed or amended (Store #4004 - Fort Myers) | | $0.00 |
| 121805737 | PSP Lapeer, LLC | PSP Lapeer, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 12/05/1997, as renewed or amended (Store #103 - Lapeer) | | $0.00 |
| 121805738 | PSP LITH, L.L.C. | PSP LITH, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 07/03/2012, as renewed or amended (Store #213 - Lake in the Hills) | | $0.00 |
| 121805739 | PSP Montgomery, L.L.C. | PSP Montgomery, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 01/08/2014, as renewed or amended (Store #227 - Montgomery) | | $0.00 |
| 121805740 | PSP Moon Valley, LLC | PSP Moon Valley, LLC<br>3814 S. Brush Arbor<br>Flagstaff, AZ 86005 | PSP Franchising, LLC | Franchise Agreement, dated 12/11/2019, as renewed or amended (Store #4294 - Phoenix) | | $0.00 |
| 121805741 | PSP Naperville Ogden, L.L.C. | PSP Naperville Ogden, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 11/15/2009, as renewed or amended (Store #184 - Naperville) | | $0.00 |
| 121805742 | PSP Naperville South, L.L.C. | PSP Naperville South, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 02/04/2008, as renewed or amended (Store #183 - Naperville) | | $0.00 |
| 121805743 | PSP North Aurora, L.L.C. | PSP North Aurora, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 11/16/2009, as renewed or amended (Store #188 - North Aurora) | | $0.00 |
| 121805744 | PSP North Scottsdale, LLC | PSP North Scottsdale, LLC<br>3814 S. Brush Arbor<br>Flagstaff, AZ 86005 | PSP Franchising, LLC | Franchise Agreement, dated 07/16/2018, as renewed or amended (Store #4190 - Scottsdale) | | $0.00 |
| 121805745 | PSP of Hollywood, LLC | PSP of Hollywood, LLC<br>3719 Condor Ct.<br>Weston, FL 33331 | PSP Franchising, LLC | Franchise Agreement, dated 05/04/2011, as renewed or amended (Store #8047 - Hollywood) | | $0.00 |
| 121805746 | PSP Orland Park, L.L.C. | PSP Orland Park, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 02/27/2014, as renewed or amended (Store #229 - Orland Park) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805747 | PSP Oro Valley, LLC | PSP Oro Valley, LLC<br>3814 S. Brush Arbor<br>Flagstaff, AZ 86005 | PSP Franchising, LLC | Franchise Agreement, dated 09/18/2023, as renewed or amended (Store #4614 - Oro Valley) | | $0.00 |
| 121805748 | PSP Ortonville, LLC | PSP Ortonville, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 05/08/2008, as renewed or amended (Store #178 - Ortonville) | | $0.00 |
| 121805749 | PSP Redford, LLC | PSP Redford, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 05/26/2022, as renewed or amended (Store #1 - Redford Township) | | $0.00 |
| 121805750 | PSP Rockies, LLC | PSP Rockies, LLC<br>336 Morning Star Way<br>Castle Rock, CO 80108 | PSP Franchising, LLC | Franchise Agreement, dated 07/29/2022, as renewed or amended (Store #4531 - Denver) | | $0.00 |
| 121805751 | PSP Streamwood, L.L.C. | PSP Streamwood, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2013, as renewed or amended (Store #222 - Streamwood) | | $0.00 |
| 121805752 | PSP TS, LLC | PSP TS, LLC<br>16409 Lucia Gardens Lane<br>Tampa, FL 33625 | PSP Franchising, LLC | Franchise Agreement, dated 02/14/2022, as renewed or amended (Store #4308 - Holiday) | | $0.00 |
| 121805753 | PSP Yorkville, L.L.C. | PSP Yorkville, L.L.C.<br>c/o National Shopping Plazas, Inc., 200 W.<br>Madison St., Suite 4200<br>Chicago, IL 60606 | PSP Franchising, LLC | Franchise Agreement, dated 06/12/2014, as renewed or amended (Store #238 - Yorkville) | | $0.00 |
| 121805789 | Quality Pet Food and Supply, LLC | Quality Pet Food and Supply, LLC<br>5543 Mahoning Avenue<br>Austintown, OH 44515-2316 | PSP Franchising, LLC | Franchise Agreement, dated 06/10/2020, as renewed or amended (Store #4326 - Austintown) | | $0.00 |
| 121805804 | Quikly®, Inc. | Quikly®, Inc.<br>1505 Woodward Ave<br>4th Floor<br>Detroit, MI 48226 | PSP Group, LLC | Quikly Master Services Agreement | | $3,600.00 |
| 121805813 | R&R's Dog House, LLC | R&R's Dog House, LLC<br>505 S Forest Ridge<br>Broken Arrow, OK 74014 | PSP Franchising, LLC | Franchise Agreement, dated 09/21/2021, as renewed or amended (Store #4092 - Tulsa) | | $0.00 |
| 121805814 | R&R's Dog House, LLC | R&R's Dog House, LLC<br>505 S Forest Ridge<br>Broken Arrow, OK 74014 | PSP Franchising, LLC | Franchise Agreement, dated 09/21/2021, as renewed or amended (Store #4221 - Owasso) | | $0.00 |
| 121805815 | R&R's Dog House, LLC | R&R's Dog House, LLC<br>505 S Forest Ridge<br>Broken Arrow, OK 74014 | PSP Franchising, LLC | Franchise Agreement, dated 10/05/2023, as renewed or amended (Store #4623 - Richmond) | | $0.00 |
| 121805823 | Radiant Pets Holdings, LLC | Radiant Pets Holdings, LLC<br>220 Newport Center Drive 11-252<br>Newport Beach, CA 92660 | PSP Franchising, LLC | Franchise Agreement, dated 10/25/2023, as renewed or amended (Store #4622 - Wichita) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121805851 | RBL Enterprise, LTD | RBL Enterprise, LTD<br>5062 Colony Woods Dr.<br>Kalamazoo, MI 49009 | PSP Franchising, LLC | Franchise Agreement, dated 10/14/2005, as renewed or amended (Store #77 - Portage) | | $0.00 |
| 121805870 | Red Bull North America, Inc. | Red Bull North America, Inc.<br>1630 Stewart Street<br>Santa Monica, ia 90404 | PSP Stores, LLC | Merchandiser Agreement | | $0.00 |
| 121805871 | Red Canary, Inc. | Red Canary, Inc.<br>1501 South Mo-Pac Expressway Suite 400<br>Austin, TX 78746 | Pet Supplies "Plus", LLC | Red Canary Managed Detection and Response Services Agreement | | $0.00 |
| 121805889 | Reiber, Inc. | Reiber, Inc.<br>14240 Imboden Rd.<br>Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 05/08/2015, as renewed or amended (Store #4001 - Englewood) | | $0.00 |
| 121805996 | Heritage Seymour I, LLC | Heritage Seymour I, LLC<br>c/o Heritage Capital Management LLC<br>123 Prospect Street<br>PO Box 627<br>Ridgewood, NJ 07451 | PSP Distribution, LLC | Commercial Industrial Lease Agreement, dated January 1, 2012, as amended (Seymour, IN) | IN Distribution Center | $0.00 |
| 121805998 | RGIS, LLC | RGIS, LLC<br>2000 Taylor Road<br>Suite #200<br>Auburn Hills, MI 48326-1771 | PSP Stores, LLC | Master Services Agreement | | $0.00 |
| 121806009 | Ricoh USA, Inc. | Ricoh USA, Inc.<br>300 Eagleview Blvd Ste 200<br>Exton, PA 19341 | PSP Group, LLC | Lease Agreement | | $~~393.72~~0.00 |
| 121806015 | Rightpoint Consulting, LLC | Rightpoint Consulting, LLC<br>29 North Wacker Drive<br>4th Floor<br>Chicago, IL 60606 | Pet Supplies "Plus", LLC | Master Services Agreement | | $0.00 |
| 121806046 | RJSB Pet Group II, LLC | RJSB Pet Group II, LLC<br>5218 Rio Grande Drive<br>Raleigh, NC 27616 | PSP Franchising, LLC | Franchise Agreement, dated 10/25/2019, as renewed or amended (Store #4284 - Wake Forest) | | $0.00 |
| 121806047 | RJSB Pet Group, LLC | RJSB Pet Group, LLC<br>5218 Rio Grande Drive<br>Raleigh, NC 27616 | PSP Franchising, LLC | Franchise Agreement, dated 10/04/2019, as renewed or amended (Store #4282 - Cary) | | $0.00 |
| 121806051 | RNU, Inc. | RNU, Inc.<br>3859 Wabeek Lake Drive E<br>Bloomfield Hills, MI 48302 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2003, as renewed or amended (Store #48 - Bloomfield Hills) | | $0.00 |
| 121806054 | Rocam, Inc. | Rocam, Inc.<br>1437 Cantoria Avenue<br>Coral Gables, FL 33146 | PSP Franchising, LLC | Franchise Agreement, dated 01/05/2021, as renewed or amended (Store #4224 - Miami) | | $0.00 |
| 121806078 | RRR and B, LLC | RRR and B, LLC<br>124 Featherstone Lane SE<br>Owens Cross Roads, AL 35763 | PSP Franchising, LLC | Franchise Agreement, dated 11/28/2016, as renewed or amended (Store #4119 - Madison) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121806079 | RRR and B, LLC | RRR and B, LLC<br>124 Featherstone Lane SE<br>Owens Cross Roads, AL 35763 | PSP Franchising, LLC | Franchise Agreement, dated 11/22/2018, as renewed or amended (Store #4212 - Huntsville) | | $0.00 |
| 121806085 | Rudra Pet Supplies Inc | Rudra Pet Supplies Inc<br>900 Green Sea Trail<br>Chesapeake, VA 23323 | PSP Franchising, LLC | Franchise Agreement, dated 09/24/2024, as renewed or amended (Store #4642 - Chesapeake) | | $0.00 |
| 121806087 | Rumpke of Indiana, LLC | Rumpke of Indiana, LLC<br>1510 E 4th Street<br>Seymour, IN 47274 | PSP Distribution, LLC | Customer Service Agreement for Waste & Recycling Services | | $0.00 |
| 121806090 | Rush Direct, Inc. | Rush Direct, Inc.<br>890 North Wood Dale Road<br>Wood Dale<br>IL 60191<br>Wood Dale, IL 60191 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121806102 | S & A Investment CO. | S & A Investment CO.<br>620 S. Wayfare Tr.<br>Oconomowoc, WI 53066 | PSP Franchising, LLC | Franchise Agreement, dated 05/10/1993, as renewed or amended (Store #41 - Brookfield) | | $0.00 |
| 121806103 | S & A Investment CO. | S & A Investment CO.<br>620 S. Wayfare Tr.<br>Oconomowoc, WI 53066 | PSP Franchising, LLC | Franchise Agreement, dated 02/04/1998, as renewed or amended (Store #60 - Glendale) | | $0.00 |
| 121806104 | S & A Investment CO. | S & A Investment CO.<br>620 S. Wayfare Tr.<br>Oconomowoc, WI 53066 | PSP Franchising, LLC | Franchise Agreement, dated 01/29/1998, as renewed or amended (Store #81 - Greenfield) | | $0.00 |
| 121806107 | S&P Global Ratings | S&P Global Ratings<br>55 Water Street<br>New York, NY 10041 | Franchise Group, Inc. | S&P Global Ratings Engagement Letter for Franchise Group, Inc. | | $953.42 |
| 121806124 | Sageflo, Inc. | Sageflo, Inc.<br>4111 E. Madison Street<br>Suite 87<br>Seattle, WA 98112 | Pet Supplies "Plus", LLC | Pet Supplies Plus Wag N Wash Applications Order Document | | $0.00 |
| 121806125 | Sageflo, Inc. | Sageflo, Inc.<br>4111 E. Madison Street<br>Suite 87<br>Seattle, WA 98112 | Pet Supplies "Plus", LLC | Solution Subscriptions + Custom Enhancements Order Document | | $0.00 |
| 121806128 | Sageflo, Inc. | Sageflo, Inc.<br>4111 E. Madison Street<br>Suite 87<br>Seattle, WA 98112 | PSP Group, LLC | Pet Supplies Plus Radiate Event Template Order Document | | $0.00 |
| 121806133 | Salesforce, Inc. | Salesforce, Inc.<br>Salesforce Tower<br>415 Mission Street<br>3rd Floor<br>San Francisco, CA 94105 | Pet Supplies "Plus", LLC | Salesforce Order Form for Pet Supplies Plus | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121806135 | Samaya Capital Group, Inc. | Samaya Capital Group, Inc.<br>14 Sunrise Hill Road<br>Orinda, CA 94563 | PSP Franchising, LLC | Franchise Agreement, dated 09/15/2023, as renewed or amended (Store #4613 - Walnut Creek) | | $0.00 |
| 121806148 | Sanvi Pet Supplies, Inc. | Sanvi Pet Supplies, Inc.<br>19 Madison Ave.<br>New Hyde Park, NY 11040 | PSP Franchising, LLC | Franchise Agreement, dated 12/10/2021, as renewed or amended (Store #4610 - East Meadow) | | $0.00 |
| 121806157 | Savills, Inc. | Savills, Inc.<br>520 Newport Center Drive<br>8th Floor<br>Newport Beach, CA 92660 | Pet Supplies "Plus", LLC | Real Estate Strategy and Brokerage Agreement | | $0.00 |
| 121806159 | SB Fateh LLC | SB Fateh LLC<br>8355 Cinnamon Ridge Lane<br>Reno, NV 89523 | PSP Franchising, LLC | Franchise Agreement, dated 06/29/2023, as renewed or amended (Store #4252 - Reno) | | $0.00 |
| 121806160 | SBB Sterling Heights, LLC | SBB Sterling Heights, LLC<br>31500 Northwestern Highway, Suite 175<br>Farmington Hills, MI 48334 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2017, as renewed or amended (Store #4144 - Sterling Heights) | | $0.00 |
| 121806161 | SC Department of Commerce | SC Department of Commerce<br>1201 Main Street<br>Suite 1600<br>Columbia, SC 29201 | Pet Supplies "Plus", LLC | Grant Application for Project Gigi - Pet Supplies Plus LLC | | $0.00 |
| 121806163 | SCB GLOBAL Ltd | SCB GLOBAL Ltd<br>37th floor<br>1 Canada Square<br>Canary Wharf<br>London,  E14 5AA | Pet Supplies "Plus", LLC | Pet Supplies Plus OPTO4Teams Cloud Calling Scope of Work | | $0.00 |
| 121806164 | SCB Global Ltd | SCB Global Ltd<br>37th floor<br>1 Canada Square<br>Canary Wharf<br>London,  E14 5AA | PSP Group, LLC | SCB Global Ltd Standard Contract V4.2 | | $0.00 |
| 121806169 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2014, as renewed or amended (Store #4016 - Bryan) | | $0.00 |
| 121806170 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 03/17/2017, as renewed or amended (Store #4134 - Montgomery) | | $0.00 |
| 121806171 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 07/15/2020, as renewed or amended (Store #4330 - Waco) | | $0.00 |
| 121806172 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 03/25/2022, as renewed or amended (Store #4512 - Portland) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121806173 | Schultz Pet Supply, LLC | Schultz Pet Supply, LLC<br>2004 Schultz Rd.<br>Franklin, TX 77856 | PSP Franchising, LLC | Franchise Agreement, dated 08/25/2022, as renewed or amended (Store #4539 - McAllen) | | $0.00 |
| 121806182 | Scottcin Enterprises, Inc. | Scottcin Enterprises, Inc.<br>2621 S. Telegraph Rd.<br>Dearborn, MI 48124 | PSP Franchising, LLC | Franchise Agreement, dated 06/23/2003, as renewed or amended (Store #2 - Woodhaven) | | $0.00 |
| 121806183 | Scottcin Enterprises, Inc. | Scottcin Enterprises, Inc.<br>15060 Eureka Rd.<br>Southgate, MI 48124 | PSP Franchising, LLC | Franchise Agreement, dated 04/22/1991, as renewed or amended (Store #18 - Taylor) | | $0.00 |
| 121806184 | Scottcin Enterprises, Inc. | Scottcin Enterprises, Inc.<br>15060 Eureka Rd.<br>Southgate, MI 48124 | PSP Franchising, LLC | Franchise Agreement, dated 01/05/1996, as renewed or amended (Store #90 - Dearborn) | | $0.00 |
| 121806186 | Scribcor Global Lease Administration, LLC | Scribcor Global Lease Administration, LLC<br>2 Mid America Plaza, Suite 650<br>Oakbrook Terrace, IL 60181 | PSP Stores, LLC | First Amendment to Lease Abstract Services Agreement | | $2,725.37 |
| 121806187 | Scully Dog Enterprises, Inc. | Scully Dog Enterprises, Inc.<br>3150 Woodwalk Dr SE, Unit 3201<br>Atlanta, GA 30339-8495 | PSP Franchising, LLC | Franchise Agreement, dated 08/12/2015, as renewed or amended (Store #4020 - Smyrna) | | $0.00 |
| 121806196 | SecureWorks, Inc. | SecureWorks, Inc.<br>1 Concourse Pkwy<br>NE #500<br>Atlanta, GA 30328 | PSP Group, LLC | Customer Relationship Agreement | | $0.00 |
| 121806203 | Security 101 LLC | Security 101 LLC<br>1450 Centrepark Blvd.<br>Ste 210<br>West Palm Beach, FL 33401 | Buddy's Newco, LLC | Security Service Contract | | $0.00 |
| 121806251 | Service Express | Service Express<br>3854 Broadmoor Ave. SE<br>Grand Rapids MI 49512, MI 49512 | Pet Supplies "Plus", LLC | Service Agreement 33427 | | $0.00 |
| 121806256 | Shaina Fishman Photography LLC | Shaina Fishman Photography LLC<br>149 Huron Street #2D<br>Brooklyn, NY 11222 | PSP Group, LLC | Intellectual Property Rights License Agreement | | $0.00 |
| 121806257 | SHAMROCK A OWNER, LLC | SHAMROCK A OWNER, LLC<br>122 Palmetto Commerce Parkway<br>Orangeburg, SC 29115 | Pet Supplies "Plus", LLC | COMMENCEMENT DATE AGREEMENT | | $0.00 |
| 121806269 | Shaw + Scott, Inc. | Shaw + Scott, Inc.<br>1513 33rd Ave.<br>Seattle, WA 98122 | Pet Supplies "Plus", LLC | Professional Services Statement of Work | | $0.00 |
| 121806271 | Shaw + Scott, Inc. | Shaw + Scott, Inc.<br>1513 33rd Ave.<br>Seattle, WA 98122 | Pet Supplies "Plus", LLC | Master Services Agreement | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121806281 | Shenzhen XingRisheng Industrial Co., Ltd | Shenzhen XingRisheng Industrial Co., Ltd<br>Baolong Ind. City<br>Longgang<br>Shenzhen<br>Shenzhen, China | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121806295 | Shine Holdings Ken Caryl, LLC | Shine Holdings Ken Caryl, LLC<br>15741 W Eureka Avenue<br>Morrison, CO 80465 | PSP Franchising, LLC | Franchise Agreement, dated 09/30/2024, as renewed or amended (Store #4654 - Ken Caryl) | | $0.00 |
| 121806296 | Shine Holdings, LLC | Shine Holdings, LLC<br>15741 W Eureka Avenue<br>Morrison, CO 80465 | PSP Franchising, LLC | Franchise Agreement, dated 05/03/2024, as renewed or amended (Store #4641 - Lakewood) | | $0.00 |
| 121806316 | Siemens Industry, Inc. | Siemens Industry, Inc.<br>1000 Deerfield Parkway<br>Buffalo Grove, IL 60089 | PSP Stores, LLC | EQUIPMENT PURCHASE, RELATED DATA SERVICES AND PROFESSIONAL SERVICES AGREEMENT | | $434.56 |
| 121806328 | Simmons Pet Food, Inc. | Simmons Pet Food, Inc.<br>601 N. Hico Street<br>Siloam Springs, AR 72761 | PSP Group, LLC | Private Brand Pet Foods Agreement | | $0.00 |
| 121806341 | Singh Pets, LLC | Singh Pets, LLC<br>7548 Morris Street #2<br>Fulton, MD 20759 | PSP Franchising, LLC | Franchise Agreement, dated 11/15/2022, as renewed or amended (Store #4503 - Beltsville) | | $0.00 |
| 121806369 | Sitecore USA, Inc. | Sitecore USA, Inc.<br>101 California St Suite 1600<br>San Francisco, CA 94111 | Pet Supplies "Plus", LLC | Sitecore Source Code License Agreement | | $39,702.13 |
| 121806371 | Siterra, LLC | Siterra, LLC<br>10801-2 N. Mopac Expressway<br>Suite 400<br>Austin, TX 78759 | Pet Supplies "Plus", LLC | Master Subscription Agreement | | $0.00 |
| 121806378 | Skol Haus Pets L.L.C. | Skol Haus Pets L.L.C.<br>8917 W Lakeside Drive<br>Sioux Falls, SD 57107 | PSP Franchising, LLC | Franchise Agreement, dated 11/13/2019, as renewed or amended (Store #4300 - Sioux Falls) | | $0.00 |
| 121806381 | Skyepets, LLC | Skyepets, LLC<br>20619 Shadow Mill Court<br>Katy, TX 77450 | PSP Franchising, LLC | Franchise Agreement, dated 03/05/2019, as renewed or amended (Store #4243 - Spring) | | $0.00 |
| 121806386 | Sloans of PSP, LLC | Sloans of PSP, LLC<br>5771 Myers Road<br>Akron, OH 43319 | PSP Franchising, LLC | Franchise Agreement, dated 10/27/2021, as renewed or amended (Store #4485 - Norton) | | $0.00 |
| 121806410 | SOCi, Inc. | SOCi, Inc.<br>8605 Santa Monica Blvd PMB 47149<br>West Hollywood, CA 90069-4109 | PSP Group, LLC | SOCi Order Form and Master Subscription Agreement | | $0.00 |
| 121806416 | SocialWise, Inc., d.b.a. Rallio | SocialWise, Inc., d.b.a. Rallio<br>400 Spectrum Center Drive Suite 1250<br>Irvine, CA 92618 | Pet Supplies "Plus", LLC | REVV AGREEMENT | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|-------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121806421 | SocialWise, Inc., d.b.a. Rallio | SocialWise, Inc., d.b.a. Rallio 400 Spectrum Center Drive Suite 1250 Irvine, CA 92618 | Pet Supplies "Plus", LLC | Rallio Local Agreement | | $0.00 |
| 121806425 | SOEMI Pet Supplies, Inc. | SOEMI Pet Supplies, Inc. 2027 Mackenzie Place Wheaton, IL 60187 | PSP Franchising, LLC | Franchise Agreement, dated 12/09/2022, as renewed or amended (Store #4565 - Kenosha) | | $0.00 |
| 121806427 | Sole Pet, LLC | Sole Pet, LLC 29 Long Hill Road New Vernon, NJ 07976 | PSP Franchising, LLC | Franchise Agreement, dated 08/23/2023, as renewed or amended (Store #4157 - Pen Argyl) | | $0.00 |
| 121806439 | South River Mills Investments, LLC | South River Mills Investments, LLC 56 Mills Gap Road Asheville, NC 28803 | PSP Franchising, LLC | Franchise Agreement, dated 05/20/2023, as renewed or amended (Store #4601 - Hendersonville) | | $0.00 |
| 121806441 | South State Bank | South State Bank c/o REPAY 3 West Paces Ferry Road Suite 200 Atlanta, GA 30309 | Buddy's Newco, LLC | Electronic Payment Contract | | $0.00 |
| 121806443 | Southbay Ventures, LLC | Southbay Ventures, LLC 1231 Horseshoe Drive Greensboro, GA 30642 | PSP Franchising, LLC | Franchise Agreement, dated 06/21/2016, as renewed or amended (Store #4094 - Edmond) | | $0.00 |
| 121806444 | Southbay Ventures, LLC | Southbay Ventures, LLC 1231 Horseshoe Drive Greensboro, GA 30642 | PSP Franchising, LLC | Franchise Agreement, dated 02/19/2019, as renewed or amended (Store #4233 - Oklahoma City) | | $0.00 |
| 121806459 | Special D Events, Inc. | Special D Events, Inc. 1420 Washington Boulevard Suite 301 Detroit, MI 48220 | PSP Stores, LLC | Special D Events Contract | | $0.00 |
| 121806466 | Spike Enterprises, Inc. | Spike Enterprises, Inc. 18914 IH 20 Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 01/27/2015, as renewed or amended (Store #4013 - Stephenville) | | $0.00 |
| 121806467 | Spike Enterprises, Inc. | Spike Enterprises, Inc. 18914 IH 20 Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 05/24/2016, as renewed or amended (Store #4070 - Copperas Cove) | | $0.00 |
| 121806468 | Spike Enterprises, Inc. | Spike Enterprises, Inc. 18914 IH 20 Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 03/12/2018, as renewed or amended (Store #4174 - Weatherford) | | $0.00 |
| 121806469 | Spike Enterprises, Inc. | Spike Enterprises, Inc. 18914 IH 20 Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 01/31/2021, as renewed or amended (Store #4228 - Lubbock) | | $0.00 |
| 121806470 | Spike Enterprises, Inc. | Spike Enterprises, Inc. 18914 IH 20 Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 09/09/2020, as renewed or amended (Store #4349 - Abilene) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121806471 | Spike Enterprises, Inc. | Spike Enterprises, Inc. 18914 IH 20 Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 03/22/2022, as renewed or amended (Store #4508 - Midland) | | $0.00 |
| 121806472 | Spike Enterprises, Inc. | Spike Enterprises, Inc. 18914 IH 20 Cisco, TX 76437 | PSP Franchising, LLC | Franchise Agreement, dated 03/24/2022, as renewed or amended (Store #4511 - Lubbock) | | $0.00 |
| 121806503 | SSSCR, Inc. | SSSCR, Inc. 208 St. James Avenue, Suite B Goose Creek, SC 29445 | PSP Franchising, LLC | Franchise Agreement, dated 01/19/2016, as renewed or amended (Store #4262 - Goose Creek) | | $0.00 |
| 121806504 | St. Croix Valley Holdings, Inc. | St. Croix Valley Holdings, Inc. 4751 Hiawatha Avenue Minneapolis, MN 55406 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2002, as renewed or amended (Store #136 - Burnsville) | | $0.00 |
| 121806505 | St. Croix Valley Holdings, Inc. | St. Croix Valley Holdings, Inc. 4751 Hiawatha Avenue Minneapolis, MN 55406 | PSP Franchising, LLC | Franchise Agreement, dated 09/10/2002, as renewed or amended (Store #138 - Bloomington) | | $0.00 |
| 121806506 | St. Croix Valley Holdings, Inc. | St. Croix Valley Holdings, Inc. 4751 Hiawatha Avenue Minneapolis, MN 55406 | PSP Franchising, LLC | Franchise Agreement, dated 12/23/2010, as renewed or amended (Store #199 - Minneapolis) | | $0.00 |
| 121806510 | StackAdapt Inc. | StackAdapt Inc. 210 King St East - Suite 500 Toronto, ON M5A 1J7 | PSP Group, LLC | StackAdapt Digital Advertising Services Agreement | | $0.00 |
| 121806524 | Stardust Partners, LLC | Stardust Partners, LLC c/o Pet Supplies Plus, 1300 MacDade Boulevard Woodlyn, PA 19094 | PSP Franchising, LLC | Franchise Agreement, dated 01/13/2021, as renewed or amended (Store #4223 - Philadelphia) | | $0.00 |
| 121806533 | Stealth Dog, Inc. | Stealth Dog, Inc. 382 Adams St. Plymouth, MI 48170 | PSP Franchising, LLC | Franchise Agreement, dated 02/20/2004, as renewed or amended (Store #152 - Adrian) | | $0.00 |
| 121806547 | Stevens Point Pets, LLC | Stevens Point Pets, LLC 2295 Spring Rose Road Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 04/17/2023, as renewed or amended (Store #4596 - Stevens Point) | | $0.00 |
| 121806554 | STM Investments, LLC | STM Investments, LLC 3106 Southern Hills Drive Des Moines, IA 50321 | PSP Franchising, LLC | Franchise Agreement, dated 11/17/2022, as renewed or amended (Store #4599 - Kendall) | | $0.00 |
| 121806563 | STRAIGHT PATH IT SOLUTIONS, LLC | STRAIGHT PATH IT SOLUTIONS, LLC 12 E. Side Road Sanbornville, NH 03872 | PSP Group, LLC | Professional Services Agreement | | $0.00 |
| 121806566 | Strategic Defense Corporation | Strategic Defense Corporation 30 N Gould St Ste R Sheridan, WY 82801 | PSP Group, LLC | Statement of Work for Adversarial Testing Services | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121806569 | Strategic Pharmaceutical Solutions Inc., dba Vetsource | Strategic Pharmaceutical Solutions Inc., dba Vetsource 2005 SE 192nd Ave. Suite 200 Camas, WA 98607 | PSP Group, LLC | Master Services Agreement | | $0.00 |
| 121806570 | Strategic Pharmaceutical Solutions Inc., dba Vetsource Vet Success Inc. V2P2, LLC dba Vet2Pet | Strategic Pharmaceutical Solutions Inc., dba Vetsource Vet Success Inc. V2P2, LLC dba Vet2Pet  2005 SE 192nd Ave. Suite 200 Camas, WA 98607 | PSP Group, LLC | Amendment No. 1 to Statement of Work Prescription Medication and Diet Nutrition Services | | $0.00 |
| 121806602 | Sun Print Management | Sun Print Management 1101 N. Ward St. Tampa, FL 33607 | Buddy's Newco, LLC | Master Service Agreement | | $125.00 |
| 121806619 | Sunrise Technologies, Inc. | Sunrise Technologies, Inc. 525 Vine Street Suite 210 Winston Salem, NC 27101 | PSP Group, LLC | Sunrise Master Services Agreement | | $0.00 |
| 121806624 | Super Design Manufacture Co., Ltd | Super Design Manufacture Co., Ltd 3rd Floor Building 52 Yonger New Industrial Area Zhongshan City,  528467 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121806627 | Superior Consulting Services, LLC | Superior Consulting Services, LLC 350 W Burnsville Pkwy Ste 550 Burnsville, MN 55337-4900 | PSP Group, LLC | Superior Consulting Services, LLC Professional Services Agreement | | $0.00 |
| 121806630 | SupplyLogic, LLC | SupplyLogic, LLC 1400 Universal Avenue Kansas City, MO 64120 | PSP Group, LLC | Second Amendment to the Agreement | | $0.00 |
| 121806637 | Surf City Pets, LLC | Surf City Pets, LLC 16152 Whitecap Lane Huntington Beach, CA 92649 | PSP Franchising, LLC | Franchise Agreement, dated 02/12/2019, as renewed or amended (Store #4240 - Long Beach ) | | $0.00 |
| 121806654 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4546 - Florence) | | $0.00 |
| 121806655 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4547 - Athens) | | $0.00 |
| 121806656 | Sweet Home Pets, LLC | Sweet Home Pets, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4548 - Cullman) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121806658 | Sweet Home Pets, LLC | Sweet Home Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4550 - Guntersville) | | $0.00 |
| 121806659 | Sweet Home Pets, LLC | Sweet Home Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4551 - Hartselle) | | $0.00 |
| 121806660 | Sweet Home Pets, LLC | Sweet Home Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4552 - Fort Payne) | | $0.00 |
| 121806662 | Sweet Home Pets, LLC | Sweet Home Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4554 - Hazel Green) | | $0.00 |
| 121806663 | Sweet Home Pets, LLC | Sweet Home Pets, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | PSP Franchising, LLC | Franchise Agreement, dated 11/02/2022, as renewed or amended (Store #4555 - Scottsboro) | | $0.00 |
| 121806675 | Sydney's Pantry, LLC | Sydney's Pantry, LLC<br>14090 FM 2920, Ste. G551<br>Tomball, TX 77377 | PSP Franchising, LLC | Franchise Agreement, dated 07/05/2023, as renewed or amended (Store #4607 - Cypress) | | $0.00 |
| 121806684 | Synergy Franchising Corp. d/b/a Jani-King of Columbia | Synergy Franchising Corp. d/b/a Jani-King of Columbia<br>720 Gracern Road<br>Suite 116<br>Columbia, SC 29210 | PSP Distribution, LLC | JANI-KING MAINTENANCE AGREEMENT | | $3,025.00 |
| 121806687 | T&C Stillwaters, Inc. | T&C Stillwaters, Inc.<br>11930 Partridge Road Court N<br>Stillwater, MN 55082 | PSP Franchising, LLC | Franchise Agreement, dated 08/03/2020, as renewed or amended (Store #4412 - Fridley) | | $0.00 |
| 121806688 | T&C Stillwaters, Inc. | T&C Stillwaters, Inc.<br>11930 Partridge Road Court N<br>Stillwater, MN 55082 | PSP Franchising, LLC | Franchise Agreement, dated 06/18/2021, as renewed or amended (Store #4438 - Blaine) | | $0.00 |
| 121806696 | Tahoe Capital, LLC | Tahoe Capital, LLC<br>1410 Curtin St.<br>Houston, TX 77018 | PSP Franchising, LLC | Franchise Agreement, dated 02/26/2021, as renewed or amended (Store #4232 - Corpus Christi) | | $0.00 |
| 121806710 | Tallwave LLC | Tallwave LLC<br>4110 N. Scottsdale Rd. Suite 300<br>Scottsdale, AZ 85251 | PSP Group, LLC | Pet Supplies Plus Competitor Strike - Statement of Work | | |
| 121806716 | Tar Hong Melamine USA Inc. | Tar Hong Melamine USA Inc.<br>780 S. Nogales<br>City of Industry, CA 91748 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121806726 | Tayney Store 2 L.L.C. | Tayney Store 2 L.L.C.<br>8703 Black Cherry Crossing<br>Katy, TX 77494 | PSP Franchising, LLC | Franchise Agreement, dated 08/29/2016, as renewed or amended (Store #4129 - Katy) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121806727 | Tayney Store 3, LLC | Tayney Store 3, LLC<br>8703 Black Cherry Crossing<br>Katy, TX 77494 | PSP Franchising, LLC | Franchise Agreement, dated 04/15/2019, as renewed or amended (Store #4253 - Katy) | | $0.00 |
| 121806728 | Tayney Ventures, LP | Tayney Ventures, LP<br>8703 Black Cherry Crossing<br>Katy, TX 77494 | PSP Franchising, LLC | Franchise Agreement, dated 08/05/2014, as renewed or amended (Store #7019 - Katy) | | $0.00 |
| 121806744 | TEKsystems, Inc. | TEKsystems, Inc.<br>7437 Race Road<br>Hanover, MD 21076 | PSP Stores, LLC | Staffing Services Agreement - Modified | | $0.00 |
| 121806750 | Tempur-Pedic North America, LLC | Tempur-Pedic North America, LLC<br>1000 Tempur Way<br>Lexington, KY 40511-1386 | Buddy's Newco, LLC | Incentive Agreement | | $0.00 |
| 121806751 | Tempus Technologies, Inc. | Tempus Technologies, Inc.<br>120 E. Seventh St.<br>Auburn, IN 46706 | Pet Supplies "Plus", LLC | PaymentMate® Master Agreement | | $0.00 |
| 121806754 | Tennessee Yankee, LLC | Tennessee Yankee, LLC<br>401 Old Pleasant Grove Road, Apartment 821<br>Mount Juliet, TN 37122-7315 | PSP Franchising, LLC | Franchise Agreement, dated 10/09/2020, as renewed or amended (Store #4354 - Mt. Juliet) | | $0.00 |
| 121806757 | TerraCycle US LLC | TerraCycle US LLC<br>121 New York Ave<br>Trenton, NJ 8638 | PSP Group, LLC | TerraCycle Program Master Agreement | | $0.00 |
| 121806759 | TETRAD COMPUTER APPLICATIONS INC. | TETRAD COMPUTER APPLICATIONS INC.<br>Suite 318 - 1788 West 5th Avenue<br>Vancouver, BC V6J1P2 | Pet Supplies "Plus", LLC | AMENDMENT #2 TO SITEWISE SOFTWARE AS A SERVICE (SAAS) LICENSE AGREEMENT | | $0.00 |
| 121806761 | Texas Pet Supplies Inc. | Texas Pet Supplies Inc.<br>9672 E Balancing Rock Rd<br>Scottsdale, AZ 85262 | PSP Franchising, LLC | Franchise Agreement, dated 02/24/2020, as renewed or amended (Store #4311 - Amarillo) | | $0.00 |
| 121806793 | The Garmon Corporation dba NaturVet | The Garmon Corporation dba NaturVet<br>27461 Via Industrial St<br>Temecula, CA 92590 | PSP Group, LLC | Consent Agreement | | $0.00 |
| 121806797 | The Grocery Pup, LLC | The Grocery Pup, LLC<br>1401 Lavaca Street #204<br>Austin, TX 78701 | PSP Group, LLC | PSP Group, LLC Pet Partner Manual and Addendum | | $0.00 |
| 121806804 | The Hillman Group, Inc. | The Hillman Group, Inc.<br>10590 Hamilton Avenue<br>Cincinnati, OH 45231 | PSP Midco, LLC | ID Spot Engraver Agreement | | $0.00 |
| 121806813 | The J Austria Project, LLC | The J Austria Project, LLC<br>10705 Seneca Spring Way<br>Gaithersburg, MD 20886 | PSP Franchising, LLC | Franchise Agreement, dated 07/17/2023, as renewed or amended (Store #4655 - Gaithersburg) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121806858 | The Ultimate Software Group Inc. | The Ultimate Software Group Inc.<br>2000 Ultimate Way<br>Weston, FL 33326 | PSP Group, LLC | The Ultimate Software Group, Inc. SaaS Agreement | | $0.00 |
| 121806869 | Thermopylae Sciences & Technology, LLC Intergraph Corporation Hexagon Geospatial | Thermopylae Sciences & Technology, LLC Intergraph Corporation Hexagon Geospatial<br>1911 N. Fort Myer Dr. Suite 700<br>Arlington, VA 22209 | Pet Supplies "Plus", LLC | Novation Agreement | | $0.00 |
| 121806875 | Thomas Family Pet Supply, Inc. | Thomas Family Pet Supply, Inc.<br>37 Overbrook Road<br>Painted Post, NY 14870 | PSP Franchising, LLC | Franchise Agreement, dated 02/23/2022, as renewed or amended (Store #4499 – Coming/Elmira) | | $0.00 |
| 121806895 | TiLu Pets, Inc. | TiLu Pets, Inc.<br>1517 Lakeview Ave.<br>Sylvan Lake, MI 48320 | PSP Franchising, LLC | Franchise Agreement, dated 01/12/2015, as renewed or amended (Store #4024 - Tampa) | | $0.00 |
| 121806914 | T-Mobile USA, Inc. | T-Mobile USA, Inc.<br>12920 S.E. 38th Street<br>Bellevue, WA 98006 | PSP Group, LLC | T-Mobile Master Corporate Services Agreement | | $0.00 |
| 121806943 | Torberg Holdings, LLC | Torberg Holdings, LLC<br>737 Lake Shore<br>Grosse Pointe Shores, MI 48236 | PSP Franchising, LLC | Franchise Agreement, dated 12/19/2016, as renewed or amended (Store #4124 - Naples) | | $0.00 |
| 121806944 | Total Pet Supply Depot Inc. | Total Pet Supply Depot Inc.<br>9601 Humboldt Avenue South<br>Bloomington, MN 55431 | PSP Franchising, LLC | Franchise Agreement, dated 02/24/2021, as renewed or amended (Store #4488 - Apple Valley) | | $0.00 |
| 121806951 | Tradesmen International, LLC | Tradesmen International, LLC<br>9760 Shepard Rd<br>Macedonia, OH 44056 | PSP Distribution, LLC | Master Services Agreement | | $0.00 |
| 121806965 | Transplace Texas, LP | Transplace Texas, LP<br>3010 Gaylord Parkway<br>Suite 200<br>Frisco, TX 75034 | Pet Supplies "Plus", LLC | Transportation Logistics Management Services Agreement - Amendment No. 6 | | $0.00 |
| 121806972 | Trident4, Inc. | Trident4, Inc.<br>4885 Ketchum Court<br>Granite Bay, CA 95746 | PSP Franchising, LLC | Franchise Agreement, dated 06/07/2023, as renewed or amended (Store #4625 - Roseville) | | $0.00 |
| 121807008 | Twin Holdings Corp. | Twin Holdings Corp.<br>10547 Meridian Place Northeast<br>Lake Stevens, WA 98258 | PSP Franchising, LLC | Franchise Agreement, dated 09/21/2021, as renewed or amended (Store #4521 - Kennewick) | | $0.00 |
| 121807023 | UKG Inc. | UKG Inc.<br>900 Chelmsford St<br>Lowell, MA 01851 | PSP Group, LLC | UKG Order | | $0.00 |
| 121807032 | Unforgettable Pets Corp. | Unforgettable Pets Corp.<br>217 Copperwood Loop<br>Conway, SC 29526-5036 | PSP Franchising, LLC | Franchise Agreement, dated 05/19/2022, as renewed or amended (Store #4524 - Conway) | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121807036 | Unique Petz Treatz, LLC | Unique Petz Treatz, LLC<br>10 West 33rd Street<br>Suite 220<br>New York, NY 10001 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121807072 | Unleashed Brands, LLC | Unleashed Brands, LLC<br>2350 Airport Freeway, Suite 505<br>Bedford, TX 76022 | Franchise Group, Inc. | Transition Services Agreement | | $0.00 |
| 121807079 | Upstream Commerce Inc. | Upstream Commerce Inc.<br>228 Park Ave S. #89632<br>New York, NY 10003-1502 | Pet Supplies "Plus", LLC | Upstream Commerce Master Agreement | | $0.00 |
| 121807082 | Upstream Commerce Client | Upstream Commerce Client<br>228 Park Ave S. #89632<br>New York, NY 10003-1502 | PSP Group, LLC | Service Level Agreement | | $0.00 |
| 121807087 | US Pet Goods LLC | US Pet Goods LLC<br>3535 Inland Empire Blvd.<br>Ontario, CA 91764 | PSP Franchising, LLC | Franchise Agreement, dated 02/01/2023, as renewed or amended (Store #4584 - Corona) | | $0.00 |
| 121807088 | US Retail, Inc. | US Retail, Inc.<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #11 - Wyoming) | | $0.00 |
| 121807089 | US Retail, Inc. | US Retail, Inc.<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #45 - Grand Rapids) | | $0.00 |
| 121807090 | US Retail, Inc. | US Retail, Inc.<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #94 - Caledonia) | | $0.00 |
| 121807091 | US Retail, Inc. | US Retail, Inc.<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #121 - Grandville) | | $0.00 |
| 121807092 | US Retail, Inc. | US Retail, Inc.<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, as renewed or amended (Store #150 - Grand Rapids) | | $0.00 |
| 121807098 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/19/2015, as renewed or amended (Store #4026 - Maryville) | | $0.00 |
| 121807099 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/16/2021, as renewed or amended (Store #4473 - Kingsport) | | $0.00 |
| 121807100 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 10/18/2021, as renewed or amended (Store #4477 - Murfreesboro) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121807101 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/29/2023, as renewed or amended (Store #4598 - Hermitage) | | $0.00 |
| 121807102 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/02/2002, as renewed or amended (Store #8006 - Knoxville) | | $0.00 |
| 121807103 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 04/02/2002, as renewed or amended (Store #8033 - Oak Ridge) | | $0.00 |
| 121807104 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 06/02/2011, as renewed or amended (Store #8045 - Knoxville) | | $0.00 |
| 121807105 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 01/19/2012, as renewed or amended (Store #8049 - Knoxville) | | $0.00 |
| 121807106 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 08/26/2013, as renewed or amended (Store #8061 - Cookeville) | | $0.00 |
| 121807108 | USR Virginia, LLC | USR Virginia, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2015, as renewed or amended (Store #8055 - Franconia) | | $0.00 |
| 121807109 | USR Virginia, LLC | USR Virginia, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2015, as renewed or amended (Store #8056 - Centreville) | | $0.00 |
| 121807110 | USR Virginia, LLC | USR Virginia, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 02/18/2015, as renewed or amended (Store #8060 - Ashburn) | | $0.00 |
| 121807111 | USRH JV3, LLC | USRH JV3, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/07/2017, as renewed or amended (Store #4131 - Manassas) | | $0.00 |
| 121807112 | USRH JV3, LLC | USRH JV3, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/15/2017, as renewed or amended (Store #4133 - Frisco) | | $0.00 |
| 121807113 | USRH JV3, LLC | USRH JV3, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/06/2017, as renewed or amended (Store #4151 - Fort Worth) | | $0.00 |
| 121807114 | USRH JV3, LLC | USRH JV3, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 03/17/2023, as renewed or amended (Store #4591 - Richardson) | | $0.00 |
| 121807123 | VALASSIS COMMUNICATIONS, INC. | VALASSIS COMMUNICATIONS, INC.<br>275 7th Ave<br>#1701<br>New York, NY 10018 | PSP Group, LLC | AMENDMENT #1 to VALASSIS SERVICES AGREEMENT | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121807129 | Valsoft Corporation Inc dba GbBIS | Valsoft Corporation Inc dba GbBIS 7405 Rte Transcanadienne, Suite 100 Montreal, QC H4T 1Z2 | Franchise Group, Inc. | Web Application Agreement Amendment 9 | | $0.00 |
| 121807144 | Vatic Outsourcing, LLC | Vatic Outsourcing, LLC 1827 Powers Ferry Road SE Building 3 Atlanta, GA 30339 | Pet Supplies "Plus", LLC | Statement of Work Ongoing Consulting/Outsourcing Maintenance Function | | $0.00 |
| 121807145 | Vatic Outsourcing, LLC | Vatic Outsourcing, LLC 1827 Powers Ferry Road SE Building 3 Atlanta, GA 30339 | Pet Supplies "Plus", LLC | Amendment #1 to Agreement | | $0.00 |
| 121807156 | Vector Intelligent Solutions, LLC, d/b/a Vector Security Networks | Vector Intelligent Solutions, LLC, d/b/a Vector Security Networks 2000 Ericsson Dr Warrendale, PA 15086 | Pet Supplies "Plus", LLC | Sales Order for Managed Services | | $0.00 |
| 121807164 | Vector Intelligent Solutions, LLC, d/b/a Vector Security Networks | Vector Intelligent Solutions, LLC, d/b/a Vector Security Networks 2000 Ericsson Dr Warrendale, PA 15086 | Pet Supplies "Plus", LLC | Amendment to Statement of Work for IRG Services | | $0.00 |
| 121807167 | Vector Security, Inc. | Vector Security, Inc. 2000 Ericsson Dr Warrendale, PA 15086 | PSP Group, LLC | Second Amendment to Statement of Work for IRG Services | | $0.00 |
| 121807184 | Velosio, LLC | Velosio, LLC 5747 Perimeter Drive, Suite 200 Dublin, OH 43017 | Franchise Group, Inc. | Stratos Cloud Alliance Partner Agreement | | $0.00 |
| 121807238 | Violet's Pet Domain, LLC | Violet's Pet Domain, LLC 208 St. James Avenue, Suite B Goose Creek, SC 29445 | WNW Franchising, LLC | Franchise Agreement, dated 09/12/2022 (Store #3040 - ) | | $0.00 |
| 121807244 | Vitakraft Sun Seed, Inc. | Vitakraft Sun Seed, Inc. 20584 Long Judson Road Weston, OH 43569 | PSP Group, LLC | PSP Private Brand Agreement Consumables | | $0.00 |
| 121807309 | Wagging Tails, LLC | Wagging Tails, LLC 18336 Santa Belinda Circle Fountain Valley, CA 92708 | PSP Franchising, LLC | Franchise Agreement, dated 12/27/2018, as renewed or amended (Store #4019 - Yorba Linda) | | $0.00 |
| 121807310 | Wagsalot, LLC | Wagsalot, LLC 61 Boxwood Lane Dover, NH 03820 | PSP Franchising, LLC | Franchise Agreement, dated 04/16/2019, as renewed or amended (Store #4260 - Somersworth) | | $0.00 |
| 121807324 | Ware Manufacturing Inc. | Ware Manufacturing Inc. 1439 S 40th Ave Ste 400 Phoenix, AZ 85009 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121807340 | WdR Investments, LLC | WdR Investments, LLC 6 Stone Chimney Drive Wildwood, MO 63038 | PSP Franchising, LLC | Franchise Agreement, dated 10/01/2020, as renewed or amended (Store #4351 - St. Peters ) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121807341 | We Heart Pets II, LLC | We Heart Pets II, LLC<br>18184 Shinniecock Hills Place<br>Leesburg, VA 20176 | PSP Franchising, LLC | Franchise Agreement, dated 10/18/2023, as renewed or amended (Store #4618 - Glenarden) | | $0.00 |
| 121807342 | We Heart Pets, LLC | We Heart Pets, LLC<br>18184 Shinniecock Hills Place<br>Leesburg, VA 20176 | PSP Franchising, LLC | Franchise Agreement, dated 06/26/2023, as renewed or amended (Store #4620 - Suffolk) | | $0.00 |
| 121807344 | Weber Group Pets, LLC | Weber Group Pets, LLC<br>4277 Murfreesboro Rd.<br>Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2020, as renewed or amended (Store #4340 - Cabot) | | $0.00 |
| 121807345 | Weber Group Pets, LLC | Weber Group Pets, LLC<br>4277 Murfreesboro Rd.<br>Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2020, as renewed or amended (Store #4342 - Panama City) | | $0.00 |
| 121807346 | Weber Group Pets, LLC | Weber Group Pets, LLC<br>4277 Murfreesboro Rd.<br>Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 03/31/2022, as renewed or amended (Store #4514 - Gallatin) | | $0.00 |
| 121807348 | WebNoz Pets, Inc. | WebNoz Pets, Inc.<br>4277 Murfreesboro Rd.<br>Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/12/2015, as renewed or amended (Store #4022 - Hendersonville) | | $0.00 |
| 121807349 | WebNoz Pets, Inc. | WebNoz Pets, Inc.<br>4277 Murfreesboro Rd.<br>Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/12/2015, as renewed or amended (Store #4023 - Rogers) | | $0.00 |
| 121807350 | WebNoz Pets, Inc. | WebNoz Pets, Inc.<br>4277 Murfreesboro Rd.<br>Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2020, as renewed or amended (Store #4341 - Franklin) | | $0.00 |
| 121807351 | WebNoz Pets, Inc. | WebNoz Pets, Inc.<br>4277 Murfreesboro Rd.<br>Franklin, TN 37067 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2020, as renewed or amended (Store #4343 - Pensacola) | | $0.00 |
| 121807354 | Wee Pets 1, LLC | Wee Pets 1, LLC<br>118 Galvin Circle<br>Kennett Square, PA 19348 | PSP Franchising, LLC | Franchise Agreement, dated 01/22/2021, as renewed or amended (Store #4377 - Thorndale) | | $0.00 |
| 121807355 | Wee Pets 2, LLC | Wee Pets 2, LLC<br>118 Galvin Circle<br>Kennett Square, PA 19348 | PSP Franchising, LLC | Franchise Agreement, dated 01/22/2021, as renewed or amended (Store #4376 - Kennett Square) | | $0.00 |
| 121807383 | Wells Fargo Financial Leasing, Inc. | Wells Fargo Financial Leasing, Inc.<br>800 Walnut<br>4th floor<br>Des Moines, IA 50309 | PSP Stores, LLC | Master Equipment Lease Agreement and Related Schedules | | ~~$1,070.12~~1,463.84 |
| 121807391 | Wells Fargo Financial Leasing, Inc. | Wells Fargo Financial Leasing, Inc.<br>800 Walnut<br>4th floor<br>Des Moines, IA 50309 | PSP Stores, LLC | Addendum to Master Equipment Lease Agreement | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121807396 | Wenzhou Yuanfei Pet Toy Products Co; Ltd. | Wenzhou Yuanfei Pet Toy Products Co; Ltd. No.1 Chongle Road Shuitou Town Pingyang Zhejiang,  325405 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121807400 | West Orlando Pets, LLC | West Orlando Pets, LLC 2502 Lake Debra Drive, Apartment 304 Orlando, FL 32835 | PSP Franchising, LLC | Franchise Agreement, dated 06/05/2024, as renewed or amended (Store #4648 - Horizon West) | | $0.00 |
| 121807420 | Whirlpool Corporation | Whirlpool Corporation 553 Benson Road Benton Harbor, MI 49022 | Buddy's Newco, LLC | Whirlpool Corporation Sales Agreement | | $0.00 |
| 121807422 | Whiskers & Tails, LLC | Whiskers & Tails, LLC c/o Corporation Service Company, 251 Little Falls Drive Wilmington, DE 19808 | PSP Franchising, LLC | Franchise Agreement, dated 10/19/2020, as renewed or amended (Store #4365 - ) | | $0.00 |
| 121807429 | WIDEN ENTERPRISES, INC. | WIDEN ENTERPRISES, INC. 6911 Mangrove Lane Madison, WI 53713 | Pet Supplies "Plus", LLC | MASTER SERVICE AGREEMENT | | $0.00 |
| 121807433 | Wildcat Pets NC, LLC | Wildcat Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 06/06/2018, as renewed or amended (Store #4007 - Greenville) | | $0.00 |
| 121807434 | Wildcat Pets NC, LLC | Wildcat Pets NC, LLC 9300 Shelbyville Rd., Suite 204 Louisville, KY 40222 | PSP Franchising, LLC | Franchise Agreement, dated 01/15/2019, as renewed or amended (Store #4215 - Hope Mills) | | $0.00 |
| 121807443 | Wilson PSP, LLC | Wilson PSP, LLC 4135 W 9860 North Street Cedar Hills, UT 84062 | PSP Franchising, LLC | Franchise Agreement, dated 06/03/2022, as renewed or amended (Store #4533 - Sandy) | | $0.00 |
| 121807444 | Wilson Wags & Whiskers, LLC | Wilson Wags & Whiskers, LLC 28419 Wild Mustang Lane Fulshear, TX 77441 | PSP Franchising, LLC | Franchise Agreement, dated 12/19/2023, as renewed or amended (Store #4290 - Pearland) | | $0.00 |
| 121807445 | Wilson, Inc. | Wilson, Inc. 14240 Imboden Rd. Hudson, CO 80642 | PSP Franchising, LLC | Franchise Agreement, dated 04/26/2022, as renewed or amended (Store #4520 - Brighton) | | $0.00 |
| 121807455 | Winner Field Development Limited | Winner Field Development Limited Flat/ RM B BLK 8 10/F Sea Crest Villa Phase 318 Castle Peak Road Tsing Lung Tau , 999077 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121807459 | Wisconsin Pets, LLC | Wisconsin Pets, LLC 2295 Spring Rose Road Verona, WI 53593 | PSP Franchising, LLC | Franchise Agreement, dated 08/31/2015, as renewed or amended (Store #4031 - Fitchburg) | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121807466 | WNW Pet, LLC | WNW Pet, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3002 - Castle Rock) | | $0.00 |
| 121807467 | WNW Pet, LLC | WNW Pet, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3003 - Littleton) | | $0.00 |
| 121807468 | WNW Pet, LLC | WNW Pet, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3004 - Colorado Springs) | | $0.00 |
| 121807469 | WNW Pet, LLC | WNW Pet, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3005 - Colorado Springs) | | $0.00 |
| 121807470 | WNW Pet, LLC | WNW Pet, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | WNW Franchising, LLC | Franchise Agreement, dated 02/22/2022 (Store #3006 - Colorado Springs) | | $0.00 |
| 121807486 | World Wide Imports Enterprises, Inc. | World Wide Imports Enterprises, Inc.<br>5315 NW 10th Terrace<br>Fort Lauderdale, FL 33309 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121807488 | WorQFlow Solutions | WorQFlow Solutions<br>650 California St<br>7th Floor<br>San Francisco, CA 94108 | PSP Group, LLC | Client Services Agreement | | $0.00 |
| 121807491 | Wrike, Inc. | Wrike, Inc.<br>9171 Towne Center Drive<br>Suite 200<br>San Diego, CA 82122 | Pet Supplies "Plus", LLC | Amendment to the Agreement | | $0.00 |
| 121807492 | Wrike, Inc. | Wrike, Inc.<br>9171 Towne Center Drive<br>Suite 200<br>San Diego, CA 82122 | Pet Supplies "Plus", LLC | Wrike Subscription Order Form | | $0.00 |
| 121807520 | Yong Zhen Rubber & Plastic Co., Ltd. | Yong Zhen Rubber & Plastic Co., Ltd.<br>No. 2 Hong Teng Road<br>Industry (S) Park<br>Qing Yang Town<br>, 214403 | PSP Group, LLC | Private Brand Products Agreement | | $0.00 |
| 121807539 | Zhong Bi (Entity Pending) | Zhong Bi (Entity Pending)<br>Address on File | WNW Franchising, LLC | Franchise Agreement, dated 01/19/2024 (Store #N/A - Barrington) | | $0.00 |
| 121807546 | ZippyApp | ZippyApp<br>440 N Wolfe Rd # Ms177<br>Sunnyvale, CA 94085 | Buddy's Newco, LLC | Software Subscription | | $0.00 |
| 121807548 | Zmags | Zmags<br>332 Congress St<br>2nd Floor<br>Boston, MA 02210 | Pet Supplies "Plus", LLC | Order and Master Subscription Agreement | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121807549 | Zmags Corporation | Zmags Corporation<br>332 Congress St<br>2nd Floor<br>Boston, MA 02210 | Pet Supplies "Plus", LLC | Zmags Services Order Form | | $0.00 |
| 121807552 | Zoetis US LLC | Zoetis US LLC<br>10 Sylvan Way<br>Parsippany, NJ 07054 | PSP Group, LLC | Retail M&P Funds Agreement | | $0.00 |
| 121807557 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 05/17/2016, as renewed or amended (Store #4074 - Erie) | | $0.00 |
| 121807558 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 12/05/2016, as renewed or amended (Store #4103 - Erie) | | $0.00 |
| 121807559 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 12/31/2020, as renewed or amended (Store #4378 - Ashtabula) | | $0.00 |
| 121807560 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 07/28/2021, as renewed or amended (Store #4459 - Hamburg) | | $0.00 |
| 121807561 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 06/12/2018, as renewed or amended (Store #4460 - Willoughby) | | $0.00 |
| 121807562 | ZR&J Enterprises, LLC | ZR&J Enterprises, LLC<br>4304 Prestwick Dr.<br>Erie, PA 16506 | PSP Franchising, LLC | Franchise Agreement, dated 10/28/2021, as renewed or amended (Store #4478) | | $0.00 |
| 121900000 | Moody's | Moody's<br>7 World Trade Center<br>at 250 Greenwich Street<br>New York, NY 10007 | Franchise Group, Inc. | Application for Moody's Rating Assessment Service by Franchise Group | | $129,643.84 |
| 121900002 | Greenwood Plaza Corp. of Delaware | Greenwood Plaza Corp. of Delaware<br>2400 Miracle Lane<br>Mishawaka, IN 46545 | Pet Supplies "Plus", LLC | Lease, dated 06/03/1992, as amended<br>(South Bend, IN) | South Bend, IN (0025) | $0.00 |
| 121900004 | Canton Aires Shopping Plaza, LLC | Canton Aires Shopping Plaza, LLC<br>361 17th Street NW<br>Unit 2601<br>Atlanta, GA 30363 | Pet Supplies "Plus", LLC | Lease Agreement, dated 04/21/1993, as amended<br>(Canton, OH) | Canton, OH (0049) | $0.00 |
| 121900005 | Set Point Properties, LLC | Set Point Properties, LLC<br>c/o Watermark Property Management, LLC<br>1030 W. Chicago Ave<br>Suite 300<br>Chicago, IL 60642 | Pet Supplies "Plus", LLC | Lease Agreement, dated 09/02/1993, as amended<br>(Arlington Heights, IL) | Arlington Heights, IL (0057) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900006 | Mundelein 83 LLC | Mundelein 83 LLC<br>c/o Shiner Group LLC<br>3201 Old Glenview Road<br>Suite 235<br>Wilmette, IL 60091 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/17/2005, as amended<br>(Mundelein, IL) | Mundelein, IL (0063) | $0.00 |
| 121900007 | PSP Investments LLC | PSP Investments LLC<br>c/o James Antonopoulos<br>4117 Blake Lane<br>Glenview, IL 60026 | Pet Supplies "Plus", LLC | Lease Agreement, dated 03/12/1993, as amended<br>(Elmwood Park, IL) | Elmwood Park, IL (0064) | $0.00 |
| 121900008 | The Taxman Corporation | The Taxman Corporation<br>5125 Old Orchard Rd<br>Suite 130<br>Skokie, IL 60077 | Pet Supplies "Plus", LLC | Lease Agreement, dated 07/29/1993, as amended<br>(Chicago, IL) | Chicago, IL (0066) | $0.00 |
| 121900009 | Mount Pleasant Investments, LLC | Mount Pleasant Investments, LLC<br>c/o Synergy Property Management<br>5007 S Howell Avenue<br>Suite 115<br>Milwaukee, Wi 53207 | Pet Supplies "Plus", LLC | Lease Agreement, dated 09/08/1994, as amended<br>(Racine, WI) | Racine, WI (0075) | $0.00 |
| 121900012 | Shoregate Station LLC | Shoregate Station LLC<br>c/o Phillips Edison and Co.<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | Pet Supplies "Plus", LLC | Lease, dated 12/31/2008, as amended<br>(Willowick, OH) | Willowick, OH (0191) | $0.00 |
| 121900013 | 4405 Milestrip HD Lessee LLC | 4405 Milestrip HD Lessee LLC<br>c/o Northpath Investments<br>144 East 44th Street<br>Suite 601<br>New York, NY 10017 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/08/2009, as amended<br>(Blasdell, NY) | Blasdell, NY (0192) | $0.00 |
| 121900014 | 95 NYRPT, LLC | 95 NYRPT, LLC<br>c/o Benderson Development<br>7978 Cooper Creek Blvd<br>Suite 100<br>University Park, FL 34201 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/05/2010, as amended<br>(Amherst, NY) | Amherst, NY (0197) | $5,479.33 |
| 121900015 | County Line Crossing Assoc. L.L.C. | County Line Crossing Assoc. L.L.C.<br>8910 Purdue Rd<br>Suite 350<br>Indianapolis, IN 46260 | Pet Supplies "Plus", LLC | Lease Agreement, dated 06/24/2002, as amended<br>(Indianapolis, IN) | Indianapolis, IN<br>(Greenwood) (4099) | $0.00 |
| 121900016 | Oak Lawn Joint Venture I, L.L.C | Oak Lawn Joint Venture I, L.L.C<br>Attn: Gregory Moross<br>302 Datura Street<br>Suite 100<br>West Palm Beach, FL 33401 | Pet Supplies "Plus", LLC | Lease, dated 04/27/1993, as amended<br>(Oak Lawn, IL) | Oak Lawn, IL (4101) | $0.00 |
| 121900017 | Noble Creek Partners LLC | Noble Creek Partners LLC<br>PO Box 6147<br>Fishers, IN 46038 | Pet Supplies "Plus", LLC | Lease Agreement, dated 04/06/2004, as amended<br>(Noblesville, IN) | Noblesville, IN (4102) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121900018 | Hartville Station, LLC | Hartville Station, LLC<br>Attn: Robert F. Meyers, COO<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | Pet Supplies "Plus", LLC | Lease Agreement, dated 09/30/2016, as amended<br>(Hartville, OH) | Hartville, OH (4380) | $0.00 |
| 121900019 | Glassboro Properties, LLC | Glassboro Properties, LLC<br>14000 Horizon Way<br>Suite 100<br>Mount Laurel, NJ 08054 | Pet Supplies "Plus", LLC | Lease Agreement, dated 10/27/2011, as amended<br>(Glassboro, NJ) | Glassboro, NJ (4391) | $0.00 |
| 121900020 | RLGVS Partners, LLC | RLGVS Partners, LLC<br>c/o Bennet Williams Realty, Inc.<br>3528 Concord rd.<br>York, PA 17402 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/23/2012, as amended<br>(Etters, PA) | Etters, PA (4395) | $0.00 |
| 121900021 | Aberdeen Marketplace, LLC | Aberdeen Marketplace, LLC<br>c/o Carl M. Freeman Companies<br>111 Rockville Pike<br>Suite 1100<br>Rockville, MD 20850 | Pet Supplies "Plus", LLC | Lease, dated 01/17/1997, as amended<br>(Aberdeen, MD) | Aberdeen, MD (4398) | $0.00 |
| 121900022 | Warwick Devco, LP | Warwick Devco, LP<br>c/o Waters Retail Group<br>200 Old Forge Lane<br>Suite 201<br>Kennett Square, PA 19348 | Pet Supplies "Plus", LLC | Lease, dated 07/02/2015, as amended<br>(Lititz, PA) | Lititz, PA (4403) | $0.00 |
| 121900023 | Wilmann Companies | Wilmann Companies<br>9601 Katy Freeway<br>Suite 480<br>Houston, TX 77024 | Pet Supplies "Plus", LLC | Lease Agreement, dated 10/05/2015, as amended<br>(Spring, TX) | | $0.00 |
| 121900024 | Kerrville Dorado Partners, LLC | Kerrville Dorado Partners, LLC<br>c/o Dorado Development Co.<br>19787 West Interstate 10<br>Suite 201<br>San Antonio, TX 78257 | Pet Supplies "Plus", LLC | Lease, dated 04/20/2005, as amended<br>(Kerrville, TX) | Kerrville, TX | $637.16 |
| 121900025 | CPRK-II Limited Partnership | CPRK-II Limited Partnership<br>c/o DuWest Management, LLC<br>8522 Broadway<br>Ste. 209<br>San Antonio, TX 78217 | Pet Supplies "Plus", LLC | Lease, dated 06/23/2006, as amended<br>(San Antonio, TX) | San Antonio, TX (7006) | $0.00 |
| 121900027 | Aberfeldy Properties, Inc. | Aberfeldy Properties, Inc.<br>c/o TIG Real Estate Services<br>901 South MoPac<br>Suite 285<br>Austin, TX 78746 | Pet Supplies "Plus", LLC | Lease, dated 02/01/2009, as amended<br>(San Antonio, TX) | San Antonio,TX (7009) | $0.00 |
| 121900028 | Reynolda Manor, LLC | Reynolda Manor, LLC<br>c/o Meridian Realty Services<br>P.O. Box 20429<br>Winston-Salem, NC 27120 | Pet Supplies "Plus", LLC | Lease Agreement, dated 02/04/1998, as amended<br>(Winston-Salem, NC) | Winston-Salem, NC (8014) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900029 | R.K. West Roxbury, LLC | R.K. West Roxbury, LLC<br>c/o RK Centers<br>50 Cabot St.<br>Suite 200<br>Needham, MA 02494 | Pet Supplies "Plus", LLC | Lease, dated 08/01/2006, as amended<br>(West Roxbury, MA) | West Roxbury, MA (9003) | $0.00 |
| 121900030 | Bobson Portfolio Holdings LLC | Bobson Portfolio Holdings LLC<br>c/o Davis Management Company, LLC<br>125 High Street<br>Suite 2111<br>Boston, MA 02110-2704 | Pet Supplies "Plus", LLC | Lease Agreement, dated 06/29/1995, as amended<br>(Quincy, MA) | Quincy, MA (9013) | $0.00 |
| 121900031 | Brian J. McLaughlin | Brian J. McLaughlin<br>c/o D'Angelo, Inc.<br>323 Manley Street<br>West Bridgewater, MA 02379 | Pet Supplies "Plus", LLC | Lease, dated 06/06/2002, as amended<br>(Raynham, MA) | Raynham, MA (9014) | $0.00 |
| 121900032 | 175 Memorial Ave., LLC | 175 Memorial Ave., LLC<br>c/o Century Investment Co.<br>181 Park Ave.<br>Suite 1<br>West Springfield, MA 01089 | Pet Supplies "Plus", LLC | Lease Agreement, dated 09/12/1995, as amended<br>(West Springfield, MA) | West Springfield, MA (9015) | $0.00 |
| 121900033 | 470 French Road L.L.C. | 470 French Road L.L.C.<br>P.O. Box 213<br>Yorkville, NY 13495 | Pet Supplies "Plus", LLC | Lease Agreement, dated 05/21/1997, as amended<br>(New Hartford, NY) | New Hartford, NY (9027) | $0.00 |
| 121900034 | New Creek LLC | New Creek LLC<br>500 N. Broadway<br>Suite 201<br>P.O. Box 9010<br>Jericho, NY 11753 | Pet Supplies "Plus", LLC | Lease, dated 04/27/1998, as amended<br>(Medford, MA) | Medford, MA (9028) | $0.00 |
| 121900035 | Pocono Retail Associates, LLC | Pocono Retail Associates, LLC<br>c/o Riverview Management Co.<br>1765 Merriman Road<br>Akron, OH 44313 | Pet Supplies "Plus", LLC | Lease Agreement, dated 06/23/2000, as amended<br>(Stroudsburg, PA) | Stroudsburg, PA (9032) | $0.00 |
| 121900036 | CCP&FSG, L.P. | CCP&FSG, L.P.<br>c/o U.S. Realty Associates, Inc.<br>120 E. Lancaster Ave.<br>Suite 101<br>Ardmore, PA 19003 | Pet Supplies "Plus", LLC | Lease Agreement, dated 09/12/2003, as amended<br>(Telford, PA) | Telford, PA (9040) | $0.00 |
| 121900037 | Blue Mountain IPG Associates, LP | Blue Mountain IPG Associates, LP<br>c/o Stonehenge Advisors<br>4328-42 Ridge Ave<br>Unit 104<br>Philadelphia, PA 19129 | Pet Supplies "Plus", LLC | Lease Agreement, dated 01/29/2010, as amended<br>(Hamburg, PA) | Hamburg, PA (9048) | $0.00 |
| 121900038 | Sunshine Lake Shore Associates, LLC | Sunshine Lake Shore Associates, LLC<br>c/o Milbrook Properties Ltd.<br>42 Bayview Ave.<br>Manhasset, NY 11030 | Pet Supplies "Plus", LLC | Lease Agreement, dated 02/11/2010, as amended<br>(Lake Ronkonkoma, NY) | Lake Ronkonkoma, NY (9049) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900039 | CSHV 20/35, LLC | CSHV 20/35, LLC<br>c/o Principal Real Estate Investors<br>801 Grand Avenue<br>Des Moines, IA 50392-1370 | PSP Distribution, LLC | Commercial Industrial Lease Agreement,  dated November 18, 2020<br>(TX Distribution Center) | TX Distribution Center | $3,542.54 |
| 121900040 | Shamrock A Owner, LLC | Shamrock A Owner, LLC<br>101 East Washington Street<br>Suite 400<br>Greenville, SC 29601 | PSP Distribution, LLC | Lease, dated on August 1, 2022, as amended<br>(Orangeburg, SC) | Orangeburg, SC | $46,704.98 |
| 121900042 | Orchard ParkTK Owner LLC | Orchard ParkTK Owner LLC<br>Attn: David Dworkin<br>c/o JADD Management LLC<br>415 Park Avenue<br>Rochester, NY 14607 | PSP Franchising, LLC | Lease Agreement, dated 02/11/2019, as amended<br>(Orchard Park, NY) | Orchard Park, NY (4527) | $0.00 |
| 121900043 | Schoolcraft Commons Unit 9, L.L.C. | Schoolcraft Commons Unit 9, L.L.C.<br>150 W. 2nd Street<br>Ste. 200<br>Royal Oak, MI 48067 | PSP Group, LLC | Sublease, dated 06/01/2023, as amended<br>(Livonia, MI) | Livonia, MI (0000) | $0.00 |
| 121900044 | Fairview Realty Investors, Ltd. | Fairview Realty Investors, Ltd.<br>P.O. Box 16452<br>Rocky River, OH 44116 | PSP Stores, LLC | Lease, dated 05/09/1992, as amended<br>(Fairview Park, OH) | Fairview Park, OH (0027) | $954.98 |
| 121900045 | Georgetown Square Properties | Georgetown Square Properties<br>29010 Chardon Road<br>Willoughby Hills, OH 44092 | PSP Stores, LLC | Lease, dated 04/24/1992, as amended<br>(Middleburg Heights, OH) | Middleburg Heights, OH (0028) | $991.56 |
| 121900046 | Gold Star Properties | Gold Star Properties<br>c/o 606 Realty Team<br>4653 N. Milwaukee Ave<br>Chicago, IL 60630 | PSP Stores, LLC | Store Lease, dated 11/01/2008, as amended<br>(Des Plaines, IL) | Des Plaines, IL (0042) | $1,115.15 |
| 121900047 | Mayrich III, Ltd. | Mayrich III, Ltd.<br>761 East 200th Street<br>Euclid, Oh 44119 | PSP Stores, LLC | Lease Agreement, dated 03/31/2009, as amended<br>(Lyndhurst, OH) | Lyndhurst, OH (0083) | $2,112.62 |
| 121900048 | DeVille Developments, LLC | DeVille Developments, LLC<br>3951 Convenience Circle NW<br>Suite 301<br>Canton, OH 44718 | PSP Stores, LLC | Lease, dated 05/17/2013, as amended<br>(Lorain, OH) | Lorain, OH (0219) | $97.06 |
| 121900049 | SPS Properties LP | SPS Properties LP<br>11 Cleveland Circle<br>Skillman, NJ 08558 | PSP Stores, LLC | Lease, dated 07/24/2008, as amended<br>(Bethel Park, PA) | Bethel Park, PA (0087) | $0.00 |
| 121900050 | Jack W. Eichelberger Trust | Jack W. Eichelberger Trust<br>Address on File | PSP Stores, LLC | Lease, dated 04/03/1995, as amended<br>(Kettering, OH) | Kettering, OH (0088) | $959.93 |
| 121900051 | Wayne Towne Enterprises, Ltd. | Wayne Towne Enterprises, Ltd.<br>c/o Omega Real Estate Management<br>6151 Wilson Mills Road<br>Suite 100<br>Highland Heights, OH 44143 | PSP Stores, LLC | Lease Agreement, dated 07/01/1997, as amended<br>(Wooster, OH) | Wooster, OH (0102) | $4,134.27 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900052 | Wegmans Food Markets, Inc. | Wegmans Food Markets, Inc.<br>Attn: Senior VP, Real Estate Development<br>1500 Brooks Avenue<br>P.O. Box 30844<br>Rochester, NY 14603-0844 | PSP Stores, LLC | Lease, dated 12/01/2015, as amended<br>(Greece, NY) | Greece, NY (4035) | $499.73 |
| 121900053 | Bell Tower Associates | Bell Tower Associates<br>3555 Washington Road<br>McMurray, PA 15317 | PSP Stores, LLC | Lease, dated 07/02/2015, as amended<br>(McMurray, PA) | McMurray, PA (4379) | $878.00 |
| 121900054 | TT Mt. Airy, LLC | TT Mt. Airy, LLC<br>c/o Rappaport Management Company<br>8405 Greensboro Drive<br>Suite 830<br>Mclean, VA 22102 | PSP Stores, LLC | Lease Agreement, dated 09/05/2013, as amended<br>(Mt Airy, MD) | Mt. Airy, MD (4405) | $618.96 |
| 121900055 | University Plaza Associates | University Plaza Associates, LLC<br>c/o Nigro Companies<br>20 Corporate Woods Blvd.<br>Albany, NY 12211 | PSP Stores, LLC | Lease Agreement, dated 09/13/1996, as amended<br>(Albany, NY) | Albany, NY (9024) | $13,848.25 |
| 121900056 | KIN Properties, Inc. | KIN Properties, Inc.<br>Attn: General Counsel<br>185 NW Spanish River Blvd.<br>Suite 100<br>Boca Raton, FL 33431 | PSP Stores, LLC | Lease, dated 04/21/1997, as amended<br>(Whitehall, PA) | Whitehall, PA (9026) | $167.20 |
| 121900057 | Treeco/Elwood Limited Partnership | Treeco/Elwood Limited Partnership<br>10 E. Palisade Avenue<br>Englewood, NJ 07631 | PSP Stores, LLC | Lease, dated 11/02/1998, as amended<br>(East Northport, NY) | East Northport, NY (9030) | $0.00 |
| 121900058 | Fishkill Plaza Partners LP | Fishkill Plaza Partners LP<br>c/o Mosbacher Properties Group<br>18 E. 48th St<br>19 Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 08/01/2021, as amended<br>(Fishkill, NY) | Fishkill, NY (9034) | $1,235.01 |
| 121900059 | Phoenixville Town Center LP | Phoenixville Town Center LP<br>c/o Longview Management LP<br>1055 Westlakes Dr.<br>Ste 170<br>Berwyn, PA 19312 | PSP Stores, LLC | Lease, dated 09/17/2001, as amended<br>(Phoenixville, PA) | Phoenixville, PA (9035) | $1,122.55 |
| 121900060 | The Shoppes, LP | The Shoppes, LP<br>c/o The Broadbent Company<br>117 E. Washington St<br>Suite 300<br>Indianapolis, IN 46204 | PSP Stores, LLC | Lease Agreement, dated 08/10/1993, as amended<br>(Fort Wayne, IN) | Fort Wayne, IN (0052) | $0.00 |
| 121900061 | SSC Associates Limited Partnership | SSC Associates Limited Partnership<br>c/o Professional Property Mgmt. Co. of Michigan, Inc.<br>115 W. Brown<br>Birmingham, MI 48003 | PSP Stores, LLC | Lease, dated 04/02/2009, as amended<br>(St. Clair Shores, MI) | St. Clair Shores, MI (0003) | $806.20 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900062 | Joseph Plaza, LLC | Joseph Plaza, LLC<br>c/o Joseph Brothers Company<br>4133 Talmadge Road<br>Toledo, OH 43623 | PSP Stores, LLC | Business Property Lease, dated 01/31/2012, as amended<br>(Toledo, OH) | Toledo, OH (0014) | $1,187.36 |
| 121900063 | PDQ Israel Family Northtowne, LLC | PDQ Israel Family Northtowne, LLC<br>5300 W. Atlantic Avenue<br>Suite 509<br>Delray Beach, FL 33484 | PSP Stores, LLC | Lease, dated 06/03/1992, as amended<br>(Toledo, OH) | Toledo, OH (0029) | $0.00 |
| 121900064 | Nine & Mack Enterprises, LLC | Nine & Mack Enterprises, LLC<br>42475 Garfield Road<br>Clinton Twp., MI 48038 | PSP Stores, LLC | Lease, dated 06/30/2008, as amended<br>(St. Clair Shores, MI) | St. Clair Shores, MI (0032) | $0.00 |
| 121900065 | Realty Income Corporation | Realty Income Corporation<br>Attn: Legal Dept.<br>11995 El Camino Real<br>San Diego, CA 92130 | PSP Stores, LLC | Lease, dated 05/15/2009, as amended<br>(Warren, MI) | Warren, MI (0043) | $0.00 |
| 121900066 | Ford Road Ventures, LLC | Ford Road Ventures, LLC<br>c/o Vision Investment Partners<br>700 N. Old Woodward Ave<br>Suite 300<br>Birmingham, MI 48009 | PSP Stores, LLC | Lease, dated 04/02/1993, as amended<br>(Livonia, MI) | Livonia, MI (0044) | $0.00 |
| 121900067 | Boardman Plaza Associates LLC | Boardman Plaza Associates LLC<br>20950 Libby Road<br>Maple Heights, GA 30363 | PSP Stores, LLC | Lease, dated 04/12/1993, as amended<br>(Youngstown, OH) | Youngstown, OH (0051) | $0.00 |
| 121900068 | Albert Hans, LLC | Albert Hans, LLC<br>7240 West Foster Avenue<br>Chicago, IL 60656 | PSP Stores, LLC | Lease, dated 09/16/2005, as amended<br>(Chicago, IL) | Chicago, IL (0053) | $1,231.31 |
| 121900069 | Brixmor GA Arlington Heights LLC | Brixmor GA Arlington Heights LLC<br>c/o Brixmor Property Group<br>450 Lexington Ave.<br>13th Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 01/25/2017, as amended<br>(Arlington Heights, IL) | Arlington Heights, IL (Ridge Plaza) (0054) | $0.00 |
| 121900070 | Boulevard Centre LLC | Boulevard Centre LLC<br>Attn: Legal Dept<br>5577 Youngstown-Warren Road<br>Niles, OH 44446 | PSP Stores, LLC | Lease, dated 08/21/1996, as amended<br>(Niles, OH) | Niles, OH (0056) | $0.00 |
| 121900071 | Points East, LLC | Points East, LLC<br>7743 Mentor Avenue<br>Mentor, OH 44060 | PSP Stores, LLC | Lease, dated 01/02/1998, as amended<br>(Mentor, OH) | Mentor, OH (0059) | $0.00 |
| 121900072 | BWI Westwood LLC | BWI Westwood LLC<br>731 E. Palisade Avenue<br>Suite 201<br>Englewood Cliffs, NJ 07632 | PSP Stores, LLC | Lease, dated 05/02/1994, as amended<br>(Alliance, OH) | Alliance, OH (0067) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900073 | DDR Ohio Opportunity II LLC | DDR Ohio Opportunity II LLC<br>Attn: Executive VP - Leasing<br>3300 Enterprise Parkway<br>Beachwood, OH 44122 | PSP Stores, LLC | Lease, dated 01/22/2014, as amended<br>(Stow, OH) | Stow, OH (0068) | $12,500.00 |
| 121900074 | Tiffin Ave 2023 LLC | Tiffin Ave 2023 LLC<br>2407 Columbia Pike<br>Suite 200<br>Arlington, VA 22204 | PSP Stores, LLC | Lease, dated 11/30/1998, as amended<br>(Findlay, OH) | Findlay, OH (0089) | $0.00 |
| 121900075 | Centerpointe Plaza Associates LP | Centerpointe Plaza Associates LP<br>c/o Carnegie Management & Development<br>Corp.<br>27500 Detroit Road,<br>Suite 300<br>Westlake, OH 44145 | PSP Stores, LLC | Lease, dated 06/05/2002, as amended<br>(Medina, OH) | Medina, OH (0092) | $0.00 |
| 121900076 | Echo Solon, LLC | Echo Solon, LLC<br>c/o ECHO Real Estate Services Co.<br>560 Epsilon Drive<br>Pittsburgh, PA 15238 | PSP Stores, LLC | Lease, dated 07/30/2012, as amended<br>(Solon, OH) | Solon, OH (0098) | $0.00 |
| 121900077 | Western Skies Management, Inc. | Western Skies Management, Inc.<br>c/o The Kroenke Group<br>211 N. Stadium Blvd.<br>Suite 201<br>Columbia, MO 65103 | PSP Stores, LLC | Lease, dated 07/02/1997, as amended<br>(St. Clairsville, OH) | St. Clairsville, OH (0099) | $0.00 |
| 121900078 | Clocktower Plaza, LLC | Clocktower Plaza, LLC<br>c/o CTW Development Corp<br>970 Windham Court,<br>Suite 7<br>Boardman, OH 44512 | PSP Stores, LLC | Lease, dated 07/01/1997, as amended<br>(Lima, OH) | Lima, OH (0101) | $0.00 |
| 121900079 | KNM Lee Properties LLC | KNM Lee Properties LLC<br>999 High Street<br>Wadsworth , OH 44281 | PSP Stores, LLC | Lease, dated 07/01/2008, as amended<br>(Mansfield, OH) | Mansfield, OH (0106) | $0.00 |
| 121900080 | Monroe Triple Net, LLC | Monroe Triple Net, LLC<br>c/o Epic Property Management<br>12863 Eureka Rd.<br>Southgate, MI 48195 | PSP Stores, LLC | Lease, dated 03/05/2004, as amended<br>(Monroe, MI) | Monroe, MI (0108) | $0.00 |
| 121900081 | Hickory Plaza Shopping Center, Inc. | Hickory Plaza Shopping Center, Inc.<br>c/o JJ Gumberg Co.<br>1051 Brinton Road<br>Pittsburgh, PA 15221 | PSP Stores, LLC | Lease, dated 09/25/1998, as amended<br>(Hermitage, PA) | Hermitage, PA (0111) | $1,031.87 |
| 121900082 | GG Garfield Commons 2012 LP | GG Garfield Commons 2012 LP<br>c/o Glimcher Group Inc.<br>500 Grant Street<br>Suite 2000<br>Pittsburgh, PA 15219 | PSP Stores, LLC | Lease, dated 02/11/2013, as amended<br>(Garfield Heights, OH) | Garfield Heights, OH (0112) | $455.99 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900083 | FBBT/US Properties, LLC | FBBT/US Properties, LLC<br>c/o Benderson Development Co. LLC<br>570 Delaware Ave<br>Buffalo, NY 14202 | PSP Stores, LLC | Lease, dated 03/15/1999, as amended<br>(West Seneca, NY) | West Seneca, NY (0113) | $5,238.03 |
| 121900084 | WestBay Plaza, LLC | WestBay Plaza, LLC<br>c/o Carter Properties, LLC<br>13 West Hanna Lane<br>Bratenahl, Ohio 44108 | PSP Stores, LLC | Lease, dated 10/18/2017, as amended<br>(Westlake, OH) | Westlake,OH (0114) | $0.00 |
| 121900085 | Harvest Station LLC | Harvest Station LLC<br>c/o Phillips Edison & Company<br>11501 Northlake Drive<br>Cincinnati,, OH 45249 | PSP Stores, LLC | Lease, dated 04/26/2016, as amended<br>(Akron, OH) | Akron, OH (Springfield Twp) (0115) | $0.00 |
| 121900086 | 95 NYRPT, LLC | 95 NYRPT, LLC<br>c/o Benderson Development<br>7978 Cooper Creek Blvd<br>Suite 100<br>University Park, FL 34201 | PSP Stores, LLC | Lease Agreement, dated 02/17/1999, as amended<br>(Buffalo, NY) | Buffalo, NY (0116) | $5,064.52 |
| 121900087 | Alpine Income Property OP, LP | Alpine Income Property OP, LP<br>1140 N. Williamson Blvd.<br>Suite 140<br>Daytona Beach, FL 32114 | PSP Stores, LLC | Lease, dated 02/15/2000, as amended<br>(North Canton, OH) | North Canton, OH (0117) | $0.00 |
| 121900088 | Aveni-Chardon, Ltd. | Aveni-Chardon, Ltd.<br>6690 Beta Drive, Suite 220<br>Mayfield Village, 44143 44143 | PSP Stores, LLC | Lease, dated 10/06/2000, as amended<br>(Chardon, OH) | Chardon, OH (0119) | $2,389.46 |
| 121900089 | Pleasant Valley Shopping Center Ltd. | Pleasant Valley Shopping Center Ltd.<br>c/o Visconsi Companies Ltd.<br>30050 Chagrin Blvd.<br>Suite 360<br>Pepper Pike, OH 44124 | PSP Stores, LLC | Lease, dated 10/19/2000, as amended<br>(Parma, OH) | Parma, OH (0120) | $0.00 |
| 121900090 | Midway Market Square Elyria LLC | Midway Market Square Elyria LLC<br>c/o Madison Properties<br>3611 14th Ave.<br>Suite 420<br>Brooklyn, NY 11218 | PSP Stores, LLC | Lease, dated 04/16/2001, as amended<br>(Elyria, OH) | Elyria, OH (0123) | $0.00 |
| 121900091 | Fairlawn Station, LLC | Fairlawn Station, LLC<br>c/o Phillips Edison & Co.<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | PSP Stores, LLC | Lease, dated 07/24/1996, as amended<br>(Fairlawn, OH) | Fairlawn, OH (0124) | $0.00 |
| 121900092 | Lakewood (Ohio) Station LLC | Lakewood (Ohio) Station LLC<br>c/o Phillips Edison & Co.<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | PSP Stores, LLC | Retail Space Lease, dated 02/16/2011, as amended<br>(Lakewood, OH) | Lakewood, OH (0128) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900093 | ExchangeRight Value-Add Portfolio 1 DST | ExchangeRight Value-Add Portfolio 1 DST c/o ExchangeRight Real Estate, LLC 1055 E. Colorado, Blvd. Suite 310 Pasadena, CA 91106 | PSP Stores, LLC | Lease, dated 10/05/2001, as amended (Streetsboro, OH) | Streetsboro, OH (0131) | $997.42 |
| 121900094 | Sheridan Center, LLC | Sheridan Center, LLC 6120 Lendell Road Sanborn, NY 14132 | PSP Stores, LLC | Lease, dated 09/05/2002, as amended (Amherst, NY) | Amherst, NY (0134) | $0.00 |
| 121900095 | THF Clarksburg Development Two, LLC | THF Clarksburg Development Two, LLC c/o THF Realty 2127 Innerbelt Business Center Dr Suite 200 St. Louis, MO 63114 | PSP Stores, LLC | Lease, dated 07/11/2002, as amended (Clarksburg, WV) | Clarksburg, WV (0139) | $0.00 |
| 121900096 | CRI New Albany Square, LLC | CRI New Albany Square, LLC c/o Casto 250 Civic Center Dr Suite 500 Columbus, OH 43215 | PSP Stores, LLC | Lease, dated 05/16/2002, as amended (Columbus/New Albany, OH) | Columbus, OH (0140) | $0.00 |
| 121900097 | DeVille Developments, LLC | DeVille Developments, LLC 3951 Convenience Circle NW Suite 301 Canton, OH 44718 | PSP Stores, LLC | Lease Agreement, dated 01/16/1994, as amended (Canton, OH) | Canton, OH (0086) | $0.00 |
| 121900098 | Huber Management Corporation | Huber Management Corporation 7333 Paragon Rd. Suite 150 Dayton, OH 45459 | PSP Stores, LLC | Lease, dated 01/30/2003, as amended (Centerville, OH) | Centerville, OH (0143) | $0.00 |
| 121900099 | FDI Management | FDI Management 12145 Summit Ct. Beverly Hills, CA 90210 | PSP Stores, LLC | Lease, dated 06/07/2003, as amended (Sandusky, OH) | Sandusky, OH (0144) | $0.00 |
| 121900100 | Fort Steuben Mall Holdings LLC | Fort Steuben Mall Holdings LLC 4996 Indiana Avenue Winston Salem, NC 27106 | PSP Stores, LLC | Lease, dated 01/17/2003, as amended (Steubenville, OH) | Steubenville, OH (0145) | $0.00 |
| 121900101 | Central Rock, LLC | Central Rock, LLC 5215 Monroe Street Suite 8 Toledo, OH 43623 | PSP Stores, LLC | Lease, dated 06/15/2023, as amended (Sylvania, OH) | Sylvania, OH (0148) | $0.00 |
| 121900102 | Sea Mist I, LLC | Sea Mist I, LLC Attn: George K. Gesouras PO Box 21381 Columbus, OH 43211 | PSP Stores, LLC | Lease, dated 10/01/2003, as amended (Newark, OH) | Newark, OH (0151) | $1,168.66 |
| 121900103 | 601 Plaza, LLC | 601 Plaza, LLC 1000 Grand Central Mall Vienna,, WV 26105 | PSP Stores, LLC | Lease, dated 08/27/2009, as amended (Vienna, WV) | Vienna, WV (0153) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900104 | Iacono Family LP | Iacono Family LP c/o Kohr Royer Griffith Inc 1480 Dublin Rd. Columbus, Oh 43215 | PSP Stores, LLC | Lease, dated 05/18/2004, as amended (Upper Arlington, OH) | Upper Arlington, OH (0158) | $0.00 |
| 121900105 | Cranberry Creek Plaza, LLC | Cranberry Creek Plaza, LLC c/o Paramount Development Corp. 607 Briarwood Drive Suite 5 Myrtle Beach, SC 29572 | PSP Stores, LLC | Lease, dated 10/07/2004, as amended (Beckley, WV) | Beckley, WV (0165) | $916.30 |
| 121900106 | SWG-Reynoldsburg, LLC | SWG-Reynoldsburg, LLC c/o Garner Group 3715 Northside Parkway Suite 4-325 Atlanta, GA 30327 | PSP Stores, LLC | Lease, dated 01/29/2004, as amended (Reynoldsburg, OH) | Reynoldsburg, OH (0168) | $0.00 |
| 121900107 | Union Consumer Improvements, LLC | Union Consumer Improvements, LLC c/o DLC Management Corp. 565 Taxter Road Suite 400 Elmsford, NY 10523 | PSP Stores, LLC | Lease, dated 09/30/2005, as amended (Cheektowaga, NY) | Cheektowaga, NY (0172) | $0.00 |
| 121900108 | 570 Associates III, LLC | 570 Associates III, LLC c/o Benderson Development 7978 Cooper Creek Blvd. Suite 100 University Park, FL 34201 | PSP Stores, LLC | Lease, dated 05/05/2006, as amended (East Amherst, NY) | East Amherst, NY (0174) | $5,637.80 |
| 121900109 | Arlington Ridge Market Place, LLC | Arlington Ridge Market Place, LLC c/o DeVille Developments 3951 Convenience Circle NW Suite 301 Canton, OH 44718 | PSP Stores, LLC | Lease, dated 09/19/2007, as amended (Akron, OH) | Akron, OH (0182) | $0.00 |
| 121900110 | TIA Holdings ETY LLC | TIA Holdings ETY LLC c/o Realty Invest 4263 Gavin Lane Columbus, OH 43220 | PSP Stores, LLC | Lease, dated 06/25/2008, as amended (Lancaster, OH) | Lancaster, OH (0190) | $1,042.39 |
| 121900111 | Northcliff I-480 LLC | Northcliff I-480 LLC 30000 Chagrin Blvd. Ste 100 Cleveland, OH 44124 | PSP Stores, LLC | Lease, dated 08/14/2009, as amended (Brooklyn, OH) | Brooklyn, OH (0195) | $0.00 |
| 121900112 | Muffrey LLC | Muffrey LLC c/o Kin Properties 185 NW Spanish River Blvd. Suite 100 Boca Raton, FL 33431 | PSP Stores, LLC | Lease Agreement, dated 09/19/2011, as amended (Lincolnwood, IL) | Lincolnwood, IL (0204) | $0.00 |
| 121900113 | Lincoln Grace Investments, LLC | Lincoln Grace Investments, LLC c/o Washington Properties, Inc. 400 Skokie Blvd. Suite 425 Northbrook, IL 60062 | PSP Stores, LLC | Lease Agreement, dated 09/15/2011, as amended (Chicago, IL) | Chicago, IL (0205) | $2,518.87 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900114 | Portage Crossing, LLC | Portage Crossing, LLC<br>c/o Robert L. Stark Enterprises, Inc.<br>629 Euclid Avenue<br>Suite 1300<br>Cleveland, OH 44114 | PSP Stores, LLC | Lease, dated 05/31/2012, as amended<br>(Cuyahoga Falls, OH) | Cuyahoga Falls, OH<br>(0206) | $0.00 |
| 121900115 | Brookdale Shopping Center, L.L.C. | Brookdale Shopping Center, L.L.C.<br>31713 Northwestern Hwy<br>Suite 250W<br>Farmington Hills, MI 48334 | PSP Stores, LLC | Lease Agreement, dated 07/25/2012, as amended<br>(South Lyon, MI) | South Lyon, MI (0207) | $0.00 |
| 121900116 | SL Yorkhouse Commons LLC | SL Yorkhouse Commons LLC<br>c/o Cambridge Management, Ltd.<br>15941 S. Harlem Ave. PMB 108<br>Tinley Park, IL 60477 | PSP Stores, LLC | Lease Agreement, dated 07/30/2012, as amended<br>(Waukegan, IL) | Waukegan, IL (0208) | $0.00 |
| 121900117 | EGAP Crawfordsville I, LLC | EGAP Crawfordsville I, LLC<br>c/o 1045, LLC<br>1045 South Woods Mill Rd.<br>Suite One<br>Town and Country, MO 63017 | PSP Stores, LLC | Lease, dated 01/31/2014, as amended<br>(Crawfordsville, IN) | Crawfordsville, IN (0209) | $520.21 |
| 121900118 | Gosula Realty, LTD | Gosula Realty, LTD<br>6028 Trent Ct<br>Lewis Center, Oh 43035 | PSP Stores, LLC | Lease Agreement, dated 08/29/2012, as amended<br>(Delaware, OH) | Delaware, OH (0210) | $681.78 |
| 121900119 | Grove City Plaza, L.P. | Grove City Plaza, L.P.<br>c/o Casto<br>250 Civic Center Dr.<br>Suite 500<br>Columbus, OH 43215 | PSP Stores, LLC | Lease, dated 10/23/2012, as amended<br>(Grove City, OH) | Grove City, OH (0211) | $0.00 |
| 121900120 | Wegmans Food Markets, Inc. | Wegmans Food Markets, Inc.<br>Attn: Senior VP - Real Estate & Development<br>1500 Brooks Ave.<br>Box 30844<br>New York, NY 14603 | PSP Stores, LLC | Lease, dated 03/29/2013, as amended<br>(Penfield, NY) | Penfield, NY (0214) | $0.00 |
| 121900121 | ZRP Fishers Crossing LLC | ZRP Fishers Crossing LLC<br>c/o Ziff Properties, Inc.<br>200 Wingo Way<br>Suite 100<br>MT. Pleasant, SC 29464 | PSP Stores, LLC | Lease, dated 04/02/2013, as amended<br>(Fishers, IN) | Fishers, IN (0216) | $0.00 |
| 121900122 | Portage Commons LLC | Portage Commons LLC<br>c/o Cambridge Management, LTD.<br>15941 S. Harlem Ave.<br>PMB #108<br>Tinley Park, IL 60477 | PSP Stores, LLC | Lease Agreement, dated 04/03/2013, as amended<br>(Portage, IN) | Portage, IN (0217) | $0.00 |
| 121900123 | Blue Ash OH Center LLC | Blue Ash OH Center LLC<br>c/o Gershenson Realty & Investment<br>31500 Northwestern Hwy.<br>Suite 100<br>Farmington Hills, MI 48334 | PSP Stores, LLC | Lease, dated 07/23/2013, as amended<br>(Blue Ash, OH) | Blue Ash, OH (0218) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121900124 | DeVile Developments, LLC | DeVile Developments, LLC<br>3951 Convenience Circle NW<br>Suite 301<br>Canton, OH 44718 | PSP Stores, LLC | Lease, dated 07/12/2002, as amended<br>(Akron, OH) | Akron, OH (0141) | $0.00 |
| 121900125 | Gustine BV Associates, Ltd. | Gustine BV Associates, Ltd.<br>c/o Armstrong Development Properties, Inc.<br>One Armstrong Place<br>Butler, PA 16001 | PSP Stores, LLC | Lease Agreement, dated 08/22/2013, as amended<br>(Belle Vernon, PA) | Belle Vernon, PA (0220) | $0.00 |
| 121900126 | Fairfield Station LLC | Fairfield Station LLC<br>c/o Phillips Edison and Co.<br>11501 Northlake Drive<br>Cincinnati, OH 45209 | PSP Stores, LLC | Lease, dated 09/09/2013, as amended<br>(Beavercreek, OH) | Beavercreek, OH (0221) | $0.00 |
| 121900127 | RAR2 - Wicker Park Commons, LLC | RAR2 - Wicker Park Commons, LLC<br>c/o Mid-America Asset Management, Inc.<br>One Parkview Plaza<br>9th Floor<br>Oakbrook Terrace, IL 60181 | PSP Stores, LLC | Lease, dated 09/12/2013, as amended<br>(Chicago, IL) | Chicago, IL (Wicker Park)<br>(0224) | $0.00 |
| 121900128 | SJSS Powell, LLC | SJSS Powell, LLC<br>c/o MGM Management<br>485 Metro Place South<br>Suite 270<br>Dublin, OH 43017 | PSP Stores, LLC | Lease, dated 02/20/2013, as amended<br>(Powell, OH) | Powell, OH (0225) | $0.00 |
| 121900129 | PZ Southern Limited Partnership | PZ Southern Limited Partnership<br>c/o Pearson Partners, Inc.<br>630 Fifth Avenue<br>Suite 2820<br>New York, NY 10111-0202 | PSP Stores, LLC | Lease, dated 01/14/2014, as amended<br>(Bridgeville, PA) | Bridgeville, PA (0226) | $0.00 |
| 121900130 | Independence Town Center, LLC | Independence Town Center, LLC<br>6111A Burgundy Hill Drive<br>Burlington, KY 41005 | PSP Stores, LLC | Lease, dated 04/24/2014, as amended<br>(Independence, KY) | Independence, KY (0228) | $0.00 |
| 121900131 | BRE Retail Residual Owner 2 LLC | BRE Retail Residual Owner 2 LLC<br>c/o Brixmor Property Group<br>450 Lexington Ave<br>13th Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 03/31/2014, as amended<br>(Cincinnati, OH) | Cincinnati, OH (Symmes<br>Twp) (0234) | $0.00 |
| 121900134 | Norcor-Cadwell Associates LLC | Norcor-Cadwell Associates LLC<br>c/o Horizon Realty Services<br>1540 E Dundee Rd<br>Suite 240<br>Palatine, IL 60074 | PSP Stores, LLC | Lease Agreement, dated 06/05/2014, as amended<br>(Deerfield, IL) | Deerfield, IL (0237) | $0.00 |
| 121900135 | Indian Creek Commons LLC | Indian Creek Commons LLC<br>c/o Realty Resource Capital Corp<br>7600 Jericho Turnpike<br>Suite 402<br>Woodbury, NY 11797 | PSP Stores, LLC | Lease, dated 06/17/2014, as amended<br>(Indianapolis, IN) | Indianapolis, IN<br>(Lawrence) (0239) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900136 | SRK Painesville Associates, LLC | SRK Painesville Associates, LLC c/o Benchmark Management Corp. 4053 Maple Road Amherst, NY 14226 | PSP Stores, LLC | Lease, dated 06/26/2014, as amended (Painesville, OH) | Painesville, OH (0240) | $0.00 |
| 121900137 | Kercheval Owner LLC | Kercheval Owner LLC c/o Versa Real Estate, LLC 326 E. Fourth Street Suite 200 Rotal Oak, MI 48067 | PSP Stores, LLC | Lease Agreement, dated 08/25/2014, as amended (Grosse Pointe, MI) | Grosse Pointe, MI (0242) | $1,981.75 |
| 121900138 | Grand Avenue Associates L.L.C. | Grand Avenue Associates L.L.C. c/o Shiner Management Group, Inc. 3201 Old Glenview Road Suite 235 Wilmette, IL 60091 | PSP Stores, LLC | Lease, dated 10/03/2014, as amended (Gurnee, IL) | Gurnee, IL (0243) | $0.00 |
| 121900139 | Burlington Development, LLC | Burlington Development, LLC 3101 Ingersoll Avenue Suite 300 Des Moines, IA 50312 | PSP Stores, LLC | Lease Agreement, dated 09/26/2014, as amended (Burlington, IA) | Burlington, IA (0244) | $0.00 |
| 121900140 | Plaza at Northwood, LLC | Plaza at Northwood, LLC c/o WP Glimcher Inc. 180 East Broad Street Attn: General Counsel Columbus, OH 43215 | PSP Stores, LLC | Lease Agreement, dated 10/30/2014, as amended (Fort Wayne, IN) | Fort Wayne, IN (Northwood Plaza) (0246) | $0.00 |
| 121900141 | Oak Park Associates, Inc. | Oak Park Associates, Inc. 8954 Hill Drive North Huntington North Huntington, PA 15642 | PSP Stores, LLC | Lease, dated 03/05/2015, as amended (White Oak, PA) | White Oak, PA (0248) | $660.19 |
| 121900142 | CEA Beverly LLC | CEA Beverly LLC 1105 Massachusetts Avenue Suite 2F Cambridge, MA 02138 | PSP Stores, LLC | Lease, dated 02/23/2017, as amended (Beverly, MA) | Beverly, MA (3024) | $0.00 |
| 121900145 | Spartan Square Limited Partnership | Spartan Square Limited Partnership 1463 West Main Street Suite P3 Salem, VA 24153 | PSP Stores, LLC | Lease, dated 08/21/2015, as amended (Salem, VA) | Salem, VA (4027) | $854.70 |
| 121900146 | Inserra Supermarkets, Inc. | Inserra Supermarkets, Inc. 20 Ridge Road Mahwah, NJ 07430 | PSP Stores, LLC | Lease, dated 09/01/2015, as amended (Wallington, NJ) | Wallington, NJ (4028) | $0.00 |
| 121900147 | Brunswick Center Associates, L.L.C. | Brunswick Center Associates, L.L.C. c/o Nigro Companies 20 Corporate Woods Blvd. Albany, NY 12211 | PSP Stores, LLC | Lease, dated 08/28/2015, as amended (Troy, NY) | Brunswick, NY (Troy) (4032) | $837.61 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900148 | Wegmans Food Markets, Inc. | Wegmans Food Markets, Inc.<br>Attn: Senior VP - Real Estate & Development<br>1500 Brooks Ave.<br>Box 30844<br>New York, NY 14603 | Pet Supplies "Plus", LLC | Lease, dated 07/31/2007, as amended<br>(Fairport, NY) | Fairport, NY (0181) | $0.00 |
| 121900149 | TCB-Stonebrook, LLC | TCB-Stonebrook, LLC<br>c/o Newport Capital Partners<br>353 N. Clark Street<br>Suite 3625<br>Chicago, IL 60654 | PSP Stores, LLC | Lease, dated 12/01/2015, as amended<br>(Merrionette Park, IL) | Merrionette Park, IL<br>(4038) | $0.00 |
| 121900150 | Oxford Crossing LLC | Oxford Crossing LLC<br>c/o Capital Group Properties LLC<br>259 Turnpike Road<br>Suite 100<br>Southborough, MA 01772 | PSP Stores, LLC | Lease, dated 12/03/2015, as amended<br>(Oxford, MA) | Oxford, MA (4039) | $987.76 |
| 121900151 | Quaker Malls, LLC | Quaker Malls, LLC<br>1680 Route 23<br>Suite 330<br>Wayne, NJ 07470 | PSP Stores, LLC | Lease Agreement, dated 02/14/2015, as amended<br>(Bayville, NJ) | Bayville, NJ (4040) | $0.00 |
| 121900152 | Edgewood Station LLC | Edgewood Station LLC<br>c/o Phillips Edison & Company<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | PSP Stores, LLC | Lease Agreement, dated 01/28/2016, as amended<br>(Pittsburgh, PA) | Pittsburgh, PA<br>(Edgewood) (4053) | $0.00 |
| 121900153 | 8246 Delaware, Inc. | 8246 Delaware, Inc.<br>295 Main Street<br>Suite 210<br>Buffalo, NY 14203 | PSP Stores, LLC | Lease, dated 02/10/2016, as amended<br>(Rochester, NY) | Rochester, NY (Monroe<br>Ave) (4054) | $0.00 |
| 121900154 | 4968 Transit Road LLC | 4968 Transit Road LLC<br>c/o Gold Seal Equity Partnership<br>2 Wendling Court<br>Lancaster, NY 14086 | PSP Stores, LLC | Lease, dated 02/02/2016, as amended<br>(Depew, NY) | Depew, NY (4055) | $763.18 |
| 121900157 | ORF IX Freedom Plaza, LLC | ORF IX Freedom Plaza, LLC<br>c/o Parth Munshi, General Counsel<br>5865 North Point PKWY<br>Ste 345<br>Alpharetta, GA 30022 | PSP Stores, LLC | Lease, dated 04/22/2016, as amended<br>(Rome, NY) | Rome, NY (4065) | $0.00 |
| 121900158 | Brixmor GA Lunenburg Crossing LLC | Brixmor GA Lunenburg Crossing LLC<br>c/o Brixmor Property Group<br>450 Lexington Ave<br>13th Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 06/30/2016, as amended<br>(Lunenburg, MA) | Lunenburg, MA (4078) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 121900159 | Odenton Shopping Center Limited Partnership | Odenton Shopping Center Limited Partnership c/o Nellis Corporation 7811 Montrose Road Suite 420 Potomac, MD 20854 | PSP Stores, LLC | Lease, dated 07/26/2016, as amended (Odenton, MD) | Odenton, MD (4082) | $0.00 |
| 121900160 | DSM MB II LLC | DSM MB II LLC 875 East Street Tewksbury, MA 01876 | PSP Stores, LLC | Lease, dated 09/05/2018, as amended (Athol, MA) | Athol, MA (4198) | $0.00 |
| 121900161 | VILLAGE MOORESVILLE STATION LLC | VILLAGE MOORESVILLE STATION LLC c/o Phillips Edison & Company 11501 Northlake Drive Cincinnati, OH 45249 | PSP Stores, LLC | Lease Agreement, dated 10/31/2016, as amended (Mooresville, IN) | Mooresville, IN (4089) | $0.00 |
| 121900162 | Sangamon North, LLC | Sangamon North, LLC c/o Carnegie Companies Inc 6190 Cochran Rd Suite A Solon, OH 44139 | PSP Stores, LLC | Lease, dated 10/31/2016, as amended (Springfield, IL) | Springfield, IL (4090) | $0.00 |
| 121900163 | MOUNTAIN LAUREL PLAZA ASSOCIATES | MOUNTAIN LAUREL PLAZA ASSOCIATES c/o Oxford Development Company, Property Manager 301 Grant Street Suite 4500 Pittsburgh, PA 15219 | PSP Stores, LLC | Lease, dated 01/11/2016, as amended (Latrobe, PA) | Latrobe, PA (4097) | $0.00 |
| 121900164 | Central Islip Holdings LLC | Central Islip Holdings LLC 1299-B North Avenue New Rochelle, NY 10804 | PSP Stores, LLC | Lease, dated 01/18/2016, as amended (Central Islip, NY) | Central Islip, NY (4098) | $0.00 |
| 121900165 | Dawnbury Inc. | Dawnbury Inc. 7899 High Dr. Indianapolis, IN 46248 | PSP Stores, LLC | Lease, dated 08/10/1992, as amended (Indianapolis, IN) | Indianapolis, IN (Broad Ripple) (4100) | $1,076.78 |
| 121900166 | TKG Management, Inc | TKG Management, Inc 211 N. Stadium Boulevard Suite 201 Columbia, MO 65203 | PSP Stores, LLC | Lease Agreement, dated 02/22/2016, as amended (Fairhaven, MA) | Fairhaven, MA (4106) | $0.00 |
| 121900167 | Linear Retail #9 LLC | Linear Retail #9 LLC c/o Linear Retail Properties, LLC 77 South Bedford Street Suite 401 Burlington, MA 01803 | PSP Stores, LLC | Lease, dated 04/10/2017, as amended (Nashua, NH) | Nashua, NH (4137) | $652.60 |
| 121900168 | Portland Fixture Limited Partnership | Portland Fixture Limited Partnership c/o Woodsonia Real Estate, Inc. 20010 Manderson St. Suite 101 Elkhorn, NE 68022 | PSP Stores, LLC | Lease, dated 03/31/2017, as amended (Omaha, NE) | Omaha, NE (4138) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900169 | FW IL Riverside/Rivers Edge, LLC | FW IL Riverside/Rivers Edge, LLC<br>3040 Solutions Center<br>Chicago, IL 60677-3000 | PSP Stores, LLC | Lease, dated 05/12/2017, as amended<br>(Chicago, IL) | Chicago, IL (Archer-Ashland) (4139) | $12,000.00 |
| 121900170 | Berkshire Crossing Retail LLC | Berkshire Crossing Retail LLC<br>c/o Brixmor Property Group<br>450 Lexington Ave<br>13th Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease, dated 03/29/2019, as amended<br>(Pittsfield, MA) | Pittsfield, MA (4152) | $0.00 |
| 121900171 | King City Improvements, LLC | King City Improvements, LLC<br>c/o DLC Management Corporation<br>565 Taxter Road<br>Suite 400<br>Elmsford, NY 10523 | PSP Stores, LLC | Lease Agreement, dated 08/04/2017, as amended<br>(Mount Vernon, IL) | Mount Vernon, IL (4153) | $0.00 |
| 121900172 | Black Creek Diversified Property Operating Partnership LP | Black Creek Diversified Property Operating Partnership LP<br>518-17th Street<br>17th Floor<br>Denver, Co 80202 | PSP Stores, LLC | Lease, dated 09/26/2017, as amended<br>(Narragansett, RI) | Narragansett, RI (4159) | $0.00 |
| 121900173 | JLIX Milford Crossing Master Tenant, LLC | JLIX Milford Crossing Master Tenant, LLC<br>PO Box 412638<br>Boston, MA 02241-2638 | PSP Stores, LLC | Lease, dated 10/30/2017, as amended<br>(Milford, MA) | Milford, MA (4161) | $0.00 |
| 121900174 | CPEG MALTA, L.L.C | CPEG MALTA, L.L.C<br>c/o Nigro Companies<br>20 Corporate Woods Boulevard<br>Albany, NY 12211 | PSP Stores, LLC | Lease Agreement, dated 10/27/2017, as amended<br>(Rensselaer, NY) | Rensselaer, NY (East Greenbush) (4162) | $1,499.69 |
| 121900175 | T PITTSTON PA CROSSINGS, LLC | T PITTSTON PA CROSSINGS, LLC<br>T Pittston Crossings P A, LLC<br>16600 Dallas Parkway<br>Suite 300<br>Dallas, TX 75248 | PSP Stores, LLC | Lease Agreement, dated 02/21/2017, as amended<br>(Pittston, PA) | Pittston, PA (4165) | $0.00 |
| 121900176 | George Street LLC | George Street LLC<br>151 Haggetts Pond Rd.<br>Andover, MA 01810 | PSP Stores, LLC | Lease, dated 02/09/2018, as amended<br>(Olean, NY) | Olean, NY (4171) | $8,657.18 |
| 121900177 | Crossroads-Holt Drive Associates, LLC | Crossroads-Holt Drive Associates, LLC<br>20 Ridge Road<br>Suite 210<br>Mahwah, NJ 07430 | PSP Stores, LLC | Lease, dated 03/08/2018, as amended<br>(Stony Point, NY) | Stony Point, NY (4175) | $0.00 |
| 121900178 | 9-27 NATICK LLC | 9-27 NATICK LLC<br>c/o Crosspoint Associates, Inc.<br>300 Third Avenue<br>Waltham, MA 02451 | PSP Stores, LLC | Lease, dated 04/03/2018, as amended<br>(Natick, MA) | Natick, MA (4186) | $0.00 |
| 121900179 | Arsenal Plaza Associates, LLC | Arsenal Plaza Associates, LLC<br>c/o Nigro Companies<br>20 Corporate Woods Blvd<br>Albany, NY 12211 | PSP Stores, LLC | Lease Agreement, dated 08/02/2018, as amended<br>(Watertown, NY) | Watertown, NY (4193) | $699.62 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900180 | OGR Tanglewood LLC | OGR Tanglewood LLC<br>141 Robert E. Lee Blvd - 253<br>New Orleans, LA 70124 | PSP Stores, LLC | Lease, dated 08/13/2018, as amended<br>(Elizabeth City, NC) | Elizabeth City, NC (4195) | $770.71 |
| 121900181 | DSM MB II LLC | DSM MB II LLC<br>875 East Street<br>Tewksbury, MA 01876 | PSP Stores, LLC | Lease, dated 10/28/2016, as amended<br>(Ashland, MA) | Ashland, MA (4088) | $0.00 |
| 121900182 | Chili MZL, LLC | Chili MZL, LLC<br>c/o KPR Centers LLC<br>535 Fifth Ave<br>12th Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease, dated 09/12/2018, as amended<br>(Rochester, NY) | Chili (Rochester), NY<br>(4200) | $779.78 |
| 121900183 | Paint Creek South LLC | Paint Creek South LLC<br>24255 West 13 Mile Road<br>Suite 220<br>Bingham Farms, MI 48025 | PSP Stores, LLC | Lease Agreement, dated 01/21/2021, as amended<br>(Ypsilanti, MI) | Ypsilanti, MI (4227) | $0.00 |
| 121900184 | Atlantic Plaza Station LLC | Atlantic Plaza Station LLC<br>c/o Phillips Edison & Company<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | PSP Stores, LLC | Lease, dated 02/17/2021, as amended<br>(North Reading, MA) | North Reading, MA<br>(4230) | $0.00 |
| 121900185 | Brixmor Sunshine Square LLC | Brixmor Sunshine Square LLC<br>c/o Brixmor Property Group<br>200 Ridge Pike<br>Suite 100<br>Conshohocken, PA 19428 | PSP Stores, LLC | Lease, dated 03/28/2019, as amended<br>(Medford, NY) | Medford, NY (4249) | $0.00 |
| 121900186 | Brixmor SPE 5 LLC | Brixmor SPE 5 LLC<br>c/o Brixmor Property Group<br>450 Lexington Ave<br>13th Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease, dated 08/08/2019, as amended<br>(Roseville, MN) | Roseville, MN (4265) | $0.00 |
| 121900187 | Tolson Investments, LLC | Tolson Investments, LLC<br>c/o Tolson Enterprises<br>7150 W. Central Ave<br>Suite 200<br>Toledo, OH 43617 | PSP Stores, LLC | Lease, dated 08/19/2019, as amended<br>(Fremont, OH) | Fremont, OH (4267) | $0.00 |
| 121900188 | Paramount Crossroads at Pasadena, LLC | Paramount Crossroads at Pasadena, LLC<br>c/o Paramount Newco Realty<br>1195 Rt 70<br>Suite 2000<br>Lakewood, NJ 08701 | PSP Stores, LLC | Lease, dated 08/26/2019, as amended<br>(Pasadena, MD) | Pasadena, MD (4268) | $0.00 |
| 121900189 | Traver Village Limited Partnership | Traver Village Limited Partnership<br>c/o First Martin Corporation<br>115 Depot Street<br>Ann Arbor, MI 48104 | PSP Stores, LLC | Lease, dated 09/30/1991, as amended<br>(Ann Arbor, MI) | Ann Arbor, MI (4324) | $8,411.37 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900190 | GFS Realty LLC | GFS Realty LLC<br>Attn: Director of Real Estate<br>1385 Hancock Street<br>10th Floor<br>Quincy, MA 02169 | PSP Stores, LLC | Lease, dated 06/11/2007, as amended<br>(Annapolis, MD) | Annapolis, MD (4372) | $0.00 |
| 121900191 | SUSO 1 Summit Ridge, LP | SUSO 1 Summit Ridge, LP<br>c/o Slate Asset Management L.P.<br>121 King Street West<br>Suite 200<br>Toronto, ON M5H 3T9 | PSP Stores, LLC | Lease, dated 10/06/2015, as amended<br>(Mount Pleasant, PA) | Mount Pleasant, PA (4381) | $0.00 |
| 121900192 | TIA Holdings Mill Run, LLC | TIA Holdings Mill Run, LLC<br>2503 East Broad Street<br>Columbus, OH 43209 | PSP Stores, LLC | Lease, dated 07/17/1997, as amended<br>(Hilliard, OH) | Hilliard, OH (4383) | $551.64 |
| 121900193 | Timber Springfield Properties, LLC | Timber Springfield Properties, LLC<br>1060 W State Rd. 434<br>Suite 156<br>Longwood, FL 32750 | PSP Stores, LLC | Lease, dated 09/15/2004, as amended<br>(Springfield, OH) | Springfield, OH (4387) | $0.00 |
| 121900194 | S&S Singh Partners | S&S Singh Partners<br>555 East 28th Division Highway<br>Lititz, PA 17543 | PSP Stores, LLC | Lease, dated 02/10/2005, as amended<br>(Ephrata, PA) | Ephrata, PA (4389) | $0.00 |
| 121900195 | Smith Land & Improvement Corporation | Smith Land & Improvement Corporation<br>1810 Market Street<br>Camp Hill, PA 17011 | PSP Stores, LLC | Lease, dated 09/08/2010, as amended<br>(Lemoyne, PA) | Lemoyne, PA (4393) | $0.00 |
| 121900196 | Triple Bar Kendig Square, LLC | Triple Bar Kendig Square, LLC<br>c/o J.C. Bar<br>224 St. Charles Way<br>Suite 290<br>York, PA 17402 | PSP Stores, LLC | Lease, dated 08/24/2012, as amended<br>(Willow St, PA) | Willow St, PA (4394) | $0.00 |
| 121900197 | DILLON CENTER, LLC, | DILLON CENTER, LLC,<br>933<br>Columbia Boulevard<br>Bloomsburg, PA 18815 | PSP Stores, LLC | Lease, dated 01/08/2015, as amended<br>(Bloomsburg, PA) | Bloomsburg, PA (4396) | $0.00 |
| 121900198 | Shrewsbury Commons, L.P. | Shrewsbury Commons, L.P.<br>c/o Chesapeake Commercial Properties, Inc.<br>4750 Owings Mills Blvd.<br>Owings Mills, MD 21117 | PSP Stores, LLC | Lease, dated 09/07/2005, as amended<br>(Shrewsbury, PA) | Shrewsbury, PA (4400) | $0.00 |
| 121900199 | Plaza 15 Realty, LLC | Plaza 15 Realty, LLC<br>One Hospital Drive<br>Lewisburg, PA 17837 | PSP Stores, LLC | Lease, dated 09/23/2014, as amended<br>(Lewisburg, PA) | Lewisburg, PA (4401) | $0.00 |
| 121900200 | GGCAL Edgewater, LLC | GGCAL Edgewater, LLC<br>c/o Greenberg Gibbons Commercial<br>10096 Red Run Blvd<br>Suite 100<br>Owings Mills, MD 21117 | PSP Stores, LLC | Lease, dated 03/30/2006, as amended<br>(Edgewater, MD) | Edgewater, MD (4415) | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900201 | Brixmor / IA Bennets Mills Plaza, LLC | Brixmor / IA Bennets Mills Plaza, LLC c/o Brixmor Property Group 450 Lexington Ave, 13Th Floor New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 11/01/2021, as amended (Jackson Township, NJ) | Jackson, NJ (4439) | $0.00 |
| 121900202 | 27386 Carronade, LLC | 27386 Carronade, LLC 2600 West Big Beaver Rd Suite 410 Troy, MI 48084 | PSP Stores, LLC | Lease Agreement, dated 08/18/2021, as amended (Perrysburg, OH) | Perrysburg, OH (4465) | $0.00 |
| 121900203 | Sky Cortland, LLC | Sky Cortland, LLC Attn: Avi Metchik 10101 Fondren Rd. Suite 545 Houston, TX 77096 | PSP Stores, LLC | Lease Agreement, dated 08/17/2021, as amended (Cortland, NY) | Cortland, NY (4466) | $0.00 |
| 121900204 | G & I IX Empire Williamsville Place LLC | G & I IX Empire Williamsville Place LLC c/o DLC Management Corporation 565 Taxter Road Elmsford, NY 10523 | PSP Stores, LLC | Lease, dated 05/03/2019, as amended (Buffalo, NY) | Williamsville, NY (4526) | $0.00 |
| 121900205 | 250 Three Springs, LP | 250 Three Springs, LP 4041 Liberty Avenue Suite 201 Pittsburgh, PA 15224 | PSP Stores, LLC | Lease, dated 09/25/2022, as amended (Weirton, WV) | Weirton, WV (4556) | $695.16 |
| 121900206 | Meadowbrook Shopping Center Associates, LLC | Meadowbrook Shopping Center Associates, LLC 30600 Northwestern Suite 430 Farmington Hills, MI 48334 | PSP Stores, LLC | Lease, dated 06/24/2013, as amended (Novi, MI) | Novi, MI (4557) | $0.00 |
| 121900207 | Crest Properties, LLC | Crest Properties, LLC Attn: David Shenton, Managing Member 3134 Sycamore, Lane Billings, MT 59102 | PSP Stores, LLC | Lease, dated 06/25/2019, as amended (Buda, TX) | Buda, TX (4561) | $0.00 |
| 121900210 | Cross Grand Plaza LLC | Cross Grand Plaza LLC 3155 West Big Beaver Road Suite 110 Troy, MI 48084 | PSP Stores, LLC | Lease, dated 1.3.95, as amended (Brighton, MI) | Brighton, MI (4645) | $854.86 |
| 121900211 | CBL & Associates Management, Inc. | CBL & Associates Management, Inc. CBL Center Suite 500 2030 Hamilton Place Blvd Chattanooga, TN 37421-6000 | PSP Stores, LLC | Lease, dated 09/09/2010, as amended (Robinson Township, PA) | Robinson Twp, PA (Pittsburgh) (4647) | $0.00 |
| 121900212 | PBC Seguin, LLC | PBC Seguin, LLC PO Box 19831 Houston, TX 77224 | PSP Stores, LLC | Lease, dated 02/07/2008, as amended (Seguin, TX) | Seguin, TX (7008) | $415.12 |
| 121900213 | Store Property Marble, LLC | Store Property Marble, LLC 110 Hidden Pass San Antonio, TX 78323 | PSP Stores, LLC | Lease, dated 04/01/2011, as amended (Marble Falls, TX) | Marble Falls, TX (7012) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900214 | Highland Commons-Boone, LLC | Highland Commons-Boone, LLC<br>c/o Aston Properties, Inc.<br>610 E. Morehead St.<br>Suite 100<br>Charlotte, NC 28202 | PSP Stores, LLC | Lease, dated 06/30/2011, as amended<br>(Boone, NC) | Boone, NC (8048) | $0.00 |
| 121900215 | SLN Bellgrade, L.L.C. | SLN Bellgrade, L.L.C.<br>c/o S.L. Nusbaum realty Co.<br>7200 Glen Forest Dr.<br>Suite 300<br>Richmond, VA 23226 | PSP Stores, LLC | Lease Agreement, dated 01/26/2012, as amended<br>(Midlothian, VA) | Midlothian, VA (8059) | $0.00 |
| 121900216 | Garden City Leasehold Properties LLC | Garden City Leasehold Properties LLC<br>33 Boylston Street<br>Suite 3000<br>Chestnut Hill, MA 02467 | PSP Stores, LLC | Lease, dated 08/08/1994, as amended<br>(Cranston, RI) | Cranston, RI (9005) | $0.00 |
| 121900217 | KSL Realty North Providence LLC | KSL Realty North Providence LLC<br>1403 Douglas Avenue<br>North Providence, RI 02908 | PSP Stores, LLC | Lease, dated 10/01/2006, as amended<br>(North Providence, RI) | North Providence, RI (9010) | $0.00 |
| 121900218 | Brixmor GA Wilkes-Barre LP | Brixmor GA Wilkes-Barre LP<br>c/o Brixmor Property Group<br>450 Lexington Ave<br>13th Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated 06/03/2020, as amended<br>(Wilkes-Barre Township, PA) | Wilkes Barre, PA (9012) | $0.00 |
| 121900219 | LGM Equities, LLC | LGM Equities, LLC<br>c/o Milbrook Properties Ltd.<br>42 Bayview Ave.<br>Manhasset, NY 11030 | PSP Stores, LLC | Lease, dated 10/01/2009, as amended<br>(West Hempstead, NY) | West Hempstead , NY (9016) | $0.00 |
| 121900220 | MRV Dickson City, LLC | MRV Dickson City, LLC<br>c/o Integrated Properties, Inc.<br>P.O. Box 988<br>Sudbury, MA 01776 | PSP Stores, LLC | Lease, dated 1/7/2020, as amended<br>(Scranton, PA) | Scranton, PA (9022) | $0.00 |
| 121900221 | Shillington Partners, LLC. | Shillington Partners, LLC.<br>c/o Realty Resource Capital Corp.<br>7600 Jericho Turnpike<br>Suite 402<br>Woodbury, NY 11797 | PSP Stores, LLC | Lease, dated 08/29/2006, as amended<br>(Shillington, PA) | Shillington, PA (9025) | $1,619.00 |
| 121900222 | 3644 Long Beach Road, LLC | 3644 Long Beach Road, LLC<br>c/o Serota Properties<br>70 East Sunrise Hwy.<br>Suite 610<br>Valley Stream, NY 11581 | PSP Stores, LLC | Lease, dated 05/16/2003, as amended<br>(Oceanside, NY) | Oceanside, NY (9031) | $0.00 |
| 121900223 | 1170 Northern Boulevard LLC | 1170 Northern Boulevard LLC<br>40 Harbor Park Drive North<br>Port Washington, NY 11050 | PSP Stores, LLC | Lease, dated 03/30/2002, as amended<br>(Manhasset, NY) | Manhasset, NY (9036) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 121900224 | 1515 Lititz Partners, LLC | 1515 Lititz Partners, LLC<br>c/o Burkwood Associates<br>255 Butler Avenue<br>Suite 203<br>Lancaster, PA 17601 | PSP Stores, LLC | Lease, dated 01/06/2012, as amended<br>(Lancaster, PA) | Lancaster, PA (9037) | $0.00 |
| 121900225 | Regency Centers | Regency Centers<br>28 Church Lane<br>Suite 200<br>Westport, CT 06880 | PSP Stores, LLC | Lease, dated 05/16/2003, as amended<br>(Valley Stream, NY) | Valley Stream, NY (9038) | $17,359.21 |
| 121900226 | BRE DDR IVA Southmont PA LLC | BRE DDR IVA Southmont PA LLC<br>c/o DDR Corp.<br>3300 Enterprise Parkway<br>Beachwood, OH 44122 | PSP Stores, LLC | Lease, dated 05/09/2003, as amended<br>(Easton, PA) | Easton, PA (9041) | $13,048.68 |
| 121900227 | RD Branch Associates, L.P. | RD Branch Associates, L.P.<br>c/o Acadia Realty Trust<br>411 Theodore Fremd Ave.<br>Suite 300<br>Rye, NY 10580 | PSP Stores, LLC | Lease, dated 08/27/2001, as amended<br>(Smithtown, NY) | Smithtown, NY (9043) | $0.00 |
| 121900228 | Pettinaro Management LLC | Pettinaro Management LLC<br>234 North James St.<br>Newport, DE 19804 | PSP Stores, LLC | Lease, dated 08/11/2008, as amended<br>(Avondale, PA) | Avondale, PA (9044) | $0.00 |
| 121900229 | Shoppes at Bedford 15 A, LLC | Shoppes at Bedford 15 A, LLC<br>c/o ACF Property Management<br>12411 Ventura Blvd<br>Studio City, CA 91604 | PSP Stores, LLC | Lease, dated 01/08/2011, as amended<br>(Bedford, NH) | Bedford, NH (9052) | $0.00 |
| 121900231 | Margand Enterprises, LLC | Margand Enterprises, LLC<br>1680 Route 23<br>Suite 330<br>Wayne, NJ 07470 | PSP Stores, LLC | Lease, dated 06/18/2012, as amended<br>(Fair Lawn, NJ) | Fair Lawn, NJ (9056) | $0.00 |
| 121900232 | New Creek II LLC | New Creek II LLC<br>500 N. Broadway<br>Suite 201<br>PO Box 9010<br>Jericho, NY 11753 | PSP Stores, LLC | Lease, dated 08/29/2012, as amended<br>(Short Hills, NJ) | Short Hills, NJ (9058) | $0.00 |
| 121900233 | Capital Enterprises, Inc. | Capital Enterprises, Inc.<br>555 City Avenue<br>Suite 1130<br>Bala Cynwyd, PA 19004 | PSP Stores, LLC | Lease, dated 08/13/2012, as amended<br>(West Chester, PA) | West Chester, PA (9059) | $0.00 |
| 121900234 | Widewaters Country Squire Company, LLC | Widewaters Country Squire Company, LLC<br>c/o The Widewaters Group<br>5845 Widewaters Parkway<br>Suite 100<br>East Syracuse, NY 13057 | PSP Stores, LLC | Lease, dated 04/26/2013, as amended<br>(Cicero, NY) | Cicero, NY (9061) | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 121900235 | Linear Retail Waltham #1 LLC | Linear Retail Waltham #1 LLC c/o Linear Retail Properties, LLC 77 South Bedford Street Suite 401 Burlington, MA 01803 | PSP Stores, LLC | Lease, dated 03/20/2013, as amended (Waltham, MA) | Waltham, MA (9064) | $722.00 |
| 121900236 | Valley Properties, Inc. | Valley Properties, Inc. 875 East Street Tewksbury, MA 01876 | PSP Stores, LLC | Lease, dated 08/13/2013, as amended (Billerica, MA) | Billerica, MA (9069) | $782.36 |
| 121900237 | Valley Properties, Inc. | Valley Properties, Inc. 875 East Street Tewksbury, MA 01876 | PSP Stores, LLC | Lease, dated 08/13/2013, as amended (Haverhill, MA) | Haverhill, MA (9068) | $0.00 |
| 121900238 | Federal Realty Investment Trust | Federal Realty Investment Trust 909 Rose Avenue Suite 200 North Bethesda, MD 20852 | PSP Stores, LLC | Lease, dated 10/28/2013, as amended (Levittown, PA) | Levittown, PA (9070) | $0.00 |
| 121900239 | New Westgate Mall LLC | New Westgate Mall LLC c/o New England Development 75 Park Plaza Boston, MA 02116 | PSP Stores, LLC | Lease, dated 10/28/2013, as amended (Brockton, MA) | Brockton, MA (9072) | $0.00 |
| 121900240 | WKA Fairfax LLC | WKA Fairfax LLC 2213 Concord Pike Wilmington, DE 19803 | PSP Stores, LLC | Lease, dated 10/30/2013, as amended (Wilmington, DE) | Wilmington, DE (9073) | $0.00 |
| 121900241 | MFB Glenville, LLC | MFB Glenville, LLC RD Management LLC 810 Seventh Avenue 10th floor New York, NY 10019 | PSP Stores, LLC | Lease, dated 02/23/2014, as amended (Glenville, NY) | Glenville, NY (9076) | $919.34 |
| 121900242 | BCDPF Radar Distribution Center LLC | BCDPF Radar Distribution Center LLC c/o Ares 1200 17th Street Suite 2900 Denver, CO 80202 | PSP Stores, LLC | Lease, dated July 31, 2020, as amended (PA Distribution Center) | PA Distribution Center | $0.00 |
| 121900243 | Bradley Boulevard Shopping Center | Bradley Boulevard Shopping Center 12510 Property Drive Suite 150 Silver Spring, MA 20904-1639 | PSP Stores, LLC | Lease, dated 10/05/2018, as amended (Bethesda, MD) | Bethesda, MD | $1,866.67 |
| 121900244 | The Vienna Shopping Center Limited Partnership | The Vienna Shopping Center Limited Partnership c/o Rappaport Management Company 8405 Greensboro Drive 8th Floor McLean, VA 22102-5121 | WNW Stores, LLC | Lease, dated 12/07/2016, as amended (Vienna, VA) | Vienna, VA (3032) | $129.59 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 121900245 | Brixmor Holdings 1 SPE, LLC | Brixmor Holdings 1 SPE, LLC<br>c/o Brixmor Property Group<br>450 Lexington Ave<br>13th Floor<br>New York, NY 10017 | WNW Stores, LLC | Lease, dated 02/28/2022, as amended<br>(Ann Arbor, MI) | Ann Arbor, MI (3022) | $0.00 |
| 122000001 | M&S Investment Group, LLC | M&S Investment Group, LLC<br>4985 West Colonial Drive<br>Orlando, FL 32808 | Buddy's Newco, LLC | Assignment of Lease, dated October 27, 2014 (Store 3) | 303 | $854.39 |
| 122000002 | Swamp Land Acquisitions, LLC | Swamp Land Acquisitions, LLC<br>PO BOX 141105<br>GAINESVILLE, FL 32614-1105 | Buddy's Newco, LLC | Lease Agreement dated August 9, 2013, as amended (Store 9) | 909 | $522.19 |
| 122000003 | Kancov Investment Limited Partnership | Kancov Investment Limited Partnership<br>27750 STANSBURY, STE 200<br>FARMINGTON, MI 48334 | Buddy's Newco, LLC | Lease Agreement dated February 10, 2014, as amended (Store 15) | 15 | $0.00 |
| 122000007 | EGP Gainesville II, LLC | EGP Gainesville II, LLC<br>c/o 1045 LLC<br>1045 S WOODS MILL RD #1<br>TOWN & COUNTRY, MO 63017 | Buddy's Newco, LLC | Lease dated October 9, 2009, as amended (Store 20) | 20 | $0.00 |
| 122000008 | Festival Properties, Inc. | Festival Properties, Inc.<br>1215 GESSNER ROAD<br>HOUSTON, TX 77055 | Buddy's Newco, LLC | Lease dated February 11, 2021 (Store 21) | 21 | $300.99 |
| 122000009 | Ocala SC Company, Ltd. | Ocala SC Company, Ltd.<br>c/o RMC PROPERTY GROUP<br>8902 N DALE MABRY HWY<br>TAMPA, FL 33614 | Buddy's Newco, LLC | Lease Agreement dated December 30, 2009, as amended (Store 22) | 22 | $528.49 |
| 122000010 | Brooksville Square Plaza, LLC | Brooksville Square Plaza, LLC<br>RE: BROOKSVILLE SQUARE PLAZA LLC<br>PO BOX 47952<br>TAMPA, FL 33646 | Buddy's Newco, LLC | Lease Agreement dated October 3, 2019, as amended (Store 23) | 23 | $384.41 |
| 122000011 | American Plaza Group, LLC | American Plaza Group, LLC<br>106 Satsuma Drive<br>ATTN CARMEN CUELLO<br>Altamonte Springs, FL 32714 | Buddy's Newco, LLC | Lease Agreement dated May 6, 1991, as amended (Store 24) | 24 | $0.00 |
| 122000012 | Jochi Investments LLC | Jochi Investments LLC<br>106 Satsuma Drive<br>ATTN CARMEN CUELLO<br>Altamonte Springs, FL 32714 | Buddy's Newco, LLC | Lease Agreement dated May 6, 1991, as amended (Store 24) | 24 | $0.00 |
| 122000013 | Red Investments Corp | Red Investments Corp<br>106 Satsuma Drive<br>ATTN CARMEN CUELLO<br>Altamonte Springs, FL 32714 | Buddy's Newco, LLC | Lease Agreement dated May 6, 1991, as amended (Store 24) | 24 | $0.00 |
| 122000014 | Hundred Fires Ltd | Hundred Fires Ltd<br>106 Satsuma Drive<br>ATTN CARMEN CUELLO<br>Altamonte Springs, FL 32714 | Buddy's Newco, LLC | Lease Agreement dated May 6, 1991, as amended (Store 24) | 24 | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000015 | Harmony Shopping Plaza, LLC | Harmony Shopping Plaza, LLC<br>3980 TAMPA RD #205<br>OLDSMAR, FL 34677 | Buddy's Newco, LLC | Lease Agreement dated November 20, 2009, as amended (Store 25) | 25 | $469.13 |
| 122000016 | Sembler Family Land Trust | Sembler Family Land Trust<br>C/O THE SEMBLER COMPANY<br>5858 CENTRAL AVENUE<br>ST PETERSBURG, FL 33707 | Buddy's Newco, LLC | Lease Agreement dated December 17, 2012, as amended (Store 26) | 26 | $380.83 |
| 122000017 | FWI 2, LLC | FWI 2, LLC<br>197 EIGHTH ST, SUITE 800<br>BOSTON, MA 02129 | Buddy's Newco, LLC | Lease dated June 1, 2023 (Store 27) | 27 | $634.85 |
| 122000018 | CR Mango, LLC | CR Mango, LLC<br>C/O CONTINENTAL REALTY CORP<br>PO BOX 69475 -695<br>BALTIMORE, MD 21264-9475 | Buddy's Newco, LLC | Shopping Center Lease dated November 26, 2001, as amended (Store 29) | 29 | $435.09 |
| 122000020 | RB Seminole LLC | RB Seminole LLC<br>c/o RD MGT<br>810 7TH AVE, FLOOR 10<br>NEW YORK, NY 10019 | Buddy's Newco, LLC | Lease dated June 12, 1992, as amended (Store 32) | 32 | $491.75 |
| 122000021 | NORTHLAKE VILLAGE OWNER, LLC dba HIFFMAN | NORTHLAKE VILLAGE OWNER, LLC dba HIFFMAN<br>C/O HIFFMAN ASSET MGMT<br>ONE OAKBROOK TER #400<br>OAKBROOK TERRACE, IL 60181 | Buddy's Newco, LLC | Lease dated January 9, 1998, as amended (Store 33) | 33 | $466.23 |
| 122000022 | Shanri Holdings Corp | Shanri Holdings Corp<br>Post Office Box 160403<br>Mobile, AL 36616-1403 | Buddy's Newco, LLC | Lease Agreement dated October 19, 2020, as amended (Store 34) | 34 | $0.00 |
| 122000024 | Haines City Mall LLC | Haines City Mall LLC<br>20200 W DIXIE HWY STE 15G<br>AVENTURA, FL 33810 | Buddy's Newco, LLC | Lease dated on or about August 6, 2003, as amended (Store 36) | 36 | $520.32 |
| 122000025 | SHERWIN-WILLIAMS COMPANY | SHERWIN-WILLIAMS COMPANY<br>101 West Prospect Avenue<br>Cleveland, OH 44115 | Buddy's Newco, LLC | Lease dated February 29, 2000, as amended (Store 43) | 43 | $432.35 |
| 122000026 | MBABJB Holdings LLC | MBABJB Holdings LLC<br>2425 Pineapple Ave #108<br>Melbourne, FL 32935 | Buddy's Newco, LLC | Lease Agreement dated March 3, 2011, as amended (Store 47) | 47 | $0.00 |
| 122000027 | 12550 LLC | 12550 LLC<br>PO BOX 300439<br>BROOKLYN, NY 11230 | Buddy's Newco, LLC | Lease dated in July 2005 with a term commencing on September 1, 2005, as amended (Store 48) | 48 | $418.01 |
| 122000028 | Plaza West Shopping Center, LLC | Plaza West Shopping Center, LLC<br>c/o Edmund Terry<br>211 Alexander Palm Road<br>Boca Raton, FL 33432 | Buddy's Newco, LLC | Lease dated June 25, 2021 (Store 49) | 49 | $413.80 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000029 | FWI 23, LLC | FWI 23, LLC<br>c/o Flag Wharf LLC<br>197 Eighth Street Suite 800<br>Boston, MA 02129 | Buddy's Newco, LLC | Lease dated August 7, 2014, as amended (Store 50) | 50 | $0.00 |
| 122000030 | Vero Beach Investment Group II | Vero Beach Investment Group II<br>701 Devonshire Drive<br>Champaign, IL 61820 | Buddy's Newco, LLC | Lease Agreement dated October 23, 2018, as amended or assigned (Store 58) | 58 | $529.57 |
| 122000031 | Zephyr, LLC | Zephyr, LLC<br>7162 Reading Road<br>Ste 730<br>Attn: Mark D. Ayer<br>Cincinnati, OH 45327 | Buddy's Newco, LLC | Lease, executed on or about August 2018, as amended or extended (Store 60) | 60 | $346.97 |
| 122000032 | Jensen Beach Station LLC | Jensen Beach Station LLC<br>Attn: Leasing Department<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | Buddy's Newco, LLC | Lease, executed on or about September 2024 (Store 68) | 68 | $0.00 |
| 122000033 | Park Boulevard Shopping Center Ltd. | Park Boulevard Shopping Center Ltd.<br>C/O: SSG Commercial LLC<br>204 N Howard Ave<br>Tampa, FL 33606 | Buddy's Newco, LLC | Lease Agreement dated March 31, 1994, as amended (Store 1017) | 1017 | $564.47 |
| 122000035 | Tuscany Town Center Management, LLC | Tuscany Town Center Management, LLC<br>7420 GOLDEN POND<br>SUITE 100<br>ARMARILLO, TX 79121 | Buddy's Newco, LLC | Commercial Lease dated July 1, 2022 (Store 1023) | 1023 | $353.04 |
| 122000036 | Kingsville Retail Group, LP | Kingsville Retail Group, LP<br>PO Box 204391<br>Attn: John O'Shaughnessy<br>Austin, TX 78720 | Buddy's Newco, LLC | Commercial Lease dated August 9, 2013, as amended (Store 1024) | 1024 | $300.00 |
| 122000037 | The Triple M Partnership 2, LLC | The Triple M Partnership 2, LLC<br>PO BOX 2550<br>VICTORIA, TX 77902-2550 | Buddy's Newco, LLC | First amendment to Lease Agreement dated February 28, 2024 (Store 1025) | 1025 | $455.77 |
| 122000038 | Surveying and Mapping, LLC | Surveying and Mapping, LLC<br>4801 SOUTHWEST PARKWAY<br>BUILDING 2, STE 100<br>AUSTIN, TX 78735 | Buddy's Newco, LLC | Office Lease dated June 14, 2021, as amended (Orlando) | Orlando | $945.24 |
| 122000041 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 523) | 523 | $~~0.00~~27,120.00 |
| 122000042 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 524) | 524 | $0.00 |
| 122000043 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 525) | 525 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000044 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 527) | 527 | $0.00 |
| 122000045 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 528) | 528 | $0.00 |
| 122000046 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 529) | 529 | $0.00 |
| 122000047 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 531) | 531 | $0.00 |
| 122000048 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 533) | 533 | $0.00 |
| 122000049 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 534) | 534 | $0.00 |
| 122000050 | A-Team Leasing, LLC | A-Team Leasing, LLC<br>2232 Kodiak Drive NE<br>Atlanta, GA 30345 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2016, as amended or extended (Store 535) | 535 | $0.00 |
| 122000051 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/15/2021, as amended or extended (Store 590) | 590 | $0.00 |
| 122000052 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/15/2022, as amended or extended (Store 591) | 591 | $0.00 |
| 122000053 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 04/15/2022, as amended or extended (Store 594) | 594 | $0.00 |
| 122000054 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 07/15/2022, as amended or extended (Store 595) | 595 | $0.00 |
| 122000055 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/17/2022, as amended or extended (Store 596) | 596 | $0.00 |
| 122000056 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/01/2022, as amended or extended (Store 597) | 597 | $0.00 |
| 122000057 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 02) | 02 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000058 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1001) | 1001 | $0.00 |
| 122000059 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1002) | 1002 | $0.00 |
| 122000060 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1003) | 1003 | $0.00 |
| 122000061 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1004) | 1004 | $0.00 |
| 122000062 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1005) | 1005 | $0.00 |
| 122000063 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1008) | 1008 | $0.00 |
| 122000064 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1009) | 1009 | $0.00 |
| 122000065 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 1010) | 1010 | $0.00 |
| 122000066 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1031) | 1031 | $0.00 |
| 122000067 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1032) | 1032 | $0.00 |
| 122000068 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1038) | 1038 | $0.00 |
| 122000069 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1039) | 1039 | $0.00 |
| 122000070 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1040) | 1040 | $0.00 |
| 122000071 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1049) | 1049 | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000072 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/25/2021, as amended or extended (Store 1056) | 1056 | $0.00 |
| 122000073 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 17) | 17 | $0.00 |
| 122000074 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 37) | 37 | $0.00 |
| 122000075 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 45) | 45 | $0.00 |
| 122000076 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/18/2022, as amended or extended (Store 475) | 475 | $0.00 |
| 122000077 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 505) | 505 | $0.00 |
| 122000078 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 507) | 507 | $0.00 |
| 122000079 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 508) | 508 | $0.00 |
| 122000080 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 509) | 509 | $0.00 |
| 122000081 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 510) | 510 | $0.00 |
| 122000082 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 511) | 511 | $0.00 |
| 122000083 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 518) | 518 | $0.00 |
| 122000084 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 519) | 519 | $0.00 |
| 122000085 | bb BHF Stores LLC | bb BHF Stores LLC 552 Wisconsin Street San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 522) | 522 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000086 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 537) | 537 | $0.00 |
| 122000087 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 538) | 538 | $0.00 |
| 122000088 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 542) | 542 | $0.00 |
| 122000089 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 543) | 543 | $0.00 |
| 122000090 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 544) | 544 | $0.00 |
| 122000091 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 545) | 545 | $0.00 |
| 122000092 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 546) | 546 | $0.00 |
| 122000093 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 55) | 55 | $0.00 |
| 122000094 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 552) | 552 | $0.00 |
| 122000095 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 556) | 556 | $0.00 |
| 122000096 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/02/2022, as amended or extended (Store 557) | 557 | $0.00 |
| 122000097 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/02/2022, as amended or extended (Store 558) | 558 | $0.00 |
| 122000098 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 559) | 559 | $0.00 |
| 122000099 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 560) | 560 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000100 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 561) | 561 | $0.00 |
| 122000101 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 562) | 562 | $0.00 |
| 122000102 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 563) | 563 | $0.00 |
| 122000103 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 565) | 565 | $0.00 |
| 122000104 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 566) | 566 | $0.00 |
| 122000105 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 57) | 57 | $0.00 |
| 122000106 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 574) | 574 | $0.00 |
| 122000107 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 577) | 577 | $0.00 |
| 122000108 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 59) | 59 | $0.00 |
| 122000109 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 61) | 61 | $0.00 |
| 122000110 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 65) | 65 | $0.00 |
| 122000111 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 66) | 66 | $0.00 |
| 122000112 | bb BHF Stores LLC | bb BHF Stores LLC<br>552 Wisconsin Street<br>San Francisco, CA 94107 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/10/2020, as amended or extended (Store 76) | 76 | $0.00 |
| 122000114 | BMH-FAN 45, LLC | BMH-FAN 45, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 45, LLC | 604 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000115 | BMH-FAN 46, LLC | BMH-FAN 46, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 46, LLC | 605 | $0.00 |
| 122000116 | BMH-FAN 48, LLC | BMH-FAN 48, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 48, LLC | 606 | $0.00 |
| 122000117 | BMH-FAN 49, LLC | BMH-FAN 49, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 49, LLC | 607 | $0.00 |
| 122000118 | BMH-FAN 50, LLC | BMH-FAN 50, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 50, LLC | 608 | $0.00 |
| 122000120 | BMH-FAN 52, LLC | BMH-FAN 52, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 52, LLC | 610 | $0.00 |
| 122000121 | BMH-FAN 54, LLC | BMH-FAN 54, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 54, LLC | 611 | $0.00 |
| 122000123 | BMH-FAN 53, LLC | BMH-FAN 53, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 53, LLC | 613 | $0.00 |
| 122000124 | BMH-FAN 47, LLC | BMH-FAN 47, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/30/2020, between Buddy's Franchising and Licensing LLC and BMH-FAN 47, LLC | 614 | $0.00 |
| 122000126 | BMH-NEW 70, LLC | BMH-NEW 70, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/01/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 70, LLC | 616 | $0.00 |
| 122000128 | BMH-NEW 59, LLC | BMH-NEW 59, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/05/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 59, LLC | 618 | $0.00 |
| 122000129 | BMH-NEW 60, LLC | BMH-NEW 60, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/05/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 60, LLC | 619 | $0.00 |
| 122000131 | BMH-NEW 71, LLC | BMH-NEW 71, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 71, LLC | 624 | $0.00 |
| 122000132 | BMH-NEW 56, LLC | BMH-NEW 56, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 56, LLC | 625 | $0.00 |
| 122000133 | BMH-NEW 55, LLC | BMH-NEW 55, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/14/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 55, LLC | 626 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000134 | BMH-NEW 63, LLC | BMH-NEW 63, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 07/01/2021, between Buddy's Franchising and Licensing LLC and BMH-NEW 63, LLC | 627 | $0.00 |
| 122000135 | BMH-NEW 57, LLC | BMH-NEW 57, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/31/2020, between Buddy's Franchising and Licensing LLC and BMH-NEW 57, LLC | 630 | $0.00 |
| 122000136 | BMH-SM 79, LLC | BMH-SM 79, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 79, LLC | 631 | $0.00 |
| 122000137 | BMH-SM 80, LLC | BMH-SM 80, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 80, LLC | 632 | $0.00 |
| 122000138 | BMH-SM 81, LLC | BMH-SM 81, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 81, LLC | 633 | $0.00 |
| 122000139 | BMH-SM 82, LLC | BMH-SM 82, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 82, LLC | 634 | $0.00 |
| 122000140 | BMH-SM 83, LLC | BMH-SM 83, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 83, LLC | 635 | $0.00 |
| 122000141 | BMH-SM 85, LLC | BMH-SM 85, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 85, LLC | 636 | $0.00 |
| 122000142 | BMH-SM 86, LLC | BMH-SM 86, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 86, LLC | 637 | $0.00 |
| 122000143 | BMH-SM 87, LLC | BMH-SM 87, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/21/2021, between Buddy's Franchising and Licensing LLC and BMH-SM 87, LLC | 638 | $0.00 |
| 122000144 | BMH-NEW 65, LLC | BMH-NEW 65, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/15/2020, between Buddy's Franchising and Licensing LLC and BMH-NEW 65, LLC | 639 | $0.00 |
| 122000148 | BMH PRIME 96, LLC | BMH PRIME 96, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/23/2022, between Buddy's Franchising and Licensing LLC and BMH PRIME 96, LLC | 644 | $0.00 |
| 122000150 | BMH PRIME 95, LLC | BMH PRIME 95, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/23/2022, between Buddy's Franchising and Licensing LLC and BMH PRIME 95, LLC | 646 | $0.00 |
| 122000152 | BMH-TB 72, LLC | BMH-TB 72, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020, between Buddy's Franchising and Licensing LLC and BMH-TB 72, LLC | 04 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 122000154 | BMH-TB 74, LLC | BMH-TB 74, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/10/2020, between Buddy's Franchising and Licensing LLC and BMH-TB 74, LLC | 06 | $0.00 |
| 122000155 | BMH-TB 75, LLC | BMH-TB 75, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020, between Buddy's Franchising and Licensing LLC and BMH-TB 75, LLC | 07 | $0.00 |
| 122000156 | BMH-TB 76, LLC | BMH-TB 76, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated December 10, 2020, between Buddy's Franchising and Licensing LLC and BMH-TB 76, LLC | 08 | $0.00 |
| 122000158 | BMH-RCL 42, LLC | BMH-RCL 42, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 42, LLC | 304 | $0.00 |
| 122000160 | BMH-RCL 37, LLC | BMH-RCL 37, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 37, LLC | 307 | $0.00 |
| 122000161 | BMH-RCL 38, LLC | BMH-RCL 38, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 38, LLC | 308 | $0.00 |
| 122000162 | BMH-RCL 40, LLC | BMH-RCL 40, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 40, LLC | 309 | $0.00 |
| 122000165 | BMH-RCL 35, LLC | BMH-RCL 35, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 35, LLC | 312 | $0.00 |
| 122000166 | BMH-RCL 39, LLC | BMH-RCL 39, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/23/2019, between Buddy's Franchising and Licensing LLC and BMH-RCL 39, LLC | 313 | $0.00 |
| 122000169 | BMH-TNM 28, LLC | BMH-TNM 28, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/20/2017, between Buddy's Franchising and Licensing LLC and BMH-TNM 28, LLC | 375 | $0.00 |
| 122000170 | BMH-TNM 30, LLC | BMH-TNM 30, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/20/2017, between Buddy's Franchising and Licensing LLC and BMH-TNM 30, LLC | 376 | $0.00 |
| 122000172 | BMH-TNM 32, LLC | BMH-TNM 32, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/20/2017, between Buddy's Franchising and Licensing LLC and BMH-TNM 32, LLC | 378 | $0.00 |
| 122000173 | BMH-TB 78, LLC | BMH-TB 78, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/10/2020, between Buddy's Franchising and Licensing LLC and BMH-TB 78, LLC | 39 | $0.00 |
| 122000174 | Buddy Mac Eighteen, LLC | Buddy Mac Eighteen, LLC<br>400 East Centre Park Blvd, Suite 101<br>DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/16/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Eighteen, LLC | 430 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000176 | Buddy Mac Twenty-Two, LLC | Buddy Mac Twenty-Two, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Two, LLC | 433 | $0.00 |
| 122000177 | Buddy Mac Twenty-Three, LLC | Buddy Mac Twenty-Three, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Three, LLC | 434 | $0.00 |
| 122000178 | Buddy Mac Twenty-Four, LLC | Buddy Mac Twenty-Four, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Four, LLC | 435 | $0.00 |
| 122000179 | Buddy Mac Twenty-Five, LLC | Buddy Mac Twenty-Five, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Five, LLC | 436 | $0.00 |
| 122000180 | Buddy Mac Twenty-Six, LLC | Buddy Mac Twenty-Six, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Six, LLC | 437 | $0.00 |
| 122000181 | Buddy Mac Fifteen, LLC | Buddy Mac Fifteen, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/16/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Fifteen, LLC | 471 | $0.00 |
| 122000184 | Buddy Mac Three, LLC | Buddy Mac Three, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/03/2015, between Buddy's Franchising and Licensing LLC and Buddy Mac Three, LLC | 490 | $0.00 |
| 122000186 | Buddy Mac Seven, LLC | Buddy Mac Seven, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/13/2016, between Buddy's Franchising and Licensing LLC and Buddy Mac Seven, LLC | 492 | $0.00 |
| 122000188 | Buddy Mac Ten, LLC | Buddy Mac Ten, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/13/2016, between Buddy's Franchising and Licensing LLC and Buddy Mac Ten, LLC | 495 | $0.00 |
| 122000189 | Buddy Mac Six, LLC | Buddy Mac Six, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 07/06/2016, between Buddy's Franchising and Licensing LLC and Buddy Mac Six, LLC | 496 | $0.00 |
| 122000191 | Buddy Mac Twenty-Seven, LLC | Buddy Mac Twenty-Seven, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/04/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Twenty-Seven, LLC | 515 | $0.00 |
| 122000192 | BMH-TNM 29, LLC | BMH-TNM 29, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/13/2016, between Buddy's Franchising and Licensing LLC and BMH-TNM 29, LLC | 568 | $0.00 |
| 122000193 | Buddy Mac Fourteen, LLC | Buddy Mac Fourteen, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2016, between Buddy's Franchising and Licensing LLC and Buddy Mac Fourteen, LLC | 579 | $0.00 |
| 122000194 | BMH-TNM 33, LLC | BMH-TNM 33, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/01/2017, between Buddy's Franchising and Licensing LLC and BMH-TNM 33, LLC | 592 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000195 | Buddy Mac Eleven, LLC | Buddy Mac Eleven, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/25/2018, between Buddy's Franchising and Licensing LLC and Buddy Mac Eleven, LLC | 601 | $0.00 |
| 122000196 | Buddy Mac Eight, LLC | Buddy Mac Eight, LLC 400 East Centre Park Blvd, Suite 101 DeSoto, TX 75115 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/01/2019, between Buddy's Franchising and Licensing LLC and Buddy Mac Eight, LLC | 602 | $0.00 |
| 122000197 | Buddy West LLC | Buddy West LLC 144 Overlook Court Henderson, NV 89074 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/02/2024, as amended or extended (Store 140) | 140 | $0.00 |
| 122000198 | Buddy West LLC | Buddy West LLC 144 Overlook Court Henderson, NV 89074 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 04/25/2024, as amended or extended (Store 141) | 141 | $0.00 |
| 122000199 | Gator Elite RTO LLC | Gator Elite RTO LLC 9003 Classic Court Orlando, FL 32819 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/26/2020, as amended or extended (Store 1020) | 1020 | $0.00 |
| 122000200 | Gator Elite RTO LLC | Gator Elite RTO LLC 9003 Classic Court Orlando, FL 32819 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/26/2020, as amended or extended (Store 1053) | 1053 | $0.00 |
| 122000201 | Gator Elite RTO LLC | Gator Elite RTO LLC 9003 Classic Court Orlando, FL 32819 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/26/2020, as amended or extended (Store 1055) | 1055 | $0.00 |
| 122000202 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 150) | 150 | $0.00 |
| 122000203 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 151) | 151 | $0.00 |
| 122000204 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 152) | 152 | $0.00 |
| 122000205 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 153) | 153 | $0.00 |
| 122000206 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 154) | 154 | $0.00 |
| 122000207 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/16/2024, as amended or extended (Store 155) | 155 | $0.00 |
| 122000208 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/04/2023, as amended or extended (Store 156) | 156 | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000209 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/16/2023, as amended or extended (Store 157) | 157 | $0.00 |
| 122000210 | Hodge RTO Group Inc. | Hodge RTO Group Inc. 605 Roy Coppley Road Lexington, NC 27292 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/02/2024, as amended or extended (Store 158) | 158 | $0.00 |
| 122000211 | J & M Franchising, LLC | J & M Franchising, LLC 400 Union Avenue SE, Suite 200 Olympia, WA 98501 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/06/2024, as amended or extended (Store 340) | 340 | $0.00 |
| 122000212 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2023, as amended or extended (Store 1026) | 1026 | $0.00 |
| 122000213 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/13/2016, as amended or extended (Store 1051) | 1051 | $0.00 |
| 122000214 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/13/2016, as amended or extended (Store 1061) | 1061 | $0.00 |
| 122000215 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/13/2016, as amended or extended (Store 418) | 418 | $0.00 |
| 122000216 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/13/2016, as amended or extended (Store 419) | 419 | $0.00 |
| 122000217 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/10/2022, as amended or extended (Store 429) | 429 | $0.00 |
| 122000218 | KAPPA Investments LLC | KAPPA Investments LLC 1099 Jefferson Drive West Forest, VA 24551 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/17/2022, as amended or extended (Store 438) | 438 | $0.00 |
| 122000219 | Kamerade Group, LLC | Kamerade Group, LLC 58 Brookfield Lenox Road Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 384) | 384 | $0.00 |
| 122000220 | Kamerade Group, LLC | Kamerade Group, LLC 58 Brookfield Lenox Road Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 385) | 385 | $0.00 |
| 122000221 | Kamerade Group, LLC | Kamerade Group, LLC 58 Brookfield Lenox Road Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 386) | 386 | $0.00 |
| 122000222 | Kamerade Group, LLC | Kamerade Group, LLC 58 Brookfield Lenox Road Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 387) | 387 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000223 | Kamerade Group, LLC | Kamerade Group, LLC<br>58 Brookfield Lenox Road<br>Tifton, GA 31794 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/01/2021, as amended or extended (Store 472) | 472 | $0.00 |
| 122000224 | Lively Holdings, LLC | Lively Holdings, LLC<br>1170 Clover Hill Lane<br>Elgin, IL 60120 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/20/2024, as amended or extended (Store 482) | 482 | $0.00 |
| 122000225 | Magnolia Furniture, Inc. | Magnolia Furniture, Inc.<br>8848 Dawes Lake Road South<br>Mobile, AL 36619 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/27/2013, as amended or extended (Store 380) | 380 | $0.00 |
| 122000226 | Magnolia Furniture, Inc. | Magnolia Furniture, Inc.<br>8848 Dawes Lake Road South<br>Mobile, AL 36619 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 04/16/2015, as amended or extended (Store 499) | 499 | $0.00 |
| 122000227 | MID Atlantic RTO, LLC | MID Atlantic RTO, LLC<br>106 Umbrella Place<br>Jupiter, FL 33458 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/16/2022, as amended or extended (Store 502) | 502 | $0.00 |
| 122000228 | MID Atlantic RTO, LLC | MID Atlantic RTO, LLC<br>106 Umbrella Place<br>Jupiter, FL 33458 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/03/2015, as amended or extended (Store 501) | 501 | $0.00 |
| 122000229 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/16/2022, as amended or extended (Store 474) | 474 | $0.00 |
| 122000230 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 12/03/2014, as amended or extended (Store 473) | 473 | $0.00 |
| 122000231 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/26/2015, as amended or extended (Store 498) | 498 | $0.00 |
| 122000232 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/10/2020, as amended or extended (Store 547) | 547 | $0.00 |
| 122000233 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/10/2020, as amended or extended (Store 550) | 550 | $0.00 |
| 122000234 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/10/2020, as amended or extended (Store 551) | 551 | $0.00 |
| 122000235 | MTM Ventures, LLC | MTM Ventures, LLC<br>1116 Patton Avenue<br>Asheville, NC 28806 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 01/10/2020, as amended or extended (Store 554) | 554 | $0.00 |
| 122000236 | MW Management, Inc. | MW Management, Inc.<br>600 South Jefferson Street, Suite M<br>Athens, AL 35611 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/07/2023, as amended or extended (Store 441) | 441 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|--------------------------|-------|-------------|
| 122000237 | MW Management, Inc. | MW Management, Inc.<br>600 South Jefferson Street, Suite M<br>Athens, AL 35611 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/02/2024, as amended or extended (Store 442) | 442 | $0.00 |
| 122000238 | Pauhana Associates Limited | Pauhana Associates Limited<br>194 Pugua Street<br>Dededo, Guam 96929 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/01/2020, as amended or extended (Store 439 and 440) | 439<br>440 | $0.00 |
| 122000240 | Pierce RTO, LLC | Pierce RTO, LLC<br>106B Rock Quarry Road<br>Stockbridge, GA 30281 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/24/2022, as amended or extended (Store 240) | 240 | $0.00 |
| 122000241 | Pierce RTO of Commerce, LLC | Pierce RTO of Commerce, LLC<br>106B Rock Quarry Road<br>Stockbridge, GA 30281 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 08/04/2023, as amended or extended (Store 241) | 241 | $0.00 |
| 122000242 | Pierce RTO of Dublin, LLC | Pierce RTO of Dublin, LLC<br>106B Rock Quarry Road<br>Stockbridge, GA 30281 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/18/2023, as amended or extended (Store 243) | 243 | $0.00 |
| 122000243 | Pierce RTO, LLC | Pierce RTO, LLC<br>106B Rock Quarry Road<br>Stockbridge, GA 30281 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/03/2024, as amended or extended (Store 242) | 242 | $0.00 |
| 122000317 | RKR Ventures LLC | RKR Ventures LLC<br>701 Mike's Pike Street, Suite B<br>Winslow, AZ 86047 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/01/2021, as amended or extended (Store 416) | 416 | $0.00 |
| 122000318 | The Fort Companies, LLC | The Fort Companies, LLC<br>12512 Gracie Lane<br>Spanish Fort, AL 36527 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/01/2024, as amended or extended (Store 1011) | 1011 | $0.00 |
| 122000319 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/20/2023, as amended or extended (Store 160) | 160 | $0.00 |
| 122000320 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/20/2023, as amended or extended (Store 161) | 161 | $0.00 |
| 122000321 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 06/20/2023, as amended or extended (Store 162) | 162 | $0.00 |
| 122000322 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/21/2024, as amended or extended (Store 163) | 163 | $0.00 |
| 122000323 | TPGBHF, LLC | TPGBHF, LLC<br>2100 N Lake Eloise Drive<br>Winter Haven, FL 33884 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 02/23/2024, as amended or extended (Store 164) | 164 | $0.00 |
| 122000324 | TryBudCoLLC | TryBudCoLLC<br>6200 Mountain Brook Lane NW<br>Atlanta, GA 30328 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 11/21/2022, as amended or extended (Store 121) | 121 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 122000325 | TryBudCoLLC | TryBudCoLLC<br>6200 Mountain Brook Lane NW<br>Atlanta, GA 30328 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 07/07/2022, as amended or extended (Store 122) | 122 | $0.00 |
| 122000326 | TryBudCoLLC | TryBudCoLLC<br>6200 Mountain Brook Lane NW<br>Atlanta, GA 30328 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/31/2023, as amended or extended (Store 123) | 123 | $0.00 |
| 122000327 | TryBudCoLLC | TryBudCoLLC<br>6200 Mountain Brook Lane NW<br>Atlanta, GA 30328 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 10/01/2021, as amended or extended (Store 120) | 120 | $0.00 |
| 122000328 | WRCT Investments, LLC | WRCT Investments, LLC<br>1036 Glendalyn Circle<br>Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 05/27/2021, as amended or extended (Store 582) | 582 | $0.00 |
| 122000329 | WRCT Investments, LLC | WRCT Investments, LLC<br>1036 Glendalyn Circle<br>Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/29/2022, as amended or extended (Store 414) | 414 | $0.00 |
| 122000330 | WRCT Investments, LLC | WRCT Investments, LLC<br>1036 Glendalyn Circle<br>Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/31/2018, as amended or extended (Store 463) | 463 | $0.00 |
| 122000331 | WRCT Investments, LLC | WRCT Investments, LLC<br>1036 Glendalyn Circle<br>Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/31/2018, as amended or extended (Store 464) | 464 | $0.00 |
| 122000332 | WRCT Investments, LLC | WRCT Investments, LLC<br>1036 Glendalyn Circle<br>Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 03/31/2018, as amended or extended (Store 465) | 465 | $0.00 |
| 122000333 | WRCT Investments, LLC | WRCT Investments, LLC<br>1036 Glendalyn Circle<br>Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/08/2016, as amended or extended (Store 581) | 581 | $0.00 |
| 122000334 | WRCT Investments, LLC | WRCT Investments, LLC<br>1036 Glendalyn Circle<br>Spartanburg, SC 29302 | Buddy's Franchising and Licensing LLC | Franchise Agreement, dated 09/29/2023, as amended or extended (Store 583) | 583 | $0.00 |
| ~~129900001~~ | ~~FranConnect~~ | ~~FranConnect~~<br>~~13065 Sunrise Valley Drive~~<br>~~Suite 150~~<br>~~Herndon, VA 20171~~ | ~~Franchise Group, Inc.~~ | ~~Master Subscription Agreement~~ | | ~~$2,903.82~~ |
| 129900051 | Chandon Enterprise, LLC | Chandon Enterprise, LLC<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19801 | PSP Franchising, LLC | Franchise Agreement, dated 01/31/2019, as renewed or amended (Store #4431 - Doylestown ) | | $0.00 |
| 129900061 | Michelle Lambert (Entity Pending) | Michelle Lambert (Entity Pending)<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19081 | PSP Franchising, LLC | Franchise Agreement, dated 03/04/2019, as renewed or amended (Store #N/A - N/A) | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 129990001 | Electronic Imaging Services, Inc., d/b/a Vestcom Retail Solutions | Electronic Imaging Services, Inc., d/b/a Vestcom Retail Solutions 2800 Cantrell Road, Suite 500 Little Rock, AR 72202 | PSP Group, LLC | Master Services Agreement By and Between PSP Group, LLC And Electronic Imagine Services, Inc., d/b/a Vestcom Retail Solutions dated October 1st, 2024 | | $0.00 |
| 129990002 | Electronic Imaging Services, Inc., d/b/a Vestcom Retail Solutions | Electronic Imaging Services, Inc., d/b/a Vestcom Retail Solutions 2800 Cantrell Road, Suite 500 Little Rock, AR 72202 | PSP Group, LLC | Addendum A - Shelf Edge Products Service Agreement By and Between PSP Group, LLC And Electronic Imagine Services, Inc., d/b/a Vestcom Retail Solutions dated October 1st, 2024 | | $0.00 |
| 129990003 | UMR, Inc. | UMR, Inc. United Healthcare Attention: Paul Cirillo City Place I 185 Asylum St. Hartford, CT 06103 | Franchise Group, Inc. | Administrative Services Agreement, between UMR, Inc. and Franchise Group, Inc., effective as of January 1, 2024 | | $0.00 |
| 129990004 | Google, Inc. | Google, Inc. 1600 Amphitheatre Parkway Mountain View, CA 94043 | PSP Group, LLC | Google Advertising Service Agreement | | $1,041,042.04 |
| 129990005 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 02/28/2017, as renewed or amended (Store #4125 - Orange Park) | | $0.00 |
| 129990006 | DoorDash, Inc. | DoorDash, Inc. 303 2nd Street San Francisco, CA 94107 | PSP Group, LLC | Subsidiary Amendment to the DoorDash Drive Fulfillment Agreement | | $0.00 |
| 129990007 | Pet Blitz, LLC | Pet Blitz, LLC 624 Woodington Drive Pataskala, OH 43062 | PSP Franchising, LLC | Franchise Agreement, dated 04/01/2024, as renewed or amended (Store #4644 - Creve Coeur) | | $0.00 |
| 129990008 | Equifax Workforce Solutions LLC | Equifax Workforce Solutions LLC 4076 Paysphere Circle Chicago, IL 60674 | PSP Group, LLC | Amendment to the Universal Service Agreement | | $0.00 |
| 129990009 | Novi Pet Expo | Novi Pet Expo 1207 W Hawthorne Street Arlington Heights, IL 60005 | Pet Supplies "Plus", LLC | 2 Year Title Sponsorship Agreement | | $0.00 |
| 129990010 | JA Adventurers, LLC | JA Adventurers, LLC 16121 Haddam Ln Westfield, IN 46062 | PSP Franchising, LLC | Franchise Agreement, dated 05/03/2008, as renewed or amended (Store #8036 - St. Mary's) | | $0.00 |
| 129990011 | Northeast Florida Pet Nutrition, LLC | Northeast Florida Pet Nutrition, LLC 120 Palencia Village Drive, PMB 105 Box 177 St. Augustine, FL 32095 | PSP Franchising, LLC | Franchise Agreement, dated 11/18/2017, as renewed or amended (Store #4256 - St Augustine) | | $0.00 |
| 129990012 | Retail Services WIS Corporation, d/b/a WIS International | Retail Services WIS Corporation, d/b/a WIS International PO BOX 200081 DALLAS , TX 753200081 | WNW Stores, LLC | Master Services Agreement | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|------------------------|-------|-------------|
| 129990014 | USR Tennessee, LLC | USR Tennessee, LLC<br>17863 170th Avenue, Suite 101<br>Spring Lake, MI 49456 | PSP Franchising, LLC | Franchise Agreement, dated 09/08/2021, as renewed or amended (Store #4430 - Johnson City) | | $0.00 |
| 129990017 | Google, Inc. | Google, Inc.<br>c/o James C. Vandermark<br>810 Seventh Avenue<br>Suite 500<br>New York, NY 10019 | Buddy's Newco, LLC | Google Advertising Service Agreement | | $0.00 |
| ~~129990270~~ | ~~CT Corporation System~~ | ~~CT Corporation System~~<br>~~28 Liberty Street, 42nd Floor~~<br>~~New York, NY 10005~~ | ~~American Freight Outlet~~<br>~~Stores, LLC~~ | ~~MSA, dated February 28, 2024~~ | | ~~$245.00~~ |
| ~~129990271~~ | ~~LexisNexis , a division of RELX Inc.~~ | ~~LexisNexis , a division of RELX Inc.~~<br>~~1801 Varsity Drive~~<br>~~Raleigh, NC 27606~~ | ~~American Freight Outlet~~<br>~~Stores, LLC~~ | ~~MSA, dated November 30, 2024~~ | | ~~$0.00~~ |
| 129990900 | REBIS, LLC dba Property Works | REBIS, LLC dba Property Works<br>708 Church St<br>Decatur, GA 30030 | Pet Supplies "Plus", LLC | Consent and Approval Engagement Letter | | $15,700.00 |
| 140000200 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94<br>95 96 100 102 104 105<br>352 353 354 357 359 360<br>361 363 365 366 367 369<br>370 392 393 395 396 397<br>398 399 400 401 402 403<br>404 567 570 571 572 573<br>576 588 593 600 622 623<br>1021 1037 1041 1042<br>1043 1045 1057 1058<br>1060 1063 1065 1067<br>1068 1069 1070 2110<br>2111 2112 2113 2114<br>2116 2117 2118 | $0.00 |
| 140000200 | Pentex 1848, LLC | Pentex 1848, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94<br>95 96 100 102 104 105<br>352 353 354 357 359 360<br>361 363 365 366 367 369<br>370 392 393 395 396 397<br>398 399 400 401 402 403<br>404 567 570 571 572 573<br>576 588 593 600 622 623<br>1021 1037 1041 1042<br>1043 1045 1057 1058<br>1060 1063 1065 1067<br>1068 1069 1070 2110<br>2111 2112 2113 2114<br>2116 2117 2118 | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 140000200 | Pentex RTO, LLC | Pentex RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 570 571 572 573 576 588 593 600 622 623 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 1065 1067 1068 1069 1070 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000200 | Pentex Top Left, LLC | Pentex Top Left, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 570 571 572 573 576 588 593 600 622 623 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 1065 1067 1068 1069 1070 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000201 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 1, 2017, to that certain Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 622 623 | $0.00 |
| 140000201 | Pentex 1848, LLC | Pentex 1848, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 1, 2017, to that certain Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 622 623 | $0.00 |
| 140000201 | Pentex RTO, LLC | Pentex RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 1, 2017, to that certain Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 622 623 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 140000201 | Pentex Top Left, LLC | Pentex Top Left, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 1, 2017, to that certain Franchise Agreement dated December 1, 2017, by and among Buddy's Franchising and Licensing and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 84 81 87 89 91 92 93 94 95 96 100 102 104 105 352 353 354 357 359 360 361 363 365 366 367 369 370 392 393 395 396 397 398 399 400 401 402 403 404 567 622 623 | $0.00 |
| 140000202 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated March 1, 2022 between Buddy's Franchising and Licensing and EightSixThree RTO, LLC | 106 | $0.00 |
| 140000203 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated March 1, 2022, to the Franchise Agreement dated March 1, 2022 between Buddy's Franchising and Licensing and EightSixThree RTO, LLC | 106 | $0.00 |
| 140000204 | Pentex Top Left, LLC | Pentex Top Left, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated August 10, 2020, between Buddy's Franchising and Licensing LLC and Pentex Top Left, LLC | 368 | $0.00 |
| 140000205 | Pentex RTO, LLC | Pentex RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated June 17, 2022, between Buddy's Franchising and Licensing LLC and Pentex RTO, LLC | 405 | $0.00 |
| 140000206 | Pentex RTO, LLC | Pentex RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated June 17, 2022 to the Franchise Agreement dated June 17, 2022, between Buddy's Franchising and Licensing LLC and Pentex RTO, LLC | 405 | $0.00 |
| 140000207 | EightSixThree RTO, LLC | EightSixThree RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Termination Agreement and Release dated August 1, 2024, by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 360 405 | $0.00 |
| 140000207 | Pentex 1848, LLC | Pentex 1848, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Termination Agreement and Release dated August 1, 2024, by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 360 405 | $0.00 |
| 140000207 | Pentex RTO, LLC | Pentex RTO, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Termination Agreement and Release dated August 1, 2024, by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 360 405 | $0.00 |
| 140000207 | Pentex Top Left, LLC | Pentex Top Left, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Termination Agreement and Release dated August 1, 2024, by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 360 405 | $0.00 |
| 140000208 | Pentex 1848, LLC | Pentex 1848, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 2, 2021, between Buddy's Franchising and Licensing LLC and Pentex 1848, LLC | 445 | $0.00 |
| 140000209 | Pentex 1848, LLC | Pentex 1848, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 2, 2021 to the Franchise Agreement dated December 2, 2021, between Buddy's Franchising and Licensing LLC and Pentex 1848, LLC | 445 | $0.00 |
| 140000210 | Pentex 1848, LLC | Pentex 1848, LLC<br>1345 George Jenkins Blvd.<br>Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Franchise Agreement dated December 2, 2021, between Buddy's Franchising and Licensing LLC and Pentex 1848, LLC | 513 | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 140000211 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Addendum dated December 2, 2021 to the Franchise Agreement dated December 2, 2021, between Buddy's Franchising and Licensing LLC and Pentex 1848, LLC | 513 | $0.00 |
| 140000212 | EightSixThree RTO, LLC | EightSixThree RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated August 23, 2019, to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 570 571 572 573 576 588 593 600 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 | $0.00 |
| 140000212 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated August 23, 2019, to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 570 571 572 573 576 588 593 600 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 | $0.00 |
| 140000212 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated August 23, 2019, to the Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 570 571 572 573 576 588 593 600 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 | $0.00 |
| 140000212 | Pentex Top Left, LLC | Pentex Top Left, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated August 23, 2019, to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC | 570 571 572 573 576 588 593 600 1021 1037 1041 1042 1043 1045 1057 1058 1060 1063 | $0.00 |
| 140000213 | EightSixThree RTO, LLC | EightSixThree RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated October 23, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000213 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated October 23, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000213 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated October 23, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000213 | Pentex Top Left, LLC | Pentex Top Left, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated October 23, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 2110 2111 2112 2113 2114 2116 2117 2118 | $0.00 |
| 140000214 | EightSixThree RTO, LLC | EightSixThree RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated July 1, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 1065 1067 1068 1069 1070 | $0.00 |
| 140000214 | Pentex 1848, LLC | Pentex 1848, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated July 1, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 1065 1067 1068 1069 1070 | $0.00 |
| 140000214 | Pentex RTO, LLC | Pentex RTO, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated July 1, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 1065 1067 1068 1069 1070 | $0.00 |
| 140000214 | Pentex Top Left, LLC | Pentex Top Left, LLC 1345 George Jenkins Blvd. Lakeland, FL 33815 | Buddy's Franchising and Licensing LLC | Amendment dated July 1, 2019 to the Buddy's Franchising and Licensing Franchise Agreement by and among Buddy's Franchising and Licensing LLC and Pentex RTO, LLC, EightSixThree RTO, LLC, Pentex Top Left, LLC, and Pentex 1848, LLC. | 1065 1067 1068 1069 1070 | $0.00 |
| 140000215 | Alera Group | Alera Group 3 Parkway North Suite 500 Deerfield, IL 60015 | Franchise Group, Inc. | Scope of Services dated March 13, 2024 | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 140000216 | Altera Group, E3 Division | Altera Group, E3 Division 1540 International Parkway Suite 2000 Lake Mary, FL 32746 | Franchise Group, Inc. | Franchise Group Inc. Statement of Work Renewal dated August 22, 2023 | | $0.00 |
| 140000217 | American Express Travel Related Services Company, Inc. | American Express Travel Related Services Company, Inc. 200 Vesey Street New York, NY 10285 | Franchise Group, Inc. | Franchisor Marketing Assistance Amendment to the Agreement for American Express Card Acceptance dated April 7, 2022 | | $0.00 |
| 140000218 | American Express Travel Related Services Company, Inc. | American Express Travel Related Services Company, Inc. 200 Vesey Street New York, NY 10285 | Franchise Group, Inc. | Agreement for American Express Card Acceptance | | $0.00 |
| 140000222 | Bind Benefits, Inc. d/b/a Surest | Bind Benefits, Inc. d/b/a Surest 3033 Excelsior Blvd., Suite 400 Minneapolis, MN 55416 | Franchise Group, Inc. | Summary Plan Description | | $0.00 |
| 140000223 | Blackline Systems, Inc. | Blackline Systems, Inc. 21300 Victory Blvd., 12th Floor Woodland Hills, CA 91367 | Franchise Group New Holdco, LLC | Renewal Order Form | | $0.00 |
| 140000224 | Caron & Bletzer, PLLC | Caron & Bletzer, PLLC 1 Library Lane Kingston, NH 03848 | Franchise Group, Inc. | Engagement Letter and Confidentiality Agreement dated November 18, 2024 | | $0.00 |
| 140000225 | Constellation NewEnergy, Inc. | Constellation NewEnergy, Inc. 1001 Louisiana St.,  Constellation Suite 2300 Houston, TX 77002 | PSP Stores, LLC | Electricity Supply Agreement - Fixed Price Solutions, dated April 18, 2023 | | $3,187.46$0.00 |
| 140000226 | Constellation NewEnergy, Inc. | Constellation NewEnergy, Inc. 1001 Louisiana St.,  Constellation Suite 2300 Houston, TX 77002 | PSP Stores, LLC | New Jersey Electricity Supply Agreement, dated January 1, 2022 | | $0.00 |
| 140000227 | Constellation NewEnergy, Inc. | Constellation NewEnergy, Inc. 1001 Louisiana St.,  Constellation Suite 2300 Houston, TX 77002 | PSP Stores, LLC | New Jersey Electricity Supply Agreement, dated January 1, 2022 | | $0.00 |
| 140000228 | CoStar Realty Information, Inc. | CoStar Realty Information, Inc. 1331 L St NW Washington, DC 20005-4101 | Franchise Group, Inc. | CoStar Information Subscription Form dated August 23, 2021 | | $268.35 |
| 140000229 | Delta Dental | Delta Dental 4100 Okemos Rd Okemos, MI 48864 | Franchise Group, Inc. | Summary of Dental Plan Benefits | | $0.00 |
| 140000230 | Delta Dental | Delta Dental 4100 Okemos Rd Okemos, MI 48864 | Franchise Group, Inc. | Delta Dental Contract for Franchise Group, Inc. | | $302.39 |
| 140000232 | Farmers Property and Casualty Insurance Company | Farmers Property and Casualty Insurance Company 700 Quaker Lane Warwick, RI 02886 | Franchise Group, Inc. | Insurance Program Agreement | | $0.00 |
| 140000233 | Fidelity Management Trust Company | Fidelity Management Trust Company P.O. Box 770001 Cincinnati, OH 45277-0037 | Franchise Group, Inc. | Fidelity Investments Retirement Plan Service Agreement dated January 28, 2020 | | $0.00 |

Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| 140000234 | First Reliance Standard Life Insurance Company | First Reliance Standard Life Insurance Company 488 Madison Avenue, Suite 803 New York, NY 10022 | Franchise Group, Inc. | Group New York Disability Benefits Law Insurance Policy | | $0.00 |
| 140000235 | GCG Financial, LLC a subsidiary of Alera Group, Inc. | GCG Financial, LLC a subsidiary of Alera Group, Inc. 3 Parkway North Suite 500 Deerfield, IL 60015 | Franchise Group, Inc. | Employee Benefits Consulting Agreement dated June 1, 2021 | | $0.00 |
| 140000236 | Green Imaging, LLC | Green Imaging, LLC 2020 Adams Houston, TX 77005 | Franchise Group, Inc. | Medical Diagnostic Testing Services Agreement dated September 3, 2024 | | $0.00 |
| 140000238 | JPMorgan Chase Bank, N.A. | JPMorgan Chase Bank, N.A. 383 Madison Avenue New York, NY 10017 | Franchise Group, Inc. | Master Commercial Card Agreement dated December 7, 2023 | | $0.00 |
| 140000239 | Kaiser Permanente Hawaii | Kaiser Permanente Hawaii 711 Kapiolani Boulevard Suite 400 Honolulu, HI 96813 | Franchise Group, Inc. | Group Agreement | | $0.00 |
| 140000240 | KeyBank | KeyBank 88 E. Broad St., Suite 200 Columbus, OH 43215 | American Freight, LLC | Master Services Agreement | | $0.00 |
| 140000244 | MarketSphere Consulting, LLC | MarketSphere Consulting, LLC 154 Krog St. Suite 100 Atlanta, GA 30307 | Franchise Group, Inc. | Claimant Agreement dated January 16, 2023 | | $405.57 |
| 140000245 | MetLife Legal Plans, Inc. | MetLife Legal Plans, Inc. 1111 Superior Avenue Cleveland, OH 44114-2507 | Franchise Group, Inc. | Extension of the Franchise Group, Inc. Agreement and Addendum dated April 17, 2024 | | $0.00 |
| 140000246 | Morgan Stanley Smith Barney, LLC | Morgan Stanley Smith Barney, LLC 2000 Westchester Avenue 2nd Floor Purchase, NY 10577 | Franchise Group, Inc. | Morgan Stanley Smith Barney LLC Institutional Consulting Agreement For Participant Directed Retirement Plans, as amended, dated January 11, 2024 | | $0.00 |
| 140000247 | OptumRx, Inc. | OptumRx, Inc. 1600 McConnor Parkway Schaumberg, IL 60173 | Franchise Group, Inc. | Commitment Agreement | | $0.00 |
| 140000248 | OptumRx, Inc. | OptumRx, Inc. P.O. Box 509075 San Diego, CA 92150-9075 | Franchise Group, Inc. | Summary Plan Description | | $0.00 |
| 140000249 | Paymentech LLC, a/k/a Chase Merchant Services | Paymentech LLC, a/k/a Chase Merchant Services 8181 Communications Pkwy Plano, TX 75024 | Franchise Group, Inc. | December 2019 Amendment to Select Merchant Payment Instrument Processing Agreement dated December 18, 2019 | | $0.00 |
| 140000250 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Application for Colorado Paid Family and Medical Leave Insurance | | $0.00 |

## Assumed Contracts / Lease List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|-------------------------|-------|-------------|
| 140000251 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Reliance Standard Life Insurance (Ohio) | | $0.00 |
| 140000252 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | New Jersey Temporary Disability Benefits Law Insurance Policy, as amended | | $0.00 |
| 140000253 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Oregon Paid Family and Medical Leave Insurance | | $0.00 |
| 140000254 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Massachusetts Paid Family and Medical Leave Insurance | | $0.00 |
| 140000255 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Group Long Term Disability Insurance Policy | | $0.00 |
| 140000256 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Group Long Term Disability Insurance Policy | | $0.00 |
| 140000257 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Voluntary Group Critical Illness Insurance Policy | | $0.00 |
| 140000258 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Group Accident Policy | | $0.00 |
| 140000259 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Group Hospital Indemnity Policy | | $0.00 |
| 140000260 | Sealy Mattress Manufacturing Company, LLC | Sealy Mattress Manufacturing Company, LLC 1000 Tempur Way Lexington, KY 40511-1386 | Buddy's Newco, LLC | Retailer Agreement | | $0.00 |
| 140000261 | Securian Life Insurance Company | Securian Life Insurance Company 400 Robert Street North St. Paul, MN 55101-2098 | Franchise Group, Inc. | Group Term Life Amendment #1 | | $0.00 |
| 140000262 | Securian Life Insurance Company | Securian Life Insurance Company 400 Robert Street North St. Paul, MN 55101-2098 | Franchise Group, Inc. | Group Term Life Insurance Policy, dated January 1, 2023 | | $0.00 |
| 140000263 | SmartMatch Insurance Agency, LLC | SmartMatch Insurance Agency, LLC 120 W. 12th St, Suite 1700 Kansas City, MO 64105 | Franchise Group, Inc. | Strategic Alliance Application Form for SmartConnect Services | | $0.00 |
| 140000264 | Sun Life Assurance Company of Canada | Sun Life Assurance Company of Canada 6 Worcester Street, Wellesley Hills, MA | Franchise Group, Inc. | Sun Life Assurance Company of Canada Stop Loss Policy | | $0.00 |
| 140000267 | UMR, Inc. | UMR, Inc. 115 W Wausau Ave Wausau, WI 54401 | Franchise Group, Inc. | Health Benefit Summary Plan Description | | $0.00 |

**Assumed Contracts / Lease List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|
| ~~140000268~~ | ~~UMR, Inc.~~ | ~~UMR, Inc.~~<br>~~115 W Wausau Ave~~<br>~~Wausau, WI 54401~~ | ~~Franchise Group, Inc.~~ | ~~Amendment 01~~ | | ~~$0.00~~ |
| ~~140000269~~ | ~~Vision Service Plan Insurance Company~~ | ~~Vision Service Plan Insurance Company~~<br>~~3333 Quality Drive~~<br>~~Rancho Cordova, CA 95670~~ | ~~Franchise Group, Inc.~~ | ~~Client Vision Care Plan~~ | | ~~$0.00~~ |
| ~~140000270~~ | ~~WEX Health, Inc. d/b/a WEX, formerly known as Discovery Benefits, LLC~~ | ~~WEX Health, Inc.~~<br>~~82 Hopmeadow Street~~<br>~~Simsbury, CT 06089~~ | ~~Franchise Group, Inc.~~ | ~~Application~~ | | ~~$0.00~~ |
| 140000271 | WEX Health, Inc. d/b/a WEX, formerly known as Discovery Benefits, LLC | WEX Health, Inc.<br>82 Hopmeadow Street<br>Simsbury, CT 06089 | Buddy's Newco, LLC | ~~Application~~ Administration Services Agreement by and between Buddy's Newco, LLC and Wex Health, Inc. | | $0.00 |
| 140000272 | WEX Health, Inc. d/b/a WEX, formerly known as Discovery Benefits, LLC | WEX Health, Inc.<br>82 Hopmeadow Street<br>Simsbury, CT 06089 | Pet Supplies "Plus", LLC | ~~Application~~ Administration Services Agreement by and between Pet Supplies "Plus", LLC and Wex Health, Inc. | | $0.00 |
| ~~140000273~~ | ~~Paymentech LLC, a/k/a Chase Merchant Services~~ | ~~Paymentech LLC, a/k/a Chase Merchant Services~~<br>~~8181 Communications Pkwy~~<br>~~Plano, TX 75024~~ | ~~Franchise Group, Inc.~~ | ~~Select Merchant Payment Instrument Processing Agreement, dated November 16, 2012~~ | | ~~$0.00~~ |
| 140000275 | Chris Rowland | Chris Rowland<br>Address on File | Franchise Group Newco PSP, LLC | Employment Agreement, dated as of January 2021, by and between Franchise Group Newco PSP, LLC and Christopher Rowland, as amended | | $0.00 |
| ~~140000276~~ | ~~BlackLine Systems, Inc.~~ | ~~BlackLine Systems, Inc.~~<br>~~21300 Victory Blvd., 12th Floor~~<br>~~Woodland Hills, CA 91367~~ | ~~American Freight, LLC~~ | ~~Master Services Agreement~~ | | ~~$0.00~~ |
| 140000277 | BRE Retail Residual Owner 1 LLC | BRE Retail Residual Owner 1 LLC<br>c/o Brixmor Property Group<br>450 Lexington Ave<br>13th Floor<br>New York, NY 10017 | PSP Stores, LLC | Lease Agreement, dated March 31, 2014, as amended (Cincinnati, OH - Delhi) | Cincinnati, OH (Delhi) (0233) | $0.00 |
| 140000278 | Harper's Station LLC | Harper's Station LLC<br>c/o Phillips Edison & Co<br>11501 Northlake Drive<br>Cincinnati, OH 45249 | PSP Stores, LLC | Lease | | $0.00 |
| ~~TBD~~ | ~~Workiva~~ | ~~Workiva~~<br>~~2900 University Blvd.~~<br>~~Ames, IA 50010~~ | ~~Franchise Group, Inc.~~ | ~~Order dated July 5, 2024~~ | | ~~$0.00~~ |
| 140000281 | Blackline Systems, Inc. | Blackline Systems, Inc.<br>21300 Victory Blvd.<br>12th Floor<br>Woodland Hills, CA 91367 | Franchise Group New Holdco, LLC | Assignment and Assumption Agreement by and among American Freight LLC., Franchise Group New Holdco, LLC, and Blackline Systems, Inc. | | |
| ~~TBD~~ | ~~Workiva~~ | ~~Workiva~~<br>~~2900 University Blvd.~~<br>~~Ames, IA 50010~~ | ~~Franchise Group, Inc.~~ | ~~Terms and Conditions dated March, 31, 2013~~ | | ~~$0.00~~ |

## Exhibit M

### Assumed and Assigned Contracts List

Section 10.1 of the Plan provides the following:  To the extent assumption has not already occurred, the Assumed Contracts to be assumed and assigned in connection with the Partial Sale Transaction will be assumed (unless previously assumed pursuant to a separate order of the Bankruptcy Court) and assigned to the Buyer pursuant to the Sale Order in accordance with the applicable Sale Documents.  Except as otherwise provided herein, any Executory Contracts and Unexpired Leases (a) not previously assumed, (b) not previously assumed and assigned in accordance with the Sale Order or other order approving such assumption and assignment, (c) not previously rejected pursuant to an order of the Bankruptcy Court, and (d) identified on the Assumed Contracts List, will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order, except any Executory Contract or Unexpired Lease (i) identified on the Rejected Contracts/Lease List, (ii) that is the subject of (A) a separate motion or notice to reject, assume, or assume and assign or a Cure Dispute that is pending as of the Confirmation Date or (B) an order of the Bankruptcy Court that is not yet a Final Order, (iii) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code), (iv) of the American Freight Debtors that is not otherwise assumed or included on the Assumed Contracts List, (v) that relates to the Vitamin Shoppe Debtors and is not otherwise assumed pursuant to the Sale Order or included on the Assumed Contracts List, or (vi) of Franchise Group, Inc. that is not otherwise assumed or included on the Assumed Contracts List.  For the avoidance of doubt, except as otherwise set forth herein or as included on the Assumed Contracts List, all Executory Contracts and Unexpired Leases of the American Freight Debtors, Franchise Group, Inc., and the Vitamin Shoppe Debtors shall be rejected as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such other date as may be identified on the Rejected Contracts/Lease List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party (including the Buyer pursuant to the Partial Sale Transaction) on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by agreement of the parties or, other than with respect to non-residential Unexpired Leases, by an order of the Bankruptcy Court.  To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, increases, accelerates or otherwise alters any obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder as a result of, gives rise to any rights or benefits to any non-Debtor party to any such Executory Contract or Unexpired Lease, or creates any Lien on any asset or property of the Debtors or the Reorganized Debtors as a result of, the assumption of such Executory Contract or Unexpired Lease or the execution or consummation of the Plan or any other

Restructuring Transaction (including any change of control, sale of business, assignment, vesting, termination, acceleration, or similar provisions therein), then such provision shall be deemed unenforceable and modified (solely for purposes of the transactions contemplated under the Plan) such that the transactions contemplated by the Plan or any other Restructuring Transaction shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease, to exercise any other default-related rights with respect thereto, to increase, accelerate or otherwise alter the obligations, rights or liabilities of the Debtors or the Reorganized Debtors thereunder, to be entitled to any rights or benefits thereunder, or create or impose a Lien on any asset or property of the Debtors or the Reorganized Debtors.  For the avoidance of doubt, Confirmation of the Plan shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary contained in the Plan (other than Section 10.8 of the Plan) and in the Restructuring Support Agreement, except as otherwise agreed to by the Debtors and any applicable counterparty to an Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts/Lease List in their discretion prior to the later of (a) Effective Date and (b) seven (7) days after the date on which the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts List (or, in either case, such later date as may be agreed with a counterparty); provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

Section 10.2 of the Plan provides the following:  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors on the Assumed Contracts List, as applicable, to a counterparty must be Filed, served, and actually received by the Debtors on or before fourteen (14) days after such notice (together with any outstanding objections to the amount proposed on the Assumed Contracts List, a "Cure Dispute"). Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor, Reorganized Debtor, or Buyer, without the need for any objection by the Debtors or the Reorganized Debtors or any other party in interest, or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure Costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure Costs; provided, however, that nothing herein shall prevent (if applicable) the Reorganized Debtors or the Buyer from paying any Cure Costs despite the failure of the relevant counterparty to File such request for payment of such Cure Costs. The Reorganized Debtors also may settle any Cure Costs without any further notice to or action, order, or approval of the Bankruptcy Court.  In the event that a non-Debtor contract counterparty Files a timely Cure Dispute and the Debtors and such counterparty cannot resolve such Cure Dispute, the Cure Dispute shall be heard on at least seven (7) days' notice to the applicable non-Debtor contract counterparty, or such date as the parties agree, subject to the Bankruptcy Court's calendar. Any objection by a contract or lease counterparty to (a) the ability of the applicable Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or

lease to be assumed or assumed and assigned, or (b) any other matter pertaining to the proposed assumption or proposed assumption and assignment must be Filed, served, and actually received by the Debtors by the date on which objections to Confirmation of the Plan are due. The Reorganized Debtors may settle any Cure Dispute without any further notice to or action, order, or approval of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment, as applicable.

Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, the Debtors shall pay any Cure Costs, if monetary, in full in Cash either (a) on the Effective Date or as soon as reasonably practicable thereafter, or (b) in the event of a Cure Dispute, and following resolution of such Cure Dispute (either consensually or through judicial decision), upon the later of (i) the Effective Date or as soon as reasonably practicable thereafter and (ii) seven (7) days after the date on which such Cure Dispute has been resolved. The Debtors and the Reorganized Debtors, as applicable, reserve the right at any time (including, with respect to the Reorganized Debtors, after the Effective Date) to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts List, the Debtors or the Reorganized Debtors, as applicable, shall have the right to reject such Executory Contract or Unexpired Lease by amending the Rejected Contracts/Lease List to include such Executory Contract or Unexpired Lease and providing prompt notice of any such amendment to any applicable counterparty, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan and payment or performance of the applicable Cure Costs shall result in the full release and satisfaction of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid pursuant to Section 10.2 of the Plan, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing herein shall affect the allowance of any Claims or any Cure Costs agreed to by the Debtors in any written agreement amending or modifying any Executory Contract or Unexpired Lease prior to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan or otherwise.**

To the extent applicable, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired

Leases and the Debtors are entitled to all the rights provided under section 365 of the Bankruptcy Code.

Additionally, <u>Section 10.7</u> of the Plan provides the following:  Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts/Lease List or Assumed Contracts List, as applicable, nor anything contained in the Plan or Sale Documents, nor the Debtors' delivery of a notice of the proposed assumption and proposed Cure Cost to any contract and lease counterparties set forth in the Assumed Contracts List shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article XIII of the Plan.  If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts List, the Debtors shall have the right to reject such Executory Contract or Unexpired Lease, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Certain documents, or portions thereof, contained in this **Exhibit M** and the Plan Supplement remain subject to continuing review and discussions among the Debtors and interested parties with respect thereto.  The rights of the Debtors are expressly reserved, subject to the terms and conditions set forth in the Plan (including all applicable consultation, consent, and/or approval rights contained or contemplated therein), to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan, or by order of the Bankruptcy Court.

**Assumed and Assigned Contracts List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Assignee | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|---|
| 140000215 | Alera Group | Alera Group<br>3 Parkway North<br>Suite 500<br>Deerfield, IL 60015 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Scope of Services dated March 13, 2024 | | $0.00 |
| 121800368 | Alera Group Inc. & Subsidiaries | Alera Group Inc. & Subsidiaries<br>3 Parkway North<br>Suite 500<br>Deerfield, IL 60015 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Business Associate Agreement | | $0.00 |
| 140000216 | Alera Group, E3 Division | Alera Group, E3 Division<br>1540 International Parkway<br>Suite 2000<br>Lake Mary, FL 32746 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Franchise Group Inc. Statement of Work Renewal dated August 22, 2023 | | $0.00 |
| 140000218 | American Express Travel Related Services Company, Inc. | American Express Travel Related Services Company, Inc.<br>200 Vesey Street<br>New York, NY 10285 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Agreement for American Express Card Acceptance | | $0.00 |
| 140000217 | American Express Travel Related Services Company, Inc. | American Express Travel Related Services Company, Inc.<br>200 Vesey Street<br>New York, NY 10285 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Franchisor Marketing Assistance Amendment to the Agreement for American Express Card Acceptance dated April 7, 2022 | | $0.00 |
| 140000222 | Bind Benefits, Inc. d/b/a Surest | Bind Benefits, Inc. d/b/a Surest<br>3033 Excelsior Blvd., Suite 400<br>Minneapolis, MN 55416 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Summary Plan Description | | $0.00 |
| 140000276 | BlackLine Systems, Inc. | BlackLine Systems, Inc.<br>21300 Victory Blvd., 12th Floor<br>Woodland Hills, CA 91367 | American Freight, LLC | Franchise Group New Holdco, LLC | Master Services Agreement | | $0.00 |
| 121800990 | BlackLine Systems, Inc. | BlackLine Systems, Inc.<br>21300 Victory Blvd., 12th Floor<br>Woodland Hills, CA 91367 | American Freight, LLC | Franchise Group New Holdco, LLC | Order Form for Blackline Products and Services | | $608.86 |
| 140000224 | Caron & Bletzer, PLLC | Caron & Bletzer, PLLC<br>1 Library Lane<br>Kingston, NH 03848 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Engagement Letter and Confidentiality Agreement dated November 18, 2024 | | $0.00 |
| 140000282 | Chubb Group of Insurance Companies | Chubb Group of Insurance Companies<br>436 Walnut Street<br>PO Box 1000<br>Philadelphia, PA 19106-3703 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | General Liability Policy Number XSL G48596538 | | $0.00 |
| 140000283 | Chubb Group of Insurance Companies | Chubb Group of Insurance Companies<br>Centralized Operations<br>1 Beaver Valley Road<br>Wilmington, DE 19803 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Workers' Compensation and Employers' Liability Policy WLR C53501540 | | $0.00 |
| 140000284 | Chubb Group of Insurance Companies | Chubb Group of Insurance Companies<br>Centralized Operations<br>1 Beaver Valley Road<br>Wilmington, DE 19803 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Workers' Compensation and Employers' Liability Policy SCF C53501606 | | $0.00 |
| 140000285 | Chubb Group of Insurance Companies | Chubb Group of Insurance Companies<br>Centralized Operations<br>1 Beaver Valley Road<br>Wilmington, DE 19803 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Commercial Auto Policy ISA H10816051 | | $0.00 |
| 140000286 | Chubb Group of Insurance Companies | Chubb Group of Insurance Companies<br>Centralized Operations<br>1 Beaver Valley Road<br>Wilmington, DE 19803 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Commercial Auto Policy ISA H10816105 | | $0.00 |
| 121801683 | CorVel Enterprise Comp, Inc. | CorVel Enterprise Comp, Inc.<br>1920 Main Street, Suite 900<br>Irvine, CA 92614 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | CorVel Enterprise Comp Services Agreement | | $0.00 |
| 140000228 | CoStar Realty Information, Inc. | CoStar Realty Information, Inc.<br>1331 L St NW<br>Washington, DC 20005-4101 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | CoStar Information Subscription Form dated August 23, 2021 | | $268.35 |
| 129990270 | CT Corporation System | CT Corporation System<br>28 Liberty Street, 42nd Floor<br>New York, NY 10005 | American Freight Outlet Stores, LLC | Franchise Group New Holdco, LLC | MSA, dated February 28, 2024 | | $245.00 |
| 140000230 | Delta Dental | Delta Dental<br>4100 Okemos Rd<br>Okemos, MI 48864 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Delta Dental Contract for Franchise Group, Inc. | | $0.00 |
| 140000229 | Delta Dental | Delta Dental<br>4100 Okemos Rd<br>Okemos, MI 48864 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Summary of Dental Plan Benefits | | $0.00 |
| 121802199 | Empyrean Benefit Solutions, Inc. | Empyrean Benefit Solutions, Inc.<br>3010 Briarpark Drive, Suite 8000<br>Houston, TX 77042 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Empyrean Benefit Solutions Master Services Agreement | | $0.00 |

**Assumed and Assigned Contracts List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Assignee | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|---|
| 140000232 | Farmers Property and Casualty Insurance Company | Farmers Property and Casualty Insurance Company<br>700 Quaker Lane<br>Warwick, RI 02886 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Insurance Program Agreement | | $0.00 |
| 140000233 | Fidelity Management Trust Company | Fidelity Management Trust Company<br>P.O. Box 770001<br>Cincinatti, OH 45277-0037 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Fidelity Investments Retirement Plan Service Agreement dated January 28, 2020 | | $0.00 |
| 140000234 | First Reliance Standard Life Insurance Company | First Reliance Standard Life Insurance Company<br>488 Madison Avenue, Suite 803<br>New York, NY 10022 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Group New York Disability Benefits Law Insurance Policy | | $0.00 |
| 129900001 | FranConnect | FranConnect<br>13865 Sunrise Valley Drive<br>Suite 150<br>Herndon, VA 20171 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Master Subscription Agreement | | $2,903.82 |
| 140000235 | GCG Financial, LLC a subsidiary of Alera Group, Inc. | GCG Financial, LLC a subsidiary of Alera Group, Inc.<br>3 Parkway North<br>Suite 500<br>Deerfield, IL 60015 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Employee Benefits Consulting Agreement dated June 1, 2021 | | $0.00 |
| 121802981 | Globalization Partners LLC | Globalization Partners LLC<br>175 Federal Street<br>17th Floor<br>Boston, MA 02110 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Globalization Partners Master Agreement | | $0.00 |
| 121803064 | Green Imaging, LLC | Green Imaging, LLC<br>2020 Albans<br>Houston, TX 77005 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Medical Diagnostic Testing Services Agreement | | $0.00 |
| 140000236 | Green Imaging, LLC | Green Imaging, LLC<br>2020 Albans<br>Houston, TX 77005 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Medical Diagnostic Testing Services Agreement dated September 3, 2024 | | $0.00 |
| 121803577 | Intelligent Direct, Inc. | Intelligent Direct, Inc.<br>10 First Street<br>Wellsboro, PA 16901 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Web Application Agreement | | $0.00 |
| 140000238 | JPMorgan Chase Bank, N.A. | JPMorgan Chase Bank, N.A.<br>383 Madison Avenue<br>New York, NY 10017 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Master Commercial Card Agreement dated December 7, 2023 | | $0.00 |
| 140000239 | Kaiser Permanente Hawaii | Kaiser Permanente Hawaii<br>711 Kapiolani Boulevard<br>Suite 400<br>Honolulu, HI 96813 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Group Agreement | | $0.00 |
| 140000240 | KeyBank | Keybank<br>88 E. Broad St., Suite 200<br>Columbus, OH 43215 | American Freight, LLC | Franchise Group New Holdco, LLC | MSA | | $0.00 |
| 129990271 | LexisNexis , a division of RELX Inc. | LexisNexis , a division of RELX Inc.<br>1801 Varsity Drive<br>Raleigh, NC 27606 | American Freight Outlet Stores, LLC | Franchise Group New Holdco, LLC | MSA, dated November 30, 2024 | | $0.00 |
| 140000244 | MarketSphere Consulting, LLC | MarketSphere Consulting, LLC<br>154 Krog St.<br>Suite 100<br>Atlanta, GA 30307 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Claimant Agreement dated January 16, 2023 | | $405.57 |
| 140000245 | MetLife Legal Plans, Inc. | MetLife Legal Plans, Inc.<br>1111 Superior Avenue<br>Cleveland, OH 44114-2507 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Extension of the Franchise Group, Inc. Agreement and Addendum dated April 17, 2024 | | $0.00 |
| 121900000 | Moody's | Moody's<br>7 World Trade Center<br>at 250 Greenwich Street<br>New York, NY 10007 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Application for Moody's Rating Assessment Service by Franchise Group | | $129,643.84 |
| 140000246 | Morgan Stanley Smith Barney, LLC | Morgan Stanley Smith Barney, LLC<br>2000 Westchester Avenue<br>2nd Floor<br>Purchase, NY 10577 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Morgan Stanley Smith Barney LLC Institutional Consulting Agreement For Participant Directed Retirement Plans, as amended, dated January 11, 2024 | | $0.00 |
| 121805230 | OneStream Software LLC | OneStream Software LLC<br>362 South Street<br>Rochester, MI 48307 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | SaaS Agreement | | $0.00 |
| 140000248 | OptumRx, Inc. | OptumRx, Inc.<br>P.O. Box 509075<br>San Diego, CA 92150-9075 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Summary Plan Description | | $0.00 |
| 140000247 | OptumRx, Inc. | OptumRx, Inc.<br>1600 McConnor Parkway<br>Schaumberg, IL 60173 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Commitment Agreement | | $0.00 |
| 140000273 | Paymentech LLC, a/k/a Chase Merchant Services | Paymentech LLC, a/k/a Chase Merchant Services<br>8181 Communications Pkwy<br>Plano, TX 75024 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Select Merchant Payment Instrument Processing Agreement,  dated November 16, 2012 | | $0.00 |

Assumed and Assigned Contracts List

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Assignee | Description of Agreement | Store | Cure Amount |
|---|---|---|---|---|---|---|---|
| 140000249 | Paymentech LLC, a/k/a Chase Merchant Services | Paymentech LLC, a/k/a Chase Merchant Services 8181 Communications Pkwy Plano, TX 75024 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | December 2019 Amendment to Select Merchant Payment Instrument Processing Agreement dated December 18, 2019 | | $0.00 |
| 140000259 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Group Hospital Indemnity Policy | | $0.00 |
| 140000258 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Group Accident Policy | | $0.00 |
| 140000257 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Voluntary Group Critical Illness Insurance Policy | | $0.00 |
| 140000256 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Group Long Term Disability Insurance Policy | | $0.00 |
| 140000255 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Group Long Term Disability Insurance Policy | | $0.00 |
| 140000254 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Massachusetts Paid Family and Medical Leave Insurance | | $0.00 |
| 140000253 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Oregon Paid Family and Medical Leave Insurance | | $0.00 |
| 140000252 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | New Jersey Temporary Disability Benefits Law Insurance Policy, as amended | | $0.00 |
| 140000251 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Reliance Standard Life Insurance (Ohio) | | $0.00 |
| 140000250 | Reliance Standard Life Insurance Company | Reliance Standard Life Insurance Company 1700 Market Street, Suite 1200 Philadelphia, PA 19103-3938 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Application for Colorado Paid Family and Medical Leave Insurance | | $0.00 |
| 121806107 | S&P Global Ratings | S&P Global Ratings 55 Water Street New York, NY 10041 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | S&P Global Ratings Engagement Letter for Franchise Group, Inc. | | $953.42 |
| 140000262 | Securian Life Insurance Company | Securian Life Insurance Company 400 Robert Street North St. Paul, MN 55101-2098 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Group Term Life Insurance Policy, dated January 1, 2023 | | $0.00 |
| 140000261 | Securian Life Insurance Company | Securian Life Insurance Company 400 Robert Street North St. Paul, MN 55101-2098 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Group Term Life Amendment #1 | | $0.00 |
| 140000263 | SmartMatch Insurance Agency, LLC | SmartMatch Insurance Agency, LLC 120 W. 12th St., Suite 1700 Kansas City, MO 64105 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Strategic Alliance Application Form for SmartConnect Services | | $0.00 |
| 140000264 | Sun Life Assurance Company of Canada | Sun Life Assurance Company of Canada 6 Worcester Street, Wellesley Hills, MA | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Sun Life Assurance Company of Canada Stop Loss Policy | | $0.00 |
| 129990003 | UMR, Inc. | UMR, Inc. UnitedHealthcare Attention: Paul Cirillo City Place I 185 Asylum St. Hartford, CT 06103 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Administrative Services Agreement, between UMR, Inc. and Franchise Group, Inc., effective as of January 1, 2024 | | $0.00 |
| 140000268 | UMR, Inc. | UMR, Inc. 115 W Wausau Ave Wausau, WI 54401 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Amendment 01 | | $0.00 |
| 140000267 | UMR, Inc. | UMR, Inc. 115 W Wausau Ave Wausau, WI 54401 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Health Benefit Summary Plan Description | | $0.00 |
| 121807072 | Unleashed Brands, LLC | Unleashed Brands, LLC 2350 Airport Freeway, Suite 505 Bedford, TX 76022 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Transition Services Agreement | | $0.00 |
| 121807129 | Valsoft Corporation Inc dba GbBIS | Valsoft Corporation Inc dba GbBIS 7405 Rte Transcanadienne, Suite 100 Montreal, QC H4T 1Z2 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Web Application Agreement Amendment 9 | | $0.00 |
| 121807184 | Velosio, LLC | Velosio, LLC 5747 Perimeter Drive, Suite 200 Dublin, OH 43017 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Stratos Cloud Alliance Partner Agreement | | $0.00 |
| 140000269 | Vision Service Plan Insurance Company | Vision Service Plan Insurance Company 3333 Quality Drive Rancho Cordova, CA 95670 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Client Vision Care Plan | | $0.00 |
| 140000270 | WEX Health, Inc. d/b/a WEX, formerly known as Discovery Benefits, LLC | WEX Health, Inc. 82 Hopmeadow Street Simsbury, CT 06089 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Administration Services Agreement by and between Franchise Group, Inc. and Wex Health, Inc. | | $0.00 |
| 140000279 | Workiva | Workiva 2900 University Blvd. Ames, IA 50010 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Order dated July 5, 2024 | | $0.00 |

**Assumed and Assigned Contracts List**

| ID # | Assumption Counterparty | Assumption Counterparty's Address | Debtor Entity | Assignee | Description of Agreement | Store | Cure Amount |
|------|------------------------|-----------------------------------|---------------|----------|--------------------------|-------|-------------|
| 140000280 | Workiva | Workiva<br>2900 University Blvd.<br>Ames, IA 50010 | Franchise Group, Inc. | Franchise Group New Holdco, LLC | Terms and Conditions dated March, 31, 2013 | | $0.00 |