**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Obj. Deadline: August 5, 2025 at 4:00 p.m. (ET)**<br>**Hearing Date: August 19, 2025 at 10:00 a.m. (ET)** |

## MOTION OF RINGCENTRAL, INC. FOR ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM

RingCentral, Inc. ("RingCentral"), a creditor in the above-captioned jointly administered cases, files this *Motion of RingCentral, Inc. for Allowance and Payment of an Administrative Expense Claim* (the "Motion") pursuant to 11 U.S.C. § 503(b)(1), and in support thereof, RingCentral would respectfully show this Court as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

## I.    JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    FACTUAL BACKGROUND

2.    RingCentral is a leading provider of AI-driven cloud-based business communications, contact center, video, and hybrid event solutions. RingCentral offers a fully integrated communications and collaboration platform, which includes voice, online meeting, video conferencing, contact center and related services, applications, and product integrations.

3.    On or about June 20, 2018, American Freight, Inc., predecessor-in-interest to American Freight, LLC (the "American Freight Debtor"), entered into the *Master Services Agreement* (as amended, modified, and/or supplemented, the "Agreement") with RingCentral, pursuant to which RingCentral provided voice, office, and professional services (the "Services"). A true and correct copy of the Agreement is attached hereto as **Exhibit A**. Pursuant to the Agreement, RingCentral billed the American Freight Debtor monthly for Services under an account ending with the last four digits 6034 (the "Account").

4.    On November 3, 2024 (the "Petition Date"), Franchise Group, Inc. and its affiliated debtors (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 title 11 of the United States Code (the "Bankruptcy Code").  The bankruptcy cases are jointly administered under Case No. 24-12480 (the "Bankruptcy Cases").

5.    On the Petition Date, the Debtors filed their *Motion for Interim and Final Orders Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services and Deeming Utility Companies Adequately Assured of Future Payment* [Docket No. 7] (the "Utilities

Motion") in which the Debtors requested, *inter alia*, the entry of interim and final orders pursuant to § 366 of the Bankruptcy Code prohibiting certain utility companies (the "Utility Companies") from altering, refusing, or discontinuing utility services on account of the Bankruptcy Cases or any outstanding prepetition invoices; authorizing the Debtors to pay the Utility Companies post-petition charges for utility services when due in the ordinary course of business; and authorizing the payment of adequate assurance payments to the Utility Companies. RingCentral was listed on Exhibit C of the Utilities Motion as a Utility Company deemed entitled to receive payment of adequate assurance.

6.      On November 6, 2024 and December 9, 2024, the Court entered its *Interim Order* [Docket No. 128] and *Final Order* [Docket No. 384] (the "Final Utilities Order"), respectively, granting certain relief requested in the Utilities Motion. Pursuant to the Final Utilities Order, the Debtors were authorized to pay RingCentral for post-petition Services it provided to the American Freight Debtor pursuant to the Agreement in accordance with the Debtors' prepetition practices.

7.      On January 21, 2025, RingCentral filed its Proof of Claim No. 1090 seeking payment in the amount of $24,700.15 for outstanding prepetition Services it provided to the American Freight Debtor.

8.      On June 2, 2025, the Court entered its order (the "Confirmation Order")[2] confirming the Debtors' *Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* (the "Plan").[3]

---

[2] *See Findings of Fact, Conclusions of Law, and Order (I) Confirming the Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates and (II) Approving the Global Settlement and Release of Claims and Causes of Action by and Among the Global Settlement Parties* [Docket No. 1596].
[3] *See Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc., and Its Debtor Affiliates* [Docket No. 1454].

9.      On June 6, 2025, the Plan became effective (the "Effective Date").[4] Also on June 6, 2025, the Debtors filed their *Third Amended Plan Supplement* [Docket No. 1604] (the "Plan Supplement").

10.     Pursuant to § 10.1 of the Plan and Exhibit E to the Plan Supplement, the Debtors rejected the Agreement with RingCentral as of the Effective Date.

11.     From and after the Petition Date and through the Effective Date, RingCentral provided Services and billed the American Freight Debtor's Account in accordance with prepetition practices as authorized under the Final Utilities Order. On May 26, 2025, RingCentral billed the debtor for Services provided pursuant to the Agreement for the period from May 25, 2025 through June 24, 2025, in the amount of $19,931.80 (the "May Invoice Charges").  The American Freight Debtor failed to pay RingCentral for the May Invoice Charges.

12.     As of the date of filing this Motion, RingCentral is owed the amount of $7,972.68 (the "Administrative Claim Amount") for the prorated portion of the May Invoice Charges for Services it provided to the American Freight Debtor from May 25, 2025 through the Effective Date (the "Administrative Claim Services").  A summary of the charges incurred during the Administrative Claim Period and a copy of the May invoice is attached hereto as **Exhibit B**.

### III.    REQUESTED RELIEF

13.     RingCentral requests that the Court enter an order pursuant to § 503(b)(1)(A) of the Bankruptcy Code that grants the allowance and payment of an administrative expense claim in the Administrative Claim Amount of **$7,972.68** for the Administrative Claim Services.

### IV.    BASIS FOR RELIEF

14.     The Bankruptcy Code in § 503(b)(1) provides, in relevant part, that

---

[4] *See Notice of (I) Entry of Confirmation Order, (II) Occurrence of Effective Date, and (III) Related Bar Dates* [Docket No. 1605].

L7896\461475\282744476

After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate[.]

11 U.S.C. § 503(b)(1)(A).

15.     The two-prong test to establish an administrative claim requires that a claimant show that "(1) there was a post-petition transaction between the claimant and the estate; and (2) those expenses yielded a benefit to the estate." *In re Mallinckrodt PLC*, No. 20-12522, 2021 WL 4876908, at *6 (citing *In re Energy Future Holdings Corp.*, 990 F.3d 728, 741 (3d Cir. 2021)); *see also In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 532–33 (3d Cir. 1999) ("For a claim in its entirety to be entitled to first priority under [§ 503(b)(1)(A)], the debt must arise from a transaction with the debtor-in-possession . . . [and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the operation of the business.") (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)).

16.     While "[t]he 'benefit' requirement has no independent basis in the Code, [it] is merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been 'necessary.'" *See id.* (citing 4 Collier on Bankruptcy ¶ 503.06[3][b] (Lawrence P. King ed., 15th rev. ed.)). Further, "[t]he benefit conferred must be substantial and direct." *In re Carco Electronics*, 346 B.R. 377, 383 (Bankr. W.D. Pa. 2006) (citing *Microsoft Corp. v. DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995)).

17.     Lastly, 11 U.S.C. § 503(b)(1) is intended "to provide an incentive for creditors to continue doing business with a debtor and an incentive for others to engage in business transactions with the debtor." *In re Northstar Offshore Group, LLC*, 628 B.R. 286, 299 (Bankr. S.D. Tex. 2020) (quoting 4 Collier on Bankruptcy ¶ 503.06[2] (16th ed.)). "The policy behind giving priority to administrative claimants is to encourage creditors to supply necessary resources to debtors post-

5

petition . . . and to keep administrative costs to a minimum to preserve the debtor's estate." *In re Molnar Bros.*, 200 B.R. 555, 559 (Bankr. D. N.J. 1996) (internal citation omitted) (citing *In re Cole*, 189 B.R. 40, 47 (Bankr. S.D. N.Y. 1995)).

18.    The Administrative Claim Services RingCentral provided are entitled to administrative expense priority under § 503(b)(1) of the Bankruptcy Code because the Debtors elected to continue to receive the benefits from RingCentral under the Agreement post-petition in accordance with the Final Utilities Order. As the Debtors emphasized in the Utilities Motion, "[u]ninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these Chapter 11 Cases." *See* Utilities Motion ¶ 9. Pursuant to the Final Utilities Order, RingCentral was prohibited from discontinuing its services to the Debtors on account of any prepetition outstanding amounts. RingCentral complied with the terms of the Final Utilities Order and continued to provide services to the Debtors in good faith and in the ordinary course of business through the Effective Date.

19.    Accordingly, RingCentral satisfies the statutory requirements of § 503(b)(1) and acted in accordance with the policies behind the statue by continuing its business operations with the Debtors post-petition. Thus, this Court should grant RingCentral an administrative expense claim for the Administrative Claim Services it provided in the amount of $7,972.68.

## V.    RESERVATION OF RIGHTS

20.    RingCentral reserves the right to amend, alter, revise, or supplement its request for an administrative expense claim at any time and in any respect.  RingCentral further reserves the right to assert additional claims against the Debtors that are not included in this Motion.

## VI.    CONCLUSION

WHEREFORE, RingCentral respectfully requests that the Court enter an order substantially in the form attached to this Motion as **Exhibit C** (i) allowing and directing the

6

payment of an administrative expense claim under 11 U.S.C. § 503(b)(1)(A) in the amount of $7,972.68; and (ii) for such other and further relief as the Court deems RingCentral to be justly entitled.

Dated: July 7, 2025

Respectfully submitted,

**CLARK HILL PLC**

*/s/ Karen M. Grivner*
Karen M. Grivner (DE Bar No. 4372)
824 N. Market Street, Suite 710
Wilmington, Delaware 19801
Telephone: (302) 250-4750
Facsimile: (302) 421-9439
kgrivner@clarkhill.com

-and-

James L. Ugalde (AZ Bar No. 022733)
3200 N. Central Avenue, Suite 1600
Phoenix, Arizona 85012
Telephone: (602) 440-4817
Facsimile: (602) 257-9582
jugalde@clarkhill.com

-and-

Tara L. Bush (TX Bar No. 24122050)
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330
tbush@clarkhill.com

*Counsel for RingCentral, Inc.*

# **EXHIBIT A**

## **Agreement**

# MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (together with its Attachments, the "Agreement") is made as of June _____, 2018 ("Effective Date") between RingCentral, Inc., a Delaware corporation with its primary office at 20 Davis Drive, Belmont, CA 94002, ("RingCentral"), and **American Freight, Inc.,** a company organized and existing under the Laws of Delaware and having its headquarters at 680 Sunbury Rd, Delaware, OH 43015 ("Customer"). RingCentral and Customer may be individually referred to as a "Party" or collectively as the "Parties."

## BACKGROUND

A.    RingCentral is a provider of cloud-based unified communications and collaboration services, including voice, online meeting, video conferencing, contact center and related services, applications and product integrations.

B.    Customer wants to receive certain RingCentral services and products as the Parties may agree in writing from time to time, described more fully in the relevant Attachments.

C.    This Agreement sets forth the terms and conditions under which RingCentral will provide such services and products to Customer.

The Parties agree as follows:

## 1.    Definitions

Capitalized terms not defined have the meaning given to them in Exhibit A.

## 2.    Ordering and Term

### A.    Ordering Services

Customer may order the Services set forth in the relevant Attachments, attached hereto, by executing an Order Form in the format provided by RingCentral. Customer must submit the Order Form to RingCentral either in writing or electronically via the Administrative Portal.  The Order Form will identify the Services requested by Customer together with: (i) the price for each Service; (ii) scheduled Start Date; (iii) and products leased, licensed or sold to Customer, if any. An Order Form will become binding when it is executed by the Customer and accepted by RingCentral. RingCentral may accept an Order Form by commencing performance of the requested Services.  The Services will begin on the Start Date, as identified in the applicable Order Form or on the day Services are ordered via the Administrative Portal.  Customer may purchase additional Services, software, and equipment via the Administrative Portal or by executing additional Order Forms.

### B.    Attachments

The following Attachments are incorporated herein and shall be considered part of this Agreement.  Additional Attachments may be added by the parties from time to time by written agreement between them:

☑ Exhibit A – Definitions
☑ Service Attachment A – RingCentral Office
☑ Service Attachment B – Professional Services Agreement
☑ Attachment C – Service Level Agreement for Office Services

**C.    Equipment**

Customer may purchase or rent equipment from RingCentral for use with the Services.  The terms and conditions that govern any such transaction can be found at:

(i) Purchase:  http://www.ringcentral.com/legal/ringcentral-hardware-terms-conditions.html

(ii)  Rental.   http://www.ringcentral.com/legal/lease-rental.html

**D.    Term of this Agreement.**

The Term of this Agreement will commence on the Effective Date and continue until the last Order Form is terminated or expires, unless terminated earlier in accordance with its terms.

**E.    Services Term**

The Services Term will begin on the Start Date of the initial Order Form and continue for the initial term set forth in the initial Order Form ("Initial Term"). Upon expiration of the Initial Term, unless otherwise set forth in the Order Form, recurring Services will automatically renew for successive periods of the same length as the Initial Term (each a "Renewal Term") as noted in the Order Form, if applicable, unless the Customer gives notice of non-renewal at least thirty (30) days before the expiration of the Initial Term or the then-current Renewal Term.  The term of any recurring Services added to your Account after the initial Order Form is executed will start on the Start Date in the applicable Order Form, will run coterminously with the then-current Term of any preexisting Services unless otherwise extended in the applicable Order Form, and will be invoiced on the same billing cycles as the preexisting Services.

**3.    Invoicing and Payment**

**A.    Prices and Charges.**

All prices are identified in US dollars on the Administrative Portal or in the applicable Order Form unless otherwise agreed by the Parties. Additional charges may result if Customer activates additional features, exceeds usage thresholds, or purchases additional Services or equipment. Customer will be liable for all charges resulting from use of the Services on its Account.

Unless otherwise agreed between the Parties, recurring charges for the Services begin on the Start Date, and will continue for the Term.  Recurring charges (such as charges for Digital Lines, product licenses, minute bundles, and equipment rental fees) will, unless otherwise agreed between the Parties, once incurred, remain in effect for the then-current Term. RingCentral will provide notice of any proposed increase in such charges no later than sixty (60) days before the end of the Initial Term or then-current Renewal Term, and any such increase will be effective on the first day of the next Renewal Term.  Administrative Fees that RingCentral is entitled to pass on to its customers as a surcharge pursuant to applicable Law may be increased on thirty (30) days' written notice .

Outbound calling rates will be applied based on the rate in effect at the time of use. Customer may locate the currently effective rates in the Administrative Portal.

### B.    Invoicing and Payment

Invoices will be issued in accordance with the payment terms set forth in the Order Form. Unless otherwise stated in the applicable Order Form, recurring charges are invoiced in advance in the frequency set forth in the Order Form, and usage-based and onetime charges are billed monthly in arrears. Customer shall make payment in full, without deduction or set-off, within thirty (30) days of the invoice date. Any payment not made when due may be subject to a late payment fee equivalent to the lesser of (i) one and a half percent (1.5%) per month or (ii) if applicable, the highest rate allowed by Law. In no event may payment be subject to delays due to Customer internal purchase order process.

### C.    Taxes

All rates, fees, and charges are exclusive of applicable Taxes, for which Customer is solely responsible. Taxes may vary based on jurisdiction and the Services provided. Taxes, access fees, universal service or other recovery fees, or similar charges will be adjusted on the date in which those increases become effective as mandated by competent authority. If any withholding tax is levied on the payments, then Customer must increase the sums paid to RingCentral so that the amount received by RingCentral after the withholding tax is deducted is the full amount RingCentral would have received if no withholding or deduction had been made.

### D.    Billing Disputes

If a Customer reasonably and in good faith disputes any portion of RingCentral's invoice, it must provide written notice to RingCentral within thirty (30) days of the invoice date, identifying the reason for the dispute and the amount being disputed. Customer's dispute as to any portion of the invoice will not excuse Customer's obligation to timely pay the undisputed portion of the invoice. Upon resolution, Customer must pay any validly invoiced unpaid amounts within thirty (30) days.  Any amounts that are found to be in error resulting in an overpayment by the Customer will be applied as a billing credit against future invoices. Customer will be reimbursed any outstanding billing credits at the expiration or termination of this Agreement.

## 4.    Provision of the Service

### A.    General Terms

RingCentral will provide the Services as described in the relevant Service Attachment. RingCentral may enhance, replace, and/or change the features of the Services, but it will not materially reduce the core features, functions, or security of the Services during the Term without Customer's consent.

### B.    Customer Care

i.    Customer must provide all first-tier support to Customer's End Users. RingCentral may require Customer's Helpdesk support personnel to complete a series of training courses on RingCentral's Services. Such training will be provided online by RingCentral at no cost.

ii.    RingCentral will make second-tier remote support available to Customer's Helpdesk personnel and/or Account Administrators via RingCentral Customer Care call center, which will be available 24/7, to attempt to resolve technical issues with, and answer questions regarding the use of the

DocuSign Envelope ID: A2790865-311C-4701-877F-3194105E59856

Services. Onsite and implementation services are not included in the RingCentral Customer Care support.

   iii.   Customer may open a case with RingCentral Customer Care at http://success.ringcentral.com/RCContactSupp. Any individual contacting Customer Care on behalf of Customer must be authorized to do so on behalf of the Account, and will be required to follow RingCentral's authentication protocol.

**C.    Professional Services**

RingCentral offers a broad portfolio of professional services that includes onsite and remote implementation services; extended enterprise services including dedicated proactive network monitoring and premium technical support; and consulting. Any such services are governed by this Agreement, the Professional Services terms, and any applicable Statement of Work (SOW), which may be attached hereto.

**D.    Subcontracting**

RingCentral may provide any of the Services hereunder through any of its Affiliates or subcontractors, provided that RingCentral will bear the same degree of responsibility for acts and omissions for those subcontractors acting on RingCentral's behalf in the performance of its obligations under this Agreement as it would bear if such acts and omissions were performed by RingCentral directly.

**5.    Use of the Service**

**A.    Service Requirements**

The Services are dependent upon Customer's maintenance of sufficient Internet access, networks and power as set forth in RingCentral's Technical Sufficiency Criteria, available at https://www.ringcentral.com/legal/policies/technical-sufficiency-criteria.html. RingCentral will not be responsible for any deficiencies in the provision of the Services if Customer's network does not meet RingCentral's Technical Sufficiency Criteria.

**B.    Use Policies**

Customer and its End Users may use the Services only in compliance with this Agreement, applicable Law, and the Use Policies referenced below, which are incorporated into and form part of this Agreement. Customer may not use, or permit the use of the Services, to interfere with the use of RingCentral's service by others or with the operation of the RingCentral Network. Customer may not resell the Services. Customer must ensure that its End Users comply with the Use Policies. Any breach of this Section (Use Policies) will be deemed a material breach of this Agreement.

RingCentral may update the Use Policies from time to time, and will provide notice to Customer at the email address on file with the Account. Such updates will become effective thirty (30) days after such notice to Customer.

   **i.    Acceptable Use Policy**

The Services must be used in accordance with RingCentral's Acceptable Use Policy, available at https://www.ringcentral.com/legal/acceptable-use-policy.html.

Notwithstanding anything to the contrary in this Agreement, RingCentral may act immediately and without notice to suspend or limit the Services if RingCentral reasonably suspects fraudulent or illegal activity in the Customer's Account, material breach of the Acceptable Use Policy, or use of the Services that could interfere with the functioning of the RingCentral Network provided such suspension or limitation may only be to the  extent reasonably necessary to protect against the applicable condition, activity, or use. RingCentral will promptly investigate and remove the suspension or limitation as soon as the condition, activity or use is resolved and mitigated in full.  If Customer anticipates legitimate but unusual activity on its Account, Customer should contact RingCentral Support in advance to avoid any Service disruption.

### ii. Emergency Services

RingCentral's policy governing the provision of emergency services accessed via the Services is available at https://www.ringcentral.com/legal/emergency-services.html.

### iii. Numbering Policies

The provision, use, and publication of numbers used in conjunction with the Services are governed by RingCentral's Numbering Policies, available at https://www.ringcentral.com/legal/policies/numbering-policy.html.

## 6. Termination

### A. Termination for Cause

Either Party may terminate this Agreement and any Services purchased hereunder in whole or part by giving written notice to the other Party if the other Party: i) breaches any material term of this Agreement and fails to cure such breach within thirty (30) days after receipt of such notice; ii) at the written recommendation of a government or regulatory agency following a change in either applicable Law or the Services; or iii) upon the commencement by or against the other Party of insolvency, receivership or bankruptcy proceedings or any other proceedings or an assignment for the benefit of creditors.

Customer may terminate the Services on thirty (30) days' written notice if RingCentral notifies Customer of a modification that has a material adverse effect on Customer's use of the Services that the Parties cooperating in good faith are unable to mitigate to Customer's reasonable satisfaction within sixty (60) days of such modification.

### B. Effect of Termination

a) If Customer terminates the Services, a portion of the Services, or this Agreement in its entirety due to RingCentral's material breach under Section 6(A)(i) (Termination for Cause), Customer will not be liable for any fees or charges for terminated Services for any period subsequent to the effective date of such termination (except those arising from continued usage before the Services are disconnected), and RingCentral will provide Customer a pro-rata refund of any prepaid and unused fees or charges paid by Customer for terminated Services.

b) If this Agreement or any Services are terminated for any reason other than as a result of a material breach by RingCentral or as set forth in Section 14(D) (Force Majeure) or Section 14(J) (Regulatory and Legal Changes) the Customer must, to the extent permitted by applicable Law and without limiting any other right or remedy of

RingCentral, pay within thirty (30) days of such termination all amounts that have accrued prior to such termination, as well as all sums remaining unpaid for the Services for the remainder of the then-current Term plus related Taxes and fees.

**7.      Intellectual Property**

**A.      Limited License**

1.   Subject to, and conditional upon Customer's compliance with, the terms of this Agreement, RingCentral grants to Customer and its End User, a limited, personal, revocable, non-exclusive, non-transferable (other than as permitted under this Agreement), non-sublicensable license to use any software provided or made available by RingCentral to the Customer as part of the Services ("Software") to the extent reasonably required to use the Services as permitted by this Agreement, only for the duration that Customer is entitled to use the Services and subject to the Customer being current on its payment obligations.

2.   Customer will not, and will not allow its End Users, to:
   a)   Sublicense, resell, distribute or assign its right under the license granted under this Agreement to any other person or entity;
   b)   modify, adapt or create derivative works of the Software or any associated documentation;
   c)   reverse engineer, decompile, decrypt, disassemble or otherwise attempt to derive the source code for the Software;
   d)   use the Software for infringement analysis, benchmarking, or for any purpose other than as necessary to use the Services Customer is authorized to use;
   e)   create any competing Software or Services; or
   f)   remove any copyright or other proprietary or confidential notices on any Software or Services.

**B.      IP Rights**

**i.      RingCentral's Rights**

Except as expressly provided in this Agreement, the limited license granted to Customer under Section 7(A) (Limited License) does not convey any ownership or other rights or licenses, express or implied, in the Services, any related materials, or in any Intellectual Property and no IP Rights or other rights or licenses are granted, transferred, or assigned to Customer, any End User, or any other party by implication, estoppel, or otherwise. All rights not expressly granted herein are reserved and retained by RingCentral and its licensors. The Software and Services may comprise or incorporate services, software, technology or products developed or provided by third parties, including open source software or code. Customer acknowledges that misuse of RingCentral Services may violate third-party IP rights.

**ii.      Customer Rights**

As between RingCentral and Customer, Customer retains title to all IP Rights that are owned by the Customer or its suppliers. To the extent reasonably required or desirable for the provision of the Services, Customer grants to RingCentral a limited, personal, non-exclusive, royalty-free,

license to use Customer's IP Rights in the same. Customer must provide (and is solely responsible for providing) all required notices and obtaining all licenses, consents, authorizations or other approvals related to the use, reproduction, transmission, or receipt of any Customer Content that includes personal or Confidential Information or incorporates any third-party IP rights.

### C.  Use of Marks

Neither Party may use or display the other Party's trademarks, service mark or logos in any manner without such Party's prior written consent.

### 8.  Confidentiality

### A.  Restrictions on Use or Disclosures by Either Party

During the Term of this Agreement and for at least one (1) year thereafter, the Receiving Party shall hold the Disclosing Party's Confidential Information in confidence, shall use such Confidential Information only for the purpose of fulfilling its obligations under this Agreement, and shall use at least as great a standard of care in protecting the Confidential Information as it uses to protect its own Confidential Information.

Each Party may disclose Confidential Information only to those of its employees, agents or subcontractors who have a need to it in order to perform or exercise such Party's rights or obligations under this Agreement and who are required to protect it against unauthorized disclosure in a manner no less protective than required under this Agreement. Each Party may disclose the other Party's Confidential Information in any legal proceeding or to a governmental entity as required by Law.

These restrictions on the use or disclosure of Confidential Information do not apply to any information which is independently developed by the Receiving Party or lawfully received free of restriction from another source having the right to so furnish such information; after it has become generally available to the public without breach of this Agreement by the Receiving Party; which at the time of disclosure was already known to the Receiving Party, without restriction as evidenced by documentation in such Party's possession; or which the Disclosing Party confirms in writing is free of such restrictions.

Upon termination of this Agreement, the Receiving Party will promptly delete, destroy or, at the Disclosing Party's request, return to the Disclosing Party, all Disclosing Party's Confidential Information in its possession, including deleting or rendering unusable all electronic files and data that contain Confidential Information, and upon request will provide the Disclosing Party with certification of compliance with this subsection.

### 9.  Data Protection

### A.  Data Privacy

RingCentral respects Customer's privacy and will only use the information provided by Customer to RingCentral or collected in the provision of the Services in accordance with the Privacy Notice, which can be found at http://www.ringcentral.com/legal/privacy-notice.html. RingCentral may update the Privacy Notice from time to time, and will provide notice of such update to Customer at the email address on file with the Account. Such updates will be effective thirty (30) days after such notice to Customer.

### B.      Data Security

RingCentral will take commercially reasonable precautions, including, without limitation, technical (*e.g.,* firewalls and data encryption), administrative and physical measures, to help safeguard Customer's Account, Account Data, and Customer Content against unauthorized use, disclosure, or modification.

Customer must protect all End Points using industry-standard security measures. Customer is solely responsible to keep all user identifications and passwords secure. Customer must monitor use of the Services for possible unlawful or fraudulent use. Customer must notify RingCentral immediately if Customer becomes aware or has reason to believe that the Services are being used fraudulently or without authorization by any End User or third party. Failure to notify RingCentral may result in the suspension or termination of the Services and additional charges to Customer resulting from such use.  RingCentral will not be liable for any charges resulting from unauthorized use of Customer's Account.

### C.      Software Changes

RingCentral may from time to time push software updates and patches directly to Customer's device(s) for installation and Customer will not prevent RingCentral from doing so.  Customer must implement promptly all fixes, updates, upgrades and replacements of software and third-party software that may be provided by RingCentral. RingCentral will not be liable for inoperability of the Services or any other Services failures due to failure of Customer to timely implement the required changes.

### 10.      Limitation of Liability

### A.      Excluded Damages.

TO THE FULLEST EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY OR ITS AFFILIATES BE LIABLE FOR (1) INDIRECT, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, REPUTATIONAL, SPECIAL OR PUNITIVE DAMAGES OF ANY KIND; (2) COSTS OF PROCUREMENT, COVER, OR SUBSTITUTE GOODS OR SERVICES; (3) LOSS OF USE, LOSS OR CORRUPTION OF DATA; OR (4) LOSS OF BUSINESS OPPORTUNITIES, PROFITS, GOODWILL, OR SAVINGS, WHETHER IN ANY OF THE FOREGOING, ARISING UNDER CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), OR ANY OTHER THEORY OF LIABILITY, EVEN IF SUCH PARTY HAS BEEN INFORMED IN ADVANCE OF SUCH DAMAGES OR SUCH DAMAGES COULD HAVE BEEN REASONABLY FORESEEN. NEITHER PARTY WILL BE LIABLE FOR ACTIONS REASONABLY TAKEN TO COMPLY WITH LAW.

### B.      Direct Damages.

EXCEPT AS SET FORTH HEREIN, THE TOTAL CUMULATIVE LIABILITY OF THE PARTIES UNDER THIS AGREEMENT WILL NOT EXCEED THE AMOUNTS PAID OR PAYABLE UNDER THIS AGREEMENT DURING THE PREVIOUS SIX (6) MONTHS. LIMITATIONS UNDER THIS SECTION 10(B) (DIRECT DAMAGES)  WILL NOT APPLY TO: I) CUSTOMER PAYMENT OBLIGATIONS; II) EITHER PARTY'S LIABILITY FOR INFRINGEMENT OF THE OTHER PARTY'S IP RIGHTS; III) EITHER PARTY'S LIABILITY RESULTING FROM GROSS NEGLIGENCE, FRAUD, OR WILLFUL OR CRIMINAL MISCONDUCT; OR IV) CUSTOMER'S LIABILITY RESULTING FROM USE OF THE SERVICES IN BREACH OF THE ACCEPTABLE USE POLICY OR EMERGENCY SERVICES POLICY, (V) A PARTY'S LIABILITY ARISING FROM DEATH

OR PERSONAL INJURY CAUSED BY NEGLIGENCE, OR FOR ANY OTHER LIABILITY WHICH MAY NOT BE RESTRICTED, LIMITED OR EXCLUDED PURSUANT TO APPLICABLE LAW.

### C. Survival.

The limitations of liability contained in this Section 10 (Limitation of Liability) will survive termination or expiration of this Agreement and apply in any and all circumstances (except as expressly set forth above), including without limitation in the event of any failure of the essential purpose of any limited warranty or available remedy provided herein.

### 11. Indemnification

#### A. Indemnification by RingCentral

i) RingCentral agrees to indemnify, defend, and hold harmless the Customer at RingCentral's expense, from and against any and all third-party claims or causes of action, ("Third Party Claim") alleging that the Services as provided by RingCentral infringe or misappropriate the patent, copyright, trademark or trade secret rights of a third party. Further, RingCentral will indemnify and hold harmless the Customer from all damages, reasonable costs and attorneys' fees finally awarded against the Customer by a court of competent jurisdiction in connection with such Third-Party Claim or agreed to in a written settlement agreement approved in writing by RingCentral.

ii) RingCentral will have no indemnification obligations under subsection (i) above if the Third Party Claim arises from: (a) use of the Services in combination with data, software, hardware, equipment, or technology not provided or authorized by RingCentral in writing; (b) modifications to the Services not made by RingCentral; (c) Customer Content; (d) failure to promptly install any updates of any software or firmware or accept or use any modified or replacement items provided by or on behalf of RingCentral, provided free of charge, (e) breach of the Agreement or misuse of the Services, or (f) a Third Party Claim by Customer's Affiliate, successor, or assignee.

iii) If such a claim is made or appears possible, Customer agrees to permit RingCentral, at RingCentral's sole discretion, to (a) modify or replace the Services, or component or part thereof, to make it non-infringing, or (b) obtain the right for Customer to continue use. If RingCentral determines that neither alternative is commercially reasonable, RingCentral may terminate this Agreement, in its entirety or with respect to the affected Service, component or part, effective immediately on written notice to Customer in which case Customer will not owe any fees or charges for any period subsequent to the date of such termination, and will be entitled to receive a refund of any prepaid but unused fees for the terminated Services. RingCentral's obligations under this Sub-Section will be RingCentral's sole and exclusive liability and Customer's sole and exclusive remedies with respect to any actual or alleged intellectual property violations.

#### B. Indemnification by Customer

Customer agrees to indemnify , defend RingCentral and its Affiliates at Customer's expense, from and against any and all Third Party Claims, arising out of or in connection with: i) material violation of applicable Law by the Customer or its End Users in connection with the use of the Services; ii) use of the Services in a manner not authorized by this Agreement; iii) failure to promptly install any updates of any software or firmware or accept or use modified or

replacement items provided by or on behalf of RingCentral, or iv) claims relating to Customer Content. Further, Customer will indemnify and hold harmless RingCentral against all damages, costs, and attorneys' fees finally awarded against RingCentral by a court of competent jurisdiction in connection with such Third-Party Claim, or agreed to in a written settlement agreement approved in writing by the Customer.

### C.      Defense and Indemnification Procedures

Any Party seeking defense or indemnification (the "Indemnified Party") must provide the Party from which it seeks such indemnification or defense (the "Indemnifying Party") with the following: (a) prompt written notice of the Third-Party Claim, (b) sole control over the defense and settlement of the Third-Party Claim, and (c) reasonable information, cooperation, and assistance in connection with the defense and settlement of the Third-Party Claim. The Indemnified Party's failure to comply with the foregoing obligations will not relieve the Indemnifying Party of its defense or indemnification obligations under this Section (Indemnification), except to the extent that the Indemnifying Party is prejudiced by such failure. The Indemnified Party will have the right to participate at its own expense in the defense of such Third-Party Claim, including any related settlement negotiations. No such claim may be settled or compromised by the Indemnifying Party without the Indemnified Party's express written consent (which such consent may not be unreasonably withheld, conditioned, or delayed), unless such settlement or compromise includes a full and complete release of all claims and actions against the Indemnified Party by each party bringing such Third-Party Claim.

## 12.      Warranties

### A.      RingCentral Warranty

RingCentral will provide the Services using a commercially reasonable level of skill and care, in material compliance with all applicable Laws and otherwise subject to the terms of this Agreement.  To the extent permitted by Law, RingCentral shall pass through to Customer any and all warranties RingCentral receives in connection with equipment provided to Customer.

### B.      Customer Warranty

Customer's and its End Users' use of the Services must at all times comply with all applicable Laws and this Agreement.

### C.      Disclaimer of Warranties

EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT AND TO THE FULLEST EXTENT PERMITTED BY LAW, THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE," AND RINGCENTRAL MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, QUIET ENJOYMENT, AND FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM A COURSE OF DEALING OR USAGE IN TRADE, TOGETHER WITH SIMILAR WARRANTIES, WHETHER ARISING UNDER ANY LAW OR OTHERWISE. TO THE EXTENT THAT RINGCENTRAL CANNOT DISCLAIM ANY SUCH WARRANTY AS A MATTER OF APPLICABLE LAW, THE SCOPE AND DURATION OF SUCH WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY LAW.

13.    **Dispute Resolution**

A.    **Good Faith Attempt to Settle Disputes**

In the event of any dispute or claim arising out of or relating to the Agreement (a "Dispute"), each Party will appoint a duly authorized representative which will confer before either Party brings legal action, to make a reasonable and good faith effort to settle or otherwise resolve such Dispute.

B.    **Venue**

In the event that the Parties are unable to resolve a Dispute, any related action, lawsuit, or proceeding must be brought in and adjudicated exclusively by state or federal courts located in the city and county of San Francisco, California, United States of America. Each Party hereby consents to and agrees to submit to the exclusive venue and personal jurisdiction of such courts with respect to any such actions or lawsuits and irrevocably waives any right that it might have to assert that either forum is not convenient or that any such courts lack jurisdiction.

C.    **Equitable Relief**

Any breach of either Party's IP Rights will cause that Party irreparable harm for which monetary damages will be inadequate and such Party may, in addition to other remedies available at Law or in equity, obtain injunctive relief without the necessity of posting a bond or other security, proof of damages, or similar requirement, in additional to any other relief to which such Party may be entitled under applicable Law.

D.    **Limitations**

Except for actions for nonpayment or liability arising from Section 10 (Indemnification), no claim, suit, action or proceeding relating to this Agreement may be brought by either Party more than two (2) years after the cause of action has accrued and the aggrieved party knew or reasonably should have known of the potential cause of action.

14.    **Miscellaneous**

A.    **Relationship of the Parties**

RingCentral and Customer are independent contractors and this Agreement will not establish any relationship of partnership, joint venture, employment, franchise or agency between RingCentral and Customer.

B.    **Assignment**

Neither Party may assign the Agreement or any portion thereof without the other Party's prior written consent (which such consent may not be unreasonably withheld or delayed), however either Party may assign the Agreement and all of that Party's rights and obligations thereunder without consent (a) to an Affiliate; (b) to the Party's successor or surviving entity in connection with a merger, acquisition, consolidation, sale of all or substantially all of its assets used in connection with the provision of Services under this Agreement; or (c) as part of the transfer or disposition of more than fifty percent (50%) of a Party's voting control or assets. This Agreement will bind and inure to the benefit of the Parties, and their permitted assigns and successors.

C.    **Notices**

Except where otherwise expressly stated in the Agreement, all notices or other communications must be in English and are deemed to have been fully given when made in writing and delivered in person, upon delivered email, confirmed facsimile, or five days after deposit with an reputable overnight courier service, and addressed as follows: To RingCentral at RingCentral, Inc., Legal Dept., 20 Davis Drive, Belmont, CA 94002 USA, with a copy to legal@ringcentral.com. To Customer at the address stated in the Order Form.

The addresses to which notices may be given by either Party may be changed upon written notice given to the other Party pursuant to this Section or by Customer in the Administrative Portal.

### D.    Force Majeure

Excluding either Party's payment obligations under the Agreement, neither Party will be responsible or liable for any failure to perform or delay in performing to the extent resulting from any event or circumstance that is beyond that Party's reasonable control, including without limitation any act of God; national emergency; third-party telecommunications networks; riot; war; terrorism; governmental act or direction; change in Laws; fiber, cable, or wire cut; power outage or reduction; rebellion; revolution; insurrection; earthquake; storm; hurricane; flood, fire, or other natural disaster; strike or labor disturbance; or other cause, whether similar or dissimilar to the foregoing, not resulting from the actions or inactions of such Party.

### E.    Third-Party Beneficiaries

RingCentral and Customer agree that there will be no third-party beneficiaries to this Agreement.

### F.    Headings, Interpretation

The headings, section titles, and captions used in the Agreement are for convenience of reference only and will have no legal effect. All defined terms include related grammatical forms, and, whenever the context may require, the singular form of nouns and pronouns include the plural, and vice versa. The Parties agree that this Agreement will be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party or Parties on the grounds that the Party or Parties drafted or was more responsible for drafting the provision(s).

### G.    Governing Law

The Agreement is governed by the Laws of the State of California, excluding its choice of Law rules. The United Nations Convention on Contracts for the International Sale of Goods does not apply to this Agreement or Customer's use of the products or Services.

### H.    Anti-Bribery

Each Party represents that in the execution of this Agreement and in the performance of its obligations under this Agreement it has complied and will comply with all applicable anti-bribery Laws and regulations, including, without limitation, the U.S. Foreign Corrupt Practices Act, the UK Bribery Act and similar applicable Laws.

### I.    Export Control

Any services, products, software, and technical information (including, but not limited to, services and training) provided pursuant to the Agreement may be subject to U.S. export Laws

and regulations. Customer will not use distribute, transfer, or transmit the services, products, software, or technical information (even if incorporated into other products) except in compliance with U.S. and other applicable export regulations.

### J.     Regulatory and Legal Changes

In the event of any change in Law, regulation or industry change that would prohibit or otherwise materially interfere with RingCentral's ability to provide Services under this Agreement, RingCentral may terminate the affected Services or this Agreement or otherwise modify the terms thereof.

### K.     Entire Agreement

The Agreement, together with any exhibits, Order Forms, and Attachments, each of which is expressly incorporated into this Agreement with this reference, constitutes the entire agreement between the Parties and supersedes and replaces any and all prior or contemporaneous understandings, proposals, representations, marketing materials, statements, or agreements, whether oral, written, or otherwise, regarding such subject.

### L.     Order of Precedence

In the event of any conflict between the documents comprising this Agreement, precedence will be given to the documents in the following descending order: (i) the applicable Order Form; (ii) the main body of this Agreement; (iii) Use Policies and Privacy Notice incorporated by reference in this Agreement; (iv) the applicable Service Attachment; and (v) and any other document expressly referred to in this Agreement which governs the Services.

### M.     Amendments

Except as otherwise provided, this Agreement may only be modified by a written amendment executed by authorized representatives of both Parties. In no event will handwritten changes to any terms or conditions, including in the applicable Order Form, be effective.

### N.     Severability and Waiver

In the event any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, such provision(s) will be stricken and the remainder of this Agreement will remain legal, valid and binding. The failure by either Party to exercise or enforce any right conferred by this Agreement will not be deemed to be a waiver of any such right or to operate so as to bar the exercise or enforcement of any such or other right on any later occasion. Except as otherwise expressly stated in this Agreement, all rights and remedies stated in the Agreement are cumulative and in addition to any other rights and remedies available under the Agreement, at Law, or in equity.

### O.     Publicity

Subject to Customer's prior written approval, which may withheld or denied by Customer in its sole discretion, in each instance, and notwithstanding anything to the contrary in this Agreement, RingCentral may identify Customer as a customer (including use of any Customer logo or trademark) and may refer to this Agreement during its earnings calls and in connection with its business deals, press releases, and marketing and/or promotional materials.

### P.     Execution

Each Party represents and warrants that: (a) it possesses the legal right and capacity to enter into the Agreement and to perform all of its obligations thereunder; (b) the individual signing

the Agreement and (each executable part thereof) on that Party's behalf has full power and authority to execute and deliver the same; and (c) the Agreement will be a binding obligation of that Party.

**Q.    Counterparts**

This Agreement may be executed electronically and in separate counterparts each of which when taken together will constitute one in the same original.

**R.    Survival**

The rights and obligations of either Party that by their nature would continue beyond the expiration or termination of this Agreement or an Order Form will survive expiration or termination of this Agreement or the Order Form, including without limitation payment obligations, warranty disclaimers, indemnities, limitations of liability, definitions and miscellaneous.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement below through their duly authorized representatives.

| **Customer** | **RingCentral** |
|---|---|
| **American Freight, Inc.** | **RingCentral, Inc.** |
| By: | By: |
| EC415529DC27439... | |
| Jim Brownell | |
| Name: _____ | Name: _____ |
| COO | |
| Title: _____ | Title: _____ |
| 6/20/2018 | |
| Date: _____ | Date: _____ |

DocuSign Envelope ID: A2790865-311C-4701-837F-8194DCF259856

**EXHIBIT A**

**DEFINITIONS**

**Definitions.** Capitalized terms used in this Agreement but otherwise not defined have the following meaning:

1. **"Account"** means the numbered account established with RingCentral and associated with Customer and the Services provided to Customer under this Agreement. For billing and convenience purposes, multiple services, Digital Lines, or End Users may be included in a single billing account, and/or a single Customer may have multiple billing accounts encompassing different geographic locations, business units, or other designations as requested by Customer and accepted by RingCentral.

2. **"Account Administrator"** means the person(s) who have been granted authority by Customer to set up, amend, or otherwise control settings and/or make additional purchases for the Account via the Administrative Portal. Account Administrators may have varying levels of Account rights, skills, or permissions.

3. **"Account Data"** means: any business contact information provided with the Account; RingCentral-generated logs of calling or other metadata developed or collected in the provision of the Services; configuration data; and records of Digital Lines and any Services purchased under this Agreement.

4. **"Administrative Fees"** means any administrative recovery fees, 911 cost recovery fees and the like separately charged by RingCentral to Customer.

5. **"Administrative Portal"** means the online administrative portal through which Account Administrators control settings and/or make additional purchases for the Account.

6. **"Affiliate(s)"** means a person or entity that is controlled by a Party hereto, controls a Party hereto, or is under common control with a Party hereto, and "**control**" means beneficial ownership of greater than fifty percent (50%) of an entity's then-outstanding voting securities or ownership interests.

7. **"Attachment (s)"** means documents appended to the contract containing additional terms for products and Services. Attachments are part of this Agreement.

8. **"Confidential Information"** means any information disclosed by or on behalf of the Disclosing Party) to the Receiving Party that should reasonably be considered as confidential given the nature of the information and the circumstances surrounding its disclosure.

9. **"Customer Content"** means the content of calls, facsimiles, SMS messages, voicemails, voice recordings, shared files, conferences or other communications transmitted or stored through the Services.

10. **"Digital Line"** means a phone number assigned to an End User or a specifically designated location (e.g., conference room) and the associated voice service for inbound and outbound calling that permits an End User generally to make and receive calls to and from the public switched telephone network as well as to and from other extensions within the same Account.

11. **"Disclosing Party"** means the Party disclosing Confidential Information or on whose behalf Confidential Information is disclosed by such Party's agents, including but not limited to, its Affiliates, officers, directors, employees and attorneys.

12. **"Dispute"** has the meaning set forth in Section 13(A) (Good Faith Attempt to Settle Disputes).

13. **"End Point"** means an application or device through which any End-User might access and/or use any of the Services, including without limitation IP Desk Phones, Desktop Clients, Web Clients, Mobile Applications, and Software Integrations.

14. **"End User"** means an individual user to whom Customer makes the Services available, and may be a natural person, and may include but is not limited to Customer's employees, consultants, clients, external users, invitees, contractors and agents.

15. **"Helpdesk"** means first-tier support provided to End Users by Customer.

16. **"Indemnifying Party" and "Indemnified Party"** have the meanings set forth in Section 11(C) (Defense and Indemnification Procedures).

17. **"Initial Term"** has the meaning set forth in Section 2(E) (Services Term).

18. **"Intellectual Property Rights"** or **"IP Rights"** means all common law and statutory rights (whether registered or unregistered, or recorded or unrecorded, regardless of method) arising out of or associated with: (a) patents and patent applications, inventions, industrial designs, discoveries, business methods, and processes; (b) copyrights and copyright registrations, and "moral" rights; (c) the protection of trade and industrial secrets and Confidential Information; (d) other proprietary rights relating to intangible property; (e) trademarks, trade names and service marks; (f) a person's name, likeness, voice, photograph or signature, including without limitation rights of personality, privacy, and publicity; (g) analogous rights to those set forth above; and (h) divisions, continuations, continuations-in-part, renewals, reissuances and extensions of the foregoing (as applicable).

19. **"Law"** means any law, statute, regulation, rule, ordinance, administrative guidance, treaty or convention, or court or administrative order or ruling of any governing Federal, State, local or non-U.S. governmental body with jurisdiction over the Services.

20. **"Order Form(s)"** means a request for Service describing the type and quantity of Services purchased under this Agreement, prepared by RingCentral and executed by Customer.

21. **"Receiving Party"** means the Party or its agents, including, but not limited to its Affiliates, officers, directors, employees and attorneys receiving Confidential Information.

22. **"Renewal Term"** has the meaning set forth in Section 2(E) (Services Term).

23. **"RingCentral Customer Care"** means RingCentral's Customer support operations, available at https://success.ringcentral.com/RCContactSupp.

24. **"RingCentral Network"** means the network and supporting facilities between and among the RingCentral points of presence ("PoP(s)"), up to and including the interconnection point between the RingCentral's network and facilities, and the public Internet, private IP networks, and the Public Switched Telephone Network (PSTN). The RingCentral Network does not include the public Internet, a Customer's own private network, or the PSTN.

25. **"Service(s)"** means all services provided under this Agreement, and set forth in one or more Order Form(s).

26. **"Start Date"** means the date so identified in the relevant Order Form or the date on which Customer orders Services via the Administrative Portal.

27. **"Taxes"** means any and all federal, state, local, municipal, foreign and other taxes and fees charged or collected from Customers, including but not limited to any Universal Service Fund, TRS and 911 taxes and fees.

28. **"Term"** means the Initial Term plus any Renewal Terms.

DocuSign Envelope ID: A2790865-311C-4791-97F5-194I0F259856

29. **"Third Party Claim"** has the meaning set forth in Section 11(A) (Indemnification by RingCentral).

30. **"Use Policy"** refers to any of the policies identified in Section 5(B) (Use Policies).

**SERVICE ATTACHMENT A**

**Service Attachment – RingCentral Office Services**

This Service Attachment is a part of the Master Services Agreement that includes the terms and conditions agreed by the Parties under which RingCentral will provide the RingCentral Office Services to Customer.

### 1. Service Overview

RingCentral Office is a cloud-based unified communications service that includes enterprise-class voice, fax, text, call handling, mobile apps, and BYOD capability that integrates with a growing list of applications.

RingCentral Office includes

- Voice Services, including extension-to-extension calling and the ability to make and receive calls to and from the public switched telephone network (PSTN)
- RingCentral Meetings, a video and audio conferencing service, including screen sharing
- Collaboration Tools, including One-to-One and Team Chat, File Sharing, task management, SMS/Texting (where available) and other innovative tools

RingCentral Office Services may be accessed from a variety of user End Points, including IP Desk Phones, Desktop Clients, Web Clients, Mobile Applications, and Software Integrations.

### 2. Office Purchase Plans

#### A. Tiers of Service

RingCentral Office is made available in several pricing tiers, which are described more fully at https://www.ringcentral.com/office/plansandpricing.html.

RingCentral offers unlimited monthly plans for some of its products and services, RingCentral Services are intended for regular business use. "Unlimited" use does not permit any use otherwise prohibited by the Acceptable Use Policy, available at https://www.ringcentral.com/legal/acceptable-use-policy.html, including trunking, access stimulation, reselling of the Services, etc.

#### B. Minute and Calling Credit Bundles

Minute Bundles, e.g., Toll Free Minute Bundles, can be purchased in incremental buckets of minute in addition to any number of minutes included with the purchased tier.  Inbound Toll Free minutes are deducted from included minutes, purchased Minute Bundles, or charged as overage at the rates currently in effect.

International Calling Credit Bundles can be purchased in addition to any base amount included with the purchased tier.  International External Calls are charged against Calling Credits on the Account per destination rates, or as overage once Calling Credits are exceeded.  Currently effective rates are available at https://www.ringcentral.com/support/international-rates.html.

Extension-to-Extension Calls within the Customer account never incur any usage fee and are unlimited, except to the extent that such calls are forwarded to another number that is not on the Customer account.

Additional Calling Credits may be purchased through the **Auto-Purchase** feature, which can be selected for automatic purchase in various increments on the Administrative Portal.  Auto-Purchase is triggered when the combined usage of all End Users on an Account **exceeds the total Calling Credits or when End Users make calls with additional fees (e.g., 411)**.

Minute Bundles and Calling Credit Bundles expire at the end of month and cannot roll over to the following month.  Auto-Purchased Calling Credits expire twelve (12) months from date of purchase.  Bundles may not be sold, transferred, assigned, or applied to any other customer.

### 3.  N11 and other Calling

**Operator Assisted Calling, 311, 511 and other N11 Calling**.  RingCentral does not support 0+ or operator assisted calling (including, without limitation, collect calls, third party billing calls, 900, or calling card calls).  The Services may not support 211, 311, 411, 511 and/or N11 calling in one or more service areas.   Additional charges may apply for these calls.

### 4.  Directory Listing Service

RingCentral offers directory listing (the "Directory Listing Service"). If Customer subscribes to the Directory Listing Service, RingCentral will share certain Customer Contact Data with third parties as reasonably necessary to include in the phone directory ("Listing Information"). This information may include, but is not limited to, Customer's company name, address, and phone numbers.  Customer authorizes RingCentral to use and disclose the Listing Information for the purpose of publishing in, and making publicly available through, third-party directory listing services, to be selected by RingCentral or third-party service providers in their sole discretion. Customer acknowledges that by subscribing to the Directory Listing Service, Customer's Listing Information may enter the public domain and that RingCentral cannot control third parties' use of such information obtained through the Directory Listing Service.

**Opt Out.**  Customer may opt out of the Directory Listing Service at any time, however RingCentral is not obligated to have Customer's Listing Information removed from third-party directory assistance listing services that have already received Customer's information.

**No Liability.** RingCentral will have no responsibility or liability for any cost, damages, liabilities, or inconvenience caused by calls made to Customer's telephone number; materials sent to Customer, inaccuracies, errors or omissions with Listing Information; or any other use of such information. RingCentral will not be liable to Customer for any use by third parties of Customer's Listing Information obtained through the Directory Listing Service, including without limitation the use of such information after Customer has opted out of the Directory Listing Service.

### 5.  RingCentral Global Office

**RingCentral Global Office** provides a single communications system to companies that have offices around the world, offering localized service in countries for which Global Office is available.  Additional information related to Global Office Services is available at http://www.ringcentral.com/legal/policies/global-office-countries.html.

This section sets forth additional terms and conditions concerning RingCentral's Global Office for customers that subscribe to it.

### A.    Emergency Service Limitations for Global Office

RingCentral provides access to Emergency Calling Services in many, but not all, countries in which RingCentral Global Office is available, allowing End Users in most countries to access Emergency Services (911 in the United States and Canada, 999/112 in the United Kingdom and throughout the European Union, and any other applicable Emergency Services number). Emergency Services may only be accessed within the country in which the Digital Line is assigned, e.g., an End User with a Digital Line assigned in Ireland may dial Emergency Services only within Ireland.  Access to Emergency Calling Services in RingCentral Global Office countries, where available, is subject to the Emergency Services Policy, available at https://www.ringcentral.com/legal/emergency-services.html.  Customer must make available and will maintain at all times traditional landline and/or mobile network telephone services that will enable End Users to call the applicable Emergency Services number. Customer may not use the RingCentral Services in environments requiring fail-safe performance or in which the failure of the RingCentral Services could lead directly to death, personal injury, or severe physical or environmental damage.

### B.    Global Office Provided Only in Connection with Home Country Service.

RingCentral provides Global Office Service only in connection with Services purchased in the Home Country.  RingCentral may immediately suspend or terminate Customer's Global Office Services if Customer terminates its Digital Lines in the Home Country.  All invoicing for the Global Office Services will be done in the Home Country on the Customer's Account, together with other Services purchased under this Agreement, using the Home Country's currency. Customer must at all times provide a billing address located in the Home Country. RingCentral will provide all documentation, licenses, and services in connection with the Global Office Service in English; additional language support may be provided at RingCentral's sole discretion.

### C.    Relationships with Local Providers.

In connection with the provision of RingCentral Global Office Services, RingCentral relies on local providers to supply certain regulated communication services; for example (i) for the provision of local telephone numbers within local jurisdictions; (ii) to enable you to place local calls within local jurisdictions; and (iii) to enable You to receive calls from non-RingCentral numbers on Customer's Global Office telephone number(s), by connecting with the local public switched telephone network.  Customer hereby appoints RingCentral as Customer's agent with power of attorney (and such appointment is coupled with an interest and is irrevocable during the Term) to conclude and enter into agreements with such local providers on Customer's behalf to secure such services.

RingCentral's locally licensed affiliates provide all telecommunications services offered to Customer within the countries in which such affiliates are licensed.  RingCentral, Inc., is responsible for all contracting, billing, and customer care related to those services.

### 6.  Definitions

**Definitions.**  Terms used herein but not otherwise defined have the meanings ascribed to them in the Agreement.  For purposes of this Service Attachment, the following terms have the meanings set forth below:

1. **"Digital Line"** means a phone number assigned to an End User or a specifically designated location (e.g., conference room) and the associated voice service for inbound and outbound calling that permits the End User generally to make and receive calls to and from the public switched telephone network as well as to and from other extensions within the same Account.
2. **"End Point"** means an application or device through which any End-User might access and/or use any of the Services, including without limitation IP Desk Phones, Desktop Clients, Web Clients, Mobile Applications, and Software Integrations.
3. **"Extension-to-Extension Calls"** means calls made and received between End Points on the Customer Account with RingCentral, regardless of whether the calls are domestic or international.
4. **"External Calls"** means calls made to or received from external numbers on the PSTN that are not on the Customer Account with RingCentral.
5. **"Home Country**" means the United States or the country that is otherwise designated as Customer's primary or home country in the Order Form.

**SERVICE ATTACHMENT B**

**SERVICE ATTACHMENT – RINGCENTRAL PROFESSIONAL SERVICES AGREEMENT**

This Service Attachment is a part of the Master Services Agreement (the **"Agreement"**)  that includes the terms and conditions agreed by the Parties under which RingCentral will provide the RingCentral Professional Services to Customer.

In the event of any conflict between the provisions of the Agreement and the provisions of this Professional Services Agreement (the **"PS Agreement"**), such provisions of this PS Agreement will prevail.

1.  **Service Overview**

RingCentral shall provide the implementation, installation, consulting, configuration services and other professional services **("Professional Services")** as described and agreed upon in writing between the Parties pursuant to a statement of work **("Statement of Work" or "SOW").** The Professional Services may include the creation and delivery of customized software, documentation or other work product **("Deliverables").**

2.  **Project Phases**

The Professional Services may be delivered in one or more phases. The SOW will specify the milestone, objectives, Deliverables, Sites, fees and other components that are included in the scope of each phase ("**Project Phase**"). The Professional Services may also be provided on a time and material basis ("**T&M Services**") paid by the hour based on the then current T&M Services hourly rate offered by RingCentral, and calculated on the basis of RingCentral service records. Customer agrees that the delivery, installation, testing, acceptance and payment for the Professional Services rendered under any one Project Phase is not dependent on the delivery, installation, testing, acceptance and payment for the Professional Services under any other Project Phase. Each Project Phase will be billed upon Acceptance, and payment for each Project Phase is due in full within the applicable payment period agreed between the parties and is non-refundable.

3.  **Customer Sites and Site Visits**

In the event the Parties agree that the Professional Services must be performed at one or more Customer facility(ies) ("**Site(s)**"), the Site(s) will be separately identified in the applicable SOW. Each visit to a separate Customer Site will be considered a separate "**Site Visit**". When so stipulated in the SOW, each Site may constitute a Project Phase. Customer has the following obligations with respect to all Site Visits:

> **a.**     Customer will maintain and ensure safe working conditions at each Site and shall promptly inform the RingCentral project manager of any known hazardous conditions at any Site prior to any visit by RingCentral Personnel.

**b.**       Customer shall ensure that all Site hardware and network environment meets or exceed the requirements set forth in the Statement of Work and in "RingCentral VoIP Network Requirements and Recommendations" which can found                                                                                       at: https://success.ringcentral.com/articles/RC_Knowledge_Article/9233

**c.**       Customer shall provide RingCentral with all reasonable information, cooperation, and assistance that RingCentral requests in connection with performing the Services, including without limitation providing RingCentral with access to Customer's systems and networks and related system and network administrators. Any failure on the part of Customer to provide the cooperation requested by RingCentral, or to provide the information or hardware and software environment required, may result in the need for a Change Order to contemplate additional fees and extended timelines to accommodate Customer's failure to do so.

**d.**       Customer shall ensure that at least ten (10) business days prior to a Site Visit or as otherwise agreed in the applicable SOW, the Customer Project Manager shall provide to the RingCentral Project Manager the following information for the Site to be visited:

  i.   a fully completed Site Survey Data form which can be accessed and completed at   http://www.quickbase.com (Customer will be given a username and password for access to the site upon execution of the applicable SOW);

  ii.  the first and last name, extension number, and email address for delivery of message notification emails of each User for which the Services are to be implemented at the Site and any other information that RingCentral requests to configure the digital lines that are part of such Services to be implemented (this information needs to be in the form of a Microsoft Excel file suitable for use with the Plan Service's bulk configuration utility);

  iii. written or illustrated diagrams of Customer's current and proposed dial plans and data and call flows; and

  iv.  information related to configurations, equipment, and deployment requirements for the Site, as requested by RingCentral.

## 4.   Late Site Visit Change.

The Parties acknowledge and agree that Customer's cancellation or change of the dates of a Site Visit at any time during the five (5) business days immediately prior to the date that the Site Visit is scheduled to take place (a "**Late Site Visit Change**") will cause RingCentral to incur in expenses and losses (including without limitation RingCentral's costs in rescheduling the Site Visit and/or loss of opportunity for other business during the period during which such Site Visit was to take place). Accordingly, Customer agrees that for each Late Site Visit Change, Customer shall incur (at the time of cancellation or change) and be liable for, as liquidated damages, an amount equal to eight (8) hours of RingCentral T&M Services at RingCentral's then-current T&M Services hourly rate (as set forth in the applicable SOW), as well as any Service Expenses (set at $2,500.00 per trip)that have already been expended by RingCentral. The Parties acknowledge and agree that

this amount is a fair, reasonable, and appropriate pre-estimate of the losses that RingCentral will incur as a result of any single Late Site Visit Change.

5.  **Professional Services Acceptance**

Each SOW will identify the specific criteria required for the completion of each Project Phase ("**Completion Criteria**"). Unless otherwise agreed between the parties in the SOW, upon RingCentral's completion of the Professional Services for each Project Phase, RingCentral will review the Completion Criteria with Customer and will present to the Customer the Professional Services Project Completion Signoff Form ("**PCF**") for that Project Phase. Notwithstanding anything to the contrary in this PS Agreement or any SOW, RingCentral's obligations under any Project Phase are deemed accepted and the Professional Services under such Project Phase shall be considered completed in full and billable upon any of the following ("**Acceptance**"):

a.  Customer executes the PCF.

b.  If RingCentral presents Customer with the PCF and the Customer fails to execute the PCF within three (3) days, unless the Customer provides to RingCentral, within those three (3) days, with a detailed description of the items that are outstanding or that are materially non- conforming with the Completion Criteria applicable to the specific Project Phase. If RingCentral timely receives a rejection notice, then RingCentral will complete or re-perform any portion of the non-conforming Professional Services, and re-submit the PCF for the Project Phase to the Customer for Acceptance as described above. If RingCentral timely receives from the Customer a second rejection notice, and RingCentral, in its reasonable discretion determines that the Professional Services for the Project Phase were properly completed in accordance with the Completion Criteria, the Project Phase will be deemed to have been Accepted; however RingCentral shall send Customer a written acknowledgment informing Customer of the Acceptance along with a reasonable explanation.

c.  **Production Use:** Unless otherwise agreed in writing between the parties, production use will constitute Acceptance for all purposes of this PS Agreement.

d.  In the event of termination of the applicable SOW as set forth below.

e.  **T&M Services**. Acceptance for T&M Services is deemed accepted upon performance.

6.  **Payment**

a.  The SOW will set forth the fees that the Customer will pay to RingCentral for each Project Phase, and the rates for T&M Services. Customer will compensate RingCentral fees and expenses for the Services as set forth in the applicable SOW. Customer acknowledges and agrees that all fees and charges shall be due and payable without any deduction, withholding, or offset of any kind, including without limitation for any levy or tax.

b.  **Invoicing and Payment of Professional Services fees.** Except to the extent otherwise provided in an SOW, all amounts due under this PS Agreement for Professional Services other than T&M Services, shall be invoiced upon Acceptance of each Project

Phase. T&M Services will be invoiced Monthly in arrears. The payment term for each invoice is set forth in the Agreement.

   c. **Service Expenses.** In addition to the fees and expenses set forth in the applicable SOW, Customer agrees to reimburse RingCentral for its fixed travel, meal, and lodging expenses incurred in connection with any Site Visit ("**Service Expenses**"). Travel, meal, and lodging expenses shall be invoiced upon Acceptance of each Project phase, alongside all other amounts due under this PS Agreement, on a per-trip/per resource basis, at a fixed rate of $2,500 per trip. RingCentral shall, after Customer request, provide information verifying the deployment of on-site resources, but all invoices regarding Service Expenses shall only reference the fixed cost mentioned above, as applicable.

   d. **Additional Fees.** Customer agrees to incur and be liable for any additional fees or other amounts provided for in this PS Agreement or the applicable SOW. These Additional fees may include, but are not limited to the following:

      i. For any additional Site Visit(s) not included in the SOW, the Customer agrees to pay on a T&M Services basis, with a minimum fee equal to eight (8) hours of RingCentral per day at RingCentral's then-current T&M Services hourly rate.

      ii. Customer agrees to pay a reschedule fee of five hundred dollars ($500.00) for any Site Visit that must be rescheduled without at least ten (10) business days' notice to RingCentral.

   e. **Full Statement of Conditions for Customer Payment Obligations.** In no event shall Customer's incurring of or obligation to pay any amount under this PS Agreement be contingent on or tied in any way to the occurrence of any event not specifically identified in this PS Agreement, as such a condition with respect to such amounts.

## 7. Changes to SOWs

Changes to any applicable SOW shall be made only in a mutually executed written change order between RingCentral and Customer (a "**Change Order**"), outlining the requested change and the effect of such change on the Services, including without limitation the fees and the timeline as determined by RingCentral in its reasonable discretion. RingCentral shall have no obligation to commence work in connection with any Change Order until the Change Order is agreed upon by both Parties in writing. RingCentral has no obligation to provide any Professional Services outside the scope of an SOW.

## 8. Term and Termination

   a. **Term.** This PS Agreement shall remain in effect for as long as the Agreement is in effect, unless terminated in accordance with this Section.

   b. **Termination.** Customer may terminate this PS Agreement, in whole or in part, with thirty (30) days' advance written notice to the other Party. RingCentral may terminate this PS Agreement, in whole or in part, with thirty days' advance notice to Customer if (i) Customer fails to pay RingCentral ten (10) days after written notice of a past due invoice, or (ii) if RingCentral ceases offering PS services. Unless otherwise specified in the termination notice, the termination of one SOW or Project Phase shall not necessarily result in the termination of, or otherwise affect, any other SOW or Project Phase.

DocuSign Envelope ID: A2790865-311C-4701-877F-9104C0FE59856

    c.   **Effect of Termination.** In the event that this PS Agreement, a SOW, or a Project Phase is terminated, in whole or in part, for any reason other than for RingCentral's material breach of this PS Agreement, Customer shall be obligated to pay RingCentral for:

         i.   any Professional Services and T&M Services that have been rendered up until the effective date of the termination;

        ii.   all applicable Service Expenses incurred; and

      iii.   (50%) of the fees for any other Professional Services not yet performed, due under the Project Phase(s) being cancelled.

    d.   **Post-Termination Notice Wrap-Up.** Upon receiving or providing notice of termination of this PS Agreement, RingCentral shall be relieved of and excused from any obligation to continue to perform Services or to perform under any then-current SOWs or Project Phase, as the case may be, but shall have the right to elect in its sole discretion to continue to perform such Services in the period prior to the applicable SOW's or Project Phase, as the case may be, termination.

    e.   **Obligations Upon Termination.** Upon termination of this PS Agreement, Customer will promptly destroy or, at RingCentral's request, return to RingCentral, all RingCentral Confidential Information in their possession, including deleting or rendering unusable all electronic files and data that contain RingCentral Confidential Information, and will provide RingCentral with certification of compliance with this subsection.

**ATTACHMENT C**

**SERVICE LEVEL AGREEMENT FOR OFFICE SERVICES**

This Service Level Agreement for Office Services (the **"Office SLA"**) is a part of the Master Services Agreement (the **"Agreement"**) that includes the Service Availability levels RingCentral commits to deliver on the RingCentral Network for Voice Services, solely for Office Services.

1. **Overview**

RingCentral will maintain the Quality of Service for Voice Services at the performance levels as defined below:

|  | Performance Level |
|---|---|
| **Service Availability** (Monthly Calculation) | 99.999% |
| **Maximum Service Credit** (Monthly) | 30% of MRC |
| **Quality of Voice Service** (Monthly Calculation) | 3.8 MOS Score |

2. **Minimum Eligibility**

Customer is entitled to the benefits of this Office SLA only to the extent that Customer maintains a minimum of fifty (50) Digital Lines under the Office Service Attachment with a minimum twelve (12) month Initial Term and twelve (12) month Renewal Term. This Office SLA shall not apply to any period of time where Customer does not meet the foregoing requirements.

3. **Service Delivery Commitments**

   a. **Calculation of Service Availability.**
   Service Availability = [ 1 − ((number of minutes of Down Time x number of impacted users) / (total number users x total number of minutes in a calendar month)) x 100]

   Availability shall be rounded to nearest thousandth of a percent in determining the applicable credit.  Service Credits for Down Time will not exceed 30% MRC.

   b. **Calculation of Service Credits.**  Customer is entitled to Service Credits according to the following table:

| Service Availability | Service Credits |
|---|---|
| **≥ 99.999** | 0% MRC |

DocuSign Envelope ID: A2790805-311C-4781-857F-9041CF559856

| ≥ 99.500 and < 99.999% | 5% MRC |
|---|---|
| ≥ 99.000 and < 99.5000% | 10% MRC |
| ≥ 95.000 and < 99.000% | 20% MRC |
| < 95.000% | 30% MRC |

c.  **Qualifying for Service Credits.** Service Credits for Down Time will accrue only to the extent:

  i.  Down Time exceeds 1 minute;
  ii.  Customer reports the occurrence of Down Time to RingCentral Customer Service by opening a Support Case within twenty-four (24) hours of the beginning of the applicable Down Time period and in accordance with RingCentral's published customer service procedures;
  iii.  Customer submits a written request for Service Credits to RingCentral Customer Service within ten (10) business days of the date the Support Case was opened by Customer, including a short explanation of the credit claimed and the number of the corresponding Support Case;
  iv.  RingCentral confirms that the Down Time was the result of an outage or fault on the RingCentral Network; and
  v.  Customer is not in material breach of the Agreement, including its payments obligations.

**Finality of Decisions.**   Any Credits issued by RingCentral will expire at the expiration or termination of the Agreement.

4.  **Quality of Service Commitments**

  a.  **Quality of Service Targets.**  RingCentral will maintain an average MOS score of 3.8 over each calendar month for Customer Sites in the Territory, except to the extent that Customer endpoints connect via public WiFi, a low bandwidth mobile data connection (3G or lower), or Customer uses of narrowband codecs such as G.729.
  b.  **Quality of Service Report:** Customer may request a Quality of Service Report for the preceding calendar month by submitting a Support Case.  RingCentral will endeavor to provide the Quality of Service Report within five (5) business days.
  c.  **Diagnostic Investigation:** If the Quality of Service Report shows a failure to meet the target 3.8 average MOS as calculated under this Section, RingCentral will use industry-standard diagnostic techniques to investigate the cause of the failure. Customer shall cooperate with RingCentral in this investigation fully and in good faith.
  d.  **Diagnostic Remediation.** Based on its investigation, RingCentral will provide a reasonable determination of the root cause(s) of any failure for the quality of service to meet the target MOS of 3.8.  RingCentral will resolve any root cause(s)

on the RingCentral Network; Customer shall timely implement settings or other resolution advised by RingCentral to improve the quality of service.

5. **Chronic Service Failures**
   a) **Service Availability**: Customer may terminate the Agreement without penalty, and will receive a pro-rata refund of all prepaid, unused fees in the following circumstances if RingCentral fails to meet a Service Availability of at least 99.9% on the RingCentral Network for Voice Services during any three (3) calendar Months in any continuous 6-Month period, and customer has timely reported Down Time as set forth herein.
   b) **Quality of Service**: Customer may terminate the affected Customers Sites under its Agreement without penalty, and will receive a pro-rata refund of all prepaid, unused fees in the following circumstances if RingCentral fails to meet the Minimum MOS, as measured in duly requested Quality of Service Reports, for the affected Customer Sites within four (4) months of the date of Customer's initial Support Case requesting a Quality of Service Report, except that such right inures only to the extent that Customer has complied fully and in good faith with the cooperation requirements and timely implemented all suggestions from RingCentral, in RingCentral's sole reasonable judgment.
   c) To exercise its termination right under this Office SLA, Customer must deliver written notice of termination to RingCentral no later than ten (10) business days after its right to right to terminate under this Section accrues.

6. **Sole Remedy**
The remedies available pursuant to this SLA (i.e. the issuance of credits and termination for chronic service failure) shall be Customer's sole remedy for any failure to meet committed services levels under this SLA.  For the avoidance of doubt, this clause does not bar or otherwise limit the remedies Customer may otherwise have for RingCentral's breach of the Agreement, subject to the limitations therein.

7. **Definitions**
Terms used herein but not otherwise defined have the meanings ascribed to them in the Agreement.  For purposes of this Service Level Agreement, the following terms have the meanings set forth below:

   a) "**Down Time**" is an unscheduled period during which the Voice Services for RingCentral Office on the RingCentral Network are interrupted and not usable, except that Down Time does not include unavailability or interruptions due to (1) acts or omissions of Customer; (2) an event of a Force Majeure; or (3) Customer's breach of the Agreement.  Down Time begins to accrue after one (1) minute of unavailability, per incident.
   b) "**MOS**" means the Mean Opinion Score, determined according to the ITU-T E-model, as approved in June 2015, rounding to the nearest tenth of a percent. MOS provides a prediction of the expected voice quality, as perceived by a typical telephone user, for an end-to-end (i.e. mouth-to-ear) telephone connection under conversational conditions.  MOS is measured by RingCentral using network parameters between the Customer endpoint, e.g., the IP Phone

DocuSign Envelope ID: A2790865-211C-4701-B7F7-3104105F59856

or Softphone, and the RingCentral Network, and will accurately reflect quality of the call to the caller using the Voice Services.

c)    "**MRC**" means the monthly recurring subscription charges (excluding taxes, administrative or government mandated fees, metered billings, etc.) owed by Customer to RingCentral for Office Services for the relevant month. If customer is billed other than on a monthly basis, MRC refers to the pro-rata portion of the recurring subscription charges for the relevant calendar month.  MRC does not include one-time charges such as phone equipment costs, set-up fees, and similar amounts, nor does it include any charges or fees for services other than Office Services.

d)    "**Quality of Service Report**" means a technical report provided by RingCentral, detailing MOS and related technical information.

e)    "**RingCentral Network**" means the network and supporting facilities between and among the RingCentral points of presence ("PoP(s)"), up to and including the interconnection point between the RingCentral's network and facilities, and the public Internet, private IP networks, and the PSTN.  The RingCentral Network does not include the public Internet, a Customer's own private network, or the Public Switched Telephone Network (PSTN).

f)    "**Service Availability**" is the time for which Voice Services for RingCentral Office are available on the RingCentral Network, expressed as a percentage of the total time in the relevant calendar month, and calculated as set forth below.

g)    "**Service Credits**" means the amount that RingCentral will credit a Customer's account pursuant to this Office SLA.

h)    "**Site**" means a physical location in the Territory at which Customer deploys and regularly uses at least five (5) RingCentral Digital Lines.  A Digital Line used outside such physical location for a majority of days in the relevant calendar month, such as home offices, virtual offices, or other remote use, will not be included in the line count for this purpose.

i)    "**Support Case**" means an inquiry or incident reported by the Customer, through its helpdesk, to RingCentral's Customer Care department, by placing a telephone call as outlined at http://success.ringcentral.com/RCContactSupp.

j)    "**Territory**" means those countries in which Customers subscribes to RingCentral Office or Global Office Services.

k)    "**Voice Services**" means the audio portion of the Plan Services, across endpoints, including the Softphone, and IP desk phone.



# RingCentral Office Plan Purchase Order Form

This RingCentral Office Plan Purchase Order is governed by the RingCentral Office Plan Purchase Agreement between the parties, executed on June 20th, 2018.

| Service Provider | |
|---|---|
| Service Provider | RingCentral, Inc. |
| Address | 20 Davis Drive |
| City, State & ZipCode | Belmont, CA 94002 |
| Country | USA |

| Customer | |
|---|---|
| Customer | American Freight |
| Address | |
| City, State & ZipCode | Mansfield, OHIO , 44904 |
| Country | United States |
| Billing Contact Person | Scott Vance |
| Phone | +1 (740) 363-6333 |
| E-mail address | svance@americanfreight.us |

| Service Commitment Period | |
|---|---|
| Start Date | June 20th, 2018 |
| Initial Term | 36 Months |
| Renewal Term | 0 Months |

| Payment Schedule | Monthly Payment Period |
|---|---|

| Number of Digital Lines Initially Purchased | 150 Digital Lines |
|---|---|



| RingCentral Office Plan Services | | | | |
|---|---|---|---|---|
| Product and Edition | Pricing Tier | Rate Per Digital Line Per Month[*] | Rate Per Digital Line Per Year[*] | Subtotal |
| Office Standard Edition | 100 - 999 Digital Lines | $17.25 | $207.00 | $2,587.50 |

*Each Office Standard Edition account purchased includes one thousand (1,000) Toll-Free Minutes Per Month, and unlimited Local and Long Distance (U.S. & Canada).*

*Usage is subject to the terms and condition of the Office Agreement, including without limitation, Section III of the Online Terms (Acceptable Use Policy).*

| Total Pricing for Selected Options | | | | |
|---|---|---|---|---|
| Summary of Service | Quantity | Rate Per Month | Rate Per Year | Subtotal |
| Office Standard 100 lines | 150 | $17.25 | $207.00 | $2,587.50 |
| E911 Fee (DigitalLine Unlimited) | 150 | $1.00 | $12.00 | $150.00 |
| Cost Recovery Fee (DigitalLine Unlimited) | 150 | $3.50 | $42.00 | $525.00 |
| Polycom VVX411 - Rental | 70 | $7.00 | $84.00 | $490.00 |
| Yealink W56P with 3 Handsets - Rental | 43 | $15.00 | $180.00 | $645.00 |
| Polycom VVX 101 Basic IP Phone - Rental | 37 | $4.00 | $48.00 | $148.00 |
| [*]*In United States dollars; does not include Taxes* | | | | |
| | | | **Total Initial Amount**[*] | **$4,545.50** |
| | | | **Total Monthly Amount**[*] | **$4,545.50** |
| | | | **Total 12 Month Amount**[*] | **$54,546.00** |

DocuSign Envelope ID: A2790865-311C-4701-857F-194L9F259855



**IN WITNESS WHEREOF,** the Parties have executed this RingCentral Office Plan Purchase Order above through their duly authorized representatives.

<table>
<tr><td><u>**Customer**</u></td><td><u>**RingCentral**</u></td></tr>
<tr><td>**American Freight**</td><td>**RingCentral, Inc.**</td></tr>
</table>

By: _____   By: _____

Jim Newell Name: _____   Name: _____

COO Title: _____   Title: _____

6/20/2018 Date: _____   Date: _____



## INITIAL ORDER FORM - ENGAGE VOICE SERVICES

This Initial Order Form is a binding agreement between RingCentral, Inc.("**RingCentral**") and **American Freight**("**Customer**"or"**You**") (together the "**Parties**"), for the purchase of Engage Voice Service licenses, and products listed herein, and as further described in the Engage Voice Services Attachment attached hereto. The Initial Order Form is subject to the terms and conditions specified in the applicable Agreement between the Parties. Capitalized terms not defined herein shall have the same meanings as set forth in the applicable Agreement between the Parties.

If there is no Master Services Agreement executed by the Parties, then the RingCentral Online Terms of Service found here https://www.ringcentral.com/legal/eulatos.html shall apply to this Order Form. Any Appendices attached to this Order Form are incorporated into and made a part of this Initial Order Form.

| Service Provider | |
|---|---|
| Service Provider | RingCentral, Inc. |
| Address | 20 Davis Drive |
| City, State & Zip Code | Belmont, CA 94002 |
| Country | USA |

| Customer | |
|---|---|
| Customer | American Freight |
| Address | 680 Sunbury Rd |
| City, State & Zip Code | Delaware, OH 43015 |
| Country | United States |
| Signatory Contact Name | Brian Simpkins |
| Phone | ~~7408163136~~ 614-354-4283 |
| E-mail Address | bsimpkins@americanfreight.us |

| Service Commitment Period | |
|---|---|
| Start Date | April 25th, 2022 |
| Initial Term | Coterminous with the Initial Term of your RingCentral MVP Services |
| Renewal Term | Coterminous with the Renewal Term of your RingCentral MVP Services |

| Payment Schedule | Monthly Payment Schedule |
|---|---|

| Engage Voice Services | | | | | |
|---|---|---|---|---|---|
| **Summary of All Services** | | | | | |
| **Service** | **Charge Term** | **Qty** | **Rate** | **Monthly Subtotal** | **One-time Subtotal** |
| Engage Voice Inbound Edition, named agent seat | Monthly | 25 | $59.99 | $1,499.75 | $0.00 |
| Call recording storage - 90 days, per seat | Monthly | 25 | $0.00 | $0.00 | $0.00 |
| | | | **New Service Amount** * | **$1,499.75** | **$0.00** |
| | | | **Total Initial Amount** * | **$1,499.75** | |

*Amounts are exclusive of applicable Taxes and Fees.

RingCentral and Customer may have agreed to special terms and conditions related to this Initial Order Form. These special terms and conditions, if any, are attached as Appendix B. The terms and conditions included on Appendix B shall supersede any conflicting terms in this Order or in the Agreement.



**Free Services Credit.** Customer will be entitled to receive a one-time credit in the amount of $4,499.25. This credit will be applied against charges for the recurring Services set forth in this Order Form, (and any taxes and fees associated with those Services), included in future invoices issued by RingCentral to Customer until the total amount of the credit is used. The Customer will be responsible to pay for any additional services and products, including without limitation, additional lines and extensions, seats, licenses, one-time services, usage base fees and bundles, IP devices, and their associated taxes and fees. This credit is non-transferable and non-refundable and any unused credit amount will expire upon the earlier of: 1) termination of this Order Form; or 2) at the end of the monthly billing cycle in which any Seats and/or applicable licenses are activated on Your Account in a production environment (except when such Seats and/or applicable licenses are activated solely for use by RingCentral or its subcontractors for the configuration and implementation of Your Engage VoiceServices).

**IN WITNESS WHEREOF,** the Parties have executed this Order Form through their duly authorized representatives.

**Customer**

**American Freight**

By: _Brian M Simpkins_

Name: _Brian M Simpkins_

Title: _Director IT_

Date: _4/22/22_

**RingCentral**

**RingCentral, Inc.**

By: _[signature]_

Name: Joe Jacob

Title: VP, Enterprise Sales

Date: _____



## ATTACHMENT A

### RINGCENTRAL ENGAGE VOICE SERVICES - OVERAGE RATES

| Service | Rate |
|---|---|
| Inbound calls to domestic DIDs, per 10 min | $0.12 |
| Inbound calls to North America toll-free numbers, per 10 min | $0.19 |
| Outbound calls manually dialed to North America numbers, per 10 min | $0.19 |
| IVR calls processing, overage per 10 minutes | $0.20 |
| Automated speech recognition, per 10 minutes | $0.30 |
| Engage Voice Inbound Edition, named agent seat on demand | $79.99 |
| Call recording storage - 90 days, overage per seat | $10.00 |
| In-Platform Additional Local Numbers | $5.00 |
| In-Platform Additional Toll-Free Numbers | $5.00 |
| In-Platform SMS messages, per 10 messages | $0.10 |
| In-Platform MMS messages, per 10 messages | $0.20 |
| In-Platform Inbound calls via Bring Your Own Trunk (BYOT), per 10 min | $0.05 |



## AMENDMENT TO THE RINGCENTRAL MASTER SERVICES AGREEMENT

This Engage Voice Services Amendment (this "EV Amendment") amends the RingCentral Master Services Agreement (the **"Agreement"**), by and between **American Freight**("**Customer**"or "**You**") and RingCentral, Inc.("**RingCentral**"). The Parties agree to amend the Agreement as follows. Capitalized terms not defined herein shall have the same meanings as set forth in the Agreement.

1. As of the EV Amendment Effective Date, the RingCentral Engage Voice Services Attachment, attached hereto, is hereby incorporated into and made a part of the Agreement.

2. Subject to the modifications set forth in this EV Amendment, the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the Parties have each caused this EV Amendment to be signed and delivered by its duly authorized representative as of the date Customer signs below (the "**EV Amendment Effective Date**").

| **Customer** | **RingCentral** |
|---|---|
| **American Freight** | **RingCentral, Inc.** |

| | Customer | | RingCentral |
|---|---|---|---|
| By: | *Brian M Simpkins* | By: | *(signature)* |
| Name: | *Brian M Simpkins* | Name: | Joe Jacob |
| Title: | ~~Director~~ *Director IT* | Title: | VP, Enterprise Sales |
| Date: | 4/22/22 | Date: | |



**ATTACHMENT B**

**SERVICE ATTACHMENT – RINGCENTRAL ENGAGE VOICE SERVICES**

This Service Attachment is a part of the Master Services Agreement (the **"Agreement"**) that includes the terms and conditions agreed by the Parties under which RingCentral will provide to the Customer the RingCentral Engage Voice Services as described under the applicable Order Form.

In the event of any conflict between the provisions of the Agreement and the provisions of this Service Attachment, such provisions of this Service Attachment will prevail.

**1. Service Overview**

**"RingCentral Engage Voice Services"** is a contact center solution consisting of inbound and outbound voice media routing, queuing, and distribution, and related services, applications, and features, whether included as part of a Subscription Package or ordered separately.

**2. Billing and Payment**

    **A. Billing.**

Starting at the Start Date of the Order Form, and until the end of the Term, You agree to pay for: a) the Engage Voice Services fees for at least the number of Seats set forth in the Engage Voice Services Order (as amended as permitted below) (a **"EV Contract Seat"**) based on the per Seat pricing set forth in the Engage Voice Services Order (the **"EV Contract Seat Price"**), as amended from time to time, regardless of the number of Seats being used; b) any Usage (per minute) fees; c) any Subscription Packages set forth in the Engage Voice Services Order (e.g. Interactive Voice Response, minutes, international minutes); and d) any additional fees set forth in the Engage Voice Order Form.

    **B. Adding New Engage Voice Contract Seats**

You may add EV Contract Seats at any time either through a new Engage Voice Services Order or a written amendment executed by You and RingCentral. The Engage Voice Services fees related to these additional EV Contract Seats will be billed at the per Seat price set forth in the Engage Voice Order form. For the avoidance of doubt, You will be required to pay for Engage Voice Services fees related to these additional EV Contract Seats until the end of the Term.

    **C. Adding On-Demand Engage Voice Seats**

At any time, You may utilize additional Seats with your Engage Voice Services on an as-needed basis (each, an **"On-Demand EV Seat"**). You will be billed for any Engage Voice Services at the rate of the EV Contract Seat Price plus an overage charge per month per Seat (the **"On-Demand EV Price"**) until You remove this On-Demand EV Seat from Your Engage Voice Services subscription (which You may do at any time in your discretion). Engage Voice Services fees for any On-Demand EV Seats will be charged for the full month, regardless of the number of days used. For each monthly billing period, You will be charged for the highest number of On-Demand EV Seats used within such billing period. Fees for other Engage Voice Service licenses may be billed at the price set forth in the Engage Voice Order Form.

**3. Engage Voice Services, Settings, and Modifications**

A RingCentral Office account is required to use the Engage Voice Services. The settings and preferences for your Engage Voice Services, including without limitation user rights, user skills, and permissions;



routing, scripts; registration Information; and activation of On-Demand EV Seats, among others, may be set and modified by those individuals whom You allow to have access to the web console ("Account Administrators"). The Customer acknowledges that the acts or omissions of the Account Administrators may result in additional charges or affect Engage Voice Services. The Customer will be solely responsible for the acts or omissions and the impact on billable amounts of the Account Administrators.

**4. Use of Engage Voice Services**

You acknowledge and agree that all use of the Engage Voice Services shall be subject to this Service Attachment and the Agreement, including without limitation the use policies and data privacy policies. You acknowledge and agree that You are fully responsible and liable for all use of the Engage Voice Services, any software or hardware used in conjunction with the Engage Voice Services, and any and all fees and charges that are incurred as a result of such use. Notwithstanding anything to the contrary stated in the Agreement, the use of the Engage Voice Services shall be subject to the following terms:

    a. **NO 911 SERVICE. YOU ACKNOWLEDGE AND AGREE THAT 911 / EMERGENCY CALLS OR MESSAGES MAY NOT BE PLACED OR SENT THROUGH THE ENGAGE VOICE SERVICES, AND NO 911 CALLING OR SMS OR OTHER MESSAGING SERVICE IS OFFERED OR PROVIDED WITH THE ENGAGE VOICE SERVICES. YOU MUST MAKE AVAILABLE ALTERNATIVE ARRANGEMENTS TO PLACE 911 CALLS.**

    b. **Customer 911 Notification Obligations.** You represent, warrant, and covenant that: (i) You shall ensure that any person who might use the Engage Voice Services or be present at the physical location where any the Engage Voice Services might be accessed or used is fully informed and aware that he or she will not be able to place calls or send messages to 911 or other emergency response services through the Engage Voice Services; and (ii) You shall provide all of the foregoing parties with an alternate method by which to place such calls and, as applicable, to send such messages.

    c. **Cardholder Data.** You acknowledge and agree that when using Engage Voice Services, You will not record Cardholder Data (**"CHD"**) as that term is defined by the PCI Data Security Standard. If You are required to receive CHD using the Engage Voice Services, You will pause any recordings or otherwise ensure that no CHD is being recorded or saved.

**5. Compliance and Regulations**

You disclaim and deny any reliance on any marketing materials relating to the Engage Voice Services with regard to Telephone Consumer Protection Act (**"TCPA"**) compliance and/or the Telemarketing Sales Rule. Any statements regarding the TCPA or other legal compliance are opinion only, and You are ultimately responsible for making your own determinations regarding the requirements of the TCPA and its applicability to the Engage Voice Services.

RingCentral shall not redesign or otherwise modify its Safe Dial product, including any relevant hardware or software, in a manner that would give it the capacity to dial randomly or sequentially generated numbers, function as a predictive dialer or dial numbers in any manner that does not require human intervention for each call.

**6. Definitions**

Terms used herein but not otherwise defined have the meanings ascribed to them in the Agreement. For purposes of this Service Attachment, the following terms have the meanings set forth below:



**A.** "**Engage Voice Materials**" means documentation, either electronic or otherwise, that RingCentral provides or makes available to the Customer describing the Engage Voice Services, including the components of each Subscription Package, if applicable, and any other features and functionality offered as part of the Engage Voice Services. The Engage Voice Materials may include without limitation manuals, product descriptions, user or installation instructions, diagrams, printouts, listings, flowcharts and training materials related to the Engage Voice Services.

**B.** "**Engage Voice Services Order**" is an Order form executed by the Parties under the terms of the Agreement and this Service Attachment, setting out the details of the subscription to the Engage Voice Services, including any Subscription Package, and any additional products, services and functionality purchased by the Customer

**C.** "**Interactive Voice Response**"or"**IVR**" means a module that allows customers to script automated voice interactions, accessing third-party services and databases when needed to service the customer. IVR-only packages do not include any services or restrictions related to Seats.

**D.** "**Seat**" means either: i) a named license based on the named persons that use the Engage Voice Services, or ii) a concurrent license based on the number of persons simultaneously using the Engage Voice Services. Each Seat includes 2,000 minutes of IVR per month. Overages apply.

**E.** "**Subscription Package**" is a set of Engage Voice Services features and applications, as further defined in the Engage Voice Materials, that could be ordered as a bundle.

**F.** "**Usage**" means any charges incurred in connection with the use of Your Engage Voice Services, including, without limitation, local, long-distance, international, and toll-free minutes, charges, and any products listed on the Engage Voice Service Order Form.



**ATTACHMENT C**

**SERVICE ATTACHMENT – RINGCENTRAL PROFESSIONAL SERVICES AGREEMENT**

This Service Attachment is a part of the Master Services Agreement (the **"Agreement"**) that includes the terms and conditions agreed by the Parties under which RingCentral will provide the RingCentral Professional Services to Customer.

In the event of any conflict between the provisions of the Agreement and the provisions of this Professional Services Agreement (the **"PS Agreement"**), such provisions of this PS Agreement will prevail.

### 1. Service Overview

RingCentral shall provide the implementation, installation, consulting, configuration services and other professional services (**"Professional Services"**) as described and agreed upon in writing between the Parties pursuant to a statement of work (**"Statement of Work" or "SOW"**).

### 2. Project Phases

The Professional Services may be delivered in one or more phases. The SOW will specify the milestone, objectives, Sites, fees and other components that are included in the scope of each phase (**"Project Phase"**). The Professional Services may also be provided on a time and material basis (**"T&M Services"**) paid by the hour based on the then current T&M Services hourly rate offered by RingCentral, as specified in the relevant SOW. Customer agrees that the delivery, installation, testing, acceptance and payment for the Professional Services rendered under any one Project Phase is not dependent on the delivery, installation, testing, acceptance and payment for the Professional Services under any other Project Phase. Each Project Phase will be billed upon Acceptance, and payment for each Project Phase is due in full within the applicable payment period agreed between the parties and is non-refundable.

### 3. Customer Sites and Site Visits

In the event the Parties agree that the Professional Services must be performed at one or more Customer facility(ies) (**"Site(s)"**), the Site(s) will be separately identified in the applicable SOW. Each visit to a separate Customer Site will be considered a separate **"Site Visit"**. When so stipulated in the SOW, each Site may constitute a Project Phase. Customer has the following obligations with respect to all Site Visits:

    **a.** Customer will maintain and ensure safe working conditions at each Site and shall promptly inform the RingCentral project manager of any known hazardous conditions at any Site prior to any visit by RingCentral Personnel.

    **b.** Customer shall ensure that all Site hardware and network environment meets or exceed the requirements set forth in the Statement of Work and in "RingCentral VoIP Network Requirements and Recommendations" which can found at:
    https://support.ringcentral.com/s/article/9233?language=en_US

    **c.** Customer shall provide RingCentral with all reasonable information, cooperation, and assistance that RingCentral requests in connection with performing the Services, including without limitation providing RingCentral with access to Customer's systems and networks and related system and network administrators. Any failure on the part of Customer to provide the cooperation requested by RingCentral, or to provide the information or hardware and software environment required,



may result in the need for a Change Order to contemplate additional fees and extended timelines to accommodate Customer's failure to do so.

**d.** Customer shall ensure that at least ten (10) business days prior to a Site Visit or as otherwise agreed in the applicable SOW, the Customer Project Manager shall provide to the RingCentral Project Manager the following information for the Site to be visited:

    I. the first and last name, extension number, and email address for delivery of message notification emails of each End User for which the Services are to be implemented at the Site and any other information that RingCentral requests to configure the digital lines that are part of such Services to be implemented (this information needs to be in the form of a Microsoft Excel file suitable for use with the Plan Service's bulk configuration utility);

    II. written or illustrated diagrams of Customer's current and proposed dial plans and data and call flows; and

    III. information related to configurations, equipment, and deployment requirements for the Site, as requested by RingCentral.

## 4. Late Site Visit Change

The Parties acknowledge and agree that Customer's cancellation or change of the dates of a Site Visit at any time during the ten (10) business days immediately prior to the date that the Site Visit is scheduled to take place (a **"Late Site Visit Change"**) will cause RingCentral to incur in expenses and losses (including without limitation RingCentral's costs in rescheduling the Site Visit and/or loss of opportunity for other business during the period during which such Site Visit was to take place). Accordingly, Customer agrees that for each Late Site Visit Change, Customer shall incur (at the time of cancellation or change) and be liable for, as liquidated damages, an amount equal to eight (8) hours of RingCentral T&M Services at RingCentral's then-current T&M Services hourly rate, as well as any Service Expenses that have already been expended by RingCentral. The Parties acknowledge and agree that this amount is a fair, reasonable, and appropriate pre-estimate of the losses that RingCentral will incur as a result of any single Late Site Visit Change.

## 5. Professional Services Acceptance

Each SOW will identify the specific criteria required for the completion of each Project Phase ( **"Completion Criteria"**). Unless otherwise agreed between the parties in the SOW, upon RingCentral's completion of the Professional Services for each Project Phase, RingCentral will review the Completion Criteria with Customer and will present to the Customer the Professional Services Project Completion Signoff Form (**"PCF"**) for that Project Phase. Notwithstanding anything to the contrary in this PS Agreement or any SOW, RingCentral's obligations under any Project Phase are deemed accepted and the Professional Services under such Project Phase shall be considered completed in full and billable upon any of the following (**"Acceptance"**):

    **a.** Customer executes the PCF.

    **b.** If RingCentral presents Customer with the PCF and the Customer fails to execute the PCF within three (3) days, unless the Customer provides to RingCentral, within those three (3) days, with a detailed description of the items that are outstanding or that are materially non- conforming with the Completion Criteria applicable to the specific Project Phase. If RingCentral timely receives a rejection notice, then RingCentral will complete or re-perform any portion of the non-conforming Professional Services and re-submit the PCF for the Project Phase to the Customer for Acceptance as described above. If RingCentral timely receives from the Customer a second rejection notice, and RingCentral, in its reasonable discretion determines that the Professional



Services for the Project Phase were properly completed in accordance with the Completion Criteria, the Project Phase will be deemed to have been Accepted.

c. **Production Use:** Unless otherwise agreed in writing between the parties, production use will constitute Acceptance for all purposes of this PS Agreement.

d. **T&M Services.** Acceptance for T&M Services, if applicable and used in a SOW, is deemed accepted upon performance.

### 6. Payment

a. The SOW will set forth the fees that the Customer will pay to RingCentral for each Project Phase, and the rates for T&M Services. Customer will compensate RingCentral fees and expenses for the Services as set forth in the applicable SOW. Customer acknowledges and agrees that all fees and charges shall be due and payable without any deduction, withholding, or offset of any kind, including without limitation for any levy or tax.

b. **Invoicing and Payment of Professional Services fees**. Except to the extent otherwise provided in a SOW or this Section, all amounts due under this PS Agreement for Professional Services other than T&M Services, shall be invoiced upon Acceptance of each Project Phase. T&M Services will be invoiced Monthly in arrears. The payment term for each invoice is set forth in the Agreement.

c. **Service Expenses.** In addition to the fees and expenses set forth in the applicable SOW, Customer agrees to reimburse RingCentral for its fixed travel, meal, and lodging expenses incurred in connection with any Site Visit ("Service Expenses"). Travel, meal, and lodging expenses shall be invoiced upon Acceptance of each Project phase, alongside all other amounts due under this PS Agreement, on a per-trip/per resource basis. RingCentral shall, after Customer request, provide information verifying the deployment of on-site resources and expenditure of Service Expenses.

d. **Additional Fees.** Customer agrees to incur and be liable for any additional fees or other amounts not provided for in this PS Agreement or the applicable SOW. These Additional fees may include, but are not limited to the following:

   I. For any additional Site Visit(s) not included in the SOW, the Customer agrees to pay on a T&M Services basis, with a minimum fee equal to eight (8) hours of RingCentral per day at the then-current T&M Services hourly rate.

### 7. Changes to SOWs

Changes to any applicable SOW shall be made only in a mutually executed written change order between RingCentral and Customer (a **"Change Order"**), outlining the requested change and the effect of such change on the Services, including without limitation the fees and the timeline as determined by RingCentral in its reasonable discretion. RingCentral shall have no obligation to commence work in connection with any Change Order until the Change Order is agreed upon by both Parties in writing. RingCentral has no obligation to provide any Professional Services outside the scope of an SOW.

### 8. Enterprise Support

As part of the Professional Services provided, Customer may purchase Enterprise Support services from RingCentral for use with the Services. The terms and conditions that govern the Enterprise Support can be found at: https://www.ringcentral.com/legal/enterprise-service -attachment.html



**9.Term and Termination**

    **a. Term.** This PS Agreement shall remain in effect for as long as the Agreement is in effect, unless terminated in accordance with this Section.

    **b. Termination.** Either Party may terminate this PS Agreement, in whole or in part, with thirty (30) days' advance written notice to the other Party. Unless otherwise specified in the termination notice, the termination of one SOW or Project Phase shall not necessarily result in the termination of, or otherwise affect, any other SOW or Project Phase.

    **c. Effect of Termination.** In the event that this PS Agreement, a SOW, or a Project Phase is terminated, in whole or in part, for any reason other than for RingCentral's material breach of this PS Agreement, Customer shall be obligated to pay RingCentral for:

        I. any Professional Services and T&M Services that have been rendered up until the effective date of the termination;

        II. all applicable Service Expenses incurred; and

        III. (50%) of the fees for any other Professional Services not yet performed, due under the Project Phase(s) being cancelled, if termination of the PS Agreement, SOW, or a Project Phase occurs within one hundred and eighty (180) days of execution. If termination occurs after one hundred and eighty (180) days of execution, Customer shall owe all outstanding fees for any Professional Services not yet performed, due under the Project Phase being cancelled.

    **d. Post-Termination Notice Wrap-Up.** Upon receiving or providing notice of termination of this PS Agreement, RingCentral shall be relieved of and excused from any obligation to continue to perform Services or to perform under any then-current SOWs or Project Phase.

**<u>EXHIBIT B</u>**

**May Invoice**

# RingCentral ® Invoice

## Billed To

**American Freight**

109 Innovation Court Suite J

Delaware OH 43015

United States

**Phone:** 1 (423) 292-2237

**Customer Email:**
bills@americanfreight.us

## Account Information

**Customer User ID:** 141916034

**Invoice No.:** CD_001121081

**Currency:** US Dollar

**Terms:** Net 30

**Invoice Date:** 05/26/2025

**Invoice Amount to Pay:** $19,931.80

**Due Date:** 06/25/2025

Discover
what's new
at RingCentral.

Learn more. >



## Statement Summary

| SERVICE | AMOUNT |
|---|---|
| **Subscription** | |
| **Charges** | |
| DigitalLine Unlimited Standard | $10,790.03 |
| DigitalLine Basic Standard | $37.50 |
| Additional Local Number | $733.53 |
| Additional Toll-Free Number | $54.89 |
| RingCentral Rooms License | $49.00 |
| Domestic Rooms Phone Line Add-On | $14.99 |
| Advanced Support - Silver Tier - RingEX™ | $2,100.00 |
| **Taxes, Fees and Surcharges** | |
| Federal - Universal Service Fund | $1,085.81 |
| State Taxes | $1,070.50 |
| Local Taxes | $224.03 |
| Compliance and Administrative Cost Recovery Fee | $3,867.00 |
| e911 Service Fee | $1,289.00 |
| **Subscription Subtotal** | **$21,316.28** |
| **Adjustments** | |
| Credit | ($1,384.48) |
| **Subtotal** | **($1,384.48)** |
| **Amount Due** | **$19,931.80** |



**RingCentral Inc., 20 Davis Drive, Belmont, CA 94002, United States**

©2025 RingCentral.Inc. All rights reserved.

## Account Information

**Customer User ID:** 141916034
**Invoice No.:** CD_001121081
**Invoice Amount to Pay:** $19,931.80

## Payment Methods

Please email remittance advice to **Collections@RingCentral.com**

### Checks Regular Mail to Lockbox:

RingCentral Inc.
P.O. Box 734232
Dallas, TX 75373-4232

### Wire Instructions:

JPMorgan Chase Bank For credit to: RingCentral Inc.



### Overnight/Courier Check Payment:

JPMorgan Chase (TX1-0029)
Attn: RingCentral Inc. 734232
14800 Frye Road, 2nd Floor
Ft Worth, TX 76155

### ACH Payment:

JPMorgan Chase Bank For credit to: RingCentral Inc.



### For Credit Card Payment - Please call collections hotline at (415) 649-6735

## Billing Questions?

Email **billingsupport@ringcentral.com** or call **888-898-4591.**

Customer must notify RingCentral at **billingsupport@ringcentral.com** of disputes arising from invoices in writing within thirty (30) days of invoice date, unless otherwise specified in contract.

Undisputed amounts unpaid on or before agreed upon payment term on the invoice may lead to service interruption.

**Business Hours:** 12:00 AM to 12:00 AM (PST), Monday - Friday



**RingCentral Inc., 20 Davis Drive, Belmont, CA 94002, United States**
©2025 RingCentral.Inc. All rights reserved.

## Statement Details

| Description | Start Date | End Date | Qty | Rate | Amount |
|---|---|---|---|---|---|
| **Subscription - Charges** | | | | | |
| DigitalLine Unlimited Standard | 05/25/2025 | 06/24/2025 | 1283 | $8.41 | $10,790.03 |
| DigitalLine Basic Standard | 05/25/2025 | 06/24/2025 | 5 | $7.50 | $37.50 |
| Additional Local Number | 05/25/2025 | 06/24/2025 | 147 | $4.99 | $733.53 |
| Additional Toll-Free Number | 05/25/2025 | 06/24/2025 | 11 | $4.99 | $54.89 |
| RingCentral Rooms License | 05/25/2025 | 06/24/2025 | 1 | $49.00 | $49.00 |
| Domestic Rooms Phone Line Add-On | 05/25/2025 | 06/24/2025 | 1 | $14.99 | $14.99 |
| Advanced Support - Silver Tier - RingEX™ | 05/25/2025 | 06/24/2025 | 1 | $2,100.00 | $2,100.00 |
| **Subscription - Charges Subtotal** | | | | | **$13,779.94** |
| **Subscription - Taxes, Fees and Surcharges** | | | | | |
| Compliance and Administrative Cost Recovery Fee | 05/25/2025 | 06/24/2025 | 1289 | $3.00 | $3,867.00 |
| e911 Service Fee | 05/25/2025 | 06/24/2025 | 1289 | $1.00 | $1,289.00 |
| Federal - Universal Service Fund | | | | | $1,085.81 |
| State Taxes | | | | | $1,070.50 |
| Local Taxes | | | | | $224.03 |
| **Subscription - Taxes, Fees and Surcharges Subtotal** | | | | | **$7,536.34** |
| **Subscription Subtotal** | | | | | **$21,316.28** |
| **Adjustments** | | | | | |
| Credit | | | | | ($1,384.48) |
| **Subtotal** | | | | | **($1,384.48)** |
| **Total** | | | Amount Due (Tax Included) | | **$19,931.80** |



**RingCentral Inc., 20 Davis Drive, Belmont, CA 94002, United States**

©2025 RingCentral.Inc. All rights reserved.

**<u>EXHIBIT C</u>**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Related to D.I. __** |

## ORDER GRANTING MOTION OF RINGCENTRAL, INC. FOR ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM

Upon the *Motion of RingCentral, Inc. for Allowance and Payment of an Administrative Expense Claim* (the "Motion") filed by RingCentral, Inc. ("RingCentral") on June 7, 2025, in the above-captioned bankruptcy cases, seeking allowance and payment as an administrative expense the amount owed for post-petition services provided by RingCentral to the Debtors; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(1) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (B); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, its creditors, and other parties in interest; and this Court having found that RingCentral's notice of the Motion and opportunity for hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and the evidence in support thereof; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings before this Court and after due deliberation, it is hereby

**ORDERED** that the Motion is **GRANTED** as set forth herein; and it is further

**ORDERED** that RingCentral has an allowed chapter 11 administrative expense claim in the amount of $7,972.68 (the "Administrative Expense Claim") pursuant to 11 U.S.C. § 503(b)(1)(A); and it is further

**ORDERED** that the Debtors are authorized and directed to make payment of the Administrative Expense Claim to RingCentral at the same time and in the same manner as other similarly situated chapter 11 administrative claims; and it is further

**ORDERED** that this Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Obj. Deadline: August 5, 2025 at 4:00 p.m. (ET)**<br>**Hearing Date: August 19, 2025 at 10:00 a.m. (ET)** |

## NOTICE OF MOTION AND HEARING

PLEASE TAKE NOTICE that, on July 7, 2025, RingCentral, Inc. ("RingCentral") filed the *Motion of RingCentral, Inc. for Allowance and Payment of an Administrative Expense Claim* (the "Motion") with the United States Bankruptcy Court for the District of Delaware (the "Court").

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 1.35 of the *Ninth Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates*, any responses or objections to the Motion must be in writing and filed with the Clerk of the Court, 824 North Market

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

Street, 3rd Floor, Wilmington, Delaware 19801 on or before **August 5, 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").  At the same time, you must serve a copy of the objection upon the undersigned counsel to RingCentral so as to be received on or before the Objection Deadline.

PLEASE TAKE FURTHER NOTICE that, if any objections to the Motion are received, the Motion and such objections may be considered at a hearing before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge for the District of Delaware, at the Court, 824 North Market Street, 6th Floor, Courtroom No. 2, Wilmington, Delaware 19801 on **August 19, 2025 at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE THAT, IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED, SERVED AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

Dated:  July 7, 2025

Respectfully submitted,

**CLARK HILL PLC**

*/s/ Karen M. Grivner*
Karen M. Grivner (DE Bar No. 4372)
824 N. Market Street, Suite 710
Wilmington, Delaware 19801
Telephone: (302) 250-4750
Facsimile: (302) 421-9439
kgrivner@clarkhill.com

-and-

James L. Ugalde (AZ Bar No. 022733)
3200 N. Central Avenue, Suite 1600
Phoenix, Arizona 85012
Telephone: (602) 440-4817
Facsimile: (602) 257-9582
jugalde@clarkhill.com

-and-

2

Tara L. Bush (TX Bar No. 24122050)
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330
tbush@clarkhill.com

*Counsel for RingCentral, Inc.*

3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |

## CERTIFICATE OF SERVICE

I, Karen M. Grivner, certify that on July 7, 2025, a true and correct copy of the foregoing *Motion of RingCentral, Inc. for Allowance and Payment of an Administrative Expense Claims* was served upon all parties that are registered to receive electronic notices via the electronic notification pursuant to the ECF procedures in this District, and on the parties on the attached service list via email.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

Dated:  July 7, 2025

Respectfully submitted,

**CLARK HILL PLC**

*/s/ Karen M. Grivner*
Karen M. Grivner (DE Bar No. 4372)
824 N. Market Street, Suite 710
Wilmington, Delaware 19801
Telephone: (302) 250-4750
Facsimile: (302) 421-9439
kgrivner@clarkhill.com

-and-

James L. Ugalde (AZ Bar No. 022733)
3200 N. Central Avenue, Suite 1600
Phoenix, Arizona 85012
Telephone: (602) 440-4817
Facsimile: (602) 257-9582
jugalde@clarkhill.com

-and-

Tara L. Bush (TX Bar No. 24122050)
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330
tbush@clarkhill.com

*Counsel for RingCentral, Inc.*

L7896\461475\282744476

**SERVICE LIST**

Edmon L. Morton
Matthew B. Lunn
Allison S. Mielke
Shella Borovinskaya
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
emorton@ycst.com
mlunn@ycst.com
amielke@ycst.com
sborovinskaya@ycst.com

*Co-Counsel to the Reorganized Debtors*

Joshua A. Sussberg
Nicole L. Greenblatt
Derek I. Hunter
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
joshua.sussberg@kirkland.com
nicole.greenblatt@kirkland.com
derek.hunter@kirkland.com
-and-
Mark McKane
Kirkland & Ellis LLP
555 California Street
San Francisco, California 94104
mark.mckane@kirkland.com

*Co-Counsel to the Reorganized Debtors*

Bradford J. Sandler
Peter J. Keane
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
bsandler@pszjlaw.com
pkeane@pszjlaw.com
-and-
Robert J. Feinstein
Alan J. Kornfeld
Theodore S. Heckel
Pachulski Stang Ziehl & Jones LLP
1700 Broadway, 36th Floor
New York, New York 10019
rfeinstein@pszjlaw.com
akornfeld@pszjlaw.com
theckel@pszjlaw.com

*Counsel to the Official Committee of
Unsecured Creditors*

Timothy Jay Fox, Jr.
Office of the United States Trustee
U.S. Department of Justice
844 King Street, Suite 2207
Lockbox #35
Wilmington, Delaware 19801
timothy.fox@usdoj.gov

3