# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC.,[1] | Case No. 24-12480 (LSS) |
| Reorganized Debtors. | (Jointly Administered) |

## SUPPLEMENTAL AFFIDAVIT OF SERVICE

I, Paul Pullo, depose and say that I am employed by Kroll Restructuring Administration LLC ("*Kroll*"), the claims and noticing agent for the Reorganized Debtor in the above-captioned chapter 11 case.

On August 4, 2025, at my direction and under my supervision, employees of Kroll caused the following document to be served via First-Class Mail on the Supplemental Affected Contract Counterparties Service List attached hereto as **Exhibit A**:

- Debtors' Motion for Entry of an Order (I) Authorizing Franchise Group Intermediate V, LLC to Enter Into and Perform Its Obligations Under the Asset Purchase Agreement, (II) Approving the Sale of Certain Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief [Docket No. 1283]

At my direction and under my supervision, employees of Kroll caused the following document to be served via First-Class Mail on the date set forth on the Supplemental Notice Parties Service List attached hereto as **Exhibit B**:

- Notice of Filing of Amended Schedule 1 to the Sale Order [Docket No. 1293] (the "***Amended Schedule 1 to the Sale Order***")

On August 14, 2025, at my direction and under my supervision, employees of Kroll caused the following document to be served via First-Class Mail on 1010data, Inc., (ADRID: 29783763), 432 Park Ave S, 15th Floor, New York, NY 10016:

- Notice of Filing of Second Amended Plan Supplement [Docket No. 1518]

---

[1] The last four digits of Franchise Group, Inc.'s federal tax identification number are 1876. The mailing address for Franchise Group, Inc. is 2371 Liberty Way, Virginia Beach, Virginia 23456. In addition to the foregoing Reorganized Debtor, the "Reorganized Debtors" include certain affiliated entities, a complete list of which, including the last four digits of their federal tax identification numbers and addresses, may be obtained on the website of the Reorganized Debtors' claims and noticing agent at https://cases.ra.kroll.com/FRG/. All motions, contested matters, and adversary proceedings that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of Franchise Group, Inc., Case No. 24- 12480 (LSS).

On August 19, 2025, at my direction and under my supervision, employees of Kroll caused the Amended Schedule 1 to the Sale Order and following document to be served via First-Class Mail on KontractOne LLC, (ADRID: 30347523), Two Prudential Plaza, 180 N. Stetson Street, Suite 3500, Chicago, IL 60601:

- Debtors' Motion for Entry of an Order (I) Authorizing Franchise Group Intermediate V, LLC to Enter into and Perform Its Obligations Under the Asset Purchase Agreement, (II) Approving the Sale of Certain Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief, a copy of the modified version attached hereto as **Exhibit C**

Dated: September 15, 2025

*/s/ Paul Pullo*
Paul Pullo

State of New York
County of New York

Subscribed and sworn (or affirmed) to me on September 15, 2025, by Paul Pullo, proved to me on the basis of satisfactory evidence to be the person who executed this affidavit.

*/s/ OLEG BITMAN*
Notary Public, State of New York
No. 01BI6339574
Qualified in Queens County
Commission Expires April 4, 2028

SRF 90392, 90394, 90563 & 90959

**<u>Exhibit A</u>**

Exhibit A
Supplemental Affected Contract Counterparties Service List
Served via First-Class Mail

| ADRID | NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | POSTAL CODE |
|-------|------|-----------|-----------|------|-------|-------------|
| 29783801 | 6 Pack Fitness, LLC | 1999 Harrison St | | Oakland | CA | 94612 |
| 29783827 | Action Staffing Group | 1145 ELIZABETH AVENUE | | ELIZABETH | NJ | 07201 |
| 29783852 | Agilysys, Inc. | 3655 Brookside Parkway | Ste 300 | Alpharetta | GA | 30022 |
| 29783854 | AHN International Inc dba Amazing Herbs | 3037 Summer Oak Pl | | Buford | GA | 30518 |
| 29790607 | Axcess Global LLC, DBA Real Ketones, LLC | 2157 S Lincoln St | | Salt Lake City | UT | 84106-2306 |
| 29776755 | Barndad Innovative Nutrition, LLC | 811 Parkway View Drive | | Pittsburgh | PA | 15205 |
| 29776851 | CannaVest Corp | 9530 Padgett Street, | Suite 107 | San Diego | CA | 92126 |
| 29784078 | Cardiac Science Corporation | 269 Mill Rd | | Chelmsford | MA | 01824 |
| 29784117 | Chesapeake System Solutions, Inc. | One Perimeter Park South | Suite 102 | Birmingham | AL | 35243 |
| 29784228 | DSM Nutritional Products, LLC | 45 Waterview Blvd. | | Parsippany | NJ | 07054 |
| 29777009 | Dyla LLC | 450 Raritan Center Pkwy Ste G | | Edison | NJ | 08837-3944 |
| 29777022 | Eco Vessel | 300 South Riverside Plaza | Suite 2300 | Chicago | IL | 60606 |
| 29777059 | Factor Nutrition Labs LLC | 6620 Stagg Street | | Van Nuys | CA | 91406 |
| 29777100 | Forward Foods LLC | 215 West Main | | Norman | OK | 73069 |
| 29790789 | Gym Source USA LLC | 100 Central Ave | | Teterboro | NJ | 07608-1116 |
| 29784433 | Healthland LLC | 625 South Lakeshore Drive | | Glenwood | MN | 56334 |
| 29784459 | Honestly pHresh Deodorant | 320 North Arizona Street | Suite 400 | Prescott | AZ | 86303 |
| 29777236 | ICU Eyewear, Inc. | 1900 Shelton Drive | | Hollister | CA | 95023 |
| 29784576 | Kettle and Fire LLC | 1800 E 4th St | | Austin | TX | 78702-4447 |
| 29777360 | Kuli Kuli, Inc. | 548 Market Street | PMB 38526 | San Francisco | CA | 94104-5401 |
| 29790860 | Lamas Beauty, Inc. | 1223 Wilshire Boulevard | Suite 892 | Santa Monica | CA | 90403 |
| 29784662 | Lively Up Your Breath, LLC | 2828 Cochran Street | #190 | Simi Valley | CA | 93065 |
| 29784668 | Living Well Innovations, Inc. | 445 Broad Hollow Rd | Suite 25 | Melville | NY | 11747 |
| 29778188 | World Sports Expo | 2000 Convention Center Concourse | | Atlanta | GA | 30337 |
| 29785554 | Zipfizz Corporation | 16650 Woodinville Redmond Rd NE | | Woodinville | WA | 98072 |

**<u>Exhibit B</u>**

Exhibit B
Supplemental Notice Parties Service List
Served via First-Class Mail on the date as set forth

| ADRID | NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | POSTAL CODE | DATE OF SERVICE |
|---|---|---|---|---|---|---|---|
| 29783801 | 6 PACK FITNESS, LLC | 1999 HARRISON ST | | OAKLAND | CA | 94612 | AUGUST 19, 2025 |
| 29604461 | AIYA COMPANY LIMITED | 3530 VOYAGER STREET | | TORRANCE | CA | 90503 | AUGUST 19, 2025 |
| 29790576 | ALL TERRAIN | 1313 N CAMPBELL AVE | SUITE 301 | CHICAGO | IL | 60622 | AUGUST 19, 2025 |
| 29783921 | ASPIRE BRANDS, INC. | 400 N MAY ST | | CHICAGO | IL | 60642 | AUGUST 19, 2025 |
| 29776776 | BEYONDTRUST SOFTWARE, INC. | 11695 JOHNS CREEK PKWY | STE 200 | DULUTH | GA | 30097-1881 | AUGUST 19, 2025 |
| 29784002 | BIOPHARMX, INC. | 115 NICHOLSON LANE | STE 100 | SAN JOSE | CA | 95134 | AUGUST 19, 2025 |
| 29776795 | BOARDVANTAGE, INC. | 151 WEST 42ND STREET | FLOORS 26, 27, 28 | NEW YORK | NY | 10036 | AUGUST 19, 2025 |
| 29784078 | CARDIAC SCIENCE CORPORATION | 269 MILL RD | | CHELMSFORD | MA | 01824 | AUGUST 19, 2025 |
| 29784117 | CHESAPEAKE SYSTEM SOLUTIONS, INC. | ONE PERIMETER PARK SOUTH | SUITE 102 | BIRMINGHAM | AL | 35243 | AUGUST 19, 2025 |
| 29777055 | EVOLVED GROUP, LLC, D/B/A BUY BOX EXPERTS | PO BOX 1010 | | RIVERTON | UT | 84065 | AUGUST 19, 2025 |
| 29784340 | FREEMAN EXPOSITIONS, INC. | 14221 DALLAS PKWY #200 | | DALLAS | TX | 75254 | AUGUST 6, 2025 |
| 29784340 | FREEMAN EXPOSITIONS, INC. | 14221 DALLAS PKWY #200 | | DALLAS | TX | 75254 | AUGUST 19, 2025 |
| 29784433 | HEALTHLAND LLC | 625 SOUTH LAKESHORE DRIVE | | GLENWOOD | MN | 56334 | AUGUST 19, 2025 |
| 29777236 | ICU EYEWEAR, INC. | 1900 SHELTON DRIVE | | HOLLISTER | CA | 95023 | AUGUST 19, 2025 |
| 29790835 | KEMIN INDUSTRIES, INC. | 1900 SCOTT AVENUE | | DES MOINES | IA | 50309 | AUGUST 19, 2025 |
| 29777331 | KIMMERLE NEWMAN ARCHITECTS | 1109 MT KEMBLE AVE | | MORRISTOWN | NJ | 07960 | AUGUST 19, 2025 |
| 29777349 | KOUNT INC. | PO BOX 3445 | | BOISE | ID | 83707-3445 | AUGUST 19, 2025 |
| 29649023 | L.P. CORPORATION | 1610 WEST END AVENUE | SUITE 200 | NASHVILLE | TN | 37203 | AUGUST 6, 2025 |
| 29649023 | L.P. CORPORATION | 1610 WEST END AVENUE | SUITE 200 | NASHVILLE | TN | 37203 | AUGUST 19, 2025 |
| 29790860 | LAMAS BEAUTY, INC. | 1223 WILSHIRE BOULEVARD | SUITE 892 | SANTA MONICA | CA | 90403 | AUGUST 19, 2025 |
| 29777515 | MUNTECH PRODUCTS, INC. | PO BOX 271722 | | FLOWER MOUND | TX | 75027 | AUGUST 19, 2025 |
| 29670086 | NATURAL FACTORS NUTRITIONAL PRODUCTS INC | 14224 167TH AVE SE | | MONROE | WA | 98272 | AUGUST 19, 2025 |
| 29784861 | NUZEE, INC. | 2865 SCOTT STREET | SUITE #107 | VISTA | CA | 92081 | AUGUST 19, 2025 |
| 29777612 | ORGANIC INDIA USA | 7088 WINCHESTER CIRCLE | SUITE 100 | BOULDER | CO | 80301 | AUGUST 19, 2025 |
| 29784947 | PERFICIENT, INC. | 555 MARYVILLE UNIVERSITY DR. | SUITE 600 | ST. LOUIS | MO | 63141 | AUGUST 19, 2025 |
| 29777724 | PRONATURA INC. | 5420 NEWPORT DRIVE #52, ROLLING , | | MEADOWS | IL | 60008 | AUGUST 6, 2025 |
| 29777724 | PRONATURA INC. | 5420 NEWPORT DRIVE #52, ROLLING , | | MEADOWS | IL | 60008 | AUGUST 19, 2025 |
| 29777867 | SHEERID, INC. | 1300 SW 5TH AVE | SUITE 800 | PORTLAND | OR | 97201? | AUGUST 19, 2025 |
| 29785249 | SOUTHPORT SERVICES GROUP, LLC | SUITE 220 | | ASHBURN | VA | 20147 | AUGUST 19, 2025 |
| 29785500 | WELLEMENTS LLC | 8151 EAST INDIAN BEND ROAD | SUITE 10 | SCOTTSDALE | AZ | 85250 | AUGUST 19, 2025 |
| 29778188 | WORLD SPORTS EXPO | 2000 CONVENTION CENTER CONCOURSE | | ATLANTA | GA | 30337 | AUGUST 6, 2025 |
| 29778188 | WORLD SPORTS EXPO | 2000 CONVENTION CENTER CONCOURSE | | ATLANTA | GA | 30337 | AUGUST 19, 2025 |
| 29785554 | ZIPFIZZ CORPORATION | 16650 WOODINVILLE REDMOND RD NE | | WOODINVILLE | WA | 98072 | AUGUST 19, 2025 |
| 29791246 | ZULILY, LLC | 980 DISCOVERY ROAD | | EAGAN | MN | 55121 | AUGUST 19, 2025 |

**Exhibit C**

SRF 87796

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., *et al.*,[1] | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: May 6, 2025, at 11:30 a.m. (ET)**<br>**Obj. Deadline: April 29, 2025, at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING FRANCHISE GROUP INTERMEDIATE V, LLC TO ENTER INTO AND PERFORM ITS OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT, (II) APPROVING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion (the "<u>Motion</u>"):[2]

## Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Sale Order</u>"):  (a) authorizing and approving the Debtors' entry into and performance under that certain asset purchase agreement, in the form attached to the Sale Order as <u>Exhibit 1</u> (together with all schedules, exhibits, and ancillary documents related thereto, as amended, modified, or supplemented from time to time, the "<u>APA</u>"), whereby Debtor Franchise Group Intermediate V, LLC ("<u>Franchise Group Intermediate</u>" or the "<u>Seller</u>") has agreed to sell, transfer, convey, assign, and deliver to TVS Buyer, LLC (the "<u>Buyer</u>," and together with Franchise Group Intermediate, the "<u>Parties</u>"), and the Buyer has agreed to purchase, acquire, accept, and assume the Purchased Assets and the Assumed Liabilities from the Seller (including all actions taken or required to be taken in connection with the implementation and consummation of the APA, the "<u>Sale</u>"); (b) authorizing and approving the sale of the Purchased Assets and the Assumed Liabilities to the Buyer free and clear of any and all Encumbrances, other than Permitted Encumbrances and Assumed Liabilities; (c) authorizing the assumption and assignment of the Purchased Contracts and the Purchased Leases; and (d) granting related relief.

## Jurisdiction and Venue

2.     The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") under 28 U.S.C. § 157 and the *Amended Standing*

---

[2]  Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the APA, the Final DIP Order, the Bidding Procedures (each as defined herein), or the *Seventh Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1233].

*Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1 and 9013-1.

## Background

5. On November 3, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the Debtors, their businesses, and the facts and circumstances giving rise to the Debtors' chapter 11 cases is set forth in the *Declaration of David Orlofsky in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "First Day Declaration"), which is incorporated herein by reference.

6. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On November 5, 2024, the Court entered an order [Docket No. 88] authorizing the procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. On November 19, 2024, the United States

3

Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 188] (the "Creditors' Committee").  On January 15, 2025, the Debtors appointed a fee examiner [Docket No. 747] (the "Fee Examiner").

7.      On December 11, 2024, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 414] (the "Final DIP Order").  Under the Final DIP Order, the Debtors were authorized on a final basis to enter into and perform under that certain *Senior Secured Super-Priority Priming Term Loan Debtor-In-Possession Credit Agreement* dated as of November 7, 2024 (as amended, modified, or supplemented from time to time, the "DIP Credit Agreement").[3]

## The Proposed Sale

8.      As described more fully in the First Day Declaration, leading up to the Petition Date, the Debtors explored a wide array of strategic and operational measures to better position the Debtors for sustainable growth and improve their strained liquidity position.  In addition to engaging in extensive negotiations with their key lender constituents on the terms of a potential out-of-court transaction, the Debtors explored various strategic transactions to monetize

---

[3]      Pursuant to section 6.05(k) of the DIP Credit Agreement and paragraph 8(b) of the Final DIP Order, the Debtors are not permitted to sell, transfer, lease, or otherwise dispose of any assets, including any Equity Interests (as defined in the DIP Credit Agreement) owned by the Debtors, unless such Disposition (as defined in the DIP Credit Agreement) is made in connection with a Sufficient Bid (as defined in the DIP Credit Agreement) or otherwise with the prior written consent of the Required Supermajority Lenders (as defined in the DIP Credit Agreement). At the request of the Buyer and the applicable Debtors, the Required Supermajority Lenders have consented to the Sale, as further described herein.

their core business segments, including The Vitamin Shoppe ("TVS"), the Debtors' market-leading, omni-channel, specialty retailer and wellness lifestyle company.

9.     Prior to the Petition Date, in April 2023, the Debtors retained Jefferies LLC ("Jefferies") to gauge market interest and undertake a broad search for any potential buyers in connection with a potential sale of TVS.  In January 2024, Jefferies launched a formal marketing and sale process, which included contacting 34 parties—22 financial buyers and 12 strategic buyers—executing 17 non-disclosure agreements ("NDAs") and engaging with the 17 parties under NDA with respect to a potential going concern sale of TVS.  Despite these efforts, no actionable proposals were received.  In parallel, the Debtors' liquidity position continued to tighten, and it became clear that achieving a comprehensive, value-maximizing out-of-court transaction on the timeline required was not feasible.

10.     To that end, on November 1, 2024, the Debtors and the Ad Hoc Group entered into a Restructuring Support Agreement which, among other things, memorialized the Ad Hoc Group's support for a sale process in chapter 11 for the purpose of identifying a value-maximizing transaction with a bidder or series of bidders.  As more fully described in the bidding procedures approved by the Court on December 16, 2024 [Docket No. 444] (the "Bidding Procedures"), the Debtors, in consultation with the Ad Hoc Group and with the assistance of Ducera Partners LLC ("Ducera"), the Debtors' investment banker, commenced a formal marketing process (the "Marketing Process") on November 4, 2024, in search of such a bidder or bidders for a sale of certain of the Debtors' business segments, including TVS, pursuant to section 363 of the Bankruptcy Code.

11.     In connection with the Marketing Process, with respect to TVS, Ducera solicited interest from 208 parties—185 financial sponsors and 23 strategic buyers—and executed 59 NDAs

in connection therewith.[4]  Over the next several months, the Debtors continued to engage with multiple parties in interest, including the Buyer.  As of the February 3, 2025 Bid Deadline, no Qualified Bids were submitted.  The Buyer did, however, submit a revised indication of interest. On February 12, 2025, the Debtors filed the *Notice of Cancellation of Auction* [Docket No. 961] cancelling any potential auction and adjourning any potential sale hearing indefinitely. Nonetheless, the Debtors continued conversations with certain parties in interest, including a robust, ongoing dialogue with the Buyer, over the next several weeks regarding the terms of a potential going concern sale of TVS.  After weeks of extensive, arm's-length negotiations, the Parties entered into the APA on April 15, 2025.  Pursuant to the APA, the Buyer will purchase the Purchased Assets free and clear of any Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) in exchange for, among other things, (a) the assumption of the Assumed Liabilities and (b) a cash payment of $193.5 million (the "Purchase Price"), subject to the post-closing adjustment process as set forth in the APA.

12.    The Debtors determined, in an exercise of their business judgment, that a transaction with the Buyer on the terms set forth in the APA was value maximizing for the Debtors and their estates.  Among other things, the sale represents the highest or otherwise best offer for the Purchased Assets.  Additionally, the TVS business was not growing and failing to meet the Debtors' profitability targets.  Selling TVS will allow management to focus their efforts on the Debtors' other business lines, and specifically on implementing a long-term, value-maximizing business plan for its other business segments.  The APA provides for, and the Ancillary

---

[4]    On December 19, 2024, Greenhill & Co., investment banker to the Freedom Lender Group, provided Ducera with a list of 59 additional parties—44 financial sponsors and 15 strategic buyers—requesting that Ducera solicit interest from these parties in connection with the Marketing Process.  Ducera promptly solicited interest from 51 of the 59 parties and executed 5 NDAs in connection therewith, allowing such parties to receive access to the data room and confidential information memorandum.

Agreements include, a Transition Services Agreement that will ensure the continuation of key services previously performed by the Debtors, which in turn will significantly diminish the impact of the Sale on the Debtors' customers during these chapter 11 cases. For these reasons, the Sale aligns with the Debtors' business objectives and is in the best interest of the Debtors, their estates, and their stakeholders.

13.     The Debtors and their advisors do not believe that the cost and delay inherent in a public auction or additional marketing of the Purchased Assets would be outweighed by any marginal increase to the Sale proceeds, if any, particularly in light of the benefits to the Debtors, their estates, and all stakeholders if the Sale is approved. The Debtors, in their reasonable business judgment, believe that the Sale is necessary to preserve and support their core business. Approval of the Sale on the terms set forth herein and in the APA represents the most value-maximizing path to divesting the Purchased Assets for fair consideration for the benefit of all stakeholders in these chapter 11 cases.

14.     The Debtors therefore believe that entering into the APA and consummating the Sale is fair, reasonable, represents a sound exercise of the Debtors' business judgment, and is the best available option to maximize value for the Debtors and all stakeholders.

## Summary of Key Sale Terms

15.     The following chart summarizes the material terms and conditions of the APA:[5]

| Provision | Summary Description |
|---|---|
| Parties | Seller: Franchise Group Intermediate V, LLC |
| | Buyer: TVS Buyer, LLC |
| Purchased Assets | "Purchased Assets" means all rights, title and interests of Seller or its Subsidiaries in and to all of the assets, properties, interests, rights and Claims of Seller and its Subsidiaries |

---

[5]     This summary is provided for the convenience of the Court and parties in interest and describes, generally, the terms contained in the APA. To the extent there is any conflict between this summary and the APA, the APA shall govern in all respects. Capitalized terms used in the following summary shall have the meanings ascribed to them in the APA.

| Provision | Summary Description |
|---|---|
| | related to, or used in connection with, the Business (other than the Excluded Assets), including the following assets related to, or used in connection with, the Business, in each case free and clear of any Encumbrances (other than Permitted Encumbrances and Assumed Liabilities). |
| | *See* APA, Art. II § 2.1.1. |
| **Excluded Assets** | Notwithstanding anything to the contrary in the APA or in any Ancillary Agreement, (a) Buyer shall not acquire the Excluded Assets, including any Contract (including Leases) set forth on Section 2.1.2 of Seller Disclosure Schedules (each such Contract or Lease, an "Excluded Contract"), (b) the Purchased Assets shall not include the Excluded Assets, and (c) Seller shall retain the Excluded Assets following the Closing. |
| | *See* APA, Art. II § 2.1.2. |
| **Date, Time, and Place of Sale** | Pursuant to the terms and subject to the conditions of the APA, the closing of the Transactions (the "Closing") shall take place by telephone conference and electronic exchange of documents, at 10:00 a.m. local time, on the third (3rd) Business Day following satisfaction of all conditions (other than those that by their terms are to be satisfied or taken at the Closing) set forth in Article 6 (or, to the extent permitted by applicable Law, waived by the Party entitled to the benefits thereof), or such other time and place as the Parties may mutually agree to in writing (such date of the Closing being hereinafter referred to as the "Closing Date"); *provided*, that, in no event shall the Closing occur prior to May 15, 2025 without the prior written consent of Buyer. |
| | *See* APA, Art. II § 2.4. |
| **Purchase Price** | Upon the terms and subject to the conditions of the APA, in consideration of the conveyances contemplated under Section 2.1, Buyer shall at the Closing, pay to Seller an amount equal to the Estimated Cash Purchase Price, *less* the Deposit (together with any and all investment interest thereon, if any, that is released to Seller), by wire transfer of immediately available funds to the account designated by Seller by Notice to Buyer, such Notice to be provided at least five (5) Business Days prior to the Closing Date (such amount, the "Closing Payment"). |
| | *See* APA, Art. II § 2.3.1(a). |
| | "Estimated Cash Purchase Price" means an amount equal to (a) the Base Cash Purchase Price,[6] *plus* (b) the amount by which the Estimated Net Working Capital Amount is greater than the Target Net Working Capital Amount (if any), *less* (c) the amount by which the Target Net Working Capital Amount is greater than the Estimated Net Working Capital Amount (if any) *less* (d) the Estimated Assumed Indebtedness; *provided*, that in any and all events, the Base Cash Purchase Price is inclusive of the Deposit. |
| | *See* APA, Art. I. |
| **Conditions Precedent of Sale** | Conditions to Obligations of Buyer and Seller. The obligations of Buyer and Seller to complete the Transactions are subject to the satisfaction or waiver (if permitted by applicable Law) at or prior to the Closing of the following conditions: |
| | 6.1.1    No Illegality or Law. There shall not be in effect any applicable Law that enjoins or prohibits the Transactions. |
| | 6.1.2    Bankruptcy Orders. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order. |

---

6    The Base Cash Purchase Price is $193.5 million.

| Provision | Summary Description |
|---|---|
| | 6.1.3 <u>Regulatory Approvals</u>. Any waiting period (including any extension thereof) or approvals applicable to the consummation of the Transactions under the HSR Act shall have expired or been terminated (and the Laws set forth on Section 6.1.3 of Seller Disclosure Schedules shall have expired or been terminated and any agreement with a Governmental Authority not to consummate the Transactions).<br><br>*See* APA, Art. VI § 6.1.<br><br>There are also Conditions to Obligations of Buyer and Conditions to Obligations of Seller. *See* APA, Art VI § 6.2, 6.3. |
| **Deadline for the Approval of the Sale** | 11:59 p.m. (Eastern Time) on May 15, 2025 (unless further extended upon mutual agreement by Buyer and Seller in writing (email to counsel being sufficient)).<br><br>*See* APA, Art. VIII § 8.1.3. |
| **Executory Contracts and Leases to be Assumed and Assigned** | Section 2.7.1 of Seller Disclosure Schedules sets forth a true and complete list, as of the date of entry into the APA, of (a) all executory Contracts which require expenditures made or to be made by Seller or payments or amounts received or to be received by Seller in excess of $100,000 in the twelve (12) months prior to the date hereof and unexpired Leases to which any Seller is a party (excluding the Excluded Contracts), including Seller's proposed Cure Costs associated with each such Contract and unexpired Lease set forth therein, and (b) the Purchased Contracts and Purchased Leases as of the date of entry into the APA.<br><br>From and after the date hereof until 3:00 P.M. (Eastern Time) on May 4, 2025, Buyer may, in its sole discretion, (a) add any Contract or any Lease listed on Section 2.7.1 of Seller Disclosure Schedules (or otherwise used in connection with the Business) to the schedule of Purchased Contracts and Purchased Leases, (b) remove from the schedule of Purchased Contracts and Purchased Leases any Contract listed on Section 2.7.1 of Seller Disclosure Schedules and instead designate such Contract for rejection effective on and as of the Closing or (c) remove from the schedule of Purchased Contracts and Purchased Leases any Lease listed on Section 2.7.1 of Seller Disclosure Schedules and instead designate such Lease for rejection effective on and as of the Closing; *provided*, that in the immediately preceding clauses (a), (b), and (c), Buyer shall not be able to add any Contract or Lease to the schedule of Purchased Contracts and Purchased Leases if such Contract or Lease is associated with a Store already in the active process of Closing. The schedule of Purchased Contracts and Purchased Leases shall be (and shall be deemed) modified or supplemented to reflect the additions or removals, as applicable, of Leases and Contracts that are (i) designated for assumption and assignment or (ii) designated for rejection, each as set forth in Section 2.7.2 of the APA.<br><br>*See* APA, Art. II § 2.7.1.–2.7.2. |
| **Assumed Liabilities** | Upon the terms and subject to the conditions of the APA, at the Closing, Seller shall (or shall cause its applicable Subsidiaries to) assign to Buyer and Buyer shall assume from Seller or its applicable Subsidiaries and agree to pay and discharge when due, only the following Liabilities of Seller and its Subsidiaries (other than the Excluded Liabilities) arising out of the conduct of the Business or the ownership of the Purchased Assets or the Business, in each case, immediately following the Closing (collectively, the "<u>Assumed Liabilities</u>"):<br><br>(a)     all Liabilities arising under the Purchased Contracts and the Purchased Leases that become due from and after, solely to the extent relating to facts, occurrences or other circumstances first arising after, the Closing;<br><br>(b)     (i) the "current liabilities" of the Business to the extent set forth in the Net Working |

9

| Provision | Summary Description |
|---|---|
| | Capital Amount and (ii) the accounts payable, arising from the ownership of the Purchased Assets or the conduct or operation of the Business from and after the Closing; |
| | (c)    all Liabilities (i) arising from the employment or termination of any Continuing Employees and currently engaged independent contractors whenever incurred or arising, including, any wages, salaries, commissions, or normal course bonuses or incentive obligations with respect to the Continuing Employees, and (ii) with respect to any accrued and unused paid time off and sick time accrued prior to the Closing by any Continuing Employee to the extent permitted by applicable Law to the extent set forth in the Net Working Capital Amount (including any amounts required to be paid out by Seller under applicable law, which amounts shall be timely reimbursed to Seller by Buyer following the Closing); |
| | (d)    all Liabilities for Transfer Taxes; |
| | (e)    all Liabilities arising from the sale of merchandise pursuant to product warranties, product returns and rebates from and after the Closing, in each case solely to the extent arising out of the Purchased Contracts; |
| | (f)    all Liabilities for gift cards, store credits, customer loyalty programs, and gift certificates validly issued by Seller and/or its Subsidiaries prior to the Closing Date; and |
| | (g)    (i) all Liabilities for Taxes with respect to the Purchased Assets, the Assumed Liabilities, the Business, or the Continuing Employees with respect to any taxable period (or portion thereof) beginning after the Closing Date and (ii) all Liabilities for Transfer Taxes pursuant to Section 5.3.2 (such Taxes described in prongs (i) and (ii), the "Assumed Taxes"); |
| | (h)    all Liabilities arising for the Plans set forth on Section 2.1.1(w) of Seller Disclosure Schedules from and after Closing; and |
| | (i)    all Liabilities for Assumed Indebtedness (including the Liabilities set forth in Exhibit H attached hereto with respect to (and not taking into account any caps or amounts set forth in) clause (a) through (h) in the definition of Assumed Indebtedness) and which shall include, for the avoidance of doubt, the Tax Reserve Liabilities. |
| | *See* APA, Art. II § 2.2.1. |
| **Excluded Liabilities** | "Excluded Liabilities" means all Liabilities of Seller or any of its Subsidiaries of whatever nature, whether presently in existence or arising or asserted hereafter (other than the Assumed Liabilities), including, without limiting the generality of the foregoing, the following: (a) Excluded Taxes; (b) all Liabilities arising out of, resulting from, or relating to any Excluded Assets; (c) all (i) indebtedness for borrowed money of the Debtors' (other than the Assumed Indebtedness) and (ii) other indebtedness set forth on Section 1.1.2(c) of Seller Disclosure Schedules; (d) fees, costs and expenses incurred in connection with the Chapter 11 Cases or the Transactions (except as otherwise contemplated by this Agreement); (e) except, in each case, with respect to any Liabilities specifically assumed by Buyer pursuant to Section 5.12, (i) any transaction, change of control, success, retention or stay bonuses, severance, bonus incentive, or deferred compensation payments or other similar payments or obligations payable to any current or former employee, officer, director or other individual service provider of Seller or its Subsidiaries (including the Business |

| Provision | Summary Description |
|-----------|--------------------|

Employees) under each Plan, policy, program, agreement, arrangement, or Contract sponsored or maintained by Seller or its Subsidiaries or to which Seller or its Subsidiaries is a party (including in connection with or arising out of the consummation of the Transactions (except as excluded pursuant this clause (e), including any "double-trigger" severance or other payments or obligations payable in combination with any other event)), (ii) other than Liabilities assumed by Buyer pursuant to <u>Section 2.2.1(c)</u>, any outstanding and unpaid bonus, commission or incentive obligations in respect of any current or former employee, officer, director or other individual service provider of Seller or its Subsidiaries (including the Business Employees), (iii) other than payments required to be made by Buyer to Seller pursuant to the Transition Services Agreement, all Liabilities at any time arising under, pursuant to or in connection with each Plan and any other benefit or compensation plan, program, policy, agreement, arrangement, or Contract, in each case, at any time sponsored, maintained, contributed to or required to be contributed to by Seller or any of its Affiliates or under or with respect to which Seller or any of its Affiliates has (or has had) any Liability (including on account of an ERISA Affiliate), including Liabilities arising under Title IV of ERISA or on account of any violation of COBRA, (iv) all Liabilities relating to or arising out of the employment or termination of employment of (A) any Business Employee who becomes a Continuing Employee with respect to periods of employment or termination of employment with Seller or its Subsidiaries prior to the Closing (but excluding in respect of any (1) Liabilities assumed pursuant to <u>Section 2.2.1(c)</u> and (2) severance obligations for any Continuing Employee caused directly by any actions taken by Buyer or at the direction of Buyer after the Closing), (B) any former employees of Seller or its Subsidiaries (including any former employees of the Business) and Business Employees who do not become Continuing Employees with respect to periods of employment or termination of employment with Seller or its Subsidiaries, and (C) any applicant for employment with Seller or its Subsidiaries at any time prior to the Closing, including any Claims in respect of hiring, promotion, compensation, overtime, bonuses, commissions, workers' compensation or disability, vacation, sick pay or paid time off, other employee benefits to which any such employees may be entitled as a result of his or her employment by Seller or its Subsidiaries, and any other terms and conditions of employment, (v) all Liabilities arising out of or relating to Claims by any agents or independent contractors of, and who provide personal services to, Seller or its Subsidiaries with respect to any Claims or personal injuries sustained in connection with the retention of such Person by Seller or any of its Subsidiaries, including workers' compensation or disability, regardless of when such claim is made or asserted; (f) except for the accrued and unpaid accounts payable of the Business reflected on <u>Exhibit E</u> attached hereto (and included as part of Net Working Capital), all accrued and unpaid accounts payable of the Business as of the Closing Date, including legal expenses accrued but unpaid as of the Closing Date related to any Litigation to which Seller or its Subsidiaries are party, in each case, whether invoiced before or after Closing; (g) all Cure Costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Purchased Assets, including the Purchased Contracts and the Purchased Leases as finally determined by the Bankruptcy Court (*provided*, that, in no event shall Buyer be liable for any Cure Costs); (h) any pending or threatened Litigation with respect to any events, acts or circumstances occurring prior to the Closing; and (i) any Liabilities set forth on <u>Section 1.1.2(i)</u> of Seller Disclosure Schedules.

*See* APA Art. I § 1.1.

<u>Excluded Liabilities</u>. Notwithstanding anything to the contrary in the APA or any Ancillary Agreement, neither Buyer nor any of its Affiliates shall assume, nor shall they be or become responsible for, any Excluded Liabilities or any Liabilities of Seller or any of its Subsidiaries, other than the Assumed Liabilities. For greater certainty, the Excluded Liabilities shall remain the sole obligation and responsibility of Seller and its Subsidiaries.

| Provision | Summary Description |
|---|---|
| | *See* APA Art. II § 2.2. |
| **Sale of Property Free and Clear of Leasehold Interest, License, or Other Right** | Except as set forth in <u>Section 3.1.7(a)</u> of Seller Disclosure Schedules, Seller has good and valid title to, a valid leasehold interest in or right to use, all of the Purchased Assets that is necessary for Seller to operate the Business in all material respects. Upon the entry and effectiveness of the Sale Order, Seller will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to Buyer the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances and Assumed Liabilities. Other than Encumbrances that will be released upon the entry and effectiveness of the Sale Order, Seller owns or has rights to, and upon delivery to Buyer at the Closing will transfer to Buyer, good title to or a valid leasehold interest in all of the Purchased Assets, free and clear of all Encumbrances, except for Permitted Encumbrances and Assumed Liabilities. <br><br>*See* APA, Art. III § 3.1.7(a). |
| **Buyer Expense Reimbursement** | The Buyer may terminate the APA if certain conditions are met: <br><br>(a) if there is a material breach of the Sale Order or the APA by the Seller such that the conditions of Closing set forth in <u>Section 6.2.1</u> or <u>Section 6.2.2</u> would not be satisfied and the breach is not cured within twenty (20) days following Notice of such breach by the Buyer, then the APA will be terminated; <br><br>(b) if (a) the Bankruptcy Court has not approved and entered the Sale Order prior to 11:59 p.m. (Eastern Time) on May 15, 2025 (unless further extended upon mutual agreement by Buyer and Seller in writing (email to counsel being sufficient)), (b) following entry of the Sale Order if such Sale Order is not a Final Order (unless such Final Order requirement is waived by Seller and Buyer in their respective discretion) within fourteen (14) days of entry of the Sale Order, or (c) the Bankruptcy Court enters any Order materially inconsistent with the Sale Order or the consummation of this Agreement and such order is not reversed, modified or amended to the satisfaction of Buyer within thirty (30) days; *provided*, that the right to terminate this Agreement under this <u>Section 8.1.3</u> shall not be available to Buyer if Buyer failed to fulfill any material obligation under this Agreement and such failure is the cause of, or resulted in, such stay, reversal, modification, amendment or vacation; <br><br>(c) if Seller seeks to have the Bankruptcy Court enter an order (or consents to or does not oppose entry of an order) (a) dismissing the Chapter 11 Cases or converting the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code, (b) appointing a trustee, receiver or other Person responsible for operation or administration of Seller or its business or assets, or a responsible officer for Seller, or an examiner with enlarged powers relating to the operation or administration of Seller or its business or assets (each, an "<u>Appointee</u>"); *provided*, that Appointee shall not include any chief restructuring officer that has been or that may be appointed by Seller and authorized by the Bankruptcy Court in the Chapter 11 Cases, or (c) if Seller files any stand-alone plan of reorganization or liquidation, in each case, that does not contemplate consummation of the Transactions (or announces support of any such plan filed by any other party); <br><br>(d) if (a) the Bankruptcy Court enters any Final Order that would reasonably be expected to prevent, impede or materially delay the consummation of the Transactions in accordance with the terms of this Agreement or (b) any creditor of Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the automatic stay to foreclose on any material portion of the Purchased Assets; or |

| Provision | Summary Description |
|---|---|
| | (e)  if Seller fails to file the Sale Motion within five (5) Business Days after execution of this Agreement. |
| | If the Buyer terminates due to any of the above circumstances, within three (3) Business Days of such termination, Buyer shall receive reimbursement from Seller (by wire transfer of immediately available funds to the account designated by Buyer by Notice to Seller) for Buyer's reasonable fees, costs, expenses in an amount not to exceed $3,000,000 (the "<u>Buyer Expense Reimbursement</u>"). |
| | *See* APA, Art. VIII § 8.1. |
| **6004(h) and 6004(d) Waivers**<br><br>**Local Rule 6004-1(b)(iv)(O)** | In order to close the Sale prior to the Outside Date, the Seller seeks a waiver of the stay imposed by Bankruptcy Rules 6004(h) or 6006(d). |

## **Basis for Relief Requested**

I.      **The Sale Is a Sound Exercise of the Debtors' Business Judgment, Is Appropriate Pursuant to Bankruptcy Rule 6004(f), and Should be Approved.**

16.      Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  In determining whether to authorize the use, sale, or lease of property of the estates under section 363 of the Bankruptcy Code, "courts require the debtor to show that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *see*, *e.g.*, *In re ICL Holding Co., Inc.*, 802 F.3d 547, 551 (3d Cir. 2015).  The "sound business purpose" test requires a debtor to establish that:  "(1) a sound business purpose [for the sale] exists; (2) the [total consideration] is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith."  *In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *see also In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).  The Debtors submit that the Sale satisfies each of these elements.

- *A sound business purpose for the Sale exists.*  The Debtors submit that the proposed

13

Sale is a sound exercise of the Debtors' business judgment. Among other things, the Purchased Assets were not meeting the Debtors' profitability targets. The value generated by the Sale therefore outweighs any potential future benefits of maintaining the Purchased Assets. Consummating the Sale on the terms set forth in the APA will allow the Debtors to maximize the value of the Debtors' estates. Further, the Debtors are able to consummate the Sale with minimal disruption to customer operations. To that end, the APA contemplates, and the Ancillary Agreements include, a Transition Services Agreement that provides for the smooth transition of operational and financial information, which in turn maintains the continuity of customer operations.

- ***The total consideration is fair.*** After engaging in good-faith, arm's-length negotiations, the Parties agreed on the applicable purchase price in cash for the Purchased Assets, which totals approximately $193.5 million in cash consideration (subject to the Net Adjustment Amount) *plus* the assumption of certain Assumed Liabilities. The $193.5 million in cash will be increased or decreased by the Net Adjustment Amount prior to payment in accordance with the terms and conditions set forth in the APA. The Debtors and their advisors analyzed the Purchase Price and (a) concluded it measured favorably against comparable transactions and (b) determined that further marketing of the Purchased Assets would be unlikely to yield additional value. The value generated by the Sale outweighs any benefits of maintaining the Purchased Assets.

- ***The Debtors have provided adequate and reasonable notice.*** The Debtors have provided adequate and reasonable notice to all interested persons—the Debtors, with the assistance of Ducera, solicited interest from 208 parties through the Marketing Process as of the date hereof, and only the Buyer submitted a viable bid worthy of pursuit. This robust level of marketing, combined with the sustained interest from the Buyer and the strength of the terms of the Sale, reflects the comprehensiveness of the marketing of the Purchased Assets and demonstrates that notice was provided to all parties in interest.

- ***The Buyer has acted in good faith.*** As more fully described herein, the Buyer is an unaffiliated third party acting for bona fide commercial purposes. The Debtors agreed to sell the Purchased Assets to the Buyer following a fair and extensive negotiation process.

17. Once a debtor articulates a valid business justification, then the burden of rebutting the "strong presumption . . . that the agreement at issue was negotiated in good faith and in the best interests of the estate" falls to parties opposing the transaction. *In re Filene's Basement*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49

14

(2d Cir. 1993).  Thus, if a debtor satisfies the business judgment rule, the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

18.     Moreover, Bankruptcy Rule 6004(f)(1) authorizes a debtor to sell estate property outside of the ordinary course of its business by private sale or public auction.  Courts generally afford debtors in possession broad discretion in determining the manner in which estate property is sold.  *See*, *e.g.*, *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998).  Sales by a debtor outside of the ordinary course of business are appropriate where the debtor demonstrates that the sale is permissible pursuant to section 363 of the Bankruptcy Code.  *See In re Stephens Indus., Inc.*, 789 F.2d 386, 390 (6th Cir. 1986) (holding a debtor may sell property via private sale "when a sound business purpose dictates such action"); *In re Schipper*, 933 F.2d 513 (7th Cir. 1991) (approving private real estate sale by debtor when purchase price was the same as independent appraisal); *In re Woodscape Ltd. P'ship*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction."); *In re Paper Corp. of Am.*, 138 F.Supp. 29 (S.D.N.Y. 1956) (holding that the trustee's inability to sell the property after "many months . . . was sufficient to warrant the private sale."); *see also In re Blue Coal Corp.*, 168 B.R. 553, 564 (M.D. Penn. 1994) ("[A] larger measure of discretion is available to the court in considering whether a private bid should be approved or confirmed.").

19.     Selling the Purchased Assets is in the best interests of the Debtors' estates and should be approved.  The Debtors believe that a public auction for the Purchased Assets would require the Debtors' estates to incur substantial additional costs and create undue delay and would not result in any incremental value.  A sale of the Purchased Assets under the terms and conditions of the APA—as opposed to a lengthy public auction process—will allow the Debtors to avoid

15

incurring additional operating and lease expenses associated with the retail locations, thereby preserving value for the Debtors' estates and all stakeholders.  Additionally, the Debtors believe that the Buyer is uniquely positioned to fully appreciate the value in the Purchased Assets, and that, despite a robust prepetition marketing process and subsequent postpetition marketing efforts, it is unlikely that another purchaser would come forward within a reasonable time frame with a higher or otherwise better offer.  The Debtors believe that the Sale comports with the long-term strategic initiatives of the Debtors and is value-maximizing.  Accordingly, the Debtors have determined that entry into the APA and consummation of the Sale is in the best interests of their estates and all stakeholders.

20.    Courts in this jurisdiction have authorized sales pursuant to section 363 of the Bankruptcy Code.  *See, e.g.*, *In re Sunpower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 29, 2024) (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Mar. 11, 2024) (same); *In re Armstrong Flooring, Inc.*, No. 22-10426 (MFW) (Bankr. D. Del. Mar. 27, 2023) (same); *In re Indep. Pet Partners Holdings, LLC*, No. 23-10153 (LSS) (Bankr. D. Del. Feb. 24, 2023); and *In re Boy Scouts of Am.*, No. 20-10343 (LSS) (Bankr. D. Del. Apr. 22, 2022) (same).

## II.    The Sale Free and Clear of Liens and Other Interests Is Authorized by Section 363(f) of the Bankruptcy Code.

21.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

(1)    applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(2)    such entity consents;

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Because these requirements are listed in the disjunctive, the Debtors only need to satisfy one of the five requirements to permit the Purchased Assets to be sold "free and clear" of liens and interests. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002). The Debtors submit that each lien or interest in the Purchased Assets, except with respect to any Assumed Liabilities or Permitted Encumbrances, satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code. The Debtors further submit that any interest that will not be an Assumed Liability or Permitted Encumbrance satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing or by attaching to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.

22.      Importantly, the requisite DIP Lenders and Prepetition First Lien Lenders under the DIP Facility and the First Lien Term Loan Facility consented to the Sale on the condition that, among other things, (a) the DIP Liens and the Prepetition First Lien Liens attach to the proceeds of the Sale with the same validity, force, and effect that such DIP Liens and Prepetition First Lien Liens had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto, and (b) the proceeds of the Sale shall be distributed in accordance with the DIP Credit Agreement and the Final DIP Order. Further, to the extent any prepetition secured lenders have a prepetition security interest in and liens upon the Purchased Assets, these creditors can be compelled to accept a monetary satisfaction of their interests or are adequately

17

protected by having their claims that constitute interests in the Purchased Assets, if any, attach to the proceeds of the Sale with the same priority that existed immediately prior to the closing.  Thus, section 363(f)(5) of the Bankruptcy Code is satisfied and any existing interests in the Purchased Assets will be adequately protected through attachment to the proceeds of the Sale.  *See In re Katy Indus.*, No. 17-11101 (KJC), 2017 WL 5434578, at *5 (Bankr. D. Del. 2017) (finding that holders of liens against property sold free and clear of all liens are "adequately protected by having their Encumbrances, if any, attach to the cash proceeds of the Sale attributable to the Purchased Assets in which such holder alleges an Encumbrance"); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.").

23.     Accordingly, the Debtors request that the Purchased Assets be transferred to the Buyer free and clear of liens, claims, and encumbrances, other than Assumed Liabilities and Permitted Encumbrances, with any such liens, claims, and encumbrances attaching to the net sale proceeds realized from the Sale.

**III.     The Buyer Is a Good-Faith Purchaser and Is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.**

24.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith[.]"  Although good faith is not specifically defined in the Bankruptcy Code, one court has stated that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings . . .  A purchaser's good faith is lost by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt

18

to take grossly unfair advantage of other bidders." *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (internal quotations omitted). Within the Third Circuit, a good faith purchaser is one who purchases assets for value and in good faith. *See In re Abbotts Dairies of Pa.,* 788 F.2d 143, 147 (3d Cir. 1986). "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pa.,* 788 F.2d at 147.

25.     The Debtors submit that the Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and that the APA is a good faith agreement on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code. All Parties were represented by competent counsel and all negotiations in connection with the APA and the Sale contemplated therein were conducted on an arm's-length, good-faith basis. There is no indication of fraud or any improper insider dealing. Further, the consideration to be received by the Debtors for the Purchased Assets pursuant to the APA is substantial, fair, and reasonable under the circumstances.

26.     The Sale was evaluated and approved by the Debtors in consultation with their advisors and the Ad Hoc Group, the Freedom Lender Group, and the Creditors' Committee. Additionally, the Buyer and the Debtors are wholly unrelated, share no officers, directors, shareholders, incorporators, employees, or economic interests—other than as embodied in the Sale—in common, and the Buyer is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code. Accordingly, the Debtors request that the Court enter an order entitling the APA and the Parties to the Sale to the full protections of section 363(m) of the Bankruptcy Code.

**IV.    The Assumption and Assignment of the Purchased Contracts and Purchased Leases Should Be Approved**.

    **A.    The Assumption and Assignment of the Purchased Contracts and the Purchased Leases Reflects the Debtors' Reasonable Business Judgment.**

    27.    Assumption and assignment of the Purchased Contracts and Purchased Leases in connection with the Sale reflects the Debtors' sound business judgment.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign their executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such executory contracts and unexpired leases are cured and adequate assurance of future performance is provided.  A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Grp. of Inst'l Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co*., 318 U.S. 523 (1943) (applying section 77(b) of the Bankruptcy Act, predecessor to section 365 of the Bankruptcy Code, and rejecting the test of whether an executory contract was burdensome in favor of whether rejection is within a debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code."); *In re S.A. Holding Co., LLC*, 357 B.R. 51, 56 (Bankr. D.N.J. 2006) (applying the business judgment test in determining whether to approve a contract rejection); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) ("Although the [Bankruptcy Code] does not provide the standard to be applied in determining the propriety of the [debtor's] decision [to assume or reject a contract], most Circuits, including the Third Circuit have adopted the business judgment test.").

28.     Here, the Court should approve the decision to assume and assign the Purchased Contracts and the Purchased Leases in connection with the Sale as a sound exercise of the Debtors' business judgment.  The Purchased Contracts and Purchased Leases—which include, among other things, customer and supplier contracts, real property leases, intellectual property agreements, and liabilities related thereto—are necessary to manage the day-to-day operations of the Purchased Assets, and the assumption and assignment of the Purchased Contracts and the Purchased Leases are therefore essential to inducing the best offer for the Purchased Assets.  The assumption and assignment of the Purchased Contracts and the Purchased Leases is necessary and appropriate under the circumstances in connection with the Sale, is integral to the Debtors' overall restructuring efforts, and the Buyer has demonstrated that it can reasonably carry on the obligations under the Purchased Contracts and the Purchased Leases.  Importantly, the counterparties to the Purchased Contracts and the Purchased Leases will be treated fairly and equitably, as all existing defaults under the Purchased Contracts and the Purchased Leases will be promptly cured by the Debtors as described below.  Accordingly, the Debtors submit that the assumption of the Purchased Contracts and the Purchased Leases and their assignment to the Buyer should be approved as a sound exercise of the Debtors' business judgment.

**B.     Defaults Under the Purchased Contracts and Purchased Leases will be Cured in Connection with the Sale.**

29.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code.  Specifically, before assumption will be permitted, a debtor must (a) cure existing defaults or provide adequate assurance that cure will promptly occur, (b) compensate any party to the agreement that has suffered actual pecuniary loss as a result of default or provide adequate

21

assurance of prompt compensation to the injured party, and (c) provide adequate assurance of future performance under the agreement.  *In re Carlisle Homes, Inc.,* 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *see also Cinicola v. Scharffenberger,* 248 F.3d 110, 120 (3d Cir. 2001) ("Before an executory contract may be assigned, the trustee first must assume the contract and 'adequate assurance of future performance' of the contract must be provided.").  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *Id.* (*quoting In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)).

30.     Here, the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will promptly be satisfied because the applicable Debtor or Debtors will cure all defaults associated with, or required to properly assume and assign, the Purchased Contracts and the Purchased Leases on, prior to, or after the Closing Date, as applicable, in accordance with the terms of the APA.  The Debtors believe that if any defaults exist that must be cured, such cure will be achieved fairly, efficiently, properly, and consistently with the Bankruptcy Code.  In conjunction with or following consummation of the Sale, the applicable Debtor or Debtors will pay all identified and outstanding obligations under the Purchased Contracts and the Purchased Leases and will perform all of their undisputed prepetition obligations in connection with the assumption and assignment of any Purchased Contract and the Purchased Lease.

31.     Further, the Purchased Contracts and the Purchased Leases and the related amounts required to cure all defaults or other obligations thereunder pursuant to section 365 of the Bankruptcy Code are listed on <u>Schedule 1</u> of the Sale Order (as may be amended or modified from time to time, the "<u>Cure Schedule</u>," and the related costs, collectively, the "<u>Cure Costs</u>").  On the

date hereof, the applicable Debtor or Debtors will serve each non-Debtor counterparty to a Purchased Contract or Purchased Lease with the Motion, the Sale Order, and the Cure Schedule, notifying such counterparty (a) that the Purchased Contract or the Purchased Lease may be assumed and assigned to the Buyer in connection with the Sale and (b) of the proposed Cure Cost associated with the relevant Purchased Contract or Purchased Lease.  Objections to the proposed assumption and assignment of a Purchased Contract or Purchased Lease (including with respect to the proposed Cure Cost) must (i) be in writing, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state, with specificity, the legal and factual bases thereof, including the Cure Cost that the counterparty believes is required to cure defaults under the relevant Purchased Contract or Purchased Lease if different from the Cure Cost set forth in Schedule 1, and (iv) be filed with the Court (contemporaneously with a proof of service) by no later than (A) April 29, 2025 (which shall be no less than 14 days after the date of notice) or (B) for any Purchased Contract or Purchased Lease added to Schedule 1 after April 15, 2025, 14 days after service of the notice to such Purchased Contract or Purchased Lease counterparty (each, an "Assignment Objection").

32.    If a counterparty to a Purchased Contract or Purchased Lease fails to properly and timely file and serve an Assignment Objection in accordance with paragraph 31 of this Motion, the counterparty shall be forever barred from asserting any objection with regard to the assumption or assignment of its Purchased Contract or Purchased Lease, as applicable, and notwithstanding anything to the contrary in the Purchased Contract or Purchased Lease or any other document, the Cure Costs set forth in the Cure Schedule shall be the only amount necessary to cure outstanding defaults under the applicable Purchased Contract or Purchased Lease under section 365 of the Bankruptcy Code.

33.     In the event of a dispute between the applicable Debtor or Debtors and a counterparty to any Purchased Contract or Purchase Lease with respect to a Cure Cost for which there is an unresolved objection, the Seller proposes that it will promptly pay the appropriate amount, on the date that is five (5) Business Days after the date on which:  (a) the applicable Debtor or Debtors reach agreement on the amount of the cure with the applicable counterparty; or (b) the Court has entered an order fixing such amount.  The applicable Debtor or Debtors propose that any Cure Costs be satisfied pursuant to the APA.  For the avoidance of doubt, the Debtors are not seeking to impair any cure claims.

34.     Similarly, the requirement of section 365(b)(1)(C) of the Bankruptcy Code— adequate assurance of future performance—is also satisfied here.  "The phrase 'adequate assurance of future performance,' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."  *Carlisle Homes*, 103 B.R. at 538 (internal citations omitted).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Filene's Basement,* 2014 WL 1713416, at *12 (holding that a contract could be assigned because the assignee had the financial ability to perform the contract obligations going forward and would not fail to perform the contract's obligations at risk of losing a significant investment); *In re Bygaph, Inc*., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is present where a prospective assignee has the financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

24

35.     Here, the Buyer is a well-capitalized, sophisticated private investment firm primarily focused on businesses in transition.  The Debtors evaluated the financial wherewithal of the Buyer before finalizing the APA (*e.g.*, financial credibility, willingness, and ability of the Buyer to perform under executory contracts and unexpired leases).  The Buyer has demonstrated such financial wherewithal, willingness, and ability to perform under the Purchased Contracts and the Purchased Leases.  As such, the Buyer is equipped to step into the Debtors' position as operator of the Purchased Assets.

## V.     The Buyer Expense Reimbursement Has a Sound Business Purpose and Should be Approved.

36.     The Debtors are also seeking approval of the Buyer Expense Reimbursement under section 8.1 of the APA.  Specifically, if, prior to the Closing Date, the Buyer terminates the APA in accordance with sections 8.1.2, 8.1.3, 8.1.4, 8.1.8, or 8.1.9 of the APA, then, within three (3) Business Days of such termination, the Buyer shall receive reimbursement from the Seller for its reasonable fees, costs, and expenses in an amount not to exceed $3 million in accordance with the applicable terms and conditions of the APA.  Bid protections are a normal and necessary component of significant sales conducted in chapter 11 to protect the potential buyer from circumstances where a debtor determines not to proceed with the signing and closing of the sale.  *See In re Integrated Res. Inc.*, 147 B.R. 650, 659–61 (S.D.N.Y. 1992) ("break-up fees can be *necessary* to discharge the directors' duties to maximize value . . . [and] ensure that a bidder does not retract its bid") (emphasis in original); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's…due diligence"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter

the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

37.     As a result, courts regularly approve such buyer protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp*., 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees. . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (citing *In re O'Brien Envtl. Energy, Inc.,* 181 F.3d 527, 535 (3d Cir. 1999)) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (same).

38.     The Debtors submit that the Buyer Expense Reimbursement is amply justified, within the Debtors' business judgment, and in the best interests of the Debtors' estates and their creditors.   The Debtors believe, and the Buyer has represented that, the Buyer Expense Reimbursement is a material inducement for the Buyer's commitment to purchase the Purchased Assets.  The Sale, including the Buyer Expense Reimbursement, has been thoroughly negotiated, and the Debtors were able to achieve other material concessions from the Buyer in exchange for providing the Buyer Expense Reimbursement.

39.     Additionally, the benefits provided by the Sale and the Transactions will far outweigh the potential costs associated with the Buyer Expense Reimbursement, especially since the Buyer Expense Reimbursement will only be paid to the extent that the APA is terminated by the Buyer in accordance with section 8.1 of the APA.  Accordingly, the Debtors believe that the Buyer Expense Reimbursement is reasonable and appropriate under the circumstances of the Sale. As such, the Debtors respectfully request that the Court approve the Buyer Expense Reimbursement.

## VI.        Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.

40.        Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

41.        The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *In re Filene's Basement,* 2014 WL 1713416, at *14; see Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, the leading treatise on bankruptcy suggests that the 14-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  *See* 10 *Collier on Bankruptcy* ¶ 6004.11, ¶ 6004.04 (16th rev. ed. 2014).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *See id.*; *In re Filene's Basement,* 2014 WL 1713416, at *14 (reducing the stay to seven days from the date of entry of the sale order).

42.        Time is of the essence in closing the Sale and the Transactions, and the Seller and the Buyer seek to close the Sale as soon as practicable to maximize the value received for the Purchased Assets and reduce the accrual of administrative expenses relating to such assets.

27

Additionally, there is no credible basis for concluding that a delay in the Sale would result in a higher or otherwise better offer for the Purchased Assets, and absent the relief requested in this Motion, the closing process would likely be delayed, thereby placing the consummation of the Sale in jeopardy.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## **Reservation of Rights**

43.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law.

**Notice**

44.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) the Creditors' Committee; (c) counsel to the ABL Lenders; (d) counsel to the Ad Hoc Group of First Lien Lenders; (e) counsel to the Second Lien Term Loan Lenders; (f) counsel to the HoldCo Lenders; (g) counsel to the DIP Agent; (h) counsel to the DIP Lenders; (i) counsel to the Buyer; (j) all parties to the Purchased Contracts and Purchased Leases to be assumed and assigned in connection with the Sale; (k) all known holders of Encumbrances secured by the Purchased Assets; and (l) any party that is entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder Of Page Intentionally Left Blank]*

WHEREFORE, the Debtors request entry of the Sale Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  April 15, 2025
Wilmington, Delaware

*/s/ Allison S. Mielke*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    emorton@ycst.com
    mlunn@ycst.com
    amielke@ycst.com
    sborovinskaya@ycst.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com
    nicole.greenblatt@kirkland.com
    derek.hunter@kirkland.com

- and -

Mark McKane, P.C. (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:    mark.mckane@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRANCHISE GROUP, INC., *et al.*,[1] | ) | Case No. 24-12480 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: May 6, 2025, at 11:30 a.m. (ET)** |
| | ) | **Obj. Deadline: April 29, 2025, at 4:00 p.m. (ET)** |

## NOTICE OF DEBTORS' MOTION FOR ENTRY
## OF AN ORDER (I) AUTHORIZING FRANCHISE GROUP
## INTERMEDIATE V, LLC TO ENTER INTO AND PERFORM
## ITS OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT,
## (II) APPROVING THE SALE OF CERTAIN ASSETS FREE AND CLEAR
## OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES,
## (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that, on April 15, 2025, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion for Entry of an Order (I) Authorizing Franchise Group Intermediate V, LLC to Enter into and Perform its Obligations Under the Asset Purchase Agreement, (II) Approving the Sale of Certain Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (III) Approving the Assumption and*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

*Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "<u>Motion</u>") with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").[2]

**PLEASE TAKE FURTHER NOTICE** that, as contemplated under the APA, certain of the Debtors' executory contracts and unexpired leases (including, without limitation, any and all amendments, modifications, side letters, memoranda of understanding, documents incorporated by reference, attachments, and exhibits thereto) (each, a "<u>Purchased Contract</u>" or a "<u>Purchased Lease</u>," as applicable) listed on <u>Schedule 1</u> to the Sale Order will be assumed or assumed and assigned on, prior to, or after the Closing Date of the Sale without the need for any further notice to or action, order, or approval of the Court pursuant to section 365 of the Bankruptcy Code.

---

**PLEASE TAKE FURTHER NOTICE THAT YOU MAY BE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU MAY BE A PARTY TO A PURCHASED CONTRACT OR PURCHASED LEASE THAT WILL BE ASSUMED AND ASSIGNED PURSUANT TO THE SALE.  THEREFORE, YOU ARE ADVISED TO CAREFULLY REVIEW <u>SCHEDULE 1</u> TO THE SALE ORDER, THE APA, AND THE INFORMATION CONTAINED IN THIS NOTICE.**

---

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in Motion must:  (a) be in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (c) state, with specificity, the legal and factual bases thereof, including the Cure Cost that the counterparty believes is required to cure defaults under the relevant Purchased Contract or Purchased Lease if different from the Cure Cost set forth in <u>Schedule 1</u> to the Sale Order, if applicable; (d) be filed with the Court by no later than **4:00 p.m. (prevailing Eastern Time) on April 29, 2025** (which shall be no less than 14 days after the date of notice); and (e) be served upon the Objection Notice Parties (as defined below).

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the assumption and assignment of the Purchased Contracts or Purchased Leases must:  (a) be in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (c) state, with specificity, the legal and factual bases thereof, including the Cure Cost that the counterparty believes is required to cure defaults under the relevant Purchased Contract or Purchased Lease if different from the Cure Cost set forth in <u>Schedule 1</u> to the Sale Order, if applicable; (d) be filed with the Court by no later than **4:00 p.m. (prevailing Eastern Time) on May 3, 2025** (which shall be no less than 14 days after the date of notice); and (e) be served upon the Objection Notice Parties (as defined below).

**PLEASE TAKE FURTHER NOTICE** that a timely filed and properly served objection to the assumption and assignment of a Purchased Contract or Purchased Lease will only reserve the counterparty's rights relating to the Purchased Contract or the Purchased Lease, as applicable,

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the *Seventh Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1233], as applicable.

but will not be deemed to constitute an objection to the relief generally requested in the Motion with respect to the approval of the Sale.

**PLEASE TAKE FURTHER NOTICE** that if a counterparty to a Purchased Contract or Purchased Lease fails to properly and timely file and serve an objection in accordance with the Motion and this notice, the counterparty shall be forever barred from asserting any objection with regard to the assumption and assignment of its Purchased Contract or Purchased Lease, as applicable, and notwithstanding anything to the contrary in the Purchased Contract or Purchased Lease or any other document, the Cure Costs set forth on <u>Schedule 1</u> to the Sale Order shall be the only amount necessary to cure outstanding defaults under the applicable Purchased Contract or Purchased Lease under section 365 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that the objection notice parties are: (a) co-counsel for the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Joshua A. Sussberg, P.C. (jsussberg@kirkland.com), Nicole L. Greenblatt, P.C. (nicole.greenblatt@kirkland.com), and Derek I. Hunter (derek.hunter@kirkland.com), Brian J. Nakhaimousa (brian.nakhaimousa@kirkland.com), and Maddison Levine (maddison.levine@kirkland.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon L. Morton, Esq. (emorton@ycst.com) and Matthew B. Lunn, Esq. (mlunn@ycst.com); (b) counsel to the Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899, Attn: Bradford J. Sandler, Esq. (bsandler@pszjlaw.com) and Colin R. Robinson, Esq. (crobinson@pszjlaw.com), and 780 Third Avenue, 34th Floor, New York, NY 10017, Attn: Robert J. Feinstein, Esq. (rfeinstein@pszjlaw.com), Alan J. Kornfeld, Esq. (akornfeld@pszjlaw.com), and Theodore S. Heckel, Esq. (theckel@pszjlaw.com); (c) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox, Esq. (timothy.fox@usdoj.gov); (d) counsel to the DIP Agent, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004, Attn: Gregg Bateman, Esq. (bateman@sewkis.com), Sagar Patel, Esq. (patel@sewkis.com), and Michael Danenberg, Esq.(danenberg@sewkis.com); (e) counsel to the DIP Lenders and Ad Hoc Group, (i) Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn: Jayme Goldstein, Esq. (jaymegoldstein@paulhastings.com), Jeremy Evans, Esq. (jeremyevans@paulhastings.com), and Isaac Sasson, Esq. (isaacsasson@paulhastings.com), and (ii) Landis Rath & Cobb LLP, 919 N. Market Street Suite 1800, Wilmington, DE 19317, Attn: Adam G. Landis, Esq. (landis@lrclaw.com) and Matthew McGuire, Esq. (mcguire@lrclaw.com); (f) counsel to the ABL Lenders, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, Attn: Jennifer Ezring, Esq. (Jennifer.Ezring@lw.com), James Ktsanes, Esq. (James.Ktsanes@lw.com) and Andrew Sorkin, Esq. (andrew.sorkin@lw.com); (g) counsel to the Second Lien Lenders, White & Case LLP, 200 S Biscayne Blvd, Miami, FL 33131, Attn: Thomas Lauria, Esq. (tlauria@whitecase.com), and 111 S. Wacker Dr., Suite 5100, Chicago, IL 60606, Attn: Bojan Guzina, Esq. (bojan.guzina@whitecase.com); and (h) counsel to the HoldCo Lenders at the address set forth in (g) above, and (m) the Fee Examiner, Don F. Oliver (dfr.dfo@gmail.com), Direct Fee Review LLC, 24A Trolley Square, #1225, Wilmington, Delaware, 19806 (collectively, the <u>Objection Notice Parties</u>").

**PLEASE TAKE FURTHER NOTICE** that a hearing at which the Court will consider the Motion and approval of the Sale will commence on May 6, 2025, or as soon thereafter as counsel may be heard, before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge for the District of Delaware, 824 Market Street, Courtroom #2, Sixth Floor, Wilmington, Delaware 19801.  Only objections made in writing and timely filed will be considered by the Court at such hearing.  If you fail to respond in accordance with this notice, the Court may grant the relief demanded by the Motion without further notice or hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other related documents may be obtained: (a) by visiting the Debtors' restructuring website: https://cases.ra.kroll.com/FRG and clicking the link on the left-hand side of the website landing page titled "Plan and Disclosure Statement;" (b) upon written request to the Debtors' solicitation agent, Kroll Restructuring Administration LLC (the "Solicitation Agent"), at Franchise Group, Inc. Solicitation Processing Center, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (c) by contacting the Solicitation Agent via telephone at (844) 285-4564 (U.S./Canada toll free) or +1 (646) 937-7751 (International); or (d) for a fee, from the Bankruptcy Court's website, www.deb.uscourts.gov (a PACER account is required). A PACER login and password can be obtained through the PACER Service Center at https://www.pacer.gov.

*[Remainder Of Page Intentionally Left Blank]*

Dated:  April 19, 2025
Wilmington, Delaware

<u>/s/ Allison S. Mielke</u>

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Allison S. Mielke (Del. No. 5934)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:          emorton@ycst.com
                mlunn@ycst.com
                amielke@ycst.com
                sborovinskaya@ycst.com

*Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                nicole.greenblatt@kirkland.com
                derek.hunter@kirkland.com

- and -

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
Mark McKane, P.C. (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:      (415) 439-1500
Email:          mark.mckane@kirkland.com

*Co-Counsel to the Debtors
and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Sale Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FRANCHISE GROUP, INC., *et al.*,[1] | ) | Case No. 24-12480 (LSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. [●]** |

**ORDER (I) AUTHORIZING FRANCHISE GROUP INTERMEDIATE V, LLC TO ENTER INTO AND PERFORM ITS OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT, (II) APPROVING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion for Entry of an Order (I) Authorizing Franchise Group Intermediate V, LLC to Enter into and Perform its Obligations Under the Asset Purchase Agreement, (II) Approving the Sale of Certain Assets Free and Clear of All Claims, Liens, Rights,*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their U.S. federal tax identification numbers, to the extent applicable, are Franchise Group, Inc. (1876), Freedom VCM Holdings, LLC (1225), Freedom VCM Interco Holdings, Inc. (2436), Freedom Receivables II, LLC (4066), Freedom VCM Receivables, Inc. (0028), Freedom VCM Interco, Inc. (3661), Freedom VCM, Inc. (3091), Franchise Group New Holdco, LLC (0444), American Freight FFO, LLC (5743), Franchise Group Acquisition TM, LLC (3068), Franchise Group Intermediate Holdco, LLC (1587), Franchise Group Intermediate L, LLC (9486), Franchise Group Newco Intermediate AF, LLC (8288), American Freight Group, LLC (2066), American Freight Holdings, LLC (8271), American Freight, LLC (5940), American Freight Management Company, LLC (1215), Franchise Group Intermediate S, LLC (5408), Franchise Group Newco S, LLC (1814), American Freight Franchising, LLC (1353), Home & Appliance Outlet, LLC (n/a), American Freight Outlet Stores, LLC (9573), American Freight Franchisor, LLC (2123), Franchise Group Intermediate B, LLC (7836), Buddy's Newco, LLC (5404), Buddy's Franchising and Licensing LLC (9968), Franchise Group Intermediate V, LLC (5958), Franchise Group Newco V, LLC (9746), Franchise Group Intermediate BHF, LLC (8260), Franchise Group Newco BHF, LLC (4123), Valor Acquisition, LLC (3490), Vitamin Shoppe Industries LLC (3785), Vitamin Shoppe Global, LLC (1168), Vitamin Shoppe Mariner, LLC (6298), Vitamin Shoppe Procurement Services, LLC (8021), Vitamin Shoppe Franchising, LLC (8271), Vitamin Shoppe Florida, LLC (6590), Betancourt Sports Nutrition, LLC (0470), Franchise Group Intermediate PSP, LLC (5965), Franchise Group Newco PSP, LLC (2323), PSP Midco, LLC (6507), Pet Supplies "Plus", LLC (5852), PSP Group, LLC (5944), PSP Service Newco, LLC (6414), WNW Franchising, LLC (9398), WNW Stores, LLC (n/a), PSP Stores, LLC (9049), PSP Franchising, LLC (4978), PSP Subco, LLC (6489), PSP Distribution, LLC (5242), Franchise Group Intermediate SL, LLC (2695), Franchise Group Newco SL, LLC (7697), and Educate, Inc. (5722). The Debtors' headquarters is located at 2371 Liberty Way, Virginia Beach, Virginia 23456.

*Interests, and Encumbrances, (III) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Sale Order"):  (a) authorizing and approving the Debtors' entry into and performance under the APA, substantially in the form attached hereto as **Exhibit 1**; (b) authorizing and approving the sale of the Purchased Assets free and clear of any and all mortgages, liens (statutory or otherwise, including as defined in section 101(37) of the Bankruptcy Code), claims, licenses, sublicenses, pledges, security interests, charges, hypothecations, restrictions (including restrictions on transfer or use), claims of ownership, leases, subleases, options, rights of use or possession, preferences, encroachments, restrictive covenants, rights of first offer or refusal, title or survey defects, or other encumbrances or similar restrictions of any kind (collectively, the "Encumbrances"), except Permitted Encumbrances and Assumed Liabilities; (c) authorizing the assumption and assignment of the Purchased Contracts and the Purchased Leases; and (d) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the Court under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the APA, the *Seventh Amended Joint Chapter 11 Plan of Franchise Group, Inc. and Its Debtor Affiliates* [Docket No. 1233], or the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 414] (the "Final DIP Order"), as applicable.

having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that sufficient cause exists for the relief set forth herein; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein, at a hearing before this Court (the "Sale Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND, CONCLUDED, AND DETERMINED THAT**:

I.      **Jurisdiction, Venue, and Final Order.**

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1, 6004-1, and 9013-1.

4.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), any other applicable Bankruptcy Rules or Local Rules, and to any extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court

3

expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

5.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## II.      Notice of the APA, the Sale, and the Sale Hearing.

6.      As evidenced by the affidavits of service filed with the Court [Docket Nos. 685, 735, 907, and 1008, due, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise be heard regarding, the Motion, the APA, the Sale, the Sale Hearing, this Sale Order, the assumption and assignment of the Purchased Contracts and the Purchased Leases, and the Cure Schedule (as defined herein) was provided to all parties entitled thereto in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rules 2002-1(b) and 6004-3.  No other or further notice of, other opportunity to object to, or other opportunity to be heard regarding the Motion or the entry of this Sale Order need be given to any entity.

## III.      Disclosures.

7.      The disclosures made by the Debtors in the Motion and related documents filed with the Court concerning the Sale are sufficient under the circumstances.

## IV.      Good Faith of the Debtors and the Buyer.

8.      The Sale and the Transactions, including, but not limited to, the marketing and sale process engaged in by the Debtors and the Buyer and entry into the APA, are non-collusive, in good faith, from arm's-length bargaining positions, and substantively and procedurally fair to all

parties in interest.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the APA or the Sale to be avoided, or for any costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

9.      As further described in the Motion and as demonstrated by (a) any testimony and other evidence proffered or adduced at the Sale Hearing, if any, and (b) the arguments and representations of counsel made on the record at the Sale Hearing, if any, substantial marketing efforts and a competitive sale process were conducted and, among other things, (i) the Buyer in no way induced or caused any chapter 11 filing by the Debtors, (ii) all payments to be made by the Buyer in connection with the Sale have been disclosed, and (iii) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets.  The Buyer is consummating the Sale in good faith and is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and is not an "insider" of any Debtor (as defined under section 101(31) of the Bankruptcy Code).  The Buyer has proceeded in good faith in all respects in connection with the Sale.  The Buyer is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

## V.      Highest or Otherwise Best Offer.

10.      The Debtors have adequately marketed the Purchased Assets and the marketing process with respect to the Purchased Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets. The APA, including the form and total consideration to be realized by the Seller under the APA, (a) constitutes the highest and best offer for the Purchased Assets, (b) is fair and reasonable, and (c) is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.  No other person, entity, or group of entities has presented, and it is unlikely that any entity or group of entities would present in a reasonable time frame, a higher or otherwise better

5

offer to purchase the Purchased Assets, including the Permitted Encumbrances and Assumed

Liabilities, for greater economic value and/or on better terms to the Debtors' estates than the Buyer.

## VI.    Business Justification; Fiduciary Duties.

11.    Good and sufficient reasons for approval of the Motion, the APA, and the

Transactions to be consummated in connection therewith have been articulated by the Debtors,

and the relief requested in the Motion is in the best interests of the Debtors, their estates, their

creditors, and other parties in interest.  The Debtors have demonstrated both (a) good, sufficient,

and sound business purposes and justifications and (b) compelling circumstances for the Sale

outside of the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code,

outside of a chapter 11 plan, in that, among other things, the immediate consummation of the Sale

to the Buyer is necessary and appropriate to maximize the value of the Debtors' assets and estates.

The Debtors' decision to enter into the APA and pursue and consummate the Sale constitutes a

proper exercise of the fiduciary duties of the Debtors and their respective directors, managers, and

officers.  The Sale must be approved and consummated promptly to maximize the value of the

Debtors' estates.  Time is of the essence in consummating the Sale.  Given all of the circumstances

of these chapter 11 cases and the adequacy and fair value of the Purchase Price, the proposed Sale

constitutes a reasonable and sound exercise of the Debtors' business judgment and should be

approved.  The consummation of the Sale and the assumption and assignment of the Purchased

Contracts and the Purchased Leases are legal, valid, and properly authorized under all applicable

provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f),

363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections

have been complied with in respect of the Sale.  The Debtors have demonstrated that it is an

exercise of their sound business judgment to assume and assign the Purchased Contracts and the

Purchased Leases to the Buyer in connection with the consummation of the Sale, and the

6

assumption and assignment of the Purchased Contracts and the Purchased Leases is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, subject to the requirements applicable to any Disputed Contracts (as defined below) set forth in this Sale Order and in the APA.  The Purchased Contracts and the Purchased Leases being assigned to the Buyer are an integral part of the Sale and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates.  Because the entry into the APA and the consummation of the Sale and the Transactions constitute the exercise by the Debtors of sound business judgment, the Debtors, their respective members, managers, officers, directors, employees, advisors, professionals, or agents shall have or incur no liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale and the Transactions contemplated thereunder, other than liability of the Debtors arising out of or relating to any willful misconduct or fraud, in each case as determined by a court of competent jurisdiction.

**VII.     No Fraudulent Transfer.**

12.     The total consideration provided by the Buyer to the Seller pursuant to the APA for the Purchased Assets (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Purchased Assets, and (c) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, possession, the District of Columbia, and any foreign country and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District

7

of Columbia, or any other applicable law.  Neither the Debtors nor the Buyer has entered into the APA or is consummating the Sale with any fraudulent or otherwise improper purpose.

**VIII.    No Merger.**

13.    Neither the Buyer nor any of its affiliates are a mere continuation of the Seller or any other Debtor or their estates and there is no continuity of enterprise or common identity between the Buyer or any of its affiliates, on the one hand, and the Seller or any other the Debtors, on the other hand.  Neither the Buyer nor any of its affiliates are holding themselves out to the public as a continuation of the Seller or any other Debtor.  Neither the Buyer nor any of its affiliates are successors to the Seller or any other Debtor or their estates by reason of any theory of law or equity, and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Buyer or any of its affiliates with or into Seller or any other Debtor.

**IX.    Binding Agreement.**

14.    The APA is a valid and binding contract between the Seller and the Buyer and shall be enforceable pursuant to its terms.  The APA and the Sale itself, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, their estates, and any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.  The terms and provisions of the APA and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their affiliates, their estates, all creditors of and holders of equity interests in any Debtor, any holders of Encumbrances (whether known or unknown) in, against, or on all or any portion of the Purchased Assets, all counterparties to the Purchased Contracts and the Purchased Leases, the Buyer, designees, successors, and assigns of the Buyer, the Purchased Assets, and any trustees, examiners, or receivers, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon the conversion of any of the Debtors' cases to a case

8

under chapter 7 of the Bankruptcy Code (collectively, the "<u>Bound Parties</u>").  The provisions of this Sale Order and the terms and provisions of the APA shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these chapter 11 cases, or converting these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.  The rights and interests granted pursuant to this Sale Order and the APA shall continue in these or any superseding cases and shall be binding upon the applicable Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the APA and this Sale Order without the need for further order of the Court.

## X.     No *Sub Rosa* **Plan**.

15.     The Sale and the Transactions do not constitute a *sub rosa* chapter 11 plan.  The consummation of the Sale outside of a chapter 11 plan pursuant to the APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a chapter 11 plan for any of the Debtors.

## XI.     **Validity of Transfer**.

16.     The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, the District of Columbia, or any foreign country.  None of the Debtors or the Buyer is entering into the Transactions fraudulently for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims.

17.     The applicable Debtor or Debtors are the sole and lawful owners of the Purchased Assets.  The Purchased Assets constitute property of the Debtors' estates, DIP Collateral, and Prepetition First Lien Collateral, and good title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets to the Buyer will be, as of the Closing Date, a legal, valid, and effective transfer of the Purchased Assets, which transfer vests or will vest the Buyer with all right, title, and interest of the applicable Debtor or Debtors to the Purchased Assets free and clear of all Encumbrances relating to, accruing, or arising any time prior to the Closing Date, in each case, other than any Assumed Liabilities or Permitted Encumbrances.

18.     Subject to the entry of this Sale Order, the Seller:  (a) has full requisite corporate or other organizational power and authority to execute, deliver, and perform its obligations under the APA and all other documents contemplated thereby; and (b) has taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery, and performance of its obligations under the APA and to consummate the Sale, including as required by its organizational documents, and, upon execution thereof, the APA and the related documents were or will be duly and validly executed and delivered by the Seller and enforceable against the Seller in accordance with their terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, constituted, or will constitute, a valid and binding obligation of the Seller.  No government, regulatory, or other consents or approvals, other than those expressly provided for in the APA, the Restructuring Support Agreement, the Final DIP Order, and the DIP Credit Agreement, were required for the execution, delivery, and performance by the Seller of the APA or the consummation of the Sale and Transactions contemplated thereby.

No consents or approvals of the Seller, other than those expressly provided for in the APA, this Sale Order, or the DIP Credit Agreement are required for the Seller to consummate the Sale.

**XII.    Section 363(f) of the Bankruptcy Code is Satisfied.**

19.    The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full such that, other than the Assumed Liabilities and Permitted Encumbrances, the Sale and any purchase of the Purchased Assets will be free and clear of any Encumbrances.

20.    The Buyer would not have entered into the APA and would not consummate the Transactions if (a) the sale and/or transfer of the Purchased Assets to the Buyer was not free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) or (b) the Buyer would, or in the future could, be liable for any such Encumbrances (other than Assumed Liabilities and Permitted Encumbrances).

21.    The applicable Debtor or Debtors may transfer or sell the Purchased Assets free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Subject to the terms and conditions of this Sale Order, all holders of Encumbrances (except to the extent that such Encumbrances are Permitted Encumbrances or Assumed Liabilities) are adequately protected by either (a) having their Encumbrances, if any, in each instance against the Debtors, their estates, or the Purchased Assets, attach to the net cash proceeds of the Purchase Price ultimately attributable to the Purchased Assets in which such creditor alleges Encumbrances in the same order of priority, with the same validity, force, and effect that such Encumbrances had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto, or (b) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

11

22.     Those holders of Encumbrances who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

**XIII.     Cure Costs and Adequate Assurance of Future Performance.**

23.     Under the circumstances, the Debtors have demonstrated that assuming and assigning the Purchased Contracts and the Purchased Leases in connection with the Sale is an exercise of their sound business judgment, and that such assumption and assignment is in the best interests of the Debtors' estates, for the reasons set forth in the Motion and this Sale Order. Assumption and assignment of the Purchased Contracts and the Purchased Leases to the Buyer is necessary and appropriate under the circumstances, is integral to the Debtors' overall restructuring efforts, and the Buyer has demonstrated that it can reasonably carry on the obligations under the Purchased Contracts and the Purchased Leases.

24.     The assumption and assignment of the Purchased Contracts and the Purchased Leases listed in the APA pursuant to the terms of this Sale Order is integral to the APA, does not constitute unfair discrimination, and is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and represents a reasonable exercise of sound and prudent business judgment by the Debtors.  Subject to the terms and conditions of the APA, the applicable Debtor or Debtors shall, (a) to the extent necessary, cure or provide adequate assurance of cure, of any default existing prior to the Closing Date with respect to the Purchased Contracts and the Purchased Leases within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (b) to the extent necessary, provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Purchased Contracts and the Purchased Leases within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code.  The applicable

12

Debtor's or Debtors' promise to pay or otherwise cure all defaults or other obligations of the applicable Debtor or Debtors under the Purchased Contracts and the Purchased Leases arising or accruing prior to the Closing Date, or otherwise required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Purchased Contracts and the Purchased Leases that are listed on **Schedule 1** attached hereto (as may be amended or modified from time to time, the "Cure Schedule," and the related costs, collectively,  the "Cure Costs") in accordance with the terms of the APA and the Buyer's promise to perform the obligations under the Purchased Contracts and the Purchased Leases shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the counterparties to such Purchased Contracts and Purchased Leases.

25.    On, prior to, or after the Closing Date, as applicable, the applicable Debtor or Debtors shall pay the Cure Costs for the Purchased Contracts and the Purchased Leases and cure any and all other defaults and breaches under the Purchased Contracts and the Purchased Leases to the extent required under section 365 of the Bankruptcy Code; *provided, however*, that the applicable Debtor or Debtors shall not pay any Cure Costs on account of any Purchased Contract or Purchased Lease for which there is an unresolved objection by a non-Debtor counterparty to the Cure Costs or other dispute as to the assumption or assignment of such Contract or Lease (such contract or lease, a "Disputed Contract" or "Disputed Lease").  With respect to each Purchased Contract or Purchased Lease that is a Disputed Contract or Disputed Lease, on the date that is five Business Days after the date on which (a) the Cure Costs with respect to such Purchased Contract or Purchased Lease have been consensually agreed or (b) the Court has entered an order fixing such Cure Costs, or as soon as reasonably practical thereafter, the applicable Debtor or

13

Debtors shall pay such Cure Costs, upon which such Purchased Contracts and/or Purchased Leases, as applicable, shall be deemed assumed by the applicable Debtor or Debtors and assigned to the Buyer.

26.     Under the circumstances, the Debtors have demonstrated that assuming and assigning the Purchased Contracts and the Purchased Leases in connection with the Sale as of the Closing Date is an exercise of their sound business judgment, and that such assumption and assignment is in the best interests of the Debtors' estates, for the reasons set forth in the Motion and on the record at the Sale Hearing, including, without limitation, because the assumption and assignment of the Purchased Contracts and the Purchased Leases in connection with the Sale is a material component to the overall consideration provided by the Buyer and will maintain the ongoing business operations of the Debtors, limit the losses of counterparties to Purchased Contracts and Purchased Leases, and maximize the distribution to creditors of the Debtors.

27.     The assignment of the Purchased Contracts and the Purchased Leases is necessary and appropriate under the circumstances in connection with the Sale, is integral to the Debtors' overall restructuring efforts, and the Buyer has demonstrated that it can reasonably carry on the obligations under the Purchased Contracts and the Purchased Leases.

**XIV.     Compelling Circumstances for an Immediate Sale.**

28.     Good and sufficient reasons for approval of the APA and the Sale have been articulated. The relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors have demonstrated both (a) good, sufficient, and sound business purposes and justifications for approving the APA and (b) compelling circumstances for the Sale outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a chapter 11 plan, in that, among other things, the immediate consummation of the Sale with the Buyer is necessary and appropriate

14

to maximize the value of the Debtors' estates and the Sale will provide the means for the Debtors to maximize distributions to creditors.

29.     The Debtors have articulated good and sound business reasons for waiving the stay otherwise imposed by Bankruptcy Rules 6004(h), 6006(d), and 7062.

## XV.     Buyer Expense Reimbursement.

30.     Approval of the Buyer Expense Reimbursement in an amount not to exceed $3 million, solely to the extent contemplated in the APA, is in the best interests of the Debtors' estates and their creditors.  The Buyer Expense Reimbursement is:  (a) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Buyer; (b) reasonable and appropriate in light of (i) the size and nature of the Sale contemplated by the APA, (ii) the commitments that have been made by the Buyer, and (iii) the efforts that have been expended by the Buyer; and (c) an essential inducement to, and condition of, the Buyer's entry into the APA. As such, the Debtors' agreement to pay the Buyer Expense Reimbursement solely to the extent contemplated in and subject to the terms of the APA is a valid exercise of the Debtors' business judgment.

## XVI.     Consent and Waiver.

31.     Section 6.05(k) of the DIP Credit Agreement and paragraph 8(b) of the Final DIP Order provide that the Debtors are not permitted to sell, transfer, lease, or otherwise dispose of any assets, including any Equity Interests (as defined in the DIP Credit Agreement) owned by the Debtors, unless such Disposition (as defined in the DIP Credit Agreement) is made in connection with a Sufficient Bid (as defined in the DIP Credit Agreement) or otherwise with the prior written consent of the Required Supermajority Lenders (as defined in the DIP Credit Agreement). Additionally, section 8.12 of the DIP Credit Agreement, section 8.12 of the Prepetition First Lien Credit Agreement, and paragraph 28 of the Final DIP Order provide that (a) the DIP Agent or its

designee (in each case, acting at the direction of the Required DIP Lenders) has the unqualified

right to credit bid up to the full amount of the DIP Obligations in any sale of all or any portion of

the DIP Collateral, and (b) the Prepetition First Lien Agent or its designee (in each case, acting at

the direction of Prepetition First Lien Lenders constituting "Required Lenders" under, and as

defined in, the Prepetition First Lien Credit Agreement) has the unqualified right to credit bid up

to the full amount of the Prepetition First Lien Secured Obligations in any sale of all or any portion

of the Prepetition First Lien Collateral.

32.     At the request of the Buyer and the applicable Debtors, on April 15, 2025, the DIP

Agent, acting at the direction of the Required DIP Lenders, the Prepetition First Lien Agent, acting

at the direction of the Required Lenders, the DIP Lenders (constituting Required Supermajority

Lenders under the DIP Credit Agreement), and the Prepetition First Lien Lenders (constituting

Required Lenders under the Prepetition First Lien Credit Agreement) executed and delivered to

the Buyer a consent and waiver agreement (the "Consent and Waiver Agreement"), pursuant to

which, among other things, and subject to the terms and conditions therein, (a) the Required

Supermajority Lenders consented to the Sale pursuant to section 6.05(k) of the DIP Credit

Agreement and paragraph 8(b) of the Final DIP Order and (b) the Required DIP Lenders under the

DIP Credit Agreement and the Required Lenders under the Prepetition First Lien Credit

Agreement agreed to waive the applicability of section 8.12 of the DIP Credit Agreement,

section 8.12 of the Prepetition First Lien Credit Agreement, and paragraph 28 of the Final DIP

Order in connection with the Sale; *provided* that (i) the DIP Liens and the Prepetition First Lien

Liens attach to the proceeds of the Sale with the same priority as existed prior to the Sale and retain

the same validity, force, and effect that existed prior to the Sale and (ii) the proceeds of the Sale

shall be distributed in accordance with the DIP Credit Agreement and the Final DIP Order.

33.     The Consent and Waiver Agreement is a material component to the overall consideration provided by the Seller to the Buyer and is appropriate under the circumstances of the Sale.  The Buyer would not have entered into the APA without the Consent and Waiver Agreement, thereby adversely affecting the Debtors, their estates, and their creditors.  The Consent and Waiver Agreement was thus a material inducement to the Buyer agreeing to (a) enter into the APA, (b) purchase the Purchased Assets for the Purchase Price, and (c) consummate the Sale and the Transactions.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

**I.      General Provisions.**

1.     The Motion is granted and approved to the extent indicated herein, and entry into and performance under, and in respect of, the APA, and the consummation of the Sale contemplated thereby, is authorized and approved as set forth in this Sale Order.

2.     All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing (the full record of which is incorporated herein by reference) or by stipulation filed with the Court, and all reservations of rights included in such objections, are hereby denied and overruled on the merits with prejudice.  Those parties who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code to the relief granted herein.

3.     Notice of the Motion and Sale Hearing was adequate, appropriate, fair, and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014.

17

## II.    Approval of the APA.

4.    The APA, all other instruments and documents related thereto or contemplated thereby, and all of the terms and conditions thereof, are hereby approved pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

5.    Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) perform, consummate, implement, and close the Sale pursuant to and in accordance with the terms and conditions of, and as contemplated in, the APA and this Sale Order and (b) execute and deliver, perform under, consummate, implement, and fully close the APA, including the assumption and assignment to the Buyer of the Purchased Contracts and the Purchased Leases, together with all other additional instruments and documents that may be necessary or desirable to implement the APA and the Sale, without any further corporate action or order of the Court.

6.    Subject only to the restrictions set forth in this Sale Order and the APA, the Debtors and the Buyer are hereby authorized to take any and all actions as may be necessary or desirable to implement the Sale, and any actions taken by the Debtors and/or the Buyer necessary or desirable to implement the Sale prior to the date of this Sale Order, are hereby approved and ratified.

7.    This Sale Order and the terms and provisions of the APA shall be binding in all respects upon the Bound Parties.  The APA shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustees, examiners, or receivers. Any trustee appointed in these cases (including a chapter 7 trustee, if applicable) shall be and hereby is authorized to operate the businesses of the Debtors to the fullest extent necessary to permit compliance with the terms of this Sale Order.  This Sale Order and the APA shall inure to

the benefit of the Debtors, their estates and creditors, the Buyer, and the respective successors and assigns of each of the foregoing (including the Buyer's designees).

### III.     Transfer of the Purchased Assets.

8.     Subject only to the terms of this Sale Order, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Purchased Assets to the Buyer in accordance with the terms of the APA.  Such transfer shall constitute a legal, valid, binding, and effective transfer of all such Purchased Assets and shall vest the Buyer with title to the Purchased Assets.  Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be sold free and clear of all Encumbrances of any kind or nature whatsoever, other than Permitted Encumbrances and Assumed Liabilities.  Any and all valid and perfected Encumbrances shall attach to the net proceeds of the Sale ultimately attributable to the property against or in which such Encumbrances are asserted, subject to the terms thereof, after application of the net proceeds in accordance with this Sale Order, with the same validity, force, and effect, and in the same order of priority, which such Encumbrances had prior to the Sale, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

9.     The Debtors are hereby authorized to take any and all actions necessary to consummate the APA, including any actions that otherwise would require further approval by shareholders, members, or their board of directors, as the case may be, without the need of obtaining such approvals.

10.     The sale of the Purchased Assets to the Buyer pursuant to the APA and the consummation of the Transactions do not require any consents other than as specifically provided for in the APA, the Restructuring Support Agreement, the Final DIP Order, and the DIP Credit Agreement.  Each and every foreign and domestic federal, provincial, territorial, state, and local

governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Transactions. A certified copy of this Sale Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, province, or local authority to act to cancel any of the Encumbrances, and any other encumbrances of record, except for the Permitted Encumbrances and Assumed Liabilities.

11.    If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances on or in all or any portion of the Purchased Assets (other than statements or documents with respect to Permitted Encumbrances or Assumed Liabilities) has not delivered, or refused to deliver, to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Debtors and the Buyer are hereby authorized, on behalf of the Debtors, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets. The Debtors and the Buyer are each authorized to file a copy of this Sale Order in any court where the person or entity filed the statements, documents, or agreements evidencing such Encumbrances, which, upon filing, shall be conclusive evidence of the release and termination of all such Encumbrances.

12.    This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, foreign or domestic federal, state, provincial, territorial, and local officials, and all other persons and entities who may be required by operation

20

of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Transactions, including the Sale.  The Purchased Assets are sold free and clear of any reclamation rights.

13.    Except for as provided in the APA and this Sale Order, after the Closing Date, the Debtors shall have no further liability with respect to the Purchased Assets, and any claims, whether administrative or otherwise, relating to or arising from such Purchased Assets after the Closing Date asserted against the Debtors shall be deemed disallowed.

**IV.      Assumption and Assignment of Purchased Contracts and Purchased Leases.**

14.    The applicable Debtor or Debtors are hereby authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, in accordance with the terms of the APA and this Sale Order, the Purchased Contracts and the Purchased Leases identified on **Exhibit 1** to this Sale Order (as may be amended or modified from time to time in accordance with the terms of this Sale Order and the APA) free and clear of all Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) effective as of the Closing Date or such other date after the Closing Date, subject to the terms of the APA and this Sale Order, or as otherwise provided by a separate order of this Bankruptcy Court, and (b) execute and deliver to the Buyer such documents or other instruments as the Buyer deems may be necessary to assign and transfer the Purchased Contracts and the Purchased Leases to the Buyer.

15.    With respect to the Purchased Contracts and the Purchased Leases:  (a) the applicable Debtor or Debtors may assume each of the Purchased Contracts and the Purchased Leases in accordance with section 365 of the Bankruptcy Code; (b) the applicable Debtor or

Debtors may assign each of the Purchased Contracts and the Purchased Leases to the Buyer in accordance with sections 363 and 365 of the Bankruptcy Code, this Sale Order, and the APA, and any provisions in any of the Purchased Contracts and the Purchased Leases that prohibit or condition the assignment of such Purchased Contracts and Purchased Leases or allow the party to such Purchased Contract and Purchased Lease to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Purchased Contract and Purchased Lease, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (c) subject to the applicable Debtor's or Debtors' payment of Cure Costs, all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the applicable Debtor or Debtors and assignment to the Buyer of each Purchased Contract and Purchased Lease have been satisfied; and (d) the Purchased Contracts and the Purchased Leases shall be transferred and assigned to, and following the Closing Date, or such other date after the Closing Date, as applicable, remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Purchased Contract or Purchased Lease (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts, or conditions, or that purports to prohibit, restrict, or condition, such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Purchased Contracts and Purchased Leases after such assumption and assignment to the Buyer.

16.     Assignment Objections were to be filed with the Court, or will be filed with the Court, by no later than (a) April 29, 2025, or (b) for any Purchased Contract or Purchased Lease added to **Schedule 1** after April 15, 2025, 14 days after service of the notice to such Purchased Contract or Purchased Lease counterparty.  If a counterparty to a Purchased Contract or Purchased

Lease failed to properly and timely file and serve an Assignment Objection in accordance with the Motion, the counterparty is hereby forever barred from asserting any objection with regard to the assumption or assignment of its Purchased Contract or Purchased Lease, as applicable, and notwithstanding anything to the contrary in the Purchased Contract or the Purchased Lease or any other document, the Cure Costs set forth in the Cure Schedule shall be the only amount necessary to cure outstanding defaults under the applicable Purchased Contract or Purchased Lease under section 365 of the Bankruptcy Code.  If no Assignment Objection has been filed, or an Assignment Objection has been properly filed but has been resolved by the parties or determined by the Court, this Sale Order shall serve as approval of the assumption and assignment of the applicable Purchased Contract or Purchased Lease to the Buyer without need for a further notice of order.  If an Assumption Objection has been properly filed with respect to a Purchased Contract or Purchased Lease and is not resolved by the parties or determined by the Court prior to the Closing Date, the Seller's assumption and assignment of such Purchased Contract or Purchased Lease shall be subject to the requirements applicable to Disputed Contracts set forth in the APA.

17.    The pendency of a dispute relating to a particular Purchased Contract and Purchased Lease shall not delay the assumption and assignment of any other Purchased Contract and Purchased Lease or the Closing.  Upon the effective date of the assignment of any Purchased Contract and Purchased Lease, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of each Purchased Contract and Purchased Lease.  To the extent provided in the APA, the Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

18.    Each Purchased Contract and Purchased Lease counterparty is deemed to have consented to the assumption and assignment of such Purchased Contract and Purchased Lease, as

applicable, and the Buyer shall be deemed to have demonstrated adequate assurance of future performance with respect to each such Purchased Contract and Purchased Lease pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

19.     Upon the applicable Debtor's or Debtors' assignment of the Purchased Contracts and Purchased Leases to the Buyer under the provisions of this Sale Order, any additional orders of this Court, and the applicable Debtor's or Debtors' payment of any Cure Costs pursuant to the terms hereof or the APA, no default shall exist under any Purchased Contract and Purchased Lease, and no counterparty to any Purchased Contract and Purchased Lease shall be permitted (a) to declare a default under such Purchased Contract and Purchased Lease or (b) to otherwise take action against the Debtors, the Reorganized Debtors, or the Buyer as a result of any Debtors' financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Purchased Contract and/or Purchased Lease, as applicable.  Each non-Debtor party to a Purchased Contract and Purchased Lease hereby is forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the Buyer, or the property of any of them, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Date, or, against the Buyer, any counterclaim, defense, setoff, or any other Claim asserted or assertable against the Debtors and (ii) imposing or charging against the Buyer or its affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the applicable Debtor's or Debtors' assumption and assignment of the Purchased Contracts and the Purchased Leases to the Buyer.  Any provision in any Purchased Contract or Purchased Lease that purports to declare a breach, default, or termination as a result of a change of control of the Purchased Assets is hereby deemed unenforceable under section 365(f) of the Bankruptcy Code.  To the extent that any counterparty to a Purchased Contract and/or Purchased

24

Lease was notified of the Cure Costs (or the absence thereof) and failed to object to such Cure Costs (or the absence thereof) with respect to a Purchased Contract and/or Purchased Lease, as applicable, such counterparty shall be deemed to have consented to such Cure Costs (or the absence thereof) and is deemed to have waived any right to assert or collect or enforce any Cure Costs that may arise or have arisen prior to or as of the Closing.

20.     On the Closing Date, or such other date after the Closing Date as provided in this Sale Order and the APA, the Buyer shall be deemed to be substituted for the applicable Debtor as a party to the applicable Purchased Contract and Purchased Lease and the applicable Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Purchased Contract and the Purchased Lease.  There shall be no rent or other payment accelerations, assignment fees, increases, or any similar fees, costs, or expenses charged to the Debtors or to the Buyer as a result of the assumption and assignment of the Purchased Contracts and the Purchased Leases.

21.     All counterparties to the Purchased Contracts and Purchased Leases shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not charge the Debtors or the Buyer for any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

22.     For the avoidance of doubt, any amendments to the Purchased Leases entered into by the Debtors prior to the Closing Date that provide that such amendment shall be effective upon the assumption of such amendment pursuant to a chapter 11 plan shall be deemed effective as of the assumption of such Purchased Lease pursuant to the terms of this Sale Order and the APA.

23.     The assumption and assignment of each of the Purchased Contracts and Purchased Leases is made in good faith under sections 363(b) and 363(m) of the Bankruptcy Code and is entitled to the protections thereof.

**V.      Buyer Expense Reimbursement.**

24.     The Buyer Expense Reimbursement is appropriate under the circumstances and is hereby approved.  The Debtors, in an exercise of their reasonable business judgment and their fiduciary duties, are hereby authorized to pay the Buyer Expense Reimbursement in accordance with the APA without further order of this Court solely to the extent required pursuant to section 8.1 of the APA.

**VI.     Use of Proceeds.**

25.     Notwithstanding anything to the contrary set forth herein, in accordance with the Final DIP Order, the DIP Loan Documents, the Prepetition ABL Loan Documents, the Prepetition ABL Intercreditor Agreement, and the Prepetition First Lien Loan Documents, on the Closing Date, the Debtors shall transfer, or cause to be transferred, the proceeds generated from the Sale of (a) the Purchased Assets constituting ABL Priority Collateral or ABL Priority DIP Collateral to the Prepetition ABL Agent for permanent application against the Prepetition ABL Secured Obligations (including the ABL Adequate Protection Claims, if any) and (b) all other Purchased Assets to the DIP Agent for permanent application against the DIP Obligations.

**VII.    Prohibition of Actions Against the Buyer**.

26.     All persons and entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets to be sold, transferred, or conveyed to or by the Buyer pursuant to the APA are hereby directed to surrender possession of those portions of the Assets to the Buyer on the Closing Date.  Subject to the terms, conditions, and provisions of this Sale Order, all persons and entities are hereby forever prohibited and enjoined from taking any

26

action that would adversely affect or interfere with the ability of the applicable Debtor or Debtors to sell and/or transfer the Purchased Assets to the Buyer in accordance with the terms of the APA and this Sale Order.

27.     To the maximum extent permitted by law, in accordance with the APA, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "<u>Licenses</u>") of the applicable Debtor or Debtors with respect to the Purchased Assets and the Sale.  To the extent the Buyer cannot operate under any Licenses in accordance with the previous sentence, such Licenses shall be in effect while the Buyer, with assistance from the Debtors, works promptly and diligently to apply for and secure all necessary government approvals for new issuance of Licenses to the Buyer.

28.     Notwithstanding anything in this Sale Order, subject to section 525(a) of the Bankruptcy Code, no governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may revoke, suspend any right, license, trademark, or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases, the conduct of the Sale, or the consummation of the Transactions.

**VIII.     Other Provisions.**

29.     The Debtors and the DIP Agent are authorized to prepare and file, execute, and deliver any applicable UCC termination statement or other release documentation pursuant to this Sale Order.

30.     This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any other provisions of the Bankruptcy Rules or the Local Rules stating the contrary, the terms and provisions of this Sale Order shall be immediately effective and enforceable upon its entry, any

27

applicable stay of the effectiveness and enforceability of this Sale Order is hereby waived, and the Debtors and the Buyer are authorized to close the Sale immediately upon entry of this Sale Order.

31.     The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in their entirety; *provided* that this Sale Order shall govern if there is any inconsistency between such agreements, as applicable, and this Sale Order.

32.     The APA and any related documents or other instruments may, with the consent of the Required DIP Lenders under the DIP Credit Agreement and the Required Lenders under the Prepetition First Lien Credit Agreement (such consents not to be unreasonably withheld), be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court.

33.     During the pendency of these chapter 11 cases, the Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned by the applicable Debtor or Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to:  (a) compel delivery of the Purchased Assets to the Buyer; (b) interpret, implement, and enforce the provisions of this Sale Order; and (c) protect the Buyer against any Encumbrances (other than the Assumed Liabilities or Permitted Encumbrances) with respect to the applicable Debtor or Debtors or the Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale.

34.     Notwithstanding the relief granted in this Sale Order and any actions taken pursuant to such relief, nothing in this Sale Order shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Sale Order or the Motion or any order granting the relief requested by the Motion; (e) a request or authorization to reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) a rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) to otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code to reject any executory contract or unexpired lease.

35.     The Debtors, including their respective officers, employees, and agents, and the Buyer are authorized to take all actions necessary to effectuate the relief granted pursuant to this Sale Order in accordance with the Motion.

36.     To the extent this Sale Order is inconsistent with any prior order or pleading filed in these chapter 11 cases related to the Motion, the terms of this Sale Order shall govern.

37.     The headings in this Sale Order are for purposes of reference and shall not limit or otherwise affect the meaning of the Sale Order.

**<u>Exhibit 1</u>**

**APA**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**by and between**

**FRANCHISE GROUP INTERMEDIATE V, LLC**

**and**

**TVS BUYER, LLC**

**Dated as of April 15, 2025**

**TABLE OF CONTENTS**                                    **Page**

ARTICLE 1 DEFINITIONS ............................................................................................2

    1.1    Certain Defined Terms ..................................................................2
    1.2    Construction ...................................................................................23

ARTICLE 2 SALE AND PURCHASE OF ASSETS; LIABILITIES ........................24

    2.1    Sale of Purchased Assets ...............................................................24
    2.2    Liabilities ......................................................................................26
    2.3    Consideration .................................................................................27
    2.4    Closing ..........................................................................................28
    2.5    No Offset .......................................................................................28
    2.6    Deposit ..........................................................................................29
    2.7    Assumption/Rejection of Certain Contracts and Leases; Non-Assignment .........29
    2.8    Cash Purchase Price ......................................................................30

ARTICLE 3 REPRESENTATIONS AND WARRANTIES ......................................34

    3.1    Representations and Warranties of Seller .....................................34
    3.2    Representations and Warranties of Buyer .....................................49
    3.3    Exclusivity of Representations ......................................................51

ARTICLE 4 PRE-CLOSING COVENANTS ............................................................52

    4.1    Access and Information .................................................................52
    4.2    Ordinary Course of Business .........................................................53
    4.3    Notification of Certain Matters .....................................................54
    4.4    Obligation to Consummate the Transaction ..................................54
    4.5    Filings; Other Actions; Notification and Cooperation ..................55
    4.6    Working Capital Target Adjustment ..............................................57

ARTICLE 5 ADDITIONAL COVENANTS ..............................................................57

    5.1    Further Assurances........................................................................57
    5.2    Publicity ........................................................................................58
    5.3    Certain Tax Matters ......................................................................59
    5.4    Accounts Receivable and Payable .................................................61
    5.5    Wrong Pockets ..............................................................................61
    5.6    Purchased Intellectual Property ....................................................62
    5.7    Social Media Accounts .................................................................62
    5.8    Bankruptcy Court Filings and Approval........................................62
    5.9    Copies of Pleadings.......................................................................65
    5.10    Books and Records .......................................................................65
    5.11    Trade Notification .........................................................................65
    5.12    Employee Matters .........................................................................65
    5.13    Insurance .......................................................................................69
    5.14    Relocation of Purchased Assets ....................................................69
    5.15    Legal Entity Names.......................................................................69
    5.16    Financing Cooperation (Seller).....................................................70
    5.17    Financial Statements .....................................................................72

ARTICLE 6 CONDITIONS PRECEDENT ...................................................................73

    6.1    Conditions to Obligations of Buyer and Seller....................................73
    6.2    Conditions to Obligations of Buyer......................................................73
    6.3    Conditions to Obligations of Seller......................................................74

ARTICLE 7 NO SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-
            CLOSING COVENANTS ...................................................................75

    7.1    No Survival ...........................................................................................75
    7.2    No Recourse ..........................................................................................75

ARTICLE 8 TERMINATION .....................................................................................77

    8.1    Termination...........................................................................................77
    8.2    Procedure and Effect of Termination....................................................79

ARTICLE 9 MISCELLANEOUS ................................................................................81

    9.1    Governing Law, Jurisdiction, Venue and Service ...............................81
    9.2    Notices..................................................................................................82
    9.3    No Benefit to Third Parties ..................................................................83
    9.4    Waiver...................................................................................................84
    9.5    Expenses...............................................................................................84
    9.6    Assignment ...........................................................................................84
    9.7    Amendment...........................................................................................85
    9.8    Severability ..........................................................................................85
    9.9    Equitable Relief ...................................................................................85
    9.10   No Liability...........................................................................................86
    9.11   Bulk Sales Statutes...............................................................................86
    9.12   Representation by Counsel ...................................................................86
    9.13   Counterparts..........................................................................................86
    9.14   Entire Agreement .................................................................................87
    9.15   Debt Financing Sources .......................................................................87
    9.16   Seller Disclosure Schedules .................................................................88

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exhibit B | Form of Domain Name Transfer Agreement |
| Exhibit C | Form of Trademark Assignment Agreement |
| Exhibit D | Form of Lease Assignment |
| Exhibit E | Illustrative Net Working Capital Calculation |
| Exhibit F | Equity Commitment Letter |
| Exhibit G | Transition Services Agreement |
| Exhibit H | Assumed Indebtedness |
| Exhibit I | Form of Secured Party Deliverables |
| Exhibit J | Accounting Policies |

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and executed as of April 15, 2025 (the "**Execution Date**"), by and between Franchise Group Intermediate V, LLC, a Delaware limited liability company ("**Seller**"), and TVS Buyer, LLC, a Delaware limited liability company ("**Buyer**"). Seller and Buyer may be referred to herein individually as a "**Party**" and collectively as the "**Parties.**" Capitalized terms used herein and not otherwise defined will have the meaning set forth in <u>Article 1</u>.

## RECITALS

**WHEREAS**, Seller and its Subsidiaries are engaged in the Business;

**WHEREAS**, on November 3, 2024, Seller and certain of its Affiliates (collectively, the "**Debtors**") commenced cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, Seller desires to sell, transfer, convey, assign and deliver to Buyer, and Buyer desires to purchase, acquire, accept and assume from Seller, the Purchased Assets and the Assumed Liabilities, in each case upon the terms and subject to the conditions hereinafter set forth;

**WHEREAS**, the Purchased Assets and the Assumed Liabilities are assets and liabilities of Seller and its Subsidiaries which are to be sold, transferred, conveyed, assigned and delivered and purchased, acquired, accepted and assumed pursuant to the Sale Order and this Agreement, free and clear of all Encumbrances and Liabilities except the Assumed Liabilities and the Permitted Encumbrances, which Sale Order will include the authorization for the assumption and assignment of certain executory contracts and unexpired leases and liabilities thereunder under section 365 of the Bankruptcy Code, all in the manner and on the terms and subject to the conditions set forth herein and in accordance with other applicable provisions of the Bankruptcy Code;

**WHEREAS**, in connection with entering into this Agreement, Buyer received the Secured Party Deliverables; and

**WHEREAS**, in connection with entering into this Agreement, an aggregate amount equal to $15,000,000 in cash shall be deposited by Buyer on its behalf as a "good faith deposit" (the "**Deposit**") by wire transfer of immediately available funds to the Escrow Agent, to be held in escrow in accordance with the terms of that certain Escrow Agreement (as amended, restated, amended and restated, supplemented, or modified from time to time in accordance with its terms, the "**Deposit Escrow Agreement**"), by and among Buyer, Seller and the Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Buyer and shall be applied against payment of the Purchase Price on the Closing Date or otherwise distributed or returned according to the terms of this Agreement and Deposit Escrow Agreement, as applicable.

- 1 -

**NOW, THEREFORE**, in consideration of the mutual benefits to be derived from this Agreement, the representations, warranties, conditions, agreements and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.1    Certain Defined Terms**. As used herein, the following terms shall have the following meanings:

"**Accounting Firm**" means (a) a nationally recognized independent accounting firm mutually acceptable to Buyer and Seller, or (b) if Buyer and Seller are unable to agree on a mutually agreeable nationally recognized independent accounting firm, each of Buyer and Seller shall select a nationally recognized independent accounting firm and such two accounting firms shall designate a third nationally independent public accounting firm that neither presently is, nor in the past one (1) year has been, engaged by any Party or its Affiliates.

"**Accounting Policies**" has the meaning set forth on Exhibit J attached hereto.

"**Accounts Receivable**" means all amounts (whether current or non-current) related to the Purchased Assets that constitute, as of the Closing, accounts receivable, notes receivable and other rights or indebtedness due and owed by any Third Party to Seller or any of its Subsidiaries and related to the Business, in each case, whether billed or unbilled, recorded or unrecorded, written off or not written off.

"**Affiliate**" means, with respect to a Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such first Person, and a Person shall be deemed to be controlled by another Person if controlled in any manner whatsoever that results in control in fact by that other Person (or that other Person and any Person or Persons with whom that other Person is acting jointly or in concert), whether directly or indirectly.

"**Agreement**" has the meaning set forth in the Preamble (as amended, restated, amended and restated, supplemented, or modified from time to time in accordance with its terms), and includes all schedules and exhibits hereto, and all instruments amending, restating, amending and restating, supplementing, modifying, or otherwise confirming this Agreement.

"**Allocation**" has the meaning set forth in Section 2.3.2.

"**Ancillary Agreements**" means the Bill of Sale, the Deposit Escrow Agreement, the Domain Name Transfer Agreement, the Lease Assignment, the Trademark Assignment Agreement, the Transition Services Agreement and any other agreements, certificates and other instruments delivered, given or contemplated pursuant to this Agreement.

"**Anti-Corruption Laws**" has the meaning set forth in Section 3.1.17.

"**Antitrust Laws**" means the Sherman Act of 1890, the Clayton Act of 1914, the Federal Trade Commission Act of 1914, the HSR Act and all other federal, state and foreign statutes, rules, regulations, orders, decrees and other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition.

"**Appointee**" has the meaning set forth in Section 8.1.4.

"**Apportioned Obligations**" has the meaning set forth in Section 5.3.2(b).

"**Artificial Intelligence Systems**" has the meaning set forth in Section 3.1.8(j).

"**Associated Person**" means, with respect to a Person, any of such Person's former, current and future Affiliates, incorporators, financing sources, consultants, equity holders, members, stockholders, shareholders, controlling Persons, Representatives, managers, general or limited partners or assignees (or any former, current or future Affiliates, incorporators, financing sources (including the Debt Financing Sources), consultants, equity holders, members, stockholders, shareholders, controlling Persons, Representatives, managers, general or limited partners or assignees of any of the foregoing).

"**Assumed Indebtedness**" means in connection with the Business, and without duplication, the aggregate amounts of any of the following types of indebtedness set forth in Exhibit H attached hereto: (a) any obligation in respect of any Purchased Contract classified as a capital or finance lease or required to be capitalized in accordance with GAAP, (b) the Tax Reserve Liability Amount, (c) fifty percent (50%) of all Liabilities for gift cards store credits, customer loyalty programs, and gift certificates validly issued by Seller and/or its Subsidiaries prior to the Closing Date, (d) fifty percent (50%) of all Liabilities for unclaimed property balance related to gift cards, store credits, customer loyalty programs, and gift certificates validly issued by Seller and/or its Subsidiaries prior to the Closing Date, (e) fifty percent (50%) of all Liabilities (other than the immediately preceding clause (d)) for unclaimed property liabilities (including, escheat unclaimed property, unclaimed property (i.e., Accounts Payable, unclaimed property and cash on accounts)), (f) obligations of the types referred to in the preceding clauses (a) through (e) of any other Person secured by any Encumbrances on any assets, even though such Person has not assumed or otherwise become liable for the payment thereof, (g) all accrued interest thereon and all penalties (including any penalties, expenses, premiums, make-whole, breakage costs or similar liabilities related to the repayment or pre-payment thereof), fees and premiums associated with the repayment of the obligations described in clauses (a) through (f) or (h) any indebtedness not taken into account in the immediately preceding clause (a) through (g), in each case that is associated with a Purchased Asset and/or an Assumed Liability.

"**Assumed Liabilities**" has the meaning set forth in Section 2.2.1.

"**Assumed Taxes**" has the meaning set forth in Section 2.2.1(g).

"**Avoidance Actions**" means those actual and/or potential claims and causes of action under sections 502(d) and 544 through 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or any analogous state law.

"**Bank Accounts**" has the meaning set forth in the definition of Excluded Assets.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means (a) the Federal Rules of Bankruptcy Procedure, (b) any local rules of the Bankruptcy Court, and (c) any chambers rules of the Bankruptcy Court.

"**Base Cash Purchase Price**" means $193,500,000.

"**Bill of Sale**" means the Bill of Sale and Assignment and Assumption Agreement, in substantially the form attached hereto as <u>Exhibit A</u>.

"**Business**" means the business and operations of Seller and its Subsidiaries as of the Closing that are related to its Vitamin Shoppe segment.

"**Business Day**" means any day other than Saturday, Sunday or a day on which banking institutions in New York, New York are permitted or obligated by Law to remain closed.

"**Business Employee**" means an individual employed by Seller or any of its Subsidiaries who is (a) a Store Employee, or (b) providing services primarily in connection with the Business.

"**Business Internet Properties**" means all Internet Properties used or held for use in connection with the Business and operated by or on behalf of Seller or any of its Affiliates, including the Internet domain names and Social Media Accounts listed on <u>Section 3.1.8(b)</u> of Seller Disclosure Schedules, together with (a) all site maps, templates, style guides, design materials and content (including any text, fonts, colors, cascading style sheets (CSS) layouts, video, images, graphics and e-mail templates) made available thereon, (b) all content, including blog content, posted on the foregoing Internet Properties, and (c) any documentation, information and other materials used or held for use in connection with any of the foregoing.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer 401(k) Plan**" has the meaning set forth in <u>Section 5.12.6</u>.

"**Buyer Benefit Plans**" has the meaning set forth in <u>Section 5.12.5</u>.

"**Buyer Expense Reimbursement**" has the meaning set forth in <u>Section 8.1.2</u>.

"**Buyer's Knowledge**" or "**Knowledge of Buyer**" means Michael A. Niegsch and Clayton Lechleiter in each case after reasonable inquiry of applicable direct reports.

"**Buyer Related Person**" means Buyer, each of its Affiliates, and each of Buyer's and its Affiliates' respective equity holders, stockholders, shareholders, officers, directors, employees, partners, members, managers, agents, attorneys, representatives, successors and permitted assigns (including the Business from and after the Closing).

"**Buyer Tax Benefits**" has the meaning set forth in <u>Section 2.1.1(t)</u>.

"**Cash**" means with respect to the Business, the aggregate amount of all cash and cash equivalents determined in accordance with GAAP, including bank or other financial institution deposits, marketable securities, short-term investments and checks, wire transfers and ACHs received by not yet posted (net of any overdrafts and checks written, or wire transfers or ACHs initiated by the Business but not yet cleared), excluding (a) Restricted Cash associated with the Transferred Stores, (b) Store Cash, and (c) credit card receivables.

"**Cash Purchase Price**" means an amount equal to (a) the Base Cash Purchase Price, *less* (b) the Net Working Capital Shortfall (if any), *plus* (c) the Net Working Capital Surplus (if any) *less* (d) the Assumed Indebtedness; *provided*, that in any and all events, the Base Cash Purchase Price is inclusive of the Deposit.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Claims**" mean, collectively, all rights, claims (as that term is defined in section 101(5) of the Bankruptcy Code), causes of action, rights of recovery (including rights of indemnity, warranty rights, rights of contribution, rights to refunds and rights to reimbursement) and rights of set-off, in each case, whether class, individual or otherwise in nature, under contract or in law or in equity, known or unknown, contingent or matured, liquidated or unliquidated and all rights and remedies with respect thereto.

"**Closing**" has the meaning set forth in Section 2.4.

"**Closing Date**" has the meaning set forth in Section 2.4.

"**Closing Payment**" has the meaning set forth in Section 2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.8(a).

"**COBRA**" has the meaning set forth in Section 3.1.9(c).

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means that certain Amended and Restated Confidentiality Agreement, effective as of November 11, 2024, by and between Franchise Group, Inc. and Performance Investment Partners, LLC and that certain joinder agreement, dated as of February 19, 2025, by and between Kingswood Capital Management, L.P. and Performance Investment Partners, LLC.

"**Consenting First Lien Lenders**" means, collectively, as of the relevant time, those First Lien Lenders that are party to the Restructuring Support Agreement.

"**Continuing Employee Transfer Date**" has the meaning set forth in Section 5.12.10.

"**Continuing Employees**" has the meaning set forth in Section 5.12.2.

"**Contract**" means any executory contract, agreement, obligation, lease, sublease, license, sublicense, regulatory license, undertaking, engagement, sales order, purchase order, instrument

or other commitment, whether written or oral, that is binding on any Person or any part of its property under applicable Law.

"**Contracting Party**" has the meaning set forth in <u>Section 7.2.1</u>.

"**control,**" "**controlled by**" and "**under common control with**" mean, when used with respect to any specified Person, (a) the possession, directly or indirectly, of the power to direct the management or policies of that Person, directly or indirectly, whether through the ownership of securities, by trust, by contract, or otherwise or (b) the ownership, directly or indirectly, of more than 50% of the voting securities or other ownership interest of a business entity (or, with respect to a limited partnership or other similar entity, its general partner or controlling entity).

"**Copyrights**" has the meaning set forth in the definition of Intellectual Property.

"**Cure Costs**" shall mean the Liabilities that must be paid or otherwise satisfied to cure all of Debtors' monetary defaults under the Purchased Contracts or the Purchased Leases necessary for such assumption and assignment to Buyer, in each case, pursuant to section 365 of the Bankruptcy Code, as provided herein and in the Sale Order (*provided*, that in no event shall Buyer be liable for any Cure Costs).

"**Data Privacy Laws**" means any Law concerning the collection, use, analysis, retention, storage, protection, transfer, disclosure, disposal or Processing of Personal Information.

"**Debt Commitment Letters**" means, collectively, the executed debt commitment letters dated as of the date hereof, provided to Buyer from each of (a) Wells Fargo Bank, N.A. and (b) Blue Torch Capital LP (or each of their respective Affiliates or other "Commitment Parties" referred to therein), together with all related term sheets, including all exhibits, schedules and annexes, and all fee letters and engagement letters delivered in connection therewith, in each case as amended, restated, amended and restated, supplemented, or modified from time to time in accordance with its terms.

"**Debt Financing**" means the debt financing incurred or intended to be incurred pursuant to the Debt Commitment Letters.

"**Debt Financing Sources**" means the entities that have committed to provide or arrange or otherwise entered into agreements in connection with all or any part of the Debt Financing in connection with the Transactions, including the parties to any joinder agreements, indentures or credit agreements entered pursuant thereto or relating thereto, together with their respective Affiliates, and their and their respective Affiliates' officers, directors, managers, members, employees, agents, advisors, consultants and representatives and their respective successors and assigns.

"**Debtors**" has the meaning set forth in the Recitals.

"**Deposit**" has the meaning set forth in the Recitals.

"**Deposit Escrow Agreement**" has the meaning set forth in the Recitals.

"**Determination Time**" means 12:01 A.M. (Eastern Time) on the Closing Date.

"**DIP Financing Order**" means the Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief [Docket No. 414], entered by the Bankruptcy Court on December 11, 2024.

"**Disputed Contract**" has the meaning set forth in <u>Section 5.8.6</u>.

"**Disputed Item**" has the meaning set forth in <u>Section 2.8(e)</u>.

"**Distribution Centers**" means the distribution centers of Seller located at (a) 112 The Vitamin Shoppe Way, Ashland, VA 23005 and (b) 925 N. 127th Ave, Avondale, AZ 85323.

"**Domain Name Transfer Agreement**" means the Domain Name Transfer Agreement, in substantially the form attached hereto as <u>Exhibit B</u>.

"**Employee Equipment**" means all mobile phones, computers, and related peripherals owned by Seller or its Subsidiaries and used by any Continuing Employee as of immediately prior to the Closing in connection with the Business, if any.

"**Employment Matters**" has the meaning set forth in <u>Section 5.12.9</u>.

"**Encumbrance**" means any mortgage, lien (statutory or otherwise, including as defined in section 101(37) of the Bankruptcy Code), Claim, license, sublicense, pledge, security interest, charge, hypothecation, restriction (including restrictions on transfer or use), claim of ownership, lease, sublease, option, right of use or possession, preference, encroachment, restrictive covenant, right of first offer or refusal, title or survey defect, or other encumbrance or similar restriction of any kind.

"**Enforceability Exceptions**" has the meaning set forth in <u>Section 3.1.2</u>.

"**Environmental Laws**" means all Laws concerning pollution, public or worker health or safety (as it pertains to exposure to Hazardous Materials), or protection of the environment.

"**Equity Commitment Letter**" has the meaning set forth in <u>Section 3.2.6(a)</u>.

"**Equity Financing**" has the meaning set forth in <u>Section 3.2.6(a)</u>.

"**Equity Investors**" means (a) Kingswood Capital Opportunities Fund III, L.P. and (b) Kingswood Capital Opportunities Fund III-A, L.P.

"**Equity Securities**" means, (a) if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such entity, whether membership interests or partnership interests, or (b) other securities directly

or indirectly convertible into, exercisable or exchangeable for or measured by reference to, any securities described in the immediately preceding clause (a).

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any corporation, partnership, limited liability company, sole proprietorship, trade, business or other Person that, together with Seller is or at any time was treated as a single employer under section 414(b), (c), (m) or (o) of the Code or section 4001(a)(14) or 4001(b)(1) of ERISA.

"**Escrow Agent**" means Citibank, N.A., together with its permitted successors and assigns.

"**Estimated Assumed Indebtedness**" has the meaning set forth in Section 2.8(a).

"**Estimated Cash Purchase Price**" means an amount equal to (a) the Base Cash Purchase Price, _plus_ (b) the amount by which the Estimated Net Working Capital Amount is greater than the Target Net Working Capital Amount (if any), _less_ (c) the amount by which the Target Net Working Capital Amount is greater than the Estimated Net Working Capital Amount (if any) _less_ (d) the Estimated Assumed Indebtedness; _provided_, that in any and all events, the Base Cash Purchase Price is inclusive of the Deposit.

"**Estimated Net Working Capital Amount**" has the meaning set forth in Section 2.8(a).

"**Excluded Assets**" means the following assets, property, rights and interests of Seller and its Subsidiaries (in each case excluding any Purchased Assets): (a) all Cash; (b) all refunds, rebates, abatements, credits, deposits, prepayments, overpayments, or other recovery for Taxes, Claims for refunds or rights to receive refunds from any Taxing Authority with respect to any and all Taxes paid or to be paid by Seller or any of its Subsidiaries or with respect to the Purchased Assets, the Business, Assumed Liabilities, or Business Employees (including any and all Taxes paid or to be paid by any of Seller's Subsidiaries or with respect to the Purchased Assets, the Business, Assumed Liabilities, or Business Employees and including any other Tax assets (including any net operating or other losses, credits, carryforwards and other Tax attributes)), together with any refund of interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) (in each case, other than Buyer Tax Benefits); (c) (i) any legal or beneficial interest in the capital stock and other Equity Securities of Seller, its Subsidiaries or any other Person, and (ii) the corporate or other entity charter, qualifications to conduct business as a foreign corporation or other form of business entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, Tax Returns and other tax records, seals, minute books, stock transfer books, and similar organizational documents of Seller or any of its Subsidiaries; (d) all Excluded Items; (e) all Excluded Contracts; (f) all rights of Seller under this Agreement and the Ancillary Agreements; (g) except for the insurance policies described in Section 2.1.1(s), all insurance policies and all rights and benefits of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert Claims with respect to such insurance recoveries, including any directors and officers liability insurance policies; (h) (i) all Claims against current and former directors and officers of Seller and its Subsidiaries; and (ii) Claims or causes of action pursuant to 11 U.S.C. §§ 544, 547 and 548 and

all state law equivalents, other than Claims or causes of action pursuant to 11 U.S.C. §§ 544, 547 and 548 (and all state law equivalent) against or in respect of go-forward trade, vendors and/or landlords of Seller or its Subsidiaries; (i) except for the Plans described in <u>Section 2.1.1(w)</u> of Seller Disclosure Schedules, the sponsorship of, and all assets, properties and rights (including all trusts, insurance policies and administrative services contracts related thereto) related to any Plan and any other benefit or compensation plan, program, policy, agreement, arrangement or Contract at any time maintained, sponsored, participated in, contributed to (or required to be contributed to) by Seller or any of its Affiliates or under or with respect to which Seller or any of its Affiliates has (or has had) any liability or obligation, including on account of an ERISA Affiliate; (j) any intangible assets, including Intellectual Property, that are not used in any manner in the Business, and which are not necessarily for use by Buyer in connection with the Business; (k) any Permit set forth on <u>Section 2.1.1(d)</u> of Seller Disclosure Schedules to the extent not assignable or transferable shall remain subject to the terms and conditions of the Transition Services Agreement; (l) all assets, cash and properties located or held at any of the Non-Transferred Stores, including all Inventory and store fixtures located or held at any of the Non-Transferred Stores; and (m) all bank accounts of Seller and its Subsidiaries related to the Business, including those set forth on <u>Section 3.1.22</u> of Seller Disclosure Schedules, (the "**Bank Accounts**"), each of which Bank Accounts shall remain subject to the terms and conditions of the Transition Services Agreement.

"**Excluded Benefits**" has the meaning set forth in <u>Section 5.12.2</u>.

"**Excluded Contract**" has the meaning set forth in <u>Section 2.1.2</u>.

"**Excluded Items**" means any and all (a) books, documents, records, files and other items prepared in connection with or relating to the negotiation and consummation of the Chapter 11 Cases or any of Transactions or otherwise prepared in connection with the divestiture of any of the assets, properties, contracts, rights or interests of any of the Debtors in connection with the Chapter 11 Cases, including all (i) bids received from Third Parties (and related analyses) relating to the Business, (ii) confidentiality, joint defense or similar agreements with prospective purchasers of the Business, (iii) strategic, financial or Tax analyses relating to the divestiture of the Purchased Assets, the Assumed Liabilities and the Business, (iv) presentations or minutes relating to any of the meetings of Debtors' board of directors or committees thereof, including materials relating to strategic alternatives, including the Transactions and (v) presentations or other materials relating to discussion with Seller's lenders or key constituents or counterparties; and (b) all personnel records (including all human resources and other records), whether or not held by Seller or any of its Subsidiaries and whether or not relating to employees (other than the Continuing Employees) of Seller or any of its Subsidiaries.

"**Excluded Liabilities**" means all Liabilities of Seller or any of its Subsidiaries of whatever nature, whether presently in existence or arising or asserted hereafter (other than the Assumed Liabilities), including, without limiting the generality of the foregoing, the following: (a) Excluded Taxes; (b) all Liabilities arising out of, resulting from, or relating to any Excluded Assets; (c) all (i) indebtedness for borrowed money of the Debtors' (other than the Assumed Indebtedness) and (ii) other indebtedness set forth on <u>Section 1.1.2(c)</u> of Seller Disclosure Schedules; (d) fees, costs and expenses incurred in connection with the Chapter 11 Cases or the Transactions (except as otherwise contemplated by this Agreement); (e) except, in each case, with

respect to any Liabilities specifically assumed by Buyer pursuant to <u>Section 5.12,</u> (i) any transaction, change of control, success, retention or stay bonuses, severance, bonus incentive, or deferred compensation payments or other similar payments or obligations payable to any current or former employee, officer, director or other individual service provider of Seller or its Subsidiaries (including the Business Employees) under each Plan, policy, program, agreement, arrangement, or Contract sponsored or maintained by Seller or its Subsidiaries or to which Seller or its Subsidiaries is a party (including in connection with or arising out of the consummation of the Transactions (except as excluded pursuant this clause (e), including any "double-trigger" severance or other payments or obligations payable in combination with any other event)), (ii) other than Liabilities assumed by Buyer pursuant to <u>Section 2.2.1(c)</u>, any outstanding and unpaid bonus, commission or incentive obligations in respect of any current or former employee, officer, director or other individual service provider of Seller or its Subsidiaries (including the Business Employees), (iii) other than payments required to be made by Buyer to Seller pursuant to the Transition Services Agreement, all Liabilities at any time arising under, pursuant to or in connection with each Plan and any other benefit or compensation plan, program, policy, agreement, arrangement, or Contract, in each case, at any time sponsored, maintained, contributed to or required to be contributed to by Seller or any of its Affiliates or under or with respect to which Seller or any of its Affiliates has (or has had) any Liability (including on account of an ERISA Affiliate), including Liabilities arising under Title IV of ERISA or on account of any violation of COBRA, (iv) all Liabilities relating to or arising out of the employment or termination of employment of (A) any Business Employee who becomes a Continuing Employee with respect to periods of employment or termination of employment with Seller or its Subsidiaries prior to the Closing (but excluding in respect of any (1) Liabilities assumed pursuant to <u>Section 2.2.1(c)</u> and (2) severance obligations for any Continuing Employee caused directly by any actions taken by Buyer or at the direction of Buyer after the Closing), (B) any former employees of Seller or its Subsidiaries (including any former employees of the Business) and Business Employees who do not become Continuing Employees with respect to periods of employment or termination of employment with Seller or its Subsidiaries, and (C) any applicant for employment with Seller or its Subsidiaries at any time prior to the Closing, including any Claims in respect of hiring, promotion, compensation, overtime, bonuses, commissions, workers' compensation or disability, vacation, sick pay or paid time off, other employee benefits to which any such employees may be entitled as a result of his or her employment by Seller or its Subsidiaries, and any other terms and conditions of employment, (v) all Liabilities arising out of or relating to Claims by any agents or independent contractors of, and who provide personal services to, Seller or its Subsidiaries with respect to any Claims or personal injuries sustained in connection with the retention of such Person by Seller or any of its Subsidiaries, including workers' compensation or disability, regardless of when such claim is made or asserted; (f) except for the accrued and unpaid accounts payable of the Business reflected on <u>Exhibit E</u> attached hereto (and included as part of Net Working Capital), all accrued and unpaid accounts payable of the Business as of the Closing Date, including legal expenses accrued but unpaid as of the Closing Date related to any Litigation to which Seller or its Subsidiaries are party, in each case, whether invoiced before or after Closing; (g) all Cure Costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Purchased Assets, including the Purchased Contracts and the Purchased Leases as finally determined by the Bankruptcy Court (*provided*, that, in no event shall Buyer be liable for any Cure Costs); (h) any pending or threatened Litigation

with respect to any events, acts or circumstances occurring prior to the Closing; and (i) any Liabilities set forth on Section 1.1.2(i) of Seller Disclosure Schedules.

"**Excluded Tax Returns**" means Tax Returns (or any portion of any Tax Return) and other books and records related to (a) Taxes that are not primarily related to the Purchased Assets or (b) any income Tax Returns of Seller or its Affiliates.

"**Excluded Taxes**" means any (a) Taxes of Seller (or any Affiliates or subsidiaries of Seller) (other than as expressly provided in this Agreement), (b) Taxes arising out of, relating to or with respect to Excluded Assets or Excluded Liabilities, and (c) Taxes arising out of, relating to or with respect to the Business, the Purchased Assets or the Assumed Liabilities with respect to any taxable period ending on or before the Closing Date and the portion of any Straddle Period through and including the Closing Date (allocated in accordance with Section 5.3.2(b)).

"**Execution Date**" has the meaning set forth in the Preamble.

"**Final Assumed Indebtedness**" has the meaning set forth in Section 2.8(f).

"**Final Net Working Capital**" has the meaning set forth in Section 2.8(f).

"**Final Order**" shall mean an Order or judgment of the Bankruptcy Court entered by the clerk of the Bankruptcy Court or such other court on the docket in the Chapter 11 Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the applicable Bankruptcy Court, or other court of competent jurisdiction shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or a similar rule of such other court of competent jurisdiction; *provided*, that, with respect to the Bankruptcy Court, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be (but for the avoidance of doubt has not been) filed relating to such order, shall not cause such order not to be a Final Order.

"**Final Post-Closing Statement**" has the meaning set forth in Section 2.8(f).

"**Financial Statements**" has the meaning set forth in Section 3.1.18(a).

"**First Lien Credit Agreement**" has the meaning set forth in the definition of First Lien Lenders.

"**First Lien Lenders**" means, collectively, beneficial holders of, or investment advisors, sub-advisors or managers of discretionary funds, accounts or sub-accounts that beneficially hold, any claim on account of prepetition first lien loans arising under or pursuant to (a) that certain

First Lien Credit Agreement, dated as of March 10, 2021 (the "**First Lien Credit Agreement**"), among Franchise Group, Inc., as lead borrower, the other borrowers and guarantors party thereto, Wilmington Trust, National Association (as successor to JPMorgan Chase Bank, N.A.), as agent, and the lenders party thereto from time to time, as amended, restated, amended or restated, supplemented, or otherwise modified from time to time or (b) the other Loan Documents as defined in the First Lien Credit Agreement.

"**Fraud**" means, an actual and intentional misrepresentation of fact with respect to the making of the representations and warranties set forth in this Agreement, any of the Ancillary Agreements, or in any certificates delivered pursuant hereto or thereto with the intent to deceive another Person or to induce that Person to enter into this Agreement, any of the Ancillary Agreements, or in any certificates delivered pursuant hereto or thereto and requires (a) a false representation, (b) knowledge that such representation is false, (c) an intention to induce the Person to whom such representation is made to act or refrain from acting in reliance upon it, and (d) caused such Party to suffer a loss by reason of such reliance. "Fraud" should not include constructive fraud, negligent misrepresentation, recklessness or equitable claim (including unjust enrichment).

"**GAAP**" means United States generally accepted accounting principles, consistently applied from time to time.

"**Governmental Authority**" means (a) any governmental or public department, central bank, court, minister, governor-in-council, cabinet, commission, tribunal, board, bureau, agency, commissioner or instrumentality or other regulatory or administrative authority, whether international, multinational, national, federal, provincial, state, municipal, local, or other; (b) any subdivision or authority of any of the above; (c) any stock exchange; (d) any arbitral body (public or private); and (e) any quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the above.

"**Hazardous Materials**" means any materials, substances or wastes for which Liability or binding standards of conduct may be imposed pursuant to any Environmental Laws, including any petroleum products or byproducts, asbestos or asbestos-containing materials, polychlorinated biphenyls, per- and polyfluoroalkyl substances, lead, toxic mold or radioactive materials.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Inactive Business Employee**" has the meaning set forth in <u>Section 5.12.4</u>.

"**Independent Contractors**" has the meaning set forth in <u>Section 3.1.10(b)</u>.

"**Intellectual Property**" means all of the following: (a) Patents; (b) copyrights and other equivalent rights in works of authorship (published or unpublished), including all data compilations, website content, advertising collateral, and promotional materials, designs, moral rights (or other similar rights) and all other rights associated therewith, copyright registrations, applications and renewals in connection therewith, together with all translations, adaptations, derivations, and combinations thereof ("**Copyrights**"); (c) designs, design registrations, and design registration applications; (d) trademarks, names, trade names, business names, corporate

names, domain names, Social Media Accounts, website names and world wide web addresses, common law trademarks, unregistered trademarks, service marks, trade dress and logos, slogans, and other designations of source or origin, and all goodwill related to the foregoing, and all applications, registrations, and renewals in connection therewith ("**Trademarks**"); (e) rights in computer programs and software (whether in source code, object code, html code, executable code, or other form), whether or not copyrightable, algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation thereto, including user manuals, developer notes, comments, annotations, and training materials, related to any of the foregoing, and all version updates, corrections, enhancements, and modifications thereto; (f) rights in trade secrets and all other confidential information, know-how, inventions, improvements, processes, formulae, recipes, models, techniques, plans, ideas, concepts, designs, drawings, specifications, business, manufacturing and production processes and techniques, technical data and information, scientific and technical data or information, and methodologies, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals, and all other information that derives economic value from not being generally known ("**Trade Secrets**"); (g) Internet domain names, URLs, internet protocol addresses, Social Media Accounts, websites and all content provided in the foregoing ("**Internet Properties**"); (h) registrations and applications for any of the foregoing; (i) all goodwill associated or arising in connection with the forgoing; (j) all other intellectual property or proprietary rights of any kind or nature arising under any jurisdiction; (k) all rights of publicity, including the right to use the name, voice, likeness, signature and biographies of real persons, together with all goodwill related thereto; (l) all other similar proprietary rights; and (m) all copies and tangible embodiments thereof (in whatever form or medium).

"**Interim Financial Statements**" has the meaning set forth in Section 5.17.

"**Interim Period**" means the period commencing immediately after the execution and delivery of this Agreement on the Execution Date and ending on the earlier of (a) Closing and (b) the termination of this Agreement.

"**Internet Properties**" has the meaning set forth in the definition of Intellectual Property.

"**Inventory**" means (a) all inventories relating to the Business which are owned by Seller or its Subsidiaries and which are on hand at the Transferred Stores, Distribution Centers, or in transit thereto, as of the Determination Time (including all inventories that Seller or any of its Subsidiaries buys back from their franchisees), and (b) constituent inventory (including any raw materials, work in process inventory or finished good inventory) to the extent owned by Seller or its Subsidiaries and related to the Business. Notwithstanding the foregoing, "Inventory" shall not include: (i) goods which belong to sublessees or concessionaires of Seller or its Subsidiaries or (ii) goods held by Seller or its Subsidiaries on memo, on consignment, or as bailee, with respect to Purchased Products held by manufacturers thereof, with respect to Purchased Products held by manufacturers thereof.

"**IRS**" means the Internal Revenue Service or any successor Governmental Authority.

"**IT Systems**" means all software, computer hardware, servers, networks, platforms, peripherals, and similar or related items of automated, computerized, or other information

technology networks and systems (including telecommunications networks and systems for voice, data and video) owned, leased, licensed, or used (including through cloud-based or other third-party service providers) by Seller or its Subsidiaries.

"**Joint Written Instructions**" has the meaning set forth in Section 8.2.5.

"**Latest Balance Sheet**" means the most recent balance sheet included in the Financial Statements.

"**Law**" means any (a) applicable national, supranational, domestic or foreign, federal, state, provincial or local statute, law (including the common law), act, treaty, code, constitution, ordinance, Order, decree, rule, ruling, directive, determination, decision, opinion, administrative interpretation, regulation, or by-law, and (b) any other policy, guideline, notice, protocol or requirement having the force of law of any Governmental Authority, in each case as in effect from time to time.

"**Lease**" means all rights and interests of Seller or its Subsidiaries for all unexpired leases, subleases, licenses, or other rights to use or occupy real property, and any amendments, supplements, concessions, options, extension letters, assignments, termination agreements, subordination agreements and nondisturbance agreements and guaranties related to the foregoing.

"**Lease Assignment**" means the Lease Assignment and Assumption Agreement, in substantially the form attached hereto as Exhibit D.

"**Leased Real Property**" has the meaning set forth in Section 2.1.1(i).

"**Liability**" means any debt, loss, liability, obligation, commitment, claim, damage, demand, fine, judgment, deficiency, fee, charge, cost, expense, expenditure, Tax, or penalty, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, known or unknown, fixed or contingent, matured or unmatured, direct or indirect, determined or determinable or otherwise (including all adverse reactions, recalls, product and packaging complaints or other liabilities), whether arising under any Law, Order, Contract or otherwise and without regard to when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"**Litigation**" means any claim, action, charge, complaint, audit, investigation, examination, inquiry, arbitration, mediation, hearing, proceeding, suit (whether civil, criminal, administrative, or investigative or appellate proceeding), warning letter, or notice of violation by or before any Governmental Authority.

"**Look-Back Date**" means August 21, 2023.

"**Material Adverse Effect**" means any event, result, effect, occurrence, state of facts, circumstance, development, condition or change, that, individually or in the aggregate, (a) has had or would reasonably be expected to have a material adverse effect on the business, results of operations, assets, liabilities or condition (financial or otherwise) of the Business or the Purchased Assets and the Assumed Liabilities, taken as a whole or (b) would reasonably be expected to prevent or materially impair or delay the ability of Seller to consummate the Closing; *provided,*

*however*, that in the case of the foregoing clause (a) only, none of the following shall be deemed (individually or in combination) to constitute, or shall be taken into account in determining whether there has been, a "Material Adverse Effect": (i) general political or economic conditions or conditions affecting the capital or financial markets generally, including the worsening of any existing conditions or changes affecting the availability or cost of financing; (ii) conditions generally affecting any industry or industry sector in which Seller and its Subsidiaries operate or compete; (iii) any change in accounting requirements, applicable Laws or the enforcement, implementation or interpretation thereof; (iv) any hostility, act of war, sabotage, terrorism or military actions, or any escalation of any of the foregoing; (v) any hurricane, flood, tornado, earthquake, pandemic, epidemic, disease, outbreak, public health crisis or other natural disaster or force majeure event; (vi) this Agreement, the Transactions or the Chapter 11 Cases, including the public announcement thereof or the impact of such announcement or pendency on the relationship of Seller and its Subsidiaries with any supplier, distributor, customer, partner, franchisee or similar relationship or any loss of employees resulting therefrom; (vii) the failure of Seller and its Subsidiaries to achieve any financial projections, predictions, forecasts or estimates of revenues for any period (*provided*, that the underlying causes of such failure shall not be excluded unless otherwise excluded pursuant to this definition); (viii) any act or omission of Seller or any of its Subsidiaries required by the terms of this Agreement or at the request (or with the consent) of Buyer; (ix) (A) the commencement or pendency of the Chapter 11 Cases, (B) any objections in the Bankruptcy Court to (1) this Agreement, any Ancillary Agreement or the Transactions, (2) the reorganization of Seller or any of its Subsidiaries or (3) the assumption or rejection of any Purchased Contract otherwise in compliance with this Agreement, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller or its Subsidiaries required to be taken (or not taken) to comply therewith; (x) actions taken by Buyer or its Affiliates with respect to the Transactions or the financing thereof or any breach by Buyer of this Agreement; (xi) any act or omission by Seller or any of its Subsidiaries required to be taken pursuant to the terms of the DIP Financing Order; and (xii) any change in the market price, credit rating or trading volume of Seller's or any of its Subsidiaries' stock or other securities or any change affecting the ratings or the ratings outlook for Seller or any of its Subsidiaries (*provided*, that the underlying factors contributing to any such change shall not be excluded unless such underlying factors would otherwise be excluded from the definition of Material Adverse Effect); except, in the case of clauses (i) through (v), to the extent that any such event, result, effect, occurrence, state of facts, circumstance, development, condition or change has a disproportionate and adverse effect on the Purchased Assets and Assumed Liabilities, taken as a whole, relative to other Persons operating businesses similar to the Business.

"**Material Contracts**" has the meaning set forth in <u>Section 3.1.19(a)</u>.

"**Mobile Platform**" means all consoles, certificates, profiles, identifiers, files, keys, API, and any other information, documentation or materials necessary or useful for maintaining user accessibility to the mobile Software applications made available through the Apple App Store or the Google Play Store by or on behalf of Seller in connection with the Business, as necessary or useful for Buyer to provide notice and redirection to users through such application in a manner controlled by Buyer at and following Closing, together with (a) all administrator usernames, passwords and credentials used to access, use, manage, maintain or renew such consoles, certificates, profiles, identifiers, files or keys, and (b) all site maps, templates, style guides, design

materials and content (including any text, fonts, colors, cascading style sheets (CSS), layouts, video, images and graphics) with respect thereto or made available thereon.

"**Multiemployer Plan**" has the meaning set forth in Section 3.1.9(c).

"**Net Adjustment Amount**" has the meaning set forth in Section 2.8(b).

"**Net Working Capital Amount**" means, without duplication, (a) the aggregate dollar amount of the "current assets" of the Business that constitute Purchased Assets (*provided*, that, with respect to Taxes solely to the extent apportioned to the Pre-Closing Tax Period in accordance with Section 5.3.2(b)) *minus* (b) the aggregate dollar amount of the "current liabilities" of the Business that constitute Assumed Liabilities (*provided*, that, with respect to Taxes solely to the extent apportioned to the Pre-Closing Tax Period in accordance with Section 5.3.2(b)), measured as of the Determination Time, in each case calculated in accordance with the Accounting Policies. Notwithstanding anything to the contrary, Net Working Capital Amount shall not be calculated with respect to any Taxes except for Apportioned Obligations, which shall (i) be apportioned in accordance with Section 5.3.2(b), (ii) shall not include any contingent Taxes, Tax reserves or uncertain Taxes, and (iii) shall be calculated consistently with Section 5.3.4. Net Working Capital Amount shall exclude Assumed Indebtedness, the Tax Reserve Liabilities, Cure Costs, Cash, Restricted Cash, shall include Store Cash and shall reflect only the line items of the "current assets" and the "current liabilities" of the Business as set forth on Exhibit E.

"**Net Working Capital Shortfall**" has the meaning set forth in Section 2.8(b).

"**Net Working Capital Surplus**" has the meaning set forth in Section 2.8(b).

"**Non-Recourse Persons**" has the meaning set forth in Section 7.2.1.

"**Non-Transferred Store**" has the meaning set forth in Section 4.6.

"**Notice**" has the meaning set forth in Section 9.2.1.

"**Objection Notice**" has the meaning set forth in Section 2.8(e).

"**Offer Employees**" has the meaning set forth in Section 5.12.2.

"**Offer List Deadline**" has the meaning set forth in Section 5.12.2.

"**Open Source Software**" means any software that is licensed pursuant to (a) any license that is a license now or in the future approved by the Open Source Initiative and listed at http://opensource.org/licenses, which licenses include all version of the GNU General Public License (GPL), the GNU Lesser General Public License (LGPL), the GNU Affero GPL (AGPL), the MIT license, the Eclipse Public License, the Common Public License, the CDDL, the Mozilla Public License (MPL), the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL), and the Sun Industry Standards License (SISL); (b) any license to software that is considered "free" or "open source software" by the Open Source Foundation or the Free Software Foundation; or (c) any reciprocal license, in each case whether or not source code is available or included in such license.

"**Order**" means any judicial, arbitral, administrative, ministerial, departmental or regulatory writ, judgment, edict, directive, adjudication, decree, injunction, ruling, order, decision, award or other binding obligation, pronouncement, determination or similar action taken by, or applied by, any Governmental Authority (in each case, whether temporary, preliminary or permanent).

"**Ordinary Course**" means, with respect to an action taken by a Person, that such action is taken in the ordinary course of the normal day-to-day operations of such Person, taking into account the Chapter 11 Cases, consistent with past practice.

"**Organizational Documents**" means, as applicable, (a) the certificate or articles of incorporation, formation, organization, limited partnership or association, (b) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person, (c) the bylaws or any similar governing document adopted in connection with the creation, formation or organization of a Person, (d) the operating agreement or limited liability company agreement of a limited liability company or limited partnership agreement of a limited partnership, (e) any similar organizational documents or instruments of any other type of foreign or domestic entity and (f) any amendment or modification to any of the foregoing.

"**Outside Date**" means July 15, 2025.

"**Owned Intellectual Property**" means all Intellectual Property owned or purported to be owned by Seller or any of its Subsidiaries and related to the Business.

"**Party**" or "**Parties**" has the meaning set forth in the Preamble.

"**Patents**" means all inventions (whether patentable or unpatentable and whether or not reduced to practice), invention disclosures, discoveries, all improvements thereto, and all issued patents and patent applications, provisional patent applications, together with all counterparts claiming priority therefrom, and all applications for reissues, industrial designs, or invention disclosures in any country or supranational jurisdiction, and any substitutions, divisionals, continuations, continuations-in-part, reissues, renewals, confirmations, re-examinations, extensions, and supplementary protection certificates and all application sharing common technical specifications.

"**Payee**" has the meaning set forth in Section 5.3.1(a).

"**Payer**" has the meaning set forth in Section 5.3.1(a).

"**Payments**" has the meaning set forth in Section 5.3.1(a).

"**PCI DSS**" means the Payment Card Industry Data Security Standard.

"**Permit**" means with respect to any Person, any permit, license, grant, authorization, consent, registration, certificate, franchise, certification, variance, exemption, Order or approval or similar authorization of any Governmental Authority having jurisdiction over such Person.

"**Permitted Encumbrance**" means any (a) Encumbrance for utilities and Taxes not yet due or delinquent or for those Taxes being contested in good faith by appropriate proceedings and, in each case, for which appropriate reserves have been established in accordance with GAAP or the nonpayment of which is permitted or required by applicable bankruptcy Law; (b) Encumbrance imposed by Law that does not or would not be reasonably expected to materially detract from the current value of, or materially interfere with the present use and enjoyment of, any Purchased Asset subject thereto or affected thereby in the Ordinary Course; (c) non-exclusive licenses of Intellectual Property granted in the Ordinary Course; (d) mechanics', materialmen's, carriers', workmen's, warehouseman's, repairmen's, landlords' and similar Encumbrances granted or which arise in the Ordinary Course for amounts which are not due and payable; (e) Encumbrances on the Leased Real Property in favor of the landlord of such Leased Real Property, whether contractual, statutory or otherwise; (f) matters that would be disclosed by a title commitment, or current and accurate survey of each parcel of Leased Real Property, in each case, that would not, individually or in the aggregate, reasonably be expected to materially detract from the property and/or the value thereof or in any way prohibit use of the property for its current purposes; (g) Encumbrances expressly contemplated by, or that are removed or released by operation of, the Sale Order; and (h) Encumbrances disclosed on Section 1.1.3 of Seller Disclosure Schedules.

"**Person**" means any individual, partnership, limited partnership, limited liability partnership, limited liability company, unlimited liability company, joint stock company, joint venture, syndicate, sole proprietorship, corporation, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, or any other legal entity, including a Governmental Authority, and pronouns have a similarly extended meaning.

"**Personal Information**" means all data and information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly to a particular individual or otherwise is subject to any applicable Data Privacy Laws related to the privacy or security of information associated with an individual.

"**Personal Property**" means all tangible personal property relating to the Business that is owned or used by Seller and/or its Subsidiaries, including apparatus, materials, furniture, fixtures, supplies, parts, equipment, computers, servers, machinery, vehicles, rolling stock, and other tangible property.

"**Personnel Records**" means the following current employment and current personnel information with respect to each Continuing Employee, in each case, to the extent permitted by applicable Law: salary, wage grade, job description, variable compensation targets, performance documentation, training and continuing education records, business and personal mailing addresses and telephone numbers, any employment, confidentiality, restrictive covenants and/or intellectual property assignment agreements, employee handbook and policy acknowledgments, and any other employment-related agreements, acknowledgements and authorizations, Family and Medical Leave Act (or similar) records, disability accommodation records, workplace injury records, internal or external complaints by or concerning such Continuing Employee, Forms I-9 (Employment Eligibility Verification) related to such Continuing Employee; *provided*, that Personnel Records shall not include any medical records.

"**Plan**" means each "employee benefit plan" within the meaning of section 3(3) of ERISA (whether or not subject to ERISA) and each other stock purchase, stock option, restricted stock, phantom stock, equity or equity-based, employment, consulting, termination, severance, retention, stay-on, change-of-control, bonus, incentive, deferred compensation, retirement, supplemental retirement, retiree medical or life insurance, and any other plan, policy, program, agreement, arrangement or Contract providing compensation or benefits, in each case, whether written or oral, and (a) with or covering (including eligibility to participate) any Business Employee (or the dependent or beneficiary thereof) to which Seller or any of its Subsidiaries or Affiliates is a party, or (b) that is maintained, sponsored or contributed to by Seller or any of its Subsidiaries or Affiliates for the benefit of any Business Employee, or to which Seller or any of its Subsidiaries or Affiliates has or could reasonably be expected to have any Liability.

"**Post-Closing Statement**" has the meaning set forth in Section 2.8(c).

"**Post-Closing Tax Period**" has the meaning set forth in Section 5.3.2(b).

"**Pre-Closing Tax Period**" has the meaning set forth in Section 5.3.2(b).

"**Privacy Policies**" has the meaning set forth in Section 3.1.8(o).

"**Processing**" shall mean any operation or set of operations which is performed on Personal Information, whether or not by automatic means, such as collection, recording, organization, storage, access, storage, distribution, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination, transfer or otherwise making available, alignment or combination, blocking, erasure or destruction.

"**Public Statement**" has the meaning set forth in Section 5.2.

"**Purchase Price**" means the Cash Purchase Price, *plus* the Assumed Liabilities.

"**Purchased Assets**" has the meaning set forth in Section 2.1.1.

"**Purchased Books and Records**" means all books and records data, databases, taxonomies (including all Tax books records, Tax Returns and related workpapers or other documents, but excluding Excluded Tax Returns), documents and files collected, held or used in connection with the Business of Seller and its Subsidiaries, including (to the extent collected, held or used in connection with the Business) all (a) vendor and supplier lists and associated information, (b) customer data, together with all data held or collected in connection therewith (in any data field), including all contact information, demographic information, transaction and usage histories, registry information, loyalty program data (including with respect to customer participation, loyalty tiers, reward balances and other information) and gift card information (including with respect to usage, cards issued and balances), (c) customer opt-out or opt-in lists, (d) current customer models, segmentation, life time value, share of wallet, probability to shop and next product to buy, and other customer-based analyses or reports, (e) blog content, social media content, analytics (including data relating to Internet Properties) visitor data, product review and user-generated content (including images, text, video and all other content), (f) other cost, pricing and sales data, (g) other information incorporated in or relating to any other Purchased Asset (including the development, maintenance, use or operation thereof), and (h)

usernames, passwords and credentials used to access, use, manage, maintain or renew any of the foregoing.

"**Purchased Contracts**" has the meaning set forth in Section 2.1.1(a).

"**Purchased Intellectual Property**" means the Intellectual Property licensed to Seller or its Subsidiaries under the Purchased Contracts, and all other Owned Intellectual Property.

"**Purchased Leases**" has the meaning set forth in Section 2.1.1(i).

"**Purchased Products**" means the products that are formulated and supplied by a third-party to Seller and its Subsidiaries' with Seller's branding as of the Closing.

"**Representatives**" means a Party's officers, directors, employees, agents, attorneys, accountants, consultants, advisors, financing sources and other representatives.

"**Restricted Cash**" shall mean all cash held in escrow or as a security or other deposit, held for or on behalf of any person, deposited with any person, or if usage of, or access to, cash is restricted by Law, Contract, or otherwise, and/or if such cash is restricted in any manner whatsoever, then including the amount of the fees, costs, expenses, interest, penalties, reductions, withholdings, and/or Taxes or other levies imposed on, and/or related to, removing any restrictions and/or limitations on the use, or repatriation, of such cash.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement, dated as of November 1, 2024, inclusive of all exhibits and schedules thereto, by and among the Debtors, the Consenting First Lien Lenders, and any other Person that may become a party to such agreement pursuant to its terms, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the Transactions.

"**Sale Motion**" has the meaning set forth in Section 5.8.1.

"**Sale Order**" has the meaning set forth in Section 5.8.1.

"**Sanctioned Country**" means any of Cuba, Iran, North Korea, Syria, and the Crimea region or so-called Donetsk People's Republic or Luhansk People's Republic regions in Ukraine.

"**Sanctioned Person**" means any Person with whom dealings are restricted or prohibited under any Sanctions, including (a) any Person identified in any list of Sanctioned Persons maintained by (i) the U.S. Department of Treasury, Office of Foreign Assets Control or the U.S. Department of State, (ii) His Majesty's Treasury of the United Kingdom, (iii) the United Nations or (iv) the European Union, (b) any Person located, organized, or resident in, organized in, or a Governmental Authority or government instrumentality of, any Sanctioned Country and (c) any Person directly or indirectly 50% or more owned or controlled by a Person described in clause (a) or (b).

"**Sanctions**" means all applicable Laws concerning economic sanctions.

"**Secured Party Deliverables**" means a written waiver and consent executed by the Required Lenders under and as defined in the First Lien Credit Agreement and the Required Supermajority Lenders under as defined in the DIP Credit Agreement (as defined in the DIP Financing Order) in the form of Exhibit I attached hereto.

"**Seller**" has the meaning set forth in the Preamble.

"**Seller 401(k) Plan**" has the meaning set forth in Section 5.12.6.

"**Seller Disclosure Schedules**" means the disclosure schedules of Seller delivered by Seller pursuant to this Agreement.

"**Seller Expense Reimbursement**" has the meaning set forth in Section 8.2.5.

"**Seller Insurance Coverage**" has the meaning set forth in Section 5.13.

"**Seller's Knowledge**" or "**Knowledge of Seller**" means the actual knowledge of any one of Andrew Laurence, Eric Seeton, Andrew Kaminsky and Tiffany McMillan-McWaters, in each case after reasonable inquiry of applicable direct reports and without personal liability on the part of any of them, other than Fraud.

"**Seller Related Person**" means Seller, its Affiliates, and each of Seller's and its Affiliates' respective equity holders, stockholders, shareholders, officers, directors, employees, partners, members, managers, agents, attorneys, representatives, heirs, trustees, trust beneficiaries, successors and permitted assigns.

"**Seller Software**" has the meaning set forth in Section 3.1.8(a).

"**Seller Source Code**" has the meaning set forth in Section 3.1.8(k).

"**Social Media Accounts**" means social media profiles, accounts, addresses and handles (including those made available through Facebook, X.com, YouTube, TikTok, or similar platforms).

"**Software**" means all software, software platforms, computer programs, operating systems, applications, firmware, user interfaces, application programming interfaces, and other code, including all related source code, object code, application programming interfaces, data files, databases, protocols, specifications, and all documentation relating to any of the foregoing.

"**Store Cash**" has the meaning set forth in Section 2.1.1(u).

"**Store Employee**" means an individual employed by Seller or any of its Subsidiaries who is providing services at one of the Stores or Distribution Centers.

"**Store Threshold**" has the meaning set forth in Section 4.6.

"**Store Transfer Date**" has the meaning set forth in Section 5.12.2.

"**Stores**" means the retail store locations leased by Seller and/or its Subsidiaries that are set forth on Section 1.1.4 of Seller Disclosure Schedules.

"**Straddle Period**" means any taxable period that includes but does not end on the Closing Date.

"**Subsidiary**" means, with respect to any Person, any entity of which at least a majority of the securities or ownership interests having by their terms voting power to elect a majority of the board of directors or other Persons performing similar functions is directly or indirectly owned or controlled by such Person or by one or more of its respective Subsidiaries, or is under common control with such Person. The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"**Target Net Working Capital Amount**" means $139,840,437.00.

"**Tax Laws**" has the meaning set forth in Section 2.3.2.

"**Tax Reserve Liabilities**" means any and all sales and use Taxes imposed with respect operations of the Business in any taxable period (or portion thereof) ending on or before the Closing Date.

"**Tax Reserve Liability Amount**" means $4,200,000.00.

"**Tax Reserve Liability Proceedings**" has the meaning set forth in Section 5.3.6.

"**Tax Return**" means any return, declaration, report, election, notice, filing, claim for refund, information return or statement relating to Taxes, including any schedule or attachment thereto, filed or maintained, or required to be filed or maintained, in connection with the calculation, determination, assessment or collection of any Tax and includes any amended returns required as a result of examination adjustments made by the IRS or other Taxing Authority.

"**Taxes**" means any and all taxes, charges, fees, customs, levies, duties, excises, premiums, imposts, required deposits or other assessments of any kind whatsoever and however denominated, including all federal, state, local or foreign net income, capital gains, gross income, gross receipt, property, franchise, sales, use, excise, withholding, payroll, employment, social security, worker's compensation, unemployment, occupation, capital stock, transfer, registration, recording, gains, windfall profits, environmental, net worth, asset, transaction and other taxes, and any interest, penalties, fines or additions to tax with respect thereto, imposed upon any Person by any Taxing Authority or other Governmental Authority under applicable Law.

"**Taxing Authority**" means any Governmental Authority or any quasi-governmental body exercising tax regulatory authority.

"**Third Party**" means any Person other than Seller, Buyer and their respective Affiliates and permitted successors and assigns.

"**Top Suppliers**" has the meaning set forth in Section 3.1.20.

"**Trade Secrets**" has the meaning set forth in the definition of Intellectual Property.

"**Trademark Assignment Agreement**" means the Trademark Assignment Agreement, in substantially the form attached hereto as <u>Exhibit C</u>.

"**Trademarks**" has the meaning set forth in the definition of Intellectual Property.

"**Transactions**" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"**Transfer Taxes**" has the meaning set forth in <u>Section 5.3.2(a)</u>.

"**Transferred Stores**" means the Stores or the Distribution Centers that become designated for assumption and assignment in accordance with <u>Section 2.7.2</u>.

"**Transition Services Agreement**" means the transition services agreement substantially in the form attached hereto as <u>Exhibit G</u>.

"**U.S.**" or "**United States**" means the United States of America.

"**Vitamin Shoppe Marks**" has the meaning set forth in <u>Section 5.15</u>.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Laws.

"**Willful Breach**" shall mean (a) Fraud or (b) a deliberate act or a deliberate failure to act, in each case, in material breach of a covenant set forth in this Agreement or any Ancillary Agreement.

     **1.2**    **Construction**. Except where the context otherwise requires, wherever used, the singular includes the plural, the plural the singular, the use of any gender shall be applicable to all genders and the word "or" is used in the inclusive sense (and/or). The captions of this Agreement are for convenience of reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision contained in this Agreement. The terms "include," "includes" and "including" mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and do not limit the generality of any description preceding such term. The language of this Agreement shall be deemed to be the language mutually chosen by the Parties and no rule of strict construction shall be applied against either Party. Unless otherwise specified or where the context otherwise requires, (a) references in this Agreement to any Article, Section, Schedule or Exhibit are references to such Article, Section, Schedule or Exhibit of this Agreement; (b) references in any Section to any clause are references to such clause of such Section; (c) "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (d) references to a Person are also to its successors and permitted assigns; (e) references to a Law include any amendment or modification to such Law and any rules or regulations issued thereunder, in each case, as in effect at the relevant time of reference thereto; (f) references to any agreement, instrument or other document in this Agreement refer to such agreement, instrument or other document as originally executed or, if subsequently amended, replaced or supplemented from time to time, as so amended, replaced or supplemented and in effect at the relevant time of

reference thereto; (g) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; (h) all references to "made available" means, when used with respect to any document or other item of information, that such document or other item of information was provided or made available to Buyer in the "virtual data room" prepared by Seller to which Buyer has been provided access prior to the date hereof; (i) references to monetary amounts are denominated in United States Dollars and all references to "$" shall be deemed to refer to United States dollars; and (j) references to "reasonable best efforts" with respect to the Parties or their respective Affiliates means the efforts that a commercially reasonable Person desirous of achieving a result would use in similar circumstances to achieve that result as expeditiously as reasonably practicable. The Parties have participated jointly in the negotiation and drafting of this Agreement and in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party (or any Affiliate thereof) by virtue of the authorship of any of the provisions of this Agreement. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions of this Agreement.

## ARTICLE 2
## SALE AND PURCHASE OF ASSETS; LIABILITIES

**2.1    Sale of Purchased Assets**.

2.1.1    <u>Purchase and Sale of Purchased Assets</u>. Upon the terms and subject to the conditions of this Agreement and the Ancillary Agreements, at and effective as of the Closing, and pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Seller shall (or shall cause its applicable Subsidiaries to), sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller (or such Subsidiaries), all rights, title and interests of Seller or its Subsidiaries in and to all of the assets, properties, interests, rights and Claims of Seller and its Subsidiaries related to, or used in connection with, the Business (other than the Excluded Assets), including the following assets related to, or used in connection with, the Business (collectively, the "**Purchased Assets**"), in each case free and clear of any Encumbrances (other than Permitted Encumbrances and Assumed Liabilities):

(a)    all rights and interests of Seller or its Subsidiaries under the Contracts set forth in <u>Section 2.7.1</u> of Seller Disclosure Schedules, which Section of Seller Disclosure Schedules may be modified at the request of Buyer, up to 3:00 P.M. (Eastern Time) on May 4, 2025 or as otherwise set forth in <u>Section 2.7.2</u> (such Contracts, the "**Purchased Contracts**");

(b)    the Purchased Books and Records;

(c)    the Purchased Intellectual Property and the Business Internet Properties, and the Mobile Platform, including all rights of action associated therewith;

(d)    all Permits that are listed on <u>Section 2.1.1(d)</u> of Seller Disclosure Schedules, to the extent assignable or transferable;

(e)     all Inventory;

(f)     to the extent available and in existence as of the date hereof and the Closing, all advertising, marketing, sales and promotional materials samples, artwork, photography, images, videos, copy, catalogues, labels, brand books, style guides, retailer presentations, drawings, recordings and similar material, and any other printed or written material showing the heritage of any Trademarks, in each case used in connection with the Business;

(g)     all fax numbers and telephone numbers;

(h)     all pre-paid expenses and security deposits associated with the Transferred Stores;

(i)     all rights and interests of Seller or its Subsidiaries under the Leases set forth in Section 2.7.1 of Seller Disclosure Schedules, which Section of Seller Disclosure Schedules may be modified at the request of Buyer, up to 3:00 P.M. (Eastern Time) on May 4, 2025 or as otherwise set forth in Section 2.7.2 hereto (such real property, the "**Leased Real Property,**" and such Leases, the "**Purchased Leases**");

(j)     the Purchased Products;

(k)     to the extent permitted by Law and applicable employment or privacy policies communicated to Continuing Employees, copies of Seller's Personnel Records with respect to the Continuing Employees;

(l)     all Personal Property;

(m)     all Accounts Receivable;

(n)     all goodwill of Seller as a going concern and any goodwill related to the Business, the Purchased Assets and the Assumed Liabilities;

(o)     all rights of Seller under any non-disclosure or confidentiality, non-compete, non-interference or non-solicitation agreements with current and former employees and agents of Seller or with third parties, in each case, related to the Purchased Assets or the Business (or any portion thereof);

(p)     all rights of publicity, personality rights and similar rights relating to, used in (or held for use in) or arising out of, the sale or marketing of any products or services of the Business;

(q)     all Avoidance Actions against any of Seller's vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Purchased Assets after the Closing and any of their Affiliates;

(r)     all Employee Equipment;

(s)    the insurance policies set forth on <u>Section 2.1.1(s)</u> of Seller Disclosure Schedules;

(t)    any Tax attributes that transfer to Buyer by automatic operation of Law as a result of Buyer acquiring the Purchased Assets and any Tax refunds solely to the extent such refunds relate to Assumed Taxes ("**Buyer Tax Benefits**");

(u)    any cash on hand (whether in a cash register, safe, deposit box) at a Transferred Store ("**Store Cash**");

(v)    all unexpired transferrable warranties, indemnities or guarantees from any third party related to the other Purchased Assets or Assumed Liabilities;

(w)    the Plans set forth on <u>Section 2.1.1(w)</u> of Seller Disclosure Schedules; and

(x)    any Restricted Cash associated with the Transferred Stores.

2.1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, (a) Buyer shall not acquire the Excluded Assets, including any Contract (including Leases) set forth on <u>Section 2.1.2</u> of Seller Disclosure Schedules (each such Contract or Lease, an "**Excluded Contract**"), (b) the Purchased Assets shall not include the Excluded Assets, and (c) Seller shall retain the Excluded Assets following the Closing.

2.1.3    <u>Retention of Rights</u>. Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, Seller retains, on behalf of itself and its Affiliates, a right to retain copies of all or any part of all documentation that Seller delivers to Buyer pursuant to this Agreement as may be reasonably necessary to exercise its or its Affiliates' respective rights or perform its or its Affiliates' respective obligations under this Agreement or any Ancillary Agreement, for purposes of administration of the Chapter 11 Cases, and for purposes of complying with Law.

**2.2    Liabilities**.

2.2.1    <u>Assumed Liabilities</u>. Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall (or shall cause its applicable Subsidiaries to) assign to Buyer and Buyer shall assume from Seller or its applicable Subsidiaries and agree to pay and discharge when due, only the following Liabilities of Seller and its Subsidiaries (other than the Excluded Liabilities) arising out of the conduct of the Business or the ownership of the Purchased Assets or the Business, in each case, immediately following the Closing (collectively, the "**Assumed Liabilities**"):

(a)    all Liabilities arising under the Purchased Contracts and the Purchased Leases that become due from and after, solely to the extent relating to facts, occurrences or other circumstances first arising after, the Closing;

(b)    (i) the "current liabilities" of the Business to the extent set forth in the Net Working Capital Amount and (ii) the accounts payable, arising from the ownership of the Purchased Assets or the conduct or operation of the Business from and after the Closing;

(c)    all Liabilities (i) arising from the employment or termination of any Continuing Employees and currently engaged independent contractors whenever incurred or arising, including any wages, salaries, commissions, or normal course bonuses or incentive obligations with respect to the Continuing Employees and (ii) with respect to any accrued and unused paid time off and sick time accrued prior to the Closing by any Continuing Employee to the extent permitted by applicable Law to the extent set forth in the Net Working Capital Amount (including any amounts required to be paid out by Seller under applicable Law, which amounts shall be timely reimbursed to Seller by Buyer following the Closing);

(d)    all Liabilities for Transfer Taxes;

(e)    all Liabilities arising from the sale of merchandise pursuant to product warranties, product returns and rebates from and after the Closing, in each case solely to the extent arising out of the Purchased Contracts;

(f)    all Liabilities for gift cards, store credits, customer loyalty programs, and gift certificates validly issued by Seller and/or its Subsidiaries prior to Closing Date; and

(g)    (i) all Liabilities for Taxes with respect to the Purchased Assets, the Assumed Liabilities, the Business, or the Continuing Employees with respect to any taxable period (or portion thereof) beginning after the Closing Date and (ii) all Liabilities for Transfer Taxes pursuant to Section 5.3.2 (such Taxes described in the immediately preceding clause (i) and clause (ii), the "**Assumed Taxes**");

(h)    all Liabilities arising for the Plans set forth on Section 2.1.1(w) of Seller Disclosure Schedules from and after Closing; and

(i)    all Liabilities for Assumed Indebtedness (including the Liabilities set forth in Exhibit H attached hereto with respect to (and not taking into account any caps or amounts set forth in) clause (a) through (h) in the definition of Assumed Indebtedness) and which shall include, for the avoidance of doubt, the Tax Reserve Liabilities.

2.2.2    Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, neither Buyer nor any of its Affiliates shall assume, nor shall they be or become responsible for, any Excluded Liabilities or any Liabilities of Seller or any of its Subsidiaries, other than the Assumed Liabilities. For greater certainty, the Excluded Liabilities shall remain the sole obligation and responsibility of Seller and its Subsidiaries.

**2.3    Consideration**.

2.3.1    Purchase Price. Upon the terms and subject to the conditions of this Agreement, in consideration of the conveyances contemplated under Section 2.1, Buyer shall:

(a)      at the Closing, pay to Seller an amount equal to the Estimated Cash Purchase Price, *less* the Deposit (together with any and all investment interest thereon, if any, that is released to Seller), by wire transfer of immediately available funds to the account designated by Seller by Notice to Buyer, such Notice to be provided at least five (5) Business Days prior to the Closing Date (such amount, the "**Closing Payment**"); and

(b)      at the Closing, assume the Assumed Liabilities.

2.3.2    <u>Allocation of Consideration</u>. Buyer shall allocate the Purchase Price (including the Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes, to the extent properly taken into account under applicable tax laws "**Tax Laws**"), among the Purchased Assets in accordance with Section 1060 of the Code, all other applicable Tax Laws and the methodology set forth in <u>Section 2.3.2</u> of Seller Disclosure Schedules (the "**Allocation**") as soon as commercially practicable, but no later than forty-five (45) days following the determination of the final Purchase Price, and shall deliver to Seller a copy of such Allocation promptly after such determination for Seller's review, comment and consent (such consent not to be unreasonably withheld, conditioned or delayed). If Seller delivers a written objection within thirty (30) days after receipt of the draft Allocation proposed by Buyer, then Buyer and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Buyer cannot resolve such dispute within thirty (30) days of Buyer's receipt of Seller's objection, then the Accounting Firm shall resolve such dispute, with the costs of such resolution to be allocated by such accounting firm between Buyer and Seller based upon the percentage of the aggregate contested amount submitted to such accounting firm that is ultimately awarded to Buyer, on the one hand, or Seller on the other hand, such that Buyer bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Seller and Seller bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Buyer, and the resolution of such dispute shall be final and binding on the Parties. Buyer and Seller (and their respective Affiliates) agree to file their respective IRS Form 8594 and all federal, state and local Tax Returns in accordance with the Allocation and agree not to take any position inconsistent with the Allocation in any Tax Return, in any refund claim, in any litigation or otherwise, except as otherwise required by a "determination" as defined in Section 1313(a) of the Code (or corresponding provision of state or local law). To the extent of any adjustment to the Purchase Price, Buyer shall revise the Allocation in accordance with this <u>Section 2.3.2</u>, including the methodology set forth in <u>Section 2.3.2</u> of Seller Disclosure Schedules.

**2.4**      **Closing**. Pursuant to the terms and subject to the conditions of this Agreement, the closing of the Transactions (the "**Closing**") shall take place by telephone conference and electronic exchange of documents, at 10:00 a.m. local time, on the third (3rd) Business Day following satisfaction of all conditions (other than those that by their terms are to be satisfied or taken at the Closing) set forth in <u>Article 6</u> (or, to the extent permitted by applicable Law, waived by the Party entitled to the benefits thereof), or such other time and place as the Parties may mutually agree to in writing (such date of the Closing being hereinafter referred to as the "**Closing Date**"); *provided*, that, in no event shall the Closing occur prior to May 15, 2025 without the prior written consent of Buyer.

**2.5**      **No Offset**. Buyer's obligations under this <u>Article 2</u> shall not be subject to offset, reduction, netting or recoupment.

**2.6**     **Deposit**. At Closing, Buyer and Seller shall deliver Joint Written Instructions to the Escrow Agent to release the Deposit (together with any and all investment interest thereon, if any) to Seller in accordance with the Deposit Escrow Agreement.

**2.7**     **Assumption/Rejection of Certain Contracts and Leases; Non-Assignment**.

2.7.1     <u>Section 2.7.1</u> of Seller Disclosure Schedules sets forth a true and complete list, as of the date hereof, of (a) all executory Contracts which require expenditures made or to be made by Seller or payments or amounts received or to be received by Seller in excess of $100,000 in the twelve (12) months prior to the date hereof and unexpired Leases to which any Seller is a party (excluding the Excluded Contracts), including Seller's proposed Cure Costs associated with each such Contract and unexpired Lease set forth therein, and (b) the Purchased Contracts and Purchased Leases as of the date hereof.

2.7.2     From and after the date hereof until 3:00 P.M. (Eastern Time) on May 4, 2025, Buyer may, in its sole discretion, (a) add any Contract or any Lease listed on <u>Section 2.7.1</u> of Seller Disclosure Schedules (or otherwise used in connection with the Business) to the schedule of Purchased Contracts and Purchased Leases, (b) remove from the schedule of Purchased Contracts and Purchased Leases any Contract listed on <u>Section 2.7.1</u> of Seller Disclosure Schedules and instead designate such Contract for rejection effective on and as of the Closing or (c) remove from the schedule of Purchased Contracts and Purchased Leases any Lease listed on <u>Section 2.7.1</u> of Seller Disclosure Schedules and instead designate such Lease for rejection effective on and as of the Closing; *provided*, that in the immediately preceding clauses (a), (b), and (c), Buyer shall not be able to add any Contract or Lease to the schedule of Purchased Contracts and Purchased Leases if such Contract or Lease is associated with a Store already in the active process of Closing. The schedule of Purchased Contracts and Purchased Leases shall be (and shall be deemed) modified or supplemented to reflect the additions or removals, as applicable, of Leases and Contracts that are (i) designated for assumption and assignment or (ii) designated for rejection, each as set forth in this <u>Section 2.7.2</u>.

2.7.3     Seller shall as promptly as reasonably practicable, but in any event upon assumption of any Purchased Contract or Purchased Lease under this <u>Section 2.7</u>, pay all Cure Costs (if any) in connection therewith (or as otherwise required).

2.7.4     Notwithstanding the foregoing and anything herein to the contrary, a Contract or Lease shall not be assigned to, or assumed by, Buyer or its designee hereunder to the extent that such Contract or Lease (a) is terminated by a Seller (pursuant to, and in accordance with, the terms and conditions set forth herein) or the counterparty thereto, or terminates or expires by and in accordance with its terms, on or prior to the Closing Date and is not continued or otherwise extended upon assumption, or (b) requires a consent or authorization from a Governmental Authority (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer or its designee of the applicable Seller's rights under such Contract or Lease, and such consent or authorization has not been obtained prior to the Closing. In the event that any Purchased Contract or Purchased Lease is deemed not to be assigned pursuant to clause (b) of this <u>Section 2.7.4</u>, the Closing shall nonetheless occur and, thereafter, through the earlier of (i) such time as such consent or authorization is obtained, (ii) twelve (12) months following the Closing (or the remaining term of such Contract or Lease or

- 29 -

the closing of the Chapter 11 Cases, if shorter) and (iii) the date on which the Bankruptcy Court enters an order confirming the Debtors' chapter 11 plan on the docket of the Chapter 11 Cases, Seller and Buyer shall (A) use reasonable best efforts to secure such consent or authorization as promptly as practicable after the Closing, and (B) cooperate in good faith to allow Buyer or its designee to perform the services thereunder on Seller's behalf, in all cases, without infringing upon the legal rights of any third party, including by good faith cooperation with any lawful and commercially reasonable arrangement reasonably proposed by Buyer, including subcontracting, licensing or sublicensing to Buyer any or all of any Seller's rights and obligations with respect to any such Contract or Lease, under which (1) Buyer shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Contract or Lease with respect to which the consent and/or authorization has not been obtained, and (2) Buyer shall assume any related burden (net of the amount of any related Tax benefit obtained by Seller or its Affiliates) and obligation (including performance) with respect to such Contract or Lease. Upon satisfying all such requisite consent or authorization requirements applicable to such Contract or Lease after the Closing, such Contract or Lease shall promptly be assumed and assigned to Buyer in accordance with the terms of this Agreement.

**2.8    Cash Purchase Price**.

(a)    At least two (2) Business Days before the Closing, Seller shall prepare and deliver to Buyer a written statement (the "**Closing Statement**") setting forth in reasonable detail its good faith estimate of (i) Net Working Capital Amount, as of the Determination Time (the "**Estimated Net Working Capital Amount**"), (ii) the Assumed Indebtedness, as of the Closing (the "**Estimated Assumed Indebtedness**"), and (iii) based upon the immediately preceding clause (i) and clause (ii), the resulting Estimated Cash Purchase Price. Seller will prepare the Closing Statement and all items included therein consistent with this Agreement (including the definitions herein) and the Accounting Policies, which statement shall be substantially in the form of Exhibit E attached hereto (in the case of the Estimated Net Working Capital Amount) and Exhibit H attached hereto (in the case of the Estimated Assumed Indebtedness). During the period after the delivery of the Closing Statement and prior to the Closing Date, Buyer shall have an opportunity to review the Closing Statement and Seller shall provide Buyer and its Representatives reasonable access during normal business hours to all properties, books and records relating thereto and the officers and other employees and advisors of Seller and its Affiliates, in each case, to the extent reasonably necessary to assist Buyer and its Representatives in their review of the Closing Statement; *provided*, that such access shall be in a manner that does not interfere with the normal business operations of Seller and its Subsidiaries. Seller shall in good faith consider any questions or comments received from Buyer regarding the Closing Statement; *provided*, that, to the extent that Buyer and Seller disagree as to any one or more items, then with respect to such item, the amount of such item set forth in the Closing Statement sent by Seller shall be used for purposes of calculating the Estimated Cash Purchase Price; *provided*, *however*, that, Buyer's acceptance of the Estimated Cash Purchase Price as proposed by Seller (or as otherwise agreed by Buyer and Seller pursuant to this Section 2.8(a)) will not be deemed to waive or otherwise impair any rights of Buyer relating to its preparation of the Post-Closing Statement and the adjustments to the Estimated Cash Purchase Price or the Cash Purchase Price pursuant to this Agreement, or waive, limit or otherwise modify any of its rights or remedies under this Agreement.

(b)      Subsequent to the Closing and subject to this <u>Section 2.8</u> (as applicable), the Estimated Cash Purchase Price shall be <u>increased</u> (if the Net Adjustment Amount is positive) or <u>decreased</u> (if the Net Adjustment Amount is negative) by the absolute value of the Net Adjustment Amount (which may be negative or positive); *provided*, that if the absolute value of the Net Adjustment Amount is less than or equal to 500,000.00, the Net Adjustment Amount shall be deemed to be zero ($0). "**Net Adjustment Amount**" means an amount equal to the net result of (i) the amount by which Final Net Working Capital exceeds the Estimated Net Working Capital Amount (if any) (the "**Net Working Capital Surplus**"), less (ii) the amount by which the Estimated Net Working Capital Amount exceeds the Final Net Working Capital (if any) (the "**Net Working Capital Shortfall**"), <u>plus</u> (iii) the amount (if any) by which Estimated Assumed Indebtedness exceeds Final Assumed Indebtedness, <u>less</u> (iv) the amount (if any) by which Final Assumed Indebtedness exceeds Estimated Assumed Indebtedness.

(c)      As soon as reasonably practicable, but no later than thirty (30) days after the Closing Date, Buyer shall (i) prepare a statement of (A) the calculation of Net Working Capital Amount, as of the Determination Time, (B) the Assumed Indebtedness, as of the Closing, and (C) based upon the immediately preceding clause (A) and clause (B) (and taking into account the Net Adjustment Amount, including the limitation set forth in the proviso in the first sentence of <u>Section 2.8(b)</u>), the resulting Cash Purchase Price as if (and solely for this purpose) such Net Working Capital Amount is the Final Net Working Capital and such Assumed Indebtedness is the Final Assumed Indebtedness (the "**Post-Closing Statement**"), and (ii) deliver the Post-Closing Statement to Seller. The Post-Closing Statement shall be prepared in good faith consistent with this Agreement (including the definitions herein) and the Accounting Policies, which statement shall be substantially in the form of <u>Exhibit E</u> attached hereto (in the case of the Net Working Capital Amount) and <u>Exhibit H</u> attached hereto (in the case of the Assumed Indebtedness). The Parties agree that (1) in determining the Final Net Working Capital, the Final Assumed Indebtedness, and the related adjustment contemplated by this <u>Section 2.8(c)</u>, no Party will be permitted to introduce judgments, accounting methods, policies, principles, practices, procedures, assumptions, conventions, categorizations, definitions, techniques (including in respect of management's exercise of judgment), classifications or estimation methodologies different than those set forth in the Accounting Policies, and (2) the Post-Closing Statement shall not include any purchase accounting or other adjustment arising out of the consummation of the Transactions and shall not be impacted by any changes requested by Buyer between the Closing and the delivery of the Post-Closing Statement. Without the prior consent of Seller pursuant to this <u>Section 2.8</u>, Buyer shall not have the right to modify the Post-Closing Statement or any items or amounts set forth therein after Buyer delivers the Post-Closing Statement to Seller. If Buyer does not deliver the Post-Closing Statement to Seller within thirty (30) days after the Closing Date, Seller (acting in its sole discretion) may elect by written notice to Buyer to deem the Closing Statement as the Final Post-Closing Statement that is final, binding and non-appealable by the Parties.

(d)      In connection with the review of the Post-Closing Statement by Seller, Buyer shall provide Seller and its Representatives with reasonable access to the books and records, personnel and facilities of the Business (in each case upon reasonable advance notice in writing and during normal business hours in a manner that does not unreasonable interfere with the Business). Furthermore, Seller shall have the right to review the work papers of Buyer underlying or utilized in preparing the Post-Closing Statement and the calculation of the Cash

Purchase Price set forth therein; *provided*, *however*, that the independent accountants of the Business, if any, shall not be obligated to make any such work papers available to Seller unless and until Seller has signed a customary confidentiality agreement relating to such access to such work papers in form and substance reasonably acceptable to such independent accountants.

(e)    Within fourteen (14) days after its receipt of the Post-Closing Statement, Seller shall inform Buyer in writing either (i) that the Post-Closing Statement is acceptable or (ii) of any objection to the Post-Closing Statement, setting forth in reasonable detail the basis for such objection and the specific adjustment to amounts, determinations and calculations set forth on the Post-Closing Statement that Seller believes should be made, including specific dollar amounts of adjustments necessary (an "**Objection Notice**"). If an Objection Notice is timely delivered within such fourteen (14) day period, Buyer and Seller shall negotiate in good faith to resolve each dispute raised therein (each, a "**Disputed Item**"). Any amounts that are not a Disputed Item on the Objection Notice shall be final, conclusive, binding and non-appealable on the Parties. If Buyer and Seller, notwithstanding such good faith efforts, fail to resolve any Disputed Item within five (5) days after Seller timely delivers an Objection Notice or such longer period of time as the Parties may mutually agree in writing, then Buyer and Seller shall jointly engage the Accounting Firm to resolve only any remaining Disputed Items as soon as practicable thereafter (but in any event, within ten (10) days after engagement of the Accounting Firm or such longer period as the Accounting Firm may reasonably require), which resolution must be in writing and set forth in reasonable detail the basis therefor; *provided*, that, all negotiations and discussions between Buyer and Seller regarding the matters specified on the Objection Notice shall (unless otherwise agreed to in writing by Buyer and Seller) be governed by Rule 408 of the U.S. Federal Rules of Evidence and any comparable applicable state rule of evidence. The amounts, determinations and calculations (or any component thereof) contained in the Post-Closing Statement shall become final, conclusive, binding and non-appealable on the Parties at the following times:

i.    in the event that Seller has informed Buyer in writing that the Post-Closing Statement is acceptable pursuant to this <u>Section 2.8(e)</u>, the date on which Seller so informs Buyer (in which case such amounts, determinations and calculations (or any component thereof) shall be as set forth in the Post-Closing Statement delivered or deemed to be delivered pursuant to <u>Section 2.8(c)</u>);

ii.    in the event that Seller does not deliver an Objection Notice to Buyer pursuant to this <u>Section 2.8(e)</u> within fourteen (14) days after receipt of the Post-Closing Statement, on the next Business Day following the expiration of such period (in which case such amounts, determinations and calculations (or any component thereof) shall be as set forth in the Post-Closing Statement delivered pursuant to <u>Section 2.8(c)</u>);

iii.    in the event that Seller has delivered an Objection Notice to Buyer pursuant to this <u>Section 2.8(e)</u>, the date of an agreement in writing by Buyer and Seller that such amounts, determinations and calculations (or any component thereof) that are the subject of such Objection Notice, together with any modifications thereto agreed to by Buyer and Seller, are final, conclusive, binding and non-

appealable (in which case such amounts, determinations and calculations (or any component thereof) shall be as agreed upon by Buyer and Seller); and

iv.    in the event that Buyer and Seller engage the Accounting Firm to resolve any remaining Disputed Items pursuant to this <u>Section 2.8(e)</u>, the date on which the Accounting Firm issues its written resolution of such Disputed Items (in which case such amounts, determinations and calculations (or any component thereof) shall be as resolved by the Accounting Firm pursuant to this <u>Section 2.8(e)</u> with respect to all Disputed Items submitted to the Accounting Firm, and shall otherwise be as set forth in the Post-Closing Statement delivered pursuant to <u>Section 2.8(c)</u>, together with any modifications thereto agreed to by Buyer and Seller).

(f)    At such time determined in accordance with this <u>Section 2.8</u>, the Post-Closing Statement as so agreed (or deemed agreed) or determined shall be the "**Final Post-Closing Statement**" for purposes of this Agreement, and shall be final, conclusive, binding and non-appealable (absent fraud, willful misrepresentation or mathematical or manifest error and such determination may be entered and enforced in accordance with <u>Section 9.1.2</u>) on the Parties and shall be used for the adjustment of the Cash Purchase Price, if any, pursuant to <u>Section 2.8(i)</u>. The statements of (i) Net Working Capital as of the Determination Time set forth in the Final Post-Closing Statement shall be the "**Final Net Working Capital**" for purposes of this Agreement and (ii) Assumed Indebtedness as of the Closing set forth in the Final Post-Closing Statement shall be the "**Final Assumed Indebtedness**" for purposes of this Agreement.

(g)    In resolving any Disputed Item, the Accounting Firm (i) shall act as an expert and not as an arbitrator, (ii) shall be bound by the provisions of this <u>Section 2.8(g)</u>, (iii) shall not assign a value to any Disputed Item greater than the greatest value claimed for such Disputed Item or less than the smallest value for such Disputed Item claimed by either Buyer in the Post-Closing Statement or Seller in the Objection Notice, (iv) shall limit its determination to each unresolved Disputed Item, (v) shall make its determination based solely on presentations by Buyer and Seller which are in accordance with the guidelines and procedures set forth in this Agreement and not on the basis of independent review; *provided*, that, the Accounting Firm may make reasonable requests for additional information from Buyer and Seller, (vi) may not consider for any purpose, any settlement discussions or settlement offer(s) made by or on behalf of either Seller or Buyer unless otherwise agreed in writing by Seller and Buyer, and (vii) shall have exclusive jurisdiction over any disputes arising out of or relating to the calculation of, and any adjustments to, the Closing Payment; *provided*, that upon the determination of the Accounting Firm, such determination may be entered and enforced in any court of competent jurisdiction in accordance with <u>Section 9.1.2</u>.

(h)    For purposes of complying with this <u>Section 2.8</u>, Buyer and Seller shall furnish to each other and to the Accounting Firm such work papers and other documents and information relating to the Disputed Items as the Accounting Firm may require and that are available to the Party (or its independent public accountants) from whom such documents or information are requested. The Accounting Firm shall deliver its determination of the Disputed Items to Buyer and Seller in writing, together with a reasonable basis for its determination of each Disputed Item. In no event shall either Party engage in ex parte communications with the

Accounting Firm with respect to any Disputed Item until the Accounting Firm issues its final determination of the Disputed Items. The fees and expenses of the Accounting Firm incurred pursuant to this Section 2.8 shall be allocated between Buyer and Seller in inverse proportion to their success on the unresolved Disputed Items, i.e., (i) Buyer shall be responsible for that portion of the fees and expenses multiplied by a fraction, the numerator of which is the aggregate Dollar value of the Disputed Items submitted to the Accounting Firm that are resolved against Buyer (as finally determined by the Accounting Firm) and the denominator of which is the total Dollar value of the Disputed Items so submitted and (ii) Seller shall be responsible for the remaining amount of fees and expenses. In the event of any dispute regarding such allocation, the Accounting Firm shall determine the allocation of its fees and expenses as between Buyer and Seller in accordance with such allocation methodology, such determination to be final and binding on both Buyer and Seller. Except as otherwise set forth in Section 2.8(b) and this Section 2.8(h), the fees and expenses of Seller and its Representatives incurred in connection with the Post-Closing Statement and any Disputed Items shall be borne by Seller, and the fees and expenses of Buyer and its Representatives incurred in connection with the Post-Closing Statement and any Disputed Items shall be borne by Buyer.

(i)     If the Cash Purchase Price (as finally determined in the Final Post-Closing Statement): (A) is less than the Estimated Cash Purchase Price and the Net Adjustment Amount is not deemed to be zero ($0), then within three (3) Business Days after the Cash Purchase Price is finally determined in the Final Post-Closing Statement, Seller shall repay to Buyer an amount equal to the difference between the Cash Purchase Price and the Estimated Cash Purchase Price by wire transfer of immediately available funds to the bank accounts designated by Buyer in writing; or (B) exceeds the Estimated Cash Purchase Price and the Net Adjustment Amount is not deemed to be zero ($0), then within three (3) Business Days after the Cash Purchase Price is finally determined in the Final Post-Closing Statement, Buyer shall pay (or Buyer shall cause to be paid) to Seller an amount equal to the difference (if any) between the Cash Purchase Price and the Estimated Cash Purchase Price by wire transfer of immediately available funds to the bank accounts designated by Seller in writing. The amounts in this Section 2.8(i) shall be exclusive of any fees and expenses owed to the Accounting Firm by any Party pursuant to Section 2.8(h). If the Net Adjustment Amount is deemed to be zero ($0), the Estimated Cash Purchase Price is the Cash Purchase Price.

(j)     This Section 2.8 shall be the sole and exclusive remedy of the Parties with respect to the determination of the Cash Purchase Price; *provided*, *however*, that in no event shall Buyer or Seller be entitled to any duplicative recovery as a result of the rights and remedies afforded in this Agreement and the Ancillary Agreements.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

**3.1     Representations and Warranties of Seller**. Seller represents and warrants to Buyer as of the date hereof (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date) as follows, with each such representation and warranty subject to such exceptions, if any, as are set forth in the corresponding section of Seller Disclosure Schedules. Disclosures in any section or paragraph of Seller Disclosure Schedules shall be deemed disclosed with respect to any other sections or paragraphs

of this Agreement to the extent that it is readily apparent from the face of such disclosure that such disclosure is applicable to such other sections or paragraphs.

3.1.1    Organization; Good Standing; Qualification. Seller is a limited liability company validly existing and in good standing under the Laws of the State of Delaware. Seller is duly qualified to carry on business in each jurisdiction in which the nature or character of the properties and assets owned, leased or operated by it, including for greater certainty, the Purchased Assets, or the nature of its business or activities, including for greater certainty, the operation of the Business, makes such qualification necessary, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

3.1.2    Authority and Enforceability. Seller has the requisite power, authority and capacity to enter into this Agreement and the Ancillary Agreements to which it is or will be a party, and, subject to the requisite Bankruptcy Court approvals and Sale Order, to perform its obligations hereunder or thereunder and to complete the Transactions. The execution and delivery of this Agreement and each Ancillary Agreement to which Seller is or will be a party, the performance of the obligations hereunder or thereunder and the consummation of the Transactions have been, or will be at or prior to Closing, duly authorized by all necessary action on the part of Seller. This Agreement and each of the Ancillary Agreements to which Seller is or will be a party, have been, or will be at or prior to Closing, duly executed and delivered by Seller, and, subject to the Bankruptcy Court's requisite approvals and entry of the Sale Order, constitute or will constitute a legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium and other similar Laws relating to limitations of actions or affecting the availability of equitable remedies and the enforcement of creditors' rights generally and by general principles of equity (the "**Enforceability Exceptions**").

3.1.3    Authorizations and Consents. Except for (a) the entry of the Sale Order and, as applicable, the expiration or waiver by the Bankruptcy Court of the applicable 14-day period set forth in Rule 6004(h) of the Bankruptcy Rules and (b) the items disclosed in Section 3.1.3 of Seller Disclosure Schedules, no material Order, Permit, license, consent, approval, waiver, notification or filing, in each case, with a Governmental Authority, is required on the part of Seller for the execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder or thereunder and the consummation of the Transactions, including, for greater certainty, the transfer of the Purchased Assets.

3.1.4    No Broker. Except as disclosed in Section 3.1.4 of Seller Disclosure Schedules, Seller has not used any broker or finder in connection with the Transactions for which Buyer is or will become liable.

3.1.5    Litigation. Section 3.1.5 of Seller Disclosure Schedules sets forth a list of all material Litigation to which Seller or any of its Subsidiaries is a party as of the date hereof relating to any of the Purchased Assets, the Assumed Liabilities, or the Business. Except for the Chapter 11 Cases and the Litigation listed on Section 3.1.5 of Seller Disclosure Schedules, there are no, and since the Look-Back Date to the date hereof there has not been any, material Litigation pending or, to Seller's Knowledge, threatened against the Purchased Assets or, to the extent involving or related to the operations or conduct of the Business (including with respect to

any current or former employees or other individual service providers who provided services to the Business), against Seller or its Subsidiaries. Except as set forth on <u>Section 3.1.5</u> of Seller Disclosure Schedules, as of the date hereof, there are no material Orders of or by a court of competent jurisdiction or other Governmental Authority outstanding against Seller with respect to the Business or any of the Purchased Assets, except for the Chapter 11 Cases.

3.1.6   <u>No Violation</u>. Subject to (a) the entry of the Sale Order and, as applicable, the expiration or waiver by the Bankruptcy Court of the applicable 14-day period set forth in Rule 6004(h) of the Bankruptcy Rules and (b) the items disclosed in <u>Section 3.1.6</u> of Seller Disclosure Schedules, the execution and delivery by Seller of this Agreement and each Ancillary Agreement to which it is or will be a party, the performance by Seller of its obligations hereunder or thereunder and the consummation of the Transactions do not and will not: (i) result in a violation of any Law applicable to Seller; (ii) result in a breach of, or conflict with, the constituent documents of Seller; (iii) result in a breach of, or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification or cancelation of any obligations under, or result in the loss of any rights or the imposition or acceleration of obligations under, any Material Contract; or (iv) result in the creation of any Encumbrance (other than any Permitted Encumbrance) upon the Purchased Assets other than Encumbrances created by Buyer and assumption of the Assumed Liabilities, in each case, except as would not be material to the Business or the Purchased Assets.

3.1.7   <u>Purchased Assets; No Material Dispositions</u>.

(a)     Except as set forth in <u>Section 3.1.7(a)</u> of Seller Disclosure Schedules, Seller has good and valid title to, a valid leasehold interest in or the right to use, all of the Purchased Assets that is necessary for Seller to operate the Business in all material respects. Upon the entry and effectiveness of the Sale Order, Seller will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to Buyer the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances and Assumed Liabilities. Other than Encumbrances that will be released upon the entry and effectiveness of the Sale Order, Seller owns or has rights to, and upon delivery to Buyer at the Closing will transfer to Buyer, good title to or a valid leasehold interest in all of the Purchased Assets, free and clear of all Encumbrances, except for Permitted Encumbrances and Assumed Liabilities.

(b)     Other than the Excluded Assets and the rights and services to be provided under the Transition Services Agreement, the Purchased Assets constitute substantially all of the properties, assets and rights used by Seller and its Subsidiaries necessary to conduct and operate the Business in substantially the same manner as conducted by Seller and its Subsidiaries before the Closing.

(c)     Other than the Excluded Assets and the rights and services to be provided under the Transition Services Agreement, no other Person (other than Seller and its Subsidiaries) owns any assets that are material to operate the Business in substantially the same manner as conducted by Seller and its Subsidiaries before Closing.

(d)     Since the Look-Back Date, Seller has not sold or disposed of any assets (including any licenses, assignments, transfers, or abandonments of Intellectual Property

or tangible embodiments thereof) that are material to the Business or the Purchased Assets, other than (i) for sales of the Inventory, expiration of any registered or issued Intellectual Property in accordance with its maximum statutory term and non-exclusive licenses granted in the Ordinary Course and (ii) expirations or terminations of Leases in accordance with the terms of such Leases or negotiated terminations of Leases.

3.1.8    Intellectual Property.

(a)    Section 3.1.8(a) of Seller Disclosure Schedules sets forth a correct and complete list of (i) all Owned Intellectual Property that is registered, issued, or the subject of an application for registration or issuance, including Patents, Trademarks, and Copyrights, (ii) material unregistered Trademarks, and (iii) Proprietary Software included in the Owned Intellectual Property ("**Seller Software**"). All Intellectual Property set forth on Section 3.1.8(a) of Seller Disclosure Schedules is subsisting, and, to Seller's Knowledge, valid and enforceable. All applications and registrations for Owned Intellectual Property are in the name of one of Seller or a Subsidiary. The Purchased Intellectual Property, collectively with the Intellectual Property set forth in Section 3.1.8(a) of Seller Disclosure Schedules, includes all material Intellectual Property used in or necessary for the operation of the Business as conducted since the Look-Back Date.

(b)    Section 3.1.8(b) of Seller Disclosure Schedules contains a correct and complete list of all material Social Media Accounts used by Seller or its Subsidiaries in the Business. The use of the Social Media Accounts by Seller and its Subsidiaries have complied with all terms and conditions or terms of use applicable to the Accounts in all material respects.

(c)    Seller or its Subsidiaries own all right, title and interest in and to, free and clear of all Encumbrances (other than Permitted Encumbrances) all Owned Intellectual Property, and have a valid right to use, under a Purchased Contract, all other Purchased Intellectual Property. Neither Seller nor any of its Subsidiaries have entered into any agreement granting any license or other rights to any Purchased Intellectual Property that could materially limit or restrict the ability of Buyer to use, assert, enforce, or otherwise exploit any Purchased Intellectual Property.

(d)    To Seller's Knowledge, no Governmental Authority, educational institution or research center has any claim or right in or to any Owned Intellectual Property.

(e)    Since the Look-Back Date, no current or former employee, independent contractor, or consultant has asserted any claim, right, or interest in or to any material Owned Intellectual Property. All Persons who have contributed, developed or conceived any material Owned Intellectual Property have done so pursuant to an agreement that protects the confidential information of Seller or its Subsidiaries and effectively grants the employing or contracting entity exclusive ownership of the Person's contribution, development or conception pursuant to a present-tense assignment grant or by operation of law.

(f)    To Seller's Knowledge, (i) the operation of the Business has not, since the Look-Back Date, infringed, misappropriated or violated any Intellectual Property of any Third Party and (ii) no Claims or actions are pending or threatened in writing (A) regarding

infringement, misappropriation, dilution, or other violation of the Intellectual Property of any Person against Seller or its Subsidiaries in respect of the conduct or operation of the Business by Seller or its Subsidiaries, or (B) challenging the ownership, validity, enforceability or use of any Owned Intellectual Property (except, in each case, for non-final office actions).

(g)     To Seller's Knowledge, Seller and its Subsidiaries have all consents, authorizations, permissions, and/or waivers necessary to use any names, images, likenesses, quotes, or other personal indicia of any individual as so used by Seller and its Subsidiaries as of the date hereof.

(h)     Since the Look-Back Date, Seller and its Subsidiaries have taken commercially reasonable steps designed to protect and preserve the confidentiality of all material Trade Secrets and to Seller's Knowledge all use or disclosure thereof by or to any third party has been pursuant to the terms of a written confidentiality agreement between such third party and Seller or its Subsidiaries, and Seller and its Subsidiaries have complied in all material respects with all of its confidentiality obligations under each Contract to which such Person is a party.

(i)     Seller and its Subsidiaries do not use and have not used any Open Source Software (i) in a manner that would grant or purport to grant to any Person any rights to or immunities under any of the material Owned Intellectual Property, or (ii) under any license requiring Seller or its Subsidiaries to: (A) disclose or distribute the source code included in the material Owned Intellectual Property; (B) to license or provide the source code included in the Owned Intellectual Property for the purpose of making derivative works; or (C) to make available for redistribution to any Person the source code included in the material Owned Intellectual Property at no charge.

(j)     Seller Software does not contain, link to, or use any artificial intelligence or machine learning based platforms, engines, models (including any large language models or foundational models) or systems ("**Artificial Intelligence Systems**"). To Seller's Knowledge, no material Owned Intellectual Property or material confidential information are used in a manner where they become part of an Artificial Intelligence System or are accessible for any secondary use by any third party (including any third party provider of an Artificial Intelligence System).

(k)     Neither Seller nor its Subsidiaries, nor any other party acting on behalf of Seller or its Subsidiaries has disclosed or delivered to any third party (including an escrow agent), or permitted the disclosure or delivery by any escrow agent or other party of, any Seller Software or source code constituting material Owned Intellectual Property ("**Seller Source Code**"). No event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time, or both) will, or would reasonably be expected to, require the disclosure or delivery by Seller or its Subsidiaries, or any other party acting on behalf of Seller or its Subsidiaries to any third party of any Seller Source Code, other than disclosures or deliveries made to any Independent Contractors in the Ordinary Course. Neither the execution of the Transaction documents nor the consummation of any of the Transaction, in and of itself, would reasonably be expected to result in the release of any Seller Source Code from escrow.

(l)    To Seller's Knowledge, no Person is, or has been since Look-Back Date, infringing, misappropriating or otherwise violating any Owned Intellectual Property, and no such Claims have been asserted or threatened against any Person by Seller or to Seller's Knowledge, any other Person, since the Look-Back Date.

(m)    Since the Look-Back Date, Seller and its Subsidiaries are in material compliance with, and have complied with, all Data Privacy Laws with respect to the collection, use, processing, storage, transfer, and security of Personal Information. The Transactions will not, as of the Closing, violate in any material respect Seller and its Subsidiaries Privacy Policies, Laws or Contracts relating to the use, dissemination, or transfer of Personal Information.

(n)    To Seller's Knowledge, no Governmental Authority or other Person has commenced or threatened any litigation or other written complaint, audit, proceeding, fines, judgments, claim or investigation related to Seller and its Subsidiaries collection, use, processing, storage, transfer, and security of Personal Information in any jurisdiction in which any of Seller and its Subsidiaries operate the Business.

(o)    Seller and its Subsidiaries are in compliance in all material respects with and since the Look-Back Date have complied in all material respects with (i) all provisions in Contracts that impose restrictions or conditions on the collection, use, processing, storage, transfer, and security of Personal Information, and (ii) all internal privacy and data security policies as well as privacy policies or statements posted on or in any website, application or other digital service owned or operated by Seller and its Subsidiaries in connection with the Business (collectively, "**Privacy Policies**").

(p)    Since the Look-Back Date, there has been no malfunction, failure, continued substandard performance, denial-of-service, or other cyber incident, including any cyberattack, or other impairment of Seller and its Subsidiaries IT Systems that has resulted in a material disruption or damage to the business of Seller and its Subsidiaries and that has not been remedied in all material respects. Seller and its Subsidiaries have commercially reasonable administrative, technical and physical safeguards designed to protect the confidentiality, privacy and security of Personal Information. Since the Look-Back Date, Seller nor its Subsidiaries have not experienced: (i) any material unauthorized access to or acquisition of information that compromises the security, confidentiality or integrity of Personal Information held or processed by or on behalf of Seller or its Subsidiaries or otherwise in the possession, custody or control of Seller and its Subsidiaries; (ii) any material unauthorized disclosure of, access to or use of Personal Information or (iii) any material unauthorized intrusion into any IT Systems containing Personal Information that results in unauthorized access or access in excess of authorization.

(q)    To the extent necessary or required, Seller and its Subsidiaries are in material compliance, and has been in material compliance since the Look-Back Date, with PCI DSS.

3.1.9    <u>Benefit Matters</u>.

(a)    <u>Section 3.1.9(a)</u> of Seller Disclosure Schedules lists each material Plan. With respect to each material Plan, Seller has made available to Buyer (to the extent applicable) accurate and complete copies of: (i) the current plan document and all amendments thereto (or, if such Plan is not reduced to writing, a written summary of the material terms thereof); (ii) the most recent summary plan description together with each subsequent summary of material modifications thereto; and (iii) the most recent determination letter or pre-approved plan advisory or opinion letter, if any, issued by the IRS.

(b)    Each Plan (and each related trust, insurance Contract or fund) is and has been established, maintained, operated and administered in all material respects in accordance with the express terms of such Plan and with the requirements of ERISA, the Code and other applicable Law. All contributions, distributions, reimbursements and premium payments with respect to a Plan that are due by Seller or any of its Subsidiaries have in all material respects been timely made for any period ending on or before the Closing Date, and any such amounts that are not yet due, have been properly accrued in accordance with GAAP. Each Plan that is intended to be qualified within the meaning of section 401(a) of the Code has received a favorable determination letter or opinion letter, as applicable, from the IRS or may rely upon a favorable determination, advisory or opinion letter from the IRS, and, to Seller's Knowledge, nothing has occurred and no facts circumstances exist that would reasonably be expected adversely affect the qualified status of such Plan that would result in material Liability to the Business. As of the date of this Agreement, there are no pending or, to Seller's Knowledge, threatened (i) investigations by any Governmental Authority involving the Plans, or (ii) Claims or Litigation with respect to any Plans (other than routine claims for benefits and their appeals), in each case, that would result in material Liability to the Business.

(c)    No Plan is, and neither Seller nor its Subsidiaries sponsors, maintains, contributes to or is obligated to contribute to, or has or could reasonably be expected to have any Liability with respect to (including on account of an ERISA Affiliate), any: (i) multiemployer plan (within the meaning of section 3(37) of ERISA (a "**Multiemployer Plan**") or section 4001(a)(3) of the Code); (ii) "multiple employer plan" as described in section 413(c) of the Code; (iii) "multiple employer welfare arrangement" (within the meaning of section 3(40) of ERISA); or (iv) a defined benefit pension plan (as defined in section 3(35) of ERISA) or any plan, program or arrangement that is or was at any time subject to Title IV of ERISA or subject to the minimum funding standards of section 302 of ERISA or sections 412 or 430 of the Code. No Plan provides that is an "employee welfare benefit plan" as defined in section 3(1) of ERISA provides, and Seller and its Subsidiaries have no obligation to provide, any current or former officer, director, manager, employee or individual contractor or consultant (including the Business Employees) retiree medical, disability or life insurance benefits, except as required by section 4980B of the Code, Part 6 Title I of ERISA or similar applicable state Law ("**COBRA**").

(d)    Seller and its Subsidiaries have not incurred (whether or not assessed) any Tax or other penalty with respect to the reporting requirements under sections 6055 and 6056 of the Code, as applicable, or under sections 4980B, 4980D or 4980H of the Code, in each case, that would result in material Liability to the Business. No event has occurred with respect to a Plan and no condition exists that would reasonably be expected to subject the Business

or Buyer to any material Tax, fine, lien, penalty or other Liability imposed by ERISA, the Code or other applicable Laws.

(e)     Except as set forth on Section 3.1.9(e) of Seller Disclosure Schedules, neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated by this Agreement (whether alone or in connection with any other event, including a termination of employment) would (i) entitle any current or former employee, independent contractor, officer, director or other service provider (including the Business Employees) to any payment or any increase in payment under any Plan, (ii) accelerate the time of payment, funding or vesting of any benefit under any Plan, or (iii) result in any payments or benefits under any agreement with Seller, its Subsidiaries and their Affiliates that, individually or in combination with any other payment or benefit, could constitute the payment to any Business Employee of an "excess parachute payment" within the meaning of section 280G of the Code or in the imposition of an excise Tax under section 4999 of the Code. Neither Seller nor its Subsidiaries has any obligation to "gross-up," compensate, reimburse, "make-whole," or otherwise indemnify any Business Employee for the imposition of any Tax under sections 4999 or 409A of the Code.

(f)     Each Plan that is a nonqualified deferred compensation plan within the meaning of section 409A of the Code has at all times been established, administered, operated and maintained in all material respects in operational and documentary compliance with section 409A of the Code and applicable regulations guidance thereunder, and no amount under any such Plan is, has been or is reasonably expected to be subject to any Tax under section 409A of the Code.

(g)     Seller and its Subsidiaries are not a party to any collective bargaining agreement, nor to Seller's Knowledge, are there any activities or proceedings of any labor union to organize any Business Employees.

3.1.10  Employee and Labor Matters.

(a)     Section 3.1.10(a) of Seller Disclosure Schedules sets forth as of April 9, 2025 an accurate, complete and correct list of all Business Employees of Seller, together with their work location, employing entity, title/position, date of hire or engagement, base salary or hourly wage rate, bonus and commission potential, accrued but unused paid time off or vacation balance, immigration status (and to the extent that the service provider requires a visa, work permit, employee pass, or other legal or regulatory approval for their engagement, the type of visa, permit, pass or approval) and classification as exempt or non-exempt, full-time or part-time, leave of absence status (including the type of leave of absence and the expected date of return to active employment, if known). Except as set forth in Section 3.1.10(a) of Seller Disclosure Schedules, the Business Employees are at-will and their employment may be terminated without any liability and no Business Employee is subject to any contract, express or implied, written or oral, with Seller or any of its Subsidiaries that cannot be terminated at will.

(b)     Section 3.1.10(b) of Seller Disclosure Schedules sets forth as of April 8, 2025 a true, correct and complete list of all independent contractors who are individuals (excluding individuals engaged or leased through staffing agencies or other third-party entities)

providing the services of a single individual to the Business ("**Independent Contractors**"), which list is current as of the date herein and includes for each such Independent Contractor: (i) start date of services; (ii) type of services; (iii) duration of agreement; (iv) fee or compensation arrangements; and (v) approximate number of weekly hours of services provided by each such Independent Contractor.

(c)　　Neither Seller nor any of its Subsidiaries is a party to, or is bound by, any collective bargaining agreement or other contract with a labor organization or labor union covering any Business Employee. Since January 1, 2022, (i) there is no and there has been no unfair labor practice charge or labor arbitration proceeding pending, or to the Knowledge of Seller, threatened in writing against Seller or any of its Subsidiaries relating to any Business Employee, (ii) to the Knowledge of Seller, there are and have been no activities or proceedings of any labor organization or labor union to organize any Business Employee and no demand for recognition as the exclusive bargaining representative of any Business Employees has been made by or on behalf of any labor organization or labor union, and (iii) there is no and has been no pending or, to the Knowledge of Seller, threatened strike, lockout, concerted work slowdown or work stoppage, picketing, handbilling, labor arbitration, labor grievance, unfair labor practice charges or other collective bargaining disputes by or with respect to the Business Employees.

(d)　　With respect to the Business Employees, Seller and its Subsidiaries are in compliance in all material respects with all applicable Laws relating to the employment of the Business Employees (including employment or labor standards, labor relations, occupational health and safety, workers' compensation, severance payment, pay equity, terms and conditions of employment, wages and hours (including overtime wages), fair employment practices, worker classification as exempt or non-exempt, employment practices, prohibited discrimination, equal employment, immigration status, unemployment insurance, child labor laws, background checks, pay transparency, collective bargaining, and leaves of absence) and have paid in full all wages, salaries, commissions, other compensation and benefits and all levies, assessments, contributions and payments to third parties due to or on behalf of such Business Employees.

(e)　　Except as would not reasonably be expected to result in material Liability to the Business, since the Look-Back Date, no individual has been engaged by any Seller or any of its Subsidiaries as or in the capacity of an independent contractor who does not qualify for such status under all applicable Laws, and all employees who have been classified as exempt under the Fair Labor Standards Act (and state, provincial and local counterpart Laws) have been properly classified as such. Except as set forth on Section 3.1.10(e) of Seller Disclosure Schedules, since the Look-Back Date, there have not been, and there are no, material actions, claims, charges, complaints, or demands made, pending or, to the Knowledge of Seller, threatened to be made in writing, before any Governmental Authority or under any private dispute resolution procedure with respect to any alleged violation of any such applicable Laws.

(f)　　Since the Look-Back Date (i) no Business Employee or Independent Contractor has made any allegation of discrimination, harassment (including sexual harassment) or other similar serious workplace misconduct against any Seller or any of its Subsidiaries or against any Business Employee who is an executive officer or who is employed at the level of Vice President or above; and (ii) neither Seller nor any of its Subsidiaries have entered into any settlement agreements related to allegations of discrimination or harassment

(including sexual harassment) or other similar serious workplace misconduct made by a Business Employee or Independent Contractor.

(g)     Except as set forth on <u>Section 3.1.10(g)</u> of Seller Disclosure Schedules, (i) no Business Employee is on a visa sponsored by Seller or any of its Subsidiaries which visa will require continued sponsorship; and (ii) neither Seller nor any of its Subsidiaries, have, within the past three (3) years, received a "no match" letter from the Social Security Administration concerning any current or former Business Employee. Except as would not result in material liability to the Business, a USCIS Form I-9 has been properly prepared and retained for each Business Employee as required by Law. To the Knowledge of Seller, in the past three (3) years with respect to any current Business Employee, no such Form I-9 was improperly prepared or that false documentation was provided in connection with satisfying the requirements of such Form I-9. To the Knowledge of Seller, all Business Employees who are working in the United States are legally authorized to work in the United States.

3.1.11   <u>Compliance with Laws; Permits</u>.

(a)     Except as set forth in <u>Section 3.1.11(a)</u> of Seller Disclosure Schedules, the Business is currently being, and since the Look-Back Date has been, conducted in compliance, in all material respects, with all applicable Laws. Seller has not received any written, or, to Seller's Knowledge, oral notice of any actual or alleged material non-compliance or violation of any Laws in connection with the ownership of the Purchased Assets or the operation of the Business.

(b)     Seller and its Subsidiaries are and have been since the Look-Back Date in possession of all material Permits pursuant to any applicable Law required for the ownership or operation of the Purchased Assets or Assumed Liabilities. All such Permits are in full force and effect, no default (with or without notice, lapse of time or both), to Seller's Knowledge, has occurred under any such Permit, and none of Seller or any of its Subsidiaries has received any written or, to Seller's Knowledge, oral notice from any Governmental Authority threatening to suspend, revoke, or withdraw any such Permit, in each case except as would not have a Material Adverse Effect.

3.1.12   <u>Purchased Contracts and Purchased Leases</u>. As of the date hereof, each Purchased Contract listed or described in <u>Section 2.7.1</u> of Seller Disclosure Schedules and each Purchased Lease listed or described in <u>Section 2.7.1</u> of Seller Disclosure Schedules (in each case, without giving effect to any such Contracts or Leases that are rejected pursuant to <u>Section 2.7</u>) is in full force and effect and is a valid and binding obligation of Seller or its Subsidiaries and, to Seller's Knowledge, the other parties thereto, in accordance with its terms and conditions, in each case except (a) as such enforceability may be limited by the Enforceability Exceptions and (b) as set forth on <u>Section 3.1.12(a)</u> of Seller Disclosure Schedules, and is free and clear of any Encumbrances (other than Permitted Encumbrances). Seller has made available to Buyer correct and complete copies of all Purchased Contracts and Purchased Leases in effect as of the date hereof. Subject to requisite Bankruptcy Court approvals, and except (i) as a result of the commencement of the Chapter 11 Cases, (ii) as set forth on <u>Section 3.1.12(b)</u> of Seller Disclosure Schedules, and (iii) for which payment of the Cure Costs will cure, (A) Seller is not in material breach or default of its obligations under any Purchased Contract or Purchased Lease, (B) to

Seller's Knowledge, no condition exists that with notice or lapse of time or both would constitute a material default by Seller or its applicable Subsidiary under any such Purchased Contract or Purchased Lease, and (C) to Seller's Knowledge, no other party to any such Purchased Contract or Purchased Lease (1) is in material breach or default thereunder or (2) has repudiated or threatened to terminate or cancel the applicable Purchased Contract or Purchased Lease. Except as set forth on Section 3.1.12(c) of Seller Disclosure Schedules, (x) neither Seller nor any Subsidiary has subleased, licensed or otherwise granted to any Third Party the right to use or occupy any Leased Real Property with respect to a Purchased Lease or any portion thereof and (y) neither Seller nor any Subsidiary has collaterally assigned or granted any other security interest in any Leased Real Property with respect to a Purchased Lease or any interest therein (other than Permitted Encumbrances).

3.1.13  Environmental Matters.

(a)     The Business is, and since the Look-Back Date has been, conducted in compliance in all material respects with all Environmental Laws, which compliance has included obtaining, maintaining and complying in all material respects with all Permits required under Environmental Law.

(b)     Neither Seller nor any of its Subsidiaries have received any written or, to Seller's Knowledge, oral notice, and no Claim is pending or, to Seller's Knowledge, threatened, in each case, alleging any material violation of, or material Liability under, Environmental Laws.

(c)     Neither Seller nor any of its Subsidiaries (nor, to Seller's Knowledge, any other Person to the extent giving rise to Liability for Seller or any of its Subsidiaries) have treated, stored, disposed of, arranged for or permitted disposal of, transported, handled, manufactured, distributed, released, exposed any Person to, or owned or operated any property or facility contaminated by, any Hazardous Materials, in each case, so as to give rise to any material Liability of Seller and its Subsidiaries under Environmental Law.

(d)     Seller and its Subsidiaries have furnished to Buyer all material environmental audits, reports, assessments and other material environmental, health and safety documents relating to the current properties, facilities or operations of the Business or the Purchased Assets, in each case, that are in their possession or under their reasonable control.

3.1.14  Taxes.

(a)     (i) All material Tax Returns required to be filed by Seller with respect to the Business and any Purchased Assets have been timely filed (taking into account extensions), and (ii) all material Taxes due and payable with respect to the Business and the Purchased Assets have been timely paid, whether or not shown on any Tax Return.

(b)     All Tax withholding, collection and deposit obligations (including amounts owing or allocated to any employee, creditor or other Person) imposed on or with respect to the Purchased Assets have been timely satisfied in all material respects in accordance with applicable Law. All Forms W-2 and Form 1099 required with respect to such withholding and payment have been properly completed and filed.

(c)      (i) No Tax proceeding for material unpaid Taxes with respect to the Business or any Purchased Asset is ongoing, pending or being proposed or threatened in writing by a Governmental Authority, (ii) no assessment, deficiency or adjustment with respect to material Taxes has been asserted, or proposed or threatened in writing, with respect to the Business or any Purchased Asset, other than any assessment, deficiency or adjustment which has been fully satisfied by payment, settled or withdrawn, and (iii) no claim has ever been made by a Governmental Authority in a jurisdiction in which Seller or its Subsidiaries do not file Tax Returns or pay Taxes that Seller or any of its Subsidiaries, as applicable, is or may be required to file a Tax Return or pay material Taxes in that jurisdiction with respect to the Business or any Purchased Asset.

(d)      Seller has not requested or consented to extend the time or is the beneficiary of any extension of time that has not lapsed or expired (i) with respect to the due date for the filing of any material Tax Return (other than any automatic or automatically granted extension), (ii) in which any material Tax may be assessed or collected by any Governmental Authority (other than any extension which is no longer in effect or any automatic extension as a result of any ongoing Tax proceeding) or (iii) any statute of limitations in respect of material Taxes, in each case, with respect to the Business or any Purchased Asset.

(e)      There are no Encumbrances with respect to Taxes upon any of the Purchased Assets other than Permitted Encumbrances.

(f)      There are no Tax rulings, requests for rulings, voluntary disclosure applications or agreements or closing agreements regarding Taxes with respect to the Business, the Purchased Assets or the Assumed Liabilities that would increase Buyer's (or any of its Affiliates') liability for Taxes with respect thereto for any Post-Closing Tax Period.

(g)      Seller is not nor has not been a party to a "listed transaction" within the meaning of section 6707A(c)(2) of the Code and Treasury Regulation section 1.6011-4(b)(2).

(h)      Seller, with respect to the Business or the Purchased Assets, is not a party to any written Tax sharing, allocation or indemnity agreement or arrangement that will be in effect after the Closing (other than any such agreement entered into in the Ordinary Course the primary purpose of which does not relate to any Taxes).

(i)      Seller has (i) timely paid all material sales and use Taxes with respect to the Business and the Purchased Assets required to be paid under Applicable Law, and (ii) properly collected and remitted all material sales and use Taxes with respect to the Business and the Purchased Assets required to be collected and remitted under Applicable Law.

3.1.15  Absence of Certain Changes. Except as set forth in Section 3.1.15 of Seller Disclosure Schedules, since December 31, 2024, (a) no event, result, effect, occurrence, fact, circumstance, development, condition or change has occurred or arisen that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (b) Seller has not taken any action that would be prohibited by Section 4.2 (other than Section 4.2(vi)) if taken during the Interim Period.

3.1.16 <u>Sanctions</u>. Seller is not a Sanctioned Person. Since the Look-Back Date, the Business has been operated in material compliance with all applicable Sanctions. To Seller's Knowledge, there are no pending or threatened actions or investigations related to violations of Sanctions that could have a material effect on the Business.

3.1.17 <u>Foreign Corrupt Practices Act</u>. Since the Look-Back Date, the Business has been operated in material compliance with all applicable anti-bribery and anti-corruption Laws (the "**Anti-Corruption Laws**"), including the Foreign Corrupt Practices Act of 1977, as amended.

3.1.18 <u>Financial Statements</u>.

(a)     Set forth in <u>Section 3.1.18(a)</u> of Seller Disclosure Schedules are true, correct and complete copies of: (i) the combined balance sheet of the Business as of December 28, 2024, and December 30, 2023, and the related income statement of the Business for the fiscal years then ended, each of which are included in Seller Disclosure Schedules, and (ii) the combined balance sheet of the Business as of February 22, 2025, and the related income statement of the Business for the fiscal period then ended, each of which are included in the Disclosure Schedule (collectively, the "**Financial Statements**"). The Financial Statements fairly present, in all material respects, the financial position and results of operations of the Business for the periods indicated, in each case in accordance with GAAP consistent with past practice. The Financial Statements have been prepared from the books and records of Seller and its Affiliates.

(b)     The accounts payable of the Business reflected on the Financial Statements, and all accounts payable incurred since the date of the Latest Balance Sheet arose from bona fide transactions in the Ordinary Course consistent with past practice, and all such accounts payable have either been paid, are not yet due and payable in the Ordinary Course consistent with past practice, or are being contested by Seller in good faith. All notes and accounts receivable reflected on the Financial Statements, and all accounts receivable of the Business generated since the date of the Latest Balance Sheet, (i) constitute bona fide receivables resulting from the sale of services or other obligations in favor of Seller as to which full performance has been fully rendered, (ii) are valid and enforceable claims, (iii) are not subject to any pending or threatened defense, counterclaim, right of offset, returns, allowances or credits, except to the extent reserved on the Latest Balance Sheet, (iv) are current and collectible, subject only to the reserve for bad debt set forth on the Latest Balance Sheet and adjusted for the passage of time, and (v) are not subject in whole or in part to any Encumbrance or any Contract for deduction, free goods or services, discount or other deferred price or quantity adjustment.

(c)     All inventory of the Business is of a quality and quantity usable and salable by Seller in the Ordinary Course, except for obsolete, damaged, defective or slow-moving items that have been written off or written down in the Ordinary Course or for which reserves have been established and set forth in the Latest Balance Sheet.

3.1.19  <u>Material Contracts</u>.

(a)      <u>Section 3.1.19</u> of Seller Disclosure Schedules contains a complete and correct list, as of the date of this Agreement, of each Contract described below in this <u>Section 3.1.19(a)</u> under which Seller or any of its Subsidiaries is a party and to which Seller or any of its Subsidiaries has any current or future rights, responsibilities, obligations or liabilities in connection with the Business, other than (i) any stand-alone purchase order, sale orders, statements of work, invoices or similar instruments not made pursuant to a separate Contract (as long as such purchase order does not impose future obligations on Seller or its Subsidiaries outside of the Ordinary Course for purchase orders of such products), and (ii) any Plan or confidentiality agreements to which Seller or its Subsidiaries is a party (all Contracts of the type described in this <u>Section 3.1.19(a)</u>, being referred to herein as the "**Material Contracts**"):

  i.    is with a Top Supplier;

 ii.    requires expenditures by Seller or payments to be received by Seller in excess of $6,000,000 in the twelve (12) months ended on December 31, 2024;

iii.    (A) limits or purports to limit, in any material respect, the freedom of the Business to engage or compete in any line of business or with any Person or in any geographic area, (B) contains exclusivity or "most favored nation" obligations to which the Business is subject in favor of any Person or (C) contains any other provisions restricting or purporting to restrict the ability of the Business to sell, market, distribute, promote, manufacture, develop, commercialize or test or research the Purchased Products in any material respect, directly or indirectly through third parties (in the case of clauses (A), (B) and (C), other than any such restriction or purported restrictions that have a de minimis effect on the Business);

iv.    is a Contract pursuant to which (A) Seller receives any license to any Intellectual Property material to the Business (other than (w) non-exclusive licenses to use commercially available Software for an annual fee of less than $500,000, (x) non-disclosure agreements, (y) licenses for open source Software, and (z) licenses which are merely incidental to the primary transactions contemplated by the Contract), (B) Seller grants or licenses to a third party any rights to use any material Owned Intellectual Property (other than Intellectual Property licensed in the Ordinary Course on a non-exclusive basis), (C) any Person (other than a Business Employee) has developed Intellectual Property for the Business that is used in and material to the Business, and (D) Seller entered into to settle or resolve any intellectual property-related dispute or litigation, including settlement agreements, coexistence agreements, covenant not to sue agreements, and consent to use agreements;

 v.    is a Contract regarding the employment or engagement of any Business Employee or Independent Contractor, including (A) employment, independent contractor and consulting and similar Contracts (excluding offer letters) and

(B) Contracts providing bonuses, retention, stay-on, severance, termination pay, change in control payments, transaction bonuses, or similar compensation or benefits to personnel (whether employees or independent contractors) or agents;

vi.    is a collective bargaining agreement covering any Business Employee;

vii.    is a Contract with any Affiliate of Seller relating to the provision of funds, real property, goods or services by or to Seller as it relates to the Business; or

viii.    relate to any settlement, conciliation or stipulation of any Litigation against the Business by any other Person to which the Business will have any monetary obligation after the date hereof in excess of $100,000, individually, or $250,000, in the aggregate.

(b)    Seller has made available to Buyer correct and complete copies of all Material Contracts in effect as of the date hereof. Subject to requisite Bankruptcy Court approvals, and except (i) as a result of the commencement of the Chapter 11 Cases, (ii) as set forth on Section 3.1.19 of Seller Disclosure Schedules, and (iii) for which Seller's payment of the Cure Costs will cure, (A) to Seller's Knowledge, Seller is not in material breach or default of its obligations under any Material Contract, (B) to Seller's Knowledge, no condition exists that with notice or lapse of time or both would constitute a material default by Seller or its applicable Subsidiary under any such Material Contract, and (C) to Seller's Knowledge, no other party to any such Material Contract is in material breach or default (or has made any written demand (or claim) for indemnification) thereunder.

3.1.20  Suppliers. Section 3.1.20 of Seller Disclosure Schedules sets forth a list of the top ten (10) suppliers and vendors based on the aggregate dollar amount of purchases by the Business ("**Top Suppliers**") for the year ended December 31, 2024. As of the date hereof and to Seller's Knowledge, no such supplier has (a) cancelled or terminated its business relationship with the Business, or (b) notified or informed Seller in writing that it intends to terminate or materially alter the terms of its distributing or supplying practices or its business relationship with the Business, or any written demand (or claim) for indemnification, and Seller does not otherwise have knowledge of such intent. Except as set forth on Section 3.1.20 of Seller Disclosure Schedules, since the Look Back Date, (i) the Business has not had any material disputes concerning any nonconformance in any finished products and/or services with any such Top Supplier except in the Ordinary Course and (ii) to Seller's Knowledge, there are no other facts or circumstances relating to the Top Suppliers that could reasonably be expected to materially and adversely impact the operations of the Business following the Closing.

3.1.21  Business Continuity. None of the IT Systems have experienced bugs, failures, breakdowns, or continued substandard performance in the past twelve (12) months that has caused any material disruption or interruption in or to the use of any such Systems by Seller or its Subsidiaries that have not been remediated in all material respects.

3.1.22  Bank Accounts. Section 3.1.22 of Seller Disclosure Schedules is a correct and complete list of all of the banks in which an account or safety deposit box (if any) is

maintained by or on behalf of the Business or Seller and its Subsidiaries, as the case may be, together with the account numbers and names of all authorized signatories for such accounts or with access to the safety deposit box(es) (if any).

**3.2     Representations and Warranties of Buyer**. Buyer represents and warrants to Seller as of the date hereof (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date) as follows.

3.2.1    <u>Entity Status</u>. Buyer is duly formed and validly existing under the laws of its jurisdiction of formation and has the requisite corporate power to enter into and perform its obligations under this Agreement and the Ancillary Agreements to which it is or will be a party.

3.2.2    <u>Authority</u>. The execution and delivery of and performance by Buyer of this Agreement and the Ancillary Agreements to which it is or will be a party have been, or will be at or prior to Closing, authorized by all necessary corporate action on the part of Buyer.

3.2.3    <u>No Conflict</u>. The execution and delivery of and performance by Buyer of this Agreement and the Ancillary Agreements to which it is or will be a party (a) do not and will not constitute or result in a violation or breach of, or conflict with, or allow any Person to exercise any rights under, any of the terms or provisions of Buyer's Organizational Documents, (b) do not and will not constitute or result in a breach or violation of, or conflict with or allow any Person to exercise any rights under, any Contract, license, lease or instrument to which it is a party; and (c) do not result in the violation of any Law applicable to Buyer, except in the case of clauses (b) and (c), as would not materially adversely affect the ability of Buyer to consummate the Transactions.

3.2.4    <u>Required Authorizations</u>. Other than the requisite Bankruptcy Court approvals and entry of the Sale Order, no filing with (other than as required under the HSR Act), notice to or Order, Permit, approval, consent, waiver, license or similar authorization of, any Governmental Authority is required on the part of Buyer as a condition to the lawful consummation of the Transactions.

3.2.5    <u>Execution and Binding Obligation</u>. Subject to the requisite Bankruptcy Court approvals, this Agreement and the Ancillary Agreements to which Buyer is or will be a party have been, or will be, duly executed and delivered by Buyer and constitute, or will constitute, legal, valid and binding agreements of Buyer, enforceable against it in accordance with its terms, subject only to the Enforceability Exceptions.

3.2.6    <u>Financial Capacity</u>.

(a)     Attached hereto as <u>Exhibit F</u> is an executed equity commitment letter (the "**Equity Commitment Letter**") from the Equity Investors to provide, subject to the terms and conditions therein, cash in the aggregate amount set forth therein (the "**Equity Financing**").

(b)     The Equity Commitment Letter has not been amended, modified or terminated, and the commitment contained in the Equity Commitment Letter, to the Knowledge

of Buyer, assuming satisfaction of the conditions set forth in <u>Article 6</u>, have not been withdrawn or rescinded in any respect. Assuming the Equity Financing is funded in accordance with the Equity Commitment Letter, the aggregate proceeds contemplated by the Equity Commitment Letter will be sufficient when funded for Buyer to perform its obligations under this Agreement, including making the payments described in <u>Section 2.3</u> and to pay all fees and expenses related to the Transactions, including the payments described in <u>Section 2.3</u>. The Equity Commitment Letter provides, and will continue to provide, that Seller is a third-party beneficiary thereof and is entitled to enforce such agreement in each case in accordance with the terms set forth therein. Assuming satisfaction of the conditions set forth in <u>Article 6</u>, to the Knowledge of Buyer, there are no side letters or other Contracts or understandings relating to the Equity Commitment Letter that would reasonably be expected to affect the availability of the Equity Financing, and Buyer does not know of any facts or circumstances that may be expected to result in any of the conditions set forth in the Equity Commitment Letter not being satisfied, or the Equity Financing not being available to Buyer, on the Closing Date. The Equity Commitment Letter is not subject to any conditions precedent or other contingencies to fund the Equity Commitment other than as set forth therein and, as of the date hereof, is (x) in full force and effect and (y) a legal, valid, binding and enforceable obligation of Buyer and each of the other parties thereto, except as the same may be limited by Enforceability Exceptions.

(c)     Buyer's obligations under this Agreement are not and will not be subject to the receipt by Buyer of any financing (other than pursuant to, and in accordance with the terms and conditions set forth in the Equity Commitment Letter).

3.2.7     <u>Litigation</u>. There is no material Litigation in progress, pending, or to Buyer's Knowledge, threatened against Buyer, which prohibits, restricts or seeks to enjoin the Transactions.

3.2.8     <u>Qualification</u>. As of the Closing, Buyer will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Purchased Contracts and the Purchased Leases and the related Assumed Liabilities (*provided*, that in no event shall Buyer be required to pay or assume any Cure Costs). To the knowledge of Buyer, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under section 363(m) of the Bankruptcy Code (*provided*, that in no event shall Buyer be required to pay or assume any Cure Costs).

3.2.9     <u>No Broker</u>. Except for Jefferies LLC, no broker, agent or other intermediary is entitled to any fee, commission or other remuneration in connection with the Transactions based upon arrangements made by or on behalf of Buyer.

3.2.10     <u>Solvency</u>. Assuming (x) the accuracy of the representations and warranties set forth in <u>Section 3.1</u> and (y) the performance by Seller of the covenants and agreements required to be performed by it under this Agreement prior to the Closing, immediately after giving effect to the consummation of the Transactions (including any financings being entered into in connection therewith) and taking into account all obligations of Buyer pursuant to this Agreement and the Ancillary Agreements to which it is a party, solely as of and immediately after the Closing: (a) the fair saleable value of the assets of Buyer will be greater than the total

amount of its Liabilities; (b) Buyer will be solvent and able to pay its debts and obligations in the Ordinary Course as they become due; (c) no transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Buyer in connection with the Transactions; and (d) Buyer will have adequate capital to carry on its business and all businesses in which Buyer is about to engage.

3.2.11 <u>Independent Investigation</u>. Buyer knowingly, willingly, irrevocably and expressly represents, warrants, acknowledges and agrees, on its own behalf and on behalf of its Affiliates, that Buyer has conducted to its satisfaction its own independent review and analysis of, and based thereon has formed an independent judgment concerning, the Transactions, the Business, the Purchased Assets and the Assumed Liabilities. In entering into this Agreement, Buyer has relied solely upon its own review and analysis, and the specific representations and warranties of Seller expressly set forth in <u>Section 3.1</u> (as qualified or modified by Seller Disclosure Schedules), and has not relied on, and hereby disclaims reliance on, any other representations, warranties, statements or omissions (whether by Seller or another Person). Buyer confirms that Seller has made available to Buyer and Buyer's Representatives such opportunity to ask questions of the personnel of Seller and its Subsidiaries, as well as such access to the offices, properties and books and records of the business of Seller and its Subsidiaries as deemed appropriate by Buyer in connection with its determination to enter into this Agreement and consummate the Transactions.

3.2.12 <u>Certain Compliance Matters</u>. Buyer is not, nor is acting for or on behalf of, a Sanctioned Person. Buyer will not fund any part of the purchase consideration contemplated by this Agreement with proceeds derived from any violation of Anti-Corruption Laws or Sanctions.

**3.3     Exclusivity of Representations**. Except for the representations and warranties made by Seller in <u>Section 3.1</u> or in any Ancillary Agreement to be delivered by Seller pursuant to this Agreement, neither Seller nor any other Person makes any express or implied representation or warranty with respect to Seller, its Subsidiaries or their businesses, assets, operations, liabilities, condition (financial or otherwise) or prospects, and Seller hereby disclaims any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made by Seller in <u>Section 3.1</u> or in any Ancillary Agreement to be delivered by Seller pursuant to this Agreement, neither Seller nor any of its Subsidiaries or Affiliates or any other Person makes or has made any representation or warranty to Buyer or any of its respective representatives, with respect to, nor has Buyer or any of its respective representatives relied on, (a) any financial projection, forecast, estimate (other than as set forth in the Financial Statements), budget or prospective information relating to Seller, its Subsidiaries or the Business or (b) any oral or written information furnished or made available to Buyer or any of its representatives in the course of its due diligence investigation of Seller and its Subsidiaries, the Business, the negotiation of this Agreement and the Ancillary Agreements or the consummation of the Transactions, including the accuracy, completeness or currency thereof, and neither Seller nor any of its Subsidiaries or Affiliates or any other Person will have any liability to Buyer or any other Person in respect of such information, including any subsequent use of such information.

# ARTICLE 4
# PRE-CLOSING COVENANTS

**4.1**     **Access and Information**.

4.1.1   During the Interim Period, Seller shall, and shall cause its Subsidiaries to, (a) afford Buyer and its Representatives reasonable access to the Business, the Purchased Assets, the Business' senior management team, and information pertaining to the Assumed Liabilities, (b) use reasonable best efforts to cause its employees and Representatives to cooperate with and aid Buyer and its Representatives in its investigation of the Business, (c) direct its senior management team to consult with and reasonably cooperate with Buyer regarding Buyer's post-Closing operation of the Business (including by consulting regarding the Transition Services Agreement and the services to be provided thereunder, as well as Buyer's post-Closing transition plans), (d) reasonably consult with Buyer regarding any material ongoing Litigation that may have a material or adverse impact on the Business after the Closing and provide Buyer with any material communications in connection therewith reasonably promptly following Seller's receipt or delivery thereof, and (e) shall use reasonable best efforts to inform and consult Buyer with respect to any "major" business decisions related to the Business (including real estate matters, or other matters that will materially or adversely impact the future operation of the Business) following the Closing. Any request or investigation under this Section 4.1.1 shall be made or conducted on a reasonable basis by Buyer providing reasonable Notice to Seller and shall be conducted during normal business hours in such a manner as not to interfere unreasonably with the conduct of the Business. Buyer acknowledges and agrees that Seller shall be entitled to restrict any such access to or restrict information (x) as determined, in its reasonable discretion, to be appropriate to ensure compliance in all material respects with any Law, (y) that in the reasonable judgment of Seller would result in the disclosure of any Trade Secrets or any violation of any of its obligations with respect to confidentiality and/or (z) to preserve any applicable attorney client privilege, attorney work product or other legal privilege; *provided*, that in the event any information is withheld pursuant to this sentence, Seller shall promptly notify Buyer and at Buyer's request, Seller shall use reasonable best efforts to the extent feasible to develop an arrangement to communicate or provide the applicable information (or a portion thereof) in a manner that would not conflict with the foregoing clauses (x), (y) and (z). The information provided pursuant to this Section 4.1.1 shall remain subject to the Confidentiality Agreement. Seller and its Subsidiaries make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 4.1.1, and Buyer may not rely on the accuracy of any such information, in each case, other than the representations and warranties made by Seller in Section 3.1 or in any Ancillary Agreement to be delivered by Seller pursuant to this Agreement.

4.1.2   During the Interim Period, Buyer hereby agrees it shall not contact, and it shall cause its Affiliates or Representatives to not contact, any licensor, licensee, competitor, supplier, distributor, franchisee, or customer of Seller or its Subsidiaries with respect to the Purchased Assets, the Business, this Agreement, the Ancillary Agreements or the Transactions, without the prior written consent of Seller (which shall not be unreasonably withheld, delayed or conditioned), in each case other than (a) in the Ordinary Course, and (b) not specifically targeted at (i) Seller or its Affiliates, (ii) the Business or the Purchased Assets, or (iii) this Agreement, the Ancillary Agreements or the Transactions.

4.1.3    Seller shall not, and shall cause its Affiliates and each of their respective Representatives not to, for a period of two (2) years after the Closing, directly or indirectly, without Buyer's prior written consent, use for any purpose (except as otherwise specifically permitted in this Agreement or any Ancillary Agreement) or disclose to any third party (other than each other and their respective Representatives) any confidential or proprietary information concerning the Business, the Purchased Assets or the Assumed Liabilities (including such information as may be disclosed to Seller or its Affiliates or any of their Representatives pursuant to the exercise of its rights to access information following the Closing as set forth herein); *provided*, that the foregoing restriction shall not (a) apply to any information (i) generally available to, or known by, the public (other than as a result of disclosure in violation of this Agreement), (ii) independently developed by Seller, its Affiliates or any of its and their respective Representatives following the Closing without any reference to confidential or proprietary information concerning the Business, or (iii) becomes available to Seller, its Affiliates or any of its and their respective Representatives from a third party if such source is not actually known by Seller at the time of the disclosure to be bound by a confidentiality agreement with, or other known contractual or legal obligation of confidentiality to, Buyer with respect to such information, or (b) prohibit any disclosure (i) pursuant to a request or requirement of any applicable Law, Governmental Authority or rules of any securities exchange, or legal proceeding or process or as otherwise legally compelled (including pursuant to a deposition, interrogatory, subpoena, civil investigation or similar process) so long as, to the extent reasonably practicable and legally permissible, Seller provides Buyer with reasonable prior notice of such disclosure and a reasonable opportunity (at Buyer's sole cost and expense) to contest such disclosure, or (ii) necessary in connection with the administration of the Chapter 11 Cases, the winding down of Seller's estate, the payment of any Taxes or the filing of any Tax Returns or the recording of any Claims in connection therewith.

**4.2    Ordinary Course of Business**. Except (v) with the prior written consent of Buyer, which consent shall not be unreasonably withheld or delayed, (w) as required by applicable Law or Order of the Bankruptcy Court, including the DIP Financing Order, (x) as expressly provided in this Agreement or on <u>Section 4.2</u> of Seller Disclosure Schedules, (y) for actions taken by Seller or its Subsidiaries as required in connection with the Chapter 11 Cases, or (z) any actions taken in connection with a Store closure, during the Interim Period, Seller shall: (i) use reasonable best efforts to operate and/or maintain the tangible Purchased Assets in the Ordinary Course and in compliance in all material respects with applicable Laws, (ii) (A) not terminate or cancel any of the Purchased Contracts or Purchased Leases other than expirations of any Purchased Contracts or any Purchased Leases in accordance with the terms of such Purchased Contracts or such Purchased Leases, or (B) not amend, modify, release, assign or waive any rights under any Purchased Contract or Purchased Lease other than in the Ordinary Course or as provided for in the DIP Financing Order or as contemplated or permitted in the DIP Budget (as defined in the DIP Financing Order), (iii) not encumber, pledge, transfer, sell, assign, abandon, allow to lapse, fail to prosecute or maintain, exclusively license, or otherwise dispose of any material Owned Intellectual Property other than (A) in the Ordinary Course or (B) due to the expiration of issued or registered Owned Intellectual Property at the end of the maximum statutory term, in each case, other than in the Ordinary Course, (iv) not voluntarily or knowingly or intentionally permit any of the Purchased Assets to become subject to any Encumbrance, except for Permitted Encumbrances, (v) not sell, assign, license, transfer, convey, lease, sublease, surrender, relinquish, terminate or otherwise dispose of any portion of the Purchased Assets other than (A)

in the Ordinary Course or (B) the disposition of obsolete, worn out or immaterial assets, (vi) except as required by a Plan in effect as of the date hereof or as required by applicable Law, not pay, grant or announce any new compensation or benefits, and not pay, grant or announce any increase in the compensation or benefits of any Business Employee, other than any increase in compensation that is less than three percent (3%) of the overall compensation of a Store Employee in the Ordinary Course, (vii) not accelerate the vesting, funding of or lapse of restrictions with respect to any award, compensation or benefit owing, due or payable to a Business Employee, (viii) not enter into, modify, negotiate or terminate any collective bargaining agreement covering any Business Employee, (ix) not forgive any loans, or issue any loans to any Business Employee, (x) not plan, announce, implement or effectuate a reduction in force, lay-off, early retirement program, severance program or other program of effort concerning the termination of employment of any vice president level or above Business Employee, or otherwise terminate the employment of any such Business Employee other than for "cause" or in accordance with Seller's policies or pursuant to applicable Laws, (xi) not transfer, offer employment to, or otherwise attempt to persuade any Business Employee not to accept Buyer's offer of employment, (xii) not grant any Top Supplier any material discounts, pricing accommodations, or other similar changes relating to pricing, payment terms or credit support other than in the Ordinary Course, (xiii) not seek any relief from, or modification of, the automatic stay on any Litigation involving Seller and/or any of its Subsidiaries issued by the Bankruptcy Court, (xiv) adopt, materially modify, materially amend or terminate any material Plan except as required by applicable Law or the terms of any Plan, or (xv) not authorize or enter into any agreement or commitment, whether or not in writing, to take any action prohibited by this <u>Section 4.2</u>.

**4.3    Notification of Certain Matters**.

4.3.1    From the Execution Date through 3:00 P.M. (Eastern Time) on May 4, 2025 (and in any event, within two (2) Business Days after Seller discovers the existence of any such Contract), Seller shall use reasonable best efforts to provide Buyer Notice of any Contract or Lease to which Seller or any of its Subsidiaries is a party as of the Execution Date that was not set forth on <u>Section 2.7.1</u> of Seller Disclosure Schedules, and any Contracts or Leases that are entered into after the Execution Date, and Buyer shall be entitled, in its sole discretion and upon Notice to Seller (email to counsel being sufficient), to add any such Contract or Lease to its schedule of Purchased Contracts and Purchased Leases pursuant to the terms set forth in <u>Section 2.7.2</u>.

4.3.2    If any Contract is added to (or removed from) <u>Section 2.7.1</u> of Seller Disclosure Schedules, Seller shall promptly take such steps as are reasonably necessary, and shall promptly deliver Notice to the non-debtor counterparty, to the extent necessary to cause any such added Contracts to be assumed by Seller and assigned to Buyer or rejected by Seller, as applicable, from the Execution Date through 3:00 P.M. (Eastern Time) on May 4, 2025 or as soon as reasonably practicable thereafter according to the terms herein.

**4.4    Obligation to Consummate the Transaction**. Each of the Parties agrees that it shall use reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to the extent permissible under applicable Law, to consummate and make effective the Transactions and to ensure that the conditions set forth in <u>Article 6</u> are satisfied.

**4.5    Filings; Other Actions; Notification and Cooperation**.

4.5.1    Seller and Buyer shall cooperate with each other and use, and shall cause their respective Affiliates and Subsidiaries to use, their respective reasonable best efforts to take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable under this Agreement and applicable Law to consummate and make effective the Transactions as expeditiously as reasonably practicable after the date of this Agreement, including using reasonable best efforts in: (a) preparing and filing all documentation to effect all necessary notices, reports and other filings (and in any event, by filing by no later twenty (20) Business Days after the date hereof, any notifications, filings and other information required to be filed under the HSR Act with respect to the Transactions, unless mutually agreed otherwise); (b) obtaining as expeditiously as practicable all consents, registrations, approvals, permits and authorizations necessary to be obtained from any Governmental Authority in order to consummate the Transactions; (c) obtaining (and cooperating with each other in obtaining) any consent, approval of, waiver or any exemption by, any non-governmental third party, in each case, to the extent necessary, proper or advisable in connection with the Transactions; and (d) executing and delivering any reasonable additional instruments necessary to consummate the Transactions and to fully carry out the purposes of this Agreement. Nothing herein shall require Seller or any of its Subsidiaries to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations.

4.5.2    Neither Buyer nor Seller shall, and shall cause its respective Subsidiaries not to, enter into a definitive agreement providing for, or consummate, any transaction which would reasonably be expected to materially delay or prevent consummation of the Transactions. Neither Party, without the other Party's prior written consent, shall: (a) enter into any timing, settlement or similar agreement, or otherwise agree or commit to any arrangement, that would have the effect of extending, suspending, lengthening or otherwise tolling the expiration or termination of the waiting period applicable to the contemplated transactions under the HSR Act or any Antitrust Laws; or (b) enter into any timing or similar agreement, or otherwise agree or commit to any arrangement, that would bind or commit the Parties not to consummate the Transactions (or that would otherwise prevent or prohibit the Parties from consummating the Transactions), in both cases (a) and (b) without the consent of the other Party, not to be unreasonably withheld, conditioned, or delayed.

4.5.3    Buyer and Seller shall cooperate with one another, and consider in good faith the views of one another, with respect to the appropriate course of action with respect to obtaining the consents, approvals, permits, waiting period expirations or authorizations of any Governmental Authority required to consummate the Transactions prior to the Outside Date. No Party hereto or its counsel shall independently participate in any substantive call or meeting with any Governmental Authority in respect of any such filing, investigation, or other inquiry relating to the matters that are the subject of this Section 4.5 without giving the other Party or its counsel reasonable prior notice of such call or meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and participate. In furtherance of the foregoing and to the extent permitted by applicable Law: (a) each Party shall notify the other, as far in advance as practicable, of any filing or material or substantive communication or inquiry it or any of its

Subsidiaries intends to make with any Governmental Authority relating to the matters that are the subject of this <u>Section 4.5</u>; (b) prior to submitting any such filing or making any such communication or inquiry, such Party shall provide the other Party and its counsel a reasonable opportunity to review, and shall consider in good faith the comments of the other Party in connection with, any such filing, communication or inquiry; (c) promptly following the submission of such filing or making such communication or inquiry, such Party shall provide the other Party with a copy of any such filing or, if in written form, communication or inquiry; (d) each Party shall inform the other of and if in writing, furnish the other with copies of (or, in the case of oral communications, advise the other of) any substantive communication from or with any Governmental Authority regarding any of the Transactions; and (e) each Party shall consult with the other Party in connection with any inquiry, hearing, investigation or litigation by, or negotiations with, any Governmental Authority relating to the Transactions, including the scheduling of, and strategic planning for, any meetings with any Governmental Authority relating thereto. In exercising the foregoing cooperation rights, Seller and Buyer each shall act reasonably and as promptly as reasonably practicable. Notwithstanding the foregoing, materials provided pursuant to this <u>Section 4.5</u> may be reasonably redacted to (i) remove references concerning valuation, (ii) comply with contractual arrangements, (iii) comply with applicable Law, and (iv) address legal privilege or confidentiality concerns.

4.5.4    Notwithstanding the foregoing, nothing in this <u>Section 4.5</u> or otherwise in this Agreement shall require Buyer including its Affiliates, to (a) commit, agree or submit (or offer to commit, agree or submit) to any consent decree, hold separate order, sale, divestiture, lease, license, transfer, disposal, Encumbrance, other change or restructuring of, or operating restriction with respect to the businesses, properties, product lines, assets, permits, operations, rights or interest therein of Buyer, its Affiliates, the Purchased Assets or any of the Business; or (b) otherwise take or commit to take any action that could limit its freedom with respect to, or its ability to retain, one or more of the businesses of Buyer or any of its Affiliates or the Purchased Assets; *provided*, that Seller shall take any of the foregoing actions if requested by Buyer in writing so long as any such actions are conditioned on the occurrence of the Closing; *provided*, *further*, that Seller shall not take any such actions without the prior written direction of Buyer.

4.5.5    In furtherance and not in limitation of the covenants of the Parties contained in this <u>Section 4.5</u>, if any administrative or judicial action or proceeding, including any proceeding by a private party, is instituted challenging the Transactions as violative of any Antitrust Law, each of Seller and Buyer shall use reasonable best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the Transactions.

4.5.6    Seller and Buyer each shall, upon request by the other, promptly furnish the other with all information concerning itself, its Affiliates, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of Buyer, Seller or any of their respective Affiliates to any Third Party or any Governmental Authority in connection with the Transactions, all of which information shall be true and correct in all material respects when provided; *provided*, that each Party shall be entitled to redact discussions of the transaction value

and competitively sensitive information, and may reasonably designate applicable materials to be reviewed solely by the other Party's outside counsel.

4.5.7   Seller and Buyer each shall keep the other reasonably apprised of the status of matters relating to completion of the Transactions, including promptly furnishing the other with copies of notices or other communications received by Seller or Buyer, as the case may be, or any of their respective Affiliates from any Third Party or any Governmental Authority with respect to the Transactions, other than immaterial communications and communications on the docket in any of the Chapter 11 Cases.

4.5.8   Buyer shall bear the cost of any filing fee payable to a Governmental Authority in connection with any filings made under this <u>Section 4.5</u>.

**4.6**   **Working Capital Target Adjustment**. During the Interim Period, the Parties agree to adjust the Target Net Working Capital Amount as follows: (a) for each Store Seller or its Subsidiaries identifies for closure as listed in <u>Section 4.6</u> of Seller Disclosure Schedules, or Buyer determines to close at any time after February 22, 2025 (each, a "**Non-Transferred Store**") which results in the number of Transferred Stores to be less than 677 (the "**Store Threshold**"), the Target Net Working Capital Amount shall be lowered by $198,200, (b) the adjustment to the Target Net Working Capital Amount shall be calculated based on the number of Stores, in the aggregate, that Seller or its Subsidiaries identifies for closure as listed in <u>Section 4.6</u> of Seller Disclosure Schedules, or Buyer determines to close at any time after February 22, 2025 which results in the number of Transferred Stores to be less than the Store Threshold, with each closure resulting in a reduction of $198,200, and (c) the adjustments to the Target Net Working Capital Amount set forth in this <u>Section 4.6</u> shall take effect immediately upon the closure of each Store or Buyer's determination of closure; *provided*, that if any Store has closed prior to the date hereof, such adjustment with respect to such Store shall take effect on the date of this Agreement.  For purposes of this <u>Section 4.6</u>, any Store listed in <u>Section 4.6</u> of Seller Disclosure Schedules with a "Closing Process Status" of "Currently Winding Down", or "Fully Closed" shall be considered a Store that Seller or its Subsidiaries has identified for closure and shall constitute a Non-Transferred Store; *provided*, *however*, that in no event shall either Store 904 (Nashville, TN) or Store 910 (Riverbend, FL) reduce the Store Threshold.

## ARTICLE 5
## ADDITIONAL COVENANTS

**5.1**   **Further Assurances**.

5.1.1   Each of Seller and Buyer shall, at any time or from time to time after the Closing, at the request and expense of the other Party, take, or cause to be taken, all reasonable actions, and to do, or cause to be done, and to assist and cooperate with the other Party in doing, all reasonable things necessary to consummate and make effective, in the most expeditious manner practicable, the Transactions, including executing and delivering to the other Party all such reasonable instruments and documents or further reasonable assurances as the other Party may reasonably request, in each case that are consistent with the terms of this Agreement, in order to (a) vest in Buyer all of Seller's right, title and interest in and to the Purchased Assets (including the Purchased Intellectual Property) as contemplated hereby, (b) effectuate Buyer's

assumption of the Assumed Liabilities, (c) confirm Seller's retention of the Excluded Assets and the Excluded Liabilities, and (d) grant to each Party all rights contemplated to be granted to such Party under this Agreement and the Ancillary Agreements; *provided*, *however*, that after the Closing, apart from such foregoing customary further assurances, neither Seller nor Buyer shall have any other obligations except as specifically set forth and described herein or in the Ancillary Agreements.

5.1.2    If any approval, consent or waiver required for Seller to assume and assign to Buyer the Purchased Contracts, the Purchased Leases and other Purchased Assets shall not have been obtained prior to the Closing, Seller shall use reasonable best efforts to obtain such approval, consent or waiver to assign to Buyer the Purchased Contracts, the Purchased Leases and other Purchased Assets, including using reasonable best efforts to facilitate any negotiations with the counterparties to such Purchased Contracts and such Purchased Leases and to obtain an order (which may be the Sale Order) containing a finding that the proposed assumption of such Purchased Contracts and such Purchased Leases and assignment to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code. At the Closing (a) Seller shall, pursuant to the Sale Order, assign to Buyer each of the Purchased Contracts and Purchased Leases that is capable of being assigned and (b) Seller shall pay all Cure Costs (if any), in each case in connection with such assumption and assignment, and Buyer shall assume and discharge when due the Assumed Liabilities (if any) under the Purchased Contracts and the Purchased Leases. Except as to the Purchased Contracts and the Purchased Leases assigned pursuant to section 365 of the Bankruptcy Code or the Sale Order, anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Contract, any Purchased Lease or other Purchased Asset or any right thereunder if an attempted assignment, without the consent of a Third Party, would constitute a breach or in any way adversely affect the rights of Buyer or Seller thereunder, and Seller, at Buyer's expense (if any), shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If such consent is not obtained or such assignment is not attainable pursuant to section 365 of the Bankruptcy Code or the Sale Order, or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Assets in question so that Buyer would not in effect acquire the benefit of all such rights, then Seller, to the maximum extent permitted by applicable Law, shall act after the Closing, at Buyer's request and expense, as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by applicable Law, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Seller and its Subsidiaries are not under any obligation to pay any money to a Third Party (unless Buyer agrees in writing to reimburse Seller for such payment), incur any material obligations, commence any Litigation (*provided*, that Seller shall reasonably cooperate in any Litigation initiated by Buyer in the Bankruptcy Court regarding the assumption and assignment of any Purchased Contract or any Purchased Lease and matters related thereto) or offer or grant any material accommodation (financial or otherwise) to any Third Party in order to obtain any approval, consent or waiver. All obligations of Seller under this Section 5.1.2 shall expire on the date that is twelve (12) months after the Closing Date.

**5.2**    **Publicity**. No press release, public statement or announcement or other public disclosure (a "**Public Statement**") with respect to this Agreement, the Ancillary Agreements or the Transactions may be made except (a) with the prior written consent and joint approval of Buyer and Seller, not to be unreasonably withheld, delayed or conditioned, (b) if required by

applicable Law, the Chapter 11 Cases, a Governmental Authority, or stock exchange requirements, or (c) Buyer or its Affiliates may make customary disclosures in connection with marketing purposes and financial disclosures to (i) any current or prospective investors of Buyer or its Affiliates and (ii) their lenders, banks and advisors who have a reasonable need to receive such information. Where the Public Statement is required by applicable Law, the Chapter 11 Cases, a Governmental Authority, or stock exchange requirement, the Party required to make the Public Statement will use its reasonable best efforts consistent with applicable Law or Bankruptcy Court requirement to consult with the other Party, and consider in good faith any revisions proposed by the other Party, prior to making such disclosure, and shall limit such disclosure to only that information that is legally or otherwise required to be disclosed.

**5.3    Certain Tax Matters**.

5.3.1    <u>Withholding Taxes</u>.

(a)    The amounts payable by one Party (the "**Payer**") to another Party (the "**Payee**") pursuant to this Agreement ("**Payments**") shall not be reduced on account of any Taxes unless required by applicable Law. The Payer shall deduct or withhold from the Payments any Taxes that it is required by applicable Law to deduct or withhold, and all such amounts deducted and withheld that are timely remitted to the appropriate Governmental Authority shall be treated for all purposes of this Agreement as having been paid to Payee. Notwithstanding the foregoing, other than in connection with any compensatory payments or the failure of Seller to deliver any Tax forms described in <u>Section 5.3.2(b)</u>, prior to any deduction or withholding the Payer shall take reasonable best efforts to notify the Payee of its intent to withhold, and take reasonable best efforts to cooperate with the Payee to reduce or eliminate such withholding, and if the Payee is entitled under any applicable Law or Tax treaty to a reduction of rate of, or the elimination of, or recovery of, applicable withholding Tax, it shall timely deliver to the Payer or the appropriate Governmental Authority (with the assistance of the Payer to the extent that this is reasonably required) the prescribed forms necessary to reduce the applicable rate of withholding or to relieve the Payer of its obligation to withhold Tax, and the Payer shall apply the reduced rate of withholding, or dispense with the withholding, as the case may be, to the extent it complies with the applicable Law or Tax treaty. If, in accordance with the foregoing, the Payer withholds any amount, it shall make timely payment to the proper Taxing Authority of the withheld amount and send to the Payee proof of such payment as soon as reasonably practicable.

(b)    Seller (or if it is a disregarded entity for federal income Tax purposes, its regarded owner) shall deliver to Buyer a properly completed and executed IRS Form W-9, *provided* that the failure to deliver such form shall not be deemed a breach of any condition or covenant in this Agreement and Buyer's sole remedy for the failure to provide any such form shall be to withhold any required amount under the Code or any other applicable Tax law from the consideration otherwise payable to Seller hereunder in accordance with <u>Section 5.3.1(a)</u>.

5.3.2    <u>Transfer Taxes and Apportioned Obligations</u>.

(a)    All amounts payable hereunder or under any Ancillary Agreement are exclusive of all recordation, transfer, documentary, stamp, conveyance, value added, sales, consumption, goods and services taxes or other similar Taxes and fees imposed or levied by

reason of, in connection with or attributable to this Agreement and the Ancillary Agreements or the Transactions (collectively, "**Transfer Taxes**"). Buyer shall be responsible for the timely payment of all Transfer Taxes that are not exempted under a Sale Order pursuant to section 1146(a) of the Bankruptcy Code, and shall pay all amounts due and owing in respect of any Transfer Taxes, these amounts in addition to the sums otherwise payable, at the rate in force at the due time for payment or such other time as is stipulated under applicable Law and the parties shall cooperate to timely and properly file all Tax Returns with respect to any Transfer Taxes.

(b)     All personal property and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Seller and Buyer based on the number of days of such taxable period ending on and including the Closing Date (such portion of such taxable period, the "**Pre-Closing Tax Period**") and the number of days of such taxable period beginning on the day after the Closing Date (such portion of such taxable period, the "**Post-Closing Tax Period**"), *provided*, that for clarity sake and without prejudice to any apportionment provided for in the determination of the Net Working Capital Amount, the Parties agree and acknowledge that Seller shall have no obligations with respect to the payment of Taxes pursuant to this Section 5.3.2(b).

5.3.3    Cooperation and Exchange of Information. Each of Seller and Buyer shall (a) provide the other with such assistance as may reasonably be requested by the other Party (subject to reimbursement of reasonable out-of-pocket expenses) in connection with the preparation of any Tax Return or election or any, audit or other examination by any Taxing Authority or judicial or administrative proceeding relating to Liability for Taxes in connection with the Business or the Purchased Assets, (b) retain and provide the other Party with any records or other information that may be relevant to such Tax Return, audit or examination, or proceeding and (c) inform the other Party of any final determination of any such audit or examination or proceeding that affects any amount required to be shown on any Tax Return of the other for any period. Seller shall promptly notify and forward to Buyer in writing upon receipt by Seller of notice of any pending or threatened Tax audits or assessments that reasonably may be expected to relate the Purchased Assets or Allocation.

5.3.4    Other Tax Matters. The calculation of the Net Working Capital Amount, as finally determined, shall not take into account any change in Tax liability as a result of the following actions undertaken by Buyer or any of its Affiliates following Closing with respect to a Pre-Closing Tax Period: (a) filing any Tax Return or any amendment or modification to any previously-filed Tax Return, (b) taking or initiating any voluntary discussion, examination or contract with a taxing authority (including any voluntary disclosure agreement or similar process), (c) making any Tax election that has retroactive effect to a Pre-Closing Tax Period, or (d) extending or waiving any statute of limitations or other period for the assessment of any Tax or deficiency.

5.3.5    Continuing Employees. Seller and Buyer agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Revenue Procedure 2004-53, 2004-2 C.B. 320, with respect to wage reporting in respect of Continuing Employees, unless otherwise required by applicable Law.

5.3.6    <u>Tax Reserve Liabilities</u>. Buyer shall control, at its sole cost and expense, the conduct of any and all audits, examinations, contests, litigations, deficiency notices, or other proceedings with or against any taxing authority with respect to the Tax Reserve Liabilities (the "**Tax Reserve Liability Proceedings**"). Seller shall reasonably cooperate to put Buyer in control of any Tax Reserve Liability Proceedings and shall promptly notify Buyer of any written communication received with respect to any Tax Reserve Liability Proceeding.

**5.4    Accounts Receivable and Payable**.

5.4.1    <u>Accounts Receivable; Bank Accounts</u>. The Parties acknowledge and agree that all Accounts Receivable that are Purchased Assets shall become the property of Buyer subsequent to the Closing. From the Closing Date until ninety (90) days following Closing, in the event that, Seller or any of its Subsidiaries receives any payments from any obligor with respect to an such Accounts Receivable outstanding on the Closing Date, then Seller shall, or shall cause such Subsidiary to, within five (5) Business Days after receipt of such payment, remit the full amount of such payment to Buyer by wire transfer of immediately available funds to the account designated by Buyer by Notice to Seller. Subsequent to the Closing and until ninety (90) days following Closing, Seller shall not cause any of the signatories on the Bank Accounts to be changed; *provided*, that that Seller may remove any signatories no longer employed by Seller or its Affiliates, other than any signatory that is employed by Buyer or its Affiliates. In the event any Cash is transferred from any Bank Account, each of the Parties shall provide written Notice to the other Parties at least five (5) Business Days prior to such transfer and include the amount of Cash to be transferred and each recipient of such Cash; *provided*, that each of the Parties shall in good faith consider any questions or comments received from the other Parties, and mutually agree regarding such Cash transfer.

5.4.2    <u>Accounts Payable</u>. In the event that, subsequent to the Closing, Buyer, Seller or any of its Subsidiaries receives any invoices from any Third Party with respect to any account payable of the Business outstanding prior to the Closing that is not an Assumed Liability, then Seller shall be responsible for payment thereof. In the event that, subsequent to the Closing, Seller or any of its Subsidiaries receives any invoices from any Third Party with respect to any account payable of the Business that is an Assumed Liability, then Seller shall, within five (5) Business Days after receipt of such invoice, remit such invoice to Buyer and Buyer shall be responsible for payment thereof.

5.4.3    <u>Cash</u>. The Parties acknowledge and agree that all pre-Closing Cash shall remain the property of Seller. In the event that, Buyer or any of its Subsidiaries receives any pre-Closing Cash, then Seller shall, or shall cause such Subsidiary to, within five (5) Business Days after receipt of such payment, remit the full amount of such payment to Seller by wire transfer of immediately available funds to the account designated by Seller by notice to Buyer.

**5.5    Wrong Pockets**.

5.5.1    <u>Assets</u>. Without limiting <u>Section 5.1</u>, if either Buyer or Seller becomes aware subsequent to the Closing that any of the Purchased Assets has not been transferred to Buyer or that any of the Excluded Assets (including Cash) has been transferred to Buyer, it shall promptly notify (in writing) the other Party and the Parties shall, and shall cause

their Subsidiaries to, as soon as reasonably practicable, take all commercially reasonable actions (including executing any further instruments or documents) to ensure that such property is transferred, at the expense of requesting Party and with any necessary prior Third Party consent or approval, to (a) Buyer, in the case of any Purchased Asset that was not transferred to Buyer at the Closing; or (b) Seller, in the case of any Excluded Asset that was transferred to Buyer at the Closing.

      5.5.2  <u>Payments</u>. If, on or after the Closing, either Party shall receive any payments or other funds due to or belonging to the other Party pursuant to the terms of this Agreement or any Ancillary Agreement, then the Party receiving such funds shall, within five (5) Business Days after receipt of such funds, forward such funds to the proper Party. The Parties acknowledge and agree there is no right of offset regarding such payments and a Party may not withhold funds received from Third Parties for the account of the other Party in the event there is a dispute regarding any other issue under this Agreement or any of the Ancillary Agreements. As soon as practicable but no later than fifteen (15) Business Days following the Closing Date, Buyer shall inform Seller of Buyer's bank account and Seller shall use reasonable best efforts during the term of the Transitions Services Agreement to inform any counterparty to a Purchased Contract of Buyer's bank account together with the request to make any payments after the Closing Date to Buyer's bank account.

    **5.6**    **Purchased Intellectual Property**. Promptly following the Closing, at Buyer's sole cost and expense, Seller shall take such further actions and execute such further reasonable documents as may be necessary or reasonably requested by Buyer to effectuate, evidence and perfect the assignment and transfer of the Owned Intellectual Property to Buyer, including making such filings with any Governmental Authorities as may be required to transfer the Owned Intellectual Property to Buyer.

    **5.7**    **Social Media Accounts**. Seller shall use reasonable best efforts or as reasonably requested by Buyer to transfer the registration, ownership, and control of the Social Media Accounts to Buyer. Post-Closing, neither Seller nor its Affiliates shall, nor shall they knowingly permit any third person to, attempt to access the Social Media Accounts or alter the settings or credentials applicable thereto following the Closing.

    **5.8**    **Bankruptcy Court Filings and Approval**.

      5.8.1  Seller shall use its reasonable best efforts to obtain entry of the Sale Order and such other approvals and relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the Transactions. Within five (5) Business Days after execution of this Agreement, Seller shall file with the Bankruptcy Court a motion seeking approval of this Agreement, in part, pursuant to sections 363 and 365 of the Bankruptcy Code (the "**Sale Motion**") and the proposed Sale Order (as defined below), both in form and substance acceptable to Seller and Buyer. The proposed form of the Sale Order shall be in form and substance acceptable to Seller and Buyer, and with such changes Seller and Buyer find reasonably acceptable, (a) authorizing and approving pursuant to sections 105, 363, and 365 of the Bankruptcy Code, inter alia, (i) the sale of the Purchased Assets of Seller to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances (to the extent set forth herein), other than Permitted Encumbrances and Assumed Liabilities, and (ii) the assumption and

assignment of the Purchased Contracts and Purchased Leases to Buyer; (b) finding that (i) Buyer has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Purchased Contracts and Purchased Leases, (ii) the consideration provided by Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Purchased Assets, and (iii) Buyer and Seller did not engage in any conduct that would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code; (c) ordering that (i) notwithstanding Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry, (ii) Seller has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code, (iii) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, and (iv) Buyer shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (as amended, modified, or supplemented, the "**Sale Order**") and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the Transactions.

       5.8.2    Seller shall give appropriate notice, and provide appropriate opportunity for hearing, to all Persons entitled thereto, of all motions, orders, hearings, and other proceedings relating to this Agreement or any Ancillary Agreement and the Transactions and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

       5.8.3    Seller and Buyer shall take all commercially reasonable actions as may be reasonably necessary to cause the Sale Order to become a Final Order, including, to the extent reasonably practicable, furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Buyer agrees that it will promptly take such commercially reasonable actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of (x) providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

       5.8.4    Buyer acknowledges that under the Bankruptcy Code, the sale is subject to approval of the Bankruptcy Court. Buyer acknowledges that to obtain such approval Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best bid possible for the assets, including giving notice of the Transactions to creditors and other interested parties and entertaining any higher or otherwise better offers from prospective buyers.

       5.8.5    If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), and this Agreement has not otherwise been terminated pursuant to <u>Section 8.1</u>, Seller shall

immediately notify Buyer of such appeal, petition, or motion and shall, at Seller's sole cost and expense, use reasonable best efforts to defend such appeal, petition, or motion and shall use reasonable best efforts to obtain an expedited resolution of any such appeal, petition, or motion.

5.8.6    Subject to entry of the Sale Order, (a) on or prior to the Closing, Seller shall pay the Cure Costs for the Purchased Contracts and Purchased Leases and cure any and all other defaults and breaches under the Purchased Contracts and Purchased Leases to the extent required under section 365 of the Bankruptcy Code (excluding any Purchased Contracts or Purchased Leases for which there is an unresolved objection by a non-debtor counterparty to the Cure Costs asserted by Seller with regard to any such Contract or Lease or other dispute as to the assumption or assignment of such Contract or Lease as of the Sale Hearing (such contract, a "**Disputed Contract**") for which Cure Costs (or other matters related to the assumption and assignment of such Contract or Lease) have not been consensually agreed with the Contract counterparty and Seller or fixed by an order of the Bankruptcy Court as of the Closing), and (b) with respect to each Purchased Contract or Purchased Lease that is a Disputed Contract, on the date that is five (5) Business Days after the date on which (i) the Cure Costs with respect to such Purchased Contract or Purchased Lease have been consensually agreed, or (ii) the Bankruptcy Court has entered an order fixing such Cure Costs, or as soon as reasonably practical thereafter, Seller shall pay such Cure Costs so that such Purchased Contracts and such Purchased Leases may be assumed by Seller and assigned to Buyer (subject to payment by Seller of the Cure Costs and provision by Buyer of adequate assurance of future performance), in each case of the foregoing clauses (a) and (b), in accordance with the provisions of section 365 of the Bankruptcy Code, the Sale Order, and this Agreement. Seller agrees that it will promptly take such commercially reasonable actions as are necessary to obtain a final order of the Bankruptcy Court (which may be the Sale Order) providing for the assumption and assignment of such Purchased Contracts and Purchased Leases that are not designated as Excluded Contracts. For the avoidance of doubt, if there is any inconsistency between this Agreement and the Sale Order with respect to the assumption and assignment of the Purchased Contracts and Purchased Leases, or Seller's payment of the Cure Costs, the Sale Order shall govern.

5.8.7    Notwithstanding the foregoing, Buyer shall have the option pursuant to <u>Section 2.7.2</u> to remove any Disputed Contract from the schedule of Purchased Contracts or Purchased Leases, in which case Buyer shall not assume the Disputed Contracts and neither Seller nor Buyer shall be responsible for any Cure Costs associated with such Disputed Contract; *provided, however,* that Seller shall use its reasonable best efforts, in cooperation with Buyer, to resolve any disputes regarding the Cure Costs relating to any Disputed Contract. Any Disputed Contract as of the Closing shall not be deemed a Purchased Contract or Purchased Lease at the Closing.

5.8.8    After entry of the Sale Order, Seller shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

5.8.9    Nothing in this Agreement, or any document related to the Transactions, shall require Buyer, Seller or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or their respective stakeholders. Debtors retain the

right to pursue any transaction or restructuring strategy that, in Debtors' business judgment, will maximize the value of their estates.

    5.8.10 Notwithstanding anything to the contrary herein, in no event shall Buyer be required to pay or assume any Cure Costs.

  **5.9**  **Copies of Pleadings**. Seller shall consult with Buyer concerning the Sale Motion, the Sale Order, and any other Orders of the Bankruptcy Court relating to the Transactions, and the bankruptcy pleadings and proceedings in connection therewith. As soon as reasonably practicable, prior to filing thereof, Seller shall provide Buyer with drafts of all documents, motions, orders, filings or pleadings that Seller proposes to file with the Bankruptcy Court that relate to the approval of this Agreement, the Sale Order and the consummation of the Transactions. Seller shall also promptly provide Buyer with copies of all pleadings received by or served by or upon Seller in connection with the Chapter 11 Cases that relate to or, in Seller's judgment, are reasonably expected to affect the transactions provided for in this Agreement and which have not, to the Knowledge of Seller, otherwise been served on Buyer.

  **5.10**  **Books and Records**. For a period of six (6) years after the Closing, Buyer shall: (a) retain all books and records related to the Purchased Assets, the Assumed Liabilities and the Business (including all Purchased Books and Records); and (b) upon reasonable Notice from Seller to Buyer and during normal business hours, cooperate with and provide Seller, any of Seller's Affiliates, and the officers, employees, agents and Representatives of Seller and Seller's Affiliates reasonable access (including the right to make copies at Seller's expense or the expense of any Affiliate of Seller) to such books and records and to Buyer's Representatives, to the extent necessary for a reasonable business purpose, including as may be necessary for the preparation of financial statements, withholding or Tax forms, Tax Returns, in connection with any Litigation, or in connection with the administration of the Chapter 11 Cases or the wind-down of its remaining business and operations, and to any and all books and records relating to any Purchase Price payments or any related reports, including all documents, work papers, schedules, memoranda, and records used by or prepared by Buyer or its Representatives in preparing any such reports, together with any other information related thereto which Seller may reasonably request. Notwithstanding the foregoing, Buyer shall not be required by this Section 5.10 to provide Seller, any of Seller's Affiliates, and the officers, employees, agents and Representatives of Seller and Seller's Affiliates with access to or to disclose information (i) the disclosure of which would violate applicable Law, (ii) that in the reasonable judgment of Buyer would result in the disclosure of any Trade Secrets of third parties or violate any of its obligations with respect to confidentiality or (iii) the disclosure of which would cause the loss of any attorney-client, attorney work product or other legal privilege.

  **5.11**  **Trade Notification**. Seller and Buyer shall consult with each other on the timing, method, form and content of notifications to customers and suppliers regarding the Transactions and shall consider in good faith any comments or proposed changes received from the other Party.

  **5.12**  **Employee Matters**.

    5.12.1 List of Business Employees. Section 3.1.10(a) of Seller Disclosure Schedules shall be updated by Seller and delivered to Buyer no later than 3:00 P.M. (Eastern

Time) on May 4, 2025, solely to reflect any Business Employees who, subject to Seller's obligations under Section 4.2, are hired or whose employment is terminated by Seller after the date of this Agreement and prior to 3:00 P.M. (Eastern Time) on May 4, 2025.

        5.12.2  Offers of Employment. On or prior to 3:00 P.M. (Eastern Time) on May 4, 2025 (the "**Offer Deadline**"), Buyer will provide Seller with a list identifying the Business Employees to whom Buyer intends to offer employment (the "**Offer Employees**"); *provided*, *however*, that the number of Offer Employees (who are not Store Employees) shall be equal to or greater than the sum of the number of Business Employees (who are not Store Employees) as of the Offer List Deadline minus 75; *provided*, *further* that notwithstanding anything to the contrary herein, Buyer shall offer employment to a sufficient number of Business Employees (and provide for terms and conditions of employment to such Business Employees that would not reasonably be expected to constitute a constructive discharge under the WARN Act) such that Seller and its Affiliates are not subject to any obligations or Liabilities under the WARN Act resulting from employment losses, layoffs or plant closings in connection with the Closing. On or prior to the Offer List Deadline, Buyer shall, or shall cause one of its Affiliates to, offer employment on an at-will basis, to be effective on the applicable Continuing Employee Transfer Date, to each Offer Employee (the Offer Employees who accept such an offer of employment, satisfy each of the requirements of such offer, and actually commence employment with Buyer, the "**Continuing Employees**"). Such offers of employment shall be conditioned on the Closing and, in Buyer's sole discretion, on the Offer Employee (who is not a Store Employee) satisfying Buyer's requirements to execute and deliver non-competition, non-solicitation, confidentiality agreements, and, with respect to Store Employees, further conditioned on the Store at which such Store Employee works becoming a Transferred Store (the date of such occurrence, the "**Store Transfer Date**"). Seller will cooperate with any reasonable requests by Buyer in order to facilitate the offers of employment and delivery of such offers to the Offer Employees and shall not take any steps to discourage any Offer Employee from accepting such offer of employment. Each offer made pursuant to this Section 5.12.2 shall provide for (a) base salary or hourly wage rate, as applicable, not less than such Offer Employee's base salary or hourly wage rate, as applicable, as in effect immediately prior to the Closing Date, (b) annual short-term cash incentive compensation opportunities (excluding any equity or equity-based, long-term incentive, stay-on or retention opportunities), to the extent applicable, that are reasonably comparable, in the aggregate, to the annual short-term cash incentive compensation opportunities provided to such Offer Employee by Seller and its Subsidiaries immediately prior to the Closing Date, and (c) employee benefits (excluding defined benefit pension, nonqualified deferred compensation, severance, equity, equity-based and post-employment or retiree health and welfare benefits, collectively, the "**Excluded Benefits**") that are substantially comparable, in the aggregate, to the employee benefits provided to such Offer Employee by Seller and its Subsidiaries immediately prior to the Closing Date.

        5.12.3  Terms and Conditions of Employment. Until December 31, 2025, or, if earlier, until the relevant Continuing Employee's termination of service following the Closing each Continuing Employee shall receive (a) base salary or hourly wage rate, as applicable, not less than such Continuing Employee's base salary or hourly wage rate as in effect immediately prior to the Closing Date, (b) annual short-term cash incentive compensation opportunities (excluding any equity or equity-based, long-term incentive, stay-on or retention opportunities), to the extent applicable, that are reasonably comparable, in the aggregate, to the

annual short-term cash incentive compensation opportunities provided to such Continuing Employee by Seller and its Subsidiaries immediately prior to the Closing Date, and (c) employee benefits (excluding the Excluded Benefits) that are substantially comparable, in the aggregate, to the employee benefits provided to such Continuing Employee by Seller and its Subsidiaries immediately prior to the Closing Date. Buyer shall, or shall cause one of its Affiliates to, cause each Continuing Employee to be provided with the severance and termination benefits substantially similar to the severance and termination benefits set forth on Section 5.12.3 of Seller Disclosure Schedules.

5.12.4 At-Will Employment. Nothing in this Agreement shall limit Buyer's ability to amend or terminate a Continuing Employee's employment terms following the Closing. With respect to any Business Employee who is, on the Closing Date (or, such later date as may be specified in the Transition Services Agreement), absent as a result of an approved leave due to short-term or long-term disability (including a maternity disability) (each an "**Inactive Business Employee**"), Buyer's offer of employment in accordance with Section 5.12.2 shall (a) be contingent upon such Inactive Business Employee's return to active duty on or prior to the six-month anniversary of such date or such longer period as such Business Employee has reinstatement rights under applicable Law, and (b) be effective as of the date that such Business Employee presents himself or herself to Buyer or its Affiliates for active employment. The applicable Plan shall retain any obligations to provide any applicable disability benefits to such Inactive Business Employee in accordance with the terms of such Plan until such Inactive Business Employee becomes a Continuing Employee.

5.12.5 Buyer Benefit Plans. In respect of the employee benefit plans, programs, policies, contracts, agreements or other arrangements (whether written or unwritten) established or maintained by Buyer or its Affiliates that do not provide the Excluded Benefits (collectively, "**Buyer Benefit Plans**"), Buyer shall, for purposes of determining eligibility to participate, vesting and the level of paid time off, vacation and severance benefits, recognize each Continuing Employee's service with Seller and its Subsidiaries to the same extent and for the same purpose that such service was recognized under the corresponding Plans prior to the Closing Date; *provided*, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits or relates to the Excluded Benefits. With respect to each Buyer Benefit Plan that is an "employee welfare benefit plan" (within the meaning of section 3(1) of ERISA), Buyer or its Affiliates shall use reasonable best efforts to: (a) waive all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to each Continuing Employee (and his or her covered dependents) to the extent that such was satisfied under the analogous Plan, and (b) for the year in which the Closing Date occurs, provide each Continuing Employee (and his or her covered dependents) with credit for all co-payments, co-insurance, maximum out-of-pocket provisions and deductibles paid by such Continuing Employee (and his or her covered dependents) prior to the Closing Date under the corresponding Plan for purposes of satisfying the corresponding deductible, co-insurance, co-payment and maximum out-of-pocket provisions under the analogous Buyer Benefit Plan. Buyer and its Affiliates shall cause each Continuing Employee (and his or her eligible dependents) who is covered by a Plan that is a group health or welfare plan immediately prior to the Closing Date (or such later date as may be specified in the Transition Services Agreement) to be covered on and after such date by a Buyer Benefit Plan that is a group health or welfare plan that is

substantially comparable, in the aggregate, to the Plan provided to such Continuing Employee by Seller and its Subsidiaries immediately prior to the Closing Date.

5.12.6 <u>401(k) Plan</u>. Buyer and its Affiliates shall cause each Continuing Employee who is a participant in any Plan that is intended to be qualified under section 401(a) of the Code (the "**Seller 401(k) Plan**") to be allowed to participate in and make elective deferrals into, effective as soon as administratively feasible following the Closing Date, a 401(k) plan sponsored by Buyer or any of its Affiliates (the "**Buyer 401(k) Plan**"). In addition, Seller and Buyer or its applicable Affiliate shall take all steps necessary to permit each Continuing Employee who is eligible to receive an eligible rollover distribution (as defined in section 401(a)(31) of the Code) from the Seller 401(k) Plan, if any, to rollover such eligible rollover distribution, including any loan notes to the Buyer 401(k) Plan in accordance with ERISA and the Code.

5.12.7 <u>COBRA Continuation</u>. For the avoidance of doubt, Seller will retain all Liability to provide COBRA continuation health coverage with respect to any "qualifying event" that occurs on or prior to the Closing Date for any qualified beneficiary.

5.12.8 <u>WARN Act</u>. To the extent Buyer's failure to offer employment to a sufficient number of Business Employees (and provide for terms and conditions of employment that would not reasonably be expected to constitute a constructive discharge under the WARN Act) triggers any Liabilities for Seller or its Affiliates under the WARN Act in connection with the Closing, Buyer shall indemnify and hold Seller and its Affiliates harmless for any and all such Liabilities. Buyer will not, and will cause its Affiliates not to, take any action on or after the Closing Date that would cause any termination of employment of any employees by Seller or its Affiliates occurring prior to or at the Closing to constitute a "plant closing," "mass layoff" or group termination or similar event under the WARN Act, or to create any Liability or penalty to Seller or any of its Affiliates for any employment terminations under applicable Law. Buyer shall indemnify and hold Seller and its Affiliates harmless for any and all Liabilities under the WARN Act arising out of, relating to, or in respect of any actions of Buyer or its Affiliates occurring on or after the Closing (including as a result of the consummation of Transaction).

5.12.9 <u>Employee Communications; Cooperation</u>. Prior to the Closing or Store Transfer Date, as applicable, except as required by Law, Buyer shall not issue any communication (including any electronic communication) to any Business Employee without the prior written approval of Seller, such approval not to be unreasonably withheld. Except as required by Law, the Parties shall mutually consider and agree to the contents, scope, form and timing of any communications by Buyer with the Business Employees on all employment-related matters pertaining to the Transactions (the "**Employment Matters**"). The Parties agree that at all times prior to the Closing or Store Transfer Date, as applicable they will consult with each other prior to carrying out any communication sessions relating to Employment Matters or otherwise effecting any communications to the Business Employees relating to Employment Matters. Seller and its Subsidiaries shall waive any notice requirements, post-termination restrictions or other contractual constraints that might prevent Business Employees from commencing services with or providing services to Buyer and its Affiliates as of the applicable Continuing Employee Transfer Date.

5.12.10<u>Continuing Employee Transfer Date</u>. "**Continuing Employee Transfer Date**" shall be (a) for Continuing Employees and Store Employees, the Closing Date; (b) for Continuing Employees who are Store Employees, the applicable Store Transfer Date; and (c) for Inactive Business Employees, the first date on which such employee presents his or herself to Buyer or any of its Affiliates from active employment. Effective as of immediately prior to the Closing or the Store Transfer Date, as applicable, Seller shall, or shall cause its applicable Subsidiary to, terminate the employment of each Offer Employee who has accepted an offer of employment from Buyer or its Affiliate and who has satisfied each of the requirements of such offer. Upon the Continuing Employee Transfer Date (or, if applicable, such later date as set forth in the Transition Services Agreement), such Continuing Employee will become an employee of Buyer or its Affiliate and cease to actively participate in or accrue benefits under any Plan.

5.12.11<u>Third-Party Beneficiaries</u>. This <u>Section 5.12</u> shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement; nothing in this <u>Section 5.12</u>, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature whatever; and no provision of this <u>Section 5.12</u> will create any third-party beneficiary rights in any current or former employee, officer, director or individual independent contractor of Seller or any of its Affiliates in respect of continued employment (or resumed employment) or service or any other matter. This <u>Section 5.12</u> shall not be considered, or deemed to be, an amendment to any Plan or any compensation or benefit plan, program, agreement or arrangement of Buyer or any of its Affiliates. Nothing in this <u>Section 5.12</u> shall (i) obligate Buyer or any of its Affiliates to continue to employ any Continuing Employee for any specific period of time following the Closing Date, subject to the requirements of applicable Law or (ii) limit the right of Buyer, Seller or any of their respective Affiliates to, at any time, change or modify any Plan or Buyer Benefit Plans or other plans, policies, programs, agreements, arrangements or Contracts providing compensation or benefits at any time and in any manner.

**5.13    Insurance**. Other than the policies described in <u>Section 2.1.1(s)</u>, Buyer hereby acknowledges and agrees that, effective upon the Closing, all policies of, and binders evidencing, any form or type of insurance that are owned or maintained by Seller or any of its Affiliates that cover or relate to Seller, its Subsidiaries, or any of their respective assets, liabilities, employees, businesses or operations (such policies and binders, the "**Seller Insurance Coverage**") may be terminated or modified by Seller or any of its Affiliates to exclude coverage of the Purchased Assets, the Continuing Employees and the Assumed Liabilities, and neither Seller nor any of its Affiliates will be purchasing or otherwise acquiring any "tail" policy or other additional or substitute coverage for the foregoing. Any refund, rebate, credit or other amount paid, distributed or returned by any insurance provider or other Person in respect of, or relating to, Seller's or any of its Affiliates' termination or modification of any Seller Insurance Coverage shall be the property of Seller or such Affiliate.

**5.14    Relocation of Purchased Assets**. Seller shall, and shall cause its Subsidiaries to, use reasonable best efforts to relocate (at Buyer's sole cost and expense) all Purchased Assets (including Inventory) that are located at a Store that Buyer rejects pursuant to <u>Section 2.7.2</u> to a Transferred Store as directed by Buyer.

**5.15    Legal Entity Names**. To the extent that Seller or its Affiliates continue to incorporate the Trademarks or words "Vitamin Shoppe" or any similar name ("**Vitamin Shoppe**

Marks") in their corporate or legal names following the Closing, Seller shall, and shall cause any such applicable Affiliates to, by no later than thirty (30) days post-Closing, change the corporate and legal names of such entities to no longer incorporate any Vitamin Shoppe Marks.

**5.16    Financing Cooperation (Seller)**.

5.16.1 From and after the date of this Agreement and on or prior to the Closing Date, Seller shall use its, and shall cause its Affiliates to use their, reasonable best efforts to provide to Buyer, at Buyer's sole cost and expense, such reasonable cooperation as may be reasonably requested by Buyer or the Debt Financing Sources to assist Buyer in obtaining any Debt Financing being arranged for the purpose of financing the Transactions and the related fees and expenses, including the following:

(a)    permitting the marketing and syndication efforts to benefit from existing banking relationships;

(b)    upon reasonable advance Notice, making Seller's and its Subsidiaries' senior officers continuing in their positions following the Closing with appropriate expertise available to participate in a reasonable number of meetings (but no more than a total of four (4)) (including customary one-on-one meetings with the Debt Financing Sources), presentations, road shows, due diligence sessions, drafting sessions and sessions with rating agencies at reasonable times to be mutually agreed;

(c)    assisting with the preparation of customary information and materials regarding Seller and its Affiliates in connection with rating agency presentations, private placement memoranda, bank information memoranda, lender presentations, projections, pro forma financial statements, credit agreements (and security documentation related thereto) and similar documents (including the provision of customary authorization letters for distribution of materials to lenders and other investors); *provided*, that any such information distributed in connection with authorization letters shall contain customary language which shall exculpate the Business, Seller, its Affiliates and their respective Representatives with respect to any liability related to the unauthorized use or misuse of the contents of such information or related marketing materials by the recipients thereof;

(d)    furnishing Buyer and the Debt Financing Sources with (i) financial statements prepared in accordance with GAAP and presenting fairly in all material respects the financial position and the results of operations and cash flows of the Business, (ii) all other reasonably available financial information of the Business that is reasonably requested or that is required to permit Buyer to prepare pro forma financial statements required in connection with the Debt Financing and (iii) other customary business, financial, operational and other information regarding the Business reasonably requested in connection with the Debt Financing;

(e)    furnishing Buyer and the Debt Financing Sources upon the reasonable written request (including via electronic mail) of Buyer promptly with all documentation and other information requested by the Debt Financing Sources which are required by Governmental Authorities with respect to the Debt Financing under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act; and

(f)     facilitating the negotiation of, and executing and delivering as of (but not effective prior to) the Closing any credit agreements, pledge and security documents, guarantees and other definitive financing documents or instruments, certificates and documents (including facilitating the evaluation of the Business' assets and the collateral arrangements required by the Debt Financing Sources to create, perfect and enforce the liens and security interests therein) and facilitating the preparation of schedules to such agreements and other documents.

5.16.2 Seller hereby consents to the reasonable use of Seller's and its Affiliate's trademarks and logos, in each case, in connection with the Debt Financing; *provided*, that such trademarks and logos are used in a manner that is not intended to or reasonably likely to harm or disparage Seller or the reputation or goodwill of Seller or the Business or any assets or rights material to the operation of the business of Seller or the Business.

5.16.3 Notwithstanding anything to the contrary contained in this Section 5.16, Seller shall not be required to take or permit the taking of any action pursuant to this Section 5.16 that would: (a) require Seller or any of its Affiliates or any Persons who are officers or directors of such entities to pass resolutions or consents to approve or authorize the execution of the Debt Financing, except those which are subject to the occurrence of the Closing passed by directors or officers continuing in their positions following the Closing; (b) require Seller or any of its Affiliates or any Persons who are officers or directors of such entities to enter into, execute or deliver any certificate, document, instrument or agreement or agree to any change or modification of any existing certificate, document, instrument or agreement, in each case, that is not contingent upon the Closing or that would be effective prior to the Closing (other than the execution of customary authorization letters referenced above); (c) cause any representation or warranty in this Agreement to be breached by Seller; (d) require Seller or any of its Affiliates to pay any commitment or other similar fee or incur any other material liability in connection with the Debt Financing prior to the Closing; (e) cause any director, officer, employee or stockholder of Seller or any of its Affiliates to incur any personal liability; (f) conflict with the Organizational Documents of Seller or any of its Affiliates or any Laws; (g) provide access to or disclose information that is subject to an attorney-client or attorney work-product privilege or other similar privilege; (h) require Seller, the Business or any of their respective Affiliates, prior to the Closing, to be an issuer or other obligor with respect to the Debt Financing; and (i) require Seller, the Business or any of their respective Affiliates to prepare or deliver any (i) financial statements or information that is not reasonably available to it or prepared in the ordinary course of its financial reporting practice, (ii) pro forma financial statements or pro forma financial information, (iii) projections, "management's discussion and analysis" or similar narrative disclosures for Seller, the Business or their respective Affiliates or (iv) information regarding any post-Closing or pro forma cost savings, synergies, capitalization, ownership or other post-Closing pro forma adjustments desired to be incorporated into any information used in connection with the Debt Financing. Buyer shall, promptly on request by Seller on or after the Closing Date, reimburse Seller or any of its Affiliates for all reasonable and documented out-of-pocket costs incurred by them or their respective Representatives in connection with such cooperation and shall indemnify and hold harmless Seller and its Affiliates and their respective Representatives from and against any and all losses suffered or incurred by them in connection with the arrangement of the Debt Financing, any action taken by them at the request of Buyer or its Representatives pursuant to this Section 5.16, except with respect to any losses suffered or incurred as a result of any gross

negligence or willful misconduct by Seller or otherwise arising as a result of information provided by or on behalf of Seller.

      5.16.4 Buyer shall indemnify, defend and hold harmless Seller, the Business and their respective Affiliates and their respective Representatives from and against any and all liabilities, losses, damages, Claims, costs and expenses, interest, awards, judgments and penalties suffered or incurred by them in connection with their cooperation in the arrangement of the Debt Financing (including the arrangement thereof) or any action taken in accordance with this <u>Section 5.16</u> (and any information utilized in connection therewith), except with respect to any liabilities, losses, damages, Claims, costs and expenses, interest, awards, judgments and penalties suffered or incurred as a result of any gross negligence or willful misconduct by Seller and its Affiliates and their respective Representatives. In addition, in the event the Closing does not occur due to termination of this Agreement by Seller pursuant to, and in accordance with, <u>Section 8.1</u>, Buyer shall, promptly upon request by Seller and in any event on the earlier of (x) ten (10) days after request or (y) prior to or concurrently with Closing reimburse Seller for all reasonable and documented out-of-pocket costs and expenses incurred by Seller, its Affiliates and their respective Representatives in connection with this <u>Section 5.16</u>.

      5.16.5 Notwithstanding anything in this Agreement to the contrary, in no event shall the receipt or availability of any funds or financing (including any Debt Financing) by or to Buyer or any of its Affiliates or any other financing transaction be a condition to any of Buyer's obligations hereunder.

      5.16.6 Notwithstanding anything in this Agreement to the contrary, any failure by Seller or the Company to perform or comply with any covenant under this <u>Section 5.16</u> will not be considered in determining the satisfaction of the conditions in <u>Article 6</u>.

      5.16.7 Any information provided to or obtained by Buyer pursuant to this <u>Section 5.16</u> will be subject to the Confidentiality Agreement and must be held by Buyer and in accordance with and be subject to the terms of the Confidentiality Agreement.

    **5.17** **Financial Statements**. During the Interim Period, Seller shall furnish to Buyer as soon as practicable, in each case, within thirty (30) days of the month-end or quarter-end, as applicable, (a) the unaudited statement of operations and unaudited combined balance sheet, and the related income statement of the Business, in each case, prepared in Ordinary Course for the monthly period after February 22, 2025, and each subsequent monthly period ended during the Interim Period and (b) the unaudited cash flow statement of the Business prepared in the Ordinary Course for the quarterly period after December 28, 2024 and each subsequent quarterly period end during the Interim Period (collectively, "**Interim Financial Statements**"). For the avoidance of doubt, Closing shall not be delayed or conditioned on the receipt of such Interim Financial Statements.

## ARTICLE 6
## CONDITIONS PRECEDENT

**6.1** **Conditions to Obligations of Buyer and Seller**. The obligations of Buyer and Seller to complete the Transactions are subject to the satisfaction or waiver (if permitted by applicable Law) at or prior to the Closing of the following conditions:

6.1.1 <u>No Illegality or Law</u>. There shall not be in effect any applicable Law or Order that enjoins or prohibits the Transactions.

6.1.2 <u>Bankruptcy Orders</u>. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

6.1.3 <u>Regulatory Approvals</u>. Any waiting period (including any extension thereof) or approvals applicable to the consummation of the Transactions under the HSR Act shall have expired or been terminated (and the Laws set forth on <u>Section 6.1.3</u> of Seller Disclosure Schedules shall have expired or been terminated and any agreement with a Governmental Authority not to consummate the Transactions).

**6.2** **Conditions to Obligations of Buyer**. The obligation of Buyer to complete the Transactions is subject to the satisfaction, or waiver (if permitted by applicable Law) by Buyer, at or prior to the Closing of the following additional conditions:

6.2.1 <u>Truth of Representations and Warranties</u>. The representations and warranties of Seller contained in <u>Section 3.1.1</u> (*Organization; Good Standing; Qualification*), <u>Section 3.1.2</u> (*Authority and Enforceability*), <u>Section 3.1.4</u> (*No Broker*), and <u>Section 3.1.7(a)</u> (*Purchased Assets*) must be true and correct in all material respects as of the Closing with the same force and effect as if such representations and warranties were made on and as of such date (*provided*, that if a representation and warranty speaks only as of a specific date it only needs to be true and correct as of that date) and all other representations and warranties of Seller contained in <u>Section 3.1</u> must be true and correct (disregarding any "materiality", "Material Adverse Effect" or similar qualifications contained therein) as of the Closing with the same force and effect as if such representations and warranties were made on and as of such date (*provided*, that if a representation and warranty speaks only as of a specific date it only needs to be true and correct as of that date), except where the failure of such representations and warranties to be so true and correct would not have, or be reasonably expected to have, a Material Adverse Effect. Seller shall also have executed and delivered a certificate confirming the foregoing signed by an officer of Seller.

6.2.2 <u>Performance of Covenants</u>. Seller must have fulfilled or complied, in all material respects, with all covenants contained in this Agreement required to be fulfilled or complied with by it at or prior to the Closing. Seller shall also have executed and delivered a certificate confirming the foregoing signed by an officer of Seller.

6.2.3 <u>Material Adverse Effect</u>. Since the date of this Agreement, there shall not have occurred a Material Adverse Effect. Seller shall also have executed and delivered a certificate confirming the foregoing signed by an officer of Seller.

6.2.4    <u>Closing Deliveries</u>. At or prior to the Closing, Buyer must have received the following:

(a)    a true and complete copy of the Sale Order, as entered by the Bankruptcy Court;

(b)    the certificates referred to in <u>Section 6.2.1</u>, <u>Section 6.2.2</u> and <u>Section 6.2.3</u>;

(c)    a receipt acknowledging receipt of the Closing Payment, in satisfaction of Buyer's obligations pursuant to <u>Section 2.3</u>, validly executed by a duly authorized representative of Seller; and

(d)    each of the Ancillary Agreements to which Seller or any of its Subsidiaries is a party, validly executed by a duly authorized representative of Seller or its applicable Subsidiary.

**6.3    Conditions to Obligations of Seller**. The obligation of Seller to complete the Transactions is subject to the satisfaction, or waiver (if permitted by applicable Law) by Seller, at or prior to the Closing of the following additional conditions:

6.3.1    <u>Truth of Representations and Warranties</u>. The representations and warranties of Buyer contained in <u>Section 3.2</u> must be true and correct in all respects (disregarding any "materiality" or similar qualifications contained therein) as of the Closing with the same force and effect as if such representations and warranties were made on and as of such date (*provided* that if a representation and warranty speaks only as of a specific date it only needs to be true and correct as of that date), except where the failure of such representations and warranties to be so true and correct would not, or be reasonably expected, to, materially adversely affect the ability of Buyer to consummate the Transactions. Buyer shall also have executed and delivered a certificate confirming the foregoing, signed by an officer of Buyer.

6.3.2    <u>Performance of Covenants</u>. Buyer must have fulfilled or complied, in all material respects, with all covenants contained in this Agreement required to be fulfilled or complied with by it at or prior to the Closing. Buyer shall also have executed and delivered a certificate confirming the foregoing, signed by an officer of Buyer.

6.3.3    <u>Closing Deliveries</u>. At or prior to the Closing, Seller must have received the following:

(a)    a true and complete copy of the Sale Order, as entered by the Bankruptcy Court;

(b)    the certificates referred to in <u>Section 6.3.1</u> and <u>Section 6.3.2</u>;

(c)    each of the Ancillary Agreements to which Buyer or any of its Affiliates is a party, validly executed by a duly authorized representative of Buyer or its applicable Affiliate;

- 74 -

(d)     the Closing Payment in accordance with <u>Section 2.3.1</u> (along with a U.S. Federal Reserve reference or similar number evidencing execution of such payment); and

(e)     the Deposit (together with all accrued interest or other earnings thereon), from the Escrow Agent.

## ARTICLE 7
## NO SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-CLOSING COVENANTS

**7.1     No Survival**. The representations and warranties of the Parties and the covenants and agreements of the Parties that are to be performed prior to the Closing, whether contained in this Agreement or in any agreement or document delivered pursuant to this Agreement, shall not survive beyond the Closing and other than with respect to claims for Fraud, there shall be no liability following the Closing in respect thereof, whether such liability has accrued prior to or after the Closing, on the part of any Party or any of its officers, directors, equity holders, managers, agents or Affiliates; *provided*, *however*, that this <u>Section 7.1</u> shall not limit any covenant or agreement of the Parties that by its terms contemplates performance after the Closing, and such covenants or agreements shall survive in accordance with its terms, and if no term is specified, then for six (6) years following the Closing Date. Buyer and Seller acknowledge and agree that the agreements contained in this <u>Section 7.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for six (6) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 7.1</u>, none of the Parties would enter into this Agreement. Notwithstanding anything in this <u>Section 7.1</u> to the contrary, nothing in this Agreement shall limit or restrict the rights of any Party hereto to maintain or recover any amounts in connection with any action or claim based on Fraud or Willful Breach of the other Party, in each case (as applicable) subject to terms, conditions and limitations set forth in <u>Section 8.2</u>.

**7.2     No Recourse**.

7.2.1     Notwithstanding anything that may be expressed or implied in this Agreement or any Ancillary Agreement to the contrary, each Party acknowledges and agrees, both for itself and its Associated Persons and their respective successors and assigns, that, other than with respect to claims of Fraud, and to the extent otherwise set forth in the Confidentiality Agreement and the Equity Commitment Letter, (a) any Liability that may be based upon, in respect of, arise under, out of or by reason of, be connected with or relate in any manner to this Agreement or any Ancillary Agreement or any documents or instruments delivered thereunder or the negotiation, execution or performance or non-performance of this Agreement or any Ancillary Agreement or any documents or instruments delivered thereunder (including any representation or warranty made in, in connection with or as an inducement to this Agreement or any Ancillary Agreement) may be made only against (and such representations and warranties are those solely of) the entities that are expressly identified as a Party in the Preamble of this Agreement or any Ancillary Agreement (each a "**Contracting Party**"), and then only to the extent of the specific obligations, terms and limitations set forth in this Agreement or any Ancillary Agreement or any documents or instruments delivered thereunder, (b) in no event shall a Contracting Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the

actions, omissions of any other Person, (c) none of the Associated Persons of Seller and Buyer (other than the Contracting Party) (collectively, the "**Non-Recourse Persons**") shall have any Liability arising under, out of or by reason of, connected with or relate in any manner to this Agreement or any Ancillary Agreement or any documents or instruments delivered thereunder or for any claim based on, in respect of or by reason of this Agreement or any Ancillary Agreement or any documents or instruments delivered thereunder or their negotiation, execution, performance, non-performance or breach, and each Party hereto, both for itself and its Associated Persons and their respective successors and assigns, waives and releases all such Liabilities against any such Non-Recourse Persons, including any and all causes of action arising from or otherwise relating to such Non-Recourse Persons' receipt of consideration or other benefits from this Agreement or any Ancillary Agreement and the Transactions, and (d) to the maximum extent permitted by applicable Laws, each of Buyer and Seller, both for themselves and their respective Associated Persons and their respective successors and assigns, (i) waives and releases any and all rights, claims, demands or causes of action that may otherwise be available at law or in equity, or granted by statute, regulation or other applicable Law to avoid or disregard the entity form of the Contracting Party or otherwise impute or extend the Liability of the Contracting Party to any Non-Recourse Person, whether based on statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization or otherwise and (ii) disclaims any reliance upon any Non-Recourse Person with respect to the performance of this Agreement or any Ancillary Agreement or any representation or warranty made in, in connection with or as an inducement to this Agreement or any Ancillary Agreement. The Non-Recourse Persons are intended third-party beneficiaries of this Section 7.2 with full rights of enforcement of this Section 7.2 as if a party hereto.

            7.2.2    Except to the extent otherwise expressly provided in Section 9.9, Buyer's sole and exclusive remedy (a) for a breach of any representation or warranty made by Seller herein or in any document, certificate or instrument delivered pursuant hereto or (b) for a breach of any covenant made by Seller herein or in any document, certificate or instrument delivered pursuant hereto and required to be performed by Seller at or prior to the Closing, shall, in either case, be limited to Buyer's right to validly terminate this Agreement solely to the extent permitted pursuant to Section 8.1, in which case Seller shall not have any further liability or any kind (whether in equity or at Law, in Contract, in tort or otherwise), except to the extent expressly provided in Section 8.1 or Section 8.2.

            7.2.3    Except to the extent otherwise expressly provided in Section 9.9, Seller's sole and exclusive remedy (a) for a breach of any representation or warranty made by Buyer herein or in any document, certificate or instrument delivered pursuant hereto or (b) for a breach of any covenant made by Buyer herein or in any document, certificate or instrument delivered pursuant hereto and required to be performed by Buyer at or prior to the Closing, shall, in either case, be limited to Seller's right to validly terminate this Agreement solely to the extent permitted pursuant to Section 8.1, in which case Buyer shall not have any further liability of any kind (whether in equity or at Law, in Contract, in tort or otherwise), except to the extent expressly provided in Section 8.1 or Section 8.2 (and subject to Section 8.2.5).

# ARTICLE 8
# TERMINATION

**8.1**    **Termination**. This Agreement may, by Notice given prior to the Closing, be terminated:

        8.1.1    by mutual written agreement of Buyer and Seller;

        8.1.2    by Buyer or Seller if there has been a material breach of the Sale Order or this Agreement by the other Party such that the conditions of Closing (a) set forth in Section 6.2.1 or Section 6.2.2, in the case of a termination by Buyer, or (b) set forth in Section 6.3.1 or Section 6.3.2, in the case of a termination by Seller, would not be satisfied (*provided*, that the non-breaching Party is not also in breach of this Agreement so as to cause the conditions of Closing for the benefit of the other Party to not be satisfied), and such breach has not been cured within twenty (20) days following Notice of such breach by the non-breaching Party; *provided*, that, for greater certainty, a failure by Buyer to provide, or cause to be provided, Seller with sufficient funds to complete the Transactions at the time which the Closing should have occurred shall not be subject to this Section 8.1.2 and shall only be subject to Section 8.1.7(a); *provided*, *further*, that within three (3) Business Days of such termination, if Buyer is the terminating party pursuant to this Section 8.1.2, Buyer shall receive reimbursement from Seller (by wire transfer of immediately available funds to the account designated by Buyer by Notice to Seller) for Buyer's reasonable fees, costs, expenses in an amount not to exceed $3,000,000 (the "**Buyer Expense Reimbursement**");

        8.1.3    by Buyer, if (a) the Bankruptcy Court has not approved and entered the Sale Order prior to 11:59 p.m. (Eastern Time) on May 15, 2025 (unless further extended upon mutual agreement by Buyer and Seller in writing (email to counsel being sufficient)), (b) following entry of the Sale Order if such Sale Order is not a Final Order (unless such Final Order requirement is waived by Seller and Buyer in their respective discretion) within fourteen (14) days of entry of the Sale Order, or (c) the Bankruptcy Court enters any Order materially inconsistent with the Sale Order or the consummation of this Agreement and such order is not reversed, modified or amended to the satisfaction of Buyer within thirty (30) days; *provided*, that the right to terminate this Agreement under this Section 8.1.3 shall not be available to Buyer if Buyer failed to fulfill any material obligation under this Agreement and such failure is the cause of, or resulted in, such stay, reversal, modification, amendment or vacation; *provided*, *further*, that within three (3) Business Days of such termination, if Buyer is the terminating party pursuant to this Section 8.1.3, Buyer shall receive Buyer Expense Reimbursement from Seller (by wire transfer of immediately available funds to the account designated by Buyer by Notice to Seller);

        8.1.4    by Buyer, if Seller seeks to have the Bankruptcy Court enter an order (or consents to or does not oppose entry of an order) (a) dismissing the Chapter 11 Cases or converting the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code, (b) appointing a trustee, receiver or other Person responsible for operation or administration of Seller or its business or assets, or a responsible officer for Seller, or an examiner with enlarged powers relating to the operation or administration of Seller or its business or assets (each, an "**Appointee**"); *provided*, that Appointee shall not include any chief restructuring officer that has been or that may be appointed by Seller and authorized by the Bankruptcy Court in the Chapter

11 Cases, or (c) if Seller files any stand-alone plan of reorganization or liquidation, in each case, that does not contemplate consummation of the Transactions (or announces support of any such plan filed by any other party); *provided*, that within three (3) Business Days of such termination, if Buyer is the terminating party pursuant to this Section 8.1.4, Buyer shall receive Buyer Expense Reimbursement from Seller (by wire transfer of immediately available funds to the account designated by Buyer by Notice to Seller);

8.1.5    by Buyer or Seller if Closing has not occurred by the Outside Date; *provided* that such terminating Party is not in material breach of this Agreement at the time of such termination;

8.1.6    by Buyer or Seller (*provided*, that such terminating Party is not in material breach of this Agreement) if a Governmental Authority of competent jurisdiction shall have issued a final and non-appealable Order or taken any other non-appealable final action, in each case, having the effect of permanently making the consummation of the Transactions illegal or otherwise permanently restraining or prohibiting consummation of the Transactions;

8.1.7    by Seller, if (a) (i) all of the conditions set forth in Sections 6.1 and 6.2 are satisfied as of the Closing Date (other than those conditions that, by their nature, can only be satisfied as of the Closing Date, but which would be satisfied as of the Closing Date), (ii) Seller has irrevocably notified Buyer in writing that (A) it is ready, willing and able to consummate the Transactions and (B) all conditions set forth in Section 6.3 have been satisfied (other than those conditions that, by their nature, can only be satisfied as of the Closing Date, but which would be satisfied as of the Closing Date) or that it is willing to irrevocably waive any unsatisfied conditions set forth in Section 6.3, (iii) Seller has given Buyer Notice at least two (2) Business Days prior to such termination stating Seller's intention to terminate this Agreement pursuant to this Section 8.1.7, and (iv) Buyer does not provide, or cause to be provided, Seller with immediately available funds in amount equal to the Closing Payment at the time which the Closing should have occurred by the expiration of the two (2) Business Day period contemplated by clause (iii) hereof, or (b) Seller or its board of directors (or other applicable body), upon consultation with outside financial advisors and legal counsel, determines in its good faith business judgment that proceeding with the Transactions would violate Law or be inconsistent with its fiduciary obligations under Law;

8.1.8    by Buyer, if (a) the Bankruptcy Court enters any Final Order that would reasonably be expected to prevent, impede or materially delay the consummation of the Transactions in accordance with the terms of this Agreement or (b) any creditor of Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the automatic stay to foreclose on any material portion of the Purchased Assets; *provided*, that within three (3) Business Days of such termination, if Buyer is the terminating party pursuant to this Section 8.1.8, Buyer shall receive Buyer Expense Reimbursement from Seller (by wire transfer of immediately available funds to the account designated by Buyer by Notice to Seller); and

8.1.9    by Buyer, if Seller fails to file the Sale Motion within five (5) Business Days after execution of this Agreement; *provided*, that within three (3) Business Days of such termination, if Buyer is the terminating party pursuant to this Section 8.1.9, Buyer shall

receive Buyer Expense Reimbursement from Seller (by wire transfer of immediately available funds to the account designated by Buyer by Notice to Seller).

**8.2    Procedure and Effect of Termination**.

8.2.1    Termination of this Agreement by either Buyer or Seller shall be by delivery of a Notice to the other Party. Such Notice shall state the termination provision in this Agreement that such terminating Party is claiming provides a basis for termination of this Agreement. Termination of this Agreement pursuant to the provisions of Section 8.1 shall be effective upon and as of the date of delivery of such Notice as determined pursuant to Section 9.2.

8.2.2    If a Party waives compliance with any of the conditions, obligations or covenants contained in this Agreement, the waiver will be without prejudice to any of its rights of termination in the event of non-fulfilment, non-observance or non-performance of any other condition, obligation or covenant in whole or in part.

8.2.3    If this Agreement is terminated, the Parties are released from all of their obligations under this Agreement, except that each Party's obligations under Sections 5.2, 7.1, 7.2, and 8.2, and Article 9 will survive.

8.2.4    As soon as practicable following a termination of this Agreement for any reason, but in no event more than thirty (30) days after such termination, Buyer and Seller shall, to the extent practicable, withdraw all filings, applications and other submissions relating to the Transactions filed or submitted by or on behalf of such Party to any Governmental Authority or other Person.

8.2.5    Notwithstanding Section 8.2.3, in the event of a valid termination of this Agreement by Seller pursuant to Section 8.1.2 or Section 8.1.7(a), then Buyer and Seller shall, within two (2) Business Days after the date of such termination, deliver joint written instructions ("**Joint Written Instructions**") to the Escrow Agent directing the Escrow Agent to deliver to Seller an amount equal to the Deposit plus any accrued interest or other earnings thereon. Buyer acknowledges that the agreements contained in this Section 8.2.5 are an integral part of the Transactions, and that without these agreements, Seller would not have entered into this Agreement; accordingly, if Buyer fails to deliver such Joint Written Instructions or pay any amount due pursuant to this Section 8.2.5 and, in order to obtain any such Joint Written Instructions and/or to obtain such payment, Seller commences a Litigation which results in a judgment against Buyer for any Joint Written Instructions and/or payment set forth in this Section 8.2.5, Buyer shall pay Seller its costs and expenses (including reasonable attorneys' fees and disbursements not to exceed $1,000,000) in connection with such Litigation ("**Seller Expense Reimbursement**"). For the avoidance of doubt, subject to Section 9.9, Seller's receipt of the Deposit and Seller Expense Reimbursements, to the extent applicable, pursuant to this Section 8.2.5 shall be Seller's sole and exclusive remedy in connection with a termination of the Agreement in accordance with Section 8.1.2 or Section 8.1.7(a) by Seller; excluding any Willful Breach of this Agreement prior to the date of such Termination; *provided*, that, in no event shall Buyer's liability for any Willful Breach (pursuant to a non-appealable Order from a court of competent jurisdiction) exceed the amount of the Deposit (minus any other payments made

pursuant to this <u>Section 8.2.5</u>); *provided*, *further*, that, in no event shall Buyer's liability exceed the Deposit (together with any Seller Expense Reimbursement).

        8.2.6    In no event shall Seller seek any other remedies available at law or in equity in the event of a valid termination of this Agreement, including equitable relief, consequential, indirect, special, and/or punitive damages, damages for the benefit of the bargain lost by Seller (taking into consideration relevant matters, including opportunities foregone while negotiating this Agreement or in reliance on this Agreement or on the expectation of the consummation of the transactions contemplated hereby or the time value of money), any diminution in value of the Business, or the reimbursement of any Seller's costs and expenses against the Buyer Related Persons in excess of the amount of the Deposit (together with any Seller Expense Reimbursement). While Seller may pursue either a grant of specific performance (in accordance with <u>Section 9.9</u> and subject to the limitations thereof) or the payment of the Deposit (together with any Seller Expense Reimbursement) or monetary damages up to the amount of the Deposit (together with any Seller Expense Reimbursement) in accordance with this <u>Section 8.2</u>, under no circumstances will Seller be permitted or entitled to receive both (A) a grant of specific performance to cause the Closing to occur (or other equitable relief) and (B) monetary damages up to the amount of the Deposit (together with any Seller Expense Reimbursement) in accordance with this <u>Section 8.2</u>, and in no circumstances will Buyer be required to pay the Deposit (together with any Seller Expense Reimbursement) on more than one (1) occasion, and in no event shall Seller receive an amount in excess of the Deposit (together with any Seller Expense Reimbursement).

        8.2.7    Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, but subject to Seller's right expressly set forth in <u>Section 9.9</u>, in the event that this Agreement is terminated (including in the event of any Willful Breach), the maximum aggregate liability of the Buyer Related Persons shall be limited to the amount of the Deposit (together with any Seller Expense Reimbursement), and in no event shall any Seller Related Person seek any other remedies available at Law or in equity, including equitable relief, consequential, indirect, special, and/or punitive damages, damages for the benefit of the bargain lost by any Seller Related Person (taking into consideration relevant matters, including opportunities foregone while negotiating this Agreement or in reliance on this Agreement or on the expectation of the consummation of the transactions contemplated hereby or the time value of money), any diminution in value of Seller, the Business, or the reimbursement of any of Seller's costs and expenses against the Buyer Related Persons in excess of the amount of the Deposit (together with any Seller Expense Reimbursement).

        8.2.8    The Parties acknowledge and agree that the agreements contained in this <u>Section 8.2</u> are an integral part of the Transactions and without these agreements, the other Parties would not enter into this Agreement. The Parties acknowledge and agree that the Deposit (together with any Seller Expense Reimbursement) is liquidated damages, and not a penalty, and the payment of the Deposit (together with any Seller Expense Reimbursement) in the circumstances specified herein is supported by due and sufficient consideration (including the fact that Seller would not be entitled to receive the Closing Payment and would suffer other damages of an incalculable nature and amount).

8.2.9    Notwithstanding Section 8.2.3 and subject to Section 8.2.5, in the event of a termination of this Agreement other than by Seller pursuant to Section 8.1.2 or Section 8.1.7(a), then Buyer and Seller shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver to Buyer an amount equal to the Deposit plus any accrued investment interest thereon (less any fees or expenses owing to the Escrow Agent).

8.2.10   In the event of termination of this Agreement pursuant to Section 8.1: (a) Buyer shall (in accordance with the Confidentiality Agreement) return or destroy all documents and other material received from Seller relating to Seller and its Subsidiaries, the Business, the Purchased Assets and/or the Transactions, whether so obtained before or after the execution hereof, to Seller; and (b) all confidential information received by Buyer with respect to Seller and its Subsidiaries, the Business, the Purchased Assets and/or the Transactions shall be treated in accordance with the Confidentiality Agreement, and with the Confidentiality Agreement remaining in full force and effect in accordance with its terms, notwithstanding the termination of this Agreement.

## ARTICLE 9
## MISCELLANEOUS

**9.1     Governing Law, Jurisdiction, Venue and Service**.

9.1.1    <u>Governing Law</u>. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, including all matters of construction, validity and performance, in each case without reference to any conflicts or choice of Law rule or principle (whether of the State of Delaware or any other jurisdiction) that might otherwise refer construction or interpretation of this Agreement to the substantive Law of another jurisdiction.

9.1.2    <u>Consent to Jurisdiction and Venue</u>.

(a)      Subject to Section 9.9, the Parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the Bankruptcy Court for any action, suit or proceeding (other than appeals therefrom) arising out of or relating to this Agreement or any Ancillary Agreement, the negotiation, execution, or performance of this Agreement or any Ancillary Agreement, or the Transactions and any questions concerning the construction, interpretation, validity, and enforceability of this Agreement or any Ancillary Agreement and agree not to commence any action, suit or proceeding (other than appeals therefrom) related thereto except in such court. The Parties further hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding (other than appeals therefrom) arising out of or relating to this Agreement or any Ancillary Agreement, the negotiation, execution, or performance of this Agreement or any Ancillary Agreement, or the Transactions and any questions concerning the construction, interpretation, validity, and enforceability of this Agreement or any Ancillary Agreement in the Bankruptcy Court, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum. Following the conclusion, dismissal or entry of a final order otherwise

resolving or ending the Chapter 11 Cases, such Litigation arising out of or relating to this Agreement or any Ancillary Agreement, the negotiation, execution, or performance of this Agreement or any Ancillary Agreement, or the Transactions and any questions concerning the construction, interpretation, validity, and enforceability of this Agreement or any Ancillary Agreement shall be heard and determined exclusively in the Court of Chancery of the State of Delaware (of if such court lacks jurisdiction, any other federal or state courts in the State of Delaware), and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Litigation and irrevocably waive the defense of any inconvenient forum to the maintenance of any such Litigation.

(b)     ANY LITIGATION IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ALL THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS. ANY LITIGATION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.1.2(b)</u>.

9.1.3  <u>Service</u>. Each Party further agrees that service of any process, summons, Notice or document by registered mail to its address set forth in <u>Section 9.2.2</u> shall be effective service of process for any action, suit or proceeding brought against it under this Agreement in any such court. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**9.2     Notices**.

9.2.1  <u>Notice Requirements</u>. Any notice, request, demand, waiver, consent, approval or other communication permitted or required under this Agreement (each, a "**Notice**") shall be in writing, shall refer specifically to this Agreement and shall be deemed given only if delivered by hand or sent by email or by internationally recognized overnight delivery service that maintains records of delivery, addressed to the Parties at their respective addresses specified in <u>Section 9.2.2</u> or to such other address as the Party to whom Notice is to be given may have provided to the other Party at least five (5) days' prior to such address taking effect in accordance with this <u>Section 9.2</u>. Such Notice shall be deemed to have been given as of the date delivered by hand or internationally recognized overnight delivery service or when sent by email (with no bounce back or other notification of failure to be delivered). If a Notice deemed given upon receipt is given after 5:00 p.m. in the place of receipt (the Parties understand and agree that

the foregoing applies only to Notice and not to copies), such Notice will be deemed given on the next succeeding Business Day.

        9.2.2   Address for Notice.

        If to Seller, to:

        c/o Franchise Group, Inc.
        109 Innovation Court, Suite J
        Delaware, Ohio 43015
        Attention: Tiffany McMillan-McWaters
        Email: tmcwaters@franchisegrp.com

        with a copy (which shall not constitute effective Notice) to:

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, NY 10022
        Attention: Shawn OHargan, P.C.; Joshua A. Sussberg, P.C.; Nicole L. Greenblatt, P.C.; Keli Huang; and Derek I. Hunter
        Email: shawn.ohargan@kirkland.com; jsussberg@kirkland.com; ngreenblatt@kirkland.com; keli.huang@kirkland.com; and derek.hunter@kirkland.com

        If to Buyer, to:

        TVS Buyer, LLC
        c/o Kingswood Capital Management, L.P.
        11812 San Vincente Blvd., Suite 604
        Los Angeles, California 90049
        Attention: Alex Wolf, Michael Niegsch, and Clayton Lechleiter
        Email: awolf@kingswood-capital.com; mniegsch@kingswood-capital.com; and clechleiter@kingswood-capital.com

        with a copy (which shall not constitute effective Notice) to:

        McDermott Will & Emery LLP
        333 SE 2nd Avenue, Suite 4500
        Miami, Florida 33131
        Attention: Frederic Levenson, Michael Hacker, and Jay Kapp
        Email: flevenson@mwe.com; mhacker@mwe.com; and jkapp@mwe.com

    **9.3**    **No Benefit to Third Parties**. Except as otherwise expressly provided in this Agreement, Seller and Buyer intend that this Agreement will not benefit or create any right or cause of action in favor of any Person, other than the Parties and their respective heirs, administrators, executors, legal representatives, successors and permitted assigns. Except as otherwise expressly provided in this Agreement, no Person, other than the Parties and their

respective heirs, administrators, executors, legal representatives, successors and permitted assigns, is entitled to rely on the provisions of this Agreement in any action, suit, proceeding, hearing or other forum. The Parties reserve their right to vary or rescind the rights at any time and in any way whatsoever, if any, granted by or under this Agreement to any Person who is not a Party, without notice to or consent of that Person.

**9.4     Waiver**. No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision (whether or not similar). No waiver will be binding unless executed in writing by the Party against whom the waiver is to be effective. A Party's failure or delay in exercising any right under this Agreement will not operate as a waiver of that right. A single or partial exercise of any right will not preclude a Party from any other or further exercise of that right or the exercise of any other right.

**9.5     Expenses**. Except as otherwise expressly provided in this Agreement (including Section 8.1) and whether or not the Transactions, each Party will pay for their own fees, costs and expenses (including fees, costs and expenses of advisors) incurred in connection with the negotiation, performance and consummation of this Agreement and the Ancillary Agreements, and the Transactions; *provided*, *however*, Buyer shall be responsible for all fees and expenses of the Escrow Agent.

**9.6     Assignment**.

9.6.1     This Agreement becomes effective only when executed by Seller and Buyer. After that time, it will be binding upon and inure to the benefit of Seller, Buyer and their respective heirs, administrators, executors, legal representatives, successors and permitted assigns, including any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 cases.

9.6.2     Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned or transferred, in whole or in part, by any Party without the prior written consent of the other Party; *provided*, *however*, that (a) Seller may transfer or assign such rights and obligations under this Agreement pursuant to any chapter 11 plan of reorganization or to a liquidation trust or similar vehicle under a confirmed chapter 11 plan of liquidation in the Chapter 11 Cases, (b) Buyer may transfer or assign such rights and/or obligations (or any document to be delivered by Buyer pursuant hereto) under this Agreement to one or more Affiliates of Buyer, by prior written notice to Seller, and, to the extent of any such transfer or assign, this Agreement shall be binding upon each of such Affiliates, their successors and permitted assigns, which shall be treated as Buyer to such extent; *provided*, that, no such assignment shall (i) relieve Buyer of its obligations hereunder and Buyer shall in all cases remain responsible for all such obligations, (ii) result in Seller incurring any incremental unreimbursed fees, costs, Taxes or expenses (other than immaterial attorney's fees), (iii) result in notifications or other information required to be filed under any Antitrust Law or (iv) delay the receipt of any Consent, clearance or authorization of or from any Governmental Authority or (c) at or after the Closing, Buyer may assign its rights (but not its obligations) to any lender (including the Debt Financing Sources) providing financing in connection with the transactions contemplated hereby for collateral security purposes. Any transferee of any Purchased Asset or any interest therein

shall be a creditworthy entity and shall agree to assume all obligations under this Agreement and the Ancillary Agreements.

**9.7    Amendment**. This Agreement may only be amended, supplemented or otherwise modified by written agreement signed by Buyer and Seller. Notwithstanding the foregoing, this Section 9.7 and Section 9.15 (and any other provision of this Agreement to the extent the modification, waiver or termination of such provision would modify the substance of such provisions) may not be amended, modified, waived or terminated in a manner materially adverse to the Debt Financing Sources without the prior written consent of the Debt Financing Sources.

**9.8    Severability**. If any provision of this Agreement is determined to be illegal, invalid or unenforceable by an arbitrator or any court of competent jurisdiction, that provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction and will be severed from this Agreement and the remainder of such provision or the remaining provisions of this Agreement shall remain in full force and effect.

**9.9    Equitable Relief**.

9.9.1    Subject to Section 9.9.4, the Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Subject to Section 9.9.4, it is accordingly agreed that (a) a Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Buyer would have entered into this Agreement. Subject to Section 9.9.4, each Party hereby waives (i) any requirement that the other Party post a bond or other security as a condition for obtaining any such relief and (ii) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate. Subject to Section 9.9.4, the Parties agree that the foregoing is in addition to any other remedy to which the Parties are entitled under this Agreement,

9.9.2    Each Party hereby agrees not to raise any objections to the availability of equitable remedies to the extent provided for herein, and the Parties further agree that nothing set forth in this Section 9.9 shall require any Party hereto to institute any proceeding for (or limit any Party's right to institute any proceeding for) specific performance under this Section 9.9 prior or as a condition to exercising any termination right under this Agreement, nor shall the commencement of any legal action or legal proceeding pursuant to this Section 9.9 or anything set forth in this Section 9.9 restrict or limit any Party's right to terminate this Agreement in accordance with the terms hereof.

9.9.3    If, prior to the Outside Date, any Party brings any Litigation, in each case in accordance with Section 9.1.2, to enforce specifically the performance of the terms and provisions of this Agreement by any other Party, the Outside Date will automatically be extended (a) for the period during which such Litigation is pending, *plus* ten (10) Business Days or (b) by such other time period established by the court presiding over such Litigation, as the case may be.

9.9.4    Notwithstanding anything to the contrary herein, while Seller may pursue both a grant of specific performance (in accordance with this Section 9.9 and subject to the limitations hereof) and the payment of the Deposit (together with any Seller Expense Reimbursement) in accordance with Section 8.2, under no circumstances will Seller be permitted or entitled to receive both (a) a grant of specific performance to cause the Closing to occur (or other equitable relief) and (b) the Deposit (together with any Seller Expense Reimbursement), and in no circumstances will Buyer be required to pay the Deposit (together with any Seller Expense Reimbursement) on more than one (1) occasion, and in no event shall Seller, in the aggregate receive an amount in excess of the Deposit (together with any Seller Expense Reimbursement).

**9.10    No Liability**. No director, officer or employee of Buyer or its Affiliates shall have any personal liability whatsoever to Seller under this Agreement or any other document delivered in connection with the Transactions on behalf of Buyer. No director, officer or employee of Seller or its Affiliates shall have any personal liability whatsoever to Buyer or its Affiliates under this Agreement or any other document delivered in connection with the Transactions on behalf of Seller.

**9.11    Bulk Sales Statutes**. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Encumbrances in the Purchased Assets including any liens or Claims arising out of the bulk transfer laws, except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

**9.12    Representation by Counsel**. Each Party represents and agrees with the other that (a) it has been represented by, or had the opportunity to be represented by, independent counsel of its own choosing, and that it has had the full right and opportunity to consult with its respective attorney(s) to the extent that it desired, (b) it availed itself of this right and opportunity, (c) it or its authorized officers (as the case may be) have carefully read and fully understand this Agreement and the Ancillary Agreements in their entirety and have had them fully explained to them by such Party's respective counsel, (d) each is fully aware of the contents hereof and thereof and their meaning, intent and legal effect, and (e) it or its authorized officer (as the case may be) is competent to execute this Agreement and has executed this Agreement free from coercion, duress or undue influence.

**9.13    Counterparts**. This Agreement and any Ancillary Agreements, and any amendments to this Agreement and any Ancillary Agreements, may be executed in any number of counterparts, each of which is deemed to be an original, and such counterparts together constitute one and the same instrument. Transmission of an executed signature page by email or other electronic means is as effective as a manually executed counterpart of this Agreement. Any counterpart, to the extent signed and delivered by means of a .PDF, DocuSign, or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version of such Contract delivered in person. Minor variations in the form of the signature page to this Agreement or any Ancillary Agreement, including footers from earlier versions of any such other document,

will be disregarded in determining the effectiveness of such signature. At the request of any party to this Agreement or any Ancillary Agreement, each other party to such agreement will re-execute original forms of such agreement and deliver them to all other parties. No party to this Agreement or any Ancillary Agreement will raise the use of a .PDF, DocuSign, or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF, DocuSign, or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

**9.14    Entire Agreement**. This Agreement, together with Seller Disclosure Schedules and Exhibits expressly contemplated hereby and attached hereto, Seller Disclosure Schedules, the Ancillary Agreements, the Confidentiality Agreement and the other agreements, certificates and documents delivered in connection herewith or therewith or otherwise in connection with the Transactions, contain the entire agreement between the Parties with respect to the Transactions and supersede all prior agreements, understandings, promises and representations, whether written or oral, between the Parties with respect to the subject matter hereof and thereof. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and any Ancillary Agreement will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions of this Agreement or the intent of the Parties, and will be deemed joint work product of the Parties.

**9.15    Debt Financing Sources**. Notwithstanding anything in this Agreement to the contrary (but in all cases subject to and without in any way limiting the rights, remedies and Claims of Buyer and/or any of its Affiliates party to the Debt Commitment Letters, if any, under or pursuant to the Debt Commitment Letters or any other agreement entered into with respect to the Debt Financing), each Party, on behalf of itself and each of its Affiliates, hereby:

9.15.1    agrees that no Debt Financing Source will have any liability (whether in contract or in tort, in law or in equity, or granted by statute or otherwise) for any Claims, causes of action, suits, litigation, proceedings, obligations or any related losses, costs or expenses arising under, out of, in connection with or related in any manner to this Agreement, the Debt Financing, the Debt Commitment Letters, any contract entered into with respect the Debt Financing, or any of the Transactions or based on, in respect of or by reason of this Agreement, the Debt Commitment Letters or any contract entered into with respect the Debt Financing or their respective negotiation, execution, performance or breach;

9.15.2    agrees not to commence (and if commenced agrees to dismiss or otherwise terminate) any claim, cause of action, suit, litigation, or other proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) against any Debt Financing Source arising under, out of, in connection with or related in any manner to this Agreement, the Debt Commitment Letters, any contract entered into with respect the Debt Financing or any of the Transactions;

9.15.3    agrees (without limiting the foregoing clauses 9.15.1 and 9.15.2) that any Litigation against the Debt Financing Sources arising out of or relating to this Agreement, the Debt Financing, the Debt Commitment Letters, any contract entered into with respect the Debt

Financing or any of the Transactions or the performance of any services hereunder or thereunder, shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, and any appellate court thereof, and each Party irrevocably submits itself and its property with respect to any such Litigation to the exclusive jurisdiction of such courts;

9.15.4  agrees (without limiting the foregoing clauses <u>9.15.1</u> and <u>9.15.2</u>) not to bring or support or permit any of its Affiliates to bring or support any Litigation, whether in law or in equity, whether in contract or in tort or otherwise, against the Debt Financing Sources in any way arising out of or relating to this Agreement, the Debt Financing, the Debt Commitment Letters, any contract entered into with respect the Debt Financing or any of the Transactions or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York;

9.15.5  irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Litigation in any such court;

9.15.6  knowingly, intentionally and voluntarily waives to the fullest extent permitted by applicable Law trial by jury in any Litigation brought against the Debt Financing Sources and arising out of or relating to this Agreement, the Debt Financing, the Debt Commitment Letters, any contract entered into with respect the Debt Financing or any of the Transactions or the performance of any services hereunder or thereunder; and

9.15.7  waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Litigation against the Debt Financing Sources or the Transactions, any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason. Notwithstanding anything to the contrary, the provisions of this <u>Section 9.15</u> will survive any termination of this Agreement.

9.15.8  The Debt Financing Sources shall be express third party beneficiaries of this <u>Section 9.15</u>, and this Section shall expressly inure to the benefit of the Debt Financing Sources and the Debt Financing Sources shall be entitled to rely on and enforce the provisions herein.

**9.16    Seller Disclosure Schedules**. Seller Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement. However, each section of Seller Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section of Seller Disclosure Schedules to the extent the relevance of such disclosure to such other section is readily apparent on the face of such disclosure, and any disclosure in Seller Disclosure Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, Seller Disclosure Schedules, or the Exhibits does not imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, Seller Disclosure

Schedules, or Exhibits as to whether any obligation, item, or matter not set forth or included in this Agreement, Seller Disclosure Schedules, or Exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in Seller Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in Seller Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in Seller Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement, or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item, and such terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, Seller Disclosure Schedules, and the Exhibits is disclosed solely for purposes of this Agreement, and no information contained in this Agreement, Seller Disclosure Schedules, or the Exhibits will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

*[Signature page follows]*