IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FRANCHISE GROUP, INC., et al., | Case No. 24-12480 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 1269** |

# MEMORANDUM
## (Granite Telecommunications, LLC administrative claim)

This is a request for payment of an administrative expense for telecommunications services and equipment provided postpetition to debtor American Freight Outlet Services, LLC ("Debtor") pursuant to an executory contract with Granite Telecommunications, LLC ("Granite"). Debtor accepted those services while it conducted going out of business sales, conducted a private sale of certain assets and confirmed its plan.

When Granite presented invoices for services, Debtor paid only what it deemed appropriate, which were the monthly service and certain miscellaneous charges. It did not pay other charges specified in the contract. Granite, therefore, filed its request for payment. At the evidentiary hearing, Granite presented the invoices and witnesses explaining the various charges. Debtor did not counter Granite's presentation with any evidence. Accordingly, for the reasons set forth below, Granite is entitled to the relief it seeks.

*Factual Findings*[1]

Granite is the nation's largest local exchange carrier providing telecommunications services (voice and data) to its customers across North America. On September 30, 2011, Granite entered into a Master Services Agreement to provide telecommunication services to Sears Holdings Management Corporation ("Sears"). The Master Services Agreement has been amended seven times (the Master Services Agreement, with all amendments, "Agreement"). The last amendment, Amendment No. 7, was executed on or about October 10, 2024 and renewed the Service Term (as defined) for an additional year to April 30, 2028.

Debtor was a retail chain with in-store and online sales of furniture, mattresses and other home items. Stores were located across 41 states. It is the successor-in-interest to Sears under the Agreement and has been operating under the Agreement since approximately 2018. Debtor, together with certain affiliated entities, filed voluntary bankruptcy petitions on November 3, 2024 ("Petition Date").[2] As of the Petition Date, Granite was providing voice and data services to Debtor at approximately 380 locations. In late December, 2024, Debtor requested that telecommunications services at all but 34 of its locations be disconnected. On April 8, 2025, Debtor requested that telecommunications services at the remaining 34 locations be disconnected; it did not specify a date.

In addition to providing telecommunications services, Debtor also chose to have Granite provide the equipment necessary to provide the services. Granite supplied Debtor with 1,425 pieces of equipment from two providers, Meraki (485) and Fortinet (940). The

---

[1] This constitutes the court's findings of fact and conclusions of law after an evidentiary hearing as required by Fed. R. Bankr. P. 7052 made applicable by Fed. R. Bankr. P. 9014.

[2] Debtor was part of the Franchise Group, Inc., which directly or indirectly, owned franchised and franchisable businesses, including American Freight, Vitamin Shoppe, Buddy's and Pet Supplies Plus.

equipment was mounted on a backboard or small rack in each store. Wireless access points were usually located in the ceiling. The installation or removal of this equipment in a Debtor location requires two technical personnel and a lift.

The Agreement provides (and Debtor has not disputed) that "[a]ll CPE equipment must be returned if when [sic] Services are disconnected in good working condition, otherwise Customer shall be responsible for the replacement cost of such CPE." In order to facilitate return of equipment by its customers, Granite provides the customer with a shipping label; the customer boxes up the equipment and sends it back. Pre-bankruptcy, Granite and Debtor followed this process for returned equipment when services were disconnected. Granite never went to a Debtor location to pick up equipment. Post-bankruptcy, Debtor did not follow this process when it sought disconnection of services. Debtor returned only 41 pieces of equipment. It failed to return 485 pieces of Meraki equipment and 899 pieces of Fortinet equipment, leaving Granite's equipment in the leased store premises it was vacating. Certain of Granite's equipment ended up on eBay. In any event, Granite was unable to repurpose the unreturned equipment. The replacement cost of the unreturned equipment is $1,795,159.09.[3]

Requesting disconnection of services is not a breach of the Agreement. But, it does trigger Early Termination Fees. Early Termination Fees are assessed when Debtor seeks to disconnect a specific service at a specific location prior to the end of the term.[4] A termed

[3] This figure gives Debtor credit for $38,177 in replacement costs for equipment that Granite believed might be returned by various landlords.

[4] Early Termination Fee means: "an amount charged to Customer by Granite if Customer terminates any specific Service prior to the end of such Services' initial minimum Service Term or any renewal Service Term selected by Customer. The Parties agree that the Early Termination Fee is not a penalty but is liquidated damages." Ex. G-3, Amend. 2, Attach. 3.

service (e.g. a term of three years), rather than service on a month-to-month basis, permits the customer to receive lower rates from Granite. It also provides the customer with tremendous flexibility as its business changes and/or grows because the contract is not terminated if the customer needs to downsize or upsize its telecommunications services. For that reason, the customer must also pay the early termination fee.[5] If there were no term to the contract and no early termination fee, the rate for service would be significantly higher. Granite is owed $3,974,195.87 in Early Termination Fees on account of Debtor's disconnection of services.

Granite invoiced Debtor for these charges in the normal course of business. Debtor did not pay them.

***Proceedings in the Bankruptcy Case***

From the inception of Debtor's bankruptcy case, Debtor intended to run going out of business sales and close its stores. The day after it filed, Debtor filed a motion to retain HillCo Merchant Resources LLC ("HillCo") to conduct store closing sales.[6] HillCo was retained to liquidate Debtor's inventory as well as its furniture, fixtures, and equipment through "everything must go" sales or the equivalent. The store closing sales occurred in place, that is, at Debtor's store locations. The initial round of store closings encompassed all but 31 stores and three other locations; it was scheduled to conclude on December 29, 2024. In further anticipation of these initial store closings, Debtor filed a series of motions

---

[5] As a competitive local exchange carrier, Granite must contract with an incumbent local exchange carrier ("ILEC") in order to provide services to Granite's customers. These contracts are also long-term contracts, which poses risk to Granite. The Early Termination Fees mitigate Granite's risk to the ILEC.

[6] Debtors' Mot. for Entry of Interim and Final Ords. (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procs. for Store Closing Sales, and (III) Granting Related Relief, Dkt. No. 14. Details of the store closing sales can be found there.

to reject leases of real property, leases of non-real property and other executory contracts related to Debtor's business.[7] Debtor continued to use services provided by the Agreement through the initial store closing sales and beyond until at least April 8, 2024, when Debtor instructed Granite to "shut everything down."

In parallel with its store closing sales, Hillco marketed Debtor's intangible assets. On December 13, 2024, Debtor filed a motion seeking approval of a private sale of Debtor's intellectual property (including its name) as well as the assumption and assignment of 31 leases.[8] An Order approving the sale was entered on January 10, 2025.[9] Under the purchase agreement, purchaser could terminate the agreement if the closing of the transaction did not occur on or prior to January 28, 2025.[10] The sale closed and the purchaser apparently used Granite's telecommunications services and equipment through at least the end of March.[11]

---

[7] *See, e.g.*, Debtors First Omnibus Mot. for Entry of an Ord., Purs. to Secs. 105(a), 365(a), and 554 of the Bankr. Code Authorizing the Debtors to (I) Reject Certain (A) Unexpired Leases of Nonresidential Real Prop., (B) Unexpired Leases of Nonresidential Non-Real Prop., and (C) Executory Conts, Effective as of the Petition Date; and (II) Abandon Personal Prop., Schedule 1 (listing 26 real estate leases), Schedule 2 (listing 5 non-real property leases), Schedule 3 (listing 38 executory contracts), Dkt. No. 13); Debtors Ninth Omnibus Mot. for Entry of an Ord., Purs. to Secs. 105(a), 365(a), and 554 of the Bankr. Code Authorizing the Debtors to Reject Certain Unexpired Executory Conts., Effective as of the Rejection Date, Schedule 1 (listing 26 executory contracts), (Dkt. No. 590).

[8] Mot. of Debtors for Entry of Ord. (A) Approving the Private Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, and (B) Granting Related Relief, Dkt. No. 435.

[9] Ord. (A) Authorizing Debtors to Sell By Private Sale Certain of Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, and (B) Granting Related Relief, Dkt. No. 712.

[10] Dkt. No. 435-2, § 3.4 of the agreement.

[11] Ex. G-26 at 1 ("AF Newco has moved forward with another provider and equipment installation will be complete by the end of March; the first 20 sites will be converted by 3/15 and remaining sites

None of Debtor's nine rejection motions included the Agreement. The first time Debtor sought to reject the Agreement was through its Plan.[12] The Plan provides that any executory contract with Debtor that was not assumed by way of motion or on the Assumed Contracts List is rejected.[13] Rejections are effective on the occurrence of the Effective Date, or "such other date as may be identified on the Rejected Contracts/Lease List."[14] The Rejected Contracts/Lease List puts the rejection date of the Agreement at April 30, 2025.[15]

---

by end of March. Given AF Newco is not moving forward with Granite, no American Freight employee will be reaching out to negotiate with Granite on behalf of AF Newco.").

[12] Ninth Amend. Joint Chapter 11 Plan of Franchise Grp., Inc. and its Debtor Affiliates, Dkt. No. 1596-1.

[13] *Id.* at 72. Section 10.1 provides:

> Except as otherwise provided herein, any Executory Contracts and Unexpired Leases (a) not previously assumed, (b) not previously assumed and assigned in accordance with the Sale Order or other order approving such assumption and assignment, (c) not previously rejected pursuant to an order of the Bankruptcy Court, and (d) identified on the Assumed Contracts List will be assumed effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the Confirmation Order, except any Executory Contract or Unexpired Lease . . . (iv) of the American Freight Debtors that is not otherwise assumed or included on the Assumed Contracts List . . . .

[14] *Id.* Section 10.1 provides:

> Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective on the occurrence of the Effective Date or, as to rejected Executory Contracts and Unexpired Leases, on such other date as may be identified on the Rejected Contracts/Lease List or other motion or notice to reject by agreement of the affected counterparty to such Executory Contract or Unexpired Lease.

[15] Notice of Filing of Third Amend. Plan Supp., Dkt. No. 1604, Ex. E.

Nonetheless, Debtor could amend the Rejected Contracts/Lease List up to the Effective Date.[16] The Effective Date occurred on June 6, 2025.[17]

Granite timely filed its Motion for Allowance and Payment of Administrative Expense Claim ("Motion").[18] Through the Motion, Granite seeks an Order awarding it an administrative expense in the amount of $5,847,701.49 consisting of (i) $1,787,680.94 for the replacement cost of the unreturned equipment, (ii) $3,974,195.87 for the Early Termination Fees, (iii) $20,989.70 for network integration charges, (iv) $24,878.69 for service-related charges and (v) $39,956.29 in one-time charges.[19] Debtor objected to the

---

[16] Ninth Amend. Plan, Dkt. No. 1596-1 at 72. Section 10.1 provides:

> Notwithstanding anything to the contrary herein (other than Section 10.8 of this Plan) and in the Restructuring Support Agreement, except as otherwise agreed to by the Debtors and any applicable counterparty to an Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, subject to the Definitive Document Consent Rights, reserve the right to amend or supplement the Rejected Contracts/Lease List in their discretion, prior to the later of (a) Effective Date and (b) seven (7) days after the date on which the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Assumed Contracts List (or, in either case, such later date as may be agreed with a counterparty); provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

[17] Notice of (I) Entry of Confirmation Ord., (II) Occurrence of Effective Date, and (III) Related Bar Dates, Dkt. No. 1605.

[18] Granite Telecomms., LLC for Allowance and Payment of Admin. Expense Claim, Dkt. No. 1269.

[19] At the hearing, it was announced that Debtor stipulated it owed Granite $64,834.98 for the service-related charges in (iv) and the one-time charges in (v). Debtor did not specifically object to the network integration charges in (iii).

Motion.[20] An ad hoc group of first lien lenders joined Debtor's objection.[21] Granite filed a reply.[22] Separately, Granite timely objected to the retroactive rejection date under the Plan.

An evidentiary hearing was held on May 20, 2025. Granite's Exhibits G-1 through G-27 were admitted into evidence. Ms. Amanda Christoforo and Ms. Kayla Zbinden testified both by declaration and from the witness stand. Both witnesses were entirely credible. Neither the Debtor nor the ad hoc group of lenders offered any documents or witnesses.

***The Parties' Positions***

Granite asserts it is entitled to an administrative expense for all of the above charges under § 503(b) of the Bankruptcy Code. It contends that a debtor must pay for postpetition provision of goods and services prior to rejection, which did not occur until June 6, 2025. Granite asserts that the entire administrative expense request is for charges that are due in the postpetition period and did not (and will not) arise because of any rejection. Granite asserts that Debtor received the benefit of the services under the Agreement at the negotiated rates, which included each of the charges at issue. Granite asserts that §365(d)(5) further supports its claim for the replacement cost of the equipment. Finally, Granite asserts that *Reading*[23] also supports its claim for the replacement cost of the

---

[20] Debtors' Objection to Mot. of Granite Telecomms., LLC for Allowance and Payment of Admin. Expense Claim, Dkt. No. 1361.

[21] Ad Hoc Grp. of First Lien Lenders' Joinder to Debtors' Objection to Mot. of Granite Telecomms., LLC for Allowance and Payment of Admin. Expense Claim, Dkt. No. 1364.

[22] Reply in Support of Granite Telecomms., LLC for Allowance and Payment of Admin. Expense Claim, Dkt. No. 1447.

[23] *Reading Co. v. Brown*, 391 U.S. 471 (1968).

equipment because Debtor's failure to return the equipment constitutes a cost of doing business as well as the tort of conversion.

Debtor contends that it owes nothing to Granite as it paid the monthly service charges through April 30, 2025. It argues that it receives no benefit from payment of the other charges. It also contends that any such charges must be rejection damages. Debtor asserts that there is no circumstance under which the claim can obtain administrative expense status as there was no postpetition transaction and no benefit to the estate. Debtor contends that paying the administrative expenses would harm the estate, not benefit it. In particular, it argued that as a liquidating debtor, its money was needed elsewhere.

***Analysis***

Section 503(b) provides, in pertinent part, that: "[a]fter notice and a hearing, there shall be allowed administrative expenses, . . . including—(1)(A) the actual, necessary costs and expenses of preserving the estate . . . ."[24]

Generally speaking, there is a two-part test: the expense must arise from a postpetition transaction with the debtor and the transaction must be necessary to preserve the estate.[25] Debtor first argues there is no postpetition transaction because the Agreement was entered into prepetition. That argument proves too much. If Debtor is correct, then Debtor would not even owe the monthly charges for telecommunications services it admittedly received postpetition because the charges stem from a prepetition contract. Yet, Debtor does not contest that it owes monthly service charges and miscellaneous fees for

---

[24] 11 U.S.C. § 503(b)(1)(A).

[25] *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy Inc.)*, 181 F.3d 527, 532–33 (3d Cir. 1999).

these services. In the context of an executory contract, therefore, Debtor's decision to continue to accept services under the contract, is enough to satisfy this prong.[26]

Debtor next argues that the charges at issue provided no benefit to the estate. Once, again, this argument proves too much. The question cannot be whether the particular charge at issue benefits the debtor. It would always be beneficial to a debtor not to pay an invoice.[27] Instead, the issue is whether the underlying goods or services provided by the claimant postpetition provided a benefit to the estate.[28] Here, they clearly did. Debtor continued to receive telecommunications services which allowed the store closing sales to be conducted on-site. The telecommunication services also allowed the closing on the private sale and permitted services to be provided to Debtor in the interim (and to the purchaser for at least one month after the closing). Fundamentally, if at any point Debtor thought it was not receiving a benefit from the telecommunications services, it could have, and should have, moved to reject the Agreement. It did not do so until after it received the above benefits.

---

[26] *In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 741 (Bankr. D. Del. 2010) ("Courts in this District have consistently held that administrative expense priority is available to contract parties when the debtor enjoys the benefits of the contract pending assumption or rejection." (citation omitted)).

[27] *See, e.g.*, *In re OldCo Tire Distribs., Inc.*, 676 B.R. 310, 319–20 (Bankr. D. Del. 2025) ("The principal argument the debtors make in response to landlord's argument is that having to pay the cost of removing the equipment would harm, rather than benefit, the bankruptcy estate. . . . That way of thinking about the issue, however, cannot be correct. After all, it's *always* the case that it is better from the estate's perspective for a creditor to hold a general unsecured claim rather than an administrative claim.").

[28] *Id.* at 320 (the question is "whether what the debtor *received* from the creditor in exchange provided such a benefit.").

The issue, then, is the reasonable value of the goods and services provided. When goods and services are provided under an executory contract, the presumption is that the contract rate is reasonable.[29] The presumption can be rebutted, but to do so the debtor must present "convincing evidence to the contrary."[30] Here, Debtor presented no evidence to contradict the contract rates in the Agreement.[31]

Instead, Debtor appears to rely on the fact that the Agreement has multiple components and makes the legal argument that early termination fees can never be administrative expenses. Assuming for the sake of argument that a debtor can pick and choose those parts of negotiated contract obligations it wishes to honor, the evidence shows that each of the components at issue is critical to fairly compensating Granite for the goods and services it provided.

(i) *Early Termination Fees and Equipment Rental*

The Early Termination Fees are an integral part of the Agreement and—as pointed out by Granite's counsel—are not well named for bankruptcy purposes. These fees compensate Granite for the risk it takes in entering into long-term contracts with ILECs and enable Granite to offer, and Debtor to receive, services at lower monthly costs. Without the Early Termination Fee component, Granite would have paid "significantly more" on a monthly basis over the entire life of the then-current term of the Agreement.

---

[29] *Smurfit-Stone*, 425 B.R. at 741 (citing *N.L.R.B. v. Bildisco*, 465 U.S. 513, 531 (1984); *In re Bethelem Steel Corp.*, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003)).

[30] *Smurfit-Stone*, 425 B.R. at 741 (quoting *In re Washington-St. Tammany Elec. Coop., Inc.*, 111 B.R. 555, 559 (Bankr. E.D. La. 1989) (this "presumption is viable unless the debtor introduces convincing evidence to the contrary.").

[31] In *Smurfit-Stone*, the court denied cross-summary judgment motions finding issues of fact as to the reasonableness of the asserted charges. I have already conducted the evidentiary hearing and the evidentiary record is closed.

Debtor argues—without a factual basis—that the Early Termination Fees arose because of rejection of the Agreement and are thus *per se* prepetition claims.[32] This is not correct.[33] Under the Agreement, the Early Termination Fees are due upon the disconnection of service at a specific store location. As contemplated under the Agreement, the disconnection of services occurred while the Agreement was in place and prior to rejection, which did not occur until June 6 (see below).

That this component of compensation is something other than a traditional monthly fee does not mean it cannot constitute an administrative expense. For example, in *Smurfit-Stone* a debtor partnered with the local town to provide electricity to debtor's paper manufacturing mill. They entered into a utility operating agreement which provided for the debtor to pay the town for all of its costs in connection with the ownership and maintenance of the town's electricity plant. Those expenses included both the operating cost and the principal, redemption price and interest on bonds issued to finance an upgrade to the plant. When Smurfit-Stone filed bankruptcy, it paid the monthly operating cost under the utility operating agreement, but not the semi-annual bond payments. Smurfit-Stone argued that these amounted to prepetition interest payments and thus could not, as a matter of law, constitute actual and necessary costs of preserving the estate. Rejecting the argument, the court concluded that Smurfit-Stone produced no evidence that the prepetition contract rate

---

[32] 11 U.S.C. § 365(g)–(g)(1) (". . . the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—. . . immediately before the date of the filing of the petition[.]").

[33] Notwithstanding this argument, as of the hearing date, the Agreement had not been rejected. Debtor argues it cannot be using any services as of the hearing because it disconnected services. Hr'g Tr. 208:5–17, May 20, 2025, Dkt. No. 1688. But, Debtor had not filed a motion to reject the Agreement, which could, at least in theory, still be assumed and assigned (another benefit Debtor received).

was unreasonable. The court denied cross motions for summary judgment and directed the parties to schedule an evidentiary hearing concerning the market value of the service received.[34]

In the instant matter, the evidentiary hearing was held and Debtor did not present any evidence to counter the contract rate in the Agreement.

(ii) *Unreturned Equipment*

Debtor's objection focuses on the Early Termination Fee and makes no specific argument on the replacement cost of the unreturned equipment or the network integration charges. At argument, Debtor's counsel argued that Granite should only be paid the rental rate of the equipment (which was mostly paid), but not anything for Debtor's failure to return the equipment as mandated by the Agreement. Debtor believes it is acceptable for a liquidating debtor to simply fail to return rented equipment because its limited funds could be used better elsewhere.[35] Debtor also argued that since it rejected the store leases as of December 31, 2024, it could not go back onto the premises to obtain the equipment lest it incur additional lease expense to its landlord.[36] It also pointed to its cooperation in that it agreed to send a communication to its prior landlords at Granite's request.

In *Hayes Lemmerz*,[37] the court presided over a five-day trial to determine the amount of the administrative expense claim of an equipment lessor. Evidence presented showed

---

[34] *Smurfit-Stone*, 425 B.R. at 742 ("A broad universe of similar utility arrangements may not be available. But that does not mean that the Debtors can simply excise portions of the payment due under the Utility Contract, nor does it mean that Debtors are absolved of the burden of demonstrating the reasonable value of the services received [if they challenge the contract rate].").

[35] Hr'g Tr. 201:18–202:16, May 20, 2025, Dkt. No. 1688.

[36] Hr'g Tr. 204:22–205:13, May 20, 2025, Dkt. No. 1688.

[37] *In re Hayes Lemmerz Intern., Inc., 340 B.R. 461 (Bankr. D. Del. 2006).*

that the debtor damaged rented equipment postpetition and stripped parts from the machines which it placed into debtor-owned equipment to keep it running. The court concluded that this conduct amounted to a postpetition breach of the equipment lease as well as a postpetition tort and awarded damages as an administrative expense under both sections 503(b) and 365(d)(10).[38]

Debtor attempts to distinguish *Hayes Lemmerz* by arguing that it did not abscond with the equipment, damage it or strip it of parts.[39] But, if returning rented equipment in a damaged condition serves as the basis for an administrative expense claim, not returning it at all must do so as well.[40] Not only is this a postpetition breach of the Agreement,[41] but it is

---

[38] *Hayes Lemmerz*, 340 B.R. 461, 479–81. I do not rely on § 365(d)(10) (now § 365(d)(5)) for my conclusions herein. No party briefed the applicability of § 365(d)(5) to this type of contract.

[39] Hr'g Tr. 202:18–203:8, May 20, 2025, Dkt. No. 1688.

[40] *Cf. In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 89 (Bankr. W.D. Pa. 1987) (Debtor not entitled to return of monthly payments made to equipment lessor during course of bankruptcy case even though Debtor transferred bulk of equipment to a sister corporation prepetition and did not use the equipment during its bankruptcy case. "In the case at bar, not only does the Debtor deny its obligation to make the past lease payments, it also believes it should be released from any responsibility to return Defendant's equipment. Such a result would effectively require Defendant to consider its equipment to be a donation to the Debtor's rehabilitation efforts.").

[41] Debtor does not dispute that the return obligation was its own, that Granite did not have a relationship with any of Debtor's landlords or that Granite did not have in-house capability to obtain the equipment, but would have to retain third-party vendors to perform this service.

the tort of conversion.[42] As such, *Reading* is apt providing an additional basis for an administrative expense claim.[43]

Debtor's argument that Granite had two days (December 30 and 31) to pick up its equipment from approximately 350 store locations in 41 states or that it agreed to send a communication to landlords after-the-fact is not persuasive. Debtor cites no decision for the

---

[42] Though neither party cited a case for conversion, there is no question that leaving the equipment in the possession of third-parties who have no right to possess the equipment amounts to conversion. Black's Law Dictionary defines conversion as:

> 2. *Tort & criminal law.* The wrongful possession or disposition of another's property as if it were one's own; an act or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property. — Also termed *tortious conversion*; *criminal conversion*. — **convert**, *vb.* — **conversionary**, *adj.*
>
> "There are three distinct methods by which one man may deprive another of his property, and so be guilty of a conversion and liable in an action for trover — (1) by wrongly taking it, (2) by wrongly detaining it, and (3) by wrongly disposing of it. The term conversion was originally limited to the third of these cases. To convert goods meant to dispose of them, or make away with them, to deal with them, in such a way that neither owner nor wrongdoer had any further possession of them: for example, by consuming them, or by destroying them, or by selling them, or otherwise delivering them to some third person. Merely to take another's goods, however wrongfully, was not to convert them. Merely to detain them in defiance of the owner's title was not to convert them. The fact that conversion in its modern sense includes instances of all three modes in which a man may be wrongfully deprived of his goods, and not of one mode only, is the outcome of a process of historical development whereby, by means of legal fictions and other devices, the action of trover was enabled to extend its limits and appropriate the territories that rightly belonged to other and earlier forms of action." R.F.V. Heuston, *Salmond on the Law of Torts* 94 (17th ed. 1977).
>
> "By conversion of goods is meant any act in relation to goods which amounts to an exercise of dominion over them, inconsistent with the owner's right of property. It does not include mere acts of damage, or even an asportation which does not amount to a denial of the owner's right of property; but it does include such acts as taking possession, refusing to give up on demand, disposing of the goods to a third person, or destroying them." William Geldart, *Introduction to English Law* 143 (D.C.M. Yardley ed., 9th ed. 1984).

*Conversion*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[43] *Reading*, 391 U.S. at 476–85 (1968) (receiver's negligence in causing fire that damaged neighboring property owner's warehouse constituted administrative expense as cost of doing business postpetition); *Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 230–31 (3d Cir. 2021) (applying *Reading* to an employment discrimination claim to conclude that an award based on a postpetition violation of employment discrimination laws constitutes an administrative expense).

proposition that it can foist its return obligation on Granite while continuing to accept services under an executory contract.

(iii) *Rejection Date*

Absent an agreement or exceptional circumstances, the effective date of a rejection is the date the Order is entered.[44] *Nunc pro tunc* relief may be appropriate in certain circumstances based on equitable considerations.[45]

In its Plan, Debtor seeks *nunc pro tunc* relief to April 30, 2025. *Nunc pro tunc* relief is not appropriate here for at least two reasons: (i) Debtor had the ability to remove the Agreement from the Rejected Contracts/Lease List up to June 6, 2025 and (ii) Debtor did not return Granite's equipment. These circumstances do not warrant any equitable relief.

***Conclusion***

Granite has met its burden of proof to show that it has an administrative expense claim against Debtor's estate. Debtor provided <u>no evidence</u> that the contract rate is not reasonable. I conclude that Granite has an administrative claim for (i) $5,847,701.49 as detailed above and (ii) monthly charges, if any, through June 6, 2025. Counsel should confer and settle an order which will monetize the unpaid monthly charges through June 6, 2025. At the same time, Granite should submit a further declaration detailing the calculation.

Dated: October 2, 2026

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[44] *In re Fleming Cos., Inc.*, 304 B.R. 85, 96 (Bankr. D. Del. 2003).

[45] *Id.; see In re Thinking Machs. Corp.*, 67 F.3d 1021, 1028 (1st Cir. 1995).